*Amor v. Cross, et al.*
Case No. 18-CV-2523
Our File No. 18-4078

# EXHIBIT 36

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3   WILLIAM E. AMOR,              )
                                   )
 4                 Plaintiff,      )
                                   )
 5          vs.                    )    No. 18 CV 2523
                                   )
 6   MICHAEL CROSS, et al.,        )
                                   )
 7                 Defendants.     )

 8            The deposition of MICHAEL MASOKAS, taken

 9   pursuant to the Federal Rules of Civil Procedure,

10   before Katie K. Elliott, Certified Shorthand

11   Reporter No. 084-004537, at 141 West Jackson

12   Boulevard, Suite 1240A, Chicago, Illinois, on

13   Tuesday, November 5, 2019, commencing at 10:34 a.m.

14   pursuant to notice.

15         APPEARANCES:

16              LOEVY & LOEVY, by
                MS. TARA THOMPSON
17              (311 North Aberdeen Street, Third Floor
                 Chicago, Illinois  60607
18               312.243.5900
                 tara@loevy.com)
19                 appeared on behalf of the plaintiff;

20

21

22

23

24
```

```
 1          APPEARANCES:  (Cont'd)

 2              THE SOTOS LAW FIRM, PC, by
                MS. LAURA M. RANUM
 3              (141 West Jackson Boulevard, Suite 1240A
                 Chicago, Illinois  60604
 4               630.735.3300
                 lranum@jsotoslaw.com)
 5                 appeared on behalf of the defendants;

 6              LAW OFFICE OF JAMES T. NYESTE, by
                MR. JAMES T. NYESTE
 7              (820 Davis Street, Room 504 E
                 Evanston, Illinois  60201
 8               847.242.0601
                 jnyeste@coveragelaw.com)
 9                 appeared on behalf of the deponent.

10

           ALSO PRESENT:
11
                Ms. Carson Canonie, The Sotos Law Firm;
12              Ms. Mariah Garcia, Loevy & Loevy.

13                     *   *   *   *   *   *   *

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                        I N D E X

 2
    Witness:                                    Page
 3
         MICHAEL MASOKAS
 4
              Examination by:
 5
                 Ms. Ranum....................    4
 6               Ms. Thompson.................  173
                 Ms. Ranum....................  224
 7               Ms. Thompson.................  226
                 Ms. Ranum....................  279
 8               Ms. Thompson.................  286

 9
                     E X H I B I T S
10
    No.   Description                Marked/Referenced
11
      1   Polygraph Case History (SDT-REID
12        21-22) and Polygraph Examination
          (SDT-REID 14-15).....................   18
13    2   Medical Data Sheet....................   29
      3   Notes from Pretest Interview -
14        SDT-REID 47 and 49...................   37
      4   Front side of Pretest Interview -
15        SDT-REID 46...........................   61
      5   Polygraph Records for William Amor.....  81
16    6   Written Report to Dect. Cross from
          Masokas dated 10/20/95................  163
17    7   Invoice from John Reid & Associates.... 165
      8   People v. Amor - 3/6/1996 -
18        Transcript............................ 171
      9   Handwritten drawing by Deponent........ 216
19   10   Richard T. O'Brien & Associates -
          Polygraph of William Amor and Tina
20        Miceli - 9/14/95...................... 280

21
              (Exhibits attached/scanned.)
22

23                        - - -

24
```

```
 1                    (Witness sworn.)
 2                    MICHAEL MASOKAS
 3  called as a witness herein, having been first duly
 4  sworn, was examined and testified as follows:
 5                    EXAMINATION
 6  BY MS. RANUM:
 7        Q.    Good afternoon, Mr. Masokas.
 8              Can you please state and spell your
 9  name for the record.
10        A.    Sure.  Michael, M-i-c-h-a-e-l; Masokas,
11  M-a-s-o-k-a-s.
12        Q.    Thank you.
13              And just briefly, to kind of give
14  you an idea of how everything is going to go today,
15  there's a court reporter here taking down
16  everything we say, so it's important that we do our
17  best not to talk over each other.  So even if
18  you're anticipating that you know what I'm going to
19  ask, I would ask that you just let me finish the
20  question before you start your answer.
21        A.    Okay.
22        Q.    And likewise, if at any point I think
23  you're done with an answer but I've cut you off,
24  please let me know.
```

1              All of your answers need to be

2    verbal so she can record them.  And we can take as

3    many breaks as you need.  The only thing I would

4    ask is that we not take a break while there's a

5    question pending.  So if there is a question

6    pending, we just wrap that up first, okay?

7         A.    Yes.

8         Q.    Great.

9                   Mr. Masokas, where did you attend

10   college?

11        A.    St. Xavier -- well, two years junior

12   college, Richard J. Daley College; and then the

13   following two years, St. Xavier College in Chicago.

14        Q.    Did you receive a degree from

15   St. Xavier?

16        A.    Yes.

17        Q.    What was the degree you received?

18        A.    It was a degree in criminal justice.

19        Q.    What year did you receive that degree?

20        A.    1981.

21        Q.    And at some point did you become a

22   licensed polygrapher?

23        A.    Yes.

24        Q.    Can you tell me a little bit about the

 1   process to become a licensed polygraph examiner.

 2        A.    I went through Reid College.  It was a

 3   six-month program.  The first three months were

 4   classroom, the second three months were hands-on,

 5   actually doing testing under supervision.  The

 6   classroom study was in fields of psychology,

 7   physiology, law, question formulation, and

 8   interviewing and interrogation.

 9        Q.    Okay.  And what years did you study

10   that at Reid College?

11        A.    It went -- it was a six-month program.

12   I went from August of 1981 through I believe

13   February of 1982.

14        Q.    Okay.  And at the completion of that

15   program, did you receive a certification of sorts

16   or --

17        A.    Yes, yes.  It was -- fortunately I

18   passed everything and graduated, but then I had to

19   take the state exam through the Department of

20   Professional Regulation to be licensed.

21        Q.    Okay.  So you received a certification

22   through Reid College and then a license through

23   State of Illinois, correct?

24        A.    Yes.

```
 1        Q.    And what year did you obtain your
 2   license with the State of Illinois?
 3        A.    1982.
 4        Q.    Okay.  And what was your first job
 5   after you became a polygraph examiner?
 6        A.    My first job working with polygraph was
 7   a part-time position with FL Hunter & Associates in
 8   Hinsdale, and I worked for Mr. Hunter for one year
 9   in a part-time capacity.
10        Q.    At some point did you become employed
11   with Reid & Associates?
12        A.    Yes.
13        Q.    When did you first become employed with
14   Reid & Associates?
15        A.    It was May -- I believe May of 1983.
16        Q.    What was the first position you held
17   with Reid?
18        A.    I was a staff polygraph examiner.
19        Q.    How long were you a staff polygraph
20   examiner for Reid & Associates?
21        A.    From the time I started in 1983 until
22   approximately 1988.
23        Q.    And what happened in 1988?
24        A.    I was promoted to the chief polygraph
```

1  examiner position.

2       Q.    Did you ever -- I know you attended

3  Reid College back in 1981 and 1982.

4            Did you ever take any classes at

5  Reid College at any point after you received that

6  initial certification?

7       A.    Reid College, per se, no.

8       Q.    Okay.  Do you have -- did you ever have

9  any higher education following receiving your

10 license?

11      A.    In the field?

12      Q.    Yes.

13      A.    The only other training I would have

14 had was I attended through John Reid & Associates

15 their four-day interview/interrogation training

16 seminar.

17      Q.    Okay.  Did you ever receive any sort of

18 master's degree of any sort from Reid College?

19      A.    Yeah, yes.  Well, that was through a

20 research project and a published paper, and it was

21 a master's degree in detection of deception.  That

22 would have been several years into my employment

23 with Reid.

24      Q.    Do you remember about what year that

1  was?

2        A.    I want to say maybe 1986.

3        Q.    Okay.  What were your duties as chief

4  polygraph examiner at Reid & Associates?

5        A.    I would oversee our staff of examiners

6  and interviewers, review and consult with them on

7  cases that they were working, as well as continue

8  to run examinations myself.

9        Q.    How many staff polygraph examiners did

10  you have on your staff at any given time?

11        A.    It fluctuated because of our training

12  class.  Oftentimes, examiners would move out for a

13  period of time to do training, and then they'd come

14  back later, so it could have been anywhere from two

15  to five or six.

16        Q.    Okay.  By 1995 -- so at this point I

17  guess you would have been about 12 years into your

18  career at Reid, correct?

19        A.    Yes.

20        Q.    By 1995, how many polygraph

21  examinations would you estimate you had conducted

22  during your time at Reid?

23        A.    I would say it would have been -- and

24  this is a complete estimation, but it would have

1   been a few thousand.

2        Q.    Have you ever given testimony as an

3   expert on the subject of lie detection or polygraph

4   examination?

5        A.    Such -- can you be more specific?

6   Like -- I mean, I taught at Reid College.

7        Q.    Okay.  Let's talk about that.

8              When did you teach at Reid College?

9        A.    Well, it would have been 1990 -- or

10  1985, a bit in 1986.

11       Q.    What subjects did you teach at Reid

12  College?

13       A.    I don't remember.  Specifically right

14  now, I could not say.

15       Q.    Okay.  We're going to talk a lot about

16  a polygraph examination which you conducted on

17  October 3, 1995, of a man named William Amor.

18              Do you remember conducting that

19  investigation?

20       A.    Yes.

21       Q.    And do you also remember that you

22  testified in a motion to suppress hearing regarding

23  Mr. Amor's polygraph examination?

24       A.    Yes.

1      Q.    And you testified truthfully at that

2 hearing?

3      A.    Yes.

4      Q.    Have you had an opportunity to review

5 your testimony recently?

6      A.    Yes, I have.

7      Q.    And in your review -- in your recent

8 review, do you still find your testimony to be

9 truthful and accurate to the best of your ability?

10     A.    Yes.

11     Q.    Now, in October of 1985, did Reid &

12 Associates have a standard protocol or practice for

13 how they would handle polygraph examinations of

14 noncustodial individuals?

15     MS. THOMPSON:  Object to form.

16     THE WITNESS:  Yes.

17 BY MS. RANUM:

18     Q.    And can you explain to me what that

19 protocol was.

20     A.    The subject would come in for the exam.

21 Sometimes they were accompanied by investigators,

22 sometimes they would come in on their own,

23 depending on the circumstances and the situation.

24              If they were accompanied by an

1   investigator, oftentimes we would sit with the

2   investigator prior to the exam to where they would

3   provide background information for us.  On other

4   instances, we may have done that by phone prior to

5   the arrival of the subject.

6              And then at some point, we would

7   walk the subject back to an interview room and

8   start the procedure.

9       Q.    Okay.  And did that standard practice

10  vary at all if it was an individual who was in

11  custody of the police?

12      A.    Yes.

13      Q.    And how did it vary if they were in

14  custody?

15      A.    If the subject was in custody, we would

16  move them to a back office to where they were not

17  in the lobby so that they didn't feel

18  uncomfortable, but also so some of our other

19  clients didn't feel uncomfortable.

20              And at that point if they were in a

21  side office, typically an investigator would sit

22  with them when we would speak with the other

23  investigator.

24      Q.    Okay.  Now, the standard practice that

1  you've described for a noncustodial polygraph

2  examination, was that followed in the case of

3  Mr. Amor's examination on October 3, 1995?

4       MS. THOMPSON:  Object to form.

5  BY MS. RANUM:

6       Q.    You can answer.

7       A.    Yes.

8       Q.    Do you recall how you were retained for

9  the polygraph examination of Mr. Amor?

10      A.    At this point, I do not.

11      Q.    Okay.  You testified at the motion to

12  suppress that you received a call to your lobby in

13  your office around 3:50 p.m. on October 3, 1995 --

14      A.    Yes.

15      Q.    -- regarding Mr. Amor's arrival; is

16  that correct?

17      A.    Yes.

18      Q.    Where was your office located in

19  October of 1995?

20      A.    We were at 250 South Wacker Drive on

21  the 11th floor.

22      Q.    And when you went out to the lobby to

23  greet Mr. Amor, was that the first time you ever

24  met Mr. Amor?

```
 1        A.    Yes.

 2        Q.    What do you recall about that initial

 3   greeting with Mr. Amor?

 4        A.    When I walked out, there were three

 5   individuals sitting there, two of which were the

 6   detectives from Naperville and Mr. Amor.  They were

 7   all dressed in casual clothing, specifically I

 8   don't remember what, but they were casual.  And the

 9   three were just sitting in the lobby.

10        Q.    Do you remember the names of the two

11   individuals that were with Mr. Amor?

12        A.    One I believe -- and I'm probably going

13   to mess up with pronunciation -- was Guerreri.

14        Q.    Was it Detective Bob Guerreri?

15        A.    Yeah, I believe so.

16              And the other one I believe was Mike

17   Cross.

18        Q.    Okay.  Had you ever met Detective

19   Michael Cross before?

20        A.    I do not believe so.

21        Q.    Okay.  Had you ever met Detective

22   Guerreri before?

23        A.    No.

24        Q.    Was there anything unusual about that
```

 1  initial encounter in the lobby of your office?

 2       A.    No.

 3       Q.    Did Mr. Amor seem like he was in any

 4  sort of distress?

 5       A.    No.

 6       Q.    Can you describe just kind of briefly

 7  the layout of what the lobby looks like and kind of

 8  the entrance into the office.

 9       MS. THOMPSON:  Object to form.

10       THE WITNESS:  The entrance face the

11  elevators, it was two glass doors, and then you

12  would walk into just a vestibule that opened up

13  into the lobby area.

14            At the time I want to say maybe

15  there were a dozen chairs out there.  There was

16  also a magazine rack out there.

17            And then on the other side were

18  sliding glass windows for the reception area and a

19  door, a secure door that led into the actual office

20  space.

21  BY MS. RANUM:

22       Q.    Okay.  So when you came -- if you're

23  coming up from the street, you take the elevator up

24  to the 11th floor, and you come out kind of in like

1   an elevator bank area?  Is that fair to say?

2        A.    Yes.

3        Q.    And then there's an entrance into John

4   Reid & Associates office?

5        A.    Yes.

6        Q.    And that entrance puts you into the

7   lobby that you've just described?

8        A.    Correct.

9        Q.    And that entrance into the lobby, is

10  that door unlocked from the inside?  In other

11  words, if you want to exit the lobby, are you able

12  to do so without any sort of key or assistance?

13       A.    Correct.

14       Q.    Okay.  Once you met the three

15  individuals, what happened next after you met them

16  in the lobby?

17       A.    At that time I escorted the two

18  detectives back to the library area, which is

19  behind the secure door, and Mr. Amor stayed in the

20  lobby.  And we sat down, and they provided the

21  background information as to what their case was

22  about, what they wanted us to talk to him about.

23       Q.    Was anyone present for your meeting

24  with the officers in the library other than you and

1  Detectives Cross and Guerreri?

2        A.    Right now as we speak, I believe it was

3  just the three of us.

4        Q.    Okay.  And during that time the three

5  of you met in the library, Mr. Amor remained in the

6  lobby to the best of your knowledge?

7        A.    Yes.

8        Q.    And from your perspective, was it your

9  understanding that Mr. Amor was free to leave while

10  he was in the lobby?

11        MS. THOMPSON:  Object to form.

12        THE WITNESS:  Yes.

13  BY MS. RANUM:

14        Q.    During your conversations with

15  Detectives Cross and Guerreri -- well, let's back

16  up for a minute.

17              What is the point of this sort of

18  briefing that you do with the officers when you

19  first greet them?

20        MS. THOMPSON:  Object to form.

21        THE WITNESS:  They provide information on

22  their investigation, what the issue is, and what

23  they want us to question him on, what they want him

24  tested on basically.

1              At that point prior to their

2    arrival, we really didn't know what the details

3    were.

4    BY MS. RANUM:

5        Q.    Okay.  Did Detectives Cross and

6    Guerreri tell you that Mr. Amor was not in custody?

7        A.    Specifically right now, I don't

8    remember.  I know he wasn't handcuffed.  I know he

9    was sitting in the lobby by himself.  So at that

10   point I was assuming he was not in custody.

11       Q.    Okay.  Do you recall any of the

12   information that was provided to you during that

13   background meeting?

14       MS. THOMPSON:  Object to form.

15       THE WITNESS:  It would help me if I looked at

16   my notes.

17       MS. RANUM:  Sure.

18                      (Deposition Exhibit No. 1,

19                       Witness Masokas, was marked for

20                       identification 11/05/2019.)

21   BY MS. RANUM:

22       Q.    Mr. Masokas, I'm showing you a

23   four-page document that's been marked Exhibit 1 to

24   your deposition.  For the record, it's Bates

1   stamped SDT-REID 21 through 22 and SDT-REID 14

2   through 15.

3                  I'm going to ask you about the first

4   two pages of the document, but please feel free to

5   review the document as much as you'd like and let

6   me know when you're ready.

7        A.    Okay.

8        Q.    Now, the first two pages of this

9   document, SDT-REID 21 and 22, are a document

10  titled, Polygraph Case History, correct?

11       A.    Yes.

12       Q.    And would this have been the notes you

13  were referring to that you would have taken

14  regarding your meeting with Detectives Cross and

15  Guerreri in the library?

16       A.    Yes.

17       Q.    So if we could just go through the

18  notes that you took and maybe you can decipher your

19  handwriting in a couple places, if you don't mind.

20       A.    Yeah, if I can.

21       Q.    Sure.

22                  So at the top you've indicated that

23  it's Sunday.  You indicate Sunday, September -- it

24  says 9/10.  Is that '95?

```
 1          A.    Yes.

 2          Q.    And what would that date have been that

 3   you would have written down?

 4          A.    That would have been the date of the

 5   fire.

 6          Q.    Okay.  And then you have written down,

 7   Mike Cross and Bob, under INV.

 8                Is that supposed to be the

 9   investigators?

10          A.    Correct.

11          Q.    And then can you just kind of explain

12   for us and read through the rest of what you wrote

13   down on this form.

14          A.    Yes.

15                Just a little bit below that where

16   it says, Suspects:  No. 1, William Amor; No. 2,

17   Marianne Miceli; No. 3, Tina, daughter of subject 2.

18          Q.    Okay.

19          A.    Down a little bit further.  And now

20   they're speaking, and I'm just writing as they're

21   talking.  So they're providing information; I'm

22   just writing.

23                And they had said that there was a

24   $100,000 life insurance policy on subject 2, who
```

```
 1  was Marianne Miceli.  And right under there,
 2  subject 2 is the victim; cause of death, smoke
 3  inhalation; and then a little bit further down on
 4  9/10/95, there was a fire in subject 2's apartment;
 5  subject 2 calls the fire department at 6:40 p.m.,
 6  says she can't exit the apartment because two
 7  chairs were blocking the doors and both were
 8  burning.
 9                   It's one at -- and I can't make that
10  out.  It says as you continue, one is in the middle
11  of the living room.  I'm not sure what that says.
12  See, I can't even read my own writing.
13                   But there's two chairs both blocking
14  the doors, and they're both burning.
15                   A little bit further down towards
16  the bottom, subject 2 is on the phone with a
17  girlfriend until 6:31.
18                   And then following page now, in
19  reviewing my notes there was -- again, they're
20  speaking, I'm writing, and I misidentified on the
21  next page -- I'm sorry.  No, that is correct.
22                   Subject 2, they said, was mentally
23  retarded.  Subject 1, William Amor, was initially
24  romantically involved with subject 2.  Then
```

```
 1  subject 1 became involved with subject 3, Tina.  A
 2  bit further on down -- and this is where I
 3  misidentified where it says subject 2 and
 4  subject 3.  It should be subject 1 and subject 3.
 5  William Amor and Tina say they left this apartment
 6  at 6:25 to 6:30.
 7                    And then again, misidentification.
 8  I got these mixed up as they were talking.  So
 9  subject 2 denies -- it should be subject 1.
10                    Mr. Amor denies any knowledge of the
11  insurance policy.  Friends of subject 1 and
12  subject 3 claims that subject 1 and subject 3 spoke
13  openly about the policy in their presence.
14                    A little bit under that after a
15  number of interviews subject 1, Mr. Amor, says he
16  spilled vodka and may have left a burning cigarette
17  in the ashtray that may have fallen out of the
18  ashtray.
19                    And then towards the bottom,
20  subject 1 has a history of scamming families out of
21  money just prior to -- just prior, subject 1 spent
22  six months in a lockup for forgery.
23                    So they were providing; I was just
24  writing.
```

1       Q.    Okay.  Now, I notice that when you were

2  referring to the S1, S2, and S3, you were referring

3  to as subject 1, subject 2, and subject 3?

4       A.    Correct.

5       Q.    On the form, it actually says Chief

6  Suspects above?

7       A.    Yes.

8       Q.    So did you write down those names

9  because they were all considered suspects or

10 because they were like players involved?

11      MS. THOMPSON:  Object to form.

12      THE WITNESS:  Primarily they were the three

13 involved in the incident, and so the chief suspects

14 isn't necessarily chief suspects.  It's whoever's

15 involved, we just mark them 1, 2, 3, 4.

16 BY MS. RANUM:

17      Q.    Okay, thank you.

18            Now, this meeting that you had with

19 Detectives Cross and Guerreri, you testified that

20 that meeting took about a half an hour?

21      A.    Roughly, yes.  I would say

22 approximately 3:50 p.m. until maybe 4:30 p.m.

23      Q.    Okay.  Once you finished your meeting

24 in the library with Detectives Cross and Guerreri,

 1  what did you do next?

 2        A.    At that point I escorted Mr. Amor back

 3  to one of our interview rooms, and they then went

 4  back to the lobby.

 5        Q.    Okay.  So did you then meet with

 6  Mr. Amor in the interview room?

 7        A.    Yes.

 8        Q.    And did Detective Cross and Detective

 9  Guerreri at any point come into the interview room

10  while you met with Mr. Amor?

11        A.    No.

12        Q.    What was the first thing you did when

13  you met with Mr. Amor?

14        A.    I handed him a consent form and

15  explained to him that I need him to read through

16  it.  If he has any questions, he should feel free

17  to ask.  And then once he's done, flip it over, and

18  fill out the medical form on the back.

19        Q.    Okay.  Can you turn to the third page

20  of Exhibit 1, which is SDT-REID 14.

21        A.    Yes.

22        Q.    Is this the consent form you were just

23  discussing?

24        A.    Yes.

```
 1        Q.    Now, whose handwriting is on this form?

 2        A.    At the top where it says Examiner,

 3   that's mine.  That's my name.

 4                   And then a bit further on down where

 5   it says, Naperville Police Department, that's also

 6   mine.

 7                   And then a bit further on down the

 8   page where it says, In view of the foregoing, I

 9   release John Reid & Associates, and where it says

10   Naperville Police Department, that's my writing.

11        Q.    Okay.

12        A.    Where it says date and time, that also

13   is my writing.  "Chicago" is also my writing, and

14   then where it says "Witness," that's my writing.

15        Q.    Okay.  Who else's handwriting appears

16   on this form?

17        A.    This would be Mr. Amor's about just a

18   little under halfway down where it says,

19   Furthermore, I understand I am free to leave this

20   office at any time, and then there's a BA.  That's

21   his initials; he wrote that.

22                   A bit further down where it says

23   Signature on the right, that's his writing.

24                   And then again where printed in
```

```
 1  there, it says, I understand that I am not in
 2  custody, and the initials BA, he wrote all of that
 3  in again.
 4        Q.    Okay.  And when you signed as a
 5  witness, was that you witnessing Mr. Amor's
 6  signature on the form?
 7        A.    Yes.
 8        Q.    And you saw him sign this form, correct?
 9        A.    I believe so, yes.
10        Q.    Do you know why Mr. Amor wrote in on
11  this form, I understand that I am not in custody?
12        A.    Yes.
13        Q.    Why is that?
14        MS. THOMPSON:  Object to form.
15              You can answer.
16        THE WITNESS:  Because I asked him to.
17  BY MS. RANUM:
18        Q.    And why did you ask him to do that?
19        A.    Because I wanted to make sure he
20  understood he was free to leave.
21        Q.    Okay.
22        A.    And if you notice up at the top a
23  little bit further above where it says,
24  Furthermore, I understand that I am free to leave
```

 1  this office at any time, I reread that to him after

 2  he signed and asked him if he understood that.  He

 3  said, yes, so I had him initial that as well.

 4       Q.    What would you have done if you had

 5  presented Mr. Amor with this form and he had told

 6  you he did not understand that he was free to leave?

 7       MS. THOMPSON:  Object to form.

 8       THE WITNESS:  We would have explained that he

 9  was free to leave.  If he still didn't understand,

10  then we probably wouldn't have run the test.

11  BY MS. RANUM:

12       Q.    Okay.  After the release form that

13  we've just reviewed was filled out, what would be

14  the next -- what was the next thing that you and

15  Mr. Amor would have done?

16       A.    We flipped the form over, and on the

17  backside was the medical sheet that he had

18  completed, and we reviewed that.

19       Q.    Okay.  Now, the interview room that

20  Mr. Amor was in while he was completing these

21  forms, can you describe the interview room.

22       A.    It was approximately 10 feet by 10 feet

23  square.  There was a desk and three chairs.

24       Q.    The medical data sheet, this is a form

 1  that was completed by Mr. Amor himself, correct?

 2       A.    Yes.

 3       Q.    Was anyone else present when he

 4  completed this form?

 5       A.    No, he was by himself.

 6       Q.    Did your handwriting appear anywhere on

 7  this form?

 8       A.    Yes.

 9       Q.    Where is your handwriting?

10       A.    About halfway down on the -- in the

11  right side there, kind of by the margin, he had

12  checked off recent arm injury -- or I'm sorry --

13  respiratory lung problems, he said yes.  And so I

14  asked him about that.

15             And then he said he had had a

16  surgery.  He had some spots on his lungs in the mid

17  '80s.  And it's cut off there, no something.  So I

18  probably asked him if he was on medication or

19  something for that, and it's no something.

20  Something got cut off.

21       MR. NYESTE:  Can we look at the original?

22       MS. RANUM:  Yeah.  Do you have the original?

23       MR. NYESTE:  My copy even has what is cut off

24  on your exhibit.

```
 1          MS. RANUM:  Okay.  So I guess why don't we --
 2   should we take a quick break, and I'll just make
 3   that one an exhibit.  Is that okay?
 4          MR. NYESTE:  Yeah, just copy that.  It shows
 5   DR, doctor.  No doctor.
 6                        (Recess taken.)
 7                        (Deposition Exhibit No. 2,
 8                         Witness Masokas, was marked for
 9                         identification 11/05/2019.)
10   BY MS. RANUM:
11          Q.    All right.  Mr. Masokas, I'm showing
12   you what we've marked as Exhibit 2 to your
13   deposition, which is a better copy of the Medical
14   Data Sheet.
15                  So if you could please just explain
16   what your writing is about halfway down the page on
17   this form.
18          A.    Yes.  When he said "yes" to respiratory
19   lung problems, I asked him about that.  He said he
20   had surgery due to some spots on his lungs back in
21   the mid '80s.  But at the current time, he was not
22   under a doctor's care for that.
23          Q.    Okay.  What's the point of -- what is
24   the purpose of the medical data sheet?
```

 1          A.    We want to make sure that they're

 2    healthy and that they're in a condition that would

 3    be suitable for a polygraph test.

 4          Q.    Now, that's because the polygraph

 5    examination looks at certain physiological

 6    responses, correct?

 7          A.    Yes.

 8          Q.    Can you explain what the physiological

 9    responses are that a polygraph examination looks at?

10          A.    The polygraph measures respiration, it

11    measures blood pressure, and it measures galvanic

12    skin response or electricity in the skin.

13          Q.    And those were the measurements that a

14    polygraph examination was monitoring back in

15    October of 1995, correct?

16          A.    Yes.

17          Q.    And so is one of the purposes of the

18    medical data sheet to ensure that there isn't a

19    medical condition that could impact those three

20    physiological responses that you just testified to?

21          MS. THOMPSON:  Object to form.

22          THE WITNESS:  Yes.

23    BY MS. RANUM:

24          Q.    Because if there was something

 1  indicated on the medical data sheet that could

 2  impact one of those three physiological responses,

 3  that could impact the accuracy of the exam, correct?

 4       A.    Not necessarily the accuracy, but just

 5  the recordings, the ability for them to respond.

 6  So I wouldn't necessarily say accuracy, but the

 7  responses.

 8                  You know, for instance, if someone

 9  is on blood pressure medication and they failed to

10  take their medication, then their blood pressure is

11  going to be elevated.  And so we suggest taking

12  your medicine because it brings everything back to

13  normal, and so we want to be able to see

14  appropriate responses.

15       Q.    So it would be something you would want

16  to know about so you could factor it into your

17  evaluation?

18       A.    Yes.

19       Q.    It indicated on the form -- Mr. Amor

20  indicated that he had a headache and some cold

21  symptoms.

22                  Do you see that?

23       A.    Yes.

24       Q.    Now, was that of any concern to you in

1    terms of being able to perform a polygraph

2    examination?

3          A.    No major concern, no.

4          Q.    Mr. Amor indicated that he had taken an

5    Actifed at about 1:00 o'clock p.m. that day for

6    cold and sinus problems.

7                Was that something that concerned

8    you in terms of moving forward with the polygraph

9    examination?

10         A.    No.

11         Q.    Mr. Amor indicated that he had received

12   about 4 hours of sleep in the last 24 hours.

13                Was that something that concerned

14   you in terms of moving forward with the polygraph

15   examination?

16         MS. THOMPSON:  Object to form.

17         THE WITNESS:  It was a bit of a concern, but

18   at the time he was alert; he seemed fine.  He

19   didn't seem as though he was exhausted, so we

20   continued.

21   BY MS. RANUM:

22         Q.    Okay.  So based on the completion of

23   the medical data sheet and the conversation that

24   you had with him regarding the form, fair to say

 1   you felt completely comfortable moving forward with

 2   the polygraph examination?

 3         A.    Yes.

 4         Q.    The interview -- where is the interview

 5   room located in relation to -- the interview room

 6   that Mr. Amor was in, where is that located in

 7   relation to the lobby that you've described?

 8         A.    I'm trying to figure out how to explain

 9   it.  Well, the lobby is in the front near the

10   elevators, and then from the lobby, you come

11   through a secure door past the reception area, past

12   the library, and then there was a hallway to the

13   right.  And if you turn to the right down that

14   hallway, there were I want to say six interview

15   rooms down that hallway, so it was several feet

16   away from the lobby area.

17         Q.    Okay.  And you've mentioned that

18   there's a secure door --

19         A.    Yes.

20         Q.    -- between the lobby and the office

21   area, correct?

22         A.    Yes.

23         Q.    And because there's a secure door

24   there, you cannot access the office area from the

 1   lobby, I assume, without receiving some sort of

 2   buzz-in or something from someone in reception.  Is

 3   that fair to say?

 4        A.    Yes.

 5        Q.    Okay.  What about if you want to leave

 6   the secure area and go out into the lobby?

 7        A.    No, there's free access.  It's unlocked.

 8        Q.    So it's locked in terms of entrance to

 9   the office area.

10        A.    Yes.

11        Q.    And unlocked in terms of exiting the

12   office area.

13        A.    Correct.

14        Q.    Okay.  And what about the interview

15   room that Mr. Amor was in?  Was he at any point

16   locked in that room, or was that door always

17   unlocked?

18        A.    No, none of our interview rooms have

19   locks.  They're all unlocked doors.

20        Q.    Okay.  And just to back up for a

21   moment, I think I asked you this, but I want to

22   make sure we have a clear record.

23              When Detectives Guerreri and Cross

24   were in the library with you, Mr. Amor remained in

1  the lobby, correct?

2         A.    Yes.

3         Q.    And that was for the entire duration of

4  your meeting with Detectives Cross and Guerreri,

5  correct?

6         A.    Yes.

7         Q.    So once you complete your review with

8  Mr. Amor of the medical data sheet, what is the

9  next thing that you do in the course of your

10 examination process?

11        A.    Once we review everything, we would

12 start the interview, the pretest interview.

13        Q.    Did the pretest interview take place in

14 the same interview room that you've described?

15        A.    Yes.

16        Q.    And was anyone else present for the

17 pretest interview other than you and Bill Amor?

18        A.    No.

19        Q.    I believe you testified at the motion

20 to suppress that the pretest interview lasted

21 roughly 40 minutes or so.  Does that sound about

22 right?

23        MS. THOMPSON:  Object to form.

24        THE WITNESS:  Yes.

 1  BY MS. RANUM:

 2       Q.    And during that time, was Mr. Amor free

 3  to leave?

 4       MS. THOMPSON:  Object to form.

 5       THE WITNESS:  Yes.

 6  BY MS. RANUM:

 7       Q.    What's the purpose of the pretest

 8  interview?

 9       A.    We -- well, first of all, we want to

10  make sure that they understand why they're there.

11  And so we ask them, Do you understand why you're

12  here today?

13                   And then we will go through with

14  them the investigation basically as to what was

15  provided to us by the investigators, if it's

16  pertinent.  And we give him an opportunity to deny

17  involvement.  We give him an opportunity to explain

18  his side of the story or his version of events, if

19  necessary.

20                   And then ultimately, we will review

21  the actual test questions with him at some point.

22       Q.    Okay.  So let's start with the pretest

23  interview itself.

24                   Do you document anything during the

 1   pretest interview?

 2       A.    Yes.

 3                        (Deposition Exhibit No. 3,

 4                         Witness Masokas, was marked for

 5                         identification 11/05/2019.)

 6   BY MS. RANUM:

 7       Q.    Mr. Masokas, I'm showing you a document

 8   which we've marked Exhibit 3 to your deposition.

 9   It's a two-page document Bates stamped SDT-REID 47

10   and SDT-REID 49.  You could take a moment to look

11   at this document.

12              Is this your notes from the pretest

13   interview that you did with Bill Amor?

14       A.    Yes.

15       Q.    All right.  I apologize.  I'm going to

16   ask you again to decipher some of your handwriting

17   for me.

18       A.    You can't make it out?

19       Q.    So first of all, there's these circled

20   numbers on the side?

21       A.    Yes.

22       Q.    What do those indicate?

23       A.    The circled numbers down the left

24   margin correspond to the numbers at the top of the

1  page.

2       Q.    Okay.

3       A.    It's almost, for lack of a better term,

4  a little cheat sheet, so to speak.  Instead of

5  having to write out the entire question that we're

6  asking, we just correlate the number to what's at

7  the top.

8       Q.    Sure.

9       A.    And so that way at the top, what you

10 see at the top is abbreviated, but we know what

11 it -- like for instance, where it says, No. 1,

12 work, that basically is we would ask them a little

13 bit of work history.  Are you currently employed?

14 Where are you working?  How long have you been

15 there?

16             27, which isn't on there, is a

17 question that was added.  Question 27 is:  Do you

18 know the reason for the interview today?  Do you

19 understand why you're here today?

20             And so we just write the number as

21 opposed to having to write out the whole question.

22 Does that --

23       Q.    Okay.  That makes sense.

24             So for No. 1 -- I'm just going to go

1  through it kind of line by line with you.

2                    So No. 1, can you tell me what you

3  would have asked Bill Amor, and then based on your

4  note what he responded?

5        A.    Sure.

6        MS. THOMPSON:  Object to form.

7        THE WITNESS:  Are you currently employed?

8  Are you currently working?

9                    He said he's working part-time at a

10 church as a maintenance man or in the maintenance

11 department, and he's been there for one to two

12 months.

13 BY MS. RANUM:

14       Q.    Okay.  Then let's just go through --

15 actually, so No. 27 is the second one.

16                    What would you have asked Bill Amor,

17 and based on your notes, what would he have

18 responded?

19       MS. THOMPSON:  Object to form.

20       THE WITNESS:  Question 27 was:  Do you

21 understand the reason for the test today, or, Do

22 you understand the reason you're here today?

23                    His response, he said uh-hmm or

24 uh-huh, and then there was a short pause, and then

1    he said, Yes, sir.

2                    And then he went on to say, It's

3    questionable about how the fire started.  I feel it

4    may have been intentionally started, and they feel

5    I may have something to do with it.  That's why I'm

6    here.  To clear it up.

7    BY MS. RANUM:

8         Q.    Okay, thank you.

9                    The next one is signals.  It's No. 2.

10        A.    Yes.

11        Q.    So what would you have asked Bill Amor

12   as No. 2?

13        A.    Question 2, as you notice, goes to the

14   top where it says "you," and the "you" is just a

15   simple question.

16                    Bill, before we move forward here, I

17   just have to ask you:  Did you set the fire?

18                    And he said -- he whispered, No, and

19   he crossed his arms.

20        Q.    What is the next number indicated on

21   the form?

22        A.    Letter A.  Again, letter -- 2A is not

23   up there, but 2A is knowledge:  Do you know who set

24   the fire?

1              He repeated the question, and then

2    he said, No, sir.

3        Q.    Okay.  Next is No. 3, what would you

4    have asked Bill Amor?

5        A.    No. 3 is a --

6        MS. THOMPSON:  Object to form.

7        THE WITNESS:  It's a suspicion question.  So

8    he would have been asked, Is there anyone that you

9    suspect or have a suspicion about as to who you

10   think may have set the fire?

11             And he said, Previously but they're

12   out of the area.  Somebody who had keys.  Mike -- I

13   believe it's Dish, D-i-s-h, my wife's ex-boyfriend.

14   He spoke to her on the phone and found out we were

15   married.  Told her he was going to hurt me and that

16   occurred in June of '95.  We've met.  He's a big

17   mouth.

18   BY MS. RANUM:

19       Q.    Next is No. 4, what did you ask him for

20   No. 4?

21       A.    No. 4 is a vouch for question.

22             Is there anybody you trust that you

23   could vouch for who you feel would not have set the

24   fire?

```
 1                   And he said Tina.  He delayed before
 2   he answered, and he shifted in the chair.  He says,
 3   I don't believe my wife would kill her mother.
 4        Q.    Next, you indicate No. 16.  What did
 5   you ask him in No. 16?
 6        A.    16 is the at the top, What should
 7   happen to the doer?
 8                   The question was:  If the fire was
 9   set deliberately, intentionally, what do you think
10   should happen to the person who set it?
11                   He bent over and started to fix his
12   shoe.  He delayed before he answered.  He looked
13   away from the investigator.  And then he said, I
14   don't know the law, but definitely life and some
15   help, and then he shifted in the chair.
16        Q.    Next is No. 29.  What did you ask him
17   in No. 29?
18        A.    No. 29, again it's not listed up there,
19   but it's a question that was added.  It's called
20   the second chance question.
21                   And so the question was:  If the
22   fire was set intentionally, do you think whoever
23   set it deserves a second chance?
24                   He sighed, and then there was a long
```

 1  delay before he answered the question, and then he
 2  said, I suppose if they're truly remorseful and
 3  with a lot of provisions so they wouldn't harm
 4  anybody again.
 5       Q.    Next is No. 5.  What did you ask in
 6  question 5?
 7       A.    Question 5 is:  Do you actually think
 8  the fire was deliberately started?
 9              And his response was, That's a
10  loaded question.
11              And so I asked him, Okay.  Well, why
12  don't you tell me then what happened or what you
13  did on Sunday, September 10th?
14              And then he goes on to explain what
15  they were doing.
16              Want me to read that?
17       Q.    Yes, please.
18       A.    I got up between 9:00 and 10:00 a.m.,
19  watched football at home.  The three of us were
20  there.  Tina and mom went to pick up pizza.  They
21  were back by 2:30.  I made a few phone calls or got
22  a few phone calls from friends.  Watched football
23  until 6:15 p.m.  I loaded up the car with the
24  cooler and a blanket, and Tina and I went to a

1  drive-in movie.  Left home about 6:20 p.m.

2              When I took the cooler down, I

3  stayed down, and Tina was down a few minutes later.

4  Got home a little after 11:00 p.m.  Then we heard

5  about it.

6              And then I had asked him, Well, how

7  do you think the fire started?

8              He said, I don't know.  Been through

9  this a lot.  The fire started so fast, and then he

10 shifted in the chair.

11             Next question:  How did you get

12 along with Marianne?

13             He said good.

14             And then:  How'd you get along with

15 Tina?

16             I can't make that out at the bottom.

17 I'm not sure what that is at the bottom.  Can I

18 check my original?

19     Q.    Sure.

20     A.    I believe he says his marriage is

21 pretty sound.

22             How do you get along with Marianne?

23             Good.

24             How'd you get along with Tina?

```
 1                    The marriage is pretty sound.
 2         Q.    Thank you.
 3                    And going to page 2.
 4         A.    Okay.
 5                    Top of page 2:  How did Tina and her
 6    mother get along?
 7                    They got along okay.  Just not close
 8    as a mother and daughter.
 9                    What about on September 10th?  The
10    question, September 10th.  What did you have to
11    drink that afternoon?
12                    He said:  Two and a half to three
13    drinks, tall glass, vodka and 7up.
14                    And then I asked him if he had any
15    drugs that day; he said no drugs.
16                    And then what about Tina and
17    Marianne?  Were they drinking?
18                    He says, No, Tina and mom were not
19    drinking.
20         Q.    Next you have No. 17.
21                    What did you ask him for No. 17?
22         A.    No. 17:  How do you feel about coming
23    in for the polygraph today?
24                    He said, I feel a little annoyed
```

```
 1  that someone would think I'd hurt someone I loved.
 2       Q.    Next is No. 9.  What did you ask him
 3  for question 9?
 4       A.    No. 9:  Had anything like this ever
 5  happened before to you where there was a fire like
 6  this?
 7            He said, No.  And then he acted like
 8  surprised.  Like, No, something to that effect.
 9            I've known -- I asked him:  How long
10  did you know Tina and her mom?
11            He said about four years.
12            Next one, question 10:  Have you
13  ever thought about setting a fire like this?  Have
14  you ever thought about doing anything similar?
15            He said no.
16       Q.    Is that what that -- looks like a minus
17  sign?
18       A.    Yeah, negative, minus sign.
19       Q.    And then what would question I guess
20  25?  What was question 25?
21       A.    Question 25:  Why wouldn't you do
22  something like this.
23            He said:  It's too gruesome for me.
24       Q.    Next is question 11.  What did you ask
```

 1 | him for No. 11?

 2 |         A.    Question 11:  Has anyone ever

 3 | approached you or talked with you about ways of

 4 | doing something like this.

 5 |                   He said no.

 6 |         Q.    Next is 21.  What did you ask him for

 7 | question 21?

 8 |         A.    Did you tell anybody about having to

 9 | come down for the polygraph test today?

10 |                   He said, Here?  No, I just found out

11 | today.

12 |                   And then right under 21, I asked him

13 | about the insurance, Marianne's insurance, did he

14 | know about it.

15 |                   He said, If I was talking about it,

16 | I must have been really drunk.  I didn't even know

17 | about the insurance or the contents.  It's none of

18 | my business.

19 |                   And he had shifted in the chair.

20 |         Q.    Next is No. 7.  What did you ask him

21 | for No. 7?

22 |         A.    No. 7 corresponds to the top where you

23 | see 7 it says FP.  FP stands for fingerprints.

24 |                   Fingerprints in this issue really

 1  wouldn't be appropriate.  We call it a bait

 2  question.

 3                    And so the question he was asked

 4  was:  You said that you had come downstairs from

 5  the apartment, and you didn't go back up.  You

 6  waited until Tina came down.  Would there be any

 7  reason that someone would say they saw you going

 8  back up to the apartment?

 9                    There was a very long delay.  He

10  says, I can't think of any reason why I would have

11  gone back up.

12      Q.    Next is No. 12.  What did you ask him

13  for No. 12?

14      A.    No. 12:  How do you feel the polygraph

15  test is going to come out on you today?

16                    He says, Yeah, I'm telling the

17  truth, and had very good eye contact when he

18  responded that way.  I need to clear this up.

19      Q.    Next is No. 18.  What did you ask him

20  for No. 18?

21      A.    No. 18:  Did anyone ever give you any

22  advice or tell you how to act when you take a

23  polygraph test?

24                    He said no.

```
 1                    And then I'd asked him how was he
 2  feeling here about taking the test?
 3                    He said, Tense and nervous.
 4        Q.    Okay.  And there's some notations below
 5  there.  Can you explain what those are?
 6        A.    Yes.  At the very, very bottom, those
 7  were the questions that were going to be utilized
 8  for the control questions on the polygraph.
 9                    Our control questions, there's two
10  of them that we utilize, and we want them to be
11  very broad, all-encompassing questions to the point
12  where we want them to be a known lie, so to speak.
13                    So I had asked him one question
14  where you see on the left it says, against the law.
15                    And I'd asked him, I said, Going
16  back your entire life, Bill, have you ever done
17  anything illegal?  Anything that would have been
18  against the law?
19                    He said, Traffic violations and
20  stealing.
21                    I said, Anything else?
22                    He said, no, that was it.
23                    And then the next question right
24  next to that to the right where it's abbreviated,
```

 1  it should be it's intentionally.

 2                    Have you ever intentionally hurt

 3  someone?

 4                    He said, Well, yes, in an argument.

 5                    I said:  Well, other than an

 6  argument that you may have had, have you ever done

 7  anything intentional to hurt someone else?

 8                    He said no.

 9      Q.    And then below that, there's a No. 20?

10      A.    Yes.  No. 20 is medication in the last

11  24 hours.  Have you had any medication?

12                    He said Tylenol, and then my

13  notation is, See sheet, see medical sheet.

14      Q.    Okay.  Thank you for going through that.

15                    The notes that we've looked at in

16  Exhibit 3, were these taken contemporaneously while

17  you were doing your pretest interview with Mr. Amor?

18      A.    Yes.

19      Q.    Is there anything else that you recall

20  asking Mr. Amor that's not documented in your

21  pretest interview?

22      MS. THOMPSON:  Object to form.

23      THE WITNESS:  I believe that's everything.

24

 1  BY MS. RANUM:

 2       Q.    Okay.  Thank you.

 3              After the pretest interview

 4  concluded, what was the next thing that you did?

 5       A.    I stepped out of the room and went back

 6  to my office and formulated the actual test

 7  questions.

 8       Q.    What's the process for formulating your

 9  questions?

10       A.    Well, after speaking with the

11  investigators, they give us an idea as to what

12  they're looking for.

13              In Mr. Amor's case, they wanted to

14  know if he was involved in setting the fire, if he

15  knew who set the fire, or had any knowledge of the

16  fire.  And then based on the interview with

17  Mr. Amor, we take all of that into consideration,

18  and we just come up with the three or four main

19  questions that we feel will encompass what they're

20  looking for.

21       Q.    During the time that you formulated the

22  questions, where were you in the office?

23       A.    I would have been in my office, which

24  is kind of a little bit further away from the

```
 1  interview room.  It's kind of in the opposite end

 2  of where the lobby was.

 3       Q.    Did anyone -- other than the interview,

 4  the pretest interview that you've testified to with

 5  Mr. Amor and the meeting you had in the library at

 6  the beginning of the day with Detectives Cross and

 7  Guerreri, did anything else factor into your

 8  formulation of the questions?

 9       MS. THOMPSON:  Object to form.

10  BY MS. RANUM:

11       Q.    Well, let me ask it differently.

12             Did anyone else help you formulate

13  the questions?

14       A.    The question formulation, no.  It would

15  have been me.

16       Q.    Okay.  As the polygraph examiner, you

17  come up with the questions, correct?

18       A.    Yes.

19       Q.    And are there different -- you've

20  already mentioned that there's two control

21  questions that you ask, correct?

22       A.    Yes.

23       Q.    And are there other types of questions

24  that are asked in the course of the polygraph
```

1    examination?

2         A.    Well, there's three standard questions:

3    There's two control questions, there's the relevant

4    questions -- those are the questions that pertain

5    to the investigation -- and then there are

6    irrelevant questions, which basically are known

7    truths.

8         Q.    Okay.  So you're basically coming up

9    with questions that are going to elicit known

10   truths, correct?

11        MS. THOMPSON:  Object to form.

12        THE WITNESS:  Yes.

13   BY MS. RANUM:

14        Q.    In your words.

15        A.    Yes.

16        Q.    Known lies are the control questions,

17   correct?

18        A.    Correct.

19        Q.    The irrelevant questions are the known

20   truths, correct?

21        A.    Yes.

22        Q.    And then the relevant questions are the

23   ones that pertain to the investigation itself?

24        A.    Yes.

```
 1        Q.    And all of those questions are written
 2   by you, correct?
 3        A.    Yes.
 4        Q.    Are all of those questions in a
 5   yes-or-no form?
 6        A.    Yes.
 7        Q.    Where was Mr. Amor while you formulated
 8   the questions?
 9        A.    I believe when I stepped out of the
10   room -- I believe we changed rooms.  I put him in a
11   different room, the room with the polygraph in it,
12   which is right across the hall basically from the
13   original interview room.  And he was in there by
14   himself.
15        Q.    Okay.  Is there a lock on the door to
16   the examination room that you've just testified to?
17        A.    No.
18        Q.    And was Mr. Amor free to leave at that
19   time?
20        A.    Yes.
21        Q.    Can you describe the examination room
22   that Mr. Amor was moved to?
23        A.    It was a little bit smaller, maybe 9 by
24   9.  There was two -- well, three chairs again and
```

1   the desk that contained the polygraph instrument.

2        Q.    And once you formulated your questions,

3   did you go back into the exam room with Mr. Amor?

4        A.    Yes.

5        Q.    And what happened at that point in time?

6        A.    We reviewed the actual questions that

7   were going to be on the exam.

8        Q.    And did you review all of the questions?

9        A.    Yes.

10       Q.    And is that part of the standard

11  practice?

12       A.    Yes.

13       Q.    And what is the purpose of reviewing

14  the questions?

15       A.    We --

16       MS. THOMPSON:  Object to form.

17       THE WITNESS:  We want him to be able -- we

18  want to make sure he understands the questions.  If

19  he doesn't understand the question, we may have to

20  rephrase a question or maybe even eliminate it if

21  they don't understand it.  So make sure he

22  understands them.  And we want him to know ahead of

23  time what the questions are so there's no

24  surprises.

1    BY MS. RANUM:

2         Q.    And why do you not want them to be

3    surprised?

4         A.    Because with a -- if he's surprised, we

5    may get an initial reaction to a question just

6    because he's never heard it before, and he didn't

7    know it was going to be on the test.

8         Q.    Okay.  So is eliminating the variable

9    of surprise something that helps in terms of the

10   physiological aspects of the tests that you've

11   already testified to -- strike that.  That's a bad

12   question.

13              But I mean, you're looking at things

14   like -- you're looking at blood pressure, correct?

15        MS. THOMPSON:  Object to form.

16   BY MS. RANUM:

17        Q.    And you're looking at breathing during

18   the exam, correct?

19        A.    Yes.

20        Q.    And what's the third one again?

21        A.    Galvanic skin response.

22        Q.    Okay.  And so would there be a concern

23   that if the person -- if the subject of the

24   examination was surprised that that could impact

```
 1  one of those physiological responses?
 2         A.    Yes.
 3         Q.    Okay.  So you're hoping to eliminate
 4  that variable to help create a controlled --
 5         A.    Yes.
 6         Q.    -- environment.  Is that fair to say?
 7         A.    Yes.
 8         MS. THOMPSON:  Object to form.
 9  BY MS. RANUM:
10         Q.    And when you reviewed the questions
11  with Mr. Amor, did he have any difficulty
12  understanding any of the questions?
13         MS. THOMPSON:  Object to form.
14         THE WITNESS:  No.
15  BY MS. RANUM:
16         Q.    Based on your observations, did he have
17  any difficulty understanding any of the questions?
18         A.    No.
19         Q.    Did you have to rephrase or eliminate
20  any questions after reviewing questions with
21  Mr. Amor?
22         A.    No.
23         Q.    And so at that point did you proceed
24  with the exam -- the polygraph examination itself?
```

1        A.    Yes.

2        Q.    Can you explain what happens at that

3   point in terms of commencing the actual polygraph

4   examination?

5        MS. THOMPSON:  Object to form.

6        THE WITNESS:  Well, we have to attach them to

7   the polygraph, that's the first step.  And then

8   once we begin, we'll run a test chart just so he

9   gets accustomed to the blood pressure cuff

10  tightening up.  And we'll do that for maybe about

11  30 seconds, at which time no questions are being

12  asked.

13            And then the blood pressure cuff is

14  deflated, and then we give him the instructions

15  that we're going to begin.  And we explain the

16  first test, and then we start.

17  BY MS. RANUM:

18       Q.    Okay.  So let's talk about how each of

19  the three physiological responses are measured

20  during the course of the test.

21            So you've mentioned a blood pressure

22  cuff.

23       A.    Yes.

24       Q.    So he has a blood pressure cuff on his

1  arm during the test?

2          A.    Yes.

3          Q.    And is that taking his blood

4  pressure -- how does it work?  Is it taking it

5  continuously and charting it for you?

6          A.    Yes.

7          MS. THOMPSON:  Object to form.

8  BY MS. RANUM:

9          Q.    And we're going to look at the chart

10 itself in a second.  I just want to understand how

11 he's hooked up during the exam.

12         A.    Sure.

13         Q.    How are you measuring breathing during

14 the exam?

15         A.    The respiration is measured by two

16 pneumograph tubes, p-n-e-u-m-o-g-r-a-p-h:  One

17 across the chest, one across the stomach.

18               And then the galvanic skin response,

19 there's two little metal kind of like clips on two

20 fingers.

21         Q.    Okay.  So he has two monitors on his

22 midsection, correct?

23         A.    Yes.

24         Q.    To measure respiratory?

```
 1         A.    Yes.

 2         Q.    Blood pressure cuff on his arm to

 3  measure blood pressure, correct?

 4         A.    Yes.

 5         Q.    And then like kind of like clips on two

 6  of his fingers to measure skin conductive responses?

 7         A.    Yes.

 8         Q.    So once all of those monitors that

 9  we've discussed are put into place, what happens

10  next?

11         MS. THOMPSON:  Object to form.

12         THE WITNESS:  We would give him the

13  instructions as to how we're going to run the test

14  and then -- and step around to the side and begin.

15  BY MS. RANUM:

16         Q.    What are the instructions that are

17  given?

18         A.    Well, it depends on which exam we're

19  giving.  We give different types of exams, and so

20  depending on which one we're giving, instructions

21  might be a little bit different.

22         Q.    Do you know which exam Mr. Amor was

23  given?

24         A.    Yeah.  He was -- well, he was given
```

 1  three or four different exams all in the same

 2  series, so I can explain.

 3       Q.    Let's back up.  I think it will help --

 4  will it help if I show you your notes?

 5       A.    Uh-hmm.

 6                      (Deposition Exhibit No. 4,

 7                       Witness Masokas, was marked for

 8                       identification 11/05/2019.)

 9  BY MS. RANUM:

10       Q.    All right.  Mr. Masokas, I'm showing

11  you a document that's been marked Exhibit 4 to your

12  deposition.  It's Bates stamped SDT-REID 46.

13                  What is this document?

14       A.    This is the front side of his pretest

15  interview sheet.

16       Q.    Oh, okay.

17       A.    The two sheets we reviewed a little bit

18  earlier would be the backside of this.

19       Q.    Okay.

20       A.    So this is actually the front side of

21  that first document we reviewed with all his

22  questions that we asked that we went through.

23       Q.    So this would be -- so Exhibit 4 is

24  actually the front side of Exhibit 3?

```
 1        A.    Correct.

 2        Q.    Got it.

 3              Does this form contain the questions

 4   that were asked to -- that were posed to Mr. Amor

 5   during the actual polygraph examination?

 6        A.    Yes.

 7        Q.    And when were -- when were these

 8   questions written out?  Was this what you wrote

 9   them on in your office when you were formulating

10   them?

11        A.    Yes.

12        MS. THOMPSON:  Object to form.

13   BY MS. RANUM:

14        Q.    Can you tell by looking at this form

15   what instructions would have been given to Mr. Amor

16   at the beginning of the examination?

17        A.    No.

18        Q.    Okay.  Is there anything I can show you

19   that would tell you what instructions he had been

20   given?

21        A.    No.

22        Q.    Okay.

23        A.    I mean, I know the instructions.  They

24   just vary from one test to the other.
```

1        Q.    Okay.  So generally speaking, what

2   would the instructions have been?

3        MS. THOMPSON:  Object to form.

4        THE WITNESS:  Well, the first -- the first

5   test we ran is called a straight through test,

6   which means we just go straight through.

7                    And so he would have been told,

8   Bill, this first test that we're going to run, I'm

9   going to ask you all of these questions, all 10

10  questions that we just reviewed, and I'm going to

11  read them right in order.  I'm not going to

12  deviate.  It's going to be 1 to 10.  And all I need

13  you to do is answer yes or no.  All I need is a

14  one-word answer, just a simple yes or no.  And then

15  from there, we go through the test.

16                    And so that would be one set of

17  instructions.

18  BY MS. RANUM:

19       Q.    And is the first --

20       A.    Straight through.

21       Q.    So based on your testimony, I want to

22  make sure I understand.

23                    Is it fair to say that there are

24  multiple tests given in the course of one polygraph

 1   examination?

 2        A.    Yes.

 3        Q.    Okay.  And so the first test that's

 4   given is what's called a straight through test?

 5        A.    Yes.

 6        Q.    And in that test, the questions are

 7   asked in the exact order that we see them listed on

 8   Exhibit 4?

 9        A.    Yes.

10        Q.    Okay.  What is the second test that

11   Bill Amor was given?

12        A.    The second test is called a card test.

13             A card test is -- it's actually a

14   stimulation test.  We give that -- the purpose for

15   that test is for innocent people.  A truthful

16   person who's taking the test, we want to be able to

17   show them that the test works.  And so if they are

18   nervous, it typically will calm them down a little

19   bit.

20             For deceptive individuals, we want

21   to show them that the test works.  And that if

22   they're going to lie, we're going to find out.

23             So that was the second test in the

24   series.

```
 1                    And so the way we do the card test,
 2   we actually have five playing cards.  And we fan
 3   them out and say, I need you to pick one of the
 4   cards.  Look at it, but don't tell me what it is.
 5                    And then he looks at it, we have him
 6   place it back in the deck, and in front of them, we
 7   shuffle the deck.
 8                    And then we instruct them, Now I'm
 9   going to ask you a bunch of numbers here.  I want
10   you to answer "no" to all of the numbers.  Even if
11   I call your card, I want you to say "no."  And you
12   understand that?
13                    Yes.
14                    And then we go ahead and we run the
15   card test.  And usually we'll call their number
16   twice.  And then at the end we'll say, Did you --
17   in his case, it's marked on the front of his sheet,
18   he chose No. 4.  On the right side where it says
19   card?
20        Q.    Oh, okay.
21        A.    So he picked out No. 4, and so 4 would
22   have been called twice.
23                    And then we'd stop the test and say,
24   Bill, what I see here is looks as though you picked
```

 1  card No. 4; is that correct?
 2                  And he acknowledged yes.
 3                  And so that was the end of the test.
 4      Q.    Okay.
 5      A.    And then we would simply say, Well, now
 6  I've got a good picture of what it looks like when
 7  you don't tell the truth on something, so we'll be
 8  able to use that to compare with the rest of the
 9  results.
10      Q.    What's the next test that Bill Amor was
11  given after the card test?
12      A.    The third test is another straight
13  through.  It would be straight through No. 2.
14      MR. NYESTE:  Would it be helpful to look at
15  the originals?
16      THE WITNESS:  For me?
17      MR. NYESTE:  Yeah.
18      THE WITNESS:  Not at this point.  Eventually
19  at some point, yes.  But I think the instructions
20  are pretty straightforward.
21  BY MS. RANUM:
22      Q.    Now, the straight through No. 2, again,
23  it's the same thing.  He would have been asked the
24  questions that we see in Exhibit 4 in the exact

1  order that we see them numerically listed in

2  Exhibit 4, correct?

3       A.    Yes.

4       Q.    And what instructions would be given

5  for the straight through test No. 2?

6       A.    Well, just -- if I can just say, after

7  the card test, we step out of the room for like

8  3 minutes.

9            And we just say, Bill, at this point

10 I'm going to give you a break.  I'm going to step

11 out of the room for 3, 4 minutes, and when I get

12 back, we'll just keep going.

13           And so we -- I stepped out for a

14 couple minutes and then came back, and then told

15 him that the next test is going to be just like the

16 first one, where we're going to go through the same

17 questions in the same order.  And again, just

18 answer with a simple yes or no.

19      Q.    Okay.  You've said "we" a couple times.

20 I just want to clarify.

21           Are you the only person in the room

22 while you're giving the examination, other than

23 Bill Amor of course?

24      A.    Yes.

 1        Q.    And so after straight through No. 2,
 2   what's the next test given?
 3        A.    In Bill's case, it would have been a
 4   silent answer test.
 5        Q.    What is a silent answer test?
 6        A.    We go through the same list, same
 7   order, only this time we instruct him to answer the
 8   question silently to themselves.
 9              So, Bill, we're going to go through
10   another test.  This test will be exactly like the
11   first two we did, same questions in the same order;
12   only this time, I'm going to ask you not to say
13   anything.  Just I want you to listen to the
14   questions and think the answers silently to
15   yourself.
16        Q.    Okay.  And so the questions in the
17   silent answer test were also asked in the numerical
18   order that we see them depicted in Exhibit 4,
19   correct?
20        A.    Yes.
21        Q.    What happens after the silent answer
22   test?
23        A.    The fourth test is a mixed question
24   test.

 1      Q.    And I just want to make sure I
 2  understand.   I think we're actually on the fifth
 3  test, correct?
 4      A.    Yeah.   I'm not counting the card test
 5  as one of them.
 6            But yes, it would be No. 5 in the
 7  series, and it's mixed question.
 8            On the front of the sheet, it shows
 9  four.
10      Q.    Okay.
11      A.    Because we don't score up any card test
12  or anything.   We just put the number over there.
13            So it's the mixed question is the
14  next one.
15      Q.    Okay.
16      A.    And this time we just mix the order up,
17  and we would instruct -- well, I instructed him
18  basically that the next test we're going to ask the
19  same questions; only this time, we're going to mix
20  the order up.   Some of the questions I may ask more
21  than once; some I might drop out and not ask at
22  all.   But just answer again exactly like you've
23  been doing with a simple yes or a no.
24      Q.    Okay.   Is the mixed question test the

 1  final test?

 2       A.    Sometimes.   There was -- he was given

 3  one more.

 4       Q.    He was given one more, okay.

 5             What was the final test that Bill

 6  Amor was given?

 7       A.    The final test is a yes test.

 8       Q.    What is a yes test?

 9       A.    A yes test is where we ask the same

10  questions, only we drop two out.  And the two we

11  drop out are the two control questions.  These are

12  eliminated.  We don't ask those.

13       Q.    Okay.  What are the instructions given

14  for the yes test?

15       A.    The yes test would -- what I said to

16  him was, Bill, this next and final test is going to

17  be a little bit different than what we've been

18  doing.  I'm going to ask you all the same questions

19  again, with the exception of two.  I'm not going to

20  ask you, besides traffic violations and stealing,

21  have you ever done anything else in your life

22  against the law.  We're dropping that out.  And I'm

23  not going to ask you, Besides an argument, have you

24  ever done anything to intentionally hurt another

1  person?  I'm going to drop that out.  So those two

2  won't be asked.

3              However, on the last test, what I'd

4  like you to do is answer "yes" to all of the

5  questions, even the questions about the fire.

6              So now he's answering "yes" to the

7  investigative questions as well.  And that those

8  are the instructions, and we go from there.

9              Sometimes they'll say -- and I don't

10 know if he did or not.  But sometimes they'll say,

11 So you want me to say "yes" to the ones about theft

12 or -- and we say, Yes.  Whatever I ask you, just

13 answer "yes."

14      Q.    Okay.  And after the yes test, was

15 there any other component of the actual polygraph

16 examination, or was that the end of the test --

17      A.    That was the end.

18      Q.    -- the examination?

19              I want to walk through with you in

20 Exhibit 4, can you -- and again, I just want to

21 make sure I can read your handwriting.

22              Can you read for me what was

23 question 1?

24      A.    Do they call you Bill?

1          Q.     Okay.  What was question 2?

2          A.     Are you over 35 years old?

3          Q.     What was question 3?

4          A.     On Sunday, September 10 -- and then in

5    parentheses, '95 -- did you do anything to start a

6    fire in your apartment?  And then in parentheses,

7    in Naperville.

8          Q.     How would you have read that question

9    aloud to Bill?

10         A.     The question would have been read on

11   the polygraph:  On Sunday, September 10th, did you

12   do anything to start a fire in your apartment?

13         Q.     What was question 4?

14         A.     Question 4:  Are you in Chicago right

15   now?

16         Q.     What was question 5?

17         A.     Did you help or plan with anyone to

18   start that fire?

19         Q.     And is that how the question would have

20   been read to Bill Amor?

21         A.     Yes.

22         MS. THOMPSON:  Object to form.

23   BY MS. RANUM:

24         Q.     What was question 6?

1          A.     Question 6:   Besides traffic violations

2     and stealing, did you ever do anything else against

3     the law?

4          Q.     What was question 7?

5          A.     Did you ever go to school?

6          Q.     What was question 8?

7          A.     In parentheses, On September 10, '95,

8     before you left for the movies, did you know your

9     apartment was going to be destroyed by a fire?

10         Q.     How was question 8 read to Bill Amor?

11         A.     Before you left for the movies, did you

12    know your apartment was going to be destroyed by a

13    fire?

14         Q.     What was question 9?

15         A.     Do you know who set that fire in your

16    apartment?

17         Q.     How was question 9 read to Bill Amor?

18         A.     Just that way:   Do you know who set

19    that fire in your apartment?

20         Q.     Okay.  And then --

21         A.     11.

22         Q.     Is there not a 10?

23         A.     There's not a 10.

24         Q.     What was question 11?

```
 1        A.    Besides an argument, did you ever do
 2  anything to intentionally hurt someone?
 3        Q.    Is that how the question was read to
 4  Bill Amor?
 5        A.    Yes.
 6        Q.    Okay.  Now, you spoke about how when
 7  you're formulating these questions there's three
 8  types:  There's the irrelevant, the relevant, and
 9  the control, correct?
10        A.    Yes.
11        Q.    Can you identify for us of the
12  questions that we just read aloud together which
13  ones were the irrelevant questions?
14        A.    1, 2, 4, 7.
15        Q.    Of the questions that we just read
16  aloud together, which ones were the relevant
17  questions?
18        A.    3, 5, 8, and 9.
19        Q.    And then I believe you've already said
20  that No. 6 and No. 11 were the control questions.
21        A.    Yes.
22        Q.    And for the straight through test that
23  you have testified to already, these questions were
24  asked in the same order that we just went through
```

 1  them together, correct?

 2          A.    Yes.

 3          Q.    Now, there's all these check marks to

 4  the left of the questions.

 5                      Can you explain what those check

 6  marks are?

 7          A.    The check marks would be my marks when

 8  I reviewed and evaluated his polygraph test.

 9          Q.    Okay.  So are the markings to the left

10  of the questions made during your evaluation

11  process after the exam?

12          A.    Yes.

13          Q.    Okay.  So we'll go over that in a

14  minute then.

15                      What about the writing at the top?

16  Like it says, LD before?  What does that indicate?

17          A.    Yes.  I had asked him if he had ever

18  had a polygraph test previously; he said yes.

19          Q.    Okay.  Then to the right of that it

20  says, MFCW.

21          A.    Right.  It was male, white.  And then a

22  little further to the right, it says address.  He

23  wrote, No current residence.

24          Q.    Okay.

1        A.    A little further to the right, he said

2    he's married.  I circled M.  And going down that

3    column, see the line children, and it's got a line,

4    no children.  Age 39.  Date would have been the

5    date of the exam, 10/3/95.  Card was the card

6    number he picked on the card test, and then the

7    times.

8        Q.    Okay.  Is this information written

9    down, do you go over this information with Bill

10   before the polygraph examination starts?

11       MS. THOMPSON:  Object to form.

12       THE WITNESS:  Yes.  It's actually before the

13   pretest interview.  It's just general clerical

14   information we get right off the bat.

15   BY MS. RANUM:

16       Q.    Got it.

17              Except for is that the case for the

18   card, or does that come later?

19       A.    No, the card is later.

20       Q.    Okay.  Some of the question numbers are

21   circled on this form.

22              Is that something that happens -- at

23   what point were these circled?

24       A.    When we reviewed the questions with

 1  him --

 2         Q.    Okay.

 3         A.    -- is when we would circle it, and then

 4  at that point we know it's been already reviewed.

 5         Q.    Okay.  So that's your way of indicating

 6  that you've gone over that question with Bill Amor

 7  before you start your examination?

 8         A.    Yes.

 9         Q.    And is that your way of indicating that

10  you don't have any concern that he didn't

11  understand the question or that it needed to be

12  reformulated?

13         A.    Basically, yes.  Because if he would

14  have had a concern, we would have addressed it at

15  the time.

16         Q.    Okay.  Under the LD portion, it says,

17  EX, and then there's something written there.

18               What does that say?

19         A.    Oh, on the far right?

20         Q.    Yes, I'm sorry.

21         A.    Oh, re-examination.  If they would have

22  been back for a re-exam, a re-examination.  If he

23  would have had a prior test, it was inconclusive,

24  now he's coming back a second time for

```
 1   re-examination.
 2         Q.    Got it.
 3         A.    Then we would have just filled that in
 4   there.
 5         Q.    And that wasn't applicable here,
 6   correct?
 7         A.    Correct.
 8         Q.    And then on the left-hand side, it says
 9   EX on that second line.
10         A.    Where?
11         Q.    On the left-hand side?
12         A.    Oh, way over here?  Those are my
13   initials.  Examiner?
14         Q.    Yeah.
15         A.    Those would be my initials.
16         Q.    And then what's the "S" that's circled
17   below that?
18         A.    The "S" means that the test we're
19   running is a specific issue polygraph exam; "R"
20   would be a re-exam or a routine -- businesses back
21   many years ago would have us come in every nine
22   months and just run examinations, routine tests, to
23   see if employees are absconding or doing anything
24   they shouldn't be doing.  So that's what the "R"
```

 1  was.  Those are routine tests.

 2                  I'm not sure what the next one is,

 3  "B."  I've never used that "B."  I'm not sure what

 4  that is.

 5                  But the last one, SA, is specific

 6  applicant.  Specific applicant was a police

 7  candidate or a firefighter candidate.  Those were

 8  very -- those were specific types of tests.  So if

 9  somebody's applying for the police department and

10  we were doing the pre-employment polygraph, that's

11  what that would be.

12      Q.    Got it.

13                  And then on the right-hand side,

14  sort of along the right-hand side of the paper,

15  there's some notes.

16                  Is that your handwriting as well?

17      A.    Down the far column -- margin there?

18      Q.    Yes.

19      A.    Yes.

20      Q.    When did you make those notes, if you

21  know?

22      A.    Right down the margin would have been

23  on October 4th.

24                  Now, if you go to the left of that a

1  little bit where it says time, see Time?

2       Q.    Yes.

3       A.    It says 4:40 p.m.

4       Q.    Yeah.

5       A.    That would have been marked at the time

6  of his exam when he came in when we started the

7  pretest.  And then right to the right of that, the

8  5:20, that's where the questions -- when I would

9  have stepped out to formulate the questions.  And

10 then if you continue to the right, some of this,

11 5:45 and then further on down, I would have marked

12 that the next morning when I came in.

13      Q.    Okay.

14      A.    Because my associate was working on

15 this with me.

16      Q.    Okay.  During the time that you were

17 doing the actual polygraph examination of Mr. Amor,

18 it was the two of you in the examination room,

19 correct?

20      A.    Yes.

21      Q.    Did Detective Guerreri or Detective

22 Cross ever enter the examination room?

23      A.    No.

24      Q.    At this point, I --

```
 1          MS. RANUM:  Can we go off the record for a
 2   second.
 3                         (Discussion off the record.)
 4                         (Recess taken.)
 5          MS. RANUM:  Back on the record.
 6                         (Deposition Exhibit No. 5,
 7                          Witness Masokas, was marked for
 8                          identification 11/05/2019.)
 9   BY MS. RANUM:
10          Q.   Mr. Masokas, I'm showing you what we
11   are marking as Exhibit No. 5, and just so we have a
12   clean record, we're going to -- at break, we'll
13   make a better copy of the original.
14          MS. RANUM:  Mr. Masokas is actually going to
15   refer to the original from his file during the
16   deposition.
17   BY MS. RANUM:
18          Q.   Mr. Masokas, can you identify the
19   document that is in front of you?
20          A.   Yes.  These are the -- this is the
21   polygraph records for William Amor.
22          Q.   And so is this paper actually printing
23   out in realtime as the questions are being asked to
24   Mr. Amor during the polygraph examination?
```

```
 1         A.    Yes.

 2         MS. THOMPSON:   I'm sorry to interrupt, Laura,

 3   and I apologize.  And I know you asked this, but I

 4   just want the record to be perfectly clear that in

 5   answering these questions what the witness has in

 6   front of him is his original.

 7         THE WITNESS:  Yes.

 8         MS. THOMPSON:   Okay.

 9         THE WITNESS:  Can I say something?

10   BY MS. RANUM:

11         Q.    Yeah.

12         A.    It's actually got his signature on it.

13         Q.    Okay.  And we'll talk about that as

14   well.

15              So if we could just start -- I

16   really just want to walk through this with you so

17   that we understand what all the different markings

18   mean, and then how -- you ultimately use this

19   document to score the polygraph examination,

20   correct?

21         A.    Yes.

22         Q.    And so if we can just start at the

23   beginning.

24              Right at the beginning, it looks
```

Case: 1:18-cv-02523 Document #: 141-6 Filed: 12/18/21 Page 84 of 361 PageID #:3828

1  like there's some writing on this.

2        A.    Yes.  At the very beginning, it's --

3  you can see the "S" with a circle on the left?

4        Q.    Uh-huh.

5        A.    That's a specific issue test.  And then

6  Mr. Amor's name.  And then underneath, Naperville

7  Police Department, that's who the test was done for.

8              And then under that is the date

9  October 3, 1995; under there is my initials; and

10 then under that is the room, lab 1.  That's the

11 room that the polygraph test was conducted in.

12       Q.    Okay.  There are several lines that

13 appear to be measured on this, so I'd just like to

14 start with the uppermost line on the paper.

15       A.    Yes.

16       Q.    What is that line?

17       A.    The very top line is connected to the

18 subject's chair.  If they should move around -- can

19 you see the little spike there (indicating) --

20       Q.    Uh-hmm.

21       A.    -- he would have moved in the chair.

22 So it just lets us know if there's any movement on

23 their part.

24       Q.    Okay.  What is the second line

 1  measuring?

 2        A.    The second line is the one of the

 3  respiration parameters.  I believe that's the

 4  abdominal recording.

 5        Q.    What is the third line?

 6        A.    The third line is another respiration

 7  recording, which would have been the chest.

 8        Q.    Okay.  What is the fourth line?

 9        A.    The fourth line is a skinny little line

10  that's floating.  That's the galvanic skin

11  response, the little electrodes on the fingers, the

12  one that's floating there.

13        Q.    Got it.

14              So if you look at the very beginning

15  of the sheet before the activity starts, it's the

16  fourth line down, correct?

17        A.    Yep.

18        Q.    Okay.  And then what's the fifth final

19  line?

20        A.    And then the last one at the bottom

21  would be the blood pressure.

22        Q.    Okay.  Now, can you walk me through --

23  there's all these markings kind of within the

24  sheets.

 1                    Are these markings that you're

 2   making during the examination?

 3        A.    Yes.

 4        Q.    Can you explain what those markings are?

 5        A.    Sure.

 6                    The very first one here indicating,

 7   see the 20?

 8        Q.    Yep?

 9        A.    20, it's SU.  It means 20 sensitivity

10   units.  That's the adjustment for the GSR.  So you

11   can see how in the very beginning it's just a

12   straight line, and then it drops.  That's where it

13   was turned on.  And so it was set to 20, and then

14   right below the 20 to the right a little bit is an

15   X.

16                    Any X you see is going to be my

17   adjustment.  An X is the examiner's adjustment.  So

18   that X there means that we adjusted it back to

19   center, and then it kind of starts floating up a

20   little bit.

21                    There's going to -- at the very

22   bottom, you're going to see a 110 over 80.  You see

23   that?

24        Q.    Yes.

1        A.    Before the blood pressure.

2              The blood pressure cuff was inflated

3   to 100 pounds of pressure -- or I'm sorry --

4   110 pounds of pressure.  And then what we do is we

5   squeeze it out, we shake it out.  And kind of like

6   if the blood pressure cuff was here, once it's

7   inflated, we squeeze it out because the air will

8   get caught underneath between the cuff and the

9   clothing, so we kind of squeeze it out to squeeze

10  out any excess air (indicating).

11             So it's inflated to 110, and then

12  after it's squeezed out, it will drop to 80.

13       Q.    Okay.

14       A.    Or actually, I should say it didn't

15  drop completely to 80.  It would have -- after

16  squeezing out the air, it might have dropped to

17  maybe 100, and then we would release some of the

18  air.

19             We like it to be about 80 pounds of

20  pressure, because if it's too high, it gets

21  uncomfortable quicker.  So 80 is usually about what

22  we run it at, so that's what that is.

23       Q.    Okay.

24       A.    So it's inflated.  And then you see it

```
 1  starts to swing a little bit there, and then
 2  there's an X, my adjustment.  I brought it down.
 3  And then you notice there's a 70 at the bottom?
 4       Q.    Uh-hmm.
 5       A.    The cuff, for some reason, deflated
 6  from 80 to 70.  Well, it didn't -- let me rephrase
 7  that.
 8             It didn't deflate.  I deflated it.
 9             See the tracing, how big the blood
10  pressure tracing is?
11       Q.    Yes.
12       A.    It was too high.  So by lowering the
13  pressure, I brought the tracing -- made the tracing
14  a little bit smaller.  Does that make sense?
15       Q.    There's what looks to be an "R"
16  directly to the left of the part of the tracing you
17  were just describing.
18             Do you see that right here
19  (indicating)?
20       A.    It's actually an X.
21       Q.    Oh, that's an X too.
22       A.    Yeah, it's kind of a quick X.
23       Q.    So that's where you're making
24  adjustments as well.
```

 1          A.      Uh-huh.

 2                        And then to the left of that X, you

 3    see a TC to the left?  Right next to the -- you

 4    have the TC.

 5          Q.      Okay.

 6          A.      That's test chart.

 7          Q.      And what does test chart mean?

 8          A.      Test chart, we're just getting

 9    everything adjusted.

10          Q.      Just getting everything in order.

11          A.      So no questions or anything like that

12    are being asked.

13          Q.      And then is there an X to the left of

14    that TC?

15          A.      There is -- you mean up here

16    (indicating)?

17          Q.      Yes.

18          A.      Yeah.  It was an adjustment --

19          MS. THOMPSON:  Sorry.  Did the witness

20    indicate where he was saying up here?  Did he mark

21    something?

22          THE WITNESS:  See this second respiration

23    recording, there's a little X right there.

24          MS. THOMPSON:  Okay.

1          THE WITNESS:  I made an adjustment of the

2     respiration recording.  You see prior to the X

3     where the bottom of the breaths are?  They're above

4     the red line?

5     BY MS. RANUM:

6          Q.     Uh-hmm.

7          A.     So I just made the adjustment -- I

8     brought it down a little bit to where the bottoms

9     of the breaths now are on the red line.

10         Q.     Okay.

11         A.     Can you -- you can see it?

12         Q.     So you're just trying to get everything

13    in order.

14         A.     Trying to get it all straightened out

15    so it's a little bit maybe easier to read if

16    everything's straightened out.

17         Q.     And it looks like there might have been

18    an adjustment made on the first respirator line

19    that we discussed as well?

20         A.     Yes.

21         Q.     All right.  Can you tell from looking

22    at your chart at what point you actually start your

23    first straight through test?

24         A.     Yes.  After the test chart, the blood

 1  pressure was released, and so there's no air in the

 2  cuff.  And then there's that space between the

 3  blood pressure recordings.

 4          Q.    Okay.  The --

 5          A.    You see there's nothing --

 6          Q.    Where it's a straight line.

 7          A.    There's a straight line.  That's where

 8  I was giving him the instructions for the first

 9  straight through.

10          Q.    Okay.

11          A.    So, Bill, this first test we're going

12  to go through, I'm going to ask you those questions

13  just like we reviewed right in order from 1 to 10.

14          Q.    Okay.

15          A.    And then the cuff was inflated to 100,

16  it was shaken out, and then brought down to 70.

17                      See that?

18          Q.    Yes.

19          A.    So and then the test starts with the

20  first -- the markings at the very bottom underneath

21  the blood pressure are the questions that are being

22  asked.

23                      So you see No. 1 with the plus?

24          Q.    Yes.

1      A.    That's question No. 1 off of the

2  interview sheet:  Do they call you Bill?

3              Now, what you actually see is three

4  marks.  It looks like three slash lines.

5              The first slash line is when the

6  question is being read.

7      Q.    Okay.

8      A.    The second slash line is when the

9  question is complete.  And then we just put in

10  between the number of the question that was just

11  asked.

12              So if you go a little bit to the

13  right of that, you see No. 2.  So you've got the

14  slash where the question begins, the slash where

15  the question ends, and then right between the two

16  lines a little bit lower is the number 2.

17      Q.    Yes.

18      A.    And then he's either going to answer in

19  the affirmative or the negative.  So the plus is a

20  yes; the minus is a no.

21      Q.    Okay.  And is the location of the plus

22  or minus the point at which he responded?

23      A.    Correct.

24      Q.    Okay.  Above and to the right of where

1  you have 100 over 70 written --

2         A.    Yes.

3         Q.    -- it looks like you wrote something.

4  Is it --

5         A.    It's ST No. 1, straight through No. 1.

6         Q.    Got it.

7                So for straight through No. 1, for

8  question 1, where is his answer?

9                    Oh, I'm sorry.  I see it now.

10                   So for question 1, Bill Amor

11 answered in the affirmative, correct?

12        A.    Yes.

13                   Do they call you Bill?

14        Q.    For question 2, he answered in the

15 affirmative?

16        A.    Yes.

17        Q.    For question 3, he answered in the

18 negative?

19        A.    Yes.

20        Q.    For question 4, he answered in the

21 affirmative?

22        A.    Yes.

23        Q.    Question 5, he answered in the negative?

24        A.    Yes.

```
 1          Q.    Question 6, he answered in the negative?

 2          A.    Yes.

 3          Q.    Question 7, he answered in the

 4  affirmative?

 5          A.    Yes.

 6          Q.    Question 8, he answered in the negative?

 7          A.    Correct.

 8          Q.    Question 9, he answered in the negative?

 9          A.    Correct.

10          Q.    Question 11, he answered in the

11  negative?

12          A.    Yes.

13          Q.    Okay.  And then can you explain to

14  us -- so now this is the first test.

15                    What are we seeing after you

16  complete that first straight through test?

17          A.    When the test is done, we say that's

18  the last question.  And then you see a little check

19  mark at the end of the blood pressure recording?

20          Q.    Uh-hmm, yes.

21          A.    That means the test is over.

22                    And then the 74, the No. 74?

23          Q.    Yes.

24          A.    That is how much pressure was in the
```

1  cuff at the end.  And then right above the 74,

2  there's two little Xs.

3        Q.    Yep.

4        A.    The double X means that the blood

5  pressure cuff was released, the air was released.

6  And that's where it goes to the flat line then

7  again.

8              So now we're in between the first

9  straight through test, and the next one in line is

10 the card test.  And so this is where -- now I made

11 an adjustment on the galvanic skin response.  You

12 see the 30 equals SU?  So we started off with the

13 20 sensitivity units, and I increased it to 30 as

14 we began the card test.  The fourth line down, the

15 fourth recording -- tracing down, that floaty

16 little line?

17       Q.    Yes.

18       A.    You see the 30 SU?  It's kind of hard

19 to see.  You've got to go back to the card test.

20 Do you have the card test?

21       Q.    I don't think so.

22       MS. THOMPSON:  I wasn't seeing that either,

23 so --

24       THE WITNESS:  May I look and see if it's

```
 1   there?
 2          MS. RANUM:  Sure.
 3          THE WITNESS:  No, you don't have it.  They
 4   didn't copy it.  Nope.  They did not copy for you
 5   the card test.  It's missing.
 6                       So here, this is the test chart.
 7   That's what we just talked about.  Your straight
 8   through No. 1 starts here (indicating), it ends
 9   here (indicating).  And then next in line should be
10   the card test, but they skipped it and they jumped
11   right to the second straight through test.  So you
12   don't have a card test.
13          MS. RANUM:  Why don't we off the record for a
14   second.
15                       (Discussion off the record.)
16          MS. RANUM:  Back on the record.
17   BY MS. RANUM:
18          Q.    Okay.  Mr. Masokas, I believe you were
19   just testifying about where the card test commenced.
20          A.    Yes.
21          Q.    And can you please explain, there's a
22   marking here 300 or 30 --
23          A.    30.  The 30 is when we originally
24   adjusted everything at the beginning in the test
```

1  chart, I had set the GSR to 20 sensitivity units.

2                        And here now, starting the card

3  test, I increased the sensitivity from 20 to 30, so

4  I made the mark there.  And when I did that, it's

5  the fourth tracing from the top, that skinny little

6  line.

7                        See the 30?

8        Q.    Yes.

9        A.    Just left -- immediately left of the 30

10 is like a pen fluctuated up and down?

11       Q.    Yep.

12       A.    That's the GSR.

13                       And so when I adjusted it to 30, see

14 how it shot way up there?

15       Q.    Yes.

16       A.    And then there's an X.  I made an

17 adjustment.

18       Q.    Okay.

19       A.    Just brought it back down.

20                       And then to the right of the 30 SU,

21 you see that indication CT?  That just means card

22 test simply.

23                       And then right under the CT again is

24 where we're starting the test, and we inflate the

1   blood pressure cuff.  So it was initially inflated

2   to 100 and then shaken out to 70.

3        Q.    Okay.

4        A.    And then we started.

5              And so going along, and it only

6   lasted about a little bit over a minute or so.

7              And then at the end of the card

8   test, you see there's two Xs at the bottom by the

9   cardio, by the blood pressure?  Two Xs means that

10  the blood pressure cuff was deflated, the air was

11  let out to 72 at the bottom of the --

12       MS. CANONIE:  Right here.

13       THE WITNESS:  At the end of the card test,

14  the 72.  That's what the pressure was when the air

15  was let out.

16             And then just to the left of that is

17  the check mark, meaning the test is over.  You see

18  a circle around it?  The circle means that I left

19  the room.  So the test was over; I left the room.

20             Bill, I'm going to give your arm a

21  little rest here, and then I'll be back in a few

22  minutes.

23  BY MS. RANUM:

24       Q.    To the left of what you just described

 1  as the end of the card test, what are the numerical

 2  markings on the bottom of the page?

 3        A.    The numbers at the bottom are the

 4  numbers that were called in regards to the cards.

 5  So if you go to the beginning of the card test,

 6  you'll see No. 2.  That was the first card that was

 7  called.

 8                  Did you pick card No. 2?  He said

 9  no.

10                  Did you pick card 7?  He said no.

11                  Did you pick card 4?  He said no.

12                  And then it was underlined, because

13  that was his card.

14                  Next to that, Did you pick card

15  No. 8?  He said no.

16                  And then one more time, Did you pick

17  card No. 4?  He said no.

18                  And it was underlined, because that

19  was his card.

20                  So, And, Bill, the test is over.  It

21  appears as though you picked card No. 4.  Is that

22  the card you chose?  And he said yes.

23                  And so then at that point I just

24  told him, We're going to take a break.  I'll give

1   your arm a little rest.  I'll be back in a few

2   minutes, and we'll start again.

3       Q.    Okay.  So then when you come back in

4   the room -- how long do you think you left the room

5   for?

6       A.    Probably no more than 5 minutes.

7       Q.    And when you came back in the room, it

8   looks like there's this marking ST 2.

9                 Is that where you started straight

10  through test No. 2?

11      A.    Yes.

12                And you see the same markings at the

13  bottom.  The blood pressure cuff was inflated to

14  100, we shook it out to 70, and then that's where

15  the test started.

16                That fourth line down, that GSR line

17  again, see how it's kind of falling and falling?  I

18  made an adjustment and I moved it up.  I didn't

19  want it to interfere with the blood pressure, so I

20  adjusted it up.  And then we started, and it was

21  right in order, just like the first test.

22      Q.    Okay.  And so he was asked question

23  No. 1 and answered in the affirmative, correct?

24      A.    Yes.

 1        Q.    And No. 2, he answered in the

 2   affirmative?

 3        A.    Yes.

 4        Q.    And No. 3, he answered in the negative?

 5        A.    Yes.

 6        Q.    And No. 4, he answered in the

 7   affirmative?

 8        A.    Yes.

 9        Q.    And No. 5, he answered in the negative?

10        A.    Yes.

11        Q.    No. 6, he answered in the negative?

12        A.    Yes.

13        Q.    No. 7, he answered in the affirmative?

14        A.    Yes.

15        Q.    Now, did you have to make an adjustment

16   after question 7?

17        A.    Yes.

18        Q.    What was the adjustment you made?

19        A.     In the blood pressure, it started --

20   the blood pressure was going up, and I didn't want

21   it to interfere with the GSR recording, so I

22   brought it down.  I made the adjustment, and that's

23   my X to indicate that.

24        Q.    Okay.  And then question 8 was

```
 1   answered -- or was asked, and he answered in the

 2   negative?

 3        A.    Yes.

 4        Q.    Question 9 was asked, and he answered

 5   in the negative?

 6        A.    Yes.

 7        Q.    Question 11 was asked, and he answered

 8   in the negative?

 9        A.    Yes.

10        Q.    You already testified for straight

11   through test No. 1 that the first slash is when you

12   start reading the question; the second slash is

13   when you complete the question.

14             Is that true for this test as well?

15        A.    Yes.

16        Q.    And just like straight through test

17   No. 1 where you indicate the marking of a negative

18   sign or a positive sign is where he actually

19   started to give his answer, correct?

20        A.    Yes.

21        Q.    Okay.  Now, can you describe for us

22   where straight through test No. 2 officially

23   concludes?

24        A.    Yeah, yes.
```

```
 1                After he was read question 11, you
 2   see where the blood pressure just kind of
 3   disappears and goes through the straight line
 4   again?
 5        Q.    Yes.
 6        A.    That was the end of the test.  The
 7   double X means the air was released from the cuff.
 8   The number 74, that was how much pressure was in
 9   the cuff at the end of the test, and then the X
10   meaning the test was complete.
11                And so what I just described until
12   the next tracing of the blood pressure, this all in
13   between is just the in-between where we're giving
14   him instructions for the next test.
15        Q.    Okay.  There's a notation on here.  I
16   can't tell what it says.  It looks like it says
17   wipe?
18        A.    Yeah, wipe, and it's got an S with a
19   circle, subject.  Wiped the subject's fingers.
20                There was a lack of response in the
21   GSR recording.  It's just diving.  There was
22   nothing going on here.
23                At the end of the second straight
24   through that we just described, do you see it?
```

1    Q.    Yes.

2    A.    Where I let the air out of the cuff?

3  See where the blood pressure cuff is deflated

4  (indicating)?

5    Q.    Yes.

6    A.    Right above that, go right above that

7  to the floaty little line, the fourth line down.

8  You see how it goes up?

9    Q.    Yes.

10   A.    That was -- he responded to that.  That

11 was actually a response because the cuff was

12 released.  That's what we look for in the GSR on

13 questions is responses like this.

14            And so during the second straight

15 through, there was nothing.  The GSR just kept

16 falling and falling and falling.

17            So sometimes what happens with the

18 subject if their hands are sweaty, we won't get any

19 response, and so we'll wipe their fingers off to

20 dry out their fingers just to see if that might be

21 what's causing that.

22            And so at that point I took the

23 electrodes off his fingers, and I took a Kleenex

24 and wiped his fingers, in case it was perspiration,

1   and then reattached.

2                   So that's, wiped subject's fingers.

3   And then again, I made an adjustment.  At the

4   beginning of the second straight through, I

5   adjusted the GSR from 20 to 30 now because of the

6   lack of any type of response.  I adjusted it again

7   from 30 to 40, so that's the 40 SU.

8        Q.    Okay.

9        A.    And then to the right of that is SAT.

10  That's the test.  This is a silent answer test.

11       Q.    Okay.

12       A.    And that's where the test begins.

13                  He's been given the instructions,

14  and so where you see the blood pressure gets thick

15  again, that's where the test started, and you'll

16  see No. 1, the bottom.

17       Q.    Okay.  Now, I believe you already said

18  that the silent answer test, the questions are also

19  asked in the same straight through numerical order,

20  correct?

21       A.    Yes.

22       Q.    And so on this test, there's obviously

23  no answer to record, but are the two slash marks we

24  see consistent with what you've done with the other

1  tests?  The first slash mark is where you start

2  reading the question; the second slash mark is

3  where you complete the question?

4       A.    Yes.

5       Q.    And then do you just give a pause?  How

6  long do you wait before you ask the next question?

7       A.    With the control questions and the

8  relevant questions, we will wait anywhere from

9  maybe 20 to 30 seconds before we ask.  With the

10 irrelevant questions, usually maybe about 10 to 15.

11 It's a little bit shorter time.

12      Q.    So following -- I just want to make

13 sure I'm clear.

14            Following an irrelevant question,

15 how long do you typically pause?

16      A.    10 to 15.

17      Q.    Following a relevant question, how long

18 do you typically pause?

19      A.    20 to 30.

20      Q.    Following a control question, how long

21 do you pause?

22      A.    20 to 30.

23      Q.    Okay.

24      A.    So we go through the silent answer

1   test.

2                    And then again, where you see the

3   blood pressure, it kind of -- the black marking

4   disappears, we got the straight line.  That was the

5   end of the test, end of the straight through.

6                    See again on the line is a double X,

7   meaning the cuff was deflated.  The check mark

8   which means the test was over.  He was informed,

9   Bill, that's the last question, the test is over.

10                   And then the number 76, that was the

11  pressure in the cuff when it was deflated.

12       Q.    Okay.

13       A.    Moving along, you're going to see a

14  circle with a GSS in it?

15       Q.    Yes.

16       A.    That stands for general stimulation.

17                   And what we'll do, if we feel we're

18  not getting any dramatic responses, they might be

19  subtle, which is what we were getting up to this

20  point.  There was responses, but they were more

21  subtle.

22                   Sometimes we'll give a general

23  stimulation to where before we started the mixed

24  question test, which is the next test in line --

1  you see the MQ -- I asked him, I said:  Bill, out

2  of all of the questions that we've been covering on

3  the polygraph, are there any questions that are

4  bothering you?  Any questions that you feel you

5  want to change, just to get him to think.

6                    And so he said no.

7                    And so that was this general

8  stimulation prior to that test, and then we started

9  the test.

10      Q.    So you asked that question where it's

11  marked GSS?

12      A.    Yes.

13      Q.    How can you tell he answered no?

14      A.    Because all the questions are the same.

15  The question was:  Is there any question bothering

16  you?  Anything you want to change?

17                    And there would have been -- if

18  there was a change -- for example, let's say he

19  changed the control question No. 6.  Maybe he

20  wanted to add something besides stealing.  What we

21  would be marking then is 6A.

22      Q.    Ah, okay.

23      A.    Because the question would have been

24  changed.

(Case: 1:18-cv-02523 Document #: 141-6 Filed: 12/18/21 Page 109 of 361 PageID #:3853)

1      Q.    Got it.

2      A.    So now it's a new question.

3            And so all the questions are the

4   same, so there would have been no additions to

5   anything or no changes.

6      Q.    Okay.  And then you gave your

7   instructions and started your mixed question test,

8   correct?

9      A.    Yes.

10           And it was all the way through.

11  There was an adjustment again.  You see on the GSR,

12  that floaty little line in the middle, it kept

13  diving.  And so it was starting to get kind of in

14  the way with the cardio, so I made the adjustment,

15  moved it back to the middle, and continued on.

16           And then at the end, you see where

17  the cuff gets deflated.  That's the end of the

18  mixed question test.

19     Q.    Okay.  So in terms of the questions

20  that were asked, the order that they were asked in,

21  the first question you asked him was question

22  No. 9; is that correct?

23     A.    7.

24           Well, are you talking about

Urlaub Bowen & Associates, Inc.   312-781-9586

1  irrelevant or relevant?  Because the very, very

2  first question of the test would have been No. 7.

3                  See where the cardio is inflated

4  right away?

5       Q.    Yeah.  Maybe it's just our copy doesn't

6  show it.

7       MS. CANONIE:  It's his handwriting.  It's 7.

8  BY MS. RANUM:

9       Q.    Oh.

10      A.    Yeah, that's a 7.

11      Q.    Got it.

12                  So you asked question 7?

13      A.    Yes, ma'am.

14      Q.    And he answered in the affirmative,

15  correct?

16      A.    Yes.

17      Q.    What was the next question you asked?

18      A.    No. 4.

19      Q.    And Bill answered in the affirmative,

20  correct?

21      A.    Yes.

22      Q.    And just like the other tests, the

23  first slash signifies when you start answering the

24  question, correct?

```
 1          A.    Yes.

 2          Q.    The second question signifies when you

 3    finish reading the question?

 4          A.    Yes.

 5          Q.    And the plus or minus sign signifies

 6    where he begins his answer, correct?

 7          A.    Correct.

 8          Q.    The next question you asked was

 9    question No. 9?

10          A.    Yes.

11          Q.    He answered in the negative, correct?

12          A.    Yes.

13          Q.    Next question you asked was question 2?

14          A.    Yes.

15          Q.    And he answered in the affirmative?

16          A.    Yes.

17          Q.    Next question you asked was question 3?

18          A.    Yes.

19          Q.    And he answered in the negative?

20          A.    Yes.

21          Q.    The next question you asked was

22    question 6?

23          A.    Yes.

24          Q.    And he answered in the negative?
```

1        A.    Yes.

2        Q.    Was there some sort of adjustment made

3   after question 6?

4        A.    Correct.  That was my adjustment for

5   cardio.  The blood pressure recording was -- it was

6   going up, and so I brought it back down.  And

7   that's my X, my adjustment.

8              And then a little bit to the right

9   of that, there's another adjustment in the GSR

10  recording.  It started -- was diving, getting too

11  close to the blood pressure, so I adjusted it back

12  up, and that's my X.

13       Q.    Now, so you made the adjustment to the

14  cardio after question 6, correct?

15       A.    Yes.

16       Q.    And then after that adjustment, you

17  asked question No. 5, correct?

18       A.    Yes.

19       Q.    And he answered in the negative?

20       A.    Yes.

21       Q.    And then after question 5, you made the

22  adjustment to the GSR that you've just described,

23  correct?

24       A.    Yes.

1       Q.    And then you asked question 11?

2       A.    Yes.

3       Q.    And he answered in the negative?

4       A.    Yes.

5       Q.    And you asked question 8?

6       A.    Yes.

7       Q.    And he answered in the negative?

8       A.    Yes.

9       Q.    And then you asked question 6?

10      A.    Yes.

11      Q.    And he answered in the negative?

12      A.    Correct.

13      Q.    And was that the last question that you

14  asked in the mixed question test?

15      A.    Yes.

16      Q.    Okay.  And then can you describe for us

17  how that test concluded in terms of your chart?

18      A.    Yes.  Where you see again the cardio

19  tracing, it got small, and then now you just have

20  that line.  The air was released from the cuff.

21  The double X again indicates that the air was

22  released from the cuff.  The check mark means the

23  test is over.  He was instructed that that was the

24  last question.  The test is over.

```
 1                    And then the 76 again is the
 2    pressure that was in the cuff at the time it was
 3    released.
 4           Q.    Okay.
 5           A.    And then it continues on to the final
 6    test, which was the yes test.
 7           Q.    All right.  Now, the yes test,
 8    why did you give the yes test?
 9           A.    The yes test was given -- can we go
10    back to the card test?
11           Q.    Yes.
12           A.    Go back to the card test.
13                    If you look at the very first time
14    his card was called, No. 4 --
15           Q.    Yep.
16           A.    -- you see the breath?  If you go up to
17    the second -- well, one, two, three, the third
18    tracing down, which is also the second.
19           Q.    Second abdominal?
20           A.    Yes.
21                    See the big breath (indicating)?
22    Like he took -- that breath is a lot bigger than
23    everything else?
24           Q.    Yes.
```

 1        A.    Does that make sense?

 2              That -- he did that when his card

 3   was called.  He didn't appear to do that really --

 4   that dramatic of a breath, he didn't appear to do

 5   that anywhere else.

 6        Q.    Okay.

 7        A.    Now, from our experience, sometimes

 8   subjects will try to manipulate the test in

 9   order -- in other words, they'll try to, for lack

10   of a better term, beat the test by trying to make

11   it look like a lie, make it different than what

12   their real lies are, so to speak.  And so

13   oftentimes, this is the test that they'll try to

14   manipulate.

15        Q.    The card test?

16        A.    Yes.

17        Q.    Okay.

18        A.    Because we tell them -- we tell them,

19   When I call off your card, say no to it.

20              Oh, you want me to lie to my card?

21              Yes, I want you to lie to your card.

22              So then when they lie to the card,

23   sometimes if they're trying to manipulate, they'll

24   try to make it look different.  This is what the

1  lie looks like.

2                      I like to compare it to a

3  Breathalyzer.  If you're asked to take a

4  Breathalyzer, you have to blow for a certain amount

5  of time.  Well, if I don't want them to be able to

6  get a reading, as I start to blow, I cough

7  (indicating).

8                      And then I'm instructed, All right.

9  We have to do it again.  Try not to cough.  Just

10 keep blowing until I tell you.

11                     Well, now I start to blow

12 (indicating), and I sneeze.

13                     All right.  We've got to do it a

14 third time.  Try not to sneeze, try not to cough,

15 and just keep blowing until I tell you.

16                     The third time, I do something else.

17                     And the reason I'm doing this is

18 because I know I've been drinking, and I don't want

19 you to get a result on the Breathalyzer.  It's a

20 deliberate manipulation.  We see oftentimes the

21 same thing on the polygraph.

22                     And so because he did this the first

23 time -- now the second time the number was called,

24 he didn't do it, and so it's not consistent.  So I

1  ran the card test just as a precaution just to see

2  if he was trying to do anything to manipulate his

3  test.

4        Q.    Now, you said the card test.  You mean

5  the yes test?

6        A.    The yes test.

7        MS. THOMPSON:  Sorry.  You guys were talking

8  over each other.  I couldn't hear that.

9        THE WITNESS:  My mistake, sorry.

10       MS. THOMPSON:  Could you read back the

11 question?

12                    (Discussion off the record.)

13       MS. RANUM:  We can clear it up.

14 BY MS. RANUM:

15       Q.    So during the card test, you saw this

16 spike in his respiration when his card was called

17 the first time, correct?

18       A.    Yes.

19       Q.    And that signaled to you that it could

20 be an indicator that he was trying to manipulate

21 the test, correct?

22       A.    Possibly, yes.

23       Q.    And so that prompted you to do the

24 yes test after the mixed question test, correct?

```
 1        A.    Yes.
 2        Q.    Okay.  So now we can talk about the
 3  yes test.
 4        A.    So this is the test where we eliminate
 5  the control questions.
 6              So question 6 and question 11 were
 7  dropped out.
 8        Q.    Okay.
 9        A.    And he was instructed to that, that
10  we're not going to ask these two questions.  And on
11  all of the questions, he was instructed to answer
12  yes, including the ones about the fire.
13              So as you see, we started the yes
14  test.  You see YT.  We inflated the -- I inflated
15  the blood pressure cuff at the bottom, 100, and
16  then shook it out to 70.  And then we started the
17  test.
18              The first question, again -- and
19  he's instructed also, I should say, I'm going to go
20  straight down the list, just like we did before.
21        Q.    Straight through.
22        A.    Straight through, right down the list.
23              So he was asked No. 1; he answered
24  in the affirmative.
```

1          Q.    And let me just interject for a moment.

2                    So as you have said for the other

3     tests, the first slash indicates when you started

4     reading the question, correct?

5          A.    Yes.

6          Q.    Second slash is when you finished

7     reading the question, correct?

8          A.    Yes.

9          Q.    And the plus or minus sign is where he

10    started his answer, correct?

11         A.    Yes.

12         Q.    So now you can go through the

13    questions, please.

14         A.    So the first question he answered in

15    the affirmative; second question he also answered

16    in the affirmative; the third question, also in the

17    affirmative; question No. 4, he answered yes;

18    question 5, he answered in the affirmative.

19                    And then right after question 5, I

20    made an adjustment again to the GSR.  It just kept

21    dropping, and it was interfering with the blood

22    pressure.  So I adjusted it back up to center, and

23    that's my X.

24                    And then he was asked question 7,

1   and he answered in the affirmative.

2                   Question -- the next question was

3   No. 8.  He answered in the affirmative.

4                   Question 9, he answered in the

5   affirmative.

6                   And then the last question was a

7   repeat, and he was asked question 1 again, and he

8   answered in the affirmative.

9       Q.    Okay.  And that was the last test in

10  the examination, correct?

11      A.    Yes.

12      Q.    And so then can you describe for us

13  what the 76 at the end means?

14      A.    Sure.

15                  The 76 at the bottom was the

16  pressure in the cuff at the time it was deflated.

17  The double X indicates that the cuff was in fact

18  deflated; air was released.  And then the check

19  mark was the end of the test, and the circle around

20  the check mark is where I stepped out of the room.

21      Q.    Okay.

22      A.    And before I stepped out, once I tore

23  the tracings off the polygraph, I folded them up

24  and had him sign the bottom.

```
 1        Q.    Okay.  And then at that point you take
 2   your chart, I assume, to go do your evaluation of
 3   the test, correct?
 4        A.    Yes.
 5        Q.    Okay.  Where did you -- would you call
 6   it a scoring or an evaluation?
 7        A.    We -- scoring, that's what we usually
 8   say.
 9        Q.    Where do you score the test at?
10        A.    It's on the front.
11              Oh, you mean in the office you mean?
12        Q.    Yes.
13        A.    It would have been back at my office.
14        Q.    Okay.  And when you're scoring the
15   test, do you have the chart in front of you that
16   was the printout from the polygraph machine that
17   we're looking at in Exhibit 5, correct?
18        A.    Yes.
19        Q.    And then you also have the questions
20   that you wrote out that we've looked at in
21   Exhibit 4, correct?
22        A.    Yes.
23        Q.    Do you have anything else with you when
24   you're scoring the test?
```

 1        A.    That's it.

 2        Q.    Do you score the test alone?

 3        A.    Not necessarily.  I mean, somebody may

 4   be sitting in the room with me.  But I would

 5   initially score it, and then I may have someone

 6   else look at it as a second opinion.

 7        Q.    Okay.  So now I'd like to understand

 8   how you scored the test.

 9              So if you could explain to us, you

10   take Exhibit 4 and Exhibit 5 into your office, and

11   how do you go about scoring the test?

12        A.    John Reid & Associates uses what's

13   called a visual inspection.  And what that simply

14   means is we go through the chart, and we will

15   use -- it was a check mark system.  And so imagine

16   you're making a check mark.  The lighter the check

17   mark, the less of a response; the darker the check

18   mark, the stronger, the more dramatic a response.

19        Q.    Okay.

20        A.    So again, visual.  We're just kind of

21   indicating what we're seeing.

22        Q.    So the check marks you're describing,

23   are those check marks that you are making in that

24   left-hand column on Exhibit 4?

1          A.     Yes.

2          Q.     So that's where you're signifying those

3    responses to the extent that you're observing them?

4          A.     Yes.

5          Q.     All right.  So the first thing I want

6    to understand, there's these columns, and there's

7    four columns where I see some form of a check mark

8    in it.

9          A.     Yes.

10         Q.     So which test does each column

11   correspond to?

12         A.     We would go from -- down the columns.

13   As you're looking at those columns, we're going

14   from left -- I'm sorry -- from right to left.

15         Q.     Oh, okay.

16         A.     So you see the numbers -- 1, 2, 3, 4,

17   5 -- all the way down to 11.  The first column to

18   the left of the numbers would be straight through

19   No. 1.

20         Q.     Okay.

21         A.     The second column down is straight

22   through No. 2.

23         Q.     Okay.

24         A.     The third column would be the silent

1  answer test.  And then the last one is the mixed

2  question test.

3       Q.    Now, does the yes test not get scored

4  on the columns in Exhibit 4?

5       A.    That is correct.

6       Q.    And why is that?

7       A.    Because we're not utilizing the yes

8  test for scoring purposes.  The purpose of the yes

9  test -- the primary purpose of the yes test is to

10  see if they're going to manipulate it.

11       Q.    Okay.  And what were the results to the

12  yes test in your opinion?

13       A.    It was questionable.

14       Q.    Okay.

15       A.    His breathing, he was breathing quite a

16  bit faster on the one yes test than he was

17  throughout the entire test.  If you were to count

18  the breaths on the first straight through, on the

19  card test, on the second straight through, on the

20  silent answer test, and on the mixed question, if

21  you would count those out, he was breathing between

22  maybe 18 and 22 breaths per minute on all of those

23  tests.

24            And then on the yes test, he was

1  breathing between 24 and 26 breaths per minute.

2        Q.    And okay.  Is that indicated anywhere

3  on here --

4        A.    No.

5        Q.    -- or are those the numbers if you were

6  to count it out?

7        A.    That's if you were just counting.  It

8  wasn't indicated.

9              So the question then in our mind is

10  why on that one test is there such a big difference

11  in his respirations when everything else was

12  consistent.  And so it raises a little bit of a

13  concern for us.  Was he intentionally trying to

14  manipulate that?

15             Now, we didn't go as far as

16  reporting that because we weren't certain.  But in

17  our mind, it was suspicious.

18        Q.    Okay.  So let's just go in order.

19             So straight through test No. 1, can

20  you explain for us what your scoring was there?

21  Why you made the check marks that you did?

22        A.    Yes.  If you look at No. 3 in the

23  straight through No. 1, you see question 3 at the

24  bottom.  It may be a little hard for you to see,

1  but where his answer is, where he says no, if you

2  kind of go straight up, you've got to try to see

3  where his answer was on the breath.

4                    And what had happened was he

5  answered no, and then there's a baseline change.

6  You see the second respiration parameter?

7      Q.    Yes.

8      A.    If you look just prior to the question

9  how at the bottom of the tracing is on the red

10 line --

11     Q.    Yes.

12     A.    -- and then once we start to ask the

13 question, then he answers, all of a sudden now his

14 baseline dropped.

15                    Can you see it?

16     Q.    Yes.

17     A.    It's under the red line.

18     Q.    Yep.

19     A.    And that was when he answered the

20 question.  So that's a baseline response.  His

21 breathing, his respiration has changed, so he got a

22 question mark -- or a check.

23                    A check mark alone indicates that

24 there's only a response in the respiration.  So if

 1  you see just a check mark, that means there was a

 2  response in the respiration channel or recording.

 3       Q.    What about the fact that the check mark

 4  is circled?

 5       A.    The circle means it's the very first

 6  relevant question being asked.

 7                  So you see No. 3 is circled three

 8  times?

 9       Q.    Yes.

10       A.    Every single -- the first straight

11  through, the second straight through, and the

12  silent answer test, we went right down the list

13  chronologically -- 1, 2, 3, 4, 5, 6, 7, 8 -- 1, 2,

14  3, 4, 5, 6, 7, 8 -- 1, 2, 3, 4, 5 ...

15                  And so No. 3 was the very first

16  relevant question asked on each one of those tests,

17  so it's indicated by the circle.

18                  And if you look at the last column,

19  the mixed question test, can you tell which

20  number -- which question, relevant question was the

21  first one asked?  No. 9.

22                  So it's -- the circles always

23  indicate that's going to be the first relevant

24  question that was asked on the test.

1       Q.    Okay.  Now, what about -- I think you

2   made a comment about like the check marks, how dark

3   they are on the sheet?

4       A.    Yeah.  It's like the lighter the check,

5   the less dramatic of the response; the darker the

6   check, the more significant the response.

7       Q.    Okay.  So how significant was that

8   response on question No. 3 in the silent answer

9   test No. 1?

10      A.    It wasn't -- it wasn't super

11  significant.  I mean, you could see the check is

12  fairly light.  It's kind of like if you would --

13  like in a broken bone, is it a severe break, or is

14  it just a hairline fracture?  Kind of like that.

15  They're both broke, but one's more significant than

16  the other.

17      Q.    Okay.  Now, what is the next thing that

18  you signify from straight through test No. 1 in

19  your observations?

20      A.    What we do is we look at the relevant

21  questions and the control questions.  So the next

22  one is relevant question No. 5, and I have a very

23  light check mark as far as just a minimal

24  respiration response.  It's not super significant.

1   We look at amplitude, the height.  We look at the

2   duration.  Sometimes like if you give a slower

3   exhale, it would be (indicating), as opposed to

4   somebody who's (indicating).  So it's reflected on

5   the charts.

6              So we're looking at the height,

7   which is the amplitude; we're looking at the

8   duration as far as is it drawn out.

9              And so here, it's drawn out a little

10  bit the duration, just slightly.  So it's a very

11  light check.

12      Q.    Okay.  And then you look at No. 6, your

13  control question?

14      A.    No. 6 is a control question.  You can

15  see No. 6 is actually a little bit more significant

16  than No. 5 on that first straight through.

17              No. 6, if you -- you see his answer,

18  you go up to see where he kind of answered on the

19  breath, and then that first breath right after his

20  answer is rounded on the second parameter.  The

21  second respiration, you see how it kind of rounds

22  at the top?

23      Q.    Yes.

24      A.    Then you go up to the top respiration,

```
 1   and it kind of drags out a little bit longer.
 2                   So I actually gave him a little bit
 3   more of a respiration response on 6 than on 5 that
 4   first time through.
 5        Q.    And then you go to question No. --
 6        A.    8.
 7        Q.    -- 8.
 8        A.    Which is another relevant question and
 9   again very, very light; very minimal response.  Not
10   much there.
11                   You can see again it's the baseline.
12   If you take his answer, you go up, and you try to
13   see where his answer was on the breath, there's a
14   little bit of a baseline rise.  It's right here
15   (indicating) at the bottom, kind of comes off the
16   red line a little bit.  The first breath is a
17   little bit drawn out.
18                   So again, it's not a big response.
19   It's minimal, so he got a light check there.
20        Q.    Next is question 9?
21        A.    Yep.
22                   Question 9, a little bit -- maybe
23   even a little bit stronger than question 8 as far
24   as the respiration goes.  Again, you've got to go
```

1  up to see where his answer was in the breath.  And

2  then it's drawn out a little bit.  It's rounded

3  off.  The next breath is rounded off at the top.

4              Again, this is not real dramatic,

5  not real significant, but there's a little bit

6  there.  More so on 9 than on 11, and so 11 got a

7  very light check.  And that's it.

8              And we did the same thing on the

9  others.

10      Q.    Okay.  So then for straight through

11  test No. 2, obviously No. 3 is yet again the first

12  question asked, so you've circled that check mark.

13      A.    It's the first relevant question, yes.

14      Q.    First relevant question.

15      A.    So again, he got a light check.  It's

16  circled.  This check is just a little bit darker

17  than the first.  You can see again -- if you go up,

18  you can almost see better at the top respiration,

19  you see the little -- almost like a little notch?

20  If you go to his answer on No. 3 and you take your

21  pen, and you just kind of point it up (indicating),

22  see the top respiration?

23      Q.    Yep.

24      A.    There's a little notch at the top?

1        Q.      Yes.

2        A.      That's where he answered.

3                So and then the first breath after

4   that, it's kind of -- it drags out a little bit on

5   the exhale.  But if you go to the second

6   respiration recording right under it, that first

7   breath after the answer is rounded, see how -- it's

8   more rounded than some of the others, but it's more

9   suppressed and it drags out.  Again, the duration

10  is -- drags it out a little bit.  Not

11  significantly.  That's why the check isn't that

12  dark, but there's something there.

13               Question 5, if you go to question 5

14  is -- you see question 5 and then his answer.

15  What's interesting about question 5 is the blood

16  pressure.  He answers the question -- if you put

17  your pen on the answer, it's right when he answers

18  the question, there's that increase.  Can you see

19  it?

20       Q.      Yes.

21       A.      And it's right when he answered the

22  question.  The blood pressure goes up.  There's a

23  slight response in the respiration.

24               And so because if you notice now on

1   the evaluation sheet, No. 5 the second time

2   through, there's a check and a plus.  The plus

3   means that there were responses in both respiration

4   and blood pressure.

5        Q.    Okay.

6        MR. NYESTE:  Your plus looks like an X; is

7   that true?

8        THE WITNESS:  Im sorry?

9        MR. NYESTE:  Your plus looks like an X; is

10  that fair?

11       THE WITNESS:  Yeah, yeah.  It kind of looks

12  like a little X, but it's supposed to be a plus.

13             And then we go to question 6, and

14  there's really nothing going on at question 6.  As

15  a matter of fact, his blood pressure almost starts

16  to come back down.  It's like -- it's as if he's

17  relieving.  Like he hears the question 5, blood

18  pressure shoots up, and then when we get to 6, it

19  almost starts to drop a little bit.  And so there's

20  really not much going on at all in the breathing.

21  So that's why we didn't give him anything, or

22  that's why I didn't give him anything on No. 6 the

23  second time through.

24             Then if you go to 8, question 8,

 1  it's a little bit -- again, not very significant,

 2  but there's a little bit of a respiration response,

 3  so you got a light check again.

 4               And No. 9, No. 9 you got a fairly

 5  dark check or darker, because if you look at the

 6  second parameter -- sorry -- the second respiration

 7  recording, the bottom part that's closest to the

 8  red line, he's got a pretty good significant

 9  baseline rise here.  It goes up and then it comes

10  back down.

11               And then on the top respiration too,

12  there's just a little bit of a -- he drags out his

13  breath a little bit there at the top, but it's more

14  in the second one.

15  BY MS. RANUM:

16       Q.    Okay.

17       A.    And then nothing on 11.  There's really

18  nothing there.

19       Q.    Okay.  And next is the silent answer

20  test.

21       A.    Next is the silent answer test.  Same

22  thing.

23               So again, we go in order.  We start

24  off, the first relevant question is question 3.

1   There's a little bit on the second respiration.

2   Again, he kind of drags it out a little bit, but

3   again, it's not real significant.  That's why the

4   light check mark, it's circled.  It's the first

5   question.

6              But if you go now to question 5 on

7   the silent answer, if you were to put your pen --

8   the second respiration, if you were to put your pen

9   at the very top of the breaths and then you look at

10  his breathing on question 5, you can see how

11  suppressed it is.

12      Q.    (Nodding.)

13      A.    I don't know how apparent that is, but

14  question 5, it's quite lengthy.

15             Now, there's several breaths that

16  are suppressed at question 5 on that second

17  respiration.  And not only are they suppressed, but

18  the duration, he drags them out a little bit more.

19             And also he's got blood pressure, it

20  starts -- because he's thinking the answer, there's

21  really not an indicator as to when he's answering.

22  But when question 5 is read, it just -- his blood

23  pressure starts to go up, so that's why he got the

24  plus and the check.

1                    Do you see it?

2         Q.    Yes.

3         A.    And then at 6, question 6, which is the

4    control question, there is -- the blood pressure

5    continues to rise.  It almost levels out right

6    before 6, but then it continues to go up once he's

7    read No. 6.  And so I did give him a blood pressure

8    response at 6.

9                    8 --

10        MR. NYESTE:  Excuse me.  That's a B and a

11   check.

12        THE WITNESS:  Yes.  A "B" and a check is just

13   a blood pressure response.

14   BY MS. RANUM:

15        Q.    I thought the plus was a blood pressure

16   response.

17        A.    A check and a plus is blood pressure

18   and respiration.

19        Q.    Ah, okay.

20        A.    A check with just the B is just a blood

21   pressure response by itself.

22        Q.    And then a check by itself is a

23   respiration response --

24        A.    Alone.

1      Q.     -- by itself?

2      A.     That is correct.

3      Q.     Okay.

4      A.     I mean, it sounds confusing, but when

5 you do it half a dozen times --

6      Q.     Sure.

7      A.     -- it's -- yeah, it's not super hard.

8             And then question 8, there's really

9 nothing going on -- well, there's really no

10 response at question 8.

11     Q.     Okay.

12     A.     Question No. 8, there's really not a

13 response at all in respiration or blood pressure,

14 and so if you'll notice on my sheet, I didn't even

15 mark a response for question 8.

16     Q.     Okay.

17     A.     Question 9, however, the cardio again

18 is suppressed on the second cardio -- or I'm sorry.

19 The second respiration, if you put your pen on the

20 tops of the breaths and then you look at where

21 question 9 was read, right following question 9 is

22 he's got a pretty good suppression there, if you

23 lay your pen across the top where you mark a line.

24     Q.     Yeah.

```
 1          A.    And it's drawn out.  You see several
 2  breaths are kind of rounded off there.
 3                And then question 11, almost he goes
 4  back to normal.
 5          Q.    Okay.
 6          A.    And then the last is the mixed question
 7  where we mixed up the order.
 8                So the first relevant question on
 9  the mixed question, that would be the one that's
10  circled, which is actually No. 9.  And he's got a
11  fairly dramatic, not super, but fairly dramatic
12  respiration response.  The baseline changes a
13  little bit.  The duration is drawn out a little
14  bit, so he got a check mark.
15                No. 3 is the next relevant question.
16  There's -- if you notice again where his answer on
17  the question, on the blood pressure tracing when he
18  answers "no" to No. 3, there's a blood pressure
19  increase?  See how it starts going up?
20          Q.    Yes.
21          A.    So on No. 3, he got the B.
22          Q.    Okay.  Is there another notation above
23  the B?
24          A.    Yes.  It's the No. 6.  Because on the
```

1   mixed question test, we now compare the relevant

2   questions to the control question.  This is where

3   we put them back to back.

4        Q.    Okay.

5        A.    So the 6 above question 3 there, it

6   means that there was a stronger response on 3 than

7   there was on 6.

8        Q.    Okay.

9        A.    So in other words, there was a stronger

10  response to the relevant question 3 than the

11  control question in 6.

12       Q.    With regard to his blood pressure.

13       A.    Overall.

14       Q.    Overall.

15       A.    Yeah, because at 6, we've got no

16  response indicated at all.

17       Q.    Okay.

18       A.    So we would say question 3 is stronger

19  than question 6 on that particular response or

20  test.

21             And then continuing on, the next one

22  is No. 5.  And again, with question 5, if you look

23  at the second respiration, at question 5 you see

24  his answer, and if you take your pen and you put

1  your pen right on the answer and go up, you can see

2  where he answered the question.  But on the second

3  respiration, the bottom part of it?  See how it

4  comes off the red line?

5       Q.    Yes.

6       A.    And then there's a baseline rise there.

7  And then it starts to come back to normal again.

8              As well as if you put your pen there

9  where his answer is, you can see right after he

10  answers, the blood pressure starts going up again.

11  And so that's why he got the check and the plus.

12  There's a response in respiration.  There's a

13  response in blood pressure.

14              And then we compare that with

15  question 11, which is the next question, and

16  there's not much at question 11 at all considering

17  where he answers the question, and then his next

18  breath is normal.  So that's why you see the 11.

19              So question 5 being compared to

20  question 11 is more significant, so it's 5 over 11.

21       Q.    Okay.

22       A.    Next question was question 8.

23              There's a bit of a blood pressure

24  response there.  That's why he's got the check with

1  the B.  Then when you compare that with the next

2  question, which is question 6, the control

3  question; question 8 is -- there's more of a

4  response at 8 than 6.  That's why he's got the 6

5  over the check mark.  See it?  Question 8?

6        Q.    Yes.

7        A.    So now you've got your marks, and what

8  we would do is we would look at the markings.

9                    And 3, 5, 8 and 9 -- the four

10  relevant questions -- are more significant

11  consistently than 6 and 11.

12        Q.    I see.

13        A.    Can you see that?  Like there's hardly

14  any marks at 6; there's hardly any marks at 11.

15                    And so in looking at the

16  consistency, especially that last test, question 3

17  is more significant than 6; question 5 is more

18  significant than 11; question 8 is more significant

19  than 6.

20                    And so now we're looking at these,

21  and with the consistency that we have, we evaluated

22  him as being deceptive.

23        Q.    And when you're evaluating whether

24  someone is deceptive, you're making that evaluation

1  independently for each of the relevant questions,

2  correct?

3       MS. THOMPSON:  Object to form.

4       THE WITNESS:  Can you rephrase that?

5  BY MS. RANUM:

6       Q.    Well, you have four relevant questions

7  that you've asked.

8       A.    Yes.

9       Q.    And are you assessing whether each one

10 of those -- whether there was an indication of

11 deception on each one of those?

12      MS. THOMPSON:  Object to form.

13      THE WITNESS:  Yes.

14 BY MS. RANUM:

15      Q.    So would it be possible that you could

16 have a finding that someone wasn't deceptive on one

17 of the relevant questions but was deceptive on the

18 other three?

19      A.    That's possible.

20      Q.    Okay.  But here you found an indication

21 of deception on all four relevant questions?

22      A.    In doing the evaluation with the

23 consistency and responses on each relevant

24 question, we evaluated each question as deceptive.

1        Q.    Now, when you're doing those

2   evaluations, what are the possible results?

3   Obviously an indication of deception is one.  What

4   are the alternative results that you could get?

5        MS. THOMPSON:  Object to form.

6        THE WITNESS:  Truthful, inconclusive,

7   unresponsive.  Or there is a final one which would

8   be purposeful noncooperative.

9   BY MS. RANUM:

10       Q.    So truthful, deceptive, nonresponsive,

11  intentionally uncooperative, or inconclusive?

12       A.    Yes.

13       Q.    So there are five possible results for

14  each of the relevant questions?

15       A.    The unresponsive report or result

16  typically would apply to the entire -- to all

17  relevant questions.

18       Q.    I see, okay.

19       A.    In other words, for some reason, we're

20  not getting any responses to any of the questions.

21  That could be a lack of sleep.  That could be

22  medication or some other unknown reason.

23                  So the unresponsive more often is

24  going to apply to all questions across the board,

1  whereas the truthful, the deceptive, and the

2  inconclusive could be individualized for each

3  question.

4        Q.    For each relevant question?

5        A.    Correct.

6        Q.    What about the intentionally

7  uncooperative?

8        A.    If we reported that, it would primarily

9  be based upon all of the questions.

10        Q.    Okay.  Once you were done scoring the

11  exam, did you have someone else score the exam?

12        A.    Yes.

13        Q.    And who was that?

14        A.    Another examiner Arthur Newey,

15  N-e-w-e-y.

16        Q.    And when you have -- strike that.

17              So then Mr. Newey's asked to score

18  the exam.

19        A.    Yes.

20        Q.    And he's obviously given the chart that

21  we see in Exhibit 5, correct?

22        A.    Yes.

23        Q.    And what else is he given?

24        A.    That's it.

```
 1                    Well, he's told the questions, and
 2      then he just scores them as he sees them.
 3           Q.    Is he given your evaluation form that
 4      we see in Exhibit 4?
 5           A.    No.
 6           Q.    Okay.  Do you tell him the results or
 7      determinations that you made in the process of your
 8      scoring?
 9           A.    No.
10           Q.    So then is it a blind scoring of sorts?
11           A.    Yes.
12           Q.    So he doesn't know what determination
13      you've made?
14           A.    Right.
15           Q.    Okay.  And then Mr. Newey also scored
16      the exam?
17           A.    Yes.
18           Q.    Where did he score the exam?
19           A.    That I don't know.  He probably used a
20      scratch pad.
21           Q.    And what was Mr. Newey's result?
22           A.    He was consistent with mine, and we
23      drew the same conclusion.
24           Q.    Was anyone else a part of the scoring
```

1  of the exam?

2        A.    I do not believe so.

3        Q.    Did Detective Cross or Detective

4  Guerreri have any role in scoring the exam?

5        A.    No.

6        Q.    What is the purpose of the blind

7  scoring that Mr. Newey did?

8        MS. THOMPSON:  Object to form.

9        THE WITNESS:  We just want to make sure that

10  we're both consistent; that without really knowing

11  any information, specifics anyway, he's going to be

12  objective in his scoring.

13  BY MS. RANUM:

14        Q.    And so once you've made your final

15  determination that there's an indication of

16  deception, did you communicate that result to

17  Detectives Cross and Detective Guerreri?

18        A.    Yes.

19        Q.    Did you know before administering the

20  polygraph examination that Mr. Amor had been given

21  a polygraph in September of 1995 specifically

22  related to this investigation?

23        A.    I believe I did.  With 100 percent

24  certainty, I cannot say.  But I know in our file we

 1  did have copies of his exam and his wife's, so I'm

 2  assuming that we were told that at the time.

 3       Q.    Now, would the fact that there had

 4  already been a polygraph administered in regards to

 5  this investigation a few weeks prior, would that

 6  have any impact on your examination?

 7       A.    None.

 8       Q.    And why is that?

 9       A.    Because it was completely independent.

10  We had nothing to do with it.  As far as we're

11  concerned, this is a new investigation.

12       Q.    Okay.  If you could turn back to

13  Exhibit 4, please.

14       A.    Yes.

15       Q.    I just wanted to walk through with you

16  the notations on the right-hand side.

17       A.    Yes.

18       Q.    Can you walk us through these notations

19  and when they were -- first of all, this is all

20  your handwriting, correct?

21       A.    Yes.

22       Q.    And can you walk through when these

23  notations were made?

24       A.    Sure.

```
1               The starting off -- if we go to the
2   top, a little bit to the left where it says Time,
3   do you see that?  If you go to the top and then
4   where I made all my hand notations --
5        Q.    Yes.
6        A.      -- with the times.
7               If you go to the left a little bit,
8   printed in there it says Time.
9        Q.    Okay.
10       A.    And then right next to that, I have
11  written in 4:40.
12       Q.    Yes.
13       A.    At 4:40 p.m., that's when I would have
14  started the pretest interview.  That was written in
15  there at the time the pretest interview began.
16       Q.    Okay.
17       A.    And then there's a slash mark, and then
18  it says 5:20, and right next to that, it says Qs.
19  So at 5:20, I would have stepped out of the
20  interview room to formulate the questions, the test
21  questions.
22               And then to the right of that, it
23  says 5:40 charts and then 6:15 out.  So I ran the
24  test, I ran the polygraph charts from 5:40, and
```

1  then concluded at 6:15.  And that's when I stepped

2  out of the polygraph.

3                    And then a little bit further down

4  where it says, Post 6:30, was when we would have --

5  when I would have started the post-test interview.

6  And then right underneath 6:30, it says, 7:30 out.

7  So the post-test interview with myself and Mr. Amor

8  lasted an hour.

9                    And then further on down under 7:30,

10 it says, In 7:45, and then you see the equal sign,

11 and it says ATN.

12    Q.    Yes.

13    A.    That's Arthur Newey.  ATN is Arthur

14 Newey.

15                   So at 7:45, he and I together went

16 back into the room with Mr. Amor and spoke with him

17 further about his polygraph results.  And we

18 stepped back out at 8:30 for the rundown.

19                   The line continues.  It says, ATN

20 in -- that's Arthur Newey -- went back in with

21 Mr. Amor by himself at 8:45, and he came out of the

22 room at 9:15.  So he was in for about a half hour

23 with Mr. Amor.

24                   And then further on the arrow points

1  further down, where it says NPD, Naperville Police,

2  went in to speak with Mr. Amor at 9:30 until 10:00.

3  And then at 10:00 they came out, and they would

4  have left our office at approximately 10:30.

5          Q.    Okay.

6          A.    Now, as far as the time line, I would

7  have written most of this -- it's all in my

8  writing, but I would have written most of this on

9  10/3, on October 3rd, while I was there in the

10 office.  But at some point, I had left the office.

11 I left there at 9:00, and they were still there, so

12 I would have filled the rest in the next morning

13 when I got back in.  Because Mr. Newey was still

14 there with the investigators.

15         Q.    Thank you.

16               Now, what about the notation above

17 your -- directly above your time line that's sort

18 of in that upper right-hand corner.

19         A.    Yes.

20         Q.    What does that say?

21         A.    It says S with a circle, subject.

22 Subject used the washroom two to three times and

23 was offered cigarettes and water.

24         Q.    Okay.  Where was the washroom located

1  in regards to your office?

2         A.    It was out by the elevators.  So you

3  had to leave our lobby, and then there was the bank

4  of elevators, and it was on the far side of the

5  elevators, the men's room.

6         Q.    Okay.  And so on the 11th floor but

7  outside of your lobby in the elevator area is where

8  the bathroom is, correct?

9         A.    Yes.

10        Q.    And Mr. Amor used that washroom two or

11  three times, according to your notes?

12        A.    Yes.

13        Q.    Now, next to the questions, there are

14  plus and minus signs after the written questions

15  that you've written out.

16        A.    Yes.

17        Q.    What do those indicate?

18        A.    When we review the questions with him

19  like prior to running of the test.  Just before we

20  begin the test, we review all the questions.  And I

21  read him the question and then have him answer yes

22  or no.

23              And then whatever his appropriate

24  response is, like on question No. 3, On Sunday,

1  September 10th, did you do anything to start a fire

2  in your apartment?  And when he verbally answered

3  no, I made the indication that minus sign and then

4  just circled it.  So those are his answers to the

5  questions.

6        Q.    So those are his answers during that

7  time before the actual exam when you're going

8  through the questions with him?

9        A.    Yes.

10       Q.    And then there's a notation under

11  question No. 6.

12       A.    Yes.

13       Q.    What does that notation say?

14       A.    It says, Post, which would have been

15  the post-test interview, the time we spent with him

16  after the conclusion of the exam.  It says, Post

17  denies, says if talked about insurance doesn't

18  recall.

19            So during the post-test interview,

20  we talked to him about the setting of the fire.  We

21  talked to him about the allegations that he and

22  Tina spoke about the insurance money in front of

23  friends and family.  And he continued to deny any

24  discussion about the insurance, even after the

```
 1   tests.  So those were my notes.
 2        Q.    Okay.  So you had a finding of
 3   deception on all four relevant questions, correct?
 4        A.    Yes.
 5        Q.    And so did Mr. Newey; is that correct?
 6        A.    Yes.
 7        Q.    That scoring was not in any way
 8   influenced by Detective Cross or Detective
 9   Guerreri, correct?
10        A.    Not at all.
11        MS. THOMPSON:  Object to form.
12   BY MS. RANUM:
13        Q.    So you've already referenced -- so
14   after the test, did Mr. Amor leave the examination
15   room?
16        A.    Yes.  When we were done running the
17   examination, I moved him back to the original
18   interview room.  It's a little bit bigger, a little
19   bit more comfortable, so he was put in there.
20        Q.    Okay.  And at this point he's still
21   free to leave, correct?
22        A.    Yes.
23        MS. THOMPSON:  Object to form.
24
```

1  BY MS. RANUM:

2       Q.    And was Mr. Amor in the interview room

3  when you went to go communicate the results to

4  Detectives Cross and Guerreri?

5       A.    Yes.

6       Q.    Where did you -- where were you in the

7  office when you communicated those results to

8  Detectives Cross and Guerreri?

9       A.    I can't be specific and certain

10  100 percent, but I believe it was in the lobby of

11  our office.  It was after hours at that point.

12  They were the only ones sitting out there, so I

13  believe that that's where the conversation took

14  place.

15       Q.    Okay.  So to the best of your

16  recollection, Detectives Cross and Guerreri were

17  sitting in the lobby outside of the secure area

18  during the time that you did the actual polygraph

19  examination?

20       A.    Yes.

21       Q.    Was anyone else present for your

22  conversation with Detectives Cross and Guerreri?

23       A.    I think Mr. Newey may have been present

24  at the time.

1        Q.    What did you discuss with Detectives

2   Cross and Guerreri?

3        A.    The results of the examination; that it

4   was our opinion that he wasn't being truthful.

5        Q.    And did you -- how did the -- did you

6   suggest the post-test interview, or how did that

7   come about?

8        A.    Basic --

9        MS. THOMPSON:  Object to form.

10       THE WITNESS:  Well, basically, whenever we

11  conduct an examination, if someone is not passing,

12  for lack of a better term, if they show deception,

13  it's a standard procedure that we'll talk to them

14  further in an attempt to give them an opportunity

15  to explain as to why they may not be passing.

16  BY MS. RANUM:

17       Q.    Okay.

18       A.    And so it was just -- it's just

19  something that we do as standard practice.

20       Q.    Did you tell Detectives Cross and

21  Guerreri that you intended to do a post-test

22  interview of Bill Amor?

23       A.    Yes.

24       Q.    And did they provide you with any

1  questions that they wanted asked in the post-test

2  interview?

3        A.    No.

4        Q.    So were all the questions that were

5  asked in the post-test interview your questions and

6  your questions alone?

7        MS. THOMPSON:  Object to form.

8        THE WITNESS:  Well, and not necessarily an

9  interview, per se.  We're just talking to him

10 pretty much in general terms.  You know, you're not

11 passing on the test.

12 BY MS. RANUM:

13       Q.    Okay.

14       A.    What's going on?

15             So we give him an opportunity to

16 explain.

17       Q.    So you went back into the interview

18 room with Mr. Amor.

19       A.    Yes.

20       Q.    And tell me what you said to Mr. Amor

21 when you went back into the room.

22       A.    Verbatim?  That I do not remember.

23       Q.    You can summarize.

24       A.    Initially, it would have been something

1  to the effect of, You're not passing the polygraph

2  test.  The test indicates that you're involved in

3  the setting of the fire.  I just would like to talk

4  to you about this to see if we can clear something

5  up.

6            And then at that point, I more than

7  likely suggested some options as to why he may be

8  failing the test, as to why he might have been

9  involved in setting the fire.

10           He denied it.

11      Q.    And during that post-test interview,

12  Mr. Amor never admitted to starting the fire,

13  correct?

14      A.    Correct.

15      Q.    When you -- was part -- when you went

16  back in the room to talk to Mr. Amor, did you tell

17  him that he was still free to leave?

18      A.    Yes.  I believe I told him that a

19  couple times.

20      Q.    Okay.  And what did he say in response?

21      A.    He said he didn't want to leave.  He

22  wanted to get it straightened out.

23      Q.    Okay.  So you already said I think that

24  you went back in the interview room for about an

1  hour, and then after that hour, you came out of the

2  interview room, correct?

3       A.    Yes.

4       Q.    And what did you do at that point?

5       A.    I consulted with Mr. Newey, my

6  associate, as to where we were, what Mr. Amor was

7  saying at that point.  And between the two of us,

8  we decided to go back in and talk to him a little

9  bit more, get a new face in there.  And Mr. Newey's

10 personality is a little bit different than mine,

11 so ...

12      Q.    And how is that?

13      A.    He's more gregarious, and I think his

14 personality kind of lined up a little bit more with

15 Mr. Amor's as far as they seemed to like -- I don't

16 know -- have similar likes and dislikes and stuff.

17 So we kind of thought maybe he might be a better

18 fit in talking to him.

19      Q.    Okay.  So obviously you were making

20 some observations about Mr. Amor.

21            What were your observations of

22 Mr. Amor's personality at that point?

23      MS. THOMPSON:  Object to form.

24      THE WITNESS:  Well, I don't -- he was laid

1  back.  But just based on some of the things that we

2  learned in speaking with the investigators before

3  the test, it sounded like he was a drinker.  He was

4  a smoker.  Mr. Newey was a smoker; he liked to have

5  a good time; he was a funny guy.

6                    And so just overall personality

7  wise, we thought maybe it's just a better fit than

8  me, and so that's why he decided to come in with me.

9  BY MS. RANUM:

10      Q.    Okay.  And the second time that you

11  went back in, approximately how long were you in

12  the interview room with Mr. Newey and Mr. Amor

13  together?

14      A.    Approximately 45 minutes.

15      Q.    And during that time, did Mr. Newey

16  take the lead on the questioning?

17      A.    It was kind of both of us just talking,

18  and Mr. Amor would interject, you know, and kind of

19  a three-way discussion really.

20      Q.    Okay.  And how long did that discussion

21  last?

22      A.    Again, probably about 45 minutes.

23      Q.    During the course of that discussion,

24  Mr. Amor did not admit to starting the fire,

1  correct?

2       A.    Correct.

3       Q.    After that second interview, did you

4  and Mr. Newey both come out of the interview room

5  together?

6       A.    Yes.

7       Q.    And what did you do at that point?

8       A.    We consulted, I believe, with the

9  investigators at that point, and we told them that

10 Mr. Amor was not explaining anything, not

11 acknowledging anything; that he's still denying

12 involvement.  And that pretty much was it at that

13 point, as far as what we were discussing with them.

14      Q.    Did you go back into the interview room

15 at all after that second interview?

16      A.    I did not.  Mr. Newey felt that it

17 might be advantageous if he went by himself, so he

18 decided to go in by himself at that point.

19      Q.    Okay.  And I believe you testified that

20 you left the office around 9:00 p.m. that night?

21      A.    Yes.

22      Q.    And so was Mr. Newey in the interview

23 room when you left?

24      A.    Yes.

1      Q.     During the course of the time that you

2  spent with Mr. Amor, did he ever tell you that he

3  wanted to leave?

4      A.     No.

5      Q.     Did he ever tell you that he was afraid

6  of Detective Cross?

7      A.     No.

8      Q.     Did he ever tell you that he was afraid

9  of Detective Guerreri?

10     A.     No.

11     Q.     During the time that you spent with

12 Mr. Amor on October 3, 1995, did you ever see

13 Detective Cross hit or in any way physically abuse

14 Bill Amor?

15     A.     No.

16     Q.     And same for Detective Guerreri.

17            During your time on October 3, 1995,

18 did you ever see Detective Guerreri hit or

19 physically abuse Bill Amor?

20     A.     No.

21     Q.     During your time with Mr. Amor on

22 October 3, 1995, did you ever see either Detective

23 Cross or Detective Guerreri yell or verbally abuse

24 Bill Amor in any way?

1      A.    No.

2      Q.    During your time with Mr. Amor, did you

3  have any concerns about him not being in a good

4  physical condition to give a polygraph examination?

5      A.    No.

6      Q.    Did you have any concerns about him not

7  being in a physical condition sufficient to sit

8  through a post-test interview with you?

9      A.    No.

10     Q.    And when you left that night and

11  Mr. Newey made a decision to go back in and try to

12  continue the post-test interview, did you have any

13  concerns at that time about Mr. Amor's physical

14  condition?

15     A.    Not at all.

16     Q.    Did Mr. Amor ever say he was hungry or

17  request food in your presence?

18     A.    No.

19     Q.    And you did -- I believe you already

20  said, there's a notation that you offered him

21  water, correct?

22     A.    Yes.

23     Q.    And Mr. Amor was given smoke breaks

24  when requested, correct?

```
 1         A.    Yes.
 2         Q.    Did Mr. Amor ever tell you that he
 3  wanted to stop the test?
 4         A.    No.
 5         Q.    During the course of the -- well, let's
 6  start with the pretest process.
 7                    During the course of the pretest
 8  process, did he ever say he wanted to stop either
 9  due to his headache or his lack of sleep?
10         A.    No.
11         Q.    During the course of the examination
12  itself, did he ever say he wanted to stop?
13         A.    No.
14         Q.    During the course of the examination,
15  did he ever complain about being tired?
16         A.    No.
17         Q.    Did he ever complain about being tired
18  during the post-test interview?
19         A.    No.
20         Q.    Did he ever say he wanted to stop
21  during the post-test interview?
22         A.    No.
23         Q.    Did he ever complain about his headache
24  during the post-test interview?
```

```
 1         A.    No.
 2         Q.    I think you described Mr. Amor as being
 3   laid back throughout the process; is that correct?
 4         A.    Yes.
 5         Q.    Was it your perception that Mr. Amor
 6   seemed comfortable during his time at your office?
 7         A.    He did.
 8                         (Deposition Exhibit No. 6,
 9                          Witness Masokas, was marked for
10                          identification 11/05/2019.)
11   BY MS. RANUM:
12         Q.    All right.  Mr. Masokas, I'm showing
13   you a document that is Bates stamped SDT-REID 6, 7,
14   and 8.  It is a three-page document.  Please take a
15   moment to review this document and let me know if
16   you recognize it.
17         MS. THOMPSON:  Sorry.  What exhibit number is
18   this?
19         MS. RANUM:  No. 6.  I'm sorry.
20         THE WITNESS:  This is the written report that
21   I submitted to Naperville.
22   BY MS. RANUM:
23         Q.    Okay.  Did you author this report?
24         A.    Yes.
```

```
 1        Q.    Is that your signature that appears on
 2   the last page of the report?
 3        A.    Yes.
 4        Q.    Did you finalize this report and send
 5   it out on October 20, 1995?
 6        A.    Yes.
 7        Q.    Okay.  And this report is concerning
 8   the October 3, 1995, polygraph examination of
 9   Mr. Amor, correct?
10        A.    Yes.
11        Q.    The same one we've talked about
12   extensively today?
13        A.    Yes.
14        Q.    On the second page towards the bottom,
15   it says, There were significant emotional responses
16   indicative of deception throughout the subject's
17   polygraph records when asked the following
18   questions.
19              And then you list out four questions
20   there.  Do you see that?
21        A.    Yes.
22        Q.    Are those the same relevant questions
23   that we've discussed at length today from Exhibit
24   No. 4?
```

```
 1        A.    Yes.
 2        Q.    And those are the relevant questions
 3  that were posed to Mr. Amor during the polygraph
 4  examination, correct?
 5        A.    Yes.
 6        Q.    And these are the same results that you
 7  communicated to Detectives Cross and Detective
 8  Guerreri in John Reid's office on October 3, 1995,
 9  correct?
10        A.    Yes.
11        Q.    Now, we've obviously gone through the
12  chart that can be seen in Exhibit 5 at length today.
13              In re-reviewing that chart today, is
14  it still your opinion that Mr. Amor was deceptive
15  on all four of these questions --
16        A.    Yes.
17        Q.    -- during your examination?
18        A.    Yes.
19                    (Deposition Exhibit No. 7,
20                     Witness Masokas, was marked for
21                     identification 11/05/2019.)
22  BY MS. RANUM:
23        Q.    Mr. Masokas, I'm showing you what we've
24  marked as Exhibit No. 7 to your deposition.  It is
```

```
 1  a document Bates stamped SDT-REID 16.

 2                     Is this the invoice that was sent

 3  out to the Naperville Police Department regarding

 4  the polygraph examination that was done of Bill

 5  Amor on October 3, 1995?

 6       A.    Yes.

 7       Q.    Okay.  And it looks like the cost was

 8  $450 for 4 and a half hours?

 9       A.    Yes.

10       Q.    And was that -- did you have like a

11  standard fee that you charged in 1995?

12       A.    I'm sure there was.  I don't remember

13  exactly what it was.  The fees changed over time.

14  So 20 years ago, right now, I can't specifically

15  say.

16       Q.    Any reason to believe that Naperville

17  was charged more or less than your normal fee?

18       A.    No.

19       Q.    Okay.

20       A.    No.

21       Q.    Thank you.

22       MS. RANUM:  Mind if we take a two-minute

23  break?  I think I'm just about done.

24                     (Recess taken.)
```

```
 1          MS. RANUM:  Back on the record.
 2    BY MS. RANUM:
 3          Q.    Okay, Mr. Masokas.  Just a couple more
 4    questions for you.
 5                We talked a little bit about that
 6    there's this examination room that you would have
 7    been in with Mr. Amor for the actual examination.
 8          A.    Yes.
 9          Q.    And inside that room is the machine
10    that he's essentially hooked up to, correct?
11          A.    Yes.
12          Q.    And who places the blood pressure cuff
13    and the monitors and the finger clips onto Mr. Amor?
14          A.    I do.
15          Q.    You did that?
16          A.    Yes.
17          Q.    And when we went through your charts in
18    Exhibit 5, which we obviously went through all the
19    results today, was there anything in there that
20    indicated to you that a lack of sleep or sleep
21    deprivation was impacting the output that you were
22    getting on your charts?
23          A.    No.
24          Q.    And what would you be looking for -- or
```

1  strike that.

2                    What would you expect to see if you

3  thought sleep depression -- sleep depravation is

4  impacting this test?  What would you expect the

5  results to look like?

6       A.    Earlier you had asked me what are the

7  different types of results you report on, and one

8  of those I had mentioned was unresponsive.  And so

9  that would be typical of someone who's just

10 exhausted, lack of sleep, or could be heavily

11 medicated, and there would be no response on

12 anything.  Respiration there would be nothing, the

13 GSR nothing, the blood pressure nothing.  It would

14 be absent of any response at all.

15      Q.    Thank you.

16                    Do you mind referring back to

17 Exhibit No. 4.  I just have a couple more questions

18 for you.

19                    Now, with regard to the time line

20 that we went over on the right-hand margin of the

21 sheet, to the best of your recollection, is this

22 time line accurate as to the time that you spent

23 with Mr. Amor on October 3, 1995?

24      A.    Yes.

1      Q.    Now, if we look at the scoring that you

2  did on the left-hand side, I do have a question for

3  you.

4            If you look at question No. 9 --

5      A.    Uh-hmm.

6      Q.    -- the straight through answer No. 2

7  test.

8      A.    Straight through No. 2, uh-huh.

9      Q.    Is that an 11 above the check mark?

10     A.    It is.

11     Q.    What does that signify?

12     A.    Well, if you look at question 11, right

13  underneath it, there's no check.  So the response

14  on question 9 was more significant than 11.  So

15  because they were next to each other, question 9

16  and then question 11, we just kind of compared the

17  two at that point.  So it was 9 over 11, which

18  means question 9 was a bit more significant than

19  11.

20     Q.    Okay.  So we talked a lot about, you

21  know, using the control questions for comparison

22  purposes on the mixed question test, and we went

23  through each of those notations earlier today,

24  correct?

```
 1        A.    Yes.
 2        Q.    Are you also doing that with the
 3   straight through tests No. 1 and 2?
 4        A.    No, not normally.  But simply because
 5   9 and 11 were next to each other, I just made the
 6   notation.
 7        Q.    Okay.  I asked you a little bit in the
 8   beginning about the process for a polygraph
 9   examination when someone is in custody versus not
10   in police custody.  Do you remember talking about
11   that?
12        A.    Yes.
13        Q.    And I believe you testified that if
14   someone is in custody, they would not be left in
15   the lobby, correct?
16        A.    Yes.
17        Q.    And they would typically be escorted
18   around your office by one of the police officers
19   who had brought them to your office; is that
20   correct?
21        MS. THOMPSON:  Object to form.
22        THE WITNESS:  Yes.
23   BY MS. RANUM:
24        Q.    Okay.  Would the -- if someone is in
```

1   custody, would a police officer sit in on any of

2   the components that we've discussed today, whether

3   it be the pretest interview, the exam itself, or

4   the post-test interview?

5          A.    No.

6          Q.    Okay.  So that's consistent both for

7   someone who's in custody and not in custody.

8          A.    Yes.

9          Q.    Okay.  If a person is in custody, would

10  you go through or would you have a police officer

11  go through their Miranda rights with them?

12         MS. THOMPSON:  Object to form.

13         THE WITNESS:  Yes.

14  BY MS. RANUM:

15         Q.    Okay.  I believe earlier you were

16  uncertain of whether the police officers told you

17  that Mr. Amor was not in custody, and so I just

18  wanted to go through your motion to suppress

19  testimony with you briefly.

20                          (Deposition Exhibit No. 8,

21                           Witness Masokas, was marked for

22                           identification 11/05/2019.)

23  BY MS. RANUM:

24         Q.    I'm showing you what's been marked as

1  Exhibit No. 8.  I will represent to you that this

2  is -- this was received by our office and is your

3  March 6, 1996, motion to suppress testimony.  And

4  you can look at as much of it as you'd like.

5                    But I'm curious, you testified you

6  had an opportunity to review your testimony

7  recently.  Is this the testimony you reviewed?

8        A.    Yes, I believe so, yes.

9        Q.    And you only testified at that one

10 motion to suppress hearing with regards to Bill

11 Amor, correct?

12       A.    Yes.

13       Q.    I'd like to direct your attention to

14 pages 16 and 17.  If you could just read those

15 pages quietly to yourself, and then I'll have a

16 couple questions.

17       A.    Okay.

18       Q.    Now, we talked earlier about the fact

19 that after Mr. Amor arrived with Detectives Cross

20 and Guerreri at your office, Mr. Amor waited in the

21 lobby and you met with the detectives in the

22 library of your office, correct?

23       A.    Yes.

24       Q.    And does this refresh your recollection

1  as to whether in that meeting with Detectives Cross

2  and Guerreri they told you Mr. Amor was not in

3  custody?

4         A.    Yes.

5         Q.    And did they in fact tell you he was

6  not in custody?

7         A.    Yes.

8         MS. RANUM:  I believe that plaintiff's

9  counsel has some questions for you at this time.  I

10  don't have any further questions for you.  Thank

11  you for your time.

12         THE WITNESS:  You're welcome.

13                         EXAMINATION

14  BY MS. THOMPSON:

15         Q.    Good afternoon, sir.  As I told you

16  earlier in this deposition, my name is Tara

17  Thompson.  I'm one of the attorneys for the

18  plaintiff in this case, and I do have additional

19  questions for you.

20              And just like Counsel told you at

21  the beginning of the deposition, if there's any

22  questions I ask that are unclear, please let me

23  know.  I'll try to rephrase them.  But I want to

24  make sure that if you don't indicate in response to

```
 1  a question that there's something that's confusing
 2  about it, I'm going to assume that you understood
 3  the question.  Okay, sir?
 4         A.    Yes.
 5         Q.    All right.  I take it that in
 6  preparation for this deposition today you reviewed
 7  your file you reviewed -- let me strike that
 8  question.
 9               I take it in preparation for your
10  deposition today you reviewed the file that John
11  Reid & Associates had about Mr. Amor's polygraph
12  and interrogation from October 3rd of 1995; is that
13  correct?
14         A.    Yes.
15         Q.    And it sounds like you also reviewed a
16  copy of your March 6, 1996, testimony that you just
17  referenced; is that correct?
18         A.    Yes.
19         Q.    Are there any other documents that you
20  reviewed in preparation for this deposition?
21         A.    In regards to this case specifically,
22  no.
23         Q.    Were there documents you reviewed that
24  were not related to this case specifically to
```

1  prepare for this deposition?

2         A.    I reviewed prior testimony.

3         Q.    What testimony did you review?

4         A.    The Juan Rivera deposition.

5         Q.    Was that a deposition in which you were

6  defended by the firm that represents the defendants

7  in this case?

8         A.    Yes.

9         MS. RANUM:  Objection to form.

10        MS. THOMPSON:  Okay.  I think we got an

11 answer there.

12        MS. RANUM:  I want to clear up the record.

13 Our firm did not represent him in the Juan Rivera

14 case.

15        MS. THOMPSON:  That's what the deposition

16 says.

17        MR. NYESTE:  No, that wouldn't be accurate.

18        MS. THOMPSON:  It says it's Sotos.

19        MR. NYESTE:  No.  He was represented by

20 Swanson, Martin & Bell.

21        MS. RANUM:  Yeah.

22        THE WITNESS:  Sorry.  I misunderstood your

23 question.

24

```
 1   BY MS. THOMPSON:

 2        Q.    Let me -- I think with that

 3   understanding, let me ask you this question.

 4               Since you've had a chance to review

 5   that deposition testimony, do you stand by the

 6   testimony that you gave in that case?

 7        MR. NYESTE:  Objection as to form.

 8        THE WITNESS:  Yes.

 9   BY MS. THOMPSON:

10        Q.    Well, in your review of that deposition

11   in preparation for today, was there any testimony

12   you saw that you gave in that deposition that you

13   want to amend or correct?

14        A.    No.

15        Q.    In 1995, you had the title of director

16   of the services division of John E. Reid &

17   Associates; is that correct?

18        A.    Yes.

19        Q.    What was the services division in 1995?

20        A.    Services division provided services to

21   the community, polygraph services, interview

22   services, for various clients and customers.

23        Q.    That included law enforcement customers?

24        A.    Yes.
```

1       Q.    And as director of the services

2    division, what responsibility did you have over

3    interviewing services that were provided to the

4    community?

5       A.    Well, this would go back to an earlier

6    question.  In 1988, I was promoted to the chief

7    polygraph examiner position to where I oversaw the

8    other examiners, interviewers, consulted with

9    their -- with them on their cases.  The title

10   changed over a period of time.

11              So the title changed from chief

12   polygraph examiner to director of services.  So it

13   was basically the same capacity, just a different

14   name for the position.  But I had the same

15   responsibilities, just overseeing the staff that

16   worked in the services division.

17      Q.    Okay.  In 1995, had you been certified

18   in the use of Reid Technique?

19      A.    Yes.

20      Q.    And can you tell -- let me start the

21   question again.

22              Can you explain to me what it means

23   to be certified in the Reid Technique?

24      MS. RANUM:  Object to form.

1          THE WITNESS:  Well, I have the knowledge and

2    the experience to apply the Reid Technique as to

3    how it's outlined.  I follow the methodology as to

4    the training and the acceptance of the procedures

5    and the policies of Reid & Associates.

6    BY MS. THOMPSON:

7          Q.    As of today, when was the last time

8    that you conducted a polygraph examination?

9          A.    2004.

10         Q.    And do you have any -- I think you were

11   asked some questions about how many polygraph exams

12   you've conducted as of 1995.

13              In total in your career, how many

14   polygraph examinations have you conducted?

15         A.    Breaking down polygraphs specifically?

16   I would say several thousand.

17         Q.    In your career in total, how many times

18   have you interviewed someone about the results of

19   the polygraph examination?

20         A.    Again, probably several thousand.

21         Q.    All right.  And prior to the review of

22   your file to prepare for this deposition, when is

23   the last time you thought at all about your

24   interrogation or polygraph exam of Mr. Amor?

```
 1        A.    Prior to preparation for this?

 2        Q.    Yes.

 3        A.    1995.

 4        Q.    Do you have an independent memory of

 5   all of the polygraph examinations and interviews

 6   that you've conducted in your career as you sit

 7   here today?

 8        A.    Can you please ask the question again?

 9        Q.    Sure.  Let me ask you that again.

10              As you sit here today, do you have

11   an independent memory of all of the interviews or

12   polygraph examinations that you conducted in your

13   career?

14        A.    No.

15        Q.    How many times have you given testimony

16   in criminal court about a polygraph exam or an

17   interview that you conducted over the course of

18   your career?

19        A.    I would say a dozen approximately.

20        Q.    When was the last time that you gave

21   testimony in a criminal matter about a polygraph

22   exam or an interview that you conducted?

23        A.    At a trial?  In a courtroom?

24        Q.    That's a fair clarification.
```

```
 1                    So when I say give testimony in a
 2    criminal matter, I'm asking you about either a
 3    criminal trial or a criminal pretrial proceeding, a
 4    suppression hearing, some proceeding related to a
 5    criminal matter.
 6         A.    It would have -- I'm guessing on the
 7    year, I can't be exact.  Maybe '09, 2010.
 8         Q.    And do you remember what the name of
 9    the defendant in the case that you're --
10         A.    Sure.
11         Q.    What case was that?
12         A.    The Rivera case.
13         Q.    Is there something in particular about
14    Mr. Amor's case that gives you a memory of this
15    particular exam or interrogation out of, you know,
16    all of the exams or interrogations that you've
17    conducted in your career?
18         A.    Yes.
19         Q.    What is that?
20         A.    A couple of things.
21                    First, his name.  He had a very
22    unusual name:  Amor.  And so when I was talking to
23    my associate when he came in, we thought it was
24    more like love, and so we thought that would be
```

1  kind of a cool name.  And so it was just something

2  about him that stuck out with the name.

3              And the other thing was his attitude

4  or his demeanor in the post-test.  He was very --

5  and I say attitude.  He was very acceptant of what

6  we were saying, very agreeable to what we were

7  saying, which was unusual considering the issue we

8  were dealing with.

9       Q.    When you say that he was acceptant or

10 agreeable, can you tell me what you mean.

11      A.    When we were -- when I was speaking

12 with him after the polygraph exam and trying to

13 figure out why he's not passing the test, I had

14 suggested maybe it was a situation that he was

15 talked into getting involved with someone in doing

16 something like this, or possibly he had been

17 drinking the night of the fire and just something

18 came over him.  Just making suggestions as to what

19 could have prompted something like this.

20              And he was listening, and at times

21 he was nodding his head and just accepting these

22 different possibilities and really not rejecting as

23 though they would sound ridiculous.  And so when I

24 say acceptant, that's what I mean.

1        Q.    And so I think -- and correct me if

2   I've got this wrong -- but it sounds like when you

3   are describing him as accepting, you're describing

4   a demeanor of -- not of rejection.  Is that a fair

5   assessment?

6        A.    Yes.

7        Q.    I mean, it's not that he was saying

8   words that indicated acceptance, but it was his

9   demeanor that to you reflected acceptance.

10        A.    Yes.

11        Q.    And you found that demeanor unusual in

12   the context of all the people that you interviewed

13   in the course of your career at that time; is that

14   correct?

15        A.    Yes.  But not only that, but also in

16   regards to our training.  In our training, we say

17   consistently and historically what we've seen is

18   that when individuals tend to be more acceptant,

19   not rejecting, more often than not, it's a sign of

20   deception.

21        Q.    What does your training tell you about

22   why that's a sign of deception?

23        A.    Because on the flip side of the coin,

24   we find that when truthful people are offered

1  various scenarios and suggestions, they immediately

2  reject the --

3                       (Brief interruption.)

4        THE REPORTER:  I apologize.  I'm so sorry.  I

5  didn't hear that last part.  "Various scenarios and

6  suggestions, they immediately reject ...

7        THE WITNESS:  Reject the thought of doing

8  something of that nature.  That it's not in their

9  character, and that it's -- they're almost offended

10  by the fact that we would even suggest it.

11  BY MS. THOMPSON:

12       Q.   Does your training indicate to you that

13  acceptance in the context of the demeanor that you

14  described here can be an indicator that someone is

15  tired?

16       A.   Is tired?

17       Q.   Yes.

18       MS. RANUM:  Objection to form, foundation.

19       THE WITNESS:  No, no.  Not in the full

20  context of what you're asking.

21  BY MS. THOMPSON:

22       Q.   Can you explain what you mean by that?

23       A.   Taking everything into consideration,

24  overall if they've expressed -- expressed verbally

1  they're tired, if they look tired, if they've asked

2  for numerous breaks, if they say they're not

3  feeling well, none of that occurred.

4            And so based on his demeanor, as you

5  said earlier, there was no indicator that he was

6  tired or exhausted at all.

7       Q.   How many breaks is numerous in your

8  mind?  You said if someone's taking numerous

9  breaks, and I guess my question for you is:  How

10 many breaks in the context of what occurred with

11 Mr. Amor would you consider to be numerous?

12      A.   I can't give a specific number.  But if

13 I were to guess, every 10 minutes, every 15

14 minutes.

15      Q.   Could acceptance, again in the context

16 of the demeanor that you've described here, be an

17 indicator that someone has a personality that is

18 particularly acquiescing of authority figures?

19      MS. RANUM:  Objection to form and foundation,

20 calls for speculation.

21      THE WITNESS:  Again, in the full context of

22 what we're talking about -- I mean, is it possible?

23 Yes.  But in the full context of, again as I just

24 described, we went through an interview prior to

1    the polygraph.  We went through the polygraph.

2    There was prior discussion.  Nothing -- there was

3    nothing there that were to suggest that there was a

4    problem.

5    BY MS. THOMPSON:

6         Q.    Well, in the course of the entirety of

7    your interactions with Mr. Amor on October 3rd of

8    1995, is there anything you asked him to do that he

9    didn't do?

10        A.    No.

11        Q.    I mean, he agreed to every request that

12   you made of him during the entirety of the time you

13   were with him, correct?

14        A.    Yes.

15        MR. NYESTE:  Objection as to form.

16        THE WITNESS:  Yes.

17   BY MS. THOMPSON:

18        Q.    Do you have people in the course of

19   interviews who, you know, reject requests that you

20   make of them?

21        A.    Yes.

22        Q.    He wasn't that guy, right?

23        MS. RANUM:  Objection to form.

24        MR. NYESTE:  Join.

```
 1        THE WITNESS:  Correct.
 2   BY MS. THOMPSON:
 3        Q.    Is there anything in your mind that
 4   acceptance in the context of the demeanor that
 5   you've described Mr. Amor having might indicate
 6   besides deception?
 7        MR. NYESTE:  Objection as to form.
 8        MS. RANUM:  I'm sorry.  Can you read that
 9   back?
10                        (The record was read as follows:
11                          Q. Is there anything in your
12                          mind that acceptance in the
13                          context of the demeanor that
14                          you've described Mr. Amor
15                          having might indicate besides
16                          deception?)
17        MS. RANUM:  Objection to form.
18        THE WITNESS:  Again, taking everything into
19   context from the beginning until where we were at
20   that point, I would say no.
21   BY MS. THOMPSON:
22        Q.    And when you say "no," you mean it is
23   your opinion, given the sum total of everything
24   that you observed about Mr. Amor and your
```

1  experience with polygraph examinations and

2  interrogations, that Mr. Amor's acceptance as you

3  described it could only indicate deception and

4  nothing else?

5       MR. NYESTE:  Objection as to form and

6  misstates what he's testified to.

7       MS. RANUM:  Objection to form.

8       THE WITNESS:  I'm not a psychologist.

9  Anything is possible.  But based on the way we were

10  trained, based on what we teach, based on history

11  and consistency and observations and studies and

12  research, what I saw at that time was my opinion

13  was more deception.

14  BY MS. THOMPSON:

15       Q.    Well, you're saying more deception.

16       A.    Well, was deception, yes.

17       Q.    And it couldn't be anything else.

18       A.    I mean, again, I'm not a psychologist

19  to get inside Mr. Amor's head.  But taking

20  everything into consideration, the way I just

21  described it, what I saw, what I observed in

22  regards to acceptance in regards to his demeanor,

23  yes.

24       Q.    Do you have any experience yourself in

1   the investigation of fires?

2        A.    No.

3        Q.    Have you ever received any particular

4   training on the conducting of polygraph

5   examinations or interrogations in the context of a

6   fire investigation or an arson investigation?

7        A.    Specific training?

8        Q.    Yes.

9        A.    No.

10       Q.    In your training on the use of the Reid

11  Technique and polygraph examinations, did you ever

12  receive any particular training about conducting

13  polygraph examinations of people who are alcoholics?

14       A.    Again, that I have it correct, you're

15  asking specific training in regards to that?

16       Q.    Yes.

17       A.    No.

18       Q.    Did John E. Reid & Associates, as of

19  October of 1995, have any particular policies or

20  procedures about the conducting of polygraph

21  examinations of people who were alcoholics?

22       A.    No.

23       Q.    In your experience, are there any

24  different steps that a polygraph examiner should

1  take when they become aware that the person that is

2  going to be the subject of a polygraph examination

3  is an alcoholic?

4        A.    Well, we would want to find out when

5  the last time they consumed any alcohol.

6        Q.    And why is that?

7        A.    Because if they're intoxicated, we

8  would not conduct the test.

9        Q.    Is there anything else as of October of

10 1995 that John E. Reid's policies and procedures

11 would say to do on if subject of a potential

12 polygraph examination is an alcoholic?

13       A.    No.

14       Q.    In October of 1995, given your

15 understanding of the proper way to apply the Reid

16 Technique to interrogations, is there anything that

17 an interrogator needed to do if they determined

18 that the person they were questioning was an

19 alcoholic?

20       MS. RANUM:  Objection to form.

21       THE WITNESS:  No.

22 BY MS. THOMPSON:

23       Q.    When a person is applying the Reid

24 Technique to question a person, can the fact that

1 someone is experiencing alcohol withdrawal create a

2 risk that that person would give false information

3 to the interrogator in order to end an interview?

4         MS. RANUM:  Objection to form, foundation,

5 calls for speculation.

6         THE WITNESS:  If you're asking me if it's a

7 possibility, in the broad picture, I would say

8 anything is possible, yes.  But if the guidelines

9 are followed -- you're talking about applying the

10 Reid Technique.  If the guidelines are followed and

11 we adhere to the policies and procedures of

12 applying the Reid Technique, I would say no.

13 BY MS. THOMPSON:

14     Q.    I want to ask you about Exhibit 3, if

15 you have that in front of you, sir.  That's your

16 notes for Mr. Amor's exam.

17     A.    Yes.

18     Q.    To make sure we're on the same page,

19 this is the ones that have the numbers on the top.

20 We're looking at the same one, sir?

21     A.    Yes.

22     Q.    Thank you.  I'm going to have you turn

23 to page 2.

24              You testified earlier, it looks like

1  there's a first line there that where it talks

2  about Tina and mom --

3         A.    Yes.

4         Q.    -- correct?

5               And then the sort of second section

6  of notes on this page 2 of Exhibit 3, which is

7  SDT-REID 49, that's where you made some notations

8  about alcohol, correct?

9         A.    Yes.

10        Q.    How did the topic of alcohol come up in

11 your interview of Mr. Amor that's reflected in this

12 portion of your notes on Exhibit 3?

13        A.    I believe that may have come up through

14 what I was told by the investigators when they gave

15 me their background information.  I'm not sure.

16               Can I check prior notes?

17        Q.    Sure.  Please check your notes and just

18 tell me where you're reviewing to try to refresh

19 your memory, if you find something.

20        A.    I will.

21               I believe in the information that

22 was provided by the investigators prior to the

23 examination when they first came in.  This is in

24 regards to Exhibit No. 1.

```
 1         Q.    Yes, sir.

 2         A.    On the backside, the second page.

 3         Q.    Are you looking at SDT-REID 22?

 4         A.    Yes, yes.

 5         Q.    Okay.

 6         A.    About halfway down, they had said that

 7    after a number of different interviews subject 1,

 8    Mr. Amor, says that he spilled vodka and may have

 9    left a burning cigarette in the ashtray that might

10    have fallen out.

11               And so I was just, in regards to

12    that, was determining whether or not he'd been

13    drinking on the day in question.

14         Q.    Did the detectives in your

15    pre-interview with them tell you Mr. Amor was a

16    person who had a problem with his level of drinking?

17         A.    No.   That would have been in the notes.

18    Because again, they're talking, I'm writing.  And I

19    don't see anything in here, no.

20         Q.    Is that something that you would have

21    noted if that's something that they had told you?

22         A.    Yes.

23         Q.    Would that have been information that

24    you would have wanted to know in examining and
```

```
 1  questioning Mr. Amor on October 3rd of 1995?
 2        A.    I mean, it could have been helpful,
 3  yes.
 4        Q.    In your experience, do people who have
 5  a problem with alcohol frequently try to hide that
 6  fact from other people?
 7        MS. RANUM:  Objection to form and foundation.
 8        THE WITNESS:  I don't know for sure.  I would
 9  imagine.
10  BY MS. THOMPSON:
11        Q.    While we're on Exhibit 1, let me ask
12  you a couple other questions while we have this in
13  front of us.
14              Looking at that same page,
15  SDT-REID 22, this top section of it.
16        A.    Yes.
17        Q.    Where it talks about S2 and S3 say left
18  apartment at 6:25.  You see where I'm looking?
19        A.    Yes, ma'am.
20        Q.    I think it was your testimony before
21  that at some point you determined that although
22  this said S2 that that was actually incorrect; is
23  that right?
24        A.    Yes.
```

1      Q.    How did you determine that was wrong?

2      A.    Because it was William and Tina who

3  left the apartment to go to the movies at

4  approximately 6:25.  And so page -- this is page --

5  the front side, this would be the backside.

6            And so as I was writing, I didn't

7  want to keep flipping over to reference who's S1,

8  S2, and so I just wrote down the wrong number.  So

9  it's actually William and Tina that left at

10  approximately 6:25 and 6:30.  So when I was

11  reviewing this (indicating), recently, I realized

12  that I had got the number wrong.

13      Q.    And is that the same with, S2 denies

14  any knowledge of insurance policy?  Did you learn

15  that when you were re-reviewing your notes?

16      A.    Yes, ma'am.

17      Q.    Similarly -- and I don't mean any

18  disrespect to anybody -- but these are your notes,

19  so I'm going to refer to them as worded.

20            Your notes indicate, S2 mentally

21  retarded.  Do you see that?

22      A.    Yes.

23      Q.    Was it indicated to you that it was

24  Marianne Miceli who potentially had a problem with

1  her cognitive abilities?

2      A.    Yes, I believe that was correct.  Right

3  now as I think back to the best of my recollection,

4  yes.

5      Q.    When the -- well, let me ask you this

6  too.

7              Looking at page 1 of Exhibit 1, so

8  SDT-REID 21, you said you had not known either

9  Detective Cross or Detective Guerreri before they

10  came that day with Mr. Amor, correct?

11      A.    Yes.

12      Q.    Did Detective Cross introduce himself

13  to you as Mike?

14      A.    He may have possibly.  I don't know.

15      Q.    Did Mr. Guerreri introduce himself to

16  you as Bob?

17      A.    Could be.  I have his first name down

18  there, so I would guess he did.

19      Q.    And I note that for the investigator

20  box there, Bob's last name doesn't appear; is that

21  correct?

22      A.    Right.

23      Q.    Do you know why you didn't write down

24  the last name?

```
 1          A.    I didn't know how to spell it.

 2          Q.    That's fair.  I don't either.

 3                Are there any other details that you

 4   recall being given by the detectives that don't

 5   appear in the notes that you took in Exhibit 1?

 6          A.    No.

 7          Q.    Did the detectives express to you any

 8   question about whether or not the fire that they

 9   were investigating was an arson?

10          A.    I'm sorry.  I spaced out for a second.

11   Could you please repeat that?

12          Q.    And let me give you a -- let me

13   actually ask that question in a better way, so I'll

14   re-ask the question.

15                In your pre-meeting with Detective

16   Cross and Detective Guerreri where you were taking

17   the notes that are on Exhibit 1, did they indicate

18   to you that they were investigating whether or not

19   the fire at issue in this case was an arson?

20          A.    Yes.  Yes, I'm sure.

21          Q.    Well, do your notes -- is there some

22   portion of your notes that reflect to you that they

23   gave you an indication that they were investigating

24   whether or not this was an arson?
```

1      A.     Well, just the fact that they had

2  referred, I believe, to Mr. Amor as a suspect.  And

3  so if someone's a suspect in a fire, then I would

4  imagine there's a question as to whether or not it

5  was set deliberately.

6      Q.     My specific question for you is:  Did

7  they indicate to you that they had some doubt as to

8  whether or not this fire was intentionally set at

9  the time that you were talking to them and taking

10  the notes that are reflected in Exhibit 1?

11      A.     Specifically, I don't know.

12      MS. RANUM:  Objection to form.

13      THE WITNESS:  I don't remember at this point.

14  BY MS. THOMPSON:

15      Q.     You've had chance to review your notes

16  in connection with this deposition today; is that

17  correct?

18      A.     Yes.

19      Q.     And by that, I mean during the

20  deposition itself.

21      A.     Yes.

22      Q.     Were there any notes that you reviewed

23  in looking at Exhibit 1 that to you potentially

24  reflect that they told you that they had some

1  question about whether or not this was an arson,

2  meaning some doubt as to whether or not it was an

3  arson?

4        A.    No.

5        Q.    Were these notes that you took in

6  Exhibit 1 essentially in chronological order of

7  what they told you?

8        A.    Yes, yes.  This is where we started,

9  and this is continued on the next page.

10       Q.    So the first thing they told you was

11  that there was a $100,000 life insurance policy on

12  Ms. Miceli?

13       A.    Yes.

14       Q.    And they then told you she died of

15  smoke inhalation and so forth; is that correct?

16       A.    Yes.

17       Q.    And I want to go back to one thing from

18  earlier.

19             And let me just state to you, sir --

20  and I think to whoever is here -- that when I

21  looked at a copy of your deposition from the Juan

22  Rivera case, the cover sheet reflects that -- and

23  it sounds like it reflects in error -- that The

24  Sotos Firm represented you in that case.

```
 1              Obviously I wasn't trying to imply
 2   something that's not true, but that's what the
 3   cover sheet reflects.
 4        MR. NYESTE:  I think it indicates Mr. Haley's
 5   name first before Sotos, and so Haley of Swanson,
 6   Martin & Bell represented Mr. Masokas.
 7        MS. THOMPSON:  I'm not disputing that that's
 8   the case.
 9   BY MS. THOMPSON:
10        Q.   And I guess my question for you is:  In
11   preparing for this deposition, did you talk with
12   anybody from The Sotos Firm about your testimony
13   here today?
14        A.   Well, yes, we had a discussion.
15        Q.   With The Sotos Firm?
16        A.   Yeah.
17        Q.   When did you all talk?
18        A.   Oh, gosh.  Maybe a month ago.
19        Q.   How long was your conversation?
20        A.   Hour, 90 minutes.
21        Q.   Who did you meet with?
22        A.   I remember Carson because it's a cool
23   name, and Laura.
24        Q.   Was there anybody else present besides
```

 1   Carson and Laura?

 2        A.    Yes.  Charles Marino, an attorney for

 3   John Reid & Associates.

 4        Q.    I take it that you're now retired from

 5   John Reid & Associates; is that right?

 6        A.    No, I'm part-time.

 7        Q.    Okay.  And what do you -- what is your

 8   current role with John Reid & Associates?

 9        A.    I am an instructor.

10        Q.    What do you instruct?

11        A.    On the Reid Technique of interview

12   interrogation.

13        Q.    Do you have any current role in

14   instruction on polygraph examinations?

15        A.    No.

16        Q.    When is the last time you were an

17   instructor on the topic of polygraph examination

18   with John Reid & Associates or through John Reid &

19   Associates?

20        A.    1985, '86.

21        Q.    In 1995, were you an instructor with

22   John Reid & Associates on the topic of the use of

23   the Reid Technique?

24        A.    No.

1          Q.     When did you start becoming an

2    instructor on that topic?

3          A.     Full-time, 2005.

4          Q.     What about in a part-time capacity?

5          A.     Part-time, 2000.

6          Q.     Do you still have any of your materials

7    from any training that you've received on the Reid

8    Technique at any point?

9          A.     Oh, gosh.  I may.  It's possible.

10         Q.     Do you like have an area of your home

11   or office where you store those kinds of materials?

12         A.     Could be in the attic.  Could be in the

13   basement.

14         Q.     I think you testified earlier that --

15   and we looked obviously at a copy of the bill from

16   John E. Reid & Associates to Naperville for this

17   work.

18                Was there any professional agreement

19   in 1995 between John E. Reid & Associates and the

20   Naperville Police Department about how much Reid &

21   Associates would charge Naperville, or how much

22   Naperville would consult with Reid & Associates, or

23   any aspect of the relationship?

24         A.     No.

1         MS. RANUM:  Objection to form.

2    BY MS. THOMPSON:

3         Q.    When did you learn that the Naperville

4    Police Department would be bringing in Mr. Amor for

5    a polygraph and an interview on October 3rd of 1995?

6         A.    That I don't remember specifically.  I

7    can't recall when I personally would have heard

8    they were coming in.  I don't remember speaking to

9    them ahead of time to set up an appointment.  I

10   don't know how they came to be on the schedule.

11   The first time I found out would have been I'm sure

12   prior to them arriving on October 3rd.

13        Q.    Was there somebody who was responsible

14   for managing the Reid & Associates schedule at that

15   time?

16        A.    Yes.

17        Q.    Who was that person?

18        A.    I believe -- well, it would have been

19   two people:  Marge Anderson and Marlene -- I'm

20   guessing -- Jacobowski.  They were two of the

21   receptionists.

22        Q.    Was there any kind of paperwork that

23   you would get at Reid & Associates in '95 when you

24   were notified, Hey, you know, you're being assigned

 1  to this potential exam?

 2       A.     Paperwork, no.  No, it was just verbal.

 3       Q.    Okay.  We've looked at various notes of

 4  yours and forms that you filled out in connection

 5  with your work with Mr. Amor.

 6             Are there any other notes that you

 7  took relative to your work on October 3, 1995, with

 8  Mr. Amor that we have not looked at so far in this

 9  deposition today?

10       A.     No.  That's -- that's the whole file.

11       Q.    Prior to October 3rd of 1995, had you

12  conducted other interrogations for other members of

13  the Naperville Police Department besides Detective

14  Cross and Detective Guerreri?

15       A.     As -- again, right now as I sit here,

16  to the best of my knowledge, I -- no.  I believe

17  that this was the first time I had any dealings

18  with Naperville PD.

19       Q.    And you were asked some questions about

20  the other polygraph materials that appear in your

21  file from the O'Brien -- from the Richard O'Brien &

22  Associates related to prior polygraphs that were

23  conducted in connection with this case, correct?

24       A.     Yes, ma'am.

1      Q.    And I know that you said that it was

2   your testimony that you wouldn't have relied on

3   those in any way in making your assessments about

4   your work with Mr. Amor, correct?

5      A.    Correct.

6      Q.    Do you have any idea as you sit here

7   today why those polygraph reports ended up in the

8   Reid & Associates file?

9      A.    The only thing that I could -- that I

10  believe is they would have been brought in by

11  Officers Cross and the other gentleman and given to

12  us as part of their investigation, and that's the

13  only logical thing that I could come up with.

14     Q.    Do you have any idea why those would

15  have been brought in for you?

16     A.    I don't.

17     Q.    So given -- I want to ask you some

18  questions about the policies and procedures that

19  Reid & Associates used in connection with

20  polygraphs and interviews in October of 1995, okay?

21     A.    Yes.

22     Q.    And so when I ask you these questions,

23  you understand that that's the time period I'm

24  asking you about.

```
 1        A.    Okay.

 2        Q.    I take it that one possibility that

 3  could occur for polygraphs that were conducted at

 4  that time is that you could determine that there

 5  was no deception indicated in a polygraph, correct?

 6        A.    Yes.

 7        Q.    And in that situation, again in this

 8  time period, October of 1995, would Reid &

 9  Associates interview someone about the results of

10  the polygraph in a situation where there was no

11  deception indicated?

12        MR. NYESTE:   Interview about the results?

13  BY MS. THOMPSON:

14        Q.    Well, let's start with that question.

15        A.    Is that what you're asking?

16        Q.    Let's start with that question, yeah.

17        A.    Would we interview someone following a

18  polygraph test if the results were truthful?

19        Q.    Well, if the results were that -- if

20  your conclusion about the exam was that there was

21  no deception indicated.

22        A.    No.  We would not interview them

23  further or question them further.

24        Q.    What if in that situation where
```

1  somebody was brought in by law enforcement, law

2  enforcement asked you to do that, to talk to them

3  further?  Is that something that Reid & Associates

4  would do?

5       A.    No.  It would be unnecessary.

6       Q.    Why would it be unnecessary?

7       A.    Because if we're reporting them as

8  truthful, there would be no need to talk to them

9  about anything.  What's the point?

10      Q.    If in October of 1995 law enforcement

11 brought in someone for a polygraph examination

12 where it was the conclusion, as it was with

13 Mr. Amor, that the person was not being truthful

14 about some relevant question that was being asked

15 in the polygraph, then would Reid & Associates

16 always conduct a further interview of the person

17 after you scored the polygraph examination and, you

18 know, determined that there was deception?

19      A.    That was the general practice.  If

20 there was deception indicated, we always wanted to

21 give them the opportunity -- the subject an

22 opportunity to explain.

23            Now, there have been times over the

24 years where we were instructed specifically not to

1  move past the results.  Run the test, get your

2  results, and call me with the results.  Don't talk

3  to the subject afterwards.

4          Q.    And when you say you got those

5  instructions, you mean that the law enforcement

6  agency that's asking for the polygraph exam would

7  instruct you specifically, Do the polygraph and

8  don't go further?

9          A.    Well, it -- I would say it was not law

10 enforcement that did that.  It was defense

11 attorneys.

12         Q.    Okay.  Did you ever have a situation

13 where law enforcement -- and I'm asking now about

14 your entirety of your career with Reid &

15 Associates, not just October of 1995.

16         A.    Yes.

17         Q.    In the entirety of your career where

18 law enforcement brought somebody in and

19 specifically told you, you know, Do this polygraph

20 exam, but if there's deception indicated or you

21 believe the person's not being truthful, do not

22 conduct a follow-up interview?

23         A.    In my experiences with law enforcement,

24 I cannot remember one time where law enforcement

1  asked that.

2        Q.    And one of the things that you said

3  that you did specifically in this case is after you

4  scored this exam you went and told Cross and

5  Guerreri the results, correct?

6        A.    Yes.

7        Q.    Why'd you do that?

8        A.    It's a standard procedure.

9        Q.    But why is that the standard procedure?

10 Do you know?

11       A.    Because we want to keep them involved

12 and let them know where we are in the process.  We

13 would let them know that, Look, we ran the tests.

14 This person is either telling the truth or not

15 telling the truth based on our opinion.  And so now

16 since there's deception indicated, we're going to

17 take a few minutes and we're going to talk to this

18 individual, give them an opportunity to explain.

19       Q.    And when you went out in this case and

20 told Cross and Guerreri that it was your conclusion

21 that Mr. Amor was not being truthful, they did not

22 tell you, Don't talk to Mr. Amor further?

23       A.    Correct.

24       Q.    When you told them, I'm going to go

1  talk to him further, they agreed with you that you

2  should do that, correct?

3        A.    I don't know if they said, you know,

4  Oh, yeah, we agree with you, but they said, Okay.

5                    I mean, that was part of our

6  procedure.  That was the standard procedure,

7  whether it was Naperville PD, whether it was the

8  Jewel down the street, if we were doing work for

9  the Jewel.  Whenever the subject was showing

10  deception, as a standard procedure, we would let

11  the client know what the results were.  They're --

12  part of what they're paying us for or what they are

13  paying us for is for polygraph results.

14        Q.    And part of what they're paying you for

15  is the follow-up interview, right?

16        A.    Well, it's all part of it, sure.

17        Q.    I mean, you billed them in this case

18  not just for the time you spent on the polygraph,

19  but the time you spent on the interview.

20        A.    Yes.

21        Q.    And that wasn't something that you

22  did -- well, let me withdraw that question.

23                    Here's a question I have for you:

24  In October of 1995, did Reid & Associates have the

1   capability to video record post-polygraph

2   interviews with the polygraph subject?

3        A.    Yes.

4        Q.    And is that something that you did in

5   Mr. Amor's case?

6        A.    No.

7        Q.    Why not?

8        A.    There was no protocol as to when things

9   should be recorded, when things shouldn't be

10  recorded.  Oftentimes what it came down to is who

11  was available to work the equipment.  And if there

12  wasn't a lot of staff on hand, it was a bit

13  difficult for one person or two people to be trying

14  to conduct an interview, a polygraph test, and

15  worry about video equipment.

16               So again, it was just a time where

17  it wasn't done.

18        Q.    What was Mr. Newey doing during the

19  time you were conducting the polygraph exam of

20  Mr. Amor?

21        A.    I have no idea.  I mean, he had his own

22  cases to work.  I don't know if he was on the phone

23  with the clients.  I don't know.  He was in the

24  office, but I couldn't tell you what he was doing.

1        Q.    Was there anyone else in the office on

2   October 3rd from the time that Cross and Guerreri

3   and Amor came in around 4:40 to when they left

4   other than you and Mr. Newey?

5        MS. RANUM:  Objection to form.

6        THE WITNESS:  There would have been a few

7   people there.  Probably the receptionists were

8   there until 5:00 and probably administrative people

9   in the back, bookkeeper.  But everybody would have

10  left at 5:00 o'clock.

11  BY MS. THOMPSON:

12       Q.    Other than you and Mr. Newey?

13       A.    Yes.

14       Q.    Is it your understanding that Mr. Newey

15  has passed away?

16       A.    Yes.

17       Q.    Did he pass away in about 2009; is that

18  correct?

19       A.    This Saturday will be ten years, yes.

20       Q.    Did you ever discuss with Mr. Newey

21  anything having to do with Mr. Amor's polygraph

22  exam or interrogation after October 4th of 1995?

23       A.    I don't believe -- well, I can't be

24  certain at this point.  Possibly around the time of

1 the suppression hearing to refresh my memory after

2 looking at the file that -- I don't know.

3 Specifically, I can't say yes or no.  I mean,

4 that's possible.

5              But once the suppression hearing was

6 concluded, no.

7      Q.    To your knowledge, did Mr. Newey

8 prepare any reports of his interviews with Mr. Amor?

9      A.    No.

10     Q.    Did he confer with you in your -- in

11 the preparation of your October 20, 1995, report

12 that you prepared for Detective Cross?

13     A.    Yes.

14     Q.    And what did he tell you that went into

15 that report?

16     A.    He basically told me he was there until

17 about 10:30 on the 3rd with the investigators, and

18 that Mr. Amor, when they left, was still denying

19 his involvement in the fire as well as the

20 insurance discussions.  He was consistent in his

21 denial of having any conversation with Tina about

22 insurance.

23     Q.    So your understanding is that Mr. Newey

24 was in there with Mr. Amor on his own between 8:45

 1  and 9:15; is that correct?

 2       A.    Yes.

 3       Q.    And then was he not present for the

 4  half an hour then that at least some people from

 5  the Naperville Police Department were in there with

 6  Mr. Amor between 9:30 and 10:00?

 7       A.    Correct.

 8       MS. RANUM:  Objection to foundation.

 9  BY MS. THOMPSON:

10       Q.    Do you know what was going on between

11  10:00 and 10:30?

12       A.    I'm guessing Mr. Newey was talking with

13  the two investigators during that time.  After they

14  left the room with Mr. Amor, I'm sure the three of

15  them were probably talking.

16       Q.    Why are you sure they were talking?

17       A.    Well, I don't know what else they'd be

18  doing.  Otherwise, they would have left at 10:00.

19       Q.    What would they have been talking about?

20       A.    Probably their discussions with Mr.

21  Amor as far as their observations and the results

22  of the polygraph.  Mr. Newey was -- he was a senior

23  examiner.  He was almost my counterpart.  He

24  started shortly after I did, and so he was a very

1  good investigator, very good examiner.  So I'm sure

2  that he was just having conversations with them

3  about the issue, the case.

4       Q.   Is it your understanding that in that

5  conversation the Naperville Police Department

6  detectives would have been talking with Mr. Newey

7  about what Bill Amor told them between 9:30 and

8  10:00?

9       MS. RANUM:  Objection to form and foundation,

10  calls for speculation.

11       THE WITNESS:  I can't be specific on what

12  they were discussing.  To me, it -- logically,

13  that's what they would have been talking about.  I

14  mean, I wasn't there so I can't say.

15  BY MS. THOMPSON:

16       Q.   Well, in your experience in that

17  situation where -- well, let me ask you a different

18  question.

19            Did you or anybody at Reid &

20  Associates let the Naperville Police Department

21  people know that there was the capability for

22  Reid & Associates to videotape, you know, some

23  portion of the things being done with Mr. Amor at

24  Reid & Associates on October 3rd of 1995?

1        MS. RANUM:  I'm sorry.  Can you read that

2    question back?

3                       (The record was read as follows:

4                        Q. Did you or anybody at

5                        Reid & Associates let the

6                        Naperville Police Department

7                        people know that there was the

8                        capability for Reid &

9                        Associates to videotape, you

10                       know, some portion of the

11                       things being done with Mr. Amor

12                       at Reid & Associates on October

13                       3rd of 1995?)

14       MS. RANUM:  Objection, form.

15       THE WITNESS:  I did not, and I'm sure

16   Mr. Newey did not, because that is not something

17   that we typically do.  It's not a common practice

18   for us to be telling, Well, we have this capability

19   and that cape -- it's just not something we do.

20   BY MS. THOMPSON:

21       Q.    In October 3rd of 1995, was there any

22   way to leave the Reid & Associates offices other

23   than through the lobby back to the elevator bank

24   that you've described?

```
 1        A.    No, that was the only way in and out.
 2        Q.    Okay.  Now, you described the interview
 3   room where the post-polygraph interviews with
 4   Mr. Amor took place, and I think you said that room
 5   was about 10 by 10, and there was a table and three
 6   chairs in it; is that right?
 7        A.    Yes.
 8        Q.    How was that furniture arranged in the
 9   room during Mr. Amor's interviews?
10        A.    Do you want me to draw it out?
11        Q.    I'd love that.  Let me -- I'm just
12   going to give you -- what are we on?
13        THE REPORTER:  9.
14                    (Deposition Exhibit No. 9,
15                     Witness Masokas, was marked for
16                     identification 11/05/2019.)
17   BY MS. THOMPSON:
18        Q.    Sir, I've just given you a blank --
19   before you start writing, I've given you a blank
20   piece of writing paper that I think has been marked
21   as Exhibit 9, and I'm just going to ask you, using
22   your pen, to draw the layout of the furniture in
23   the interview room where Mr. Amor was interviewed
24   on October 3rd of 1995.
```

1              And I'm not going to hold you to

2  scale, I don't know what your drawing capabilities

3  are, but if you could just draw the layout for us,

4  I'd appreciate it.

5         A.    Stick figures work?

6         Q.    Whatever you can do.  I can't even do

7  stick figures.

8         A.    (Complying.)

9                   That's a chair.

10                  So it would look like this.  This

11 would be -- do you want this?  Or should I --

12        Q.    I'm going to take it from you.  Why

13 don't you show us what you've drawn there and

14 explain it.

15        A.    So this is the hallway and then this

16 was at the time a dead end over here, I believe

17 (indicating).  And if you were to go this way

18 (indicating), you would go -- come to the end of

19 the hall, you make a left turn, and then you would

20 go out to the lobby.  The lobby was kind of out

21 this way (indicating).

22                  But this is quite a ways down the

23 hallway.  You make your right, and there's

24 different rooms on either side.

1          So as you enter the room, it's about

2    10 by 10.  You enter the door, and the door kind of

3    swung this way (indicating).  And then there was a

4    chair right here right next to the door, another

5    chair hear (indicating), and then this was the desk

6    with kind of a chair -- almost a stool, more of a

7    stool kind of underneath the desk.

8               And so Mr. Amor sat here

9    (indicating).  And then initially when I was --

10   when we started the post-test, I was here

11   (indicating).  The door obviously was closed,

12   privacy.  And so it was just the two of us like

13   this.

14        Q.    I'm going to try to do a couple things

15   for the record here, so that we make sure we've

16   made a record.  I'm going to have you hold on to

17   that for a second.

18               So you've written "hallway" on the

19   bottom of Exhibit 9 where the hallway area was; is

20   that correct?

21        A.    Yes.

22        Q.    And then you've got a square on

23   Exhibit 9 that has a -- at least one place where

24   there's not a line, and that's where you're

```
 1   indicating the door to the room; is that correct?
 2        A.    Yes.
 3        Q.    And you've got a rectangular box to the
 4   left of that that indicates a door in an open
 5   position; is that correct?
 6        A.    Yes.
 7        Q.    You've then got four shapes inside of
 8   the box that you drew.
 9                There's one that is larger than the
10   other three, and that's the desk; is that right?
11        A.    Yes.
12        Q.    Could you just write "desk" inside the
13   piece of furniture that's the desk.
14        A.    Sure, (complying).
15        Q.    And then the other three smaller shapes
16   inside that rectangle are all are chairs or stools;
17   is that correct?
18        A.    Yes, ma'am.
19        Q.    And I think you said the one circular
20   object that's right next to the desk was a stool.
21        A.    Yeah.  This is like a stool
22   (indicating).
23        Q.    And it looks like you've just written
24   stool inside that?
```

1      A.    I did, yes.

2      Q.    And then there's two other chairs.

3            The two other shapes in that box are

4  chairs, correct?

5      A.    Yes.

6      Q.    Now, during your -- you were initially

7  interviewing Mr. Amor between 6:30 and 7:30; is

8  that correct?

9      A.    Post-test?

10     Q.    Yeah, post-test.

11     A.    Yes.

12     Q.    And did you do that in the polygraph

13 room or in the room you've just drawn on Exhibit 9?

14     A.    In this room (indicating).

15     Q.    And can you show us using Exhibit 9

16 where during that post-test interview Mr. Amor was

17 and you were.

18     A.    Mr. Amor was right here in the chair

19 right next to the door (indicating), and I was here

20 (indicating).

21     Q.    And when you say "here," you've

22 indicated the other chair in the room, not the

23 stool, correct?

24     A.    Yes.

```
 1        Q.    And then --
 2        MS. RANUM:  Tara, do you want him to mark it
 3   or maybe describe which chair he's identifying
 4   because he's just saying "here."
 5   BY MS. THOMPSON:
 6        Q.    Yeah.  But I don't want to -- I
 7   appreciate that request.  I'll clean this up, but I
 8   want to go to the second question first.
 9               Then there was that time period from
10   7:45 to 8:30 where you were also in the same room
11   that's depicted in Exhibit 9 talking to Mr. Amor,
12   correct?
13        A.    Yes.
14        Q.    And at that point you were in there
15   with Mr. Newey; is that right?
16        A.    Yes.
17        Q.    And can you tell us using Exhibit 9
18   where for that period of time people were in the
19   room.
20        A.    I -- to the best of my recollection
21   right now, I believe Mr. Newey was in the chair
22   that I was originally sitting in, and I was in the
23   stool.
24        Q.    And Mr. Amor was in the same chair by
```

1  the door?

2       A.    Yes.

3       Q.    Do you have any idea for that 8:45 to

4  9:15 interview where Mr. Newey was and where

5  Mr. Amor were?

6       A.    That I don't know.  However, I would

7  again say it was probably the same thing, because

8  Mr. Amor never got -- came -- as far as I know,

9  left the office unless he used the restroom when I

10 was not there.  But this was the -- this is the

11 subject's chair, so we would always have the

12 subject sit in this chair.

13      Q.    And is there a reason why that chair

14 was always the subject's chair, given your

15 knowledge of the procedures for Reid & Associates

16 for doing interviews in the room that's depicted in

17 Exhibit 9?

18      A.    In this particular room, we wanted the

19 chair next to the door.  We didn't want to be

20 sitting in front of the door or blocking the door

21 in any way.  We wanted him to know -- and the door

22 was right -- the doorknob was right next to his

23 head, and so we just wanted to make sure he didn't

24 feel as though he couldn't leave.

```
 1        Q.    Is that why you wanted the subject
 2   sitting in a way that where you or another
 3   interviewer wasn't blocking the door?
 4        A.    Yes.
 5        Q.    Why was that important to you?
 6        A.    Because it's noncustodial, and we don't
 7   want him to feel as though he can't leave.
 8        Q.    So it sounds like there was, as you
 9   said, only one spot that Mr. Amor was sitting in
10   during that time.
11              Can you write "Amor" in the chair
12   that you've been describing as being the place
13   where you saw him sitting in this room.
14        A.    Sure, (complying).
15              It's A-m-o-r-e?
16        MS. RANUM:  No "e," A-m-o-r.
17        MS. THOMPSON:  A-m-o-r.
18   BY MS. THOMPSON:
19        Q.    It looks like you've then written Amor
20   in the chair that you were describing that you saw
21   him sitting in; is that correct?
22        A.    Yes.
23        Q.    Were there any portions of at least the
24   time that you were in the room depicted in
```

 1  Exhibit 9 with Mr. Amor where he was standing up or
 2  not in that chair?
 3       A.    No, no.  The times I was in there, he
 4  was sitting in the chair.
 5       Q.    And when you originally took Mr. Amor
 6  to this room, did you indicate to him that he
 7  should sit in that chair?
 8       A.    Yes.
 9       MS. THOMPSON:  Laura, I mean, we could go
10  into this later.  If you have more marking you want
11  him to do, we can do it now, and you don't have to
12  wait for your questions.
13                 I'm satisfied.  If there's something
14  else you want clarified, you can do it now.
15                 FURTHER EXAMINATION
16  BY MS. RANUM:
17       Q.    Just real quick, Counsel's questions
18  all related to the post-test interview.
19                 When you first went in the room with
20  Mr. Amor and he completed the medical data form and
21  the release that we've looked at, where was he
22  sitting when he completed those forms?
23       A.    He would have been in the same chair.
24  He more than likely had a clipboard.

1      Q.    So he would have been in the subject's

2 chair with a clipboard that he was writing on.

3      A.    Yes.

4      Q.    And then was he also in that chair for

5 the pretest interview?

6      A.    Yes.

7      Q.    And were you in the same chair that

8 you've described yourself being in for the

9 post-test interview during the pretest interview?

10     A.    Yes.

11           Just for clarification, the chair

12 that we would sit in, this is a regular chair,

13 something you'd see in a lobby or in your living

14 room.

15     Q.    Like was it like an armchair?

16     A.    Yeah, it had arms on it.  Had kind of a

17 round back, it was padded.

18     Q.    And when you say "this," you were

19 referring to the subject's chair?

20     A.    Mr. Amor's chair, yes.

21           This chair that we would sit in is

22 like a school desk.  You know the old school desk?

23 It's got the writing -- the square writing part?

24     Q.    Yeah.

 1      A.    You rest your arm on it?  That's what

 2  that is.  It's a wooden like school desk type of

 3  thing.  So that way we don't need to use a

 4  clipboard, it's right here, so we just write on it.

 5      MS. RANUM:  Thank you.  That's all I had.

 6                  FURTHER EXAMINATION

 7  BY MS. THOMPSON:

 8      Q.    I think I'm done with Exhibit 9, so you

 9  can set that aside if you want to.  And I'm happy

10  to get you a copy of that after the deposition if

11  you want it today for some reason, sir.

12              I want to have you look back at

13  Exhibit 4, your scoring sheet, if you've got that

14  in front of you.

15      A.    Yes.

16      Q.    If I understand your testimony about

17  the scoring that you walked us through earlier in

18  your exam, it was your determination that Mr. Amor

19  was not being truthful about the questions that

20  we've talked about -- Nos. 3, 5, 8 and 9 -- because

21  of the relative emotional response to those

22  questions in comparison to the other questions that

23  he was asked; is that correct?

24      A.    Yes.

```
 1        Q.    So using the scoring system that Reid &
 2   Associates was using in October of 1995, how much
 3   more of a response does there need to be on certain
 4   questions than others for there to be a
 5   determination that there's deception indicated as
 6   to that question?
 7        MR. NYESTE:  Objection to the form.
 8        MS. RANUM:  Join.
 9        THE WITNESS:  That's a difficult question
10   because it's not just again a significant of a
11   response.  It's --
12                   (Brief interruption.)
13        THE REPORTER:  I apologize.
14        MS. RANUM:  I'm sorry.
15        THE REPORTER:  That's okay.
16              "It's not just again a significant
17   of a response...
18        THE WITNESS:  I'm sorry?
19        THE REPORTER:  I missed the answer.  I
20   apologize.
21        THE WITNESS:  That's okay.  Want me to start
22   over?
23        THE REPORTER:  Sure.
24        THE WITNESS:  It's not just the significance
```

1  of a response, but it's also the consistency in

2  responses across the board from one test to the

3  next.

4  BY MS. THOMPSON:

5      Q.    And by that, do you mean for a

6  particular question, if there's some emotional

7  response indicated across multiple tests, that's an

8  indicator as well that there's some deception

9  indicated as to that question?

10     A.    Yes, ma'am.

11     Q.    So how many questions have to have a

12 consistent emotional response for that to be a

13 factor in whether or not there's deception

14 indicated?

15     A.    Again, we can't -- I can't say two

16 tests or three tests or four, because the -- for

17 example, question 8, there was responses in three

18 out of four tests.  But in comparison with question

19 6, question 6, the responses were not as

20 significant and they were not as consistent.

21             So it's consistency, it's the

22 significance in response.  There's a number of

23 different factors that would be weighed in.

24     Q.    Can you at all explain to me how you

 1  would make that assessment in this exam other than

 2  the scoring analysis that you've already taken us

 3  through earlier in your deposition?

 4        A.    It's -- I can't think of any other way

 5  to explain it.

 6        Q.    I mean, are you telling me you sort of

 7  have to have a feel for this?

 8        MS. RANUM:  Objection to form.

 9        MR. NYESTE:  Objection to form.

10  BY MS. THOMPSON:

11        Q.    That's my question.

12        A.    Well, yeah, you've got to know what

13  you're looking at, what you're looking for.  And

14  it's like any job, anything you do, the more you

15  do, usually the better you get at it.

16        Q.    But are you then -- you're not applying

17  a rigid scoring system of, you know, if I have this

18  many -- if I have emotion indicated on, you know,

19  this many of the tests and, you know, the

20  comparison to the questions where there's not

21  emotion is present on this many tests, then I can

22  determine that there's deception indicated.

23                  There's not a methodology like that;

24  is that correct?

1          MS. RANUM:  Objection, form.

2          MR. NYESTE:  Objection as to form.

3                    You mean a numerical scoring system?

4     BY MS. THOMPSON:

5          Q.    Well, do you understand my question?

6          A.    I believe I understand your question.

7     And I would have to say no.  The way you've

8     described it, I would say no.

9          Q.    And your determination as to Mr. Amor

10    was that another person who'd been trained in the

11    same type of system that you had been trained in

12    for scoring polygraph exams agreed with your

13    assessment; is that correct?

14         A.    Yes.

15         Q.    Did Mr. Newey do his own physical

16    scoring sheet where he wrote stuff down like you

17    did on Exhibit 4?

18         A.    I believe he did.

19         Q.    Do you have any idea where that scoring

20    sheet is today?

21         A.    I don't.

22         Q.    It's not in the file, correct?

23         A.    That is correct.

24         Q.    Why do you believe that he did that

1  type of scoring sheet?

2       A.    Most of the examiners, when they would

3  review an exam, would write it out, handwrite their

4  scoring.  Now, it is a possibility it was visual

5  and he just looked at it.  I can't give you a

6  100 percent certain answer.  There is a possibility

7  it was just a visual inspection.

8       Q.    Can you score these kinds of exams

9  doing just a visual inspection without doing a

10  score sheet like Exhibit 4?

11       A.    Yes.

12       Q.    So you don't even really need these

13  numbers to make your call.  You can just do it by

14  literally looking at the printout.

15       MS. RANUM:  Objection to form, misstates

16  prior testimony.

17       THE WITNESS:  Oftentimes, yes.

18  BY MS. THOMPSON:

19       Q.    Could you do that in Mr. Amor's case?

20       A.    His responses were a little bit more

21  subtle.  Personally, I would rather write it out.

22  I would rather, you know, write it down so I can

23  see it.  Another examiner may just look at it.

24  They may feel more comfortable in doing that.

1       Q.    Was there -- other than -- let me start

2   that question.

3                   I think you described that the type

4   of scoring system that you used was a visual

5   scoring system.  Is that --

6       A.    Visual inspection, yes.

7       Q.    Excuse me, visual inspection.

8                   Are there any -- am I correct that

9   there are different methods of polygraph

10  examination, conducting and scoring, that people

11  are taught, you know, depending on where you go to

12  school for this type of training?

13      A.    Yes.

14      Q.    And were there any other particular

15  methodologies or, you know, schools of thought in

16  polygraph examination that you were applying when

17  you conducted your examination of Mr. Amor, other

18  than doing a visual inspection of scoring and other

19  than conducting the specific types of tests that

20  you already I think named and described for us?

21      MR. NYESTE:  I'm going to object that.  That

22  is kind of a long question, form.

23  BY MS. THOMPSON:

24      Q.    Do you understand the question?

1      A.    I believe I do.  And I would say no, I
2 did not apply any other methods to the scoring.
3      Q.    When did you learn from Mr. Newey the
4 timing of the events that had happened after you
5 left at 9:00 o'clock on October 3rd of 1995?
6      A.    It would have been the next day when he
7 came in or when we saw each other the next day.
8      Q.    You were a certified polygraph examiner
9 at the time of your examination of Mr. Amor; is
10 that correct?
11      A.    Yes, ma'am.
12      Q.    Did you have to do anything ongoing to
13 remain certified in Illinois as a polygraph
14 examiner as of 1995?
15      A.    Just pay your dues, pay your license
16 fees.
17      Q.    Was there any process in Illinois at
18 that time for there to be peer review or blind
19 review, for instance, of some of your polygraph
20 exams to check and make sure you were scoring them
21 the way that would be consistent with your field at
22 that time?
23      A.    No.
24      Q.    At the time that the Naperville Police

1   Department brought in Bill Amor to the Reid &

2   Associates offices, when they first brought him in

3   on October 3rd of 1995, were you leaning towards

4   the belief one way or another about whether

5   Mr. Amor had some involvement in the fire that was

6   at issue in this investigation?

7          A.    No.

8          Q.    After you conducted your pre-interview

9   of Mr. Amor, did you have a belief that was leaning

10  one way or another about whether he had involvement

11  in that fire?

12         A.    No.

13         Q.    After you conducted your polygraph

14  examination, before you scored it, did you have a

15  belief one way or another about whether or not

16  Mr. Amor was involved in that fire?

17         A.    I was starting to lean, because I was

18  watching the test as it was rolling out.

19         Q.    After you did your scoring evaluation,

20  did your beliefs further lean in one direction or

21  another about whether he was involved in that fire?

22         A.    Yes.

23         Q.    Which and how did they change at that

24  point?

1      A.    Well, because of the indicators of

2  deception on the polygraph, something was causing

3  those, whether or not it was direct involvement,

4  whether it was knowledge, whether it was both.  But

5  that was a question I couldn't answer.

6      Q.    After you conducted your post-polygraph

7  interview of Mr. Amor, did your beliefs change any

8  further in one direction or another?

9      A.    No.

10      Q.    After you conducted that additional

11  interview of Mr. Amor between 7:45 and 8:30, did

12  your beliefs change any further about his

13  involvement in the fire?

14      A.    No.

15      Q.    Do your opinions remain the same today

16  as they were at the time you drafted your report in

17  October 20th of 1995 about whether the information

18  that Mr. Amor gave you on October 3rd of 1995 was

19  not true about his involvement in and knowledge of

20  the circumstances surrounding the death of Marianne

21  Miceli?

22      A.    Let me make sure I understand what

23  you're asking me.

24      Q.    Sure.

1        A.    Are my opinions the same today as they

2   were on October 3rd of 1995?

3        Q.    I was asking you if they're the same

4   today as they were on October 20th, '95, when you

5   wrote your report.

6        A.    Oh, yes, they are the same.

7        Q.    Have you learned any further

8   information since October 20, 1995, about anything

9   having to do with the fire in this case?

10       A.    I heard that the fire was not or could

11  not be set the way he described it.

12       Q.    Did anyone ever tell you whether there

13  were any arson experts retained by the state who

14  concluded that the fire could not have begun at a

15  time that Mr. Amor was in the apartment?

16       A.    No one told me that.  I heard it on the

17  radio.

18       Q.    Did that fact alter for you at all your

19  opinions about whether Mr. Amor was telling the

20  truth or not?

21       A.    No.

22       Q.    Do you have an opinion about what

23  Mr. Amor was not telling the truth about related to

24  his involvement in and knowledge of the

1   circumstances surrounding the death of Marianne

2   Miceli?

3       A.    No.

4       Q.    You can't say because you -- you're

5   testing doesn't allow you to know that, correct?

6       A.    Yes, ma'am.

7       Q.    And your interviews with Mr. Amor

8   didn't allow you to know that either, right?

9       A.    Correct.

10      Q.    One of the questions that you concluded

11  Mr. Amor was not being -- was not being deceptive

12  about was the question that you asked him about --

13  it was about whether he had ever had an intention

14  to hurt someone, correct?

15      A.    That was a control question, correct.

16      Q.    I mean, the question you asked him with

17  respect to that was whether he'd ever done anything

18  to intentionally hurt someone, right?

19      A.    The question on the actual polygraph

20  test was:  Besides an argument, have you ever done

21  anything to intentionally hurt someone?

22      Q.    And you did not conclude that he was

23  indicating deception in his responses to that

24  question.

```
 1        A.     There was -- yeah, there was no
 2  deception to that particular question.
 3               If you look at question 11, he had
 4  one response on the first test and then really
 5  nothing thereafter.
 6        Q.     Do you think that that answer is
 7  somehow in contradiction to the deception that you
 8  concluded were present for the other questions that
 9  you asked him in the polygraph where you found
10  there was deception?
11        MR. NYESTE:  Objection as to form.
12               Maybe just have it again.
13        MS. RANUM:  Join.
14        MR. NYESTE:  Can you read it back?
15                      (The record was read as follows:
16                        Q. Do you think that that
17                        answer is somehow in
18                        contradiction to the deception
19                        that you concluded were present
20                        for the other questions that
21                        you asked him in the polygraph
22                        where you found there was
23                        deception?)
24        MR. NYESTE:  I'll object as to form.
```

```
 1          MS. RANUM:  Join.
 2   BY MS. THOMPSON:
 3          Q.    Do you understand the question?
 4          A.    Yes.
 5                My answer would be no.  I do not
 6   find it to be in contradiction.
 7          Q.    When you were asked some questions
 8   about that card test, you said -- and correct me if
 9   I've got this wrong -- one of the purposes for the
10   card test is to show deceptive people that the test
11   works, correct?
12          A.    Yes.
13          Q.    And what do you mean by that?
14          A.    Quite often, guilty people will come
15   in.  They'll agree to take a polygraph test because
16   they believe they can beat the test; that they're
17   able to control their emotions and their
18   physiological responses to where they can pass the
19   test, even though they're deceptive.
20                And so we give them that test to
21   show them that if you're being deceptive, we're
22   going to find out, and here's how we know that.
23          Q.    And you testified earlier that you --
24   it's your testimony that you had some concerns
```

1  about the way Mr. Amor was breathing in certain

2  questions that made you concerned that he might be

3  trying to beat the test in some way, correct?

4         A.    It was a concern, yes.

5         Q.    Well, at the conclusion of all of your

6  work with Mr. Amor, did you reach an opinion about

7  whether or not he was in actuality doing that?

8         A.    No, no.  It was a suspicion but nothing

9  to say definitively.

10        Q.    Is there something that you did in

11 October of 1995 as a practice to try to assess

12 whether or not somebody was trying to beat the test

13 other than asking that final yes test to sort of

14 see what their response was?

15        A.    No, that would be the extent of it.  I

16 mean, if there was any suspicion throughout the

17 examination, as a final test, we would run that yes

18 test just to either confirm it or deny it or -- and

19 so there was nothing concrete to say he was doing

20 anything deliberate.

21        Q.    The yes test did not confirm that in

22 Mr. Amor's case?

23        A.    No.  Again, it was suspicious but not

24 enough for us to say yes, he was.

1       Q.    In your suspicions about that, have you

2   testified in this deposition about your entire

3   basis for having those suspicions?  You were asked

4   a number of questions about that, and I just want

5   to know, Is there anything else that gave you that

6   suspicion?

7       A.    In regards to?

8       Q.    In regards to whether Mr. Amor was

9   trying to beat the test.

10      A.    Oh.

11      Q.    And let me be clear about that question.

12            You've given a significant amount of

13  testimony previously in this deposition about

14  concerns you had that Mr. Amor might be trying to

15  beat the test.

16            And my question for you is:  Is

17  there any other basis that you have for believing

18  he might have been trying to beat the test other

19  than what you've already testified about?

20      A.    No.

21      Q.    I want to ask you a few questions about

22  Exhibit 3.  If you could pull that back up in front

23  of you.

24      A.    Sure.

```
 1        Q.    You have some -- and you've already
 2  gone through these notes with us on Exhibit 3 about
 3  what these mean.
 4               You have some fairly detailed notes
 5  in Exhibit 3, and I'm looking at STD-REID 47, the
 6  first page --
 7        A.    Yes.
 8        Q.    -- about the specific way in which
 9  Mr. Amor responded to various of these questions.
10  Would you agree?
11        A.    Yes.
12        Q.    I mean, for instance, you were telling
13  us about question 2, which I think is the third
14  thing on page 1.
15               In your notes, you know, you
16  describe specifically how he said no, the volume of
17  him saying that, and how his body was at the time
18  he said that, correct?
19        A.    Yes.
20        Q.    Why did you take this level of detail
21  of notes about how Mr. Amor responded to these
22  questions?
23        A.    Because people don't just respond
24  verbally.  Oftentimes, they'll also respond
```

1  nonverbally, body language.  And so we also will

2  document any observations that we see in regards

3  to -- we write down his verbal answers, but we'll

4  also document nonverbal responses as well.

5       Q.    And my question is:  Why do you

6  document those nonverbal responses?

7       A.    Well, because we find that there's

8  times when deceptive individuals may answer a

9  question nonverbally, whereas a truthful person may

10  answer that question differently nonverbally.

11            For instance, 29, you see further

12  down to 29?

13       Q.    I do.

14       A.    That question is this -- do you want me

15  to use his an example, or you want me to use

16  something different?

17       Q.    If you want to talk about 29, that's

18  great.  Why don't you explain -- if you want to use

19  29 to explain your answer, please do, sir.

20       A.    So for instance, with Mr. Amor,

21  question No. 29:  If the fire was set deliberately,

22  under any circumstances, do you think whoever set

23  the fire deserves a second chance?

24            And what we find is that truthful

1  people have a direct and spontaneous response to

2  that, and more often than not, they look us in the

3  eye, and they would say, Absolutely not.  There's

4  no way you can give this person a second chance.

5  Look at what they did to my mother-in-law.

6                    Whereas deceptive individuals

7  will -- may hesitate, they may shift in the chair,

8  they're not sure how to answer the question,

9  because they know they were the ones that committed

10 the offense and they're thinking about themselves

11 and they don't know how to answer the question.

12                    If my wife was murdered and I was

13 asked a question, Well, whoever murdered your wife,

14 you think they deserve a second chance?

15                    What, are you nuts?  There's no way

16 they should get a second chance.  As a matter of

17 fact, leave him in a room with me for about

18 15 minutes first and then you can have them.

19                    That's a typical answer for a

20 truthful person.

21                    Whereas if I murdered my wife and

22 you asked me that question, You think whoever

23 murdered your wife deserves a second chance; I may

24 say, Well, I guess you may want to find out why

1   they did it, because that would be important to

2   know.

3                    That tends to go more on the side of

4   deception.

5                    And so not only do people respond

6   verbally to questions, but we also find that they

7   will answer nonverbally, body language.  And so we

8   just make indicators.

9        Q.    Is it your understanding of the Reid

10  Technique and the training about interviewing under

11  the Reid Technique, that if someone indicates a

12  forgiving attitude towards someone that that's an

13  indication that they themselves were involved in

14  the crime?

15       A.    No, no.  It's -- the response model,

16  it's more indicative of a deceptive person.

17  Deceptive individuals tend to answer questions like

18  that more often than a truthful person.  So just

19  because we get one response to one question like

20  that, we certainly would not say, Well, they're

21  guilty.

22                    Or on the flip side, because we get

23  a truthful response to one question, we wouldn't

24  automatically say, Well, they're innocent.

```
 1                    It's the totality of the process.
 2          Q.    I appreciate that.
 3                    And my question is -- I understand
 4   from what you're telling me the reason why these
 5   various observations about nonverbal conduct are
 6   indicative to you of certain things.
 7                    And my question is:  Why were you
 8   documenting your observations about those things?
 9          A.    Because if 20 years goes by and I have
10   to read my sheet, and they say, Well, how did he
11   respond nonverbally; I would say, I have no idea
12   because I don't remember from 20 years ago.
13                    Same reason we would document their
14   verbal response.  So that there's some indication
15   as to how they answered the question.
16          Q.    Is one reason you documented the
17   nonverbal responses that someone gave you in these
18   interviews because you might want notes about that
19   to be able to give testimony about it at a later
20   proceeding?
21          A.    That's part of it, sure.
22          Q.    And did you understand when you were
23   interviewing Mr. Amor that your observations of
24   Mr. Amor might some day be relevant for court?
```

1       A.    Oh, I knew that was a possibility,

2    sure.

3       Q.    I want to ask you if you turn to

4    SDT-REID 49, that's the second page.

5       A.    Yes.

6       Q.    No. 7 that I think is the third from

7    the bottom, more or less there.  Do you see where I

8    am?

9       A.    Yes, ma'am.

10      Q.    You said that that was something called

11   a bait question?

12      A.    Yes.

13      Q.    Can you explain to me what a bait

14   question -- what it means for something to be a

15   bait question?

16      A.    A bait question is -- it's a

17   hypothetical question.  And the way it's phrased,

18   it's phrased in such a manner that there's an

19   implication that maybe there's evidence.  So again,

20   we're not -- we're not telling somebody we've got

21   evidence when we don't.  It's a hypothetical.

22            Like in this example, he had --

23   prior to question 7, he had said that on the

24   evening of this Sunday in question the day of the

1  fire, after leaving the apartment at approximately

2  6:30, he went downstairs to load up the car.  He

3  said he never went back up.

4                    And so the question -- the

5  hypothetical question at 7 was:  Bill, you had said

6  that you had gone downstairs to load up the car.

7  You said you never went back upstairs.  Would there

8  be any reason why someone might say that they saw

9  you going back upstairs into the apartment?

10                   So it's a hypothetical.

11                   And again, he -- there was a long

12  delay.  He never really answered the question.  He

13  said, Well, I can't think of any reason why I would

14  go back upstairs.

15      Q.    Is the purpose of a bait question to

16  suggest to the subject of the interview that there

17  might be some evidence of their involvement in

18  order to assess how that person responds verbally

19  and nonverbally to that suggestion?

20      A.    Yes.

21      Q.    And does that information about the

22  person's psychology at that point assist the

23  interviewer in deciding how to conduct an interview

24  with that person about the events in question?

1      MS. RANUM:  Objection to form.

2      MR. NYESTE:  Join.

3      THE WITNESS:  Not necessarily.  It's a

4  regular question we would ask, just like all the

5  other questions are standard questions.  It's just

6  a standard question that we ask as part of

7  interview.

8  BY MS. THOMPSON:

9      Q.    Well, what is the purpose of that being

10 a standard question?

11     A.    Part of the reason for asking a bait

12 question like that is to see if the subject will

13 change any earlier responses.

14            Now, he did not change any earlier

15 responses.  But there are times where deceptive

16 subjects, after hearing the possibility of

17 evidence, that they have changed earlier responses

18 to explain away why there might be evidence;

19 whereas innocent people don't have to change an

20 earlier response.  Whether there's evidence or not,

21 it's irrelevant to them.

22     Q.    You said that after the card test you

23 left the interview, and you told Mr. Amor that that

24 was to give his arm a rest.

1      A.    Yes.

2      Q.    I mean, is there some stress associated

3  with having a blood pressure cuff on someone's arm

4  during the polygraph exam process?

5      A.    A little bit, not significant.  It gets

6  a little annoying.

7      Q.    And relatedly, I think you said there

8  were various times in this exam where you had to

9  adjust the blood pressure cuff because it was too

10  high?

11      A.    A couple of times.  We typically --

12  when we pump it up initially, we pump it up a

13  little bit more than what we need, because air gets

14  underneath the cuff between the cuff and the

15  clothing.  And so we kind of squeeze it out to

16  squeeze the air out, and then we'll reduce the air

17  even more to where we need it for the test, which

18  is usually about 80 pounds of pressure.

19            But as we go through the test, if

20  they respond to some questions and their blood

21  pressure starts to go up, which he did a number of

22  times, it may get to a point where we just have to

23  make the adjustment of the pen, not necessarily

24  reduce the pressure in the cuff, but we make an

1  adjustment to bring the pen back down.

2       Q.    The adjustment is just making it so the

3  lines aren't over each other on the sheet.

4       A.    Yes, ma'am.

5       Q.    You're not really adjusting the cuff?

6       A.    Correct.

7       MS. RANUM:  Tara, I'm not sure how much you

8  have left.

9                 (Discussion off the record.)

10                (Recess taken.)

11 BY MS. THOMPSON:

12      Q.    I want to ask you some additional

13 questions then about the post-exam interview, and

14 then the interview that you did with Mr. Newey with

15 Mr. Amor, okay?

16      A.    Yes.

17      Q.    For both of those interviews, were you

18 using the Reid Technique to ask questions of

19 Mr. Amor?

20      A.    Are you specifically addressing

21 post-test?

22      Q.    I appreciate that.  So let me ask them

23 one at a time.

24                In the post-test interview you did

1   with Mr. Amor, were you using the Reid Technique to

2   question him?

3        A.    Yes.

4        Q.    In the interview that you next did with

5   Mr. Newey with Mr. Amor, the one that was from

6   about 7:45 to 8:30, were you and Mr. Newey using

7   the Reid Technique in that interview?

8        A.    Yes.

9        Q.    And by the way, is there a specific

10  reason you left at 9:00 o'clock?

11       A.    Yes.  It was getting late.  I can't --

12  again, I can't be certain since I don't remember

13  how the appointment was set up, but this -- the

14  appointment time was an unusual time to set up an

15  appointment.  I'm just surmising here, but this may

16  have been like a last-minute appointment.  Our last

17  appointment time was usually 3:00 o'clock.  They

18  didn't arrive until 3:50.  So this may have been

19  like a, Hey, could you get us in, something like

20  that.  I don't know.

21            But I'm -- the reason I would have

22  left at 9:00 is two reasons:  No. 1, I was probably

23  going to miss my last train if I waited any longer

24  and be sleeping in the office all night; and No. 2,

1   at that time in October of '95 my wife was pregnant

2   with twins and she was ill, she had hyperemesis and

3   stuff, so I wanted to get home.

4        Q.    I take it that to your knowledge

5   Mr. Newey didn't have the same personal concerns

6   that day about needing to leave?

7        A.    Correct.

8        Q.    In your -- well, let me strike that,

9   and ask you this.

10             Is it your understanding of the Reid

11  Technique methodology of questioning someone that

12  there are different approaches for an examination

13  where you suspect someone of involvement in a crime

14  and a case where you do not believe somebody to be

15  a suspect?

16       MS. RANUM:  Objection to form.

17       THE WITNESS:  I'm sorry, but the question is

18  a little confusing, because I'm not sure if you're

19  talking about the pretest interview or the

20  post-test.

21  BY MS. THOMPSON:

22       Q.    That's a fair point, so let me ask you

23  the question again.

24             And I'm not asking you in reference

 1  to any particular interviews that you conducted

 2  with Mr. Amor.

 3              I'm just asking you this:  Given

 4  your understanding of the Reid Technique, are there

 5  different approaches that an interviewer should

 6  take in an interview where the interviewer believes

 7  that the subject of the interview may have been

 8  involved in the misconduct that's the subject of

 9  the interview and a situation where the interviewer

10  does not believe that the subject had involvement

11  in the misconduct?

12      A.    No.  The approach would be the same.

13      Q.    Is it your understanding that there

14  is -- let me start the question again.

15              Is it your testimony that there is

16  nothing different that an interviewer using the

17  Reid Technique is supposed to do in a situation

18  where the interviewer does not have reason to

19  believe that the subject of the interview was

20  involved in the misconduct about which the

21  interviewee is being questioned?

22      MS. RANUM:  Objection to form.

23      MR. NYESTE:  Join that.

24      THE WITNESS:  Again, I want to clarify.  Are

1  we talking about the pretest interview or post-test?

2  BY MS. THOMPSON:

3      Q.    Let's -- I appreciate what you're

4  asking, so let me ask you a different question.

5             Let me ask you this:  You were asked

6  some questions about what you talked about with

7  Mr. Amor in your post-test interview with him.  And

8  I'm specifically talking to you now about the

9  interview you did that was just him and you, not

10  with Mr. Newey, okay?

11     A.    Yes.

12     Q.    And you said that in that interview

13  that you suggested to him options about maybe why

14  he was failing, correct?

15     A.    Yes.

16     Q.    Can you tell me as you sit here today

17  what your memory is of how that interview proceeded

18  in terms of things you said and things Mr. Amor

19  said and what was discussed?

20     A.    I cannot specifically say verbatim what

21  was said, what wasn't said.  What I can say is I

22  made suggestions as to why people sometimes act out

23  of character, whether they get involved with the

24  wrong crowd, whether it's drinking and they're not

 1  thinking straight; so various suggestions,

 2  generally speaking.

 3                 And Mr. Amor's response was no.

 4                 I mean, at times, I had alluded to

 5  the fact that he was acceptant.  And so he would

 6  sit, he would listen, he'd acknowledge what I was

 7  saying.  And then ultimately when I would ask him,

 8  you know, Is this what happened; no, I didn't do

 9  it.

10                 So he maintained his denials, but

11  throughout most of my suggestions, he was quiet.

12  He was engaged.  He was listening.  He was nodding

13  along.  And that's how I would have to describe it.

14        Q.    Did he in this post-test interview that

15  was just you and him provide any narrative to you

16  about, you know, what had happened the day of the

17  fire or any of the events leading up to the fire?

18        A.    No.  He primarily just stuck with what

19  he had already said.  You know, we went to the

20  movies.  Everything was fine.  We got back later,

21  and we heard about the fire.

22        Q.    And my question for you is:  In that

23  interview, did you ask him questions to the effect

24  of, you know, What happened the day of the fire, to

1  which he provided responses, like what you just

2  described, We went to the movies, or, Here's when I

3  was home, or you know, information?

4        A.    In the post-test, no.  In the pretest,

5  yes, but not in the post-test.

6        Q.    So in the post-test interview, were you

7  asking him questions about what happened to which

8  he provided responses?

9        A.    No.  It was primarily my suggestions

10  that I was offering as to what could have

11  contributed to his involvement.

12              When I started the post-test, I

13  started the post-test based on the results of the

14  polygraph exam, that he was involved in some way.

15  And so now we're looking for a reason.

16              Again, did he set the fire?  Was he

17  aware of someone else who set the fire?

18              And so you know, offering these

19  suggestions, I wanted to see if he understood what

20  I was talking about.

21              And so he was listening.  He was

22  listening, and he was nodding along.  He was

23  accepting the theories I was suggesting.

24              But then when I would ask a

1  question, Bill, is that what happened?  He would

2  say, No, no, I didn't do it.

3              So it was more, for lack of a better

4  term, more of a monologue as opposed to a dialogue.

5      Q.    It was a monologue from you --

6      A.    Yes.

7      Q.    -- some responses from him?

8      A.    Yes.

9      Q.    And that lasted about an hour.

10     A.    Yes, yeah, pretty much.

11     Q.    When Mr. Amor in that post-test

12 interview would tell you that -- through his

13 answers of no or similar answers, that he had not

14 been responsible for this fire, would you respond

15 in a way that indicated that you did not accept

16 that answer?

17     A.    Yes.

18     Q.    And you were following the methodology

19 of the Reid Technique when you did that, correct?

20     A.    Yes, ma'am.

21     Q.    And you said that during that hour, you

22 described him as engaged in the interview, correct?

23     A.    Yes.

24     Q.    He was not uncooperative or not

1  listening to you.

2          A.    That is correct.

3          Q.    So why is it that after that hour of

4  him being engaged and cooperative you decided that

5  you needed a different approach with him?

6          A.    The denials that we were -- that I was

7  seeing, my observations, his acceptant attitude,

8  his denials were more deceptive as far as they

9  weren't very forceful in the delivery.  The

10 nonverbal behaviors, eye contact wasn't very good.

11               And so based on my observations, I

12 still wasn't convinced that he was innocent.  And

13 so I still believed that there may be something

14 wrong as far as why he's not doing well on the

15 test.

16               And at some point, I thought, Well,

17 it may be me that is not connecting with him.  That

18 happens sometimes.

19               And so I stepped out of the room,

20 and that's when I consulted with Mr. Newey.

21         Q.    So when you say that you were concerned

22 that maybe it was you who wasn't connecting with

23 him, do you mean that you were concerned that you

24 were not able to engage Mr. Amor in a way that got

 1  satisfactory responses to what you were asking?

 2  I'm trying to understand what you mean by that.

 3       A.     Rapport, rapport.

 4              If I'm going to buy a car and the

 5  salesman is a complete jerk and I don't like him,

 6  even though he might be giving me the car at a

 7  cheaper price, I'm not going to buy a car from him.

 8  I'd rather go to somebody that is a nice

 9  individual, somebody that has decent personality.

10  If the guy's being kind of an idiot, I don't want

11  to engage with him.

12              And so sometimes it's that rapport.

13  And if there's something that's just not connecting

14  for some reason, maybe he doesn't trust me.

15       Q.    And I just want to understand, so I

16  want to pose this question, which is:  If you

17  described Mr. Amor as engaged and listening to you

18  and nodding and responsive, why is it that you

19  believe you didn't have a rapport with him?

20       A.    Again, I'm saying that's not exactly

21  what it is.  It's what I'm surmising.  It may be

22  that; it may be something else.

23              I was at a point after an hour of

24  talking with him, it just didn't seem as though I

1  personally was making any progress with him.  He

2  just -- he was still in denial.  He just -- he

3  just -- he was at a point where he just continued

4  to deny involvement.

5       Q.    And when you say lack of progress, you

6  mean that you were not progressing towards him

7  agreeing with you that he had some knowledge or

8  responsibility for this fire?

9       A.    Yes.

10      Q.    And it was your goal to get him to the

11 point where he would acknowledge that?

12      A.    At the time, it was -- well, it's

13 always the goal to elicit the truth.  We're trying

14 to find out what the truth is.  And at this point,

15 we're still at a place where I didn't know what the

16 truth was.

17      Q.    You said in describing Mr. Newey that

18 you thought he was more similar to Mr. Amor because

19 he was more gregarious; is that right?

20      A.    Uh-hmm; yes, ma'am.

21      Q.    And I think you said too that he

22 potentially had some other things in common with

23 Mr. Amor, including being a smoker?

24      A.    A smoker.

1        Q.    So let me ask you this then:  When you

2   and Mr. Newey and Mr. Amor talked for that second

3   post-exam interview from 7:45 to 8:30, you said at

4   that point Mr. Newey was taking the lead; is that

5   right?

6        A.    I believe so, yes.

7        Q.    And was --

8        A.    Yes.

9        Q.    I'm sorry.  I didn't mean to --

10       A.    No, that's okay.

11       Q.    And during that interview, was it a

12  monologue by Mr. Newey to which Mr. Amor was

13  providing some responses?

14       A.    Yes.  It was very similar to the first

15  discussion that I had with him where Mr. Amor was

16  engaged, he was acknowledging, he was nodding

17  along, accepting what Mr. Newey was saying.  But

18  again, he maintained his denials.

19       Q.    Did Mr. Newey do anything to, you know,

20  establish those connections with Mr. Amor by

21  talking with him about subjects they might have in

22  common, like smoking or drinking or joking or

23  something to establish rapport?

24       A.    Right now as I sit here and answer the

1  questions, I cannot be specific.  I don't recall,

2  but it would not be out of the ordinary for a

3  smoker to have a cigarette with the subject.  I

4  mean, that's not out of the ordinary.

5         Q.    Is it possible that they smoked

6  together like in the interview room?

7         A.    Yes, possibly.

8         Q.    Is that something that routinely

9  happened in interviews as a rapport building --

10        A.    Occasionally, occasionally.

11              It was before, you know, all

12  buildings became nonsmoking and things like that,

13  so it was kind of prior to that.  So it was not --

14  I don't want to say it was uncommon, but it was not

15  at the same time a common practice.

16        Q.    Did the topic of alcohol come up in the

17  45 minutes that you and Mr. Newey talked to

18  Mr. Amor together between 7:45 and 8:30?

19        A.    In regards to what specifically?

20        Q.    In regards to anything.

21        A.    Anything?

22              It's a possibility it could have

23  come up as part of him spilling the vodka as was

24  given to us by the investigators.  We may have

1  brought that up.  I don't remember right now as I

2  sit here and talk about it.  It's a possibility

3  though.

4       Q.    Do you have any specific -- well,

5  strike that.

6              Is there anything that you could

7  review that you have not reviewed in preparation

8  for this deposition that would refresh your memory

9  any further about any specifics of what was

10 discussed between 7:45 and 8:30?

11      A.    No.

12      Q.    Is there anything you could review that

13 you haven't looked at already that would refresh

14 your memory at all about any further details of

15 what occurred in your post-exam interview between

16 6:30 and 7:30?

17      A.    No.  I mean, between the suppression

18 hearing testimony and my file, there's -- I don't

19 know what else I could review.

20      Q.    And I think you said that when you left

21 that second interview, the 7:45 to 8:30 interview,

22 that Mr. Amor was still not explaining anything; is

23 that right?

24      A.    Correct.

1        Q.    And what do you mean by that?

2        A.    He was not offering any explanation for

3    the results, the way they were coming out as being

4    deceptive.  He was still saying he had nothing to

5    do with the fire.  He was still saying that, you

6    know, if he did have a conversation about

7    insurance, he doesn't remember.

8              So there was nothing being offered

9    like, Well, you know, this -- this did happen.  I

10   didn't want to say anything about this because I

11   was scared.  I mean, there was nothing of that

12   sort.  It was just, I didn't do it.  I don't know

13   anything about it.  That's all I could tell you.

14       Q.    And you said that when that interview

15   concluded, that ultimately Mr. Newey wanted to go

16   in by himself because he felt it was advantageous

17   to go in alone, correct?

18       A.    Yes.

19       Q.    What advantage did Newey believe he

20   would obtain by going in by himself?

21       A.    Privacy.  When he and I are in there,

22   there's two of us in the room.  And oftentimes, we

23   find that some individuals may be a little bit more

24   reluctant to talk about things that might be

1  embarrassing or sensitive to where there might have

2  been a commission of a crime possibly in front of a

3  number of people.

4              Oftentimes privacy is important, a

5  one-on-one is important.  And so he felt as though

6  that might make Mr. Amor feel a little more

7  comfortable.

8      Q.    Is there anything you could review that

9  you haven't looked at already that would refresh

10  your memory about anything Mr. Newey later told you

11  about his interview with Mr. Amor alone between

12  8:45 and 9:15?

13     A.    No.

14     Q.    Anything you could review that would

15  refresh your memory any further about anything that

16  either Mr. Newey or anybody else told you about

17  what happened in that interview between 9:30 and

18  10:00?

19     A.    Unfortunately, no.

20     Q.    And you've given some testimony here

21  about what happened in between those interviews,

22  and I think it was generally your testimony that in

23  between those interviews you and Mr. Newey updated

24  Cross and Guerreri about what was going on in the

 1  interviews, right?

 2          A.    Yes.

 3          Q.    Is there -- do you have any further

 4  details or information about what you said in those

 5  intervening interviews with Mr. Gross and

 6  Mr. Guerreri that you haven't already testified

 7  about?

 8          A.    No.

 9          Q.    Is there anything you could review that

10  would refresh your memory any further about any

11  details of those conversations?

12          A.    No.

13          Q.    You said that Mr. Amor got smoke

14  breaks, and I think we just talked about the

15  possibility of him smoking in the interview room?

16          A.    Yes.

17          Q.    Were there any other locations where

18  Mr. Amor took those smoke breaks?

19          A.    I cannot be specific right now and say

20  yes or no to that.  But I do know -- and again, I'm

21  not saying this happened, but I do know Mr. Newey

22  occasionally would smoke in the men's room, so

23  that's a possibility.

24                    That if Mr. Amor needed to use the

1  restroom or Mr. Newey may have said, You want to

2  have a cigarette, and they may have gone into the

3  men's rooms.  That's where he would smoke

4  sometimes.

5       Q.    I understand your testimony that

6  although that inner door in the Reid & Associates

7  offices, you know, locks so that people couldn't

8  get in from the outside, but from the inside,

9  somebody could walk out that door to go into the

10 hall to go to bathroom, right?

11      A.    Yes.

12      Q.    If somebody did that, how would they

13 get back into the Reid & Associates office?

14      A.    Well, hopefully there's a receptionist

15 up at desk, because she would buzz you in.  If not,

16 we would typically do on those days, if I forgot my

17 keys or something, I'd have to slide the glass open

18 and pick up the phone and call somebody to -- I

19 hope they're at their desk, for them to come up and

20 buzz me in.

21      Q.    Do you know for Mr. Amor whether he

22 took any of those bathroom breaks after

23 5:00 o'clock when the receptionist left?

24      A.    Specifically, well, yeah.  After

```
 1   5:00 o'clock, I'm sure he probably did, because you
 2   know, they were there until 10:30.  I don't
 3   remember exactly, you know, what times he would
 4   have used the restroom, but I do recall he did use
 5   the restroom a few times.
 6        Q.    How did he get back in?
 7        A.    There was -- it was probably one of us
 8   out in the lobby with the investigators.
 9        Q.    While he was outside?
10        A.    While he was in the bathroom.
11        Q.    Okay.  Throughout your career as an
12   interviewer, on how many occasions has somebody
13   left an interview with you where they were brought
14   in by law enforcement for that interview?
15        MS. RANUM:  Objection to form.
16        MR. NYESTE:  Yeah.  Can you repeat that?
17                       (The record was read as follows:
18                         Q. Throughout your career as
19                         an interviewer, on how many
20                         occasions has somebody left an
21                         interview with you where they
22                         were brought in by law
23                         enforcement for that
24                         interview?)
```

 1          MR. NYESTE:  Oh, departed the office.

 2    BY MS. THOMPSON:

 3          Q.    Do you understand the question?

 4          A.    Could you be more specific?

 5          Q.    Let me ask you the question in this way.

 6                The interviews that you did with

 7    Mr. Amor were ones where law enforcement brought

 8    him into the Reid & Associates offices and waited

 9    outside, as you've described, while you did the

10    interview, right?

11          A.    Yes.

12          Q.    How many times in your career have you

13    had a situation where, just like Mr. Amor, law

14    enforcement brings somebody in for an interview,

15    you conduct the interview, and in the interview,

16    the person decides, I'm leaving, and they get up

17    and leave?

18          A.    I could not give you a specific number.

19                Has it happened?  Yes.  Has it

20    happened more than once?  Yes.  To say a dozen

21    times, five dozen times, that I can't be specific,

22    but I know for a fact it has.

23          Q.    Do you have -- can you give any

24    estimate as you sit here today about how many times

1  in your career that's occurred?

2       A.   I would have no guess exactly how many

3  times, even an estimate.

4       Q.   Can you say at all whether that number

5  is 2 or 200?

6       A.   I know it's more than 2.  Is it 200?

7  That I don't know.  I don't know.

8            Because keep in mind, law

9  enforcement could be custodial.  And if it's

10  custodial, then certainly they can't leave.  You

11  know, and so to try to answer that, I couldn't.

12  But I can be definite to say it's happened, and

13  it's happened a number of times.

14       Q.   Would that be unusual in your

15  experience?  For somebody to choose to leave an

16  interview where they're brought in by law

17  enforcement for the interview?

18       MS. RANUM:  Objection to form.

19       MR. NYESTE:  Join.

20       THE WITNESS:  Is it unusual?  That's a hard

21  question.  I don't know if I would say it's

22  unusual.  It happens.  I don't know.  I can't

23  really give you an answer to that question, it

24  being unusual.

```
 1  BY MS. THOMPSON:

 2       Q.    Did it happen frequently?

 3       A.    No.

 4       MS. RANUM:  Objection, asked and answered.

 5  BY MS. THOMPSON:

 6       Q.    Did it happen infrequently?

 7       MS. RANUM:  Same objection.

 8       THE WITNESS:  I would say it happened more

 9  infrequently than frequently.

10  BY MS. THOMPSON:

11       Q.    And I think you've testified, and you

12  said here again today, that it's your memory that

13  Mr. Amor was dressed casually; is that right?

14       A.    Yes.

15       Q.    Do you have any further memory as you

16  sit here today about how specifically he was

17  dressed other than that it was in a casual manner?

18       A.    I don't, no.

19       Q.    And when you say "casually," you mean

20  not a suit and tie.

21       A.    Correct.

22       Q.    Do you have any further details about

23  it other than knowing it wasn't a suit and tie?

24       A.    No, I don't.
```

```
 1       Q.    Have you conducted any polygraph
 2  examinations in your career where you concluded
 3  that somebody was not being truthful in their
 4  denial that they were involved in a crime where you
 5  later learned information that caused you to change
 6  your opinion about that belief that they were not
 7  being truthful?
 8       MS. RANUM:  Objection to form.
 9       THE WITNESS:  No, but I had it go the other
10  way.
11  BY MS. THOMPSON:
12       Q.    When you say "go the other way," what
13  do you mean?
14       A.    There were a couple of times where I
15  reported someone on the polygraph as being truthful
16  and it turns out they lied.
17       Q.    Do you believe there is any information
18  that you could learn about Mr. Amor's case that
19  would lead you to conclude that he was truthful
20  with you when he denied having any involvement in
21  the fire in this case?
22       MS. RANUM:  Objection to form and foundation,
23  calls for speculation.
24       MR. NYESTE:  Join.
```

```
 1        THE WITNESS:  If it goes to -- if the
 2   information he provides would go to an explanation
 3   as to what caused the deceptive results on the
 4   polygraph, then I would change my mind.
 5   BY MS. THOMPSON:
 6        Q.    If you learned information that you
 7   credit that led you to conclude that it was
 8   physically impossible for Mr. Amor to have been
 9   involved in this fire, then would you accept that
10   Mr. Amor was being truthful with you when he denied
11   having any involvement?
12        MS. RANUM:  Objection to form and foundation,
13   calls for speculation.
14        THE WITNESS:  That one I'm not sure what
15   you're asking.  Could you please ask that one more
16   time?
17        MS. THOMPSON:  Yeah, sure.
18                    Can you repeat the question for me,
19   please?
20                        (The record was read as follows:
21                           Q. If you learned information
22                           that you credit that led you to
23                           conclude that it was physically
24                           impossible for Mr. Amor to have
```

```
 1                        been involved in this fire,

 2                        then would you accept that

 3                        Mr. Amor was being truthful

 4                        with you when he denied having

 5                        any involvement?)

 6        MR. NYESTE:  Objection as to form.  I

 7   don't -- physically impossible in what respect?

 8        THE WITNESS:  Yeah.  That one, I don't know

 9   if I can answer that.  Physically impossible.

10   There's got to be some reason why the results came

11   out so poorly.  There's got to be something on his

12   mind, something he was thinking.  Unless he can

13   explain that, I don't know how I can change my

14   opinion.

15   BY MS. THOMPSON:

16        Q.    So let me ask you this.

17              If you learned information that gave

18   an explanation why in your view Mr. Amor did so

19   poorly on this polygraph examination, would you

20   change your opinion that he was being deceptive in

21   his responses to you?

22        MS. RANUM:  Objection to form and foundation,

23   calls for speculation.

24        MR. NYESTE:  Join.
```

```
 1        MS. RANUM:  And at this point it also
 2   misstates the record in terms of what the findings
 3   were.
 4   BY MS. THOMPSON:
 5        Q.    Do you understand the question?
 6        A.    Yes.
 7              If he had an explanation as to why
 8   the results were coming out deceptive, would it
 9   change my initial opinion immediately?  No.
10              If we took that into consideration
11   and ran another polygraph test to determine at that
12   point if he was being truthful, then -- and if he
13   passed, then I would say yes, that would change my
14   opinion.
15        Q.    If there was scientific evidence that
16   made it impossible for Mr. Amor to have been
17   involved in this fire, would you change your
18   opinion that Mr. Amor was being untruthful when he
19   told you that he didn't have any involvement in
20   starting this fire?
21        MR. NYESTE:  Objection.
22        MS. RANUM:  Objection.
23        MR. NYESTE:  Asked and answered and form.
24        MS. RANUM:  And foundation, calls for
```

```
 1  speculation.
 2        THE WITNESS:  If I learned information that
 3  it was impossible for him -- how -- impossible for
 4  him to set the fire.
 5        MR. NYESTE:  It wasn't so limited.
 6                  If you want to hear the question
 7  back?
 8        THE WITNESS:  Yes.
 9        MS. THOMPSON:  She can re-read it for you.
10                        (The record was read as follows:
11                          Q. If there was scientific
12                          evidence that made it
13                          impossible for Mr. Amor to have
14                          been involved in this fire,
15                          would you change your opinion
16                          that Mr. Amor was being
17                          untruthful when he told you
18                          that he didn't have any
19                          involvement in starting this
20                          fire?)
21        MR. NYESTE:  Let me repeat the objection.
22        THE WITNESS:  Scientific evidence to show
23  that he did not start the fire.  Now, is that
24  different than scientific evidence to show that the
```

1  fire couldn't have started in a certain way?  I

2  mean, that's where I'm getting confused here.

3            I'll answer it like I did.  If --

4       MR. NYESTE:  Let me ask:  Is "involved" -- do

5  you use the word "involvement" to mean set the

6  fire, or does it encompass things like knowledge

7  and planning?

8  BY MS. THOMPSON:

9       Q.    Let me restate this question.

10            If you learned information that made

11  it scientifically impossible for Mr. Amor to have

12  been present when this fire began, would you still

13  conclude that Mr. Amor was being untruthful in his

14  statement to you that when he left for the movies

15  on September 10th of 1995 he did not know his

16  apartment was going to be destroyed by a fire?

17       MS. RANUM:  Objection to form, foundation,

18  calls for speculation.

19       THE WITNESS:  Would it change my opinion, no.

20  BY MS. THOMPSON:

21       Q.    And why is that?

22       A.    Because one of the questions is, Do you

23  know who set the fire in your apartment, and he

24  could have found out the next day and now he

1  doesn't want to say anything, which means he's

2  still being deceptive.

3       Q.    In that situation, is he still being

4  deceptive about when he left on September 10th of

5  1995?

6       A.    It's possible.

7       MS. THOMPSON:  I think I'm pretty much done

8  here.  Let's just take a quick break.  I'll make

9  sure I don't have anything else.

10                      (Recess taken.)

11      MS. RANUM:  Back on the record.

12      MS. THOMPSON:  I don't have any other

13  questions.  Thank you so much for your time, sir.

14                   FURTHER EXAMINATION

15  BY MS. RANUM:

16      Q.    Just a brief couple follow-ups.

17             You were asked a couple questions

18  about whether you were aware of whether or not

19  Mr. Amor had any sort of drinking problem.  Do you

20  remember being asked about that?

21      A.    Yes.

22      Q.    I want to show you ...

23

24

```
 1                       (Deposition Exhibit No. 10,

 2                        Witness Masokas, was marked for

 3                        identification 11/05/2019.)

 4   BY MS. RANUM:

 5        Q.    I'm showing you a document that's been

 6   marked as Exhibit No. 10 to your deposition.  It's

 7   a two-page document -- excuse me -- it's a

 8   four-page document marked SDT-REID 9 consecutively

 9   through 12.

10                  Now, earlier you were asked some

11   questions where the polygraphs of Tina Miceli and

12   Bill Amor, which were previously conducted in

13   September of 1995, you were asked if you had any

14   knowledge of those.  Do you remember being asked

15   about that?

16        A.    Yes.

17        Q.    I believe you testified that you had

18   seen that the reports from Richard O'Brien were in

19   Reid's file, correct?

20        A.    Yes.

21        Q.    And are these the reports that you were

22   referring to when you testified about that?

23        A.    Yes.

24        Q.    Now, if you refer to page SDT-REID 10,
```

1   which is the second page of the first report, now

2   this says, Due to the unemotional response in this

3   subject's polygraph records, this examiner is

4   precluded from rendering an opinion as to the

5   subject's status in this case at this time.

6              However, it should be noted that the

7   subject consumed a quantity of alcohol just prior

8   to the administration of this polygraph examination

9   which may account for the unemotional nature his

10  polygraph records.  It is recommended, if deemed

11  necessary, that this subject is given a polygraph

12  re-examination at a later date in order to further

13  clarify the results of his test.

14             Do you see that?

15       A.    Yes.

16       Q.    Do I understand your testimony

17  correctly that you are not certain when you first

18  received these letters in Exhibit 10, correct?

19       A.    Correct.

20       Q.    But you believe that they may have been

21  presented to you upon arrival on October 3, 1995.

22       A.    Yes.

23       Q.    So you may have been aware that

24  Mr. Amor had specifically been drinking during his

1  last polygraph examination, correct?

2        A.    Yes.

3        MS. THOMPSON:  Object to form.

4  BY MS. RANUM:

5        Q.    And you in the course of asking

6  Mr. Amor to complete the medical data sheet, which

7  we've looked at in Exhibit 2, one of the questions

8  specifically asks about alcohol intake, correct, in

9  the last 24 hours?

10       A.    I believe so.

11       Q.    And please feel free to take a moment

12 to look at it, that very first question.

13       A.    Yes.

14       Q.    And Mr. Amor did not indicate that he

15 had had any alcohol in the last 24 hours, correct?

16       A.    Correct.

17       Q.    He only indicated that he had had this

18 one tablet of Actifed for his cold and sinus

19 problems, correct?

20       A.    Yes.

21       Q.    So knowing that Mr. Amor was not -- or

22 at least based on the medical data form, you had no

23 indication that Mr. Amor was intoxicated at the

24 time that you did your examination on October 3,

1  1995, correct?

2          A.    Correct.

3          Q.    You were asked some questions about the

4  post-exam interviews that are done when there's an

5  indication of deception.  Both myself and counsel

6  for plaintiff asked you some questions about that.

7                Counsel asked you a question about

8  whether you would always do a post-interview for

9  deception.

10                Do you remember being asked about

11 that?

12         A.    Yes.

13         Q.    Now, if it's a noncustodial polygraph

14 examination, the post-interview would still be

15 dependent on the cooperation of the examinee,

16 correct?

17         A.    Correct.

18         Q.    Because they were still free to leave

19 at that point, correct?

20         A.    Yes.

21         MS. THOMPSON:  Object to form.

22 BY MS. RANUM:

23         Q.    So when you answered you would always

24 do a post-test interview, that's assuming that the

 1  person continued to agree to sit for the post-test

 2  interview in the case of a noncustodial

 3  examination, correct?

 4       A.    Yes.

 5       Q.    You mentioned at one point when you

 6  were describing the results and how you scored

 7  Mr. Amor's exam, you said that some of his

 8  responses were -- I believe you used the word

 9  subtle.  Do you remember that?

10       A.    Yes.

11       Q.    Now, one of the conclusions that you

12  could have come to with any of the four relevant

13  questions that we've gone over today was

14  inconclusive, correct?

15       A.    Yes.

16       Q.    And so fair to say you're drawing a

17  distinction between subtle and inconclusive,

18  correct?

19       A.    Yes.

20       Q.    So some of Mr. Amor's responses were

21  subtle, but based on your October 10th --

22  October 20th report, am I correct that none of his

23  responses were inconclusive in terms of your final

24  determinations?

1     A.    Correct.

2     Q.    Okay.  You were asked some question

3  about the blood pressure cuff that was put on

4  Mr. Amor.

5           Have you ever had the blood pressure

6  cuff put on your arm that was used during the

7  polygraph examination back in 1995?

8     A.    Yes.

9     Q.    Have you also had your blood pressure

10  taken just generally at the doctor?

11     A.    Yes.

12     Q.    Is it the same -- when the cuff is used

13  during the test, is it the same feeling that you

14  get when you either take your own blood pressure

15  with a home machine or your blood pressure is taken

16  at the doctor?

17     A.    Yes.  However, we do run it at a little

18  bit of a lower pressure, so it doesn't get as

19  comfortable as quickly as when you --

20     MR. NYESTE:  As comfortable or uncomfortable?

21     THE WITNESS:  Doesn't get as uncomfortable,

22  like at the doctor.  You know, they pump it up

23  pretty high, and then they slowly release it.

24           For us, we don't pump it up as high,

1  so it's not as tight.  And so our tests can only

2  run -- we run them at 4 minutes, no longer than

3  4 minutes, and then we release the pressure.  So

4  they're either 4 minutes or less.

5  BY MS. RANUM:

6       Q.   So your test is intended, if anything,

7  to be more comfortable than what we've all

8  experienced when our blood pressure is taken at the

9  doctor.

10      A.   Yes.

11      MS. RANUM:  Thank you.  I think that's all I

12 have.  Thank you.

13      MS. THOMPSON:  I just have like two follow-up

14 questions to that.

15                  FURTHER EXAMINATION

16 BY MS. THOMPSON:

17      Q.   So for each of these test segments

18 where Mr. Amor is wearing the blood pressure cuff,

19 how long does the segment last?

20      A.   4 minutes or less.

21           The main test, like the first

22 straight through, the second straight through, the

23 silent answer, and the mixed question where we're

24 asking all of the question, it's 4 minutes or less.

```
 1        Q.    And there's four segments, correct?
 2        A.    When you say --
 3        MS. RANUM:  Objection.
 4        THE WITNESS:  -- four segments?
 5   BY MS. THOMPSON:
 6        Q.    It's 4 minutes or less for each of
 7   these segments, correct?
 8        A.    Yes.  4 minutes or less for the first
 9   straight through, and then there's a short break;
10   and then 4 minutes or less for the second straight
11   through, and then there's a break in between, so
12   yes.
13        Q.    Did Detective Cross or Detective
14   Guerreri give you any information about Mr. Amor's
15   marital status at any point when you saw them on
16   October 3rd of 1995?
17        A.    No, no.  It was just that he and Tina
18   were married.  That was it.
19        MS. THOMPSON:  Okay.  I don't have any
20   anything else.
21        MS. RANUM:  Great.
22             Do you want to explain signature to
23   him?
24        MR. NYESTE:  Oh, yes.  We'll review.  We'll
```

 1  reserve signature.

 2       MS. RANUM:  And then just while we're on the

 3  record, to avoid any confusion for the future, I

 4  know we've sort of tried to use whatever versions

 5  of Exhibit 5 that we could find.  But I am going to

 6  now take the original, and we'll make a nice color

 7  copy that has some overlapping between the pages so

 8  that we can kind of reconstruct it later.  And we

 9  will submit that to you as the formal Exhibit No. 5.

10            Do we have an agreement about that.

11       MS. THOMPSON:  That's fine.  If you can

12  tender a copy to us as well.

13       MS. RANUM:  We'll tender a copy, and we'll

14  Bates stamp it as well.

15       MS. THOMPSON:  Sure.

16       MS. RANUM:  All right.  Off the record.

17                 (The proceedings adjourned at

18                  4:40 p.m.)

19

20

21

22

23

24

```
1              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3    WILLIAM E. AMOR,            )
                                 )
4                 Plaintiff,     )
                                 )
5            vs.                 )   No. 18 CV 2523
                                 )
6    MICHAEL CROSS, et al.,      )
                                 )
7                 Defendants.    )

8

9          This is to certify that I have read my

10   deposition taken on Tuesday, November 5, 2019,

11   in the foregoing cause and that the foregoing

12   transcript accurately states the questions asked

13   and the answers given by me, with the changes or

14   corrections, if any, made on the Errata Sheet

15   attached hereto.

16

17                    _____
                              MICHAEL MASOKAS

18

     No errata sheets submitted (Please initial)
19   Number of errata sheets submitted _____ pages

20   Subscribed and sworn to
     before me this _____ day
21   of _____ 2019.

22

     _____
23       Notary Public

24
```

```
1                    REPORTER'S CERTIFICATE

2          I, Katie K. Elliott, do hereby certify that
     MICHAEL MASOKAS was duly sworn by me to testify the
3    whole truth, that the foregoing deposition was
     recorded stenographically by me and was reduced to
4    computerized transcript under my direction, and
     that said deposition constitutes a true record of
5    the testimony given by said witness.

6          I further certify that the reading and
     signing of the deposition was not waived, and the
7    deposition was submitted to Mr. James Nyeste,
     deponent's counsel, for signature.  Pursuant to
8    Rule 30(e) of the Federal Rules of Civil Procedure,
     if deponent does not appear or read and sign the
9    deposition within 30 days, the deposition may be
     used as fully as though signed, and this
10   certificate will then evidence such failure to
     appear as the reason for signature not being
11   obtained.

12         I further certify that I am not a relative
     or employee or attorney or counsel of any of the
13   parties, or a relative or employee of such attorney
     or counsel, or financially interested directly or
14   indirectly in this action.

15         IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office at Chicago,
16   Illinois, this 25th day of November 2019.

17

18         _____
           Illinois CSR No. 084-004537
19

20

21

22

23

24
```

1  Errata Sheet

2

3  NAME OF CASE: WILLIAM E. AMOR vs MICHAEL CROSS

4  DATE OF DEPOSITION: 11/05/2019

5  NAME OF WITNESS: Michael Masokas

6  Reason Codes:

7        1. To clarify the record.

8        2. To conform to the facts.

9        3. To correct transcription errors.

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  Page _____ Line _____ Reason _____

23  From _____ to _____

24

25                          _____

### Exhibits

**1 Masokas 110619-1** 18:18,23
24:20 191:24 193:11 195:7 196:5,
17 197:10,23 198:6

**2 Masokas 110619-2** 29:7,12
282:7

**3 Masokas 110619-3** 37:3,8
50:16 61:24 190:14 191:6,12
241:22 242:2,5

**4 Masokas 110619-4** 61:6,11,23
64:8 66:24 67:2 68:18 71:20
120:21 121:10,24 123:4 144:4
146:13 164:23,24 168:17 226:13
230:17 231:10

**5 Masokas 110619-5** 81:6,11
120:17 121:10 143:21 165:12
167:18 288:5,9

**6 Masokas 110619-6** 163:8

**7 Masokas 110619-7** 165:19,24

**8 Masokas 110619-8** 171:20
172:1

**9 Masokas 110619-9** 216:14,21
218:19,23 220:13,15 221:11,17
222:17 224:1 226:8

**10 Masokas 110619-10** 280:1,6
281:18

---

### $

**$100,000** 20:24 198:11

**$450** 166:8

---

### 0

**09** 180:7

---

### 1

**1** 18:18,23 20:16 21:23 22:1,4,9,11,
12,15,20,21 23:3,15 24:20 38:11,
24 39:2 63:12 71:23 74:14 83:10
90:13,23 91:1 92:5,7,8,10 95:8
99:23 101:11,17 104:16 117:23
119:7 122:16,19 124:19,23 126:13,
14 127:9,18 170:3 191:24 192:7
193:11 195:7 196:5,17 197:10,23
198:6 242:14 252:22

**10** 27:22 46:12 63:9,12 72:4 73:7,
22,23 90:13 105:10,16 184:13
216:5 218:2 280:1,6,24 281:18

**10/3** 149:9

**10/3/95** 76:5

**100** 86:3,17 90:15 92:1 97:2 99:14
117:15 145:23 153:10 231:6

**10:00** 43:18 149:2,3 213:6,11,18
214:8 266:18

**10:30** 149:4 212:17 213:11 269:2

**10th** 43:13 45:9,10 72:11 151:1
278:15 279:4 284:21

**11** 46:24 47:1,2 73:21,24 74:20
93:10 101:7 102:1 112:1 117:6
122:17 130:6 133:17 137:3 139:15,
16,18,20 140:11,14,18 169:9,12,
14,16,17,19 170:5 238:3

**11/05/2019** 18:20 29:9 37:5 61:8
81:8 163:10 165:21 171:22 216:16
280:3

**110** 85:22 86:4,11

**11:00** 44:4

**11th** 13:21 15:24 150:6

**12** 9:17 48:12,13,14 280:9

**14** 19:1 24:20

**15** 19:2 105:10,16 184:13 244:18

**16** 42:4,5,6 166:1 172:14

**17** 45:20,21,22 172:14

**18** 48:19,20,21 123:22

**1981** 5:20 6:12 8:3

**1982** 6:13 7:3 8:3

**1983** 7:15,21

**1985** 10:10 11:11 200:20

**1986** 9:2 10:10

**1988** 7:22,23 177:6

**1990** 10:9

**1995** 9:16,20 10:17 13:3,13,19
30:15 83:9 145:21 160:12,17,22
164:5,8 165:8 166:5,11 168:23
174:12 176:15,19 177:17 178:12
179:3 185:8 188:19 189:10,14
193:1 200:21 201:19 202:5 203:7,
11 204:20 205:8 206:10 207:15
209:24 211:22 212:11 214:24
215:13,21 216:24 227:2 233:5,14
234:3 235:17,18 236:2,8 240:11
278:15 279:5 280:13 281:21 283:1
285:7 287:16

**1996** 172:3 174:16

**1:00** 32:5

---

### 2

**2** 20:16,17,24 21:2,5,16,22,24 22:3,
9 23:3,15 29:7,12 40:9,12,13 45:3,
5 66:13,22 67:5 68:1 72:1 74:14
91:13,16 92:14 98:6,8 99:8,10
100:1 101:22 110:13 122:16,22
126:13,14 130:11 169:6,8 170:3
190:23 191:6 242:13 252:24 271:5,
6 282:7

**2's** 21:4

**20** 50:9,10 85:7,9,13,14 94:13 96:1,
3 104:5 105:9,19,22 164:5 166:14
212:11 236:8 246:9,12

**200** 271:5,6

**2000** 201:5

**2004** 178:9

**2005** 201:3

**2009** 211:17

**2010** 180:7

**20th** 235:17 236:4 284:22

**21** 19:1,9 47:6,7,12 195:8

**22** 19:1,9 123:22 192:3 193:15

**24** 32:12 50:11 124:1 282:9,15

**25** 46:20,21

**250** 13:20

**26** 124:1

**27** 38:16,17 39:15,20

**29** 42:16,17,18 243:11,12,17,19,21

**2:30** 43:21

**2A** 40:22,23

---

### 3

**3** 10:17 13:3,13 20:17 22:1,4,12
23:3,15 37:3,8 41:3,5 50:16 61:24
67:8,11 72:3 74:18 83:9 92:17
100:4 110:17 122:16 124:22,23
126:7,13,14,15 127:8 130:11,20

133:24 137:15,18,21 138:5,6,10,18
140:9,16 150:24 160:12,17,22
164:8 165:8 166:5 168:23 190:14
191:6,12 203:7 226:20 241:22
242:2,5 281:21 282:24

**30** 58:11 94:12,13,18 95:22,23
96:3,7,9,13,20 104:5,7 105:9,19,22

**300** 95:22

**35** 72:2

**39** 76:4

**3:00** 252:17

**3:50** 13:13 23:22 252:18

**3rd** 149:9 174:12 185:7 193:1
202:5,12 203:11 211:2 212:17
214:24 215:13,21 216:24 233:5
234:3 235:18 236:2 287:16

---

**4**

**4** 23:15 32:12 41:19,20,21 61:6,11,
23 64:8 65:18,21 66:1,24 67:2,11
68:18 71:20 72:13,14 74:14 92:20
98:11,17,21 100:6 109:18 113:14
118:17 120:21 121:10,24 122:16
123:4 126:13,14 144:4 146:13
164:24 166:8 168:17 226:13
230:17 231:10 286:2,3,4,20,24
287:6,8,10

**40** 35:21 104:7

**45** 158:14,22 263:17

**46** 61:12

**47** 37:9 242:5

**49** 37:10 191:7 247:4

**4:30** 23:22

**4:40** 80:3 147:11,13 211:3 288:18

**4th** 79:23 211:22

---

**5**

**5** 43:5,6,7 69:6 72:16 74:18 81:6,11
92:23 99:6 100:9 111:17,21
118:18,19 120:17 121:10 122:17
126:13,14 127:22 128:16 129:3
131:13,14,15 132:1,17 134:6,10,
14,16,22 138:22,23 139:19,20
140:9,17 143:21 165:12 167:18
226:20 288:5,9

**5:00** 211:8,10 268:23 269:1

**5:20** 80:8 147:18,19

**5:40** 147:23,24

**5:45** 80:11

---

**6**

**6** 72:24 73:1 74:20 93:1 100:11
107:19 110:22 111:3,14 112:9
117:6 126:13,14 128:12,14,15,17
129:3 132:13,14,18,22 135:3,6,7,8
137:24 138:5,7,11,15,19 140:2,4,
11,14,17,19 151:11 163:8,13,19
172:3 174:16 228:19

**6:15** 43:23 147:23 148:1

**6:20** 44:1

**6:25** 22:6 193:18 194:4,10

**6:30** 22:6 148:4,6 194:10 220:7
248:2 264:16

**6:31** 21:17

**6:40** 21:5

**6A** 107:21

---

**7**

**7** 47:20,21,22,23 73:4 74:14 93:3
98:10 100:13,16 108:23 109:2,7,
10,12 118:24 126:13,14 163:13
165:19,24 247:6,23 248:5

**70** 87:3,6 90:16 92:1 97:2 99:14
117:16

**72** 97:11,14

**74** 93:22 94:1 102:8

**76** 106:10 113:1 119:13,15

**7:30** 148:6,9 220:7 264:16

**7:45** 148:10,15 221:10 235:11
252:6 262:3 263:18 264:10,21

**7up** 45:13

---

**8**

**8** 73:6,10 74:18 93:6 98:15 100:24
112:5 119:3 126:13,14 129:6,7,23
132:24 135:9 136:8,10,12,15
139:22 140:3,4,5,9,18 163:14
171:20 172:1 226:20 228:17

**80** 85:22 86:12,15,19,21 87:6
250:18

**80s** 28:17 29:21

**86** 200:20

**8:30** 148:18 221:10 235:11 252:6
262:3 263:18 264:10,21

**8:45** 148:21 212:24 222:3 266:12

---

**9**

**9** 46:2,3,4 54:23,24 73:14,17 74:18
93:8 101:4 108:22 110:9 119:4
126:21 129:20,22 130:6 133:4
136:17,21 137:10 140:9 169:4,14,
15,17,18 170:5 216:13,14,21
218:19,23 220:13,15 221:11,17
222:17 224:1 226:8,20 280:8

**9/10** 19:24

**9/10/95** 21:4

**90** 199:20

**95** 19:24 41:16 72:5 73:7 202:23
236:4 253:1

**9:00** 43:18 149:11 159:20 233:5
252:10,22

**9:15** 148:22 213:1 222:4 266:12

**9:30** 149:2 213:6 214:7 266:17

---

**A**

**A-M-O-R** 223:16,17

**A-M-O-R-E** 223:15

**a.m.** 43:18

**abbreviated** 38:10 49:24

**abdominal** 84:4 113:19

**abilities** 195:1

**ability** 11:9 31:5

**absconding** 78:23

**absent** 168:14

**Absolutely** 244:3

**abuse** 160:13,19,23

**accept** 258:15 274:9 275:2

**acceptance** 178:4 182:8,9 183:13
184:15 186:4,12 187:2,22

MICHAEL MASOKAS, 11/05/2019

**acceptant** 181:5,9,24 182:18 256:5 259:7

**accepting** 181:21 182:3 257:23 262:17

**access** 33:24 34:7

**accompanied** 11:21,24

**account** 281:9

**accuracy** 31:3,4,6

**accurate** 11:9 168:22 175:17

**accustomed** 58:9

**acknowledge** 256:6 261:11

**acknowledged** 66:2

**acknowledging** 159:11 262:16

**acquiescing** 184:18

**act** 48:22 255:22

**acted** 46:7

**Actifed** 32:5 282:18

**activity** 84:15

**actual** 15:19 36:21 51:6 55:6 58:3 62:5 71:15 80:17 151:7 153:18 167:7 237:19

**actuality** 240:7

**add** 107:20

**added** 38:17 42:19

**additional** 173:18 235:10 251:12

**additions** 108:4

**address** 75:22

**addressed** 77:14

**addressing** 251:20

**adhere** 190:11

**adjourned** 288:17

**adjust** 250:9

**adjusted** 85:18 88:9 95:24 96:13 99:20 104:5,6 111:11 118:22

**adjusting** 251:5

**adjustment** 85:10,17 87:2 88:18 89:1,7,18 94:11 96:17 99:18 100:15,18,22 104:3 108:11,14 111:2,4,7,9,13,16,22 118:20 250:23 251:1,2

**adjustments** 87:24

**administered** 146:4

**administering** 145:19

**administration** 281:8

**administrative** 211:8

**admit** 158:24

**admitted** 156:12

**advantage** 265:19

**advantageous** 159:17 265:16

**advice** 48:22

**affirmative** 91:19 92:11,15,21 93:4 99:23 100:2,7,13 109:14,19 110:15 117:24 118:15,16,17,18 119:1,3,5,8

**afraid** 160:5,8

**afternoon** 4:7 45:11 173:15

**Age** 76:4

**agency** 207:6

**agree** 209:4 239:15 242:10 284:1

**agreeable** 181:6,10

**agreed** 185:11 209:1 230:12

**agreeing** 261:7

**agreement** 201:18 288:10

**ahead** 55:22 65:14 202:9

**air** 86:7,10,16,18 90:1 94:5 97:10, 14 102:7 103:2 112:20,21 119:18 250:13,16

**alcohol** 189:5 190:1 191:8,10 193:5 263:16 281:7 282:8,15

**alcoholic** 189:3,12,19

**alcoholics** 188:13,21

**alert** 32:18

**all-encompassing** 49:11

**allegations** 151:21

**alluded** 256:4

**aloud** 72:9 74:12,16

**alter** 236:18

**alternative** 142:4

**amend** 176:13

**Amor** 10:17 13:9,23,24 14:3,6,11 15:3 16:19 17:5,9 18:6 20:16 21:23 22:5,10,15 24:2,6,10,13 26:10

27:5,15,20 28:1 31:19 32:4,11 33:6 34:15,24 35:8,17 36:2 37:13 39:3, 16 40:11 41:4 50:17,20 51:17 52:5 54:7,18,22 55:3 57:11,21 60:22 62:4,15 64:11 66:10 67:23 70:6 72:20 73:10,17 74:4 77:6 80:17 81:21,24 92:10 145:20 148:7,16, 21,23 149:2 150:10 152:14 153:2 154:22 155:18,20 156:12,16 157:6, 20 158:12,18,24 159:10 160:2,12, 14,19,21,24 161:2,16,23 162:2 163:2,5 164:9 165:3,14 166:5 167:7,13 168:23 171:17 172:11,19, 20 173:2 178:24 180:22 184:11 185:7 186:5,14,24 191:11 192:8,15 193:1 195:10 197:2 202:4 203:5,8 204:4 206:13 208:21,22 210:20 211:3 212:8,18,24 213:6,14,21 214:7,23 215:11 216:4,23 218:8 220:7,16,18 221:11,24 222:5,8 223:9,11,19 224:1,5,20 226:18 230:9 232:17 233:9 234:1,5,9,16 235:7,11,18 236:15,19,23 237:7,11 240:1,6 241:8,14 242:9,21 243:20 246:23,24 249:23 251:15,19 252:1, 5 254:2 255:7,18 258:11 259:24 260:17 261:18,23 262:2,12,15,20 263:18 264:22 266:6,11 267:13,18, 24 268:21 270:7,13 272:13 274:8, 10,24 275:3,18 276:16,18 277:13, 16 278:11,13 279:19 280:12 281:24 282:6,14,21,23 285:4 286:18

**Amor's** 10:23 13:3,15 25:17 26:5 51:13 83:6 157:15,22 161:13 174:11 180:14 187:2,19 190:16 210:5 211:21 216:9 225:20 231:19 240:22 256:3 273:18 284:7,20 287:14

**amount** 115:4 241:12

**amplitude** 128:1,7

**analysis** 229:2

**Anderson** 202:19

**annoyed** 45:24

**annoying** 250:6

**answering** 71:6 82:5 109:23 134:21

**answers** 5:1 68:14 125:13 131:16, 17 137:18 139:10,17 151:4,6 243:3 258:13

**anticipating** 4:18

**apartment** 21:4,6 22:5 48:5,8

72:6,12 73:9,12,16,19 151:2 193:18 194:3 236:15 248:1,9 278:16,23

**apologize** 37:15 82:3 183:4 227:13,20

**apparent** 134:13

**appears** 25:15 98:21 164:1

**applicable** 78:5

**applicant** 79:6

**apply** 142:16,24 178:2 189:15 233:2

**applying** 79:9 189:23 190:9,12 229:16 232:16

**appointment** 202:9 252:13,14,15, 16,17

**approach** 254:12 259:5

**approached** 47:3

**approaches** 253:12 254:5

**approximately** 7:22 23:22 27:22 149:4 158:11,14 179:19 194:4,10 248:1

**area** 15:13,18 16:1,18 33:11,16,21, 24 34:6,9,12 41:12 150:7 153:17 201:10 218:19

**argument** 50:4,6 70:23 74:1 237:20

**arm** 28:12 59:1 60:2 97:20 99:1 226:1 249:24 250:3 285:6

**armchair** 225:15

**arms** 40:19 225:16

**arranged** 216:8

**arrival** 12:5 13:15 18:2 281:21

**arrive** 252:18

**arrived** 172:19

**arriving** 202:12

**arrow** 148:24

**arson** 188:6 196:9,19,24 198:1,3 236:13

**Arthur** 143:14 148:13,20

**ashtray** 22:17,18 192:9

**asks** 282:8

**aspect** 201:23

**aspects** 56:10

**assess** 240:11 248:18

**assessing** 141:9

**assessment** 182:5 229:1 230:13

**assessments** 204:3

**assigned** 202:24

**assist** 248:22

**assistance** 16:12

**associate** 80:14 157:6 180:23

**Associates** 7:7,11,14,20 8:14 9:4 11:12 16:4 25:9 121:12 174:11 176:17 178:5 188:18 200:3,5,8,18, 19,22 201:16,19,21,22 202:14,23 203:22 204:8,19 205:9 206:3,15 207:15 209:24 214:20,22,24 215:5, 9,12,22 222:15 227:2 234:2 268:6, 13 270:8

**assume** 34:1 120:2 174:2

**assuming** 18:10 146:2 283:24

**ATN** 148:11,13,19

**attach** 58:6

**attempt** 154:14

**attend** 5:9

**attended** 8:2,14

**attention** 172:13

**attic** 201:12

**attitude** 181:3,5 245:12 259:7

**attorney** 200:2

**attorneys** 173:17 207:11

**August** 6:12

**author** 163:23

**authority** 184:18

**automatically** 245:24

**avoid** 288:3

**aware** 189:1 257:17 279:18 281:23

---

**B**

**BA** 25:20 26:2

**back** 8:3 9:14 12:7,16 16:18 17:15 24:2,4,18 29:20 30:14 31:12 34:20 43:21 48:5,8,11 49:16 51:5 55:3

61:3 65:6 67:12,14 77:22,24 78:20 81:5 85:18 94:19 95:16 96:19 97:21 99:1,3,7 108:15 111:6,11 113:10,12 116:10 118:22 120:13 132:16 133:10 137:4 138:3 139:7 146:12 148:16,18,20 149:13 152:17 155:17,21 156:16,24 157:8 158:1,11 159:14 161:11 163:3 167:1 168:16 177:5 186:9 195:3 198:17 211:9 215:2,23 225:17 226:12 238:14 241:22 248:3,7,9,14 251:1 256:20 268:13 269:6 277:7 279:11 285:7

**background** 12:3 16:21 18:13 191:15

**backside** 27:17 61:18 192:2 194:5

**bad** 56:11

**bait** 48:1 247:11,13,15,16 248:15 249:11

**bank** 16:1 150:3 215:23

**based** 32:22 39:3,17 51:16 57:16 63:21 143:9 158:1 184:4 187:9,10 208:15 257:13 259:11 282:22 284:21

**baseline** 125:5,14,20 129:11,14 133:9 137:12 139:6

**basement** 201:13

**Basic** 154:8

**basically** 17:24 36:14 38:12 53:6, 8 54:12 69:18 77:13 154:10 177:13 212:16

**basis** 241:3,17

**bat** 76:14

**Bates** 18:24 37:9 61:12 163:13 166:1 288:14

**bathroom** 150:8 268:10,22 269:10

**beat** 114:10 239:16 240:3,12 241:9,15,18

**began** 94:14 147:15 278:12

**begin** 58:8,15 60:14 150:20

**beginning** 52:6 62:16 82:23,24 83:2 84:14 85:11 95:24 98:5 104:4 170:8 173:21 186:19

**begins** 91:14 104:12 110:6

**begun** 236:14

**behaviors** 259:10

MICHAEL MASOKAS, 11/05/2019

**belief** 234:4,9,15 273:6

**beliefs** 234:20 235:7,12

**believed** 259:13

**believes** 254:6

**believing** 241:17

**Bell** 175:20 199:6

**bent** 42:11

**big** 41:16 87:9 113:21 124:10 129:18

**bigger** 113:22 152:18

**bill** 35:17 37:13 39:3,16 40:11,16 41:4 49:16 63:8 64:11 65:24 66:10 67:9,23 68:9 70:5,16 71:24 72:9,20 73:10,17 74:4 76:9 77:6 90:11 91:2 92:10,13 97:20 98:20 106:9 107:1 109:19 154:22 160:14,19,24 166:4 172:10 201:15 214:7 234:1 248:5 258:1 280:12

**Bill's** 68:3

**billed** 209:17

**bit** 5:24 10:10 20:15,19 21:3,15 22:2,14 25:4,7,22 26:23 32:17 38:13 51:24 54:23 60:21 61:17 64:19 70:17 80:1 85:14,20 87:1,14 89:8,15 91:12,16 97:6 105:11 111:8 123:16 124:12 128:10,15 129:1,2,14,16,17,22,23 130:2,5,16 131:4,10 132:19 133:1,2,12,13 134:1,2,18 137:13,14 139:23 147:2,7 148:3 152:18,19 157:9,10, 14 167:5 169:18 170:7 210:12 231:20 250:5,13 265:23 285:18

**black** 106:3

**blank** 216:18,19

**blanket** 43:24

**blind** 144:10 145:6 233:18

**blocking** 21:7,13 222:20 223:3

**blood** 30:11 31:9,10 56:14 58:9,13, 21,24 59:3 60:2,3 84:21 86:1,2,6 87:9 89:24 90:3,21 93:19 94:4 97:1,9,10 99:13,19 100:19,20 102:2,12 103:3 104:14 106:3 111:5,11 117:15 118:21 131:15,22 132:4,15,17 134:19,22 135:4,7,13, 15,17,20 136:13 137:17,18 138:12 139:10,13,23 167:12 168:13 250:3, 9,20 285:3,5,9,14,15 286:8,18

**blow** 115:4,6,11

**blowing** 115:10,15

**board** 142:24 228:2

**Bob** 14:14 20:7 195:16

**Bob's** 195:20

**body** 242:17 243:1 245:7

**bone** 127:13

**bookkeeper** 211:9

**bothering** 107:4,15

**bottom** 21:16 22:19 44:16,17 49:6 84:20 85:22 87:3 89:3 90:20 97:8, 11 98:2,3 99:13 104:16 117:15 119:15,24 124:24 125:9 129:15 133:7 139:3 164:14 218:19 247:7

**bottoms** 89:8

**box** 195:20 219:3,8 220:3

**break** 5:4 29:2 67:10 81:12 98:24 127:13 166:23 279:8 287:9,11

**Breaking** 178:15

**breaks** 5:3 161:23 184:2,7,9,10 267:14,18 268:22

**breath** 113:16,21,22 114:4 125:3 128:19 129:13,16 130:1,3 131:3,7 133:13 139:18

**Breathalyzer** 115:3,4,19

**breathing** 56:17 59:13 123:15,21 124:1 125:21 132:20 134:10 240:1

**breaths** 89:3,9 123:18,22 124:1 134:9,15 136:20 137:2

**briefing** 17:18

**briefly** 4:13 15:6 171:19

**bring** 251:1

**bringing** 202:4

**brings** 31:12 270:14

**broad** 49:11 190:7

**broke** 127:15

**broken** 127:13

**brought** 87:2,13 89:8 90:16 96:19 100:22 111:6 170:19 204:10,15 206:1,11 207:18 234:1,2 264:1 269:13,22 270:7 271:16

**building** 263:9

**buildings** 263:12

**bunch** 65:9

**burning** 21:8,14 22:16 192:9

**business** 47:18

**businesses** 78:20

**buy** 260:4,7

**buzz** 268:15,20

**buzz-in** 34:2

---

**C**

**call** 13:12 48:1 65:11,15 71:24 91:2 92:13 114:19 120:5 207:2 231:13 268:18

**called** 4:3 42:19 63:5 64:4,12 65:22 98:4,7 113:14 114:3 115:23 116:16 121:13 247:10

**calls** 21:5 43:21,22 184:20 190:5 214:10 273:23 274:13 275:23 276:24 278:18

**calm** 64:18

**candidate** 79:7

**CANONIE** 97:12 109:7

**capabilities** 217:2

**capability** 210:1 214:21 215:8,18

**capacity** 7:9 177:13 201:4

**cape** 215:19

**car** 43:23 248:2,6 260:4,6,7

**card** 64:12,13 65:1,11,15,19 66:1, 11 67:7 69:4,11 76:5,6,18,19 94:10,14,19,20 95:5,10,12,19 96:2, 21 97:7,13 98:1,5,6,8,10,11,13,14, 17,19,21,22 113:10,12,14 114:2, 15,19,20,21,22 116:1,4,15,16 123:19 239:8,10 249:22

**cardio** 97:9 108:14 109:3 111:5,14 112:18 136:17,18

**cards** 65:2,4 98:4

**care** 29:22

**career** 9:18 178:13,17 179:6,13,18 180:17 182:13 207:14,17 269:11, 18 270:12 271:1 273:2

**Carson** 199:22 200:1

**case** 13:2 16:21 19:10 51:13 65:17 68:3 76:17 103:24 173:18 174:21,

MICHAEL MASOKAS, 11/05/2019

24 175:7,14 176:6 180:9,11,12,14 196:19 198:22,24 199:8 203:23 208:3,19 209:17 210:5 214:3 231:19 236:9 240:22 253:14 273:18,21 281:5 284:2

**cases** 9:7 177:9 210:22

**casual** 14:7,8 272:17

**casually** 272:13,19

**caught** 86:8

**caused** 273:5 274:3

**causing** 103:21 235:2

**center** 85:19 118:22

**certainty** 145:24

**certification** 6:15,21 8:6

**certified** 177:17,23 233:8,13

**chair** 42:2,15 44:10 47:19 83:18,21 217:9 218:4,5,6 220:18,22 221:3, 21,24 222:11,12,13,14,19 223:11, 20 224:2,4,7,23 225:2,4,7,11,12, 19,20,21 244:7

**chairs** 15:15 21:7,13 27:23 54:24 216:6 219:16 220:2,4

**chance** 42:20,23 176:4 197:15 243:23 244:4,14,16,23

**change** 107:5,16,18 125:5 234:23 235:7,12 249:13,14,19 273:5 274:4 275:13,20 276:9,13,17 277:15 278:19

**changed** 54:10 107:19,24 125:21 166:13 177:10,11 249:17

**channel** 126:2

**character** 183:9 255:23

**charge** 201:21

**charged** 166:11,17

**Charles** 200:2

**chart** 58:8 59:9 88:6,7,8 89:22,24 95:6 96:1 112:17 120:2,15 121:14 143:20 165:12,13

**charting** 59:5

**charts** 128:5 147:23,24 167:17,22

**cheaper** 260:7

**cheat** 38:4

**check** 44:18 75:3,5,7 93:18 97:17 106:7 112:22 119:18,20 121:15,16,

17,22,23 122:7 124:21 125:22,23 126:1,3 127:2,4,6,11,23 128:11 129:19 130:7,12,15,16 131:11 132:2 133:3,5 134:4,24 135:11,12, 17,20,22 137:14 139:11,24 140:5 169:9,13 191:16,17 233:20

**checked** 28:12

**chest** 59:17 84:7

**Chicago** 5:13 25:13 72:14

**chief** 7:24 9:3 23:5,13,14 177:6,11

**children** 76:3,4

**choose** 271:15

**chose** 65:18 98:22

**chronological** 198:6

**chronologically** 126:13

**church** 39:10

**cigarette** 22:16 192:9 263:3 268:2

**cigarettes** 149:23

**circle** 77:3 83:3 97:18 102:19 106:14 119:19 126:5,17 149:21

**circled** 37:19,23 76:2,21,23 78:16 126:4,7 130:12,16 134:4 137:10 151:4

**circles** 126:22

**circular** 219:19

**circumstances** 11:23 235:20 237:1 243:22

**claims** 22:12

**clarification** 179:24 225:11

**clarified** 224:14

**clarify** 67:20 254:24 281:13

**class** 9:12

**classes** 8:4

**classroom** 6:4,6

**clean** 81:12 221:7

**clear** 34:22 40:6 48:18 82:4 105:13 116:13 156:4 175:12 241:11

**clerical** 76:13

**client** 209:11

**clients** 12:19 176:22 210:23

**clipboard** 224:24 225:2 226:4

**clips** 59:19 60:5 167:13

**close** 45:7 111:11

**closed** 218:11

**closest** 133:7

**clothing** 14:7 86:9 250:15

**cognitive** 195:1

**coin** 182:23

**cold** 31:20 32:6 282:18

**college** 5:10,12,13 6:2,10,22 8:3,5, 7,18 10:6,8,12

**color** 288:6

**column** 76:3 79:17 121:24 122:10, 17,21,24 126:18

**columns** 122:6,7,12,13 123:4

**comfortable** 33:1 152:19 163:6 231:24 266:7 285:19,20 286:7

**commenced** 95:19

**commencing** 58:3

**comment** 127:2

**commission** 266:2

**committed** 244:9

**common** 215:17 261:22 262:22 263:15

**communicate** 145:16 153:3

**communicated** 153:7 165:7

**community** 176:21 177:4

**compare** 66:8 115:2 138:1 139:14 140:1

**compared** 139:19 169:16

**comparison** 169:21 226:22 228:18 229:20

**complain** 162:15,17,23

**complete** 9:24 35:7 91:9 93:16 101:13 102:10 105:3 260:5 282:6

**completed** 27:18 28:1,4 224:20, 22

**completely** 33:1 86:15 146:9

**completing** 27:20

**completion** 6:14 32:22

**complying** 217:8 219:14 223:14

**component** 71:15

**components** 171:2

**concern** 31:24 32:3,17 56:22 77:10,14 124:13 240:4

**concerned** 32:7,13 146:11 240:2 259:21,23

**concerns** 161:3,6,13 239:24 241:14 253:5

**conclude** 237:22 273:19 274:7,23 278:13

**concluded** 51:4 112:17 148:1 212:6 236:14 237:10 238:8,19 265:15 273:2

**concludes** 101:23

**conclusion** 144:23 151:16 205:20 206:12 208:20 240:5

**conclusions** 284:11

**concrete** 240:19

**condition** 30:2,19 161:4,7,14

**conduct** 154:11 189:8 206:16 207:22 210:14 246:5 248:23 270:15

**conducted** 9:21 10:16 83:11 178:8,12,14 179:6,12,17,22 180:17 203:12,23 205:3 232:17 234:8,13 235:6,10 254:1 273:1 280:12

**conducting** 10:18 188:4,12,20 210:19 232:10,19

**conductive** 60:6

**confer** 212:10

**confirm** 240:18,21

**confused** 278:2

**confusing** 136:4 174:1 253:18

**confusion** 288:3

**connected** 83:17

**connecting** 259:17,22 260:13

**connection** 197:16 203:4,23 204:19

**connections** 262:20

**consecutively** 280:8

**consent** 24:14,22

**consideration** 51:17 183:23 187:20 276:10

**considered** 23:9

**consistency** 140:16,21 141:23 187:11 228:1,21

**consistent** 104:24 115:24 124:12 144:22 145:10 171:6 212:20 228:12,20 233:21

**consistently** 140:11 182:17

**consult** 9:6 201:22

**consulted** 157:5 159:8 177:8 259:20

**consumed** 189:5 281:7

**contact** 48:17 259:10

**contained** 55:1

**contemporaneously** 50:16

**contents** 47:17

**context** 182:12 183:13,20 184:10, 15,21,23 186:4,13,19 188:5

**continue** 9:7 21:10 80:10 161:12

**continued** 32:20 108:15 151:23 198:9 261:3 284:1

**continues** 113:5 135:5,6 148:19

**continuing** 138:21

**continuously** 59:5

**contradiction** 238:7,18 239:6

**contributed** 257:11

**control** 49:8,9 52:20 53:3,16 70:11 74:9,20 105:7,20 107:19 117:5 127:21 128:13,14 135:4 138:2,11 140:2 169:21 237:15 239:17

**controlled** 57:4

**conversation** 32:23 153:13,22 199:19 212:21 214:5 265:6

**conversations** 17:14 214:2 267:11

**convinced** 259:12

**cool** 181:1 199:22

**cooler** 43:24 44:2

**cooperation** 283:15

**cooperative** 259:4

**copies** 146:1

**copy** 28:23 29:4,13 81:13 95:4 109:5 174:16 198:21 201:15 226:10 288:7,12,13

**corner** 149:18

**correct** 6:23 9:18 13:16 16:8,13 19:10 20:10 21:21 23:4 26:8 28:1 30:6,15 31:3 33:21 34:13 35:1,5 52:17,21 53:10,17,18,20 54:2 56:14,18 59:22 60:3 62:1 66:1 67:2 68:19 69:3 74:9 75:1 78:6,7 80:19 82:20 84:16 91:23 92:11 93:7,9 99:23 101:19 104:20 108:8,22 109:15,20,24 110:6,7,11 111:4,14, 17,23 112:12 116:17,21,24 118:4, 7,10 119:10 120:3,17,21 123:5 136:2 141:2 143:5,21 146:20 150:8 152:3,5,9,21 156:13,14 157:2 159:1,2 161:21,24 163:3 164:9 165:4,9 167:10 169:24 170:15,20 172:11,22 174:13,17 176:13,17 182:1,14 185:13 186:1 188:14 191:4,8 195:2,10,21 197:17 198:15 203:23 204:4,5 205:5 208:5,23 209:2 211:18 213:1,7 218:20 219:1,5,17 220:4,8,23 221:12 223:21 226:23 229:24 230:13,22, 23 232:8 233:10 237:5,9,14,15 239:8,11 240:3 242:18 251:6 253:7 255:14 258:19,22 259:2 264:24 265:17 272:21 280:19 281:18,19 282:1,8,15,16,19 283:1,2,16,17,19 284:3,14,18,22 285:1 287:1,7

**correctly** 281:17

**correlate** 38:6

**correspond** 37:24 122:11

**corresponds** 47:22

**cost** 166:7

**cough** 115:6,9,14

**counsel** 173:9,20 283:5,7

**Counsel's** 224:17

**count** 123:17,21 124:6

**counterpart** 213:23

**counting** 69:4 124:7

**couple** 19:19 67:14,19 156:19 167:3 168:17 172:16 180:20 193:12 218:14 250:11 273:14 279:16,17

**court** 4:15 179:16 246:24

**courtroom** 179:23

**cover** 198:22 199:3

**covering** 107:2

MICHAEL MASOKAS, 11/05/2019

**create** 57:4 190:1

**credit** 274:7,22

**crime** 245:14 253:13 266:2 273:4

**criminal** 5:18 179:16,21 180:2,3,5

**Cross** 14:17,19 17:1,15 18:5 19:14
20:7 23:19,24 24:8 34:23 35:4 52:6
80:22 145:3,17 152:8 153:4,8,16,
22 154:2,20 160:6,13,23 165:7
172:19 173:1 195:9,12 196:16
203:14 204:11 208:4,20 211:2
212:12 266:24 287:13

**crossed** 40:19

**crowd** 255:24

**CT** 96:21,23

**cuff** 58:9,13,22,24 60:2 86:2,6,8
87:5 90:2,15 94:1,5 97:1,10 99:13
102:7,9 103:2,3,11 106:7,11
108:17 112:20,22 113:2 117:15
119:16,17 167:12 250:3,9,14,24
251:5 285:3,6,12 286:18

**curious** 172:5

**current** 29:21 75:23 200:8,13

**custodial** 271:9,10

**custody** 12:11,14,15 18:6,10 26:2,
11 170:9,10,14 171:1,7,9,17 173:3,
6

**customers** 176:22,23

**cut** 4:23 28:17,20,23

———————————— D ————————————

**D-I-S-H** 41:13

**Daley** 5:12

**dark** 127:2 131:12 133:5

**darker** 121:17 127:5 130:16 133:5

**data** 27:24 29:14,24 30:18 31:1
32:23 35:8 224:20 282:6,22

**date** 20:2,4 25:12 76:4,5 83:8
281:12

**daughter** 20:17 45:8

**day** 32:5 45:15 52:6 192:13 195:10
233:6,7 246:24 247:24 253:6
256:16,24 278:24

**days** 268:16

**dead** 217:16

**dealing** 181:8

**dealings** 203:17

**death** 21:2 235:20 237:1

**decent** 260:9

**deception** 8:21 141:11,21 142:3
145:16 152:3 154:12 164:16
182:20,22 186:6,16 187:3,13,15,16
205:5,11,21 206:18,20 207:20
208:16 209:10 227:5 228:8,13
229:22 235:2 237:23 238:2,7,10,
18,23 245:4 283:5,9

**deceptive** 64:20 140:22,24
141:16,17,24 142:10 143:1 165:14
237:11 239:10,19,21 243:8 244:6
245:16,17 249:15 259:8 265:4
274:3 275:20 276:8 279:2,4

**decided** 157:8 158:8 159:18 259:4

**decides** 270:16

**deciding** 248:23

**decipher** 19:18 37:16

**decision** 161:11

**deck** 65:6,7

**deemed** 281:10

**defendant** 180:9

**defendants** 175:6

**defended** 175:6

**defense** 207:10

**definite** 271:12

**definitively** 240:9

**deflate** 87:8

**deflated** 58:14 87:5,8 97:10 103:3
106:7,11 108:17 119:16,18

**degree** 5:14,17,18,19 8:18,21

**delay** 43:1 48:9 248:12

**delayed** 42:1,12

**deliberate** 115:20 240:20

**deliberately** 42:9 43:8 197:5
243:21

**delivery** 259:9

**demeanor** 181:4 182:4,9,11
183:13 184:4,16 186:4,13 187:22

**denial** 212:21 261:2 273:4

**denials** 256:10 259:6,8 262:18

**denied** 156:10 273:20 274:10
275:4

**denies** 22:9,10 151:17 194:13

**deny** 36:16 151:23 240:18 261:4

**denying** 159:11 212:18

**departed** 270:1

**department** 6:19 21:5 25:5,10
39:11 79:9 83:7 166:3 201:20
202:4 203:13 213:5 214:5,20 215:6
234:1

**dependent** 283:15

**depending** 11:23 60:20 232:11

**depends** 60:18

**depicted** 68:18 221:11 222:16
223:24

**deposition** 18:18,24 29:7,13 37:3,
8 61:6,12 81:6,16 163:8 165:19,24
171:20 173:16,21 174:6,10,20
175:1,4,5,15 176:5,10,12 178:22
197:16,20 198:21 199:11 203:9
216:14 226:10 229:3 241:2,13
264:8 280:1,6

**depravation** 168:3

**depression** 168:3

**deprivation** 167:21

**describe** 15:6 27:21 54:21 101:21
112:16 119:12 221:3 242:16
256:13

**describing** 87:17 121:22 182:3
223:12,20 261:17 284:6

**deserve** 244:14

**deserves** 42:23 243:23 244:23

**desk** 27:23 55:1 218:5,7 219:10,
12,13,20 225:22 226:2 268:15,19

**destroyed** 73:9,12 278:16

**detail** 242:20

**detailed** 242:4

**details** 18:2 196:3 264:14 267:4,11
272:22

**detection** 8:21 10:3

**Detective** 14:14,18,21 24:8 80:21
145:3,17 152:8 160:6,9,13,16,18,
22,23 165:7 195:9,12 196:15,16
203:13,14 212:12 287:13

**detectives** 14:6 16:18 17:1,15 18:5 19:14 23:19,24 34:23 35:4 52:6 145:17 153:4,8,16,22 154:1, 20 165:7 172:19,21 173:1 192:14 196:4,7 214:6

**determination** 144:12 145:15 226:18 227:5 230:9

**determinations** 144:7 284:24

**determine** 194:1 205:4 229:22 276:11

**determined** 189:17 193:21 206:18

**determining** 192:12

**deviate** 63:12

**dialogue** 258:4

**died** 198:14

**difference** 124:10

**differently** 52:11 243:10

**difficult** 210:13 227:9

**difficulty** 57:11,17

**direct** 172:13 235:3 244:1

**direction** 234:20 235:8

**directly** 87:16 149:17

**director** 176:15 177:1,12

**disappears** 102:3 106:4

**discuss** 154:1 211:20

**discussed** 60:9 89:19 164:23 171:2 255:19 264:10

**discussing** 24:23 159:13 214:12

**discussion** 81:3 95:15 116:12 151:24 158:19,20,23 185:2 199:14 251:9 262:15

**discussions** 212:20 213:20

**Dish** 41:13

**dislikes** 157:16

**disputing** 199:7

**disrespect** 194:18

**distinction** 284:17

**distress** 15:4

**diving** 102:21 108:13 111:10

**division** 176:16,19,20 177:2,16

**doctor** 29:5 285:10,16,22 286:9

**doctor's** 29:22

**document** 18:23 19:4,5,9 36:24 37:7,9,11 61:11,13,21 81:19 82:19 163:13,14,15 166:1 243:2,4,6 246:13 280:5,7,8

**documented** 50:20 246:16

**documenting** 246:8

**documents** 174:19,23

**doer** 42:7

**door** 15:19 16:10,19 33:11,18,23 34:16 54:15 218:2,4,11 219:1,4 220:19 222:1,19,20,21 223:3 268:6,9

**doorknob** 222:22

**doors** 15:11 21:7,14 34:19

**double** 94:4 102:7 106:6 112:21 119:17

**doubt** 197:7 198:2

**downstairs** 48:4 248:2,6

**dozen** 15:15 136:5 179:19 270:20, 21

**drafted** 235:16

**drags** 129:1 131:4,9,10 133:12 134:2,18

**dramatic** 106:18 114:4 121:18 127:5 130:4 137:11

**draw** 216:10,22 217:3

**drawing** 217:2 284:16

**drawn** 128:8,9 129:17 130:2 137:1, 13 217:13 220:13

**dressed** 14:7 272:13,17

**drew** 144:23 219:8

**drink** 45:11

**drinker** 158:3

**drinking** 45:17,19 115:18 181:17 192:13,16 255:24 262:22 279:19 281:24

**drinks** 45:13

**Drive** 13:20

**drive-in** 44:1

**drop** 69:21 70:10,11 71:1 86:12,15 132:19

**dropped** 86:16 117:7 125:14

**dropping** 70:22 118:21

**drops** 85:12

**drugs** 45:15

**drunk** 47:16

**dry** 103:20

**due** 29:20 162:9 281:2

**dues** 233:15

**duly** 4:3

**duration** 35:3 128:2,8,10 131:9 134:18 137:13

**duties** 9:3

## E

**earlier** 61:18 168:6 169:23 171:15 172:18 173:16 177:5 184:5 190:24 198:18 201:14 226:17 229:3 239:23 249:13,14,17,20 280:10

**easier** 89:15

**education** 8:9

**effect** 46:8 156:1 256:23

**electricity** 30:12

**electrodes** 84:11 103:23

**elevated** 31:11

**elevator** 15:23 16:1 150:7 215:23

**elevators** 15:11 33:10 150:2,4,5

**elicit** 53:9 261:13

**eliminate** 55:20 57:3,19 117:4

**eliminated** 70:12

**eliminating** 56:8

**else's** 25:15

**embarrassing** 266:1

**emotion** 229:18,21

**emotional** 164:15 226:21 228:6,12

**emotions** 239:17

**employed** 7:10,13 38:13 39:7

**employees** 78:23

**employment** 8:22

**encompass** 51:19 278:6

**encounter** 15:1

**end** 52:1 65:16 66:3 71:16,17 93:19 94:1 97:7,13 98:1 102:6,9,23 106:5 108:16,17 119:13,19 190:3 217:16,18

**ended** 204:7

**ends** 91:15 95:8

**enforcement** 176:23 206:1,2,10 207:5,10,13,18,23,24 269:14,23 270:7,14 271:9,17

**engage** 259:24 260:11

**engaged** 256:12 258:22 259:4 260:17 262:16

**ensure** 30:18

**enter** 80:22 218:1,2

**entire** 35:3 38:5 49:16 123:17 142:16 241:2

**entirety** 185:6,12 207:14,17

**entrance** 15:8,10 16:3,6,9 34:8

**environment** 57:6

**equal** 148:10

**equals** 94:12

**equipment** 210:11,15

**error** 198:23

**escorted** 16:17 24:2 170:17

**essentially** 167:10 198:6

**establish** 262:20,23

**estimate** 9:21 270:24 271:3

**estimation** 9:24

**evaluated** 75:8 140:21 141:24

**evaluating** 140:23

**evaluation** 31:17 75:10 120:2,6 132:1 140:24 141:22 144:3 234:19

**evaluations** 142:2

**evening** 247:24

**events** 36:18 233:4 248:24 256:17

**Eventually** 66:18

**everything's** 89:16

**evidence** 247:19,21 248:12 249:17,18,20 276:15 277:12,22,24

**ex-boyfriend** 41:13

**exact** 64:7 66:24 180:7

**exam** 6:19 11:20 12:2 31:3 55:3,7 56:18 57:24 59:11,14 60:18,22 75:11 76:5 78:19 80:6 143:11,18 144:16,18 145:1,4 146:1 151:7,16 171:3 178:24 179:16,22 180:15 181:12 190:16 203:1 205:20 207:6, 20 208:4 210:19 211:22 226:18 229:1 231:3 250:4,8 257:14 284:7

**examination** 4:5 10:4,16,23 13:2, 3,9 30:5,9,14 32:2,9,15 33:2 35:10 53:1 54:16,21 56:24 57:24 58:4 62:5,16 64:1 67:22 71:16,18 76:10 77:7 80:17,18,22 81:24 82:19 85:2 119:10 145:20 146:6 152:14,17 153:19 154:3,11 161:4 162:11,14 164:8 165:4,17 166:4 167:6,7 170:9 173:13 178:8,19 189:2,12 191:23 200:17 206:11,17 224:15 226:6 232:10,16,17 233:9 234:14 240:17 253:12 275:19 279:14 281:8 282:1,24 283:14 284:3 285:7 286:15

**examinations** 9:8,21 11:13 78:22 178:14 179:5,12 187:1 188:5,11, 13,21 200:14 273:2

**examined** 4:4

**examinee** 283:15

**examiner** 6:1 7:5,18,20 8:1 9:4 25:2 52:16 78:13 143:14 177:7,12 188:24 213:23 214:1 231:23 233:8, 14 281:3

**examiner's** 85:17

**examiners** 9:5,9,12 177:8 231:2

**examining** 192:24

**exams** 60:19 61:1 178:11 180:16 230:12 231:8 233:20

**exception** 70:19

**excess** 86:10

**excuse** 135:10 232:7 280:7

**exhale** 128:3 131:5

**exhausted** 32:19 168:10 184:6

**exhibit** 18:18,23 24:20 28:24 29:3, 7,12 37:3,8 50:16 61:6,11,23,24 64:8 66:24 67:2 68:18 71:20 81:6, 11 120:17,21 121:10,24 123:4 143:21 144:4 146:13 163:8,17 164:23 165:12,19,24 167:18 168:17 171:20 172:1 190:14 191:6, 12,24 193:11 195:7 196:5,17 197:10,23 198:6 216:14,21 218:19,

23 220:13,15 221:11,17 222:17 224:1 226:8,13 230:17 231:10 241:22 242:2,5 280:1,6 281:18 282:7 288:5,9

**exit** 16:11 21:6

**exiting** 34:11

**expect** 168:2,4

**experience** 114:7 178:2 187:1,24 188:23 193:4 214:16 271:15

**experienced** 286:8

**experiences** 207:23

**experiencing** 190:1

**expert** 10:3

**experts** 236:13

**explain** 11:18 20:11 29:15 30:8 33:8 36:17 43:14 49:5 58:2,15 61:2 75:5 85:4 93:13 95:21 121:9 124:20 154:15 155:16 177:22 183:22 206:22 208:18 217:14 228:24 229:5 243:18,19 247:13 249:18 275:13 287:22

**explained** 24:15 27:8

**explaining** 159:10 264:22

**explanation** 265:2 274:2 275:18 276:7

**express** 196:7

**expressed** 183:24

**extensively** 164:12

**extent** 122:3 240:15

**eye** 48:17 244:3 259:10

F

**face** 15:10 157:9

**fact** 119:17 126:3 132:15 146:3 172:18 173:5 183:10 189:24 193:6 197:1 236:18 244:17 256:5 270:22

**factor** 31:16 52:7 228:13

**factors** 228:23

**failed** 31:9

**failing** 156:8 255:14

**fair** 16:1 32:24 34:3 57:6 63:23 132:10 179:24 182:4 196:2 253:22 284:16

**fairly** 127:12 133:4 137:11 242:4

**fallen** 22:17 192:10

**falling** 99:17 103:16

**false** 190:2

**families** 22:20

**family** 151:23

**fan** 65:2

**fast** 44:9

**faster** 123:16

**February** 6:13

**fee** 166:11,17

**feel** 12:17,19 19:4 24:16 40:3,4 41:23 45:22,24 48:14 51:19 106:17 107:4 222:24 223:7 229:7 231:24 266:6 282:11

**feeling** 49:2 184:3 285:13

**fees** 166:13 233:16

**feet** 27:22 33:15

**felt** 33:1 159:16 265:16 266:5

**field** 8:11 233:21

**fields** 6:6

**figure** 33:8 181:13

**figures** 184:18 217:5,7

**file** 81:15 145:24 174:7,10 178:22 203:10,21 204:8 212:2 230:22 264:18 280:19

**fill** 24:18

**filled** 27:13 78:3 149:12 203:4

**final** 70:1,5,7,16 84:18 113:5 142:7 145:14 240:13,17 284:23

**finalize** 164:4

**find** 11:8 64:22 182:24 189:4 191:19 239:6,22 243:7,24 244:24 245:6 261:14 265:23 288:5

**finding** 141:16 152:2

**findings** 276:2

**fine** 32:18 256:20 288:11

**finger** 167:13

**fingerprints** 47:23,24

**fingers** 59:20 60:6 84:11 102:19 103:19,20,23,24 104:2

**finish** 4:19 110:3

**finished** 23:23 118:6

**fire** 20:5 21:4,5 40:3,17,24 41:10, 24 42:8,22 43:8 44:7,9 46:5,13 51:14,15,16 71:5 72:6,12,18 73:9, 13,15,19 117:12 151:1,20 156:3,9, 12 158:24 181:17 188:6 196:8,19 197:3,8 212:19 234:5,11,16,21 235:13 236:9,10,14 243:21,23 248:1 256:17,21,24 257:16,17 258:14 261:8 265:5 273:21 274:9 275:1 276:17,20 277:4,14,20,23 278:1,6,12,16,23

**firefighter** 79:7

**fires** 188:1

**firm** 175:6,13 198:24 199:12,15

**fit** 157:18 158:7

**fix** 42:11

**FL** 7:7

**flat** 94:6

**flip** 24:17 182:23 245:22

**flipped** 27:16

**flipping** 194:7

**floating** 84:10,12 85:19

**floaty** 94:15 103:7 108:12

**floor** 13:21 15:24 150:6

**fluctuated** 9:11 96:10

**folded** 119:23

**follow** 178:3

**follow-up** 207:22 209:15 286:13

**follow-ups** 279:16

**food** 161:17

**football** 43:19,22

**forceful** 259:9

**foregoing** 25:8

**forgery** 22:22

**forgiving** 245:12

**forgot** 268:16

**form** 11:15 13:4 15:9 17:11,20 18:14 20:13 23:5,11 24:14,18,22 25:1,16 26:6,8,11,14 27:5,7,12,16, 24 28:4,7 29:17 30:21 31:19 32:16, 24 35:23 36:4 39:6,19 40:21 41:6

50:22 52:9 53:11 54:5 55:16 56:15 57:8,13 58:5 59:7 60:11 62:3,12,14 63:3 72:22 76:11,21 122:7 141:3, 12 142:5 144:3 145:8 152:11,23 154:9 155:7 157:23 170:21 171:12 175:9 176:7 177:24 183:18 184:19 185:15,23 186:7,17 187:5,7 189:20 190:4 193:7 197:12 202:1 211:5 214:9 215:14 224:20 227:7 229:8,9 230:1,2 231:15 232:22 238:11,24 249:1 253:16 254:22 269:15 271:18 273:8,22 274:12 275:6,22 276:23 278:17 282:3,22 283:21

**formal** 288:9

**forms** 27:21 203:4 224:22

**formulate** 52:12 80:9 147:20

**formulated** 51:6,21 54:7 55:2

**formulating** 51:8 62:9 74:7

**formulation** 6:7 52:8,14

**fortunately** 6:17

**forward** 32:8,14 33:1 40:16

**found** 41:14 47:10 141:20 182:11 202:11 238:9,22 278:24

**foundation** 183:18 184:19 190:4 193:7 213:8 214:9 273:22 274:12 275:22 276:24 278:17

**four-day** 8:15

**four-page** 18:23 280:8

**fourth** 68:23 84:8,9,16 94:14,15 96:5 99:16 103:7

**FP** 47:23

**fracture** 127:14

**free** 17:9 19:4 24:16 25:19 26:20, 24 27:6,9 34:7 36:2 54:18 152:21 156:17 282:11 283:18

**frequently** 193:5 272:2,9

**friends** 22:11 43:22 151:23

**front** 33:9 61:14,20,24 65:6,17 69:8 81:19 82:6 120:10,15 151:22 190:15 193:13 194:5 222:20 226:14 241:22 266:2

**full** 183:19 184:21,23

**Full-time** 201:3

**funny** 158:5

**furniture** 216:8,22 219:13

**future** 288:3

---

## G

**galvanic** 30:11 56:21 59:18 84:10 94:11

**gave** 108:6 129:2 176:6,12 179:20 191:14 196:23 235:18 241:5 246:17 275:17

**general** 76:13 106:16,22 107:7 155:10 206:19

**generally** 63:1 256:2 266:22 285:10

**gentleman** 204:11

**get along** 44:14,22,24 45:6

**girlfriend** 21:17

**give** 4:13 36:16,17 48:21 51:11 58:14 60:12,19 64:14 67:10 97:20 98:24 101:19 105:5 106:22 113:8 128:2 132:21,22 135:7 154:14 155:15 161:4 180:1 184:12 190:2 196:12 206:21 208:18 216:12 231:5 239:20 244:4 246:19 249:24 270:18,23 271:23 287:14

**giving** 60:19,20 67:22 90:8 102:13 260:6

**glass** 15:11,18 45:13 268:17

**goal** 261:10,13

**good** 4:7 44:13,23 48:17 66:6 133:8 136:22 158:5 161:3 173:15 214:1 259:10

**gosh** 199:18 201:9

**graduated** 6:18

**great** 5:8 243:18 287:21

**greet** 13:23 17:19

**greeting** 14:3

**gregarious** 157:13 261:19

**Gross** 267:5

**gruesome** 46:23

**GSR** 85:10 96:1,12 99:16 100:21 102:21 103:12,15 104:5 108:11 111:9,22 118:20 168:13

**GSS** 106:14 107:11

**Guerreri** 14:13,14,22 17:1,15 18:6 19:15 23:19,24 24:9 34:23 35:4 52:7 80:21 145:4,17 152:9 153:4,8,

16,22 154:2,21 160:9,16,18,23 165:8 172:20 173:2 195:9,15 196:16 203:14 208:5,20 211:2 266:24 267:6 287:14

**guess** 9:17 29:1 46:19 184:9,13 195:18 199:10 244:24 271:2

**guessing** 180:6 202:20 213:12

**guidelines** 190:8,10

**guilty** 239:14 245:21

**guy** 158:5 185:22

**guy's** 260:10

**guys** 116:7

---

## H

**hairline** 127:14

**Haley** 199:5

**Haley's** 199:4

**half** 23:20 45:12 136:5 148:22 166:8 213:4

**halfway** 25:18 28:10 29:16 192:6

**hall** 54:12 217:19 268:10

**hallway** 33:12,14,15 217:15,23 218:18,19

**hand** 147:4 210:12

**handcuffed** 18:8

**handed** 24:14

**handle** 11:13

**hands** 103:18

**hands-on** 6:4

**handwrite** 231:3

**handwriting** 19:19 25:1,15 28:6,9 37:16 71:21 79:16 109:7 146:20

**happen** 42:7,10 265:9 272:2,6

**happened** 7:23 16:15 43:12 46:5 55:5 125:4 233:4 256:8,16,24 257:7 258:1 263:9 266:17,21 267:21 270:19,20 271:12,13 272:8

**happy** 226:9

**hard** 94:18 124:24 136:7 271:20

**harm** 43:3

**head** 181:21 187:19 222:23

**headache** 31:20 162:9,23

**healthy** 30:2

**hear** 116:8 183:5 218:5 277:6

**heard** 44:4 56:6 202:7 236:10,16 256:21

**hearing** 10:22 11:2 172:10 180:4 212:1,5 249:16 264:18

**hears** 132:17

**heavily** 168:10

**height** 128:1,6

**held** 7:16

**helpful** 66:14 193:2

**helps** 56:9

**hesitate** 244:7

**Hey** 202:24 252:19

**hide** 193:5

**high** 86:20 87:12 250:10 285:23,24

**higher** 8:9

**Hinsdale** 7:8

**historically** 182:17

**history** 19:10 22:20 38:13 187:10

**hit** 160:13,18

**hold** 217:1 218:16

**home** 43:19 44:1,4 201:10 253:3 257:3 285:15

**hooked** 59:11 167:10

**hope** 268:19

**hoping** 57:3

**hour** 23:20 148:8,22 157:1 199:20 213:4 258:9,21 259:3 260:23

**hours** 32:12 50:11 153:11 166:8 282:9,15

**How'd** 44:14,24

**hungry** 161:16

**Hunter** 7:7,8

**hurt** 41:15 46:1 50:2,7 70:24 74:2 237:14,18,21

**hyperemesis** 253:2

**hypothetical** 247:17,21 248:5,10

## I

**idea** 4:14 51:11 204:6,14 210:21 222:3 230:19 246:11

**identification** 18:20 29:9 37:5 61:8 81:8 163:10 165:21 171:22 216:16 280:3

**identify** 74:11 81:18

**identifying** 221:3

**idiot** 260:10

**ill** 253:2

**illegal** 49:17

**Illinois** 6:23 7:2 233:13,17

**lm** 132:8

**imagine** 121:15 193:9 197:4

**immediately** 96:9 183:1,6 276:9

**impact** 30:19 31:2,3 56:24 146:6

**impacting** 167:21 168:4

**implication** 247:19

**imply** 199:1

**important** 4:16 223:5 245:1 266:4, 5

**impossible** 274:8,24 275:7,9 276:16 277:3,13 278:11

**in-between** 102:13

**incident** 23:13

**included** 176:23

**including** 117:12 261:23

**inconclusive** 77:23 142:6,11 143:2 284:14,17,23

**incorrect** 193:22

**increase** 131:18 137:19

**increased** 94:13 96:3

**independent** 146:9 179:4,11

**independently** 141:1

**indicating** 77:5,9 83:19 85:6 86:10 87:19 88:16 95:8,9 103:4 113:21 115:7,12 121:21 128:3,4 129:15 130:21 194:11 217:17,18,21 218:3, 5,9,11 219:1,22 220:14,19,20 237:23

**indication** 96:21 141:10,20 142:3 145:15 151:3 196:23 245:13 246:14 282:23 283:5

**indicative** 164:16 245:16 246:6

**indicator** 116:20 134:21 183:14 184:5,17 228:8

**indicators** 235:1 245:8

**individual** 12:10 208:18 260:9

**individualized** 143:2

**individuals** 11:14 14:5,11 16:15 64:20 182:18 243:8 244:6 245:17 265:23

**inflate** 96:24

**inflated** 86:2,7,11,24 90:15 97:1 99:13 109:3 117:14

**influenced** 152:8

**information** 12:3 16:21 17:21 18:12 20:21 76:8,9,14 145:11 190:2 191:15,21 192:23 235:17 236:8 248:21 257:3 267:4 273:5,17 274:2,6,21 275:17 277:2 278:10 287:14

**informed** 106:8

**infrequently** 272:6,9

**inhalation** 21:3 198:15

**initial** 8:6 14:2 15:1 27:3 56:5 276:9

**initially** 21:23 97:1 121:5 155:24 218:9 220:6 250:12

**initials** 25:21 26:2 78:13,15 83:9

**injury** 28:12

**innocent** 64:15 245:24 249:19 259:12

**inside** 16:10 167:9 187:19 219:7, 12,16,24 268:8

**inspection** 121:13 231:7,9 232:6, 7,18

**instance** 31:8 38:11 233:19 242:12 243:11,20

**instances** 12:4

**instruct** 65:8 68:7 69:17 200:10 207:7

**instructed** 69:17 112:23 115:8 117:9,11,19 206:24

**instruction** 200:14

**instructions** 58:14 60:13,16,20 62:15,19,23 63:2,17 66:19 67:4 70:13 71:8 90:8 102:14 104:13 108:7 207:5

**instructor** 200:9,17,21 201:2

**instrument** 55:1

**insurance** 20:24 22:11 47:13,17 151:17,22,24 194:14 198:11 212:20,22 265:7

**intake** 282:8

**intended** 154:21 286:6

**intention** 237:13

**intentional** 50:7

**intentionally** 40:4 42:9,22 50:1,2 70:24 74:2 124:13 142:11 143:6 197:8 237:18,21

**interactions** 185:7

**interesting** 131:15

**interfere** 99:19 100:21

**interfering** 118:21

**interject** 118:1 158:18

**interrogation** 6:8 174:12 178:24 180:15 200:12 211:22

**interrogations** 180:16 187:2 188:5 189:16 203:12

**interrogator** 189:17 190:3

**interrupt** 82:2

**interruption** 183:3 227:12

**intervening** 267:5

**interview** 12:7 24:3,6,9 27:19,21 33:4,5,14 34:14,18 35:12,13,14,17, 20 36:8,23 37:1,13 38:18 50:17,21 51:3,16 52:1,3,4 54:13 61:15 76:13 91:2 147:14,15,20 148:5,7 151:15, 19 152:18 153:2 154:6,22 155:2,5, 9,17 156:11,24 157:2 158:12 159:3,4,14,15,22 161:8,12 162:18, 21,24 171:3,4 176:21 179:17,22 184:24 190:3 191:11 200:11 202:5 205:9,12,17,22 206:16 207:22 209:15,19 210:14 216:2,23 220:16 222:4 224:18 225:5,9 235:7,11 248:16,23 249:7,23 251:13,14,24 252:4,7 253:19 254:6,7,9,19 255:1, 7,9,12,17 256:14,23 257:6 258:12, 22 262:3,11 263:6 264:15,21

265:14 266:11,17 267:15 269:13, 14,21,24 270:10,14,15 271:16,17 283:24 284:2

**interview/interrogation** 8:15

**interviewed** 178:18 182:12 216:23

**interviewee** 254:21

**interviewer** 223:3 248:23 254:5,6, 9,16,18 269:12,19

**interviewers** 9:6 177:8

**interviewing** 6:8 177:3 220:7 245:10 246:23

**interviews** 22:15 179:5,11 185:19 192:7 204:20 210:2 212:8 216:3,9 222:16 237:7 246:18 251:17 254:1 263:9 266:21,23 267:1,5 270:6 283:4

**intoxicated** 189:7 282:23

**introduce** 195:12,15

**INV** 20:7

**investigating** 196:9,18,23

**investigation** 10:19 17:22 36:14 53:5,23 145:22 146:5,11 188:1,6 204:12 234:6

**investigative** 71:7

**investigator** 12:1,2,21,23 42:13 195:19 214:1

**investigators** 11:21 20:9 36:15 51:11 149:14 158:2 159:9 191:14, 22 212:17 213:13 263:24 269:8

**invoice** 166:2

**involved** 21:24 22:1 23:10,13,15 51:14 156:2,9 181:15 208:11 234:16,21 245:13 254:8,20 255:23 257:14 273:4 274:9 275:1 276:17 277:14 278:4

**involvement** 36:17 159:12 212:19 234:5,10 235:3,13,19 236:24 248:17 253:13 254:10 257:11 261:4 273:20 274:11 275:5 276:19 277:19 278:5

**irrelevant** 53:6,19 74:8,13 105:10, 14 109:1 249:21

**issue** 17:22 47:24 78:19 83:5 181:7 196:19 214:3 234:6

## J

**Jacobowski** 202:20

**jerk** 260:5

**Jewel** 209:8,9

**job** 7:4,6 229:14

**John** 8:14 16:3 25:9 121:12 165:8 174:10 176:16 188:18 189:10 200:3,5,8,18,22 201:16,19

**Join** 185:24 227:8 238:13 239:1 249:2 254:23 271:19 273:24 275:24

**joking** 262:22

**Juan** 175:4,13 198:21

**jumped** 95:10

**June** 41:16

**junior** 5:11

**justice** 5:18

## K

**key** 16:12

**keys** 41:12 268:17

**kill** 42:3

**kind** 4:13 15:6,7,24 20:11 28:11 39:1 51:24 52:1 59:19 60:5 84:23 85:19 86:5,9 87:22 94:18 99:17 102:2 106:3 108:13 121:20 125:2 127:12,14 128:18,21 129:1,15 130:21 131:4 132:11 134:2 137:2 157:14,17 158:17,18 169:16 181:1 202:22 217:20 218:2,6,7 225:16 232:22 250:15 260:10 263:13 288:8

**kinds** 201:11 231:8

**Kleenex** 103:23

**knew** 51:15 247:1

**knowing** 145:10 272:23 282:21

**knowledge** 17:6 22:10 40:23 51:15 178:1 194:14 203:16 212:7 222:15 235:4,19 236:24 253:4 261:7 278:6 280:14

## L

**lab** 83:10

**lack** 38:3 102:20 104:6 114:9 142:21 154:12 162:9 167:20 168:10 258:3 261:5

**laid** 157:24 163:3

**language** 243:1 245:7

**larger** 219:9

**last-minute** 252:16

**lasted** 35:20 97:6 148:8 258:9

**late** 252:11

**Laura** 82:2 199:23 200:1 224:9

**law** 6:7 42:14 49:14,18 70:22 73:3 176:23 206:1,10 207:5,9,13,18,23, 24 269:14,22 270:7,13 271:8,16

**lay** 136:23

**layout** 15:7 216:22 217:3

**LD** 75:16 77:16

**lead** 158:16 262:4 273:19

**leading** 256:17

**lean** 234:17,20

**leaning** 234:3,9

**learn** 194:14 202:3 233:3 273:18

**learned** 158:2 236:7 273:5 274:6, 21 275:17 277:2 278:10

**leave** 17:9 25:19 26:20,24 27:6,9 34:5 36:3 54:18 150:3 152:14,21 156:17,21 160:3 215:22 222:24 223:7 244:17 253:6 270:17 271:10, 15 283:18

**leaving** 248:1 270:16

**led** 15:19 274:7,22

**left** 22:5,16 37:23 44:1 49:14 73:8, 11 75:4,9 79:24 83:3 87:16 88:2,3, 13 96:9 97:16,18,19,24 99:4 122:14,18 147:2,7 149:4,10,11 159:20,23 161:10 170:14 192:9 193:17 194:3,9 211:3,10 212:18 213:14,18 217:19 219:4 222:9 233:5 249:23 251:8 252:10,22 264:20 268:23 269:13,20 278:14 279:4

**left-hand** 78:8,11 121:24 169:2

MICHAEL MASOKAS, 11/05/2019

**length** 164:23 165:12

**lengthy** 134:14

**lets** 83:22

**letter** 40:22

**letters** 281:18

**level** 192:16 242:20

**levels** 135:5

**library** 16:18,24 17:5 19:15 23:24 33:12 34:24 52:5 172:22

**license** 6:22 7:2 8:10 233:15

**licensed** 5:22 6:1,20

**lie** 10:3 49:12 64:22 114:11,20,21, 22 115:1

**lied** 273:16

**lies** 53:16 114:12

**life** 20:24 42:14 49:16 70:21 198:11

**light** 127:12,23 128:11 129:9,19 130:7,15 133:3 134:4

**lighter** 121:16 127:4

**likes** 157:16

**likewise** 4:22

**limited** 277:5

**lined** 157:14

**lines** 83:12 91:4,16 251:3

**list** 68:6 117:20,22 126:12 164:19

**listed** 42:18 64:7 67:1

**listen** 68:13 256:6

**listening** 181:20 256:12 257:21,22 259:1 260:17

**literally** 231:14

**living** 21:11 225:13

**load** 248:2,6

**loaded** 43:10,23

**lobby** 12:17 13:12,22 14:9 15:1,7, 13 16:7,9,11,16,20 17:6,10 18:9 24:4 33:7,9,10,16,20 34:1,6 35:1 52:2 150:3,7 153:10,17 170:15 172:21 215:23 217:20 225:13 269:8

**located** 13:18 33:5,6 149:24

**location** 91:21

**locations** 267:17

**lock** 54:15

**locked** 34:8,16

**locks** 34:19 268:7

**lockup** 22:22

**logical** 204:13

**logically** 214:12

**long** 7:19 38:14 42:24 46:9 48:9 99:4 105:6,15,17,20 158:11,20 199:19 232:22 248:11 286:19

**longer** 129:1 252:23 286:2

**looked** 18:15 42:12 50:15 120:20 198:21 201:15 203:3,8 224:21 231:5 264:13 266:9 282:7

**lot** 10:15 43:3 44:9 113:22 169:20 210:12

**love** 180:24 216:11

**loved** 46:1

**lower** 91:16 285:18

**lowering** 87:12

**lung** 28:13 29:19

**lungs** 28:16 29:20

---

**M**

**M-A-S-O-K-A-S** 4:11

**M-I-C-H-A-E-L** 4:10

**machine** 120:16 167:9 285:15

**made** 43:21 75:10 87:13 89:1,7,18 94:10 96:4,16 99:18 100:18,22 104:3 108:14 111:2,13,21 118:20 124:21 127:2 144:7,13 145:14 146:23 147:4 151:3 161:11 170:5 185:12 191:7 218:16 240:2 255:22 276:16 277:12 278:10

**magazine** 15:16

**main** 51:18 286:21

**maintained** 256:10 262:18

**maintenance** 39:10

**major** 32:3

**make** 21:9 26:19 29:2 30:1 34:22 36:10 37:18 44:16 55:18,21 63:22 69:1 71:21 79:20 81:13 87:14 100:15 105:12 114:1,10,11,24

145:9 173:24 185:20 190:18 217:19,23 218:15 222:23 229:1 231:13 233:20 235:22 245:8 250:23,24 266:6 279:8 288:6

**makes** 38:23

**making** 85:2 87:23 121:16,23 140:24 157:19 181:18 204:3 251:2 261:1

**male** 75:21

**man** 10:17 39:10

**managing** 202:14

**manipulate** 114:8,14,23 116:2,20 123:10 124:14

**manipulation** 115:20

**manner** 247:18 272:17

**March** 172:3 174:16

**Marge** 202:19

**margin** 28:11 37:24 79:17,22 168:20

**Marianne** 20:17 21:1 44:12,22 45:17 194:24 235:20 237:1

**Marianne's** 47:13

**Marino** 200:2

**marital** 287:15

**mark** 23:15 88:20 93:19 96:4 97:17 105:1,2 106:7 112:22 119:19,20 121:15,16,17,18 122:7 125:22,23 126:1,3 127:23 130:12 134:4 136:15,23 137:14 140:5 147:17 169:9 221:2

**marked** 18:19,23 29:8,12 37:4,8 61:7,11 65:17 80:5,11 81:7 107:11 163:9 165:20,24 171:21,24 216:15, 20 280:2,6,8

**marking** 81:11 95:22 99:8 101:17 106:3 107:21 224:10

**markings** 75:9 82:17 84:23 85:1,4 90:20 98:2 99:12 140:8

**marks** 75:3,6,7 91:4 104:23 121:22,23 124:21 127:2 140:7,14

**Marlene** 202:19

**marriage** 44:20 45:1

**married** 41:15 76:2 287:18

**Martin** 175:20 199:6

MICHAEL MASOKAS, 11/05/2019

**Masokas** 4:2,7,10 5:9 18:19,22 29:8,11 37:4,7 61:7,10 81:7,10,14, 18 95:18 163:9,12 165:20,23 167:3 171:21 199:6 216:15 280:2

**master's** 8:18,21

**materials** 201:6,11 203:20

**matter** 132:15 179:21 180:2,5 244:16

**meaning** 97:17 102:10 106:7 198:2

**means** 63:6 78:18 85:9,18 93:21 94:4 96:21 97:9,18 102:7 106:8 112:22 119:13 121:14 126:1,5 132:3 138:6 169:18 177:22 247:14 279:1

**measure** 59:24 60:3,6

**measured** 58:19 59:15 83:13

**measurements** 30:13

**measures** 30:10,11

**measuring** 59:13 84:1

**medical** 24:18 27:17,24 29:13,24 30:18,19 31:1 32:23 35:8 50:13 224:20 282:6,22

**medicated** 168:11

**medication** 28:18 31:9,10 50:10, 11 142:22

**medicine** 31:12

**meet** 24:5 199:21

**meeting** 16:23 18:13 19:14 23:18, 20,23 35:4 52:5 173:1

**members** 203:12

**memory** 179:4,11 180:14 191:19 212:1 255:17 264:8,14 266:10,15 267:10 272:12,15

**men's** 150:5 267:22 268:3

**mentally** 21:22 194:20

**mentioned** 33:17 52:20 58:21 168:8 284:5

**mess** 14:13

**met** 13:24 14:18,21 16:14,15 17:5 24:10,13 41:16 172:21

**metal** 59:19

**methodologies** 232:15

**methodology** 178:3 229:23

253:11 258:18

**methods** 232:9 233:2

**MFCW** 75:20

**Miceli** 20:17 21:1 194:24 198:12 235:21 237:2 280:11

**Michael** 4:2,10 14:19

**mid** 28:16 29:21

**middle** 21:10 108:12,15

**midsection** 59:22

**Mike** 14:16 20:7 41:12 195:13

**mind** 19:19 124:9,17 166:22 168:16 184:8 186:3,12 271:8 274:4 275:12

**mine** 25:3,6 144:22 157:10

**minimal** 127:23 129:9,19

**minus** 46:16,18 91:20,22 110:5 118:9 150:14 151:3

**minute** 17:16 75:14 97:6 123:22 124:1

**minutes** 35:21 44:3 67:8,11,14 97:22 99:2,6 158:14,22 184:13,14 199:20 208:17 244:18 263:17 286:2,3,4,20,24 287:6,8,10

**Miranda** 171:11

**misconduct** 254:8,11,20

**misidentification** 22:7

**misidentified** 21:20 22:3

**missed** 227:19

**missing** 95:5

**misstates** 187:6 231:15 276:2

**mistake** 116:9

**misunderstood** 175:22

**mix** 69:16,19

**mixed** 22:8 68:23 69:7,13,24 106:23 108:7,18 112:14 116:24 123:1,20 126:19 137:6,7,9 138:1 169:22 286:23

**model** 245:15

**mom** 43:20 45:18 46:10 191:2

**moment** 34:21 37:10 118:1 163:15 282:11

**money** 22:21 151:22

**monitoring** 30:14

**monitors** 59:21 60:8 167:13

**monologue** 258:4,5 262:12

**month** 199:18

**months** 6:3,4 22:22 39:12 78:22

**morning** 80:12 149:12

**mother** 42:3 45:6,8

**mother-in-law** 244:5

**motion** 10:22 13:11 35:19 171:18 172:3,10

**mouth** 41:17

**move** 9:12 12:16 40:16 83:18 207:1

**moved** 54:22 83:21 99:18 108:15 152:17

**movement** 83:22

**movie** 44:1

**movies** 73:8,11 194:3 256:20 257:2 278:14

**moving** 32:8,14 33:1 106:13

**MQ** 107:1

**multiple** 63:24 228:7

**murdered** 244:12,13,21,23

_____

**N**

**N-E-W-E-Y** 143:15

**named** 10:17 232:20

**names** 14:10 23:8

**Naperville** 14:6 25:5,10 72:7 83:6 149:1 163:21 166:3,16 201:16,20, 21,22 202:3 203:13,18 209:7 213:5 214:5,20 215:6 233:24

**narrative** 256:15

**nature** 183:8 281:9

**necessarily** 23:14 31:4,6 121:3 155:8 249:3 250:23

**needed** 77:11 189:17 259:5 267:24

**needing** 253:6

**negative** 46:18 91:19 92:18,23 93:1,6,8,11 100:4,9,11 101:2,5,8, 17 110:11,19,24 111:19 112:3,7,11

MICHAEL MASOKAS, 11/05/2019

**nervous** 49:3 64:18

**Newey** 143:14 144:15 145:7 148:13,14,20 149:13 152:5 153:23 157:5 158:4,12,15 159:4,16,22 161:11 210:18 211:4,12,14,20 212:7,23 213:12,22 214:6 215:16 221:15,21 222:4 230:15 233:3 251:14 252:5,6 253:5 255:10 259:20 261:17 262:2,4,12,17,19 263:17 265:15,19 266:10,16,23 267:21 268:1

**Newey's** 143:17 144:21 157:9

**nice** 260:8 288:6

**night** 159:20 161:10 181:17 252:24

**nodding** 134:12 181:21 256:12 257:22 260:18 262:16

**noncooperative** 142:8

**noncustodial** 11:14 13:1 223:6 283:13 284:2

**nonresponsive** 142:10

**nonsmoking** 263:12

**nonverbal** 243:4,6 246:5,17 259:10

**nonverbally** 243:1,9,10 245:7 246:11 248:19

**normal** 31:13 137:4 139:7,18 166:17

**Nos** 226:20

**notation** 50:13 102:15 137:22 149:16 151:10,13 161:20 170:6

**notations** 49:4 146:16,18,23 147:4 169:23 191:7

**notch** 130:19,24

**note** 39:4 195:19

**noted** 192:21 281:6

**notes** 18:16 19:12,18 21:19 37:12 39:17 50:15 61:4 79:15,20 150:11 152:1 190:16 191:6,12,16,17 192:17 194:15,18,20 196:5,17,21, 22 197:10,15,22 198:5 203:3,6 242:2,4,15,21 246:18

**notice** 23:1 26:22 40:13 87:3 131:24 136:14 137:16

**notified** 202:24

**NPD** 149:1

**number** 22:15 38:6,20 40:20 65:15 69:12 76:6 91:10,16 102:8 106:10 115:23 126:20 163:17 184:12 192:7 194:8,12 228:22 241:4 250:21 266:3 270:18 271:4,13

**numbers** 37:20,23,24 65:9,10 76:20 98:3,4 122:16,18 124:5 190:19 231:13

**numerical** 68:17 98:1 104:19 230:3

**numerically** 67:1

**numerous** 184:2,7,8,11

**nuts** 244:15

**NYESTE** 28:21,23 29:4 66:14,17 132:6,9 135:10 175:17,19 176:7 185:15,24 186:7 187:5 199:4 205:12 227:7 229:9 230:2 232:21 238:11,14,24 249:2 254:23 269:16 270:1 271:19 273:24 275:6,24 276:21,23 277:5,21 278:4 285:20 287:24

---

## O

**O'BRIEN** 203:21 280:18

**object** 11:15 13:4 15:9 17:11,20 18:14 23:11 26:14 27:7 30:21 32:16 35:23 36:4 39:6,19 41:6 50:22 52:9 53:11 55:16 56:15 57:8, 13 58:5 59:7 60:11 62:12 63:3 72:22 76:11 141:3,12 142:5 145:8 152:11,23 154:9 155:7 157:23 170:21 171:12 177:24 219:20 232:21 238:24 282:3 283:21

**objection** 175:9 176:7 183:18 184:19 185:15,23 186:7,17 187:5,7 189:20 190:4 193:7 197:12 202:1 211:5 213:8 214:9 215:14 227:7 229:8,9 230:1,2 231:15 238:11 249:1 253:16 254:22 269:15 271:18 272:4,7 273:8,22 274:12 275:6,22 276:21,22 277:21 278:17 287:24

**objective** 145:12

**observations** 57:16 127:19 157:20,21 187:11 213:21 243:2 246:5,8,23 259:7,11

**observed** 186:24 187:21

**observing** 122:3

**obtain** 7:1 265:20

**occasionally** 263:10 267:22

**occasions** 269:12,20

**occur** 205:3

**occurred** 41:16 184:3,10 264:15 271:1

**October** 10:17 11:11 13:3,13,19 30:15 79:23 83:9 149:9 160:12,17, 22 164:5,8 165:8 166:5 168:23 174:12 185:7 188:19 189:9,14 193:1 202:5,12 203:7,11 204:20 205:8 206:10 207:15 209:24 211:2, 22 212:11 214:24 215:12,21 216:24 227:2 233:5 234:3 235:17, 18 236:2,4,8 240:11 253:1 281:21 282:24 284:21,22 287:16

**offended** 183:9

**offense** 244:10

**offered** 149:23 161:20 182:24 265:8

**offering** 257:10,18 265:2

**office** 12:16,21 13:13,18 15:1,8,19 16:4 25:20 27:1 33:20,24 34:9,12 51:6,22,23 62:9 120:11,13 121:10 149:4,10 150:1 153:7,11 159:20 163:6 165:8 170:18,19 172:2,20,22 201:11 210:24 211:1 222:9 252:24 268:13 270:1

**officer** 171:1,10

**officers** 16:24 17:18 170:18 171:16 204:11

**offices** 215:22 234:2 268:7 270:8

**officially** 101:22

**oftentimes** 9:12 12:1 114:13 115:20 210:10 231:17 242:24 265:22 266:4

**one's** 127:15

**one-on-one** 266:5

**one-word** 63:14

**ongoing** 233:12

**open** 219:4 268:17

**opened** 15:12

**openly** 22:13

**opinion** 121:6 123:12 154:4 165:14 186:23 187:12 208:15 236:22 240:6 273:6 275:14,20 276:9,14,18 277:15 278:19 281:4

**opinions** 235:15 236:1,19

**opportunity** 11:4 36:16,17 154:14 155:15 172:6 206:21,22 208:18

**opposed** 38:21 128:3 258:4

**opposite** 52:1

**options** 156:7 255:13

**order** 63:11 64:7 67:1,17 68:7,11, 18 69:16,20 74:24 88:10 89:13 90:13 99:21 104:19 108:20 114:9 124:18 133:23 137:7 190:3 198:6 248:18 281:12

**ordinary** 263:2,4

**original** 28:21,22 44:18 54:13 81:13,15 82:6 152:17 288:6

**originally** 95:23 221:22 224:5

**originals** 66:15

**outlined** 178:3

**output** 167:21

**overlapping** 288:7

**oversaw** 177:7

**oversee** 9:5

**overseeing** 177:15

———————————

**P**

———————————

**p-n-e-u-m-o-g-r-a-p-h** 59:16

**p.m.** 13:13 21:5 23:22 32:5 43:23 44:1,4 80:3 147:13 159:20 288:18

**pad** 144:20

**padded** 225:17

**pages** 19:4,8 172:14,15 288:7

**paper** 8:20 79:14 81:22 83:14 216:20

**paperwork** 202:22 203:2

**parameter** 125:6 128:20 133:6

**parameters** 84:3

**parentheses** 72:5,6 73:7

**part** 55:10 83:23 87:16 133:7 139:3 144:24 156:15 183:5 204:12 209:5, 12,14,16 225:23 246:21 249:6,11 263:23

**part-time** 7:7,9 39:9 200:6 201:4,5

**pass** 211:17 239:18

**passed** 6:18 211:15 276:13

**passing** 154:11,15 155:11 156:1 181:13

**past** 33:11 207:1

**pause** 39:24 105:5,15,18,21

**pay** 233:15

**paying** 209:12,13,14

**PD** 203:18 209:7

**peer** 233:18

**pen** 96:10 130:21 131:1 134:7,8 136:19,23 138:24 139:1,8 216:22 250:23 251:1

**pending** 5:5,6

**people** 64:15 182:12,24 185:18 188:13,21 193:4,6 202:19 210:13 211:7,8 213:4 214:21 215:7 221:18 232:10 239:10,14 242:23 244:1 245:5 249:19 255:22 266:3 268:7

**percent** 145:23 153:10 231:6

**perception** 163:5

**perfectly** 82:4

**perform** 32:1

**period** 9:13 177:10 204:23 205:8 221:9,18

**person** 42:10 56:23 64:16 67:21 71:1 171:9 189:1,18,23,24 190:2 192:16 202:17 206:13,16 208:14 210:13 230:10 243:9 244:4,20 245:16,18 248:18,24 270:16 284:1

**person's** 207:21 248:22

**personal** 253:5

**personality** 157:10,14,22 158:6 184:17 260:9

**personally** 202:7 231:21 261:1

**perspective** 17:8

**perspiration** 103:24

**pertain** 53:4,23

**pertinent** 36:16

**phone** 12:4 21:16 41:14 43:21,22 210:22 268:18

**phrased** 247:17,18

**physical** 161:4,7,13 230:15

**physically** 160:13,19 274:8,23 275:7,9

**physiological** 30:5,8,20 31:2 56:10 57:1 58:19 239:18

**physiology** 6:7

**pick** 43:20 65:3 98:8,10,11,14,16 268:18

**picked** 65:21,24 76:6 98:21

**picture** 66:6 190:7

**piece** 216:20 219:13

**pizza** 43:20

**place** 35:13 60:9 65:6 153:14 216:4 218:23 223:12 261:15

**places** 19:19 167:12

**plaintiff** 173:18 283:6

**plaintiff's** 173:8

**plan** 72:17

**planning** 278:7

**players** 23:10

**playing** 65:2

**pneumograph** 59:16

**point** 4:22 5:21 7:10 8:5 9:16 12:6, 20 13:10 17:17 18:1,10 24:2,9 29:23 34:15 36:21 49:11 55:5 57:23 58:3 66:18,19 67:9 76:23 77:4 80:24 89:22 91:22 98:23 103:22 106:20 120:1 130:21 149:10 152:20 153:11 156:6 157:4, 7,22 159:7,9,13,18 169:17 186:20 193:21 197:13 201:8 206:9 211:24 221:14 234:24 248:22 250:22 253:22 259:16 260:23 261:3,11,14 262:4 276:1,12 283:19 284:5 287:15

**points** 148:24

**police** 12:11 25:5,10 79:6,9 83:7 149:1 166:3 170:10,18 171:1,10,16 201:20 202:4 203:13 213:5 214:5, 20 215:6 233:24

**policies** 178:5 188:19 189:10 190:11 204:18

**policy** 20:24 22:11,13 194:14 198:11

**polygraph** 6:1 7:5,6,18,19,24 9:4, 9,20 10:3,16,23 11:13 13:1,9 19:10 30:3,4,9,10,14 32:1,8,14 33:2

45:23 47:9 48:14,23 49:8 52:16,24
54:11 55:1 57:24 58:3,7 62:5 63:24
71:15 72:11 75:8,18 76:10 78:19
79:10 80:17 81:21,24 82:19 83:11
107:3 115:21 119:23 120:16
145:20,21 146:4 147:24 148:2,17
153:18 156:1 161:4 164:8,17 165:3
166:4 170:8 174:11 176:21 177:7,
12 178:8,11,14,19,24 179:5,12,16,
21 181:12 185:1 187:1 188:4,11,
13,20,24 189:2,12 200:14,17 202:5
203:20 204:7 205:5,10,18 206:11,
15,17 207:6,7,19 209:13,18 210:2,
14,19 211:21 213:22 220:12
230:12 232:9,16 233:8,13,19
234:13 235:2 237:19 238:9,21
239:15 250:4 257:14 273:1,15
274:4 275:19 276:11 281:3,8,10,11
282:1 283:13 285:7

**polygrapher** 5:22

**polygraphs** 178:15 203:22 204:20
205:3 280:11

**poorly** 275:11,19

**portion** 77:16 191:12 196:22
214:23 215:10

**portions** 223:23

**pose** 260:16

**posed** 62:4 165:3

**position** 7:7,16 8:1 177:7,14 219:5

**positive** 101:18

**possibilities** 181:22

**possibility** 190:7 205:2 231:4,6
247:1 249:16 263:22 264:2 267:15,
23

**possibly** 116:22 181:16 195:14
211:24 263:7 266:2

**Post** 148:4 151:14,16

**post-exam** 251:13 262:3 264:15
283:4

**post-interview** 283:8,14

**post-polygraph** 210:1 216:3
235:6

**post-test** 148:5,7 151:15,19 154:6,
21 155:1,5 156:11 161:8,12
162:18,21,24 171:4 181:4 218:10
220:9,10,16 224:18 225:9 251:21,
24 253:20 255:1,7 256:14 257:4,5,
6,12,13 258:11 283:24 284:1

**potential** 189:11 203:1

**potentially** 194:24 197:23 261:22

**pounds** 86:3,4,19 250:18

**practice** 11:12 12:9,24 55:11
154:19 206:19 215:17 240:11
263:15

**pre-employment** 79:10

**pre-interview** 192:15 234:8

**pre-meeting** 196:15

**precaution** 116:1

**precluded** 281:4

**pregnant** 253:1

**preparation** 174:6,9,20 176:11
179:1 212:11 264:7

**prepare** 175:1 178:22 212:8

**prepared** 212:12

**preparing** 199:11

**presence** 22:13 161:17

**present** 16:23 28:3 35:16 153:21,
23 199:24 213:3 229:21 238:8,19
278:12

**presented** 27:5 281:21

**pressure** 30:11 31:9,10 56:14
58:9,13,21,24 59:4 60:2,3 84:21
86:1,2,3,4,6,20 87:10,13 90:1,3,21
93:19,24 94:5 97:1,9,10,14 99:13,
19 100:19,20 102:2,8,12 103:3
104:14 106:3,11 111:5,11 113:2
117:15 118:22 119:16 131:16,22
132:4,15,18 134:19,23 135:4,7,13,
15,17,21 136:13 137:17,18 138:12
139:10,13,23 167:12 168:13 250:3,
9,18,21,24 285:3,5,9,14,15,18
286:3,8,18

**pretest** 35:12,13,17,20 36:7,22
37:1,12 50:17,21 51:3 52:4 61:14
76:13 80:7 147:14,15 162:6,7
171:3 225:5,9 253:19 255:1 257:4

**pretrial** 180:3

**pretty** 44:21 45:1 66:20 133:8
136:22 155:10 159:12 258:10
279:7 285:23

**previously** 41:11 75:18 241:13
280:12

**price** 260:7

**primarily** 23:12 143:8 256:18
257:9

**primary** 123:9

**printed** 25:24 147:8

**printing** 81:22

**printout** 120:16 231:14

**prior** 12:2,4 18:1 22:21 77:23 89:2
107:8 125:8 146:5 150:19 175:2
178:21 179:1 184:24 185:2 191:16,
22 202:12 203:11,22 231:16
247:23 263:13 281:7

**privacy** 218:12 265:21 266:4

**problem** 185:4 192:16 193:5
194:24 279:19

**problems** 28:13 29:19 32:6
282:19

**procedure** 12:8 154:13 208:8,9
209:6,10

**procedures** 178:4 188:20 189:10
190:11 204:18 222:15

**proceed** 57:23

**proceeded** 255:17

**proceeding** 180:3,4 246:20

**proceedings** 288:17

**process** 6:1 35:10 51:8 75:11
144:7 162:6,8 163:3 170:8 208:12
233:17 246:1 250:4

**professional** 6:20 201:18

**program** 6:3,11,15

**progress** 261:1,5

**progressing** 261:6

**project** 8:20

**promoted** 7:24 177:6

**prompted** 116:23 181:19

**pronunciation** 14:13

**proper** 189:15

**protocol** 11:12,19 210:8

**provide** 12:3 17:21 154:24 256:15

**provided** 16:20 18:12 36:15
176:20 177:3 191:22 257:1,8

**providing** 20:21 22:23 262:13

**provisions** 43:3

**psychologist** 187:8,18

**psychology** 6:6 248:22

**published** 8:20

**pull** 241:22

**pump** 250:12 285:22,24

**purpose** 29:24 36:7 55:13 64:14 123:8,9 145:6 248:15 249:9

**purposeful** 142:8

**purposes** 30:17 123:8 169:22 239:9

**put** 54:10 60:9 69:12 91:9 131:16 134:7,8 136:19 138:3,24 139:8 152:19 285:3,6

**puts** 16:6

---

**Q**

**Qs** 147:18

**quantity** 281:7

**question** 4:20 5:5 6:7 17:23 38:5, 17,21 39:20 40:13,15 41:1,7,21 42:8,19,20,21 43:1,6,7,10 44:11 45:10 46:3,12,19,20,21,24 47:2,7 48:2,3 49:13,23 52:14 55:19,20 56:5,12 68:8,23 69:7,13,24 71:23 72:1,3,8,10,13,14,16,19,24 73:1,4, 6,10,14,17,24 74:3 76:20 77:6,11 91:1,6,9,10,14,15 92:8,10,14,17, 20,23 93:1,3,6,8,10,18 99:22 100:16,24 101:4,7,12,13 102:1 105:2,3,6,14,17,20 106:9,24 107:10,15,19,23 108:2,7,18,21 109:2,12,17,24 110:2,3,8,9,13,17, 21,22 111:3,14,17,21 112:1,5,9,13, 14,24 116:11,24 117:6,18 118:4,7, 14,15,16,17,18,19,24 119:2,4,6,7 123:2,20 124:9,23 125:8,13,20,22 126:6,16,19,20,24 127:8,22 128:13,14 129:5,8,20,22,23 130:12,13,14 131:13,14,15,16,18, 22 132:13,14,17,24 133:24 134:5, 6,10,14,16,22 135:3,4 136:8,10,12, 15,17,21 137:3,6,8,9,15,17 138:1, 2,5,10,11,18,19,22,23 139:2,15,16, 17,19,20,22 140:2,3,5,16,17,18 141:24 143:3,4 150:21,24 151:11 169:2,4,12,14,15,16,18,22 174:1,3, 8 175:23 176:3 177:6,21 179:8 184:9 189:24 192:13 196:8,13,14 197:4,6 198:1 199:10 205:14,16,23 206:14 209:22,23 214:18 215:2

221:8 227:6,9 228:6,9,17,18,19 229:11 230:5,6 232:2,22,24 235:5 237:12,15,16,19,24 238:2,3 239:3 241:11,16 242:13 243:5,9,10,14,21 244:8,11,13,22 245:19,23 246:3,7, 15 247:11,14,15,16,17,23,24 248:4,5,12,15,24 249:4,6,10,12 252:2 253:17,23 254:14 255:4 256:22 258:1 260:16 270:3,5 271:21,23 274:18 276:5 277:6 278:9 282:12 283:7 285:2 286:23, 24

**questionable** 40:3 123:13

**questioned** 254:21

**questioning** 158:16 189:18 193:1 253:11

**questions** 24:16 36:21 49:7,8,9,11 51:7,9,19,22 52:8,13,17,21,23 53:2,3,4,6,9,16,19,22 54:1,4,8 55:2,6,8,14,18,23 57:10,12,17,20 58:11 61:22 62:3,8 63:9,10 64:6 66:24 67:17 68:11,14,16 69:19,20 70:10,11,18 71:5,7 74:7,12,13,15, 17,20,23 75:4,10 76:24 80:8,9 81:23 82:5 88:11 90:12,21 103:13 104:18 105:7,8,10 107:2,3,4,14 108:3,19 117:5,10,11 118:13 120:19 127:21 138:2 140:10 141:1, 6,17,21 142:14,17,20,24 143:9 144:1 147:20,21 150:13,14,18,20 151:5,8 152:3 155:1,4,5,6 164:18, 19,22 165:2,15 167:4 168:17 169:21 172:16 173:9,10,19,22 178:11 193:12 203:19 204:18,22 224:12,17 226:19,22 227:4 228:11 229:20 237:10 238:8,20 239:7 240:2 241:4,21 242:9,22 245:6,17 249:5 250:20 251:13,18 255:6 256:23 257:7 263:1 278:22 279:13, 17 280:11 282:7 283:3,6 284:13 286:14

**quick** 29:2 87:22 224:17 279:8

**quicker** 86:21

**quickly** 285:19

**quiet** 256:11

**quietly** 172:15

---

**R**

**rack** 15:16

**radio** 236:17

**raises** 124:12

**ran** 63:5 116:1 147:23,24 208:13 276:11

**RANUM** 4:6 11:17 13:5 15:21 17:13 18:4,17,21 23:16 26:17 27:11 28:22 29:1,10 30:23 32:21 36:1,6 37:6 39:13 40:7 41:18 51:1 52:10 53:13 56:1,16 57:9,15 58:17 59:8 60:15 61:9 62:13 63:18 66:21 72:23 76:15 81:1,5,9,14,17 82:10 89:5 95:2,13,16,17 97:23 109:8 116:13,14 133:15 135:14 141:5,14 142:9 145:13 152:12 153:1 154:16 155:12 158:9 163:11,19,22 165:22 166:22 167:1,2 170:23 171:14,23 173:8 175:9,12,21 177:24 183:18 184:19 185:23 186:8,17 187:7 189:20 190:4 193:7 197:12 202:1 211:5 213:8 214:9 215:11,14 221:2 223:16 224:16 226:5 227:8,14 229:8 230:1 231:15 238:13 239:1 249:1 251:7 253:16 254:22 269:15 271:18 272:4,7 273:8,22 274:12 275:22 276:1,22,24 278:17 279:11, 15 280:4 282:4 283:22 286:5,11 287:3,21 288:2,13,16

**rapport** 260:3,12,19 262:23 263:9

**re-ask** 196:14

**re-exam** 77:22 78:20

**re-examination** 77:21,22 78:1 281:12

**re-read** 277:9

**re-reviewing** 165:13 194:15

**reach** 240:6

**reaction** 56:5

**read** 20:12 21:12 24:15 43:16 63:11 71:21,22 72:8,10,20 73:10, 17 74:3,12,15 89:15 91:6 102:1 116:10 134:22 135:7 136:21 150:21 172:14 186:8,10 215:1,3 238:14,15 246:10 269:17 274:20 277:10

**reading** 101:12 105:2 110:3 115:6 118:4,7

**ready** 19:6

**real** 114:12 130:4,5 134:3 224:17

**realized** 194:11

**realtime** 81:23

**reason** 38:18 39:21,22 48:7,10 87:5 115:17 142:19,22 166:16 222:13 226:11 246:4,13,16 248:8, 13 249:11 252:10,21 254:18 257:15 260:14 275:10

**reasons** 252:22

**reattached** 104:1

**recall** 13:8 14:2 18:11 50:19 151:18 196:4 202:7 263:1 269:4

**receive** 5:14,19 6:15 8:17 188:12

**received** 5:17 6:21 8:5 13:12 32:11 172:2 188:3 201:7 281:18

**receiving** 8:9 34:1

**recent** 11:7 28:12

**recently** 11:5 172:7 194:11

**reception** 15:18 33:11 34:2

**receptionist** 268:14,23

**receptionists** 202:21 211:7

**recess** 29:6 81:4 166:24 251:10 279:10

**recognize** 163:16

**recollection** 153:16 168:21 172:24 195:3 221:20

**recommended** 281:10

**reconstruct** 288:8

**record** 4:9 5:2 18:24 34:22 81:1,3, 5,12 82:4 95:13,15,16 104:23 116:12 167:1 175:12 186:10 210:1 215:3 218:15,16 238:15 251:9 269:17 274:20 276:2 277:10 279:11 288:3,16

**recorded** 210:9,10

**recording** 84:4,7 88:23 89:2 93:19 94:15 100:21 102:21 111:5,10 126:2 131:6 133:7

**recordings** 31:5 90:3

**records** 81:21 164:17 281:3,10

**rectangle** 219:16

**rectangular** 219:3

**red** 89:4,9 125:9,17 129:16 133:8 139:4

**reduce** 250:16,24

**refer** 81:15 194:19 280:24

**reference** 194:7 253:24

**referenced** 152:13 174:17

**referred** 197:2

**referring** 19:13 23:2 168:16 225:19 280:22

**reflect** 196:22 197:24

**reflected** 128:4 182:9 191:11 197:10

**reflects** 198:22,23 199:3

**reformulated** 77:12

**refresh** 172:24 191:18 212:1 264:8,13 266:9,15 267:10

**regard** 138:12 168:19

**regular** 225:12 249:4

**Regulation** 6:20

**Reid** 6:2,10,22 7:11,14,17,20 8:3,5, 7,14,18,23 9:4,18,22 10:6,8,11 11:11 16:4 25:9 121:12 174:11 176:16 177:18,23 178:2,5 188:10, 18 189:15,23 190:10,12 200:3,5,8, 11,18,22,23 201:7,16,19,20,22 202:14,23 204:8,19 205:8 206:3,15 207:14 209:24 214:19,22,24 215:5, 8,12,22 222:15 227:1 234:1 245:9, 11 251:18 252:1,7 253:10 254:4,17 258:19 268:6,13 270:8

**Reid's** 165:8 189:10 280:19

**reject** 183:2,6,7 185:19

**rejecting** 181:22 182:19

**rejection** 182:4

**related** 145:22 174:24 180:4 203:22 224:18 236:23

**relatedly** 250:7

**relation** 33:5,7

**relationship** 201:23

**relative** 203:7 226:21

**release** 25:9 27:12 86:17 224:21 285:23 286:3

**released** 90:1 94:5 102:7 103:12 112:20,22 113:3 119:18

**relevant** 53:3,22 74:8,16 105:8,17 109:1 126:6,16,20,23 127:20,22 129:8 130:13,14 133:24 137:8,15 138:1,10 140:10 141:1,6,17,21,23 142:14,17 143:4 152:3 164:22

165:2 206:14 246:24 284:12

**relied** 204:2

**relieving** 132:17

**reluctant** 265:24

**remain** 233:13 235:15

**remained** 17:5 34:24

**remember** 8:24 10:13,18,21 14:8, 10 18:8 155:22 166:12 170:10 180:8 197:13 199:22 202:6,8 207:24 246:12 252:12 264:1 265:7 269:3 279:20 280:14 283:10 284:9

**remorseful** 43:2

**rendering** 281:4

**repeat** 119:7 196:11 269:16 274:18 277:21

**repeated** 41:1

**rephrase** 55:20 57:19 87:6 141:4 173:23

**report** 142:15 163:20,23 164:2,4,7 168:7 212:11,15 235:16 236:5 281:1 284:22

**reported** 143:8 273:15

**reporter** 4:15 183:4 216:13 227:13,15,19,23

**reporting** 124:16 206:7

**reports** 204:7 212:8 280:18,21

**represent** 172:1 175:13

**represented** 175:19 198:24 199:6

**represents** 175:6

**request** 161:17 185:11 221:7

**requested** 161:24

**requests** 185:19

**reread** 27:1

**research** 8:20 187:12

**reserve** 288:1

**residence** 75:23

**respect** 237:17 275:7

**respiration** 30:10 59:15 84:3,6 88:22 89:2 116:16 125:6,21,24 126:2 127:24 128:21,24 129:3,24 130:18,22 131:6,23 132:3 133:2,6, 11 134:1,8,17 135:18,23 136:13,19 137:12 138:23 139:3,12 168:12

**respirations** 124:11

**respirator** 89:18

**respiratory** 28:13 29:18 59:24

**respond** 31:5 242:23,24 245:5 246:11 250:20 258:14

**responded** 39:4,18 48:18 91:22 103:10 242:9,21

**responds** 248:18

**response** 30:12 39:23 43:9 56:21 59:18 84:11 94:11 102:20 103:11, 19 104:6 121:17,18 125:20,24 126:2 127:5,6,8,24 129:3,9,18 131:23 133:2 135:8,13,16,21,23 136:10,13,15 137:12 138:6,10,16, 19 139:12,13,24 140:4 150:24 156:20 168:11,14 169:13 173:24 226:21 227:3,11,17 228:1,7,12,22 238:4 240:14 244:1 245:15,19,23 246:14 249:20 256:3 281:2

**responses** 30:6,9,20 31:2,7,14 57:1 58:19 60:6 103:13 106:18,20 122:3 132:3 141:23 142:20 164:15 228:2,17,19 231:20 237:23 239:18 243:4,6 246:17 249:13,15,17 257:1,8 258:7 260:1 262:13 275:21 284:8,20,23

**responsibilities** 177:15

**responsibility** 177:2 261:8

**responsible** 202:13 258:14

**responsive** 260:18

**rest** 20:12 66:8 97:21 99:1 149:12 226:1 249:24

**restate** 278:9

**restroom** 222:9 268:1 269:4,5

**result** 115:19 142:15 144:21 145:16

**results** 66:9 123:11 142:2,4,13 144:6 148:17 153:3,7 154:3 165:6 167:19 168:5,7 178:18 205:9,12, 18,19 207:1,2 208:5 209:11,13 213:21 257:13 265:3 274:3 275:10 276:8 281:13 284:6

**retained** 13:8 236:13

**retarded** 21:23 194:21

**retired** 200:4

**review** 9:6 11:4,7,8 19:5 35:7,11 36:20 55:8 150:18,20 163:15 172:6 175:3 176:4,10 178:21 197:15 231:3 233:18,19 264:7,12,19 266:8,14 267:9 287:24

**reviewed** 27:13,18 55:6 57:10 61:17,21 63:10 75:8 76:24 77:4 90:13 172:7 174:6,7,10,15,20,23 175:2 197:22 264:7

**reviewing** 21:19 55:13 57:20 191:18 194:11

**Richard** 5:12 203:21 280:18

**ridiculous** 181:23

**right-hand** 79:13,14 146:16 149:18 168:20

**rights** 171:11

**rigid** 229:17

**rise** 129:14 133:9 135:5 139:6

**risk** 190:2

**Rivera** 175:4,13 180:12 198:22

**role** 145:4 200:8,13

**rolling** 234:18

**romantically** 21:24

**room** 12:7 21:11 24:6,9 27:19,21 33:5 34:15,16 35:14 51:5 52:1 54:10,11,13,16,21 55:3 67:7,11,21 80:18,22 83:10,11 97:19 99:4,7 119:20 121:4 147:20 148:16,22 150:5 152:15,18 153:2 155:18,21 156:16,24 157:2 158:12 159:4,14, 23 167:6,9 213:14 216:3,4,9,23 218:1 219:1 220:13,14,22 221:10, 19 222:16,18 223:13,24 224:6,19 225:14 244:17 259:19 263:6 265:22 267:15,22

**rooms** 24:3 33:15 34:18 54:10 217:24 268:3

**roughly** 23:21 35:21

**round** 225:17

**rounded** 128:20 130:2,3 131:7,8 137:2

**rounds** 128:21

**routine** 78:20,22 79:1

**routinely** 263:8

**run** 9:8 27:10 58:8 60:13 63:8 65:14 78:22 86:22 207:1 240:17 285:17 286:2

**rundown** 148:18

**running** 78:19 150:19 152:16

---

**S**

**S1** 23:2 194:7

**S2** 23:2 193:17,22 194:8,13,20

**S3** 23:2 193:17

**SA** 79:5

**salesman** 260:5

**sat** 16:20 104:9 218:8

**satisfactory** 260:1

**satisfied** 224:13

**Saturday** 211:19

**scale** 217:2

**scamming** 22:20

**scared** 265:11

**scenarios** 183:1,5

**schedule** 202:10,14

**school** 73:5 225:22 226:2 232:12

**schools** 232:15

**scientific** 276:15 277:11,22,24

**scientifically** 278:11

**score** 69:11 82:19 120:9 121:2,5 143:11,17 144:18 231:8,10

**scored** 121:8 123:3 144:15 206:17 208:4 234:14 284:6

**scores** 144:2

**scoring** 120:6,7,14,24 121:11 123:8 124:20 143:10 144:8,10,24 145:4,7,12 152:7 169:1 226:13,17 227:1 229:2,17 230:3,12,16,19 231:1,4 232:4,5,10,18 233:2,20 234:19

**scratch** 144:20

**SDT-REID** 19:1,9 24:20 37:9,10 61:12 163:13 166:1 191:7 192:3 193:15 195:8 247:4 280:8,24

**seconds** 58:11 105:9

**section** 191:5 193:15

**secure** 15:19 16:19 33:11,18,23 34:6 153:17

MICHAEL MASOKAS, 11/05/2019

**sees** 144:2

**segment** 286:19

**segments** 286:17 287:1,4,7

**seminar** 8:16

**send** 164:4

**senior** 213:22

**sense** 38:23 87:14 114:1

**sensitive** 266:1

**sensitivity** 85:9 94:13 96:1,3

**September** 19:23 43:13 45:9,10 72:4,11 73:7 145:21 151:1 278:15 279:4 280:13

**series** 61:2 64:24 69:7

**services** 176:16,19,20,21,22 177:1,3,12,16

**set** 40:17,23 41:10,23 42:9,10,22, 23 51:15 63:16 73:15,18 85:13 96:1 197:5,8 202:9 226:9 236:11 243:21,22 252:13,14 257:16,17 277:4 278:5,23

**setting** 46:13 51:14 151:20 156:3, 9

**severe** 127:13

**shake** 86:5

**shaken** 90:16 97:2

**shapes** 219:7,15 220:3

**sheet** 27:17,24 29:14,24 30:18 31:1 32:23 35:8 38:4 50:13 61:15 65:17 69:8 84:15 91:2 127:3 132:1 136:14 168:21 198:22 199:3 226:13 230:16,20 231:1,10 246:10 251:3 282:6

**sheets** 61:17 84:24

**shift** 244:7

**shifted** 42:2,15 44:10 47:19

**shoe** 42:12

**shook** 99:14 117:16

**shoots** 132:18

**short** 39:24 287:9

**shorter** 105:11

**shortly** 213:24

**shot** 96:14

**show** 61:4 62:18 64:17,21 109:6 154:12 217:13 220:15 239:10,21 277:22,24 279:22

**showing** 18:22 29:11 37:7 61:10 81:10 163:12 165:23 171:24 209:9 280:5

**shows** 29:4 69:8

**shuffle** 65:7

**side** 12:21 15:17 28:11 36:18 37:20 60:14 61:14,20,24 65:18 78:8,11 79:13,14 146:16 150:4 169:2 182:23 194:5 217:24 245:3, 22

**sighed** 42:24

**sign** 26:8 46:17,18 101:18 110:5 118:9 119:24 148:10 151:3 182:19, 22

**signaled** 116:19

**signals** 40:9

**signature** 25:23 26:6 82:12 164:1 287:22 288:1

**signed** 26:4 27:2

**significance** 227:24 228:22

**significant** 127:6,7,11,15,24 128:15 130:5 133:1,8 134:3 139:20 140:10,17,18 164:15 169:14,18 227:10,16 228:20 241:12 250:5

**significantly** 131:11

**signifies** 109:23 110:2,5

**signify** 127:18 169:11

**signifying** 122:2

**signs** 150:14

**silent** 68:4,5,17,21 104:10,18 105:24 122:24 123:20 126:12 127:8 133:19,21 134:7 286:23

**silently** 68:8,14

**similar** 46:14 157:16 258:13 261:18 262:14

**Similarly** 194:17

**simple** 40:15 63:14 67:18 69:23

**simply** 66:5 96:22 121:13 170:4

**single** 126:10

**sinus** 32:6 282:18

**sir** 40:1 41:2 173:15 174:3 190:15,

20 192:1 198:19 216:18 226:11 243:19 279:13

**sit** 12:1,21 161:7 171:1 179:6,10 203:15 204:6 222:12 224:7 225:12, 21 255:16 256:6 262:24 264:2 270:24 272:16 284:1

**sitting** 14:5,9 18:9 121:4 153:12, 17 221:22 222:20 223:2,9,13,21 224:4,22

**situation** 11:23 181:14 205:7,10, 24 207:12 214:17 254:9,17 270:13 279:3

**six-month** 6:3,11

**skin** 30:12 56:21 59:18 60:6 84:10 94:11

**skinny** 84:9 96:5

**skipped** 95:10

**slash** 91:4,5,8,14 101:11,12 104:23 105:1,2 109:23 118:3,6 147:17

**sleep** 32:12 142:21 162:9 167:20 168:3,10

**sleeping** 252:24

**slide** 268:17

**sliding** 15:18

**slight** 131:23

**slightly** 128:10

**slower** 128:2

**slowly** 285:23

**small** 112:19

**smaller** 54:23 87:14 219:15

**smoke** 21:2 161:23 198:15 267:13, 18,22 268:3

**smoked** 263:5

**smoker** 158:4 261:23,24 263:3

**smoking** 262:22 267:15

**sneeze** 115:12,14

**somebody's** 79:9

**someone's** 184:8 197:3 250:3

**sort** 8:17,18 15:4 16:12 17:17 34:1 79:14 111:2 149:17 191:5 229:6 240:13 265:12 279:19 288:4

**sorts** 6:15 144:10

**Sotos** 175:18 198:24 199:5,12,15

**sound** 35:21 44:21 45:1 181:23

**sounded** 158:3

**sounds** 136:4 174:15 182:2 198:23 223:8

**South** 13:20

**space** 15:20 90:2

**spaced** 196:10

**speak** 12:22 17:2 38:4 49:12 114:12 149:2

**speaking** 20:20 21:20 51:10 63:1 158:2 181:11 202:8 256:2

**specific** 10:5 78:19 79:5,6,8 83:5 153:9 184:12 188:7,15 197:6 214:11 232:19 242:8 252:9 263:1 264:4 267:19 270:4,18,21

**specifically** 10:13 14:7 18:7 145:21 166:14 174:21,24 178:15 197:11 202:6 206:24 207:7,19 208:3 212:3 242:16 251:20 255:8, 20 263:19 268:24 272:16 281:24 282:8

**specifics** 145:11 264:9

**speculation** 184:20 190:5 214:10 273:23 274:13 275:23 277:1 278:18

**spell** 4:8 196:1

**spent** 22:21 151:15 160:2,11 168:22 209:18,19

**spike** 83:19 116:16

**spilled** 22:16 192:8

**spilling** 263:23

**spoke** 22:12 41:14 74:6 148:16 151:22

**spontaneous** 244:1

**spot** 223:9

**spots** 28:16 29:20

**square** 27:23 218:22 225:23

**squeeze** 86:5,7,9 250:15,16

**squeezed** 86:12

**squeezing** 86:16

**St** 5:11,13,15 92:5 99:8

**staff** 7:18,19 9:5,9,10 177:15 210:12

**stamp** 288:14

**stamped** 19:1 37:9 61:12 163:13 166:1

**stand** 176:5

**standard** 11:12 12:9,24 53:2 55:10 154:13,19 166:11 208:8,9 209:6,10 249:5,6,10

**standing** 224:1

**stands** 47:23 106:16

**start** 4:20 12:8 35:12 36:22 58:16 72:5,12,18 77:7 82:15,22 83:14 89:22 99:2 101:12 105:1 109:23 115:6,11 125:12 133:23 151:1 162:6 177:20 201:1 205:14,16 216:19 227:21 232:1 254:14 277:23

**started** 7:21 40:3,4 42:11 43:8 44:7,9 80:6 94:12 97:4 99:9,15,20 100:19 101:19 104:15 106:23 107:8 108:7 111:10 117:13,16 118:3,10 147:14 148:5 198:8 213:24 218:10 257:12,13 278:1

**starting** 96:2,24 108:13 147:1 156:12 158:24 234:17 276:20 277:19

**starts** 76:10 84:15 85:19 87:1 90:19 95:8 132:15,19 134:20,23 137:19 139:7,10 250:21

**state** 4:8 6:19,23 7:2 198:19 236:13

**statement** 278:14

**status** 281:5 287:15

**stayed** 16:19 44:3

**STD-REID** 242:5

**stealing** 49:20 70:20 73:2 107:20

**step** 58:7 60:14 67:7,10

**stepped** 51:5 54:9 67:13 80:9 119:20,22 147:19 148:1,18 259:19

**steps** 188:24

**stick** 217:5,7

**stimulation** 64:14 106:16,23 107:8

**stomach** 59:17

**stool** 218:6,7 219:20,21,24 220:23 221:23

**stools** 219:16

**stop** 65:23 162:3,8,12,20

**store** 201:11

**story** 36:18

**straight** 63:5,6,20 64:4 66:12,13, 22 67:5 68:1 74:22 85:12 89:23 90:6,7,9 92:5,7 93:16 94:9 95:7,11 99:9 101:10,16,22 102:3,23 103:14 104:4,19 106:4,5 117:20,21,22 122:18,21 123:18,19 124:19,23 125:2 126:10,11 127:18 128:16 130:10 169:6,8 170:3 256:1 286:22 287:9,10

**straightened** 89:14,16 156:22

**straightforward** 66:20

**street** 15:23 209:8

**stress** 250:2

**strike** 56:11 143:16 168:1 174:7 253:8 264:5

**stronger** 121:18 129:23 138:6,9, 18

**stuck** 181:2 256:18

**studies** 187:11

**study** 6:6,9

**stuff** 157:16 230:16 253:3

**SU** 85:9 94:12,18 96:20 104:7

**subject** 10:3 11:20 12:5,7,15 20:17,24 21:2,4,5,16,22,23,24 22:1,3,4,9,11,12,15,20,21 23:3 56:23 102:19 103:18 149:21,22 189:2,11 192:7 206:21 207:3 209:9 210:2 222:12 223:1 248:16 249:12 254:7,8,10,19 263:3 281:7,11

**subject's** 83:18 102:19 104:2 164:16 222:11,14 225:1,19 281:3,5

**subjects** 10:11 114:8 249:16 262:21

**submit** 288:9

**submitted** 163:21

**subtle** 106:19,21 231:21 284:9,17, 21

**sudden** 125:13

**sufficient** 161:7

**suggest** 31:11 154:6 183:10 185:3 248:16

**suggested** 156:7 181:14 255:13

**suggesting** 257:23

**suggestion** 248:19

**suggestions** 181:18 183:1,6 255:22 256:1,11 257:9,19

**suit** 272:20,23

**suitable** 30:3

**sum** 186:23

**summarize** 155:23

**Sunday** 19:23 43:13 72:4,11 150:24 247:24

**super** 127:10,24 136:7 137:11

**supervision** 6:5

**suppose** 43:2

**supposed** 20:8 132:12 254:17

**suppress** 10:22 13:12 35:20 171:18 172:3,10

**suppressed** 131:9 134:11,16,17 136:18

**suppression** 136:22 180:4 212:1, 5 264:17

**surgery** 28:16 29:20

**surmising** 252:15 260:21

**surprise** 56:9

**surprised** 46:8 56:3,4,24

**surprises** 55:24

**surrounding** 235:20 237:1

**suspect** 41:9 197:2,3 253:13,15

**suspects** 20:16 23:6,9,13,14

**suspicion** 41:7,9 240:8,16 241:6

**suspicions** 241:1,3

**suspicious** 124:17 240:23

**Swanson** 175:20 199:5

**sweaty** 103:18

**swing** 87:1

**sworn** 4:1,4

**swung** 218:3

**symptoms** 31:21

**system** 121:15 227:1 229:17 230:3,11 232:4,5

---

## T

**table** 216:5

**tablet** 282:18

**taking** 4:15 31:11 49:2 59:3,4 64:16 183:23 184:8 186:18 187:19 196:16 197:9 262:4

**talk** 4:17 10:7,15 16:22 58:18 82:13 117:2 154:13 156:3,16 157:8 199:11,17 206:2,8 207:2 208:17,22 209:1 243:17 264:2 265:24

**talked** 47:3 95:7 151:17,20,21 164:11 167:5 169:20 172:18 181:15 226:20 255:6 262:2 263:17 267:14

**talking** 20:21 22:8 47:15 108:24 116:7 155:9 157:18 158:17 170:10 180:22 184:22 190:9 192:18 197:9 213:12,15,16,19 214:6,13 221:11 253:19 255:1,8 257:20 260:24 262:21

**talks** 191:1 193:17

**tall** 45:13

**Tara** 173:16 221:2 251:7

**taught** 10:6 232:11

**TC** 88:3,4,14

**teach** 10:8,11 187:10

**Technique** 177:18,23 178:2 188:11 189:16,24 190:10,12 200:11,23 201:8 245:10,11 251:18 252:1,7 253:11 254:4,17 258:19

**telling** 48:16 208:14,15 215:18 229:6 236:19,23 242:12 246:4 247:20

**ten** 211:19

**tend** 182:18 245:17

**tender** 288:12,13

**Tense** 49:3

**term** 38:3 114:10 154:12 258:4

**terms** 32:1,8,14 34:8,11 56:9 58:3 108:19 112:17 155:10 255:18 276:2 284:23

**test** 27:10 30:3 36:21 39:21 47:9 48:15,23 49:2 51:6 56:7 58:8,16,20 59:1 60:13 62:24 63:5,8,15 64:3,4, 6,10,12,13,14,15,16,17,21,23 65:1,

15,23 66:3,10,11,12 67:5,7,15 68:2,4,5,10,17,22,23,24 69:3,4,11, 18,24 70:1,5,7,8,9,14,15,16 71:3, 14,16 74:22 75:8,18 76:6 77:23 78:18 83:5,7,11 88:6,7,8 89:23,24 90:11,19 93:14,16,17,21 94:9,10, 14,19,20 95:5,6,10,11,12,19,24 96:3,22,24 97:8,13,17,19 98:1,5,20 99:10,15,21 101:11,14,16,22 102:6,9,10,14 104:10,12,15,18,22 106:1,5,8,9,24 107:8,9 108:7,18 109:2 112:14,17,23,24 113:6,7,8,9, 10,12 114:8,10,13,15 116:1,3,4,5, 6,15,21,24 117:3,4,14,17 119:9,19 120:3,9,15,24 121:2,8,11 122:10 123:1,2,3,8,9,12,16,17,19,20,24 124:10,19 126:12,19,24 127:9,18 130:11 133:20,21 138:1,20 140:16 147:20,24 150:19,20 152:14 155:11 156:2,8 158:3 162:3 168:4 169:7,22 181:13 189:8 205:18 207:1 210:14 228:2 234:18 237:20 238:4 239:8,10,15,16,19,20,24 240:3, 12,13,17,18,21 241:9,15,18 249:22 250:17,19 259:15 276:11 281:13 285:13 286:6,17,21

**tested** 17:24

**testified** 4:4 10:22 11:1 13:11 23:19 30:20 35:19 52:4 54:16 56:11 74:23 101:10 159:19 170:13 172:5,9 187:6 190:24 201:14 239:23 241:2,19 267:6 272:11 280:17,22

**testifying** 95:19

**testimony** 10:2 11:5,8 63:21 171:19 172:3,6,7 174:16 175:2,3 176:5,6,11 179:15,21 180:1 193:20 199:12 204:2 226:16 231:16 239:24 241:13 246:19 254:15 264:18 266:20,22 268:5 281:16

**testing** 6:5 237:5

**tests** 56:10 63:24 78:22 79:1,8 105:1 109:22 118:3 123:23 126:16 152:1 170:3 208:13 228:7,16,18 229:19,21 232:19 286:1

**theft** 71:11

**theories** 257:23

**thick** 104:14

**thing** 5:3 24:12 27:14 35:9 51:4 66:23 115:21 122:5 127:17 130:8 133:22 181:3 198:10,17 204:9,13 222:7 226:3 242:14

MICHAEL MASOKAS, 11/05/2019

**things** 56:13 158:1 180:20 208:2 210:8,9 214:23 215:11 218:14 246:6,8 255:18 261:22 263:12 265:24 278:6

**thinking** 134:20 244:10 256:1 275:12

**Thompson** 11:15 13:4 15:9 17:11, 20 18:14 23:11 26:14 27:7 30:21 32:16 35:23 36:4 39:6,19 41:6 50:22 52:9 53:11 55:16 56:15 57:8, 13 58:5 59:7 60:11 62:12 63:3 72:22 76:11 82:2,8 88:19,24 94:22 116:7,10 141:3,12 142:5 145:8 152:11,23 154:9 155:7 157:23 163:17 170:21 171:12 173:14,17 175:10,15,18 176:1,9 178:6 183:11,21 185:5,17 186:2,21 187:14 189:22 190:13 193:10 197:14 199:7,9 202:2 205:13 211:11 213:9 214:15 215:20 216:17 221:5 223:17,18 224:9 226:7 228:4 229:10 230:4 231:18 232:23 239:2 249:8 251:11 253:21 255:2 270:2 272:1,5,10 273:11 274:5,17 275:15 276:4 277:9 278:8,20 279:7,12 282:3 283:21 286:13,16 287:5,19 288:11,15

**thought** 46:13,14 135:15 157:17 158:7 168:3 178:23 180:23,24 183:7 232:15 259:16 261:18

**thousand** 10:1 178:16,20

**three-page** 163:14

**three-way** 158:19

**tie** 272:20,23

**tight** 286:1

**tightening** 58:10

**time** 7:21 9:10,13,22 13:23 15:14 16:17 17:4 25:12,20 27:1 29:21 32:18 36:2 51:21 54:19 55:5,23 58:11 68:7,12 69:16,19 77:15,24 80:1,5,16 98:16 105:11 113:2,13 115:5,14,16,23 116:17 119:16 129:4 132:1,23 146:2 147:2,8,15 149:6,17 151:7,15 153:18,24 158:5,10,15 160:1,11,17,21 161:2, 13 163:6 166:13 168:19,22 173:9, 11 177:10 178:7,23 179:20 182:13 185:12 187:12 189:5 197:9 200:16 202:9,11,15 203:17 204:23 205:4,8 207:24 209:18,19 210:16,19 211:2, 24 213:13 217:16 221:9,18 223:10, 24 233:9,18,22,24 235:16 236:15 242:17 251:23 252:14,17 253:1

261:12 263:15 274:16 279:13 281:5 282:24

**times** 67:19 76:7 126:8 136:5 147:6 149:22 150:11 156:19 178:17 179:15 181:20 206:23 224:3 243:8 249:15 250:8,11,22 256:4 269:3,5 270:12,21,24 271:3, 13 273:14

**timing** 233:4

**Tina** 20:17 22:1,5 42:1 43:20,24 44:3,15,24 45:5,16,18 46:10 48:6 151:22 191:2 194:2,9 212:21 280:11 287:17

**tired** 162:15,17 183:15,16 184:1,6

**title** 176:15 177:9,11

**titled** 19:10

**today** 4:14 36:12 38:18,19 39:21, 22 45:23 47:9,11 48:15 164:12,23 165:12,13 167:19 169:23 171:2 174:6,10 176:11 178:7 179:7,10 197:16 199:13 203:9 204:7 226:11 230:20 235:15 236:1,4 255:16 270:24 272:12,16 284:13

**told** 27:5 41:15 63:7 67:14 98:24 144:1 146:2 156:18 159:9 171:16 173:2,15,20 191:14 192:21 197:24 198:7,10,14 207:19 208:4,20,24 212:16 214:7 236:16 249:23 266:10,16 276:19 277:17

**top** 19:22 25:2 26:22 37:24 38:7,9, 10 40:14 42:6 45:5 47:22 75:15 83:17 96:5 128:22,24 130:3,18,22, 24 133:11,13 134:9 136:23 147:2,3 190:19 193:15

**topic** 191:10 200:17,22 201:2 263:16

**tops** 136:20

**tore** 119:22

**total** 178:13,17 186:23

**totality** 246:1

**tracing** 87:9,10,13,16 94:15 96:5 102:12 112:19 113:18 125:9 137:17

**tracings** 119:23

**traffic** 49:19 70:20 73:1

**train** 252:23

**trained** 187:10 230:10,11

**training** 8:13,15 9:11,13 178:4 182:16,21 183:12 188:4,7,10,12,15 201:7 232:12 245:10

**trial** 179:23 180:3

**true** 101:14 132:7 199:2 235:19

**trust** 41:22 260:14

**truth** 48:17 66:7 208:14,15 236:20, 23 261:13,14,16

**truthful** 11:9 64:15 142:6,10 143:1 154:4 182:24 205:18 206:8,13 207:21 208:21 226:19 243:9,24 244:20 245:18,23 273:3,7,15,19 274:10 275:3 276:12

**truthfully** 11:1

**truths** 53:7,10,20

**tubes** 59:16

**turn** 24:19 33:13 146:12 190:22 217:19 247:3

**turned** 85:13

**turns** 273:16

**twins** 253:2

**two-minute** 166:22

**two-page** 37:9 280:7

**Tylenol** 50:12

**type** 104:6 226:2 230:11 231:1 232:3,12

**types** 52:23 60:19 74:8 79:8 168:7 232:19

**typical** 168:9 244:19

**typically** 12:21 64:18 105:15,18 142:16 170:17 215:17 250:11 268:16

---

**U**

**uh-hmm** 39:23 61:5 83:20 87:4 89:6 93:20 169:5 261:20

**uh-huh** 39:24 83:4 88:1 169:8

**ultimately** 36:20 82:18 256:7 265:15

**uncertain** 171:16

**unclear** 173:22

**uncomfortable** 12:18,19 86:21 285:20,21

**uncommon** 263:14

**uncooperative** 142:11 143:7 258:24

**underlined** 98:12,18

**underneath** 83:6 86:8 90:20 148:6 169:13 218:7 250:14

**understand** 25:19 26:1,11,24 27:6,9 36:10,11 38:19 39:21,22 55:19,21 59:10 63:22 65:12 69:2 77:11 82:17 121:7 122:6 204:23 226:16 230:5,6 232:24 235:22 239:3 246:3,22 260:2,15 268:5 270:3 276:5 281:16

**understanding** 17:9 57:12,17 176:3 189:15 211:14 212:23 214:4 245:9 253:10 254:4,13

**understands** 55:18,22

**understood** 26:20 27:2 174:2 257:19

**unemotional** 281:2,9

**units** 85:10 94:13 96:1

**unknown** 142:22

**unlocked** 16:10 34:7,11,17,19

**unnecessary** 206:5,6

**unresponsive** 142:7,15,23 168:8

**untruthful** 276:18 277:17 278:13

**unusual** 14:24 180:22 181:7 182:11 252:14 271:14,20,22,24

**updated** 266:23

**upper** 149:18

**uppermost** 83:14

**upstairs** 248:7,9,14

**utilize** 49:10

**utilized** 49:7

**utilizing** 123:7

---

**V**

**variable** 56:8 57:4

**vary** 12:10,13 62:24

**verbal** 5:2 203:2 243:3 246:14

**verbally** 151:2 160:23 183:24 242:24 245:6 248:18

**verbatim** 155:22 255:20

**version** 36:18

**versions** 288:4

**versus** 170:9

**vestibule** 15:12

**victim** 21:2

**video** 210:1,15

**videotape** 214:22 215:9

**view** 25:8 275:18

**violations** 49:19 70:20 73:1

**visual** 121:13,20 231:4,7,9 232:4, 6,7,18

**vodka** 22:16 45:13 192:8 263:23

**volume** 242:16

**vouch** 41:21,23

---

**W**

**Wacker** 13:20

**wait** 105:6,8 224:12

**waited** 48:6 172:20 252:23 270:8

**walk** 12:7 15:12 71:19 82:16 84:22 146:15,18,22 268:9

**walked** 14:4 226:17

**wanted** 16:22 26:19 51:13 107:20 146:15 155:1 156:22 160:3 162:3, 8,12,20 171:18 192:24 206:20 222:18,21,23 223:1 253:3 257:19 265:15

**washroom** 149:22,24 150:10

**watched** 43:19,22

**watching** 234:18

**water** 149:23 161:21

**ways** 47:3 217:22

**wearing** 286:18

**weeks** 146:5

**weighed** 228:23

**whispered** 40:18

**white** 75:21

**who'd** 230:10

**whoever's** 23:14

**Why'd** 208:7

**wife** 42:3 244:12,13,21,23 253:1

**wife's** 41:13 146:1

**William** 10:17 20:16 21:23 22:5 81:21 194:2,9

**windows** 15:18

**wipe** 102:17,18 103:19

**wiped** 102:19 103:24 104:2

**wise** 158:7

**withdraw** 209:22

**withdrawal** 190:1

**witnessing** 26:5

**wooden** 226:2

**word** 278:5 284:8

**worded** 194:19

**words** 16:11 53:14 114:9 138:9 142:19 182:8

**work** 38:12,13 59:4 201:17 203:5,7 204:4 209:8 210:11,22 217:5 240:6

**worked** 7:8 177:16

**working** 7:6 9:7 38:14 39:8,9 80:14

**works** 64:17,21 239:11

**worry** 210:15

**wrap** 5:6

**write** 23:8 38:5,20,21 195:23 219:12 223:11 226:4 231:3,21,22 243:3

**writing** 20:20,22 21:12,20 22:24 25:10,13,14,23 29:16 75:15 83:1 149:8 192:18 194:6 216:19,20 225:2,23

**written** 20:3,6 54:1 62:8 76:8 77:17 92:1 147:11,14 149:7,8 150:14,15 163:20 218:18 219:23 223:19

**wrong** 182:2 194:1,8,12 239:9 255:24 259:14

**wrote** 20:12 25:21 26:2,10 62:8 75:23 92:3 120:20 194:8 230:16 236:5

MICHAEL MASOKAS, 11/05/2019

### X

**Xavier**  5:11,13,15

**Xs**  94:2 97:8,9

### Y

**year**  5:19 7:1,8 8:24 180:7

**years**  5:11,13 6:9 8:22 9:17 46:11
72:2 78:21 166:14 206:24 211:19
246:9,12

**yell**  160:23

**yes-or-no**  54:5

**YT**  117:14



97-1189

FILED

1    STATE OF ILLINOIS    )
                          ) SS:        98 JAN 27 PH 3:20
2    COUNTY OF DU PAGE    )

3                                      P.F. Kagann
                                       CLERK OF THE
4        IN THE CIRCUIT COURT OF DU PAGE 18TH JUDICIAL CIRCUIT
         EIGHTEENTH JUDICIAL CIRCUIT OF ILLINOIS

5

6    THE PEOPLE OF THE STATE )
     OF ILLINOIS,           )          ORIGINAL
                            )
7              Plaintiff,   )
                            )
8        vs.                ) No. 95 CF 2075
                            )                    FILED
9    WILLLIAM E. AMOR,      )
                            )                    OCT 08 1998
10             Defendant.   )
                                       LOREN J. STROTZ, CLERK
11                 Wednesday, March 6, 1996  APPELLATE COURT 2nd DISTRICT

12                 1:30 o'clock p.m.

13

14             The hearing resumed, pursuant to

     recess, before Judge RONALD B. MEHLING.
15

16   PRESENT:

17       MR. BAYER

18       MR. CHVAL

19       MR. PADISH                    EXHIBIT # 8
                                       WIT: Masokas
20       MS. NAJERA                    DATE: 11 5 19
                                       Katie K. Elliott, CSR, RPR
21       MS. PANTSIOS

22       DEFENDANT WILLIAM E. AMOR.

23

24                 CHESTER H. KOCHANEK
                   Official Court Reporter
                   DuPage County Courthouse
                   Wheaton, Illinois 60187

1                    I N D E X

2    WITNESS:                                    PAGE

3    ROBERT GUERRIERI

4        Direct Examination                         3

5        Cross Examination                         10

6    MICHAEL MASOKAS

7        Direct Examination                        12

8        Cross Examination                         39

9        Redirect Examination                      48

10   ARGUMENTS                    ·                53

11

12

13

14

15

16

17

18

19

20

21

22

23

24

DUPAGE COUNTY
C-000626

DEFS 2760

```
 1                    MICHAEL MASOKAS,

 2   called as a witness by The People of the State

 3   of Illinois, having been first duly sworn, was

 4   examined and testified as follows:

 5                    DIRECT EXAMINATION

 6                    BY

 7                    MR. CHVAL:

 8        Q.    Please introduce yourself to the

 9   Judge.

10        A.    Michael M-a-s-o-k-a-s.

11        Q.    How old are you?

12        A.    37.

13        Q.    What level of education have you

14   obtained?

15        A.    A BA degree in criminal justice

16   from St. Xaviors, and a masters degree from

17   Reid College.

18        Q.    Have you had any specialized

19   training beyond those degrees?

20        A.    Yes.

21        Q.    What has that consisted of?

22        A.    I am a licensed polygraph examiner

23   in the State of Illinois.

24        Q.    And how are you employed?
```

DUPAGE COUNTY

C-000636

DEFS 2770

1     A.     I work for John Reid and

2  Associates.

3     Q.     And what is John Reid and

4  Associates?

5     A.     We are a polygraph firm.

6     Q.     You do other things besides

7  polygraph examinations?

8     A.     Yes, we do interviewing for

9  employment purposes, we do work for

10  corporations.

11     Q.     What is your position within John

12  Reid and Associates?

13     A.     I am the chief polygraph examiner.

14     Q.     How long have you been employed by

15  John Reid?

16     A.     Since 1983.

17     Q.     What office do you work out of?

18     A.     It is in Chicago, 250 South Wacker

19  Drive.

20     Q.     I'd like to direct your attention

21  to October 3, 1995.  In the late afternoon or

22  early evening hours.

23           I ask you if you were at work that

24  day?

DUPAGE COUNTY
C-000637

DEFS 2771

14

1     A.     Yes.

2     Q.     Do you recall receiving a call to

3  the lobby of the building about 3:50 p.m.?

4     A.     Yes.

5     Q.     Did you then proceed out to the

6  lobby?

7     A.     Yes.

8     Q.     Describe for the Judge what the

9  lobby looks like, what it consists of?

10    A.     Looks like a typical lobby, got

11  about a dozen chairs.  There's an exit out to

12  the elevators.  There's a window for our

13  receptionist, and a magazine rack.  Typical

14  lobby.

15    Q.     The door out to the elevators, is

16  it a locked door?

17    A.     No.

18    Q.     How far are the elevators from

19  that door?

20    A.     Ten, five feet.

21    Q.     When you went out to the lobby on

22  that afternoon, what did you see?

23    A.     I was going out there to start a

24  case that I was about to work on, and present

DUPAGE COUNTY

C-000638

DEFS 2772

15

```
1    in the lobby were two officers from Naperville

2    Police Department, along with Mr. Amor, who

3    was the subject of the examination.

4         Q.    Do you recall how the officers

5    were dressed?

6         A.    Casual.

7         Q.    And you refer to Mr. Amor.  Do you

8    see that person here in Court today?

9         A.    Yes.

10        Q.    Would you identify him by where he

11   is and item of clothing he's wearing?

12        A.    Off to my right at the end of the

13   table in the orange jump suit.

14        MR. CHVAL:  Ask the record reflect

15   identification of the defendant.

16        THE COURT:  So reflected.

17   BY MR. CHVAL:

18        Q.    You recall generally what Mr. Amor

19   appeared like that night?

20        A.    He was dressed casual as far as I

21   can recall.

22        Q.    After you exchanged greetings with

23   the three individuals out in the lobby, where

24   did you go?
```

DUPAGE COUNTY
C-000639

DEFS 2773

1    A.    At that point I escorted the two

2  officers into our library, at which time I

3  took down factual information about the case.

4  Mr. Amor remained in the lobby.

5    Q.    When you first saw Mr. Amor at any

6  point that evening, was he in handcuffs?

7    A.    No.

8    Q.    How did you have to go to get to

9  the library at your offices?

10    A.    There's a door next to the

11  reception area that separates the lobby from

12  the inner office.  And you open the door, you

13  are in the lobby.

14         I escorted the officers through

15  there, down about ten feet.  And the library

16  is off to the right.

17    Q.    From the library can you see back

18  to the lobby?

19    A.    No.

20    Q.    What was the purpose of meeting

21  with the officers at that point?

22    A.    To get case background

23  information.

24    Q.    Did they give you that

DUPAGE COUNTY

C-000640

DEFS 2774

17

1    information?

2         A.      Yes.

3         Q.      Did you also have a discussion

4    with them with regard to whether or not Mr.

5    Amor was in custody at that point?

6         A.      Yes.

7         Q.      What did they tell you?

8         A.      They said he was not.

9         Q.      Why is it that you had that

10   conversation with the officers?

11        MR. PADISH:  Objection, Judge.

12        THE COURT:  Overruled.

13        A.      If a subject is in custody, then

14   we as a formality will issue Miranda.

15   BY MR. CHVAL:

16        Q.      How would you describe Mr. Amor's

17   status at that point?

18        A.      They said that he was a suspect in

19   a fire that had occurred in the town of

20   Naperville, simply because his mother in law

21   had been killed in the fire and he was married

22   to the daughter.

23        Q.      Can you tell the Judge about what

24   kinds of procedures John Reid has used

C-000641

1    administering polygraph examinations?

2        A.      I am not sure I follow the

3    question.

4        Q.      Is there a particular procedure

5    you go through when an individual is brought

6    to John Reid to have a polygraph examination

7    done? What is the general procedure that you

8    follow?

9        A.      Basically it is pretty much the

10    same for everybody. Once we get case

11    background information, we escort the subject

12    into an interview room, at which time we

13    present to them a release form that we need

14    them to read and sign before we can conduct

15    the exam.

16        Basically the release form says that

17    they are voluntarily consenting to the test,

18    and that we can release the information to the

19    specified person or company that is listed on

20    there.

21        It also states that they are free to

22    leave the office at any time. Once they

23    complete that, we have them fill out a medical

24    data form.

DUPAGE COUNTY

C-000642

DEFS 2776

1         From that point, if they make any

2    indications on that, we talk to them a little

3    bit about their medical history.

4         From that point we conduct a pre

5    test interview.  After the pre test interview

6    we formulate the test questions.

7         From that point we conduct the

8    actual polygraph test.  And then, depending on

9    the outcome of that, we may conduct a post

10   test interview.

11        Q.    How does whether the post test

12   interview is conducted depend on the polygraph

13   examination?

14        A.    If we report a person as truthful

15   we don't conduct the post interview because

16   there's no notice to clarify the truth of

17   their examination.

18        If someone is reported as deceptive

19   we offer them the opportunity to clarify or

20   make statements that may clarify those a

21   results.

22        Q.    Is it Reid and Associates

23   standards that post test interview be

24   conducted had upon failure of the test, unless

C-000643

DEFS 2777

1    the Police Department indicates you should not

2    do that?

3          A.    Yes.

4          Q.    Approximately how long, to go

5    back to this particular evening, approximately

6    how long did you speak with both officers

7    about the background and circumstances of Mr.

8    Amor?

9          A.    Approximately a half hour.

10         Q.    And during this time Mr. Amor was

11   out in the lobby?

12         A.    Yes.

13         Q.    After that half hour, did you go

14   out and speak with Mr. Amor?

15         A.    I didn't speak with him in the

16   lobby, I escorted him back to an interview

17   room.

18         Q.    Where did the officers go when you

19   did that?

20         A.    They remained in the lobby.

21         Q.    Could you describe the interview

22   room?

23         A.    Approximately ten by ten, no

24   windows, couple of chairs, a desk, a credenza.

DUPAGE COURT

C-000644

DEFS 2778

1    That's about it.

2        Q.    When you spoke to Mr. Amor in that

3    room, was the door closed?

4        A.    Yes.

5        Q.    Was it locked?

6        A.    No.  There are no locks on the

7    doors.

8        Q.    What did you do after you entered

9    the room with Mr. Amor?

10        A.    I gave him the copy of our release

11    form, explained to him that I need him to read

12    it over and need his signature at the bottom

13    to conduct the exam.  And then instructed him

14    also to fill out the medical sheet.

15        At that point I stepped out of the

16    room and let him work on that.

17    MR. CHVAL:  Permission to approach?

18    THE COURT:  Yes.

19    BY MR. CHVAL:

20        Q.    Sir I hand you what is marked

21    People's Exhibit No. 6 for motion to suppress.

22    Do you recognize that?

23        A.    Yes.

24        Q.    And what do you recognize that to

DUPAGE COUNTY

C-000645

DEFS 2779

1   be?

2       A.      This is a copy of our release form

3   that we in this case gave to Mr. Amor.

4       Q.      Could you read for the Judge what

5   the first paragraph indicates?

6       A.      I hereby voluntarily consent to

7   the taking of a polygraph lie detector

8   examination, to be conducted by licensed

9   examiners of John Reid and Associates.  I also

10  consent to a disclosure of the results of such

11  an examination and relevant statements which

12  may be made by me to Naperville Police

13  Department.

14      Q.      And is this form in substantially

15  the same condition as it was when Mr. Amor

16  finished completing it?

17      A.      Yes.

18      Q.      Other than it has an exhibit

19  sticker on it?

20      A.      Yes.

21      Q.      After you left the room and left

22  that with Mr. Amor, did you return to the

23  room?

24      A.      Yes.

DUPAGE COUNTY
C-000646

1     Q.     What did you do when you returned

2  to the room?

3     A.     I asked him -- I returned to the

4  room with an associate of mine who works for

5  the company, individual by the name of Arthur

6  T. N-e-e-w-e-y. And we had asked Mr. Amor

7  if he had been placed under arrest. He said

8  no.

9        We asked him again if he was in

10  custody, and he said no.

11        So we had him write that at the

12  bottom of the sheet, that he understands he's

13  not in custody. We had him initial that.

14     Q.     Is there a preprinted statement on

15  the form regarding whether or not he can leave

16  the office?

17     A.     Yes.

18     Q.     What does that statement say?

19     A.     It is the last paragraph here.

20  Furthermore, I understand that I am free to

21  leave this office at any time.

22        When I reentered the room after

23  having him put this at the bottom, I also

24  pointed this out to him. Told him he

DUPAGE COUNTY
C-000647

DEFS 2781

1   understands he's free to leave the room at any

2   time.  He acknowledged yes.  I had him initial

3   off, that he understood it.

4        Q.     And with regards to what he wrote,

5   read that.

6        A.     I understand that I am not in

7   custody.  Then he initialed it.

8        Q.     Thank you.  Now, on the reverse

9   side of the original of No. 6, People's

10  Exhibit No. 6, is also contained a medical

11  data sheet, I think you said?

12       A.     Yes.

13       Q.     Did he fill that sheet out while

14  you are out of the room?

15       A.     Yes.

16       Q.     On that sheet did he indicate if

17  he had any medication?

18       A.     I think he did.  If I can look at

19  my notes.

20       Q.     Is your memory exhausted as to

21  whether or not he did?

22       A.     I believe he did.  I think it had

23  something to do with a cold.

24       Q.     Did he indicate on the medical

DUPAGE COUNTY
C-000648

DEFS 2782

1  data sheet also how much sleep he had in the

2  last 24 hours?

3     A.    I believe it was four.

4     Q.    At some point your memory's

5  exhausted, please tell me.

6     A.    Okay.

7     Q.    Is there also a question that

8  basically states are you experiencing any

9  physical discomfort at the present time?

10    A.    There is a question on there,

11  yes.

12    Q.    What was the response to that?

13    A.    I don't remember.

14    Q.    Would your report refresh your

15  recollection?

16    A.    Yes, my notes, or a copy of that

17  sheet would.

18    MR. CHVAL:  Do you have any problem?

19    MR. PADISH:  No.

20  BY MR. CHVAL:

21    Q.    Do you have those notes with you

22  here today?

23    A.    Yes I have the original.

24    Q.    Would you please take the report,

DUPAGE COUNTY
C-000649

DEFS 2783

26

1    please?

2         A.      Yes.

3         Q.      Let me know when you're ready.

4         A.      Yes, he did indicate yes to the

5    question are you experiencing any physical

6    discomfort at the present time.

7         Q.      And did he give you more

8    information?

9         A.      Yes, he wrote down he had a

10   headache and some cold symptoms.

11        Q.      Did he tell you that because of

12   these problems, the headaches and cold

13   symptoms, that he didn't want to proceed

14   with any questions or the polygraph

15   examination?

16        A.      No.

17        Q.      Did he indicate because of the

18   headache and the cold symptoms he was having

19   difficulty answering your questions or taking

20   the polygraph examination?

21        A.      No.

22        Q.      What did you do after you

23   completed or the processing of these

24   polygraphs, the waiver form and the consent al

DUPAGE COUNTY

C-000650

DEFS 2784

27

1    data sheet?

2         A.      The next step would be a pretest

3    interview, at which time we go through various

4    questions about the incident under

5    investigation.

6         Q.      Do you recall approximately what

7    time you began that test?

8         A.      Approximately 4:40.

9         Q.      Approximately how long did that

10   questioning go on, did that conversation go

11   on?

12        A.      Until about 5:20.

13        Q.      Was that a continuous conversation

14   with defendant?

15        A.      Yes.

16        Q.      During the course of the

17   conversation, did the defendant give any

18   indication of why he was there or what

19   motivated him to go there?

20        MR. PADISH:  Objection as to the form of

21   the question.

22        THE COURT:  Overruled.

23        A.      I believe there was a couple of

24   responses to a couple of questions that he

1    made during the pretest interview.  His

2    statement was something to the effect of that

3    he --

4         MR. PADISH:  Judge, I object to this

5    answer.  This is a multiple answer to a

6    compound question.

7         THE COURT:  Well, overruled.

8         A.    Something to the effect of he's

9    here to clear things up.  That people think he

10   may have started this fire and he wants to

11   clear it up.

12   BY MR. CHVAL:

13        Q.    Do you recall how many times he

14   indicated to you his desire to clear this

15   matter up?

16        A.    I believe twice.

17        Q.    When was the first time he did in

18   relation to the sequence of questions?

19        A.    I believe it was the second

20   question that we were going through.  The

21   first question pertained, I just got a little

22   clerical information, work history.  Then the

23   next question I asked him, does he know the

24   reason for the examination or the reason he's

DUPAGE COUNTY

C-000652

DEFS 2786

1    here.

2           During his answer to that question

3    he had said he was here to clear this up.

4       Q.    Second time that he indicates to

5    you about a desire to clear this up, do you

6    recall when that was?

7       A.    That was near the conclusion of

8    the pretest interview.

9       Q.    And what was the context of that

10   statement?

11      A.    I believe I had asked him how the

12   results were going to come out on the test,

13   and he said that he was telling the truth and

14   he just wanted to get this over with and clear

15   it up, something to that effect.

16      Q.    At any time during the course of

17   the pretest interview, did members of the

18   Naperville Police Department enter that

19   interview room?

20      A.    No.

21      Q.    Do you recall approximately what

22   time it was or what time it was that that

23   interview concluded?

24      A.    About 5:20.

DUPAGE COUNTY
C-000653

1      Q.     What did he do when you concluded

2   that?

3      A.     At that point I stepped out to

4   formulate all the questions that were going to

5   be in the polygraph test.

6      Q.     Where did the defendant go?

7      A.     He moved to another room, the room

8   with the polygraph in it.  Right across the

9   hall.

10      Q.     Was anybody in that room with

11   him?

12      A.     No.

13      Q.     Did you lock the door to that

14   room?

15      A.     No, sir.  There's no lock on the

16   door.

17      Q.     How long did it take you to

18   formulate the polygraph questions?

19      A.     15 to 20 minutes.

20      Q.     During that entire time was the

21   defendant alone in the room?

22      A.     Yes.

23      Q.     After you formulated questions,

24   what did you do?

DUPAGE COUNTY

C-000654

DEFS 2788

1      A.      After I finished with the

2  questions I went back in the room and I sat

3  down with Mr. Amor and we reviewed each one of

4  the test questions that were going to appear

5  on the polygraph test, so he knew ahead of

6  time what he was going to be asked.

7            When we finished, that is when we

8  started the actual testing process.

9      Q.      About how long did that process

10  last?

11      A.      From roughly 5:40 until about

12  6:15.

13      Q.      When you finished the examination,

14  what did you do?

15      A.      I stepped out at that point, moved

16  him back to the original room we were in, it

17  is a little bigger room, put him back in

18  there, I evaluated the test at that point in

19  time.

20      Q.      Approximately how long did it take

21  you to evaluate the test?

22      A.      About 15 minutes.

23      Q.      When you finished that, what did

24  you do?

DUPAGE COUNTY

C-000655

DEFS 2789

32

1      A.      At that point I went back in the

2  room and conducted a post test interview.

3      Q.      Before you did that, did you speak

4  with either detective from Naperville?

5      A.      Yes, I had my associate review the

6  test, to confirm my results.  Then we spoke

7  with the officers.

8      Q.      Did you inform them of the results

9  of the test?

10     A.      Yes.

11     Q.      What did he tell you you were

12  going to do next?

13     A.      I told them I was going to go back

14  in and offer Mr. Amor an opportunity to

15  clarify the record.

16     Q.      Did you have any further

17  conversation with the officers at that point?

18     A.      No.

19     Q.      When you went back into the room,

20  to talk to the defendant, who was there?

21     A.      Just he and I.

22     Q.      Take you back a half a step.

23  Either of the officers tell you anything to do

24  with regards to the post test interview?

33

1    A.    No.

2        Q.    Did you then have a conversation

3    with the defendant back in the original room

4    you were in with him?

5        A.    Yes.

6        Q.    During the course of that

7    conversation, did you talk to him about

8    whether or not he could leave the room?

9        A.    Yes, I originally entered the

10   room at roughly 6:30, and was in there until

11   about 7:30.  During the course of that 60

12   minutes there was a couple of occasions where

13   I had told him he was free to leave at any

14   time.

15       Q.    What did he say in response to

16   your statement?

17       A.    He said he didn't want to leave

18   because he was there to get it straightened

19   out, he wanted to get it straightened out.

20       Q.    Your conversation with the

21   defendant after the polygraph test, was that a

22   continuous conversation?

23       A.    Just for about an hour that I

24   spoke with him, the two of us.

DUPAGE COUNTY

C-000657

DEFS 2791

34

1    Q.    And after that hour, what

2  happened?

3    A.    About 7:30 or so I stepped out,

4  conferred with my associate, talked to the

5  officers.  And then at roughly 7:45 myself

6  and my associate went in and spoke with Mr.

7  Amor.

8    Q.    How long were you in speaking with

9  the defendant for the 7:45 conversation?

10   A.    About 45 minutes.  I think we were

11  in until about 8:30.

12   Q.    What happened at 8:30?

13   A.    We stepped out, again conferred,

14  and then my associate went back in by himself

15  with Mr. Amor at about 8:45.

16   Q.    What did you do?

17   A.    I talked to the officers for a

18  little bit, and then I left the office at 9:00

19  o'clock.

20   Q.    So when was the last time you saw

21  Mr. Amor that evening?

22   A.    It would have been at 8:30, when

23  we stepped out of the room.

24   Q.    What was the condition of Mr. Amor

DUPAGE COUNTY
C-000658

DEFS 2792

1    at that point?

2         A.      Fine.  Very cooperative.

3         Q.      At any time up until the last time

4    you saw the defendant, did the Naperville

5    officers go into the room and talk to Mr.

6    Amor?

7         A.      I'm sorry, can you repeat that?

8         Q.      At any time from when you first

9    began your procedures to when you last saw the

10   defendant, did the Naperville officers or

11   detectives step into the interview room or

12   talk to Mr. Amor?

13        A.      No.

14        Q.      During the course of the evening,

15   from the time you spent with Mr. Amor, at any

16   point did he request food from you?

17        A.      No.

18        Q.      At any point did he express that

19   he was hungry?

20        A.      No.

21        Q.      At any point did he request

22   anything to drink from you?

23        A.      Yes, we offered him water.

24        Q.      Did he ever ask to use the

DUPAGE COUNTY
C-000659

DEFS 2793

```
 1    washroom?

 2         A.      Yes, on two or three different

 3    occasions he used the washroom.

 4         Q.      Where is the washroom in your

 5    office?

 6         A.      The washroom is out through the

 7    lobby, out by the elevators.

 8         Q.      Actually not on John Reid

 9    premises; is that correct?

10         A.      Correct.

11         Q.      Did anybody else accompany him out

12    to the washroom?

13         A.      I don't think so, but I can't be

14    positive.

15         Q.      Did the defendant request to have

16    a cigarette to smoke during the course of the

17    evening?

18         A.      Yes.

19         Q.      Was he provided with cigarettes to

20    smoke?

21         A.      Yes.

22         Q.      At any point in the evening did he

23    ask to leave?

24         A.      No.
```

DUPAGE COUNTY

C-000660

DEFS 2794

1      Q.    Did he ever express any fear of

2  the Naperville police or detectives?

3      A.    No.

4      Q.    At any point did he complain of

5  not being able to concentrate because of his

6  headache?

7      A.    No.

8      Q.    Did he ask you to stop the test

9  because of his headache?

10     A.    No.

11     Q.    Did he ever complain to you of a

12  lack of sleep?

13     A.    No.

14     Q.    At any point did it appear to you

15  he was suffering from lack of sleep?

16     A.    No.

17     Q.    Did he appropriately answer your

18  questions that you asked him that evening?

19     MR. PADISH:  Objection as to the form of

20  the question.

21     THE COURT:  Sustained.

22

23

24

DUPAGE COUNTY

C-000661

DEFS 2795

1   BY MR. CHVAL:

2       Q.     Were the defendant's responses

3   to your questions appropriate to the

4   questions?

5       A.     Yes.

6       Q.     Can you tell the Judge what kind

7   of demeanor the defendant exhibited in that

8   evening?

9       MR. PADISH:  Objection as to the form of

10  that question.  It is overbroad, demeanor.

11      THE COURT:  Sustained.

12  BY MR. CHVAL:

13      Q.     Sir, what was the tone of the

14  conversation?

15      A.     Very laid back.

16      Q.     What makes you say that?

17      A.     Just in the way we were talking.

18  Mr. Amor seemed very comfortable, he was

19  slouching down in the chair.  At one point he

20  had his foot over the side of the chair.

21  Pretty comfortable.  At times we were

22  laughing.  So it was a very laid back kind of

23  thing.

24      Q.     Would you describe him as being

DUPAGE COUNTY

C-000662

DEFS 2796

1    cooperative?

2        A.     Yes.

3        Q.     During the course of your

4    conversations with Mr. Amor that evening, did

5    he ever implicate himself in terms of criminal

6    conduct with regards to the fire?

7        A.     No.

8        MR. CHVAL:  Judge, nothing further.

9        THE COURT:  All right.  Defense.

10       MR. PADISH:  Thank you, Judge.

11               CROSS EXAMINATION

12               BY

13               MR. PADISH:

14        Q.     Sir, you are an employee of John

15    Reid and Associates, is that correct?

16        A.     Yes.

17        Q.     And John E. Reid and Associates

18    has a contractual relationship with the

19    Naperville Police Department, is that

20    correct?

21        A.     No.

22        Q.     They were a customer of yours,

23    correct?

24        A.     They are a customer, not on

1    contract.

2        Q.      Being the customer, they are the

3    ones paying the bill for your services?

4        A.      Correct.

5        Q.      Mr. Amor didn't pay the bill for

6    the services, correct?

7        A.      That is correct.

8        Q.      And you knew on October 3, '95

9    · that this bill was being paid by the

10   Naperville, the City of Naperville; is that

11   correct?

12       A.      Yes.

13       Q.      In fact, the fact that you had

14   past dealings with the City of Naperville was

15   one of your customers, for the Naperville

16   Police Department?

17       A.      Yes.

18       Q.      For polygraph services, that sort

19   of thing?

20       A.      Yes.

21       Q.      Now, when you saw -- when did you

22   first see Bill Amor?

23       A.      Approximately 3:50 in the

24   afternoon.

DUPAGE COUNTY
C-000664

DEFS 2798

41

```
1       Q.      And he was in the company of two
2   Naperville police detectives?
3       A.      Yes.
4       Q.      That would be Detectives Cross and
5   Guerrieri?
6       A.      Yes.
7       Q.      Can you describe what kind of
8   clothing Mr. Amor was wearing that day?
9       A.      I don't recall.
10      Q.      Do you recall if he was wearing
11  shorts or if he was wearing long pants?
12      A.      I don't remember.
13      Q.      Do you recall what the weather was
14  like on October 3, '95?  Was it cold out?
15      A.      I have no idea.
16      Q.      Cold or warm, or seasonal?
17      A.      No.
18      Q.      How long did you talk to the
19  detectives about particulars of the case?
20      A.      Roughly a half hour.
21      Q.      Do you remember when that
22  occurred?
23      A.      Approximately 3:50, until about
24  4:20.
```

DUPAGE COUNTY
C-000665

DEFS 2799

42

1     Q.    And this is -- what detectives did

2  you speak to?

3     A.    Both.

4     Q.    And they gave you their version of

5  the case to that point; is that correct?

6     A.    Yes.

7     Q.    And they told you that Bill Amor

8  was the suspect for this case; is that

9  correct?

10    A.    Yes.

11    Q.    And again, Bill was in the company

12  of Detectives Cross and Guerrieri; is that

13  correct?

14    A.    Yes.

15    MR. PADISH:  May I approach the witness,

16  Judge?

17    THE COURT:  Yes.

18  BY MR. PADISH:

19    Q.    Detective, -- strike that.

20       Mr. Masokas, I show you what has

21  previously been marked as People's Exhibit No.

22  6 for motion to suppress.  Is this the

23  document you testified to?

24    A.    Yes.

DUPAGE COUNTY

C-000666

DEFS 2800

1      Q.     Isn't it true, sir, that for a

2  signature line on this, that the name William

3  Amor is written out in handwriting?

4      A.     Yes.

5      Q.     And this is an added line, it is

6  not preprinted, I understand I am not in

7  custody, BA.  That is in printing?

8      A.     Yes.

9      Q.     Whereas the signature for William

10  Amor is in writing?

11      A.     Yes.

12      Q.     Isn't it also true that there is

13  no date or time next to the line, I understand

14  that I am not in custody, BA?

15      A.     Correct.

16      Q.     And you testified, sir, that the

17  reason you put that line in there is that you

18  asked Mr. Amor about whether or not he was in

19  custody; is that correct?

20      A.     Yes.

21      Q.     Well, sir, did you not believe

22  the Naperville Police Department when they

23  told you the defendant was not in custody?

24      A.     I believed them.

DUPAGE COUNTY
C-000667

44

1     Q.    Is that why you asked the

2  defendant then about his custody status?

3     A.    I wanted to make sure he

4  understood.

5     Q.    And at this time you also told Mr.

6  Amor that you were not a police detective; is

7  that correct?

8     A.    I may have.

9     Q.    You told him you were not a police

10  officer; is that correct?

11     A.    I may have.  If he asked.

12     Q.    Let me ask you this.  At any time

13  did you tell Mr. Amor you were a police

14  officer?

15     A.    No.

16     Q.    Did you tell him you were a

17  polygraph person on this?

18     A.    I am sure I did, yes.

19     Q.    You defined your role; is that

20  correct?

21     A.    Yes.

22     Q.    You didn't identify yourself as a

23  police officer; is that correct?

24     A.    Correct.

DUPAGE COUNTY
C-000668

DEFS 2802

45

1    Q.    And you told Mr. Amor you were

2  associated with Reid and Associates; is that

3  correct?

4    A.    Yes.

5    Q.    You didn't tell him you were

6  associated with the Naperville Police

7  Department, is that correct?

8    A.    Correct.

9    Q.    Sir, you testified that you have

10  had Mr. Amor fill out a medical data sheet?

11    A.    Yes.

12    Q.    I show you what I marked as

13  Defendant's Exhibit No. 1 for identification

14  for motion to suppress.

15        Does this medical data sheet, does

16  this truly and accurately reflect the medical

17  data sheet Mr. Amor signed in your presence,

18  filled out in your presence?

19    A.    Yes.

20    Q.    One of the questions you asked Mr.

21  Amor on the data sheet was whether or not he

22  had taken any medication or drugs in the last

23  24 hours, is that correct?

24    A.    Yes.    DUPAGE COUNTY

C-000669

DEFS 2803

46

1    Q.    Isn't it true that on this sheet

2  that he marked that he had taken Actifed?

3    A.    Yes.

4    Q.    And he also on this sheet told you

5  he was experiencing physical discomfort at the

6  time; is that correct?

7    A.    Yes.

8    Q.    And this would have been on

9  October 3rd again?

10    A.    Yes.

11    Q.    And he also mentioned to you that

12  he had had a headache?

13    A.    Yes.

14    Q.    He also mentioned to you that he

15  had cold symptoms?

16    A.    Yes.

17    Q.    Isn't it true, sir, that there's a

18  line in there that says in the last 24 hours

19  how many hours of sleep have you had; is that

20  correct?

21    A.    Yes.

22    Q.    Mr. Amor indicated that he had had

23  just four hours of sleep?

24    A.    Yes.    DUPAGE COUNTY

C-000670

DEFS 2804

1    Q.    Sir, you were asked a question by

2  Mr. Chval about his condition at 9:00 o'clock

3  that night; is that correct?

4    A.    Yes.

5    Q.    And you mentioned he seemed fine

6  to you?

7    A.    Yes.

8    Q.    But up to in point he told you

9  he only had four hours of sleep; is that

10  correct?

11    A.    Yes.

12    Q.    Isn't it true, sir, that you also

13  testified on direct examination that Mr. Amor

14  was slouched in his chair?

15    A.    Yes.

16    Q.    With his leg dangling over part of

17  the chair?

18    A.    At one time it was dangling over

19  the side, another time he was slouched.  He

20  moved around.

21    Q.    Moved around?

22    A.    At times.

23    MR. PADISH:  If I could have a moment,

24  Judge?

DUPAGE COUNTY
C-000671

DEFS 2805

48

1          THE COURT:  Yes.

2     BY MR. PADISH:

3          Q.     Sir, let me ask you this.  On the

4     medical data sheet, the reason you ask these

5     questions as regards the amount of how many

6     hours of sleep you had, do these questions

7     tend to impact the results?

8          A.     They can.

9          MR. PADISH:  I have nothing further,

10    Judge.

11         THE COURT:  Mr. Chval.

12                    REDIRECT EXAMINATION

13                    BY

14                    MR. CHVAL:

15         Q.     Mr. Masokas, if there was some

16    condition of the defendant relating to his

17    headache or impact as a result of the test,

18    would you know it?

19         MR. PADISH:  Objection as to the form of

20    that question.  Calls for speculation.

21         THE COURT:  Well, to some extent, I

22    guess.  But they asked the question.

23    Overruled.

24         A.     It would depend on what was put on

DUPAGE COUNTY

C-000672

DEFS 2806

49

1     the sheet.  For instance, if someone had

2     indicated that they were on numerous

3     medications for heart problems or anxiety,

4     various types of things that could very well

5     have an impact on the results.

6              Or if someone currently has heart

7     problems and had a recent heart attack.  In a

8     case like that we may not conduct the test.

9     So all depends what is put on the forms.

10    BY MR. CHVAL:

11        Q.     In the Defendant's instance, did

12    the results seem in any way impacted by the

13    conditions he put down on the medical data

14    sheet?

15        A.     No.

16        MR. CHVAL:  I have nothing further.

17        MR. PADISH:  Nothing further.

18        THE COURT:  Thank you, sir.  You may step

19    down.  Watch your step.

20                    (Witness excused.)

21        THE COURT:  I believe we were in the

22    rebuttal section of the case.  State have have

23    any other rebuttal?

24        MR. BAYER:  No other evidence, Judge.

C-000673

DEFS 2807

