*Amor v. Cross, et al.*
Case No. 18-CV-2523
Our File No. 18-4078

# EXHIBIT 49

1            UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF ILLINOIS

3                 EASTERN DIVISION

4    ---------------------------x

5    WILLIAM AMOR,                    :

6               Plaintiff,            :

7       v.                           :   Case No. 18-cv-2523

8    OFFICER MICHAEL CROSS,           :

9    et al.,                          :

10              Defendants.    :

11   ---------------------------x

12

13       Videotaped Deposition of MICHAEL CROSS

14              Naperville, Illinois

15            Friday, October 16, 2020

16                  9:42 a.m.

17

18

19

20

21

22   Job No.:  327818

23   Pages:  1 - 320

24   Reported by:  Paula M. Quetsch, CSR, RPR

1      Videotaped deposition of MICHAEL CROSS, held at

2    the location of:

3

4          NAPERVILLE MUNICIPAL CENTER

5          400 South Eagle Street

6          Naperville, Illinois 60540

7          (630) 420-6111

8

9

10

11      Pursuant to notice before Paula M. Quetsch, a

12    Certified Shorthand Reporter, Registered

13    Professional Reporter, and a Notary Public in and

14    for the State of Illinois.

15

16

17

18

19

20

21

22

23

24

```
 1                 A P P E A R A N C E S

 2    ON BEHALF OF THE PLAINTIFF:

 3         MARIAH GARCIA, ESQUIRE

 4         LOEVY & LOEVY

 5         311 North Aberdeen Street

 6         Third Floor

 7         Chicago, Illinois 60607

 8         (312) 243-5900

 9

10    ON BEHALF OF THE DEFENDANTS:

11         JOSEPH POLICK, ESQUIRE

12         THE SOTOS LAW FIRM

13         550 East Devon Avenue

14         Suite 150

15         Itasca, Illinois 60143

16         (630) 735-3300

17

18    ALSO PRESENT:

19         MASON DOUGLAS, Videographer

20

21

22

23

24
```

Transcript of Michael Cross
Conducted on October 16, 2020                    4

```
1                    C O N T E N T S

2    EXAMINATION OF MICHAEL CROSS                PAGE

3         By Ms. Garcia                          6

4         By Mr. Polick                          302

5         By Ms. Garcia                          318

6

7                    E X H I B I T S

8              (Attached to transcript.)

9

10   CROSS DEPOSITION EXHIBITS                    PAGE

11

12    Exhibit 1  Text Message                     87

13    Exhibit 2  Text Message                     88

14    Exhibit 3  DEFS 12779 to DEFS 12788        100

15    Exhibit 4  DEFS 12754 to DEFS 12761        109

16    Exhibit 5  DEFS 11273 to DEFS 11279        141

17    Exhibit 6  2018 Testimony, 28905 to 29107  196

18

19

20

21

22

23

24
```

Transcript of Michael Cross
Conducted on October 16, 2020                    5

| | | |
|---|---|---|
| 1 | P R O C E E D I N G S | 09:42:28 |
| 2 | THE VIDEOGRAPHER:  Here begins Tape No. 1 in | 09:42:28 |
| 3 | the videotaped deposition of Michael Cross in the | 09:42:31 |
| 4 | matter of Amor v. Officer Cross in the Northern | 09:42:34 |
| 5 | District of Illinois, Case No. 18-CV-2523. | 09:42:38 |
| 6 | Today's date is October 16th, 2020.  The | 09:42:44 |
| 7 | time on the video monitor is 9:42 a.m.  The | 09:42:46 |
| 8 | videographer today is Mason Douglas, representing | 09:42:52 |
| 9 | Planet Depos.  This video deposition is taking | 09:42:54 |
| 10 | place at 400 South Eagle Street, Naperville, | 09:42:55 |
| 11 | Illinois. | 09:42:57 |
| 12 | Would counsel please identify themselves | 09:42:58 |
| 13 | and state whom they represent. | 09:43:00 |
| 14 | MS. GARCIA:  For the plaintiff, Mariah | 09:43:02 |
| 15 | Garcia. | 09:43:05 |
| 16 | MR. POLICK:  For the Defendants Joseph | 09:43:05 |
| 17 | Polick, P-o-l-i-c-k, and also for the Witness | 09:43:08 |
| 18 | Michael Cross. | 09:43:12 |
| 19 | THE VIDEOGRAPHER:  The court reporter | 09:43:14 |
| 20 | today is Paula Quetsch representing Planet Depos. | 09:43:15 |
| 21 | Would you please swear in the witness. | 09:43:26 |
| 22 | (Witness sworn.) | 09:43:26 |
| 23 | MICHAEL CROSS, | 09:43:26 |
| 24 | having been duly sworn, testified as follows: | 11:40:16 |

Transcript of Michael Cross
Conducted on October 16, 2020                    6

| | | |
|---|---|---|
| 1 | EXAMINATION BY COUNSEL FOR THE PLAINTIFF | 11:40:16 |
| 2 | BY MS. GARCIA: | 09:43:28 |
| 3 | Q  Mr. Cross, will you please state your name | 09:43:28 |
| 4 | and spell it for the record. | 09:43:31 |
| 5 | A  Michael M-i-c-h-a-e-l; Cross C-r-o-s-s. | 09:43:32 |
| 6 | MS. GARCIA:  And for the record, we are | 09:43:40 |
| 7 | socially distancing from the deponent.  The | 09:43:42 |
| 8 | deponent has asked if he can take his mask off with | 09:43:47 |
| 9 | the addition of preventative barriers and social | 09:43:51 |
| 10 | distancing in this deposition, and both counsel | 09:43:54 |
| 11 | have stipulated that that's all right with us. | 09:43:57 |
| 12 | So, Mr. Cross, please feel free to take | 09:43:58 |
| 13 | your mask off. | 09:44:02 |
| 14 | THE WITNESS:  Thank you. | 09:44:04 |
| 15 | Q  Mr. Cross, my name is Mariah Garcia, and I | 09:44:05 |
| 16 | am the attorney for the Plaintiff Bill Amor.  Have | 09:44:09 |
| 17 | you ever been deposed before, sir? | 09:44:13 |
| 18 | A  Yes. | 09:44:14 |
| 19 | Q  How many times? | 09:44:15 |
| 20 | A  Once. | 09:44:15 |
| 21 | Q  Once.  And were you a party in that case | 09:44:19 |
| 22 | of that deposition, or were you just the witness? | 09:44:21 |
| 23 | A  Party. | 09:44:24 |
| 24 | Q  In the case that you were deposed in before, | 09:44:24 |

Transcript of Michael Cross
Conducted on October 16, 2020                    7

| | | |
|---|---|---|
| 1 | what was the topic of the lawsuit? | 09:44:34 |
| 2 | A  Aggravated battery to a police officer. | 09:44:37 |
| 3 | Q  And were you the one who was being sued | 09:44:43 |
| 4 | for aggravated battery? | 09:44:46 |
| 5 | A  No. | 09:44:49 |
| 6 | Q  Who was being sued for aggravated battery? | 09:44:50 |
| 7 | A  Another officer.  I don't recall his name. | 09:44:55 |
| 8 | Q  Okay. | 09:44:57 |
| 9 | A  It's been a while. | 09:45:01 |
| 10 | Q  And why were you a party to the lawsuit? | 09:45:04 |
| 11 | MR. POLICK:  Objection to the form. | 09:45:07 |
| 12 | Go ahead, Mike, you can answer. | 09:45:11 |
| 13 | A  It was part of my job in the detective | 09:45:13 |
| 14 | division. | 09:45:16 |
| 15 | Q  What was the name of that case, sir? | 09:45:18 |
| 16 | A  Furstenau versus the City of Naperville -- | 09:45:33 |
| 17 | no, Furstenau versus the officer that I can't | 09:45:43 |
| 18 | remember his name. | 09:45:47 |
| 19 | Q  Do you remember how to spell Furstenau?  I | 09:45:47 |
| 20 | didn't understand. | 09:45:51 |
| 21 | A  Pardon me? | 09:45:51 |
| 22 | Q  Do you know how to spell Furstenau? | 09:45:52 |
| 23 | A  I believe it's F-e-r-s-t-i-n-e-u [sic]. | 09:45:56 |
| 24 | Q  And, Mr. Cross, how was that lawsuit | 09:46:02 |

Transcript of Michael Cross
Conducted on October 16, 2020                    8

| | | |
|---|---|---|
| 1 | resolved, if you know? | 09:46:06 |
| 2 | A  It was dismissed. | 09:46:06 |
| 3 | Q  I know you've been deposed in the past, so | 09:46:09 |
| 4 | you have some familiarity, but because we are in a | 09:46:15 |
| 5 | more unique situation today I'm just going to go | 09:46:20 |
| 6 | over some ground rules first.  Okay? | 09:46:22 |
| 7 | A  Okay. | 09:46:24 |
| 8 | Q  First, please keep your answers verbal and | 09:46:24 |
| 9 | audible.  Because we have the court reporter, | 09:46:29 |
| 10 | nodding your head and shaking your head is not | 09:46:31 |
| 11 | going to help her understand what you're saying. | 09:46:33 |
| 12 | Okay? | 09:46:36 |
| 13 | A  Okay. | 09:46:36 |
| 14 | Q  If I ask a question that you don't | 09:46:36 |
| 15 | understand, please let me know.  Otherwise, I'm | 09:46:40 |
| 16 | going to assume you understand what I'm saying, | 09:46:42 |
| 17 | and I'm going to expect a response.  Okay? | 09:46:44 |
| 18 | A  Okay. | 09:46:46 |
| 19 | Q  Let me finish my question before you answer. | 09:46:46 |
| 20 | I promise that I will let you answer any question | 09:46:48 |
| 21 | I have to the extent that you need to, but if | 09:46:51 |
| 22 | we're interrupting each other, it's again going to | 09:46:53 |
| 23 | hard for the court reporter.  Okay? | 09:46:57 |
| 24 | A  I understand. | 09:46:58 |

Transcript of Michael Cross
Conducted on October 16, 2020                    9

| | | |
|---|---|---|
| 1 | Q  And if you need a break at any time, | 09:46:59 |
| 2 | please let me know.  All I ask is that you let me | 09:47:01 |
| 3 | finish my line of questioning before we take a | 09:47:05 |
| 4 | break.  Okay? | 09:47:06 |
| 5 | A  Okay. | 09:47:07 |
| 6 | Q  Mr. Cross, you're currently retired; correct? | 09:47:07 |
| 7 | A  Yes. | 09:47:11 |
| 8 | Q  When did you retire? | 09:47:11 |
| 9 | A  I believe it was 2019. | 09:47:13 |
| 10 | Q  2019?  And where did you retire from, sir? | 09:47:21 |
| 11 | A  Naperville Police Department. | 09:47:25 |
| 12 | Q  What position did you hold when you retired | 09:47:29 |
| 13 | in 2019? | 09:47:32 |
| 14 | A  I was a detective. | 09:47:32 |
| 15 | Q  Can you please tell me everything you did | 09:47:34 |
| 16 | to prepare for today's deposition? | 09:47:40 |
| 17 | A  I met with my attorney, and I studied my | 09:47:42 |
| 18 | reports and prior testimony. | 09:47:46 |
| 19 | Q  How many times did you meet with your | 09:47:48 |
| 20 | attorney? | 09:47:57 |
| 21 | A  Three times. | 09:47:58 |
| 22 | Q  And did you meet with your attorney over | 09:47:59 |
| 23 | the phone or in person? | 09:48:02 |
| 24 | A  In person. | 09:48:03 |

Transcript of Michael Cross
Conducted on October 16, 2020                    10

| | | |
|---|---|---|
| 1 | Q  Do you recall the first time approximately | 09:48:04 |
| 2 | you met with your attorney?  And by asking that, I | 09:48:11 |
| 3 | mean what date that was. | 09:48:14 |
| 4 | A  I don't recall the exact date. | 09:48:16 |
| 5 | Q  Do you have an approximation? | 09:48:18 |
| 6 | A  No. | 09:48:22 |
| 7 | Q  Was it a year ago? | 09:48:24 |
| 8 | A  It was before -- or since that. | 09:48:26 |
| 9 | Q  Since? | 09:48:30 |
| 10 | A  Less than a year. | 09:48:31 |
| 11 | Q  Less than a year?  Was it before or after | 09:48:33 |
| 12 | the COVID-19 lockdown in March? | 09:48:36 |
| 13 | A  After. | 09:48:39 |
| 14 | Q  After.  So would it be fair to say it was | 09:48:39 |
| 15 | sometime in the last seven months? | 09:48:42 |
| 16 | A  Yes. | 09:48:45 |
| 17 | Q  Okay.  And how long did you meet with your | 09:48:46 |
| 18 | attorney when you met with him or her for the | 09:48:58 |
| 19 | first time? | 09:49:06 |
| 20 | A  Several hours.  Two to three hours. | 09:49:06 |
| 21 | Q  How many lawyers were present at this | 09:49:10 |
| 22 | meeting? | 09:49:13 |
| 23 | A  Two. | 09:49:13 |
| 24 | Q  And were those lawyers Mr. Polick and | 09:49:15 |

Transcript of Michael Cross
Conducted on October 16, 2020                    11

| | | |
|---|---|---|
| 1 | Ms. Ranum? | 09:49:26 |
| 2 | A  Yes. | 09:49:28 |
| 3 | Q  Was anyone else present besides your | 09:49:30 |
| 4 | lawyers? | 09:49:33 |
| 5 | A  No. | 09:49:33 |
| 6 | Q  And the second time you met with your | 09:49:34 |
| 7 | attorneys, approximately how long ago was that time? | 09:49:42 |
| 8 | A  I'm not sure. | 09:49:47 |
| 9 | Q  Was it less than three months ago or more | 09:49:49 |
| 10 | than three months ago? | 09:49:55 |
| 11 | A  I'm not sure. | 09:49:55 |
| 12 | Q  Was it very soon after your first meeting | 09:49:57 |
| 13 | or a while past? | 09:50:02 |
| 14 | A  I can't tell you.  I don't recall. | 09:50:03 |
| 15 | Q  Was it within the last month? | 09:50:05 |
| 16 | A  No.  Before that. | 09:50:07 |
| 17 | Q  Okay.  So would it be fair to say around | 09:50:12 |
| 18 | two months? | 09:50:15 |
| 19 | A  I told you I don't understand -- I don't | 09:50:17 |
| 20 | know -- I don't remember, I mean. | 09:50:21 |
| 21 | Q  Okay.  Well, we know it wasn't three months | 09:50:22 |
| 22 | ago but less than a month ago, so we'll just go in | 09:50:25 |
| 23 | that date range.  Okay? | 09:50:29 |
| 24 | A  Sure. | 09:50:30 |

Transcript of Michael Cross
Conducted on October 16, 2020                    12

| | | |
|---|---|---|
| 1 | Q   Okay.  At that second meeting were both | 09:50:30 |
| 2 | Mr. Polick and Ms. Ranum present or just one. | 09:50:34 |
| 3 | A   Just Mr. Polick. | 09:50:38 |
| 4 | Q   Okay.  And how long was that meeting for? | 09:50:39 |
| 5 | A   Several hours. | 09:50:42 |
| 6 | Q   Would you say two to three hours? | 09:50:45 |
| 7 | A   Several hours. | 09:50:51 |
| 8 | Q   Is that less than four, more than four? | 09:50:53 |
| 9 | A   I don't recall. | 09:50:57 |
| 10 | Q   And was that meeting in person or over the | 09:50:58 |
| 11 | phone? | 09:51:02 |
| 12 | A   In person. | 09:51:02 |
| 13 | Q   And the last and third meeting you had | 09:51:03 |
| 14 | with your attorneys, do you recall when that was? | 09:51:09 |
| 15 | A   Just recently.  Within the last week. | 09:51:11 |
| 16 | Q   And by "recently" -- oh, I'm sorry; I | 09:51:16 |
| 17 | jumped the gun on that question.  Was it just | 09:51:22 |
| 18 | Mr. Polick at that meeting? | 09:51:25 |
| 19 | A   Yes. | 09:51:26 |
| 20 | Q   And how long was that meeting? | 09:51:27 |
| 21 | A   Several hours. | 09:51:30 |
| 22 | Q   By "several hours," do you mean two to | 09:51:32 |
| 23 | three hours? | 09:51:40 |
| 24 | A   Several hours. | 09:51:40 |

Transcript of Michael Cross
Conducted on October 16, 2020                                    13

| 1 | Q  Was it more than six hours? | 09:51:41 |
| 2 | A  Several hours. | 09:51:43 |
| 3 | Q  So it could have been more than six hours? | 09:51:46 |
| 4 | MR. POLICK:  Objection; misstates the | 09:51:50 |
| 5 | witness' testimony. | 09:51:53 |
| 6 | You can answer over the objection. | 09:51:55 |
| 7 | A  Several hours. | 09:51:56 |
| 8 | Q  And you mentioned that you read over your | 09:51:58 |
| 9 | police reports and your prior testimony; correct? | 09:52:08 |
| 10 | A  Yes. | 09:52:11 |
| 11 | Q  And by "police reports," you mean the | 09:52:12 |
| 12 | supplemental reports you wrote in the investigation | 09:52:22 |
| 13 | into Mr. Amor; correct? | 09:52:26 |
| 14 | A  Correct. | 09:52:27 |
| 15 | Q  Did you read any police reports outside of | 09:52:27 |
| 16 | your own? | 09:52:29 |
| 17 | A  No. | 09:52:30 |
| 18 | Q  Did you read any of the fire department | 09:52:31 |
| 19 | reports in this matter? | 09:52:41 |
| 20 | A  No. | 09:52:42 |
| 21 | Q  Did you reread any of the letters written | 09:52:43 |
| 22 | by Bill Amor? | 09:52:47 |
| 23 | A  No. | 09:52:48 |
| 24 | Q  Did you reread Bill Amor's confession, | 09:52:48 |

Transcript of Michael Cross
Conducted on October 16, 2020                                14

| | | |
|---|---|---|
| 1 | either the one he hand wrote or a transcript of | 09:52:52 |
| 2 | the one given to Mr. Nigohosian? | 09:52:54 |
| 3 | A  Yes. | 09:53:01 |
| 4 | Q  Which of those did you read? | 09:53:01 |
| 5 | A  Both. | 09:53:03 |
| 6 | Q  And then you testified that you reviewed | 09:53:16 |
| 7 | your testimony; correct? | 09:53:18 |
| 8 | A  Yes. | 09:53:20 |
| 9 | Q  Did you review your grand jury testimony? | 09:53:22 |
| 10 | A  I don't recall. | 09:53:25 |
| 11 | Q  Did you recall your testimony in the | 09:53:27 |
| 12 | 1997 criminal trial? | 09:53:36 |
| 13 | A  Yes. | 09:53:38 |
| 14 | Q  And did you reread your testimony in the | 09:53:39 |
| 15 | 2018 criminal retrial? | 09:53:46 |
| 16 | A  Yes. | 09:53:48 |
| 17 | Q  When was the last time you reviewed the | 09:53:49 |
| 18 | documents I just mentioned?  So that would be the | 09:54:07 |
| 19 | police reports, Mr. Amor's confessions, and the | 09:54:10 |
| 20 | testimony that you had given prior. | 09:54:16 |
| 21 | A  I reviewed the police reports yesterday. | 09:54:19 |
| 22 | Q  When did you review the confession? | 09:54:22 |
| 23 | A  Probably when I was reviewing yesterday. | 09:54:27 |
| 24 | Q  And when did you review last the testimony | 09:54:32 |

Transcript of Michael Cross
Conducted on October 16, 2020                    15

| 1 | that you gave in 1997? | 09:54:45 |
| 2 | A  I don't recall. | 09:54:48 |
| 3 | Q  And when did you review last the testimony | 09:54:49 |
| 4 | you gave in 2018? | 09:54:54 |
| 5 | A  Within the last couple days. | 09:54:56 |
| 6 | Q  And when you reviewed your police reports | 09:55:00 |
| 7 | yesterday, how long did you review them for? | 09:55:14 |
| 8 | A  An hour. | 09:55:16 |
| 9 | Q  When you reviewed the -- Mr. Amor's | 09:55:17 |
| 10 | confession yesterday, how long did you review | 09:55:22 |
| 11 | that for? | 09:55:24 |
| 12 | A  Half hour. | 09:55:25 |
| 13 | Q  I know you don't recall when you last | 09:55:26 |
| 14 | reviewed your criminal -- your testimony in the | 09:55:32 |
| 15 | criminal trial in 1997, but do you remember how | 09:55:34 |
| 16 | long you reviewed it for? | 09:55:38 |
| 17 | A  No. | 09:55:39 |
| 18 | Q  And you testified that you reviewed your | 09:55:40 |
| 19 | testimony in the 2018 retrial a few days ago; | 09:55:44 |
| 20 | correct? | 09:55:48 |
| 21 | A  I believe that's what I said. | 09:55:49 |
| 22 | Q  Okay.  Do you recall how long you reviewed | 09:55:53 |
| 23 | that testimony for? | 09:55:55 |
| 24 | A  No. | 09:55:56 |

Transcript of Michael Cross
Conducted on October 16, 2020                                    16

```
 1       Q   Did you review it for more than an hour or        09:55:58

 2   less than an hour?                                         09:56:13

 3       A   More than an hour.                                 09:56:14

 4       Q   More than two hours or less than two hours?        09:56:15

 5       A   Don't recall.                                      09:56:17

 6       Q   And prior to reviewing the police reports          09:56:19

 7   and the confession yesterday, did you review them         09:56:27

 8   before that at any point?                                 09:56:29

 9       A   Could you ask me that again?                       09:56:31

10       Q   Sure.  Prior to reviewing your police             09:56:34

11   reports and the confession yesterday, did you             09:56:37

12   review those documents any other time?                    09:56:40

13       A   Probably, yes.                                     09:56:44

14       Q   What do you mean by "Probably, yes"?               09:56:46

15       A   Probably, yes.                                     09:56:51

16       Q   Do you recall specifically times prior to         09:56:53

17   yesterday that you reviewed either your police            09:56:54

18   reports or the confession that Mr. Amor gave?             09:56:59

19       A   Not exactly, no.                                   09:57:03

20       Q   Okay.  Did you review any deposition              09:57:05

21   testimony in this case?                                   09:57:17

22       A   Yes.                                               09:57:17

23       Q   Whose deposition testimony did you review?        09:57:19

24       A   Mine.                                              09:57:22
```

Transcript of Michael Cross
Conducted on October 16, 2020                    17

| | | |
|---|---|---|
| 1 | Q  And I'm not trying to be difficult, but, | 09:57:24 |
| 2 | Mr. Cross, when were you last deposed in this case? | 09:57:36 |
| 3 | A  I don't recall the exact dates. | 09:57:40 |
| 4 | Q  Did you review any deposition testimony | 09:57:45 |
| 5 | other than your own in this case? | 09:57:57 |
| 6 | A  No. | 09:57:59 |
| 7 | Q  Did you discuss this case with anyone | 09:58:00 |
| 8 | other than your counsel? | 09:58:09 |
| 9 | A  No. | 09:58:10 |
| 10 | Q  Did you discuss this case with Brian | 09:58:12 |
| 11 | Cunningham? | 09:58:16 |
| 12 | A  No. | 09:58:17 |
| 13 | Q  Did you discuss this case with Robert | 09:58:17 |
| 14 | Guerrieri? | 09:58:25 |
| 15 | A  No. | 09:58:26 |
| 16 | Q  Did you discuss this case with any family | 09:58:26 |
| 17 | members? | 09:58:29 |
| 18 | A  No. | 09:58:30 |
| 19 | Q  When you reviewed your trial testimony | 09:58:31 |
| 20 | from 1997, did you find that testimony to be | 09:58:37 |
| 21 | truthful and accurate? | 09:58:40 |
| 22 | A  Yes. | 09:58:41 |
| 23 | Q  Did you have any reason to doubt your | 09:58:44 |
| 24 | testimony in that 1997 trial? | 09:58:47 |

Transcript of Michael Cross
Conducted on October 16, 2020                    18

| | | |
|---|---|---|
| 1 | A  I believe there was a couple of errors | 09:58:50 |
| 2 | in that. | 09:58:54 |
| 3 | Q  We'll come back to that. | 09:58:54 |
| 4 | And when you reviewed your 2018 criminal | 09:59:06 |
| 5 | trial testimony a couple days ago, did you find | 09:59:14 |
| 6 | that testimony to be truthful and accurate? | 09:59:17 |
| 7 | A  Yes. | 09:59:19 |
| 8 | Q  Did you find -- did you have any reason to | 09:59:19 |
| 9 | doubt the testimony you gave? | 09:59:21 |
| 10 | A  No. | 09:59:22 |
| 11 | Q  And outside Mr. Amor's case, have you | 09:59:23 |
| 12 | testified in other criminal cases? | 09:59:41 |
| 13 | A  Yes. | 09:59:43 |
| 14 | Q  How many times have you testified in other | 09:59:44 |
| 15 | criminal cases? | 09:59:47 |
| 16 | A  Hundreds. | 09:59:48 |
| 17 | Q  Hundreds?  And in the hundreds of times | 09:59:49 |
| 18 | you've testified, have you ever provided false | 09:59:54 |
| 19 | testimony? | 09:59:56 |
| 20 | A  No. | 09:59:56 |
| 21 | Q  Have you ever provided inaccurate | 09:59:57 |
| 22 | testimony in any of the times you testified in | 10:00:00 |
| 23 | court? | 10:00:03 |
| 24 | A  No. | 10:00:03 |

Transcript of Michael Cross
Conducted on October 16, 2020                    19

| | | |
|---|---|---|
| 1 | Q   You -- when you testified at the | 10:00:05 |
| 2 | 2018 retrial, you talked about suffering a stroke; | 10:00:32 |
| 3 | correct? | 10:00:35 |
| 4 | A   Yes, ma'am. | 10:00:35 |
| 5 | Q   And you said that that stroke in | 10:00:36 |
| 6 | 2008 affected your ability to recall certain | 10:00:39 |
| 7 | things? | 10:00:44 |
| 8 | A   Yes, it did. | 10:00:44 |
| 9 | Q   Did you lose some of your memory after | 10:00:45 |
| 10 | that stroke? | 10:00:47 |
| 11 | A   Yes. | 10:00:47 |
| 12 | Q   And some of that memory loss impacted | 10:00:47 |
| 13 | your ability to remember events from the | 10:00:51 |
| 14 | 1995 investigation; correct? | 10:00:58 |
| 15 | A   Yes. | 10:01:01 |
| 16 | Q   When you were testifying in 2018, did you | 10:01:02 |
| 17 | review documents that were related to the case? | 10:01:19 |
| 18 | A   Yes. | 10:01:23 |
| 19 | Q   Okay.  Did you review your testimony prior | 10:01:24 |
| 20 | to 2018 from the 1997 case? | 10:01:28 |
| 21 | A   Yes. | 10:01:31 |
| 22 | Q   And after reading those documents, did you | 10:01:32 |
| 23 | have your memory refreshed, or were there still | 10:01:34 |
| 24 | aspects of the 1995 investigation that you couldn't | 10:01:39 |

Transcript of Michael Cross
Conducted on October 16, 2020                          20

| | | |
|---|---|---|
| 1 | recall? | 10:01:41 |
| 2 | A  My memory has gotten better, but there are | 10:01:42 |
| 3 | some aspects that I didn't recall off the top of | 10:01:45 |
| 4 | my head. | 10:01:51 |
| 5 | Q  When you say your memory has gotten better, | 10:01:52 |
| 6 | do you mean your memory has gotten better from | 10:01:54 |
| 7 | 2008 to the 2018 retrial, or from the 2018 retrial | 10:01:57 |
| 8 | until now? | 10:02:01 |
| 9 | A  The earlier one. | 10:02:02 |
| 10 | Q  Okay.  So your memory was worse in 2008, | 10:02:05 |
| 11 | but it had gotten better by 2018? | 10:02:11 |
| 12 | A  Yes, ma'am. | 10:02:14 |
| 13 | Q  I know this might be a hard question to | 10:02:15 |
| 14 | ask, but what are some of the aspects of the case | 10:02:22 |
| 15 | you were asked about in 2018 that you weren't able | 10:02:26 |
| 16 | to recall even after reviewing the documents? | 10:02:32 |
| 17 | A  I can't name them. | 10:02:34 |
| 18 | Q  And since the 2018 retrial, have you been | 10:02:37 |
| 19 | able to recall more events from the 1995 | 10:02:53 |
| 20 | investigation than you could at the 2018 retrial? | 10:02:58 |
| 21 | A  No. | 10:03:07 |
| 22 | Q  Has your memory gotten worse, better, or | 10:03:08 |
| 23 | stayed the same? | 10:03:12 |
| 24 | A  It's gotten better.  Before I couldn't | 10:03:13 |

Transcript of Michael Cross
Conducted on October 16, 2020                    21

| | | |
|---|---|---|
| 1 | remember what my wife asked me to get at the store. | 10:03:18 |
| 2 | Now at least I can do that. | 10:03:21 |
| 3 | Q  Yeah, I guess I'll rephrase the question. | 10:03:22 |
| 4 | From the 2018 retrial has your memory gotten | 10:03:25 |
| 5 | better, or stayed the same, or gotten worse? | 10:03:28 |
| 6 | MR. POLICK:  I'm going to object to the | 10:03:31 |
| 7 | extent that you're asking him for a medical | 10:03:33 |
| 8 | opinion. | 10:03:35 |
| 9 | But for his understanding he can go ahead | 10:03:35 |
| 10 | and answer that question. | 10:03:38 |
| 11 | A  It's gotten better. | 10:03:39 |
| 12 | Q  What leads you to believe that your memory | 10:03:41 |
| 13 | has gotten better in the past two years? | 10:03:55 |
| 14 | MR. POLICK:  Again, object to the extent | 10:03:57 |
| 15 | you're asking him for a medical opinion. | 10:03:59 |
| 16 | He can answer over the objection. | 10:04:02 |
| 17 | A  Could you repeat that, please? | 10:04:03 |
| 18 | Q  Yes.  What are -- you testified that your | 10:04:05 |
| 19 | memory has gotten better in the last few years; | 10:04:09 |
| 20 | right? | 10:04:11 |
| 21 | A  Yes. | 10:04:12 |
| 22 | Q  What are some of the -- why are -- in what | 10:04:12 |
| 23 | ways do you believe your memory has gotten better? | 10:04:21 |
| 24 | A  I remember more things, more current things. | 10:04:24 |

Transcript of Michael Cross
Conducted on October 16, 2020                    22

| | | |
|---|---|---|
| 1 | Q  So would it be fair to say you feel like | 10:04:29 |
| 2 | your short-term memory has improved? | 10:04:31 |
| 3 | A  Yes. | 10:04:34 |
| 4 | MR. POLICK:  Objection to the form of the | 10:04:34 |
| 5 | question to the extent it's requesting a medical | 10:04:36 |
| 6 | opinion. | 10:04:39 |
| 7 | MS. GARCIA:  That can just be a standing | 10:04:39 |
| 8 | objection.  I'm not asking for a medical opinion. | 10:04:42 |
| 9 | I'm just asking based on your lived experience. | 10:04:45 |
| 10 | Q  After you had your stroke, did you visit a | 10:04:52 |
| 11 | neurologist -- | 10:04:56 |
| 12 | A  Yes. | 10:04:57 |
| 13 | Q  -- in consultation? | 10:04:57 |
| 14 | A  Yes. | 10:04:59 |
| 15 | Q  What did the neurologist say about your | 10:05:00 |
| 16 | memory? | 10:05:06 |
| 17 | A  She's given me certain tests, and I've | 10:05:06 |
| 18 | done a little bit better each time. | 10:05:11 |
| 19 | Q  Did the neurologist say that in -- and if | 10:05:14 |
| 20 | you don't know, that's fine.  Did the neurologist | 10:05:19 |
| 21 | say that you would eventually regain all your | 10:05:21 |
| 22 | memory, or would there potentially be things that | 10:05:25 |
| 23 | you could never remember? | 10:05:29 |
| 24 | A  She never said. | 10:05:30 |

Transcript of Michael Cross
Conducted on October 16, 2020                        23

| | | |
|---|---|---|
| 1 | Q  And have you continued to see your | 10:05:32 |
| 2 | neurologist since your 2008 stroke? | 10:05:36 |
| 3 | A  Yes. | 10:05:38 |
| 4 | Q  Other than your 2008 stroke, have you been | 10:05:40 |
| 5 | diagnosed with any conditions that would impact | 10:05:44 |
| 6 | your memory? | 10:05:47 |
| 7 | A  I don't think so. | 10:05:49 |
| 8 | Q  Have you been diagnosed with dementia? | 10:05:54 |
| 9 | A  Yes. | 10:06:02 |
| 10 | Q  And is the dementia, to the best of your | 10:06:04 |
| 11 | knowledge, related to the stroke you had, or is it | 10:06:10 |
| 12 | an independent diagnosis? | 10:06:14 |
| 13 | MR. POLICK:  I'm going to object to the | 10:06:18 |
| 14 | form of the question and also to the extent -- and | 10:06:19 |
| 15 | I'll make a standing objection as to any medical | 10:06:21 |
| 16 | opinions you may be trying to elicit from the | 10:06:24 |
| 17 | witness.  He's certainly not competent to give a | 10:06:26 |
| 18 | medical opinion, but I will allow him to answer | 10:06:30 |
| 19 | what his understanding is. | 10:06:32 |
| 20 | So with those objections, Mike, you can | 10:06:34 |
| 21 | answer the question. | 10:06:36 |
| 22 | MS. GARCIA:  And for the record, again, | 10:06:37 |
| 23 | I'm only asking for your experiences and your | 10:06:38 |
| 24 | knowledge. | 10:06:41 |

Transcript of Michael Cross
Conducted on October 16, 2020                    24

| | | |
|---|---|---|
| 1 | THE WITNESS:  Okay.  Could you ask it | 10:06:42 |
| 2 | again, please? | 10:06:44 |
| 3 | Q  Yes.  To the best of your knowledge -- I'm | 10:06:45 |
| 4 | not asking for a medical opinion -- was the dementia | 10:06:47 |
| 5 | something that would have occurred outside of the | 10:06:50 |
| 6 | stroke, or is it something that was psycho- | 10:06:53 |
| 7 | symptomatic with the stroke? | 10:06:56 |
| 8 | MR. POLICK:  Same objections. | 10:06:58 |
| 9 | A  I don't know. | 10:06:58 |
| 10 | Q  Okay.  And have you been diagnosed with | 10:07:00 |
| 11 | Alzheimer's? | 10:07:02 |
| 12 | A  I don't recall. | 10:07:08 |
| 13 | Q  Mr. Cross, if I represent to you that we | 10:07:09 |
| 14 | have been provided medical records that say you | 10:07:23 |
| 15 | have been diagnosed with Alzheimer's, would you | 10:07:27 |
| 16 | have reason to dispute that? | 10:07:29 |
| 17 | A  No. | 10:07:30 |
| 18 | Q  And since the 2018 testimony, have you | 10:07:31 |
| 19 | gone to the neurologist for any updates on your | 10:07:49 |
| 20 | condition? | 10:07:53 |
| 21 | A  Yes. | 10:07:53 |
| 22 | Q  Has the neurologist said that you've | 10:07:55 |
| 23 | improved? | 10:07:57 |
| 24 | A  Yes. | 10:07:58 |

Transcript of Michael Cross
Conducted on October 16, 2020                              25

| | | |
|---|---|---|
| 1 | Q  I want to talk very quickly about your | 10:08:00 |
| 2 | independent recollection of William Amor in the | 10:08:17 |
| 3 | investigation into the Miceli residence fire in | 10:08:19 |
| 4 | 1995.  Okay? | 10:08:24 |
| 5 | A  Sure. | 10:08:25 |
| 6 | Q  Do you understand what I mean by | 10:08:25 |
| 7 | "independent recollection"? | 10:08:27 |
| 8 | A  Yes. | 10:08:28 |
| 9 | Q  Okay.  And just so we're both clear, when | 10:08:30 |
| 10 | I'm referring to independent recollection, I mean | 10:08:34 |
| 11 | what you can independently remember as we sit here | 10:08:38 |
| 12 | without relying on documents or prior testimony or | 10:08:40 |
| 13 | what you've been told about the case.  Okay? | 10:08:42 |
| 14 | A  Okay. | 10:08:44 |
| 15 | Q  With that in mind, do you have an independent | 10:08:45 |
| 16 | recollection into the investigation into William | 10:08:48 |
| 17 | Amor and the Miceli residence fire in 1995? | 10:08:50 |
| 18 | A  Yes. | 10:09:00 |
| 19 | Q  Since 2018, have you suffered any further | 10:09:01 |
| 20 | strokes? | 10:09:11 |
| 21 | A  No. | 10:09:11 |
| 22 | Q  And other than dementia and Alzheimer's, | 10:09:15 |
| 23 | are there any other medical conditions you have | 10:09:21 |
| 24 | that may impact your memory? | 10:09:25 |

Transcript of Michael Cross
Conducted on October 16, 2020                    26

| | | |
|---|---|---|
| 1 | A  No. | 10:09:28 |
| 2 | Q  Are you taking any medications currently | 10:09:34 |
| 3 | to treat any symptoms or side-effects of your stroke? | 10:09:38 |
| 4 | A  Yes. | 10:09:42 |
| 5 | Q  What medications are those? | 10:09:43 |
| 6 | A  I'm receiving two.  Namenda and | 10:09:45 |
| 7 | rivastigmine.  I don't know if I can pronounce | 10:09:58 |
| 8 | that right. | 10:10:00 |
| 9 | Q  And I'm not asking for a medical opinion, | 10:10:01 |
| 10 | but based on your experience, does that medicine | 10:10:03 |
| 11 | affect your memory in some way? | 10:10:08 |
| 12 | A  I believe it's helpful. | 10:10:10 |
| 13 | Q  And are you taking any medications to | 10:10:12 |
| 14 | treat your dementia or Alzheimer's? | 10:10:15 |
| 15 | A  Isn't that the same question you asked me? | 10:10:18 |
| 16 | Q  No, sir, I asked if I were taking any for | 10:10:23 |
| 17 | your stroke. | 10:10:27 |
| 18 | A  I'm not clear on your -- your question, | 10:10:28 |
| 19 | how it relates.  It would probably be the same | 10:10:33 |
| 20 | answer as before. | 10:10:37 |
| 21 | Q  Okay.  Do you believe that your stroke, | 10:10:38 |
| 22 | dementia, or Alzheimer's will affect your ability to | 10:10:48 |
| 23 | provide truthful and accurate testimony today, sir? | 10:10:50 |
| 24 | A  I will -- I will testify to the best of my | 10:10:53 |

Transcript of Michael Cross
Conducted on October 16, 2020                    27

| | | |
|---|---|---|
| 1 | ability. | 10:10:57 |
| 2 | Q   Okay.  And by testifying to the best of | 10:10:58 |
| 3 | your ability, do you mean that if you don't recall | 10:11:03 |
| 4 | something, you'll say you don't recall? | 10:11:07 |
| 5 | A   Yes. | 10:11:08 |
| 6 | Q   And other than the two medications you | 10:11:09 |
| 7 | listed today, are you taking any other medications | 10:11:19 |
| 8 | that might affect your ability to provide truthful | 10:11:23 |
| 9 | and accurate testimony? | 10:11:26 |
| 10 | A   No. | 10:11:27 |
| 11 | Q   And anything else besides your stroke, | 10:11:28 |
| 12 | Alzheimer's, dementia, or medication you're taking | 10:11:34 |
| 13 | that you believe will impact your ability to | 10:11:38 |
| 14 | provide truthful and accurate testimony today? | 10:11:42 |
| 15 | A   No. | 10:11:49 |
| 16 | Q   I'm going to ask you again about your | 10:11:54 |
| 17 | independent recollection because I know you've | 10:11:56 |
| 18 | testified you have independent recollection of | 10:12:00 |
| 19 | this investigation, but there are some things you | 10:12:03 |
| 20 | don't recall.  Correct? | 10:12:05 |
| 21 | A   Correct. | 10:12:06 |
| 22 | Q   I specifically wanted to ask, do you have | 10:12:08 |
| 23 | an independent recollection of going to the scene of | 10:12:15 |
| 24 | the fire, 218 East Bailey on September 10th, 1995? | 10:12:22 |

Transcript of Michael Cross
Conducted on October 16, 2020                28

| | | |
|---|---|---|
| 1 | A   Yes. | 10:12:27 |
| 2 | Q   Do you have an independent recollection of | 10:12:27 |
| 3 | speaking with Bill Amor and Tina Miceli at the | 10:12:28 |
| 4 | Pam Leavenworth house on September 11th, 1995? | 10:12:34 |
| 5 | A   Vaguely. | 10:12:38 |
| 6 | Q   Do you remember speaking to Bill Amor and | 10:12:40 |
| 7 | Tina Miceli on September 12th, 1995, when they | 10:12:44 |
| 8 | came into Naperville Police Department for a | 10:12:51 |
| 9 | polygraph? | 10:12:54 |
| 10 | A   Not without reviewing my reports. | 10:12:54 |
| 11 | Q   Do you recall speaking with Bill Amor with | 10:13:06 |
| 12 | Detective Sullivan on September 12th, 1995? | 10:13:12 |
| 13 | A   Only from reading my reports. | 10:13:15 |
| 14 | Q   On September 14th, 1995, do you recall | 10:13:18 |
| 15 | attending the fire critique with Naperville Fire | 10:13:28 |
| 16 | Department? | 10:13:33 |
| 17 | A   Only from reading my reports. | 10:13:33 |
| 18 | Q   And on September 14th, 1995, do you recall | 10:13:35 |
| 19 | canvassing the 2000 -- rather 218 East Bailey | 10:13:46 |
| 20 | apartment with Mitch Kushner and Lieutenant | 10:13:55 |
| 21 | Guerrieri? | 10:14:00 |
| 22 | MR. POLICK:  Objection to the form of the | 10:14:00 |
| 23 | question. | 10:14:02 |
| 24 | A   I didn't do the canvassing. | 10:14:05 |

Transcript of Michael Cross
Conducted on October 16, 2020                    29

| | | |
|---|---|---|
| 1 | Q  Do you have an independent recollection of | 10:14:08 |
| 2 | going to 218 East Bailey with Kushner and Ferreri | 10:14:10 |
| 3 | on September 14th, 1995? | 10:14:21 |
| 4 | A  No. | 10:14:25 |
| 5 | Q  Do you recall speaking with Bill Amor and | 10:14:28 |
| 6 | Tina Miceli with Lieutenant Ferreri on | 10:14:34 |
| 7 | September 14th, 1995? | 10:14:38 |
| 8 | A  Not independently, no, not without reading | 10:14:41 |
| 9 | my reports. | 10:14:45 |
| 10 | Q  And do you recall speaking with Tina Miceli | 10:14:53 |
| 11 | and Bill Amor on September 15th, 1995, with | 10:14:56 |
| 12 | Detective Cunningham? | 10:15:00 |
| 13 | A  Only from reading my reports. | 10:15:02 |
| 14 | Q  Do you recall speaking with Tina Miceli | 10:15:04 |
| 15 | after she wrote a statement and took a polygraph | 10:15:17 |
| 16 | on September 15th, 1995? | 10:15:20 |
| 17 | A  Only from reading my reports. | 10:15:23 |
| 18 | Q  And do you recall speaking with Mr. Amor | 10:15:25 |
| 19 | on September 15th, 1995, after he was brought into | 10:15:35 |
| 20 | the Naperville Police Department on a traffic | 10:15:41 |
| 21 | ticket offense? | 10:15:44 |
| 22 | A  Only from reading my reports. | 10:15:46 |
| 23 | Q  Do you recall attending the test burn of a | 10:15:48 |
| 24 | VCR and tape at -- on, rather, September 29th, 1995? | 10:15:55 |

Transcript of Michael Cross
Conducted on October 16, 2020                     30

| | | |
|---|---|---|
| 1 | A  Yes, I do. | 10:16:03 |
| 2 | Q  Do you recall meeting Mr. Amor on | 10:16:04 |
| 3 | October 3rd, 1995, at DeKalb County jail? | 10:16:21 |
| 4 | A  Yes. | 10:16:29 |
| 5 | Q  Do you have an independent recollection of | 10:16:30 |
| 6 | meeting Mr. Amor on October 3rd, 1995 -- | 10:16:31 |
| 7 | A  Yes. | 10:16:35 |
| 8 | Q  -- at DeKalb County jail? | 10:16:36 |
| 9 | A  Yes. | 10:16:38 |
| 10 | Q  Do you have an independent recollection | 10:16:39 |
| 11 | of taking Mr. Amor to Reid & Associates on that | 10:16:40 |
| 12 | same day? | 10:16:44 |
| 13 | A  Yes. | 10:16:45 |
| 14 | Q  Do you have an independent recollection of | 10:16:45 |
| 15 | interacting with a process server on October 3rd, | 10:16:48 |
| 16 | 1995? | 10:16:53 |
| 17 | A  No. | 10:16:53 |
| 18 | Q  Do you recall talking to Detective Sullivan | 10:17:12 |
| 19 | on October 3rd, 1995? | 10:17:16 |
| 20 | A  No. | 10:17:18 |
| 21 | Q  Do you have an independent recollection of | 10:17:20 |
| 22 | Mr. Amor's confession to you and Detective Guerrieri? | 10:17:27 |
| 23 | A  An independent recollection? | 10:17:35 |
| 24 | Q  Yes. | 10:17:36 |

Transcript of Michael Cross
Conducted on October 16, 2020                          31

| | | |
|---|---|---|
| 1 | A  No. | 10:17:36 |
| 2 | Q  Do you have an independent recollection of | 10:17:37 |
| 3 | interacting with Mr. Nigohosian on October 4th, | 10:17:53 |
| 4 | 1995, when he came to take Mr. Amor's confessed | 10:17:56 |
| 5 | statement? | 10:18:01 |
| 6 | A  Yes. | 10:18:01 |
| 7 | Q  Do you have an independent recollection of | 10:18:03 |
| 8 | what the fire scene looked like at 218 East Bailey? | 10:18:57 |
| 9 | A  No. | 10:19:06 |
| 10 | Q  Do you have an independent recollection of | 10:19:07 |
| 11 | testifying at the grand jury hearing for | 10:19:12 |
| 12 | Mr. Amor's case? | 10:19:16 |
| 13 | A  No. | 10:19:17 |
| 14 | Q  Do you have an independent recollection of | 10:19:18 |
| 15 | testifying at Mr. Amor's criminal trial in 1997? | 10:19:20 |
| 16 | A  No. | 10:19:26 |
| 17 | Q  Do you have an independent recollection of | 10:19:27 |
| 18 | testifying at the suppression hearing for Mr. Amor's | 10:19:32 |
| 19 | criminal case? | 10:19:36 |
| 20 | A  No. | 10:19:37 |
| 21 | Q  Do you have an independent recollection of | 10:19:38 |
| 22 | testifying at the inquest related to Mr. Amor's | 10:19:40 |
| 23 | criminal case? | 10:19:44 |
| 24 | A  No. | 10:19:44 |

Transcript of Michael Cross
Conducted on October 16, 2020                         32

| | | |
|---|---|---|
| 1 | Q   Do you have an independent recollection of | 10:19:46 |
| 2 | the testimony you gave at the 2018 retrial? | 10:19:50 |
| 3 | A   No. | 10:19:53 |
| 4 | Q   So when we're talking about the aspects of | 10:19:56 |
| 5 | the case that you don't have an independent | 10:20:09 |
| 6 | recollection of, would it be fair for me to say | 10:20:11 |
| 7 | you're relying on your review of the documents | 10:20:14 |
| 8 | that we've discussed today and the testimony that | 10:20:17 |
| 9 | we discussed today? | 10:20:20 |
| 10 | A   The documents, yes. | 10:20:22 |
| 11 | Q   And you can't tell me any aspect of the | 10:20:42 |
| 12 | case that you don't have an independent | 10:20:46 |
| 13 | recollection of without relying on the documents; | 10:20:48 |
| 14 | correct? | 10:20:50 |
| 15 | A   Correct. | 10:20:50 |
| 16 | Q   Is it fair to say that your memories of | 10:20:52 |
| 17 | events in 1995 were better when you testified in | 10:20:57 |
| 18 | 1997 than they are today? | 10:21:01 |
| 19 | A   I don't recall. | 10:21:03 |
| 20 | Q   Okay. | 10:21:06 |
| 21 | A   I don't know. | 10:21:06 |
| 22 | Q   Mr. Amor, where did you graduate high | 10:21:07 |
| 23 | school from? | 10:21:21 |
| 24 | A   Mr. Amor?  You said Mr. Amor. | 10:21:22 |

Transcript of Michael Cross
Conducted on October 16, 2020                     33

| | | |
|---|---|---|
| 1 | Q  Sorry.  Mr. Cross, where did you graduate | 10:21:24 |
| 2 | from high school from? | 10:21:28 |
| 3 | A  York Community High School in Elmhurst. | 10:21:29 |
| 4 | Q  And when did you graduate high school? | 10:21:47 |
| 5 | A  1967. | 10:21:49 |
| 6 | Q  Okay.  Did you obtain any education prior | 10:21:52 |
| 7 | to -- strike that. | 10:21:59 |
| 8 | Did you obtain any education following | 10:22:00 |
| 9 | your graduation of high school? | 10:22:01 |
| 10 | A  Yes. | 10:22:02 |
| 11 | Q  Where did you go? | 10:22:02 |
| 12 | A  I went to Aurora University and College of | 10:22:04 |
| 13 | DuPage. | 10:22:10 |
| 14 | Q  How long were you at Aurora University? | 10:22:10 |
| 15 | A  A little over two years. | 10:22:13 |
| 16 | Q  Did you obtain a degree or certification? | 10:22:15 |
| 17 | A  Yes. | 10:22:17 |
| 18 | Q  In what? | 10:22:17 |
| 19 | A  Master's degree in criminology. | 10:22:18 |
| 20 | Q  And how long were you at College of DuPage? | 10:22:25 |
| 21 | A  Two years. | 10:22:28 |
| 22 | Q  And those are two different institutions; | 10:22:29 |
| 23 | correct? | 10:22:32 |
| 24 | A  Yes. | 10:22:32 |

Transcript of Michael Cross
Conducted on October 16, 2020                    34

```
1      Q  Okay.  Did you obtain a degree or          10:22:34

2    certification?                                   10:22:36

3      A  At COD?                                     10:22:37

4      Q  Yes.                                        10:22:38

5      A  Yes.                                        10:22:39

6      Q  What was your degree in?                    10:22:40

7      A  It was in law enforcement.                  10:22:41

8      Q  And did you go to Aurora straight after     10:22:44

9    high school or when did you enroll?             10:22:50

10     A  One year after I graduated.                 10:22:52

11     Q  Okay.  So 1968?                             10:22:54

12     A  Yes.                                        10:22:57

13     Q  And when did you enroll in College of       10:22:57

14   DuPage?                                          10:23:02

15     A  Probably -- I'm not sure.                   10:23:02

16     Q  When did you first begin working for the    10:23:08

17   Naperville Police Department?                    10:23:18

18     A  1970.                                       10:23:20

19     Q  Did you get your degree from College of     10:23:26

20   DuPage before you started working at Naperville or  10:23:30

21   after?                                           10:23:32

22     A  Before.                                     10:23:33

23     Q  So then would you have been at College of   10:23:33

24   DuPage from 1968 to 1970?                        10:23:36
```

Transcript of Michael Cross
Conducted on October 16, 2020                35

| | | |
|---|---|---|
| 1 | A   Somewhere around there, yes. | 10:23:39 |
| 2 | Q   Okay.  Did you have any jobs prior to | 10:23:41 |
| 3 | applying for Naperville Police Department? | 10:23:50 |
| 4 | A   Yes. | 10:23:54 |
| 5 | Q   Can you quickly give me an overview of | 10:23:55 |
| 6 | those jobs? | 10:23:58 |
| 7 | A   I worked for a Goodyear service station in | 10:23:59 |
| 8 | Elmhurst.  I worked for a Shell service station in | 10:24:02 |
| 9 | Elmhurst. | 10:24:09 |
| 10 | Q   And why did you decide to apply for | 10:24:10 |
| 11 | Naperville Police Department? | 10:24:16 |
| 12 | A   I was referred or suggested to by another | 10:24:17 |
| 13 | guy that was a current officer. | 10:24:23 |
| 14 | Q   Do you remember his name? | 10:24:24 |
| 15 | A   George Pradel. | 10:24:25 |
| 16 | THE COURT REPORTER:  I'm sorry? | 10:24:25 |
| 17 | THE WITNESS:  George Pradel. | 10:24:25 |
| 18 | THE COURT REPORTER:  Thank you. | 10:24:25 |
| 19 | THE WITNESS:  P-r-a-d-e-l. | 10:24:29 |
| 20 | Q   And what's the application process like | 10:24:37 |
| 21 | for Naperville Police Department? | 10:24:40 |
| 22 | A   Other than filling out the application and | 10:24:41 |
| 23 | submitting it, I don't recall. | 10:24:47 |
| 24 | Q   What was the first position you held at | 10:24:49 |

Transcript of Michael Cross
Conducted on October 16, 2020                    36

| | | |
|---|---|---|
| 1 | Naperville Police Department? | 10:24:52 |
| 2 | A  Patrol officer. | 10:24:54 |
| 3 | Q  And was that before, after, or at the same | 10:24:56 |
| 4 | time -- strike that. | 10:25:00 |
| 5 | Did you have to go to the police academy | 10:25:01 |
| 6 | prior to becoming a patrol officer? | 10:25:04 |
| 7 | A  I didn't, no.  I worked at the desk for a | 10:25:06 |
| 8 | period of time before I actually went to the | 10:25:16 |
| 9 | police academy. | 10:25:20 |
| 10 | Q  Okay.  So because you worked at the desk, | 10:25:21 |
| 11 | you didn't -- oh, I'm sorry; I got confused.  So | 10:25:25 |
| 12 | you worked on the desk for a little while and then | 10:25:31 |
| 13 | went to the police academy? | 10:25:35 |
| 14 | A  Yes. | 10:25:36 |
| 15 | Q  Okay.  And how long was the police academy? | 10:25:36 |
| 16 | A  A total of four months at that time. | 10:25:39 |
| 17 | Q  And you said that you left the Naperville | 10:25:55 |
| 18 | Police Department in 2019; correct? | 10:25:58 |
| 19 | A  It was late 2018, early 2019. | 10:25:59 |
| 20 | Q  From 1970 when you started as a patrol | 10:26:14 |
| 21 | officer until 2018 when you left as a detective, | 10:26:18 |
| 22 | can you give me an overview of the positions | 10:26:21 |
| 23 | you've held at Naperville Police Department? | 10:26:23 |
| 24 | A  Patrol officer, juvenile officer, and | 10:26:24 |

Transcript of Michael Cross
Conducted on October 16, 2020                    37

| | | |
|---|---|---|
| 1 | detective. | 10:26:27 |
| 2 | Q  And how long did you hold the position of | 10:26:32 |
| 3 | patrol officer? | 10:26:36 |
| 4 | A  Seven years. | 10:26:36 |
| 5 | Q  So was that from 1970 to 1977? | 10:26:38 |
| 6 | A  No.  There was a break when I became a | 10:26:41 |
| 7 | juvenile officer.  Then I went back on the road | 10:26:44 |
| 8 | for two years before becoming a detective. | 10:26:47 |
| 9 | Q  Okay.  So from what year to what year were | 10:26:50 |
| 10 | you a patrol officer after you first started? | 10:26:53 |
| 11 | A  1970 until '74, I believe. | 10:26:56 |
| 12 | Q  And then after that you became a juvenile | 10:27:13 |
| 13 | officer? | 10:27:21 |
| 14 | A  Yes, ma'am. | 10:27:21 |
| 15 | Q  And then how long were you a juvenile | 10:27:23 |
| 16 | officer? | 10:27:27 |
| 17 | A  For about four years. | 10:27:27 |
| 18 | Q  Okay.  Was that from 1974 to 1978? | 10:27:29 |
| 19 | A  Yes. | 10:27:34 |
| 20 | Q  And then you said you took off two years; | 10:27:35 |
| 21 | correct? | 10:27:40 |
| 22 | A  I went back on the road for a couple | 10:27:41 |
| 23 | of years. | 10:27:44 |
| 24 | Q  What does "back on the road" mean? | 10:27:44 |

Transcript of Michael Cross
Conducted on October 16, 2020                                      38

| | | |
|---|---|---|
| 1 | A  That means a patrol officer. | 10:27:48 |
| 2 | Q  Okay.  I didn't know. | 10:27:50 |
| 3 | A  Okay. | 10:27:52 |
| 4 | Q  So that would have been from 1978 to 1980? | 10:27:53 |
| 5 | A  Approximately. | 10:27:57 |
| 6 | Q  And then you became a detective in 1980? | 10:27:58 |
| 7 | A  '80 or '81.  I believe it was '80. | 10:28:03 |
| 8 | Q  And are there different types of detectives | 10:28:15 |
| 9 | with the Naperville Police Department? | 10:28:21 |
| 10 | A  Yes. | 10:28:22 |
| 11 | Q  What types of positions within the role of | 10:28:23 |
| 12 | detective did you hold? | 10:28:30 |
| 13 | A  Initially I was a crimes -- like burglaries, | 10:28:31 |
| 14 | thefts, I investigated those.  Burglaries and | 10:28:39 |
| 15 | thefts. | 10:28:47 |
| 16 | Q  And what would -- was there a specific | 10:28:47 |
| 17 | title for people who investigated burglaries and | 10:28:49 |
| 18 | thefts? | 10:28:53 |
| 19 | A  Just a detective. | 10:28:53 |
| 20 | Q  Okay.  And did you hold any other | 10:28:55 |
| 21 | specialized positions within the role of detective? | 10:29:00 |
| 22 | A  Yes. | 10:29:03 |
| 23 | Q  And what were those positions? | 10:29:04 |
| 24 | A  I was a homicide investigator, and I was | 10:29:05 |

Transcript of Michael Cross
Conducted on October 16, 2020                    39

1   an arson investigator.  Actually, they changed it          10:29:12

2   to fire investigator since then.                           10:29:15

3       Q  And when were you a homicide investigator?          10:29:18

4       A  For the last several years of my working            10:29:22

5   there for quite a while.                                   10:29:35

6       Q  Do you recall -- how do you become a                10:29:37

7   homicide detective might be a better question.             10:29:40

8       A  Okay.  You take a number of seminars; you           10:29:42

9   show an interest; you show proficiency in your             10:29:46

10  investigation capabilities.                                10:29:51

11      Q  Is there a test?                                     10:30:00

12      A  No, there wasn't at the time.                        10:30:01

13      Q  Was there any specialized training other            10:30:02

14  than what you listed?                                       10:30:12

15      A  Not other than what I listed prior to               10:30:13

16  becoming a detective.                                       10:30:18

17      Q  Okay.  And so when did you transition into          10:30:20

18  becoming a homicide detective?  What year?                 10:30:24

19      A  I don't recall exactly.                             10:30:29

20      Q  Was it before 2000 or after 2000?                   10:30:33

21      A  It was before 2000.                                 10:30:37

22      Q  Was it before 1990 or after 1990?                   10:30:39

23      A  After 1990.                                         10:30:43

24      Q  Okay.  Was it before '95 or after 1995?            10:30:44

Transcript of Michael Cross
Conducted on October 16, 2020                    40

| | | |
|---|---|---|
| 1 | A  I can't tell you. | 10:30:48 |
| 2 | Q  And you said you also were an arson | 10:30:50 |
| 3 | investigator; correct? | 10:31:05 |
| 4 | A  Yes. | 10:31:06 |
| 5 | Q  And what is the process for becoming an | 10:31:06 |
| 6 | arson investigator? | 10:31:09 |
| 7 | A  Attending several seminars.  Ultimately, I | 10:31:10 |
| 8 | went to the National Fire Academy in Emmitsburg, | 10:31:16 |
| 9 | Maryland. | 10:31:28 |
| 10 | Q  And when did you attend the National Fire | 10:31:28 |
| 11 | Academy? | 10:31:31 |
| 12 | A  I don't recall the exact dates.  I had | 10:31:31 |
| 13 | been a fire investigator for a little while. | 10:31:33 |
| 14 | Q  Do you recall approximately when you | 10:31:36 |
| 15 | became an arson investigator? | 10:31:38 |
| 16 | A  Not that I -- other than what I already | 10:31:41 |
| 17 | answered you. | 10:31:45 |
| 18 | Q  So was it before 2000 or after 2000? | 10:31:47 |
| 19 | A  That I became an arson investigator? | 10:31:51 |
| 20 | Q  Yes. | 10:31:53 |
| 21 | A  I don't recall. | 10:31:54 |
| 22 | Q  Okay.  Were you an arson investigator at | 10:31:56 |
| 23 | the time that you were investigating Bill Amor? | 10:31:58 |
| 24 | A  No -- oh, yes, I was.  Yes; I'm sorry.  I | 10:32:02 |

Transcript of Michael Cross
Conducted on October 16, 2020                          41

| | | |
|---|---|---|
| 1 | hadn't attended the National Fire Academy. | 10:32:06 |
| 2 | Q  So you attended the National Fire Academy | 10:32:09 |
| 3 | after you investigated the Bill Amor homicide? | 10:32:12 |
| 4 | A  Yes. | 10:32:15 |
| 5 | Q  Okay.  Does the National Fire Academy give | 10:32:15 |
| 6 | any certificates? | 10:32:26 |
| 7 | A  Yes. | 10:32:28 |
| 8 | Q  Would that be something that would be | 10:32:29 |
| 9 | within your personnel file at the Naperville | 10:32:31 |
| 10 | Police Department? | 10:32:33 |
| 11 | A  Probably. | 10:32:33 |
| 12 | Q  But prior to the Bill Amor investigation, | 10:33:00 |
| 13 | you had taken seminars to become an arson | 10:33:05 |
| 14 | investigator; correct? | 10:33:09 |
| 15 | A  Yes. | 10:33:10 |
| 16 | Q  What did those seminars entail? | 10:33:10 |
| 17 | A  The study of fire behavior mostly. | 10:33:14 |
| 18 | Q  Can you expand on that? | 10:33:20 |
| 19 | A  No. | 10:33:22 |
| 20 | Q  Did the seminars cover fire dynamics? | 10:33:23 |
| 21 | A  Yes. | 10:33:40 |
| 22 | Q  Did they cover origin and cause | 10:33:41 |
| 23 | determinations? | 10:33:45 |
| 24 | A  Yes. | 10:33:45 |

Transcript of Michael Cross
Conducted on October 16, 2020                    42

| | | |
|---|---|---|
| 1 | Q  Did they cover electric fires? | 10:33:45 |
| 2 | A  Yes. | 10:33:49 |
| 3 | Q  Did they cover incendiary fires? | 10:33:50 |
| 4 | A  Yes. | 10:33:55 |
| 5 | Q  Did they cover accidental fires? | 10:33:55 |
| 6 | A  Yes. | 10:33:57 |
| 7 | Q  Did they cover natural fires? | 10:33:57 |
| 8 | A  I don't know what you would mean by | 10:34:01 |
| 9 | "natural fires." | 10:34:07 |
| 10 | Q  And how many seminars did you take in | 10:34:11 |
| 11 | order to become a fire investigator -- or arson | 10:34:14 |
| 12 | investigator, rather? | 10:34:17 |
| 13 | A  I don't recall. | 10:34:18 |
| 14 | Q  Did these seminars take place in a | 10:34:18 |
| 15 | classroom, or did they take place somewhere else? | 10:34:21 |
| 16 | A  In classrooms and at the fire department. | 10:34:24 |
| 17 | Q  Were there a certain number of hours you | 10:34:37 |
| 18 | had to spend in these seminars prior to becoming | 10:34:40 |
| 19 | an arson investigator? | 10:34:44 |
| 20 | A  No. | 10:34:44 |
| 21 | Q  Was there a certain number of seminars you | 10:34:49 |
| 22 | had to take prior to becoming an arson investigator? | 10:34:52 |
| 23 | A  No. | 10:34:53 |
| 24 | Q  Who gives you the determination within | 10:34:54 |

Transcript of Michael Cross
Conducted on October 16, 2020                    43

| | | |
|---|---|---|
| 1 | Naperville Police Department of arson investigator? | 10:34:56 |
| 2 | A  A supervisor. | 10:34:58 |
| 3 | Q  Do you recall which supervisor gave you | 10:35:01 |
| 4 | that determination? | 10:35:04 |
| 5 | A  No. | 10:35:04 |
| 6 | Q  When you became a patrol officer from | 10:35:06 |
| 7 | 1970 to 1974, what were your roles and | 10:35:29 |
| 8 | responsibilities? | 10:35:33 |
| 9 | A  My responsibility was to patrol different | 10:35:34 |
| 10 | sections of the city of Naperville. | 10:35:40 |
| 11 | Q  Okay.  And then when you became a juvenile -- | 10:35:44 |
| 12 | was it juvenile officer? | 10:35:48 |
| 13 | A  Yes. | 10:35:51 |
| 14 | Q  What were your duties and responsibilities | 10:35:51 |
| 15 | then? | 10:35:53 |
| 16 | A  To investigate juvenile crimes, to | 10:35:53 |
| 17 | interview children to determine if they should be | 10:36:00 |
| 18 | helped in any way such as going to social workers | 10:36:06 |
| 19 | or, you know, other facilities.  I worked directly | 10:36:10 |
| 20 | with a social worker at the police department for | 10:36:19 |
| 21 | a while. | 10:36:21 |
| 22 | Q  Did you choose to become a juvenile officer | 10:36:21 |
| 23 | or were you placed there? | 10:36:24 |
| 24 | A  I chose it. | 10:36:25 |

Transcript of Michael Cross
Conducted on October 16, 2020                    44

| | | |
|---|---|---|
| 1 | Q  Why did you choose it? | 10:36:26 |
| 2 | A  I thought I could do some good. | 10:36:28 |
| 3 | Q  And when you went on the road from | 10:36:33 |
| 4 | approximately 1978 to 1980, was there a reason | 10:36:38 |
| 5 | for that? | 10:36:42 |
| 6 | A  No. | 10:36:42 |
| 7 | Q  Were you instructed to go back to being a | 10:36:44 |
| 8 | patrol officer or did you choose to? | 10:36:53 |
| 9 | A  I chose it. | 10:36:54 |
| 10 | Q  And what is the process from -- for | 10:36:56 |
| 11 | becoming a detective from patrol officer? | 10:37:05 |
| 12 | A  At that time it was just an assignment. | 10:37:09 |
| 13 | Q  Did you choose the assignment, or were you | 10:37:11 |
| 14 | chosen for the assignment? | 10:37:17 |
| 15 | A  I was chosen. | 10:37:20 |
| 16 | Q  And why -- what reasons were you given for | 10:37:21 |
| 17 | being chosen? | 10:37:23 |
| 18 | A  My abilities to interview people, my | 10:37:24 |
| 19 | arrest record. | 10:37:30 |
| 20 | Q  Okay.  And do you recall who chose you to | 10:37:32 |
| 21 | become a detective? | 10:37:42 |
| 22 | A  No. | 10:37:43 |
| 23 | Q  And as a detective, what were your job and | 10:37:48 |
| 24 | responsibilities? | 10:37:57 |

Transcript of Michael Cross
Conducted on October 16, 2020                          45

| | | |
|---|---|---|
| 1 | A   Like I said, initially it was -- I was | 10:37:57 |
| 2 | burglary, burglary and theft investigations.  Then | 10:38:01 |
| 3 | I moved up to crimes against people, and then they | 10:38:05 |
| 4 | changed that to like homicide and that | 10:38:10 |
| 5 | terminology. | 10:38:18 |
| 6 | Q   At the time of Marianne Miceli's death in | 10:38:27 |
| 7 | 1995, you were a detective; correct? | 10:38:33 |
| 8 | A   Yes. | 10:38:34 |
| 9 | Q   Were you both a homicide and an arson | 10:38:35 |
| 10 | investigator or just an arson investigator? | 10:38:38 |
| 11 | A   I believe I was just an arson investigator. | 10:38:39 |
| 12 | Q   So you hadn't taken seminars, courses into | 10:38:43 |
| 13 | becoming a homicide investigator? | 10:38:48 |
| 14 | A   Yes, I had. | 10:38:51 |
| 15 | Q   You had? | 10:38:52 |
| 16 | A   Yes. | 10:38:52 |
| 17 | Q   Okay. | 10:38:53 |
| 18 | A   Just hadn't been assigned to it yet. | 10:38:54 |
| 19 | Q   Okay.  In 1995 around the time of the | 10:38:57 |
| 20 | Miceli death investigation, do you recall who you | 10:39:15 |
| 21 | reported to? | 10:39:19 |
| 22 | MR. POLICK:  Objection to the form. | 10:39:20 |
| 23 | You can go ahead and answer. | 10:39:21 |
| 24 | A   Could you ask that again, please? | 10:39:23 |

Transcript of Michael Cross
Conducted on October 16, 2020                46

| | | |
|---|---|---|
| 1 | Q   Yes.  In September 1995 do you recall who | 10:39:25 |
| 2 | you reported to or who supervised you? | 10:39:27 |
| 3 | A   I believe it was Sergeant Mark Carlson and | 10:39:29 |
| 4 | then Captain Paul Shafer. | 10:39:35 |
| 5 | Q   And in Naperville are there certain | 10:39:47 |
| 6 | divisions you're assigned to work in? | 10:39:51 |
| 7 | A   There's patrol division and detective | 10:39:53 |
| 8 | division, traffic division.  Those are the | 10:39:56 |
| 9 | three that I recall. | 10:40:01 |
| 10 | Q   And where did the detective division | 10:40:03 |
| 11 | detectives work? | 10:40:08 |
| 12 | A   In the basement of the police department. | 10:40:08 |
| 13 | Q   Did all detectives work in the police | 10:40:11 |
| 14 | department? | 10:40:13 |
| 15 | A   No. | 10:40:13 |
| 16 | Q   Which detectives worked in the police | 10:40:14 |
| 17 | department? | 10:40:20 |
| 18 | A   Anyone that was assigned down there. | 10:40:20 |
| 19 | There were also school resource officers, and they | 10:40:24 |
| 20 | were detectives, and they did not work in the | 10:40:27 |
| 21 | police department. | 10:40:29 |
| 22 | Q   Okay.  And how many people worked in the | 10:40:31 |
| 23 | basement of the police department when you were a | 10:40:37 |
| 24 | detective? | 10:40:39 |

Transcript of Michael Cross
Conducted on October 16, 2020                           47

| | | |
|---|---|---|
| 1 | A  It depends upon when you're talking. | 10:40:39 |
| 2 | Originally, there was probably three of us. | 10:40:43 |
| 3 | Q  In 1995 do you recall how many people | 10:40:46 |
| 4 | worked in the basement of the police department? | 10:40:48 |
| 5 | A  I think -- by 1995 I think we were in the | 10:40:51 |
| 6 | new building or just moved to the new building. | 10:40:59 |
| 7 | Q  In the new building were you still in the | 10:41:02 |
| 8 | basement? | 10:41:04 |
| 9 | A  Yeah.  We had windows, though. | 10:41:04 |
| 10 | Q  That's an improvement. | 10:41:08 |
| 11 | A  Yeah. | 10:41:09 |
| 12 | Q  In that new building do you recall how | 10:41:09 |
| 13 | many people worked with you in the basement? | 10:41:12 |
| 14 | A  Not exactly, no. | 10:41:14 |
| 15 | Q  Did all homicide investigators work in the | 10:41:16 |
| 16 | basement or do you not recall? | 10:41:34 |
| 17 | A  Yes. | 10:41:36 |
| 18 | Q  Did all arson investigators work in the | 10:41:36 |
| 19 | basement? | 10:41:40 |
| 20 | A  Yes. | 10:41:40 |
| 21 | Q  And outside of SRO detectives, all | 10:41:41 |
| 22 | detectives worked in the basement? | 10:41:52 |
| 23 | A  Yes. | 10:41:54 |
| 24 | Q  Did you have offices, or was it an open | 10:41:54 |

Transcript of Michael Cross
Conducted on October 16, 2020                    48

| | | |
|---|---|---|
| 1 | layout? | 10:41:57 |
| 2 | A   There were dividers between each detective. | 10:41:58 |
| 3 | Q   Okay.  Did you work with a partner at all | 10:42:07 |
| 4 | in Naperville Police Department? | 10:42:13 |
| 5 | A   A couple of different ones. | 10:42:13 |
| 6 | Q   Okay.  Did you work with a partner prior | 10:42:17 |
| 7 | to 1995? | 10:42:20 |
| 8 | A   Not that I recall. | 10:42:22 |
| 9 | Q   Did you work with a partner in 1995? | 10:42:23 |
| 10 | A   Not that I recall.  I don't know who it | 10:42:26 |
| 11 | would have been -- | 10:42:31 |
| 12 | Q   Okay. | 10:42:33 |
| 13 | A   -- if anyone. | 10:42:34 |
| 14 | Q   And are partners at Naperville Police | 10:42:35 |
| 15 | Department assigned, or do you choose them, or are | 10:42:40 |
| 16 | they given on a case-by-case basis? | 10:42:44 |
| 17 | A   No, they're assigned. | 10:42:47 |
| 18 | Q   And who would have assigned those partners? | 10:42:50 |
| 19 | A   One of the supervisors. | 10:42:58 |
| 20 | Q   Prior to the 1995 investigation into the | 10:43:02 |
| 21 | fire at the Miceli residence, had you ever worked | 10:43:13 |
| 22 | cases with Detective Guerrieri? | 10:43:18 |
| 23 | A   No. | 10:43:20 |
| 24 | Q   Had you ever worked cases with Brian | 10:43:22 |

Transcript of Michael Cross
Conducted on October 16, 2020                    49

| | | |
|---|---|---|
| 1 | Cunningham? | 10:43:24 |
| 2 | A  Yes. | 10:43:26 |
| 3 | Q  How many? | 10:43:27 |
| 4 | A  I don't recall. | 10:43:28 |
| 5 | Q  And Mark Carlson was your supervisor; | 10:43:29 |
| 6 | correct? | 10:43:37 |
| 7 | A  Correct. | 10:43:37 |
| 8 | Q  How many years had he been your supervisor? | 10:43:38 |
| 9 | A  I think all in total was four years. | 10:43:40 |
| 10 | Q  Did he start supervising you in 1995 or -- | 10:43:45 |
| 11 | A  Did what?  Pardon me. | 10:43:48 |
| 12 | Q  Did he begin supervising you in 1995, or | 10:43:50 |
| 13 | did he begin supervising you in the years before | 10:43:53 |
| 14 | that? | 10:43:56 |
| 15 | A  It was 1995. | 10:43:56 |
| 16 | Q  Had you ever been assigned cases with | 10:43:59 |
| 17 | Lieutenant Ferreri? | 10:44:04 |
| 18 | A  Yes. | 10:44:08 |
| 19 | Q  How many? | 10:44:09 |
| 20 | A  Don't recall. | 10:44:09 |
| 21 | Q  More than 15? | 10:44:11 |
| 22 | A  Less than 15. | 10:44:13 |
| 23 | Q  More than 10? | 10:44:16 |
| 24 | A  I don't know. | 10:44:19 |

Transcript of Michael Cross
Conducted on October 16, 2020                    50

```
1       Q   Had you ever been assigned to work a case      10:44:23

2   with Mitch Kushner by 1995?                            10:44:26

3       A   Prior to that, no.                             10:44:29

4       Q   Did you know Robert Guerrieri before the       10:44:32

5   investigation into the Miceli fire?                    10:44:40

6       A   Yes.                                           10:44:42

7       Q   Would you consider yourself friends?           10:44:43

8       A   Yes.                                           10:44:45

9       Q   And Detective Cunningham, would you            10:44:46

10  consider yourself friendly or friends with him?        10:44:55

11      A   Yes.                                           10:44:57

12      Q   Would you consider yourself friendly or        10:44:57

13  friends with Mark Carlson?                             10:45:00

14      A   No.                                            10:45:01

15      Q   Would you consider yourself friendly or        10:45:03

16  friends with Lieutenant Ferreri?                       10:45:05

17      A   Yes.                                           10:45:07

18      Q   Would you consider yourself friendly or        10:45:08

19  friends with Mitch Kushner?                            10:45:11

20      A   No.                                            10:45:17

21      Q   Prior to 1995, you knew who Jon Ripsky         10:45:17

22  was; correct?                                          10:45:22

23      A   Uh-huh.                                        10:45:23

24          MR. POLICK:  Yes?                              10:45:23
```

Transcript of Michael Cross
Conducted on October 16, 2020                    51

| | | |
|---|---|---|
| 1 | THE WITNESS:  Yes. | 10:45:24 |
| 2 | Q  He was a captain in the Naperville Police | 10:45:25 |
| 3 | Department; correct? | 10:45:29 |
| 4 | A  Yes. | 10:45:30 |
| 5 | Q  Did he have a supervisory role over you? | 10:45:30 |
| 6 | A  No. | 10:45:34 |
| 7 | Q  He was a captain over the investigations | 10:45:35 |
| 8 | unit; correct? | 10:45:44 |
| 9 | A  Yes. | 10:45:44 |
| 10 | Q  Were you part of the investigations unit? | 10:45:45 |
| 11 | A  Yes. | 10:45:46 |
| 12 | Q  So if you're part of the investigations | 10:45:47 |
| 13 | unit, and he was the captain over it, would he not | 10:45:49 |
| 14 | have a supervisory role over you? | 10:45:53 |
| 15 | A  He was not the captain of investigations. | 10:45:55 |
| 16 | I might have stated that earlier and that was a | 10:45:57 |
| 17 | mistake. | 10:46:01 |
| 18 | Q  Okay.  So what was he captain of? | 10:46:01 |
| 19 | A  Administration. | 10:46:05 |
| 20 | Q  And as captain of administration, he still | 10:46:07 |
| 21 | outranked you; correct? | 10:46:15 |
| 22 | A  Say that again, please. | 10:46:16 |
| 23 | Q  As captain of administration, he still | 10:46:17 |
| 24 | outranked you; correct? | 10:46:20 |

Transcript of Michael Cross
Conducted on October 16, 2020                          52

| | | |
|---|---|---|
| 1 | A  I couldn't get that one word. | 10:46:21 |
| 2 | Q  Outranked. | 10:46:24 |
| 3 | A  Outrage? | 10:46:25 |
| 4 | Q  Outranked. | 10:46:27 |
| 5 | A  I don't know what you're talking about. | 10:46:29 |
| 6 | Q  O-u-t-r-a-n-k-e-d. | 10:46:30 |
| 7 | A  Outranked? | 10:46:35 |
| 8 | Q  Yes.  As in he had a greater rank than | 10:46:37 |
| 9 | you did. | 10:46:40 |
| 10 | A  Oh, yes. | 10:46:40 |
| 11 | Q  As a captain, if he told you to do | 10:46:41 |
| 12 | something, were you required to do so under | 10:46:44 |
| 13 | Naperville policy? | 10:46:46 |
| 14 | A  Yes. | 10:46:46 |
| 15 | Q  As a captain, did he have the ability to | 10:46:47 |
| 16 | formally discipline you? | 10:46:51 |
| 17 | A  Yes. | 10:46:52 |
| 18 | Q  And speaking of discipline, have you ever | 10:46:54 |
| 19 | been fired or suspended from any job for any reason? | 10:46:58 |
| 20 | A  No. | 10:47:05 |
| 21 | Q  Have you ever been officially disciplined | 10:47:05 |
| 22 | at any job? | 10:47:08 |
| 23 | A  Yes. | 10:47:09 |
| 24 | Q  When have you been officially disciplined? | 10:47:09 |

Transcript of Michael Cross
Conducted on October 16, 2020                    53

| | | |
|---|---|---|
| 1 | A  I was disciplined for a couple of traffic | 10:47:12 |
| 2 | accidents with patrol cars. | 10:47:16 |
| 3 | Q  This was when you were a patrol officer? | 10:47:20 |
| 4 | A  Yes. | 10:47:23 |
| 5 | Q  And what level of severity were these | 10:47:23 |
| 6 | traffic accidents? | 10:47:29 |
| 7 | A  Minor. | 10:47:30 |
| 8 | Q  What was the consequence, if any, for | 10:47:31 |
| 9 | these disciplines for traffic accidents? | 10:47:35 |
| 10 | A  I believe I received a one-day suspension | 10:47:39 |
| 11 | for each one. | 10:47:43 |
| 12 | Q  Were you ever suspended without pay? | 10:47:44 |
| 13 | A  No. | 10:47:47 |
| 14 | Q  Have you ever received a negative feedback | 10:47:48 |
| 15 | or performance review with the Naperville Police | 10:47:56 |
| 16 | Department? | 10:47:59 |
| 17 | A  No. | 10:47:59 |
| 18 | Q  And other than the present case, has | 10:48:00 |
| 19 | anyone, to your knowledge, accused you of police | 10:48:07 |
| 20 | misconduct? | 10:48:12 |
| 21 | A  I don't recall. | 10:48:13 |
| 22 | Q  I want to circle back to the training you | 10:48:16 |
| 23 | recalled -- strike that. | 10:48:27 |
| 24 | I want to circle back to the training you | 10:48:29 |

Transcript of Michael Cross
Conducted on October 16, 2020                          54

| | | |
|---|---|---|
| 1 | received at the police academy.  Okay? | 10:48:32 |
| 2 | A  Sure. | 10:48:33 |
| 3 | Q  What topics of training did you cover at | 10:48:34 |
| 4 | the police academy? | 10:48:38 |
| 5 | A  That was a long time ago.  Overall -- | 10:48:40 |
| 6 | overall police work.  That's the only way I can | 10:48:45 |
| 7 | answer that. | 10:48:49 |
| 8 | Q  Did you have continuing training or cycle | 10:48:51 |
| 9 | training that happen at Naperville Police | 10:49:00 |
| 10 | Department or no? | 10:49:02 |
| 11 | A  I attended seminars and things like that | 10:49:02 |
| 12 | for different subjects. | 10:49:04 |
| 13 | Q  Were those seminars required? | 10:49:06 |
| 14 | A  I think I was assigned, yes. | 10:49:09 |
| 15 | Q  And what were the frequency of the | 10:49:18 |
| 16 | required seminars? | 10:49:20 |
| 17 | A  Well, they were only required because at | 10:49:20 |
| 18 | the time the supervisor would assign me to that. | 10:49:23 |
| 19 | The frequency I don't know. | 10:49:26 |
| 20 | Q  And I know you've said you went to | 10:49:29 |
| 21 | seminars on homicide investigation and arson | 10:49:35 |
| 22 | investigation.  Correct? | 10:49:40 |
| 23 | A  Yes. | 10:49:42 |
| 24 | Q  Did you go to seminars on any other topic? | 10:49:42 |

Transcript of Michael Cross
Conducted on October 16, 2020                    55

```
1       A   Probably burglary/theft.  Any type of      10:49:45

2   criminal investigation.                            10:49:53

3       Q   Did you have any mentors during your time  10:49:55

4   at Naperville Police Department?                   10:49:59

5       A   I don't want to say no but I'm not sure.   10:50:00

6   I'm sure I had people that, you know, helped       10:50:15

7   me out.                                            10:50:17

8       Q   Yeah.  Did you have any official mentors?  10:50:17

9       A   No.                                        10:50:22

10      Q   And you said at the academy you generally  10:50:23

11  were trained in police work; right?                10:50:28

12      A   Yes.                                       10:50:31

13      Q   Does that include crime scene investigation? 10:50:31

14      A   Yes.                                       10:50:33

15      Q   Did that include interrogation tactics?    10:50:34

16      A   Yes.                                       10:50:44

17      Q   Did that include crisis management?        10:50:45

18      A   I don't recall.                            10:50:47

19      Q   Okay.  Did that include report writing?    10:50:48

20      A   Yes.                                       10:50:55

21      Q   And when you were writing reports during   10:50:58

22  your time at the Naperville Police Department, was 10:51:23

23  it your practice to write down every question you  10:51:25

24  asked?                                             10:51:28
```

Transcript of Michael Cross
Conducted on October 16, 2020                    56

| | | |
|---|---|---|
| 1 | A No. | 10:51:29 |
| 2 | Q What questions would you not write down in | 10:51:30 |
| 3 | reports? | 10:51:36 |
| 4 | A Everything was a sum and substance or a | 10:51:36 |
| 5 | summary. | 10:51:40 |
| 6 | Q Was it your practice to write down everything | 10:51:41 |
| 7 | a witness said? | 10:51:50 |
| 8 | A No. | 10:51:51 |
| 9 | Q Was it your practice to only write down | 10:51:52 |
| 10 | important things that witnesses said? | 10:51:55 |
| 11 | THE VIDEOGRAPHER: The mic fell off. | 10:52:03 |
| 12 | THE WITNESS: Sorry about that. | 10:52:08 |
| 13 | Could you repeat that, please? | 10:52:26 |
| 14 | Q Yeah. You said that it wasn't your practice | 10:52:28 |
| 15 | to write down every answer a witness gave, and | 10:52:30 |
| 16 | then I asked if it was your practice to write down | 10:52:35 |
| 17 | the important things that witnesses said to you. | 10:52:37 |
| 18 | A I wrote down a summary of what the | 10:52:40 |
| 19 | witnesses said to me. | 10:52:42 |
| 20 | Q And how did you decide what went into that | 10:52:43 |
| 21 | summary? | 10:52:45 |
| 22 | A On my own. | 10:52:46 |
| 23 | Q And did you -- sorry; one second. | 10:52:49 |
| 24 | And what things did you consider when | 10:53:04 |

Transcript of Michael Cross
Conducted on October 16, 2020                    57

| | | |
|---|---|---|
| 1 | determining what to put into a summary? | 10:53:06 |
| 2 | A  Things that I needed to remember and | 10:53:09 |
| 3 | things that I thought were important towards the | 10:53:13 |
| 4 | investigation or the interview. | 10:53:16 |
| 5 | Q  How did you determine what was important? | 10:53:23 |
| 6 | A  It is my own determination. | 10:53:26 |
| 7 | Q  Did you write down things -- strike that. | 10:53:31 |
| 8 | If you wrote down things that you wanted | 10:53:56 |
| 9 | to remember, is that because you knew that there | 10:53:59 |
| 10 | might be a possibility of a criminal trial down | 10:54:01 |
| 11 | the line? | 10:54:03 |
| 12 | A  Yes. | 10:54:03 |
| 13 | Q  And you knew that at a criminal trial a | 10:54:05 |
| 14 | prosecutor or defense attorney would be relying on | 10:54:09 |
| 15 | what you had written in your report? | 10:54:12 |
| 16 | A  Yes. | 10:54:13 |
| 17 | Q  And you knew that it was important in | 10:54:13 |
| 18 | order to enact justice and fairness within the | 10:54:16 |
| 19 | criminal process to have accurate and important | 10:54:20 |
| 20 | details written in your report? | 10:54:22 |
| 21 | A  Yes, ma'am. | 10:54:23 |
| 22 | Q  And you know it's important to document | 10:54:24 |
| 23 | facts because there may be times down the line | 10:54:27 |
| 24 | when you're testifying that you can't recall | 10:54:31 |

Transcript of Michael Cross
Conducted on October 16, 2020                    58

| | | |
|---|---|---|
| 1 | exactly what occurred? | 10:54:33 |
| 2 | A  Correct. | 10:54:34 |
| 3 | Q  And then you have to rely on your reports? | 10:54:35 |
| 4 | A  Yes. | 10:54:36 |
| 5 | Q  You talked about becoming an arson | 10:54:37 |
| 6 | investigator, and you said that occurred sometime | 10:54:51 |
| 7 | between 1990 and 1995; correct? | 10:54:55 |
| 8 | A  I think around 1990. | 10:54:59 |
| 9 | Q  Okay.  And you had to take seminars in | 10:55:04 |
| 10 | order for -- in order to become an arson | 10:55:08 |
| 11 | investigator; right? | 10:55:10 |
| 12 | A  Yes.  I took them but it wasn't required | 10:55:10 |
| 13 | at the time. | 10:55:14 |
| 14 | Q  Okay.  When was the first time you took | 10:55:15 |
| 15 | seminars about arson investigation? | 10:55:24 |
| 16 | A  I don't recall. | 10:55:26 |
| 17 | Q  Was it -- it was prior to 1995, though; | 10:55:27 |
| 18 | correct? | 10:55:31 |
| 19 | A  Yes. | 10:55:31 |
| 20 | Q  And you also said that you were trained at | 10:55:32 |
| 21 | the police academy in interrogation; correct? | 10:55:44 |
| 22 | A  Some training, yes. | 10:55:48 |
| 23 | Q  And you also received some training from | 10:55:49 |
| 24 | the Reid Academy or John Reid School of Interview | 10:55:57 |

Transcript of Michael Cross
Conducted on October 16, 2020                                    59

| | | |
|---|---|---|
| 1 | and Interrogation; correct? | 10:56:01 |
| 2 | A   Yes. | 10:56:04 |
| 3 | Q   When did you attend the John Reid school? | 10:56:04 |
| 4 | A   I don't recall. | 10:56:07 |
| 5 | Q   Was it before or after 1995? | 10:56:08 |
| 6 | A   I don't recall. | 10:56:10 |
| 7 | Q   Was it before or after 1990? | 10:56:12 |
| 8 | A   I don't recall. | 10:56:15 |
| 9 | Q   And the John Reid school, that is a certain | 10:56:16 |
| 10 | technique; correct? | 10:56:32 |
| 11 | A   Yes. | 10:56:32 |
| 12 | Q   And there are several steps in that | 10:56:34 |
| 13 | technique; correct? | 10:56:37 |
| 14 | A   I believe so, yes. | 10:56:38 |
| 15 | Q   And one of the steps in that technique is | 10:56:41 |
| 16 | to confront a suspect and let them understand that | 10:56:49 |
| 17 | you have evidence against them? | 10:56:55 |
| 18 | A   I don't recall. | 10:56:57 |
| 19 | Q   And one of the techniques is shifting the | 10:56:58 |
| 20 | blame away from the suspect and trying to propose | 10:57:01 |
| 21 | a sequence of events that makes them feel less | 10:57:07 |
| 22 | culpable; correct? | 10:57:10 |
| 23 | A   I don't know. | 10:57:12 |
| 24 | Q   One of the techniques is to try and | 10:57:12 |

Transcript of Michael Cross
Conducted on October 16, 2020                    60

1    discourage a suspect from persisting in something      10:57:15

2    that you think is false by confronting them about      10:57:22

3    that falsehood until they stop insisting; correct?     10:57:25

4        A  I'm not sure.  I'm not sure exactly.            10:57:31

5        Q  Another technique of the John Reid school       10:57:40

6    is to offer alternative -- alternatives to the         10:57:43

7    crime -- strike that; that's a bad question.           10:57:52

8           One of the techniques of the John Reid          10:58:00

9    school is to lead the suspect to repeat their          10:58:02

10   admission of guilt once they've made it; correct?      10:58:06

11       A  No, I don't believe so.                         10:58:09

12       Q  What are the steps or techniques that you       10:58:11

13   learned from the John Reid school that you can         10:58:23

14   recall?                                                10:58:26

15       A  I recall vaguely some of the steps, but I      10:58:27

16   can't just -- I can't say exactly.                     10:58:37

17       Q  You say you recall vaguely.  What do you       10:58:41

18   vaguely recall?                                        10:58:48

19       A  Well, I took what I learned at John Reid,      10:58:48

20   and I applied it to my own technique and developed    10:58:52

21   my own technique of interviewing people.               10:58:55

22       Q  So would it be fair to say that there were     10:59:00

23   aspects of the John Reid training that you used when  10:59:03

24   you were interviewing or interrogating suspects?      10:59:06

Transcript of Michael Cross
Conducted on October 16, 2020                                    61

| | | |
|---|---|---|
| 1 | A   I believe so. | 10:59:13 |
| 2 | Q   And you've used polygraph examination | 10:59:15 |
| 3 | during examinations; correct? | 10:59:28 |
| 4 | A   Yes. | 10:59:30 |
| 5 | Q   In what circumstances do you believe | 10:59:30 |
| 6 | polygraph examinations are appropriate? | 10:59:35 |
| 7 | A   Well, when you believe and have evidence | 10:59:37 |
| 8 | that the person is lying to you and they persist | 10:59:42 |
| 9 | in their lies. | 10:59:45 |
| 10 | Q   Are there times when polygraphs are | 10:59:47 |
| 11 | inappropriate to use? | 11:00:01 |
| 12 | A   There are times they're not necessary. | 11:00:04 |
| 13 | Q   Do you believe there's any times when a | 11:00:07 |
| 14 | polygraph examination may be too excessive? | 11:00:14 |
| 15 | MR. POLICK:  Objection to the form of the | 11:00:19 |
| 16 | question. | 11:00:23 |
| 17 | You can go ahead and answer. | 11:00:23 |
| 18 | A   Could you restate that? | 11:00:24 |
| 19 | Q   Yeah.  Are there ever any times when you | 11:00:26 |
| 20 | believe use of a polygraph examination would be | 11:00:29 |
| 21 | excessive? | 11:00:35 |
| 22 | MR. POLICK:  Same objection as to form. | 11:00:37 |
| 23 | Go ahead and answer. | 11:00:38 |
| 24 | A   I wouldn't say excessive.  I would say | 11:00:39 |

Transcript of Michael Cross
Conducted on October 16, 2020                                    62

| | | |
|---|---|---|
| 1 | maybe inappropriate. | 11:00:42 |
| 2 | Q  And you said it would be inappropriate if | 11:00:42 |
| 3 | it was unnecessary; correct? | 11:00:45 |
| 4 | A  You're using semantics.  I can't answer that. | 11:00:47 |
| 5 | Q  Is there a limit on the number of | 11:00:53 |
| 6 | polygraphs that you would give one suspect before | 11:00:56 |
| 7 | you felt like it was inappropriate? | 11:00:58 |
| 8 | A  Normally, yes. | 11:01:00 |
| 9 | Q  And what is that normal baseline? | 11:01:01 |
| 10 | A  Well, if the person is intoxicated or | 11:01:04 |
| 11 | somehow unable to complete the polygraph.  And | 11:01:08 |
| 12 | that wouldn't be my determination; that would have | 11:01:14 |
| 13 | been the polygraphist's determination. | 11:01:17 |
| 14 | Q  You said "intoxicated."  What other states | 11:01:25 |
| 15 | of mind would you not want a person to possess if | 11:01:29 |
| 16 | they were being polygraphed? | 11:01:33 |
| 17 | A  If they're mentally incapable of doing it; | 11:01:35 |
| 18 | if they're slow in some way. | 11:01:42 |
| 19 | Q  What does "mentally incapable" mean in | 11:01:48 |
| 20 | this context? | 11:01:54 |
| 21 | A  I don't know. | 11:01:54 |
| 22 | MR. POLICK:  Objection to the form of the | 11:01:54 |
| 23 | question to the extent you're asking him for an | 11:01:56 |
| 24 | expert opinion on polygraphs. | 11:01:58 |

Transcript of Michael Cross
Conducted on October 16, 2020                          63

| | | |
|---|---|---|
| 1 | Q  I'm asking you, in your experience as a | 11:02:00 |
| 2 | police officer for many years who used polygraphs, | 11:02:03 |
| 3 | what would "mentally incapable" mean in terms of a | 11:02:07 |
| 4 | polygraph test? | 11:02:13 |
| 5 | MR. POLICK:  Same objection as to an | 11:02:15 |
| 6 | expert opinion -- giving an expert opinion on | 11:02:16 |
| 7 | polygraphs or giving an opinion on mental health. | 11:02:19 |
| 8 | You can go ahead and answer. | 11:02:22 |
| 9 | THE WITNESS:  Can you ask me again, please? | 11:02:25 |
| 10 | MS. GARCIA:  Can you repeat back? | 11:02:25 |
| 11 | (Pending question read.) | 11:03:01 |
| 12 | A  If somebody appears to not be functioning | 11:03:01 |
| 13 | at a normal physical human capacity. | 11:03:07 |
| 14 | Q  Okay.  That's fair.  Would that include | 11:03:14 |
| 15 | people who are having panic attacks? | 11:03:18 |
| 16 | MR. POLICK:  Objection to the form of the | 11:03:20 |
| 17 | question because it requires him to give a medical | 11:03:23 |
| 18 | opinion or a mental health opinion on someone's | 11:03:25 |
| 19 | mental status. | 11:03:28 |
| 20 | You can go ahead and answer the question. | 11:03:29 |
| 21 | A  I've never given anybody a polygraph test | 11:03:32 |
| 22 | that was experiencing a panic attack. | 11:03:36 |
| 23 | Q  Sorry; I couldn't -- I didn't understand | 11:03:38 |
| 24 | the last thing you said. | 11:03:41 |

Transcript of Michael Cross
Conducted on October 16, 2020                          64

| | | |
|---|---|---|
| 1 | A  I never gave a polygraph to an individual | 11:03:42 |
| 2 | who was under a panic attack or was having a panic | 11:03:45 |
| 3 | attack. | 11:03:49 |
| 4 | Q  And how do you know that? | 11:03:49 |
| 5 | A  Only my judgment. | 11:03:50 |
| 6 | Q  And how do you judge if someone is having | 11:03:52 |
| 7 | a panic attack or not? | 11:03:56 |
| 8 | A  I can't answer that. | 11:03:57 |
| 9 | Q  So it's your judgment that someone is | 11:03:59 |
| 10 | having a panic attack or not but -- | 11:04:02 |
| 11 | MR. POLICK:  Objection to the form of the | 11:04:05 |
| 12 | question. | 11:04:06 |
| 13 | You can answer over the objection. | 11:04:07 |
| 14 | MS. GARCIA:  I would like to make my | 11:04:09 |
| 15 | question first, please, Joe. | 11:04:12 |
| 16 | Q  If you have -- if you can make a judgment | 11:04:15 |
| 17 | that someone is having a panic attack or not, that | 11:04:17 |
| 18 | would mean you have some measure of understanding | 11:04:20 |
| 19 | of what a panic attack is; correct? | 11:04:23 |
| 20 | MR. POLICK:  Objection; that's | 11:04:25 |
| 21 | argumentative.  Again, I'm going to object to this | 11:04:27 |
| 22 | line of questioning to the extent you're | 11:04:30 |
| 23 | requesting the witness to give an opinion on | 11:04:32 |
| 24 | polygraphs which you have established no | 11:04:33 |

Transcript of Michael Cross
Conducted on October 16, 2020                              65

| | | |
|---|---|---|
| 1 | foundation for or to give an opinion on somebody's | 11:04:36 |
| 2 | physical or mental health, which he's not | 11:04:38 |
| 3 | competent to give.  Also, not competent to give -- | 11:04:41 |
| 4 | MS. GARCIA:  Okay.  Joe, I feel like | 11:04:44 |
| 5 | you're going into a speaking objection.  We can | 11:04:46 |
| 6 | have these standing objections as they are; I'm | 11:04:48 |
| 7 | fine with that.  I'm also not asking within the | 11:04:51 |
| 8 | terms of a polygraph examination. | 11:04:54 |
| 9 | MR. POLICK:  Well, you need to make that | 11:04:55 |
| 10 | clear in your question.  If your question is not | 11:04:58 |
| 11 | clear, I'm going to make my objections. | 11:05:00 |
| 12 | Please answer over the objections. | 11:05:02 |
| 13 | THE WITNESS:  Please ask me again. | 11:05:06 |
| 14 | Q  How would you determine whether someone | 11:05:07 |
| 15 | was having a panic attack or not? | 11:05:10 |
| 16 | A  Through observation. | 11:05:12 |
| 17 | Q  And what would you observe -- or | 11:05:13 |
| 18 | strike that. | 11:05:18 |
| 19 | What sort of observations would you have | 11:05:20 |
| 20 | to make in order to determine whether someone was | 11:05:22 |
| 21 | having a panic attack? | 11:05:24 |
| 22 | A  I can't answer that, either. | 11:05:28 |
| 23 | Q  Have you ever observed someone having a | 11:05:48 |
| 24 | panic attack? | 11:05:51 |

Transcript of Michael Cross
Conducted on October 16, 2020                    66

| | | |
|---|---|---|
| 1 | A  Yes. | 11:05:52 |
| 2 | Q  And what were the -- what aspects about | 11:05:57 |
| 3 | the person having a panic attack did you observe | 11:06:02 |
| 4 | that led you to believe they were having a panic | 11:06:06 |
| 5 | attack? | 11:06:09 |
| 6 | A  It's really hard to explain.  Just what I -- | 11:06:09 |
| 7 | what I view and the way the person is acting. | 11:06:23 |
| 8 | Q  Were they breathing heavy? | 11:06:31 |
| 9 | A  That could be part of it. | 11:06:34 |
| 10 | Q  Were they nervous? | 11:06:36 |
| 11 | A  Again, that could be part of it, also. | 11:06:39 |
| 12 | Q  Were they having a hard time speaking? | 11:06:42 |
| 13 | A  I'm not sure. | 11:06:45 |
| 14 | Q  Were they quiet or were they loud? | 11:06:47 |
| 15 | A  I don't know. | 11:06:50 |
| 16 | Q  Did they appear to be lively or catatonic? | 11:06:51 |
| 17 | MR. POLICK:  Objection to the form of the | 11:07:05 |
| 18 | question, again, to the extent you're asking him | 11:07:07 |
| 19 | to give medical opinions.  Not competent to do so. | 11:07:10 |
| 20 | A  Yeah, I -- | 11:07:14 |
| 21 | MR. POLICK:  You can answer over the | 11:07:15 |
| 22 | objections. | 11:07:16 |
| 23 | A  (Continuing.)  I can't -- I can't say how | 11:07:18 |
| 24 | I would determine that.  Just by observation. | 11:07:19 |

Transcript of Michael Cross
Conducted on October 16, 2020                    67

| | | |
|---|---|---|
| 1 | Q   Okay.   And how many times have you | 11:07:23 |
| 2 | interrogated someone? | 11:07:32 |
| 3 | A   Hundreds. | 11:07:34 |
| 4 | Q   And of the times you've interrogated | 11:07:36 |
| 5 | someone, what percentage have you used a polygraph | 11:07:41 |
| 6 | examination? | 11:07:43 |
| 7 | A   Small percentage. | 11:07:44 |
| 8 | Q   10 percent? | 11:07:46 |
| 9 | A   I can't specifically tell you. | 11:07:47 |
| 10 | Q   An approximation.   20 percent? | 11:07:52 |
| 11 | A   No. | 11:07:55 |
| 12 | Q   50 percent? | 11:07:56 |
| 13 | A   No. | 11:07:57 |
| 14 | Q   5 percent? | 11:07:57 |
| 15 | A   I can't tell you. | 11:07:59 |
| 16 | Q   Okay.   Is there a point where interrogation | 11:08:00 |
| 17 | becomes too excessive? | 11:08:15 |
| 18 | MR. POLICK:   Objection to the form of the | 11:08:18 |
| 19 | question. | 11:08:20 |
| 20 | You can answer over the objection. | 11:08:20 |
| 21 | A   Not in the case of the -- cases that | 11:08:21 |
| 22 | I've had. | 11:08:24 |
| 23 | Q   Have there been cases that aren't yours | 11:08:25 |
| 24 | where you felt interrogation was too excessive? | 11:08:28 |

Transcript of Michael Cross
Conducted on October 16, 2020                    68

| | | |
|---|---|---|
| 1 | A   I don't know.  I don't believe so. | 11:08:34 |
| 2 | Q   Do you believe there can be a point where | 11:08:36 |
| 3 | interrogation becomes too excessive? | 11:08:43 |
| 4 | A   Yes. | 11:08:46 |
| 5 | Q   And what is that point? | 11:08:47 |
| 6 | A   I would have to use -- I would have to see | 11:08:48 |
| 7 | individual cases.  I would have to determine it by | 11:08:50 |
| 8 | individual cases, situations. | 11:08:54 |
| 9 | Q   Would it be predicated on physical harm? | 11:08:56 |
| 10 | A   That could be part of it, yes. | 11:09:01 |
| 11 | Q   Okay.  What level of physical harm would | 11:09:04 |
| 12 | someone have to have in order for an interrogation | 11:09:07 |
| 13 | to be excessive in your view? | 11:09:12 |
| 14 | A   I'll -- | 11:09:15 |
| 15 | MR. POLICK:  Objection to the form of the | 11:09:16 |
| 16 | question. | 11:09:19 |
| 17 | But go ahead, Mike. | 11:09:19 |
| 18 | A   Almost any kind of physical abuse. | 11:09:20 |
| 19 | Q   Okay. | 11:09:24 |
| 20 | A   In fact, I wouldn't say almost; I would | 11:09:28 |
| 21 | say there's no cases where it's acceptable. | 11:09:31 |
| 22 | Q   At what point should an interrogation cease? | 11:09:36 |
| 23 | A   Could you ask that again? | 11:09:45 |
| 24 | Q   At what point should an interrogation cease | 11:09:47 |

Transcript of Michael Cross
Conducted on October 16, 2020                              69

| | | |
|---|---|---|
| 1 | or stop? | 11:09:50 |
| 2 | A  Peak or stop? | 11:09:51 |
| 3 | Q  Cease, s -- c-e-a-s-e. | 11:09:52 |
| 4 | A  When you're done. | 11:09:59 |
| 5 | Q  Is there a time limit on interrogations, | 11:10:00 |
| 6 | in your view? | 11:10:07 |
| 7 | A  No. | 11:10:07 |
| 8 | Q  Is there a limit on the amount of sleep | 11:10:08 |
| 9 | someone could have had or not had? | 11:10:16 |
| 10 | A  Yes. | 11:10:19 |
| 11 | Q  And what is that limit? | 11:10:23 |
| 12 | A  Specifically it would depend upon the | 11:10:25 |
| 13 | individual and how they were reacting. | 11:10:29 |
| 14 | Q  And what type of reactions would you stop | 11:10:34 |
| 15 | an interrogation on someone who had not slept in | 11:10:46 |
| 16 | a while? | 11:10:50 |
| 17 | MR. POLICK:  Objection to the form of the | 11:10:51 |
| 18 | question.  You can go ahead and answer. | 11:10:53 |
| 19 | THE WITNESS:  Could you repeat that, please? | 11:10:55 |
| 20 | MS. GARCIA:  Can you read that back? | 11:10:55 |
| 21 | THE COURT REPORTER:  I'm sorry; would you | 11:10:55 |
| 22 | repeat the question. | 11:11:17 |
| 23 | Q  You testified that there's some times | 11:11:17 |
| 24 | based on how someone reacted that you would stop | 11:11:21 |

Transcript of Michael Cross
Conducted on October 16, 2020                    70

| | | |
|---|---|---|
| 1 | an interrogation if they hadn't slept in a while; | 11:11:24 |
| 2 | correct? | 11:11:27 |
| 3 | MR. POLICK:  I think that misstates the | 11:11:28 |
| 4 | witness' testimony. | 11:11:30 |
| 5 | You may go ahead and answer. | 11:11:33 |
| 6 | A  I don't think that's what I said. | 11:11:34 |
| 7 | Q  Other than an interrogation being -- | 11:11:36 |
| 8 | actually, strike that. | 11:11:56 |
| 9 | What is your -- you said you wouldn't stop | 11:11:58 |
| 10 | an interrogation until it was done; correct? | 11:12:00 |
| 11 | A  Correct. | 11:12:02 |
| 12 | Q  What does "done" mean to you? | 11:12:04 |
| 13 | A  When I'm done interviewing; when I'm done | 11:12:09 |
| 14 | asking questions. | 11:12:13 |
| 15 | Q  How do you determine when that is? | 11:12:14 |
| 16 | A  There comes a point where you just run out | 11:12:16 |
| 17 | of questions. | 11:12:19 |
| 18 | Q  And other than running out of questions, | 11:12:27 |
| 19 | under what criteria would you stop an interrogation? | 11:12:40 |
| 20 | A  I'm not sure about your question. | 11:12:44 |
| 21 | Q  So you're not sure -- | 11:12:48 |
| 22 | A  I think it's vague. | 11:12:50 |
| 23 | Q  Other than being finished with your line | 11:12:53 |
| 24 | of questioning, are there circumstances under | 11:12:57 |

Transcript of Michael Cross
Conducted on October 16, 2020                    71

| | | |
|---|---|---|
| 1 | which you would stop an interrogation? | 11:12:59 |
| 2 | A  Probably. | 11:13:01 |
| 3 | Q  And what are some of those circumstances? | 11:13:02 |
| 4 | A  If somebody passed out, that would be one | 11:13:04 |
| 5 | of them.  That's never happened to me.  I would | 11:13:12 |
| 6 | keep my interrogation going as long as it was | 11:13:17 |
| 7 | necessary. | 11:13:19 |
| 8 | Q  What if someone was experiencing | 11:13:20 |
| 9 | psychological harm?  Would you stop then? | 11:13:23 |
| 10 | MR. POLICK:  Objection to the form of the | 11:13:26 |
| 11 | question.  That again calls for him to give an | 11:13:27 |
| 12 | expert opinion for which no foundation has been | 11:13:30 |
| 13 | established. | 11:13:33 |
| 14 | You can go ahead and answer over those | 11:13:33 |
| 15 | objections. | 11:13:36 |
| 16 | THE WITNESS:  Could you ask that again, | 11:13:37 |
| 17 | please? | 11:13:38 |
| 18 | Q  Would psychological harm be a reason that | 11:13:38 |
| 19 | you would stop an interrogation prior to being | 11:13:42 |
| 20 | done with your questioning? | 11:13:45 |
| 21 | MR. POLICK:  Same objections. | 11:13:46 |
| 22 | A  To me psychological harm is very vague, | 11:13:47 |
| 23 | and I don't know exactly what you're saying. | 11:13:51 |
| 24 | Q  Well, I mean, would you stop an interrogation | 11:14:00 |

Transcript of Michael Cross
Conducted on October 16, 2020                           72

| | | |
|---|---|---|
| 1 | if someone was crying? | 11:14:03 |
| 2 | A  Probably not. | 11:14:08 |
| 3 | Q  Would you stop an interrogation if someone | 11:14:09 |
| 4 | was hyperventilating? | 11:14:11 |
| 5 | A  I might take a break, yes. | 11:14:14 |
| 6 | Q  Would you stop an interrogation if someone | 11:14:16 |
| 7 | was having a panic attack? | 11:14:19 |
| 8 | A  I don't know what a panic attack is. | 11:14:20 |
| 9 | Q  Would you stop interrogating someone if | 11:14:23 |
| 10 | they appeared intoxicated? | 11:14:32 |
| 11 | A  Yes. | 11:14:35 |
| 12 | Q  Prior to the investigation into the fire | 11:15:02 |
| 13 | at Marianne Miceli's apartment, how many fires had | 11:15:09 |
| 14 | you investigated? | 11:15:16 |
| 15 | A  A lot. | 11:15:18 |
| 16 | Q  Approximately how many? | 11:15:19 |
| 17 | A  100 or more. | 11:15:20 |
| 18 | Q  And how many fires had you investigated | 11:15:23 |
| 19 | that someone died in? | 11:15:32 |
| 20 | A  One other one. | 11:15:33 |
| 21 | Q  In your experience, what were the -- what | 11:15:35 |
| 22 | were the majority of causes of the hundreds of | 11:15:49 |
| 23 | fires you had investigated prior to 1995? | 11:15:53 |
| 24 | A  It could be accidental; it could be | 11:15:56 |

Transcript of Michael Cross
Conducted on October 16, 2020                    73

| | | |
|---|---|---|
| 1 | incendiary; it would be natural fires, combustion. | 11:16:09 |
| 2 | Q  And what portion of the fires you | 11:16:21 |
| 3 | investigated prior to the Miceli investigation | 11:16:23 |
| 4 | were determined to be incendiary? | 11:16:28 |
| 5 | A  I couldn't tell you an exact percentage. | 11:16:31 |
| 6 | Q  Were the majority of the cases you had -- | 11:16:37 |
| 7 | fire cases you had investigated? | 11:16:40 |
| 8 | A  Were incendiary? | 11:16:42 |
| 9 | Q  Yes. | 11:16:45 |
| 10 | A  No. | 11:16:45 |
| 11 | Q  Were the majority accidental? | 11:16:46 |
| 12 | A  That would be a higher number.  Not | 11:16:50 |
| 13 | majority, though. | 11:16:58 |
| 14 | Q  What were the majority? | 11:16:59 |
| 15 | A  I don't know. | 11:17:00 |
| 16 | Q  And how many homicides had you investigated | 11:17:01 |
| 17 | prior to the fire at Miceli residence? | 11:17:17 |
| 18 | A  I don't know the exact number. | 11:17:25 |
| 19 | Q  More than 50? | 11:17:26 |
| 20 | A  Maybe a little less than that.  The | 11:17:32 |
| 21 | majority of my investigations into homicides were | 11:17:41 |
| 22 | with the major crimes task force. | 11:17:45 |
| 23 | Q  And tell me about that. | 11:17:48 |
| 24 | A  It was a group of detectives that were | 11:17:50 |

Transcript of Michael Cross
Conducted on October 16, 2020                          74

1    selected throughout the county by the State's          11:17:53

2    Attorney to be involved in that unit.                  11:17:58

3         Q   Okay.  And what did the major crimes task     11:18:04

4    force -- am I getting that right?                      11:18:08

5         A   Major crimes task force.                      11:18:10

6         Q   -- major crimes task force do when they met?  11:18:13

7         A   When we investigated or when we met?          11:18:18

8         Q   When you met.                                 11:18:22

9         A   Okay.  When we met, we would -- we would      11:18:23

10   probably have some training.  We'd talk about          11:18:29

11   cases that we worked.                                  11:18:33

12        Q   Okay.  And you also investigated cases,        11:18:38

13   you said?                                              11:18:43

14        A   With the major crimes task force, yes.        11:18:43

15        Q   What was the process for investigating a      11:18:48

16   case with the major crimes task force?                 11:18:51

17        A   Pretty much the same as any investigation.    11:18:52

18        Q   Was there a specific reason a major crimes    11:18:55

19   task force would get involved?                         11:18:59

20        A   The majority of them were for departments     11:19:00

21   within DuPage County that were too small to have a     11:19:05

22   full investigations unit to put forth a major          11:19:11

23   investigation.                                         11:19:17

24        Q   And would you say that the majority of        11:19:18

Transcript of Michael Cross
Conducted on October 16, 2020                    75

| | | |
|---|---|---|
| 1 | your homicide investigations were with the major | 11:19:22 |
| 2 | crimes task force? | 11:19:28 |
| 3 | A Yes. | 11:19:28 |
| 4 | Q Okay. And that was all around DeKalb, not | 11:19:29 |
| 5 | just Naperville? | 11:19:33 |
| 6 | A All around DuPage. | 11:19:34 |
| 7 | Q DuPage, my apologies. | 11:19:36 |
| 8 | Were you also on an arson task force? | 11:19:40 |
| 9 | A Yes. | 11:19:42 |
| 10 | Q When did you join the arson task force? | 11:19:43 |
| 11 | A I don't know specifically. | 11:19:45 |
| 12 | Q Was it before or after 1995? | 11:19:46 |
| 13 | A Probably after. | 11:19:49 |
| 14 | Q So it was after the fire at the Miceli | 11:19:52 |
| 15 | residence? | 11:19:59 |
| 16 | A Yes. | 11:20:00 |
| 17 | Q Who was on that task force with you? | 11:20:02 |
| 18 | A Myself, Fire Investigator Ferreri -- this | 11:20:09 |
| 19 | is the fire investigation team you're talking | 11:20:20 |
| 20 | about; correct? | 11:20:23 |
| 21 | Q Is there a difference between the fire | 11:20:23 |
| 22 | investigation team and arson task force, or are | 11:20:26 |
| 23 | they maybe the same thing? | 11:20:29 |
| 24 | A They're probably the same thing. | 11:20:30 |

Transcript of Michael Cross
Conducted on October 16, 2020                           76

| | | |
|---|---|---|
| 1 | Q  So you called it -- my apologies -- the | 11:20:32 |
| 2 | fire -- | 11:20:36 |
| 3 | A  Investigation team, FIT. | 11:20:37 |
| 4 | Q  FIT.  And you joined FIT after the | 11:20:40 |
| 5 | 1995 investigation? | 11:20:46 |
| 6 | A  I'm not sure. | 11:20:46 |
| 7 | Q  What did you do with FIT? | 11:20:48 |
| 8 | A  I assisted in investigating fires. | 11:21:00 |
| 9 | Q  How did you provide assistance?  What did | 11:21:06 |
| 10 | you help do? | 11:21:13 |
| 11 | A  I -- we'd respond to the scene, observe | 11:21:14 |
| 12 | the scene, and then I would interview either by | 11:21:24 |
| 13 | myself or along with another fire department | 11:21:27 |
| 14 | investigator, people, witnesses.  Suspects would | 11:21:30 |
| 15 | be interviewed by myself and another detective, | 11:21:39 |
| 16 | not a fireman. | 11:21:43 |
| 17 | Q  And were you asked to be a part of the | 11:21:47 |
| 18 | fire investigative task force? | 11:21:55 |
| 19 | A  The fire investigative team, yes. | 11:21:59 |
| 20 | Q  Team.  I'm going to remember team, I | 11:22:02 |
| 21 | promise.  You were asked, you said? | 11:22:07 |
| 22 | A  Yes. | 11:22:09 |
| 23 | Q  Do you recall who asked you? | 11:22:10 |
| 24 | A  No. | 11:22:11 |

Transcript of Michael Cross
Conducted on October 16, 2020                    77

1     Q   Do you recall why you were asked?                11:22:11

2     A   Because I was a good detective.                  11:22:13

3     Q   Were you asked because you had training in       11:22:17

4   fire investigation prior?                              11:22:21

5     A   I had some.                                      11:22:22

6     Q   You had enough for the fire investigative        11:22:30

7   team to want you to join with them; correct?           11:22:33

8     A   Yes.                                             11:22:36

9     Q   And you had enough for the fire                  11:22:37

10  investigative team to feel like you were capable       11:22:43

11  of helping investigate fires; correct?                 11:22:46

12    A   Yes.  And, also, that they didn't have the       11:22:48

13  arrest powers which I had, and a lot of them           11:22:51

14  didn't have -- or most of them didn't have the         11:22:58

15  training on interviewing.  Their training was in       11:23:01

16  fire suppression and investigation.                    11:23:07

17    Q   Is the investigation into Marianne               11:23:09

18  Miceli's -- strike that.                               11:23:29

19        What would you say the most memorable            11:23:32

20  cases you've ever had in your career are?              11:23:35

21    A   Overall?                                         11:23:37

22    Q   Yes.                                             11:23:38

23    A   The Lemak case, Marilyn Lemak killed her         11:23:38

24  children.                                              11:23:51

| | | |
|---|---|---|
| 1 | Q  Was the investigation into Marianne | 11:23:53 |
| 2 | Miceli's death a case you considered to be | 11:23:58 |
| 3 | significant? | 11:24:02 |
| 4 | A  Yes. | 11:24:02 |
| 5 | Q  And why is that? | 11:24:03 |
| 6 | A  Because it involved a death. | 11:24:04 |
| 7 | Q  Before we move on, I would like to turn | 11:24:20 |
| 8 | back to the 2018 retrial.  Okay? | 11:24:22 |
| 9 | A  Okay. | 11:24:25 |
| 10 | Q  At the 2018 retrial you testified with a | 11:24:26 |
| 11 | notebook; is that correct? | 11:24:32 |
| 12 | A  I don't recall. | 11:24:33 |
| 13 | Q  Do you dispute that you testified with a | 11:24:36 |
| 14 | notebook on the stand? | 11:24:39 |
| 15 | A  I never said that. | 11:24:40 |
| 16 | Q  Well, you never said it but I'm asking, do | 11:24:43 |
| 17 | you dispute that you testified at the 2018 retrial | 11:24:47 |
| 18 | with a notebook on the stand? | 11:24:49 |
| 19 | A  I never testified anyplace with a notebook. | 11:24:52 |
| 20 | Q  So you do dispute that you testified at | 11:24:55 |
| 21 | the 2018 retrial with a notebook -- | 11:24:58 |
| 22 | A  Yes, I do. | 11:24:59 |
| 23 | Q  -- on the stand?  Okay. | 11:25:00 |
| 24 | Prior to the 2018 retrial, did you meet | 11:25:16 |

Transcript of Michael Cross
Conducted on October 16, 2020                    79

| | | |
|---|---|---|
| 1 | with the prosecutors before testifying? | 11:25:18 |
| 2 | A  Yes. | 11:25:21 |
| 3 | Q  How many times? | 11:25:21 |
| 4 | A  I don't recall exactly. | 11:25:26 |
| 5 | Q  And what did you discuss with the | 11:25:34 |
| 6 | prosecutors prior to the 2018 retrial? | 11:25:44 |
| 7 | A  The case. | 11:25:49 |
| 8 | Q  What was discussed about the case? | 11:25:50 |
| 9 | A  Probably all aspects. | 11:25:58 |
| 10 | Q  Did you ever speak with John Golder during | 11:26:01 |
| 11 | postconviction proceedings? | 11:26:05 |
| 12 | A  I don't recall that name John Golder. | 11:26:06 |
| 13 | Q  Okay.  So that's a no, you didn't meet | 11:26:10 |
| 14 | with John Golder to your recollection? | 11:26:12 |
| 15 | MR. POLICK:  Objection; misstates the | 11:26:15 |
| 16 | witness' testimony. | 11:26:17 |
| 17 | A  I don't know anybody by the name of John | 11:26:18 |
| 18 | Golder.  Don't remember anybody with that name. | 11:26:21 |
| 19 | Q  So just for the record, you don't recall | 11:26:24 |
| 20 | meeting with someone named John Golder? | 11:26:27 |
| 21 | A  No -- | 11:26:29 |
| 22 | MR. POLICK:  Objection; misstates his | 11:26:30 |
| 23 | testimony. | 11:26:32 |
| 24 | Go ahead and answer. | 11:26:32 |

Transcript of Michael Cross
Conducted on October 16, 2020                    80

| | | |
|---|---|---|
| 1 | A  I don't remember anybody by the name of | 11:26:33 |
| 2 | John Golder. | 11:26:35 |
| 3 | Q  You don't remember anybody by the name of | 11:26:36 |
| 4 | John Golder? | 11:26:39 |
| 5 | A  No, I don't. | 11:26:39 |
| 6 | Q  And you don't recall meeting with anybody | 11:26:40 |
| 7 | by the name of John Golder? | 11:26:42 |
| 8 | A  Nope. | 11:26:44 |
| 9 | Q  Other than talking to the prosecutors | 11:26:49 |
| 10 | prior to the 2018 retrial, did you speak with | 11:26:51 |
| 11 | anybody else? | 11:26:54 |
| 12 | A  I don't recall. | 11:26:54 |
| 13 | Q  Did you speak with any of the other | 11:26:56 |
| 14 | defendants in this case? | 11:27:00 |
| 15 | A  I don't believe so. | 11:27:01 |
| 16 | MR. POLICK:  Do you mind if we take a | 11:27:25 |
| 17 | short break? | 11:27:27 |
| 18 | MS. GARCIA:  Sure. | 11:27:28 |
| 19 | THE VIDEOGRAPHER:  We are going off the | 11:27:29 |
| 20 | record.  The time is 11:27 a.m. | 11:27:32 |
| 21 | (Recess taken, 11:27 a.m. to 11:37 a.m.) | 11:37:19 |
| 22 | THE VIDEOGRAPHER:  We are back on the | 11:37:19 |
| 23 | record.  The time is 11:37 a.m. | 11:37:21 |
| 24 | /// | |

Transcript of Michael Cross
Conducted on October 16, 2020                81

| | | |
|---|---|---|
| 1 | BY MS. GARCIA: | 11:37:26 |
| 2 | Q  Mr. Cross, prior to going off the record | 11:37:31 |
| 3 | we were discussing the 2018 retrial; correct? | 11:37:42 |
| 4 | A  Yes. | 11:37:47 |
| 5 | Q  A little bit earlier you testified that | 11:37:49 |
| 6 | you did not have a notebook while you were | 11:37:54 |
| 7 | testifying at the 2018 retrial; correct? | 11:37:57 |
| 8 | A  Correct. | 11:37:59 |
| 9 | Q  If people in the courtroom saw you with a | 11:38:00 |
| 10 | notebook at the 2018 retrial, would you dispute | 11:38:03 |
| 11 | that claim? | 11:38:05 |
| 12 | A  Yes. | 11:38:06 |
| 13 | Q  And you'd dispute it because having a | 11:38:06 |
| 14 | notebook while testifying would be slightly | 11:38:13 |
| 15 | unusual; correct? | 11:38:16 |
| 16 | A  Yes. | 11:38:17 |
| 17 | Q  Because when you're testifying, you should | 11:38:17 |
| 18 | be testifying to your recall; correct? | 11:38:19 |
| 19 | A  Correct. | 11:38:21 |
| 20 | Q  And you should only be testifying as to a | 11:38:21 |
| 21 | document if it's handed to you; correct? | 11:38:25 |
| 22 | A  Yes. | 11:38:27 |
| 23 | Q  Did you take any notes other than -- | 11:38:28 |
| 24 | leaving aside the notebook, did you take any notes | 11:38:32 |

Transcript of Michael Cross
Conducted on October 16, 2020                    82

| | | |
|---|---|---|
| 1 | in preparation for the 2018 retrial? | 11:38:35 |
| 2 | A  I don't recall. | 11:38:37 |
| 3 | Q  Have you looked for any of your notes that | 11:38:38 |
| 4 | you may have taken in the 2018 retrial? | 11:38:51 |
| 5 | A  I don't have any notes that are left. | 11:38:54 |
| 6 | Q  Where would they have gone? | 11:38:56 |
| 7 | A  Trash, shredder. | 11:38:58 |
| 8 | Q  Why would you shred your notes related to | 11:39:00 |
| 9 | a criminal trial? | 11:39:05 |
| 10 | A  Well, first of all, I didn't need them | 11:39:07 |
| 11 | anymore as far as I knew, and second of all, it | 11:39:09 |
| 12 | wasn't required at that time to keep your notes. | 11:39:12 |
| 13 | Q  And this is for the 2018 retrial; correct? | 11:39:14 |
| 14 | A  Correct. | 11:39:17 |
| 15 | Q  Okay.  And you didn't foresee that there | 11:39:17 |
| 16 | may be civil litigation that you would need to | 11:39:20 |
| 17 | have your notes in? | 11:39:22 |
| 18 | A  Yes. | 11:39:23 |
| 19 | Q  Even though someone had been acquitted of | 11:39:25 |
| 20 | a conviction after decades in prison, you didn't | 11:39:28 |
| 21 | think there was going to be civil litigation on | 11:39:33 |
| 22 | the matter? | 11:39:35 |
| 23 | A  Oh, yeah, I believe so. | 11:39:36 |
| 24 | Q  So you believed there would be civil | 11:39:37 |

Transcript of Michael Cross
Conducted on October 16, 2020                              83

| | | |
|---|---|---|
| 1 | litigation but -- | 11:39:40 |
| 2 | A  Absolutely. | 11:39:41 |
| 3 | Q  -- you threw your notes out anyway? | 11:39:42 |
| 4 | A  I don't have my notes. | 11:39:45 |
| 5 | Q  You testified that you either threw them | 11:39:46 |
| 6 | away or put them in the shredder; right? | 11:39:49 |
| 7 | A  I don't have my notes. | 11:39:52 |
| 8 | Q  So do you dispute you put them in the | 11:39:52 |
| 9 | shredder and threw them away? | 11:39:55 |
| 10 | A  I guess.  I'm not sure, ma'am. | 11:39:58 |
| 11 | Q  How do you know you don't have them?  Have | 11:39:59 |
| 12 | you looked for any notes that you may have taken | 11:40:03 |
| 13 | prior to the 2018 retrial? | 11:40:05 |
| 14 | A  No. | 11:40:07 |
| 15 | Q  And you know as part of civil litigation | 11:40:07 |
| 16 | defendants are asked to look for relevant | 11:40:11 |
| 17 | materials as to that civil litigation; correct? | 11:40:13 |
| 18 | A  I'm not sure about that. | 11:40:16 |
| 19 | Q  Well, if I represent to you that part of | 11:40:19 |
| 20 | the disclosure process in civil litigation is | 11:40:22 |
| 21 | document requests that go towards relevant | 11:40:24 |
| 22 | information a person may have on that litigation, | 11:40:29 |
| 23 | would you have reason to doubt that? | 11:40:33 |
| 24 | A  I really don't understand your question. | 11:40:36 |

Transcript of Michael Cross
Conducted on October 16, 2020                            84

| | | |
|---|---|---|
| 1 | Q   During the course of this lawsuit, have | 11:40:38 |
| 2 | you looked for documents or notes that may have | 11:40:43 |
| 3 | been relevant to the events in this lawsuit -- | 11:40:46 |
| 4 | A   No. | 11:40:48 |
| 5 | Q   -- prior to this deposition? | 11:40:49 |
| 6 | A   No. | 11:40:51 |
| 7 | Q   Did you say no or yes? | 11:40:52 |
| 8 | A   No. | 11:40:54 |
| 9 | Q   And you understand that is required by the | 11:40:56 |
| 10 | Federal rules? | 11:41:02 |
| 11 | A   For me to look for my notes? | 11:41:03 |
| 12 | Q   Yes. | 11:41:05 |
| 13 | A   No. | 11:41:05 |
| 14 | Q   And why do you think it's not required for | 11:41:06 |
| 15 | you to look for your notes? | 11:41:14 |
| 16 | A   It never has been. | 11:41:15 |
| 17 | Q   Have you in your previous civil litigation | 11:41:17 |
| 18 | or in your previous criminal litigation? | 11:41:21 |
| 19 | A   Either. | 11:41:26 |
| 20 | Q   You've never been required to look for | 11:41:27 |
| 21 | notes you've kept in anticipation of litigation in | 11:41:30 |
| 22 | any of the hundreds of cases you've testified on? | 11:41:38 |
| 23 | A   I would have either had my notes, I | 11:41:41 |
| 24 | wouldn't have to look for them, or I would have | 11:41:46 |

Transcript of Michael Cross
Conducted on October 16, 2020                    85

| | | |
|---|---|---|
| 1 | discarded them. | 11:41:49 |
| 2 | Q  And why would you discard notes that have | 11:41:50 |
| 3 | to do with the criminal investigation? | 11:41:53 |
| 4 | A  Because I felt that it was -- I was done | 11:41:54 |
| 5 | with them or I wouldn't need them anymore. | 11:41:56 |
| 6 | Q  And you felt like you didn't need your | 11:41:59 |
| 7 | notes anymore for this litigation? | 11:42:01 |
| 8 | A  That's correct. | 11:42:02 |
| 9 | Q  Even though you had the belief that there | 11:42:04 |
| 10 | would be civil litigation after Mr. Amor was | 11:42:08 |
| 11 | acquitted? | 11:42:11 |
| 12 | A  That's correct. | 11:42:12 |
| 13 | Q  So just so we're clear, did you discard | 11:42:14 |
| 14 | your notes after the retrial, or can you just -- | 11:42:17 |
| 15 | you just don't know where they are? | 11:42:21 |
| 16 | MR. POLICK:  Objection to the form of the | 11:42:23 |
| 17 | question and as to the foundation, as well. | 11:42:25 |
| 18 | You can go ahead and answer. | 11:42:27 |
| 19 | A  Could you ask it again, please? | 11:42:28 |
| 20 | Q  Sure.  Did you discard your notes after | 11:42:31 |
| 21 | you gave testimony in the 2018 retrial, or are you | 11:42:41 |
| 22 | just not sure where your notes are? | 11:42:46 |
| 23 | A  Well, I don't have my notes anymore. | 11:42:48 |
| 24 | Q  How do you know you don't have them anymore? | 11:42:52 |

Transcript of Michael Cross
Conducted on October 16, 2020                                86

| | | |
|---|---|---|
| 1 | A  I just know it. | 11:42:55 |
| 2 | Q  Did you look for them? | 11:42:57 |
| 3 | A  No. | 11:42:58 |
| 4 | Q  So how do you know that you don't have | 11:43:01 |
| 5 | them anymore if you didn't look for them? | 11:43:04 |
| 6 | A  I just know it. | 11:43:05 |
| 7 | MS. GARCIA:  I'd like to turn to what will | 11:43:34 |
| 8 | be mark that as Exhibit 1 -- actually, strike that. | 11:43:37 |
| 9 | I actually don't have what I was looking for. | 11:44:43 |
| 10 | Q  If I represent to you that the plaintiff | 11:44:46 |
| 11 | turned over requests for production on you that | 11:44:52 |
| 12 | specifically asked you for your notes, would you | 11:44:56 |
| 13 | have reason to dispute that? | 11:44:58 |
| 14 | A  I just don't recall. | 11:44:59 |
| 15 | Q  Do you recall being served requests for | 11:45:01 |
| 16 | production by plaintiff? | 11:45:09 |
| 17 | A  No. | 11:45:10 |
| 18 | Q  You don't recall doing anything in | 11:45:12 |
| 19 | response to the requests for production that you | 11:45:19 |
| 20 | were served? | 11:45:24 |
| 21 | A  I don't recall being served with in fact. | 11:45:25 |
| 22 | Q  You don't recall or you don't know one way | 11:45:30 |
| 23 | or the other? | 11:45:33 |
| 24 | A  I don't recall. | 11:45:33 |

Transcript of Michael Cross
Conducted on October 16, 2020                        87

| | | |
|---|---|---|
| 1 | Q  So it's possible that you may have been | 11:45:34 |
| 2 | served the requests for production? | 11:45:37 |
| 3 | A  Not that I recall. | 11:45:39 |
| 4 | MR. POLICK:  Objection; it's argumentative. | 11:45:39 |
| 5 | Q  Is it possible? | 11:45:42 |
| 6 | A  Not that I recall. | 11:45:43 |
| 7 | Q  Earlier you -- earlier you stated that you | 11:46:22 |
| 8 | did not recall independently the -- strike that. | 11:46:33 |
| 9 | Earlier you testified that you had not | 11:47:06 |
| 10 | spoken with any of the other defendants prior to | 11:47:08 |
| 11 | the 2018 retrial; is that correct? | 11:47:12 |
| 12 | A  Correct. | 11:47:14 |
| 13 | Q  Did you speak with any of the other | 11:47:14 |
| 14 | defendants during the 2018 retrial? | 11:47:16 |
| 15 | A  No. | 11:47:17 |
| 16 | Q  Did you text with any of the other | 11:47:18 |
| 17 | defendants during the 2018 retrial? | 11:47:20 |
| 18 | A  No. | 11:47:21 |
| 19 | (Cross Deposition Exhibit 1 marked for | 11:47:58 |
| 20 | identification and attached to the transcript.) | 11:48:25 |
| 21 | Q  Handing you what's been marked 1, which I | 11:48:25 |
| 22 | believe should be Bates-stamped which was | 11:48:29 |
| 23 | disclosed to plaintiff by Defendant Guerrieri and | 11:48:35 |
| 24 | it says "Mike" at the top.  Do you see that? | 11:48:40 |

| | | |
|---|---|---|
| 1 | A  Yes. | 11:48:46 |
| 2 | Q  Is the "Mike" at the top in reference to | 11:48:46 |
| 3 | you, Mike Cross? | 11:48:49 |
| 4 | A  I would assume so, yes. | 11:48:51 |
| 5 | Q  And is the "Bob" in the text Robert | 11:48:54 |
| 6 | Guerrieri? | 11:48:59 |
| 7 | A  Yes. | 11:48:59 |
| 8 | Q  So you were in communication with one of the | 11:49:00 |
| 9 | defendants, Mr. Guerrieri, during the 2018 retrial? | 11:49:02 |
| 10 | A  I didn't -- I didn't regard him as a | 11:49:05 |
| 11 | defendant at the time that you asked me the question. | 11:49:10 |
| 12 | Q  Okay. | 11:49:14 |
| 13 | A  I'm thinking of criminal defendants | 11:49:16 |
| 14 | like Amor. | 11:49:20 |
| 15 | MS. GARCIA:  Okay.  We can move on. | 11:49:28 |
| 16 | (Cross Deposition Exhibit 2 marked for | 11:49:28 |
| 17 | identification and attached to the transcript.) | 11:51:02 |
| 18 | MR. POLICK:  Is this the same exhibit? | 11:51:02 |
| 19 | THE WITNESS:  It's different. | 11:51:06 |
| 20 | MS. GARCIA:  Did I give you the wrong | 11:51:07 |
| 21 | first page? | 11:51:09 |
| 22 | MR. POLICK:  Mine look the same here. | 11:51:10 |
| 23 | MS. GARCIA:  This is the first one.  My | 11:51:12 |
| 24 | apologies. | 11:51:15 |

Transcript of Michael Cross
Conducted on October 16, 2020                    89

| | | |
|---|---|---|
| 1 | Q  Okay.  Does this exhibit display -- | 11:51:22 |
| 2 | MR. POLICK:  Which one do you have?  I | 11:51:26 |
| 3 | think this is already -- all right.  Mine are | 11:51:28 |
| 4 | mismarked.  Let me see that, please.  One second. | 11:51:34 |
| 5 | Thank you.  Are these Bates'd in any way?  Because | 11:51:41 |
| 6 | I was handed the wrong exhibits. | 11:51:47 |
| 7 | MS. GARCIA:  Yes. | 11:51:50 |
| 8 | MR. POLICK:  Do you have a Bates number | 11:51:51 |
| 9 | for these? | 11:51:52 |
| 10 | MS. GARCIA:  I'm not sure why it's not | 11:52:02 |
| 11 | showing up on the actual document but it's | 11:52:03 |
| 12 | DEFS 11588 and DEFS 11589. | 11:52:05 |
| 13 | MR. POLICK:  Thank you. | 11:52:14 |
| 14 | Q  And this is still a text thread between | 11:52:21 |
| 15 | you -- | 11:52:25 |
| 16 | MR. POLICK:  I'm still sorting out.  He | 11:52:25 |
| 17 | doesn't have the documents in front of him.  I'll | 11:52:28 |
| 18 | give them back to him as soon as I sort it out here. | 11:52:31 |
| 19 | BY MS. GARCIA: | 11:53:10 |
| 20 | Q  Mr. Cross, is this -- is the second exhibit | 11:53:11 |
| 21 | still a text between you and Mr. Guerrieri? | 11:53:14 |
| 22 | A  Okay. | 11:53:18 |
| 23 | Q  And you see a Chicago Tribune article; | 11:53:24 |
| 24 | correct? | 11:53:29 |

Transcript of Michael Cross
Conducted on October 16, 2020                    90

| | | |
|---|---|---|
| 1 | A   Chicago Tribune article? | 11:53:29 |
| 2 | Q   Yes. | 11:53:32 |
| 3 | A   No. | 11:53:32 |
| 4 | Q   Or a speech bubble that says "Chicago | 11:53:32 |
| 5 | Tribune" on it; correct? | 11:53:35 |
| 6 | A   No. | 11:53:37 |
| 7 | Q   On the second exhibit? | 11:53:37 |
| 8 | A   Chicago Tribune, oh, yes, I do see that. | 11:53:42 |
| 9 | Q   And then further down it says, "I'm not | 11:53:48 |
| 10 | surprised after Judge Brennan threw out the first | 11:53:50 |
| 11 | conviction."  Tom Minser said, "The Miceli family | 11:53:54 |
| 12 | understood the ruling but were disappointed"; | 11:54:01 |
| 13 | correct? | 11:54:04 |
| 14 | A   Yes. | 11:54:05 |
| 15 | Q   Is that in reference to the overturning of | 11:54:05 |
| 16 | Mr. Amor's conviction, to your understanding? | 11:54:08 |
| 17 | A   Yes. | 11:54:10 |
| 18 | Q   And then your response, though, "When is | 11:54:10 |
| 19 | he going to sue everyone"; correct? | 11:54:14 |
| 20 | A   Correct. | 11:54:15 |
| 21 | Q   Because you knew at the time he was | 11:54:16 |
| 22 | planning on suing you potentially? | 11:54:20 |
| 23 | A   I figured he would. | 11:54:21 |
| 24 | MR. POLICK:  Objection as to what someone | 11:54:22 |

Transcript of Michael Cross
Conducted on October 16, 2020                    91

| | | |
|---|---|---|
| 1 | else knew.  Answer can stand. | 11:54:24 |
| 2 | MS. GARCIA:  Let's move on. | 11:54:27 |
| 3 | Q  Mr. Cross, earlier we talked about | 11:54:29 |
| 4 | interrogation tactics; correct? | 11:54:32 |
| 5 | A  Yes. | 11:54:34 |
| 6 | Q  And you talked about having your own | 11:54:35 |
| 7 | technique; correct? | 11:54:37 |
| 8 | A  Yes. | 11:54:38 |
| 9 | Q  When you were conducting an interrogation, | 11:54:39 |
| 10 | is it important for the suspect to give voluntary | 11:54:44 |
| 11 | statements? | 11:54:51 |
| 12 | A  Yes. | 11:54:51 |
| 13 | Q  Is it important for the suspect to give | 11:54:52 |
| 14 | statements that are noncoerced? | 11:55:04 |
| 15 | A  Yes. | 11:55:06 |
| 16 | Q  Is it important that the statement -- that | 11:55:06 |
| 17 | the witness themselves is capable of giving a | 11:55:09 |
| 18 | statement? | 11:55:13 |
| 19 | A  Yes. | 11:55:13 |
| 20 | MR. POLICK:  Objection to the form. | 11:55:14 |
| 21 | Q  How do you tell whether or not a statement | 11:55:15 |
| 22 | is voluntary? | 11:55:18 |
| 23 | A  Just from my observations -- | 11:55:20 |
| 24 | Q  What do you observe -- | 11:55:22 |

Transcript of Michael Cross
Conducted on October 16, 2020                              92

| | | |
|---|---|---|
| 1 | A  -- my training. | 11:55:24 |
| 2 | Q  -- as to what was voluntary? | 11:55:25 |
| 3 | A  You have to be more specific.  I don't | 11:55:29 |
| 4 | understand. | 11:55:32 |
| 5 | Q  Have there been times when you've stopped | 11:55:32 |
| 6 | an interrogation because you felt the statements | 11:55:34 |
| 7 | they were giving were involuntary? | 11:55:37 |
| 8 | A  No. | 11:55:39 |
| 9 | Q  In what situations would you believe a | 11:55:41 |
| 10 | statement to be involuntary from someone you're | 11:55:49 |
| 11 | interrogating? | 11:56:00 |
| 12 | A  I don't -- none.  I don't remember ever | 11:56:01 |
| 13 | taking an involuntary statement or confession. | 11:56:04 |
| 14 | Q  What were the signs you'd look for in | 11:56:08 |
| 15 | order to tell whether something was involuntary? | 11:56:12 |
| 16 | MR. POLICK:  Objection to the form of the | 11:56:15 |
| 17 | question. | 11:56:17 |
| 18 | You can answer over the objection. | 11:56:17 |
| 19 | A  I really don't understand what you're | 11:56:19 |
| 20 | saying. | 11:56:21 |
| 21 | Q  Well, you said confessions need to be | 11:56:23 |
| 22 | voluntary; correct? | 11:56:27 |
| 23 | A  Yes. | 11:56:28 |
| 24 | Q  How do you tell whether a confession is | 11:56:28 |

Transcript of Michael Cross
Conducted on October 16, 2020                    93

| | | |
|---|---|---|
| 1 | voluntary or not? | 11:56:32 |
| 2 | MR. POLICK:  I'm going to object to the | 11:56:33 |
| 3 | form of the question to the extent you're asking | 11:56:34 |
| 4 | him for a legal opinion. | 11:56:36 |
| 5 | But you can go ahead and answer over the | 11:56:38 |
| 6 | objection. | 11:56:38 |
| 7 | THE WITNESS:  Please ask me again. | 11:56:40 |
| 8 | Q  How do you tell whether a confession is | 11:56:41 |
| 9 | voluntary or not? | 11:56:45 |
| 10 | A  Just in the way I observe the individual | 11:56:46 |
| 11 | acting and what and what he's saying, if it | 11:56:50 |
| 12 | corroborates what I -- the information I have | 11:56:53 |
| 13 | obtained from him or other people or -- | 11:56:56 |
| 14 | Q  So voluntariness -- | 11:56:58 |
| 15 | MR. POLICK:  Objection.  He's not finished | 11:57:00 |
| 16 | his answer.  Please don't cut him off. | 11:57:02 |
| 17 | MS. GARCIA:  Are you finished? | 11:57:04 |
| 18 | THE WITNESS:  Yes. | 11:57:05 |
| 19 | Q  So is voluntariness contingent upon what | 11:57:06 |
| 20 | someone has said prior to you? | 11:57:11 |
| 21 | A  No, not specifically.  That's not the only | 11:57:12 |
| 22 | reason or the only thing. | 11:57:15 |
| 23 | Q  Well, what would be the other things? | 11:57:17 |
| 24 | A  I believe I already answered that. | 11:57:18 |

Transcript of Michael Cross
Conducted on October 16, 2020                    94

| | | |
|---|---|---|
| 1 | Q   Other than their demeanor? | 11:57:23 |
| 2 | A   That's one. | 11:57:26 |
| 3 | Q   Okay.  So the demeanor is one.  What you've | 11:57:27 |
| 4 | been told previously by them is another? | 11:57:33 |
| 5 | A   Yes. | 11:57:36 |
| 6 | Q   What you know of the investigation is | 11:57:36 |
| 7 | another? | 11:57:38 |
| 8 | A   Yes, ma'am. | 11:57:38 |
| 9 | Q   Okay.  Is there anything else that goes to | 11:57:39 |
| 10 | the voluntariness, in your opinion? | 11:57:42 |
| 11 | A   I'm not sure. | 11:57:48 |
| 12 | Q   And you mentioned that demeanor would be | 11:57:49 |
| 13 | one aspect that you would observe when determining | 11:57:53 |
| 14 | whether a statement was voluntary; correct? | 11:57:57 |
| 15 | A   Yes. | 11:57:58 |
| 16 | Q   And what sort of demeanor, in your | 11:57:59 |
| 17 | experience, indicates that a statement is voluntary? | 11:58:04 |
| 18 | A   Again, it's my ability to -- to judge. | 11:58:08 |
| 19 | And I rely on my memory, and my training, and my | 11:58:11 |
| 20 | practices, and what I've learned over the years. | 11:58:17 |
| 21 | Q   What does your training say? | 11:58:19 |
| 22 | MR. POLICK:  Objection to the form of the | 11:58:22 |
| 23 | question. | 11:58:23 |
| 24 | You can answer. | 11:58:24 |

Transcript of Michael Cross
Conducted on October 16, 2020                    95

| | | |
|---|---|---|
| 1 | A   I don't understand your question. | 11:58:24 |
| 2 | Q   What does your training say about someone's | 11:58:26 |
| 3 | demeanor when conducting interrogations such that | 11:58:29 |
| 4 | you're getting a voluntary statement? | 11:58:34 |
| 5 | A   I think it would be my own observations, | 11:58:37 |
| 6 | and I'm sure there's some training in there but I | 11:58:43 |
| 7 | can't answer that. | 11:58:46 |
| 8 | Q   Well, you said that your training is part | 11:58:46 |
| 9 | of it.  So what specifically about your training? | 11:58:48 |
| 10 | A   All the interviewing classes that I've | 11:58:52 |
| 11 | took -- taken, all the investigation classes I've | 11:58:55 |
| 12 | taken, all the seminars that I've gone to, that | 11:59:00 |
| 13 | would go into it. | 11:59:04 |
| 14 | Q   Well, have -- in your training, have you | 11:59:05 |
| 15 | been taught signs through which to tell whether or | 11:59:08 |
| 16 | not a statement is voluntary? | 11:59:11 |
| 17 | A   Some, yes. | 11:59:12 |
| 18 | Q   And what are some of those signs? | 11:59:13 |
| 19 | A   Well, if they close up like this, that's | 11:59:15 |
| 20 | probably involuntary or they're not telling the | 11:59:20 |
| 21 | truth.  If they're open like this, then I would | 11:59:24 |
| 22 | believe that they're being open and honest and | 11:59:27 |
| 23 | telling me the truth. | 11:59:30 |
| 24 | MR. POLICK:  Indicating, for the record, | 11:59:31 |

Transcript of Michael Cross
Conducted on October 16, 2020                96

| | | |
|---|---|---|
| 1 | that the witness folded his arms in front of him | 11:59:33 |
| 2 | to signify involuntary and then opened his arms | 11:59:37 |
| 3 | outward to indicate voluntary. | 11:59:42 |
| 4 | Q  So you indicated that having open arms | 12:00:06 |
| 5 | indicates that they're giving a voluntary | 12:00:11 |
| 6 | statement or is one of the signs? | 12:00:15 |
| 7 | A  Yes. | 12:00:17 |
| 8 | Q  Couldn't it be that someone was just -- | 12:00:18 |
| 9 | had just given up and was cooperating and that's | 12:00:20 |
| 10 | why they had open arms? | 12:00:23 |
| 11 | MR. POLICK:  Objection; calls for | 12:00:25 |
| 12 | speculation, lacks foundation. | 12:00:27 |
| 13 | You may answer. | 12:00:27 |
| 14 | A  I'm not sure. | 12:00:30 |
| 15 | Q  Well, what is it about having a closed or | 12:00:32 |
| 16 | open arm that signals whether a statement is | 12:00:37 |
| 17 | voluntary or not? | 12:00:39 |
| 18 | A  It's body language and we've learned it | 12:00:40 |
| 19 | over the years.  I've learned it in different | 12:00:42 |
| 20 | classes when you're folded up like that, you're | 12:00:45 |
| 21 | not telling the truth or you're not being | 12:00:48 |
| 22 | voluntary.  If you're opened up, you're being | 12:00:51 |
| 23 | truthful and wanting to continue. | 12:00:54 |
| 24 | Q  What else about body language would | 12:00:55 |

Transcript of Michael Cross
Conducted on October 16, 2020                    97

| | | |
|---|---|---|
| 1 | display voluntariness? | 12:00:58 |
| 2 | A  That's it. | 12:01:00 |
| 3 | Q  Only being open or closed, that's -- | 12:01:00 |
| 4 | A  That's all I can -- | 12:01:04 |
| 5 | Q  -- the only aspect of voluntariness? | 12:01:05 |
| 6 | A  That's all I can remember. | 12:01:08 |
| 7 | MR. POLICK:  Mike, let her finish her | 12:01:09 |
| 8 | question first -- | 12:01:12 |
| 9 | THE WITNESS:  I'm sorry. | 12:01:12 |
| 10 | MR. POLICK:  -- and then give the answer. | 12:01:12 |
| 11 | Otherwise, it's going to be very difficult for the | 12:01:14 |
| 12 | court reporter to take it down. | 12:01:17 |
| 13 | THE WITNESS:  I'm sorry. | 12:01:18 |
| 14 | Q  Other than a voluntary statement, when | 12:01:34 |
| 15 | you're taking an interrogation you want to make | 12:01:40 |
| 16 | sure that the person being interrogated is capable | 12:01:44 |
| 17 | of answering your questions; correct? | 12:01:50 |
| 18 | A  Yes. | 12:01:54 |
| 19 | Q  And what are some signs that someone is | 12:01:56 |
| 20 | capable of answering your questions in an | 12:01:58 |
| 21 | interrogation? | 12:02:01 |
| 22 | A  Their demeanor. | 12:02:02 |
| 23 | Q  What about their demeanor? | 12:02:07 |
| 24 | A  Again, same -- same thing.  If they're | 12:02:09 |

Transcript of Michael Cross
Conducted on October 16, 2020                    98

| | | |
|---|---|---|
| 1 | open, if they appear to be answering truthfully, | 12:02:12 |
| 2 | situations like that. | 12:02:17 |
| 3 |    Q  Can you think of any situations where | 12:02:20 |
| 4 | openness would not indicate that someone was | 12:02:26 |
| 5 | capable of answering your questions? | 12:02:29 |
| 6 |      MR. POLICK:  Objection to the form; calls | 12:02:32 |
| 7 | for speculation, incomplete hypothetical. | 12:02:37 |
| 8 |      You may answer. | 12:02:40 |
| 9 |    A  Can you ask me again, please? | 12:02:41 |
| 10 |    Q  Sure.  Can you think of any situations | 12:02:43 |
| 11 | where the openness of someone's body language | 12:02:45 |
| 12 | would not indicate that they were capable of | 12:02:47 |
| 13 | giving the statement that they had given? | 12:02:50 |
| 14 |    A  Maybe if they're pathological liars. | 12:02:53 |
| 15 |    Q  Earlier did you say you had an independent | 12:02:57 |
| 16 | recollection of going to the fire scene at | 12:03:46 |
| 17 | 218 East Bailey on September 10th, or did you say | 12:03:48 |
| 18 | you did not? | 12:03:53 |
| 19 |    A  I did. | 12:03:53 |
| 20 |    Q  When did you first heard -- hear about the | 12:04:15 |
| 21 | fire that led to Marianne Miceli's death? | 12:04:17 |
| 22 |    A  When I was called about it. | 12:04:21 |
| 23 |    Q  When you were you called? | 12:04:22 |
| 24 |    A  That day, that evening. | 12:04:24 |

Transcript of Michael Cross
Conducted on October 16, 2020                              99

| | | |
|---|---|---|
| 1 | Q   Around what time? | 12:04:26 |
| 2 | A   Around 5:30 p.m. | 12:04:28 |
| 3 | Q   And you have an independent recollection | 12:04:43 |
| 4 | of going to the scene of the fire? | 12:04:45 |
| 5 | A   Yes. | 12:04:46 |
| 6 | Q   Who was at the scene when you arrived? | 12:04:47 |
| 7 | A   Lieutenant Ferreri from the fire | 12:04:53 |
| 8 | department and Lieutenant Bedell from the police | 12:04:59 |
| 9 | department -- or Sergeant Bedell from the police | 12:05:04 |
| 10 | department. | 12:05:09 |
| 11 | Q   Were Bill Amor and Tina Miceli at the | 12:05:09 |
| 12 | scene when you arrived? | 12:05:16 |
| 13 | A   No. | 12:05:18 |
| 14 | Q   What did you do when you arrived? | 12:05:19 |
| 15 | A   I went through the scene with Ferreri. | 12:05:21 |
| 16 | Q   What did going through the fire scene entail? | 12:05:23 |
| 17 | A   Viewing it.   Viewing it. | 12:05:28 |
| 18 | Q   Viewing it?   And when you got to the | 12:05:30 |
| 19 | scene, were fire suppression efforts ongoing? | 12:05:36 |
| 20 | A   Yes -- actually, overhaul was going on. | 12:05:40 |
| 21 | Q   What is overhaul? | 12:05:43 |
| 22 | A   That's when they -- they're making sure | 12:05:44 |
| 23 | there's no hot spots and checking behind walls and | 12:05:47 |
| 24 | behind -- | 12:05:53 |

Transcript of Michael Cross
Conducted on October 16, 2020                    100

1      Q   And as part of the overhaul, were the            12:05:56

2   firefighters moving debris out of the house?            12:06:02

3      A   Yes.                                              12:06:04

4      Q   Had they moved debris into the parking lot?      12:06:04

5      A   It was either the parking lot or behind          12:06:12

6   the unit and on the patio.                              12:06:15

7      Q   So it's fair to say that when you got to         12:06:22

8   the apartment, there was debris from the apartment      12:06:25

9   that had gotten moved out already?                      12:06:29

10     A   Yes.                                             12:06:31

11     Q   Had furniture been moved out?                    12:06:31

12     A   Yes.                                             12:06:33

13     Q   What pieces of furniture?                        12:06:34

14     A   Most of it.                                      12:06:35

15     Q   Do you recall there being any furniture         12:06:38

16  left?                                                   12:06:42

17     A   I don't recall one way or the other.            12:06:42

18        MS. GARCIA:  Let's mark this as Exhibit 3.        12:07:09

19        (Cross Deposition Exhibit 3 marked for            12:07:09

20  identification and attached to the transcript.)         12:07:35

21        MS. GARCIA:  For the record, Exhibit 3 is         12:07:35

22  from Bates DEFS 12779 until DEFS 12788.                 12:07:39

23     Q   Mr. Cross, is your signature at the bottom       12:07:57

24  of this report?                                         12:07:59

Transcript of Michael Cross
Conducted on October 16, 2020                        101

| | | |
|---|---|---|
| 1 | A  Yes. | 12:08:00 |
| 2 | Q  Is this one of the reports you wrote in | 12:08:00 |
| 3 | the Amor matter? | 12:08:04 |
| 4 | A  Yes. | 12:08:04 |
| 5 | Q  Is this one of the reports that you | 12:08:06 |
| 6 | reviewed in preparation for this deposition? | 12:08:17 |
| 7 | A  Yes. | 12:08:22 |
| 8 | Q  Will you please read the first two paragraphs | 12:08:23 |
| 9 | of the second page for me? | 12:08:26 |
| 10 | A  "Sunday, 9/10/1995" -- | 12:08:33 |
| 11 | Q  You can read it to yourself.  Just let me | 12:08:37 |
| 12 | know when you're done. | 12:08:41 |
| 13 | A  Oh, okay.  Okay. | 12:08:41 |
| 14 | Q  And the first two paragraphs describe your | 12:10:13 |
| 15 | observations of the fire scene at 10:00 on | 12:10:17 |
| 16 | September 10th, 1995; correct? | 12:10:19 |
| 17 | A  Yes. | 12:10:21 |
| 18 | Q  Is there anything in these first | 12:10:22 |
| 19 | two paragraphs that you recall that you have not | 12:10:25 |
| 20 | testified to already? | 12:10:27 |
| 21 | A  I'm not sure. | 12:10:30 |
| 22 | Q  Is there -- is there anything in here -- | 12:10:31 |
| 23 | these two paragraphs describe you going to the | 12:10:39 |
| 24 | scene of the fire and investigating the apartment; | 12:10:43 |

Transcript of Michael Cross
Conducted on October 16, 2020                    102

| | | |
|---|---|---|
| 1 | correct? | 12:10:50 |
| 2 | A  Observing the apartment. | 12:10:50 |
| 3 | Q  Observing the apartment; correct? | 12:10:52 |
| 4 | A  Yes. | 12:10:53 |
| 5 | Q  Other than the observations you made in this | 12:10:54 |
| 6 | police report in these first two paragraphs, are | 12:10:58 |
| 7 | there other recollections you have of that night? | 12:11:01 |
| 8 | A  Yes. | 12:11:03 |
| 9 | Q  What are those? | 12:11:04 |
| 10 | A  Going to the hospital. | 12:11:04 |
| 11 | Q  Okay.  But specifically within your | 12:11:06 |
| 12 | observation of the scene, do you have any further | 12:11:09 |
| 13 | recollections that you haven't put in this report | 12:11:12 |
| 14 | or testified to today? | 12:11:15 |
| 15 | A  No. | 12:11:16 |
| 16 | Q  Okay.  And you said later you went to the | 12:11:18 |
| 17 | hospital; correct? | 12:11:23 |
| 18 | A  Yes. | 12:11:23 |
| 19 | Q  Do you have an independent recollection of | 12:11:24 |
| 20 | going to the hospital? | 12:11:26 |
| 21 | A  No. | 12:11:26 |
| 22 | Q  Do you recall when you went to the hospital? | 12:11:28 |
| 23 | A  Not exactly, other than -- I would have to | 12:11:35 |
| 24 | refresh my memory by reading my reports for the | 12:11:41 |

Transcript of Michael Cross
Conducted on October 16, 2020                    103

| | | |
|---|---|---|
| 1 | exact time, but I don't recall exactly. | 12:11:44 |
| 2 |    Q  Okay.  Do you recall meeting with Pam and | 12:11:46 |
| 3 | Bill Leavenworth? | 12:11:50 |
| 4 |    A  Yes. | 12:11:52 |
| 5 |    MR. POLICK:  Objection to the form of the | 12:11:53 |
| 6 | question. | 12:11:54 |
| 7 |    A  (Continuing.)  Yes. | 12:11:55 |
| 8 |    Q  Do you recall meeting Pam and Bill | 12:11:55 |
| 9 | Leavenworth at the hospital on September 10th, 1995? | 12:11:58 |
| 10 |    MR. POLICK:  Same objection to the form. | 12:12:08 |
| 11 |    A  Yes. | 12:12:08 |
| 12 |    Q  You recall that independently without | 12:12:09 |
| 13 | looking at the documents? | 12:12:11 |
| 14 |    A  Yes. | 12:12:12 |
| 15 |    Q  But earlier you said you had no | 12:12:12 |
| 16 | independent recollection of going to the hospital | 12:12:15 |
| 17 | on September 10th, 1995.  So how do you recall now? | 12:12:17 |
| 18 |    A  I don't believe I said that.  I don't even | 12:12:22 |
| 19 | know if I was asked that. | 12:12:26 |
| 20 |    Q  I asked earlier if you had any independent | 12:12:27 |
| 21 | recollection of going to the hospital on | 12:12:30 |
| 22 | September 10th, 1995, and you said you did not. | 12:12:33 |
| 23 |    A  I don't recall that. | 12:12:37 |
| 24 |    Q  Regardless, you have a recollection of | 12:12:38 |

Transcript of Michael Cross
Conducted on October 16, 2020                    104

| | | |
|---|---|---|
| 1 | going to the hospital on September 10th, 1995, now? | 12:12:42 |
| 2 | A  Yes. | 12:12:46 |
| 3 | Q  Okay.  What is that recollection without | 12:12:46 |
| 4 | looking at the documents? | 12:12:51 |
| 5 | A  That I went to the hospital.  I met with a | 12:12:52 |
| 6 | couple of family members, and I might have also | 12:12:55 |
| 7 | met with the coroner there.  I'm not positive. | 12:12:58 |
| 8 | Q  What family members did you meet with? | 12:13:03 |
| 9 | A  Pardon me? | 12:13:05 |
| 10 | Q  What family members did you meet with? | 12:13:06 |
| 11 | A  Pam and Gary Leavenworth. | 12:13:08 |
| 12 | Q  And did you know Pam and Bill Leavenworth | 12:13:12 |
| 13 | already? | 12:13:16 |
| 14 | A  No. | 12:13:16 |
| 15 | Q  When you saw Pam and Gary Leavenworth, | 12:13:16 |
| 16 | what did you say to them, and what did they say | 12:13:20 |
| 17 | to you? | 12:13:23 |
| 18 | A  I don't recall exactly. | 12:13:23 |
| 19 | Q  What do you recall? | 12:13:25 |
| 20 | A  Nothing. | 12:13:25 |
| 21 | Q  Do you recall discussing Bill Amor with | 12:13:26 |
| 22 | Pam and Gary Leavenworth? | 12:13:33 |
| 23 | A  I don't recall.  Without reviewing my | 12:13:40 |
| 24 | report I don't recall. | 12:13:43 |

Transcript of Michael Cross
Conducted on October 16, 2020                    105

| | | |
|---|---|---|
| 1 | Q  Do you have an independent recollection of | 12:13:43 |
| 2 | Pam and Gary Leavenworth talking to you about | 12:13:46 |
| 3 | Marianne Miceli? | 12:13:55 |
| 4 | A  No. | 12:13:57 |
| 5 | Q  Do you have an independent recollection of | 12:13:58 |
| 6 | Pam and Gary Leavenworth talking to you about Tina | 12:14:00 |
| 7 | Miceli? | 12:14:06 |
| 8 | A  No. | 12:14:06 |
| 9 | Q  Do you have an independent recollection of | 12:14:07 |
| 10 | Pam and Gary Leavenworth telling you that they were | 12:14:17 |
| 11 | not happy that Bill Amor had married Tina Miceli? | 12:14:24 |
| 12 | A  Only from my reports. | 12:14:28 |
| 13 | Q  Only from your reports.  Okay. | 12:14:29 |
| 14 | I apologize if I asked this already.  Did | 12:14:42 |
| 15 | you know Pam and Gary Leavenworth prior to meeting | 12:14:45 |
| 16 | them at the hospital on September 10th, 1995? | 12:14:47 |
| 17 | MR. POLICK:  Asked and answered. | 12:14:51 |
| 18 | You can answer again. | 12:14:52 |
| 19 | A  No. | 12:14:53 |
| 20 | Q  But you knew that they were related to | 12:14:53 |
| 21 | your Captain Jon Ripsky; right? | 12:14:55 |
| 22 | A  No. | 12:14:59 |
| 23 | Q  You didn't know that they were related to -- | 12:15:00 |
| 24 | A  Not when I met them. | 12:15:01 |

Transcript of Michael Cross
Conducted on October 16, 2020                    106

1      Q   Not -- I'm not asking if you met them.        12:15:03

2  I'm asking if you were aware when you met them --     12:15:06

3      A   No.                                           12:15:09

4      Q   -- on 9/10/1995 whether or not they were      12:15:10

5  related to Captain Jon Ripsky.                        12:15:13

6      A   I didn't know that.                           12:15:16

7      Q   Mr. Cross, I'd like you to read the last      12:15:33

8  two paragraphs on page 2 and the first few           12:15:37

9  paragraphs on page 3.                                 12:15:45

10     A   Okay.                                         12:16:22

11     Q   Does reading this refresh your recollection   12:16:24

12 as to your conversation with Pam and Gary            12:16:35

13 Leavenworth at the hospital on September 10th, 1995?  12:16:42

14     A   Some of it, yes.                              12:16:45

15     Q   What is your -- what parts of your            12:16:47

16 recollection have been refreshed?                     12:16:50

17     A   Only from what I read in my reports that      12:16:52

18 Marianne had lived in the apartment for about         12:17:20

19 three years, and Bill lived there for about a year.   12:17:23

20     Q   Is there anything that you have not           12:17:27

21 mentioned today or that is not within your reports    12:17:35

22 that you recall about the September 10th, 1995,       12:17:39

23 meeting with Pam and Gary Leavenworth?                12:17:43

24     A   No.                                           12:17:44

Transcript of Michael Cross
Conducted on October 16, 2020                    107

| | | |
|---|---|---|
| 1 | Q  After the hospital, do you recall what you | 12:17:46 |
| 2 | did next? | 12:17:55 |
| 3 | A  No. | 12:17:56 |
| 4 | Q  Do you recall -- do you recall when on | 12:17:58 |
| 5 | September 10th, 1995, you and Detective Guerrieri | 12:18:11 |
| 6 | met up? | 12:18:15 |
| 7 | A  No. | 12:18:16 |
| 8 | Q  Do you recall why you met up with | 12:18:17 |
| 9 | Detective Guerrieri? | 12:18:21 |
| 10 | A  I believe that he was the on-call | 12:18:22 |
| 11 | investigator, and he called me because this was a | 12:18:29 |
| 12 | fire investigation. | 12:18:33 |
| 13 | Q  Okay.  So he was the one who called you to | 12:18:34 |
| 14 | come to the scene? | 12:18:37 |
| 15 | A  I believe so. | 12:18:38 |
| 16 | Q  Okay.  Do you recall whether or not you | 12:18:39 |
| 17 | met him at the scene or not? | 12:18:41 |
| 18 | A  I don't recall that. | 12:18:43 |
| 19 | Q  Did you go to the hospital with Detective | 12:18:51 |
| 20 | Guerrieri? | 12:18:54 |
| 21 | A  I either went there with him or met him. | 12:18:55 |
| 22 | Q  Okay.  And then after, did you and Detective | 12:18:59 |
| 23 | Guerrieri go meet Bill Amor and Tina Miceli? | 12:19:02 |
| 24 | A  Say that again, please. | 12:19:11 |

Transcript of Michael Cross
Conducted on October 16, 2020                    108

1      Q  After you met with Detective Guerrieri,        12:19:12

2  did you two go and meet Bill Amor and Tina Miceli?    12:19:15

3      A  I believe we went back to the police          12:19:21

4  station first.                                        12:19:23

5      Q  Okay.  What did you do at the police          12:19:24

6  station?                                              12:19:26

7      A  We ran some records checks on the names       12:19:26

8  that we had to see what contacts we had with them.    12:19:30

9      Q  And did you find any contacts?                12:19:33

10     A  No.                                           12:19:35

11     Q  And then did you go to meet Bill Amor and     12:19:36

12  Tina Miceli?                                         12:19:40

13     A  Yes.                                          12:19:40

14     Q  And you testified earlier that you don't      12:19:42

15  have an independent recollection of your             12:19:52

16  conversation with Bill and Tina Amor on              12:19:56

17  October 11th, 1995; correct?                         12:20:01

18     A  Correct.                                      12:20:03

19     Q  You don't have an independent recollection    12:20:04

20  of going to Pam and Gary Leavenworth's house and     12:20:05

21  talking to them; correct?                            12:20:14

22     A  An independent recollection, no.              12:20:15

23         MS. GARCIA:  Can you mark that Exhibit 4,     12:20:59

24  please?                                              12:21:02

| | | |
|---|---|---|
| 1 | And you should keep Exhibit 3 for later. | 12:21:03 |
| 2 | (Cross Deposition Exhibit 4 marked for | 12:21:03 |
| 3 | identification and attached to the transcript.) | 12:21:03 |
| 4 | MS. GARCIA:  For the record, this is | 12:21:27 |
| 5 | Bates-stamped 12754 to 12761. | 12:21:28 |
| 6 | Q  Mr. Cross, is that your signature on the | 12:21:39 |
| 7 | bottom of the report? | 12:21:41 |
| 8 | A  Yes. | 12:21:42 |
| 9 | Q  Is this a report that you authored? | 12:21:42 |
| 10 | A  Yes. | 12:21:44 |
| 11 | Q  Is this one of the reports that you | 12:21:45 |
| 12 | reviewed prior to this deposition? | 12:21:46 |
| 13 | A  Yes. | 12:21:49 |
| 14 | Q  And this report at the top says "Monday, | 12:21:51 |
| 15 | September 10th, 1995, right around midnight"; | 12:22:00 |
| 16 | correct? | 12:22:04 |
| 17 | A  Yes. | 12:22:04 |
| 18 | Q  Which is right before September 11th, 1995; | 12:22:05 |
| 19 | correct? | 12:22:08 |
| 20 | A  Yes. | 12:22:08 |
| 21 | Q  From your review of this document, did -- | 12:22:09 |
| 22 | does this contain a summary of the time that you | 12:22:14 |
| 23 | spoke to Bill Amor and Tina Miceli at Pam and Gary | 12:22:20 |
| 24 | Leavenworth's house? | 12:22:28 |

Transcript of Michael Cross
Conducted on October 16, 2020                    110

| | | |
|---|---|---|
| 1 | A  I believe so, yes. | 12:22:28 |
| 2 | Q  And when you're testifying as to the | 12:22:31 |
| 3 | meeting with Tina Miceli and Bill Amor at Pam and | 12:22:35 |
| 4 | Gary Leavenworth's house, it's based on a | 12:22:45 |
| 5 | recollection that was refreshed by this document? | 12:22:47 |
| 6 | A  Yes. | 12:22:48 |
| 7 | Q  Okay.  You talked with Ms. Miceli first; | 12:22:50 |
| 8 | correct? | 12:22:54 |
| 9 | A  Yes, I did. | 12:22:55 |
| 10 | Q  And where did you talk to her? | 12:22:56 |
| 11 | A  At the Leavenworth residence. | 12:22:58 |
| 12 | Q  Do you recall whether you were in the | 12:23:03 |
| 13 | living room or somewhere else in the house? | 12:23:05 |
| 14 | A  No. | 12:23:09 |
| 15 | Q  Were you alone? | 12:23:10 |
| 16 | A  With her, yes. | 12:23:15 |
| 17 | Q  Do you recall where Mr. Amor was? | 12:23:16 |
| 18 | A  He was with Detective Guerrieri. | 12:23:21 |
| 19 | Q  And do you recall where Ms. Leavenworth was? | 12:23:27 |
| 20 | A  No. | 12:23:35 |
| 21 | Q  What did Tina tell you -- or rather, what | 12:23:36 |
| 22 | did you ask Tina when you first met with her? | 12:23:39 |
| 23 | A  I don't recall. | 12:23:42 |
| 24 | Q  What did Tina tell you when you met with her? | 12:23:43 |

| | | |
|---|---|---|
| 1 | A  Don't recall. | 12:23:47 |
| 2 | Q  Did Tina tell you about the day prior, | 12:23:49 |
| 3 | which would be September 10th, 1995? | 12:23:58 |
| 4 | A  I don't recall. | 12:24:00 |
| 5 | Q  Did Tina tell you about the events that | 12:24:02 |
| 6 | led up to her leaving the house prior to her | 12:24:09 |
| 7 | mother's death? | 12:24:13 |
| 8 | A  No.  I don't recall. | 12:24:14 |
| 9 | Q  She didn't or you don't recall? | 12:24:17 |
| 10 | A  I don't recall. | 12:24:19 |
| 11 | Q  Okay.  Do you recall what Ms. Miceli's | 12:24:21 |
| 12 | demeanor was like when you talked to her? | 12:24:29 |
| 13 | A  No. | 12:24:31 |
| 14 | Q  Was she calm? | 12:24:31 |
| 15 | A  I don't know. | 12:24:32 |
| 16 | Q  Was she emotional? | 12:24:34 |
| 17 | A  I don't know.  Don't remember. | 12:24:37 |
| 18 | Q  Was she upset? | 12:24:39 |
| 19 | A  I don't remember. | 12:24:40 |
| 20 | Q  When you were talking with Ms. Miceli, did | 12:24:42 |
| 21 | you find what she was saying to be credible? | 12:24:53 |
| 22 | A  To what I knew, yes. | 12:24:56 |
| 23 | Q  And what do you mean by to what you knew? | 12:25:01 |
| 24 | A  To what I had learned at the fire scene | 12:25:05 |

Transcript of Michael Cross
Conducted on October 16, 2020                    112

| | | |
|---|---|---|
| 1 | and -- that, basically. | 12:25:08 |
| 2 | Q  So are you saying that what she said to | 12:25:13 |
| 3 | you seemed plausible given what you believed | 12:25:20 |
| 4 | happened at the fire scene? | 12:25:24 |
| 5 | A  I'm not -- I'm not sure. | 12:25:25 |
| 6 | Q  Okay. | 12:25:28 |
| 7 | A  I'm not really understanding your way of | 12:25:29 |
| 8 | questioning or what you're asking me to relate | 12:25:33 |
| 9 | to you. | 12:25:40 |
| 10 | Q  You said that part of what you do is look | 12:25:40 |
| 11 | at people's demeanors to determine whether or not | 12:25:43 |
| 12 | they're giving voluntary statements; right? | 12:25:49 |
| 13 | A  Yes. | 12:25:51 |
| 14 | Q  And I would assume you look at someone's | 12:25:51 |
| 15 | demeanor as to whether or not they are a | 12:25:55 |
| 16 | trustworthy person. | 12:25:56 |
| 17 | A  I can't answer that.  I wouldn't know by | 12:25:58 |
| 18 | looking at somebody initially that they're | 12:26:01 |
| 19 | trustworthy or not.  I would have to base that on | 12:26:03 |
| 20 | a number of occasions and meetings and -- you | 12:26:06 |
| 21 | know, to find out if what they're telling me is | 12:26:11 |
| 22 | the truth. | 12:26:14 |
| 23 | Q  Okay.  And when you're talking to a | 12:26:14 |
| 24 | witness or a suspect, do you make a credibility | 12:26:16 |

Transcript of Michael Cross
Conducted on October 16, 2020                    113

| | | |
|---|---|---|
| 1 | determination as to what they're saying? | 12:26:19 |
| 2 | A  At some time. | 12:26:21 |
| 3 | Q  When? | 12:26:23 |
| 4 | A  When I determine it. | 12:26:24 |
| 5 | Q  How do you determine that? | 12:26:27 |
| 6 | A  By viewing them, by observing them, by | 12:26:29 |
| 7 | talking to them. | 12:26:35 |
| 8 | Q  Okay.  And so did you make a credibility | 12:26:35 |
| 9 | determination with Ms. Miceli when you first | 12:26:39 |
| 10 | met her? | 12:26:44 |
| 11 | A  I don't recall. | 12:26:44 |
| 12 | Q  Do you recall whether you found her | 12:26:45 |
| 13 | trustworthy or not? | 12:26:47 |
| 14 | A  I don't recall. | 12:26:48 |
| 15 | Q  Do you recall whether you found her | 12:26:49 |
| 16 | credible or not? | 12:26:51 |
| 17 | A  I don't recall. | 12:26:52 |
| 18 | Q  Will you please read the first -- the | 12:26:53 |
| 19 | entire first page and the first paragraph on the | 12:27:18 |
| 20 | second page, please? | 12:27:22 |
| 21 | A  The entire first page and the -- okay. | 12:27:23 |
| 22 | Q  Yes.  And let me know when you're done. | 12:27:26 |
| 23 | A  Okay. | 12:29:30 |
| 24 | Q  Does that refresh your recollection as to | 12:29:31 |

Transcript of Michael Cross
Conducted on October 16, 2020                    114

| | | |
|---|---|---|
| 1 | your conversation with Ms. Miceli in the | 12:29:33 |
| 2 | Leavenworth house? | 12:29:42 |
| 3 |    A  Yes. | 12:29:43 |
| 4 |    Q  Do you recall what Tina's demeanor was | 12:29:44 |
| 5 | like when you were talking to her on | 12:29:46 |
| 6 | September 10th to September 11th, 1995? | 12:29:48 |
| 7 |     MR. POLICK:  Asked and answered.  You can | 12:29:51 |
| 8 | answer again. | 12:29:53 |
| 9 |    A  I don't recall her demeanor. | 12:29:54 |
| 10 |    Q  Do you recall whether or not you and | 12:29:56 |
| 11 | Ms. Miceli were alone when you were interviewing | 12:30:11 |
| 12 | her based on your refreshing your recollection? | 12:30:14 |
| 13 |    A  I believe so. | 12:30:20 |
| 14 |    Q  Okay.  I want to point you to the first | 12:30:21 |
| 15 | paragraph on -- the last paragraph on the first | 12:30:25 |
| 16 | page where Tina said, "Tina was sitting in the | 12:30:28 |
| 17 | living room in her mother's chair smoking a | 12:30:41 |
| 18 | cigarette.  I asked Tina what she did with the | 12:30:41 |
| 19 | cigarette.  Tina said she thought she put it out | 12:30:45 |
| 20 | in an ashtray in the dining room -- on the dining | 12:30:46 |
| 21 | room table but wasn't sure." | 12:30:49 |
| 22 |    A  Yes. | 12:30:50 |
| 23 |    Q  "She commented to Bill when they left that | 12:30:51 |
| 24 | she couldn't remember what she did with her | 12:30:53 |

Transcript of Michael Cross
Conducted on October 16, 2020                    115

| | | |
|---|---|---|
| 1 | cigarette.  Bill told her she probably put it | 12:30:56 |
| 2 | out."  Do you recall that? | 12:31:00 |
| 3 | A   Yes.  From reading my reports, yes. | 12:31:00 |
| 4 | Q   And when she told you that she had sat in | 12:31:05 |
| 5 | her mom's chair smoking a cigarette, that she wasn't | 12:31:09 |
| 6 | sure what she did with it, did you believe her? | 12:31:12 |
| 7 | A   Yes. | 12:31:16 |
| 8 | Q   You found her statements credible, that's | 12:31:18 |
| 9 | why you put them in the report? | 12:31:27 |
| 10 | MR. POLICK:  Objection to the form of the | 12:31:28 |
| 11 | question. | 12:31:30 |
| 12 | You can answer over the objection. | 12:31:31 |
| 13 | A   Yes. | 12:31:33 |
| 14 | Q   Okay.  And at some point Pam Leavenworth | 12:31:35 |
| 15 | was -- you talked to Pam Leavenworth while you | 12:31:41 |
| 16 | were talking to Ms. Miceli; correct? | 12:31:45 |
| 17 | A   I don't know if it was at the same time. | 12:31:48 |
| 18 | I'm not sure. | 12:31:52 |
| 19 | Q   Okay.  What happened after you asked | 12:31:53 |
| 20 | Ms. Miceli what had occurred the day of the fire? | 12:31:59 |
| 21 | A   I believe she related what she knew to me. | 12:32:07 |
| 22 | Q   Okay.  And then after that, what did she | 12:32:11 |
| 23 | do?  Where did she go? | 12:32:15 |
| 24 | A   Where did I go? | 12:32:17 |

Transcript of Michael Cross
Conducted on October 16, 2020                    116

| | | |
|---|---|---|
| 1 | Q  Where did she go? | 12:32:19 |
| 2 | A  I don't know where she went. | 12:32:20 |
| 3 | Q  Where did you go? | 12:32:21 |
| 4 | A  I met with Detective Guerrieri sometime | 12:32:22 |
| 5 | after that. | 12:32:25 |
| 6 | Q  Do you recall where or when? | 12:32:25 |
| 7 | A  At the house.  I don't know where exactly. | 12:32:27 |
| 8 | And it was after he had finished interviewing | 12:32:30 |
| 9 | Bill Amor. | 12:32:34 |
| 10 | Q  Okay.  And when you met with Mr. Guerrieri, | 12:32:35 |
| 11 | what did he tell you? | 12:32:38 |
| 12 | A  I don't recall. | 12:32:39 |
| 13 | Q  Did he tell you about what Mr. Amor had said? | 12:32:41 |
| 14 | A  I don't recall. | 12:32:44 |
| 15 | Q  When Mr. Amor and Detective Guerrieri were | 12:32:47 |
| 16 | finished talking, did you ask Tina if she would go | 12:33:10 |
| 17 | downstairs with Bill? | 12:33:18 |
| 18 | A  I don't remember that. | 12:33:20 |
| 19 | Q  Did you discuss -- strike that. | 12:33:22 |
| 20 | While you were talking with Ms. Miceli, | 12:33:48 |
| 21 | did you ask her what -- if there were any issues | 12:33:51 |
| 22 | she was having with appliances? | 12:33:54 |
| 23 | A  Yes. | 12:33:57 |
| 24 | Q  Did you ask if there were any issues she | 12:33:57 |

| | | |
|---|---|---|
| 1 | was having with electricity? | 12:34:01 |
| 2 | A  Yes. | 12:34:02 |
| 3 | Q  Why did you ask her that? | 12:34:02 |
| 4 | A  To rule them out as causes of the fire. | 12:34:04 |
| 5 | Q  Okay.  And what did she say when you asked | 12:34:08 |
| 6 | her that? | 12:34:15 |
| 7 | A  She said they were blowing -- not fuses | 12:34:16 |
| 8 | but breakers when the toaster and the microwave | 12:34:18 |
| 9 | were on at the same time. | 12:34:22 |
| 10 | Q  Did she say anything else? | 12:34:23 |
| 11 | A  Not that I recall. | 12:34:26 |
| 12 | Q  Did she talk about the VCR at all? | 12:34:28 |
| 13 | A  She talked about the TV and the VCR. | 12:34:35 |
| 14 | Q  Okay.  What did she say about the TV and | 12:34:41 |
| 15 | the VCR? | 12:34:47 |
| 16 | A  She believed that they turned the TV off, | 12:34:47 |
| 17 | but she wasn't sure about the VCR. | 12:34:53 |
| 18 | Q  Did she say she was having issues with the | 12:34:55 |
| 19 | VCR at all? | 12:35:02 |
| 20 | A  No, not that I recall. | 12:35:03 |
| 21 | Q  Okay.  Mr. Amor -- I'm sorry -- Mr. Cross, | 12:35:05 |
| 22 | will you please read from the second paragraph | 12:35:29 |
| 23 | page 2 until the middle paragraph of page 3, | 12:35:35 |
| 24 | please. | 12:35:49 |

Transcript of Michael Cross
Conducted on October 16, 2020                              118

| | | |
|---|---|---|
| 1 | A   Okay. | 12:35:50 |
| 2 | Q   Mr. Cross, does this refresh your | 12:38:36 |
| 3 | recollection as to the conversation you had with | 12:38:40 |
| 4 | Tina about any issues she would have been having | 12:38:42 |
| 5 | with electronics within the house? | 12:38:47 |
| 6 | A   Yes. | 12:38:51 |
| 7 | Q   You testified before that Tina didn't say | 12:38:52 |
| 8 | that they were having issues with the TV, but in | 12:38:55 |
| 9 | your report it says that they were; correct? | 12:38:59 |
| 10 | A   Yes. | 12:39:01 |
| 11 | Q   Can you explain the discrepancy to me, | 12:39:01 |
| 12 | please? | 12:39:04 |
| 13 | A   My memory. | 12:39:05 |
| 14 | Q   And earlier you testified that you were | 12:39:07 |
| 15 | interviewing Tina by herself; correct? | 12:39:17 |
| 16 | A   Yes. | 12:39:20 |
| 17 | Q   And that Pam Leavenworth wasn't there? | 12:39:21 |
| 18 | A   No. | 12:39:27 |
| 19 | Q   And in the report it does say that Pam | 12:39:28 |
| 20 | Leavenworth was there when you were interviewing | 12:39:32 |
| 21 | her; correct? | 12:39:35 |
| 22 | A   I think she might have came in after we | 12:39:35 |
| 23 | started, but I don't -- I really don't recall her | 12:39:38 |
| 24 | being there. | 12:39:41 |

Transcript of Michael Cross
Conducted on October 16, 2020                    119

| | | |
|---|---|---|
| 1 | Q  Okay.  So you don't recall one way or the | 12:39:42 |
| 2 | other, or you don't recall her being there. | 12:39:44 |
| 3 | A  I don't recall one way or the other. | 12:39:44 |
| 4 | Q  Okay.  But it's fair to say that if it was | 12:39:47 |
| 5 | in the report, then she would have been there; | 12:39:47 |
| 6 | correct? | 12:39:50 |
| 7 | A  Yes, yes. | 12:39:50 |
| 8 | Q  Because your reports are accurate to what | 12:39:51 |
| 9 | you experienced? | 12:39:53 |
| 10 | A  Yes. | 12:39:53 |
| 11 | Q  And then at some point you sent Tina | 12:39:55 |
| 12 | downstairs with Bill; correct? | 12:40:05 |
| 13 | A  Yes. | 12:40:07 |
| 14 | Q  And you talked with Detective Guerrieri? | 12:40:07 |
| 15 | A  Yes. | 12:40:09 |
| 16 | Q  And you talked to Detective Guerrieri | 12:40:10 |
| 17 | about potential insurance on Marianne; correct? | 12:40:14 |
| 18 | A  We talked about what they had said, what | 12:40:18 |
| 19 | Tina said to me and what Bill said to her -- him. | 12:40:23 |
| 20 | Q  Okay.  So what did Tina say to you that | 12:40:28 |
| 21 | you talked about with Detective Guerrieri once you | 12:40:31 |
| 22 | sent Tina away? | 12:40:34 |
| 23 | A  I don't recall. | 12:40:35 |
| 24 | Q  Okay.  And do you recall what Detective | 12:40:37 |

Transcript of Michael Cross
Conducted on October 16, 2020                    120

| | | |
|---|---|---|
| 1 | Guerrieri told you about his conversation with | 12:40:40 |
| 2 | Mr. Amor? | 12:40:42 |
| 3 | A  Not specifically. | 12:40:42 |
| 4 | Q  Okay.  What, if anything, do you recall? | 12:40:44 |
| 5 | You said "not specifically." | 12:40:47 |
| 6 | A  In regards to what? | 12:40:49 |
| 7 | Q  What Detective Guerrieri told you about | 12:40:50 |
| 8 | his conversation with Mr. Amor. | 12:40:52 |
| 9 | A  I'm having a hard time remembering that. | 12:40:55 |
| 10 | Q  Okay.  And then after you spoke with | 12:41:05 |
| 11 | Mr. Guerrieri about Mr. Amor and discussed your | 12:41:08 |
| 12 | interviews, you then asked Pam Leavenworth if | 12:41:17 |
| 13 | there was any insurance on the condo or insurance | 12:41:22 |
| 14 | on Marianne; correct? | 12:41:25 |
| 15 | A  Yes. | 12:41:26 |
| 16 | Q  And what did Pam say? | 12:41:27 |
| 17 | A  I believe she told me they had contents | 12:41:29 |
| 18 | insurance on the apartment and that there was a | 12:41:32 |
| 19 | $100,000 life insurance policy. | 12:41:36 |
| 20 | Q  Did she say who the beneficiary of the | 12:41:41 |
| 21 | policy was? | 12:41:46 |
| 22 | A  She said initially it was Tina, but Tina | 12:41:46 |
| 23 | had been taken off of it, and I believe Pam was | 12:41:49 |
| 24 | put on it. | 12:41:53 |

Transcript of Michael Cross
Conducted on October 16, 2020                        121

| | | |
|---|---|---|
| 1 | Q  Did Pam say why she was put on it? | 12:41:53 |
| 2 | A  She said that Tina was hanging around with | 12:41:56 |
| 3 | a bad crowd. | 12:42:01 |
| 4 | Q  And how did you find Pam's demeanor when | 12:42:03 |
| 5 | you were talking with her about this? | 12:42:08 |
| 6 | A  Calm, fine. | 12:42:10 |
| 7 | Q  Did you find what she was saying credible? | 12:42:12 |
| 8 | A  Yes. | 12:42:15 |
| 9 | Q  So when she told you that Marianne was not | 12:42:16 |
| 10 | supposed to tell Tina and other members of the | 12:42:19 |
| 11 | family were not supposed to tell Tina about the | 12:42:23 |
| 12 | life insurance, did you believe her? | 12:42:26 |
| 13 | MR. POLICK:  Objection to the form of the | 12:42:27 |
| 14 | question. | 12:42:29 |
| 15 | You can answer. | 12:42:29 |
| 16 | A  Yes. | 12:42:30 |
| 17 | Q  And after talking to Pam about the | 12:42:32 |
| 18 | insurance, at some point did Bill and Tina come | 12:42:45 |
| 19 | back to the kitchen? | 12:42:49 |
| 20 | A  I don't recall. | 12:42:50 |
| 21 | Q  Do you recall Bill and Tina coming back | 12:42:55 |
| 22 | after they had left at all? | 12:43:00 |
| 23 | A  No. | 12:43:01 |
| 24 | Q  After you talked to Pam Leavenworth, did | 12:43:16 |

Transcript of Michael Cross
Conducted on October 16, 2020                    122

| | | |
|---|---|---|
| 1 | you at some point ask Tina about the insurance her | 12:43:19 |
| 2 | mother might have had? | 12:43:25 |
| 3 | A  Yes. | 12:43:26 |
| 4 | Q  What did you ask her? | 12:43:27 |
| 5 | A  I asked her if she knew about the insurance. | 12:43:29 |
| 6 | Q  And what did she say? | 12:43:33 |
| 7 | A  She knew about the contents insurance of | 12:43:34 |
| 8 | the apartment, and she also believed that there | 12:43:39 |
| 9 | was a life insurance policy.  I don't remember if | 12:43:42 |
| 10 | she knew how much it was. | 12:43:45 |
| 11 | Q  So she did say that she believed there was | 12:43:46 |
| 12 | a life insurance policy? | 12:43:49 |
| 13 | A  As far as I can remember, yes. | 12:43:51 |
| 14 | Q  And did Bill say anything about the life | 12:43:53 |
| 15 | insurance policy? | 12:43:58 |
| 16 | A  Yeah, he said, "We don't know anything | 12:43:59 |
| 17 | about that" in a rather loud voice. | 12:44:00 |
| 18 | Q  And what was Bill's demeanor like when he | 12:44:06 |
| 19 | said that? | 12:44:12 |
| 20 | A  He was talking over Tina, and he seemed to | 12:44:12 |
| 21 | be not upset but over -- overreacting. | 12:44:20 |
| 22 | Q  What do you mean by "overreacting"? | 12:44:24 |
| 23 | A  Just he was overreacting. | 12:44:26 |
| 24 | Q  Was Tina upset at this point? | 12:44:28 |

Transcript of Michael Cross
Conducted on October 16, 2020                    123

| | | |
|---|---|---|
| 1 | A  I don't recall. | 12:44:31 |
| 2 | Q  Can you demonstrate how Bill said, "We | 12:44:33 |
| 3 | don't know anything about that"? | 12:44:37 |
| 4 | A  He said it in a little louder voice. | 12:44:45 |
| 5 | Wasn't screaming or shouting or anything.  He was | 12:44:48 |
| 6 | talking over Tina. | 12:44:50 |
| 7 | Q  Can you demonstrate in your voice to the | 12:44:51 |
| 8 | closest approximation? | 12:44:55 |
| 9 | A  No. | 12:44:57 |
| 10 | Q  No? | 12:44:58 |
| 11 | A  No. | 12:45:01 |
| 12 | Q  You said you felt like he was overreacting; | 12:45:04 |
| 13 | correct? | 12:45:07 |
| 14 | A  I believe so. | 12:45:08 |
| 15 | Q  Did Bill's interruption raise any alarm | 12:45:10 |
| 16 | bells for you? | 12:45:15 |
| 17 | A  His what? | 12:45:15 |
| 18 | Q  His interpretation of Tina raise any alarm | 12:45:16 |
| 19 | bells for you. | 12:45:20 |
| 20 | A  Yes. | 12:45:21 |
| 21 | Q  Why? | 12:45:21 |
| 22 | A  Because there was no reason for him to -- | 12:45:22 |
| 23 | to do that, to interrupt her. | 12:45:25 |
| 24 | Q  Well, I mean, you were talking about life | 12:45:28 |

Transcript of Michael Cross
Conducted on October 16, 2020                          124

| | | |
|---|---|---|
| 1 | insurance of her newly dead mother; correct? | 12:45:31 |
| 2 | A Yes. | 12:45:38 |
| 3 | Q Do you believe perhaps he could tell she | 12:45:39 |
| 4 | was upset and didn't want her to have to think | 12:45:41 |
| 5 | about the fact that her mom had life insurance now? | 12:45:43 |
| 6 | MR. POLICK: Objection to the form of the | 12:45:46 |
| 7 | question to the extent it requires him to know | 12:45:50 |
| 8 | what someone else was thinking. | 12:45:52 |
| 9 | You can answer over the objection. | 12:45:54 |
| 10 | A Would you ask that again, please? | 12:45:55 |
| 11 | Q Did you think that perhaps Bill was trying | 12:45:57 |
| 12 | to protect Tina from an upsetting topic of | 12:45:59 |
| 13 | conversation? | 12:46:02 |
| 14 | A No. | 12:46:03 |
| 15 | Q Why not? | 12:46:03 |
| 16 | A I believe he was trying to protect himself. | 12:46:04 |
| 17 | Q Why? | 12:46:07 |
| 18 | A That's my thought. | 12:46:08 |
| 19 | Q Based on his demeanor? | 12:46:11 |
| 20 | A Based on my experience, his demeanor, my | 12:46:13 |
| 21 | training, based on a lot of things. | 12:46:16 |
| 22 | Q Based on what aspects of his demeanor? | 12:46:19 |
| 23 | A Pardon me? | 12:46:23 |
| 24 | Q What aspects of his demeanor made you | 12:46:24 |

Transcript of Michael Cross
Conducted on October 16, 2020                    125

| | | |
|---|---|---|
| 1 | think that he was trying to protect himself and | 12:46:26 |
| 2 | not -- | 12:46:29 |
| 3 | A  Because he was talking -- | 12:46:29 |
| 4 | Q  -- Tina? | 12:46:31 |
| 5 | A  Because he was talking over Tina in a | 12:46:32 |
| 6 | rather loud voice. | 12:46:38 |
| 7 | Q  And what about talking over someone in a | 12:46:40 |
| 8 | loud voice indicates that they're trying to | 12:46:43 |
| 9 | protect themselves and not their wife? | 12:46:45 |
| 10 | A  Because he had something to protect | 12:46:47 |
| 11 | himself from. | 12:46:50 |
| 12 | Q  Which was? | 12:46:52 |
| 13 | A  Knowing about the life insurance policy | 12:46:53 |
| 14 | and killing his mother-in-law. | 12:46:58 |
| 15 | Q  Did you believe at that point that he knew | 12:46:59 |
| 16 | about the life insurance policy and killed his | 12:47:01 |
| 17 | mother-in-law? | 12:47:03 |
| 18 | A  No. | 12:47:04 |
| 19 | Q  Well, then at that moment why would you | 12:47:04 |
| 20 | think that he was trying to protect himself? | 12:47:07 |
| 21 | A  Because it was just talked about. | 12:47:09 |
| 22 | Q  And you said that he was trying to protect | 12:47:13 |
| 23 | himself from talking about life insurance policy | 12:47:22 |
| 24 | and killing his mother; correct? | 12:47:29 |

Transcript of Michael Cross
Conducted on October 16, 2020                    126

| | | |
|---|---|---|
| 1 | A  Mother-in-law. | 12:47:32 |
| 2 | Q  Mother-in-law, correct. | 12:47:32 |
| 3 | A  Yes. | 12:47:34 |
| 4 | Q  But you didn't -- you didn't believe that | 12:47:35 |
| 5 | he had killed his mother-in-law at that moment, | 12:47:39 |
| 6 | did you? | 12:47:42 |
| 7 | A  Yes. | 12:47:42 |
| 8 | Q  You did on November -- sorry -- on | 12:47:44 |
| 9 | September 11th, 1995, you believed that Bill Amor | 12:47:48 |
| 10 | had killed his mother-in-law? | 12:47:52 |
| 11 | A  I was starting to -- starting to believe | 12:47:53 |
| 12 | that.  I was ruling everything out and starting to | 12:47:57 |
| 13 | believe that, yes. | 12:48:00 |
| 14 | Q  Why did you believe within hours of | 12:48:01 |
| 15 | Marianne Miceli's death that Bill Amor was the one | 12:48:05 |
| 16 | who had caused her death or even that the fire | 12:48:09 |
| 17 | wasn't accidental? | 12:48:12 |
| 18 | A  I don't recall.  I really don't. | 12:48:13 |
| 19 | Q  And had you even met Bill Amor prior to | 12:48:16 |
| 20 | him coming into the kitchen with Tina? | 12:48:19 |
| 21 | A  No. | 12:48:21 |
| 22 | Q  Had you had a conversation with him? | 12:48:22 |
| 23 | A  No. | 12:48:24 |
| 24 | Q  And yet you believed on November -- | 12:48:24 |

Transcript of Michael Cross
Conducted on October 16, 2020                     127

| | | |
|---|---|---|
| 1 | strike that. | 12:48:30 |
| 2 | And you believed on September 10th, 1995, | 12:48:31 |
| 3 | that he had likely killed his mother-in-law? | 12:48:35 |
| 4 | A  Again, my memory is bad.  I get to a point | 12:48:39 |
| 5 | where I feel overwhelmed, and that's how I'm | 12:48:46 |
| 6 | feeling right now. | 12:48:52 |
| 7 | Q  Okay.  Well, you testified as to -- do you | 12:48:53 |
| 8 | believe being overwhelmed by a deposition is | 12:49:01 |
| 9 | something that could impede you from having | 12:49:03 |
| 10 | truthful and accurate testimony? | 12:49:05 |
| 11 | A  No, it would impede me from answering | 12:49:07 |
| 12 | questions, and, you know, I'm just having trouble. | 12:49:10 |
| 13 | Q  So are you saying you are having trouble | 12:49:15 |
| 14 | giving truthful and accurate testimony? | 12:49:17 |
| 15 | MR. POLICK:  Objection; misstates the | 12:49:19 |
| 16 | witness' testimony. | 12:49:22 |
| 17 | You can answer over the objection. | 12:49:23 |
| 18 | A  I'm not trying to hide anything.  I'm not | 12:49:24 |
| 19 | trying to not be truthful.  I just don't recall | 12:49:28 |
| 20 | things. | 12:49:30 |
| 21 | Q  Okay.  Rewinding a little bit, you said | 12:49:32 |
| 22 | that you felt that Bill Amor was attempting to | 12:49:35 |
| 23 | protect himself by interrupting Tina; correct? | 12:49:39 |
| 24 | A  Yes. | 12:49:41 |

Transcript of Michael Cross
Conducted on October 16, 2020                    128

```
1        Q   And you said that you felt he was trying        12:49:42

2    to protect himself from -- or rather, he was           12:49:44

3    trying to protect himself based on the fact that       12:49:48

4    he knew about the life insurance and had likely        12:49:52

5    murdered his mother-in-law; correct?                   12:50:02

6        A   I'm not sure.                                   12:50:05

7        MR. POLICK:  Mike, do you need to take a           12:50:18

8    break or are you all right?                            12:50:20

9        THE WITNESS:  I'm all right.                        12:50:21

10       MR. POLICK:  Okay.                                  12:50:23

11       Q   Will you please read the last paragraph of     12:50:29

12   page 3 and the first paragraph of page 4.              12:50:31

13       A   Okay.                                           12:52:58

14       Q   Does that refresh your recollection as to      12:53:00

15   the conversation you had with Tina and Bill about      12:53:02

16   the insurance that Marianne Miceli had?                12:53:06

17       A   Yes.                                            12:53:12

18       Q   And do you recall what Tina's demeanor was     12:53:13

19   like during this conversation?                         12:53:16

20       A   I don't know how you would judge her           12:53:19

21   demeanor.  She seemed to be fine with me.              12:53:23

22       Q   Did she seem happy?                            12:53:26

23       A   No.                                            12:53:28

24       Q   Did she seem calm?                             12:53:29
```

Transcript of Michael Cross
Conducted on October 16, 2020                    129

| | | |
|---|---|---|
| 1 | A  Yes. | 12:53:31 |
| 2 | Q  Did she seem upset? | 12:53:33 |
| 3 | A  I don't recall. | 12:53:36 |
| 4 | Q  Did she seem sad? | 12:53:39 |
| 5 | A  I don't know. | 12:53:42 |
| 6 | Q  So you know she seemed calm, but you don't | 12:53:44 |
| 7 | know whether she was upset or sad? | 12:53:49 |
| 8 | A  Yes, correct. | 12:53:51 |
| 9 | Q  And after -- based on your recollection, | 12:53:54 |
| 10 | after Bill Amor interrupted Ms. Tina Miceli, what | 12:54:12 |
| 11 | was her reaction? | 12:54:17 |
| 12 | A  She quit talking. | 12:54:18 |
| 13 | Q  Did she seem upset? | 12:54:21 |
| 14 | A  She just quit talking. | 12:54:24 |
| 15 | Q  Was she not calm any longer? | 12:54:26 |
| 16 | A  She quit talking. | 12:54:28 |
| 17 | Q  Did she have any sort of emotional reaction? | 12:54:29 |
| 18 | A  She just quit talking. | 12:54:32 |
| 19 | Q  Did her stopping talking raise any alarm | 12:54:34 |
| 20 | bells for you? | 12:54:38 |
| 21 | A  No. | 12:54:38 |
| 22 | Q  What happened after you had a conversation | 12:54:42 |
| 23 | with Tina and Bill about the insurance? | 12:54:47 |
| 24 | A  I don't recall. | 12:54:54 |

Transcript of Michael Cross
Conducted on October 16, 2020                    130

1      Q  At some point did Tina and Bill go outside          12:54:57

2  to have a cigarette?                                       12:55:05

3      A  I believe so.                                       12:55:06

4      Q  Okay.  And do you recall what happened              12:55:08

5  after that?                                                12:55:09

6      A  No.                                                 12:55:10

7      Q  Eventually, did Detective Guerrieri go              12:55:12

8  outside after Tina and Bill?                               12:55:15

9      A  I know he went outside.                             12:55:18

10     Q  Okay.  And what happened after he went              12:55:20

11  outside?                                                  12:55:22

12     A  You mean speaking for Guerrieri?                    12:55:23

13     Q  Well, you were inside.  So what happened            12:55:29

14  after he went outside?                                    12:55:31

15     A  Well, he told me -- he told -- should I             12:55:33

16  relate what he told me?  Because that's hearsay.          12:55:37

17     Q  I mean chronologically what happened after          12:55:41

18  he went outside?                                          12:55:44

19     A  After Guerrieri went outside?                       12:55:45

20     Q  Yes.                                                12:55:47

21     A  He was observing Bill Amor.                         12:55:48

22     Q  Okay.  And why was he observing Bill Amor.          12:55:50

23     A  He was just watching him.                           12:55:51

24     Q  How did you know he was observing Bill Amor?        12:55:52

Transcript of Michael Cross
Conducted on October 16, 2020                                    131

| | | |
|---|---|---|
| 1 | A  He told me later. | 12:55:56 |
| 2 | Q  And did he tell you why he was observing | 12:55:57 |
| 3 | Bill Amor? | 12:55:58 |
| 4 | A  No. | 12:55:58 |
| 5 | Q  Did he tell you prior that he was going to | 12:55:58 |
| 6 | observe Bill Amor, or did he just go outside? | 12:56:00 |
| 7 | A  He just went outside. | 12:56:03 |
| 8 | Q  And did you ask him why he was going | 12:56:04 |
| 9 | outside? | 12:56:06 |
| 10 | A  No. | 12:56:07 |
| 11 | Q  And after he went outside, did you | 12:56:07 |
| 12 | eventually join him? | 12:56:14 |
| 13 | A  Eventually, yes. | 12:56:15 |
| 14 | Q  How long after? | 12:56:16 |
| 15 | A  Minutes. | 12:56:21 |
| 16 | Q  After you joined him, what did you do? | 12:56:22 |
| 17 | A  We spoke about what he had done. | 12:56:24 |
| 18 | Q  And what had he done? | 12:56:27 |
| 19 | A  He saw Amor going through the trunk of | 12:56:28 |
| 20 | Tina's car. | 12:56:33 |
| 21 | Q  And did he say what he -- if he saw | 12:56:34 |
| 22 | anything from the trunk of the car? | 12:56:39 |
| 23 | A  No. | 12:56:42 |
| 24 | Q  And did he say what happened after Bill | 12:56:44 |

Transcript of Michael Cross
Conducted on October 16, 2020                    132

| | | |
|---|---|---|
| 1 | was going through the trunk of the car? | 12:56:46 |
| 2 | A  I don't recall. | 12:56:49 |
| 3 | Q  Okay.  And what did you do next? | 12:56:51 |
| 4 | A  What did I do next? | 12:56:52 |
| 5 | Q  Yes. | 12:56:55 |
| 6 | A  I can't recall right now. | 12:56:56 |
| 7 | Q  Did you and Detective Guerrieri eventually | 12:56:58 |
| 8 | search Tina's car? | 12:57:03 |
| 9 | A  Yes. | 12:57:07 |
| 10 | Q  And when you searched, what did you find? | 12:57:07 |
| 11 | A  Some lighter fluid, a bottle of vodka. | 12:57:10 |
| 12 | Q  Okay -- sorry.  Was that all?  I don't | 12:57:21 |
| 13 | want to interrupt you. | 12:57:24 |
| 14 | A  That's all I can remember. | 12:57:25 |
| 15 | Q  And did you ask about the lighter fluid? | 12:57:28 |
| 16 | A  I don't recall -- yes, I did -- or Bob | 12:57:33 |
| 17 | did, Guerrieri. | 12:57:38 |
| 18 | Q  Okay.  And what did Tina or Bill say about | 12:57:39 |
| 19 | the lighter fluid? | 12:57:42 |
| 20 | A  I believe it was Bill, and he said that | 12:57:44 |
| 21 | they had taken it to a cookout prior to us talking | 12:57:47 |
| 22 | to them. | 12:57:51 |
| 23 | Q  Okay.  You said you found vodka in the | 12:57:53 |
| 24 | car, as well; right? | 12:57:55 |

Transcript of Michael Cross
Conducted on October 16, 2020                          133

| | | |
|---|---|---|
| 1 | A  Yes. | 12:57:56 |
| 2 | Q  Did you ask Tina or Bill about the alcohol? | 12:57:57 |
| 3 | A  No. | 12:58:01 |
| 4 | Q  Do you have an independent recollection of | 12:58:04 |
| 5 | what you did next? | 12:58:21 |
| 6 | A  No. | 12:58:22 |
| 7 | Q  Mr. Cross, will you please read the second | 12:58:23 |
| 8 | paragraph of page 4. | 12:58:38 |
| 9 | A  Okay. | 13:00:11 |
| 10 | Q  Okay.  So you testified that you asked | 13:00:12 |
| 11 | Bill about the lighter fluid; correct? | 13:00:15 |
| 12 | A  I asked Tina about the lighter fluid. | 13:00:17 |
| 13 | Q  Earlier you testified that you asked Bill. | 13:00:24 |
| 14 | Do you dispute that or do you not remember? | 13:00:29 |
| 15 | A  I don't remember. | 13:00:31 |
| 16 | Q  Okay.  And in the report it says Tina; | 13:00:32 |
| 17 | correct? | 13:00:35 |
| 18 | A  Yes. | 13:00:35 |
| 19 | Q  Which version of your testimony should I | 13:00:35 |
| 20 | credit in this case? | 13:00:42 |
| 21 | A  I don't know.  Credit whatever you want to | 13:00:44 |
| 22 | credit. | 13:00:46 |
| 23 | Q  I mean, did he -- did he -- did you ask | 13:00:46 |
| 24 | Bill or did you ask Tina? | 13:00:50 |

Transcript of Michael Cross
Conducted on October 16, 2020                          134

| | | |
|---|---|---|
| 1 | A   I spoke with Bill -- or with Tina, and | 13:00:51 |
| 2 | Investigator Guerrieri spoke with Amor. | 13:00:57 |
| 3 | Q   No, about the lighter fluid, did you speak | 13:00:59 |
| 4 | with Bill, or did you speak with Tina about the | 13:01:03 |
| 5 | lighter fluid after you had searched the car? | 13:01:06 |
| 6 | A   I believe I spoke with Tina. | 13:01:08 |
| 7 | Q   Okay.  And if you testified earlier that | 13:01:11 |
| 8 | you spoke with Bill, that was incorrect? | 13:01:15 |
| 9 | A   I'm not sure.  I don't remember what I | 13:01:19 |
| 10 | testified to. | 13:01:21 |
| 11 | Q   If you testified that you had asked Bill, | 13:01:22 |
| 12 | is that incorrect, or is it correct? | 13:01:26 |
| 13 | A   I asked Tina. | 13:01:29 |
| 14 | Q   Okay. | 13:01:30 |
| 15 | A   Investigator Guerrieri asked Bill. | 13:01:32 |
| 16 | Q   About the lighter fluid? | 13:01:34 |
| 17 | A   Yes. | 13:01:36 |
| 18 | Q   Okay.  And you also testified that you | 13:01:37 |
| 19 | asked -- strike that. | 13:01:44 |
| 20 |      You also testified that you found a bottle | 13:01:54 |
| 21 | of vodka in the car; correct? | 13:01:56 |
| 22 | A   Yes.  Bill -- or Guerrieri did. | 13:01:59 |
| 23 | Q   And where in your report does it say that | 13:02:03 |
| 24 | Guerrieri found vodka in the car? | 13:02:07 |

Transcript of Michael Cross
Conducted on October 16, 2020                    135

| | | |
|---|---|---|
| 1 | A  I believe I just read it.  I don't remember | 13:02:09 |
| 2 | which paragraph it was. | 13:02:12 |
| 3 | Q  Well, I don't see it in the first sentence. | 13:02:23 |
| 4 | I don't see it in the second sentence.  I don't | 13:02:32 |
| 5 | see it in the third sentence, the fourth, fifth. | 13:02:36 |
| 6 | In looking at the document I only see information | 13:02:44 |
| 7 | about the lighter fluid. | 13:02:52 |
| 8 | A  And what was the other, the vodka? | 13:02:54 |
| 9 | Q  Yeah. | 13:02:56 |
| 10 | A  I don't recall. | 13:02:58 |
| 11 | Q  So it's possible you found vodka in the | 13:03:03 |
| 12 | car, but you didn't put it in your report -- or | 13:03:17 |
| 13 | Guerrieri found vodka in the car and you didn't | 13:03:20 |
| 14 | put it in your report? | 13:03:23 |
| 15 | A  Oh, Guerrieri would have put it in his | 13:03:24 |
| 16 | report. | 13:03:28 |
| 17 | Q  You were with them when they conducted the | 13:03:28 |
| 18 | permission search; correct? | 13:03:30 |
| 19 | A  Yes. | 13:03:31 |
| 20 | Q  And you didn't put it in your report? | 13:03:32 |
| 21 | A  No.  We don't want to double up on what we | 13:03:34 |
| 22 | write.  We want to -- the individual is writing | 13:03:37 |
| 23 | one thing and I would write another.  We didn't | 13:03:42 |
| 24 | normally in any investigation double up on writing | 13:03:46 |

Transcript of Michael Cross
Conducted on October 16, 2020                    136

| | | |
|---|---|---|
| 1 | something, both of us or any two investigators | 13:03:48 |
| 2 | writing something different from the other one. | 13:03:53 |
| 3 |    Q  Okay.  So if I look at Investigator | 13:03:55 |
| 4 | Guerrieri's report, I should expect to see nothing | 13:03:59 |
| 5 | about the lighter fluid? | 13:04:02 |
| 6 |    A  I would think you would see something | 13:04:04 |
| 7 | about the lighter fluid. | 13:04:06 |
| 8 |    Q  But you've already written about the | 13:04:07 |
| 9 | lighter fluid here, and if you don't double up on | 13:04:10 |
| 10 | what you write, then why would you expect to see | 13:04:13 |
| 11 | something about the lighter fluid? | 13:04:16 |
| 12 |    A  I don't know.  You're talking semantics. | 13:04:18 |
| 13 |    Q  I'm just trying to understand.  You said -- | 13:04:20 |
| 14 |    A  Well, I don't understand. | 13:04:21 |
| 15 |    Q  You said you had found vodka, and it's not | 13:04:22 |
| 16 | in your report; correct?  And I'm just trying to | 13:04:25 |
| 17 | understand why it wouldn't be in your report. | 13:04:28 |
| 18 |    A  If I found it, it would be in my report. | 13:04:30 |
| 19 | It would be either in my report or in Detective | 13:04:30 |
| 20 | Guerrieri's report.  He's the one that searched | 13:04:34 |
| 21 | the car. | 13:04:36 |
| 22 |    Q  Okay.  But you also wrote about what he | 13:04:37 |
| 23 | found when he searched the car; correct? | 13:04:39 |
| 24 |    A  I don't recall. | 13:04:41 |

Transcript of Michael Cross
Conducted on October 16, 2020                    137

```
1       Q  You don't recall just reading about it --        13:04:42

2       A  No.                                               13:04:44

3       Q  -- five minutes ago?                              13:04:44

4       A  Nope.                                             13:04:46

5       Q  I thought --                                      13:04:46

6       A  My memory is bad.  And when I'm pressured         13:04:47

7  and I get under stress, it gets worse, and it's          13:04:51

8  getting worse.                                            13:04:55

9       Q  So I'll ask you again, if your memory gets        13:04:57

10  worse when you're pressured and under stress, do         13:05:01

11  you believe you can provide truthful and accurate        13:05:04

12  testimony under a deposition setting?                    13:05:06

13      A  I'm having a hard time.  It's not whether         13:05:10

14  I'm being truthful; it's whether I'm being               13:05:17

15  pressured to answer questions.                           13:05:20

16      Q  Well, you are a defendant in this case;           13:05:21

17  correct?                                                 13:05:23

18      A  Yes.                                              13:05:23

19      Q  And you're here because as a defendant            13:05:24

20  you're compelled to give testimony; correct?             13:05:28

21      A  I understand that.  But due to the                13:05:30

22  severity of my memory loss, I have a lot of              13:05:33

23  trouble with this, and it gets worse when I'm            13:05:35

24  under pressure.                                          13:05:40
```

Transcript of Michael Cross
Conducted on October 16, 2020                    138

| | | |
|---|---|---|
| 1 | Q   Do you believe that you can continue to | 13:05:42 |
| 2 | give truthful and accurate testimony as to what | 13:05:44 |
| 3 | occurred in this case? | 13:05:46 |
| 4 | A   No. | 13:05:47 |
| 5 | Q   Then why did you agree to do a deposition? | 13:05:49 |
| 6 | A   Because at the time I thought I could, but | 13:05:53 |
| 7 | now under stress and pressure I'm having trouble | 13:05:56 |
| 8 | because of my memory. | 13:05:59 |
| 9 | Q   And do you believe that there -- | 13:06:01 |
| 10 | A   I'm not lying about anything. | 13:06:04 |
| 11 | Q   I'm not trying to get -- I'm not asking | 13:06:06 |
| 12 | you to lie.  I'm just trying to figure out whether | 13:06:08 |
| 13 | or not ethically I can continue to ask you | 13:06:12 |
| 14 | questions if you can't remember. | 13:06:14 |
| 15 | MR. POLICK:  Mike, do you feel that you | 13:06:15 |
| 16 | need to take a break?  Because this has not | 13:06:17 |
| 17 | occurred up until this point.  Do you think you | 13:06:19 |
| 18 | need to take a break and then you can continue? | 13:06:21 |
| 19 | THE WITNESS:  We'll see if that will help, | 13:06:23 |
| 20 | yeah. | 13:06:25 |
| 21 | MR. POLICK:  All right.  Well, why don't | 13:06:26 |
| 22 | we take a break and see if you can continue. | 13:06:27 |
| 23 | THE WITNESS:  Okay. | 13:06:31 |
| 24 | THE VIDEOGRAPHER:  We are going off the | 13:06:32 |

Transcript of Michael Cross
Conducted on October 16, 2020                    139

| | | |
|---|---|---|
| 1 | record at 1:06 p.m. | 13:06:36 |
| 2 | (Recess taken, 1:06 p.m. to 1:48 p.m.) | 13:49:00 |
| 3 | THE VIDEOGRAPHER: We are back on the | 13:49:01 |
| 4 | record. The time is 1:48 p.m. | 13:49:02 |
| 5 | BY MS. GARCIA: | 13:49:10 |
| 6 | Q Mr. Cross, when we took a break you had | 13:49:11 |
| 7 | indicated that you were having a hard time | 13:49:14 |
| 8 | recalling certain things, including testimony you | 13:49:21 |
| 9 | had given recently because you were feeling | 13:49:25 |
| 10 | overwhelmed. Is that correct? | 13:49:27 |
| 11 | A Yes. | 13:49:28 |
| 12 | Q And you said you were feeling pressured; | 13:49:29 |
| 13 | correct? | 13:49:32 |
| 14 | A Yes. | 13:49:32 |
| 15 | Q Now that you've had a break, do you feel | 13:49:33 |
| 16 | prepared to continue on with this deposition? | 13:49:36 |
| 17 | A I'd like to try. | 13:49:38 |
| 18 | MR. POLICK: I think, you know, if he | 13:49:39 |
| 19 | needs to take a break, or we need to take more | 13:49:43 |
| 20 | breaks, he's going to let us go. I think we were | 13:49:48 |
| 21 | trying to take breaks periodically, but if he | 13:49:52 |
| 22 | needs to take something more, we'll just do it. | 13:49:55 |
| 23 | But, Mike, you just let us know if you | 13:49:55 |
| 24 | need to take another break, but are you all right | 13:49:59 |

Transcript of Michael Cross
Conducted on October 16, 2020                    140

| | | |
|---|---|---|
| 1 | to go ahead? | 13:50:01 |
| 2 | THE WITNESS:  Yes. | 13:50:02 |
| 3 | MS. GARCIA:  Of course.  Like I said at | 13:50:03 |
| 4 | the beginning of the deposition, I don't want you | 13:50:04 |
| 5 | to not take breaks if you need them.  So just let | 13:50:06 |
| 6 | me know. | 13:50:10 |
| 7 | MR. POLICK:  I don't think either of us | 13:50:10 |
| 8 | knew until -- because we had gotten, you know, | 13:50:12 |
| 9 | quite far into the dep, so I just assumed | 13:50:16 |
| 10 | everything was okay.  But I think Mr. Cross is | 13:50:20 |
| 11 | going to let us know if he needs to take another | 13:50:23 |
| 12 | break and we're ready to continue. | 13:50:26 |
| 13 | MS. GARCIA:  Okay. | 13:50:28 |
| 14 | MR. POLICK:  Okay. | 13:50:28 |
| 15 | BY MS. GARCIA: | 13:50:28 |
| 16 | Q  With all that being said, Mr. Cross, now | 13:50:29 |
| 17 | that you've had a chance to take a break and | 13:50:36 |
| 18 | potentially get some air, do you feel less | 13:50:42 |
| 19 | overwhelmed? | 13:50:45 |
| 20 | A  Yes. | 13:50:46 |
| 21 | Q  Do you feel less pressured? | 13:50:48 |
| 22 | A  So far.  We haven't started. | 13:50:53 |
| 23 | Q  Okay.  Do you feel at this moment that you | 13:50:55 |
| 24 | will be able to provide truthful and accurate | 13:50:58 |

Transcript of Michael Cross
Conducted on October 16, 2020                    141

1   testimony?                                          13:51:01

2        A   Absolutely.                                13:51:02

3        MS. GARCIA:   Okay.   I'm going to turn to a   13:51:09

4   different report, which I believe is Exhibit 5.    13:51:11

5        (Cross Deposition Exhibit 5 marked for         13:51:11

6   identification and attached to the transcript.)    13:51:38

7        Q   Before we get into the exhibit out of the  13:51:38

8   list I read earlier of events you had an           13:51:41

9   independent recollection of, you said you          13:51:44

10  independently recalled the test burn on            13:51:47

11  September 29th; correct?                            13:51:49

12       A   Yes, yes.                                  13:51:50

13       Q   To your recollection, where did that test  13:51:53

14  burn take place?                                    13:51:58

15       A   At Fire Station 3.                         13:51:58

16       Q   And who was with you?                      13:52:03

17       A   Ferreri.                                   13:52:04

18       Q   Was anyone else with you?                  13:52:04

19       A   I don't recall anybody else.               13:52:05

20       Q   Okay.   And up to that point in the        13:52:07

21  investigation do you recall whether or not there   13:52:10

22  had been a hypothesis as to the origin of the fire 13:52:15

23  at the Miceli residence?                           13:52:21

24       A   Yes.                                       13:52:28

Transcript of Michael Cross
Conducted on October 16, 2020                            142

| | | |
|---|---|---|
| 1 | Q  Do recall what that hypothesis was? | 13:52:28 |
| 2 | A  It was by the sliding glass doors near a | 13:52:32 |
| 3 | chair in the living room area. | 13:52:36 |
| 4 | Q  And so did you agree with that hypothesis? | 13:52:39 |
| 5 | A  Yes. | 13:52:46 |
| 6 | Q  Why did you agree with that hypothesis? | 13:52:47 |
| 7 | A  Well, we investigated with the fire | 13:52:54 |
| 8 | department, and it was relying a lot on the fire | 13:52:56 |
| 9 | department's assessment of the origin. | 13:52:59 |
| 10 | Q  And you had had at that point some | 13:53:02 |
| 11 | experience in arson investigation; correct? | 13:53:05 |
| 12 | A  Yes. | 13:53:08 |
| 13 | Q  And you had taken some courses about arson | 13:53:09 |
| 14 | investigation; correct? | 13:53:12 |
| 15 | A  Yes. | 13:53:13 |
| 16 | Q  And those courses included seminars on | 13:53:13 |
| 17 | the -- or at least that spoke to the origin-and- | 13:53:21 |
| 18 | cause determination of fires; correct? | 13:53:26 |
| 19 | A  Yes. | 13:53:28 |
| 20 | Q  And so, of course, you were working with | 13:53:28 |
| 21 | the fire department to investigate this matter; | 13:53:33 |
| 22 | correct? | 13:53:35 |
| 23 | A  Yes. | 13:53:35 |
| 24 | Q  But you had some experience as to | 13:53:35 |

Transcript of Michael Cross
Conducted on October 16, 2020                    143

| | | |
|---|---|---|
| 1 | investigations into origin and cause of fires | 13:53:40 |
| 2 | already; correct? | 13:53:42 |
| 3 | A  Yes. | 13:53:43 |
| 4 | Q  And you with that experience did not | 13:53:43 |
| 5 | disagree with their hypothesis as to the origin; | 13:53:46 |
| 6 | correct? | 13:53:52 |
| 7 | A  No. | 13:53:52 |
| 8 | Q  And you agreed that it would have been | 13:53:52 |
| 9 | near the sliding glass door near the chair by the | 13:53:55 |
| 10 | sliding glass door; correct? | 13:53:58 |
| 11 | A  Correct. | 13:54:00 |
| 12 | Q  When you went to the test burn, what | 13:54:02 |
| 13 | precisely was being burned? | 13:54:07 |
| 14 | A  A TV and a VCR. | 13:54:08 |
| 15 | Q  And why were the TV and VCR being burned? | 13:54:11 |
| 16 | A  To see if they could have been -- there | 13:54:15 |
| 17 | would have been enough heat to start the fire. | 13:54:19 |
| 18 | Q  So were you trying to determine whether | 13:54:21 |
| 19 | they would have been the cause versus the origin | 13:54:23 |
| 20 | of the fire? | 13:54:25 |
| 21 | A  They were, yes. | 13:54:26 |
| 22 | Q  Okay.  And what was the conclusion of the | 13:54:27 |
| 23 | test burn? | 13:54:28 |
| 24 | A  I don't recall. | 13:54:29 |

Transcript of Michael Cross
Conducted on October 16, 2020                    144

| | | |
|---|---|---|
| 1 | Q  Do you recall if the -- during the | 13:54:35 |
| 2 | investigation it was found that the VCR could have | 13:54:56 |
| 3 | caused the fire? | 13:54:58 |
| 4 | A  Yes. | 13:54:59 |
| 5 | Q  So it's your recollection that based on | 13:55:03 |
| 6 | the investigation the TV could have been the cause | 13:55:09 |
| 7 | of the fire? | 13:55:14 |
| 8 | A  I believe the TV was turned off, and the | 13:55:14 |
| 9 | VCR was not turned off. | 13:55:19 |
| 10 | Q  Okay.  And so did you burn the VCR to see | 13:55:21 |
| 11 | whether or not it could have been the origin of | 13:55:24 |
| 12 | the fire? | 13:55:27 |
| 13 | A  The fire department conducted that. | 13:55:27 |
| 14 | Q  Okay.  And do you remember what the | 13:55:29 |
| 15 | conclusion of the VCR burn was? | 13:55:30 |
| 16 | A  No. | 13:55:32 |
| 17 | Q  During the course of the investigation, do | 13:55:33 |
| 18 | you recall whether or not the VCR was eliminated | 13:55:46 |
| 19 | as a potential hypothesis for the cause of the fire? | 13:55:49 |
| 20 | A  No, I don't recall. | 13:55:53 |
| 21 | Q  If I represent to you that it was eliminated | 13:55:57 |
| 22 | as a hypothesis that the fire department had as to | 13:56:01 |
| 23 | the cause of the fire, would you have reason to | 13:56:08 |
| 24 | not believe me? | 13:56:10 |

Transcript of Michael Cross
Conducted on October 16, 2020                         145

```
1        A   No, I wouldn't.                          13:56:11

2        Q   And at that point on September 29th, 1995,  13:56:14

3    other than the VCR and the TV being thought to be   13:56:40

4    a hypothesis for the cause of the fire, were there  13:56:46

5    other hypotheses that you or the fire investigators 13:56:50

6    had as to the cause of the fire?                    13:56:56

7        A   Yes.                                        13:56:59

8        Q   And what were those?                        13:57:00

9        A   That accelerant had been used by the        13:57:00

10   sliding glass doors near the chair.                 13:57:06

11       Q   Did you have a hypothesis as to whether     13:57:18

12   Tina Miceli's misplaced cigarette could have been   13:57:25

13   the cause of the fire?                              13:57:34

14       A   At that time we did not believe so.         13:57:35

15       Q   Why did you not believe so?                 13:57:37

16       A   Because a cigarette, if it was dropped in   13:57:39

17   a chair in that situation would have -- it might    13:57:42

18   have burned a little bit of the chair and a little  13:57:45

19   bit of the foam, but it would have gone out.        13:57:47

20       Q   Did you test that hypothesis in a test      13:57:50

21   burn capacity during the investigation?             13:57:52

22       A   I did not.                                  13:57:53

23       Q   Did, to the best of your knowledge, anyone? 13:57:55

24       A   I don't know.                               13:57:59
```

Transcript of Michael Cross
Conducted on October 16, 2020                    146

| | | |
|---|---|---|
| 1 | Q  And you were the person who was running | 13:58:00 |
| 2 | the investigation for Naperville Police Department; | 13:58:01 |
| 3 | correct? | 13:58:05 |
| 4 | A  For the police department, yes. | 13:58:05 |
| 5 | Q  And so presumably you would have been | 13:58:07 |
| 6 | informed if someone was running that type of test; | 13:58:09 |
| 7 | correct? | 13:58:12 |
| 8 | A  Yes. | 13:58:12 |
| 9 | Q  And presumably you would have been invited | 13:58:12 |
| 10 | to come view that type of test as you were for the | 13:58:14 |
| 11 | test burn itself? | 13:58:18 |
| 12 | A  Yes. | 13:58:19 |
| 13 | Q  But you had not been informed or invited | 13:58:19 |
| 14 | to a test burn or other testing of whether the | 13:58:25 |
| 15 | cigarette that Tina misplaced could have started a | 13:58:30 |
| 16 | fire in one of the chairs in the living room, | 13:58:35 |
| 17 | did you? | 13:58:38 |
| 18 | MR. POLICK:  Objection to the form. | 13:58:38 |
| 19 | But you can answer. | 13:58:41 |
| 20 | A  Could you repeat it, please? | 13:58:42 |
| 21 | Q  Sure.  You said that you would have likely | 13:58:44 |
| 22 | been invited or informed if the fire department | 13:58:47 |
| 23 | was conducting a test as to whether Tina's | 13:58:49 |
| 24 | cigarette could have been the cause of the fire; | 13:58:53 |

Transcript of Michael Cross
Conducted on October 16, 2020                    147

| | | |
|---|---|---|
| 1 | correct? | 13:58:56 |
| 2 | A Correct. | 13:58:56 |
| 3 | Q But you never were informed or invited to | 13:58:57 |
| 4 | one of those tests if they existed? | 13:59:00 |
| 5 | A Not that I recall. | 13:59:03 |
| 6 | Q Okay. Do you have any other hypotheses | 13:59:05 |
| 7 | besides whether an accelerant had been used or | 13:59:12 |
| 8 | whether the VCR and TV had an electrical issue as | 13:59:19 |
| 9 | to the cause of the fire? | 13:59:27 |
| 10 | A No. | 13:59:30 |
| 11 | Q At that point did you believe that -- | 13:59:31 |
| 12 | strike that. | 13:59:36 |
| 13 | At that point you had received testimony | 13:59:37 |
| 14 | from Bill Amor as to his actions on September 10th, | 13:59:40 |
| 15 | 1995; correct? | 13:59:52 |
| 16 | A Yes. | 13:59:53 |
| 17 | Q And you had received -- when you had | 13:59:54 |
| 18 | interviewed him, Bill Amor had told the Naperville | 14:00:00 |
| 19 | Police Department that he had spilled a bottle of | 14:00:04 |
| 20 | vodka near the chair that you determined the | 14:00:06 |
| 21 | origin had been; correct? | 14:00:11 |
| 22 | A Correct. | 14:00:14 |
| 23 | Q And Bill Amor had admitted that he knew | 14:00:15 |
| 24 | that vodka was flammable within alcoholic drinks; | 14:00:29 |

Transcript of Michael Cross
Conducted on October 16, 2020                    148

| | | |
|---|---|---|
| 1 | correct? | 14:00:33 |
| 2 | A  Yes. | 14:00:33 |
| 3 | Q  He didn't -- strike that. | 14:00:34 |
| 4 | Did you believe that the vodka that Bill | 14:00:39 |
| 5 | Amor had admitted to spilling could have been an | 14:00:43 |
| 6 | accelerant within the situation which had caused | 14:00:46 |
| 7 | the fire? | 14:00:51 |
| 8 | A  At the original time? | 14:00:52 |
| 9 | Q  Yes. | 14:00:55 |
| 10 | A  No. | 14:00:55 |
| 11 | Q  So you didn't believe vodka could have | 14:00:56 |
| 12 | been an accelerant to this fire? | 14:00:59 |
| 13 | A  I don't know if that came about right then | 14:01:00 |
| 14 | or if that was determined later from testing with | 14:01:02 |
| 15 | the fire department testing. | 14:01:05 |
| 16 | Q  So do you recall doing any testing of | 14:01:08 |
| 17 | whether or not vodka could be an accelerant which | 14:01:14 |
| 18 | would have caused the type of fire which occurred | 14:01:20 |
| 19 | at Marianne Miceli's residence? | 14:01:23 |
| 20 | A  No. | 14:01:27 |
| 21 | Q  And prior to the test burn, Bill Amor had | 14:01:29 |
| 22 | also said that it was possible he had dropped a | 14:01:46 |
| 23 | cigarette onto the vodka spill which had been onto | 14:01:50 |
| 24 | a pile of newspapers; correct? | 14:01:55 |

Transcript of Michael Cross
Conducted on October 16, 2020                    149

| | | |
|---|---|---|
| 1 | A  Yes. | 14:01:58 |
| 2 | Q  And did you at any point attend a test | 14:01:59 |
| 3 | burn which attempted to light a fire by dropping a | 14:02:05 |
| 4 | cigarette on soaked newspapers that were soaked | 14:02:13 |
| 5 | with vodka? | 14:02:18 |
| 6 | MR. POLICK:  Objection to the form of the | 14:02:20 |
| 7 | question. | 14:02:22 |
| 8 | But you can answer. | 14:02:23 |
| 9 | A  I don't recall anything like that. | 14:02:25 |
| 10 | Q  Do you recall being informed Naperville | 14:02:27 |
| 11 | Fire Department was going to run a test that would | 14:02:31 |
| 12 | see whether or not a cigarette dropped on vodka- | 14:02:35 |
| 13 | soaked newspapers would actually light? | 14:02:40 |
| 14 | A  No, I wasn't. | 14:02:41 |
| 15 | Q  Do you -- strike that. | 14:02:44 |
| 16 | As lead investigator, you had a vested | 14:03:09 |
| 17 | interest in figuring out what occurred in this | 14:03:15 |
| 18 | fire; correct? | 14:03:17 |
| 19 | A  No. | 14:03:18 |
| 20 | MR. POLICK:  Objection to the form of the | 14:03:18 |
| 21 | question. | 14:03:20 |
| 22 | The answer can stand. | 14:03:21 |
| 23 | A  (Continuing.)  No. | 14:03:23 |
| 24 | Q  As a detective, was it important to you to | 14:03:23 |

Transcript of Michael Cross
Conducted on October 16, 2020                          150

| | | |
|---|---|---|
| 1 | try and solve the cause or origin of the fire? | 14:03:25 |
| 2 | A To solve the case, yes. | 14:03:29 |
| 3 | Q And as a lead detective, did you give | 14:03:32 |
| 4 | directives to different officers in order to solve | 14:03:37 |
| 5 | the case? | 14:03:41 |
| 6 | A I don't recall anything specific. | 14:03:42 |
| 7 | Q Just generally, did you give -- | 14:03:45 |
| 8 | A I don't recall. | 14:03:46 |
| 9 | Q As lead detective, would you have had the | 14:03:48 |
| 10 | authority to assign officers to do different | 14:03:57 |
| 11 | things? | 14:04:00 |
| 12 | A Not really. I would have been able to ask | 14:04:00 |
| 13 | them or ask the supervisor, but I wouldn't be able | 14:04:03 |
| 14 | to just assign them anything. | 14:04:06 |
| 15 | Q Okay. So what does the role of lead | 14:04:07 |
| 16 | investigator mean within the context of a | 14:04:11 |
| 17 | Naperville investigation? | 14:04:14 |
| 18 | A The case is assigned to me, and I conduct | 14:04:15 |
| 19 | it as thoroughly as I can. | 14:04:22 |
| 20 | Q And was there any specific procedure that | 14:04:25 |
| 21 | you were instructed or trained to follow as lead | 14:04:29 |
| 22 | investigator? | 14:04:33 |
| 23 | A Yes, it -- any investigative procedures | 14:04:33 |
| 24 | the same as you would do for a minor case to a | 14:04:37 |

| | | |
|---|---|---|
| 1 | major case, there are certain steps you follow. | 14:04:40 |
| 2 |     Q  Okay.  And what steps are those? | 14:04:42 |
| 3 |     A  Reviewing what happened, speaking to | 14:04:44 |
| 4 | witnesses, interviewing suspects, and speaking to | 14:04:50 |
| 5 | other officers who may be involved in the | 14:04:54 |
| 6 | investigation. | 14:04:57 |
| 7 |     Q  And so who decided which officers would | 14:04:59 |
| 8 | talk to which suspects? | 14:05:17 |
| 9 |     A  The supervisor. | 14:05:20 |
| 10 |     Q  Was that at that point Mark Carlson? | 14:05:21 |
| 11 |     A  I believe so. | 14:05:25 |
| 12 |     Q  So was Mark Carlson directing you as to | 14:05:26 |
| 13 | what to do? | 14:05:29 |
| 14 |     A  Yes. | 14:05:30 |
| 15 |     Q  Did you have any discretion? | 14:05:30 |
| 16 |     A  Yes. | 14:05:32 |
| 17 |     Q  What discretion did you have? | 14:05:32 |
| 18 |     A  I mean, I didn't have to go to him with | 14:05:35 |
| 19 | every question and every -- you know, I just had | 14:05:38 |
| 20 | to report back to him to let him know what had | 14:05:40 |
| 21 | occurred and what we were -- what we were doing. | 14:05:43 |
| 22 |     Q  And so you were able to direct some of the | 14:05:45 |
| 23 | officers on the ground then? | 14:05:47 |
| 24 |     MR. POLICK:  Objection; misstates the | 14:05:49 |

Transcript of Michael Cross
Conducted on October 16, 2020                                    152

| | | |
|---|---|---|
| 1 | witness' testimony. | 14:05:51 |
| 2 | You can answer over the objection. | 14:05:52 |
| 3 | A  It was not my assignment or anything to | 14:05:55 |
| 4 | really direct anybody.  We pretty much worked as a | 14:06:00 |
| 5 | team, and we knew pretty much what everybody was | 14:06:04 |
| 6 | going to do and what everybody's responsibility was. | 14:06:08 |
| 7 | Q  And so what was your responsibility within | 14:06:10 |
| 8 | that team? | 14:06:12 |
| 9 | A  Overall case preparation and investigation. | 14:06:13 |
| 10 | Q  So as overall case investigator, was it | 14:06:26 |
| 11 | important for you to be kept aware of the different | 14:06:30 |
| 12 | aspects of the case as they were ongoing? | 14:06:34 |
| 13 | A  Yes. | 14:06:36 |
| 14 | Q  Did you try to be in communication with | 14:06:36 |
| 15 | all the officers who were investigating the case? | 14:06:38 |
| 16 | A  Yes. | 14:06:42 |
| 17 | Q  Did you try to be in contact with all the | 14:06:42 |
| 18 | people from the fire department who were | 14:06:44 |
| 19 | investigating the case? | 14:06:46 |
| 20 | A  Yes. | 14:06:47 |
| 21 | Q  Did you have any input in the investigation | 14:06:49 |
| 22 | as it pertained to determining the cause and | 14:06:58 |
| 23 | origin of the fire? | 14:07:06 |
| 24 | A  No. | 14:07:06 |

Transcript of Michael Cross
Conducted on October 16, 2020                    153

| | | |
|---|---|---|
| 1 | Q  Did you have conversations with Ferreri | 14:07:07 |
| 2 | and Kushner as to the cause and origin of the fire? | 14:07:16 |
| 3 | A  Yes. | 14:07:19 |
| 4 | Q  In those conversations did they give their | 14:07:19 |
| 5 | opinions? | 14:07:23 |
| 6 | A  Yes. | 14:07:23 |
| 7 | Q  In those conversations did you give your | 14:07:24 |
| 8 | opinions? | 14:07:26 |
| 9 | A  I didn't give my opinion on the fire | 14:07:33 |
| 10 | itself because I was listening to them and relying | 14:07:35 |
| 11 | on them to tell me. | 14:07:37 |
| 12 | Q  So then if you're relying on them to tell | 14:07:39 |
| 13 | you, then why did you attend the test burn with | 14:07:47 |
| 14 | them? | 14:07:50 |
| 15 | A  To see what happens. | 14:07:52 |
| 16 | Q  And you didn't give any sort of input into | 14:07:54 |
| 17 | what you thought had happened? | 14:07:59 |
| 18 | A  No. | 14:08:01 |
| 19 | Q  You didn't talk to them about what could | 14:08:01 |
| 20 | have been the course or origin given your | 14:08:04 |
| 21 | experience with arson investigation? | 14:08:07 |
| 22 | A  Well, we spoke about the sliding glass door | 14:08:10 |
| 23 | being opened and the possibility that there was an | 14:08:17 |
| 24 | accelerant used because of the pour pattern, the | 14:08:20 |

Transcript of Michael Cross
Conducted on October 16, 2020                                      154

| | | |
|---|---|---|
| 1 | spill pattern. | 14:08:23 |
| 2 | Q  And you agreed with that? | 14:08:24 |
| 3 | A  Yes. | 14:08:25 |
| 4 | Q  Had you disagreed with something that they | 14:08:26 |
| 5 | had told you or come to a conclusion with, would | 14:08:35 |
| 6 | you have asked them about it? | 14:08:38 |
| 7 | A  Yes. | 14:08:40 |
| 8 | Q  If you had disagreed with something that | 14:08:41 |
| 9 | they had come to a conclusion about, would you | 14:08:44 |
| 10 | dispute what they had said? | 14:08:47 |
| 11 | A  No, I would have -- I would have questioned | 14:08:48 |
| 12 | them.  I would have asked them why and, you know, | 14:08:51 |
| 13 | what their reasoning was behind it, but I wouldn't | 14:08:54 |
| 14 | dispute what they said. | 14:08:57 |
| 15 | Q  If they had come to a conclusion that | 14:08:58 |
| 16 | based on your experience as an arson investigator | 14:09:03 |
| 17 | you felt was outside the realm of possibility, | 14:09:08 |
| 18 | would you have relied on that conclusion in | 14:09:12 |
| 19 | making -- in going forward? | 14:09:14 |
| 20 | A  I would have questioned them.  We would | 14:09:15 |
| 21 | have discussed it. | 14:09:19 |
| 22 | Q  But you wouldn't have relied on them | 14:09:25 |
| 23 | without questioning? | 14:09:29 |
| 24 | MR. POLICK:  Objection to the form of the | 14:09:30 |

Transcript of Michael Cross
Conducted on October 16, 2020                              155

| | | |
|---|---|---|
| 1 | question. | 14:09:32 |
| 2 | But you can answer over the objection. | 14:09:33 |
| 3 | A  Yeah, I would rely on them highly. | 14:09:34 |
| 4 | Q  Prior to Bill Amor's confession, neither | 14:09:37 |
| 5 | Ferreri nor Kushner came to a determination as to | 14:10:12 |
| 6 | the cause of the fire; correct? | 14:10:15 |
| 7 | A  I don't recall. | 14:10:16 |
| 8 | Q  If I told you that neither Kushner nor | 14:10:17 |
| 9 | Ferreri came to a determination about the cause of | 14:10:26 |
| 10 | the fire, would you have reason to dispute that? | 14:10:29 |
| 11 | A  No. | 14:10:32 |
| 12 | Q  Now we can turn to Exhibit 5, which is | 14:10:33 |
| 13 | Bates No. Defense 11273 to Defense 11279. | 14:10:54 |
| 14 | Mr. Cross, you testified that you have an | 14:11:24 |
| 15 | independent recollection of a meeting with | 14:11:27 |
| 16 | Mr. Amor on October 3rd after he was released from | 14:11:29 |
| 17 | DeKalb jail; correct? | 14:11:35 |
| 18 | A  Yes. | 14:11:38 |
| 19 | Q  When you first met Mr. Amor on October 3rd, | 14:11:38 |
| 20 | you knew he was going to be released prior to | 14:11:48 |
| 21 | going to the jail; correct? | 14:11:51 |
| 22 | A  Yes. | 14:11:52 |
| 23 | Q  And you went to DeKalb because you knew | 14:11:54 |
| 24 | that he had a court date; correct? | 14:11:58 |

Transcript of Michael Cross
Conducted on October 16, 2020                      156

| | | |
|---|---|---|
| 1 | A  Yes. | 14:11:59 |
| 2 | Q  You went to DeKalb because you knew he'd | 14:12:00 |
| 3 | be released as a result of that court date; | 14:12:03 |
| 4 | correct? | 14:12:06 |
| 5 | A  Well, that was the third time I was out | 14:12:06 |
| 6 | there seeing if he was going to be released.  So I | 14:12:08 |
| 7 | had gone out there twice prior when he wasn't | 14:12:12 |
| 8 | released and this time he was. | 14:12:15 |
| 9 | Q  So you were going more to speak with him | 14:12:16 |
| 10 | after he had been released from jail; correct? | 14:12:19 |
| 11 | A  Correct. | 14:12:22 |
| 12 | Q  Why did you go to jail to meet him? | 14:12:22 |
| 13 | A  Because I knew if he got out he wouldn't | 14:12:28 |
| 14 | have been drinking.  He would have been sober and | 14:12:31 |
| 15 | would have been able to answer my questions without | 14:12:34 |
| 16 | having alcohol in his system. | 14:12:36 |
| 17 | Q  And had alcohol been an issue prior in | 14:12:38 |
| 18 | this case? | 14:12:42 |
| 19 | A  Yes. | 14:12:42 |
| 20 | Q  In what ways? | 14:12:43 |
| 21 | A  He was always drunk, always drinking. | 14:12:44 |
| 22 | Q  And you knew that as long as he was | 14:12:50 |
| 23 | drinking it would be hard to get a reliable | 14:12:52 |
| 24 | statement from him; correct? | 14:12:55 |

Transcript of Michael Cross
Conducted on October 16, 2020                    157

| | | |
|---|---|---|
| 1 | A  Correct. | 14:12:56 |
| 2 | Q  You knew if he was drinking it would be | 14:12:56 |
| 3 | hard to get a credible statement from him; correct? | 14:12:58 |
| 4 | MR. POLICK:  Objection -- | 14:13:01 |
| 5 | A  Correct. | 14:13:01 |
| 6 | MR. POLICK:  -- to the form. | 14:13:06 |
| 7 | You can answer. | 14:13:06 |
| 8 | Q  And you knew that if he was drinking you | 14:13:07 |
| 9 | couldn't polygraph him; correct? | 14:13:11 |
| 10 | A  Correct. | 14:13:13 |
| 11 | Q  And you knew that the only way to get him | 14:13:13 |
| 12 | to answer in a credible way would be to put him in | 14:13:22 |
| 13 | a situation where he wasn't drinking; correct? | 14:13:28 |
| 14 | MR. POLICK:  Objection to the form of the | 14:13:31 |
| 15 | question. | 14:13:33 |
| 16 | You can answer. | 14:13:34 |
| 17 | A  I wouldn't be the one putting him in any | 14:13:35 |
| 18 | situation.  It's him putting himself in a | 14:13:39 |
| 19 | situation. | 14:13:42 |
| 20 | Q  Regardless, prior to Mr. Amor being taken | 14:13:43 |
| 21 | to a jail on an unrelated offense, there had been | 14:13:50 |
| 22 | several interactions with him you had had where he | 14:13:55 |
| 23 | had been drunk; correct? | 14:13:58 |
| 24 | A  Yes. | 14:13:59 |

Transcript of Michael Cross
Conducted on October 16, 2020                    158

| | | |
|---|---|---|
| 1 | Q  And because he had been drinking, you | 14:13:59 |
| 2 | hadn't been able to polygraph him; correct? | 14:14:02 |
| 3 | A  I think we tried to polygraph him once | 14:14:05 |
| 4 | when Mr. O'Brien said he couldn't -- it was | 14:14:10 |
| 5 | inconclusive because he had been drinking. | 14:14:14 |
| 6 | Q  Other than the polygraph being | 14:14:20 |
| 7 | inconclusive because he had been drinking, what | 14:14:24 |
| 8 | other ways were the investigation hindered by | 14:14:26 |
| 9 | Mr. Amor's drinking? | 14:14:30 |
| 10 | A  Could you rephrase -- restate that | 14:14:32 |
| 11 | again? | 14:14:35 |
| 12 | Q  What other -- what ways were -- in what | 14:14:35 |
| 13 | ways did Mr. Amor's drinking hinder the | 14:14:38 |
| 14 | investigation? | 14:14:45 |
| 15 | A  He wasn't able to clearly -- I believe | 14:14:51 |
| 16 | clearly understand everything that was going on. | 14:14:54 |
| 17 | Q  And what about your interactions with | 14:15:00 |
| 18 | Mr. Amor gave you that indication? | 14:15:04 |
| 19 | A  Just the way he acted, the way he responded. | 14:15:06 |
| 20 | Q  And what is the way he acted and responded? | 14:15:09 |
| 21 | A  That's the way he acted and responded, | 14:15:12 |
| 22 | that he didn't know what he was doing or saying or | 14:15:14 |
| 23 | didn't understand.  He was not clear -- clear- | 14:15:16 |
| 24 | headed or clear in what he was saying. | 14:15:20 |

Transcript of Michael Cross
Conducted on October 16, 2020                    159

| | | |
|---|---|---|
| 1 | Q  And how could you tell he wasn't clear- | 14:15:23 |
| 2 | headed? | 14:15:26 |
| 3 | A  From my experience. | 14:15:26 |
| 4 | Q  Were there physical symptoms or ways that | 14:15:27 |
| 5 | you could tell he wasn't clear-headed? | 14:15:32 |
| 6 | A  I can't respond to that.  I -- you know, | 14:15:35 |
| 7 | you're very unclear -- I don't get what you're | 14:15:40 |
| 8 | trying to get at. | 14:15:44 |
| 9 | Q  I just want to know, in what ways did you | 14:15:49 |
| 10 | come to the conclusion he wasn't clear-headed? | 14:15:51 |
| 11 | A  From my experience, from watching him, and | 14:15:55 |
| 12 | from knowing other people who had been -- viewing | 14:15:58 |
| 13 | other people who had been intoxicated. | 14:16:01 |
| 14 | Q  And what were the physical signs that | 14:16:04 |
| 15 | Mr. Amor was intoxicated? | 14:16:06 |
| 16 | A  Slurred speech, glassy eyes, flushed | 14:16:10 |
| 17 | appearance. | 14:16:16 |
| 18 | Q  When you talked to Mr. Amor when he was | 14:16:16 |
| 19 | intoxicated, what was his demeanor like? | 14:16:20 |
| 20 | A  Calm and relaxed like always. | 14:16:23 |
| 21 | Q  Did Mr. Amor refuse to answer questions | 14:16:27 |
| 22 | when he had been drinking? | 14:16:55 |
| 23 | A  No. | 14:16:56 |
| 24 | Q  Did Mr. Amor refuse to cooperate when he | 14:16:57 |

| | | |
|---|---|---|
| 1 | had been drinking? | 14:17:02 |
| 2 | A  No. | 14:17:03 |
| 3 | Q  Was Mr. Amor cooperative when he had been | 14:17:03 |
| 4 | drinking? | 14:17:06 |
| 5 | A  Yes. | 14:17:06 |
| 6 | Q  Did he answer your questions when he had | 14:17:06 |
| 7 | been drinking? | 14:17:08 |
| 8 | A  Yes. | 14:17:09 |
| 9 | Q  And did those answers contradict what you | 14:17:10 |
| 10 | had up to the point he went to jail heard from | 14:17:19 |
| 11 | Tina Miceli? | 14:17:24 |
| 12 | MR. POLICK:  Objection to the form of the | 14:17:26 |
| 13 | question. | 14:17:28 |
| 14 | But you may answer. | 14:17:29 |
| 15 | A  I don't -- I don't recall that. | 14:17:30 |
| 16 | Q  Did Tina and Bill have different accounts | 14:17:32 |
| 17 | of what occurred on September 10th, 1995, prior to | 14:17:35 |
| 18 | Bill going to jail? | 14:17:39 |
| 19 | MR. POLICK:  Objection to the form of the | 14:17:40 |
| 20 | question. | 14:17:42 |
| 21 | But you can answer. | 14:17:43 |
| 22 | A  I don't recall. | 14:17:45 |
| 23 | Q  You don't recall or you don't know one way | 14:17:49 |
| 24 | or another? | 14:17:52 |

Transcript of Michael Cross
Conducted on October 16, 2020                                        161

| | | |
|---|---|---|
| 1 | A  I don't recall. | 14:17:52 |
| 2 | Q  Is it possible that they had the -- | 14:17:53 |
| 3 | strike that. | 14:17:58 |
| 4 | Is it possible that they had extremely | 14:17:58 |
| 5 | similar versions of events prior to Bill going | 14:18:01 |
| 6 | to jail? | 14:18:07 |
| 7 | MR. POLICK:  Objection to the form of the | 14:18:07 |
| 8 | question. | 14:18:09 |
| 9 | You may answer. | 14:18:10 |
| 10 | A  I don't recall. | 14:18:14 |
| 11 | Q  But it's not impossible that prior to Bill | 14:18:15 |
| 12 | going to jail they had given the same or | 14:18:20 |
| 13 | substantially similar versions of events to the | 14:18:25 |
| 14 | police when they had been questioned; correct? | 14:18:29 |
| 15 | MR. POLICK:  Objection to the form; calls | 14:18:31 |
| 16 | for speculation. | 14:18:38 |
| 17 | But go ahead and answer. | 14:18:38 |
| 18 | A  It's possible. | 14:18:46 |
| 19 | Q  When you went to the jail to meet Bill, | 14:18:53 |
| 20 | what time of day was it? | 14:18:58 |
| 21 | A  DeKalb? | 14:18:59 |
| 22 | Q  What time of day was it? | 14:19:03 |
| 23 | A  In DeKalb? | 14:19:04 |
| 24 | Q  Yes. | 14:19:06 |

Transcript of Michael Cross
Conducted on October 16, 2020                                    162

1    A  In the afternoon about 2:00 or so.                    14:19:06

2    Q  And prior to leaving DeKalb, had Mr. Amor             14:19:09

3  been in court?                                             14:19:16

4    A  Yes.                                                  14:19:17

5    Q  Was it an early morning call?                         14:19:18

6    A  Don't know.                                           14:19:21

7    Q  Did you speak to -- you had spoken to                 14:19:22

8  someone prior to picking up Mr. Amor in DeKalb;            14:19:31

9  correct?                                                   14:19:37

10   A  Yes.                                                  14:19:37

11   Q  And who was that?                                     14:19:38

12   A  I don't recall.                                       14:19:39

13   Q  And they didn't tell you one way or another           14:19:39

14 what time his court date was at?                           14:19:42

15   A  I don't recall.                                       14:19:44

16   Q  But he was released from jail on that day;            14:19:45

17 correct?                                                   14:19:49

18   A  Yes.                                                  14:19:49

19   Q  And when someone is released from jail,               14:19:50

20 there's some time where they have to be processed          14:19:53

21 through; correct?                                          14:19:55

22   A  Yes.                                                  14:19:56

23   Q  So it's safe to say that prior to meeting             14:19:56

24 you he had had to spend some time being processed          14:20:01

| | | |
|---|---|---|
| 1 | out of jail? | 14:20:10 |
| 2 | A  Yes. | 14:20:11 |
| 3 | MR. POLICK:  Objection; calls for | 14:20:11 |
| 4 | speculation.  Answer can stand. | 14:20:14 |
| 5 | Q  And who did you go to meet Mr. Amor with? | 14:20:21 |
| 6 | A  Detective Guerrieri. | 14:20:25 |
| 7 | Q  And you said you had gone to meet him at | 14:20:28 |
| 8 | the jailhouse because you knew he'd be sober, but | 14:20:35 |
| 9 | did you have any other reason for meeting him | 14:20:39 |
| 10 | that day? | 14:20:40 |
| 11 | A  To talk to him when sober. | 14:20:42 |
| 12 | Q  And where had you planned on talking to him? | 14:20:49 |
| 13 | A  At John Reid & Associates. | 14:20:52 |
| 14 | Q  Whose idea was it to go to John Reid & | 14:20:53 |
| 15 | Associates? | 14:20:57 |
| 16 | A  I believe it was mine. | 14:20:57 |
| 17 | Q  And why did you want to go to John Reid & | 14:20:58 |
| 18 | Associates? | 14:21:02 |
| 19 | A  Because they were very good at their job. | 14:21:02 |
| 20 | They were very good interviewers.  They were the | 14:21:06 |
| 21 | best in the business as far as polygraph examiners | 14:21:11 |
| 22 | are -- | 14:21:15 |
| 23 | Q  When you -- | 14:21:15 |
| 24 | A  -- in our area anyway. | 14:21:16 |

Transcript of Michael Cross
Conducted on October 16, 2020                              164

1        Q   Sorry.  I didn't mean to interrupt.          14:21:17

2        A   In our area.                                 14:21:19

3        Q   And you had used a polygraph examiner for    14:21:20

4    Tina earlier, correct, in the investigation?         14:21:23

5        A   Yes.                                         14:21:25

6        Q   Did you have reason to doubt their ability   14:21:26

7    to conduct a proper polygraph examination?           14:21:33

8        A   No.                                          14:21:35

9        Q   And John Reid & Associates was at least an   14:21:35

10   hour away from DeKalb; correct?                       14:21:39

11       A   About an hour and a half.                    14:21:42

12       Q   And at least an hour away from Naperville;   14:21:43

13   correct?                                              14:21:46

14       A   Yes.                                         14:21:46

15       Q   Why did you decide not to use the polygraph  14:21:47

16   examiner that you could use in Naperville and         14:21:51

17   instead go an hour and a half into the city to use    14:21:53

18   John Reid & Associates?                               14:21:57

19       A   Because, like I said before, they're the     14:21:58

20   best; they're well known for their abilities.         14:22:00

21   They train other polygraphers in the job.             14:22:05

22       Q   And you didn't feel that going to the        14:22:09

23   polygrapher you had already used would give you a     14:22:14

24   reliable read on Mr. Amor?                            14:22:18

Transcript of Michael Cross
Conducted on October 16, 2020                    165

| 1 | MR. POLICK: Objection to the form. | 14:22:19 |

1       MR. POLICK:  Objection to the form.       14:22:19

2       But you may answer.                        14:22:23

3    A  I believed they were the best in the      14:22:25

4  business, and I wanted him to be interviewed and  14:22:29

5  polygraphed by the best.                         14:22:31

6    Q  Why didn't you have Tina interviewed and  14:22:33

7  polygraphed by the best?                         14:22:37

8    A  By that time I didn't believe she was a   14:22:38

9  suspect.                                         14:22:41

10   Q  Why?                                       14:22:41

11   A  Just through the investigation.           14:22:41

12   Q  What about the investigation led you to   14:22:43

13  believe she wasn't a suspect?                   14:22:46

14   A  Just the way things were moving along.    14:22:47

15   Q  And how were things moving along?         14:22:52

16   A  They were just moving along.              14:22:55

17   Q  What specific evidence had you gathered   14:22:57

18  that led you to believe Tina was not a suspect at  14:22:59

19  that point?                                     14:23:04

20   A  I don't recall.                           14:23:04

21   Q  And at that point you didn't have a cause  14:23:08

22  as to the fire; correct?                        14:23:11

23   A  I don't believe so.                       14:23:13

24   Q  And if you didn't have a cause as to the  14:23:15

Transcript of Michael Cross
Conducted on October 16, 2020                          166

```
 1  fire, then you didn't know how the fire started;       14:23:24
 2  correct?                                               14:23:26
 3      A  Well, we had only speculated how it had         14:23:27
 4  started.                                               14:23:30
 5      Q  What was the speculation?                       14:23:31
 6      A  Speculation that there was some sort of a       14:23:32
 7  flammable liquid used, and it was lit by an open       14:23:38
 8  flame.                                                 14:23:43
 9      Q  And what had you done to eliminate the          14:23:43
10  possibility that Tina had used flammable liquid        14:23:47
11  and lit it with a flame?                               14:23:51
12      MR. POLICK:  Objection to the form of the          14:23:54
13  question.                                              14:23:56
14      A  Originally, we did suspect Tina as a            14:23:57
15  possibility because she was the one who said and       14:24:00
16  Bill said she was the last one out of the              14:24:03
17  apartment about a minute after he left.  So            14:24:05
18  originally, we thought she could have been involved.   14:24:10
19      Q  And at what point did you believe that she      14:24:12
20  wasn't involved anymore?                               14:24:15
21      A  At some point during the investigation she      14:24:16
22  took a polygraph, she passed.  She didn't seem to      14:24:20
23  be smart enough to be able to successfully do          14:24:25
24  that.  Plus, it was her mother who died.               14:24:30
```

Transcript of Michael Cross
Conducted on October 16, 2020                    167

1     Q   And you had come to the determination that        14:24:33

2   whoever set the fire did so on purpose?                 14:24:37

3     A   Yes.                                              14:24:39

4     Q   And out of malice?                                14:24:40

5     A   Yes.                                              14:24:42

6     Q   And what evidence led you to believe that         14:24:43

7   the person who had started the fire did so on           14:24:48

8   purpose and out of malice?                              14:24:53

9     A   Because they used a flammable liquid; they        14:24:54

10  knew that the mother-in-law was in the apartment,       14:24:57

11  in the bedroom; they didn't do anything to stop         14:24:59

12  the fire and left the scene with knowing that a         14:25:03

13  fire was going to start.                                14:25:07

14    Q   So they left the scene.  You said they            14:25:10

15  didn't do anything to stop the fire; correct?           14:25:13

16    A   That's one of them.                               14:25:15

17    Q   And they left the scene knowing a fire            14:25:16

18  would start; correct?                                   14:25:19

19    A   That's what he said, Amor.                        14:25:20

20    Q   This is what Mr. Amor says later.  I'm            14:25:23

21  talking about before you -- Mr. Amor confesses.         14:25:27

22    A   It's a part of the investigation, and you         14:25:30

23  can determine or at least partially determine or        14:25:38

24  build an idea of what occurred in your own mind or      14:25:41

Transcript of Michael Cross
Conducted on October 16, 2020                    168

| | | |
|---|---|---|
| 1 | in the group -- in the team's mind what occurred. | 14:25:44 |
| 2 | Q  So prior to Mr. Amor's confession, you had | 14:25:49 |
| 3 | determined that Tina wasn't a suspect? | 14:25:53 |
| 4 | A  Pretty much, yes. | 14:25:57 |
| 5 | Q  Pretty much, yes.  And part of your reason | 14:25:58 |
| 6 | for determining that is because you determined the | 14:26:01 |
| 7 | fire was started on purpose; correct? | 14:26:09 |
| 8 | A  Yes. | 14:26:11 |
| 9 | Q  And part of the reason for determining | 14:26:11 |
| 10 | that is because you suspected the fire had been | 14:26:13 |
| 11 | started intentionally; correct? | 14:26:15 |
| 12 | A  Yes. | 14:26:18 |
| 13 | Q  And you had determined the fire had been | 14:26:18 |
| 14 | started with malice; correct? | 14:26:21 |
| 15 | A  Yes. | 14:26:23 |
| 16 | Q  And you eliminated Tina because you didn't | 14:26:24 |
| 17 | feel that she had started it on fire or had | 14:26:29 |
| 18 | malice; correct? | 14:26:33 |
| 19 | A  Correct. | 14:26:33 |
| 20 | Q  Had you -- other than the polygraph | 14:26:34 |
| 21 | examination, did you take any other steps to | 14:26:36 |
| 22 | determine whether or not Tina could have been the | 14:26:43 |
| 23 | person who started the fire? | 14:26:48 |
| 24 | A  Our interviews of her. | 14:26:49 |

Transcript of Michael Cross
Conducted on October 16, 2020                    169

| | | |
|---|---|---|
| 1 | Q  Did you take a sample of Ms. Miceli's | 14:26:51 |
| 2 | clothing from the night of the fire to test it for | 14:26:57 |
| 3 | accelerants? | 14:26:59 |
| 4 | A  I don't believe so. | 14:27:00 |
| 5 | Q  Did you take a sample from Tina's shoes on | 14:27:01 |
| 6 | the night of the fire and test it for accelerants? | 14:27:07 |
| 7 | A  No. | 14:27:09 |
| 8 | Q  But you did take Mr. Amor's shoes and a | 14:27:09 |
| 9 | sample of his clothing on September 11th, 1995, to | 14:27:15 |
| 10 | test for accelerants; correct? | 14:27:19 |
| 11 | A  We took his shoes. | 14:27:21 |
| 12 | Q  Took his shoes.  And you did test them for | 14:27:22 |
| 13 | accelerants; correct? | 14:27:26 |
| 14 | A  I didn't. | 14:27:27 |
| 15 | Q  They were tested for accelerants; correct? | 14:27:27 |
| 16 | A  I believe so. | 14:27:29 |
| 17 | Q  And there were no accelerants found on his | 14:27:30 |
| 18 | shoes; correct? | 14:27:34 |
| 19 | A  That's correct. | 14:27:34 |
| 20 | Q  And you hadn't taken the step to test | 14:27:36 |
| 21 | Ms. Miceli's shoes for accelerant; correct? | 14:27:42 |
| 22 | A  Correct. | 14:27:44 |
| 23 | Q  And was Tina -- was Bill still a suspect | 14:27:45 |
| 24 | prior to your interview of him on October 3rd on | 14:28:05 |

Transcript of Michael Cross
Conducted on October 16, 2020                    170

| # | | Time |
|---|---|---|
| 1 | October 4th? | 14:28:09 |
| 2 | A  Yes. | 14:28:10 |
| 3 | Q  But Tina wasn't? | 14:28:11 |
| 4 | A  No. | 14:28:12 |
| 5 | Q  Even though Bill's shoes had been tested | 14:28:12 |
| 6 | for accelerant, and they found none of it, and | 14:28:17 |
| 7 | Tina's shoes hadn't been tested at all? | 14:28:20 |
| 8 | A  Correct. | 14:28:23 |
| 9 | Q  And you went into the meeting with him on | 14:28:27 |
| 10 | October 3rd with the belief that he was a suspect | 14:28:34 |
| 11 | in the fire; correct? | 14:28:39 |
| 12 | A  Yes. | 14:28:42 |
| 13 | MR. POLICK:  Objection to the form. | 14:28:43 |
| 14 | Q  Did you have any suspects? | 14:28:45 |
| 15 | A  No. | 14:28:47 |
| 16 | Q  And you believed it had been intentionally | 14:28:49 |
| 17 | set? | 14:28:56 |
| 18 | A  Yes. | 14:28:56 |
| 19 | Q  You didn't believe there was potential for | 14:28:57 |
| 20 | it to be an accidental fire? | 14:28:59 |
| 21 | A  No. | 14:29:00 |
| 22 | Q  And why did you believe it was intentionally | 14:29:10 |
| 23 | set at that point? | 14:29:12 |
| 24 | A  I believe I already answered that question, | 14:29:13 |

Transcript of Michael Cross
Conducted on October 16, 2020                        171

| | | |
|---|---|---|
| 1 | but because of the spill pattern, the pour pattern, | 14:29:19 |
| 2 | the fact that there hadn't been any gas cause or | 14:29:36 |
| 3 | electric cause or anything else.  We ruled | 14:29:40 |
| 4 | everything else out. | 14:29:45 |
| 5 | Q  Ruled everything else out? | 14:29:47 |
| 6 | A  I believe so, yeah, between us and the | 14:29:49 |
| 7 | fire department. | 14:29:54 |
| 8 | Q  But to your recollection, the only test | 14:29:54 |
| 9 | the fire department did was on the VCR and the | 14:29:57 |
| 10 | videotapes; correct? | 14:30:01 |
| 11 | A  Well, they also checked to see if the gas | 14:30:02 |
| 12 | was on; they checked the electrical, the | 14:30:05 |
| 13 | electrical box. | 14:30:10 |
| 14 | Q  They didn't -- they didn't test whether | 14:30:11 |
| 15 | the other furniture in the apartment could have | 14:30:20 |
| 16 | caused the fire if a cigarette had landed on it; | 14:30:22 |
| 17 | correct? | 14:30:27 |
| 18 | A  Say that again. | 14:30:28 |
| 19 | Q  They didn't test whether or not the other | 14:30:29 |
| 20 | furniture in the apartment could have caused the | 14:30:31 |
| 21 | fire? | 14:30:33 |
| 22 | A  There's no such thing as spontaneous | 14:30:34 |
| 23 | combustion.  Something didn't just all of a sudden | 14:30:39 |
| 24 | explode into fire. | 14:30:42 |

Transcript of Michael Cross
Conducted on October 16, 2020                                    172

| | | |
|---|---|---|
| 1 | Q  Well, there's testimony that Ms. Miceli | 14:30:43 |
| 2 | had misplaced her cigarette; correct? | 14:30:47 |
| 3 | A  Yes. | 14:30:50 |
| 4 | Q  And was there testing done to see whether | 14:30:50 |
| 5 | or not her misplaced cigarette on one of the | 14:30:53 |
| 6 | pieces of furniture in the living room could have | 14:30:56 |
| 7 | caused the fire? | 14:30:58 |
| 8 | MR. POLICK:  That's been asked and | 14:30:59 |
| 9 | answered. | 14:31:00 |
| 10 | But go ahead and answer it again. | 14:31:00 |
| 11 | A  I don't recall anything being -- of that | 14:31:02 |
| 12 | being done. | 14:31:05 |
| 13 | Q  So is it fair for you to then say that | 14:31:06 |
| 14 | everything had been done to rule out whether it | 14:31:09 |
| 15 | was an accidental cause? | 14:31:11 |
| 16 | A  Yes. | 14:31:12 |
| 17 | Q  When you met Bill on October 3rd, what was | 14:31:13 |
| 18 | his appearance like? | 14:31:18 |
| 19 | A  Same as always. | 14:31:19 |
| 20 | Q  What was -- what is "same as always"? | 14:31:22 |
| 21 | A  Talkative, carefree, using his arms to | 14:31:25 |
| 22 | talk, I don't know what you would call that.  But | 14:31:35 |
| 23 | hadn't changed much or at all. | 14:31:40 |
| 24 | Q  You said before that he was calm usually. | 14:31:43 |

Transcript of Michael Cross
Conducted on October 16, 2020                    173

| | | |
|---|---|---|
| 1 | A   He was never calm.  I never said that.  He | 14:31:46 |
| 2 | was always animated. | 14:31:51 |
| 3 | Q   You testified earlier in this deposition | 14:31:52 |
| 4 | that he was calm when you talked to him prior to | 14:31:55 |
| 5 | him going to jail.  So had something changed -- | 14:31:57 |
| 6 | A   I don't recall that. | 14:32:01 |
| 7 | Q   -- or is that testimony incorrect? | 14:32:02 |
| 8 | A   I'm sorry; I don't recall that testimony. | 14:32:08 |
| 9 | Q   His demeanor wasn't substantially | 14:32:10 |
| 10 | different prior to going to jail after he was | 14:32:16 |
| 11 | released from jail? | 14:32:21 |
| 12 | A   Correct. | 14:32:21 |
| 13 | Q   And Bill was wearing the same clothes that | 14:32:26 |
| 14 | he had been arrested in, correct, when you met him? | 14:32:31 |
| 15 | A   I don't recall. | 14:32:35 |
| 16 | Q   Okay.  Do you recall whether or not he was | 14:32:36 |
| 17 | wearing shorts or pants? | 14:32:39 |
| 18 | A   I don't recall. | 14:32:40 |
| 19 | Q   Do you recall whether or not he had a car | 14:32:42 |
| 20 | with him or not? | 14:32:44 |
| 21 | A   At what point? | 14:32:48 |
| 22 | Q   When you met him on October 3rd. | 14:32:49 |
| 23 | A   In DeKalb? | 14:32:52 |
| 24 | Q   Yes. | 14:32:53 |

Transcript of Michael Cross
Conducted on October 16, 2020                    174

| | | |
|---|---|---|
| 1 | A   He didn't have a car. | 14:32:54 |
| 2 | Q   And how do you know that? | 14:32:55 |
| 3 | A   He didn't have any way home.  He went with | 14:32:56 |
| 4 | us.  He never owned a car.  He didn't own a car at | 14:32:59 |
| 5 | that time. | 14:33:07 |
| 6 | Q   So without you being there, he wouldn't | 14:33:07 |
| 7 | have had a way home? | 14:33:09 |
| 8 | MR. POLICK:  Objection; calls for | 14:33:11 |
| 9 | speculation. | 14:33:12 |
| 10 | But you may answer. | 14:33:12 |
| 11 | A   I don't know who he could have called.  I | 14:33:16 |
| 12 | really don't. | 14:33:19 |
| 13 | Q   And there was nobody there to pick him up | 14:33:23 |
| 14 | when he was released? | 14:33:26 |
| 15 | MR. POLICK:  Again, calls for speculation. | 14:33:27 |
| 16 | But you may answer. | 14:33:28 |
| 17 | A   Not that I know of. | 14:33:30 |
| 18 | Q   Did you see anybody in the vicinity when | 14:33:32 |
| 19 | you went to pick him up who was there for Mr. Amor? | 14:33:34 |
| 20 | A   No. | 14:33:37 |
| 21 | Q   Do you recall what he had on him when he | 14:33:38 |
| 22 | was released from jail? | 14:33:45 |
| 23 | MR. POLICK:  Objection to the form of the | 14:33:46 |
| 24 | question. | 14:33:48 |

Transcript of Michael Cross
Conducted on October 16, 2020                    175

| | | |
|---|---|---|
| 1 | But go ahead and answer. | 14:33:48 |
| 2 | A  As far as clothing goes? | 14:33:50 |
| 3 | Q  Yes. | 14:33:52 |
| 4 | A  I don't recall. | 14:33:53 |
| 5 | Q  Do you recall what you said to Bill after | 14:33:55 |
| 6 | he was released when you first saw him? | 14:34:07 |
| 7 | A  Not exactly. | 14:34:10 |
| 8 | Q  Did you tell him he was going to get a | 14:34:13 |
| 9 | polygraph? | 14:34:18 |
| 10 | A  I asked him if he would go to take a | 14:34:18 |
| 11 | polygraph. | 14:34:21 |
| 12 | Q  Did you tell him how far away the | 14:34:24 |
| 13 | polygraph was? | 14:34:27 |
| 14 | A  I told him it was in Chicago. | 14:34:28 |
| 15 | Q  So he knew you were going into the city; | 14:34:30 |
| 16 | correct? | 14:34:34 |
| 17 | A  Yes. | 14:34:34 |
| 18 | Q  When you were meeting with Mr. Amor, you | 14:34:39 |
| 19 | were with Detective Guerrieri; correct? | 14:34:44 |
| 20 | A  Yes. | 14:34:45 |
| 21 | Q  Did either you or Detective Guerrieri tell | 14:34:47 |
| 22 | Mr. Amor it would be in his best interests to come | 14:34:50 |
| 23 | with you to be at the polygraph exam? | 14:34:52 |
| 24 | A  No. | 14:34:56 |

Transcript of Michael Cross
Conducted on October 16, 2020                                    176

| | | |
|---|---|---|
| 1 | Q  And do you recall that being a no, or do | 14:34:56 |
| 2 | you not know one way or another? | 14:34:59 |
| 3 | A  I recall it being a no. | 14:35:01 |
| 4 | Q  And when Mr. Amor talked with you about | 14:35:04 |
| 5 | the polygraph examination, what did he say in | 14:35:18 |
| 6 | response to you asking if he wanted to go? | 14:35:23 |
| 7 | A  He responded, "I want to get this over | 14:35:27 |
| 8 | with.  Let's go." | 14:35:31 |
| 9 | THE WITNESS:  Excuse me.  I'm going to | 14:35:45 |
| 10 | take this off for a little while. | 14:35:47 |
| 11 | MS. GARCIA:  Okay. | 14:35:50 |
| 12 | THE WITNESS:  Thank you. | 14:36:06 |
| 13 | Q  And this was the first time you had seen | 14:36:10 |
| 14 | Mr. Amor since he had been arrested; correct? | 14:36:14 |
| 15 | A  Yes. | 14:36:16 |
| 16 | Q  And you hadn't attempted to contact him | 14:36:17 |
| 17 | from between September 15th to October 3rd; | 14:36:20 |
| 18 | correct? | 14:36:23 |
| 19 | A  No. | 14:36:24 |
| 20 | Q  You didn't go visit him in jail? | 14:36:24 |
| 21 | A  No. | 14:36:26 |
| 22 | Q  Why not? | 14:36:27 |
| 23 | A  I was waiting until he got out. | 14:36:29 |
| 24 | Q  Why? | 14:36:33 |

Transcript of Michael Cross
Conducted on October 16, 2020                    177

| | | |
|---|---|---|
| 1 | A  Just was waiting. | 14:36:34 |
| 2 | Q  As a police officer, you could have gone | 14:36:37 |
| 3 | and visited him in jail; correct? | 14:36:39 |
| 4 | A  Yes. | 14:36:41 |
| 5 | Q  And he would have been sober in jail; | 14:36:42 |
| 6 | correct? | 14:36:44 |
| 7 | A  Yes. | 14:36:44 |
| 8 | Q  And at that point you had eliminated Tina | 14:36:45 |
| 9 | as a suspect; correct? | 14:36:50 |
| 10 | A  Yes. | 14:36:51 |
| 11 | Q  So why didn't you go ask him in jail -- | 14:36:51 |
| 12 | why didn't you go talk to him in jail about the | 14:36:54 |
| 13 | investigation? | 14:36:58 |
| 14 | A  I don't know. | 14:36:58 |
| 15 | Q  Was it because you wanted to take him to | 14:36:59 |
| 16 | John Reid & Associates? | 14:37:01 |
| 17 | A  That would be one of the reasons, yeah. | 14:37:02 |
| 18 | But I would have taken him there anyway if he | 14:37:05 |
| 19 | would have gone even if I would have talked to him | 14:37:08 |
| 20 | in jail. | 14:37:12 |
| 21 | Q  You didn't decide to talk to him in jail? | 14:37:13 |
| 22 | MR. POLICK:  Objection to the form; asked | 14:37:21 |
| 23 | and answered. | 14:37:24 |
| 24 | But go ahead. | 14:37:24 |

Transcript of Michael Cross
Conducted on October 16, 2020                    178

| | | |
|---|---|---|
| 1 | A  Will you repeat that, please? | 14:37:27 |
| 2 | Q  You didn't decide to visit him in jail | 14:37:28 |
| 3 | prior to October 3rd; correct? | 14:37:31 |
| 4 | MR. POLICK:  Object again; asked and | 14:37:33 |
| 5 | answered. | 14:37:33 |
| 6 | But go ahead and answer again. | 14:37:35 |
| 7 | A  I didn't decide to go speak to him in jail. | 14:37:35 |
| 8 | Q  You waited until you had plans to take him | 14:37:35 |
| 9 | to John Reid & Associates? | 14:37:37 |
| 10 | A  Yeah, but I could have done that at any | 14:37:42 |
| 11 | point, at any given point. | 14:37:45 |
| 12 | Q  But you didn't? | 14:37:47 |
| 13 | A  I didn't.  You're right. | 14:37:48 |
| 14 | Q  Do you recall the trip to Reid & Associates? | 14:37:51 |
| 15 | A  Yes. | 14:37:59 |
| 16 | Q  Who was driving? | 14:38:00 |
| 17 | A  I believe Bob Guerrieri was driving. | 14:38:02 |
| 18 | Q  And was Bill handcuffed in the backseat? | 14:38:08 |
| 19 | A  No. | 14:38:12 |
| 20 | Q  But the doors were locked; right? | 14:38:14 |
| 21 | A  The doors had automatic locks.  As soon as | 14:38:17 |
| 22 | you put it in gear, they locked. | 14:38:21 |
| 23 | Q  Is that true of all cars you had access to | 14:38:24 |
| 24 | at Naperville Police Department? | 14:38:27 |

Transcript of Michael Cross
Conducted on October 16, 2020                                    179

| | | |
|---|---|---|
| 1 | A  Anyone, yes. | 14:38:28 |
| 2 | Q  Did you talk about anything with Mr. Amor | 14:38:31 |
| 3 | when you went to John Reid & Associates? | 14:38:37 |
| 4 | A  Along the way, no.  Might have been some | 14:38:40 |
| 5 | small talk, but I don't recall what it was. | 14:38:44 |
| 6 | Q  And what was his demeanor on the way to | 14:38:46 |
| 7 | John Reid & Associates? | 14:38:48 |
| 8 | A  As always, quiet, somewhat animated. | 14:38:50 |
| 9 | Q  Earlier -- sorry. | 14:38:53 |
| 10 | A  Go ahead. | 14:38:56 |
| 11 | Q  Earlier you testified that he was | 14:38:57 |
| 12 | talkative? | 14:38:59 |
| 13 | A  He was always talkative.  I said that a | 14:38:59 |
| 14 | number of times. | 14:39:03 |
| 15 | Q  Is it possible for people to be both | 14:39:03 |
| 16 | talkative and quiet? | 14:39:08 |
| 17 | A  Sure, talkative one minute and quiet the | 14:39:09 |
| 18 | next. | 14:39:14 |
| 19 | Q  And you say that other than small talk, | 14:39:16 |
| 20 | you didn't discuss anything; correct? | 14:39:18 |
| 21 | A  We didn't discuss the case. | 14:39:20 |
| 22 | Q  Why not?  You were planning on going to | 14:39:22 |
| 23 | Reid to interview him; right? | 14:39:24 |
| 24 | A  I'm not used to or it wasn't my practice | 14:39:26 |

Transcript of Michael Cross
Conducted on October 16, 2020                    180

| | | |
|---|---|---|
| 1 | to interview people in a squad car. | 14:39:30 |
| 2 | Q  You had learned new material since -- | 14:39:34 |
| 3 | there had been more developments in the case since | 14:39:37 |
| 4 | he went to jail; correct? | 14:39:40 |
| 5 | A  I'm not sure. | 14:39:42 |
| 6 | Q  But you didn't talk to him about any of | 14:39:43 |
| 7 | the new developments on the case? | 14:39:46 |
| 8 | A  No, I didn't. | 14:39:47 |
| 9 | Q  Was this your first time bringing a | 14:39:48 |
| 10 | witness to John Reid & Associates? | 14:39:51 |
| 11 | A  No. | 14:39:53 |
| 12 | Q  How many previous occasions have you | 14:39:53 |
| 13 | brought a witness to John Reid & Associates? | 14:39:57 |
| 14 | A  I can't give you a number. | 14:40:00 |
| 15 | Q  I mean, was it 100 times? | 14:40:03 |
| 16 | A  No. | 14:40:03 |
| 17 | Q  50 times? | 14:40:03 |
| 18 | A  No. | 14:40:03 |
| 19 | Q  20 times? | 14:40:04 |
| 20 | A  Around there maybe.  Maybe even less. | 14:40:07 |
| 21 | Q  One of the polygraph examiners was Michael | 14:40:12 |
| 22 | Masokas; correct? | 14:40:17 |
| 23 | A  Yes. | 14:40:19 |
| 24 | Q  Did you know Mr. Masokas prior to meeting | 14:40:19 |

Transcript of Michael Cross
Conducted on October 16, 2020                          181

| | | |
|---|---|---|
| 1 | him at John Reid & Associates? | 14:40:23 |
| 2 | A  No. | 14:40:25 |
| 3 | Q  And another was Arthur Newey; correct? | 14:40:26 |
| 4 | A  Yes. | 14:40:30 |
| 5 | Q  Had you met or did you know Mr. Newey prior | 14:40:30 |
| 6 | to meeting him at John Reid & Associates on | 14:40:37 |
| 7 | October 3rd? | 14:40:42 |
| 8 | A  No. | 14:40:42 |
| 9 | Q  When did you arrive at John Reid & | 14:40:43 |
| 10 | Associates? | 14:40:48 |
| 11 | A  I think it was about 4:00 in the afternoon. | 14:40:48 |
| 12 | Q  Okay.  When you go to Reid -- strike that. | 14:40:52 |
| 13 | When you got to the offices, how did you | 14:40:58 |
| 14 | get into the building? | 14:41:00 |
| 15 | A  We walked. | 14:41:03 |
| 16 | Q  And what was the layout of John Reid & | 14:41:05 |
| 17 | Associates? | 14:41:11 |
| 18 | A  I don't -- the actual floor that it was on | 14:41:11 |
| 19 | was the 12th floor.  When you walk in, there's a | 14:41:14 |
| 20 | large lobby, and then there's rooms off that lobby. | 14:41:17 |
| 21 | Q  What are the ways that you can enter and | 14:41:21 |
| 22 | exit the 12th floor? | 14:41:26 |
| 23 | A  Well, there's stairs and there's an | 14:41:28 |
| 24 | elevator and doors. | 14:41:32 |

Transcript of Michael Cross
Conducted on October 16, 2020                    182

| | | |
|---|---|---|
| 1 | Q  Other than the -- how many staircases are | 14:41:35 |
| 2 | there on the 12th floor? | 14:41:41 |
| 3 | A  You mean going up to the 12th floor? | 14:41:44 |
| 4 | Q  Entering or exiting the 12th floor? | 14:41:47 |
| 5 | A  I don't understand your question.  There's | 14:41:51 |
| 6 | a staircase that goes from the ground all the way | 14:41:53 |
| 7 | up.  One as far as I know. | 14:41:56 |
| 8 | Q  Okay.  You said you had brought 20 or so | 14:42:01 |
| 9 | people to John Reid & Associates before? | 14:42:04 |
| 10 | A  Yeah. | 14:42:07 |
| 11 | Q  And had you always brought them to the | 14:42:08 |
| 12 | Chicago office? | 14:42:09 |
| 13 | A  Yes. | 14:42:10 |
| 14 | Q  And so if you wanted to exit the 12th floor | 14:42:15 |
| 15 | once you got to the 12th floor, the only way you | 14:42:19 |
| 16 | could exit would be taking the stairs or taking an | 14:42:22 |
| 17 | elevator; correct? | 14:42:26 |
| 18 | A  Yes. | 14:42:27 |
| 19 | Q  And where were the stairs located relative | 14:42:28 |
| 20 | to the elevator? | 14:42:31 |
| 21 | A  I don't recall. | 14:42:34 |
| 22 | Q  On the 12th floor were there other | 14:42:34 |
| 23 | businesses besides John Reid & Associates? | 14:42:38 |
| 24 | A  I don't believe so. | 14:42:41 |

Transcript of Michael Cross
Conducted on October 16, 2020                    183

| | | |
|---|---|---|
| 1 | Q  And when you enter the Reid & Associates | 14:42:43 |
| 2 | offices from the lobby, what is the layout of the | 14:42:53 |
| 3 | offices themselves? | 14:42:57 |
| 4 | A  Like I said, there's a larger lobby and | 14:42:58 |
| 5 | then there's offices off of that, and I -- we only | 14:43:01 |
| 6 | were in one, so I can only talk to the one.  There | 14:43:06 |
| 7 | would be a table and chairs and lighting. | 14:43:12 |
| 8 | Q  Are you describing the lobby, or are you | 14:43:15 |
| 9 | describing the actual office? | 14:43:18 |
| 10 | A  You asked about the office. | 14:43:20 |
| 11 | Q  Yes. | 14:43:22 |
| 12 | A  So I'm answering you about the office. | 14:43:22 |
| 13 | Q  And were there interview rooms that were | 14:43:26 |
| 14 | separate from the office or that were off the | 14:43:30 |
| 15 | office? | 14:43:32 |
| 16 | A  Off the office, yes. | 14:43:32 |
| 17 | Q  And how would you enter and exit the | 14:43:34 |
| 18 | interview rooms? | 14:43:43 |
| 19 | A  Through a door. | 14:43:43 |
| 20 | Q  Was there only one door you could enter | 14:43:44 |
| 21 | and exit? | 14:43:48 |
| 22 | A  I believe so. | 14:43:48 |
| 23 | Q  And were those doors locked? | 14:43:49 |
| 24 | A  I don't believe so. | 14:43:52 |

Transcript of Michael Cross
Conducted on October 16, 2020                    184

| | | |
|---|---|---|
| 1 | Q  Do you have any reason to -- strike that. | 14:43:53 |
| 2 | What is the reason for your belief that | 14:44:01 |
| 3 | they weren't locked? | 14:44:03 |
| 4 | MR. POLICK:  Objection to the form. | 14:44:04 |
| 5 | But go ahead. | 14:44:07 |
| 6 | A  I walked in and walked out without going | 14:44:10 |
| 7 | through a lock. | 14:44:13 |
| 8 | Q  So you had walked into the interview rooms? | 14:44:14 |
| 9 | A  Yes. | 14:44:17 |
| 10 | Q  When? | 14:44:17 |
| 11 | A  Prior to Amor being interviewed and on | 14:44:19 |
| 12 | other occasions when I've gone down there. | 14:44:23 |
| 13 | Q  When you arrived at Reid with Mr. Amor, | 14:44:28 |
| 14 | what was the intake process? | 14:44:31 |
| 15 | A  There was no intake process. | 14:44:33 |
| 16 | Q  Was there anybody you met when you got | 14:44:36 |
| 17 | there? | 14:44:39 |
| 18 | A  I met with the examiners. | 14:44:40 |
| 19 | Q  Was there any receptionist? | 14:44:42 |
| 20 | A  Not that I recall. | 14:44:44 |
| 21 | Q  And after you arrived at Reid but prior to | 14:44:46 |
| 22 | Bill being polygraphed, did you speak to | 14:45:01 |
| 23 | Mr. Masokas? | 14:45:10 |
| 24 | A  Yes. | 14:45:11 |

Transcript of Michael Cross
Conducted on October 16, 2020                    185

| | | |
|---|---|---|
| 1 | Q  What did you speak to him about? | 14:45:11 |
| 2 | A  Giving the general overview of the case. | 14:45:13 |
| 3 | Q  What facts did you tell him? | 14:45:16 |
| 4 | A  That we had a fire, that we ruled pretty | 14:45:19 |
| 5 | much everything else out as to other than it was | 14:45:23 |
| 6 | an arson fire and that we had developed Bill Amor | 14:45:28 |
| 7 | as a suspect. | 14:45:33 |
| 8 | Q  Okay.  So did you tell him you wanted him | 14:45:36 |
| 9 | to ask questions that would determine whether or | 14:45:43 |
| 10 | not Bill Amor was the person who had set the fire? | 14:45:47 |
| 11 | A  That was up to them.  Their formatted | 14:45:47 |
| 12 | questions were totally up to them. | 14:45:51 |
| 13 | Q  You didn't tell them any questions you | 14:45:52 |
| 14 | wanted to be answered? | 14:45:54 |
| 15 | A  I might have had some questions, but I | 14:45:56 |
| 16 | don't know if I -- I don't remember if I told him | 14:45:59 |
| 17 | or not. | 14:46:03 |
| 18 | Q  So it's possible that you did tell | 14:46:03 |
| 19 | Mr. Masokas questions you wanted Bill Amor to be | 14:46:08 |
| 20 | polygraphed on? | 14:46:12 |
| 21 | A  I might have. | 14:46:13 |
| 22 | MR. POLICK:  Objection to the form of the | 14:46:14 |
| 23 | question; calls for speculation. | 14:46:17 |
| 24 | Go ahead. | 14:46:19 |

Transcript of Michael Cross
Conducted on October 16, 2020                    186

| | |
|---|---|
| 1 | Q  Did you tell Mr. Masokas that Bill had | 14:46:19 |
| 2 | been incarcerated hours prior to this polygraph | 14:46:22 |
| 3 | examination? | 14:46:25 |
| 4 | A  No. | 14:46:25 |
| 5 | Q  Did you tell Mr. Masokas that Bill had | 14:46:26 |
| 6 | issues with alcohol? | 14:46:29 |
| 7 | A  Yes. | 14:46:30 |
| 8 | Q  What did you tell him? | 14:46:31 |
| 9 | A  That he drank a lot and that when we | 14:46:35 |
| 10 | picked him up from the jail we were sure that he | 14:46:42 |
| 11 | wasn't drinking, and that's why we brought him | 14:46:45 |
| 12 | there, to be sober. | 14:46:48 |
| 13 | Q  Did you tell him that Mr. Amor was an | 14:46:51 |
| 14 | alcoholic? | 14:46:56 |
| 15 | A  No. | 14:46:56 |
| 16 | Q  Did you tell him the frequency with which | 14:46:57 |
| 17 | Mr. Amor had been drinking -- | 14:47:00 |
| 18 | A  No. | 14:47:02 |
| 19 | Q  -- during your interactions with him? | 14:47:02 |
| 20 | A  No. | 14:47:05 |
| 21 | Q  Where was Bill during your conversation | 14:47:05 |
| 22 | with Mr. Masokas? | 14:47:07 |
| 23 | A  In the lobby. | 14:47:09 |
| 24 | Q  Was he by himself? | 14:47:11 |

Transcript of Michael Cross
Conducted on October 16, 2020                    187

```
 1        A   Yes.                                     14:47:15

 2        Q   Where was Detective Guerrieri?          14:47:16

 3        A   He was with me.                         14:47:17

 4        Q   He wasn't with Mr. Amor?                14:47:18

 5        A   No, he had -- he had parked the car and 14:47:20

 6   then came up, but he was generally with me when he 14:47:22

 7   got to the office.                               14:47:25

 8        Q   Could you see Mr. Amor from where you were 14:47:26

 9   talking to Mr. Masokas?                          14:47:29

10        A   No.                                     14:47:30

11        Q   Where were you talking to Mr. Masokas?  14:47:30

12        A   In an office.                           14:47:32

13        Q   And after your conversation with        14:47:34

14   Mr. Masokas but before Bill took the polygraph,  14:47:42

15   Bill was interviewed by Mr. Masokas; correct?    14:47:47

16        A   Yes.                                    14:47:52

17        Q   Did Mr. Masokas tell you that the       14:47:53

18   prepolygraph interview had finished prior to     14:47:58

19   giving Bill the polygraph?                       14:48:02

20        MR. POLICK:   Objection to the form of the  14:48:05

21   question.                                        14:48:09

22        But you can answer.                         14:48:11

23        A   Yeah, please repeat that.               14:48:12

24        Q   Prior to Mr. Masokas starting the polygraph 14:48:13
```

| | | |
|---|---|---|
| 1 | examination, did Mr. Masokas tell you that he was | 14:48:16 |
| 2 | finished with the interview and the polygraph was | 14:48:18 |
| 3 | going to start? | 14:48:21 |
| 4 | A  I believe he told us that they were going | 14:48:22 |
| 5 | to do the polygraph. | 14:48:24 |
| 6 | Q  And where did the prepolygraph interview | 14:48:26 |
| 7 | take place? | 14:48:34 |
| 8 | A  Of Mr. Amor? | 14:48:36 |
| 9 | Q  Yes. | 14:48:38 |
| 10 | A  I believe it was in an office at Reid. | 14:48:38 |
| 11 | Q  Okay. | 14:48:45 |
| 12 | A  Or an interview room. | 14:48:46 |
| 13 | Q  And where were you when the preinterview -- | 14:48:48 |
| 14 | the prepolygraph interview was taking place? | 14:48:52 |
| 15 | A  In the lobby. | 14:48:55 |
| 16 | Q  And how long in total did the polygraph | 14:48:57 |
| 17 | take of Mr. Amor? | 14:49:09 |
| 18 | A  I don't recall. | 14:49:10 |
| 19 | Q  Do you recall how many times Mr. Amor was | 14:49:12 |
| 20 | polygraphed? | 14:49:22 |
| 21 | A  Well, he was polygraphed once at the | 14:49:23 |
| 22 | Naperville Police Department -- or he wasn't | 14:49:33 |
| 23 | because he was intoxicated, and one time at Reid | 14:49:36 |
| 24 | as far as I can remember.  Or he was interviewed | 14:49:39 |

Transcript of Michael Cross
Conducted on October 16, 2020                          189

| | | |
|---|---|---|
| 1 | and he was polygraphed at the police department, | 14:49:46 |
| 2 | but it came back inconclusive because he was | 14:49:50 |
| 3 | intoxicated. | 14:49:54 |
| 4 | Q  Sure.  But at Reid you can only recall him | 14:49:55 |
| 5 | being polygraphed once? | 14:49:58 |
| 6 | A  Yes. | 14:49:59 |
| 7 | Q  If I represent to you that there's | 14:50:00 |
| 8 | testimony in the case that Mr. Amor was | 14:50:02 |
| 9 | polygraphed twice at Reid, would you have reason | 14:50:06 |
| 10 | to dispute that? | 14:50:08 |
| 11 | MR. POLICK:  Objection; calls for | 14:50:09 |
| 12 | speculation, no foundation. | 14:50:12 |
| 13 | You may answer over the objection. | 14:50:14 |
| 14 | A  I wouldn't believe you're telling me a lie. | 14:50:17 |
| 15 | Q  So you wouldn't have reason to dispute | 14:50:20 |
| 16 | testimony that Mr. Amor had been polygraphed twice | 14:50:22 |
| 17 | while at Reid & Associates? | 14:50:27 |
| 18 | MR. POLICK:  Same objection; no | 14:50:28 |
| 19 | foundation, calls for speculation. | 14:50:28 |
| 20 | You may answer. | 14:50:29 |
| 21 | A  I don't recall. | 14:50:31 |
| 22 | Q  I mean, it's not a "I don't recall"; it's | 14:50:32 |
| 23 | a yes-or-no question.  Do you dispute it or not? | 14:50:35 |
| 24 | A  I believe -- say the -- I'm sorry; ask me | 14:50:37 |

Transcript of Michael Cross
Conducted on October 16, 2020                           190

| | | |
|---|---|---|
| 1 | again, please. | 14:50:40 |
| 2 | MS. GARCIA:  Yes.  And the objections can | 14:50:41 |
| 3 | stand, Joe. | 14:50:44 |
| 4 | Q  Do you dispute that -- strike that. | 14:50:47 |
| 5 | If there's testimony in the case, which | 14:50:52 |
| 6 | I'm representing there is, that Mr. Amor was | 14:50:55 |
| 7 | polygraphed twice at the Reid & Associates office, | 14:50:58 |
| 8 | would you have reason to dispute that? | 14:51:04 |
| 9 | A  No, I wouldn't. | 14:51:06 |
| 10 | MR. POLICK:  Same objections. | 14:51:06 |
| 11 | Q  No, you wouldn't? | 14:51:09 |
| 12 | A  No, I wouldn't. | 14:51:10 |
| 13 | Q  But you only recall him being polygraphed | 14:51:11 |
| 14 | once? | 14:51:14 |
| 15 | A  Yes. | 14:51:15 |
| 16 | MR. POLICK:  Objection -- | 14:51:15 |
| 17 | Q  And you don't recall? | 14:51:15 |
| 18 | MR. POLICK:  -- asked and answered. | 14:51:17 |
| 19 | Q  You don't recall Mr. Masokas coming out to | 14:51:18 |
| 20 | tell you he, Mr. Amor had failed the first | 14:51:21 |
| 21 | polygraph so he was going to be polygraphed again? | 14:51:24 |
| 22 | A  No. | 14:51:27 |
| 23 | Q  And so you arrived around 4:00 at Reid & | 14:51:38 |
| 24 | Associates; right? | 14:51:42 |

Transcript of Michael Cross
Conducted on October 16, 2020                    191

| | | |
|---|---|---|
| 1 | A  Yes. | 14:51:42 |
| 2 | Q  How long did you talk to Mr. Masokas prior | 14:51:43 |
| 3 | to Bill being polygraphed? | 14:51:49 |
| 4 | A  I think it was less -- a little less than | 14:51:52 |
| 5 | an hour. | 14:51:55 |
| 6 | Q  Okay.  So you talked to Mr. Masokas for an | 14:51:56 |
| 7 | hour about the case prior to the polygraph? | 14:51:59 |
| 8 | A  Approximately. | 14:52:02 |
| 9 | Q  Okay.  And so then Bill was -- and you | 14:52:04 |
| 10 | were talking to him in one of the interview rooms? | 14:52:08 |
| 11 | A  I believe it was in an office. | 14:52:11 |
| 12 | Q  Okay.  Where was the office located? | 14:52:14 |
| 13 | A  Reid & Associates. | 14:52:22 |
| 14 | Q  Was it located in the lobby, or was it | 14:52:23 |
| 15 | located -- | 14:52:26 |
| 16 | A  It's been too long.  I don't recall. | 14:52:26 |
| 17 | MR. POLICK:  Object to the form, as well. | 14:52:28 |
| 18 | Q  Where -- how did you -- how would you get | 14:52:32 |
| 19 | into one of the interview rooms at Reid & | 14:52:35 |
| 20 | Associates? | 14:52:38 |
| 21 | A  Through a door. | 14:52:38 |
| 22 | Q  Was there a hallway? | 14:52:39 |
| 23 | A  I don't recall. | 14:52:44 |
| 24 | Q  And you weren't talking to Mr. Masokas in | 14:52:47 |

Transcript of Michael Cross
Conducted on October 16, 2020                                    192

| | | |
|---|---|---|
| 1 | the lobby; correct? | 14:52:53 |
| 2 | A  Correct. | 14:52:55 |
| 3 | Q  And while you were talking to Mr. Masokas, | 14:52:57 |
| 4 | was Detective Guerrieri with you? | 14:53:02 |
| 5 | A  I don't recall. | 14:53:05 |
| 6 | Q  So it's possible that he was in the lobby | 14:53:12 |
| 7 | with Mr. Amor; correct? | 14:53:14 |
| 8 | MR. POLICK:  Objection; calls for | 14:53:16 |
| 9 | speculation, no foundation. | 14:53:19 |
| 10 | You can answer over the objection. | 14:53:21 |
| 11 | A  Yes. | 14:53:23 |
| 12 | Q  And then Mr. Amor goes in to be | 14:53:23 |
| 13 | polygraphed at 5:00-ish; correct? | 14:53:27 |
| 14 | A  Yes. | 14:53:29 |
| 15 | Q  And at some point Mr. Masokas tells you | 14:53:30 |
| 16 | that Mr. Amor failed the polygraph exam; correct? | 14:53:40 |
| 17 | A  Correct. | 14:53:45 |
| 18 | Q  And just to be clear, during the polygraph | 14:53:46 |
| 19 | exam you were located in the lobby; correct? | 14:53:50 |
| 20 | A  Yes. | 14:53:52 |
| 21 | Q  And Mr. Amor was located in one of the | 14:53:53 |
| 22 | office spaces? | 14:53:57 |
| 23 | A  Yes. | 14:53:57 |
| 24 | Q  Around what time did Mr. Masokas come out | 14:53:59 |

Transcript of Michael Cross
Conducted on October 16, 2020                    193

| | | |
|---|---|---|
| 1 | and tell you that Bill had failed the polygraph? | 14:54:02 |
| 2 | A  I don't recall. | 14:54:06 |
| 3 | Q  How many hours had passed since you had | 14:54:07 |
| 4 | talked to Mr. Masokas before the polygraph? | 14:54:10 |
| 5 | A  Before the polygraph? | 14:54:15 |
| 6 | Q  Yes. | 14:54:17 |
| 7 | A  I don't recall. | 14:54:18 |
| 8 | Q  From the time that Bill went into the | 14:54:24 |
| 9 | office to be polygraphed or presumably be | 14:54:27 |
| 10 | polygraphed and the time that Mr. Masokas came out | 14:54:29 |
| 11 | and told you that he had failed the polygraph | 14:54:33 |
| 12 | examination, had you seen Bill Amor leave the | 14:54:36 |
| 13 | office at all? | 14:54:40 |
| 14 | A  No. | 14:54:41 |
| 15 | Q  Had you seen Bill Amor come into the lobby | 14:54:41 |
| 16 | at all? | 14:54:45 |
| 17 | A  No. | 14:54:46 |
| 18 | Q  And was Detective Guerrieri with you the | 14:54:47 |
| 19 | entire time that Bill was being polygraphed? | 14:54:50 |
| 20 | A  Other than that time it took him to park | 14:54:54 |
| 21 | the car, yes. | 14:54:58 |
| 22 | Q  And were you in the lobby with | 14:54:59 |
| 23 | Mr. Guerrieri the entire time Bill was being | 14:55:02 |
| 24 | polygraphed? | 14:55:05 |

Transcript of Michael Cross
Conducted on October 16, 2020                    194

| | | |
|---|---|---|
| 1 | A  I don't know if one of us went to go to | 14:55:06 |
| 2 | the bathroom or something like that.  Other than | 14:55:09 |
| 3 | that, yes. | 14:55:11 |
| 4 | Q  Okay.  When Mr. Masokas told you Bill | 14:55:12 |
| 5 | failed to pass the interview, did he explain how | 14:55:18 |
| 6 | he had failed or on what questions? | 14:55:21 |
| 7 | A  Yes.  He -- I believe he gave me a list of | 14:55:23 |
| 8 | the questions that he had asked and indicated that | 14:55:26 |
| 9 | he had failed every one of them other than the | 14:55:29 |
| 10 | control questions.  They ask him control questions | 14:55:33 |
| 11 | to determine whether or not they're telling the | 14:55:37 |
| 12 | truth when they ask them the polygraph questions. | 14:55:42 |
| 13 | Q  Okay.  And did Mr. Masokas indicate to you | 14:55:47 |
| 14 | that he thought Bill was lying due to Bill's | 14:55:52 |
| 15 | failure to pass the polygraph examination? | 14:55:57 |
| 16 | A  No.  He just told me that he failed. | 14:55:59 |
| 17 | Q  Okay.  Did he indicate to you that he | 14:56:02 |
| 18 | believed Bill had lied about not starting the fire? | 14:56:04 |
| 19 | A  I don't recall. | 14:56:09 |
| 20 | Q  And Mr. Newly was also present for some of | 14:56:12 |
| 21 | the polygraph examinations; correct? | 14:56:24 |
| 22 | A  You know, I don't remember him.  I know | 14:56:25 |
| 23 | I've heard his name, but I really don't remember | 14:56:27 |
| 24 | him at all. | 14:56:29 |

Transcript of Michael Cross
Conducted on October 16, 2020                    195

| | | |
|---|---|---|
| 1 | Q  You don't recall meeting him at all? | 14:56:29 |
| 2 | A  I remember him other than through the -- | 14:56:32 |
| 3 | you know, from the reports him being mentioned, | 14:56:35 |
| 4 | but I don't recall meeting him. | 14:56:36 |
| 5 | Q  Prior to going back to Naperville Police | 14:56:42 |
| 6 | Department but after Bill was polygraphed, | 14:56:49 |
| 7 | Mr. Masokas interviewed Mr. Amor again; correct? | 14:56:55 |
| 8 | A  I believe so, yes. | 14:56:59 |
| 9 | Q  Do you recall at approximately what time | 14:57:01 |
| 10 | that occurred? | 14:57:07 |
| 11 | A  No. | 14:57:07 |
| 12 | Q  Were you present for that interview? | 14:57:09 |
| 13 | A  No. | 14:57:11 |
| 14 | Q  And where did that interview take place? | 14:57:13 |
| 15 | A  I don't know. | 14:57:15 |
| 16 | Q  When Mr. Masokas came out to tell you that | 14:57:16 |
| 17 | the interview was open -- over, rather -- did he | 14:57:28 |
| 18 | tell you what Bill had said in the interview? | 14:57:34 |
| 19 | A  I don't believe so. | 14:57:35 |
| 20 | Q  Did they -- strike that. | 14:57:37 |
| 21 | Did Mr. Masokas tell you whether or not | 14:57:43 |
| 22 | Bill had admitted to starting the fire? | 14:57:49 |
| 23 | A  No. | 14:57:50 |
| 24 | Q  Did they tell you that Bill had denied | 14:57:51 |

Transcript of Michael Cross
Conducted on October 16, 2020                                    196

| | | |
|---|---|---|
| 1 | setting the fire even after he was polygraphed? | 14:57:55 |
| 2 | A  Yes. | 14:57:58 |
| 3 | Q  Okay.  And then after Mr. Amor was | 14:57:59 |
| 4 | polygraphed, before you left Reid & Associates you | 14:58:05 |
| 5 | and Detective Guerrieri interviewed Mr. Amor; | 14:58:09 |
| 6 | correct? | 14:58:12 |
| 7 | A  I don't believe so. | 14:58:12 |
| 8 | (Cross Deposition Exhibit 6 marked for | 14:58:12 |
| 9 | identification and attached to the transcript.) | 14:59:13 |
| 10 | MS. GARCIA:  For the record, this is the | 14:59:13 |
| 11 | testimony in the 2018 People v. William Amor | 14:59:14 |
| 12 | proceedings in front of Judge Brennan.  It is the | 14:59:26 |
| 13 | testimony from the 26th of January, 2018, and the | 14:59:30 |
| 14 | Bates range is 28905 to 29107. | 14:59:34 |
| 15 | Q  Mr. Cross, will you please turn to page 85? | 14:59:45 |
| 16 | And the numbers are at the top for those | 14:59:55 |
| 17 | indications, and for the record, that is | 14:59:57 |
| 18 | Bates 28989 to 28990.  Can you read from line 12 on | 15:00:02 |
| 19 | page 85 until line 12 on page 86, please? | 15:00:55 |
| 20 | A  How far did you want me to read?  I'm | 15:02:58 |
| 21 | sorry. | 15:03:02 |
| 22 | Q  Just from line 12 and 85 to line 12 on 86. | 15:03:02 |
| 23 | A  On 86? | 15:03:12 |
| 24 | Q  Yes. | 15:03:14 |

Transcript of Michael Cross
Conducted on October 16, 2020                    197

| | | |
|---|---|---|
| 1 | A   Okay. | 15:03:38 |
| 2 | Q   Okay.  And on line 12 it says:  "Question: | 15:03:39 |
| 3 | Well, you told him at the interview in Chicago | 15:03:42 |
| 4 | that you wanted him to tell the truth? | 15:03:44 |
| 5 | "Answer:  I believe that took place at | 15:03:47 |
| 6 | Naperville Police Department later when we got | 15:03:49 |
| 7 | back."  And the response to that was, "Question: | 15:03:51 |
| 8 | Well" -- | 15:03:54 |
| 9 | A   Again, I'm sorry, is this on page -- | 15:03:54 |
| 10 | Q   85. | 15:03:58 |
| 11 | A   -- 85? | 15:03:58 |
| 12 | Q   Yes. | 15:03:59 |
| 13 | A   Okay.  Line 12? | 15:04:00 |
| 14 | Q   Yes. | 15:04:03 |
| 15 | A   Okay. | 15:04:04 |
| 16 | Q   So I'll start that again.  "Question: | 15:04:04 |
| 17 | Well, you told him at the interview in Chicago | 15:04:08 |
| 18 | that you wanted him to tell the truth? | 15:04:08 |
| 19 | "Answer:  I believe that took place at the | 15:04:11 |
| 20 | Naperville Police Department later when we got back. | 15:04:12 |
| 21 | "Question:  Well, did Bill talk with you | 15:04:17 |
| 22 | in that half hour interview that you had with him | 15:04:20 |
| 23 | there, was Bill talking to you? | 15:04:20 |
| 24 | "Yes. | 15:04:20 |

Transcript of Michael Cross
Conducted on October 16, 2020                                   198

| | | |
|---|---|---|
| 1 | "Question:  And he was giving you | 15:04:23 |
| 2 | information on the case? | 15:04:24 |
| 3 | "I don't recall. | 15:04:28 |
| 4 | "Question:  Okay.  Were you talking to him? | 15:04:29 |
| 5 | "Answer:  We were talking, yes. | 15:04:31 |
| 6 | "Question:  And you were talking to him | 15:04:34 |
| 7 | about this case. | 15:04:35 |
| 8 | "Answer:  Nothing else to talk to him | 15:04:36 |
| 9 | about, yes. | 15:04:38 |
| 10 | "Question:  You told him in that interview | 15:04:40 |
| 11 | in Chicago that you thought he started the fire? | 15:04:44 |
| 12 | "Answer:  Again, I recall that happening | 15:04:48 |
| 13 | at the Naperville Police Department." | 15:04:51 |
| 14 | So does this at all refresh your | 15:04:53 |
| 15 | recollection as to your testimony in 2018? | 15:04:59 |
| 16 | A  Yes. | 15:05:01 |
| 17 | Q  And do you still believe that you did not | 15:05:02 |
| 18 | interview Mr. Amor at Reid & Associates -- | 15:05:06 |
| 19 | A  Yes. | 15:05:12 |
| 20 | Q  -- prior leaving for Naperville? | 15:05:12 |
| 21 | A  Yes. | 15:05:17 |
| 22 | Q  Okay.  So after you left Reid & Associates -- | 15:05:18 |
| 23 | actually, strike that. | 15:05:34 |
| 24 | After you were told Mr. Amor failed the | 15:05:37 |

Transcript of Michael Cross
Conducted on October 16, 2020                    199

| | | |
|---|---|---|
| 1 | polygraph interview, what did you do next? | 15:05:42 |
| 2 | A  After I was told by Mr. Masokas? | 15:05:48 |
| 3 | Q  Yes. | 15:05:51 |
| 4 | A  We went back to Naperville. | 15:05:52 |
| 5 | Q  Okay.  And did you ask Mr. Amor if he was | 15:05:55 |
| 6 | willing to go back to Naperville? | 15:06:00 |
| 7 | A  If he wanted to go back to Naperville? | 15:06:02 |
| 8 | Q  If he was willing to go back to | 15:06:05 |
| 9 | Naperville, yes. | 15:06:08 |
| 10 | A  Yes. | 15:06:09 |
| 11 | Q  Did you ask Mr. Amor if he was willing to | 15:06:09 |
| 12 | go back to Naperville and be questioned by the | 15:06:12 |
| 13 | police? | 15:06:14 |
| 14 | A  Yes, to -- to continue the interview. | 15:06:15 |
| 15 | Q  And did Mr. Amor have any other way to get | 15:06:21 |
| 16 | back to Naperville besides going with you in the car? | 15:06:24 |
| 17 | A  I don't know. | 15:06:27 |
| 18 | Q  Did Mr. Amor have any money on him -- | 15:06:28 |
| 19 | A  I don't know. | 15:06:32 |
| 20 | Q  -- after leaving jail? | 15:06:33 |
| 21 | A  I don't know. | 15:06:36 |
| 22 | Q  Did you see a wallet on him when he left? | 15:06:36 |
| 23 | A  I didn't look. | 15:06:39 |
| 24 | Q  And it was late at night when you were | 15:06:40 |

Transcript of Michael Cross
Conducted on October 16, 2020                              200

| | | |
|---|---|---|
| 1 | leaving; correct? | 15:06:43 |
| 2 | A  We got back, I believe around 10:30. | 15:06:44 |
| 3 | Q  If I represent to you that you left the | 15:06:47 |
| 4 | office around -- the Reid & Associates' office | 15:06:51 |
| 5 | around 10:30, would you have reason to dispute that? | 15:06:54 |
| 6 | A  No, I wouldn't.  You're correct; I'm sorry. | 15:06:57 |
| 7 | Q  Was there public transit in Naperville | 15:07:01 |
| 8 | back to -- rather, was there public transit back | 15:07:03 |
| 9 | to Naperville at 10:30 at night? | 15:07:08 |
| 10 | A  I don't know. | 15:07:10 |
| 11 | Q  So it's possible that he had no other way | 15:07:12 |
| 12 | to get back to Naperville than to go with you in | 15:07:12 |
| 13 | the car; correct? | 15:07:14 |
| 14 | MR. POLICK:  Objection, calls for | 15:07:14 |
| 15 | speculation, no foundation. | 15:07:16 |
| 16 | You may answer. | 15:07:17 |
| 17 | A  Correct. | 15:07:18 |
| 18 | Q  And what was Mr. Amor's demeanor after | 15:07:22 |
| 19 | being polygraphed? | 15:07:25 |
| 20 | A  Same as always. | 15:07:30 |
| 21 | Q  It had been at least 5 1/2 hours of him | 15:07:31 |
| 22 | being polygraphed; right? | 15:07:41 |
| 23 | MR. POLICK:  Objection; calls for | 15:07:42 |
| 24 | speculation, no foundation. | 15:07:45 |

Transcript of Michael Cross
Conducted on October 16, 2020                    201

| | | |
|---|---|---|
| 1 | You may answer. | 15:07:47 |
| 2 | A  I don't believe he was polygraphed for | 15:07:49 |
| 3 | 5 1/2 hours, no. | 15:07:51 |
| 4 | Q  Well, you said he started getting | 15:07:52 |
| 5 | polygraphed at 5:00; correct? | 15:07:54 |
| 6 | A  I don't know what they did exactly in | 15:07:56 |
| 7 | there, but they do interview him before.  So I'm | 15:07:58 |
| 8 | sure that, you know, a 9- or 10-question polygraph | 15:08:02 |
| 9 | doesn't take that long. | 15:08:06 |
| 10 | Q  So how long do you in your experience with | 15:08:08 |
| 11 | giving polygraph examinations -- strike that. | 15:08:15 |
| 12 | You had taken suspects to be polygraphed | 15:08:20 |
| 13 | before; correct? | 15:08:22 |
| 14 | A  Yes. | 15:08:23 |
| 15 | Q  How long did that usually take? | 15:08:24 |
| 16 | A  I would say an hour or less. | 15:08:26 |
| 17 | Q  And you left Reid & Associates after | 15:08:33 |
| 18 | Mr. Masokas told you that Bill had failed his | 15:08:39 |
| 19 | polygraph examination; correct? | 15:08:44 |
| 20 | A  Correct. | 15:08:45 |
| 21 | Q  And Mr. Masokas was with Bill the entire | 15:08:46 |
| 22 | time that he was either being interviewed or | 15:08:52 |
| 23 | polygraphed; correct? | 15:08:55 |
| 24 | MR. POLICK:  Objection; calls for | 15:08:56 |

Transcript of Michael Cross
Conducted on October 16, 2020                    202

| | | |
|---|---|---|
| 1 | speculation, no foundation. | 15:09:00 |
| 2 | You may answer. | 15:09:01 |
| 3 | A  You have to reask that question, please. | 15:09:03 |
| 4 | Q  I'll ask it a different way.  Mr. Amor | 15:09:04 |
| 5 | went into the interview room or office outside of | 15:09:07 |
| 6 | the lobby with Mr. Masokas around 5:00; correct? | 15:09:10 |
| 7 | A  I believe so. | 15:09:13 |
| 8 | Q  And then Mr. Amor did not leave the | 15:09:14 |
| 9 | interview room of the offices until it was time to | 15:09:18 |
| 10 | go back to Naperville; correct? | 15:09:20 |
| 11 | A  Correct. | 15:09:21 |
| 12 | Q  So he was in the interview room for at | 15:09:22 |
| 13 | least 5 1/2 hours; correct? | 15:09:25 |
| 14 | A  I don't -- I'm not sure. | 15:09:27 |
| 15 | Q  Well, where could he have gone if he | 15:09:32 |
| 16 | wasn't in the interview room? | 15:09:34 |
| 17 | MR. POLICK:  Objection.  That's | 15:09:35 |
| 18 | argumentative, calls for speculation, no | 15:09:37 |
| 19 | foundation. | 15:09:40 |
| 20 | You can answer over the objections, though. | 15:09:40 |
| 21 | A  I have no idea where he could have gone. | 15:09:42 |
| 22 | Q  You had been to Reid & Associates before; | 15:09:44 |
| 23 | correct? | 15:09:47 |
| 24 | A  Yes. | 15:09:47 |

Transcript of Michael Cross
Conducted on October 16, 2020                       203

| | | |
|---|---|---|
| 1 | Q  And you testified that you had gone into | 15:09:47 |
| 2 | the office space; correct? | 15:09:50 |
| 3 | A  Yes. | 15:09:51 |
| 4 | Q  You had gone into the interview room; | 15:09:52 |
| 5 | correct? | 15:09:54 |
| 6 | A  Yes. | 15:09:54 |
| 7 | Q  So you had a familiarity with the layout | 15:09:54 |
| 8 | of the offices; correct? | 15:09:58 |
| 9 | A  At that time I did, yes. | 15:09:59 |
| 10 | Q  And based on your familiarity with the | 15:10:01 |
| 11 | offices, where could Mr. Amor have gone other than | 15:10:05 |
| 12 | the interview rooms at Reid & Associates? | 15:10:08 |
| 13 | MR. POLICK:  Objection; calls for | 15:10:11 |
| 14 | speculation. | 15:10:11 |
| 15 | But go ahead and answer. | 15:10:13 |
| 16 | A  He could have walked out past us, past the | 15:10:14 |
| 17 | lobby, and walked right out of the building. | 15:10:16 |
| 18 | Q  Did he walk out past you? | 15:10:18 |
| 19 | A  No. | 15:10:20 |
| 20 | Q  During that 5 1/2 hours he never walked | 15:10:21 |
| 21 | out past you and left the building? | 15:10:24 |
| 22 | A  No. | 15:10:26 |
| 23 | Q  So he spent that 5 1/2 hours within | 15:10:26 |
| 24 | the internal office space of Reid & Associates; | 15:10:29 |

Transcript of Michael Cross
Conducted on October 16, 2020                              204

| | | |
|---|---|---|
| 1 | correct? | 15:10:32 |
| 2 | A As far as I can remember, yes. | 15:10:33 |
| 3 | Q And you weren't there, so you don't know | 15:10:34 |
| 4 | how long he was polygraphed for; correct? | 15:10:36 |
| 5 | A Correct. | 15:10:37 |
| 6 | Q But it's your testimony he was only | 15:10:38 |
| 7 | polygraphed once? | 15:10:41 |
| 8 | A That's all -- | 15:10:42 |
| 9 | MR. POLICK: Objection; that's been asked | 15:10:43 |
| 10 | and answered. | 15:10:43 |
| 11 | But go ahead and answer again. | 15:10:45 |
| 12 | A That's all I recall. | 15:10:46 |
| 13 | Q Okay. And it's also your testimony that | 15:10:47 |
| 14 | the polygraphs you had given in the past -- or had | 15:10:50 |
| 15 | taken suspects or witnesses to get in the past had | 15:10:55 |
| 16 | only lasted for approximately an hour or so; | 15:10:58 |
| 17 | correct? | 15:11:01 |
| 18 | A Correct. | 15:11:01 |
| 19 | Q So then why do you believe it took | 15:11:05 |
| 20 | 5 1/2 hours for Mr. Amor's polygraph to conclude? | 15:11:12 |
| 21 | MR. POLICK: Objection. It calls for | 15:11:19 |
| 22 | speculation; there's no foundation. | 15:11:24 |
| 23 | Go ahead. You can answer. | 15:11:31 |
| 24 | A Ask me again, please. | 15:11:33 |

Transcript of Michael Cross
Conducted on October 16, 2020                           205

| | | |
|---|---|---|
| 1 | Q   Sure.  I'll ask in a slightly different way. | 15:11:34 |
| 2 | Did you believe that Mr. Amor was being | 15:11:39 |
| 3 | polygraphed the entirety of his time within the | 15:11:52 |
| 4 | internal office space at Reid? | 15:11:57 |
| 5 | MR. POLICK:  Same objections; calls for | 15:11:59 |
| 6 | speculation, there's no foundation. | 15:12:03 |
| 7 | You may answer -- and it's been asked and | 15:12:04 |
| 8 | answered.  Go ahead and answer again. | 15:12:07 |
| 9 | A  I don't believe it would take that long. | 15:12:08 |
| 10 | Normally polygraphs didn't take that long for the | 15:12:10 |
| 11 | whole entire time, no. | 15:12:17 |
| 12 | Q  And during the times when you had brought | 15:12:20 |
| 13 | other suspects to Reid & Associates, had the | 15:12:23 |
| 14 | polygraph technicians at Reid & Associates taken | 15:12:32 |
| 15 | 5 1/2 hours to complete the interview and | 15:12:39 |
| 16 | polygraph process? | 15:12:41 |
| 17 | MR. POLICK:  Objection; calls for | 15:12:44 |
| 18 | speculation, no foundation. | 15:12:46 |
| 19 | Go ahead and answer. | 15:12:47 |
| 20 | A  The people that I've taken down there have | 15:12:48 |
| 21 | not taken 5, 5 1/2 hours to complete it, no. | 15:12:52 |
| 22 | Q  Okay.  So prior to Mr. Amor's time at Reid | 15:12:55 |
| 23 | & Associates, no one you had taken to Reid & | 15:13:05 |
| 24 | Associates had been within the internal interview | 15:13:07 |

Transcript of Michael Cross
Conducted on October 16, 2020                    206

| | | |
|---|---|---|
| 1 | rooms for 5 1/2 hours? | 15:13:09 |
| 2 | A No. | 15:13:11 |
| 3 | Q So it was unusual that Mr. Amor was in the | 15:13:12 |
| 4 | internal interview room for that long; correct? | 15:13:14 |
| 5 | MR. POLICK: Objection to the form; calls | 15:13:17 |
| 6 | for speculation, no foundation. | 15:13:21 |
| 7 | You may answer. | 15:13:22 |
| 8 | A You said it was unusual? | 15:13:23 |
| 9 | Q Yeah. | 15:13:24 |
| 10 | A It was different. | 15:13:25 |
| 11 | Q And did that difference concern you at all? | 15:13:26 |
| 12 | A No. | 15:13:28 |
| 13 | Q Why not? | 15:13:28 |
| 14 | A Just didn't concern me. | 15:13:29 |
| 15 | Q Did you ask Mr. Masokas why it took | 15:13:32 |
| 16 | 5 1/2 hours? | 15:13:36 |
| 17 | A I don't believe so. | 15:13:36 |
| 18 | Q Why not? | 15:13:38 |
| 19 | A Because I didn't. | 15:13:39 |
| 20 | Q What -- had Mr. Amor left the offices | 15:13:41 |
| 21 | during the 5 1/2 hours he was in them to get | 15:14:30 |
| 22 | anything to eat? | 15:14:34 |
| 23 | A I don't recall. | 15:14:36 |
| 24 | Q Did he leave the offices during the | 15:14:36 |

Transcript of Michael Cross
Conducted on October 16, 2020                    207

| | | |
|---|---|---|
| 1 | 5 1/2 hours he was in them to get anything to | 15:14:39 |
| 2 | drink? | 15:14:42 |
| 3 | A  I don't recall. | 15:14:42 |
| 4 | Q  And at the -- between taking Mr. Amor from | 15:14:44 |
| 5 | jail and taking him to the Reid & Associates' | 15:14:56 |
| 6 | offices, had Mr. Amor slept at all? | 15:15:05 |
| 7 | A  No. | 15:15:07 |
| 8 | Q  Did he sleep at all at the Reid & | 15:15:07 |
| 9 | Associates' offices? | 15:15:12 |
| 10 | MR. POLICK:  Objection; calls for | 15:15:12 |
| 11 | speculation. | 15:15:12 |
| 12 | But go ahead. | 15:15:14 |
| 13 | A  Not when he was with me. | 15:15:15 |
| 14 | Q  And did Mr. Masokas when you spoke to him | 15:15:17 |
| 15 | after the polygraph indicate that Mr. Amor had | 15:15:19 |
| 16 | slept at all? | 15:15:21 |
| 17 | A  He didn't say one way or the other. | 15:15:22 |
| 18 | THE WITNESS:  Excuse me.  Can I take a | 15:15:25 |
| 19 | break to go to the bathroom? | 15:15:27 |
| 20 | MS. GARCIA:  Sure. | 15:15:29 |
| 21 | THE WITNESS:  Thank you. | 15:15:30 |
| 22 | THE VIDEOGRAPHER:  We are going off the | 15:15:31 |
| 23 | record at 3:15 p.m. | 15:15:33 |
| 24 | (Recess taken, 3:15 p.m. to 3:23 p.m.) | 15:23:18 |

Transcript of Michael Cross
Conducted on October 16, 2020                    208

```
 1        THE VIDEOGRAPHER:  We are back on the        15:23:19
 2   record.  The time is 3:23 p.m.                    15:23:21
 3   BY MS. GARCIA:                                    15:23:31
 4      Q  Mr. Cross, prior to taking the break we     15:23:31
 5   were talking about you, and Mr. Amor, and         15:23:35
 6   Detective Guerrieri leaving Reid & Associates to  15:23:39
 7   go back to Naperville; correct?                   15:23:45
 8      A  Okay.  Yes.                                 15:23:46
 9      Q  How long did it take you to get back to     15:23:48
10   Naperville Police Department after leaving        15:23:52
11   Reid & Associates?                                15:23:57
12      A  Approximately an hour.                      15:23:57
13      Q  Did you talk to Bill at all in the car?     15:23:59
14      A  If anything, it was small talk.  No         15:24:00
15   interview.                                        15:24:04
16      Q  What was Mr. Amor's demeanor like in        15:24:04
17   the car?                                          15:24:07
18      A  Same as always.                             15:24:07
19      Q  How was that?                               15:24:10
20      A  Talkative, animated.  That's about it.      15:24:11
21      Q  Was Mr. Amor calm?                          15:24:20
22      A  Yes.                                        15:24:23
23      Q  And who was driving on the way back to      15:24:24
24   Naperville Police Department?                     15:24:30
```

Transcript of Michael Cross
Conducted on October 16, 2020                                     209

| | | |
|---|---|---|
| 1 | A  I don't recall. | 15:24:31 |
| 2 | Q  Did you stop at all on your way back to | 15:24:33 |
| 3 | Naperville Police Department? | 15:24:37 |
| 4 | A  Yes. | 15:24:38 |
| 5 | Q  When did you stop? | 15:24:38 |
| 6 | A  I got a page from Detective Sullivan. | 15:24:39 |
| 7 | Q  What did the page say? | 15:24:45 |
| 8 | A  To call him.  It was his number. | 15:24:46 |
| 9 | Q  And what time did you receive that page? | 15:24:50 |
| 10 | A  I don't recall. | 15:24:54 |
| 11 | Q  And did you stop to call him back after | 15:24:55 |
| 12 | you received the page? | 15:25:01 |
| 13 | A  Yes. | 15:25:02 |
| 14 | Q  Where did you stop? | 15:25:02 |
| 15 | A  I don't know exactly.  It was a pay phone | 15:25:03 |
| 16 | somewhere in between. | 15:25:05 |
| 17 | Q  And what did Mr. Sullivan say when you | 15:25:07 |
| 18 | talked to him? | 15:25:11 |
| 19 | A  I don't recall. | 15:25:12 |
| 20 | Q  Earlier you testified that you didn't have | 15:25:13 |
| 21 | an independent recollection of talking to | 15:25:27 |
| 22 | Mr. Sullivan? | 15:25:28 |
| 23 | A  I did or I didn't? | 15:25:29 |
| 24 | Q  You did not, on October 3rd, 1995.  So do | 15:25:31 |

Transcript of Michael Cross
Conducted on October 16, 2020                    210

| | | |
|---|---|---|
| 1 | you have an independent recollection now? | 15:25:36 |
| 2 | A  Yes. | 15:25:38 |
| 3 | Q  Earlier what you said was false; correct? | 15:25:40 |
| 4 | MR. POLICK:  Objection to the form of the | 15:25:45 |
| 5 | question. | 15:25:48 |
| 6 | Go ahead and answer. | 15:25:48 |
| 7 | A  It was incorrect.  Again, I'm not trying | 15:25:49 |
| 8 | to lie to you or anything. | 15:25:53 |
| 9 | Q  No, I'm just trying to see what you | 15:25:54 |
| 10 | remember and what you don't -- | 15:25:57 |
| 11 | A  Okay. | 15:25:59 |
| 12 | Q  -- that's really all. | 15:25:59 |
| 13 | Other than stopping to talk to Detective | 15:26:00 |
| 14 | Sullivan, did you talk to anybody else on the pay | 15:26:03 |
| 15 | phone? | 15:26:07 |
| 16 | A  I don't recall. | 15:26:08 |
| 17 | Q  Did you stop and make a call to a process | 15:26:09 |
| 18 | server? | 15:26:15 |
| 19 | A  No. | 15:26:15 |
| 20 | Q  At the time that you left Reid & Associates, | 15:26:18 |
| 21 | you were aware that a process server was on his | 15:26:36 |
| 22 | way to Naperville Police Department to serve Bill | 15:26:41 |
| 23 | divorce papers; correct? | 15:26:45 |
| 24 | A  No. | 15:26:47 |

Transcript of Michael Cross
Conducted on October 16, 2020                                    211

| | | |
|---|---|---|
| 1 | Q  Do you not recall or do you dispute that? | 15:26:48 |
| 2 | A  I dispute that.  I didn't know. | 15:26:51 |
| 3 | Q  And you arrived at the Naperville Police | 15:26:54 |
| 4 | Department around 11:30; correct? | 15:27:06 |
| 5 | A  I'm not sure.  I don't recall. | 15:27:09 |
| 6 | Q  If you left Reid, and it was about an hour | 15:27:11 |
| 7 | drive, you would have gotten back 11:30; correct? | 15:27:16 |
| 8 | A  Approximately. | 15:27:21 |
| 9 | Q  When you arrived, you met with the process | 15:27:21 |
| 10 | server in the lobby of the Naperville Police | 15:27:24 |
| 11 | Department? | 15:27:28 |
| 12 | A  No. | 15:27:28 |
| 13 | Q  Well, when you got back to Naperville, | 15:27:29 |
| 14 | what occurred? | 15:27:31 |
| 15 | A  We went down to the investigations division. | 15:27:32 |
| 16 | Q  Who went down? | 15:27:36 |
| 17 | A  Me, Guerrieri, and Amor. | 15:27:37 |
| 18 | Q  And where did you take Mr. Amor? | 15:27:40 |
| 19 | A  To an interview room. | 15:27:44 |
| 20 | Q  There's testimony from the first trial | 15:27:46 |
| 21 | that the process server says you met him in the | 15:27:56 |
| 22 | lobby of the Naperville Police Department. | 15:27:59 |
| 23 | A  It was in the lobby of the investigations | 15:28:01 |
| 24 | division of the Naperville Police Department. | 15:28:04 |

Transcript of Michael Cross
Conducted on October 16, 2020                    212

| | | |
|---|---|---|
| 1 | Q  Okay.  Do you recall meeting him in the | 15:28:06 |
| 2 | lobby? | 15:28:09 |
| 3 | A  Of the investigations division? | 15:28:10 |
| 4 | Q  Yes. | 15:28:12 |
| 5 | A  Yes. | 15:28:13 |
| 6 | Q  And that was after you had taken Mr. Amor | 15:28:15 |
| 7 | to an investigation room; correct? | 15:28:19 |
| 8 | A  Correct. | 15:28:21 |
| 9 | Q  Around what time did you meet the process | 15:28:22 |
| 10 | server after you got back to Naperville Police | 15:28:50 |
| 11 | Department? | 15:28:52 |
| 12 | A  I don't recall. | 15:28:52 |
| 13 | Q  How long after was it from taking Bill to | 15:28:53 |
| 14 | the investigations room? | 15:28:58 |
| 15 | A  I don't recall. | 15:28:59 |
| 16 | Q  Was it more than 10 minutes, less than | 15:29:00 |
| 17 | 10 minutes? | 15:29:05 |
| 18 | A  I really don't recall. | 15:29:05 |
| 19 | Q  Was it more than 20 minutes? | 15:29:06 |
| 20 | A  I don't recall. | 15:29:08 |
| 21 | Q  When you met -- how did you know you | 15:29:09 |
| 22 | needed to meet the process server in the lobby of | 15:29:20 |
| 23 | Naperville Police Department? | 15:29:23 |
| 24 | A  Again, it was in the lobby of the | 15:29:24 |

Transcript of Michael Cross
Conducted on October 16, 2020                        213

| | | |
|---|---|---|
| 1 | investigations division downstairs at the police | 15:29:26 |
| 2 | department. | 15:29:29 |
| 3 | Q  So you met him downstairs at the police | 15:29:29 |
| 4 | department? | 15:29:31 |
| 5 | A  He came down.  Somebody brought him down. | 15:29:32 |
| 6 | I don't remember who. | 15:29:35 |
| 7 | Q  And did he walk into the investigations room? | 15:29:36 |
| 8 | A  He was -- | 15:29:44 |
| 9 | MR. POLICK:  Objection to the form of the | 15:29:45 |
| 10 | question. | 15:29:47 |
| 11 | But you can answer over the objection. | 15:29:48 |
| 12 | A  He was in the lobby. | 15:29:49 |
| 13 | Q  Well, how did you know he was in the lobby? | 15:29:50 |
| 14 | A  Somebody told me. | 15:29:54 |
| 15 | Q  Were you surprised to see the process server? | 15:29:55 |
| 16 | A  No. | 15:29:59 |
| 17 | Q  Why not? | 15:30:00 |
| 18 | A  Just wasn't surprised. | 15:30:01 |
| 19 | Q  Well, it's a little bit strange for a | 15:30:06 |
| 20 | process server to show up at a police department | 15:30:10 |
| 21 | at 11:30 at night, isn't it? | 15:30:13 |
| 22 | A  I had never had it happen before. | 15:30:15 |
| 23 | Q  So you weren't surprised? | 15:30:19 |
| 24 | A  No. | 15:30:20 |

Transcript of Michael Cross
Conducted on October 16, 2020                                    214

| | | |
|---|---|---|
| 1 | Q   Even though it never happened before? | 15:30:20 |
| 2 | A   No, I wouldn't say I was surprised. | 15:30:22 |
| 3 | Q   Didn't it strike you as unusual? | 15:30:24 |
| 4 | MR. POLICK:   Objection to the form. | 15:30:27 |
| 5 | But you can go ahead. | 15:30:29 |
| 6 | A   It was unusual for me because I had never | 15:30:31 |
| 7 | had it happen to me before. | 15:30:34 |
| 8 | Q   And once you met the process server, you | 15:30:36 |
| 9 | told him that you were interviewing Bill about the | 15:30:43 |
| 10 | arson murder of Marianne Miceli; correct? | 15:30:48 |
| 11 | A   No. | 15:30:51 |
| 12 | Q   And you told him you were trying to get | 15:30:53 |
| 13 | Mr. Amor to confess; correct? | 15:30:59 |
| 14 | A   No. | 15:31:03 |
| 15 | Q   And you had actually contacted the process | 15:31:04 |
| 16 | server around 7:00 p.m. that evening to tell him | 15:31:09 |
| 17 | to serve the papers -- | 15:31:12 |
| 18 | A   No. | 15:31:13 |
| 19 | Q   -- on Mr. Amor for the divorce? | 15:31:14 |
| 20 | A   No. | 15:31:16 |
| 21 | Q   If I represented to you there's testimony | 15:31:17 |
| 22 | in the first trial from the process server that he | 15:31:27 |
| 23 | was, in fact, contacted at 7:00 p.m. to serve the | 15:31:30 |
| 24 | divorce papers on Mr. Amor by the Naperville | 15:31:35 |

Transcript of Michael Cross
Conducted on October 16, 2020                    215

| | | |
|---|---|---|
| 1 | Police Department, would you dispute that? | 15:31:38 |
| 2 | MR. POLICK:  Objection; calls for | 15:31:39 |
| 3 | speculation, no foundation. | 15:31:42 |
| 4 | Go ahead and answer. | 15:31:45 |
| 5 | THE WITNESS:  Please ask me again. | 15:31:46 |
| 6 | MS. GARCIA:  Would you read it back? | 15:32:11 |
| 7 | (Pending question read.) | 15:32:13 |
| 8 | MR. POLICK:  Same objections. | 15:32:13 |
| 9 | You can answer. | 15:32:14 |
| 10 | A  He wasn't contacted by me. | 15:32:15 |
| 11 | Q  Would you dispute that he was contacted by | 15:32:17 |
| 12 | someone in the Naperville Police Department? | 15:32:22 |
| 13 | A  I didn't say that. | 15:32:23 |
| 14 | MR. POLICK:  Object to the form of the | 15:32:24 |
| 15 | question. | 15:32:26 |
| 16 | Q  Would you or not? | 15:32:27 |
| 17 | MR. POLICK:  And speculation. | 15:32:28 |
| 18 | A  Pardon? | 15:32:31 |
| 19 | Q  So you wouldn't dispute that he was | 15:32:31 |
| 20 | contacted by the Naperville Police Department? | 15:32:33 |
| 21 | MR. POLICK:  Same -- | 15:32:35 |
| 22 | A  I don't know -- | 15:32:35 |
| 23 | MR. POLICK:  Hang on.  Let me get my | 15:32:36 |
| 24 | objection. | 15:32:37 |

Transcript of Michael Cross
Conducted on October 16, 2020                    216

| | | |
|---|---|---|
| 1 | THE WITNESS:  Sure. | 15:32:37 |
| 2 | MR. POLICK:  I'm going to object to the | 15:32:38 |
| 3 | form of the question and also lack of foundation | 15:32:39 |
| 4 | and calls for speculation. | 15:32:42 |
| 5 | But you can go ahead and answer, Mike. | 15:32:42 |
| 6 | THE WITNESS:  Please ask me again. | 15:32:46 |
| 7 | Q  You -- you wouldn't dispute that Naperville | 15:32:49 |
| 8 | Police Department contacted the process server? | 15:32:57 |
| 9 | MR. POLICK:  Objection to the form of the | 15:33:01 |
| 10 | question; misstates the witness' testimony. | 15:33:04 |
| 11 | You may go ahead and answer. | 15:33:07 |
| 12 | A  I don't know who contacted him. | 15:33:07 |
| 13 | Q  And you're aware -- strike that. | 15:33:09 |
| 14 | There's testimony in the first trial from | 15:33:22 |
| 15 | the process server that said when he met with you, | 15:33:25 |
| 16 | you told him that you were investigating Mr. Amor | 15:33:30 |
| 17 | for the arson murder of Marianne Miceli.  Do you | 15:33:35 |
| 18 | have reason to dispute that testimony? | 15:33:40 |
| 19 | A  Yes. | 15:33:43 |
| 20 | MR. POLICK:  He just did and it's been | 15:33:43 |
| 21 | asked and answered.  So -- | 15:33:45 |
| 22 | MS. GARCIA:  I was asking him about -- I | 15:33:45 |
| 23 | was asking about -- | 15:33:47 |
| 24 | MR. POLICK:  Let me finish -- | 15:33:47 |

Transcript of Michael Cross
Conducted on October 16, 2020                          217

| | | |
|---|---|---|
| 1 | MS. GARCIA:  -- being contacted -- | 15:33:47 |
| 2 | MR. POLICK:  -- my objection.  You just -- | 15:33:48 |
| 3 | you just asked him that question two minutes ago | 15:33:51 |
| 4 | and he disputed -- | 15:33:54 |
| 5 | MS. GARCIA:  I did not ask him that | 15:33:56 |
| 6 | question, for the record. | 15:33:57 |
| 7 | MR. POLICK:  He's already testified that | 15:33:57 |
| 8 | he disputed that. | 15:34:00 |
| 9 | MS. GARCIA:  He testified that he -- | 15:34:00 |
| 10 | MR. POLICK:  I'm going to -- | 15:34:02 |
| 11 | MS. GARCIA:  -- disputed being contacted. | 15:34:03 |
| 12 | MR. POLICK:  I don't think so.  But go | 15:34:05 |
| 13 | ahead and reask the question, but I'm asserting my | 15:34:05 |
| 14 | objection that it's been asked and answered, and | 15:34:07 |
| 15 | he's already disputed it. | 15:34:09 |
| 16 | But you can go ahead and answer the | 15:34:11 |
| 17 | question again. | 15:34:13 |
| 18 | THE WITNESS:  Please ask me again. | 15:34:14 |
| 19 | Q  There's testimony in the first trial from | 15:34:15 |
| 20 | the process server that when you met with him in | 15:34:19 |
| 21 | the lobby, you told him you were investigating | 15:34:22 |
| 22 | Bill Amor for the arson murder of his mother-in-law. | 15:34:26 |
| 23 | Do you dispute that? | 15:34:31 |
| 24 | A  I would -- yes, I would dispute that. | 15:34:32 |

Transcript of Michael Cross
Conducted on October 16, 2020                              218

| | | |
|---|---|---|
| 1 | Q  Okay.  And are you aware that the Judge in | 15:34:36 |
| 2 | Mr. Amor's 2018 retrial didn't believe your | 15:34:43 |
| 3 | testimony on this? | 15:34:47 |
| 4 | MR. POLICK:  Objection to the form of the | 15:34:48 |
| 5 | question.  Calls for speculation and no | 15:34:49 |
| 6 | foundation. | 15:34:52 |
| 7 | But go ahead and answer the question. | 15:34:53 |
| 8 | A  I have no idea. | 15:34:55 |
| 9 | Q  Well, do you have any thoughts about the fact | 15:34:56 |
| 10 | that the Judge didn't find that testimony believable? | 15:34:58 |
| 11 | MR. POLICK:  Objection to the form of the | 15:35:01 |
| 12 | question; misstates the record and calls for | 15:35:02 |
| 13 | speculation and lack of foundation. | 15:35:08 |
| 14 | You may answer over those objections. | 15:35:10 |
| 15 | A  I don't know that he didn't believe my | 15:35:13 |
| 16 | testimony.  I don't know that. | 15:35:15 |
| 17 | Q  And eventually, the process server served | 15:35:25 |
| 18 | divorce papers on Mr. Amor; correct? | 15:35:28 |
| 19 | A  Yes. | 15:35:30 |
| 20 | Q  And he served them in the interrogation | 15:35:30 |
| 21 | room; correct? | 15:35:33 |
| 22 | A  No. | 15:35:34 |
| 23 | Q  Well, Mr. Amor was in the interrogation | 15:35:34 |
| 24 | room when you met the process server; correct? | 15:35:36 |

Transcript of Michael Cross
Conducted on October 16, 2020                    219

| | | |
|---|---|---|
| 1 | A  No. | 15:35:39 |
| 2 | Q  You testified earlier that Mr. Amor was in | 15:35:39 |
| 3 | the interrogation room when you met the process | 15:35:43 |
| 4 | server. | 15:35:45 |
| 5 | A  I brought him out to the lobby to meet | 15:35:45 |
| 6 | with the process server.  The process server, as I | 15:35:49 |
| 7 | said before, had not gone into the interview room. | 15:35:51 |
| 8 | Nobody from the outside other than a police | 15:35:54 |
| 9 | officer would go into the interview room with me. | 15:35:56 |
| 10 | Q  Because if a process server went into an | 15:36:00 |
| 11 | interview room, that would be inappropriate; correct? | 15:36:04 |
| 12 | A  Yes. | 15:36:07 |
| 13 | Q  It would be counter to good policing | 15:36:07 |
| 14 | practices; correct? | 15:36:10 |
| 15 | A  Yes. | 15:36:10 |
| 16 | Q  It would potentially taint the | 15:36:11 |
| 17 | investigation into Mr. Amor; correct? | 15:36:13 |
| 18 | MR. POLICK:  Objection to the form of the | 15:36:14 |
| 19 | question; calls for speculation and calls for him | 15:36:16 |
| 20 | to give a legal opinion. | 15:36:20 |
| 21 | But go ahead and answer the question. | 15:36:22 |
| 22 | A  I don't understand your question. | 15:36:24 |
| 23 | Q  Would you find it appropriate if a process | 15:36:26 |
| 24 | server was brought into an interrogation or an | 15:36:31 |

Transcript of Michael Cross
Conducted on October 16, 2020                220

| | | |
|---|---|---|
| 1 | interview with a suspect? | 15:36:33 |
| 2 | MR. POLICK: Same objection as to the form | 15:36:34 |
| 3 | of the question; no foundation, calls for | 15:36:37 |
| 4 | speculation. | 15:36:39 |
| 5 | But go ahead and answer. | 15:36:39 |
| 6 | A  In my practice as a detective, mine and | 15:36:41 |
| 7 | mine alone, I would not let a process server come | 15:36:45 |
| 8 | into my interview room to serve papers. | 15:36:48 |
| 9 | Q  Why is that? | 15:36:51 |
| 10 | A  Because I wouldn't.  It's not proper. | 15:36:52 |
| 11 | Q  Why is it not proper? | 15:36:55 |
| 12 | A  It's just not proper. | 15:36:56 |
| 13 | Q  Is there a reason that you wouldn't do it | 15:36:59 |
| 14 | other than that's not proper? | 15:37:02 |
| 15 | A  I wouldn't do it.  I just wouldn't do it. | 15:37:03 |
| 16 | Q  How long did the process take between | 15:37:12 |
| 17 | getting to the Naperville Police Department, | 15:37:17 |
| 18 | taking Mr. Amor down into the lobby, taking him | 15:37:22 |
| 19 | into the interview room, leaving the interview | 15:37:26 |
| 20 | room to meet the process server, and having | 15:37:32 |
| 21 | Mr. Amor be served with divorce papers? | 15:37:34 |
| 22 | MR. POLICK:  Can we have that question | 15:37:34 |
| 23 | read back, please? | 15:38:00 |
| 24 | (Pending question read.) | 15:38:03 |

Transcript of Michael Cross
Conducted on October 16, 2020                        221

```
1        MR. POLICK:  You can answer.              15:38:03

2     A  I don't recall.                           15:38:05

3     Q  Did it take more than 10 minutes?         15:38:06

4     A  I don't --                                15:38:09

5        MR. POLICK:  Calls for speculation.       15:38:11

6        Go ahead and answer.                      15:38:13

7     A  (Continuing.)  I don't recall.            15:38:14

8     Q  Did it take less than two minutes?        15:38:14

9     A  I don't recall.                           15:38:16

10    Q  Did it take more than 20 minutes?         15:38:17

11    A  I don't recall.                           15:38:19

12    Q  Did it take less than one minute?         15:38:20

13       MR. POLICK:  Same objections; calls for   15:38:26

14    speculation.                                 15:38:30

15       Go ahead and answer again.                15:38:30

16    A  I don't recall.                           15:38:32

17       MS. GARCIA:  I don't feel it calls for    15:38:33

18    speculation if I'm asking him about his recollection.  15:38:37

19       MR. POLICK:  Counsel, I'm just making my  15:38:37

20    objections for the record.  You don't need to  15:38:39

21    comment on my objections.  I've made my objection  15:38:42

22    pursuant to the rules of evidence.  You can go  15:38:44

23    ahead and ask your next question.  The witness has  15:38:48

24    answered the question; there's no debate here.  15:38:51
```

Transcript of Michael Cross
Conducted on October 16, 2020                    222

| | | |
|---|---|---|
| 1 | Q   What was Mr. Amor's reaction after being | 15:38:53 |
| 2 | served? | 15:38:56 |
| 3 | A   He might have become a little quieter, a | 15:38:56 |
| 4 | little more reserved. | 15:39:02 |
| 5 | Q   And why do you say that? | 15:39:04 |
| 6 | A   Just as I recall. | 15:39:08 |
| 7 | Q   What about his demeanor makes you think | 15:39:13 |
| 8 | that he may have gotten quieter and more reserved? | 15:39:15 |
| 9 | A   Because he was always so talkative and | 15:39:19 |
| 10 | animated all the time, and he still remained | 15:39:21 |
| 11 | talkative, but he just was less talkative maybe. | 15:39:24 |
| 12 | Q   So it would be fair to say he was upset | 15:39:30 |
| 13 | after being served divorce papers? | 15:39:33 |
| 14 | MR. POLICK:   Objection; misstates the | 15:39:35 |
| 15 | witness' testimony. | 15:39:39 |
| 16 | You may answer over objection. | 15:39:40 |
| 17 | A   I didn't notice him being upset. | 15:39:43 |
| 18 | Q   Well, why did you think that he was less | 15:39:44 |
| 19 | talkative? | 15:39:46 |
| 20 | A   I don't know. | 15:39:48 |
| 21 | Q   Did you think it was because he had been | 15:39:48 |
| 22 | served with divorce papers? | 15:39:50 |
| 23 | A   Possibly, yes. | 15:39:52 |
| 24 | Q   What other reason would he have for being | 15:39:53 |

Transcript of Michael Cross
Conducted on October 16, 2020                    223

| | | |
|---|---|---|
| 1 | less talkative after being served the divorce | 15:39:56 |
| 2 | papers? | 15:39:58 |
| 3 | A  Nothing.  No other reason. | 15:39:59 |
| 4 | Q  And at some point before you continued the | 15:40:07 |
| 5 | interview with Mr. Amor, you met with Detective | 15:40:12 |
| 6 | Sullivan; correct? | 15:40:19 |
| 7 | A  Would you repeat that, please? | 15:40:20 |
| 8 | Q  Sure.  At some point before you continued | 15:40:23 |
| 9 | the interview with Mr. Amor, you met with | 15:40:25 |
| 10 | Detective Sullivan; correct? | 15:40:27 |
| 11 | MR. POLICK:  Objection to the form. | 15:40:28 |
| 12 | But go ahead and answer. | 15:40:30 |
| 13 | A  I don't believe so. | 15:40:31 |
| 14 | Q  You don't remember that you met with | 15:40:33 |
| 15 | Mr. Sullivan at the Naperville Police Department | 15:40:35 |
| 16 | on October 3rd, 1995? | 15:40:37 |
| 17 | A  I don't recall. | 15:40:38 |
| 18 | Q  And you read Mr. Amor his Miranda rights | 15:40:40 |
| 19 | prior to the process server serving him his | 15:41:07 |
| 20 | divorce papers; correct? | 15:41:10 |
| 21 | A  Bob Guerrieri did. | 15:41:11 |
| 22 | Q  Mr. Guerrieri read him his Miranda rights | 15:41:12 |
| 23 | prior to the process server serving him divorce | 15:41:18 |
| 24 | papers? | 15:41:22 |

Transcript of Michael Cross
Conducted on October 16, 2020                                224

| | |
|---|---|
| 1 | A  I believe that's correct. | 15:41:22 |
| 2 | Q  And did Mr. Amor indicate that he understood | 15:41:25 |
| 3 | the Miranda rights? | 15:41:33 |
| 4 | A  Yes. | 15:41:35 |
| 5 | Q  What were the indications that he understood | 15:41:36 |
| 6 | his Miranda rights? | 15:41:40 |
| 7 | A  He said he did. | 15:41:42 |
| 8 | Q  If Mr. Amor had been read his Miranda | 15:41:43 |
| 9 | rights prior to being served the divorce papers, | 15:42:01 |
| 10 | wouldn't that mean that he left the interview room | 15:42:08 |
| 11 | after being read his Miranda rights? | 15:42:11 |
| 12 | A  I don't know.  I don't believe so. | 15:42:15 |
| 13 | Q  But he had to leave the interview room to | 15:42:18 |
| 14 | be served the divorce papers; correct? | 15:42:22 |
| 15 | A  Correct. | 15:42:24 |
| 16 | Q  And when Mr. Amor went back into the | 15:42:25 |
| 17 | interview room, he wasn't reread his Miranda | 15:42:34 |
| 18 | rights; correct? | 15:42:37 |
| 19 | A  Correct. | 15:42:37 |
| 20 | Q  Can you describe the interrogation room | 15:42:39 |
| 21 | you had Mr. Amor in? | 15:42:43 |
| 22 | A  I would say it's approximately 12 by 12. | 15:42:44 |
| 23 | Q  Okay. | 15:42:52 |
| 24 | A  It has ceiling lighting; it has a table | 15:42:53 |

Transcript of Michael Cross
Conducted on October 16, 2020                    225

| | | |
|---|---|---|
| 1 | and several chairs.  And that's about it. | 15:42:59 |
| 2 | Q  Okay.  Had Mr. Amor been in this interview | 15:43:09 |
| 3 | room before -- or interrogation room, rather? | 15:43:19 |
| 4 | A  No. | 15:43:21 |
| 5 | Q  And what happened after Mr. Amor had been | 15:43:24 |
| 6 | read his Miranda rights and had had papers served | 15:43:36 |
| 7 | on him? | 15:43:41 |
| 8 | A  He was questioned again. | 15:43:41 |
| 9 | Q  And what was he questioned on? | 15:43:45 |
| 10 | A  About the case. | 15:43:48 |
| 11 | Q  What specifically did you ask him? | 15:43:50 |
| 12 | A  I don't remember specifically. | 15:43:52 |
| 13 | Q  What generally did you ask him? | 15:43:54 |
| 14 | A  Questions about the case. | 15:43:56 |
| 15 | Q  What questions did you have remaining | 15:43:59 |
| 16 | about the case at that point? | 15:44:07 |
| 17 | A  It was more going over what was already said. | 15:44:08 |
| 18 | Q  And what did he say in response? | 15:44:16 |
| 19 | A  I don't remember all he said. | 15:44:18 |
| 20 | Q  Did he tell you the same story he had told | 15:44:21 |
| 21 | you before? | 15:44:29 |
| 22 | A  Yes.  Pretty much the same story. | 15:44:29 |
| 23 | Q  And what happened after that? | 15:44:35 |
| 24 | A  That was probably when I got up and yelled | 15:44:41 |

Transcript of Michael Cross
Conducted on October 16, 2020                    226

| | | |
|---|---|---|
| 1 | at him and said he wasn't telling me the truth. | 15:44:51 |
| 2 | Q  And why did you get up and yell at him? | 15:44:54 |
| 3 | A  Because he wasn't telling me the truth, | 15:44:57 |
| 4 | and it was an attempt to see if he would start | 15:45:01 |
| 5 | telling us the truth. | 15:45:04 |
| 6 | Q  And was that a technique that you learned | 15:45:05 |
| 7 | from Reid & Associates? | 15:45:07 |
| 8 | A  Partially, yes. | 15:45:08 |
| 9 | Q  So it was a technique that was partially | 15:45:10 |
| 10 | learned from your training at Reid & Associates? | 15:45:13 |
| 11 | A  Yes.  The training was that you don't | 15:45:17 |
| 12 | allow the suspect to keep lying to you. | 15:45:20 |
| 13 | Q  Were you angry at Mr. Amor? | 15:45:24 |
| 14 | A  No. | 15:45:26 |
| 15 | Q  Were you frustrated? | 15:45:27 |
| 16 | A  No. | 15:45:28 |
| 17 | Q  And you confronted him and told him you | 15:45:30 |
| 18 | didn't believe he was telling you the truth? | 15:45:36 |
| 19 | A  Correct. | 15:45:39 |
| 20 | Q  And you yelled that? | 15:45:40 |
| 21 | A  Yes. | 15:45:41 |
| 22 | Q  How loud? | 15:45:42 |
| 23 | A  A medium loud voice.  I didn't scream at | 15:45:43 |
| 24 | him.  I just raised my voice. | 15:45:48 |

Transcript of Michael Cross
Conducted on October 16, 2020                    227

| | | | |
|---|---|---|---|
| 1 | Q | Can you demonstrate for us? | 15:45:50 |
| 2 | A | I don't believe you're telling me the truth. | 15:45:52 |
| 3 | Q | And when you yelled at him, did you also | 15:45:56 |
| 4 | | stand up at the same time? | 15:45:59 |
| 5 | A | Yes. | 15:45:59 |
| 6 | Q | Did you gesticulate in any way? | 15:46:00 |
| 7 | A | No. | 15:46:03 |
| 8 | Q | Did you slam your hands on the table? | 15:46:04 |
| 9 | A | No. | 15:46:06 |
| 10 | Q | Did you kick the chair back? | 15:46:08 |
| 11 | A | No. | 15:46:11 |
| 12 | Q | After you confronted him, what did you | 15:46:11 |
| 13 | | do next? | 15:46:14 |
| 14 | A | I left the room. | 15:46:14 |
| 15 | Q | And how long were you outside of the room? | 15:46:15 |
| 16 | A | A couple minutes. | 15:46:17 |
| 17 | Q | And what were you doing outside of the room? | 15:46:19 |
| 18 | A | Got a cup of coffee. | 15:46:21 |
| 19 | Q | Did you speak with any other detective | 15:46:23 |
| 20 | | when you left? | 15:46:25 |
| 21 | A | No. | 15:46:26 |
| 22 | Q | After you left the room, was Detective | 15:46:29 |
| 23 | | Guerrieri still in the room? | 15:46:46 |
| 24 | A | Yes. | 15:46:48 |

Transcript of Michael Cross
Conducted on October 16, 2020                     228

1      Q   After you got your cup of coffee, what did          15:46:49
2  you do then?                                                15:46:59
3      A   Went back.                                          15:47:00
4      Q   And what happened once you were back?               15:47:01
5      A   Detective Guerrieri was speaking to                 15:47:03
6  Mr. Amor, and Mr. Amor was making some admissions.          15:47:08
7      Q   What admissions was Mr. Amor making?                15:47:19
8      A   He was making admissions that he started            15:47:25
9  the fire.                                                   15:47:27
10     Q   And do you have an independent recollection          15:47:28
11 of him making admissions?                                   15:47:31
12     A   Yes.                                                15:47:32
13     Q   Earlier you testified that you did not              15:47:33
14 have an independent recollection of Mr. Amor's              15:47:37
15 confession on October 3rd, 1995.                            15:47:40
16     A   At that point when you asked me, no.  At            15:47:42
17 this particular point I remember that happening.            15:47:46
18     Q   And why do you remember now?                        15:47:47
19     A   Because it was a different time frame.              15:47:49
20     Q   How is it a different time frame?                   15:47:52
21     A   There was other times where he was -- was          15:47:55
22 not being truthful, not cooperating, and now he was.       15:47:58
23     Q   That wasn't quite my question.  So earlier         15:48:02
24 in the deposition I asked if you had an independent        15:48:05

Transcript of Michael Cross
Conducted on October 16, 2020                          229

| | | |
|---|---|---|
| 1 | recollection of Mr. Amor's confession October 3rd, | 15:48:08 |
| 2 | 1995, and you answered no. | 15:48:13 |
| 3 |    A  I believe that was in a different context. | 15:48:15 |
| 4 | It wasn't in the context of being back at the police | 15:48:18 |
| 5 | department in an interview room with Detective | 15:48:22 |
| 6 | Guerrieri and myself at that particular time. | 15:48:26 |
| 7 |    Q  Well, was there another time on October 3rd, | 15:48:29 |
| 8 | 1995, when Mr. Amor confessed? | 15:48:32 |
| 9 |    A  No. | 15:48:37 |
| 10 |    Q  So there would only have been this | 15:48:38 |
| 11 | confession time; correct? | 15:48:41 |
| 12 |    A  Correct. | 15:48:42 |
| 13 |    Q  So I'm referring to exact same events that | 15:48:43 |
| 14 | I'm asking about now which I asked about earlier | 15:48:47 |
| 15 | in the deposition. | 15:48:50 |
| 16 |    A  All right.  I didn't realize that.  I | 15:48:52 |
| 17 | thought you were talking earlier in the deposition | 15:48:55 |
| 18 | about any other occasions.  You weren't specifically | 15:48:58 |
| 19 | talking about -- at least I didn't believe you | 15:49:02 |
| 20 | were specifically talking about this part. | 15:49:05 |
| 21 |    Q  Okay.  Well, I specifically asked if on | 15:49:08 |
| 22 | October 3rd, 1995, you had an independent | 15:49:10 |
| 23 | recollection of Mr. Amor's confession, and you | 15:49:15 |
| 24 | said you did not.  So are you now saying that you do? | 15:49:20 |

Transcript of Michael Cross
Conducted on October 16, 2020                           230

| | | |
|---|---|---|
| 1 | A  I'm not going to argue with you, ma'am. | 15:49:22 |
| 2 | Q  Do you or do you not?  I just need to know. | 15:49:24 |
| 3 | A  Do I remember what? | 15:49:27 |
| 4 | Q  Do you have an independent recollection of | 15:49:29 |
| 5 | Mr. Amor's confession on October 3rd, 1995? | 15:49:31 |
| 6 | A  At that point, yes. | 15:49:36 |
| 7 | Q  At what point, yes? | 15:49:38 |
| 8 | A  At the point that I came back in and | 15:49:40 |
| 9 | talked to -- and Bob Guerrieri was talking to him. | 15:49:42 |
| 10 | Q  So at what point do you not have an | 15:49:46 |
| 11 | independent recollection? | 15:49:52 |
| 12 | A  Like I said, I'm not going to argue with | 15:49:53 |
| 13 | you.  I don't know. | 15:49:55 |
| 14 | Q  I'm not arguing.  I'm just trying to | 15:49:56 |
| 15 | figure out -- | 15:49:58 |
| 16 | A  Well, you seem to be. | 15:49:59 |
| 17 | Q  -- where your independent recollection is. | 15:50:00 |
| 18 | A  I -- I don't know. | 15:50:02 |
| 19 | Q  And do you have an independent recollection | 15:50:04 |
| 20 | of Mr. Amor signing a written statement as to his | 15:50:15 |
| 21 | confession? | 15:50:23 |
| 22 | A  Yes. | 15:50:24 |
| 23 | Q  Do you have an independent recollection of | 15:50:24 |
| 24 | Mr. Amor reading that written statement into a | 15:50:26 |

Transcript of Michael Cross
Conducted on October 16, 2020                    231

| | | |
|---|---|---|
| 1 | tape recorder? | 15:50:31 |
| 2 | A  Yes. | 15:50:32 |
| 3 | Q  Do you have an independent recollection of | 15:50:33 |
| 4 | Mr. Nigohosian coming to take Mr. Amor's testimony? | 15:50:39 |
| 5 | A  Yes. | 15:50:42 |
| 6 | Q  Earlier in the deposition I asked you if you | 15:50:43 |
| 7 | had an independent recollection of Mr. Nigohosian | 15:50:46 |
| 8 | coming to take Mr. Amor's testimony, and you said no. | 15:50:49 |
| 9 | A  I don't recall that.  I -- you know, I | 15:50:53 |
| 10 | don't know. | 15:50:57 |
| 11 | MR. POLICK:  I believe that misstates the | 15:50:57 |
| 12 | witness' testimony. | 15:50:58 |
| 13 | But go ahead and answer, Mike. | 15:50:59 |
| 14 | THE WITNESS:  What did you say, Joe? | 15:51:01 |
| 15 | MR. POLICK:  I'm just objecting.  I | 15:51:02 |
| 16 | believe that question misstates your testimony. | 15:51:04 |
| 17 | But go ahead and answer. | 15:51:06 |
| 18 | THE WITNESS:  Yeah.  Could you ask me again? | 15:51:07 |
| 19 | MS. GARCIA:  We can move on, actually. | 15:51:14 |
| 20 | Q  So you do have an independent recollection | 15:51:15 |
| 21 | of Mr. Nigohosian taking Mr. Amor's statement; | 15:51:17 |
| 22 | correct? | 15:51:24 |
| 23 | A  Correct. | 15:51:24 |
| 24 | Q  And you said that one -- the reason you | 15:51:25 |

Transcript of Michael Cross
Conducted on October 16, 2020                                    232

| | | |
|---|---|---|
| 1 | stood up and yelled is because you were employing | 15:51:44 |
| 2 | a technique against Mr. Amor; correct? | 15:51:48 |
| 3 | A Yes. | 15:51:50 |
| 4 | Q You were confronting him? You were -- | 15:51:51 |
| 5 | sorry -- yes? | 15:51:55 |
| 6 | A Yes. | 15:51:58 |
| 7 | Q You were making it so that he couldn't | 15:51:58 |
| 8 | keep on telling a story you thought was not true? | 15:52:00 |
| 9 | A Correct. | 15:52:04 |
| 10 | Q Because you believed that Mr. Amor had set | 15:52:04 |
| 11 | the fire intentionally; correct? | 15:52:08 |
| 12 | A Yes. | 15:52:10 |
| 13 | Q And you believed that he had set the fire | 15:52:11 |
| 14 | by dropping a lit cigarette onto the soaked vodka; | 15:52:14 |
| 15 | correct? | 15:52:21 |
| 16 | A No. | 15:52:21 |
| 17 | Q Well, Mr. Amor had said that he had | 15:52:22 |
| 18 | dropped potentially a lit cigarette onto the | 15:52:30 |
| 19 | newspaper-soaked vodka; correct? | 15:52:35 |
| 20 | A Yes. | 15:52:39 |
| 21 | MR. POLICK: Objection to the form but the | 15:52:40 |
| 22 | answer can stand. | 15:52:41 |
| 23 | Q And that's not how you believed he had set | 15:52:43 |
| 24 | the fire? | 15:52:45 |

Transcript of Michael Cross
Conducted on October 16, 2020                          233

| | | |
|---|---|---|
| 1 | A   No. | 15:52:45 |
| 2 | Q   Is that because you knew that a cigarette | 15:52:46 |
| 3 | dropped on a newspaper-soaked vodka couldn't | 15:52:49 |
| 4 | actually start a fire? | 15:52:52 |
| 5 | A   At the time I didn't believe it could. | 15:52:53 |
| 6 | Q   You didn't believe a cigarette falling on | 15:52:56 |
| 7 | a vodka-soaked newspaper could start a fire at | 15:52:59 |
| 8 | the time? | 15:53:02 |
| 9 | A   I did not believe that. | 15:53:02 |
| 10 | Q   Okay.  And so after Mr. Amor starts making | 15:53:05 |
| 11 | admissions, what exactly did he say? | 15:53:11 |
| 12 | A   Say that again, please. | 15:53:17 |
| 13 | Q   Yes.  You said earlier Mr. Amor began | 15:53:19 |
| 14 | making admissions to Mr. Guerrieri when you came | 15:53:22 |
| 15 | back into the room; right? | 15:53:26 |
| 16 | A   Yes. | 15:53:27 |
| 17 | Q   And what admissions did he make? | 15:53:28 |
| 18 | A   He was admitting to starting the fire and | 15:53:29 |
| 19 | intending to do it for monetary gain.  They needed | 15:53:34 |
| 20 | new furniture; they wanted a new TV; he didn't | 15:53:42 |
| 21 | believe that anybody would be harmed or he didn't | 15:53:46 |
| 22 | intend to harm anybody. | 15:53:49 |
| 23 | Q   He said he didn't intend to harm anybody; | 15:53:53 |
| 24 | correct? | 15:53:56 |

Transcript of Michael Cross
Conducted on October 16, 2020                    234

| | | |
|---|---|---|
| 1 | A  Yes. | 15:53:56 |
| 2 | Q  What did he -- how did he explain how the | 15:54:00 |
| 3 | fire had started? | 15:54:04 |
| 4 | A  He said he spilled vodka and dropped a | 15:54:05 |
| 5 | cigarette in it. | 15:54:09 |
| 6 | Q  And you said you didn't believe that the | 15:54:10 |
| 7 | fire could have been started prior to that moment | 15:54:13 |
| 8 | by dropping a cigarette on newspaper-soaked vodka; | 15:54:16 |
| 9 | correct? | 15:54:21 |
| 10 | A  Correct. | 15:54:22 |
| 11 | MR. POLICK:  Object to the form of the | 15:54:22 |
| 12 | question -- | 15:54:24 |
| 13 | Q  Why did you believe -- | 15:54:24 |
| 14 | MR. POLICK:  -- but you may answer. | 15:54:25 |
| 15 | Q  Did you believe then Mr. Amor's statement | 15:54:26 |
| 16 | then as to how the fire started? | 15:54:28 |
| 17 | A  No.  I believed he was minimizing. | 15:54:30 |
| 18 | Q  If you believed he was minimizing, why did | 15:54:33 |
| 19 | you not confront him more? | 15:54:41 |
| 20 | A  I probably did. | 15:54:43 |
| 21 | Q  And what did he say? | 15:54:45 |
| 22 | A  He continued to tell the same story until | 15:54:46 |
| 23 | I left the room and Guerrieri stayed in the room, | 15:54:52 |
| 24 | and then he made admissions. | 15:54:59 |

Transcript of Michael Cross
Conducted on October 16, 2020                    235

1     Q  I'm asking you if you kept on confronting          15:55:00

2  after he had already made admissions.                    15:55:03

3     A  I don't believe so.                                15:55:06

4     Q  You said you felt that he was minimizing           15:55:07

5  the way that the fire was started; correct?              15:55:09

6     A  Yes.                                               15:55:11

7     Q  So why didn't you keep on confronting him          15:55:12

8  as had been your technique before as to what the         15:55:16

9  real story was if you thought he was minimizing?         15:55:19

10    A  I -- I don't know.                                 15:55:22

11    Q  Doesn't that go counter to the technique           15:55:24

12 you had been employing before?                           15:55:29

13    MR. POLICK:  Objection to the form of the             15:55:30

14 question.                                                15:55:32

15    But you may answer.                                   15:55:33

16    A  I don't know.                                      15:55:34

17    Q  Doesn't it run counter to a technique of           15:55:35

18 confronting someone if they're giving you a story        15:55:38

19 you don't believe is true?                               15:55:41

20    MR. POLICK:  Same objection to the form.              15:55:43

21    You may answer.                                       15:55:46

22    A  I was glad that we had an admission.  Why          15:55:46

23 I didn't go forward with asking further or               15:55:49

24 confronting him with lies again, I don't know.           15:55:51

Transcript of Michael Cross
Conducted on October 16, 2020                    236

| | | |
|---|---|---|
| 1 | Maybe because I didn't feel that he would ultimately | 15:55:54 |
| 2 | tell me the entire truth. | 15:55:58 |
| 3 | Q  So you were okay with him -- strike that. | 15:55:59 |
| 4 | He later wrote down a written statement of | 15:56:05 |
| 5 | his admissions; correct? | 15:56:09 |
| 6 | A  Yes. | 15:56:10 |
| 7 | Q  He told substantially the same story? | 15:56:11 |
| 8 | A  Yes. | 15:56:14 |
| 9 | Q  And you're okay with him writing down an | 15:56:14 |
| 10 | admission that you knew or believed not to | 15:56:17 |
| 11 | actually be true? | 15:56:19 |
| 12 | MR. POLICK:  Objection to the form of the | 15:56:20 |
| 13 | question. | 15:56:22 |
| 14 | You can answer over the objection. | 15:56:22 |
| 15 | A  I wouldn't say that, no. | 15:56:23 |
| 16 | Q  Then why did you let him write down a | 15:56:26 |
| 17 | statement that you believed not to be true? | 15:56:30 |
| 18 | MR. POLICK:  Objection to the form of the | 15:56:34 |
| 19 | question. | 15:56:35 |
| 20 | Again, you may answer over that objection. | 15:56:35 |
| 21 | A  At this point I'm totally lost at what | 15:56:39 |
| 22 | you're asking.  It's one of these things that my | 15:56:43 |
| 23 | mind is shutting down, I think.  I get to this | 15:56:47 |
| 24 | point where because of my medical and psychological | 15:56:52 |

Transcript of Michael Cross
Conducted on October 16, 2020                    237

| | | |
|---|---|---|
| 1 | condition that I just shut down. | 15:57:00 |
| 2 | MR. POLICK:  Do you need to break, Mike? | 15:57:05 |
| 3 | THE WITNESS:  I don't know if it would do | 15:57:09 |
| 4 | any good, Joe. | 15:57:11 |
| 5 | MR. POLICK:  Do you want to take a break | 15:57:12 |
| 6 | and see if that helps? | 15:57:14 |
| 7 | THE WITNESS:  I guess I could.  I just | 15:57:15 |
| 8 | don't want to drag this on and drag it out. | 15:57:17 |
| 9 | MR. POLICK:  It's not dragging on. | 15:57:20 |
| 10 | Ms. Garcia has the amount of time that she has to | 15:57:23 |
| 11 | do that, and she's entitled to that time.  So if | 15:57:26 |
| 12 | you're feeling that you need to take a break | 15:57:29 |
| 13 | because you're becoming overwhelmed like you did | 15:57:32 |
| 14 | earlier, then I suggest we take a break and we | 15:57:35 |
| 15 | come back and do that, but she's entitled to the | 15:57:38 |
| 16 | time that she has here. | 15:57:41 |
| 17 | THE WITNESS:  Let's just keep going. | 15:57:43 |
| 18 | BY MS. GARCIA: | 15:57:46 |
| 19 | Q   Okay.  I'm going to back up a little bit. | 15:57:57 |
| 20 | So Mr. Amor makes a statement to you that | 15:57:59 |
| 21 | he started the fire by dropping a cigarette on | 15:58:04 |
| 22 | newspaper-soaked vodka; correct? | 15:58:10 |
| 23 | MR. POLICK:  Object to the form of the | 15:58:13 |
| 24 | question. | 15:58:14 |

Transcript of Michael Cross
Conducted on October 16, 2020                              238

| | | |
|---|---|---|
| 1 | But you can go ahead and answer. | 15:58:15 |
| 2 | A  Yes. | 15:58:16 |
| 3 | Q  And previously you testified you didn't | 15:58:19 |
| 4 | believe that dropping a newspaper on -- my | 15:58:24 |
| 5 | apologies -- dropping a cigarette on a newspaper | 15:58:29 |
| 6 | soaked with vodka could start a fire; correct? | 15:58:34 |
| 7 | A  Correct. | 15:58:37 |
| 8 | Q  And after he confessed, you still didn't | 15:58:37 |
| 9 | believe that dropping a cigarette on newspaper-soaked | 15:58:40 |
| 10 | vodka could start a fire; correct? | 15:58:43 |
| 11 | A  Correct. | 15:58:44 |
| 12 | MR. POLICK:  Again, objection to the form | 15:58:44 |
| 13 | but the answer can stand. | 15:58:46 |
| 14 | Q  And you testified you felt he was | 15:58:46 |
| 15 | minimizing his answer -- his answer for why the | 15:58:48 |
| 16 | fire had started; correct? | 15:58:52 |
| 17 | A  Correct. | 15:58:54 |
| 18 | Q  And yet you didn't ask him any follow-up | 15:58:54 |
| 19 | questions to try and elicit what would have been a | 15:58:57 |
| 20 | believable cause of the fire? | 15:59:02 |
| 21 | MR. POLICK:  Objection to the form of the | 15:59:05 |
| 22 | question. | 15:59:08 |
| 23 | You may answer over the objection. | 15:59:08 |
| 24 | A  I don't believe so. | 15:59:10 |

Transcript of Michael Cross
Conducted on October 16, 2020                    239

| | | |
|---|---|---|
| 1 | Q  Did you ask any questions to try and | 15:59:10 |
| 2 | elicit what would have been a believable reason | 15:59:13 |
| 3 | for the fire to have been started? | 15:59:16 |
| 4 | MR. POLICK:  Objection to the form of the | 15:59:18 |
| 5 | question. | 15:59:20 |
| 6 | You may answer over the objection. | 15:59:21 |
| 7 | A  I don't recall. | 15:59:22 |
| 8 | Q  You don't recall or you did not? | 15:59:23 |
| 9 | MR. POLICK:  That's been asked and answered. | 15:59:26 |
| 10 | A  I don't recall. | 15:59:28 |
| 11 | Q  So you might have asked more questions | 15:59:30 |
| 12 | after his admission? | 15:59:33 |
| 13 | MR. POLICK:  Objection; calls for | 15:59:34 |
| 14 | speculation. | 15:59:36 |
| 15 | But go ahead and answer. | 15:59:36 |
| 16 | A  I don't remember. | 15:59:41 |
| 17 | Q  And did you eventually ask Mr. Amor why he | 15:59:43 |
| 18 | did what he did? | 16:00:02 |
| 19 | A  You mean as far as setting the fire? | 16:00:05 |
| 20 | Q  Yes. | 16:00:08 |
| 21 | A  Yes. | 16:00:09 |
| 22 | Q  What did he say? | 16:00:09 |
| 23 | A  He said they needed new furniture, he had | 16:00:10 |
| 24 | a bill to pay, and he thought he could get some | 16:00:16 |

Transcript of Michael Cross
Conducted on October 16, 2020                    240

| | | |
|---|---|---|
| 1 | money for the bill that he had to pay and they | 16:00:20 |
| 2 | could get maybe a new place to live in. | 16:00:24 |
| 3 | Q  Did he say there was any other reason? | 16:00:28 |
| 4 | A  I don't recall. | 16:00:29 |
| 5 | Q  And when the cigarette fell on the | 16:00:31 |
| 6 | newspapers soaked in vodka, did Mr. Amor indicate | 16:00:48 |
| 7 | that he saw flames? | 16:00:52 |
| 8 | MR. POLICK:  Objection to the form of the | 16:00:54 |
| 9 | question. | 16:00:55 |
| 10 | But you may answer. | 16:00:58 |
| 11 | A  He said he heard sizzling and saw some | 16:01:00 |
| 12 | smoke.  I don't recall him saying that he saw | 16:01:03 |
| 13 | flames. | 16:01:07 |
| 14 | Q  After Mr. Amor told you why he started the | 16:01:10 |
| 15 | fire, what happened next? | 16:01:34 |
| 16 | A  I don't recall. | 16:01:38 |
| 17 | Q  Did he -- and around what time did he make | 16:01:46 |
| 18 | the admission that he started the fire? | 16:01:56 |
| 19 | A  I don't recall. | 16:01:57 |
| 20 | Q  Do you recall whether or not he made a | 16:01:58 |
| 21 | written statement after he gave his verbal | 16:02:07 |
| 22 | admissions? | 16:02:13 |
| 23 | A  Yes. | 16:02:13 |
| 24 | Q  Do you recall what time he gave his | 16:02:14 |

Transcript of Michael Cross
Conducted on October 16, 2020                                    241

| | | |
|---|---|---|
| 1 | written statement? | 16:02:16 |
| 2 | A  No. | 16:02:17 |
| 3 | Q  Do you recall how long it took him to give | 16:02:18 |
| 4 | a written statement? | 16:02:24 |
| 5 | A  It was less than an hour. | 16:02:26 |
| 6 | Q  Were you and Detective Guerrieri still | 16:02:28 |
| 7 | both in the room with him when he gave his written | 16:02:31 |
| 8 | statement? | 16:02:34 |
| 9 | A  Guerrieri was there.  I believe I went to | 16:02:34 |
| 10 | call Nigohosian, the State's Attorney. | 16:02:37 |
| 11 | Q  Around what time did you call Mr. Nigohosian? | 16:02:41 |
| 12 | A  I don't recall. | 16:02:44 |
| 13 | Q  What did you tell Mr. Nigohosian when you | 16:02:45 |
| 14 | called him? | 16:02:48 |
| 15 | A  That we had a suspect in an arson fire | 16:02:48 |
| 16 | measure -- or arson fire where somebody had died | 16:02:54 |
| 17 | and that we were questioning him. | 16:02:59 |
| 18 | Q  And prior to Mr. Nigohosian arriving at | 16:03:03 |
| 19 | Naperville Police Department, you had Mr. Amor | 16:03:07 |
| 20 | read his written confession into a tape recorder; | 16:03:11 |
| 21 | correct? | 16:03:16 |
| 22 | A  Yes. | 16:03:16 |
| 23 | Q  Why did you have him do that? | 16:03:18 |
| 24 | A  So that we would have a verbal documentation | 16:03:20 |

Transcript of Michael Cross
Conducted on October 16, 2020                    242

| | | |
|---|---|---|
| 1 | of the confession. | 16:03:24 |
| 2 |    Q  And did you have access to a tape recorder | 16:03:26 |
| 3 | the entire time you were at Naperville Police | 16:03:29 |
| 4 | Department? | 16:03:31 |
| 5 |    A  Yes. | 16:03:31 |
| 6 |    Q  Why did you not use a tape recorder earlier | 16:03:32 |
| 7 | in the interrogation? | 16:03:35 |
| 8 |    A  Just didn't. | 16:03:36 |
| 9 |    Q  Was there a practice against using the | 16:03:37 |
| 10 | tape recorder? | 16:03:42 |
| 11 |    A  No.  The practice that became where he | 16:03:43 |
| 12 | recorded the entire interview came later than 1995. | 16:03:45 |
| 13 |    Q  You could have if you wanted to; correct? | 16:03:54 |
| 14 |    A  Sure. | 16:04:00 |
| 15 |    Q  And you decided not to? | 16:04:01 |
| 16 |    A  What was your question? | 16:04:05 |
| 17 |    Q  You decided not to use a tape recorder? | 16:04:27 |
| 18 |    A  I just didn't use a tape recorder. | 16:04:31 |
| 19 |    Q  And what happened after Mr. Amor gave his | 16:04:35 |
| 20 | statement into the tape recorder? | 16:04:53 |
| 21 |    A  I don't recall. | 16:04:56 |
| 22 |    Q  How long between giving a statement to the | 16:05:03 |
| 23 | tape recorder and Mr. Nigohosian arriving at | 16:05:08 |
| 24 | Naperville Police Department was it? | 16:05:10 |

Transcript of Michael Cross
Conducted on October 16, 2020                    243

| | | |
|---|---|---|
| 1 | A  Between a half hour and an hour. | 16:05:14 |
| 2 | Q  And what time did Mr. Nigohosian arrive at | 16:05:18 |
| 3 | the Naperville Police Department? | 16:05:23 |
| 4 | A  I don't recall. | 16:05:23 |
| 5 | Q  What happened after Mr. Nigohosian arrived | 16:05:24 |
| 6 | at the Naperville Police Department? | 16:05:27 |
| 7 | A  I explained to him what was going on, and | 16:05:28 |
| 8 | he asked to talk to Amor. | 16:05:35 |
| 9 | Q  Okay.  Did you tell him that Mr. Amor had | 16:05:38 |
| 10 | confessed to starting -- or intending to start a | 16:05:42 |
| 11 | fire by dropping a cigarette onto vodka-soaked | 16:05:48 |
| 12 | newspapers? | 16:05:55 |
| 13 | A  I told him -- | 16:05:56 |
| 14 | MR. POLICK:  Objection to the form. | 16:05:57 |
| 15 | I'm sorry; go ahead. | 16:06:00 |
| 16 | A  I told him what Bill Amor had said to | 16:06:02 |
| 17 | me, yes. | 16:06:05 |
| 18 | Q  Did you tell him that you didn't believe | 16:06:05 |
| 19 | that a fire could start by dropping a cigarette | 16:06:08 |
| 20 | onto vodka-soaked newspaper? | 16:06:12 |
| 21 | A  I don't recall. | 16:06:15 |
| 22 | Q  How long did you talk to Mr. Nigohosian | 16:06:16 |
| 23 | once he got to Naperville Police Department? | 16:06:18 |
| 24 | A  I would say between a half hour and | 16:06:20 |

Transcript of Michael Cross
Conducted on October 16, 2020                               244

| | | | |
|---|---|---|---|
| 1 | | 45 minutes. | 16:06:24 |
| 2 | Q | And where was Mr. Amor during this? | 16:06:25 |
| 3 | A | In the same interview room. | 16:06:28 |
| 4 | Q | Who was with Mr. Amor? | 16:06:30 |
| 5 | A | Guerrieri. | 16:06:32 |
| 6 | Q | And around what time did Mr. Nigohosian | 16:06:35 |
| 7 | | talk to Mr. Amor in the interview room? | 16:06:44 |
| 8 | A | I don't recall. | 16:06:48 |
| 9 | Q | And how long did he speak to Mr. Amor for? | 16:06:49 |
| 10 | A | I don't recall. | 16:06:52 |
| 11 | Q | What questions did Mr. Nigohosian ask | 16:06:57 |
| 12 | | Mr. Amor? | 16:07:01 |
| 13 | A | I don't know. | 16:07:01 |
| 14 | Q | And around what time did Mr. Nigohosian | 16:07:03 |
| 15 | | finish interviewing Mr. Amor? | 16:07:14 |
| 16 | A | What time did he begin? | 16:07:15 |
| 17 | Q | What time did he finish? | 16:07:18 |
| 18 | A | I don't recall. | 16:07:20 |
| 19 | Q | Where did that interview take place? | 16:07:23 |
| 20 | A | It took place in Sergeant McGury's office. | 16:07:25 |
| 21 | Q | And when did you take Mr. Amor from the | 16:07:31 |
| 22 | | interview room into Sergeant McGury's office? | 16:07:34 |
| 23 | A | When Mr. Nigohosian got there. | 16:07:39 |
| 24 | Q | Was it late at night when Mr. Amor gave | 16:07:42 |

Transcript of Michael Cross
Conducted on October 16, 2020                    245

| | | |
|---|---|---|
| 1 | Mr. Nigohosian the statement about his confession? | 16:07:51 |
| 2 | A  What do you consider late at night? | 16:07:57 |
| 3 | Q  Past 1:00 in the morning. | 16:08:01 |
| 4 | A  No.  I don't believe so. | 16:08:04 |
| 5 | Q  So he gave the statement prior to 1:00 in | 16:08:07 |
| 6 | the morning to Mr. Nigohosian? | 16:08:10 |
| 7 | A  I'm -- I'm not positive but I believe so. | 16:08:11 |
| 8 | Q  Mr. Cross, will you please read from page -- | 16:08:21 |
| 9 | the middle of page 3 of Exhibit 5 until the end of | 16:08:39 |
| 10 | Exhibit 5.  And that starts where it says, | 16:08:51 |
| 11 | "Tuesday, 10/03/95 2:15 p.m."  and just let me | 16:08:54 |
| 12 | know when you're done. | 16:09:02 |
| 13 | A  Okay. | 16:09:04 |
| 14 | MR. POLICK:  Which document are you asking | 16:09:04 |
| 15 | him to read? | 16:09:05 |
| 16 | MS. GARCIA:  Exhibit 5, so that's -- | 16:09:06 |
| 17 | THE WITNESS:  Yes, okay.  I have that. | 16:09:13 |
| 18 | MR. POLICK:  Do you have that in front | 16:09:15 |
| 19 | of you? | 16:09:16 |
| 20 | THE WITNESS:  Yes.  What page? | 16:09:16 |
| 21 | MS. GARCIA:  Page -- I think it's No. 4, | 16:09:20 |
| 22 | and it's Bates No. 11276. | 16:09:23 |
| 23 | THE WITNESS:  For 10/3/95 at 2:15 p.m.? | 16:09:51 |
| 24 | MS. GARCIA:  Yes.  And all the way until | 16:10:00 |

| | | |
|---|---|---|
| 1 | the end. | 16:10:02 |
| 2 | THE WITNESS:  Okay. | 16:12:20 |
| 3 | BY MS. GARCIA: | 16:12:24 |
| 4 | Q  Mr. Amor -- sorry -- Mr. Cross, does that | 16:12:25 |
| 5 | refresh your recollection at all as to the | 16:12:28 |
| 6 | interrogation of Mr. Amor on October 3rd, 1995? | 16:12:34 |
| 7 | MR. POLICK:  I'm going to object to the | 16:12:40 |
| 8 | form.  What you just had him read was about | 16:12:45 |
| 9 | Reid & Associates and the DeKalb County jail.  You | 16:12:49 |
| 10 | specified page 4, which is DEFS 11276? | 16:12:53 |
| 11 | MS. GARCIA:  Yes. | 16:13:02 |
| 12 | Q  Does reading this refresh your recollection | 16:13:03 |
| 13 | as to the interrogation or polygraph of Mr. Amor | 16:13:05 |
| 14 | at Reid & Associates? | 16:13:09 |
| 15 | MR. POLICK:  Objection to the form of that | 16:13:11 |
| 16 | question. | 16:13:16 |
| 17 | But go ahead. | 16:13:16 |
| 18 | A  I believe so.  Didn't I already answer that? | 16:13:18 |
| 19 | Q  No, you said that you did not have an | 16:13:23 |
| 20 | independent recollection of certain things that | 16:13:34 |
| 21 | occurred during the investigation at Reid & | 16:13:37 |
| 22 | Associates, which is why I'm asking you if this | 16:13:41 |
| 23 | refreshes your recollection at all. | 16:13:44 |
| 24 | A  This doesn't -- the page I'm reading doesn't | 16:13:46 |

Transcript of Michael Cross
Conducted on October 16, 2020                     247

| | | |
|---|---|---|
| 1 | have anything at all about Reid & Associates. | 16:13:51 |
| 2 | MR. POLICK:  What page are you on, Mike? | 16:13:52 |
| 3 | THE WITNESS:  11277. | 16:13:55 |
| 4 | MR. POLICK:  No, it's the page before. | 16:13:59 |
| 5 | She's directing you to the page before, 11276, | 16:14:00 |
| 6 | which is page 4 of the report. | 16:14:08 |
| 7 | THE WITNESS:  What did you want me to | 16:14:24 |
| 8 | read, ma'am? | 16:14:26 |
| 9 | MS. GARCIA:  From page 4 of the report to | 16:14:27 |
| 10 | page 7 of the report. | 16:14:28 |
| 11 | THE WITNESS:  Okay. | 16:18:28 |
| 12 | Q  So on page 4, which is Bates 11276, the | 16:18:30 |
| 13 | last two paragraphs summarize your -- you and | 16:18:36 |
| 14 | Mr. Guerrieri taking Mr. Amor to Reid & Associates; | 16:18:45 |
| 15 | correct? | 16:18:48 |
| 16 | A  Yes. | 16:18:48 |
| 17 | Q  And within these two paragraphs -- | 16:18:49 |
| 18 | strike that. | 16:18:57 |
| 19 | Besides what you've testified to today and | 16:18:58 |
| 20 | what's within these two paragraphs, do you have | 16:19:01 |
| 21 | any other independent recollections of what | 16:19:03 |
| 22 | occurred at Reid & Associates on October 3rd, 1995? | 16:19:06 |
| 23 | A  No. | 16:19:10 |
| 24 | Q  And then the first paragraph of page 5, | 16:19:12 |

Transcript of Michael Cross
Conducted on October 16, 2020                    248

| | | |
|---|---|---|
| 1 | Bates 11277 it describes your journey back to | 16:19:18 |
| 2 | Naperville Police Department from Reid & Associates; | 16:19:26 |
| 3 | correct? | 16:19:27 |
| 4 | A  Yes. | 16:19:28 |
| 5 | Q  And in this paragraph -- strike that. | 16:19:34 |
| 6 | Other than what you've testified to today | 16:19:40 |
| 7 | and what's within this paragraph, are there any | 16:19:43 |
| 8 | other details you independently recall about the | 16:19:48 |
| 9 | trip from Reid & Associates to Naperville Police | 16:19:51 |
| 10 | Department? | 16:19:54 |
| 11 | A  No. | 16:19:54 |
| 12 | Q  And on the second paragraph of page 5 it | 16:19:55 |
| 13 | talks about you advising -- or Mr. Amor being | 16:20:12 |
| 14 | advised of his Miranda warnings, signing a waiver, | 16:20:18 |
| 15 | and the process of Mr. Guerrieri asking Bill to go | 16:20:29 |
| 16 | over the story again; correct? | 16:20:33 |
| 17 | MR. POLICK:  Which section are you | 16:20:37 |
| 18 | referring to, Counsel? | 16:20:39 |
| 19 | MS. GARCIA:  The second paragraph on page 5. | 16:20:41 |
| 20 | A  What was your question, please? | 16:21:12 |
| 21 | Q  Sure.  The first half of the second | 16:21:14 |
| 22 | paragraph describes the process of Mr. Amor being | 16:21:16 |
| 23 | advised of his Miranda rights and being asked if | 16:21:25 |
| 24 | he would go over his recollection of the night of | 16:21:31 |

Transcript of Michael Cross
Conducted on October 16, 2020                    249

| | | |
|---|---|---|
| 1 | the fire again; correct? | 16:21:33 |
| 2 | A  Well, he signed the form and then | 16:21:34 |
| 3 | Guerrieri started going over the facts. | 16:21:39 |
| 4 | Q  Okay.  And besides what you've testified | 16:21:42 |
| 5 | to here today and what's within the first 1, 2, 3, | 16:21:44 |
| 6 | 4 1/2 sentences of the second paragraph, do you | 16:21:53 |
| 7 | have any other independent recollection of what | 16:21:59 |
| 8 | occurred? | 16:22:00 |
| 9 | A  Not other than reading what this says here. | 16:22:01 |
| 10 | Q  Okay.  And then from the part that says, | 16:22:08 |
| 11 | "I then advised Bill Amor that Tina told other | 16:22:13 |
| 12 | investigators that he had intentionally started | 16:22:17 |
| 13 | the fire but she didn't think he intended to kill | 16:22:19 |
| 14 | Marianne" to the second paragraph, the end of the | 16:22:23 |
| 15 | second paragraph on page 6 you summarize the sum | 16:22:42 |
| 16 | and substance of what Mr. Amor said happened on | 16:22:54 |
| 17 | September 10th, 1995? | 16:22:58 |
| 18 | A  Seven questions? | 16:23:00 |
| 19 | Q  The sum and substance? | 16:23:02 |
| 20 | A  Oh, sum and substance. | 16:23:03 |
| 21 | MR. POLICK:  Which paragraph of what page? | 16:23:05 |
| 22 | MS. GARCIA:  From the second paragraph on | 16:23:08 |
| 23 | page 5 to the second paragraph on page 6. | 16:23:09 |
| 24 | Q  It says on the second paragraph, | 16:23:12 |

Transcript of Michael Cross
Conducted on October 16, 2020                    250

```
 1    "Following is the sum and substance of what        16:23:15

 2    Mr. Amor said happened"; correct?                  16:23:17

 3        A  I'm sorry; what paragraph did it summarize? 16:23:19

 4        Q  At the bottom of the second paragraph.      16:23:33

 5        A  On that page, on page 7?                     16:23:39

 6        Q  On page 5.                                   16:23:41

 7        A  Okay.  That was like the -- the end of the  16:23:54

 8    first paragraph -- or the second paragraph on      16:23:57

 9    page 5, yes.                                        16:23:59

10        Q  Yes.  Up until the second paragraph on      16:24:00

11    page 6, Mr. Amor describes what happened the night 16:24:03

12    of the fire; correct?                              16:24:11

13        A  Yes.                                         16:24:12

14        Q  And other than what you've written in       16:24:13

15    these paragraphs and what you've testified to here 16:24:19

16    today, do you have any other independent recollection 16:24:21

17    as to Mr. Amor's confession about how the fire     16:24:28

18    started on the night of September 10th, 1995?      16:24:34

19        A  No.                                          16:24:38

20        Q  And in the third paragraph of page 6 you    16:24:49

21    wrote about the reasons why Mr. Amor started the   16:24:56

22    fire; correct?                                      16:25:04

23        MR. POLICK:  Objection to the form of the      16:25:05

24    question.                                           16:25:08
```

Transcript of Michael Cross
Conducted on October 16, 2020                    251

| | | |
|---|---|---|
| 1 | But you may answer. | 16:25:11 |
| 2 | A  Yes. | 16:25:13 |
| 3 | Q  You asked him if he did it to collect life | 16:25:14 |
| 4 | insurance.  He said he did it to collect content | 16:25:18 |
| 5 | insurance; correct? | 16:25:21 |
| 6 | A  Yes. | 16:25:22 |
| 7 | Q  Said he planned to use the insurance money | 16:25:22 |
| 8 | to pay for Fingerhut products and get a new TV and | 16:25:26 |
| 9 | some furniture; correct? | 16:25:30 |
| 10 | A  Yes. | 16:25:31 |
| 11 | Q  And outside of him saying he wanted the | 16:25:32 |
| 12 | contents insurance and he was planning on using | 16:25:37 |
| 13 | that money to pay for Fingerhut products and get a | 16:25:40 |
| 14 | new TV and some new furniture, is there any other | 16:25:44 |
| 15 | reason you can recall Mr. Amor giving you for the | 16:25:47 |
| 16 | reason he started the fire? | 16:25:51 |
| 17 | A  No. | 16:25:52 |
| 18 | Q  And then the -- in the fourth paragraph, | 16:25:54 |
| 19 | page 6 it says that you asked Tina -- you asked | 16:26:10 |
| 20 | Mr. Amor why Tina didn't see the fire if she | 16:26:18 |
| 21 | walked out after him; correct? | 16:26:21 |
| 22 | A  I'm sorry; I'm adjusting this thing again. | 16:26:23 |
| 23 | Q  Yeah, of course. | 16:26:26 |
| 24 | A  I'm sorry.  I thought I could keep | 16:26:27 |

Transcript of Michael Cross
Conducted on October 16, 2020                    252

| | | |
|---|---|---|
| 1 | following you but I can't.  Okay.  Go ahead. | 16:26:31 |
| 2 | Q  In paragraph 4 on page 6 -- | 16:26:35 |
| 3 | A  Okay. | 16:26:41 |
| 4 | Q  -- Mr. Amor says that Tina, according to | 16:26:42 |
| 5 | what you wrote, didn't see the fire after she | 16:26:49 |
| 6 | walked out after him? | 16:26:51 |
| 7 | A  Yes. | 16:26:53 |
| 8 | Q  And you asked why; correct? | 16:26:54 |
| 9 | A  I asked -- asked if he was trying to | 16:26:58 |
| 10 | protect Tina. | 16:27:04 |
| 11 | Q  And he said he wasn't; correct? | 16:27:04 |
| 12 | A  Correct. | 16:27:06 |
| 13 | Q  And other than what you've written here | 16:27:07 |
| 14 | and what you've testified about, do you have any | 16:27:11 |
| 15 | other independent recollection about why Mr. Amor | 16:27:13 |
| 16 | believed Tina hadn't seen the flames? | 16:27:23 |
| 17 | A  No. | 16:27:27 |
| 18 | Q  And the last -- second to last paragraph | 16:27:28 |
| 19 | of page 6 you ask -- Mr. Guerrieri, according to | 16:27:54 |
| 20 | your report, said that he did not look at the fire | 16:28:00 |
| 21 | before he walked out of the door; correct? | 16:28:07 |
| 22 | MR. POLICK:  Objection to the form of the | 16:28:10 |
| 23 | question. | 16:28:13 |
| 24 | You can go ahead and answer. | 16:28:14 |

Transcript of Michael Cross
Conducted on October 16, 2020                      253

| | | |
|---|---|---|
| 1 | A  I believe he said that -- asked Tina, not | 16:28:16 |
| 2 | Bill.  Were you asking about Tina? | 16:28:19 |
| 3 | Q  No.  I was asking about Bill. | 16:28:22 |
| 4 | A  No, this was about Tina.  I asked Tina -- | 16:28:24 |
| 5 | I asked Tina -- I asked why Tina didn't see the | 16:28:30 |
| 6 | fire if she walked out after him.  He said he | 16:28:36 |
| 7 | didn't know.  And he talked about at the movie | 16:28:39 |
| 8 | they didn't talk about it.  He kept telling me | 16:28:44 |
| 9 | that Tina knew nothing about it, and he said he | 16:28:48 |
| 10 | wasn't trying to protect Tina. | 16:28:53 |
| 11 | Q  And do you have any other independent | 16:28:55 |
| 12 | recollection of the conversation about why Tina | 16:29:00 |
| 13 | Miceli didn't see the flames? | 16:29:04 |
| 14 | A  No. | 16:29:06 |
| 15 | MR. POLICK:  Objection to the form. | 16:29:06 |
| 16 | The answer can stand. | 16:29:09 |
| 17 | A  (Continuing.)  No. | 16:29:11 |
| 18 | Q  And in paragraph -- in the last paragraph | 16:29:13 |
| 19 | of page 6 into the first paragraph of page 7, you | 16:29:23 |
| 20 | wrote about the smoke detector in the Miceli | 16:29:30 |
| 21 | residence; correct? | 16:29:41 |
| 22 | A  Yes. | 16:29:42 |
| 23 | Q  And Mr. Amor said he didn't take it down; | 16:29:42 |
| 24 | correct? | 16:29:45 |

Transcript of Michael Cross
Conducted on October 16, 2020                    254

| | | |
|---|---|---|
| 1 | A  Yes.  At first. | 16:29:45 |
| 2 | Q  And he said that he just took the cover | 16:29:47 |
| 3 | off the smoke detector; correct? | 16:29:50 |
| 4 | A  Correct. | 16:29:53 |
| 5 | Q  He said that him and Tina got a new | 16:29:53 |
| 6 | battery; correct? | 16:29:57 |
| 7 | A  They went to Kmart to get a new battery. | 16:29:58 |
| 8 | Q  And he said they got a new battery because | 16:30:01 |
| 9 | the alarm was low so it would go off -- | 16:30:04 |
| 10 | A  Okay. | 16:30:07 |
| 11 | Q  -- and start to beep; correct? | 16:30:08 |
| 12 | A  Yes. | 16:30:09 |
| 13 | Q  And he said he bought a new battery but | 16:30:10 |
| 14 | never put it in and never put the cover back on; | 16:30:12 |
| 15 | correct? | 16:30:15 |
| 16 | A  Correct. | 16:30:15 |
| 17 | Q  And you advised him that you had not | 16:30:16 |
| 18 | located the smoke detector after it had -- after | 16:30:21 |
| 19 | you had observed the scene of the fire; correct? | 16:30:27 |
| 20 | A  Correct. | 16:30:30 |
| 21 | Q  And he said he did not know where it would | 16:30:32 |
| 22 | have been if not on the shelf; correct? | 16:30:37 |
| 23 | A  Correct. | 16:30:41 |
| 24 | Q  Is all of what you wrote in your report | 16:30:41 |

Transcript of Michael Cross
Conducted on October 16, 2020                               255

| | | |
|---|---|---|
| 1 | about the smoke detector truthful and accurate? | 16:30:45 |
| 2 | A Yes. | 16:30:50 |
| 3 | Q Do you have any other independent | 16:30:50 |
| 4 | recollection as to what Mr. Amor said about the | 16:30:53 |
| 5 | smoke detector on the night of October 3rd, 1995, | 16:31:01 |
| 6 | other than what you testified to today and what's | 16:31:04 |
| 7 | in your report? | 16:31:07 |
| 8 | A I'm not sure I testified to the fact that | 16:31:07 |
| 9 | when we went back into the building that we could | 16:31:10 |
| 10 | tell that the entire smoke detector was taken down | 16:31:13 |
| 11 | because there was soot covering the entire wall | 16:31:16 |
| 12 | and not -- that had been protected by anything, | 16:31:21 |
| 13 | including the smoke detector. | 16:31:24 |
| 14 | Q You don't -- as to the conversation you | 16:31:26 |
| 15 | had with Bill on the night of the confession, you | 16:31:29 |
| 16 | have no further independent recollection or do you? | 16:31:32 |
| 17 | A No. | 16:31:34 |
| 18 | Q And then in the -- in the second paragraph | 16:31:35 |
| 19 | on page 7 you said you asked him why he didn't | 16:31:52 |
| 20 | give a shit anymore; correct? | 16:31:59 |
| 21 | A Yes. | 16:32:01 |
| 22 | Q And he said he was trying to do better; | 16:32:02 |
| 23 | correct? | 16:32:04 |
| 24 | A Yes. | 16:32:04 |

Transcript of Michael Cross
Conducted on October 16, 2020                    256

| | | |
|---|---|---|
| 1 | Q  He got married in April and then got put | 16:32:05 |
| 2 | in jail? | 16:32:07 |
| 3 | A  Yes. | 16:32:08 |
| 4 | Q  He got out, he didn't have a job and was | 16:32:08 |
| 5 | drinking too much? | 16:32:11 |
| 6 | A  Yes. | 16:32:12 |
| 7 | Q  He went to start a small contained fire to | 16:32:12 |
| 8 | get some new things? | 16:32:16 |
| 9 | A  Yes. | 16:32:18 |
| 10 | Q  And you asked if Marianne knew anything | 16:32:18 |
| 11 | about his plan, and he said she did not? | 16:32:21 |
| 12 | A  Correct. | 16:32:25 |
| 13 | Q  And you said you asked him why he hadn't | 16:32:26 |
| 14 | done it when she was out of the apartment, and he | 16:32:28 |
| 15 | said he didn't know? | 16:32:31 |
| 16 | A  Correct. | 16:32:32 |
| 17 | Q  You asked him again if he had spilled the | 16:32:32 |
| 18 | vodka on purpose; he said he didn't know? | 16:32:35 |
| 19 | A  He said he did. | 16:32:38 |
| 20 | Q  Where does that say that on the report? | 16:32:41 |
| 21 | A  He said he didn't -- he said he didn't.  I | 16:32:43 |
| 22 | asked him if he spilled the vodka on purpose.  He | 16:32:45 |
| 23 | said he didn't.  I asked him if he knocked the | 16:32:49 |
| 24 | cigarette on the paper on purpose; he said he did. | 16:32:52 |

Transcript of Michael Cross
Conducted on October 16, 2020                        257

| | | |
|---|---|---|
| 1 | Q   Right.  And that's accurate? | 16:32:56 |
| 2 | A   Yes. | 16:32:57 |
| 3 | Q   You asked him if Tina knew anything about | 16:32:58 |
| 4 | his plan to start the fire, and he said she did | 16:33:02 |
| 5 | not.  Is that accurate? | 16:33:05 |
| 6 | A   Yes. | 16:33:06 |
| 7 | Q   "I asked him -- I asked if he would make a | 16:33:07 |
| 8 | written statement; he said he would"; is that | 16:33:10 |
| 9 | accurate? | 16:33:12 |
| 10 | A   Yes. | 16:33:12 |
| 11 | Q   "I gave him a statement form and he | 16:33:13 |
| 12 | started to write"; is that accurate? | 16:33:16 |
| 13 | A   Yes. | 16:33:16 |
| 14 | Q   And then you said you left the felony | 16:33:17 |
| 15 | screening room to speak to Assistant Attorney | 16:33:20 |
| 16 | Brian Nigohosian; is that correct? | 16:33:24 |
| 17 | A   I left the interview room to call Brian. | 16:33:25 |
| 18 | Q   Okay.  Or to contact felony screening | 16:33:27 |
| 19 | rather? | 16:33:30 |
| 20 | A   Correct. | 16:33:30 |
| 21 | Q   And Mr. Nigohosian advised you to get | 16:33:34 |
| 22 | Mr. Amor to do a tape-recorded statement; correct? | 16:33:38 |
| 23 | A   Yes. | 16:33:41 |
| 24 | Q   And then Mr. Nigohosian came to the police | 16:33:43 |

Transcript of Michael Cross
Conducted on October 16, 2020                    258

| | | |
|---|---|---|
| 1 | department and spoke to Investigator Guerrieri | 16:33:46 |
| 2 | around 3:00 in the morning; correct? | 16:33:49 |
| 3 | A  Yes. | 16:33:50 |
| 4 | Q  Mr. Nigohosian interviewed Mr. Amor in | 16:33:50 |
| 5 | Sergeant McGury's office; correct? | 16:33:55 |
| 6 | A  Yes. | 16:33:58 |
| 7 | Q  In Sergeant McGury's office he was | 16:33:58 |
| 8 | reminded of his Miranda rights and said he | 16:34:04 |
| 9 | understood them; correct? | 16:34:07 |
| 10 | A  Yes. | 16:34:08 |
| 11 | Q  And after that interview, Mr. Amor agreed | 16:34:08 |
| 12 | to take -- make another taped statement; correct? | 16:34:12 |
| 13 | A  Yes. | 16:34:16 |
| 14 | Q  And other than -- I just took you through | 16:34:17 |
| 15 | from leaving Reid & Associates all the way until | 16:34:24 |
| 16 | the taking of the statement by Mr. Nigohosian; | 16:34:31 |
| 17 | correct? | 16:34:32 |
| 18 | A  Yes. | 16:34:33 |
| 19 | Q  Other than what you've read in this report | 16:34:33 |
| 20 | and what you've testified to here today, do you | 16:34:38 |
| 21 | have any other independent recollection of what | 16:34:40 |
| 22 | occurred on October 3rd into October 4th, 1995? | 16:34:43 |
| 23 | A  No. | 16:34:49 |
| 24 | Q  And we discussed that writing reports are | 16:34:54 |

Transcript of Michael Cross
Conducted on October 16, 2020                                     259

| | | |
|---|---|---|
| 1 | important for memorialization purposes; correct? | 16:35:00 |
| 2 | A  Yes. | 16:35:05 |
| 3 | Q  And they're important because they might | 16:35:05 |
| 4 | be used later on in criminal prosecution? | 16:35:07 |
| 5 | A  Yes. | 16:35:10 |
| 6 | Q  And they're important because you might | 16:35:11 |
| 7 | need them to refresh your recollection; correct? | 16:35:13 |
| 8 | A  Yes. | 16:35:15 |
| 9 | Q  So where in the report did it mention that | 16:35:15 |
| 10 | a process server came to serve Mr. Amor divorce | 16:35:20 |
| 11 | papers? | 16:35:23 |
| 12 | A  I don't recall. | 16:35:24 |
| 13 | Q  Why was it not put in the report? | 16:35:26 |
| 14 | A  Don't know. | 16:35:28 |
| 15 | Q  Wouldn't that -- | 16:35:31 |
| 16 | A  I thought it was in the report.  I've | 16:35:32 |
| 17 | looked at it.  I never found it but I thought it | 16:35:34 |
| 18 | had been reported. | 16:35:38 |
| 19 | Q  Wouldn't that be an important part of the | 16:35:38 |
| 20 | interviewing and interrogation of Mr. Amor? | 16:35:42 |
| 21 | A  No, it would only be relative to the fact | 16:35:44 |
| 22 | that he got divorce papers. | 16:35:50 |
| 23 | Q  So you don't think it's important to | 16:35:51 |
| 24 | indicate that in a report about someone's | 16:35:54 |

Transcript of Michael Cross
Conducted on October 16, 2020                    260

| | | |
|---|---|---|
| 1 | confession that they were served divorce papers | 16:36:00 |
| 2 | only a few hours prior to that confession? | 16:36:02 |
| 3 | A  I believe it is -- I should have, yes. | 16:36:07 |
| 4 | Q  And why didn't you? | 16:36:10 |
| 5 | A  I don't know.  Again, I thought I had and | 16:36:11 |
| 6 | when I went over the report, I couldn't find it, | 16:36:15 |
| 7 | so I have to assume that I didn't write it down -- | 16:36:18 |
| 8 | or in the report. | 16:36:22 |
| 9 | Q  And you feel you should have written it down | 16:36:23 |
| 10 | because it would have been an important detail? | 16:36:35 |
| 11 | A  Yes. | 16:36:36 |
| 12 | Q  And you testified earlier that you felt | 16:36:37 |
| 13 | Mr. Amor was minimizing what occurred on the night | 16:36:55 |
| 14 | of the fire; correct? | 16:37:00 |
| 15 | A  Yes. | 16:37:02 |
| 16 | Q  And you wrote -- and you testified, rather, | 16:37:03 |
| 17 | that you didn't believe that a fire could be | 16:37:06 |
| 18 | started by dropping a lit cigarette onto vodka- | 16:37:09 |
| 19 | soaked newspapers; correct? | 16:37:13 |
| 20 | A  Correct. | 16:37:14 |
| 21 | Q  And where in the report does it say that | 16:37:15 |
| 22 | you didn't believe Mr. Amor's confession? | 16:37:17 |
| 23 | A  If you didn't find it, it's not there. | 16:37:20 |
| 24 | Q  And you just reviewed the report; correct? | 16:37:22 |

Transcript of Michael Cross
Conducted on October 16, 2020                    261

| | | |
|---|---|---|
| 1 | A   Correct. | 16:37:24 |
| 2 | Q   And did you see it in the report? | 16:37:24 |
| 3 | A   No. | 16:37:25 |
| 4 | Q   So it was not in the report? | 16:37:26 |
| 5 | MR. POLICK:  Objection to the form of the | 16:37:28 |
| 6 | question unless you're going to refer to a | 16:37:30 |
| 7 | specific part of the report but you can go ahead | 16:37:33 |
| 8 | and answer. | 16:37:36 |
| 9 | A   Apparently not. | 16:37:36 |
| 10 | Q   From the part you wrote -- read just | 16:37:37 |
| 11 | minutes ago about the time in between October 3rd, | 16:37:39 |
| 12 | 1995, and Reid & Associates and Mr. Amor giving | 16:37:46 |
| 13 | the statement to Mr. Nigohosian on October 4th, | 16:37:50 |
| 14 | 1995, there was no written statement saying that | 16:37:55 |
| 15 | you did not believe his confession; correct? | 16:37:59 |
| 16 | A   No. | 16:38:02 |
| 17 | Q   And there's no written statement in your | 16:38:02 |
| 18 | report that you believed he was trying to minimize | 16:38:04 |
| 19 | his statement; correct? | 16:38:08 |
| 20 | A   Correct. | 16:38:10 |
| 21 | Q   And wouldn't you agree with me that's a | 16:38:12 |
| 22 | pretty important aspect of this investigation? | 16:38:15 |
| 23 | A   Yes. | 16:38:17 |
| 24 | Q   So why didn't you put it in your report? | 16:38:18 |

Transcript of Michael Cross
Conducted on October 16, 2020                    262

```
 1        A  I don't know.  I kept it in my mind.  I        16:38:20

 2    don't know.                                           16:38:24

 3        Q  And did you follow up on it after?            16:38:24

 4        A  I don't recall.                               16:38:26

 5        Q  If you had followed up on it after, would     16:38:27

 6    you have memorialized it in another report?          16:38:29

 7        A  Yes.                                           16:38:32

 8        Q  Did you memorialize it in another report?     16:38:33

 9        A  No.                                            16:38:36

10        Q  Did you tell anyone that you felt he was      16:38:37

11    minimizing his confession?                            16:38:40

12        A  Not at that time, no.                         16:38:41

13        Q  Did you tell anyone that you felt his         16:38:46

14    confession was not believable?                        16:38:50

15        A  No.                                            16:38:51

16        Q  Did you tell anyone prior to Mr. Amor's       16:38:53

17    criminal trial you thought his confession was not    16:38:55

18    believable?                                           16:38:58

19        A  I don't recall.                               16:38:59

20        Q  Did you tell anyone prior to his retrial      16:39:00

21    you felt his confession was not believable?          16:39:02

22        A  I don't recall.                               16:39:05

23        Q  Did you do any follow-up investigation to     16:39:06

24    see if, in fact, his confession was believable or    16:39:14
```

Transcript of Michael Cross
Conducted on October 16, 2020                     263

| | | |
|---|---|---|
| 1 | reliable? | 16:39:18 |
| 2 | MR. POLICK:  Objection to the form of the | 16:39:21 |
| 3 | question. | 16:39:22 |
| 4 | A  I don't recall. | 16:39:28 |
| 5 | MS. GARCIA:  Can we take a break really | 16:39:30 |
| 6 | quickly so I can run to the bathroom? | 16:39:33 |
| 7 | MR. POLICK:  Yeah, sure. | 16:39:35 |
| 8 | THE VIDEOGRAPHER:  We are going off the | 16:39:36 |
| 9 | record at 4:39 p.m. | 16:39:38 |
| 10 | (Recess taken, 4:39 p.m. to 4:54 p.m.) | 16:54:11 |
| 11 | THE VIDEOGRAPHER:  We are back on the | 16:54:13 |
| 12 | record.  The time is 4:54 p.m. | 16:54:17 |
| 13 | BY MS. GARCIA: | 16:54:24 |
| 14 | Q  Mr. Cross, after Mr. Amor confessed, you | 16:54:25 |
| 15 | called or paged Mr. Ferreri; correct? | 16:54:32 |
| 16 | A  No. | 16:54:36 |
| 17 | Q  Do you recall calling or paging Mr. Ferreri? | 16:54:37 |
| 18 | A  No. | 16:54:41 |
| 19 | Q  If I represent to you that there's | 16:54:42 |
| 20 | testimony from Mr. Ferreri that you called him | 16:54:52 |
| 21 | after the confession, would you have reason to | 16:54:56 |
| 22 | dispute that? | 16:54:57 |
| 23 | A  At some point I spoke to him and told him | 16:54:58 |
| 24 | that Bill had confessed.  I don't know exactly | 16:55:02 |

Transcript of Michael Cross
Conducted on October 16, 2020                    264

```
1    when it was.                                        16:55:04

2        Q  It could have been that night?              16:55:05

3        A  It could have been that night, could have   16:55:06

4    been the next day.  It was pretty late -- getting  16:55:11

5    late that night.                                   16:55:17

6        Q  And prior to Mr. Amor's confession, there   16:55:19

7    had been indications as to the origin of where the 16:55:26

8    fire originated from; correct?                     16:55:31

9        A  I believe so, yes.                          16:55:34

10       Q  Okay.  And those indications led to a       16:55:35

11   determination that the origin was somewhere near   16:55:43

12   the swivel chair; correct?                         16:55:48

13       A  And the sliding glass doors.                16:55:50

14       Q  And the sliding glass doors.  But prior to  16:55:54

15   Mr. Amor's confession, there had been no cause     16:55:59

16   determination as to the fire itself; correct?      16:56:02

17       A  Correct.                                    16:56:05

18       Q  There had been no determination that it     16:56:05

19   was incendiary; correct?                           16:56:08

20       A  Say that again, please.                     16:56:11

21       Q  There had been no determination that the   16:56:12

22   cause was incendiary; correct?                     16:56:15

23       A  I don't think that's correct.              16:56:16

24       Q  Had there been a determination by          16:56:18
```

Transcript of Michael Cross
Conducted on October 16, 2020                    265

| 1  | Mr. Ferreri that the fire was incendiary -- | 16:56:22 |
| 2  | A  Yes. | 16:56:25 |
| 3  | Q  -- prior to the confession? | 16:56:25 |
| 4  | A  Yes. | 16:56:28 |
| 5  | Q  And where was that written down? | 16:56:29 |
| 6  | A  I don't recall.  Probably in Ferreri's | 16:56:36 |
| 7  | report. | 16:56:39 |
| 8  | Q  If I represent to you that there is nothing | 16:56:39 |
| 9  | written in Mr. Ferreri's reports from prior to the | 16:56:42 |
| 10 | confession that the cause of the fire was | 16:56:47 |
| 11 | incendiary, would you have reason to dispute that? | 16:56:49 |
| 12 | A  I believe he told me. | 16:56:51 |
| 13 | Q  When did he tell you? | 16:56:53 |
| 14 | A  I don't recall. | 16:56:54 |
| 15 | Q  And did you document somewhere that he | 16:56:55 |
| 16 | told you? | 16:56:57 |
| 17 | A  No. | 16:56:58 |
| 18 | Q  Why not? | 16:56:58 |
| 19 | A  I don't know. | 16:56:59 |
| 20 | Q  Isn't that important? | 16:57:01 |
| 21 | A  Yes, it's important. | 16:57:03 |
| 22 | Q  Wouldn't you -- | 16:57:05 |
| 23 | A  Again, I believe that he -- I believe that | 16:57:06 |
| 24 | he would have written it down, not me.  It was his | 16:57:08 |

Transcript of Michael Cross
Conducted on October 16, 2020                                    266

| | | |
|---|---|---|
| 1 | statement; it was his, you know, thoughts; it was | 16:57:12 |
| 2 | his determination. | 16:57:15 |
| 3 |    Q  You wrote reports about the investigation | 16:57:16 |
| 4 | as it went along; correct? | 16:57:21 |
| 5 |    A  Yes. | 16:57:23 |
| 6 |    Q  And you wrote reports about the | 16:57:23 |
| 7 | determination Mr. Kushner had about the cause of | 16:57:27 |
| 8 | the fire; correct? | 16:57:30 |
| 9 |    A  Yes. | 16:57:31 |
| 10 |    Q  So if Mr. Ferreri had told you prior to | 16:57:32 |
| 11 | Bill's confession he believed he had a | 16:57:36 |
| 12 | determination as to the cause of the fire, | 16:57:38 |
| 13 | wouldn't you have written that down in a report? | 16:57:42 |
| 14 |    A  Apparently not. | 16:57:43 |
| 15 |    Q  And why did you not? | 16:57:45 |
| 16 |    A  Because I believed that Ferreri would have | 16:57:46 |
| 17 | wrote it down, and I -- we never want to contradict | 16:57:49 |
| 18 | each other.  So if he's going to go write | 16:57:55 |
| 19 | something down, he would write it down; if I'm | 16:57:57 |
| 20 | going to write some portion down, I would, just | 16:58:00 |
| 21 | like I would in any investigation. | 16:58:05 |
| 22 |    Q  So is it your testimony here today that | 16:58:07 |
| 23 | Mr. Ferreri told you prior to Mr. Amor's | 16:58:20 |
| 24 | confession that the fire was incendiary? | 16:58:22 |

Transcript of Michael Cross
Conducted on October 16, 2020                    267

| | | |
|---|---|---|
| 1 | A  I don't recall now. | 16:58:25 |
| 2 | Q  When Mr. Ferreri told you that the fire | 16:58:27 |
| 3 | was incendiary, what reason did he give you for | 16:58:36 |
| 4 | that belief? | 16:58:41 |
| 5 | A  I don't recall. | 16:58:42 |
| 6 | Q  Did he give you a reason for that belief? | 16:58:43 |
| 7 | A  I don't recall. | 16:58:45 |
| 8 | Q  And would you defer to Mr. Ferreri's | 16:58:46 |
| 9 | determination as to the cause of the fire? | 16:58:55 |
| 10 | A  Yes. | 16:58:56 |
| 11 | Q  Why? | 16:58:56 |
| 12 | A  Because he's a fireman, fire investigator. | 16:58:57 |
| 13 | Q  And you were an arson investigator; correct? | 16:59:03 |
| 14 | A  Yes. | 16:59:05 |
| 15 | Q  In your scope as arson investigator, did | 16:59:05 |
| 16 | you find it plausible when he said that the cause | 16:59:11 |
| 17 | of the fire was incendiary? | 16:59:14 |
| 18 | A  Yes. | 16:59:16 |
| 19 | Q  For what reasons? | 16:59:16 |
| 20 | A  Because, again, there was spill patterns, | 16:59:18 |
| 21 | the rapidity of the fire, and by what Ferreri told | 16:59:25 |
| 22 | me, and the damage. | 16:59:32 |
| 23 | Q  And other than the spill pattern, rapidity | 16:59:37 |
| 24 | of the fire, damage of the fire, and what Ferreri | 16:59:42 |

Transcript of Michael Cross
Conducted on October 16, 2020                    268

| | | |
|---|---|---|
| 1 | told you, did you -- what other reasons did you | 16:59:46 |
| 2 | have for believing that the cause of the fire was | 16:59:48 |
| 3 | incendiary prior Mr. Amor's confession? | 16:59:53 |
| 4 | A  I don't know. | 16:59:55 |
| 5 | Q  Did you have any other reasons besides | 16:59:56 |
| 6 | what I just listed? | 16:59:58 |
| 7 | A  I'm unsure of that. | 16:59:59 |
| 8 | Q  And did Mr. Kushner come to a determination | 17:00:01 |
| 9 | prior to Mr. Amor's confession as to whether the | 17:00:23 |
| 10 | cause of the fire was incendiary -- or accidental | 17:00:27 |
| 11 | or undetermined? | 17:00:34 |
| 12 | A  I don't recall. | 17:00:36 |
| 13 | Q  And if you believed that it was impossible | 17:00:39 |
| 14 | for the fire to be set by dropping a cigarette on | 17:01:07 |
| 15 | a vodka-soaked newspaper, how did you believe that | 17:01:14 |
| 16 | the fire had been started? | 17:01:25 |
| 17 | A  With some sort of an accelerant. | 17:01:27 |
| 18 | Q  Did you find any evidence that Mr. Amor | 17:01:31 |
| 19 | had used an accelerant? | 17:01:33 |
| 20 | A  Other than the -- yeah, the pour patterns | 17:01:35 |
| 21 | and the rapidity, again, of the fire spreading and | 17:01:45 |
| 22 | the same thing I answered before. | 17:01:49 |
| 23 | Q  Did you have any evidence that Mr. Amor | 17:01:50 |
| 24 | used an accelerant other than him saying that he | 17:01:54 |

Transcript of Michael Cross
Conducted on October 16, 2020                    269

| | | |
|---|---|---|
| 1 | had spilled vodka? | 17:02:02 |
| 2 | A  Did I believe so? | 17:02:03 |
| 3 | Q  Did you have any evidence other than that? | 17:02:07 |
| 4 | A  Yes. | 17:02:10 |
| 5 | Q  What was the evidence? | 17:02:10 |
| 6 | A  The same thing I said before, how fast the | 17:02:11 |
| 7 | fire went, the spill patterns. | 17:02:14 |
| 8 | Q  And what evidence physically tied Mr. Amor | 17:02:17 |
| 9 | to the accelerant that you believed was present in | 17:02:21 |
| 10 | the Miceli household on that night? | 17:02:26 |
| 11 | A  I had a very limited scope of suspects. | 17:02:28 |
| 12 | Q  So a process of elimination? | 17:02:32 |
| 13 | A  At one time I had him and Tina, and Tina | 17:02:35 |
| 14 | was determined not to have been involved in | 17:02:38 |
| 15 | starting the fire, and so he left everybody else | 17:02:41 |
| 16 | out.  It was only him. | 17:02:46 |
| 17 | Q  And you didn't think that maybe if Tina | 17:02:48 |
| 18 | didn't start the fire it was an accidental fire? | 17:02:51 |
| 19 | A  No. | 17:02:53 |
| 20 | Q  And you never found any evidence that | 17:02:54 |
| 21 | Mr. Amor had accelerants on his body after the | 17:03:09 |
| 22 | fire; correct? | 17:03:15 |
| 23 | A  Correct. | 17:03:16 |
| 24 | Q  And you tested his shoes for accelerants; | 17:03:17 |

Transcript of Michael Cross
Conducted on October 16, 2020                     270

| | | |
|---|---|---|
| 1 | correct? | 17:03:22 |
| 2 | A  Yes. | 17:03:22 |
| 3 | Q  And you had -- | 17:03:23 |
| 4 | A  Crime lab tested.  I didn't test it. | 17:03:27 |
| 5 | Q  You got his shoes tested after for | 17:03:30 |
| 6 | accelerants; correct? | 17:03:33 |
| 7 | A  Yes. | 17:03:34 |
| 8 | Q  And you didn't smell any accelerants on him? | 17:03:34 |
| 9 | A  No. | 17:03:37 |
| 10 | Q  And the crime lab never came back and said | 17:03:37 |
| 11 | there was any accelerants on him? | 17:03:40 |
| 12 | A  On his shoes, no. | 17:03:41 |
| 13 | Q  And you still believe that he used an | 17:03:43 |
| 14 | accelerant in order to set the fire; correct? | 17:03:45 |
| 15 | A  Yes. | 17:03:47 |
| 16 | Q  Do you believe that vodka was that | 17:03:48 |
| 17 | accelerant? | 17:03:51 |
| 18 | A  No. | 17:03:51 |
| 19 | Q  Is there any evidence other than his | 17:03:52 |
| 20 | confession that he used vodka that Mr. Amor used | 17:03:57 |
| 21 | an accelerant on September 10th, 1995, to start | 17:04:04 |
| 22 | the fire? | 17:04:09 |
| 23 | MR. POLICK:  Objection to the form of the | 17:04:10 |
| 24 | question. | 17:04:12 |

Transcript of Michael Cross
Conducted on October 16, 2020                    271

| | | |
|---|---|---|
| 1 | But you may answer. | 17:04:13 |
| 2 | A  I think I've already answered that several | 17:04:15 |
| 3 | times. | 17:04:17 |
| 4 | Q  Is there any physical evidence? | 17:04:18 |
| 5 | MR. POLICK:  Same objection. | 17:04:19 |
| 6 | But go ahead and answer. | 17:04:21 |
| 7 | A  Yes.  The physical evidence is the pour | 17:04:23 |
| 8 | pattern on the rug and on the chair. | 17:04:27 |
| 9 | Q  Prior to Mr. Amor's confession, you didn't | 17:04:30 |
| 10 | have probable cause for his arrest, did you? | 17:04:36 |
| 11 | A  Yes, we did. | 17:04:39 |
| 12 | Q  What was the probable cause for his arrest? | 17:04:41 |
| 13 | A  Everything else that I said before plus -- | 17:04:43 |
| 14 | I'm getting confused.  I'm -- my brain is not | 17:04:59 |
| 15 | working. | 17:05:04 |
| 16 | Q  Okay.  Just so the record is clear, I'll | 17:05:05 |
| 17 | start the question again a little bit differently. | 17:05:08 |
| 18 | Prior to Mr. Amor's confession, was there | 17:05:19 |
| 19 | probable cause for him to be arrested? | 17:05:24 |
| 20 | A  Yes. | 17:05:26 |
| 21 | Q  And why was there probable cause for him | 17:05:26 |
| 22 | to be arrested? | 17:05:30 |
| 23 | A  Again, the limited scope of suspects. | 17:05:32 |
| 24 | Everybody had been eliminated except for him, the | 17:05:37 |

Transcript of Michael Cross
Conducted on October 16, 2020                                      272

| | | |
|---|---|---|
| 1 | spill patterns on the rug and the chair, and the | 17:05:41 |
| 2 | rapidity of the fire. | 17:05:47 |
| 3 |    Q  And when did you eliminate Tina Miceli as | 17:05:48 |
| 4 | a suspect? | 17:05:53 |
| 5 |    A  When it was determined that she was -- | 17:05:54 |
| 6 | left the building before Bill. | 17:06:04 |
| 7 |    Q  So it's your testimony today that you | 17:06:09 |
| 8 | determined -- or it was determined that Tina left | 17:06:13 |
| 9 | the building before Bill? | 17:06:15 |
| 10 |    A  I believe so, yes. | 17:06:17 |
| 11 |    Q  And where in the reports that you wrote is | 17:06:19 |
| 12 | that reflected? | 17:06:24 |
| 13 |    A  I would have to look at the reports.  I | 17:06:24 |
| 14 | don't know. | 17:06:27 |
| 15 |    Q  Regardless, was Tina eliminated as a suspect | 17:06:27 |
| 16 | prior to meeting Mr. Amor at DeKalb County jail? | 17:06:36 |
| 17 |    A  I believe so. | 17:06:40 |
| 18 |    Q  And if he was -- if Tina was eliminated as | 17:06:41 |
| 19 | a suspect, and you had probable cause for | 17:06:46 |
| 20 | Mr. Amor's arrest, why did you not arrest him when | 17:06:48 |
| 21 | you met him at DeKalb County jail? | 17:06:51 |
| 22 |    A  Because I wanted to have all the | 17:06:54 |
| 23 | information I could before I made an arrest, all | 17:06:56 |
| 24 | the probable cause. | 17:07:00 |

Transcript of Michael Cross
Conducted on October 16, 2020                    273

| 1 | Q  Probable cause is a -- strike that. | 17:07:03 |
| 2 | Is it your practice as a Naperville police | 17:07:10 |
| 3 | officer not to arrest someone after you've | 17:07:14 |
| 4 | determined you have probable cause to arrest them? | 17:07:16 |
| 5 | A  No, it's not. | 17:07:17 |
| 6 | Q  Then why didn't you follow the procedure | 17:07:18 |
| 7 | of the Naperville -- | 17:07:22 |
| 8 | A  I did -- | 17:07:22 |
| 9 | Q  -- Police Department? | 17:07:23 |
| 10 | A  -- when I found out I -- | 17:07:23 |
| 11 | MR. POLICK:  Let her finish her question. | 17:07:24 |
| 12 | THE WITNESS:  Okay.  I'm sorry. | 17:07:24 |
| 13 | MR. POLICK:  You can't talk over each | 17:07:26 |
| 14 | other.  Okay?  Let her finish her question. | 17:07:29 |
| 15 | Q  Okay.  It wasn't the procedure of | 17:07:29 |
| 16 | Naperville Police Department to not arrest a | 17:07:32 |
| 17 | suspect after you determined there was probable | 17:07:34 |
| 18 | cause, then why did you not follow that procedure? | 17:07:37 |
| 19 | A  I did follow the procedure. | 17:07:39 |
| 20 | Q  What was the procedure? | 17:07:41 |
| 21 | A  If you had probable cause, arrest somebody. | 17:07:43 |
| 22 | Q  And you -- but you just testified you had | 17:07:46 |
| 23 | probable cause to arrest -- | 17:07:49 |
| 24 | A  It does -- I'm sorry. | 17:07:51 |

Transcript of Michael Cross
Conducted on October 16, 2020                          274

```
 1      Q  -- Mr. Amor prior to meeting him at the      17:07:54

 2   DeKalb County jail on October 3rd; correct?        17:07:56

 3      A  Correct.                                      17:08:01

 4      Q  Why did you not arrest him when you met       17:08:02

 5   him at the DeKalb County jail on October 3rd if     17:08:05

 6   you had probable cause?                             17:08:09

 7      A  It's -- I don't have to arrest him            17:08:09

 8   immediately upon having probable cause.  I can      17:08:11

 9   wait and build more information into my case        17:08:14

10   before I arrest somebody.                           17:08:20

11      Q  And you believed that Mr. Amor had            17:08:22

12   committed arson that led to someone dying; correct? 17:08:25

13      A  Yes.                                          17:08:28

14      Q  And still you didn't arrest him once you      17:08:28

15   had probable cause to believe he had committed a    17:08:31

16   murder?                                             17:08:33

17      A  Yes.                                          17:08:33

18      Q  If Mr. Amor had tried to leave after you      17:08:34

19   met up with him at DeKalb County jail, would you    17:08:48

20   have let him?                                       17:08:52

21      A  Yes.                                          17:08:53

22      Q  You wouldn't have arrested him?               17:08:53

23      A  No.                                           17:08:55

24      Q  Even though you had probable cause to         17:08:55
```

Transcript of Michael Cross
Conducted on October 16, 2020                    275

| | | |
|---|---|---|
| 1 | arrest him? | 17:08:57 |
| 2 | A  I wouldn't have arrested him at that | 17:08:58 |
| 3 | point, no. | 17:09:00 |
| 4 | Q  You wouldn't have arrested him even though | 17:09:01 |
| 5 | you had probable cause to arrest him? | 17:09:04 |
| 6 | A  At that point, no. | 17:09:05 |
| 7 | Q  Why not? | 17:09:07 |
| 8 | A  Because I want to have as much information | 17:09:09 |
| 9 | and as much evidence against him as I could get. | 17:09:13 |
| 10 | Q  So if Mr. Amor decided not to go with you | 17:09:16 |
| 11 | to Reid & Associates, you would have let him leave? | 17:09:22 |
| 12 | A  Yes. | 17:09:26 |
| 13 | Q  You would have let him leave even though | 17:09:27 |
| 14 | you had probable cause to believe he committed an | 17:09:30 |
| 15 | arson that led to someone's death? | 17:09:32 |
| 16 | A  Yes. | 17:09:35 |
| 17 | Q  Since the criminal trial in 1997, did you | 17:09:36 |
| 18 | stay in contact with any of the defendants on the | 17:10:07 |
| 19 | case? | 17:10:09 |
| 20 | A  I'm not sure. | 17:10:09 |
| 21 | Q  I can go through them. | 17:10:15 |
| 22 | A  Okay. | 17:10:16 |
| 23 | Q  Did you stay in contact since 1997 with | 17:10:17 |
| 24 | Brian Cunningham? | 17:10:20 |

Transcript of Michael Cross
Conducted on October 16, 2020                    276

| | | |
|---|---|---|
| 1 | A  Yes. | 17:10:21 |
| 2 | Q  Have you -- when was the last time you saw | 17:10:22 |
| 3 | Mr. Cunningham? | 17:10:28 |
| 4 | A  I believe it was at a friend's house.  We | 17:10:29 |
| 5 | went fishing. | 17:10:32 |
| 6 | Q  And how long ago was that? | 17:10:33 |
| 7 | A  At least a year, maybe more. | 17:10:35 |
| 8 | Q  Would you consider yourself to still be | 17:10:41 |
| 9 | friends with Mr. Cunningham? | 17:10:45 |
| 10 | A  Yes. | 17:10:46 |
| 11 | Q  How often do you see him? | 17:10:47 |
| 12 | A  Not very often. | 17:10:48 |
| 13 | Q  And since the criminal trial in 1997, have | 17:10:50 |
| 14 | you stayed in contact with Robert Guerrieri? | 17:10:57 |
| 15 | A  Yes. | 17:10:59 |
| 16 | Q  When was the last time you saw him? | 17:11:00 |
| 17 | A  Again, it was probably the same time I saw | 17:11:03 |
| 18 | Brian.  We went fishing at a friend's house. | 17:11:07 |
| 19 | Q  And how frequently would you say you've | 17:11:10 |
| 20 | seen Mr. Guerrieri? | 17:11:12 |
| 21 | A  A couple of times. | 17:11:13 |
| 22 | Q  Okay.  And I understand that Mark Carlson | 17:11:16 |
| 23 | is deceased, but after 1997 at the trial of | 17:11:21 |
| 24 | Mr. Amor, did you stay in contact with Mr. Carlson? | 17:11:28 |

Transcript of Michael Cross
Conducted on October 16, 2020                    277

```
 1        A  Not very much.                              17:11:31

 2        Q  After the -- actually, what does "not very  17:11:33

 3   much" mean?                                         17:11:41

 4        A  We just never got together.                 17:11:41

 5        Q  Okay.  You weren't friendly?                17:11:43

 6        A  No.                                          17:11:45

 7        Q  When was the last time you saw Jon Ripsky?  17:11:48

 8        A  I saw him recently at one of the -- one of  17:11:59

 9   the hearings, saw him and his wife.                 17:12:07

10        Q  One of the hearings in this case?           17:12:12

11        A  Yes.                                         17:12:13

12        Q  Prior to -- that would have been around     17:12:14

13   2017 or 2018?                                       17:12:18

14        A  Yes.                                         17:12:19

15        Q  And prior to that, had you stayed in        17:12:20

16   contact with him?                                   17:12:22

17        A  Not very much.  But yeah, infrequently.     17:12:24

18        Q  Would you say that you were friends?        17:12:32

19        A  Yes.                                         17:12:35

20        Q  During postconviction proceedings Mike Paul 17:12:36

21   and Detective Guerrieri interviewed Tina.  Did you  17:12:44

22   know anything about that?                           17:12:48

23        A  I don't recall that, no.                    17:12:49

24        Q  Do you recall being involved at all in the  17:12:51
```

Transcript of Michael Cross
Conducted on October 16, 2020                    278

| | | |
|---|---|---|
| 1 | interviewing process? | 17:12:53 |
| 2 | A  Of Tina then? | 17:12:55 |
| 3 | Q  Yes. | 17:12:56 |
| 4 | A  I don't recall. | 17:12:57 |
| 5 | Q  Were you uninvolved? | 17:12:59 |
| 6 | A  I don't recall. | 17:13:01 |
| 7 | Q  You said that you didn't arrest Mr. Amor | 17:13:02 |
| 8 | at DeKalb County jail even though you had probable | 17:14:16 |
| 9 | cause to because you wanted to get more | 17:14:21 |
| 10 | information about the arrest? | 17:14:23 |
| 11 | A  Yes. | 17:14:24 |
| 12 | Q  The fire, rather. | 17:14:24 |
| 13 | A  Correct. | 17:14:28 |
| 14 | Q  But you've also testified that you -- | 17:14:28 |
| 15 | after Mr. Amor confessed, you did not believe that | 17:14:34 |
| 16 | his confession was truthful? | 17:14:39 |
| 17 | MR. POLICK:  Objection; misstates the | 17:14:40 |
| 18 | witness' testimony. | 17:14:43 |
| 19 | A  I believe that it was minimizing what he | 17:14:45 |
| 20 | had done. | 17:14:48 |
| 21 | Q  And you didn't believe that the way he | 17:14:48 |
| 22 | described the fire was believable? | 17:14:53 |
| 23 | A  Yes.  And I believe I said that a number | 17:14:59 |
| 24 | of times. | 17:15:03 |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Transcript of Michael Cross
Conducted on October 16, 2020                     279

```
1      Q  Okay.  So if you didn't think that the way        17:15:03

2    he started the fire was believable, and your          17:15:05

3    reason for not arresting him at DeKalb County jail     17:15:09

4    was because you wanted more information as to what     17:15:13

5    happened in the fire, why did you arrest Mr. Amor      17:15:16

6    after he confessed to setting the fire in a way        17:15:20

7    you didn't believe could have actually happened?       17:15:24

8      A  Because he had made an admission that he          17:15:27

9    had started the fire.  Whether he was minimizing       17:15:31

10   or not, he had made an admission.                      17:15:36

11     Q  Well, didn't you want to see if he was            17:15:37

12   telling the truth?                                     17:15:40

13     A  Of course.                                        17:15:40

14     Q  Didn't you want to see if there was more          17:15:41

15   information?                                           17:15:44

16     A  I believe he was telling the truth as far        17:15:44

17   as starting the fire but not exactly how he did it.    17:15:49

18     Q  And so you said you arrested him after you       17:15:53

19   got the admission; correct?                            17:16:07

20     A  Yes.                                              17:16:10

21     Q  Was the -- it was the admission that was         17:16:11

22   important to you in this instance; correct?            17:16:14

23     A  Yes.                                              17:16:18

24     Q  Okay.  I read you a list of events earlier       17:16:19
```

Transcript of Michael Cross
Conducted on October 16, 2020                    280

| | | |
|---|---|---|
| 1 | and asked you if you had independent recollections | 17:16:42 |
| 2 | of them.  Do you recall that? | 17:16:45 |
| 3 | A  You'd have to go over it with me again. | 17:16:46 |
| 4 | Q  Sure.  I'm going to read you a list based | 17:16:50 |
| 5 | on the testimony you gave earlier about what you | 17:17:03 |
| 6 | independently recalled just to double-check whether | 17:17:07 |
| 7 | or not you have an independent recollection. | 17:17:10 |
| 8 | A  Yes, ma'am. | 17:17:11 |
| 9 | Q  Okay.  You have no independent | 17:17:14 |
| 10 | recollection -- and, again, this is without | 17:17:20 |
| 11 | relying on reports -- of speaking to Bill and Tina | 17:17:22 |
| 12 | at Pam Leavenworth's house on September 11th, | 17:17:28 |
| 13 | 1995; correct? | 17:17:34 |
| 14 | A  No.  Incorrect. | 17:17:35 |
| 15 | Q  You do have an independent recollection? | 17:17:36 |
| 16 | A  Yeah.  I believe that's what I testified to. | 17:17:37 |
| 17 | Q  So you do have an independent recollection | 17:17:41 |
| 18 | of speaking with Bill and Tina at Pam Leavenworth's | 17:17:47 |
| 19 | house on September 11th, 1995? | 17:17:52 |
| 20 | A  Yes. | 17:17:56 |
| 21 | MR. POLICK:  Are you asking other than | 17:17:56 |
| 22 | what he testified to here today?  Because you did | 17:17:58 |
| 23 | go through that with him.  I'm just trying to | 17:18:02 |
| 24 | clarify the question. | 17:18:04 |

Transcript of Michael Cross
Conducted on October 16, 2020                    281

| | | |
|---|---|---|
| 1 | MS. GARCIA:  Well, I believe he testified | 17:18:06 |
| 2 | he didn't have an independent recollection, and | 17:18:07 |
| 3 | he's saying he did, so I'm just trying to make | 17:18:08 |
| 4 | that clear. | 17:18:11 |
| 5 | MR. POLICK:  Okay.  I mean, your question, | 17:18:12 |
| 6 | does it encompass his testimony here today?  I'm | 17:18:14 |
| 7 | just not sure what the question was.  I want to | 17:18:17 |
| 8 | pose -- maybe I'll just pose an objection to form, | 17:18:23 |
| 9 | but I just wanted to make sure before I did. | 17:18:26 |
| 10 | MS. GARCIA:  I'll ask it a different way. | 17:18:45 |
| 11 | Q  Putting aside the previous question, you | 17:19:16 |
| 12 | have no independent recollection of Bill and Tina | 17:19:22 |
| 13 | coming to Naperville Police Department for | 17:19:26 |
| 14 | polygraphic examination on September 12th, 1995; | 17:19:31 |
| 15 | correct? | 17:19:36 |
| 16 | A  Incorrect. | 17:19:36 |
| 17 | Q  You do have an independent recollection | 17:19:37 |
| 18 | of that? | 17:19:39 |
| 19 | A  Yes. | 17:19:40 |
| 20 | Q  You testified earlier you did not have an | 17:19:40 |
| 21 | independent recollection of that. | 17:19:42 |
| 22 | A  I don't believe I did. | 17:19:43 |
| 23 | Q  So if you testified earlier that you had | 17:19:44 |
| 24 | no independent recollection of that, you're | 17:19:46 |

Transcript of Michael Cross
Conducted on October 16, 2020                    282

| | | |
|---|---|---|
| 1 | testifying now that you do, which testimony should | 17:19:49 |
| 2 | I believe? | 17:19:52 |
| 3 | A  I believe I remember them coming to the | 17:19:52 |
| 4 | police department to take polygraph tests, and I | 17:19:55 |
| 5 | believe that's what I said before. | 17:19:59 |
| 6 | Q  Do you have an independent recollection of | 17:20:00 |
| 7 | that without your review of the documents? | 17:20:01 |
| 8 | A  Yes. | 17:20:05 |
| 9 | Q  So if you testified earlier that you don't | 17:20:07 |
| 10 | have an independent recollection of that, that | 17:20:15 |
| 11 | testimony earlier was false? | 17:20:17 |
| 12 | MR. POLICK:  Objection.  That's | 17:20:19 |
| 13 | argumentative and improper. | 17:20:20 |
| 14 | You can go ahead and answer the question. | 17:20:21 |
| 15 | A  I didn't lie to you.  I wouldn't give a | 17:20:24 |
| 16 | false statement in a court proceeding at all, ever. | 17:20:28 |
| 17 | Q  Okay.  So if you earlier testified that | 17:20:31 |
| 18 | you didn't have an independent recollection of | 17:20:36 |
| 19 | Tina and Bill coming in for a polygraph examination | 17:20:38 |
| 20 | on September 12th, 1995, and now you're saying | 17:20:43 |
| 21 | that you do -- | 17:20:47 |
| 22 | A  I believe that was incorrect what you're | 17:20:48 |
| 23 | saying. | 17:20:50 |
| 24 | Q  You believe that you didn't testify as | 17:20:51 |

Transcript of Michael Cross
Conducted on October 16, 2020                           283

| | | |
|---|---|---|
| 1 | to that? | 17:20:53 |
| 2 | A  Yes. | 17:20:53 |
| 3 | Q  Okay.  Moving on, you don't have an | 17:20:55 |
| 4 | independent recollection of talking to Bill Amor | 17:20:58 |
| 5 | with Investigator Sullivan on September 12th, | 17:21:09 |
| 6 | 1995; correct? | 17:21:12 |
| 7 | A  Correct. | 17:21:12 |
| 8 | Q  And you don't recall -- or you rather have | 17:21:13 |
| 9 | no independent recollection of talking to Bill Amor | 17:21:17 |
| 10 | and Tina on September 14th, 1995, with Detective | 17:21:27 |
| 11 | Guerrieri; correct? | 17:21:31 |
| 12 | A  I don't recall. | 17:21:32 |
| 13 | Q  You don't recall or you have no independent | 17:21:33 |
| 14 | recollection? | 17:21:37 |
| 15 | A  I don't recall. | 17:21:37 |
| 16 | Q  So do you have an independent recollection? | 17:21:38 |
| 17 | A  What did I say before?  What I said before | 17:21:42 |
| 18 | was what I said.  I don't -- at this point I'm done | 17:21:44 |
| 19 | with -- I can't remember anything.  I've lost it. | 17:21:48 |
| 20 | Q  Okay.  So would you say you have no ability | 17:21:53 |
| 21 | to provide answers at this time? | 17:21:55 |
| 22 | MR. POLICK:  Objection to the form of the | 17:21:59 |
| 23 | question. | 17:22:02 |
| 24 | Do you need to take a break, or are you | 17:22:03 |

Transcript of Michael Cross
Conducted on October 16, 2020                    284

| | | |
|---|---|---|
| 1 | able to go on?  If you don't recall, then that's | 17:22:06 |
| 2 | your answer. | 17:22:08 |
| 3 | THE WITNESS:  I just don't recall. | 17:22:09 |
| 4 | MR. POLICK:  Well, then just answer her | 17:22:10 |
| 5 | question to the best of your ability. | 17:22:12 |
| 6 | THE WITNESS:  Okay. | 17:22:15 |
| 7 | Q  Okay.  So I'll reask my question.  You do | 17:22:19 |
| 8 | not have an independent recollection of speaking | 17:22:23 |
| 9 | to Bill and Tina with Lieutenant Ferreri on | 17:22:26 |
| 10 | September 14th, 1995; is that correct? | 17:22:31 |
| 11 | A  Please repeat that again. | 17:22:34 |
| 12 | Q  Sure.  You have no independent recollection | 17:22:37 |
| 13 | of speaking with Bill and Tina with Mr. Ferreri on | 17:22:41 |
| 14 | September 14th, 1995? | 17:22:48 |
| 15 | A  Yes. | 17:22:52 |
| 16 | Q  Yes, you have independent recollection or | 17:22:52 |
| 17 | no -- | 17:22:55 |
| 18 | A  Yes. | 17:22:56 |
| 19 | Q  -- you don't? | 17:22:56 |
| 20 | A  Yes, I believe I do. | 17:22:58 |
| 21 | Q  And if you testified earlier that you did | 17:23:00 |
| 22 | not have independent recollection, should I | 17:23:03 |
| 23 | believe your earlier testimony, or should I | 17:23:06 |
| 24 | believe this testimony now? | 17:23:08 |

Transcript of Michael Cross
Conducted on October 16, 2020                    285

1       A   Believe what I'm saying now because that's          17:23:09

2   what I said before.                                         17:23:12

3       Q   So you do have independent recollection?            17:23:12

4       A   Yes.                                                17:23:14

5       Q   Okay.                                               17:23:15

6       A   God.                                                17:23:16

7       Q   And you do not have an independent                  17:23:20

8   recollection of the fire critique with Naperville           17:23:24

9   Fire Department on September 14th, 1995?                    17:23:29

10      A   No.                                                 17:23:33

11      Q   And you don't have an independent                   17:23:35

12  recollection of observing 218 East Bailey with              17:23:37

13  Kushner and Ferreri on September 14th, 1995?                17:23:42

14      A   I believe I do and I believe I testified           17:23:47

15  to the fact that I do.  I remember us being there           17:23:51

16  together.  I remember that Kushner had a dog, but           17:23:55

17  he didn't bring his dog.  I expected him to bring           17:23:59

18  his dog but he didn't.                                      17:24:03

19      Q   So if you testified earlier that you did           17:24:04

20  not have an independent recollection as to the              17:24:06

21  observation on September 14th, 1995, should I               17:24:09

22  believe that testimony or testimony now?                    17:24:10

23      A   You know, you can believe whatever you             17:24:11

24  want to believe.  I believe I said the same thing           17:24:15

Transcript of Michael Cross
Conducted on October 16, 2020                    286

| | | |
|---|---|---|
| 1 | both times. | 17:24:17 |
| 2 | Q  Okay.  And if you didn't, should I take | 17:24:18 |
| 3 | your word now? | 17:24:21 |
| 4 | A  Take whatever you want.  Take my word for -- | 17:24:22 |
| 5 | MR. POLICK:  Don't argue.  Just answer her | 17:24:25 |
| 6 | questions. | 17:24:27 |
| 7 | THE WITNESS:  I'm tired of her asking me -- | 17:24:28 |
| 8 | MR. POLICK:  Let's take a break.  Let's | 17:24:31 |
| 9 | take a break.  She's entitled to ask her | 17:24:32 |
| 10 | questions.  Okay? | 17:24:34 |
| 11 | THE WITNESS:  I understand but -- | 17:24:35 |
| 12 | MR. POLICK:  Okay.  Let's take a break. | 17:24:35 |
| 13 | THE WITNESS:  -- she's asking things over | 17:24:36 |
| 14 | and over that I've already answered. | 17:24:37 |
| 15 | MR. POLICK:  Let's take a break. | 17:24:40 |
| 16 | THE VIDEOGRAPHER:  We're going off the | 17:24:41 |
| 17 | record at 5:24 p.m. | 17:24:43 |
| 18 | (Recess taken, 5:24 p.m. to 5:30 p.m.) | 17:30:14 |
| 19 | THE VIDEOGRAPHER:  We are back on the | 17:30:15 |
| 20 | record.  The time is 5:30 p.m. | 17:30:16 |
| 21 | BY MS. GARCIA: | 17:30:19 |
| 22 | Q  Prior to taking the break, we were talking | 17:30:21 |
| 23 | about the observation of 218 East Bailey with | 17:30:24 |
| 24 | Kushner and Ferreri; correct? | 17:30:29 |

Transcript of Michael Cross
Conducted on October 16, 2020                    287

| | | |
|---|---|---|
| 1 | A  Yes. | 17:30:31 |
| 2 | Q  And you testified you do have an | 17:30:32 |
| 3 | independent recollection of that; correct? | 17:30:33 |
| 4 | A  Yes. | 17:30:34 |
| 5 | Q  And earlier you testified that you do not | 17:30:45 |
| 6 | have an independent recollection of speaking with | 17:30:48 |
| 7 | Tina and Bill with Detective Cunningham on | 17:30:53 |
| 8 | September 15th, 1995; correct? | 17:30:57 |
| 9 | A  I don't recall. | 17:31:01 |
| 10 | Q  You don't recall giving that testimony? | 17:31:01 |
| 11 | A  No. | 17:31:03 |
| 12 | Q  You don't have an independent recollection? | 17:31:03 |
| 13 | A  I don't recall, no. | 17:31:07 |
| 14 | Q  And by saying that, you are saying that | 17:31:08 |
| 15 | you do not have an independent recollection of | 17:31:11 |
| 16 | September 15th, 1995, when you spoke to Tina and | 17:31:12 |
| 17 | Bill with Detective Cunningham? | 17:31:19 |
| 18 | A  No, I don't. | 17:31:21 |
| 19 | Q  And you have no independent recollection | 17:31:22 |
| 20 | of talking to Tina on September 15th, 1995, after | 17:31:31 |
| 21 | she wrote a statement about the night of the fire | 17:31:36 |
| 22 | and took a polygraph? | 17:31:40 |
| 23 | A  Yes, I do. | 17:31:42 |
| 24 | Q  You have an independent recollection of that? | 17:31:43 |

Transcript of Michael Cross
Conducted on October 16, 2020                                288

| | | |
|---|---|---|
| 1 | A  Yes. | 17:31:44 |
| 2 | Q  You testified earlier that you had no | 17:31:45 |
| 3 | independent recollection of talking to Tina after | 17:31:55 |
| 4 | she took the polygraph.  Given that earlier | 17:31:57 |
| 5 | testimony, should I believe that you have an | 17:32:02 |
| 6 | independent recollection now? | 17:32:11 |
| 7 | A  I don't recall that testimony. | 17:32:11 |
| 8 | Q  Okay.  But you do have an independent | 17:32:13 |
| 9 | recollection of talking to Tina after giving that | 17:32:16 |
| 10 | statement? | 17:32:18 |
| 11 | A  Yes. | 17:32:18 |
| 12 | Q  And earlier you testified that you do not | 17:32:19 |
| 13 | have an independent recollection of talking to | 17:32:27 |
| 14 | Mr. Amor after he was brought into Naperville | 17:32:29 |
| 15 | Police Department on an unrelated traffic offense | 17:32:34 |
| 16 | on September 15th, 1995.  Is that accurate | 17:32:37 |
| 17 | testimony? | 17:32:42 |
| 18 | A  Again, I don't -- no, I don't believe so. | 17:32:43 |
| 19 | Q  So you do have an independent recollection | 17:32:47 |
| 20 | of talking -- | 17:32:49 |
| 21 | A  I remember speaking -- | 17:32:49 |
| 22 | Q  -- to Mr. Amor on September 15th, 1995, | 17:32:50 |
| 23 | after he was brought in on an unrelated traffic | 17:32:55 |
| 24 | offense? | 17:32:59 |

Transcript of Michael Cross
Conducted on October 16, 2020                    289

| | | |
|---|---|---|
| 1 | A  I believe so, yes. | 17:32:59 |
| 2 | Q  You earlier testified you do not have an | 17:33:01 |
| 3 | independent recollection of testifying at the | 17:33:20 |
| 4 | grand jury in this matter.  Is that correct? | 17:33:21 |
| 5 | A  No. | 17:33:27 |
| 6 | Q  You do have an independent recollection of | 17:33:27 |
| 7 | testifying at the grand jury in this matter? | 17:33:29 |
| 8 | A  I recalled I did, yes. | 17:33:32 |
| 9 | Q  Do you or do you not? | 17:33:34 |
| 10 | A  Yes, I do. | 17:33:35 |
| 11 | Q  Why did you say earlier you didn't have a | 17:33:36 |
| 12 | recollection of testifying at the grand jury? | 17:33:39 |
| 13 | A  I don't believe that's what I said. | 17:33:41 |
| 14 | Q  Okay.  Do you -- earlier -- strike that. | 17:33:44 |
| 15 | Earlier you testified you don't have any | 17:33:49 |
| 16 | independent recollection of testifying at the | 17:33:52 |
| 17 | inquest.  Is that earlier testimony correct? | 17:33:54 |
| 18 | A  No. | 17:33:56 |
| 19 | Q  Why did you say that you had no memory of | 17:33:57 |
| 20 | the inquest earlier if you do have memory of the | 17:34:02 |
| 21 | inquest now? | 17:34:05 |
| 22 | A  I do have -- I always had a memory of the | 17:34:05 |
| 23 | inquest. | 17:34:09 |
| 24 | Q  And why did you not testify to that earlier? | 17:34:10 |

Transcript of Michael Cross
Conducted on October 16, 2020                                    290

| | | |
|---|---|---|
| 1 | A  I don't recall that not being my testimony. | 17:34:14 |
| 2 | I don't recall that I didn't testify about that. | 17:34:19 |
| 3 | Q  And earlier you testified that you have no | 17:34:21 |
| 4 | recollection of testifying -- strike that. | 17:34:26 |
| 5 | Earlier you testified you have no independent | 17:34:28 |
| 6 | recollection of testifying at the 1997 trial.  Is | 17:34:29 |
| 7 | that still your testimony? | 17:34:34 |
| 8 | A  No. | 17:34:35 |
| 9 | Q  So you do have an independent recollection | 17:34:36 |
| 10 | of testifying at the 1997 trial? | 17:34:38 |
| 11 | A  I'm not sure.  I'm getting them all mixed | 17:34:40 |
| 12 | up now. | 17:34:45 |
| 13 | Q  Well, do you have an independent | 17:34:46 |
| 14 | recollection of -- | 17:34:48 |
| 15 | A  No. | 17:34:48 |
| 16 | Q  -- testifying -- | 17:34:49 |
| 17 | MR. POLICK:  Let her finish her question, | 17:34:50 |
| 18 | Mike. | 17:34:53 |
| 19 | Q  -- at the 1997 trial? | 17:34:54 |
| 20 | A  No. | 17:35:00 |
| 21 | Q  And Mr. Amor was acquitted after the | 17:35:01 |
| 22 | 2018 retrial; correct? | 17:35:08 |
| 23 | A  Yes. | 17:35:09 |
| 24 | Q  The Judge found that -- strike that. | 17:35:09 |

Transcript of Michael Cross
Conducted on October 16, 2020                                     291

| | | |
|---|---|---|
| 1 | Given his acquittal, do you have any | 17:35:17 |
| 2 | remorse about the role you played in putting him | 17:35:19 |
| 3 | in jail? | 17:35:23 |
| 4 | A  No. | 17:35:24 |
| 5 | Q  Why not? | 17:35:24 |
| 6 | A  Because I believed he committed a crime, | 17:35:25 |
| 7 | and I still believe he committed the crime. | 17:35:29 |
| 8 | Q  And you believe he committed the crime | 17:35:32 |
| 9 | even though his confession is scientifically | 17:35:36 |
| 10 | impossible? | 17:35:39 |
| 11 | MR. POLICK:  Objection to the form of the | 17:35:40 |
| 12 | question. | 17:35:42 |
| 13 | But you can go ahead and answer. | 17:35:42 |
| 14 | A  I don't understand your question. | 17:35:43 |
| 15 | Q  You said you don't believe his confession | 17:35:45 |
| 16 | was believable; correct? | 17:35:47 |
| 17 | A  Yes. | 17:35:48 |
| 18 | Q  And yet you have no remorse for arresting | 17:35:49 |
| 19 | him after he gave that confession; correct? | 17:35:52 |
| 20 | A  Correct. | 17:35:54 |
| 21 | Q  And you have no remorse for the fact that | 17:35:55 |
| 22 | he went to prison for decades after you arrested him? | 17:35:58 |
| 23 | A  No. | 17:36:02 |
| 24 | Q  Why not? | 17:36:03 |

Transcript of Michael Cross
Conducted on October 16, 2020                    292

| | | |
|---|---|---|
| 1 | A   Because I believe he committed the crime. | 17:36:03 |
| 2 | Q   How do you believe he committed the crime? | 17:36:06 |
| 3 | A   From my investigation. | 17:36:08 |
| 4 | Q   And what did your investigation tell you | 17:36:09 |
| 5 | about how he committed the crime? | 17:36:12 |
| 6 | A   The probable cause, his admission, other | 17:36:14 |
| 7 | people's statements. | 17:36:17 |
| 8 | Q   And other than his admission and other | 17:36:19 |
| 9 | people's statements, what other evidence in your | 17:36:23 |
| 10 | mind is there that he committed the arson? | 17:36:26 |
| 11 | A   The crime scene investigation, his | 17:36:37 |
| 12 | statements that contradicted what we found at the | 17:36:42 |
| 13 | scene.  At least that. | 17:36:45 |
| 14 | Q   What statements did he give that | 17:36:51 |
| 15 | contradicted what you found at the scene? | 17:36:53 |
| 16 | A   I can't recall that. | 17:36:54 |
| 17 | Q   Okay. | 17:36:56 |
| 18 | A   Can't answer it. | 17:36:57 |
| 19 | Q   So other than what you saw at the crime | 17:36:58 |
| 20 | scene, his statements that allegedly contradicted | 17:37:03 |
| 21 | what you found at the scene, and his admission, | 17:37:06 |
| 22 | and the probable cause, what other evidence can | 17:37:12 |
| 23 | you point me to that supports your belief he set | 17:37:15 |
| 24 | the fire? | 17:37:19 |

Transcript of Michael Cross
Conducted on October 16, 2020                    293

| | | |
|---|---|---|
| 1 | A  Nothing I can recall right now other than | 17:37:19 |
| 2 | what I've already said. | 17:37:23 |
| 3 | Q  So you can't at this moment testify to | 17:37:26 |
| 4 | anything else other than what you've already said? | 17:37:29 |
| 5 | A  I mean, yes.  And it's because of my | 17:37:32 |
| 6 | neurological problems that I've had and continue | 17:37:36 |
| 7 | to have. | 17:37:39 |
| 8 | Q  Earlier I asked you if your neurological | 17:37:51 |
| 9 | issues would impede you from giving truthful and | 17:37:56 |
| 10 | accurate testimony; correct? | 17:37:59 |
| 11 | A  Correct. | 17:38:00 |
| 12 | Q  And so you're now testifying that you're | 17:38:00 |
| 13 | unable to give any other testimony at this moment | 17:38:04 |
| 14 | due to your neurological problems; correct? | 17:38:08 |
| 15 | A  There becomes a point where I can't do it. | 17:38:10 |
| 16 | Q  And what is that point? | 17:38:16 |
| 17 | A  That point is now. | 17:38:18 |
| 18 | Q  Did you know about that point before we | 17:38:20 |
| 19 | walked into this deposition room? | 17:38:22 |
| 20 | A  Yes. | 17:38:23 |
| 21 | Q  Then why didn't you disclose it with your | 17:38:24 |
| 22 | attorneys or plaintiff's attorneys? | 17:38:26 |
| 23 | A  I told you that I had neurological | 17:38:28 |
| 24 | problems and I had problems remembering things. | 17:38:30 |

Transcript of Michael Cross
Conducted on October 16, 2020                    294

| | | |
|---|---|---|
| 1 | So as far as I'm concerned, I disclosed it to you. | 17:38:33 |
| 2 | Q  Today? | 17:38:36 |
| 3 | A  I believe so, yes. | 17:38:36 |
| 4 | Q  Did you disclose it in any interrogatories | 17:38:37 |
| 5 | you were served? | 17:38:40 |
| 6 | A  I don't recall. | 17:38:41 |
| 7 | Q  And you know that a deposition is under | 17:38:45 |
| 8 | oath; correct? | 17:38:47 |
| 9 | A  Yes. | 17:38:48 |
| 10 | Q  And you understand that it's important to | 17:38:48 |
| 11 | give truthful and accurate testimony under oath; | 17:38:53 |
| 12 | correct? | 17:38:55 |
| 13 | A  Always. | 17:38:55 |
| 14 | Q  And you felt comfortable walking into this | 17:38:55 |
| 15 | room knowing that a neurological problem might | 17:38:59 |
| 16 | keep you from giving truthful or accurate | 17:39:01 |
| 17 | testimony or fully recalling the scope of the | 17:39:03 |
| 18 | case, and you decided to give a deposition anyway? | 17:39:06 |
| 19 | MR. POLICK:  I'm going to object to that | 17:39:10 |
| 20 | question because I think it's improper.  I mean, | 17:39:11 |
| 21 | you questioned Mr. Cross at length about his | 17:39:13 |
| 22 | memory problems, and he told you about his memory | 17:39:17 |
| 23 | problems as he could describe them not as a | 17:39:21 |
| 24 | doctor, not as a neurologist, but he described how | 17:39:24 |

Transcript of Michael Cross
Conducted on October 16, 2020                          295

| | | |
|---|---|---|
| 1 | they affect him. | 17:39:27 |
| 2 | And you have been apprised of that in | 17:39:28 |
| 3 | advance of this deposition.  We produced his | 17:39:31 |
| 4 | medical records on that regard; we produced his | 17:39:33 |
| 5 | medication.  He told you today he was on | 17:39:37 |
| 6 | medication. | 17:39:39 |
| 7 | And what he also told you is that he | 17:39:39 |
| 8 | believed despite his memory issues he was going to | 17:39:42 |
| 9 | do his best to try to answer your questions today, | 17:39:46 |
| 10 | and that's what he's done.  So I really think it's | 17:39:48 |
| 11 | unfair and improper to continue to badger and | 17:39:52 |
| 12 | suggest that he did not disclose these things with | 17:39:55 |
| 13 | you or that you are suggesting that he somehow, | 17:39:57 |
| 14 | you know, has not tried to answer your questions | 17:40:01 |
| 15 | to the best of his ability given his limitations. | 17:40:04 |
| 16 | MS. GARCIA:  I never said he didn't try to | 17:40:07 |
| 17 | answer my questions to the best of his ability.  I | 17:40:09 |
| 18 | also believe that's an improper speaking objection. | 17:40:13 |
| 19 | MR. POLICK:  It wasn't a -- | 17:40:16 |
| 20 | MS. GARCIA:  However, I will ask it a | 17:40:18 |
| 21 | different way, Mr. Cross. | 17:40:20 |
| 22 | Q  Prior to coming to this deposition, did you | 17:40:22 |
| 23 | know that sitting in a room for up to seven hours | 17:40:26 |
| 24 | might produce within you the inability to fully | 17:40:31 |

Transcript of Michael Cross
Conducted on October 16, 2020                    296

| | | |
|---|---|---|
| 1 | recall memories you had as to this investigation? | 17:40:40 |
| 2 | A  Yes. | 17:40:43 |
| 3 | Q  And you knew that and you decided to sit | 17:40:49 |
| 4 | for the deposition anyway? | 17:40:53 |
| 5 | A  I decided to do the best of my ability. | 17:40:54 |
| 6 | Q  And has counsel disclosed to you that we | 17:41:00 |
| 7 | were willing to do the deposition over more than | 17:41:04 |
| 8 | one day? | 17:41:09 |
| 9 | MR. POLICK:  Objection as to any | 17:41:10 |
| 10 | discussions between him and his counsel -- | 17:41:11 |
| 11 | MS. GARCIA:  That's fair. | 17:41:14 |
| 12 | MR. POLICK:  -- attorney-client privilege. | 17:41:15 |
| 13 | I'm going to direct him not to answer that question. | 17:41:16 |
| 14 | MS. GARCIA:  I'll ask a different question. | 17:41:18 |
| 15 | Q  I've given you plenty of breaks during | 17:41:19 |
| 16 | this deposition; correct? | 17:41:22 |
| 17 | A  Yes. | 17:41:24 |
| 18 | MR. POLICK:  I'm going to object to that | 17:41:26 |
| 19 | question.  We've taken -- you have given breaks, | 17:41:28 |
| 20 | and we have taken breaks that have been at the | 17:41:30 |
| 21 | agreement of the parties here.  So I think your | 17:41:34 |
| 22 | question is a little inaccurate. | 17:41:36 |
| 23 | Q  Over the course of this deposition we have | 17:41:38 |
| 24 | taken several breaks; correct? | 17:41:41 |

Transcript of Michael Cross
Conducted on October 16, 2020                                    297

| 1  |     A  Yes.                                          | 17:41:43 |
|----|------------------------------------------------------|----------|
| 2  |     Q  And during those breaks you had a time to      | 17:41:45 |
| 3  | not be in a situation where you felt pressured?       | 17:41:50 |
| 4  |     A  Yes.                                            | 17:41:54 |
| 5  |     Q  And each time you have said you felt            | 17:41:54 |
| 6  | comfortable to continue giving testimony as to        | 17:41:58 |
| 7  | your knowledge in this case; correct?                 | 17:42:07 |
| 8  |     A  Yes.                                            | 17:42:08 |
| 9  |     Q  And we took every break that you wanted to     | 17:42:09 |
| 10 | take; correct?                                        | 17:42:16 |
| 11 |     A  I never asked for a break.                     | 17:42:18 |
| 12 |     Q  Did we prevent -- did I prevent you from       | 17:42:20 |
| 13 | taking any breaks?                                    | 17:42:23 |
| 14 |     A  No.                                            | 17:42:25 |
| 15 |     Q  And I told you you could take breaks if        | 17:42:25 |
| 16 | you needed to?                                        | 17:42:27 |
| 17 |     A  Yes.                                            | 17:42:28 |
| 18 |     MR. POLICK:  We'll stipulate that breaks         | 17:42:29 |
| 19 | have been taken.  Do you have any further             | 17:42:30 |
| 20 | questions you want to ask Mr. Cross here about        | 17:42:32 |
| 21 | this?  Because I think it's unfair to continue --     | 17:42:35 |
| 22 |     MS. GARCIA:  Do you need to take a break         | 17:42:37 |
| 23 | now, Mr. Cross?                                       | 17:42:39 |
| 24 |     MR. POLICK:  Excuse me.  What I'd like to        | 17:42:40 |

Transcript of Michael Cross
Conducted on October 16, 2020                    298

| | | |
|---|---|---|
| 1 | know is if you have any further questions about | 17:42:42 |
| 2 | this case.  Because if you're going to -- | 17:42:44 |
| 3 | MS. GARCIA:  I'm sorry; is it your turn to | 17:42:46 |
| 4 | be speaking right now, Joe? | 17:42:48 |
| 5 | MR. POLICK:  No, because I'm objecting to | 17:42:49 |
| 6 | your line of questioning challenging his memory | 17:42:51 |
| 7 | here.  That's been fully disclosed. | 17:42:53 |
| 8 | MS. GARCIA:  I'm not challenging his | 17:42:55 |
| 9 | memory.  I'm asking if he's been given the chance | 17:42:56 |
| 10 | to take breaks. | 17:42:59 |
| 11 | MR. POLICK:  We stipulated that there have | 17:43:00 |
| 12 | been breaks during the course -- | 17:43:02 |
| 13 | MS. GARCIA:  You stipulated when I was | 17:43:02 |
| 14 | asking your client a question? | 17:43:04 |
| 15 | MR. POLICK:  No.  What I'm saying is we | 17:43:05 |
| 16 | stipulated that there were breaks during this | 17:43:07 |
| 17 | deposition. | 17:43:08 |
| 18 | MS. GARCIA:  You stipulated without me | 17:43:08 |
| 19 | agreeing to that stipulation. | 17:43:12 |
| 20 | MR. POLICK:  I'm not understanding what | 17:43:13 |
| 21 | you're saying.  All I'm saying is that there were | 17:43:14 |
| 22 | points in this deposition where we agreed to take | 17:43:16 |
| 23 | breaks.  Other than for Mr. Cross' sake we agreed | 17:43:20 |
| 24 | to take a break for lunch.  There's been other | 17:43:25 |

Transcript of Michael Cross
Conducted on October 16, 2020                    299

| | | |
|---|---|---|
| 1 | breaks that have been taken.  So -- | 17:43:27 |
| 2 | MS. GARCIA:  Have I contested that? | 17:43:27 |
| 3 | MR. POLICK:  It sounds like you are, and | 17:43:29 |
| 4 | it sounds like you're blaming my client for taking | 17:43:31 |
| 5 | breaks.  So if you have further questions about | 17:43:33 |
| 6 | the case, why don't you ask them instead of | 17:43:36 |
| 7 | debating with him about breaks. | 17:43:38 |
| 8 | MS. GARCIA:  How about you please stop | 17:43:40 |
| 9 | directing me how to undertake a deposition. | 17:43:42 |
| 10 | MR. POLICK:  I'm not trying to tell you | 17:43:45 |
| 11 | how to take a deposition. | 17:43:47 |
| 12 | MS. GARCIA:  So why -- | 17:43:47 |
| 13 | MR. POLICK:  I want you to continue with | 17:43:48 |
| 14 | this deposition -- | 17:43:50 |
| 15 | MS. GARCIA:  Let's go off the record. | 17:43:51 |
| 16 | MR. POLICK:  -- but I don't think it's | 17:43:52 |
| 17 | fair to allow -- | 17:43:54 |
| 18 | MS. GARCIA:  Let's go off the record.  I | 17:43:54 |
| 19 | do not want to take my time to -- if you're going | 17:43:56 |
| 20 | to continue to -- | 17:43:56 |
| 21 | MR. POLICK:  I just want my record here. | 17:43:56 |
| 22 | MS. GARCIA:  -- berate me and tell me how | 17:43:58 |
| 23 | take a deposition -- | 17:43:59 |
| 24 | MR. POLICK:  I'm not -- | 17:43:59 |

Transcript of Michael Cross
Conducted on October 16, 2020                           300

| | | |
|---|---|---|
| 1 | MS. GARCIA:  -- then I want my time back. | 17:43:59 |
| 2 | MR. POLICK:  -- telling you how to take a | 17:44:00 |
| 3 | deposition, but at some point I don't think you | 17:44:01 |
| 4 | get to badger Mr. Cross -- | 17:44:03 |
| 5 | MS. GARCIA:  I don't believe I am | 17:44:05 |
| 6 | badgering Mr. Cross. | 17:44:06 |
| 7 | MR. POLICK:  -- about his -- you may not | 17:44:08 |
| 8 | believe it, but you're continuing to challenge him | 17:44:09 |
| 9 | regarding his memory.  His memory is -- | 17:44:11 |
| 10 | MS. GARCIA:  Do you want to call the Judge | 17:44:12 |
| 11 | about this?  Because I'm willing to do so. | 17:44:13 |
| 12 | MR. POLICK:  He's not -- he's not -- there's | 17:44:15 |
| 13 | no reason to go to the Judge at this point -- | 17:44:17 |
| 14 | MS. GARCIA:  Either we go off the record -- | 17:44:19 |
| 15 | MR. POLICK:  -- because he's not -- you're | 17:44:21 |
| 16 | interrupting me.  Do you want to go off the | 17:44:21 |
| 17 | record?  Let's go off the record. | 17:44:24 |
| 18 | MS. GARCIA:  Let's go off the record. | 17:44:26 |
| 19 | THE VIDEOGRAPHER:  We're going off the | 17:44:28 |
| 20 | record at 5:44 p.m. | 17:44:30 |
| 21 | (Recess taken, 5:44 p.m. to 5:48 p.m.) | 17:48:31 |
| 22 | THE VIDEOGRAPHER:  We're back on the | 17:48:32 |
| 23 | record.  The time is 5:48 p.m. | 17:48:33 |
| 24 | /// | |

Transcript of Michael Cross
Conducted on October 16, 2020                    301

| | | |
|---|---|---|
| 1 | BY MS. GARCIA: | 17:48:38 |
| 2 | Q  Prior to going off the record we were | 17:48:41 |
| 3 | talking about breaks that were taken during this | 17:48:44 |
| 4 | deposition, and just for the record, you were not | 17:48:50 |
| 5 | prevented from taking any breaks; correct? | 17:48:55 |
| 6 | A  Correct. | 17:48:58 |
| 7 | Q  Other than the documents you reviewed | 17:48:59 |
| 8 | prior to this deposition and the testimony that | 17:49:12 |
| 9 | you reviewed prior to this deposition, as well as | 17:49:17 |
| 10 | the documents you reviewed in this deposition, are | 17:49:21 |
| 11 | there any other documents you believe you could | 17:49:26 |
| 12 | review that would further refresh your recollection? | 17:49:28 |
| 13 | A  No. | 17:49:31 |
| 14 | Q  During the course of this deposition, | 17:49:32 |
| 15 | given what we've discussed and what you've | 17:49:53 |
| 16 | reviewed, has your memory on any aspect of this | 17:49:56 |
| 17 | case been refreshed? | 17:49:58 |
| 18 | A  From this particular deposition? | 17:50:00 |
| 19 | Q  Yes. | 17:50:08 |
| 20 | A  No. | 17:50:09 |
| 21 | Q  Okay.  That's a no? | 17:50:10 |
| 22 | A  That's a no. | 17:50:20 |
| 23 | MS. GARCIA:  And then I did have a line of | 17:50:22 |
| 24 | questioning about punitive damages, but I believe | 17:50:24 |

Transcript of Michael Cross
Conducted on October 16, 2020                    302

| | | |
|---|---|---|
| 1 | we've agreed to defer that until later. | 17:50:27 |
| 2 | MR. POLICK: I believe there is a | 17:50:29 |
| 3 | stipulation with regard to that. | 17:50:30 |
| 4 | MS. GARCIA: Just for the record, we have | 17:50:32 |
| 5 | stipulated between plaintiff and defendants' | 17:50:34 |
| 6 | counsel to speak about punitive damages later in | 17:50:39 |
| 7 | the proceedings. | 17:50:44 |
| 8 | I have no further questions. | 17:50:53 |
| 9 | MR. POLICK: Mr. Cross, I have some | 17:51:01 |
| 10 | questions for you. Are you ready to continue? | 17:51:03 |
| 11 | THE WITNESS: Yes, sir. | 17:51:07 |
| 12 | EXAMINATION BY COUNSEL FOR THE DEFENDANTS | 17:51:07 |
| 13 | BY MR. POLICK: | 17:51:10 |
| 14 | Q Do you recall how many years you worked | 17:51:10 |
| 15 | for the Naperville Police Department? | 17:51:13 |
| 16 | A Approximately 38. | 17:51:15 |
| 17 | Q Okay. And you said you started with the | 17:51:18 |
| 18 | police department in 1970; correct? | 17:51:20 |
| 19 | A Yes. | 17:51:24 |
| 20 | Q Okay. So 38 years would bring us to about | 17:51:24 |
| 21 | 2008; correct? | 17:51:28 |
| 22 | A Yes. | 17:51:29 |
| 23 | Q When you testified at the beginning of the | 17:51:30 |
| 24 | deposition that you retired in 2019, was that | 17:51:32 |

Transcript of Michael Cross
Conducted on October 16, 2020                    303

| | | |
|---|---|---|
| 1 | incorrect? | 17:51:37 |
| 2 | A  Yes. | 17:51:38 |
| 3 | Q  Do your memory issues affect your ability | 17:51:39 |
| 4 | to recall certain dates? | 17:51:43 |
| 5 | A  Yes. | 17:51:43 |
| 6 | Q  And during the course of the deposition | 17:51:45 |
| 7 | you were asked to look at some of your reports to | 17:51:54 |
| 8 | refresh your memory; correct? | 17:52:00 |
| 9 | A  Yes. | 17:52:01 |
| 10 | Q  And did looking at those reports at times | 17:52:02 |
| 11 | refresh your memory of certain things during the | 17:52:05 |
| 12 | course of the deposition? | 17:52:08 |
| 13 | A  Yes. | 17:52:09 |
| 14 | Q  When you review reports, does your memory | 17:52:10 |
| 15 | condition as you experience it cause you any | 17:52:16 |
| 16 | problems in retaining what you have looked at? | 17:52:22 |
| 17 | MS. GARCIA:  Object to form. | 17:52:25 |
| 18 | A  Sometimes I don't retain it even though | 17:52:27 |
| 19 | I've just read it. | 17:52:31 |
| 20 | Q  Okay.  So in terms of reading it, how do | 17:52:34 |
| 21 | you experience the retention or what is your | 17:52:37 |
| 22 | experience with regard to your memory retention | 17:52:39 |
| 23 | when you read something? | 17:52:41 |
| 24 | A  Sometimes I recall it but it usually doesn't | 17:52:42 |

Transcript of Michael Cross
Conducted on October 16, 2020                              304

| | | |
|---|---|---|
| 1 | last long. | 17:52:52 |
| 2 | Q  Okay.  And is that part of the memory | 17:52:53 |
| 3 | issues that you spoke about today? | 17:53:00 |
| 4 | A  Yes. | 17:53:03 |
| 5 | Q  Mr. Dave Ferreri worked for the Naperville | 17:53:04 |
| 6 | Fire Department at the time of the Miceli fire | 17:53:39 |
| 7 | investigation; correct? | 17:53:41 |
| 8 | A  Yes. | 17:53:42 |
| 9 | Q  And you understood that Mr. Ferreri was a | 17:53:43 |
| 10 | certified fire investigator? | 17:53:45 |
| 11 | A  Yes. | 17:53:47 |
| 12 | Q  And you also testified about Mr. Kushner? | 17:53:48 |
| 13 | A  Yes. | 17:53:53 |
| 14 | Q  He was a State fire investigator? | 17:53:54 |
| 15 | A  Fire marshal, yes. | 17:53:57 |
| 16 | Q  Okay.  And was it your understanding that | 17:53:59 |
| 17 | Fire Marshal Kushner was also certified by the | 17:54:02 |
| 18 | State? | 17:54:06 |
| 19 | A  Yes. | 17:54:06 |
| 20 | Q  At any time did you ever take a test to be | 17:54:07 |
| 21 | certified as a fire investigator? | 17:54:10 |
| 22 | A  No. | 17:54:13 |
| 23 | Q  Did you ever take any State test to be | 17:54:14 |
| 24 | certified as a fire investigator? | 17:54:17 |

Transcript of Michael Cross
Conducted on October 16, 2020                    305

| | | |
|---|---|---|
| 1 | A No. | 17:54:18 |
| 2 | Q Have you ever been certified as a fire | 17:54:19 |
| 3 | investigator? | 17:54:21 |
| 4 | A No. | 17:54:21 |
| 5 | Q During the course of this investigation, | 17:54:22 |
| 6 | you testified that you relied upon the judgment | 17:54:26 |
| 7 | and deferred to those people in the fire | 17:54:32 |
| 8 | department and who had experience in fire | 17:54:39 |
| 9 | investigation; correct? | 17:54:40 |
| 10 | MS. GARCIA: Object to form. | 17:54:42 |
| 11 | Q You told us that during the course of this | 17:54:44 |
| 12 | investigation you worked within the investigations | 17:54:57 |
| 13 | division of the Naperville Police Department; | 17:55:01 |
| 14 | correct? | 17:55:05 |
| 15 | A Correct. | 17:55:06 |
| 16 | Q Okay. And I think you also testified | 17:55:07 |
| 17 | there was also a patrol division. | 17:55:09 |
| 18 | A Experience, yes. | 17:55:12 |
| 19 | Q I'm -- just in terms of the divisions in | 17:55:13 |
| 20 | the department, was there also a patrol division? | 17:55:17 |
| 21 | A Yes. | 17:55:19 |
| 22 | Q And you worked in that prior to the | 17:55:19 |
| 23 | investigations division? | 17:55:21 |
| 24 | A Yes. | 17:55:22 |

Transcript of Michael Cross
Conducted on October 16, 2020                    306

| | | |
|---|---|---|
| 1 | Q  When you were working in the investigations | 17:55:22 |
| 2 | division during the time of this Miceli | 17:55:26 |
| 3 | investigation, were you a supervisor in that | 17:55:28 |
| 4 | division? | 17:55:31 |
| 5 | A  No. | 17:55:31 |
| 6 | Q  Were you ever a supervisor? | 17:55:32 |
| 7 | A  No. | 17:55:33 |
| 8 | Q  And you testified that your immediate | 17:55:34 |
| 9 | supervisor in the investigations division was | 17:55:42 |
| 10 | Sergeant Mark Carlson? | 17:55:46 |
| 11 | A  Yes. | 17:55:48 |
| 12 | Q  And that the captain of that investigations | 17:55:48 |
| 13 | division at the time of this investigation, the | 17:55:52 |
| 14 | Miceli investigation, was captain Paul Shaffer; | 17:55:55 |
| 15 | correct? | 17:55:59 |
| 16 | A  Correct. | 17:56:00 |
| 17 | Q  In your testimony at the 2018 retrial of | 17:56:01 |
| 18 | Mr. Amor, you testified that Jon Ripsky was the | 17:56:07 |
| 19 | captain in charge of the investigations division | 17:56:12 |
| 20 | at the time of this Miceli investigation.  Was | 17:56:16 |
| 21 | that testimony incorrect? | 17:56:19 |
| 22 | A  Yes, it was. | 17:56:20 |
| 23 | Q  You were asked some questions about | 17:56:21 |
| 24 | polygraph examinations.  Were you ever trained on | 17:56:43 |

| | | |
|---|---|---|
| 1 | how to do polygraph examinations? | 17:56:49 |
| 2 | A  No. | 17:56:52 |
| 3 | Q  Did you yourself ever conduct polygraph | 17:56:52 |
| 4 | examinations? | 17:56:56 |
| 5 | A  No. | 17:56:56 |
| 6 | Q  Would it be fair to say that you relied on | 17:56:57 |
| 7 | others to do polygraph examinations? | 17:57:00 |
| 8 | A  Yes. | 17:57:02 |
| 9 | Q  Do you have any training as a doctor? | 17:57:03 |
| 10 | A  No. | 17:57:06 |
| 11 | Q  Do you have any training in being a mental | 17:57:07 |
| 12 | health professional like a psychologist or a | 17:57:13 |
| 13 | psychiatrist? | 17:57:16 |
| 14 | A  No. | 17:57:17 |
| 15 | Q  Because you were not trained in doing | 17:57:18 |
| 16 | polygraph examinations, would it be fair to say | 17:57:36 |
| 17 | that you would rely on the polygraph examiners to | 17:57:39 |
| 18 | explain things to you about whatever their | 17:57:44 |
| 19 | interviews or tests concluded? | 17:57:46 |
| 20 | A  Yes. | 17:57:47 |
| 21 | Q  You testified that at the time of the | 17:57:49 |
| 22 | Miceli fire investigation you were a member of the | 17:57:56 |
| 23 | fire investigation team or FIT for short; right? | 17:58:01 |
| 24 | A  Yes. | 17:58:08 |

Transcript of Michael Cross
Conducted on October 16, 2020                    308

```
1        Q   And that was comprised of both members of      17:58:09

2   the Naperville Police Department and the Naperville     17:58:13

3   Fire Department; correct?                               17:58:16

4        A   Yes.                                           17:58:16

5        Q   And in the Miceli investigation,               17:58:17

6   Dave Ferreri was the fire department member of the      17:58:20

7   FIT team; correct?                                      17:58:23

8        A   Yes.                                           17:58:25

9        Q   Do you recall any other people from the        17:58:25

10  fire department who worked on the FIT team during       17:58:27

11  this investigation?                                     17:58:31

12       A   Not specifically, no.                          17:58:31

13       Q   And you from the police department --          17:58:34

14  strike that.                                            17:58:39

15           You were the police department member on       17:58:40

16  this fire investigation team; correct?                  17:58:42

17       A   Correct.                                       17:58:44

18       Q   Do you recall anybody else from the police     17:58:45

19  department that was a member of the fire                17:58:47

20  investigation team at the time of the Miceli            17:58:49

21  investigation?                                          17:58:51

22       A   I believe that Detective Griffith was as       17:58:52

23  it relates to evidence collecting.                      17:58:57

24       Q   Okay.  Was Detective Griffith trained in       17:58:59
```

Transcript of Michael Cross
Conducted on October 16, 2020                          309

| | | |
|---|---|---|
| 1 | evidence collection? | 17:59:04 |
| 2 | A  Yes. | 17:59:04 |
| 3 | Q  For like an evidence technician? | 17:59:04 |
| 4 | A  Yes. | 17:59:07 |
| 5 | Q  And with regard to the fire investigation | 17:59:08 |
| 6 | team, would it be fair to say that you would rely on | 17:59:13 |
| 7 | the opinions and conclusions of the fire department | 17:59:16 |
| 8 | and particularly with regard to Mr. Ferreri with | 17:59:21 |
| 9 | regard to origin and cause of fires? | 17:59:25 |
| 10 | MS. GARCIA:  Object to form. | 17:59:27 |
| 11 | A  Yes. | 17:59:29 |
| 12 | Q  During the course of the Miceli fire and | 17:59:31 |
| 13 | murder investigation, did Jon Ripsky ever direct | 18:00:20 |
| 14 | you how to conduct your investigation? | 18:00:23 |
| 15 | A  No. | 18:00:26 |
| 16 | Q  Did he ever supervise you during the course | 18:00:27 |
| 17 | of that investigation? | 18:00:32 |
| 18 | A  No. | 18:00:32 |
| 19 | Q  You testified that you recalled that | 18:00:33 |
| 20 | Mr. Amor had taken a polygraph examination early | 18:01:00 |
| 21 | in the investigation, but it was determined by | 18:01:05 |
| 22 | that polygraph examiner to be inconclusive because | 18:01:10 |
| 23 | Mr. Amor had been drinking alcohol.  Do you recall | 18:01:14 |
| 24 | that testimony? | 18:01:17 |

Transcript of Michael Cross
Conducted on October 16, 2020                    310

| | | |
|---|---|---|
| 1 | A  Yes. | 18:01:17 |
| 2 | Q  And after that period of time, you did | 18:01:18 |
| 3 | have other interviews with Mr. Amor; correct? | 18:01:23 |
| 4 | A  Yes. | 18:01:26 |
| 5 | Q  And during those interviews with Mr. Amor, | 18:01:26 |
| 6 | did he express an interest in completing or | 18:01:30 |
| 7 | retaking that polygraph examination at a time when | 18:01:33 |
| 8 | he was sober? | 18:01:38 |
| 9 | A  Yes. | 18:01:39 |
| 10 | Q  The car that you were in when Mr. Amor | 18:01:40 |
| 11 | went with you and Detective Guerrieri from the | 18:01:52 |
| 12 | DeKalb County jail to Reid & Associates in Chicago | 18:01:56 |
| 13 | and then from Reid & Associates in Chicago back to | 18:02:00 |
| 14 | the Naperville Police Department, do you recall | 18:02:04 |
| 15 | that vehicle you were in? | 18:02:06 |
| 16 | A  Yes. | 18:02:07 |
| 17 | Q  The vehicle itself, did it have a cage or | 18:02:08 |
| 18 | a -- like a Plexiglas shield like we have here | 18:02:13 |
| 19 | today between the front seats and the back seats? | 18:02:18 |
| 20 | A  No. | 18:02:20 |
| 21 | Q  When you were at Reid & Associates, did | 18:02:50 |
| 22 | you take part in the -- Mr. Masokas' pretest | 18:02:54 |
| 23 | interview of Mr. Amor, or did you remain in the | 18:03:01 |
| 24 | lobby with Detective Guerrieri? | 18:03:04 |

Transcript of Michael Cross
Conducted on October 16, 2020                    311

| | | |
|---|---|---|
| 1 | A  I remained in the lobby. | 18:03:06 |
| 2 | Q  And you were also not present when | 18:03:08 |
| 3 | Mr. Masokas gave Mr. Amor his polygraph exam; | 18:03:11 |
| 4 | correct? | 18:03:17 |
| 5 | A  Correct. | 18:03:17 |
| 6 | Q  You remained in the lobby at that point, | 18:03:18 |
| 7 | as well; correct? | 18:03:20 |
| 8 | A  Yes. | 18:03:21 |
| 9 | Q  When you got back to the Naperville Police | 18:03:22 |
| 10 | Department when Mr. Amor came back with you and | 18:03:38 |
| 11 | Detective Guerrieri from Reid & Associates in | 18:03:41 |
| 12 | Chicago, did you and Detective Guerrieri and | 18:03:45 |
| 13 | Mr. Amor all go down into the investigations | 18:03:50 |
| 14 | section together? | 18:03:55 |
| 15 | A  Yes. | 18:03:56 |
| 16 | Q  Okay. | 18:03:58 |
| 17 | A  Well, no.  I went down with Mr. Amor first, | 18:03:59 |
| 18 | and Bob parked the car and then came in. | 18:04:02 |
| 19 | Q  Okay.  And so where did Mr. -- strike that. | 18:04:05 |
| 20 | Did Detective Guerrieri drop you off at | 18:04:09 |
| 21 | some point? | 18:04:12 |
| 22 | A  Yes. | 18:04:12 |
| 23 | Q  Where did he drop you off in relation -- | 18:04:13 |
| 24 | A  The front door. | 18:04:16 |

Transcript of Michael Cross
Conducted on October 16, 2020                                    312

| | | |
|---|---|---|
| 1 | Q   Okay.  And then where did he have to go | 18:04:17 |
| 2 | park the car? | 18:04:20 |
| 3 | A   In the back of the building. | 18:04:21 |
| 4 | Q   All right.  And then could Detective | 18:04:22 |
| 5 | Guerrieri get to the investigations section | 18:04:24 |
| 6 | through a rear entrance of the building? | 18:04:28 |
| 7 | A   Yes. | 18:04:30 |
| 8 | Q   So when you walk into the front door of | 18:04:31 |
| 9 | the police department there in Naperville at the | 18:04:34 |
| 10 | time of this investigation in 1995, was there like | 18:04:36 |
| 11 | a front desk area? | 18:04:38 |
| 12 | A   Yes. | 18:04:39 |
| 13 | Q   And then where was this investigations | 18:04:40 |
| 14 | section in relation to that front desk area? | 18:04:43 |
| 15 | A   On the lower level. | 18:04:44 |
| 16 | Q   Okay.  So the front desk where you walk in | 18:04:46 |
| 17 | is the main level, and then there's a lower level | 18:04:52 |
| 18 | in the building? | 18:04:55 |
| 19 | A   Yes. | 18:04:55 |
| 20 | Q   And the investigations section was in the | 18:04:55 |
| 21 | lower level? | 18:04:59 |
| 22 | A   Yes. | 18:04:59 |
| 23 | Q   And how did you get down into the lower | 18:05:00 |
| 24 | level of the building to the investigations section? | 18:05:03 |

Transcript of Michael Cross
Conducted on October 16, 2020                    313

| | | |
|---|---|---|
| 1 | A   I don't recall.  There's stairs and there's | 18:05:07 |
| 2 | an elevator, but I don't recall which one we used. | 18:05:09 |
| 3 | Q   And then when you get down in the | 18:05:14 |
| 4 | investigations section, you described that there's | 18:05:17 |
| 5 | a lobby area down there? | 18:05:20 |
| 6 | A   Yes. | 18:05:22 |
| 7 | Q   Was there a reception desk at all or just | 18:05:22 |
| 8 | like a lobby area? | 18:05:25 |
| 9 | A   There's a reception desk. | 18:05:25 |
| 10 | Q   Okay.  Do you recall if there was any | 18:05:27 |
| 11 | reception person there when you came down with | 18:05:28 |
| 12 | Mr. Amor at that point around 11:30 at night? | 18:05:31 |
| 13 | A   No, there wasn't. | 18:05:35 |
| 14 | Q   And then you spoke of the interview room | 18:05:38 |
| 15 | that you were in with Mr. Amor in the | 18:05:41 |
| 16 | investigations section.  Can you tell us where | 18:05:43 |
| 17 | that was in relation to the lobby area? | 18:05:46 |
| 18 | A   Right off the lobby there's a door to go | 18:05:48 |
| 19 | into the interview room. | 18:05:50 |
| 20 | Q   And you already described the interview | 18:05:51 |
| 21 | room to us.  Can you describe the lobby area and | 18:05:53 |
| 22 | what that looked like? | 18:05:57 |
| 23 | A   The lobby area is quite a bit larger than | 18:05:57 |
| 24 | the interview room.  It has a reception desk; it | 18:06:00 |

Transcript of Michael Cross
Conducted on October 16, 2020                    314

| | | |
|---|---|---|
| 1 | has numerous or several couches and chairs, also. | 18:06:05 |
| 2 | Q  When you and Detective Guerrieri were in | 18:06:14 |
| 3 | the interview room with Mr. Amor, and he eventually | 18:06:27 |
| 4 | made his admissions and his confession, were there | 18:06:30 |
| 5 | any other Naperville police officers in that | 18:06:34 |
| 6 | interview room with you besides you and Detective | 18:06:37 |
| 7 | Guerrieri? | 18:06:39 |
| 8 | A  No. | 18:06:40 |
| 9 | Q  And when Assistant State's Attorney | 18:06:41 |
| 10 | Nigohosian arrived at Naperville Police Department | 18:06:50 |
| 11 | to speak with Bill as part of the felony review | 18:06:53 |
| 12 | process, were there any other officers or detectives | 18:06:56 |
| 13 | there besides you and Detective Guerrieri with | 18:07:01 |
| 14 | Mr. Nigohosian? | 18:07:06 |
| 15 | A  Not in the downstairs area, no. | 18:07:07 |
| 16 | Q  You testified that at some point you went | 18:07:10 |
| 17 | back to the apartment where the fire had occurred | 18:07:37 |
| 18 | and looked on the wall for where the smoke detector | 18:07:46 |
| 19 | was supposed to have been? | 18:07:53 |
| 20 | A  Yes. | 18:07:54 |
| 21 | Q  Do you recall where in the apartment it | 18:07:54 |
| 22 | was located? | 18:07:56 |
| 23 | A  Above the breaker box. | 18:07:56 |
| 24 | Q  Okay.  And you described that you went | 18:07:58 |

Transcript of Michael Cross
Conducted on October 16, 2020                    315

| | | |
|---|---|---|
| 1 | there, and you didn't see any pattern on the wall? | 18:08:01 |
| 2 | A  No. | 18:08:03 |
| 3 | Q  Okay.  Meaning the wall was covered | 18:08:05 |
| 4 | with soot? | 18:08:08 |
| 5 | A  Yes. | 18:08:08 |
| 6 | Q  Okay.  Did you find any anchors or screws in | 18:08:10 |
| 7 | that wall where the smoke detector should have been? | 18:08:15 |
| 8 | A  Yes.  There were two screws. | 18:08:17 |
| 9 | Q  I think you indicated earlier that you did | 18:08:20 |
| 10 | not review any fire department documents regarding | 18:08:47 |
| 11 | this case to prepare. | 18:08:51 |
| 12 | A  No, I did not. | 18:08:54 |
| 13 | Q  You didn't review Lieutenant Ferreri's | 18:08:56 |
| 14 | report at all? | 18:08:59 |
| 15 | A  No. | 18:08:59 |
| 16 | Q  If Lieutenant Ferreri's origin-and-cause | 18:09:01 |
| 17 | report did not contain any determination of a | 18:09:25 |
| 18 | cause, would you stand by his report? | 18:09:29 |
| 19 | A  Yes. | 18:09:31 |
| 20 | Q  You testified with regard to Mr. Amor's | 18:09:32 |
| 21 | admissions about the fire that it was important to | 18:10:03 |
| 22 | you that he told you that he had started it; | 18:10:07 |
| 23 | correct? | 18:10:10 |
| 24 | A  Yes. | 18:10:10 |

Transcript of Michael Cross
Conducted on October 16, 2020                        316

| | | |
|---|---|---|
| 1 | Q   But you believed that he was minimizing | 18:10:11 |
| 2 | what he had told you about it? | 18:10:18 |
| 3 | A   Yes. | 18:10:20 |
| 4 | Q   Did you believe that he could have started | 18:10:21 |
| 5 | the fire with an open flame source as opposed to a | 18:10:25 |
| 6 | cigarette? | 18:10:29 |
| 7 | A   Yes. | 18:10:29 |
| 8 | Q   Did you believe that if he had thrown, or | 18:10:30 |
| 9 | dropped, or flicked the cigarette into just | 18:10:37 |
| 10 | newspaper, dry newspaper that that could cause | 18:10:41 |
| 11 | a fire? | 18:10:46 |
| 12 | A   Yeah, over an amount of time it would | 18:10:47 |
| 13 | smolder and would -- could cause a fire. | 18:10:50 |
| 14 | Q   So that was plausible to you? | 18:10:52 |
| 15 | A   Yes. | 18:10:54 |
| 16 | Q   Did you believe an accelerant was used by | 18:10:55 |
| 17 | Mr. Amor to start the fire? | 18:10:59 |
| 18 | A   Yes. | 18:11:00 |
| 19 | Q   What did you believe the accelerant to be | 18:11:01 |
| 20 | in this particular case? | 18:11:04 |
| 21 | A   I believe it was charcoal lighter fluid. | 18:11:05 |
| 22 | THE VIDEOGRAPHER:  Sorry for the bad | 18:11:11 |
| 23 | timing, but I've only got 3 minutes left.  Should | 18:11:13 |
| 24 | I switch tapes? | 18:11:17 |

Transcript of Michael Cross
Conducted on October 16, 2020                                      317

| | | |
|---|---|---|
| 1 | MR. POLICK:  I think I can wrap it up. | 18:11:18 |
| 2 | Q  During the course of his confession | 18:11:21 |
| 3 | Mr. Amor told you he was on the floor watching | 18:11:24 |
| 4 | television that day? | 18:11:26 |
| 5 | A  Yes. | 18:11:26 |
| 6 | Q  And where he had spilled vodka and had the | 18:11:27 |
| 7 | newspapers out, that was in the area where it was | 18:11:31 |
| 8 | determined the origin of the fire was near the | 18:11:33 |
| 9 | swivel rocker chair? | 18:11:36 |
| 10 | A  Yes. | 18:11:38 |
| 11 | MS. GARCIA:  Object to form. | 18:11:40 |
| 12 | Q  And during the course of that confession, | 18:11:42 |
| 13 | Mr. Amor told you that he intended to start that | 18:11:44 |
| 14 | fire; correct? | 18:11:46 |
| 15 | A  Yes. | 18:11:47 |
| 16 | Q  And he knew by not doing anything about it | 18:11:47 |
| 17 | that he believed a fire was going to occur; he | 18:11:50 |
| 18 | told you that; correct? | 18:11:54 |
| 19 | A  Yes. | 18:11:55 |
| 20 | Q  And, in fact, he told you he just didn't | 18:11:55 |
| 21 | give a shit; right? | 18:11:58 |
| 22 | A  Yes. | 18:12:00 |
| 23 | Q  And you asked him why he started the fire; | 18:12:01 |
| 24 | correct? | 18:12:04 |

Transcript of Michael Cross
Conducted on October 16, 2020                    318

| | | |
|---|---|---|
| 1 | A  Yes. | 18:12:04 |
| 2 | Q  And he gave you various reasons all that | 18:12:04 |
| 3 | amounted to financial gain; correct? | 18:12:10 |
| 4 | A  Yes. | 18:12:11 |
| 5 | Q  During the course of the deposition today, | 18:12:33 |
| 6 | Mr. Cross, have you testified to your -- to the | 18:12:35 |
| 7 | best of your ability given your memory limitations | 18:12:38 |
| 8 | that you testified to here today? | 18:12:42 |
| 9 | A  Yes. | 18:12:43 |
| 10 | MR. POLICK:  I don't have anything further. | 18:12:45 |
| 11 | Ms. Garcia may have some follow-up. | 18:12:48 |
| 12 | MS. GARCIA:  I just have one question. | 18:12:50 |
| 13 | EXAMINATION BY COUNSEL FOR THE PLAINTIFF | 18:12:50 |
| 14 | BY MS. GARCIA: | 18:12:53 |
| 15 | Q  You just testified that you believed | 18:12:53 |
| 16 | charcoal lighter fluid is how Mr. Amor started the | 18:12:56 |
| 17 | fire; correct? | 18:12:59 |
| 18 | A  Yes. | 18:13:00 |
| 19 | Q  Is there any physical evidence tying | 18:13:00 |
| 20 | Mr. Amor or any physical evidence, rather, that | 18:13:02 |
| 21 | proved Mr. Amor had interacted with any charcoal | 18:13:06 |
| 22 | lighter fluid? | 18:13:14 |
| 23 | A  No. | 18:13:16 |
| 24 | MS. GARCIA:  No further questions. | 18:13:16 |

Transcript of Michael Cross
Conducted on October 16, 2020                    319

1          MR. POLICK:  Signature is reserved.              18:13:18

2          MS. GARCIA:  We're going to order.               18:13:21

3          MR. POLICK:  We'll take a copy.                  18:13:23

4          THE VIDEOGRAPHER:  We're going off the           18:13:24

5    record, ending this deposition at 6:13 p.m.            18:13:28

6          (Off the record at 6:13 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Transcript of Michael Cross
Conducted on October 16, 2020                                320

```
1       CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

2

3          I, Paula M. Quetsch, Certified Shorthand

4    Reporter No. 084-003733, CSR, RPR, and a Notary

5    Public in and for the County of Kane, State of

6    Illinois, the officer before whom the foregoing

7    deposition was taken, do hereby certify that the

8    foregoing transcript is a true and correct record

9    of the testimony given; that said testimony was

10   taken by me stenographically and thereafter reduced

11   to typewriting under my direction; that reading and

12   signing was requested; and that I am neither

13   counsel for, related to, nor employed by any of

14   the parties to this case and have no interest,

15   financial or otherwise, in its outcome.

16          IN WITNESS WHEREOF, I have hereunto set my

17   hand and affixed my notarial seal this 3rd day of

18   November, 2020.

19

20   My commission expires:  October 16, 2021

21

22   _____

23   Notary Public in and for the

24   State of Illinois
```

Transcript of Michael Cross
Conducted on October 16, 2020

321

| A |
|---|

**aberdeen**
3:5
**abilities**
44:18, 164:20
**ability**
19:6, 19:13,
26:22, 27:1,
27:3, 27:8,
27:13, 52:15,
94:18, 164:6,
283:20, 284:5,
295:15, 295:17,
296:5, 303:3,
318:7
**able**
20:15, 20:19,
140:24, 150:12,
150:13, 151:22,
156:15, 158:2,
158:15, 166:23,
284:1
**above**
314:23
**absolutely**
83:2, 141:2
**abuse**
68:18
**academy**
36:5, 36:9,
36:13, 36:15,
40:8, 40:11,
41:1, 41:2,
41:5, 54:1,
54:4, 55:10,
58:21, 58:24
**accelerant**
145:9, 147:7,
148:6, 148:12,
148:17, 153:24,
169:21, 170:6,
268:17, 268:19,
268:24, 269:9,
270:14, 270:17,
270:21, 316:16,
316:19
**accelerants**
169:3, 169:6,

169:10, 169:13,
169:15, 169:17,
269:21, 269:24,
270:6, 270:8,
270:11
**acceptable**
68:21
**access**
178:23, 242:2
**accidental**
42:5, 72:24,
73:11, 126:17,
170:20, 172:15,
268:10, 269:18
**accidents**
53:2, 53:6,
53:9
**according**
252:4, 252:19
**accounts**
160:16
**accurate**
17:21, 18:6,
26:23, 27:9,
27:14, 57:19,
119:8, 127:10,
127:14, 137:11,
138:2, 140:24,
255:1, 257:1,
257:5, 257:9,
257:12, 288:16,
293:10, 294:11,
294:16
**accused**
53:19
**acquittal**
291:1
**acquitted**
82:19, 85:11,
290:21
**acted**
158:19, 158:20,
158:21
**acting**
66:7, 93:11
**actions**
147:14
**actual**
89:11, 181:18,

183:9
**actually**
36:8, 39:1,
70:8, 86:8,
86:9, 99:20,
149:13, 198:23,
214:15, 231:19,
233:4, 236:11,
277:2, 279:7
**addition**
6:9
**adjusting**
251:22
**administration**
51:19, 51:20,
51:23
**admission**
60:10, 235:22,
236:10, 239:12,
240:18, 279:8,
279:10, 279:19,
279:21, 292:6,
292:8, 292:21
**admissions**
228:6, 228:7,
228:8, 228:11,
233:11, 233:14,
233:17, 234:24,
235:2, 236:5,
240:22, 314:4,
315:21
**admitted**
147:23, 148:5,
195:22
**admitting**
233:18
**advance**
295:3
**advised**
248:14, 248:23,
249:11, 254:17,
257:21
**advising**
248:13
**affect**
26:11, 26:22,
27:8, 295:1,
303:3

**affected**
19:6
**affixed**
320:17
**afternoon**
162:1, 181:11
**again**
8:22, 16:9,
21:14, 23:22,
24:2, 27:16,
45:24, 51:22,
63:9, 64:21,
65:13, 66:11,
66:18, 68:23,
71:11, 71:16,
85:19, 93:7,
94:18, 97:24,
98:9, 105:18,
107:24, 114:8,
124:10, 127:4,
137:9, 158:11,
171:18, 172:10,
174:15, 178:4,
178:6, 190:1,
190:21, 195:7,
197:9, 197:16,
198:12, 204:11,
204:24, 205:8,
210:7, 212:24,
215:5, 216:6,
217:17, 217:18,
221:15, 225:8,
231:18, 233:12,
235:24, 236:20,
238:12, 248:16,
249:1, 251:22,
256:17, 260:5,
264:20, 265:23,
267:20, 268:21,
271:17, 271:23,
276:17, 280:3,
280:10, 284:11,
288:18
**against**
45:3, 59:17,
232:2, 242:9,
275:9
**aggravated**
7:2, 7:4, 7:6

Transcript of Michael Cross
Conducted on October 16, 2020

322

| | | | |
|---|---|---|---|
| **ago** | **al** | **allegedly** | **always** |
| 10:7, 11:7, | 1:9 | 292:20 | 156:21, 159:20, |
| 11:9, 11:10, | **alarm** | **allow** | 172:19, 172:20, |
| 11:22, 15:19, | 123:15, 123:18, | 23:18, 226:12, | 173:2, 179:8, |
| 18:5, 54:5, | 129:19, 254:9 | 299:17 | 179:13, 182:11, |
| 137:3, 217:3, | **alcohol** | **almost** | 200:20, 208:18, |
| 261:11, 276:6 | 133:2, 156:16, | 68:18, 68:20 | 222:9, 289:22, |
| **agree** | 156:17, 186:6, | **alone** | 294:13 |
| 138:5, 142:4, | 309:23 | 110:15, 114:11, | **alzheimer's** |
| 142:6, 261:21 | **alcoholic** | 220:7 | 24:11, 24:15, |
| **agreed** | 147:24, 186:14 | **along** | 25:22, 26:14, |
| 143:8, 154:2, | **all** | 76:13, 165:14, | 26:22, 27:12 |
| 258:11, 298:22, | 6:11, 9:2, | 165:15, 165:16, | **amor's** |
| 298:23, 302:1 | 22:21, 46:13, | 179:4, 266:4 | 13:24, 14:19, |
| **agreeing** | 47:15, 47:18, | **already** | 15:9, 18:11, |
| 298:19 | 47:21, 48:3, | 40:16, 89:3, | 30:22, 31:4, |
| **agreement** | 49:9, 75:4, | 93:24, 100:9, | 31:12, 31:15, |
| 296:21 | 75:6, 79:9, | 101:20, 104:13, | 31:18, 31:22, |
| **ahead** | 82:10, 82:11, | 105:14, 136:8, | 90:16, 155:4, |
| 7:12, 21:9, | 89:3, 95:10, | 143:2, 164:23, | 158:9, 158:13, |
| 45:23, 61:17, | 95:11, 95:12, | 170:24, 217:7, | 168:2, 169:8, |
| 61:23, 63:8, | 97:4, 97:6, | 217:15, 225:17, | 200:18, 204:20, |
| 63:20, 68:17, | 117:12, 117:19, | 235:2, 246:18, | 205:22, 208:16, |
| 69:18, 70:5, | 121:22, 128:8, | 271:2, 286:14, | 218:2, 222:1, |
| 71:14, 79:24, | 128:9, 132:12, | 293:2, 293:4, | 228:14, 229:1, |
| 85:18, 93:5, | 132:14, 138:21, | 313:20 | 229:23, 230:5, |
| 140:1, 161:17, | 139:24, 140:16, | **also** | 231:4, 231:8, |
| 172:10, 175:1, | 152:15, 152:17, | 3:18, 5:17, | 231:21, 234:15, |
| 177:24, 178:6, | 170:7, 171:23, | 23:14, 40:2, | 250:17, 260:22, |
| 179:10, 184:5, | 172:23, 178:23, | 46:19, 58:20, | 262:16, 264:6, |
| 185:24, 203:15, | 182:6, 193:13, | 58:23, 65:3, | 264:15, 266:23, |
| 204:11, 204:23, | 193:16, 194:24, | 65:7, 66:11, | 268:3, 268:9, |
| 205:8, 205:19, | 195:1, 198:14, | 74:12, 75:8, | 271:9, 271:18, |
| 207:12, 210:6, | 204:8, 204:12, | 77:12, 104:6, | 272:20, 315:20 |
| 214:5, 215:4, | 206:11, 207:6, | 122:8, 134:18, | **amount** |
| 216:5, 216:11, | 207:8, 207:16, | 134:20, 136:22, | 69:8, 237:10, |
| 217:13, 217:16, | 208:13, 209:2, | 148:22, 171:11, | 316:12 |
| 218:7, 219:21, | 210:12, 222:10, | 194:20, 204:13, | **amounted** |
| 220:5, 221:6, | 225:19, 229:16, | 216:3, 227:3, | 318:3 |
| 221:15, 221:23, | 245:24, 246:5, | 278:14, 295:7, | **anchors** |
| 223:12, 231:13, | 246:23, 247:1, | 295:18, 304:12, | 315:6 |
| 231:17, 238:1, | 254:24, 258:15, | 304:17, 305:16, | **angry** |
| 239:15, 243:15, | 272:22, 272:23, | 305:17, 305:20, | 226:13 |
| 246:17, 252:1, | 277:24, 282:16, | 311:2, 314:1 | **animated** |
| 252:24, 261:7, | 290:11, 298:21, | **alternative** | 173:2, 179:8, |
| 271:6, 282:14, | 311:13, 312:4, | 60:6 | 208:20, 222:10 |
| 291:13 | 313:7, 315:14, | **alternatives** | **another** |
| **air** | 318:2 | 60:6 | 7:7, 35:12, |
| 140:18 | | | |

Transcript of Michael Cross
Conducted on October 16, 2020

60:5, 76:13,
76:15, 94:4,
94:7, 135:23,
139:24, 140:11,
160:24, 162:13,
176:2, 181:3,
229:7, 258:12,
262:6, 262:8
**answered**
40:17, 93:24,
105:17, 114:7,
170:24, 172:9,
177:23, 178:5,
185:14, 190:18,
204:10, 205:8,
216:21, 217:14,
221:24, 229:2,
239:9, 268:22,
271:2, 286:14
**answering**
97:17, 97:20,
98:1, 98:5,
127:11, 183:12
**answers**
8:8, 160:9,
283:21
**anticipation**
84:21
**anybody**
63:21, 79:17,
79:18, 80:1,
80:3, 80:6,
80:11, 141:19,
152:4, 174:18,
184:16, 210:14,
233:21, 233:22,
233:23, 308:18
**anymore**
82:11, 85:5,
85:7, 85:23,
85:24, 86:5,
166:20, 255:20
**anyone**
11:3, 17:7,
46:18, 48:13,
53:19, 141:18,
145:23, 179:1,
262:10, 262:13,

262:16, 262:20
**anyplace**
78:19
**anything**
27:11, 86:18,
94:9, 101:18,
101:22, 106:20,
117:10, 120:4,
122:14, 122:16,
123:3, 123:5,
127:18, 131:22,
138:10, 149:9,
150:6, 150:14,
152:3, 167:11,
167:15, 171:3,
172:11, 179:2,
179:20, 206:22,
207:1, 208:14,
210:8, 247:1,
255:12, 256:10,
257:3, 277:22,
283:19, 293:4,
317:16, 318:10
**anyway**
83:3, 163:24,
177:18, 294:18,
296:4
**apartment**
28:20, 72:13,
100:8, 101:24,
102:2, 102:3,
106:18, 120:18,
122:8, 166:17,
167:10, 171:15,
171:20, 256:14,
314:17, 314:21
**apologies**
75:7, 76:1,
88:24, 238:5
**apologize**
105:14
**apparently**
261:9, 266:14
**appear**
66:16, 98:1
**appearance**
159:17, 172:18
**appeared**
72:10

**appears**
63:12
**appliances**
116:22
**application**
35:20, 35:22
**applied**
60:20
**apply**
35:10
**applying**
35:3
**apprised**
295:2
**appropriate**
61:6, 219:23
**approximately**
10:1, 11:7,
38:5, 40:14,
44:4, 72:16,
191:8, 195:9,
204:16, 208:12,
211:8, 224:22,
302:16
**approximation**
10:5, 67:10,
123:8
**april**
256:1
**area**
142:3, 163:24,
164:2, 312:11,
312:14, 313:5,
313:8, 313:17,
313:21, 313:23,
314:15, 317:7
**aren't**
67:23
**argue**
230:1, 230:12,
286:5
**arguing**
230:14
**argumentative**
64:21, 87:4,
202:18, 282:13
**arm**
96:16

**arms**
96:1, 96:2,
96:4, 96:10,
172:21
**around**
11:17, 35:1,
45:19, 58:8,
75:4, 75:6,
99:1, 99:2,
109:15, 121:2,
180:20, 190:23,
192:24, 200:2,
200:4, 200:5,
202:6, 211:4,
212:9, 214:16,
240:17, 241:11,
244:6, 244:14,
258:2, 277:12,
313:12
**arrest**
44:19, 77:13,
271:10, 271:12,
272:20, 272:23,
273:3, 273:4,
273:16, 273:21,
273:23, 274:4,
274:7, 274:10,
274:14, 275:1,
275:5, 278:7,
278:10, 279:5
**arrested**
173:14, 176:14,
271:19, 271:22,
274:22, 275:2,
275:4, 279:18,
291:22
**arresting**
279:3, 291:18
**arrive**
181:9, 243:2
**arrived**
99:6, 99:12,
99:14, 184:13,
184:21, 190:23,
211:3, 211:9,
243:5, 314:10
**arriving**
241:18, 242:23

Transcript of Michael Cross
Conducted on October 16, 2020

324

arson
39:1, 40:2,
40:6, 40:15,
40:19, 40:22,
41:13, 42:11,
42:19, 42:22,
43:1, 45:9,
45:10, 45:11,
47:18, 54:21,
58:5, 58:10,
58:15, 75:8,
75:10, 75:22,
142:11, 142:13,
153:21, 154:16,
185:6, 214:10,
216:17, 217:22,
241:15, 241:16,
267:13, 267:15,
274:12, 275:15,
292:10
arthur
181:3
article
89:23, 90:1
ashtray
114:20
aside
81:24, 281:11
asked
6:8, 20:15,
21:1, 26:15,
26:16, 55:24,
56:16, 76:17,
76:21, 76:23,
77:1, 77:3,
83:16, 86:12,
88:11, 103:19,
103:20, 105:14,
105:17, 114:7,
114:18, 115:19,
117:5, 120:12,
122:5, 133:10,
133:12, 133:13,
134:11, 134:13,
134:15, 134:19,
154:6, 154:12,
172:8, 175:10,
177:22, 178:4,

183:10, 190:18,
194:8, 204:9,
205:7, 216:21,
217:3, 217:14,
228:16, 228:24,
229:14, 229:21,
231:6, 239:9,
239:11, 243:8,
248:23, 251:3,
251:19, 252:8,
252:9, 253:1,
253:4, 253:5,
255:19, 256:10,
256:13, 256:17,
256:22, 256:23,
257:3, 257:7,
280:1, 293:8,
297:11, 303:7,
306:23, 317:23
asking
10:2, 21:7,
21:15, 22:8,
22:9, 23:23,
24:4, 26:9,
62:23, 63:1,
65:7, 66:18,
70:14, 78:16,
93:3, 106:1,
106:2, 112:8,
138:11, 176:6,
216:22, 216:23,
221:18, 229:14,
235:1, 235:23,
236:22, 245:14,
246:22, 248:15,
253:2, 253:3,
280:21, 286:7,
286:13, 298:9,
298:14
aspect
32:11, 94:13,
97:5, 261:22,
301:16
aspects
19:24, 20:3,
20:14, 32:4,
60:23, 66:2,
79:9, 124:22,

124:24, 152:12
asserting
217:13
assessment
142:9
assign
54:18, 150:10,
150:14
assigned
45:18, 46:6,
46:18, 48:15,
48:17, 48:18,
49:16, 50:1,
54:14, 150:18
assignment
44:12, 44:13,
44:14, 152:3
assistance
76:9
assistant
257:15, 314:9
assisted
76:8
associates
30:11, 163:13,
163:15, 163:18,
164:9, 164:18,
177:16, 178:9,
178:14, 179:3,
179:7, 180:10,
180:13, 181:1,
181:6, 181:10,
181:17, 182:9,
182:23, 183:1,
189:17, 190:7,
190:24, 191:13,
191:20, 196:4,
198:18, 198:22,
200:4, 201:17,
202:22, 203:12,
203:24, 205:13,
205:14, 205:23,
205:24, 207:5,
207:9, 208:6,
208:11, 210:20,
226:7, 226:10,
246:9, 246:14,
246:22, 247:1,

247:14, 247:22,
248:2, 248:9,
258:15, 261:12,
275:11, 310:12,
310:13, 310:21,
311:11
assume
8:16, 88:4,
112:14, 260:7
assumed
140:9
attached
4:8, 87:20,
88:17, 100:20,
109:3, 141:6,
196:9
attack
63:22, 64:2,
64:3, 64:7,
64:10, 64:17,
64:19, 65:15,
65:21, 65:24,
66:3, 66:5,
72:7, 72:8
attacks
63:15
attempt
226:4
attempted
149:3, 176:16
attempting
127:22
attend
40:10, 59:3,
149:2, 153:13
attended
41:1, 41:2,
54:11
attending
28:15, 29:23,
40:7
attorney
6:16, 9:17,
9:20, 9:22,
10:2, 10:18,
57:14, 74:2,
241:10, 257:15,
314:9

Transcript of Michael Cross
Conducted on October 16, 2020

**attorney-client**
296:12
**attorneys**
11:7, 12:14,
293:22
**audible**
8:9
**aurora**
33:12, 33:14,
34:8
**authored**
109:9
**authority**
150:10
**automatic**
178:21
**avenue**
3:13
**aware**
106:2, 152:11,
210:21, 216:13,
218:1
**away**
59:20, 83:6,
83:9, 119:22,
164:10, 164:12,
175:12

**B**

**back**
18:3, 37:7,
37:22, 37:24,
44:7, 53:22,
53:24, 63:10,
69:20, 78:8,
80:22, 89:18,
108:3, 121:19,
121:21, 139:3,
151:20, 189:2,
195:5, 197:7,
197:20, 199:4,
199:6, 199:7,
199:8, 199:12,
199:16, 200:2,
200:8, 200:12,
202:10, 208:1,
208:7, 208:9,
208:23, 209:2,

209:11, 211:7,
211:13, 212:10,
215:6, 220:23,
224:16, 227:10,
228:3, 228:4,
229:4, 230:8,
233:15, 237:15,
237:19, 248:1,
254:14, 255:9,
263:11, 270:10,
286:19, 300:1,
300:22, 310:13,
310:19, 311:9,
311:10, 312:3,
314:17
**backseat**
178:18
**bad**
60:7, 121:3,
127:4, 137:6,
316:22
**badger**
295:11, 300:4
**badgering**
300:6
**bailey**
27:24, 28:19,
29:2, 31:8,
98:17, 285:12,
286:23
**barriers**
6:9
**base**
112:19
**based**
22:9, 26:10,
69:24, 110:4,
114:12, 124:19,
124:20, 124:21,
124:22, 128:3,
129:9, 144:5,
154:16, 203:10,
280:4
**baseline**
62:9
**basement**
46:12, 46:23,
47:4, 47:8,

47:13, 47:16,
47:19, 47:22
**basically**
112:1
**basis**
48:16
**bates**
89:8, 100:22,
155:13, 196:14,
196:18, 245:22,
247:12, 248:1
**bates'd**
89:5
**bates-stamped**
87:22, 109:5
**bathroom**
194:2, 207:19,
263:6
**battery**
7:2, 7:4, 7:6,
254:6, 254:7,
254:8, 254:13
**became**
37:6, 37:12,
38:6, 40:15,
40:19, 43:6,
43:11, 242:11
**because**
8:4, 8:9,
27:17, 36:10,
54:17, 57:9,
57:23, 63:17,
77:2, 77:3,
78:6, 81:13,
81:17, 85:4,
89:5, 90:21,
92:6, 107:11,
119:8, 123:22,
125:3, 125:5,
125:10, 125:21,
130:16, 137:19,
138:6, 138:8,
138:16, 139:9,
140:8, 145:16,
153:10, 153:24,
155:23, 156:2,
156:13, 158:1,
158:5, 158:7,

163:8, 163:19,
164:19, 166:15,
167:9, 168:6,
168:10, 168:16,
171:1, 177:15,
188:23, 189:2,
206:19, 214:6,
219:10, 220:10,
222:9, 222:21,
226:3, 228:19,
232:1, 232:10,
233:2, 236:1,
236:24, 237:13,
254:8, 255:11,
259:3, 259:6,
260:10, 266:16,
267:12, 267:20,
272:22, 275:8,
278:9, 279:4,
279:8, 280:22,
285:1, 291:6,
292:1, 293:5,
294:20, 297:21,
298:2, 298:5,
300:11, 300:15,
307:15, 309:22
**become**
39:6, 41:13,
42:11, 43:22,
44:21, 58:10,
222:3
**becomes**
67:17, 68:3,
293:15
**becoming**
36:6, 37:8,
39:16, 39:18,
40:5, 42:18,
42:22, 44:11,
45:13, 58:5,
237:13
**bedell**
99:8, 99:9
**bedroom**
167:11
**beep**
254:11
**before**
2:11, 6:17,

Transcript of Michael Cross
Conducted on October 16, 2020

6:24, 8:19, 9:3,
10:8, 10:11,
11:16, 16:8,
20:24, 26:20,
34:20, 34:22,
36:3, 36:8,
37:8, 39:20,
39:21, 39:22,
39:24, 40:18,
49:13, 50:4,
59:5, 59:7,
62:6, 75:12,
78:7, 79:1,
109:18, 118:7,
141:7, 164:19,
167:21, 172:24,
182:9, 187:14,
193:4, 193:5,
196:4, 201:7,
201:13, 202:22,
213:22, 214:1,
214:7, 219:7,
223:4, 223:8,
225:3, 225:21,
235:8, 235:12,
247:4, 247:5,
252:21, 268:22,
269:6, 271:13,
272:6, 272:9,
272:23, 274:10,
281:9, 282:5,
283:17, 285:2,
293:18, 320:6
**began**
233:13
**begin**
34:16, 49:12,
49:13, 244:16
**beginning**
140:4, 302:23
**begins**
5:2
**behalf**
3:2, 3:10
**behavior**
41:17
**behind**
99:23, 99:24,

100:5, 154:13
**being**
7:3, 7:6, 44:7,
44:17, 62:16,
70:7, 70:23,
71:19, 86:15,
86:21, 95:22,
96:21, 96:22,
97:3, 97:16,
100:15, 118:24,
119:2, 127:8,
137:14, 140:16,
143:13, 143:15,
145:3, 149:10,
153:23, 157:20,
158:6, 162:24,
172:11, 172:12,
174:6, 176:1,
176:3, 184:11,
184:22, 189:5,
190:13, 191:3,
193:19, 193:23,
195:3, 200:19,
200:22, 201:22,
205:2, 217:1,
217:11, 222:1,
222:13, 222:17,
222:24, 223:1,
224:9, 224:11,
228:22, 229:4,
248:13, 248:22,
248:23, 277:24,
285:15, 290:1,
307:11
**belief**
85:9, 170:10,
184:2, 267:4,
267:6, 292:23
**believable**
218:10, 238:20,
239:2, 262:14,
262:18, 262:21,
262:24, 278:22,
279:2, 291:16
**believed**
82:24, 112:3,
117:16, 122:8,
122:11, 126:9,

126:24, 127:2,
165:3, 170:16,
194:18, 232:10,
232:13, 232:23,
234:17, 234:18,
236:10, 236:17,
252:16, 261:18,
266:11, 266:16,
268:13, 269:9,
274:11, 291:6,
295:8, 316:1,
317:17, 318:15
**believing**
268:2
**bells**
123:16, 123:19,
129:20
**beneficiary**
120:20
**berate**
299:22
**besides**
11:3, 27:11,
147:7, 182:23,
199:16, 247:19,
249:4, 268:5,
314:6, 314:13
**best**
23:10, 24:3,
26:24, 27:2,
145:23, 163:21,
164:20, 165:3,
165:5, 165:7,
175:22, 284:5,
295:9, 295:15,
295:17, 296:5,
318:7
**better**
20:2, 20:5,
20:6, 20:11,
20:22, 20:24,
21:5, 21:11,
21:13, 21:19,
21:23, 22:18,
32:17, 39:7,
255:22
**between**
48:2, 58:7,

75:21, 89:14,
89:21, 171:6,
176:17, 207:4,
209:16, 220:16,
242:22, 243:1,
243:24, 261:11,
296:10, 302:5,
310:19
**bill's**
122:18, 123:15,
170:5, 194:14,
266:11
**bit**
22:18, 81:5,
127:21, 145:18,
145:19, 213:19,
237:19, 271:17,
313:23
**blame**
59:20
**blaming**
299:4
**blowing**
117:7
**bob**
88:5, 132:16,
178:17, 223:21,
230:9, 311:18
**body**
96:18, 96:24,
98:11, 269:21
**both**
6:10, 12:1,
14:5, 25:9,
45:9, 136:1,
179:15, 241:7,
286:1, 308:1
**bottle**
132:11, 134:20,
147:19
**bottom**
100:23, 109:7,
250:4
**bought**
254:13
**box**
171:13, 314:23
**brain**
271:14

Transcript of Michael Cross
Conducted on October 16, 2020

**break**
9:1, 9:4, 37:6,
72:5, 80:17,
128:8, 138:16,
138:18, 138:22,
139:6, 139:15,
139:19, 139:24,
140:12, 140:17,
207:19, 208:4,
237:2, 237:5,
237:12, 237:14,
263:5, 283:24,
286:8, 286:9,
286:12, 286:15,
286:22, 297:9,
297:11, 297:22,
298:24
**breaker**
314:23
**breakers**
117:8
**breaks**
139:20, 139:21,
140:5, 296:15,
296:19, 296:20,
296:24, 297:2,
297:13, 297:15,
297:18, 298:10,
298:12, 298:16,
298:23, 299:1,
299:5, 299:7,
301:13, 301:5
**breathing**
66:8
**brennan**
90:10, 196:12
**brian**
17:10, 48:24,
257:16, 257:17,
275:24, 276:18
**bring**
285:17, 302:20
**bringing**
180:9
**brought**
29:19, 180:13,
182:8, 182:11,
186:11, 205:12,

213:5, 219:5,
219:24, 288:14,
288:23
**bubble**
90:4
**build**
167:24, 274:9
**building**
47:6, 47:7,
47:12, 181:14,
203:17, 203:21,
255:9, 272:6,
272:9, 312:3,
312:6, 312:18,
312:24
**burglaries**
38:13, 38:14,
38:17
**burglary**
45:2, 55:1
**burn**
29:23, 141:10,
141:14, 143:12,
143:23, 144:10,
144:15, 145:21,
146:11, 146:14,
148:21, 149:3,
153:13
**burned**
143:13, 143:15,
145:18
**business**
163:21, 165:4
**businesses**
182:23

---
**C**
---
**c-e-a-s-e**
69:3
**c-r-o-s-s**
6:5
**cage**
310:17
**call**
162:5, 172:22,
209:8, 209:11,
210:17, 241:10,
241:11, 257:17,

300:10
**called**
76:1, 98:22,
98:23, 107:11,
107:13, 174:11,
241:14, 263:15,
263:20
**calling**
263:17
**calls**
71:11, 96:11,
98:6, 161:15,
163:3, 174:8,
174:15, 185:23,
189:11, 189:19,
192:8, 200:14,
200:23, 201:24,
202:18, 203:13,
204:21, 205:5,
205:17, 206:5,
207:10, 215:2,
216:4, 218:5,
218:12, 219:19,
220:3, 221:5,
221:13, 221:17,
239:13
**calm**
111:14, 121:6,
128:24, 129:6,
129:15, 159:20,
172:24, 173:1,
173:4, 208:21
**came**
28:8, 31:4,
118:22, 148:13,
155:5, 155:9,
187:6, 189:2,
193:10, 195:16,
213:5, 230:8,
233:14, 242:12,
257:24, 259:10,
270:10, 311:10,
311:18, 313:11
**can't**
7:17, 11:14,
20:17, 32:11,
40:1, 57:24,
60:16, 62:4,

64:8, 65:22,
66:23, 67:9,
67:15, 95:7,
112:17, 132:6,
138:14, 159:6,
180:14, 252:1,
273:13, 283:19,
292:16, 292:18,
293:3, 293:15
**canvassing**
28:19, 28:24
**capabilities**
39:10
**capable**
77:10, 91:17,
97:16, 97:20,
98:5, 98:12
**capacity**
63:13, 145:21
**captain**
46:4, 51:2,
51:7, 51:13,
51:15, 51:18,
51:20, 51:23,
52:11, 52:15,
105:21, 106:5,
306:12, 306:14,
306:19
**car**
131:20, 131:22,
132:1, 132:8,
132:24, 134:5,
134:21, 134:24,
135:12, 135:13,
136:21, 136:23,
173:19, 174:1,
174:4, 180:1,
187:5, 193:21,
199:16, 200:13,
208:13, 208:17,
310:10, 311:18,
312:2
**career**
77:20
**carefree**
172:21
**carlson**
46:3, 49:5,

Transcript of Michael Cross
Conducted on October 16, 2020                                              328

50:13, 151:10,
151:12, 276:22,
276:24, 306:10
**cars**
53:2, 178:23
**case**
1:7, 5:5, 6:21,
6:24, 7:15,
16:21, 17:2,
17:5, 17:7,
17:10, 17:13,
17:16, 18:11,
19:17, 19:20,
20:14, 25:13,
31:12, 31:19,
31:23, 32:5,
32:12, 50:1,
53:18, 67:21,
74:16, 77:23,
78:2, 79:7,
79:8, 80:14,
133:20, 137:16,
138:3, 150:2,
150:5, 150:18,
150:24, 151:1,
152:9, 152:10,
152:12, 152:15,
152:19, 156:18,
179:21, 180:3,
180:7, 185:2,
189:8, 190:5,
191:7, 198:2,
198:7, 225:10,
225:14, 225:16,
274:9, 275:19,
277:10, 294:18,
297:7, 298:2,
299:6, 301:17,
315:11, 316:20,
320:14
**case-by-case**
48:16
**cases**
18:12, 18:15,
48:22, 48:24,
49:16, 67:21,
67:23, 68:7,
68:8, 68:21,

73:6, 73:7,
74:11, 74:12,
77:20, 84:22
**catatonic**
66:16
**cause**
41:22, 142:18,
143:1, 143:19,
144:6, 144:19,
144:23, 145:4,
145:6, 145:13,
146:24, 147:9,
150:1, 152:22,
153:2, 155:6,
155:9, 165:21,
165:24, 171:2,
171:3, 172:15,
238:20, 264:15,
264:22, 265:10,
266:7, 266:12,
267:9, 267:16,
268:2, 268:10,
271:10, 271:12,
271:19, 271:21,
272:19, 272:24,
273:1, 273:4,
273:18, 273:21,
273:23, 274:6,
274:8, 274:15,
274:24, 275:5,
275:14, 278:9,
292:6, 292:22,
303:15, 309:9,
315:18, 316:10,
316:13
**caused**
126:16, 144:3,
148:6, 148:18,
171:16, 171:20,
172:7
**causes**
72:22, 117:4
**cease**
68:22, 68:24,
69:3
**ceiling**
224:24
**center**
2:4

**certain**
19:6, 22:17,
42:17, 42:21,
46:5, 59:9,
139:8, 151:1,
246:20, 303:4,
303:11
**certainly**
23:17
**certificate**
320:1
**certificates**
41:6
**certification**
33:16, 34:2
**certified**
2:12, 304:10,
304:17, 304:21,
304:24, 305:2,
320:3
**certify**
320:7
**chair**
114:17, 115:5,
142:3, 143:9,
145:10, 145:17,
145:18, 147:20,
227:10, 264:12,
271:8, 272:1,
317:9
**chairs**
146:16, 183:7,
225:1, 314:1
**challenge**
300:8
**challenging**
298:6, 298:8
**chance**
140:17, 298:9
**changed**
39:1, 45:4,
172:23, 173:5
**charcoal**
316:21, 318:16,
318:21
**charge**
306:19
**checked**
171:11, 171:12

**checking**
99:23
**checks**
108:7
**chicago**
3:7, 89:23,
90:1, 90:4,
90:8, 175:14,
182:12, 197:3,
197:17, 198:11,
310:12, 310:13,
311:12
**children**
43:17, 77:24
**choose**
43:22, 44:1,
44:8, 44:13,
48:15
**chose**
43:24, 44:9,
44:20
**chosen**
44:14, 44:15,
44:17
**chronologically**
130:17
**cigarette**
114:18, 114:19,
115:1, 115:5,
130:2, 145:12,
145:16, 146:15,
146:24, 148:23,
149:4, 149:12,
171:16, 172:2,
172:5, 232:14,
232:18, 233:2,
233:6, 234:5,
234:8, 237:21,
238:5, 238:9,
240:5, 243:11,
243:19, 256:24,
260:18, 268:14,
316:6, 316:9
**circle**
53:22, 53:24
**circumstances**
61:5, 70:24,
71:3

Transcript of Michael Cross
Conducted on October 16, 2020

329

**city**
7:16, 43:10,
164:17, 175:15
**civil**
82:16, 82:21,
82:24, 83:15,
83:17, 83:20,
84:17, 85:10
**claim**
81:11
**clarify**
280:24
**classes**
95:10, 95:11,
96:20
**classroom**
42:15
**classrooms**
42:16
**clear**
25:9, 26:18,
65:10, 65:11,
85:13, 158:23,
158:24, 159:1,
192:18, 271:16,
281:4
**clear-headed**
159:5, 159:10
**clearly**
158:15, 158:16
**client**
298:14, 299:4
**close**
95:19
**closed**
96:15, 97:3
**closest**
123:8
**clothes**
173:13
**clothing**
169:2, 169:9,
175:2
**cod**
34:3
**coffee**
227:18, 228:1
**collect**
251:3, 251:4

**collecting**
308:23
**collection**
309:1
**college**
33:12, 33:20,
34:13, 34:19,
34:23
**combustion**
73:1, 171:23
**come**
18:3, 107:14,
121:18, 146:10,
154:5, 154:9,
154:15, 159:10,
167:1, 175:22,
192:24, 193:15,
220:7, 237:15,
268:8
**comes**
70:16
**comfortable**
294:14, 297:6
**coming**
121:21, 126:20,
190:19, 231:4,
231:8, 281:13,
282:3, 282:19,
295:22
**comment**
221:21
**commented**
114:23
**commission**
320:20
**committed**
274:12, 274:15,
275:14, 291:6,
291:7, 291:8,
292:1, 292:2,
292:5, 292:10
**communication**
88:8, 152:14
**community**
33:3
**compelled**
137:20
**competent**
23:17, 65:3,

**66:19**
**complete**
62:11, 205:15,
205:21
**completing**
310:6
**comprised**
308:1
**concern**
206:11, 206:14
**concerned**
294:1
**conclude**
204:20
**concluded**
307:19
**conclusion**
143:22, 144:15,
154:5, 154:9,
154:15, 154:18,
159:10
**conclusions**
309:7
**condition**
24:20, 237:1,
303:15
**conditions**
23:5, 25:23
**condo**
120:13
**conduct**
150:18, 164:7,
307:3, 309:14
**conducted**
135:17, 144:13
**conducting**
91:9, 95:3,
146:23
**confess**
214:13
**confessed**
31:4, 229:8,
238:8, 243:10,
263:14, 263:24,
278:15, 279:6
**confesses**
167:21
**confession**
13:24, 14:22,

15:10, 16:7,
16:11, 16:18,
30:22, 92:13,
92:24, 93:8,
155:4, 168:2,
228:15, 229:1,
229:11, 229:23,
230:5, 230:21,
241:20, 242:1,
245:1, 250:17,
255:15, 260:1,
260:2, 260:22,
261:15, 262:11,
262:14, 262:17,
262:21, 262:24,
263:21, 264:6,
264:15, 265:3,
265:10, 266:11,
266:24, 268:3,
268:9, 270:20,
271:9, 271:18,
278:16, 291:9,
291:15, 291:19,
314:4, 317:2,
317:12
**confessions**
14:19, 92:13
**confront**
59:16, 234:19
**confronted**
226:17, 227:12
**confronting**
60:2, 232:4,
235:1, 235:7,
235:18, 235:24
**confused**
36:11, 271:14
**consequence**
53:8
**consider**
50:7, 50:10,
50:12, 50:15,
50:18, 56:24,
245:2, 276:8
**considered**
78:2
**consultation**
22:13

Transcript of Michael Cross
Conducted on October 16, 2020

330

contact
152:17, 176:16,
257:18, 275:18,
275:23, 276:14,
276:24, 277:16
contacted
214:15, 214:23,
215:10, 215:11,
215:20, 216:8,
216:12, 217:1,
217:11
contacts
108:8, 108:9
contain
109:22, 315:17
contained
256:7
content
251:4
contents
120:17, 122:7,
251:12
contested
299:2
context
62:20, 150:16,
229:3, 229:4
contingent
93:19
continue
96:23, 138:1,
138:13, 138:18,
138:22, 139:16,
140:12, 199:14,
293:6, 295:11,
297:6, 297:21,
299:13, 299:20,
302:10
continued
23:1, 223:4,
223:8, 234:22
continuing
54:8, 66:23,
103:7, 149:23,
221:7, 253:17,
300:8
contradict
160:9, 266:17

contradicted
292:12, 292:15,
292:20
control
194:10
conversation
106:12, 108:16,
114:1, 118:3,
120:1, 120:8,
124:13, 126:22,
128:15, 128:19,
129:22, 186:21,
187:13, 253:12,
255:14
conversations
153:1, 153:4,
153:7
conviction
82:20, 90:11,
90:16
cookout
132:21
cooperate
159:24
cooperating
96:9, 228:22
cooperative
160:3
copy
319:3
coroner
104:7
corroborates
93:12
couches
314:1
could
13:3, 16:9,
20:20, 21:17,
22:23, 24:1,
44:2, 45:24,
56:13, 61:18,
66:9, 66:11,
68:10, 68:23,
69:9, 69:19,
71:16, 72:24,
85:19, 124:3,
127:9, 138:6,

143:16, 144:2,
144:6, 144:11,
145:12, 146:15,
146:20, 146:24,
148:5, 148:11,
148:17, 153:19,
158:10, 159:1,
159:5, 164:16,
166:18, 168:22,
171:15, 171:20,
172:6, 174:11,
177:2, 178:10,
182:16, 183:20,
187:8, 202:15,
202:21, 203:11,
203:16, 231:18,
233:5, 233:7,
234:7, 237:7,
238:6, 238:10,
239:24, 240:2,
242:13, 243:19,
251:24, 255:9,
260:17, 264:2,
264:3, 272:23,
275:9, 279:7,
294:23, 297:15,
301:11, 312:4,
316:4, 316:10,
316:13
couldn't
19:24, 20:24,
52:1, 63:23,
73:5, 96:8,
114:24, 157:9,
158:4, 232:7,
233:3, 260:6
counsel
5:12, 6:1,
6:10, 17:8,
221:19, 248:18,
296:6, 296:10,
302:6, 302:12,
318:13, 320:13
counter
219:13, 235:11,
235:17
county
30:3, 30:8,

74:1, 74:21,
246:9, 272:16,
272:21, 274:2,
274:5, 274:19,
278:8, 279:3,
310:12, 320:5
couple
15:5, 18:1,
18:5, 37:22,
48:5, 53:1,
104:6, 227:16,
276:21
course
84:1, 140:3,
142:20, 144:17,
153:20, 251:23,
279:13, 296:23,
298:12, 301:14,
303:6, 303:12,
305:5, 305:11,
309:12, 309:16,
317:2, 317:12,
318:5
courses
45:12, 142:13,
142:16
court
1:1, 5:19, 8:9,
8:23, 18:23,
35:16, 35:18,
69:21, 97:12,
155:24, 156:3,
162:3, 162:14,
282:16, 320:1
courtroom
81:9
cover
41:20, 41:22,
42:1, 42:3,
42:5, 42:7,
54:3, 254:2,
254:14
covered
315:3
covering
255:11
covid
10:12

Transcript of Michael Cross
Conducted on October 16, 2020

331

credibility
112:24, 113:8
credible
111:21, 113:16,
115:8, 121:7,
157:3, 157:12
credit
133:20, 133:21,
133:22
crime
55:13, 60:7,
270:4, 270:10,
291:6, 291:7,
291:8, 292:1,
292:2, 292:5,
292:11, 292:19
crimes
38:13, 43:16,
45:3, 73:22,
74:3, 74:5,
74:6, 74:14,
74:16, 74:18,
75:2
criminal
14:12, 14:15,
15:14, 15:15,
18:4, 18:12,
18:15, 31:15,
31:19, 31:23,
55:2, 57:10,
57:13, 57:19,
82:9, 84:18,
85:3, 88:13,
259:4, 262:17,
275:17, 276:13
criminology
33:19
crisis
55:17
criteria
70:19
critique
28:15, 285:8
cross
1:8, 1:13, 2:1,
4:2, 4:10, 5:3,
5:4, 5:18, 5:23,
6:3, 6:5, 6:12,

6:15, 7:24, 9:6,
17:2, 24:13,
33:1, 81:2,
87:19, 88:3,
88:16, 89:20,
91:3, 100:19,
100:23, 106:7,
109:2, 109:6,
117:21, 118:2,
133:7, 139:6,
140:10, 140:16,
141:5, 155:14,
196:8, 196:15,
208:4, 245:8,
246:4, 263:14,
294:21, 295:21,
297:20, 297:23,
298:23, 300:4,
300:6, 302:9,
318:6
crowd
121:3
crying
72:1
csr
1:24, 320:4
culpable
59:22
cunningham
17:11, 29:12,
49:1, 50:9,
275:24, 276:3,
276:9, 287:7,
287:17
cup
227:18, 228:1
current
21:24, 35:13
currently
9:6, 26:2
cut
93:16
cv
1:7, 5:5
cycle
54:8

D

damage
267:22, 267:24

damages
301:24, 302:6
date
5:6, 10:3,
10:4, 11:23,
155:24, 156:3,
162:14
dates
17:3, 40:12,
303:4
dave
304:5, 308:6
day
30:12, 98:24,
111:2, 115:20,
161:20, 161:22,
162:16, 163:10,
264:4, 296:8,
317:4, 320:17
days
15:5, 15:19,
18:5
dead
124:1
death
45:6, 45:20,
78:2, 78:6,
98:21, 111:7,
126:15, 126:16,
275:15
debate
221:24
debating
299:7
debris
100:2, 100:4,
100:8
decades
82:20, 291:22
deceased
276:23
decide
35:10, 56:20,
164:15, 177:21,
178:2, 178:7
decided
151:7, 242:15,
242:17, 275:10,

294:18, 296:3,
296:5
defendant
87:23, 88:11,
137:16, 137:19
defendants
1:10, 3:10,
5:16, 80:14,
83:16, 87:10,
87:14, 87:17,
88:9, 88:13,
275:18, 302:5,
302:12
defense
57:14, 155:13
defer
267:8, 302:1
deferred
305:7
defs
4:14, 4:15,
4:16, 89:12,
100:22, 246:10
degree
33:16, 33:19,
34:1, 34:6,
34:19
dekalb
30:3, 30:8,
75:4, 155:17,
155:23, 156:2,
161:21, 161:23,
162:2, 162:8,
164:10, 173:23,
246:9, 272:16,
272:21, 274:2,
274:5, 274:19,
278:8, 279:3,
310:12
demeanor
94:1, 94:3,
94:12, 94:16,
95:3, 97:22,
97:23, 111:12,
112:15, 114:4,
114:9, 121:4,
122:18, 124:19,
124:20, 124:22,

Transcript of Michael Cross
Conducted on October 16, 2020

124:24, 128:18,
128:21, 159:19,
173:9, 179:6,
200:18, 208:16,
222:7
**demeanors**
112:11
**dementia**
23:8, 23:10,
24:4, 25:22,
26:14, 26:22,
27:12
**demonstrate**
123:2, 123:7,
227:1
**denied**
195:24
**dep**
140:9
**department's**
142:9
**departments**
74:20
**depend**
69:12
**depends**
47:1
**deponent**
6:7, 6:8
**depos**
5:9, 5:20
**deposed**
6:17, 6:24,
8:3, 17:2
**deposition**
1:13, 2:1,
4:10, 5:3, 5:9,
6:10, 6:22,
9:16, 16:20,
16:23, 17:4,
84:5, 87:19,
88:16, 100:19,
101:6, 109:2,
109:12, 127:8,
137:12, 138:5,
139:16, 140:4,
141:5, 173:3,
196:8, 228:24,

229:15, 229:17,
231:6, 293:19,
294:7, 294:18,
295:3, 295:22,
296:4, 296:7,
296:16, 296:23,
298:17, 298:22,
299:9, 299:11,
299:14, 299:23,
300:3, 301:4,
301:8, 301:9,
301:10, 301:14,
301:18, 302:24,
303:6, 303:12,
318:5, 319:5,
320:7
**describe**
101:14, 101:23,
224:20, 294:23,
313:21
**described**
278:22, 294:24,
313:4, 313:20,
314:24
**describes**
248:1, 248:22,
250:11
**describing**
183:8, 183:9
**desk**
36:7, 36:10,
36:12, 312:11,
312:14, 312:16,
313:7, 313:9,
313:24
**despite**
295:8
**detail**
260:10
**details**
57:20, 248:8
**detective**
7:13, 9:14,
28:12, 29:12,
30:18, 30:22,
36:21, 37:1,
37:8, 38:6,
38:12, 38:19,

38:21, 39:7,
39:16, 39:18,
44:11, 44:21,
44:23, 45:7,
46:7, 46:10,
46:24, 48:2,
48:22, 50:9,
76:15, 77:2,
107:5, 107:9,
107:19, 107:22,
108:1, 110:18,
116:4, 116:15,
119:14, 119:16,
119:21, 119:24,
120:7, 130:7,
132:7, 136:19,
149:24, 150:3,
150:9, 163:6,
175:19, 175:21,
187:2, 192:4,
193:18, 196:5,
208:6, 209:6,
210:13, 220:6,
223:5, 223:10,
227:19, 227:22,
228:5, 229:5,
241:6, 277:21,
283:10, 287:7,
287:17, 308:22,
308:24, 310:11,
310:24, 311:11,
311:12, 311:20,
312:4, 314:2,
314:6, 314:13
**detectives**
38:8, 46:11,
46:13, 46:16,
46:20, 47:21,
47:22, 73:24,
314:12
**detector**
253:20, 254:3,
254:18, 255:1,
255:5, 255:10,
255:13, 314:18,
315:7
**determination**
42:24, 43:4,

57:6, 62:12,
62:13, 113:1,
113:9, 142:18,
155:5, 155:9,
167:1, 264:11,
264:16, 264:18,
264:21, 264:24,
266:2, 266:7,
266:12, 267:9,
268:8, 315:17
**determinations**
41:23
**determine**
43:17, 57:5,
65:14, 65:20,
66:24, 68:7,
70:15, 112:11,
113:4, 113:5,
143:18, 167:23,
168:22, 185:9,
194:11
**determined**
73:4, 147:20,
148:14, 168:3,
168:6, 168:13,
269:14, 272:5,
272:8, 273:4,
273:17, 309:21,
317:8
**determining**
57:1, 94:13,
152:22, 168:6,
168:9
**developed**
60:20, 185:6
**developments**
180:3, 180:7
**devon**
3:13
**diagnosed**
23:5, 23:8,
24:10, 24:15
**diagnosis**
23:12
**died**
72:19, 166:24,
241:16
**difference**
75:21, 206:11

Transcript of Michael Cross
Conducted on October 16, 2020

333

**different**
33:22, 38:8,
43:9, 48:5,
54:12, 88:19,
96:19, 136:2,
141:4, 150:4,
150:10, 152:11,
160:16, 173:10,
202:4, 205:1,
206:10, 228:19,
228:20, 229:3,
281:10, 295:21,
296:14
**differently**
271:17
**difficult**
17:1, 97:11
**dining**
114:20
**direct**
151:22, 152:4,
296:13, 309:13
**directing**
151:12, 247:5,
299:9
**direction**
320:11
**directives**
150:4
**directly**
43:19
**disagree**
143:5
**disagreed**
154:4, 154:8
**disappointed"**
90:12
**discard**
85:2, 85:13,
85:20
**discarded**
85:1
**discipline**
52:16, 52:18
**disciplined**
52:21, 52:24,
53:1
**disciplines**
53:9

**disclose**
293:21, 294:4,
295:12
**disclosed**
87:23, 294:1,
296:6, 298:7
**disclosure**
83:20
**discourage**
60:1
**discrepancy**
118:11
**discretion**
151:15, 151:17
**discuss**
17:7, 17:10,
17:13, 17:16,
79:5, 116:19,
179:20, 179:21
**discussed**
32:8, 32:9,
79:8, 120:11,
154:21, 258:24,
301:15
**discussing**
81:3, 104:21
**discussions**
296:10
**dismissed**
8:2
**display**
89:1, 97:1
**dispute**
24:16, 78:13,
78:17, 78:20,
81:10, 81:13,
83:8, 86:13,
133:14, 154:10,
154:14, 155:10,
189:10, 189:15,
189:23, 190:4,
190:8, 200:5,
211:1, 211:2,
215:1, 215:11,
215:19, 216:7,
216:18, 217:23,
217:24, 263:22,
265:11

**disputed**
217:4, 217:8,
217:11, 217:15
**distancing**
6:7, 6:10
**district**
1:1, 1:2, 5:5
**dividers**
48:2
**division**
1:3, 7:14,
46:7, 46:8,
46:10, 211:15,
211:24, 212:3,
213:1, 305:13,
305:17, 305:20,
305:23, 306:2,
306:4, 306:9,
306:13, 306:19
**divisions**
46:6, 305:19
**divorce**
210:23, 214:19,
214:24, 218:18,
220:21, 222:13,
222:22, 223:1,
223:20, 223:23,
224:9, 224:14,
259:10, 259:22,
260:1
**doctor**
294:24, 307:9
**document**
57:22, 81:21,
83:21, 89:11,
109:21, 110:5,
135:6, 245:14,
265:15
**documentation**
241:24
**documents**
14:18, 16:12,
19:17, 19:22,
20:16, 25:12,
32:7, 32:10,
32:13, 84:2,
89:17, 103:13,
104:4, 282:7,

**disputed**
301:7, 301:10,
301:11, 315:10
**dog**
285:16, 285:17,
285:18
**doing**
62:17, 86:18,
148:16, 151:21,
158:22, 227:17,
307:15, 317:16
**done**
22:18, 69:4,
70:10, 70:12,
70:13, 71:20,
85:4, 101:12,
113:22, 131:17,
131:18, 166:9,
172:4, 172:12,
172:14, 178:10,
245:12, 256:14,
278:20, 283:18,
295:10
**door**
143:9, 143:10,
153:22, 183:19,
183:20, 191:21,
252:21, 311:24,
312:8, 313:18
**doors**
142:2, 145:10,
178:20, 178:21,
181:24, 183:23,
264:13, 264:14
**double**
135:21, 135:24,
136:9
**double-check**
280:6
**doubt**
17:23, 18:9,
83:23, 164:6
**douglas**
3:19, 5:8
**down**
46:18, 55:23,
56:2, 56:6,
56:9, 56:15,
56:16, 56:18,

Transcript of Michael Cross
Conducted on October 16, 2020

57:7, 57:8,
57:10, 57:23,
90:9, 97:12,
184:12, 205:20,
211:15, 211:16,
213:5, 220:18,
236:4, 236:9,
236:16, 236:23,
237:1, 253:23,
255:10, 260:7,
260:9, 265:5,
265:24, 266:13,
266:17, 266:19,
266:20, 311:13,
311:17, 312:23,
313:3, 313:5,
313:11
**downstairs**
116:17, 119:12,
213:1, 213:3,
314:15
**drag**
237:8
**dragging**
237:9
**drank**
186:9
**drink**
207:2
**drinking**
156:14, 156:21,
156:23, 157:2,
157:8, 157:13,
158:1, 158:5,
158:7, 158:9,
158:13, 159:22,
160:1, 160:4,
160:7, 186:11,
186:17, 256:5,
309:23
**drinks**
147:24
**drive**
211:7
**driving**
178:16, 178:17,
208:23
**drop**
311:20, 311:23

**dropped**
145:16, 148:22,
149:12, 232:18,
233:3, 234:4,
316:9
**dropping**
149:3, 232:14,
234:8, 237:21,
238:4, 238:5,
238:9, 243:11,
243:19, 260:18,
268:14
**drunk**
156:21, 157:23
**dry**
316:10
**due**
137:21, 194:14,
293:14
**duly**
5:24
**dupage**
33:13, 33:20,
34:14, 34:20,
34:24, 74:21,
75:6, 75:7
**during**
55:3, 55:21,
61:3, 79:10,
84:1, 87:14,
87:17, 88:9,
128:19, 144:1,
144:17, 145:21,
166:21, 186:19,
186:21, 192:18,
203:20, 205:12,
206:21, 206:24,
244:2, 246:21,
277:20, 296:15,
297:2, 298:12,
298:16, 301:3,
301:14, 303:6,
303:11, 305:5,
305:11, 306:2,
308:10, 309:12,
309:16, 310:5,
317:2, 317:12,
318:5

**duties**
43:14
**dying**
274:12
**dynamics**
41:20

**E**

**each**
8:22, 22:18,
48:2, 53:11,
266:18, 273:13,
297:5
**eagle**
2:5, 5:10
**earlier**
20:9, 51:16,
81:5, 87:7,
87:9, 91:3,
98:15, 103:15,
103:20, 108:14,
118:14, 133:13,
134:7, 141:8,
164:4, 173:3,
179:9, 179:11,
209:20, 210:3,
219:2, 228:13,
228:23, 229:14,
229:17, 231:6,
233:13, 237:14,
242:6, 260:12,
279:24, 280:5,
281:20, 281:23,
282:9, 282:11,
282:17, 284:21,
284:23, 285:19,
287:5, 288:2,
288:4, 288:12,
289:2, 289:11,
289:14, 289:15,
289:17, 289:20,
289:24, 290:3,
290:5, 293:8,
315:9
**early**
36:19, 162:5,
309:20
**east**
3:13, 27:24,

28:19, 29:2,
31:8, 98:17,
285:12, 286:23
**eastern**
1:3
**eat**
206:22
**education**
33:6, 33:8
**efforts**
99:19
**either**
14:1, 16:17,
65:22, 76:12,
83:5, 84:19,
84:23, 100:5,
107:21, 136:19,
140:7, 175:21,
201:22, 300:14
**electric**
42:1, 171:3
**electrical**
147:8, 171:12,
171:13
**electricity**
117:1
**electronics**
118:5
**elevator**
181:24, 182:17,
182:20, 313:2
**elicit**
23:16, 238:19,
239:2
**eliminate**
166:9, 272:3
**eliminated**
144:18, 144:21,
168:16, 177:8,
271:24, 272:15,
272:18
**elimination**
269:12
**elmhurst**
33:3, 35:8,
35:9
**else**
11:3, 27:11,

Transcript of Michael Cross
Conducted on October 16, 2020

42:15, 80:11,
91:1, 94:9,
96:24, 110:13,
117:10, 124:8,
141:18, 141:19,
171:3, 171:4,
171:5, 185:5,
198:8, 210:14,
269:15, 271:13,
293:4, 308:18
**emmitsburg**
40:8
**emotional**
111:16, 129:17
**employed**
320:13
**employing**
232:1, 235:12
**enact**
57:18
**encompass**
281:6
**end**
245:9, 246:1,
249:14, 250:7
**ending**
319:5
**enforcement**
34:7
**enough**
77:6, 77:9,
143:17, 166:23
**enroll**
34:9, 34:13
**entail**
41:16, 99:16
**enter**
181:21, 183:1,
183:17, 183:20
**entering**
182:4
**entire**
113:19, 113:21,
193:19, 193:23,
201:21, 205:11,
236:2, 242:3,
242:12, 255:10,
255:11

**entirety**
205:3
**entitled**
237:11, 237:15,
286:9
**entrance**
312:6
**errors**
18:1
**esquire**
3:3, 3:11
**established**
64:24, 71:13
**et**
1:9
**ethically**
138:13
**even**
20:16, 82:19,
85:9, 103:18,
126:16, 126:19,
170:5, 177:19,
180:20, 196:1,
214:1, 274:24,
275:4, 275:13,
278:8, 291:9,
303:18
**evening**
98:24, 214:16
**events**
19:13, 20:19,
32:17, 59:21,
84:3, 111:5,
141:8, 161:5,
161:13, 229:13,
279:24
**eventually**
22:21, 130:7,
131:12, 131:13,
132:7, 218:17,
239:17, 314:3
**ever**
6:17, 18:18,
18:21, 48:21,
48:24, 49:16,
50:1, 52:18,
52:21, 53:12,
53:14, 61:19,

65:23, 77:20,
79:10, 92:12,
282:16, 304:20,
304:23, 305:2,
306:6, 306:24,
307:3, 309:13,
309:16
**every**
55:23, 56:15,
151:19, 194:9,
297:9
**everybody**
152:5, 269:15,
271:24
**everybody's**
152:6
**everyone"**
90:19
**everything**
9:15, 56:4,
56:6, 126:12,
140:10, 158:16,
171:4, 171:5,
172:14, 185:5,
271:13
**evidence**
59:17, 61:7,
165:17, 167:6,
221:22, 268:18,
268:23, 269:3,
269:5, 269:8,
269:20, 270:19,
271:4, 271:7,
275:9, 292:9,
292:22, 308:23,
309:1, 309:3,
318:19, 318:20
**exact**
10:4, 17:3,
40:12, 73:5,
73:18, 103:1,
229:13
**exactly**
16:19, 39:19,
47:14, 58:1,
60:4, 60:16,
71:23, 79:4,
102:23, 103:1,

104:18, 116:7,
175:7, 201:6,
209:15, 233:11,
263:24, 279:17
**exam**
175:23, 192:16,
192:19, 311:3
**examination**
4:2, 6:1, 61:2,
61:14, 61:20,
65:8, 67:6,
164:7, 168:21,
176:5, 186:3,
188:1, 193:12,
194:15, 201:19,
281:14, 282:19,
302:12, 309:20,
310:7, 318:13
**examinations**
61:3, 61:6,
194:21, 201:11,
306:24, 307:1,
307:4, 307:7,
307:16
**examiner**
164:3, 164:16,
309:22
**examiners**
163:21, 180:21,
184:18, 307:17
**except**
271:24
**excessive**
61:14, 61:21,
61:24, 67:17,
67:24, 68:3,
68:13
**excuse**
176:9, 207:18,
297:24
**exhibit**
4:12, 4:13,
4:14, 4:15,
4:16, 4:17,
86:8, 87:19,
88:16, 88:18,
89:1, 89:20,
90:7, 100:18,

Transcript of Michael Cross
Conducted on October 16, 2020

336

100:19, 100:21,
108:23, 109:1,
109:2, 141:4,
141:5, 141:7,
155:12, 196:8,
245:9, 245:10,
245:16
**exhibits**
4:10, 89:6
**existed**
147:4
**exit**
181:22, 182:14,
182:16, 183:17,
183:21
**exiting**
182:4
**expand**
41:18
**expect**
8:17, 136:4,
136:10
**expected**
285:17
**experience**
22:9, 26:10,
63:1, 72:21,
94:17, 124:20,
142:11, 142:24,
143:4, 153:21,
154:16, 159:3,
159:11, 201:10,
303:15, 303:21,
303:22, 305:8,
305:18
**experienced**
119:9
**experiences**
23:23
**experiencing**
63:22, 71:8
**expert**
62:24, 63:6,
71:12
**expires**
320:20
**explain**
66:6, 118:11,

194:5, 234:2,
307:18
**explained**
243:7
**explode**
171:24
**express**
310:6
**extent**
8:21, 21:7,
21:14, 22:5,
23:14, 62:23,
64:22, 66:18,
93:3, 124:7
**extremely**
161:4
**eyes**
159:16

**F**

f-e-r-s-t-i-n-e-u
7:23
**facilities**
43:19
**fact**
68:20, 86:21,
124:5, 128:3,
171:2, 214:23,
218:9, 255:8,
259:21, 262:24,
285:15, 291:21,
317:20
**facts**
57:23, 185:3,
249:3
**failed**
190:20, 192:16,
193:1, 193:11,
194:5, 194:6,
194:9, 194:16,
198:24, 201:18
**failure**
194:15
**fair**
10:14, 11:17,
22:1, 32:6,
32:16, 60:22,
63:14, 100:7,

119:4, 172:13,
222:12, 296:11,
299:17, 307:6,
307:16, 309:6
**fairness**
57:18
**falling**
233:6
**false**
18:18, 60:2,
210:3, 282:11,
282:16
**falsehood**
60:3
**familiarity**
8:4, 203:7,
203:10
**family**
17:16, 90:11,
104:6, 104:8,
104:10, 121:11
**far**
82:11, 122:13,
140:9, 140:22,
163:21, 175:2,
175:12, 182:7,
188:24, 196:20,
204:2, 239:19,
279:16, 294:1
**fast**
269:6
**federal**
84:10
**feedback**
53:14
**feel**
6:12, 22:1,
59:21, 65:4,
77:10, 127:5,
138:15, 139:15,
140:18, 140:21,
140:23, 164:22,
168:17, 221:17,
236:1, 260:9
**feeling**
127:6, 139:9,
139:12, 237:12
**fell**
56:11, 240:5

**felony**
257:14, 257:18,
314:11
**felt**
62:7, 67:24,
85:4, 85:6,
92:6, 123:12,
127:22, 128:1,
154:17, 235:4,
238:14, 260:12,
262:10, 262:13,
262:21, 294:14,
297:3, 297:5
**ferreri**
29:2, 29:6,
49:17, 50:16,
75:18, 99:7,
99:15, 141:17,
153:1, 155:5,
155:9, 263:15,
263:17, 263:20,
265:1, 266:10,
266:16, 266:23,
267:2, 267:21,
267:24, 284:9,
284:13, 285:13,
286:24, 304:5,
304:9, 308:6,
309:8
**ferreri's**
265:6, 265:9,
267:8, 315:13,
315:16
**few**
15:19, 21:19,
106:8, 260:2
**fifth**
135:5
**figure**
138:12, 230:15
**figured**
90:23
**figuring**
149:17
**file**
41:9
**filling**
35:22

Transcript of Michael Cross
Conducted on October 16, 2020                337

| | | | |
|---|---|---|---|
| **financial** | 37:10, 58:14, | 132:19, 133:11, | 91:20, 92:16, |
| 318:3, 320:15 | 64:15, 82:10, | 133:12, 134:3, | 93:3, 94:22, |
| **find** | 88:21, 88:23, | 134:5, 134:16, | 98:6, 103:5, |
| 17:20, 18:5, | 90:10, 97:8, | 135:7, 136:5, | 103:10, 115:10, |
| 18:8, 108:9, | 98:20, 101:8, | 136:7, 136:9, | 121:13, 124:6, |
| 111:21, 112:21, | 101:14, 101:18, | 136:11, 316:21, | 146:18, 149:6, |
| 121:4, 121:7, | 102:6, 106:8, | 318:16, 318:22 | 149:20, 154:24, |
| 132:10, 218:10, | 108:4, 110:7, | **flushed** | 157:6, 157:14, |
| 219:23, 260:6, | 110:22, 113:9, | 159:16 | 160:12, 160:19, |
| 260:23, 267:16, | 113:18, 113:19, | **foam** | 161:7, 161:15, |
| 268:18, 315:6 | 113:21, 114:14, | 145:19 | 165:1, 166:12, |
| **fine** | 114:15, 128:12, | **folded** | 170:13, 174:23, |
| 22:20, 65:7, | 135:3, 155:19, | 96:1, 96:20 | 177:22, 184:4, |
| 121:6, 128:21 | 175:6, 176:13, | **follow** | 185:22, 187:20, |
| **fingerhut** | 180:9, 190:20, | 150:21, 151:1, | 191:17, 206:5, |
| 251:8, 251:13 | 211:20, 214:22, | 262:3, 273:6, | 210:4, 213:9, |
| **finish** | 216:14, 217:19, | 273:18, 273:19 | 214:4, 215:14, |
| 8:19, 9:3, | 247:24, 248:21, | **follow-up** | 216:3, 216:9, |
| 97:7, 216:24, | 249:5, 250:8, | 238:18, 262:23, | 218:4, 218:11, |
| 244:15, 244:17, | 253:19, 254:1, | 318:11 | 219:18, 220:2, |
| 273:11, 273:14, | 311:17 | **followed** | 223:11, 232:21, |
| 290:17 | **fishing** | 262:5 | 234:11, 235:13, |
| **finished** | 276:5, 276:18 | **following** | 235:20, 236:12, |
| 70:23, 93:15, | **fit** | 33:8, 250:1, | 236:18, 237:23, |
| 93:17, 116:8, | 76:3, 76:4, | 252:1 | 238:12, 238:21, |
| 116:16, 187:18, | 76:7, 307:23, | **follows** | 239:4, 240:8, |
| 188:2 | 308:7, 308:10 | 5:24 | 243:14, 246:8, |
| **fired** | **five** | **force** | 246:15, 249:2, |
| 52:19 | 137:3 | 73:22, 74:4, | 250:23, 252:22, |
| **firefighters** | **flame** | 74:5, 74:6, | 253:15, 257:11, |
| 100:2 | 166:8, 166:11, | 74:14, 74:16, | 261:5, 263:2, |
| **fireman** | 316:5 | 74:19, 75:2, | 270:23, 281:8, |
| 76:16, 267:12 | **flames** | 75:8, 75:10, | 283:22, 291:11, |
| **fires** | 240:7, 240:13, | 75:17, 75:22, | 303:17, 305:10, |
| 42:1, 42:3, | 252:16, 253:13 | 76:18 | 309:10, 317:11 |
| 42:5, 42:7, | **flammable** | **foregoing** | **formally** |
| 42:9, 72:13, | 147:24, 166:7, | 320:6, 320:8 | 52:16 |
| 72:18, 72:23, | 166:10, 167:9 | **foresee** | **formatted** |
| 73:1, 73:2, | **flicked** | 82:15 | 185:11 |
| 76:8, 77:11, | 316:9 | **form** | **forth** |
| 142:18, 143:1, | **floor** | 7:11, 22:4, | 74:22 |
| 309:9 | 3:6, 181:18, | 23:14, 28:22, | **forward** |
| **firm** | 181:19, 181:22, | 45:22, 61:15, | 154:19, 235:23 |
| 3:12 | 182:2, 182:3, | 61:22, 62:22, | **found** |
| **first** | 182:4, 182:14, | 63:16, 64:11, | 113:12, 113:15, |
| 8:6, 8:8, 10:1, | 182:15, 182:22, | 66:17, 67:18, | 115:8, 132:23, |
| 10:19, 11:12, | 317:3 | 68:15, 69:17, | 134:20, 134:24, |
| 34:16, 35:24, | **fluid** | 71:10, 85:16, | 135:11, 135:13, |
| | 132:11, 132:15, | | |

Transcript of Michael Cross
Conducted on October 16, 2020

338

136:15, 136:18,
136:23, 144:2,
169:17, 170:6,
259:17, 269:20,
273:10, 290:24,
292:12, 292:15,
292:21
**foundation**
65:1, 71:12,
85:17, 96:12,
189:12, 189:19,
192:9, 200:15,
200:24, 202:1,
202:19, 204:22,
205:6, 205:18,
206:6, 215:3,
216:3, 218:6,
218:13, 220:3
**four**
12:8, 36:16,
37:17, 49:9
**fourth**
135:5, 251:18
**frame**
228:19, 228:20
**free**
6:12
**frequency**
54:15, 54:19,
186:16
**frequently**
276:19
**friday**
1:15
**friend's**
276:4, 276:18
**friendly**
50:10, 50:12,
50:15, 50:18,
277:5
**friends**
50:7, 50:10,
50:13, 50:16,
50:19, 276:9,
277:18
**front**
89:17, 96:1,
196:12, 245:18,

310:19, 311:24,
312:8, 312:11,
312:14, 312:16
**frustrated**
226:15
**full**
74:22
**fully**
294:17, 295:24,
298:7
**functioning**
63:12
**furniture**
100:11, 100:13,
100:15, 171:15,
171:20, 172:6,
233:20, 239:23,
251:9, 251:14
**furstenau**
7:16, 7:17,
7:19, 7:22
**further**
25:19, 90:9,
102:12, 235:23,
255:16, 297:19,
298:1, 299:5,
301:12, 302:8,
318:10, 318:24
**fuses**
117:7

--- G ---

**gain**
233:19, 318:3
**garcia**
3:3, 4:3, 4:5,
5:14, 5:15, 6:2,
6:6, 6:15, 22:7,
23:22, 63:10,
64:14, 65:4,
69:20, 80:18,
81:1, 86:7,
88:15, 88:20,
88:23, 89:7,
89:10, 89:19,
91:2, 93:17,
100:18, 100:21,
108:23, 109:4,

139:5, 140:3,
140:13, 140:15,
141:3, 176:11,
190:2, 196:10,
207:20, 208:3,
215:6, 216:22,
217:1, 217:5,
217:9, 217:11,
221:17, 231:19,
237:10, 237:18,
245:16, 245:21,
245:24, 246:3,
246:11, 247:9,
248:19, 249:22,
263:5, 263:13,
281:1, 281:10,
286:21, 295:16,
295:20, 296:11,
296:14, 297:22,
298:3, 298:8,
298:13, 298:18,
299:2, 299:8,
299:12, 299:15,
299:18, 299:22,
300:1, 300:5,
300:10, 300:14,
300:18, 301:1,
301:23, 302:4,
303:17, 305:10,
309:10, 317:11,
318:11, 318:12,
318:14, 318:24,
319:2
**gary**
104:11, 104:15,
104:22, 105:2,
105:6, 105:10,
105:15, 106:12,
106:23, 108:20,
109:23, 110:4
**gas**
171:2, 171:11
**gathered**
165:17
**gave**
15:1, 15:4,
16:18, 18:9,
32:2, 43:3,

56:15, 64:1,
85:21, 158:18,
194:7, 240:21,
240:24, 241:7,
242:19, 244:24,
245:5, 257:11,
280:5, 291:19,
311:3, 318:2
**gear**
178:22
**general**
185:2
**generally**
55:10, 150:7,
187:6, 225:13
**george**
35:15, 35:17
**gesticulate**
227:6
**getting**
74:4, 95:4,
137:8, 201:4,
220:17, 264:4,
271:14, 290:11
**give**
23:17, 35:5,
36:22, 41:5,
62:6, 63:17,
64:23, 65:1,
65:3, 66:19,
71:11, 88:20,
89:18, 91:10,
91:13, 97:10,
137:20, 138:2,
150:3, 150:7,
153:4, 153:7,
153:9, 153:16,
164:23, 180:14,
219:20, 241:3,
255:20, 267:3,
267:6, 282:15,
292:14, 293:13,
294:11, 294:18,
317:21
**given**
14:2, 14:20,
22:17, 44:16,
48:16, 63:21,

Transcript of Michael Cross
Conducted on October 16, 2020

339

96:9, 98:13,
112:3, 139:9,
153:20, 161:12,
178:11, 204:14,
288:4, 291:1,
295:15, 296:15,
296:19, 298:9,
301:15, 318:7,
320:9
**gives**
42:24
**giving**
63:6, 63:7,
91:17, 92:7,
96:5, 98:13,
112:12, 127:14,
185:2, 187:19,
198:1, 201:11,
235:18, 242:22,
251:15, 261:12,
287:10, 288:9,
293:9, 294:16,
297:6
**glad**
235:22
**glass**
142:2, 143:9,
143:10, 145:10,
153:22, 264:13,
264:14
**glassy**
159:16
**god**
285:6
**goes**
94:9, 175:2,
182:6, 192:12
**going**
8:5, 8:11,
8:16, 8:17,
8:22, 21:6,
23:13, 27:16,
27:23, 29:2,
43:18, 64:21,
65:5, 65:11,
71:6, 76:20,
80:19, 81:2,
82:21, 90:19,

93:2, 97:11,
98:16, 99:4,
99:16, 99:20,
101:23, 102:10,
102:20, 103:16,
103:21, 104:1,
108:20, 131:5,
131:8, 131:19,
132:1, 138:24,
139:20, 140:11,
141:3, 149:11,
152:6, 154:19,
155:20, 155:21,
156:6, 156:9,
158:16, 160:18,
161:5, 161:12,
164:22, 167:13,
173:5, 173:10,
175:8, 175:15,
176:9, 179:22,
182:3, 184:6,
188:3, 188:4,
190:21, 195:5,
199:16, 207:22,
216:2, 217:10,
225:17, 230:1,
230:12, 237:17,
237:19, 243:7,
246:7, 249:3,
261:6, 263:8,
266:18, 266:20,
280:4, 286:16,
294:19, 295:8,
296:13, 296:18,
298:2, 299:19,
300:19, 301:2,
317:17, 319:2,
319:4
**golder**
79:10, 79:12,
79:14, 79:18,
79:20, 80:2,
80:4, 80:7
**gone**
24:19, 82:6,
95:12, 145:19,
156:7, 163:7,
177:2, 177:19,

184:12, 202:15,
202:21, 203:1,
203:4, 203:11,
219:7
**good**
44:2, 77:2,
163:19, 163:20,
219:13, 237:4
**goodyear**
35:7
**gotten**
20:2, 20:5,
20:6, 20:11,
20:22, 20:24,
21:4, 21:5,
21:11, 21:13,
21:19, 21:23,
100:9, 140:8,
211:7, 222:8
**graduate**
32:22, 33:1,
33:4
**graduated**
34:10
**graduation**
33:9
**grand**
14:9, 31:11,
289:4, 289:7,
289:12
**greater**
52:8
**griffith**
308:22, 308:24
**ground**
8:6, 151:23,
182:6
**group**
73:24, 168:1
**guerrieri**
17:14, 28:21,
30:22, 48:22,
50:4, 87:23,
88:6, 88:9,
89:21, 107:5,
107:9, 107:20,
107:23, 108:1,
110:18, 116:4,

116:10, 116:15,
119:14, 119:16,
119:21, 120:1,
120:7, 120:11,
130:7, 130:12,
130:19, 132:7,
132:17, 134:2,
134:15, 134:22,
134:24, 135:13,
135:15, 163:6,
175:19, 175:21,
178:17, 187:2,
192:4, 193:18,
193:23, 196:5,
208:6, 211:17,
223:21, 223:22,
227:23, 228:5,
229:6, 230:9,
233:14, 234:23,
241:6, 241:9,
244:5, 247:14,
248:15, 249:3,
252:19, 258:1,
276:14, 276:20,
277:21, 283:11,
310:11, 310:24,
311:11, 311:12,
311:20, 312:5,
314:2, 314:7,
314:13
**guerrieri's**
136:4, 136:20
**guess**
21:3, 83:10,
237:7
**guilt**
60:10
**gun**
12:17
**guy**
35:13

| H |
| --- |

**half**
15:12, 164:11,
164:17, 197:22,
243:1, 243:24,
248:21

Transcript of Michael Cross
Conducted on October 16, 2020

340

hallway
191:22
hand
14:1, 320:17
handcuffed
178:18
handed
81:21, 89:6
handing
87:21
hands
227:8
hang
215:23
hanging
121:2
happen
54:9, 213:22,
214:7
happened
71:5, 112:4,
115:19, 129:22,
130:4, 130:10,
130:13, 130:17,
131:24, 151:3,
153:17, 214:1,
225:5, 225:23,
228:4, 240:15,
242:19, 243:5,
249:16, 250:11,
279:5, 279:7
happened"
250:2
happening
198:12, 228:17
happens
153:15
happy
105:11, 128:22
hard
8:23, 20:13,
66:6, 66:12,
120:9, 137:13,
139:7, 156:23,
157:3
harm
68:9, 68:11,
71:9, 71:18,

71:22, 233:22,
233:23
harmed
233:21
head
8:10, 20:4
headed
158:24, 159:2
health
63:7, 63:18,
65:2, 307:12
hear
98:20
heard
98:20, 160:10,
194:23, 240:11
hearing
31:11, 31:18
hearings
277:9, 277:10
hearsay
130:16
heat
143:17
heavy
66:8
held
2:1, 35:24,
36:23
help
8:11, 76:10,
138:19
helped
43:18, 55:6
helpful
26:12
helping
77:11
helps
237:6
here
5:2, 25:11,
88:22, 89:18,
101:22, 136:9,
137:19, 221:24,
237:16, 249:5,
249:9, 250:15,
252:13, 258:20,

266:22, 280:22,
281:6, 296:21,
297:20, 298:7,
299:21, 310:18,
318:8
hereby
320:7
hereunto
320:16
herself
118:15
hide
127:18
high
32:22, 33:2,
33:3, 33:4,
33:9, 34:9
higher
73:12
highly
155:3
himself
124:16, 125:1,
125:11, 125:20,
125:23, 127:23,
128:2, 128:3,
157:18, 186:24
hinder
158:13
hindered
158:8
hold
9:12, 37:2,
38:12, 38:20
home
174:3, 174:7
homicide
38:24, 39:3,
39:7, 39:18,
41:3, 45:4,
45:9, 45:13,
47:15, 54:21,
75:1
homicides
73:16, 73:21
honest
95:22
hospital
102:10, 102:17,

102:20, 102:22,
103:9, 103:16,
103:21, 104:1,
104:5, 105:16,
106:13, 107:1,
107:19
hot
99:23
hour
15:8, 15:12,
16:1, 16:2,
16:3, 164:10,
164:11, 164:12,
164:17, 191:5,
191:7, 197:22,
201:16, 204:16,
208:12, 211:6,
241:5, 243:1,
243:24
hours
10:20, 12:5,
12:6, 12:7,
12:21, 12:22,
12:23, 12:24,
13:1, 13:2,
13:3, 13:7,
16:4, 42:17,
126:14, 186:2,
193:3, 200:21,
201:3, 202:13,
203:20, 203:23,
204:20, 205:15,
205:21, 206:1,
206:16, 206:21,
207:1, 260:2,
295:23
house
28:4, 100:2,
108:20, 109:24,
110:4, 110:13,
111:6, 114:2,
116:7, 118:5,
276:4, 276:18,
280:12, 280:19
household
269:10
however
295:20

Transcript of Michael Cross
Conducted on October 16, 2020

human
63:13
hundreds
18:16, 18:17,
67:3, 72:22,
84:22
hyperventilating
72:4
hypotheses
145:5, 147:6
hypothesis
141:22, 142:1,
142:4, 142:6,
143:5, 144:19,
144:22, 145:4,
145:11, 145:20
hypothetical
98:7

I

idea
163:14, 167:24,
202:21, 218:8
identification
87:20, 88:17,
100:20, 109:3,
141:6, 196:9
identify
5:12
illinois
1:2, 1:14, 2:6,
2:14, 3:7, 3:15,
5:5, 5:11,
320:6, 320:24
immediate
306:8
immediately
274:8
impact
23:5, 25:24,
27:13
impacted
19:12
impede
127:9, 127:11,
293:9
important
56:10, 56:17,

57:3, 57:5,
57:17, 57:19,
57:22, 91:10,
91:13, 91:16,
149:24, 152:11,
259:1, 259:3,
259:6, 259:19,
259:23, 260:10,
261:22, 265:20,
265:21, 279:22,
294:10, 315:21
impossible
161:11, 268:13,
291:10
improper
282:13, 294:20,
295:11, 295:18
improved
22:2, 24:23
improvement
47:10
inability
295:24
inaccurate
18:21, 296:22
inappropriate
61:11, 62:1,
62:2, 62:7,
219:11
incapable
62:17, 62:19,
63:3
incarcerated
186:2
incendiary
42:3, 73:1,
73:4, 73:8,
264:19, 264:22,
265:1, 265:11,
266:24, 267:3,
267:17, 268:3,
268:10
include
55:13, 55:15,
55:17, 55:19,
63:14
included
142:16

including
139:8, 255:13
incomplete
98:7
inconclusive
158:5, 158:7,
189:2, 309:22
incorrect
134:8, 134:12,
173:7, 210:7,
280:14, 281:16,
282:22, 303:1,
306:21
independently
25:11, 29:8,
87:8, 103:12,
141:10, 248:8,
280:6
indicate
96:3, 98:4,
98:12, 194:13,
194:17, 207:15,
224:2, 240:6,
259:24
indicated
96:4, 139:7,
194:8, 315:9
indicates
94:17, 96:5,
125:8
indicating
95:24
indication
158:18
indications
196:17, 224:5,
264:7, 264:10
individual
64:1, 68:7,
68:8, 69:13,
93:10, 135:22
information
83:22, 93:12,
135:6, 198:2,
272:23, 274:9,
275:8, 278:10,
279:4, 279:15
informed
146:6, 146:13,

146:22, 147:3,
149:10
infrequently
277:17
initially
38:13, 45:1,
112:18, 120:22
input
152:21, 153:16
inquest
31:22, 289:17,
289:20, 289:21,
289:23
inside
130:13
insisting
60:3
instance
279:22
instead
164:17, 299:6
institutions
33:22
instructed
44:7, 150:21
insurance
119:17, 120:13,
120:18, 120:19,
121:12, 121:18,
122:1, 122:5,
122:7, 122:9,
122:12, 122:15,
124:1, 124:5,
125:13, 125:16,
125:23, 128:4,
128:16, 129:23,
251:4, 251:5,
251:7, 251:12
intake
184:14, 184:15
intend
233:22, 233:23
intended
249:13, 317:13
intending
233:19, 243:10
intentionally
168:11, 170:16,

Transcript of Michael Cross
Conducted on October 16, 2020

170:22, 232:11, 249:12
**interacted** 318:21
**interacting** 30:15, 31:3
**interactions** 157:22, 158:17, 186:19
**interest** 39:9, 149:17, 310:6, 320:14
**interests** 175:22
**internal** 203:24, 205:4, 205:24, 206:4
**interpretation** 123:18
**interrogated** 67:2, 67:4, 97:16
**interrogating** 60:24, 72:9, 92:11
**interrogation** 55:15, 58:21, 59:1, 67:16, 67:24, 68:3, 68:12, 68:22, 68:24, 69:15, 70:1, 70:7, 70:10, 70:19, 71:1, 71:6, 71:19, 71:24, 72:3, 72:6, 91:4, 91:9, 92:6, 97:15, 97:21, 218:20, 218:23, 219:3, 219:24, 224:20, 225:3, 242:7, 246:6, 246:13, 259:20
**interrogations** 69:5, 95:3
**interrogatories** 294:4

**interrupt** 123:23, 132:13, 164:1
**interrupted** 129:10
**interrupting** 8:22, 127:23, 300:16
**interruption** 123:15
**interview** 43:17, 44:18, 57:4, 58:24, 76:12, 169:24, 179:23, 180:1, 183:13, 183:18, 184:8, 187:18, 188:2, 188:6, 188:12, 188:14, 191:10, 191:19, 194:5, 195:12, 195:14, 195:17, 195:18, 197:3, 197:17, 197:22, 198:10, 198:18, 199:1, 199:14, 201:7, 202:5, 202:9, 202:12, 202:16, 203:4, 203:12, 205:15, 205:24, 206:4, 208:15, 211:19, 219:7, 219:9, 219:11, 220:1, 220:8, 220:19, 223:5, 223:9, 224:10, 224:13, 224:17, 225:2, 229:5, 242:12, 244:3, 244:7, 244:19, 244:22, 257:17, 258:11, 310:23, 313:14, 313:19, 313:20, 313:24, 314:3, 314:6
**interviewed** 76:15, 147:18,

165:4, 165:6, 184:11, 187:15, 188:24, 195:7, 196:5, 201:22, 258:4, 277:21
**interviewers** 163:20
**interviewing** 60:21, 60:24, 70:13, 77:15, 95:10, 114:11, 116:8, 118:15, 118:20, 151:4, 214:9, 244:15, 259:20, 278:1
**interviews** 120:12, 168:24, 307:19, 310:3, 310:5
**intoxicated** 62:10, 62:14, 72:10, 159:13, 159:15, 159:19, 188:23, 189:3
**investigate** 43:16, 77:11, 142:21
**investigated** 38:14, 38:17, 41:3, 72:14, 72:18, 72:23, 73:3, 73:7, 73:16, 74:7, 74:12, 142:7
**investigating** 40:23, 74:15, 76:8, 101:24, 152:15, 152:19, 216:16, 217:21
**investigation** 13:12, 19:14, 19:24, 20:20, 25:3, 25:16, 27:19, 39:10, 41:12, 45:20, 48:20, 50:5, 54:21, 54:22, 55:2, 55:13,

57:4, 58:15, 72:12, 73:3, 74:17, 74:23, 75:19, 75:22, 76:3, 76:5, 77:4, 77:16, 77:17, 78:1, 85:3, 94:6, 95:11, 107:12, 135:24, 141:21, 142:11, 142:14, 144:2, 144:6, 144:17, 145:21, 146:2, 150:17, 151:6, 152:9, 152:21, 153:21, 158:8, 158:14, 164:4, 165:11, 165:12, 166:21, 167:22, 177:13, 212:7, 219:17, 246:21, 261:22, 262:23, 266:3, 266:21, 292:3, 292:4, 292:11, 296:1, 304:7, 305:5, 305:9, 305:12, 306:3, 306:13, 306:14, 306:20, 307:22, 307:23, 308:5, 308:11, 308:16, 308:20, 308:21, 309:5, 309:13, 309:14, 309:17, 309:21, 312:10
**investigations** 45:2, 51:7, 51:10, 51:12, 51:15, 73:21, 74:22, 75:1, 143:1, 211:15, 211:23, 212:3, 212:14, 213:1, 213:7, 305:12, 305:23, 306:1, 306:9, 306:12, 306:19, 311:13,

Transcript of Michael Cross
Conducted on October 16, 2020

343

312:5, 312:13,
312:20, 312:24,
313:4, 313:16
**investigative**
76:18, 76:19,
77:6, 77:10,
150:23
**investigator**
38:24, 39:1,
39:2, 39:3,
40:3, 40:6,
40:13, 40:15,
40:19, 40:22,
41:14, 42:11,
42:12, 42:19,
42:22, 43:1,
45:10, 45:11,
45:13, 58:6,
58:11, 75:18,
76:14, 107:11,
134:2, 134:15,
136:3, 149:16,
150:16, 150:22,
152:10, 154:16,
258:1, 267:12,
267:13, 267:15,
283:5, 304:10,
304:14, 304:21,
304:24, 305:3
**investigators**
47:15, 47:18,
136:1, 145:5,
249:12
**invited**
146:9, 146:13,
146:22, 147:3
**involuntary**
92:7, 92:10,
92:13, 92:15,
95:20, 96:2
**involved**
74:2, 74:19,
78:6, 151:5,
166:18, 166:20,
269:14, 277:24
**issue**
147:8, 156:17
**issues**
116:21, 116:24,

117:18, 118:4,
118:8, 186:6,
293:9, 295:8,
303:3, 304:3
**itasca**
3:15
**itself**
146:11, 153:10,
264:16, 310:17

**J**

**jail**
30:3, 30:8,
155:17, 155:21,
156:10, 156:12,
157:21, 160:10,
160:18, 161:6,
161:12, 161:19,
162:16, 162:19,
163:1, 173:5,
173:10, 173:11,
174:22, 176:20,
177:3, 177:5,
177:11, 177:12,
177:20, 177:21,
178:2, 178:7,
180:4, 186:10,
199:20, 207:5,
246:9, 256:2,
272:16, 272:21,
274:2, 274:5,
274:19, 278:8,
279:3, 291:3,
310:12
**jailhouse**
163:8
**january**
196:13
**job**
1:22, 7:13,
44:23, 52:19,
52:22, 163:19,
164:21, 256:4
**jobs**
35:2, 35:6
**joe**
64:15, 65:4,
190:3, 231:14,

237:4, 298:4
**john**
58:24, 59:3,
59:9, 60:5,
60:8, 60:13,
60:19, 60:23,
79:10, 79:12,
79:14, 79:17,
79:20, 80:2,
80:4, 80:7,
163:13, 163:14,
163:17, 164:9,
164:18, 177:16,
178:9, 179:3,
179:7, 180:10,
180:13, 181:1,
181:6, 181:9,
181:16, 182:9,
182:23
**join**
75:10, 77:7,
131:12
**joined**
76:4, 131:16
**jon**
50:21, 105:21,
106:5, 277:7,
306:18, 309:13
**joseph**
3:11, 5:16
**journey**
248:1
**judge**
64:6, 90:10,
94:18, 128:20,
196:12, 218:1,
218:10, 290:24,
300:10, 300:13
**judgment**
64:5, 64:9,
64:16, 305:6
**jumped**
12:17
**jury**
14:9, 31:11,
289:4, 289:7,
289:12
**justice**
57:18

**juvenile**
36:24, 37:7,
37:12, 37:15,
43:11, 43:12,
43:16, 43:22

**K**

**kane**
320:5
**keep**
8:8, 71:6,
82:12, 109:1,
226:12, 232:8,
235:7, 237:17,
251:24, 294:16
**kept**
84:21, 152:11,
235:1, 253:8,
262:1
**kick**
227:10
**kill**
249:13
**killed**
77:23, 125:16,
126:5, 126:10,
127:3
**killing**
125:14, 125:24
**kind**
68:18
**kitchen**
121:19, 126:20
**kmart**
254:7
**knew**
50:21, 57:9,
57:13, 57:17,
82:11, 90:21,
91:1, 105:20,
111:22, 111:23,
115:21, 122:5,
122:7, 122:10,
125:15, 128:4,
140:8, 147:23,
152:5, 155:20,
155:23, 156:2,
156:13, 156:22,

Transcript of Michael Cross
Conducted on October 16, 2020

344

157:2, 157:8,
157:11, 163:8,
167:10, 175:15,
233:2, 236:10,
253:9, 256:10,
257:3, 296:3,
317:16
**knocked**
256:23
**knowing**
125:13, 159:12,
167:12, 167:17,
294:15
**knowledge**
23:11, 23:24,
24:3, 53:19,
145:23, 297:7
**known**
164:20
**kushner**
28:20, 29:2,
50:2, 50:19,
153:2, 155:5,
155:8, 266:7,
268:8, 285:13,
285:16, 286:24,
304:12, 304:17

**L**

**lab**
270:4, 270:10
**lack**
216:3, 218:13
**lacks**
96:12
**landed**
171:16
**language**
96:18, 96:24,
98:11
**large**
181:20
**larger**
183:4, 313:23
**last**
10:15, 11:15,
12:13, 12:15,
14:17, 14:24,

15:3, 15:5,
15:13, 17:2,
21:19, 39:4,
63:24, 106:7,
114:15, 128:11,
166:16, 247:13,
252:18, 253:18,
276:2, 276:16,
277:7, 304:1
**lasted**
204:16
**late**
36:19, 199:24,
244:24, 245:2,
264:4, 264:5
**later**
102:16, 109:1,
131:1, 148:14,
167:20, 197:6,
197:20, 236:4,
242:12, 259:4,
302:1, 302:6
**law**
3:12, 34:7
**lawsuit**
7:1, 7:10,
7:24, 84:1, 84:3
**lawyers**
10:21, 10:24,
11:4
**layout**
48:1, 181:16,
183:2, 203:7
**lead**
60:9, 149:16,
150:3, 150:9,
150:15, 150:21
**leads**
21:12
**learned**
60:13, 60:19,
94:20, 96:18,
96:19, 111:24,
180:2, 226:6,
226:10
**least**
21:2, 142:17,
164:9, 164:12,

167:23, 200:21,
202:13, 229:19,
276:7, 292:13
**leave**
193:12, 202:8,
206:24, 224:13,
274:18, 275:11,
275:13
**leavenworth**
28:4, 103:3,
103:9, 104:11,
104:12, 104:15,
104:22, 105:2,
105:6, 105:10,
105:15, 106:13,
106:23, 110:11,
110:19, 114:2,
115:14, 115:15,
118:17, 118:20,
120:12, 121:24
**leavenworth's**
108:20, 109:24,
110:4, 280:12,
280:18
**leaving**
81:24, 111:6,
162:2, 198:20,
199:20, 200:1,
208:6, 208:10,
220:19, 258:15
**led**
66:4, 98:21,
111:6, 165:12,
165:18, 167:6,
264:10, 274:12,
275:15
**left**
36:17, 36:21,
82:5, 100:16,
114:23, 121:22,
166:17, 167:12,
167:14, 167:17,
196:4, 198:22,
199:22, 200:3,
201:17, 203:21,
206:20, 210:20,
211:6, 224:10,
227:14, 227:20,

227:22, 234:23,
257:14, 257:17,
269:15, 272:6,
272:8, 316:23
**legal**
93:4, 219:20
**lemak**
77:23
**length**
294:21
**less**
10:10, 10:11,
11:9, 11:22,
12:8, 16:2,
16:4, 49:22,
59:21, 73:20,
140:18, 140:21,
180:20, 191:4,
201:16, 212:16,
221:8, 221:12,
222:11, 222:18,
223:1, 241:5
**let's**
91:2, 100:18,
176:8, 237:17,
286:8, 286:12,
286:15, 299:15,
299:18, 300:17,
300:18
**letters**
13:21
**level**
53:5, 68:11,
312:15, 312:17,
312:21, 312:24
**liars**
98:14
**lie**
138:12, 189:14,
210:8, 282:15
**lied**
194:18
**lies**
61:9, 235:24
**lieutenant**
28:20, 29:6,
49:17, 50:16,
99:7, 99:8,

Transcript of Michael Cross
Conducted on October 16, 2020

284:9, 315:13,
315:16
**life**
120:19, 121:12,
122:9, 122:12,
122:14, 123:24,
124:5, 125:13,
125:16, 125:23,
128:4, 251:3
**light**
149:3, 149:13
**lighter**
132:11, 132:15,
132:19, 133:11,
133:12, 134:3,
134:5, 134:16,
135:7, 136:5,
136:7, 136:9,
136:11, 316:21,
318:16, 318:22
**lighting**
183:7, 224:24
**likely**
127:3, 128:4,
146:21
**limit**
62:5, 69:5,
69:8, 69:11
**limitations**
295:15, 318:7
**limited**
269:11, 271:23
**line**
9:3, 57:11,
57:23, 64:22,
70:23, 196:18,
196:19, 196:22,
197:2, 197:13,
298:6, 301:23
**liquid**
166:7, 166:10,
167:9
**list**
141:8, 194:7,
279:24, 280:4
**listed**
27:7, 39:14,
39:15, 268:6

**listening**
153:10
**lit**
166:7, 166:11,
232:14, 232:18,
260:18
**litigation**
82:16, 82:21,
83:1, 83:15,
83:17, 83:20,
83:22, 84:17,
84:18, 84:21,
85:7, 85:10
**little**
22:18, 33:15,
36:12, 40:13,
73:20, 81:5,
123:4, 127:21,
145:18, 176:10,
191:4, 213:19,
222:3, 222:4,
237:19, 271:17,
296:22
**live**
240:2
**lived**
22:9, 106:18,
106:19
**lively**
66:16
**living**
110:13, 114:17,
142:3, 146:16,
172:6
**lobby**
181:20, 183:2,
183:4, 183:8,
186:23, 188:15,
191:14, 192:1,
192:6, 192:19,
193:15, 193:22,
202:6, 203:17,
211:10, 211:22,
211:23, 212:2,
212:22, 212:24,
213:12, 213:13,
217:21, 219:5,
220:18, 310:24,

311:1, 311:6,
313:5, 313:8,
313:17, 313:18,
313:21, 313:23
**located**
182:19, 191:12,
191:14, 191:15,
192:19, 192:21,
254:18, 314:22
**location**
2:2
**lock**
184:7
**lockdown**
10:12
**locked**
178:20, 178:22,
183:23, 184:3
**locks**
178:21
**loevy**
3:4
**long**
10:17, 11:7,
12:4, 12:20,
15:7, 15:10,
15:16, 15:22,
33:14, 33:20,
36:15, 37:2,
37:15, 54:5,
71:6, 131:14,
156:22, 188:16,
191:2, 191:16,
201:9, 201:10,
201:15, 204:4,
205:9, 205:10,
206:4, 208:9,
212:13, 220:16,
227:15, 241:3,
242:22, 243:22,
244:9, 276:6,
304:1
**longer**
129:15
**look**
83:16, 84:11,
84:15, 84:20,
84:24, 86:2,

86:5, 88:22,
92:14, 112:10,
112:14, 136:3,
199:23, 252:20,
272:13, 303:7
**looked**
31:8, 82:3,
83:12, 84:2,
259:17, 303:16,
313:22, 314:18
**looking**
86:9, 103:13,
104:4, 112:18,
135:6, 303:10
**lose**
19:9
**loss**
19:12, 137:22
**lost**
236:21, 283:19
**lot**
72:15, 77:13,
100:4, 100:5,
124:21, 137:22,
142:8, 186:9
**loud**
66:14, 122:17,
125:6, 125:8,
226:22, 226:23
**louder**
123:4
**low**
254:9
**lower**
312:15, 312:17,
312:21, 312:23
**lunch**
298:24
**lying**
61:8, 138:10,
194:14, 226:12

---
**M**
**m-i-c-h-a-e-l**
6:5
**ma'am**
19:4, 20:12,
37:14, 57:21,

Transcript of Michael Cross
Conducted on October 16, 2020

346

83:10, 94:8,
230:1, 247:8,
280:8
**made**
60:10, 102:5,
124:24, 221:21,
234:24, 235:2,
240:20, 272:23,
279:8, 279:10,
314:4
**main**
312:17
**major**
73:22, 74:3,
74:5, 74:6,
74:14, 74:16,
74:18, 74:22,
75:1, 151:1
**majority**
72:22, 73:6,
73:11, 73:13,
73:14, 73:21,
74:20, 74:24
**make**
23:15, 64:14,
64:16, 65:9,
65:11, 65:20,
97:15, 112:24,
113:8, 210:17,
233:17, 240:17,
257:7, 258:12,
281:3, 281:9
**makes**
59:21, 222:7,
237:20
**making**
99:22, 154:19,
221:19, 228:6,
228:7, 228:8,
228:11, 232:7,
233:10, 233:14
**malice**
167:4, 167:8,
168:14, 168:18
**management**
55:17
**many**
6:19, 9:19,

10:21, 18:14,
42:10, 46:22,
47:3, 47:13,
49:3, 49:8,
49:19, 63:2,
67:1, 72:13,
72:16, 72:18,
73:16, 79:3,
180:12, 182:1,
188:19, 193:3,
302:14
**march**
10:12
**mariah**
3:3, 5:14, 6:15
**marianne**
45:6, 72:13,
77:17, 78:1,
98:21, 105:3,
106:18, 119:17,
120:14, 121:9,
126:15, 128:16,
148:19, 214:10,
216:17, 249:14,
256:10
**marilyn**
77:23
**mark**
46:3, 49:5,
50:13, 86:8,
100:18, 108:23,
151:10, 151:12,
276:22, 306:10
**marked**
87:19, 87:21,
88:16, 100:19,
109:2, 141:5,
196:8
**married**
105:11, 256:1
**marshal**
304:15, 304:17
**maryland**
40:9
**mask**
6:8, 6:13
**masokas**
180:22, 180:24,

184:23, 185:19,
186:1, 186:5,
186:22, 187:9,
187:11, 187:14,
187:15, 187:17,
187:24, 188:1,
190:19, 191:2,
191:6, 191:24,
192:3, 192:15,
192:24, 193:4,
193:10, 194:4,
194:13, 195:7,
195:16, 195:21,
199:2, 201:18,
201:21, 202:6,
206:15, 207:14,
310:22, 311:3
**mason**
3:19, 5:8
**master's**
33:19
**material**
180:2
**materials**
83:17
**matter**
5:4, 13:19,
82:22, 101:3,
142:21, 289:4,
289:7
**maybe**
62:1, 73:20,
75:23, 98:14,
180:20, 222:11,
236:1, 240:2,
269:17, 276:7,
281:8
**mcgury's**
244:20, 244:22,
258:5, 258:7
**mean**
10:3, 11:20,
12:22, 13:11,
16:14, 20:6,
25:6, 25:10,
27:3, 37:24,
42:8, 62:19,
63:3, 64:18,

70:12, 71:24,
111:23, 122:22,
123:24, 130:12,
130:17, 133:23,
150:16, 151:18,
164:1, 180:15,
182:3, 189:22,
224:10, 239:19,
277:3, 281:5,
293:5, 294:20
**meaning**
315:3
**means**
38:1
**measure**
64:18, 241:16
**medical**
21:7, 21:15,
22:5, 22:8,
23:15, 23:18,
24:4, 24:14,
25:23, 26:9,
63:17, 66:19,
236:24, 295:4
**medication**
27:12, 295:5,
295:6
**medications**
26:2, 26:5,
26:13, 27:6,
27:7
**medicine**
26:10
**medium**
226:23
**meet**
9:19, 9:22,
10:17, 78:24,
79:13, 104:8,
104:10, 107:23,
108:2, 108:11,
156:12, 161:19,
163:5, 163:7,
212:9, 212:22,
219:5, 220:20
**meeting**
10:22, 11:12,
12:1, 12:4,

Transcript of Michael Cross
Conducted on October 16, 2020

12:10, 12:13,
12:18, 12:20,
30:2, 30:6,
79:20, 80:6,
103:2, 103:8,
105:15, 106:23,
110:3, 155:15,
162:23, 163:9,
170:9, 175:18,
180:24, 181:6,
195:1, 195:4,
212:1, 272:16,
274:1

**meetings**
112:20

**member**
307:22, 308:6,
308:15, 308:19

**members**
17:17, 104:6,
104:8, 104:10,
121:10, 308:1

**memorable**
77:19

**memorialization**
259:1

**memorialize**
262:8

**memorialized**
262:6

**memories**
32:16, 296:1

**memory**
19:9, 19:12,
19:23, 20:2,
20:5, 20:6,
20:10, 20:22,
21:4, 21:12,
21:19, 21:23,
22:2, 22:16,
22:22, 23:6,
25:24, 26:11,
94:19, 102:24,
118:13, 127:4,
137:6, 137:9,
137:22, 138:8,
289:19, 289:20,
289:22, 294:22,

295:8, 298:6,
298:9, 300:9,
301:16, 303:3,
303:8, 303:11,
303:14, 303:22,
304:2, 318:7

**mental**
63:7, 63:18,
63:19, 65:2,
307:11

**mentally**
62:17, 62:19,
63:3

**mention**
259:9

**mentioned**
13:8, 14:18,
94:12, 106:21,
195:3

**mentors**
55:3, 55:8

**message**
4:12, 4:13

**met**
9:17, 10:2,
10:18, 11:6,
74:6, 74:7,
74:8, 74:9,
104:5, 104:7,
105:24, 106:1,
106:2, 107:6,
107:8, 107:17,
107:21, 108:1,
110:22, 110:24,
113:10, 116:4,
116:10, 126:19,
155:19, 172:17,
173:14, 173:22,
181:5, 184:16,
184:18, 211:9,
211:21, 212:21,
213:3, 214:8,
216:15, 217:20,
218:24, 219:3,
223:5, 223:9,
223:14, 272:21,
274:4, 274:19

**mic**
56:11

**miceli**
25:3, 25:17,
28:3, 28:7,
29:6, 29:10,
29:14, 45:20,
48:21, 50:5,
73:3, 73:17,
75:14, 90:11,
99:11, 105:3,
105:7, 105:11,
107:23, 108:2,
108:12, 109:23,
110:3, 110:7,
111:20, 113:9,
114:1, 114:11,
115:16, 115:20,
116:20, 128:16,
129:10, 141:23,
160:11, 172:1,
214:10, 216:17,
253:13, 253:20,
269:10, 272:3,
304:6, 306:2,
306:14, 306:20,
307:22, 308:5,
308:20, 309:12

**miceli's**
45:6, 72:13,
77:18, 78:2,
98:21, 111:11,
126:15, 145:12,
148:19, 169:1,
169:21

**michael**
1:8, 1:13, 2:1,
4:2, 5:3, 5:18,
5:23, 6:5,
180:21

**microwave**
117:8

**middle**
117:23, 245:9

**midnight"**
109:15

**might**
20:13, 27:8,
39:7, 51:16,
57:10, 72:5,

104:6, 118:22,
122:2, 145:17,
179:4, 185:15,
185:21, 222:3,
239:11, 259:3,
259:6, 294:15,
295:24

**mike**
7:12, 23:20,
68:17, 87:24,
88:2, 88:3,
97:7, 128:7,
138:15, 139:23,
216:5, 231:13,
237:2, 247:2,
277:20, 290:18

**mind**
25:15, 62:15,
80:16, 167:24,
168:1, 236:23,
262:1, 292:10

**mine**
16:24, 88:22,
89:3, 163:16,
220:6, 220:7

**minimize**
261:18

**minimizing**
234:17, 234:18,
235:4, 235:9,
238:15, 260:13,
262:11, 278:19,
279:9, 316:1

**minor**
53:7, 150:24

**minser**
90:11

**minute**
166:17, 179:17,
221:12

**minutes**
131:15, 137:3,
212:16, 212:17,
212:19, 217:3,
221:3, 221:8,
221:10, 227:16,
244:1, 261:11,
316:23

Transcript of Michael Cross
Conducted on October 16, 2020

348

miranda
223:18, 223:22,
224:3, 224:6,
224:8, 224:11,
224:17, 225:6,
248:14, 248:23,
258:8
misconduct
53:20
mismarked
89:4
misplaced
145:12, 146:15,
172:2, 172:5
misstates
13:4, 70:3,
79:15, 79:22,
127:15, 151:24,
216:10, 218:12,
222:14, 231:11,
231:16, 278:17
mistake
51:17
mitch
28:20, 50:2,
50:19
mixed
290:11
mom
124:5
mom's
115:5
moment
125:19, 126:5,
140:23, 234:7,
293:3, 293:13
monday
109:14
monetary
233:19
money
199:18, 240:1,
251:7, 251:13
monitor
5:7
month
11:15, 11:22
months
10:15, 11:9,

11:10, 11:18,
11:21, 36:16
more
8:5, 11:9,
12:8, 13:1,
13:3, 16:1,
16:3, 16:4,
20:19, 21:24,
49:21, 49:23,
72:17, 73:19,
92:3, 139:19,
139:22, 156:9,
180:3, 212:16,
212:19, 221:3,
221:10, 222:4,
222:8, 225:17,
234:19, 239:11,
274:9, 276:7,
278:9, 279:4,
279:14, 296:7
morning
162:5, 245:3,
245:6, 258:2
most
77:14, 77:19,
100:14
mostly
41:17
mother
122:2, 124:1,
125:24, 166:24
mother's
111:7, 114:17
mother-in-law
125:14, 125:17,
126:1, 126:2,
126:5, 126:10,
127:3, 128:5,
167:10, 217:22
move
78:7, 88:15,
91:2, 231:19
moved
45:3, 47:6,
100:4, 100:9,
100:11
movie
253:7

moving
100:2, 165:14,
165:15, 165:16,
283:3
much
74:17, 122:10,
152:4, 152:5,
168:4, 168:5,
172:23, 185:5,
225:22, 256:5,
275:8, 275:9,
277:1, 277:3,
277:17
municipal
2:4
murder
214:10, 216:17,
217:22, 274:16,
309:13
murdered
128:5
myself
75:18, 76:13,
76:15, 229:6

**N**

name
6:3, 6:15, 7:7,
7:15, 7:18,
20:17, 35:14,
79:12, 79:17,
79:18, 80:1,
80:3, 80:7,
194:23
named
79:20
namenda
26:6
names
108:7
naperville
1:14, 2:4, 2:6,
5:10, 7:16,
9:11, 28:8,
28:15, 29:20,
34:17, 34:20,
35:3, 35:11,
35:21, 36:1,

36:17, 36:23,
38:9, 41:9,
43:1, 43:10,
46:5, 48:4,
48:14, 51:2,
52:13, 53:15,
54:9, 55:4,
55:22, 75:5,
146:2, 147:18,
149:10, 150:17,
164:12, 164:16,
178:24, 188:22,
195:5, 197:6,
197:20, 198:13,
198:20, 199:4,
199:6, 199:7,
199:9, 199:12,
199:16, 200:7,
200:9, 200:12,
202:10, 208:7,
208:10, 208:24,
209:3, 210:22,
211:3, 211:10,
211:13, 211:22,
211:24, 212:10,
212:23, 214:24,
215:12, 215:20,
216:7, 220:17,
223:15, 241:19,
242:3, 242:24,
243:3, 243:6,
243:23, 248:2,
248:9, 273:2,
273:7, 273:16,
281:13, 285:8,
288:14, 302:15,
304:5, 305:13,
308:2, 310:14,
311:9, 312:9,
314:5, 314:10
national
40:8, 40:10,
41:1, 41:2, 41:5
natural
42:7, 42:9,
73:1
near
142:2, 143:9,

Transcript of Michael Cross
Conducted on October 16, 2020

349

145:10, 147:20,
264:11, 317:8
**necessary**
61:12, 71:7
**need**
8:21, 9:1,
65:9, 82:10,
82:16, 85:5,
85:6, 92:21,
128:7, 138:16,
138:18, 139:19,
139:24, 140:5,
221:20, 230:2,
237:2, 237:12,
259:7, 283:24,
297:22
**needed**
57:2, 212:22,
233:19, 239:23,
297:16
**needs**
139:19, 139:22,
140:11
**negative**
53:14
**neither**
155:4, 155:8,
320:12
**nervous**
66:10
**neurological**
293:6, 293:8,
293:14, 293:23,
294:15
**neurologist**
22:11, 22:15,
22:19, 22:20,
23:2, 24:19,
24:22, 294:24
**never**
22:23, 22:24,
63:21, 64:1,
71:5, 78:15,
78:16, 78:19,
84:16, 84:20,
147:3, 173:1,
174:4, 203:20,
213:22, 214:1,

214:6, 254:14,
259:17, 266:17,
269:20, 270:10,
277:4, 295:16,
297:11
**new**
47:6, 47:7,
47:12, 180:2,
180:7, 233:20,
239:23, 240:2,
251:8, 251:14,
254:5, 254:7,
254:8, 254:13,
256:8
**newey**
181:3, 181:5
**newly**
124:1, 194:20
**newspaper**
233:7, 238:4,
238:5, 243:20,
268:15, 316:10
**newspaper-soaked**
232:19, 233:3,
234:8, 237:22,
238:9
**newspapers**
148:24, 149:4,
149:13, 240:6,
243:12, 260:19,
317:7
**next**
107:2, 132:3,
132:4, 133:5,
179:18, 199:1,
221:23, 227:13,
240:15, 264:4
**night**
102:7, 169:2,
169:6, 199:24,
200:9, 213:21,
244:24, 245:2,
248:24, 250:11,
250:18, 255:5,
255:15, 260:13,
264:2, 264:3,
264:5, 269:10,
287:21, 313:12

**nigohosian**
14:2, 31:3,
231:4, 231:7,
231:21, 241:10,
241:11, 241:13,
241:18, 242:23,
243:2, 243:5,
243:22, 244:6,
244:11, 244:14,
244:23, 245:1,
245:6, 257:16,
257:21, 257:24,
258:4, 258:16,
261:13, 314:10,
314:14
**nobody**
174:13, 219:8
**nodding**
8:10
**noncoerced**
91:14
**none**
92:12, 170:6
**nope**
80:8, 137:4
**normal**
62:9, 63:13
**normally**
62:8, 135:24,
205:10
**north**
3:5
**northern**
1:2, 5:4
**notarial**
320:17
**notary**
2:13, 320:1,
320:4, 320:23
**notebook**
78:11, 78:14,
78:18, 78:19,
78:21, 81:6,
81:10, 81:14,
81:24
**notes**
81:23, 81:24,
82:3, 82:5,

82:8, 82:12,
82:17, 83:3,
83:4, 83:7,
83:12, 84:2,
84:11, 84:15,
84:21, 84:23,
85:2, 85:7,
85:14, 85:20,
85:22, 85:23,
86:12
**nothing**
104:20, 136:4,
198:8, 223:3,
253:9, 265:8,
293:1
**notice**
2:11, 222:17
**november**
126:8, 126:24,
320:18
**number**
39:8, 42:17,
42:21, 62:5,
73:12, 73:18,
89:8, 112:20,
179:14, 180:14,
209:8, 278:23
**numbers**
196:16
**numerous**
314:1

--- O ---

**o'brien**
158:4
**o-u-t-r-a-n-k-e-d**
52:6
**oath**
294:8, 294:11
**object**
21:6, 21:14,
23:13, 64:21,
93:2, 178:4,
191:17, 215:14,
216:2, 234:11,
237:23, 246:7,
294:19, 296:18,
303:17, 305:10,

Transcript of Michael Cross
Conducted on October 16, 2020

309:10, 317:11
**objecting**
231:15, 298:5
**objections**
23:20, 24:8,
65:6, 65:11,
65:12, 66:22,
71:15, 71:21,
190:2, 190:10,
202:20, 205:5,
215:8, 218:14,
221:13, 221:20,
221:21
**observation**
65:16, 66:24,
102:12, 285:21,
286:23
**observations**
65:19, 91:23,
95:5, 101:15,
102:5
**observe**
65:17, 66:3,
76:11, 91:24,
93:10, 94:13,
131:6
**observed**
65:23, 254:19
**observing**
102:2, 102:3,
113:6, 130:21,
130:22, 130:24,
131:2, 285:12
**obtain**
33:6, 33:8,
33:16, 34:1
**obtained**
93:13
**occasions**
112:20, 180:12,
184:12, 229:18
**occur**
317:17
**occurred**
24:5, 58:1,
58:6, 115:20,
138:3, 138:17,
148:18, 149:17,

151:21, 160:17,
167:24, 168:1,
195:10, 211:14,
246:21, 247:22,
249:8, 258:22,
260:13, 314:17
**october**
1:15, 5:6,
30:3, 30:6,
30:15, 30:19,
31:3, 108:17,
155:16, 155:19,
169:24, 170:1,
170:10, 172:17,
173:22, 176:17,
178:3, 181:7,
209:24, 223:16,
228:15, 229:1,
229:7, 229:22,
230:5, 246:6,
247:22, 255:5,
258:22, 261:11,
261:13, 274:2,
274:5, 320:20
**offense**
29:21, 157:21,
288:15, 288:24
**offer**
60:6
**office**
182:12, 183:9,
183:10, 183:12,
183:14, 183:15,
183:16, 187:7,
187:12, 188:10,
190:7, 191:11,
191:12, 192:22,
193:9, 193:13,
200:4, 202:5,
203:2, 203:24,
205:4, 244:20,
244:22, 258:5,
258:7
**officer**
1:8, 5:4, 7:2,
7:7, 7:17,
35:13, 36:2,
36:6, 36:21,

36:24, 37:3,
37:7, 37:10,
37:13, 37:16,
38:1, 43:6,
43:12, 43:22,
44:8, 44:11,
53:3, 63:2,
177:2, 219:9,
273:3, 320:6
**officers**
46:19, 150:4,
150:10, 151:5,
151:7, 151:23,
152:15, 314:5,
314:12
**offices**
47:24, 181:13,
183:2, 183:3,
183:5, 202:9,
203:8, 203:11,
206:20, 206:24,
207:6, 207:9
**official**
55:8
**officially**
52:21, 52:24
**often**
276:11, 276:12
**oh**
12:16, 36:11,
40:24, 52:10,
82:23, 90:8,
101:13, 135:15,
249:20
**on-call**
107:10
**once**
6:20, 6:21,
60:10, 119:21,
158:3, 182:15,
188:21, 189:5,
190:14, 204:7,
214:8, 228:4,
243:23, 274:14
**one**
7:3, 12:2,
14:1, 14:2,
20:9, 34:10,

48:19, 52:1,
53:11, 56:23,
59:15, 59:19,
59:24, 60:8,
62:6, 71:4,
72:20, 86:22,
88:8, 88:23,
89:2, 89:4,
94:2, 94:3,
94:13, 96:6,
100:17, 101:2,
101:5, 107:13,
109:11, 119:1,
119:3, 126:15,
135:23, 136:2,
136:20, 146:16,
147:4, 157:17,
160:23, 162:13,
166:15, 166:16,
167:16, 172:5,
176:2, 177:17,
179:17, 180:21,
182:7, 183:6,
183:20, 188:23,
191:10, 191:19,
192:21, 194:1,
194:9, 205:23,
207:17, 221:12,
231:24, 236:22,
269:13, 277:8,
277:10, 296:8,
313:2, 318:12
**one-day**
53:10
**ones**
48:5
**ongoing**
99:19, 152:12
**only**
23:23, 28:13,
28:17, 29:13,
29:17, 29:22,
54:6, 54:17,
56:9, 64:5,
81:20, 93:21,
93:22, 97:3,
97:5, 105:12,
105:13, 106:17,

Transcript of Michael Cross
Conducted on October 16, 2020

351

135:6, 157:11,
166:3, 171:8,
182:15, 183:5,
183:6, 183:20,
189:4, 190:13,
204:6, 204:16,
229:10, 259:21,
260:2, 269:16,
316:23
**open**
47:24, 95:21,
95:22, 96:4,
96:10, 96:16,
97:3, 98:1,
166:7, 195:17,
316:5
**opened**
96:2, 96:22,
153:23
**openness**
98:4, 98:11
**opinion**
21:8, 21:15,
22:6, 22:8,
23:18, 24:4,
26:9, 62:24,
63:6, 63:7,
63:18, 64:23,
65:1, 71:12,
93:4, 94:10,
153:9, 219:20
**opinions**
23:16, 66:19,
153:5, 153:8,
309:7
**opposed**
316:5
**order**
42:11, 57:18,
58:10, 65:20,
68:12, 92:15,
150:4, 270:14,
319:2
**origin**
41:22, 141:22,
142:9, 143:1,
143:5, 143:19,
144:11, 147:21,

150:1, 152:23,
153:2, 153:20,
264:7, 264:11,
309:9, 317:8
**origin-and**
142:17
**origin-and-cause**
315:16
**original**
148:8
**originally**
47:2, 166:14,
166:18
**originated**
264:8
**others**
307:7
**otherwise**
8:15, 97:11,
320:15
**out**
35:22, 55:7,
70:16, 70:18,
71:4, 83:3,
89:16, 89:18,
90:10, 100:2,
100:9, 100:11,
112:21, 114:19,
115:2, 117:4,
126:12, 138:12,
141:7, 145:19,
149:17, 156:5,
156:7, 156:13,
163:1, 166:16,
167:4, 167:8,
171:4, 171:5,
172:14, 176:23,
184:6, 185:5,
190:19, 192:24,
193:10, 195:16,
203:16, 203:17,
203:18, 203:21,
219:5, 230:15,
237:8, 251:21,
252:6, 252:21,
253:6, 256:4,
256:14, 269:16,
273:10, 317:7

**outcome**
320:15
**outrage**
52:3
**outranked**
51:21, 51:24,
52:2, 52:4, 52:7
**outside**
13:15, 18:11,
24:5, 47:21,
130:1, 130:8,
130:9, 130:11,
130:14, 130:18,
130:19, 131:6,
131:7, 131:9,
131:11, 154:17,
202:5, 219:8,
227:15, 227:17,
251:11
**outward**
96:3
**over**
8:6, 9:22,
12:10, 13:6,
13:8, 21:16,
33:15, 51:5,
51:7, 51:13,
51:14, 64:13,
65:12, 66:21,
67:20, 71:14,
86:11, 92:18,
93:5, 94:20,
96:19, 115:12,
122:20, 122:21,
123:6, 124:9,
125:5, 125:7,
127:17, 152:2,
155:2, 176:7,
189:13, 192:10,
195:17, 202:20,
213:11, 218:14,
222:16, 225:17,
236:14, 236:20,
238:23, 239:6,
248:16, 248:24,
249:3, 260:6,
273:13, 280:3,
286:13, 286:14,

296:7, 296:23,
316:12
**overall**
54:5, 54:6,
77:21, 152:9,
152:10
**overhaul**
99:20, 99:21,
100:1
**overreacting**
122:21, 122:22,
122:23, 123:12
**overturning**
90:15
**overview**
35:5, 36:22,
185:2
**overwhelmed**
127:5, 127:8,
139:10, 140:19,
237:13
**own**
13:16, 17:5,
56:22, 57:6,
60:20, 60:21,
91:6, 95:5,
167:24, 174:4
**owned**
174:4

**P**

**p-o-l-i-c-k**
5:17
**p-r-a-d-e-l**
35:19
**page**
4:2, 4:10,
88:21, 101:9,
106:8, 106:9,
113:19, 113:20,
113:21, 114:16,
117:23, 128:12,
133:8, 196:15,
196:19, 197:9,
209:6, 209:7,
209:9, 209:12,
245:8, 245:9,
245:20, 245:21,

Transcript of Michael Cross
Conducted on October 16, 2020
352

246:10, 246:24,
247:2, 247:4,
247:5, 247:6,
247:9, 247:10,
247:12, 247:24,
248:12, 248:19,
249:15, 249:21,
249:23, 250:5,
250:6, 250:9,
250:11, 250:20,
251:19, 252:2,
252:19, 253:19,
255:19
**paged**
263:15
**pages**
1:23
**paging**
263:17
**pam**
28:4, 103:2,
103:8, 104:11,
104:12, 104:15,
104:22, 105:2,
105:6, 105:10,
105:15, 106:12,
106:23, 108:20,
109:23, 110:3,
115:14, 115:15,
118:17, 118:19,
120:12, 120:16,
120:23, 121:1,
121:17, 121:24,
280:12, 280:18
**pam's**
121:4
**panic**
63:15, 63:22,
64:2, 64:7,
64:10, 64:17,
64:19, 65:15,
65:21, 65:24,
66:3, 66:4,
72:7, 72:8
**pants**
173:17
**paper**
256:24

**papers**
210:23, 214:17,
214:24, 218:18,
220:8, 220:21,
222:13, 222:22,
223:2, 223:20,
223:24, 224:9,
224:14, 225:6,
259:11, 259:22,
260:1
**paragraph**
113:19, 114:15,
117:22, 117:23,
128:11, 128:12,
133:8, 135:2,
247:24, 248:5,
248:7, 248:12,
248:19, 248:22,
249:6, 249:14,
249:15, 249:21,
249:22, 249:23,
249:24, 250:3,
250:4, 250:8,
250:10, 250:20,
251:18, 252:2,
252:18, 253:18,
253:19, 255:18
**paragraphs**
101:8, 101:14,
101:19, 101:23,
102:6, 106:8,
106:9, 247:13,
247:17, 247:20,
250:15
**pardon**
7:21, 49:11,
104:9, 124:23,
215:18
**park**
193:20, 312:2
**parked**
187:5, 311:18
**parking**
100:4, 100:5
**part**
7:13, 51:10,
51:12, 66:9,
66:11, 68:10,

76:17, 83:15,
83:19, 95:8,
100:1, 112:10,
167:22, 168:5,
168:9, 229:20,
249:10, 259:19,
261:7, 261:10,
304:2, 310:22,
314:11
**partially**
167:23, 226:8,
226:9
**particular**
228:17, 229:6,
301:18, 316:20
**particularly**
309:8
**parties**
296:21, 320:14
**partner**
48:3, 48:6,
48:9
**partners**
48:14, 48:18
**parts**
106:15
**party**
6:21, 6:23,
7:10
**pass**
194:5, 194:15
**passed**
71:4, 166:22,
193:3
**past**
8:3, 11:13,
21:13, 203:16,
203:18, 203:21,
204:14, 204:15,
245:3
**pathological**
98:14
**patio**
100:6
**patrol**
36:2, 36:6,
36:20, 36:24,
37:3, 37:10,

38:1, 43:6,
43:9, 44:8,
44:11, 46:7,
53:2, 53:3,
305:17, 305:20
**pattern**
153:24, 154:1,
171:1, 267:23,
271:8, 315:1
**patterns**
267:20, 268:20,
269:7, 272:1
**paul**
46:4, 277:20,
306:14
**paula**
1:24, 2:11,
5:20, 320:3
**pay**
53:12, 209:15,
210:14, 239:24,
240:1, 251:8,
251:13
**peak**
69:2
**pending**
63:11, 215:7,
220:24
**people**
38:17, 44:18,
45:3, 46:22,
47:3, 47:13,
55:6, 60:21,
63:15, 76:14,
81:9, 93:13,
152:18, 159:12,
159:13, 179:15,
180:1, 182:9,
196:11, 205:20,
305:7, 308:9
**people's**
112:11, 292:7,
292:9
**percent**
67:8, 67:10,
67:12, 67:14
**percentage**
67:5, 67:7,

Transcript of Michael Cross
Conducted on October 16, 2020

353

73:5
**performance**
53:15
**perhaps**
124:3, 124:11
**period**
36:8, 310:2
**periodically**
139:21
**permission**
135:18
**persist**
61:8
**persisting**
60:1
**person**
9:23, 9:24,
12:10, 12:12,
61:8, 62:10,
62:15, 66:3,
66:7, 83:22,
97:16, 112:16,
146:1, 167:7,
168:23, 185:10,
313:11
**personnel**
41:9
**pertained**
152:22
**phone**
9:23, 12:11,
209:15, 210:15
**physical**
63:13, 65:2,
68:9, 68:11,
68:18, 159:4,
159:14, 271:4,
271:7, 318:19,
318:20
**physically**
269:8
**pick**
174:13, 174:19
**picked**
186:10
**picking**
162:8
**pieces**
100:13, 172:6

**pile**
148:24
**place**
5:10, 42:14,
42:15, 141:14,
188:7, 188:14,
195:14, 197:5,
197:19, 240:2,
244:19, 244:20
**placed**
43:23
**plaintiff**
1:6, 3:2, 5:14,
6:1, 6:16,
86:10, 86:16,
87:23, 302:5,
318:13
**plaintiff's**
293:22
**plan**
256:11, 257:4
**planet**
5:9, 5:20
**planned**
163:12, 251:7
**planning**
90:22, 179:22,
251:12
**plans**
178:8
**plausible**
112:3, 267:16,
316:14
**played**
291:2
**please**
5:12, 5:21,
6:3, 6:12, 8:8,
8:15, 9:2, 9:15,
21:17, 24:2,
45:24, 51:22,
56:13, 63:9,
64:15, 65:12,
65:13, 69:19,
71:17, 85:19,
89:4, 93:7,
93:16, 98:9,
101:8, 107:24,

108:24, 113:18,
113:20, 117:22,
117:24, 118:12,
124:10, 128:11,
133:7, 146:20,
178:1, 187:23,
190:1, 196:15,
196:19, 202:3,
204:24, 215:5,
216:6, 217:18,
220:23, 223:7,
233:12, 245:8,
248:20, 264:20,
284:11, 299:8
**plenty**
296:15
**plexiglas**
310:18
**plus**
166:24, 271:13
**point**
16:8, 67:16,
68:2, 68:5,
68:22, 68:24,
70:16, 114:14,
115:14, 119:11,
121:18, 122:1,
122:24, 125:15,
127:4, 130:1,
138:17, 141:20,
142:10, 145:2,
147:11, 147:13,
149:2, 151:10,
160:10, 165:19,
165:21, 166:19,
166:21, 170:23,
173:21, 177:8,
178:11, 192:15,
223:4, 223:8,
225:16, 228:16,
228:17, 230:6,
230:7, 230:8,
230:10, 236:21,
236:24, 263:23,
275:3, 275:6,
283:18, 292:23,
293:15, 293:16,
293:17, 293:18,

300:3, 300:13,
311:6, 311:21,
313:12, 314:16
**points**
298:22
**policing**
219:13
**policy**
52:13, 120:19,
120:21, 122:9,
122:12, 122:15,
125:13, 125:16,
125:23
**polygraph**
28:9, 29:15,
61:2, 61:6,
61:14, 61:20,
62:11, 63:4,
63:21, 64:1,
65:8, 67:5,
157:9, 158:2,
158:3, 158:6,
163:21, 164:3,
164:7, 164:15,
166:22, 168:20,
175:9, 175:11,
175:13, 175:23,
176:5, 180:21,
186:2, 187:14,
187:19, 187:24,
188:2, 188:5,
188:16, 190:21,
191:7, 192:16,
192:18, 193:1,
193:4, 193:5,
193:11, 194:12,
194:15, 194:21,
199:1, 201:8,
201:11, 201:19,
204:20, 205:14,
205:16, 207:15,
246:13, 282:4,
282:19, 287:22,
288:4, 306:24,
307:1, 307:3,
307:7, 307:16,
307:17, 309:20,
309:22, 310:7,

Transcript of Michael Cross
Conducted on October 16, 2020

354

311:3
**polygraphed**
62:16, 165:5,
165:7, 184:22,
185:20, 188:20,
188:21, 189:1,
189:5, 189:9,
189:16, 190:7,
190:13, 190:21,
191:3, 192:13,
193:9, 193:10,
193:19, 193:24,
195:6, 196:1,
196:4, 200:19,
200:22, 201:2,
201:5, 201:12,
201:23, 204:4,
204:7, 205:3
**polygrapher**
164:23
**polygraphers**
164:21
**polygraphic**
281:14
**polygraphist's**
62:13
**polygraphs**
61:10, 62:6,
62:24, 63:2,
63:7, 64:24,
204:14, 205:10
**portion**
73:2, 266:20
**pose**
281:8
**position**
9:12, 35:24,
37:2
**positions**
36:22, 38:11,
38:21, 38:23
**positive**
104:7, 245:7
**possess**
62:15
**possibility**
57:10, 153:23,
154:17, 166:10,

166:15
**possible**
87:1, 87:5,
135:11, 148:22,
161:2, 161:4,
161:18, 179:15,
185:18, 192:6,
200:11
**possibly**
222:23
**postconviction**
79:11, 277:20
**potential**
119:17, 144:19,
170:19
**potentially**
22:22, 90:22,
140:18, 219:16,
232:18
**pour**
153:24, 171:1,
268:20, 271:7
**powers**
77:13
**practice**
55:23, 56:6,
56:9, 56:14,
56:16, 179:24,
220:6, 242:9,
242:11, 273:2
**practices**
94:20, 219:14
**pradel**
35:15, 35:17
**precisely**
143:13
**predicated**
68:9
**preinterview**
188:13
**preparation**
82:1, 101:6,
152:9
**prepare**
9:16, 315:11
**prepared**
139:16
**prepolygraph**
187:18, 188:6,

188:14
**present**
3:18, 10:21,
11:3, 12:2,
53:18, 194:20,
195:12, 269:9,
311:2
**pressure**
137:24, 138:7
**pressured**
137:6, 137:10,
137:15, 139:12,
140:21, 297:3
**presumably**
146:5, 146:9,
193:9
**pretest**
310:22
**pretty**
74:17, 152:4,
152:5, 168:4,
168:5, 185:4,
225:22, 261:22,
264:4
**prevent**
297:12
**preventative**
6:9
**prevented**
301:5
**previous**
84:17, 84:18,
180:12, 281:11
**previously**
94:4, 238:3
**prior**
9:18, 13:9,
14:20, 16:6,
16:10, 16:16,
19:19, 25:12,
33:6, 35:2,
36:6, 39:15,
41:12, 42:18,
42:22, 48:6,
48:20, 50:3,
50:21, 58:17,
71:19, 72:12,
72:23, 73:3,

73:17, 77:4,
78:24, 79:6,
80:10, 81:2,
83:13, 84:5,
87:10, 93:20,
105:15, 109:12,
111:2, 111:6,
126:19, 131:5,
132:21, 148:21,
155:4, 155:20,
156:7, 156:17,
157:20, 160:17,
161:5, 161:11,
162:2, 162:8,
162:23, 168:2,
169:24, 173:4,
173:10, 178:3,
180:24, 181:5,
184:11, 184:21,
186:2, 187:18,
187:24, 191:2,
191:7, 195:5,
198:20, 205:22,
208:4, 223:19,
223:23, 224:9,
234:7, 241:18,
245:5, 260:2,
262:16, 262:20,
264:6, 264:14,
265:3, 265:9,
266:10, 266:23,
268:3, 268:9,
271:9, 271:18,
272:16, 274:1,
277:12, 277:15,
286:22, 295:22,
301:2, 301:8,
301:9, 305:22
**prison**
82:20, 291:22
**privilege**
296:12
**probable**
271:10, 271:12,
271:19, 271:21,
272:19, 272:24,
273:1, 273:4,
273:17, 273:21,

273:23, 274:6,
274:8, 274:15,
274:24, 275:5,
275:14, 278:8,
292:6, 292:22
**probably**
14:23, 16:13,
16:14, 16:15,
26:19, 34:15,
41:11, 47:2,
55:1, 71:2,
72:2, 74:10,
75:13, 75:24,
79:9, 95:20,
115:1, 225:24,
234:20, 265:6,
276:17
**problem**
294:15
**problems**
293:6, 293:14,
293:24, 294:22,
294:23, 303:16
**procedure**
150:20, 273:6,
273:15, 273:18,
273:19, 273:20
**procedures**
150:23
**proceeding**
282:16
**proceedings**
79:11, 196:12,
277:20, 302:7
**process**
30:15, 35:20,
40:5, 44:10,
57:19, 74:15,
83:20, 184:14,
184:15, 205:16,
210:17, 210:21,
211:9, 211:21,
212:9, 212:22,
213:15, 213:20,
214:8, 214:15,
214:22, 216:8,
216:15, 217:20,
218:17, 218:24,

219:3, 219:6,
219:10, 219:23,
220:7, 220:16,
220:20, 223:19,
223:23, 248:15,
248:22, 259:10,
269:12, 278:1,
314:12
**processed**
162:20, 162:24
**produce**
295:24
**produced**
295:3, 295:4
**production**
86:11, 86:16,
86:19, 87:2
**products**
251:8, 251:13
**professional**
2:13, 307:12
**proficiency**
39:9
**promise**
8:20, 76:21
**pronounce**
26:7
**proper**
164:7, 220:10,
220:11, 220:12,
220:14
**propose**
59:20
**prosecution**
259:4
**prosecutor**
57:14
**prosecutors**
79:1, 79:6,
80:9
**protect**
124:12, 124:16,
125:1, 125:9,
125:10, 125:20,
125:22, 127:23,
128:2, 128:3,
252:10, 253:10
**protected**
255:12

**proved**
318:21
**provide**
26:23, 27:8,
27:14, 76:9,
137:11, 140:24,
283:21
**provided**
18:18, 18:21,
24:14
**psychiatrist**
307:13
**psycho**
24:6
**psychological**
71:9, 71:18,
71:22, 236:24
**psychologist**
307:12
**public**
2:13, 200:7,
200:8, 320:1,
320:5, 320:23
**punitive**
301:24, 302:6
**purpose**
167:2, 167:8,
168:7, 256:18,
256:22, 256:24
**purposes**
259:1
**pursuant**
2:11, 221:22
**put**
57:1, 74:22,
83:6, 83:8,
102:13, 114:19,
115:1, 115:9,
120:24, 121:1,
135:12, 135:14,
135:15, 135:20,
157:12, 178:22,
254:14, 256:1,
259:13, 261:24
**putting**
157:17, 157:18,
281:11, 291:2

----

**Q**

**questioned**
154:11, 154:20,

161:14, 199:12,
225:8, 225:9,
294:21
**questioning**
9:3, 64:22,
70:24, 71:20,
112:8, 154:23,
241:17, 298:6,
301:24
**questions**
56:2, 70:14,
70:17, 70:18,
97:17, 97:20,
98:5, 127:12,
137:15, 138:14,
156:15, 159:21,
160:6, 185:9,
185:12, 185:13,
185:15, 185:19,
194:6, 194:8,
194:10, 194:12,
225:14, 225:15,
238:19, 239:1,
239:11, 244:11,
249:18, 286:6,
286:10, 295:9,
295:14, 295:17,
297:20, 298:1,
299:5, 302:8,
302:10, 306:23,
318:24
**quetsch**
1:24, 2:11,
5:20, 320:3
**quickly**
25:1, 35:5,
263:6
**quiet**
66:14, 179:8,
179:16, 179:17
**quieter**
222:3, 222:8
**quit**
129:12, 129:14,
129:16, 129:18
**quite**
39:5, 140:9,
228:23, 313:23

Transcript of Michael Cross
Conducted on October 16, 2020

356

| R |
|---|

**raise**
123:15, 123:18, 129:19
**raised**
226:24
**ran**
108:7
**range**
11:23, 196:14
**rank**
52:8
**ranum**
11:1, 12:2
**rapidity**
267:21, 267:23, 268:21, 272:2
**rather**
28:19, 29:24, 42:12, 110:21, 122:17, 125:6, 128:2, 195:17, 200:8, 225:3, 257:19, 260:16, 278:12, 283:8, 318:20
**reacted**
69:24
**reacting**
69:13
**reaction**
129:11, 129:17, 222:1
**reactions**
69:14
**read**
13:8, 13:15, 13:18, 14:4, 63:11, 69:20, 101:8, 101:11, 106:7, 106:17, 113:18, 117:22, 128:11, 133:7, 135:1, 141:8, 164:24, 196:18, 196:20, 215:6, 215:7, 220:23,

220:24, 223:18, 223:22, 224:8, 224:11, 225:6, 241:20, 245:8, 245:15, 246:8, 247:8, 258:19, 261:10, 279:24, 280:4, 303:19, 303:23
**reading**
19:22, 28:13, 28:17, 29:8, 29:13, 29:17, 29:22, 102:24, 106:11, 115:3, 137:1, 230:24, 246:12, 246:24, 249:9, 303:20, 320:11
**ready**
140:12, 302:10
**real**
235:9
**realize**
229:16
**really**
66:6, 83:24, 92:19, 112:7, 118:23, 126:18, 150:12, 152:4, 174:12, 194:23, 210:12, 212:18, 263:5, 295:10
**realm**
154:17
**rear**
312:6
**reask**
202:3, 217:13, 284:7
**reason**
17:23, 18:8, 24:16, 44:4, 52:19, 71:18, 74:18, 83:23, 86:13, 93:22, 123:22, 144:23, 155:10, 163:9,

164:6, 168:5, 168:9, 184:1, 184:2, 189:9, 189:15, 190:8, 200:5, 216:18, 220:13, 222:24, 223:3, 231:24, 239:2, 240:3, 251:15, 251:16, 263:21, 265:11, 267:3, 267:6, 279:3, 300:13
**reasoning**
154:13
**reasons**
44:16, 177:17, 250:21, 267:19, 268:1, 268:5, 318:2
**recall"**
189:22
**recalled**
53:23, 141:10, 280:6, 289:8, 309:19
**recalling**
139:8, 294:17
**receive**
209:9
**received**
53:10, 53:14, 54:1, 58:23, 147:13, 147:17, 209:12
**receiving**
26:6
**recently**
12:15, 12:16, 139:9, 277:8
**reception**
313:7, 313:9, 313:11, 313:24
**receptionist**
184:19
**recess**
80:21, 139:2, 207:24, 263:10, 286:18, 300:21

**recollections**
102:7, 102:13, 247:21, 280:1
**record**
6:4, 6:6, 23:22, 44:19, 79:19, 80:20, 80:23, 81:2, 95:24, 100:21, 109:4, 139:1, 139:4, 196:10, 196:17, 207:23, 208:2, 217:6, 218:12, 221:20, 263:9, 263:12, 271:16, 286:17, 286:20, 299:15, 299:18, 299:21, 300:14, 300:17, 300:18, 300:20, 300:23, 301:2, 301:4, 302:4, 319:5, 319:6, 320:8
**recorded**
242:12
**recorder**
231:1, 241:20, 242:2, 242:6, 242:10, 242:17, 242:18, 242:20, 242:23
**records**
24:14, 108:7, 295:4
**reduced**
320:10
**refer**
261:6
**reference**
88:2, 90:15
**referred**
35:12
**referring**
25:10, 229:13, 248:18
**reflected**
272:12

Transcript of Michael Cross
Conducted on October 16, 2020

357

| | | | |
|---|---|---|---|
| **refresh** | 184:13, 184:21, | **relevant** | 228:18, 230:3, |
| 102:24, 106:11, | 188:10, 188:23, | 83:16, 83:21, | 239:16, 282:3, |
| 113:24, 118:2, | 189:4, 189:9, | 84:3 | 283:19, 285:15, |
| 128:14, 198:14, | 189:17, 190:7, | **reliable** | 285:16, 288:21 |
| 246:5, 246:12, | 190:23, 191:13, | 156:23, 164:24, | **remembering** |
| 259:7, 301:12, | 191:19, 196:4, | 263:1 | 120:9, 293:24 |
| 303:8, 303:11 | 198:18, 198:22, | **relied** | **reminded** |
| **refreshed** | 200:4, 201:17, | 154:18, 154:22, | 258:8 |
| 19:23, 106:16, | 202:22, 203:12, | 305:6, 307:6 | **remorse** |
| 110:5, 301:17 | 203:24, 205:4, | **rely** | 291:2, 291:18, |
| **refreshes** | 205:13, 205:14, | 58:3, 94:19, | 291:21 |
| 246:23 | 205:22, 205:23, | 155:3, 307:17, | **repeat** |
| **refreshing** | 207:5, 207:8, | 309:6 | 21:17, 56:13, |
| 114:12 | 208:6, 208:11, | **relying** | 60:9, 63:10, |
| **refuse** | 210:20, 211:6, | 25:12, 32:7, | 69:19, 69:22, |
| 159:21, 159:24 | 226:7, 226:10, | 32:13, 57:14, | 146:20, 178:1, |
| **regain** | 246:9, 246:14, | 142:8, 153:10, | 187:23, 223:7, |
| 22:21 | 246:21, 247:1, | 153:12, 280:11 | 284:11 |
| **regard** | 247:14, 247:22, | **remain** | **rephrase** |
| 88:10, 295:4, | 248:2, 248:9, | 310:23 | 21:3, 158:10 |
| 302:3, 303:22, | 258:15, 261:12, | **remained** | **report** |
| 309:5, 309:8, | 275:11, 310:12, | 222:10, 311:1, | 55:19, 57:15, |
| 309:9, 315:20 | 310:13, 310:21, | 311:6 | 57:20, 100:24, |
| **regarding** | 311:11 | **remaining** | 102:6, 102:13, |
| 300:9, 315:10 | **relate** | 225:15 | 104:24, 109:7, |
| **regardless** | 112:8, 130:16 | **remember** | 109:9, 109:14, |
| 103:24, 157:20, | **related** | 7:18, 7:19, | 115:9, 118:9, |
| 272:15 | 19:17, 23:11, | 11:20, 15:15, | 118:19, 119:5, |
| **regards** | 31:22, 82:8, | 19:13, 21:1, | 133:16, 134:23, |
| 120:6 | 105:20, 105:23, | 21:24, 22:23, | 135:12, 135:14, |
| **registered** | 106:5, 115:21, | 25:11, 28:6, | 135:16, 135:20, |
| 2:12 | 320:13 | 35:14, 57:2, | 136:4, 136:16, |
| **reid** | **relates** | 57:9, 76:20, | 136:17, 136:18, |
| 30:11, 58:24, | 26:19, 308:23 | 79:18, 80:1, | 136:19, 136:20, |
| 59:3, 59:9, | **relation** | 80:3, 92:12, | 141:4, 151:20, |
| 60:5, 60:8, | 311:23, 312:14, | 97:6, 111:17, | 247:6, 247:9, |
| 60:13, 60:19, | 313:17 | 111:19, 114:24, | 247:10, 252:20, |
| 60:23, 163:13, | **relative** | 116:18, 122:9, | 254:24, 255:7, |
| 163:14, 163:17, | 182:19, 259:21 | 122:13, 132:14, | 256:20, 258:19, |
| 164:9, 164:18, | **relaxed** | 133:14, 133:15, | 259:9, 259:13, |
| 177:16, 178:9, | 159:20 | 134:9, 135:1, | 259:16, 259:24, |
| 178:14, 179:3, | **released** | 138:14, 144:14, | 260:6, 260:8, |
| 179:7, 179:23, | 155:16, 155:20, | 185:16, 188:24, | 260:21, 260:24, |
| 180:10, 180:13, | 156:3, 156:6, | 194:22, 194:23, | 261:2, 261:4, |
| 181:1, 181:6, | 156:8, 156:10, | 195:2, 204:2, | 261:7, 261:18, |
| 181:9, 181:12, | 162:16, 162:19, | 210:10, 213:6, | 261:24, 262:6, |
| 181:16, 182:9, | 173:11, 174:14, | 223:14, 225:12, | 262:8, 265:7, |
| 182:23, 183:1, | 174:22, 175:6 | 225:19, 228:17, | 266:13, 315:14, |

Transcript of Michael Cross
Conducted on October 16, 2020

358

315:17, 315:18
**reported**
1:24, 45:21,
46:2, 259:18
**reporter**
2:12, 2:13,
5:19, 8:9, 8:23,
35:16, 35:18,
69:21, 97:12,
320:1, 320:4
**reports**
9:18, 13:9,
13:11, 13:12,
13:15, 13:19,
14:19, 14:21,
15:6, 16:6,
16:11, 16:18,
28:10, 28:13,
28:17, 29:9,
29:13, 29:17,
29:22, 55:21,
56:3, 58:3,
101:2, 101:5,
102:24, 105:12,
105:13, 106:17,
106:21, 109:11,
115:3, 119:8,
195:3, 258:24,
265:9, 266:3,
266:6, 272:11,
272:13, 280:11,
303:7, 303:10,
303:14
**represent**
5:13, 24:13,
83:19, 86:10,
144:21, 189:7,
200:3, 263:19,
265:8
**represented**
214:21
**representing**
5:8, 5:20,
190:6
**requested**
320:12
**requesting**
22:5, 64:23

**requests**
83:21, 86:11,
86:15, 86:19,
87:2
**required**
52:12, 54:13,
54:16, 54:17,
58:12, 82:12,
84:9, 84:14,
84:20
**requires**
63:17, 124:7
**reread**
13:21, 13:24,
14:14, 224:17
**reserved**
222:4, 222:8,
319:1
**residence**
25:3, 25:17,
48:21, 73:17,
75:15, 110:11,
141:23, 148:19,
253:21
**resolved**
8:1
**resource**
46:19
**respond**
76:11, 159:6
**responded**
158:19, 158:20,
158:21, 176:7
**response**
8:17, 86:19,
90:18, 176:6,
197:7, 225:18
**responsibilities**
43:8, 43:14,
44:24
**responsibility**
43:9, 152:6,
152:7
**restate**
61:18, 158:10
**result**
156:3
**retain**
303:18

**retaining**
303:16
**retaking**
310:7
**retention**
303:21, 303:22
**retire**
9:8, 9:10
**retired**
9:6, 9:12,
302:24
**retrial**
14:15, 15:19,
19:2, 20:7,
20:18, 20:20,
21:4, 32:2,
78:8, 78:10,
78:17, 78:21,
78:24, 79:6,
80:10, 81:3,
81:7, 81:10,
82:1, 82:4,
82:13, 83:13,
85:14, 85:21,
87:11, 87:14,
87:17, 88:9,
218:2, 262:20,
290:22, 306:17
**review**
14:9, 14:22,
14:24, 15:3,
15:7, 15:10,
16:1, 16:7,
16:12, 16:20,
16:23, 17:4,
19:17, 19:19,
32:7, 53:15,
109:21, 282:7,
301:12, 303:14,
314:11, 315:10,
315:13
**reviewed**
14:6, 14:17,
14:21, 15:6,
15:9, 15:14,
15:16, 15:18,
15:22, 16:17,
17:19, 18:4,

101:6, 109:12,
260:24, 301:7,
301:9, 301:10,
301:16
**reviewing**
14:23, 16:6,
16:10, 20:16,
28:10, 104:23,
151:3
**rewinding**
127:21
**right**
6:11, 21:20,
26:8, 55:11,
58:11, 74:4,
83:6, 89:3,
105:21, 109:15,
109:18, 112:12,
127:6, 128:8,
128:9, 132:6,
132:24, 138:21,
139:24, 148:13,
178:13, 178:20,
179:23, 190:24,
200:22, 203:17,
229:16, 233:15,
257:1, 293:1,
298:4, 307:23,
312:4, 313:18,
317:21
**rights**
223:18, 223:22,
224:3, 224:6,
224:9, 224:11,
224:18, 225:6,
248:23, 258:8
**ripsky**
50:21, 105:21,
106:5, 277:7,
306:18, 309:13
**rivastigmine**
26:7
**road**
37:7, 37:22,
37:24, 44:3
**robert**
17:13, 50:4,
88:5, 276:14

Transcript of Michael Cross
Conducted on October 16, 2020

| | | | |
|---|---|---|---|
| **rocker** | **ruled** | 169:9 | 239:22, 240:3, |
| 317:9 | 171:3, 171:5, | **sat** | 243:24, 256:20, |
| **role** | 185:4 | 115:4 | 260:21, 264:20, |
| 38:11, 38:21, | **rules** | **saw** | 276:19, 277:18, |
| 51:5, 51:14, | 8:6, 84:10, | 81:9, 104:15, | 283:17, 283:20, |
| 150:15, 291:2 | 221:22 | 131:19, 131:21, | 289:11, 289:19, |
| **roles** | **ruling** | 175:6, 240:7, | 307:6, 307:16, |
| 43:7 | 90:12, 126:12 | 240:11, 240:12, | 309:6 |
| **room** | **run** | 276:2, 276:16, | **saying** |
| 110:13, 114:17, | 70:16, 149:11, | 276:17, 277:7, | 8:11, 8:16, |
| 114:20, 114:21, | 235:17, 263:6 | 277:8, 277:9, | 71:23, 92:20, |
| 142:3, 146:16, | **running** | 292:19 | 93:11, 111:21, |
| 172:6, 188:12, | 70:18, 146:1, | **say** | 112:2, 113:1, |
| 202:5, 202:9, | 146:6 | 10:14, 11:17, | 121:7, 127:13, |
| 202:12, 202:16, | | 12:6, 20:5, | 158:22, 158:24, |
| 203:4, 206:4, | **S** | 22:1, 22:15, | 229:24, 240:12, |
| 211:19, 212:7, | | 22:19, 22:21, | 251:11, 261:14, |
| 212:14, 213:7, | **sad** | 24:14, 27:4, | 268:24, 281:3, |
| 218:21, 218:24, | 129:4, 129:7 | 32:6, 32:16, | 282:20, 282:23, |
| 219:3, 219:7, | **safe** | 51:22, 55:5, | 285:1, 287:14, |
| 219:9, 219:11, | 162:23 | 60:16, 60:17, | 298:15, 298:21 |
| 220:8, 220:19, | **sake** | 60:22, 61:24, | **says** |
| 220:20, 224:10, | 298:23 | 66:23, 68:20, | 87:24, 90:4, |
| 224:13, 224:17, | **same** | 68:21, 74:24, | 90:9, 109:14, |
| 224:20, 225:3, | 20:23, 21:5, | 77:19, 84:7, | 118:9, 133:16, |
| 227:14, 227:15, | 24:8, 26:15, | 94:21, 95:2, | 167:20, 197:2, |
| 227:17, 227:22, | 26:19, 30:12, | 98:15, 98:17, | 211:21, 245:10, |
| 227:23, 229:5, | 36:3, 61:22, | 100:7, 104:16, | 249:9, 249:10, |
| 233:15, 234:23, | 63:5, 71:21, | 107:24, 117:5, | 249:24, 251:19, |
| 241:7, 244:3, | 74:17, 75:23, | 117:10, 117:14, | 252:4 |
| 244:7, 244:22, | 75:24, 88:18, | 117:18, 118:7, | **scene** |
| 257:15, 257:17, | 88:22, 97:24, | 118:19, 119:4, | 27:23, 31:8, |
| 293:19, 294:15, | 103:10, 115:17, | 119:20, 120:16, | 55:13, 76:11, |
| 295:23, 313:14, | 117:9, 150:24, | 120:20, 121:1, | 76:12, 98:16, |
| 313:19, 313:21, | 161:12, 172:19, | 122:6, 122:11, | 99:4, 99:6, |
| 313:24, 314:3, | 172:20, 173:13, | 122:14, 131:21, | 99:12, 99:15, |
| 314:6 | 189:18, 190:10, | 131:24, 132:18, | 99:16, 99:19, |
| **rooms** | 200:20, 205:5, | 134:23, 162:23, | 101:15, 101:24, |
| 181:20, 183:13, | 208:18, 215:8, | 171:18, 172:13, | 102:12, 107:14, |
| 183:18, 184:8, | 215:21, 220:2, | 176:5, 179:19, | 107:17, 111:24, |
| 191:10, 191:19, | 221:13, 225:20, | 189:24, 201:16, | 112:4, 167:12, |
| 203:12, 206:1 | 225:22, 227:4, | 207:17, 209:7, | 167:14, 167:17, |
| **rpr** | 229:13, 234:22, | 209:17, 214:2, | 254:19, 292:11, |
| 1:24, 320:4 | 235:20, 236:7, | 215:13, 222:5, | 292:13, 292:15, |
| **rug** | 244:3, 268:22, | 222:12, 224:22, | 292:20, 292:21 |
| 271:8, 272:1 | 269:6, 271:5, | 225:18, 231:14, | **school** |
| **rule** | 276:17, 285:24 | 233:11, 233:12, | 32:23, 33:2, |
| 117:4, 172:14 | **sample** | 234:21, 236:15, | 33:3, 33:4, |
| | 169:1, 169:5, | | |

Transcript of Michael Cross
Conducted on October 16, 2020

33:9, 34:9,
46:19, 58:24,
59:3, 59:9,
60:5, 60:9,
60:13
**scientifically**
291:9
**scope**
267:15, 269:11,
271:23, 294:17
**scream**
226:23
**screaming**
123:5
**screening**
257:15, 257:18
**screws**
315:6, 315:8
**seal**
320:17
**search**
132:8, 135:18
**searched**
132:10, 134:5,
136:20, 136:23
**seats**
310:19
**second**
11:6, 12:1,
56:23, 82:11,
89:4, 89:20,
90:7, 101:9,
113:20, 117:22,
133:7, 135:4,
248:12, 248:19,
248:21, 249:6,
249:14, 249:15,
249:22, 249:23,
249:24, 250:4,
250:8, 250:10,
252:18, 255:18
**section**
248:17, 311:14,
312:5, 312:14,
312:20, 312:24,
313:4, 313:16
**sections**
43:10

**see**
23:1, 68:6,
87:24, 89:4,
89:23, 90:8,
108:8, 135:3,
135:4, 135:5,
135:6, 136:4,
136:6, 136:10,
138:19, 138:22,
143:16, 144:10,
149:12, 153:15,
171:11, 172:4,
174:18, 187:8,
199:22, 210:9,
213:15, 226:4,
237:6, 251:20,
252:5, 253:5,
253:13, 261:2,
262:24, 276:11,
279:11, 279:14,
315:1
**seeing**
156:6
**seem**
128:22, 128:24,
129:2, 129:4,
129:13, 166:22,
230:16
**seemed**
112:3, 122:20,
128:21, 129:6
**seen**
176:13, 193:12,
193:15, 252:16,
276:20
**selected**
74:1
**semantics**
62:4, 136:12
**seminars**
39:8, 40:7,
41:13, 41:16,
41:20, 42:10,
42:14, 42:18,
42:21, 45:12,
54:11, 54:13,
54:16, 54:21,
54:24, 58:9,

58:15, 95:12,
142:16
**sent**
119:11, 119:22
**sentence**
135:3, 135:4,
135:5
**sentences**
249:6
**separate**
183:14
**september**
27:24, 28:4,
28:7, 28:12,
28:14, 28:18,
29:3, 29:7,
29:11, 29:16,
29:19, 29:24,
46:1, 98:17,
101:16, 103:9,
103:17, 103:22,
104:1, 105:16,
106:13, 106:22,
107:5, 109:15,
109:18, 111:3,
114:6, 126:9,
127:2, 141:11,
145:2, 147:14,
160:17, 169:9,
176:17, 249:17,
250:18, 270:21,
280:12, 280:19,
281:14, 282:20,
283:5, 283:10,
284:10, 284:14,
285:9, 285:13,
285:21, 287:8,
287:16, 287:20,
288:16, 288:22
**sequence**
59:21
**sergeant**
46:3, 99:9,
244:20, 244:22,
258:5, 258:7,
306:10
**serve**
210:22, 214:17,

214:23, 220:8,
259:10
**served**
86:15, 86:20,
86:21, 87:2,
218:17, 218:20,
220:21, 222:2,
222:13, 222:22,
223:1, 224:9,
224:14, 225:6,
260:1, 294:5
**server**
30:15, 210:18,
210:21, 211:10,
211:21, 212:10,
212:22, 213:15,
213:20, 214:8,
214:16, 214:22,
216:8, 216:15,
217:20, 218:17,
218:24, 219:4,
219:6, 219:10,
219:24, 220:7,
220:20, 223:19,
223:23, 259:10
**service**
35:7, 35:8
**serving**
223:19, 223:23
**set**
167:2, 170:17,
170:23, 185:10,
232:10, 232:13,
232:23, 268:14,
270:14, 292:23,
320:16
**setting**
137:12, 196:1,
239:19, 279:6
**seven**
10:15, 37:4,
249:18, 295:23
**several**
10:20, 12:5,
12:7, 12:21,
12:22, 12:24,
13:2, 13:7,
39:4, 40:7,

Transcript of Michael Cross
Conducted on October 16, 2020

59:12, 157:22,
225:1, 271:2,
296:24, 314:1
**severity**
53:5, 137:22
**shafer**
46:4
**shaffer**
306:14
**shaking**
8:10
**shelf**
254:22
**shell**
35:8
**shield**
310:18
**shifting**
59:19
**shit**
255:20, 317:21
**shoes**
169:5, 169:8,
169:11, 169:12,
169:18, 169:21,
170:5, 170:7,
269:24, 270:5,
270:12
**short**
80:17, 307:23
**short-term**
22:2
**shorthand**
2:12, 320:3
**shorts**
173:17
**should**
43:17, 68:22,
68:24, 81:17,
81:20, 87:22,
109:1, 130:15,
133:19, 136:4,
260:3, 260:9,
282:1, 284:22,
284:23, 285:21,
286:2, 288:5,
315:7, 316:23
**shouting**
123:5

**show**
39:9, 213:20
**showing**
89:11
**shred**
82:8
**shredder**
82:7, 83:6,
83:9
**shut**
237:1
**shutting**
236:23
**sic**
7:23
**side-effects**
26:3
**signals**
96:16
**signature**
100:23, 109:6,
319:1
**signature-4pu1p**
320:21
**signed**
249:2
**significant**
78:3
**signify**
96:2
**signing**
230:20, 248:14,
320:12
**signs**
92:14, 95:15,
95:18, 96:6,
97:19, 159:14
**similar**
161:5, 161:13
**since**
10:8, 10:9,
20:18, 23:2,
24:18, 25:19,
39:2, 176:14,
180:2, 180:3,
193:3, 275:17,
275:23, 276:13
**sir**
6:17, 7:15,

9:10, 26:16,
26:23, 302:11
**sit**
25:11, 296:3
**sitting**
114:16, 295:23
**situation**
8:5, 145:17,
148:6, 157:13,
157:18, 157:19,
297:3
**situations**
68:8, 92:9,
98:2, 98:3,
98:10
**six**
13:1, 13:3
**sizzling**
240:11
**slam**
227:8
**sleep**
69:8, 207:8
**slept**
69:15, 70:1,
207:6, 207:16
**sliding**
142:2, 143:9,
143:10, 145:10,
153:22, 264:13,
264:14
**slightly**
81:14, 205:1
**slow**
62:18
**slurred**
159:16
**small**
67:7, 74:21,
179:5, 179:19,
208:14, 256:7
**smart**
166:23
**smell**
270:8
**smoke**
240:12, 253:20,
254:3, 254:18,

255:1, 255:5,
255:10, 255:13,
314:18, 315:7
**smoking**
114:17, 115:5
**smolder**
316:13
**soaked**
149:4, 149:13,
232:14, 238:6,
240:6, 260:19
**sober**
156:14, 163:8,
163:11, 177:5,
186:12, 310:8
**social**
6:9, 43:18,
43:20
**socially**
6:7
**solve**
150:1, 150:2,
150:4
**some**
8:4, 8:6, 19:9,
19:12, 20:3,
20:14, 21:22,
26:11, 27:19,
44:2, 58:22,
58:23, 60:15,
62:18, 64:18,
69:23, 71:3,
74:10, 77:5,
95:6, 95:17,
95:18, 97:19,
106:14, 108:7,
113:2, 115:14,
119:11, 121:18,
122:1, 130:1,
132:11, 140:18,
142:10, 142:13,
142:24, 151:22,
162:20, 162:24,
166:6, 166:21,
179:4, 185:15,
192:15, 194:20,
223:4, 223:8,
228:6, 239:24,

Transcript of Michael Cross
Conducted on October 16, 2020

240:11, 251:9,
251:14, 256:8,
263:23, 266:20,
268:17, 300:3,
302:9, 303:7,
306:23, 311:21,
314:16, 318:11
**somebody**
63:12, 71:4,
112:18, 213:5,
213:14, 241:16,
273:21, 274:10
**somebody's**
65:1
**somehow**
62:11, 295:13
**someone**
64:6, 64:9,
64:17, 65:14,
65:20, 65:23,
67:2, 67:5,
68:12, 69:9,
69:15, 69:24,
71:8, 72:1,
72:3, 72:6,
72:9, 72:19,
79:20, 82:19,
90:24, 92:10,
93:20, 96:8,
97:19, 98:4,
124:8, 125:7,
146:6, 162:8,
162:19, 215:12,
235:18, 273:3,
274:12
**someone's**
63:18, 95:2,
98:11, 112:14,
259:24, 275:15
**something**
24:5, 24:6,
27:4, 41:8,
52:12, 60:1,
92:15, 125:10,
127:9, 136:1,
136:2, 136:6,
136:11, 139:22,
154:4, 154:8,

171:23, 173:5,
194:2, 266:19,
303:23
**sometime**
10:15, 58:6,
116:4
**sometimes**
303:18, 303:24
**somewhat**
179:8
**somewhere**
35:1, 42:15,
110:13, 209:16,
264:11, 265:15
**soon**
11:12, 89:18,
178:21
**soot**
255:11, 315:4
**sorry**
12:16, 33:1,
35:16, 36:11,
40:24, 56:12,
56:23, 63:23,
69:21, 97:9,
97:13, 117:21,
126:8, 132:12,
164:1, 173:8,
179:9, 189:24,
196:21, 197:9,
200:6, 232:5,
243:15, 246:4,
250:3, 251:22,
251:24, 273:12,
273:24, 298:3,
316:22
**sort**
65:19, 89:18,
94:16, 129:17,
153:16, 166:6,
268:17
**sorting**
89:16
**sotos**
3:12
**sounds**
299:3, 299:4
**source**
316:5

**south**
2:5, 5:10
**space**
203:2, 203:24,
205:4
**spaces**
192:22
**speak**
79:10, 80:10,
80:13, 87:13,
134:3, 134:4,
156:9, 162:7,
178:7, 184:22,
185:1, 227:19,
244:9, 257:15,
302:6, 314:11
**speaking**
28:3, 28:6,
28:11, 29:5,
29:10, 29:14,
29:18, 52:18,
65:5, 66:12,
130:12, 151:3,
151:4, 228:5,
280:11, 280:18,
284:8, 284:13,
287:6, 288:21,
295:18, 298:4
**specialized**
38:21, 39:13
**specific**
38:16, 74:18,
92:3, 150:6,
150:20, 165:17,
261:7
**specifically**
16:16, 27:22,
67:9, 69:12,
75:11, 86:12,
93:21, 95:9,
102:11, 120:3,
120:5, 225:11,
225:12, 229:18,
229:20, 229:21,
308:12
**specified**
246:10
**speculated**
166:3

**speculation**
96:12, 98:7,
161:16, 163:4,
166:5, 166:6,
174:9, 174:15,
185:23, 189:12,
189:19, 192:9,
200:15, 200:24,
202:1, 202:18,
203:14, 204:22,
205:6, 205:18,
206:6, 207:11,
215:3, 215:17,
216:4, 218:5,
218:13, 219:19,
220:4, 221:5,
221:14, 221:18,
239:14
**speech**
90:4, 159:16
**spell**
6:4, 7:19, 7:22
**spend**
42:18, 162:24
**spent**
203:23
**spill**
148:23, 154:1,
171:1, 267:20,
267:23, 269:7,
272:1
**spilled**
147:19, 234:4,
256:17, 256:22,
269:1, 317:6
**spilling**
148:5
**spoke**
109:23, 120:10,
131:17, 134:1,
134:2, 134:6,
134:8, 142:17,
153:22, 207:14,
258:1, 263:23,
287:16, 304:3,
313:14
**spoken**
87:10, 162:7

Transcript of Michael Cross
Conducted on October 16, 2020

363

spontaneous
171:22
spots
99:23
spreading
268:21
squad
180:1
sro
47:21
staircase
182:6
staircases
182:1
stairs
181:23, 182:16,
182:19, 313:1
stand
78:14, 78:18,
78:23, 91:1,
149:22, 163:4,
190:3, 227:4,
232:22, 238:13,
253:16, 315:18
standing
22:7, 23:15,
65:6
start
49:10, 143:17,
167:13, 167:18,
188:3, 197:16,
226:4, 233:4,
233:7, 238:6,
238:10, 243:10,
243:19, 254:11,
256:7, 257:4,
269:18, 270:21,
271:17, 316:17,
317:13
started
34:20, 36:20,
37:10, 118:23,
140:22, 146:15,
166:1, 166:4,
167:7, 168:7,
168:11, 168:14,
168:17, 168:23,
198:11, 201:4,

228:8, 234:3,
234:7, 234:16,
235:5, 237:21,
238:16, 239:3,
240:14, 240:18,
249:3, 249:12,
250:18, 250:21,
251:16, 257:12,
260:18, 268:16,
279:2, 279:9,
302:17, 315:22,
316:4, 317:23,
318:16
starting
126:11, 126:12,
187:24, 194:18,
195:22, 233:18,
243:10, 269:15,
279:17
starts
233:10, 245:10
state
2:14, 5:13,
6:3, 304:14,
304:18, 304:23,
320:5, 320:24
state's
74:1, 241:10,
314:9
stated
51:16, 87:7
statement
29:15, 31:5,
91:16, 91:18,
91:21, 92:10,
92:13, 94:14,
94:17, 95:4,
95:16, 96:6,
96:16, 97:14,
98:13, 156:24,
157:3, 230:20,
230:24, 231:21,
234:15, 236:4,
236:17, 237:20,
240:21, 241:1,
241:4, 241:8,
242:20, 242:22,
245:1, 245:5,

257:8, 257:11,
257:22, 258:12,
258:16, 261:13,
261:14, 261:17,
261:19, 266:1,
282:16, 287:21,
288:10
statements
91:11, 91:14,
92:6, 112:12,
115:8, 292:7,
292:9, 292:12,
292:14, 292:20
states
1:1, 62:14
station
35:7, 35:8,
108:4, 108:6,
141:15
status
63:19
stay
275:18, 275:23,
276:24
stayed
20:23, 21:5,
234:23, 276:14,
277:15
stenographically
320:10
step
169:20
steps
59:12, 59:15,
60:12, 60:15,
151:1, 151:2,
168:21
still
19:23, 47:7,
51:20, 51:23,
89:14, 89:16,
89:21, 169:23,
198:17, 222:10,
227:23, 238:8,
241:6, 270:13,
274:14, 276:8,
290:7, 291:7
stipulate
297:18

stipulated
6:11, 298:11,
298:13, 298:16,
298:18, 302:5
stipulation
298:19, 302:3
stood
232:1
stop
60:3, 69:1,
69:2, 69:14,
69:24, 70:9,
70:19, 71:1,
71:9, 71:19,
71:24, 72:3,
72:6, 72:9,
167:11, 167:15,
209:2, 209:5,
209:11, 209:14,
210:17, 299:8
stopped
92:5
stopping
129:19, 210:13
store
21:1
story
225:20, 225:22,
232:8, 234:22,
235:9, 235:18,
236:7, 248:16
straight
34:8
strange
213:19
street
2:5, 3:5, 5:10
stress
137:7, 137:10,
138:7
strike
33:7, 36:4,
53:23, 57:7,
60:7, 65:18,
70:8, 77:18,
86:8, 87:8,
116:19, 127:1,
134:19, 147:12,

Transcript of Michael Cross
Conducted on October 16, 2020

148:3, 149:15,
161:3, 181:12,
184:1, 190:4,
195:20, 198:23,
201:11, 214:3,
216:13, 236:3,
247:18, 248:5,
273:1, 289:14,
290:4, 290:24,
308:14, 311:19
**stroke**
19:2, 19:5,
19:10, 22:10,
23:2, 23:4,
23:11, 24:6,
24:7, 26:3,
26:17, 26:21,
27:11
**strokes**
25:20
**studied**
9:17
**study**
41:17
**subjects**
54:12
**submitting**
35:23
**substance**
56:4, 249:16,
249:19, 249:20,
250:1
**substantially**
161:13, 173:9,
236:7
**successfully**
166:23
**sudden**
171:23
**sue**
90:19
**sued**
7:3, 7:6
**suffered**
25:19
**suffering**
19:2
**suggest**
237:14, 295:12

**suggested**
35:12
**suggesting**
295:13
**suing**
90:22
**suite**
3:14
**sullivan**
28:12, 30:18,
209:6, 209:17,
209:22, 210:14,
223:6, 223:10,
223:15, 283:5
**sum**
56:4, 249:15,
249:19, 249:20,
250:1
**summarize**
247:13, 249:15,
250:3
**summary**
56:5, 56:18,
56:21, 57:1,
109:22
**sunday**
101:10
**supervise**
309:16
**supervised**
46:2
**supervising**
49:10, 49:12,
49:13
**supervisor**
43:2, 43:3,
49:5, 49:8,
54:18, 150:13,
151:9, 306:3,
306:6, 306:9
**supervisors**
48:19
**supervisory**
51:5, 51:14
**supplemental**
13:12
**supports**
292:23

**supposed**
121:10, 121:11,
314:19
**suppression**
31:18, 77:16,
99:19
**sure**
11:8, 11:11,
11:24, 16:10,
25:5, 34:15,
54:2, 55:5,
55:6, 60:4,
66:13, 70:20,
70:21, 76:6,
80:18, 83:10,
83:18, 85:20,
85:22, 89:10,
94:11, 95:6,
96:14, 97:16,
98:10, 99:22,
101:21, 112:5,
114:21, 115:6,
115:18, 117:17,
128:6, 134:9,
146:21, 179:17,
180:5, 186:10,
189:4, 201:8,
202:14, 205:1,
207:20, 211:5,
216:1, 223:8,
242:14, 248:21,
255:8, 263:7,
275:20, 280:4,
281:7, 281:9,
284:12, 290:11
**surprised**
90:10, 213:15,
213:18, 213:23,
214:2
**suspect**
59:16, 59:20,
60:1, 60:9,
62:6, 91:10,
91:13, 112:24,
165:9, 165:13,
165:18, 166:14,
168:3, 169:23,
170:10, 177:9,

**supposed** ... 

185:7, 220:1,
226:12, 241:15,
272:4, 272:15,
272:19, 273:17
**suspected**
168:10
**suspects**
60:24, 76:14,
151:4, 151:8,
170:14, 201:12,
204:15, 205:13,
269:11, 271:23
**suspended**
52:19, 53:12
**suspension**
53:10
**swear**
5:21
**switch**
316:24
**swivel**
264:12, 317:9
**sworn**
5:22, 5:24
**symptomatic**
24:7
**symptoms**
26:3, 159:4
**system**
156:16

**T**

**table**
114:21, 183:7,
224:24, 227:8
**tactics**
55:15, 91:4
**taint**
219:16
**take**
6:8, 6:12, 9:3,
31:4, 39:8,
42:10, 42:14,
42:15, 42:22,
58:9, 72:5,
80:16, 81:23,
81:24, 97:12,
128:7, 138:16,

Transcript of Michael Cross
Conducted on October 16, 2020

365

138:18, 138:22,
139:19, 139:21,
139:22, 139:24,
140:5, 140:11,
140:17, 141:14,
168:21, 169:1,
169:5, 169:8,
175:10, 176:10,
177:15, 178:8,
188:7, 188:17,
195:14, 201:9,
201:15, 205:9,
205:10, 207:18,
208:9, 211:18,
220:16, 221:3,
221:8, 221:10,
221:12, 231:4,
231:8, 237:5,
237:12, 237:14,
244:19, 244:21,
253:23, 258:12,
263:5, 282:4,
283:24, 286:2,
286:4, 286:8,
286:9, 286:12,
286:15, 297:10,
297:15, 297:22,
298:10, 298:22,
298:24, 299:11,
299:19, 299:23,
300:2, 304:20,
304:23, 310:22,
319:3
**taken**
41:13, 45:12,
80:21, 82:4,
83:12, 95:11,
95:12, 120:23,
132:21, 139:2,
142:13, 157:20,
169:20, 177:18,
201:12, 204:15,
205:14, 205:20,
205:21, 205:23,
207:24, 212:6,
255:10, 263:10,
286:18, 296:19,
296:20, 296:24,

297:19, 299:1,
300:21, 301:3,
309:20, 320:7,
320:10
**taking**
5:9, 26:2,
26:13, 26:16,
27:7, 27:12,
30:11, 92:13,
97:15, 182:16,
188:14, 207:4,
207:5, 208:4,
212:13, 220:18,
231:21, 247:14,
258:16, 286:22,
297:13, 299:4,
301:5
**talk**
25:1, 74:10,
110:10, 117:12,
151:8, 153:19,
163:11, 172:22,
177:12, 177:21,
179:2, 179:5,
179:19, 180:6,
183:6, 191:2,
197:21, 198:8,
208:13, 208:14,
210:13, 210:14,
243:8, 243:22,
244:7, 253:8,
273:13
**talkative**
172:21, 179:12,
179:13, 179:16,
179:17, 208:20,
222:9, 222:11,
222:19, 223:1
**talked**
19:2, 58:5,
91:3, 91:6,
110:7, 111:12,
115:15, 117:13,
119:14, 119:16,
119:18, 119:21,
121:24, 125:21,
159:18, 173:4,
176:4, 177:19,

191:6, 193:4,
209:18, 230:9,
253:7
**talking**
30:18, 32:4,
47:1, 52:5,
75:19, 80:9,
105:2, 105:6,
108:21, 111:20,
112:23, 113:7,
114:5, 115:16,
116:16, 116:20,
121:5, 121:17,
122:20, 123:6,
123:24, 125:3,
125:5, 125:7,
125:23, 129:12,
129:14, 129:16,
129:18, 129:19,
132:21, 136:12,
163:12, 167:21,
187:9, 187:11,
191:10, 191:24,
192:3, 197:23,
198:4, 198:5,
198:6, 208:5,
209:21, 229:17,
229:19, 229:20,
230:9, 283:4,
283:9, 286:22,
287:20, 288:3,
288:9, 288:13,
288:20, 301:3
**talks**
248:13
**tape**
5:2, 29:24,
231:1, 241:20,
242:2, 242:6,
242:10, 242:17,
242:18, 242:20,
242:23
**tape-recorded**
257:22
**taped**
258:12
**tapes**
316:24

**task**
73:22, 74:3,
74:5, 74:6,
74:14, 74:16,
74:19, 75:2,
75:8, 75:10,
75:17, 75:22,
76:18
**taught**
95:15
**team**
75:19, 75:22,
76:3, 76:19,
76:20, 77:7,
77:10, 152:5,
152:8, 307:23,
308:7, 308:10,
308:16, 308:20,
309:6
**team's**
168:1
**technician**
309:3
**technicians**
205:14
**technique**
59:10, 59:13,
59:15, 60:5,
60:20, 60:21,
91:7, 226:6,
226:9, 232:2,
235:8, 235:11,
235:17
**techniques**
59:19, 59:24,
60:8, 60:12
**television**
317:4
**tell**
9:15, 11:14,
32:11, 40:1,
67:9, 67:15,
73:5, 73:23,
91:21, 92:15,
92:24, 93:8,
95:15, 110:21,
110:24, 111:2,
111:5, 116:11,

Transcript of Michael Cross
Conducted on October 16, 2020

366

116:13, 121:10,
121:11, 124:3,
131:2, 131:5,
153:11, 153:12,
159:1, 159:5,
162:13, 175:8,
175:12, 175:21,
185:3, 185:8,
185:13, 185:18,
186:1, 186:5,
186:8, 186:13,
186:16, 187:17,
188:1, 190:20,
193:1, 195:16,
195:18, 195:21,
195:24, 197:4,
197:18, 214:16,
225:20, 234:22,
236:2, 241:13,
243:9, 243:18,
255:10, 262:10,
262:13, 262:16,
262:20, 265:13,
292:4, 299:10,
299:22, 313:16
**telling**
95:20, 95:23,
96:21, 105:10,
112:21, 189:14,
194:11, 226:1,
226:3, 226:5,
226:18, 227:2,
232:8, 253:8,
279:12, 279:16,
300:2
**tells**
192:15
**terminology**
45:5
**terms**
63:3, 65:8,
303:20, 305:19
**test**
29:23, 39:11,
63:4, 63:21,
141:10, 141:13,
143:12, 143:23,
145:20, 146:6,

146:10, 146:11,
146:14, 146:23,
148:21, 149:2,
149:11, 153:13,
169:2, 169:6,
169:10, 169:12,
169:20, 171:8,
171:14, 171:19,
270:4, 304:20,
304:23
**tested**
169:15, 170:5,
170:7, 269:24,
270:4, 270:5
**testified**
5:24, 14:6,
15:18, 18:12,
18:14, 18:18,
18:22, 19:1,
21:18, 27:18,
32:17, 69:23,
78:10, 78:13,
78:17, 78:19,
78:20, 81:5,
83:5, 84:22,
87:9, 101:20,
102:14, 108:14,
118:7, 118:14,
127:7, 133:10,
133:13, 134:7,
134:10, 134:11,
134:18, 134:20,
155:14, 173:3,
179:11, 203:1,
209:20, 217:7,
217:9, 219:2,
228:13, 238:3,
238:14, 247:19,
248:6, 249:4,
250:15, 252:14,
255:6, 255:8,
258:20, 260:12,
260:16, 273:22,
278:14, 280:16,
280:22, 281:1,
281:20, 281:23,
282:9, 282:17,
284:21, 285:14,

285:19, 287:2,
287:5, 288:2,
288:12, 289:2,
289:15, 290:3,
290:5, 302:23,
304:12, 305:6,
305:16, 306:8,
306:18, 307:21,
309:19, 314:16,
315:20, 318:6,
318:8, 318:15
**testify**
26:24, 282:24,
289:24, 290:2,
293:3
**testifying**
19:16, 27:2,
31:11, 31:15,
31:18, 31:22,
57:24, 79:1,
81:7, 81:14,
81:17, 81:18,
81:20, 110:2,
282:1, 289:3,
289:7, 289:12,
289:16, 290:4,
290:6, 290:10,
290:16, 293:12
**testing**
146:14, 148:14,
148:15, 148:16,
172:4
**tests**
22:17, 147:4,
282:4, 307:19
**text**
4:12, 4:13,
87:16, 88:5,
89:14, 89:21
**th**
5:6, 27:24,
28:4, 28:7,
28:12, 28:14,
28:18, 29:3,
29:7, 29:11,
29:16, 29:19,
29:24, 98:17,
101:16, 103:9,

103:17, 103:22,
104:1, 105:16,
106:13, 106:22,
107:5, 108:17,
109:15, 109:18,
111:3, 114:6,
126:9, 127:2,
141:11, 145:2,
147:14, 160:17,
169:9, 176:17,
181:19, 181:22,
182:2, 182:3,
182:4, 182:14,
182:15, 182:22,
196:13, 249:17,
250:18, 270:21,
280:12, 280:19,
281:14, 282:20,
283:5, 283:10,
284:10, 284:14,
285:9, 285:13,
285:21, 287:8,
287:16, 287:20,
288:16, 288:22
**thank**
6:14, 35:18,
89:5, 89:13,
176:12, 207:21
**theft**
45:2, 55:1
**thefts**
38:14, 38:15,
38:18
**themselves**
5:12, 91:17,
125:9, 183:3
**thereafter**
320:10
**thing**
63:24, 75:23,
75:24, 93:22,
97:24, 135:23,
171:22, 251:22,
268:22, 269:6,
285:24
**things**
19:7, 21:24,
22:22, 27:19,

Transcript of Michael Cross
Conducted on October 16, 2020

54:11, 56:10,
56:17, 56:24,
57:2, 57:3,
57:7, 57:8,
93:23, 124:21,
127:20, 139:8,
150:11, 165:14,
165:15, 236:22,
246:20, 256:8,
286:13, 293:24,
295:12, 303:11,
307:18

**think**
23:7, 47:5,
49:9, 54:14,
58:8, 60:2,
70:3, 70:6,
70:22, 82:21,
84:14, 89:3,
95:5, 98:3,
98:10, 118:22,
124:4, 124:11,
125:1, 125:20,
136:6, 138:17,
139:18, 139:20,
140:7, 140:10,
158:3, 181:11,
191:4, 217:12,
222:7, 222:18,
222:21, 236:23,
245:21, 249:13,
259:23, 264:23,
269:17, 271:2,
279:1, 294:20,
295:10, 296:21,
297:21, 299:16,
300:3, 305:16,
315:9, 317:1

**thinking**
88:13, 124:8

**third**
3:6, 12:13,
135:5, 156:5,
250:20

**thoroughly**
150:19

**thought**
44:2, 57:3,

114:19, 124:18,
137:5, 138:6,
145:3, 153:17,
166:18, 194:14,
198:11, 229:17,
232:8, 235:9,
239:24, 251:24,
259:16, 259:17,
260:5, 262:17

**thoughts**
218:9, 266:1

**thread**
89:14

**three**
9:21, 10:20,
11:9, 11:10,
11:21, 12:6,
12:23, 46:9,
47:2, 106:19

**threw**
83:3, 83:5,
83:9, 90:10

**through**
65:16, 95:15,
99:15, 99:16,
131:19, 132:1,
162:21, 165:11,
183:19, 184:7,
191:21, 195:2,
258:14, 275:21,
280:23, 312:6

**throughout**
74:1

**thrown**
316:8

**ticket**
29:21

**tied**
269:8

**times**
6:19, 9:19,
9:21, 16:16,
18:14, 18:17,
18:22, 57:23,
61:10, 61:12,
61:13, 61:19,
67:1, 67:4,
69:23, 79:3,

92:5, 179:14,
180:15, 180:17,
180:19, 188:19,
205:12, 228:21,
271:3, 276:21,
278:24, 286:1,
303:10

**timing**
316:23

**tina's**
114:4, 128:18,
131:20, 132:8,
146:23, 169:5,
170:7

**tired**
286:7

**title**
38:17

**toaster**
117:8

**today**
5:8, 5:20, 8:5,
26:23, 27:7,
27:14, 32:8,
32:9, 32:18,
102:14, 106:21,
247:19, 248:6,
249:5, 250:16,
255:6, 258:20,
266:22, 272:7,
280:22, 281:6,
294:2, 295:5,
295:9, 304:3,
310:19, 318:5,
318:8

**today's**
5:6, 9:16

**together**
277:4, 285:16,
311:14

**told**
11:19, 25:13,
52:11, 94:4,
115:1, 115:4,
120:1, 120:7,
120:17, 121:9,
130:15, 130:16,
131:1, 147:18,

154:5, 155:8,
175:14, 185:16,
188:4, 193:11,
194:4, 194:16,
197:3, 197:17,
198:10, 198:24,
199:2, 201:18,
213:14, 214:9,
214:12, 216:16,
217:21, 225:20,
226:17, 236:7,
240:14, 243:13,
243:16, 249:11,
263:23, 265:12,
265:16, 266:10,
266:23, 267:2,
267:21, 268:1,
293:23, 294:22,
295:5, 295:7,
297:15, 305:11,
315:22, 316:2,
317:3, 317:13,
317:18, 317:20

**tom**
90:11

**took**
29:15, 37:20,
58:12, 58:14,
60:19, 95:11,
139:6, 166:22,
169:11, 169:12,
187:14, 193:20,
197:5, 197:19,
204:19, 206:15,
241:3, 244:20,
254:2, 258:14,
287:22, 288:4,
297:9

**top**
20:3, 87:24,
88:2, 109:14,
196:16

**topic**
7:1, 54:24,
124:12

**topics**
54:3

**total**
36:16, 49:9,

Transcript of Michael Cross
Conducted on October 16, 2020

368

188:16
**totally**
185:12, 236:21
**towards**
57:3, 83:21
**traffic**
29:20, 46:8,
53:1, 53:6,
53:9, 288:15,
288:23
**train**
164:21
**trained**
55:11, 58:20,
150:21, 306:24,
307:15, 308:24
**training**
39:13, 53:22,
53:24, 54:3,
54:8, 54:9,
58:22, 58:23,
60:23, 74:10,
77:3, 77:15,
92:1, 94:19,
94:21, 95:2,
95:6, 95:8,
95:9, 95:14,
124:21, 226:10,
226:11, 307:9,
307:11
**transcript**
4:8, 14:1,
87:20, 88:17,
100:20, 109:3,
141:6, 196:9,
320:8
**transit**
200:7, 200:8
**transition**
39:17
**trash**
82:7
**treat**
26:3, 26:14
**trial**
14:12, 15:15,
17:19, 17:24,
18:5, 31:15,

57:10, 57:13,
82:9, 211:20,
214:22, 216:14,
217:19, 262:17,
275:17, 276:13,
276:23, 290:6,
290:10, 290:19
**tribune**
89:23, 90:1,
90:5, 90:8
**tried**
158:3, 274:18,
295:14
**trip**
178:14, 248:9
**trouble**
127:12, 127:13,
137:23, 138:7
**true**
178:23, 232:8,
235:19, 236:11,
236:17, 320:8
**trunk**
131:19, 131:22,
132:1
**trustworthy**
112:16, 112:19,
113:13
**truth**
95:21, 95:23,
96:21, 112:22,
194:12, 197:4,
197:18, 226:1,
226:3, 226:5,
226:18, 227:2,
236:2, 279:12,
279:16
**truthful**
17:21, 18:6,
26:23, 27:8,
27:14, 96:23,
127:10, 127:14,
127:19, 137:11,
137:14, 138:2,
140:24, 228:22,
255:1, 278:16,
293:9, 294:11,
294:16

**truthfully**
98:1
**try**
59:24, 139:17,
150:1, 152:14,
152:17, 238:19,
239:1, 295:9,
295:16
**trying**
17:1, 23:16,
59:20, 124:11,
124:16, 125:1,
125:8, 125:20,
125:22, 127:18,
127:19, 128:1,
128:3, 136:13,
136:16, 138:11,
138:12, 139:21,
143:18, 159:8,
210:7, 210:9,
214:12, 230:14,
252:9, 253:10,
255:22, 261:18,
280:23, 281:3,
299:10
**tuesday**
245:11
**turn**
78:7, 86:7,
141:3, 155:12,
196:15, 298:3
**turned**
86:11, 117:16,
144:8, 144:9
**tv**
117:13, 117:14,
117:16, 118:8,
143:14, 143:15,
144:6, 144:8,
145:3, 147:8,
233:20, 251:8,
251:14
**twice**
156:7, 189:9,
189:16, 190:7
**two**
10:20, 10:23,
11:18, 12:6,

12:22, 16:4,
21:13, 26:6,
27:6, 33:15,
33:21, 33:22,
37:8, 37:20,
101:8, 101:14,
101:19, 101:23,
102:6, 106:8,
108:2, 136:1,
217:3, 221:8,
247:13, 247:17,
247:20, 315:8
**tying**
318:19
**type**
55:1, 69:14,
146:6, 146:10,
148:18
**types**
38:8, 38:11
**typewriting**
320:11

U

**uh-huh**
50:23
**ultimately**
40:7, 236:1
**unable**
62:11, 293:13
**unclear**
159:7
**under**
52:12, 64:2,
70:19, 70:24,
137:7, 137:10,
137:12, 137:24,
138:7, 294:7,
294:11, 320:11
**understand**
7:20, 8:11,
8:15, 8:16,
8:24, 11:19,
25:6, 59:16,
63:23, 83:24,
84:9, 92:4,
92:19, 95:1,
136:13, 136:14,

Transcript of Michael Cross
Conducted on October 16, 2020

136:17, 137:21,
158:16, 158:23,
182:5, 219:22,
276:22, 286:11,
291:14, 294:10
**understanding**
21:9, 23:19,
64:18, 90:16,
112:7, 298:20,
304:16
**understood**
90:12, 224:2,
224:5, 258:9,
304:9
**undertake**
299:9
**undetermined**
268:11
**unfair**
295:11, 297:21
**uninvolved**
278:5
**unique**
8:5
**unit**
51:8, 51:10,
51:13, 74:2,
74:22, 100:6
**united**
1:1
**university**
33:12, 33:14
**unless**
261:6
**unnecessary**
62:3
**unrelated**
157:21, 288:15,
288:23
**unsure**
268:7
**until**
20:8, 36:21,
37:11, 60:3,
70:10, 100:22,
117:23, 138:17,
140:8, 176:23,
178:8, 196:19,

202:9, 234:22,
245:9, 245:24,
250:10, 258:15,
302:1
**unusual**
81:15, 206:3,
206:8, 214:3,
214:6
**updates**
24:19
**upset**
111:18, 122:21,
122:24, 124:4,
129:2, 129:7,
129:13, 222:12,
222:17
**upsetting**
124:12
**use**
61:11, 61:20,
68:6, 164:15,
164:16, 164:17,
242:6, 242:17,
242:18, 251:7
**using**
62:4, 172:21,
242:9, 251:12
**usually**
172:24, 201:15,
303:24

---

**V**

**vague**
70:22, 71:22
**vaguely**
28:5, 60:15,
60:17, 60:18
**various**
318:2
**vcr**
29:24, 117:12,
117:13, 117:15,
117:17, 117:19,
143:14, 143:15,
144:2, 144:9,
144:10, 144:15,
144:18, 145:3,
147:8, 171:9

**vehicle**
310:15, 310:17
**verbal**
8:8, 240:21,
241:24
**version**
133:19
**versions**
161:5, 161:13
**versus**
7:16, 7:17,
143:19
**vested**
149:16
**vicinity**
174:18
**video**
5:7, 5:9
**videographer**
3:19, 5:2, 5:8,
5:19, 56:11,
80:19, 80:22,
138:24, 139:3,
207:22, 208:1,
263:8, 263:11,
286:16, 286:19,
300:19, 300:22,
316:22, 319:4
**videotaped**
1:13, 2:1, 5:3
**videotapes**
171:10
**view**
66:7, 68:13,
69:6, 146:10
**viewing**
99:17, 99:18,
113:6, 159:12
**visit**
22:10, 176:20,
178:2
**visited**
177:3
**vodka**
132:11, 132:23,
134:21, 134:24,
135:8, 135:11,
135:13, 136:15,

147:20, 147:24,
148:4, 148:11,
148:17, 148:23,
149:5, 149:12,
232:14, 232:19,
233:3, 234:4,
234:8, 237:22,
238:6, 238:10,
240:6, 256:15,
256:22, 260:18,
269:1, 270:16,
270:20, 317:6
**vodka-soaked**
233:7, 243:11,
243:20, 268:15
**voice**
122:17, 123:4,
123:7, 125:6,
125:8, 226:23,
226:24
**voluntariness**
93:14, 93:19,
94:10, 97:1,
97:5
**voluntary**
91:10, 91:22,
92:2, 92:22,
93:1, 93:9,
94:14, 94:17,
95:4, 95:16,
96:3, 96:5,
96:17, 96:22,
97:14, 112:12

---

**W**

**wait**
274:9
**waited**
178:8
**waiting**
176:23, 177:1
**waiver**
248:14
**walk**
181:19, 203:18,
213:7, 312:8,
312:16
**walked**
181:15, 184:6,

Transcript of Michael Cross
Conducted on October 16, 2020

370

184:8, 203:16,
203:17, 203:20,
251:21, 252:6,
252:21, 253:6,
293:19
**walking**
294:14
**wall**
255:11, 314:18,
315:1, 315:3,
315:7
**wallet**
199:22
**walls**
99:23
**want**
25:1, 53:22,
53:24, 55:5,
62:15, 77:7,
97:15, 114:14,
124:4, 132:13,
133:21, 135:21,
135:22, 140:4,
159:9, 163:17,
176:7, 196:20,
237:5, 237:8,
247:7, 266:17,
275:8, 279:11,
279:14, 281:7,
285:24, 286:4,
297:20, 299:13,
299:19, 299:21,
300:1, 300:10,
300:16
**wanted**
27:22, 57:8,
165:4, 176:6,
177:15, 182:14,
185:8, 185:14,
185:19, 197:4,
197:18, 199:7,
233:20, 242:13,
251:11, 272:22,
278:9, 279:4,
281:9, 297:9
**wanting**
96:23
**warnings**
248:14

**watching**
130:23, 159:11,
317:3
**way**
26:11, 43:18,
54:6, 62:18,
66:7, 86:22,
89:5, 93:10,
100:17, 112:7,
119:1, 119:3,
157:11, 157:12,
158:19, 158:20,
158:21, 160:23,
162:13, 165:14,
174:3, 174:7,
176:2, 179:4,
179:6, 182:6,
182:15, 199:15,
200:11, 202:4,
205:1, 207:17,
208:23, 209:2,
210:22, 227:6,
235:5, 245:24,
258:15, 278:21,
279:1, 279:6,
281:10, 295:21
**ways**
21:23, 156:20,
158:8, 158:12,
158:13, 159:4,
159:9, 181:21
**we'll**
11:22, 18:3,
138:19, 139:22,
297:18, 319:3
**we're**
8:22, 25:9,
32:4, 85:13,
140:12, 286:16,
300:19, 300:22,
319:2, 319:4
**we've**
32:8, 96:18,
296:19, 301:15,
302:1
**wearing**
173:13, 173:17
**week**
12:15

**went**
33:12, 36:8,
36:13, 37:7,
37:22, 40:8,
44:3, 54:20,
56:20, 99:15,
102:16, 102:22,
104:5, 107:21,
108:3, 116:2,
130:9, 130:10,
130:14, 130:18,
130:19, 131:7,
131:11, 143:12,
155:23, 156:2,
160:10, 161:19,
170:9, 174:3,
174:19, 179:3,
180:4, 193:8,
194:1, 199:4,
202:5, 211:15,
211:16, 219:10,
224:16, 228:3,
241:9, 254:7,
255:9, 256:7,
260:6, 266:4,
269:7, 276:5,
276:18, 291:22,
310:11, 311:17,
314:16, 314:24
**weren't**
20:15, 184:3,
191:24, 204:3,
213:23, 229:18,
277:5
**whatever**
133:21, 285:23,
286:4, 307:18
**whereof**
320:16
**whether**
65:14, 65:20,
91:21, 92:15,
92:24, 93:8,
94:14, 95:15,
96:16, 106:4,
107:16, 110:12,
112:11, 112:15,
113:12, 113:15,

114:10, 129:7,
137:13, 137:14,
138:12, 141:21,
143:18, 144:11,
144:18, 145:11,
146:14, 146:23,
147:7, 147:8,
148:17, 149:12,
168:22, 171:14,
171:19, 172:4,
172:14, 173:16,
173:19, 185:9,
194:11, 195:21,
240:20, 268:9,
279:9, 280:6
**whoever**
167:2
**whole**
205:11
**wife**
21:1, 125:9,
277:9
**william**
1:5, 25:2,
25:16, 196:11
**willing**
199:6, 199:8,
199:11, 296:7,
300:11
**windows**
47:9
**within**
11:15, 12:15,
15:5, 38:11,
38:21, 41:9,
42:24, 57:18,
65:7, 74:21,
102:11, 106:21,
118:5, 126:14,
147:24, 148:6,
150:16, 152:7,
203:23, 205:3,
205:24, 247:17,
247:20, 248:7,
249:5, 295:24,
305:12
**without**
25:12, 28:10,

Transcript of Michael Cross
Conducted on October 16, 2020

371

29:8, 32:13,
53:12, 103:12,
104:3, 104:23,
154:23, 156:15,
174:6, 184:6,
280:10, 282:7,
298:18
**witness**
5:17, 5:21,
5:22, 6:14,
6:22, 13:5,
23:17, 24:1,
35:17, 35:19,
51:1, 56:7,
56:12, 56:15,
63:9, 64:23,
65:13, 69:19,
70:4, 71:16,
79:16, 88:19,
91:17, 93:7,
93:18, 96:1,
97:9, 97:13,
112:24, 127:16,
128:9, 138:19,
138:23, 140:2,
152:1, 176:9,
176:12, 180:10,
180:13, 207:18,
207:21, 215:5,
216:1, 216:6,
216:10, 217:18,
221:23, 222:15,
231:12, 231:14,
231:18, 237:3,
237:7, 237:17,
245:17, 245:20,
245:23, 246:2,
247:3, 247:7,
247:11, 273:12,
278:18, 284:3,
284:6, 286:7,
286:11, 286:13,
302:11, 320:16
**witnesses**
56:10, 56:17,
56:19, 76:14,
151:4, 204:15
**word**
52:1, 286:3,

286:4
**work**
46:6, 46:11,
46:13, 46:20,
47:15, 47:18,
48:3, 48:6,
48:9, 50:1,
54:6, 55:11
**worked**
35:7, 35:8,
36:7, 36:10,
36:12, 43:19,
46:16, 46:22,
47:4, 47:13,
47:22, 48:21,
48:24, 74:11,
152:4, 302:14,
304:5, 305:12,
305:22, 308:10
**worker**
43:20
**workers**
43:18
**working**
34:16, 34:20,
39:4, 142:20,
271:15, 306:1
**worse**
20:10, 20:22,
21:5, 137:7,
137:8, 137:10,
137:23
**would"**
257:8
**wouldn't**
61:24, 62:12,
68:20, 70:9,
84:24, 85:5,
112:17, 136:17,
145:1, 150:13,
154:13, 154:22,
156:13, 157:17,
174:6, 189:14,
189:15, 190:9,
190:11, 190:12,
200:6, 214:2,
215:19, 216:7,
220:10, 220:13,

220:15, 224:10,
236:15, 259:15,
259:19, 261:21,
265:22, 266:13,
274:22, 275:2,
275:4, 282:15
**wrap**
317:1
**write**
55:23, 56:2,
56:6, 56:9,
56:15, 56:16,
57:7, 135:22,
135:23, 136:10,
236:16, 260:7,
266:18, 266:19,
266:20
**write"**
257:12
**writing**
55:19, 55:21,
135:22, 135:24,
136:2, 236:9,
258:24
**written**
13:21, 57:15,
57:20, 136:8,
230:20, 230:24,
236:4, 240:21,
241:1, 241:4,
241:7, 241:20,
250:14, 252:13,
257:8, 260:9,
261:14, 261:17,
265:5, 265:9,
265:24, 266:13
**wrong**
88:20, 89:6
**wrote**
13:12, 14:1,
29:15, 56:18,
57:8, 101:2,
136:22, 236:4,
250:21, 252:5,
253:20, 254:24,
260:16, 261:10,
266:3, 266:6,
266:17, 272:11,

287:21

---
**Y**
---

**yeah**
21:3, 47:9,
47:11, 55:8,
56:14, 61:19,
66:20, 82:23,
122:16, 135:9,
138:20, 155:3,
171:6, 177:17,
178:10, 182:10,
187:23, 206:9,
231:18, 251:23,
263:7, 268:20,
277:17, 280:16,
316:12
**year**
10:7, 10:10,
10:11, 34:10,
37:9, 39:18,
106:19, 276:7
**years**
21:13, 21:19,
33:15, 33:21,
37:4, 37:8,
37:17, 37:20,
37:23, 39:4,
49:8, 49:9,
49:13, 63:2,
94:20, 96:19,
106:19, 302:14,
302:20
**yell**
226:2
**yelled**
225:24, 226:20,
227:3, 232:1
**yes-or-no**
189:23
**yesterday**
14:21, 14:23,
15:7, 15:10,
16:7, 16:11,
16:17
**york**
33:3
**yourself**
50:7, 50:10,

Transcript of Michael Cross
Conducted on October 16, 2020

372

| | | | |
|---|---|---|---|
| 50:12, 50:15, 50:18, 101:11, 276:8, 307:3 | 249:17, 250:18, 270:21 | **13** 319:5, 319:6 | 44:4 |
| | **100** | **14** | **1990** |
| **$** | 4:14, 72:17, | 28:14, 28:18, | 39:22, 39:23, |
| **$100,000** | 180:15 | 29:3, 29:7, | 58:7, 58:8, 59:7 |
| 120:19 | **109** | 283:10, 284:10, | **1995** |
| | 4:15 | 284:14, 285:9, | 19:14, 19:24, |
| **0** | **11** | 285:13, 285:21 | 20:19, 25:4, |
| **0/3/95** | 28:4, 80:20, | **141** | 25:17, 27:24, |
| 245:23 | 80:21, 80:23, | 4:16 | 28:4, 28:7, |
| **00** | 108:17, 109:18, | **15** | 28:12, 28:14, |
| 101:15, 162:1, | 114:6, 126:9, | 29:11, 29:16, | 28:18, 29:3, |
| 181:11, 190:23, | 169:9, 211:4, | 29:19, 49:21, | 29:7, 29:11, |
| 192:13, 201:5, | 211:7, 213:21, | 49:22, 176:17, | 29:16, 29:19, |
| 202:6, 214:16, | 280:12, 280:19, | 207:23, 207:24, | 29:24, 30:3, |
| 214:23, 245:3, | 313:12 | 245:11, 245:23, | 30:6, 30:16, |
| 245:5, 258:2 | **11273** | 287:8, 287:16, | 30:19, 31:4, |
| **003733** | 4:16, 155:13 | 287:20, 288:16, | 32:17, 39:24, |
| 320:4 | **11276** | 288:22 | 45:7, 45:19, |
| **03** | 245:22, 246:10, | **150** | 46:1, 47:3, |
| 245:11 | 247:5, 247:12 | 3:14 | 47:5, 48:7, |
| **06** | **11277** | **16** | 48:9, 48:20, |
| 139:1, 139:2 | 247:3, 248:1 | 1:15, 5:6, | 49:10, 49:12, |
| **084** | **11279** | 320:20 | 49:15, 50:2, |
| 320:4 | 4:16, 155:13 | **18** | 50:21, 58:7, |
| | **11588** | 1:7, 5:5 | 58:17, 59:5, |
| **1** | 89:12 | **19** | 72:23, 75:12, |
| **1** | **11589** | 10:12, 39:24 | 76:5, 101:10, |
| 139:1, 139:2, | 89:12 | **196** | 101:16, 103:9, |
| 139:4, 245:3, | **12** | 4:17 | 103:17, 103:22, |
| 245:5 | 28:7, 28:12, | **1967** | 104:1, 105:16, |
| **10** | 181:19, 181:22, | 33:5 | 106:4, 106:13, |
| 27:24, 49:23, | 182:2, 182:3, | **1968** | 106:22, 107:5, |
| 67:8, 98:17, | 182:4, 182:14, | 34:11, 34:24 | 108:17, 109:15, |
| 101:10, 101:15, | 182:15, 182:22, | **1970** | 109:18, 111:3, |
| 101:16, 103:9, | 196:18, 196:19, | 34:18, 34:24, | 114:6, 126:9, |
| 103:17, 103:22, | 196:22, 197:2, | 36:20, 37:5, | 127:2, 145:2, |
| 104:1, 105:16, | 197:13, 224:22, | 37:11, 43:7, | 147:15, 160:17, |
| 106:4, 106:13, | 281:14, 282:20, | 302:18 | 169:9, 209:24, |
| 106:22, 107:5, | 283:5 | **1974** | 223:16, 228:15, |
| 109:15, 111:3, | **12754** | 37:18, 43:7 | 229:2, 229:8, |
| 114:6, 127:2, | 4:15, 109:5 | **1977** | 229:22, 230:5, |
| 147:14, 160:17, | **12761** | 37:5 | 242:12, 246:6, |
| 200:2, 200:5, | 4:15, 109:5 | **1978** | 247:22, 249:17, |
| 200:9, 201:8, | **12779** | 37:18, 38:4, | 250:18, 255:5, |
| 212:16, 212:17, | 4:14, 100:22 | 44:4 | 258:22, 261:12, |
| 221:3, 245:11, | **12788** | **1980** | 261:14, 270:21, |
| | 4:14, 100:22 | 38:4, 38:6, | 280:13, 280:19, |
| | | | 281:14, 282:20, |

283:6, 283:10,
284:10, 284:14,
285:9, 285:13,
285:21, 287:8,
287:16, 287:20,
288:16, 288:22,
312:10
**1997**
14:12, 15:1,
15:15, 17:20,
17:24, 19:20,
31:15, 32:18,
275:17, 275:23,
276:13, 276:23,
290:6, 290:10,
290:19

**2**

**2**
162:1, 245:11,
245:23
**20**
67:10, 180:19,
182:8, 212:19,
221:10
**2000**
28:19, 39:20,
39:21, 40:18
**2008**
19:6, 20:7,
20:10, 23:2,
23:4, 302:21
**2017**
277:13
**2018**
4:17, 14:15,
15:4, 15:19,
18:4, 19:2,
19:16, 19:20,
20:7, 20:11,
20:15, 20:18,
20:20, 21:4,
24:18, 25:19,
32:2, 36:19,
36:21, 78:8,
78:10, 78:17,
78:21, 78:24,
79:6, 80:10,

81:3, 81:7,
81:10, 82:1,
82:4, 82:13,
83:13, 85:21,
87:11, 87:14,
87:17, 88:9,
196:11, 196:13,
198:15, 218:2,
277:13, 290:22,
306:17
**2019**
9:9, 9:10,
9:13, 36:18,
36:19, 302:24
**2020**
1:15, 5:6,
320:18
**2021**
320:20
**218**
27:24, 28:19,
29:2, 31:8,
98:17, 285:12,
286:23
**23**
207:24, 208:2
**24**
286:17, 286:18
**243**
3:8
**2523**
1:7, 5:5
**26**
196:13
**27**
80:20, 80:21
**28905**
4:17, 196:14
**28989**
196:18
**28990**
196:18
**29**
29:24, 141:11,
145:2
**29107**
4:17, 196:14

**3**

**3**
207:23, 207:24,

208:2, 258:2
**30**
99:2, 200:2,
200:5, 200:9,
211:4, 211:7,
213:21, 286:18,
286:20, 313:12
**302**
4:4
**311**
3:5
**312**
3:8
**318**
4:5
**320**
1:23
**327818**
1:22
**3300**
3:16
**37**
80:21, 80:23
**38**
302:16, 302:20
**39**
263:9, 263:10
**3rd**
30:3, 30:6,
30:15, 30:19,
155:16, 155:19,
169:24, 170:10,
172:17, 173:22,
176:17, 178:3,
181:7, 209:24,
223:16, 228:15,
229:1, 229:7,
229:22, 230:5,
246:6, 247:22,
255:5, 258:22,
261:11, 274:2,
274:5, 320:17

**4**

**4**
181:11, 190:23,
263:9, 263:10,
263:12

**400**
2:5, 5:10
**42**
1:16, 5:7
**420**
2:7
**44**
300:20, 300:21
**45**
244:1
**48**
139:2, 139:4,
300:21, 300:23
**4th**
31:3, 170:1,
258:22, 261:13

**5**

**5**
99:2, 286:17,
286:18, 286:20,
300:20, 300:21,
300:23
**50**
67:12, 73:19,
180:17
**54**
263:10, 263:12
**550**
3:13
**5900**
3:8
**5:**
201:5, 202:6
**5:-ish**
192:13

**6**

**6**
319:5, 319:6
**60143**
3:15
**60540**
2:6
**60607**
3:7
**6111**
2:7

Transcript of Michael Cross
Conducted on October 16, 2020                                      374

**630**
2:7, 3:16

**7**

**7**
214:16, 214:23
**735**
3:16
**74**
37:11

**8**

**80**
38:7
**81**
38:7
**85**
196:15, 196:19,
196:22, 197:10,
197:11
**86**
196:19, 196:22,
196:23
**87**
4:12
**88**
4:13

**9**

**9**
1:16, 5:7,
201:8
**95**
39:24, 245:11





**Mike**

Text Message
Tue, Feb 20, 16:28

Bob, any verdict in the Amor case. I called Tom but he didn't call me back.

Should be announced tomorrow. I'm not hopeful

I hope you are wrong.



Wed, Feb 21, 11:39

chicagotribune.com 

Wed, Feb 21, 13:34



I really don't believe that.

  Text Message 

     

  

**Mike**

 chicagotribune.com

Wed, Feb 21, 13:34

I really don't believe that.

I'm not surprised after Judge Brennan threw out the first conviction. Tom Minser said the Miceli family understood the ruling but were disappointed.

So, when is he going to sue everyone?

Soon

I guess I should let NPD know.

 Yes



I will.

   Text Message 

     

NAPERVILLE POLICE DEPARTMENT
INVESTIGATIVE SUPPLEMENTARY REPORT
[✓] Original     [ ] Copy

Page 1 of  10                                              I.R. #

7632 Sudden Death, Suspicious Circumstances

Name: Miceli, Marianne R.                                        Add

Offense Classification: 0110 Homicide, Murder - First Degree.

Offense Classification: 1025 Aggravated Arson.

Victim: Miceli, Marianne R. F/W, REDACTED, 218 E. Bailey Rd. Unit M,
        Naperville, Il. 527-1720.

Other: Amor, Tina M. F/W, REDACTED, 218 E. Bailey Rd. Unit M, Naperville, Il.
       527-1720.

Other: Amor, William E. M/W, REDACTED 218 E. Bailey Rd. Unit M. Naperville,
       Il. 527-1720.

Other: Leavenworth, Gary J. M/W, REDACTED 1008 Muirhead Naperville, Il.
       420-1978, (Brother-in-law).

Other: Leavenworth, Pamela K. F/W, REDACTED 1008 Muirhead Naperville, Il.
       420-1978, (Sister).

Other: Froderman, Kathleen M. F/W, REDACTED 208 E. Bailey Rd. Unit C.
       Naperville, Il. 983-1978, (Sister).

Other: Ripsky, REDACTED F/W, ████████████████████

Other: Powers/Bretzman, Patricia A. F/W, 716 Julius, Lake Charles La.
       (818474-6608, work (318)491-7789, (Sister).

Other: Powers, Philip C. M/W, REDACTED 11107 Callanish Park Dr. Austin
       (512)335-0441, work (512)823-2400, (Brother-in-law).

Business: American States Insurance Co. 100 W. 22nd St. Suite 185, Lombard,
          Il. 60148, 268-3530, agent for condo Assoc. policy, Jeff Heimerl.

Business: State Farm Insurance Co. 185 N. Randall Rd. Batavia, Il.
          406-5081; agent for Dwelling policy, Roger Krupp.

Business: Metropolitan Life Insurance Policy # REDACTED .

EXHIBIT
Cross
3
18-16-20

| Additional Reports | | | | Distribution: | ☐ COP  ☐ JUV  ☐ INV  ☐ TR |
| --- | --- | --- | --- | --- | --- |
| | | | | | ☐ B OF I ☐ OTHER: |
| W/C Approval | Assignments | F/U Date | Status Code | Pims Entry | Additional F/U |
| Officers Signature: M. Cross | | | | | Badge Number: 131 |

DEFS

NAPERVILLE POLICE DEPARTMENT
INVESTIGATIVE SUPPLEMENTARY REPORT
[ ✓ ] Original     [ ] Copy

Page 2 of  10                                              I.R. # 95-42 127

7632 Sudden Death, Suspicious Circumstances

Name: Miceli, Marianne R.                                          Add

---

**Sun. 09/10/95, 2000 Hrs.**

I, Inv. Cross #131 responded to the scene of a fire investigation at 218 E.
Bailey Rd. unit M.  Upon arriving at the scene I met with Sgt. Bedell, Fire
Investigator Lt. Dave Ferreri and Inv. Guerrieri who advised me that
the occupants of the apartment, Marianne Miceli had been taken to
Hospital but had expired.  I was advised that there were two other occupants
of the apartment but they were not home at the time of the fire and had not
been located.  The other two occupants are the victims daughter Tina
Amor and her husband Bill Amor.  I was also advised that relatives
coroner were at the hospital.

I was told that the fire was first reported by the victim who called 911.  I
entered unit M and observed extensive fire damage in the living room area.
The majority of the fire damage was along the West wall in the area of
patio doors.  The damage radiated out from that area.  The unit has two
bedrooms along a hallway that runs in a northerly direction from between the
living room and dining room area.  The first room on the left along the west
side of the hall had minor smoke and water damage due to the door being
closed during the fire.  That bedroom was Tina and Bill Amor's room.  The
second bedroom along the same side of the hall was the victims room.
door was open during the fire and received heat and sever smoke damage.


**Sun. 09/10/95, 2105 Hrs.**

I went to Edward Hospital and met with Deputy Coroner Tom Doggett.
Doggett advised me that an autopsy would be held tomorrow morning at 1000
hours.  We viewed the body which had burns on the top of the feet, legs and
right side.  I noticed soot around the nose.  No trauma besides the burns was
noticed.  A more thorough examination of the body will be conducted at the
autopsy.

I then met with family members Gary Leavenworth, Pam Leavenworth, Kathleen
Froderman and Jeanne Ripsky in the hospital's, Family room.  I received the
following information.  Marianne and her daughter have lived in the unit for
about three years.  Bill Amor has lived there for about a year.  He married
Tina last April.  The family was not happy with the marriage due to the age
difference, Tina being 18 and Bill being in his late thirties.  (The family

| Additional Reports | | | | | Distribution: | ☐ COP  ☐ JUV  ☐ | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | ☐ B OF 1 ☐ OTHER: | |
| W/C Approval | Assignments | F/U Date | Status Code | Pims Entry | | Additional F/U | Final |
| | | | 5 | | | | |
| Officers Signature: *M. Cross* | | | | | | Badge Number:  131 | |

DEFS 12780

NAPERVILLE POLICE DEPARTMENT
INVESTIGATIVE SUPPLEMENTARY REPORT
[✓] Original      [ ] Copy

Page 3 of __10__                                    I.R. # 95-42030

7632 Sudden Death, Suspicious Circumstances

**Name: Miceli, Marianne R.**

members were not sure of Bills age).  They also advised me that Bill
part of the summer in the DuPage County Jail for forgery and is unemployed.
Tina works at Edwardo's Pizza.  The family contacted Edwardo's but Tina was
not working.  They were unaware where Tina and Bill were.

Pam and Gary Leavenworth advised me that Marianne was hit by a car
was three years old and was handicapped since the accident.  She
partial use of her left hand and arm and walked with a pronounced limp.  She
had poor vision but was able to get around without much trouble.  They also
advised me that Marianne was suffered from Manic Depression.  She took a form
of lithium, blood pressure medication and sometimes took a sedative to sleep.
Recently she was also diagnosed as having diabetes.  I asked who Marianne's
doctor is.  Pam advised me that she sees Dr. Schultz who's office is at
Hobson Rd. and Naper Blvd. and Dr. Haddad.  I asked who last talked to
Marianne and was advised that her sister Kathy Froderman spoke to her this
morning.  Kathy could not remember what time she talked to Marianne but said
that everything seemed fine.  Tina's father is Phill Miceli.  He and Marianne
have been divorced for about five years.  Phill Miceli is re-married and
lives in Lombard.

I concluded the interviews and returned to the fire scene.  Lt. Ferreri Fire
Fighter Steve Hinze, Officer Ensworth, Officer Goergen and Eliz...
were processing.  Inv. Guerrieri had completed an initial neighbor...
investigation.  Inv. Guerrieri and I returned to the police department and
did PIMS checks in an attempt to determine where Tina and Bill may be.  That
met with negative results.  We then returned to the scene.  While on the way
back to 218 E. Bailey were informed that Tina and Bill had arrived.  When we
arrived we were advised that Bill and Tina had left.  They were at Gary and
Pan Leavenworth's house.  Inv. Guerreri and I went to 1008 Muirhead to
interview Tina and Bill.  See separate reports for those interviews.  After
the interviews we returned to the fire scene.  After talking to evidence
technicians and Fire Investigator Ferreri we returned to the Leavenworth's
and obtained a permission to search Tina and Bill's bedroom at 3:45 ... We
returned and conducted a search of the bedroom.  Misc. letters written by
Bill Amor to Tina were located in the room and collected by Elizabeth
Guerrero.

| Additional Reports | | | | Distribution: | ☐ COP  ☐ JUV  ☐ INV |  |
|---|---|---|---|---|---|---|
| | | | | | ☐ B OF I ☐ OTHER: | |
| W/C Approval | Assignments | F/U Date | Status Code | Pims Entry | Additional F/U | Final Closure |
| | | | 3 | | | |
| Officers Signature: | M. Cross | | | | Badge Number: 131 | |

NAPERVILLE POLICE DEPARTMENT
INVESTIGATIVE SUPPLEMENTARY REPORT
[✓] Original       [ ] Copy

Page 4 of __10__                                                    I.R. # 95-42030

7632 Sudden Death, Suspicious Circumstances

Name: Miceli, Marianne R.

---

**Mon. 09/11/95, 0900 Hrs.**

Investigators Guerrieri, Ferreri and I attended the autopsy at the DuPage County Morgue. Dr. Teas conducted the autopsy and DuPage County Evidence Technician Ray Rodriguez took photographs. After the autopsy Dr. Teas advised us that the burns on the victims body were radiation type burns not contact burns. She advised that the victim died of carbon monoxide poisoning due to smoke inhalation.

**Mon. 09/11/95, 1020 Hrs.**

Sgt. Carlson and Inv. Sullivan received permission from Tina and Bill to search their storage locker. Inv. Guerreri and I searched the locker at 1:00P.M.. Nothing was removed. Tina and her aunt Patricia Powers / Bretzman entered the apartment to retrieve some of Tina's personal property.

**Tues. 09/12/95, 1800 Hrs.**

Inv. Griffith, Ferreri and I obtained a permission to search from Bill Powers, the actual owner of the condo and re-entered to examine burn patterns we noticed in photo's from the scene. Inv. Griffith took several more photos. At 1630 Hrs. I recovered two cans of lighter fluid from a kitchen cabinet under the sink. At 1650 I recovered a patch of unburned carpet at the request of Sgt. Carlson.

**Tues. 09/12/95, 1600 Hrs. through 2100 Hrs.**

The victim's wake was held.

**Wed. 09/13/95.**

The victim's funeral was held.

**Thurs. 09/14/95, 0730 Hrs.**

I attended a Critique of the response to the fire at the Fire Station.

I was advised by Pam Leavenworth that Tina and Bill would be staying at Exel. The family rented them a room for two weeks.

| Additional Reports | | | | Distribution: | ☐ COP ☐ JUV ☐ INV ☐ TR | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | | ☐ B OF I ☐ OTHER: | |
| W/C Approval | Assignments | F/U Date | Status Code | Pims Entry | Additional F/U | |
| Officers Signature: M. Cross | | | | | Badge Number: 131 | |

DEFS 12792

NAPERVILLE POLICE DEPARTMENT
INVESTIGATIVE SUPPLEMENTARY REPORT
[✓] Original     [ ] Copy

Page 5 of  10                                    I.R. # 95-42030

7632 Sudden Death, Suspicious Circumstances

**Name: Miceli, Marianne R.**

---

I met with Inv. Ferreri, Inv. Griffith and Special Agent Mitch Kushner of the
State Fire Marshal's office.  Inv. Kushner reviewed the photographs and we
then went to the scene.

**Thurs. 09/14/95, 1300 Hrs.**

Phil Powers signed another Permission to Search form.  Inv. Griffith, Ferreri
and I re-entered the fire scene with the Fire Marshal.  Agent Kushner felt
that the fire started in or near the swivel rocker that was between the couch
and the sliding glass doors in the south west corner of the living
cited the extensive damage to the chair which was almost comple
and noted the spread of the fire from that point.  He also noted
burn in the north west corner behind the television.  See his repo  for
details.  Agent Kushner suggested we find out if anyone sat in that
day of the fire.  His report is attached.

Inv. Ferreri and I discussed a list of nine questions we needed to ask Tina
and Bill Amor.  The questions were as follows.

1. **Where was everyone sitting in the living room throughout the day?**
2. **Did anyone sit in the swivel rocker while they were smoking?**
3. **What windows and doors were open and what was closed?**
4. **Was Marianne's bedroom window and door open?**
5. **Was their bedroom door open or closed and was it locked?**
6. **If the door was locked, why?**
7. **Did they lock the front door when they left?**
8. **Were the television or VCR turned off?**
9. **When was the charcoal lighter fluid purchased?**

**Thurs. 09/14/95, 1440 Hrs.**

Inv. Ferreri and I went to room 217 at the Exel Inn.  I spoke t
room and Inv. Ferreri spoke to Bill outside in the hall.  Following is the
sum and substance of Tina's interview.  Tina said that Marianne sat in her
chair all day.  They referred to the chair as her throne.  She went into the
bedroom five to ten minutes before they finished watching the football games.
Bill started out on the couch but moved to the floor.  Tina was on the
and moved to the floor to lay next to Bill.

| Additional Reports | | | | Distribution: | ☐ COP | ☐ JUV | ☐ INV | ☐ TR | ☐ CP |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | ☐ B OF I | ☐ OTHER: | | | |
| W/C Approval | Assignments | F/U Date | Status Code | Pims Entry | | | Additional F/U | | Final |
| | | | 3 | | | | | | |
| Officers Signature: *M. Cross* | | | | | | | Badge Number: 131 | | |

NAPERVILLE POLICE DEPARTMENT
INVESTIGATIVE SUPPLEMENTARY REPORT
[✓] Original       [ ] Copy

Page 6 of __10__                                                I.R. #

7632 Sudden Death, Suspicious Circumstances

**Name: Miceli, Marianne R.**                                              **Add**

---

A few minutes after mom went into the bedroom they got up to get ready
to the show.  Marianne wanted a back rub.  Bill said he would do it.
went into the bathroom and Bill gave her the back rub.  When Tina came out of
the bathroom Bill was giving Marianne her back rub.  Tina lit a cigarette and
sat down in mom's chair.  She took two or three drags of the cigarette and
got up to pour the strawberry daiquiri into a container.  This is when she
doesn't remember what she did with the cigarette.  She then called
and he came out.  Bill picked up the cooler and a blanket and they
leave.  Tina told him that she didn't remember what she did with the
cigarette and he said not to worry about it.  When they were walking out Tina
stopped and went back to the dining room table to get something
not remember what but thought it could have been her keys or cigar
walked out and Bill was half way down the stairs.  She locked the door and
left.  I asked if she locked the dead bolt.  She said she didn't.  I asked if
she noticed anything unusual when she left.  Tina said she didn't.  I asked
if she saw any smoke or fire when she left.  She said she did not.

I asked if the sliding glass door was open.  Tina said she was not
it may have been open a crack because that is how they keep it sometimes.  I
asked which way the door slides.  Tina said it slid open from the side the TV
was on toward the air conditioner and pile of boxes.  I asked Tina how she
tripped on the chair when`she came in from the patio if it was not in front
of the part of the door that opens.  Tina said she tripped on a three
that was in front of the door, not the chair. I told her that during the
initial interview she told Inv. Guerrieri and I that she tripped on the chair
and spilled the lighter fluid.  Tina said she thought she told us she tripped
on the rug.  I asked if the vertical blinds were open.  Tina said
they were.

I asked if her mothers bedroom door was open.  Tina said it was and she could
hear her mother talking on the phone.  I asked Tina if her bedroom door was
open or closed.  She said it was closed.  I asked if it was locked.  She said
it was.  I asked her why it was locked and Tina replied that they always lock
it.  I asked her why.  She said she doesn't know, because you don't need a
key to open it.  All you have to do is stick something into the slot and it
will open.  Tina said she opens it with her nail.  I asked if her mothers
bedroom window was open and Tina replied that she didn't know.

<table>
<tr><td>Additional Reports</td><td colspan="2">Distribution:</td><td>☐ COP   ☐ JUV   ☐ INV   ☐ TR   ☐ CP</td></tr>
<tr><td></td><td></td><td></td><td>☐ B OF I ☐ OTHER:</td></tr>
</table>

| H/C Approval | Assignments | F/U Date | Status Code | Pims Entry | Additional |
|---|---|---|---|---|---|
| | | | | | |

Officers Signature: _M. Cross_                     Badge Number: 131

**DEFS**

NAPERVILLE POLICE DEPARTMENT
INVESTIGATIVE SUPPLEMENTARY REPORT
[ ✓ ] Original        [ ] Copy

Page 7 of  10                                              I.R. # 95-42030

7632 Sudden Death, Suspicious Circumstances

Name: Miceli, Marianne R.                                              Add

---

I asked if they turned the TV and VCR off.  Tina said Bill turned off the TV off but she doesn't remember if he turned off the VCR.

I asked if anyone sat in the swivel rocker that day.  Tina said sat in that chair.  she said that Bill only sat in it once and that her dad gave it to them.  Bill wanted to see if they should take it when they moved into their own place.  I asked if she was sure that no one sat in that chair. Tina said she never saw anyone sit in the chair that day.

**Mon. 09/18/95, 0900 Hrs.**

I was advised by Pam Leavenworth that Tina is now staying at their house. I was also advised that John Kuruda, a friend of Bills stayed with Tina, Bill and Marianne over the Labor Day weekend.  Tina advised me that Kuruda number is 592-9703.   The pager has a voice mail message that indicates Kuruda lives in the Streator or Pontiac Illinois area.

I left a message on Kuruda's pager but did not receive a return call.  On 09/21/95 I called the pager again and was advised that the number was out of service.

Pam called me later in the afternoon and advised me that according to Tina there was a smoke alarm in the apartment.  It was located on the bathroom on the wall above the breaker box.  No smoke alarm had by the fire investigators or evidence technicians when they processed scene.  I checked the photos and was not able to see a smoke alarm in that area.

**Tues. 09/19/95, 0800 Hrs.**

I went to 218 E. Bailey, unit M.  The unit was being re-habbed by Brandon Builders.  I entered the apartment and checked the area above the breaker box.  I located two screws in the wall, apparently where the smoke detector had been.  The wall was soot covered and blistered.  There was no pattern, indicating the smoke alarm was not on the wall at the time of the fire. I returned to the unit at 0930 Hrs. with Inv. Griffith.  We took the following seven photos  of the area above the breaker box.

1: Facing south toward the wall.
2: Facing south west toward the wall

| Additional Reports | | | | Distribution: | ☐ COP | ☐ JUV | ☐ INV | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | ☐ B OF I | ☐ OTHER: | | | |
| W/C Approval | Assignments | F/U Date | Status Code | Pims Entry | | Additional F/U | | | |
| Officers Signature: *M. Cross* | | | | | | Badge Number:  131 | | | |

**DEFS 12785**

NAPERVILLE POLICE DEPARTMENT
INVESTIGATIVE SUPPLEMENTARY REPORT
[✓] Original        [ ] Copy

Page 8 of   10                                                    I.R.

7632 Sudden Death, Suspicious Circumstances

**Name: Miceli, Marianne R.**                                    Add

---

3, 4, and 5: Photo's using a flashlight for remote lighting.
6 and 7: Photos with flashlight and remote flash.

I measured from the floor to the lowest screw which was 82 1/2".
I measured from the floor to the top screw, which was 87".
I measured from the floor to the ceiling which was 96".


Wed. 09/20/95, 1205 Hrs.

I went to the Exel Inn and met with the General Manager Dan Ranthum.  He gave
me the garbage form Tina and Bill Amor's room from Sat 09/16/95.  I also
copied phone records from their list.  Mr. Ranthum requested a subpoena for
the actual paperwork.  The below listed calls were made from room 217
09/15 to 09/16/95.  I returned to the P.D., went through the garbage and did
not find anything of evidentiary value.

Telephone calls made from room 217 of the Exel Inn on 09/15/95.

653-2264, 7:48 A.M. 7 min. D. Atten 148 Quail Run Carol Stream, Il.
369-3600, 8:11 A.M. 1 min. Days Inn Naperville.
420-1978, 8:11 A.M. 1 min. Pam and Gary Leavenworth.
420-6158, 8:32 A.M. 2 min. Inv. Cross.
420-1978, 8:33 A.M. 1 min. Pam and Gary Leavenworth, two calls.
690-8833, Mimirth Clinic 2100 Manchester Rd. Wheaton, Il.
393-2870, 9:34 A.M. Non Published number.
977-0576, 10:25 A.M. No listing.
305-5500, Linden Oaks.
653-1717, Mimirth Clinic.
393-2870, 1:02 P.M. 1 min. Non Published number.
355-5582, 10:37 P.M. 14 min. R.H. Powers 1212 Modaff Rd. Naperville (Family).
420-1978, 1054 A.M. 14 min. Pam and Gary Leavenworth.

Telephone calls made from room 217 of the Exel Inn on 09/16/95.

REDACTED, 12:20 A.M. 1 min. My pager.
355-9488, 12:20 A.M. 1 min. Allan DeGrandis 1070 Carriage Ct. Naperville,
(Tina's Friend).
510-3052, 12:23 A.M. 3 min. Keith Vandermier 510 W. Wesley, Wheaton

| Additional Reports | | | | Distribution: | ☐ COP  ☐ JUV  ☐ INV  ☐ TR  ☐ CP | | |
|---|---|---|---|---|---|---|---|
| | | | | | ☐ B OF I ☐ OTHER: | | |
| W/C Approval | Assignments | F/U Date | Status Code | Pims Entry | | Additional F/U | First |
| Officers Signature: M. Cross | | | | | | Badge Number: 131 | |

**DEFS 12786**

NAPERVILLE POLICE DEPARTMENT
INVESTIGATIVE SUPPLEMENTARY REPORT
[✓] Original      [ ] Copy

Page 9 of __10__                                                    I.R. # 95-_____

7632 Sudden Death, Suspicious Circumstances

Name: Miceli, Marianne R.                                               Add

---

355-9488, 12:44 A.M. 1 min. Degrandis (above).
293-4736, 12:51 A.M. 1 min. Ed Sipolt 1204   Kings Ct. West Chicago, Il.
(Tina's Friend).
293-4736, 12:53 A.M. 1 min. Ed Sipolt.
REDACTED 1:01 A.M. 1 min. My pager.
379-8204, 1:11 A.M. 1 min. Unk. pager.
355-5582, 1:13 A.M. 39 min. R. H. Powers, 1212 Modaff Rd. Naperville,
(Family).
(800)234-9192, 1:52 A.M. 21 min. Charter Health Systems.
355-5582, 2:12 A.M. 2 min. Powers family.
420-6666, 2:15 A.M. N.P.D.
592-9703, 3:14 A.M. 1 min. No listing.
510-3052, 3:40 A.M. 2 min. Keith Vandermeir.
510-3052, 3:49 A.M. 1 min. Keith Vandermeir.
690-3594, 3:51 A.M. 1 min. Amita Nukherjee 217 E. Roosevelt Rd. _____
690-3594, 3:52 A.M. 1 min. Same as above.
305-8300, 11:47 A.M. 1 min. Mid America Federal.
305-8300, 11:48 A.M. 1 min. Mid America federal.


Thurs. 09/21/95, 1120 Hrs.

I spoke to Rita Condon from the DuPage County Housing Department. _____
advised me that her department checks on everyone who receives funds through
the County at least once a year. The visit includes a residential
inspection. The Miceli residence was last checked on 12/21/94. There was no
indication of any fire hazards in the residence at that time. Their files
indicate that there was a smoke alarm in the residence.

Fri. 09/22/95, 1400 Hrs.

Lt. Ferreri and I met with State Farm Insurance Claim Specialist _____
and discussed the fire. Mr. Krupp advised us that the contents ____
$7,000.00.

| Additional Reports | | | | Distribution: | ☐ COP | ☐ JUV | ☐ INV | ☐ TR | ☐ CP |
| | | | | | ☐ B OF I | ☐ OTHER: | | | |
| W/C Approval | Assignments | F/U Date | Status Code | Pims Entry | Additional F/U | | Final Closure | | |
| Officers Signature: M. Cross | | | 3 | | Badge Number: 131 | | | | |

**DEFS 12787**

NAPERVILLE POLICE DEPARTMENT
INVESTIGATIVE SUPPLEMENTARY REPORT
[ √ ] Original      [ ] Copy

Page 10 of __10___                                    I.R. # 95-~~~~~

7632 Sudden Death, Suspicious Circumstances

**Name: Miceli, Marianne R.**                                    Add


Thurs. 09/28/95.

I received the attached Investigative Report from the State Fire Marshal
Mitch Kushner.

| Additional Reports | | Distribution: | ☐ COP   ☐ JUV   ☐ INV   ☐ |
|---|---|---|---|
| | | | ☐ B OF I ☐ OTHER: |
| W/C Approval | Assignments | F/U Date | Status Code | Pims Entry | Additional F/U | |
| Officers' Signature: _M. Cross_ | | | | | Badge Number: 13_ | |

**DEFS 12788**

NAPERVILLE POLICE DEPARTMENT
INVESTIGATIVE SUPPLEMENTARY REPORT
[✓] Original      [ ] Copy

Page 1 of __8__                                              I.R.' # 95-42030

7632 Sudden death, Suspicious Circumstances

Name: Miceli, Marianne R.

**EXHIBIT**
*Cross*
**4**
10-16-20

Add

Other: Miceli, Tina M. (AKA Tina M. Amor), F/W, REDACTED 218 E. Bailey Rd.
    Naperville, Il. 527-1720.

Other: Neske, Beverly J. F/W, REDACTED 566 Timber Ridge #103 Carol Stream,
    Il. 668-2964.

Mon. 09/10/95, 1159 Hrs.

I, Inv. Cross #131 interviewed the victims daughter Tina Amor in the kitchen
of 1008 Muirhead, Naperville, Illinois.  Also present during parts of the
interview were Tina's aunt and uncle Gary and Pam Leavenworth.  Following is
the sum and substance of the interview.  I identified myself to Tina and told
her that I was sorry for the loss of her mother.  I advised her that we were
conducting a routine fire investigation told her that I had to ask her some
questions.  I then asked Tina to tell me what her and her husband William
Amor did today.

Tina stated that she woke up between 11:30 and 11:45 A.M..  Her husband Bill
and her mother were already up.  Tina said Bill slept on the couch last night
because he was not feeling well.  At 1:30 P.M. Tina and her mother left the
apartment and drove to Lisle to buy cigarettes.  Bill did not go because he
was sick.  They went to Lisle because there is a store where cigarettes are
cheaper.  After buying cigarettes they went to Edwardos Pizza, where she
works to pick up a pizza.  They returned to the apartment, ate the pizza and
watched football.  Bill was laying on the couch when they returned.  He did
not eat any pizza because he was still sick.  Tina remembers watching the
Dallas, Denver game then part of the Colts game.  Her mom fell asleep in her
chair and Tina and Bill were on the couch.  At some point during the game
Bill got up from the couch and went to lay on the floor.  Tina joined him
after awhile and was dozing off.

Her mother went to bed at about 6:00P.M. to take a nap.  She said she was
going to set the alarm for 7:00 P.M. so she could watch the Emmy Award's
show.  They left the apartment just before 6:30 P.M. to go to the Cascade
Drive Inn Theater.  On the way they stopped at the Mobil gas station at Rt.59
and Ogden Avenue.  I asked Tina what they were doing just before they left.
She said that Bill was giving her mother a back rub in her bedroom.  Tina was
sitting in the living room in her mothers chair smoking a cigarette.  I asked
Tina what she did with the cigarette.  Tina said she thought she put it out
in the ash tray on the dinning room table but wasn't sure.  She commented to

| Additional Reports | | | | Distribution: | ☐ COP   ☐ JUV   ☐ INV   ☐ TR   ☐ CP | | |
|---|---|---|---|---|---|---|---|
| | | | | | ☐ B OF 1 ☐ OTHER: | | |
| M/C Approval 9/16/95 | Assignments | F/U Date | Status Code | Pims Entry | | Additional F/U | Final Closure |
| Officers Signature: *M. Cross* | | | | | | Badge Number:   131 | |

**DEFS 12754**

NAPERVILLE POLICE DEPARTMENT
INVESTIGATIVE SUPPLEMENTARY REPORT
[ ✓ ] Original     [ ] Copy

Page 2 of  8                                                      I.R. # 95-42030

7632 Sudden death, Suspicious Circumstances

Name: Miceli, Marianne R.                                                    Add

---

Bill when they left that she couldn't remember what she did with her cigarette. Bill told her that she probably put it out. I asked Tina if she ever found the cigarette. She said she did not. I asked Tina what her mom was wearing when they left. She said that mom was wearing a purple smock type polyester night gown. I asked if her mother was sleeping when she left. Tina said she her mother was in bed talking on the phone to one of her girlfriends, either Dorothy Atten or Beverly Neske.

Pam Leavenworth obtained Beverly Neshke's phone number from the telephone book. Pam called Beverly and told her that Marianne had died. I then spoke to Beverly. I asked when she last spoke to Marianne. Beverly said she talked to Marianne earlier that day, sometime after 5:00 P.M.. Beverly said that Marianne was feeling good and was in good spirits but she (Beverly) was depressed. Beverly told me she is also manic and that is how her and Marianne met. The conversation between Marianne and Beverly lasted about 10 minutes. Marianne did not mention any problems and did not say anything about smelling smoke or a fire.

I asked Tina to tell me how the furniture was arranged in the living room. She stated that there is a book case along the south wall in the dinning room area. The next piece of furniture along the along the south wall was a small wood table, then her mothers reclining chair and then the couch. On the other side of the couch, near the sliding glass door was a swivel rocking chair. Behind the chair in the south west corner below the air conditioner was a pile of boxes. The sliding glass doors are in the middle of the west wall. On the other side of the sliding glass doors in the north west corner was a television set and a VCR. On the north wall were two desks. I asked Tina if they have been having any trouble with any electrical appliances. She advised that they were blowing fuses in the kitchen when they ran the microwave and toaster at the same time. She also said they have been smelling gas off and on recently.

Pam Leavenworth advised that they have been having trouble keeping the pilot light on the oven lit. One burner and the bottom oven didn't work. The family just purchased a new refrigerator for them and were planning to purchase a new oven in the next few months. Pam talked to Marianne on Friday night. Marianne told Pam that the gas company was out that day to check the stove. Pam also explained that the Condo and all its contents were purchased by the family as was the car Tina drives. Most of the furnishings were old hand-me-downs.

| Additional Reports | | | | | Distribution: | ☐ COP   ☐ JUV   ☐ INV   ☐ TR   ☐ CP | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | ☐ B OF I ☐ OTHER: | | |
| W/C Approval | Assignments | F/U Date | Status Code | Pims Entry | | Additional F/U | | Final Closure |
| MC 10/16/95 | | | S | | | | | |
| Officers Signature: M. Cross | | | | | | Badge Number:   131 | | |

**DEFS 12755**

NAPERVILLE POLICE DEPARTMENT
INVESTIGATIVE SUPPLEMENTARY REPORT
[ ✓ Original    [ ] Copy

Page 3 of  8                                                I.R. # 95-42030

       7632 Sudden death, Suspicious Circumstances

Name: Miceli, Marianne R.                                                Add

---

I asked Tina if they have been having trouble with the television or the VCR.
Tina said the TV has a fuzzy picture at times but that was all.   Pam
Leavenworth said Tina, Bill and Marianne also wanted a new television with a
remote control.   The family had not felt it necessary to purchase one
however.  I asked what the brand name of the TV was.  Pam said that it was a
15 year old Mittsubishi or MGA.   No one could remember the brand name  VCR
however.  Next to the TV and VCR were two desks then the hall way to the
bedrooms.  There was a picture on the wall behind the couch, a clock on the
wall behind the TV and a couple of pictures on the north wall.   I asked if
the patio door was open.  Tina said that she could not remember but that
sometimes they open it a crack.  I asked if they turned off the TV and VCR
when they left.  Tina said that Bill turned off the TV but she couldn't
remember if he turned off the VCR.  She said they have a tendency to leave it
on.  I asked if there were any lights left on.  Tina said the lamp on the
table next to her mother's chair was on.  I asked if they locked the front
door when they left. Tina said they always do and was sure she locked it this
time.

I asked Tina what movies they went to see.   Tina said they saw Babe and
Something to Talk About.

At this point, about 12:40 P.M. Inv. Guerrieri returned from his interview
with Bill Amor.  Bill was still down stairs.  I asked Tina if she would go
down stairs with Bill while I talked with Inv. Guerrieri.  We discussed our
interviews.  I then asked Pam if there is any insurance on the condo or life
insurance on Marianne.  Pam advised me that there was some insurance on the
condo and that their mother and Marianne had taken out a life insurance
policy with Tina as the beneficiary.  I asked how much the policy was for.
Pam went and got the policy and we looked it over.  The policy was from
**Metropolitan Life Insurance** # <span style="background-color:red; color:red;">REDACTED</span>   The face value was $100,000.00.
The policy was taken out in 1987 with Tina as the primary beneficiary.  In
1992 the policy was changed.  Pam was made primary beneficiary and Tina was
secondary.  Pam explained that Tina was hanging around with a bad crowd in
1992 and they were afraid of what would happen if Marianne did die and Tina
got the money. Gary Leavenworth added that Tina was hanging around with a
bunch of devil worshipers.  Pam said that Marianne was not supposed to tell
Tina about the insurance.

| Additional Reports | | | | Distribution: | ☐ COP   ☐ JUV   ☐ INV   ☐ TR   ☐ CP | | |
|---|---|---|---|---|---|---|---|
| | | | | | ☐ B OF I ☐ OTHER: | | |
| W/C Approval 10/6/95 | Assignments | F/U Date | Status Code | Pims Entry | Additional F/U | Final Closure | |
| Officers Signature: M. Cross | | | | | Badge Number: | 131 | |

DEFS 12756

NAPERVILLE POLICE DEPARTMENT
INVESTIGATIVE SUPPLEMENTARY REPORT
[✓] Original     [ ] Copy

Page 4 of __8__                                                    I.R. # 95-42030

7632 Sudden death, Suspicious Circumstances

Name: Miceli, Marianne R.                                                   Add

---

At this point Tina and Bill came back into the kitchen. I asked Tina if her
mother had any insurance. Tina stated that they had car insurance and some
insurance on the condo. I asked her if she had any life insurance. Tina
said her mother had a life insurance policy. As Tina was answering Bill
said, "We don't know anything about that". He appeared to be trying to
answer for Tina and was talking loudly and hurriedly. I asked Tina what she
knew about the policy. Tina said she didn't know anything other than her
mother had a policy.

Tina and Bill went outside to have a cigarette. Inv. Guerrieri went outside
after them. When Bill came in I went outside with Inv. Guerrieri who was
conducting a permission search of Tina's Car. In the trunk he found a
container of Golf Light charcoal lighter fluid. Tina said the lighter fluid
has been in the trunk since last Friday when Bill and her mother went to a
cook out at a friends apartment in lisle. That would have been Friday
09/08/95. Inv. Guerrieri asked Tina what she would say if they found traces
of that lighter fluid in the area where the fire started. Tina said she
spilled charcoal lighter fluid from that bottle on the carpet and boxes in
the corner under the air conditioner about two weeks ago. (At this time Tina
had not been told where the fire started). Tina said she tripped over the
chair by the patio door when she was coming in from starting the grill on the
patio. She said they kept the bottle of lighter fluid inside the apartment,
in that corner by the boxes. See Investigator Guerrieri's report for
details.

About 1:15 A.M. I went inside to talk to Mr. Amor. I told Mr. Amor that I
wanted to talk to him further about what happened. We went into the basement
of the Leavenworth's house. I asked him to go over what they did Sunday. He
told me substantially the same story as he told Inv. Guerrieri. I asked if
they have been having trouble with any of the electrical appliances in the
living room. Mr. Amor said the television tuner had to be moved slightly to
have the color come in but that was all. I asked if there was anything else,
and he said not that he knew of. Mr. Amor gave me two yellow ticket stubs
from the Cascade drive-in Theater. I asked Mr. Amor if they had been at a
cook out last Friday. Mr. Amor said he and Marianne went to the cook out in
Lisle at a friends apartment. They dropped Tina off at work and went to
Marilyn Glisson's apartment. At around 3:30 P.M. he picked Tina up at work.
They went back to the cook out but Tina wanted to go home so they picked up
Marianne and went home.

<table>
<tr><td>Additional Reports</td><td colspan="4"></td><td>Distribution:</td><td>☐ COP</td><td>☐ JUV</td><td>☐ INV</td><td>☐ TR</td><td>☐ CP</td></tr>
<tr><td></td><td colspan="4"></td><td></td><td colspan="5">☐ 8 OF 1 ☐ OTHER:</td></tr>
<tr><td>W/C Approval</td><td>Assignments</td><td>F/U Date</td><td>Status Code</td><td>Pims Entry</td><td colspan="3">Additional F/U</td><td colspan="3">Final Closure</td></tr>
<tr><td>Officers Signature:</td><td colspan="4"></td><td colspan="3">Badge Number:   131</td><td colspan="3"></td></tr>
</table>

**DEFS 12757**

NAPERVILLE POLICE DEPARTMENT
INVESTIGATIVE SUPPLEMENTARY REPORT
[✓] Original    [ ] Copy

Page 5 of  8                                                    I.R. # 95-42030

7632 Sudden death, Suspicious Circumstances

Name: Miceli, Marianne R.                                              Add

---

I asked Mr. Amor if they brought anything to the cook out and he asked me
what I meant. I asked if he could remember bringing anything for the cook
out. He said he couldn't remember. I asked if they brought charcoal. He
said they brought charcoal and lighter fluid. I asked where they kept the
charcoal and lighter fluid. He said they brought it to the cook out in the
trunk of Marianne's car. I asked Mr. Amor where they kept the charcoal
lighter fluid at the condo. He said they kept it in the storage locker. I
asked him why they didn't keep it on the patio by the grill. Mr. Amor said
that he put it in the locker because it was to dangerous on the patio. I
told Bill that Tina said they kept it in the apartment by the patio doors.
Bill then said, "Oh, that's what I meant, they kept it inside". He then said
he moved it about a month ago to the basement and that is where he got it on
Friday. It has been in the trunk of the car ever since.

I asked Mr. Amor what he knew about Marianne's Life insurance police. He
said that he didn't know anything about it. I asked him if he was sure he
didn't know anything at all about the policy. Mr. Amor said he had no
knowledge at all of a life insurance policy. I asked if he ever heard
Marianne, Tina or anyone else in the family talking about life insurance on
Marianne. He said that he never heard anyone talking about it and knew
nothing about the policy. I asked if he ever talked to anyone else about a
life insurance police on Marianne. He said that he never did.

I checked Mr. Amor's clothing for stains or the smell of a flammable liquid
and detected none. I asked for his shoes which he took off and handed to me.
It was hard to tell if his shoes had any odor of accelerants so I asked if I
could take them. He asked how long we would have them. I told him that I
didn't know. He gave me the shoes at 2:15 A.M.. I took them to the P.D.,
packaged and submitted them into evidence.

**Tues. 09/12/95, 1000 Hrs.**

William and Tina Amor came to the police Department to take polygraph tests.
The tests were given by Richard T. O'Brien. William Amor's polygraph test
was inconclusive due to alcohol consumption by Amor that morning prior to the
test. Amor agreed to be re-tested at a time when he had not been drinking.
Tina did not take the test because she was to emotionally upset over her
mother's death.

| Additional Reports | | | | Distribution: | ☐ COP  ☐ JUV  ☐ INV  ☐ TR  ☐ CP |
|---|---|---|---|---|---|
| | | | | | ☐ B OF I ☐ OTHER: |
| W/C Approval | Assignments | F/U Date | Status Code | Pims Entry | Additional F/U | Final Closure |
| Officers Signature: | | | | | Badge Number:  131 | |

**DEFS 12758**

NAPERVILLE POLICE DEPARTMENT
INVESTIGATIVE SUPPLEMENTARY REPORT
[ ✓ ] Original     [ ] Copy

Page 6 of  8                                           I.R. # 95-42030

7632 Sudden death, Suspicious Circumstances

**Name: Miceli, Marianne R.**                                      Add

---

Wed. 09/13/95.

I was advised by the victims aunt, Patricia Powers Bretzmann that during the wake, which was held on Tues. 09/12/95, Tina was commenting that the investigation was over because someone said the cause of the fire was electrical.  Aunt Pat did not know where Tina got that impression and told her that was not the case.  Another incident Aunt Pat thought may be of interest to us, she described as follows.  Tina and a friend were standing by the coffin talking about how peaceful and natural Marianne looked.  The friend commented that Marianne smoked so much she would look more natural with a cigarette in her hand and not a rosary.  Tina said they should take the rosary out of her hand and replace it with a cigarette.  Another aunt, Jeanne Ripsky, got angry and said, "Oh my God Tina, your mother may have died because of a cigarette."  Tina became very upset and started yelling over and over, "I killed my mother, I killed my mother."  Tina also told her aunt that a couple of nights ago she was cooking a steak on the grill outside and she spilled charcoal lighter fluid on the carpet in the corner under the air conditioner where the boxes were stacked.

**Fri. 09/15/95, 0800 Hrs.**

Tina and Bill Amor were due to come to the Police Department to take poly-graph tests.  Bill called and advised that Tina woke up at 4:00 A.M. having nightmares about her mother's death.  they had been up since then and he had been drinking.  He advised that they would not be coming in for the polygraph tests.

**Fri. 09/15/95, 0900 Hrs.**

Inv. Cunningham and I went to room 217 at the Excel Inn where Tina and Bill are staying.  I spoke to Bill outside and Inv. Cunningham spoke to Tina.  See Investigator Cunningham's report on that interview.  See separate report for my interview of Bill Amor.  After the interviews Tina and Bill said they were going to the cemetery and would come to the Police Department later.  Bill was subsequently arrested on a DeKalb Co. Warrant for failure to appear on a traffic offense.  Tina came to the Police Department voluntarily.  She was asked if it would help her remember what happened if she wrote it down.  she said it would.  She wrote a four page statement, a copy of which is attached. The original is in evidence.  Tina started writing at approximately 4:00 P.M.

| Additional Reports | | | | Distribution: | ☐ COP   ☐ JUV   ☑ INV   ☐ TR   ☐ CP | | |
|---|---|---|---|---|---|---|---|
| | | | | | ☐ B OF I ☐ OTHER: | | |
| W/C Approval | Assignments | F/U Date | Status Code | Pims Entry | | Additional F/U | Final Closure |
| Officers Signature: M. Cunn | | | | | | Badge Number: 131 | |

**DEFS 12759**

NAPERVILLE POLICE DEPARTMENT
INVESTIGATIVE SUPPLEMENTARY REPORT
[✓] Original      [ ] Copy

Page 7 of __8__                                      I.R. # 95-42030

7632 Sudden death, Suspicious Circumstances

Name: Miceli, Marianne R.                                    Add

and finished at 5:25 P.M.  She had a can of pop while writing the statement and went outside the cafeteria to have a cigarette afterward.


**Fri. 09/15/95, 1745 Hrs.**

After writing the statement Tina was asked to take a Polygraph test.  She took the test and passed it.  The test was administered by Richard O'Brien. After the test I again talked to Tina.  I told her she passed the test but we still suspected that the fire was not accidental.  I asked Tina what she thought should happen to Bill if he started the fire.  Tina replied that she didn't know because she didn't think he did it.  I told Tina that I knew she thinks that Bill is going to receive profit sharing money from Honda of Lisle and money from sale of a house in Iowa.  I told her that our investigation revealed that none of that is true.  I told her that Bill has lived with people in the past, taken advantage of them and stole their money. Tina said she didn't believe that Bill would do that, or start the fire.

I asked Tina if she was sure she was the last one to leave the condo when they went to the movie.  Tina said she was sure.  I went over with her again what occurred on Sunday and she told me substantially the same story.  I asked her if Bill was drinking anything while watching the football games. Tina said he had a clear liquid in a glass with ice in it that he was drinking out of.  I asked her if it was vodka.  Tina said she didn't pay any attention to Bills drinking but assumed it was vodka.  I asked if she saw the bottle.  She said she did not.  I asked if Bill spilled any of the drink. Tina said she never saw Bill spill it but she had been sleeping off and on. Tina continued to deny and knowledge of the fire and did not think Bill started it.

After the interview Tina's aunt Pam Leavenworth came to the P.D. to be with Tina before she went back to the motel.

**Sat. 09/16/95, 0300 Hrs.**

Tina paged me and I returned her page at the motel.  Tina said that she now feels that Bill started the fire.  She had spoken to some of her friends and they told her what they saw in their relationship that she had hot seen or realized.  They told Tina that Bill was living off them and taking their

| Additional Reports | | | | Distribution: | ☐ COP   ☐ JUV   ☐ INV   ☐ TR   ☐ CP |
|---|---|---|---|---|---|
| | | | | | ☐ B OF 1 ☐ OTHER: |
| W/C Approval | Assignments | F/U Date | Status Code | Pims Entry | Additional F/U | Final Closure |
| Officers Signature: M. Cross | | | | | Badge Number:   131 | |

DEFS 12760

NAPERVILLE POLICE DEPARTMENT
INVESTIGATIVE SUPPLEMENTARY REPORT
[✓] Original      [ ] Copy

Page 8 of  8                                              I.R. # 95-42030

7632 Sudden death, Suspicious Circumstances

Name: Miceli, Marianne R.                                          Add

---

money.  The friends she talked to were Janielle Ball and Anita McGurgy, (Unk. spelling of last names).  Tina did not offer any new information that could implicate Bill Amor further in the fire.  Tina's plans are to get out of the motel, live with Aunt Pam and Uncle Gary Leavenworth and to divorce Bill.

Mon. 09/18/95, 1645 Hrs.

Inv. Cunningham #151 and I spoke to Tina in the soft interview room regarding our telephone conversation the night of 09/16/95.  Tina related that she talked to her girlfriends Janielle Ball, 510-3052 and Anita McGury, 690-3594 over the weekend.  They convinced her that Bill Amor is a scam artist and is no good for her.  She now realizes that Bill has been taking her tips from work and most of her pay check.  Because of those conversations Tina thinks Bill may have started the fire.  Tina said she has no direct evidence that Bill started it, just thinks he did.  Tina did not relate any new information regarding the fire to us.

| Additional Reports | | | | | Distribution: | ☐ COP  ☐ JUV  ☐ INV  ☐ TR  ☐ CP | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | ☐ B OF I ☐ OTHER: | | |
| W/C Approval | Assignments | F/U Date | Status Code | Pims Entry | | Additional F/U | | Final Closure |
| Officers Signature: | | | | | | Badge Number: | 131 | |

**DEFS 12761**

INVESTIGATIVE SUPPLEMENTARY REPORT

[ ] Original     [ ] Copy

Page 1 of __7__                                                    I.R. # 95-42030

7632 Sudden Death, Suspicious Circumstances

Name: Miceli. Marianne R.

---

Other: Amor, William E. M/W, <mark>REDACTED</mark>, 218 E. Bailey Rd. Naperville, Il.
       527-1720.

Tues. 09/12/95, 1000 Hrs.

William Amor was given a polygraph test by Richard T. O'Brian.  The test
results were inconclusive however, due possibly to Mr. Amor drinking a
quantity of an alcoholic beverage prior to taking the test.

Tues. 09/12/95, 1120 Hrs.

Inv. Sullivan and I interviewed Bill Amor in an Investigations Division
interview room.  We received the following background information.

Mr. Amor was born and raised in South Bend Indiana.  He left his family when
he was 16 years old due to an abusive father.  Between the ages of 16 and 18
he lived in South bend with a friend by the name of Randy Anderson.  He could
not remember the address but thinks that Anderson still lives in South Bend.
While living in South Bend he worked for Roseland Shell gas station.

At the age of 18 he moved to Mesa Arizona and lived with a friend by the name
of Rick Wallace.  He couldn't remember Wallaces address and doesn't know how
to contact him.  While living in Mesa he worked at Bush 66 gas station.

In 1980 Mr. Amor moved to Indianapolis Indiana where he worked for Fleenor
Auto Parts which is now Giant Auto Parts.  He worked his way up to parts
manager.  He lived with several people in Indianapolis and by himself for
awhile.  I asked him who he lived with.  He could only remember one name,
David Rouille, (Unk. Spelling).  I asked him why he moved to the Indianapolis
area.  Mr. Amor said that his sister Sherry lived there.  He told me that
Sherry was killed in an automobile in the Chicago area in 1980.  Her husband,
David Kalan lives in a Northern Chicago Suburb.

In 1983 he was transferred to Elkhart Indiana where he worked at Fleenor for
six months.  In 1984 he was transferred to the Schererville Indiana store.
While in Schererville he lived in the Pine Island Apartments on Pine Island
drive.  He did not have a room mate at the time.  Mr. Amor said he could not
remember where he lived in Elkhart but thought he lived by himself.

EXHIBIT
Cross
5
10-16-70

KC 56

| Additional Reports | | | | Distribution: | ☐ COP   ☐ JUV   ☑ INV   ☐ TR   ☐ CP | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| W/C Approval  9/95 | Assignments | F/U Date | Status Code | Pims Entry | | Additional F/U | Final Closure |
| Officers Signature:  M. Cross | | | | | | Badge Number:  131 | |

DEFS 11273

INVESTIGATIVE  SUPPLEMENTARY  REPORT

[ ] Original       [ ] Copy

Page 2 of  7                                                    I.R. # 95-42030

7632 Sudden Death, Suspicious Circumstances

Name: Miceli. Marianne R.

---

In 1986 he went to work for Honda of Lisle.  He again worked his way up to parts manager.  In 1989 he quit Honda of Lisle and went to work for Pauly Acura.  Mr. Amor said he was only hired for six months to start up the parts department.  When the six months were over he became unemployed.  I asked him why he left a three year position at Honda of Lisle for a six month position. Mr. Amor said it was because he had a falling out with the owner who wouldn't let him manage the parts department the way he wanted.  When he worked for Honda of Lisle he lived in a two unit apartment building on Yender road in Lisle.

In 1990 he met and started to date a woman by the name of Donna Reed who lived in Highland Indiana.  He moved to Highland and worked at Coral Honda for a year.  He broke up with Donna in 1991 and moved back to Illinois.  He tried to get a job at Honda of Lisle but was not re-hired.  He lived in Pads in part of 1991 and 1992.

In 1993 he got an apartment at 1014 N. Burlington in Lisle  through contacts at Elizabeth Seaton Church.  The last name of the people was Hallauer.  He worked at the church to make money to pay his rent.

In 1994 he met Marianne at Elizabeth Seaton Church and moved into 218 E. Bailey.  He and Tina worked at McDonalds on 75th street in Naperville.  They quit because they were working different shifts, the low pay and the cost of driving to work.  He continued to work at the church however.

Mr. Amor said that he and Tina plan to live at Pam and Gary Leavenworth's house for two or three months then get an apartment in Naperville.  Mr. Amor agreed to take another polygraph test when he is sober.

Fri. 09/15/95, 0800 Hrs.

Bill and Tina Amor were scheduled to come to the police department for polygraph tests.  Mr. Amor called me and advised that Tina woke up at 4:00 A.M. having nightmare's about her mothers death.  They were not able to go back to sleep.  He had a couple of drinks to calm his nerves.  They did not feel up to taking the tests.

KC  57

| Additional Reports | | | | Distribution: | ☐ COP   ☐ JUV   ☐ INV   ☐ TR   ☐ CP | |
|---|---|---|---|---|---|---|
| | | | | ☐ B OF I ☐ OTHER: | | |
| W/C Approval | Assignments | F/U Date | Status Code | Pims Entry | Additional F/U | Final Closure |
| Officers Signature: M. Cross | | | | | Badge Number:  131 | |

DEFS 11274

INVESTIGATIVE SUPPLEMENTARY REPORT

[ ] Original          [ ] Copy

Page 3 of 7                                              I.R. # 95-42030

7632 Sudden Death, Suspicious Circumstances

Name: Miceli. Marianne R.

Fri. 09/15/95, 0900 Hrs.

Inv. Cunningham and I went to room 217 of the Excel Inn to interview Tina and
Bill Amor. Inv. Cunningham interviewed Tina and I interviewed Bill outside
the building by the front entrance. Following is the sum and substance of my
interview with Mr. Amor. I advised Mr. Amor that we have been conducting an
extensive investigation into Marianne's death. I advised him that there were
several indications that the fire may not have been accidental. I advised
Mr. Amor that the fire spread so fast that within 10 to 15 minutes after they
left the apartment Marianne was not able to get out. I advised Mr. Amor that
we interviewed Marilyn Glisson and she told us she overheard he and Tina
talking about Marianne's life insurance policy on several occasion's. She
heard him say that things would be easier if Marianne was out of the picture.
She also head him say that they had to keep Marianne happy so she did not
write Tina off the policy. I told Mr. Amor that I read his letters to Tina
from Jail. I asked him what he meant by having a plan of attack for some
capital gain for the late summer. Mr. Amor did not answer.

During the questioning Mr. Amor continued to deny knowing anything about the
life insurance policy and finally said he has no recollection of any
conversations with Tina about any life insurance. He denied any involvement
in setting the fire and denied knowing who set it. I advised him that we
were aware of his past schemes to take money from people who trusted him and
that this appeared to be another one. He again denied starting the fire. I
advised him that if it was just a scheme to get new furnishings for the condo
that got out of hand to tell me. Mr. Amor said that he did not know about
any plan to start a fire.

I asked Mr. Amor if there was anything else that happened that day that might
help us understand how the fire started and spread so fast. Mr. Amor said he
could not think of anything that he had not already told us. He again agreed
to take another polygraph test when he was sober. *Still could not think
of any reason the fire would have started*

Fri. 09/15/95, 1915 Hrs.

I interviewed Mr. Amor in the Naperville Police Dept. Detention Center. Mr.
Amor had been arrested earlier on a failure to appear warrant out of DeKalb
County. He was interviewed by Sgt. Carlson and Investigator Cunningham. He
told them that he spilled a bottle of vodka on some news papers that were
laying on the floor between the couch, the swivel rocker and the coffee

KC 58

| Additional Reports | | | | | Distribution: | ☐ COP  ☐ JUV  ☐ INV  ☐ TR  ☐ CP | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | ☐ B OF I ☐ OTHER: | | |
| W/C Approval | Assignments | F/U Date | Status Code | Pims Entry | | Additional F/U | | Final Closure |
| Officers Signature: M. Cross | | | | | | Badge Number:  131 | | |

DEFS 11275

INVESTIGATIVE SUPPLEMENTARY REPORT

[ ] Original      [ ] Copy

Page 4 of  7                                                    I.R. # 95-42030

7632 Sudden Death, Suspicious Circumstances

Name: Miceli, Marianne R.

---

table.  Mr. Amor said he had been smoking and left a cigarette in an ash tray on the coffee table.  They also had a candle burning on the coffee table that he did not blow out when he left.  He suggested that the cigarette could have burned down, fell into the papers and started the fire.  I advised Mr. Amor that the fire appeared to have started in the swivel rocking chair, not on the floor in front of the chair.  I advised him that we could tell that from the burn patterns.  I asked him why he had not told us about this in the prior interviews.  Mr. Amor said he just remembered it.  I told Mr. Amor that I didn't think the fire could not have started that way and again asked him if he had anything to do with starting the fire.  He continued to deny having anything to do with starting the fire.  He advised me that he would take the polygraph test when he was released from DeKalb Co. jail because at that time he would be sober.

Tues. 10/03/95, 2:15 P.M.

Inv. Guerrieri and I went to the DeKalb County Jail and met with Bill Amor when he was released.  Mr. Amor was asked if he was still willing to take the polygraph test as he previously indicated he would take.  Mr. Amor said he was willing to do so  and said he wanted to get it over with.  Mr. Amor was advised that an appointment was set up for the polygraph test today.  He agreed to voluntarily accompany us to John E. Reid and Associates in Chicago where the test would be conducted.  We asked him if he had eaten lunch.  He said he had.  We asked if he wanted anything else.  He asked if he could smoke.  We said he could.  He smoked several cigarettes while on the way to Chicago to take the test.  Mr. Amor asked why we were going to Chicago for the test.  I advised him that we wanted to used the best examiners in the area and that we were going to John Reid and Associates, the ones who teach other examiners.

We arrived at John E. Reid and Associates, 250 S. Wacker Dr. at 3:55 P.M. and met with polygraph examiners Arthur Newey and Mike Masokas.  Mr. Amor was interviewed and given a polygraph test.  We were advised that he failed.  Masokas and Newey interviewed Amor regarding the test.  He did not make any admissions.  While at Reid Mr. Amor was allowed to go to the bathroom when he asked.  He was left alone several times in the lobby and during the interviews.

KC 59

| Additional Reports | | | | Distribution: | ☐ COP  ☐ JUV  ☐ INV  ☐ TR  ☐ CP | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| W/U Approval | Assignments | F/U Date | Status Code | Pims Entry | ☐ B OF I ☐ OTHER: Additional F/U | | Final Closure |
| Officers Signature: | M. Cross | | | | Badge Number:  131 | | |

DEFS 11276

INVESTIGATIVE SUPPLEMENTARY REPORT

[ ] Original     [ ] Copy

Page 5 of  7                                           I.R. # 95-42030

       7632 Sudden Death, Suspicious Circumstances

Name: Miceli. Marianne R.

---

Tues. 10/03/95, 2230 Hrs.

We left Reid and returned to the Naperville Police Department.  Mr. Amor
agreed to accompany us and continue the interview.  He smoked several
cigarettes while on the way to Naperville.  He was never handcuffed or
restrained in any way.  We asked him if he was hungry or wanted anything to
drink.  He requested and received several cans of pop.  I met with Inv.
Sullivan who had been talking to Tina Amor.  He advised me that Tina said she
knew Bill intentionally started the fire but didn't think he meant to kill
her mother.

Tues. 10/03/95, 2337 Hrs.

Bill Amor was advised of his Miranda Rights in writing by Inv. Guerrieri who
also read them to him.  Mr. Amor was given the waiver, told to also read the
rights himself and sign the waiver if he wished to continue to talk to us.
He read and signed the form.  Inv. Guerrieri started to go over Mr. Amor's
story again.  I then advised Bill Amor that Tina told other investigators
that he had intentionally started the fire but she didn't think he intended
to kill Marianne.  Bill then said he had started the fire.  Following is the
sum and substance of what Mr. Amor said happened.

Mr. Amor said he was at home all day on Sunday watching football games.  He
had two or three drinks of Vodka mixed with ice and 7-Up.  The glasses were 8
to 12 ounces.  The bottle he was drinking from was on the living room table
in front of the couch.  He was watching the end of the Colts game and
accidentally spilled the vodka from the bottle onto a pile of newspaper that
was laying on the floor between the swivel rocking chair, the couch and the
table.  Marianne had left the room about 20 minutes prior to that.  Tina was
in the bathroom or bedroom getting ready to go out with him to the drive in
theater.  Mr. Amor finished one cigarette, lit another one and put it in the
ash tray.  He knocked the new cigarette off the ash tray when he got up to
give Marianne a back rub.  He saw it fall onto the pile of news papers and
catch fire.  Mr. Amor said he saw it sizzling and smoldering and knew it
would start a fire but he didn't give a shit.  He went to the bathroom
urinated and then gave Marianne a short back rub, about two minutes.  Tina
saw him giving her the back rub and yelled at him that they would be late for

*kc 60*

---

| Additional Reports | | | | | Distribution: | ☐ COP   ☐ JUV   ☐ INV   ☐ TR   ☐ CP |
|---|---|---|---|---|---|---|
| | | | | | ☐ B OF I ☐ OTHER: | |
| W/C Approval | Assignments | F/U Date | Status Code | Pims Entry | Additional F/U | Final Closure |
| Officers Signature: M. Cross | | | | | Badge Number:   131 | |

DEFS 11277

Page 6 of  7                                          I.R. # 95-42030

7632 Sudden Death, Suspicious Circumstances

Name: Miceli. Marianne R.

the show.  Mr. Amor walked quickly out to the dinning room area, grabbed the cooler, his jacket and a blanket.  He walked out the door and down to the car.  He was putting the cooler in the back seat when Tina came down.  He said that Tina was about a minute behind him.

I asked Mr. Amor what time he got up to go to the bathroom.  He said it was about 6:15 P.M..  I asked if that was when he knocked the cigarette off the ash tray.  He said it was.  Inv. Guerrieri asked if he knocked the cigarette off the ash tray on purpose.  Mr. Amor said he did.  I asked him why.  He said, "I just didn't give a shit any more".  Inv. Guerrieri asked him why he didn't give a shit.  Mr. Amor said that he has no job, drinks to much and didn't like living with Tina and Marianne because they always argued about him.  I asked him if he hadn't poured the vodka on the chair and floor then lit the cigarette and dropped it onto the papers.  He said that he did not pour it, he accidentally spilled it.  I asked how the vodka got on the chair.  He said it splashed up on the chair.  He then knocked the cigarette off the ash tray knowing it would start a fire.

I asked Mr. Amor if he did it to collect Marianne's life insurance.  He said he did it to collect money from the insurance company for the contents of the apartment.  He planned to use the insurance money to pay for the "Fingerhut" products he and Tina owed $200.00 on, get a new TV and some new furniture.  I asked him how much he spilled.  He said he spilled about 1/2 of a one liter bottle.  Contents Insurance

I asked why Tina didn't see the fire if she walked out after him.  He said he didn't know.  I asked if they talked about it at the movie.  He said they never talked about it and he never told Tina.  We went over this point several times during the interview.  Bill continued to say that Tina knew nothing about it and that he never told her what he did.  I asked if he was trying to protect Tina and he said he was not.

Inv. Guerrieri asked Mr. Amor if he looked at the fire before he walked out the door.  Mr. Amor said he did not look because he didn't want to see what was happening.  He said, "I didn't care at that point.  I knew something was going to happen, I obviously knew a fire would start."

I asked him when he took the smoke detector down.  Mr. Amor said he didn't take it down.  He said the Friday before the fire he took the cover off the smoke detector and put in on the book shelf.  He and Tina went to K-Mart to

KC 61

| Additional Reports | | | | Distribution: | ☐ COP  ☐ JUV  ☐ INV  ☐ TR  ☐ CP  ☐ B OF I ☐ OTHER: | | |
|---|---|---|---|---|---|---|---|
| W/C Approval | Assignments | F/U Date | Status Code | Pims Entry | | Additional F/U | Final Closure |
| Officers Signature: | | | | | | Badge Number:  131 | |

DEFS 11278

INVESTIGATIVE SUPPLEMENTARY REPORT
[ ] Original      [ ] Copy

Page 7 of 7                                                          I.R. # 95-42030

              7632 Sudden Death, Suspicious Circumstances

Name: Miceli. Marianne R.

---

buy a new battery. He said the alarm would go off from the steam in the
bathroom and then started to beep because the battery was low. Tina and he
bought the battery but he never put it in and never put the cover back on. I
advised Mr. Amor that the entire smoke detector had been removed from the
wall and was not located in the apartment after the fire. I advised him that
it was not on the book shelves and had not burned or melted. He then said he
may have taken the entire unit down. He did not know where it was if it
wasn't on the shelf.

I asked him why he didn't give a shit anymore. Mr. Amor said he was trying
to do better. He got married in April then got put in jail. When he got out
he didn't have a job and was drinking to much. The more he touched the more
went wrong. He just wanted to start a small, "Contained" fire to get some
new things. I asked if Marianne knew anything about his plan to start the
fire. He said she did not. I asked him why he hadn't done it when she was
out of the apartment. Mr. Amor said that he didn't know. I again asked him
if he spilled the vodka on purpose. He said he didn't. I asked him if he
knocked the cigarette onto the paper on purpose. He said he did. I asked if
Tina knew anything about his plan to start the fire. He said she did not. I
asked if he would make a written statement. He said he would. I gave him a
statement form and he began to write. I left the room to contact Felony
Screening.

I spoke to Assistant State's Attorney Brian Nigohosian and advised him of the
facts in the case thus far. He advised me to ask Mr. Amor to do a tape
recorded statement and said he would come to the Police Department.

Wed. 10/04/95, 0300 Hrs.

Mr. Nigohosian came to the P.D. and spoke to Inv. Guerrieri while I sat with
Mr. Amor.

Wed. 10/04/95, 0345 Hrs.

Mr. Nigohosian interviewed Mr. Amor in Sgt. McGury office. He was reminded
of his Miranda rights and said he understood them. See Mr. Negohosian's
report on that interview. Subsequent to that interview Mr. Amor agreed to
make an additional taped statement.

KC 62

| Additional Reports | | | | Distribution: | ☐ COP  ☐ JUV  ☐ INV  ☐ TR  ☐ CP | | |
| | | | | | ☐ B OF I ☐ OTHER: | | |
| W/C Approval | Assignments | F/U Date | Status Code | Pims Entry | | Additional F/U | Final Closure |
| Officers Signature: | | | | | | Badge Number: 131 | |

DEFS 11279

IN THE CIRCUIT COURT OF THE 18TH JUDICIAL CIRCUIT
DU PAGE COUNTY, ILLINOIS


THE PEOPLE OF THE          )
STATE OF ILLINOIS,         )
                           )
      Plaintiff,           )
                           )
         -vs-              )      No.  95 CF 2075
                           )           Trial
WILLIAM AMOR,              )
                           )
      Defendant.           )


          REPORT OF PROCEEDINGS had at the hearing of

the above-entitled cause, before the HONORABLE LIAM C.

BRENNAN, Judge of said Court, on the 26th day of

January, 2018.


Jillian Doctor, CSR, RPR
Official Court Reporter
CSR 084-004809

EXHIBIT
Cross
6
10-16-20

Pl. Amor 028905

```
1    PRESENT:

2          MR. ROBERT B. BERLIN,
            State's Attorney of DuPage County, by
3                MR. JAMES SCALIATINE,
                 MR. THOMAS MINSER,
4                Assistant State's Attorney,

5                appeared on behalf of The People of the
                 State of Illinois;
6
            EXONERATION PROJECT, by
7           MS. TARA THOMPSON;

8           COZEN O'CONNOR, by
            MR. KEVIN CARAHER;
9
            ILLINOIS INNOCENCE PROJECT, by
10          MS. LAUREN KAESEBERG,
            MS. ERICA NICHOLS-COOK,
11          MS. LAUREN MYERSCOUGH-MUELLER,

12               appeared on behalf of William Amor,
                 Defendant.
13

14

15

16

17

18

19

20

21

22

23

24
```

Pl. Amor 028906

1                    I N D E X

2     WITNESS                                    PAGE

3     DETECTIVE MICHAEL CROSS

4          Direct Examination by Mr. Minser          5

5          Cross-Examination by Ms. Thompson        33

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1       THE CLERK:  William Amor.

2       MR. SCALIATINE:  Jim Scaliatine and Tom Minser for

3  the People.

4       MS. THOMPSON:  Tara Thompson, T H O M P S O N, on

5  behalf of William Amor, who is present before the

6  Court.

7       MS. COOK:  Erica Nichols Cook, N I C H O L S, C O

8  O K, on behalf of Mr. Amor.

9       MS. COUGH-MUELLER:  Lauren Myerscough-Mueller,

10  M Y E R S C O U G H - M U E L L E R, on behalf of

11  Mr. Amor.

12       MR. CARAHER:  Kevin Caraher, C A R A H E R, of

13  Cozen O'Connor Law Firm on behalf of Mr. Amor.

14       MS. KAESEBERG:  And Lauren Kaeseberg, K A E S E B

15  E R G, on behalf of Mr. Amor who is present in court.

16       THE COURT:  Good morning all.  Anything we need to

17  spread of record before we begin the trial?

18       MS. THOMPSON:  Not for the Defense, Your Honor.

19       MR. MINSER:  Nothing from the State, Your Honor.

20       THE COURT:  Great.  State, are you ready to call

21  your first witness?

22       MR. MINSER:  Yes, Your Honor.  The State's next

23  witness is Detective Cross.

24       THE DEPUTY:  Face the clerk, raise your right hand

*Jillian Doctor, CSR #084-004809*

```
 1    to be sworn, please.

 2                        (Witness sworn.)

 3         THE DEPUTY:  Okay, sir, if you come up here, have

 4    a seat and keep your voice up, please.

 5         THE WITNESS:  Thank you.

 6         THE COURT:  Mr. Minser, you may inquire.

 7         MR. MINSER:  Thank you, Your Honor.

 8                    DETECTIVE MICHAEL CROSS,

 9    called as a witness, having been first duly sworn, was

10    examined and testified as follows:

11                     DIRECT EXAMINATION

12    BY MR. MINSER:

13         Q.    Sir, can you please state your name and spell

14    your last name for the record, please.

15         A.    Michael Cross, C R O S S.

16         Q.    Sir, you're currently retired?

17         A.    Yes, sir.

18         Q.    What did you do before you were retired?

19         A.    I was a police officer with the City of

20    Naperville.

21         Q.    When did you retire from the City of

22    Naperville Police Department?

23         A.    Approximately 11 years ago.

24         Q.    And what was your assignment with the
```

1    Naperville Police Department exactly?

2        A.    Initially I spent seven years on patrol, four

3    years as a juvenile officer and the rest of my career

4    was a detective.

5        Q.    So how many years as a detective were you for

6    the Naperville Police Department?

7        A.    28 years approximately.

8        Q.    I'm going to direct your attention then to

9    September 10th of 1995.  Were you working for the

10   Naperville Police Department at that time?

11       A.    Yes.

12       Q.    In what capacity at that time?

13       A.    I was a detective.

14       Q.    What unit were you assigned to at that time?

15       A.    Violent crimes.

16       Q.    Now, on September 10th of 1995, did you

17   receive a dispatch to a fire?

18       A.    Yes.

19       Q.    What was the location of that fire?

20       A.    218 East Bailey, Unit M.

21       Q.    And that's in DuPage County, Illinois?

22       A.    Yes.

23       Q.    And that was around 7:15 p.m.?

24       A.    Yes.

1       Q.      When you arrived to that scene, can you give

2    a general description of what you saw?

3       A.      Fire truck, squad car, possibly an ambulance.

4       Q.      And did you get any background information

5    about anyone who might have been in that fire?

6       A.      Yes.

7       Q.      What information did you receive?

8       A.      I was told that there was a victim that had

9    expired, and her name was Marianne Miceli, and that she

10   was at the hospital.

11      Q.      Did you end up that night being able to go

12   inside that apartment where the fire had occurred?

13      A.      Yes.

14      Q.      Can you describe what you saw when you went

15   in that apartment?

16      A.      There was heavy fire damage in the living

17   room area.  The worst of it was closest to the sliding

18   glass doors in the front room.

19      Q.      Did you observe any smoke detector when you

20   were looking around that apartment?

21      A.      No.

22      Q.      Through the course of your investigation that

23   night did you learn of anyone else who resided at that

24   apartment?

```
1        A.    Yes.
2        Q.    And who were those people?
3        A.    Tina Amor and William Amor.
4        Q.    Do you see William Amor in the courtroom
5    today?
6        A.    Yes, I do.
7        Q.    Can you identify him by using an article of
8    clothing?
9        A.    Yeah, he's siting at the table over there,
10   he's got a dark suit, a red shirt.
11       THE COURT:   In courtroom identification noted for
12   the record.
13       MR. MINSER:   Thank you, Your Honor.
14   BY MR. MINSER:
15       Q.    When you learned there were two other people
16   who lived in that apartment, did you try and contact
17   them?
18       A.    Yes.
19       Q.    Why?
20       A.    To find out where they were and what had
21   occurred.
22       Q.    Initially did you also believe you were going
23   to have to inform them of Marianne's death?
24       A.    Yes.
```

```
 1        Q.    Did you ultimately locate them on--

 2        A.    Yes.

 3        Q.    -- 9/10/1995?

 4        A.    Yes.

 5        Q.    And where were they at?

 6        A.    They were at the Leavenworth's home, which

 7   was the sister of the victim.

 8        Q.    Did you respond to the Leavenworth home?

 9        A.    Yes.

10        Q.    And at that time it's approximately midnight

11   on 9/10 going into 9/11?

12        A.    Yes, sir.

13        Q.    And when you go to the Leavenworth home, who

14   are you with?

15        A.    Detective Guerreri of the Naperville Police

16   Department.

17        Q.    Ultimately when you arrived at the

18   Leavenworth home, who did you speak to first?

19        A.    I spoke to Tina.

20        Q.    And did Detective Guerreri speak to anyone?

21        A.    Yes.

22        Q.    Who did he speak to?

23        A.    He spoke to Mr. Amor.

24        Q.    When you spoke to Tina, where was Mr. Amor
```

1   and Detective Guerreri having their conversation?

2       A.   I believe they were in the basement of the

3   residence.

4       Q.   But you weren't having your conversations in

5   the same spot?

6       A.   No.

7       Q.   After you spoke to Tina, did you get any

8   information about insurance?

9       A.   Yes, I did.

10      Q.   What information did you receive?

11      A.   I received information that Marianne had

12  approximately a $100,000 life insurance policy on her.

13      Q.   When you found out this information, were

14  Tina or the defendant around?

15      A.   No.

16      Q.   After you found out this information, did you

17  then have a conversation with Tina?

18      A.   Yes.

19      Q.   Was the defendant also present?

20      A.   No.

21      Q.   Did you bring up the insurance to Tina?

22      A.   Yes, and Mr. Amor was present.

23      Q.   Okay.  So you had a conversation, and this is

24  at the Leavenworth home?

```
1          A.    Yes.

2          Q.    What did you ask Tina?

3          A.    I asked Tina what she knew about the

4    insurance policies on Marianne.

5          Q.    What happened when you asked this question to

6    Tina?

7          A.    Bill Amor blurted out we don't know anything

8    about that in a loud voice.

9          Q.    Was Tina answering your question at the time?

10         A.    She started to.

11         Q.    And then what happened?

12         A.    Well, he interrupted her.

13         Q.    At this point did you and Detective Guerreri

14   have a conversation with the defendant?

15         A.    Yes.

16         Q.    And the time now is approximately 1:15 in the

17   morning?

18         A.    Yes.

19         Q.    And this is September 11th, 1995?

20         A.    Correct.

21         Q.    In this conversation, what was the

22   defendant's demeanor at this time?

23         A.    Very calm.

24         Q.    And did you go over what occurred that day?
```

Pl. Amor 028915

```
1         A.    Yes.
2         Q.    Specifically what did the defendant say he
3   was watching on television?
4         A.    He was watching a football game.
5         Q.    And did he indicate that they -- if he had
6   any plans that previous day?
7         A.    Yes.
8         Q.    What were the plans he had?
9         A.    The plans were for he and Tina to go to a
10  drive-in theatre that night.
11        Q.    Did he explain to you anything about what
12  occurred just before they left to go to the drive-in
13  theatre?
14        A.    Yes.
15        Q.    What did he say in regards to what Tina did?
16              Actually I'll rephrase that.  What did he
17  describe to you that he did right before going to the
18  movie?
19        A.    He had been drinking some vodka.  He
20  accidentally spilled the vodka off the table, it landed
21  about -- it landed on a --
22        Q.    I'm going to stop you there.
23        A.    Yes.
24        Q.    In your report you didn't indicate anything
```

```
 1    about vodka spilling initially --

 2           MS. THOMPSON:  Objection, Your Honor.

 3           THE COURT:  What's the objection?

 4           MS. THOMPSON:  He's impeaching him with his

 5    report.

 6           THE COURT:  He's allowed to do that.

 7           MS. THOMPSON:  All right.  Objection withdrawn,

 8    Your Honor.

 9           THE COURT:  All right.

10    BY MR. MINSER:

11           Q.    In your report, Detective, you don't indicate

12    anything about that vodka spill in your conversation

13    with the defendant on 9/10 and 9/11?

14           A.    Correct.  Yes, that took place later.

15           Q.    Is there anything that would refresh your

16    recollection -- Let's just say, is your memory

17    exhausted in regards to the conversation you had with

18    the defendant?

19           A.    Yeah, the specific question, yes.

20           Q.    Is there anything that would refresh your

21    recollection in regards to what the defendant told you

22    on 9/11 of 1995?

23           A.    My police report.

24           MR. MINSER:  Your Honor, I'm showing Counsel
```

1     what's been marked as People's Exhibit No. 49.

2     BY MR. MINSER:

3         Q.    Sir, I'm showing you what's marked as

4     People's Exhibit 49.

5         A.    Yes.

6         Q.    Would this refresh your recollection?

7         A.    Yes.

8         Q.    And is this your police report?

9         A.    Yes, it is.

10         Q.    Just look up when your memory has been

11     refreshed.   Look up when your memory has been refreshed

12     as to that.

13            Is your memory refreshed?

14         A.    Yes.

15         Q.    Now, in regards to what the defendant said,

16     did he end up saying anything about spilling vodka?

17         A.    Yes.

18         Q.    I'm sorry, that night?

19         A.    No.

20         Q.    Okay.   Did the defendant mention around

21     6:30 that night where Marianne Miceli was?

22         A.    Yes.

23         Q.    What did he say?

24         A.    She had gone to take a nap.

```
 1          Q.     And prior to leaving, did the defendant tell
 2     you anything about if he came into contact with
 3     Marianne Miceli?
 4          A.     Yes.
 5          Q.     What did he say?
 6          A.     He said he did.
 7          Q.     Did he say he did anything with Marianne
 8     Miceli?
 9          A.     Yeah.
10          Q.     What did he say specifically?
11          A.     He gave her a back rub for a short amount of
12     time, about two minutes.
13          Q.     Did he say what he did after he gave Marianne
14     Miceli a back rub?
15          A.     Yes.
16          Q.     What did he do?
17          A.     They left to go to the drive-in theatre, he
18     and Tina.
19          Q.     Did you then ask the defendant if he had any
20     idea how this fire started?
21          A.     Yes.
22          Q.     What did he say?
23          A.     He had no idea.
24          Q.     Did he indicate if there were smokers in the
```

1   household?

2       A.    Yes.

3       Q.    What did the defendant say?

4       A.    He said they all smoke.

5       Q.    During your conversation with the defendant,

6   did you ask him anything about the appliances or

7   electronics in the apartment?

8       A.    Yes.

9       Q.    What did you ask him?

10      A.    I asked him if there was any appliances that

11  were in need of repair or acting up or having any

12  problems.

13      Q.    What did he say in response to that question?

14      A.    Just a TV, it needed to be in between

15  channels for the color to come on.

16      Q.    Did you ask anything -- I should say, did you

17  ask the defendant if he knew about any life insurance

18  Marianne Miceli had?

19      A.    Yes.

20      Q.    What did he say?

21      A.    He said he didn't know of any insurance.

22      Q.    Now, at that time you see -- that's the last

23  time you contacted the defendant until -- I'm sorry.

24            You come in contact with the defendant again

1     on 9/15 of 1995 at around 10:00 a.m. at the Exel Inn in

2     Naperville?

3          A.    Yes.

4          Q.    Who were you with?  You were with Detective

5     Cunningham at that time?

6          A.    Yes, sir.

7          Q.    And at that time, again, you went over what

8     occurred on 9/10 of 1995?

9          A.    Yes.

10         Q.    And did you ask the defendant at this time if

11    he knew of any accelerants?

12         A.    Yes.

13         Q.    And why did you ask him that?

14         A.    Because the fire appeared to me to have

15    traveled very fast.

16         Q.    And did the defendant indicate to you he knew

17    of any accelerants?

18         A.    No.

19         Q.    Did you again ask him if he knew how the fire

20    had been started?

21         A.    Yes.

22         Q.    And what did he say?

23         A.    He said he had no idea.

24         Q.    Did you again ask -- Through the course of

1    your investigation had you learned of some letters at

2    this point?

3           A.    Yes, I had.

4           Q.    What letters?

5           A.    There was letters that Mr. Amor had written

6    to Tina.

7           Q.    Did you ask the defendant anything about

8    these letters?

9           A.    Yes.

10          Q.    What did you ask him?

11          A.    One of the letters had an indication that

12   Mr. Amor said that he had a plan of attack for

13   financial gains toward the end of the summer.

14          Q.    Did you ask the defendant what he meant?

15          A.    Yes.

16          Q.    What did he say in response to that?

17          A.    He did not answer me.

18          Q.    Did you again ask the defendant at this point

19   if he knew of anything about Marianne Miceli's life

20   insurance?

21          A.    Yes.

22          Q.    What did he say?

23          A.    He didn't know anything about it.

24          Q.    Detective, now I'm going to direct your

1    attention to October 3rd of 1995.  On October 3rd of

2    1995 around 2:15 p.m., did you have the opportunity to

3    come into contact with the defendant again?

4         A.   Yes, I did.

5         Q.   And was that in DeKalb?

6         A.   Yes.

7         Q.   Why did you come into contact with him on

8    10/3?

9         A.   I wanted to ask him if he would go down to

10   Chicago to be interviewed by a gentleman down there

11   that I knew.

12        Q.   Did he agree to go with you?

13        A.   Yes.

14        Q.   And how did you get down to Chicago?

15        A.   Drove.

16        Q.   Now, prior to driving down to Chicago with

17   the defendant and driving down to Chicago with the

18   defendant, did anything occur?  Let me rephrase that.

19             What was the defendant's demeanor like when

20   he got in the car?

21        A.   He was calm, about the same, just very quiet.

22        Q.   Was he in handcuffs at the time?

23        A.   No.

24        Q.   Did you ask him if he wanted any food or

1    drink?

2         A.    Yes.

3         Q.    And what did he say?

4         A.    He said he had already eaten in DeKalb, and

5    that he just wanted to have a cigarette.

6         Q.    Did you give him a cigarette?

7         A.    Yes.

8         Q.    So it took you approximately about an hour or

9    so to get down to Chicago?

10        A.    Yes, sir.

11        Q.    And once you got down to Chicago, was the

12   defendant interviewed again?

13        A.    Yes.

14        Q.    When you finished up in Chicago it was around

15   10:30 p.m.?

16        A.    Yes, sir.

17        Q.    And then you gave the defendant a ride back

18   to Naperville?

19        A.    Yes.

20        Q.    And what was the car ride back like with the

21   defendant?

22        A.    Same as on the ride down, just very quiet and

23   just drove back to Naperville.

24        Q.    Was he handcuffed at all?

1          A.     No.

2          Q.     At any time was he handcuffed at that point

3     prior to that?

4          A.     No.

5          Q.     You arrived back to the Naperville Police

6     Department at approximately 11:30 p.m.?

7          A.     Yes, sir.

8          Q.     And what did you do when you arrived back to

9     the Naperville Police Department?

10         A.     We went down to an interview room in the

11    investigation division area.

12         Q.     Prior to that, did you ask the defendant if

13    he'd continue talking with you?

14         A.     Yes.

15         Q.     And what did he say?

16         A.     He said he would.

17         Q.     Now, at around 11:30 p.m. at the Naperville

18    Police Department, was there a process server present?

19         A.     Yes, sir.

20         Q.     And specifically what occurred with that

21    process server?

22         A.     I was told that there was a process server

23    that had some papers for Mr. Amor, and I brought him

24    down to the investigations area.

1    Q.    Who brought him, the process server, down to

2    the investigation area, do you recall?

3    A.    No.

4    Q.    Did you have anything to do with arranging

5    this process server being there?

6    A.    No.

7    Q.    What happened when the process server got

8    down to the investigation room?

9    A.    He served Mr. Amor with divorce papers.

10    Q.    When the defendant was served with the

11    divorce papers, did you notice any change in him?

12    A.    No.

13    Q.    Was his demeanor the same?

14    A.    Yes.

15    Q.    And what was that demeanor?

16    A.    Just very calm and quiet.

17    Q.    Did you have a conversation at all with the

18    person who served the divorce papers on the defendant?

19    A.    No.

20    Q.    After the defendant was served divorce

21    papers, what happened?

22    A.    We conducted an interview.

23    Q.    This interview, where did it occur?

24    A.    In the interview room in the investigations

1      division of the Naperville Police Department.

2              Q.     And you said we, who was with you at that

3      point?

4              A.     Detective Guerreri.

5              Q.     And was Detective Guerreri with you when you

6      picked up the defendant from DeKalb that day?

7              A.     Yes.

8              Q.     Was he with you the entire time from DeKalb

9      to Chicago back to Naperville?

10             A.     Yes.

11             Q.     Once you got the defendant into the interview

12     room again, is he handcuffed?

13             A.     No, sir.

14             Q.     And at this point did you read him his

15     Miranda rights?

16             A.     Detective Guerreri did.

17             Q.     And did the defendant ultimately consent to

18     questioning?

19             A.     Yes.

20             Q.     At this juncture what was the defendant's

21     condition like?  And I'll rephrase that.

22                    Did he ask for any food?

23             A.     No.

24             Q.     Drink?

```
 1        A.    Yes, we gave him a can of pop.

 2        Q.    Did you also allow throughout this

 3   interaction the defendant to smoke?

 4        A.    Yes.

 5        Q.    Were there any emotional outbursts at this

 6   point?

 7        A.    No.

 8        Q.    Was the defendant crying?

 9        A.    No.

10        Q.    So once you took the defendant into the

11   interview room you read him his Miranda rights, did you

12   again ask the defendant anything?

13        A.    We asked him to explain what occurred on the

14   date of the 10th.

15        Q.    And did the defendant begin to do that?

16        A.    Yes.

17        Q.    And when the defendant began to do that, what

18   story was he giving?

19        A.    From the information I had received from

20   other investigators he was not telling -- I didn't

21   believe he was telling the truth.

22        Q.    And because of that what did you do?

23        A.    I stood up and yelled at him that he wasn't

24   telling the truth, and then left the room for about a
```

```
 1    couple of minutes.

 2         Q.    When you told him that statement --

 3         A.    Yes, sir.

 4         Q.    -- how did you do it?  Can you describe it?

 5         A.    I stood up and yelled at him.

 6         Q.    And did you specifically yell at him that you

 7    believed he killed his mother, but he didn't do it on

 8    purpose --

 9         A.    Yes.

10         Q.    -- or something to that effect?

11         A.    Yes, sir.

12         Q.    And would you say you got up abruptly?

13         A.    Yes.

14         Q.    And then you left the room?

15         A.    Yes.

16         MS. THOMPSON:  Objection, Your Honor, to leading.

17         THE COURT:  Don't lead the witness.

18    BY MR. MINSER:

19         Q.    When you left the room what did you do next?

20         A.    I went out and got a cup of coffee.  I was

21    out there about two minutes, and then I came back into

22    the room.

23         Q.    When you came back into the room, what did

24    you observe?
```

1      A.    Mr. Amor was talking to Detective Guerreri

2  and indicating that he wanted to make a statement.

3      Q.    What was Mr. Amor's demeanor like at this

4  point?

5      A.    The same as he had been all day, quiet and

6  calm.

7      Q.    At this point did the defendant make any

8  statements about the fire?

9      A.    Yes.

10      Q.    And specifically what did he say in regards

11  to the fire?

12      A.    That he had been drinking vodka all day.

13  That at one point in time he spilled a approximately

14  12-ounce glass of vodka, 7 Up and ice cubes.  He

15  spilled it on some newspapers next to the table where

16  he was at.

17      Q.    Did he say anything at this point about any

18  ignition sources or a cigarette?

19      A.    Yes.

20      Q.    What did he say about a cigarette?

21      A.    Well, he had smoked a couple of cigarettes,

22  and he left one of the cigarettes in the ashtray on the

23  table.

24      Q.    And did he say if anything happened to that

```
1    cigarette?

2         A.    Yes.

3         Q.    What did he say?

4         A.    He said he knocked the cigarette off of the

5    ashtray onto the newspapers that were soaked with the

6    vodka.

7         Q.    And did he say anything about any

8    observations he made at this point?

9         A.    Yes, he said he saw smoke, he heard sizzling

10   noises, and a little bit of fire.

11        Q.    Did you follow up and question him about

12   that?

13        A.    Yes.

14        Q.    Did the defendant make any statement

15   pertaining to what he was thinking?

16        A.    Yes.

17        Q.    What did he say?

18        A.    He said he just didn't give a shit anymore.

19        Q.    Did he say anything at all about if he

20   observed the fire starting?

21        A.    Yes.

22        Q.    What did he say?

23        A.    He said that he saw that it was sizzling and

24   smoking and that a fire was starting.
```

1       Q.   After he observed that fire starting, what

2   did the defendant say he did next?

3       A.   He went and gave the victim Marianne a back

4   rub for a couple of minutes, and he and Tina left the

5   apartment for -- to go to the movie.

6       Q.   Did you ask the defendant if he knocked that

7   cigarette off on purpose?

8       A.   Yes, I did.

9       Q.   What did the defendant respond?

10       A.   He said he did.

11       Q.   Did the defendant say why he did it?

12       A.   He said he did it for financial gain, they

13   needed new furniture, he wanted a new TV, and he owed a

14   couple hundred dollars on a bill that he wanted to pay.

15       Q.   You said financial gain, what was the

16   defendant referring to about financial gain?

17       MS. THOMPSON:  Objection, Your Honor, speculation.

18       THE COURT:  Sustained.

19   BY MR. MINSER:

20       Q.   What did the defendant say about financial

21   gain in regards to where the money was coming from?

22       A.   He said he had a plan of attack for financial

23   gain toward the end of the summer.

24       Q.   But in regards to the money, he mentioned

```
 1    money to you?

 2         A.    Yes.

 3         Q.    Did he indicate where he believed this money

 4    was coming from?  I'll rephrase that.

 5               Were there any insurance policies that were

 6    mentioned?

 7         A.    Yes.

 8         Q.    What about insurance policies did he mention?

 9         A.    That's where he felt that he would want to

10    get some money, from an insurance policy.

11         Q.    Did you ask him about specific insurance

12    policies?

13         A.    Yes.

14         Q.    What did you ask him about specific insurance

15    policies?

16         A.    I said -- I asked him if he specifically knew

17    what insurance policies there were and how he was going

18    to collect the money.

19         Q.    And what did the defendant say?

20         A.    He said he didn't care, just whatever

21    insurance policies he could get the money from.

22         Q.    Did you ever talk to the defendant during

23    this conversation you're having about Tina?

24         A.    Yes.
```

1       Q.   Did you ask if Tina was involved in this?

2       A.   Yes.

3       Q.   What did the defendant say?

4       A.   No.  She had nothing to do with it.

5       Q.   Was the defendant asked about a smoke alarm

6 in the apartment?

7       A.   Yes.

8       Q.   What was he asked?

9       A.   Asked him where was the smoke detector in the

10 apartment.

11       Q.   What did the defendant say?

12       A.   He said he had taken it down the previous

13 Friday to put new batteries in it.

14       Q.   Throughout the course of this interview with

15 the defendant, what's his demeanor like?

16       A.   Very calm, quiet, talkative.

17       Q.   Did he ever appear distressed at all?

18       A.   No, sir.

19       Q.   Did you provide him with anything during this

20 interview process?

21       A.   Can of pop.  I let him smoke when he needed

22 to.

23       Q.   Ultimately did you have the defendant do a

24 written statement?

```
 1        A.    Yes.

 2        Q.    How was that written statement done?  What

 3   did you have him do?

 4        A.    He was read his Miranda rights off the

 5   written statement form, and then he was given the

 6   opportunity to write a statement.

 7        Q.    Did you direct him on how to write anything?

 8        A.    No, sir.

 9        Q.    Did the defendant do a written statement?

10        A.    Yes.

11        Q.    After the defendant had conducted a written

12   statement, which was done -- finished around -- I'm

13   sorry, conducted around 1:15 in the morning?

14        MS. THOMPSON:  Objection to the leading, Your

15   Honor.

16        MR. MINSER:  I apologize, Your Honor, I won't

17   lead.  I'll rephrase.

18        THE COURT:  Sustained.

19   BY MR. MINSER:

20        Q.    Sir, the written statement that was provided

21   after that, did you have the defendant do any other

22   recordings?

23        A.    Yes.

24        Q.    What did you have the defendant do?
```

Pl. Amor 028935

1      A.   I asked him to -- if he would make a

2  written -- or a voice recording of the interview.

3      Q.   And you would say -- when you refer to the

4  interview, what portion of the interview?

5      A.   The confession portion.

6      Q.   Did you have the defendant do a recorded

7  statement of the written statement specifically?

8      A.   Yes.

9      MR. MINSER:  If I can have one moment, Your Honor.

10     THE COURT:  You may.

11 BY MR. MINSER:

12     Q.   And, Detective, what you just testified to

13 about the interview, that's a summary of the interview?

14     A.   Yes.

15     Q.   And after you obtained these statements from

16 the defendant, did you contact anyone else?

17     A.   Yes.

18     Q.   Who did you contact?

19     A.   I spoke to Brian Nigohosian from the State's

20 Attorney's Office.

21     Q.   Why did you call him?

22     A.   He was on felony screening that night, and he

23 would approve charges.

24     Q.   You say that night, you had originally picked

```
1    up the defendant on 10/3?

2         A.    Yes.

3         Q.    1995?

4         A.    Yes.

5         Q.    At this point we're into 10/4, right?

6         A.    10/4, yes, sir.

7         Q.    And, Detective, were you present for a

8    recorded interview that was conducted with ASA

9    Nigohosian?

10        A.    Yes.

11   MR. MINSER:  Nothing further, Your Honor.

12   THE COURT:  Ms. Thompson, you may inquire.

13   MS. THOMPSON:  Thank you, Your Honor.

14                    CROSS-EXAMINATION

15   BY MS. THOMPSON:

16        Q.    Good morning, Detective Cross.

17        A.    Good morning.

18        Q.    You went through some of your background in

19   your time with the Naperville Police Department, but I

20   wanted to understand a couple of things about that

21   start.

22             At the time of this investigation you had

23   been a police officer for over 25 years, correct?

24        A.    Yes.
```

1      Q.   And you had 13 years of experience as a

2  detective?

3      A.   Approximately, yes.

4      Q.   How many death cases had you investigated

5  before you began investigating this one?

6      A.   Maybe 100.

7      Q.   And had you had experience in interviewing

8  suspects in other investigations that you did before

9  this one?

10      A.   Yes.

11      Q.   How many suspects had you investigated -- how

12  many suspects had you interviewed before you became

13  involved in this investigation?

14      A.   Probably 1,000.

15      Q.   How many confessions or -- Well, let me ask

16  you this, how many confessions had you taken before the

17  statement that you took for Mr. Amor?

18      A.   Numerous.  I can't give you an actual number

19  though.

20      Q.   This is something you had a lot of experience

21  doing?

22      A.   Yes.

23      Q.   And you have been trained in how to interview

24  a suspect in a crime, correct?

```
 1        A.    Yes.
 2        Q.    Where did you receive your training in how to
 3   interview a suspect?
 4        A.    It started in basic training -- when I was in
 5   basic.  Then I was -- attended numerous seminars and
 6   classes regarding that.  I also went to the John Reid
 7   School of Interview and Interrogation, they're a well
 8   known company that teaches interviewing.
 9        Q.    When did you attend John Reid?
10        A.    I don't recall exactly.
11        Q.    Was that before the investigation into this
12   case?
13        A.    Yes.
14        Q.    In your training with John Reid, did you
15   learn something -- did you learn an interview technique
16   known as the Reid method?
17        A.    Yes.
18        Q.    And is the Reid method an interviewing
19   technique that you apply in your job as an
20   investigator?
21        A.    Sometimes.
22        Q.    Did you use the Reid technique in your
23   interviews in this case?
24        A.    No.
```

1          Q.    And we understand that the -- Well, let me

2     ask you this, in the Reid technique the goal is to get

3     someone to make a statement implicating them self in a

4     crime, right?

5          A.    Yes.

6          MR. MINSER:  Objection, Your Honor, relevance.

7          THE COURT:  What's the relevance if the witness

8     testified he did not utilize the method?

9          MS. THOMPSON:  I believe I'm allowed to -- it's

10    appropriate, I think, to question whether that's the

11    case, Your Honor, and that's why I'm inquiring.

12         THE COURT:  I'll give a little latitude,

13    overruled.

14    BY MS. THOMPSON:

15         Q.    The question I asked you, Mr. Cross, is the

16    purpose of the Reid technique is to, by a method of

17    questioning, get someone to implicate them self in a

18    crime, correct?

19         A.    Correct.

20         Q.    And the goal in the Reid technique is to get

21    someone to truthfully do so, right?

22         A.    Yes.

23         Q.    But -- Well, in the Reid technique the way

24    that you, as the investigator, do so is by -- through

1    your method of questioning, letting the suspect know

2    that they don't have an option other than to make a

3    statement implicating them self, right?

4            MR. MINSER:  Objection, Your Honor.  Again,

5    relevance.

6            THE COURT:  Overruled.  If he knows he can answer.

7    BY THE WITNESS:

8        A.    Not exactly, no.  It's just a technique of

9    questioning that has been successful in obtaining

10   statements.

11       Q.    We'll, get back to the Reid technique a

12   little more in a minute.

13             I want to ask you this, this was not the

14   first fire that you investigated in your career, right?

15       A.    Correct.

16       Q.    And you have actually taken some classes in

17   fire investigation?

18       A.    Yes.

19       Q.    And did you take those in -- did you take

20   those with -- did you take those fire classes in your

21   capacity as a detective?

22       A.    Yes.

23       Q.    You are not a -- you are not certified as a

24   fire investigator, right?

Pl. Amor 028941

1       A.    Not at that time, no.

2       Q.    All right.  And you're not qualified to offer

3  opinions about the cause or the origin of a fire?

4       A.    That's correct.

5       Q.    And you're, in fact, not offering any

6  opinions about that in your testimony today, right?

7       A.    No, I am not.

8       Q.    At the time of this fire there was a captain

9  in the Naperville Police Department named Jon Ripsky,

10  J O N, R I P S K Y, correct?

11      A.    Yes.

12      Q.    And, in fact, he was your supervisor?

13      A.    Yes.

14      Q.    And he was a captain?

15      A.    Yeah, he was over the entire investigations

16  unit.

17      Q.    Okay.  And after this -- after you went to

18  the fire scene at Ms. Miceli's condo on September 10th,

19  you went to the hospital after the scene, right?

20      A.    Yes.

21      Q.    And there were members of Ms. Miceli's

22  family at the hospital that you met with?

23      A.    Yes.

24      Q.    And you learned at the hospital that, in

1    fact, Ms. Miceli was the sister-in-law of Captain

2    Ripsky?

3        A.    Yes.

4        Q.    You're always motivated to do your job when

5    you're investigating cases, correct?

6        A.    Yes.

7        Q.    But you learned early on that this was a

8    family member of a fellow police officer?

9        A.    Yes.

10        Q.    And that motivated you to investigate this

11    case thoroughly?

12        A.    Yeah.

13        Q.    That made this case a little more personal?

14        A.    No.

15        Q.    There was a person in the Miceli family who

16    you communicated with over the course of this

17    investigation that became sort of the spokesperson of

18    the family, right?

19        A.    Yeah, yes.

20        Q.    Well, you talked with Pam Leavenworth a

21    number of times over the course of this investigation,

22    right?

23        A.    Yes.

24        Q.    And she was Ms. Miceli's sister?

Pl. Amor 028943

1        A.    Yes.

2        Q.    And she also was Captain Ripsky's

3  sister-in-law?

4        A.    Yeah, I believe so.

5        Q.    And you updated her about the case every

6  couple days?

7        A.    Probably, yes.

8        Q.    And you talked to her and got various pieces

9  of information from her every couple days at least?

10       A.    No, it wasn't that often.  She only shared

11  information with me on a couple of occasions.

12       Q.    You had at least four conversations with her

13  between September 10th and September 16th, right?

14       A.    Yes.

15       Q.    And you were also giving her updates about

16  the investigation?

17       A.    Yes.

18       Q.    And you learned from Pam Leavenworth that

19  there were going to be divorce papers that Tina Miceli

20  was going to file against Bill, right?

21       A.    I don't believe so.  I don't recall that.

22       Q.    Well, is it your testimony here today that

23  you did not know that -- Well, let me ask you a

24  different question.

```
 1            You testified about the process server being
 2    at the Naperville Police Department on October 3rd, did
 3    you know before that moment that Tina Miceli was going
 4    to file divorce papers against Bill?
 5         A.   No.
 6         Q.   So your testimony here today is that's the
 7    first time you learned that information?
 8         A.   Yes.
 9         Q.   Did you ever at any point before the time
10    when there was a process server in the Naperville
11    Police Department, as you just testified, speak with
12    that process server?
13         A.   I don't understand the question.  Could you
14    please rephrase it.
15         Q.   Let me ask the question in a better way.
16    When you brought Bill Amor back to the Naperville
17    Police Department on October 3rd, you said there was a
18    process server there, correct?
19         A.   Yes.
20         Q.   And that process server's name was Russel
21    Wiedemann?
22         A.   I don't recall.
23         Q.   All right.  Had you ever talked to that
24    process server before being at the Naperville Police
```

1    Department with that person that night?

2         A.    No.

3         Q.    When you came back to the Naperville Police

4    Department that night after being in Chicago, did you

5    tell anyone what time you were going to get back to the

6    police department?

7         A.    No.

8         Q.    We'll get back to that in a minute.  You've

9    testified here about a couple of times that you

10   interviewed William Amor, but there were other times

11   that you talked to him in the course of the

12   investigation beyond what you've testified about this

13   morning, right?

14        A.    I don't recall.

15        Q.    Well, I want to go through that with you now.

16        MS. THOMPSON:  I'm showing the witness what's been

17   marked as Defendant's Exhibit 10.  This is just for

18   demonstrative purposes, Your Honor.

19   BY MS. THOMPSON:

20        Q.    Mr. Cross, do you recall that the day of this

21   fire, September 10th of 1995, was a Sunday?

22        A.    Yes.

23        Q.    And so Defendant's Exhibit 10 is a calendar

24   that reflects the dates between September 10th and

1 October 7th, correct?

2  A. Correct.

3  MS. THOMPSON: Your Honor, permission to publish

4 Defendant's Exhibit 10.

5  THE COURT: Any objection?

6  MR. MINSER: No objection.

7  THE COURT: Granted.

8  MS. THOMPSON: Thank you, Your Honor.

9 BY MS. THOMPSON:

10  Q. Mr. Cross, can you see the screen?

11  A. Yes.

12  MS. THOMPSON: Can the Court see the screen?

13  THE COURT: Yes.

14  MS. THOMPSON: All right.

15 BY MS. THOMPSON:

16  Q. So I want to briefly go through the times

17 that you interviewed Mr. Amor. So the fire happened

18 late on the evening of the 10th, correct?

19  A. Correct.

20  Q. And you've talked about going to see

21 Mr. Amor at Pam Leavenworth's house, and that was

22 early on the 11th, correct?

23  A. Yes.

24  Q. That was roughly midnight?

1   A. 12:30-ish.

2   Q. All right.  How long did you talk with

3 Mr. Amor on the 11th?

4   A. A short period of time, maybe a half hour.

5   Q. You were talking to Tina Miceli before

6 that --

7   A. Actually I was talking to Tina, yes.

8   Q. Right, but the time you actually spent

9 talking to Bill was half an hour; is that right?

10   A. That night I believe it was Detective

11 Guerreri that spoke to Bill.

12   Q. Well, you described at least an exchange you

13 had with Bill where you -- where Tina -- you were

14 asking Tina about the life insurance, right?

15   A. Yes.

16   Q. And didn't you talk with Bill Amor after that

17 exchange?

18   A. Yes.

19   Q. And how long did you talk with him after that

20 exchange?

21   A. A couple minutes.

22   Q. And then the next day, September 12th,

23 Mr. Amor came into the police station for an interview

24 that morning that was with someone that was not you,

```
 1    right?
 2         A.    Correct.
 3         Q.    And you talked with him after that interview,
 4    right?
 5         A.    I don't recall.
 6         Q.    Is your memory exhausted about whether you
 7    talked with Mr. Amor after that interview?
 8         A.    Yes.
 9         Q.    And would reviewing a copy of your report
10    refresh your memory about whether or not you spoke with
11    him?
12         A.    Yes, ma'am, it would.
13         Q.    We'll move on to that in one second.
14               December 12th -- or excuse me, September 12th
15    of 1995 was also the day of Marianne Miceli's wake,
16    right?
17         A.    I don't recall.
18         Q.    All right.  September 13th was the day of her
19    funeral, right?
20         A.    Again, I don't recall those.
21         Q.    Okay.  And then September 14th -- September
22    14th was not a day that you interviewed Bill, right?
23         A.    I'm not sure.  I don't believe so.
24         Q.    But you did talk with him on September 15th?
```

```
 1          A.    I don't recall exactly.

 2          Q.    Well, was there a time when you went and

 3    interviewed him at a hotel that he was staying at with

 4    his then wife?

 5          A.    Yes.

 6          Q.    And how long did you talk with him with that

 7    interview?

 8          A.    About a half hour.

 9          Q.    All right.  And later in the day when you

10    talked with him at the Exel Inn you learned that he had

11    actually been arrested by the Naperville Police

12    Department, right?

13          A.    Yes.

14          Q.    And that was on something unrelated to this

15    case?

16          A.    Correct.

17          Q.    And when did you learn that he had been

18    arrested?

19          A.    I don't recall.

20          Q.    You talked with him that day as well while he

21    was in the custody of the Naperville Police Department

22    on this other matter, right?

23          A.    I don't recall.

24          Q.    Do you have any memory of interviewing him at
```

1     the Naperville Police Department before he was taken to
2     DeKalb?
3          A.    No.
4          Q.    And is your memory exhausted on that point?
5          A.    Yes, it is.
6          Q.    And would reviewing a report that you
7     completed refresh your memory about that?
8          A.    Yes, ma'am, it would.
9          Q.    All right.  We'll come back to that in a
10    minute.
11               And then we talked about you interviewing him
12    on October 3rd, right?
13         A.    Yes.
14         Q.    And into October 4th?
15         A.    Yes.
16         Q.    And when did you first meet with Mr. Amor on
17    October 3rd?
18         A.    Before midnight.
19         Q.    Well, you'd actually started the day with him
20    at 2:15 on October 3rd, right?
21         A.    I don't recall.
22         Q.    Well, you met him in DeKalb?
23         A.    Yes.
24         Q.    And that was in the afternoon?

```
 1        A.    That was on that date.

 2        Q.    On October 3rd?

 3        A.    Was that on that date?

 4        Q.    Well, I'm asking what you remember.

 5        A.    Okay.

 6        Q.    You met him on a day in DeKalb?

 7        A.    Yes.

 8        Q.    And you met with him up until he had

 9   completed an interview with ASA Nigohosian early the

10   next morning?

11        A.    Yes.

12        Q.    So in total you were with him that day from

13   in the afternoon when you picked him up until ASA

14   Nigohosian was done with him, correct?

15        A.    Yes.

16        Q.    And you're aware that other detectives

17   interviewed him about this case other times as well,

18   correct?

19        A.    Yes.

20        Q.    So let's go back to -- let's go back to your

21   interview with him on 9/11.  Well, let's actually go

22   back to the scene, I have a couple questions for you

23   about that first.

24              By the time you got to the scene of this
```

1    fire, the fire was -- had been suppressed, right?

2         A.    Yes.

3         Q.    And you said that you did not observe a smoke

4    detector while you were looking around?

5         A.    Yes.

6         Q.    Did you look for a smoke detector?

7         A.    Yes.

8         Q.    Where in the apartment did you look for a

9    smoke detector?

10        A.    I looked on the wall, I think it was above

11   the breaker box because there was a couple of screw

12   holes there.

13        Q.    Are those the only screw holes you saw in the

14   entire apartment?

15        A.    It's the only ones I paid attention to.

16        Q.    Why was your attention drawn to that

17   particular area?

18        A.    Because it looked like an area where you

19   might have a smoke detector.

20        Q.    And so you saw two screw holes on the wall

21   there?

22        A.    Yes.

23        Q.    And did you look anywhere else in the

24   apartment for a smoke detector?

1      A.    Yes, I looked through the whole apartment.

2      Q.    How long did you spend looking for a smoke

3   detector?

4      A.    Half hour at the most.

5      Q.    Were you just looking for one that was on the

6   wall or the ceiling?

7      A.    Yes.

8      Q.    All right.  So you weren't looking elsewhere

9   in the -- on the furnishings of the apartment for a

10  smoke detector?

11     A.    Yes, I did.

12     Q.    Where in the apartment did you check the

13  furnishings?

14     A.    There was a shelf right near where the smoke

15  detector was.

16     Q.    And anywhere else besides that shelf you

17  looked?

18     A.    No.

19     Q.    Did anyone else join you in your search of

20  the apartment for a smoke detector?

21     A.    I believe Lieutenant Ferrari from the fire

22  department was there.

23     Q.    And was he looking as well?

24     A.    Yes.

```
 1        Q.    When you were there you saw that there was

 2   debris all over the floor of the condo, right?

 3        A.    Yes.

 4        Q.    And you're aware that there were materials

 5   that had been shoveled out of the apartment into the

 6   courtyard area below?

 7        A.    Yes.

 8        Q.    And the furniture was in disarray?

 9        A.    Yes.

10        Q.    There had been water that had been sprayed in

11   the apartment?

12        A.    Yes.

13        Q.    Things had been moved?

14        A.    Yes.

15        Q.    It certainly didn't look like how it looked

16   when presumably when someone was living there, right?

17        A.    Correct.

18        Q.    And you became the lead investigator in this

19   case ultimately, right?

20        A.    Yes.

21        Q.    And that's because you had experience in fire

22   investigations?

23        A.    Yes.

24        Q.    And as you said, even at the scene you
```

1  learned that there were other people that lived in this
2  condo besides Ms. Miceli?
3      A.    Yes.
4      Q.    And as you said, you learned that one of them
5  was Bill Amor?
6      A.    Yes.
7      Q.    You also learned even at the scene -- well,
8  let me ask you this.
9            After the scene is when you said you went to
10 the hospital?
11     A.    Yes.
12     Q.    And as you've said, you met with the family
13 at the hospital?
14     A.    Yes.
15     Q.    And you learned even at the hospital that the
16 family did not care for Bill Amor?
17     A.    Yes.
18     Q.    And you learned that they were upset about
19 his marriage to Tina Amor?
20     A.    Yes.
21     Q.    And then after meeting with them at the
22 hospital you went back to the scene, right?
23     A.    Yes.
24     Q.    I want to ask you a couple questions about

1    your interview then with Tina and with Bill.  Now, as

2    you said, when you went to Pam Leavenworth's house

3    after being at the hospital, you talked with Tina and

4    someone else talked with Bill in the basement?

5        A.    Yes.

6        Q.    And it was actually in that interview with

7    Tina where she told you that she lost a cigarette that

8    night, right?

9        MR. MINSER:  Objection, Your Honor, hearsay.

10       THE COURT:  Overruled.

11   BY THE WITNESS:

12       A.    Could you ask me that question again, please?

13       Q.    Sure.  It was in that interview with Tina

14   that she told you that she lost a cigarette that night?

15       A.    No, I don't recall that.

16       Q.    Well, would looking at a copy of your report

17   refresh your memory about what Tina told you in her

18   interview with you that night?

19       A.    Sure.

20       THE COURT:  For the record, this is to perfect the

21   impeachment of Tina as it relates to what she told law

22   enforcement; is that correct?

23       MS. THOMPSON:  Well, we have two purposes, Your

24   Honor.  One is not for the truth, but simply for when

Pl. Amor 028957

1    this concept was introduced into the investigation.

2         THE COURT:  Okay.

3         MS. THOMPSON:  And there is also the issue with

4    Ms. Miceli.

5         THE COURT:  All right.

6         MS. THOMPSON:  But we're addressing it for both

7    purposes, Your Honor.

8         THE COURT:  All right.

9         MR. SCALIATINE:  I'm sorry, and I understand the

10    perfecting of the Miceli impeachment, but if we can

11    just flush out this not for the truth of the matter

12    asserted other purpose.

13         THE COURT:  To show which concept, Ms. Thompson?

14         MS. THOMPSON:  The issue is when in this

15    investigation the concept that someone may have had a

16    cigarette somehow involved in this fire, what that

17    concept first came up in the investigation, that's the

18    purpose, Your Honor.

19         THE COURT:  All right.  Overruled.

20    BY MS. THOMPSON:

21         Q.  I'm showing the witness what's been marked as

22    Defendant's Exhibit 57.

23         THE COURT:  I'm sorry, what was the number?

24         MS. THOMPSON:  57, Your Honor.

BY MS. THOMPSON:

Q.    Mr. Cross, this is a copy of a report that you completed that includes, in part, a summary of your interview with Tina Miceli on September 11th of 1995, correct?

A.    Yes.

Q.    And I'm not asking you to read it out loud, but please review it and let me know if your memory is refreshed as to whether Tina told you that she misplaced a cigarette that night.

A.    She said that she had put a cigarette in the ashtray.  She didn't say she lost it, but she left it there, but she couldn't recall if it was lit or ...

Q.    So after reviewing your report, is that your memory of what Ms. Miceli told you on September 11th in the early morning hours?

A.    Yeah, it wasn't that she lost the cigarette, it was just she left it behind.

Q.    Well, in the report I just showed you, Defendant's Exhibit 57, didn't you record Tina said she thought she put it out in the ashtray on the dining room table but wasn't sure?

A.    Yes.

Q.    And that was the first time in your

```
1    investigation that someone had mentioned the idea that

2    there might have been a lost cigarette?

3         A.    Nobody ever said that there was a lost

4    cigarette.

5         Q.    Well --

6         A.    It might have been left there, but it wasn't

7    lost.

8         Q.    Okay.  Well, that's the first time someone

9    mentioned to you that they had a cigarette and they

10   weren't sure where they put it?

11        A.    Correct.

12        Q.    All right.  And you said in your testimony

13   that you then learned from someone that there had been

14   a life insurance policy?

15        A.    Yes.

16        Q.    You did not learn that from Bill?

17        A.    No.

18        Q.    You did not learn that from Tina?

19        A.    No.

20        Q.    And, in fact, at various times you did have

21   an opportunity to inquire of Tina as to whether she

22   knew that there had been a life insurance policy from

23   her personal knowledge, right?

24        A.    Yes.
```

1      Q.      And that's not something she ever told you?

2      A.      No, she never did.

3      Q.      Okay.  And you said that when you asked Tina

4  about the life insurance policy that Bill blurted

5  something out and interrupted her?

6      A.      Yes.

7      Q.      And you said she was starting to answer?

8      A.      Yes.

9      Q.      When you came to Pam Leavenworth's home on

10  the morning of September 11th, you didn't have to tell

11  Tina that her mother had died, right?

12      A.      No.

13      Q.      When you came she already -- she'd already

14  been told that?

15      A.      Yes.

16      Q.      And she was upset?

17      A.      Yes.

18      Q.      And she was crying?

19      A.      I don't recall.

20      Q.      She was shocked?

21      A.      She was upset.

22      Q.      This is obviously upsetting news?

23      A.      Sure.

24      Q.      And when you started talking with her, as you

1    said, it was about midnight?

2         A.    Mm-hmm.  Yes.

3         Q.    And this is not information she had known for

4    very long?

5         A.    No.

6         Q.    Did you receive any information that -- Well,

7    let me ask you this.

8               In your conversation with Tina Miceli did it

9    seem that she had been drinking?

10        A.    No.

11        Q.    Did you smell alcohol on her breath?

12        A.    No.

13        Q.    In your experience is life insurance

14   sometimes one of the ways that people use to pay for a

15   loved one's funeral?

16        A.    Yes.

17        Q.    And obviously also a reason that life

18   insurance could come up in an investigation that you're

19   doing is because it's relevant to why someone died,

20   right?

21        A.    Yes.

22        Q.    And so asking somebody about life insurance

23   could be about, you know, the logistics of how a

24   funeral's going to happen?

```
 1          A.    That can be part of it, yes.

 2          MR. MINSER:  Objection, speculation.

 3          THE COURT:  Sustained.

 4   BY MS. THOMPSON:

 5          Q.    Well, asking somebody about life insurance

 6   can be an upsetting question, right?

 7          MR. MINSER:  Objection, speculation.

 8          THE COURT:  Sustained.

 9   BY MS. THOMPSON:

10          Q.    You were asking this question of somebody who

11   was already upset, right?

12          A.    Yes.

13          Q.    And that was a question that Bill didn't want

14   his wife to have to answer, right?

15          A.    Yes.

16          Q.    And he cut the question off?

17          A.    Yes.

18          Q.    And he said to you that they didn't know

19   anything about that?

20          A.    He said we don't know anything about that.

21          Q.    And in all the conversations that you ever

22   had with Bill, he never told you that he did know about

23   the life insurance, right?

24          A.    Right.
```

1      Q.   And he never told you that Tina knew about

2  it?

3      A.   Correct.

4      Q.   And the other times -- You mentioned earlier

5  that you did have other conversations with Tina, you

6  had those conversations when Bill wasn't there, right?

7      A.   Yes.

8      Q.   So those conversations obviously came after

9  this, right?

10      A.   Yes.

11      Q.   But you had other opportunities to ask her

12  about the life insurance, right?

13      A.   Yes.

14      Q.   And she didn't -- Again, she never told you

15  that she had known about it?

16      MR. MINSER:  Objection, hearsay.

17  BY THE WITNESS:

18      A.   No.

19      THE COURT:  Sustained.

20      MS. THOMPSON:  I'll move on, Your Honor.

21  BY MS. THOMPSON:

22      Q.   So after that exchange, as you said, you

23  talked with Bill again?

24      A.   Yes.

```
1          Q.    And he was cooperative with you?

2          A.    Yes.

3          Q.    And he answered your questions?

4          A.    Yes.

5          Q.    And you also asked him about this cigarette,

6    right?

7          A.    Yes.

8          Q.    And he told you that maybe someone had left a

9    cigarette somewhere?

10         A.    Yes.

11         Q.    At this point you also asked Bill to inspect

12   his clothes, right?

13         A.    Yes.

14         Q.    And that's because at this point you were

15   concerned that this fire might have been intentionally

16   set?

17         A.    Yes, ma'am.

18         Q.    So you were looking for evidence of that?

19         A.    Yes.

20         Q.    So you smelled Bill's clothes for -- to see

21   if they smelled unusual?

22         A.    Yes.

23         Q.    You were looking for the smell of gasoline?

24         A.    Or any other accelerant.
```

```
1        Q.    Right.  Accelerants you could smell, one
2   would be gasoline?
3        A.    Yes.
4        Q.    Or lighter fluid?
5        A.    Yes.
6        Q.    Or kerosene?
7        A.    Yes.
8        Q.    Or a paint thinner?
9        A.    Sure.
10       Q.    And you didn't smell any of that?
11       A.    No.
12       Q.    You also asked him to look at his shoes?
13       A.    Yes.
14       Q.    And you smelled those?
15       A.    Yes.
16       Q.    You didn't smell anything that smelled like
17  an accelerant?
18       A.    No.
19       Q.    And, in fact, you asked Bill if you could
20  take his shoes?
21       A.    Yes.
22       Q.    And one reason you might be taking someone's
23  shoes is so there can be some testing done on those?
24       A.    Yes.
```

1    Q.    And Bill did not appear to you to be somebody

2    who had a lot of money?

3         A.    No.

4         MR. MINSER:  Objection, Your Honor, relevance.

5         THE COURT:  Overruled.

6    BY MS. THOMPSON:

7         Q.    And he did ask you, you know, if you were

8    going to need to keep them?

9         A.    Yes.

10        Q.    And he let you have them, right?

11        A.    Yes.

12        Q.    And he, in fact, asked you if he was going to

13   get them back?

14        A.    Yes.

15        Q.    And you said no?

16        A.    No, I said eventually you'll get them back.

17        Q.    Okay.  But not right away?

18        A.    Not right away.

19        Q.    He still gave them to you?

20        A.    Yes.

21        Q.    And you did also collect while you were there

22   with Tina and Bill some movie ticket stubs from them?

23        A.    Don't recall.

24        Q.    All right.  Well, they told you they had been

1    at the movies, right?

2           A.    Yes.

3           Q.    Is your memory exhausted about whether you

4    got ticket stubs from them?

5           A.    Yes.

6           Q.    And would reviewing a copy of your --

7           MS. THOMPSON:  Well, I'll move on, Your Honor.

8    BY MS. THOMPSON:

9           Q.    So there was a search that was conducted of

10   the house later that morning, of Marianne Miceli's

11   house later that morning, right?

12          A.    Yes.

13          Q.    And that's when there were these letters that

14   were found?

15          A.    Yeah, they weren't found in the house.

16          Q.    There were found in the condo, right?

17          A.    I don't recall.  I thought they were found in

18   Bill's -- trunk of Bill's car.

19          Q.    Were you the person who specifically looked

20   for them?

21          A.    No.

22          Q.    And when did you become aware that there had

23   been letters that had been located?

24          A.    Later on.

1    Q.    Okay.  And you immediately started reviewing

2    those letters when you got them?

3    A.    Yes.

4    Q.    There were a bunch of letters, right?

5    A.    Yes.

6    Q.    A big stack?

7    A.    Yes.

8    Q.    And you found something in one of those

9    letters that you thought was relevant to this

10   investigation?

11   A.    Yes, I did.

12   Q.    And that was the plan for monetary gain

13   language you just talked about?

14   A.    Yes.

15   Q.    You didn't find anything that to you was

16   relevant to the investigation in any of the rest of the

17   letters?

18   A.    Not that I recall.

19   Q.    Okay.  And I know your testimony a minute ago

20   was that you did not recall talking to William Amor the

21   next day?

22   A.    Yes, that's correct.

23   Q.    Would reviewing a copy of your report refresh

24   your memory about whether you talked to him the next

1  day?

2       A.    Okay.   What date would that be?

3       Q.    Talking about September 12th of 1995.

4       A.    Okay.

5       Q.    Would reviewing the report refresh your

6  memory?

7       A.    Yes.

8       Q.    The question that I'd ask you earlier,

9  Mr. Cross, was whether you interviewed Mr. Amor the

10  next day on September 12th?

11       A.    Yes.

12       Q.    You did interview him.  And is it -- He had

13  actually come in for an interview with someone that was

14  not you?

15       A.    Correct.

16       Q.    And after that interview you talked to him,

17  right?

18       A.    I don't recall.

19       Q.    Is your memory exhausted on whether you spoke

20  to him?

21       A.    Yes, it is.

22       Q.    And would reviewing a copy of your report

23  refresh your memory on that point?

24       A.    Yes.

1    MS. THOMPSON:  Okay.  I'm approaching the witness

2    with what has been marked as Defendant's 52.

3    BY MS. THOMPSON:

4        Q.    And I'd ask you to look at Defendant's 52 and

5    let me know if your memory is refreshed as to whether

6    you spoke with Mr. Amor.

7        A.    Yes.

8        Q.    When you spoke with Mr. Amor on

9    September 12th he had been drinking, right?

10       A.    I don't remember specifically, no.

11       Q.    Well, would reviewing a copy of your report

12   refresh your memory on whether it was your conclusion

13   he had been drinking?

14       A.    Yes.

15       Q.    All right.  And I'm going to hand you again

16   Defendant's 52.

17       A.    Yes, I remember.

18       Q.    On September 12th when you talked to him had

19   he been drinking?

20       A.    Yes.

21       Q.    You still interviewed him?

22       A.    No, he didn't want to come into the police

23   station because they had been drinking.

24       Q.    Well, he did come into the police station

1    that day though, right?

2         A.    I think I'm getting my days confused between

3    the 12th and the 15th.

4         Q.    Okay.  So is it your testimony that he did

5    not come into the police station on September 12th to

6    be interviewed?

7         A.    I don't recall him coming in that day.

8         Q.    Well, didn't you complete a report that

9    indicated that you interviewed him at the

10   investigations division of the Naperville Police

11   Department on September 12th of 1995 at 11:20 hours?

12        A.    I don't recall.

13        Q.    Well, is your memory exhausted on that point,

14   sir?

15        A.    Yes, it is.

16        Q.    And would reviewing a copy of your report

17   refresh your memory?

18        A.    Yes, ma'am.

19        Q.    Okay.  Showing the witness again what's been

20   marked as Defendant's 52.

21        A.    This is on the 12th?

22        Q.    This report is dated September 12th.

23        A.    Yes, we did interview him.

24        Q.    And, as you said, he had been drinking?

1      A.     Yes.

2      Q.     But he was cooperative with you?

3      A.     Yes.

4      Q.     And he agreed to talk to you?

5      A.     Yes.

6      Q.     And did he give you any information on

7   September 12th during your interview that was relevant

8   to your investigation?

9      A.     That was an interview -- a background

10  information on him, where he had grown up, where he

11  lived.

12     Q.     Did you only ask him those background

13  questions on September 12th because he had been

14  drinking?

15     A.     No.

16     Q.     Well, was your intention to ask him other

17  questions that day beyond background questions?

18     A.     Yes.

19     Q.     But you couldn't do that because he had been

20  drinking?

21     A.     Yes.

22     Q.     And he came to the police station on

23  September 12th because the police department had asked

24  him to come in for an interview?

1        A.      Yes.

2        Q.      And he did that willingly?

3        A.      Mm-hmm.  Yes.

4        Q.      And at the end of your interview on the 12th

5    you asked him if he would be willing to come in again

6    for an interview, right?

7        A.      Yes.

8        Q.      And that takes us to September 15th, that was

9    the date that was set?

10       A.      Yes.

11       Q.      And he called you that morning, and he said

12   that Tina had been upset and that they couldn't come,

13   right?

14       A.      Yes.

15       Q.      And he also told you on September 15th that

16   he had been drinking?

17       A.      Yes.

18       Q.      And so he didn't want to come in to do those

19   interviews?

20       A.      Correct.

21       Q.      And so instead of doing those interviews, you

22   and Investigator Cunningham went to the motel?

23       A.      Yes.

24       Q.      And you personally interviewed Bill on that

1    date?

2            THE COURT:   What was that date, I apologize?

3            MS. THOMPSON:   On September 15th of 1995.

4    BY THE WITNESS:

5            A.    Yes.

6            Q.    It was on September 15th of 1995 that you

7    asked him those questions, as you testified, about the

8    nature of this fire, right?

9            A.    Yes.

10           Q.    And some of the questions you were asking him

11   were because of information you had actually learned

12   the day before, right?

13           A.    I believe so, yes.

14           Q.    Because on September 14th of 1995 you

15   actually met with fire investigators?

16           A.    Yes.

17           Q.    And the fire investigators had focused your

18   attention on one of the chairs that were in the living

19   room of the condo?

20           A.    Yes.

21           Q.    And they had actually asked you to talk to

22   witnesses to see if anyone had been smoking in a chair

23   that day?

24           A.    Yes.

1      Q.   And so you did talk to Tina Miceli on

2  September 14th, right?

3      A.   Yes.

4      Q.   And she told you on September 14th that she

5  had actually sat in her mom's recliner smoking that

6  day, right?

7      MR. MINSER:  Objection, Your Honor.

8      THE COURT:  What's the objection?

9      MR. MINSER:  Hearsay.

10     THE COURT:  Sustained.  Actually, I apologize.

11  Overruled as it relates to impeachment.

12     MR. SCALIATINE:  Once I hear hearsay I object.

13     THE COURT:  No, it would be relevant as it relates

14  to Tina impeachment.

15     MR. SCALIATINE:  And, Judge, just for the record,

16  and I apologize for interrupting, but so that the

17  witness doesn't have to be re brought in their case in

18  chief we've agreed to allow certain impeachment, but as

19  soon as I heard hearsay I jumped the gun.

20     THE COURT:  That's fine.  I understand.

21  BY MS. THOMPSON:

22      Q.   On September 14th of 1995, Tina Miceli told

23  you that she had sat in her mom's recliner on September

24  10th of 1995, and she had lit a cigarette, right?

Pl. Amor 028976

```
 1          A.    Yes.

 2          Q.    And she told you that she does not remember

 3    what she did with that cigarette?

 4          A.    That's correct.

 5          Q.    So that's why on September 15th you were

 6    interviewing Bill and asking him questions -- more

 7    additional questions about the fire?

 8          A.    Yes.

 9          Q.    And you asked him questions that were more

10    focused than some of the questions you'd asked him

11    before, right?

12          A.    Yes.

13          Q.    I mean, you told him at the beginning of the

14    interview that this was a fast fire?

15          A.    Yes.

16          Q.    And you started asking him very specific

17    questions about accelerants?

18          A.    Yes, I did.

19          Q.    And you also were aware that Tina Miceli had

20    mentioned to investigators earlier that she had spilled

21    lighter fluid in the house at some point or in the

22    condo at some point?

23          A.    Yes.

24          Q.    And he told you that he did not know anything
```

Pl. Amor 028977

1    about any accelerants in the house?

2         A.    That's correct.

3         Q.    And that's taking us back to September 15th,

4    that's when Bill told you that?

5         A.    Yes.

6         Q.    And as you said, you asked him about that

7    plan of attack language from the letters?

8         A.    Mm-hmm.

9         Q.    And you said he didn't answer?

10        A.    Correct.

11        Q.    So can you describe what exactly happened

12   when you asked him that question?

13        A.    He just sat there in silence.

14        Q.    How long did he sit there in silence for?

15        A.    Until I asked him the next question.

16        Q.    How long was that?

17        A.    I don't recall.

18        Q.    Do you have any idea as you sit here today

19   how long that was?

20        A.    A short period of time, probably a minute or

21   so.

22        Q.    What was the next question?

23        A.    I don't recall.

24        Q.    And later that day, as you've said, Bill was

```
1    arrested, although not by you?
2         A.    Yes.
3         Q.    And Tina Miceli also came to the police
4    station that day as well as Bill?
5         A.    Yes.
6         Q.    Did you talk with Tina Miceli at the police
7    station that day?
8         A.    I don't recall.
9         Q.    Before you talked to Bill on September 15th
10   he talked with other detectives?
11        A.    Yes.
12        Q.    And he made a statement to them?
13        A.    Yes.
14        Q.    And when you talked with him later you were
15   confronting him about that statement?
16        A.    I believe so.
17        Q.    And you told him that you didn't think he was
18   telling the truth?
19        A.    Yes.
20        Q.    And he persisted in telling you that the same
21   account he'd given to you before about what had
22   happened that morning was true?
23        A.    Yes.
24        Q.    And you told him that you didn't believe him?
```

```
 1        A.    Yes.

 2        Q.    And that's something that you told him

 3   repeatedly during that interview?

 4        A.    I probably told him once.

 5        Q.    Well, how many times did you go through his

 6   account with him on the interview you had with him on

 7   September 15?

 8        A.    I didn't even go through the whole account.

 9        Q.    And you said you talked with him for about a

10   half an hour?

11        A.    Yes.

12        Q.    So what did you talk with him about for about

13   a half an hour?

14        A.    About what happened on the date of the fire.

15        Q.    Who -- Were both of you talking equal

16   amounts?

17        A.    I don't recall.

18        Q.    Was there someone who was doing more talking?

19        A.    Again, I don't recall.

20        Q.    All right.  And then at that point, as you

21   said, Bill went to DeKalb?

22        A.    He went where?

23        Q.    He went to DeKalb after that?

24        A.    Yes, yes.
```

```
1          Q.    And he was in jail in DeKalb?

2          A.    Yes.

3          Q.    For several weeks?

4          A.    A couple weeks I believe.

5          Q.    And you did not try to go talk to him while

6     he was at the DeKalb Jail?

7          A.    No.

8          Q.    As a law enforcement officer that's something

9     that you could have done?

10         A.    Yes.

11         Q.    But it's not something you chose to do?

12         A.    Correct.

13         Q.    You were in DeKalb on October 3rd because you

14    learned that Bill had a court date on that day, right?

15         A.    Yes.

16         Q.    And that he could be released as a result of

17    the court date?

18         A.    Yes.

19         Q.    And your desire was to continue interviewing

20    him?

21         A.    Yes.

22         Q.    And you obviously didn't -- you wanted to

23    make sure that he'd be there when you went to get him

24    so you could continue to interview him if he agreed?
```

1       A.    Yes.

2       Q.    Okay.  So you said that -- Well, I want to

3  ask you this, when you met him in the lobby it was

4  about 2:15?

5       A.    Yes.

6       Q.    And he had court earlier that day?

7       A.    Yes.

8       Q.    So it was your understanding he'd actually

9  gone to court?

10      A.    Yes.

11      Q.    So he didn't wake up two minutes before you

12  came to pick him up?

13      A.    No.

14      Q.    Someone has to be processed out of the jail?

15      A.    Yes.

16      Q.    And that takes some time?

17      A.    Yes.

18      Q.    And when he walked out do you remember what

19  he was wearing?

20      A.    No.

21      Q.    Did he have any property with him when he

22  came out?

23      A.    I don't recall.

24      Q.    Were you the person who booked him into

1    custody at Naperville the next morning on October 4th?

2          A.    No.

3          Q.    Do you remember at any point between when you

4    picked him up on October 3rd and when you last saw him

5    at the Naperville Police Department on October 4th

6    whether he had any property with him?

7          A.    I don't recall.

8          Q.    Did you ever see him take out a wallet?

9          A.    I don't remember.

10         Q.    Did he have his own cigarettes with him?

11         A.    I don't remember.

12         Q.    So when you saw him in the lobby at the jail,

13   you said words to the effect of him that you -- words

14   to the effect that you wanted him to come participate

15   in an interview with a third-party?

16         A.    Yes.

17         Q.    And you told him that it would be in his best

18   interest if he did that?

19         A.    No.

20         Q.    Well, did Detective -- Detective Guerreri was

21   with you?

22         A.    Yes.

23         Q.    Did Detective Guerreri tell him it would be

24   in his best interest to do that?

Pl. Amor 028983

1      MR. MINSER:  Objection, hearsay.

2  BY THE WITNESS:

3      A.    I don't recall that.

4      THE COURT:  Overruled.

5  BY MS. THOMPSON:

6      Q.    Did you say anything in the lobby other than

7  words to the effect that you wanted him to come for

8  that interview?

9      A.    Not that I recall.

10     Q.    So you said that and he agreed?

11     A.    Yes.

12     Q.    And then you walked out in silence?

13     A.    Yeah.

14     Q.    And you said he agreed to come with you?

15     A.    Yes.

16     Q.    And he was calm?

17     A.    Yes.

18     Q.    What about his demeanor was calm?

19     A.    He was just very calm.  He was always

20  talkative, but he was just -- he was not distressed, he

21  was not crying, he was not -- didn't appear to be upset

22  in any way.

23     Q.    So he wasn't animated?

24     A.    He was always animated, but he wasn't

1     really -- you know, because he was always talking, you

2     know, but he was not upset in any way, not crying,

3     not --

4         Q.   Well, describe how he was animated.

5         A.   Like I said, he was always very talkative.

6         Q.   Okay.  But you said this time he wasn't

7     talkative.

8         A.   I don't recall.

9         Q.   Well, wasn't your testimony that he was

10    quiet?

11         A.   Yes.

12         Q.   And you said he was calm?

13         A.   Yes.

14         Q.   Was his behavior consistent with someone who

15    is tired?

16         MR. MINSER:  Objection, Your Honor, speculation.

17         THE COURT:  Overruled.

18   BY THE WITNESS:

19         A.   I didn't notice that he was tired.

20         Q.   But he didn't say much?

21         A.   Correct.

22         Q.   And he didn't do much?

23         A.   No.

24         Q.   And then you had to drive to Chicago?

Pl. Amor 028985

```
1           A.      Yes.

2           Q.      And Detective Guerreri is the one who's

3    driving?

4           A.      Yes -- no, I was driving.

5           Q.      Okay.  Detective Guerreri is up in the front

6    with you?

7           A.      Yes.

8           Q.      And Bill's in the back?

9           A.      Yes.

10          Q.      Did you talk with Bill on the drive to

11   Chicago about anything?

12          A.      No.

13          Q.      Did you talk with Detective Guerreri on the

14   way to Chicago?

15          A.      No, I don't recall any conversation.

16          Q.      Okay.  That's a 90 minute drive?

17          A.      Probably.

18          Q.      Did anyone say anything?

19          A.      You know, it might have been some small talk,

20   but I don't recall anything specifically that we would

21   have talked about.

22          Q.      You get to Chicago at about 4:15?

23          A.      Yes.

24          Q.      And this is an arranged appointment at the
```

PI. Amor 028986

1    offices in Chicago?

2         A.    Yes.

3         Q.    And when you get to Chicago does either you

4    or Detective Guerreri have to open the back door of the

5    car for Bill to get out, right?

6         A.    No, it was not locked.

7         Q.    Well, the car you're driving is a type of car

8    where when it goes into drive the doors automatically

9    lock?

10        A.    Yes.

11        Q.    Did you unlock the doors for Bill when you

12   got to Chicago?

13        A.    I think he just unlocked it himself.  I mean,

14   you have the tab you pull up and unlock the door.

15        Q.    When you go to those interviews in Chicago,

16   can you describe the office space that they took place

17   in?

18        A.    Yeah, it's a rather large office space, large

19   lobby.  Then there is interview rooms beyond the lobby.

20   I believe it was on the 12th floor of the building.

21        Q.    So you went into that interview space, and

22   Bill went into one of those interview rooms?

23        A.    Yes.

24        Q.    And you and Detective Guerreri waited?

```
1          A.    Yes, we did.
2          Q.    Did you talk with the person who was going to
3    be interviewing Bill before he went back into the
4    interview?
5          A.    Yes.
6          Q.    And how long did you talk with that person
7    for?
8          A.    Approximately a half hour.
9          Q.    And Bill waited while you did that?
10         A.    Yes.
11         Q.    And then he had his interview?
12         A.    Yes.
13         Q.    And that took about a half an hour?
14         A.    A little bit more.
15         Q.    Okay.  There was an -- he had an interview,
16   and then there was sort of a second interview component
17   to that, right?
18         A.    Correct.
19         Q.    And in total that took about 90 minutes?
20         A.    Yes.
21         Q.    And after that interview concluded with the
22   third-party, you and Detective Guerreri questioned
23   Bill?
24         A.    Yes.
```

1   Q. And you were talking to him about this case?

2   A. Nothing else to talk to him about, yes.

3   Q. You told him in that interview in Chicago

4 that you thought he started this fire?

5   A. Again, I recall that happening later at the

6 Naperville Police Department.

7   Q. So you went back to Chicago?

8   THE COURT: Ms. Thompson, can I just ask you to

9 hold on one second.

10   MS. THOMPSON: Sure.

11   THE COURT: The Court's taking an extremely brief

12 recess.

13       (A short recess was had.)

14   THE COURT: You may continue.

15   MS. THOMPSON: Thank you, Your Honor.

16 BY MS. THOMPSON:

17   Q. After leaving Chicago you go back to

18 Naperville?

19   A. Yes.

20   Q. And you're in the car for about an hour?

21   A. Yes.

22   Q. And did you talk with Bill on that car ride?

23   A. If it was anything it was just small talk.

24 It wasn't any interview or anything other than small

```
 1          Q.    At those offices?

 2          A.    Yes.

 3          Q.    How long did you question him for?

 4          A.    I don't recall, half hour probably --

 5     possibly.

 6          Q.    That interview got heated, right?

 7          A.    No.

 8          Q.    Well, you told Bill in that interview that

 9     you did not believe his story?

10          A.    That was later at the Naperville Police

11     Department.

12          Q.    Well, you told him at that interview in

13     Chicago that you wanted him to tell the truth?

14          A.    I believe that took place at the Naperville

15     Police Department later on when we got back.

16          Q.    Well, did Bill talk with you -- In that half

17     an hour interview that you had with him there, was Bill

18     talking to you?

19          A.    Yes.

20          Q.    And was he giving you information about this

21     case?

22          A.    I don't recall.

23          Q.    Okay.  Were you talking with him?

24          A.    We were talking, yes.
```

```
1    talk.

2         Q.    Did you and Detective Guerreri talk to each

3    other on that car ride?

4         A.    Yeah, I guess.

5         Q.    Was Bill making small talk in the car with

6    you?

7         A.    I don't recall what was said.

8         Q.    During the time that you were in Chicago in

9    that interview with Bill what was his demeanor, the one

10   that he had with you?

11        A.    Quiet and calm, reserved.

12        Q.    Okay.  So when you were back at the

13   Naperville Police Department after leaving Chicago,

14   what part of the police station did you go to?

15        A.    The investigations section.

16        Q.    And where -- it was -- it was while you were

17   at the Naperville Police Department that Bill gets

18   served with these divorce papers?

19        A.    Yes.

20        Q.    Where in the Naperville Police Department was

21   he served with these divorce papers?

22        A.    In the investigations lobby downstairs.

23        Q.    And is the investigations lobby an area of

24   the police department that somebody from the outside
```

1    can just walk into?

2        A.    No.

3        Q.    You have to be buzzed in?

4        A.    Yes.

5        Q.    Is there a person whose job it is to buzz

6    people into that area, like a receptionist?

7        A.    Yeah, but not at that time of the night.

8        Q.    Okay.  Who else was at the investigations

9    division that night besides you and Bill and Detective

10   Guerreri?

11       A.    I believe Sergeant Carlson and Detective

12   Cunningham were there.

13       Q.    Did you tell either Sergeant Carlson or

14   Detective Cunningham when it is that you were going to

15   be back from Chicago with Bill?

16       A.    I don't recall, no.

17       Q.    And in all your conversations with Pam

18   Leavenworth, did she ever tell you that there had

19   actually been divorce papers that had been filed by

20   Tina against Bill?

21       MR. MINSER:  Objection, Your Honor, hearsay.

22       THE COURT:  Overruled.

23   BY THE WITNESS:

24       A.    I don't recall.

Q.    When that process server came to the lobby of the Naperville Police Department, did you talk to that person?

A.    Yes.

Q.    And, in fact, you told that process server that you were interviewing Bill about the arson murder of his mother-in-law?

A.    No.

Q.    And you, in fact, told that process server that you were trying to get a confession from Bill in this case?

A.    No.

Q.    And you also told him at 7:00 o'clock that day that he could come to the police station to serve Bill at 11:30 p.m.?

A.    No.

Q.    And, in fact, those divorce papers were served on Bill in the interrogation room of the Naperville Police Department?

A.    Yes.

Q.    So they were not served in the lobby?

A.    I don't believe so.  I think he came downstairs and served them -- in the lobby downstairs, not in the interview room.

1      Q.    My question for you is different, so I want

2   to clarify.

3      A.    Okay.

4      Q.    You actually let the process server come into

5   the interview room and serve Bill there, right?

6      A.    No, no.

7      Q.    And why are you confident that didn't happen?

8      A.    My recollection is that it took place in the

9   lobby outside the interview room in the investigations

10  division area.

11     Q.    Well, having a process server come into an

12  interrogation room to serve someone with divorce papers

13  there would be inappropriate?

14     A.    Yes.

15     Q.    And when those divorce papers were served,

16  did you have any understanding of whether Mr. Amor had

17  been in touch with Tina Miceli while he was in jail?

18     A.    No.

19     Q.    And your testimony was that he didn't have a

20  response when those papers were served?

21     A.    That's correct.

22     Q.    He had been quiet before those papers were

23  served?

24     A.    Yes.

1       Q.      And he was quiet after?

2       A.      Yes.

3       Q.      And he had been -- he had been not animated

4    before those papers were served, right?

5       A.      No.

6       Q.      And he was not animated after?

7       A.      No.

8       Q.      Do you have any training on assessing whether

9    or not a person is having a panic attack?

10      A.      No.

11      Q.      Do you know the symptoms of someone having a

12   panic attack?

13          MR. MINSER:  Objection, Your Honor.

14          THE COURT:  What's the objection?

15          MR. MINSER:  Relevance.  Foundation too.

16          THE COURT:  What's the relevance?

17          MS. THOMPSON:  Well, the witness has testified

18   that he was calm, and I think the behavior he's

19   describing is capable of different interpretation, Your

20   Honor.

21          THE COURT:  I don't know if any behavior was

22   described, but the objection is sustained.

23   BY MS. THOMPSON:

24      Q.      After Mr. Amor received those divorce papers,

1    you and Detective Guerreri -- or excuse me -- you and

2    Detective Guerreri questioned him, right?

3         A.    Yes.

4         Q.    And you questioned him in an interrogation

5    room?

6         A.    Yes.

7         Q.    That was a small room?

8         A.    Yes.

9         Q.    And at the beginning of that conversation, as

10   you said, you asked him once again to tell you what

11   happened?

12        A.    Yes.

13        Q.    And he started telling you the same story

14   that he told you many times before?

15        A.    Yes.

16        Q.    And you stood up and confronted him?

17        A.    Yes.

18        Q.    And it was your intention to shock him?

19        A.    Yes.

20        Q.    You were angry?

21        A.    No.

22        Q.    Well, you were frustrated that he was still

23   giving you the same story?

24        A.    No, it's an investigative or interrogative

1   tool that you use.

2          Q.    Well, it's an interrogative tool you use so

3   that someone cannot keep persisting in a denial, right?

4          A.    That would be part of it, yes.

5          Q.    Right, and that is part of the Reid

6   technique?

7          A.    Yes.

8          Q.    That's something that the Reid technique

9   trains?

10         A.    Yes.

11         Q.    The Reid technique trains that if a person is

12  telling you a story you believe not to be true, you

13  shouldn't let them keep telling it?

14         A.    Yes.

15         Q.    That you should stop them?

16         A.    Correct.

17         Q.    And so that's what you did in that interview

18  with Bill?

19         A.    Yes.

20         Q.    And so you said that you spoke in a raised

21  voice?

22         A.    Yes.

23         Q.    And could you demonstrate for us how loud you

24  spoke when you said this to Bill?

```
 1        A.    You're not telling me the truth.

 2        Q.    And that's something you said while you were

 3   standing?

 4        A.    Yes.

 5        Q.    And it wasn't any louder than that?

 6        A.    No.

 7        Q.    You're sure?

 8        A.    Yes.

 9        Q.    And then you left?

10        A.    Yes.

11        Q.    And how tall were you at the time, sir?

12        A.    5'10".

13        Q.    How much did you weigh?

14        A.    About 190.

15        Q.    And that was bigger than Bill?

16        A.    Yes.

17        Q.    And it was your testimony that when you came

18   back to the room that Detective Guerreri was talking to

19   Bill?

20        A.    Yes.

21        Q.    What was Detective Guerreri saying when you

22   came back into the room?

23        A.    That Bill had agreed to make a statement.

24        Q.    That's what Detective Guerreri said to you?
```

```
 1          A.    Words to that effect.

 2          Q.    Okay.  So did you -- After he said that and

 3     you sat down, what happened?

 4          A.    He made a statement.

 5          Q.    Was he talking to Detective Guerreri when you

 6     came in?

 7          A.    Yes.

 8          Q.    And what was he saying to Detective Guerreri?

 9          A.    I don't recall.

10          Q.    You've talked some about that statement, and

11     I have some specific questions for you about it.

12          THE COURT:  Ms. Thompson, I just want to ask for a

13     scheduling question if I may.  I don't want to in

14     anyway limit it, but can you give me a sense of how

15     much longer your cross-examination is.

16          MS. THOMPSON:  I do have some additional

17     questions, Your Honor.

18          THE COURT:  And then there will be some Redirect I

19     take it.  I think that at this point we're going to

20     break for the lunch hour.  We'll see everybody back at

21     1:30.

22          MS. THOMPSON:  Thank you, Your Honor.

23          THE COURT:  Thank you.

24                    (Whereupon, the noon recess was had.)
```

Pl. Amor 028999

1        THE COURT:  William Amor.

2        MR. SCALIATINE:  Jim Scaliatine and Tom Minser for

3    the people.

4        MS. THOMPSON:  Tara Thompson, Erica Nichols-Cook,

5    Lauren Myerscough-Mueller, Kevin Caraher, Lauren

6    Kaeseberg, on behalf of Mr. Amor, who is present before

7    the Court.

8        THE COURT:  Very well.  Anything to spread of

9    record before we have Investigator Cross resume the

10   stand?

11       MS. THOMPSON:  No, Your Honor.

12       MR. SCALIATINE:  Not at this time, Judge.

13       THE COURT:  All right.  Detective Cross, if you

14   could please resume the witness stand, and you remain

15   under oath.

16       THE WITNESS:  Yes, sir.

17       THE COURT:  And, Ms. Thompson, you may resume your

18   Cross-Examination.

19       MS. THOMPSON:  Thank you, Your Honor.

20                   CONTINUED CROSS-EXAMINATION

21   BY MS. THOMPSON:

22       Q.   Mr. Cross, before we broke for lunch we were

23   talking about your interrogation of William Amor on

24   October 3rd of 1995.

1            When you were in the Naperville Police

2    Department with William Amor before he confessed, you

3    and Detective Guerreri advised him of his rights?

4            A.    Correct.

5            Q.    And you told him that we, meaning you and

6    Detective Guerreri, felt that he had started the fire?

7            A.    Yes.

8            Q.    And you also told him that his wife had told

9    you that she felt that he started the fire?

10           A.    Yes.

11           Q.    And it was after that you told him these

12   things that he confessed?

13           A.    Yes.

14           Q.    I have a couple of questions for you about

15   the statement that -- the verbal statement that he made

16   to you before the written statement was taken.

17                 And you said that he told you that he had a

18   glass with vodka and ice cubes in it, and that that's

19   what spilled?

20           A.    Yes.

21           Q.    And he told you -- I believe your testimony

22   was that he told you that he saw smoke and he saw

23   sizzling?

24           A.    Yes.

```
 1          Q.    And was it your testimony that he observed

 2     the fire starting?

 3          A.    Yes.

 4          Q.    You completed a report in this case?

 5          A.    Yes.

 6          Q.    And your report documents what it is that he

 7     verbally told you?

 8          A.    Yes.

 9          Q.    As a person who prepares reports, you

10     understood that your reports need to be accurate?

11          A.    Yes.

12          Q.    And your reports needed to include relevant

13     details of the case, right?

14          A.    Yes.

15          Q.    It would be a relevant detail of this case if

16     someone had reported that they were a witness to the

17     fire starting in this case?

18          A.    Yes.

19          Q.    I mean, Mr. Amor -- You're saying that

20     Mr. Amor told you that there were actual flames that he

21     saw, right?

22          A.    Yes.

23          Q.    And that's something that you would want to

24     include in your report?
```

Pl. Amor 029002

1        A.    Yes.

2        Q.    That is not something that you included in

3    your report of the verbal statements that Mr. Amor made

4    to you, right?

5        A.    I would have to review the report.

6        MS. THOMPSON:  I'm showing the witness what's been

7    previously marked as Defendant's 52.

8    BY MS. THOMPSON:

9        Q.    And I am referring you, Mr. Cross, to Page 5

10   of that report.  There is a section of that report

11   dated Tuesday 10/3/95 at 23:37 hours.  And I'm going to

12   ask you to read that section and tell me whether you

13   included in your report that Mr. Amor told you that he

14   saw flames.

15             Have you completed your review of that

16   exhibit?

17       A.    Yes.

18       Q.    And does it indicate in your report that

19   Mr. Amor told you that he saw flames?

20       A.    No, I didn't see it.

21       Q.    And by the way, other detectives besides you

22   had interviewed Mr. Amor before you sat down to talk

23   with him on October 3rd?

24       A.    Yes.

1      Q.    And had you -- you had kept up with the parts

2   of the investigation that you weren't personally

3   involved in before you sat down to talk to Mr. Amor on

4   October 3rd?

5      A.    Yes.

6      Q.    You knew what his accounts had been to other

7   detectives?

8      A.    Yeah, basically.

9      Q.    And you knew the important interviews of

10  other witnesses that had happened with other

11  detectives?

12     A.    Yes.

13     Q.    You had talked with either Detective

14  Cunningham or Detective Carlson about their prior

15  interview with Bill on September 15th?

16     A.    I believe I did.

17     Q.    And had they talked to you about their

18  interview with Mr. Amor where the issue of vodka being

19  flammable was raised?

20     A.    I don't recall.

21     Q.    So after you talked to him, as you said, he

22  made a written statement?

23     A.    Yes.

24     Q.    And how -- Let me ask you this.  Were you

1    present while he was writing out the written statement?

2        A.    Yes.

3        Q.    Was Detective Guerreri present?

4        A.    He was in and out of the room.

5        Q.    And while Mr. Amor was filling out this

6    written statement, did you talk to him?

7        A.    Not while he was doing the statement.

8        Q.    How long did it take for him to finish?

9        A.    I believe it was about a half hour.

10        Q.    And what instructions did you give to him

11    about how to fill out this statement?

12        A.    None.

13        Q.    So anything that is included in the written

14    statement is something that to your mind was something

15    he chose to write down in response to the instruction

16    to write down what happened?

17        A.    Yes.

18        MS. THOMPSON:  Your Honor, permission to publish

19    People's Exhibit 44.

20        THE COURT:  Yes.

21    BY MR. THOMPSON:

22        Q.    Can you see the screen, Mr. Cross?

23        A.    Not really.

24        Q.    Can you see that?

1      A.   Sort of.

2      Q.   Let me --

3      MS. THOMPSON:  Your Honor, I have a second copy of

4   People's Exhibit 44, can I provide that to the witness?

5      THE COURT:  Yes.

6      MS. THOMPSON:  Thank you, Your Honor.

7      THE WITNESS:  Thank you.

8      MS. THOMPSON:  Can the Court see the exhibit?

9      THE COURT:  Yes, and I recall getting down and

10  looking at it earlier.

11      MS. THOMPSON:  All right.  Thank you, Your Honor.

12  BY MS. THOMPSON:

13      Q.   Mr. Cross, do you see six lines down on the

14  end of the line that there appear the words and chair?

15      A.   Yes.

16      Q.   And are those words that Mr. Amor included on

17  this written statement while he was writing it out?

18      A.   Yes.

19      Q.   Those aren't words that got added in a review

20  afterwards?

21      A.   No.

22      Q.   Let me have you continue to where it says I

23  did not pick up the cigarette.

24      A.   Okay.

1      Q.    Do you see that?  That's about halfway down.

2      A.    Yes.

3      Q.    It reads, in part, I did not pick up the

4  cigarette, but instead continued to use the restroom

5  knowing a fire would probably result.  Are those words

6  that Mr. Amor wrote on his statement without any

7  instruction from you or Detective Guerreri?

8      A.    That's correct.

9      Q.    And then do you see the bottom two lines and

10  then there is a couple words there that are not on

11  lines at the bottom?

12      A.    Yes.

13      Q.    That reads, The loss was meant to be minimal

14  for personal gain.  No harm was ever supposed to come

15  to any person or persons.  Is it your testimony that

16  those are words that Mr. Amor wrote without any

17  instruction from you or Detective Guerreri?

18      A.    Yes.

19      Q.    Do you know how far Mr. Amor went in school,

20  Detective?

21      A.    No.

22      Q.    Let me take that copy back from you.

23           Did he tell you in your interview with him

24  about his background, that he had -- that he had not

1    gone beyond high school in his life?

2         A.    I don't recall that.  He mostly was about his

3    job history.

4         Q.    Didn't he tell you in that interview that he

5    got a high school diploma going to night school?

6         A.    No.

7         Q.    And after he was done writing out that

8    statement, did you and Detective Guerreri review the

9    statement with him?

10        A.    Yes.

11        Q.    Did he make any edits to the statement during

12   that review?

13        A.    No.

14        Q.    All right.  And as you previously described.

15   ASA Nigohosian then was called and came to the police

16   station?

17        A.    Yes.

18        Q.    And he -- and ASA Nigohosian talked to you

19   and Detective Guerreri?

20        A.    Yes.

21        Q.    And you caught him up?

22        A.    Yes.

23        Q.    You then talked to Bill?

24        A.    Yes.

1      Q.   And there was another audio statement that

2  was taken?

3      A.   Yes, there was.

4      Q.   The entire time up until that audio statement

5  was given by Mr. Amor, had you seen Mr. Amor eat

6  anything that entire day?

7      A.   No.

8      Q.   And I think you testified you gave him a can

9  of pop?

10      A.   Yes.

11      Q.   Had you seen him drink anything else?

12      A.   No.

13      Q.   Did he have water to drink?

14      A.   No.

15      Q.   And he had smoked a few times?

16      A.   Yes.

17      Q.   And those were cigarettes that the police

18  provided to him?

19      A.   I believe they were, yeah.

20      Q.   Had you seen him sleeping at all at any point

21  during that day?

22      A.   No.

23      Q.   When Bill -- There was also a time, to go

24  back, where the written statement that I just showed

1  you, People's Exhibit 44, where Bill read that onto an

2  audio -- made an audio recording of himself reading

3  that statement, right?

4      A.   Yes.

5      Q.   And did he get instructions from Detective

6  Guerreri before he read that audio -- made an audio

7  statement?

8      A.   I don't recall.

9      Q.   Well, Detective Guerreri told him to speak

10 up, right?

11     A.   I don't recall.

12     Q.   Do you recall Detective Guerreri telling him

13 to speak clearly?

14     A.   No.

15     Q.   At any point when you were at the fire scene

16 of the fire on 218 East Bailey Road, did you ever

17 search through the debris in the condo?

18     A.   Yes.

19     Q.   When did you do that?

20     A.   The -- actually when they were starting to

21 clean it up.

22     Q.   And how long did you spend searching in the

23 debris?

24     A.   Not long, maybe a half hour or so.

```
 1          Q.    What areas of the debris did you search?

 2          A.    All over.

 3          Q.    And was anyone looking through the debris

 4    with you?

 5          A.    I don't recall.

 6          Q.    Did you note anywhere in any written reports

 7    that you made in this case that you searched through

 8    the debris in the condo?

 9          A.    I don't recall making a statement to that.

10          Q.    And did you find anything in the debris?

11          A.    No.

12          MS. THOMPSON:  Can I have just one moment, Your

13    Honor?

14          THE COURT:  You may.

15    BY MS. THOMPSON:

16          Q.    Your search of the debris, was that on

17    September 10th after you had arrived at the scene?

18          A.    Yes.

19          Q.    What time was it at?

20          A.    After midnight.

21          Q.    And was that after there had already been

22    materials that had been put into the central area of

23    the condominium unit?

24          A.    I don't recall.
```

1    Q.    You've talked about various statements that

2    Bill made to you over various times that you

3    interviewed him.  In all of the times that you talked

4    with Mr. Amor, he never told you that he knew how much

5    life insurance that Marianne Miceli had, right?

6    A.    Correct.

7    Q.    And he never told you that he understood Tina

8    Miceli to be a beneficiary?

9    A.    No.

10   Q.    Or that he thought he himself was a

11   beneficiary?

12   A.    No.

13   Q.    He never told you that when he supposedly set

14   the fire that he intended for Marianne to die?

15   A.    No.

16   Q.    He never told you that he deliberately

17   spilled any vodka in the apartment?

18   A.    No.

19   Q.    He never told you that he left the condo that

20   day after Tina?

21   A.    No, Tina left after him.

22   Q.    And he never told you that he took down the

23   smoke detector anticipating that that would help him

24   start a fire?

1      A.    No.

2      Q.    And after Bill made that audio recorded

3  statement to ASA Nigohosian, you didn't ask him any

4  more questions?

5      A.    I don't recall asking him any more questions.

6      Q.    And Detective Guerreri didn't ask him any

7  more questions?

8      A.    I don't believe so.

9      Q.    And ASA Nigohosian didn't ask him any more

10 questions?

11     A.    I don't know.

12     Q.    Well, to your knowledge he didn't?

13     A.    Correct.

14     Q.    This interview stopped?

15     A.    Yes.

16     Q.    At that point; is that correct?

17     A.    Yes.

18     Q.    And at the time that you were taking this

19 statement from Bill, you believed that this fire could

20 have started by a cigarette igniting vodka-soaked

21 newspapers?

22     MR. MINSER:   Objection, Your Honor, as to

23 relevance.

24     THE COURT:   Overruled.

```
 1    BY THE WITNESS:

 2         A.    Could you ask that again, please?

 3         Q.    Sure.  At the time that you were taking this

 4    statement from Mr. Amor --

 5         A.    Mm-hmm.

 6         Q.    -- on October 3rd into October 4th of 1995,

 7    you believed that the fire in this case could have

 8    started by a cigarette igniting vodka-soaked

 9    newspapers?

10         A.    I wasn't sure of that.

11         Q.    Well, at the time you testified before the

12    grand jury in this case, that was your belief, right?

13         A.    I don't recall that testimony exactly.

14         Q.    Well, would it refresh your memory to review

15    your testimony from the grand jury?

16         A.    Yes, ma'am.

17         MS. THOMPSON:  Your Honor, I'm approaching the

18    witness with Defendant's Exhibit 61.

19    BY MS. THOMPSON:

20         Q.    Mr. Cross, this is a copy of your testimony

21    to the grand jury on October 25th of 1995, correct?

22         A.    Yes.

23         Q.    And for purposes of refreshing your

24    recollection, I'm going to refer you to Page 16.  And
```

1    I'll ask you to review that, and let me know if it

2    refreshes your memory about whether at the time you

3    testified before the grand jury you believed that this

4    fire could have started by a cigarette igniting

5    vodka-soaked newspapers.  And you may need to review

6    into Page 17, sir.

7         A.    Okay.

8         Q.    Have you finished reviewing those materials?

9         A.    Yes, ma'am.

10        Q.    And does that refresh your memory whether at

11   the time of your grand jury testimony you believed that

12   the fire in this case could have started by a cigarette

13   igniting vodka-soaked newspapers?

14        A.    I don't know that that's what that says.

15        Q.    Well, that -- but that wasn't my question, my

16   question was whether that refreshed your memory.

17        A.    I guess.

18        Q.    Well, did it refresh your memory?

19        A.    Not to what you're asking me.

20        Q.    Okay.  Well, let me ask you this, as you sit

21   here today, you know that that's not possible, right?

22        MR. MINSER:   Objection, Your Honor, foundation.

23   And also the relevance of this question to this

24   witness.

1      THE COURT:  What would the relevance be?

2      MS. THOMPSON:  Well, he said he was not sure what

3   he remembered at the time.  I'm trying to understand

4   what his -- what his understanding is to try to go

5   backwards, Your Honor.

6      THE COURT:  Overruled.

7   BY THE WITNESS:

8      A.    Could you ask me the question again, please?

9      Q.    Sure.  As you sit here today, you know that

10   it's not possible for this fire to have began by a

11   cigarette igniting vodka-soaked newspapers?

12      A.    I believe that's correct.  I think we did

13   some testing.

14      Q.    And at the time of this investigation, you

15   did attend a test burn that the fire department ran

16   where they tested -- they did a test burn on a

17   television VCR relevant to this investigation, right?

18      A.    Yes.

19      Q.    And before the time that you interrogated

20   Mr. Amor on October 3rd, you didn't attend any similar

21   test burn assessing anything having to do with

22   vodka-soaked newspapers, correct?

23      A.    Correct.

24      MS. THOMPSON:  One moment, Your Honor.

```
1                   No further questions, Your Honor.

2            THE COURT:  Redirect.

3            MR. MINSER:  Thank you, Your Honor.

4                         REDIRECT EXAMINATION

5      BY MR. MINSER:

6            Q.    Detective, in regards to what you testified

7      here today, you testified of your independent

8      recollection?

9            A.    Yes.

10           Q.    To the best of your ability?

11           A.    Yes.

12           Q.    Is it fair to say that your memory today

13     isn't as good as it was during the time of this

14     investigation?

15           A.    Correct.

16           Q.    Has there been any health reasons why your

17     memory isn't as good today as it was back then?

18           A.    Yes.

19           Q.    What is that?

20           A.    Eight years ago I had a stroke.

21           Q.    And does that affect your ability to recall

22     certain things?

23           A.    It didn't affect my physical skills, but my

24     memory it did affect.
```

1          Q.    Counsel also asked you about interviews that

2    were attempted with the defendant on 9/12 of 1995 and

3    9/15 of 1995.  Is it fair to say those interviews

4    required the defendant to be sober on those days?

5          A.    Yes.

6          Q.    And the defendant wasn't sober, that's why

7    those interviews couldn't happen?

8          A.    Correct.

9          Q.    On October 3rd, though, when the defendant

10   was getting out of DeKalb County Jail, you believed he

11   was sober at that time, right?

12         A.    Yes.

13         Q.    And that interview you were taking him to

14   Chicago to conduct, that was another interview that

15   required him to be sober?

16         A.    Yes.

17         Q.    You were also asked about informing family

18   members information about an investigation; do you

19   remember that?

20         A.    Yes.

21         Q.    Was it normal for you to update family

22   members of investigations you were doing?  Family

23   members of people involved?

24         A.    Yes.

1    Q.    And I should say of victims?

2    A.    Yes.

3    Q.    When you were in the interview room with the

4  defendant, at any time did he request any food?

5    A.    No.

6    Q.    Any beverage or drink?

7    A.    Yes.

8    Q.    And did you give it to him?

9    A.    Yes.

10    Q.    Did he indicate he needed sleep?

11    A.    No.

12    Q.    Did he appear or indicate to you that he was

13  distressed at all?

14    A.    No.

15    MR. MINSER:  Nothing further, Your Honor.

16    MS. THOMPSON:  Just briefly, Your Honor.

17                    RECROSS-EXAMINATION

18  BY MS. THOMPSON:

19    Q.    Mr. Cross, the medical information that you

20  just shared, is that something that's impacted your

21  ability to remember events in this case?

22    A.    Yes.

23    Q.    And I take it that in preparation for your

24  testimony today, you reviewed some documents related to

1    this case?

2         A.    Yes.

3         Q.    But there are still aspects of this

4    investigation that you simply don't recall?

5         A.    Yes.

6         MS. THOMPSON:  Normally we'd ask to be heard at

7    side bar, Your Honor, I don't know if that's

8    appropriate given we don't have a jury, but --

9         THE COURT:  Well, are you asking to have

10   discussion in the witness's presence or outside the

11   witness's presence?

12        MS. THOMPSON:  Outside the witness's presence,

13   Your Honor.

14        THE COURT:  Detective Cross, if I could ask you to

15   step out of the courtroom for a moment, please.

16        THE WITNESS:  Sure.

17        THE COURT:  The record should reflect we are

18   outside the presence of the witness.

19        MS. THOMPSON:  Your Honor, the State advised us of

20   this potential issue with this witness in advance, so I

21   don't plead surprise.  I am concerned about the, you

22   know, witness's ability to recall these events, and I

23   would like to -- I mean, it's obviously difficult to

24   assess the level of his memory, and it's appropriate

1    for someone to refresh their memory with reports.  I

2    would like to inquire about this issue further, but I

3    don't want to do so if -- it would be inquiring further

4    with potential towards some kind of motion to strike

5    his testimony.  I don't want to do that if that's not a

6    motion that the Court would entertain, but we have some

7    questions given what he testified to, Your Honor.

8         THE COURT:  They've given me lots of things as a

9    Judge, but not a crystal ball.  I don't know how I

10    could answer your question without knowing what it is

11    that might or might not transpire.

12         MS. THOMPSON:  Understood.  I intend -- I have a

13    few additional questions for the witness then Your

14    Honor.

15         THE COURT:  Very well.

16                 (Witness back in room.)

17         Detective Cross, if we could please ask you

18    to resume the stand.  You remain under oath.

19         THE WITNESS:  Thank you.

20         THE COURT:  You may inquire.

21         MS. THOMPSON:  Thank you, Your Honor.

22    BY MS. THOMPSON:

23        Q.   Mr. Cross, do you have an independent memory

24    of the events that occurred with respect to this

1    investigation?

2         A.    Yes.

3         Q.    And what materials did you review in

4    preparing to testify?

5         A.    I reviewed my reports.  I reviewed -- I've

6    reviewed other testimony from other hearings.

7         Q.    Do you have a memory of other events in your

8    life that occurred in 1995 in that time period?

9         A.    I'm not sure.

10        Q.    And I don't mean to be -- I'm just trying to

11   understand the affect that your stroke has had on you.

12              But have you lost memory from other time

13   periods in your life going back twenty years?

14        A.    Initially I lost quite a bit of memory.  A

15   lot of it has come back over the years.

16        Q.    And is this one of the things that you

17   initially lost the memory of, but that's come back?

18        A.    Not really.  I just hadn't thought of it for

19   years.

20        Q.    When specifically did you suffer your stroke?

21        A.    11 years ago.  I don't remember the exact

22   date.

23        Q.    Okay.  So that would be 2007 roughly?

24        A.    Yes, 2007, 2008.

1        Q.    Have you had any professional licenses that

2    have been -- that have been revoked because of the

3    affect of your stroke?

4        A.    No.

5        MS. THOMPSON:  Just one moment, Your Honor.

6        THE COURT:  Sure.

7    BY MS. THOMPSON:

8        Q.    Mr. Cross, did you suffer your stroke after

9    you retired from the police department?

10       A.    Yes.

11       MS. THOMPSON:  Your Honor, we have no further

12   questions.

13       THE COURT:  Anything back on that?

14       MR. MINSER:  No, Your Honor.

15       THE COURT:  Detective Cross, thank you.  You may

16   step down.

17       THE WITNESS:  Thank you, Your Honor.

18       MS. KAESEBERG:  Your Honor, if I may speak on

19   behalf of the Defense.  This makes me actually

20   uncomfortable and upset.  I mean, it's obviously not

21   something that we want to, you know, exploit in an open

22   courtroom these details of Mr. Cross's stroke and his

23   situation, but, you know, I don't want us to appear at

24   this juncture sort of I guess, like, the bad guys.  I

1    think the State put us all in this position.

2          THE COURT:  We're not playing bean bags, just

3    state your position.

4          MS. KAESEBERG:  No, I know.  But I'm telling you

5    this just happened, so we're reacting to it.  And I

6    think --

7          THE COURT:  Well, you were apprised of the fact

8    that he had a stroke.  And that --

9          MS. KAESEBERG:  We were, but --

10         THE COURT:  Go on.

11         MS. KAESEBERG:  Sorry to interrupt you, Your

12   Honor.  Yeah, we did know ahead of time.  And, you

13   know, for the State to not bring that out on Direct

14   with this witness, we didn't have any details, we

15   weren't given any reports or anything like that, it was

16   told to us in conversation with the State.  For them

17   not to bring this out on Direct and allow the Court to

18   observe the witness, assess his memory, assess his

19   credibility as a witness with that in mind is

20   problematic, and for us to go through --

21         THE COURT:  Well, I deal in legal principles.  I

22   don't know what problematic means.  Do you want to

23   refer to some legal issue?

24         MS. KAESEBERG:  Yes.  I think it undercuts the

1    ability of this Court to assess the witness's

2    credibility.

3        THE COURT:  How?

4        MS. KAESEBERG:  Unless he testifies to his memory.

5    What can he remember --

6        THE COURT:  He just did.  He answered all the

7    questions that were posed to him.  Isn't that the

8    purpose of Cross-Examination?

9        MS. KAESEBERG:  It is.  And I think we've

10   witnessed numerous times that he didn't have a memory

11   on this.  So, I mean, we're making a record.  We

12   believe his testimony should be stricken for the fact

13   that as the Court observed him testify, it was not

14   known during his Direct Examination that he had this

15   stroke, and there were significant issues.  And, I

16   mean, that's our record, and we believe that his

17   testimony should be stricken.

18       THE COURT:  State.

19       MR. SCALIATINE:  Judge, the Court certainly had an

20   opportunity to observe the witness.  The Court had the

21   opportunity to observe the witness -- when his memory

22   was exhausted he used -- his recollection was refreshed

23   on more than a couple of occasions.

24            As we proceeded through the Direct, I, and my

1    trial partner, did not think that his -- there was such

2    a memory loss or such an inability to recall items to

3    bring up the issue of him telling us several days ago

4    that he had a stroke.  He has stated emphatically that

5    he has an independent recollection of these events.

6              Now, certainly he's not as specific as to

7    dates, but I don't -- I don't think it would rise

8    anywhere near to a level of his testimony being

9    stricken.  I believe I marked approximately four or

10   five times that his recollection had to be refreshed

11   with the report, and maybe one or two more times with

12   the grand jury transcript, but he had very specific

13   recollection of the salient points that were brought

14   up.  And the Court certainly had the opportunity to

15   observe that, and could observe that on some of the

16   things he wasn't as clear on.

17             THE COURT:  Well, it's intriguing because if

18   someone's dead we can admit their trial testimony

19   pursuant to 804 sub -- I can't remember the

20   subparagraphs, but I think it's Rule 804.  If someone

21   had a stroke and were incapacitated we could probably

22   do it the same way.  And I presume the Defense isn't

23   seeking to introduce and would object vociferously if

24   the State sought to introduce the testimony of

1    Detective Cross pursuant to that statute because a rule

2    because of a stroke.

3            We're in a gray area where we have a witness

4    whose memory may be impaired to some extent, and yet

5    who has testified under oath here today.  And I found

6    it credible, that he does have an independent

7    recollection at least of some of the events.  He was

8    asked that on Cross, he gave that answer.

9            I think what's been raised by the Defense, by

10   good faith and fairly, wasn't the best witness on the

11   planet, there is no question of that, goes to the

12   weight and not the admissibility.  And the motion to

13   strike, respectfully, is denied.

14        MR. MINSER:  And, Your Honor, the State's next

15   witness is Brian Nigohosian.

16        THE DEPUTY:  If you'd remain standing, raise your

17   right hand, face the clerk, please.

18                    (Witness sworn.)

19        THE DEPUTY:  All right, sir, if you'd have a seat.

20   Keep your voice up, please.

21        THE COURT:  Mr. Minser, when you're ready you may

22   inquire.

23        MR. MINSER:  Thank you, Your Honor.

24

```
1                        BRIAN NIGOHOSIAN,
2      called as a witness, having been first duly sworn, was
3      examined and testified as follows:
4                       DIRECT EXAMINATION
5      BY MR. MINSER:
6           Q.    Sir, can you please state your name and spell
7      your last for the record, please.
8           A.    Brian Nigohosian, N I G O H O S I A N.
9           Q.    Where do you currently work, sir?
10          A.    I'm a partner at Nigohosian and Dahlquist,
11     it's a law firm in Wheaton.
12          Q.    So are you a lawyer?
13          A.    I am.
14          Q.    What kind of law does your firm handle?
15          A.    We handle exclusively family law cases.
16          Q.    You mentioned family law, but back in 1995
17     where were you employed?
18          A.    I was an Assistant State's Attorney with
19     DuPage County.
20          Q.    In September of 1995, what unit were you
21     assigned to or I should say what was your assignment?
22          A.    In September I was a felony assistant.
23          Q.    And what kind of duties did you have as a
24     felony assistant at that time?
```

Pl. Amor 029028

1          A.     The practice was that assistant state's

2     attorneys would rotate felony review, and my primary

3     responsibility was I was a -- I think it was a second

4     chair or a first chair in a courtroom.

5          Q.     So what kind of cases were you handling as a

6     second or third chair in a courtroom in the felony

7     division?

8          A.     Anything from the Class 4 felonies, theft,

9     robberies, sexual assaults, murders.

10         Q.     You mentioned felony review, what's felony

11    review?

12         A.     So felony in DuPage County there was an

13    assistant state's attorney on call 24 hours a day.  And

14    there was an assistant who had the daytime obligation,

15    and then assistants would rotate felony review from

16    5:00 p.m. to 8:00 a.m. over night.

17         Q.     What were some of the duties associated with

18    being on felony review as a state's attorney?

19         A.     So if a police department was conducting an

20    investigation and they believed that the felony charges

21    were warranted, they would contact the assistant

22    state's attorney on duty, and that attorney would

23    review the facts, review the applicable law, determine

24    whether or not further investigation had to be done and

1    then determine whether or not felony charges were

2    appropriate.

3        Q.   So the assistant state's attorney would

4    determine whether or not felony charges would be filed?

5        A.   Yes.

6        Q.   On October 4th of 1995, were you on felony

7    review?

8        A.   Yes.

9        Q.   In terms of on, you were working as a felony

10    review assistant?

11        A.   Over night I was -- I had the assignment for

12    felony review.

13        Q.   In regards to that, around 3:00 a.m. on that

14    date did you receive a call from the Naperville Police

15    Station?

16        A.   Actually, I got a call -- I got a page.  I

17    didn't get -- we didn't have calls, we had pagers.  So

18    I got paged, and I returned that call.  The page came

19    in sometime between 1:30 and 1:45 in the morning.

20    After I had got the page, I then returned the call to

21    the Naperville Police Department.

22        Q.   Did you end up going out to the Naperville

23    Police Department that night?

24        A.   I did.  I got to the Naperville Police

1    Department around 3:00 a.m.

2        Q.    What information did you have prior to

3    arriving at the Naperville Police Department at

4    3:00 a.m.?

5        A.    I knew that on September 10th there had been

6    a death.  A woman had died in a fire in a condo or an

7    apartment, and there was information that the smoke

8    detector had been disabled and was not functioning.

9    And there was an individual that they were talking to

10   who was present at the time of the fire or immediately

11   before the fire.

12       Q.    And is that why you went out to the

13   Naperville Police Department?

14       A.    I did.

15       Q.    And specifically what was that reason?

16       A.    To investigate whether or not a murder charge

17   would be appropriate in this case.

18       Q.    So when you got to the Naperville Police

19   Department around 3:00 a.m., what did you do first?

20       A.    When I arrived at the Naperville Police

21   Department I was met by Detective Robert Guerreri.

22       Q.    At this point did you receive more

23   information?

24       A.    He reiterated what we had spoken about on the

1    phone. Well, actually on the phone I talked to

2    Detective Cross, but he reiterated that. Told me

3    William Amor was present, that they had been

4    questioning Mr. Amor for a while, and that Mr. Amor had

5    made certain incriminating statements.

6        Q.   How long did this conversation getting the

7    background information take?

8        A.   Maybe 45 minutes to an hour.

9        Q.   After you received that information, what did

10   you do after?

11       A.   At that point I went into an office at the

12   Naperville Police Department. It was a -- it was a

13   police officer's office, maybe a sergeant's office, and

14   I met William Amor and Detective Cross was also there.

15       Q.   You mentioned William Amor, do you see

16   William Amor in court today?

17       A.   I do.

18       Q.   Can you identify him by using an article of

19   clothing, please?

20       A.   He's wearing a maroon shirt, looks like a

21   black tie with some red print in it. He's seated at

22   the far left of the two tables closest to the jury box.

23       THE COURT: In courtroom identification of the

24   defendant noted for the record.

1      MR. MINSER:  Thank you, Your Honor.

2    BY MR. MINSER:

3      Q.   Can you describe the room in which you met

4    the defendant at this point?

5      A.   Yeah.  So it was basically just a detective's

6    office or a sergeant's office.  It had a desk, a file

7    cabinet.  There was at least one window and a couple

8    chairs.

9      Q.   Where were you seated in relation to the

10   defendant?

11     A.   So after I went into the room I took a seat

12   probably about three feet away from Mr. Amor.  I was

13   probably the closest to him.  Detective Cross was

14   seated behind a desk.

15     Q.   Can you describe the observations you made of

16   the defendant at this point?

17     A.   He was relaxed.  Did not appear to be

18   agitated.  He wasn't restrained in any way.  He

19   appeared alert.  And he was receptive and responsive to

20   me when I went and introduced myself.

21     Q.   How did you introduce yourself to the

22   defendant?

23     A.   I told him I was Brian Nigohosian, I was an

24   assistant state's attorney from DuPage County, that I

Pl. Amor 029033

1    was not his attorney and that my interests were not his

2    interests.  And I asked him if he would speak to me

3    about what had happened on September 10th.

4         Q.    Did the defendant agree to speak to you?

5         A.    Yes.

6         Q.    And did you instruct the defendant as to

7    whether or not to be truthful, and, kind of,

8    information to get?

9         A.    I also asked him if he was aware and had

10   understood the Miranda rights that had been read to him

11   previously by the officers.

12        Q.    How did he respond to that?

13        A.    He said he did.  I asked him if he would

14   agree to speak to me, and he said yes.

15        Q.    Okay.  At this point what did you ask the

16   defendant?

17        A.    Well, I told him I wanted him to be truthful.

18   I told him this was an opportunity for him to give a

19   truthful explanation of what occurred.  I went on to

20   say that I did not believe that vodka that he had

21   indicated to the officers had accidentally spilled on

22   some paper, and I told him I think it was intentionally

23   spilt there.

24        Q.    So what did the defendant tell you at this

1  point?

2     A.   He reiterated that he spilled the vodka.  He

3  did not indicate it was intentional, but he said he

4  intentionally knocked a cigarette onto a stack of

5  newspapers where he had spilt the vodka.

6     Q.   Did you then go through what the defendant

7  did on September 10th with him?

8     A.   Yes.

9     Q.   What did you do -- what did he tell you

10  happened on September 10?

11     A.   So he said he was in the apartment or condo

12  that Marianne Miceli lived in.  Earlier that day he had

13  spilled some vodka onto some newspapers next to a

14  chair.  He then went on to say that he intentionally

15  knocked a cigarette onto the stack of papers.  He said

16  that he heard a sizzling sound, and then he left the

17  room and went into a bedroom where Marianne Miceli was.

18     Q.   Did he indicate to you what he was doing in

19  that bedroom?

20     A.   I believe Ms. Miceli had asked him to give

21  her a back rub.  He proceeded to give her a back rub,

22  and a short time afterwards Tina, Ms. Miceli's

23  daughter, came out of a bathroom, saw Mr. Amor and

24  became a little bit upset at what she was seeing.

1    Q. Did the defendant indicate to you any

2 problems within that residence in regards to the people

3 who lived there?

4    A. Yes.

5    Q. What did he say?

6    A. He said that there were constant arguments

7 between Tina, Marianne, and he felt he was unfairly

8 placed in the middle of those arguments. He said that

9 that living arrangement in Ms. Miceli's apartment or

10 condo where he was staying was unbearable.

11    Q. Did the defendant give you any details as to

12 what occurred when he left the apartment?

13    A. He said he had seen smoke from the

14 newspapers, but never saw flame. He then left the

15 apartment with Tina Miceli knowing that Marianne Miceli

16 would remain behind.

17    Q. Did the defendant say anything as to whether

18 or not he looked back in the apartment when he was

19 leaving?

20    A. I believe his statement was he did not want

21 to look at it.

22    Q. Did he say whether or not he knew a fire was

23 starting?

24    A. He said he knew that a fire would start or

Pl. Amor 029036

1    would result.

2         Q.    Did you ask the defendant why he started the

3    fire?

4         A.    Yes.

5         Q.    What did he say?

6         A.    He said his sole purpose was to collect

7    money.

8         Q.    Did he indicate why he wanted money?

9         A.    He said that he was desperate, that that

10   living arrangement was unbearable, and that he needed

11   to get out of that apartment with Tina.  They wanted to

12   get their own place.  So he didn't care how he got it

13   or what kind of money he got, he needed to collect some

14   money.

15        Q.    Did you ask the defendant where he came up

16   with this idea to start the fire?

17        A.    I did.

18        Q.    What did he say in response?

19        A.    He said he had been in the DuPage County Jail

20   on work release during the months of April, May and

21   June of that year.  During that time, he met an

22   individual, he described that person as Mike, and that

23   he and Mike had talked about a couple different ways to

24   collect money.

1      Q.    You mentioned a couple different ways, did he

2   specify -- the defendant, did he specify what ways he

3   had an idea for?

4      A.    Yes.

5      Q.    What were those ways he gave you?

6      A.    Well, the first way he talked about was

7   creating some type of an overdose by giving Ms. Miceli

8   street drugs mixed with her medication to cause an

9   overdose.

10      Q.    Did he indicate anything further about that

11   idea?

12      A.    He said he was unable to go forward with that

13   idea because he didn't know how to mix the drugs, and

14   that he didn't know how to get street drugs.

15      Q.    Did you then ask the defendant about the

16   other idea he came up with?

17      A.    Then he came up with an idea for a fire to

18   collect insurance money.

19      Q.    Did you ask the defendant if he made any

20   plans to carry out his ideas for collecting the

21   insurance money?

22      A.    I did.  He said that while he had never told

23   anybody in detail, he wrote a letter to Tina while he

24   was in the jail about a way to collect money or to get

1    some kind of financial gain.

2        Q.    So in that -- when you asked him about that

3    letter, did you ask him then what he was specifically

4    referring to in that letter?

5        A.    Well, I don't recall if it was -- which way

6    it was at that point.  If he said it was -- if he had

7    already made a determination that the drugs was not an

8    option and it was just the fire.

9        Q.    But I guess what I'm getting at is, in that

10   letter then he indicated that that letter of plans was

11   referring to his plans of either overdosing or starting

12   a fire?

13       A.    Yeah.

14       MS. THOMPSON:  Objection to leading, Your Honor.

15       THE COURT:  Don't lead the witness.

16   BY THE WITNESS:

17       A.    The letter itself did not indicate how he was

18   going to do it, just that he had a plan for financial

19   gain.

20       Q.    Was the defendant asked about how often he

21   thought about this idea?

22       A.    Yes.

23       Q.    What did he say?

24       A.    He said he would think about it from time to

1    time, and the idea would come back into his head

2    whenever he felt he was once again unfairly placed into

3    the middle of an argument between Tina and Marianne.

4         Q.    Did you also ask the defendant any details or

5    if he knew any details about the insurance?

6         A.    He knew that -- Yes, he knew that there was

7    insurance, but he didn't know the amount.

8         Q.    Did he give you an estimate or anything about

9    an amount?

10        A.    Yeah, he guessed that it would be between

11   $10,000 and $15,000.

12        Q.    Did you ask him anything specifically about

13   life insurance?

14        A.    I asked him if it was going to be life

15   insurance or some other kind, and he said he didn't

16   care.

17        Q.    Was the defendant also asked about a smoke

18   detector in the apartment?

19        A.    Yes.

20        Q.    What did he say in regards to that?

21        A.    He said that there was a smoke detector that

22   had a burned out battery.  He had taken it down before

23   the fire, had purchased a battery to replace into that

24   smoke detector, but had not put that back in yet.

```
 1        Q.    The fire that you were talking to the
 2   defendant about, did you ask him about --
 3        THE COURT:  Can I interrupt, I apologize.
 4             Had not put the battery back in or had not
 5   put the fire thing back up?
 6        THE WITNESS:  I don't think the battery had been
 7   put back into the smoke detector.
 8        THE COURT:  All right.  Continue.
 9   BY MR. MINSER:
10        Q.    Did the defendant -- did you talk to the
11   defendant and ask the defendant about why he started
12   the fire when Marianne Miceli was present?
13        A.    I did.
14        Q.    What did you ask him, what did the defendant
15   say?
16        A.    I asked him if he wanted to just collect
17   content insurance why did he not wait until Ms. Miceli
18   was not there.
19        Q.    What did the defendant say in response?
20        A.    He didn't answer that question, he just said
21   his only desire was to collect money, he didn't care
22   how he got it.
23        Q.    Was the defendant asked if Tina Miceli had
24   anything to do or any role in this fire?
```

1     A.     Yes.

2     Q.     What did he respond?

3     A.     He said she knew nothing about it and had no

4     involvement in it.

5     Q.     At this point you'd been talking to the

6     defendant for how long?  At the end of this initial

7     conversation?

8     A.     Maybe 45 minutes.

9     Q.     And how was this conversation with you and

10    the defendant?  Can you describe it?

11    A.     Yeah.  It was conversational.  It was -- he

12    was relaxed.  He never once indicated either in a

13    verbally or non verbal manner that he did not want to

14    talk anymore.  He was receptive to me.  He was almost

15    polite at times.

16    Q.     Did you eventually have the defendant record

17    a conversation with you?

18    A.     Yes, after --

19    Q.     Approximately what time did that occur?

20    A.     So after the first interview we left the

21    room.  I'm not sure if we went to get a tape recorder

22    or the tape recorder was already there, and then I went

23    back -- Well, before I left I asked him if he would

24    tape record his statement.  And he said --

1          Q.    And did he agree?

2          A.    He said yes.  So then I came back with the

3     detectives.  Again, I'm not sure if both detectives

4     left the room, I think they did and came back with a

5     tape recorder.

6          Q.    Did you ultimately complete a recorded

7     statement with the defendant?

8          A.    Yes.

9          MR. MINSER:  I'm showing Counsel what's been

10    marked as People's Exhibit 46.  May I approach?

11         THE COURT:  Yes.

12    BY MR. MINSER:

13         Q.    Sir, I'm showing you what's marked as

14    People's Exhibit 46, can you describe what this is?

15         A.    Yes, it's a disk with a recording of my

16    interview with William Amor on October 4th, 1995.

17         Q.    And is it an accurate recording of that

18    conversation?

19         A.    It is.  It has my initials on it.

20         MR. MINSER:  Your Honor, at this juncture the

21    State would ask to play what's been marked as People's

22    Exhibit No. 46.

23         THE COURT:  Any objection?

24         MS. THOMPSON:  No, Your Honor.

1      THE COURT:  It's admitted, you may play it.

2      MR. MINSER:  Thank you.

3      THE COURT:  To the extent that there is sound on

4   it, which obviously is the point, I take it neither

5   side wishes the court reporter to take it down.

6      MR. MINSER:  That's correct, Your Honor.

7      MS. THOMPSON:  No, Your Honor.

8      THE COURT:  And there is probably going to be

9   decibel lines, but no other images on it, correct?

10      MR. MINSER:  That's right, Your Honor.

11              (Whereupon, a videotape was played for

12              the Judge.)

13      MR. MINSER:  Your Honor, I'm going to pause this

14   right now because I know the volume might not be

15   sufficient.  I don't believe I can get this any louder.

16      THE COURT:  Then it's fine.

17      MR. MINSER:  I will move the TV.

18      THE COURT:  No, no, it's fine.

19              (Whereupon, a videotape was played for

20              the Judge.)

21   BY MR. MINSER:

22      Q.   Mr. Nigohosian, in that recording, your

23   questioning, how would you compare it to your initial

24   conversation with the defendant that wasn't recorded?

1       A.   It was summarizing and re-going over the

2  things that he had just said to me previously.

3       Q.   And when you say summarizing, going over,

4  that's on the recording you're talking about?

5       A.   Correct.

6       Q.   So is it fair to say your questions were more

7  directed at that point or more specific?

8       A.   Correct.

9       MS. THOMPSON:  Objection to the leading, Your

10  Honor.

11       THE COURT:  Overruled.

12  BY MR. MINSER:

13       Q.   At any time you were around the defendant

14  that night did he appear distressed at all?

15       A.   No.

16       Q.   Did he appear tired?

17       A.   No.

18       Q.   Did he ask the questioning to stop?

19       A.   No, he never asked the questioning to stop.

20  He was the same demeanor from the moment I met him

21  until the moment I finished that recording.

22       MR. MINSER:  Can I have one moment, Your Honor?

23       THE COURT:  You may.

24       MR. MINSER:  Nothing further, Your Honor.

```
 1            THE COURT:  Cross.

 2            MS. THOMPSON:  Yes, Your Honor.

 3                          CROSS-EXAMINATION

 4   BY MS. THOMPSON:

 5        Q.    The voice we just heard on the tape,

 6   Mr. Nigohosian, is that how Bill sounded when you were

 7   talking with him before you started recording?

 8        A.    Yes.

 9        Q.    And he sounds tired, right?

10        A.    I didn't notice that he sounded tired.  He

11   sounded the same to me throughout that.  I didn't get a

12   tired indication from the sound of his voice.

13        Q.    That is the relaxed calm Bill that you're

14   describing?

15        A.    Yes.

16        Q.    What we just heard.

17              Do you have an independent memory of being at

18   the police station in the early morning hours of

19   October 4th?

20        A.    Independent from what?

21        Q.    Well, did you review your memo that you

22   prepared in preparation for today?

23        A.    Yes.

24        Q.    And you previously testified about this?
```

1    A.    I did.

2    Q.    Do you have an independent memory beyond what

3    you reviewed in preparing to come testify?

4    A.    Beyond what I've reviewed?

5    Q.    Yes.

6    A.    No.

7    Q.    And to be clear, as you sit here today do you

8    recall sitting in the police station asking Bill Amor

9    these questions?

10    A.    Yes.

11    Q.    How many statements did you take while you

12    were assigned to felony review?

13    A.    A handful.

14    Q.    And how long were you assigned to felony

15    review?

16    A.    That particular night it was a rotation, so

17    my rotation would come up maybe once a month.  There

18    was a period of time where I was on the day time

19    assignment, but that -- this is not it.

20    Q.    For the night time rotation, where -- where

21    would you be while you were waiting for the call that

22    you were needed somewhere?

23    A.    You were doing whatever you would be doing at

24    that time, if you were at home, if you were out.  I was

1    at home.

2         Q.    So this is -- you were paged, you said, at

3    like 1:30 in the morning.

4         A.    Between 1:30 and 1:45.

5         Q.    Okay.  Were you asleep at home?

6         A.    I was.

7         Q.    And Counsel asked you some questions about

8    what you knew at the time you came.  The information

9    you described as there being a death and the smoke

10   detector and someone being present, was that

11   information you got over the phone before you got to

12   the station?

13        A.    I'm not sure if I got that over the phone or

14   at the station.

15        Q.    When you got to the station, you did talk

16   with Detective Cross and Detective Guerreri, right?

17        A.    I met with Detective Guerreri at the station.

18   I'm not sure if I talked with Cross before I went into

19   the interview.

20        Q.    Okay.  So Detective Guerreri filled you in

21   about what was going on at the station?

22        A.    Yes.

23        Q.    And other than what Detective Guerreri told

24   you, before you walked in to talk to Bill, you didn't

1    have any other information about what had happened that

2    day?

3        A.    No, I was unaware that there was a fire or a

4    death before that night.

5        Q.    And in terms of what had happened in the

6    course of the interviews, you were relying on Detective

7    Guerreri to fill you in on that before you started

8    talking with Bill?

9        A.    Well, I had talked to Detective Cross on the

10    phone, and then I talked to Detective Guerreri and

11    possibly Cross at the station, but, yes, I was relying

12    on what they were telling me.

13        Q.    All the information you had came from one of

14    those two people?

15        A.    Yes.

16        Q.    And before you started talking to Mr. Amor,

17    Cross and Guerreri told you about that letter with the

18    plan for making money, right?

19        A.    I think I knew about that going into the

20    interview.

21        Q.    And did they tell you that Tina was the

22    beneficiary of this life insurance policy?

23        A.    I don't recall.

24        Q.    Well, did they tell you that -- did either

1  Detective Cross or Detective Guerreri tell you that

2  Bill Amor had been in custody that day since 4:00 p.m.?

3       A.   I don't know if Mr. Amor voluntarily went to

4  the police department that day or not.  I know they had

5  been questioning him since earlier that -- that would

6  have been the prior day.

7       Q.   My question for you was a little bit

8  different.  My question was, did either Detective

9  Guerreri or Detective Cross tell you that William Amor

10 had been in custody since 4:00 p.m.?

11      A.   I don't think they used that word.

12      Q.   Did you take -- you took some notes while you

13 were at the police station, right?

14      A.   I took -- Yes.

15      Q.   I mean, you ultimately created a memorandum

16 as well?

17      A.   Right.

18      Q.   But you had some notes that you were taking

19 while you were at the station?

20      A.   Yes.

21      Q.   And some of those notes are information that

22 you learned at some point after you were talking to

23 Bill?

24      A.   Yes.

```
 1        Q.    And some of them are information you learned
 2   before?
 3        A.    Yes.
 4        Q.    Well, would looking at your notes refresh
 5   your memory about -- Well, let me ask you this, is your
 6   memory exhausted as to whether Detective Cross or
 7   Detective Guerreri told you that Tina was the
 8   beneficiary of a life insurance policy?
 9        A.    They might.
10        Q.    And would those notes refresh your memory
11   about whether --
12        A.    I'm sorry, you asked me if my memory was
13   exhausted, it is.
14        Q.    Okay.
15        A.    And the notes might refresh my memory.
16        Q.    Thank you.  And would looking at those -- Is
17   your memory exhausted as to whether Detective Cross or
18   Detective Guerreri told you that William Amor had been
19   in custody since 4:00 p.m.?
20        MR. MINSER:  Objection, Your Honor, to relevance,
21   and this is also hearsay.
22        THE COURT:  Overruled.
23   BY THE WITNESS:
24        A.    I never said that they told me he was in
```

1    custody.

2          Q.    And I want to understand your testimony.  Is

3    your testimony that they did not tell you that?

4          A.    That's correct.

5          Q.    Okay.  I'm going to show you what's been

6    marked as Defendant's Exhibit 26.  That is a copy of

7    the two pages of notes that you took while you were at

8    the station, correct?

9          A.    Yes.

10         Q.    And on the third line of those notes above

11   where the handwriting -- above where the lined paper

12   starts, the words custody since 4:00 p.m. appear,

13   right?

14         A.    Yes.

15         Q.    And then --

16         A.    That's my handwriting.

17         Q.    -- if you go halfway down to -- Well, and let

18   me ask you this, you said your memory was exhausted as

19   to the policy.  If you could review Defendant's Exhibit

20   26 --

21         A.    Yes.

22         Q.    -- and let me know whether this refreshes

23   your memory about whether or not either Detective Cross

24   or Detective Guerreri told you that Tina was the

1    beneficiary of the policy?

2        A.    Yes, it's refreshed.

3        Q.    Did either of them tell you that Tina was the

4    beneficiary of the policy?

5        A.    Somebody told me that, yes.  The $100,000

6    insurance policy and the beneficiary is Tina.

7        Q.    Well, Bill didn't tell you that Tina was the

8    beneficiary of a $100,000 insurance policy, right?

9        A.    No.

10        Q.    Did you read the handwritten statement that

11    Bill gave to Detective Guerreri and Detective Cross

12    before you got there before you started talking with

13    Bill?

14        A.    I don't recall reading a handwritten

15    statement.

16        Q.    And we've heard the audio recording that you

17    made with Bill, you said you talked with him before the

18    recording?

19        A.    Yes.

20        Q.    And how long did you talk with him for?

21        A.    It was about 45 minutes.

22        Q.    All right.  And why didn't you record that

23    conversation?

24        A.    I wanted to go in and introduce myself,

```
 1    establish some rapport with him and see what he had to

 2    say, and then ask him if he would consent to a tape

 3    recorded conversation.

 4         Q.    Did you -- How much of the 45 minutes did you

 5    spend introducing yourself?

 6         A.    However long it took -- a minute and a half.

 7         Q.    How long of the 45 minutes did you spend

 8    establishing rapport?

 9         A.    I think that would be the entire course of

10    the conversation.

11         Q.    At what point in that conversation did you

12    start talking about the facts of this case?

13         A.    Within the first five minutes.

14         Q.    And you said that he told you as to the

15    situation at home, that that situation was unbearable?

16         A.    That's correct.

17         Q.    Is that a word that he -- that's the specific

18    word that he used?

19         A.    He used the word unbearable.

20         Q.    And you did create a memorandum of your

21    conversation with Mr. Amor, right?

22         A.    I did.

23         Q.    And that memorandum was intended to be a

24    summary I take it?
```

```
1          A.    Yes.

2          Q.    It was intended to reflect the important

3     things that Mr. Amor had said?

4          A.    Yes.

5          Q.    And you prepared that memo on November 1st of

6     1995?

7          A.    That's the date of the memo.

8          Q.    Did you have additional notes that you used

9     to prepare that memo?

10         A.    No.

11         Q.    So from memory you wrote the memo almost a

12    month later?

13         A.    I wouldn't say -- I don't know if I started

14    it before then, but that's the date I finished it.

15         MS. THOMPSON:   I'm going to show the witness

16    what's been marked as Defendant's Exhibit 17.

17    BY MS. THOMPSON:

18         Q.    That is -- Defendant's Exhibit 17 is the memo

19    that you created of your interview with Mr. Amor,

20    right?

21         A.    Yes.

22         Q.    And it does have a date at the top, right?

23         A.    Yes.

24         Q.    What is that date?
```

Pl. Amor 029055

| | |
|---|---|
| 1 | A.    November 1st, 1995. |
| 2 | Q.    Did it take you between October 4th and |
| 3 | November 1st of 1995 to prepare this memo? |
| 4 | A.    I did not -- |
| 5 | MR. MINSER:  Objection, Your Honor. |
| 6 | THE COURT:  Overruled. |
| 7 | BY THE WITNESS: |
| 8 | A.    I did not work on it continuously. |
| 9 | Q.    Do you know when you started it? |
| 10 | A.    Probably within a day or so of my interview |
| 11 | with him. |
| 12 | Q.    Why did it take you so long to finish it? |
| 13 | A.    Don't know. |
| 14 | Q.    And this is a document that you reviewed in |
| 15 | preparation for your testimony today? |
| 16 | A.    It is. |
| 17 | Q.    And it refreshed your memory? |
| 18 | A.    Yes, it did. |
| 19 | Q.    Nowhere in this memo do you indicate that |
| 20 | Bill Amor told you that the situation at home was |
| 21 | unbearable, right? |
| 22 | A.    Can I have a moment? |
| 23 | Q.    Sure. |
| 24 | A.    I'm not seeing that word in this memo. |

1      Q.    So that's not something you put in your memo?

2      A.    I'm not seeing it in here.

3      Q.    Okay.  But you recall all these years later

4  that he used the word unbearable?

5      A.    I do recall that.  I don't know if that was

6  something from the tape or --

7      Q.    Well, I have a transcript of the tape I can

8  show you.

9            Is it your memory as you sit here today that

10  he used the word unbearable on the audiotape we just

11  listened to?

12      A.    I'm not sure.  I'm not sure if that was on

13  the tape or not.

14      MS. THOMPSON:  Your Honor, this is Defendant's

15  Exhibit 62, and I think the parties agree that it's an

16  accurate transcript of the audio that we just listened

17  to.

18      MR. MINSER:  That's correct, Your Honor.

19      THE COURT:  Very well.

20      MS. THOMPSON:  I'm showing the witness what's been

21  marked as Defendant's Exhibit 62.

22  BY MS. THOMPSON:

23      Q.    Would reviewing Defendant's Exhibit 62

24  refresh your memory as to whether he said unbearable on

1    the tape we just listened to?

2        A.    It might.

3        Q.    Could you review it?

4    THE COURT:  Are you going to direct him to the --

5    Because I wrote it down, are you going to direct him to

6    the page at least so we don't have to have him read the

7    whole thing?

8    MS. THOMPSON:  Well, to the page where that issue

9    is addressed?

10    THE COURT:  Sure.

11    MS. THOMPSON:  Well, I'm going to refer -- I guess

12    I'll refer the witness to Page 4 of this transcript.

13    BY MS. THOMPSON:

14        Q.    On Page 4 of this transcript is some

15    discussion of Mr. Amor's time in the household, right?

16        A.    Yes.

17        Q.    Please review that page and let me know if

18    that refreshes your memory as to whether he said

19    unbearable in the tape.

20        A.    It's not on this page.

21        Q.    I'll take it back from you, sir.

22        You would agree that the questions that you

23    asked Mr. Amor in that audiotape, they're leading

24    questions?

```
1        A.    Some of them are.

2        Q.    Well, and they're leading questions because

3   sometimes leading questions can lead a person to an

4   area you want to discuss, right?

5        A.    Yes.

6        Q.    And so when you ultimately did this audio

7   there were particular things that you wanted to make

8   sure ended up in the audiotape?

9        A.    Sure.

10       Q.    Issues you wanted to make sure were covered?

11       A.    Yes.

12       Q.    And so that's specifically what you asked him

13  about on the tape, right?

14       A.    There were both leading and open-ended

15  questions in the tape.

16       Q.    Which the tape isn't tell me what happened

17  Mr. Amor.

18       A.    The tape is we just talked about a number of

19  things and are these the things we talked about and are

20  these the answers you gave me.

21       Q.    Right, but it doesn't have him go through

22  everything he just told you before again?

23       A.    I think I -- we kind of bore it down to the

24  significant parts of this investigation.
```

1    Q.    As determined by you with the questions that

2    you asked?

3    A.    As determined by the entire investigation.

4    Q.    Well, but you're the one asking the

5    questions?

6    A.    I am asking the questions.  Actually,

7    Guerreri and -- I think Guerreri asked a question or

8    two at the end.

9    Q.    And I appreciate that.  I want to go back to

10    that in one second.

11    You said that he was relaxed at the station,

12    and you were meeting at an office that I think you

13    described had some furniture in it?

14    A.    Yes.

15    Q.    How was Mr. -- And Mr. Amor was sitting in

16    that office?

17    A.    Yes.

18    Q.    How was he sitting?

19    A.    Legs crossed, just sitting.  I don't know

20    how -- I don't understand the question how was he

21    sitting.

22    Q.    How -- Describe the manner in which he was

23    sitting.

24    A.    He was relaxed.  I don't know what else to

*Jillian Doctor, CSR #084-004809*

1    describe it as.

2        Q.    Can you describe anything about him that

3    struck you as relaxed other than to say he was relaxed?

4        A.    Well, he wasn't -- he wasn't tapping his

5    legs.  He wasn't fidgeting in the chair.  He sat still.

6    He wasn't restrained.  He didn't act as if he was

7    trying to get up.  No one ever stopped him from moving

8    around.

9        Q.    Those are all consistent with someone who's

10   tired?

11       MR. MINSER:  Objection, Your Honor, speculation.

12       THE COURT:  Overruled.

13   BY THE WITNESS:

14       A.    I don't think that's necessarily tired,

15   that's somebody who's just sitting in a chair.

16       Q.    It's also consistent with a person who's

17   tired?

18       A.    I suppose it could be a person who's tired.

19       Q.    And you mentioned that there is a couple

20   questions that are asked by the other -- by the

21   detective at the end of this tape.  There is a point in

22   the interview where you asked the questions -- there

23   came a point in the interview that was being recorded

24   that asked the questions that you wanted to ask, right?

1          A.    Yes.

2          Q.    And then you asked Mr. Amor was there

3     anything else that we talked about earlier that you

4     wanted to bring up, right?

5          A.    I believe so.

6          Q.    And that's the point where he says everything

7     I have said at least once -- everything I have said I

8     said at least once and the truth and from my heart,

9     right?

10         A.    Correct.

11         Q.    And that was the end of you asking him

12    questions on the audiotape other than to ask if he had

13    been treated well, right?

14         A.    Yes.

15         Q.    So he made that statement and then this

16    interview ended, right?

17         A.    When I was done asking questions, again, I

18    think Guerreri chimed in with one or two.  Cross made a

19    statement.  I -- Yes, that was the end of my

20    questioning of Mr. Amor.

21         Q.    Well, no one asked Mr. Amor any more

22    questions after he said everything I've said I said at

23    least once and the truth and from my heart other than

24    you asking him if he had been treated fairly, right?

1        And --

2        A.   If that's the transcript then, yes, I believe

3   so.

4        Q.   That was the end of the substantive

5   questioning of Mr. Amor, right?

6        A.   Yes.

7        MS. THOMPSON:  One moment, Your Honor.

8             No further questions, Your Honor.

9        THE COURT:  Redirect.

10       MR. MINSER:  Yes, Your Honor.

11                    REDIRECT EXAMINATION

12   BY MR. MINSER:

13       Q.   Mr. Nigohosian, Counsel asked you some words

14   about the word unbearable, did you hear the word

15   unbearable come out of the defendant's mouth?

16       A.   I believe so.

17       Q.   In addition, Counsel asked you about your

18   recollection of this interview and your interaction

19   with the defendant, and you stated you had no

20   independent recollection; do you recall that answer?

21       A.   Well, she -- as I understood the question it

22   was was there anything I understood that I know other

23   than what my recollection and my -- the documents I

24   reviewed.

1      Q.    And that's what I'm getting at is that you

2   remember this event independently?

3      A.    I do.

4      Q.    And, in fact, you had previously interviewed

5   how many -- in cases that ended up with murder charges,

6   how many people have you interviewed in relation to

7   that in your training and experience?

8      A.    There is maybe one or two others before that.

9      Q.    And you said you'd only done a handful of

10  interviews of suspects through your time in the State's

11  Attorney's Office?

12     A.    Yes.

13     Q.    And this was one?

14     A.    Yes.

15     Q.    You also indicated you had written down

16  custody on some notes you had taken?

17     A.    Correct.

18     Q.    Why did you write that term down?

19     A.    That was my interpretation of what was going

20  on.  There was no -- I wasn't advised that he was under

21  arrest.  So in the legal context of whether he was in

22  custody, not free to leave, I didn't write that down as

23  something somebody had told me.  I wrote it down as

24  basically he had been there since 4:00 p.m.

Pl. Amor 029064

 1          MR. MINSER:  If I can have one moment, Your Honor.

 2          THE COURT:  You may.

 3     BY MR. MINSER:

 4          Q.   It's fair to say you remember this night you

 5     questioned the defendant, you remember it well?

 6          A.   Yes.

 7          MR. MINSER:  Nothing further, Your Honor.

 8          MS. THOMPSON:  No further questions, Your Honor.

 9          THE COURT:  I have a question, my recollection of

10     the transcript that you have the benefit of, but I just

11     want to ask because of the questioning on this

12     bearable, my notes suggest, hopefully they're correct,

13     that Mr. Nigohosian said to the defendant in the

14     audiotape -- he ascribed to the defendant the use of

15     the word unbearable, that that's part of the audiotape;

16     is that not correct?

17          MR. SCALIATINE:  The word unbearable -- the

18     sentence if you would wish me to read it, Judge.

19          THE COURT:  I think I remember the sentence, but

20     Mr. Nigohosian uses that word but ascribes it to the

21     defendant, and the defendant says yes; isn't that

22     correct?

23          MR. SCALIATINE:  Yeah.

24          THE COURT:  Do you agree with that, Ms. Thompson?

 1    Because I don't know if that's on Page 4, but it is in

 2    that -- I recall that in the video or the audio.

 3         MS. THOMPSON:  That is in the transcript, Your

 4    Honor.  I think it's on page --

 5         MR. SCALIATINE:  Top of Page 4.  I'm sorry, Judge,

 6    the pages aren't numbered for the --

 7         THE COURT:  All right.  I just want to make sure I

 8    wasn't confusing the pre-audio interview with the audio

 9    interview.  Very good.  And if either side wishes to

10    ask questions based on my questions, feel free.

11         MS. THOMPSON:  No, Your Honor.

12         MR. MINSER:  No, Your Honor.

13         THE COURT:  All right.  Mr. Nigohosian, you may

14    step down.  Thank you.

15         THE WITNESS:  Thank you, Your Honor.

16         THE COURT:  State?

17         MR. SCALIATINE:  Judge, the only issue -- for

18    scheduling purposes and for the remainder of the

19    People's case, the People have the transcripts of the

20    witnesses who were unfortunately deceased.

21         THE COURT:  Which witnesses are you anticipating

22    to introduce?

23         MR. SCALIATINE:  A Mr. Gust.

24         THE COURT:  Is he a neighbor?

1    MR. SCALIATINE:  Gust was the expert who said

2    there was no electrical problems.

3         THE COURT:  Oh, okay.

4         MR. SCALIATINE:  Mr. Knuth was the neighbor.

5         THE COURT:  Okay.

6         MR. SCALIATINE:  And Sergeant Carlson, those three

7    from the People's perspective and People's case in

8    chief.  And then we have two stipulations that have

9    been agreed upon and signed.

10        THE COURT:  Do you want to handle those

11   stipulations?

12        MR. SCALIATINE:  I think that would be

13   appropriate, Judge, for us.  If I can have one second,

14   Judge.

15        THE COURT:  Yes.

16             You know, actually this might be a good time

17   to take a ten minute break.

18                  (A short recess was had.)

19        THE CLERK:  William Amor.

20        THE COURT:  All the parties are present with their

21   respective Counsel.

22        MR. SCALIATINE:  Yes, Judge.

23        MS. THOMPSON:  Can I address one issue before we

24   proceed, Your Honor?

1      THE COURT:  Yes.

2      MS. THOMPSON:  I want to make one thing of record,

3   which is the copy of the transcript of the tape that

4   the Defense has is missing a page, and the pages are

5   not numbered.  And we're missing a key page, which is

6   the page that we just discussed the testimony with

7   unbearable on it.  And obviously that's my error

8   because the tape was played in court --

9      THE COURT:  I only asked because you confronted

10   the witness with a transcript, but I had a distinct

11   recollection that it was on the transcript.

12      MS. THOMPSON:  I showed the witness that

13   transcript and I want to be clear that I did not mean

14   to, you know, commit some fraud on the Court or --

15      THE COURT:  Would never have thought that.

16      MS. THOMPSON:  But that is not -- the transcript

17   that I showed him does not have that page, and so I

18   want to make that clear for the record.  We just got a

19   complete copy from the State, and I'm suggesting that

20   we also submit an addition as Defendant's Exhibit 62-A

21   which includes that page, Your Honor.

22      THE COURT:  Very well.

23          Well, it wouldn't ultimately, absent a

24   stipulation, come into evidence anyway.  It was solely

1  for purposes of impeachment and/or refreshing

2  recollection.  That having been said, of course if the

3  parties want to stipulate and allow it to come into

4  evidence, I'd love to see it, but that's a separate

5  issue.  So 62-A includes the missing page.

6       MS. THOMPSON:  Yes, Your Honor.

7       THE COURT:  All right.  Mr. Scaliatine.

8       MR. SCALIATINE:  Judge, at this time the People

9  would be seeking to submit by agreement three

10  stipulations.  And if I can publish those for the

11  Court.

12       THE COURT:  Please.

13       MR. SCALIATINE:  People's Exhibit 50 is a

14  stipulation.  It reads:  Now come the People of the

15  State of Illinois by Robert B. Berlin, DuPage County

16  State's Attorney in and for the County of DuPage,

17  Illinois by and through his assistants James Scaliatine

18  and Thomas Minser, and the Defendant William Amor by

19  his Counsel the Illinois Innocence Project, the

20  Exoneration Project at the University of Chicago Law

21  School and Cozen O'Connor do agree and stipulate as

22  follows:  That if Phil Powers were called as a witness

23  in this trial by the State he would testify as follows:

24  One, that he is the brother of Marianne Miceli; Two,

1    that on September 10th, 1995 Phil Powers was the owner

2    of real property being the condominium located at 218

3    East Bailey, Apartment M, Naperville in DuPage County,

4    Illinois; Three, that on September 10, 1995 Phil Powers

5    gave no consent or authority to any individual to

6    damage the property on those premises.

7          THE COURT:  So stipulated?

8          MS. KAESEBERG:  So stipulated.

9          MR. SCALIATINE:  People's Exhibit 51 would be a

10    stipulation between the same parties, and that

11    stipulation would state that the parties stipulate if

12    called to testify Andrea Haidu would testify that --

13          THE COURT:  Can you spell that, please.

14          MR. SCALIATINE:  I apologize, Judge.  The name

15    A N D R E A, and Haidu, H A I D U.

16          THE COURT:  All right.

17          MR. SCALIATINE:  Ms. Haidu would testify that on

18    September the 10th, 1995 she was employed as a 911

19    dispatcher with the Naperville Police Department.

20    Ms. Haidu would further testify that while she was

21    working on September the 10th, 1995 she received a 911

22    call at 6:40 p.m.  That People's 27 is a true and

23    accurate recording of the 911 call she received.  And

24    the parties would further stipulate that proper

1    foundation would be laid for the admission of People's

2    Exhibit 27 at trial.

3         THE COURT:  So stipulated?

4         MS. KAESEBERG:  So stipulated.

5         MR. SCALIATINE:  People's Exhibit 52 would be a

6    stipulation between the parties, and that stipulation

7    would state that the parties stipulate that if called

8    to testify in this matter Dr. Dean Porter, P O R T E R,

9    would testify as follows:  One, that his full name is

10   Dean Porter; that in 1995 he was a physician licensed

11   to practice medicine in the State of Illinois.  He

12   would testify that as of 1995 he had been so licensed

13   for the prior 13 years.  On September the 10th, 1995

14   Dr. Porter, while on duty in the emergency room of

15   Edwards Hospital, treated Marianne Miceli, female,

16   white, date of birth of November the 4th, 1954.

17        He would further identify People's Exhibit 31

18   as a photograph of Marianna Miceli, the person he

19   treated in the emergency room.  Paragraph 3, he

20   observed burns to Marianne Miceli's back, chest, legs,

21   feet, arm and hand.  He also observed there to be soot

22   all over her body and inside her mouth and nose.

23   Marianne Miceli was in cardiac arrest, as well as,

24   other medical personnel and paramedics rendered medical

1    treatment.  Paragraph 4, at 7:36 p.m. on September

2    the 10th, 1995 he pronounced Marianne Miceli dead.

3         The parties would further stipulate that a

4    proper foundation would be laid to admit the medical

5    reports in this matter marked as Defense Exhibit 4.

6         MS. KAESEBERG:  So stipulated.

7         THE COURT:  Plaintiff's, I'm sorry, what exhibit

8    number, the last part?

9         MR. SCALIATINE:  4.

10        THE COURT:  I show 4 is the photo of the boot mark

11   in the south bedroom.

12        MS. THOMPSON:  Defense Exhibit 4, Your Honor.

13        THE COURT:  Defendant's 4, I apologize.

14        MR. SCALIATINE:  Defendant -- ER report.

15        THE COURT:  EMS report.

16        MR. SCALIATINE:  EMS report.

17        THE COURT:  All right.  Thank you for that.

18        MR. SCALIATINE:  At this time, Judge, the People

19   would seek to admit People's 1 through 52 with the

20   exception of 49, and that would include People's 25, 26

21   and 48, which the Court has previously ruled on the

22   prior testimony of the witness.

23        THE COURT:  We're going to have to go a little

24   slower as it relates to the exhibits.  I don't have

1    anything on 3 or 7.

2         MR. MINSER:  Your Honor, People's Exhibit 3 is

3    actually an exhibit which is going to be authenticated

4    and the foundation laid through the testimony -- the

5    former of testimony of Mark Knuth.

6         THE COURT:  All right.  So it hasn't happened yet

7    though?

8         MR. MINSER:  Technically it has not happened,

9    correct.

10        THE COURT:  And then 7 was the photo of the

11   telephone, that actually we do have.  I apologize.  Why

12   don't I just go through here.  And then 25 is the

13   former testimony of Knuth that you've just referenced.

14        MR. MINSER:  That's correct, Your Honor.

15        THE COURT:  All right.  And 26 is the former

16   testimony of Carlson.  Both of those I previously

17   indicated motions in limine would be admitted.  41, the

18   death certificate, I don't know that I've seen that.

19        MR. MINSER:  Your Honor, we were going to present

20   that now.  We do have a certified copy of the death

21   certificate for the Court, if I can approach.

22        THE COURT:  Any objection?

23        MS. THOMPSON:  As to the death certificate, no,

24   Your Honor.

1       THE COURT: All right. 41 is admitted. And then

2    I have -- I have all the exhibits discussed at least

3    with the exception then next of 48-A, which is the

4    testimony of Gust, which I previously admitted by

5    motions in limine.

6           So let me ask the -- without going through

7    each of these individually, let me ask the Defense, do

8    they have objections to -- And I know some we've

9    specifically addressed, others we have not, but let's

10   just discuss them all now. Are there any objections to

11   any of Exhibits 1 through 52 with the understanding

12   that any objections to prior testimony previously been

13   made are not waived by what we're talking about now?

14      MS. THOMPSON: Your Honor, we maintain our

15   objections to the prior testimony of Carlson and Gust

16   for the same reasons stated in our motion in limine.

17   We can argue further or we'd rest on those same

18   arguments, Your Honor.

19      THE COURT: All right. But other than those and

20   with the understanding -- And I'll --

21      MR. SCALIATINE: 49 is Cross's report that was

22   used for --

23      THE COURT: 49 was for refreshing of recollection

24   only, you're not seeking that to be admitted; is that

1    correct?

2       MR. SCALIATINE: Yes. And, I apologize, in the

3    typed version, Judge, it does say Golder's CV, but

4    that's not --

5       THE COURT: All right. So you're not seeking to

6    admit 49. And then there are objections remaining as

7    it relates to Knuth and Carlson, but with the exception

8    of those and with the understanding that 49 is not

9    being offered, any objections?

10       MS. THOMPSON: We have -- we addressed, I think,

11    in the testimony of the witness Exhibit 7, which is a

12    photo of the telephone. The witness testified that

13    that is not where the phone was when he found the

14    victim, but I think that was addressed in testimony.

15    So with that understanding, we don't object to that

16    exhibit either. And otherwise I don't think we have

17    further objection, Your Honor.

18       THE COURT: All right. Everything is admitted

19    then excluding 49. The previously raised objections to

20    25 and 26 persist.

21         All right. So of course I have not had an

22    opportunity to review the testimony of Knuth, Carlson

23    and Gust, which of course I need to do.

24       MS. THOMPSON: I just want to make sure that the

Pl. Amor 029075

1    record is clear, Your Honor, we object to Gust as well.

2    I think you said our previous objections to --

3          THE COURT:  Fair enough.

4          MS. THOMPSON:  -- 26 and 27.  Just so the record

5    is clear, Your Honor.

6          THE COURT:  No, and it's important to be clear.

7    Likewise, no waivers as it relates to the objections of

8    Gust either.

9              So do you have transcripts of those available

10   to the Court?

11         MR. MINSER:  Yes, Your Honor.

12         MR. SCALIATINE:  Yes, Judge, and copies of the

13   stipulation, Judge.

14         THE COURT:  Yes.

15         MR. SCALIATINE:  Judge, the original stipulation

16   and copies for Your Honor or no?

17         THE COURT:  I'll take copies if you have them.

18         MR. MINSER:  Actually, Your Honor, I believe these

19   are the only copies of the transcripts I have, Your

20   Honor.

21         THE COURT:  That's fine.

22         MR. MINSER:  I apologize.

23         THE COURT:  So these are -- I'm just going to

24   write original on them.

1      MR. MINSER:  Thank you, Your Honor.

2      THE COURT:  So the Court is not the fastest reader

3  on the planet.  Some people read at a very high clip, I

4  don't.  How extensive do the -- does the Defense --

5  assuming the Defense is going to make a motion for

6  directed finding, which I'm confident it will, how

7  extensive do you anticipate the argument to be?

8      MS. KAESEBERG:  Your Honor, I think we probably

9  have less than ten minutes of argument.  I do have some

10  cases that we printed out to provide to the Court.

11      THE COURT:  Would you like to do that this

12  afternoon?

13      MS. KAESEBERG:  If possible, I mean, yeah.

14      THE COURT:  All right.  So then with that in mind,

15  what I would like to do is I'll take the copies of

16  the -- I'll take the cases now so I can review those in

17  anticipation of the arguments, and we'll take a half

18  hour break so I can read through these transcripts and

19  the cases.  And then I'll entertain argument.

20      MS. KAESEBERG:  Thank you.

21      THE COURT:  Now, is the State -- with the

22  admission of these transcripts and all the exhibits

23  that we've discussed, does the State rest?

24      MR. SCALIATINE:  The People rest.

```
1        THE COURT:  Very good.  I'll take --
2        MS. KAESEBERG:  One thing to note is there is one
3   case that I neglected to print, and I can provide the
4   citation for the Court.
5        THE COURT:  Yes, what's the citation?
6        MS. KAESEBERG:  It's People vs Bauer, B A U E R,
7   393 Ill.App.3d 414.  It's the 2nd District Appellate
8   Court, 2009.
9        THE COURT:  All right.
10       MR. MINSER:  And, Your Honor, the State is going
11  to have some case law too.  I unfortunately don't have
12  it on me, I will get it to you as quick as I can.
13       THE COURT:  Very well.
14       MR. MINSER:  I'll provide it to Counsel too.
15       MS. MYERSCOUGH-MUELLER:  Judge, if I may, just one
16  more thing.  So that you know, I will not be in the
17  courtroom when you return.  I have a wedding that I'm
18  maid of honor in, and I have to be downtown for that by
19  5:30.
20       THE COURT:  Very well.
21       MS. MYERSCOUGH-MUELLER:  Thank you, Your Honor.
22       THE COURT:  All right.  So at 4:15 we'll
23  reconvene.
24                   (A short recess was had.)
```

1      THE COURT:  All right.  All the parties are

2  present with their respective counsel on People versus

3  Amor.

4           Before we move to arguments on a motion for

5  directed finding, as it relates to the testimony of the

6  Knuth -- Let's start with Knuth.  Exhibits 2 and 3 that

7  are referenced in the Knuth transcript, photos of the

8  fire from outside, what exhibits are they in our

9  current trial?

10      MR. MINSER:  2 and 3, Your Honor.  And the three

11  exhibits that should be mentioned in those transcripts

12  should be the same as the exhibits we entered.

13      THE COURT:  All right.  That's great.

14      MR. SCALIATINE:  Thanks, Mr. Minser.

15      THE COURT:  So then just to make sure, makes life

16  easier.  So then on Carlson, and specifically the

17  diagrams that Mr. Amor marked up, those are, where,

18  just through Cunningham No. 24?

19      MR. MINSER:  Yes, Your Honor.

20      THE COURT:  All right.  Thank you.

21           All right.  Both sides ready to proceed to

22  argument on a motion for directed finding?

23      MS. KAESEBERG:  Yes, Your Honor.

24      THE COURT:  Ms. Kaeseberg.

1              MS. KAESEBERG:   Thank you.

2                    Section 115-4(k) of the Criminal Code

3        provides, and I quote, that when at the close of the

4        State's evidence or at the close of all the evidence

5        and the evidence is insufficient to support a finding

6        or verdict of guilty, the Court may, and on motion of

7        the defendant shall, make a finding of not guilty,

8        enter a judgment of an acquittal and discharge the

9        defendant.

10                   In evaluating the motion for directed verdict

11       the Court is to construe the evidence in the light most

12       favorable to the State.  And the Court should consider

13       whether a reasonable mind could fairly conclude the

14       guilt of the accused beyond a reasonable doubt.  And

15       there is a cite for People versus Tibbs, T I B B S, 67

16       Ill.App.3d 1012.

17                   Even considering the light -- excuse me --

18       even considering the evidence in the light most

19       favorable to the State as a matter of law in this case,

20       the State's evidence is insufficient to support a

21       guilty verdict.

22                   The six count indictment against Mr. Amor

23       charges him with one aggravated arson count, which is

24       Count 2; and 5 first-degree murders counts, Counts 1, 3

 1    through 6.  Every count alleges that Mr. Amor is guilty

 2    of murder which occurred in the commission of an arson

 3    or that he set fire to a residence.

 4              The corpus delecti where the offense of an

 5    arson is charged consists of two elements:  One, that a

 6    certain result occurred in this case, being the burning

 7    of a building; and, Two, that some person is criminally

 8    responsible for that act.  Carlton versus the People,

 9    150 Ill. 181; and People versus Lueder, L U E D E R,

10    Ill.2d 487.

11              Corpus delecti cannot be established through

12    a confession alone.  Independent evidence must exist

13    tending to prove that an offense was committed by the

14    defendant, and there is a citation for that, In Re

15    DA 114 Ill.App.3d 522.  Showing merely that a fire

16    occurred alone is insufficient to establish the corpus

17    delecti, and that comes from In Re DA.

18              In order for a conviction based upon a

19    confession to be sustained, the confession must be

20    corroborated according to People versus Willingham.

21    Two reasons for this requirement are commonly given.

22    One, that confessions are unreliable if coerced; and,

23    Two, that for various psychological reasons individuals

24    confess to crimes that either have never occurred or

1    for which they are not legally responsible, and that

2    comes from In Re DA, and also People versus Dolton 91

3    Ill.2d 22.  This legal requirement, frankly, is

4    designed to protect against cases just like this one.

5              In its case in chief the State presented

6    testimony from the following witnesses:  Fire Fighter

7    Born, Fire Fighter Brazzale, Dr. Teas, Elizabeth

8    Guerrero-Davis, Norita Condon, Pam Leavenworth, Tina

9    Miceli, Chief Cunningham, Investigator Guerreri,

10   Detective Cross, Former ASA Nigohosian and stipulations

11   from Dr. Porter, Phil Powers and Andrea Haidu, and also

12   the prior testimony of Andrew Knuth and Michael

13   Carlson.

14             Outside of the confession, which is

15   uncorroborated and thus not sufficient for corpus

16   delecti, the State has not presented a single witness

17   to testify to the cause of this fire, the origin of

18   this fire or even that it was incendiary.  They

19   presented no testimony, not even from a fire

20   investigator, to describe the nature of the fire or to

21   evaluate the scene for the Court; instead, they had a

22   police evidence technician show a video without real

23   comment of what the apartment looked like after the

24   fire.  They're asking the Court to make

1     interpretations.  They've offered zero interpretations

2     of the fire.  That does not prove arson, that proves

3     fire.

4              Obviously the State's focal point in the case

5     is what we expected, Mr. Amor's confession.  However,

6     the confession cannot be considered evidence sufficient

7     to convict if there is no independent corroboration for

8     the facts alleged in the confession.  That comes from

9     In Re DA, again, People versus Willingham, again,

10    People versus Lueder and also People versus Hougas,

11    H O U G A S, 91 Ill.App.2d 246.

12             We provided another case to the Court which

13    is People versus Bauer, the citation to the Court.  And

14    what's interesting about Bauer is that it's a 2nd

15    District decision from 2009.  And what it shows us is

16    that all of these cases -- This is good law.  This is

17    the law in the State of Illinois today.  In Bauer the

18    conviction was affirmed, it was an arson case.  And in

19    that case origin was provided by an expert in testimony

20    origin for the fire -- the cause of the fire was given

21    by an expert.  And there were independent facts that

22    supported the defendant's confession.  And in Bauer the

23    defendant did not dispute the confession, but was

24    offering a mistake of fact, the fact that they thought

1    the fire was extinguished before they left.  While

2    finding that evidence was sufficient, the 2nd District

3    cited In Re DA, which we are relying on in our argument

4    here, also Hougas -- The point being that this is a

5    fairly recent case.  2009, this is good law in

6    Illinois.  They have not proved arson.

7              Turning to In Re DA --

8         THE COURT:  You would -- Can I just ask?

9         MS. KAESEBERG:  Yes.

10        THE COURT:  You would agree that there doesn't

11   necessarily have to be cause and origin evidence if the

12   confession's otherwise corroborated to prove an arson?

13   Would you agree with that?

14        MS. KAESEBERG:  Yeah, I don't know that I agree

15   with that because I think, you know, what the cases

16   shows is that you can circumstantially support or prove

17   arson, but there has to be a predicate there that there

18   is actually an arson.  You can't -- Yeah.

19        THE COURT:  Well, arson is fire plus somebody

20   caused the fire, right?

21        MS. KAESEBERG:  Right.

22        THE COURT:  That's the traditional definition.

23        MS. KAESEBERG:  Correct.  As I understand it, yes.

24        THE COURT:  Continue.

1      MS. KAESEBERG:  In the case of In the Interest of

2  DA, I'll just call it DA to keep it simple.  The facts

3  of that case basically are there is a fire that

4  occurred on the second floor of a bathroom at a group

5  home.  Everyone -- the testimony was that everyone had

6  left the building and the defendant had returned back

7  inside the building and she was alone.  There was a

8  fire that then occurred in a bathroom on the second

9  floor.  The defendant provided two separate statements

10  where she admitted to having set this fire.  And she

11  maintained in her statements that she had set the fire

12  by lighting a box of Kotex on fire in the bathroom.  At

13  that trial a fire investigator testified to the origin

14  of the fire, but there was no testimony about the cause

15  of the fire and there was no testimony that anyone

16  knowingly set the fire.  And what the 2nd District held

17  in that case was that, quote, there is no evidence in

18  this record absent Respondent's admission that anyone

19  was criminally responsible for this fire.  And based on

20  that, they reversed that conviction.

21      In order to prove corpus delecti in an arson

22  case you have to prove that, One, the burning in a

23  building occurred and that someone was criminally

24  responsible.  They have only met that first prong that

1    a burning in a building occurred.

2            The Court in DA also ruled that, quote, where

3    the independent evidence tends to establish that only a

4    building burned, and there is nothing save the

5    confession alone, the corpus delecti has not been

6    proved.

7            The Appellate Court also noted that, quote,

8    the defendant's mere presence at the scene of the fire

9    sometime before the fire without other facts is not

10    evidence which tends to show that someone was

11    criminally responsible for the fire.  Just as in DA,

12    here, the State has completely failed to present any

13    independent evidence which tends to establish that

14    anyone was criminally responsible for this fire.

15            It's very important to note as well that the

16    cases hold that motive alone is not enough.  People

17    versus Hougas, again, H O U G A S, stands for that.

18    And in that case it was an arson where there was a

19    confession, but no independent evidence corroborated

20    that confession.  The confession in that case also like

21    our case had indicia of unreliability.  The motive was

22    all that the State had put in in that case.  And the

23    Court found that that was, quote, insufficient to

24    support the conclusion that a fire was willfully set.

1    In a criminal case the State must prove

2  beyond a reasonable doubt that the crime was

3  perpetrated by the person accused; citing People versus

4  Urbana, U R B A N A, 18 Ill.2d 81.  Mere probabilities

5  will not support a conviction; People versus Jackson,

6  23 Ill.2d 360.  Suspicious circumstances are not enough

7  to exclude doubt; People versus Sustak, S U S T A K, 15

8  Ill.2d 115.  And suspicious circumstances although of

9  probative value cannot substitute for proof sufficient

10  to support a conviction; In Re Whittenburg, W H I T T E

11  N B U R G, 37 Ill.App.3d 797.  Those points come from

12  the dissent of Justice Bowman in People versus Smith,

13  and I think are particularly relevant here.

14    The issue before the Court is whether the

15  State presented evidence independent of defendant's

16  admissions which tended to prove the defendant was

17  criminally responsible for the fire; citing people

18  versus Carter, 200 Ill.App.3d 760.  In Carter the

19  defendant's conviction was affirmed where there was an

20  expert who testified to cause and origin.  And in

21  Carter the Court referenced and distinguished two cases

22  where convictions were reversed, Hougas, which I

23  mentioned where the motive was not sufficient, and

24  Gugliotta, G U G L I O T T A, which that case was

1    provided to the Court.  The Carter Court noted that

2    these cases were reversed, and a guilty verdict was

3    unstainable because no independent evidence existed to

4    establish that the fires in those cases had incendiary

5    origins.

6              In People versus Gugliotta, the defendant was

7    accused of starting a fire at an apartment building.

8    He was even asked to leave a party at the building

9    about 15 minutes before the fire started.  The

10   defendant was caught that same morning setting a

11   different fire.  And then when he was released from

12   custody on the fire in question on that case, two other

13   fires he was suspected of setting as well.  And the

14   State in that case had motive evidence as well as MO

15   evidence.  That was not enough where no independent

16   evidence of incendiary origin -- cause and origin was

17   provided.  And Gugliotta is really interesting because

18   the fire expert in that case actually testified that

19   the fire was incendiary, but did not testify to cause

20   and origin, and that was not enough in that case.

21             Now, the 2nd District opinion where they said

22   even despite the expert opinion that the fire was

23   incendiary, absent the proof of cause and origin,

24   quote, it was not shown that these fires were of

1    incendiary origin and we cannot presume that fact.

2            The court in that case also directly pointed

3    to the State's inability to determine the cause of the

4    fire including there was insufficient evidence of a

5    crime, quote, that there was a fire in the elevator and

6    first floor drapes at Rock River Towers on

7    November 19th was proved by positive direct evidence

8    that these fires were caused by human agency or, in

9    other words, that the fire was of incendiary origin was

10   not proved.  Considering the expert's testimony that he

11   could not determine the cause of the fire, the Court

12   finally concluded the State -- and I quote again, the

13   State has failed to prove that the defendant and no one

14   else could have been responsible for the fire.  Again,

15   fire is not enough.  Merely being present at the scene

16   is not enough to establish guilt.  Even being present

17   at the scene -- it's less probative to be present at

18   the scene when the defendant lived at the scene or was

19   expected to be at the scene or resided next door as we

20   see in People versus Hendricks, H E N D R I C K S, 41

21   Ill.App.3d 178.

22           In this case the State has not presented a

23   single witness to say what the cause of this fire was.

24   The State has not presented a single witness to testify

1    to cause and origin.  The State has not presented a

2    single witness to say that this was an incendiary fire.

3    The State has not presented a single witness to say

4    that this fire was caused by a person.  The State has

5    not presented a single witness that they saw -- to

6    say -- excuse me, I'll start again.  The State has not

7    presented a single witness who can get up there and say

8    that they saw Bill Amor start this fire.  There is no

9    independent evidence outside of the so called

10    confession in this case that Bill Amor set fire to

11    anything.

12           The case law is clear, confession alone is

13    not enough, it must be corroborated by independent

14    evidence that proves the confession.  That is intended

15    to avoid the use of unreliable confessions.  There must

16    be independent evidence that the fire was incendiary.

17    There must be independent facts that support the

18    confession and support that the fire was incendiary and

19    caused by the criminal act of the person accused.

20           Courts have held, just to reiterate, that the

21    confession, plus presence, plus motive is not enough

22    without evidence of cause and origin.  Even an expert

23    saying something was incendiary as we saw in Gugliotta

24    was not enough.

1        Assuming the facts in the light most

2   favorable to the State, they have not proven their

3   case.  They have established that there was a fire.

4   They have not established that there was an arson.  And

5   I want to just point the Court's attention to the very

6   end of the Smith decision in the dissent by Justice

7   Bowman because when I read it it harkened back to the

8   case -- And Justice Bowman there said in the very last

9   paragraph that in his dissent if the decision of the

10  majority, quote, emasculates any common sense meaning

11  of our constitutionality enshrined phrase proof beyond

12  a reasonable doubt.  To twist the facts before us into

13  the definition of proof beyond a reasonable doubt is to

14  hurl a barred spear into the beating hearts of a

15  definition which for so long in our history has

16  protected the innocent against the powers of the State

17  to charge and convict its citizens of crime.  Your

18  Honor, the State simply has not put the evidence in in

19  their case in chief to establish that this was an

20  arson, and we would move for a directed verdict of not

21  guilty.

22        THE COURT:  Thank you.  State.

23        MR. SCALIATINE:  Judge, at this stage with the

24  motion for directed verdict it is the evidence most

1    favorable to the State.  And the evidence that you have

2    heard in this very courtroom that corroborates the

3    confession of the defendant includes the testimony and

4    description by evidence technician Guerrero; and the

5    photos that you have as exhibits that show most of the

6    damage that occurred, occurred in the living room, it

7    occurred in the southwest and northwest corners of that

8    living room; that there was a lack of a smoke detector

9    found, two officers testified to that.  Plus, you had

10   Ms. Condon's testimony that there was previously a

11   smoke alarm there.  Plus, you had Ms. Leavenworth's

12   testimony that there was previously a smoke alarm

13   there.  Plus, you have the defendant's admission on the

14   confession that he took down -- took away the cover of

15   the smoke alarm to change the battery and then changed

16   that story.  Plus, you have in this case to corroborate

17   the confession, the letter that was recovered during

18   this massive destroyed fire in which the defendant has

19   a plan to move.  You have the testimony of

20   Ms. Miceli -- Tina Miceli of the defendant and hers

21   plan to move.  You have the testimony that the

22   defendant was unemployed.  That they had this grand

23   scheme plan to move, that they were buying furniture or

24   bedding and putting it in the corner with this plan to

1    move, yet no financial ability to do so.

2          Then you have the testimony of the officers

3    that when first confronted about -- by the defendant

4    about the concept of life insurance, not only does he

5    know knowing about life insurance at first, but he

6    tries to shut Ms. Miceli up when she's about to talk

7    about life insurance.  Then you find out later from the

8    confession that he did know about the life insurance.

9          THE COURT:  When did I learn that?

10         MR. SCALIATINE:  During the confession.

11         THE COURT:  All right.  Continue.

12         MR. SCALIATINE:  You also have in the People's

13   case in chief the testimony of Mr. Gust that this was

14   not an electrical fire.  There is an expert that

15   testifies that says this is not an electrical fire.

16         You have on top of that, Judge, the shifting

17   versions of the defendant's statements.  And if Counsel

18   wants to take those differing versions of statements

19   and argue that it shows the confession it was done by

20   suggestibility or that it's not reliable, but let's

21   look now at the confession.  All those other items

22   corroborate the confession.  But let's look at the

23   confession, Judge.  You have testimony from the

24   officers, and no one's disputing it, that they didn't

1    have any guns, that there wasn't any force, that there

2    wasn't any handcuffs, that there was one statement to

3    the defendant in a loud volume. Period. That he was

4    offered drinks, that he was offered cigarettes, that he

5    was Mirandized, not once, but twice. And then reminded

6    about his Miranda rights by the prosecutor who was

7    there.

8         This concept of over borne and

9    suggestibility, Judge, is belied by the audio taped

10   confession that Your Honor has heard today when the

11   defendant says that he lowballed this concept of the

12   life insurance and how much it was to $10,000 or

13   $15,000 when he was thinking about it and when he was

14   contemplating his act. And then he contemplated his

15   acts over several days.

16        You also have the direct testimony of a

17   former prosecutor Nigohosian that the defendant with

18   him discussed not only this idea of fire, but that the

19   first idea was to kill Ms. Miceli in intentional murder

20   was to overdose her with medications. The defendant

21   lies about not drinking vodka. Lies about not knowing

22   about insurance. Lies about where this alarm -- this

23   smoke alarm was. And the People have presented

24   evidence that is sufficient at this point, and would

Pl. Amor 029094

1    ask that you deny the motion.

2           But before I finish, Judge, excuse me, one of

3    the cases that the defendant cited is this People v.

4    Smith at 253 Ill.App.3d 443, it is a 2nd District case.

5    And it says in it in Headnote 3, quote, however, the

6    elements of the crime of arson may be shown by

7    circumstantial evidence. And they cite People v.

8    Haines. In most arson cases, Judge, there is only

9    circumstantial evidence because most of the evidence is

10    burned or destroyed and there is not usually any

11    witnesses in the fire when the fire is set. This is a

12    circumstantial case, the confession is corroborated and

13    the motion should be denied.

14    THE COURT: All right.

15    MS. KAESEBERG: Can I briefly reply to that Your

16    Honor?

17    THE COURT: Don't do rebuttals in motions for

18    directed findings, but thank you.

19           All right. What I would say is this, there

20    is no question there was a fire, that part's easy.

21    There is not testimony of a cause from an expert, there

22    is no question. There is certainly a strong suggestion

23    that the origin at least was in the living room. Where

24    in the living room? It's hard to say.

```
 1          And I want to say something from the outset
 2     because I've struggled with one thing as I've thought
 3     about this argument in anticipation of it being made,
 4     and it is my knowledge of certain things based upon the
 5     hearing we had in terms of whether to vacate the
 6     conviction that are not yet part of the record in the
 7     trial itself.  And I've struggled with whether the
 8     Court can or cannot, for lack of a better word, take
 9     judicial notice of that knowledge, and in abundance of
10     caution, think the answer is that I cannot, but, boy,
11     is it tempting to do so.
12          So assuming that I cannot, there are certain
13     things that I know that I have to put aside as it
14     relates to the sufficiency of the evidence on the
15     defendant's motion for a directed finding.  We have a
16     fire.  We don't have any expert testimony certainly as
17     it relates to the cause.  We do have an expert who's
18     testified that it was not electrical, but that doesn't
19     discount other types of causes, of course; i.e.,
20     cigarettes.  I'm sure there is any number of other
21     possibilities too, but the -- And as I've indicated, we
22     do have some suggestion of the origin.
23          It is true that many arsons, I don't know if
24     it's most, but there are arsons of course that most, if
```

1    not all, the evidence disappears in the fire, and

2    sometimes you're left with a confession. And as the

3    Defense points out, an uncorroborated confession

4    standing alone with proof of an arson is not going to

5    be sufficient. And even with a motive sometimes that's

6    not sufficient. All these cases of course turn on

7    their specific facts, and with the exception of the

8    Stauter opinion, the name of which escapes me, all of

9    the cases provided are of course proof beyond a

10   reasonable doubt at the close of evidence, not at the

11   close of a motion for a directed finding where the

12   State gets a consideration of the evidence in the light

13   most favorable to the non-moving party. And I take the

14   testimony of witnesses to be true.

15           So, here, is the confession corroborated

16   ultimately I suppose is the question. And what we have

17   are a couple of things which do, I believe, tend to

18   corroborate it. One is of course the letter where part

19   of the letter, at least, discusses the defendant's plan

20   for capital or financial gain. And of course he

21   indicates to Mr. Nigohosian that what he was referring

22   to was a plan for a fire. And the fact that the fire

23   or smoke detector is removed certainly suggests

24   inferentially that the defendant intended to do this,

1    and it makes less likely that the fire would be

2    discovered prior to a certain goal being accomplished.

3    The existence of insurance and at least the suggestion

4    at one point in the evolution of the defendant's

5    statements that he was aware of the insurance, the fact

6    that it exists is something that the Court can

7    consider.  And of course the testimony of Leavenworth

8    and the HUD inspector that, in fact, that fire

9    detection device had been there in a relatively

10   proximate time to the fire.

11           Like I said, I don't get to consider the

12   things that are, I believe, highly relevant that were

13   the actual innocence hearing.  Considering the evidence

14   in the light most favorable to the non-moving party at

15   this time, though it is close, I do believe there is

16   sufficient evidence beyond a reasonable doubt to allow

17   the case to proceed.  So the motion for a directed

18   finding is denied.

19           So now moving forward, next week the

20   defense's case in chief we had discussed the

21   possibility of starting at 1:30 on Monday, I don't know

22   what the parties -- what your thought process is on

23   that.

24           MS. THOMPSON:  That works for the Defense, Your

1  Honor, we do have some structure to think about a

2  schedule, and we're prepared to talk about that, Your

3  Honor.

4        THE COURT:  Let's do that.

5        MS. THOMPSON:  What we anticipate, and I have

6  conferred with the state about this, is that we have a

7  couple of fire fighter witnesses who have to travel for

8  some distance.  Some of them are now living in DeKalb

9  County that we would probably call first on Monday

10  because we anticipate they'll be shorter to get those

11  gentlemen done.  And then we would -- although

12  obviously we need to think about everything that's

13  happened today, we anticipate that we would call Doug

14  Carpenter.  And I assume his testimony will for sure go

15  into Tuesday.

16        THE COURT:  Okay.

17        MS. THOMPSON:  Tuesday afternoon is where we have

18  a little bit of trouble because, as the Court knows, we

19  have some experts that couldn't come until later.  We

20  have a couple of witnesses that we might call in

21  addition to Carpenter that I also think would be short,

22  but, frankly, depending on the testimony Monday we may

23  not need.  And that's where we have sort of a little

24  bit of a gap.  We would anticipate calling --

1      THE COURT:  Now, if you recall I have that

2  obligation at 3:00 o'clock on Tuesday.

3      MS. THOMPSON:  I understand that, Your Honor.  I'm

4  saying I don't know that we'll go to 3:00, but I think

5  that Carpenter could be a lengthy witness certainly.

6      THE COURT:  Sure.

7      MS. THOMPSON:  We would anticipate calling John

8  DeHaan on Wednesday.  And then on Thursday, that

9  Thursday is the day that Dr. Greg DeClue could get

10  here.  So he --

11      THE COURT:  That's the new expert?

12      MS. THOMPSON:  That is the expert to talk about

13  Dr. Chiapetta's testimony about the --

14      THE COURT:  Got it.

15      MS. THOMPSON:  -- about the confession.  And then

16  we have our other arson expert David Smith who, I'll be

17  candid, I'm not sure that we would need both Dr. DeHaan

18  and David Smith, we need to think about that, but if he

19  were to testify it would be Thursday as well.

20      THE COURT:  Okay.

21          Well, I think that's --  I mean, we may have

22  some gaps, but that's pretty impressive in terms of

23  filling up the Court's time.  I mean, if we have gaps,

24  we have gaps, it's fine.  So with that in mind, it

```
 1    sounds reasonable.  We'll start up Monday at 1:30.  And
 2    then in terms of the structure of the courtroom, it's
 3    working out okay.
 4          And then I know Carpenter had that thing --
 5    he had a visual.  So it probably works out like that,
 6    but, if not, the parties could think about how they
 7    want to do it in terms of the location of the TV.
 8    Anything else we need to spread of record?
 9          MR. SCALIATINE:  Judge, as to a possible expert
10    from the State in rebuttal, he does live in North
11    Carolina.  He was here for, and he is in the -- he is
12    here today.  He's been here several days.  He's going
13    to be sent home because of the length of the defenses's
14    case, I think, I can't ask the man to stay 11 days.  So
15    he's going to go home.  I was contemplating having him
16    come Friday, but if we're rolling into Friday still
17    with the defenses's case in chief I don't want to hold
18    him over to the next weekend.  Would Your Honor
19    consider rebuttal on that Monday?  Then I can bring him
20    in --
21          THE COURT:  Let me interrupt for a second.  So
22    DeClue was Thursday.  And then you had mentioned, was
23    it Smith?
24          MS. THOMPSON:  Yes, Your Honor.
```

| | |
|---|---|
| 1 | THE COURT:  Being uncertain in light of DeHaan's |
| 2 | availability whether you would or would not call Smith, |
| 3 | but you're not prepared to make that decision yet. |
| 4 | MS. THOMPSON:  I am honestly not, Your Honor. |
| 5 | THE COURT:  Sure. |
| 6 | MS. THOMPSON:  Let me -- Can I add one thing, |
| 7 | which is I really do anticipate that Dr. DeClue is |
| 8 | going to be short.  The Court -- I mean we have the |
| 9 | Chiapetta's testimony which we're going to put in, and |
| 10 | I think Dr. DeClue honestly would be to sort of clean |
| 11 | up the gaps.  You know, we will probably renew our |
| 12 | motion as to Dr. DeClue testifying about other issues. |
| 13 | I have a feeling that his testimony will be short, Your |
| 14 | Honor.  So that -- I don't -- I think that if we waited |
| 15 | until -- |
| 16 | THE COURT:  So if -- let me ask this question, and |
| 17 | I appreciate that.  If -- I don't know if Mr. Smith is |
| 18 | a doctor, is he a doctor? |
| 19 | MR. SCALIATINE:  Fire expert. |
| 20 | MS. THOMPSON:  He's not, Your Honor. |
| 21 | THE COURT:  So if Mr. Smith were to testify in |
| 22 | light of your anticipation that DeClue is relatively |
| 23 | short, would he testify on Thursday? |
| 24 | MS. THOMPSON:  Mr. Smith? |

```
1          THE COURT:  Yes.

2          MS. THOMPSON:  Absolutely.

3          THE COURT:  And do you believe that would conclude

4     the testimony you would be offering?

5          MS. THOMPSON:  Yes.  And as I said, I think it's

6     still very unclear whether we would call Mr. Smith, but

7     we would be done on Thursday.

8          THE COURT:  With that understanding,

9     Mr. Scaliatine, do you think it's reasonable to have

10    Agent Golder come on Friday?

11         MR. SCALIATINE:  I can do that, Judge.

12         THE COURT:  All right.  Well, let's try that.

13         MR. SCALIATINE:  And, Judge, just for the record

14    because there has been some minor disagreements between

15    the parties on this particular issue in the Court's

16    rulings.  If Agent Golder were to stay here the week,

17    it's the People's position that they would want him in

18    the courtroom to observe the other experts who are

19    testifying about the fire science, be able to observe

20    that testimony, that's the People's position.

21         THE COURT:  That's been the practice that I've

22    always observed.  What's the Defense's position?

23              It's not based upon -- I'm sorry, I shouldn't

24    be listening to your conversation.
```

```
1        MS. THOMPSON:  I think as the Court heard, you

2   know, we're not making that request, but I think the

3   Court manages his own courtroom, and the Court

4   should --

5        THE COURT:  Well, I guess the question is do you

6   have an objection to the motion to exclude not applying

7   to expert witnesses on both sides?

8        MS. THOMPSON:  I want to say I don't like that,

9   but I don't think we have a basis truly to object.

10       THE COURT:  All right.  I would allow that.  If he

11  happens to be here I would allow him to be present for

12  the testimony of other experts and vice versa.  All

13  right.  So with that --

14       MS. THOMPSON:  Could I add one more thing, Your

15  Honor?

16       THE COURT:  Yes.

17       MS. THOMPSON:  I'm sorry to interrupt the Court.

18  What I also think would make sense from a scheduling

19  perspective because we do have one member of the

20  Defense team that has to be back to -- I think actually

21  two people in the Defense team who have to be back to

22  jobs a week from Monday.  It seems to me that the

23  Defense ought to think carefully about how we can

24  shorten this so that if there is going to be rebuttal
```

| | |
|---|---|
| 1 | it can happen next week, and we're committed to doing |
| 2 | that. And what I would suggest is that we think about |
| 3 | witnesses we truly need to call so that we can try to |
| 4 | move this along -- |
| 5 | THE COURT: All right. When you say rebuttal, are |
| 6 | you contemplating surrebuttal? |
| 7 | MS. THOMPSON: I'm not. But what I'm saying is I |
| 8 | think we have people here that truly need this trial to |
| 9 | conclude on Friday if possible. And I want to make |
| 10 | sure that happens. And so I think we want to think |
| 11 | about what witnesses we have, and I'd like to confer |
| 12 | with the State about that, you know, over the weekend |
| 13 | so that they could be prepared to call their rebuttal |
| 14 | on Thursday. If we have, you know, one short witness |
| 15 | on Thursday it seems to me we should be rolling right |
| 16 | into rebuttal. |
| 17 | THE COURT: Well, I will let you and the State |
| 18 | talk about that. Like I said, I have the whole week |
| 19 | available for this with the exception of the afternoon |
| 20 | of the -- after 3:00 o'clock on Tuesday. And then I |
| 21 | have this concern that I am truly gone the following |
| 22 | week, and there are no exceptions to that, I'm required |
| 23 | to be away for the week. So I'd love this to resolve |
| 24 | on Friday as well. |

```
1        MR. SCALIATINE:  It will.

2        THE COURT:  Okay.  1:30 on Monday.

3             Now, in terms of the State's evidence at this

4    juncture in light of them having rested, it probably

5    makes sense for the clerk to retain the exhibits at

6    this time.

7        MR. SCALIATINE:  That would be fine, Judge.

8        THE COURT:  All right.  And I'll give the three

9    exhibits that I have to the clerk.  Mr. Minser or

10   Mr. Scaliatine, can I ask you to get me copies of

11   Exhibits 25, 26 and 48-A.

12       MR. MINSER:  Yes, Your Honor.

13       THE COURT:  Because I didn't mark up the

14   originals, but I might want to mark up a copy.

15       MR. MINSER:  I will provide copies, Your Honor, I

16   apologize.

17       THE COURT:  No, no, it's quite all right.

18                 (Which were all of the proceedings had

19                  in the above-entitled matter.)

20

21

22

23

24
```

```
 1        IN THE CIRCUIT COURT OF THE 18TH JUDICIAL CIRCUIT

 2                  DU PAGE COUNTY, ILLINOIS

 3

 4

 5            I, JILLIAN DOCTOR, do hereby certify that the

 6     foregoing Report of Proceedings, consisting of Pages 1

 7     to 108, inclusive, was reported in shorthand by me, and

 8     the said Report of Proceedings is a true, correct and

 9     complete transcript of my shorthand notes so taken at

10     the time and place hereinabove set forth.

11

12

13

14         _____

15                  Official Court Reporter
             Eighteenth Judicial Circuit of Illinois
16                       DuPage County
                 C.S.R. License No. 084-004809
17

18

19

20

21

22

23

24
```

Pl. Amor 029107