```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   WILLIAM E. AMOR,              )
                                   )
 4                  Plaintiff,     )
                                   )
 5           vs.                   )   No. 18 CV 2523
                                   )
 6   MICHAEL CROSS, et al.,        )
                                   )
 7                  Defendants.    )

 8           The deposition of MICHAEL MASOKAS, taken

 9   pursuant to the Federal Rules of Civil Procedure,

10   before Katie K. Elliott, Certified Shorthand

11   Reporter No. 084-004537, at 141 West Jackson

12   Boulevard, Suite 1240A, Chicago, Illinois, on

13   Tuesday, November 5, 2019, commencing at 10:34 a.m.

14   pursuant to notice.

15        APPEARANCES:

16             LOEVY & LOEVY, by
               MS. TARA THOMPSON
17             (311 North Aberdeen Street, Third Floor
                Chicago, Illinois  60607
18              312.243.5900
                tara@loevy.com)
19                appeared on behalf of the plaintiff;

20

21

22

23

24
```

MICHAEL MASOKAS, 11/05/2019                                    Page 2..5

Page 2

```
 1      APPEARANCES:  (Cont'd)
 2          THE SOTOS LAW FIRM, PC, by
            MS. LAURA M. RANUM
 3          (141 West Jackson Boulevard, Suite 1240A
            Chicago, Illinois  60604
 4          630.735.3300
            lranum@jsotoslaw.com)
 5            appeared on behalf of the defendants;
 6      LAW OFFICE OF JAMES T. NYESTE, by
        MR. JAMES T. NYESTE
 7          (820 Davis Street, Room 504 E
            Evanston, Illinois  60201
 8          847.242.0601
            jnyeste@coveragelaw.com)
 9            appeared on behalf of the deponent.
10

11      ALSO PRESENT:

12          Ms. Carson Canonie, The Sotos Law Firm;
            Ms. Mariah Garcia, Loevy & Loevy.
13              *  *  *  *  *  *  *
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1              I N D E X
 2
    Witness:                              Page
 3
        MICHAEL MASOKAS
 4
        Examination by:
 5
        Ms. Ranum....................    4
 6      Ms. Thompson.................  173
        Ms. Ranum....................  224
 7      Ms. Thompson.................  226
        Ms. Ranum....................  279
 8      Ms. Thompson.................  286
 9
            E X H I B I T S
10
    No.   Description          Marked/Referenced
11
     1  Polygraph Case History (SDT-REID
12      21-22) and Polygraph Examination
        (SDT-REID 14-15)....................   18
13   2  Medical Data Sheet....................   29
     3  Notes from Pretest Interview -
14      SDT-REID 47 and 49..................   37
     4  Front side of Pretest Interview -
15      SDT-REID 46.........................   61
     5  Polygraph Records for William Amor....   81
16   6  Written Report to Dect. Cross from
        Masokas dated 10/20/95..............  163
17   7  Invoice from John Reid & Associates....  165
     8  People v. Amor - 3/6/1996 -
18      Transcript..........................  171
     9  Handwritten drawing by Deponent........  216
19  10  Richard T. O'Brien & Associates -
        Polygraph of William Amor and Tina
20      Miceli - 9/14/95....................  280
21
            (Exhibits attached/scanned.)
22
23              - - -
24
```

Page 4

```
 1              (Witness sworn.)
 2          MICHAEL MASOKAS
 3  called as a witness herein, having been first duly
 4  sworn, was examined and testified as follows:
 5              EXAMINATION
 6  BY MS. RANUM:
 7      Q.   Good afternoon, Mr. Masokas.
 8          Can you please state and spell your
 9  name for the record.
10      A.   Sure.  Michael, M-i-c-h-a-e-l; Masokas,
11  M-a-s-o-k-a-s.
12      Q.   Thank you.
13          And just briefly, to kind of give
14  you an idea of how everything is going to go today,
15  there's a court reporter here taking down
16  everything we say, so it's important that we do our
17  best not to talk over each other.  So even if
18  you're anticipating that you know what I'm going to
19  ask, I would ask that you just let me finish the
20  question before you start your answer.
21      A.   Okay.
22      Q.   And likewise, if at any point I think
23  you're done with an answer but I've cut you off,
24  please let me know.
```

Page 5

```
 1          All of your answers need to be
 2  verbal so she can record them.  And we can take as
 3  many breaks as you need.  The only thing I would
 4  ask is that we not take a break while there's a
 5  question pending.  So if there is a question
 6  pending, we just wrap that up first, okay?
 7      A.   Yes.
 8      Q.   Great.
 9          Mr. Masokas, where did you attend
10  college?
11      A.   St. Xavier -- well, two years junior
12  college, Richard J. Daley College; and then the
13  following two years, St. Xavier College in Chicago.
14      Q.   Did you receive a degree from
15  St. Xavier?
16      A.   Yes.
17      Q.   What was the degree you received?
18      A.   It was a degree in criminal justice.
19      Q.   What year did you receive that degree?
20      A.   1981.
21      Q.   And at some point did you become a
22  licensed polygrapher?
23      A.   Yes.
24      Q.   Can you tell me a little bit about the
```

Page 6

1 process to become a licensed polygraph examiner.
2     A.   I went through Reid College.  It was a
3 six-month program.  The first three months were
4 classroom, the second three months were hands-on,
5 actually doing testing under supervision.  The
6 classroom study was in fields of psychology,
7 physiology, law, question formulation, and
8 interviewing and interrogation.
9     Q.   Okay.  And what years did you study
10 that at Reid College?
11     A.   It went -- it was a six-month program.
12 I went from August of 1981 through I believe
13 February of 1982.
14     Q.   Okay.  And at the completion of that
15 program, did you receive a certification of sorts
16 or --
17     A.   Yes, yes.  It was -- fortunately I
18 passed everything and graduated, but then I had to
19 take the state exam through the Department of
20 Professional Regulation to be licensed.
21     Q.   Okay.  So you received a certification
22 through Reid College and then a license through
23 State of Illinois, correct?
24     A.   Yes.

Page 7

1     Q.   And what year did you obtain your
2 license with the State of Illinois?
3     A.   1982.
4     Q.   Okay.  And what was your first job
5 after you became a polygraph examiner?
6     A.   My first job working with polygraph was
7 a part-time position with FL Hunter & Associates in
8 Hinsdale, and I worked for Mr. Hunter for one year
9 in a part-time capacity.
10     Q.   At some point did you become employed
11 with Reid & Associates?
12     A.   Yes.
13     Q.   When did you first become employed with
14 Reid & Associates?
15     A.   It was May -- I believe May of 1983.
16     Q.   What was the first position you held
17 with Reid?
18     A.   I was a staff polygraph examiner.
19     Q.   How long were you a staff polygraph
20 examiner for Reid & Associates?
21     A.   From the time I started in 1983 until
22 approximately 1988.
23     Q.   And what happened in 1988?
24     A.   I was promoted to the chief polygraph

Page 8

1 examiner position.
2     Q.   Did you ever -- I know you attended
3 Reid College back in 1981 and 1982.
4          Did you ever take any classes at
5 Reid College at any point after you received that
6 initial certification?
7     A.   Reid College, per se, no.
8     Q.   Okay.  Do you have -- did you ever have
9 any higher education following receiving your
10 license?
11     A.   In the field?
12     Q.   Yes.
13     A.   The only other training I would have
14 had was I attended through John Reid & Associates
15 their four-day interview/interrogation training
16 seminar.
17     Q.   Okay.  Did you ever receive any sort of
18 master's degree of any sort from Reid College?
19     A.   Yeah, yes.  Well, that was through a
20 research project and a published paper, and it was
21 a master's degree in detection of deception.  That
22 would have been several years into my employment
23 with Reid.
24     Q.   Do you remember about what year that

Page 9

1 was?
2     A.   I want to say maybe 1986.
3     Q.   Okay.  What were your duties as chief
4 polygraph examiner at Reid & Associates?
5     A.   I would oversee our staff of examiners
6 and interviewers, review and consult with them on
7 cases that they were working, as well as continue
8 to run examinations myself.
9     Q.   How many staff polygraph examiners did
10 you have on your staff at any given time?
11     A.   It fluctuated because of our training
12 class.  Oftentimes, examiners would move out for a
13 period of time to do training, and then they'd come
14 back later, so it could have been anywhere from two
15 to five or six.
16     Q.   Okay.  By 1995 -- so at this point I
17 guess you would have been about 12 years into your
18 career at Reid, correct?
19     A.   Yes.
20     Q.   By 1995, how many polygraph
21 examinations would you estimate you had conducted
22 during your time at Reid?
23     A.   I would say it would have been -- and
24 this is a complete estimation, but it would have

MICHAEL MASOKAS, 11/05/2019                                    Page 10..13

Page 10

1 been a few thousand.

2     Q.  Have you ever given testimony as an
3 expert on the subject of lie detection or polygraph
4 examination?

5     A.  Such -- can you be more specific?
6 Like -- I mean, I taught at Reid College.

7     Q.  Okay.  Let's talk about that.

8        When did you teach at Reid College?

9     A.  Well, it would have been 1990 -- or
10 1985, a bit in 1986.

11     Q.  What subjects did you teach at Reid
12 College?

13     A.  I don't remember.  Specifically right
14 now, I could not say.

15     Q.  Okay. We're going to talk a lot about
16 a polygraph examination which you conducted on
17 October 3, 1995, of a man named William Amor.

18        Do you remember conducting that
19 investigation?

20     A.  Yes.

21     Q.  And do you also remember that you
22 testified in a motion to suppress hearing regarding
23 Mr. Amor's polygraph examination?

24     A.  Yes.

Page 11

1     Q.  And you testified truthfully at that
2 hearing?

3     A.  Yes.

4     Q.  Have you had an opportunity to review
5 your testimony recently?

6     A.  Yes, I have.

7     Q.  And in your review -- in your recent
8 review, do you still find your testimony to be
9 truthful and accurate to the best of your ability?

10     A.  Yes.

11     Q.  Now, in October of 1985, did Reid &
12 Associates have a standard protocol or practice for
13 how they would handle polygraph examinations of
14 noncustodial individuals?

15     MS. THOMPSON: Object to form.

16     THE WITNESS: Yes.

17 BY MS. RANUM:

18     Q.  And can you explain to me what that
19 protocol was.

20     A.  The subject would come in for the exam.
21 Sometimes they were accompanied by investigators,
22 sometimes they would come in on their own,
23 depending on the circumstances and the situation.

24        If they were accompanied by an

Page 12

1 investigator, oftentimes we would sit with the
2 investigator prior to the exam to where they would
3 provide background information for us.  On other
4 instances, we may have done that by phone prior to
5 the arrival of the subject.

6        And then at some point, we would
7 walk the subject back to an interview room and
8 start the procedure.

9     Q.  Okay.  And did that standard practice
10 vary at all if it was an individual who was in
11 custody of the police?

12     A.  Yes.

13     Q.  And how did it vary if they were in
14 custody?

15     A.  If the subject was in custody, we would
16 move them to a back office to where they were not
17 in the lobby so that they didn't feel
18 uncomfortable, but also so some of our other
19 clients didn't feel uncomfortable.

20        And at that point if they were in a
21 side office, typically an investigator would sit
22 with them when we would speak with the other
23 investigator.

24     Q.  Okay.  Now, the standard practice that

Page 13

1 you've described for a noncustodial polygraph
2 examination, was that followed in the case of
3 Mr. Amor's examination on October 3, 1995?

4     MS. THOMPSON: Object to form.

5 BY MS. RANUM:

6     Q.  You can answer.

7     A.  Yes.

8     Q.  Do you recall how you were retained for
9 the polygraph examination of Mr. Amor?

10     A.  At this point, I do not.

11     Q.  Okay.  You testified at the motion to
12 suppress that you received a call to your lobby in
13 your office around 3:50 p.m. on October 3, 1995 --

14     A.  Yes.

15     Q.  -- regarding Mr. Amor's arrival; is
16 that correct?

17     A.  Yes.

18     Q.  Where was your office located in
19 October of 1995?

20     A.  We were at 250 South Wacker Drive on
21 the 11th floor.

22     Q.  And when you went out to the lobby to
23 greet Mr. Amor, was that the first time you ever
24 met Mr. Amor?

Urlaub Bowen & Associates, Inc.   312-781-9586

MICHAEL MASOKAS, 11/05/2019                          Page 14..17

Page 14

1    A.   Yes.
2    Q.   What do you recall about that initial
3  greeting with Mr. Amor?
4    A.   When I walked out, there were three
5  individuals sitting there, two of which were the
6  detectives from Naperville and Mr. Amor.  They were
7  all dressed in casual clothing, specifically I
8  don't remember what, but they were casual.  And the
9  three were just sitting in the lobby.
10    Q.   Do you remember the names of the two
11  individuals that were with Mr. Amor?
12    A.   One I believe -- and I'm probably going
13  to mess up with pronunciation -- was Guerreri.
14    Q.   Was it Detective Bob Guerreri?
15    A.   Yeah, I believe so.
16         And the other one I believe was Mike
17  Cross.
18    Q.   Okay.  Had you ever met Detective
19  Michael Cross before?
20    A.   I do not believe so.
21    Q.   Okay.  Had you ever met Detective
22  Guerreri before?
23    A.   No.
24    Q.   Was there anything unusual about that

Page 15

1  initial encounter in the lobby of your office?
2    A.   No.
3    Q.   Did Mr. Amor seem like he was in any
4  sort of distress?
5    A.   No.
6    Q.   Can you describe just kind of briefly
7  the layout of what the lobby looks like and kind of
8  the entrance into the office.
9       MS. THOMPSON:  Object to form.
10       THE WITNESS:  The entrance face the
11  elevators, it was two glass doors, and then you
12  would walk into just a vestibule that opened up
13  into the lobby area.
14         At the time I want to say maybe
15  there were a dozen chairs out there.  There was
16  also a magazine rack out there.
17         And then on the other side were
18  sliding glass windows for the reception area and a
19  door, a secure door that led into the actual office
20  space.
21  BY MS. RANUM:
22    Q.   Okay.  So when you came -- if you're
23  coming up from the street, you take the elevator up
24  to the 11th floor, and you come out kind of in like

Page 16

1  an elevator bank area?  Is that fair to say?
2    A.   Yes.
3    Q.   And then there's an entrance into John
4  Reid & Associates office?
5    A.   Yes.
6    Q.   And that entrance puts you into the
7  lobby that you've just described?
8    A.   Correct.
9    Q.   And that entrance into the lobby, is
10  that door unlocked from the inside?  In other
11  words, if you want to exit the lobby, are you able
12  to do so without any sort of key or assistance?
13    A.   Correct.
14    Q.   Okay.  Once you met the three
15  individuals, what happened next after you met them
16  in the lobby?
17    A.   At that time I escorted the two
18  detectives back to the library area, which is
19  behind the secure door, and Mr. Amor stayed in the
20  lobby.  And we sat down, and they provided the
21  background information as to what their case was
22  about, what they wanted us to talk to him about.
23    Q.   Was anyone present for your meeting
24  with the officers in the library other than you and

Page 17

1  Detectives Cross and Guerreri?
2    A.   Right now as we speak, I believe it was
3  just the three of us.
4    Q.   Okay.  And during that time the three
5  of you met in the library, Mr. Amor remained in the
6  lobby to the best of your knowledge?
7    A.   Yes.
8    Q.   And from your perspective, was it your
9  understanding that Mr. Amor was free to leave while
10  he was in the lobby?
11       MS. THOMPSON:  Object to form.
12       THE WITNESS:  Yes.
13  BY MS. RANUM:
14    Q.   During your conversations with
15  Detectives Cross and Guerreri -- well, let's back
16  up for a minute.
17         What is the point of this sort of
18  briefing that you do with the officers when you
19  first greet them?
20       MS. THOMPSON:  Object to form.
21       THE WITNESS:  They provide information on
22  their investigation, what the issue is, and what
23  they want us to question him on, what they want him
24  tested on basically.

MICHAEL MASOKAS, 11/05/2019                          Page 18..21

Page 18

1           At that point prior to their
2  arrival, we really didn't know what the details
3  were.
4  BY MS. RANUM:
5      Q.   Okay.  Did Detectives Cross and
6  Guerreri tell you that Mr. Amor was not in custody?
7      A.   Specifically right now, I don't
8  remember.  I know he wasn't handcuffed.  I know he
9  was sitting in the lobby by himself.  So at that
10 point I was assuming he was not in custody.
11     Q.   Okay.  Do you recall any of the
12 information that was provided to you during that
13 background meeting?
14     MS. THOMPSON:  Object to form.
15     THE WITNESS:  It would help me if I looked at
16 my notes.
17     MS. RANUM:  Sure.
18           (Deposition Exhibit No. 1,
19            Witness Masokas, was marked for
20            identification 11/05/2019.)
21 BY MS. RANUM:
22     Q.   Mr. Masokas, I'm showing you a
23 four-page document that's been marked Exhibit 1 to
24 your deposition.  For the record, it's Bates

Page 19

1  stamped SDT-REID 21 through 22 and SDT-REID 14
2  through 15.
3           I'm going to ask you about the first
4  two pages of the document, but please feel free to
5  review the document as much as you'd like and let
6  me know when you're ready.
7      A.   Okay.
8      Q.   Now, the first two pages of this
9  document, SDT-REID 21 and 22, are a document
10 titled, Polygraph Case History, correct?
11     A.   Yes.
12     Q.   And would this have been the notes you
13 were referring to that you would have taken
14 regarding your meeting with Detectives Cross and
15 Guerreri in the library?
16     A.   Yes.
17     Q.   So if we could just go through the
18 notes that you took and maybe you can decipher your
19 handwriting in a couple places, if you don't mind.
20     A.   Yeah, if I can.
21     Q.   Sure.
22           So at the top you've indicated that
23 it's Sunday.  You indicate Sunday, September -- it
24 says 9/10.  Is that '95?

Page 20

1      A.   Yes.
2      Q.   And what would that date have been that
3  you would have written down?
4      A.   That would have been the date of the
5  fire.
6      Q.   Okay.  And then you have written down,
7  Mike Cross and Bob, under INV.
8           Is that supposed to be the
9  investigators?
10     A.   Correct.
11     Q.   And then can you just kind of explain
12 for us and read through the rest of what you wrote
13 down on this form.
14     A.   Yes.
15           Just a little bit below that where
16 it says, Suspects:  No. 1, William Amor; No. 2,
17 Marianne Miceli; No. 3, Tina, daughter of subject 2.
18     Q.   Okay.
19     A.   Down a little bit further.  And now
20 they're speaking, and I'm just writing as they're
21 talking.  So they're providing information; I'm
22 just writing.
23           And they had said that there was a
24 $100,000 life insurance policy on subject 2, who

Page 21

1  was Marianne Miceli.  And right under there,
2  subject 2 is the victim; cause of death, smoke
3  inhalation; and then a little bit further down on
4  9/10/95, there was a fire in subject 2's apartment;
5  subject 2 calls the fire department at 6:40 p.m.,
6  says she can't exit the apartment because two
7  chairs were blocking the doors and both were
8  burning.
9           It's one at -- and I can't make that
10 out.  It says as you continue, one is in the middle
11 of the living room.  I'm not sure what that says.
12 See, I can't even read my own writing.
13           But there's two chairs both blocking
14 the doors, and they're both burning.
15           A little bit further down towards
16 the bottom, subject 2 is on the phone with a
17 girlfriend until 6:31.
18           And then following page now, in
19 reviewing my notes there was -- again, they're
20 speaking, I'm writing, and I misidentified on the
21 next page -- I'm sorry.  No, that is correct.
22           Subject 2, they said, was mentally
23 retarded.  Subject 1, William Amor, was initially
24 romantically involved with subject 2.  Then

Page 22

1 subject 1 became involved with subject 3, Tina. A
2 bit further on down -- and this is where I
3 misidentified where it says subject 2 and
4 subject 3. It should be subject 1 and subject 3.
5 William Amor and Tina say they left this apartment
6 at 6:25 to 6:30.
7          And then again, misidentification.
8 I got these mixed up as they were talking. So
9 subject 2 denies -- it should be subject 1.
10         Mr. Amor denies any knowledge of the
11 insurance policy. Friends of subject 1 and
12 subject 3 claims that subject 1 and subject 3 spoke
13 openly about the policy in their presence.
14         A little bit under that after a
15 number of interviews subject 1, Mr. Amor, says he
16 spilled vodka and may have left a burning cigarette
17 in the ashtray that may have fallen out of the
18 ashtray.
19         And then towards the bottom,
20 subject 1 has a history of scamming families out of
21 money just prior to -- just prior, subject 1 spent
22 six months in a lockup for forgery.
23         So they were providing; I was just
24 writing.

Page 23

1    Q.   Okay. Now, I notice that when you were
2 referring to the S1, S2, and S3, you were referring
3 to as subject 1, subject 2, and subject 3?
4    A.   Correct.
5    Q.   On the form, it actually says Chief
6 Suspects above?
7    A.   Yes.
8    Q.   So did you write down those names
9 because they were all considered suspects or
10 because they were like players involved?
11   MS. THOMPSON: Object to form.
12   THE WITNESS: Primarily they were the three
13 involved in the incident, and so the chief suspects
14 isn't necessarily chief suspects. It's whoever's
15 involved, we just mark them 1, 2, 3, 4.
16 BY MS. RANUM:
17   Q.   Okay, thank you.
18        Now, this meeting that you had with
19 Detectives Cross and Guerreri, you testified that
20 that meeting took about a half an hour?
21   A.   Roughly, yes. I would say
22 approximately 3:50 p.m. until maybe 4:30 p.m.
23   Q.   Okay. Once you finished your meeting
24 in the library with Detectives Cross and Guerreri,

Page 24

1 what did you do next?
2    A.   At that point I escorted Mr. Amor back
3 to one of our interview rooms, and they then went
4 back to the lobby.
5    Q.   Okay. So did you then meet with
6 Mr. Amor in the interview room?
7    A.   Yes.
8    Q.   And did Detective Cross and Detective
9 Guerreri at any point come into the interview room
10 while you met with Mr. Amor?
11   A.   No.
12   Q.   What was the first thing you did when
13 you met with Mr. Amor?
14   A.   I handed him a consent form and
15 explained to him that I need him to read through
16 it. If he has any questions, he should feel free
17 to ask. And then once he's done, flip it over, and
18 fill out the medical form on the back.
19   Q.   Okay. Can you turn to the third page
20 of Exhibit 1, which is SDT-REID 14.
21   A.   Yes.
22   Q.   Is this the consent form you were just
23 discussing?
24   A.   Yes.

Page 25

1    Q.   Now, whose handwriting is on this form?
2    A.   At the top where it says Examiner,
3 that's mine. That's my name.
4         And then a bit further on down where
5 it says, Naperville Police Department, that's also
6 mine.
7         And then a bit further on down the
8 page where it says, In view of the foregoing, I
9 release John Reid & Associates, and where it says
10 Naperville Police Department, that's my writing.
11   Q.   Okay.
12   A.   Where it says date and time, that also
13 is my writing. "Chicago" is also my writing, and
14 then where it says "Witness," that's my writing.
15   Q.   Okay. Who else's handwriting appears
16 on this form?
17   A.   This would be Mr. Amor's about just a
18 little under halfway down where it says,
19 Furthermore, I understand I am free to leave this
20 office at any time, and then there's a BA. That's
21 his initials; he wrote that.
22         A bit further down where it says
23 Signature on the right, that's his writing.
24         And then again where printed in

MICHAEL MASOKAS, 11/05/2019                    Page 26..29

Page 26

1 there, it says, I understand that I am not in
2 custody, and the initials BA, he wrote all of that
3 in again.
4      Q.   Okay.  And when you signed as a
5 witness, was that you witnessing Mr. Amor's
6 signature on the form?
7      A.   Yes.
8      Q.   And you saw him sign this form, correct?
9      A.   I believe so, yes.
10     Q.   Do you know why Mr. Amor wrote in on
11 this form, I understand that I am not in custody?
12     A.   Yes.
13     Q.   Why is that?
14 MS. THOMPSON:  Object to form.
15          You can answer.
16 THE WITNESS:  Because I asked him to.
17 BY MS. RANUM:
18     Q.   And why did you ask him to do that?
19     A.   Because I wanted to make sure he
20 understood he was free to leave.
21     Q.   Okay.
22     A.   And if you notice up at the top a
23 little bit further above where it says,
24 Furthermore, I understand that I am free to leave

Page 27

1 this office at any time, I reread that to him after
2 he signed and asked him if he understood that.  He
3 said, yes, so I had him initial that as well.
4      Q.   What would you have done if you had
5 presented Mr. Amor with this form and he had told
6 you he did not understand that he was free to leave?
7 MS. THOMPSON:  Object to form.
8 THE WITNESS:  We would have explained that he
9 was free to leave.  If he still didn't understand,
10 then we probably wouldn't have run the test.
11 BY MS. RANUM:
12     Q.   Okay.  After the release form that
13 we've just reviewed was filled out, what would be
14 the next -- what was the next thing that you and
15 Mr. Amor would have done?
16     A.   We flipped the form over, and on the
17 backside was the medical sheet that he had
18 completed, and we reviewed that.
19     Q.   Now, the interview room that
20 Mr. Amor was in while he was completing these
21 forms, can you describe the interview room.
22     A.   It was approximately 10 feet by 10 feet
23 square.  There was a desk and three chairs.
24     Q.   The medical data sheet, this is a form

Page 28

1 that was completed by Mr. Amor himself, correct?
2      A.   Yes.
3      Q.   Was anyone else present when he
4 completed this form?
5      A.   No, he was by himself.
6      Q.   Did your handwriting appear anywhere on
7 this form?
8      A.   Yes.
9      Q.   Where is your handwriting?
10     A.   About halfway down on the -- in the
11 right side there, kind of by the margin, he had
12 checked off recent arm injury -- or I'm sorry --
13 respiratory lung problems, he said yes.  And so I
14 asked him about that.
15          And then he said he had had a
16 surgery.  He had some spots on his lungs in the mid
17 '80s.  And it's cut off there, no something.  So I
18 probably asked him if he was on medication or
19 something for that, and it's no something.
20 Something got cut off.
21 MR. NYESTE:  Can we look at the original?
22 MS. RANUM:  Yeah.  Do you have the original?
23 MR. NYESTE:  My copy even has what is cut off
24 on your exhibit.

Page 29

1 MS. RANUM:  Okay.  So I guess why don't we --
2 should we take a quick break, and I'll just make
3 that one an exhibit.  Is that okay?
4 MR. NYESTE:  Yeah, just copy that.  It shows
5 DR, doctor.  No doctor.
6          (Recess taken.)
7          (Deposition Exhibit No. 2,
8           Witness Masokas, was marked for
9           identification 11/05/2019.)
10 BY MS. RANUM:
11     Q.   All right.  Mr. Masokas, I'm showing
12 you what we've marked as Exhibit 2 to your
13 deposition, which is a better copy of the Medical
14 Data Sheet.
15          So if you could please just explain
16 what your writing is about halfway down the page on
17 this form.
18     A.   Yes.  When he said "yes" to respiratory
19 lung problems, I asked him about that.  He said he
20 had surgery due to some spots on his lungs back in
21 the mid '80s.  But at the current time, he was not
22 under a doctor's care for that.
23     Q.   Okay.  What's the point of -- what is
24 the purpose of the medical data sheet?

Page 30

1    A.   We want to make sure that they're
2 healthy and that they're in a condition that would
3 be suitable for a polygraph test.
4    Q.   Now, that's because the polygraph
5 examination looks at certain physiological
6 responses, correct?
7    A.   Yes.
8    Q.   Can you explain what the physiological
9 responses are that a polygraph examination looks at?
10    A.   The polygraph measures respiration, it
11 measures blood pressure, and it measures galvanic
12 skin response or electricity in the skin.
13    Q.   And those were the measurements that a
14 polygraph examination was monitoring back in
15 October of 1995, correct?
16    A.   Yes.
17    Q.   And so is one of the purposes of the
18 medical data sheet to ensure that there isn't a
19 medical condition that could impact those three
20 physiological responses that you just testified to?
21    MS. THOMPSON: Object to form.
22    THE WITNESS: Yes.
23 BY MS. RANUM:
24    Q.   Because if there was something

Page 31

1 indicated on the medical data sheet that could
2 impact one of those three physiological responses,
3 that could impact the accuracy of the exam, correct?
4    A.   Not necessarily the accuracy, but just
5 the recordings, the ability for them to respond.
6 So I wouldn't necessarily say accuracy, but the
7 responses.
8        You know, for instance, if someone
9 is on blood pressure medication and they failed to
10 take their medication, then their blood pressure is
11 going to be elevated. And so we suggest taking
12 your medicine because it brings everything back to
13 normal, and so we want to be able to see
14 appropriate responses.
15    Q.   So it would be something you would want
16 to know about so you could factor it into your
17 evaluation?
18    A.   Yes.
19    Q.   It indicated on the form -- Mr. Amor
20 indicated that he had a headache and some cold
21 symptoms.
22        Do you see that?
23    A.   Yes.
24    Q.   Now, was that of any concern to you in

Page 32

1 terms of being able to perform a polygraph
2 examination?
3    A.   No major concern, no.
4    Q.   Mr. Amor indicated that he had taken an
5 Actifed at about 1:00 o'clock p.m. that day for
6 cold and sinus problems.
7        Was that something that concerned
8 you in terms of moving forward with the polygraph
9 examination?
10    A.   No.
11    Q.   Mr. Amor indicated that he had received
12 about 4 hours of sleep in the last 24 hours.
13        Was that something that concerned
14 you in terms of moving forward with the polygraph
15 examination?
16    MS. THOMPSON: Object to form.
17    THE WITNESS: It was a bit of a concern, but
18 at the time he was alert; he seemed fine. He
19 didn't seem as though he was exhausted, so we
20 continued.
21 BY MS. RANUM:
22    Q.   Okay. So based on the completion of
23 the medical data sheet and the conversation that
24 you had with him regarding the form, fair to say

Page 33

1 you felt completely comfortable moving forward with
2 the polygraph examination?
3    A.   Yes.
4    Q.   The interview -- where is the interview
5 room located in relation to -- the interview room
6 that Mr. Amor was in, where is that located in
7 relation to the lobby that you've described?
8    A.   I'm trying to figure out how to explain
9 it. Well, the lobby is in the front near the
10 elevators, and then from the lobby, you come
11 through a secure door past the reception area, past
12 the library, and then there was a hallway to the
13 right. And if you turn to the right down that
14 hallway, there were I want to say six interview
15 rooms down that hallway, so it was several feet
16 away from the lobby area.
17    Q.   Okay. And you've mentioned that
18 there's a secure door --
19    A.   Yes.
20    Q.   -- between the lobby and the office
21 area, correct?
22    A.   Yes.
23    Q.   And because there's a secure door
24 there, you cannot access the office area from the

Page 34

1 lobby, I assume, without receiving some sort of
2 buzz-in or something from someone in reception.  Is
3 that fair to say?
4    A.   Yes.
5    Q.   Okay.  What about if you want to leave
6 the secure area and go out into the lobby?
7    A.   No, there's free access.  It's unlocked.
8    Q.   So it's locked in terms of entrance to
9 the office area.
10    A.   Yes.
11    Q.   And unlocked in terms of exiting the
12 office area.
13    A.   Correct.
14    Q.   Okay.  And what about the interview
15 room that Mr. Amor was in?  Was he at any point
16 locked in that room, or was that door always
17 unlocked?
18    A.   No, none of our interview rooms have
19 locks.  They're all unlocked doors.
20    Q.   Okay.  And just to back up for a
21 moment, I think I asked you this, but I want to
22 make sure we have a clear record.
23          When Detectives Guerreri and Cross
24 were in the library with you, Mr. Amor remained in

Page 35

1 the lobby, correct?
2    A.   Yes.
3    Q.   And that was for the entire duration of
4 your meeting with Detectives Cross and Guerreri,
5 correct?
6    A.   Yes.
7    Q.   So once you complete your review with
8 Mr. Amor of the medical data sheet, what is the
9 next thing that you do in the course of your
10 examination process?
11    A.   Once we review everything, we would
12 start the interview, the pretest interview.
13    Q.   Did the pretest interview take place in
14 the same interview room that you've described?
15    A.   Yes.
16    Q.   And was anyone else present for the
17 pretest interview other than you and Bill Amor?
18    A.   No.
19    Q.   I believe you testified at the motion
20 to suppress that the pretest interview lasted
21 roughly 40 minutes or so.  Does that sound about
22 right?
23    MS. THOMPSON:  Object to form.
24    THE WITNESS:  Yes.

Page 36

1 BY MS. RANUM:
2    Q.   And during that time, was Mr. Amor free
3 to leave?
4    MS. THOMPSON:  Object to form.
5    THE WITNESS:  Yes.
6 BY MS. RANUM:
7    Q.   What's the purpose of the pretest
8 interview?
9    A.   We -- well, first of all, we want to
10 make sure that they understand why they're there.
11 And so we ask them, Do you understand why you're
12 here today?
13          And then we will go through with
14 them the investigation basically as to what was
15 provided to us by the investigators, if it's
16 pertinent.  And we give him an opportunity to deny
17 involvement.  We give him an opportunity to explain
18 his side of the story or his version of events, if
19 necessary.
20          And then ultimately, we will review
21 the actual test questions with him at some point.
22    Q.   Okay.  So let's start with the pretest
23 interview itself.
24          Do you document anything during the

Page 37

1 pretest interview?
2    A.   Yes.
3          (Deposition Exhibit No. 3,
4          Witness Masokas, was marked for
5          identification 11/05/2019.)
6 BY MS. RANUM:
7    Q.   Mr. Masokas, I'm showing you a document
8 which we've marked Exhibit 3 to your deposition.
9 It's a two-page document Bates stamped SDT-REID 47
10 and SDT-REID 49.  You could take a moment to look
11 at this document.
12          Is this your notes from the pretest
13 interview that you did with Bill Amor?
14    A.   Yes.
15    Q.   All right.  I apologize.  I'm going to
16 ask you again to decipher some of your handwriting
17 for me.
18    A.   You can't make it out?
19    Q.   So first of all, there's these circled
20 numbers on the side?
21    A.   Yes.
22    Q.   What do those indicate?
23    A.   The circled numbers down the left
24 margin correspond to the numbers at the top of the

MICHAEL MASOKAS, 11/05/2019                           Page 38..41

Page 38

1 page.

2    **Q.   Okay.**

3        A.   It's almost, for lack of a better term,

4 a little cheat sheet, so to speak.  Instead of

5 having to write out the entire question that we're

6 asking, we just correlate the number to what's at

7 the top.

8    **Q.   Sure.**

9        A.   And so that way at the top, what you

10 see at the top is abbreviated, but we know what

11 it -- like for instance, where it says, No. 1,

12 work, that basically is we would ask them a little

13 bit of work history.  Are you currently employed?

14 Where are you working?  How long have you been

15 there?

16             27, which isn't on there, is a

17 question that was added.  Question 27 is:  Do you

18 know the reason for the interview today?  Do you

19 understand why you're here today?

20             And so we just write the number as

21 opposed to having to write out the whole question.

22 Does that --

23    **Q.   Okay.  That makes sense.**

24         **So for No. 1 -- I'm just going to go**

Page 39

1 **through it kind of line by line with you.**

2         **So No. 1, can you tell me what you**

3 **would have asked Bill Amor, and then based on your**

4 **note what he responded?**

5        A.   Sure.

6        MS. THOMPSON:  Object to form.

7        THE WITNESS:  Are you currently employed?

8 Are you currently working?

9             He said he's working part-time at a

10 church as a maintenance man or in the maintenance

11 department, and he's been there for one to two

12 months.

13 BY MS. RANUM:

14    **Q.   Okay.  Then let's just go through --**

15 **actually, No. 27 is the second one.**

16         **What would you have asked Bill Amor,**

17 **and based on your notes, what would he have**

18 **responded?**

19    MS. THOMPSON:  Object to form.

20    THE WITNESS:  Question 27 was:  Do you

21 understand the reason for the test today, or, Do

22 you understand the reason you're here today?

23             His response, he said uh-hmm or

24 uh-huh, and then there was a short pause, and then

Page 40

1 he said, Yes, sir.

2             And then he went on to say, It's

3 questionable about how the fire started.  I feel it

4 may have been intentionally started, and they feel

5 I may have something to do with it.  That's why I'm

6 here.  To clear it up.

7 BY MS. RANUM:

8    **Q.   Okay, thank you.**

9         **The next one is signals.  It's No. 2.**

10       A.   Yes.

11    **Q.   So what would you have asked Bill Amor**

12 **as No. 2?**

13       A.   Question 2, as you notice, goes to the

14 top where it says "you," and the "you" is just a

15 simple question.

16             Bill, before we move forward here, I

17 just have to ask you:  Did you set the fire?

18             And he said -- he whispered, No, and

19 he crossed his arms.

20    **Q.   What is the next number indicated on**

21 **the form?**

22       A.   Letter A.  Again, letter -- 2A is not

23 up there, but 2A is knowledge:  Do you know who set

24 the fire?

Page 41

1             He repeated the question, and then

2 he said, No, sir.

3    **Q.   Okay.  Next is No. 3, what would you**

4 **have asked Bill Amor?**

5       A.   No. 3 is a --

6    MS. THOMPSON:  Object to form.

7    THE WITNESS:  It's a suspicion question.  So

8 he would have been asked, Is there anyone that you

9 suspect or have a suspicion about as to who you

10 think may have set the fire?

11             And he said, Previously but they're

12 out of the area.  Somebody who had keys.  Mike -- I

13 believe it's Dish, D-i-s-h, my wife's ex-boyfriend.

14 He spoke to her on the phone and found out we were

15 married.  Told her he was going to hurt me and that

16 it occurred in June of '95.  We've met.  He's a big

17 mouth.

18 BY MS. RANUM:

19    **Q.   Next is No. 4, what did you ask him for**

20 **No. 4?**

21       A.   No. 4 is a vouch for question.

22             Is there anybody you trust that you

23 could vouch for who you feel would not have set the

24 fire?

Page 42

1       And he said Tina. He delayed before
2 he answered, and he shifted in the chair. He says,
3 I don't believe my wife would kill her mother.
4     Q.   Next, you indicate No. 16. What did
5 you ask him in No. 16?
6     A.   16 is the at the top, What should
7 happen to the doer?
8          The question was: If the fire was
9 set deliberately, intentionally, what do you think
10 should happen to the person who set it?
11          He bent over and started to fix his
12 shoe. He delayed before he answered. He looked
13 away from the investigator. And then he said, I
14 don't know the law, but definitely life and some
15 help, and then he shifted in the chair.
16    Q.   Next is No. 29. What did you ask him
17 in No. 29?
18    A.   No. 29, again it's not listed up there,
19 but it's a question that was added. It's called
20 the second chance question.
21          And so the question was: If the
22 fire was set intentionally, do you think whoever
23 set it deserves a second chance?
24          He sighed, and then there was a long

Page 43

1 delay before he answered the question, and then he
2 said, I suppose if they're truly remorseful and
3 with a lot of provisions so they wouldn't harm
4 anybody again.
5     Q.   Next is No. 5. What did you ask in
6 question 5?
7     A.   Question 5 is: Do you actually think
8 the fire was deliberately started?
9          And his response was, That's a
10 loaded question.
11          And so I asked him, Okay. Well, why
12 don't you tell me then what happened or what you
13 did on Sunday, September 10th?
14          And then he goes on to explain what
15 they were doing.
16          Want me to read that?
17    Q.   Yes, please.
18    A.   I got up between 9:00 and 10:00 a.m.,
19 watched football at home. The three of us were
20 there. Tina and mom went to pick up pizza. They
21 were back by 2:30. I made a few phone calls or got
22 a few phone calls from friends. Watched football
23 until 6:15 p.m. I loaded up the car with the
24 cooler and a blanket, and Tina and I went to a

Page 44

1 drive-in movie. Left home about 6:20 p.m.
2          When I took the cooler down, I
3 stayed down, and Tina was down a few minutes later.
4 Got home a little after 11:00 p.m. Then we heard
5 about it.
6          And then I had asked him, Well, how
7 do you think the fire started?
8          He said, I don't know. Been through
9 this a lot. The fire started so fast, and then he
10 shifted in the chair.
11          Next question: How did you get
12 along with Marianne?
13          He said good.
14          And then: How'd you get along with
15 Tina?
16          I can't make that out at the bottom.
17 I'm not sure what that is at the bottom. Can I
18 check my original?
19    Q.   Sure.
20    A.   I believe he says his marriage is
21 pretty sound.
22          How do you get along with Marianne?
23          Good.
24          How'd you get along with Tina?

Page 45

1          The marriage is pretty sound.
2     Q.   Thank you.
3          And going to page 2.
4     A.   Okay.
5          Top of page 2: How did Tina and her
6 mother get along?
7          They got along okay. Just not close
8 as a mother and daughter.
9          What about on September 10th? The
10 question, September 10th. What did you have to
11 drink that afternoon?
12          He said: Two and a half to three
13 drinks, tall glass, vodka and 7up.
14          And then I asked him if he had any
15 drugs that day; he said no drugs.
16          And then what about Tina and
17 Marianne? Were they drinking?
18          He says, No, Tina and mom were not
19 drinking.
20    Q.   Next you have No. 17.
21          What did you ask him for No. 17?
22    A.   No. 17: How do you feel about coming
23 in for the polygraph today?
24          He said, I feel a little annoyed

Page 46

1 that someone would think I'd hurt someone I loved.
2 **Q. Next is No. 9. What did you ask him**
3 **for question 9?**
4 A. No. 9: Had anything like this ever
5 happened before to you where there was a fire like
6 this?
7 He said, No. And then he acted like
8 surprised. Like, No, something to that effect.
9 I've known -- I asked him: How long
10 did you know Tina and her mom?
11 He said about four years.
12 Next one, question 10: Have you
13 ever thought about setting a fire like this? Have
14 you ever thought about doing anything similar?
15 He said no.
16 **Q. Is that what that -- looks like a minus**
17 **sign?**
18 A. Yeah, negative, minus sign.
19 **Q. And then what would question I guess**
20 **25? What was question 25?**
21 A. Question 25: Why wouldn't you do
22 something like this.
23 He said: It's too gruesome for me.
24 **Q. Next is question 11. What did you ask**

Page 47

1 **him for No. 11?**
2 A. Question 11: Has anyone ever
3 approached you or talked with you about ways of
4 doing something like this.
5 He said no.
6 **Q. Next is 21. What did you ask him for**
7 **question 21?**
8 A. Did you tell anybody about having to
9 come down for the polygraph test today?
10 He said, Here? No, I just found out
11 today.
12 And then right under 21, I asked him
13 about the insurance, Marianne's insurance, did he
14 know about it.
15 He said, If I was talking about it,
16 I must have been really drunk. I didn't even know
17 about the insurance or the contents. It's none of
18 my business.
19 And he had shifted in the chair.
20 **Q. Next is No. 7. What did you ask him**
21 **for No. 7?**
22 A. No. 7 corresponds to the top where you
23 see it says FP. FP stands for fingerprints.
24 Fingerprints in this issue really

Page 48

1 wouldn't be appropriate. We call it a bait
2 question.
3 And so the question he was asked
4 was: You said that you had come downstairs from
5 the apartment, and you didn't go back up. You
6 waited until Tina came down. Would there be any
7 reason that someone would say they saw you going
8 back up to the apartment?
9 There was a very long delay. He
10 says, I can't think of any reason why I would have
11 gone back up.
12 **Q. Next is No. 12. What did you ask him**
13 **for No. 12?**
14 A. No. 12: How do you feel the polygraph
15 test is going to come out on you today?
16 He says, Yeah, I'm telling the
17 truth, and had very good eye contact when he
18 responded that way. I need to clear this up.
19 **Q. Next is No. 18. What did you ask him**
20 **for No. 18?**
21 A. No. 18: Did anyone ever give you any
22 advice or tell you how to act when you take a
23 polygraph test?
24 He said no.

Page 49

1 And then I'd asked him how was he
2 feeling here about taking the test?
3 He said, Tense and nervous.
4 **Q. Okay. And there's some notations below**
5 **there. Can you explain what those are?**
6 A. Yes. At the very, very bottom, those
7 were the questions that were going to be utilized
8 for the control questions on the polygraph.
9 Our control questions, there's two
10 of them that we utilize, and we want them to be
11 very broad, all-encompassing questions to the point
12 where we want them to be a known lie, so to speak.
13 So I had asked him one question
14 where you see on the left it says, against the law.
15 And I'd asked him, I said, Going
16 back your entire life, Bill, have you ever done
17 anything illegal? Anything that would have been
18 against the law?
19 He said, Traffic violations and
20 stealing.
21 I said, Anything else?
22 He said, no, that was it.
23 And then the next question right
24 next to that to the right where it's abbreviated,

MICHAEL MASOKAS, 11/05/2019                    Page 50..53

Page 50

1 it should be it's intentionally.
2        Have you ever intentionally hurt
3 someone?
4            He said, Well, yes, in an argument.
5            I said:  Well, other than an
6 argument that you may have had, have you ever done
7 anything intentional to hurt someone else?
8            He said no.
9     Q.    And then below that, there's a No. 20?
10    A.    Yes.  No. 20 is medication in the last
11 24 hours.  Have you had any medication?
12            He said Tylenol, and then my
13 notation is, See sheet, see medical sheet.
14    Q.    Okay.  Thank you for going through that.
15            The notes that we've looked at in
16 Exhibit 3, were these taken contemporaneously while
17 you were doing your pretest interview with Mr. Amor?
18    A.    Yes.
19    Q.    Is there anything else that you recall
20 asking Mr. Amor that's not documented in your
21 pretest interview?
22        MS. THOMPSON:  Object to form.
23        THE WITNESS:  I believe that's everything.
24

Page 51

1 BY MS. RANUM:
2     Q.    Okay.  Thank you.
3            After the pretest interview
4 concluded, what was the next thing that you did?
5     A.    I stepped out of the room and went back
6 to my office and formulated the actual test
7 questions.
8     Q.    What's the process for formulating your
9 questions?
10    A.    Well, after speaking with the
11 investigators, they give us an idea as to what
12 they're looking for.
13            In Mr. Amor's case, they wanted to
14 know if he was involved in setting the fire, if he
15 knew who set the fire, or had any knowledge of the
16 fire.  And then based on the interview with
17 Mr. Amor, we take all of that into consideration,
18 and we just come up with the three or four main
19 questions that we feel will encompass what they're
20 looking for.
21    Q.    During the time that you formulated the
22 questions, where were you in the office?
23    A.    I would have been in my office, which
24 is kind of a little bit further away from the

Page 52

1 interview room.  It's kind of in the opposite end
2 of where the lobby was.
3     Q.    Did anyone -- other than the interview,
4 the pretest interview that you've testified to with
5 Mr. Amor and the meeting you had in the library at
6 the beginning of the day with Detectives Cross and
7 Guerreri, did anything else factor into your
8 formulation of the questions?
9        MS. THOMPSON:  Object to form.
10 BY MS. RANUM:
11    Q.    Well, let me ask it differently.
12            Did anyone else help you formulate
13 the questions?
14    A.    The question formulation, no.  It would
15 have been me.
16    Q.    Okay.  As the polygraph examiner, you
17 come up with the questions, correct?
18    A.    Yes.
19    Q.    And are there different -- you've
20 already mentioned that there's two control
21 questions that you ask, correct?
22    A.    Yes.
23    Q.    And are there other types of questions
24 that are asked in the course of the polygraph

Page 53

1 examination?
2     A.    Well, there's three standard questions:
3 There's two control questions, there's the relevant
4 questions -- those are the questions that pertain
5 to the investigation -- and then there are
6 irrelevant questions, which basically are known
7 truths.
8     Q.    Okay.  So you're basically coming up
9 with questions that are going to elicit known
10 truths, correct?
11        MS. THOMPSON:  Object to form.
12        THE WITNESS:  Yes.
13 BY MS. RANUM:
14    Q.    In your words.
15    A.    Yes.
16    Q.    Known lies are the control questions,
17 correct?
18    A.    Correct.
19    Q.    The irrelevant questions are the known
20 truths, correct?
21    A.    Yes.
22    Q.    And then the relevant questions are the
23 ones that pertain to the investigation itself?
24    A.    Yes.

MICHAEL MASOKAS, 11/05/2019                          Page 54..57

Page 54

1    Q.    And all of those questions are written
2  by you, correct?
3    A.   Yes.
4    Q.    Are all of those questions in a
5  yes-or-no form?
6    A.   Yes.
7    Q.    Where was Mr. Amor while you formulated
8  the questions?
9    A.   I believe when I stepped out of the
10 room -- I believe we changed rooms.  I put him in a
11 different room, the room with the polygraph in it,
12 which is right across the hall basically from the
13 original interview room.  And he was in there by
14 himself.
15   Q.    Okay.  Is there a lock on the door to
16 the examination room that you've just testified to?
17   A.   No.
18   Q.    And was Mr. Amor free to leave at that
19 time?
20   A.   Yes.
21   Q.    Can you describe the examination room
22 that Mr. Amor was moved to?
23   A.   It was a little bit smaller, maybe 9 by
24 9.  There was two -- well, three chairs again and

Page 55

1  the desk that contained the polygraph instrument.
2    Q.    And once you formulated your questions,
3  did you go back into the exam room with Mr. Amor?
4    A.   Yes.
5    Q.    And what happened at that point in time?
6    A.   We reviewed the actual questions that
7  were going to be on the exam.
8    Q.    And did you review all of the questions?
9    A.   Yes.
10   Q.    And is that part of the standard
11 practice?
12   A.   Yes.
13   Q.    And what is the purpose of reviewing
14 the questions?
15   A.   We --
16   MS. THOMPSON:  Object to form.
17   THE WITNESS:  We want him to be able -- we
18 want to make sure he understands the questions.  If
19 he doesn't understand the question, we may have to
20 rephrase a question or maybe even eliminate it if
21 they don't understand it.  So make sure he
22 understands them.  And we want him to know ahead of
23 time what the questions are so there's no
24 surprises.

Page 56

1  BY MS. RANUM:
2    Q.    And why do you not want them to be
3  surprised?
4    A.   Because with a -- if he's surprised, we
5  may get an initial reaction to a question just
6  because he's never heard it before, and he didn't
7  know it was going to be on the test.
8    Q.    Okay.  So is eliminating the variable
9  of surprise something that helps in terms of the
10 physiological aspects of the tests that you've
11 already testified to -- strike that.  That's a bad
12 question.
13        But I mean, you're looking at things
14 like -- you're looking at blood pressure, correct?
15   MS. THOMPSON:  Object to form.
16 BY MS. RANUM:
17   Q.    And you're looking at breathing during
18 the exam, correct?
19   A.   Yes.
20   Q.    And what's the third one again?
21   A.   Galvanic skin response.
22   Q.    Okay.  And so would there be a concern
23 that if the person -- if the subject of the
24 examination was surprised that that could impact

Page 57

1  one of those physiological responses?
2    A.   Yes.
3    Q.    Okay.  So you're hoping to eliminate
4  that variable to help create a controlled --
5    A.   Yes.
6    Q.    -- environment.  Is that fair to say?
7    A.   Yes.
8    MS. THOMPSON:  Object to form.
9  BY MS. RANUM:
10   Q.    And when you reviewed the questions
11 with Mr. Amor, did he have any difficulty
12 understanding any of the questions?
13   MS. THOMPSON:  Object to form.
14   THE WITNESS:  No.
15 BY MS. RANUM:
16   Q.    Based on your observations, did he have
17 any difficulty understanding any of the questions?
18   A.   No.
19   Q.    Did you have to rephrase or eliminate
20 any questions after reviewing questions with
21 Mr. Amor?
22   A.   No.
23   Q.    And so at that point did you proceed
24 with the exam -- the polygraph examination itself?

MICHAEL MASOKAS, 11/05/2019                                    Page 58..61

Page 58

1    A.  Yes.
2        Q.  Can you explain what happens at that
3    point in terms of commencing the actual polygraph
4    examination?
5        MS. THOMPSON:  Object to form.
6        THE WITNESS:  Well, we have to attach them to
7    the polygraph, that's the first step.  And then
8    once we begin, we'll run a test chart just so he
9    gets accustomed to the blood pressure cuff
10   tightening up.  And we'll do that for maybe about
11   30 seconds, at which time no questions are being
12   asked.
13           And then the blood pressure cuff is
14   deflated, and then we give him the instructions
15   that we're going to begin.  And we explain the
16   first test, and then we start.
17   BY MS. RANUM:
18       Q.  Okay.  So let's talk about how each of
19   the three physiological responses are measured
20   during the course of the test.
21           So you've mentioned a blood pressure
22   cuff.
23       A.  Yes.
24       Q.  So he has a blood pressure cuff on his

Page 59

1    arm during the test?
2        A.  Yes.
3        Q.  And is that taking his blood
4    pressure -- how does it work?  Is it taking it
5    continuously and charting it for you?
6        A.  Yes.
7        MS. THOMPSON:  Object to form.
8    BY MS. RANUM:
9        Q.  And we're going to look at the chart
10   itself in a second.  I just want to understand how
11   he's hooked up during the exam.
12       A.  Sure.
13       Q.  How are you measuring breathing during
14   the exam?
15       A.  The respiration is measured by two
16   pneumograph tubes, p-n-e-u-m-o-g-r-a-p-h:  One
17   across the chest, one across the stomach.
18           And then the galvanic skin response,
19   there's two little metal kind of like clips on two
20   fingers.
21       Q.  Okay.  So he has two monitors on his
22   midsection, correct?
23       A.  Yes.
24       Q.  To measure respiratory?

Page 60

1    A.  Yes.
2        Q.  Blood pressure cuff on his arm to
3    measure blood pressure, correct?
4        A.  Yes.
5        Q.  And then like kind of like clips on two
6    of his fingers to measure skin conductive responses?
7        A.  Yes.
8        Q.  So once all of those monitors that
9    we've discussed are put into place, what happens
10   next?
11       MS. THOMPSON:  Object to form.
12       THE WITNESS:  We would give him the
13   instructions as to how we're going to run the test
14   and then -- and step around to the side and begin.
15   BY MS. RANUM:
16       Q.  What are the instructions that are
17   given?
18       A.  Well, it depends on which exam we're
19   giving.  We give different types of exams, and so
20   depending on which one we're giving, instructions
21   might be a little bit different.
22       Q.  Do you know which exam Mr. Amor was
23   given?
24       A.  Yeah.  He was -- well, he was given

Page 61

1    three or four different exams all in the same
2    series, so I can explain.
3        Q.  Let's back up.  I think it will help --
4    will it help if I show you your notes?
5        A.  Uh-hmm.
6            (Deposition Exhibit No. 4,
7             Witness Masokas, was marked for
8             identification 11/05/2019.)
9    BY MS. RANUM:
10       Q.  All right.  Mr. Masokas, I'm showing
11   you a document that's been marked Exhibit 4 to your
12   deposition.  It's Bates stamped SDT-REID 46.
13           What is this document?
14       A.  This is the front side of his pretest
15   interview sheet.
16       Q.  Oh, okay.
17       A.  The two sheets we reviewed a little bit
18   earlier would be the backside of this.
19       Q.  Okay.
20       A.  So this is actually the front side of
21   that first document we reviewed with all his
22   questions that we asked that we went through.
23       Q.  So this would be -- so Exhibit 4 is
24   actually the front side of Exhibit 3?

Page 62

1   A.   Correct.

2   Q.   Got it.

3        Does this form contain the questions
4   that were asked to -- that were posed to Mr. Amor
5   during the actual polygraph examination?

6   A.   Yes.

7   Q.   And when were -- when were these
8   questions written out?  Was this what you wrote
9   them on in your office when you were formulating
10  them?

11  A.   Yes.

12       MS. THOMPSON:  Object to form.

13 BY MS. RANUM:

14  Q.   Can you tell by looking at this form
15  what instructions would have been given to Mr. Amor
16  at the beginning of the examination?

17  A.   No.

18  Q.   Okay.  Is there anything I can show you
19  that would tell you what instructions he had been
20  given?

21  A.   No.

22  Q.   Okay.

23  A.   I mean, I know the instructions.  They
24  just vary from one test to the other.

Page 63

1   Q.   Okay.  So generally speaking, what
2   would the instructions have been?

3        MS. THOMPSON:  Object to form.

4        THE WITNESS:  Well, the first -- the first
5   test we ran is called a straight through test,
6   which means we just go straight through.

7        And so he would have been told,
8   Bill, this first test that we're going to run, I'm
9   going to ask you all of these questions, all 10
10  questions that we just reviewed, and I'm going to
11  read them right in order.  I'm not going to
12  deviate.  It's going to be 1 to 10.  And all I need
13  you to do is answer yes or no.  All I need is a
14  one-word answer, just a simple yes or no.  And then
15  from there, we go through the test.

16       And so that would be one set of
17  instructions.

18 BY MS. RANUM:

19  Q.   And is the first --

20  A.   Straight through.

21  Q.   So based on your testimony, I want to
22  make sure I understand.

23       Is it fair to say that there are
24  multiple tests given in the course of one polygraph

Page 64

1  examination?

2   A.   Yes.

3   Q.   Okay.  And so the first test that's
4  given is what's called a straight through test?

5   A.   Yes.

6   Q.   And in that test, the questions are
7  asked in the exact order that we see them listed on
8  Exhibit 4?

9   A.   Yes.

10  Q.   Okay.  What is the second test that
11 Bill Amor was given?

12  A.   The second test is called a card test.

13       A card test is -- it's actually a
14 stimulation test.  We give that -- the purpose for
15 that test is for innocent people.  A truthful
16 person who's taking the test, we want to be able to
17 show them that the test works.  And so if they are
18 nervous, it typically will calm them down a little
19 bit.

20       For deceptive individuals, we want
21 to show them that the test works.  And that if
22 they're going to lie, we're going to find out.

23       So that was the second test in the
24 series.

Page 65

1        And so the way we do the card test,
2  we actually have five playing cards.  And we fan
3  them out and say, I need you to pick one of the
4  cards.  Look at it, but don't tell me what it is.

5        And then he looks at it, we have him
6  place it back in the deck, and in front of them, we
7  shuffle the deck.

8        And then we instruct them, Now I'm
9  going to ask you a bunch of numbers here.  I want
10 you to answer "no" to all of the numbers.  Even if
11 I call your card, I want you to say "no."  And you
12 understand that?

13       Yes.

14       And then we go ahead and we run the
15 card test.  And usually we'll call their number
16 twice.  And then at the end we'll say, Did you --
17 in his case, it's marked on the front of his sheet,
18 he chose No. 4.  On the right side where it says
19 card?

20  Q.   Oh, okay.

21  A.   So he picked out No. 4, and so 4 would
22 have been called twice.

23       And then we'd stop the test and say,
24 Bill, what I see here is looks as though you picked

MICHAEL MASOKAS, 11/05/2019                                    Page 66..69

Page 66

1 card No. 4; is that correct?

2          And he acknowledged yes.

3          And so that was the end of the test.

4     **Q.   Okay.**

5     A.   And then we would simply say, Well, now

6 I've got a good picture of what it looks like when

7 you don't tell the truth on something, so we'll be

8 able to use that to compare with the rest of the

9 results.

10    **Q.   What's the next test that Bill Amor was**

11 **given after the card test?**

12    A.   The third test is another straight

13 through.  It would be straight through No. 2.

14    MR. NYESTE:  Would it be helpful to look at

15 the originals?

16    THE WITNESS:  For me?

17    MR. NYESTE:  Yeah.

18    THE WITNESS:  Not at this point.  Eventually

19 at some point, yes.  But I think the instructions

20 are pretty straightforward.

21 BY MS. RANUM:

22    **Q.   Now, the straight through No. 2, again,**

23 **it's the same thing.  He would have been asked the**

24 **questions that we see in Exhibit 4 in the exact**

Page 67

1 **order that we see them numerically listed in**

2 **Exhibit 4, correct?**

3     A.   Yes.

4     **Q.   And what instructions would be given**

5 **for the straight through test No. 2?**

6     A.   Well, just -- if I can just say, after

7 the card test, we step out of the room for like

8 3 minutes.

9          And we just say, Bill, at this point

10 I'm going to give you a break.  I'm going to step

11 out of the room for 3, 4 minutes, and when I get

12 back, we'll just keep going.

13         And so we -- I stepped out for a

14 couple minutes and then came back, and then told

15 him that the next test is going to be just like the

16 first one, where we're going to go through the same

17 questions in the same order.  And again, just

18 answer with a simple yes or no.

19    **Q.   Okay.  You've said "we" a couple times.**

20 **I just want to clarify.**

21         **Are you the only person in the room**

22 **while you're giving the examination, other than**

23 **Bill Amor of course?**

24    A.   Yes.

Page 68

1     **Q.   And so after straight through No. 2,**

2 **what's the next test given?**

3     A.   In Bill's case, it would have been a

4 silent answer test.

5     **Q.   What is a silent answer test?**

6     A.   We go through the same list, same

7 order, only this time we instruct him to answer the

8 question silently to themselves.

9          So, Bill, we're going to go through

10 another test.  This test will be exactly like the

11 first two we did, same questions in the same order;

12 only this time, I'm going to ask you not to say

13 anything.  Just I want you to listen to the

14 questions and think the answers silently to

15 yourself.

16    **Q.   Okay.  And so the questions in the**

17 **silent answer test were also asked in the numerical**

18 **order that we see them depicted in Exhibit 4,**

19 **correct?**

20    A.   Yes.

21    **Q.   What happens after the silent answer**

22 **test?**

23    A.   The fourth test is a mixed question

24 test.

Page 69

1     **Q.   And I just want to make sure I**

2 **understand.  I think we're actually on the fifth**

3 **test, correct?**

4     A.   Yeah.  I'm not counting the card test

5 as one of them.

6          But yes, it would be No. 5 in the

7 series, and it's mixed question.

8          On the front of the sheet, it shows

9 four.

10    **Q.   Okay.**

11    A.   Because we don't score up any card test

12 or anything.  We just put the number over there.

13         So it's the mixed question is the

14 next one.

15    **Q.   Okay.**

16    A.   And this time we just mix the order up,

17 and we would instruct -- well, I instructed him

18 basically that the next test we're going to ask the

19 same questions; only this time, we're going to mix

20 the order up.  Some of the questions I may ask more

21 than once; some I might drop out and not ask at

22 all.  But just answer again exactly like you've

23 been doing with a simple yes or a no.

24    **Q.   Okay.  Is the mixed question test the**

MICHAEL MASOKAS, 11/05/2019                               Page 70..73

Page 70

1 final test?

2    A.   Sometimes.  There was -- he was given

3 one more.

4    Q.   He was given one more, okay.

5         What was the final test that Bill

6 Amor was given?

7    A.   The final test is a yes test.

8    Q.   What is a yes test?

9    A.   A yes test is where we ask the same

10 questions, only we drop two out.  And the two we

11 drop out are the two control questions.  These are

12 eliminated.  We don't ask those.

13   Q.   Okay.  What are the instructions given

14 for the yes test?

15   A.   The yes test would -- what I said to

16 him was, Bill, this next and final test is going to

17 be a little bit different than what we've been

18 doing.  I'm going to ask you all the same questions

19 again, with the exception of two.  I'm not going to

20 ask you, besides traffic violations and stealing,

21 have you ever done anything else in your life

22 against the law.  We're dropping that out.  And I'm

23 not going to ask you, Besides an argument, have you

24 ever done anything to intentionally hurt another

Page 71

1 person?  I'm going to drop that out.  So those two

2 won't be asked.

3         However, on the last test, what I'd

4 like you to do is answer "yes" to all of the

5 questions, even the questions about the fire.

6         So now he's answering "yes" to the

7 investigative questions as well.  And that those

8 are the instructions, and we go from there.

9         Sometimes they'll say -- and I don't

10 know if he did or not.  But sometimes they'll say,

11 So you want me to say "yes" to the ones about theft

12 or -- and we say, Yes.  Whatever I ask you, just

13 answer "yes."

14   Q.   Okay.  And after the yes test, was

15 there any other component of the actual polygraph

16 examination, or was that the end of the test --

17   A.   That was the end.

18   Q.   -- the examination?

19        I want to walk through with you in

20 Exhibit 4, can you -- and again, I just want to

21 make sure I can read your handwriting.

22        Can you read for me what was

23 question 1?

24   A.   Do they call you Bill?

Page 72

1    Q.   Okay.  What was question 2?

2    A.   Are you over 35 years old?

3    Q.   What was question 3?

4    A.   On Sunday, September 10 -- and then in

5 parentheses, '95 -- did you do anything to start a

6 fire in your apartment?  And then in parentheses,

7 in Naperville.

8    Q.   How would you have read that question

9 aloud to Bill?

10   A.   The question would have been read on

11 the polygraph:  On Sunday, September 10th, did you

12 do anything to start a fire in your apartment?

13   Q.   What was question 4?

14   A.   Question 4:  Are you in Chicago right

15 now?

16   Q.   What was question 5?

17   A.   Did you help or plan with anyone to

18 start that fire?

19   Q.   And is that how the question would have

20 been read to Bill Amor?

21   A.   Yes.

22        MS. THOMPSON:  Object to form.

23 BY MS. RANUM:

24   Q.   What was question 6?

Page 73

1    A.   Question 6:  Besides traffic violations

2 and stealing, did you ever do anything else against

3 the law?

4    Q.   What was question 7?

5    A.   Did you ever go to school?

6    Q.   What was question 8?

7    A.   In parentheses, On September 10, '95,

8 before you left for the movies, did you know your

9 apartment was going to be destroyed by a fire?

10   Q.   How was question 8 read to Bill Amor?

11   A.   Before you left for the movies, did you

12 know your apartment was going to be destroyed by a

13 fire?

14   Q.   What was question 9?

15   A.   Do you know who set that fire in your

16 apartment?

17   Q.   How was question 9 read to Bill Amor?

18   A.   Just that way:  Do you know who set

19 that fire in your apartment?

20   Q.   Okay.  And then --

21   A.   11.

22   Q.   Is there not a 10?

23   A.   There's not a 10.

24   Q.   What was question 11?

Page 74

1    A.   Besides an argument, did you ever do
2 anything to intentionally hurt someone?
3    Q.   Is that how the question was read to
4 Bill Amor?
5    A.   Yes.
6    Q.   Okay.  Now, you spoke about how when
7 you're formulating these questions there's three
8 types:  There's the irrelevant, the relevant, and
9 the control, correct?
10   A.   Yes.
11   Q.   Can you identify for us of the
12 questions that we just read aloud together which
13 ones were the irrelevant questions?
14   A.   1, 2, 4, 7.
15   Q.   Of the questions that we just read
16 aloud together, which ones were the relevant
17 questions?
18   A.   3, 5, 8, and 9.
19   Q.   And then I believe you've already said
20 that No. 6 and No. 11 were the control questions.
21   A.   Yes.
22   Q.   And for the straight through test that
23 you have testified to already, these questions were
24 asked in the same order that we just went through

Page 75

1 them together, correct?
2    A.   Yes.
3    Q.   Now, there's all these check marks to
4 the left of the questions.
5         Can you explain what those check
6 marks are?
7    A.   The check marks would be my marks when
8 I reviewed and evaluated his polygraph test.
9    Q.   Okay.  So are the markings to the left
10 of the questions made during your evaluation
11 process after the exam?
12   A.   Yes.
13   Q.   Okay.  So we'll go over that in a
14 minute then.
15        What about the writing at the top?
16 Like it says, LD before?  What does that indicate?
17   A.   Yes.  I had asked him if he had ever
18 had a polygraph test previously; he said yes.
19   Q.   Okay.  Then to the right of that it
20 says, MFCW.
21   A.   Right.  It was male, white.  And then a
22 little further to the right, it says address.  He
23 wrote, No current residence.
24   Q.   Okay.

Page 76

1    A.   A little further to the right, he said
2 he's married.  I circled M.  And going down that
3 column, see the line children, and it's got a line,
4 no children.  Age 39.  Date would have been the
5 date of the exam, 10/3/95.  Card was the card
6 number he picked on the card test, and then the
7 times.
8    Q.   Okay.  Is this information written
9 down, do you go over this information with Bill
10 before the polygraph examination starts?
11   MS. THOMPSON:  Object to form.
12   THE WITNESS:  Yes.  It's actually before the
13 pretest interview.  It's just general clerical
14 information we get right off the bat.
15 BY MS. RANUM:
16   Q.   Got it.
17        Except for is that the case for the
18 card, or does that come later?
19   A.   No, the card is later.
20   Q.   Okay.  Some of the question numbers are
21 circled on this form.
22        Is that something that happens -- at
23 what point were these circled?
24   A.   When we reviewed the questions with

Page 77

1 him --
2    Q.   Okay.
3    A.   -- is when we would circle it, and then
4 at that point we know it's been already reviewed.
5    Q.   Okay.  So that's your way of indicating
6 that you've gone over that question with Bill Amor
7 before you start your examination?
8    A.   Yes.
9    Q.   And is that your way of indicating that
10 you don't have any concern that he didn't
11 understand the question or that it needed to be
12 reformulated?
13   A.   Basically, yes.  Because if he would
14 have had a concern, we would have addressed it at
15 the time.
16   Q.   Okay.  Under the LD portion, it says,
17 EX, and then there's something written there.
18        What does that say?
19   A.   Oh, on the far right?
20   Q.   Yes, I'm sorry.
21   A.   Oh, re-examination.  If they would have
22 been back for a re-exam, a re-examination.  If he
23 would have had a prior test, it was inconclusive,
24 now he's coming back a second time for

MICHAEL MASOKAS, 11/05/2019                                    Page 78..81

Page 78

1 re-examination.

2    **Q.   Got it.**

3    A.   Then we would have just filled that in

4 there.

5    **Q.   And that wasn't applicable here,**

6 **correct?**

7    A.   Correct.

8    **Q.   And then on the left-hand side, it says**

9 **EX on that second line.**

10   A.   Where?

11   **Q.   On the left-hand side?**

12   A.   Oh, way over here?  Those are my

13 initials.  Examiner?

14   **Q.   Yeah.**

15   A.   Those would be my initials.

16   **Q.   And then what's the "S" that's circled**

17 **below that?**

18   A.   The "S" means that the test we're

19 running is a specific issue polygraph exam; "R"

20 would be a re-exam or a routine -- businesses back

21 many years ago would have us come in every nine

22 months and just run examinations, routine tests, to

23 see if employees are absconding or doing anything

24 they shouldn't be doing.  So that's what the "R"

Page 79

1 was.  Those are routine tests.

2           I'm not sure what the next one is,

3 "B."  I've never used that "B."  I'm not sure what

4 that is.

5           But the last one, SA, is specific

6 applicant.  Specific applicant was a police

7 candidate or a firefighter candidate.  Those were

8 very -- those were specific types of tests.  So if

9 somebody's applying for the police department and

10 we were doing the pre-employment polygraph, that's

11 what that would be.

12   **Q.   Got it.**

13           And then on the right-hand side,

14 sort of along the right-hand side of the paper,

15 there's some notes.

16           Is that your handwriting as well?

17   A.   Down the far column -- margin there?

18   **Q.   Yes.**

19   A.   Yes.

20   **Q.   When did you make those notes, if you**

21 **know?**

22   A.   Right down the margin would have been

23 on October 4th.

24           Now, if you go to the left of that a

Page 80

1 little bit where it says time, see Time?

2    **Q.   Yes.**

3    A.   It says 4:40 p.m.

4    **Q.   Yeah.**

5    A.   That would have been marked at the time

6 of his exam when he came in when we started the

7 pretest.  And then right to the right of that, the

8 5:20, that's where the questions -- when I would

9 have stepped out to formulate the questions.  And

10 then if you continue to the right, some of this,

11 5:45 and then further on down, I would have marked

12 that the next morning when I came in.

13   **Q.   Okay.**

14   A.   Because my associate was working on

15 this with me.

16   **Q.   Okay.  During the time that you were**

17 **doing the actual polygraph examination of Mr. Amor,**

18 **it was the two of you in the examination room,**

19 **correct?**

20   A.   Yes.

21   **Q.   Did Detective Guerreri or Detective**

22 **Cross ever enter the examination room?**

23   A.   No.

24   **Q.   At this point, I --**

Page 81

1    MS. RANUM:  Can we go off the record for a

2 second.

3           (Discussion off the record.)

4           (Recess taken.)

5    MS. RANUM:  Back on the record.

6           (Deposition Exhibit No. 5,

7           Witness Masokas, was marked for

8           identification 11/05/2019.)

9 BY MS. RANUM:

10   **Q.   Mr. Masokas, I'm showing you what we**

11 **are marking as Exhibit No. 5, and just so we have a**

12 **clean record, we're going to -- at break, we'll**

13 **make a better copy of the original.**

14   MS. RANUM:  Mr. Masokas is actually going to

15 refer to the original from his file during the

16 deposition.

17 BY MS. RANUM:

18   **Q.   Mr. Masokas, can you identify the**

19 **document that is in front of you?**

20   A.   Yes.  These are the -- this is the

21 polygraph records for William Amor.

22   **Q.   And so is this paper actually printing**

23 **out in realtime as the questions are being asked to**

24 **Mr. Amor during the polygraph examination?**

MICHAEL MASOKAS, 11/05/2019                                    Page 82..85

Page 82

1    A.   Yes.

2       MS. THOMPSON:  I'm sorry to interrupt, Laura,

3 and I apologize.  And I know you asked this, but I

4 just want the record to be perfectly clear that in

5 answering these questions what the witness has in

6 front of him is his original.

7       THE WITNESS:  Yes.

8       MS. THOMPSON:  Okay.

9       THE WITNESS:  Can I say something?

10 BY MS. RANUM:

11      **Q.   Yeah.**

12      A.   It's actually got his signature on it.

13      **Q.   Okay.  And we'll talk about that as**

14 **well.**

15           **So if we could just start -- I**

16 **really just want to walk through this with you so**

17 **that we understand what all the different markings**

18 **mean, and then how -- you ultimately use this**

19 **document to score the polygraph examination,**

20 **correct?**

21      A.   Yes.

22      **Q.   And so if we can just start at the**

23 **beginning.**

24           **Right at the beginning, it looks**

Page 83

1 **like there's some writing on this.**

2      A.   Yes.  At the very beginning, it's --

3 you can see the "S" with a circle on the left?

4      **Q.   Uh-huh.**

5      A.   That's a specific issue test.  And then

6 Mr. Amor's name.  And then underneath, Naperville

7 Police Department, that's who the test was done for.

8           And then under that is the date

9 October 3, 1995; under there is my initials; and

10 then under that is the room, lab 1.  That's the

11 room that the polygraph test was conducted in.

12      **Q.   Okay.  There are several lines that**

13 **appear to be measured on this, so I'd just like to**

14 **start with the uppermost line on the paper.**

15      A.   Yes.

16      **Q.   What is that line?**

17      A.   The very top line is connected to the

18 subject's chair.  If they should move around -- can

19 you see the little spike there (indicating) --

20      **Q.   Uh-hmm.**

21      A.   -- he would have moved in the chair.

22 So it just lets us know if there's any movement on

23 their part.

24      **Q.   Okay.  What is the second line**

Page 84

1 **measuring?**

2      A.   The second line is the one of the

3 respiration parameters.  I believe that's the

4 abdominal recording.

5      **Q.   What is the third line?**

6      A.   The third line is another respiration

7 recording, which would have been the chest.

8      **Q.   Okay.  What is the fourth line?**

9      A.   The fourth line is a skinny little line

10 that's floating.  That's the galvanic skin

11 response, the little electrodes on the fingers, the

12 one that's floating there.

13      **Q.   Got it.**

14           **So if you look at the very beginning**

15 **of the sheet before the activity starts, it's the**

16 **fourth line down, correct?**

17      A.   Yep.

18      **Q.   Okay.  And then what's the fifth final**

19 **line?**

20      A.   And then the last one at the bottom

21 would be the blood pressure.

22      **Q.   Okay.  Now, can you walk me through --**

23 **there's all these markings kind of within the**

24 **sheets.**

Page 85

1           **Are these markings that you're**

2 **making during the examination?**

3      A.   Yes.

4      **Q.   Can you explain what those markings are?**

5      A.   Sure.

6           The very first one here indicating,

7 see the 20?

8      **Q.   Yep?**

9      A.   20, it's SU.  It means 20 sensitivity

10 units.  That's the adjustment for the GSR.  So you

11 can see how in the very beginning it's just a

12 straight line, and then it drops.  That's where it

13 was turned on.  And so it was set to 20, and then

14 right below the 20 to the right a little bit is an

15 X.

16           Any X you see is going to be my

17 adjustment.  An X is the examiner's adjustment.  So

18 that X there means that we adjusted it back to

19 center, and then it kind of starts floating up a

20 little bit.

21           There's going to -- at the very

22 bottom, you're going to see a 110 over 80.  You see

23 that?

24      **Q.   Yes.**

MICHAEL MASOKAS, 11/05/2019                    Page 86..89

Page 86

1    A.    Before the blood pressure.
2          The blood pressure cuff was inflated
3  to 100 pounds of pressure -- or I'm sorry --
4  110 pounds of pressure.  And then what we do is we
5  squeeze it out, we shake it out.  And kind of like
6  if the blood pressure cuff was here, once it's
7  inflated, we squeeze it out because the air will
8  get caught underneath between the cuff and the
9  clothing, so we kind of squeeze it out to squeeze
10 out any excess air (indicating).
11         So it's inflated to 110, and then
12 after it's squeezed out, it will drop to 80.
13   Q.    Okay.
14   A.    Or actually, I should say it didn't
15 drop completely to 80.  It would have -- after
16 squeezing out the air, it might have dropped to
17 maybe 100, and then we would release some of the
18 air.
19         We like it to be about 80 pounds of
20 pressure, because if it's too high, it gets
21 uncomfortable quicker.  So 80 is usually about what
22 we run it at, so that's what that is.
23   Q.    Okay.
24   A.    So it's inflated.  And then you see it

Page 87

1  starts to swing a little bit there, and then
2  there's an X, my adjustment.  I brought it down.
3  And then you notice there's a 70 at the bottom?
4    Q.    Uh-hmm.
5    A.    The cuff, for some reason, deflated
6  from 80 to 70.  Well, it didn't -- let me rephrase
7  that.
8          It didn't deflate.  I deflated it.
9          See the tracing, how big the blood
10 pressure tracing is?
11   Q.    Yes.
12   A.    It was too high.  So by lowering the
13 pressure, I brought the tracing -- made the tracing
14 a little bit smaller.  Does that make sense?
15   Q.    There's what looks to be an "R"
16 directly to the left of the part of the tracing you
17 were just describing.
18         Do you see that right here
19 (indicating)?
20   A.    It's actually an X.
21   Q.    Oh, that's an X too.
22   A.    Yeah, it's kind of a quick X.
23   Q.    So that's where you're making
24 adjustments as well.

Page 88

1    A.    Uh-huh.
2          And then to the left of that X, you
3  see a TC to the left?  Right next to the -- you
4  have the TC.
5    Q.    Okay.
6    A.    That's test chart.
7    Q.    And what does test chart mean?
8    A.    Test chart, we're just getting
9  everything adjusted.
10   Q.    Just getting everything in order.
11   A.    So no questions or anything like that
12 are being asked.
13   Q.    And then is there an X to the left of
14 that TC?
15   A.    There is -- you mean up here
16 (indicating)?
17   Q.    Yes.
18   A.    Yeah.  It was an adjustment --
19         MS. THOMPSON:  Sorry.  Did the witness
20 indicate where he was saying up here?  Did he mark
21 something?
22         THE WITNESS:  See this second respiration
23 recording, there's a little X right there.
24         MS. THOMPSON:  Okay.

Page 89

1          THE WITNESS:  I made an adjustment of the
2  respiration recording.  You see prior to the X
3  where the bottom of the breaths are?  They're above
4  the red line?
5  BY MS. RANUM:
6    Q.    Uh-hmm.
7    A.    So I just made the adjustment -- I
8  brought it down a little bit to where the bottoms
9  of the breaths now are on the red line.
10   Q.    Okay.
11   A.    Can you -- you can see it?
12   Q.    So you're just trying to get everything
13 in order.
14   A.    Trying to get it all straightened out
15 so it's a little bit maybe easier to read if
16 everything's straightened out.
17   Q.    And it looks like there might have been
18 an adjustment made on the first respirator line
19 that we discussed as well?
20   A.    Yes.
21   Q.    All right.  Can you tell from looking
22 at your chart at what point you actually start your
23 first straight through test?
24   A.    Yes.  After the test chart, the blood

MICHAEL MASOKAS, 11/05/2019                    Page 90..93

Page 90

1 pressure was released, and so there's no air in the
2 cuff.  And then there's that space between the
3 blood pressure recordings.
4    Q.   Okay.  The --
5    A.   You see there's nothing --
6    Q.   Where it's a straight line.
7    A.   There's a straight line.  That's where
8 I was giving him the instructions for the first
9 straight through.
10    Q.   Okay.
11    A.   So, Bill, this first test we're going
12 to go through, I'm going to ask you those questions
13 just like we reviewed right in order from 1 to 10.
14    Q.   Okay.
15    A.   And then the cuff was inflated to 100,
16 it was shaken out, and then brought down to 70.
17         See that?
18    Q.   Yes.
19    A.   So and then the test starts with the
20 first -- the markings at the very bottom underneath
21 the blood pressure are the questions that are being
22 asked.
23         So you see No. 1 with the plus?
24    Q.   Yes.

Page 91

1    A.   That's question No. 1 off of the
2 interview sheet:  Do they call you Bill?
3         Now, what you actually see is three
4 marks.  It looks like three slash lines.
5         The first slash line is when the
6 question is being read.
7    Q.   Okay.
8    A.   The second slash line is when the
9 question is complete.  And then we just put in
10 between the number of the question that was just
11 asked.
12         So if you go a little bit to the
13 right of that, you see No. 2.  So you've got the
14 slash where the question begins, the slash where
15 the question ends, and then right between the two
16 lines a little bit lower is the number 2.
17    Q.   Yes.
18    A.   And then he's either going to answer in
19 the affirmative or the negative.  So the plus is a
20 yes; the minus is a no.
21    Q.   Okay.  And is the location of the plus
22 or minus the point at which he responded?
23    A.   Correct.
24    Q.   Okay.  Above and to the right of where

Page 92

1 you have 100 over 70 written --
2    A.   Yes.
3    Q.   -- it looks like you wrote something.
4 Is it --
5    A.   It's ST No. 1, straight through No. 1.
6    Q.   Got it.
7         So for straight through No. 1, for
8 question 1, where is his answer?
9         Oh, I'm sorry.  I see it now.
10         So for question 1, Bill Amor
11 answered in the affirmative, correct?
12    A.   Yes.
13         Do they call you Bill?
14    Q.   For question 2, he answered in the
15 affirmative?
16    A.   Yes.
17    Q.   For question 3, he answered in the
18 negative?
19    A.   Yes.
20    Q.   For question 4, he answered in the
21 affirmative?
22    A.   Yes.
23    Q.   Question 5, he answered in the negative?
24    A.   Yes.

Page 93

1    Q.   Question 6, he answered in the negative?
2    A.   Yes.
3    Q.   Question 7, he answered in the
4 affirmative?
5    A.   Yes.
6    Q.   Question 8, he answered in the negative?
7    A.   Correct.
8    Q.   Question 9, he answered in the negative?
9    A.   Correct.
10    Q.   Question 11, he answered in the
11 negative?
12    A.   Yes.
13    Q.   Okay.  And then can you explain to
14 us -- so now this is the first test.
15         What are we seeing after you
16 complete that first straight through test?
17    A.   When the test is done, we say that's
18 the last question.  And then you see a little check
19 mark at the end of the blood pressure recording?
20    Q.   Uh-hmm, yes.
21    A.   That means the test is over.
22         And then the 74, the No. 74?
23    Q.   Yes.
24    A.   That is how much pressure was in the

Urlaub Bowen & Associates, Inc.   312-781-9586

MICHAEL MASOKAS, 11/05/2019                                    Page 94..97

Page 94

1 cuff at the end. And then right above the 74,
2 there's two little Xs.
**3      Q.   Yep.**
4      A.   The double X means that the blood
5 pressure cuff was released, the air was released.
6 And that's where it goes to the flat line then
7 again.
8          So now we're in between the first
9 straight through test, and the next one in line is
10 the card test. And so this is where -- now I made
11 an adjustment on the galvanic skin response. You
12 see the 30 equals SU? So we started off with the
13 20 sensitivity units, and I increased it to 30 as
14 we began the card test. The fourth line down, the
15 fourth recording -- tracing down, that floaty
16 little line?
**17     Q.   Yes.**
18     A.   You see the 30 SU? It's kind of hard
19 to see. You've got to go back to the card test.
20 Do you have the card test?
**21     Q.   I don't think so.**
22     MS. THOMPSON: I wasn't seeing that either,
23 so --
24     THE WITNESS: May I look and see if it's

Page 95

1 there?
2      MS. RANUM: Sure.
3      THE WITNESS: No, you don't have it. They
4 didn't copy it. Nope. They did not copy for you
5 the card test. It's missing.
6          So here, this is the test chart.
7 That's what we just talked about. Your straight
8 through No. 1 starts here (indicating), it ends
9 here (indicating). And then next in line should be
10 the card test, but they skipped it and they jumped
11 right to the second straight through test. So you
12 don't have a card test.
13     MS. RANUM: Why don't we off the record for a
14 second.
15          (Discussion off the record.)
16     MS. RANUM: Back on the record.
17 BY MS. RANUM:
**18     Q.   Okay. Mr. Masokas, I believe you were**
**19 just testifying about where the card test commenced.**
20     A.   Yes.
**21     Q.   And can you please explain, there's a**
**22 marking here 300 or 30 --**
23     A.   30. The 30 is when we originally
24 adjusted everything at the beginning in the test

Page 96

1 chart, I had set the GSR to 20 sensitivity units.
2          And here now, starting the card
3 test, I increased the sensitivity from 20 to 30, so
4 I made the mark there. And when I did that, it's
5 the fourth tracing from the top, that skinny little
6 line.
7          See the 30?
**8      Q.   Yes.**
9      A.   Just left -- immediately left of the 30
10 is like a pen fluctuated up and down?
**11     Q.   Yep.**
12     A.   That's the GSR.
13          And so when I adjusted it to 30, see
14 how it shot way up there?
**15     Q.   Yes.**
16     A.   And then there's an X. I made an
17 adjustment.
**18     Q.   Okay.**
19     A.   Just brought it back down.
20          And then to the right of the 30 SU,
21 you see that indication CT? That just means card
22 test simply.
23          And then right under the CT again is
24 where we're starting the test, and we inflate the

Page 97

1 blood pressure cuff. So it was initially inflated
2 to 100 and then shaken out to 70.
**3      Q.   Okay.**
4      A.   And then we started.
5          And so going along, and it only
6 lasted about a little bit over a minute or so.
7          And then at the end of the card
8 test, you see there's two Xs at the bottom by the
9 cardio, by the blood pressure? Two Xs means that
10 the blood pressure cuff was deflated, the air was
11 let out to 72 at the bottom of the --
12     MS. CANONIE: Right here.
13     THE WITNESS: At the end of the card test,
14 the 72. That's what the pressure was when the air
15 was let out.
16          And then just to the left of that is
17 the check mark, meaning the test is over. You see
18 a circle around it? The circle means that I left
19 the room. So the test was over; I left the room.
20          Bill, I'm going to give your arm a
21 little rest here, and then I'll be back in a few
22 minutes.
23 BY MS. RANUM:
**24     Q.   To the left of what you just described**

MICHAEL MASOKAS, 11/05/2019      Page 98..101

Page 98

1 as the end of the card test, what are the numerical
2 markings on the bottom of the page?
3      A.   The numbers at the bottom are the
4 numbers that were called in regards to the cards.
5 So if you go to the beginning of the card test,
6 you'll see No. 2. That was the first card that was
7 called.
8          Did you pick card No. 2? He said
9 no.
10          Did you pick card 7? He said no.
11          Did you pick card 4? He said no.
12          And then it was underlined, because
13 that was his card.
14          Next to that, Did you pick card
15 No. 8? He said no.
16          And then one more time, Did you pick
17 card No. 4? He said no.
18          And it was underlined, because that
19 was his card.
20          So, And, Bill, the test is over. It
21 appears as though you picked card No. 4. Is that
22 the card you chose? And he said yes.
23          And so then at that point I just
24 told him, We're going to take a break. I'll give

Page 99

1 your arm a little rest. I'll be back in a few
2 minutes, and we'll start again.
3      Q.   Okay. So then when you come back in
4 the room -- how long do you think you left the room
5 for?
6      A.   Probably no more than 5 minutes.
7      Q.   And when you came back in the room, it
8 looks like there's this marking ST 2.
9          Is that where you started straight
10 through test No. 2?
11      A.   Yes.
12          And you see the same markings at the
13 bottom. The blood pressure cuff was inflated to
14 100, we shook it out to 70, and then that's where
15 the test started.
16          That fourth line down, that GSR line
17 again, see how it's kind of falling and falling? I
18 made an adjustment and I moved it up. I didn't
19 want it to interfere with the blood pressure, so I
20 adjusted it up. And then we started, and it was
21 right in order, just like the first test.
22      Q.   Okay. And so he was asked question
23 No. 1 and answered in the affirmative, correct?
24      A.   Yes.

Page 100

1      Q.   And No. 2, he answered in the
2 affirmative?
3      A.   Yes.
4      Q.   And No. 3, he answered in the negative?
5      A.   Yes.
6      Q.   And No. 4, he answered in the
7 affirmative?
8      A.   Yes.
9      Q.   And No. 5, he answered in the negative?
10      A.   Yes.
11      Q.   No. 6, he answered in the negative?
12      A.   Yes.
13      Q.   No. 7, he answered in the affirmative?
14      A.   Yes.
15      Q.   Now, did you have to make an adjustment
16 after question 7?
17      A.   Yes.
18      Q.   What was the adjustment you made?
19      A.   In the blood pressure, it started --
20 the blood pressure was going up, and I didn't want
21 it to interfere with the GSR recording, so I
22 brought it down. I made the adjustment, and that's
23 my X to indicate that.
24      Q.   Okay. And then question 8 was

Page 101

1 answered -- or was asked, and he answered in the
2 negative?
3      A.   Yes.
4      Q.   Question 9 was asked, and he answered
5 in the negative?
6      A.   Yes.
7      Q.   Question 11 was asked, and he answered
8 in the negative?
9      A.   Yes.
10      Q.   You already testified for straight
11 through test No. 1 that the first slash is when you
12 start reading the question; the second slash is
13 when you complete the question.
14          Is that true for this test as well?
15      A.   Yes.
16      Q.   And just like straight through test
17 No. 1 where you indicate the marking of a negative
18 sign or a positive sign is where he actually
19 started to give his answer, correct?
20      A.   Yes.
21      Q.   Okay. Now, can you describe for us
22 where straight through test No. 2 officially
23 concludes?
24      A.   Yeah, yes.

Page 102

1      After he was read question 11, you
2  see where the blood pressure just kind of
3  disappears and goes through the straight line
4  again?
5     Q.   Yes.
6     A.   That was the end of the test.  The
7  double X means the air was released from the cuff.
8  The number 74, that was how much pressure was in
9  the cuff at the end of the test, and then the X
10 meaning the test was complete.
11      And so what I just described until
12 the next tracing of the blood pressure, this all in
13 between is just the in-between where we're giving
14 him instructions for the next test.
15    Q.   Okay.  There's a notation on here.  I
16 can't tell what it says.  It looks like it says
17 wipe?
18    A.   Yeah, wipe, and it's got an S with a
19 circle, subject.  Wiped the subject's fingers.
20      There was a lack of response in the
21 GSR recording.  It's just diving.  There was
22 nothing going on here.
23      At the end of the second straight
24 through that we just described, do you see it?

Page 103

1     Q.   Yes.
2     A.   Where I let the air out of the cuff?
3  See where the blood pressure cuff is deflated
4  (indicating)?
5     Q.   Yes.
6     A.   Right above that, go right above that
7  to the floaty little line, the fourth line down.
8  You see how it goes up?
9     Q.   Yes.
10    A.   That was -- he responded to that.  That
11 was actually a response because the cuff was
12 released.  That's what we look for in the GSR on
13 questions is responses like this.
14      And so during the second straight
15 through, there was nothing.  The GSR just kept
16 falling and falling and falling.
17      So sometimes what happens with the
18 subject if their hands are sweaty, we won't get any
19 response, and so we'll wipe their fingers off to
20 dry out their fingers just to see if that might be
21 what's causing that.
22      And so at that point I took the
23 electrodes off his fingers, and I took a Kleenex
24 and wiped his fingers, in case it was perspiration,

Page 104

1  and then reattached.
2      So that's, wiped subject's fingers.
3  And then again, I made an adjustment.  At the
4  beginning of the second straight through, I
5  adjusted the GSR from 20 to 30 now because of the
6  lack of any type of response.  I adjusted it again
7  from 30 to 40, so that's the 40 SU.
8     Q.   Okay.
9     A.   And then to the right of that is SAT.
10 That's the test.  This is a silent answer test.
11    Q.   Okay.
12    A.   And that's where the test begins.
13      He's been given the instructions,
14 and so where you see the blood pressure gets thick
15 again, that's where the test started, and you'll
16 see No. 1, the bottom.
17    Q.   Okay.  Now, I believe you already said
18 that the silent answer test, the questions are also
19 asked in the same straight through numerical order,
20 correct?
21    A.   Yes.
22    Q.   And so on this test, there's obviously
23 no answer to record, but are the two slash marks we
24 see consistent with what you've done with the other

Page 105

1  tests?  The first slash mark is where you start
2  reading the question; the second slash mark is
3  where you complete the question?
4     A.   Yes.
5     Q.   And then do you just give a pause?  How
6  long do you wait before you ask the next question?
7     A.   With the control questions and the
8  relevant questions, we will wait anywhere from
9  maybe 20 to 30 seconds before we ask.  With the
10 irrelevant questions, usually maybe about 10 to 15.
11 It's a little bit shorter time.
12    Q.   So following -- I just want to make
13 sure I'm clear.
14      Following an irrelevant question,
15 how long do you typically pause?
16    A.   10 to 15.
17    Q.   Following a relevant question, how long
18 do you typically pause?
19    A.   20 to 30.
20    Q.   Following a control question, how long
21 do you pause?
22    A.   20 to 30.
23    Q.   Okay.
24    A.   So we go through the silent answer

MICHAEL MASOKAS, 11/05/2019                          Page 106..109

Page 106

1  test.
2           And then again, where you see the
3  blood pressure, it kind of -- the black marking
4  disappears, we got the straight line.  That was the
5  end of the test, end of the straight through.
6           See again on the line is a double X,
7  meaning the cuff was deflated.  The check mark
8  which means the test was over.  He was informed,
9  Bill, that's the last question, the test is over.
10          And then the number 76, that was the
11 pressure in the cuff when it was deflated.
12     **Q.   Okay.**
13     A.   Moving along, you're going to see a
14 circle with a GSS in it?
15     **Q.   Yes.**
16     A.   That stands for general stimulation.
17          And what we'll do, if we feel we're
18 not getting any dramatic responses, they might be
19 subtle, which is what we were getting up to this
20 point.  There was responses, but they were more
21 subtle.
22          Sometimes we'll give a general
23 stimulation to where before we started the mixed
24 question test, which is the next test in line --

Page 107

1  you see the MQ -- I asked him, I said:  Bill, out
2  of all of the questions that we've been covering on
3  the polygraph, are there any questions that are
4  bothering you?  Any questions that you feel you
5  want to change, just to get him to think.
6           And so he said no.
7           And so that was this general
8  stimulation prior to that test, and then we started
9  the test.
10     **Q.   So you asked that question where it's**
11 **marked GSS?**
12     A.   Yes.
13     **Q.   How can you tell he answered no?**
14     A.   Because all the questions are the same.
15 The question was:  Is there any question bothering
16 you?  Anything you want to change?
17          And there would have been -- if
18 there was a change -- for example, let's say he
19 changed the control question No. 6.  Maybe he
20 wanted to add something besides stealing.  What we
21 would be marking then is 6A.
22     **Q.   Ah, okay.**
23     A.   Because the question would have been
24 changed.

Page 108

1      **Q.   Got it.**
2      A.   So now it's a new question.
3           And so all the questions are the
4  same, so there would have been no additions to
5  anything or no changes.
6      **Q.   Okay.  And then you gave your**
7  **instructions and started your mixed question test,**
8  **correct?**
9      A.   Yes.
10          And it was all the way through.
11 There was an adjustment again.  You see on the GSR,
12 that floaty little line in the middle, it kept
13 diving.  And so it was starting to get kind of in
14 the way with the cardio, so I made the adjustment,
15 moved it back to the middle, and continued on.
16          And then at the end, you see where
17 the cuff gets deflated.  That's the end of the
18 mixed question test.
19     **Q.   Okay.  So in terms of the questions**
20 **that were asked, the order that they were asked in,**
21 **the first question you asked him was question**
22 **No. 9; is that correct?**
23     A.   7.
24          Well, are you talking about

Page 109

1  irrelevant or relevant?  Because the very, very
2  first question of the test would have been No. 7.
3           See where the cardio is inflated
4  right away?
5      **Q.   Yeah.  Maybe it's just our copy doesn't**
6  **show it.**
7      MS. CANONIE:  It's his handwriting.  It's 7.
8  BY MS. RANUM:
9      **Q.   Oh.**
10     A.   Yeah, that's a 7.
11     **Q.   Got it.**
12          So you asked question 7?
13     A.   Yes, ma'am.
14     **Q.   And he answered in the affirmative,**
15 **correct?**
16     A.   Yes.
17     **Q.   What was the next question you asked?**
18     A.   No. 4.
19     **Q.   And Bill answered in the affirmative,**
20 **correct?**
21     A.   Yes.
22     **Q.   And just like the other tests, the**
23 **first slash signifies when you start answering the**
24 **question, correct?**

Page 110

1    A.    Yes.
2    Q.    The second question signifies when you
3 finish reading the question?
4    A.    Yes.
5    Q.    And the plus or minus sign signifies
6 where he begins his answer, correct?
7    A.    Correct.
8    Q.    The next question you asked was
9 question No. 9?
10   A.    Yes.
11   Q.    He answered in the negative, correct?
12   A.    Yes.
13   Q.    Next question you asked was question 2?
14   A.    Yes.
15   Q.    And he answered in the affirmative?
16   A.    Yes.
17   Q.    Next question you asked was question 3?
18   A.    Yes.
19   Q.    And he answered in the negative?
20   A.    Yes.
21   Q.    The next question you asked was
22 question 6?
23   A.    Yes.
24   Q.    And he answered in the negative?

Page 111

1    A.    Yes.
2    Q.    Was there some sort of adjustment made
3 after question 6?
4    A.    Correct.  That was my adjustment for
5 cardio.  The blood pressure recording was -- it was
6 going up, and so I brought it back down.  And
7 that's my X, my adjustment.
8         And then a little bit to the right
9 of that, there's another adjustment in the GSR
10 recording.  It started -- was diving, getting too
11 close to the blood pressure, so I adjusted it back
12 up, and that's my X.
13   Q.    Now, so you made the adjustment to the
14 cardio after question 6, correct?
15   A.    Yes.
16   Q.    And then after that adjustment, you
17 asked question No. 5, correct?
18   A.    Yes.
19   Q.    And he answered in the negative?
20   A.    Yes.
21   Q.    And then after question 5, you made the
22 adjustment to the GSR that you've just described,
23 correct?
24   A.    Yes.

Page 112

1    Q.    And then you asked question 11?
2    A.    Yes.
3    Q.    And he answered in the negative?
4    A.    Yes.
5    Q.    And you asked question 8?
6    A.    Yes.
7    Q.    And he answered in the negative?
8    A.    Yes.
9    Q.    And then you asked question 6?
10   A.    Yes.
11   Q.    And he answered in the negative?
12   A.    Correct.
13   Q.    And was that the last question that you
14 asked in the mixed question test?
15   A.    Yes.
16   Q.    Okay.  And then can you describe for us
17 how that test concluded in terms of your chart?
18   A.    Yes.  Where you see again the cardio
19 tracing, it got small, and then now you just have
20 that line.  The air was released from the cuff.
21 The double X again indicates that the air was
22 released from the cuff.  The check mark means the
23 test is over.  He was instructed that that was the
24 last question.  The test is over.

Page 113

1         And then the 76 again is the
2 pressure that was in the cuff at the time it was
3 released.
4    Q.    Okay.
5    A.    And then it continues on to the final
6 test, which was the yes test.
7    Q.    All right.  Now, the yes test,
8 why did you give the yes test?
9    A.    The yes test was given -- can we go
10 back to the card test?
11   Q.    Yes.
12   A.    Go back to the card test.
13        If you look at the very first time
14 his card was called, No. 4 --
15   Q.    Yep.
16   A.    -- you see the breath?  If you go up to
17 the second -- well, one, two, three, the third
18 tracing down, which is also the second.
19   Q.    Second abdominal?
20   A.    Yes.
21        See the big breath (indicating)?
22 Like he took -- that breath is a lot bigger than
23 everything else?
24   Q.    Yes.

Page 114

1  A.  Does that make sense?
2     That -- he did that when his card
3  was called.  He didn't appear to do that really --
4  that dramatic of a breath, he didn't appear to do
5  that anywhere else.
6  Q.  Okay.
7  A.  Now, from our experience, sometimes
8  subjects will try to manipulate the test in
9  order -- in other words, they'll try to, for lack
10 of a better term, beat the test by trying to make
11 it look like a lie, make it different than what
12 their real lies are, so to speak.  And so
13 oftentimes, this is the test that they'll try to
14 manipulate.
15 Q.  The card test?
16 A.  Yes.
17 Q.  Okay.
18 A.  Because we tell them -- we tell them,
19 When I call off your card, say no to it.
20    Oh, you want me to lie to my card?
21    Yes, I want you to lie to your card.
22    So then when they lie to the card,
23 sometimes if they're trying to manipulate, they'll
24 try to make it look different.  This is what the

Page 115

1  lie looks like.
2     I like to compare it to a
3  Breathalyzer.  If you're asked to take a
4  Breathalyzer, you have to blow for a certain amount
5  of time.  Well, if I don't want them to be able to
6  get a reading, as I start to blow, I cough
7  (indicating).
8     And then I'm instructed, All right.
9  We have to do it again.  Try not to cough.  Just
10 keep blowing until I tell you.
11    Well, now I start to blow
12 (indicating), and I sneeze.
13    All right.  We've got to do it a
14 third time.  Try not to sneeze, try not to cough,
15 and just keep blowing until I tell you.
16    The third time, I do something else.
17    And the reason I'm doing this is
18 because I know I've been drinking, and I don't want
19 you to get a result on the Breathalyzer.  It's a
20 deliberate manipulation.  We see oftentimes the
21 same thing on the polygraph.
22    And so because he did this the first
23 time -- now the second time the number was called,
24 he didn't do it, and so it's not consistent.  So I

Page 116

1  ran the card test just as a precaution just to see
2  if he was trying to do anything to manipulate his
3  test.
4  Q.  Now, you said the card test.  You mean
5  the yes test?
6  A.  The yes test.
7  MS. THOMPSON:  Sorry.  You guys were talking
8  over each other.  I couldn't hear that.
9  THE WITNESS:  My mistake, sorry.
10 MS. THOMPSON:  Could you read back the
11 question?
12    (Discussion off the record.)
13 MS. RANUM:  We can clear it up.
14 BY MS. RANUM:
15 Q.  So during the card test, you saw this
16 spike in his respiration when his card was called
17 the first time, correct?
18 A.  Yes.
19 Q.  And that signaled to you that it could
20 be an indicator that he was trying to manipulate
21 the test, correct?
22 A.  Possibly, yes.
23 Q.  And so that prompted you to do the
24 yes test after the mixed question test, correct?

Page 117

1  A.  Yes.
2  Q.  Okay.  So now we can talk about the
3  yes test.
4  A.  So this is the test where we eliminate
5  the control questions.
6     So question 6 and question 11 were
7  dropped out.
8  Q.  Okay.
9  A.  And he was instructed to that, that
10 we're not going to ask these two questions.  And on
11 all of the questions, he was instructed to answer
12 yes, including the ones about the fire.
13    So as you see, we started the yes
14 test.  You see YT.  We inflated the -- I inflated
15 the blood pressure cuff at the bottom, 100, and
16 then shook it out to 70.  And then we started the
17 test.
18    The first question, again -- and
19 he's instructed also, I should say, I'm going to go
20 straight down the list, just like we did before.
21 Q.  Straight through.
22 A.  Straight through, right down the list.
23    So he was asked No. 1; he answered
24 in the affirmative.

MICHAEL MASOKAS, 11/05/2019                          Page 118..121

Page 118

1    Q.   And let me just interject for a moment.
2         So as you have said for the other
3  tests, the first slash indicates when you started
4  reading the question, correct?
5    A.   Yes.
6    Q.   Second slash is when you finished
7  reading the question, correct?
8    A.   Yes.
9    Q.   And the plus or minus sign is where he
10  started his answer, correct?
11   A.   Yes.
12   Q.   So now you can go through the
13  questions, please.
14   A.   So the first question he answered in
15  the affirmative; second question he also answered
16  in the affirmative; the third question, also in the
17  affirmative; question No. 4, he answered yes;
18  question 5, he answered in the affirmative.
19        And then right after question 5, I
20  made an adjustment again to the GSR.  It just kept
21  dropping, and it was interfering with the blood
22  pressure.  So I adjusted it back up to center, and
23  that's my X.
24        And then he was asked question 7,

Page 119

1  and he answered in the affirmative.
2         Question -- the next question was
3  No. 8.  He answered in the affirmative.
4         Question 9, he answered in the
5  affirmative.
6         And then the last question was a
7  repeat, and he was asked question 1 again, and he
8  answered in the affirmative.
9    Q.   Okay.  And that was the last test in
10  the examination, correct?
11   A.   Yes.
12   Q.   And so then can you describe for us
13  what the 76 at the end means?
14   A.   Sure.
15        The 76 at the bottom was the
16  pressure in the cuff at the time it was deflated.
17  The double X indicates that the cuff was in fact
18  deflated; air was released.  And then the check
19  mark was the end of the test, and the circle around
20  the check mark is where I stepped out of the room.
21   Q.   Okay.
22   A.   And before I stepped out, once I tore
23  the tracings off the polygraph, I folded them up
24  and had him sign the bottom.

Page 120

1    Q.   Okay.  And then at that point you take
2  your chart, I assume, to go do your evaluation of
3  the test, correct?
4    A.   Yes.
5    Q.   Okay.  Where did you -- would you call
6  it a scoring or an evaluation?
7    A.   We -- scoring, that's what we usually
8  say.
9    Q.   Where do you score the test at?
10   A.   It's on the front.
11        Oh, you mean in the office you mean?
12   Q.   Yes.
13   A.   It would have been back at my office.
14   Q.   Okay.  And when you're scoring the
15  test, do you have the chart in front of you that
16  was the printout from the polygraph machine that
17  we're looking at in Exhibit 5, correct?
18   A.   Yes.
19   Q.   And then you also have the questions
20  that you wrote out that we've looked at in
21  Exhibit 4, correct?
22   A.   Yes.
23   Q.   Do you have anything else with you when
24  you're scoring the test?

Page 121

1    A.   That's it.
2    Q.   Do you score the test alone?
3    A.   Not necessarily.  I mean, somebody may
4  be sitting in the room with me.  But I would
5  initially score it, and then I may have someone
6  else look at it as a second opinion.
7    Q.   Okay.  So now I'd like to understand
8  how you scored the test.
9         So if you could explain to us, you
10  take Exhibit 4 and Exhibit 5 into your office, and
11  how do you go about scoring the test?
12   A.   John Reid & Associates uses what's
13  called a visual inspection.  And what that simply
14  means is we go through the chart, and we will
15  use -- it was a check mark system.  And so imagine
16  you're making a check mark.  The lighter the check
17  mark, the less of a response; the darker the check
18  mark, the stronger, the more dramatic a response.
19   Q.   Okay.
20   A.   So again, visual.  We're just kind of
21  indicating what we're seeing.
22   Q.   So the check marks you're describing,
23  are those check marks that you are making in that
24  left-hand column on Exhibit 4?

MICHAEL MASOKAS, 11/05/2019                        Page 122..125

Page 122

1    A.   Yes.
2    Q.   So that's where you're signifying those
3 responses to the extent that you're observing them?
4    A.   Yes.
5    Q.   All right.  So the first thing I want
6 to understand, there's these columns, and there's
7 four columns where I see some form of a check mark
8 in it.
9    A.   Yes.
10   Q.   So which test does each column
11 correspond to?
12   A.   We would go from -- down the columns.
13 As you're looking at those columns, we're going
14 from left -- I'm sorry -- from right to left.
15   Q.   Oh, okay.
16   A.   So you see the numbers -- 1, 2, 3, 4,
17 5 -- all the way down to 11.  The first column to
18 the left of the numbers would be straight through
19 No. 1.
20   Q.   Okay.
21   A.   The second column down is straight
22 through No. 2.
23   Q.   Okay.
24   A.   The third column would be the silent

Page 123

1 answer test.  And then the last one is the mixed
2 question test.
3    Q.   Now, does the yes test not get scored
4 on the columns in Exhibit 4?
5    A.   That is correct.
6    Q.   And why is that?
7    A.   Because we're not utilizing the yes
8 test for scoring purposes.  The purpose of the yes
9 test -- the primary purpose of the yes test is to
10 see if they're going to manipulate it.
11   Q.   Okay.  And what were the results to the
12 yes test in your opinion?
13   A.   It was questionable.
14   Q.   Okay.
15   A.   His breathing, he was breathing quite a
16 bit faster on the one yes test than he was
17 throughout the entire test.  If you were to count
18 the breaths on the first straight through, on the
19 card test, on the second straight through, on the
20 silent answer test, and on the mixed question, if
21 you would count those out, he was breathing between
22 maybe 18 and 22 breaths per minute on all of those
23 tests.
24         And then on the yes test, he was

Page 124

1 breathing between 24 and 26 breaths per minute.
2    Q.   And okay.  Is that indicated anywhere
3 on here --
4    A.   No.
5    Q.   -- or are those the numbers if you were
6 to count it out?
7    A.   That's if you were just counting.  It
8 wasn't indicated.
9         So the question then in our mind is
10 why on that one test is there such a big difference
11 in his respirations when everything else was
12 consistent.  And so it raises a little bit of a
13 concern for us.  Was he intentionally trying to
14 manipulate that?
15         Now, we didn't go as far as
16 reporting that because we weren't certain.  But in
17 our mind, it was suspicious.
18   Q.   Okay.  So let's just go in order.
19         So straight through test No. 1, can
20 you explain for us what your scoring was there?
21 Why you made the check marks that you did?
22   A.   Yes.  If you look at No. 3 in the
23 straight through No. 1, you see question 3 at the
24 bottom.  It may be a little hard for you to see,

Page 125

1 but where his answer is, where he says no, if you
2 kind of go straight up, you've got to try to see
3 where his answer was on the breath.
4         And what had happened was he
5 answered no, and then there's a baseline change.
6 You see the second respiration parameter?
7    Q.   Yes.
8    A.   If you look just prior to the question
9 how at the bottom of the tracing is on the red
10 line --
11   Q.   Yes.
12   A.   -- and then once we start to ask the
13 question, then he answers, all of a sudden now his
14 baseline dropped.
15         Can you see it?
16   Q.   Yes.
17   A.   It's under the red line.
18   Q.   Yep.
19   A.   And that was when he answered the
20 question.  So that's a baseline response.  His
21 breathing, his respiration has changed, so he got a
22 question mark -- or a check.
23         A check mark alone indicates that
24 there's only a response in the respiration.  So if

MICHAEL MASOKAS, 11/05/2019                          Page 126..129

Page 126

1  you see just a check mark, that means there was a
2  response in the respiration channel or recording.
3      Q.   What about the fact that the check mark
4  is circled?
5      A.   The circle means it's the very first
6  relevant question being asked.
7           So you see No. 3 is circled three
8  times?
9      Q.   Yes.
10     A.   Every single -- the first straight
11 through, the second straight through, and the
12 silent answer test, we went right down the list
13 chronologically -- 1, 2, 3, 4, 5, 6, 7, 8 -- 1, 2,
14 3, 4, 5, 6, 7, 8 -- 1, 2, 3, 4, 5 ...
15          And so No. 3 was the very first
16 relevant question asked on each one of those tests,
17 so it's indicated by the circle.
18          And if you look at the last column,
19 the mixed question test, can you tell which
20 number -- which question, relevant question was the
21 first one asked?  No. 9.
22          So it's -- the circles always
23 indicate that's going to be the first relevant
24 question that was asked on the test.

Page 127

1      Q.   Okay.  Now, what about -- I think you
2  made a comment about like the check marks, how dark
3  they are on the sheet?
4      A.   Yeah.  It's like the lighter the check,
5  the less dramatic of the response; the darker the
6  check, the more significant the response.
7      Q.   Okay.  So how significant was that
8  response on question No. 3 in the silent answer
9  test No. 1?
10     A.   It wasn't -- it wasn't super
11 significant.  I mean, you could see the check is
12 fairly light.  It's kind of like if you would --
13 like in a broken bone, is it a severe break, or is
14 it just a hairline fracture?  Kind of like that.
15 They're both broke, but one's more significant than
16 the other.
17     Q.   Okay.  Now, what is the next thing that
18 you signify from straight through test No. 1 in
19 your observations?
20     A.   What we do is we look at the relevant
21 questions and the control questions.  So the next
22 one is relevant question No. 5, and I have a very
23 light check mark as far as just a minimal
24 respiration response.  It's not super significant.

Page 128

1  We look at amplitude, the height.  We look at the
2  duration.  Sometimes like if you give a slower
3  exhale, it would be (indicating), as opposed to
4  somebody who's (indicating).  So it's reflected on
5  the charts.
6           So we're looking at the height,
7  which is the amplitude; we're looking at the
8  duration as far as is it drawn out.
9           And so here, it's drawn out a little
10 bit the duration, just slightly.  So it's a very
11 light check.
12     Q.   Okay.  And then you look at No. 6, your
13 control question?
14     A.   No. 6 is a control question.  You can
15 see No. 6 is actually a little bit more significant
16 than No. 5 on that first straight through.
17          No. 6, if you -- you see his answer,
18 you go up to see where he kind of answered on the
19 breath, and then that first breath right after his
20 answer is rounded on the second parameter.  The
21 second respiration, you see how it kind of rounds
22 at the top?
23     Q.   Yes.
24     A.   Then you go up to the top respiration,

Page 129

1  and it kind of drags out a little bit longer.
2           So I actually gave him a little bit
3  more of a respiration response on 6 than on 5 that
4  first time through.
5      Q.   And then you go to question No. --
6      A.   8.
7      Q.   -- 8.
8      A.   Which is another relevant question and
9  again very, very light; very minimal response.  Not
10 much there.
11          You can see again it's the baseline.
12 If you take his answer, you go up, and you try to
13 see where his answer was on the breath, there's a
14 little bit of a baseline rise.  It's right here
15 (indicating) at the bottom, kind of comes off the
16 red line a little bit.  The first breath is a
17 little bit drawn out.
18          So again, it's not a big response.
19 It's minimal, so he got a light check there.
20     Q.   Next is question 9?
21     A.   Yep.
22          Question 9, a little bit -- maybe
23 even a little bit stronger than question 8 as far
24 as the respiration goes.  Again, you've got to go

Page 130

1 up to see where his answer was in the breath.  And
2 then it's drawn out a little bit.  It's rounded
3 off.  The next breath is rounded off at the top.
4            Again, this is not real dramatic,
5 not real significant, but there's a little bit
6 there.  More so on 9 than on 11, and so 11 got a
7 very light check.  And that's it.
8            And we did the same thing on the
9 others.
10    Q.    Okay.  So then for straight through
11 test No. 2, obviously No. 3 is yet again the first
12 question asked, so you've circled that check mark.
13    A.    It's the first relevant question, yes.
14    Q.    First relevant question.
15    A.    So again, he got a light check.  It's
16 circled.  This check is just a little bit darker
17 than the first.  You can see again -- if you go up,
18 you can almost see better at the top respiration,
19 you see the little -- almost like a little notch?
20 If you go to his answer on No. 3 and you take your
21 pen, and you just kind of point it up (indicating),
22 see the top respiration?
23    Q.    Yep.
24    A.    There's a little notch at the top?

Page 131

1    Q.    Yes.
2    A.    That's where he answered.
3            So and then the first breath after
4 that, it's kind of -- it drags out a little bit on
5 the exhale.  But if you go to the second
6 respiration recording right under it, that first
7 breath after the answer is rounded, see how -- it's
8 more rounded than some of the others, but it's more
9 suppressed and it drags out.  Again, the duration
10 is -- drags it out a little bit.  Not
11 significantly.  That's why the check isn't that
12 dark, but there's something there.
13            Question 5, if you go to question 5
14 is -- you see question 5 and then his answer.
15 What's interesting about question 5 is the blood
16 pressure.  He answers the question -- if you put
17 your pen on the answer, it's right when he answers
18 the question, there's that increase.  Can you see
19 it?
20    Q.    Yes.
21    A.    And it's right when he answered the
22 question.  The blood pressure goes up.  There's a
23 slight response in the respiration.
24            And so because if you notice now on

Page 132

1 the evaluation sheet, No. 5 the second time
2 through, there's a check and a plus.  The plus
3 means that there were responses in both respiration
4 and blood pressure.
5    Q.    Okay.
6        MR. NYESTE:  Your plus looks like an X; is
7 that true?
8        THE WITNESS:  Im sorry?
9        MR. NYESTE:  Your plus looks like an X; is
10 that fair?
11        THE WITNESS:  Yeah, yeah.  It kind of looks
12 like a little X, but it's supposed to be a plus.
13            And then we go to question 6, and
14 there's really nothing going on at question 6.  As
15 a matter of fact, his blood pressure almost starts
16 to come back down.  It's like -- it's as if he's
17 relieving.  Like he hears the question 5, blood
18 pressure shoots up, and then when we get to 6, it
19 almost starts to drop a little bit.  And so there's
20 really not much going on at all in the breathing.
21 So that's why we didn't give him anything, or
22 that's why I didn't give him anything on No. 6 the
23 second time through.
24            Then if you go to 8, question 8,

Page 133

1 it's a little bit -- again, not very significant,
2 but there's a little bit of a respiration response,
3 so you got a light check again.
4            And No. 9, No. 9 you got a fairly
5 dark check or darker, because if you look at the
6 second parameter -- sorry -- the second respiration
7 recording, the bottom part that's closest to the
8 red line, he's got a pretty good significant
9 baseline rise here.  It goes up and then it comes
10 back down.
11            And then on the top respiration too,
12 there's just a little bit of a -- he drags out his
13 breath a little bit there at the top, but it's more
14 in the second one.
15 BY MS. RANUM:
16    Q.    Okay.
17    A.    And then nothing on 11.  There's really
18 nothing there.
19    Q.    Okay.  And next is the silent answer
20 test.
21    A.    Next is the silent answer test.  Same
22 thing.
23            So again, we go in order.  We start
24 off, the first relevant question is question 3.

MICHAEL MASOKAS, 11/05/2019                    Page 134..137

Page 134

1 There's a little bit on the second respiration.
2 Again, he kind of drags it out a little bit, but
3 again, it's not real significant.  That's why the
4 light check mark, it's circled.  It's the first
5 question.
6         But if you go now to question 5 on
7 the silent answer, if you were to put your pen --
8 the second respiration, if you were to put your pen
9 at the very top of the breaths and then you look at
10 his breathing on question 5, you can see how
11 suppressed it is.
12     **Q.   (Nodding.)**
13     A.   I don't know how apparent that is, but
14 question 5, it's quite lengthy.
15          Now, there's several breaths that
16 are suppressed at question 5 on that second
17 respiration.  And not only are they suppressed, but
18 the duration, he drags them out a little bit more.
19          And also he's got blood pressure, it
20 starts -- because he's thinking the answer, there's
21 really not an indicator as to when he's answering.
22 But when question 5 is read, it just -- his blood
23 pressure starts to go up, so that's why he got the
24 plus and the check.

Page 135

1         Do you see it?
2     **Q.   Yes.**
3     A.   And then at 6, question 6, which is the
4 control question, there is -- the blood pressure
5 continues to rise.  It almost levels out right
6 before 6, but then it continues to go up once he's
7 read No. 6.  And so I did give him a blood pressure
8 response at 6.
9         8 --
10    MR. NYESTE:  Excuse me.  That's a B and a
11 check.
12    THE WITNESS:  Yes.  A "B" and a check is just
13 a blood pressure response.
14 BY MS. RANUM:
15    **Q.   I thought the plus was a blood pressure**
16 **response.**
17    A.   A check and a plus is blood pressure
18 and respiration.
19    **Q.   Ah, okay.**
20    A.   A check with just the B is just a blood
21 pressure response by itself.
22    **Q.   And then a check by itself is a**
23 **respiration response --**
24    A.   Alone.

Page 136

1     **Q.   -- by itself?**
2     A.   That is correct.
3     **Q.   Okay.**
4     A.   I mean, it sounds confusing, but when
5 you do it half a dozen times --
6     **Q.   Sure.**
7     A.   -- it's -- yeah, it's not super hard.
8         And then question 8, there's really
9 nothing going on -- well, there's really no
10 response at question 8.
11    **Q.   Okay.**
12    A.   Question No. 8, there's really not a
13 response at all in respiration or blood pressure,
14 and so if you'll notice on my sheet, I didn't even
15 mark a response for question 8.
16    **Q.   Okay.**
17    A.   Question 9, however, the cardio again
18 is suppressed on the second cardio -- or I'm sorry.
19 The second respiration.  If you put your pen on the
20 tops of the breaths and then you look at where
21 question 9 was read, right following question 9 is
22 he's got a pretty good suppression there, if you
23 lay your pen across the top where you mark a line.
24    **Q.   Yeah.**

Page 137

1     A.   And it's drawn out.  You see several
2 breaths are kind of rounded off there.
3         And then question 11, almost he goes
4 back to normal.
5     **Q.   Okay.**
6     A.   And then the last is the mixed question
7 where we mixed up the order.
8         So the first relevant question on
9 the mixed question, that would be the one that's
10 circled, which is actually No. 9.  And he's got a
11 fairly dramatic, not super, but fairly dramatic
12 respiration response.  The baseline changes a
13 little bit.  The duration is drawn out a little
14 bit, so he got a check mark.
15         No. 3 is the next relevant question.
16 There's -- if you notice again where his answer on
17 the question, on the blood pressure tracing when he
18 answers "no" to No. 3, there's a blood pressure
19 increase?  See how it starts going up?
20    **Q.   Yes.**
21    A.   So on No. 3, he got the B.
22    **Q.   Okay.  Is there another notation above**
23 **the B?**
24    A.   Yes.  It's the No. 6.  Because on the

Urlaub Bowen & Associates, Inc.   312-781-9586

MICHAEL MASOKAS, 11/05/2019

Page 138..141

Page 138

1 mixed question test, we now compare the relevant
2 questions to the control question. This is where
3 we put them back to back.
4     Q.    Okay.
5     A.    So the 6 above question 3 there, it
6 means that there was a stronger response on 3 than
7 there was on 6.
8     Q.    Okay.
9     A.    So in other words, there was a stronger
10 response to the relevant question 3 than the
11 control question in 6.
12     Q.    With regard to his blood pressure.
13     A.    Overall.
14     Q.    Overall.
15     A.    Yeah, because at 6, we've got no
16 response indicated at all.
17     Q.    Okay.
18     A.    So we would say question 3 is stronger
19 than question 6 on that particular response or
20 test.
21         And then continuing on, the next one
22 is No. 5. And again, with question 5, if you look
23 at the second respiration, at question 5 you see
24 his answer, and if you take your pen and you put

Page 139

1 your pen right on the answer and go up, you can see
2 where he answered the question. But on the second
3 respiration, the bottom part of it? See how it
4 comes off the red line?
5     Q.    Yes.
6     A.    And then there's a baseline rise there.
7 And then it starts to come back to normal again.
8         As well as if you put your pen there
9 where his answer is, you can see right after he
10 answers, the blood pressure starts going up again.
11 And so that's why he got the check and the plus.
12 There's a response in respiration. There's a
13 response in blood pressure.
14         And then we compare that with
15 question 11, which is the next question, and
16 there's not much at question 11 at all considering
17 where he answers the question, and then his next
18 breath is normal. So that's why you see the 11.
19         So question 5 being compared to
20 question 11 is more significant, so it's 5 over 11.
21     Q.    Okay.
22     A.    Next question was question 8.
23         There's a bit of a blood pressure
24 response there. That's why he's got the check with

Page 140

1 the B. Then when you compare that with the next
2 question, which is question 6, the control
3 question; question 8 is -- there's more of a
4 response at 8 than 6. That's why he's got the 6
5 over the check mark. See it? Question 8?
6     Q.    Yes.
7     A.    So now you've got your marks, and what
8 we would do is we would look at the markings.
9         And 3, 5, 8 and 9 -- the four
10 relevant questions -- are more significant
11 consistently than 6 and 11.
12     Q.    I see.
13     A.    Can you see that? Like there's hardly
14 any marks at 6; there's hardly any marks at 11.
15         And so in looking at the
16 consistency, especially that last test, question 3
17 is more significant than 6; question 5 is more
18 significant than 11; question 8 is more significant
19 than 6.
20         And so now we're looking at these,
21 and with the consistency that we have, we evaluated
22 him as being deceptive.
23     Q.    And when you're evaluating whether
24 someone is deceptive, you're making that evaluation

Page 141

1 independently for each of the relevant questions,
2 correct?
3     MS. THOMPSON: Object to form.
4     THE WITNESS: Can you rephrase that?
5 BY MS. RANUM:
6     Q.    Well, you have four relevant questions
7 that you've asked.
8     A.    Yes.
9     Q.    And are you assessing whether each one
10 of those -- whether there was an indication of
11 deception on each one of those?
12     MS. THOMPSON: Object to form.
13     THE WITNESS: Yes.
14 BY MS. RANUM:
15     Q.    So would it be possible that you could
16 have a finding that someone wasn't deceptive on one
17 of the relevant questions but was deceptive on the
18 other three?
19     A.    That's possible.
20     Q.    Okay. But here you found an indication
21 of deception on all four relevant questions?
22     A.    In doing the evaluation with the
23 consistency and responses on each relevant
24 question, we evaluated each question as deceptive.

Page 142

1    Q.   Now, when you're doing those
2 evaluations, what are the possible results?
3 Obviously an indication of deception is one.  What
4 are the alternative results that you could get?
5    MS. THOMPSON:  Object to form.
6    THE WITNESS:  Truthful, inconclusive,
7 unresponsive.  Or there is a final one which would
8 be purposeful noncooperative.
9 BY MS. RANUM:
10    Q.   So truthful, deceptive, nonresponsive,
11 intentionally uncooperative, or inconclusive?
12    A.   Yes.
13    Q.   So there are five possible results for
14 each of the relevant questions?
15    A.   The unresponsive report or result
16 typically would apply to the entire -- to all
17 relevant questions.
18    Q.   I see, okay.
19    A.   In other words, for some reason, we're
20 not getting any responses to any of the questions.
21 That could be a lack of sleep.  That could be
22 medication or some other unknown reason.
23        So the unresponsive more often is
24 going to apply to all questions across the board,

Page 143

1 whereas the truthful, the deceptive, and the
2 inconclusive could be individualized for each
3 question.
4    Q.   For each relevant question?
5    A.   Correct.
6    Q.   What about the intentionally
7 uncooperative?
8    A.   If we reported that, it would primarily
9 be based upon all of the questions.
10    Q.   Okay.  Once you were done scoring the
11 exam, did you have someone else score the exam?
12    A.   Yes.
13    Q.   And who was that?
14    A.   Another examiner Arthur Newey,
15 N-e-w-e-y.
16    Q.   And when you have -- strike that.
17        So then Mr. Newey's asked to score
18 the exam.
19    A.   Yes.
20    Q.   And he's obviously given the chart that
21 we see in Exhibit 5, correct?
22    A.   Yes.
23    Q.   And what else is he given?
24    A.   That's it.

Page 144

1    Well, he's told the questions, and
2 then he just scores them as he sees them.
3    Q.   Is he given your evaluation form that
4 we see in Exhibit 4?
5    A.   No.
6    Q.   Okay.  Do you tell him the results or
7 determinations that you made in the process of your
8 scoring?
9    A.   No.
10    Q.   So then is it a blind scoring of sorts?
11    A.   Yes.
12    Q.   So he doesn't know what determination
13 you've made?
14    A.   Right.
15    Q.   Okay.  And then Mr. Newey also scored
16 the exam?
17    A.   Yes.
18    Q.   Where did he score the exam?
19    A.   That I don't know.  He probably used a
20 scratch pad.
21    Q.   And what was Mr. Newey's result?
22    A.   He was consistent with mine, and we
23 drew the same conclusion.
24    Q.   Was anyone else a part of the scoring

Page 145

1 of the exam?
2    A.   I do not believe so.
3    Q.   Did Detective Cross or Detective
4 Guerreri have any role in scoring the exam?
5    A.   No.
6    Q.   What is the purpose of the blind
7 scoring that Mr. Newey did?
8    MS. THOMPSON:  Object to form.
9    THE WITNESS:  We just want to make sure that
10 we're both consistent; that without really knowing
11 any information, specifics anyway, he's going to be
12 objective in his scoring.
13 BY MS. RANUM:
14    Q.   And so once you've made your final
15 determination that there's an indication of
16 deception, did you communicate that result to
17 Detectives Cross and Detective Guerreri?
18    A.   Yes.
19    Q.   Did you know before administering the
20 polygraph examination that Mr. Amor had been given
21 a polygraph in September of 1995 specifically
22 related to this investigation?
23    A.   I believe I did.  With 100 percent
24 certainty, I cannot say.  But I know in our file we

MICHAEL MASOKAS, 11/05/2019                          Page 146..149

Page 146

1  did have copies of his exam and his wife's, so I'm
2  assuming that we were told that at the time.
3      Q.   Now, would the fact that there had
4  already been a polygraph administered in regards to
5  this investigation a few weeks prior, would that
6  have any impact on your examination?
7      A.   None.
8      Q.   And why is that?
9      A.   Because it was completely independent.
10 We had nothing to do with it.  As far as we're
11 concerned, this is a new investigation.
12     Q.   Okay.  If you could turn back to
13 Exhibit 4, please.
14     A.   Yes.
15     Q.   I just wanted to walk through with you
16 the notations on the right-hand side.
17     A.   Yes.
18     Q.   Can you walk us through these notations
19 and when they were -- first of all, this is all
20 your handwriting, correct?
21     A.   Yes.
22     Q.   And can you walk through when these
23 notations were made?
24     A.   Sure.

Page 147

1           The starting off -- if we go to the
2  top, a little bit to the left where it says Time,
3  do you see that?  If you go to the top and then
4  where I made all my hand notations --
5      Q.   Yes.
6      A.   -- with the times.
7           If you go to the left a little bit,
8  printed in there it says Time.
9      Q.   Okay.
10     A.   And then right next to that, I have
11 written in 4:40.
12     Q.   Yes.
13     A.   At 4:40 p.m., that's when I would have
14 started the pretest interview.  That was written in
15 there at the time the pretest interview began.
16     Q.   Okay.
17     A.   And then there's a slash mark, and then
18 it says 5:20, and right next to that, it says Qs.
19 So at 5:20, I would have stepped out of the
20 interview room to formulate the questions, the test
21 questions.
22           And then to the right of that, it
23 says 5:40 charts and then 6:15 out.  So I ran the
24 test, I ran the polygraph charts from 5:40, and

Page 148

1  then concluded at 6:15.  And that's when I stepped
2  out of the polygraph.
3           And then a little bit further down
4  where it says, Post 6:30, was when we would have --
5  when I would have started the post-test interview.
6  And then right underneath 6:30, it says, 7:30 out.
7  So the post-test interview with myself and Mr. Amor
8  lasted an hour.
9           And then further on down under 7:30,
10 it says, In 7:45, and then you see the equal sign,
11 and it says ATN.
12     Q.   Yes.
13     A.   That's Arthur Newey.  ATN is Arthur
14 Newey.
15           So at 7:45, he and I together went
16 back into the room with Mr. Amor and spoke with him
17 further about his polygraph results.  And we
18 stepped back out at 8:30 for the rundown.
19           The line continues.  It says, ATN
20 in -- that's Arthur Newey -- went back in with
21 Mr. Amor by himself at 8:45, and he came out of the
22 room at 9:15.  So he was in for about a half hour
23 with Mr. Amor.
24           And then further on the arrow points

Page 149

1  further down, where it says NPD, Naperville Police,
2  went in to speak with Mr. Amor at 9:30 until 10:00.
3  And then at 10:00 they came out, and they would
4  have left our office at approximately 10:30.
5      Q.   Okay.
6      A.   Now, as far as the time line, I would
7  have written most of this -- it's all in my
8  writing, but I would have written most of this on
9  10/3, on October 3rd, while I was there in the
10 office.  But at some point, I had left the office.
11 I left there at 9:00, and they were still there, so
12 I would have filled the rest in the next morning
13 when I got back in.  Because Mr. Newey was still
14 there with the investigators.
15     Q.   Thank you.
16           Now, what about the notation above
17 your -- directly above your time line that's sort
18 of in that upper right-hand corner.
19     A.   Yes.
20     Q.   What does that say?
21     A.   It says S with a circle, subject.
22 Subject used the washroom two to three times and
23 was offered cigarettes and water.
24     Q.   Okay.  Where was the washroom located

MICHAEL MASOKAS, 11/05/2019                    Page 150..153

Page 150

1 in regards to your office?

2      A.    It was out by the elevators.  So you
3 had to leave our lobby, and then there was the bank
4 of elevators, and it was on the far side of the
5 elevators, the men's room.

6      Q.    Okay.  And so on the 11th floor but
7 outside of your lobby in the elevator area is where
8 the bathroom is, correct?

9      A.    Yes.

10      Q.    And Mr. Amor used that washroom two or
11 three times, according to your notes?

12      A.    Yes.

13      Q.    Now, next to the questions, there are
14 plus and minus signs after the written questions
15 that you've written out.

16      A.    Yes.

17      Q.    What do those indicate?

18      A.    When we review the questions with him
19 like prior to running of the test.  Just before we
20 begin the test, we review all the questions.  And I
21 read him the question and then have him answer yes
22 or no.

23            And then whatever his appropriate
24 response is, like on question No. 3, On Sunday,

Page 151

1 September 10th, did you do anything to start a fire
2 in your apartment?  And when he verbally answered
3 no, I made the indication that minus sign and then
4 just circled it.  So those are his answers to the
5 questions.

6      Q.    So those are his answers during that
7 time before the actual exam when you're going
8 through the questions with him?

9      A.    Yes.

10      Q.    And then there's a notation under
11 question No. 6.

12      A.    Yes.

13      Q.    What does that notation say?

14      A.    It says, Post, which would have been
15 the post-test interview, the time we spent with him
16 after the conclusion of the exam.  It says, Post
17 denies, says if talked about insurance doesn't
18 recall.

19            So during the post-test interview,
20 we talked to him about the setting of the fire.  We
21 talked to him about the allegations that he and
22 Tina spoke about the insurance money in front of
23 friends and family.  And he continued to deny any
24 discussion about the insurance, even after the

Page 152

1 tests.  So those were my notes.

2      Q.    Okay.  So you had a finding of
3 deception on all four relevant questions, correct?

4      A.    Yes.

5      Q.    And so did Mr. Newey; is that correct?

6      A.    Yes.

7      Q.    That scoring was not in any way
8 influenced by Detective Cross or Detective
9 Guerreri, correct?

10      A.    Not at all.

11      MS. THOMPSON:  Object to form.

12 BY MS. RANUM:

13      Q.    So you've already referenced -- so
14 after the test, did Mr. Amor leave the examination
15 room?

16      A.    Yes.  When we were done running the
17 examination, I moved him back to the original
18 interview room.  It's a little bit bigger, a little
19 bit more comfortable, so he was put in there.

20      Q.    Okay.  And at this point he's still
21 free to leave, correct?

22      A.    Yes.

23      MS. THOMPSON:  Object to form.

24

Page 153

1 BY MS. RANUM:

2      Q.    And was Mr. Amor in the interview room
3 when you went to go communicate the results to
4 Detectives Cross and Guerreri?

5      A.    Yes.

6      Q.    Where did you -- where were you in the
7 office when you communicated those results to
8 Detectives Cross and Guerreri?

9      A.    I can't be specific and certain
10 100 percent, but I believe it was in the lobby of
11 our office.  It was after hours at that point.
12 They were the only ones sitting out there, so I
13 believe that that's where the conversation took
14 place.

15      Q.    Okay.  So to the best of your
16 recollection, Detectives Cross and Guerreri were
17 sitting in the lobby outside of the secure area
18 during the time that you did the actual polygraph
19 examination?

20      A.    Yes.

21      Q.    Was anyone else present for your
22 conversation with Detectives Cross and Guerreri?

23      A.    I think Mr. Newey may have been present
24 at the time.

MICHAEL MASOKAS, 11/05/2019                    Page 154..157

Page 154

1     Q.   What did you discuss with Detectives
2  Cross and Guerreri?
3     A.   The results of the examination; that it
4  was our opinion that he wasn't being truthful.
5     Q.   And did you -- how did the -- did you
6  suggest the post-test interview, or how did that
7  come about?
8     A.   Basic --
9        MS. THOMPSON:  Object to form.
10       THE WITNESS:  Well, basically, whenever we
11  conduct an examination, if someone is not passing,
12  for lack of a better term, if they show deception,
13  it's a standard procedure that we'll talk to them
14  further in an attempt to give them an opportunity
15  to explain as to why they may not be passing.
16  BY MS. RANUM:
17     Q.   Okay.
18     A.   And so it was just -- it's just
19  something that we do as standard practice.
20     Q.   Did you tell Detectives Cross and
21  Guerreri that you intended to do a post-test
22  interview of Bill Amor?
23     A.   Yes.
24     Q.   And did they provide you with any

Page 155

1  questions that they wanted asked in the post-test
2  interview?
3     A.   No.
4     Q.   So were all the questions that were
5  asked in the post-test interview your questions and
6  your questions alone?
7        MS. THOMPSON:  Object to form.
8        THE WITNESS:  Well, and not necessarily an
9  interview, per se.  We're just talking to him
10  pretty much in general terms.  You know, you're not
11  passing on the test.
12  BY MS. RANUM:
13     Q.   Okay.
14     A.   What's going on?
15        So we give him an opportunity to
16  explain.
17     Q.   So you went back into the interview
18  room with Mr. Amor.
19     A.   Yes.
20     Q.   And tell me what you said to Mr. Amor
21  when you went back into the room.
22     A.   Verbatim?  That I do not remember.
23     Q.   You can summarize.
24     A.   Initially, it would have been something

Page 156

1  to the effect of, You're not passing the polygraph
2  test.  The test indicates that you're involved in
3  the setting of the fire.  I just would like to talk
4  to you about this to see if we can clear something
5  up.
6        And then at that point, I more than
7  likely suggested some options as to why he may be
8  failing the test, as to why he might have been
9  involved in setting the fire.
10       He denied it.
11     Q.   And during that post-test interview,
12  Mr. Amor never admitted to starting the fire,
13  correct?
14     A.   Correct.
15     Q.   When you -- was part -- when you went
16  back in the room to talk to Mr. Amor, did you tell
17  him that he was still free to leave?
18     A.   Yes.  I believe I told him that a
19  couple times.
20     Q.   Okay.  And what did he say in response?
21     A.   He said he didn't want to leave.  He
22  wanted to get it straightened out.
23     Q.   Okay.  So you already said I think that
24  you went back in the interview room for about an

Page 157

1  hour, and then after that hour, you came out of the
2  interview room, correct?
3     A.   Yes.
4     Q.   And what did you do at that point?
5     A.   I consulted with Mr. Newey, my
6  associate, as to where we were, what Mr. Amor was
7  saying at that point.  And between the two of us,
8  we decided to go back in and talk to him a little
9  bit more, get a new face in there.  And Mr. Newey's
10  personality is a little bit different than mine,
11  so ...
12     Q.   And how is that?
13     A.   He's more gregarious, and I think his
14  personality kind of lined up a little bit more with
15  Mr. Amor's as far as they seemed to be -- I don't
16  know -- have similar likes and dislikes and stuff.
17  So we kind of thought maybe he might be a better
18  fit in talking to him.
19     Q.   Okay.  So obviously you were making
20  some observations about Mr. Amor.
21        What were your observations of
22  Mr. Amor's personality at that point?
23        MS. THOMPSON:  Object to form.
24        THE WITNESS:  Well, I don't -- he was laid

MICHAEL MASOKAS, 11/05/2019                    Page 158..161

Page 158

1 back.  But just based on some of the things that we
2 learned in speaking with the investigators before
3 the test, it sounded like he was a drinker.  He was
4 a smoker.  Mr. Newey was a smoker; he liked to have
5 a good time; he was a funny guy.
6           And so just overall personality
7 wise, we thought maybe it's just a better fit than
8 me, and so that's why he decided to come in with me.
9 BY MS. RANUM:
10     Q.   Okay.  And the second time that you
11 went back in, approximately how long were you in
12 the interview room with Mr. Newey and Mr. Amor
13 together?
14     A.   Approximately 45 minutes.
15     Q.   And during that time, did Mr. Newey
16 take the lead on the questioning?
17     A.   It was kind of both of us just talking,
18 and Mr. Amor would interject, you know, and kind of
19 a three-way discussion really.
20     Q.   Okay.  And how long did that discussion
21 last?
22     A.   Again, probably about 45 minutes.
23     Q.   During the course of that discussion,
24 Mr. Amor did not admit to starting the fire,

Page 159

1 correct?
2     A.   Correct.
3     Q.   After that second interview, did you
4 and Mr. Newey both come out of the interview room
5 together?
6     A.   Yes.
7     Q.   And what did you do at that point?
8     A.   We consulted, I believe, with the
9 investigators at that point, and we told them that
10 Mr. Amor was not explaining anything, not
11 acknowledging anything; that he's still denying
12 involvement.  And that pretty much was it at that
13 point, as far as what we were discussing with them.
14     Q.   Did you go back into the interview room
15 at all after that second interview?
16     A.   I did not.  Mr. Newey felt that it
17 might be advantageous if he went by himself, so he
18 decided to go in by himself at that point.
19     Q.   Okay.  And I believe you testified that
20 you left the office around 9:00 p.m. that night?
21     A.   Yes.
22     Q.   And so was Mr. Newey in the interview
23 room when you left?
24     A.   Yes.

Page 160

1     Q.   During the course of the time that you
2 spent with Mr. Amor, did he ever tell you that he
3 wanted to leave?
4     A.   No.
5     Q.   Did he ever tell you that he was afraid
6 of Detective Cross?
7     A.   No.
8     Q.   Did he ever tell you that he was afraid
9 of Detective Guerreri?
10     A.   No.
11     Q.   During the time that you spent with
12 Mr. Amor on October 3, 1995, did you ever see
13 Detective Cross hit or in any way physically abuse
14 Bill Amor?
15     A.   No.
16     Q.   And same for Detective Guerreri.
17           During your time on October 3, 1995,
18 did you ever see Detective Guerreri hit or
19 physically abuse Bill Amor?
20     A.   No.
21     Q.   During your time with Mr. Amor on
22 October 3, 1995, did you ever see either Detective
23 Cross or Detective Guerreri yell or verbally abuse
24 Bill Amor in any way?

Page 161

1     A.   No.
2     Q.   During your time with Mr. Amor, did you
3 have any concerns about him not being in a good
4 physical condition to give a polygraph examination?
5     A.   No.
6     Q.   Did you have any concerns about him not
7 being in a physical condition sufficient to sit
8 through a post-test interview with you?
9     A.   No.
10     Q.   And when you left that night and
11 Mr. Newey made a decision to go back in and try to
12 continue the post-test interview, did you have any
13 concerns at that time about Mr. Amor's physical
14 condition?
15     A.   Not at all.
16     Q.   Did Mr. Amor ever say he was hungry or
17 request food in your presence?
18     A.   No.
19     Q.   And you did -- I believe you already
20 said, there's a notation that you offered him
21 water, correct?
22     A.   Yes.
23     Q.   And Mr. Amor was given smoke breaks
24 when requested, correct?

MICHAEL MASOKAS, 11/05/2019                                Page 162..165

Page 162

1    A.   Yes.
2    Q.   Did Mr. Amor ever tell you that he
3  wanted to stop the test?
4    A.   No.
5    Q.   During the course of the -- well, let's
6  start with the pretest process.
7         During the course of the pretest
8  process, did he ever say he wanted to stop either
9  due to his headache or his lack of sleep?
10   A.   No.
11   Q.   During the course of the examination
12  itself, did he ever say he wanted to stop?
13   A.   No.
14   Q.   During the course of the examination,
15  did he ever complain about being tired?
16   A.   No.
17   Q.   Did he ever complain about being tired
18  during the post-test interview?
19   A.   No.
20   Q.   Did he ever say he wanted to stop
21  during the post-test interview?
22   A.   No.
23   Q.   Did he ever complain about his headache
24  during the post-test interview?

Page 163

1    A.   No.
2    Q.   I think you described Mr. Amor as being
3  laid back throughout the process; is that correct?
4    A.   Yes.
5    Q.   Was it your perception that Mr. Amor
6  seemed comfortable during his time at your office?
7    A.   He did.
8         (Deposition Exhibit No. 6,
9          Witness Masokas, was marked for
10         identification 11/05/2019.)
11  BY MS. RANUM:
12   Q.   All right.  Mr. Masokas, I'm showing
13  you a document that is Bates stamped SDT-REID 6, 7,
14  and 8.  It is a three-page document.  Please take a
15  moment to review this document and let me know if
16  you recognize it.
17   MS. THOMPSON:  Sorry.  What exhibit number is
18  this?
19   MS. RANUM:  No. 6.  I'm sorry.
20   THE WITNESS:  This is the written report that
21  I submitted to Naperville.
22  BY MS. RANUM:
23   Q.   Okay.  Did you author this report?
24   A.   Yes.

Page 164

1    Q.   Is that your signature that appears on
2  the last page of the report?
3    A.   Yes.
4    Q.   Did you finalize this report and send
5  it out on October 20, 1995?
6    A.   Yes.
7    Q.   Okay.  And this report is concerning
8  the October 3, 1995, polygraph examination of
9  Mr. Amor, correct?
10   A.   Yes.
11   Q.   The same one we've talked about
12  extensively today?
13   A.   Yes.
14   Q.   On the second page towards the bottom,
15  it says, There were significant emotional responses
16  indicative of deception throughout the subject's
17  polygraph records when asked the following
18  questions.
19        And then you list out four questions
20  there.  Do you see that?
21   A.   Yes.
22   Q.   Are those the same relevant questions
23  that we've discussed at length today from Exhibit
24  No. 4?

Page 165

1    A.   Yes.
2    Q.   And those are the relevant questions
3  that were posed to Mr. Amor during the polygraph
4  examination, correct?
5    A.   Yes.
6    Q.   And these are the same results that you
7  communicated to Detectives Cross and Detective
8  Guerreri in John Reid's office on October 3, 1995,
9  correct?
10   A.   Yes.
11   Q.   Now, we've obviously gone through the
12  chart that can be seen in Exhibit 5 at length today.
13        In re-reviewing that chart today, is
14  it still your opinion that Mr. Amor was deceptive
15  on all four of these questions --
16   A.   Yes.
17   Q.   -- during your examination?
18   A.   Yes.
19        (Deposition Exhibit No. 7,
20         Witness Masokas, was marked for
21         identification 11/05/2019.)
22  BY MS. RANUM:
23   Q.   Mr. Masokas, I'm showing you what we've
24  marked as Exhibit No. 7 to your deposition.  It is

MICHAEL MASOKAS, 11/05/2019                          Page 166..169

Page 166

1 a document Bates stamped SDT-REID 16.
2          Is this the invoice that was sent
3 out to the Naperville Police Department regarding
4 the polygraph examination that was done of Bill
5 Amor on October 3, 1995?
6    A.   Yes.
7    Q.   Okay.  And it looks like the cost was
8 $450 for 4 and a half hours?
9    A.   Yes.
10   Q.   And was that -- did you have like a
11 standard fee that you charged in 1995?
12   A.   I'm sure there was.  I don't remember
13 exactly what it was.  The fees changed over time.
14 So 20 years ago, right now, I can't specifically
15 say.
16   Q.   Any reason to believe that Naperville
17 was charged more or less than your normal fee?
18   A.   No.
19   Q.   Okay.
20   A.   No.
21   Q.   Thank you.
22       MS. RANUM:  Mind if we take a two-minute
23 break?  I think I'm just about done.
24          (Recess taken.)

Page 167

1    MS. RANUM:  Back on the record.
2 BY MS. RANUM:
3    Q.   Okay, Mr. Masokas.  Just a couple more
4 questions for you.
5          We talked a little bit about that
6 there's this examination room that you would have
7 been in with Mr. Amor for the actual examination.
8    A.   Yes.
9    Q.   And inside that room is the machine
10 that he's essentially hooked up to, correct?
11   A.   Yes.
12   Q.   And who places the blood pressure cuff
13 and the monitors and the finger clips onto Mr. Amor?
14   A.   I do.
15   Q.   You did that?
16   A.   Yes.
17   Q.   And when we went through your charts in
18 Exhibit 5, which we obviously went through all the
19 results today, was there anything in there that
20 indicated to you that a lack of sleep or sleep
21 deprivation was impacting the output that you were
22 getting on your charts?
23   A.   No.
24   Q.   And what would you be looking for -- or

Page 168

1 strike that.
2          What would you expect to see if you
3 thought sleep depression -- sleep depravation is
4 impacting this test?  What would you expect the
5 results to look like?
6    A.   Earlier you had asked me what are the
7 different types of results you report on, and one
8 of those I had mentioned was unresponsive.  And so
9 that would be typical of someone who's just
10 exhausted, lack of sleep, or could be heavily
11 medicated, and there would be no response on
12 anything.  Respiration there would be nothing, the
13 GSR nothing, the blood pressure nothing.  It would
14 be absent of any response at all.
15   Q.   Thank you.
16          Do you mind referring back to
17 Exhibit No. 4.  I just have a couple more questions
18 for you.
19          Now, with regard to the time line
20 that we went over on the right-hand margin of the
21 sheet, to the best of your recollection, is this
22 time line accurate as to the time that you spent
23 with Mr. Amor on October 3, 1995?
24   A.   Yes.

Page 169

1    Q.   Now, if we look at the scoring that you
2 did on the left-hand side, I do have a question for
3 you.
4          If you look at question No. 9 --
5    A.   Uh-hmm.
6    Q.   -- the straight through answer No. 2
7 test.
8    A.   Straight through No. 2, uh-huh.
9    Q.   Is that an 11 above the check mark?
10   A.   It is.
11   Q.   What does that signify?
12   A.   Well, if you look at question 11, right
13 underneath it, there's no check.  So the response
14 on question 9 was more significant than 11.  So
15 because they were next to each other, question 9
16 and then question 11, we just kind of compared the
17 two at that point.  So it was 9 over 11, which
18 means question 9 was a bit more significant than
19 11.
20   Q.   Okay.  So we talked a lot about, you
21 know, using the control questions for comparison
22 purposes on the mixed question test, and we went
23 through each of those notations earlier today,
24 correct?

MICHAEL MASOKAS, 11/05/2019                                    Page 170..173

Page 170

1    A.   Yes.
2    Q.   Are you also doing that with the
3 straight through tests No. 1 and 2?
4    A.   No, not normally.  But simply because
5 9 and 11 were next to each other, I just made the
6 notation.
7    Q.   Okay.  I asked you a little bit in the
8 beginning about the process for a polygraph
9 examination when someone is in custody versus not
10 in police custody.  Do you remember talking about
11 that?
12    A.   Yes.
13    Q.   And I believe you testified that if
14 someone is in custody, they would not be left in
15 the lobby, correct?
16    A.   Yes.
17    Q.   And they would typically be escorted
18 around your office by one of the police officers
19 who had brought them to your office; is that
20 correct?
21       MS. THOMPSON:  Object to form.
22       THE WITNESS:  Yes.
23 BY MS. RANUM:
24    Q.   Okay.  Would the -- if someone is in

Page 171

1 custody, would a police officer sit in on any of
2 the components that we've discussed today, whether
3 it be the pretest interview, the exam itself, or
4 the post-test interview?
5    A.   No.
6    Q.   Okay.  So that's consistent both for
7 someone who's in custody and not in custody.
8    A.   Yes.
9    Q.   Okay.  If a person is in custody, would
10 you go through or would you have a police officer
11 go through their Miranda rights with them?
12       MS. THOMPSON:  Object to form.
13       THE WITNESS:  Yes.
14 BY MS. RANUM:
15    Q.   Okay.  I believe earlier you were
16 uncertain of whether the police officers told you
17 that Mr. Amor was not in custody, and so I just
18 wanted to go through your motion to suppress
19 testimony with you briefly.
20       (Deposition Exhibit No. 8,
21         Witness Masokas, was marked for
22         identification 11/05/2019.)
23 BY MS. RANUM:
24    Q.   I'm showing you what's been marked as

Page 172

1 Exhibit No. 8.  I will represent to you that this
2 is -- this was received by our office and is your
3 March 6, 1996, motion to suppress testimony.  And
4 you can look at as much of it as you'd like.
5       But I'm curious, you testified you
6 had an opportunity to review your testimony
7 recently.  Is this the testimony you reviewed?
8    A.   Yes, I believe so, yes.
9    Q.   And you only testified at that one
10 motion to suppress hearing with regards to Bill
11 Amor, correct?
12    A.   Yes.
13    Q.   I'd like to direct your attention to
14 pages 16 and 17.  If you could just read those
15 pages quietly to yourself, and then I'll have a
16 couple questions.
17    A.   Okay.
18    Q.   Now, we talked earlier about the fact
19 that after Mr. Amor arrived with Detectives Cross
20 and Guerreri at your office, Mr. Amor waited in the
21 lobby and you met with the detectives in the
22 library of your office, correct?
23    A.   Yes.
24    Q.   And does this refresh your recollection

Page 173

1 as to whether in that meeting with Detectives Cross
2 and Guerreri they told you Mr. Amor was not in
3 custody?
4    A.   Yes.
5    Q.   And did they in fact tell you he was
6 not in custody?
7    A.   Yes.
8       MS. RANUM:  I believe that plaintiff's
9 counsel has some questions for you at this time.  I
10 don't have any further questions for you.  Thank
11 you for your time.
12       THE WITNESS:  You're welcome.
13             EXAMINATION
14 BY MS. THOMPSON:
15    Q.   Good afternoon, sir.  As I told you
16 earlier in this deposition, my name is Tara
17 Thompson.  I'm one of the attorneys for the
18 plaintiff in this case, and I do have additional
19 questions for you.
20       And just like Counsel told you at
21 the beginning of the deposition, if there's any
22 questions I ask that are unclear, please let me
23 know.  I'll try to rephrase them.  But I want to
24 make sure that if you don't indicate in response to

MICHAEL MASOKAS, 11/05/2019                                    Page 174..177

Page 174

1 a question that there's something that's confusing
2 about it, I'm going to assume that you understood
3 the question. Okay, sir?
4    A.   Yes.
5    Q.   All right. I take it that in
6 preparation for this deposition today you reviewed
7 your file you reviewed -- let me strike that
8 question.
9         I take it in preparation for your
10 deposition today you reviewed the file that John
11 Reid & Associates had about Mr. Amor's polygraph
12 and interrogation from October 3rd of 1995; is that
13 correct?
14   A.   Yes.
15   Q.   And it sounds like you also reviewed a
16 copy of your March 6, 1996, testimony that you just
17 referenced; is that correct?
18   A.   Yes.
19   Q.   Are there any other documents that you
20 reviewed in preparation for this deposition?
21   A.   In regards to this case specifically,
22 no.
23   Q.   Were there documents you reviewed that
24 were not related to this case specifically to

Page 175

1 prepare for this deposition?
2    A.   I reviewed prior testimony.
3    Q.   What testimony did you review?
4    A.   The Juan Rivera deposition.
5    Q.   Was that a deposition in which you were
6 defended by the firm that represents the defendants
7 in this case?
8    A.   Yes.
9    MS. RANUM: Objection to form.
10   MS. THOMPSON: Okay. I think we got an
11 answer there.
12   MS. RANUM: I want to clear up the record.
13 Our firm did not represent him in the Juan Rivera
14 case.
15   MS. THOMPSON: That's what the deposition
16 says.
17   MR. NYESTE: No, that wouldn't be accurate.
18   MS. THOMPSON: It says it's Sotos.
19   MR. NYESTE: No. He was represented by
20 Swanson, Martin & Bell.
21   MS. RANUM: Yeah.
22   THE WITNESS: Sorry. I misunderstood your
23 question.
24

Page 176

1 BY MS. THOMPSON:
2    Q.   Let me -- I think with that
3 understanding, let me ask you this question.
4         Since you've had a chance to review
5 that deposition testimony, do you stand by the
6 testimony that you gave in that case?
7    MR. NYESTE: Objection as to form.
8    THE WITNESS: Yes.
9 BY MS. THOMPSON:
10   Q.   Well, in your review of that deposition
11 in preparation for today, was there any testimony
12 you saw that you gave in that deposition that you
13 want to amend or correct?
14   A.   No.
15   Q.   In 1995, you had the title of director
16 of the services division of John E. Reid &
17 Associates; is that correct?
18   A.   Yes.
19   Q.   What was the services division in 1995?
20   A.   Services division provided services to
21 the community, polygraph services, interview
22 services, for various clients and customers.
23   Q.   That included law enforcement customers?
24   A.   Yes.

Page 177

1    Q.   And as director of the services
2 division, what responsibility did you have over
3 interviewing services that were provided to the
4 community?
5    A.   Well, this would go back to an earlier
6 question. In 1988, I was promoted to the chief
7 polygraph examiner position to where I oversaw the
8 other examiners, interviewers, consulted with
9 their -- with them on their cases. The title
10 changed over a period of time.
11        So the title changed from chief
12 polygraph examiner to director of services. So it
13 was basically the same capacity, just a different
14 name for the position. But I had the same
15 responsibilities, just overseeing the staff that
16 worked in the services division.
17   Q.   Okay. In 1995, had you been certified
18 in the use of Reid Technique?
19   A.   Yes.
20   Q.   And can you tell -- let me start the
21 question again.
22        Can you explain to me what it means
23 to be certified in the Reid Technique?
24   MS. RANUM: Object to form.

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 178

1    THE WITNESS:  Well, I have the knowledge and
2  the experience to apply the Reid Technique as to
3  how it's outlined.  I follow the methodology as to
4  the training and the acceptance of the procedures
5  and the policies of Reid & Associates.
6  BY MS. THOMPSON:
7    Q.    As of today, when was the last time
8  that you conducted a polygraph examination?
9    A.    2004.
10    Q.    And do you have any -- I think you were
11  asked some questions about how many polygraph exams
12  you've conducted as of 1995.
13         In total in your career, how many
14  polygraph examinations have you conducted?
15    A.    Breaking down polygraphs specifically?
16  I would say several thousand.
17    Q.    In your career in total, how many times
18  have you interviewed someone about the results of
19  the polygraph examination?
20    A.    Again, probably several thousand.
21    Q.    All right.  And prior to the review of
22  your file to prepare for this deposition, when is
23  the last time you thought at all about your
24  interrogation or polygraph exam of Mr. Amor?

Page 179

1    A.    Prior to preparation for this?
2    Q.    Yes.
3    A.    1995.
4    Q.    Do you have an independent memory of
5  all of the polygraph examinations and interviews
6  that you've conducted in your career as you sit
7  here today?
8    A.    Can you please ask the question again?
9    Q.    Sure.  Let me ask you that again.
10         As you sit here today, do you have
11  an independent memory of all of the interviews or
12  polygraph examinations that you conducted in your
13  career?
14    A.    No.
15    Q.    How many times have you given testimony
16  in criminal court about a polygraph exam or an
17  interview that you conducted over the course of
18  your career?
19    A.    I would say a dozen approximately.
20    Q.    When was the last time that you gave
21  testimony in a criminal matter about a polygraph
22  exam or an interview that you conducted?
23    A.    At a trial?  In a courtroom?
24    Q.    That's a fair clarification.

Page 180

1         So when I say give testimony in a
2  criminal matter, I'm asking you about either a
3  criminal trial or a criminal pretrial proceeding, a
4  suppression hearing, some proceeding related to a
5  criminal matter.
6    A.    It would have -- I'm guessing on the
7  year, I can't be exact.  Maybe '09, 2010.
8    Q.    And do you remember what the name of
9  the defendant in the case that you're --
10    A.    Sure.
11    Q.    What case was that?
12    A.    The Rivera case.
13    Q.    Is there something in particular about
14  Mr. Amor's case that gives you a memory of this
15  particular exam or interrogation out of, you know,
16  all of the exams or interrogations that you've
17  conducted in your career?
18    A.    Yes.
19    Q.    What is that?
20    A.    A couple of things.
21         First, his name.  He had a very
22  unusual name:  Amor.  And so when I was talking to
23  my associate when he came in, we thought it was
24  more like love, and so we thought that would be

Page 181

1  kind of a cool name.  And so it was just something
2  about him that stuck out with the name.
3         And the other thing was his attitude
4  or his demeanor in the post-test.  He was very --
5  and I say attitude.  He was very acceptant of what
6  we were saying, very agreeable to what we were
7  saying, which was unusual considering the issue we
8  were dealing with.
9    Q.    When you say that he was acceptant or
10  agreeable, can you tell me what you mean.
11    A.    When we were -- when I was speaking
12  with him after the polygraph exam and trying to
13  figure out why he's not passing the test, I had
14  suggested maybe it was a situation that he was
15  talked into getting involved with someone in doing
16  something like this, or possibly he had been
17  drinking the night of the fire and just something
18  came over him.  Just making suggestions as to what
19  could have prompted something like this.
20         And he was listening, and at times
21  he was nodding his head and just accepting these
22  different possibilities and really not rejecting as
23  though they would sound ridiculous.  And so when I
24  say acceptant, that's what I mean.

MICHAEL MASOKAS, 11/05/2019                    Page 182..185

Page 182

1      Q.   And so I think -- and correct me if
2  I've got this wrong -- but it sounds like when you
3  are describing him as accepting, you're describing
4  a demeanor of -- not of rejection.  Is that a fair
5  assessment?
6      A.   Yes.
7      Q.   I mean, it's not that he was saying
8  words that indicated acceptance, but it was his
9  demeanor that to you reflected acceptance.
10     A.   Yes.
11     Q.   And you found that demeanor unusual in
12 the context of all the people that you interviewed
13 in the course of your career at that time; is that
14 correct?
15     A.   Yes.  But not only that, but also in
16 regards to our training.  In our training, we say
17 consistently and historically what we've seen is
18 that when individuals tend to be more acceptant,
19 not rejecting, more often than not, it's a sign of
20 deception.
21     Q.   What does your training tell you about
22 why that's a sign of deception?
23     A.   Because on the flip side of the coin,
24 we find that when truthful people are offered

Page 183

1  various scenarios and suggestions, they immediately
2  reject the --
3          (Brief interruption.)
4      THE REPORTER:  I apologize.  I'm so sorry.  I
5  didn't hear that last part.  "Various scenarios and
6  suggestions, they immediately reject ...
7      THE WITNESS:  Reject the thought of doing
8  something of that nature.  That it's not in their
9  character, and that it's -- they're almost offended
10 by the fact that we would even suggest it.
11 BY MS. THOMPSON:
12     Q.   Does your training indicate to you that
13 acceptance in the context of the demeanor that you
14 described here can be an indicator that someone is
15 tired?
16     A.   Is tired?
17     Q.   Yes.
18     MS. RANUM:  Objection to form, foundation.
19     THE WITNESS:  No, no.  Not in the full
20 context of what you're asking.
21 BY MS. THOMPSON:
22     Q.   Can you explain what you mean by that?
23     A.   Taking everything into consideration,
24 overall if they've expressed -- expressed verbally

Page 184

1  they're tired, if they look tired, if they've asked
2  for numerous breaks, if they say they're not
3  feeling well, none of that occurred.
4          And so based on his demeanor, as you
5  said earlier, there was no indicator that he was
6  tired or exhausted at all.
7      Q.   How many breaks is numerous in your
8  mind?  You said if someone's taking numerous
9  breaks, and I guess my question for you is:  How
10 many breaks in the context of what occurred with
11 Mr. Amor would you consider to be numerous?
12     A.   I can't give a specific number.  But if
13 I were to guess, every 10 minutes, every 15
14 minutes.
15     Q.   Could acceptance, again in the context
16 of the demeanor that you've described here, be an
17 indicator that someone has a personality that is
18 particularly acquiescing of authority figures?
19     MS. RANUM:  Objection to form and foundation,
20 calls for speculation.
21     THE WITNESS:  Again, in the full context of
22 what we're talking about -- I mean, is it possible?
23 Yes.  But in the full context of, again as I just
24 described, we went through an interview prior to

Page 185

1  the polygraph.  We went through the polygraph.
2  There was prior discussion.  Nothing -- there was
3  nothing there that were to suggest that there was a
4  problem.
5  BY MS. THOMPSON:
6      Q.   Well, in the course of the entirety of
7  your interactions with Mr. Amor on October 3rd of
8  1995, is there anything you asked him to do that he
9  didn't do?
10     A.   No.
11     Q.   I mean, he agreed to every request that
12 you made of him during the entirety of the time you
13 were with him, correct?
14     A.   Yes.
15     MR. NYESTE:  Objection as to form.
16     THE WITNESS:  Yes.
17 BY MS. THOMPSON:
18     Q.   Do you have people in the course of
19 interviews who, you know, reject requests that you
20 make of them?
21     A.   Yes.
22     Q.   He wasn't that guy, right?
23     MS. RANUM:  Objection to form.
24     MR. NYESTE:  Join.

MICHAEL MASOKAS, 11/05/2019                               Page 186..189

Page 186

1    THE WITNESS:  Correct.
2 BY MS. THOMPSON:
3    **Q.   Is there anything in your mind that**
4 **acceptance in the context of the demeanor that**
5 **you've described Mr. Amor having might indicate**
6 **besides deception?**
7    MR. NYESTE:  Objection as to form.
8    MS. RANUM:  I'm sorry.  Can you read that
9 back?
10        (The record was read as follows:
11        Q. Is there anything in your
12        mind that acceptance in the
13        context of the demeanor that
14        you've described Mr. Amor
15        having might indicate besides
16        deception?)
17    MS. RANUM:  Objection to form.
18    THE WITNESS:  Again, taking everything into
19 context from the beginning until where we were at
20 that point, I would say no.
21 BY MS. THOMPSON:
22    **Q.   And when you say "no," you mean it is**
23 **your opinion, given the sum total of everything**
24 **that you observed about Mr. Amor and your**

Page 187

1 **experience with polygraph examinations and**
2 **interrogations, that Mr. Amor's acceptance as you**
3 **described it could only indicate deception and**
4 **nothing else?**
5    MR. NYESTE:  Objection as to form and
6 misstates what he's testified to.
7    MS. RANUM:  Objection to form.
8    THE WITNESS:  I'm not a psychologist.
9 Anything is possible.  But based on the way we were
10 trained, based on what we teach, based on history
11 and consistency and observations and studies and
12 research, what I saw at that time was my opinion
13 was more deception.
14 BY MS. THOMPSON:
15    **Q.   Well, you're saying more deception.**
16    A.   Well, was deception, yes.
17    **Q.   And it couldn't be anything else.**
18    A.   I mean, again, I'm not a psychologist
19 to get inside Mr. Amor's head.  But taking
20 everything into consideration, the way I just
21 described it, what I saw, what I observed in
22 regards to acceptance in regards to his demeanor,
23 yes.
24    **Q.   Do you have any experience yourself in**

Page 188

1 the investigation of fires?
2    A.   No.
3    **Q.   Have you ever received any particular**
4 **training on the conducting of polygraph**
5 **examinations or interrogations in the context of a**
6 **fire investigation or an arson investigation?**
7    A.   Specific training?
8    **Q.   Yes.**
9    A.   No.
10    **Q.   In your training on the use of the Reid**
11 **Technique and polygraph examinations, did you ever**
12 **receive any particular training about conducting**
13 **polygraph examinations of people who are alcoholics?**
14    A.   Again, that I have it correct, you're
15 asking specific training in regards to that?
16    **Q.   Yes.**
17    A.   No.
18    **Q.   Did John E. Reid & Associates, as of**
19 **October of 1995, have any particular policies or**
20 **procedures about the conducting of polygraph**
21 **examinations of people who were alcoholics?**
22    A.   No.
23    **Q.   In your experience, are there any**
24 **different steps that a polygraph examiner should**

Page 189

1 **take when they become aware that the person that is**
2 **going to be the subject of a polygraph examination**
3 **is an alcoholic?**
4    A.   Well, we would want to find out when
5 the last time they consumed any alcohol.
6    **Q.   And why is that?**
7    A.   Because if they're intoxicated, we
8 would not conduct the test.
9    **Q.   Is there anything else as of October of**
10 **1995 that John E. Reid's policies and procedures**
11 **would say to do on if subject of a potential**
12 **polygraph examination is an alcoholic?**
13    A.   No.
14    **Q.   In October of 1995, given your**
15 **understanding of the proper way to apply the Reid**
16 **Technique to interrogations, is there anything that**
17 **an interrogator needed to do if they determined**
18 **that the person they were questioning was an**
19 **alcoholic?**
20    MS. RANUM:  Objection to form.
21    THE WITNESS:  No.
22 BY MS. THOMPSON:
23    **Q.   When a person is applying the Reid**
24 **Technique to question a person, can the fact that**

MICHAEL MASOKAS, 11/05/2019                    Page 190..193

Page 190

1  someone is experiencing alcohol withdrawal create a
2  risk that that person would give false information
3  to the interrogator in order to end an interview?
4       MS. RANUM:  Objection to form, foundation,
5  calls for speculation.
6       THE WITNESS:  If you're asking me if it's a
7  possibility, in the broad picture, I would say
8  anything is possible, yes.  But if the guidelines
9  are followed -- you're talking about applying the
10 Reid Technique.  If the guidelines are followed and
11 we adhere to the policies and procedures of
12 applying the Reid Technique, I would say no.
13 BY MS. THOMPSON:
14      Q.   I want to ask you about Exhibit 3, if
15 you have that in front of you, sir.  That's your
16 notes for Mr. Amor's exam.
17      A.   Yes.
18      Q.   To make sure we're on the same page,
19 this is the ones that have the numbers on the top.
20 We're looking at the same one, sir?
21      A.   Yes.
22      Q.   Thank you.  I'm going to have you turn
23 to page 2.
24           You testified earlier, it looks like

Page 191

1  there's a first line there that where it talks
2  about Tina and mom --
3       A.   Yes.
4       Q.   -- correct?
5            And then the sort of second section
6  of notes on this page 2 of Exhibit 3, which is
7  SDT-REID 49, that's where you made some notations
8  about alcohol, correct?
9       A.   Yes.
10      Q.   How did the topic of alcohol come up in
11 your interview of Mr. Amor that's reflected in this
12 portion of your notes on Exhibit 3?
13      A.   I believe that may have come up through
14 what I was told by the investigators when they gave
15 me their background information.  I'm not sure.
16           Can I check prior notes?
17      Q.   Sure.  Please check your notes and just
18 tell me where you're reviewing to try to refresh
19 your memory, if you find something.
20      A.   I will.
21           I believe in the information that
22 was provided by the investigators prior to the
23 examination when they first came in.  This is in
24 regards to Exhibit No. 1.

Page 192

1       Q.   Yes, sir.
2       A.   On the backside, the second page.
3       Q.   Are you looking at SDT-REID 22?
4       A.   Yes, yes.
5       Q.   Okay.
6       A.   About halfway down, they had said that
7  after a number of different interviews subject 1,
8  Mr. Amor, says that he spilled vodka and may have
9  left a burning cigarette in the ashtray that might
10 have fallen out.
11           And so I was just, in regards to
12 that, was determining whether or not he'd been
13 drinking on the day in question.
14      Q.   Did the detectives in your
15 pre-interview with them tell you Mr. Amor was a
16 person who had a problem with his level of drinking?
17      A.   No.  That would have been in the notes.
18 Because again, they're talking, I'm writing.  And I
19 don't see anything in here, no.
20      Q.   Is that something that you would have
21 noted if that's something that they had told you?
22      A.   Yes.
23      Q.   Would that have been information that
24 you would have wanted to know in examining and

Page 193

1  questioning Mr. Amor on October 3rd of 1995?
2       A.   I mean, it could have been helpful,
3  yes.
4       Q.   In your experience, do people who have
5  a problem with alcohol frequently try to hide that
6  fact from other people?
7       MS. RANUM:  Objection to form and foundation.
8       THE WITNESS:  I don't know for sure.  I would
9  imagine.
10 BY MS. THOMPSON:
11      Q.   While we're on Exhibit 1, let me ask
12 you a couple other questions while we have this in
13 front of us.
14           Looking at that same page,
15 SDT-REID 22, this top section of it.
16      A.   Yes.
17      Q.   Where it talks about S2 and S3 say left
18 apartment at 6:25.  You see where I'm looking?
19      A.   Yes, ma'am.
20      Q.   I think it was your testimony before
21 that at some point you determined that although
22 this said S2 that that was actually incorrect; is
23 that right?
24      A.   Yes.

MICHAEL MASOKAS, 11/05/2019                    Page 194..197

Page 194

1    Q.   How did you determine that was wrong?
2    A.   Because it was William and Tina who
3 left the apartment to go to the movies at
4 approximately 6:25.  And so page -- this is page --
5 the front side, this would be the backside.
6         And so as I was writing, I didn't
7 want to keep flipping over to reference who's S1,
8 S2, and so I just wrote down the wrong number.  So
9 it's actually William and Tina that left at
10 approximately 6:25 and 6:30.  So when I was
11 reviewing this (indicating), recently, I realized
12 that I had got the number wrong.
13   Q.   And is that the same with, S2 denies
14 any knowledge of insurance policy?  Did you learn
15 that when you were re-reviewing your notes?
16   A.   Yes, ma'am.
17   Q.   Similarly -- and I don't mean any
18 disrespect to anybody -- but these are your notes,
19 so I'm going to refer to them as worded.
20        Your notes indicate, S2 mentally
21 retarded.  Do you see that?
22   A.   Yes.
23   Q.   Was it indicated to you that it was
24 Marianne Miceli who potentially had a problem with

Page 195

1 her cognitive abilities?
2    A.   Yes, I believe that was correct.  Right
3 now as I think back to the best of my recollection,
4 yes.
5    Q.   When the -- well, let me ask you this
6 too.
7         Looking at page 1 of Exhibit 1, so
8 SDT-REID 21, you said you had not known either
9 Detective Cross or Detective Guerreri before they
10 came that day with Mr. Amor, correct?
11   A.   Yes.
12   Q.   Did Detective Cross introduce himself
13 to you as Mike?
14   A.   He may have possibly.  I don't know.
15   Q.   Did Mr. Guerreri introduce himself to
16 you as Bob?
17   A.   Could be.  I have his first name down
18 there, so I would guess he did.
19   Q.   And I note that for the investigator
20 box there, Bob's last name doesn't appear; is that
21 correct?
22   A.   Right.
23   Q.   Do you know why you didn't write down
24 the last name?

Page 196

1    A.   I didn't know how to spell it.
2    Q.   That's fair.  I don't either.
3         Are there any other details that you
4 recall being given by the detectives that don't
5 appear in the notes that you took in Exhibit 1?
6    A.   No.
7    Q.   Did the detectives express to you any
8 question about whether or not the fire that they
9 were investigating was an arson?
10   A.   I'm sorry.  I spaced out for a second.
11 Could you please repeat that?
12   Q.   And let me give you a -- let me
13 actually ask that question in a better way, so I'll
14 re-ask the question.
15        In your pre-meeting with Detective
16 Cross and Detective Guerreri where you were taking
17 the notes that are on Exhibit 1, did they indicate
18 to you that they were investigating whether or not
19 the fire at issue in this case was an arson?
20   A.   Yes.  Yes, I'm sure.
21   Q.   Well, do your notes -- is there some
22 portion of your notes that reflect to you that they
23 gave you an indication that they were investigating
24 whether or not this was an arson?

Page 197

1    A.   Well, just the fact that they had
2 referred, I believe, to Mr. Amor as a suspect.  And
3 so if someone's a suspect in a fire, then I would
4 imagine there's a question as to whether or not it
5 was set deliberately.
6    Q.   My specific question for you is:  Did
7 they indicate to you that they had some doubt as to
8 whether or not this fire was intentionally set at
9 the time that you were talking to them and taking
10 the notes that are reflected in Exhibit 1?
11   A.   Specifically, I don't know.
12   MS. RANUM:  Objection to form.
13   THE WITNESS:  I don't remember at this point.
14 BY MS. THOMPSON:
15   Q.   You've had chance to review your notes
16 in connection with this deposition today; is that
17 correct?
18   A.   Yes.
19   Q.   And by that, I mean during the
20 deposition itself.
21   A.   Yes.
22   Q.   Were there any notes that you reviewed
23 in looking at Exhibit 1 that to you potentially
24 reflect that they told you that they had some

Page 198

1 question about whether or not this was an arson,
2 meaning some doubt as to whether or not it was an
3 arson?
4    A.   No.
5    Q.   Were these notes that you took in
6 Exhibit 1 essentially in chronological order of
7 what they told you?
8    A.   Yes, yes.  This is where we started,
9 and this is continued on the next page.
10   Q.   So the first thing they told you was
11 that there was a $100,000 life insurance policy on
12 Ms. Miceli?
13   A.   Yes.
14   Q.   And they then told you she died of
15 smoke inhalation and so forth; is that correct?
16   A.   Yes.
17   Q.   And I want to go back to one thing from
18 earlier.
19        And let me just state to you, sir --
20 and I think to whoever is here -- that when I
21 looked at a copy of your deposition from the Juan
22 Rivera case, the cover sheet reflects that -- and
23 it sounds like it reflects in error -- that The
24 Sotos Firm represented you in that case.

Page 199

1        Obviously I wasn't trying to imply
2 something that's not true, but that's what the
3 cover sheet reflects.
4    MR. NYESTE:  I think it indicates Mr. Haley's
5 name first before Sotos, and so Haley of Swanson,
6 Martin & Bell represented Mr. Masokas.
7    MS. THOMPSON:  I'm not disputing that that's
8 the case.
9 BY MS. THOMPSON:
10   Q.   And I guess my question for you is:  In
11 preparing for this deposition, did you talk with
12 anybody from The Sotos Firm about your testimony
13 here today?
14   A.   Well, yes, we had a discussion.
15   Q.   With The Sotos Firm?
16   A.   Yeah.
17   Q.   When did you all talk?
18   A.   Oh, gosh.  Maybe a month ago.
19   Q.   How long was your conversation?
20   A.   Hour, 90 minutes.
21   Q.   Who did you meet with?
22   A.   I remember Carson because it's a cool
23 name, and Laura.
24   Q.   Was there anybody else present besides

Page 200

1 Carson and Laura?
2    A.   Yes.  Charles Marino, an attorney for
3 John Reid & Associates.
4    Q.   I take it that you're now retired from
5 John Reid & Associates; is that right?
6    A.   No, I'm part-time.
7    Q.   Okay.  And what do you -- what is your
8 current role with John Reid & Associates?
9    A.   I am an instructor.
10   Q.   What do you instruct?
11   A.   On the Reid Technique of interview
12 interrogation.
13   Q.   Do you have any current role in
14 instruction on polygraph examinations?
15   A.   No.
16   Q.   When is the last time you were an
17 instructor on the topic of polygraph examination
18 with John Reid & Associates or through John Reid &
19 Associates?
20   A.   1985, '86.
21   Q.   In 1995, were you an instructor with
22 John Reid & Associates on the topic of the use of
23 the Reid Technique?
24   A.   No.

Page 201

1    Q.   When did you start becoming an
2 instructor on that topic?
3    A.   Full-time, 2005.
4    Q.   What about in a part-time capacity?
5    A.   Part-time, 2000.
6    Q.   Do you still have any of your materials
7 from any training that you've received on the Reid
8 Technique at any point?
9    A.   Oh, gosh.  I may.  It's possible.
10   Q.   Do you like have an area of your home
11 or office where you store those kinds of materials?
12   A.   Could be in the attic.  Could be in the
13 basement.
14   Q.   I think you testified earlier that --
15 and we looked obviously at a copy of the bill from
16 John E. Reid & Associates to Naperville for this
17 work.
18        Was there any professional agreement
19 in 1995 between John E. Reid & Associates and the
20 Naperville Police Department about how much Reid &
21 Associates would charge Naperville, or how much
22 Naperville would consult with Reid & Associates, or
23 any aspect of the relationship?
24   A.   No.

MICHAEL MASOKAS, 11/05/2019                    Page 202..205

Page 202

1      MS. RANUM:  Objection to form.
2 BY MS. THOMPSON:
3      Q.   When did you learn that the Naperville
4 Police Department would be bringing in Mr. Amor for
5 a polygraph and an interview on October 3rd of 1995?
6      A.   That I don't remember specifically.  I
7 can't recall when I personally would have heard
8 they were coming in.  I don't remember speaking to
9 them ahead of time to set up an appointment.  I
10 don't know how they came to be on the schedule.
11 The first time I found out would have been I'm sure
12 prior to them arriving on October 3rd.
13      Q.   Was there somebody who was responsible
14 for managing the Reid & Associates schedule at that
15 time?
16      A.   Yes.
17      Q.   Who was that person?
18      A.   I believe -- well, it would have been
19 two people:  Marge Anderson and Marlene -- I'm
20 guessing -- Jacobowski.  They were two of the
21 receptionists.
22      Q.   Was there any kind of paperwork that
23 you would get at Reid & Associates in '95 when you
24 were notified, Hey, you know, you're being assigned

Page 203

1 to this potential exam?
2      A.   Paperwork, no.  No, it was just verbal.
3      Q.   Okay.  We've looked at various notes of
4 yours and forms that you filled out in connection
5 with your work with Mr. Amor.
6          Are there any other notes that you
7 took relative to your work on October 3, 1995, with
8 Mr. Amor that we have not looked at so far in this
9 deposition today?
10      A.   No.  That's -- that's the whole file.
11      Q.   Prior to October 3rd of 1995, had you
12 conducted other interrogations for other members of
13 the Naperville Police Department besides Detective
14 Cross and Detective Guerreri?
15      A.   As -- again, right now as I sit here,
16 to the best of my knowledge, I -- no.  I believe
17 that this was the first time I had any dealings
18 with Naperville PD.
19      Q.   And you were asked some questions about
20 the other polygraph materials that appear in your
21 file from the O'Brien -- from the Richard O'Brien &
22 Associates related to prior polygraphs that were
23 conducted in connection with this case, correct?
24      A.   Yes, ma'am.

Page 204

1      Q.   And I know that you said that it was
2 your testimony that you wouldn't have relied on
3 those in any way in making your assessments about
4 your work with Mr. Amor, correct?
5      A.   Correct.
6      Q.   Do you have any idea as you sit here
7 today why those polygraph reports ended up in the
8 Reid & Associates file?
9      A.   The only thing that I could -- that I
10 believe is they would have been brought in by
11 Officers Cross and the other gentleman and given to
12 us as part of their investigation, and that's the
13 only logical thing that I could come up with.
14      Q.   Do you have any idea why those would
15 have been brought in for you?
16      A.   I don't.
17      Q.   So given -- I want to ask you some
18 questions about the policies and procedures that
19 Reid & Associates used in connection with
20 polygraphs and interviews in October of 1995, okay?
21      A.   Yes.
22      Q.   And so when I ask you these questions,
23 you understand that that's the time period I'm
24 asking you about.

Page 205

1      A.   Okay.
2      Q.   I take it that one possibility that
3 could occur for polygraphs that were conducted at
4 that time is that you could determine that there
5 was no deception indicated in a polygraph, correct?
6      A.   Yes.
7      Q.   And in that situation, again in this
8 time period, October of 1995, would Reid &
9 Associates interview someone about the results of
10 the polygraph in a situation where there was no
11 deception indicated?
12      MR. NYESTE:  Interview about the results?
13 BY MS. THOMPSON:
14      Q.   Well, let's start with that question.
15      A.   Is that what you're asking?
16      Q.   Let's start with that question, yeah.
17      A.   Would we interview someone following a
18 polygraph test if the results were truthful?
19      Q.   Well, if the results were that -- if
20 your conclusion about the exam was that there was
21 no deception indicated.
22      A.   No.  We would not interview them
23 further or question them further.
24      Q.   What if in that situation where

MICHAEL MASOKAS, 11/05/2019                          Page 206..209

Page 206

1 somebody was brought in by law enforcement, law
2 enforcement asked you to do that, to talk to them
3 further?  Is that something that Reid & Associates
4 would do?
5     A.   No.  It would be unnecessary.
6     Q.   Why would it be unnecessary?
7     A.   Because if we're reporting them as
8 truthful, there would be no need to talk to them
9 about anything.  What's the point?
10     Q.   If in October of 1995 law enforcement
11 brought in someone for a polygraph examination
12 where it was the conclusion, as it was with
13 Mr. Amor, that the person was not being truthful
14 about some relevant question that was being asked
15 in the polygraph, then would Reid & Associates
16 always conduct a further interview of the person
17 after you scored the polygraph examination and, you
18 know, determined that there was deception?
19     A.   That was the general practice.  If
20 there was deception indicated, we always wanted to
21 give them the opportunity -- the subject an
22 opportunity to explain.
23         Now, there have been times over the
24 years where we were instructed specifically not to

Page 207

1 move past the results.  Run the test, get your
2 results, and call me with the results.  Don't talk
3 to the subject afterwards.
4     Q.   And when you say you got those
5 instructions, you mean that the law enforcement
6 agency that's asking for the polygraph exam would
7 instruct you specifically, Do the polygraph and
8 don't go further?
9     A.   Well, it -- I would say it was not law
10 enforcement that did that.  It was defense
11 attorneys.
12     Q.   Okay.  Did you ever have a situation
13 where law enforcement -- and I'm asking now about
14 your entirety of your career with Reid &
15 Associates, not just October of 1995.
16     A.   Yes.
17     Q.   In the entirety of your career where
18 law enforcement brought somebody in and
19 specifically told you, you know, Do this polygraph
20 exam, but if there's deception indicated or you
21 believe the person's not being truthful, do not
22 conduct a follow-up interview?
23     A.   In my experiences with law enforcement,
24 I cannot remember one time where law enforcement

Page 208

1 asked that.
2     Q.   And one of the things that you said
3 that you did specifically in this case is after you
4 scored this exam you went and told Cross and
5 Guerreri the results, correct?
6     A.   Yes.
7     Q.   Why'd you do that?
8     A.   It's a standard procedure.
9     Q.   But why is that the standard procedure?
10 Do you know?
11     A.   Because we want to keep them involved
12 and let them know where we are in the process.  We
13 would let them know that, Look, we ran the tests.
14 This person is either telling the truth or not
15 telling the truth based on our opinion.  And so now
16 since there's deception indicated, we're going to
17 take a few minutes and we're going to talk to this
18 individual, give them an opportunity to explain.
19     Q.   And when you went out in this case and
20 told Cross and Guerreri that it was your conclusion
21 that Mr. Amor was not being truthful, they did not
22 tell you, Don't talk to Mr. Amor further?
23     A.   Correct.
24     Q.   When you told them, I'm going to go

Page 209

1 talk to him further, they agreed with you that you
2 should do that, correct?
3     A.   I don't know if they said, you know,
4 Oh, yeah, we agree with you, but they said, Okay.
5         I mean, that was part of our
6 procedure.  That was the standard procedure,
7 whether it was Naperville PD, whether it was the
8 Jewel down the street, if we were doing work for
9 the Jewel.  Whenever the subject was showing
10 deception, as a standard procedure, we would let
11 the client know what the results were.  They're --
12 part of what they're paying us for or what they are
13 paying us for is for polygraph results.
14     Q.   And part of what they're paying you for
15 is the follow-up interview, right?
16     A.   Well, it's all part of it, sure.
17     Q.   I mean, you billed them in this case
18 not just for the time you spent on the polygraph,
19 but the time you spent on the interview.
20     A.   Yes.
21     Q.   And that wasn't something that you
22 did -- well, let me withdraw that question.
23         Here's a question I have for you:
24 In October of 1995, did Reid & Associates have the

MICHAEL MASOKAS, 11/05/2019                    Page 210..213

Page 210

1  capability to video record post-polygraph
2  interviews with the polygraph subject?
3      A.   Yes.
4      Q.   And is that something that you did in
5  Mr. Amor's case?
6      A.   No.
7      Q.   Why not?
8      A.   There was no protocol as to when things
9  should be recorded, when things shouldn't be
10 recorded.  Oftentimes what it came down to is who
11 was available to work the equipment.  And if there
12 wasn't a lot of staff on hand, it was a bit
13 difficult for one person or two people to be trying
14 to conduct an interview, a polygraph test, and
15 worry about video equipment.
16          So again, it was just a time where
17 it wasn't done.
18     Q.   What was Mr. Newey doing during the
19 time you were conducting the polygraph exam of
20 Mr. Amor?
21     A.   I have no idea.  I mean, he had his own
22 cases to work.  I don't know if he was on the phone
23 with the clients.  I don't know.  He was in the
24 office, but I couldn't tell you what he was doing.

Page 211

1      Q.   Was there anyone else in the office on
2  October 3rd from the time that Cross and Guerreri
3  and Amor came in around 4:40 to when they left
4  other than you and Mr. Newey?
5      MS. RANUM:  Objection to form.
6      THE WITNESS:  There would have been a few
7  people there.  Probably the receptionists were
8  there until 5:00 and probably administrative people
9  in the back, bookkeeper.  But everybody would have
10 left at 5:00 o'clock.
11 BY MS. THOMPSON:
12     Q.   Other than you and Mr. Newey?
13     A.   Yes.
14     Q.   Is it your understanding that Mr. Newey
15 has passed away?
16     A.   Yes.
17     Q.   Did he pass away in about 2009; is that
18 correct?
19     A.   This Saturday will be ten years, yes.
20     Q.   Did you ever discuss with Mr. Newey
21 anything having to do with Mr. Amor's polygraph
22 exam or interrogation after October 4th of 1995?
23     A.   I don't believe -- well, I can't be
24 certain at this point.  Possibly around the time of

Page 212

1  the suppression hearing to refresh my memory after
2  looking at the file that -- I don't know.
3  Specifically, I can't say yes or no.  I mean,
4  that's possible.
5          But once the suppression hearing was
6  concluded, no.
7      Q.   To your knowledge, did Mr. Newey
8  prepare any reports of his interviews with Mr. Amor?
9      A.   No.
10     Q.   Did he confer with you in your -- in
11 the preparation of your October 20, 1995, report
12 that you prepared for Detective Cross?
13     A.   Yes.
14     Q.   And what did he tell you that went into
15 that report?
16     A.   He basically told me he was there until
17 about 10:30 on the 3rd with the investigators, and
18 that Mr. Amor, when they left, was still denying
19 his involvement in the fire as well as the
20 insurance discussions.  He was consistent in his
21 denial of having any conversation with Tina about
22 insurance.
23     Q.   So your understanding is that Mr. Newey
24 was in there with Mr. Amor on his own between 8:45

Page 213

1  and 9:15; is that correct?
2      A.   Yes.
3      Q.   And then was he not present for the
4  half an hour then that at least some people from
5  the Naperville Police Department were in there with
6  Mr. Amor between 9:30 and 10:00?
7      A.   Correct.
8      MS. RANUM:  Objection to foundation.
9  BY MS. THOMPSON:
10     Q.   Do you know what was going on between
11 10:00 and 10:30?
12     A.   I'm guessing Mr. Newey was talking with
13 the two investigators during that time.  After they
14 left the room with Mr. Amor, I'm sure the three of
15 them were probably talking.
16     Q.   Why are you sure they were talking?
17     A.   Well, I don't know what else they'd be
18 doing.  Otherwise, they would have left at 10:00.
19     Q.   What would they have been talking about?
20     A.   Probably their discussions with Mr.
21 Amor as far as their observations and the results
22 of the polygraph.  Mr. Newey was -- he was a senior
23 examiner.  He was almost my counterpart.  He
24 started shortly after I did, and so he was a very

Page 214

1  good investigator, very good examiner.  So I'm sure
2  that he was just having conversations with them
3  about the issue, the case.
4       **Q.  Is it your understanding that in that**
5  **conversation the Naperville Police Department**
6  **detectives would have been talking with Mr. Newey**
7  **about what Bill Amor told them between 9:30 and**
8  **10:00?**
9       MS. RANUM:  Objection to form and foundation,
10  calls for speculation.
11      THE WITNESS:  I can't be specific on what
12  they were discussing.  To me, it -- logically,
13  that's what they would have been talking about.  I
14  mean, I wasn't there so I can't say.
15  BY MS. THOMPSON:
16      **Q.  Well, in your experience in that**
17  **situation where -- well, let me ask you a different**
18  **question.**
19          **Did you or anybody at Reid &**
20  **Associates let the Naperville Police Department**
21  **people know that there was the capability for**
22  **Reid & Associates to videotape, you know, some**
23  **portion of the things being done with Mr. Amor at**
24  **Reid & Associates on October 3rd of 1995?**

Page 215

1       MS. RANUM:  I'm sorry.  Can you read that
2  question back?
3          (The record was read as follows:
4           Q. Did you or anybody at
5           Reid & Associates let the
6           Naperville Police Department
7           people know that there was the
8           capability for Reid &
9           Associates to videotape, you
10           know, some portion of the
11           things being done with Mr. Amor
12           at Reid & Associates on October
13           3rd of 1995?)
14      MS. RANUM:  Objection, form.
15      THE WITNESS:  I did not, and I'm sure
16  Mr. Newey did not, because that is not something
17  that we typically do.  It's not a common practice
18  for us to be telling, Well, we have this capability
19  and that cape -- it's just not something we do.
20  BY MS. THOMPSON:
21      **Q.  In October 3rd of 1995, was there any**
22  **way to leave the Reid & Associates offices other**
23  **than through the lobby back to the elevator bank**
24  **that you've described?**

Page 216

1       A.  No, that was the only way in and out.
2       **Q.  Okay.  Now, you described the interview**
3  **room where the post-polygraph interviews with**
4  **Mr. Amor took place, and I think you said that room**
5  **was about 10 by 10, and there was a table and three**
6  **chairs in it; is that right?**
7       A.  Yes.
8       **Q.  How was that furniture arranged in the**
9  **room during Mr. Amor's interviews?**
10      A.  Do you want me to draw it out?
11      **Q.  I'd love that.  Let me -- I'm just**
12  **going to give you -- what are we on?**
13      THE REPORTER:  9.
14          (Deposition Exhibit No. 9,
15           Witness Masokas, was marked for
16           identification 11/05/2019.)
17  BY MS. THOMPSON:
18      **Q.  Sir, I've just given you a blank --**
19  **before you start writing, I've given you a blank**
20  **piece of writing paper that I think has been marked**
21  **as Exhibit 9, and I'm just going to ask you, using**
22  **your pen, to draw the layout of the furniture in**
23  **the interview room where Mr. Amor was interviewed**
24  **on October 3rd of 1995.**

Page 217

1          **And I'm not going to hold you to**
2  **scale, I don't know what your drawing capabilities**
3  **are, but if you could just draw the layout for us,**
4  **I'd appreciate it.**
5       A.  Stick figures work?
6       **Q.  Whatever you can do.  I can't even do**
7  **stick figures.**
8       A.  (Complying.)
9          That's a chair.
10          So it would look like this.  This
11  would be -- do you want this?  Or should I --
12      **Q.  I'm going to take it from you.  Why**
13  **don't you show us what you've drawn there and**
14  **explain it.**
15      A.  So this is the hallway and then this
16  was at the time a dead end over here, I believe
17  (indicating).  And if you were to go this way
18  (indicating), you would go -- come to the end of
19  the hall, you make a left turn, and then you would
20  go out to the lobby.  The lobby was kind of out
21  this way (indicating).
22          But this is quite a ways down the
23  hallway.  You make your right, and there's
24  different rooms on either side.

MICHAEL MASOKAS, 11/05/2019                                    Page 218..221

Page 218

1          So as you enter the room, it's about
2 10 by 10.  You enter the door, and the door kind of
3 swung this way (indicating).  And then there was a
4 chair right here right next to the door, another
5 chair hear (indicating), and then this was the desk
6 with kind of a chair -- almost a stool, more of a
7 stool kind of underneath the desk.
8          And so Mr. Amor sat here
9 (indicating).  And then initially when I was --
10 when we started the post-test, I was here
11 (indicating).  The door obviously was closed,
12 privacy.  And so it was just the two of us like
13 this.
14      Q.   I'm going to try to do a couple things
15 for the record here, so that we make sure we've
16 made a record.  I'm going to have you hold on to
17 that for a second.
18          So you've written "hallway" on the
19 bottom of Exhibit 9 where the hallway area was; is
20 that correct?
21      A.   Yes.
22      Q.   And then you've got a square on
23 Exhibit 9 that has a -- at least one place where
24 there's not a line, and that's where you're

Page 219

1 indicating the door to the room; is that correct?
2      A.   Yes.
3      Q.   And you've got a rectangular box to the
4 left of that that indicates a door in an open
5 position; is that correct?
6      A.   Yes.
7      Q.   You've then got four shapes inside of
8 the box that you drew.
9          There's one that is larger than the
10 other three, and that's the desk; is that right?
11      A.   Yes.
12      Q.   Could you just write "desk" inside the
13 piece of furniture that's the desk.
14      A.   Sure, (complying).
15      Q.   And then the other three smaller shapes
16 inside that rectangle are all are chairs or stools;
17 is that correct?
18      A.   Yes, ma'am.
19      Q.   And I think you said the one circular
20 object that's right next to the desk was a stool.
21      A.   Yeah.  This is like a stool
22 (indicating).
23      Q.   And it looks like you've just written
24 stool inside that?

Page 220

1      A.   I did, yes.
2      Q.   And then there's two other chairs.
3          The two other shapes in that box are
4 chairs, correct?
5      A.   Yes.
6      Q.   Now, during your -- you were initially
7 interviewing Mr. Amor between 6:30 and 7:30; is
8 that correct?
9      A.   Post-test?
10      Q.   Yeah, post-test.
11      A.   Yes.
12      Q.   And did you do that in the polygraph
13 room or in the room you've just drawn on Exhibit 9?
14      A.   In this room (indicating).
15      Q.   And can you show us using Exhibit 9
16 where during that post-test interview Mr. Amor was
17 and you were.
18      A.   Mr. Amor was right here in the chair
19 right next to the door (indicating), and I here
20 (indicating).
21      Q.   And when you say "here," you've
22 indicated the other chair in the room, not the
23 stool, correct?
24      A.   Yes.

Page 221

1      Q.   And then --
2          MS. RANUM:  Tara, do you want him to mark it
3 or maybe describe which chair he's identifying
4 because he's just saying "here."
5 BY MS. THOMPSON:
6      Q.   Yeah.  But I don't want to -- I
7 appreciate that request.  I'll clean this up, but I
8 want to go to the second question first.
9          Then there was that time period from
10 7:45 to 8:30 where you were also in the same room
11 that's depicted in Exhibit 9 talking to Mr. Amor,
12 correct?
13      A.   Yes.
14      Q.   And at that point you were in there
15 with Mr. Newey; is that right?
16      A.   Yes.
17      Q.   And can you tell us using Exhibit 9
18 where for that period of time people were in the
19 room.
20      A.   I -- to the best of my recollection
21 right now, I believe Mr. Newey was in the chair
22 that I was originally sitting in, and I was in the
23 stool.  And Mr. Amor was in the same chair by
24      Q.   And Mr. Amor was in the same chair by

MICHAEL MASOKAS, 11/05/2019                    Page 222..225

Page 222

1 the door?

2     A.   Yes.

3     Q.   Do you have any idea for that 8:45 to

4 9:15 interview where Mr. Newey was and where

5 Mr. Amor were?

6     A.   That I don't know.  However, I would

7 again say it was probably the same thing, because

8 Mr. Amor never got -- came -- as far as I know,

9 left the office unless he used the restroom when I

10 was not there.  But this was the -- this is the

11 subject's chair, so we would always have the

12 subject sit in this chair.

13    Q.   And is there a reason why that chair

14 was always the subject's chair, given your

15 knowledge of the procedures for Reid & Associates

16 for doing interviews in the room that's depicted in

17 Exhibit 9?

18    A.   In this particular room, we wanted the

19 chair next to the door.  We didn't want to be

20 sitting in front of the door or blocking the door

21 in any way.  We wanted him to know -- and the door

22 was right -- the doorknob was right next to his

23 head, and so we just wanted to make sure he didn't

24 feel as though he couldn't leave.

Page 223

1     Q.   Is that why you wanted the subject

2 sitting in a way that where you or another

3 interviewer wasn't blocking the door?

4     A.   Yes.

5     Q.   Why was that important to you?

6     A.   Because it's noncustodial, and we don't

7 want him to feel as though he can't leave.

8     Q.   So it sounds like there was, as you

9 said, only one spot that Mr. Amor was sitting in

10 during that time.

11         Can you write "Amor" in the chair

12 that you've been describing as being the place

13 where you saw him sitting in this room.

14    A.   Sure, (complying).

15         It's A-m-o-r-e?

16    MS. RANUM:  No "e," A-m-o-r.

17    MS. THOMPSON:  A-m-o-r.

18 BY MS. THOMPSON:

19    Q.   It looks like you've then written Amor

20 in the chair that you were describing that you saw

21 him sitting in; is that correct?

22    A.   Yes.

23    Q.   Were there any portions of at least the

24 time that you were in the room depicted in

Page 224

1 Exhibit 9 with Mr. Amor where he was standing up or

2 not in that chair?

3     A.   No, no.  The times I was in there, he

4 was sitting in the chair.

5     Q.   And when you originally took Mr. Amor

6 to this room, did you indicate to him that he

7 should sit in that chair?

8     A.   Yes.

9     MS. THOMPSON:  Laura, I mean, we could go

10 into this later.  If you have more marking you want

11 him to do, we can do it now, and you don't have to

12 wait for your questions.

13         I'm satisfied.  If there's something

14 else you want clarified, you can do it now.

15         FURTHER EXAMINATION

16 BY MS. RANUM:

17    Q.   Just real quick, Counsel's questions

18 all related to the post-test interview.

19         When you first went in the room with

20 Mr. Amor and he completed the medical data form and

21 the release that we've looked at, where was he

22 sitting when he completed those forms?

23    A.   He would have been in the same chair.

24 He more than likely had a clipboard.

Page 225

1     Q.   So he would have been in the subject's

2 chair with a clipboard that he was writing on.

3     A.   Yes.

4     Q.   And then was he also in that chair for

5 the pretest interview?

6     A.   Yes.

7     Q.   And were you in the same chair that

8 you've described yourself being in for the

9 post-test interview during the pretest interview?

10    A.   Yes.

11         Just for clarification, the chair

12 that we would sit in, this is a regular chair,

13 something you'd see in a lobby or in your living

14 room.

15    Q.   Like was it like an armchair?

16    A.   Yeah, it had arms on it.  Had kind of a

17 round back, it was padded.

18    Q.   And when you say "this," you were

19 referring to the subject's chair?

20    A.   Mr. Amor's chair, yes.

21         This chair that we would sit in is

22 like a school desk.  You know the old school desk?

23 It's got the writing -- the square writing part?

24    Q.   Yeah.

Page 226

1    A.   You rest your arm on it?  That's what
2  that is.  It's a wooden like school desk type of
3  thing.  So that way we don't need to use a
4  clipboard, it's right here, so we just write on it.
5        MS. RANUM:  Thank you.  That's all I had.
6            FURTHER EXAMINATION
7  BY MS. THOMPSON:
8    Q.   I think I'm done with Exhibit 9, so you
9  can set that aside if you want to.  And I'm happy
10  to get you a copy of that after the deposition if
11  you want it today for some reason, sir.
12           I want to have you look back at
13  Exhibit 4, your scoring sheet, if you've got that
14  in front of you.
15    A.   Yes.
16    Q.   If I understand your testimony about
17  the scoring that you walked us through earlier in
18  your exam, it was your determination that Mr. Amor
19  was not being truthful about the questions that
20  we've talked about -- Nos. 3, 5, 8 and 9 -- because
21  of the relative emotional response to those
22  questions in comparison to the other questions that
23  he was asked; is that correct?
24    A.   Yes.

Page 227

1    Q.   So using the scoring system that Reid &
2  Associates was using in October of 1995, how much
3  more of a response does there need to be on certain
4  questions than others for there to be a
5  determination that there's deception indicated as
6  to that question?
7        MR. NYESTE:  Objection to the form.
8        MS. RANUM:  Join.
9        THE WITNESS:  That's a difficult question
10  because it's not just again a significant of a
11  response.  It's --
12           (Brief interruption.)
13        THE REPORTER:  I apologize.
14        MS. RANUM:  I'm sorry.
15        THE REPORTER:  That's okay.
16        "It's not just again a significant
17  of a response...
18        THE WITNESS:  I'm sorry?
19        THE REPORTER:  I missed the answer.  I
20  apologize.
21        THE WITNESS:  That's okay.  Want me to start
22  over?
23        THE REPORTER:  Sure.
24        THE WITNESS:  It's not just the significance

Page 228

1  of a response, but it's also the consistency in
2  responses across the board from one test to the
3  next.
4  BY MS. THOMPSON:
5    Q.   And by that, do you mean for a
6  particular question, if there's some emotional
7  response indicated across multiple tests, that's an
8  indicator as well that there's some deception
9  indicated as to that question?
10    A.   Yes, ma'am.
11    Q.   So how many questions have to have a
12  consistent emotional response for that to be a
13  factor in whether or not there's deception
14  indicated?
15    A.   Again, we can't -- I can't say two
16  tests or three tests or four, because the -- for
17  example, question 8, there was responses in three
18  out of four tests.  But in comparison with question
19  6, question 6, the responses were not as
20  significant and they were not as consistent.
21           So it's consistency, it's the
22  significance in response.  There's a number of
23  different factors that would be weighed in.
24    Q.   Can you at all explain to me how you

Page 229

1  would make that assessment in this exam other than
2  the scoring analysis that you've already taken us
3  through earlier in your deposition?
4    A.   It's -- I can't think of any other way
5  to explain it.
6    Q.   I mean, are you telling me you sort of
7  have to have a feel for this?
8        MS. RANUM:  Objection to form.
9        MR. NYESTE:  Objection to form.
10  BY MS. THOMPSON:
11    Q.   That's my question.
12    A.   Well, yeah, you've got to know what
13  you're looking at, what you're looking for.  And
14  it's like any job, anything you do, the more you
15  do, usually the better you get at it.
16    Q.   But are you then -- you're not applying
17  a rigid scoring system of, you know, if I have this
18  many -- if I have emotion indicated on, you know,
19  this many of the tests and, you know, the
20  comparison to the questions where there's not
21  emotion is present on this many tests, then I can
22  determine that there's deception indicated.
23           There's not a methodology like that;
24  is that correct?

MICHAEL MASOKAS, 11/05/2019                                    Page 230..233

Page 230

1      MS. RANUM:  Objection, form.
2      MR. NYESTE:  Objection as to form.
3          You mean a numerical scoring system?
4  BY MS. THOMPSON:
5      Q.   Well, do you understand my question?
6      A.   I believe I understand your question.
7  And I would have to say no.  The way you've
8  described it, I would say no.
9      Q.   And your determination as to Mr. Amor
10 was that another person who'd been trained in the
11 same type of system that you had been trained in
12 for scoring polygraph exams agreed with your
13 assessment; is that correct?
14     A.   Yes.
15     Q.   Did Mr. Newey do his own physical
16 scoring sheet where he wrote stuff down like you
17 did on Exhibit 4?
18     A.   I believe he did.
19     Q.   Do you have any idea where that scoring
20 sheet is today?
21     A.   I don't.
22     Q.   It's not in the file, correct?
23     A.   That is correct.
24     Q.   Why do you believe that he did that

Page 231

1  type of scoring sheet?
2      A.   Most of the examiners, when they would
3  review an exam, would write it out, handwrite their
4  scoring.  Now, it is a possibility it was visual
5  and he just looked at it.  I can't give you a
6  100 percent certain answer.  There is a possibility
7  it was just a visual inspection.
8      Q.   Can you score these kinds of exams
9  doing just a visual inspection without doing a
10 score sheet like Exhibit 4?
11     A.   Yes.
12     Q.   So you don't even really need these
13 numbers to make your call.  You can just do it by
14 literally looking at the printout.
15     MS. RANUM:  Objection to form, misstates
16 prior testimony.
17     THE WITNESS:  Oftentimes, yes.
18 BY MS. THOMPSON:
19     Q.   Could you do that in Mr. Amor's case?
20     A.   His responses were a little bit more
21 subtle.  Personally, I would rather write it out.
22 I would rather, you know, write it down so I can
23 see it.  Another examiner may just look at it.
24 They may feel more comfortable in doing that.

Page 232

1      Q.   Was there -- other than -- let me start
2  that question.
3          I think you described that the type
4  of scoring system that you used was a visual
5  scoring system.  Is that --
6      A.   Visual inspection, yes.
7      Q.   Excuse me, visual inspection.
8          Are there any -- am I correct that
9  there are different methods of polygraph
10 examination, conducting and scoring, that people
11 are taught, you know, depending on where you go to
12 school for this type of training?
13     A.   Yes.
14     Q.   And were there any other particular
15 methodologies or, you know, schools of thought in
16 polygraph examination that you were applying when
17 you conducted your examination of Mr. Amor, other
18 than doing a visual inspection of scoring and other
19 than conducting the specific types of tests that
20 you already I think named and described for us?
21     MR. NYESTE:  I'm going to object that.  That
22 is kind of a long question, form.
23 BY MS. THOMPSON:
24     Q.   Do you understand the question?

Page 233

1      A.   I believe I do.  And I would say no, I
2  did not apply any other methods to the scoring.
3      Q.   When did you learn from Mr. Newey the
4  timing of the events that had happened after you
5  left at 9:00 o'clock on October 3rd of 1995?
6      A.   It would have been the next day when he
7  came in or when we saw each other the next day.
8      Q.   You were a certified polygraph examiner
9  at the time of your examination of Mr. Amor; is
10 that correct?
11     A.   Yes, ma'am.
12     Q.   Did you have to do anything ongoing to
13 remain certified in Illinois as a polygraph
14 examiner as of 1995?
15     A.   Just pay your dues, pay your license
16 fees.
17     Q.   Was there any process in Illinois at
18 that time for there to be peer review or blind
19 review, for instance, of some of your polygraph
20 exams to check and make sure you were scoring them
21 the way that would be consistent with your field at
22 that time?
23     A.   No.
24     Q.   At the time that the Naperville Police

MICHAEL MASOKAS, 11/05/2019                    Page 234..237

Page 234

1 Department brought in Bill Amor to the Reid &
2 Associates offices, when they first brought him in
3 on October 3rd of 1995, were you leaning towards
4 the belief one way or another about whether
5 Mr. Amor had some involvement in the fire that was
6 at issue in this investigation?
7     A.   No.
8     Q.   After you conducted your pre-interview
9 of Mr. Amor, did you have a belief that was leaning
10 one way or another about whether he had involvement
11 in that fire?
12    A.   No.
13    Q.   After you conducted your polygraph
14 examination, before you scored it, did you have a
15 belief one way or another about whether or not
16 Mr. Amor was involved in that fire?
17    A.   I was starting to lean, because I was
18 watching the test as it was rolling out.
19    Q.   After you did your scoring evaluation,
20 did your beliefs further lean in one direction or
21 another about whether he was involved in that fire?
22    A.   Yes.
23    Q.   Which and how did they change at that
24 point?

Page 235

1     A.   Well, because of the indicators of
2 deception on the polygraph, something was causing
3 those, whether or not it was direct involvement,
4 whether it was knowledge, whether it was both.  But
5 that was a question I couldn't answer.
6     Q.   After you conducted your post-polygraph
7 interview of Mr. Amor, did your beliefs change any
8 further in one direction or another?
9     A.   No.
10    Q.   After you conducted that additional
11 interview of Mr. Amor between 7:45 and 8:30, did
12 your beliefs change any further about his
13 involvement in the fire?
14    A.   No.
15    Q.   Do your opinions remain the same today
16 as they were at the time you drafted your report in
17 October 20th of 1995 about whether the information
18 that Mr. Amor gave you on October 3rd of 1995 was
19 not true about his involvement in and knowledge of
20 the circumstances surrounding the death of Marianne
21 Miceli?
22    A.   Let me make sure I understand what
23 you're asking me.
24    Q.   Sure.

Page 236

1     A.   Are my opinions the same today as they
2 were on October 3rd of 1995?
3     Q.   I was asking you if they're the same
4 today as they were on October 20th, '95, when you
5 wrote your report.
6     A.   Oh, yes, they are the same.
7     Q.   Have you learned any further
8 information since October 20, 1995, about anything
9 having to do with the fire in this case?
10    A.   I heard that the fire was not or could
11 not be set the way he described it.
12    Q.   Did anyone ever tell you whether there
13 were any arson experts retained by the state who
14 concluded that the fire could not have begun at a
15 time that Mr. Amor was in the apartment?
16    A.   No one told me that.  I heard it on the
17 radio.
18    Q.   Did that fact alter for you at all your
19 opinions about whether Mr. Amor was telling the
20 truth or not?
21    A.   No.
22    Q.   Do you have an opinion about what
23 Mr. Amor was not telling the truth about related to
24 his involvement in and knowledge of the

Page 237

1 circumstances surrounding the death of Marianne
2 Miceli?
3     A.   No.
4     Q.   You can't say because you -- you're
5 testing doesn't allow you to know that, correct?
6     A.   Yes, ma'am.
7     Q.   And your interviews with Mr. Amor
8 didn't allow you to know that either, right?
9     A.   Correct.
10    Q.   One of the questions that you concluded
11 Mr. Amor was not being -- was not being deceptive
12 about was the question that you asked him about --
13 it was about whether he had ever had an intention
14 to hurt someone, correct?
15    A.   That was a control question, correct.
16    Q.   I mean, the question you asked him with
17 respect to that was whether he'd ever done anything
18 to intentionally hurt someone, right?
19    A.   The question on the actual polygraph
20 test was:  Besides an argument, have you ever done
21 anything to intentionally hurt someone?
22    Q.   And you did not conclude that he was
23 indicating deception in his responses to that
24 question.

MICHAEL MASOKAS, 11/05/2019                    Page 238..241

Page 238

1    A.    There was -- yeah, there was no
2  deception to that particular question.
3         If you look at question 11, he had
4  one response on the first test and then really
5  nothing thereafter.
6    Q.    Do you think that that answer is
7  somehow in contradiction to the deception that you
8  concluded were present for the other questions that
9  you asked him in the polygraph where you found
10  there was deception?
11    MR. NYESTE: Objection as to form.
12         Maybe just have it again.
13    MS. RANUM: Join.
14    MR. NYESTE: Can you read it back?
15         (The record was read as follows:
16          Q. Do you think that that
17             answer is somehow in
18             contradiction to the deception
19             that you concluded were present
20             for the other questions that
21             you asked him in the polygraph
22             where you found there was
23             deception?)
24    MR. NYESTE: I'll object as to form.

Page 239

1    MS. RANUM: Join.
2  BY MS. THOMPSON:
3    Q.    Do you understand the question?
4    A.    Yes.
5         My answer would be no.  I do not
6  find it to be in contradiction.
7    Q.    When you were asked some questions
8  about that card test, you said -- and correct me if
9  I've got this wrong -- one of the purposes for the
10  card test is to show deceptive people that the test
11  works, correct?
12    A.    Yes.
13    Q.    And what do you mean by that?
14    A.    Quite often, guilty people will come
15  in.  They'll agree to take a polygraph test because
16  they believe they can beat the test; that they're
17  able to control their emotions and their
18  physiological responses to where they can pass the
19  test, even though they're deceptive.
20         And so we give them that test to
21  show them that if you're being deceptive, we're
22  going to find out, and here's how we know that.
23    Q.    And you testified earlier that you --
24  it's your testimony that you had some concerns

Page 240

1  about the way Mr. Amor was breathing in certain
2  questions that made you concerned that he might be
3  trying to beat the test in some way, correct?
4    A.    It was a concern, yes.
5    Q.    Well, at the conclusion of all of your
6  work with Mr. Amor, did you reach an opinion about
7  whether or not he was in actuality doing that?
8    A.    No, no.  It was a suspicion but nothing
9  to say definitively.
10    Q.    Is there something that you did in
11  October of 1995 as a practice to try to assess
12  whether or not somebody was trying to beat the test
13  other than asking that final yes test to sort of
14  see what their response was?
15    A.    No, that would be the extent of it.  I
16  mean, if there was any suspicion throughout the
17  examination, as a final test, we would run that yes
18  test just to either confirm it or deny it or -- and
19  so there was nothing concrete to say he was doing
20  anything deliberate.
21    Q.    The yes test did not confirm that in
22  Mr. Amor's case?
23    A.    No.  Again, it was suspicious but not
24  enough for us to say yes, he was.

Page 241

1    Q.    In your suspicions about that, have you
2  testified in this deposition about your entire
3  basis for having those suspicions?  You were asked
4  a number of questions about that, and I just want
5  to know, Is there anything else that gave you that
6  suspicion?
7    A.    In regards to?
8    Q.    In regards to whether Mr. Amor was
9  trying to beat the test.
10    A.    Oh.
11    Q.    And let me be clear about that question.
12         You've given a significant amount of
13  testimony previously in this deposition about
14  concerns you had that Mr. Amor might be trying to
15  beat the test.
16         And my question for you is:  Is
17  there any other basis that you have for believing
18  he might have been trying to beat the test other
19  than what you've already testified about?
20    A.    No.
21    Q.    I want to ask you a few questions about
22  Exhibit 3.  If you could pull that back up in front
23  of you.
24    A.    Sure.

MICHAEL MASOKAS, 11/05/2019                           Page 242..245

Page 242

1    Q.   You have some -- and you've already
2  gone through these notes with us on Exhibit 3 about
3  what these mean.
4          You have some fairly detailed notes
5  in Exhibit 3, and I'm looking at STD-REID 47, the
6  first page --
7    A.   Yes.
8    Q.   -- about the specific way in which
9  Mr. Amor responded to various of these questions.
10  Would you agree?
11    A.   Yes.
12    Q.   I mean, for instance, you were telling
13  us about question 2, which I think is the third
14  thing on page 1.
15          In your notes, you know, you
16  describe specifically how he said no, the volume of
17  him saying that, and how his body was at the time
18  he said that, correct?
19    A.   Yes.
20    Q.   Why did you take this level of detail
21  of notes about how Mr. Amor responded to these
22  questions?
23    A.   Because people don't just respond
24  verbally.  Oftentimes, they'll also respond

Page 243

1  nonverbally, body language.  And so we also will
2  document any observations that we see in regards
3  to -- we write down his verbal answers, but we'll
4  also document nonverbal responses as well.
5    Q.   And my question is:  Why do you
6  document those nonverbal responses?
7    A.   Well, because we find that there's
8  times when deceptive individuals may answer a
9  question nonverbally, whereas a truthful person may
10  answer that question differently nonverbally.
11          For instance, 29, you see further
12  down to 29?
13    Q.   I do.
14    A.   That question is this -- do you want me
15  to use him an example, or you want me to use
16  something different?
17    Q.   If you want to talk about 29, that's
18  great.  Why don't you explain -- if you want to use
19  29 to explain your answer, please do, sir.
20    A.   So for instance, with Mr. Amor,
21  question No. 29:  If the fire was set deliberately,
22  under any circumstances, do you think whoever set
23  the fire deserves a second chance?
24          And what we find is that truthful

Page 244

1  people have a direct and spontaneous response to
2  that, and more often than not, they look us in the
3  eye, and they would say, Absolutely not.  There's
4  no way you can give this person a second chance.
5  Look at what they did to my mother-in-law.
6          Whereas deceptive individuals
7  will -- may hesitate, they may shift in the chair,
8  they're not sure how to answer the question,
9  because they know they were the ones that committed
10  the offense and they're thinking about themselves
11  and they don't know how to answer the question.
12          If my wife was murdered and I was
13  asked a question, Well, whoever murdered your wife,
14  you think they deserve a second chance?
15          What, are you nuts?  There's no way
16  they should get a second chance.  As a matter of
17  fact, leave him in a room with me for about
18  15 minutes first and then you can have them.
19          That's a typical answer for a
20  truthful person.
21          Whereas if I murdered my wife and
22  you asked me that question, You think whoever
23  murdered your wife deserves a second chance; I may
24  say, Well, I guess you may want to find out why

Page 245

1  they did it, because that would be important to
2  know.
3          That tends to go more on the side of
4  deception.
5          And so not only do people respond
6  verbally to questions, but we also find that they
7  will answer nonverbally, body language.  And so we
8  just make indicators.
9    Q.   Is it your understanding of the Reid
10  Technique and the training about interviewing under
11  the Reid Technique, that if someone indicates a
12  forgiving attitude towards someone that that's a
13  indication that they themselves were involved in
14  the crime?
15    A.   No, no.  It's -- the response model,
16  it's more indicative of a deceptive person.
17  Deceptive individuals tend to answer questions like
18  that more often than a truthful person.  So just
19  because we get one response to one question like
20  that, we certainly would not say, Well, they're
21  guilty.
22          Or on the flip side, because we get
23  a truthful response to one question, we wouldn't
24  automatically say, Well, they're innocent.

MICHAEL MASOKAS, 11/05/2019                              Page 246..249

Page 246

1          It's the totality of the process.
2    **Q.   I appreciate that.**
3          **And my question is -- I understand**
4    **from what you're telling me the reason why these**
5    **various observations about nonverbal conduct are**
6    **indicative to you of certain things.**
7          **And my question is:  Why were you**
8    **documenting your observations about those things?**
9    A.   Because if 20 years goes by and I have
10   to read my sheet, and they say, Well, how did he
11   respond nonverbally; I would say, I have no idea
12   because I don't remember from 20 years ago.
13         Same reason we would document their
14   verbal response.  So that there's some indication
15   as to how they answered the question.
16   **Q.   Is one reason you documented the**
17   **nonverbal responses that someone gave you in these**
18   **interviews because you might want notes about that**
19   **to be able to give testimony about it at a later**
20   **proceeding?**
21   A.   That's part of it, sure.
22   **Q.   And did you understand when you were**
23   **interviewing Mr. Amor that your observations of**
24   **Mr. Amor might some day be relevant for court?**

Page 247

1    A.   Oh, I knew that was a possibility,
2    sure.
3    **Q.   I want to ask you if you turn to**
4    **SDT-REID 49, that's the second page.**
5    A.   Yes.
6    **Q.   No. 7 that I think is the third from**
7    **the bottom, more or less there.  Do you see where I**
8    **am?**
9    A.   Yes, ma'am.
10   **Q.   You said that that was something called**
11   **a bait question?**
12   A.   Yes.
13   **Q.   Can you explain to me what a bait**
14   **question -- what it means for something to be a**
15   **bait question?**
16   A.   A bait question is -- it's a
17   hypothetical question.  And the way it's phrased,
18   it's phrased in such a manner that there's an
19   implication that maybe there's evidence.  So again,
20   we're not -- we're not telling somebody we've got
21   evidence when we don't.  It's a hypothetical.
22         Like in this example, he had --
23   prior to question 7, he had said that on the
24   evening of this Sunday in question the day of the

Page 248

1    fire, after leaving the apartment at approximately
2    6:30, he went downstairs to load up the car.  He
3    said he never went back up.
4          And so the question -- the
5    hypothetical question at 7 was:  Bill, you had said
6    that you had gone downstairs to load up the car.
7    You said you never went back upstairs.  Would there
8    be any reason why someone might say that they saw
9    you going back upstairs into the apartment?
10         So it's a hypothetical.
11         And again, he -- there was a long
12   delay.  He never really answered the question.  He
13   said, Well, I can't think of any reason why I would
14   go back upstairs.
15   **Q.   Is the purpose of a bait question to**
16   **suggest to the subject of the interview that there**
17   **might be some evidence of their involvement in**
18   **order to assess how that person responds verbally**
19   **and nonverbally to that suggestion?**
20   A.   Yes.
21   **Q.   And does that information about the**
22   **person's psychology at that point assist the**
23   **interviewer in deciding how to conduct an interview**
24   **with that person about the events in question?**

Page 249

1    MS. RANUM:  Objection to form.
2    MR. NYESTE:  Join.
3    THE WITNESS:  Not necessarily.  It's a
4    regular question we would ask, just like all the
5    other questions are standard questions.  It's just
6    a standard question that we ask as part of
7    interview.
8    BY MS. THOMPSON:
9    **Q.   Well, what is the purpose of that being**
10   **a standard question?**
11   A.   Part of the reason for asking a bait
12   question like that is to see if the subject will
13   change any earlier responses.
14         Now, he did not change any earlier
15   responses.  But there are times where deceptive
16   subjects, after hearing the possibility of
17   evidence, that they have changed earlier responses
18   to explain away why there might be evidence;
19   whereas innocent people don't have to change an
20   earlier response.  Whether there's evidence or not,
21   it's irrelevant to them.
22   **Q.   You said that after the card test you**
23   **left the interview, and you told Mr. Amor that**
24   **was to give his arm a rest.**

MICHAEL MASOKAS, 11/05/2019                                    Page 250..253

Page 250

1   A.   Yes.

2       Q.   I mean, is there some stress associated
3   with having a blood pressure cuff on someone's arm
4   during the polygraph exam process?

5       A.   A little bit, not significant.  It gets
6   a little annoying.

7       Q.   And relatedly, I think you said there
8   were various times in this exam where you had to
9   adjust the blood pressure cuff because it was too
10  high?

11      A.   A couple of times.  We typically --
12  when we pump it up initially, we pump it up a
13  little bit more than what we need, because air gets
14  underneath the cuff between the cuff and the
15  clothing.  And so we kind of squeeze it out to
16  squeeze the air out, and then we'll reduce the air
17  even more to where we need it for the test, which
18  is usually about 80 pounds of pressure.

19           But as we go through the test, if
20  they respond to some questions and their blood
21  pressure starts to go up, which he did a number of
22  times, it may get to a point where we just have to
23  make the adjustment of the pen, not necessarily
24  reduce the pressure in the cuff, but we make an

Page 251

1   adjustment to bring the pen back down.

2       Q.   The adjustment is just making it so the
3   lines aren't over each other on the sheet.

4       A.   Yes, ma'am.

5       Q.   You're not really adjusting the cuff?

6       A.   Correct.

7       MS. RANUM:  Tara, I'm not sure how much you
8   have left.

9           (Discussion off the record.)

10          (Recess taken.)

11  BY MS. THOMPSON:

12      Q.   I want to ask you some additional
13  questions then about the post-exam interview, and
14  then the interview that you did with Mr. Newey with
15  Mr. Amor, okay?

16      A.   Yes.

17      Q.   For both of those interviews, were you
18  using the Reid Technique to ask questions of
19  Mr. Amor?

20      A.   Are you specifically addressing
21  post-test?

22      Q.   I appreciate that.  So let me ask them
23  one at a time.

24          In the post-test interview you did

Page 252

1   with Mr. Amor, were you using the Reid Technique to
2   question him?

3       A.   Yes.

4       Q.   In the interview that you next did with
5   Mr. Newey with Mr. Amor, the one that was from
6   about 7:45 to 8:30, were you and Mr. Newey using
7   the Reid Technique in that interview?

8       A.   Yes.

9       Q.   And by the way, is there a specific
10  reason you left at 9:00 o'clock?

11      A.   Yes.  It was getting late.  I can't --
12  again, I can't be certain since I don't remember
13  how the appointment was set up, but this -- the
14  appointment time was an unusual time to set up an
15  appointment.  I'm just surmising here, but this may
16  have been like a last-minute appointment.  Our last
17  appointment time was usually 3:00 o'clock.  They
18  didn't arrive until 3:50.  So this may have been
19  like a, Hey, could you get us in, something like
20  that.  I don't know.

21          But I'm -- the reason I would have
22  left at 9:00 is two reasons:  No. 1, I was probably
23  going to miss my last train if I waited any longer
24  and be sleeping in the office all night; and No. 2,

Page 253

1   at that time in October of '95 my wife was pregnant
2   with twins and she was ill, she had hyperemesis and
3   stuff, so I wanted to get home.

4       Q.   I take it that to your knowledge
5   Mr. Newey didn't have the same personal concerns
6   that day about needing to leave?

7       A.   Correct.

8       Q.   In your -- well, let me strike that,
9   and ask you this.

10          Is it your understanding of the Reid
11  Technique methodology of questioning someone that
12  there are different approaches for an examination
13  where you suspect someone of involvement in a crime
14  and a case where you do not believe somebody to be
15  a suspect?

16      MS. RANUM:  Objection to form.

17      THE WITNESS:  I'm sorry, but the question is
18  a little confusing, because I'm not sure if you're
19  talking about the pretest interview or the
20  post-test.

21  BY MS. THOMPSON:

22      Q.   That's a fair point, so let me ask you
23  the question again.

24          And I'm not asking you in reference

Page 254

1  to any particular interviews that you conducted
2  with Mr. Amor.
3          I'm just asking you this:  Given
4  your understanding of the Reid Technique, are there
5  different approaches that an interviewer should
6  take in an interview where the interviewer believes
7  that the subject of the interview may have been
8  involved in the misconduct that's the subject of
9  the interview and a situation where the interviewer
10  does not believe that the subject had involvement
11  in the misconduct?
12      A.  No.  The approach would be the same.
13      Q.  Is it your understanding that there
14  is -- let me start the question again.
15          Is it your testimony that there is
16  nothing different that an interviewer using the
17  Reid Technique is supposed to do in a situation
18  where the interviewer does not have reason to
19  believe that the subject of the interview was
20  involved in the misconduct about which the
21  interviewee is being questioned?
22      MS. RANUM:  Objection to form.
23      MR. NYESTE:  Join that.
24      THE WITNESS:  Again, I want to clarify.  Are

Page 255

1  we talking about the pretest interview or post-test?
2  BY MS. THOMPSON:
3      Q.  Let's -- I appreciate what you're
4  asking, so let me ask you a different question.
5          Let me ask you this:  You were asked
6  some questions about what you talked about with
7  Mr. Amor in your post-test interview with him.  And
8  I'm specifically talking to you now about the
9  interview you did that was just him and you, not
10  with Mr. Newey, okay?
11      A.  Yes.
12      Q.  And you said that in that interview
13  that you suggested to him options about maybe why
14  he was failing, correct?
15      A.  Yes.
16      Q.  Can you tell me as you sit here today
17  what your memory is of how that interview proceeded
18  in terms of things you said and things Mr. Amor
19  said and what was discussed?
20      A.  I cannot specifically say verbatim what
21  was said, what wasn't said.  What I can say is I
22  made suggestions as to why people sometimes act out
23  of character, whether they get involved with the
24  wrong crowd, whether it's drinking and they're not

Page 256

1  thinking straight; so various suggestions,
2  generally speaking.
3          And Mr. Amor's response was no.
4          I mean, at times, I had alluded to
5  the fact that he was acceptant.  And so he would
6  sit, he would listen, he'd acknowledge what I was
7  saying.  And then ultimately when I would ask him,
8  you know, Is this what happened; no, I didn't do
9  it.
10          So he maintained his denials, but
11  throughout most of my suggestions, he was quiet.
12  He was engaged.  He was listening.  He was nodding
13  along.  And that's how I would have to describe it.
14      Q.  Did he in this post-test interview that
15  was just you and him provide any narrative to you
16  about, you know, what had happened the day of the
17  fire or any of the events leading up to the fire?
18      A.  No.  He primarily just stuck with what
19  he had already said.  You know, we went to the
20  movies.  Everything was fine.  We got back later,
21  and we heard about the fire.
22      Q.  And my question for you is:  In that
23  interview, did you ask him questions to the effect
24  of, you know, What happened the day of the fire, to

Page 257

1  which he provided responses, like what you just
2  described, We went to the movies, or, Here's when I
3  was home, or you know, information?
4      A.  In the post-test, no.  In the pretest,
5  yes, but not in the post-test.
6      Q.  So in the post-test interview, were you
7  asking him questions about what happened to which
8  he provided responses?
9      A.  No.  It was primarily my suggestions
10  that I was offering as to what could have
11  contributed to his involvement.
12          When I started the post-test, I
13  started the post-test based on the results of the
14  polygraph exam, that he was involved in some way.
15  And so now we're looking for a reason.
16          Again, did he set the fire?  Was he
17  aware of someone else who set the fire?
18          And so you know, offering these
19  suggestions, I wanted to see if he understood what
20  I was talking about.
21          And so he was listening.  He was
22  listening, and he was nodding along.  He was
23  accepting the theories I was suggesting.
24          But then when I would ask a

MICHAEL MASOKAS, 11/05/2019                    Page 258..261

Page 258

1 question, Bill, is that what happened?  He would
2 say, No, no, I didn't do it.
3             So it was more, for lack of a better
4 term, more of a monologue as opposed to a dialogue.
5     **Q.   It was a monologue from you --**
6     A.   Yes.
7     **Q.   -- some responses from him?**
8     A.   Yes.
9     **Q.   And that lasted about an hour.**
10    A.   Yes, yeah, pretty much.
11    **Q.   When Mr. Amor in that post-test**
12 **interview would tell you that -- through his**
13 **answers of no or similar answers, that he had not**
14 **been responsible for this fire, would you respond**
15 **in a way that indicated that you did not accept**
16 **that answer?**
17    A.   Yes.
18    **Q.   And you were following the methodology**
19 **of the Reid Technique when you did that, correct?**
20    A.   Yes, ma'am.
21    **Q.   And you said that during that hour, you**
22 **described him as engaged in the interview, correct?**
23    A.   Yes.
24    **Q.   He was not uncooperative or not**

Page 259

1 **listening to you.**
2    A.   That is correct.
3    **Q.   So why is it that after that hour of**
4 **him being engaged and cooperative you decided that**
5 **you needed a different approach with him?**
6    A.   The denials that we were -- that I was
7 seeing, my observations, his acceptant attitude,
8 his denials were more deceptive as far as they
9 weren't very forceful in the delivery.  The
10 nonverbal behaviors, eye contact wasn't very good.
11           And so based on my observations, I
12 still wasn't convinced that he was innocent.  And
13 so I still believed that there may be something
14 wrong as far as why he's not doing well on the
15 test.
16           And at some point, I thought, Well,
17 it may be me that is not connecting with him.  That
18 happens sometimes.
19           And so I stepped out of the room,
20 and that's when I consulted with Mr. Newey.
21    **Q.   So when you say that you were concerned**
22 **that maybe it was you who wasn't connecting with**
23 **him, do you mean that you were concerned that you**
24 **were not able to engage Mr. Amor in a way that got**

Page 260

1 **satisfactory responses to what you were asking?**
2 **I'm trying to understand what you mean by that.**
3    A.   Rapport, rapport.
4           If I'm going to buy a car and the
5 salesman is a complete jerk and I don't like him,
6 even though he might be giving me the car at a
7 cheaper price, I'm not going to buy a car from him.
8 I'd rather go to somebody that is a nice
9 individual, somebody that has decent personality.
10 If the guy's being kind of an idiot, I don't want
11 to engage with him.
12           And so sometimes it's that rapport.
13 And if there's something that's just not connecting
14 for some reason, maybe he doesn't trust me.
15    **Q.   And I just want to understand, so I**
16 **want to pose this question, which is:  If you**
17 **described Mr. Amor as engaged and listening to you**
18 **and nodding and responsive, why is it that you**
19 **believe you didn't have a rapport with him?**
20    A.   Again, I'm saying that's not exactly
21 what it is.  It's what I'm surmising.  It may be
22 that; it may be something else.
23           I was at a point after an hour of
24 talking with him, it just didn't seem as though I

Page 261

1 personally was making any progress with him.  He
2 just -- he was still in denial.  He just -- he
3 just -- he was at a point where he just continued
4 to deny involvement.
5    **Q.   And when you say lack of progress, you**
6 **mean that you were not progressing towards him**
7 **agreeing with you that he had some knowledge or**
8 **responsibility for this fire?**
9    A.   Yes.
10    **Q.   And it was your goal to get him to the**
11 **point where he would acknowledge that?**
12    A.   At the time, it was -- well, it's
13 always the goal to elicit the truth.  We're trying
14 to find out what the truth is.  And at this point,
15 we're still at a place where I didn't know what the
16 truth was.
17    **Q.   You said in describing Mr. Newey that**
18 **you thought he was more similar to Mr. Amor because**
19 **he was more gregarious; is that right?**
20    A.   Uh-hmm; yes, ma'am.
21    **Q.   And I think you said too that he**
22 **potentially had some other things in common with**
23 **Mr. Amor, including being a smoker?**
24    A.   A smoker.

MICHAEL MASOKAS, 11/05/2019                    Page 262..265

Page 262

1    Q.   So let me ask you this then:  When you
2 and Mr. Newey and Mr. Amor talked for that second
3 post-exam interview from 7:45 to 8:30, you said at
4 that point Mr. Newey was taking the lead; is that
5 right?
6    A.   I believe so, yes.
7    Q.   And was --
8    A.   Yes.
9    Q.   I'm sorry.  I didn't mean to --
10    A.   No, that's okay.
11    Q.   And during that interview, was it a
12 monologue by Mr. Newey to which Mr. Amor was
13 providing some responses?
14    A.   Yes.  It was very similar to the first
15 discussion that I had with him where Mr. Amor was
16 engaged, he was acknowledging, he was nodding
17 along, accepting what Mr. Newey was saying.  But
18 again, he maintained his denials.
19    Q.   Did Mr. Newey do anything to, you know,
20 establish those connections with Mr. Amor by
21 talking with him about subjects they might have in
22 common, like smoking or drinking or joking or
23 something to establish rapport?
24    A.   Right now as I sit here and answer the

Page 263

1 questions, I cannot be specific.  I don't recall,
2 but it would not be out of the ordinary for a
3 smoker to have a cigarette with the subject.  I
4 mean, that's not out of the ordinary.
5    Q.   Is it possible that they smoked
6 together like in the interview room?
7    A.   Yes, possibly.
8    Q.   Is that something that routinely
9 happened in interviews as a rapport building --
10    A.   Occasionally, occasionally.
11         It was before, you know, all
12 buildings became nonsmoking and things like that,
13 so it was kind of prior to that.  So it was not --
14 I don't want to say it was uncommon, but it was not
15 at the same time a common practice.
16    Q.   Did the topic of alcohol come up in the
17 45 minutes that you and Mr. Newey talked to
18 Mr. Amor together between 7:45 and 8:30?
19    A.   In regards to what specifically?
20    Q.   In regards to anything.
21    A.   Anything?
22         It's a possibility it could have
23 come up as part of him spilling the vodka as was
24 given to us by the investigators.  We may have

Page 264

1 brought that up.  I don't remember right now as I
2 sit here and talk about it.  It's a possibility
3 though.
4    Q.   Do you have any specific -- well,
5 strike that.
6         Is there anything that you could
7 review that you have not reviewed in preparation
8 for this deposition that would refresh your memory
9 any further about any specifics of what was
10 discussed between 7:45 and 8:30?
11    A.   No.
12    Q.   Is there anything you could review that
13 you haven't looked at already that would refresh
14 your memory at all about any further details of
15 what occurred in your post-exam interview between
16 6:30 and 7:30?
17    A.   No.  I mean, between the suppression
18 hearing testimony and my file, there's -- I don't
19 know what else I could review.
20    Q.   And I think you said that when you left
21 that second interview, the 7:45 to 8:30 interview,
22 that Mr. Amor was still not explaining anything; is
23 that right?
24    A.   Correct.

Page 265

1    Q.   And what do you mean by that?
2    A.   He was not offering any explanation for
3 the results, the way they were coming out as being
4 deceptive.  He was still saying he had nothing to
5 do with the fire.  He was still saying that, you
6 know, if he did have a conversation about
7 insurance, he doesn't remember.
8         So there was nothing being offered
9 like, Well, you know, this -- this did happen.  I
10 didn't want to say anything about this because I
11 was scared.  I mean, there was nothing of that
12 sort.  It was just, I didn't do it.  I don't know
13 anything about it.  That's all I could tell you.
14    Q.   And you said that when that interview
15 concluded, that ultimately Mr. Newey wanted to go
16 in by himself because he felt it was advantageous
17 to go in alone, correct?
18    A.   Yes.
19    Q.   What advantage did Newey believe he
20 would obtain by going in by himself?
21    A.   Privacy.  When he and I are in there,
22 there's two of us in the room.  And oftentimes, we
23 find that some individuals may be a little bit more
24 reluctant to talk about things that might be

MICHAEL MASOKAS, 11/05/2019             Page 266..269

Page 266
1 embarrassing or sensitive to where there might have
2 been a commission of a crime possibly in front of a
3 number of people.
4        Oftentimes privacy is important, a
5 one-on-one is important. And so he felt as though
6 that might make Mr. Amor feel a little more
7 comfortable.
8     Q. Is there anything you could review that
9 you haven't looked at already that would refresh
10 your memory about anything Mr. Newey later told you
11 about his interview with Mr. Amor alone between
12 8:45 and 9:15?
13     A. No.
14     Q. Anything you could review that would
15 refresh your memory any further about anything that
16 either Mr. Newey or anybody else told you about
17 what happened in that interview between 9:30 and
18 10:00?
19     A. Unfortunately, no.
20     Q. And you've given some testimony here
21 about what happened in between those interviews,
22 and I think it was generally your testimony that in
23 between those interviews you and Mr. Newey updated
24 Cross and Guerreri about what was going on in the

Page 267
1 interviews, right?
2     A. Yes.
3     Q. Is there -- do you have any further
4 details or information about what you said in those
5 intervening interviews with Mr. Gross and
6 Mr. Guerreri that you haven't already testified
7 about?
8     A. No.
9     Q. Is there anything you could review that
10 would refresh your memory any further about any
11 details of those conversations?
12     A. No.
13     Q. You said that Mr. Amor got smoke
14 breaks, and I think we just talked about the
15 possibility of him smoking in the interview room?
16     A. Yes.
17     Q. Were there any other locations where
18 Mr. Amor took those smoke breaks?
19     A. I cannot be specific right now and say
20 yes or no to that. But I do know -- and again, I'm
21 not saying this happened, but I do know Mr. Newey
22 occasionally would smoke in the men's room, so
23 that's a possibility.
24       That if Mr. Amor needed to use the

Page 268
1 restroom or Mr. Newey may have said, You want to
2 have a cigarette, and they may have gone into the
3 men's rooms. That's where he would smoke
4 sometimes.
5     Q. I understand your testimony that
6 although that inner door in the Reid & Associates
7 offices, you know, locks so that people couldn't
8 get in from the outside, but from the inside,
9 somebody could walk out that door to go into the
10 hall to go to bathroom, right?
11     A. Yes.
12     Q. If somebody did that, how would they
13 get back into the Reid & Associates office?
14     A. Well, hopefully there's a receptionist
15 up at desk, because she would buzz you in. If not,
16 we would typically do on those days, if I forgot my
17 keys or something, I'd have to slide the glass open
18 and pick up the phone and call somebody to -- I
19 hope they're at their desk, for them to come up and
20 buzz me in.
21     Q. Do you know for Mr. Amor whether he
22 took any of those bathroom breaks after
23 5:00 o'clock when the receptionist left?
24     A. Specifically, well, yeah. After

Page 269
1 5:00 o'clock, I'm sure he probably did, because you
2 know, they were there until 10:30. I don't
3 remember exactly, you know, what times he would
4 have used the restroom, but I do recall he did use
5 the restroom a few times.
6     Q. How did he get back in?
7     A. There was -- it was probably one of us
8 out in the lobby with the investigators.
9     Q. While he was outside?
10     A. While he was in the bathroom.
11     Q. Okay. Throughout your career as an
12 interviewer, on how many occasions has somebody
13 left an interview with you where they were brought
14 in by law enforcement for that interview?
15     MS. RANUM: Objection to form.
16     MR. NYESTE: Yeah. Can you repeat that?
17       (The record was read as follows:
18       Q. Throughout your career as
19       an interviewer, on how many
20       occasions has somebody left an
21       interview with you where they
22       were brought in by law
23       enforcement for that
24       interview?)

MICHAEL MASOKAS, 11/05/2019                    Page 270..273

Page 270

1    MR. NYESTE:  Oh, departed the office.
2 BY MS. THOMPSON:
3    Q.   Do you understand the question?
4    A.   Could you be more specific?
5    Q.   Let me ask you the question in this way.
6         The interviews that you did with
7 Mr. Amor were ones where law enforcement brought
8 him into the Reid & Associates offices and waited
9 outside, as you've described, while you did the
10 interview, right?
11   A.   Yes.
12   Q.   How many times in your career have you
13 had a situation where, just like Mr. Amor, law
14 enforcement brings somebody in for an interview,
15 you conduct the interview, and in the interview,
16 the person decides, I'm leaving, and they get up
17 and leave?
18   A.   I could not give you a specific number.
19        Has it happened?  Yes.  Has it
20 happened more than once?  Yes.  To say a dozen
21 times, five dozen times, that I can't be specific,
22 but I know for a fact it has.
23   Q.   Do you have -- can you give any
24 estimate as you sit here today about how many times

Page 271

1 in your career that's occurred?
2    A.   I would have no guess exactly how many
3 times, even an estimate.
4    Q.   Can you say at all whether that number
5 is 2 or 200?
6    A.   I know it's more than 2.  Is it 200?
7 That I don't know.  I don't know.
8         Because keep in mind, law
9 enforcement could be custodial.  And if it's
10 custodial, then certainly they can't leave.  You
11 know, and so to try to answer that, I couldn't.
12 But I can be definite to say it's happened, and
13 it's happened a number of times.
14   Q.   Would that be unusual in your
15 experience?  For somebody to choose to leave an
16 interview where they're brought in by law
17 enforcement for the interview?
18   MS. RANUM:  Objection to form.
19   MR. NYESTE:  Join.
20   THE WITNESS:  Is it unusual?  That's a hard
21 question.  I don't know if I would say it's
22 unusual.  It happens.  I don't know.  I can't
23 really give you an answer to that question, it
24 being unusual.

Page 272

1 BY MS. THOMPSON:
2    Q.   Did it happen frequently?
3    A.   No.
4    MS. RANUM:  Objection, asked and answered.
5 BY MS. THOMPSON:
6    Q.   Did it happen infrequently?
7    MS. RANUM:  Same objection.
8    THE WITNESS:  I would say it happened more
9 infrequently than frequently.
10 BY MS. THOMPSON:
11   Q.   And I think you've testified, and you
12 said here again today, that it's your memory that
13 Mr. Amor was dressed casually; is that right?
14   A.   Yes.
15   Q.   Do you have any further memory as you
16 sit here today about how specifically he was
17 dressed other than that it was in a casual manner?
18   A.   I don't, no.
19   Q.   And when you say "casually," you mean
20 not a suit and tie.
21   A.   Correct.
22   Q.   Do you have any further details about
23 it other than knowing it wasn't a suit and tie?
24   A.   No, I don't.

Page 273

1    Q.   Have you conducted any polygraph
2 examinations in your career where you concluded
3 that somebody was not being truthful in their
4 denial that they were involved in a crime where you
5 later learned information that caused you to change
6 your opinion about that belief that they were not
7 being truthful?
8    MS. RANUM:  Objection to form.
9    THE WITNESS:  No, but I had it go the other
10 way.
11 BY MS. THOMPSON:
12   Q.   When you say "go the other way," what
13 do you mean?
14   A.   There were a couple of times where I
15 reported someone on the polygraph as being truthful
16 and it turns out they lied.
17   Q.   Do you believe there is any information
18 that you could learn about Mr. Amor's case that
19 would lead you to conclude that he was truthful
20 with you when he denied having any involvement in
21 the fire in this case?
22   MS. RANUM:  Objection to form and foundation,
23 calls for speculation.
24   MR. NYESTE:  Join.

MICHAEL MASOKAS, 11/05/2019                          Page 274..277

Page 274

1      THE WITNESS:  If it goes to -- if the
2  information he provides would go to an explanation
3  as to what caused the deceptive results on the
4  polygraph, then I would change my mind.
5  BY MS. THOMPSON:
6      **Q.  If you learned information that you**
7  **credit that led you to conclude that it was**
8  **physically impossible for Mr. Amor to have been**
9  **involved in this fire, then would you accept that**
10 **Mr. Amor was being truthful with you when he denied**
11 **having any involvement?**
12     MS. RANUM:  Objection to form and foundation,
13 calls for speculation.
14     THE WITNESS:  That one I'm not sure what
15 you're asking.  Could you please ask that one more
16 time?
17     MS. THOMPSON:  Yeah, sure.
18         Can you repeat the question for me,
19 please?
20         (The record was read as follows:
21             Q. If you learned information
22             that you credit that led you to
23             conclude that it was physically
24             impossible for Mr. Amor to have

Page 275

1             been involved in this fire,
2             then would you accept that
3             Mr. Amor was being truthful
4             with you when he denied having
5             any involvement?)
6      MR. NYESTE:  Objection as to form.  I
7  don't -- physically impossible in what respect?
8      THE WITNESS:  Yeah.  That one, I don't know
9  if I can answer that.  Physically impossible.
10 There's got to be some reason why the results came
11 out so poorly.  There's got to be something on his
12 mind, something he was thinking.  Unless he can
13 explain that, I don't know how I can change my
14 opinion.
15 BY MS. THOMPSON:
16     **Q.  So let me ask you this.**
17         **If you learned information that gave**
18 **an explanation why in your view Mr. Amor did so**
19 **poorly on this polygraph examination, would you**
20 **change your opinion that he was being deceptive in**
21 **his responses to you?**
22     MS. RANUM:  Objection to form and foundation,
23 calls for speculation.
24     MR. NYESTE:  Join.

Page 276

1      MS. RANUM:  And at this point it also
2  misstates the record in terms of what the findings
3  were.
4  BY MS. THOMPSON:
5      **Q.  Do you understand the question?**
6      A.  Yes.
7          If he had an explanation as to why
8  the results were coming out deceptive, would it
9  change my initial opinion immediately?  No.
10         If we took that into consideration
11 and ran another polygraph test to determine at that
12 point if he was being truthful, then -- and if he
13 passed, then I would say yes, that would change my
14 opinion.
15     **Q.  If there was scientific evidence that**
16 **made it impossible for Mr. Amor to have been**
17 **involved in this fire, would you change your**
18 **opinion that Mr. Amor was being untruthful when he**
19 **told you that he didn't have any involvement in**
20 **starting this fire?**
21     MR. NYESTE:  Objection.
22     MS. RANUM:  Objection.
23     MR. NYESTE:  Asked and answered and form.
24     MS. RANUM:  And foundation, calls for

Page 277

1  speculation.
2      THE WITNESS:  If I learned information that
3  it was impossible for him -- how -- impossible for
4  him to set the fire.
5      MR. NYESTE:  It wasn't so limited.
6          If you want to hear the question
7  back?
8      THE WITNESS:  Yes.
9      MS. THOMPSON:  She can re-read it for you.
10         (The record was read as follows:
11             Q. If there was scientific
12             evidence that made it
13             impossible for Mr. Amor to have
14             been involved in this fire,
15             would you change your opinion
16             that Mr. Amor was being
17             untruthful when he told you
18             that he didn't have any
19             involvement in starting this
20             fire?)
21     MR. NYESTE:  Let me repeat the objection.
22     THE WITNESS:  Scientific evidence to show
23 that he did not start the fire.  Now, is that
24 different than scientific evidence to show that the

Page 278

1 fire couldn't have started in a certain way? I
2 mean, that's where I'm getting confused here.
3          I'll answer it like I did. If --
4      MR. NYESTE: Let me ask: Is "involved" -- do
5 you use the word "involvement" to mean set the
6 fire, or does it encompass things like knowledge
7 and planning?
8 BY MS. THOMPSON:
9      Q.   Let me restate this question.
10          If you learned information that made
11 it scientifically impossible for Mr. Amor to have
12 been present when this fire began, would you still
13 conclude that Mr. Amor was being untruthful in his
14 statement to you that when he left for the movies
15 on September 10th of 1995 he did not know his
16 apartment was going to be destroyed by a fire?
17     MS. RANUM: Objection to form, foundation,
18 calls for speculation.
19     THE WITNESS: Would it change my opinion, no.
20 BY MS. THOMPSON:
21     Q.   And why is that?
22     A.   Because one of the questions is, Do you
23 know who set the fire in your apartment, and he
24 could have found out the next day and now he

Page 279

1 doesn't want to say anything, which means he's
2 still being deceptive.
3      Q.   In that situation, is he still being
4 deceptive about when he left on September 10th of
5 1995?
6      A.   It's possible.
7      MS. THOMPSON: I think I'm pretty much done
8 here. Let's just take a quick break. I'll make
9 sure I don't have anything else.
10          (Recess taken.)
11     MS. RANUM: Back on the record.
12     MS. THOMPSON: I don't have any other
13 questions. Thank you so much for your time, sir.
14          FURTHER EXAMINATION
15 BY MS. RANUM:
16     Q.   Just a brief couple follow-ups.
17          You were asked a couple questions
18 about whether you were aware of whether or not
19 Mr. Amor had any sort of drinking problem. Do you
20 remember being asked about that?
21     A.   Yes.
22     Q.   I want to show you ...
23
24

Page 280

1          (Deposition Exhibit No. 10,
2           Witness Masokas, was marked for
3           identification 11/05/2019.)
4 BY MS. RANUM:
5      Q.   I'm showing you a document that's been
6 marked as Exhibit No. 10 to your deposition. It's
7 a two-page document -- excuse me -- it's a
8 four-page document marked SDT-REID 9 consecutively
9 through 12.
10          Now, earlier you were asked some
11 questions where the polygraphs of Tina Miceli and
12 Bill Amor, which were previously conducted in
13 September of 1995, you were asked if you had any
14 knowledge of those. Do you remember being asked
15 about that?
16     A.   Yes.
17     Q.   I believe you testified that you had
18 seen that the reports from Richard O'Brien were in
19 Reid's file, correct?
20     A.   Yes.
21     Q.   And are these the reports that you were
22 referring to when you testified about that?
23     A.   Yes.
24     Q.   Now, if you refer to page SDT-REID 10,

Page 281

1 which is the second page of the first report, now
2 this says, Due to the unemotional response in this
3 subject's polygraph records, this examiner is
4 precluded from rendering an opinion as to the
5 subject's status in this case at this time.
6          However, it should be noted that the
7 subject consumed a quantity of alcohol just prior
8 to the administration of this polygraph examination
9 which may account for the unemotional nature his
10 polygraph records. It is recommended, if deemed
11 necessary, that this subject is given a polygraph
12 re-examination at a later date in order to further
13 clarify the results of his test.
14          Do you see that?
15     A.   Yes.
16     Q.   Do I understand your testimony
17 correctly that you are not certain when you first
18 received these letters in Exhibit 10, correct?
19     A.   Correct.
20     Q.   But you believe that they may have been
21 presented to you upon arrival on October 3, 1995.
22     A.   Yes.
23     Q.   So you may have been aware that
24 Mr. Amor had specifically been drinking during his

Page 282

1 last polygraph examination, correct?

2   A.   Yes.

3       MS. THOMPSON:  Object to form.

4 BY MS. RANUM:

5   Q.   And you in the course of asking
6 Mr. Amor to complete the medical data sheet, which
7 we've looked at in Exhibit 2, one of the questions
8 specifically asks about alcohol intake, correct, in
9 the last 24 hours?

10   A.   I believe so.

11   Q.   And please feel free to take a moment
12 to look at it, that very first question.

13   A.   Yes.

14   Q.   And Mr. Amor did not indicate that he
15 had had any alcohol in the last 24 hours, correct?

16   A.   Correct.

17   Q.   He only indicated that he had had this
18 one tablet of Actifed for his cold and sinus
19 problems, correct?

20   A.   Yes.

21   Q.   So knowing that Mr. Amor was not -- or
22 at least based on the medical data form, you had no
23 indication that Mr. Amor was intoxicated at the
24 time that you did your examination on October 3,

Page 283

1 1995, correct?

2   A.   Correct.

3   Q.   You were asked some questions about the
4 post-exam interviews that are done when there's an
5 indication of deception.  Both myself and counsel
6 for plaintiff asked you some questions about that.

7       Counsel asked you a question about
8 whether you would always do a post-interview for
9 deception.

10       Do you remember being asked about
11 that?

12   A.   Yes.

13   Q.   Now, if it's a noncustodial polygraph
14 examination, the post-interview would still be
15 dependent on the cooperation of the examinee,
16 correct?

17   A.   Correct.

18   Q.   Because they were still free to leave
19 at that point, correct?

20   A.   Yes.

21       MS. THOMPSON:  Object to form.

22 BY MS. RANUM:

23   Q.   So when you answered you would always
24 do a post-test interview, that's assuming that the

Page 284

1 person continued to agree to sit for the post-test
2 interview in the case of a noncustodial
3 examination, correct?

4   A.   Yes.

5   Q.   You mentioned at one point when you
6 were describing the results and how you scored
7 Mr. Amor's exam, you said that some of his
8 responses were -- I believe you used the word
9 subtle.  Do you remember that?

10   A.   Yes.

11   Q.   Now, one of the conclusions that you
12 could have come to with any of the four relevant
13 questions that we've gone over today was
14 inconclusive, correct?

15   A.   Yes.

16   Q.   And so fair to say you're drawing a
17 distinction between subtle and inconclusive,
18 correct?

19   A.   Yes.

20   Q.   So some of Mr. Amor's responses were
21 subtle, but based on your October 10th --
22 October 20th report, am I correct that none of his
23 responses were inconclusive in terms of your final
24 determinations?

Page 285

1   A.   Correct.

2   Q.   Okay.  You were asked some question
3 about the blood pressure cuff that was put on
4 Mr. Amor.

5       Have you ever had the blood pressure
6 cuff put on your arm that was used during the
7 polygraph examination back in 1995?

8   A.   Yes.

9   Q.   Have you also had your blood pressure
10 taken just generally at the doctor?

11   A.   Yes.

12   Q.   Is it the same -- when the cuff is used
13 during the test, is it the same feeling that you
14 get when you either take your own blood pressure
15 with a home machine or your blood pressure is taken
16 at the doctor?

17   A.   Yes.  However, we do run it at a little
18 bit of a lower pressure, so it doesn't get as
19 comfortable as quickly as when you --

20       MR. NYESTE:  As comfortable or uncomfortable?

21       THE WITNESS:  Doesn't get as uncomfortable,
22 like at the doctor.  You know, they pump it up
23 pretty high, and then they slowly release it.

24       For us, we don't pump it up as high,

MICHAEL MASOKAS, 11/05/2019                    Page 286..289

Page 286

1  so it's not as tight.  And so our tests can only
2  run -- we run them at 4 minutes, no longer than
3  4 minutes, and then we release the pressure.  So
4  they're either 4 minutes or less.
5  BY MS. RANUM:
6      **Q.    So your test is intended, if anything,**
7  **to be more comfortable than what we've all**
8  **experienced when our blood pressure is taken at the**
9  **doctor.**
10     A.  Yes.
11     MS. RANUM:  Thank you.  I think that's all I
12 have.  Thank you.
13     MS. THOMPSON:  I just have like two follow-up
14 questions to that.
15          FURTHER EXAMINATION
16 BY MS. THOMPSON:
17     **Q.    So for each of these test segments**
18 **where Mr. Amor is wearing the blood pressure cuff,**
19 **how long does the segment last?**
20     A.   4 minutes or less.
21          The main test, like the first
22 straight through, the second straight through, the
23 silent answer, and the mixed question where we're
24 asking all of the question, it's 4 minutes or less.

Page 287

1      **Q.    And there's four segments, correct?**
2      A.   When you say --
3      MS. RANUM:  Objection.
4      THE WITNESS:  -- four segments?
5  BY MS. THOMPSON:
6      **Q.    It's 4 minutes or less for each of**
7  **these segments, correct?**
8      A.   Yes.  4 minutes or less for the first
9  straight through, and then there's a short break;
10 and then 4 minutes or less for the second straight
11 through, and then there's a break in between, so
12 yes.
13     **Q.    Did Detective Cross or Detective**
14 **Guerreri give you any information about Mr. Amor's**
15 **marital status at any point when you saw them on**
16 **October 3rd of 1995?**
17     A.   No, no.  It was just that he and Tina
18 were married.  That was it.
19     MS. THOMPSON:  Okay.  I don't have any
20 anything else.
21     MS. RANUM:  Great.
22          Do you want to explain signature to
23 him?
24     MR. NYESTE:  Oh, yes.  We'll review.  We'll

Page 288

1  reserve signature.
2      MS. RANUM:  And then just while we're on the
3  record, to avoid any confusion for the future, I
4  know we've sort of tried to use whatever versions
5  of Exhibit 5 that we could find.  But I am going to
6  now take the original, and we'll make a nice color
7  copy that has some overlapping between the pages so
8  that we can kind of reconstruct it later.  And we
9  will submit that to you as the formal Exhibit No. 5.
10          Do we have an agreement about that.
11     MS. THOMPSON:  That's fine.  If you can
12 tender a copy to us as well.
13     MS. RANUM:  We'll tender a copy, and we'll
14 Bates stamp it as well.
15     MS. THOMPSON:  Sure.
16     MS. RANUM:  All right.  Off the record.
17          (The proceedings adjourned at
18          4:40 p.m.)
19
20
21
22
23
24

Page 289

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION
3  WILLIAM E. AMOR,              )
                                 )
4            Plaintiff,          )
                                 )
5       vs.                      )   No. 18 CV 2523
                                 )
6  MICHAEL CROSS, et al.,        )
                                 )
7            Defendants.  )
8
9        This is to certify that I have read my
10 deposition taken on Tuesday, November 5, 2019,
11 in the foregoing cause and that the foregoing
12 transcript accurately states the questions asked
13 and the answers given by me, with the changes or
14 corrections, if any, made on the Errata Sheet
15 attached hereto.
16
17      _____
                MICHAEL MASOKAS
18
   No errata sheets submitted (Please initial)
19 Number of errata sheets submitted _____ pages
20 Subscribed and sworn to
   before me this _____ day
21 of _____ 2019.
22
   _____
23    Notary Public
24

MICHAEL MASOKAS, 11/05/2019                                    Page 290..291

Page 290

1                    REPORTER'S CERTIFICATE
2         I, Katie K. Elliott, do hereby certify that
   MICHAEL MASOKAS was duly sworn by me to testify the
3  whole truth, that the foregoing deposition was
   recorded stenographically by me and was reduced to
4  computerized transcript under my direction, and
   that said deposition constitutes a true record of
5  the testimony given by said witness.
6         I further certify that the reading and
   signing of the deposition was not waived, and the
7  deposition was submitted to Mr. James Nyeste,
   deponent's counsel, for signature.  Pursuant to
8  Rule 30(e) of the Federal Rules of Civil Procedure,
   if deponent does not appear or read and sign the
9  deposition within 30 days, the deposition may be
   used as fully as though signed, and this
10 certificate will then evidence such failure to
   appear as the reason for signature not being
11 obtained.
12        I further certify that I am not a relative
   or employee or attorney or counsel of any of the
13 parties, or a relative or employee of such attorney
   or counsel, or financially interested directly or
14 indirectly in this action.
15        IN WITNESS WHEREOF, I have hereunto set my
   hand and affixed my seal of office at Chicago,
16 Illinois, this 25th day of November 2019.
17
18
              Illinois CSR No. 084-004537
19
20
21
22
23
24

Page 291

1  Errata Sheet
2
3  NAME OF CASE: WILLIAM E. AMOR vs MICHAEL CROSS
4  DATE OF DEPOSITION: 11/05/2019
5  NAME OF WITNESS: Michael Masokas
6  Reason Codes:
7       1. To clarify the record.
8       2. To conform to the facts.
9       3. To correct transcription errors.
10 Page _____ Line _____ Reason _____
11 From _____ to _____
12 Page _____ Line _____ Reason _____
13 From _____ to _____
14 Page _____ Line _____ Reason _____
15 From _____ to _____
16 Page _____ Line _____ Reason _____
17 From _____ to _____
18 Page _____ Line _____ Reason _____
19 From _____ to _____
20 Page _____ Line _____ Reason _____
21 From _____ to _____
22 Page _____ Line _____ Reason _____
23 From _____ to _____
24
25                    _____

Index: $100,000–3

MICHAEL MASOKAS, 11/05/2019

**Exhibits**

**1 Masokas 110619-1** 18:18,23
24:20 191:24 193:11 195:7 196:5,
17 197:10,23 198:6

**2 Masokas 110619-2** 29:7,12
282:7

**3 Masokas 110619-3** 37:3,8
50:16 61:24 190:14 191:6,12
241:22 242:2,5

**4 Masokas 110619-4** 61:6,11,23
64:8 66:24 67:2 68:18 71:20
120:21 121:10,24 123:4 144:4
146:13 164:23,24 168:17 226:13
230:17 231:10

**5 Masokas 110619-5** 81:6,11
120:17 121:10 143:21 165:12
167:18 288:5,9

**6 Masokas 110619-6** 163:8

**7 Masokas 110619-7** 165:19,24

**8 Masokas 110619-8** 171:20
172:1

**9 Masokas 110619-9** 216:14,21
218:19,23 220:13,15 221:11,17
222:17 224:1 226:8

**10 Masokas 110619-10** 280:1,6
281:18

**$**

**$100,000** 20:24 198:11

**$450** 166:8

**0**

**09** 180:7

**1**

**1** 18:18,23 20:16 21:23 22:1,4,9,11,
12,15,20,21 23:3,15 24:20 38:11,
24 39:2 63:12 71:23 74:14 83:10
90:13,23 91:1 92:5,7,8,10 95:8
99:23 101:11,17 104:16 117:23
119:7 122:16,19 124:19,23 126:13,
14 127:9,18 170:3 191:24 192:7
193:11 195:7 196:5,17 197:10,23
198:6 242:14 252:22

**10** 27:22 46:12 63:9,12 72:4 73:7,
22,23 90:13 105:10,16 184:13
216:5 218:2 280:1,6,24 281:18

**10/3** 149:9

**10/3/95** 76:5

**100** 86:3,17 90:15 92:1 97:2 99:14
117:15 145:23 153:10 231:6

**10:00** 43:18 149:2,3 213:6,11,18
214:8 266:18

**10:30** 149:4 212:17 213:11 269:2

**10th** 43:13 45:9,10 72:11 151:1
278:15 279:4 284:21

**11** 46:24 47:1,2 73:21,24 74:20
93:10 101:7 102:1 112:1 117:6
122:17 130:6 133:17 137:3 139:15,
16,18,20 140:11,14,18 169:9,12,
14,16,17,19 170:5 238:3

**11/05/2019** 18:20 29:9 37:5 61:8
81:8 163:10 165:21 171:22 216:16
280:3

**110** 85:22 86:4,11

**11:00** 44:4

**11th** 13:21 15:24 150:6

**12** 9:17 48:12,13,14 280:9

**14** 19:1 24:20

**15** 19:2 105:10,16 184:13 244:18

**16** 42:4,5,6 166:1 172:14

**17** 45:20,21,22 172:14

**18** 48:19,20,21 123:22

**1981** 5:20 6:12 8:3

**1982** 6:13 7:3 8:3

**1983** 7:15,21

**1985** 10:10 11:11 200:20

**1986** 9:2 10:10

**1988** 7:22,23 177:6

**1990** 10:9

**1995** 9:16,20 10:17 13:3,13,19
30:15 83:9 145:21 160:12,17,22
164:5,8 165:8 166:5,11 168:23
174:12 176:15,19 177:17 178:12
179:3 185:8 188:19 189:10,14
193:1 200:21 201:19 202:5 203:7,
11 204:20 205:8 206:10 207:15
209:24 211:22 212:11 214:24
215:13,21 216:24 227:2 233:5,14

234:3 235:17,18 236:2,8 240:11
278:15 279:5 280:13 281:21 283:1
285:7 287:16

**1996** 172:3 174:16

**1:00** 32:5

**2**

**2** 20:16,17,24 21:2,5,16,22,24 22:3,
9 23:3,15 29:7,12 40:9,12,13 45:3,
5 66:13,22 67:5 68:1 72:1 74:14
91:13,16 92:14 98:6,8 99:8,10
100:1 101:22 110:13 122:16,20
126:13,14 130:11 169:6,8 170:3
190:23 191:6 242:13 252:24 271:5,
6 282:7

**2's** 21:4

**20** 50:9,10 85:7,9,13,14 94:13 96:1,
3 104:5 105:9,19,22 164:5 166:14
212:11 236:8 246:9,12

**200** 271:5,6

**2000** 201:5

**2004** 178:9

**2005** 201:3

**2009** 211:17

**2010** 180:7

**20th** 235:17 236:4 284:22

**21** 19:1,9 47:6,7,12 195:8

**22** 19:1,9 123:22 192:3 193:15

**24** 32:12 50:11 124:1 282:9,15

**25** 46:20,21

**250** 13:20

**26** 124:1

**27** 38:16,17 39:15,20

**29** 42:16,17,18 243:11,12,17,19,21

**2:30** 43:21

**2A** 40:22,23

**3**

**3** 10:17 13:3,13 20:17 22:1,4,12
23:3,15 37:3,8 41:3,5 50:16 61:24
67:8,11 72:3 74:18 83:9 92:17
100:4 110:17 122:16 124:22,23
126:7,13,14,15 127:8 130:11,20

MICHAEL MASOKAS, 11/05/2019

133:24 137:15,18,21 138:5,6,10,18
140:9,16 150:24 160:12,17,22
164:8 165:8 166:5 168:23 190:14
191:6,12 203:7 226:20 241:22
242:2,5 281:21 282:24

**30** 58:11 94:12,13,18 95:22,23
96:3,7,9,13,20 104:5,7 105:9,19,22

**300** 95:22

**35** 72:2

**39** 76:4

**3:00** 252:17

**3:50** 13:13 23:22 252:18

**3rd** 149:9 174:12 185:7 193:1
202:5,12 203:11 211:2 212:17
214:24 215:13,21 216:24 233:5
234:3 235:18 236:2 287:16

---

**4**

**4** 23:15 32:12 41:19,20,21 61:6,11,
23 64:8 65:18,21 66:1,24 67:2,11
68:18 71:12 72:13,14 74:14 92:20
98:11,17,21 100:6 109:18 113:14
118:17 120:21 121:10,24 122:16
123:4 126:13,14 144:4 146:13
164:24 166:8 168:17 226:13
230:17 231:10 286:2,3,4,20,24
287:6,8,10

**40** 35:21 104:7

**45** 158:14,22 263:17

**46** 61:12

**47** 37:9 242:5

**49** 37:10 191:7 247:4

**4:30** 23:22

**4:40** 80:3 147:11,13 211:3 288:18

**4th** 79:23 211:22

---

**5**

**5** 43:5,6,7 69:6 72:16 74:18 81:6,11
92:23 99:6 100:9 111:17,21
118:18,19 120:17 121:10 122:17
126:13,14 127:22 128:16 129:3
131:13,14,15 132:1,17 134:6,10,
14,16,22 138:22,23 139:19,20
140:9,17 143:21 165:12 167:18
226:20 288:5,9

**5:00** 211:8,10 268:23 269:1

**5:20** 80:8 147:18,19

**5:40** 147:23,24

**5:45** 80:11

---

**6**

**6** 72:24 73:1 74:20 93:1 100:11
107:19 110:22 111:3,14 112:9
117:6 126:13,14 128:12,14,15,17
129:3 132:13,14,18,22 135:3,6,7,8
137:24 138:5,7,11,15,19 140:2,4,
11,14,17,19 151:11 163:8,13,19
172:3 174:16 228:19

**6:15** 43:23 147:23 148:1

**6:20** 44:1

**6:25** 22:6 193:18 194:4,10

**6:30** 22:6 148:4,6 194:10 220:7
248:2 264:16

**6:31** 21:17

**6:40** 21:5

**6A** 107:21

---

**7**

**7** 47:20,21,22,23 73:4 74:14 93:3
98:10 100:13,16 108:23 109:2,7,
10,12 118:24 126:13,14 163:13
165:19,24 247:6,23 248:5

**70** 87:3,6 90:16 92:1 97:2 99:14
117:16

**72** 97:11,14

**74** 93:22 94:1 102:8

**76** 106:10 113:1 119:13,15

**7:30** 148:6,9 220:7 264:16

**7:45** 148:10,15 221:10 235:11
252:6 262:3 263:18 264:10,21

**7up** 45:13

---

**8**

**8** 73:6,10 74:18 93:6 98:15 100:24
112:5 119:3 126:13,14 129:6,7,23
132:24 135:9 136:8,10,12,15
139:22 140:3,4,5,9,18 163:14
171:20 172:1 226:20 228:17

**80** 85:22 86:12,15,19,21 87:6
250:18

**80s** 28:17 29:21

**86** 200:20

**8:30** 148:18 221:10 235:11 252:6
262:3 263:18 264:10,21

**8:45** 148:21 212:24 222:3 266:12

---

**9**

**9** 46:2,3,4 54:23,24 73:14,17 74:18
93:8 101:4 108:22 110:9 119:4
126:21 129:20,22 130:6 133:4
136:17,21 137:10 140:9 169:4,14,
15,17,18 170:5 216:13,14,21
218:19,23 220:13,15 221:11,17
222:17 224:1 226:8,20 280:8

**9/10** 19:24

**9/10/95** 21:4

**90** 199:20

**95** 19:24 41:16 72:5 73:7 202:23
236:4 253:1

**9:00** 43:18 149:11 159:20 233:5
252:10,22

**9:15** 148:22 213:1 222:4 266:12

**9:30** 149:2 213:6 214:7 266:17

---

**A**

**A-M-O-R** 223:16,17

**A-M-O-R-E** 223:15

**a.m.** 43:18

**abbreviated** 38:10 49:24

**abdominal** 84:4 113:19

**abilities** 195:1

**ability** 11:9 31:5

**absconding** 78:23

**absent** 168:14

**Absolutely** 244:3

**abuse** 160:13,19,23

**accept** 258:15 274:9 275:2

**acceptance** 178:4 182:8,9 183:13
184:15 186:4,12 187:2,22

Index: acceptant–apartment

MICHAEL MASOKAS, 11/05/2019

**acceptant** 181:5,9,24 182:18 256:5 259:7

**accepting** 181:21 182:3 257:23 262:17

**access** 33:24 34:7

**accompanied** 11:21,24

**account** 281:9

**accuracy** 31:3,4,6

**accurate** 11:9 168:22 175:17

**accustomed** 58:9

**acknowledge** 256:6 261:11

**acknowledged** 66:2

**acknowledging** 159:11 262:16

**acquiescing** 184:18

**act** 48:22 255:22

**acted** 46:7

**Actifed** 32:5 282:18

**activity** 84:15

**actual** 15:19 36:21 51:6 55:6 58:3 62:5 71:15 80:17 151:7 153:18 167:7 237:19

**actuality** 240:7

**add** 107:20

**added** 38:17 42:19

**additional** 173:18 235:10 251:12

**additions** 108:4

**address** 75:22

**addressed** 77:14

**addressing** 251:20

**adhere** 190:11

**adjourned** 288:17

**adjust** 250:9

**adjusted** 85:18 88:9 95:24 96:13 99:20 104:5,6 111:11 118:22

**adjusting** 251:5

**adjustment** 85:10,17 87:2 88:18 89:1,7,18 94:11 96:17 99:18 100:15,18,22 104:3 108:11,14 111:2,4,7,9,13,16,22 118:20 250:23 251:1,2

**adjustments** 87:24

**administered** 146:4

**administering** 145:19

**administration** 281:8

**administrative** 211:8

**admit** 158:24

**admitted** 156:12

**advantage** 265:19

**advantageous** 159:17 265:16

**advice** 48:22

**affirmative** 91:19 92:11,15,21 93:4 99:23 100:2,7,13 109:14,19 110:15 117:24 118:15,16,17,18 119:1,3,5,8

**afraid** 160:5,8

**afternoon** 4:7 45:11 173:15

**Age** 76:4

**agency** 207:6

**agree** 209:4 239:15 242:10 284:1

**agreeable** 181:6,10

**agreed** 185:11 209:1 230:12

**agreeing** 261:7

**agreement** 201:18 288:10

**ahead** 55:22 65:14 202:9

**air** 86:7,10,16,18 90:1 94:5 97:10, 14 102:7 103:2 112:20,21 119:18 250:13,16

**alcohol** 189:5 190:1 191:8,10 193:5 263:16 281:7 282:8,15

**alcoholic** 189:3,12,19

**alcoholics** 188:13,21

**alert** 32:18

**all-encompassing** 49:11

**allegations** 151:21

**alluded** 256:4

**aloud** 72:9 74:12,16

**alter** 236:18

**alternative** 142:4

**amend** 176:13

**Amor** 10:17 13:9,23,24 14:3,6,11 15:3 16:19 17:5,9 18:6 20:16 21:23 22:5,10,15 24:2,6,10,13 26:10 27:5,15,20 28:1 31:19 32:4,11 33:6 34:15,24 35:8,17 36:2 37:13 39:3, 16 40:11 41:4 50:17,20 51:17 52:5 54:7,18,22 55:3 57:11,21 60:22 62:4,15 64:11 66:10 67:23 70:6 72:20 73:10,17 74:4 77:6 80:17 81:21,24 92:10 145:20 148:7,16, 21,23 149:2 150:10 152:14 153:2 154:22 155:18,20 156:12,16 157:6, 20 158:12,18,24 159:10 160:2,12, 14,19,21,24 161:2,16,23 162:2 163:2,5 164:9 165:3,14 166:5 167:7,13 168:23 171:17 172:11,19, 20 173:2 178:24 180:22 184:11 185:7 186:5,14,24 191:11 192:8,15 193:1 195:10 197:2 202:4 203:5,8 204:4 206:13 208:21,22 210:20 211:3 212:8,18,24 213:6,14,21 214:7,23 215:11 216:4,23 218:8 220:7,16,18 221:11,24 222:5,8 223:9,11,19 224:1,5,20 226:18 230:9 232:17 233:9 234:1,5,9,16 235:7,11,18 236:15,19,23 237:7,11 240:1,6 241:8,14 242:9,21 243:20 246:23,24 249:23 251:15,19 252:1, 5 254:2 255:7,18 258:11 259:24 260:17 261:18,23 262:2,12,15,20 263:18 264:22 266:6,11 267:13,18, 24 268:21 270:7,13 272:13 274:8, 10,24 275:3,18 276:16,18 277:13, 16 278:11,13 279:19 280:12 281:24 282:6,14,21,23 285:4 286:18

**Amor's** 10:23 13:3,15 25:17 26:5 51:13 83:6 157:15,22 161:13 174:11 180:14 187:2,19 190:16 210:5 211:21 216:9 225:20 231:19 240:22 256:3 273:18 284:7,20 287:14

**amount** 115:4 241:12

**amplitude** 128:1,7

**analysis** 229:2

**Anderson** 202:19

**annoyed** 45:24

**annoying** 250:6

**answering** 71:6 82:5 109:23 134:21

**answers** 5:1 68:14 125:13 131:16, 17 137:18 139:10,17 151:4,6 243:3 258:13

**anticipating** 4:18

**apartment** 21:4,6 22:5 48:5,8

Urlaub Bowen & Associates, Inc.   312-781-9586

MICHAEL MASOKAS, 11/05/2019

72:6,12 73:9,12,16,19 151:2 193:18 194:3 236:15 248:1,9 278:16,23

**apologize** 37:15 82:3 183:4 227:13,20

**apparent** 134:13

**appears** 25:15 98:21 164:1

**applicable** 78:5

**applicant** 79:6

**apply** 142:16,24 178:2 189:15 233:2

**applying** 79:9 189:23 190:9,12 229:16 232:16

**appointment** 202:9 252:13,14,15, 16,17

**approach** 254:12 259:5

**approached** 47:3

**approaches** 253:12 254:5

**approximately** 7:22 23:22 27:22 149:4 158:11,14 179:19 194:4,10 248:1

**area** 15:13,18 16:1,18 33:11,16,21, 24 34:6,9,12 41:12 150:7 153:17 201:10 218:19

**argument** 50:4,6 70:23 74:1 237:20

**arm** 28:12 59:1 60:2 97:20 99:1 226:1 249:24 250:3 285:6

**armchair** 225:15

**arms** 40:19 225:16

**arranged** 216:8

**arrival** 12:5 13:15 18:2 281:21

**arrive** 252:18

**arrived** 172:19

**arriving** 202:12

**arrow** 148:24

**arson** 188:6 196:9,19,24 198:1,3 236:13

**Arthur** 143:14 148:13,20

**ashtray** 22:17,18 192:9

**asks** 282:8

**aspect** 201:23

**aspects** 56:10

**assess** 240:11 248:18

**assessing** 141:9

**assessment** 182:5 229:1 230:13

**assessments** 204:3

**assigned** 202:24

**assist** 248:22

**assistance** 16:12

**associate** 80:14 157:6 180:23

**Associates** 7:7,11,14,20 8:14 9:4 11:12 16:4 25:9 121:12 174:11 176:17 178:5 188:18 200:3,5,8,18, 19,22 201:16,19,21,22 202:14,23 203:22 204:8,19 205:9 206:3,15 207:15 209:24 214:20,22,24 215:5, 9,12,22 222:15 227:2 234:2 268:6, 13 270:8

**assume** 34:1 120:2 174:2

**assuming** 18:10 146:2 283:24

**ATN** 148:11,13,19

**attach** 58:6

**attempt** 154:14

**attend** 5:9

**attended** 8:2,14

**attention** 172:13

**attic** 201:12

**attitude** 181:3,5 245:12 259:7

**attorney** 200:2

**attorneys** 173:17 207:11

**August** 6:12

**author** 163:23

**authority** 184:18

**automatically** 245:24

**avoid** 288:3

**aware** 189:1 257:17 279:18 281:23

—————————————

**B**

**BA** 25:20 26:2

**back** 8:3 9:14 12:7,16 16:18 17:15 24:2,4,18 29:20 30:14 31:12 34:20 43:21 48:5,8,11 49:16 51:5 55:3

61:3 65:6 67:12,14 77:22,24 78:20 81:5 85:18 94:19 95:16 96:19 97:21 99:1,3,7 108:15 111:6,11 113:10,12 116:10 118:22 120:13 132:16 133:10 137:4 138:3 139:7 146:12 148:16,18,20 149:13 152:17 155:17,21 156:16,24 157:8 158:1,11 159:14 161:11 163:3 167:1 168:16 177:5 186:9 195:3 198:17 211:9 215:2,23 225:17 226:12 238:14 241:22 248:3,7,9,14 251:1 256:20 268:13 269:6 277:7 279:11 285:7

**background** 12:3 16:21 18:13 191:15

**backside** 27:17 61:18 192:2 194:5

**bad** 56:11

**bait** 48:1 247:11,13,15,16 248:15 249:11

**bank** 16:1 150:3 215:23

**based** 32:22 39:3,17 51:16 57:16 63:21 143:9 158:1 184:4 187:9,10 208:15 257:13 259:11 282:22 284:21

**baseline** 125:5,14,20 129:11,14 133:9 137:12 139:6

**basement** 201:13

**Basic** 154:8

**basically** 17:24 36:14 38:12 53:6, 8 54:12 69:18 77:13 154:10 177:13 212:16

**basis** 241:3,17

**bat** 76:14

**Bates** 18:24 37:9 61:12 163:13 166:1 288:14

**bathroom** 150:8 268:10,22 269:10

**beat** 114:10 239:16 240:3,12 241:9,15,18

**began** 94:14 147:15 278:12

**begin** 58:8,15 60:14 150:20

**beginning** 52:6 62:16 82:23,24 83:2 84:14 85:11 95:24 98:5 104:4 170:8 173:21 186:19

**begins** 91:14 104:12 110:6

**begun** 236:14

**behaviors** 259:10

MICHAEL MASOKAS, 11/05/2019

**belief** 234:4,9,15 273:6

**beliefs** 234:20 235:7,12

**believed** 259:13

**believes** 254:6

**believing** 241:17

**Bell** 175:20 199:6

**bent** 42:11

**big** 41:16 87:9 113:21 124:10 129:18

**bigger** 113:22 152:18

**bill** 35:17 37:13 39:3,16 40:11,16 41:4 49:16 63:8 64:11 65:24 66:10 67:9,23 68:9 70:5,16 71:24 72:9,20 73:10,17 74:4 76:9 77:6 90:11 91:2 92:10,13 97:20 98:20 106:9 107:1 109:19 154:22 160:14,19,24 166:4 172:10 201:15 214:7 234:1 248:5 258:1 280:12

**Bill's** 68:3

**billed** 209:17

**bit** 5:24 10:10 20:15,19 21:3,15 22:2,14 25:4,7,22 26:23 32:17 38:13 51:24 54:23 60:21 61:17 64:19 70:17 80:1 85:14,20 87:1,14 89:8,15 91:12,16 97:6 105:11 111:8 123:16 124:12 128:10,15 129:1,2,14,16,17,22,23 130:2,5,16 131:4,10 132:19 133:1,2,12,13 134:1,2,18 137:13,14 139:23 147:2,7 148:3 152:18,19 157:9,10, 14 167:5 169:18 170:7 210:12 231:20 250:5,13 265:23 285:18

**black** 106:3

**blank** 216:18,19

**blanket** 43:24

**blind** 144:10 145:6 233:18

**blocking** 21:7,13 222:20 223:3

**blood** 30:11 31:9,10 56:14 58:9,13, 21,24 59:3 60:2,3 84:21 86:1,2,6 87:9 89:24 90:3,21 93:19 94:4 97:1,9,10 99:13,19 100:19,20 102:2,12 103:3 104:14 106:3 111:5,11 117:15 118:21 131:15,22 132:4,15,17 134:19,22 135:4,7,13, 15,17,20 136:13 137:17,18 138:12 139:10,13,23 167:12 168:13 250:3, 9,20 285:3,5,9,14,15 286:8,18

**blow** 115:4,6,11

**blowing** 115:10,15

**board** 142:24 228:2

**Bob** 14:14 20:7 195:16

**Bob's** 195:20

**body** 242:17 243:1 245:7

**bone** 127:13

**bookkeeper** 211:9

**bothering** 107:4,15

**bottom** 21:16 22:19 44:16,17 49:6 84:20 85:22 87:3 89:3 90:20 97:8, 11 98:2,3 99:13 104:16 117:15 119:15,24 124:24 125:9 129:15 133:7 139:3 164:14 218:19 247:7

**bottoms** 89:8

**box** 195:20 219:3,8 220:3

**break** 5:4 29:2 67:10 81:12 98:24 127:13 166:23 279:8 287:9,11

**Breaking** 178:15

**breaks** 5:3 161:23 184:2,7,9,10 267:14,18 268:22

**breath** 113:16,21,22 114:4 125:3 128:19 129:13,16 130:1,3 131:3,7 133:13 139:18

**Breathalyzer** 115:3,4,19

**breathing** 56:17 59:13 123:15,21 124:1 125:21 132:20 134:10 240:1

**breaths** 89:3,9 123:18,22 124:1 134:9,15 136:20 137:2

**briefing** 17:18

**briefly** 4:13 15:6 171:19

**bring** 251:1

**bringing** 202:4

**brings** 31:12 270:14

**broad** 49:11 190:7

**broke** 127:15

**broken** 127:13

**brought** 87:2,13 89:8 90:16 96:19 100:22 111:6 170:19 204:10,15 206:1,11 207:18 234:1,2 264:1 269:13,22 270:7 271:16

**building** 263:9

**buildings** 263:12

**bunch** 65:9

**burning** 21:8,14 22:16 192:9

**business** 47:18

**businesses** 78:20

**buy** 260:4,7

**buzz** 268:15,20

**buzz-in** 34:2

**C**

**call** 13:12 48:1 65:11,15 71:24 91:2 92:13 114:19 120:5 207:2 231:13 268:18

**called** 4:3 42:19 63:5 64:4,12 65:22 98:4,7 113:14 114:3 115:23 116:16 121:13 247:10

**calls** 21:5 43:21,22 184:20 190:5 214:10 273:23 274:13 275:23 276:24 278:18

**calm** 64:18

**candidate** 79:7

**CANONIE** 97:12 109:7

**capabilities** 217:2

**capability** 210:1 214:21 215:8,18

**capacity** 7:9 177:13 201:4

**cape** 215:19

**car** 43:23 248:2,6 260:4,6,7

**card** 64:12,13 65:1,11,15,19 66:1, 11 67:7 69:4,11 76:5,6,18,19 94:10,14,19,20 95:5,10,12,19 96:2, 21 97:7,13 98:1,5,6,8,10,11,13,14, 17,19,21,22 113:10,12,14 114:2, 15,19,20,21,22 116:1,4,15,16 123:19 239:8,10 249:22

**cardio** 97:9 108:14 109:3 111:5,14 112:18 136:17,18

**cards** 65:2,4 98:4

**care** 29:22

**career** 9:18 178:13,17 179:6,13,18 180:17 182:13 207:14,17 269:11, 18 270:12 271:1 273:2

**Carson** 199:22 200:1

**case** 13:2 16:21 19:10 51:13 65:17 68:3 76:17 103:24 173:18 174:21,

Index: cases-component

MICHAEL MASOKAS, 11/05/2019

24 175:7,14 176:6 180:9,11,12,14
196:19 198:22,24 199:8 203:23
208:3,19 209:17 210:5 214:3
231:19 236:9 240:22 253:14
273:18,21 281:5 284:2

**cases** 9:7 177:9 210:22

**casual** 14:7,8 272:17

**casually** 272:13,19

**caught** 86:8

**caused** 273:5 274:3

**causing** 103:21 235:2

**center** 85:19 118:22

**certainty** 145:24

**certification** 6:15,21 8:6

**certified** 177:17,23 233:8,13

**chair** 42:2,15 44:10 47:19 83:18,21
217:9 218:4,5,6 220:18,22 221:3,
21,24 222:11,12,13,14,19 223:11,
20 224:2,4,7,23 225:2,4,7,11,12,
19,20,21 244:7

**chairs** 15:15 21:7,13 27:23 54:24
216:6 219:16 220:2,4

**chance** 42:20,23 176:4 197:15
243:23 244:4,14,16,23

**change** 107:5,16,18 125:5 234:23
235:7,12 249:13,14,19 273:5 274:4
275:13,20 276:9,13,17 277:15
278:19

**changed** 54:10 107:19,24 125:21
166:13 177:10,11 249:17

**channel** 126:2

**character** 183:9 255:23

**charge** 201:21

**charged** 166:11,17

**Charles** 200:2

**chart** 58:8 59:9 88:6,7,8 89:22,24
95:6 96:1 112:17 120:2,15 121:14
143:20 165:12,13

**charting** 59:5

**charts** 128:5 147:23,24 167:17,22

**cheaper** 260:7

**cheat** 38:4

**check** 44:18 75:3,5,7 93:18 97:17
106:7 112:22 119:18,20 121:15,16,

17,22,23 122:7 124:21 125:22,23
126:1,3 127:2,4,6,11,23 128:11
129:19 130:7,12,15,16 131:11
132:2 133:3,5 134:4,24 135:11,12,
17,20,22 137:14 139:11,24 140:5
169:9,13 191:16,17 233:20

**checked** 28:12

**chest** 59:17 84:7

**Chicago** 5:13 25:13 72:14

**chief** 7:24 9:3 23:5,13,14 177:6,11

**children** 76:3,4

**choose** 271:15

**chose** 65:18 98:22

**chronological** 198:6

**chronologically** 126:13

**church** 39:10

**cigarette** 22:16 192:9 263:3 268:2

**cigarettes** 149:23

**circle** 77:3 83:3 97:18 102:19
106:14 119:19 126:5,17 149:21

**circled** 37:19,23 76:2,21,23 78:16
126:4,7 130:12,16 134:4 137:10
151:4

**circles** 126:22

**circular** 219:19

**circumstances** 11:23 235:20
237:1 243:22

**claims** 22:12

**clarification** 179:24 225:11

**clarified** 224:14

**clarify** 67:20 254:24 281:13

**class** 9:12

**classes** 8:4

**classroom** 6:4,6

**clean** 81:12 221:7

**clear** 34:22 40:6 48:18 82:4 105:13
116:13 156:4 175:12 241:11

**clerical** 76:13

**client** 209:11

**clients** 12:19 176:22 210:23

**clipboard** 224:24 225:2 226:4

**clips** 59:19 60:5 167:13

**close** 45:7 111:11

**closed** 218:11

**closest** 133:7

**clothing** 14:7 86:9 250:15

**cognitive** 195:1

**coin** 182:23

**cold** 31:20 32:6 282:18

**college** 5:10,12,13 6:2,10,22 8:3,5,
7,18 10:6,8,12

**color** 288:6

**column** 76:3 79:17 121:24 122:10,
17,21,24 126:18

**columns** 122:6,7,12,13 123:4

**comfortable** 33:1 152:19 163:6
231:24 266:7 285:19,20 286:7

**commenced** 95:19

**commencing** 58:3

**comment** 127:2

**commission** 266:2

**committed** 244:9

**common** 215:17 261:22 262:22
263:15

**communicate** 145:16 153:3

**communicated** 153:7 165:7

**community** 176:21 177:4

**compare** 66:8 115:2 138:1 139:14
140:1

**compared** 139:19 169:16

**comparison** 169:21 226:22
228:18 229:20

**complain** 162:15,17,23

**complete** 9:24 35:7 91:9 93:16
101:13 102:10 105:3 260:5 282:6

**completed** 27:18 28:1,4 224:20,
22

**completely** 33:1 86:15 146:9

**completing** 27:20

**completion** 6:14 32:22

**complying** 217:8 219:14 223:14

**component** 71:15

MICHAEL MASOKAS, 11/05/2019

**components** 171:2

**concern** 31:24 32:3,17 56:22 77:10,14 124:13 240:4

**concerned** 32:7,13 146:11 240:2 259:21,23

**concerns** 161:3,6,13 239:24 241:14 253:5

**conclude** 237:22 273:19 274:7,23 278:13

**concluded** 51:4 112:17 148:1 212:6 236:14 237:10 238:8,19 265:15 273:2

**concludes** 101:23

**conclusion** 144:23 151:16 205:20 206:12 208:20 240:5

**conclusions** 284:11

**concrete** 240:19

**condition** 30:2,19 161:4,7,14

**conduct** 154:11 189:8 206:16 207:22 210:14 246:5 248:23 270:15

**conducted** 9:21 10:16 83:11 178:8,12,14 179:6,12,17,22 180:17 203:12,23 205:3 232:17 234:8,13 235:6,10 254:1 273:1 280:12

**conducting** 10:18 188:4,12,20 210:19 232:10,19

**conductive** 60:6

**confer** 212:10

**confirm** 240:18,21

**confused** 278:2

**confusing** 136:4 174:1 253:18

**confusion** 288:3

**connected** 83:17

**connecting** 259:17,22 260:13

**connection** 197:16 203:4,23 204:19

**connections** 262:20

**consecutively** 280:8

**consent** 24:14,22

**consideration** 51:17 183:23 187:20 276:10

**considered** 23:9

**consistency** 140:16,21 141:23 187:11 228:1,21

**consistent** 104:24 115:24 124:12 144:22 145:10 171:6 212:20 228:12,20 233:21

**consistently** 140:11 182:17

**consult** 9:6 201:22

**consulted** 157:5 159:8 177:8 259:20

**consumed** 189:5 281:7

**contact** 48:17 259:10

**contained** 55:1

**contemporaneously** 50:16

**contents** 47:17

**context** 182:12 183:13,20 184:10, 15,21,23 186:4,13,19 188:5

**continue** 9:7 21:10 80:10 161:12

**continued** 32:20 108:15 151:23 198:9 261:3 284:1

**continues** 113:5 135:5,6 148:19

**continuing** 138:21

**continuously** 59:5

**contradiction** 238:7,18 239:6

**contributed** 257:11

**control** 49:8,9 52:20 53:3,16 70:11 74:9,20 105:7,20 107:19 117:5 127:21 128:13,14 135:4 138:2,11 140:2 169:21 237:15 239:17

**controlled** 57:4

**conversation** 32:23 153:13,22 199:19 212:21 214:5 265:6

**conversations** 17:14 214:2 267:11

**convinced** 259:12

**cool** 181:1 199:22

**cooler** 43:24 44:2

**cooperation** 283:15

**cooperative** 259:4

**copies** 146:1

**copy** 28:23 29:4,13 81:13 95:4 109:5 174:16 198:21 201:15 226:10 288:7,12,13

**corner** 149:18

**correct** 6:23 9:18 13:16 16:8,13 19:10 20:10 21:21 23:4 26:8 28:1 30:6,15 31:3 33:21 34:13 35:1,5 52:17,21 53:10,17,18,20 54:2 56:14,18 59:22 60:3 62:1 66:1 67:2 68:19 69:3 74:9 75:1 78:6,7 80:19 82:20 84:16 91:23 92:11 93:7,9 99:23 101:19 104:20 108:8,22 109:15,20,24 110:6,7,11 111:4,14, 17,23 112:12 116:17,21,24 118:4, 7,10 119:10 120:3,17,21 123:5 136:2 141:2 143:5,21 146:20 150:8 152:3,5,9,21 156:13,14 157:2 159:1,2 161:21,24 163:3 164:9 165:4,9 167:10 169:24 170:15,20 172:11,22 174:13,17 176:13,17 182:1,14 185:13 186:1 188:14 191:4,8 195:2,10,21 197:17 198:15 203:23 204:4,5 205:5 208:5,23 209:2 211:18 213:1,7 218:20 219:1,5,17 220:4,8,23 221:12 223:21 226:23 229:24 230:13,22, 23 232:8 233:10 237:5,9,14,15 239:8,11 240:3 242:18 251:6 253:7 255:14 258:19,22 259:2 264:24 265:17 272:21 280:19 281:18,19 282:1,8,15,16,19 283:1,2,16,17,19 284:3,14,18,22 285:1 287:1,7

**correctly** 281:17

**correlate** 38:6

**correspond** 37:24 122:11

**corresponds** 47:22

**cost** 166:7

**cough** 115:6,9,14

**counsel** 173:9,20 283:5,7

**Counsel's** 224:17

**count** 123:17,21 124:6

**counterpart** 213:23

**counting** 69:4 124:7

**couple** 19:19 67:14,19 156:19 167:3 168:17 172:16 180:20 193:12 218:14 250:11 273:14 279:16,17

**court** 4:15 179:16 246:24

**courtroom** 179:23

**cover** 198:22 199:3

**covering** 107:2

MICHAEL MASOKAS, 11/05/2019

**create** 57:4 190:1

**credit** 274:7,22

**crime** 245:14 253:13 266:2 273:4

**criminal** 5:18 179:16,21 180:2,3,5

**Cross** 14:17,19 17:1,15 18:5 19:14
20:7 23:19,24 24:8 34:23 35:4 52:6
80:22 145:3,17 152:8 153:4,8,16,
22 154:2,20 160:6,13,23 165:7
172:19 173:1 195:9,12 196:16
203:14 204:11 208:4,20 211:2
212:12 266:24 287:13

**crossed** 40:19

**crowd** 255:24

**CT** 96:21,23

**cuff** 58:9,13,22,24 60:2 86:2,6,8
87:5 90:2,15 94:1,5 97:1,10 99:13
102:7,9 103:2,3,11 106:7,11
108:17 112:20,22 113:2 117:15
119:16,17 167:12 250:3,9,14,24
251:5 285:3,6,12 286:18

**curious** 172:5

**current** 29:21 75:23 200:8,13

**custodial** 271:9,10

**custody** 12:11,14,15 18:6,10 26:2,
11 170:9,10,14 171:1,7,9,17 173:3,
6

**customers** 176:22,23

**cut** 4:23 28:17,20,23

——————————

**D**

**D-I-S-H** 41:13

**Daley** 5:12

**dark** 127:2 131:12 133:5

**darker** 121:17 127:5 130:16 133:5

**data** 27:24 29:14,24 30:18 31:1
32:23 35:8 224:20 282:6,22

**date** 20:2,4 25:12 76:4,5 83:8
281:12

**daughter** 20:17 45:8

**day** 32:5 45:15 52:6 192:13 195:10
233:6,7 246:24 247:24 253:6
256:16,24 278:24

**days** 268:16

**dead** 217:16

**dealing** 181:8

**dealings** 203:17

**death** 21:2 235:20 237:1

**decent** 260:9

**deception** 8:21 141:11,21 142:3
145:16 152:3 154:12 164:16
182:20,22 186:6,16 187:3,13,15,16
205:5,11,21 206:18,20 207:20
208:16 209:10 227:5 228:8,13
229:22 235:2 237:23 238:2,7,10,
18,23 245:4 283:5,9

**deceptive** 64:20 140:22,24
141:16,17,24 142:10 143:1 165:14
237:11 239:10,19,21 243:8 244:6
245:16,17 249:15 259:8 265:4
274:3 275:20 276:8 279:2,4

**decided** 157:8 158:8 159:18 259:4

**decides** 270:16

**deciding** 248:23

**decipher** 19:18 37:16

**decision** 161:11

**deck** 65:6,7

**deemed** 281:10

**defendant** 180:9

**defendants** 175:6

**defended** 175:6

**defense** 207:10

**definite** 271:12

**definitively** 240:9

**deflate** 87:8

**deflated** 58:14 87:5,8 97:10 103:3
106:7,11 108:17 119:16,18

**degree** 5:14,17,18,19 8:18,21

**delay** 43:1 48:9 248:12

**delayed** 42:1,12

**deliberate** 115:20 240:20

**deliberately** 42:9 43:8 197:5
243:21

**delivery** 259:9

**demeanor** 181:4 182:4,9,11
183:13 184:4,16 186:4,13 187:22

**denial** 212:21 261:2 273:4

**denials** 256:10 259:6,8 262:18

**denied** 156:10 273:20 274:10
275:4

**denies** 22:9,10 151:17 194:13

**deny** 36:16 151:23 240:18 261:4

**denying** 159:11 212:18

**departed** 270:1

**department** 6:19 21:5 25:5,10
39:11 79:9 83:7 166:3 201:20
202:4 203:13 213:5 214:5,20 215:6
234:1

**dependent** 283:15

**depending** 11:23 60:20 232:11

**depends** 60:18

**depicted** 68:18 221:11 222:16
223:24

**deposition** 18:18,24 29:7,13 37:3,
8 61:6,12 81:6,16 163:8 165:19,24
171:20 173:16,21 174:6,10,20
175:1,4,5,15 176:5,10,12 178:22
197:16,20 198:21 199:11 203:9
216:14 226:10 229:3 241:2,13
264:8 280:1,6

**depravation** 168:3

**depression** 168:3

**deprivation** 167:21

**describe** 15:6 27:21 54:21 101:21
112:16 119:12 221:3 242:16
256:13

**describing** 87:17 121:22 182:3
223:12,20 261:17 284:6

**deserve** 244:14

**deserves** 42:23 243:23 244:23

**desk** 27:23 55:1 218:5,7 219:10,
12,13,20 225:22 226:2 268:15,19

**destroyed** 73:9,12 278:16

**detail** 242:20

**detailed** 242:4

**details** 18:2 196:3 264:14 267:4,11
272:22

**detection** 8:21 10:3

**Detective** 14:14,18,21 24:8 80:21
145:3,17 152:8 160:6,9,13,16,18,
22,23 165:7 195:9,12 196:15,16
203:13,14 212:12 287:13

MICHAEL MASOKAS, 11/05/2019

**detectives** 14:6 16:18 17:1,15 18:5 19:14 23:19,24 34:23 35:4 52:6 145:17 153:4,8,16,22 154:1, 20 165:7 172:19,21 173:1 192:14 196:4,7 214:6

**determination** 144:12 145:15 226:18 227:5 230:9

**determinations** 144:7 284:24

**determine** 194:1 205:4 229:22 276:11

**determined** 189:17 193:21 206:18

**determining** 192:12

**deviate** 63:12

**dialogue** 258:4

**died** 198:14

**difference** 124:10

**differently** 52:11 243:10

**difficult** 210:13 227:9

**difficulty** 57:11,17

**direct** 172:13 235:3 244:1

**direction** 234:20 235:8

**directly** 87:16 149:17

**director** 176:15 177:1,12

**disappears** 102:3 106:4

**discuss** 154:1 211:20

**discussed** 60:9 89:19 164:23 171:2 255:19 264:10

**discussing** 24:23 159:13 214:12

**discussion** 81:3 95:15 116:12 151:24 158:19,20,23 185:2 199:14 251:9 262:15

**discussions** 212:20 213:20

**Dish** 41:13

**dislikes** 157:16

**disputing** 199:7

**disrespect** 194:18

**distinction** 284:17

**distress** 15:4

**diving** 102:21 108:13 111:10

**division** 176:16,19,20 177:2,16

**doctor** 29:5 285:10,16,22 286:9

**doctor's** 29:22

**document** 18:23 19:4,5,9 36:24 37:7,9,11 61:11,13,21 81:19 82:19 163:13,14,15 166:1 243:2,4,6 246:13 280:5,7,8

**documented** 50:20 246:16

**documenting** 246:8

**documents** 174:19,23

**doer** 42:7

**door** 15:19 16:10,19 33:11,18,23 34:16 54:15 218:2,4,11 219:1,4 220:19 222:1,19,20,21 223:3 268:6,9

**doorknob** 222:22

**doors** 15:11 21:7,14 34:19

**double** 94:4 102:7 106:6 112:21 119:17

**doubt** 197:7 198:2

**downstairs** 48:4 248:2,6

**dozen** 15:15 136:5 179:19 270:20, 21

**drafted** 235:16

**drags** 129:1 131:4,9,10 133:12 134:2,18

**dramatic** 106:18 114:4 121:18 127:5 130:4 137:11

**draw** 216:10,22 217:3

**drawing** 217:2 284:16

**drawn** 128:8,9 129:17 130:2 137:1, 13 217:13 220:13

**dressed** 14:7 272:13,17

**drew** 144:23 219:8

**drink** 45:11

**drinker** 158:3

**drinking** 45:17,19 115:18 181:17 192:13,16 255:24 262:22 279:19 281:24

**drinks** 45:13

**Drive** 13:20

**drive-in** 44:1

**drop** 69:21 70:10,11 71:1 86:12,15 132:19

**dropped** 86:16 117:7 125:14

**dropping** 70:22 118:21

**drops** 85:12

**drugs** 45:15

**drunk** 47:16

**dry** 103:20

**due** 29:20 162:9 281:2

**dues** 233:15

**duly** 4:3

**duration** 35:3 128:2,8,10 131:9 134:18 137:13

**duties** 9:3

**E**

**earlier** 61:18 168:6 169:23 171:15 172:18 173:16 177:5 184:5 190:24 198:18 201:14 226:17 229:3 239:23 249:13,14,17,20 280:10

**easier** 89:15

**education** 8:9

**effect** 46:8 156:1 256:23

**electricity** 30:12

**electrodes** 84:11 103:23

**elevated** 31:11

**elevator** 15:23 16:1 150:7 215:23

**elevators** 15:11 33:10 150:2,4,5

**elicit** 53:9 261:13

**eliminate** 55:20 57:3,19 117:4

**eliminated** 70:12

**eliminating** 56:8

**else's** 25:15

**embarrassing** 266:1

**emotion** 229:18,21

**emotional** 164:15 226:21 228:6,12

**emotions** 239:17

**employed** 7:10,13 38:13 39:7

**employees** 78:23

**employment** 8:22

**encompass** 51:19 278:6

**encounter** 15:1

MICHAEL MASOKAS, 11/05/2019

**end** 52:1 65:16 66:3 71:16,17 93:19 94:1 97:7,13 98:1 102:6,9,23 106:5 108:16,17 119:13,19 190:3 217:16,18

**ended** 204:7

**ends** 91:15 95:8

**enforcement** 176:23 206:1,2,10 207:5,10,13,18,23,24 269:14,23 270:7,14 271:9,17

**engage** 259:24 260:11

**engaged** 256:12 258:22 259:4 260:17 262:16

**ensure** 30:18

**enter** 80:22 218:1,2

**entire** 35:3 38:5 49:16 123:17 142:16 241:2

**entirety** 185:6,12 207:14,17

**entrance** 15:8,10 16:3,6,9 34:8

**environment** 57:6

**equal** 148:10

**equals** 94:12

**equipment** 210:11,15

**error** 198:23

**escorted** 16:17 24:2 170:17

**essentially** 167:10 198:6

**establish** 262:20,23

**estimate** 9:21 270:24 271:3

**estimation** 9:24

**evaluated** 75:8 140:21 141:24

**evaluating** 140:23

**evaluation** 31:17 75:10 120:2,6 132:1 140:24 141:22 144:3 234:19

**evaluations** 142:2

**evening** 247:24

**events** 36:18 233:4 248:24 256:17

**Eventually** 66:18

**everything's** 89:16

**evidence** 247:19,21 248:2 249:17,18,20 276:15 277:12,22,24

**ex-boyfriend** 41:13

**exact** 64:7 66:24 180:7

**exam** 6:19 11:20 12:2 31:3 55:3,7 56:18 57:24 59:11,14 60:18,22 75:11 76:5 78:19 80:6 143:11,18 144:16,18 145:1,4 146:1 151:7,16 171:3 178:24 179:16,22 180:15 181:12 190:16 203:1 205:20 207:6, 20 208:4 210:19 211:22 226:18 229:1 231:3 250:4,8 257:14 284:7

**examination** 4:5 10:4,16,23 13:2, 3,9 30:5,9,14 32:2,9,15 33:2 35:10 53:1 54:16,21 56:24 57:24 58:4 62:5,16 64:1 67:22 71:16,18 76:10 77:7 80:17,18,22 81:24 82:19 85:2 119:10 145:20 146:6 152:14,17 153:19 154:3,11 161:4 162:11,14 164:8 165:4,17 166:4 167:6,7 170:9 173:13 178:8,19 189:2,12 191:23 200:17 206:11,17 224:15 226:6 232:10,16,17 233:9 234:14 240:17 253:12 275:19 279:14 281:8 282:1,24 283:14 284:3 285:7 286:15

**examinations** 9:8,21 11:13 78:22 178:14 179:5,12 187:1 188:5,11, 13,21 200:14 273:2

**examined** 4:4

**examinee** 283:15

**examiner** 6:1 7:5,18,20 8:1 9:4 25:2 52:16 78:13 143:14 177:7,12 188:24 213:23 214:1 231:23 233:8, 14 281:3

**examiner's** 85:17

**examiners** 9:5,9,12 177:8 231:2

**examining** 192:24

**exams** 60:19 61:1 178:11 180:16 230:12 231:8 233:20

**exception** 70:19

**excess** 86:10

**excuse** 135:10 232:7 280:7

**exhale** 128:3 131:5

**exhausted** 32:19 168:10 184:6

**exhibit** 18:18,23 24:20 28:24 29:3, 7,12 37:3,8 50:16 61:6,11,23,24 64:8 66:24 67:2 68:18 71:20 81:6, 11 120:17,21 121:10,24 123:4 143:21 144:4 146:13 163:8,17 164:23 165:12,19,24 167:18 168:17 171:20 172:1 190:14 191:6, 12,24 193:11 195:7 196:5,17 197:10,23 198:6 216:14,21 218:19,

23 220:13,15 221:11,17 222:17 224:1 226:8,13 230:17 231:10 241:22 242:2,5 280:1,6 281:18 282:7 288:5,9

**exit** 16:11 21:6

**exiting** 34:11

**expect** 168:2,4

**experience** 114:7 178:2 187:1,24 188:23 193:4 214:16 271:15

**experienced** 286:8

**experiences** 207:23

**experiencing** 190:1

**expert** 10:3

**experts** 236:13

**explain** 11:18 20:11 29:15 30:8 33:8 36:17 43:14 49:5 58:2,15 61:2 75:5 85:4 93:13 95:21 121:9 124:20 154:15 155:16 177:22 183:22 206:22 208:18 217:14 228:24 229:5 243:18,19 247:13 249:18 275:13 287:22

**explained** 24:15 27:8

**explaining** 159:10 264:22

**explanation** 265:2 274:2 275:18 276:7

**express** 196:7

**expressed** 183:24

**extensively** 164:12

**extent** 122:3 240:15

**eye** 48:17 244:3 259:10

---

**F**

**face** 15:10 157:9

**fact** 119:17 126:3 132:15 146:3 172:18 173:5 183:10 189:24 193:6 197:1 236:18 244:17 256:5 270:22

**factor** 31:16 52:7 228:13

**factors** 228:23

**failed** 31:9

**failing** 156:8 255:14

**fair** 16:1 32:24 34:3 57:6 63:23 132:10 179:24 182:4 196:2 253:22 284:16

MICHAEL MASOKAS, 11/05/2019

**fairly** 127:12 133:4 137:11 242:4

**fallen** 22:17 192:10

**falling** 99:17 103:16

**false** 190:2

**families** 22:20

**family** 151:23

**fan** 65:2

**fast** 44:9

**faster** 123:16

**February** 6:13

**fee** 166:11,17

**feel** 12:17,19 19:4 24:16 40:3,4
41:23 45:22,24 48:14 51:19 106:17
107:4 222:24 223:7 229:7 231:24
266:6 282:11

**feeling** 49:2 184:3 285:13

**fees** 166:13 233:16

**feet** 27:22 33:15

**felt** 33:1 159:16 265:16 266:5

**field** 8:11 233:21

**fields** 6:6

**figure** 33:8 181:13

**figures** 184:18 217:5,7

**file** 81:15 145:24 174:7,10 178:22
203:10,21 204:8 212:2 230:22
264:18 280:19

**fill** 24:18

**filled** 27:13 78:3 149:12 203:4

**final** 70:1,5,7,16 84:18 113:5 142:7
145:14 240:13,17 284:23

**finalize** 164:4

**find** 11:8 64:22 182:24 189:4
191:19 239:6,22 243:7,24 244:24
245:6 261:14 265:23 288:5

**finding** 141:16 152:2

**findings** 276:2

**fine** 32:18 256:20 288:11

**finger** 167:13

**fingerprints** 47:23,24

**fingers** 59:20 60:6 84:11 102:19
103:19,20,23,24 104:2

**finish** 4:19 110:3

**finished** 23:23 118:6

**fire** 20:5 21:4,5 40:3,17,24 41:10,
24 42:8,22 43:8 44:7,9 46:5,13
51:14,15,16 71:5 72:6,12,18 73:9,
13,15,19 117:12 151:1,20 156:3,9,
12 158:24 181:17 188:6 196:8,19
197:3,8 212:19 234:5,11,16,21
235:13 236:9,10,14 243:21,23
248:1 256:17,21,24 257:16,17
258:14 261:8 265:5 273:21 274:9
275:1 276:17,20 277:4,14,20,23
278:1,6,12,16,23

**firefighter** 79:7

**fires** 188:1

**firm** 175:6,13 198:24 199:12,15

**fit** 157:18 158:7

**fix** 42:11

**FL** 7:7

**flat** 94:6

**flip** 24:17 182:23 245:22

**flipped** 27:16

**flipping** 194:7

**floating** 84:10,12 85:19

**floaty** 94:15 103:7 108:12

**floor** 13:21 15:24 150:6

**fluctuated** 9:11 96:10

**folded** 119:23

**follow** 178:3

**follow-up** 207:22 209:15 286:13

**follow-ups** 279:16

**food** 161:17

**football** 43:19,22

**forceful** 259:9

**foregoing** 25:8

**forgery** 22:22

**forgiving** 245:12

**forgot** 268:16

**form** 11:15 13:4 15:9 17:11,20
18:14 20:13 23:5,11 24:14,18,22
25:1,16 26:6,8,11,14 27:5,7,12,16,
24 28:4,7 29:17 30:21 31:19 32:16,
24 35:23 36:4 39:6,19 40:21 41:6

50:22 52:9 53:11 54:5 55:16 56:15
57:8,13 58:5 59:7 60:11 62:3,12,14
63:3 72:22 76:11,21 122:7 141:3,
12 142:5 144:3 145:8 152:11,23
154:9 155:7 157:23 170:21 171:12
175:9 176:7 177:24 183:18 184:19
185:15,23 186:7,17 187:5,7 189:20
190:4 193:7 197:12 202:1 211:5
214:9 215:14 224:20 227:7 229:8,9
230:1,2 231:15 232:22 238:11,24
249:1 253:16 254:22 269:15
271:18 273:8,22 274:12 275:6,22
276:23 278:17 282:3,22 283:21

**formal** 288:9

**forms** 27:21 203:4 224:22

**formulate** 52:12 80:9 147:20

**formulated** 51:6,21 54:7 55:2

**formulating** 51:8 62:9 74:7

**formulation** 6:7 52:8,14

**fortunately** 6:17

**forward** 32:8,14 33:1 40:16

**found** 41:14 47:10 141:20 182:11
202:11 238:9,22 278:24

**foundation** 183:18 184:19 190:4
193:7 213:8 214:9 273:22 274:12
275:22 276:24 278:17

**four-day** 8:15

**four-page** 18:23 280:8

**fourth** 68:23 84:8,9,16 94:14,15
96:5 99:16 103:7

**FP** 47:23

**fracture** 127:14

**free** 17:9 19:4 24:16 25:19 26:20,
24 27:6,9 34:7 36:2 54:18 152:21
156:17 282:11 283:18

**frequently** 193:5 272:2,9

**friends** 22:11 43:22 151:23

**front** 33:9 61:14,20,24 65:6,17
69:8 81:19 82:6 120:10,15 151:22
190:15 193:13 194:5 222:20
226:14 241:22 266:2

**full** 183:19 184:21,23

**Full-time** 201:3

**funny** 158:5

**furniture** 216:8,22 219:13

MICHAEL MASOKAS, 11/05/2019

**future** 288:3

**G**

**galvanic** 30:11 56:21 59:18 84:10 94:11

**gave** 108:6 129:2 176:6,12 179:20 191:14 196:23 235:18 241:5 246:17 275:17

**general** 76:13 106:16,22 107:7 155:10 206:19

**generally** 63:1 256:2 266:22 285:10

**gentleman** 204:11

**get along** 44:14,22,24 45:6

**girlfriend** 21:17

**give** 4:13 36:16,17 48:21 51:11 58:14 60:12,19 64:14 67:10 97:20 98:24 101:19 105:5 106:22 113:8 128:2 132:21,22 135:7 154:14 155:15 161:4 180:1 184:12 190:2 196:12 206:21 208:18 216:12 231:5 239:20 244:4 246:19 249:24 270:18,23 271:23 287:14

**giving** 60:19,20 67:22 90:8 102:13 260:6

**glass** 15:11,18 45:13 268:17

**goal** 261:10,13

**good** 4:7 44:13,23 48:17 66:6 133:8 136:22 158:5 161:3 173:15 214:1 259:10

**gosh** 199:18 201:9

**graduated** 6:18

**great** 5:8 243:18 287:21

**greet** 13:23 17:19

**greeting** 14:3

**gregarious** 157:13 261:19

**Gross** 267:5

**gruesome** 46:23

**GSR** 85:10 96:1,12 99:16 100:21 102:21 103:12,15 104:5 108:11 111:9,22 118:20 168:13

**GSS** 106:14 107:11

**Guerreri** 14:13,14,22 17:1,15 18:6 19:15 23:19,24 24:9 34:23 35:4 52:7 80:21 145:4,17 152:9 153:4,8, 16,22 154:2,21 160:9,16,18,23 165:8 172:20 173:2 195:9,15 196:16 203:14 208:5,20 211:2 266:24 267:6 287:14

**guess** 9:17 29:1 46:19 184:9,13 195:18 199:10 244:24 271:2

**guessing** 180:6 202:20 213:12

**guidelines** 190:8,10

**guilty** 239:14 245:21

**guy** 158:5 185:22

**guy's** 260:10

**guys** 116:7

**H**

**hairline** 127:14

**Haley** 199:5

**Haley's** 199:4

**half** 23:20 45:12 136:5 148:22 166:8 213:4

**halfway** 25:18 28:10 29:16 192:6

**hall** 54:12 217:19 268:10

**hallway** 33:12,14,15 217:15,23 218:18,19

**hand** 147:4 210:12

**handcuffed** 18:8

**handed** 24:14

**handle** 11:13

**hands** 103:18

**hands-on** 6:4

**handwrite** 231:3

**handwriting** 19:19 25:1,15 28:6,9 37:16 71:21 79:16 109:7 146:20

**happen** 42:7,10 265:9 272:2,6

**happened** 7:23 16:15 43:12 46:5 55:5 125:4 233:4 256:8,16,24 257:7 258:1 263:9 266:17,21 267:21 270:19,20 271:12,13 272:8

**happy** 226:9

**hard** 94:18 124:24 136:7 271:20

**harm** 43:3

**head** 181:21 187:19 222:23

**headache** 31:20 162:9,23

**healthy** 30:2

**hear** 116:8 183:5 218:5 277:6

**heard** 44:4 56:6 202:7 236:10,16 256:21

**hearing** 10:22 11:2 172:10 180:4 212:1,5 249:16 264:18

**hears** 132:17

**heavily** 168:10

**height** 128:1,6

**held** 7:16

**helpful** 66:14 193:2

**helps** 56:9

**hesitate** 244:7

**Hey** 202:24 252:19

**hide** 193:5

**high** 86:20 87:12 250:10 285:23,24

**higher** 8:9

**Hinsdale** 7:8

**historically** 182:17

**history** 19:10 22:20 38:13 187:10

**hit** 160:13,18

**hold** 217:1 218:16

**home** 43:19 44:1,4 201:10 253:3 257:3 285:15

**hooked** 59:11 167:10

**hope** 268:19

**hoping** 57:3

**hour** 23:20 148:8,22 157:1 199:20 213:4 258:9,21 259:3 260:23

**hours** 32:12 50:11 153:11 166:8 282:9,15

**How'd** 44:14,24

**hungry** 161:16

**Hunter** 7:7,8

**hurt** 41:15 46:1 50:2,7 70:24 74:2 237:14,18,21

**hyperemesis** 253:2

**hypothetical** 247:17,21 248:5,10

MICHAEL MASOKAS, 11/05/2019

## I

**idea** 4:14 51:11 204:6,14 210:21 222:3 230:19 246:11

**identification** 18:20 29:9 37:5 61:8 81:8 163:10 165:21 171:22 216:16 280:3

**identify** 74:11 81:18

**identifying** 221:3

**idiot** 260:10

**ill** 253:2

**illegal** 49:17

**Illinois** 6:23 7:2 233:13,17

**lm** 132:8

**imagine** 121:15 193:9 197:4

**immediately** 96:9 183:1,6 276:9

**impact** 30:19 31:2,3 56:24 146:6

**impacting** 167:21 168:4

**implication** 247:19

**imply** 199:1

**important** 4:16 223:5 245:1 266:4, 5

**impossible** 274:8,24 275:7,9 276:16 277:3,13 278:11

**in-between** 102:13

**incident** 23:13

**included** 176:23

**including** 117:12 261:23

**inconclusive** 77:23 142:6,11 143:2 284:14,17,23

**incorrect** 193:22

**increase** 131:18 137:19

**increased** 94:13 96:3

**independent** 146:9 179:4,11

**independently** 141:1

**indicating** 77:5,9 83:19 85:6 86:10 87:19 88:16 95:8,9 103:4 113:21 115:7,12 121:21 128:3,4 129:15 130:21 194:11 217:17,18,21 218:3, 5,9,11 219:1,22 220:14,19,20 237:23

**indication** 96:21 141:10,20 142:3 145:15 151:3 196:23 245:13 246:14 282:23 283:5

**indicative** 164:16 245:16 246:6

**indicator** 116:20 134:21 183:14 184:5,17 228:8

**indicators** 235:1 245:8

**individual** 12:10 208:18 260:9

**individualized** 143:2

**individuals** 11:14 14:5,11 16:15 64:20 182:18 243:8 244:6 245:17 265:23

**inflate** 96:24

**inflated** 86:2,7,11,24 90:15 97:1 99:13 109:3 117:14

**influenced** 152:8

**information** 12:3 16:21 17:21 18:12 20:21 76:8,9,14 145:11 190:2 191:15,21 192:23 235:17 236:8 248:21 257:3 267:4 273:5,17 274:2,6,21 275:17 277:2 278:10 287:14

**informed** 106:8

**infrequently** 272:6,9

**inhalation** 21:3 198:15

**initial** 8:6 14:2 15:1 27:3 56:5 276:9

**initially** 21:23 97:1 121:5 155:24 218:9 220:6 250:12

**initials** 25:21 26:2 78:13,15 83:9

**injury** 28:12

**innocent** 64:15 245:24 249:19 259:12

**inside** 16:10 167:9 187:19 219:7, 12,16,24 268:8

**inspection** 121:13 231:7,9 232:6, 7,18

**instance** 31:8 38:11 233:19 242:12 243:11,20

**instances** 12:4

**instruct** 65:8 68:7 69:17 200:10 207:7

**instructed** 69:17 112:23 115:8 117:9,11,19 206:24

**instruction** 200:14

**instructions** 58:14 60:13,16,20 62:15,19,23 63:2,17 66:19 67:4 70:13 71:8 90:8 102:14 104:13 108:7 207:5

**instructor** 200:9,17,21 201:2

**instrument** 55:1

**insurance** 20:24 22:11 47:13,17 151:17,22,24 194:14 198:11 212:20,22 265:7

**intake** 282:8

**intended** 154:21 286:6

**intention** 237:13

**intentional** 50:7

**intentionally** 40:4 42:9,22 50:1,2 70:24 74:2 124:13 142:11 143:6 197:8 237:18,21

**interactions** 185:7

**interesting** 131:15

**interfere** 99:19 100:21

**interfering** 118:21

**interject** 118:1 158:18

**interrogation** 6:8 174:12 178:24 180:15 200:12 211:22

**interrogations** 180:16 187:2 188:5 189:16 203:12

**interrogator** 189:17 190:3

**interrupt** 82:2

**interruption** 183:3 227:12

**intervening** 267:5

**interview** 12:7 24:3,6,9 27:19,21 33:4,5,14 34:14,18 35:12,13,14,17, 20 36:8,23 37:1,13 38:18 50:17,21 51:3,16 52:1,3,4 54:13 61:15 76:13 91:2 147:14,15,20 148:5,7 151:15, 19 152:18 153:2 154:6,22 155:2,5, 9,17 156:11,24 157:2 158:12 159:3,4,14,15,22 161:8,12 162:18, 21,24 171:3,4 176:21 179:17,22 184:24 190:3 191:11 200:11 202:5 205:9,12,17,22 206:16 207:22 209:15,19 210:14 216:2,23 220:16 222:4 224:18 225:5,9 235:7,11 248:16,23 249:7,23 251:13,14,24 252:4,7 253:19 254:6,7,9,19 255:1, 7,9,12,17 256:14,23 257:6 258:12, 22 262:3,11 263:6 264:15,21

Urlaub Bowen & Associates, Inc.   312-781-9586

265:14 266:11,17 267:15 269:13,
14,21,24 270:10,14,15 271:16,17
283:24 284:2

**interview/interrogation** 8:15

**interviewed** 178:18 182:12
216:23

**interviewee** 254:21

**interviewer** 223:3 248:23 254:5,6,
9,16,18 269:12,19

**interviewers** 9:6 177:8

**interviewing** 6:8 177:3 220:7
245:10 246:23

**interviews** 22:15 179:5,11 185:19
192:7 204:20 210:2 212:8 216:3,9
222:16 237:7 246:18 251:17 254:1
263:9 266:21,23 267:1,5 270:6
283:4

**intoxicated** 189:7 282:23

**introduce** 195:12,15

**INV** 20:7

**investigating** 196:9,18,23

**investigation** 10:19 17:22 36:14
53:5,23 145:22 146:5,11 188:1,6
204:12 234:6

**investigative** 71:7

**investigator** 12:1,2,21,23 42:13
195:19 214:1

**investigators** 11:21 20:9 36:15
51:11 149:14 158:2 159:9 191:14,
22 212:17 213:13 263:24 269:8

**invoice** 166:2

**involved** 21:24 22:1 23:10,13,15
51:14 156:2,9 181:15 208:11
234:16,21 245:13 254:8,20 255:23
257:14 273:4 274:9 275:1 276:17
277:14 278:4

**involvement** 36:17 159:12 212:19
234:5,10 235:3,13,19 236:24
248:17 253:13 254:10 257:11
261:4 273:20 274:11 275:5 276:19
277:19 278:5

**irrelevant** 53:6,19 74:8,13 105:10,
14 109:1 249:21

**issue** 17:22 47:24 78:19 83:5
181:7 196:19 214:3 234:6

## J

**Jacobowski** 202:20

**jerk** 260:5

**Jewel** 209:8,9

**job** 7:4,6 229:14

**John** 8:14 16:3 25:9 121:12 165:8
174:10 176:16 188:18 189:10
200:3,5,8,18,22 201:16,19

**Join** 185:24 227:8 238:13 239:1
249:2 254:23 271:19 273:24
275:24

**joking** 262:22

**Juan** 175:4,13 198:21

**jumped** 95:10

**June** 41:16

**junior** 5:11

**justice** 5:18

## K

**key** 16:12

**keys** 41:12 268:17

**kill** 42:3

**kind** 4:13 15:6,7,24 20:11 28:11
39:1 51:24 52:1 59:19 60:5 84:23
85:19 86:5,9 87:22 94:18 99:17
102:2 106:3 108:13 121:20 125:2
127:12,14 128:18,21 129:1,15
130:21 131:4 132:11 134:2 137:2
157:14,17 158:17,18 169:16 181:1
202:22 217:20 218:2,6,7 225:16
232:22 250:15 260:10 263:13
288:8

**kinds** 201:11 231:8

**Kleenex** 103:23

**knew** 51:15 247:1

**knowing** 145:10 272:23 282:21

**knowledge** 17:6 22:10 40:23
51:15 178:1 194:14 203:16 212:7
222:15 235:4,19 236:24 253:4
261:7 278:6 280:14

## L

**lab** 83:10

**lack** 38:3 102:20 104:6 114:9
142:21 154:12 162:9 167:20
168:10 258:3 261:5

**laid** 157:24 163:3

**language** 243:1 245:7

**larger** 219:9

**last-minute** 252:16

**lasted** 35:20 97:6 148:8 258:9

**late** 252:11

**Laura** 82:2 199:23 200:1 224:9

**law** 6:7 42:14 49:14,18 70:22 73:3
176:23 206:1,10 207:5,9,13,18,23,
24 269:14,22 270:7,13 271:8,16

**lay** 136:23

**layout** 15:7 216:22 217:3

**LD** 75:16 77:16

**lead** 158:16 262:4 273:19

**leading** 256:17

**lean** 234:17,20

**leaning** 234:3,9

**learn** 194:14 202:3 233:3 273:18

**learned** 158:2 236:7 273:5 274:6,
21 275:17 277:2 278:10

**leave** 17:9 25:19 26:20,24 27:6,9
34:5 36:3 54:18 150:3 152:14,21
156:17,21 160:3 215:22 222:24
223:7 244:17 253:6 270:17 271:10,
15 283:18

**leaving** 248:1 270:16

**led** 15:19 274:7,22

**left** 22:5,16 37:23 44:1 49:14 73:8,
11 75:4,9 79:24 83:3 87:16 88:2,3,
13 96:9 97:16,18,19,24 99:4
122:14,18 147:2,7 149:4,10,11
159:20,23 161:10 170:14 192:9
193:17 194:3,9 211:3,10 212:18
213:14,18 217:19 219:4 222:9
233:5 249:23 251:8 252:10,22
264:20 268:23 269:13,20 278:14
279:4

**left-hand** 78:8,11 121:24 169:2

MICHAEL MASOKAS, 11/05/2019

**length** 164:23 165:12

**lengthy** 134:14

**lets** 83:22

**letter** 40:22

**letters** 281:18

**level** 192:16 242:20

**levels** 135:5

**library** 16:18,24 17:5 19:15 23:24
33:12 34:24 52:5 172:22

**license** 6:22 7:2 8:10 233:15

**licensed** 5:22 6:1,20

**lie** 10:3 49:12 64:22 114:11,20,21,
22 115:1

**lied** 273:16

**lies** 53:16 114:12

**life** 20:24 42:14 49:16 70:21 198:11

**light** 127:12,23 128:11 129:9,19
130:7,15 133:3 134:4

**lighter** 121:16 127:4

**likes** 157:16

**likewise** 4:22

**limited** 277:5

**lined** 157:14

**lines** 83:12 91:4,16 251:3

**list** 68:6 117:20,22 126:12 164:19

**listed** 42:18 64:7 67:1

**listen** 68:13 256:6

**listening** 181:20 256:12 257:21,22
259:1 260:17

**literally** 231:14

**living** 21:11 225:13

**load** 248:2,6

**loaded** 43:10,23

**lobby** 12:17 13:12,22 14:9 15:1,7,
13 16:7,9,11,16,20 17:6,10 18:9
24:4 33:7,9,10,16,20 34:1,6 35:1
52:2 150:3,7 153:10,17 170:15
172:21 215:23 217:20 225:13
269:8

**located** 13:18 33:5,6 149:24

**location** 91:21

**locations** 267:17

**lock** 54:15

**locked** 34:8,16

**locks** 34:19 268:7

**lockup** 22:22

**logical** 204:13

**logically** 214:12

**long** 7:19 38:14 42:24 46:9 48:9
99:4 105:6,15,17,20 158:11,20
199:19 232:22 248:11 286:19

**longer** 129:1 252:23 286:2

**looked** 18:15 42:12 50:15 120:20
198:21 201:15 203:3,8 224:21
231:5 264:13 266:9 282:7

**lot** 10:15 43:3 44:9 113:22 169:20
210:12

**love** 180:24 216:11

**loved** 46:1

**lower** 91:16 285:18

**lowering** 87:12

**lung** 28:13 29:19

**lungs** 28:16 29:20

---

## M

**M-A-S-O-K-A-S** 4:11

**M-I-C-H-A-E-L** 4:10

**machine** 120:16 167:9 285:15

**made** 43:21 75:10 87:13 89:1,7,18
94:10 96:4,16 99:18 100:18,22
104:3 108:14 111:2,13,21 118:20
124:21 127:2 144:7,13 145:14
146:23 147:4 151:3 161:11 170:5
185:12 191:7 218:16 240:2 255:22
276:16 277:12 278:10

**magazine** 15:16

**main** 51:18 286:21

**maintained** 256:10 262:18

**maintenance** 39:10

**major** 32:3

**make** 21:9 26:19 29:2 30:1 34:22
36:10 37:18 44:16 55:18,21 63:22
69:1 71:21 79:20 81:13 87:14
100:15 105:12 114:1,10,11,24

145:9 173:24 185:20 190:18
217:19,23 218:15 222:23 229:1
231:13 233:20 235:22 245:8
250:23,24 266:6 279:8 288:6

**makes** 38:23

**making** 85:2 87:23 121:16,23
140:24 157:19 181:18 204:3 251:2
261:1

**male** 75:21

**man** 10:17 39:10

**managing** 202:14

**manipulate** 114:8,14,23 116:2,20
123:10 124:14

**manipulation** 115:20

**manner** 247:18 272:17

**March** 172:3 174:16

**Marge** 202:19

**margin** 28:11 37:24 79:17,22
168:20

**Marianne** 20:17 21:1 44:12,22
45:17 194:24 235:20 237:1

**Marianne's** 47:13

**Marino** 200:2

**marital** 287:15

**mark** 23:15 88:20 93:19 96:4 97:17
105:1,2 106:7 112:22 119:19,20
121:15,16,17,18 122:7 125:22,23
126:1,3 127:23 130:12 134:4
136:15,23 137:14 140:5 147:17
169:9 221:2

**marked** 18:19,23 29:8,12 37:4,8
61:7,11 65:17 80:5,11 81:7 107:11
163:9 165:20,24 171:21,24 216:15,
20 280:2,6,8

**marking** 81:11 95:22 99:8 101:17
106:3 107:21 224:10

**markings** 75:9 82:17 84:23 85:1,4
90:20 98:2 99:12 140:8

**marks** 75:3,6,7 91:4 104:23
121:22,23 124:21 127:2 140:7,14

**Marlene** 202:19

**marriage** 44:20 45:1

**married** 41:15 76:2 287:18

**Martin** 175:20 199:6

MICHAEL MASOKAS, 11/05/2019

**Masokas** 4:2,7,10 5:9 18:19,22 29:8,11 37:4,7 61:7,10 81:7,10,14, 18 95:18 163:9,12 165:20,23 167:3 171:21 199:6 216:15 280:2

**master's** 8:18,21

**materials** 201:6,11 203:20

**matter** 132:15 179:21 180:2,5 244:16

**meaning** 97:17 102:10 106:7 198:2

**means** 63:6 78:18 85:9,18 93:21 94:4 96:21 97:9,18 102:7 106:8 112:22 119:13 121:14 126:1,5 132:3 138:6 169:18 177:22 247:14 279:1

**measure** 59:24 60:3,6

**measured** 58:19 59:15 83:13

**measurements** 30:13

**measures** 30:10,11

**measuring** 59:13 84:1

**medical** 24:18 27:17,24 29:13,24 30:18,19 31:1 32:23 35:8 50:13 224:20 282:6,22

**medicated** 168:11

**medication** 28:18 31:9,10 50:10, 11 142:22

**medicine** 31:12

**meet** 24:5 199:21

**meeting** 16:23 18:13 19:14 23:18, 20,23 35:4 52:5 173:1

**members** 203:12

**memory** 179:4,11 180:14 191:19 212:1 255:17 264:8,14 266:10,15 267:10 272:12,15

**men's** 150:5 267:22 268:3

**mentally** 21:22 194:20

**mentioned** 33:17 52:20 58:21 168:8 284:5

**mess** 14:13

**met** 13:24 14:18,21 16:14,15 17:5 24:10,13 41:16 172:21

**metal** 59:19

**methodologies** 232:15

**methodology** 178:3 229:23

253:11 258:18

**methods** 232:9 233:2

**MFCW** 75:20

**Miceli** 20:17 21:1 194:24 198:12 235:21 237:2 280:11

**Michael** 4:2,10 14:19

**mid** 28:16 29:21

**middle** 21:10 108:12,15

**midsection** 59:22

**Mike** 14:16 20:7 41:12 195:13

**mind** 19:19 124:9,17 166:22 168:16 184:8 186:3,12 271:8 274:4 275:12

**mine** 25:3,6 144:22 157:10

**minimal** 127:23 129:9,19

**minus** 46:16,18 91:20,22 110:5 118:9 150:14 151:3

**minute** 17:16 75:14 97:6 123:22 124:1

**minutes** 35:21 44:3 67:8,11,14 97:22 99:2,6 158:14,22 184:13,14 199:20 208:17 244:18 263:17 286:2,3,4,20,24 287:6,8,10

**Miranda** 171:11

**misconduct** 254:8,11,20

**misidentification** 22:7

**misidentified** 21:20 22:3

**missed** 227:19

**missing** 95:5

**misstates** 187:6 231:15 276:2

**mistake** 116:9

**misunderstood** 175:22

**mix** 69:16,19

**mixed** 22:8 68:23 69:7,13,24 106:23 108:7,18 112:14 116:24 123:1,20 126:19 137:6,7,9 138:1 169:22 286:23

**model** 245:15

**mom** 43:20 45:18 46:10 191:2

**moment** 34:21 37:10 118:1 163:15 282:11

**money** 22:21 151:22

**monitoring** 30:14

**monitors** 59:21 60:8 167:13

**monologue** 258:4,5 262:12

**month** 199:18

**months** 6:3,4 22:22 39:12 78:22

**morning** 80:12 149:12

**mother** 42:3 45:6,8

**mother-in-law** 244:5

**motion** 10:22 13:11 35:19 171:18 172:3,10

**mouth** 41:17

**move** 9:12 12:16 40:16 83:18 207:1

**moved** 54:22 83:21 99:18 108:15 152:17

**movement** 83:22

**movie** 44:1

**movies** 73:8,11 194:3 256:20 257:2 278:14

**moving** 32:8,14 33:1 106:13

**MQ** 107:1

**multiple** 63:24 228:7

**murdered** 244:12,13,21,23

**N**

**N-E-W-E-Y** 143:15

**named** 10:17 232:20

**names** 14:10 23:8

**Naperville** 14:6 25:5,10 72:7 83:6 149:1 163:21 166:3,16 201:16,20, 21,22 202:3 203:13,18 209:7 213:5 214:5,20 215:6 233:24

**narrative** 256:15

**nature** 183:8 281:9

**necessarily** 23:14 31:4,6 121:3 155:8 249:3 250:23

**needed** 77:11 189:17 259:5 267:24

**needing** 253:6

**negative** 46:18 91:19 92:18,23 93:1,6,8,11 100:4,9,11 101:2,5,8, 17 110:11,19,24 111:19 112:3,7,11

MICHAEL MASOKAS, 11/05/2019

**nervous** 49:3 64:18

**Newey** 143:14 144:15 145:7 148:13,14,20 149:13 152:5 153:23 157:5 158:4,12,15 159:4,16,22 161:11 210:18 211:4,12,14,20 212:7,23 213:12,22 214:6 215:16 221:15,21 222:4 230:15 233:3 251:14 252:5,6 253:5 255:10 259:20 261:17 262:2,4,12,17,19 263:17 265:15,19 266:10,16,23 267:21 268:1

**Newey's** 143:17 144:21 157:9

**nice** 260:8 288:6

**night** 159:20 161:10 181:17 252:24

**nodding** 134:12 181:21 256:12 257:22 260:18 262:16

**noncooperative** 142:8

**noncustodial** 11:14 13:1 223:6 283:13 284:2

**nonresponsive** 142:10

**nonsmoking** 263:12

**nonverbal** 243:4,6 246:5,17 259:10

**nonverbally** 243:1,9,10 245:7 246:11 248:19

**normal** 31:13 137:4 139:7,18 166:17

**Nos** 226:20

**notation** 50:13 102:15 137:22 149:16 151:10,13 161:20 170:6

**notations** 49:4 146:16,18,23 147:4 169:23 191:7

**notch** 130:19,24

**note** 39:4 195:19

**noted** 192:21 281:6

**notes** 18:16 19:12,18 21:19 37:12 39:17 50:15 61:4 79:15,20 150:11 152:1 190:16 191:6,12,16,17 192:17 194:15,18,20 196:5,17,21, 22 197:10,15,22 198:5 203:3,6 242:2,4,15,21 246:18

**notice** 23:1 26:22 40:13 87:3 131:24 136:14 137:16

**notified** 202:24

**NPD** 149:1

**number** 22:15 38:6,20 40:20 65:15 69:12 76:6 91:10,16 102:8 106:10 115:23 126:20 163:17 184:12 192:7 194:8,12 228:22 241:4 250:21 266:3 270:18 271:4,13

**numbers** 37:20,23,24 65:9,10 76:20 98:3,4 122:16,18 124:5 190:19 231:13

**numerical** 68:17 98:1 104:19 230:3

**numerically** 67:1

**numerous** 184:2,7,8,11

**nuts** 244:15

**NYESTE** 28:21,23 29:4 66:14,17 132:6,9 135:10 175:17,19 176:7 185:15,24 186:7 187:5 199:4 205:12 227:7 229:9 230:2 232:21 238:11,14,24 249:2 254:23 269:16 270:1 271:19 273:24 275:6,24 276:21,23 277:5,21 278:4 285:20 287:24

---

## O

**O'BRIEN** 203:21 280:18

**object** 11:15 13:4 15:9 17:11,20 18:14 23:11 26:14 27:7 30:21 32:16 35:23 36:4 39:6,19 41:6 50:22 52:9 53:11 55:16 56:15 57:8, 13 58:5 59:7 60:11 62:12 63:3 72:22 76:11 141:3,12 142:5 145:8 152:11,23 154:9 155:7 157:23 170:21 171:12 177:24 219:20 232:21 238:24 282:3 283:21

**objection** 175:9 176:7 183:18 184:19 185:15,23 186:7,17 187:5,7 189:20 190:4 193:7 197:12 202:1 211:5 213:8 214:9 215:14 227:7 229:8,9 230:1,2 231:15 238:11 249:1 253:16 254:22 269:15 271:18 272:4,7 273:8,22 274:12 275:6,22 276:21,22 277:21 278:17 287:3

**objective** 145:12

**observations** 57:16 127:19 157:20,21 187:11 213:21 243:2 246:5,8,23 259:7,11

**observed** 186:24 187:21

**observing** 122:3

**obtain** 7:1 265:20

**occasionally** 263:10 267:22

**occasions** 269:12,20

**occur** 205:3

**occurred** 41:16 184:3,10 264:15 271:1

**October** 10:17 11:11 13:3,13,19 30:15 79:23 83:9 149:9 160:12,17, 22 164:5,8 165:8 166:5 168:23 174:12 185:7 188:19 189:9,14 193:1 202:5,12 203:7,11 204:20 205:8 206:10 207:15 209:24 211:2, 22 212:11 214:24 215:12,21 216:24 227:2 233:5 234:3 235:17, 18 236:2,4,8 240:11 253:1 281:21 282:24 284:21,22 287:16

**offended** 183:9

**offense** 244:10

**offered** 149:23 161:20 182:24 265:8

**offering** 257:10,18 265:2

**office** 12:16,21 13:13,18 15:1,8,19 16:4 25:20 27:1 33:20,24 34:9,12 51:6,22,23 62:9 120:11,13 121:10 149:4,10 150:1 153:7,11 159:20 163:6 165:8 170:18,19 172:2,20,22 201:11 210:24 211:1 222:9 252:24 268:13 270:1

**officer** 171:1,10

**officers** 16:24 17:18 170:18 171:16 204:11

**offices** 215:22 234:2 268:7 270:8

**officially** 101:22

**oftentimes** 9:12 12:1 114:13 115:20 210:10 231:17 242:24 265:22 266:4

**one's** 127:15

**one-on-one** 266:5

**one-word** 63:14

**ongoing** 233:12

**open** 219:4 268:17

**opened** 15:12

**openly** 22:13

**opinion** 121:6 123:12 154:4 165:14 186:23 187:12 208:15 236:22 240:6 273:6 275:14,20 276:9,14,18 277:15 278:19 281:4

Index: opinions-polygraph

MICHAEL MASOKAS, 11/05/2019

**opinions** 235:15 236:1,19

**opportunity** 11:4 36:16,17 154:14 155:15 172:6 206:21,22 208:18

**opposed** 38:21 128:3 258:4

**opposite** 52:1

**options** 156:7 255:13

**order** 63:11 64:7 67:1,17 68:7,11, 18 69:16,20 74:24 88:10 89:13 90:13 99:21 104:19 108:20 114:9 124:18 133:23 137:7 190:3 198:6 248:18 281:12

**ordinary** 263:2,4

**original** 28:21,22 44:18 54:13 81:13,15 82:6 152:17 288:6

**originally** 95:23 221:22 224:5

**originals** 66:15

**outlined** 178:3

**output** 167:21

**overlapping** 288:7

**oversaw** 177:7

**oversee** 9:5

**overseeing** 177:15

---

**P**

**p-n-e-u-m-o-g-r-a-p-h** 59:16

**p.m.** 13:13 21:5 23:22 32:5 43:23 44:1,4 80:3 147:13 159:20 288:18

**pad** 144:20

**padded** 225:17

**pages** 19:4,8 172:14,15 287:7

**paper** 8:20 79:14 81:22 83:14 216:20

**paperwork** 202:22 203:2

**parameter** 125:6 128:20 133:6

**parameters** 84:3

**parentheses** 72:5,6 73:7

**part** 55:10 83:23 87:16 133:7 139:3 144:24 156:15 183:5 204:12 209:5, 12,14,16 225:23 246:21 249:6,11 263:23

**part-time** 7:7,9 39:9 200:6 201:4,5

**pass** 211:17 239:18

**passed** 6:18 211:15 276:13

**passing** 154:11,15 155:11 156:1 181:13

**past** 33:11 207:1

**pause** 39:24 105:5,15,18,21

**pay** 233:15

**paying** 209:12,13,14

**PD** 203:18 209:7

**peer** 233:18

**pen** 96:10 130:21 131:17 134:7,8 136:19,23 138:24 139:1,8 216:22 250:23 251:1

**pending** 5:5,6

**people** 64:15 182:12,24 185:18 188:13,21 193:4,6 202:19 210:13 211:7,8 213:4 214:21 215:7 221:18 232:10 239:10,14 242:23 244:1 245:5 249:19 255:22 266:3 268:7

**percent** 145:23 153:10 231:6

**perception** 163:5

**perfectly** 82:4

**perform** 32:1

**period** 9:13 177:10 204:23 205:8 221:9,18

**person** 42:10 56:23 64:16 67:21 71:1 171:9 189:1,18,23,24 190:2 192:16 202:17 206:13,16 208:14 210:13 230:10 243:9 244:4,20 245:16,18 248:18,24 270:16 284:1

**person's** 207:21 248:22

**personal** 253:5

**personality** 157:10,14,22 158:6 184:17 260:9

**personally** 202:7 231:21 261:1

**perspective** 17:8

**perspiration** 103:24

**pertain** 53:4,23

**pertinent** 36:16

**phone** 12:4 21:16 41:14 43:21,22 210:22 268:18

**phrased** 247:17,18

**physical** 161:4,7,13 230:15

**physically** 160:13,19 274:8,23 275:7,9

**physiological** 30:5,8,20 31:2 56:10 57:1 58:19 239:18

**physiology** 6:7

**pick** 43:20 65:3 98:8,10,11,14,16 268:18

**picked** 65:21,24 76:6 98:21

**picture** 66:6 190:7

**piece** 216:20 219:13

**pizza** 43:20

**place** 35:13 60:9 65:6 153:14 216:4 218:23 223:12 261:15

**places** 19:19 167:12

**plaintiff** 173:18 283:6

**plaintiff's** 173:8

**plan** 72:17

**planning** 278:7

**players** 23:10

**playing** 65:2

**pneumograph** 59:16

**point** 4:22 5:21 7:10 8:5 9:16 12:6, 20 13:10 17:17 18:1,10 24:2,9 29:23 34:15 36:21 49:11 55:5 57:23 58:3 66:18,19 67:9 76:23 77:4 80:24 89:22 91:22 98:23 103:22 106:20 120:1 130:21 149:10 152:20 153:11 156:6 157:4, 7,22 159:7,9,13,18 169:17 186:20 193:21 197:13 201:8 206:9 211:24 221:14 234:24 248:22 250:22 253:22 259:16 260:23 261:3,11,14 262:4 276:1,12 283:19 284:5 287:15

**points** 148:24

**police** 12:11 25:5,10 79:6,9 83:7 149:1 166:3 170:10,18 171:1,10,16 201:20 202:4 203:13 213:5 214:5, 20 215:6 233:24

**policies** 178:5 188:19 189:10 190:11 204:18

**policy** 20:24 22:11,13 194:14 198:11

**polygraph** 6:1 7:5,6,18,19,24 9:4, 9,20 10:3,16,23 11:13 13:1,9 19:10 30:3,4,9,10,14 32:1,8,14 33:2

---

MICHAEL MASOKAS, 11/05/2019

45:23 47:9 48:14,23 49:8 52:16,24 54:11 55:1 57:24 58:3,7 62:5 63:24 71:15 72:11 75:8,18 76:10 78:19 79:10 80:17 81:21,24 82:19 83:11 107:3 115:21 119:23 120:16 145:20,21 146:4 147:24 148:2,17 153:18 156:1 161:4 164:8,17 165:3 166:4 170:8 174:11 176:21 177:7, 12 178:8,11,14,19,24 179:5,12,16, 21 181:12 185:1 187:1 188:4,11, 13,20,24 189:2,12 200:14,17 202:5 203:20 204:7 205:5,10,18 206:11, 15,17 207:6,7,19 209:13,18 210:2, 14,19 211:21 213:22 220:12 230:12 232:9,16 233:8,13,19 234:13 235:2 237:19 238:9,21 239:15 250:4 257:14 273:1,15 274:4 275:19 276:11 281:3,8,10,11 282:1 283:13 285:7

**polygrapher** 5:22

**polygraphs** 178:15 203:22 204:20 205:3 280:11

**poorly** 275:11,19

**portion** 77:16 191:12 196:22 214:23 215:10

**portions** 223:23

**pose** 260:16

**posed** 62:4 165:3

**position** 7:7,16 8:1 177:7,14 219:5

**positive** 101:18

**possibilities** 181:22

**possibility** 190:7 205:2 231:4,6 247:1 249:16 263:22 264:2 267:15, 23

**possibly** 116:22 181:16 195:14 211:24 263:7 266:2

**Post** 148:4 151:14,16

**post-exam** 251:13 262:3 264:15 283:4

**post-interview** 283:8,14

**post-polygraph** 210:1 216:3 235:6

**post-test** 148:5,7 151:15,19 154:6, 21 155:1,5 156:11 161:8,12 162:18,21,24 171:4 181:4 218:10 220:9,10,16 224:18 225:9 251:21, 24 253:20 255:1,7 256:14 257:4,5, 6,12,13 258:11 283:24 284:1

**potential** 189:11 203:1

**potentially** 194:24 197:23 261:22

**pounds** 86:3,4,19 250:18

**practice** 11:12 12:9,24 55:11 154:19 206:19 215:17 240:11 263:15

**pre-employment** 79:10

**pre-interview** 192:15 234:8

**pre-meeting** 196:15

**precaution** 116:1

**precluded** 281:4

**pregnant** 253:1

**preparation** 174:6,9,20 176:11 179:1 212:11 264:7

**prepare** 175:1 178:22 212:8

**prepared** 212:12

**preparing** 199:11

**presence** 22:13 161:17

**present** 16:23 28:3 35:16 153:21, 23 199:24 213:3 229:21 238:8,19 278:12

**presented** 27:5 281:21

**pressure** 30:11 31:9,10 56:14 58:9,13,21,24 59:4 60:2,3 84:21 86:1,2,3,4,6,20 87:10,13 90:1,3,21 93:19,24 94:5 97:1,9,10,14 99:13, 19 100:19,20 102:2,8,12 103:3 104:14 106:3,11 111:5,11 113:2 117:15 118:22 119:16 131:16,22 132:4,15,18 134:19,23 135:4,7,13, 15,17,21 136:13 137:17,18 138:12 139:10,13,23 167:12 168:13 250:3, 9,18,21,24 285:3,5,9,14,15,18 286:3,8,18

**pretest** 35:12,13,17,20 36:7,22 37:1,12 50:17,21 51:3 52:4 61:14 76:13 80:7 147:14,15 162:6,7 171:3 225:5,9 253:19 255:1 257:4

**pretrial** 180:3

**pretty** 44:21 45:1 66:20 133:8 136:22 155:10 159:12 258:10 279:7 285:23

**previously** 41:11 75:18 241:13 280:12

**price** 260:7

**primarily** 23:12 143:8 256:18 257:9

**primary** 123:9

**printed** 25:24 147:8

**printing** 81:22

**printout** 120:16 231:14

**prior** 12:2,4 18:1 22:21 77:23 89:2 107:8 125:8 146:5 150:19 175:2 178:21 179:1 184:24 185:2 191:16, 22 202:12 203:11,22 231:16 247:23 263:13 281:7

**privacy** 218:12 265:21 266:4

**problem** 185:4 192:16 193:5 194:24 279:19

**problems** 28:13 29:19 32:6 282:19

**procedure** 12:8 154:13 208:8,9 209:6,10

**procedures** 178:4 188:20 189:10 190:11 204:18 222:15

**proceed** 57:23

**proceeded** 255:17

**proceeding** 180:3,4 246:20

**proceedings** 288:17

**process** 6:1 35:10 51:8 75:11 144:7 162:6,8 163:3 170:8 208:12 233:17 246:1 250:4

**professional** 6:20 201:18

**program** 6:3,11,15

**progress** 261:1,5

**progressing** 261:6

**project** 8:20

**promoted** 7:24 177:6

**prompted** 116:23 181:19

**pronunciation** 14:13

**proper** 189:15

**protocol** 11:12,19 210:8

**provide** 12:3 17:21 154:24 256:15

**provided** 16:20 18:12 36:15 176:20 177:3 191:22 257:1,8

**providing** 20:21 22:23 262:13

**provisions** 43:3

MICHAEL MASOKAS, 11/05/2019

**psychologist** 187:8,18

**psychology** 6:6 248:22

**published** 8:20

**pull** 241:22

**pump** 250:12 285:22,24

**purpose** 29:24 36:7 55:13 64:14 123:8,9 145:6 248:15 249:9

**purposeful** 142:8

**purposes** 30:17 123:8 169:22 239:9

**put** 54:10 60:9 69:12 91:9 131:16 134:7,8 136:19 138:3,24 139:8 152:19 285:3,6

**puts** 16:6

---

**Q**

**Qs** 147:18

**quantity** 281:7

**question** 4:20 5:5 6:7 17:23 38:5, 17,21 39:20 40:13,15 41:1,7,21 42:8,19,20,21 43:1,6,7,10 44:11 45:10 46:3,12,19,20,21,24 47:2,7 48:2,3 49:13,23 52:14 55:19,20 56:5,12 68:8,23 69:7,13,24 71:23 72:1,3,8,10,13,14,16,19,24 73:1,4, 6,10,14,17,24 74:3 76:20 77:6,11 91:1,6,9,10,14,15 92:8,10,14,17, 20,23 93:1,3,6,8,10,18 99:22 100:16,24 101:4,7,12,13 102:1 105:2,3,6,14,17,20 106:9,24 107:10,15,19,23 108:2,7,18,21 109:2,12,17,24 110:2,3,8,9,13,17, 21,22 111:3,14,17,21 112:1,5,9,13, 14,24 116:11,24 117:6,18 118:4,7, 14,15,16,17,18,19,24 119:2,4,6,7 123:2,20 124:9,23 125:8,13,20,22 126:6,16,19,20,24 127:8,22 128:13,14 129:5,8,20,22,23 130:12,13,14 131:13,14,15,16,18, 22 132:13,14,17,24 133:24 134:5, 6,10,14,16,22 135:3,4 136:8,10,12, 15,17,21 137:3,6,8,9,15,17 138:1, 2,5,10,11,18,19,22,23 139:2,15,16, 17,19,20,22 140:2,3,5,16,17,18 141:24 143:3,4 150:21,24 151:11 169:2,4,12,14,15,16,18,22 174:1,3, 8 175:23 176:3 177:6,21 179:8 184:9 189:24 192:13 196:8,13,14 197:4,6 198:1 199:10 205:14,16,23 206:14 209:22,23 214:18 215:2

221:8 227:6,9 228:6,9,17,18,19 229:11 230:5,6 232:2,22,24 235:5 237:12,15,16,19,24 238:2,3 239:3 241:11,16 242:13 243:5,9,10,14,21 244:8,11,13,22 245:19,23 246:3,7, 15 247:11,14,15,16,17,23,24 248:4,5,12,15,24 249:4,6,10,12 252:2 253:17,23 254:14 255:4 256:22 258:1 260:16 270:3,5 271:21,23 274:18 276:5 277:6 278:9 282:12 283:7 285:2 286:23, 24

**questionable** 40:3 123:13

**questioned** 254:21

**questioning** 158:16 189:18 193:1 253:11

**questions** 24:16 36:21 49:7,8,9,11 51:7,9,19,22 52:8,13,17,21,23 53:2,3,4,6,9,16,19,22 54:1,4,8 55:2,6,8,14,18,23 57:10,12,17,20 58:11 61:22 62:3,8 63:9,10 64:6 66:24 67:17 68:11,14,16 69:19,20 70:10,11,18 71:5,7 74:7,12,13,15, 17,20,23 75:4,10 76:24 80:8,9 81:23 82:5 88:11 90:12,21 103:13 104:18 105:7,8,10 107:2,3,4,14 108:3,19 117:5,10,11 118:13 120:19 127:21 138:2 140:10 141:1, 6,17,21 142:14,17,20,24 143:9 144:1 147:20,21 150:13,14,18,20 151:5,8 152:3 155:1,4,5,6 164:18, 19,22 165:2,15 167:4 168:17 169:21 172:16 173:9,10,19,22 178:11 193:12 203:19 204:18,22 224:12,17 226:19,22 227:4 228:11 229:20 237:10 238:8,20 239:7 240:2 241:4,21 242:9,22 245:6,17 249:5 250:20 251:13,18 255:6 256:23 257:7 263:1 278:22 279:13, 17 280:11 282:7 283:3,6 284:13 286:14

**quick** 29:2 87:22 224:17 279:8

**quicker** 86:21

**quickly** 285:19

**quiet** 256:11

**quietly** 172:15

---

**R**

**rack** 15:16

**radio** 236:17

**raises** 124:12

**ran** 63:5 116:1 147:23,24 208:13 276:11

**RANUM** 4:6 11:17 13:5 15:21 17:13 18:4,17,21 23:16 26:17 27:11 28:22 29:1,10 30:23 32:21 36:1,6 37:6 39:13 40:7 41:18 51:1 52:10 53:13 56:1,16 57:9,15 58:17 59:8 60:15 61:9 62:13 63:18 66:21 72:23 76:15 81:1,5,9,14,17 82:10 89:5 95:2,13,16,17 97:23 109:8 116:13,14 133:15 135:14 141:5,14 142:9 145:13 152:12 153:1 154:16 155:12 158:9 163:11,19,22 165:22 166:22 167:1,2 170:23 171:14,23 173:8 175:9,12,21 177:24 183:18 184:19 185:23 186:8,17 187:7 189:20 190:4 193:7 197:12 202:1 211:5 213:8 214:9 215:1,14 221:2 223:16 224:16 226:5 227:8,14 229:8 230:1 231:15 238:13 239:1 249:1 251:7 253:16 254:22 269:15 271:18 272:4,7 273:8,22 274:12 275:22 276:1,22,24 278:17 279:11, 15 280:4 282:4 283:22 286:5,11 287:3,21 288:2,13,16

**rapport** 260:3,12,19 262:23 263:9

**re-ask** 196:14

**re-exam** 77:22 78:20

**re-examination** 77:21,22 78:1 281:12

**re-read** 277:9

**re-reviewing** 165:13 194:15

**reach** 240:6

**reaction** 56:5

**read** 20:12 21:12 24:15 43:16 63:11 71:21,22 72:8,10,20 73:10, 17 74:3,12,15 89:15 91:6 102:1 116:10 134:22 135:7 136:21 150:21 172:14 186:8,10 215:1,3 238:14,15 246:10 269:17 274:20 277:10

**reading** 101:12 105:2 110:3 115:6 118:4,7

**ready** 19:6

**real** 114:12 130:4,5 134:3 224:17

**realized** 194:11

**realtime** 81:23

MICHAEL MASOKAS, 11/05/2019

**reason** 38:18 39:21,22 48:7,10 87:5 115:17 142:19,22 166:16 222:13 226:11 246:4,13,16 248:8, 13 249:11 252:10,21 254:18 257:15 260:14 275:10

**reasons** 252:22

**reattached** 104:1

**recall** 13:8 14:2 18:11 50:19 151:18 196:4 202:7 263:1 269:4

**receive** 5:14,19 6:15 8:17 188:12

**received** 5:17 6:21 8:5 13:12 32:11 172:2 188:3 201:7 281:18

**receiving** 8:9 34:1

**recent** 11:7 28:12

**recently** 11:5 172:7 194:11

**reception** 15:18 33:11 34:2

**receptionist** 268:14,23

**receptionists** 202:21 211:7

**recess** 29:6 81:4 166:24 251:10 279:10

**recognize** 163:16

**recollection** 153:16 168:21 172:24 195:3 221:20

**recommended** 281:10

**reconstruct** 288:8

**record** 4:9 5:2 18:24 34:22 81:1,3, 5,12 82:4 95:13,15,16 104:23 116:12 167:1 175:12 186:10 210:1 215:3 218:15,16 238:15 251:9 269:17 274:20 276:2 277:10 279:11 288:3,16

**recorded** 210:9,10

**recording** 84:4,7 88:23 89:2 93:19 94:15 100:21 102:21 111:5,10 126:2 131:6 133:7

**recordings** 31:5 90:3

**records** 81:21 164:17 281:3,10

**rectangle** 219:16

**rectangular** 219:3

**red** 89:4,9 125:9,17 129:16 133:8 139:4

**reduce** 250:16,24

**refer** 81:15 194:19 280:24

**reference** 194:7 253:24

**referenced** 152:13 174:17

**referred** 197:2

**referring** 19:13 23:2 168:16 225:19 280:22

**reflect** 196:22 197:24

**reflected** 128:4 182:9 191:11 197:10

**reflects** 198:22,23 199:3

**reformulated** 77:12

**refresh** 172:24 191:18 212:1 264:8,13 266:9,15 267:10

**regard** 138:12 168:19

**regular** 225:12 249:4

**Regulation** 6:20

**Reid** 6:2,10,22 7:11,14,17,20 8:3,5, 7,14,18,23 9:4,18,22 10:6,8,11 11:11 16:4 25:9 121:12 174:11 176:16 177:18,23 178:2,5 188:10, 18 189:15,23 190:10,12 200:3,5,8, 11,18,22,23 201:7,16,19,20,22 202:14,23 204:8,19 205:8 206:3,15 207:14 209:24 214:19,22,24 215:5, 8,12,22 222:15 227:1 234:1 245:9, 11 251:18 252:1,7 253:10 254:4,17 258:19 268:6,13 270:8

**Reid's** 165:8 189:10 280:19

**reject** 183:2,6,7 185:19

**rejecting** 181:22 182:19

**rejection** 182:4

**related** 145:22 174:24 180:4 203:22 224:18 236:23

**relatedly** 250:7

**relation** 33:5,7

**relationship** 201:23

**relative** 203:7 226:21

**release** 25:9 27:12 86:17 224:21 285:23 286:3

**released** 90:1 94:5 102:7 103:12 112:20,22 113:3 119:18

**relevant** 53:3,22 74:8,16 105:8,17 109:1 126:6,16,20,23 127:20,22 129:8 130:13,14 133:24 137:8,15 138:1,10 140:10 141:1,6,17,21,23 142:14,17 143:4 152:3 164:22

165:2 206:14 246:24 284:12

**relied** 204:2

**relieving** 132:17

**reluctant** 265:24

**remain** 233:13 235:15

**remained** 17:5 34:24

**remember** 8:24 10:13,18,21 14:8, 10 18:8 155:22 166:12 170:10 180:8 197:13 199:22 202:6,8 207:24 246:12 252:12 264:1 265:7 269:3 279:20 280:14 283:10 284:9

**remorseful** 43:2

**rendering** 281:4

**repeat** 119:7 196:11 269:16 274:18 277:21

**repeated** 41:1

**rephrase** 55:20 57:19 87:6 141:4 173:23

**report** 142:15 163:20,23 164:2,4,7 168:7 212:11,15 235:16 236:5 281:1 284:22

**reported** 143:8 273:15

**reporter** 4:15 183:4 216:13 227:13,15,19,23

**reporting** 124:16 206:7

**reports** 204:7 212:8 280:18,21

**represent** 172:1 175:13

**represented** 175:19 198:24 199:6

**represents** 175:6

**request** 161:17 185:11 221:7

**requested** 161:24

**requests** 185:19

**reread** 27:1

**research** 8:20 187:12

**reserve** 288:1

**residence** 75:23

**respect** 237:17 275:7

**respiration** 30:10 59:15 84:3,6 88:22 89:2 116:16 125:6,21,24 126:2 127:24 128:21,24 129:3,24 130:18,22 131:6,23 132:3 133:2,6, 11 134:1,8,17 135:18,23 136:13,19 137:12 138:23 139:3,12 168:12

**respirations** 124:11

**respirator** 89:18

**respiratory** 28:13 29:18 59:24

**respond** 31:5 242:23,24 245:5 246:11 250:20 258:14

**responded** 39:4,18 48:18 91:22 103:10 242:9,21

**responds** 248:18

**response** 30:12 39:23 43:9 56:21 59:18 84:11 94:11 102:20 103:11, 19 104:6 121:17,18 125:20,24 126:2 127:5,6,8,24 129:3,9,18 131:23 133:2 135:8,13,16,21,23 136:10,13,15 137:12 138:6,10,16, 19 139:12,13,24 140:4 150:24 156:20 168:11,14 169:13 173:24 226:21 227:3,11,17 228:1,7,12,22 238:4 240:14 244:1 245:15,19,23 246:14 249:20 256:3 281:2

**responses** 30:6,9,20 31:2,7,14 57:1 58:19 60:6 103:13 106:18,20 122:3 132:3 141:23 142:20 164:15 228:2,17,19 231:20 237:23 239:18 243:4,6 246:17 249:13,15,17 257:1,8 258:7 260:1 262:13 275:21 284:8,20,23

**responsibilities** 177:15

**responsibility** 177:2 261:8

**responsible** 202:13 258:14

**responsive** 260:18

**rest** 20:12 66:8 97:21 99:1 149:12 226:1 249:24

**restate** 278:9

**restroom** 222:9 268:1 269:4,5

**result** 115:19 142:15 144:21 145:16

**results** 66:9 123:11 142:2,4,13 144:6 148:17 153:3,7 154:3 165:6 167:19 168:5,7 178:18 205:9,12, 18,19 207:1,2 208:5 209:11,13 213:21 257:13 265:3 274:3 275:10 276:8 281:13 284:6

**retained** 13:8 236:13

**retarded** 21:23 194:21

**retired** 200:4

**review** 9:6 11:4,7,8 19:5 35:7,11 36:20 55:8 150:18,20 163:15 172:6
175:3 176:4,10 178:21 197:15 231:3 233:18,19 264:7,12,19 266:8,14 267:9 287:24

**reviewed** 27:13,18 55:6 57:10 61:17,21 63:10 75:8 76:24 77:4 90:13 172:7 174:6,7,10,15,20,23 175:2 197:22 264:7

**reviewing** 21:19 55:13 57:20 191:18 194:11

**Richard** 5:12 203:21 280:18

**ridiculous** 181:23

**right-hand** 79:13,14 146:16 149:18 168:20

**rights** 171:11

**rigid** 229:17

**rise** 129:14 133:9 135:5 139:6

**risk** 190:2

**Rivera** 175:4,13 180:12 198:22

**role** 145:4 200:8,13

**rolling** 234:18

**romantically** 21:24

**room** 12:7 21:11 24:6,9 27:19,21 33:4 34:15,16 35:14 51:5 52:1 54:10,11,13,16,21 55:3 67:7,11,21 80:18,22 83:10,11 97:19 99:4,7 119:20 121:4 147:20 148:16,22 150:5 152:15,18 153:2 155:18,21 156:16,24 157:2 158:12 159:4,14, 23 167:6,9 213:14 216:3,4,9,23 218:1 219:1 220:13,14,22 221:10, 19 222:16,18 223:13,24 224:6,19 225:14 244:17 259:19 263:6 265:22 267:15,22

**rooms** 24:3 33:15 34:18 54:10 217:24 268:3

**roughly** 23:21 35:21

**round** 225:17

**rounded** 128:20 130:2,3 131:7,8 137:2

**rounds** 128:21

**routine** 78:20,22 79:1

**routinely** 263:8

**run** 9:8 27:10 58:8 60:13 63:8 65:14 78:22 86:22 207:1 240:17 285:17 286:2

**rundown** 148:18

**running** 78:19 150:19 152:16

**S**

**S1** 23:2 194:7

**S2** 23:2 193:17,22 194:8,13,20

**S3** 23:2 193:17

**SA** 79:5

**salesman** 260:5

**sat** 16:20 104:9 218:8

**satisfactory** 260:1

**satisfied** 224:13

**Saturday** 211:19

**scale** 217:2

**scamming** 22:20

**scared** 265:11

**scenarios** 183:1,5

**schedule** 202:10,14

**school** 73:5 225:22 226:2 232:12

**schools** 232:15

**scientific** 276:15 277:11,22,24

**scientifically** 278:11

**score** 69:11 82:19 120:9 121:2,5 143:11,17 144:18 231:8,10

**scored** 121:8 123:3 144:15 206:17 208:4 234:14 284:6

**scores** 144:2

**scoring** 120:6,7,14,24 121:11 123:8 124:20 143:10 144:8,10,24 145:4,7,12 152:7 169:1 226:13,17 227:1 229:2,17 230:3,12,16,19 231:1,4 232:4,5,10,18 233:2,20 234:19

**scratch** 144:20

**SDT-REID** 19:1,9 24:20 37:9,10 61:12 163:13 166:1 191:7 192:3 193:15 195:8 247:4 280:8,24

**seconds** 58:11 105:9

**section** 191:5 193:15

**secure** 15:19 16:19 33:11,18,23 34:6 153:17

MICHAEL MASOKAS, 11/05/2019

**sees** 144:2

**segment** 286:19

**segments** 286:17 287:1,4,7

**seminar** 8:16

**send** 164:4

**senior** 213:22

**sense** 38:23 87:14 114:1

**sensitive** 266:1

**sensitivity** 85:9 94:13 96:1,3

**September** 19:23 43:13 45:9,10
72:4,11 73:7 145:21 151:1 278:15
279:4 280:13

**series** 61:2 64:24 69:7

**services** 176:16,19,20,21,22
177:1,3,12,16

**set** 40:17,23 41:10,23 42:9,10,22,
23 51:15 63:16 73:15,18 85:13
96:1 197:5,8 202:9 226:9 236:11
243:21,22 252:13,14 257:16,17
277:4 278:5,23

**setting** 46:13 51:14 151:20 156:3,
9

**severe** 127:13

**shake** 86:5

**shaken** 90:16 97:2

**shapes** 219:7,15 220:3

**sheet** 27:17,24 29:14,24 30:18
31:1 32:23 35:8 38:4 50:13 61:15
65:17 69:8 84:15 91:2 127:3 132:1
136:14 168:21 198:22 199:3
226:13 230:16,20 231:1,10 246:10
251:3 282:6

**sheets** 61:17 84:24

**shift** 244:7

**shifted** 42:2,15 44:10 47:19

**shoe** 42:12

**shook** 99:14 117:16

**shoots** 132:18

**short** 39:24 287:9

**shorter** 105:11

**shortly** 213:24

**shot** 96:14

**show** 61:4 62:18 64:17,21 109:6
154:12 217:13 220:15 239:10,21
277:22,24 279:22

**showing** 18:22 29:11 37:7 61:10
81:10 163:12 165:23 171:24 209:9
280:5

**shows** 29:4 69:8

**shuffle** 65:7

**side** 12:21 15:17 28:11 36:18
37:20 60:14 61:14,20,24 65:18
78:8,11 79:13,14 146:16 150:4
169:2 182:23 194:5 217:24 245:3,
22

**sighed** 42:24

**sign** 26:8 46:17,18 101:18 110:5
118:9 119:24 148:10 151:3 182:19,
22

**signaled** 116:19

**signals** 40:9

**signature** 25:23 26:6 82:12 164:1
287:22 288:1

**signed** 26:4 27:2

**significance** 227:24 228:22

**significant** 127:6,7,11,15,24
128:15 130:5 133:1,8 134:3 139:20
140:10,17,18 164:15 169:14,18
227:10,16 228:20 241:12 250:5

**significantly** 131:11

**signifies** 109:23 110:2,5

**signify** 127:18 169:11

**signifying** 122:2

**signs** 150:14

**silent** 68:4,5,17,21 104:10,18
105:24 122:24 123:20 126:12
127:8 133:19,21 134:7 286:23

**silently** 68:8,14

**similar** 46:14 157:16 258:13
261:18 262:14

**Similarly** 194:17

**simple** 40:15 63:14 67:18 69:23

**simply** 66:5 96:22 121:13 170:4

**single** 126:10

**sinus** 32:6 282:18

**sir** 40:1 41:2 173:15 174:3 190:15,

20 192:1 198:19 216:18 226:11
243:19 279:13

**sit** 12:1,21 161:7 171:1 179:6,10
203:15 204:6 222:12 224:7 225:12,
21 255:16 256:6 262:24 264:2
270:24 272:16 284:1

**sitting** 14:5,9 18:9 121:4 153:12,
17 221:22 222:20 223:2,9,13,21
224:4,22

**situation** 11:23 181:14 205:7,10,
24 207:12 214:17 254:9,17 270:13
279:3

**six-month** 6:3,11

**skin** 30:12 56:21 59:18 60:6 84:10
94:11

**skinny** 84:9 96:5

**skipped** 95:10

**slash** 91:4,5,8,14 101:11,12
104:23 105:1,2 109:23 118:3,6
147:17

**sleep** 32:12 142:21 162:9 167:20
168:3,10

**sleeping** 252:24

**slide** 268:17

**sliding** 15:18

**slight** 131:23

**slightly** 128:10

**slower** 128:2

**slowly** 285:23

**small** 112:19

**smaller** 54:23 87:14 219:15

**smoke** 21:2 161:23 198:15 267:13,
18,22 268:3

**smoked** 263:5

**smoker** 158:4 261:23,24 263:3

**smoking** 262:22 267:15

**sneeze** 115:12,14

**somebody's** 79:9

**someone's** 184:8 197:3 250:3

**sort** 8:17,18 15:4 16:12 17:17 34:1
79:14 111:2 149:17 191:5 229:6
240:13 265:12 279:19 288:4

**sorts** 6:15 144:10

MICHAEL MASOKAS, 11/05/2019

**Sotos** 175:18 198:24 199:5,12,15

**sound** 35:21 44:21 45:1 181:23

**sounded** 158:3

**sounds** 136:4 174:15 182:2 198:23 223:8

**South** 13:20

**space** 15:20 90:2

**spaced** 196:10

**speak** 12:22 17:2 38:4 49:12 114:12 149:2

**speaking** 20:20 21:20 51:10 63:1 158:2 181:11 202:8 256:2

**specific** 10:5 78:19 79:5,6,8 83:5 153:9 184:12 188:7,15 197:6 214:11 232:19 242:8 252:9 263:1 264:4 267:19 270:4,18,21

**specifically** 10:13 14:7 18:7 145:21 166:14 174:21,24 178:15 197:11 202:6 206:24 207:7,19 208:3 212:3 242:16 251:20 255:8, 20 263:19 268:24 272:16 281:24 282:8

**specifics** 145:11 264:9

**speculation** 184:20 190:5 214:10 273:23 274:13 275:23 277:1 278:18

**spell** 4:8 196:1

**spent** 22:21 151:15 160:2,11 168:22 209:18,19

**spike** 83:19 116:16

**spilled** 22:16 192:8

**spilling** 263:23

**spoke** 22:12 41:14 74:6 148:16 151:22

**spontaneous** 244:1

**spot** 223:9

**spots** 28:16 29:20

**square** 27:23 218:22 225:23

**squeeze** 86:5,7,9 250:15,16

**squeezed** 86:12

**squeezing** 86:16

**St** 5:11,13,15 92:5 99:8

**staff** 7:18,19 9:5,9,10 177:15 210:12

**stamp** 288:14

**stamped** 19:1 37:9 61:12 163:13 166:1

**stand** 176:5

**standard** 11:12 12:9,24 53:2 55:10 154:13,19 166:11 208:8,9 209:6,10 249:5,6,10

**standing** 224:1

**stands** 47:23 106:16

**start** 4:20 12:8 35:12 36:22 58:16 72:5,12,18 77:7 82:15,22 83:14 89:22 99:2 101:12 105:1 109:23 115:6,11 125:12 133:23 151:1 162:6 177:20 201:1 205:14,16 216:19 227:21 232:1 254:14 277:23

**started** 7:21 40:3,4 42:11 43:8 44:7,9 80:6 94:12 97:4 99:9,15,20 100:19 101:19 104:15 106:23 107:8 108:7 111:10 117:13,16 118:3,10 147:14 148:5 198:8 213:24 218:10 257:12,13 278:1

**starting** 96:2,24 108:13 147:1 156:12 158:24 234:17 276:20 277:19

**starts** 76:10 84:15 85:19 87:1 90:19 95:8 132:15,19 134:20,23 137:19 139:7,10 250:21

**state** 4:8 6:19,23 7:2 198:19 236:13

**statement** 278:14

**status** 281:5 287:15

**stayed** 16:19 44:3

**STD-REID** 242:5

**stealing** 49:20 70:20 73:2 107:20

**step** 58:7 60:14 67:7,10

**stepped** 51:5 54:9 67:13 80:9 119:20,22 147:19 148:1,18 259:19

**steps** 188:24

**stick** 217:5,7

**stimulation** 64:14 106:16,23 107:8

**stomach** 59:17

**stool** 218:6,7 219:20,21,24 220:23 221:23

**stools** 219:16

**stop** 65:23 162:3,8,12,20

**store** 201:11

**story** 36:18

**straight** 63:5,6,20 64:4 66:12,13, 22 67:5 68:1 74:22 85:12 89:23 90:6,7,9 92:5,7 93:16 94:9 95:7,11 99:9 101:10,16,22 102:3,23 103:14 104:4,19 106:4,5 117:20,21,22 122:18,21 123:18,19 124:19,23 125:2 126:10,11 127:18 128:16 130:10 169:6,8 170:3 256:1 286:22 287:9,10

**straightened** 89:14,16 156:22

**straightforward** 66:20

**street** 15:23 209:8

**stress** 250:2

**strike** 56:11 143:16 168:1 174:7 253:8 264:5

**stronger** 121:18 129:23 138:6,9, 18

**stuck** 181:2 256:18

**studies** 187:11

**study** 6:6,9

**stuff** 157:16 230:16 253:3

**SU** 85:9 94:12,18 96:20 104:7

**subject** 10:3 11:20 12:5,7,15 20:17,24 21:2,4,5,16,22,23,24 22:1,3,4,9,11,12,15,20,21 23:3 56:23 102:19 103:18 149:21,22 189:2,11 192:7 206:21 207:3 209:9 210:2 222:12 223:1 248:16 249:12 254:7,8,10,19 263:3 281:7,11

**subject's** 83:18 102:19 104:2 164:16 222:11,14 225:1,19 281:3,5

**subjects** 10:11 114:8 249:16 262:21

**submit** 288:9

**submitted** 163:21

**subtle** 106:19,21 231:21 284:9,17, 21

**sudden** 125:13

**sufficient** 161:7

**suggest** 31:11 154:6 183:10 185:3 248:16

Urlaub Bowen & Associates, Inc.    312-781-9586

Index: suggested-thing

MICHAEL MASOKAS, 11/05/2019

**suggested** 156:7 181:14 255:13

**suggesting** 257:23

**suggestion** 248:19

**suggestions** 181:18 183:1,6 255:22 256:1,11 257:9,19

**suit** 272:20,23

**suitable** 30:3

**sum** 186:23

**summarize** 155:23

**Sunday** 19:23 43:13 72:4,11 150:24 247:24

**super** 127:10,24 136:7 137:11

**supervision** 6:5

**suppose** 43:2

**supposed** 20:8 132:12 254:17

**suppress** 10:22 13:12 35:20 171:18 172:3,10

**suppressed** 131:9 134:11,16,17 136:18

**suppression** 136:22 180:4 212:1, 5 264:17

**surgery** 28:16 29:20

**surmising** 252:15 260:21

**surprise** 56:9

**surprised** 46:8 56:3,4,24

**surprises** 55:24

**surrounding** 235:20 237:1

**suspect** 41:9 197:2,3 253:13,15

**suspects** 20:16 23:6,9,13,14

**suspicion** 41:7,9 240:8,16 241:6

**suspicions** 241:1,3

**suspicious** 124:17 240:23

**Swanson** 175:20 199:5

**sweaty** 103:18

**swing** 87:1

**sworn** 4:1,4

**swung** 218:3

**symptoms** 31:21

**system** 121:15 227:1 229:17 230:3,11 232:4,5

**T**

**table** 216:5

**tablet** 282:18

**taking** 4:15 31:11 49:2 59:3,4 64:16 183:23 184:8 186:18 187:19 196:16 197:9 262:4

**talk** 4:17 10:7,15 16:22 58:18 82:13 117:2 154:13 156:3,16 157:8 199:11,17 206:2,8 207:2 208:17,22 209:1 243:17 264:2 265:24

**talked** 47:3 95:7 151:17,20,21 164:11 167:5 169:20 172:18 181:15 226:20 255:6 262:2 263:17 267:14

**talking** 20:21 22:8 47:15 108:24 116:7 155:9 157:18 158:17 170:10 180:22 184:22 190:9 192:18 197:9 213:12,15,16,19 214:6,13 221:11 253:19 255:1,8 257:20 260:24 262:21

**talks** 191:1 193:17

**tall** 45:13

**Tara** 173:16 221:2 251:7

**taught** 10:6 232:11

**TC** 88:3,4,14

**teach** 10:8,11 187:10

**Technique** 177:18,23 178:2 188:11 189:16,24 190:10,12 200:11,23 201:8 245:10,11 251:18 252:1,7 253:11 254:4,17 258:19

**telling** 48:16 208:14,15 215:18 229:6 236:19,23 242:12 246:4 247:20

**ten** 211:19

**tend** 182:18 245:17

**tender** 288:12,13

**Tense** 49:3

**term** 38:3 114:10 154:12 258:4

**terms** 32:1,8,14 34:8,11 56:9 58:3 108:19 112:17 155:10 255:18 276:2 284:23

**test** 27:10 30:3 36:21 39:21 47:9 48:15,23 49:2 51:6 56:7 58:8,16,20 59:1 60:13 62:24 63:5,8,15 64:3,4, 6,10,12,13,14,15,16,17,21,23 65:1,

15,23 66:3,10,11,12 67:5,7,15 68:2,4,5,10,17,22,23,24 69:3,4,11, 18,24 70:1,5,7,8,9,14,15,16 71:3, 14,16 74:22 75:8,18 76:6 77:23 78:18 83:5,7,11 88:6,7,8 89:23,24 90:11,19 93:14,16,17,21 94:9,10, 14,19,20 95:5,6,10,11,12,19,24 96:3,22,24 97:8,13,17,19 98:1,5,20 99:10,15,21 101:11,14,16,22 102:6,9,10,14 104:10,12,15,18,22 106:1,5,8,9,24 107:8,9 108:7,18 109:2 112:14,17,23,24 113:6,7,8,9, 10,12 114:8,10,13,15 116:1,3,4,5, 6,15,21,24 117:3,4,14,17 119:9,19 120:3,9,15,24 121:2,8,11 122:10 123:1,2,3,8,9,12,16,17,19,20,24 124:10,19 126:12,19,24 127:9,18 130:11 133:20,21 138:1,20 140:16 147:20,24 150:19,20 152:14 155:11 156:2,8 158:3 162:3 168:4 169:7,22 181:13 189:8 205:18 207:1 210:14 228:2 234:18 237:20 238:4 239:8,10,15,16,19,20 240:3, 12,13,17,18,21 241:9,15,18 249:22 250:17,19 259:15 276:11 281:13 285:13 286:6,17,21

**tested** 17:24

**testified** 4:4 10:22 11:1 13:11 23:19 30:20 35:19 52:4 54:16 56:11 74:23 101:10 159:19 170:13 172:5,9 187:6 190:24 201:14 239:23 241:2,19 267:6 272:11 280:17,22

**testifying** 95:19

**testimony** 10:2 11:5,8 63:21 171:19 172:3,6,7 174:16 175:2,3 176:5,6,11 179:15,21 180:1 193:20 199:12 204:2 226:16 231:16 239:24 241:13 246:19 254:15 264:18 266:20,22 268:5 281:16

**testing** 6:5 237:5

**tests** 56:10 63:24 78:22 79:1,8 105:1 109:22 118:3 123:23 126:16 152:1 170:3 208:13 228:7,16,18 229:19,21 232:19 286:1

**theft** 71:11

**theories** 257:23

**thick** 104:14

**thing** 5:3 24:12 27:14 35:9 51:4 66:23 115:21 122:5 127:17 130:8 133:22 181:3 198:10,17 204:9,13 222:7 226:3 242:14

MICHAEL MASOKAS, 11/05/2019

**things** 56:13 158:1 180:20 208:2 210:8,9 214:23 215:11 218:14 246:6,8 255:18 261:22 263:12 265:24 278:6

**thinking** 134:20 244:10 256:1 275:12

**Thompson** 11:15 13:4 15:9 17:11, 20 18:14 23:11 26:14 27:7 30:21 32:16 35:23 36:4 39:6,19 41:6 50:22 52:9 53:11 55:16 56:15 57:8, 13 58:5 59:7 60:11 62:12 63:3 72:22 76:11 82:2,8 88:19,24 94:22 116:7,10 141:3,12 142:5 145:8 152:11,23 154:9 155:7 157:23 163:17 170:21 171:12 173:14,17 175:10,15,18 176:1,9 178:6 183:11,21 185:5,17 186:2,21 187:14 189:22 190:13 193:10 197:14 199:7,9 202:2 205:13 211:11 213:9 214:15 215:20 216:17 221:5 223:17,18 224:9 226:7 228:4 229:10 230:4 231:18 232:23 239:2 249:8 251:11 253:21 255:2 270:2 272:1,5,10 273:11 274:5,17 275:15 276:4 277:9 278:8,20 279:7,12 282:3 283:21 286:13,16 287:5,19 288:11,15

**thought** 46:13,14 135:15 157:17 158:7 168:3 178:23 180:23,24 183:7 232:15 259:16 261:18

**thousand** 10:1 178:16,20

**three-page** 163:14

**three-way** 158:19

**tie** 272:20,23

**tight** 286:1

**tightening** 58:10

**time** 7:21 9:10,13,22 13:23 15:14 16:17 17:4 25:12,20 27:1 29:21 32:18 36:2 51:21 54:19 55:5,23 58:11 68:7,12 69:16,19 77:15,24 80:1,5,16 98:16 105:11 113:2,13 115:5,14,16,23 116:17 119:16 129:4 132:1,23 146:2 147:2,8,15 149:6,17 151:7,15 153:18,24 158:5,10,15 160:1,11,17,21 161:2, 13 163:6 166:13 168:19,22 173:9, 11 177:10 178:7,23 179:20 182:13 185:12 187:12 189:5 197:9 200:16 202:9,11,15 203:17 204:23 205:4,8 207:24 209:18,19 210:16,19 211:2, 24 213:13 217:16 221:9,18 223:10, 24 233:9,18,22,24 235:16 236:15 242:17 251:23 252:14,17 253:1

261:12 263:15 274:16 279:13 281:5 282:24

**times** 67:19 76:7 126:8 136:5 147:6 149:22 150:11 156:19 178:17 179:15 181:20 206:23 224:3 243:8 249:15 250:8,11,22 256:4 269:3,5 270:12,21,24 271:3, 13 273:14

**timing** 233:4

**Tina** 20:17 22:1,5 42:1 43:20,24 44:3,15,24 45:5,16,18 46:10 48:6 151:22 191:2 194:2,9 212:21 280:11 287:17

**tired** 162:15,17 183:15,16 184:1,6

**title** 176:15 177:9,11

**titled** 19:10

**today** 4:14 36:12 38:18,19 39:21, 22 45:23 47:9,11 48:15 164:12,23 165:12,13 167:19 169:23 171:2 174:6,10 176:11 178:7 179:7,10 197:16 199:13 203:9 204:7 226:11 230:20 235:15 236:1,4 255:16 270:24 272:12,16 284:13

**told** 27:5 41:15 63:7 67:14 98:24 144:1 146:2 156:18 159:9 171:16 173:2,15,20 191:14 192:21 197:24 198:7,10,14 207:19 208:4,20,24 212:16 214:7 236:16 249:23 266:10,16 276:19 277:17

**top** 19:22 25:2 26:22 37:24 38:7,9, 10 40:14 42:6 45:5 47:22 75:15 83:17 96:5 128:22,24 130:3,18,22, 24 133:11,13 134:9 136:23 147:2,3 190:19 193:15

**topic** 191:10 200:17,22 201:2 263:16

**tops** 136:20

**tore** 119:22

**total** 178:13,17 186:23

**totality** 246:1

**tracing** 87:9,10,13,16 94:15 96:5 102:12 112:19 113:18 125:9 137:17

**tracings** 119:23

**traffic** 49:19 70:20 73:1

**train** 252:23

**trained** 187:10 230:10,11

**training** 8:13,15 9:11,13 178:4 182:16,21 183:12 188:4,7,10,12,15 201:7 232:12 245:10

**trial** 179:23 180:3

**true** 101:14 132:7 199:2 235:19

**trust** 41:22 260:14

**truth** 48:17 66:7 208:14,15 236:20, 23 261:13,14,16

**truthful** 11:9 64:15 142:6,10 143:1 154:4 182:24 205:18 206:8,13 207:21 208:21 226:19 243:9,24 244:20 245:18,23 273:3,7,15,19 274:10 275:3 276:12

**truthfully** 11:1

**truths** 53:7,10,20

**tubes** 59:16

**turn** 24:19 33:13 146:12 190:22 217:19 247:3

**turned** 85:13

**turns** 273:16

**twins** 253:2

**two-minute** 166:22

**two-page** 37:9 280:7

**Tylenol** 50:12

**type** 104:6 226:2 230:11 231:1 232:3,12

**types** 52:23 60:19 74:8 79:8 168:7 232:19

**typical** 168:9 244:19

**typically** 12:21 64:18 105:15,18 142:16 170:17 215:17 250:11 268:16

---

**U**

**uh-hmm** 39:23 61:5 83:20 87:4 89:6 93:20 169:5 261:20

**uh-huh** 39:24 83:4 88:1 169:8

**ultimately** 36:20 82:18 256:7 265:15

**uncertain** 171:16

**unclear** 173:22

**uncomfortable** 12:18,19 86:21 285:20,21

MICHAEL MASOKAS, 11/05/2019

**uncommon** 263:14

**uncooperative** 142:11 143:7
258:24

**underlined** 98:12,18

**underneath** 83:6 86:8 90:20 148:6
169:13 218:7 250:14

**understand** 25:19 26:1,11,24
27:6,9 36:10,11 38:19 39:21,22
55:19,21 59:10 63:22 65:12 69:2
77:11 82:17 121:7 122:6 204:23
226:16 230:5,6 232:24 235:22
239:3 246:3,22 260:2,15 268:5
270:3 276:5 281:16

**understanding** 17:9 57:12,17
176:3 189:15 211:14 212:23 214:4
245:9 253:10 254:4,13

**understands** 55:18,22

**understood** 26:20 27:2 174:2
257:19

**unemotional** 281:2,9

**units** 85:10 94:13 96:1

**unknown** 142:22

**unlocked** 16:10 34:7,11,17,19

**unnecessary** 206:5,6

**unresponsive** 142:7,15,23 168:8

**untruthful** 276:18 277:17 278:13

**unusual** 14:24 180:22 181:7
182:11 252:14 271:14,20,22,24

**updated** 266:23

**upper** 149:18

**uppermost** 83:14

**upstairs** 248:7,9,14

**utilize** 49:10

**utilized** 49:7

**utilizing** 123:7

---

**V**

**variable** 56:8 57:4

**vary** 12:10,13 62:24

**verbal** 5:2 203:2 243:3 246:14

**verbally** 151:2 160:23 183:24
242:24 245:6 248:18

**verbatim** 155:22 255:20

**version** 36:18

**versions** 288:4

**versus** 170:9

**vestibule** 15:12

**victim** 21:2

**video** 210:1,15

**videotape** 214:22 215:9

**view** 25:8 275:18

**violations** 49:19 70:20 73:1

**visual** 121:13,20 231:4,7,9 232:4,
6,7,18

**vodka** 22:16 45:13 192:8 263:23

**volume** 242:16

**vouch** 41:21,23

---

**W**

**Wacker** 13:20

**wait** 105:6,8 224:12

**waited** 48:6 172:20 252:23 270:8

**walk** 12:7 15:12 71:19 82:16 84:22
146:15,18,22 268:9

**walked** 14:4 226:17

**wanted** 16:22 26:19 51:13 107:20
146:15 155:1 156:22 160:3 162:3,
8,12,20 171:18 192:24 206:20
222:18,21,23 223:1 253:3 257:19
265:15

**washroom** 149:22,24 150:10

**watched** 43:19,22

**watching** 234:18

**water** 149:23 161:21

**ways** 47:3 217:22

**wearing** 286:18

**weeks** 146:5

**weighed** 228:23

**whispered** 40:18

**white** 75:21

**who'd** 230:10

**whoever's** 23:14

**Why'd** 208:7

**wife** 42:3 244:12,13,21,23 253:1

**wife's** 41:13 146:1

**William** 10:17 20:16 21:23 22:5
81:21 194:2,9

**windows** 15:18

**wipe** 102:17,18 103:19

**wiped** 102:19 103:24 104:2

**wise** 158:7

**withdraw** 209:22

**withdrawal** 190:1

**witnessing** 26:5

**wooden** 226:2

**word** 278:5 284:8

**worded** 194:19

**words** 16:11 53:14 114:9 138:9
142:19 182:8

**work** 38:12,13 59:4 201:17 203:5,7
204:4 209:8 210:11,22 217:5 240:6

**worked** 7:8 177:16

**working** 7:6 9:7 38:14 39:8,9
80:14

**works** 64:17,21 239:11

**worry** 210:15

**wrap** 5:6

**write** 23:8 38:5,20,21 195:23
219:12 223:11 226:4 231:3,21,22
243:3

**writing** 20:20,22 21:12,20 22:24
25:10,13,14,23 29:16 75:15 83:1
149:8 192:18 194:6 216:19,20
225:2,23

**written** 20:3,6 54:1 62:8 76:8
77:17 92:1 147:11,14 149:7,8
150:14,15 163:20 218:18 219:23
223:19

**wrong** 182:2 194:1,8,12 239:9
255:24 259:14

**wrote** 20:12 25:21 26:2,10 62:8
75:23 92:3 120:20 194:8 230:16
236:5

MICHAEL MASOKAS, 11/05/2019

## X

**Xavier** 5:11,13,15

**Xs** 94:2 97:8,9

## Y

**year** 5:19 7:1,8 8:24 180:7

**years** 5:11,13 6:9 8:22 9:17 46:11
72:2 78:21 166:14 206:24 211:19
246:9,12

**yell** 160:23

**yes-or-no** 54:5

**YT** 117:14