**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WILLIAM E. AMOR, | ) | |
| | ) | 18-CV-02523 |
| Plaintiff, | ) | |
| | ) | Honorable John Z. Lee |
| v. | ) | |
| | ) | |
| MICHAEL CROSS; et al., | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF
ADDITIONAL MATERIAL FACTS UNDER LOCAL RULE 56.1(b)(3)**

Defendants Michael Cross, Robert Guerrieri, Brian Cunningham, and the City of

Naperville ("Defendants"), by and through their attorneys, The Sotos Law Firm, P.C., pursuant

to Local Rule 56.1, hereby respond to Plaintiff's Statement of Additional Material Facts as

follows:

1.    On September 10, 1995, at approximately 6:40 p.m., Marianne Miceli

("Marianne") called 911 to report a fire in her apartment at 218 East Bailey Street, apartment M.

Ex. 1 (Haidu Test., 9/10/97) at 3; Ex. 2 (911 Call Trans.). Marianne reported that smoke was

coming through her bedroom and that she could not exit because the chair by her balcony and

her door was on fire. Ex. 2 (911 Call Trans.) at Amor 020208-09. By 6:41 p.m., Marianne told

the 911 dispatch that she was "overcome with smoke" and the line went silent. Ex. 2 (911 Call

Trans.) at Amor 020209; Ex. 3 (Carpenter 12/12/16 Test.) at 116:10-16 (911 call at 6:40 p.m.; 45

seconds to one minute later, victim is incapacitated).

**RESPONSE:**    Defendants object to the averments in Paragraph 1 as largely redundant to
            Defendants' SOF ¶¶ 6-7. Defendants deny the averment in the second sentence of
            paragraph 1 that Marianne "could not exit because the chair by her balcony and
            her door was on fire" because it is unsupported by Plaintiff's cited evidence.
            Defendants deny that the averment in the third sentence of Paragraph 1 that "by
            6:41 p.m., Marianne told the 911 dispatch that she was 'overcome with smoke'

and the line went silent" is material to any issue raised by Defendants' motion for summary judgment, but it is otherwise admitted. Defendants admit the remaining averments in Paragraph 1.

2.     According to the pathologist, Marianne died as a result of carbon monoxide intoxication due to inhalation of smoke and soot during the fire. Exhibit 4 (Teas Test., 9/12/97) at 61:1-8.

**RESPONSE:**     Defendants admit Marianne died as a result of the fire but deny the remaining averments in Paragraph 2 because they are unsupported by Plaintiff's cited evidence and because they are immaterial to any issue raised by Defendants' motion for summary judgment.

3.     The Naperville Fire Department ("NFD") responded to the fire at approximately 6:42 p.m. Ex. 5 (Born Test., 9/10/97) at 60:12-16 (arrived within two-to-three minutes of dispatch call); Ex. 6 (Golder Test., 2/2/18) at 27:13-22 (call at 6:40 p.m., victim incapacitated at 6:41 p.m., Fire Department on scene at 6:42 p.m.). When the firefighters arrived at apartment M, the door was too hot to touch and they were met with heavy black smoke; they could only get six to eight feet inside the apartment before having to turn back. Ex. 5 (Born Test., 9/10/97) at 62:10-64:23; Ex. 6 (Golder Test., 2/2/18) at 28:19-29:2.

**RESPONSE:**     Defendants admit the averments in Paragraph 3 but deny that such averments are material to any issue raised by Defendants' motion for summary judgment.

4.     The fire had reached the point of flashover. Ex. 7 (Ferreri Dep.) at 100:11-101:14; Ex. 8 (Structure of Scene Checklist) at DEFS 5333. Flashover is when "surfaces exposed to thermal radiation reach ignition temperature more or less simultaneously and fire spreads rapidly throughout the space, resulting in full room involvement." Ex. 9 (Carpenter Report, 12/24/14) at 14-15 (quoting NFPA 921).

**RESPONSE:**     Defendants deny that the averments in Paragraph 4 are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

2

5.      NFD Lieutenant Ferreri arrived on the scene at approximately 7 p.m. Ex. 7 (Ferreri Dep.) at 70:2-6. At that time, the fire was under control and firefighters were engaged in the overhaul process. Ex. 7 (Ferreri Dep.) at 70:16-71:7. Overhaul is when "firefighters go through the scene and just extinguish small smoldering areas that are left to make sure the fire is completely out." Ex. 7 (Ferreri Dep.) at 71:1-4.

**RESPONSE:** Defendants deny that the averments in Paragraph 5 are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

6.      During both the suppression and overhaul processes, materials from inside the apartment—including objects, furniture and drywall—were removed and placed in a pile outside. Ex. 7 (Ferreri Dep.) at 75:15-76:4, 76:10-22; Ex. 10 (Guerrieri Test., 1/25/18) at 93:3-13 (describing a "heap" outside); Ex. 11 (Guerrieri Dep.) at 148:3-14 (pile was approximately four feet by four feet); Ex. 12 (Cross Test., 1/26/18) at 51:4-9. Some of the objects were so significantly burned and/or melted that it was impossible to tell what they were. Ex. 11 (Guerrieri Dep). at 148:22-149:21.

**RESPONSE:** Defendants deny the averments in Paragraph 6 are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

7.      Lieutenant Ferreri was concerned that the overhaul was too zealous and that the firefighters were potentially "destroying things that they did not have to" and obscuring the fire scene. Ex. 7 (Ferreri Dep.) at 77:19-79:6.

**RESPONSE:** Defendants deny the quoted portion is an accurate quote from Plaintiff's cited evidence and further deny the averments in Paragraph 7 are material to any issue raised by Defendants' motion for summary judgment, but admit the remaining averments for purposes of summary judgment with the clarification that the overhaul was only conducted by the firefighters and not by any defendant in this case.

3

8.      In addition to the NPD, Naperville Police Department ("NPD") detectives Robert Guerrieri and Michael Cross responded to the scene. Ex. 10 (Guerrieri Test., 1/25/18) at 46:16-47:14; Ex. 13 (Cross Dep.) at 98:20-99:10. Defendant Guerrieri was the on-call detective on September 10, 1995, and Cross was a member of the Naperville Fire Investigation Team ("FIT") and became the lead investigator on the case. Ex. 11 (Guerrieri Dep.) at 121:21-122:6; Ex. 13 (Cross Dep.) at 307:21-24; Ex. 12 (Cross Test., 1/26/18) at 51:18-23.

**RESPONSE:** Defendants object to the assertion that Guerrieri and Cross responded to the scene as redundant of Defendants SOF ¶ 7, but otherwise admit with the clarification that the NPD responded in addition to the Naperville Fire Department (NFD), not "in addition to NPD." Defendants object to the averment that Guerrieri was the on-call detective on September 10, 1995, because it is redundant to Defendants SOF ¶ 8, but otherwise admit. Defendants object to the averment that Cross was a police member of the Naperville Fire Investigation Team because it is redundant to Defendants SOF ¶ 11, but otherwise admit. Defendants deny the assertion that Cross "became the lead investigator on the case" because it is unsupported by Plaintiff's cited evidence.

9.      Plaintiff William Amor had absolutely nothing whatsoever to do with the fire at 218 East Bailey and Marianne's death. Ex. 14 (Pltf. Dep.) at 294:6-7, 332:21-24.

**RESPONSE:** Defendants deny that Plaintiff's alleged innocence is material to any issue raised in Defendants' motion for summary judgment and further deny the averments in Paragraph 9 because they are unsupported by Plaintiff's cited evidence. Plaintiff's cited evidence only indicates that Plaintiff stated "And I just -- to this point, I kept denying everything as I always knew I was innocent" (Plt. Ex. 14, Plaintiff Dep., p. 294:6-7) and that Plaintiff told a Counselor at DuPage County jail "that [he] was innocent and [he] continues [sic] to fight." (*Id*. at 332:21-24).

10.     At the time of the fire, Plaintiff and his wife, Tina Miceli ("Tina"), lived with Tina's mother Marianne at 218 East Bailey, Apartment M. Ex. 14 (Pltf. Dep.) at 33:19-23, 35:14-23. Apartment M was on the third floor of the apartment complex. Ex. 14 (Pltf. Dep.). at 39:21-24; Ex. 15 (Tina Test., 1/25/18) at 28:15-16.

**RESPONSE:** Defendants object to Paragraph 10 as largely redundant to Defendants' SOF ¶ 6 with the exception of the averment that Apartment M was on the third floor of the apartment complex. The averments in paragraph 10 are otherwise admitted.

11.     Marianne was hit by a car as a child; as a result, she had a significant limp on her left side, collected disability benefits and could not drive. Ex. 14 (Pltf. Dep.) at 38:4-20; Ex. 16 (Leavenworth Test., 9/10/97) at 10:4-11:7. Given her limitations, Plaintiff would assist Marianne around the house and drive her to various appointments. Ex. 17 (Tina Dep., 3/13/20) at 77:22-78:13; Ex. 15 (Tina Test., 1/25/18) at 52:12-53:11. Plaintiff and Marianne got along well. Ex. 17 (Tina Dep., 3/13/20) at 77:22-78:4; Ex. 15 (Tina Test., 1/25/18) at 58:16-22.

**RESPONSE:** Defendants deny that the averments contained in Paragraph 11 are material to any issue raised by their motion for summary judgment, but otherwise admit them for purposes of summary judgment.

12.     Marianne, Tina and Plaintiff were all heavy smokers; Tina estimated that her mother Marianne smoked at least two packs per day and that she and Plaintiff each smoked a pack a day. Ex. 15 (Tina Test., 1/25/18) at 38:13-40. In addition, at this time, Plaintiff had a drinking problem and would drink vodka every day. Ex. 17 (Tina Dep., 3/13/20) at 57:23-58:7.

**RESPONSE:** Defendants deny that the averments in Paragraph 12 are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

13.     On the day of the fire, Plaintiff had been at home reading the paper and watching football. Ex. 14 (Pltf. Dep.) at 44:6-15; Ex. 15 (Tina Test., 1/25/18) at 13:8-11 (all three were off-and-on watching football together). Over the course of the day, Plaintiff drank two mixed drinks of vodka and soda. Ex. 14 (Pltf. Dep.) at 62:8-14.

**RESPONSE:** Defendants object to the averments contained in the first sentence of Paragraph 13 as largely redundant to Defendants' SOF ¶¶ 18, 21, but otherwise admit. Defendants deny the averment in the second sentence that "over the course of the day, Plaintiff drank two mixed drinks of vodka and soda" because it is unsupported by Plaintiff's cited evidence.

14.     For her part, Tina was also at home that day. During the Sunday afternoon football game, Tina sat in her mother's chair and did her nails. Ex. 14 (Pltf. Dep.) at 60:23-61:22

(describing Marianne's chair); *id.*at 98:1-13 (Tina doing her nails). Marianne's chair was a recliner that was closest to the door. Ex. 15 (Tina Test., 1/25/18) at 80:4-15 (describing Marianne's chair as the chair closest to the entry door).

**RESPONSE:** Defendants deny the averments in Paragraph 14 are material to any issue raised by the Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

15.     While she was doing her nails in her mother's recliner, Tina was also smoking a cigarette. Ex. 14 (Pltf. Dep.) at 98:1-13. When she was interviewed by Defendant Cross on the night of the fire, Tina admitted that she could not remember what she had done with her cigarette. Ex. 13 (Cross Dep.) at 114:14-115:7; Ex. 18 (Cross 8-page Supp.) at DEFS 667-68.

**RESPONSE:** Defendants deny the averments in Paragraph 15 are material to any issue raised by Defendants' motion for summary judgment. Defendants deny the averment in Paragraph 15 that "while she was doing her nails in her mother's recliner, Tina was also smoking a cigarette" because it is unsupported by Plaintiff's cited evidence in which Plaintiff testified that he can only assume she was smoking while doing her nails. (Plt. Ex. 14, Plaintiff Dep., p. 98:1-13.) Defendants admit the remaining averments for purposes of summary judgment.

16.     Marianne was home on the day of the fire. Tina testified that Marianne was also smoking in her reclining chair that day. Ex. 15 (Tina Test., 1/25/18) at 81:4-11.

**RESPONSE:** Defendants deny that the averments contained in Paragraph 16 are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

17.     Around 6:20 or 6:25 p.m., Plaintiff and Tina left to go to the drive-in movie theater. Ex. 14 (Pltf. Dep.) at 63:11-24, 69:7-11, Ex. 19 (Guerrieri Test. 9/10/1997 at 171:4-8). Tina had wanted to go to the movies so she could spend time with her husband. Ex. 15 (Tina Test., 1/25/18) at 26:11-22, 31:15-24. Tina packed a cooler and blankets for their outing, which Plaintiff grabbed on his way out the door. Ex. 14 (Pltf. Dep.) at 82:14-24, 83:19-24; Ex. 20 (Tina Dep., 3/14/20) at 136:7-16, 146:19-22.

**RESPONSE:** Defendants object to the averment that Plaintiff and Tina left to go to the movies around 6:20 or 6:25 p.m. as redundant to Defendants' SOF ¶ 21, but otherwise admit. Defendants deny that the remainder of the averments in Paragraph 17 are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

18.     Marianne stayed behind. She was in her bedroom on the phone when Tina and Plaintiff left for the movies. Ex. 14 (Pltf. Dep.) at 78:18-20; Ex. 15 (Tina Test., 1/25/18) at 82:16-83:6.

**RESPONSE:** Defendants object to the averments in Paragraph 18 that Marianne stayed behind and was in her bedroom when Tina and Bill left for the movies as redundant to Defendants' SOF ¶¶ 18, 21. Defendants admit the remaining averments in Paragraph 18, but further clarify that Marianne went into the bedroom with the intention of taking a nap. (Plt. Ex. 14, Plaintiff Dep., pp. 79:6-11, 80:15-17).

19.     Plaintiff left the apartment before Tina. Ex. 17 (Tina Dep., 3/13/20) at 29:22-30:3 (Plaintiff went to the car first); Ex. 14 (Pltf. Dep.) at 84:1-6. Plaintiff went out to the parking lot, pulled the car up to the dumpster, cleaned the car out and cleaned the windows. Ex. 14 (Pltf. Dep.) at 85:20-87:15. That took approximately 10 minutes. Ex. 14 (Pltf. Dep.) at 87:16-17, 89:22-90:1.

**RESPONSE:** Defendants deny that the averments in Paragraph 19 are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

20.     Plaintiff then waited for Tina inside the car. Ex. 14 (Pltf. Dep.) at 89:7-15. When Tina got downstairs to the front of the building, she realized that she had left something upstairs. Ex. 14 (Pltf. Dep.) at 90:2-20. Tina went back upstairs to retrieve her cigarettes. Ex. 17 (Tina Dep., 3/13/20) at 30:4-18; Ex. 14 (Pltf. Dep.) at 91:20-92:14. It took Tina anywhere from two to five minutes to go back upstairs to retrieve her missing keys or cigarettes. Ex. 14 (Pltf. Dep.) at 92:15-17 (four to five minutes); Ex. 20 (Tina Dep., 3/14/20) at 151:6-9 (two minutes).

**RESPONSE:** Defendants deny the averments in Paragraph 20 are material to any issue raised in Defendants' motion for summary judgment, but otherwise admit them for the purpose of summary judgment.

21.     When Tina left the apartment, she did not see anything out of the ordinary nor did she observe a fire. Ex. 20 (Tina Dep. 3/13/20) at 30:19-31:1. The same was true when she went back inside the apartment to get her cigarettes: She did not see anything unusual, and she did not see or smell a fire. Ex. 15 (Tina Test., 1/25/18) at 84:16-85:8; Ex. 17 (Tina Dep. 3/13/20) at 31:1-31:8; Ex. 21(Cross 10-page Supp.) at DEFS 588 ("I asked if she noticed anything unusual when she left. Tina said she didn't. I asked if she saw any smoke or fire when she left. She said she did not."). The fire had not commenced at the time Plaintiff and Tina left. Ex. 15 (Tina Test., 1/25/18) at 84:16-85:8; Ex. 17 (Tina Dep. 3/13/20) at 31:1-31:8; Ex. 21(Cross 10-page Supp.) at DEFS 588.

**RESPONSE:** Defendants deny the averments in Paragraph 21 are material to any issue raised by Defendants' motion for summary judgment. Defendants deny the averment that "the fire had not commenced at the time Plaintiff and Tina left" because it is unsupported by Plaintiff's cited evidence. Defendants admit the remaining averments in Paragraph 21 for purposes of summary judgment.

22.     Plaintiff and Tina then drove to the movies. Ex. 14 (Pltf. Dep) at 96:7-19. On their way there, Tina and Plaintiff stopped at the Mobil gas station on Route 59 to get gas, and at the White Hen. Ex. 14 (Pltf. Dep.) at 104:15-24, 106:22-24. The receipt from the gas station indicated that they stopped to get gas at 6:43 p.m. Ex. 14 (Pltf. Dep.) at 106:1-18 (got receipt); Ex. 22 (Bedell Test., 9/10/97) at 33:9-15, 35:4-11.

