**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JEANNE OLSON as successor plaintiff )
for WILLIAM E. AMOR, )
)    No. 18 CV 2523
       Plaintiff, )
)    Judge John J. Tharp, Jr.
       v. )
)
Naperville Police Officers MICHAEL )
CROSS; ROBERT GUERRIERI; THE )
ESTATE OF MARK CARLSON )
BRIAN CUNNINGHAM; JON )
LIPSKY; and the CITY OF )
NAPERVILLE, )
)
       Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

William Amor spent twenty-two years in prison for an arson-homicide that he insisted he did not commit.[1] In 2017, the Circuit Court of Illinois granted Mr. Amor's successive post-conviction petition and vacated his conviction. The court found that Mr. Amor's 1995 "lynchpin" confession that he caused the fire by dropping a lit cigarette on a stack of vodka-soaked papers was scientifically impossible. Defs. Statement of Facts ¶ 117, ECF No. 156. Mr. Amor was later acquitted in a 2018 bench retrial. *Id.* ¶ 118. Mr. Amor then sought, unsuccessfully, a certificate of innocence ("COI"). The Illinois circuit court denied his petition, finding that Mr. Amor "voluntarily" brought about his own conviction by confessing to the crime. *Id.* ¶ 121.

---

[1] William E. Amor passed away on January 31, 2023. Suggestion of Death, ECF No. 191. The Court subsequently granted the Plaintiff's motion to substitute Jeanne Olson, the trustee of the William Amor Trust, as the successor plaintiff. Order, ECF No. 200. For clarity and consistency between the briefs and this opinion, however, the Court will continue to refer to Mr. Amor as the plaintiff.

In this case, Mr. Amor sued three former members of the Naperville Police Department (NPD) who worked as detectives in the original investigation, Michael Cross,[2] Robert Guerrieri, and Brian Cunningham,[3] and the City of Naperville, seeking damages for the harm he suffered as a result of his twenty-two-year imprisonment. Though Mr. Amor raises several claims, the essence of his allegations is that the defendants coerced his confession, which led to his wrongful conviction. The defendants moved for summary judgment on all ten counts of the complaint. For the reasons stated below, the defendants' motion is granted in part and denied in part.

## BACKGROUND

The following account is compiled from the parties' Local Rule 56.1 statements of fact and responses. ECF Nos. 156, 170. Local Rule 56.1(a)(2) is intended to "alert the court to precisely what factual questions are in dispute and point the court to the specific evidence in the record that supports a party's position on each of these questions." *Hinterberger v. City of Indianapolis*, 966 F.3d 523, 527 (7th Cir. 2020) (internal citation omitted). The Court disregards any legal arguments or unsupported assertions made in a party's statement of fact. *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008). In response to an opposing party's Rule 56.1 statement, a party must either admit the fact, deny the fact, and cite to evidence supporting its denial, or object to the statement of fact on the basis that it relies upon inadmissible

---

[2] Michael Cross passed away on October 6, 2022. ECF No. 178. The Court subsequently appointed Rebecca Gomez as the special representative, substituted for Michael Cross. ECF No. 190.

[3] The Court dismissed another defendant from this case, Jon Ripsky (also referred to as "Lipsky"), with prejudice on December 15, 2021. Order, ECF No. 134.

The plaintiff originally named the estate of Seargent Mark Carlson as a defendant in this matter but did not name a personal representative of the deceased and did not execute service of process. The Court later denied the plaintiff's motion to appoint and substitute a special representative for Mark Carlson, who was never made a party to this case. Order, ECF No. 73.

evidence, such as hearsay. *See Jones v. City of Chicago*, No. 21-00137, 2023 WL 3479172 at *6 (N.D. Ill. May 16, 2023). "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009).

As an initial matter, both parties lodged numerous recurrent evidentiary objections to the opposing party's Rule 56.1(a)(2) statement of facts. The parties object to the general relevance or materiality of several statements made by the opposing party (plaintiff's objections: SOF ¶¶ 6, 13, 27, 29, 30, 35, 58-63, 67, 72, 99, 104, 105, 115, 116, 123) (defendants' objections: SOAF ¶¶ 1-7, 9, 11, 12, 14-17, 19-26, 29, 30, 33, 35-37, 39, 44-46, 50, 51, 55, 56, 58, 61, 72, 73, 75, 76, 77-92, 95-99, 101-107, 110-114, 116-123, 125, 127, 145, 147, 149, 154). Many of these objections comprise improper legal argument, rather than genuine evidentiary objections. *See Spiegel v. EngageTel Inc.*, 372 F. Supp. 3d 672, 677 (N.D. Ill. 2019).

In addition to general objections to materiality, the defendants object to the plaintiff's statements of additional fact as redundant to their own. (SOAF ¶¶ 1, 8, 10, 13, 17-18, 27, 29, 31-32, 36-39, 41-43, 46-49, 59, 64, 70-72, 74, 75, 77, 79, 85, 105, 108, 109, 112, 113, 115-117, 126, 129, 145-148, 150, 151, 154, 156). The defendants also object to several of the plaintiffs' statements on the basis that they are unsupported by the cited evidence ( SOAF ¶¶ 1, 2, 8, 9, 13, 15, 21, 24, 28-30, 32-34, 36, 44, 45, 49-52, 54-57, 59-63, 65-70, 77, 79, 83, 84, 86, 89, 93-95, 99, 106-110, 114, 118-120, 123, 124, 134, 136, 137, 141, 153, 154).

The plaintiff lodges several objections to defendants' statements of fact on the basis of hearsay (SOF ¶¶ 13, 18, 26-32, 35, 36, 38, 46, 58, 61-63, 65, 73, 74, 96, 111, 112, 117, 118, 121, 122), improper authentication (SOF ¶¶ 26, 27, 29-32), and inadmissible character evidence under

Federal Rule of Evidence 404 (SOF ¶¶ 28-30, 33, 59-63). The Court will make any evidentiary determinations regarding the admissibility of a particular fact in the discussion below as necessary.

*The Fire at 218 E. Barry St.*

The events that gave rise to Mr. Amor's claims began on September 10, 1995. At the time, thirty-nine-year-old William Amor was living in a condominium with his eighteen-year-old wife, Tina Amor, and Tina's physically disabled mother, Marianne Miceli, the owner of the condo. Defs. SOF ¶ 6, ECF. No. 156. That evening, around 6:20-6:25 p.m., Tina and William left the apartment to go to a drive-in movie. *Id.* ¶ 21. Less than twenty minutes after they left, the NPD received a 911 call from Ms. Miceli reporting that there was a fire in the condo, and she had no means of escape. *Id.* ¶ 7. Ms. Miceli died later that night from smoke inhalation. *Id.*

Detectives Cross and Guerrieri interviewed Tina and William the night of the fire. *Id.* ¶ 14. By that point, the detectives had learned from Ms. Miceli's family that Ms. Miceli had a life insurance policy for which Tina was a secondary beneficiary.[4] *Id.* ¶¶ 13, 15. In his interview with the detectives, Mr. Amor denied having knowledge of the policy. *Id.* ¶ 16. When it comes to Detective Cross's questioning of Tina that night about the life insurance policy, the parties' versions of events diverge. According to the plaintiff's statement of facts, when Detective Cross asked Tina about the policy, Mr. Amor suggested that the police "leave her alone as she had just lost her mother and was very upset." Pl. SOAF ¶ 34, ECF No. 170. The defendants characterize these events differently, stating that Mr. Amor "interjected" as Tina was answering, which the defendants construe as Mr. Amor "trying to answer for Tina." Defs. SOF ¶ 17, ECF No. 156. This

---

[4] Ms. Miceli's sister, Pam Leavenworth, was the primary beneficiary of the life insurance policy. *Id.* at ¶ 15. There is no evidence in the record as to whether Mr. Amor or Tina knew that Pam, not Tina, was the primary beneficiary.

was one factor that led to the defendants' suspicion that Mr. Amor "was controlling Tina." Def. Mot. for Summ. J. 27, ECF No. 136.

Following the initial interview, the defendants received Tina's consent to search her vehicle, where they discovered a bottle of vodka, charcoal, and a bottle of charcoal lighter fluid. Pl. SOAF ¶ 36, 37, ECF No. 170. Tina clarified that the vodka did not belong to her, but the parties dispute whether she told police that the bottle belonged to Mr. Amor. *Id.* ¶ 38. As for the charcoal and lighter fluid, the police confirmed that Marilyn Glisson, a close friend of the family, hosted a cookout two days prior to the fire. *Id.* ¶ 39. Tina stated that Mr. Amor brought those items for the cookout. *Id.*

The following day, September 11, 1995, detectives interviewed Ms. Glisson, who stated that she overheard Tina and William discussing a life insurance policy on several occasions and the need to make sure it remained in place.[5] *Id.* ¶ 26. Ms. Glisson also claimed that Mr. Amor was a "scammer who controlled his victims by using their money and food stamps," and believed he was doing the same to Ms. Miceli and Tina.[6] *Id.* ¶ 28. When the defendants informed Ms. Glisson

---

[5] In his response to ¶ 26 of the defendants' statement of facts, Mr. Amor disputes the defendants' account of Ms. Glisson's testimony regarding the insurance policy, stating, "Neither Tina nor Plaintiff were even aware that Marianne had life insurance; indeed, when Glisson testified before the grand jury, she admitted as much." Pl. Resp. to SOF ¶ 26, ECF No. 156. The plaintiff then cites to Ms. Glisson's grand jury testimony, but that testimony paints a very different picture than the plaintiff's representation that Ms. Glisson "did not even know whose insurance they were talking about." *Id.* Ms. Glisson stated at one point that she did not know whose insurance policy Tina and William were discussing. Pl. Resp. to Mot. for Summ. J. Ex. 60, at 9:4-5, ECF No. 165 ("[N]ot exactly. They did not come out directly and say it."). Just further down the page, however, Ms. Glisson states that Tina and William said "that they had to make sure Marianne's insurance were [sic] paid up," and on the following page Ms. Glisson affirmatively states that the discussions she overheard were about a life insurance policy. *Id.* Ex. 60, at 9:12-13, 10:2.

