# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| LARRY GILLARD | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 10-CV-7606 |
| v. | ) | |
| | ) | |
| | ) | Judge Lee |
| CITY OF CHICAGO, RICHARD CAUBLE, CHRISTINE SAHS (formerly known as Christine Kokocinski), and other as-yet unidentified employees of the CITY OF CHICAGO | ) ) ) ) ) ) ) | Magistrate Judge Mason |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## PLAINTIFF'S RULE 26(a)(2) DISCLOSURES

NOW COMES the Plaintiff, LARRY GILLARD, by and through his attorneys, Loevy & Loevy, and pursuant to Fed. R. Civ. P. 26(a)(2) makes the following disclosures of his testifying expert witnesses in this case:

**A.    Gary Harmor, Executive Director, Serological Research Institute, Richmond, CA.** Mr. Harmor's written report is attached to these disclosures, along with its supporting exhibits, as is a copy of Mr. Harmor's C.V. Pursuant to Fed. R. Civ. P. 26(a)(2)(b)(6), Plaintiff states that Plaintiff is paying $290/hour for Mr. Harmor's work on the case. In addition, as provided by Mr. Harmor, here is a list of cases in the last four years where Mr. Harmor has testified by deposition or at trial:

| Case Name | State | Party Engaged By |
|---|---|---|
| CA v. Edgar Zavala | California | Prosecution |
| CA v. Barry Mosley | California | Prosecution |
| MA v. Wanildo Dasilva | Massachussets | Defendant |
| CA v. Travell Pouge | California | Prosecution |
| CA v. Alberto Hernandez | California | Prosecution |
| CA v. Gary Glazier | California | Prosecution |
| CA v. Jorge Villalobos | California | Prosecution |
| CA v. Corey Johnson & Lee Dixon | California | Prosecution |
| CA v. Rolando Gallego | California | Defendant |

| | | |
|---|---|---|
| CA v. James Dwayne Smith | California | Proseuction |
| OR v. Robert Bettelyoun | Oregon | Prosecution |
| CA v. Daniel Harper | California | Defendant |
| MO v. Stanley Johnson | Missouri | Prosecution |
| CA v. Miguel Garcia | California | Prosecution |
| TN v. Berome Carrett | Tennessee | Prosecution |
| CA v. David Robles & Jesse Garcia | California | Prosecution |
| CA v. Londin Shaw | California | Prosecution |
| US v. Johnny Williams | California | Prosecution |
| CA v. Deandre Blay | California | Defendant |
| TN v. Randy Mills | Tennessee | Defendant |
| CA v. Glenn Cartwright | California | Prosecution |
| CA v. Steven Montanez & Eddie Montanez | California | Defendant |
| AK v. William Grossman | Alaska | Defendant |
| USAF v. 1st Lt. Brandon McClannahan | Utah | Defendant |
| CA v. Palmer Wright | California | Prosecution |
| CA v. Joseph Heredia | California | Prosecution |
| CA v. Roy Melanson | California | Prosecution |
| US v. Gale Joseph Young | California | Prosecution |
| CA v. Alonzo Harris | California | Defendant |
| AZ v. James Lee Hess | Arizona | Defendant |
| US v. Mark Jenkins Jr. | California | Prosecution |
| CA v. Roy Melanson | California | Prosecution |
| NV v. Eugene Ross & Keith Coulter | Nevada | Prosecution |
| CA v. Angel Chris Rojas | California | Defendant |
| CA v. Bruce Jason Hunsucker et al. | California | Defendant |
| CA v. Demarco Jackson | California | Prosecution |
| CA v. Andre Jackson | California | Defendant |

| Cage v. City of Chicago, et al. | Illinois | Plaintiff |
| OR v. Michael Garrett | Oregon | Defendant |
| US v. Neftaly Platero | Georgia | Defendant |
| CA v. Gorge L. Hill | California | Prosecution |
| SC v. William J. Hullett | South Carolina | Defendant |

**B.     Dr. Jason Hershberger, M.D., Chief, Department of Psychiatry, SUNY Downstate Medical Center, University Hospital of Brooklyn at Long Island College Hospital, Brooklyn, NY.** Dr. Hershberger's written report is attached to these disclosures, along with a copy of Dr. Hershberger's C.V. In addition to the case testimony referenced in his C.V., Dr. Hershberger has been retained by the Plaintiff and deposed in *Cage v. City of Chicago*, Northern District of Illinois, Case No. 09-CV-3078, and testified after being retained by the Defendant in *In re Kenheiny Lizardo*, Case No. 8-2012, in the Bronx Supreme Court.

