2480

### STATE OF ILLINOIS COUNTY OF DU PAGE
### IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS )<br>Plaintiff-Respondent )<br>)<br>)<br>VS. )<br>)<br>WILLIAM E. AMOR )<br>Defendant/Petitioner )<br>) | Case No. 95 CF 2075 |

FILED 2017 APR -6 PM 12:56

### ORDER

After Third-Stage Hearing on Petitioner's Motion for Post-Conviction Relief, and after review of all trial evidence, hearing evidence, related exhibits and simultaneously-filed written closing arguments, THE COURT FINDS:

**I.  PROCEDURAL HISTORY**

1. On September 17, 1997, petitioner was found guilty of aggravated arson and first degree murder.

2. On October 28, 1997, petitioner was sentenced to 45 years imprisonment.

3. On April 5, 1999, the Illinois Appellate Court affirmed the convictions and sentence in an unpublished order pursuant to Supreme Court Rule 23. *People v. Amor*, No. 2-97-0685 (April 5, 1999).

4. On October 6, 1999, the Illinois Supreme Court denied petitioner's leave to appeal. *People v. Amor*, 185 Ill.2d 633, 720 N.E.2d 1095 (1999).

5. On April 13, 2000, petitioner filed a *pro se* post-conviction petition with the court that resulted in the court appointing counsel.

6. On February 21, 2001, petitioner, through counsel, filed his Amended Petition for Post-Conviction Relief.

7. On August 22, 2001, the court denied petitioner's amended post-conviction petition for reasons stated on the record.

EXHIBIT 5

C 1831
Pl. Amor 032255

8. On June 10, 2002, the Illinois Appellate Court affirmed the court's denial of the post-conviction petition in an unpublished order pursuant to Supreme Court Rule 23. *People v. Amor*, 329 Ill. App. 3d 1240, 835 N.E.2d 200 (2d. Dist. 2002).

9. On January 29, 2015, petitioner, through the Illinois Innocence Project & Cozen O'Connor, filed its "Motion for Leave to File First Successive Petition for Post-Conviction Relief".

10. This Court denied in part and granted in part petitioner's "Motion for Leave to File First Successive Petition for Post-Conviction Relief," giving leave to file only those claims under the actual innocence rubric. Ultimately, these claims were advanced to a third-stage evidentiary hearing, which is the subject of this Order.

## II. APPLICABLE LAW

The Post–Conviction Hearing Act allows a criminal defendant to assert that "in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." 725 ILCS 5/122–1(a) (West 2010). Generally, the Act contemplates the filing of a single petition: "Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived." 725 ILCS 5/122–3 (West 2010). That statutory bar is relaxed only "when fundamental fairness so requires." *People v. Pitsonbarger,* 205 Ill.2d 444, 458 (2002) (citing *People v. Flores,* 153 Ill.2d 264, 274 (1992)).

There are essentially two exceptions to this procedural default rule. See *People v. Edwards,* 2012 IL 111711, ¶ 22, 360 Ill.Dec. 784, 969 N.E.2d 829, only one of which is relevant to the instant proceeding as allowed by the court, to wit: a defendant may file a successive post-conviction petition alleging actual innocence to prevent a fundamental miscarriage of justice. *People v. Ortiz,* 235 Ill.2d 319, 329, 336 Ill.Dec. 16, 919 N.E.2d 941 (2009). Under the Illinois Constitution, a claim of newly discovered evidence showing a defendant to be actually innocent is cognizable as a matter of due process. *People v. Washington,* 171 Ill.2d 475, 489, 216 Ill.Dec. 773, 665 N.E.2d 1330 (1996). Ultimately, a court should grant relief only if evidence is presented that is (1) newly discovered; (2) material and not cumulative; and (3) of such conclusive character that it would probably change the result on retrial. *Ortiz,* 235 Ill.2d at 333, 336 Ill.Dec. 16, 919 N.E.2d at 950. "New" means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. See *Burrows,* 172

2

Ill.2d at 180, 216 Ill.Dec. 762, 665 N.E.2d 1319. "Material" means the evidence is relevant and probative of the petitioner's innocence. *People v. Smith,* 177 Ill.2d 53, 82–83, 226 Ill.Dec. 425, 685 N.E.2d 880 (1997). "Noncumulative" means the evidence adds to what the jury heard. *Molstad,* 101 Ill.2d at 135, 77 Ill.Dec. 775, 461 N.E.2d 398. And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. *Ortiz,* 235 Ill.2d at 336–37, 336 Ill.Dec. 16, 919 N.E.2d 941.

