IN THE CIRCUIT COURT OF DUPAGE COUNTY
FOR THE EIGHTEENTH JUDICIAL CIRCUIT OF ILLINOIS

```
THE PEOPLE OF THE STATE   )
OF ILLINOIS,              )
                          )
          Plaintiff,      )
                          )
          -vs-            )   No. 95 CF 2075
                          )
WILLIAM AMOR,             )           Trial
                          )
          Defendant.      )
_____)
```

REPORT OF PROCEEDINGS had at the trial of the above-entitled cause, before the Honorable Liam C. Brennan, judge of said court, on 2nd day of February, A.D., 2018.

Jean M. Tartaglia, Official Court Reporter

EXHIBIT 6

Pl. Amor 028185

```
 1                         Clerk.)
 2        THE COURT:  Mr. Scaliatine, when you're ready, you
 3   may inquire.
 4   WHEREUPON:
 5                    JOHN JETHRO GOLDER,
 6   called as a witness by People of the State of Illinois
 7   herein, having been first duly sworn, was examined and
 8   testified as follows:
 9                    DIRECT EXAMINATION
10   BY MR. SCALIATINE:
11        Q.    Sir, please state your name and spell your
12   last name for the court reporter?
13        A.    John Jethro Golder, G-o-l-d-e-r.
14        Q.    And, sir, how are you currently employed?
15        A.    I am the principal and part owner of a
16   private fire and explosion investigation firm.
17        Q.    And what's the name of that firm?
18        A.    Forensic Investigation and Consultation.
19        Q.    And what kind of clients do you have?
20        A.    Insurance companies, attorneys, local
21   prosecutors, state prosecutors, defense attorneys, lot of
22   private side insurance.
23        Q.    And what kind of consulting do you do for
24   them?
```

Jean M. Tartaglia, Official Court Reporter

1       A.    We do both fire investigation and explosion

2  investigation for our clients but, also, consult on cases

3  that they may already have been involved with.

4       Q.    Before founding that company, did you work

5  for the Department of Justice's Alcohol Tobacco ad

6  Firearms Department?

7       A.    Yes, I did.

8       Q.    When did you start working for ATF?

9       A.    1991.

10      Q.    I'm going to show you what's been marked as

11  People's 62.

12          Do you recognize this document?

13      A.    Yes, I do.

14      Q.    And what's that document?

15      A.    It's my curriculum vitae.

16    MR. SCALIATINE:  Judge, at this time I would like to

17  go through the curriculum vitae with the witness and ask

18  that he be allowed to review it and look at it while he's

19  testifying.  It's a rebuttal document.

20    THE COURT:  Any objection?

21    MR. CARAHER:  No objection.

22    THE COURT:  All right.  You may do so.

23    MR. SCALIATINE:  Does the Court wish a copy, just an

24  extra copy?

1      THE COURT:  If you wish.

2  BY MR. SCALIATINE:

3      Q.    Sir, describe your formal educational

4  background for the Court.

5      A.    I have a bachelor's degree in chemistry from

6  the University of North Carolina at Wilmington.

7           I have a master's degree in forensic science

8  from the University of New Haven in West Haven,

9  Connecticut, and a professional certificate in fire

10  science from the University of New Haven.

11      Q.    Actually, before you went to college, while

12  you were in high school, did you join a local fire

13  department?

14      A.    Yes, I did.

15      Q.    Is that where you became interested in fires

16  and burns?

17      A.    Yes.

18      Q.    Describe your career path after you received

19  your master's degree.

20      A.    I taught for a semester at the University of

21  New Haven as an adjunct professional in fire science

22  chemistry.

23           During that time period, ATF hired me; and I

24  started working for ATF in September of 1991.

1    Q.    And when you were hired in September of 1991,

2  could you describe the original training you received at

3  ATF?

4    A.    All ATF agents receive basic law enforcement

5  training at the federal law enforcement training in

6  Glynco, Georgia.  Actually, it's the same training that

7  all federal agents receive except for FBI has their own

8  academy.

9         Once you graduate from the federal law

10  enforcement training academy, you go to the ATF national

11  academy in which you learn ATF specific laws.  We discuss

12  firearms, narcotic laws, fire.  We have a two-week course

13  in fire investigation and a two-week course in explosion

14  investigation and explosives.

15    Q.    And once you completed all that training, is

16  it fair to say that by 1991 you were a special agent

17  criminal investigator for ATF?

18    A.    Yes.

19    Q.    In 1991, as a criminal investigator and a

20  special agent, what were your duties at that point in

21  time?

22    A.    To enforce all laws that ATF was responsible

23  for, firearms laws, gun trafficking, explosives, fire

24  investigations, alcohol and tobacco.

1  Q. And let me stop you there.

2   In 1998, did you begin training to become a

3 certified fire investigator for ATF?

4  A. Yes, I did.

5  Q. And describe that training program that you

6 went through to become a certified fire investigator for

7 ATF?

8  A. A little bit of background.  In 1991, I

9 became an agent.

10   In mid the 1990's there were a series of

11 church fires in the Southern United States.

12   ATF reassigned me from doing all -- enforcing

13 all laws just to investigating church fires.

14   In about 1993, 1994, my primary duties came

15 to look at church fires in North Carolina and

16 South Carolina, not only help to determine the origin and

17 cause and -- but, also, do the follow-up investigation to

18 determine what was happening with this rash of a church

19 fires that were making the news.

20   In 1996 I was transferred to Charlotte,

21 North Carolina, to the Charlotte field office.  And at

22 that time they -- ATF put me through the certified

23 explosive specialist program where we -- we're experts in

24 the handling of explosives and postblast scenes.

Jean M. Tartaglia, Official Court Reporter

1          In 1998, I started in the ATF certified fire
2   investigation program.
3      Q.     And was that a two-year program to get the
4   certification?
5      A.     Yes, it is.
6          ATF's program mirrored a graduate school
7   program.  We actually take graduate classes.  We take
8   university courses.  We take classes taught by ATF but,
9   also, taught by experts from around the world.
10          We, not only have to take these courses over
11  the two-year period, we have to conduct 100 fire scenes.
12  We have to do origins and call reports on those fire
13  scenes, all of which are mentored by a senior CFI.
14          And then we have to do a graduate thesis at
15  the end, and we have to defend our thesis.
16      Q.     And did you do all that?
17      A.     Yes, I did.
18      Q.     And by early 2001, were you a certified fire
19  investigator for ATF?
20      A.     Yes, I was.
21      Q.     And then as your career continued, did you
22  utilize those skills and investigate numerous fire scenes
23  for ATF?
24      A.     Yes, I did.

Jean M. Tartaglia, Official Court Reporter

1    Q.    In 2007 did you become the training manager

2  for the certified fire investigators program at ATF?

3    A.    Yes, I did.

4          In 2007 the national fire academy, under the

5  Department of Homeland Security and FEMA, needed to

6  rewrite their fire investigation program.  This is a

7  program that is taught to approximately 300 state, local

8  and international students a year, and it's given 12

9  times a year.

10         And it's been -- I went through the course in

11  the '90s.  It's a course that needed to be updated.  So

12  ATF brought me in our headquarters in Washington D.C.

13  just to assist in rewriting that program.

14         At that time they, also, put me over the

15  training of ATF-CFI certified fire investigators and

16  they're -- not only their training but the training of

17  our candidates that were going through the two-year

18  program and rewriting our new agent training to update

19  everything to current, make sure everything was just the

20  standards that it should be kept at.

21    Q.    Did you become the program manager for the

22  certified fire investigations program in 2009?

23    A.    Yes, I did.

24    Q.    As the program manager for the certified fire

1    investigation program, did you oversee the certification

2    and the yearly recertification of all the ATF and fire

3    investigators?

4        A.    Yes, I did.

5        Q.    And how long did you do that?

6        A.    Until 2016.  My jobs were, also, to make sure

7    that the national fire academy maintained their -- make

8    sure their program was kept up, that all the certified

9    fire investigators had -- were certified, but they, also,

10   have to be recertified.  We had to be recertified yearly

11   -- on a yearly basis, based on training that we had to

12   take, both in-bureau and out-bureau training, and the

13   number of fire scenes we had to investigate.

14            I was, also, in charge of international

15   training.  Any international training that ATF did

16   throughout the world, I made sure that either I went or I

17   picked the right individuals to go where they needed to

18   be.  And, also, any state and local classes that were

19   taught by ATF, I was responsible for making sure those

20   went through.

21       Q.    And what is the National Response Team?

22       A.    National Response Team are a group of experts

23   within ATF.  We are the -- it's made up of ATF canines.

24   It's made up of chemists, explosive specialists,

1    explosive enforcement officers, agents, certified fire

2    investigators and certified explosive specialists.

3        Q.    And what does that team do?

4        A.    We respond to fires throughout the world but

5    through the international and national response team.  We

6    respond to fires throughout the world in which instances

7    that are usually large scale or large loss of life in

8    which the local agency does not have the manpower or the

9    equipment or the money to handle those incidents.  So we

10   bring a team in.  We bring the interviewers in.  We bring

11   the crime scene people in.  We bring all the

12   investigators in.  We work with the local agency.  We

13   integrate their team in with ours to help solve what

14   occurred in the fire.

15       Q.    In 2016 did you become the supervisor of the

16   National Response Team?

17       A.    Yes, I did.

18       Q.    And were you the supervisor of the National

19   Response Team until you retired?

20       A.    Yes, I was.

21       Q.    And does your curriculum vitae list the

22   certificates that you have?

23       A.    Yes, it does.

24       Q.    And does your curriculum vitae list the

1    specialized training that you have?

2        A.    Yes, it does.

3        Q.    Does most of those training courses that you

4    had deal with fire science?

5        A.    Yes, they did.

6        Q.    Does your CV also list the training you

7    received as part of your work for the National Response

8    Team?

9        A.    Yes, it does.

10       Q.    And during your career at ATF, were you an

11   investigator?

12       A.    Yes.

13       Q.    You were an instructor when you ran the

14   certified fire investigations team?

15       A.    Yes.

16       Q.    And did you, also, instruct at the ATF

17   National Academy?

18       A.    Yes, I did.

19       Q.    For how many years?

20       A.    I started instructing at the national academy

21   -- at our ATF fire academy back in 2000 -- in the 2000's

22   I was really doing it.  We rewrote it in 2007 is when I

23   taught there.  And then they hired me to come back this

24   last December, last month.  I was hired to come back and

Jean M. Tartaglia, Official Court Reporter

1    teach our new agents.

2        Q.    Are you on any fire science-related

3    committees?

4        A.    Yes, I am.

5        Q.    And what committees are those?

6        A.    I am on the underwriters laboratory, on a

7    group of experts together to look at license issues and

8    fire scenes, and they appointed me to the committee.

9              When I retired, they kept me on the committee

10   and then reassigned another ATF person to take my ATF

11   spot.  But kept me on the committee.

12       Q.    You're still on that committee?

13       A.    Yes.  I'm still to that committee.

14             I'm on the NIS (Phonetic) committee, the

15   organization for scientific committees, which is

16   Department of Justice came out with some guidelines in

17   forensic investigation, where should we be in forensic

18   investigations, whether it's DNA, canine alerts,

19   chemistry.  And so I was put on the committee for fire

20   and explosions, and I still sit on that committee today.

21       Q.    And you're on another committee?

22       A.    I'm the IAAI committee, International

23   Association of Arson Investigators, CFI trainer.net which

24   is their on-line program.  I sit on that committee.  And

Jean M. Tartaglia, Official Court Reporter

1    what we do is we decide what's the next item that we're

2    going to put on-line to train fire investigators and then

3    get that involved.  And I've, also, helped to write some

4    of those.

5        Q.    Were you a member of the national fire

6    protection agency's 921 committee?

7        A.    Yes, I was.  That was from 2006 to 2012.  I

8    sat on the canine 921 committee.

9        Q.    And are you a member of any professional

10   organizations?

11       A.    Yes, I am.

12       Q.    And what are those?

13       A.    I'm a member of the International Association

14   of Arson Investigators, the international group, both

15   North and South Carolina.

16             I'm, also, a member of the National Fire

17   Protection Association, and I'm a member of the fire

18   department safety officers.

19       Q.    Over your career at the alcohol, tobacco and

20   firearms, approximately how many fire test burn

21   simulations have you been involved with or conducted?

22       A.    Approximately 400.

23       Q.    And of those 400, could you describe what a

24   test burn is for the Judge and what you did for the ATF.

1      A.      What we do is -- whether they're test burns

2   or recreation, what we do is we, actually, set up a

3   building, set up a room with commercial, residential and

4   we burn it.  We burn it by natural means.  We burn it by

5   meaning to pouring gasoline or we try to recreate a fire

6   that may have occurred due to smoking, may have occurred

7   due to electrical issues and we do all these burns.

