<pre>
                                                          1

 1   STATE OF ILLINOIS   )
                         ) SS:
 2   COUNTY OF DU PAGE   )

 3          IN THE CIRCUIT COURT OF DU PAGE COUNTY
        FOR THE EIGHTEENTH JUDICIAL CIRCUIT OF ILLINOIS
 4
     THE PEOPLE OF THE          )
 5   STATE OF ILLINOIS,         )
                                )
 6              Plaintiff,      )
                                )
 7          -vs-               )   No. 95 CF 2075
                                )
 8   WILLIAM E. AMOR,           )
                                )
 9              Defendant.      )

10

11          REPORT OF PROCEEDINGS had at the hearing of the

12   above-entitled cause, before the Honorable LIAM C.

13   BRENNAN, Judge of the said Court, on Wednesday, the 14th

14   day of December, 2016, morning session.

15
        PRESENT:
16
            MR. ROBERT B. BERLIN,
17          State's Attorney of DuPage County, by
            MR. MICHAEL PAWL, and
18          MS. LISA HOFFMAN,
            Assistant State's Attorneys,
19
                Appeared on behalf of the People of the
20              State of Illinois;

21          MS. ERICA NICHOLS COOK,
            MS. LAUREN KAESEBERG,
22          MS. TARA THOMPSON,
            MR. KEVIN CARAHER,
23              Appeared on behalf of the Defendant;

24          WILLIAM E. AMOR.
</pre>

EXHIBIT 8

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

11

1                    JOHN DAVID DEHAAN,

2    a witness called on behalf of the Defendant herein, having

3    been first duly sworn, was examined and testified as

4    follows:

5                    DIRECT EXAMINATION

6                    BY MS. THOMPSON:

7        Q    Good morning, Dr. DeHaan.  Could you please

8    identify yourself for the record and spell your name for

9    the court reporter?

10       A    John David DeHaan, D-e-H-a-a-n.

11       Q    Dr. DeHaan, how are you currently employed?

12       A    I am presently the president of a private

13   consultancy firm Fire-Ex Forensics, Incorporated.  I am

14   the sole practitioner.

15       Q    Can you explain for the Court what it is that

16   Fire-Ex Forensics consults about?

17       A    Yes.  I consult on a variety of criminal and

18   civil cases, ongoing investigations from police, fire,

19   prosecutors, public defenders and private attorneys

20   representing a variety of subjects on, the focus is the

21   reconstruction and investigation of fires and explosions.

22       Q    Dr. DeHaan, can you please describe for the Court

23   your formal educational background?

24       A    Yes.  I have a bachelor of science degree with a

12

1    major in physics from the University of Illinois at

2    Chicago Circle.  I have a Ph.D. in forensic science from

3    the University of Strathclyde in Glasgow, Scotland.

4        Q    What year did you receive your Ph.D.?

5        A    1995.

6        Q    Besides your Bachelor's and your Ph.D., do you

7    have training in fire investigation and in fire science?

8        A    Yes, extensive training going back to about 1975

9    in various areas.  Most of that was provided by

10   professional organizations like the International

11   Association of Arson Investigators, the California

12   Conference of Arson Investigators, University of

13   Edinburgh, and a number of other providers.

14       Q    In addition to the providers that you just

15   listed, have you received training from the Bureau of

16   Alcohol, Tobacco & Firearms?

17       A    Yes, I did, when I was an employee.

18       Q    On what topics?

19       A    On actually it was a national response team

20   response training, and moot court training as well as fire

21   debris analysis.

22       Q    Do you have training from the National Center for

23   Forensic Sciences?

24       A    Yes, while I participated in a number of the

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

Pl. Amor 030006

13

1  workshop sessions that Center for Forensic Science

2  organized back in the '90s and early 2000s.

3      Q    I believe you said your training began in the

4  1970s.  Could you tell us over what years the training

5  that you received in fire investigation and fire science

6  occurred?

7      A    Yes.  While I was a criminalist at the Alameda

8  County sheriff's department crime lab I was --

9  instrumental analysis, I guess trace evidence analysis was

10  my responsibility, and that included fire debris analysis

11  for volatile accelerants as well as chemical analysis for

12  chemical incendiaries and explosive materials.  Probably

13  the first formal training was a workshop on fires and

14  explosions actually given by an ATF agent.  I think that

15  was 1972 or '73.

16      Q    Have you received training in the field of fire

17  science and fire investigation from 1973 up until the

18  present?

19      A    Yes.  I have participated in numerous

20  professional seminars and got to listen to a variety of

21  speakers from universities to National Institute of

22  Standards and Technology to the fire research station in

23  England as well as experts from Canada and Australia.

24      Q    So that was going to be my next question.  Do you

Pl. Amor 030007

14

1 attend conferences on fire science and fire investigation?

2     A     Numerous ones, yes.

3     Q     How many a year?

4     A     Oh, well, at one time I was probably attending

5 three or four.  I am down to about one at this time.

6     Q     Since you received your Bachelor's degree, have

7 you been consistently employed?

8     A     Yes.

9     Q     And has your employment been in any fields

10 besides the fields of fire science and fire investigation?

11     A     Yes.  I am a criminalist by training and

12 experience.  And as I said that includes trace evidence

13 and instrumental analysis as well as scene investigation.

14 And the positions I have held as a criminalist at the

15 county, state, and the ATF laboratory over the years has

16 included fire debris analysis, explosives analysis,

17 reconstruction of devices, incendiary explosive on a kind

18 of irregular basis but ongoing through those 40 years or

19 so.

20     MR. PAWL:  Judge, the People agree that this witness

21 can be qualified as an expert in the area of fire

22 investigation, fire science, no objection to the defense

23 submitting his curriculum vitae as an exhibit and being

24 admitted.

15

1    MS. THOMPSON:  Dr. DeHaan has an extensive CV, which I
2  do intend to admit into evidence, your Honor.  I don't
3  intend to go through all 50 pages of this.  I have a few
4  more questions to illustrate his expertise for the Court.
5  I appreciate the agreement, but I'm not going to spend two
6  hours qualifying him, your Honor, which would be a waste
7  of our time.

8    THE COURT:  You don't have to accept the stipulation.
9  You may proceed.

10    MS. THOMPSON:  Q  Dr. DeHaan, over the course of your
11  career have you worked for criminal justice agencies in
12  the state of California?

13    A    Yes, 29 years of law enforcement laboratory work,
14  four and a half years with Alameda County, nine years with
15  the California Department of Justice Sacramento Regional
16  Laboratory, four years with ATF what was then their
17  Western regional laboratory, eleven years back with the
18  California Department of Justice in what was called the
19  California Criminalistics Institute where my
20  responsibilities included training as well as consulting
21  on high profile cases.

22    Q    In total the employment that you just described,
23  over what years did you hold those jobs?

24    A    1970 to 1998.

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

16

1    Q    You mentioned that you were employed by the ATF.

2  Over what years did you work for ATF?

3    A    1983 to 1987.

4    Q    What did you do for the ATF during those years?

5    A    I was, I think my official title was physical

6  scientist.  And I was responsible for the analysis of fire

7  debris and explosives analysis, reconstruction of

8  explosive devices, and whatever analyses were necessary

9  including physical analysis and testing.

10    Q    Following your employment with the ATF in 1987,

11  what did you do next for employment?

12    A    I went back to the California Department of

13  Justice when they started a criminalistics institute that

14  provided training to bench criminalists as well as

15  investigators in both laboratory techniques and scene

16  investigation in a variety of topics.  I taught, I created

17  courses in the analysis of low explosives, fire debris

18  analysis, microscopy of various materials, hair

19  identification, and latent fingerprints.

20    Q    When you concluded that employment what did you

21  do next?

22    A    I retired from the California Department of

23  Justice in December of 1998, and started my own

24  consultancy in January of 1999.

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

Pl. Amor 030010

17

1    Q    What was the name of the consultancy that you

2  started in 1999?

3    A    Fire-Ex Forensics, Incorporated.

4    Q    And you mentioned this to the Court before, but

5  on what kinds of cases does Fire-Ex, have you consulted on

6  with Fire-Ex Forensics since it began in 1999?

7    A    All manner of fires and explosions accidental as

8  well as intentional, sometimes fire risk assessment, and a

9  great deal of work on fire death investigations.

10   Q    For what kinds of clients have you consulted in

11 your private consulting career?

12   A    Police, fire agencies across the U.S. and

13 overseas, prosecutors across the U.S. and overseas, and

14 private attorneys, public defenders, and sometimes private

15 attorneys and in a few cases actually retained by the

16 people involved, the clients.

17   Q    In the course of your career have you won any

18 awards?

19   A    Yes.  I am a life member of the California

20 Association of Criminalists.  I won an award from the

21 Forensic Science Society in the UK for a paper on

22 destruction of bodies and fires, or I should say the

23 effects of fire on bodies.  And awards from the California

24 Association of Criminalists for a couple of papers that I

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

Pl. Amor 030011

18

1   presented and published.

2       Q     What current certifications do you hold?

3       A     I am a certified fire investigator under the

4   auspices of the International Association of Arson

5   Investigators.  I also have certification, certified fire

6   and explosion investigator from the National Association

7   of Fire Investigators.  I have a diploma in fire

8   investigation from the what's now the Chartered Society of

9   Forensic Sciences in the UK, and one from the Institution

10  of Fire Engineers in the UK.

11      Q     Are there any current fellowships that you hold

12  that you haven't already described to the Court?

13      A     Well, I am a Fellow of the Institution of Fire

14  Engineers and a Fellow of the Chartered Society of

15  Forensic Sciences.

16      Q     Dr. DeHaan, are you currently a member of any

17  professional organizations?

18      A     Numerous, yes.

19      Q     Are you currently a member of any professional

20  organizations that relates to your work in fire science

21  and fire investigation?

22      A     Yes, I am still an active member of the

23  International Association of Arson Investigators.  I am

24  actually a life member of the California Conference of

Pl. Amor 030012

19

1    Arson Investigators.  And I am still a member of the

2    National Fire Protection Association, and the American

3    Society of Testing and Materials.

4         Q    Other than what you have already described for

5    the Court, have you taught in the course of your career in

6    the field of fire science and fire investigation?

7         A    Extensively, yes.

8         Q    Have you taught in any institutions of higher

9    learning on those topics?

10        A    Yes.  Most recently I taught a course in arson

11   investigation at the University of California at Davis in

12   basically a ten week course in the Master's in forensic

13   science program.  I have also taught at the University of

14   New Haven when they held a California division or

15   extension.  And I think that's probably it for

16   universities.

17        Q    In the course of your career have you conducted

18   trainings for law enforcement or municipalities in the

19   field of fire science and fire investigation?

20        A    Yes, probably a couple hundred times on different

21   topics and different countries.

22        Q    Have you written in the field of fire science and

23   fire investigation?

24        A    Yes, I have.

Pl. Amor 030013

20

1     Q    How many articles?

2     A    Oh, there's probably 30 or so peer reviewed

3 papers over the years on various topics, and probably 50

4 or so nonpeer reviewed technical papers.  I am also the

5 author of the primary textbook on fire investigation,

6 Kirk's Fire Investigation.  I've been author of that since

7 1982.  And I am the co-author of a companion textbook

8 entitled Forensic Fire Scene Reconstruction.

9     Q    Can you describe what you mean by Kirk's Fire

10 Investigation being a primary text in your field?

11     A    Yes.  It's widely used in professional training

12 as well as a textbook in college training of forensic

13 programs.

14     Q    Do you have a co-author on Kirk's Fire

15 Investigation?

16     A    I do now, yes.  As of the 7th edition Dr. David

17 Icove is my co-author.

18     THE COURT:  Spell that for the record.

19     A    I-c-o-v-e.

20     MS. THOMPSON:  Q  Dr. DeHaan, as part of your work in

21 fire investigation and fire science, have you conducted

22 any live testing that relates to those topics?

23     A    Yes, a great deal.

24     Q    Can you explain for the Court what live testing

Pl. Amor 030014

21

1   means in the context of fire science and fire

2   investigation?

3        A    Yes.  It covers the range from laboratory bench

4   scale tests of materials, ignition processes and heat

5   release rate measurements and things like that to larger

6   scale tests including of furnished rooms or cubicles

7   simulating full size rooms, in some cases outdoor fire

8   tests, and also entire buildings basically as training

9   opportunities for fire investigators, but I and my fellow

10  instructors organize the students.  They help set up, in

11  most cases they actually help set up the test.  They watch

12  the fire.  They can gather visual information about times

13  and detection and smoke and things like that.  After it's

14  extinguished and cooled then they are allowed to go in as

15  teams to investigate and from that they learn what

16  survives and what does not and what patterns do and do not

17  look like.  And so it covers a wide range of exposures.

18       Q    Have you conducted live testing that supported a

19  publication that you have done in the area of fire science

20  and fire investigation?

21       A    Yes.  Actually a great deal of what's in the

22  various editions of Kirk's and the reconstruction book as

23  well as my peer reviewed papers has been based on the

24  testing that I've been able to do since 1974.

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

Pl. Amor 030015

22

1    Q    How many live tests related to fire science and
2  fire investigation have you conducted over the course of
3  your career?
4    A    Well, it would be hard to put an exact, it would
5  be impossible to put an exact figure on it.  I think the
6  last approximation was I have set or caused to have set
7  something on the order of 600 or so structure related
8  fires, 150 or so vehicle fires, and countless laboratory
9  scale bench tests.
10   Q    Has your involvement in live testing continued
11 since you moved into the role as a consultant in this
12 field?
13   A    Oh, yes, very much.  It's part of many of the
14 seminars that I teach in.
15   Q    Has any of the live testing that you have
16 conducted in your career related to or involved
17 cigarettes?
18   A    Yes.
19   Q    Has any of the live testing that you conducted in
20 your career related to or involved furniture?
21   A    Yes, a great deal of it.  I worked with the
22 California Bureau of Home Furnishings, and their three
23 primary researchers on ignition properties of furniture
24 and looking at flammability standards, but also the

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

Pl. Amor 030016

23

1  resistance of various kinds of furniture to various kinds

2  of ignition as well as how big a fire one generates from a

3  single piece of furniture, for instance, and how much of

4  it will burn under different ventilation conditions and

5  also how big the fire is and how long it will burn.

6      Q    Dr. DeHaan, over the course of your career on how

7  many cases have you provided expert analysis in the field

8  of fire science and fire investigation?

9      A    I've really only been keeping track the last 20

10  years or so.  There's probably over 100.

11      Q    How many times have you been accepted in a court

12  in the United States as an expert witness in a field

13  related to fire science and fire investigation?

14      A    That would be about the same, well, fewer than

15  the 100 estimate because some of those were overseas.

16      Q    Have you been qualified as an expert witness in

17  the State of Illinois prior to your appearance in this

18  case?

19      A    Yes, I have.

20      Q    In what counties have you been qualified as an

21  expert witness in Illinois?

22      A    Kankakee and Cook, that may be it.

23      Q    In the course of your career as a consultant have

24  you consulted for prosecutors' offices?

Pl. Amor 030017

24

1       A       Numerous times.

2       Q       And for criminal defense counsel as well?

3       A       Numerous times.

4       Q       In your career in the criminal cases that you

5    have worked on have you consulted more for prosecutors or

6    more for defense counsel, or what has been the ratio?

7       A       Well, in the 29 years I worked for public safety

8    agencies virtually all of those were I testified at the

9    request of either the investigator or the local district

10   attorneys.  There were a couple of occasions where I

11   actually ended up testifying for the defense in some of

12   those cases.  Since I started my own practice it's evolved

13   a bit, but at this point it's probably about 50/50 of the

14   cases I end up testifying for the prosecution or for the

15   defense.

16      Q       Dr. DeHaan, have you ever not been accepted as an

17   expert witness in a case in which a party has tendered you

18   as such a witness?

19      A       No.

20      Q       Have you ever provided expert consultation on a

21   case in which the exoneration project, my organization,

22   represented a party that was adverse to the party for

23   which you had been retained?

24      THE COURT:  I apologize, I don't understand the

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

25

1    question.

2        MS. THOMPSON:  Your Honor, let me ask a better

3    question, and I apologize.

4            Q   Were you retained by Cook County in the case

5    of James Kluppelberg?

6        A    Yes, I was.

7        Q    Was that a case in which my organization, the

8    exoneration project, represented the party that was

9    adverse to Cook County?

10       A    Yes.

11       Q    In total in your career have you investigated

12   fires that involved multi-unit residential buildings?

13       A    Yes.

14       Q    How many?

15       A    I have no idea, dozens perhaps.

16       Q    In total in your career have you investigated

17   fires where the fire went to flashover?

18       A    Numerous times, yes.

19       Q    Have you investigated fires in the course of your

20   career that involved structures that had sliding glass

21   doors?

22       A    Yes, I have.

23       Q    How many?

24       A    Probably a dozen or so over the years.

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

26

1       MS. THOMPSON:  Your Honor, may I approach the witness?

2       THE COURT:  Continuing permission to approach.

3       MS. THOMPSON:  Thank you.

4           Q  I am showing the witness what's been marked as

5  Defendant's Exhibit 13.  I am going to ask you to look at

6  Defendant's Exhibit 13, Dr. DeHaan, I am going to ask you

7  if that is a current copy of your CV?

8       A   Yes, it is.

9       Q   Is Defendant's Exhibit 13 a true and accurate

10  copy of your CV, sir?

11      A   Yes, this is the version that I prepared in

12  November of this year.

13      MS. THOMPSON:  Your Honor, I would offer Defendant's

14  Exhibit 13 into evidence.

15      THE COURT:  Admitted.

16      MS. THOMPSON:  With that, your Honor, I would tender

17  Dr. DeHaan as an expert in fire investigation and fire

18  reconstruction.

19      THE COURT:  State.

20      MR. PAWL:  No objection, Judge.

21      THE COURT:  The Court finds that Dr. DeHaan is an

22  expert in fire investigation and fire science.  Any other

23  expertise as you wish me to qualify him in?

24      MS. THOMPSON:  I think fire reconstruction, your

Pl. Amor 030020

27

1    Honor.

2         THE COURT:  And fire reconstruction.

3         MS. THOMPSON:  Thank you, your Honor.

4              Q    In this case, Dr. DeHaan, you were retained by

5    the defense to consult in the case for which Mr. Amor

6    stands convicted, correct?

7         A     That is correct.

8         Q     You are being paid for your work in this case?

9         A     Yes, I am.

10        Q     What is the hourly rate at which you're being

11   paid?

12        A     For public agencies the office rate is $200 an

13   hour for analysis, report, testimony, hundred dollars an

14   hour for travel.

15        Q     Do you know how many hours you devoted to this

16   case so far?

17        A     I think when I closed the file out last Friday it

18   was about 37 hours of analysis and report time and about

19   seven hours of consultation.

20        Q     Do you have any expectation of being provided any

21   honorariums or funds beyond the hourly rate that you just

22   described?

23        A     Just compensation or reimbursement for travel

24   expenses.

Pl. Amor 030021

28

1    Q    In your work on this case have you reviewed

2  materials related to Mr. Amor's case?

3    A    Yes, I have, extensive.

4    Q    I am approaching the witness and showing him

5  what's been marked as Defendant's 14.  Dr. DeHaan, is

6  Defendant's 14 a copy of a report that you prepared in

7  this case dated August 31st of 2016?

8    A    Yes, it is.

9    Q    And does the report that you are looking at list

10  the materials that you reviewed in your assessment in this

11  case?

12    A    Yes, some 70 exhibits that were received, one

13  that I created, the weather reports for the area, and

14  actually a video I saw for the first time this morning.

15    Q    What is the video that you saw for the first time

16  this morning?

17    A    It was a walk through of the apartment after the

18  fire.

19    Q    Other than the walk through of the apartment

20  after the fire is there anything else that you reviewed

21  related to this case that is not listed on Defendant's 14?

22    A    No.

23    Q    Generally speaking, did the materials that you

24  reviewed in this case include police reports?

29

1    A    Yes.

2    Q    Did it include reports from the medical examiner

3  and toxicology reports related to the death of the person

4  who passed away in this fire?

5    A    Yes.

6    Q    Did it review, did it include reports from the

7  Illinois state fire marshal?

8    A    Yes.

9    Q    And trial testimony?

10    A    Yes.

11    Q    And I think you said you reviewed video from the

12  fire scene?

13    A    Yes.

14    Q    Did you review other photographs and video

15  related to the fire scene?

16    A    Yes, I did.

17    Q    What are the, you testified there were weather

18  reports that you created.  Can you explain what those

19  were?

20    A    Yes.  As a matter of routine when I open a case I

21  actually go to Weather Underground, a regrettable name for

22  a pretty useful service, but I go to their website and

23  look up whatever closest airports or reporting stations I

24  can find to the scene to see what the weather conditions

Pl. Amor 030023

30

1 were like, temperatures, especially wind conditions and

2 things like that in case they bear an effect on the

3 behavior of the fire.

4     Q    What airports' weather records did you look at

5 related to this case?

6     A    In this case I have one from Midway and one from

7 DuPage County.

8     Q    Did you also review as part of your review of

9 materials in this case statements from witnesses and

10 statements from the defendant in this case?

11     A    Yes, I did, including the fire service personnel

12 that attended.

13     Q    As part of your work in this case did you attempt

14 to visit the scene where this fire occurred?

15     A    I drove past it, and just to see if the building

16 looked the same as it did in the investigative

17 photographs.

18     Q    But you haven't been inside the building?

19     A    No, I have not. I did not have legal authority

20 to enter.

21     Q    Are there any materials that you wanted to review

22 to conduct your assessment in this case that you weren't

23 able to review?

24     A    Yes. It was my understanding that there was a

Pl. Amor 030024

31

1  photographic log produced by one of or prepared by one of

2  the police investigators present.  I have not been able to

3  locate that.