**RESPONSE:** Defendants deny the averments in Paragraph 22 are material to any issue raised in the Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

23.     Tina and Plaintiff returned from the movies sometime around midnight, almost six hours after they left. Ex. 14 (Pltf. Dep.) at 111:23-112:8. At that time, they saw the fire truck and police cars at their apartment complex. Ex. 14 (Pltf. Dep.) at 112:9-16.

**RESPONSE:**     Defendants admit the averments in Paragraph 23, but deny they are material to any issue raised in Defendants' motion for summary judgment.

24.     The timing of when Plaintiff left the apartment and when the fire started makes Plaintiff's involvement in the fire impossible. Ex. 23 (Golder Report) at 14-15; Ex. 6 (Golder Test., 2/2/18) at 103:1-19; Ex. 24 (Order of Acquittal dated 2/21/18) at 7. First, if Plaintiff started the fire by open flame before leaving the apartment, Tina should have seen the fire when she returned to the apartment after he had left. Ex. 9 (Carpenter Report 1/22/21) at 7-8, 9. Second, if an open flame fire started contemporaneously with defendant [sic] leaving the apartment, then Marianne would have seen and smelled the smoke, and called 911 between 6:23 and 6:28 p.m. Ex. 9 (Carpenter Report 1/22/21) at 8, 9. Indeed, even the State's own expert, former Alcohol Tobacco and Firearms ("ATF") agent Golder testified to the same in 2018. Ex. 23 (Golder Report) at 14-15; Ex. 6 (Golder Test., 2/2/18) at 103:1-19.

**RESPONSE:**     Defendants object to the averments in Paragraph 24 as improper argument and deny that the 2018 opinions of Agent Golder and the 2021 opinions of Douglas Carpenter are material to any issue raised in Defendants' motion for summary judgment. Defendants further deny the averments in Paragraph 24 because they are unsupported by Plaintiff's cited evidence.

25.     When Tina and Plaintiff arrived at 218 East Bailey, they were approached by a number of NPD officers, who told them that there had been a fire in their apartment. Ex. 14 (Pltf. Dep.) at 116:13-20.

**RESPONSE:**     Defendants deny the averments in Paragraph 25 are material to any issue raised in Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

26.     Tina's aunt, Jeanne Ripsky, told her that her mother had passed away in the fire. Ex. 15 (Tina Test., 1/25/18) at 21:22-22:1. When Tina found out that her mother had died, she was very upset. Ex. 17 (Tina Dep. 3/13/20) at 32:12-33:3; Ex. 15 (Tina Test., 1/25/18) at 86:18-20; Ex. 11 (Guerrieri Dep.) at 164:20-165:1 (when saw Tina on night of fire at Pamela Leavenworth's, she "had been crying, was upset"); Ex. 14 (Pltf. Dep.) at 117:17-20 (Tina was "obviously falling apart"). So too was Plaintiff: According to Tina, when Plaintiff found out that Marianne passed away, he "broke down emotionally" and was "in tears." Ex. 17 (Tina Dep. 3/13/20) at 33:4-11.

**RESPONSE:**  Defendants deny the averments in Paragraph 26 are material to any issue raised by Defendants in their motion for summary judgment, but otherwise admit them for purposes of summary judgment.

27.     Plaintiff and Tina then left the scene and went to the home of Pamela Leavenworth. Ex. 14 (Pltf. Dep.) at 117:21-118:4. Pamela Leavenworth is Marianne's sister and Tina's aunt. Ex. 16 (P. Leavenworth Test., 9/10/97) at 6:7-11.

**RESPONSE:**  Defendants object Paragraph 27 as largely redundant to Defendants SOF ¶¶ 13-14, but otherwise admit.

28.     Within hours after Marianne's death, based on only the most minimal investigation, Defendant Cross decided that Plaintiff was responsible for intentionally setting the fire, and began treating him as the suspect. Ex. 13 (Cross Dep.) at 126:8-18.

**RESPONSE:**  Defendants deny the averments in Paragraph 28 because they are unsupported by Plaintiff's cited evidence which states only that the day after the fire, Cross was "ruling everything out and starting to believe" that Plaintiff killed his mother-in-law. (Ex. 13, Cross Dep., p. 126:8-18.)

29.     At the Leavenworth home, Defendants Cross and Guerrieri split up Tina and Plaintiff and interrogated them about their whereabouts that day and evening and about the fire. Ex. 12 (Cross Test., 1/26/18) at 9:8-10:6, 52:24-53:5 (Cross spoke to Tina while Guerrieri spoke

to Plaintiff); Ex. 10 (Guerrieri Test., 1/25/18) at 50:2-56:7 (asked Plaintiff questions in basement

of Leavenworth home); Ex. 14 (Pltf. Dep.) at 152:21-153:3. Plaintiff told the Defendants he had

nothing to do with the fire. Ex. 64 (Cross Test., 9/10/97) at 49:23-50:1, 64:7-65:12, 107:24-

108:2.

**RESPONSE:**   Defendants object to the averments in Paragraph 29 as largely redundant to
Defendants SOF ¶¶ 14, 16-21. Defendants deny the additional assertion that
Defendants Cross and Guerrieri "interrogated" Tina and Plaintiff because it is
unsupported by Plaintiff's cited evidence. Defendants deny that Plaintiff's cited
evidence of Plt. Ex. 64 at 64:7-65:12 refers to an interview between Defendants
and Plaintiff that occurred at the Leavenworth home on the night of the fire.
Defendants admit that Defendants Cross and Guerrieri interviewed Plaintiff and
Tina separately at the Leavenworth home the night of the fire and Plaintiff denied
knowing how the fire started, but deny these additional facts are material to any
issue raised in Defendants' motion for summary judgment.

30.   Plaintiff was cooperative during that interrogation. Ex. 11 (Guerrieri Dep.) at

179:22-24. He agreed to give the Defendants his shoes so that they could have them tested for

the presence of an accelerant. Ex. 13 (Cross Dep.) at 269:20-270:12; Ex. 14 (Pltf. Dep.) at 149:1-

150:6. No accelerant was found. Ex. 13 (Cross Dep.) at 270:10-12. Nor did Defendant Cross ever

smell any gasoline or accelerant on Plaintiff on the night of the fire. Ex. 13 (Cross Dep.) at

269:20-270:12; Ex. 12 (Cross Test., 1/26/18) at 62:10-21. Tellingly, Defendant Cross did not ask

Tina for her shoes, nor did he test them for accelerant. Ex. 13 (Cross Dep.) at 169:5-22.

**RESPONSE:**   Defendants deny the assertion that the interview was an interrogation because it is
unsupported by Plaintiff's cited evidence. Defendants admit Plaintiff was
cooperative with Guerrieri while interviewed in the Leavenworth's basement.
Defendants admit that Cross did not ask Tina for her shoes or test them for
accelerant, but object to the characterization "tellingly" as improper argument,
and further deny that the characterization is supported by Plaintiff's cited
evidence. Defendants admit the remaining averments in Paragraph 30, but deny
they are material to any issue raised in Defendants' motion for summary
judgment.

31.     In addition to asking about their whereabouts, Defendants asked both Plaintiff and Tina about whether Marianne had insurance, including life insurance. Ex. 11 (Guerrieri Dep.) at 180:19-181:12 (asked questions of Plaintiff in basement, including about insurance); *id*. at 233:15-20 (Plaintiff said in basement not aware of life insurance); Ex. 13 (Cross Dep.) at 121:24-122:3 (asked Tina about insurance); Ex. 12 (Cross Test., 1/26/18) at 10:16-11:4 (same).

**RESPONSE:** Defendants object to Paragraph 31 as redundant to Defendants' SOF ¶¶ 16-17, but otherwise admit.

32.     At some point after the Defendants had separately interrogated Plaintiff and Tina, the four of them—Plaintiff, Tina, Defendant Cross and Defendant Guerrieri—were in the Leavenworth's kitchen. Ex. 10 (Guerrieri Test., 1/25/18) at 57:17-58:4. There, Defendant Cross asked Tina if her mother had any insurance. Ex. 12 (Cross Test., 1/26/18) at 10:23-11:4.

According to Defendant Cross's supplementary report:

> I asked [Tina] if she had any life insurance. Tina said her mother had a life insurance policy. As Tina was answering Bill said, "We don't know anything about that." He appeared to be trying to answer for Tina and was talking loudly and hurriedly.

Ex. 18 (Cross 8-page Supp.) at DEFS 670.

**RESPONSE:** Defendants object to the assertions in Paragraph 32 that Plaintiff, Tina, Cross and Guerrieri had a conversation at the Leavenworth home and Cross asked Tina whether her mom had insurance as redundant to Defendants' SOF ¶¶ 16-17, but otherwise admit the averments in paragraph 32, except Defendants deny the characterization that Plaintiff and Tina were "interrogated" because that characterization is unsupported by Plaintiff's cited evidence.

33.     The aforementioned statement in Defendant Cross's supplementary report was fabricated. First, by Defendant Cross's own admission, Tina never told him that she knew there was a life insurance policy. Ex. 12 (Cross Test., 1/26/18) at 56:20-57:2, 60:4-18; Ex. 19 (Guerrieri Test., 9/10/97) at 176:3-9 (explaining that Tina was "about to answer and Bill suddenly stopped and said we don't know anything about that before Tina could answer the

question"). Indeed, Tina was not aware of any life insurance at that time. Ex. 17 (Tina Dep.

3/13/20) at 62:7-11.

**RESPONSE:** Defendants object to Plaintiff's assertion that the statement in Cross's supplemental report was fabricated as improper legal argument and it is also unsupported by Plaintiff's cited evidence and is therefore denied. Defendants deny the remaining averments in Paragraph 33 are material to any issue raised in Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

34. Second, Plaintiff never interrupted or answered for Tina when she was asked

about life insurance, nor did he blurt out that "We don't know anything about that." Ex. 14 (Pltf.

Dep.) at 162:4-18. At most, Plaintiff suggested to Defendants Cross and Guerrieri that the

questioning stop since Tina had just lost her mother and was very upset—a fact that neither

Defendant Guerrieri nor Defendant Cross disputes. Ex. 14 (Pltf. Dep.) at 162:4-18 (suggested

that the Defendants leave Tina alone as she had just lost her mother); Ex 12 (Cross Test.,

1/26/18) at 59:10-12 (asking Tina about life insurance when she was already upset); Ex. 11

(Guerrieri Dep.) at 164:20-165:1 (Tina "had been crying, was upset"); Ex. 15 (Tina Test.,

1/25/18) at 86:6-20 (when answering police question she was very upset her mother had died).

**RESPONSE:** Defendants deny the averment that Plaintiff never interrupted or answered for Tina because it is unsupported by Plaintiff's cited evidence, which states only that Plaintiff "never told Tina not to speak." (*See* Plt. Ex. 14, Plaintiff Dep., p. 162:4-18.) Defendants admit the remaining averments in Paragraph 34 for purposes of summary judgment.

35. Although he made a police report memorializing his interactions at the

Leavenworth home on the night of the fire, including with Plaintiff, nowhere in Defendant

Guerrieri's report does Defendant Guerrieri mention this incident with Tina and Plaintiff. Ex. 10

(Guerrieri Test., 1/25/18) at 108:12-22; Ex. 25 (Guerrieri 9-page Supp.) at DEFS 703-711.

**RESPONSE:** Defendants admit the averments in Paragraph 35, but clarify that the cited police report only documents Guerrieri's interview of Plaintiff in the basement of the Leavenworth home, and that Guerrieri testified that he did not include the

exchange in the kitchen in his report because Cross documented it in his report. (Plt. Ex. 10, Guerrieri Test., 1/25/18 at 108:23-109:25; Plt. Ex. 25 at AMOR 19109-19110.) Defendants further deny that the averments contained in Paragraph 35 are material to any issue raised in Defendants' motion for summary judgment.

36.    While Defendants Cross and Guerrieri were at the Leavenworth home, they asked

Tina if they could search her car. Ex. 11 (Guerrieri Dep.) at 190:17-24. Tina gave Defendant

Guerrieri permission. Ex. 11 (Guerrieri Dep.) at 191:1-8; Ex. 26 (Permission to Search) at DEFS

568; Ex. 20 (Tina Dep. 3/14/20) at 158:12-160:13. Plaintiff did not own a car so he and Tina

would share the use of her car. Ex. 14 (Pltf. Dep.) at 85:6-17; Ex. 20 (Tina's Dep. 3/14/20) at

163:8-11.

**RESPONSE:**    Defendants object to the averments that while Cross and Guerrieri were at the Leavenworth home, they asked and Tina consented to the search of the car as redundant to Defendants' SOF ¶ 22, but they are otherwise admitted. Defendants deny the averment in the last sentence of Paragraph 36 as the citations relied upon by Plaintiff do not support the averment that Plaintiff did not own a car or that the car was owned by Tina; rather, Guerrieri testified that the car was owned by Marianne Miceli. (Plt. Ex. 11, Guerrieri Dep., p. 191:1-5.) Nonetheless, Defendants deny the last sentence is material to any issue raised by Defendants' motion for summary judgment.

37.    When Defendant Guerrieri searched Tina's car, he found empty ring boxes in the

left door, which he concedes had no relevance whatsoever to the investigation. Ex. 11 (Guerrieri

Dep.) at 191:21-192:5; Ex. 25 (Guerrieri 9-page Supp.) at DEFS 707. Defendant Guerrieri also

found the cooler in the backseat that Plaintiff and Tina had brought with them to the movies. Ex.

11 (Guerrieri Dep.) at 192:23-195:2; Ex. 14 (Pltf. Dep. at 70:20-71:18, 77:19-22. In the trunk,

Defendant Guerrieri found lighter fluid and charcoal briquettes in a cardboard box, and a bottle

of vodka. Ex. 11 (Guerrieri Dep.) at 193:20-194:20.

**RESPONSE:**    Defendants object to the averment that Guerrieri found lighter fluid and vodka in the trunk of Tina's car as redundant to Defendants' SOF ¶¶ 22-23. Defendants deny the averment in the first sentence that Guerrieri "conceded" that the empty ring boxes found in the door "had no relevance whatsoever to the investigation", because the cited testimony indicates that Guerrieri testified that he did not know

if the ring boxes were relevant to his investigation. Defendants admit the remaining averments in Paragraph 37, but deny such averments are material to any issue raised by Defendants' motion for summary judgment.

38.     With regard to the contents of the trunk, Defendant Guerrieri asked Tina about the vodka bottle, and she joked that it was not hers. Ex. 15 (Tina Dep. 3/13/20) at 60:2-16; Ex. 20 (Tina Dep. 3/14/20) at 162:13-163:3.

**RESPONSE:** Defendants object to the averment that a bottle of vodka was found in the trunk and Tina told Guerrieri it belonged to Plaintiff as redundant to Defendants' SOF ¶ 22. With regard to the remaining allegation that Tina "joked that it was not hers," Defendants admit that Tina testified as described in Paragraph 38, but assert that it is an incomplete summary of the cited testimony contrary to FED.R.EVID. 106, as Tina also testified that she joked that she does not drink vodka and that she told Guerrieri that the vodka was Plaintiff's.

39.     Defendant Guerrieri also learned from Tina that two days prior, on Friday September 8, 1995, Plaintiff, Tina and Marianne went to a barbecue at Marilyn Glisson's house in Lisle. Ex. 25 (Guerrieri 9-page Supp.) at DEFS 707. Tina told Defendant Guerrieri that Plaintiff brought the lighter fluid and charcoal for that barbecue. Ex. 25 (Guerrieri 9-page Supp.) at DEFS 707. Plaintiff told Defendant Cross the same thing. Ex. 18 (Cross 8-page Supp.) at DEFS 670-71.

**RESPONSE:** Defendants object to the averment that Guerrieri learned from Tina that there was a barbecue at Marilyn Glisson's house in Lisle which was attended by Plaintiff and Marianne as redundant to Defendants' SOF ¶ 23, but clarify that the barbeque was two days prior to the September 10, 1995 fire. (Plt. Ex. 25, Guerrieri Report at DEFS 707.) Defendants admit the remaining averments in Paragraph 39 but deny such averments are material to any issue raised in Defendants' motion for summary judgment.

40.     Detective Griffith and Defendant Cunningham confirmed the barbecue with Glisson. Ex. 27 (Griffith 3-page Supp.) at DEFS 696; Ex. 28 (Cunningham Dep.) at 101:2-20. According to Griffith's report, Glisson told her that on September 8, 1995, she had a barbecue at her house. Griffith's report indicates that Glisson said that "[t]here had also been some

conversation between her and Amor about Amor bringing over charcoal and lighter fluid as she

was not sure she had enough." Ex. 27 (Griffith 3-page Supp.) at DEFS 696; Ex. 28 (Cunningham

Dep.) at 101:2-20. Griffith further reported that Glisson said that "[s]he believed Amor had

mentioned something about having the charcoal and fluid in the trunk of his car if they needed

it." Ex. 27 (Griffith 3-page Supp.) at DEFS 696; Ex. 28 (Cunningham Dep.) at 101:2-102:15

**RESPONSE:**  Defendants admit the averments in Paragraph 40.

41.     In addition to searching Tina's car, in the early morning hours after the fire,

Defendants Guerrieri and Cross searched Plaintiff's and Tina's bedroom. Ex. 10 (Guerrieri Test.,

1/25/18) at 61:20-62:3. During that search, the Defendants recovered letters from a dresser

drawer. Ex. 10 (Guerrieri Test., 1/25/18) at 62:4-6.