[6] The plaintiff objects to the admission of Ms. Glisson's statements as hearsay and inadmissible character evidence under Fed. R. Evid. 404(b). First, the Court is not considering these statements for the truth of the matter asserted, but rather to show the effect on the listener: the defendants. Fed. R. Evid. 801(c)(1); *United States v. Taylor*, 569 F.3d 742, 749 (7th Cir. 2009) ("We have recognized repeatedly that statements offered to 'establish the course of the

that Ms. Miceli had passed away in the fire, she responded with "he did it," referring to Mr. Amor.[7]
*Id.* ¶ 27.

During the early stages of the investigation, the defendants learned of additional facts that
they claim were relevant to their investigation, including that Mr. Amor removed the smoke
detector to replace its batteries but had not reinstalled it and that the couple released their pet mice
a few days before the fire. Defs. SOF ¶ 43, 61, ECF No. 156. Additionally, in a search of the
couple's bedroom, which was the only room spared in the fire, the police discovered a letter written
by Mr. Amor to Tina while he was in jail that prior summer. *Id.* ¶ 24. The letter stated that he had
"a plan or two of attack for some capital gain for late summer so we can move," and that he would
"explain in person." *Id.* ¶ 25. The letter also included statements about the need for the couple to
build a "sound foundation" to care for Tina's mother and family members in the future. Pl. SOAF
¶ 44, ECF No. 170.

Mr. Amor agreed to take a polygraph examination on September 12, 1995. Defs. SOF ¶
33, ECF No. 156. The results were inconclusive, possibly because Mr. Amor was intoxicated at

---

investigation,' rather than to prove the truth of the matter asserted, are nonhearsay and therefore
admissible.") (internal citation omitted). The plaintiff's claims for malicious prosecution and
fabrication of evidence directly implicate the defendants' activities over the course of their
investigation and these statements are relevant to evaluate the investigative decisions of the
defendants. Second, the plaintiff's claim for malicious prosecution raises the issue whether the
defendants had probable cause to arrest Mr. Amor and "evidence need not be admissible at trial in
order to support a finding of probable cause." *Phillips v. Allen*, 668 F.3d 912, 915 (7th Cir. 2012).
Even if these statements would be inadmissible at trial as improper propensity evidence, they can
come in at this stage as a piece of evidence in the probable cause calculus.

[7] The plaintiff objects to this statement on several bases. Pl. Resp. to Defs. SOF ¶ 27, ECF
No. 156. The hearsay objection is rejected for the same reason as those stated in footnote five. The
plaintiff also argues that the statement lacks foundation because Detective Cunningham could not
testify to the validity of a police report that contained the statement. *Id.* The defendants also cite
to Detective Cunningham's trial testimony, however, where he testified, based on his independent
recollection, that Ms. Glisson made this statement. Defs. SOF Ex. 39, at 88:15-18, ECF No. 141.
The statement is sufficiently authenticated.

the time. *Id.*; Pl. SOAF ¶ 46, ECF No. 170. NPD scheduled another polygraph for the Amors on September 15, 1995, but Mr. Amor called Detective Cross that morning and informed him that the couple had little sleep the night before, Mr. Amor had been drinking, and the couple "did not feel up to taking the tests." *Id.* ¶ 48. Tina took a polygraph examination later that day, which she passed. Defs. SOF ¶ 50, ECF No. 156.

*The Fire Investigation*

The Naperville Fire Investigation Team (FIT), comprised of members of the Naperville Fire and Police Departments, investigated the scene of the fire. Detective Cross was a member of the FIT but was not certified as a fire investigator by the State of Illinois at the time. Def. SOF ¶ 11, ECF No. 156. On September 14, 1995, Investigator Mitchell Kushner viewed the apartment, examining potential accidental causes of the fire. *Id.* ¶ 38. By this time, things in the apartment had been moved around and removed. Pl. SOAF ¶ 6, ECF No. 170. Investigator Kushner stated that, in his opinion, the fire started in the southwest corner of the living room, focusing on what appeared to be a "burned-out chair and the area where it was located."[8] Defs. SOF ¶ 42, ECF No. 156. On September 29, the FIT eliminated the VCR and television as the cause of the fire and issued a report describing the fire as "suspicious in nature." *Id.* ¶ 64-65. Following Mr. Amor's confession on October 4, the official cause of the fire was changed from "undetermined" to "incendiary." Pl. SOAF ¶ 129, ECF No. 170.

---

[8] In response to the defendants' statement of facts, the plaintiff disputes many of Investigator Kushner's findings, including that the fire began on the swivel chair, based on expert opinions provided in 2014, as evidence in Mr. Amor's retrial, and in 2021, in the context of this litigation. Pl. Resp. to Defs. SOF ¶ 41, ECF No. 156. The scientific validity of Investigator Kushner's determinations is not relevant in the context of the current litigation, where Mr. Amor's actual innocence is not an issue before the Court. Investigator Kushner's opinions are only relevant to the extent that they provide greater context for the defendants' investigation and the information available at the time.

*Mr. Amor's Confession*

There are two interrogations that serve as the basis for the plaintiff's claims: one on September 15, and one that took place over October 3 and October 4. Initially, on September 14, the defendants questioned the Amors at the Excel Inn, where the couple was staying following the fire. Defs. SOF ¶ 44, ECF No. 156. According to Detective Ferreri, Mr. Amor became visibly anxious upon being questioned about the presence of lighter fluid in Ms. Amor's vehicle. *Id.*

The next day, on September 15, after the Amors declined to take a polygraph examination, the NPD arrested Mr. Amor on an outstanding warrant from DeKalb County. *Id.* ¶ 48. Following his arrest, Mr. Amor was interviewed by Detective Cunningham and Sargent Mark Carlson between 4:45 p.m. and 10 p.m. *Id.* ¶ 51; Defs. Resp. to Pl. SOAF ¶ 60, ECF No. 170. Mr. Amor was likely intoxicated during the interrogation and does not recall any details of the interrogation. Defs. SOF ¶ 51, ECF No. 156; Pl. Resp to Mot. for Summ. J. 35, ECF No. 165.

During the September 15 interrogation, it was brought up that Tina spilled lighter fluid in the condo a week before the fire and that Mr. Amor spilled vodka on a Chicago Tribune newspaper on the day of the fire. Defs. SOF ¶ 51, ECF No. 156; Pl. SOAF ¶ 64, ECF No. 170. At the end of questioning, Mr. Amor provided a one-page handwritten statement, explaining that he spilled vodka onto a newspaper on September 10, he did not clean it up, there was a lit candle on the coffee table that he is not sure he blew out, and he could not recall whether he put out his last lit cigarette. Defs. SOF ¶ 56, ECF No. 156; Pl. SOAF ¶ 70, ECF No. 170.

The parties dispute several facts about the September 15 interrogation. According to the plaintiff's account, Mr. Amor's admission that he spilled vodka on a newspaper was untrue, and therefore must have been fed to him by Detective Cunningham. Pl. SOAF ¶¶ 62-64, ECF No. 170. Mr. Amor further claims that the defendants provided him with numerous details about the crime

scene, such as where the fire originated, and raised the possibility of different ignition scenarios, including that a lit cigarette may have started the fire. *Id.* ¶ 64-67. Notably, Mr. Amor acknowledges that he cannot recall the events of the September 15 interrogation due to his likely intoxication at the time. Pl. Resp. to Mot. for Summ. J. 35, ECF No. 165. In contrast, according to the defendants' account of events, Mr. Amor independently offered that Tina had spilled lighter fluid a week earlier and that he spilled vodka on a newspaper the day of the fire. Defs. SOF ¶ 51, ECF No. 156. According to the defendants, Mr. Amor stated that he could not remember putting out his cigarette before leaving the condo. *Id.* ¶ 52. The defendants also claim that Mr. Amor provided a diagram, charting out the living room and identifying the location of the vodka spill. *Id.* ¶ 53.

Following the September 15 interrogation and statement, Mr. Amor spent two weeks in the DeKalb County Jail. *Id.* ¶ 57. Immediately upon his release, on October 3, Detectives Cross and Guerrieri took Mr. Amor to Chicago for a polygraph examination, telling him it was "in his best interest to take it." Pl. SOAF ¶ 73, ECF No. 170. Mr. Amor informed the detectives and the examiner that he had very minimal sleep the night before, but he still took the exam. *Id.* ¶ 77. The polygraph examiner told the detectives that Mr. Amor had failed the examination. *Id.* ¶ 79; Defs. SOF ¶ 70, ECF No. 156.

After the examination, the detectives and Mr. Amor drove back to the NPD and began to question him around 11:30 p.m. Defs. SOF ¶ 74, ECF No. 156; Pl. SOAF ¶ 88, ECF No. 170. By this point, Mr. Amor had not eaten and informed the detectives that he was "extremely tired." Pl. SOAF Ex. 44, at 6:2-3, ECF No. 155; Pl. SOAF ¶ 88, 105, ECF No. 170; Defs. SOF ¶ 87, ECF No. 156. During the interrogation, a process server, who was tasked with serving Mr. Amor with divorce papers from Tina, arrived at the NPD. Pl. SOAF ¶ 96, ECF No. 170. Detective Cross

allowed the process server to enter the interrogation room and serve Mr. Amor with the divorce papers in the middle of the interrogation. *Id.* ¶¶ 97-98. Mr. Amor found the news that Tina had filed for divorce upsetting. *Id.* ¶ 99. Prior to filing for divorce, Tina met with other NPD detectives on the evening of October 3 and told them that Mr. Amor had a fine due on September 15 from a prior court case, but he told Tina that he could delay paying it if "something disastrous" happened to the family. Defs. SOF ¶¶ 70-72, ECF No. 156.

Later that night, Detective Cross came into the interrogation room, grabbed Mr. Amor "by his upper shoulders/neck, shook him and pushed him against the wall." Pl. SOAF. ¶ 102, ECF No. 170. Detective Cross then yelled, "I am going to kick your fucking ass if you don't confess." *Id.* ¶ 103. Both defendants told Mr. Amor that he could go home if he told them what happened. *Id.* ¶ 106. At 1:14 a.m., Mr. Amor wrote out a statement where he confessed to spilling vodka on the newspaper, knocking a lit cigarette onto the newspaper soaked with vodka, and not picking up the cigarette even though he knew a fire was likely to result. Defs. SOF ¶ 77, ECF No. 170. Detectives Cross and Guerrieri recorded Mr. Amor reading the statement and asked him a series of leading questions on tape at 2:11 a.m. *Id.* ¶ 82; Pl. SOAF ¶ 113, ECF No. 170. These recordings contain statements that Mr. Amor claims were fed to him by the detectives. Defs. SOF ¶ 85, ECF No. 156; Pl. SOAF ¶ 118, ECF No. 170. Mr. Amor repeated many of these statements again in a later tape recording made in the presence of Assistant State's Attorney Brian Nigohosian at 5:10 a.m. on the morning of October 4. *Id.* ¶ 117.