**C.     Dr. Carl Bell, M.D., Acting Director, Institute for Juvenile Research and Professor, Department of Psychiatry and School of Public Health, UIC, Chicago, Illinois.** Dr. Bell's written report and exhibits are attached to these disclosures, along with a copy of Dr. Bell's C.V., list of other cases in which he has testified, and fee schedule.

**D.     James Kluppelberg, Chicago, IL.** Mr. Kluppelberg's written report is attached to these disclosures. To Plaintif's knowledge, Mr. Kluppelberg has not testified as an expert in any other cases. Pursuant to Fed. R. Civ. P. 26(a)(2)(b)(6), Plaintiff states that Plaintiff is paying $150/hour for Mr. Kluppelberg's consultation and $250/hour for Mr. Kluppelberg's testimony in this case.

**E.     Alan Keel, DNA Section Technical Leader, Forensic Analytical Sciences, Inc., Richmond, CA.** Pursuant to the Court's order in this case, Mr. Keel's report will be disclosed by October 31, 2012. Mr. Keel's C.V. is attached to these disclosures. Pursuant to Fed. R. Civ. P. 26(a)(2)(b)(6), Plaintiff states that Plaintiff is paying $250/hour for Mr. Keel's work on the case.

*/s/ Tara Thompson*
Attorneys for Plaintiff

Arthur Loevy
Jon Loevy
Tara Thompson
LOEVY & LOEVY
312 North May Street, Suite 100
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

I, Tara Thompson, attorney for Plaintiff, certify that on August 31, 2012, I served by electronic mail and U.S. mail a copy of the attached Rule 26(a)(2) Disclosures to counsel of record.

*Tara Thompson*

**Expert Report of James Kluppelberg**

My name is James Kluppelberg. I spent over 22 years incarcerated in the Illinois Department of Corrections for crimes that I did not commit in Case Number 88 CR 1662. In my 22 years in prison between 1990 and 2012, as well as time spent in prison on an unrelated case between 1985-87, I became intimately familiar with how the Illinois Department of Corrections ("IDOC") functions, and what life is like for inmates in IDOC institutions. This reports reflects my expert opinion on what life in the Illinois Department of Corrections was like for inmates in the various IDOC institutions, including Menard, Stateville and Joliet Correctional Centers, who served time in the 1980s and 1990s. In addition, because of my work in various positions while incarcerated, including long-term positions as an accounting clerk, doing data entry, working in the print shop, as a law clerk, in maintenance and in commissary, I gained expertise in how IDOC functions and how the Menard Psych facility operated.

**Institutional Experience**

Between 1985 and 1987 I spent time in prison in Joliet Correctional Center (for processing, for about 60 days), then in Logan Correctional Center and later East Moline Correctional Center. In the early part of 1990 I again spent about 50 days in Joliet Correctional Center for processing, and was then sent to Menard Correction Center, where I served time between approximately April of 1990 to May of 1998. I then was sent back to Joliet Correctional Center between approximately May of 1998 to January of 2002. I then served time in Stateville from approximately January of 2002 until September of 2011. In September of 2011 I was transferred back to Menard Correctional Center, where I served my time until I was released in May of 2012. During my time in prison I never met Larry Gillard and have never otherwise met Mr. Gillard.

## Joliet Correctional Center Processing and Transfers

Before 1996, the processing at Joliet Correctional Center was controlled by prison gangs. If you arrived at Joliet and identified yourself as the member of the same gang as the inmates who worked in processing, you could be given a cell of your choosing near other gang members. Gang members controlled which inmates got jobs while waiting to finish processing. These jobs weren't paid, but at least you got out of your cell during the day. Inmates who weren't members of gangs didn't get these perks. Gangs even started recruiting people during processing, telling new inmates that they needed to join a gang for protection.