"In practice, the trial court typically will review the evidence presented at the evidentiary hearing to determine first whether it was new, material, and noncumulative. If any of it was, the trial court then must consider whether that evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict. This is a comprehensive approach and involves credibility determinations that are uniquely appropriate for trial judges to make. But the trial court should not redecide the defendant's guilt in deciding whether to grant relief." *People v. Coleman,* 2013 IL 113307 at ¶ 97.

### III. TRIAL EVIDENCE

Before turning to the merits of petitioner's actual innocence claim, it is perhaps helpful to summarize the salient evidence introduced at petitioner's 1997 trial. In summarizing this evidence, the Court focuses primarily on the expert testimony that was elicited at trial, which must be understood to evaluate petitioner's contention that the subsequent evolution of arson science is new evidence for purposes of his actual innocence claim.

On September 10, 1995, Petitioner William Amor (40) and his wife Tina Miceli (18) were living with Tina's mother, Marianne Miceli (40), in her condominium in Naperville, IL. During the course of that day, petitioner watched football and consumed alcohol in the living room. Tina and Marianne were also present. Marianne was partially disabled physically due to a childhood accident, but was ambulatory and could get around with difficulty. Tina was learning disabled but had managed to obtain a high school diploma with assistance. Petitioner was an unemployed alcoholic. All three were cigarette smokers.

At approximately 6:15 p.m., petitioner left the apartment to get the car ready to take Tina to the movies. At approximately 6:30 Tina left the apartment and joined petitioner in the car. Marianne stayed behind to watch the Emmys later that night, and was napping when petitioner and Tina left the apartment. At 6:41 p.m., Marianne called 911 to report a fire at the apartment

3

C 1833

Pl. Amor 032257

and lost consciousness during the 911 call. When fire officials gained entry to the unit, Marianne was ultimately found dead on the floor of her bedroom from smoke inhalation. A significant fire had occurred in the living room of the apartment and its cause and origin was investigated by the Naperville Police with the assistance of fire investigators from the Naperville Fire Department and the Office of the Illinois Fire Marshal.

Initially, petitioner and Tina indicated no knowledge of how the fire started, though Tina, who was the last person to leave the apartment, suggested that she had lost track of a lit cigarette before leaving for the movie and also acknowledged spilling lighter fluid on the floor of the apartment in the days leading up to the fire. Petitioner acknowledged knowing about the missing cigarette but denied keeping the lighter fluid on the patio of the apartment until confronted with Tina's admission. The Naperville Police, with the assistance of Lt. Ferreri of the Naperville Fire Department and Special Agt. Kushner of the Illinois State Fire Marshal's Office, conducted a thorough investigation and made observations that led them to suspect that the fire may not have been accidental.

The investigation determined that Marianne had insurance for the contents of the apartment and life insurance, though neither petitioner nor Tina were the direct beneficiaries of these policies. Further, petitioner denied knowledge of the life insurance policy. A letter to Tina from petitioner was found in the bedroom of the apartment where petitioner remarked he had a plan for capital gain later in the summer, though the significance of this was potentially minimized when placed in context with the rest of the letter and other letters found in the same location. It was also determined that a smoke/fire detector for the apartment, which was present in the apartment as recently as the December before, was not on the wall at the time of the fire. Defendant acknowledged removing the detector to change batteries and not putting it back on the wall in the weeks leading up to the fire. The smoke detector was not found in the apartment.