8           We do mostly for teaching purposes.  And what

9   we'll do is we'll burn these and then bring investigators

10  in to have them come in and look.

11          One of the big tests we did, actually, was

12  Bensenville.  When Chicago O'Hare took over Bensenville,

13  we came in and burnt a lot of the residential structures

14  and the commercial structures with the City of Chicago

15  and Bensenville Fire Departments to aid the fire

16  department on how to put fires out but, also, to look at

17  to help NIS study firefighter fatalities and to train

18  local investigators on how to investigate fires.

19      Q.      And once these tests burns are concluded to

20  the desired end of what you are studying, the fire has to

21  be put out?

22      A.      Yes, it does.

23      Q.      And approximately how many times with this

24  approximately 400 test burns that you did, did you

Jean M. Tartaglia, Official Court Reporter

Pl. Amor 028201

1     actually assist in putting out the test burn?

2        A.      Probably one-third of the fires.

3        Q.      And by doing that, I mean, you literally put

4     on the fire gear; correct?

5        A.      Yes.  I'm a certified firefighter.  And being

6     a certified firefighter, I had the ability to go in and

7     put the fires out.  And doing that also helps to

8     understand the fire behavior.

9        Q.      And are there occasions when, while in this

10    burning structure assisting others putting out the fire,

11    you're also pointing out to them some aspects of the

12    fire?

13        A.      Yes.

14        Q.      As it's burning?

15        A.      Yes.

16        Q.      Approximately how many fire scenes have you

17    assisted in investigating as an ATF fire investigator?

18        A.      Approximately 500.

19        Q.      And of those, approximately how many of them

20    were related to a residential structure or building?

21        A.      About two thirds were residential in what

22    most people would think of residential as far as someone

23    lived there.

24            In the federal system, an apartment is

Jean M. Tartaglia, Official Court Reporter

Pl. Amor 028202

1    considered a commercial building.  But most people think

2    of that as a residence.  But including the residences,

3    about two thirds were residential.

4         THE COURT:  So that excludes apartments?

5         MR. GOLDER:  No.  That would -- for the purpose of

6    here, that would include the apartment buildings and that

7    about two thirds.

8         THE COURT:  All right.

9    BY MR. SCALIATINE:

10        Q.    And of those 400 fire scenes that you

11   investigated, approximately how many of them involve

12   fires that began from smoldering of fires or smoldering

13   cigarettes?

14        A.    The ones that we could actually determine,

15   about ten to 15 were smoldering fires that we actually

16   were able to look at and say.

17             There were many that we felt could have been

18   smoldering, but there was not enough evidence to

19   determine whether or not -- it was an undetermined fire.

20   We couldn't say whether it was smoldering or not.

21        Q.    So you've investigated numerous smoldering

22   fire incidents?

23        A.    Yes.

24        Q.    Have you ever been qualified as an expert in

Jean M. Tartaglia, Official Court Reporter

1    court in the field of fire science and fire

2    investigation?

3        A.    Yes, I have.

4        Q.    On how many times?

5        A.    Approximately three times in the State of

6    South Carolina and worked for the U.S. Coast Guard in --

7    last December.

8        Q.    In this very courtroom?

9        A.    In this courtroom.

10       Q.    For this case?

11       A.    Yes.

12       MR. SCALIATINE:  Judge, at this point, the People

13   would tender Mr. Golder as an expert in the field of fire

14   science and fire investigation.

15       THE COURT:  Mr. Caraher, do you wish to inquire?

16       MR. CARAHER:  No, your Honor.

17       THE COURT:  All right.

18           The Court finds the defendant, again, to be an

19   expert in fire science and fire investigation.

20   BY MR. SCALIATINE:

21       Q.    Sir, were you paid for your work in reviewing

22   the data in this case?

23       A.    No.  I was an employee of ATF.

24       Q.    And you've been hauled back to the great

Jean M. Tartaglia, Official Court Reporter

1    State of Illinois in the middle of winter, again;

2    correct?

3         A.    Yes.

4         Q.    And have you been paid for any updated

5    evaluation or your time here today?

6         A.    No.

7         Q.    Your flights were paid for?

8         A.    Yes.  My flights were paid for by the State,

9    my hotel was paid for by the State, and the State gave me

10   a stipend of about, approximately, $35 a day to eat.

11        Q.    Was that enough?

12        A.    Not in Chicago.

13        Q.    As to this case, have you reached an opinion,

14   to a reasonable degree of scientific certainty, as to the

15   origin and cause of this fire?

16        A.    Yes, I have.

17        Q.    And what did you review to establish your

18   opinion?

19        A.    I reviewed the initial fire reports from the

20   fire department.  I reviewed the 9-1-1 call from the

21   victim, the fire -- the police department reports, the

22   original detective reports, the original investigators

23   reports, witness statements, witness videos, the videos

24   that occurred from the original investigators.

Jean M. Tartaglia, Official Court Reporter

1          I've, also, reviewed -- done background

2     research, just on the ignition scenarios that occurred,

3     and used my previous training in burning and fire

4     reconstruction to help come to this point.

5          Q.     Did you, also, review the 9-1-1 tape and the

6     transcript of it?

7          A.     Yes, I did.

8          Q.     And transcripts from the previous hearings?

9          A.     Yes, and -- Yes.

10         Q.     Did you, also, have, in the course of

11    reviewing this case, an opportunity to actually sit down

12    with the defendant and interview him?

13         A.     Yes, I did.

14         Q.     Do you see him here in court?

15         A.     Yes, I do.

16         Q.     Could you identify him by where he's sitting

17    or an article of clothing he's wearing?

18         A.     He's between -- second from the left, from my

19    left.

20         THE COURT:  In-court identification of the defendant

21    noted for the record.

22         MR. SCALIATINE:  Thank you.

23    BY MR. SCALIATINE:

24         Q.     Did you generate a report after you reviewed

1    all that data?

2        A.    Yes, I did.

3        Q.    Is it fair to say that you became involved in

4    assessing this case to originally examine the fire

5    experts and their determinations that they made back in

6    1995?

7        A.    Yes, I did.

8        Q.    Did you form an opinion as to the possibility

9    of this fire being caused by spilled vodka on newspaper

10   and then being ignited by a cigarette?

11       A.    Yes.

12       Q.    And what was that opinion that you formulated

13   upon that scenario?

14       A.    That that couldn't happen.  That that was --

15   we knew from previous tests that we had completed with

16   ATF that a cigarette will not ignite a flammable liquid.

17   It will not ignite vodka.  It will not ignite any type of

18   liquid like that.

19       Q.    Did you form an independent opinion as to the

20   cause and origin of this fire?

21       A.    Yes, I did.

22       Q.    And as to the origin of the fire, what is

23   your opinion?

24       A.    The southwest corner of the living room

1    around a -- there was a swivel chair sitting in the

2    southwest corner, in and around that area.

3         Q.    That is what you believe to be the area of

4    origin?

5         A.    Yes.

6         Q.    The area adjacent to that swivel chair and on

7    that swivel chair?

8         A.    Yes.

9         Q.    With that opinion, can you explain for the

10   Court what you believed that the progression of this fire

11   was from that origin point?

12        A.    The original diagram showed us -- the diagram

13   that was completed by the original investigators showed

14   where the furniture was put, placed and the photos

15   afterwards.

16             When we interviewed Mr. Amor, he actually

17   moved one piece, the swivel chair, closer to the

18   southwest corner, also.

19             And so that kind of helped us design where

20   the future was.

21             The damage that I looked at from the photos

22   and the witnesses and all the statements, the fire

23   started in and around that chair.  We've got --

24        Q.    Swivel chair?

Jean M. Tartaglia, Official Court Reporter

1      A.      The swivel chair.  I'm sorry.

2              We've got a corner configuration fire.  The

3      fire is naturally going to travel up and outwards when it

4      starts to burn.  It travels up towards that -- up that

5      corner, the material behind it, the radiation and

6      convected gases are causing the flames to rise.

7              In the beginning stages of a fire, the

8      convection is the actual greatest transition of fire.  It

9      actually does -- it causes the fire to grow the most.

10             Then radiation becomes involved, which means

11     the fire is radiating out to other objects.  It's

12     radiating out to the couch that's adjacent.  It's

13     radiating out to the boxes that you were in the corner.

14             The fire traveled up to the ceiling.  Once it

15     hits the ceiling, there's no place for it to go but out

16     because then it's going to start traveling laterally

17     across the ceiling.

18             This apartment was designed where it had a

19     structural beam that separated the living room from the

20     hallway and the dining room in the front entrance.  That

21     structural beam actually sat -- came down from the

22     ceiling.

23             So when that smoke, superheated air starts

24     traveling across the ceiling, it hits that beam.  Just

Jean M. Tartaglia, Official Court Reporter

1    like -- an example is when you fill a bathtub up, the

2    water goes in all directions and fills up that bathtub or

3    if you fill up a kitty pool, it goes everywhere and

4    starts to fill up.

5            If you turn that upside down, that's what

6    happens in a room.  If a fire started in this courtroom,

7    it would fill up all the voids at the ceiling and start

8    to bank down.

9        Q.    And is that what you believe happened here?

10       A.    Yes, it is.

11       Q.    And as the fire spread out on the ceiling and

12   the radiant heat spread out, what happened, in your

13   opinion, then?

14       A.    The radiant heat is banking down.  Radiant

15   heat goes in a straight line.  It's coming down onto the

16   objects that are in the room.  The room is, also, being

17   heated up at the same time from the fire in the chair.

18            The top of the couch, the top of the chair,

19   the top of the tables, everything is starting to off-gas.

20            In fire the solid objects don't burn.  It's

21   the vapors that burn.  So they start what we call

22   off-gassing.  They start paralyzing.  They actually start

23   -- vapors come off that are ignitable.  So what it does

24   is it -- once they reach their ignition temperature, they

1    ignite.

2            So now we have the top of the couch igniting.

3    We have the top of the chair igniting.

4        Q.    By chair?

5        A.    Recliner.  The recliner that's in the other

6    room.

7            What's significant in this case is that

8    recliner is below that beam.  It's actually below that

9    portion of the ceiling that's lowered.  So the radiant

10   heat effects, when it hits that beam, are actually

11   greater right there at that chair.  The movement of that

12   chair inwards, outwards affects where the fire hit.

13       Q.    And from your review of all the police

14   reports and, more importantly, the fire reports and

15   dispatch times, can you lay out for the Judge a general

16   description of the timeline of this fire?

17       A.    We know that the victim called at 6:40.

18   That's on the 9-1-1 recording.  She was incapacitated at

19   6:41, approximately a minute and ten seconds later.

20           At 6:42 the fire department arrived.  And

21   engine two, rescue two and engine five arrived almost at

22   the same time.

23           Firefighter Lynn did a 360.  When the fire

24   department arrives on the scene, one person usually tries

1　to go all the way around the fire to say, hey, what do we

2　have burning?  Other firefighters, Firefighter Born, one

3　of them, takes the inch and half off of engine two.

4　　　　Q.　　When you say inch and a half, what do you

5　mean?

6　　　　A.　　Inch-and-a-half hose line.  That's the size

7　of the hose line.

8　　　　　　　They actually go up the stairs.  They feel

9　the doors in this area, and the door on M was hot.  They

10　can't get in because the door is locked.

11　　　　　　　Firefighter -- another firefighter comes off

12　of rescue two, and they actually cut a hole in the door.

13　They reach their hand in and --

14　　　　Q.　　And when they cut a hole in the door, are

15　they using a saber saw, like I would?

16　　　　A.　　They're using an axe.

17　　　　　　　They used an axe, cut a hole in the door, and

18　reached through the hole and unlocked the door.

19　　　　　　　Once they opened the door, they were met with

20　heavy black smoke.  They were met with high heat.

21　　　　　　　They made it approximately ten feet in.  Some

22　firefighters say six feet.  Some firefighters say ten

23　feet.

24　　　　　　　And they tried to get in, but it was too hot.

Jean M. Tartaglia, Official Court Reporter

1   It was just too much.  They couldn't even see any fire at

2   that time.

3            At that time other firefighters went to the

4   adjacent apartment to see, maybe, we have a fire in

5   there.  But they knew the smoke was there.

6            What they then do is they understand that

7   they have to vent this fire.  This fire is not getting

8   vented.  There's too much smoke for them to go in.  They

9   could become the victim.  So they leave the apartment to

10  regroup.  But at that time they, also, break the windows

11  in the stairwell.

12       Q.    Describe for the Court how they broke the

13  windows from the stairwell and what they did at that

14  point in time?

15       A.    The reason they broke the stairwell --

16  windows in the stairwell is to get ventilation.