4      Q      Anything else besides that photographic log that

5  you wanted to review and weren't able to see?

6      A      Not that I can recall, no.

7      Q      Why did you want to see that photographic log?

8      A      Well, I was presented with a large number of

9  photographs, and they basically were reprints.  There were

10 no captions or descriptions associated with them.  And I

11 was hoping to find a log that would describe when and

12 where each of those photographs was taken.

13     Q      Did your inability to see that photographic log

14 impact your ability to reach opinions in this case?

15     A      It complicated the analysis, but I was ultimately

16 able to identify a number of the critical photographs and

17 use them, yes.

18     THE COURT:  May I just inquire, did you see a

19 reference to a log that actually existed or you would have

20 liked to see a log?

21     THE WITNESS:  A  Actually both.  There was a mention

22 in the police notes that Officer Goerger created the log

23 as his colleague took the pictures and so I thought there

24 was one, but it has not been found.

Pl. Amor 030025

32

1      MS. THOMPSON:  Dr. DeHaan, have you reached opinions

2  in this case to a degree of scientific certainty that is

3  accepted in the field of fire science and fire

4  investigation?

5      A    Yes, I have.

6      Q    Just so we all understand when I am talking about

7  this case we're talking about the fire that occurred on

8  September 10th in 1995 for which Mr. Amor stands

9  convicted.  Do you understand that's what I am referring

10  to?

11      A    Yes, I do.

12      Q    And on what do you base the opinions that you

13  have reached in this case?

14      A    Well, basically applying the, my normal method of

15  analysis, collecting all of the available data, and

16  extracting information about what was present at the

17  scene, how much damage was done from the photographs and

18  the descriptions, what the behavior was like from the

19  witnesses including the fire service personnel, and seeing

20  what laboratory analyses and other supporting documents

21  might offer.

22      Q    I take it too that your opinions in this case are

23  also based on your training and your experience in the

24  field of fire investigation and fire reconstruction?

Pl. Amor 030026

33

1    A    Oh, yes.

2    Q    I am going to ask you a number of questions about

3 your opinions in this case. Is the testimony that you are

4 going to provide about these opinions testimony that is

5 given to a reasonable degree of scientific certainty as

6 accepted in the field of fire investigation and fire

7 reconstruction?

8    A    Yes, it is.

9    Q    I want to ask you some questions now about your

10 opinions then, Doctor. As part of your review in this

11 case I think you testified earlier that you did review

12 testimony from Mr. Amor's trial?

13    A    Yes, I did.

14    Q    Did that include testimony from fire

15 investigators?

16    A    Yes, it did.

17    Q    And the fire in Mr. Amor's case was in 1995; is

18 that right?

19    A    Yes.

20    Q    It's your understanding his trial occurred in

21 1997?

22    A    Yes.

23    Q    Did you review testimony from a Lieutenant David

24 Ferrari?

Pl. Amor 030027

34

1     A     Yes, I did.

2     Q     What was your understanding from the trial

3  testimony that you reviewed as to what Lieutenant

4  Ferrari's opinion was about the cause and the origin of

5  the fire in this case?

6     A     He concluded the fire was started in the

7  northwest corner of the apartment in the vicinity of a

8  swivel rocker, swivel chair, I should say.

9     Q     You just testified it was northwest corner, was

10 it the southwest corner?

11    A     Yes, I'm sorry.

12    Q     Do you recall what was in the northwest corner of

13 the apartment in this case?

14    A     Yes, there was a television, well, a VCR shelf

15 unit and a shelf unit of videotapes.

16    Q     Lieutenant Ferrari did not give the opinion that

17 it started in that area where the television set was?

18    A     That's correct.

19    Q     Did you also review trial testimony from a

20 Special Agent Kushner?

21    A     Yes, I did.

22    Q     What is your understanding of the opinion that

23 Special Agent Kushner offered about the cause and the

24 origin of the fire in this case?

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

Pl. Amor 030028

35

1      A      It's my understanding that he opined that the

2  fire was started in or near the swivel chair in the

3  southwest corner of the apartment with the assistance of

4  an ignitable liquid, that form would be vodka, and an open

5  flame ignition source.

6      Q      Dr. DeHaan, are you familiar with the state of

7  fire science as it existed in 1995?

8      A      Very.

9      Q      You are also familiar with the state of fire

10  science as it existed in 1997?

11      A      Yes.

12      Q      Has the state of fire science changed between

13  1995 and today?

14      A      Yes, it has.

15      Q      Can you explain for the Court how it is that this

16  field of science has changed?

17      A      There's been a vast improvement in the scientific

18  knowledge base of the investigators about the behavior and

19  nature of fire, the ignitability of materials, the nature

20  of fire spread, the role of fuels and ventilation in

21  controlling the growth and intensity of fires, especially

22  in compartments.

23      Q      Have there been any other changes in the field of

24  fire science between 1995 and today?

Pl. Amor 030029

36

1      A     Well, yes.  As of 1995 there was really no

2   general guidance that was widely accepted in the fire

3   investigative community.  In 1992 the National Fire

4   Protection Association issued its first version of the

5   guide to fire, the Investigation of Fires and Explosions,

6   that's NFPA 921.  That was introduced to the fire

7   investigation community, but it did not have a great deal

8   of traction or acceptance by large portions of the

9   community.  And it was basically the aftermath of the

10  Daubert decision in 1993 that technical experts including

11  fire investigators were expected to apply science

12  correctly to their investigations and their

13  reconstructions and their conclusions.

14      Q     I want to ask you some questions about NFPA 921,

15  but let me ask you this question first.  You described

16  some of the changes in the field of fire science between

17  1995 and today.  Was there a corresponding change in the

18  training of fire investigators and arson investigators

19  between 1995 and today?

20      A     Yes.  The training has basically grown from just

21  case study examples to a lot more science presented by

22  qualified scientists and engineers in the fire field.

23      Q     In 1995 what was the background that most fire

24  investigators in the United States had?  By background I

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

37

1  mean training and formal education to do their jobs as

2  fire investigators?

3      A    Most of them were high school graduates, and with

4  some exposure to fire science and fire behavior in their

5  training as firefighters, and very little in the way of

6  actual hard science, and the application of that

7  scientific knowledge or that scientific database to the

8  interpretation of reconstruction of fires.

9      Q    Has that background changed for people who work

10  as fire investigators today?

11     A    Yes, over the years it has changed.  More

12  investigators have college level training in the science

13  and engineering aspects of fire.  And there are some

14  actual higher educational facilities that provide training

15  in fire investigation.  There was I guess you can call it

16  a companion publication from the NFPA entitled

17  Professional Qualifications for Fire Investigators that

18  NFPA actually created I think in 1987 was the first

19  edition.  Very few fire investigators were aware it

20  existed, but it actually laid out the educational

21  preparation that a fire investigator either public or

22  private should have to meet the job qualifications as a

23  fire investigator.  And that's evolved since it was

24  introduced.  And more and more people, more and more fire

Pl. Amor 030031

38

1  investigators are made aware of those requirements and

2  there is a concerted effort to improve that training to

3  meet those requirements.  In fact I have helped produce

4  some of those seminars to improve the knowledge based on

5  those topics.

6      Q    For fire investigators that were working in 1995,

7  you mentioned that and I don't want to misstate your

8  testimony, you testified that many of those individuals

9  had high school diplomas, and had been firefighters who

10  then became investigators; is that right?

11      A    That's correct.

12      Q    In 1995 what was the common way for people to

13  receive training as fire investigators?

14      A    Most common training was they were basically

15  trained by their senior investigators that they would be

16  brought into a field on basically an apprentice master

17  program and they would accompany the lead investigator to

18  scenes and they would offer whatever guidance they could

19  to the junior member.  There are of course a lot of

20  investigators even in 1995 who were getting supplemental

21  education from their professional organizations.  Like in

22  Illinois there's a number of regional fire investigator

23  organizations, many of whom I have actually lectured for.

24  And there's the Illinois Fire Academy at Urbana.  And so

MARIE R. JAKUBIEC  CSR LICENSE NO. 084-001117

Pl. Amor 030032

39

1   there are a number of investigators who have even in 1995

2   who had those additional qualifications.

3       Q   You mentioned NFPA 921 in your testimony a minute

4   ago.  I take it from your mention of NFPA 921 that you are

5   familiar with that publication?

6       A   Very.

7       Q   How are you very familiar with NFPA 921?

8       A   I was actually on the NFPA technical committee

9   responsible for it for about nine years.  Some time about

10   1990 I was invited to join that committee, and I was on it

11   until early 1999.

12       Q   So were you involved in the drafting of the first

13   version of NFPA 921 in 1992?

14       A   Yes.  It was well along, but I was involved in

15   that edition.

16       Q   And I think you testified that when NFPA 921

17   first came out that it didn't have traction or acceptance,

18   I believe was your testimony.  Can you explain what that

19   means?

20       A   The practicing fire investigators at the time did

21   not see the need for such educational background because

22   they argued that those court decisions applied to science

23   based investigations, and that fire investigation was more

24   an art than a science and therefore science didn't really

40

1    or scientific requirements didn't apply to them as

2    investigators.  And that's one of the reasons why the 921

3    guide encountered resistance actually from many portions

4    of the investigative community.

5        MR. PAWL:  Judge, I do have an objection.  It's

6    somewhat cumulative to testimony that's already been

7    received by the Court.

8        THE COURT:  Overruled.

9        MR. PAWL:  The only other part of the objection, and I

10   certainly appreciate the historical background, I think

11   the focus should be with respect to the investigators who

12   testified.

13       THE COURT:  The problem with that is that in my ruling

14   for purposes of allowing this, allowing the petitioner to

15   file an actual innocence petition I allowed it, but I did

16   not conclude one way or the other whether in fact what's

17   being proffered was new science or new.  So it seems to me

18   it's particularly relevant in that context so it's

19   overruled.

20       MS. THOMPSON:  Q  You mentioned the Daubert decision

21   as being part of this evolution in the field of fire

22   science?

23       A    Yes.

24       Q    The Daubert decision you said was in 1993?

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

41

1    A    That's the date I associate with it, yes.

2    Q    Following that in 1993 was it the case that

3  immediately fire investigators began applying science to

4  the work that they were doing in fire investigation?

5    A    No.  The predominant feeling among practicing

6  fire investigators, as it was explained to me, was that

7  that ruling only applied to real science, and what fire

8  investigators were doing wasn't real science.  So

9  therefore they were not expected to meet the same

10 standards of information quality, shall we say, that the

11 scientists were.  And it took a couple more case law

12 decisions to emphasize the fact that no opinion testimony

13 offered by fire investigators did include science and that

14 they need to pay attention to that area of knowledge.

15   Q    Can you point to a date for when NFPA 921 was

16 accepted by the fire investigation community in the United

17 States?

18   A    Not really because it varied a lot as I lectured

19 across the country in that time frame, that some

20 organizations adopted it fairly early on by the mid 1990s.

21 Others seemed to resist it beyond probably into maybe 2000

22 or so, in that time frame, '98, 2000.  Now it's widely

23 accepted.

24   Q    Do you know when NFPA 921 became widely accepted

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

Pl. Amor 030035

42

1  in Illinois?

2      A    No, I do not.

3      Q    Going back to NFPA 921 itself, in 1995 was NFPA

4  921 something that fire investigators were required to

5  follow?

6      A    No.

7      Q    And is it true today that fire investigators are

8  required to follow NFPA 921?

9      A    Well, not really.  There is an expectation from

10  the client that the work an investigator does is

11  defensible, according to current standards.  And so that's

12  where the pressure comes from is that an investigator

13  today if they are conducting an investigation that does

14  not follow the general guidelines and that's why it is a

15  guide not a code with sequential steps that must be

16  followed, that if they do not follow the guidance of 921,

17  then the reliability of their expert conclusions can be

18  challenged or is more likely to be challenged.

19      Q    Can you explain what you mean to the Court that

20  NFPA 921 is a guide and not a code?

21      A    Yes.  Well, the problem that 921 addresses has an

22  infinite number of variables, not only what was on fire,

23  but or what was involved in the fire, possible ignition

24  sources, different sets of circumstances, time frames and

43

1   things like that, as well as the target materials, sorry,

2   the target properties, whether it was a virulent fire or a

3   vehicle fire or a structure fire or limited to a single

4   piece of furniture or some combination thereof.

5          So as a result you really can't cover everything

6   by basically a cook book that you shalt do this and you

7   have to do that next and then you have to do this.  It's

8   mostly a matter of the variables you realize what your

9   obligations are to collect proper data, and then create

10  the possible hypotheses that might apply to this

11  situation.  Then test those hypotheses against the

12  available data.  See if one hypothesis has significant

13  support and then test that against other possible sources

14  of data back and forth until you have a conclusion about

15  the cause and origin of an event that withstands

16  reasonable challenge, and does not conflict with the

17  available data.

18      Q    Is it widely accepted in the field of fire

19  investigation and fire reconstruction today that fire

20  investigators will use the scientific method that you just

21  described in investigating fires?

22      A    Yes.  That's really kind of the thrust of 921 and

23  as well as my textbooks is what's generally labeled as the

24  scientific method as a structure of reliably evaluating

Pl. Amor 030037

44

1　events, collecting data, evaluating that data and testing

2　those hypotheses and coming to a defensible supportable

3　conclusion.  And yes, the shorthand for that is the

4　scientific method.

5　　　Q　Was it widely accepted in 1995 that fire

6　investigators needed to apply those methods in

7　investigating fires?

8　　　A　Well, there were professional expectations in

9　most agencies that an investigator needed to accomplish

10　those goals.  It was not organized as a scientific method

11　approach in most areas.  It was organized that way in my

12　textbook, but my textbook was the only one for many years

13　that was actually written by a scientist rather than a

14　fire investigator or detective.  And so it was organized

15　around science and engineering knowledge and how that

16　applied to the fire explosion investigator.

17　　　Q　Well, so your testimony is that there were

18　expectations in certain agencies that that's what fire

19　investigators would be doing?

20　　　A　Yes.

21　　　Q　My question is was it widely accepted that fire

22　investigators would in fact do their investigations in

23　that fashion that you described?

24　　　A　In 1995?

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

Pl. Amor 030038

45

1    Q    Yes.

2    A    I would have to estimate that compliance with

3    that would be sketchy or fragmentary, and not uniform

4    across the profession.

5    Q    What about in 1997?

6    A    Well, by 1997 921 had been out there a little

7    longer and people were beginning to realize its value as

8    supporting the investigative process, I should say

9    recognizing that the guidance it offered would help

10    support good investigative practice.

11    Q    Well, so in 1997 was it widely accepted that fire

12    investigations needed to be conducted using the scientific

13    method as you described in your testimony?

14    A    Well, the acceptance was evolving, I would not

15    say it was universal in 1997.

16    Q    I want to talk about some of the particular

17    testimony in this came.  We talked about some of that

18    testimony from Special Agent Kushner and from Lieutenant

19    Ferrari a minute ago.  Did you review in this case a

20    statement from the defendant that the fire in this case

21    began by vodka soaked newspapers being ignited by a

22    cigarette?

23    MR. PAWL:  Objection.

24    THE COURT:  What's the objection?

Pl. Amor 030039

46

1      MR. PAWL:  Part of it is that, I might have misheard I

2  thought she said Gerrari.

3      THE COURT:  She said the defendant.

4      MS. THOMPSON:  I said Ferrari.

5      MR. PAWL:  The other was about the igniting the vodka

6  by cigarette.  I thought his testimony was by open flame.

7      THE COURT:  Can you describe is there, what is an open

8  flame?

9      THE WITNESS:  A  Open flame is actually that

10  combustion of a fuel in air, and you have visible light

11  being generated by that reaction in a gaseous medium.

12      THE COURT:  Can open flame include a cigarette?

13      A   No, well, only briefly as you light it sometimes

14  the paper will flare with a very brief flame.  But the

15  process that supports the combustion of a cigarette is the

16  smoldering combustion.  And there's a number of properties

17  of smoldering combustion that make it very different than

18  combustion as an open flame.  So whereas a match or a

19  lighter or a gas burner on your stove, that's an open

20  flame.  Whereas a cigarette or any other similar material

21  typically cellulosic fuel that's usually burning as a

22  smoldering fire with no external flame.

23      THE COURT:  Thank you.  Please rephrase the question.

24      MS. THOMPSON:  Q  I want to make sure there's no

Pl. Amor 030040

47

1  confusion, let me step back just a second,

2  Dr. DeHaan.  So in this case did you review, you did

3  review testimony from Special Agent Kushner about how,

4  about his opinion as to the cause of this fire, right?

5      A    Yes, I did.

6      Q    What is your understanding of the testimony that

7  he provided about the cause of this fire?

8      A    That he opined that the fire was started on or

9  near the swivel chair with vodka as an ignitable liquid

10  with an open flame.

11      Q    Did you also review information in this case

12  about the defendant in this case making a statement that

13  the fire in this case began by him putting a cigarette on

14  vodka soaked newspapers?

15      A    Yes.

16      Q    So those are two different mechanisms for

17  potentially starting a fire; is that right?

18      A    Very different, yes.

19      Q    I want to talk about both of those.  Setting

20  Special Agent Kushner aside, as to what the statement from

21  the defendant was, do you agree that it is possible in

22  this case that the fire in this case began by newspapers

23  soaked in vodka having a cigarette put on them?

24      A    No.  It's impossible.

48

1    Q    Why is that impossible?

2    A    Well, the smoldering process in a tobacco

3    cigarette is a very low energy fire.  And as I just

4    described to his Honor, it's a combination of the oxygen

5    in the air directly with the surface of the fuel creating

6    heat, and the material, the energy is transferred through

7    the available fuel basically by direct contact.  And the

8    processes do or can in a tobacco cigarette create a high

9    temperature zone in the center of the column of burning

10   tobacco.

11           And it was once thought that well, that's all you

12   need is something that's a high temperature.  It turns out

13   that the proper scientific analysis of the process shows

14   that while the coal of even an actively smoked cigarette

15   is very high temperatures, there's virtually no oxygen

16   around that coal because it's all being used up in the

17   smoldering process.  In addition there's quite a bit of

18   carbon monoxide and carbon dioxide that would further

19   suppress the production of any kind of oxidative reaction.

20           The contact time between molecules of vapor

21   actually being drawn through a cigarette that is normally

22   smoked while it produces a bright yellow glow that we

23   associate with that process, the contact time for

24   molecules of fuel actually being dragged through that zone

Pl. Amor 030042

49

1    is too short to allow enough energy to be transferred to

2    those molecules.  And the only materials -- then there's

3    also the factor that the packing of the shreds of tobacco

4    is so close that if you do get any kind of flame generated

5    on the surface of the tobacco, for instance, the

6    extinction occurs because the other elements of

7    uncombusted tobacco around it basically suppress it.

8          And so as a result the only materials that are

9    sensitive enough to ignition, that they can be ignited by

10   a glowing cigarette are very unstable materials like

11   acetylene, hydrogen, and ethylene, and ethylene oxide

12   vapors under the right conditions.  Natural gas, gasoline

13   vapors, none of those have ever been demonstrated to be

14   ignitable by a smoldering cigarette.

15         The additional problem here is if I have

16   newspaper soaked with vodka, that's a very poor fuel.  I

17   may be able to get a portion of beverage, vodka, to

18   briefly support a flame in the alcohol portion of the

19   vapors, but the presence of the water, which is 60 or so

20   percent of that beverage, is going to suppress the water,

21   sorry, it's going to suppress the flame to the point where

22   it won't propagate.  And if you do put a cigarette on a

23   patch of tobacco, for instance, the water absorbed into

24   the cigarette paper and the tobacco quickly suppresses any

Pl. Amor 030043

50

1  kind of combustion, actually puts the cigarette out.

2      Q      Are you aware of any scientific studies,

3  Dr. DeHaan, about the ability of cigarettes to be an

4  ignition source for liquid fuels?

5      A      Yes.  The primary one was a review paper

6  published by actually a colleague of mine Robin Holyhead

7  in 1996 on the actual heat transfer and other processes

8  occurring in cigarettes.  And I think the title of the

9  paper was Ignition of Flammable Vapors and Gases By

10 Cigarette.  And that was published I think in 1996.

11     Q      Are you aware of any publications before 1996 on

12 that topic?

13     A      No, not that I have ever come across.

14     Q      Have there been other publications on this topic

15 of whether cigarettes can be an ignition source of a

16 liquid fuel besides the 1996 study that you just testified

17 about?

18     A      Yes.  There was a paper actually prepared by some

19 of the investigators with the Alcohol, Tobacco and

20 Firearms group that actually tested extensively the

21 hypothesis that a cigarette could ignite gasoline

22 distributed on various surfaces, either poured on a

23 horizontal pan or presented on the vertical surface of a

24 cloth simulating a shirt that had been soaked in gasoline.

Pl. Amor 030044

51

1  They did I think over the course of a series of tests,

2  they tested hundreds of cigarettes under a variety of

3  conditions including being connected to a smoking machine

4  that would actually smoke the cigarette at maximum energy

5  in about a minute or two. And no matter what kind of

6  contact was presented, none of those ever resulted in

7  ignition of the gasoline vapors.

8      Q    What year was the ATF paper that you just

9  described?

10     A    Well, I saw a version of it presented I think

11 about 2003. I don't think the actual paper was actually

12 published until maybe five years ago.

13     Q    Are you aware of any publication or presentation

14 of the data behind that ATF paper that was earlier than

15 the version that you saw presented in 2003?

16     A    Yes, I suspect that Special Agent, retired

17 Special Agent Jack Malooley, who was one of the

18 researchers, it was his case, he may well have presented

19 those results to training seminars and things like that.