**RESPONSE:**  Defendants object to the averments in Paragraph 41 as largely redundant to
               Defendants' SOF ¶¶ 24-25, but otherwise admit.

42.     Those letters were addressed to Tina from Plaintiff and were written while

Plaintiff was incarcerated on an unrelated charge in the Summer of 1995. Ex. 17 (Tina Dep.

3/13/20) at 48:7-49:14; Ex. 14 (Pltf. Dep.) at 356:18-357:10. In those letters, Plaintiff expressed

his love for Tina, his concern and care for Marianne, and his hope that they could start over and

move soon. Ex. 14 (Pltf. Dep.) at 356:18-357:10; Ex. 29 (Ex. 15 to Pltf. Dep.) at DEFS 491-556;

*id*. at DEFS 497 ("Tell your mom I love her and she should be getting a letter one day this

week!"); *id*. at DEFS 502 ("Tina Marie Amor, I love nothing more than you . . . ."); *id*. at DEFS

520-21 (discussing moving but staying "close to your family because of their health . . . and to

make sure your mom is alright"); *id*. at 554 (talking about his wanting to "work hard and pay the

bills!").

**RESPONSE:**  Defendants object to the first sentence as redundant to Defendants' SOF ¶ 25.
               Defendants admit the remaining averments in Paragraph 42 for purposes of

summary judgment, but deny they are a complete summary of the letters recovered by Defendants. *See also* Defendants' SOF ¶ 25.

43.     Among those numerous letters, Defendants Guerrieri and Cross homed in on a single one in which Defendant stated that he had "a plan or two of attack for some capital gain late summer so we can move. Will explain in person!" Ex. 14 (Pltf. Dep.) at 356:18-371:10; Ex. 29 (Ex. 15 to Pltf. Dep.) at DEFS 548. According to the Defendants, this letter was inculpatory. Ex. 11 (Guerrieri Dep.) at 232:15-233:14 (describing how the "couple-line statement about he had a plan to get some capital gain at the end of the summer" in a letter to Tina contributed to their decision to move forward).

**RESPONSE:**     Defendants deny that the averment in Paragraph 43 that Defendants Guerrieri and Cross "homed [*sic*] in on a single" letter or that "[a]ccording to the Defendants, this letter was inculpatory" accurately describe Det. Guerrieri's testimony and assert that he testified that the statement by Plaintiff in the letter to Tina "was a piece of the puzzle at the time," one of a number of…factors that played into the decision to move forward with the case" nor does his testimony reflect any thought process of other Defendants. (Plt. Ex. 11, Guerrieri Dep., pp. 232:15-234:17.) Defendants object to the remaining averments as largely redundant to Defendants' SOF ¶ 25, but otherwise admit.

44.     When Plaintiff wrote that he had "a plan or two of attack for some capital gain," he did not mean capital murder. Rather, he meant simply that what anyone would reasonably expect to mean: he was going to "get [his] life together, get out of jail, get a better job." Ex. 14 (Pltf. Dep.) at 358:3-13. Indeed, the letter describes the importance of caring for Marianne, explaining that "we better start and maintain a real sound foundation because we may never know when we might have to take care of any members of our families; your mom . . . ." Ex. 29 (Ex. 15 to Pltf Dep.) at DEFS 549; Ex. 14 (Pltf. Dep.) at 356:18-371:10; Ex. 24 (Order of Acquittal dated 2/21/18) at 1 ("Again, the state's nefarious interpretation of the capital gain language makes little sense given that the defendant subsequently raises the possibility of taking care of Marianne later in life.").

**RESPONSE:** Defendants object to Paragraph 44 as improper argument. Defendants deny the averments in the second sentence of Paragraph 44 that Plaintiff "meant simply that what anyone would reasonably expect to mean: he was going to "get [his] life together, get out of jail, get a better job" because they are unsupported by Plaintiff's cited evidence. Defendants admit that the remaining averments contained in Paragraph 44 accurately describe Plaintiff's deposition testimony, but deny that such averments are material to any issue raised by Defendants' motion for summary judgment.

45.     Moreover, Tina testified that Plaintiff never subsequently told her in person, or otherwise, that his "plan or two of attack" to earn some money meant that he was going to murder Tina's mother, nor does it make sense that Plaintiff was planning to kill Tina's mother— with whom Tina was close—and intended to explain that to Tina in person. Ex. 15 (Tina Test., 1/25/18) at 56:17-18; Ex. 24 (Order of Acquittal dated 2/21/18) at 1 ("It defies credulity to suggest that the defendant planned to kill Tina's mother, and intended to explain this to her in person later."); Ex. 15 (Tina Test. 1/25/2018) at 57:16-22.

**RESPONSE:** Defendants object to Paragraph 45 as improper argument. Defendants deny the averments in Paragraph 45 are material to any issue raised in Defendants' motion for summary judgment and because they are also unsupported by Plaintiff's cited evidence.

46.     Around the time of the fire at 218 East Bailey Street, Plaintiff had a drinking problem. Ex. 17 (Tina Dep., 3/13/20) at 57:23-58:7; Ex. 20 (Tina Dep. 3/14/20) at 140:8-12 (describing Plaintiff as an "alcoholic"). Possibly as a result of his drinking, when Plaintiff went to take a polygraph on September 12, 1995, the results were reported as inconclusive. Ex. 13 (Cross Dep.) at 158:1-5; Ex. 30 (SDT-REID 9-10).

**RESPONSE:** Defendants deny that the averments in the first sentence in Paragraph 47 are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment. Defendants object to the remaining averments in Paragraph 46 as largely redundant to Defendants' SOF ¶ 33, but otherwise admit.

47. Plaintiff was scheduled to take a polygraph examination again on September 15, 1995. Ex. 13 (Cross Dep.) at 109:2-10; Ex. 28 (Cunningham Dep.) at 130:9-132:3; Ex. 31 (Cross 7-page Supp.) at DEFS 717 ("Bill and Tina Amor were scheduled to come to the police department for polygraph tests."). On the same date, Tina was also going to take a polygraph. Ex. 31 (Cross 7-page Supp.) at DEFS 717 ("Bill and Tina Amor were scheduled to come to the police department for polygraph tests.").

**RESPONSE:** Defendants object to Paragraph 47 as redundant to Defendants' SOF ¶ 45, but otherwise admit.

48. At approximately 8 a.m. that morning, Plaintiff called Defendant Cross and told him that "Tina had woken up at 4 a.m. having nightmare's [*sic*] about her mothers [*sic*] death" and "[t]hey were not able to go back to sleep." Ex. 31 (Cross 7-page Supp.) at DEFS 717. Plaintiff admitted that he had been drinking and "did not feel up to taking the tests." Ex. 31 (Cross 7-page Supp.) at DEFS 717; Ex. 28 (Cunningham Dep.) at 142:4-15 (Plaintiff told Cross he could not take a polygraph because he had been drinking); Ex. 12 (Cross Test., 1/26/18) at 70:15-20.

**RESPONSE:** Defendants object to Paragraph 48 as largely redundant to Defendants' SOF ¶ 45. Defendants deny that the averment in the first sentence in Paragraph 48 that Plaintiff told Cross that "Tina had woken up at 4 a.m. having nightmare's [*sic*] about her mothers [*sic*] death" and "[t]hey were not able to go back to sleep" accurately quotes the cited report but otherwise admit the remaining averments.

49. An hour later, Defendants Cross and Cunningham went to the Exel Inn where Plaintiff and Tina were staying and interrogated them. Ex. 31 (Cross 7-page Supp.) at DEFS 718; Ex. 28 (Cunningham Dep.) at 128:20-129:19 (interviewed Tina at Exel Inn at 9 a.m. on 9/15; Cross and Sgt. Carlson also there); Ex. 12 (Cross Test., 1/26/18) at 70:15-71:5.

**RESPONSE:** Defendants deny that the averment in Paragraph 49 that Plaintiff and Tina were "interrogated" because it is unsupported by Plaintiff's cited exhibits, and state further that Det. Cunningham and Det. Cross testified that Plaintiff and Tina were

"interviewed." (Plt. Ex. 28, Cunningham Dep., 128:16-19; Plt. Ex. 12, Cross Test., 1/26/18, p. 70:21-71:5.) Defendants object to the remaining averments as redundant to Defendants' SOF ¶ 46, but they are otherwise admitted.

50. Defendants Cross and Cunningham were undeterred by the fact that Plaintiff and Tina had been up since 4 a.m. and were drinking. Indeed, Defendant Cross testified that unless someone passed out, he would "keep [his] interrogation going as long as it was necessary." Ex. 13 (Cross. Dep.) at 70: 23-71:7. For his part, Defendant Cunningham admitted that he would interrogate an intoxicated person as long as they could respond to his questions. Ex. 28 (Cunningham Dep.) at 205:13-20.

**RESPONSE:** Defendants deny that the averments in Paragraph 50 are supported by Plaintiff's cited exhibits and further deny that the evidence supports any inference that Cross and Cunningham were describing their questioning of Plaintiff and Tina, as opposed to general circumstances under which they would stop or limit questioning (Plt. Ex. 13, Cross Dep, pp. 68:22-72:11; Plt. Ex. 28, Det. Cunningham Dep., pp. 201:11-206:7). Cross responded that, among several reasons he would stop an interrogation would be: "[i]f someone passed out…" (p. 71:3-7) or if the person appeared intoxicated (p. 72:9-11) he may limit questioning based on the amount of sleep a person had depending "upon the individual and how they were reacting" (p. 69:5-13). Further, Cunningham responded that when he questions a person he "tr[ies] to gauge the fact is there some outside source that might influence them whether it is alcohol or drugs" (pp. 201:23-202:6) and whether he continues questioning a person who was intoxicated "depends on the level of intoxication" of the person (p. 204:7-14), that he would stop questioning a person who "was so intoxicated they couldn't respond" (p. 205:6-12) but "if they were able to respond, and I felt that it wasn't a danger to them, yes, I would keep talking to them" (p. 206:5-7). Cunningham testified specifically with regard to questioning Plaintiff on September 15, 1995, that he sat 3 feet away from Plaintiff and at no time did Plaintiff appear intoxicated or under the influence of alcohol, Plaintiff was able to respond to his questions, nothing about those responses alerted him that Plaintiff might be under the influence of alcohol or drugs, and he never smelled alcohol on Plaintiff's breath. (Plt. Ex. 28, Cunningham Dep., pp. 291:4-292:9; 296:1-9.) Defendants further deny that the averments in Paragraph 50 are material to any issue raised by Defendants' motion for summary judgment.

51. According to Defendant Cross, every time he spoke to Plaintiff, Plaintiff was "always drunk, always drinking." Ex. 13 (Cross Dep.) at 156:21. Defendant Cross indicated that

Plaintiff's drinking made it so that he could not "clearly understand everything that was going

on." Ex. 13 (Cross Dep.) at 158:12-18. Plaintiff "didn't know what he was doing or saying or

didn't understand. He was not clear – clear-headed or clear in what he was saying." Ex. 13

(Cross Dep.) at 158:21-24.

**RESPONSE:** Defendants deny the averments in paragraph 51 are material to any issue raised by Defendants' motion for summary judgment, but admit that the averments contained in Paragraph 51 accurately quote the cited testimony. Defendants object to the extent that Plaintiff mischaracterizes the testimony in failing to identify a time frame or specific instances to which the descriptions apply and Defendants further clarify that Plaintiff testified that he was not under the influence of any substance when he was arrested on September 15 (*See* Plt. Ex. 14, Plaintiff Dep., pp. 222:4-225:9) and Cross testified that they went to speak to Plaintiff when he was released from DeKalb County Jail on October 3rd because they knew he wouldn't have been drinking. (Plt. Ex. 13, Cross Dep., pp. 155:19-156:21).

52. That was true on September 15—both at the Exel Inn and later at the police

station. Plaintiff admitted that morning that he had been drinking and "did not feel up to taking

the tests." Ex. 31 (Cross 7-page Supp.) at DEFS 717; Ex. 28 (Cunningham Dep.) at 142:4-15

(Plaintiff told Cross he could not take a polygraph because he had been drinking); Ex. 12 (Cross

Test., 1/26/18) at 70:15-20. Nor was he sober enough to take the polygraph when Defendant

Cross interrogated him at 7:15 p.m. in the Naperville Police Department. Ex. 31 (Cross 7-page

Supp.) at DEFS 719 (indicating that Plaintiff would not be able to take the polygraph test then,

but only once "he was released from DeKalb Co. jail because at that time [as opposed to this

time] he would be sober").

**RESPONSE:** Defendants deny the averments in Paragraph 52 because they are unsupported by Plaintiff's cited evidence. Defendants further deny that Plaintiff was not sober when he was at the Naperville Police Department at 7:15 p.m. that night as further contradicted by Plaintiff's own testimony that he was not under the influence of any substance when he was arrested on September 15. (*See* Plt. Ex. 14, Plaintiff Dep., pp. 222:4-225:9.) *See also* Response to Plaintiff's Statement of Additional Fact ¶ 51.

53.     After the fire, Defendants received information from the DuPage Housing Authority that there had been a smoke detector present during their last inspection of Apartment M. Ex. 32 (Ferreri Test., 9/11/97) at 48:15-24. Defendant Cross also learned from Pamela Leavenworth that there was a smoke detector in the apartment. Ex. 21 (Cross 10-page Supp.) at DEFS 589. As a result, on September 19, 1995, Lt. Ferreri returned to the apartment to look for a smoke detector, but did not locate one. Ex. 32 (Ferreri Test., 9/11/97) at 48:15-49:21; Ex. 12 (Cross Test., 1/26/2018) at 50:19-24).

**RESPONSE:** Defendants admit the averments in Paragraph 53.

54.     When Defendants later questioned Plaintiff about an absent smoke detector, his best recollection or explanation was that he took the smoke detector down to change the batteries and he thought he left it on the dining room table. Ex. 14 (Pltf. Dep.) at 336:10-338:2; Ex. 13 (Cross Dep.) at 253:18-245:23; Ex. 31 (Cross 7-page Supp.) at DEFS 721-722.

**RESPONSE:** Defendants object to the improper characterization of Plaintiff's cited testimony as "his best recollection or explanation" because it is unsupported by Plaintiff's cited evidence because Plaintiff never characterized his testimony here as such. Defendants further deny the averments in Paragraph 54 because they are unsupported by Plaintiff's cited evidence and state further that when Plaintiff was questioned about the missing smoke detector, Plaintiff told Cross and Guerrieri on October 3, 1995, that he didn't take it down and only took off the cover and went with Tina to Kmart to get a new battery but never put it in. (Plt. Ex. 13, Cross Dep., pp. 253:18-255:2); When confronted with the fact that the entire smoke detector had been taken off the wall and was not found after the fire, Plaintiff said he did not know where it would have been if not on the bookshelf where he had left it. (Plt. Ex. 13, Det. Cross Dep., pp. 253:18-255:2; Plt. Ex. 31, 7-page Supp Report at p. 6-7.)

55.     Defendants never found the smoke detector in the apartment. There was substantial fire damage in the dining room where Plaintiff stated that he left the smoke detector. Ex. 32 (Ferreri Test., 9/11/97) at 41:18-42:1 (explaining that the dining area had "sustained quite

significant damage"). Additionally, given the size and severity of the fire, a number of objects were completely melted and indecipherable. Ex. 11 (Guerrieri Dep). at 148:22-149:21

**RESPONSE:** Defendants admit the averment that Ferreri never found the smoke detector in the apartment and that the dining room sustained substantial fire damage. Defendants deny the remaining averments contained in paragraph 55 because they are unsupported by Plaintiff's cited evidence and further clarify that Ferreri testified only about his own actions, not those of Defendants; and Plaintiff testified that he did not know where he left the smoke detector. (Plt. Ex. 32, Ferreri Test. 9/11/97 at 41:18-42:1; Def. Resp. to Plt. SOAF ¶ 54.) Defendants further deny that the averments in Paragraph 55 are material to any issue raised by Defendants' motion for summary judgment because it is undisputed that Plaintiff removed the smoke detector in the days before the fire. *See* Def. Resp. to Plt. SOAF ¶ 54.

56. Moreover, Defendant Guerrieri—who was the responding detective—admitted that he did not look for a smoke detector in the unit nor did he ever see anyone else looking for the smoke detector. Ex. 10 (Guerrieri Test., 1/25/18) at 97:19-98:4. Nor did anyone ever look through the debris or materials that were taken out of the unit or dropped downstairs for a smoke detector; indeed, those materials would have been discarded by September 19, when Ferreri conducted his search. Ex. 11 (Guerrieri Dep.) at 243:15-19; Ex. 32 (Ferreri Test., 9/11/97 at 48:15-49:21 (conducted search on September 19, 1995). Rather, all Defendant Cross indicated in his supplementary report that he did was "check[] the photos" to see if he could see a smoke detector in one of them. Ex. 21 (Cross 10-page Supp.) at DEFS 589.