*Trial, Conviction, and Acquittal*

A grand jury returned an indictment charging Mr. Amor with first-degree murder and aggravated arson. *Id.* ¶ 139. Detective Cross testified before the grand jury, introducing the confession, and describing the incident where Mr. Amor was alleged to have interrupted Tina when

10

the detectives asked her about insurance. *Id.* ¶¶ 131, 133. At the 1997 trial, Detectives Cross and Guerrieri testified again about Mr. Amor's confession and the incident where they believed Mr. Amor interrupted Tina. *Id.* ¶ 141. The jury found Mr. Amor guilty, and the court sentenced him to forty-five years for murder and twenty years for arson. *Id.* ¶ 142.

In 2015, Mr. Amor filed a successive post-conviction petition, raising a claim of actual innocence on the basis that modernized fire science put into doubt the FIT's determination that the cause of the fire was incendiary. *Id.* ¶ 143, 144. Mr. Amor also challenged the voluntariness of his confession in the petition, but the circuit court granted him leave to file the successive petition only to address his actual innocence claim. *Id.* ¶ 145. The Illinois circuit court granted Mr. Amor's petition and vacated his conviction on April 6, 2017, finding that his original confession was "scientifically impossible." *Id.* ¶ 146; Defs. SOF ¶ 117, ECF No. 156. The State retried Mr. Amor, excluding the confession, and he was acquitted following a bench trial on February 21, 2018. *Id.* ¶ 118.

Following his acquittal, Mr. Amor was released from prison. He subsequently filed a petition for a Certificate of Innocence (COI) in Illinois state court. Pl. SOAF ¶ 150, ECF No. 170. The Circuit Court of Illinois granted the State's motion to dismiss because it found that Mr. Amor voluntarily brought about his conviction by confessing to the crime, which precludes his ability to obtain a COI under the statute. *Id.* ¶ 155; Defs. SOF ¶ 120, 121, ECF No. 156.

## **DISCUSSION**

The defendants move for summary judgment on all ten counts of Mr. Amor's complaint. Mot. for Summ. J., ECF No. 136. Summary judgement is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating

11

the absence of a genuine issue of material fact. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In determining whether there is a genuine issue of material fact precluding summary judgment, the Court views "the record in the light most favorable to the nonmoving party." *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 682 (7th Cir. 2014).

## I. Count I: Fabrication of Evidence

Mr. Amor sues the individual defendants for violating his due process rights, alleging that they deliberately fabricated evidence, namely his confession and the claim that he interrupted Tina on September 10, and that this evidence was used at trial to bring about his conviction. The defendants move for summary judgment on the merits and raise two defenses of judicial estoppel and qualified immunity.

### A. Judicial Estoppel and Qualified Immunity

Before reaching the merits of the fabrication of evidence claim, the defendants raise two affirmative defenses. First, the defendants argue that the plaintiff is judicially estopped from arguing that the defendants knew the confessed ignition scenario was impossible because it directly contradicts Mr. Amor's position during the state post-conviction proceedings. Mot. for Summ. J. 10, ECF No. 136. A party may be judicially estopped from adopting a specific position when, (1) a party's position is "clearly inconsistent with its earlier position," (2) the party "succeeded in persuading a court to accept that party's earlier position," and (3) the party "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001).

In his successive post-conviction petition, Mr. Amor argued that he was actually innocent based on "newly discovered" evidence, namely developments in fire science that rendered his

confession impossible. Pl. SOAF ¶ 144, ECF No. 170. Mr. Amor further claimed that investigators would know today, based on this new evidence, that the ignition scenario he confessed to was scientifically impossible. Mot. for Summ. J. 11, ECF No. 136. In the current proceedings, Mr. Amor argues that he is not estopped from raising his fabrication of evidence claim because it is not inconsistent with the position taken during the 2017 proceedings. He is not arguing that the defendants knew the confession scenario was scientifically impossible at the time of the confession—only that they knew the confession was fabricated. Resp. to Mot. for Summ. J. 32, ECF No. 165 ("[T]he question is whether Defendants knowingly fabricated Plaintiff's confession, not whether they knew that it was scientifically impossible to start a fire by dropping a cigarette on a newspaper soaked in vodka."). In reply, the defendants acknowledge that Mr. Amor's position at summary judgment is aligned with his "post-conviction theory that the Defendants did not know [his confession] was false in 1995." Reply to Mot. for Summ. J. 8, ECF No. 170. Because Mr. Amor's claim that the defendants fabricated his confession is not "clearly inconsistent" with the position taken during the 2017 proceedings, he is not judicially estopped from litigating his fabrication of evidence claim.

Second, the defendants raise the defense of qualified immunity. Government officials are entitled to qualified immunity, shielding them from civil liability, unless the plaintiff can demonstrate (1) "a violation of a constitutional right," and (2) that "the right at issue was clearly established at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (cleaned up). These prongs may be addressed by the Court in either order. *Id.* at 236. Ultimately, "[i]t is the plaintiff who bears the burden of establishing the existence of the allegedly clearly established constitutional right." *Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th Cir. 1988).

13

The defendants take the second prong of the qualified immunity inquiry first and argue that in 1995 police officers were not on notice that they violated a clearly established right by "suggesting an incorrect ignition scenario based on details first offered by the suspect in order to elicit an admission." Mot. for Summ. J. 16, ECF No. 136. Mr. Amor sees the defendants' framing of the inquiry as "much too specific," urging that the question be reframed to, "whether it was clearly established in 1995 that police officers could not feed a suspect information about a crime—through both directly telling the suspect about it as well as by using leading questions— and then coerce that suspect into adopting that false statement as his own." Resp. to Mot. for Summ. J. 36, ECF No. 165.

The plaintiff's sarcastic description of the defendants' inquiry requiring the Court to identify a case dealing with "left-handed officers," is, of course, a tongue-in-cheek critique of the defendants' pointed phrasing of the issue, but it is not an accurate description of the law. Courts have been instructed time and again that "the right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful." *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987); *see also Rice v. Burks*, 999 F.2d 1172, 1174 (7th Cir. 1993) (holding that qualified immunity applied in an excessive force case because the plaintiff failed to provide an analogous case establishing that officers "should avoid hitting the fleeing suspect in the back to prevent escape."). "[D]efining a right too narrowly may defeat the purpose of § 1983," but, at the same time, "existing precedent must have placed the statutory or constitutional question beyond debate." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 732 (7th Cir. 2013); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Notwithstanding his objection to the defendants' narrow framing of the qualified immunity question, Mr. Amor acknowledges that the issue in this case is "whether it was clearly established

14

in 1995 that police officers could not feed a suspect information about a crime—through both directly telling the suspect about it as well as by using leading questions—and then coerce that suspect into adopting that false information as his own." Pl. Resp. to Mot. for Summ. J. 36, ECF No. 165. In support of his argument that qualified immunity should not apply, the plaintiff cites to three cases, *Mooney v. Holohan*, 294 U.S. 103 (1935), *Pyle v. Kansas*, 317 U.S. 213 (1942), and *Napue v. Illinois*, 360 U.S. 264 (1959), that he claims are "closely analogous" and therefore sufficient to put the defendants on notice that their actions violated a clearly established constitutional right. Resp. to Mot. for Summ. J. 37, ECF No. 165. These cited cases stand for the broad and well-accepted principle that the prosecution may not fabricate evidence and utilize "false testimony, to obtain a tainted conviction." *Napue*, 360 U.S. at 269; *Pyle*, 317 U.S. at 216 (holding that petitioner's constitutional rights were violated when the State knowingly utilized perjured testimony to obtain his conviction); *Mooney*, 294 U.S. at 112 (holding that due process is violated by deceiving the Court and knowingly presenting perjured testimony). This constitutional rule, establishing that the presentation of fabricated evidence at trial violates due process, is far more general than the plaintiff's allegation that the defendants violated Mr. Amor's rights by "feeding Plaintiff all of the pertinent details of his confession over multiple interrogations." Resp. to Mot. for Summ. J. 37, ECF No. 165.

Therefore, while it was clearly established in 1995 that knowingly using fabricated evidence to secure a conviction violates a suspect's constitutional rights, that is not the qualified immunity inquiry that the Court must address. *Whitlock v. Bruggemann*, 682 F.3d 567, 580 (7th Cir. 2012). The availability of § 1983 as a cause of action to adjudicate fabrication of evidence claims settles that issue, but "[t]he issue is not whether issues concerning the availability of a *remedy* are settled. The qualified immunity defense focuses instead on whether the official

defendant's *conduct* violated a clearly established constitutional right." *Armstrong v. Daily*, 786 F.3d 529, 556 (7th Cir. 2015).

To the extent that Mr. Amore maintains that the defendants coerced him into a false confession by feeding him inaccurate information,[9] he bears the burden of identifying an analogous case. "The right to be free from coercive interrogation," however, "is highly generalized. Therefore, it cannot be the basis for defeating a qualified immunity defense, unless there is closely analogous precedent that is particularized to the facts of the instant case." *Gill v. City of Milwaukee*, 850 F.3d 335, 341 (7th Cir. 2017) (cleaned up). Mr. Amor fails to establish that a police officer violates a suspect's constitutional rights by suggesting possible scenarios or methods by which a crime was committed and using the tactics alleged to pressure the suspect to adopt them as his own.