Every time that we were transferred between institutions we were sent on busses, supervised by guards with guns. We would be cuffed to another inmate and then the cuffs would be attached to a chain that ran through the center of the seating system. We would be chained to each other and to the seat on the bus. Every time we arrived at a new institution we would then go through processing again - strip searches, body cavity searches, receiving new clothes, getting assigned a new cell. Once you were assigned to a new cell you would then start doing your time.

## Living In A Cell

Most of inmates' time in prison is spent in their cell. At Menard, Joliet and Stateville, inmates shared a cell with another person. Cells are really small – about five feet wide, nine feet deep, and maybe eight to ten feet tall. They include metal bunks, a toilet, and sink. This space is a person's bedroom, living room, and bathroom. There is no real room to move around in the cell.

None of the maximum security facilities in IDOC had air conditioning, and so the summer could be very hard. People had to do things like take off all of their clothes, put wet towels on themselves, or rely on the guards to pass out ice, when they were willing to do that, just to avoid the heat. Likewise, in the winter, the lower cell houses ran cold because the prisons were designed for the heat to rise to the top through a forced air system. People had to try to put on extra clothes or buy extra blankets at commissary if they could afford it.

There are always issues with cellmate compatibility. Sometimes inmates would be fortunate to have a cellmate that they got along with, but many inmates didn't have compatibility with their cellmates. Most guys have constant violence with their cellmates, fighting because one doesn't get along with the other. Sometimes this violence is reported, but most times it is not. People were seriously injured or even killed by cellmates while I was at Menard and Stateville. It was common to hear fighting in other cells. The choice was either to fight with a cellmate and go to segregation, or figure out how to get along.

Before 1996, gangs also controlled the cell assignment system. If you were a member of a gang or could pay money to the gang, then you would get assigned to live in a cell. Otherwise, you often had to get beaten up and go to segregation. Gangs controlled who got to live where. You could walk down the gallery and tell from the color of the curtains which gang controlled each cell.

**Gang Control Over Institutions**

Before 1996, IDOC maximum security institutions were run by various gangs. There was a saying that the only thing IDOC controlled was who went home at night. Gangs controlled who you were celled with. If you were not hooked up with a gang or could not pay for a cell, the

3

gangs would beat you up and you went to segregation. Each cellhouse had a chain of command of a superintendent, captains, lieutenants, and sergeants assigned to it. The superintendent would hold meetings in the morning with gang chiefs, with the gang chiefs telling the superintendents what they wanted. The guards let the gangs run the cellhouse.

**Yard and Recreation Time**

Recreation time was actually a volatile situation with a lot of violence. Before 1996, the yard was really a battle zone. You had to associate on the yard with the organization you were affiliated with. People carried weapons. Guys were assigned to watch over the gangs. Even things like basketball would be one organization's team playing another. If you were not affiliated with a gang you would really have to watch your back. Inmates got to go to the yard several times a week, and it was often stressful to be outside with everyone else.

**Weapons**

Before 1996, weapons were incredibly common in IDOC. Primarily the gangs had weapons, because if you were not a member of a gang and used a weapon against someone who was a member of a gang, you were going to get yourselves killed or at least put in administrative segregation. Many inmates were armed. Anything that a person could conceivably fashion into an instrument to stick someone with was made into a weapon. Gangs mostly fought with homemade knives with an occasional pipe or batteries or soap packed into a sock. The prevalent weapon was knives. Some people even used magazines to create homemade body armor to avoid getting stabbed. Several people were murdered before 1996 at Menard.

Before 1996, the idea that you would be safe in administrative segregation or protective custody was a joke. If gangs wanted to come kill you they could do that anywhere in the prison,

including in segregation or protective custody. You weren't safe anywhere from people who wanted to hurt you.