Various law enforcement officers interviewed petitioner at different points between September 10th and October 4th, 1995. Initially the petitioner indicated no knowledge as to how the fire may have started and denied any involvement in setting the fire. In a September 15, 1995 interview, the defendant shared a new fact about the day of the fire, to wit: that earlier in the day he had accidentally spilled a significant portion of a bottle of vodka on newspapers on the floor near the swivel chair where investigators suspected the fire had started, and that there was a cigarette in a nearby ashtray when he left the living room to get ready for the movie. In

4

C 1835

an interview spanning October 3rd and 4th, defendant's statement further evolved to an outright admission. He indicated that he dropped a cigarette on the vodka soaked papers, saw the papers sizzle and smoke, and didn't care what happened.

Defendant's confession, introduced at trial, was corroborated by the testimony of Lt. Ferreri and Special Agt. Kushner, both of whom were qualified as experts in fire investigation. Lt. Ferreri testified that a V-pattern of smoke left on a surface by a fire usually indicates the origin of the fire, with the apex being close to the start. Ferreri then identified a V-pattern on the wall near where the swivel chair was in the southwest corner of the apartment as the origin of the fire, and further noted that the apex of that V-pattern, near the floor, was where the fire started. This corresponded to the area petitioner stated he spilled the vodka and saw the newspapers start on fire. Indeed, he indicated that a fire's origin is usually where the lowest and greatest fire damage occurs. Ferreri further opined that the extensive damage suffered by the swivel chair (the most out of any piece of furniture in the living room) indicated it had been subject the greatest heat for the longest duration, also corroborating the point of origin for the fire. Also corroborating the swivel chair area as the point of origin was that other items burned in the living room had the most damage facing the swivel chair.

Ferreri further noted a very clean, sharp edge of burned carpet near the swivel chair that could have been due to radiant heat emanating from the burning chair in a symmetrical manner or possible evidence of an accelerant poured on the carpet. The swivel chair being at the point of origin was also significant because petitioner indicated no one was sitting in the swivel chair that day, and presumably then Tina's missing cigarette could not have been the source of fire in that chair. This last fact, along with test burns discounting the most likely electronics as sources of accidental fire, led Ferreri to conclude the fire was intentionally set. Ferreri concluded that the fire was incendiary, i.e., started intentionally, using possibly a flammable liquid and heat source, being an open flame. He indicated a burning cigarette could cause an open flame.

Agent Kushner's expert testimony mirrored much of Ferreri's testimony. He similarly noted the geometric pattern in the carpet near the swivel chair which he said evidenced a tremendous amount of heat in that one spot, inferentially suggesting that something flammable was poured there. He also agreed that the extent of the damage to the swivel chair indicated this was the point of origin of the fire. Kushner concluded his testimony with the expert opinion that

5

Pl. Amor 032259

a lit cigarette could cause an open flame and that the instant fire resulted from the ignition of a combustible liquid, vodka, on the papers and swivel chair, by an open flame heat source.

At trial, the defense presented its own fire investigation expert, Det. Sherwin of the Chicago Police Department. Sherwin identified a V-Pattern in an opposite corner of the apartment and suggested that this was the correct point of origin, near electronics that he opined may have been the source of an accidental electrical fire. On direct examination Sherwin explained how he had tried on three occasions to start newspapers on fire with a cigarette and vodka, all three times being unsuccessful. Ultimately, however, Sherwin acknowledged on cross-examination that it might be possible to start a fire in the manner stated by the defendant, but he did not believe it was probable.

In rebuttal, the State called an engineer who had examined the electronics and outlets defense expert Sherwin suggested might have been involved in an accidental fire. He testified to an analysis of the materials that discounted their involvement in an accidental fire.

The Jury returned a verdict of Guilty on all counts.

## IV. THIRD-STAGE EVIDENTIARY HEARING AND THE ACTUAL INNOCENCE FACTORS

To satisfy the newly discovered evidence prong, the Petitioner essentially argues that the evolution of fire and explosion investigation science, both as to its underpinnings and acceptance in the scientific community, renders it new for purposes of the defendant's trial. Petitioner asserts specifically that the "evolution and advancement of the scientific understanding of fire behavior was not available during Amor's trial in 1997, nor his first post-conviction petition in 2001." The Petitioner acknowledges that the benchmark publication that helped facilitate the evolution and advancement of scientific fire investigation, the *Guide for Fire and Explosion Investigation* ("NFPA 921"), was first published in 1992, and thus was available at the time of the defendant's trial and first post-conviction petition. To escape the otherwise inevitable conclusion that NFPA 921's standards were available at the time of the defendant's trial and thus not new evidence, Petitioner asserts that the standards set forth in NFPA 921 started to challenge old methods of fire investigation in the courts around 1996 and have been generally accepted by the scientific community only since the early 2000s.