17            They did use the fog nozzle, which is what we

18  do in firefighting to force ventilate the smoke out of

19  that apartment, to help get that out.  And all you're

20  doing is you're spraying water.  And when you spray water

21  in a fog pattern when it's going out, air entrains back

22  behind the water.  And what it does is it pulls that

23  smoke out.  So you're actually forcing the smoke out of

24  the apartment by the use of water.

Jean M. Tartaglia, Official Court Reporter

1          Q.     Well, let me stop you there.

2                 From your review of the materials that you

3     were given, it's your understanding, as I understand it

4     --

5          MR. CARAHER:  Objection, your Honor.  We're well

6     beyond background, so I have to object to the leading

7     question from the State.

8          THE COURT:  Don't lead the witness.

9     BY MR. SCALIATINE:

10         Q.     Could you describe the direction of this fog

11    nozzle spray?

12         A.     It actually goes out towards the windows in

13    the stairwell.  It's actually trying to get that area.

14                They were met with light smoke in the

15    stairwell.  But once they open the door, they have smoke

16    coming out.  The fire is now getting ventilation.

17                At the time that firefighters came in, the

18    fire was very underventilated fire.  We have deep smoke.

19    We don't have a lot of oxygen in that room at all.

20                We've got a -- and they have to be able to

21    get that heat out.  Firefighters understand that when you

22    start giving oxygen, now all that smoke, which is really

23    just unburned fuel, all that smoke has a chance to

24    ignite.  So they need to get that out before they can get

Jean M. Tartaglia, Official Court Reporter

```
 1    in there, before they can -- to make sure they don't get

 2    injured.

 3            At the same time, Firefighter Lynn is doing

 4    the 360 degrees.  All these things are happening at the

 5    same time.  He actually observes fire coming out of the

 6    second floor balcony.  This apartment was on the second

 7    floor.  So he observes fire coming from the second floor.

 8            We have firefighters that go into the

 9    apartments to the side.  And they're trying to determine

10    to see whether or not they can get in this apartment or

11    whether or not fire is in the other apartments and it

12    extended.

13            The firefighters, in all this process, they

14    then go back in.  Once they get to where they can, when

15    they go back in, they can start seeing the glow of the

16    fire; and they instantly hit it with water.  And the fire

17    is -- within a minute after that, the fire is, while not

18    under full control in the terms we use in firefighting,

19    the fire is really out.

20            Once you add water to that, it cools the fire

21    -- rapidly cools the fire.  You get that.

22            And firefighter -- and the firefighters from

23    the exterior actually talk about they see -- when they

24    were told to go to the west side, they pulled a line off,
```

1   went to the west side.  And they said they remember

2   seeing the fire coming out the doors and then they'd see

3   water.  They hit the top above, the hit the roof, because

4   they didn't want to fire to get in the roof.

5            And shortly after that did that, within a

6   couple of minutes, they see water coming out of the --

7   from inside the apartment.

8        Q.     When assessing and establishing your opinion

9   as to the origin of the fire, did you contemplate

10  ventilation?

11       A.     Yes, we did.

12       Q.     And could you explain to the Court, briefly,

13  ventilation and how you analyze that in this fire?

14       A.     Fires have to have three things to burn,

15  heat, fuel and oxygen.  Those are the main three things.

16  We've got the fuel.  We've got the contents inside the

17  room.  We've got the heat because the fire is in there.

18  And now we have to have oxygen.

19           The oxygen had already been used up in this

20  apartment.  Flashover has already occurred.  The fire is

21  actually starting to die down, except for at that

22  doorway, the sliding glass door, where the fire was going

23  out.

24           When that door broke, the firefighters -- at

1    the time that door broke, the firefighters are there; and

2    they ignite -- they put that fire out pretty quickly.

3                In tests that we've done with ATF and tests

4    that we've done in burning, all that -- we constantly use

5    ventilation as a factor in teaching other fire

6    investigators what the effects of ventilation is because

7    ventilation can cause a fire from one part of the

8    building to go to the complete opposite.

9                So what I looked at in this was what was the

10   time frame of that ventilation that they had at that door

11   as to compared when the firefighters actually put the

12   fire out.

13        Q.    And in your analysis of the ventilation and

14   the origin of the fire and where you placed this area of

15   origin of the fire, you previously stated that you

16   considered the defendant's statements that he made to

17   you?

18        A.    Yes.

19        Q.    Could you describe for the Court the concept

20   of external fire impingement?

21        A.    That means fire attacks something.  One of

22   the things we look at is we have to determine how fire

23   traveled throughout the room, throughout the building.

24                We look -- the original investigators in the

1    photos show where they looked at the electrical outlets.

2              Did the fire come out of it?  Was it an

3    electric problem?

4              When you look at the outlets, you can see

5    that they were attacked by fire.  They had fire

6    impingement on them.  They weren't failed due to a fire.

7    They were actually attacked by fire.

8              I looked at all the pieces of furniture in

9    the room.  You can look at the table, the center table,

10   and see that it was attacked by fire.

11             You look at the couch.  You look at the

12   chair, the recliner chair, and everything appears to have

13   been that they were attacked by fire.

14             The fire actually -- the fire didn't start

15   within those objects.  They actually were attacked by

16   flames, and then they burnt from the exterior to the

17   interior.

18        Q.    Did you formulate an opinion based on that

19   review and your analysis as to whether it was possible

20   that a smoldering cigarette fire could have begun in the

21   recliner?

22        A.    Yes, I did.

23        Q.    And what was your analysis?  And what were

24   your conclusions as to that?

Jean M. Tartaglia, Official Court Reporter

1      A.     In order for a smoldering fire to occur --

2  smoldering is not flaming combustion.  It's a combustion

3  across a surface.

4          So you don't -- a minute ago I talked about

5  how flames, the vapors burn.  In smoldering they don't.

6  In smoldering they actually, because of the volume of the

7  objects that were burning, the unit value of those, they,

8  actually, just combust across the surface.  A cigarette

9  is a smoldering product.

10         But in order for them to maintain an exit,

11  they have to have oxygen and they have to have heat.  For

12  a cigarette to cause ignition of a chair, to cause

13  ignition of anything, it has to have insulation around

14  it.

15         What happens is a cigarette falls in the

16  crevices of a chair.  Once that occurs, we now have

17  insulation which means that heat can continue to char the

18  material.  The material starts to move away from the

19  cigarette ignition, and it starts to heat up.  So it's

20  paralyzing, but it doesn't really have the oxygen it

21  needs to go to flame.  So it starts to create a crevice.

22         And it starts -- especially in polyurethane

23  furniture, it starts to create that crevice and it starts

24  to grow and grow.

Jean M. Tartaglia, Official Court Reporter

1          Once it breaks through, and it can break

2     through at any point in time, once it breaks through, the

3     flaming, the transition from smoldering to flame is very

4     quick because we have a -- we already have the heated

5     material.

6          But what -- the damage that's caused within

7     that chair, what we find within that chair, within the

8     couch, within items that are there, we find the damage --

9     because the heat has been in there for such a period of

10    time, we find the damage to the wood.  We find the damage

11    -- it looks like a fire came from within that object.

12         We don't find the insulation.  We don't find

13    the material that's left on the chairs or on the couch.

14    We actually finds holes there.  We find where that area

15    has spread out to where it got the oxygen it needed and

16    then came to flame and combustion.  And that takes a fair

17    amount of time for that to occur, depending on the

18    substrate that it's in.

19        MR. SCALIATINE:  Let me approach with what's been

20    previously marked as a copy of Defendant's 99.

21    BY MR. SCALIATINE:

22        Q.    Do you recognize that photo?

23        A.    Yes, I do.

24        Q.    And what is that a photo of?

Jean M. Tartaglia, Official Court Reporter

1      A.     It's the -- what we are calling the recliner

2    that was located in the east portion of the living room.

3      Q.     And when you examined this photo and other

4    photos of that recliner, did you see evidence of external

5    impingement or a smoldering cigarette?

6      A.     External impingement.

7             What I'm looking at in this chair is the

8    damage to the top of the chair.  We're looking at the

9    damage to -- the fact that there's still cloth on the

10   seat.  There's still cloth on the arms.

11            If a cigarette fell in the crevice, which is

12   in the portion of the chair -- the cushion, we should

13   have more damage on one of the arms or the other of the

14   arms.  We should have damage on the -- in the back side,

15   around the frame.

16            We still have good wood.  And it's not as

17   clear to see on this picture, but in the bottom portion

18   of that chair, we still, actually, have real good -- we

19   have good wood.

20            The wood is -- while it's charred, there's

21   not really -- it's sooted.

22            And if a cigarette would have fallen in any

23   corners of that chair, which it is required to do, it's

24   required to have some form of insulation, if it falls in

Jean M. Tartaglia, Official Court Reporter

1    any of those areas, we need to have, not only the time

2    frame for that to occur, for it to go into flaming

3    combustion, but we need to have the damage that normally

4    occurs that I found in other cases that -- in tests that

5    we've done, the damage to that chair consistent with that

6    because, again, it's creating that pocket.  It's creating

7    the heat.  It's damaging the wood.  The wood is starting

8    to char.

9            And then as that cigarette moves, as that

10   insulated area and hole starts to get greater and then

11   breaks through, then we have fire breaking through

12   somewhere in that chair.

13   Q.    I'm going to show you what's been previously

14   marked as a copy of Defendant's 96.

15           Do you recognize that photo?

16   A.    Yes.  This is after -- I'm assuming this is

17   after your overhaul or it has to be between the time

18   period that the first photo is taken and the second one.

19           The chair has actually been broken in this

20   one, but you still see the cloth material.  You still see

21   the stuffing.  You still see the padding on that chair.

22           Another thing that I looked at in that chair

23   is the damage to the -- if the fire would have started in

24   that chair, we look -- we need to look at the radiant

Jean M. Tartaglia, Official Court Reporter

1    heat affects against the table that's in front of it,

2    that's right directly across from that and the couch

3    that's -- to the right of it in this picture.  And we

4    don't see the damage to that material of this chair

5    igniting.  We don't see the damage going to that chair.

6    We don't see the damage going to the couch.  We don't see

7    the damage going to the table.

8            In fact, that end of the table is pretty well

9    intact; and this end of the couch, this east end of the

10   couch, other than some of the cushions, the wood is

11   pretty well intact.

12       Q.    In Defendant's 96, you see what you believe

13   to be items of actually cloth material still left on the

14   recliner?

15       A.    It's not really the cloth of the covering,

16   but the -- not the cloth, but the stuffing.

17       Q.    All right.

18            And as to your description of your analysis

19   of the table and the couch, I'm going to show you what's

20   been previously marked as People's 18.

21            And can you describe for the Court where on

22   this photo you see the evidence that this was external

23   impingement versus some other damage as to that sofa and

24   the coffee table?

Jean M. Tartaglia, Official Court Reporter

1     A.     One thing we have to remember is this room

2   was a flashover, which means this entire room was

3   engulfed in flames.  Everything in this room reached an

4   ignition temperature to where it ignited so we're going

5   to have a lot of damage to items when that room reaches

6   ignition.  But it has to reach that first.  It has to

7   buildup the heat.

8           The east end of the couch, you still see the

9   cushioning at the east end of the couch.  You still see

10  some of the cushioning -- cushions in the chair.  In

11  fact, they found some of the bottoms of those cushions

12  and took photos of them from the couch.

13          You see the table is broken on the west end

14  but not on the east end.  The damage to the table is

15  soot.  It's burn damage.  You see protected areas.

16          There was a protected area that you can see

17  in the corner of this photograph.  There's still a

18  portion of a magazine left, but there was a protected

19  area there.

20          If that fire would have started in that

21  chair, that radiant heat from that fire is going to

22  travel to that and it's going to ignite.  The first thing

23  it's going to ignite are the lighter materials which are

24  the paper materials.  It's going to ignite the other

1    couch.

2              And I don't see the damage on that table,

3    that couch that was consistent with the fire starting in

4    that chair.

5         Q.    In the recliner chair?

6         A.    In the recliner chair.

7         Q.    And that is part of the way you determine the

8    point of origin that you determine?

9         A.    Yes.

10        Q.    Did you, also, consider the concept of

11   comparable mass loss?

12        A.    Yes, I did.

13        Q.    I'm going to show you what's been previously

14   marked a People's 15.

15              Do you recognize that photo?

16        A.    Yes.  That's a -- the investigators put in a

17   bucket the remnants, what they found of the swivel chair.

18   On top of that is the actual base of the chair, and then

19   there's some springs.  There's some -- that are left

20   over.

21        Q.    As to the issue of a time frame for a

22   smoldering cigarette, did you consider studies in your

23   expertise in that -- on that issue?

24        A.    Yes, I did.

1    Q.    Did you formulate an opinion as to the cause

2  of this fire?