20     Q    Do you know the earliest period that he would

21 have presented that in training seminars?

22     A    No, I don't

23     Q    Was he presenting that in 1997?

24     A    Not that I know of, no.

Pl. Amor 030045

52

1    Q    He was presenting that later than 1997?

2    A    Yes.

3    Q    In 1997 then what was the generally accepted

4 position in the field of fire investigation as to whether

5 a fire could begin by a cigarette being placed on

6 newspapers that had been soaked in vodka?

7    THE COURT:  I apologize.  Can you read that question

8 back?

9        (Desired portion read:  Lines 3-6 Page 52.)

10    THE WITNESS:  A  Well, it's such an unusual scenario

11 that I don't think there would be any industry wide survey

12 on that particular topic.  The alcohol portion of the

13 beverage alcohol would be considered ignitable liquid,

14 which in fact is in its pure form.  And cigarettes were

15 largely considered to be capable ignition sources, I

16 should say accurate term is competent ignition sources of

17 a variety of fuels including ignitable liquids.

18    MS. THOMPSON:  Q  In 1997 was it generally accepted in

19 the fire investigation community that a fire could begin

20 by a cigarette smoldering on newspapers that had been

21 soaked in a beverage alcohol?

22    A    Like I said it's such an unusual construct that I

23 would not be able to put any kind of survey date on that.

24    Q    What about in the field of fire investigation

MARIE R. JAKUBIEC  CSR LICENSE NO. 084-001117

53

1  today, is it generally accepted that a smoldering fire

2  could begin by a cigarette being placed on newspapers that

3  had been soaked in vodka?

4      A   No. I think the knowledge about the competence

5  of a smoldering cigarette to ignite any kind of ignitable

6  liquid has pretty well permeated the professional field

7  and that that suggestion is considered unlikely. I won't

8  say that there are still not investigators out there who

9  are convinced that a glowing cigarette will ignite

10  ignitable liquid vapors especially gasoline, but I don't

11  know what the percentage would be.

12      Q   I have asked you a couple of questions about

13  liquid fuel. Can you explain to the Court what a liquid

14  fuel source is?

15      A   Yes. A liquid fuel is evaporating and it's the

16  molecules that escape as a vapor that are the ignitable

17  portions of that material. Ignitable liquids by code,

18  fire code definition kind of vary a bit, but it's usually

19  whether a material produces ignitable vapors in sufficient

20  quantity to be ignitable by a standard ignition source at

21  a particular temperature, say 100 degrees Fahrenheit. If

22  it's greater than 100 degrees Fahrenheit, it's considered

23  a combustible liquid. And if it's less than that, at

24  least in most American codes it's considered ignitable

Pl. Amor 030047

54

1    liquid, sorry, flammable liquid.  Let me clarify that.  We

2    use the term in fire investigation ignitable liquid to

3    cover both classifications, flammable and combustible,

4    just to save words.

5        Q    Going back then to the state of fire science in

6    1997, was it believed by fire investigators that vodka

7    could be ignited by an open flame?

8        A    Probably, I mean like I said I don't know how

9    widespread that suspicion might have been.

10       Q    Given the state of modern fire investigation and

11   modern fire science, can vodka be a fuel that lights a

12   fire?

13       A    Not under normal circumstances, no.

14       Q    Can you explain what you mean by that?

15       A    Yes.  For the reason I talked about earlier that

16   beverage of vodka is normally 80 to 86 proof, that means

17   40 to 43 percent of it is vodka, the rest of it is water,

18   sorry, is alcohol, the rest of it is water.  As a result

19   there isn't enough vapor actually being generated at

20   ordinary temperatures under ordinary conditions to

21   actually support combustion.

22       Q    There are some different scenarios in this case

23   about how this fire might have begun or where in the

24   apartment this fire might have begun, right?

55

1    A    Yes.

2    Q    So let's take a couple of those different

3  scenarios.  With the understanding of modern fire science,

4  could this fire have begun by vodka being lit by an open

5  flame where the vodka had been spilled onto the carpet of

6  this apartment?

7    A    You might have been able to get the ethanol

8  vapors to support combustion very briefly, but it would

9  not be enough to actually ignite anything else.  There

10  wouldn't be enough energy produced to ignite ordinary

11  combustibles nearby.

12    Q    The vodka might have burned but it wouldn't have

13  gotten this room going on fire, as obviously happened?

14    A    Well, the ethanol is a flammable liquid.  And it

15  would support a little bit of combustion but it's so weak

16  in my experience, and I have recently had a case in which

17  beverage vodka was potentially spilled on a garment and

18  the issue was what could have ignited it.  I actually

19  tested that hypothesis and you get a very brief blue flash

20  of flame and then it goes out.  And if you get the rest of

21  the fabric actually ignited, the patch where the vodka was

22  actually suppresses the fire.

23    Q    What about again given the understandings of

24  modern fire science and modern fire investigation, could

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

Pl. Amor 030049

56

1    the fire in this case have begun by vodka being spilled

2    onto the swivel chair in this apartment and being ignited

3    with an open flame?

4        A    I very much doubt it.  That would entirely depend

5    on the nature of the fabric covering on the chair.

6        Q    I want to go back to the concepts of cigarettes

7    for a moment, setting the vodka and setting liquid fuel

8    sources aside.  Can a cigarette be the ignition source of

9    any fuel at all?

10       A    No.  It can ignite many fuels, but not any as in

11   terms of every fuel.  You have to have, because it's a

12   very weak source in terms of its heat release rate, you

13   basically have to have that active burning area or volume

14   in direct contact with a susceptible fuel.  A cigarette

15   just a fraction of an inch away from an ordinary

16   combustible material such as newspaper won't ignite it.

17   You have to have basically the glowing part of the

18   cigarette or the combusting part of the cigarette in

19   direct contact with it with enough fuel around it that

20   once that initial sheet does ignite, that there's more

21   fuel immediately adjacent to it to keep the reaction

22   going.

23       Q    Is there a difference between the ignition of

24   materials that we have just been discussing and

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

57

1    smoldering?

2         A    Well, yes, with the exception of the highly

3    flammable gases that I talked about, acetylene and

4    hydrogen, the transition is from the smoldering tobacco of

5    a cigarette to institute smoldering combustion and

6    whatever fuel is in contact with it.  If the material is

7    not susceptible to smolder, smoldering combustion like

8    many synthetic fabrics, if you heat them up they melt and

9    shrink away from the heat source.  And as they melt that

10   reduces their surface area and makes them much less

11   susceptible to smoldering ignition, which is dependent on

12   the contact permeation actually of the oxygen in the air

13   with the fuel.  Cellulosic materials like paper and

14   cardboard and tobacco will sustain smoldering combustion

15   whereas most of the synthetic materials as they melted at

16   a temperature below their ignition temperature simply

17   stop.  That melt absorbs some of the heat and that's the

18   end of the reaction.

19        Q    So could, if you put a cigarette on a newspaper

20   that's been put on the floor, can that cigarette cause

21   smoldering combustion into the newspaper, in the newspaper

22   that would eventually start a fire?

23        A    Well, that's a two stage question.  Yes, the

24   cigarette will induce smoldering combustion in the fibers

Pl. Amor 030051

58

1   of the cellulosic material of the newspaper, but then you

2   have to get that ignition to proceed into a larger mass,

3   and that's where smoldering ignition becomes very

4   difficult.  And I would say if you had kind of a loosely

5   stacked rack of papers, dropping a cigarette on the papers

6   as long as they were dry in terms of their humidity

7   content or humidity exposure, you might get it to ignite,

8   actually the rest of the newspapers to ignite, you might

9   well burn a hole through the layers of newspaper, that's

10  most likely the procedure.

11      Q    If you put a cigarette on the newspapers in the

12  scenario that you just described, would those newspapers

13  be able to light a larger mass on fire?

14      A    If you could get them to actually transition to a

15  flaming fire, yes.

16      Q    What would you have to do to get those newspapers

17  to transition to a flaming fire?

18      A    You have to have enough of the smoldering

19  combustion occurring to transfer enough heat to adjacent

20  fuels that are susceptible to flame, flaming combustion.

21      Q    How much time would it take in the scenario you

22  just described for a cigarette being put on newspapers for

23  that to transition into a fire that could get something

24  besides the newspaper going?

MARIE R. JAKUBIEC  CSR LICENSE NO. 084-001117

59

1     A    I don't recall ever getting a cigarette lying

2  flat on a stack of newspapers to actually ignite the

3  newspapers to flame.  There always has to be a more finely

4  divided fuel present.

5     THE COURT:  What do you mean by a finely divided fuel?

6     A    Well, like cotton fibers or a frayed cotton

7  fabric.  Cotton is very susceptible to smoldering ignition

8  because it will support a smoldering combustion.  And if

9  you get enough of it creating heat then it can transition

10  to flame.  And so cotton batting like what used to be used

11  in traditional furniture, cotton fabrics like terrycloth

12  towels and things like that, those are very susceptible to

13  ignition by cigarette.

14     THE COURT:  So it seems at one point that you thought

15  it would be possible to, for a cigarette left, a lit

16  cigarette left on newspaper to move to open flame, but

17  then you seem to think it not possible?

18     A    Well, theoretically is it possible that I get

19  just the right spacing, for instance, between the sheets

20  of newspapers to get it to transition to open flame before

21  I lose all that energy, yes.  But as I said I have never

22  been able to get it to go.  I can char up a hole through

23  several layers of newspaper and then I have lost all that

24  energy.

Pl. Amor 030053

60

1        It's very dependent on how much heat you are

2  losing from this very weak source to the surroundings.

3  And so if the cigarette or the smoldering cigarette can

4  kind of bury itself in a susceptible fuel so that it's

5  losing less energy by convective losses and its maximum

6  contact is with the surroundings, then yeah.  Like I said

7  cotton rags and cotton stuffing I have routinely been able

8  to get those.  Traditional rolls of toilet paper are very

9  readily ignited if you put the cigarette inside the tube

10  and allow it to burn into the cardboard tube and kind of

11  bury itself in the layers of tissue around it, that I have

12  used routinely, but not newspapers.

13      THE COURT:  And if there was vodka on the newspapers

14  that the cigarette, the lit cigarette was laying on, that

15  does not add to the ignitability?

16      THE COURT:  No, it doesn't.  In fact it will prevent

17  it because now in order to get the fuel, the solid fuel to

18  burn now you have to evaporate the water.

19      THE COURT:  What if the vodka is dry?

20      THE WITNESS:  A  Then the ignitable component, the

21  ethanol is long gone.

22      THE COURT:  Dissipated?

23      THE WITNESS:  A  Yes.

24      MS. THOMPSON:  Q  Is that true, to go back to the last

Pl. Amor 030054

61

1  thing that you said, is that true if the vodka has been

2  spilled on carpet or chair or a chair as well?

3      A      Oh, yes.  The ethanol is very volatile, it

4  evaporates very readily even at room temperature, and so

5  it dissipates very quickly, whereas the wet spot that

6  remains is going to be the residual water.

7      Q    I want to ask you a question on a slightly

8  different topic now, which is evaluating witness

9  statements and witness testimony.  As a fire investigator,

10  and I am taking you to modern fire investigation, stepping

11  away from the 1990s that we have been talking about, are

12  witness statements something that you as a fire

13  investigator take into account in making a cause or origin

14  assessment for a fire?

15      A      Yes.

16      Q    How do you use those statements as part of your

17  analysis and investigation?

18      A      Well, very often the firefighters are the first

19  people that actually get a closeup look of what's burning.

20  And so that's really very useful information and sometimes

21  critical about how much heat is being generated, how much

22  smoke is being generated, where is the fire, where is the

23  fire not, what seems to be on fire and what's not.  What

24  steps, what do they observe in terms of the fire

Pl. Amor 030055

62

1   conditions when they first saw it or opened the door and

2   encountered the room on fire, what did they do in reaction

3   to that condition, what did the fire do in reaction to

4   their steps.  And so those are all really can be sometimes

5   absolutely critical in evaluating or testing various

6   hypotheses about a fire.

7       Q    Setting aside the statements of firefighters,

8   what about statements of lay persons who may have been

9   witnesses to some aspect of the fire?

10      A    Well, you always want to, you get an interview

11  with any witness.  The problem there is most witnesses

12  have not encountered fires, especially hostile fires at

13  close range, and they may be reacting more emotionally or

14  with surprise that they are not seeing everything or not

15  capturing everything because of the shock of the

16  situation.  So lay witnesses, you need to talk to them

17  because they may have seen something and recorded

18  something that can be useful, but their reliability is not

19  as, their reliability of their observations is not as

20  certain as with firefighters.

21      Q    What about statements from people confessing that

22  they started a fire, how do you using modern fire

23  investigation and modern fire science techniques assess

24  statements of culpability?

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

63

1    A    Well, I typically use those statements as a

2 foundation for a hypothesis, what if the fire was started

3 in this way along with whatever other possible hypotheses

4 the rest of the data has helped create, and so I will test

5 that hypothesis.

6    Q    Is your approach different from what's generally

7 accepted in fire science today about how to evaluate

8 statements of culpability?

9    A    No.  I think the fire investigative community has

10 learned from past cases that they need to consider the

11 statements of witnesses, both the fire service and lay

12 witnesses, and consider that as just what I said, a

13 possible hypothesis to be tested against the other data.

14 Is it possible, is it possible under these conditions or

15 with these fuels or these time frames and things like

16 that, to test those rather than just say okay, somebody

17 said they saw X or did Y, and take it at face value, you

18 can't do that.

19    Q    At the time of the investigation of this fire was

20 there a generally accepted standard in the field of fire

21 investigation about how to evaluate confessions from

22 someone that they had started a fire?

23    A    Well, most criminal investigations that I've been

24 involved with over the decades they considered confessions

Pl. Amor 030057

64

1  to be really vital evidence, that almost incontrovertible

2  proof that this individual was responsible.  And as an

3  outsider basically looking at the science of the

4  confessions and feasibility thereof, I have to say like I

5  said I use it to create a hypothesis to be tested, but

6  that's all.

7      Q    So to make sure I understand at the time of the

8  investigation of this fire was there some generally

9  accepted standard for how confessions ought to be treated

10 in the course of a fire investigation?

11     A    Well, as I said all I know is the cases that I've

12 been involved in in that time frame.  If they had a

13 confession, the investigators were more certain of its

14 value than I was as the scientist, but I don't know how

15 widespread that feeling was.

16     MS. THOMPSON:  Your Honor, I have some of the original

17 exhibits from trial that I am going to go through and show

18 the witness now.  Do you want us to mark them with new

19 exhibit numbers or to refer to them by their trial exhibit

20 numbers, or how does the Court want me to do that?

21     MR. PAWL:  Well, I can tell you, Judge, I have

22 actually made some exhibits with different numbers on

23 them, with People's numbers that are --

24     THE COURT:  For example, the 911 tape.

Pl. Amor 030058

65

1    MR. PAWL:  Right.  I did have, counsel did show me

2 some of the original photographs that were part of the

3 trial.  I have duplicates made with different stickers.  I

4 have no objection if it makes things easier to separate

5 those or she can use those for purposes of showing them

6 because --

7    THE COURT:  Let me just stop you.  I think you can

8 label them however you like, but if they happen to marry

9 the exhibit numbers with the original trial, that's fine,

10 but we're actually not using the trial exhibits, we're

11 using copies, correct?

12    MS. THOMPSON:  Well, these are actually the ones that

13 are from the original record.  I think it makes sense to

14 refer to them by their original numbers.  It doesn't make

15 sense to duplicate a record of what already exists, but I

16 will do whatever the Court --

17    THE COURT:  That's fine.  So you are actually, you are

18 also utilizing the original exhibit labels.

19    MS. THOMPSON:  Well --

20    THE COURT:  You didn't put new labels on them.

21    MS. THOMPSON:  I did not.

22    THE COURT:  I think that's fine, just the record will

23 be clear that's what you are doing.  The state is not

24 required to do that.  They can use different numbers.

66

1      MR. PAWL:  I was offering we do have some copies made

2  that have different stickers if we want a differentiation

3  for the record, I don't have a problem with that

4  procedure.

5      THE COURT:  Alright.  You can do it either way you

6  like.  Let me suggest this, however.  It is three or four

7  minutes before 12, we are going to stop for lunch.  Why

8  don't we stop now and we'll start back up at 1:30

9  promptly.

10      MS. THOMPSON:  Thank you, your Honor.

11

12          (Whereupon, said proceedings were continued

13           to 1:30 o'clock P.M.)

14

15

16

17

18

19

20

21

22

23

24

Pl. Amor 030060

67

```
1   STATE OF ILLINOIS   )
                        ) SS:
2   COUNTY OF DU PAGE   )

3            IN THE CIRCUIT COURT OF DU PAGE COUNTY
         FOR THE EIGHTEENTH JUDICIAL CIRCUIT OF ILLINOIS
4
    THE PEOPLE OF THE        )
5   STATE OF ILLINOIS,       )
                             )
6            Plaintiff,      )
                             )
7       -vs-                 )  No. 95 CF 2075
                             )
8   WILLIAM E. AMOR,         )
                             )
9            Defendant.      )

10

11           REPORT OF PROCEEDINGS had at the hearing of the

12   above-entitled cause, before the Honorable LIAM C.

13   BRENNAN, Judge of the said Court, on Wednesday, the 14th

14   day of December, 2016, afternoon session.

15
        PRESENT:
16
            MR. ROBERT B. BERLIN,
17          State's Attorney of DuPage County, by
            MR. MICHAEL PAWL, and
18          MS. LISA HOFFMAN,
            Assistant State's Attorneys,
19
                Appeared on behalf of the People of the
20              State of Illinois;

21          MS. ERICA NICHOLS COOK,
            MS. LAUREN KAESEBERG,
22          MS. TARA THOMPSON,
            MR. KEVIN CARAHER,
23              Appeared on behalf of the Defendant;

24          WILLIAM E. AMOR.
```

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

Pl. Amor 030061

68

1    THE CLERK:  William Amor.

2    THE COURT:  The record will reflect all the parties

3 are present with their respective counsel.

4         Dr. DeHaan, you may retake the witness stand.

5 You remain under oath.

6    THE WITNESS:  A  Thank you, your Honor.

7              JOHN DAVID DEHAAN,

8 a witness called on behalf of the Defendant, having been

9 previously duly sworn, resumed the stand and testified as

10 follows:

11              FURTHER DIRECT EXAMINATION

12              BY MS. THOMPSON:

13    Q    Dr. DeHaan, before lunch we were talking some

14 about aspects of fire investigation at the time of the

15 investigation of this fire and today.  I want to move on

16 to talk about some of your direct opinions in this case.

17 As a result of your investigation and analysis of the fire

18 in this case, do you have an opinion about the cause of

19 this fire?

20    A    Yes, I do.

21    Q    What is your opinion as to the cause of this

22 fire?

23    A    It's an undetermined cause.

24    Q    And do you have an opinion about the origin of

MARIE R. JAKUBIEC  CSR LICENSE NO. 084-001117

69

1  this fire?

2      A      Yes, I do.

3      Q      What is your opinion as to the origin?

4      A      Based on the materials that I reviewed, I would

5  also consider the area of origin to be undetermined.

6      Q      When you say that the cause and the origin of

7  this fire are undetermined, what does that mean?

8      A      It means there are, well, let's start with

9  origin.  You have to establish a likely area of origin

10 before you can test any hypothesis about ignition sources

11 in that area.  And the determination of the area of origin

12 in this fire is complicated by the data that demonstrates

13 that at least part of that room, the portion, combination

14 dining room and living room, and at least the western half

15 of the living room had gone to what's called flashover.

16 That means all of the fuels in that area are on fire and

17 are burning as fast as air can get to them.  And that

18 produced the low burns to the walls all the way down to

19 the floor, the baseboards, and the damage to the carpet in

20 the exposed areas of the carpet in the middle of the room.

21         Then there was a ventilation limit basically

22 imposed by the geometry, I guess you will, of the room,

23 that the sliders were closed or very nearly closed, the

24 best of the reconstruction.  The other windows and doors

Pl. Amor 030063

70

1    to the apartment were closed.  That means there was a

2    finite amount of air with a finite amount of oxygen that

3    could get in there to keep that fire going because every

4    fire needs fuel, it needs oxygen to produce the heat that

5    keeps it going.

6              And in this case basically the air ran out, and

7    the fire became under ventilated.  It continued to burn

8    but because of the limited oxygen you ended up with

9    extremely hot, extremely fuel rich i.e. dark, black smoke.

10   And that's the condition that the firefighters experienced

11   when they approached the apartment, they noticed, I think

12   it was the lieutenant touched the door.  The outside

13   surface of the door was very hot to the touch.  When they

14   opened the door, they were met with extremely hot, very

15   dense black smoke.  They couldn't see any flame.  They

16   couldn't see any glow.  In fact they couldn't even see the

17   daylight that should have been coming through the sliding

18   doors.  And he anticipated this was a problem to his entry

19   crew and they shut the door again to decide how they were

20   going to attack this fire.

21             And it was about that time that in my

22   reconstruction based on the documentation I had that the,

23   one of the sliding glass doors failed from thermal shock.

24   That produced a very large opening at the west end of the

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

Pl. Amor 030064

71

1   building.  That allowed a tremendous quantity of the

2   accumulated hot smoke to vent out the top of the door, and

3   to balance it, there's a lot of fresh air that comes in

4   the bottom of the door.  That fresh air has 21 percent

5   oxygen.  That would dramatically enhance the combustion

6   rate of any fuel that was on fire at that end of the room,

7   and that would include the coffee table, the swivel chair,

8   the end of the sofa, the television and VCR rack.