**RESPONSE:** Defendants deny the averments in Paragraph 56 are material to any issue raised by Defendants' motion for summary judgment. Defendants deny the assertion in the first sentence that Guerrieri "was the responding detective" because it is unsupported by Plaintiff's cited testimony. Defendants admit the remaining averments contained in the first sentence of Paragraph 56. Defendants deny the averments in the second and third sentences because they are unsupported by Plaintiff's cited evidence because Ferreri and Guerrieri testified only that they did not find a smoke detector in the apartment, but were not asked if they or anyone else looked through the debris or materials that were taken out of the unit; neither testified that the materials were discarded by September 19; and Cross' report indicates not just that he checked the photos, but also that he then went to the apartment to see if a smoke detector was present (Plt. Ex. 11, Guerrieri Dep at pp.

243:15-244:20; Plt. Ex. 32, Ferreri Test. 9/11/97 at 48:15-49:21; Plt. Ex. 21, Cross Supp. at DEFS 589.)

57.     On September 15, after speaking with Plaintiff at the Exel Inn, Defendant Cross made the decision to arrest Plaintiff on an outstanding traffic warrant. Ex. 11 (Guerrieri Dep.) at 198:7-12. Guerrieri was directed by Defendant Cross to arrest Plaintiff, "take him back to the police station . . . for booking . . . and then . . . they were going to talk to him then at the police station" about the fire at 218 East Bailey. Ex. 11 (Guerrieri Dep.) at 198:13-19; 200:3-16, 205:19-206:10.

**RESPONSE:** Defendants admit that Cross spoke with Plaintiff at the Excel Inn on September 15. Defendants deny the remaining averments in Paragraph 57 because they are unsupported by Plaintiff's cited evidence and further clarify that Guerrieri testified that either Sgt. Carlson or Cross decided that day to arrest Plaintiff on an outstanding traffic warrant and it was routine procedure to have taken him back to the station for booking and he believed "they were going to talk to [Plaintiff] then at the police station." (Plt. Ex. 11, Guerrieri Dep., pp. 98:7-12, 199:24-200:7.).

58.     When Defendant Cross spoke to Plaintiff and Tina earlier in the morning, he learned that they were going to drive back to the Leavenworth house. Ex. 11 (Guerrieri Dep.) at 200:21-201:10. To get to the Leavenworth home, Plaintiff and Tina would have to drive down Naperville Boulevard. Ex. 11 (Guerrieri Dep.) at 200:23-201:4. As a result, Defendant Guerrieri waited on Naperville Boulevard to catch them. Ex. 11 (Guerrieri Dep.) at 201:17-21.

**RESPONSE:** Defendants deny the averments in Paragraph 58 are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit them.

59.     Guerrieri subsequently arrested Plaintiff and brought him to the Naperville police station. Ex. 11 (Guerrieri Dep.) at 203:2-205:9.

**RESPONSE:** Defendants object to Paragraph 59 as largely redundant to Defendants' SOF ¶ 48 in its assertion that Plaintiff was arrested and transported to the NPD. Defendants deny the additional averment contained in Paragraph 59 that Det. Guerrieri "brought [Plaintiff] to the Naperville police station" after his arrest because it is unsupported by Plaintiff's cited evidence which indicates that Guerrieri did not transport Plaintiff to the NPD. Defendants further deny that this additional

averment is material to any issue raised by Defendants' motion for summary
judgment.

60.     Once at the Naperville police station, Plaintiff was interrogated by Defendants

Cunningham and Cross over the next five hours about the fire at 218 East Bailey. Ex. 28

(Cunningham Dep.) at 143:3-5, 145:24-146:4 (started interrogation at 4:45/4:50 p.m. and

finished just before 10 p.m.); Ex. 33 (Cunningham 4-page Supp.) at DEFS 676-79; Ex.31 (Cross

7-page Supp.) at DEFS 718-19. Plaintiff again repeated that he was innocent of the fire. Ex. 64

(Cross Test., 9/10/97) at 64:7-65:12.

**RESPONSE:**     Defendants object to the mischaracterization in Paragraph 60 that Plaintiff was
continuously interrogated for 5 hours because Plaintiff's cited evidence does not
support any such averment but rather establishes that Plaintiff was first spoken to
around 4:45/4:50 pm and last spoken to around 10:00 pm. (Plt. Ex. 28,
Cunningham Dep., pp. 142:20-143:5; 145:16-147:10.) Defendants admit that
Plaintiff stated during the September 15 interview that he did not have anything to
do with starting the fire.

61.     It is well established in the law enforcement field that it is improper to provide a

suspect during an interrogation with information about a crime. Ex. 11 (Guerrieri Dep) at 90:15-

91:1 ("[I]t is a widely held belief in our community of investigators to not provide information

about the crime that – or the incident that the person you are interviewing doesn't already

know."); Ex. 34 (Leo Report) at 16.

**RESPONSE:**     Defendants deny the averment in Paragraph 61 because it is unsupported by the
cited testimony which demonstrates that Det. Guerrieri testified that investigators
do not provide information about the crime "that the person you are interviewing
*doesn't already know."* (Plt. Ex. 11, Guerrieri Dep., pp. 90:15-91:1.) Defendants
further deny that the averment contained in Paragraph 61 is material to any issue
raised by Defendants' motion for summary judgment.

62.     Nonetheless, during Plaintiff's five hours of interrogation on September 15, 1995,

Defendants Cunningham and Cross fed Plaintiff information about the fire at 218 East Bailey.

Ex. 28 (Cunningham Dep.) at 224:12-19 (admitting it could happen that he would supply a

suspect with information about a crime). In particular, and by his own admission, Defendant

Cunningham told Plaintiff "various aspects of the fire," including that "shortly after he and Tina

left the apartment the fire broke out and spread quickly" and that Tina had told him "that she

may have left a lit cigarette in the apartment." Ex. 33 (Cunningham 4-page Supp.) at DEFS 677.

**RESPONSE:** Defendants object to the averment that information was "fed" to Plaintiff as
improper legal argument and deny the averments in Paragraph 62 because they
are unsupported by Plaintiff's cited evidence. Defendants further object to the
mischaracterizations that Plaintiff was continuously interrogated by Dets.
Cunningham and Cross for five hours (*See* Def. Resp. to Plaintiff's Addl. SOF ¶
60) and that the information described in the second sentence constitutes
information "fed" to Plaintiff because those mischaracterizations are unsupported
by Plaintiff's cited evidence.

63.     Defendant Cunningham also told Plaintiff that vodka was flammable. Ex. 28

(Cunningham Dep.) at 163:8-11 ("I said that could be considered flammable, that's my concern

about it. He goes, oh, didn't realize it would be flammable."), *id*. at 265:6-9; Ex. 35

(Cunningham Test., 1/25/18) at 17:17-22, 35:23-36:2 ("Q. And my question is: Who was it in the

conversation that first raised the issue of whether or not vodka could be flammable? A. I would

have brought that up."); *id*. at 36:22-37:2 ("Q. Well, who raised the concept first? A. Well, I had

asked, you know – I probably did, yeah, because we started – I started talking about it's a

concern for me: that it could be flammable. We talked about it, yeah."); Ex. 33 (Cunningham 4-

page Supp.) at DEFS 676 (at start of interview, Plaintiff explained that on the day of the fire "he

started to drink vodka" and "that he drank heavily during the course of the day and he had a

'pretty good buzz going.'").

**RESPONSE:** Defendants deny the averment in Paragraph 63 that Det. Cunningham "told
Plaintiff that vodka was flammable" because it is unsupported by Plaintiff's cited
evidence, and clarify that Plaintiff admitted knowing alcohol was flammable and
brought up the example of flaming shots. (Plt. Ex. 28, Cunningham Dep., p.
165:7-11; Plt. Ex. 33, Cunningham Report at DEFS 678.)

64.     Defendant Cunningham further questioned Plaintiff about anything that he might have spilled in the apartment and any possible ignition sources, including from cigarettes or a candle. Ex. 33 (Cunningham 4-page Supp.) at DEFS 677 ("We then asked Amor if he ever spilled anything in the apartment."); *id*. at DEFS 678 ("We then questioned Amor regarding any source of ignition that may have been present in the area of the spill."); Ex. 35 (Cunningham Test., 1/25/18) at 32:21-33:2 (went through some of the possible ways that the fire might have begun). Defendant Cunningham also expressly asked Plaintiff if the vodka spill was "a possible source of ignition that would have caused the fire." Ex. 33 (Cunningham 4-page Supp.) at DEFS 678 ("I continued to question Amor regarding the vodka that was spilled and a possible source of ignition that would have caused the fire.").

**RESPONSE:**     Defendants object to the averment in Paragraph 64 as redundant to Defendants' SOF ¶ 51, but otherwise admit.

65.     Cunningham got these potential scenarios from Lt. Ferreri. Lt. Ferreri had shared with the Defendants that he thought that the fire might have been caused by someone putting a cigarette where it should not have been. Ex. 7 (Ferreri Dep.) at 124:6-13, 127:19-128:10. To that end, Ferreri and Defendant Cross had drafted a question to ask Plaintiff and Tina to determine whether the fire was caused by a cigarette. Ex. 21 (Cross 10-page Supp.) at DEFS 587 ("Inv. Ferreri and I discussed a list of nine questions we needed to ask Tina and Bill Amor," including "Did anyone sit in the swivel rocker while they were smoking?").

**RESPONSE:**     Defendants deny that Cunningham received any potential scenario from Ferreri or that Ferreri shared anything with Cunningham because Plaintiff's cited evidence does not support these averments. Defendants admit the averments to the extent they state that Ferreri and Mike Cross shared information and that they had drafted a question to ask Plaintiff and Tina, "[d]id anyone sit in the swivel rocking chair while they were smoking?" (Plt. Ex. 21, Cross Report at DEFS 587.)

66. Defendant Cross also interrogated Plaintiff at the police station on September 15. Ex. 13 (Cross Dep.) at 288:19-289:1; Ex. 31 (Cross 7-page Supp.) at DEFS 718-19. By September 15, Defendant Cross was aware of where the fire had started; the fire investigators told him that they thought it was near or on the swivel chair. Ex. 12 (Cross Test., 1/26/18) at 71:13-24; Ex. 7 (Ferreri Dep.) at 148:11-14; Ex. 21 (Cross 10-page Supp.) at DEFS 586-87 (met with fire investigators on September 14, 1995 and told "that the fire started in or near the swivel rocker").

**RESPONSE:** Defendants admit the averment contained in the first sentence of Paragraph 66. Defendants deny the averment contained in the second sentence of Paragraph 66 because it is unsupported by Plaintiff's cited exhibits, and state further that those exhibits describe Det. Cross' testimony that the fire investigators told him the area where they thought the fire had started, but do not support the averment that Det. Cross knew where the fire had started.

67. Defendant Cross then told Plaintiff this information. Specifically, according to Defendant Cross's own report, he "advised Mr. Amor that the fire appeared to have started in the swivel rocking chair . . . ." Ex. 31 (Cross 7-page Supp.) at DEFS 719.

**RESPONSE:** Defendants admit that the second sentence of Paragraph 67 accurately quotes the report cited. Defendants object to and deny the mischaracterization that Det. Cross knew where the fire started or told Plaintiff as much prior to any statements by Plaintiff as the cited report reflects rather that Plaintiff had already told Sgt. Carlson and Det. Cunningham that he spilled vodka on the Chicago Tribune in the area between the couch and coffee table, that he smoked heavily on the day of the fire and may have left a cigarette to burn itself out in the ashtray on the coffee table when he left the condo, that his cigarette possibly flipped off the ashtray and ignited something, and that he did not recall if he had extinguished a lit candle in the living room before he left. *See* Def. SOF ¶¶ 51-56.

68. This was improper: Particularly if he was treating Plaintiff as a suspect, Defendant Cross should not have told Plaintiff where the fire originated. Ex. 7 (Ferreri Dep.) at 180:20-181:23; Ex. 34 (Leo Report) at 16, 20-21.

**RESPONSE:** Defendants object to the averment in Paragraph 68 as improper legal argument and deny the averment because it is unsupported by Plaintiff's cited evidence.

28

69.     In addition, Defendant Cross also fed Plaintiff the idea that on the day of the fire, he spilled vodka on newspapers and may have misplaced a lit cigarette—just as Defendant Cunningham had done. Ex. 14 (Pltf. Dep. at 396:3-12); Ex. 35 (Cunningham Test., 1/25/18) at 32:21-33:2; Ex. 33 (Cunningham 4-page Supp.) at DEFS 677-78.

**RESPONSE:**   Defendants object to the averments in Paragraph 69 as improper legal argument that information was "fed" to Plaintiff and further deny the averments because they are unsupported by Plaintiff's cited evidence. And, by Plaintiff's own admission, he "has no recollection of his interrogation on September 15[.]" (Dkt. 156 at ¶ 51.) Defendants further deny any implication that Cross spoke with Plaintiff at the NPD prior to Cunningham as contradicted by the undisputed record. (Def. Ex. 39, Cunningham Dep., pp. 160:19-162:16; 172:11-19; Ex. 3 to Cunningham Dep.; Def. Ex. 49, Ex. 5 to Cross Dep.)

70.     Following his interrogations by Defendants Cross and Cunningham, Plaintiff wrote out a one-page handwritten statement. In that statement, Plaintiff indicated that he went to refill his vodka drink and knocked over the bottle; that the bottle spilled on the newspaper that he was reading, but he did not wipe it up; and that he could not remember where or when he put out his last cigarette. Ex. 37 (Ex. 4 to Pltf. Dep.) at SDT-SAO 695-97. That information was fed to him by the Defendants and was false. Ex. 14 (Pltf Dep.) at 229:5-232:3.

**RESPONSE:**   Defendants object to the first two sentences of Paragraph 70 as largely redundant to Defendants' SOF ¶¶ 54 and 56, but otherwise admit. Defendants object to the assertion that the information was fed to Plaintiff by Defendants as improper legal argument and deny the averment because it is unsupported by Plaintiff's deposition testimony which lacks foundation as to timing because by Plaintiff's own admission, he "has no recollection of his interrogation on September 15[.]" (Dkt. 156 at ¶ 51; Plt. Ex. 14, Plaintiff Dep., p. 214:14-20.)

71.     After he wrote out his statement, Plaintiff was transported to DeKalb County jail, where he remained for the next two weeks. Ex. 14 (Pltf. Dep) at 234:6-21.

**RESPONSE:**   Defendants object to Paragraph 71 as redundant to Defendants' SOF ¶ 57, but otherwise admit.

72.     On October 3, 1995, Plaintiff was released from DeKalb County jail around 2

p.m. Ex. 38 (Pltf Test., 2/27/96 a.m.) at 35:9-36:14; Ex. 10 (Guerrieri Test., 1/25/18) at 62:17-22.

At the time he was released, Plaintiff had not yet eaten that day and he had only slept three hours

the night before. Ex. 38 (Pltf. Test., 2/27/96 a.m.) at 35:1-36:17.

**RESPONSE:** Defendants object to the averment contained in the first sentence of Paragraph 72
as largely redundant to Defendants' SOF ¶ 68, but otherwise admit. Defendants
admit that the averment contained in the second sentence of Paragraph 72 is an
accurate description of the cited testimony, but deny the averments are material to
any issue raised by Defendants' motion for summary judgment. (Plt. Ex. 14,
Plaintiff's Dep., p. 237:9-15.)

73.     Defendants Cross and Guerrieri were waiting for Plaintiff in the lobby of the jail.

Ex. 14 (Pltf. Dep.) at 238:7-239:16; Ex. 38 (Pltf. Test., 2/27/96 a.m.) at 36:23-37:11. "[T]hey

said . . . 'We would like you to come and take a polygraph with us to Chicago.'" Ex. 38 (Pltf.

Test., 2/27/96 a.m.) at 37:15-16. Plaintiff was additionally told that it was "in [his] best interest

to take it." Ex. 38 (Pltf. Test., 2/27/96 a.m.) at 38:4-6. Plaintiff was not told that he was free to

leave, and he did not feel as though he had a choice. Ex. 38 (Pltf. Test., 2/27/96 a.m.) at 37:17-

38:6.

**RESPONSE:** Defendants deny the averments in Paragraph 73 are material to any issue raised
by Defendants' motion for summary judgment, but otherwise admit them for
purposes of summary judgment.

74.     As a result, Plaintiff went with Defendants Guerrieri and Cross to Reid &

Associates ("Reid") in Chicago to take a polygraph. The drive from DeKalb County Jail to the

Reid office in Chicago took approximately one-and-a-half to two hours. Ex. 14 (Pltf. Dep.) at

242:9-11. They arrived at Reid at approximately 4 p.m. Ex. 11 (Guerrieri Dep.) at 254:13-18.

**RESPONSE:** Defendants object to the first sentence as redundant to Defendants' SOF ¶ 68.
Defendants admit the averments in Paragraph 74.