Though Mr. Amor frames the issue as a fabrication of evidence problem, for which a constitutional right is clearly established, the qualified immunity question boils down to whether the defendants' methods of interrogation (namely, suggesting how the fire may have started and providing a suspect with information about the crime) violated Mr. Amor's constitutional rights. The Seventh Circuit has reframed a fabrication of evidence claim as a coercion case where "the tactics alleged . . . are similar in nature to other coercion cases." *Petty v. City of Chicago*, 754 F.3d 416, 423 (7th Cir. 2014); *see also Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019) ("[C]oercion and fabrication are not synonyms."). In *Petty*, a plaintiff, who was tried for murder

---

[9] Mr. Amore also argues that the defendants fabricated evidence when they testified that he tried to prevent Tina from answering Officer Cross's question about whether she knew that her mother had a life insurance policy. Pl. SOAF ¶ 32, ECF No. 170. As to that specific conduct, the Court agrees that it was clearly established that testifying falsely in the grand jury and at trial violated Mr. Amore's right not to be prosecuted on the basis of fabricated evidence. That claim, however, fails on the merits. *See* Section I.B *infra*.

and acquitted, brought a § 1983 claim against several Chicago Police Department officers, alleging that they violated his due process rights by manufacturing evidence against him when they coerced a witness into falsely identifying him as the shooter. *Petty*, 754 F.3d at 419. Because there was "not one shred of evidence to suggest that CPD officers fabricated evidence," and the true nature of the plaintiff's allegations were that the defendants' conduct in interrogating the witness led to a false identification, the court rejected the labeling of the plaintiff's claim. *Id.* at 423. ("'Manufactured false evidence' and 'false identification' are not magic talismans that will transform a coercion case into an evidence fabrication case and give rise to a cognizable claim.").

The same is true here. Though Mr. Amor styles Count I as a fabrication of evidence issue, characterizing the conduct he alleges to support his claim of evidence fabrication is like trying to fit a square peg into a round hole. In framing the issue to oppose qualified immunity, Mr. Amor acknowledges the entanglement of his claim with coercion: "whether it was clearly established that police officers could not feed a suspect information about a crime . . . and then coerce that suspect into adopting that false information as his own." Pl. Resp. to Mot. for Summ. J. 36, ECF No. 165. The rest of the plaintiff's briefing on fabrication further solidifies that we are really dealing with a coercion claim. For example, to prove that a defendant fabricated evidence, a plaintiff must show that a defendant knew that the information at issue was false, but Mr. Amor states that the defendants "believed that Plaintiff intentionally set [the fire]." Pl. Resp. to Mot. for Summ. J. 34, ECF No. 165. He also raises the rhetorical question, "[w]hy would Defendants feed Plaintiff a confession that they knew to be false?" *Id.* at 32. Again, a fabrication claim requires proof that the defendants knew the evidence to be false—*i.e.*, the Detectives knew Mr. Amor's confession and the scenarios they raised during the interrogation were not the way the crime

occurred.[10] But that is not Mr. Amor's argument. He does not maintain that the defendants knew that what they were suggesting to him was false; he asserts that they coerced him to confess to what they were suggesting:

> Defendants—having made up their mind at the outset of the investigation that Plaintiff was guilty—fabricated a confession by feeding Plaintiff all of the pertinent details of his confession over multiple interrogations. Defendants were able to get Plaintiff to adopt this false inculpatory statement by unlawfully coercing him and making him believe he had no choice but to parrot back Defendants' story.

Resp. to Mot. for Summ. J. 37, ECF No. 165.

For these reasons, it is appropriate to reframe Count I as a coerced confession claim, which is addressed in the following Section. Notably, the Court's decision to grant summary judgment on Count I will have little practical impact on the subsequent litigation of this case. Mr. Amor will have the opportunity to pursue the real theory underlying his claims: that the defendants coerced him into adopting a false confession scenario which ultimately led to his conviction. As Section II *infra* lays out, the Court finds the defendants' legal arguments in favor of summary judgment on Mr. Amor's coerced confession claim unavailing, allowing those claims to move forward.

Mr. Amor also argues in passing that "the unlawfulness of Defendants' conduct would have been apparent given the egregiousness of it," exempting him from the requirement to demonstrate that the defendants were on notice that their conduct violated the Constitution through a factually analogous case. The conduct alleged in this case does not come close to the

---

[10] The Court notes that Detective Cross acknowledged in his deposition testimony that he "did not believe" Mr. Amor's confessed ignition scenario was possible. Pl. SOAF Ex. 13, at 233:9, ECF No. 155. In that same deposition, Detective Cross testified that he believed Mr. Amor had set the fire intentionally, but that "he was minimizing" his conduct in the confession he gave. *Id.* at 232:12, 234:17. Regardless, even if Detective Cross doubted the substance of the confession that Mr. Amor gave on October 3, it does not detract from the Court's determination that Mr. Amor's fabrication of evidence claim is best characterized as a coerced confession claim, as he does not provide sufficient evidence that the defendants knowingly falsified his confession.

egregiousness of conduct in *Hope v. Pelzer*, which the plaintiff cites, where "the Eighth Amendment violation [was] obvious." 536 U.S. 730, 738 (2002) (holding that handcuffing an individual to a hitching post for seven hours in the hot sun with minimal water clearly violated the Eighth Amendment, despite the lack of cases addressing factually analogous circumstances). In sum, the plaintiff's cited cases do not place the "constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. Therefore, the defendants are entitled to qualified immunity on Mr. Amor's fabrication of evidence claim.

### B.     The Defendants Are Otherwise Entitled to Summary Judgment

Though the Court finds that the defendants are entitled to qualified immunity on the fabrication of evidence claim, the defendants are similarly entitled to summary judgment on the merits.  The defendants argue that Mr. Amor's fabrication claim fails because he concedes that the defendants did not knowingly fabricate evidence and, in fact, actively believed that Mr. Amor was responsible for starting the fire. Defs. Reply 5-9, ECF No. 173. To state a claim for the denial of due process based on the fabrication of evidence, a plaintiff must demonstrate four elements: "(1) the defendant knowingly fabricated evidence against the plaintiff, (2) the evidence was used at his criminal trial, (3) the evidence was material, and (4) the plaintiff was damaged as a result." *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1156-57 (N.D. Ill. 2022). To succeed, a plaintiff must provide evidence "from which a reasonable jury could find that the Individual Defendants knew the evidence they were eliciting was false." *Gray v. City of Chicago*, No. 18 C 2624, 2022 WL 910601, at *10 (N.D. Ill. Mar. 29, 2022). Unlike a claim involving "testimony that a witness is forced by improper means to give . . . [f]abricated testimony is testimony that is made up; it is invariably false." *Petty*, 754 F.3d at 422.

The Seventh Circuit has been clear to distinguish between fabrication of evidence and coercion claims. *See Coleman v. City of Peoria*, *Illinois*, 925 F.3d 336, 346 (7th Cir. 2019) ("A

reluctant witness . . . whose testimony an officer must pry out through aggressive interrogation techniques may be telling the truth . . . Fabricated testimony, meanwhile, is invariably false because it is made up by the officer, who knows he is making it up."); *Petty*, 754 F.3d at 423 (holding that a plaintiff's allegation that officers coerced a witness into giving false testimony by threatening him with jail time if he refused to cooperate is better characterized as a coercion claim).

In *Hyung Seok Koh v. Graf*, another court in this district found that defendant police officers were entitled to summary judgment on a fabrication of evidence claim in a case that parallels this one. 307 F. Supp. 3d 827, 860 (N.D. Ill. 2018). In *Koh*, the plaintiff, who was charged with and later acquitted of first-degree murder, sued two police officers alleging that they violated the Due Process Clause by preparing falsified police reports, which were subsequently used to charge the plaintiff. *Id.* at 857. The court distinguished between fabrication and coerced confession claims, clarifying that even though there was "ample evidence that Graf and Kim coerced Mr. Koh's confession," a reasonable jury could not "find that Graf and Kim knew that the coerced confession was false." *Id.* at 858. The plaintiff in that case, like Mr. Amor, alleged that the police fed him the information that eventually made up his confession. *Id.* at 838 ("Graf began to present details of his theory of the crime."). Still, the court granted summary judgment in favor of the defendants because the plaintiff "eventually adopt[ed] the details proposed by Graf," so the report of the confession was not fabricated. *Id.* at 858.

The same is true in this case. Mr. Amor made a statement confessing to the crime. There is no basis on which a reasonable jury could find that the defendants knew his confession to be false. A detective telling a suspect his theory of a case or how he believes a crime occurred is not enough to give rise to a fabrication claim. *Koh*, 307 F. Supp. 3d. at 858. Although the detectives questioned whether Mr. Amor was being wholly truthful in his confession, and harbored some

doubt that his confession accurately reflected the manner in which the fire started, neither party disputes that the defendants believed Mr. Amor was guilty of the crime for which he confessed. Def. SOF ¶¶ 89, 90, ECF No. 156; Pl. Resp. to Mot. for Summ. J. 34, ECF No. 165. Accordingly, the defendants are entitled to summary judgment on Count I.

In addition to the allegations surrounding his confession, Mr. Amor claims that the defendants fabricated the police report which stated that he interrupted Tina when police inquired about Ms. Miceli's insurance policy the night after the fire. Resp. to Mot. for Summ J. 38, ECF No. 165. The defendants argue that even if the parties' accounts of this conversation differ, it is to such a minor degree that its influence at trial could not be considered material. Reply to Mot. for Summ. J. 11, ECF No. 173. To state a claim for fabrication of evidence, the fabricated evidence must have been used at trial and it must have been material. *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020). Evidence is material if "there is a reasonable likelihood the evidence affected the judgment of the jury." *Id.*

Mr. Amor highlights two details of this interaction with the defendants that he claims were fabricated. First, the police report states that Tina confirmed that her mother had a life insurance policy when asked by Detective Cross. Pl. SOAF ¶ 32, ECF No. 170. The plaintiff cites to evidence in his statement of additional facts that contradicts this account. *Id.* ¶ 33 (both defendants acknowledged in later statements that Tina never actually answered the question). Second, and more important, is the defendants' description of the plaintiff's actions during the questioning. The defendants describe Mr. Amor as "interject[ing]," when they asked Tina about the insurance policy, which the defendants perceived as him "trying to answer for Tina." ¶ 17, Defs. SOF, ECF No. 156. The plaintiff takes issue with this account because he "never interrupted Tina," and instead, "at most . . . [he] made a 'suggestion' to leave her alone as she had just lost her mother."