**Communication**

Communication with the outside world was important but very hard to achieve. The only ways as an inmate to communicate with the outside world was by getting visits, writing letters, or using the telephone. Not being able to communicate with family and friends contributed to inmates' stress.

Before 1996 the IDOC institutions would give people three envelopes a week to use to write out letters. Any letters beyond that people wanted to write had to come from buying envelopes at commissary.

The telephone was very expensive to use – inmates had to make collect calls that the call recipient had to pay for. Back before 1993-94, when Consolidated Communications took over the IDOC telephone contract, a half-hour phone call cost around $10. So mail became very important. Many inmates never made personal phone calls, but the phone was really the only way to get in touch with family quickly because the lag time on mail was incredible – mail wouldn't get back and forth for several weeks, so you had to wait to hear news from the outside or share news unless you could use the phone.

In addition to that, the gangs controlled the phones before 1996, and you had to buy phone time from the gangs to use it. There would be a phone log and an officer standing by the phone but the officer would let the gang control the phone. This also made it very hard for people who were not in a gang or who had no money to use the telephone to communicate.

Especially at Menard, visits were very difficult because of the long distance – Menard is at least 1.5 hours south of Saint Louis, and about 6.5 or 7 hours from Chicago. Some inmates never got visits from family at Menard because it was so far away.

**Food and Commissary**

Back before 1996, Joliet Correctional Center had privately catered food, but places like Stateville and Menard did not. If inmates got really unsatisfied with meals, there would be riots. Eating the food at Stateville and Menard was like eating fast food for every meal. Many inmates did not even eat any of the food, because they wanted to buy what the commissary had instead.

If inmates had money they could use it to buy goods at the commissary. The commissary sold food, clothing, toiletries, and entertainment items like walkmans and radios. If an inmate did not have a job, they would get only $10 a month to use to buy these items. The prisons would pass out a bar of soap a week and maybe toothpaste every two weeks, and if inmates wanted any other toiletry items they had to buy them at commissary.

**Living in Prison**

The prevailing attitude in prison was to wake up every day in prison praying that you would survive, that you would not be stabbed by another inmate or shot and killed by guards, that you would not be put in a position where you had to harm someone else to protect yourself. The stress level of life in prison is difficult to even explain. Inmates had to constantly be aware and look over their shoulder. Prisoners always had to be aware of what was going on and what was out of the ordinary. Inmates' senses become heightened. In prison inmates would only sleep a few hours a night because the slightest little sound out of the ordinary would wake you right up. In prison inmates became accustomed to sleeping through the constant yelling and loud noises

and music, but inmates would wake up if you heard someone brushing past your door. There were unmistakable sounds that would freeze everyone in their tracks, like the sound of a shotgun being chambered at the other end of the cellhouse.

The stress in prison is monumental because your mortality is always an issue. You could be anywhere and be forced into a fight and know that the guard would start shooting, not really caring who started it. Many inmates were shot at. As an inmate, you realize how vulnerable and truly mortal you are, and you live every minute knowing that something terrible could happen to you at any time.

In prison you have to constantly deal with a fear of violence and a culture of violence. People were stabbed playing cards. They were killed or hurt over little things like the mistaken belief that an inmate had taken someone's clothes. They would be killed and put back in their bed to be discovered whenever. People would be beaten so badly that it was hard to tell they were human because their bodies would be so swollen. People were beaten to death by other people, by their own cellmates, and some guards would laugh and just listen to what was happening without intervening. There were sometimes mass riots where 30-40 inmates would beat and stab each other. These kinds of mass events could be started by something as simple as someone bumping into someone else. Inmates had to live knowing something like that could happen anytime.

That culture of violence did not just come from other inmates, but from guards too. Guards controlled your life and used violence to intimidate inmates. Before 1996, when the gangs ran the prisons, many guards would only last a day or two and then quit because they did not want to be in that environment. Many of the guards who did work there enjoyed intimidating

7

inmates. For example, the guards used dogs for narcotics control and for intimidation and inmate control. During cellhouse shakedowns inmates would be in a single-file line and would be moved through an area. Dog handlers would have dogs and would measure off how much leash they could give to a dog so that if the dog rushed the inmates they would get almost to the inmates but not quite there. Then, the handlers would release the dogs to rush towards the inmates marching through in a line. Inmates would see the dog coming at them and if by reflex the inmate stepped away outside of the line, guards would use that as an excuse to hit or shove the inmate. This gave the guards an excuse because it appeared the inmate was resisting or causing a disturbance. Things like that happened dozens of times.