At the third-stage evidentiary hearing, petitioner called two experts: Doug Carpenter, a fire protection engineer and past member of the NFPA 921 Committee, and Dr. DeHaan, a

6

C 1836
Pl. Amor 032260

physicist, and author of a seminal textbook for teaching science investigation science, who is a current member of the NFPA 921 Committee. The State countered with their own expert: ATF Senior Special Agent John Golder, also a member of the NFPA 921 Committee. These three experts, all extremely accomplished personages in the fire investigation community, rendered three different opinions as to the origin and cause of the instant fire. Carpenter concluded the origin was in a recliner (not the swivel chair) and the cause an accidentally discarded smoldering cigarette that ignited and caused the fire; Dr. DeHaan concluded that the origin and cause were undeterminable due to flashover and ventilation; and Agent Golder, the State's expert, concluded that the origin was in the southwest corner near the recliner and that the cause was an open flame possibly applied to a flammable liquid, ***but not by the defendant/petitioner***.

Over the course of the third-stage hearing, all three experts agreed that fire science investigation has evolved significantly since the NFPA 921 was first published in 1992, as well as since petitioner's trial in 1997 and 2001 post-conviction petition. Further all three experts acknowledged that the fire investigation community was slow to accept the scientific principles underlying NFPA 921, first published in 1992, and that its utilization of the scientific method was not generally accepted in the fire investigation community till the early 2000's. Though there was testimony that it would be difficult to defend a fire investigation today that did not follow the principles and scientific method outlined in NFPA 921, it was conceded that NFPA 921 is a consensus document updated every three years and not a code. Indeed, NFPA 921 itself provides that investigators may deviate based upon their own independent judgment. It is also worth noting that there was no testimony as to whether the state and defense experts at trial accepted or utilized the scientific method and principles set forth in the version of NFPA 921 that existed at the time of trial, though all three experts criticized certain aspects of the fire investigation in light of modern science investigation knowledge.

The evolution of fire science, however, no matter how substantial, does not avail the petitioner in his actual innocence claim unless it consists of new facts that could not have been discovered by the exercise of due diligence and, even then, unless otherwise material and non-cumulative. In rendering its opinion, this Court will not recount the entirety of the third-stage hearing testimony to point out all the things the original investigators might have done differently or better. As the State notes, many of these observations are merely opinions by new experts about old evidence, which is not new evidence for purposes of an actual innocence claim.

7

That having been said, this court believes new evidence was presented that warrants careful analysis.

### A. New Evidence - Scientific Impossibility of Defendant's Confession

The first and most significant new evidence concerns the defendant's confession as to how he caused the fire, and whether it is scientifically possible.

At trial the State's expert, Illinois State Fire Marshall Kushner, opined that the fire was incendiary and the result of flammable liquid, vodka, located on newspapers and the chair, being ignited by a cigarette. While the Defense expert Sherwin found this scenario improbable based upon his testing, he nevertheless conceded it might be possible on cross-examination. And it was this theory that the State urged upon the Jury both in opening statement and closing argument.

The defendant's confession as to the cause of the fire was directly and emphatically discounted by the defense and state experts at the third-stage hearing, all of whom agree that it is impossible to ignite vodka soaked papers with a cigarette. The State now concedes defendant's confession is scientifically impossible, but argues this fact is cumulative because defense trial expert Sherwin testified he thought it improbable based upon his unsuccessful attempts to ignite vodka soaked papers with a cigarette. Ignoring that the State in rebuttal closing argued that Sherwin was a retained expert who was paid to be unsuccessful, the state's cumulative argument otherwise fails in light of Sherwin's concession on cross-examination that it was possible to ignite vodka soaked papers with a cigarette. As all three third-stage experts opined, it is impossible.