3    A.    Yes, I did.

4    Q.    And what was that opinion?

5    A.    The cause of the fire, first, the origin is

6  in and around the swivel chair.  The cause was due to

7  open flame, human factor.

8    Q.    And not a smoldering fire of some sort?

9    A.    No.

10    Q.    That transitioned into an open flame?

11    A.    No.  We asked the defendant, when we

12  interviewed him, whether or not there was -- how messy

13  was the apartment?

14          And he said that the victim, no, she kept an

15  apartment clean.

16          Where did you put out your cigarettes?

17          Did you use the swivel chair?

18    Q.    What did he say about that?

19    A.    No.  They said, in fact, he had been laying

20  on the floor that day, which is the original statement

21  he, also, gave to investigators, that he'd been laying on

22  the floor watching a game, that the Chicago paper was

23  there, that they kept that stacked, and they kept

24  everything neat in that area; that they didn't really use

1 the swivel chair.

2         The victim liked to use -- the victim's chair

3 was -- that was -- the recliner, that was her chair.

4 They sat on the couch or sat on the floor, but nobody

5 really liked the swivel chair.

6     Q.    And when reaching your opinion that this fire

7 was due to open flame ignition, what else did you analyze

8 or consider?

9     A.    Looked at the fire dynamics, the time frame

10 that it takes to -- for a cigarette to cause the fire.

11         The opportunity that occurred as far as the

12 time frame of when the defendant left as to when -- and

13 his wife as to when the fire was called in, what would

14 occur as the fire tracked, what would occur as the fire

15 proceeded throughout the building, throughout the

16 apartment, and what were the ignition sources in.

17         What we have to do is we have to rule out

18 things.  We looked at the weather.  Was there a lightning

19 storm that came through that day?

20         And there wasn't.

21         We looked at the electrical.  The electrical

22 system, not only was examined originally and they took

23 photographs of the electrical outlets, they brought in an

24 electrical engineer, and they had those looked at.

Jean M. Tartaglia, Official Court Reporter

```
1              I used his report.  I used their services
2    originally and my observations from the photographs we
3    had to rule out the electrical causes.
4              The next thing we got, because all three
5    individuals in the room smoked, that is one major concern
6    that we have is that why it -- could this have been a
7    smoking fire?
8              So the questions I asked Mr. Amor
9    specifically were:  Where did you smoke?
10             What did you do with your cigarettes?
11             Who was in this chair compared to that chair?
12             And what are the time frames we looked at in
13   ruling out the cause?
14             Because we need to rule out the accidental
15   causes, if not with this fire, we need to -- and we can't
16   determine a fire.  It's undetermined.  We have to rule
17   out causes.  And into a -- and be able to test the
18   hypothesis that we have on whether or not they can
19   actually occur.
20        Q.    And did you do so in this case?
21        A.    Yes, I did.
22        Q.    And that's when you reached your opinion as
23   to cause -- the cause of the fire?
24        A.    Yes.
```

Jean M. Tartaglia, Official Court Reporter

1      Q.    And that was, in your opinion, what?

2      A.    That the fire was set, was intentionally set.

3 It was incendiary.

4      Q.    With open flame?

5      A.    With open flame.

6      Q.    Could you describe for the Court the general

7 dynamics involved in that area that you have determined

8 to be the origin in relationship to the fact it was near

9 the corner of two walls?  It was in a corner?

10      A.    It was towards the corner and behind it were

11 cardboard.

12      In a corner configuration fire, you're only

13 getting oxygen from 90 degrees.  Where a fire in the

14 middle of the room, you're getting -- oxygen is coming

15 from all directions.

16      A fire against a wall, you're getting a fire

17 from one side.  Well, the fire against the wall and the

18 fire in the middle of the room actually had the same

19 flame heights.

20      The fire in the corner is going to, actually,

21 have a greater flame height.  That's only getting oxygen

22 from one area, and your flame heights are going to start

23 getting -- you're going to have increased flame heights

24 in that concentration.

Jean M. Tartaglia, Official Court Reporter

1          And so we are going to get, while this fire

2     wasn't completely in the corner, we now have -- the

3     radiant heat allows the ignition of the outside of the

4     cardboard in the material that was in the corner and in

5     the couch that was there.

6          So now we have a -- we're getting a larger

7     fire in that area.  So we're able to transition,

8     eventually, flashover because of that fire.

9          Q.    And, Mr. Golder, did you have an opportunity

10    to look at some slides that were presented by Douglas

11    Carpenter?

12         A.    Yes, I did.

13         MR. SCALIATINE:  If I could have one moment, Judge.

14         THE COURT:  Yes.

15         MR. SCALIATINE:  I'm going to approach with what has

16    been previously marked as People's 64.

17         MR. GOLDER:  Yes.

18         THE COURT:  Is this new?

19         MR. SCALIATINE:  It is.

20         THE COURT:  Okay.

21    BY MR. SCALIATINE:

22         Q.    And do you recognize People's 64?

23         A.    Yes, I do.

24         Q.    And what do you recognize it to be?

1       A.    The article is called, "Simulating Bluff-Body

2  Flameholders:  On the Use of Proper Orthogonal

3  Decomposition for Combustion Dynamics Validation."

4           It was in the *Journal of Engineering for Gas*

5  *Turbines and Power* in December of 2014, Volume 136.

6       Q.    So it's an article from a gas turbine

7  magazine; correct?

8       A.    Yes.

9       Q.    And I'm going to show you what I will mark as

10  People's Exhibit 64B.

11                (Marked People's Exhibit 64B for

12                  identification.)

13  BY MR. SCALIATINE:

14       Q.    Do you recognize this?

15       A.    Yes, I do.

16       Q.    Let me put it on the ELMO.

17           Do you recognize 64B as a slide that was

18  presented in this case by Mr. Carpenter?

19       A.    Well, it was in the slide show that I was

20  provided by you.  It was in his slide show.

21       Q.    And in this slide it talks about bluff-body

22  flameholders; correct?

23       A.    Yes.

24       Q.    Are you aware of this concept in fire

1    investigation, arson investigation as to a concept of the

2    bluff-body flameholders?

3        A.    No.

4        Q.    When you saw that slide, what did you do?

5        A.    Determined -- try to determine what

6    bluff-body -- why they were using it in terms of fire.

7             Bluff-body, the simulation is used for gas

8    turbines.  It's, also, used for subsonic and supersonic

9    engines.  It's really designed -- when you're designing a

10   rocket, when you're designing an airplane that's going to

11   fly at high speeds, you have to worry about what's going

12   to happen when the flames come out of the engine and

13   what's going to happen when it hits any point and what is

14   going to occur.

15            Similar to -- in slow motion is a boat.  Once

16   you drive a boat in the water, you're pushing water out

17   of the way, and you're a hole in the water.  As you go

18   through, the water is filling back in behind your boat to

19   maintain its level.

20            Well, bluff-body is an issue that they have

21   -- what they have to worry about and what they have to

22   look at in turbine engines and supersonic and subsonic

23   airplanes is what -- and rockets is how does that effect,

24   not only how the engine reacts, but the -- how the -- how

Jean M. Tartaglia, Official Court Reporter

1    it's -- how the object is going to work, the engine is
2    going to work, and how it's going to fly through the air.
3        Q.    And showing -- publishing what's been marked
4    as People's 64, which is that article that you found;
5    correct?
6        A.    Yes.
7        Q.    And on the bottom of second page of People's
8    64, there's a very familiar document, a very familiar
9    diagram?
10       A.    Yes.  That's a black and white version, but
11   it's the same picture Mr. Carpenter used in his slide.
12       Q.    I'm going to approach you with what has been
13   previously marked as People's 65.
14             What is that?
15       A.    It is a Technical Paper, in the *International*
16   *Journal of Aeronautical and Space Science*, called, "The
17   Characteristic Modes and Structures of Bluff-Body
18   Stabilized Flames in Supersonic Coflow Air."
19       Q.    So it's an article about supersonic engines
20   and supersonic planes; correct?
21       A.    Yes, it is.
22       Q.    I'd like to direct your attention to page 38
23   of that article.
24       A.    You mean 388?

Jean M. Tartaglia, Official Court Reporter

1      Q.      388.  I apologize.

2              It's on the ELMO here.

3              You see the diagram on the bottom of the

4   first column?

5      A.      Yes.  Figure 2.

6      Q.      All right.

7              I'm going to approach you with what will be

8   marked as People's 65A.

9                          (Marked People's Exhibit 65A for

10                          identification.)

11  BY MR. SCALIATINE:

12     Q.      Do you recognize that?

13     A.      Yes.  This is what's in Mr. Carpenters's

14  diagram for -- in his slide presentation.  What this

15  shows in the article is what they were trying to

16  determine was the width that they need when they do the

17  -- when -- in aeronautics what's the width of the space

18  they need so they can actually keep this recirculation

19  zone out so they can -- and they found that they -- what

20  is the actual -- the D of A, the distance of A, the

21  distance of F and the distance of O and the distance of

22  I?  what are those distances they need in an airplane

23  when they're flying at such speeds?

24     Q.      So this is a model of an airplane engine?

1       A.     Yes.

2       Q.     As far as you know, an airplane engine wasn't

3 involved in this fire; was it?

4       A.     Not that I know of.

5       Q.     Did you -- lastly, if I could just approach

6 with People's 63.

7             Do you recognize that document?

8       A.     Yes, I do.

9       Q.     What do you recognize that document to be?

10      A.     This is the document -- this is a diagram of

11 apartment that I carried with me when the State, the

12 defense attorneys and myself interviewed Mr. Amor in

13 prison.  And this is the drawings that he helped us

14 complete and where things were; and it's, actually, where

15 he was sitting, where -- I asked him where ashtrays were,

16 where trash cans were.

17             And he actually -- this diagram shows the

18 swivel chair, although it looks like the same chair.

19 It's actually a different style chair.  It's a swivel

20 chair.  He actually moved it closer to that corner for

21 us.  He said the diagram was off a little bit, and he

22 moved it towards the corner.

23       Q.     And in your opinion, when trying to assess

24 ventilation, and Dr. DeHaan's opinions about ventilation

1    and the swivel chair, you took this into account?

2        A.    Yes, I did.

3        Q.    You took all of the materials that you were

4    -- you reviewed into your account to formulate your

5    opinions as to cause and origin?

6        A.    Yes.

7        MR. SCALIATINE:  May I have one moment, Judge?

8            No further questions.

9        THE COURT:  Mr. Caraher.

10       MR. CARAHER:  Your Honor, is this a convenient time

11   for a break?

12       THE COURT:  It is a good time for a break, actually,

13   although it's very close to our breaking hour.  But we'll

14   take a break -- well, we're going to break at noon.

15   We'll take a five-minute break.

16                    (Recess taken)

17       THE CLERK:  William Amor.

18       MR. SCALIATINE:  Jim Scaliatine, Tom Minser for the

19   People.

20       THE COURT:  All the parties are with their

21   respective counsel.

22           And then Mr. Golder is on the stand, remains

23   under oath.

24           Mr. Caraher, you may inquire.

Jean M. Tartaglia, Official Court Reporter

Pl. Amor 028236

```
1        MS. THOMPSON:  I apologize.  Our client is coming
2    in.
3        THE COURT:  No.  No.  I'm glad you interrupted.  I
4    suppose I should look more carefully.
5                    (Recess taken)
6        THE COURT:  All right.  We'll try this again.  All
7    parties are now present and respective counsel.  The
8    defendant is present.
9            Mr. Caraher, you may commence your cross.
10                   CROSS-EXAMINATION
11   BY MR. CARAHER:
12       Q.    Mr. Golder, let me show you Exhibit 62, which
13   you identified as your CV.
14           Does that document indicate your current
15   employment situation?
16       A.    No, it does not.
17       Q.    Why is that?
18       A.    I did not give the State a current CV.  This
19   is my CV, the same I was using last year.
20       Q.    Do you have a current updated CV that
21   includes your current employer?
22       A.    Yes, I do.
23       Q.    Sir, what year was it that you began
24   investigating fires?
```

Jean M. Tartaglia, Official Court Reporter

1  A.  I started assisting the Waco Beach Fire

2 Department back in 1987. I would walk with the chief. I

3 would walk with the police officers. That's when I

4 became interested in fires.

5    So I started assisting them being the -- we

6 sometimes call them a shovel monkey, just shoveling for

7 them, and letting them teach me how to investigate fires.

8 That's when I became interested, about 1987.

9  Q.  And when was it that you started

10 investigating fires as lead investigator?

11  A.  In 1993-1994 time period with ATF when the

12 church fires started.

13  Q.  You mentioned on direct examination that you

14 issued a report in this matter.

15    Was that a written report?

16  A.  Yes, it was.

17  Q.  And does it contain your opinions as to the

18 Miceli fire based upon your professional training,

19 education, and experience?