9            And that continued in that intense combustion

10  state until the fire department on their second entry

11  noticed the change in conditions, they could actually see

12  the glow of the fire at the west end of the living room,

13  and they opened up the glow stream and knocked it down,

14  and relatively quickly, and then were able to advance in

15  to do the rest of the extinguishment.

16           That enhanced ventilation into a very hot portion

17  of a room in the last few years we have come to appreciate

18  and we as the fire investigative community have come to

19  appreciate just how much more damage can accumulate in a

20  very short period of time from that enhanced ventilation.

21  And when the -- at the time this investigation was

22  conducted and to a large extent even today the first

23  examination of a fire scene as to potential areas of

24  origin is where the damage is the greatest.  And in this

Pl. Amor 030065

72

1   case there's no doubt that the area of damage, sorry, the

2   area of greatest damage is at the west end of that room in

3   the sofa, the swivel chair, the coffee table, and the pile

4   of boxes of combustible material that were in the corner.

5       Q    I want to ask you a followup question going back

6   to what you were just talking about.  One of the ways that

7   a fire investigator determines origin is by analyzing the

8   patterns, the burn patterns that you see at the location

9   of a fire, is that accurate?

10      A    That's right, that's one of the leading

11  signatures that investigators look for then and today.

12      Q    I am going to show you what was marked at trial

13  as People's Exhibit 30.  People's Exhibit 30 is a

14  photograph of the scene of this fire after the fire,

15  right?

16      A    Yes, and after the investigation and the

17  reconstruction.

18      Q    So can you explain what the reconstruction in

19  this case was?

20      A    Well, the furniture had been tossed around, moved

21  during the suppression and overhaul phases of the fire

22  fighting.  There were earlier photographs of the room, and

23  the sofa had actually been moved out in front of the

24  sliding door, which is that dark area in the center with

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

73

1    the railing across it.  And the remains of a night stand

2    had been or a side stand had been turned over on top of

3    it.  The chair, the remains of the recliner had been

4    moved.  And the TV, VCR stand had collapsed.  There was

5    also a very large pile of partially burned boxes of

6    clothing or bedding, something like that, in the what

7    would be the corner under the air conditioner.

8         Q    You are referencing the southwest corner when you

9    just touched the exhibit?

10        A    Yes.  And so and the ceiling had been partially

11   pulled by the responding firefighters as part of their

12   overhaul process.  And in fact the gypsum wall board on

13   the north wall had been, the other sidewall had been

14   peeled, exposing the unburned studs behind.

15        Q    There's some damage to the room in People's

16   Exhibit 30 that you're looking that was not caused by the

17   fire?

18        A    That's correct.

19        Q    But you do see burn patterns in this photo; is

20   that right?

21        A    Yes, you can see the burn patterns on the remains

22   of the carpet and you can see the burn patterns on the

23   walls, both the west and the sidewall.

24        Q    So let me ask you this.  It's your opinion that

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

74

1   the origin of this fire is undetermined but can you

2   pinpoint the origin of this fire to some location within

3   the apartment that burned?

4       A     Yes.   I would say for a variety of reasons the

5   fire had to have started somewhere on the sidewall in the

6   either the chair, the pile of boxes in the corner, the

7   sofa or the recliner, somewhere on the south side of the

8   room.

9       Q     Somewhere on the south side of the living room?

10      A     Yes, in one of the upholstery pieces.

11      Q     Is it your opinion that you can pinpoint the

12  origin to there but you can't go further than that?

13      A     That's correct.  Because if I test each of these

14  as a hypothesis, and it turns out that as a result of the

15  ventilation controlled fire and prior to that the

16  existence of a flashover event in that end of the room,

17  the damage to the furniture is, that remains, you can no

18  longer see the characteristic features of an ignition in

19  any one of those items.  For instance, the descent of the

20  hot gas layer in the room with lots of radiant heat

21  traditionally takes out the top of the back rest

22  upholstery and sometimes the framing of any upholstered

23  chairs or sofas.

24          It's been my experience in starting fires in

75

1    rooms like this that I can start the fire, yes, it

2    produces an area of localized damage, and if a fire isn't

3    too intense and of fairly short duration after the fire

4    those indicators, those patterns still help you say yes,

5    the fire started there, which I know I started it there or

6    I know it was started there.

7            In this case I would have the same reaction or

8    the same opinion if I for instance started the fire in the

9    recliner closer to the center of that wall. There's

10   nothing remaining on the pattern of damage to the recliner

11   that says yes or no, the fire did or did not start there,

12   can't tell that. Of course there's nothing left of the

13   swivel chair nearest the slider. At that point you just

14   can't say there isn't anything to indicate that an

15   ignition occurred here. And the pile of boxes in the

16   corner, that was never examined and there's only a few

17   photographs that actually show what was left after the

18   fire. And I would get the same appearance if I started a

19   fire with an open flame, for instance, in that corner with

20   rapid involvement of the pile of boxes.

21        Q   Dr. DeHaan, looking at People's Exhibit 30, can

22   you indicate where on People's Exhibit 30 demonstrates to

23   you that this room went into flashover at some point

24   during this fire?

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

76

1     A     Yes.  Well, as I said, it was easier before all
2    the walls were peeled back and all the rest of the fuel
3    packages were eliminated.  Basically the hallmarks we look
4    for are basically uniform damage to the ceiling, the walls
5    right down to the baseboards, and extensive damage to the
6    floor, floor covering of the room, and that's what we had
7    here.
8     Q     So obviously not everything in this room burned
9    during the flashover period, right?
10    A     That's right, because the flashover was basically
11   quenched or held back by the limitation of the oxygen in
12   the entire apartment.
13    Q     Well, does the limited, does the fact that the
14   flashover here wasn't total, meaning it didn't burn
15   everything in the room, does that preserve burn patterns
16   that would help you make some assessment about origin in
17   this case?
18    A     Yes, even a full flashover if it's a very short
19   duration often does leave some indications of the patterns
20   such that you could eliminate some of the patterns and
21   some of the hypotheses, but in this case you had the
22   double complication of first the flashover and then the
23   enhanced ventilation effect when the sliders failed.
24    Q     There was some testimony from your review of the

Pl. Amor 030070

77

1   records in this case at trial about there being flashover

2   in this fire, do you recall reviewing that testimony?

3       A    Yes, I do.

4       Q    In your opinion was the testimony that was given

5   at trial about flashover consistent with a modern

6   understanding in fire science of how a flashover operates?

7       A    Well, I remember the fire lieutenant when they

8   first made entry and he expressed concern of extremely

9   hot, extremely dense smoke. And his, I think his

10  statement was we need to get out of here because this is a

11  flashover risk, this room is at risk of flashover,

12  something like that. And that was a good caution. But

13  what was actually more likely to have been an aftermath if

14  they hadn't backed out would have been what's called a

15  backdraft, explosion, a smoke explosion, where fresh air

16  is suddenly admitted to the room and with all of that hot

17  fuel rich smoke now you have a very large fire propagating

18  through the room. In some cases that can actually cause a

19  deflagration that can have mechanical effects like blowing

20  windows out and walls down and things like that.

21      Q    Do you recall testimony from trial from

22  Lieutenant Ferrari about there being flashover that

23  occurred in this fire?

24      A    Yes.

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

78

1    Q   And was Lieutenant Ferrari's analysis of the

2  flashover that occurred in this fire consistent with

3  principles of modern fire investigation?

4    A   Yes, pretty much, although there's been some

5  debate back and forth as to the progressive status of

6  flashover.  Certainly been my experience in these test

7  fires that depending on the size and shape of the room and

8  the location of the main fuel packages I can get flashover

9  to develop in a part of the room and then spread through

10  the rest of the room over a period of well, up to a minute

11  or more, and still have the full involvement, the same end

12  point of full involvement of all the exposed fuel surfaces

13  in the room.  Back when flashover was first discussed in

14  the fire investigation literature, it was actually defined

15  as a near instantaneous event involving the contents of

16  the room.  And that's at least in my opinion not correct.

17  It's never instantaneous.  It may take some time actually

18  to propagate.

19    Q   So when you reached the determination that the

20  origin of this fire is undetermined, under modern fire

21  science principles can anyone say with reliability where

22  specifically on the west end of the living room this fire

23  originated?

24    A   Considering the damage that I just described from

MARIE R. JAKUBIEC  CSR LICENSE NO. 084-001117

Pl. Amor 030072

79

1  the flashover and the ventilation effect intensity at the

2  west end?

3      Q      Right.

4      A      Yes.  No, in my opinion, no.  Those compromise

5  all of the possible indicators that a modern fire

6  investigator would look at and say you know, I just don't

7  have enough data.

8      Q      Looking back at People's Exhibit 30, as you just

9  testified, Dr. DeHaan, you can see that some portion of

10 this recliner remained after the fire; is that right?

11     A      Oh, yes, the wood framework did.

12     Q      Some portion of the couch remained, right?

13     A      Yes.  Most of the wood framework is still there

14 and portions of the seat cushions are still there.

15     Q      As you testified no portion, essentially very

16 limited amounts of the swivel chair remained after this

17 fire?

18     A      That's correct.

19     Q      Why doesn't that tell you that the swivel chair

20 is the origin because it obviously burned more than the

21 recliner and the couch?

22     A      Well, two things.  Most importantly we don't

23 know, nobody knows what that swivel chair was made of,

24 what the nature of the fabric was, what the nature of the

MARIE R. JAKUBIEC  CSR LICENSE NO. 084-001117

80

1 filler was. And between those two things you really can't

2 evaluate how quickly that material will basically be

3 consumed under even steady state conditions to end up the

4 way it was, which was just the metal base and the metal

5 springs as far as I can tell from the photographs.

6     Q    I am going to show you People's Exhibit 32. In

7 People's Exhibit 30 that you were just looking at, the

8 swivel chair isn't actually there at wall, right?

9     A   Well, there's some debris there in the general

10 location, but you can't tell what it is.

11     Q   In People's Exhibit 32, does that indicate what

12 of the swivel chair remained after the fire?

13     A   Yes. It appeared to be the metal base which is

14 four, five metal legs and it's been posed on top of this

15 metal salvage bucket, and with some of the seat springs

16 which are the S curved springs found in modern upholstered

17 furniture.

18     Q   At some point in the history of fire

19 investigation and fire reconstruction was there a theory

20 that the area of greatest burning in a fire is the origin

21 of the fire?

22     A   Yes, that's still a predominant theory. And it's

23 the way most fire investigations today proceed as a first

24 evaluation of the scene starting from the least damage to

Pl. Amor 030074

81

1   the most damage, where is it most damaged, what was there

2   to burn.  The complication is that today we insist that

3   investigators document available ventilation openings

4   because fire requires both fuel and ventilation.

5           So it isn't just enough to say okay, I had an

6   object here, it was combustible and it's burned a lot

7   therefore it burned for a longer period of time than other

8   even similar materials.  Whereas we know today that once

9   this six foot wide opening occurred, lots of fresh air

10  rushed in and this swivel chair would have been right in

11  the middle of that fresh air stream and burning at

12  tremendously intense rates much faster than other even

13  similar objects elsewhere in the room out of the flow of

14  fresh air.

15      Q    And you testified about that this understanding

16  about enhanced ventilation is something that's really only

17  been appreciated in the last few years; is that right?

18      A    That's right.

19      Q    When did fire science and fire investigation

20  begin to appreciate the effects of ventilation on a post

21  flashover fire?

22      A    Well, talking about a very widespread population.

23      Q    What's the spread, Dr. DeHaan?

24      A    Well, some tests that I did in 1996 using

Pl. Amor 030075

82

1  infrared video camera technology actually documented, I

2  was looking through the door of a furnished cubicle, a

3  couple of furnished cubicles that went to flashover. And

4  I documented the intensity of the fire and the

5  variability, the movement of the very high temperature

6  fire zone in the doorway as a function of the fresh air

7  rushing through that. I didn't, at that point I was

8  looking at what would enhance damage the floors and

9  materials just inside the door because at the time a lot

10 of fire investigators would look at consumption of floors

11 just inside a door to a heavily burned room as a strong

12 indicator that an ignitable liquid had been poured there

13 and thereby enhancing the combustion.

14         And I knew that wasn't right because when I

15 actually tried that test the ignitable liquid didn't

16 penetrate, didn't cause combustion of the floor in that

17 area. So this was an attempt to test the other variable

18 and that is ventilation in a post flashover fire. That

19 work was eventually published in part in later editions of

20 Kirk. I think I published a brief mention of it in a

21 publication from the California Association of

22 Criminalists, but it didn't get out in the mainstream

23 except through Kirk.

24         And then well, in either 2003 or 2005 the people

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

83

1  from NIST, National Institute of Standards and Technology,

2  burned a series of furnished cubicles as part of a class

3  at the California Conference of Arson Investigators. And

4  one of them was a kitchen scenario and sliding glass doors

5  much like this formed a good part of one wall. The fire

6  was ignited with an overheated pan of cooking oil on the

7  far end of the room. That ignited, flames ignited the

8  cabinets, and the fire was basically driven by that, the

9  combustion of those cabinets.

10          We were standing outside the front and noticed

11  that the sliders were open maybe a foot or so, and we were

12  getting extremely hot, extremely dark black fuel rich

13  smoke coming out of that opening and then one of the

14  sliders failed. And it changed dramatically what was

15  happening inside the room. Suddenly the dinette set, the

16  table and chairs just inside the one slider were seen to

17  just be roaring hot fire, very bright yellow flames. And

18  then the second slider failed. And we got an even bigger

19  fire right there in the door. And when we got into the

20  room later after the fire had been put out, the damage to

21  the actual area of origin to the wooden cabinets there

22  wasn't much different, in fact not demonstrably different

23  than the damage to the wooden dinette set indicating the

24  important role of ventilation in these kinds of

Pl. Amor 030077

84

1    compartment fires.

2        Q    What year was the testing that you just described

3    you did?

4        A    It was either 2003 or 2005.

5        Q    In 1997 were the ventilation effects that you

6    just testified about with respect to flashover and areas

7    of greatest burning, was that generally accepted in the

8    fire investigation community?

9        A    Well, it was known to some.  I don't think it was

10   part of the analytical process.  Over the years the

11   documentation requirements or suggested documentation

12   guidelines both in Kirk and in 921 have expanded to

13   include documentation of wall coverings, floor coverings,

14   ceilings and ventilation openings.  And that's been a

15   gradual process over the last ten years or so.

16       Q    While we're looking at this photo, looking at

17   People's Exhibit 32, when you are looking at the wall

18   that's to the left of, this opening in People's 32, this

19   is where the slider doors were?

20       A    Yes, that's the railing of the balcony just

21   beyond.

22       Q    When you look to the left of those slider doors,

23   do you see a line of demarcation on the wall to the left?

24       A    Yes, you do.  You see basically what would be

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

Pl. Amor 030078

85

1  half of a V on the frame of the door, and the wall

2  covering on the gypsum wallboard below the air

3  conditioner.

4      Q     Can you indicate on People's Exhibit 32 where

5  that is?

6      A     Yes, standing from floor level diagonally up at

7  about a 60 degree angle to end under the air conditioner.

8      Q     There was some testimony at trial about this V,

9  about this half of a V pattern, and the indications that

10  that pattern gave for the origin of this fire. Do you

11  recall reading that testimony?

12     A     Yes, I do.

13     Q     Why doesn't this V pattern on the wall tell you

14  that the area of the origin of this fire was this swivel

15  chair?

16     A     Well, one of the important things that we have

17  gotten into the general practice of fire investigation is

18  realization that a V pattern used to be an indication to

19  investigators that the fire started here, in other words,

20  an area of origin. Well, after burning enough real

21  buildings that we were able to demonstrate and it's now

22  part of the accepted literature that a V pattern damaging

23  a wall like that doesn't indicate necessarily a point of

24  origin, it demonstrates there was a fuel package probably

86

1    close by, maybe at floor level, and that's all it does.

2            Then if you see that, the next question is why do

3    we get a pattern here.  Is there the physical remains of

4    something immediately adjacent to that wall or in this

5    case just adjacent to the door frame that sits there or is

6    there another fuel package in the area that could support

7    a fire basically striking the wall from in this case from

8    the left.  And that's where we get into the presence of

9    that pile of burned boxes in the corner.

10       Q    When did it become part of the literature that a

11   V pattern like the one on the wall in People's Exhibit 32

12   was not necessarily an indicator of the area of origin of

13   the fire?

14       A    It's probably been in the literature since the

15   mid '90s.

16       Q    Can you specify beyond the mid '90s when that

17   appeared?

18       A    No.

19       THE COURT:  Can you specify when it became generally

20   accepted in the fire investigation community that the V

21   pattern is not necessarily the point of origin?

22       A    No.  As I said, you know, investigators that I

23   work with were aware of it by the mid '90s, and I don't

24   remember when it was specifically when it was introduced

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

87

1   to Kirk or 921 as a warning.

2       THE COURT:  The Court is going to take a two minute

3   recess.

4           (Whereupon, a recess was taken, after which

5               the following proceedings were had herein:)

6       THE COURT:  Back on the record on People versus Amor.

7   All the parties are present with their respective counsel.

8   You may proceed.

9       MS. THOMPSON:  Q  Dr. DeHaan, I am going to show you a

10  portion of amateur video that was recorded of the fire in

11  this case.  You have reviewed that video before today; is

12  that right?

13      A    Yes, I have.

14      Q    The portion I am going to show you has actually

15  been prepared by the People.  I think this is their

16  Exhibit 15A.  There is sound that accompanies this video,

17  but I am not going to play it with sound.

18          (Whereupon, a videotape was played in open

19              court, after which the following further

20              proceedings were had herein:)

21          So Dr. DeHaan, I just played you that portion of

22  this video.  Was it your testimony earlier that -- well,

23  let me ask you this question.  From your review of this

24  video in its entirety, and from your review of other

88

1  materials in the case, have you determined when

2  specifically during the course of the fire this video was

3  shot?

4      A    Yes, I have.  Basically between the time the

5  firefighters made their first entry and encountered

6  extremely dense smoke and very high temperatures to the

7  time they made their second entry.  At that point the

8  smoked had lessened and they could actually see the glow

9  of the fire to both sides of this doorway from the entry

10 door.

11     Q    The clip that we looked at here in court, is this

12 before the fire lessened or after the fire lessened?

13     A    Well, it's burning very freely at this point.

14 And the fire is basically you can see the fire cross the

15 header of the doors, that both sliders have failed, and

16 we're seeing the ventilation effect of basically a six

17 foot wide opening supporting fire with extremely bright

18 flames near floor level and extending up maybe three or

19 four feet.  And I believe that that diagonal dark line

20 there on the right side of the second opening may well be

21 like a curtain rod or something like that that's fallen.

22     Q    Am I pointing to that?

23     A    Yes.  So you are seeing basically the remains of

24 the chair and the coffee table and whatever is burning on

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

89

1  the right side of the door including those, the sofa and

2  the pile of boxes.

3       Q    Well, Dr. DeHaan, in this video clip that you

4  just watched you can see flame in the unit, right?

5       A    Oh, yes.

6       Q    You can see a lot of flame that's right here, I

7  am indicating on the screen of the video the sort of

8  bottom right corner of the patio door, right?

9       A    Yes.

10      Q    Can you tell from this video or from the other

11 things you reviewed whether that flame is inside the patio

12 or outside the patio?

13      A    Almost all of that is inside the door.

14      Q    This is roughly the location of where the swivel

15 chair was in the apartment living room, right?

16      A    Well, yes, approximately, somewhere in what's now

17 that flame zone that we can see, yes.

18      Q    So in this video you can see a lot of fire right

19 there as you said in the approximate area where the swivel

20 chair was, right?

21      A    Yes.

22      Q    Why doesn't this video, the flame you can see in

23 this video indicate to you that the area of origin of this

24 fire was in the approximate area of the swivel chair?

90

1    A    Because at this point the fire has tried to

2  involve much of the contents of the living room, and the

3  intense fire that we see here is not as a result of where

4  the fire started but where the fire is being most

5  energetically driven by the available ventilation, which

6  is all the fresh air going in the bottom half of this

7  door.

8    Q    I am going to show you what's been marked as

9  previously as People's, I am showing you what's been

10  marked previously as People's Exhibit 3.  It's got a

11  bigger area depicted but it depicts the same outside view

12  of the patio, right?

13    A    Yes.

14    Q    In this picture can you tell whether that door

15  has failed yet or not, can you show it to the Court as

16  well?

17    A    Yes.  It looks in this photograph that the

18  northern or right hand slider has failed, and you see

19  extremely intense flames in the lower right quadrant of

20  the door.  There's smoke and flame coming out the top of

21  that same opening and extending a little bit across the

22  underside of the eve.  On the left side this looks like

23  what you get when you have an intense fire inside a room

24  that has darkened glass of a window or a door.  And you

Pl. Amor 030084

91

1    can see an orange glow down at the bottom, that's where

2    the most intense fire once again being fueled by the air

3    that's rushing in the open portion and the top half is,

4    it's still at kind of a lower temperature so the soot is

5    still blocking basically the light coming from inside to

6    the outside.

7       Q    I am going to show you People's Exhibit 2 as

8    well.  That's another photograph of the same area view of

9    the outside of the apartment building?

10      A    Yes.

11      Q    In People's Exhibit 2 has any portion of the

12   slider failed?

13      A    Yes, in this case the right hand half looks like

14   it's failed.

15      Q    As well as the left or just the right?

16      A    In this case there is a portion of the glass, it

17   looks like the smoked glass that's still kind of stuck in

18   the frame of the left hand portion.  So at this point my

19   estimation would be both halves have failed but not all

20   the glass has fallen out.

21      MR. PAWL:  May I have a moment, Judge?

22      THE COURT:  You may.

23                                   (Pause.)