75.     When they arrived at the Reid office, Defendants Guerrieri and Cross went to speak to Michael Masokas, the polygrapher who would be administering Plaintiff's polygraph examination. Ex. 39 (Masokas Dep.) at 16:14-22, 18:22-22:4; Ex. 40 (Polygraph Case History) at SDT-REID 21-22; Ex. 13 (Cross Dep.) at 184:21-185:21; Ex. 11 (Guerrieri Dep.) at 249:5-250:23. Masokas was trained in the Reid technique for polygraphing. Ex. 39 (Masokas Dep.) at 5:21-6:24, 177:20-180:5.

**RESPONSE:**   Defendants object to the assertion in Paragraph 75 that Michael Masokas was the polygrapher who administered Plaintiff's polygraph examination as being redundant to Defendants' SOF ¶ 75, but otherwise admit. Defendants deny the remaining averments in Paragraph 75 are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit.

76.     Masokas, Cross and Guerrieri spoke for a little less than an hour prior to Masokas polygraphing Plaintiff. Ex. 13 (Cross Dep.) at 191:2-8. During that conversation, Defendants Guerrieri and Cross explained to Masokas that they believed that Plaintiff had started the fire at 218 E. Bailey; that Plaintiff had allegedly admitted to spilling vodka and leaving a burning cigarette out; and that they had ruled out any accidental causes of the fire. Ex. 13 (Cross Dep.) at 184:21-185:21; Ex. 39 (Masokas Dep.) at 16:14-22, 18:22-22:4; Ex. 40 (Polygraph Case History) at SDT-REID 21-22; Ex. 11 (Guerrieri Dep.) at 249:5-250:23. Defendants Cross and Guerrieri also discussed with Masokas what topics and questions they wanted Masokas to ask Plaintiff. Ex. 13 (Cross Dep.) at 184:21-185:21.

**RESPONSE:**   Defendants deny that the averments in Paragraph 76 are material to any issue raised by Defendants' motion for summary judgment. Defendants admit the averments in Paragraph 76, but deny that they are a complete summary of the conversation between Masokas, Cross and Guerrieri, and also clarify that Cross testified that he does not recall whether he provided any questions to Masokas and that Reid's "formatted questioned were totally up to them." (Plt. Ex. 13, Cross Dep., p. 185:8-21.)

77. Plaintiff had not had anything to eat or drink on the way to Reid. Ex. 38 (Pltf. Test., 2/27/96 a.m.) at 41:6-11. Nor had Plaintiff slept on the drive to Reid. Ex. 14 (Pltf. Dep. 255:1-5; Ex. 12 (Cross Test., 1/26/18) at 105:4-22 (did not see Plaintiff rest the entire time he was with him). Indeed, Plaintiff told Masokas that he had only gotten a few hours of sleep. Ex. 39 (Masokas Dep.) at 32:11-20.

**RESPONSE:** Defendants deny the averments in Paragraph 77 are material to any issue raised in Defendants' motion for summary judgment. Defendants object to Paragraph 77 as redundant to Plaintiff's SOAF ¶ 105. Defendants admit that Plaintiff did not eat or drink on the drive to Reid. Defendants deny Plaintiff's assertion that he did not sleep on the drive to Reid because it is unsupported by Plaintiff's cited evidence. Defendants admit that Plaintiff told Masokas he had had a few hours of sleep but clarify that he stated it was 4 hours of sleep in the last 24 hours. (*See* Dkt. 144-1, Medical Data Sheet, Ex. 2 to Masokas Deposition.)

78. Regardless of the fact that Masokas had "a bit of a concern" about Plaintiff's lack of sleep, he administered the polygraph to Plaintiff. Ex. 39 (Masokas Dep.) at 10:15-20, 32:11-20; Ex. 14 (Pltf. Dep.) at 252:15-253:4. Plaintiff was never told that he was free to leave or that he could stop the test at any time; and even if he had been, he felt "trapped" and as if he had to continue with the exam. Ex. 14 (Pltf. Dep.) at 252:2-7; Ex. 38 (Pltf. Test., 2/27/96 a.m.) at 44:11-45:5.

**RESPONSE:** Defendants deny that the averments in Paragraph 78 are material to any issue raised in Defendants' motion for summary judgment. Defendants admit that Masokas testified that it was "a bit of a concern" that Plaintiff had received about 4 hours of sleep in the prior 24 hours, but also testified that "he was alert; he seemed fine. He didn't seem as though he was exhausted, so we continued." (Plt. Ex. 39, Masokas Dep., p. 32:11-20.) Defendants admit that Plaintiff testified that he felt "trapped", but deny that he was never told he was free to leave, as he testified at his deposition that he initialed a consent form at Reid in which he was informed that he was free to leave. (*See* Plt. Ex. 14, Plaintiff Dep., pp. 263:16-264:12.)

79. Even before he scored the examination, Masokas thought that Plaintiff was being deceptive. Ex. 39 (Masokas Dep.) at 234:13-18. Masokas then scored the examination and told

Defendants Cross and Guerrieri that Plaintiff failed the examination "badly." Ex. 11 (Guerrieri Dep.) at 255:12-17; Ex. 39 (Masokas Dep.) at 208:2-6. Masokas also told Plaintiff that he failed the polygraph. Ex. 14 (Pltf. Dep.) at 254:12-19; Ex. 39 (Masokas Dep.) at 155:17-156:10.

**RESPONSE:** Defendants admit that Masokas scored the exam, but object to the averment that Masokas told Cross and Guerrieri that Plaintiff failed the polygraph because it is redundant to Defendants' SOF ¶ 70. Defendants deny that the remaining averments contained in Paragraph 79 are material to any issue raised in Defendants' motion for summary judgment. Defendants deny Plaintiff's assertion that Masokas thought Plaintiff was being deceptive before he scored the examination because it is unsupported by Plaintiff's cited evidence. To the contrary, Masokas testified only that he "started to lean" as he "watch[ed] the test as it was rolling out." (Plt. Ex. 39, Masokas Dep., p. 234:13-18.) Defendants admit that Masokas told Plaintiff that he failed the polygraph.

80.     It was not true that Plaintiff had failed the polygraph examination. Plaintiff's polygraph expert, Dan Sosnowski, reviewed the raw data and question worksheet that Masokas generated for Plaintiff's polygraph. Ex. 41 (Sosnowski Dep.) at 61:15-18; Ex. 42 (Sosnowski Report) at 1-2. Like Masokas, Sosnowski was a former Reid employee and was trained in the Reid technique for polygraph evaluation. Ex. 41 (Sosnowski Dep.) at 17:8-19:12; Ex. 39 (Masokas Dep.) at 5:21-6:13, 7:10-8:1. Using that technique, Sosnowski found that there was no deception in Plaintiff's answers and that he passed the polygraph. Ex. 41 (Sosnowski Dep.) at 103:1-104:9, 105:1-106:18; Ex. 42 (Sosnowski Report) at 3-4.

**RESPONSE:** Defendants deny the averments concerning Mr. Sosnowski's analysis of the accuracy of third-party Mr. Masokas's scoring of Plaintiff's polygraph examination are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

81.     Falsely telling a suspect that he failed a polygraph when he actually passed can lead to a false confession. Ex. 34 (Leo Report) at 33; Ex. 41 (Sosnowski Dep.) at 49:16-50:11 (polygraphs can be used as a tool to coerce a confession). Indeed, even Defendants' own false

confession expert—Dr. Michael Welner—has testified to the same. Ex. 43 (Welner Dep.) at 248:12-249:13.

**RESPONSE:** Defendants deny the averments concerning Mr. Sosnowski's analysis of the accuracy of third-party Mr. Masokas's scoring of Plaintiff's polygraph examination are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment. Defendants deny the remaining averments concerning Dr. Welner because they are also immaterial to any issue raised by Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

82. After the polygraph, Masokas conducted a post-test interrogation with Plaintiff at Reid. Ex. 39 (Masokas Dep.) at 154:5-15, 20-23, 155:17-156:14. So too did Defendants Cross and Guerrieri. Ex. 12 (Cross Test., 1/26/18) at 84:21-24; Ex. 38 (Pltf. Test., 2/27/96 a.m.) at 53:6-54:11; Ex. 10 (Guerrieri Test., 1/25/18) at 119:24-120:6.

**RESPONSE:** Defendants deny that the averments in Paragraph 82 are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

83. During those post-test interrogations, Plaintiff continued to maintain his innocence. Ex. 38 (Pltf. Test., 2/27/96 a.m.) at 53:22-54:3; Ex. 39 (Masokas Dep.) at 156:11-14. Defendants Cross and Guerrieri told Plaintiff to "come clean" and continuously accused him of lying. Ex. 38 (Pltf. Test., 2/27/96 a.m.) at 54:1-11. The interrogation was "very heated." (Pltf. Test., 2/27/96 a.m.) at 54:4-11.

**RESPONSE:** Defendants deny the averments in Paragraph 83 are material to any issue raised by Defendants' motion for summary judgment. Defendants admit the averments in Paragraph 83 for purposes of summary judgment, but clarify that the cited evidence only supports the assertion that Plaintiff stated during the post-test interview that he had already told the truth and did not admit to starting the fire, not that he "continued to maintain his innocence." (Plt. Ex. 38, Plt. Mot. to Suppress Tr. at 53:22-54:3; Plt. Ex. 39, Masokas Dep., p. 156:11-14.)

84. Plaintiff went into the interview room at Reid at 5:00 p.m. with Masokas and left around 10:30 p.m. Ex. 13 (Cross Dep.) at 202:4-10; 203:10-204:2. All told, the polygraph

process took 5.5 hours. Ex. 13 (Cross Dep.) at 202:4-10; 203:10-204:2. As Defendant Cross

testified, that was a very long time for a polygraph examination and was "different" and

"unusual." Ex 13 (Cross Dep.) at 205:12-206:10.

**RESPONSE:** Defendants deny that any averments in paragraph 84 are material to any issue raised by Defendants' motion for summary judgment. Defendants admit Plaintiff went into the interview room at Reid at 5:00 p.m. with Masokas, left around 10:30 p.m. and that all told, the polygraph process took 5.5 hours. Defendants deny that Cross testified that was a very long time for a polygraph examination and was "different" and "unusual" because the cited evidence does not support the averment. Defendants clarify that Cross only testified that other individuals he took to Reid did not take 5.5 hours to complete the polygraph process.

85.    At around 10:30 p.m., Plaintiff and Defendants Cross and Guerrieri left for the

Naperville Police Department. Ex. 38 (Pltf. Test., 2/27/96 a.m.) at 55:2-8; Ex. 44 (Pltf. Test.,

2/27/96 p.m.) at 4:1-7. Plaintiff was not asked if he would continue speaking with the

Defendants, but instead simply told that they would be continuing their interrogation in

Naperville. Ex. 38 (Pltf. Test., 2/27/96 a.m.) at 55:2-8; Ex. 44 (Pltf. Test., 2/27/96 p.m.) at 4:1-7.

Plaintiff felt as though he had no choice but to go with Defendants Cross and Guerrieri. Ex. 38

(Pltf. Test., 2/27/96 a.m.) at 55:9-11.

**RESPONSE:** Defendants object to Plaintiff's assertion in Paragraph 85 that Cross, Guerrieri and Plaintiff left Reid together for the Naperville Police Department as redundant to Defendants' SOF ¶ 74. Defendants deny the remaining averments contained in Paragraph 85 are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

86.    That was so regardless of the fact that Plaintiff was exhausted. Plaintiff told

Defendants Cross and Guerrieri when they left Reid that he was "extremely tired" and he asked

the Defendants if he could rest once they were back in Naperville. Ex. 44 (Pltf. Test., 2/27/96

p.m.) at 5:11-6:3. Defendants Cross and Guerrieri told Plaintiff that he could rest once they were

done with their questioning. Ex. 44 (Pltf. Test., 2/27/96 p.m.) at 6:8-10.

**RESPONSE:** Defendants deny the averments in Paragraph 86 are material to any issue raised in Defendants' motion for summary judgment. Defendants deny the assertion in Paragraph 86 that Plaintiff asked Defendants if he could rest once they were back in Naperville because it is unsupported by Plaintiff's cited evidence, which states that Plaintiff did not make such a request. (*See* Plt. Ex. 44, Plt. Mot. to Suppress Tr. at 6:4-7.) Defendants further deny the assertion that Cross and Guerrieri told Plaintiff he could rest when they were done with their questioning because it is unsupported by Plaintiff's cited evidence. (*See* Plt. Ex. 44, Plt. Mot. to Suppress Tr. at 6:8-10.) Defendants admit that Plaintiff was very tired and told Cross and Guerrieri so.

87.     On the way back to Naperville, Defendants Cross and Guerrieri stopped the car at one point. Defendant Cross got a phone call, which he went to return. Ex. 14 (Pltf. Dep.) at 272:19-273:21.

**RESPONSE:** Defendants deny that the averments in Paragraph 87 are material to any issue raised by Defendants' motion for summary judgment but otherwise admit them for purposes of summary judgment.

88.     Plaintiff and Defendants Cross and Guerrieri arrived at the Naperville Police Department around 11:30 p.m. Ex. 44 (Pltf. Test., 2/27/96 p.m.) at 8:17-19. Again, Plaintiff requested that he be permitted to get some rest, and he was again rebuffed by Defendants Cross and Guerrieri. Ex. 44 (Pltf. Test., 2/27/96 p.m.) at 7:19-8:16.

**RESPONSE:** Defendants deny the averments in Paragraph 88 are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

89.     At 11:37 p.m., Plaintiff read and signed a *Miranda* waiver, and Defendant Guerrieri and Cross began questioning Plaintiff. Ex. 11 (Guerrieri Dep.) at 261:7-262:24; Ex. 45 (Statement of Miranda Rights) at Amor 019002; Ex. 14 (Pltf. Dep.) at 283:1-14. Plaintiff continued to maintain his innocence. Ex. 14 (Pltf. Dep.) at 294:4-7 ("I kept denying everything because I knew I was innocent.").

**RESPONSE:** Defendants deny the averments in Paragraph 89 are material to any issue raised by their motion for summary judgment. Defendants admit that Plaintiff read and signed a Miranda waiver at 11:37 p.m. and that Cross and Guerrieri began

questioning him. Defendants deny the assertion that he continued to maintain his innocence because it is unsupported by Plaintiff's cited evidence, which is also incorrectly quoted. To clarify, Plaintiff testified, "I kept denying everything as I always knew I was innocent." (Plt. Ex. 14, Plaintiff Dep., p. 294:6-7.)

90.     Plaintiff was not questioned for long at the NPD before a process server arrived.

Ex. 14 (Pltf. Dep.) at 283:10-19.

**RESPONSE:**  Defendants deny the averment in Paragraph 90 is material to any issue raised by Defendants' motion for summary judgment, but otherwise admit it for purposes of summary judgment.

91.     Taking a step back, on October 3, 1995, a process server named Russell

Wiedemann was instructed to serve Plaintiff with divorce papers. Ex. 46 (Wiedemann Test.,

9/16/97) at 71:14-20. That assignment was a "rush assignment," meaning it had to be completed

within 24 hours. Ex. 46 (Wiedemann Test., 9/16/97) at 71:21-72:3.

**RESPONSE:**  Defendants deny that the averments in Paragraph 91 are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

92.     Tina decided to divorce Plaintiff when she was told by Defendants Cross and

Guerrieri that Plaintiff had "confessed to everything." Ex. 17 (Tina Dep. 3/13/20) at 42:3-8; *id*. at

42:22-45:4, 46:4-47:10. After the Defendants told her that Plaintiff confessed, Tina's aunt

Pamela Leavenworth asked Tina if she wanted to get a divorce. Ex. 17 (Tina Dep. 3/13/20) at

46:4-47:6.

**RESPONSE:**  Defendants deny that the averments in Paragraph 92 are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit that it accurately describes the cited testimony. Defendants further state under the rule of completeness that Tina testified that she first started talking about divorcing Plaintiff a couple of weeks after the fire and before she heard he confessed when her aunt Pam brought it up by asking whether she would want a divorce if [Plaintiff] killed her mom, and Tina said she would if he honestly killed her. (Plt. Ex. 17, Tina Dep., pp. 43:4-45:14; *see also* Def. SOF ¶¶ 58-59, 71-74.)

93.     Pamela Leavenworth arranged for Tina to meet with a divorce attorney to sign

paperwork. Tina did so on the same day Tina was told by Defendants Guerrieri and Cross that

Plaintiff confessed. Ex. 17 (Tina Dep. 3/13/20) at 47:17-20; Ex. 47 (Petition for Dissolution of

Marriage) at DEFS 4762-64 (signed Petition for Dissolution of Marriage on October 3, 1995).

**RESPONSE:**  Defendants admit to the averment in the first sentence of paragraph 93.
Defendants deny the remaining averments in Paragraph 93 because they are
unsupported by Plaintiff's cited evidence.