21

Pl. Resp. to Defs. SOF ¶ 17, ECF No. 156. Because he never interrupted Tina, Mr. Amor argues, the defendants "could not have 'perceived Plaintiff' as having done so," and therefore fabricated the police report. *Id.*

Even considering the evidence presented at the original trial cumulatively, as the plaintiff urges, there is no evidence of a reasonable likelihood that presenting the defendants' version of this event, rather than the plaintiff's, affected the judgment of the jury. *Patrick*, 974 F.3d at 835. The jury evaluated several pieces of evidence, including Mr. Amor's multiple incriminatory statements and expert testimony that the fire was incendiary. Mr. Amor argues that, although the confession was the lynchpin of the State's case, the fabricated police report "provided important corroboration for his confession," namely that he was aware of the insurance policy and tried to hide his knowledge. Resp. to Mot. for Summ. J. 39, ECF No. 165. The State introduced other evidence at trial, however, to establish Mr. Amor's knowledge of the insurance policy. Ms. Glisson testified to the grand jury that Mr. Amor and Tina discussed an insurance policy on several occasions. Pl. SOAF ¶ 130, ECF No. 170. In contrast, the defendants testified that when they asked Mr. Amor about the policy the night after the fire, he denied having any knowledge. Defs. SOF ¶ 16, ECF No. 165. As such, there was ample evidence, apart from the allegedly fabricated statements by defendants, that Mr. Amor was aware of Ms. Miceli's insurance policy and tried to hide that fact during the investigation.

There is no basis on which a reasonable jury could conclude that these two differences in the parties' accounts of the September 10 interview would qualify as material at the original trial.[11]

---

[11] The standard governing relevance for a fabrication of evidence claim—whether the allegedly fabricated evidence was material at trial—is not the same for determinations of probable cause as it relates to Mr. Amor's malicious prosecution claim, addressed in Section V *infra*. In the context of whether the defendants had probable cause to arrest Mr. Amor, the Court finds the inconsistency in the parties' accounts of the September 10 conversation relevant as it leaves "room

Therefore, the defendants are entitled to summary judgment on the fabrication claim as it relates to Tina Miceli's statements about the insurance policy.

## II.     Count II: Coerced Confession in Violation of the Fifth and Fourteenth Amendments

Mr. Amor brings additional claims under the Due Process Clause, alleging that the defendants coerced his confession in violation of the Fifth and Fourteenth Amendments.[12] With regards to the Fifth Amendment claim, the defendants argue that Mr. Amor is collaterally estopped from relitigating the voluntariness of his confession because the Illinois Circuit Court previously found that the confession was voluntary. Second, in response to Mr. Amor's Fourteenth Amendment substantive due process claim, the defendants argue that the claim is barred by the statute of limitations and that Mr. Amor alleges insufficient evidence on the merits to survive summary judgment.

### A.     Collateral Estoppel

Turning to the Fifth Amendment claim first, the defendants argue that Mr. Amor is collaterally estopped from relitigating the voluntariness of his confession because this issue was previously adjudicated by the Illinois court when it denied Mr. Amor's petition for a COI. Under Illinois law, collateral estoppel applies, barring relitigation of an issue, when, "(1) the court rendered a final judgment in the prior case; (2) the party against whom estoppel is asserted was a party or in privity with a party in the prior case; and (3) the issue decided in the prior case is identical with the one presented in the instant case." *People v. Tenner*, 794 N.E.2d 238, 247 (Ill. 2002).

---

for a difference of opinion" as to the reasonableness of the defendants' probable cause determination. *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1013-14 (7th Cir. 2006).

[12] Mr. Amore's coerced confession claim pertains only to the October 3-4 interrogation; he does not assert a coercion claim as to his September 15 statement. Pl. Resp., ECF No. 165, at 20 n.4.

Following his acquittal, Mr. Amor filed a petition for a COI in Illinois state court, which would allow him to "obtain relief through a petition in the Court of Claims" and recover damages for his wrongful conviction. 735 Ill. Comp. Stat. Ann. 5/2-702(a) (2012). The petition must demonstrate that "the petitioner did not by his or her own conduct voluntarily cause or bring about his or her conviction," including by confessing to the crime. *Id.* § 5/2-702(d); *Betts v. United States*, 10 F.3d 1278, 1285 (7th Cir. 1993). The state court denied Mr. Amor's petition, finding that by confessing to the crime "the defendant did act in such a manner voluntarily to bring about his or her own conviction." Defs. SOF ¶ 121, ECF No. 156.[13]

Federal courts must give the same full faith and credit to state court judicial proceedings as they would receive in the state where the judgment was rendered. 28 U.S.C. § 1738; *Allen v. McCurry*, 449 U.S. 90, 103-04 (1980) (holding that the preclusive effect of state court judgments applies in federal § 1983 actions). Therefore, to determine whether the state court's determinations at the COI hearing are entitled to preclusive effect, it is necessary to determine what effect these findings would have under Illinois law. Here, the COI statute expressly provides that, "[t]he decision to grant or deny a certificate of innocence shall be binding only with respect to claims filed in the Court of Claims and shall not have a res judicata effect on any other proceedings." 735 Ill. Comp. Stat. Ann. 5/2-702(j).

The defendants raise several arguments that seek to minimize the impact of Section 702(j) on their collateral estoppel defense. First, the defendants argue that the provision limiting res judicata effect applies solely to "the decision to grant or deny a certificate of innocence," not to

---

[13] The plaintiff objects to the introduction of the court's findings at the COI proceeding as hearsay if offered for the truth of the matter asserted. Pl. Resp. to Def. SOF ¶ 111, ECF No. 156. These findings are not being used for the truth of the matter asserted, but to determine their procedural effect on the current proceedings and are therefore admissible.

the court's findings on issues of fact and law, like the judge's finding that Mr. Amor's confession was voluntary. Mot. for Summ. J. 19-20, ECF No. 136. Second, the defendants claim that res judicata refers to claim preclusion under Illinois law, which is distinct from collateral estoppel, or issue preclusion, which they seek to apply here. *Id.* at 20. Third, the Illinois legislature has expressly prohibited the use of a court's findings of fact or law in other contexts, so its failure to do so here must have been an intentional omission. *Id.*

None of these arguments persuade the Court that Mr. Amor's coercion claim should be collaterally estopped. Contrary to the defendants' assertions, Illinois common law does not use the term res judicata in exclusive reference to claim preclusion. Instead, res judicata is commonly described as a "judicial doctrine comprised of two corollary branches." *Osborne v. Kelly*, 565 N.E.2d 1340, 1342 (Ill. App. Ct. 1991); *see also Bagnola v. SmithKline Beecham Clinical Lab'ys*, 776 N.E.2d 730, 735 (Ill. App. Ct. 2002) ("The doctrine of res judicata precludes relitigation of claims or issues previously decided. It is divided into two branches: estoppel by judgment, referred to as res judicata and estoppel by verdict, also known as collateral estoppel."). The Seventh Circuit held the same in *Council v. Vill. of Dolton*. 764 F.3d 747, 748 (7th Cir. 2014). In that case, even though the statute in question mentioned only res judicata and not collateral estoppel, the Seventh Circuit recognized that "collateral estoppel is a branch of res judicata" under Illinois law. *Id.* The statute therefore barred the operation of collateral estoppel when the statute stated that "no finding, determination, decision, ruling, or order . . .  issued pursuant to this Act . . . shall . . . constitute res judicata." *Id.*

The defendant's reliance on the language in Section 702(j) referring to "the decision to grant or deny," and not the "findings" of the court, is similarly unavailing. In Mr. Amor's case, the state court's decision not to issue a COI ultimately turned on its determination that Mr. Amor

25

voluntarily confessed, thereby foreclosing his ability to obtain a COI under Section 702(d). Granting preclusive effect to the state judge's finding regarding the voluntariness of Mr. Amor's confession is indistinguishable from granting preclusive effect to the decision to deny the COI in the first instance. It represents the entire issue before the court. Thus, in *Fields v. City of Chicago*, No. 10 C 1168, 2014 WL 12778835 (N.D. Ill. Apr. 29, 2014), Judge Kennelly entered an order stating that a state court's findings at a COI proceeding were not entitled to issue preclusive effect or judicial notice in federal court, citing Section 702(j). Order on Mot. Concerning Certificate of Innocence Proceeding, *Fields v. City of Chicago*, 10-cv-01168, ECF No. 551 ("[T]he Illinois statute governing COI petitions unambiguously provides that a decision on such a petition 'shall not have a res judicata effect on any other proceedings' . . . Allowing the state trial judge's findings in evidence would essentially end-run this prohibition.").

Relatedly, in *Patrick v. City of Chicago*, the Seventh Circuit reviewed a district court's decision to admit a § 1983 plaintiff's COI at trial, finding that Fed. R. Evid. 403 did not operate to exclude it. 974 F.3d at 827. Though this case did not directly address issue preclusion, the Seventh Circuit acknowledged that the "principal purpose of a certificate of innocence is to remove legal obstacles that prevent a wrongly convicted person from receiving relief in the Illinois Court of Claims," which is why the statute specifies that a COI decision "shall not have a res judicata effect on any other proceedings." *Id.* at 833. The court clarified that this provision did not render "a certificate of innocence . . . categorically inadmissible in other proceedings," though it was a legitimate concern for the purposes of Rule 403 that jurors would give the COI "conclusive weight." *Id.* The Court ultimately found that the district court's decision to admit the COI with a limiting jury instruction was not an abuse of discretion. *Id.* at 834. Though addressing the issue in

a different context, *Patrick* illustrates that COIs, even if they are admissible at trial, are not entitled to conclusive weight. It follows that the same holds true at the summary judgment stage.[14]

Because a judicial finding in a COI proceeding would not receive issue preclusive effect under Illinois law, Mr. Amor is not barred from litigating the voluntariness of his confession in these proceedings.