There are many psychological stresses even outside of what is happening at the prison. There is the feeling of knowing that you are not able to help your family – hearing that something is going wrong for family and being unable to help them. Having important family members get sick or even die, and being unable to do anything for them or even attend the funeral, is really difficult for inmates, as is just being away from people that you care about.

In prison, everything about your life is controlled by someone else. When you enter and leave your cell. When you eat. When you shower. When you go on the yard. Guards bring meals whenever they wanted to bring them if the prison was on lockdown. You were at their mercy about when you could go on visits, when you could get healthcare, when you could go to the law library. Imagine as a grown adult not being able to control when you can even clean yourself. It is beyond frustrating having to rely on someone else who could decide if they felt like allowing you to shower.

All of this is much harder as an innocent person. You live constantly knowing that you have been locked up as an innocent person, but people treat you like you are guilty and did something terrible. In prison I tried to associate with other people who I also believed were innocent, and knew how these guys and how I lived our lives in prison. The hardest thing for innocent inmates is to look at the clock, see the minutes ticking by and realize that every minute was time that you can never get back, that this time is gone forever. Prisoners would get letters from family about them missing the prisoners. Inmates watch families grow up through photographs. Inmates lose a part of their selves to be separated from family so long like that.

It is harder as an innocent person to form social relationships because innocent people do not fit the profile of the average inmate. In addition, prison does not help you have trust for other people. Prisoners have to look with suspicion at the "nice guy" because nice guys in prison so often comes with strings attached.

**Inmates with Mental Health Problems**

Even before 1996 there were inmates in general population with mental health issues. There were only a few mental health providers on staff at each institution. Although sometimes inmates would tolerate people with mental health issues, even that tolerance only went so far. Inmates with mental health issues would be shunned by other inmates. Inmates with mental health issues were taken advantage of by other inmates who would try to get them to buy them things at commissary or otherwise take their money. The institution did not do much to protect these inmates. Gangs preyed on these people. People also frequently did not want to share a cell with someone with mental health problems, and would beat up inmates with these problems so they could change their cell assignment.

9

Inmates with mental health issues were precluded from work because they were considered a danger. Jobs were really important to inmates because it meant you could leave your cell, shower every day, interact with other people, and have structure and normalcy in your life. Jobs also meant you got money to spend at commissary. Inmates with mental health issues couldn't get those things.

Inmates with mental health problems also had no confidentiality. Although inmates were not supposed to know who was taking medication, inmates could see which cells nurses went to in order to pass out medication, and inmates frequently saw people lining up in medication lines to go to the health care unit.

**Menard Psych Unit**

For the first few years while I was incarcerated at Menard Correctional Center, I worked in the maintenance unit where I frequently performed maintenance tasks in the Menard Psych Unit. At that time, the Menard Psych Unit was a separate facility from Menard Correctional Center. I spent time there in the yard working on maintenance tasks at least on a dozen occasions. The inmates I saw wandering around the Menard Psych Unit "yard" during recreation time seemed to have no control over their bodies. I saw few inmates who were coherent enough to talk. Unlike the yard at the regular prison, where inmates frequently congregated together and talked, few inmates spoke with one another. There were buzzers and bells that sounded on the yard, at which time everyone would line up to take medications.

I also have spent time inside the units that housed the Menard Psych Unit. Cells in the Menard Psych Unit were smaller than the cells in the Menard Correctional Center, and had high ceilings. A grown man could touch both sides of the walls. The cells were approximately 5 feet

by 9 feet, with approximately 12 foot-high ceilings. Most cells were single-man cells. There were 50-something cells on the galleries.

James Kluppelberg