Nor is this a fact that could have been discovered with the exercise of due diligence. According to the uncontradicted testimony of Dr. DeHaan, at the time of the Amor investigation and trial, the alcohol portion of the beverage alcohol was considered ignitable liquid and cigarettes considered a capable ignition source of a variety of fuels including ignitable liquids. Unlike then, today it is not generally accepted that a smoldering fire can begin by a cigarette being placed on newspapers. Further, DeHaan testified that the knowledge about the competence of a smoldering cigarette to ignite any kind of ignitable liquid has pretty well permeated the professional field and that that suggestion is now considered unlikely. Moreover, it is now understood that the water portion of vodka makes it use as an accelerant impossible.

Accordingly, a modern understanding of how cigarettes do not readily ignite paper or flammable liquids, much less alcohol such as vodka, led each of the third-stage experts to

8

conclude that the defendant's confession was impossible. The significance of this cannot be overstated given that the defendant's confession was the lynchpin evidence that tied together otherwise circumstantial evidence.

### B. New Evidence - Flashover, Ventilation, V-Patterns and Pours

At trial, the State corroborated the defendant's confession by expert testimony that the V-Pattern on the wall near the swivel chair showed the origin of the fire, and its apex at the floor, which was right near where the defendant said the cigarette ignited the vodka-soaked papers, the actual location where the fire started. Likewise, the State's experts suggested that the linear obliteration of the carpet near the swivel chair may have been evidence of a poured flammable liquid, also corroborating the defendant's confession that he spilled and ignited vodka at that location. Also, the State's experts opined that the fire damage in the lower parts of the living room near the chair also demonstrated origin.

All three experts in the third-stage hearing, however, agreed that modern fire science has utterly discounted the once-held belief that V-Patterns *always* shows a fire's origin. While a V-pattern, or any pattern for that matter, is evidence to be considered, it should never standing alone be presumed to be the point of origin. Rather, it is an observation that should cause the investigator to explore what burned and why as it relates to the broader questions of cause and origin. This is similarly the case with patterns found in flooring, which occur for a variety of reasons in a fire. Indeed, modern fire science investigators generally do not believe that a floor pattern should be deemed evidence of a flammable liquid pour absent chemical testing confirming an accelerant.

The above understandings are all the more critical where fires, such as in the instant case, reach flashover or post-flashover states. Dr. DeHaan testified that recent cause and origin studies in post-flashover conditions have shown the effect flashover has on basing origin findings on patterns. In a 2005 study done by the ATF in Las Vegas, a room was brought to flashover conditions and then investigators were asked to visually inspect and identify the quadrant of origin. Out of 53 investigators, only 3 identified the correct quadrant. In a follow-up study in 2007 by the ATF in Oklahoma City, similar findings showed that the longer the flashover conditions lasted, the more obscure the patterns become.[1] When flashover occurs and an entire

---

[1] Carpenter explained flashover as a transition in a fire from a single fuel package burning to transitioning to everything in the compartment that can burn, ordinary combustibles being ignited. So that it goes from an overly

9

room is on fire, it obscures any prior burn patterns and eliminates their usefulness to investigators when determining origin and cause. The modern understanding of flashover also calls into question the once-held belief that the area of most damage is the area that must have burned longer and thus is the origin. The instant investigators used findings of the most severe damage to help determine origin. Under the current edition of NFPA 921, investigators no longer do that because there can be areas that have a higher burning rate at different stages of a fire. At post flashover fire, the amount of heat that is generated can increase the generation or mass loss rate of different materials at different rates. So a portion of the compartment that doesn't get exposed to fire until after flashover may suffer damage that looks like it was greater than the actual area of origin.

It is not disputed that flashover occurred in this case; the investigators in 1995 simply lacked the modern understanding of how flashover changes, obscures and created new patterns that necessarily affects the interpretation of patterns, and likewise the extent of fire damage and its investigative significance.

Even more problematic than the rudimentary understanding of flashover effects in the mid-90's was the complete lack of understanding about how ventilation impacts the interpretation of a fire scene. All three experts at the third-stage hearing agreed that ventilation played a role in this fire, which is a newly-understood area of fire science not known at the time of the investigation in this case or at the post-conviction proceedings. Indeed, Dr. DeHaan testified that ventilation has really only been appreciated in the last few years, with studies on the effects of ventilation and testing performed since 2003.