20  A.  Yes, it does.

21  Q.  Was that report addressed to and provided to

22 the DuPage County State's Attorney?

23  A.  Yes, it was.

24  Q.  In that report, did you express the opinion

Jean M. Tartaglia, Official Court Reporter

Pl. Amor 028238

1    that further investigation should be conducted as to

2    Mrs. Amor's, Tina Miceli's, possible involvement into the

3    ignition of the fire?

4        A.    Yes, I did.

5        Q.    And that Mrs. Amor, at the time of the fire,

6    is currently know as Tina Miceli; correct?

7        A.    Yes, she was.

8        Q.    Since the date of that report, have you

9    performed any further investigation of Tina Miceli or

10    Mrs. Staple?

11        A.    I have not.  The State interviewed her,

12    conducted about a six-hour interview of her, and they

13    sent me a copy of the video.

14        Q.    And were you involved in that interview?

15        A.    No, I was not.

16        Q.    Were you present for the interview?

17        A.    No, I was not.

18        Q.    Have you viewed the videotape of that

19    interview?

20        A.    Yes, I have.

21        Q.    All six hours?

22        A.    Yes.

23        Q.    Have you done anything on your own to further

24    investigate Tina Miceli's potential involvement in the

1   ignition of the fire?

2       A.      No, I have not.

3       Q.      Are you aware of anything else the State has

4   done since you issued your written report to investigate

5   Ms. Miceli's possible involvement in the ignition of that

6   fire?

7       A.      No, I do not.  I don't have any knowledge of

8   anything they've done.

9       Q.      Have you inquired of the State's Attorney

10  whether they've done any further investigation of

11  Tina Miceli?

12      MR. SCALIATINE:  Objection, relevance.

13      THE COURT:  Overruled.

14      MR. GOLDER:  No, I have not.

15  BY MR. CARAHER:

16      Q.      Have you made any investigation, following

17  your testimony in this courtroom to the postconviction

18  hearing, besides reviewing that six-hour interview?

19      A.      Just further research, further documentation,

20  as far as me getting documents to further research

21  materials pertaining to this, pertaining to

22  Mr. Carpenter's slide presentation,

23      Q.      Which you've already testified about;

24  correct?

1      A.     I testified about two of the slides.  I

2  reviewed all of his slides, and his slides were

3  consistent with those two that I pulled.

4      Q.     And after watching the six-hour interview of

5  Tina Miceli and doing your own additional research, have

6  you issued any additional reports?

7      A.     No, I have not.

8      Q.     Have you modified your original written

9  report?

10     A.     No, I have not.

11     Q.     Have you withdrawn your original written

12  report?

13     A.     No, I have not.

14     Q.     Can I correctly assume then that the reports

15  that you held at the time of writing your written report

16  are the opinions that you still have today?

17     A.     Yes.

18     Q.     Now, you're a private investigator; is that

19  correct?

20     A.     Yes, I am.

21     Q.     And a certified fire investigator?

22     A.     Yes, I am.

23     Q.     And so if, since the time of the

24  postconviction hearing, the State's Attorney had

Jean M. Tartaglia, Official Court Reporter

1    requested that you conduct further investigation of

2    Tina Miceli, would you have been able to do that?

3         MR. SCALIATINE:  Object to speculation.

4         THE COURT:  Sustained.

5         MR. GOLDER:  If --

6         THE COURT:  Sustained.

7         MR. CARAHER:  Sustained, sir.

8    BY mr. caraher:

9         Q.    At the time you wrote your report, were you a

10   senior special agent with Alcohol Tobacco Firearms and

11   Explosions --

12        A.    Yes, I was.

13        Q.    -- Explosives?

14        A.    Yes.  Yes.

15        Q.    And HAD you responsibility for training ATF

16   agents about fire investigation?

17        A.    Yes, I did.

18        Q.    Does your fire investigation work predate

19   NFPA 921?

20        A.    Yes, it does.

21        Q.    What is NFPA 921?

22        A.    It's a guideline that was brought about --

23   it's a consensus document.  It brings in experts from

24   around the world, and they decide what fire investigators

1    should do, what are the procedures that they can follow.

2    It's kind -- it's a guide for fire investigators.

3            Back in the '80s when we started, when I

4    started, there was no guide.  There was nothing.  It was

5    you learned from the guy that learned from the guy that

6    learned from the guy.

7            What NFPA did was brought science -- more of

8    science into it.  People like Dr. Quinterry were using

9    science for fire investigation but fire investigators

10   weren't.

11           So it was help TO -- it brought about to help

12   educate fire investigators and to give them a guide on

13   what you should do in fire investigation.  And because

14   it's a consensus document and because science has

15   changed, it has changed -- the size of it has gone from a

16   few pages to now what it is today, which is -- in 2020 it

17   will be even bigger.  Every three years a little more is

18   added to it.

19       Q.    And by "consensus document," you mean that it

20   is widely accepted in the fire investigation community as

21   the gold standard for fire investigation?

22       A.    Well, by consensus document, I mean that the

23   document -- the items in the document are determined by

24   consensus which means there's a group of individuals in

1    there and it takes a vote to add something into it.

2              If you add -- if you decide that I want to

3    change something, any person can write in and say, we

4    think this needs to be changed.

5              We, in the committee, when I was in the

6    committee, look at those changes, every request that

7    comes in, and decide, okay, is this good or bad.

8              Some of it is a spelling error, some of it is

9    a coma, and some of it is actual material items.  So what

10   we do is we vote on that.

11             And the consensus means that if more people

12   vote yes than vote no, then the item goes into the

13   document.  And there's a lot of items that are turned

14   down and lot of items that -- but it takes a vote of

15   that.  It's a concensus of the people in that room.

16        Q.    And is NFPA 921 widely accepted by the fire

17   investigation --

18        A.    Yes, it is.

19        Q.    What is the current version of NFPA?

20        A.    2017 version.

21        Q.    This one that I'm holding in my hand?

22        A.    Yes, it is.  Sorry.

23        Q.    And how often is 921 updated?

24        A.    Every three years.

Jean M. Tartaglia, Official Court Reporter

1     Q.    In the synopsis section of your written

2  report, you state that all of your reviews are based on

3  current scientific methods, research and data available;

4  is that correct?

5     A.    Yes.

6     Q.    And why is that important?

7     A.    Because you need to stay current in the field

8  of fire investigation.  You need to understand what are

9  the changes, what is going on so you can actually

10  continue doing that because new concepts are coming out

11  as more research is done as agencies, as ATF does more

12  research.  And we publish papers.  ATF publishes papers,

13  more items, that's where ventilation issues started was

14  from research that was conducted, really came to the

15  forefront from research that was conducted by ATF.

16     Q.    Can we assume that you follow the 2017

17  version of NFPA 921 in your fire investigations today?

18     A.    Yes.

19     Q.    And that you followed the then current

20  edition of 921 in your review of this matter?

21     A.    Yes.  I followed 2014 at that time, looked at

22  the standards that were available in the original case or

23  the guides that were available, but then looked at --

24  and, also, looked at 2017 version.

1    Q.    Now, Mr. Amor confessed to having spilled

2  vodka on newspaper and igniting it with a cigarette; is

3  that accurate?

4    A.    Yes.

5    Q.    And isn't it true that the admission of an

6  individual intentionally starting a fire must match the

7  actual fire dynamics and scene examinations?

8    A.    Yes.

9    Q.    You testified earlier that the ignition of

10  vodka absorbed into newspaper is not a possible ignition

11  scenario?

12    A.    That is true.

13    Q.    What is the basis for that opinion?

14    A.    Based on testing we have done and the testing

15  we have done with ATF with alcohol, with gasoline, with

16  other items that we've had, with ignitable liquids that

17  we used and the actual cigarette ignition.

18          In the vodka case, I actually tried to do a

19  piece of cloth, tried to ignite cloth with vodka spilled

20  on it with a lighter and could not get it -- the vodka to

21  have any real effect on the cloth at all.  All it does is

22  just do a flash across the cloth.  It doesn't -- it,

23  actually, hurts the ignition because of the amount of

24  water that's in the vodka.

Jean M. Tartaglia, Official Court Reporter

1    Q.    This testing that you just talked about,

2  about vodka on a cloth, is that something that you just

3  recently performed?

4    A.    Yes.

5    Q.    Perhaps last week?

6    A.    Yes.

7    Q.    Let me show you Exhibit 119.

8          Is that an email that you prepared to

9  Mr. Scaliatine?

10   A.    Yes, I did on Tuesday, January 30th.

11   Q.    And so you did that testing last week, based

12  upon an inquiry he made to you?

13   A.    Yes.

14   Q.    And what was it that he asked about?

15   A.    On page 9 of DeHaan's report, he states

16  beverage alcohol such a vodka is mostly water and can be

17  ignited by flame if it is on suitable wick, like a cloth.

18         And he asked, can the vodka poured onto the

19  cloth chair ignite?

20         And I answered, not very readily.

21   Q.    And you answered him, not very readily, after

22  performing this test?

23   A.    Yes.  We had done previous tests, as I had

24  done previous tests, not specifically with vodka, but

Jean M. Tartaglia, Official Court Reporter

1    I've done alcohol.  I've done previous tests with

2    ignitable liquids in cigarette combustion.

3         Q.     And so by doing this test last week, you got

4    confirmation of something you already knew; correct?

5         A.     Yes.

6         Q.     In fact, some of the prior testing of

7    cigarette ignition of flammable liquids was done by ATF

8    using gasoline?

9         A.     Yes, it has been.

10        Q.     And even with gasoline, ATF was not able to

11   get cigarette ignition; correct?

12        A.     No, we cannot.

13        Q.     Now, you say in that Exhibit 119 that vodka

14   is mostly water.

15               And, in fact, 80 proof vodka is 40 percent

16   alcohol by volume; correct?

17        A.     Yes.

18        Q.     And so it's about 60 percent water; is that

19   true?

20        A.     Yes, it is.

21        Q.     And can you ignite water even with an open

22   flame?

23        A.     No.

24        Q.     Are you aware of former Detective Cross's

Jean M. Tartaglia, Official Court Reporter

1    testimony that William Amor stated that what he spilled

2    onto the newspaper was a 12-ounce glass containing vodka,

3    7-Up and ice?

4         A.    If I recall correctly, that is what -- Yes.

5         Q.    And isn't that diluted solution even less

6    likely to ignite than straight vodka out of a bottle?

7         A.    Yes.

8         Q.    And if that's not a possible scenario,

9    doesn't it follow that Mr. Amor's confession had to be

10   false?

11        MR. SCALIATINE:  Objection.

12        THE COURT:  What's the objection?

13        MR. SCALIATINE:  Speculation, Judge.  We are asking

14   the fire investigator to speculate on the falseness of

15   the entire confession.

16        THE COURT:  Sustained as to the form of the

17   question.

18   BY MR. CARAHER:

19        Q.    Did the testing that you performed and the

20   prior testing that ATF performed confirm that what

21   Mr. Amor confessed to in that he had lit with a cigarette

22   spilled vodka or spilled mixture of vodka, 7-Up and ice

23   cubes an impossible scenario?

24        A.    Yes, it is impossible.

Jean M. Tartaglia, Official Court Reporter

1      Q.    This morning, Mr. Scaliatine, asked about

2   your background and how many fires you had investigated

3   and how many of those were residential and how many

4   involved smoldering ignition.

5          And I think you said that you investigated

6   about 500 fires, and there were only about ten or 15 in

7   which it was determined that they were smoldering fires;

8   correct?

9      A.    Yes.

10     Q.    Small number?

11     A.    Yes.

12     Q.    But you, also, stated that there were many

13  more of those fires that could have been smoldering, you

14  just couldn't rule it in or out; is that accurate?

15     A.    Yes.  Due to the damage in the -- due to the

16  extent of damage that we had, we did not have enough to

17  say whether or not there was smoldering.

18     Q.    Or not?

19     A.    Or not.  Yes.  The fires were undetermined.

20     Q.    So if you have smoldering combustion, it must

21  be hard then to find sufficient evidence as to whether

22  that particular fire was caused by smoldering combustion

23  or not because you can only get confirmation in a very

24  small number of the total fires you investigated?

Jean M. Tartaglia, Official Court Reporter

1      A.    It depends on the transition of fire and how

2  much damage the fire resulted in.  A lot of the fires

3  that we're involved in, that I was involved with ATF,

4  when ATF is involved in a fire, many of those fires are

5  called in because the local investigator can't determine

6  the cause.  They can't determine the origin or -- and

7  many of those, the damage is too great for us to actually

8  be -- for anybody to be able to determine the cause

9  because the damage is too great.  We may have an idea,

10 but we don't exactly know what it is because the fire was

11 -- there's too much damage to determine.