24      MS. THOMPSON:  Q  Dr. DeHaan, I am going to show you

Pl. Amor 030085

92

1   People's Exhibit 38.  That's a photograph of a portion of

2   the carpet or it's looking towards the floor of the

3   portion of the living room in the apartment building; is

4   that right?

5       A    Yes, it is.

6       Q    Do you see an irregular pattern on the carpet

7   that's depicted in People's Exhibit 38?

8       A    Yes, there's a margin of thermal damage to the

9   carpet extending roughly across the middle of the image,

10  and the carpet is very badly burned to the right, and just

11  scorched to the left.

12      Q    Did you review some trial testimony in this case

13  that indicated that this irregular pattern might be

14  indicative of an area of origin of this fire?

15      A    Yes, I did.

16      Q    And do you have an opinion about whether or not

17  this pattern is indicative of the origin of this fire?

18      A    Yes, I do.

19      Q    What is your opinion?

20      A    No, it's not.  It's just the artifact of the

21  reach of the radiant heat from the rest of the room where

22  some portions of the carpet had been protected and other

23  portions have not.  And the carpet and pad were not

24  sampled so we can't be sure, but it looks very typical of

MARIE R. JAKUBIEC  CSR LICENSE NO. 084-001117

93

1     a synthetic carpet with a thin polyurethane pad

2     underneath. And those are synthetic materials that react

3     quite differently actually to heat. And depending on

4     where the intensity of the heat reaches that kind of

5     critical boundary between destruction and combustion is

6     basically where these edges occur.

7         Q     Does People's Exhibit 38 depict something that at

8     one point in fire science was referred to as a pour

9     pattern?

10        A     Oh, yes. At one stage fire investigators were

11     very likely to look at any kind of pool shaped pattern or

12     irregular burn on floor or floor coverings as a strong

13     indicator of the presence of an ignitable liquid fuel.

14        Q     Was that true in the period that this fire was

15     investigated?

16        A     Oh, yes.

17        Q     Is that true in fire science today?

18        A     No. It has taken a long time to defeat that

19     particular myth or misconception, but I think today the

20     concensus is that we're agreed that it's an interesting

21     pattern and you need to look at it and figure out why, but

22     it's not a strong indicator of the ignitable liquid. It's

23     much more in the function of radiant heat especially in a

24     post flashover compartment.

Pl. Amor 030087

94

1    Q    People's Exhibit 38 in the top, well, really on

2  the left side of the photograph, do you see some cardboard

3  on the left side of the photograph?

4    A    Yes.

5    Q    And do you know where in the living room that

6  cardboard is? We're looking at it close up, do you know

7  more broadly speaking where that cardboard is in the room?

8    A    Yes. It was basically located between the sofa,

9  the west end of the sofa, and the west wall of the

10  apartment.

11    Q    I am going to show you what was previously marked

12  as People's Exhibit 33. Do you see a larger portion of

13  that cardboard reflected in People's Exhibit 33?

14    A    Yes.

15    Q    Can you indicate for the Court where on that

16  photograph that cardboard is?

17    A    Yes. There's a number of cardboard boxes very

18  badly burned from the top down, and it contains what

19  appears to be bedding or other combustible materials, kind

20  of a sloped wall of collapsing debris. And that's once

21  again between the end of the sofa and the west wall where

22  the air conditioner was.

23    Q    I believe it was your testimony earlier that you

24  cannot rule out these cardboard boxes as being the area of

MARIE R. JAKUBIEC  CSR LICENSE NO. 084-001117

Pl. Amor 030088

95

1  origin of this fire?

2      A      That's true.

3      Q      Again Dr. DeHaan, some portion of the materials

4  in those boxes and the boxes themselves was not burned,

5  right?

6      A      That's right.

7      Q      So how could that be the origin of this fire if

8  there's parts of it that didn't get burned?

9      A      Well, there simply wasn't enough time.  On the

10  closely packed boxes filled with blankets and clothing or

11  whatever this stuff was burns from the outside in, and

12  basically collapses in on itself and actually produces the

13  kind of sloped pattern of protection that you see at the

14  right hand margin of Exhibit 33, in fact adjoining the

15  clean burned area that we addressed earlier on that wall.

16      Q      Well, how could, if these boxes were the area of

17  origin of this fire, how could the boxes themselves not

18  have been burned completely but other items around those

19  boxes burned more than these items were?

20      A      Well, because if they are packed in cardboard

21  boxes, as I said, they are going to burn much more slowly

22  than the thin well displayed soft materials along the top

23  and the back rest of the adjoining sofa.  I mean it's like

24  taking a 15 inch diameter log and saying why does it burn

96

1    less than the half inch thick exposed to the same fire,

2    the same reason, that's a solid mass that's burning from

3    the outside in.

4        Q    To go back to your testimony about ventilation

5    effects in this fire.  Does it impact your analysis of the

6    ventilation effects of this fire if the slider had been

7    open a few inches at some point before the slider failed?

8        A    Not a few inches because the effect of an opening

9    on a fire in a compartment is largely driven by the area

10   of that opening.  So if I have a narrow slit a couple of

11   inches wide and six feet eight inches tall, that's going

12   to represent a fairly modest supply of air getting in,

13   especially in near still air conditions, which we can

14   verify from the smoke plume in that video on display now.

15   But if I have a three foot wide opening the same height,

16   that's going to make a major difference to the ventilation

17   conditions inside that room.  And that's why, it's a

18   matter of a couple of inches versus 30 inches, and then

19   ultimately an estimated 60 inches or even larger, because

20   that slider was never measured.

21       Q    So Dr. DeHaan, if the door, if the slider door

22   that we have been looking at had been cracked open at the

23   time that this fire began, would the entire area that was

24   open on the door top to bottom all have been space that

Pl. Amor 030090

97

1  air could have come in and ventilated the first part of

2  this fire?

3      A    No, not in a compartment fire where there's no

4  prevailing wind from the outside in.  Basically you see

5  just what's happening here, the hot gases are buoyant,

6  they are escaping through the top of the opening, and air,

7  cool fresh air is rushing into the bottom to try to

8  maintain a volume balance inside that room.  And so there

9  is no pressure differential.  So basically half of the

10  height of that door opening would be functioning as an

11  inlet for fresh air.

12      Q    Looking back at People's Exhibit 34, this also

13  depicts those boxes we have been talking about, right?

14      A    Yes.

15      Q    It depicts a portion of the couch?

16      A    That's right.

17      Q    How could the couch have been the origin of this

18  fire if portions of the couch frame are still intact,

19  portions of the cushions still appear intact in this

20  photograph?

21      A    Well, for the same reason as I have expressed

22  earlier.  I have started fires in furniture like this by a

23  variety of means, and the material especially on the back

24  rest is very thin and readily combustible and that burns

98

1  away very quickly.  If the fire is stopped or extinguished

2  or otherwise halted, at that point you can see the

3  patterns of damage are different where the fire started

4  versus where it hadn't been started because of the short

5  duration.  But if the room has gone to flashover, now we

6  have tremendously intense radiant heat coming from the hot

7  smoke layer blasting every exposed inch of the fabric not

8  only of the back rest but the seat cushions as well.  And

9  the intensity of that basically causes very rapid ignition

10  and very rapid combustion of those exposed surfaces.  Now,

11  under these conditions you couldn't tell.

12          In this case doubling the problem is this light

13  area at the side of Exhibit 34 is the door frame.  So now

14  once those sliders fail, the door is allowing lots of

15  fresh air in past the pile of boxes and combustibles in

16  the corner and striking the sofa for that two or three

17  minutes between the fire surface attacks.  And that can

18  make all the difference because now we're seeing 21

19  percent oxygen in every bit of that air as opposed to

20  maybe 5 percent in the air and smoke trapped inside the

21  room.

22     Q    People's Exhibit 31 actually shows I think even

23  more it looks like the interior of the cushions of the

24  couch that survived?

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

Pl. Amor 030092

99

1    A    Yes.

2    Q    Does that change your opinion about whether or

3 not the couch could be the origin of the fire?

4    A    No, I mean it could have been.  I just can't tell

5 because of the combination of the severe flashover fire

6 and the ventilation effect.

7    Q    The amount of cushion that's depicted in People's

8 Exhibit 31 could have survived even if the couch was the

9 origin?

10    A    Yes, because the whole event was pretty a fairly

11 short duration event in terms of a working fire.  We don't

12 know once again what those cushions were made of.  And the

13 different materials from which sofa cushions are made vary

14 considerably in their combustion properties.  I have set

15 numerous fires where the room looks like this and the

16 cushions are still, especially if you turn them over, are

17 still identifiable as cushions, and whereas adjacent

18 materials are completely charred.

19    Q    I want to ask you some questions about the

20 duration of this fire.  Let me ask you about one other

21 issue first.  I am showing you People's Exhibit 36.

22 People's Exhibit 36 shows a view of the we have been

23 calling it I think the upholstered chair, or the recliner

24 chair.  Do you see that in this photo?

100

1    A    Yes.

2    Q    It's the yellow, it's burned but it's got a

3  somewhat yellow color to it; is that right?

4    A    Yes, that's the wood platform under the foot rest

5  that you see is that yellow.  This is after the

6  reconstruction, the physical reconstruction by the fire

7  investigators.  The sofa has been put back in its original

8  condition.  It looks like I think that was a suitcase

9  against the wall on the right there beyond the end of the

10  sofa.  And then the recliner has been moved into its

11  approximate estimated position.  All of the upholstery is

12  burned away.  What you see is the framework basically and

13  there appears to be some padding left on the armrest.

14    Q    So in this photograph at least it looks like the

15  top of the chair other than the armrest didn't survive; is

16  that right?

17    A    Well, in this photograph, yes.  There were

18  earlier photographs showing the framework of the back rest

19  that was still pretty intact, although it burned through

20  the cross member at the top of the back rest.  But moving

21  furniture around after it's been, wood frame furniture

22  after it's been badly charred, those components are very

23  fragile, and it's very difficult to replace furniture and

24  maintain the integrity of those charred pieces.

101

1      Q     From any of the photographs that you have

2   reviewed of the recliner including this photograph, do the

3   burn patterns on the recliner or any of the other

4   information you have about this case give you any

5   indication of the direction in which the fire spread on

6   this recliner when it burned?

7      A     No.   The patterns of damage visible in the

8   photographs do not indicate any directionality.   And so

9   could all of this have been the result of the flashover

10  process with the hot gases descending from the ceiling and

11  igniting all the horizontal surfaces by radiant heat, yes.

12  And by doing so could that have eliminated any of the

13  smaller patterns indicating an origin on any of those

14  pieces, and the answer is once again yes.   By the way, the

15  remains of the coffee table which appears to be wood

16  topped are there.   The few pictures of the coffee table

17  indicate that the end of the coffee table nearest the door

18  is essentially completely burned away and all the pictures

19  show it burned in half sitting this way, which once again

20  confirms that you had a strong ventilation effect coming

21  in through the bottom of that slider.

22      Q     Again your opinion about the possible origins or

23  the undetermined origin of this fire is not impacted by

24  the fact as you pointed out in People's Exhibit 36 it

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

102

1   looks like some portion of the coffee table didn't burn?

2       A     That's right.  This is what I'd expect from the

3   ventilation effect, and actually what I produced in tests

4   involving ventilation controlled post flashover fires.

5       Q     It's your opinion in this case that the cause of

6   this fire is undetermined as well?

7       A     That's correct.

8       Q     Are there any other reasons why the cause of this

9   fire is undetermined?

10      A     Unless you are going to establish reliably the

11  area of origin, it's very difficult to exclude various

12  sources of ignition.  And in this case, for instance, the

13  pile of material in the corner was never examined.  And

14  the air conditioner and its electrical cables and things

15  like that were never examined.  So once again we don't

16  know if something failed in an air conditioner and dropped

17  hot materials or whatever onto this pile of boxes and then

18  the fire spread from there or whether in fact something in

19  that region of the room was deliberately ignited with

20  either a cigarette or open flame.

21      Q     There was some testing of potential accidental

22  causes of this fire by the original fire investigation;

23  isn't that right?

24      A     Yes.

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

103

1    Q    What testing of accidental causes or analysis of

2  accidental causes was that?

3    A    Well, the original area of origin by the first

4  investigators was actually in the other corner of the

5  living room where the television set was and the VCR.  So

6  electrical connections in the wiring for the plug-ins for

7  those units and the adjacent receptacles were examined and

8  eliminated as an ignition source for materials in that

9  area.  There was also a fire test conducted by the

10  original investigators involving an attempt to recreate

11  the fuel packages and to examine how big, well, how tall

12  the flames were from that package.

13    Q    Well, from your review of this investigation were

14  all accidental causes of this fire investigated by the

15  original investigation?

16    A    No, they were not.

17    Q    According to principles of modern fire science is

18  it necessary to identify a first fuel in order to identify

19  the cause of the fire?

20    A    Yes.

21    Q    And did the original investigation identify the

22  first fuel in this fire?

23    A    No, there were no laboratory tests that were

24  actually conducted on some of the debris to indicate the

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

Pl. Amor 030097

104

1  presence of an ignitable liquid.  Those tests were

2  negative.  And of course keep in mind those tests in most

3  instances are focused looking for petroleum distillate

4  type residues or petroleum product type residues not

5  necessarily ethanol.  But the most important oversight was

6  really the failure of the investigators to sample or at

7  least identify the combustible portions of those target

8  fuels.

9       For instance, what was the sofa covered with,

10  what was the padding, the same thing for the swivel chair

11  that was the focus of most of the attention, the recliner,

12  the contents of those boxes because small samples of those

13  would have allowed forensic tests to establish whether

14  they were cellulosic or synthetic and that would help rule

15  out for instance direct ignition with a cigarette and

16  establish that yes, an open flame could have ignited those

17  materials or vice versa.  And the padding, how big a fire

18  would one of these upholstered items produce, and none of

19  that could be done because there was no sample taken.

20  There may have not been any that survived, but there was

21  no sample taken for later identification and that's a

22  major failing.

23       Q    In the course of your investigation to this fire,

24  into this fire, can you determine what the first fuel in

Pl. Amor 030098

105

1   this case was?

2       A   No, I can't.

3       Q   In your opinion can anyone applying modern fire

4   investigation techniques determine the first fuel in this

5   case?

6       A   No, because no samples were taken.  And you can

7   say well, physically this sofa looks like this sofa and

8   we'll test that sofa or this recliner or this swivel

9   chair.  They physically look like that, but that doesn't

10  mean that you have actually identified either the cover

11  fabric or the filler.  And those are the materials are

12  going to be ignited by whatever ignition source is

13  presented to them.  And that was a significant failing.

14  Today investigators are pointed towards those, identifying

15  those first fuels and taking samples if it isn't obvious

16  from other indications of what they are.

17      Q   As part of your investigation into this case,

18  Dr. DeHaan, did you review information about a 911 call

19  that the woman who passed away in this case made to 911?

20      A   Yes, I did.  I had the transcript and then

21  yesterday overheard the tape itself.

22      Q   You are aware obviously that in the 911 call

23  there's a reference to a chair being on fire?

24      A   Yes.

106

1    Q    So why doesn't the 911 call assist you in making

2    a finding as to the origin of this fire based on what the

3    victim said in that call?

4    A    That's certainly basically a witness statement,

5    and information like that is considered very important.

6    And I did evaluate that and the caller identified the

7    chair's on fire and there are two chairs, which one.  And

8    at one stage the caller says it's the one by the balcony,

9    but in the next breath or the previous breath there's a

10    description of the fire blocking both exits.  Well, the

11    balcony is about 25 feet away from the main entry to the

12    apartment.  And that means something very large has to be

13    on fire to have a fire big enough that if you are

14    approaching the fire in the living room from the hallway,

15    which is apparently where she saw the fire, what's going

16    to be a big enough fire to block both of those exits.

17    And that's even not allowing for the panic, you

18    know, the panic distortion if you want to look at it that

19    way of you see something on fire as a lay observer, how

20    accurate is your description going to be.  And so that

21    description basically goes both ways.  Could it have been

22    the chair, yeah, but if the chair is what's on fire and

23    that's all that's on fire at that point, that single chair

24    no matter what it's made of in terms of modern synthetic

Pl. Amor 030100

107

1  material is not enough to drive a fire to the point where

2  the other chair is the recliner if the other end of the

3  sofa is on fire.  It just isn't a big enough fire.

4         However, if the sofa, for instance, is on fire,

5  now you could have a big enough fire to spread the fire

6  both ways.  And then when you came out of the hall you

7  would see both chairs on fire, but the one that caught,

8  apparently caught the attention first was the one nearest

9  the balcony.  So it's basically self-contradictory

10  information, but you test both hypotheses against the

11  science.

12     Q     Let's talk a little bit about timing.  Do you

13  have an opinion as to in this fire the time at which there

14  were first flames associated with this fire?

15     A     You mean clock time?

16     Q     Right, or how long before, let's ask you a better

17  question.  Applying modern fire science do you have an

18  opinion as to how long before the victim in this case

19  called 911 this fire began?

20     A     No, I don't because we don't know what the first

21  fuels were.  We don't know in what piece of furniture it

22  started in, and therefore don't know what actually was on

23  fire in the minutes prior to her call.

24     Q     Applying modern fire science is it possible for

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

108

1    anyone to reach a determination as to when clock time-wise

2    this fire began?

3       A    Not to my knowledge.

4       Q    And why is it that someone applying modern fire

5    science cannot make a determination about when this fire

6    began?

7       A    Well, as I have said we don't know, it's not

8    known what the furniture was actually made of, so we don't

9    know what its growth rate of a fire started by any means

10   in any of those components actually are.

11      Q    Well, you know there's at least interviews and

12   witness statements from other people who lived in this

13   apartment about the time they left that day, right?

14      A    Yes.

15      Q    That's obviously from Mr. Amor and from Tina

16   Miceli, right?

17      A    Yes.

18      Q    Don't those statements, wouldn't those statements

19   assist someone in making a determination about when this

20   fire began?

21      A    Yes, because their observations were reported as

22   no fire invisible or detected when each of them left the

23   apartment. So if you can establish exactly when that

24   occurred or sequence reliably then yes, you could estimate

Pl. Amor 030102

109

1  well, the fire for one reason or another wasn't detected

2  by X or Y and it was visible at 6:40 when the occupant saw

3  it.

4      Q    But beyond that is it possible using modern fire

5  science to make a specific determination about when this

6  fire began?

7      A    Once again only if you know what the first fuels

8  were and how those furnishings were made and how the

9  detection might have occurred at an early stage of the

10  fire.

11      Q    Is that information that, at least from what you

12  have reviewed, that you have in this case?

13      A    No.

14      Q    We talked some this morning about smoldering

15  fires.  Can you explain to the Court the difference

16  between a fire that has begun by smoldering and a fire

17  that has begun by open flame?

18      A    Well, yes.  As I said this morning a smoldering

19  fire is a very low energy event where the oxygen in the

20  atmosphere is combining directly with the surface of the

21  fuel and that fuel as it burns then has to be in contact,

22  physical contact with another fuel to spread the fire.  If

23  I have a suitable fuel and a suitable physical

24  arrangement, I can burn a considerable quantity of

110

1  material if it's susceptible to smoldering combustion to

2  completion and never get an open flame.

3         Whereas an open flame propagates at a predictable

4  rate in a particular direction because it's got more

5  energy than the smoldering reaction, and it's driven by

6  physical processes like the buoyancy of the hot gases

7  generated move the heat in a particular direction and draw

8  fresh air in.  And smoldering fires do not propagate by

9  convective or even radiant transfer.  They may have to be

10  basically in contact for direct conductive transmittal to

11  the next fuel.

12     Q    So taking a cigarette as an example, if a

13  cigarette is left on some item that can smolder, there

14  will be some period of time where that cigarette smolders

15  and it's possible depending on what that item is that it

16  is left on, that could transition into an open flame fire,

17  right?

18     A    Yes.

19     Q    Are you aware of any studies or information that

20  provides scientific insight on how long a cigarette left

21  on a particular item takes from when it's left to when

22  there's that transition from smolder to open flame?

23     A    Well, there have been some studies done by the

24  researchers at NIST center for fire research.  I have

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

111

1   conducted some observational tests of looking at placing

2   cigarettes on different surfaces and timing the interval

3   between placement of the cigarette and the observation of

4   open flame, if any, and of course that varies considerably

5   with the nature of the fuel being placed in contact with a

6   weak source like a cigarette.

7        Q    From the NIST studies you are referencing and

8   from your own investigation what is the shortest amount of

9   time it can take for a cigarette to smolder into an open

10  flame?

11       A    Krasny's work on maybe 20 years ago, Krasny and

12  his colleagues did a great number of tests on furniture.

13  And the results were that the shortest interval of time

14  was 22 minutes from placing a lighted cigarette onto a

15  fabric, a susceptible upholstered surface before there was

16  open flame.

17       Q    Have you in your own research conducted tests

18  that have had a cigarette that's left to smolder

19  transitioning to open flame in shorter than 22 minutes?

20       A    Yes.

21       Q    What in your research were the materials that the

22  cigarette was left on that could smolder to an open flame

23  in less than 20 minutes?

24       A    In several cases it was the cotton batting or

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

Pl. Amor 030105

112

1   stuffing in a traditional upholstered chair. And if the

2   cigarette was placed on the face fabric, the minimum time

3   that I have observed is 22 minutes. If there is a flaw in

4   the face fabric such that the cigarette could be in direct

5   contact with the susceptible stuffing, I had it transition

6   to flame in as little as 18 minutes. And in several cases

7   I have attempted cigarette ignition of cotton towel, dry

8   cotton towel, I have had ignition in less than 15 minutes.

9   And the ignition of the toilet paper rolls that have been

10  successful are typically in that same range, 15 to 20

11  minutes, if they are going to transition at all.