94.     The chronology described in the paragraphs above demonstrates that Defendants

Cross and Guerrieri lied to Tina when they told her that Plaintiff had confessed. Plaintiff did not

confess—either orally or in writing—until after he was served with divorce papers, sometime in

the early morning hours of October 4. Ex. 46 (Wiedemann Test., 9/16/97) at 80:18-22 (served

Plaintiff at 11:55 p.m.); Ex. 48 (Pltf. Stmt. 1:14 am) at DEFS 818, also marked as Exhibit 7 to

Plaintiff's deposition; Ex. 14 (Pltf. Dep.) at 284:20-313:8 (demonstrating that first Plaintiff was

served with divorce papers and then he later confessed); Ex. 49 (Field Service Record) at Pl

Amor 17477-78; *see also* Ex. 46 (Wiedemann Test., 9/16/97) at 72:14-75:15 (indicating he filled

out Field Service Record in course of regular business and kept in course of regular business).

**RESPONSE:**  Defendants object to the averments in Paragraph 94 as improper legal argument.
Defendants admit for purposes of summary judgment that Plaintiff confessed after
he was served with divorce papers and that he provided his confession in the early
morning hours of October 4. Defendants deny the remaining averments in
Paragraph 94 because they are unsupported by Plaintiff's cited evidence.

95.     In his instructions, Wiedemann was told to contact Defendant Cross to coordinate

serving Plaintiff. Ex. 46 (Wiedemann Test., 9/16/97) at 76:5-20. Wiedemann contacted

Defendant Cross around 7 p.m. and left a message for him. Defendant Cross then paged

Wiedemann and the two spoke. Ex. 46 (Wiedemann Test., 9/16/97) at 76:21-77:7.

**RESPONSE:**  Defendants deny the averments in Paragraph 95 are material to any issue raised
by Defendants' motion for summary judgment. Defendants deny that Wiedemann

was told to contact Cross "to coordinate" service because the averment is unsupported by Plaintiff's cited evidence. Defendants admit the remaining averments for purposes of summary judgment, but clarify that the cited testimony begins at Plt. Ex. 46 at 76:11 rather than 76:21.

96.     Wiedemann went to the Naperville Police Department sometime after 11:30 p.m. and met with Defendant Cross in the lobby of the police department. Ex. 46 (Wiedemann Test., 9/16/97) at 77:8-78:5. At that time, Defendant Cross told him that "Mr. Amor was a suspect in a murder case, and that his partner was currently interviewing Mr. Amor and he requested that I wait a few minutes before serving him, because he didn't want to interrupt and interfere with what his partner was doing." Ex. 46 (Wiedemann Test., 9/16/97) at 78:6-79:1. Cross further told Wiedemann "that they were interviewing [Plaintiff] to attempt to get him to confess to the crime, that they felt that he had committed it . . . ." Ex. 46 (Wiedemann Test., 9/16/97) at 79:3-10.

RESPONSE: Defendants deny the averments in Paragraph 96 are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

97.     Wiedemann waited around 15 minutes in the lobby. Ex. 46 (Wiedemann Test., 9/16/97) at 79:11-17. At 11:55 p.m., Defendant Cross came out of the interrogation room and told Wiedemann he could now serve Plaintiff. Ex. 46 (Wiedemann Test., 9/16/97) at 79:18-80:2, 80:18-22. Weidemann went into the interrogation room to do so. Ex. 46 (Wiedemann Test., 9/16/97) at 79:18-80:2; Ex. 14 (Pltf. Dep.) at 283:10-285:24; Ex. 49 (Field Service Report) at Pl Amor at 17477-78; Ex. 46 (Wiedemann Test., 9/16/97) at 72:14-75:15 (indicating he filled out Field Service Record in course of regular business and kept in course of regular business).

RESPONSE: Defendants deny the averments in Paragraph 97 are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

98.     Defendant Cross admitted that it is improper to have a process server serve divorce papers inside an interrogation room. Ex. 13 (Cross Dep.) at 219:10-15.

**RESPONSE:** Defendants deny the averment in Paragraph 98 is material to any issue raised by Defendants' motion for summary judgment, but it is otherwise admitted for purposes of summary judgment.

99.     Once he was served, Plaintiff looked at the documents and saw they were divorce papers. Ex. 14 (Pltf. Dep.) at 286:1-5. Plaintiff, who had committed no crime and done nothing wrong, began crying and was an emotional wreck. Ex. 14 (Pltf. Dep.) at 287:13-14; Ex. 44 (Pltf. Test., 2/27/96 p.m.) at 12:10-12.

**RESPONSE:** Defendants deny that the averments in Paragraph 99 are material to any issue raised by Defendants' motion for summary judgment. Defendants deny the assertion that Plaintiff "had committed no crime and done nothing wrong" because it is unsupported by Plaintiff's cited evidence. The remainder of the averments in Paragraph 99 are admitted for purposes of summary judgment.

~~100.     During his interrogations on the night of October 3 and into the morning of October 4, Defendant Cross was doing most of the questioning. Ex. 14 (Pltf. Dep.) at 289:6-12. Defendant Cunningham joined Defendants Cross and Guerrieri in the interrogation room later. Ex. 14 (Pltf. Dep.) at 289:6-24; Ex. 12 (Cross Test., 1/26/18) at 88:8-12 (Cunningham was in the investigations division that night). The three Defendants would rotate in and out of the interrogation room. Ex. 14 (Pltf. Dep.) at 290:2-4.~~

**RESPONSE:** Plaintiff has withdrawn Paragraph 100 and Defendants therefore do not submit a response. (Dkts. 159-162.)

101.     Defendant Cross was a very intimidating man. Defendant Cross was approximately 6 feet tall and between 220 and 240 pounds; by contrast, Plaintiff was 5'8" and only 140 pounds. Ex. 14 (Pltf. Dep.) at 295:18-296:17; Ex. 19 (Guerrieri Test., 9/10/97) at 46:20-47:4.

**RESPONSE:** Defendants deny the averments in Paragraph 101 are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit for purposes of summary judgment.

102.    Sometime after he was served with divorce papers, Plaintiff was moved from one interrogation room to another interrogation room across the hall. Ex. 14 (Pltf. Dep.) at 290:2-6. At this point, Defendant Cross came into the interrogation room, grabbed Plaintiff by his upper shoulders/neck, shook him and pushed him against the wall. Ex. 14 (Pltf. Dep.) at 294:4-20, 297:17-299:10; Ex. 44 (Pltf. Test., 2/27/96 p.m.) at 12:22-14:8. At the time, Plaintiff was sitting in a chair and Defendant Cross lifted him out of it when he assaulted Plaintiff. Ex. 44 (Pltf. Test., 2/27/96 p.m.) at 13:23-14:2. The back of Plaintiff's head struck the wall. Ex. 14 (Pltf. Dep.) at 298:21-291:1.

**RESPONSE:**    Defendants deny the averments in Paragraph 102 are material to any issue raised in Defendants' motion for summary judgment, but otherwise admit them only for purposes of summary judgment.

103.    Defendant Cross then yelled at Plaintiff: "I'm going to kick your fucking ass if you don't confess." Ex. 14 (Pltf Dep.) at 300:5-8.

**RESPONSE:**    Defendants deny the averments in Paragraph 103 are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

104.    Plaintiff was dizzy and had a headache from this assault, and he was also crying. Ex. 44 (Pltf. Test., 2/27/96 p.m.) at 14:9-24.

**RESPONSE:**    Defendants deny the averments in Paragraph 104 are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit them only for purposes of summary judgment.

105.    In addition, as Defendant Cross testified, Plaintiff had not eaten anything all day. Ex. 14 (Pltf. Dep.) at 242:14-16, 256:13-15; Ex. 38 (Pltf. Test., 2/27/96 a.m.) at 41:6-11; Ex. 12 (Cross Test., 1/26/18) at 105:4-22 (no food or sleep during the entire duration of interrogation). Despite repeated requests, Plaintiff also had not been permitted to sleep. Ex. 14 (Pltf. Dep.) at

312:19-20; Ex. 44 (Pltf. Test., 2/27/96 p.m.) at 6:2-10, 8:7-14; Ex. 12 (Cross Test., 1/26/18) at

105:4-22 (no food or sleep during the entire duration of interrogation).

**RESPONSE:** Defendants object to the assertion in Paragraph 105 that despite requests, Plaintiff had not been permitted to sleep as redundant to Plaintiff's SOAF ¶¶ 86 and 88. Defendants deny the averments in Paragraph 105 are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

106.    Instead, either Defendant Cross or Defendant Guerrieri told Plaintiff that if he

signed a statement he could go home. Ex. 14 (Pltf. Dep.) at 303:14-304:12.

**RESPONSE:** Defendants deny the averment in Paragraph 106 is material to any issue raised by Defendants' motion for summary judgment. Defendants otherwise deny the averment in Paragraph 106 because it is unsupported by Plaintiff's cited evidence which indicates that Plaintiff testified that he was told "you let us know what actually happened, you can go home" but makes no mention of Cross or Guerrieri telling Plaintiff that if he signed a statement he could go home. (Plt. Ex. 14, Plaintiff Dep., p. 303:15-17.)

107.    By this point, Plaintiff felt helpless: He had not slept despite his repeated requests;

he had endured a polygraph during which he had been falsely told he lied; he had not been fed;

he was intimidated and frightened after being threatened and assaulted; and he was homeless as

his wife was divorcing him. Ex. 14 (Pltf. Dep.) at 305:23-306:5 (repeatedly asked to sleep); *id*. at

312:9-313:8 ("I'd been up for 24 hours . . . I went through a polygraph, I'd had no sleep, nothing

to eat, I mean . . . I was intimidated, I was frightened, I was homeless, I was broke."); Ex. 44

(Pltf. Test., 2/27/96 p.m.) at 15:1-2 (was scared); *id*. at 23:4-22 (told detectives that he was tired,

wanted to rest and they told him he had to wait until after the prosecutor questioned him; was

frightened); *see also* Plt. SOAF ¶¶ 96-99 (served divorce papers); Plt. SOAF ¶¶ 79-80 (falsely

told failed polygraph). As a result, Plaintiff agreed to write out a false statement. Ex. 14 (Pltf.

Dep.) at 312:9-313:8.

**RESPONSE:** Defendants admit that Plaintiff agreed to write out a statement, but deny any implication that Plaintiff communicated to any Defendant that his statement was

false because it is unsupported by Plaintiff's cited evidence. Defendants deny that all remaining averments in Paragraph 107 are material to any issue raised by their motion for summary judgment, but they are otherwise admitted for purposes of summary judgment.

108.     The statement was written out at 1:14 a.m. Ex. 14 (Pltf. Dep.) at 309:6-20; Ex.48 (Pltf. Stmt. 10/4/95 1:14 a.m.) at DEFS 818, also marked as Exhibit 7 to Plaintiff's deposition. That statement is not true. Ex. 14 (Pltf. Dep.) at 310:12-318:8; Ex. 48 (Pltf. Stmt. 10/4/95 1:14 a.m.) at DEFS 818, also marked as Exhibit 7 to Plaintiff's deposition (with untruthful parts highlighted in yellow).

**RESPONSE:**  Defendants object to the averments in Paragraph 108 as largely redundant to Defendants' SOF ¶¶ 76-79. Defendants deny the averment that Plaintiff's handwritten "statement is not true" because Plaintiff's cited evidence supports only an assertion that the statement contains untruthful statements as well as truthful statements. (*See* Plt. Ex. 48, Plt. Stmt. 10/4/95.)

109.     While he was writing out the statement, Defendant Guerrieri was in the room with him. Ex. 38 (Pltf. Test., 2/27/96 a.m.) at 16:14-19 (Guerrieri was with him). In that statement, Plaintiff stated that he started the fire by knocking a lit cigarette onto a newspaper soaked with vodka. Ex. 48 (Pltf. Stmt. 10/4/95 1:14 a.m.) at DEFS 818, also marked as Exhibit 7 to Plaintiff's Deposition. That ignition scenario was fed to him by Defendant Cross. Ex. 14 (Pltf. Dep.) at 396:3-9.

**RESPONSE:**  Defendants deny the averment that Guerrieri was in the room with him while he was writing out the statement because it is unsupported by Plaintiff's cited evidence which refers to page 16 in Plaintiff's Exhibit 38, but no such page exists. Defendants admit that in Plaintiff's written statement, he stated in part that he "bumped the ashtray knocking the cigarette onto the newspaper with the vodka spilled on it[,]" but object to this averment as redundant to Defendants' SOF ¶ 77. (Plt. Ex. 48, Plt. Stmt. 10/4/95.) Defendants admit for purposes of summary judgment that the ignition scenario in Plaintiff's October 4 statement was provided to him by Cross on that day, but deny any assertion that Cross fed Plaintiff any portion of his September 15 statement, including his statement that he spilled vodka on the Chicago Tribune in the area between the couch and the coffee table on the day of the fire, because it is flatly contradicted by the record (Def. Ex. 39, Cunningham Dep., pp. 160:19-162:16; 172:11-19; Ex. 3 to

Cunningham Dep; Def. Ex. 49, Ex. 5 to Cross Dep.), and by Plaintiff's own admission that he "has no recollection of his interrogation on September 15[.]" (Dkt. 156 at ¶ 51.) *See also* Def. Resp. to Plt. SOAF ¶ 69.

110.    After he finished writing out his statement, Defendant Guerrieri had Plaintiff add in that he spilled the vodka on "the chair" in addition to spilling vodka on the newspaper. Ex. 11 (Guerrieri Dep.) at 269:15-270:3; Ex. 10 (Guerrieri Test., 1/25/18) at 144:17-24. By Defendant Guerrieri's own admission after he reviewed Plaintiff's statement, he told Plaintiff "Well, you said you spilled it up on the chair when I asked you" and told him to add in the language "and chair" on the sixth line of his confession. Ex. 11 (Guerrieri Dep.) at 269:15-270:3; Ex. 10 (Guerrieri Test., 1/25/18) at 144:17-24, 145:13-15, 145:24-146:18; Ex. 14 (Pltf. Dep.) at 330:2-14, 396:3-12 (defendants fed Plaintiff information in confession).

**RESPONSE:** Defendants deny the averments in Paragraph 110 are material to any issue raised by Defendants' motion for summary judgment. Defendants admit the averments in Paragraph 110 only for purposes of summary judgment, but clarify that the cited evidence only supports the averment that Guerrieri "reminded" Plaintiff of his verbal statement which Plaintiff then added to his written statement.

111.    By that time, Defendant Guerrieri had been told that the chair was the point of origin of the fire. Ex. 10 (Guerrieri Test., 1/25/18) at 148:7 -11 ("Q. Well, at the time that you interviewed Mr. Amor on October 3rd when you asked him about adding the chair to that statement, did you believe that the chair was the area where this fire began? A. It was the general area, correct.").

**RESPONSE:** Defendants deny the averments in Paragraph 111 are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

112.    An hour later, at 2:11 a.m., Defendants Cross and Guerrieri had Plaintiff read his statement into a tape recorder. Ex. 50 (Pltf. Stmt. 10/4/95 2:11 a.m.) at SDT-SAO 10648-50, also marked as Exhibit 8 to Plaintiff's deposition; Ex. 13 (Cross Dep.) at 241:18-242:1. Although a

44

tape recorder was available throughout the duration of Plaintiff's interrogation, the Defendants did not tape record anything except Plaintiff's confession. Ex. 13 (Cross Dep.) at 242:2-18; Ex. 19 (Guerrieri Test., 9/11/97) at 50:19-51:4.

**RESPONSE:** Defendants object to the assertion that at 2:11 a.m., Cross and Guerrieri had Plaintiff read his handwritten statement into a tape recorder as redundant to Defendants' SOF ¶ 82. Defendants deny the confession was the only thing recorded because that averment is flatly contradicted by the record which clearly demonstrates that a subsequent question and answer session with Guerrieri and Cross was also recorded, and that a second recording was made at 5:10 a.m. during ASA Nigohosian's interview with Plaintiff. *See* Defendants' SOF ¶¶ 82-84. Defendants deny that the averments that a tape recorder was available and the entire duration of Plaintiff's October 3 and 4 interviews was not recorded are material to any issue raised in Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

113.    After Plaintiff read his confession on the tape recording, Defendants Guerrieri and Cross asked him a series of leading questions. Ex. 19 (Guerrieri Test., 9/11/97) at 51:14-22. For example, the following exchange occurred:

M. Cross:     Okay, but didn't you also say that you knocked the pur . . . the cigarette onto the paper on purpose?

W. Amor:     Yes, both would . . .

M. Cross:     Okay.

W. Amor:     Yeah . . . Well . . . Yeah.

M. Cross:     And did you, did you also ahh, say that you saw smoke coming from the paper?

W. Amor:     I saw a little bit of smoke. Yes.

M. Cross:     Okay . . . and you knew that a fire was going to start?

W. Amor:     I anticipated that it would.

M. Cross:     Okay . . . and you said at that point you just didn't give a shit?

W. Amor:     That is correct.

Ex. 50 (Pltf. Stmt. 10/4/95 2:11 a.m.) at SDT-SAO 10649-50, also marked as Exhibit 8 to

Plaintiff's deposition.

**RESPONSE:**    Defendants object to the assertion that after Plaintiff read his confession on the tape recorder, he was asked a series of questions as redundant to Defendants' SOF ¶ 82. Defendants admit Plaintiff's additional assertion that Defendants asked "a series of leading questions", but deny that it is material to any issue raised by Defendants' motion for summary judgment.