### B. Statute of Limitations

The defendants contend that Mr. Amor's Fourteenth Amendment substantive due process claim is untimely. Section 1983 requires a federal court to "adopt the forum state's statute of limitations for personal injury claims," which is two years in Illinois. *Ashafa v. City of Chicago*, 146 F.3d 459, 461 (7th Cir. 1998); 735 Ill. Comp. Stat. Ann. 5/13-202. According to the defendants, Mr. Amor's coerced confession claim expired back in October 1997, two years after the interrogation took place. Defs. Mot. for Summ. J. 22, ECF No. 156. Mr. Amor counters that the favorable termination rule from *Heck v. Humphrey* controls, where the Supreme Court held that if "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction," then a § 1983 action for damages relating to that claim "does not accrue until the conviction or sentence has been invalidated." 512 U.S. 477, 487, 489 (1994).

---

[14] Other courts have addressed the admissibility of a COI in the context of evidentiary disputes, where the party opposing its admission was not a party to the original COI proceeding. *Chatman v. City of Chicago*, No. 14 C 2945, 2018 WL 11426432 at *4 (N.D. Ill. Oct. 11, 2018) ("As discussed above, the COI does not have any preclusive effect on any of the issues in this case—the jury will have the prerogative to weigh it along with all other evidence to render its verdict as to Chatman's claims . . . Nothing in the Illinois statute prohibits the COI's mere admission into evidence."); *Kluppelberg v. Burge*, 84 F. Supp. 3d 741, 747 (N.D. Ill. 2015) ("Although the COI is evidence supporting Kluppelberg's position that he did not commit the crime, evidence that he did commit the crime may also be admitted."); *Walker v. White*, No. 16 CV 7024, 2021 WL 1058096 at *13 (N.D. Ill. Mar. 19, 2021) ("Though it lacks preclusive effect, a certificate of innocence may be 'directly relevant' at trial on a malicious-prosecution claim to prove that the criminal proceeding was terminated consistent with innocence.").

There are two claims under Count II of the complaint, one for a violation of Fifth Amendment procedural due process, based on the use of a coerced confession that led to Mr. Amor's conviction, and one for substantive due process, which challenges the interrogation tactics the defendants used. As for the first, *Heck* applies to alter the date that his Fifth Amendment coerced confession claim accrued under § 1983, to the extent that it alleges that his "unlawfully obtained inculpatory statement [was] used against him in a criminal case." *Johnson v. Winstead*, 900 F.3d 428, 434 (7th Cir. 2018); *see also Smith v. Burge*, 222 F. Supp. 3d 669, 685 (N.D. Ill. 2016) ("[C]ourts in this district 'have concluded that where . . . the plaintiff's conviction rested largely upon the allegedly coerced confession, a coercive interrogation claim necessarily impugns the validity of the conviction.'") (internal citation omitted); Defs. Answer ¶ 43, ECF No. 24 (the court that vacated Mr. Amor's conviction described the confession as the "lynchpin" at the original trial). The defendants do not contest this point. Mot. for Summ. J. 22, ECF No. 136.

In contrast to his Fifth Amendment claim, it is not readily apparent from the complaint and summary judgment briefing whether Mr. Amor's Fourteenth Amendment claim asserts a standalone claim for a violation of his due process rights during the interrogation itself or attacks the use of the allegedly unlawfully obtained confession at trial. *See Mordi v. Zeigler*, 870 F.3d 703, 707 (7th Cir. 2017) ("A plaintiff is the master of his own complaint, however, and so we must examine what [the plaintiff] is asking for, before we can decide whether he may pursue his section 1983 action or if the *Heck* line of cases stands in his way."). If it is the former, then *Heck* does not apply to alter the date of accrual because "claims based on out-of-court events, such as gathering of evidence, accrue as soon as the constitutional violation occurs . . . misconduct by the police

does not (at least, need not) imply the invalidity of any particular conviction." *Moore v. Burge*, 771 F.3d 444, 446 (7th Cir. 2014).[15]

In his complaint, Mr. Amor includes his Fifth and Fourteenth Amendment claims under Count II for a "coerced confession," and claims that the defendants "deprived Plaintiff of his constitutional right to be free from compelled self-incrimination." Compl. ¶ 57, ECF No. 1. He further states that the "Defendants' misconduct described herein shocks the conscience." *Id.* ¶ 60. Turning to his response to the defendants' motion for summary judgment, Mr. Amor first allegation is that "the interrogation methods that Defendants used violated substantive due process" because they shocked the conscience. Resp. to Mot. for Summ. J. 25, ECF No. 165. He then goes on to list that alleged conduct, including "detaining him for 15 hours, refusing food and sleep . . . threatening and beating plaintiff." *Id.* at 26. Based on the briefing, Mr. Amor's description seems to allege a separate claim, seeking damages for the torturous tactics used by defendants during the interrogation.

Therefore, to the extent that Mr. Amor asserts a standalone claim for a constitutional violation arising from the interrogation itself, his Fourteenth Amendment claim seeks damages for a "constitutional wrong[] that occurred[ed] and [was] complete *outside* a criminal proceeding." *Johnson*, 900 F.3d at 436. This claim, unlike other claims that necessarily implicate the validity of

---

[15] Mr. Amor, recognizing the negative impact of *Moore* on the survival of his claim, argues that *Moore* was implicitly overturned by the Supreme Court's more recent decision in *McDonough v. Smith*, 139 S. Ct. 2149 (2019). Pl. Resp. to Mot. for Summ. J. 26-27, ECF No. 165. Although several courts in this district have observed that *McDonough* expands "the definition of what falls within the Seventh Circuit's categorical approach," *Andersen v. City of Chicago,* No. 16 C 1963, 2019 WL 6327226 at *6 n.6 (N.D. Ill. Nov. 26, 2019), neither the Seventh Circuit, nor any other court in this district, has held that *McDonough* overturned *Moore* and the Court declines to find so here. In any event, because Mr. Amor's Fourteenth Amendment claim has significant overlap with his Fifth Amendment claim, and the motion for summary judgment would be granted on the merits regardless.

his later conviction, accrued as soon as the harm occurred in 1995.[16] Therefore, in so far as Mr. Amor's substantive due process claim seeks damages for the harm he experienced from "the [defendants'] use of force and violence to coerce him into confessing," the statute of limitations expired in 1997, two years after he experienced the alleged conduct. *Hobbs v. Cappelluti*, 899 F. Supp. 2d 738, 756 (N.D. Ill. 2012).

Although Mr. Amor's substantive due process claim is untimely, that does not mean that Mr. Amor's evidence relating to the circumstances and conduct of the defendants during the interrogation is inadmissible in this litigation. As conscience-shocking tactics are, by their very nature, inherently coercive, evidence of such tactics may still come in as it relates to Mr. Amor's Fifth Amendment claim that the defendants coerced a confession which was later introduced at a trial, resulting in his conviction.

## C. Procedural Due Process Claim

The defendants failed to attack the merits of Mr. Amor's procedural due process coerced confession claim in their motion for summary judgment, arguing only that Mr. Amor is collaterally estopped from litigating the issue because of the Illinois court's determination that the confession was voluntary during the COI proceedings. Mot. for Summ. J. 17-21, ECF No. 136. As explained in Section II.A *supra*, the Court rejects the application of collateral estoppel because Illinois courts would similarly refuse to grant the judge's findings preclusive effect. Having waived any other

---

[16] Other claims that are not subject to *Heck's* favorable accrual rule include unlawful search and seizure, false arrest, and excessive force claims. *See Heck*, 512 U.S. at 487 n.7 ("For example, a suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction."); *Wallace v. Kato*, 549 U.S. 384, 391 (2007) (holding that *Heck* does not apply to the plaintiff's false arrest claim); *Evans v. Poskon*, 603 F.3d 362, 364 (7th Cir. 2010) (holding that *Heck* did not apply to delay accrual of the plaintiff's claim of excessive force during an arrest).

argument on the merits, the defendants are not entitled to summary judgment on Mr. Amor's coerced confession claim.[17] *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited."); *United States v. Turner*, 203 F.3d 1010, 1019 (7th Cir. 2000) (holding that arguments not raised until a reply brief are waived).

## III.    Counts III and IV: Civil Conspiracy & Failure to Intervene

The defendant moved for summary judgment on Counts III and IV on the basis that they are derivative of Mr. Amor's fabrication of evidence and coerced confession claims. Mot. for Summ. J. 28, ECF No. 136. If Counts I and II are dismissed on summary judgment, the same must be true for civil conspiracy and failure to intervene. As described in Section II.C *supra*, the Court denies summary judgment on Mr. Amor's Fifth Amendment coerced confession claim. As a result, Counts III and IV also survive summary judgment because the defendants failed to raise any alternative arguments to support their motion for summary judgment in their opening brief. *See*

---

[17] The defendants did, however, attack the merits of Mr. Amor's claim that the defendant's interrogation tactics shocked the conscience and were therefore unconstitutional. As described in Section II.B *supra*, to the extent this claim seeks redress for the harm alleged, independent of the use of the allegedly coerced confession at Mr. Amor's trial, it is time barred. Separate from the statute of limitations issue, however, the Court holds that the defendants are entitled to summary judgment on the merits.

"[C]onscience-shocking interrogation tactics" can support a due process claim under § 1983. *Fox v. Hayes*, 600 F.3d 819, 841 (7th Cir. 2010). This is an extremely high threshold which penalizes "[o]nly 'the most egregious official conduct.'" *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654 (7th Cir. 2011) (internal citation omitted). Even construing the facts in the light most favorable to Mr. Amor, there is no indication that the conduct of the defendants meets the "very high" bar to qualify as conscience shocking. *Hurt v. Wise*, 880 F.3d 831, 844 (7th Cir. 2018) (holding that an interview where police threatened a suspect with a "a fate 'worse than prison'" and told another "she was 'going to hang'" "may have been abusive," but it was "nothing extreme enough to invoke substantive due process."). The tactics alleged may amount to coercion, but conduct that shocks the conscience is a separate, heightened inquiry. *Cairel v. Alderden*, 821 F.3d 823, 833 (7th Cir. 2016) ("'[L]ying to, threatening, or insulting a suspect' does not shock the conscience."). Therefore, the Court would grant summary judgment on this claim on merits, even if Mr. Amor's claim were timely.

*Nelson v. La Crosse Cnty. Dist. Atty. (State of Wisconsin)*, 301 F.3d 820, 836 (7th Cir. 2002) ("It is well settled that issues raised for the first time in a reply brief are deemed waived.").