Today's understanding of ventilation can otherwise explain several of the observations testified to by the State's experts at trial to corroborate the defendant's scientifically impossible confession. Ventilation, that is to say the vast amount of air that entered the living room when the patio door system failed, can cause low level burning, which was used by the original investigators as an indicator of origin. Agent Golder testified he believed the V-Pattern was the result of ventilation, and based his opinion in part on a 2016 study. According to Dr. DeHaan, ventilation effect played a large role in the destruction of the swivel chair: once this six foot wide opening occurred, lots of fresh air rushed in and this swivel chair would have been right in the

---

ventilated fire, where the fuel is controlling, to an under-ventilated fire, which is the air flow in the compartment that controls the burning behavior.

10

C 1840

Pl. Amor 032264

middle of that fresh air stream and burning at tremendously intense rates and much faster than other even similar objects elsewhere in the room, but out of the flow of fresh air.

The modern understanding of flashover effects on patterns and the completely new understanding of the role of ventilation could not have been discovered with the exercise of due diligence and are material in that they undercut the basis for believing defendant's confession which we now understand to be scientifically impossible.

### C. New Evidence – Special Agent Golder's Opinion that Fire was Incendiary, but that Petitioner Did Not Set the Fire

Petitioner's closing argument puts much stock in Special Agent Golder's opinion that though the fire was incendiary, Petitioner did not set the fire. Petitioner characterized this opinion by the State's expert as nothing less than "astonishing," and contends that this, standing alone, is new evidence warranting a new trial. Equally astonishing perhaps, or at least it would be to a lay person, is that this opinion is not new evidence for purposes of Petitioner's actual innocence claim. Agent Golder's opinion in this regard stems from the common sense conclusion that if the fire was incendiary and its cause the ignition of a flammable liquid, there is no way Defendant set the fire if Tina did not see it for 15 minutes after Defendant left the apartment. Either the defendant and Tina for some reason lied about who was where when, someone other than petitioner set the fire, or the fire was an accident as Mr. Carpenter opined. In any event, all these arguments were available to the parties at the time of the original trial, and thus Agent Golder's opinion cannot be considered new in the sense of an actual innocence claim.

### V. CONCLUSIVITY OF THE NEW EVIDENCE AND CONCLUSION

In light of the foregoing, what remains is to determine whether the new, non-cumulative evidence detailed above, when considered along with the trial evidence, would probably lead to a different result on retrial. *Ortiz,* 235 Ill.2d at 336–37. Where this Court determines evidence is new, material, and noncumulative, it must then consider whether the new evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict. This is a comprehensive approach and involves credibility determinations that are uniquely appropriate for trial judges to make. In making this determination, our Supreme Court has cautioned trial judges not to redecide the defendant's guilt in deciding whether to grant relief. *Coleman,* 2013 IL 113307 at ¶ 97. Probability, not certainty,

11

C 1841

Pl. Amor 032265

C 1842

is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together. *See People v. Davis*, 2012 IL App (4th) 110305, ¶¶ 62-64 ("New evidence need not be completely dispositive of an issue to be likely to change the result upon retrial.")

In the instant case there was evidence of motive and intent: consider, for example, the need for money to obtain a new residence and start a new life; knowledge of at least some insurance; and the disabling of the fire detector. There was also evidence of consciousness of guilt: consider, for example, defendant's lies about insurance, denial of drinking, denials concerning Tina and the lighter fluid, and the evolution of his statements generally. But all that being said, there can be no question that the lynchpin of the State's case at trial was the defendant's confession, which the State and Defense experts today agree is scientifically impossible. Whatever the reasons for the Defendant's scientifically impossible confession, the new evidence places the evidence presented at trial in a different light and undercuts this Court's confidence in the factual correctness of the guilty verdict.

**WHEREFORE,** Petitioners convictions are vacated and the matter is continued for further proceedings.

Liam C. Brennan
Circuit Judge

April 6, 2017

Pl. Amor 032266