12     Q.    And that's true in most of the fires that you

13 investigated where smoldering combustion was possible;

14 correct?

15     A.    Yes.

16     Q.    Now, you said that your area of origin was in

17 the southwest corner of the apartment in or around the

18 swivel chair?

19     A.    Yes.

20     Q.    Did you come up with a point of origin?

21     A.    No, I did not.

22     Q.    The point of origin should be within the area

23 of origin; correct?

24     A.    Yes, it is.

Jean M. Tartaglia, Official Court Reporter

1    Q.    And when you say that the area of origin was

2  in or around the swivel chair, it could be somewhere on

3  the swivel chair; correct?

4    A.    Yes.

5    Q.    Around the swivel chair.  What was around the

6  swivel chair?

7    A.    There was carpet, and we do know there was

8  some newspaper.  According to Mr. Amor, there was the

9  newspaper that he had, the Chicago paper.

10    Q.    And when you say in or around the swivel

11  chair, would that include the recently purchased items,

12  the linens and the packaging, that was behind the swivel

13  chair in the corner?

14    A.    Depending on how close those items were, yes.

15    Q.    Well, did you --

16    A.    Yes.

17    Q.    Are they in or outside your area of origin?

18    A.    They are actually a little bit -- they are

19  where Mr. Amor put the chair.  He put the chair closer to

20  those items.  So those items could have been ignited.

21    Q.    So you cannot exclude those items from your

22  area of origin; correct?

23    A.    The back portion I can.  There was still some

24  remaining, but the edge of those I could not.

1     Q.    The edge closest to the chair?

2     A.    Yes, the edge closest to the --

3     Q.    Okay.

4           So in terms of the first fuel ignited, it

5 could have been the chair in your opinion?

6     A.    The swivel chair?

7     Q.    Yes.

8     A.    Yes.

9     Q.    It could have been the carpet next to the

10 chair?

11    A.    No.

12    Q.    Why not?

13    A.    Carpet doesn't burn.  Carpet doesn't ignite.

14 Carpet will melt away from a fire.  It actually will

15 sustain combustion, if it has a continued heat.

16         But once you put a flame up to carpet, you

17 have to maintain the flame there.

18         In flashover we have that occur.  We have the

19 carpet ignite because the flames and the heat release

20 right from the fires that are attacking the radiant heat

21 occurs.  But a flame on a carpet will not ignite.  It's

22 designed not to do that.

23    Q.    What about the Chicago newspaper next to the

24 chair?

1     A.    Yes.

2     Q.    That will burn?

3     A.    Yes, that will.

4     Q.    And the leading edge or the closest edge of

5 that stack of recently purchased items and packaging

6 materials close to the swivel chair, will that burn?

7     A.    Yes, it will.

8     Q.    So the first fuel ignited could have been the

9 chair, a newspaper, the items recently purchased close to

10 the chair?

11     A.    Yes.

12     Q.    On the sliding door next to the swivel chair,

13 were there curtains or draperies on those?

14     A.    I can't recall.

15     Q.    So if they had curtains or draperies, could

16 that have been the first material ignited?

17     A.    No.

18     Q.    Why is that?

19     A.    The damage to the chair is not consistent

20 with the ignition of the curtains.

21     Q.    In talking about your investigation of this

22 fire, you mentioned that there's a structural beam in the

23 living room?

24     A.    Yes.  It's between the living room and the

1    hallway, the hallway/dining room.

2        Q.    How tall was that beam?

3            What's the height of it?

4        A.    I will have to look at my notes, but it would

5    probably be -- I think it was either 12 or 14 inches down

6    from the ceiling.

7        Q.    So about a foot?

8        A.    Yes.

9        MR. CARAHER:  And let me publish, your Honor, if I

10   may, Exhibit 71, which I believe is already in evidence.

11        THE COURT:  You absolutely may.

12          Let me just inquire in terms of timing.  Any

13   sense of how much longer -- and I don't want to limit it

14   in any way, but how much longer the cross of Agent Golder

15   might be?

16        MR. CARAHER:  We have a ways to go, your Honor.

17        THE COURT:  All right.  So let's hold the exhibit

18   back for a moment, and let's take a break.  And we'll

19   start this back up at 1:30.

20          And then off the record.

21              (Discussion off the record)

22        THE COURT:  Back on the record.

23          So we're going to reconvene back in courtroom

24   4000 at 1:30.

Jean M. Tartaglia, Official Court Reporter

1     MR. CARAHER:  Can we move our materials there now?

2  Do you know if it's open, available?

3     THE DEPUTY:  I have the key.

4     UNIDENTIFIED SPEAKER:  It's locked right now.

5     THE DEPUTY:  Excuse me.

6     UNIDENTIFIED SPEAKER:  The courtroom is locked.

7     THE DEPUTY:  Excuse me

8       I have a key.  We can do whatever you need to

9  do.

10    MR. CARAHER:  Thank you.

11    THE COURT:  I'd appreciate absolutely no commentary

12  at any point from the gallery.  Thank you.

13       So we'll see everybody in courtroom 4000 at

14  1:30.

15         (Lunch recess taken)

16    THE CLERK:  William Amor.

17    MR. SCALIATINE:  Jim Scaliatine and Thomas Minser

18  for people.

19    MR. CARAHER:  Kevin Caraher for Mr. Amor.

20    MS. THOMPSON:  And Cara Thompson,

21  Erica Nickels-Cook, Lauren Kaeseberg,

22  Lauren Myerscough-Mueller on behalf of Mr. Amor who's

23  present before the Court.

24    THE COURT:  All right.

Jean M. Tartaglia, Official Court Reporter

Pl. Amor 028256

1          Agent Golder, if you would resume the witness

2     stand, please.

3          AGENT GOLDER:  Okay.

4          THE COURT:  You remain under oath.

5          Mr. Caraher, when you're ready, you may resume

6     your inquiry.

7          MR. CARAHER:  Thank you.

8     BY MR. CARAHER:

9          Q.    Mr. Golder, before we broke for lunch, we

10    were talking about a structural beam.  You said it was

11    about a foot tall.  It extended down from the ceiling in

12    the apartment.

13         A.    Yes, it did.

14         Q.    Do you recall that?

15               All right.

16         MR. CARAHER:  Your Honor, I'd like to publish

17    defense exhibit 71, which I understand is already in

18    evidence.

19         THE COURT:  Yes.

20    BY MR. CARAHER:

21         Q.    Mr. Golder, this beam that you were talking

22    about, did it run from this little cutout extension on

23    the south wall of the living room and go across over to

24    the west wall of the kitchen?

74

1     A.    Yes.  I believe so.

2     Q.    Okay.

3           So as smoke rose in the living room, it would

4     fill this area, not only above the living room, but,

5     also, the area down the bedroom hallway; correct?

6     A.    Yes, it would.

7     Q.    And it would do that until it got to the

8     bottom lip of the beam, and then it would crossover into

9     the dining room area?

10    A.    Yes.

11    Q.    Thank you.

12          I think you said this morning that when the

13    fire department arrived at the site, the fire was not

14    being vented?

15          Did I get that correct?

16    A.    No.

17    Q.    Okay.

18          Can you explain what you meant?

19    A.    When the fire department, engine five, engine

20    two, rescue two arrived, they found heavy, dark smoke and

21    high heat in the actual -- in the building apartment when

22    they opened it.

23          When Firefighter Lynn did his 360 degree, he

24    found that the fire was venting through the glass doors,

Jean M. Tartaglia, Official Court Reporter

1    as far as the second floor went; and he was part of one

2    of those teams.

3            When exactly the glass broke, as far as when

4    the firefighters got there to when they started putting

5    -- open the ventilation, that time we're not sure of as

6    far as the opening of the door, did it get enough oxygen

7    when they opened the door to break out the window or did

8    the window break out at that time frame.

9        Q.    I think when you just referred to window,

10   you're talking about --

11       A.    I'm talking about the sliding door.  Yes,

12   sir.

13       Q.    So when the fire department arrived, were

14   those sliding doors open or closed?

15       A.    The sliding door was, based on the photos I

16   saw, the sliding door was opening about -- between six

17   and eight inches.  And when I talked to Mr. Amor, he said

18   that was common.

19       Q.    And what photos are you talking about?

20       A.    There's a video of the -- external video by a

21   witness.  I think it may have been an off-duty

22   firefighter that -- he's with his son, and he videotapes

23   the fire coming -- pouring out of the door.

24            At that time all the door, both the sliding

Jean M. Tartaglia, Official Court Reporter

Pl. Amor 028259

1     glass door and the frame and the sixth pane, have already

2     broken out and fire is coming out the -- at that.  You

3     can see the frame of the door there.

4          Q.     What time was it that Mr. Lynn,

5     Firefighter Lynn, made that observation?

6          A.     We don't know.  It was after his arrival.

7          Q.     Within seconds; ten minutes; half an hour?

8          A.     I would say within --

9          MR. SCALIATINE:  Objection, speculation.

10         MR. GOLDER:  -- a couple minutes.

11         THE COURT:  Overruled.  If he knows, he may answer.

12    BY MR. CARAHER:

13         Q.     Why would you say a "couple minutes"?

14                Are you speculating?

15         A.     Yes.

16         Q.     You, also, talked about some of the firemen

17    opening the door to an apartment and seeing a lot of

18    smoke inside and heat, and they broke out some windows.

19                The windows you're talking about are in the

20    front of the building; correct?

21         A.     They're in the stairwell.

22         Q.     They're in the stairwell in the front of the

23    building?

24         A.     Yes.

```
 1        Q.      And Apartment M was on the back side of the
 2   building?
 3        A.      Yes.
 4        Q.      So the windows they broke out after entering
 5   the apartment and then withdrawing are not in the
 6   apartment?
 7        A.      No, they're not.
 8        Q.      You, also, made a quick reference this
 9   morning to flashover occurring in the apartment.
10               Do you recall that?
11        A.      Yes, I do.
12        Q.      What time did flashover occur?
13        A.      I don't have the time.
14        Q.      That's important, isn't it, to the
15   ventilation effect and the burn patterns that would
16   result from the flashover?
17        A.      No.  The fact that we know flashover
18   occurred, we can see that flashover occurred, that's
19   important to the burn patterns.
20               As far as when it occurred, again, that would
21   be a speculation of after she called 9-1-1 but prior to
22   the fire department arriving.
23        Q.      Well, let's examine that.
24               You said flashover is when everything in the
```

Jean M. Tartaglia, Official Court Reporter

1  room reaches ignition temperature; correct?

2  　　　A.　　Yes.　A generic term.　Yes.

3  　　　Q.　　And the whole contents of the room becomes

4  engulfed; correct?

5  　　　A.　　Not necessarily, no.　Everything -- a fire --

6  a simply way that we try to teach it is a fire in a room

7  becomes a room on fire.

8  　　　　　　Everything needs to -- all items across the

9  horizontal surfaces will ignite.　They will reach their

10 ignition.　That's when carpet starts to degrade.　Carpet

11 can ignite.　The papers that are on top.　The boxes, the

12 couches, those will ignite.　They may not sustain

13 combustion.　It depends on ventilation occurring.

14 　　　Q.　　So if you were at ceiling level in the room

15 looking down, everything that you can see from above

16 would ignite and flashover?

17 　　　A.　　Would look like it, yes.

18 　　　Q.　　Okay.

19 　　　　　　And that's going to distort the burn patterns

20 that were already there?

21 　　　A.　　Oh, absolutely.

22 　　　Q.　　Making the original burn patterns harder to

23 identify?

24 　　　A.　　Harder but not impossible.

Jean M. Tartaglia, Official Court Reporter

1      Q.    And you said that flashover, although you

2  don't know a time, would have been after Marianne went

3  out into the hallway; correct?

4      A.    I believe so.

5      Q.    But before the fire department got there?

6      A.    Yes.  In that two-minute time frame before

7  they actually entered the apartment.

8      Q.    Okay.

9          Well, do you believe that flashover occurred

10  without the sliding glass doors being broken open?

11      A.    Prior to the sliding glass doors being --

12      Q.    Yes.

13      A.    Yes, I do.

14      Q.    You don't think flashover caused those glass

15  panes to shatter?

16      A.    They could have.

17      Q.    When Marianne came out of her bedroom and

18  entered the hallway, how far did she come out of the

19  bedroom?

20      A.    She didn't say.

21      Q.    You don't know?

22      A.    No.  We do not.

23  MR. CARAHER:  We'll put 71 up again, your Honor.

24  BY MR. CARAHER:

Jean M. Tartaglia, Official Court Reporter

1      Q.    If she came out of her bedroom right outside

2  her bedroom door and looked down the hallway, what could

3  she see?

4      A.    I assume she could just see straight down the

5  hallway.

6      Q.    And what's straight down the hallway from

7  where she was?