12      Q    When you are talking about a, the example you are

13  giving about a cigarette on something with cotton batting

14  where there's a flaw, you are talking about a rip in the

15  outside fabric essentially?

16      A    Yes, or an open seam.

17      Q    Now, did you review trial testimony in this case

18  that it was the opinion of the state fire marshal

19  investigator that there was not enough time in this case

20  for the fire to be caused by a smoldering cigarette?

21      A    Yes.

22      Q    And do you agree that in this case it's not

23  possible for this fire to have been caused by a smoldering

24  cigarette?

113

1      A      No, I don't agree.

2      Q      Why don't you agree?

3      A      Well, because there are still my test results and

4   the ones reported by Krasny, for instance, are down in

5   that range of 20 to 22 minutes.  And they of course occupy

6   a great range of values because as I said smoldering

7   ignition is not necessarily a reproducible event

8   especially when it comes to duration of the contact

9   necessary.  But while I would have to consider it

10  unlikely, I do not think you can necessarily exclude

11  entirely the possibility of a cigarette actually igniting

12  furniture in the time frame available to and having it

13  transition to open flame.

14     Q      If a cigarette is left on a couch cushion or a

15  chair cushion, are there studies on how long it takes for

16  that cigarette to create smoke?

17     A      Just what I have observed in my cigarette tests.

18     Q      What have you observed in your tests?

19     A      That within five minutes or so if you are going

20  to have ignition of the substrate, the fuel, there is a

21  modest increase in the volume of smoke being produced by

22  that contact between the burning cigarette and the

23  upholstered surface over and above what you would get from

24  the cigarette alone.

114

1    Q   If a cigarette was wedged down between the

2  cushion and the side of the chair or between two cushions

3  on a couch, is it possible that that cigarette could

4  smolder in between the end or in between the cushions

5  without smoking?

6    A   No.  The cigarette as long as it's combusting

7  will generate smoke.  But I have had the transition occur,

8  the ignition, well, the smoldering process actually

9  penetrate through a vertical cloth surface and actually

10  most of the smoke would be generated actually inside the

11  arm of the chair or the back rest of the chair.  And I'd

12  be sitting there watching it waiting for it to happen and

13  think well, it's gone out and then look a little closer

14  and realize there was smoke being produced but it was

15  trapped inside the upholstered surface.

16    Q   You have done studies where the cigarette

17  smolders and it's not necessarily observable from the

18  outside?

19    A   Yes, I have had that occur a couple of times,

20  yes.

21    Q   One possibility in this case for how this fire

22  began is that a smoldering cigarette was trapped in the

23  couch or one of the two chairs for some period of time

24  prior to this fire beginning, do you agree that's a

Pl. Amor 030108

115

1   possible cause for this fire?

2      A    Yes.

3      Q    And given all of your experience and your

4   training as a fire investigator is it possible that a

5   cigarette in that situation could have gone undetected for

6   some period of time?

7      A    Depending on the size of the room and the prefire

8   conditions, the physical abilities of the person detecting

9   it, yes.

10      Q    Well, if someone was sitting in the same room as

11  a smoldering cigarette that was inside of a chair or

12  trapped in between cushions like we've been talking about,

13  wouldn't somebody smell there was a problem?

14      A    If the starting conditions were clean air and the

15  individual's sense of smell was normal, yes.

16      Q    Are there situations in which someone could be

17  sitting in the same room as a smoldering cigarette in a

18  chair or a couch and not realize that a cigarette was

19  smoldering there?

20      A    Yes, if that room had been used previously or

21  recently for smoking of cigarettes with closed windows and

22  closed doors, the smell of the burning cigarettes would

23  linger.

24      Q    To go back to the Krasny research that we were

Pl. Amor 030109

116

1    talking about just a minute ago, does anything about the

2    well, actually I misspoke, let me go back.  You were

3    talking about some research that was done by NIST about

4    the time frames for cigarettes to ignite?

5         A    Yes.

6         Q    Is there research from Krasny about this topic as

7    well?

8         A    That's who I had in mind.

9         Q    The NIST research is the Krasny research?

10        A    Yes.

11        Q    Have you reviewed an opinion from Mr. Golder in

12   this case that references that Krasny research?

13        A    Yes.

14        Q    In your opinion is the Krasny research about the

15   timing of cigarettes correct other than your personal

16   tests that you have testified about that were a little

17   shorter?

18        A    Yes, in terms of the minimum time required, yes.

19        Q    I take it you don't take issue with the results

20   of the Krasny research on this topic?

21        A    No, they are in concert with my findings.

22        Q    Well, does the research from Krasny about the

23   timing that it takes for a cigarette to smolder into a

24   fire indicate in this case that a smoldering cigarette

117

1  can't be the cause of this fire?

2      A    Not to my analysis, no.

3      Q    Why doesn't it?

4      A    Well, because the Krasny data represents the

5  range of delay times that they recorded in their tests of

6  various kinds of furniture, and that's just that, a range.

7  As I said earlier ignition by any smoldering cigarette is

8  very much a chance event. And the Krasny results show

9  that, that in some cases even with the same chairs there's

10 a wide range of times that, between the placement of the

11 cigarette and transition to flame. And in some cases, if

12 I remember correctly, there was never a transition to

13 flame. Basically it continued to smolder until it

14 self-extinguished. When you are applying that data you

15 have to look at saying okay, it's a very short period of

16 time, and it's very close to the minimum observed in these

17 tests, and as I said a few minutes ago is it unlikely.

18 Yes, because most of the transitions will occur in a

19 longer period of time. But is it impossible, no, because

20 of the variability of the cigarette ignition process.

21     Q    I think I have one more topic to cover with you,

22 Dr. DeHaan, and then I will tender you as a witness. In

23 your review of this case do you see any evidence that this

24 fire was set with the assistance of a liquid accelerant?

Pl. Amor 030111

118

1      A      No.

2      Q      A liquid accelerant could include beverage

3  alcohol and we have been talking about vodka?

4      A      Well, no, not really.

5      Q      Because that can't light a fire, right?

6      A      That's right, it won't sustain a flame long

7  enough to actually start a fire.  It has to be a higher

8  proof beverage alcohol.

9      Q      Liquid accelerants are things like gasoline,

10  propane, things like that?

11      A      Well, for the most part we're talking about

12  ignitable liquids, gasoline, paint thinner, kerosene,

13  things like that, yes.

14      Q      There was some reference in witness interviews in

15  this case that there might have been lighter fluid that at

16  some point was present in the apartment in the living

17  room?

18      A      Charcoal lighter fluid, yes.

19      Q      Do you see any evidence that charcoal lighter

20  fluid was used to cause this fire?

21      A      No.  The lab tests on the debris that was

22  submitted were all negative, and there were no patterns to

23  indicate the presence of an ignitable liquid that survived

24  the flashover duration of that fire.

119

1    Q    Is there any evidence that any kind of

2    accelerant, liquid or otherwise, was involved in this

3    fire?

4    A    Not that I saw in the documentation, no.

5    Q    Given what you know about all of the evidence in

6    this case about the timing involved in this case, could

7    the defendant have set this fire deliberately by using

8    charcoal lighter fluid to set a fire in some area of the

9    living room before he left that day?

10    A    Not considering the time frame that was suggested

11    in the evidence that I saw that there was, that Tina was

12    present for some or came back some minutes after Mr. Amor

13    left, and if the fire had been started with an open flame

14    in such a manner to actually spread quickly, it would have

15    been visible by smoke or odor because it would be a

16    significant fire.

17    Q    If Mr. Amor had started this fire assuming that

18    the timing that he provides are accurate, if he had

19    started this fire and then left, and then Tina had come

20    back, what condition would the living room have been in

21    when she returned?

22    A    Well, there would have been a noticeable

23    generation of flames and smoke no matter what was ignited.

24    Q    We had talked I think primarily before lunch

120

1   about the state of fire science in the time that this fire

2   was investigated between 1995 and 1997.  In this time

3   period 1995 to 1997 was there a difference in the way that

4   leaders in the field of fire science were thinking about

5   fires and the way that fire investigators and fire

6   departments and state fire investigation offices were

7   thinking about fires?

8        A    Yes, there was.

9        Q    What was the difference?

10       A    Well, the professionals in the field were pushing

11  the science aspects understanding that science of why burn

12  patterns occur, why they look this way, what the balance

13  of ventilation was, what the process of flashover was.

14  And a lot of the field investigators were still pursuing

15  what does the burn pattern alone tell me, and can I tell

16  it was an incendiary fire based on the burn patterns that

17  are left.

18       Q    And I think what we have been talking about is

19  when it was that fire science became modernized.  Do you

20  know when it was that -- well, let me ask you a better

21  question.  In fire science today is there still a

22  difference between what leaders in the field of fire

23  science are thinking about fires and what fire

24  investigators in fire departments and state fire

121

1    investigation offices are thinking about fires?

2        A    Yes, in some cases -- not just, there's no

3    geographical pattern or anything like that.  It's just

4    some investigators will not step up to the greater

5    challenge.  Many of the people who were practicing fire

6    investigation in the '80s and '90s, for instance, when

7    faced with the demands from 921 and 1033 actually chose to

8    retire rather than change their processes.  So the balance

9    point, the majority is shifting to better and better

10   practices.  Are there still some holdouts, yes.

11       Q    Dr. DeHaan, was it true that even in the 1995

12   version of NFPA 921, in the 1995 version that NFPA 921 at

13   that time was still advising investigators that V patterns

14   can often be traced back to a point of origin?

15       A    Yes.

16       Q    When did that language come out of NFPA 921?

17       A    I have no idea.

18       Q    Is it in the current version of NFPA 921?

19       A    Not that I know of.

20       MS. THOMPSON:  Your Honor, I have no more questions

21   for the witness at this time.

22       THE COURT:  Alright.  We're going to take a break and

23   at 3:15 we'll start the cross examination.

24           (Whereupon, a recess was taken, after which

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

Pl. Amor 030115

122

1          the following proceedings were had herein:)

2     THE CLERK:  William Amor.

3     THE COURT:  All the parties are present with their

4 respective counsel.  Dr. DeHaan has resumed the witness

5 stand.  Sir, you do remain under oath.  Anything before

6 we --

7     MS. THOMPSON:  Your Honor, I intended to offer into

8 evidence Defendant's Exhibit 14, which was Dr. DeHaan's

9 report.

10     THE COURT:  Any objection?

11     MR. PAWL:  No.

12     THE COURT:  Admitted.

13     MS. THOMPSON:  We have the other photographs from the

14 record.  They were already tendered into evidence.  I

15 don't believe I need to offer them again.  I don't know

16 how the Court wants me to address that.

17     THE COURT:  Well, as it relates to the original trial

18 exhibits that have been referenced as part of this hearing

19 less there would be any issue, I take it there's no

20 objection to their admissibility either.

21     MR. PAWL:  Oh, no, not at all.

22     MS. THOMPSON:  Does the Court want a list or --

23     THE COURT:  We have been keeping track here.  I don't

24 know if you have a separate exhibit list.

---

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

123

1    MS. THOMPSON: We do. I have written down which ones

2 we have used, if the Court has done so as well.

3    THE COURT: I think my clerk will compare it to yours

4 when we're done.

5    MS. THOMPSON: That makes sense, Judge, thank you.

6    THE COURT: Mr. Pawl, you may inquire.

7    MR. PAWL: Thank you, Judge.

8                   CROSS EXAMINATION

9                   BY MR. PAWL:

10    Q    Doctor, good afternoon. My name is Mike Pawl. I

11 have the opportunity to ask you some questions too if you

12 don't mind, okay?

13    A    By all means.

14    Q    I couldn't help but notice that your lapel pin is

15 a profile of Sherlock Holmes?

16    A    Yes. He's basically the reason I am a

17 criminalist, yes, from high school.

18    Q    Then I take it that you have heard of the maxim

19 or understood the maxim when you have eliminated the

20 impossible whatever remains however improbable must be the

21 truth?

22    A    I have incurred that exact maxim, yes.

23    Q    Do you agree with Sherlock Holmes on that maxim?

24    A    In many cases, yes.

Pl. Amor 030117

124

1     Q    On that topic the NFPA 921 does talk about how

2  the process of elimination is an integral part of the

3  scientific method?

4     A    It does now finally, yes.

5     Q    Do you agree with that?

6     A    Yes, yes.

7     Q    Have you experienced any experts in the field who

8  disagree with that?

9     A    Well, 921 over the years has struggled so much

10  with the concept of process of elimination and overlapping

11  negative corpus that at one point one edition they

12  actually had both of them eliminated.  And some of us said

13  a negative comment and said hang on a minute, process of

14  elimination is part of the scientific process.  And

15  negative corpus is kind of an extreme example of that.  I

16  think they tried to fix the language again.  I'm not sure

17  if they have or not.

18     Q    I suppose maybe that's my next question.  I take

19  it over the years 921, NFPA 921 has kind of addressed it a

20  number of times, maybe even gone back and forth?

21     A    Yes, that's true, yes.

22     Q    So fair to say if there's a different concensus

23  it might change again, it's what it is, it's concensus?

24     A    Yes, and it's a committee, so you have two forces

Pl. Amor 030118

125

1  working against each other.

2      Q     Currently what are the classifications of a fire?

3  We'll just use this fire.  What are the possible

4  classifications for a fire?

5      A     Incendiary, accidental, natural or undetermined.

6      Q     How about back in 1995, 1997, those were the same

7  classifications, right, in that time frame?

8      A     Well, it depends on what agency you were

9  reporting to including the national statistical gathering

10  things where undetermined was not a recognized

11  classification, and so investigators were kind of forced

12  to pick one or the other.

13      Q     Let me ask you this, if I asked would you agree

14  with this statement:  Without evidence of an incendiary

15  fire such a fire must be labeled as accidental, would you

16  agree with that sentence?

17      A     No, I wouldn't.

18      Q     Are you aware of any expert in your field that

19  has such an opinion that if it's not incendiary it's got

20  to be accidental?

21      A     Well, there have been some interpretations

22  offered by a couple of private sector investigators who

23  claim that, yes.

24      Q     So is there even today this difference of opinion

126

1  amongst fire investigators about classification, is that

2  fair to say then?

3      A    No.   I think the majority of the investigative

4  community will adhere to the incendiary, accidental,

5  undetermined or natural classification scheme.

6      Q    But your assessment saying if it's not incendiary

7  it has to be accidental, that's not proper?

8      A    That's wrong, yes.

9      Q    In the course of your analyzing the trial

10 evidence, I take it you also considered Special Agent

11 Golder's report?

12     A    Yes, I did.

13     Q    Did you also examine Mr. Carpenter's report?

14     A    Yes, I did.

15     Q    Mr. Paul Bieber's report?

16     A    Yes.

17     Q    You understood that Mr. Carpenter, Mr. Bieber

18 were asked to provide opinions by the defense; is that

19 right?

20     A    Yes, that was my understanding.

21     Q    Just as an aside, I know you had mentioned that

22 you didn't have lawful authority to get into the

23 structure.   It's always a good idea if you can to get into

24 the structure that's in question, right?

127

1      A      Yes.

2      Q      This is 20 years some now gone by, there still

3  may be some evidence that you can glean from it?

4      A      Well, yes, basically to fill in the gaps on

5  documentation like the dimensions that were missing from

6  the original investigation and what the physical

7  relationships were, where that cross beam was in the

8  ceiling between the living room and dining room, things

9  like that.

10     Q      I know you said you didn't have lawful authority

11 to get in there.  Did you know that you could make a

12 request of the prosecution or through the defense to see

13 if you can get in there, we could make arrangements for

14 you, you know that's a possibility?

15     A      No, I didn't realize that.  I did ask if anybody

16 had done it and I was told no.

17     Q      It never hurts to ask.  But let me ask you about

18 your opinion in total.  With all that you do have and I

19 understand the limitations like you couldn't go off to

20 walk the scene, I think it's fair to say at this point

21 none of the current investigators have had that ability to

22 do that, but with all the data that you had if you were

23 looking at this fire back in 1995 how would you have

24 classified it?

Pl. Amor 030121

128

1      A     Undetermined.

2      Q     Right. And you had all the tools available in

3 1995 to look at all this evidence back then to come to

4 that determination?

5      A     Yes.

6      Q     You certainly were around in 1995 as an expert in

7 your field?

8      A     Yes.

9      Q     I take it back in 1995 with your expertise in

10 that field you believed that the methodology, the methods

11 that you were using were the proper methods?

12     A     Yes.

13     Q     So when we talk about ventilation certainly back

14 in at the time of this trial between 1995 and 1997, you

15 understood and there are experts in your field that

16 understood the concept of ventilation and how they

17 affected fires?

18     A     Yes.

19     Q     I just noticed something in your report. In your

20 report I think you had mentioned that you believed that

21 the only ventilation serving the fire is the successive

22 failure of two glass balcony doors, does that sound about

23 right?

24     A     Yes.

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

129

1    Q    At the time when you wrote your report were you

2 under the belief that the patio doors were closed?

3    A    Well, the pictures that I had like those did not

4 indicate a significant overlap between the visible

5 portions of the frames.  So if it had been open it was

6 open just an inch or so.  Mr. Amor's statements indicated

7 that that's very often the status, that that was

8 frequently the position if the weather outside was

9 friendly.  And yes, that as I said earlier a very narrow

10 opening would provide a little bit of ventilation and

11 extend the lifetime of the fire before it ran completely

12 out of oxygen.

13    Q    So after your report was done you found out Agent

14 Golder had the opportunity to speak with the defendant and

15 try to get some additional information or new information

16 or confirm old information?

17    A    Yes, I knew there had been an interview done by

18 Agent Golder.

19    Q    Did you make a request at all or have you spoken

20 with the defendant?

21    A    No, I have not.

22    Q    Did you make a request to do so at all?

23    A    No.  The time that had elapsed I felt would

24 render new information to be kind of marginal in terms of

Pl. Amor 030123

130

1   its reliability considering what do you remember about 18

2   years ago, that's difficult to account for.

3         Q      Speaking about the patio doors, this is People's

4   3 from the original trial, this is the photograph that you

5   identified where the south, just the south patio door has

6   failed; is that right?

7         A      Yes.

8         Q      On People's No. 2, this is the one where you

9   identified that the south patio door has failed and the

10  north patio door has failed, right?

11        A      Yes, it's broken.  There's a portion of it still

12  kind of stuck in the frame, yes.

13        Q      Did you review the transcript of the witness who

14  testified about the timing of these photos?

15        A      That was Mr. Knuth?

16        Q      Yes.

17        A      I remember reading the transcript.  I don't

18  remember --

19        Q      About which one came first?

20        A      Right.

21        Q      Did you read that transcript or no?

22        A      Yes, I did.

23        Q      On the topic just of the sliding glass door, it

24  was your opinion that the south failed first; is that

Pl. Amor 030124

131

1  right?

2      A    Yes.

3      Q    That's consistent with flashover effect that both

4  would be defeated at the same time?

5      A    Yes, there is some variability in the response of

6  glass to thermal shock.  But typically when you have

7  flashover in a room the windows exposed to the same kind

8  of thermal shock fail within a minute or two of each

9  other.  You can actually hear them fail.

10     Q    So if the south failed before the north or if the

11 north failed first and the south failed, it could make a

12 difference?

13     A    It could, but it's within the normal variability

14 of thermal response, yes.  Because sometimes the failure

15 actually is induced by the distortion in the aluminum

16 frame.  Whether one is mobile and the other one is fixed

17 may affect how much that distorts.

18     Q    But there is impact on the fire as you believe it

19 which one goes first or if they go at the same time?

20     A    Yes.

21     Q    On that topic of flashover while we're on it, I

22 don't have a lot of questions on that, but I do want to

23 ask was it your understanding that, and I think you used

24 the term one of the original investigators believed the or

Pl. Amor 030125

132

1    looked for origin or significant burn on, low level

2    significant burn on the northwest corner, that line of

3    questioning, do you recall that line of questioning?

4        A    Yes.

5        Q    Did you understand that Lieutenant Ferrari was

6    one of the first investigators on the scene?

7        A    Yes.

8        Q    And that there was some information about they

9    were looking at that northwest corner about that?

10       A    Yes.

11       Q    That was from Lieutenant Ferrari?

12       A    That was my memory, yes.

13       Q    Later on he completed a full report, is that a

14   yes or no?

15       A    Yes.

16       Q    And then when he completed his full report he

17   actually, Lieutenant Ferrari talked about flashover,

18   right; is that right?

19       A    Yes.

20       Q    And attributed that damage including that area of

21   the northwest corner as part of the flashover?

22       A    That's correct.

23       Q    So he properly, you agreed with his evaluation

24   with flashover causing damage to that northwest corner?

Pl. Amor 030126

133

1    A    Yes.

2    Q    And that would be part of applying his knowledge

3    and understanding about how fire works to this particular

4    scene?

5    A    Yes.

6    Q    Regarding the 911 call, I don't think it's

7    necessary to play it, did you actually listen to the call?

8    A    I actually could overhear it.  I was in the

9    witness room around the corner.  It was pretty loud.

10   Q    It's a good thing that there was not a motion to

11   exclude involving you.

12   A    That was about all I could hear.

13   Q    But it's a good lesson for everybody in the

14   courtroom, I will remember that.

15        That was the first time you heard it?

16   A    Yes.

17   Q    Without having to play it again is it a fair

18   assessment that there's various interpretations that can

19   be given to that 911 call, what she means?

20   A    Yes, because I had been looking at the printed

21   transcript of that same thing and I had the same opinion,

22   yes.

23   Q    So you do talk about your report from time to

24   time about what impact testimony can have on a jury, and

Pl. Amor 030127

134

1   I'm not going to belabor this.  You don't have any

2   specific training or experience in how juries other than

3   your own personal experience maybe, there's no scientist

4   on juries and how they work or what they think of, every

5   jury is different, is that fair enough to say?