114.    Defendants Cross and Guerrieri were experienced detectives. Ex. 12 (Cross Test., 1/26/18) at 33:18-34:22; Ex. 10 (Guerrieri Test., 1/25/18) at 89:20-22. As a result, they would

have known that it is not proper to ask such leading questions. Ex. 28 (Cunningham Dep.) at

222:3-12. That is because leading questions can provide information to the suspect that he does

not already know. Ex. 11 (Guerrieri Dep.) at 90:15-91:1.

**RESPONSE:**    Defendants admit that in 1995, Cross was an experienced detective and Guerrieri was an experienced police officer. Defendants deny the remaining averments contained in Paragraph 114 because they are unsupported by Plaintiff's cited evidence. Defendants further deny that the averments in Paragraph 114 are material to any issue raised by Defendants' motion for summary judgment.

115.    Around 1:30 or 1:45 a.m. on October 4, 1995, Defendant Cross paged Assistant

State's Attorney ("ASA") Brian Nigohosian. Ex. 51 (Nigohosian Dep.) at 74:9-75:6; Ex. 52

(Nigohosian Test., 2/27/96) at 7:13-8:8. Defendant Cross told Nigohosian that Plaintiff had

implicated himself, and Cross asked Nigohosian if he would come to the police station. Ex. 52

(Nigohosian Test., 2/28/9 at 7:13-8:8. The two spoke for approximately 10 to 15 minutes. Ex. 51

(Nigohosian Dep.) at 74:9-75:6.

**RESPONSE:**    Defendants object to Paragraph 115 as largely redundant to Defendants' SOF ¶ 80, but otherwise admit.

116.    Nigohosian arrived at the Naperville Police Department at approximately 3 a.m.

on October 4, 1995. Ex. 52 (Nigohosian Test., 2/27/96) at 8:9-12. Nigohosian then met with

Defendants Cross and Guerrieri for 20 to 30 minutes; Cross and Guerrieri summarized their

investigation for Nigohosian. Ex. 52 (Nigohosian Test., 2/27/96) at 9:1-10; Ex. 51 (Nigohosian

Dep.) at 77:11-78:2.

**RESPONSE:** Defendants object to the assertion in Paragraph 116 that Nighosian arrived at the Naperville Police Department on October 4, 1995, at approximately 3 a.m. as redundant to Defendants' SOF ¶84. Defendants admit the remaining averments, but deny they are material to any issue raised by Defendants' motion for summary judgment.

117.    Nighosian met with Plaintiff around 3:45 a.m. and interrogated him. Ex. 52

(Nighosian Test., 2/27/96) at 13:18-24. At the end of the interrogation, at 5:10 a.m., Nighosian

asked Plaintiff to record another confession. Ex. 51 (Nighosian Test., 2/27/96) at 13:18-24; Ex.

53 (Pltf. Stmt. 10/4/95 5:10 a.m.) at SDT-SAO 10517-24, also marked as Exhibit 9 to Plaintiff's

deposition.

**RESPONSE:** Defendants object to the assertion that Nighosian interviewed Plaintiff because it is redundant to Defendants' SOF ¶ 84. Defendants admit the remainder of the averments contained in Paragraph 117, but clarify that Mr. Nighosian testified that he requested that Plaintiff "give a tape-recorded version of what he had just told me." (Plt. Ex. 51, Nighosian Mot. to Suppress, 2/27/96 at 13:18-23.)

118.    The information in Plaintiff's 5:10 a.m. confession was fed to Plaintiff by the

Defendants. That included each of the following: (a) that the fire started as a result of a cigarette

being intentionally knocked on a pile of newspapers doused in vodka; (b) that Plaintiff formed

the idea to set the fire while in DuPage County Jail; (c) that he wrote to Tina to explain the idea;

(d) that he was going to use insurance money to get out of the apartment because his living

situation was unbearable; (e) that he was aware of various forms of insurance, including life

insurance; and (f) that when he left the apartment he started to see smoke but no flames. Ex. 14

(Pltf. Dep.) at 328:22-330:14; Ex. 53 (Pltf. Stmt. 10/4/95 5:10 a.m.) at SDT-SAO 10517-24 and

highlighting, also marked as Exhibit 9 to Plaintiff's deposition.

**RESPONSE:** Defendants deny the averments in Paragraph 118 are material to any issue raised by Defendants' motion for summary judgment, but admit that Plaintiff made

allegations that the statements set forth in Paragraph 118 were fed to him on October 4, 1995. Defendants deny that any specific statement contained in Paragraph 118 was fed to Plaintiff by any defendant because it is unsupported by Plaintiff's cited evidence. (*See also* Plt. Ex. 14, Plaintiff Dep., p. 330:2-18.)

119. During the 5:10 a.m. confession, Nigohosian asked Plaintiff a series of leading questions to which Plaintiff responded "yes" or in the affirmative. Ex. 53 (Pltf. Stmt. 10/4/95 5:10 a.m.) at SDT-SAO 10518-20, 10522, also attached as Exhibit 9 to Plaintiff's deposition.

**RESPONSE:** Defendants deny the averments contained in Paragraph 119 are material to any issue raised by Defendants' motion for summary judgment. Defendants further deny that the averments are supported by Plaintiff's cited evidence.

120. According to the arrest report that Defendant Guerrieri filled out, Plaintiff was arrested at 11:37 p.m.—before he confessed. Ex. 11 (Guerrieri Dep.) at 309:2-14; Ex. 54 (Arrest Report) at DEFS 66-67. But as Defendant Guerrieri concedes, without that confession, Plaintiff would not have been arrested for Marianne's murder. Ex. 11 (Guerrieri Dep.) at 235:16-19.

**RESPONSE:** Defendants deny the averments contained in Paragraph 120 are material to any issue raised in Defendants' motion for summary judgment. Defendants admit that Guerrieri filled out Plaintiff's arrest report indicating the time of arrest was 11:37 p.m. which coincides with Plaintiff signing the Miranda waiver form. (Plt. Ex. 11, Guerrieri Dep., pp. 261:7-262:24; Plt. Ex. 45, Stmt. of Miranda Rights; Plt. Ex. 14, Plaintiff Dep., p. 283:1-11.) Plaintiff's citation to Ex. 54 as the Arrest Report is incorrect. Defendants deny that Guerrieri "conceded" Plaintiff would not have been arrested for Marianne's murder without his confession because it is inaccurate and taken out of context contrary to FED.R.EVID. 106; Ex. 11, Guerrieri Dep., pp. 235:16-236:19. To clarify, Guerrieri testified that had Plaintiff not confessed that night he would not likely have been arrested on October 4, 1995. *Id.* at 235:16-19.

121. The ignition scenario in Plaintiff's false confession is scientifically impossible. Ex. 6 (Golder Test., 2/2/18) at 23:8-18, 62:9-12; Ex. 9 (Carpenter Report 1/22/21) at 10, 12; Ex. 55 (DeHaan Test., 12/14/16) at 47:19-24. It is not possible to start a fire—let alone a fire of the magnitude of the fire at 218 E. Bailey—by dropping a cigarette onto a vodka-soaked newspaper.

48

Ex. 6 (Golder Test., 2/2/18) at 23:8-18, 62:9-12; Ex. 9 (Carpenter Report 1/22/21) at 10, 12; Ex. 55 (DeHaan Test., 12/14/16) at 47:19-24.

**RESPONSE:** Defendants deny the averments in Paragraph 121 are material to any issue raised by Defendants' motion for summary judgment, but admit them for purposes of summary judgment.

122.    There are a number of reasons why the ignition scenario in Plaintiff's confession is not scientifically viable. First, vodka is not an accelerant: Vodka is largely made up of water, which will actually suppress, and not ignite, a fire. Ex. 9 (Carpenter Report 1/22/21) at 10, 12; Ex. 6 (Golder Test., 2/2/18) at 62:13-24; Ex. 55 (DeHaan Test., 12/14/16) at 49:15-50:1. Moreover, the vapors from vodka—which are the portion of vodka that will burn—do not ignite at room temperature. Ex. 9 (Carpenter Report 1/22/21) at 8-10, 12.

**RESPONSE:** Defendants deny the averments in Paragraph 122 are material to any issue raised by Defendants' motion for summary judgment, but admit them for purposes of summary judgment.

123.    Second, a cigarette is not a competent ignition source to ignite liquids or newspaper Ex. 9 (Carpenter Report 1/22/21) at 10 12; Ex. 6 (Golder Test., 2/2/18) at 23:8-18.

**RESPONSE:** Defendants deny the averments in Paragraph 123 are material to any issue raised in Defendants' motion for summary judgment. Defendants admit that a cigarette is not a competent ignition source to ignite liquids, but deny that it is not a competent ignition source to ignite newspaper because that averment is not supported by Plaintiff's cited evidence. (*See also* Def. Ex. 48, Kushner Dep., pp. 168:14-169:1.)

124.    Defendants have alternatively testified that at the time they took Plaintiff's confession they knew the ignition scenario in it was impossible or that they believed it to be possible. Ex. 13 (Cross Dep.) at 232:13-233:9 (at time took confession did not believe ignition scenario was plausible); Ex. 56 (Cross Grand Jury Test.) at 20:8-21:2 (ignition scenario plausible); Ex. 11 (Guerrieri Dep.) at 222:22-223:24, 231:6-23 (believed ignition scenario in Plaintiff's confession was possible).

**RESPONSE:** Defendants deny the averments in Paragraph 124 because they are not supported by Plaintiff's cited evidence. Guerrieri's cited testimony does not support the averment, and Cross's cited grand jury testimony that the newspaper would have to catch on fire and have a flame to actually ignite the vodka (Cross Grand Jury Test. at 20:10-16) does not contradict his deposition testimony that he did not believe how Plaintiff said he started the fire.

125.    Regardless, the Defendants conducted no follow-up investigation to corroborate the plausibility of a cigarette on a vodka-soaked newspaper lighting a fire. Although Lieutenant Ferreri conducted test burns of the VCR and television, he and the other Defendants claim that they conducted no test burn of cigarettes on newspaper soaked in vodka. Ex. 11 (Guerrieri Dep) at 230:10-232:3; Ex.13 (Cross Dep.) at 149:2-14; Ex. 57 (Report on the Television/VCR Test Burn) at DEFS 687-88. That was true notwithstanding the ready ease of conducting such a test and of the importance of corroborating information in a confession. Ex. 11 (Guerrieri Dep.) at 82:23-83:1; Ex. 34 (Leo Report) at 19, 31.

**RESPONSE:** Defendants deny the averments contained in Paragraph 125 are material to any issue raised in Defendants' motion for summary judgment, but otherwise admit them for purposes of summary judgment.

126.    Lt. Ferreri was responsible for making the cause and origin determination of the fire at 218 E. Bailey. Ex. 7 (Ferreri Dep.) at 64:1-12. When Ferreri initially evaluated the fire, he determined that the cause of the fire should be "undetermined." Ex. 7 (Ferreri Dep.) at 143:11-19, 168:11-169:3.

**RESPONSE:** Defendants object to the averment that Ferreri was responsible for making the cause and origin determination as redundant to Defendants' SOF ¶ 10. Defendants admit the remaining averments for purposes of summary judgment.

127.    The fire investigators collected debris and carpet samples to test for an accelerant. Ex. 7 (Ferreri Dep.) at 105:14-109:8; Ex. 75 (Carpenter Aff. 12/24/14) at 66. No samples tested positive for either vodka or any other accelerant. Ex. 88 (Ex. 4 to Ferreri Dep.) at Amor 1875, 1877, 1878; Ex. 75 (Carpenter Aff. 12/24/14) at 66.

**RESPONSE:** Defendants deny the averments in Paragraph 127 are material to any issue raised by Defendants' motion for summary judgment, but otherwise admit.

128.    After Plaintiff's confession, Defendant Cross called Ferreri to tell him that Plaintiff had confessed. Ex. 7 (Ferreri Dep.) at 146:5-14, 147:23-148:10. During that conversation, Cross told Ferreri that Plaintiff said that he set fire to the apartment by spilling vodka on newspapers, and then dropping a cigarette onto those newspapers. Ex. 7 (Ferreri Dep.) at 147:23-148:10.

**RESPONSE:** Defendants admit the averments in Paragraph 128.

129.    Based on Plaintiff's confession, Ferreri changed the cause of the fire from "undetermined" to "incendiary." Ex. 7 (Ferreri Dep.) at 149:22-150:19, 150:22-152:1; Ex. 58 (Ferreri Supp.) at Amor 16903. Ferreri issued a supplemental report with his new cause determination. Ex. 7 (Ferreri Dep.) at 151:7-152:1; Ex. 58 (Ferreri Supp.) at Amor 16903.

**RESPONSE:** Defendants object to the averments in Paragraph 129 as largely redundant to Defendants' SOF ¶¶ 65, 96, but otherwise admit with the clarification that prior to Plaintiff's October 3, 1995 confession, fire investigators had eliminated "all potential accidental causes" and considered the fire "suspicious in nature." *See* Def.'s SOF ¶ 65.

130.    Detective Cross testified before the grand jury as did Michael Manion and Marilyn Glisson. Ex. 56 (Cross Test., 10/18/95) at 2-21; Ex. 59 (Manion Test., 10/18/95) at 2-18; Ex. 60 (Glisson Test., 10/18/95) at 2-21.

**RESPONSE:** Defendants admit the averments in Paragraph 130.

131.    Cross testified that Plaintiff voluntarily confessed to setting the fire. Ex. 56 (Cross Test., 10/18/95) at 12:1-13:9. According to Cross, during that confession, Plaintiff said that while he was in jail in DuPage County on an unrelated crime in June or July 1995, Plaintiff spoke to a man named "Mike." Ex. 56 (Cross Test., 10/18/95) at 13:11-23. Cross testified that Plaintiff said "Mike" told him to "burn his mother-in-law, start a fire in the unit or else put street drugs into

her medication." Ex. 56 (Cross Test., 10/18/95) at 13:20-23. Plaintiff's alleged statement

regarding "Mike" is not in any of Plaintiff's handwritten or recorded confessions or in Cross's

report regarding his October 3 and 4 interrogations of Plaintiff. Ex. 48 (Pltf. Stmt. 10/4/95 1:14

a.m.) at DEFS 818, also marked as Exhibit 7 to Plaintiff's deposition; Ex. 50 (Pltf. Stmt. 10/4/95

2:11 a.m.) at SDT-SAO 10648-50, also marked as Exhibit 8 to Plaintiff's deposition; Ex. 53

(Pltf. Stmt. 10/4/95 5:10 a.m.) at SDT-SAO 10517-24, also marked as Exhibit 9 to Plaintiff's

deposition; Ex. 31 (Cross 7-page Supp.) at DEFS 720-22.

**RESPONSE:**     Defendants admit the averments in Paragraph 31, but deny any implication that
the cited portion of Plaintiff's confession was uncorroborated. (*See* Ex. 7 to
Guerrieri Dep, Def's. Ex. 38.)

132.     Cross further testified that they were able to identify "Mike" as Mike Manion, and

that Manion supposedly "confirmed some of the subject matter discussed" with Plaintiff. Ex. 56

(Cross Test., 10/18/95) at 13:24-14:10. However, Manion testified at the grand jury only that

Plaintiff said Marianne was mad at him for drinking and that Manion jokingly told Plaintiff to

run Marianne over. Ex. 59 (Manion Test., 10/18/95) at 13:5-14.

**RESPONSE:**     Defendants admit Cross further testified that they were able to identify "Mike" as
Michael Manion, and that Manion "confirmed some of the subject matter
discussed", but Mannion gave a different version of the specifics of his
conversation with Plaintiff. (Ex. 56, Cross Test., 10/18/95 at 13:24-14:10.)
Defendants deny Mannion's grand jury testimony was so limited and further
clarify that Mannion also testified Plaintiff told him he could live without
Marianne and all the intervention and issues she was causing in his life with his
wife. (Ex. 59, Manion Test., 10/18/95 at 9:10-14:20.) Defendants further deny
that the averment in the second sentence of Paragraph 132 is material to any issue
raised by Defendants' motion for summary judgment.

133.     Also according to Cross' grand jury testimony, Plaintiff "spoke over" Tina when

asked by the detectives about her mother's life insurance; Plaintiff wrote a letter to Tina

discussing "a plan of attack for capital gain;" and that the reason Tina did not smell or see the

fire was because she was "not completely out the door when she turned around to get something off the table." Ex. 56 (Cross Test., 10/18/95) at 7:18-8:7, 9:7-10:7, 16:7-13, 17:15-22.

**RESPONSE:** Admit that at the grand jury Cross testified that Plaintiff "spoke over" Tina when asked by the detectives about her mother's life insurance. Defendants deny that the remaining averments are accurate or complete. Cross testified at the grand jury that the letter from Plaintiff to Tina where Plaintiff wrote "I have a plan or two of attack to obtain some capital gain for late summer so we can move," raised Cross' suspicion. (Ex. 56, Cross Test., 10/18/95 at 9:23-10:4.) Cross further testified at the grand jury that the reason Tina may not have smelled smoke or seen the fire is because she was "not completely out the door when she turned around to get something off the table," and that "[a]ll three residents of the apartment are heavy chain smokers and if that had anything to do with it that's a possibility." (*Id.* at 17:15-22.)