## IV.    Count V: Supervisory Liability

In their motion for summary judgment, the defendants state that Detective Cross was not a supervisor of the other officers involved in the investigation, as Mr. Amor alleges, entitling him to summary judgment on the supervisory liability claim. In his response, Mr. Amor states that he "is not pursuing a supervisor liability claim across Defendant Cross." Resp. to Mot. for Summ. J. 20 n. 3, ECF No. 165. Therefore, Detective Cross is entitled to summary judgment on Count V because the plaintiff waived his supervisory liability claim.

## V.    Count VI: Malicious Prosecution

To establish a claim of malicious prosecution under Illinois law Mr. Amor must prove five elements: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Johnson v. Saville*, 575 F.3d 656, 659 (7th Cir. 2009) (quoting *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996)). As both parties readily acknowledge, Mr. Amor's malicious prosecution claim really boils down to whether the defendants had probable cause to arrest Mr. Amor for aggravated arson and first-degree murder,[18] independent of his allegedly coerced confession. Mot. for Summ. J. 24, ECF No. 136; Reply to Mot. for Summ. J. 40, ECF No.

---

[18]    In 1995, under Illinois law, "[a] 'person commits aggravated arson when in the course of committing arson he or she knowingly damages, partially or totally, any building or structure, including any adjacent building or structure, and (1) he knows or reasonably should know that one or more persons are present therein.'" *People v. Burrett*, 576 N.E.2d 293, 296 (Ill. App. Ct. 1991) (quoting Ill.Rev.Stat.1985, ch. 38, par. 20–1.1(a)(1)). Aggravated arson served as the predicate felony offense for Mr. Amor's first-degree murder charge. Defs. SOF ¶ 93, ECF No. 156.

165; *Turner v. City of Chicago*, 415 N.E.2d 481, 485 (Ill. App. Ct. 1980) ("If it appears that there was probable cause to institute the proceedings, such fact alone constitutes an absolute bar to an action for malicious prosecution.").

Under Illinois law, probable cause exists when "the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime." *People v. Grant*, 983 N.E.2d 1009, 1012 (Ill. 2013); *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013) ("[P]robable cause to arrest entails a purely objective inquiry; the officer's subjective state of mind and beliefs are irrelevant."). The existence of probable cause can be a mixed question of law and fact. *Ornelas v. United States*, 517 U.S. 690, 696-99 (1996). "The question of probable cause is typically a proper issue for a jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1013-14 (7th Cir. 2006) (cleaned up).

Discounting Mr. Amor's allegedly coerced confession and subsequent grand jury indictment,[19] the defendants point to other information that they argue established probable cause in this case. Specifically, the defendants reference the following: 1) the FIT eliminated accidental causes of the fire and classified it as "suspicious in nature"; 2) Tina and William were the only individuals other than Ms. Miceli in the residence immediately prior to the fire and there were no signs of a break in; 3) the police cleared Tina because, the defendants say, there was no evidence

---

[19] The Court agrees with the plaintiff that the grand jury proceedings relied on the allegedly coerced confession and therefore cannot serve as "*prima facie* evidence of probable cause." Resp. to Mot. for Summ. J. 44-45, ECF No. 165; *Cervantes v. Jones*, 188 F.3d 805, 811 n.7 (7th Cir. 1999). Construing the evidence in a light most favorable to Mr. Amor, the grand jury considered a confession which may have been coerced and false, rebutting the presumption that the indictment is prima facie evidence of probable cause.

pointing to her and she passed a polygraph examination; 4) Ms. Miceli had a $100,000 life insurance policy for which Tina was a secondary beneficiary; 5) Ms. Glisson stated that she heard Tina and William discussing the importance of keeping the insurance policy; 6) Tina and William's pet mice were released a few days before the fire; 7) Mr. Amor removed the fire detector; 8) Tina and William's bedroom was the only room spared in the fire; 9) Mr. Amor wrote a letter to Tina a few months earlier stating that he had some plans for "capital gains"; 10) before the fire, Mr. Amor said that he could avoid paying a court fine due on September 15 if something "disastrous" happened to the family; 11) Ms. Glisson told police that Mr. Amor was a scam artist who pocketed the money of another family he previously lived with; and 12) the detectives believed that Mr. Amor controlled Tina based on the September 10 conversation about insurance.

Most of these "facts" are disputed. According the plaintiff's response, facts that are the subject of dispute include: 1) whether Mr. Amor's admission that he removed the smoke detector was truthful; 2) whether the FIT's classification of the fire changed from "undetermined" to "incendiary" based on the fire investigation or as a result on Mr. Amor's confession; 3) the sufficiency of the fire investigation conducted by FIT in ruling out accidental causes; 4) whether Mr. Amor knew about the insurance policy and, if so, whether it was reasonable for police to identify the policy as a motive; 5) whether Tina or Mr. Amor let their pet mice go and for what reason; 6) whether it was feasible for Mr. Amor to have started the fire, given the time that elapsed between when FIT said the fire started, and when Ms. Miceli called police; and 7) whether Mr. Amor interrupted Tina during the September 10 questioning, leading to a reasonable inference that he was attempting to answer for her.

Some of these disputes involve genuine factual issues, while others are attempts to challenge facts known to the officers at the time based on hindsight. For example, the plaintiff

claims that the fire detector melted away in the fire, while the defendants contend that Mr. Amor purposefully removed the detector from the apartment prior to the fire. Resp. to Mot. for Summ. J. 44, ECF No. 165. Regardless of the parties' disagreements at this stage of the proceedings, however, the probable cause evaluation must be based "on the facts as they appeared to a reasonable person in the defendant's position, even if that reasonable belief turned out to be incorrect." *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 622 (7th Cir. 2010). Here, the parties agree that, prior to his arrest, the defendants questioned Mr. Amor about the missing smoke detector, and he admitted to removing it to replace the batteries. Pl. SOF ¶ 54, ECF No. 165. The smoke detector was never found in the apartment. *Id.* ¶ 55. The plaintiff cannot, in hindsight, dispute the validity of this admission or the reasonableness of the defendants' belief that Mr. Amor removed the smoke detector as it relates to the probable cause determination.

On the other hand, there are genuine disagreements between the parties that implicate the reasonableness of the officers' beliefs at the time, creating a genuine issue of fact for a jury to resolve. Front and center here is whether Mr. Amor tried to prevent Tina from answering Officer Cross's question as to whether her mother had a life insurance policy. The defendants state that "police had good reason to suspect Plaintiff was controlling Tina," and cite to the September 10 conversation, as well as their later interviews with Tina, as support for their "honest suspicion that plaintiff committed aggravated arson." Def. Mot. for Summ. J. 27, ECF No. 136. However, the parties present different versions of this event, one that would support the defendants' reasonable suspicion and one that would not. These contradictory accounts present the kind of genuine issue of material fact that is best left for evaluation by a jury.

In Section I.B, *supra*, the Court granted the defendant's motion for summary judgment on the plaintiff's fabrication of evidence claim, which was based on these varying accounts of the

September 10 statement, but denies summary judgment here. This is because the relevancy standard for probable cause determinations and fabrication claims are vastly different. Whereas evidence which leaves "room for a difference of opinion," is best left for a jury to determine in evaluating the existence of probable cause, a fabrication of evidence claim requires a showing that the fabricated evidence was material at trial; in other words, "a reasonable likelihood the evidence affected the judgment of the jury". *Sornberger* 434 F.3d at 1013 (quoting *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993)); *Moran v. Calumet City*, 54 F.4th 483, 498 (7th Cir. 2022). Here, Mr. Amor presented enough evidence to establish a difference of opinion as to how the events transpired on September 10, but not enough to evade summary judgment on his fabrication of evidence claim by demonstrating a reasonable likelihood that the defendant's version of events affected the final judgment of the jury.

Relatedly, the defendants reference the letter that Mr. Amor wrote to Tina from jail the summer before the fire. Mot. for Summ. J. 25, ECF No. 136; Reply to Mot. for Summ. J. 25-26, ECF No. 170. The letter stated that he had "a plan or two of attack for some capital gain for late summer so we can move!" *Id.* Mr. Amor argues that the defendants' interpretation of "capital gains" as a nefarious reference to the insurance proceeds from Ms. Micelli's policy is unreasonable because Tina was not the primary beneficiary and did not stand to receive any of the policy proceeds upon Ms. Micelli's death. Mr. Amor also argues that the defendants' interpretation of the letter is rendered illogical upon reading the latter half of the letter which refers to the need to care for Ms. Miceli and Tina's family in the future. Resp. to Mot. for Summ. J. 42, ECF No. 165 ("[W]e better start and maintain a real sound foundation because we may never know when we might have to take care of any members of our families; your mom."). The reasonableness of the defendants' interpretation of the letter and their investigative inference is the type of determination of fact that

is best left to the province of the jury. *See Howard v. Firmand*, 880 N.E.2d 1139, 1142 (Ill. App. Ct. 2007) ("Whether the circumstances alleged to show probable cause are true is a question of fact.").

Because summary judgment is appropriate "only when no reasonable jury could find that the officers did not have probable cause to arrest," the Court declines to grant summary judgment here. *Maxwell*, 998 F.2d at 434. In this case, after resolving the factual disputes between the parties and evaluating the objective reasonableness of the officers' inferences, a reasonable jury could find that the officers lacked probable cause to initiate prosecution. Therefore, the defendants' motion for summary judgment is denied.

## VI.    Count VII: Intentional Infliction of Emotional Distress

Mr. Amor brings a claim for intentional infliction of emotional distress (IIED) under Illinois law, alleging that the events giving rise to his coerced confession, fabrication of evidence, and malicious prosecution claims brought him severe emotional distress. The defendants move for summary judgment on the merits and argue that Mr. Amor's claim expired under the statute of limitations.