8      A.    The recliner chair.

9      Q.    From that location could she even see the

10  swivel chair?

11      A.    I don't know how far she went down the chair.

12  So I can't tell you what she saw.

13      But if she was right at that doorway, then,

14  no, she could not see the swivel chair.

15      Q.    And in order for her to see the swivel chair,

16  would she have to come down to where the hallway meets

17  the living room?

18      A.    Close to it.  Yes.

19      Q.    Okay.

20      And if she did that and the fire was

21  occurring in the swivel chair, why did she tell the

22  operator she couldn't get to the hallway door?

23      A.    I believe the recliner was on fire at that

24  time.

1      Q.      Very good.

2              Did you consider that the fire might have

3      started in the recliner, Marianne's chair?

4      A.      I looked at the damage to the recliner.  Yes,

5      I did.

6      Q.      And did Tina Amor tell the investigators that

7      she had been smoking is the apartment that evening and

8      that she had displaced her cigarette?

9      A.      Yes, she did.

10     Q.      And what time of the day was that?

11     A.      I don't recall.

12     Q.      Not that she told the investigators, what

13     time of the day was it that she lost track of her

14     cigarette?

15     A.      It was before she left.  They left at 20

16     minutes prior to the -- approximately 6:20, but I'm not

17     sure when -- I cannot recall when she said when she

18     discarded her cigarette.

19     Q.      Could she have, not discarded, but dislocated

20     her cigarette 35 minutes before she left the apartment?

21     MR. SCALIATINE:  Objection, speculation.

22     THE COURT:  Sustained.

23 BY MR. CARAHER:

24     Q.      How much of the cigarette was unburnt when

1    she lost track of it?

2        A.    I don't know.

3        Q.    Do you know where she was when she lost track

4    of it?

5        A.    No, I do not.

6        Q.    Are you aware of Tina Miceli's testimony last

7    week that her mother, Marianne Miceli, on the day of the

8    fire was smoking and that Marianne had fallen asleep in

9    her recliner that afternoon?

10       A.    No, I'm not.

11       Q.    Are you aware of her testimony that Tina

12   herself had been asleep on the floor; and when Tina woke

13   up and got up off the floor, she bumped into Marianne's

14   recliner, startling her awake?

15       A.    No, I'm not.

16       Q.    Do you know whether Marianne, at the time

17   that she fell asleep in that chair, was or was not

18   smoking a cigarette?

19       A.    I do not.

20       Q.    Is that a possibility as to the cause of this

21   fire that you did not eliminate?

22       A.    What?

23       Q.    Marianne smoking in her chair that afternoon

24   and losing her cigarette into the recliner.

83

```
 1        A.    In the recliner?

 2        Q.    Yes.

 3        A.    No.

 4        THE COURT:  No what?

 5        MR. GOLDER:  The damage to the recliner chair is not

 6  consistent with a cigarette ignition.

 7        MR. CARAHER:  I'd like to publish

 8  defendant's exhibit 99.  I understand this to be in

 9  evidence.  The State used it earlier.

10  BY MR. CARAHER:

11        Q.    This, sir, is a photograph of what?

12        A.    The recliner chair.

13        Q.    And it shows a lot of burning to it; does it

14  not?

15        A.    Some.

16        Q.    Okay.

17              How do you think that chair caught on fire?

18        A.    I think it was attacked by the fire from the

19  radiant heat from the ceiling and ignited the top of that

20  chair, and the chair was on fire when the victim saw the

21  chair and that the fire continued in that room; and it

22  burned that chair.

23              The damage in that chair is not consistent

24  with a cigarette because of what a cigarette has to do to
```

Jean M. Tartaglia, Official Court Reporter

Pl. Amor 028267

1    ignite a chair.

2        Q.    And you think that radiant heat caught this

3    chair on fire due to flashover or prior to flashover?

4        A.    Prior to flashover.

5        Q.    At that point in time was most of the -- did

6    most -- was most of the ceiling in the living room filled

7    with hot gases?

8        A.    Yes, it was.

9        Q.    And why then, if you have radiant heat coming

10   down from the ceiling, do you get preferential burning

11   right in the center of the top of the seat back?

12       A.    You get burning in the -- are you talking

13   about the rail across the top?

14       Q.    Yes, sir.

15       A.    You get the damage to the top, and then you

16   get the continuation of the burning throughout that --

17   throughout that chair, throughout the top of that chair;

18   and the fire continues to burn.

19       Q.    You said when you considered the possibility

20   that a cigarette got trapped in this chair and smoldered

21   for a while, that it would build an ever-increasing

22   crevice within the padding; is that right?

23       A.    Yes.

24       Q.    And you said if that had happened, we would

1    have found a hole in the seat; right?

2         A.    No.  You would have found damage consistent

3    with that.  There's nothing left to find a hole in this

4    chair.

5         Q.    Exactly.

6         A.    You would have found damage to the wood

7    consistent with that.

8              The fires that we have both set and that we

9    have investigated involving a cigarette, the damage to

10   that chair, the damage to the wood is always in that

11   chair.  It's always within that chair prior to it

12   breaking out.

13             Or when it does break out, we still have

14   extensive fire damage onto the arms, depending on if it

15   broke out on the sides, to the front, if it broke out in

16   the front, and we're not seeing the damage in that chair.

17        Q.    You crevice you talked about being expanded

18   by smoldering is in the foam, not in the wood?

19        A.    Exactly.

20        Q.    All right.

21             And this chair in this photograph is

22   post-flashover; right?

23        A.    Yes, it is.

24        Q.    And once you have flashover, or at least by

1    the time you have flashover, all of the seat  adding is

2    gone, the crevice is gone, consumed; there's nothing to

3    find?

4        A.    I'm not looking for the crevice.

5        Q.    Okay.

6              Looking at some photographs about the same

7    time as this exhibit 99, you were shown a photograph of

8    the cocktail table --

9        A.    Yes, I was.

10       Q.    -- in front of the sofa?

11             And you said there was more burning on the

12   west end of that cocktail table than the east end?

13       A.    Well, it had damage some of which was from

14   being broken.  Some of the damage was from actually

15   broken, whether or not that was firefighters or --

16       Q.    Okay.

17             But the consumption of the wood was greater

18   on the west end than the east end; correct?

19       A.    Yes.

20       Q.    But the west end was, also, the end closer to

21   the ventilation through the sliding doors; correct?

22       A.    Yes, it was.

23       Q.    And in reference to this photograph, you said

24   that if the fire had started in that recliner chair, that

Jean M. Tartaglia, Official Court Reporter

1    you would expect that the eastern end of the couch would

2    have caught fire due to radiation effects?

3          A.    We would have damage to the eastern -- we

4    would have more damage, that it is possible it could have

5    caught fire and more damage, not most damage, but more

6    damage than it did.

7          Q.    And yet, if the fire started in that chair,

8    you said that most of the heat was formed due to

9    convection rather than radiation?

10         A.    In the beginning stages of a fire, heat

11   transfers mode is mainly by convection.  But we, also,

12   have radiant heat effects that occur.

13              In this polyurethane chair, because of the

14   heat release rate of this polyurethane chair, we're going

15   to have lot of radiant heat that is occurring at the same

16   time of convection.

17         Q.    But only after flame breaks out; correct?

18         A.    Yes.

19         Q.    Not while it's smoldering?

20         A.    Oh, not while it's smoldering.  Only after

21   flame rate -- within the chair we're going to have

22   issues, but not behind the chair.

23         Q.    And if you have a cigarette caught in the

24   seat or underneath the seat of this chair, the convection

Jean M. Tartaglia, Official Court Reporter

1    is going to go up and the heat towards the ceiling above

2    the chair; correct?

3         A.    If we have -- repeat the question, please?

4         Q.    If the fire started in the seat of this

5    chair, the recliner, or underneath the chair, the

6    convected heat transfer is up towards the ceiling?

7         A.    The radiant heat is not up towards the

8    ceiling.  It actually is, but the radiant heat is mainly

9    towards the outside of the chair.  It's towards the couch

10   and the table.

11        Q.    But the heat produced by convection is

12   greater than the heat due to radiation?

13        A.    No.  It is not greater.

14              In early stages of fire, convection is the

15   most common mode of heat transfer.  Radiation still

16   occurs, particularly in a polyurethane chair that has a

17   heat release rate so great of a hot polyurethane chair.

18              The radiant heat effect is going to be,

19   especially near objects that will, also, ignite, is going

20   to be great.

21        Q.    Sir, I believe you, also, said this morning

22   that the fire was quickly extinguished and that entered

23   into your time element analysis?

24        A.    For ventilation purposes, yes.

Jean M. Tartaglia, Official Court Reporter

1      Q.      What did you mean by "quickly extinguished"?

2      A.      Once the firefighters opened the door, they

3  closed the door back, got regrouped, started venting out

4  the other side, another group then entered the apartment.

5  And as soon as they entered the apartment, they started

6  flowing water.

7          At that time we, also, have firefighters on

8  the outside saying that they're seeing water come

9  through.  We still have fire on the outside, but they

10  start seeing the water come through.

11          At that point in time, the heat release rate

12  of the fire, the steam conversion are now starting to

13  breakdown.  So that fire is really stopping the expansion

14  that it was going before.

15      Q.      When they open up a hose and start putting

16  water on the fire for the wet stuff on the red stuff,

17  that's just the beginning of the extinguishing process;

18  correct?

19      A.      Yes.

20      Q.      When was the fire extinguished?

21          How long did it take?

22      A.      We don't know.

23      Q.      Show you what's been marked as defense

24  exhibit number 116.

Jean M. Tartaglia, Official Court Reporter

1          Have you seen that document before?

2     A.     Yes, I have.

3     Q.     Can you identify what it is?

4     A.     This is a memorandum from the City of

5  Naperville.  It talks about the -- it's a summary of

6  pertinent information from the first portion of the

7  incident.  It's who was en route.  It's their fire

8  response.

9     Q.     And one of the firefighters testified last

10 week in this courtroom that they brought Marianne Miceli

11 out of the apartment before the fire was even

12 extinguished?

13    A.     Yes.

14    Q.     If you'd look at the notation around 6:59 in

15 the evening and see when it was that she was taken out.

16          Actually, I think I got that wrong.

17          It doesn't say when she was taken out.  It

18 has a notation around 6:59 in the evening that we will

19 soon bring her out.

20          What time was that?

21    A.     18:59:52.

22    Q.     So almost 7:00 o'clock exactly?

23    A.     Yes.

24    Q.     And they still had not brought her out of the

1    apartment?

2         A.    That's correct.

3         Q.    So they're still fighting the fire?

4         A.    They were fighting the fire the entire time

5    that they're doing the -- throughout the -- from the time

6    they get there until the time the fire is completely

7    extinguished, overhaul is completed.

8              Firefighters -- fire departments when they

9    call a fire under control, they do that when there are no

10   more flames.  It doesn't mean that the flame is

11   progressing -- still is progressing.  It means that, hey,

12   the fire is out; and we're just cleaning up.

13             As far as this -- them trying to find the

14   victim and putting the fire -- and starting to extinguish

15   the fire is the same.

16             As soon as they started putting, as you put

17   it, the "wet stuff on the red stuff," the fire is

18   starting to die down.  The steam conversion is occurring,

19   and the fire is controlled as far as the expansion; and

20   then they're going further in.

21             While they're doing that, another team are

22   actually going and doing the primary search.

23             They didn't do the secondary search until

24   well beyond this time, and they're still looking at hot

1    spots.

2        Q.    Sir, you weren't present at this fire?

3        A.    No, I wasn't.

4        Q.    So you are telling the Court what you

5    understand normally happens?

6        A.    Not only what I understand normally happens

7    but reading the firefighters' statements.

8        MR. CARAHER:  Well, the firefighters testified in

9    this courtroom.  We'll rely upon the Court to recall what

10   they testified about when the fire was extinguished.

11   BY MR. CARAHER:

12       Q.    Are you aware that Detective Guerrieri -- if

13   I pronounce that correctly -- testified that the

14   apartment was too hot for him to even enter until 8:00

15   p.m. that evening?

16       A.    I don't know.  I don't know about his

17   testimony from last week.

18       Q.    Is the overall methodology for determining

19   the cause of a fire the scientific method as described in

20   the basic methodology chapter of NFPA 921?

21       A.    Yes, it is.

22       Q.    Is it correct that fire cause determination

23   generally follows origin determination?

24       A.    Yes.  No.  Origin the -- Yes.  First we

Jean M. Tartaglia, Official Court Reporter

1     figure out the origin.  Then we figure out the cause.

2          Q.     Yes.  Thank you.

3               Do you agree that, generally, if the correct

4     origin is not identified, the subsequent cause

5     determination will, also, be incorrect?

6          A.     Yes.

7          Q.     And that, generally, a fire cause

8     determination can be considered reliable only if the

9     origin has been correctly determined?