6       A    Yes.

7       Q    So but in the sense of what a 911 call, how it

8   can be interpreted, there's no new science about that, is

9   there?

10      A    I don't know.  I mean, you know, I don't know how

11  those are presented and how they are perceived by

12  different juries.

13      Q    Right, but there's nothing with respect to in

14  your field of fire science that says this is how we should

15  analyze a call like that 911, it's not a scientific method

16  to dissect a 911 call?

17      A    Only to evaluate the information and the

18  reliability of that information, yes.

19      Q    The information itself could be used to in your

20  assessment of cause and origin, that sort of thing; is

21  that right?

22      A    Yes.

23      Q    But with the limitation that a 911 call, like the

24  one in this case, can be subject to various

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

135

1  interpretations?

2      A      Yes.

3      Q      And but I think one note you made is that when

4  she's talking about, she never says, she says the fire is

5  blocking her way out; is that right?

6      A      Yes.

7      Q      When she's talking about the chair that's on fire

8  she goes it's the one right by the patio door?

9      A      Yes.

10     Q      She also says it's also by the main entrance?

11     A      Yes.

12     Q      I think it's reasonable she's in the master

13  bedroom at the time when she's making that phone call?

14     A      Or up and down the hallway, yes.

15     Q      It wasn't a cordless phone, do you remember

16  seeing the pictures?

17     A      It was a wire to the base set, yes.

18     Q      But in any event so that statement of the fire is

19  blocking my way and the chair is on fire, that can be

20  consistent with the swivel chair being, the swivel chair

21  right by the patio door, the swivel chair and the fire

22  coming across the ceiling?

23     A      Yes, to a lay observer.  And that's one of the

24  interpretations I gave and that's why I looked at how big

Pl. Amor 030129

136

1  a flame plume that chair alone would have produced.

2      Q     Because I think you talked about when we were

3  talking about the recliner chair, you were shown some

4  photos of that, that damage that you observed could be

5  consistent with radiant heat coming down?

6      A     Yes, it could.

7      Q     That's not necessarily flashover though, right?

8      A     No.  It's part of the development towards

9  flashover, but I have had it stopped prior to that

10 complete involvement stage, yes.

11     Q     There's concepts of for instance rollover fire,

12 right?

13     A     Yes, rollover is the ignition of the hot smoke

14 layer itself generating more ignitable, more radiant heat.

15     Q     But certainly what you just testified to right

16 here and right now about the 911 call and this poor

17 victim's obviously distressed and what she's saying,

18 that's certainly something you could have rendered opinion

19 about back in 1995?

20     A     Yes.

21     Q     And in 1997?

22     A     Yes.

23     Q     And there were experts in your field that could

24 have equally done that in your assessment back then,

137

1  right?

2      A    I would presume so, yes.

3      Q    With respect to witness statements, and that

4  would include Mr. Amor here, I know you were aware of his

5  ultimate statement, this business about the cigarette, the

6  newspapers, the vodka?

7      A    Yes.

8      Q    Did you have information that there was a

9  progression of different statements by Mr. Amor during the

10 course of the investigation, were you aware of that?

11     A    Yes.

12     Q    Now, with respect to the statement of, there is a

13 statement and there is evidence that the defendant

14 admitted to intentionally setting this fire?

15     A    Yes.

16     Q    And he gave an area where he set, the area,

17 general area, where he set the fire; is that right?

18     A    Yes.

19     Q    He also explained how that fire, how he started

20 the fire, right?

21     A    Yes.

22     Q    But just with respect to the area where he

23 admitted to starting the fire, is that something that an

24 investigator like yourself can use now to form a

138

1  hypothesis and look into and then come to a conclusion

2  regarding maybe cause or origin?

3      A     Yes, that would be good practice to use it as a

4  foundation for at least one hypothesis.

5      Q     Again you can do that now, but you could have

6  done it back in 1995?

7      A     Yes.

8      Q     You could have done it in 1997?

9      A     Yes.

10      Q     And there were experts in the field that were

11  able to certainly do that and available for either party,

12  the prosecution or the defense?

13      A     Well, available, yes.

14      Q     They were around, right?

15      A     Yes, whether in service to somebody who could ask

16  for their help, yes.

17      Q     Correct me if I'm wrong, please, did I hear you

18  right that you thought it was a significant failure on the

19  part of the original investigators not to collect samples?

20      A     Yes.

21      Q     Were you aware that samples were collected?

22      A     Samples of the apparently carpet were collected

23  for the testing for ignitable liquids.  I was referring to

24  samples of the upholstery on the target, potential target

Pl. Amor 030132

139

1   materials. I'm not aware of any of those being collected.

2       Q   That's what I thought you were talking about.

3   I am going to mark this as People's Exhibit 15. I have

4   given a copy of this to the defense. This was made

5   available, in fact I think the defense came down to our

6   office some months, many months ago to review all the

7   evidence we had here in the state's attorney's office.

8   Judge, here's a court copy for you, sir, People's 15,

9   courtesy copy.

10          Doctor, showing you People's 15, would it be fair

11  to say that you have not seen this property --

12      THE COURT: Can I just interrupt?

13      MR. PAWL: Yes.

14      THE COURT: I apologize. You provided a witness list,

15  an exhibit list. It does have a 15 that's not this.

16      MR. PAWL: You are right, Judge.

17      MS. HOFFMAN: I apologize, 26.

18      THE COURT: What you are about to show Dr. DeHaan is

19  26.

20      MR. PAWL: Q Doctor, I need that back. I have to

21  change the numbers. Just take a look at that.

22      A   Sure.

23      MS. THOMPSON: Just for the record is it your

24  statement that this actual document was provided to

Pl. Amor 030133

140

1  petitioner before today or that it was in your file that

2  was available for petitioner to look at?

3      MR. PAWL:  It was downstairs.  We have all the

4  evidence brought up with property control, allowed the

5  defense to look through the property control as well as --

6      MS. KAESEBERG:  Absolutely.

7      THE COURT:  It would be better if, there's like four

8  lawyers talking.  It doesn't really help the record or the

9  court reporter or me.  Do you guys need to have a

10  discussion about the evidence?

11     MR. PAWL:  Sure.

12     THE COURT:  Alright.

13         (Whereupon, a discussion was held outside

14              the record, after which the following

15              proceedings were had herein:)

16     THE COURT:  Back on the record on People versus Amor.

17  All parties are present with their respective counsel.

18     MS. KAESEBERG:  If I can clarify for the record our

19  understanding of this document.  It's a 2016 printout of a

20  Naperville Police Department property report.  Throughout

21  the course of this case we have made attempts to obtain

22  materials in the case.  Some time we believe in the summer

23  or fall of this year the state made the file available in

24  their office.  We did go through and look through a vast

MARIE R. JAKUBIEC  CSR LICENSE NO. 084-001117

141

1   amount of documents.  We believe we saw this document at

2   that time.  We were never tendered technically a copy of

3   the document, but we believe it was probably in the

4   state's file at the time we looked through all of their

5   documents.

6       MR. PAWL:  And at the time the file was open all the

7   evidence was brought over including the evidence that's

8   contained in this property form, it was brought into a

9   room including the cans that contained items of evidence

10  that were seized.

11      MS. KAESEBERG:  I mean we could go down this road.

12  There were some things we did look for in the file that

13  were not there that were missing.  So just the

14  characterization of all the evidence, there are some

15  things to this day, but just to make the record very clear

16  on that point.

17      THE COURT:  But that would be a reference to items

18  that neither side has had an opportunity to re-review.

19      MS. KAESEBERG:  As far as we know.

20      THE COURT:  When you say not everything is available,

21  you are not suggesting the state saw it and you didn't,

22  you are saying neither side was able to recover it.

23      MS. KAESEBERG:  What I am saying is that it's our

24  understanding it either should have been in the clerk's

142

1  file or the state's file or the Naperville Police

2  Department file, and we did not locate at least one

3  particular document that I am thinking of.  There's

4  potentially two or three documents we did not find.

5      THE COURT:  But this was not one of them.

6      MS. KAESEBERG:  Correct.

7      THE COURT:  I take it the import is that this has

8  items in it that were testified to that didn't exist.

9      MR. PAWL:  I don't think there's testimony that it

10 didn't exist, maybe I can ask the witness.

11     THE COURT:  So there's no objection to the state

12 asking questions about 26.

13     MS. KAESEBERG:  Correct, no objection.

14     THE COURT:  Mr. Pawl, you may proceed.

15     MR. PAWL:  Q  Doctor, I take it this is not a document

16 you have seen?

17     A    That's correct, I have not.

18     Q    If I can just show you.

19     A    I was checking to see what the objects were.

20     Q    What did you find?  If you just reference where

21 you're looking.

22     A    Bottom of page 2, it says 1S, unstained control

23 of chair fabric.

24     Q    Does it give a location?

MARIE R. JAKUBIEC  CSR LICENSE NO. 084-001117

143

1     A    South edge patio door living room.

2     Q    Does it give a date when that was collected?

3     A    September 11, '95.

4     Q    What else did you find?

5     A    The next page top of page 3, 2S, stained chair

6  fabric sample, also found in the same location.

7     Q    Is that the south edge patio door area living

8  room?

9     A    That's correct.

10    Q    Same date of collection?

11    A    Yes.  And then on page 6, 12S, unstained control

12  of carpet, dining room east wall.  And the next item down

13  13S, stained carpet sample.

14    Q    What dates were those collected?

15    A    Those were both September 11, '95.  I can't find

16  it, but there was mention of the carpet tack strip, two

17  samples of those, and I can't find those.  But what's

18  interesting is that I had --

19    Q    I am going to ask you, I can ask you, it sounds

20  like you were going into an explanation, I haven't asked

21  you a question.  So I am sure you will get the opportunity

22  to elaborate.  But with respect to does it appear then

23  that there were samples taken by the investigators?

24    A    Oh, I knew there were samples but the labeling

Pl. Amor 030137

144

1    that I saw in the documents that I had indicated that they

2    were fabric or carpet, of all those.  And I don't remember

3    seeing the designation that it was chair fabric in any of

4    those.  So that's why at least we know something was

5    collected.

6        Q    So at this point it does appear that there were

7    samples of the chair taken?

8        A    Of a chair.

9        Q    Of a chair, right, that's the best you can do?

10       A    Yes.

11       Q    And that would be proper for as you pointed out

12   for an investigator to do that?

13       A    Yes.

14       Q    In your mind that's nothing new.  That is true

15   today as it was in '95 and '97?

16       A    Yes.

17       Q    Even if the investigators hadn't gotten, taken

18   any samples, there were certainly investigators back in

19   1995 and 1997 available to say hey, you should have done

20   that, right?

21       A    No, I don't think in '95 most investigators would

22   have bothered to try to collect samples for identification

23   of fabrics on chairs, certainly as a general practice.

24       Q    So Naperville Police Department was ahead of the

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

Pl. Amor 030138

145

1    game?

2        A    Well, considering the samples, the six samples

3    they gathered, they did collect controls of each of the

4    three materials they gathered and to that and they were

5    submitted to the DuPage County laboratory my understanding

6    for analysis for accelerant.  So that would have been

7    routine.  But the issue that I was raising was there were

8    no samples of the fabric or the padding of any of the

9    major fuel packages taken for identification of the fabric

10   and the pad.

11       Q    There is the sample of a chair?

12       A    The fabric of one chair.

13       Q    On the topic of the upholstered furniture, you

14   understand in reading Agent Golder's report that it's his

15   opinion with regard to the recliner chair that's

16   polyurethane fabric or a polyurethane chair?

17       A    Yes, I think he expressed that opinion, I'm not

18   sure on what basis.

19       Q    Do you have your report with you?

20       A    I have my report, yes.

21       Q    If I can direct your attention please, could you

22   open up your report please to page 8 of 13?

23       A    Yes.

24       Q    If I go down to the third sentence and the second

Pl. Amor 030139

146

1  first full paragraph, the third paragraph on the page but

2  the second full paragraph, three sentences down does it

3  read:  While the upholstered furniture appeared from its

4  charred remains to have been synthetic fabric over

5  polyurethane cushions and padding, no samples were taken.

6  Now, so from your assessment it appeared to be

7  polyurethane cushions?

8      A    Yes, with the word appeared underlined.

9      Q    So that's certainly something that you and your

10  experience and all the time you spent with fires you have

11  been, you can look at something and make a statement that

12  it appears to be polyurethane?

13      A    Appears, but that's a long way from identifying.

14      Q    And that's fine.  But it is also true that there

15  was additional evidence of what that swivel or excuse me

16  the recliner chair was made of, and that was with respect

17  to Lieutenant Ferrari, correct?

18      A    No, I don't remember his description.

19      MR. PAWL:  Judge, do you have the Defendant's 11 or

20  counsel, I don't know if you handed it up.  So there's not

21  a repeat of exhibits if I could have Defendant's 11,

22  please.

23      THE COURT:  That's the 9/10/95 Ferrari report?

24      MR. PAWL:  Yes, sir.

147

1          Q   Doctor, I am showing you what's been marked as

2    Defendant's No. 11.  This is a report of origin and cause

3    of the report of Lieutenant Ferrari, and this is something

4    that you reviewed; is that right?

5          A   Yes, it is.

6          Q   I am going to reference there's a designation

7    down on the bottom of KC 241, do you see that?

8          A   Yes.

9          Q   Is it true that in Lieutenant Ferrari's report he

10   writes:  Examination of the recliner revealed the

11   following, the wood frame of the chair was intact, the

12   polyurethane foam cushions were consumed completely.  Did

13   you review that?

14         A   Yes.

15         Q   Now, and it is true that Lieutenant Ferrari, it

16   is your understanding he was the guy, he was at the scene,

17   he is right there with the chair?

18         A   Yes.

19         Q   It is fair that under standards as of today that

20   an investigator can use his experience or her experience

21   and knowledge and their experience with the fires that

22   they have had to encounter, that's something an

23   investigator can do?

24         A   Yes.

Pl. Amor 030141

148

1    Q    I will tender back Defendant's 11.

2         With respect to the questions about cigarette on

3    a newspaper with vodka causing a fire, in your review of

4    the testimony and what was presented to the jury, there

5    was no opinion rendered by a prosecution witness that said

6    in their opinion a cigarette dropped on a newspaper soaked

7    with vodka is what caused this fire, isn't that true?

8    A    I don't remember.  The one testimony that I do

9    remember was Kushner and he talked about vodka and an open

10   flame.

11   Q    Right, he talked about vodka and an open flame,

12   you have a good memory because that's what he did.

13   Kushner didn't say cigarette on newspaper with vodka

14   caused the fire?

15   A    No, I don't remember anyone saying that.

16   Q    Do you remember that's what the defendant said

17   happened?

18   A    Yes.

19   Q    But not an expert, right?

20   A    That's correct.

21   Q    Regarding the questions about ignitable liquids,

22   and I know you were asked some questions about in your

23   opinion were those patterns, and I can't remember the

24   exhibit but the picture of the floor patterns was that

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

Pl. Amor 030142

149

1    from ignitable liquid.  It is possible that in the realm

2    of possibility it is possible that it could be an

3    ignitable liquid that caused that pattern?

4        A    It is possible, yes, but we know today that that

5    possibility has to be supported by physical evidence of

6    the remains of an ignitable liquid because there are so

7    many other mechanisms by which that that pattern could

8    have been created.

9        Q    I appreciate that but it is a possibility?

10       A    Yes.

11       Q    It's a possibility now and it was a possibility

12   in 1995?

13       A    Yes.

14       Q    With regards to the questions about the

15   smoldering cigarette and those questions about 22 minutes

16   and 18 minutes, when you were writing your report was it

17   your understanding or was it your thought that the time

18   frame of 20 minutes was important?

19       A    Yes.

20       Q    And with respect to the studies that were done

21   with respect to the 22 minutes being the low end of when a

22   cigarette can smolder and then reach to open fire, flame I

23   should say, do you remember that study?

24       A    Yes.

150

1    Q    And when it's the 22 minutes, well, actually let

2  me ask you this.  I am going to show you People's 25.

3  This was already shown to one witness, Judge.

4    THE COURT:  I have it.

5    MR. PAWL:  I don't know if you have the copy.

6     Q  Doctor, I am going to show you People's 25.

7  This is I know it's the cover of a book you are familiar

8  with; is that right?

9    A    I am.

10    Q    And for lack of a better term it's the Krasny

11  book, K-r-a-s-n-y, The Fire Behavior of Upholstered

12  Furniture and Mattresses?

13    A    Yes.

14    Q    If I can go to what would be under fundamentals

15  29 of that exhibit, is that a table showing the smoldering

16  to flame transition times for various items?

17    A    Yes.

18    Q    For chairs down here line item reference 96, the

19  time frame was that 22 minutes to 152 minutes?

20    A    Yes.

21    Q    When you were testifying earlier is that the

22  study that you were talking about with the low end being

23  22?

24    A    Yes, that was the reference, yes.

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

151

1      Q    It's fair to say, is it not, that the book points

2   out that the fastest transition from smoldering to flaming

3   22 minutes after placement of the cigarette was in a chair

4   in which the heavy cotton fabric covered the cotton

5   batting?

6      A    That's correct.

7      Q    But when you talk about polyurethane we're

8   talking about longer times like up to an hour?

9      A    Well, it can be, it can be longer, and it is

10  statistically much less likely to happen at all with

11  urethane foam.

12     Q    When you were referencing a study like that 22

13  minutes to 152 minutes, you as an expert in your field

14  wouldn't round down to 20 minutes when you are talking

15  about a study like that, would you?

16     A    Well, if I am citing that study that's what I

17  said earlier is 22 minutes was the minimum that Krasny

18  got.  And it tallies as I said with the tests that I had

19  done on similar materials.

20     Q    And with respect to that, I will ask you about

21  that.  I am going to mark --

22     THE COURT:  We're at 27.

23     MR. PAWL:  Judge, if I can tender you a copy of what's

24  People's 27.

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

152

1          Q   I am not going to mark the whole book.

2     People's 27, that's the cover of your book?

3          A    Yes, it is.   That's the current edition.

4          Q    It's got page 204 and 205 in it; is that right?

5          A    Yes.

6          Q    The only question I had on that is that when you,

7     to get to the 18 minutes that you testified to on direct

8     examination, you actually had to tear open the fabric and

9     put the cigarette into the cotton batting, right?

10         A    Yes, it had to be in contact whether it was a

11    tear or open seam, yes.

12         Q    You didn't see any evidence of that in this

13    particular case; is that right?

14         A    Of that what?

15         Q    Of a tear in any fabric, a cigarette going into

16    cotton batting?

17         A    There was no discussion of the materials at all

18    except that they were, the furniture was secondhand.

19    There was no specifics about whether they were torn or

20    dirty.

21         Q    Well, there was information and evidence

22    regarding the swivel chair being cotton, cotton batting?

23         A    No, I don't remember that.

24         Q    If I could have Defendant's 11 back again,

153

1   please.

2           Showing you again Defendant's No. 11, again this

3   is again Lieutenant Ferrari's report; is that right?

4       A    Yes.

5       Q    I am referencing what would be KC 242 on the

6   document that's what that says.

7       THE COURT:  What was that number?

8       MR. PAWL:  KC 242.

9           Q  And Lieutenant Ferrari writes:  Examination of

10  the swivel chair revealed the following:  The chair was

11  located approximately 18 inches from the west end of the

12  couch.  It was severely damaged.  All that remained was

13  the steel swivel base, some of the cotton batting

14  stuffing; is that right?

15      A    Yes.  How did he make that identification?

16      Q    I'll be more than happy to answer any questions,

17  I can't answer your questions.  I have to ask the

18  questions, if you don't mind, Doctor.  But certainly again

19  investigators who were at the scene and have experience

20  with fire scenes they can use their judgment, can they

21  not?

22      A    Yes, but my own experience has shown that even my

23  visual identification of some fabrics and some fillers can

24  be erroneous.

Pl. Amor 030147

154

1      Q    And so that's something that experts like in many

2  cases can disagree about?

3      A    All I know is visual identification alone can be

4  very risky.

5      Q    And that's certainly something that experts can

6  disagree about then; is that fair to say?

7      A    I suppose.

8      Q    I may have asked it, but I just want to make

9  sure.  So the type of material that a chair may be made

10 out of can certainly impact the transition time of a

11 smoldering cigarette from smoldering to fire?

12     A    Very much so.

13     Q    Could I ask you to please go to page 11 of 13?

14     A    Certainly.

15 THE COURT:  Is this of Dr. DeHaan's report?

16 MR. PAWL:  Yes.  Your report, page 11 of 13.

17 THE COURT:  Defendant's Exhibit 14?

18 MR. PAWL:  I believe so, yes, Judge.

19     Q  Doctor, on the fourth paragraph you wrote, is

20 it not true did you write, their use of the term, and I

21 believe you are talking about, I will ask you that.  I

22 think you were talking about original investigators if I

23 am putting this in proper context:  Their use of the terms

24 quote unnatural burn patterns end quote and the effects of

Pl. Amor 030148

155

1  a quote very hot localized fire end quote were very

2  misleading to the jury in the original trial, did you

3  write that?

4      A    Yes, I did.

5      Q    Did you also write if I could ask you to go to

6  page 6 of 13, the last line:  Mr. Amor was convicted of

7  arson and murder in 1997 on the bases of these expert

8  conclusions, did you write that?

9      A    Yes.

10     Q    You understand don't you, Doctor, I don't know if

11 you do, in Illinois a jury is entitled to wholly reject an

12 expert's testimony, did you know that?