134.    None of that was true. Plaintiff never interrupted Tina; the very same letter quoted also discussed a plan to provide for the care of Marianne; and Tina went down the stairs before she realized she had forgotten her cigarettes. Ex. 12 (Cross. Test., 1/26/18) at 56:20-57:2; Ex. 17 (Tina Dep. 3/13/20) at 62:7-11; Ex. 14 (Pltf. Dep.) at 90:2-20, 91:20-92:14, 162:4-18, 356:18-371:10; Ex. 29 (Ex. 15 to Pltf. Dep.) at DEFS 549.

**RESPONSE:** Defendants object to the unsupported averment "[n]one of that was true" as improper argument. Defendants object to the averment that "the very same letter quoted also discussed a plan to provide for the care of Marianne" as improper argument and unsupported by Plaintiff's cited evidence. Defendants further deny the averment that "Plaintiff never interrupted Tina." *See* Def. Resp. to Plt. SOAF ¶ 34. Defendants admit that the averment in paragraph 134 that "Tina went down the stairs before she realized she forgot" something accurately reflects Plaintiff's testimony, but deny that the averment that she forgot cigarettes is supported by Plaintiff's cited evidence. Defendants deny Plaintiff's citations to Cross's and Tina's testimony support the averments in paragraph 134.

135.    Cross also testified that Marilyn Glisson told Detective Guerrieri that Tina and Plaintiff would talk "like on a daily thing" about Marianne's life insurance policy. Ex. 56 (Cross Test., 10/18/95) at 18:14-23.

**RESPONSE:** Defendants admit the averments in Paragraph 135.

136.     For her part, while Glisson stated that Plaintiff and Tina discussed insurance, she testified both that she did not know what insurance policy Tina and Plaintiff were talking about, and alternatively, that they spoke about Marianne's life insurance policy. Contradicting herself yet again, Glisson testified that Tina was not even sure her mother had life insurance. Ex. 60 (Glisson Test., 10/18/95) at 8:7-18, 9:2-6, 9:23-10:2, 11:11-13.

**RESPONSE:** Defendants admit the averment in paragraph 136 that Ms. Glisson testified in the grand jury that she heard Plaintiff and Tina discussing Marianne's life insurance policy. Defendants deny Plaintiff's averments that Glisson testified "that she did not know what insurance policy Tina and Plaintiff were talking about" and object to Plaintiff's characterization that Glisson contradicted herself because they are unsupported by Plaintiff's cited evidence and taken out of context contrary to FED.R.EVID. 106. (Ex. 60, Glisson Test., 10/18/95 at 8:7-12:1.) Answering further for clarification, Glisson consistently testified in the grand jury that she heard Plaintiff and Tina discussing Marianne's life insurance policy. *Id.*

137.     Glisson claimed that she "had a feeling Bill did it" because for several weeks before the murder he was doing favors for Marianne when he had previously complained about doing Marianne's errands. Ex 60 (Glisson Test. 10/18/95) at 13:4-21. Glisson likewise speculated that Plaintiff was involved with "another scam;" that it was odd that Plaintiff wanted to buy a big house in Naperville because he could not have children; and that Marianne and Plaintiff may have had a romantic relationship. Ex. 60 (Glisson Test.) at 5:18-23, 15:11-23.

**RESPONSE:** Defendants admit Glisson testified on these subjects at the grand jury, but deny Plaintiff's characterization of Glisson's testimony as "speculative" as both improper argument and unsupported by Plaintiff's cited evidence.

138.     Finally, Cross testified that Plaintiff admitted to taking down the smoke detector in their apartment to change the batteries and never putting it back up. Ex. 56 (Cross Test., 10/18/95) at 14:18-15:7.

**RESPONSE:** Defendants admit the averments in Paragraph 138. In further answering, Plaintiff confirmed at his deposition that before the fire he took down the smoke detector in the apartment to change the battery and did not put it back up. (*See* Plt. Ex. 14, Plaintiff Dep., pp. 336:10-338:2.)

139.     Following the testimony of Cross, Glisson and Manion, Plaintiff was indicted for first degree murder and aggravated arson. Ex. 61 (Indictment).

**RESPONSE:** Defendants admit the averments in Paragraph 139.

140.     Plaintiff was tried in September 1997. His confession was the centerpiece of the prosecution. Ex. 62 (Opening Statement) at 12:9-14, 19:22-20:3, 29:19-30:20, 34:1-6; Ex. 63 (Closing Argument) at 64:2-12, 74:6-10, 76:3-12, 90:18-91:4.

**RESPONSE:** Defendants admit the averments in Paragraph 140.

141.     Defendants Cross and Guerrieri both testified about Plaintiff's confession, including asserting that it was voluntarily given. Ex. 64 (Cross Test., 9/10/97) at 66:1-4, 77:1-14, 90:16-20, 91:17-24, 97:7-17, 103:22-104:12; Ex. 19 (Guerrieri Test., 9/10/97) at 14:9-14, 15:6-20, 18:15-19:3. In addition, Defendants Cross and Guerrieri falsely testified that Tina told them that she was aware of her mother's life insurance, and that Plaintiff interrupted Tina when she was giving the Defendants this information. Ex. 64 (Cross Test., 9/10/97) at 46:12-18; 47:9-21; Ex. 19 (Guerrieri Test., 9/10/97) at 176:1-22. Finally, Defendant Cunningham testified about Plaintiff's September 15 statement. Ex. 28 (Cunningham Test., 9/11/97) at 61:14-81:18.

**RESPONSE:** Defendants admit that Defendants Cross and Guerrieri both testified about Plaintiff's confession, including asserting that it was voluntarily given, and that Cunningham testified about Plaintiff's September 15 statement. Defendants deny that Cross and Guerrieri falsely testified that Tina told them that she was aware of her mother's life insurance, and that Plaintiff interrupted Tina when she was giving the Defendants this information because those averments are not supported by Plaintiff's cited evidence. *See also* Def. Resp. to Plt. SOAF ¶ 34.

142.     Plaintiff was convicted of first-degree murder and aggravated arson and sentenced to 45 years on the murder charge and 20 years on the arson, to run concurrently. Ex. 89 (Sentencing Forms) at Amor 983-84.

**RESPONSE:** Defendants admit the averments in Paragraph 142 for purposes of summary judgment.

143.    On January 28, 2015, Plaintiff filed a motion for leave to file a successive post-conviction petition and an attached proposed successive post-conviction petition. Ex. 65 (Mot. for Leave to File and Successive PC) at Amor 16769-16813.

**RESPONSE:** Defendants admit the averments in Paragraph 143.

144.    Among other claims, Plaintiff argued that he was actually innocent, explaining that new standards of fire investigation undermined the State's evidence that the fire was incendiary; namely, that post-flashover burn patterns cannot be used to determine cause and origin; that ventilation likely contributed to the burn patterns; and that the origin of the fire cannot be determined by simply identifying the area of greatest damage. Ex. 65 (Mot. for Leave to File and Successive PC) at Amor 16793-97. Additionally, Plaintiff argued that his confession was coerced by the police and contaminated when information was fed to him through "leading questions and the detectives persuade[d him] to adopt their theory of the crime." Ex. 65 (Mot. for Leave to File and Successive PC) at Amor 16797-16800.

**RESPONSE:** Defendants admit the averments in Paragraph 144.

145.    The circuit court granted Plaintiff leave to file his successive post-conviction petition, but only as to his actual innocence claim and only as to "the evolved fire and explosion science." Ex. 66 (Order on Mot. for Leave 10/15/15) at 5-7, 10-11; *id*. at 6 ("For purposes of deciding whether to permit the filing of a successive post-conviction petition alleging actual innocence, the Court thus finds the evolved fire and explosion science to be new for purposes of determining whether to permit the filing of an actual innocence petition."). The court expressly denied Plaintiff leave to challenge the voluntariness of his confession. Ex. 66 (Order on Mot. for Leave to File 10/15/15) at 10.

2 of 62 PageID #:12925

**RESPONSE:** Defendants object to the averments contained in Paragraph 145 as redundant to Defendants' SOF ¶ 111. Defendants otherwise admit the averments, but the last sentence in Paragraph 145 is immaterial to the issues raised by Defendants' motion for summary judgment.

146.    After a hearing, the Circuit Court granted Plaintiff's post-conviction petition and vacated Plaintiff's conviction. Ex. 67 (Order Vacating Conviction 4/6/17) at Amor 32266. The Court held that modern science undercut the conclusions that the State's experts reached regarding the cause and origin of the fire. Ex. 67 (Order Vacating Conviction 4/6/17) at Amor 32262-65.

**RESPONSE:** Defendants object to the averments in Paragraph 146 as redundant to Defendants' SOF ¶¶ 112-117, but otherwise admit.

147.    The Court further found that Plaintiff's confession was "scientifically impossible." Ex. 67 (Order Vacating Conviction 4/6/17) at Amor 32266. In so ruling, the Court did not address, let alone reach a conclusion about how the confession came to be, or regarding Plaintiff's claim of coercion and contamination. Instead, the Court held that "[w]hatever the reasons for [Mr. Amor's] scientifically impossible confession, the new evidence places the evidence presented at trial in a different light and undercuts this Court's confidence in the factual correctness of the guilty verdict." Ex. 67 (Order Vacating Conviction 4/6/17) at Amor 32266.

**RESPONSE:** Defendants object to the averments in Paragraph 147 as largely redundant to Defendants' SOF ¶¶ 112-117. Defendants deny the remaining averment that the Court did not address Plaintiff's claim of coercion and contamination because it is not material to any issue raised in Defendants' motion for summary judgment, but otherwise admit it for purposes of summary judgment.

148.    Plaintiff was retried for the arson-murder, and on February 21, 2018, Judge Brennan issued a 7-page opinion acquitting Plaintiff of the crime. Ex. 24 (Order of Acquittal dated 2/21/18).

**RESPONSE:** Defendants object to the averment in Paragraph 148 as redundant to Defendants' SOF ¶ 118, but otherwise admit.

149.     Having spent more than 22 years in prison, Plaintiff was finally free. The damage to him from spending decades wrongfully convicted of a crime that he did not commit is unfathomable. Ex. 68 (Pltf. Interrog. Answer to Interrog. No. 7) at 4-5.

**RESPONSE:**   Defendants object to the averments in Paragraph 149 as improper legal argument and further deny they are material to any issue raised in Defendants' motion for summary judgment. Defendants admit that Plaintiff spent over 20 years incarcerated, but deny that it was more than 22 years. (Defs.' Amd. Answer to Pltf.s Complt., ¶¶ 1, 44.)

150.     On April 10, 2018, Plaintiff filed a Petition for a Certificate of Innocence ("COI"). Ex. 69 (Pet. COI) at Amor 167-181.

**RESPONSE:**   Defendants object to Paragraph 150 as redundant to Defendants' SOF ¶ 119, but otherwise admit.

151.     The State moved to dismiss the petition, including by arguing that Plaintiff "failed to establish that he did not by his own conduct voluntarily bring about his conviction." Ex. 70 (State Memo in Support of Mot. Dismiss COI) at Amor 192.

**RESPONSE:**   Defendants object to Paragraph 151 as redundant to Defendants' SOF ¶ 119 but otherwise admit.

152.     The parties had agreed that Judge Miller, who was presiding over the COI, could review the relevant materials under 735 ILCS § 2-702(f). Ex. 71 (Pet. Reply in Support of COI) at Amor 107; Ex. 70 (State Memo in Support of Mot. Dismiss COI) at Amor 183 n.1. That would include "prior sworn testimony or evidence admitted in the criminal proceedings." 735 ILCS § 2-702(f).

**RESPONSE:**   Defendants admit the averments in paragraph 152 and clarify that the cited evidence demonstrates that the parties to the criminal proceeding, the State and Amor, each asked presiding Judge Miller to take judicial notice of the evidence and testimony presented at Plaintiff's first trial pursuant to 735 ILCS 5/2-702(f).

153.    In addition, Plaintiff submitted as exhibits Judge Brennan's Order acquitting him;
excerpts of the criminal retrial testimony of Tina Miceli, Pamela Leavenworth and Agent Golder;
and the letter from Plaintiff to Tina Miceli in which Plaintiff discusses (among other things) a
plan for securing money and ensuring care for Marianne Miceli. Ex. 71 (Reply in Support of
COI) at Amor 104-163. For its part, the State submitted as exhibits to its motion to dismiss the
grand jury testimony of Marilyn Glisson, and the 2018 retrial testimony of Defendants
Cunningham and Guerrieri, along with the Rule 23 order denying Plaintiff's direct appeal. Ex. 70
(State Memo in Support of Mot. Dismiss COI) at Amor 212-442.

**RESPONSE:**    Defendants deny the averment in Paragraph 153 that Plaintiff submitted the letter
from Plaintiff to Tina Miceli in which Plaintiff discusses (among other things) a
plan for securing money and ensuring care for Marianne Miceli because it is not
supported by Plaintiff's cited evidence to Ex. 71, Reply in Support of COI at
Amor 104-163. Defendants admit the remaining averments in Paragraph 153.

154.    After a brief oral argument, Judge Miller denied Plaintiff's Petition for a COI. In
doing so, the Judge "considered the filing of the parties," "the applicable case and statutory law,"
"the relevant portions of the Illinois Criminal Code" and "Judge Brennan's decision regarding
the bench trial that occurred." Ex. 72 (Argument and Ruling on State's Mot. Dismiss COI) at
Amor 5771-72. Judge Miller heard no live testimony and there is nothing in the record to suggest
that he considered any materials other than those he identified in his ruling. Ex. 72 (Argument
and Ruling on State's Mot. Dismiss COI) at Amor 5731-5775.

**RESPONSE:**    Defendants object to the characterization of the oral argument as "brief" as
improper argument and also deny that the characterization is material to any issue
raised by Defendants' motion for summary judgment. Defendants deny there is
nothing in the record to suggest Judge Miller considered any materials other than
those he identified in his ruling. (Pltf.'s SOAF ¶ 152 and Defs. Response thereto;
*see also* Def. Ex. 55, Illinois Appellate Court Rule 23 Order, 4/5/1999).
Defendants object to the remaining averments in Paragraph 154 as redundant to
Defendants' SOF ¶¶ 119-121, but otherwise admit them.

155.    Based on the materials identified above, Judge Miller found that Plaintiff voluntarily brought about his conviction because he gave a statement to the police. Ex. 72 (Argument and Ruling on State's Mot. Dismiss COI) at Amor 5773. In support of that finding, the Judge stated that the appellate court on direct appeal had considered the voluntariness of Plaintiff's confession, and after taking "a look at the defendant's education, the fact that he was provided with sustenance and, otherwise, apparently, treated fairly," the appellate court concluded that the confession was freely given. Ex. 72 (Argument and Ruling on State's Mot. Dismiss COI) at Amor 5772.

**RESPONSE:**   Defendants deny that Plaintiff has accurately and completely stated Judge Miller's finding on whether Plaintiff by his own conduct voluntarily brought about his conviction. (Plt. Ex. 72 at AMOR 5772-73; *see also* Defendants' SOF ¶ 121.) Defendants admit the remaining averments in Paragraph 155 (*see also* Def. Ex. 56, Tr. of Proc. 9/12/2017).

156.    On appeal, the Second District found that the circuit court had not abused its discretion in denying Plaintiff's COI. *See People v. Amor*, 2020 IL App (2d) 190475, at ¶¶ 14, 26.

**RESPONSE:**   Defendants object to Paragraph 156 as largely redundant to Defendants' SOF ¶ 122. Defendants admit the Illinois Appellate Court, Second District, reviewed the circuit court's decision under an abuse of discretion standard, but deny that was the only finding made by the Appellate Court in affirming the circuit court's denial of Plaintiff's COI. *See People v. Amor*, 2020 IL App (2d) 190475, at ¶¶ 14-27.

60

Date: April 29, 2022                       Respectfully submitted,

                                           /s/ Laura M. Ranum
                                           LAURA M. RANUM, Attorney No. 6300636
                                           *One of the Attorneys for Defendants*

James G. Sotos
Joseph M. Polick
Laura M. Ranum
Lisa M. Meador
Carson W. Canonie
THE SOTOS LAW FIRM, P.C.
141 W. Jackson Blvd., #1240A
Chicago, IL 60604
Tel: (630) 735-3300
lranum@jsotoslaw.com

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746 that the foregoing is true and correct, that on Monday, May 2, 2022, I electronically filed the foregoing **Defendants' Response to Plaintiff's Statement of Additional Material Facts Under Local Rule 56.1(b)(3)** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants listed on the below Service List.

***<u>Attorneys for Plaintiff:</u>***
Jon Loevy
Mariah Garcia
Gayle Horn
Loevy & Loevy
311 N. Aberdeen Street, 3rd Floor
Chicago, IL 60607
(312) 243-5900
jon@loevy.com
mariah@loevy.com
gayle@loevy.com

         /s/ Laura M. Ranum       
         LAURA M. RANUM, Attorney No. 6300636
         *One of the Attorneys for Defendants*