### A.    Statute of Limitations

The statute of limitations for an intentional infliction of emotional distress claim is one year under Illinois law. 745 ILCS 10/8-101(a) ("No civil action . . . may be commenced in any court against a local entity or any of its employees for any injury unless commenced within one year from the date that the injury was received or the cause of action accrued."). The defendants' motion for summary judgment assumes that *Heck's* favorable termination rule applies. They only dispute the date when the criminal proceedings terminated in Mr. Amor's favor. Def. Mot. for Summ. J. 26, ECF No. 136. Regardless, *Heck* applies, independent of the defendants' waiver, because "the facts alleged to support [Mr. Amor's] claim of IIED directly attack the validity of the

conviction." *Parish v. City of Elkhart*, 614 F.3d 677, 684 (7th Cir. 2010); *see also Smith v. Burge*, 222 F. Supp. 3d 669 (N.D. Ill. 2016) (finding that *Heck's* favorable termination rule applied to an IIED claim brought under Illinois law that was based on the plaintiff's confession by torture, fabrication of evidence, and malicious prosecution claims); *Andersen v. City of Chicago*, No. 16 C 1963, 2019 WL 6327226 at *6 (N.D. Ill. Nov. 26, 2019).

Acknowledging that *Heck* applies, whether Mr. Amor's IIED claim is timely turns on which event the Court adopts as the date that "criminal proceeding[s] . . . ended in the defendant's favor." *McDonough v. Smith*, 139 S. Ct. 2149, 2158 (2019). There are two relevant dates in this case: (1) the date that the court vacated Mr. Amor's conviction (April 6, 2017, rendering his claim untimely), or (2) the date Mr. Amor was acquitted upon the bench retrial (February 21, 2018, falling within the statute of limitations).

The Supreme Court elaborated on *Heck's* accrual rule in *McDonough v. Smith*. In *McDonough*, the Court held that the statute of limitations for a fabrication of evidence claim began to run on the date of the plaintiff's acquittal, not when the evidence was initially used against the plaintiff at trial. *Id.* at 2153. As the *McDonough* Court explained, "[t]here is not a complete and present cause of action . . . to bring a fabricated-evidence challenge to criminal proceedings while those criminal proceedings are ongoing." *Id.* at 2158. This rule makes practical sense. To start the clock from the date that a criminal defendant becomes aware that fabricated evidence is being used against them, would give defendants the "untenable choice between (1) letting their claims expire and (2) filing a civil suit against the very person who is in the midst of prosecuting them." *Id.*

Applying *McDonough*, courts in this district have found that when a plaintiff faces prosecution for the same crime twice, after a court vacates the original conviction, the plaintiff's § 1983 claim accrues on the date of acquittal after the second prosecution—not the date when the

court vacates the first conviction. *Dukes v. Washburn*, 600 F. Supp. 3d 885, 894 (N.D. Ill. 2022); *see also Jackson v. City of Chicago*, No. 20 C 5886, 2021 WL 3883111 at *4 (N.D. Ill. Aug. 31, 2021) (holding that the plaintiff's § 1983 claim for false arrest did not accrue when he was granted a new trial, but when the prosecution formally dropped the charges against the plaintiff); *see also Brown v. City of Chicago*, No. 18 C 7064, 2019 WL 4694685 at *7 (N.D. Ill. Sept. 26, 2019) (holding that the plaintiff's IIED claim was timely "because his complaint was filed less than a year after the charges against him were finally dropped.").

In *Dukes*, the court addressed the impact of *McDonough's* accrual rule when the government tries a defendant twice for the same offense and both proceedings ultimately terminate in the individual's favor. 600 F. Supp. 3d. at 894. The court reasoned that when the government retries a defendant the "criminal proceedings are ongoing," meaning that any civil claims which "necessarily imply the invalidity of [a] conviction," have not yet accrued. *Id.* (quoting *McDonough*, 139 S. Ct. at 2158); *Heck*, 512 U.S. at 487. If the rule was that the clock starts on the date the original conviction is reversed, it would place a defendant, like Mr. Amor, "in the untenable position of mounting a civil action challenging criminal proceedings while he face[s] re-trial for murder charges in those same proceedings." *Dukes*, 600 F. Supp. 3d at 895. Therefore, the Court adopts February 21, 2018, the date the court acquitted Mr. Amor on re-trial, as the date that Mr. Amor's IIED claim accrued, making his April 9, 2018 filing timely under Illinois's one-year statute of limitations.

### B.     The Defendants Are Not Entitled to Summary Judgment

Mr. Amor's claim under Illinois law for intentional infliction of emotional distress requires that he establish: "(1) that the defendant's conduct was extreme and outrageous; (2) that the defendant knew that there was a high probability that his conduct would cause severe emotional distress; and (3) that the conduct in fact caused severe emotional distress." *Bianchi v. McQueen*,

58 N.E.3d 680, 700 (Ill. App. Ct. 2016) (quoting *Kolegas v. Heftel Broadcasting Corp.*, 607 N.E.2d 201 (Ill. 1992)). Conduct is extreme and outrageous if it goes "beyond all possible bounds of decency" such that it is "intolerable in a civilized community." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 83 (Ill. 2003) "The extreme and outrageous character of a defendant's conduct may arise . . . from the defendant's improper use of a position of power." *Kolegas*, 607 N.E.2d at 212; *see also McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988) ("The more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous.").

The defendants move for summary judgment on Mr. Amor's IIED claim, stating that "no evidence of extreme or outrageous conduct remains" if Mr. Amor's constitutional claims and malicious prosecution claim fail. Mot. for Summ. J. 29, ECF No. 136. This logic mirrors the argument put forth by the defendants in moving for summary judgment on Counts III and IV: if the underlying constitutional tort claim fails, then any claims based on those alleged violations also must fail. As described in Section IV *infra*, however, Mr. Amor has put forth sufficient evidence at this stage to survive summary judgment on his Fifth Amendment due process claim for coercion and his state law claim for malicious prosecution. Accordingly, summary judgment is denied.

## VII. Count VIII: Civil Conspiracy Under Illinois Law

In addition to his § 1983 civil conspiracy claim, Mr. Amor brings a claim for civil conspiracy under Illinois law. The elements of civil conspiracy under federal law and Illinois law are substantially similar. *Starks v. City of Waukegan*, 123 F. Supp. 3d 1036, 1065-66 (N.D. Ill. 2015). Under Illinois law, a conspiracy is established when "a combination of two or more persons for the purpose of accomplishing, by some concerted action, either an unlawful purpose or a lawful purpose by unlawful means*." Lewis v. Lead Indus. Ass'n*, 178 N.E.3d 1046, 1053 (Ill. 2020).

Apart from disputing the merits, the defendants argue that civil conspiracy is not an independent cause of action, as is the case under federal law. *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994) ("To state a cause of action for conspiracy, a plaintiff must allege not only that one of the conspirators committed an overt act in furtherance of the conspiracy, but also that such act was tortious or unlawful in character."). Therefore, if the plaintiff's claims under Illinois law fail, so must the conspiracy claim. Mot. for Summ. J. 30, ECF No. 136. Again, however, because Mr. Amor's claims for malicious prosecution and IIED survive summary judgment, this argument is rendered moot.

The defendants also contest the merits of the claim, arguing that Mr. Amor "has not adduced evidence to support any elements of his conspiracy claim," such that no reasonable jury could find that a civil conspiracy existed. Mot. for Summ. J. 30, ECF No. 136. However, Mr. Amor is not required to provide direct evidence of a conspiratorial agreement between the defendants. "Because conspiracies are carried out in secret, direct proof of agreement is rare." *Kraemer v. Grant Cnty.*, 892 F.2d 686, 689 (7th Cir. 1990). Evidence of an overt conspiratorial agreement is not required. Circumstantial evidence, combined with reasonable inference, is permissible to demonstrate the existence of a conspiracy. *Adcock*, 645 N.E.2d at 895 ("[A] conspiracy is rarely susceptible of direct proof; instead, it is established from circumstantial evidence and inferences drawn from evidence, coupled with commonsense knowledge of the behavior of persons in similar circumstances.").

Even if the evidence in this case may be such that Mr. Amor ultimately fails to prove the existence of a conspiracy, there is enough, construing the evidence in the plaintiff's favor, to deny summary judgment at this stage. Mr. Amor confessed to an ignition scenario that later turned out to be scientifically impossible, which resembled, in part, a theory of the case offered by the

defendants. This fact, combined with Mr. Amor's allegations and evidence that he faced undue and coercive pressure during the interrogation, where multiple defendants acted in concert to secure his confession, is enough to survive summary judgment on his civil conspiracy claim. *See Patrick*, 213 F. Supp. 3d 1033, 1058 (N.D. Ill. 2016) (finding that that the factually incorrect confessions of eight individuals qualified as "the sort of circumstantial evidence that precludes summary judgment on a conspiracy claim."); *see also Williams v. City of Chicago*, No. 08 C 6409, 2011 WL 133011 at *1 (N.D. Ill. Jan. 14, 2011) (finding that the consistency of the defendants' account of the incident, in contrast to the plaintiff's version of events, qualified as sufficient circumstantial evidence such that a reasonable jury could conclude a conspiracy existed).

## VIII.   Count IX and X: Indemnification and Respondeat Superior

In addition to the defendants who participated in the original investigation, Mr. Amor sues the City of Naperville under the doctrines of indemnification and respondeat superior. Under Illinois law, "an employer may be held liable for the acts of its employees under the doctrine of respondeat superior," if those acts "were committed within the scope of his employment." *Doe ex rel. Doe v. Lawrence Hall Youth Servs.*, 966 N.E.2d 52, 60 (Ill. App. Ct. 2012). Similarly, under Illinois Local Governmental and Governmental Employees Tort Immunity Act, "[a] local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages (and may pay any associated attorney's fees and costs) for which it or an employee while acting within the scope of his employment is liable in the manner provided in this Article." 745 ILCS 10/9-102.

The defendants move for summary judgment on Counts IX and X on the same basis as Counts III, IV, and VII. If the defendants are entitled to summary judgment on the plaintiff's claims under Illinois law, then the City of Naperville is entitled to summary judgment on Counts IX and X. As with the defendants' arguments (or lack thereof) regarding the plaintiff's claims for civil

conspiracy, failure to intervene, and IIED, the failure to discuss the merits of the claims waives any argument to grant summary judgment on that basis. Therefore, because the plaintiff's Illinois claims for malicious prosecution, IIED, and civil conspiracy survive summary judgment, summary judgment is denied as to Counts IX and X.

*    *    *

In sum, the defendants' motion for summary judgment is granted with respect to Counts I and V, granted in part for Count II, and denied for the remaining counts of the plaintiff's complaint.

Dated: January 30, 2024

John J. Tharp, Jr.
United States District Judge