10         A.     Yes.

11         Q.     Would you agree that fire cause determination

12    is the process of identifying the type and form of the

13    first fuel ignited, a competent ignition source, the

14    oxidizing agent, and the circumstances that allowed the

15    factors to come together to start the fire?

16         A.     As far as the first fuel ignited, no.  We

17    have to have a -- there are some instances in which you

18    cannot identify the first fuel ignited because it's been

19    destroyed.

20         Q.     Do you recognize the 2017 edition of

21    NFPA 921?

22         A.     Yes.

23         Q.     Would you read the second sentence in

24    section 19.1 into the record?

Pl. Amor 028277

```
1      A.      Fire calls determination is the process of a

2              identifying the first fuel ignited,

3              ignition source, the oxidizing agent and

4              the circumstances that resulted in the

5              fire.

6              Fire caused -- then it says exactly what you

7      said a second ago, fire calls generally follows origin

8      determination.

9              If you go into the fire cause chapter, it

10     discusses, actually, in the fire cause chapter, beyond

11     this, it actually discusses the fact that you will not

12     always have the exact first fuel ignited.  Sometimes that

13     is destroyed.  And that you can speculate.  You can look

14     at all the factors involved, the totality of the

15     circumstances, and not determining exactly the first fuel

16     ignited because a lot of times that --

17     Q.      Sir --

18     A.      -- ignition force is gone.

19     Q.      -- I didn't ask you about the next chapter.

20             I just asked whether you agree or disagree

21     with that second sentence that I had you read into the

22     record.

23     A.      Was that a question?  I'm sorry.

24     Q.      Yes.  It's a question.
```

Jean M. Tartaglia, Official Court Reporter

1          Did you agree or disagree with the sentence I

2    had you read into the record from NFPA 921?

3          A.    I disagree on the first fuel ignited, and

4    there is a caveat in this book about that, discussing

5    that.

6          Q.    All right.

7                I'm going to give you an easy question.

8                What was the oxidizing agent for the fire?

9          A.    The oxygen.

10         Q.    And the atmosphere in the room?

11         A.    Yes.

12         Q.    Thank you.

13               What was the ignition source?

14         A.    I do not know.  It was an open flame.  That's

15   all I can say, it was an open flame.  Whether or not the

16   open flame was a lighter, a match, I do not know.

17         Q.    What evidence is there that there was an open

18   flame?

19         A.    Either the evidence was taken with whoever

20   set this fire or the evidence was destroyed in the fire.

21         Q.    You don't have any evidence as to what

22   produced an open flame in your scenario; do you?

23         A.    No, I do not.

24         Q.    We talked earlier about the first fuel

```
 1     ignited, and you said it could have been the chair, could
 2     have been the newspaper, could have been the newly
 3     purchased items in packaging behind the chair.
 4              You don't know which one it was; correct?
 5     A.       Correct.
 6     Q.       Was there flammable liquid used in this fire?
 7     A.       I do not know.
 8     Q.       Is it possible then that a flammable liquid
 9     was the first fuel ignited?
10     A.       It is possible?
11     Q.       What were the circumstances that allowed the
12     ignition factors to come together to start the fire?
13     A.       A human, a person igniting any available
14     materials in that area.
15     Q.       That's conjecture; correct?
16     A.       That's my opinion.
17     Q.       Well, you don't know what the first fuel
18     ignited was; you don't know what the form of the ignition
19     was; you don't know what the factors are that caused
20     those elements to come together to ignite the fire, so
21     you're speculating that it was a human?
22     A.       Is that a question?
23     Q.       Yes.
24              Are you speculating that this fire was caused
```

Jean M. Tartaglia, Official Court Reporter

1    by a human?

2        A.      Based on the evidence, my opinion is that

3    this fire was caused by human hands.

4        Q.      And that's the evidence that you already told

5    us about?

6        A.      Yes.

7        Q.      Or the lack of evidence as to what the first

8    fuel igniter was, what the ignition source was, and the

9    circumstances as to how those elements came together,

10   that lack of evidence is what you call evidence

11   supporting your opinion?

12       A.      No, the lack of evidence --

13       MR. SCALIATINE:  Objection.

14       THE COURT:  Sustained.

15   BY MR. CARAHER:

16       Q.      Do you agree that simply identifying a fuel

17   or an ignition source by itself does not and cannot

18   describe how a fire came to be, fires results from the

19   interaction of fuel, an oxidant and an ignition source?

20       A.      I agree that -- yes.

21       Q.      Do you agree that any determination of fire

22   cause should be based on evidence rather than on the

23   absence of evidence?

24       A.      It should be based on the evidence, yes.

Jean M. Tartaglia, Official Court Reporter

```
 1        Q.      Rather than the absence of evidence; correct?
 2        A.      When you mean the absence of evidence --
 3   actually, what we need to do is based on the science.  We
 4   need to look at the fire and look at the science,
 5   testable theories.  We need to have a testable hypothesis
 6   in order to determine the cause of the fire.
 7             In some instances, the first fuel ignited and
 8   the material that which was ignited have been totally and
 9   completely destroyed.  And that we have to hypothesize
10   what those items could have been, and then see whether or
11   not these are testable theories that hold up to science.
12        Q.      So you still have NFPA 921 in front of you?
13        A.      Yes, I do.
14        Q.      Would you turn to section 19.4.4.3.
15        A.      19.4.4.3.  Yes.
16        Q.      And my question was simple:  Do you agree or
17   disagree that "any determination of fire cause should be
18   based on evidence rather than on the absence of
19   evidence?"
20        A.      However, if --
21        Q.      Answer the question.
22        MR. GOLDER:  Your Honor, there's actually --
23        THE COURT:  That's what redirect is for
24   Agent Golder.
```

1        AGENT GOLDER:  I'm sorry.

2        THE COURT:  It's a yes or no question.

3        MR. GOLDER:  Somewhat.  It is not a yes or no

4    question.  It cannot be a yes or no question because

5    there is a however.  There is a sentence prior to that

6    that discusses other items and the absence of such items.

7    So that question you asked me is out of the context of

8    the entire 19.4.3.

9    BY MR. CARAHER:

10        Q.      Let's give it a context.  Okay.

11                What's your understanding as to the doctrine

12    of negative corpus?

13        A.      Negative corpus is when you're ruling out, it

14    has untestable hypothesis.

15                Historic -- negative corpus came about when I

16    was on the committee.  We discussed this, decided to put

17    it in 921.

18                What -- a little bit of history about that

19    when we used to investigate fires, you have to -- people

20    just rolling things out.  There weren't testable

21    hypothesis.

22                When you don't have a testable hypothesis at

23    the end, you have negative corpus, when it's a

24    nontestable hypothesis.

1       When you still can roll out the --

2  investigating a fire is ruling out things.  We have to

3  rule out the weather.  We have to rule out the

4  electrical.  We have to rule out smoking.  We have to

5  rule out every possible choice, and we come up with a

6  final hypothesis.

7       That hypothesis still has to be testable.  We

8  still have to be able to test it, and it has follow

9  physics and fire dynamics.

10      When you don't have that, that's when you

11 have negative corpus which you should not use to

12 determine a fire.

13      When you can't -- when you say, well, I don't

14 care if it tests or not.  I'm still going to call it

15 this.

16      But in this instance, I still had a testable

17 hypothesis.

18   Q.    And the concept of negative corpus came out

19 in NFPA 921, as you said, when you were on the committee.

20   A.    Yes.  We discussed it several years before

21 that.

22   Q.    And after it came out, there was a lot of

23 uncertainty by fire investigators in the fire

24 investigation community as to what the concept was all

1    about?

2         MR. SCALIATINE:  Objection, relevance.

3         AGENT GOLDER:  Yes.

4         THE COURT:  Overruled.

5    BY MR. CARAHER:

6         Q.    And, therefore, section 19.6.5, which is the

7    section dealing with negative corpus which changed in the

8    2014 edition and changed, again, in the 2017 edition of

9    NFPA 921; correct?

10        A.    Yes, it was.

11        Q.    And the current condition defines negative

12   corpus as the identification of an ignition source for a

13   fire by believing to have eliminated all ignition sources

14   found, known or suspected to have been present in the

15   area of origin and for which no supporting evidence

16   exists; right?

17        A.    Yes.

18        Q.    And you eliminated, in your mind, the

19   weather, electrical, cigarettes; and so without any idea

20   what the first material ignited was or what the ignition

21   source was or what circumstances caused the factors to

22   come together to create a fire, you came to the

23   conclusion it must have been incendiary involving a

24   human?

Jean M. Tartaglia, Official Court Reporter

1        A.      By ruling out the other probable causes, yes.

2        Q.      Doesn't NFPA 921 state that, quote, in the

3   circumstance where all hypothesized fire causes had been

4   eliminated and the investigator is with -- is left with

5   no hypothesis, that is evidenced by the facts of the

6   investigation, the only choice for the investigator is to

7   conclude that the fire cause or specific causal factors

8   remains undetermined; it is improper to opine a specific

9   fire cause, ignition source, fuel or cause classification

10  that has no evidence to support it even though all other

11  such hypothesized elements were eliminated?

12       A.      That is true, but that is not this case.

13       Q.      Well, the Judge has heard the reasons behind

14  your opinions.

15              Sir, you identify an oxidizing agent for this

16  fire because it was readily available in that room, the

17  air, but you didn't identify the form or type of first

18  fuel ignited, the ignition source or the circumstances

19  which brought them together?

20       MR. SCALIATINE:  Objection, asked and answered.

21       THE COURT:  Sustained.

22  BY MR. CARAHER:

23       Q.      And I haven't gotten to the question yet, but

24  let's go on.

Jean M. Tartaglia, Official Court Reporter

Pl. Amor 028286

```
1              Regardless, sir, whether you correctly
2       determine the fire's origin, cause and classification or
3       not, you stated in belief in your written report that it
4       is unlikely that William Amor could have started the fire
5       because Tina Amor was the last person in the apartment
6       with Marianne Miceli; correct?
7            MR. SCALIATINE:  Objection.
8            THE COURT:  Overruled.
9            AGENT GOLDER:  Yes, I put that in my report.  Yes.
10      BY MR. CARAHER:
11           Q.    And that is based not only upon what
12      William Amor told you and the original investigators,
13      but, also, based upon what Tina Miceli told you the
14      investigators?
15           A.    Yes.
16           Q.    And William Amor could not have set the fire
17      after he left the apartment; correct?
18           A.    Based on the original statements that I read,
19      that's correct.
20           Q.    Sir, just very briefly, you were asked about
21      exhibits 64 and 65, two articles that you found, in which
22      some of -- couple of Mr. --
23           THE COURT:  Carpenter.
24           MR. CARAHER:  Thank you.
```

Jean M. Tartaglia, Official Court Reporter

BY MR. CARAHER:

Q.      -- Carpenter's slides came from.

Was any context provided to you about those slides?

Were you told how he made use of those slides?

A.      Not in one of the slides.  In the other slide I was.

Q.      Were you told that he was using those as illustrative diagrams to show that stabilization of flames by recirculating combustion products is a fundamental phenomenon not just with gas turbines but, also, with fires in general?

A.      No.

Q.      Is that a true statement, though?

A.      It's a simplistic form.  Repeat your question as far as --

Q.      Do recirculating combustion products lead to the stabilization of flames and fires?

A.      Recirculation can.

Q.      That's fine.

MR. CARAHER:  That's all, your Honor.

THE COURT:  Redirect.

REDIRECT EXAMINATION

Jean M. Tartaglia, Official Court Reporter

Pl. Amor 028288

1    BY MR. SCALIATINE:

2        Q.    Mr. Golder, you previously testified that you

3    reviewed a six-hour video of Ms. Miceli; correct?

4        A.    Yes.

5        Q.    And her statement to the police officer --

6    her statements to Detective Guerrieri and Assistant State

7    Attorney Michael Pawl, P-a-w-l, and in that video does

8    she discuss a timeline of when the defendant left and

9    when she left?

10       A.    In that she actually discussed -- she said

11   that she felt that they left together.

12       Q.    Or closer in time?

13       A.    Or close together.

14       MR. SCALIATINE:  No further committees.

15       THE COURT:  Anything back on that?

16       MR. CARAHER:  No, your Honor.

17       THE COURT:  You may step down.  Thank you.

18       AGENT GOLDER:  Thank you.

19       THE COURT:  Does the defense have any objection to

20   the introduction of People's 62, 64, 64 B and 65.

21       MR. CARAHER:  No, your Honor.

22       THE COURT:  Those are admitted.

23                       (People's Exhibits 62, 64, 64 B and

24                         65 admitted into evidence.)

Jean M. Tartaglia, Official Court Reporter

Pl. Amor 028289