13     A    It's true in many states, yes.

14     Q    If I informed you that in Illinois I think you

15 believe me a jury does not have to accept a prosecution

16 expert, do you understand that?

17     A    Yes.

18     Q    The jury doesn't have to understand a defense

19 expert, right?

20     A    Understand, that's correct.

21     Q    Or accept, I am sure that's the case in cases

22 too.  They don't have to accept a defense expert, right?

23     A    Yes.

24     Q    A jury is entitled to say all of this is

Pl. Amor 030149

156

1   nonsense, but he is guilty because he said he

2   intentionally set the fire for insurance money, you

3   understand they can do that?

4       A    That's correct.

5       Q    But with respect to the phrase when you said very

6   hot localized fire was misleading to the jury in the

7   original trial, would you go to page 12 of 13.

8       A    Yes.

9       Q    In conclusions on your second sentence didn't you

10  write:  The fire reached near flashover conditions in

11  which the living room area of the apartment creating a

12  great deal of heat during combustion of the modern

13  upholstered furniture and other combustibles, right, you

14  wrote that?

15      A    Yes, I did.

16      Q    The living room is a localized area?

17      A    I don't consider it a localized area, no.

18      Q    You don't?

19      A    No.

20      Q    Certainly you agree with that it was a great deal

21  of heat?

22      A    Oh, yes.

23      Q    The review of your evidence, review of the

24  evidence in your assessment -- let me ask it this way.

157

1  When Lieutenant Ferrari went through the apartment in part

2  of his investigation, I think originally he goes through

3  and he came back to the dining room, but ultimately at the

4  dining room he came to an opinion that the dining room was

5  not the area of origin; is that right?

6      A    Yes.

7      Q    And you agree with that?

8      A    Yes, I do.

9      Q    He went into the kitchen area, examined the items

10 in the kitchen and came, he examined the kitchen and its

11 contents and determined that the area of origin was not in

12 the kitchen?

13     A    That's correct.

14     Q    He did that with the hallway, he came to the same

15 conclusion not area of origin?

16     A    Yes.

17     Q    You agree with Lieutenant Ferrari about the

18 kitchen and the hallway?

19     A    Yes.

20     Q    Lieutenant Ferrari had also examined both

21 bathrooms, the small and the larger bathroom, and

22 determined both of those were not the area of origin; is

23 that right?

24     A    Yes.

Pl. Amor 030151

158

1      Q    You agree with Lieutenant Ferrari?

2      A    I do.

3      Q    With regards to the master bedroom and what's

4 labeled the south bedroom, he made the opinion in his

5 investigation those were not the areas of origin; is that

6 right?

7      A    That's right.

8      Q    You agree with Lieutenant Ferrari on that?

9      A    Yes, I do.

10     Q    The area of origin that Lieutenant Ferrari

11 ultimately determined is encompassed with an area that you

12 indicate was an area, the area of origin?

13     A    Yes, I do, and they do, yes.

14     Q    And Special Agent Golder's opinion of where the

15 area of origin is is consistent with, is within the area

16 where you found to be the area of origin?

17     A    Yes, it is.

18     Q    That area of origin if you understand it, tell me

19 if I am getting this wrong, Lieutenant Ferrari had the

20 area of origin as being on or around the area of the

21 swivel chair?

22     A    That's my recollection, yes.

23     Q    Correct me if I'm wrong though, with respect to

24 open flame, open flame can set newspaper on fire?

Pl. Amor 030152

159

1    A    Yes, it can.

2    Q    And it is possible, is it not, that under certain

3 circumstances and conditions and I will be specific, a

4 cigarette can cause open flame onto a newspaper?

5    A    As I said earlier if the multiple pages are

6 basically slightly separated, yes, it can.

7    Q    Separated or, okay.  And it is true that in your

8 assessment that vodka would, could defeat fire that has

9 developed on a newspaper because of its contents?

10    A    It would defeat it.

11    Q    But newspaper can still burn and during the

12 period of time that newspaper is burning, if the vodka is

13 on one part of the newspaper and the newspaper is burning

14 another part and that part of that newspaper is on fire

15 and it's going and comes into contact with something else,

16 it could start that something else on fire depending upon

17 what the material is?

18    A    Yes.

19    Q    And I know this, you are an expert in your field

20 but some of that is common knowledge, people have

21 experienced that setting a newspaper on fire that might be

22 wet on one side and catch on fire on the other and sets

23 another piece of fabric on fire?

24    A    That's correct.

Pl. Amor 030153

160

1    Q   And you understand though about all the questions

2  you were asked about all the studies that were done, when

3  they were done with respect to vodka and flaming and what

4  vodka, you understand that back in 1997 during the trial

5  the defense presented evidence on that very topic, you

6  understood that, right?

7    A   No, I'm not aware of it.

8    Q   Did you read Sherwin's report?

9    A   Yes.

10    Q   Were you aware in the original trial there was

11  expert testimony about tests being done about whether a

12  cigarette dropped on newspaper could start a fire?

13    A   No, I'm not. I don't recall that from anybody's

14  testimony.

15    Q   I just want to --

16    A   I was just trying to see what portions of whose

17  testimony I had reviewed and I couldn't find it.

18    Q   I think your list is on, it's got to be page 2 of

19  13.

20    A   Yes.

21    Q   Well, if you look line item 7, is it fair to say

22  that reads report of Robert Sherwin?

23    A   Yes, I remember having his report.

24    Q   If you wouldn't mind, would you mind looking on

Pl. Amor 030154

161

1   that list of things that you reviewed if you received a

2   transcript of Robert Sherwin's report, I'm sorry, a

3   transcript of Robert Sherwin's trial testimony.

4       A   I don't find one.

5       Q   I am not going to ask you any questions about

6   that.  I have to retrieve some exhibits from you.  Doctor,

7   thank you.

8          Judge, nothing further.

9       THE COURT:  Before redirect, Doctor, could you step

10  out of the room for a moment, perhaps into the hall, but

11  don't leave the building.

12      THE WITNESS:  A  Right.

13         (The following proceedings were had outside

14          the presence of the witness, Dr. David DeHaan:)

15      THE COURT:  Can someone refresh my recollection, was

16  there testimony at trial about Tina saying that she lost a

17  cigarette and couldn't find it or was that just in -- I

18  read it somewhere, and I have only read the transcript of

19  the proceedings and perhaps things in exhibits attached to

20  the petition, but at trial was there any testimony?  I

21  know Tina didn't testify.

22      MR. PAWL:  She did.  She testified twice.

23      THE COURT:  At trial was there any questioning about

24  that?

Pl. Amor 030155

162

1        MR. PAWL:  My recollection, I'd be more than happy to

2    pull the transcript.

3        THE COURT:  I am going to re-read the transcript

4    obviously after this hearing, but I am just curious.

5        MR. PAWL:  My recollection is the People called her

6    first to lay the foundation for a letter written by the

7    defendant regarding --

8        THE COURT:  From jail.

9        MR. PAWL:  -- from jail about a plan after, whatever,

10   and then I think Miss Najera was asking some questions

11   about additional letters, there was an objection.  I

12   believe the defense called her in their case in chief to

13   lay the foundation for additional letters.  Judge, there

14   was my recollection is no testimony about dropping a

15   cigarette and quite frankly, I didn't even know if there

16   was testimony about whether she was the last one to leave

17   the apartment, I'll double check on that.  To answer your

18   question regarding the dropped cigarette, that was not in

19   front of the jury is my recollection.

20       THE COURT:  Alright.  Thank you.

21       MS. COOK:  If I may I would agree with the state on

22   some points that Tina was called both by the state and the

23   defendant.  She did though in the defense case testify

24   that she was the last to leave the apartment, but she was

Pl. Amor 030156

163

1    not asked about her statement to the police officers that

2    she lost a cigarette.

3        THE COURT:  Or spilled charcoal fluid.

4        MS. COOK:  Yes, and I can give you a page number.

5        THE COURT:  No, that's okay.  It relates to something

6    I am curious about.  Let's re-call the doctor.

7        MR. PAWL:  That's why I wasn't certain about that last

8    thing.

9        THE COURT:  You didn't say you were certain, I know

10   that.

11            Doctor, back on the record on People versus Amor.

12   I guess we were never off the record.  If you can resume

13   the witness stand, remain under oath and redirect.

14       MS. THOMPSON:  Thank you, your Honor.

15                  REDIRECT EXAMINATION

16                  BY MS. THOMPSON:

17       Q    Dr. DeHaan, in 1995 what were you doing

18   professionally?

19       A    I was with the California Department of Justice

20   Criminalistics Institute and was teaching courses in fire

21   debris analysis and fire investigation and low explosives

22   analysis, I think.

23       Q    Is that also what you were doing in 1997?

24       A    Yes, those did continue.

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

164

1    Q    So I take it you were not consulting on Illinois

2  criminal cases between 1995 and 1997?

3    A    No.

4    Q    You were asked some questions about well, let's

5  start with the People's Exhibit 26.

6        Did you offer this into evidence?

7    MR. PAWL:  No, I didn't.

8    THE COURT:  The state only offered one item into

9  evidence because it's not really their case in chief.

10    MR. PAWL:  I just did it because I didn't want to

11  forget to do it.

12    THE COURT:  Let me ask a question.  Does either side

13  anticipate any exhibits where there's going to be an

14  objection?

15    MS. THOMPSON:  We have seen some new stuff today, so I

16  think that's going to be difficult for us to say.  As far

17  as what's on the list for the People, no.

18    THE COURT:  Let me do this a little differently.

19  Absent an objection would both sides agree that any

20  exhibits referenced by either side in either party's case

21  in chief are admitted unless otherwise objected to?

22    MS. COOK:  Yes.

23    THE COURT:  An awkward sentence on the Court's part,

24  Mr. Pawl?

Pl. Amor 030158

165

1    MR. PAWL:  No, no.  My inclination is to say yes.

2    THE COURT:  You can always object to any particular

3  exhibit.

4    MR. PAWL:  In my mind in this type of hearing it's,

5  even if there's an objection there's going to be a

6  proffer.  I prefer everything be part of the record in any

7  event.  I am going to say yes.

8    THE COURT:  I think that's a yes.

9    MR. PAWL:  I think that's a yes.

10    THE COURT:  You may continue.

11    MS. THOMPSON:  Q  Dr. DeHaan, you were asked some

12  questions about People's Exhibit 26 which was this

13  property report?

14    A    Yes.

15    Q    So in any of the materials that you have

16  reviewed, either in this property report or anything else,

17  have you seen any information indicating that there was

18  any testing done to identify the fabric samples that were

19  collected by the Naperville Police Department?

20    A    No.  The laboratory report from DuPage County

21  indicated they looked for ignitable liquids.

22    Q    And they found none?

23    A    That's correct.

24    Q    And I take it that you didn't see any information

166

1   anywhere in anything that you reviewed that any samples

2   were taken from the couch in the apartment, right?

3       A    That's correct.

4       Q    Or that any samples were taken of the upholstered

5   chair; is that right?

6       A    That's correct, only the verbal characterization

7   by Detective Ferrari.

8       Q    Did you see any evidence anywhere in the record

9   that samples of any of the internal cushions of any of

10  these chairs or couch were taken?

11      A    No, I saw none.

12      Q    You gave some testimony about this, but I want to

13  go back to it.  I think it was your testimony that relying

14  on a visual inspection I think you said is risky?

15      A    Yes.  I have made mistakes and I have a lot of

16  experience making those estimates.  And the difference

17  between for instance urethane foam, other isoprene rubber

18  foams and latex makes a tremendous difference in their

19  ignitability.

20      Q    Do those three products look similar?

21      A    They can look very similar and feel very similar.

22      Q    Can cotton batting look similar to synthetic

23  battings?

24      A    It can if it's quite dirty, ash stained because

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

167

1  it turns the same kind of color gray as the cotton tends

2  to look.

3      Q    Did you see any information in any of the

4  materials that you reviewed that Lieutenant Ferrari did

5  anything to identify the substances that he was, that he

6  had seen at the scene other than looking at them?

7      A    No, I saw no such indication.

8      Q    And so I take it from the questions that you

9  answered with the state that you do not necessarily accept

10 in the analysis that you made in this case his conclusions

11 about what those various substances were?

12     A    That's correct.  And the description that you

13 offered that I read or was read to me that he found a

14 small quantity of cotton batting as part of the swivel

15 chair doesn't mean that that was the padding in the

16 cushions.  Sometimes even modern chairs with urethane foam

17 the cotton batting was used especially to pad the tops of

18 armrests or the tops of back rests because it would hold

19 up better under heavy pressure than the synthetics.

20     Q    So if you accepted the representations by Ferrari

21 in his analysis that those various materials were what he

22 observed them to be, would that change your conclusions in

23 this case that the cause and the origin of this fire are

24 undetermined?

Pl. Amor 030161

168

1    A    No, it would not.

2    Q    Why not?

3    A    Well, because the critical thing is where those

4    materials were found, and whether they were actually

5    cellulosic or synthetic, and that requires laboratory

6    examination, and because that's what controls their

7    ignitability.  And they have to be a major portion of the

8    target surface whether that's a cushion or a seam or a

9    back rest, armrest, that makes a big difference when you

10   are talking about low energy ignition scenarios.

11   Q    If you accept what Ferrari's assessment was of

12   the materials that were in the swivel chair, based on his

13   assessment would you be able to determine how big any

14   flame plume that came out of the swivel chair during this

15   fire was?

16   A    No.

17   Q    There was some testimony you gave about not being

18   able to get into the space where this fire occurred.  If

19   you had been able to get into the space, would that have

20   impacted your ultimate conclusions in this case that the

21   cause and the origin of the fire are undetermined?

22   A    No.  Ultimately the issues came back to the

23   ventilation effect and the ignitable ignition properties,

24   I should say, of the target materials and those would no

Pl. Amor 030162

169

1    longer be present.  A visit would have revealed dimensions

2    and physical relationships that might have been useful in

3    testing some of the hypotheses, but ultimately it doesn't,

4    none of those would come back down to ignition.

5        Q    I hesitate to go into this topic, to go back to

6    Sherlock Holmes.  In the period of 1995 to 1997 were there

7    issues in the fire investigation community about using the

8    process of elimination incorrectly in fire investigation?

9        A    Yes.

10       Q    Can you explain what those were?

11       A    Well, the issue was really the use of the term

12   negative corpus.  And that is a term of art in the fire

13   investigation community that in general means basically a

14   superficial examination of a seam, elimination of some of

15   the more obvious accidental mechanisms like electricity or

16   lightning or something like that, and then saying because

17   I eliminated those accidental causes the only possible

18   solution is that this was a deliberately set fire.  And

19   there were a number of high profile cases in the, well,

20   prior to 1995 in which that reasoning was used and that

21   was ultimately successfully challenged.

22            And then the 921 got into isn't that the same as

23   process of elimination.  As I described there was a number

24   of revisions of 921 that confused the two terms, and at

Pl. Amor 030163

170

1  one point said process of elimination is bad, you are not

2  supposed to be doing that. Well, unfortunately that's

3  exactly what a good investigator is doing, creating

4  hypotheses, all possible hypotheses and then testing those

5  and eliminating them if there's no data to support them or

6  actual data that says that didn't happen.

7       921 over the last 12 years or so has struggled

8  with trying to get a balance in the language, and with

9  mixed success. Basically saying negative corpus is bad,

10 it's sloppy, it's error ridden. Process of elimination is

11 what you should be doing and the issue is how do those two

12 overlap.

13      Q    In your evaluation of this case did Special Agent

14 Kushner eliminate all possible sources of this fire before

15 making a determination that it was intentionally set?

16      A    No, I don't think he did. And he concluded an

17 open flame ignition mechanism without any kind of physical

18 evidence or testimonial evidence that would have supported

19 that.

20      Q    Did Ferrari in your evaluation of this case

21 eliminate all possible accidental sources of this fire

22 before concluding that it was intentionally set?

23      A    No, I don't think so.

24      Q    You were asked some questions about the

MARIE R. JAKUBIEC    CSR LICENSE NO. 084-001117

Pl. Amor 030164

171

1    defendant's interview with Golder.  Did you have an

2    opportunity to review the transcript of the interview that

3    he gave with Agent Golder before you reached your

4    conclusions in this case?

5        A    Yes.

6        Q    You were asked a couple questions about some

7    specific sentences in your report, and I just want to go

8    back to that for a minute.  I am talking about Defendant's

9    Exhibit 12, it's Defendant's Exhibit 14, your report in

10   this case, if you turn to page 11.

11       A    Yes.

12       Q    You were read this sentence which is the first

13   sentence of paragraph, the fourth paragraph on that page:

14   The original investigators in 1995 had no way of

15   appreciating the complex effects of post flashover fires

16   let alone ventilation effects both enhancing and retarding

17   combustion in different areas of a compartment fire.

18       MR. PAWL:  The only objection is that --

19       THE COURT:  That's actually not the sentence that was

20   read.  The only sentence read on that page, you are free

21   to ask other questions, but the only sentence actually

22   read was the last sentence of that paragraph.

23       MS. THOMPSON:  Q  Looking at that paragraph and the

24   sentence I just read do you agree still today, Dr. DeHaan,

MARIE R. JAKUBIEC  CSR LICENSE NO. 084-001117

172

1    that sentence is true?

2        A    Yes.

3        Q    Going to the sentence that you were read, and I

4    appreciate that clarification from the Court:  Their use

5    of the terms unnatural burn patterns and the effects of a

6    very hot localized fire were misleading to the jury in the

7    original trial.  Can you explain what you meant by that?

8        A    Yes.  When you say unusual burn patterns, when a

9    fire investigator says unusual burn patterns they are

10   implying basically that there is suspicion that those

11   patterns were caused by something other than an accidental

12   or normal fire effect.  And investigators today are

13   basically cautioned against using those to imply that

14   that's what caused them.  And because they can be caused

15   by so many other innocent processes in a fire, fall down,

16   radiant heat as well as ignitable liquids.

17           But 921 for instance and Kirk's today stress that

18   if you do have a burn pattern that seems to be isolated

19   amidst a stretch of unburned material, before you can call

20   it the residue of either result of an ignitable liquid you

21   better have a laboratory finding.  But the term unnatural

22   suggests this was not the result of normal fire

23   progression or ignition.  The same thing for very hot

24   localized fire because lay people including unfortunately

MARIE R. JAKUBIEC   CSR LICENSE NO. 084-001117

173

1   a number of fire investigators for many years were under

2   the impression that ignitable liquids like gasoline

3   produce a very hot fire because well, I put gasoline in my

4   car and it produces a really intense fire in the

5   combustion chamber.

6          But the fire investigators have been pretty

7   persistent in kind of misreading the data that's been in

8   921 I think since 1992, looking at the open flame

9   temperatures of ignitable liquid fires versus ordinary

10  combustible fires and they overlap completely.  That some

11  of the hottest fires are actually produced by the

12  combustion of urethane foam in large masses whereas

13  gasoline burning as a pool produces temperatures and the

14  flame about the same as a well ventilated wood fire,

15  plastics, some plastics have higher flame temperatures

16  than gasoline does.  The whole misconception, that's where

17  that misconception very hot localized fire to some people

18  makes it this is where a pool of flammable liquid was and

19  that's wrong.

20      Q    You were asked some questions about

21  Mr. Carpenter's report?

22      A    Yes.

23      Q    Your conclusion that as a general matter the area

24  of origin was somewhere on the south side of the living

MARIE R. JAKUBIEC  CSR LICENSE NO. 084-001117

Pl. Amor 030167

174

1   room, that's consistent with an area of origin being in

2   the recliner, right?

3       A    Yes.

4       Q    And you were asked again some questions about

5   cigarettes and newspapers.  How many layers of newspaper

6   would have to be in the arrangement that you testified

7   could lead a smoldering cigarette to start a fire for

8   there to be a sustained fire as a result?

9       A    As I think I said I don't think I have ever been

10  able to get a stack of newspapers to ignite with a

11  cigarette.  It would take just the right kind of spacing.

12  And so you know as a scientific estimate probably six or

13  eight layers with the proper spacing in between because

14  you have to have, you have to have penetration of the

15  cigarette into the potential fuel to kind of reduce the

16  losses to the surroundings because it's only if it's

17  buried in that material do you have sufficient capture of

18  the limited amount of heat that's being produced by the

19  cigarette.  So something that it can bury into like

20  sawdust is a perfect example, that's an ideal material or

21  cellulosic material, the padding that we have been talking

22  about, because as the cigarette burns it can tunnel its

23  way in and if it tunnels its way in far enough that

24  limited amount of heat can start a reaction that can

Pl. Amor 030168

175

1    ultimately end up as a flame.

2        Q    But as you said it's your testimony that that

3    would be difficult for that to occur with a newspaper?

4        A    Yes, for a newspaper lying horizontally on the

5    floor, yes.

6        MS. THOMPSON:  I have no more questions, your Honor.

7        THE COURT:  Any recross?

8        MR. PAWL:  Doctor, thank you.  Judge, no questions.

9        THE COURT:  Thank you very much.

10       THE WITNESS:  A  Thank you, your Honor.

11                                  (Witness excused.)

12       THE COURT:  Let's discuss scheduling for a little bit.

13   Does the petitioner anticipate introducing any additional

14   evidence?

15       MS. COOK:  No additional testimony or witnesses,

16   Judge, but I think we need to maybe conference to make

17   sure we don't have any other exhibits or anything.

18       THE COURT:  Sure, and you can rest tomorrow morning,

19   but no more testimony in evidence.

20       MS. COOK:  No more live evidence.  The state does have

21   at least one agent that's going to testify.

22       MR. PAWL:  That's right.  We can actually start our

23   case.

24       THE COURT:  I am inclined to give the petitioner an

MARIE R. JAKUBIEC  CSR LICENSE NO. 084-001117

Pl. Amor 030169