# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM E. AMOR | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.18 CV 02523 |
| | ) | |
| NAPERVILLE POLICE OFFICERS | ) | |
| MICHAEL CROSS; ROBERT | ) | |
| GUERRERI; THE ESTATE OF MARK | ) | |
| CARLSON; BRIAN CUNNINGHAM; | ) | |
| JON RIPSKY; OTHER | ) | |
| UNIDENTIFIED NAPERVILLE | ) | |
| POLICE OFFICERS; AND THE CITY | ) | |
| OF NAPERVILLE, | ) | |
| | ) | |
| Defendants. | ) | |

**DISCLOSURE OF THE EXPERT OPINIONS OF
DAVID J. ICOVE, Ph.D., P.E., DFE
SUBMITTED ON BEHALF OF THE DEFENDANTS**

June 17, 2021

EXHIBIT 9

ICOVE 01

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................... 6
II.  DISCLOSURE ............................................................................................... 7
III. PROFESSIONAL BACKGROUND AND QUALIFICATIONS.......................... 7
IV.  SUMMARY OF PROFESSIONAL OPINIONS ................................................ 8
V.   APPLICABLE FIRE INVESTIGATION METHODOLOGY ................................ 10

   A.   Approaching all Fire Investigations ............................................... 10
   B.   Prevailing Standards of Care.......................................................... 11
   C.   The Scientific Method ................................................................... 12

VI.  THE FIRE INCIDENT .................................................................................. 15

   A.   Weather Conditions ...................................................................... 15
   B.   Description of the Apartment ........................................................ 15
   C.   The Fire Incident ........................................................................... 17

VII. OPINION #1 – CITY OF NAPERVILLE INVESTIGATION.................................. 23

   A.   Summary of the Opinion that the City of Naperville's Investigation Meets the
        Standards of Care ......................................................................... 24
   B.   Professional Qualifications and Levels of Performance Required for Fire
        Investigators................................................................................. 25
   C.   Applying a Standard of Care Analysis to Fire Investigations ............ 27
   D.   General Requirements for a Fire Investigator ................................. 27
   E.   Scene Examinations ...................................................................... 29
   F.   Documenting the Scene................................................................. 30
   G.   Evidence Collection and Preservation ............................................ 30
   H.   Interviews.................................................................................... 31
   I.   Post-Incident Investigation............................................................ 32
   J.   Presentations................................................................................ 34

VIII. OPINION #2 – PLAINTIFF'S EXPERT'S INVESTIGATION ............................ 35

   A.   Summary of Findings Expressed by Mr. Carpenter in this Case ........... 35
   B.   Mr. Carpenter Fails to Recognize that the City of Naperville Fire Investigation is
        indeed Reliable. ........................................................................... 35

      1.   The Scientific Method and Hypothesis Testing .................................... 36
      2.   Fire Cause Determination ................................................................. 37

C.    Mr. Carpenter's Investigation Fails to Correctly Apply the Scientific Method to the Facts of This Case ................................................................................................ 38

    1.    Failure to Recognize the Need ...................................................................... 39
    2.    Failure to Correctly Define the Problem .................................................... 40
    3.    Failure to Collect Sufficient Data ............................................................... 41
    4.    Failure to Correctly Analyze Data .............................................................. 45
    5.    Failure to Develop and Assess Alternative Working Hypotheses ...................... 46
    6.    Failure to Test Alternative Working Hypotheses ........................................ 46
    7.    Failure to Correctly Select a Final Hypothesis ......................................... 47
    8.    Failure to Account for Error Rates ............................................................. 48

B.    Mr. Carpenter's Flawed use of the Scientific Method makes his Final Hypothesis in this Case Unreliable ................................................................................ 50

IX.    OPINION #3 – THE FIRE'S ORIGIN AND CAUSE ................................................. 52

A.    Review of Origin and Cause Determinations ................................................. 52
B.    Ignition Source ...................................................................................................... 52
C.    The Fire's Origin .................................................................................................. 54

    1.    Witness Information .......................................................................................... 55
    2.    Fire Pattern Analysis ....................................................................................... 55
    3.    The Ignition Source and Sequence as It Relates to Fire Dynamics ...................... 61

D.    Conclusions ............................................................................................................ 63

X.    DECLARATION ............................................................................................................. 64
APPENDIX A – DOCUMENTS, INFORMATION, AND DATA REVIEWED ................. 66
APPENDIX B – EXPERIENCE, PUBLICATIONS, TESTIMONY ...................................... 71
APPENDIX C – NFPA 1033 (1993 and 2014 Editions) ......................................................... 85

ICOVE 03

# TABLES

**Table 1.** The Narrative of the Emergency 911 Call from at 6:40 p.m. from Ms. Miceli listing an approximate Relative Recording Time in Seconds. [DEFS 05613]. .................. 22

**Table 2.** Professional Levels of Job Performance as listed in the standard *NFPA 1033 – Professional Qualifications for Fire Investigator* for the years 1993 and 2014......................... 26

**Table 3.** Typology of Common Fire Patterns ...................................................... 57

# FIGURES

**Figure 1.** Flowchart outlining the scientific method integral to *NFPA 921* as it applies to fire scene investigation and reconstruction........................................................... 13

**Figure 2.** Sources of information that may contribute to working hypotheses as it applies to fire scene investigation and reconstruction. ....................................................... 14

**Figure 3.** Floorplan layout of Apartment M at 218 East Bailey, Naperville, Illinois. [AMOR 021137]. .................................................................................................. 16

**Figure 4.** The detailed dimensional layout of Apartment M showing rooms, doors, furniture, and location of the victim. [AMOR 021139]. ....................................... 17

**Figure 5.** Annotated diagram provided September 15, 1995, Mr. Amor detailed the locations of the vodka bottle, candle, and the newspapers laying between the chair, couch, and coffee table. The area where the newspapers were laying and where Mr. Amor reported the lit cigarette landed is highlight in Yellow. [SDT-SAO 22777]. .......... 19

**Figure 6.** (a) Detailed dimensional layout of Apartment M showing rooms, doors, furniture, and location of the victim. [AMOR 021139] and (b) Computer fire model display developed by Mr. Carpenter lacking several rooms including the kitchen and two bathrooms (marked in (a) in yellow)........................................................... 44

**Figure 7.** The detailed dimensional layout of Apartment "M" showing the family rooms and the estimated area of origin as identified by witnesses, fire pattern analysis, and fire dynamics. .......................................................................................... 53

**Figure 8.** Photograph of the room of fire origin. The area of origin is near the right end of the couch. [DEFS 5178]. ................................................................................. 54

**Figure 9.** Fire pattern indicators found at fire scenes consisting of (1) demarcation, (2) calcination, (3) loss of material from wooden wainscoting and baseboard, (4) fractured glass, (5) ignitable liquid burn pattern on carpet, (6) penetration into the ceiling, and (7) area of clean burn where paper and pyrolysis products burned completely off the wall........................................................................................................ 56

**Figure 10.** The correlation between critical heat flux boundary (dashed line) and visible lines of demarcation (dashed-dotted line) in an FM Global 25-ft corner fire test (left) and a similar pattern in 218 East Bailey, Naperville, Illinois, fire scene.................................. 59

**Figure 11**. The exposed surfaces marked in blue near the base of the hourglass fire pattern demonstrating surface effects. When taken into totality, these fire patterns

ICOVE 04

document the point of fire origin as being the newspapers between the couch, chair, table, and chair. [DEFS 5258]................................................................... 60

**Figure 12.** The exposed surfaces near the base of the hourglass fire pattern demonstrating loss of material effects shown with blue lines. When taken into totality, these fire patterns document the point of fire origin as being the newspapers between the couch, chair, table, and chair. [DEFS 5258]. ..................................................... 60

**Figure 13.** (a) Extremely close area of origin documenting the thermal impact on the couch's wooden frame and (b) the hourglass fire pattern. Near the glass door to the balcony is a fire pattern caused by ventilation. ................................................... 63

ICOVE 05

# I.    INTRODUCTION

This is a report of the forensic fire engineering analysis conducted into the September 10, 1995, fire at an apartment located at 218 East Bailey in Naperville, Illinois. [AMOR 0269][1]. Residents at the time were Plaintiff William E. Amor, his wife Tina M. Amor, and mother-in-law Marianne Miceli who died during the fire incident.

After a joint investigation by the City of Naperville Police and Fire Departments, Mr. Amor was charged on October 9, 1995 [DEF 643] and found guilty on September 17, 1997, of aggravated arson and first-degree murder [DEFS 3225]. He was sentenced to 45 years imprisonment on October 28, 1997 [DEFS 3225]. Mr. Amor filed a petition for post-conviction relief based upon his argument of new evidence in his case. After a hearing on April 6, 2017, Mr. Amor's conviction was vacated in DuPage County Circuit Court. Released on May 30, 2017, he was acquitted after a bench trial on February 21, 2018.

On April 9, 2018. Mr. Amor filed in the U.S. District Court for the Northern District of Illinois, Eastern Division, a ten-count civil complaint against the City of Naperville and certain Naperville police officers alleging they caused him to be wrongfully prosecuted, convicted and imprisoned for murder and aggravated arson.

At the center of this case are Mr. Amor's self-incriminating statements to the police and a prosecutor regarding the fire's origin and cause. Mr. Amor revealed that the fire started due to him knocking a lit cigarette onto newspapers onto which he had previously spilled vodka on [Doc. 1, ¶25].  After a hearing on April 6, 2017, the Circuit Court of DuPage County vacated Amor's conviction, explaining "*There can be no question that the lynchpin of the State's case at trial was the defendant's confession, which the State and Defense experts today agree it is scientifically impossible.*" [Doc. 1, ¶43].

This report summarizes the events surrounding this fire incident. It concludes (1) the City of Naperville's fire investigation in 1995 met the standards of care at that time, (2) the Plaintiff's expert, Douglas Carpenter, failed to correctly apply the scientific method to the facts of this case, and (3) the fire's cause was a lit cigarette landing on and igniting newspapers within the southwest corner of the living room of the apartment.

---

[1]    References to a document number, ["Doc. __"], ["Bates Stamp __"], or ["Exhibit __"], refer to the number assigned to each document as it is designated on the Court's docket for this case or by the parties in discovery materials.

ICOVE 06

## II.   DISCLOSURE

This report contains my forensic fire engineering analysis and expert opinions as submitted to attorney Joseph M. Polick, Esq., from The Sotos Law Firm, P.C., Chicago, Illinois. Mr. Polick's law firm represents the Defendants in this case.

Appendix A lists the documents, information, and data reviewed, and references relied upon in the preparation of this report. Appendix B lists my qualifications and publications over the last ten years, along with my expert testimony in other cases for at least the preceding four years. Appendix C contains documents pertinent to *NFPA 1033*.

Every effort has been made to minimize the inclusion of protected information, documents, or testimony of a confidential or proprietary nature with regards to this case that are included in this report. Any photographs are respectfully displayed with sensitive areas blocked, where appropriate.

If any additional pertinent information, data, and references become available through first-hand observations, further analysis, facts presented by experts before the court through depositions or other disclosures, the opinions expressed in my expert disclosure may be amended or revised.

Compensation has been invoiced to the Defendants for professional engineering services in this matter at the rate of $400 per hour.

Exhibits that may be used in court proceedings to summarize or support my opinions in this case include figures and tables in this report as well as any document, standard, or report listed in the Appendices.  In addition, I may use at the trial as exhibits any materials and documents I have reviewed.

## III.  PROFESSIONAL BACKGROUND AND QUALIFICATIONS

I am a Board-Certified Diplomate Forensic Engineer by the National Academy of Forensic Engineers (NAFE). My specialties include forensic fire engineering and fire scene reconstruction.

My educational qualifications include a B.S. in Fire Protection Engineering, B.S. and M.S. degrees in Electrical Engineering, and a Ph.D. in Engineering Science and Mechanics. Professional certifications include a licensure as a Professional Engineer in nineteen (19) states. I am a Certified Fire Investigator, a Certified Fire and Explosion Investigator, and a Certified Fire Protection Specialist. This experience includes prior certification as a firefighter and emergency medical technician.

ICOVE 07

For more than 45 years I have investigated the origin, cause, and responsibility for fires and explosions. This includes 27 years as a law enforcement investigator on the federal, state, and local levels. During this time period, I investigated over 1,000 fires and explosions, supervised fire investigation units on the local and federal levels and participated in establishing and applying professional standards of care.

I have authored numerous scientific and academic publications, textbooks, and patents in the field of fire and explosion investigations. I presently serve as a full-time engineering professor at a large state university and have a consulting practice that delivers fire investigation seminars worldwide.

I am frequently called upon to conduct peer reviews, training, and research on matters involving fire and explosion investigations. These peer reviews consist of civil and criminal cases, papers submitted to academic journals, and management review of public and private organizations.

I am familiar with the legal qualification requirements in federal, state, and local court proceedings in both civil and criminal matters. Prior testimony has included forensic fire scene reconstructions, peer reviews of professional standards of conduct, motivation of arsonists, and the impact of spoliation. I have testified three times before United States Congressional Committees developing legislative initiatives on the investigation of the crimes of arson and bombing and other violent crime matters.

## IV. SUMMARY OF PROFESSIONAL OPINIONS

Based upon my forensic engineering review of the reports, data, depositions, court filings, evidence, documents disclosed to date, and my experience in the field along with the published standards of care in the fire and explosion investigation field in both 1995 and in 2021, I offer of the following opinions about the ***origin and cause***[2] of the fire and investigations conducted by the City of Naperville and the Plaintiff's expert, Douglas J. Carpenter:

Opinion #1 - The investigation initiated and coordinated by the City of Naperville into the September 10, 1995, apartment fire at 218 East Bailey, Naperville, Illinois, met in 1995 the minimum professional standards of professional practice for applying the

---

[2]   *NFPA 921*, 2021 Edition, Ch. 3.3.76, defines a ***fire investigation*** as "The process of determining the origin, cause, and development of a fire or explosion." *NFPA 921*, Ch. 3.3.140 defines a ***fire's origin*** as "The general location where a fire or explosion began." *NFPA 921*, Ch. 3.3.71 defines a ***fire's cause*** as "*The circumstances, conditions, or agencies that bring together a fuel, ignition source, and oxidizer (such as air or oxygen) resulting in a fire or combustion explosion.*"

ICOVE 08

Scientific Method to the origin and cause in the field of fire and explosion investigations.

Opinion #2 - The investigation by Douglas J. Carpenter into the September 10, 1995, apartment fire at 218 East Bailey, Naperville, Illinois, failed to meet the minimum professional standards of professional practice in the field of fire and explosion investigations by not correctly applying the scientific method to the facts of this case.

Opinion #3 – Based upon today's standards of care as well as the standards in effect in 1995, a forensic engineering analysis of the fire in this case, to a reasonable degree of engineering certainty, confirms that the fire started in the area of origin as determined by the City of Naperville, and observed by Mr. William Amor and Ms. Marianne Miceli. The fire's cause was, with an engineering degree of certainty, a lit cigarette landing on and igniting newspapers within that area of origin, a human act resulting in an incendiary fire.[3]

The professional standards of care[4] on which this analysis and opinions are based rely upon the fundamental fire and engineering sciences recognized in internationally accepted treatises in the field of fire and explosion investigations. These standards of care are frequently cited in criminal and civil court cases as well as in the leading international textbook on arson prosecution by Decker and Ottley.[5]

The standards used in this review include the latest present day expert treatises and those in effect in 1995 in the field of fire and explosion investigations. These standards include the National Fire Protection Association (NFPA) *Guide for Fire and Explosion Investigations* (*NFPA 921, 2021 Edition*), the **Standard for Professional Qualifications**

---

[3]    *NFPA 921* (2021 Edition). *Guide for Fire and Explosion Investigations*, National Fire Protection Association, Quincy, MA., defines an incendiary fire as "*[a] fire that is imemionally ignited in an area or under circumstances where and when there should not be a fire.*" All references to *NFPA 921* are to the current 2021 edition unless otherwise noted.

[4]    P**rofessional standards of care** for example for engineers often concern their ethical or legal duty to "*[t]he exercise of such care, skill, and diligence as other professional engineers ordinarily exercise under like circumstances in the same geographic area.*" (National Society of Professional Engineers, www.nspe.org).

[5]    Decker, J. F. and B. L. Ottley (2009). *Arson Law and Prosecution*. Durham, NC, Carolina Academic Press.

ICOVE 09

*for Fire Investigator* (*NFPA 1033, 2014 Edition*),[6] and forensic standards published by *ASTM International*.[7] Appendix "A" contains a comprehensive list of these and other standards that I relied upon.

## V.   APPLICABLE FIRE INVESTIGATION METHODOLOGY

As with other professions involving technology-driven interpretations and expert conclusions based upon observations, data, and principles of forensic science, the investigation of fires and explosions requires an accepted science-based methodology.

*NFPA 921* guides how a fire investigation is conducted using a formal process of determining the origin, cause, and development of a fire or explosion incident. *NFPA 1033* sets forth the exacting job performance responsibilities that individuals shall adhere to in conducting these investigations.

### A.   Approaching all Fire Investigations

There is often a discussion as to what sustained level of the initial effort that an investigator should attain, particularly when the origin and cause of a fire is not immediately known. The leading authority on this subject is ***Kirk's Fire Investigation***, whichclearly states:

> *A fire investigation can begin while the fire is still burning or may not begin until long after suppression due to circumstances of the fire or the resulting criminal or civil litigation. Every fire should be investigated to detect the crime of arson, or to seek out dangerous products or practices to preserve the safety of the community. If feasible, every good fire scene investigation begins with an initial "non-invasive" survey of the scene and its immediate surroundings.* (See *Kirk's Fire Investigation*, p. 298, Section 5.2) (Emphasis added).

This advice is vital to the success of the inquiry. The resulting methodology in the most reliable investigations are those that concentrate their efforts at the fire scene. From

---

[6]   ***NFPA 1033*** (2014 Edition). ***Professional Qualifications for Fire Investigator***, National Fire Protection Association, Quincy, MA. References to *NFPA 1033* are to the current 2014 edition unless otherwise noted.

[7]   ***ASTM International***, formerly known as American Society for Testing and Materials, is an organization that develops and publishes voluntary consensus technical standards used in forensic engineering investigations involving materials, products, systems, and services.

ICOVE 10

these on-scene examinations, information gleaned is often useful in interviews for suggesting lines of inquiry, corroborating, or dismissing conclusions.

## B.    Prevailing Standards of Care

The methodology and opinions expressed in this report rely upon both the 1995 and 2021 editions of **NFPA 921 – Guide for Fire and Explosion Investigations**. The latest edition of *NFPA 921* was approved and issued by the NFPA Standards Council on April 5, 2020, with an effective date of April 25, 2020. The 1995 edition of *NFPA 921* was approved and issued by the NFPA Standards Council on January 13, 1995, with an effective date of February 7, 1995.

This report also relies upon *NFPA 921's* companion standard, the 1993 and 2014 Editions of **NFPA 1033 – Professional Qualifications for Fire Investigator.** The 1993 edition was approved by the NFPA Standards Council on January 15, 1993, with an effective date of February 12, 1993. The latest 2014 edition was approved by the NFPA Standards Council on May 28, 2013, with an effective date of June 17, 2013, which supersedes all previous editions.

The 2014 edition of *NFPA 1033* was also approved as a National Standard on June 17, 2013, by the American National Standards Institute (ANSI). See Table 1 for a list of present-day requirements for *NFPA 1033*. For the purposes of present-day testimonies, the latest 2021 edition of *NFPA 921* and the 2014 edition of *NFPA 1033* supersede all previous editions. However, when appropriate, this report may refer to one or both.

The universally recognized and generally accepted methodology cited by both *NFPA 921*[8] and *NFPA 1033*[9] for conducting investigations into the determination of the origin and cause of fires, and related issues, is based upon the use of the **scientific method**.[10]

---

[8]   Per *NFPA 921*, 2021 Edition, Ch. 1.3.2, "*As every fire and explosion incident is in some way unique and different from any other, this document is not designed to encompass all the necessary components of a complete investigation or analysis of any one case. **The scientific method, however, should be applied in every instance**.*" (Emphasis added).

[9]   Per *NFPA 1033*, 2014 Edition, Ch. 4.1.2, states "*The fire investigator **shall employ all elements of the scientific method** as the operating analytical process throughout the investigation and for the drawing of conclusions.*" (Emphasis added). Per *NFPA 1033*, the 1993 Edition does not include specifically mention the scientific method.

[10]   Per *NFPA 921*, 2021 Edition, Ch. 3.3.167, **Scientific Method** is "*The systematic pursuit of knowledge involving the recognition and formulation of a problem; the collection of data through analysis and experimentation; analysis of the data; the formation, evaluation and testing of hypotheses; and, where possible, the selection of a final hypothesis.*"

ICOVE 11

## C.     The Scientific Method

The scientific method process is recursive in that it takes all available **data**[11] and sources of information into consideration. At the same time, it continuously refines and explores various "working" **hypotheses**[12] until arriving at a final validated and verified hypothesis, which becomes the professional conclusion or **opinion**.[13] See Figure 2 detailing how working hypotheses are formed and applied within the scientific method.

Although he began his professional career as a barrister, Francis Bacon (1561–1626) is best known for establishing and popularizing inductive logic or reasoning for conducting critical scientific inquiries. His method of inductive logic extracts knowledge through **observation**, **experimentation**, and **testing of hypotheses**.

The critical underpinning of forensic fire scene reconstruction is applying relevant scientific principles and research in conjunction with a systematic examination of the scene. This is particularly important for cases that later require expert witness opinions stressed by the National Academy of Sciences.[14]

The basic concepts of the scientific method are the iterative process to **observe**, **document**, **hypothesize**, **test**, **reassess**, and **conclude**, particularly when developing working hypotheses. This method, as shown in Figure 1, embraces sound scientific and fire protection engineering principles combined with peer-reviewed research and testing. This methodology is considered the best approach for conducting forensic fire scene analysis and reconstruction.

---

[11]  Per *ASTM E1138-89*, ASTM International, **data** are "*Facts or information to be used as a basis for discussion or decision*."

[12]  Per *ASTM E1138-89*, ASTM International, a **hypothesis** is "*A supposition or conjecture put forward to account for certain facts, and used as a basis for further investigation by which it may be proved or disproved*."

[13]  Per *ASTM E1138-89*, ASTM International, an **opinion** is "*A belief or judgment based on facts and logic, but without absolute proof of its truth.*"

[14]  Center, F. J., & National Research Council. (2011). *Reference manual on scientific evidence*. National Academies Press.

ICOVE 12



**Figure 1.** Flowchart outlining the scientific method integral to *NFPA 921* as it applies to fire scene investigation and reconstruction.

<u>Source</u>: Icove, D. J. & Haynes, G.A. (8th Edition, 2018) ***Kirk's Fire Investigation***, Pearson-Prentice Hall, Upper Saddle River, New Jersey

ICOVE 13



**Figure 2.** Sources of information that may contribute to working hypotheses as it applies to fire scene investigation and reconstruction.

Source: Icove, D. J. & Haynes, G.A. (8th Edition, 2018) *Kirk's Fire Investigation*, Pearson-Prentice Hall, Upper Saddle River, New Jersey.

ICOVE 14

## VI. THE FIRE INCIDENT

The following is a synopsis of the information and events leading up to, during, and after the fire incident. This report breaks down the incident as reported and documented through a summary of these events with references, where available of the information source.

### A.    Weather Conditions

The Chicago O'Hare International Airport Station for September 10, 1995, at 6:00 p.m. reported partly clouded conditions with the outside temperature of 61 degrees Farenheight, dew point 43 Farenheight, humidity 52 percent, the wind direction of East Northeast at 10 miles per hour, wind gusts at 0 miles per hour, barometric pressure 29.58 inches, with zero precipitation.

These data were obtained through Weather Underground.[15] The data are consistent with observations recorded by the City of Naperville Fire Department [DEFS 12046] and the Illinois State Fire Marshal's Office, Division of Arson Investigation [DEFS 12269].

### B.    Description of the Apartment

The apartment complex where the fire occurred is located at 218 East Bailey, Naperville, Illinois. Apartment M as shown in Figure 3, was a two-bedroom unit located on the top floor of a three-story building. It had carpeted floor except for the bathroom and kitchen, gypsum board walls, and a balcony with a sliding glass door.

A wall mounted unit provided air conditioning and heating ran through baseboard radiators. The door to the apartment opened into an enclosed hallway. The balcony faced an inner courtyard [AMOR 021138]. Figure 4 shows a more detailed dimensional layout of Apartment M indicating the location of rooms, doors, furniture, and the location of the bedroom where the victim was found. [AMOR 021139]. The apartment descriptions are taken from other sources, reports, and photographs from the materials supplied.

---

[15]   These data were obtained through Weather Underground. The data are consistent with observations recorded by the City of Naperville Fire Department [DEFS 12046] and the Illinois State Fire Marshal's Office, Division of Arson Investigation [DEFS 12269] Data obtained from Weather Underground, a commercial weather service providing real-time weather information over the Internet. Its information comes from the National Weather Service (NWS), and over 250,000 personal weather stations https://www.wunderground.com/history/daily/KORD/date/1995-9-10 (last visited May 18, 2021).

ICOVE 15



**Figure 3.** Floorplan layout of Apartment M at 218 East Bailey, Naperville, Illinois. [AMOR 021137].

ICOVE 16



**Figure 4.** The detailed dimensional layout of Apartment M showing rooms, doors, furniture, and location of the victim. [AMOR 021139].

## C. The Fire Incident

William E. Amor, his wife Tina M. Amor, and mother-in-law Marianne Miceli were living together in Apartment M at the time. After the fire and later that evening, Ms. Amor reconstructed the events of earlier that day in a detailed interview conducted by Investigator Michael Cross, Naperville Police Department. Present for parts of the interview were Ms. Amor's uncle and aunt, Gary and Pam Leavenworth. [SDT-SAO 5131].

Ms. Amor told Inv. Cross that she woke up earlier that day between 11:30 and 11:45 a.m. Both Mr. Amor and Ms. Miceli were already awake. Mr. Amor was not feeling well

ICOVE 17

and slept on the couch the previous night because of an unknown illness. At 1:30 p.m., Ms. Amor and her mother, Ms. Miceli, left the apartment to purchase cigarettes, then went to pick up a pizza and returned to the apartment. [SDT-SAO 5131].

Everyone but Mr. Amor ate the pizza while watching football on the television. At some point, Mr. Amor, sitting on the couch with his wife, got up and went to lay on the floor, where she later joined him. At approximately 6:00 p.m., Ms. Miceli went to her bedroom to take a nap and told Ms. Amor that she was setting the clock alarm to wake at 7:00 p.m. so she could watch the Emmy Awards. [SDT-SAO 5131].

According to Ms. Amor, before she and Mr. Amor left the apartment at approximately 6:30 p.m., and she was sitting in her mother's chair smoking a cigarette while Mr. Amor was giving Ms. Miceli a back rub in her bedroom. As they left, Ms. Miceli was on the telephone talking with a friend, Dorothy Atten. [SDT-SAO 5132].

Part of Inv. Cross's interview with Ms. Amor covered the layout and furnishings of the apartment, any problems with appliances, and any gas odors. Ms. Amor related that they had problems with electrical appliances in the kitchen which would blow fuses and she had trouble keeping the pilot light lit on their stove, which required a visit from the gas company. She described that most of the furnishings were "old hand-me-downs." [SDT-SAO 5132].

Regarding the sliding glass door to the balcony, Ms. Amor stated that it might have been open a "crack" normally. She related that the door opened on the right towards the air conditioner and a pile of boxes. She also earlier related and reconfirmed that she tripped on the chair in the room and spilled some lighter fluid. Asked about her mother's door, Ms. Amor stated that she remembers it was open. [SDT-SAO 5144].

In a later interview on September 14, 1995, Ms. Amor provided Inv. Cross with additional information about the apartment. She stated that her mother's chair was often referred to by residents as "her throne," where Ms. Miceli spent much of her day. [SDT-SAO 5143].

In a handwritten statement later given on September 15, 1995, to Investigator Brian Cunningham, Mr. Amor stated that while preparing a drink containing vodka, he knocked over the bottle, spilling it on newspaper laying between the chair, couch, and coffee table. On the coffee table was a burning candle. [SDT-SAO 5110]. Mr. Amor also annotated a diagram of the scene illustrating this event as shown in Figure 5. [SDT-SAO 22777].

ICOVE 18



**Figure 5.** Annotated diagram provided September 15, 1995, Mr. Amor detailed the locations of the vodka bottle, candle, and the newspapers laying between the chair, couch, and coffee table. The area where the newspapers were laying and where Mr. Amor reported the lit cigarette landed is highlight in Yellow. [SDT-SAO 22777].

ICOVE 19

On the rear of the Mr. Amor's handwritten voluntary statement to City of Naperville investigators on September 15, 1995, notes describe the conditions of the apartment and other potential ignition sources. [DEFS 820]. These notes included: (1) patio door had vertical blinds made of a woven cloth and they would open to the left, (2) the rear of the TV had nothing on the floor, (3) VCR was under the TV on the TV stand, (4) video tapes (approx. 15) were in the TV stand, (5) nothing in between chair & TV in front of patio doors, (6) TV was shut off, (7) no lighting outside, (8) air conditioning not running, (9) and no smoke or sparks from TV.

Before leaving the apartment with his wife, Mr. Amor turned off the television set, left the light on for the lamp adjacent to Ms. Miceli's reclining chair, and locked the front door as they left. [SDT-SAO 5110; SDT-SAO 5133]. Note that the exact time the Amors give for leaving the apartment that evening varies, 6:20 p.m. [DEFS 676]; 6:20 - 6:25 p.m. [DEFS 704]; and 6:30 p.m. [DEFS 658 and 667].

On October 4, 1995, at 1:14 a.m., Mr. Amor provided more details regarding the events leading up to when he left the apartment, with Ms. Amor leaving a minute or so afterward. He wrote in his voluntary statement that before getting up to use the restroom, he bumped the ashtray, knocking his cigarette onto the newspaper where the vodka had also been spilled. [DEFS 819]. He deliberately did not pick up the cigarette, "*knowing a fire would probably result.*" He added that "*The [fire] loss was meant to be minimal for personal gain. No harm was ever supposed to come to any person or persons.*" [SDT-SAO 5114].

In a recorded interview on October 4, 1995, from 2:11 through 2:14 a.m., by Mr. Amor, after signing his written statement and reciting it verbatim, provided more information to Naperville Police Department Investigators Robert Guerrieri and Michael Cross. Mr. Amor confirmed that he knocked the cigarette onto the paper on purpose, saw smoke coming from the paper, both knew and anticipated that a fire was about to start, and that he just didn't care. [SDT-SAO 5116 & 10690-10692, People's Exhibit 22J].

On October 4, 1995, at 5:10 a.m., Naperville Police Department Investigators Robert Guerrieri and Michael Cross were joined by prosecutor Brian Nigohosian. During that taped interview with all three present, Mr. Amor provided additional details about his involvement in setting the fire. Mr. Amor indicated that he had vaguely communicated this plan to his wife in a letter written from jail three months before the fire.

With regards to pre-planning, Mr. Amor devised the plan while he was in the DuPage County Jail after he married Tina, April 15, 1995 [SDT-DCPDO 5753], and before the September 10, 1995, fire. Mr. Amor told the prosecutor during this recorded interview that he was seeking financial gain and that the location of the cigarette was "in the corner where he previously was", he started to see smoke, but not flame, and he left the apartment 2-3 minutes thereafter. [SDT-SAO 3418-19].

ICOVE 20

In a signed document on November 1, 1995, prosecutor Brian Nigohosian memorialized his October 4, 1995, taped interview with Mr. Amor. [DEFS 733-737]. Mr. Amor told Mr. Nigohosian that after intentionally knocking the lit cigarette onto the newspapers to start a fire, he then went into Marianne Miceli's bedroom, where she asked him to give her a back rub. Ms. Amor then came into the bedroom and, after seeing Mr. Amor giving her mother a backrub, became upset, and an argument between them ensued.

Mr. Amor stated he was desperate and wanted to get out of the apartment where he, Ms. Amor, and Ms. Miceli were living, but he lacked the money. Mr. Amor repeatedly stated that he started the fire to collect money, a concept that he developed and discussed with a fellow inmate named "Mike" and others when incarcerated in the DuPage County jail. Mr. Amor also discussed with those inmates potential methods, including tainting Ms. Miceli's medication to concoct an overdose. Mr. Amor even wrote to Ms. Amor and told her of his plan to get money to leave the apartment. He even thought about collecting Ms. Miceli's life insurance which he estimated to be around $10 to $15 thousand dollars.

During the taped interview, Mr. Amor again stated that the purpose of the fire was to obtain insurance money to get them out of their present apartment into another home. He indicated at the time that he and his wife were in a desperate financial straits. [SDT-SAO 5123]. He stated that his actions that evening would create a situation where there was a strong possibility that a fire would result. [SDT-SAO 5125]. He concluded the taped interview, stating, "Everything I have said I said at least once and the truth and from my heart." [SDT-SAO 5126].

After the Amors left the apartment, Ms. Miceli called the Emergency 911 center at 6:40 p.m., stating that smoke was coming into her bedroom. She left the bedroom and placed the fire in a burning chair which she could not pass to reach the balcony.

During the last portion of the call, Ms. Miceli indicates she is overcome by smoke, coughing could be heard, and then there is silence. [SDT-SAO 5027-5028]. Table 1 is the narrative of this call, listing an approximate recording time. Notice that the narrative for the initial call on the tape occurs at 00:09 seconds, and Ms. Miceli fails to respond to the 911 operator starting at 01:18 seconds, which is a total call duration of just over 1 minute.

ICOVE 21

**Table 1.** The Narrative of the Emergency 911 Call from at 6:40 p.m. from Ms. Miceli listing an approximate Relative Recording Time in Seconds. [DEFS 05613].

| Relative Recording Time (seconds) | Speaker | Narrative |
|---|---|---|
| 00:00 | | Noise |
| 00:09 | A. Haidu: | 911 |
| 00:11 | Miceli: | Yes! There is smoke coming through *my bedroom. |
| 00:13 | A. Haidu: | There is smoke coming through your bedroom? |
| 00:14 | Miceli: | Yes, I'm in the one, two eighteen east Bailey. |
| 00:19 | A. Haidu: | Okay, can you get out of the apartment? |
| 00:21 | Miceli: | Ahh, No, I cannot the...the fire is in the way. |
| 00:24 | A. Haidu: | The fire is in the way? |
| 00:26 | Miceli: | There is a fire. |
| 00:27 | A. Haidu: | Okay, I...can you try to stay to the ground? |
| 00:32 | Miceli: | Okay. |
| 00:33 | A. Haidu: | Okay, low to the ground, all right hold on while I get em going. Okay? |
| 00:36 | Miceli: | Hold. |
| 00:36 | A. Haidu: | What apartment number are you in? |
| 00:37 | Miceli: | "M" |
| 00:39 | A. Haidu: | Apartment "M"? |
| 00:40 | Miceli: | Yes. |
| | A. Haidu: | Okay. |
| 00:48 | A. Haidu: | Do you know what started the fire? |
| 00:50 | Miceli: | Ah, no I don't I just came out and the chair was on fire. |
| 00:54 | A. Haidu: | Okay, you can't get past the chair? |
| 00:56 | Miceli: | I can't get past the chair No. |
| 00:57 | A. Haidu: | Do you have a balcony? |
| 00:58 | Miceli: | Yes I do. |
| | A. Haidu: | All right can you... |
| 01:01 | Miceli: | This chair is right by the balcony, and it's also by the main entrance. |
| 01:04 | A. Haidu: | Okay, hold on... |
| 01:06 | Miceli: | I'm, I'm overcome with smoke. |
| 01:08 | A. Haidu: | Okay open your windows. Can you open a window? |
| 01:10 | Miceli: | Yes I can. |
| 01:13 | A. Haidu: | Okay, go open the window. If it comes... |
| 01:15 | Miceli: | (Coughing) |
| | | (Silence) |
| 01:17 | A. Haidu: | Can't you leave the house? |
| 01:18 | A. Haidu: | Hello. |
| 01:20 | A. Haidu: | She says she is overcome with smoke, she can't get out of the apartment. |
| 01:25 | A. Haidu: | It's a chair fire. |
| 01:32 | A. Haidu: | Hello...Hello. |
| 01:35 | A. Haidu: | Hello. |
| | Unknown: | Fire. |
| 01:53 | A. Haidu: | I hear somebody yelling fire |

ICOVE 22

# VII. OPINION #1 – CITY OF NAPERVILLE INVESTIGATION

> Opinion #1 - The investigation initiated and coordinated by the City of Naperville into the September 10, 1995, apartment fire at 218 East Bailey, Naperville, Illinois, met in 1995 the minimum professional standards of professional practice for applying the Scientific Method to the origin and cause in the field of fire and explosion investigations.

Professions relying upon forensic-driven interpretations and expert conclusions require as their foundation the application of generally accepted science-based and peer-reviewed methodologies. Over time, professional standards in the forensic sciences evolve to the point where the experts in these fields develop job performance requirements founded upon science and engineering-based methodologies.

Examples in the forensic science/engineering field include the international standards-making committees of ASTM International's **Committee E05 on Fire Standards**, **Committee E30 on Forensic Sciences**, and **Committee E58 on Forensic Engineering**.

The leading organization involved in developing fire protection engineering standards nationally and internationally is the NFPA's Standards Council, which meets throughout the year to review and approve standards designed by international committees of experts in a wide range of subjects.

For example, in the field of fire and explosion investigations, the NFPA has developed two recognized peer-reviewed professional standards exist: *NFPA 921* and *NFPA 1033*. Both of these standards were developed, written, and peer-reviewed by a committee of international experts and approved by the NFPA Standards Council. *NFPA 921* and *NFPA 1033* address the procedures, practices, competencies, standards, and methodologies for conducting fire and explosion investigations.

The fire investigators' standards fall directly on the Job Performance Responsibilities (JPRs) captured in *NFPA 1033*. However, the knowledge required in support of these JPRs is contained in *NFPA 921* and other expert treatises in the field of fire investigation.[16]

---

[16]  *NFPA 1033*, 2014 Edition, Ch. 1.2.2 states that "**Job performance requirements** for each duty are the tasks an individual must be able to perform in order to successfully carry out that duty; however, they are not intended to measure a level of knowledge. Together, the duties and job performance requirements define the parameters of the job of fire investigator."

ICOVE 23

### A. Summary of the Opinion that the City of Naperville's Investigation Meets the Standards of Care

A peer review[17] of the investigation initiated and coordinated by the Defendants into the September 10, 1995, apartment fire at 218 East Bailey, Naperville, Illinois, met the minimum professional standards of professional practice in 1995 for reporting opinions by scientific or technical experts in the field of fire and explosion investigation.

Regarding the application of *NFPA 1033*, their investigation meets the requirement of both the 1993 and 2014 Editions. Therefore in applying the 2014 Edition, the City of Naperville also meets today's standard of care at the time of my report in 2021.

The significant findings, which are described and documented in detail in the following sections, are that the City of Naperville team investigation was not a rush to judgment, but a well-documented and methodical probe that met the job performance requirements of *NFPA 1033*. The following is a synopsis of the team's approach to this case that ensured they complied with *NFPA 1033* as well as the scientific method:

- Was comprehensive, methodical, explored all relative evidence, and incorporated peer review by the prosecutor and outside experts.

- On September 10, 1995, Naperville Fire Investigator David Ferreri led the systematic examination of the apartment rooms and contents. His conclusion, along with the rest of the investigation team, was "*that this fire's ignition is suspicious in nature.*" The fire was not at that time classified at to cause. [AMOR 011710].

- Initial September 10, 1995, Supplemental reports by Naperville Police Department Investigator M. Cross list the case as a "Sudden Death, Suspicious Circumstances."

- On September 11, 1995, the Naperville Police Department submitted a Laboratory Request Form to have evidence and control samples tested for potential presence of accelerants. [DEFS 177].

- On September 11, 1995, a "Critique of Incident" meeting was scheduled for September 14, 1995. [AMOR 0013].

---

[17] The term **peer review** is defined as "*A practice of independent and unbiased evaluation of sound engineering principles, judgement and their proper application in the conceptional approach and technical basis of a work product.*" 2020 Guidelines for Peer Review in the Fire Protection Design Process, Society of Fire Protection Engineers, Gaithersburg, Maryland

ICOVE 24

- Starting on September 14, 1995, the City of Naperville Police Department conducted extensive neighborhood interviews to seek out any additional information on the fire. [DEFS 68-71; DEFS 695-662].

- Obtained telephone toll records. [DEFS 192-198].

- On September 11, 1995, City of Naperville investigative team attended and documented the autopsy at the DuPage County Coroner and determined the type of burns and the manner of death being smoke inhalation causing carbon monoxide poisoning. [AMOR 0007]

- The investigation met the standards of professional care not only in 1995 but also in the present.

- Although the Scientific Method was not a cited requirement by *NFPA 1033* in the 1993 Edition, there is more than adequate documentation that their investigation conformed to this method.

- Lt. David Ferreri requested an outside expert, Special Agent Mitchell S. Kushner, an investigator with the Illinois State Fire Marshal's Office, to assist the City of Naperville investigators in systematically developing potential hypotheses for the origin and cause of the fire. [SDT-ISFM 01 - SDT-ISFM 09].

- To better understand the Fire's cause, the Officers also engaged outside extensive testing by an engineering firm  to understand potential causation better.

Finally, in my experience as a former supervisor of a local and federal arson and explosions investigations units, I have no widespread criticisms of the activities and management of this investigation.

## B.  Professional Qualifications and Levels of Performance Required for Fire Investigators

The methodology and opinions expressed in this report rely upon both the 1995 and 2021 editions of *NFPA 921 – Guide for Fire and Explosion Investigations*. The 2021 edition was approved and issued by the NFPA Standards Council on April 5, 2020, with an effective April 25, 2020. The 1995 edition was approved and issued by the NFPA Standards Council on January 13, 1995, with an effective date of February 7, 1995. This report also relies upon *NFPA 921's* companion standard, the 1993 and 2014 Editions of *NFPA 1033 – Professional Qualifications for Fire Investigator.* For present-day testimonies, the latest 2021 edition of *NFPA 921* and the 2014 edition of *NFPA 1033* supersede all previous editions. However, when appropriate, this report may refer to one or both.

ICOVE 25

**Table 2.** Professional Levels of Job Performance as listed in the standard *NFPA 1033 – Professional Qualifications for Fire Investigator* for the years 1993 and 2014.

| | 1993 | 2014 | Job Performance Requirements |
|---|---|---|---|
| **General Requirements for a Fire Investigator** | 3-1.1 | 4.1.1 | The fire investigator shall meet the job performance requirements defined in Sections 4.2 through 4.7. |
| | | 4.1.2 | Employ all elements of the Scientific Method as the operating analytical process |
| | | 4.1.3 | Complete site safety assessments on all scenes |
| | 3-1.2 | 4.1.4 | Maintain necessary liaison with other interested professionals and entities. Adhere to all applicable legal and regulatory requirements |
| | 3-1.3 | 4.1.5 | Understand the organization and operation of the investigative team and incident management system |
| | | 4.1.6 | |
| **Scene Examination** | 3-2.2 | 4.2.1 | Secure the fire ground |
| | 3-2.3 | 4.2.2 | Conduct an exterior survey |
| | 3-2.4 | 4.2.3 | Conduct an interior survey |
| | 3-2.5 | 4.2.4 | Interpret fire patterns |
| | 3-2.6 | 4.2.5 | Interpret and analyze fire patterns |
| | 3-2.7 | 4.2.6 | Examine and remove fire debris |
| | 3-2.8 | 4.2.7 | Reconstruct the area of origin |
| | 3-2.9 | 4.2.8 | Inspect the performance of building systems |
| **Documenting the Scene** | 3-3.2 | 4.3.1 | Diagram the scene |
| | 3-3.3 | 4.3.2 | Photographically document the scene |
| | 3-3.4 | 4.3.3 | Construct investigative notes |
| **Evidence Collection and Preservation** | 3-4.2 | 4.4.1 | Utilize proper procedures for managing victims and fatalities, |
| | 3-4.4 | 4.4.2 | Locate, collect, and package evidence |
| | 3-4.3 | 4.4.3 | Select evidence for analysis |
| | 3-4.5 | 4.4.4 | Maintain a chain of custody |
| | 3-4.6 | 4.4.5 | Dispose of evidence |
| **Interview** | 3-5.2 | 4.5.1 | Develop an interview plan |
| | 3-5.3 | 4.5.2 | Conduct interviews |
| | 3-5.4 | 4.5.3 | Evaluate interview information |
| **Post-Incident Investigation** | 3-6.2 | 4.6.1 | Gather reports and records |
| | 3-6.3 | 4.6.2 | Evaluate the investigative file |
| | 3-6.4 | 4.6.3 | Coordinate expert resources |
| | 3-6.5 | 4.6.4 | Establish evidence as to motive and/or opportunity |
| | 3-6.6 | 4.6.5 | Formulate an opinion concerning origin, cause, or responsibility for the fire |
| **Presentations** | 3-7.2 | 4.7.1 | Prepare a written report |
| | 3-7.3 | 4.7.2 | Express investigative findings verbally |
| | 3-7.4 | 4.7.3 | Testify during legal proceedings |
| | 3-7.5 | 4.7.4 | Conduct public informational presentations |

Source: Updated from D.J. Icove and G.A. Haynes. 2007. "*Guidelines for Conducting Peer Reviews of Complex Fire Investigations.*" (Fire and Materials Conference, San Francisco, California, January 29-31, 2007.)

ICOVE 26

## C.  Applying a Standard of Care Analysis to Fire Investigations

Determining whether the City of Naperville conducted a competent and thorough investigation, requires a "Standard of Care" analysis consisting of a peer review.

When conducting an engineering peer review "*standards of care analysis*" in evaluating forensic fire investigations, *NFPA 1033*, *NFPA 921*, *ASTM International*, and related forensic standards all play an important role. These standards cover individuals in both the public and private sectors. They document whether sufficient information has been gathered to apply the Scientific Method properly. The recognized authorities on conducting peer reviews of complex fire investigations using the Scientific Method to measure those investigations have existed for many years.[18]

The primary test in a "*standard of care*" peer review of a fire investigator's analysis scrutinizes the report to determine sufficient documentation of empirical data, proper methodologies, and sound bases for the opinions reached. The reviewer then decides if the expert applied the proper methodologies and established sound scientific bases for the proffered opinions. The final test is whether an independent expert or peer reviewer, following the same processes, would correctly arrive at the same or closely similar conclusion(s).

## D.  General Requirements for a Fire Investigator

| | |
|---|---|
| *NFPA 1033*<br><br>**General Requirements for a Fire Investigator** | **4.1.1**   The fire investigator shall meet the job performance requirements defined in Sections 4.2 through 4.7.<br>**4.1.2**   Employ all elements of the Scientific Method as the operating analytical process<br>**4.1.3**   Complete site safety assessments on all scenes<br>**4.1.4**   Maintain necessary liaison with other interested professionals and entities.<br>**4.1.5**  Adhere to all applicable legal and regulatory requirements<br>**4.1.6**   Understand the organization and operation of the investigative team and incident management system |

The first set of the *NFPA 1033* JPRs consist of the general requirements section. Regarding the investigation conducted in 1995 by the City of Naperville Police and Fire

---

[18]   Icove, D.J. & Haynes, G.A. (2007). "***Guidelines for Conducting Peer Reviews of Complex Fire Investigations***." (Fire and Materials Conference, San Francisco, California, January 29-31, 2007.) (References updated, October 2, 2011)

ICOVE 27

Departments, all of these requirements were met in this case. These requirements are also met to today's standard of care at the time of this report in 2021.

The bases to support this conclusion include but are not limited to the following citations within the investigation :

- <u>Scientific Method</u>. Although the Scientific Method appears in the 2014 Edition of *NFPA 1033*, it was not cited in the 1993 Edition. Yet the Scientific Method was used by the City of Naperville here as the operational, analytical process by considering multiple hypotheses.

  In this original fire scene investigation, investigators examined and documented each room, including those uninvolved with fire. Investigators postulated several hypotheses, collected evidence, conducted interviews, examined other natural and accidental forms of ignition, inquired about any problems and examined electrical and natural gas utilities, checked appliances, brought in outside experts for peer review, had engineering tests performed, and used this information to test those hypotheses. Other experts confirmed that this method was used. [AMOR 021280].

- <u>Site Safety</u>. Documented in the General Data Sheet, September 10, 1995, entitled the "Naperville Fire Investigation Team," the City shows its compliance with present-day standards of care for site safety. The protocol addresses weather conditions, identifies on-site investigators, and the disconnection of utilities. [AMOR 0209-0211; DEFS 645].

- <u>Liaison and Investigative Team</u>. Documented in the General Data Sheet, September 10, 1995, entitled the "Naperville Fire Investigation Team," the City shows the participation of the Illinois State Fire Marshal's Office. [AMOR 0209-0211; DEFS 645]

  The investigators further examined the potential electrical causes of ignition from the contribution of the television set, an electric lamp, and other artifacts. They relied upon external electrical engineering expertise and testing of this evidence [DEFS 05366-05390; AMOR 307-308; DEFS 487-490; DEFS 597]

- <u>Legal and Regulatory</u>. The City of Naperville complied with legal and regulatory requirements for legally accessing scenes and obtaining records.

- <u>The City of Naperville use a combined team of both Fire and Police investigators.</u>

<u>Opinion</u>. Regarding the investigation conducted in 1995, the City of Naperville met all of these requirements here. The City also met today's standard of care in these areas.

ICOVE 28

## E.    Scene Examinations

| | |
|---|---|
| *NFPA 1033*<br><br>**Scene Examination** | **4.2.1**  Secure the fire ground<br>**4.2.2**  Conduct an external survey<br>**4.2.3**  Conduct an interior survey<br>**4.2.4**  Interpret fire patterns<br>**4.2.5**  Interpret and analyze fire patterns<br>**4.2.6**  Examine and remove fire debris<br>**4.2.7**  Reconstruct the area of origin<br>**4.2.8**  Inspect the performance of building systems<br>**4.2.9**  Discriminate effects of explosions from other types of damage |

The second set of the *NFPA 1033* JPRs consist of scene examinations section. Regarding the investigation conducted in 1995, the City of Naperville Police and Fire Departments met all of these requirements in this case. These requirements are also met to today's standard of care at the time of this report in 2021.

The bases to support this conclusion include but are not limited to the following citations within the investigation:

- Securing the Fire Ground.  Documentation exists that scene security was enforced by the posting of uniformed police officers at the scene. Only fire personnel were allowed access to the building. [DEFS 645].

- External Survey. Starting on September 14, 1995, the City of Naperville Police Department conducted extensive neighborhood interviews to seek out any additional information on the fire. [DEFS 68-71; DEFS 695-662].

- Interior Survey. The interior survey of the apartment was documented before extensive scene processing commenced. [SDT-SAO 5037-5044].

- Interpretation and Analysis of Fire Patterns. Although it appears that the fire suppression personnel were attempting to make sure that the fire was extinguished, there was sufficient evidence remaining to make interpretation and analysis of the fire patterns. [SDT-SAO 5037-5044].

- Fire Scene Reconstruction. Documentation exists that the furniture was placed into their pre-fire positions. All of these steps were photographed. [SDT-SAO 5037-5044].

- Building Systems. Documentation exists that investigators searched for the missing smoke alarm. They found the mounting holes on the wall, yet not the existence in the fire debris. [SDT-SAO 5145]. Investigators also examined electrical and natural gas utilities that services that apartment.

ICOVE 29

Opinion. Regarding the investigation conducted in 1995, the City of Naperville met all of these requirements here. The City also met today's standard of care in these areas.

## F.    Documenting the Scene

| NFPA 1033 Documenting the Scene | **4.3.1**  Diagram the scene<br>**4.3.2**  Photographically document the scene<br>**4.3.3**  Construct investigative notes |
|---|---|

The third set of the *NFPA 1033* JPRs consist of the scene documentation section. The City of Naperville Police and Fire Departments met all of these requirements under then existing standards and today's standards.

The bases to support this conclusion include but are not limited to the following citations within the investigation :

- ▪ Diagramming the scene. Extensive two- and three-dimensional diagrams were completed by investigators, which became useful in interviews. [AMOR 021137-021145].

- ▪ Photographic Documentation. The fire scene was photographed and videoed before and after scene processing. Photo logs were used. [DEFS 645]

- ▪ Investigative Notes. Extensive documentation exists that investigative notes were taken and preserved. Interviews and investigations were recorded and entered into the official City of Naperville file systems.

Opinion. Regarding the investigation conducted in 1995, the City of Naperville met all of these requirements here. The City also met today's standard of care in these areas.

## G.    Evidence Collection and Preservation

| NFPA 1033<br><br>Evidence Collection and Preservation | **4.4.1**  Utilize proper procedures for managing victims and fatalities,<br>**4.4.2**  Locate, collect, and package evidence<br>**4.4.3**  Select evidence for analysis<br>**4.4.4**  Maintain a chain of custody<br>**4.4.5**  Dispose of evidence |
|---|---|

The fourth set of the *NFPA 1033* JPRs consist of the evidence collection and preservation requirements. Regarding the investigation conducted in 1995, the City of Naperville met all of these requirements in this case. The City also met today's standard of care in these areas.

ICOVE 30

The bases to support this conclusion include but are not limited to the following citations within the investigation :

- **Evidence Procedures.** As documented in the Naperville Police Department, Property Report, for Case Number 1995-042030, extensive efforts were in place to collect, package, preserve, trace, and dispose of evidence. [DEFS 177].

- **Forensic Laboratory Analysis.** On September 11, 1995, the Naperville Police Department submitted a Laboratory Request Form to have evidence and control samples tested for potential presence of accelerants. [DEFS 177].

- **Evidence Storage and Retrieval.** An example of the extensive evidence collection and storage system which maintains a chain of custody existed. An example is Special Agent John M. Gamboa to check out evidence on August 12, 2015. [SDT-SAO 5230-5232; People's Exhibit 26].

Opinion. Regarding the investigation conducted in 1995, the City of Naperville met all of these requirements here.  The City also met today's standard of care in these areas.

## H.    Interviews

| *NFPA 1033* | **4.5.1**   Develop an interview plan |
|---|---|
| | **4.5.2**   Conduct interviews |
| Interview | **4.5.3**   Evaluate interview information |

Opinion:The fifth set of the *NFPA 1033* JPRs consist of the interviewing section. The City of Naperville Police and Fire Departments met all these requirements during the 1995 investigation These requirements  also met to today's standard of care at the time of this report in 2021.

The bases to support this conclusion include but are not limited to the following citations within the investigation :

- **Pre- and Post-Interview Plans.**  Several examples of these pre- and post-interview plans exist in the Naperville Police Department files. These include documentation of reasoning by witnesses [SDT-SAO 5141] and a pre-interview inventory of questions. [SDT-SAO 5143; AMOR 0008].

- **Interviews.** City of Naperville investigators and the prosecutor used written statements, memoranda, and taped interviews to document their interactions in this case.

- **Polygraphs.** To evaluate the veracity of the persons of interest, in this case, the City of Naperville investigators used voluntary polygraph examinations on September 12, 1995, and October 3, 1995 with Mr. Amor [DEFS 448-449; DEFS 420-422] and Mrs. Amor [DEFS 446-447].

<u>Opinion</u>. Regarding the investigation conducted in 1995, the City of Naperville met all of these requirements here.  The City also met today's standard of care in these areas.

# I.     Post-Incident Investigation

| | |
|---|---|
| *NFPA 1033*<br><br>**Post-Incident Investigation** | **4.6.1**   Gather reports and records<br>**4.6.2**   Evaluate the investigative file<br>**4.6.3**   Coordinate expert resources<br>**4.6.4**    Establish evidence as to motive and/or opportunity<br>**4.6.5**   Formulate an opinion concerning the origin, cause, or responsibility for the fire |

<u>Opinion</u>: The sixth set of the *NFPA 1033* JPRs consist of the post-incident investigation section. The City of Naperville Police and Fire Departments met  all of these requirements in this case during the 1995 investigation. They also met today's standard of care.

The bases to support this conclusion include but are not limited to the following citations within the investigation:

- ▪ <u>Gathering Reports and Records</u>.  City of Naperville gathered the important records including the Autopsy Report [DEFS 102-106],Toxicology Report [DEFS 178-179], Engineering Testing Reports [ ], and Polygraph Reports [DEFS 448-449; DEFS 420-422; DEFS 446-447].

- ▪ <u>Evaluation of Investigative File</u>. Evidence exists that investigators documented and reviewed their files for potential motives, opinions of witnesses, and responsibility for the fire. [SDT-SAO 5141-5142].

- ▪ <u>Coordination of Expert Resources</u>. Evidence exists that external expert resources were requested and utilized. [DEFS 5366-5390]

- ▪ <u>Telephone records.</u> Records were obtained and reviewed. [DEFS 192-198; DEFS 728-729].

- ▪ <u>Engineering Testing</u>. The investigators effectively eliminated the potential electrical causes of ignition,including the television set, an electric lamp, and other electrical artifacts. They righty consulted and relied upon external electrical engineering expertise and testing of this evidence [DEFS 05366-05390; AMOR 307-308; DEFS 487-490; DEFS 597; DEFS 687-691].

- ▪ Investigator Ferreri drafted a comprehensive single-spaced seven-page origin and cause report. [AMOR 011704- 011710]

- ▪ <u>Formulate An Opinion Concerning the Origin, Cause, or Responsibility for the Fire</u>.

ICOVE 32

- On September 10, 1995, Naperville Fire Investigator David Ferreri led the systematic examination of the apartment rooms and contents. His conclusion, along with the rest of the investigation team, was "*that this fire's ingition is suspicious in nature.*" The fire was not at that time classified at to cause. [AMOR 011710].

- On October 10, 1995, Investigator Ferreri, Naperville Fire Department, entered into the case file a Fire Investigation Closure Report. [AMOR 011704-011710]. The report determined that the fire's <u>origin</u>: Along the west wall of the living room in the area of the swivel chair and <u>cause</u>: Incendiary/aggravated arson. Vodka was poured on a chair and newspapers, then ignited with a cigarette.

- As to fire causation, the identification of the fire's area of origin leads to the fire's cause. Fire investigators are taught the once a fire's area or point of origin is established, the determination of **fire cause** typically follows, which is the process of identifying the first fuel ignited, the ignition source, the oxidizing agent, and the circumstances that resulted in the fire. Generally, a fire cause determination can be considered reliable only if the origin has been correctly determined. (*NFPA 921*, Ch. 19.1).

- <u>Evaluate Motive and/or Opportunity</u>. On October 3, 1995, Ms. Amor told Investigator Michael Cross that she "*felt that Bill was probably responsible for the fire.*" [AMOR 0212]. Note that later, on September 21, 2012, Ms. Amor told Erica Nichols Cook during a telephone interview that Bill admitted to her that he killed her mother for the insurance money when she saw him at the jail. [AMOR 005930].

- In an arrest on October 27, 1993, by Naperville Police Department, Mr. Amor was charged with the Fraudulent Use of Electronic Transmission (193-CF-2164-011). He was sentenced to 24 months' Probation, 102 days in the DuPage County Jail time considered served, $2,186.56 restitution to First City Chicago Bank, and Court costs. [SDT-DCDPCS 10-20].

- In statements to City of Naperville investigators and the prosecutor, Mr. Amor related that he intentionally dropped a lit cigarette onto a newspaper, witnessed the smoldering, and left the apartment knowing that a fire would ensue. Mr. Amor also admitted that he set this fire to profit by collecting insurance. He had previously devised this plan while incarcerated in the DuPage County jail.

<u>Opinion</u>. Regarding the investigation conducted in 1995, the City of Naperville met all of these requirements here. The City also met today's standard of care in these areas.

ICOVE 33

## J.    Presentations

| | |
|---|---|
| *NFPA 1033*<br><br>Presentations | **4.7.1**  Prepare a written report<br>**4.7.2**  Express investigative findings verbally<br>**4.7.3**  Testify during legal proceedings<br>**4.7.4**  Conduct public informational presentations |

The seventh set of the *NFPA 1033* JPRs consist of the general presentation section. The City of Naperville Police and Fire Departments met  all of these requirements in this case during the 1995 investigation. They also met today's standard of care.

The bases to support this conclusion include but are not limited to the following citations within the investigation:

- Written Reports. A review of both the Naperville Police and Fire Department case files shows that they are documented properly.

- Express Investigative Findings. The origin and cause investigation portion of the City of Naperville's investigation was conducted by a multi-disciplinary team led by Investigator David Ferreri, while Investigators Cross and Guerrieri conducted interviews.

  In his eight-page, single-spaced Origin and Cause Narrative Report, Investigator Ferreri systematically recorded his observations room-by-room. He then narrowed the focus of his investigation to the area of fire origin and documented other potential causes for the fire. [SDT-SAO 5037-5044].

  In his initial report, Investigator Ferreri concludes:

  > *"After examining the above information it was determined that the area of Origin was along the west wan, starting from the area of the swivel chair and continuing north to the NW comer. All burn pattern evidence Indicates that flash over occurred in the living room comparment [sic], which resulted in a large amount of very low and severe fire damage. The exact time of this event Is unknown, though It Is highly probable it was after the 911 call by the victim was terminated. All potential accidental causes were studied and a/l were discounted. (See report on TV/VCR test burn) It is the opinion of myself and the rest of the investigation team that this fire's Ignition Is suspicious in nature." [SDT-SAO 5044].*

- Verbal Findings and Testimony. A review of the trial testimonies shows that the Naperville officers that testified were professional and well prepared.

Opinion. Regarding the investigation conducted in 1995, the City of Naperville met all of these requirements here.  The City also met today's standard of care in these areas.

ICOVE 34

# VIII. OPINION #2 – PLAINTIFF'S EXPERT'S INVESTIGATION

> Opinion #2 - The investigation by Douglas J. Carpenter into the September 10, 1995, apartment fire at 218 East Bailey, Naperville, Illinois, failed to meet the minimum professional standards of professional practice in the field of fire and explosion investigations by not correctly applying the scientific method to the facts of this case.

Mr. Douglas J. Carpenter offers his opinions on the origin and cause of this fire. A peer review of his work shows that he has misapplied the scientific method. This misstep, along with the use of an outdated computer fire model constructed by another undisclosed person, compromises his opinions about the fire's origin and cause.

In his analysis, Mr. Carpenter used many dated references, did no physical testing, never visited the scene, ignored the fact that other physical evidence that may have been available, and failed to rerun his computer model with the current version. Of primary concern was that Mr. Carpenter had the unique opportunity, yet never did interview Mr. Amor to learn the details of this case and the details of the conditions within the apartment.

## A. Summary of Findings Expressed by Mr. Carpenter in this Case

Douglas J. Carpenter is Mr. Amor's fire origin and cause expert in this case. He is a well-known and respected licensed Fire Protection Engineer, educator, and scientist. As the Vice President and Principal Engineer at Combustion Science & Engineering, Inc., Columbia, Maryland, his firm frequently often uses computer fire modeling.

In his supplementary report dated January 22, 2021, the following is a summary of his primary opinions in which he has testified or plans to testify in this case.

## B. Mr. Carpenter Fails to Recognize that the City of Naperville Fire Investigation is indeed Reliable.

Mr. Carpenter's criticisms of the reliability of the City of Naperville investigation is unfounded. His argument lacks the rigor of his own inexperience with conducting complex criminal investigations.

His opinion the City of Naperville ignored the use of the Scientific Method in its investigation is totally unfounded. An exhaustive peer review of the City's case investigative files, testimonies, and actions show that they indeed followed this methodology. His criticisms will be addressed point-by-point grouped into two main areas.

ICOVE 35

# 1. The Scientific Method and Hypothesis Testing

Mr. Carpenter states his following opinions which he has testified or plans to testify in this case:

- The hypothesis testing also shows that a lighted cigarette cannot ignite the vapors from vodka at nominal room temperature, and this fire cause hypothesis is also disproved by applying the Scientific Method

- No hypothesis testing was done by investigators as required by applying of the Scientific Method. Hypothesis testing by an analysis of the timeline disproves the fire cause hypothesis because it does not reproduce the observations of the occupants or the timing of the 911 call.

- The hypothesis testing shows there would not be the presence of a flammable vapor concentration above the liquid vodka or ignition at a nominal room temperature of 70°F. Thus, the vapors from vodka cannot be ignited at nominal room temperature, and the application of the Scientific Method disproves this fire cause hypothesis.

- If the investigators had reliably tested their fire cause hypothesis, they would have found that the hypothesis testing disproved their fire cause hypothesis. In this case, the lack of hypothesis testing results in the application of an unreliable methodology that produced inconsistent determinations and opinions.

The records and testimonies offered by the City of Naperville into this fire show that their investigative team, although the standards in 1995 did not require it, followed the tenants of the scientific method. In fact, their investigation meets not only the standards of care in 1995 but also those presently in effect in 2021.

The following is an overview summary of the City of Naperville's investigation that demonstrates they not only followed the scientific method, but also considered multiple hypotheses, conducted tests, and sought outside expertise in this case:

- <u>Peer Review of Hypotheses</u>. The City of Naperville's investigation methodically reviewed the fire scene, developed hypotheses as to potential sources of ignition, inspected and eliminated sources of natural and accidental ignitions from utilities and appliances, and had outside fire and engineering experts test these hypothoses.

- <u>Timeline for the Fire</u>. The City of Naperville's investigation methodically assessed the timeline for this fire and confirmed that it met and reproduced the expected development of the fire. These efforts included, but were not limited to, repeated interviews with the Amors and other persons, an extensive neighborhood canvas of potential witnesses, obtained telephone call histories to and from the Amor apartment.

ICOVE 36

- Competent Ignition Sequence. While it is true that explaination provided by Mr. Amor's statement as to the fire's ignition of vodka spilled on newspapers is not really a competent ignition scenario, this is a witnessed fire. The presence or absence of the vodka has little impact on the hypothesis that a lit cigarette can easily ignite newspaper.

- Hypothesis Development. The City of Naperville's investigation into this fire considered multiple hypotheses, sought outside experts to peer review their hypotheses, and conducted an extensive investigation. The investigative team applied the tenets of the scientific method and explored multiple hypotheses.

Many persons, let alone competent fire investigators, know and instinctively realize that a lit cigarette is a competent ignition source to start a fire on newspaper.

Mr. Amor clearly stated multiple times that he dropped the lit cigarette on the newspaper, witnessed its smoldering combustion, and left the apartment knowing that a fire most likely would develop. Whether or not spilled vodka had any contribution to this fire is inmaterial in this case.

## 2. Fire Cause Determination

Mr. Carpenter states the following opinions which he has testified or plans to testify in this case:

- The City of Naperville's determination of the fire cause in this case involving vodka, newspaper, and a cigarette was unreliable.

- For reliability, the determination of the fire cause by applying the Scientific Method must stem from evidence, not the lack of evidence. In addition, any valid fire cause hypothesis must be tested through applying the Scientific Method.

- As part of their investigation, the Naperville Police Department made a fire cause determination that resulted in a subsequent determination to classify the cause as an incendiary fire cause.

The following is an overview summary of the reliability of City of Naperville's investigation. Their investigation is clearly reliable in that they not only followed the scientific method, but also considered multiple hypotheses, conducted tests, and sought outside expertise in this case.

- Evidence. The City of Naperville's investigation collected and analyzed ample physical evidence in this case. Mr. Carpenter's limited scope as to incorporating evidence concentrated on just the vodka theory and did not assess other forms of evidence such as results of forensic testing, documents that established the timeline, witness observations.

ICOVE 37

They collected not only fire debris but also control samples for later comparison and testing, should it be necessary. An extensive fire scene reconstruction showed that fire patterns clearly isolated the area of fire origin as where Mr. Amor dropped the lit cigarette onto the newspaper. They tested other potential ignition sources and disqualified them as could have participated in the ignition sequence.

The eyewitness evidence and later determined area of fire origin where Mr. Amor dropped the lit cigarette onto the newspaper is independently confirmed by a thorough forensic fire scene examination. Subsequent testing of the fire debris showed that an flammable or combustible liquid was not found, confirming Mr. Amor's version of the fire's cause and smoldering development.

- Fire Classification. A fire's classification in the 1995 Edition of NFPA 921, pt. 12-2, states that "*[t]he cause of a fire may be classified as accidental, natural, incendiary (arson), or undetermined.*" That section 12-2.3 further describes the incendiary fire cause as "*[t]he incendiary fire is one deliberately set under circumstances in which the person knows that the fire should not be set.*"

  Although the Scientific Method appears in the 2014 Edition of *NFPA 1033*, it was not cited in the 1993 Edition. Nevertheless, the Scientific Method was used by the City of Naperville in the 1995 investigation as the operational, analytical process by considering multiple hypotheses and the classification of the fire to be incendiary.

In conclusion, in the original fire scene investigation, investigators examined and documented each room, including those uninvolved with fire. Investigators postulated several hypotheses, collected evidence, conducted interviews, examined other natural and accidental forms of ignition, inquired about any problems and examined electrical and natural gas utilities, checked appliances, brought in outside experts for peer review, had engineering tests performed, and used this information to test those hypotheses. Other experts confirmed that this method was used. [AMOR 021280].

## C.     Mr. Carpenter's Investigation Fails to Correctly Apply the Scientific Method to the Facts of This Case

When using the scientific method, fire investigators, whether they are from the public or private sector, continually refine and explore a working hypothesis until they reach a final expert conclusion or opinion, as shown by Figure 5.

As previously shown by Figures 1 and 2, applying the scientific method to fire investigation and reconstruction is a methodical seven-step systematic process. This methodology is an approach consistent with *NFPA 921* and *NFPA 1033*.

ICOVE 38

When properly applied, this systematic process addresses how to formulate, test, and validate hypotheses correctly. But Mr. Carpenter's investigation failed in almost every one of the seven-step process defined in the scientific method (see Figures 1 and 2).

The bases to support this conclusion include but are not limited to the following:

## 1.  Failure to Recognize the Need.

Mr. Carpenter's investigation into this case failed to recognize the need for a complete and open investigation using the scientific method. Although he stated that he used the scientific method in his analysis, he also admonished others for not.

The bases for my opinion include, but are not limited to, the approach in which Mr. Carpenter took on this assignment, responsibility, and role.

- Scope and Role of a Fire Investigation. Fire investigators in both the public and private sectors are trained to take on the role of being fact finders to determine not only the origin and cause of the event but also whether future fires, explosions, or loss of life can be prevented through new designs, codes, or enforcement strategies. In public safety sectors, determining the origin and cause of every fire is often a statutory requirement. Identifying unsafe products related to the cause of the fire can also lead to recalls and the prevention of future incidents. [19]

- Confirmation Bias. Here, Mr. Carpenter appears to have taken on an assignment to attempt to define and prove his version of events using a computer fire model and anecdotal references to articles, guides, and textbooks. One approach was to disprove cigarette ignition of the spilled vodka-soaked newspaper theory without recognizing and pursuing other potential hypotheses. This approach is contrary to the recommended practices of care and is known as conformation bias.

*NFPA 921* states:

> *4.3.1 * **Confirmation Bias**. Different hypotheses may be compatible with the same data. When using the schematic method, testing of hypotheses should be designed to disprove a hypothesis (i.e., falsification of the hypothesis), rather than relying only on confirming data that support the hypothesis. Confirmation bias occurs when the investigator relies exclusively on data that supports the hypothesis and fails to look for,*

---

[19]  Dixon, B. M., & Kelly, R. L. (Eds.). (2000). Fire and Arson Scene Evidence: A Guide for Public Safety Personnel. U.S. Department of Justice, Washington, DC.

ICOVE 39

*ignores, or dismisses contradictory or nonsupporting data. The same data may support alternate and even opposing hypotheses. The failure to consider alternate or opposing hypotheses, or prematurely discounting seemingly contradictory data without appropriate analysis and testing can result in incorrect conclusions. A hypothesis can be said to be valid only when rigorous testing has failed to disprove the hypothesis. Disproving the hypothesis is a process in which all the evidence is compared against the proffered hypothesis in an effort to find why the hypothesis is not true."*

▪ Presumption of Cause. Mr. Carpenter's approach to fire investigation is that fires should be considered accidental unless proven elsewise. [SDT-SAO 16129].This approach is known as presumption and is not following the standard of care in fire investigations. An important concept in applying the application of the scientific method to forensic fire scene investigations and analyses is that the investigator should approach all fire scenes without a presumption of the cause, that is hypotheses for the fire's origin and cause is undetermined until sufficient data have been collected in the examination of the scene, (NFPA 921, 2021 Edition, pt. 4.3.8).

*NFPA 921*, pt. 4.3.8 states that:

> **Avoid Presumption.** *Until data have been collected, no specific hypothesis can be reasonably formed or tested. All investigations of fire and explosion incidents should be approached by the investigator without presumption as to origin, ignition sequence, cause, fire spread, or responsibility for tl1e incident until the use of the scientific method has yielded testable hypotheses, which cannot be disproved by rigorous testing.*

## 2. Failure to Correctly Define the Problem

Mr. Carpenter's investigation failed to define the problem and assess the resources necessary and available to take on this assignment.

The bases for my opinion include, but are not limited to, the following:

▪ Ample Resources. The bases for this opinion is that being the Vice President of a consulting engineering firm, Mr. Carpenter had access to other engineers, support staff, interns, and fire testing facility to clearly define the problem, articulate a sound strategy, and implement a plan.

A review of his expert reports along with courtroom and deposition testimony shows that he failed in his responsibility to leverage and dedicate his available company

ICOVE 40

resources to investigate this case fully. He failed on how to devise a tentative investigative plan, failed to leverage available information on the apartment where the fire started, failed to use the most recent version of a computer fire model relying on results from over 5 years ago, and failed to interview Mr. Amor to learn more about the fire's origin nature and construction of the furniture near to the fire's origin.

## 3. <u>Failure to Collect Sufficient Data</u>

Data are "facts or information to be used as a basis for a discussion or decision" (ASTM International, 1989). Mr. Carpenter failed to collect sufficient data to support his version of the application of the scientific method.

The bases for this opinion focuses on not what data were collected, but what was not, particularly when that evidence was available.

- <u>Insufficient Facts and Data</u>. For example, Mr. Carpenter could have collected data through facts and information about the incident through direct observations, measurements, photography, evidence collection, testing, experimentation, historical case histories, and witness interviews.

- <u>Lack of Testing</u>. Mr. Carpenter, whose company has the equipment, resources, and staff to conduct fire tests, did not perform them in this case. He could have conducted simple ignition tests on the leading theory as to cigarette ignition of vodka-soaked newspapers and other ignition scenarios as required by the scientific method.

  For example, tests supported by peer-reviewed literature, could have shown other hypotheses of cigarette ignition of newspapers and furniture.

  In addition, there were control samples of evidence collected by the City of Naperville's investigation. There is no documentation in Mr. Carpenter's reports or testimony that he attempted to access these samples for examination or further testing.

- <u>Failure to Conduct Interviews</u>. *NFPA 921* (2021 Edition, Ch. 18.1.2) is very clear in identifying the three factors needed to determine fire origin during an investigation. The determination of the origin of the fire involves the coordination of information derived from one or more of the following:

The first factor by *NFPA 921* in determining the origin of a fire:

> (1) <u>Witness Information</u>. The analysis of observations reported by persons who witnessed the fire or were aware of conditions present at the time of the fire as well as the analysis of electronic data including, but not limited to, security camera footage, alarm system activation, or other such data recorded in and around the time of the fire event.

Here, witness information provides the golden opportunity to gain access to valuable information and data. For example, Mr. Carpenter based his computer fire model on assumptions about the types and construction of the furniture and the status of doors, windows, and a sliding door leading to the patio.

Mr. Carpenter's mistake was that he had access to the primary source of information — Amor himself. Thus, any testimonial information came via deposition transcripts and statements. Amor's interview could have enhanced the computer model by providing pre-fire conditions and types of materials used in the sofa and swivel chair.

The City of Naperville investigators collected control samples of evidence in this case. The samples consisted of carpet and chair fabric. [DEFS 180]. Nowhere does Mr. Carpenter inquire about those samples, which could have impacted his conclusions regarding their identification and potential flammability.

One should note that another expert, in this case, was able to interview Mr. Amor in person on October 20, 2015. The interview at the Illinois Department of Corrections in Taylorville, Illinois., was transcribed and now available to other experts in this case. [SDT-SAO 5300-5380].

- ▪ <u>Failure to Conduct Sufficient Fire Pattern Analyses</u>. *NFPA 921* (2021 Edition, Ch. 18.1.2) second factor needed to determine fire origin during an investigation involves interpreting fire patterns.

The second factor by *NFPA 921* in determining the origin of a fire:

> (2) <u>Fire Patterns</u>. The analysis of effects and patterns left by the fire, which may include patterns involving electrical conductors.

The determination of the origin of the fire involves the coordination of information derived from one or more of the following: Mr. Carpenter failed to examine sufficient data, for example, photographs depicting the fire patterns in this case. He dismisses any use of these patterns based upon his notion that a room going to flashover conditions would obliterate or distort these patterns.

However, a reliable technique to define an area of a fire's origin is to examine the impact of gypsum board exposed to incipient fire. The more intense the initial exposure,

ICOVE 42

the more damage the gypsum board wall sustains, forming observable lines of demarcation. Several techniques examine and explain the variation of calcination fire effect damage in gypsum board walls[20] forming lines of demarcation.[21]

- <u>Failure to Correctly Assess the Impact of Fire Dynamics</u>. *NFPA 921* (2021 Edition, Ch. 18.1.2) third factor needed to determine fire origin during an investigation involves the correct application of fire dynamics to the facts of the case.

The third factor by *NFPA 921* in determining the origin of a fire:

> (3) <u>Fire Dynamics</u>. The analysis of the fire dynamics [i.e., the physics and chemistry of fire initiation and growth, and the interaction between the fire and the building's systems.

Mr. Carpenter spent a great deal of time citing earlier work on the flammability of upholstered furniture. His discussions focused on smoldering conditions of various materials. An interview with Mr. Amor, however, could have determined the exact nature of the furniture in the room of fire origin, the condition of the door to Ms. Miceli's bedroom, and other factors.

The City of Naperville investigators collected control samples of evidence in this case. The samples consisted of carpet and chair fabric. [DEFS 180]. Nowhere does Mr. Carpenter inquire about those samples, which could have impacted his conclusions regarding their identification and potential flammability.

Mr. Carpenter did not know the following important variables concerning the fire, nor did he inquire. He only used default "guestimates" in his fire dynamics analysis and computer model, an approach that introduces significant errors in his approach:

- The failure to identify of type and nature of the upholstered material inside or covering chair on which he considers the area of origin.
- The failure to interview Mr. Amor and determine type and brand of cigarette he smoked.
- The failure to realistically identify the timeframe that a lit cigarette on newspaper transitions to smoldering combustion.

---

[20] NFPA 921, 2021 Edition, Ch. 3.3.25, defines **calcination of gypsum** as "A fire effect realized in gypsum products, including wallboard, as a result of exposure to heat that drives off free and chemically bound water."

[21] NFPA 921, 2021 Edition, Ch. 3.3.130, defines **lines of demarcation** as "The borders defining the differences between the affected area and adjacent, less-affected area."

ICOVE 43

- The failure to research and cite peer-reviewed literature on the propensity for cigarette ignition of newspaper.
- The failure to design and perform physical laboratory ignition tests to bolster his hypotheses.

Another oversight that impacts the fire dynamics is constructing the computer fire model Mr. Carpenter used in this case. Figure 6 below clearly shows that Mr. Carpenter failed to include several critical rooms in his computer model. Figure 6(a) is the actual layout of the apartment, and Figure 6(b) is the computer model, which eliminates the kitchen and two bathrooms in the computer model.

Of note is that bathrooms and kitchens typically have vents, which would change the ventilation patterns in the apartment's fire model. Including these rooms would have taken little time and would have made the model more realistic.



(a)                                                    (b)

**Figure 6.** (a) Detailed dimensional layout of Apartment M showing rooms, doors, furniture, and location of the victim. [AMOR 021139] and (b) Computer fire model display developed by Mr. Carpenter lacking several rooms including the kitchen and two bathrooms (marked in (a) in yellow).

The exclusion of these critical rooms in the computer fire model is a critical misstep since there would be ventilation openings in the kitchen and bathrooms in these rooms. These ventilation paths would divert air, smoke, and contaminates from reaching Ms. Miceli's bedroom.

This impact of ventilation would also change the amount and distribution of Carbon Monoxide within the apartment. Mr. Carpenter cites in his PowerPoint presentation [AMOR 038288- 038335] the effects of the intake of carbon monoxide and thermal injuries by fire victims to establish their time to incapacitation.[22]

In a review of a previous expert report [Exhibit 4; AMOR 039281-039286] produced in his deposition on March 31, 2021, he discussed fire origin hypotheses using thermal injuries and Carbon Monoxide uptake by the victim. These analyses could have provided additional information about Ms. Miceli's untimely death, particularly after calling 911.

However, Mr. Carpenter's computer model did produce information as to the presence and concentration of Carbon Monoxide on a room-by-room basis, yet he failed to include that data in his calculations as to tenability of Ms. Miceli. *NFPA 921*, pt. 24.10.8.2.l, covers the use of the Stewart Equation to estimate the time that the victim was exposed during the fire to Carbon Monoxide.

The equation provides a basic relationship between Carboxyhemoglobin found the in the victim, the inhaled Carbon Monoxide concentration, the victim's respiratory minute volume, and exposure duration. The equation has been cited in peer reviewed forensic literature as applicable in tenability of victims.[23]

This data was available to Mr. Carpenter that carboxyhemoglobin level of 42.1 percent was detected in the toxicology report on Ms. Miceli. [DEFS 178], yet he failed to incorporate it into his analysis. Mr. Carpenter also failed to cite the recent literature on smoldering ignition, its development, and the propensity to detect the smell.

In summary, Mr. Carpenter used insufficient facts and data in his analysis of the fire incident. One can only surmise why in other cases, these facts are used and why he chose not to include them in generating hypotheses.

## 4.    Failure to Correctly Analyze Data

- Mr. Carpenter's analysis of the data failed to account for all data that could have affected this fire. In the scientific method, the analysis of data uses inductive

---

[22]    McAllister, J. L., Carpenter, D. J., Roby, R. J., & Purser, D. (2014). The importance of autopsy and injury data in the investigation of fires. *Fire Technology*, *50*(6), 1357-1377.

[23]    Christensen, A. M., & Icove, D. J. (2003). The application of NIST's fire dynamics simulator to the investigation of carbon monoxide exposure in the deaths of three Pittsburgh fire fighters. *Journal of Forensic Science*, *49*(1), 1-4.

ICOVE 45

reasoning to formulating a conclusion based on many observations and analyze all the data collected.

The investigator relies on their knowledge, training, and experience in evaluating the totality of the data. This subjective approach to the analysis may include understanding similar loss histories (observed or obtained from references), training in and understanding fire dynamics, fire testing experience, and experimental data. Data evaluation can include the pattern of fire damage, heat, and flame vectoring, arc mapping, and fire engineering and modeling analysis.

The limited data Mr. Carpenter collected by avoiding interviewing Mr. Amor, assessing other potential hypotheses, and incorrectly modeling the fire compromised this important step of the scientific method. He had all of the resources of his company available to conduct testing, use more accurate computer models and other loss histories, yet omitted these resources.

Limiting the data collected and analyzed produces flawed hypotheses in this case.

## 5.    Failure to Develop and Assess Alternative Working Hypotheses

▪ Mr. Carpenter's analysis of this case failed to pursue and assess alternative working hypotheses thoroughly. A hypothesis is defined as "a supposition or conjecture put forward to account for certain facts and used as a basis for further investigation by which it may be proved or disproved" (ASTM International 1989).

Based on the limited data analysis, Mr. Carpenter's development of his tentative working hypothesis by not pursuing alternative hypotheses, can only lead to failure to apply the standards of care in this case. Hypotheses are used to explain, confirm, or disprove the fire's origin, cause, and development.

These hypotheses assess compliance with on-scene observations, physical evidence, and testimony from witnesses. For example, hypotheses may address a causal mechanism or a mathematical relation (e.g., plume flame height, impact of different fuel loads, locations of competent ignition sources, room dimensions, impact of open or closed doors and windows).

## 6.    Failure to Test Alternative Working Hypotheses

▪ Mr. Carpenter failed to test the alternative working hypotheses, particularly when incorporating his computer fire model as the centerpiece of his investigation.

When testing working hypotheses, fire investigators use deductive reasoning, which is "the process by which conclusions are drawn by logical inference from given premises" (NFPA 2021, pt. 3.3.41). This step involves coming to a conclusion based on previously known facts while comparing the working hypothesis with all other known facts, the incidence of prior loss histories, relevant fire test data, authoritative published treatises, and experiments.

A critical feature of hypothesis testing is creating alternative hypotheses that also can be tested. If the alternatives counter the working hypothesis, their evaluation may reveal issues that need to be addressed.

After all hypotheses have been rigorously tested against the data, those that cannot be conclusively eliminated should be considered viable. In evaluating all working hypotheses, the investigator can recommend collecting and analyzing additional data, seeking new information from witnesses, and developing or modifying the working hypothesis. This may involve reviewing the analysis with other investigators with relevant experience and training (peer review).

While the City of Naperville investigators followed and documented the philosophy of the scientific method, there is little documentation that Mr. Carpenter documented and supported his data collection, and alternative hypotheses with rigor. These failings undermine the argument that Mr. Carpenter failed to apply the scientific method to the facts of this case.

## 7.  Failure to Correctly Select a Final Hypothesis

- The improper application of the scientific method, outlined in the previous step, caused Mr. Carpenter to incorrectly select a final hypothesis in this case.

An opinion is defined as "*a belief or judgment based upon facts and logic, but without absolute proof of its truth*" (ASTM International 1989). When the working hypothesis is thoroughly consistent with evidence and research, it becomes a final hypothesis and can be authoritatively presented as a conclusion or opinion of the investigation.

Based on incorrectly following steps 1 through 6 of the scientific method, Mr. Carpenter compromised his ability to select and support his final hypotheses in this case. The effect of his approach shows that he failed to collect sufficient data, used a flawed computer fire model that compromised his methodology, and incorrectly applied the data he collected to the facts here.

As indicated, in collecting and analyzing data, fire investigators are trained to describe, observe, and document the incident; photograph, sketch, diagram, and collect evidence;

ICOVE 47

conduct tests and experiments; interview witnesses; and assemble historical loss histories of similar incidents.

This collected data and evidence should not consist of only the data and evidence which support the investigator's initial or assumed hypothesis. Still, they should include all data and evidence to consider, challenge and refute all other reasonable alternative hypotheses considered and ruled out. To ignore considering alternative hypotheses can only undermine objectivity and improperly introduce "expectation bias" into the investigation.

## 8.    Failure to Account for Error Rates

- Mr. Carpenter failed to account for significant error rates when constructing the computer fire model he selected and used in his investigation. The cumulative nature of error rates can result in wrong or erroneous conclusions about a fire's growth within a structure and distribution of combustible gases such as Carbon Monoxide.

There are inherent limitations and cautions on the use of computer fire modeling in a forensic fire investigation. *NFPA 921*, pt. 21.4.1.3 offers cautions on the limits of mathematical modeling:

> *Mathematical modeling, whether simplified hand calculations or computer fire models, has inherent limitations and assumption that should be considered. Models generally rely upon empirical data and are validated via comparison with other empirical data. Care must be taken to assure that the model is being used with due regard for limitations, assumptions, and validation. While computational models can be used to test hypotheses, models should not be utilized as the sole basis of a fire origin and cause determination.*

The investigator should consider error rates when they are used in the analysis of fires within a structure. Errors can be introduced by incorrect coding of compartments, openings, and leakage amongst compartments.

As previously shown in Figure 6, which compares the fire model that Mr. Carpenter used, there are several rooms or compartments that were not coded into the model. There is no mention of why this did not occur, which could have been a simple addition. The exclusion of these critical rooms in the computer fire model is a critical misstep since there would be ventilation openings in the kitchen and bathrooms in these rooms. These ventilation paths would divert air, smoke, and contaminates from reaching Ms. Miceli's bedroom.

ICOVE 48

The selection of an appropriate model can have an impact of accuracy. *NFPA 921*, pt. 21.4.9.2 states:

> *There is a selection of fire models used for predicting fire phenomena. In addition to the required output, selection factors include computational resources, time limitations, level of accuracy, available input data, and underlying governing equations. The modeler should consider the range of candidate models and may use multiple models for comparison purposes. If no candidate model exists, the problem may require redefinition or a new model may need to be developed. The analyst should evaluate the available information for input to the model, the desired outputs, and the resources available.*

In this case, Mr. Carpenter used a zone model, which gives a lesser accuracy than a field model. Again, this selection impacts error rates. He did not select the best computer fire model for his analysis.[24]

In another issue, Mr. Carpenter used an earlier version of a computer zone model known as the Consolidated Fire and Smoke Transport (CFAST) model.[25] The model was constructed by an employee, Haavard Boehmer, yet he is not identified in the January 22, 2021, expert report. [Carpenter Depo, March 31, 2021; 117:23-24 and 118:1-13]. The purpose of the model was to test the hypothesis and a time frame for the smoke to migrate from the fire's origin into Ms. Miceli's bedroom. [Carpenter Depo, March 31, 2021; 131:23-24; 132:1-4].

Mr. Carpenter bases his past and present opinions using an outdated version of the CFAST computer model Version 7.1.1, which was issued on April 21, 2016, and is about 5 years old. The present version of CFAST is Version 7.6.0, published on January 10, 2021.[26]

---

[24] Mowrer, F. W. (2002). The right tool for the job. *Journal of Fire Protection Engineering*, *13*, 39-44.

[25] The Consolidated Model of Fire and Smoke Transport, CFAST, is a computer program that fire investigators, safety officials, engineers, architects, and builders can use to simulate the impact of past or potential fires and smoke in a specific building environment. CFAST is a two-zone fire model used to calculate the evolving distribution of smoke, fire gases and temperature throughout compartments of a building during a fire. Website: https://www.nist.gov/el/fire-research-division-73300/product-services/consolidated-fire-and-smoke-transport-model-cfast (last accessed May 18, 2021)

[26] Peacock, R. D., Reneke, P. A., & Forney, G. P. (2017). CFAST–Consolidated Model of Fire Growth and Smoke Transport (Version 7) Volume 2: User's Guide. *NIST Technical Note 1889v2*.

ICOVE 49

The newest version of CFAST incorporates leakage factors between compartments or rooms based upon the latest implementation of the model. However, Mr. Carpenter's analysis does not consider these leakage factors when testing the hypothesis and a time frame for the smoke to migrate from the fire's origin into Ms. Miceli's bedroom. [Carpenter Depo, March 31, 2021; 131:23-24; 132:1-4].

This misstep in considering the impact of ventilation would also change the amount and distribution of Carbon Monoxide within the apartment that Ms. Miceli ingested. The leakage factors coming from the exclusion of these critical rooms in the computer fire model is a critical misstep since there would be ventilation openings in the kitchen and bathrooms in these rooms. These ventilation paths would divert air, smoke, and contaminates from reaching Ms. Miceli's bedroom.

### B. Mr. Carpenter's Flawed use of the Scientific Method makes his Final Hypothesis in this Case Unreliable

- ▪ Mr. Carpenter's analysis centers on using a computer fire model, which was rendered unreliable in its misapplication in this case.

Mr. Carpenter's application of the computer fire model known as CFAST used unreliable principles, methods, standards, and data. This model was relied on in his January 22, 2021, expert report, PowerPoint presentation, and past testimonies on January 14, 2016, December 12, 2016, January 24, 2018.

Babrauskas notes that computer fire modeling cannot be done in the absence of reliable experimental data.[27] This experimental data do not exist for mass loss rate (MLR), and heat release rate (HRL) of smoldering fires, no valid numerical submodels (pyrolysis, MLR, HRR, etc.) can be utilized as a part of computer room fire modeling. As a result, fire models, whether based on CFD (computational fluid dynamics) or other kinds, cannot properly encompass the smoldering process. For models to be credible, they must be validated against appropriate experimental data.

The use of reliable principles and methods is the central theme in scientific fire cause determination. *NFPA 921* states that reliable fire cause determinations first require the determination of the fire's origin. It specifically states:

Fire cause determination is identifying the process of identifying the first fuel ignited, the ignition source, the oxidizing agent, and the circumstances that led to the fire. Fire

---

[27] Babrauskas, V. (2021). ***Smoldering Fires***, Fire Science Publishers, New York, NY.

ICOVE 50

cause determination generally follows origin determination. Typically, a fire cause determination can be considered reliable only if the origin has been correctly determined. (NFPA 921, 2021 Edition, Ch. 19.1).

- <u>Professional Standards and Treatises</u>. Fire investigators are expected to rely on and cite the latest professional standards of proper forensic principles and methodologies, expert treatises, and peer-reviewed literature. But Mr. Carpenter failed to update and mention several of these latest references. For example, he cites the 2014 Edition of NFPA 921 while now in the 2021 Edition. He also uses Dr. Vyto Babrauskas' Ignition Handbook to discuss smoldering when a very recent 2021 treatise on smoldering fires is now available.[28]

- <u>Flawed Application of the Scientific Method</u>. Mr. Carpenter did not follow the Scientific Method in the evaluation of this fire. Nowhere in his report does Mr. Carpenter show where he conducted interviews of any witnesses, nor did he evaluate all of the original fire scene photos or witness/police videos. From Mr. Carpenter's affidavit, it appears that he based his opinion solely on police reports and testimony. [AMOR 021280-021281].

- <u>Computer Fire Modeling</u>. Mr. Carpenter has continued to use the older version of the CFAST computer fire model. He co-wrote the input file for that program, which has not been updated since December 5, 2016. The problem with this approach is that newer and more accurate computer programs have been developed.

*NFPA 921*, 2021 Edition, pt. 21.4.1.3, states:

> *While computational models can be used to test hypotheses, models should not be utilized as the sole basis of a fire origin and cause determination.*

Mr. Carpenter's computer model eliminates several rooms that a prudent model builder would have included. Depending on the door openings, the position of the sliding door, and other factors, a more accurate model could be realized, but that was not his choice in a critical case. As in any forensic computer model, there are error rates that skew the eventual predictions made by the expert. The latest CFAST version is more accurate than its predecessor versions, so it would be expected that the projections may vary.

Mr. Carpenter had every chance to update the coding of his model but apparently declined to so, a misstep that compromises his approach.

---

[28] Babrauskas, V. (2021). ***Smoldering Fires***, Fire Science Publishers, New York, NY.

ICOVE 51

## IX.  OPINION #3 – THE FIRE'S ORIGIN AND CAUSE

Opinion #3 – Based upon today's standards of care as well as the standards in effect in 1995, a forensic engineering analysis of the fire in this case, to a reasonable degree of engineering certainty, confirms that the fire started in the area of origin as determined by the City of Naperville, and observed by Mr. William Amor and Ms. Marianne Miceli. The fire's cause was, with and engineering degree of certainty, a lit cigarette landing on and igniting newspapers within that area of origin, a human act resulting in an incendiary fire.

### A.   Review of Origin and Cause Determinations

When conducting a thorough fire scene examination, the fire investigator examines the overall structure, specific parts of the structure, and the geographic location of damage within a fire scene to determine the ***area of fire origin***[29] and, if possible, the particular point of fire origin This [30]. process is vital and usually occurs before a cause for the fire is determined.

Once a fire's area or point of origin is established, the determination of ***fire cause***[31] typically follows, identifying the first fuel ignited, the ignition source, the oxidizing agent, and the circumstances that led to the fire. Generally, a fire cause determination can be considered reliable only if the origin has been correctly determined. (*NFPA 921*, Ch. 19.1).

### B.   Ignition Source

Here, the hypothesis based on Mr. Amor's statements was that he discarded a lit cigarette onto newspapers on which he had previously spilled a vodka drink. Mr. Amor claimed to see a wisp of smoke and left the apartment, knowing that the fire would ensue and develop.

---

[29]   *NFPA 921*, 2021 Edition, Ch. 3.3.13 defines a fire's ***area of origin*** as "A structure, part of a structure, or general geographic location within a fire scene, in which the "point of origin" of a fire or explosion is reasonably believed to be located."

[30]   *NFPA 921*, 2021 Edition, Ch. 3.3.149 defines a fire's ***point of origin*** as "The exact physical location within the area of origin where a heat source, a fuel, first interact, resulting in a fire or explosion."

[31]   *NFPA 921*, 2021 Edition, Ch. 3.3.26 defines a fire's ***cause*** as "The circumstances, conditions, or agencies that brought about or resulted in the fire or explosion incident, damage to property resulting from the fire or explosion incident, or bodily injury or loss of life resulting from the fire or explosion incident."

ICOVE 52






(a) Annotated diagram by Mr. Amor provided September 15, 1995, detailing the locations of the Vodka bottle, candle, and the newspapers laying between the chair, couch, and coffee table. [SDT-SAO 22777].

(b) Floorplan indicating the position of newspapers laying between the chair, couch, and coffee table. [AMOR 021139].

**Figure 7.** The detailed dimensional layout of Apartment "M" showing the family rooms and the estimated area of origin as identified by witnesses, fire pattern analysis, and fire dynamics.

In Mr. Amor's repeated initial statements to the City of Naperville's investigators and prosecutor, there is no dispute as to the fire's area of origin. As to fire causation, the identification of the fire's area of origin leads to the fire's cause. Fire investigators are taught the once a fire's area or point of origin is established, the determination of *fire cause* typically follows, which is the process of identifying the first fuel ignited, the ignition source, the oxidizing agent, and the circumstances that resulted in the fire.

Generally, a fire cause determination can be considered reliable only if the origin has been correctly determined. (*NFPA 921*, Ch. 19.1). My interpretation and analysis of the fire patterns confirms that the fire's narrowly defined area of origin was indeed located within the intersection of where the newspapers laid on the floor between the chair, couch, and coffee table. This is the same area where Mr. Amor admitted discarding the lit cigarette.

## C.     The Fire's Origin

A review of the scene documentation and photographs shows that, in my opinion, the area of origin is in concert with that identified by the Naperville Fire and Police Department investigation.

The accepted methodology for determining a fire's origin is best accomplished with a coordinated analysis of *witness observations*, *fire patterns*, and *fire dynamics* places a narrowly defined area of origin as being where the pile of newspapers sat between the couch, chair, and table as previously shown in Figure 7.

Shown in Figure 8 is the photograph of the room of fire origin. The area of origin is near the right end of the couch. [DEFS 5178].



**Figure 8.** Photograph of the room of fire origin. The area of origin is near the right end of the couch. [DEFS 5178].

*NFPA 921* has three factors that, when used in concert, form the basis for determining a fire's origin. In review, this determination is made through the coordination of information derived from one or more of the following [NFPA 921, 2021 Edition, 18.1.2]:

> **(1)** *Witness information and/or Electronic Data*. The analysis of observations reported by persons who witnessed the fire or were aware of conditions present at the time of the fire as well as the analysis of electronic data including but not limited to security camera footage, alarm system activation, or other such data recorded in and around the time of the fire event (see Chapter 14)

ICOVE 54

**(2)** *Fire Patterns*. The analysis of effects and patterns left by tJ1e fire, which may include patterns involving electrical conductors (see Chapter 6)

**(3)** *Fire Dynamics*. The analysis of the fire dynamics [i.e., the physics and chemistry of fire initiation and growth (see Chapter 5) and the interaction between the fire and the building's systems (See Chapter 7)]

Addressed below are the contributing information linking each of these three factors now used by investigators to help determine the area of fire origin.

## 1.    Witness Information

*NFPA 921* states that witness information has importance. In this case, the fire was observed or recorded at or near the time of inception or before it spread to a secondary fuel. Systematic analysis of witness statements in fire investigations is often critical in identifying the origin of fires.[32]

Here we have essentially two eyewitnesses to help determine the fire origin:

(1) Mr. Amor's initial statements to investigators and later repeated to the prosecutor he allowed a lit cigarette to fall upon the newspapers laying between the chair, couch, and coffee table Amor also annotated a diagram of the scene illustrating this event as previously shown in Figure 5. [SDT-SAO 22777].

(2) Ms. Miceli, who, upon realizing there was a fire and reporting it by telephone to 911, looked towards the patio door and saw the chair on fire which was adjacent to the area of origin. [DEFS 05613].

Each witness sees the fire concentrating near the chair next to the couch. The investigation by the City of Naperville also placed the fire's origin as to that area of newspapers laying between the chair, couch, and coffee table, as shown in Figure 7.

I also concur with the reconstruction of the fire by the City of Naperville.

## 2.    Fire Pattern Analysis

When reconstructing fire scenes, skilled fire investigators use many indicators to estimate the areas and points of origin, distribution, and behavior of a fire, such as spreading direction. When correctly identified, documented, and classified, these indicators often define a fire's area of origin.

---

[32]    Geiman, J. A., & Lord, J. M. (2012). Systematic analysis of witness statements for fire investigation. *Fire technology*, *48*(2), 219-231.

ICOVE 55

As seen in Table 3, these indicators, called *fire patterns*, are characteristically broken down into five major groupings: (1) *demarcations*, (2) *surface effects*, (3) *penetrations*, (4) *loss of material*, and (5) *victim injuries*. Fire investigators often classify these fire patterns using a typology as shown in Table 3. Illustrated in Figure 9 results from a fire test in which several of these fire pattern indicators were produced.



**Figure 9.** Fire pattern indicators found at fire scenes consisting of (1) demarcation, (2) calcination, (3) loss of material from wooden wainscoting and baseboard, (4) fractured glass, (5) ignitable liquid burn pattern on carpet, (6) penetration into the ceiling, and (7) area of clean burn where paper and pyrolysis products burned completely off the wall.

<u>Source</u>: Icove, D. J. & Haynes, G.A. (2018). *Kirk's Fire Investigation* (8th Edition), Pearson-Prentice Hall, Upper Saddle River, New Jersey

**Table 3.** Typology of Common Fire Patterns

| TABLE 5-3 | Typology of Common Fire Patterns | | |
|---|---|---|---|
| **TYPE OF PATTERN** | **DESCRIPTION** | **VARIABLES** | **EXAMPLES** |
| Demarcations | The intersection of affected and unaffected areas on materials where smoke impinge and heat impinge | ■ Type of material<br>■ Fire temperature, duration, and rate of heat release<br>■ Fire suppression<br>■ Ventilation<br>■ Heat flux reaching surface | ■ V patterns on walls<br>■ Discoloration patterns<br>■ Smoke stains |
| Surface effects | Determined by the boundary shape, areas of demarcation, and nature of heat application to various surface types | ■ Surface texture (rougher surfaces sustain more damage)<br>■ Surface-to-mass ratio<br>■ Surface coverings<br>■ Combustible and noncombustible surfaces<br>■ Thermal conductivity<br>■ Temperature of surface | ■ Spalling of floor surfaces<br>■ Combustible surfaces scorched or charred by pyrolysis and oxidation<br>■ Dehydration<br>■ Noncombustible surfaces changing color, oxidizing, melting, or burning cleanly<br>■ Smoke stains<br>■ Heat shadowing |
| Penetrations | Penetration of horizontal and vertical surfaces | ■ Preexisting openings in floors, ceilings, and walls<br>■ Direct flame impingement<br>■ Heat flux<br>■ Duration of fire<br>■ Suppression | ■ Downward penetrations under furniture<br>■ Saddle burns on exposed floor joists<br>■ Failure of walls, ceilings, and floors<br>■ Internal damage to walls and ceilings<br>■ Calcination |
| Loss of material | Combustible surfaces with loss of material and mass | ■ Type of materials<br>■ Construction methods<br>■ Room contents and fuel loads<br>■ Duration of fire | ■ Tops of wooden wall studs<br>■ Fall-down of debris<br>■ Isolated areas of consumed carpet<br>■ Beveling of corners and edges |
| Victim injuries | Areas, depths, and degrees of burns on victim's clothing and body | ■ Location of victim in relation to other objects or victims<br>■ Actions taken prior to, during, and after the fire | ■ Burns to face and hands<br>■ Absence of burn injuries where protected by clothing or furniture<br>■ Burns on lower torso<br>■ Heat shadowing |

*Source:* Expanded from Icove 1995.

Source:  Icove, D. J. & Haynes, G.A. (2018). *Kirk's Fire Investigation* (8th Edition), Pearson-Prentice Hall, Upper Saddle River, New Jersey

## Demarcations

The impingement, intensity, and direction of the fire plume's travel form lines or areas of demarcation on walls, ceilings, floors, and other materials. These patterns are known as demarcations, which form at the intersections of heavy and light-burned surfaces. After extinguishment of the fire, these demarcations are still visible. An example of that pattern is labeled as (1) in Figure 9.

Damage patterns forming lines of demarcation often appear in simple two-dimensional (cross-sectional) views of the location where the fire plume meets and damages wall surfaces. These lines are often called V-shaped fire patterns, based on their characteristic upward-sweeping curves.

At time, as in this particular fire, these characteristic lines of demarcation form curves form what is known as an *hourglass pattern*. This pattern occurs when a fuel package burns in a room next to a wall or corner, the damage appears in the shape of an hourglass burn pattern which is a variant of the V-shaped pattern, as shown in Figure 9. Fire testing and mathematical analysis[33] shows that the formation of hourglass burn patterns is a direct function of the fire plume's virtual origin, which is mathematically tied to the fuel package's heat release rate and surface area.

Tests conducted by FM Global (formerly the Factory Mutual Research Corporation) explained the formation of V-patterns. In FM Global's testing, a closer examination of a fire plume's lines of demarcation reveals distinct areas of damage to the wall surfaces, also known as the fire propagation boundary. (Figure 10). This pattern is known as the critical heat flux boundary, which forms visually distinguishable lines where the heavy pyrolysis of the surface ends.

## Surface Effects

Surface effects occur when heat transfer can cause discoloration of masonry surfaces, scorching or charring of combustible surfaces, melting or color changes, or oxidizing non-combustible surfaces. Areas not damaged by the heat and flames are called protected areas and are significant in cases when objects or bodies have been found or have been removed before inspection.

Surface effects can also include nonthermal deposits of soot or pyrolysis products that condense on the cooler surfaces. The cooler the surface, the faster these deposits occur.

---

[33]  D.J. Icove and J.D. DeHaan. 2006. "Hourglass Burn Patterns: A Scientific Explanation for their Formation," (International Symposium on Fire Investigation Science and Technology, Cincinnati, Ohio, June 26-28, 2006.)

ICOVE 58

Surface effects appeared on the nearby exposed gypsum board walls, finishing materials, carpeting, cardboard boxes, and furniture as shown in Figure 11.





(a) FM Global Fire Testing producing an hourglass fire pattern on the exposed wall and ceiling surfaces.

(b) Area of the fire's origin that produced a similar hourglass fire pattern on the exposed walls outlined in blue. [DEFS 5178].

**Figure 10.** The correlation between critical heat flux boundary (dashed line) and visible lines of demarcation (dashed-dotted line) in an FM Global 25-ft corner fire test (left) and a similar pattern in 218 East Bailey, Naperville, Illinois, fire scene.

<u>**Loss of Material**</u>

***Loss of material*** occurs in any combustible material located in the path of a fire's development and spread. This loss of material helps determine the fire's intensity and direction of travel. Heat shadowing can affect the loss of materials by shielding the heat transfer and masking the potential lines of demarcation of other fire patterns (Kennedy and Kennedy 1985, 450; NFPA 2021, pt. 6.2.3.) Loss of material can be driven by direct flame impingement or radiant heat alone.

Figure 12 shows the loss of materials above the point of fire origin where the newspaper was located on the floor. A noticeable loss occurs on the armrest, which has fallen from the front post. Note that the armrest and support directly below have burned away and are missing at the ends closest to the sofa.

There is also a significant loss of material as beveling of the front arm post. Other losses of material are on surfaces facing the point of fire origin.



**Figure 11**. The exposed surfaces marked in blue near the base of the hourglass fire pattern demonstrating surface effects. When taken into totality, these fire patterns document the point of fire origin as being the newspapers between the couch, chair, table, and chair. [DEFS 5258].



**Figure 12.** The exposed surfaces near the base of the hourglass fire pattern demonstrating loss of material effects shown with blue lines. When taken into totality, these fire patterns document the point of fire origin as being the newspapers between the couch, chair, table, and chair. [DEFS 5258].

**<u>Penetrations</u>**

Another typical fire pattern is the occurrence of **penetrations** through horizontal and vertical surfaces as direct flame impingement or intense radiant heat on walls, ceilings, and floors is sustained long enough to affect deeper layers of the material. Ceiling areas directly overhead of fire plumes may burn through or collapse, allowing flames to extend into confined spaces.

Rapid charring caused by post-flashover radiant heat can be enhanced by ventilation from doors or windows to produce penetrations through floors near doors or windows, in the center of rooms, or across the room from vents where air flows, where post-flashover mixing is most efficient.

In some cases, the fall-down of combustible debris followed by extended smoldering can lead to localized penetration of wooden floors, sills, and toe plates in wood-framed structures.  Variables influencing penetrations include preexisting openings in floors, ceilings, and walls. And direct flame impingement coupled with high heat fluxes helps create creating the conditions necessary for penetrations. The area where a fire plume intersects a ceiling is an example of penetration into the ceiling directly above the fire plume because the high heat flux and temperatures that caused the ceiling materials failure.

Penetrations or at least the start would have occurred on the ceiling, directly above or near the hourglass fire plume. But the firefighting operations appear to have pulled down the ceiling, most likely to check for extensions of the fire.

## 3.  **<u>The Ignition Source and Sequence as It Relates to Fire Dynamics</u>**

Based on the witness statements of Mr. Amor, a competent ignition source and sequence can be inferred from actual data and scientific studies. As stated in *NFPA 921*, 2021 Edition, Ch. 3.3.149, defines a fire's **point of origin** as "*The exact physical location within the area of origin where a heat source, a fuel, first interact, resulting in a fire or explosion.*"

At the center of this fire scenario were statements to the police and prosecutor where Mr. Amor stated that the fire started where he dropped a lit cigarette onto newspapers on which he had spilled vodka on [Doc. 1, ¶25]. As shown in Figure 4, the newspapers were between the couch and chair.

Except for the initial ignition scenario that was stated by Amor, there is little discussion of another potential sequence, that is, the cigarette placed on one of the dryer portions of the newspaper. This is realistic and competent ignition source and resulting scenario could ignite a fire in that same area.

ICOVE 61

As to fire causation, the identification of the fire's area of origin leads to the fire's cause. Fire investigators are taught the once a fire's area or point of origin is established, the determination of *fire cause* typically follows, which is the process of identifying the first fuel ignited, the ignition source, the oxidizing agent, and the circumstances that resulted in the fire.

Generally, a fire cause determination can be considered reliable only if the origin has been correctly determined. (*NFPA 921*, Ch. 19.1). A fire scene reconstruction by several investigators confirmed that the fire's narrowly defined area of origin was indeed located within the intersection of where the newspapers laid on the floor between the chair, couch, and coffee table. This is the same area where Mr. Amor admitted discarding the cigarette.

Mr. Carpenter, for example, does not examine the impact of the cigarette being placed on one of the dryer portions of the newspaper. This is a realistic and competent ignition source, and the resulting scenario could ignite a fire in that exact area of origin.

In the scenario of a dropped cigarette onto the newspaper is a competent ignition source and sequence, there is ample historical peer-reviewed fire testing. The latest research on smoldering fires by Dr. Vyto Babrauskas reports that laboratory studies on cigarettes placed on paper goods (aka, newspapers) had short time periods. For example, a study by Lord and Geiman found a mean time to ignition of 6.2 minutes, with a range of 1.1 to 16 minutes.[34]

Babrauskas reports that ***smoldering*** is defined as a propagating, self-sustained exothermic reaction wave deriving its central heat from heterogeneous oxidation of solid fuel.

After the fire started, it exposed the adjoining couch to convective and radiant heat, causing the armrest to burn through towards the front of the couch, as shown in Figure 13. Heat damage to the corner caused the formation of an hourglass pattern. A vector analysis of the fire patterns of exposed surfaces all point back to an initially low fire in the direct vicinity of where the newspapers rested.

---

[34] Babrauskas, V.B. (2021). *Smoldering Fires*, Fire Science Publishers, New York, NY.

 

**Figure 13.** (a) Extremely close area of origin documenting the thermal impact on the couch's wooden frame and (b) the hourglass fire pattern. Near the glass door to the balcony is a fire pattern caused by ventilation.

## D. Conclusions

In this expert report, I have expressed and documented the bases for the following opinions:

Opinion #1 - The investigation initiated and coordinated by the City of Naperville into the September 10, 1995, apartment fire at 218 East Bailey, Naperville, Illinois, met in 1995 the minimum professional standards of professional practice for applying the Scientific Method to the origin and cause in the field of fire and explosion investigations.

Opinion #2 - The investigation by Douglas J. Carpenter into the September 10, 1995, apartment fire at 218 East Bailey, Naperville, Illinois, failed to meet the minimum professional standards of professional practice in the field of fire and explosion investigations by not correctly applying the scientific method to the facts of this case.

Opinion #3 – Based upon today's standards of care as well as the standards in effect in 1995, a forensic engineering analysis of the fire in this case, to a reasonable degree of engineering certainty, confirms that the fire started in the area of origin as determined by the City of Naperville, and observed by Mr. William Amor and Ms. Marianne Miceli. The fire's cause was, with and engineering degree of certainty, a lit cigarette landing on

and igniting newspapers within that area of origin, a human act resulting in an incendiary fire.

These opinions are supported by *NFPA 921*'s guidance on ignition sources and sequences, mainly when there are times that an opinion can be rendered when no physical evidence remains of the point of fire origin. This ignition scenario can logically be inferred and does not require finding the actual cigarette in the remains.

When a competent and thorough investigation is undertaken, *NFPA 921* (Section 19.4.4.3) provides the following guidance:

> *There are times when there is no physical evidence of the ignition source found at the origin, but where an ignition sequence can logically be inferred using other data. Any determination of fire cause should be based on evidence rather than on the absence of evidence; however, there are limited circumstances when the ignition source cannot be identified, but the ignition sequence can logically be inferred. This inference may be arrived at through the testing of alternate hypotheses involving potential ignition sequences, provided that the conclusion regarding the remaining ignition sequence is consistent with all known facts (see Basic Methodology chapter).*

It is evident in this case that based upon witness statements, a thorough investigation, the following and application of the scientific method, the reliance on established forensic engineering approaches, and examination of fire patterns associated with physical debris, a lit cigarette landing initiated this fire on newspapers.

## X.   DECLARATION

The analysis performed and opinions provided in this case, to a reasonable degree of engineering certainty, conform to the generally accepted principles of forensic fire scene reconstruction and investigation and are based upon the facts and information made available to the date of this report. Evidentiary support is cited within this report to document the basis for the opinions rendered.

I hereby certify that I prepared this declaration and that I am a duly licensed Registered Professional Engineer under the laws of the State of Tennessee, License Number 16650, Expiration Date: January 21, 2023.

I hereby affirm, pursuant to 28 U.S.C. § 1746, that the foregoing declaration is true and correct under penalties of perjury.

ICOVE 64

Respectfully submitted,



David J. Icove, Ph.D., P.E., DFE

June 17, 2021

ICOVE 65

# APPENDIX A – DOCUMENTS, INFORMATION, AND DATA REVIEWED

<u>Alarm</u> – 911 Call and Radio Traffic (DEFS 5613-5615)

<u>Dispatch Times</u> (Pl. Amor 038271-038273)

<u>Court Records</u> – Court Divorce of the Amors (SDT-DCPDO 5129-5140, 5795-5802, 5753)

<u>Court Transcripts</u>

- ❏ 1997 Trial (DEFS 1134-1993, 2179-2473, SDT-SAO 17107-17271, 20120-20232, and Amor 1216-1434)

- ❏ 1997 Sentencing Proceedings (DEFS 2488-2561)

- ❏ 1997 Motion For Reconsideration (DEFS 2474-2487)

- ❏ 2016 Hearings (SDT-SAO 15412 -15736, 15753- 16188, 17361-17511)

- ❏ November 11, 2017  ROP MIL Transcript (SDT-SAO 13163-13210)

- ❏ 2018 Trial (AMOR 1523-2798, 2963-3139)

- ❏ 2019 Hearings (DEFS 14120-14164)

<u>Exhibits</u>

- ❏ Defense (Pl. Amor, 5960-6010, 6929-6982,11704-11710, 17457-17462, 17463-17464, 18988-18994, 21137-21145, 21200-21266, 21268- 21277,21278- 21292 23098-23099, 27992-28004; SDT-SAO- 8574-8604, 10331)

- ❏ Post-Conviction (Pl. Amor 8525-8547, 38288-38355; SDT-SAO 5160-5187,5210- 5222, 5223-5225, 11416-11434, 12049, 12050-12056, 12057-12065,22761-22762, 22763-22766, 22767- 22773, 22776-22793, 22794, 22797, 22962, 22963)

<u>Emails</u> -Douglas Carpenter

<u>Court</u> – Federal Filings

<u>Court </u>– State Filings

<u>Standards of Care</u>

- ❏ California Distract Attorney's Association

ICOVE 66

- ❑ NFPA 921, 1993 and 2021 Editions
- ❑ NFPA 1033, 1995 and 2014 Editions

<u>Photos</u>

- ❑ Scene Photos (DEFS 738-739, 5141-5280)
- ❑ Kragh Engineering (DEFS 5309- 5366)

<u>Reports</u>

- ❑ Autopsy (DEFS 102-106)
- ❑ Coroner's Inquest SDT-SAO (18460-18486)
- ❑ Employment Records – Amor (DEFS 245-308, 352-365, 401-419)
- ❑ Illinois State Fire Marshal (SDT-ISFM 01-09)
- ❑ Kragh Engineering (DEFS 487-490, 597, AMOR 307-308)
- ❑ Naperville Fire Department (DEFS 483, 576-578, 680-686, 692-694; AMOR 209--250, 252-306)
- ❑ Naperville Police Department (Investigative File)
- ❑ Naperville Police Department report with the phone records- (DEFS 728-729)
- ❑ Bill Amor Letters to Tina (DEFS 491-557)
- ❑ Richard T. O'Brien & Associates (DEFS 446-449)
- ❑ Reid and Assoc. Report on Amor Polygraph (DEFS 420-422)
- ❑ Pre-Plea (SDT-SAO 8415-8426)
- ❑ Pre-Sentence (SDT-DCDPCS 10-21)
- ❑ Toxicology (DEFS 178-179)
- ❑ 12-04-1996 Chiapetta Evaluation (DEFS 927-930)
- ❑ 12-06-2017 Declue Expert Report (DEFS 4343-4346)
- ❑ 01-04- 2018 David Smith Expert Report (AMOR 2847-2852)

- ❑ SAO Report (SDT-SAO 5021-5155)

- ❑ Met Life Policy (DEFS 207-217, 390-400)

- ❑ State Farm Homeowners Policy (DEFS 218-241, 444, 367- 389)

- ❑ State Farm Insurance Subpoena Response (SDT-STATEFARM 001-382)

- ❑ Doug Carpenter Flash Testing (Pl. AMOR 039376)

Expert Reports

- ❑ Douglas Carpenter Report and CFAST Models

- ❑ Michael F. Chiapetta

- ❑ Gregory DeClue

- ❑ John D. DeHaan

- ❑ David Ferreri

- ❑ John J. Golder

- ❑ Richard Leo

- ❑ David Smith

Statements

- ❑ William Amor (Deposition; Deposition Video; DEFS 818-820, 13810-13811;SDT-SAO 3413-3420, 5300-5381,10690-10692, 22962-22963)

- ❑ Tina Miceli (May 23, 2017, Interview with Pawl and Guerreri; 2020 Deposition)

- ❑ Dr. Richard Leo (Deposition)

- ❑ Doug Carpenter (Deposition)

- ❑ David Bayer (Deposition)

- ❑ Erica Nichols Cook (Deposition)

- ❑ Michael Cross  (Deposition)

- ❑ Brian Cunningham (Deposition)

- ❑ David Ferreri (Deposition)

- ❑ Robert Guerreri (Deposition)

- ❑ Mitchell Kushner (Deposition)

- ❑ Brian Nigohosian (Deposition; DEFS 733-737)

- ❑ Nicholas O'Riordan (Deposition)

- ❑ Russell S. Wiedmann (SDT-DCPDO 5795-5802)

- ❑ Lauren Kaeseberg (Deposition)

- ❑ Shelley Williams (Deposition)

Testing – Videos (DEFS 5293-5294)

Standards

- ❑ *ASTM E620-2011. Standard Practice for Reporting Opinions of Technical Experts*, West Conshohocken, PA: ASTM International.
- ❑ *ASTM E678-2013. Standard Practice for Evaluation of Scientific or Technical Data*, West Conshohocken, PA: ASTM International.
- ❑ *ASTM E860-2013. Standard Practice for Examining and Preparing Items that Are or May Become Involved in Criminal or Civil Litigation*, West Conshohocken, PA: ASTM International.
- ❑ *ASTM E1020-2013. Standard Practice for Reporting Incidents That May Involve Criminal or Civil Litigation*. West Conshohocken, PA: ASTM International.
- ❑ *ASTM E1138-1989. Terminology of Technical Aspect of Products Liability Litigation*, ASTM International, West Conshohocken, PA
- ❑ *ASTM E1188-2011. Standard Practice for Collection and Preservation of Information and Physical Items by a Technical Investigator*. West Conshohocken, PA: ASTM International.
- ❑ *ASTM E1355-2012.* Evaluates the predictive capacity of fire models by defining scenarios, validating assumptions, verifying the mathematical underpinnings of the model, and evaluating its accuracy.
- ❑ *ASTM E1459-2013. Standard Guide for Physical Evidence Labeling and Related Documentation*. West Conshohocken, PA: ASTM International.
- ❑ *ASTM E1472-2007.* Describes how a fire model is to be documented and includes a user's manual, a programmer's guide, mathematical routines, and installation and operation of the software. Note: Withdrawn in 2010.

ICOVE 69

- *ASTM E1492-2011. Standard Practice for Receiving, Documenting, Storing, and Retrieving Evidence in a Forensic Science Laboratory*. West Conshohocken, PA: ASTM International.
- *ASTM E1591-2013.* Covers and documents available literature and data that are beneficial to modelers.
- *ASTM E1895-2007.* Examines the uses and limitations of fire models and addresses how to choose the most appropriate model for the situation. Note: Withdrawn in 2011. The ASTM felt that SFPE would be best suited to maintain this application in the form of a user guide.
- NFPA *921*, 2017 Edition. *NFPA 921 – Guide for Fire and Explosion Investigations*, National Fire Protection Association, Quincy, MA
- *NFPA 1033*, 2014 Edition. *NFPA 1033 – Professional Qualifications for Fire Investigator*, National Fire Protection Association, Quincy, MA

## Textbooks

- Babrauskas, V.B. (2021). *Smoldering Fires*, Fire Science Publishers, New York, NY.
- Icove, D. J. & Haynes, G. A. (2017). *Kirk's Fire Investigation* (8th Edition). Upper Saddle River, NJ: Pearson-Prentice Hall
- Icove, D. J., DeHaan, J. D., & Haynes, G. A. (2013). *Forensic Fire Scene Reconstruction* (3rd Edition). Upper Saddle River, NJ: Pearson-Prentice Hall
- Rein, G., & Carvel, R. (Eds.). (2007).*The Dalmarnock fire tests: experiments and modelling*. School of Engineering and Electronics, University of Edinburgh.

## References

- Peacock, R. D., Reneke, P. A., & Forney, G. P. (2017). CFAST–Consolidated Model of Fire Growth and Smoke Transport (Version 7) Volume 2: User's Guide. *NIST Technical Note 1889v2*., p.15
- Geiman, J. A., & Lord, J. M. (2012). Systematic analysis of witness statements for fire investigation. *Fire technology*, *48*(2), 219-231.
- Mowrer, F. W. (2002). The right tool for the job. *Journal of Fire Protection Engineering*, *13*, 39-44.

# APPENDIX B – EXPERIENCE, PUBLICATIONS, TESTIMONY

## David J. Icove, Ph.D., P.E.

P.O. Box 1348
Knoxville, Tennessee 37901-1348
(865) 693-4361 (TEL)   (865) 693-4369 (FAX)

**PROFESSIONAL EXPERIENCE**

| | |
|---|---|
| 2019 – Present | <u>Partner/Manager</u><br>Icove Ingram Group, LLC, Knoxville, Tennessee |
| 1998 – Present | <u>President/Manager</u><br>Icove and Associates, LLC, Knoxville, Tennessee |
| Apr. 2014 – Present | <u>UL Professor of Practice</u><br>Program Coordinator, Fire Protection Engineering Certificate and Graduate Concentration<br>Department of Electrical Engineering and Computer Science, The University of Tennessee, Knoxville |
| Oct. 2009 – Apr. 2014 | <u>Research Professor</u> |
| Oct. 1995 – Sep. 2009 | <u>Adjunct Assistant Professor</u> |
| Jan. 1980 – Jan. 1984 | <u>Instructor</u> |
| Dec. 2004 – Present | <u>Adjunct Faculty</u><br>Professional Master of Fire Protection Engineering University of Maryland, College Park, Maryland |
| Sep. 2012 – Present | <u>Adjunct Faculty</u><br>University of New Haven, Henry C. Lee College of Criminal Justice and Forensic Sciences, New Haven, Connecticut |
| Mar. 2006 – Present | <u>Reserve Deputy Sheriff</u><br>Fire Investigations Bureau<br>Knox County Sheriff's Office, Knoxville, Tennessee |
| Dec. 1993 – Dec. 2005 | <u>Federal Law Enforcement Agent</u><br>Criminal Investigations Division<br>U.S. Tennessee Valley Authority Police<br>Knoxville, Tennessee |

ICOVE 71

| | |
|---|---|
| Mar. 1984 – Dec. 1993 | Program Manager, GM-1801-15 |
| | Arson and Bombing Investigative Services Sub-unit |
| | Federal Bureau of Investigation |
| | Behavioral Science Unit, Quantico, Virginia |
| | |
| Oct. 1979 – Dec. 1983 | Supervisor/Investigator |
| | Arson Task Force |
| | Knoxville Police Department, Knoxville, Tennessee |
| | |
| Mar. 1978 – Sep. 1979 | Investigator |
| | Ohio State Fire Marshal's Office, Reynoldsburg, Ohio |
| | |
| Aug. 1976 – Mar. 1978 | Investigator |
| | Tennessee State Fire Marshal's Office, Knoxville, Tenn. |
| | |
| Aug. 1971 – May 1975 | Engineer (See above date on leave for additional degrees) U.S. Navy, Hyattsville, Maryland |

**EDUCATION**
- B.S., Electrical Engineering, University of Tennessee, Knoxville (1971)
- M.S., Electrical Engineering, University of Tennessee, Knoxville (1974) Thesis: *FEDAP: The Fire Engineering Data Analysis Program*
- B.S., Fire Protection Engineering, University of Maryland, College Park, Maryland (1975) Thesis: *Application of Pattern Recognition to Arson Investigation*
- Ph.D., Engineering Science and Mechanics, University of Tennessee, Knoxville (1979) Dissertation: *Principles of Incendiary Crime Analysis*

**PROFESSIONAL CERTIFICATIONS**
- Board Certified and Diplomate Fellow, National Academy of Forensic Engineers, 2015
- Certified Fire Investigator, International Association of Arson Investigators, Certificate No. 04-121651
- Certified Fire and Explosion Investigator, National Association of Fire Investigators, June 28, 2006, Rec. No. 7271-5469
- Certified Fire Protection Specialist, National Fire Protection Association, June 1, 2014, Certification No. 3727
- Police Officer Standards and Training, Knoxville Police Department, January 1980
- Volunteer Recruit School, Prince George's County, Maryland, 1971

**PROFESSIONAL REGISTRATIONS**
- Professional Engineer, State of Alabama, 2010, License No. 31381
- Professional Engineer, State of Arkansas, July 20, 2010, License No. 14304

ICOVE 72

- ❑ Professional Engineer, State of Florida, May 31, 2013, License No. 76243
- ❑ Professional Engineer, State of Georgia, License No. PE041439
- ❑ Professional Engineer, State of Illinois, License No. 062.071463
- ❑ Professional Engineer, State of Kentucky, License No. 35845
- ❑ Professional Engineer, State of Louisiana, May 20, 2010, License No. 0035454
- ❑ Professional Engineer, State of Maryland, July 1, 2010, License No. 39316
- ❑ Professional Engineer, State of Michigan, August 22, 2014, License No. 6201061513
- ❑ Professional Engineer, State of Nebraska, February 28, 2011, License No. E13655
- ❑ Professional Engineer, State of New Hampshire, May 31, 2013, License No. 14094
- ❑ Professional Engineer, State of North Carolina, February 14, 2011, License No. 037613
- ❑ Professional Engineer, State of Ohio, February 11, 2014, License No. PE 78661
- ❑ Professional Engineer, State of Pennsylvania, January 7, 2010, License No. PE077385
- ❑ Professional Engineer, State of South Carolina, July 11, 2011, License No. 29180
- ❑ Professional Engineer, State of Tennessee, Feb. 25, 1984, License No. 16650
- ❑ Professional Engineer, State of Texas, November 24, 2009, License No. 104460
- ❑ Professional Engineer, State of Virginia, Oct. 1, 1984, License No. 15062
- ❑ Professional Engineer, State of Wisconsin, March 11, 2013, License No. 42851-6
- ❑ National Council of Examiners for Engineering and Surveying (NCEES), International Registry for Professional Engineers (IRPE)

**PROFESSIONAL ASSOCIATION MEMBERSHIPS**
- ❑ Institute of Electrical and Electronic Engineers (IEEE), Member since 1971, Senior Member since 2000.
- ❑ Society of Fire Protection Engineers (SFPE), Member since 1971, Fellow since 2011.
- ❑ International Association of Arson Investigators (IAAI), Member since 1973.
- ❑ National Fire Protection Association (NFPA), Member since 1979.
- ❑ American Society for Industrial Security (ASIS), Member since 1984.
- ❑ International Association of Bomb Technicians and Investigators (IABTI), Member since 1988.
- ❑ International Homicide Investigators Association (IHIA), Charter Member 1989.
- ❑ National Society of Professional Engineers (NSPE), Member since 1997.
- ❑ American Society for Testing and Materials (ASTM), Member since 2000.
- ❑ National Association of Fire Investigators (NAFI), Member since 2001.
- ❑ International Code Council (ICC), Member since 2009.
- ❑ National Academy of Forensic Engineers (NAFE), Fellow and Diplomate since 2015

ICOVE 73

**COMMITTEE MEMBERSHIPS**

- *NFPA 921* "Technical Committee on Fire and Explosion Investigations," Member 1992 to 2018, and liaison member to *NFPA 901*, Fire Incident Reporting
- *NFPA 901* "Fire Incident Reporting," Chairperson, March 2013 to present.
- National Institute of Justice (NIJ), Technical Working Group Publications
  - *Fire and Arson Scene Evidence: A Guide for Public Safety Personnel (June 2000)*
  - *Electronic Crime Scene Investigation: A Guide for First Responders" (July 2001)*
- American Society for Testing and Materials (ASTM),
  - Committee E05 on *Fire Testing*, Member 2000 to present
  - Committee E30.11 on *Interdisciplinary Forensic Science Standards*, 2009 to present
  - Committee E58 on *Forensic Engineering*, 2009 to present.
- Underwriters Laboratories, Inc. "Fire Advisory Council," Member 2005 to present.
- Texas State Fire Marshal's Office, "Science Advisory Working Group," Member 2011 to 2019.
- Fire and Arson Investigator Journal, Co-Chairperson of the "Editorial Review Committee," International Association of Arson Investigator, Member 2010 to 2015.
- City of Knoxville, Building Board of Adjustments and Appeals, representative of the Fire Service. Member since 2012.
- Murder Accountability Project, Board of Directors, Charter Member since 2015.

**STUDENT THESIS AND DISSERTATION COMMITTEE MEMBERSHIPS**

- John Francis Wade, Ph.D., 2020, Electrical Engineering-Fire Protection Engineering Concentration, University of Tennessee, *Arc Flash in Single Phase Electrical Systems*, Committee: D.J. Icove (Chair), J.E. Lyne, B.J. Blalock, M.E. Dean, V. Babrauskas.
- Dan Caleb Floyd, M.S., 2020, Electrical Engineering, University of Tennessee, Non-Thesis option, Committee: S.M. Djouadi (Chair), D.J. Icove, R.T. Wood.
- Justin T. Beeler, Ph.D., 2019, Electrical Engineering-Fire Protection Engineering Concentration, University of Tennessee, *An Examination of Methods to Determine the Flammability Characteristics of Electrical Cables Exposed to Extended Periods of Radiation in Nuclear Facilities*, Committee: D.J. Icove, E. Lyne, B. Blalock, A. Fathy.
- Daniel Wesley Willis, 2019, Electrical Engineering-Fire Protection Engineering Concentration, University of Tennessee, Non-Thesis option, Committee: D.J. Icove (Chair), M. Taufer, D. Wilson.
- Jackson Rondy Buckles, 2019, Electrical Engineering-Fire Protection Engineering Concentration, University of Tennessee, Non-Thesis option, Committee: D.J. Icove (Chair), M. Taufer, D. Wilson.
- Edward Benjamin Palmer, 2019, Electrical Engineering-Fire Protection Engineering Concentration, University of Tennessee, Non-Thesis option, Committee: D.J. Icove (Chair), M. Taufer, S. Djouadi, D. Wilson.

ICOVE 74

- Maxwell Hunter Robinson, M.S., 2018, Electrical Engineering and Computer Science, University of Tennessee, Non-Thesis option, Committee: B.J. Blalock (Chair), K. Islam, D.J. Icove.
- Jimmy A. Landmesser, Jr., M.S. 2018, Nuclear Engineering, University of Tennessee, *Density Matching of Particles Affects of Temperature and Viscosity on Brix Values of Sucrose-Water Solution*, Non-Thesis option, Committee: J.D. Auxier (Chair), A.E. Ruggles, D.J. Icove.
- Alexander Meadows Asbury, M.S. 2017, Electrical Engineering and Computer Science, University of Tennessee, Thesis option, Committee: D.J. Icove (Chair), B.J. Blalock, M.A. Langston.
- Jonathan Lamont, M.S. 2016, Electrical Engineering and Computer Science, University of Tennessee, Non-Thesis option, Committee: D.J. Icove, B. MacLennan, J. Gregor.
- Donald Charles Collins, M.S., 2015, Electrical Engineering and Computer Science, University of Tennessee, *Dividing and Conquering Meshes within the NIST Fire Dynamics Simulator on Multicore Computing Systems*, Committee: D.J. Icove,
- Andrew Thomas Tinsely, Ph.D., 2015, Civil Engineering, University of Tennessee, *Determination of Area of Fire Origin through Examination of Structural Failure and Deformation*, Committee: E.G. Burdette, R. Bennett, H. Deatherage, and D.J. Icove.
- Christopher Adam Shults, Ph.D., 2014, Political Science, University of Tennessee, *Smoking Related Fires and the Impact of the Fire Standard Compliant Legislation in the States*, Committee: D. Folz, D.J. Houston, P.F. Freeland, and D.J. Icove.
- Lucas A. Herrera. M.S., Computer Engineering, University of Tennessee. *A Novel Authentication Method Using Multi-Factor Eye Gaze,* Committee: J.D. Birdwell, T.W. Wang, and D.J. Icove.
- Jonathan Daniel Hatcher, M.S., 2007, Electrical and Computer Engineering, University of Tennessee, Non-Thesis option, Committee: D.W. Bouldin, Syed K. Islam, and D.J. Icove.
- Christopher Noel Carroll, M.S., 2006, Electrical and Computer Engineering, University of Tennessee, Non-Thesis option, Committee: D.W. Bouldin, D.J. Icove, and M. Ferdjallah.
- Sara Noel Abdulla, M.S., 2006, Industrial Engineering, University of Tennessee, *Analysis of Information Networks of Freshmen Engineering Students*, Committee: D.F. Jackson, D. Kong, and D.J. Icove.
- Joseph D. Barnes, M.S., 2006, Electrical and Computer Engineering, University of Tennessee, Non-Thesis option, Committee: D.W. Bouldin, J.R. Roth, D.J. Icove.
- Ronnie Chai, M.S., 2006, Electrical and Computer Engineering, University of Tennessee, Non-Thesis option, Committee: P.B. Crilly, D.W. Bouldin, D.J. Icove.
- W. Reid Williams, M.S., 2005, Engineering Science, University of Tennessee, *A Validation Simulation of a Large Pool Fire*, Committee: A.J. Baker, D.J. Icove, and C. Collins.

- ❑ Frederic J. Snow, Ph.D., 2004, Anthropology, University of Tennessee, *Geometric Morphometry Analysis of the Scapula: Implications for the Determination of Sex and Ancestry*, Committee: W. M. Bass, R.L. Jantz, D.J. Icove, W. Klippel.
- ❑ Jeffrey N. Krumm, M.S., 2004, Electrical and Computer Engineering, University of Tennessee, *Calculated Combustion: An Investigation of Electronic Equipment Tenability in Data Center Fires*, Committee: G. Peterson, D.J. Icove, and A.J. Baker.
- ❑ J. Andrew Ridnour, Ph.D., 2003, Mechanical Engineering, University of Tennessee, *Methodology for Evaluating Vehicle Fatigue Life and Durability*, Committee: J. Freeman, J.A.M. Boulet, D.J. Icove, and J. Landes.
- ❑ Angi M. Christensen, M.A., 2000, Anthropology, University of Tennessee, *Debunking the Spontaneous Human Combustion Myth: Experiments in the Combustibility of the Human Body*, Committee: W.M. Bass, D.J. Icove, R.L. Jantz, L.W. Konigsberg.

## TEXTBOOKS

- ❑ D.J. Icove and G.A. Haynes. 2018 (released September 2017). ***Kirk's Fire Investigation***, 8th Edition (Prentice Hall, Upper Saddle River, New Jersey)
- ❑ D.J. Icove, J.D. DeHaan, and G.A. Haynes. 2013. ***Forensic Fire Scene Reconstruction***, 3rd Edition (Prentice Hall, ISBN 0-13-222857-2, Upper Saddle River, New Jersey)
- ❑ J.D. DeHaan and D.J. Icove. 2012. ***Kirk's Fire Investigation***, 7th Edition (Prentice Hall, Upper Saddle River, New Jersey)
- ❑ D.J. Icove. 2006. ***Forensics in Fire*** (Harcourt Education, 2006 ISBN 1869703871, 9781869703875.)
- ❑ D.J. Icove, C.M. Blocher, and J.D. DeHaan. 2002. ***Instructor's Manual to Kirk's Fire Investigation***, 5th Edition. (Prentice Hall, ISBN 0-13-060458-5, Upper Saddle River, NJ, 2002.)
- ❑ D.J. Icove, V.B. Wherry and J.D. Schroeder. 1998. ***Combating Arson-for-Profit: Advanced Techniques for Investigators, 2nd Edition***. (Battelle Press, ISBN 0-934550-2, Columbus, OH, 1998.)
- ❑ L. Koch and D.J. Icove, editors. 1992. ***Book of Selected Articles for Arson Investigators***, 1992 Edition. (International Association of Arson Investigators, St. Louis, MO, 1992.)
- ❑ D.J. Icove, editor 1984, 1992 ***Incendiary Fire Analysis and Investigation***. Open Learning Fire Service Program, Federal Emergency Management Agency, U.S. Fire Administration, Washington, D.C. (Ginn Custom Publishing Program, 1984; republished January 1992.)

## TEXTBOOK CHAPTERS

- ❑ K.R. Adams, C.S. Barker, E. Cutright-Smith, R.D. de Valdes, R.E. Howell, D.J. Icove, J.R. Lally, V.M LaMotta, M.M Hernandez, M. Medeiros, and M. Shaw, 2016. *Chevelon: Pueblo at Blue Running Water*. Arizona State Museum-The University of Arizona.

ICOVE 76

- A.D. Sapp, T.G. Huff, G.P. Gary, and D.J. Icove. 1998. "*Arson and Fire-Related Crime Factors*" in V.B. Van Hasselt and M. Hersen, editors, ***Handbook of Psychological Approaches with Violent Offenders***. (Plenum Publishing Corp., New York, NY, ISBN 0-306-45845-4, 1998.)
- A.D. Sapp, T.G. Huff, G.P. Gary, and D.J. Icove. 1998. "*Arson and Fire-Related Crime Factors*" in V.B. Van Hasselt and M. Hersen, editors, ***Handbook of Psychological Approaches with Violent Offenders***. (Plenum Publishing Corp., New York, NY, ISBN 0-306-45845-4, 1998.)
- D.J. Icove and M.H. Estepp. 1997. "*Motive-Based Offender Profiles of Arson and Fire-Related Crimes*" in Part VIII-Property Crime, ***Criminal Detection and the Psychology of Crime***. (Ashgate-Dartmouth, Brookfield, VT, ISBN 1-85521-963-8, 1997.)
- D.J. Icove, G.P. Gary, T.G. Huff, A.D. Sapp. 1995. "*A Motive-Based Offender Analysis of Serial Arsonists,*" ***The Investigation & Prosecution of Arson***, 2nd ed. (California District Attorneys Association, CA, 1995.)
- D.J. Icove, J.E. Douglas, G. Gary, T.G. Huff, and P.A. Smerick. 1993. "*Arson*" in J.E. Douglas et al., ***Crime Classification Manual***. (Lexington Books, New York, 1993.)
- J.L. Bryan and D.J. Icove. 1983. "*Recent Advances in Computer Assisted Arson Investigation,*" Chapter 23 in ***The Social and Economic Consequences of Residential Fires*.**" Chester Rapkin, editor. (Lexington Books, Lexington, Massachusetts, ISBN 0-669-04362-1, 1983.)
- D.J. Icove and M.M. Gohar. 1979. Chapter in "*Fire Investigation Photography,*" in ***Fire Investigation Handbook***. (National Bureau of Standards, Washington, D.C., 1979.)

**PEER-REVIEWED PUBLICATIONS AND PRESENTATIONS**
- J.T. Beeler, T.A. Toll, & D.J. Icove. (pending publication 2021). *Passively Measuring the Flammability Characteristics of Electrical Cables Exposed to Radiation in Nuclear Facilitie*s, IM-19-22492, IEEE Transactions on Instrumentation and Measurement,
- J.T. Beeler, T.A. Toll, & D.J. Icove. (pending publication 2021). *Examination of the Flammability Characteristics of Electrical Cables Exposed to Radiation in Nuclear Facilities*, PDST-D-19-00437, Journal of Polymer Degradation and Stability.
- May, T. R., & Icove, D. J. 2020. Arc Mapping Methodologies & The Pursuit of Magical Globules, Notches, & Beads: A Bridge too Far to Establish Fire Origin? *Lincoln Memorial University Law Review, 7*(2), 37-77.
- E.C. Buc, M.E. Goodson, D.J. Icove, & T.R. May. 2019. *State of the Arc (Mapping)*, Invited formal paper presented at the January 2019 meeting of the National Academy of Forensic Engineers (NAFE), in Orlando, Florida, January 5-6, 2019.
- T.R. May & D.J. Icove. 2019. *Computer Fire Modeling and the Law: Application to Forensic Fire Engineering Investigations,* Invited formal paper presented at the January 2019 meeting of the National Academy of Forensic Engineers (NAFE), in Orlando, Florida.

- T. Lawton and D.J. Icove. 2018. *Forensic Identification and Root Causes of Hot Socket Problems Found in Residential Electrical Meters*. Invited paper presented at the National Academy of Forensic Engineers Seminar, NAFE 2018 Winter Conference Technical Program in Phoenix, Arizona on January 13, 2018.

- D.J. Icove & G.A. Haynes. 2017. *Guidelines for Conducting Peer Reviews of Complex Fire Investigations*. Paper presented at the National Academy of Forensic Engineers Seminar, New Orleans, LA, January 13-15, 2017.

- E.C. Buc & D.J. Icove. 2016. *Never Say Never: Black Swan Fire Investigation Statements and Hypotheses Development in the Real World*. Paper presented at the International Symposium on Fire Investigation Science and Technology, Scottsdale, AZ, September 12-14, 2016.

- T.R. May & D.J. Icove. 2016. *A Survey of the Use of Learned Treatises in Fire Litigation*. Paper presented at the International Symposium on Fire Investigation Science and Technology, Scottsdale, AZ, September 12-14, 2016.

- D.J. Icove, J.R. Lally, L.K. Miller, & E.C. Harris. 2014. *The Use of the "Harris Matrix" In Fire Scene Documentation*. Paper presented at the International Symposium on Fire Investigation Science and Technology, College Park, MD, September 22-24, 2014.

- M. Goodson & D.J. Icove. 2014. *Electrical Characterization of Corrugated Stainless Steel Tubing Components and Systems*. Paper presented at the International Symposium on Fire Investigation Science and Technology, College Park, MD, September 22-24, 2014.

- D.J. Icove & T. K. Hargrove 2014. *Project Arson: Uncovering The True Arson Rate in The United States*. International Symposium on Fire Investigation Science and Technology. College Park, MD, National Association of Fire Investigators, September 22-24, 2014.

- A.T. Tinsley, E.G. Burdette, and D.J. Icove. 2014. *Structural Deformations as an Indicator of Fire Origin*. Journal of Performance of Constructed Facilities. Volume 28, Issue 3 (June 2014).

- J. Miller and D.J. Icove, 2013. *Development and V&V Benchmarking of a High-Performance Desktop Computer for FDS Simulations*, ANS PSA 2013 International Topical Meeting on Probabilistic Safety Assessment and Analysis, Columbia, SC, September 22-26, 2013, on CD-ROM, American Nuclear Society, LaGrange Park, IL

- S. Peters, L. Tschaepe, B. Zhang, A. Ruggles, & D.J. Icove. (2011). *V&V Methodology Comparisons: AIAA G-077 (1998), ASME V&V 20 (2009), ASTM E1355-05a (2005), NEA/CSNI/R (2007), and NRC CSAU (1988)*. Paper presented at the 2011 Annual Meeting, Hollywood, FL.

- J.D. DeHaan, D.J. Icove, R. Crim, and J.L. Blankenship. 2010. "Burning *for Profit: Putting it all Together.*" (ISFI 2010, International Symposium on Fire Investigation Science and Technology, College Park, Maryland, September 27-29, 2010)

- D.J. Icove, G.E. Gorbett, J.D. Birdwell, and R.E. Merck. 2010. "*Fire Modeling: Best Practices for Constructing Academic High-Performance Computing Clusters.*" (ISFI

2010, International Symposium on Fire Investigation Science and Technology, College Park, Maryland, September 27-29, 2010)

❑ D.J. Icove and B.P. Henry. 2010. *"Expert Report Writing: Best Practices for Producing Quality Reports."* (ISFI 2010, International Symposium on Fire Investigation Science and Technology, College Park, Maryland, September 27-29, 2010)

❑ A.T. Tinsley, M. Whaley, and D.J. Icove. 2010. *"Analysis of Hay Clinkers as an Indicator of Fire Cause."* (ISFI 2010, International Symposium on Fire Investigation Science and Technology, College Park, Maryland, September 27-29, 2010)

❑ A.T. Tinsley and D.J. Icove. 2008. "*An Assessment of the Use of Structural Deformation as a Method for Determining Area of Fire Origin.*" (ISFI 2008, International Symposium on Fire Investigation Science and Technology, Cincinnati, Ohio, May 19-21, 2008)

❑ D.J. Icove and M.W. Dalton. 2008. "*A Comprehensive Prosecution Report Format for Arson Cases.*" (ISFI 2008, International Symposium on Fire Investigation Science and Technology, Cincinnati, Ohio, May 19-21, 2008)

❑ D.J. Icove and C.T. Lyster. 2007. "*Passive Microwave Fire Detection: A Survey and Assessment,*" (11th International Conference on Fire Scene and Engineering, University of London, Royal Holloway College, United Kingdom, September 3-5, 2007.)

❑ D.J. Icove and G.A. Haynes. 2007. "*Guidelines for Conducting Peer Reviews of Complex Fire Investigations.*" (Fire and Materials Conference, San Francisco, California, January 29-31, 2007.)

❑ D.J. Icove and J.D. DeHaan. 2006. "*Hourglass Burn Patterns: A Scientific Explanation for their Formation,*" (International Symposium on Fire Investigation Science and Technology, Cincinnati, Ohio, June 26-28, 2006.)

❑ D J. Icove, H.E. Welborn, A.J. Vonarx, E.C. Adams, J.R. Lally, T.G. Huff. 2006. "*Scientific Investigation and Modeling of Prehistoric Structural Fires at Chevelon Pueblo.*" (International Symposium on Fire Investigation Science and Technology, Cincinnati, Ohio, June 26-28, 2006.)

❑ D.J. Icove and J.D. DeHaan. 2004. "*NFPA 921's Impact on Fire Scene Reconstructions,*" *Fire Protection Engineering Magazine*, (Society of Fire Protection Engineers, Bethesda, Maryland, Vol. 21, pp. 10-16. Winter 2004)

❑ A.M. Christensen and D.J. Icove. 2004. "*The Application of NIST's Fire Dynamics Simulator to the Investigation of Carbon Monoxide Exposure in the Deaths of Three Pittsburgh Fire Fighters,*" (*Journal of Forensic Science*, Vol. 49, No.1, January 2004.)

❑ T.G. Huff, G.P. Gary, D.J. Icove. 2001. "*The Myth of Pyromania,*" *Fire and Arson Investigator*, (International Association of Arson Investigators, Bridgeton, MO, Vol. 51, No. 1, October 2001, pp. 28-37.)

❑ H. Stambaugh, D.S. Beaupre, D.J. Icove, R. Baker, W. Cassaday, and W.P. Williams. 2001. "*Electronic Crime Needs Assessment for State and Local Law Enforcement,*" *National Institute of Justice*, U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, NCJ 186276. March 2001.)

❑ T.G. Huff, G.P. Gary, D.J. Icove. 2001. "The Myth of Pyromania," Fire and Arson Investigator, (International Association of Arson Investigators, Bridgeton, MO, Vol. 51, No. 1, October 2001, pp.28-37.)

❑ H. Stambaugh, D.S. Beaupre, D.J. Icove, R. Baker, W. Cassaday, and W.P. Williams 2001. "*Electronic Crime Needs Assessment for State and Local Law Enforcement,*" National Institute of Justice, U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, NCJ 186276. March 2001

❑ D.J. Icove & J.D. DeHaan, 1998. "*Forensic Fire Scene Reconstruction,*" (National Fire Protection Association, Fall Meeting, Atlanta, GA, Nov. 17, 1998.)

❑ D.J. Icove. 1997. "*Collaring Cybercrooks: An Investigator's View,*" IEEE Spectrum. (New York, NY, Institute of Electrical and Electronic Engineers, June 1997.)

❑ J.D. Birdwell, D. Wiggins, L. Leedy, G. Larsen, and D. Icove. 1997. "*Wide Area Information Servers in Secure Environments.*" (Office of National Drug Control Policy (ONDCP) Symposium, 1997) see: www.lit.net/ondcp/wais.html.

❑ D.J. Icove. 1995. "*Fire Scene Reconstruction*", First International Symposium on the Forensic Aspects of Arson Investigations, Federal Bureau of Investigation, Fairfax, Virginia, July 31, 1995.

❑ D.J. Icove, & S.A. Kelly. 1993. "*Total Quality in Arson Unit Management: A Blueprint for Public Safety Managers,*" IAFC On Scene. (Washington, D.C., International Association of Fire Chiefs, April 15, 1993.)

❑ D.J. Icove. 1990. "*Safeguarding Computer Centers,*" Security Management. (American Society for Industrial Security, Arlington, VA, 1990.)

❑ D.J. Icove and P.R. Horbert. 1990. "*Serial Arsonists: An Introduction,*" The Police Chief. (International Association of Chiefs of Police, Washington, D.C., Vol. 57, No. 12, December 1990.)

❑ D.J. Icove and R. Gilman. 1989. "*Arson Reporting Immunity Laws,*" FBI Law Enforcement Bulletin. (U.S. Department of Justice, Washington, D.C., Vol. 58, No. 6, September 1989.) Republished in National Fire and Arson Report. (Charlotte, NC, Vol. 7, No. 5, 1989.)

❑ K.A. Seger and D.J. Icove. 1988. "*Power Theft: The Silent Crime,*" FBI Law Enforcement Bulletin. (U.S. Department of Justice, Washington, D.C., March 1988.)

❑ D.J. Icove and M.H. Estepp. 1987. "*Motive-Based Offender Profiles of Arson and Fire-Related Crimes,*" FBI Law Enforcement Bulletin. (U.S. Department of Justice, Washington, D.C., April 1987.)

❑ D.J. Icove. 1986. "*Automated Crime Profiling,*" FBI Law Enforcement Bulletin. (U.S. Department of Justice, Washington, D.C., December 1986.) Republished in National Fire and Arson Report. (Charlotte, NC, Vol. 5, No. 3, 1987.)

❑ D.J. Icove and M.O. Soliman. 1983. "*Computer-Assisted Arson Information Management.*" (Washington, D.C., The International Fire Chief, Vol. 49, No. 12, December, 1983.)

❑ J.L. Bryan and D.J. Icove. 1977. "*Recent Advances in Computer-Assisted Arson Investigation,*" Fire Journal. (National Fire Protection Association, Quincy, MA,

Vol. 71, No. 1, January 1977.) Republished in Fire & Arson Investigator. (International Association of Arson Investigators, St. Louis, MO, Vol. 32, No. 2, 1977.)

- ❑ D.J. Icove and H.J. Crisman. 1975. "*Application of Pattern Recognition to Arson Investigation*," Fire Technology. (National Fire Protection Association, Quincy, MA, Vol. 37, No. 4, February 1975.)
- ❑ D.J. Icove, T.W. Reddock and D. Monro. 1974. "*Mathematical Characterization of the MIRS Fire Reporting System*," 6th Annual Systems Symposium. (Institute of Electrical and Electronic Engineers, Baton Rouge, LA, February 1974.)
- ❑ D.J. Icove. 1973. "*The Application of ECAP to the Solution of One and Two Dimensional Heat Transfer Equations*," Society of Naval Engineers. (Naval Ship Systems Command, Washington, D.C., March 1973.)

## PATENTS

- ❑ U.S. Patent 10,669,668 B2, M.E. Goodson and D.J. Icove. "Clothes Dryer Fire Reduction System," June 6, 2020.
- ❑ U.S. Patent 10,502,345 B2, M.E. Goodson and D.J. Icove. "Dissipative Lightning Resistant Tubing System," December 10, 2019.
- ❑ U.S. Patent 10,330,225 B2, M.E. Goodson and D.J. Icove. "Lightning Resistant Gas Tubing," June 25, 2019.
- ❑ U.S. Patent 9,244,133, D.J. Icove, C.T. Kyster, D.A. Banwarth, and S.K. Wesson. "Handheld Devices and Structures to Detect Sticky Devices Having Magnets," January 26, 2016.
- ❑ U.S. Patent 9,123,220, D.J. Icove, C.T. Kyster, and D.A. Banwarth. "Passive Microwave System and Method for Protecting a Structure from Fire Threats," September 1, 2015.
- ❑ U.S. Patent 8,775,427 B2, J.D. Birdwell, T.W. Wang, D.J. Icove, S.P. Horn. "Method and Apparatus for Predicting Object Properties and Events Using Similarity-Based Information Retrieval and Modeling," July 8, 2014.
- ❑ U.S. Patent 8,762,379 B2, J.D. Birdwell, T.W. Wang, D.J. Icove, S.P. Horn. "Method and Apparatus for Predicting Object Properties and Events Using Similarity-Based Information Retrieval and Modeling," June 24, 2014.
- ❑ U.S. Patent 8,713,019 B2, J.D. Birdwell, T.W. Wang, D.J. Icove, S.P. Horn. "Method and Apparatus for Predicting Object Properties and Events Using Similarity-Based Information Retrieval and Modeling," April 29, 2014.
- ❑ U.S. Patent US 8,594,979 B2, D.J. Icove and C.T. Lyster, "Handheld and Imbedded Devices to Detect Sticky Devices Using Magnets" Nov. 26, 2013
- ❑ U.S. Patent 8,493,212, D.J. Icove, C.T. Lyster, and D.M. Banwarth, "Passive Microwave System and Method for Protecting a Structure from Fire Threats," July 23, 2013.
- ❑ U.S. Patent 8,429,153, J.D. Birdwell, T.W. Wang, D.J. Icove, R. Horn, D.V. Stansberry, C.G. Sapp, and M.S. Rader, "Method and Apparatus for Classifying

Known Specimens and Media Using Spectral Properties and Identifying Unknown Specimens and Media," April 23, 2013.

- U.S. Patent 8,396,870, J.D. Birdwell, T.W. Wang, R.D. Horn, D.J. Icove, S.P. Horn, R. Horn, D.V. Stansberry, and M.S. Rader, "Method and Apparatus for Predicting Object Properties and Events Using Similarity-Based Information Retrieval and Modeling," March 13, 2013.
- U.S. Patent 8,392,418, J.D. Birdwell, T.W. Wang, R.D. Horn, D.J. Icove, and S.P. Horn, "Method and Apparatus for Predicting Object Properties and Events Using Similarity-Based Information Retrieval and Modeling," February 12, 2013.
- U.S. Patent 8,375,032, J.D. Birdwell, T.W. Wang, R.D. Horn, D.J. Icove, S.P. Horn, and M.S. Rader, "Method and Apparatus for Predicting Object Properties and Events Using Similarity-Based Information Retrieval and Modeling," February 12, 2013.
- U.S. Patent 8,212,671. D.J. Icove and C.T. Lyster, "Passive Microwave Speed and Intrusion Detection System," July 3, 2012.
- U.S. Patent 8,099,733. J.D. Birdwell, T.W. Wang, R.D. Horn, P. Yadav, and D.J. Icove, "Parallel Data Processing Architecture," January 17, 2012.
- U.S. Patent 8,060,522. J.D. Birdwell, T.W. Wang, R.D. Horn, P. Yadav, and D.J. Icove, "Parallel Data Processing Architecture, "November 15, 2011.
- U.S. Patent 8,049,620. D.J. Icove and C.T. Lyster, "Passive Microwave Fire and Intrusion Detection System Including Black Body and Spectral Emission at the Hydrogen, Hydroxyl and Hydrogen Chloride Lines," November 1, 2011.
- U.S. Patent 8,044,798. D.J. Icove and C.T. Lyster, "Passive Microwave Speed and Intrusion Detection System," October 25, 2011.
- U.S. Patent 8,013,745. D.J. Icove, M.B. Zemel, C.T. Lyster and N. Feld, "Passive Microwave Assessment of Human Body Core to Surface Temperature Gradients and Basal Metabolic Rate, September 6, 2011.
- U.S. Patent 7,884,717. D.J. Icove and C.T. Lyster, "Passive Microwave Fire and Intrusion Detection System, February 8, 2011.
- U.S. Patent 7,882,106. J.D. Birdwell, T.W. Wang, R.D. Horn, P. Yadav, and D.J. Icove, Method of Indexed Storage and Retrieval of Multidimensional Information, February 1, 2011.
- U.S. Patent 7,724,134. D.J. Icove and C.T. Lyster, "Passive Microwave Fire and Intrusion Detection System," May 25, 2010.
- U.S. Patent 7,454,411. J.D. Birdwell, T.W. Wang, R.D. Horn, P. Yadav, and D.J. Icove, "Parallel Data Processing Architecture," November 18, 2008.
- U.S. Patent 7,272,612. J.D. Birdwell, T.W. Wang, R.D. Horn, P. Yadav, and D.J. Icove, "Method of Partitioning Data Records," September 18, 2007.
- U.S. Patent 6,741,983. J.D. Birdwell, T.W. Wang, R.D. Horn, P. Yadav, and D.J. Icove, "Method of Indexed Storage and Retrieval of Multidimensional Information," May 25, 2004.

**EXPERT WITNESS TESTIMONY** (Prior 10 years)

- <u>December 3, 2020 – Deposition, Civil Case No. 2017-CA-001070, In the Circuit Court of the Twelfth Judicial Circuit in and for Manatee County, Florida</u>, THE ESTATE OF DORIS L. SHELDONE, by and through RANDOLPH JAMES SHELDONE, Personal Representative, Plaintiff, vs, THE OAKS BRADENTON TRS, LLC; et al, Defendants (civil fire case)

- <u>January 11, 2016 – Trial Testimony, Civil Case No. 5:13-cv-00895-CLS, In The United States District Court of the Northern District of Alabama, Huntsville Division</u>, ACADIA INSURANCE CO., Plaintiff, vs. UNITED STATES OF AMERICA, Defendant (civil fire case).

- <u>November 23, 24, and December 18, 2015 – Deposition, Civil Case Nos. 13-1652, 13-4425, 13-4424, and 13-4427, In The Circuit Court Of The City Of Richmond, Virginia</u>, JESSICA RAE PIERCE, Administrator of the Estate of GARY EUGENE PIERCE, Deceased, LON E. BICKHAM, JEREMY EVERETT, TRENT KIMBRELL, Plaintiffs, vs. MILLER ELECTRIC MANUFACTURING COMPANY, THE MILLER GROUP, LTD., ILLINOIS TOOL WORKS, INC., ONAN CORPORATION, CUMMINS POWER GENERATION, INC., and ARCET EQUIPMENT COMPANY, Defendants (civil fire case).

- <u>November 11, 2014 – Deposition, Case No. 5:13-cv-10661-JEL-MKM, In the United States District Court Eastern District of Michigan Southern Division</u>, B. GERALD BARTUSH, PERSONAL REPRESENTATIVE OF THE ESTATE OF RANDY BERGERON, Plaintiff, vs. THE AMERICAN INSURANCE COMPANY, Defendant (civil fire case).

- <u>October 30, 2014 – Courtroom Testimony, Case Nos. No. 12-370 CF & 12-371-CF, In The Circuit Court, Fourteenth Judicial Circuit, Washington County</u>, STATE OF FLORIDA, Plaintiff, vs. LORRIE LAUREL and RUBEN A. LAUREL, Defendants (Daubert Hearing, criminal case).

- <u>May 20, 2014 – Courtroom Testimony, Case No. 12-93, In The Chancery Court For Morgan County, Tennessee</u>, RICHARD W. AUSTIN, Plaintiff, vs. TENNESSEE FARMERS MUTUAL INSURANCE COMPANY, Defendant (civil fire case).

- <u>May 13, 2014 – Deposition, Case No. 2012-504,105, In The Lubbock County, 72nd Judicial District, State of Texas</u>, KEN TEEL, Individually and as Representative of the ESTATE OF BRENNEN CHASE TEEL; BECKY TEEL; ROSS RUSHING and MEG RUSHING, Individually and as Next Friend of L.R., a Minor; STATE FARM LLOYDS INSURANCE COMPANY, as subrogee of ROSS RUSHING and MEG RUSHING; and SAFECO INSURANCE COMPANY, as subrogee of ROSS

ICOVE 83

RUSHING and MEG RUSHING, Plaintiffs, VS. TITEFLEX CORPORATION, GASTITE DIVISION; TURNER & WITT PLUMBING, INC.; MSC HOLDINGS, INC., f/d/a MORRISON SUPPLY COMPANY-LUBBOCK, INC.; and JERROD GRIFFITH, d/b/a TEXAS ELECTRIC COMPANY, Defendants, VS. THERMO DYNAMIC INSULATION; STRONG CUSTOM BUILDERS, LLC; and LENNOX HEARTH PRODUCTS, LLC, Third-Party Defendants (civil fire case).

❑ April 30, 2014 – Deposition, Case No. 12-93, In The Chancery Court For Morgan County, Tennessee, RICHARD W. AUSTIN, Plaintiff, vs. TENNESSEE FARMERS MUTUAL INSURANCE COMPANY, Defendant (civil fire case).

❑ December 3, 2012 – Courtroom Testimony, Indictment Nos.: 2011-GS-39-103-104, State of South Carolina, Court of General Sessions, Thirteenth Judicial Circuit, County of Pickens; STATE OF SOUTH CAROLINA, vs. DONALD GREGORY KINSELA, Defendant (criminal case).

❑ November 27, 2012 – Expert Witness Qualification Testimony, Indictment Nos.: 2011-GS-39-103-104, State of South Carolina, Court of General Sessions, Thirteenth Judicial Circuit, County of Pickens; STATE OF SOUTH CAROLINA, vs. DONALD GREGORY KINSELA, Defendant (criminal case).

❑ June 27, 2012 – Deposition, Case Action No. PJM 09-1894, United States District Court, District of Maryland, Southern Division, THE CHARTER OAK FIRE INS. CO., Plaintiff vs. MARLOW LIQUORS, LLC, and POTOMAC ELECTRIC POWER CO., et al., Defendants (civil fire case).

❑ October 25, 2011 - Courtroom Testimony, No. 3669, Court of Common Pleas, Philadelphia County, Pennsylvania: EDWIN BRECHBIEL, as Administrator of the Estate of KEVIN BRECHBIEL and co-Administrator of the Estates of DEXIE BRECHBIEL, KAYLA BRECHBIEL ABBY BRECHBIEL, JUSTIN BRECHBIEL and JASON BRECHBIEL and CONSTANCE C. MA YO-COLLIER, as Administratrix of the Estate of ANITA PATRICE MA YO and Co-Administratrix of the Estates of DEXIE BRECHBIEL, KAYLA BRECHBIEL, ABBY BRECHBIEL, JUSTIN BRECHBIEL and JASON BRECHBIEL and SUSAN BRECHBIEL and RUTH BRECHBIEL, v. REDMAN HOMES, INC., et al. (hearing).

(06/2021)

ICOVE 84

# APPENDIX C – NFPA 1033 (1993 and 2014 Editions)

ICOVE 85

Copyright © 1993 NFPA. All Rights Reserved

**NFPA 1033**

**Standard for**

## Professional Qualifications for

## Fire Investigator

**1993 Edition**

This edition of NFPA 1033, *Standard for Professional Qualifications for Fire Investigator*, was prepared by the Technical Committee on Fire Investigator Professional Qualifications, released by the Correlating Committee on Professional Qualifications, and acted on by the National Fire Protection Association, Inc. at its Fall Meeting held November 16-18, 1992, in Dallas, Texas. It was issued by the Standards Council on January 15, 1993, with an effective date of February 12, 1993, and supersedes all previous editions.

The 1993 edition of this document has been approved by the American National Standards Institute.

### Origin and Development of NFPA 1033

In 1972, the Joint Council of National Fire Service Organizations (JCNFSO) created the National Professional Qualifications Board for the Fire Service (NPQB) to facilitate the development of nationally applicable performance standards for uniformed fire service personnel. On December 14, 1972, the Board established four technical committees to develop those standards using the National Fire Protection Association (NFPA) standard-making system. The initial committees addressed the following jobs: fire fighter, fire officer, fire service instructor, and fire inspector and investigator.

The original concept of the professional qualification standards, as directed by the JCNFSO and the NPQB was to develop an interrelated set of performance standards specifically for the uniformed fire service. The various levels of achievement in the standards were to build upon each other within a strictly defined career ladder. In the late 1980s, revisions of the standards recognized that the documents should stand on their own merit in terms of job performance requirements for a given field. Accordingly, the strict career ladder concept was revised to allow civilian entry into many of the fields, except for the progression from fire fighter to fire officer. These revisions facilitated the use of the documents by other than the uniformed fire services.

The Committee on Fire Inspector and Investigator Professional Qualifications met from 1973 through 1977 and produced the first edition of NFPA 1031, *Professional Qualifications for Fire Inspector, Fire Investigator, and Fire Prevention Education Officer*. This document was adopted by the Association in May of 1977.

Subsequent to the adoption of the initial edition, the Committee met regularly to revise and update the standard. In 1986, the Joint Council directed the Committee to develop separate documents for each of the job functions the original document addressed. This direction was coupled with the decision to remove the job of fire investigator from the strict career path previously followed and allow for civilian entry. The first edition of this new document, NFPA 1033, *Standard for Professional Qualifications for Fire Investigator*, was adopted by the Association in June of 1987.

**ICOVE 86**

In 1990, responsibility for the appointment of Professional Qualifications committees and the development of the Professional Qualifications Standards was assumed by the NFPA. The Professional Qualifications Correlating Committee was appointed by the NFPA Standards Council and assumed the responsibility for coordinating the requirements of all of the documents in the Professional Qualifications system.

The Technical Committee on Fire Investigator Professional Qualifications was established by the NFPA Standards Council in 1990 based on a recommendation by the Professional Qualifications Correlating Committee. This recommendation addressed the need for specific expertise in the area of fire investigation to review and revise the existing document. This committee met numerous times in 1990 and 1991 to complete a job task analysis and develop specific job performance requirements for the job of fire investigator. During this process, the committee was saddened by the loss of one of its members, George T. Lewis, Fire Marshal of Delaware County, PA.

The intent of the Technical Committee was to develop clear and concise job performance requirements that can be used to determine that an individual, when measured to the standard, possesses the skills and knowledge to perform as a fire investigator. These job performance requirements are applicable to fire investigators both public and private.

ICOVE 87

## Correlating Committee on Professional Qualifications

**Douglas P. Forsman,** *Chairman*
Champaign Fire Dept., IL

**Jon C. Jones,** *Secretary*
National Fire Protection Assn.
(Nonvoting)

**Louis J. Amabili,** Delaware State Fire School
Rep. Int'l Society of Fire Service Instructors
**Stephen P. Austin,** State Farm Fire & Casualty Co.
Rep. Int'l Assn. of Arson Investigators, Inc.
**Dan W. Bailey,** USDA Forest Service
**Gene P. Carlson,** Oklahoma State University, OK
Rep. Int'l Fire Service Training Assn.

**Jack K. McElfish,** Clayton City Fire Dept., GA
Rep. Int'l Assn. of Fire Chiefs
**Mary Nachbar,** Minnesota State Fire Marshal Division
**William Peterson,** Plano Fire Dept., TX
Rep. Int'l Fire Service Training Assn.
**John P. Wolf,** University of Kansas, KS
**Ted Vratny,** Boulder Regional Communications Ctr., CO

## Technical Committee on Fire Investigator Professional Qualifications

**Stephen P. Austin,** *Chairman*
State Farm Fire & Casualty Co., DE
Rep. Int'l Assn. of Arson Investigators, Inc.

**Billy L. Buckley,** S E A, Inc., FL
**Roger A. Furrow,** Grinnell Mutual Reinsurance, IA
**Mary M. Galvin,** State of Connecticut, CT
**David B. Hooton,** TechniFire Services Co., TN
**Thomas E. Minnich,** U.S. Fire Administration, MD
**J. Brooks Semple,** Smoke/Fire Risk Mgmt. Inc., VA

**Barry W. Slotter,** Robins, Kaplan, Miller & Ciresi, GA
**Dennis W. Smith,** Atlantic City Fire Dept., NJ
Rep. T/C Fire Investigations
**Robert A. Stellingworth,** Bureau of Alcohol, Tobacco &
Firearms, DC

### Alternates

**John F. Goetz,** Bureau of Alcohol, Tobacco & Firearms, PA
(Alt. to R. A. Stellingworth)
**Joseph P. Toscano,** State Attorney's Office New Haven, CT
(Alt. to M. M. Galvin)

**Jack A. Ward,** Universal Fire Specialists, Inc., FL
(Alt. to S. P. Austin)

**Jon C. Jones,** NFPA Staff Liaison

*This list represents the membership at the time the Committee was balloted on the text of this edition. Since that time, changes in the membership may have occurred.*

NOTE: Membership on a Committee shall not in and of itself constitute an endorsement of the Association or any document developed by the Committee on which the member serves.

**Committee Scope:** To develop and prepare minimum standards of professional competence required of fire investigators.

1993 Edition

ICOVE 88

## Contents

**Chapter 1  Administration** . . . . . . . . . . . . **1033–** 5
  1-1   Scope . . . . . . . . . . . . . . . . . . . . **1033–** 5
  1-2   Purpose . . . . . . . . . . . . . . . . . . **1033–** 5
  1-3   General . . . . . . . . . . . . . . . . . . . **1033–** 5

**Chapter 2  Definitions** . . . . . . . . . . . . . **1033–** 5

**Chapter 3  Fire Investigator** . . . . . . . . . . **1033–** 6
  3-1   General . . . . . . . . . . . . . . . . . . . **1033–** 6
  3-2   Scene Examination . . . . . . . . . . . **1033–** 6
  3-3   Documenting the Scene . . . . . . . . . **1033–** 7
  3-4   Evidence Collection/Preservation . . . . **1033–** 7
  3-5   Interview/Interrogation . . . . . . . . . **1033–** 8

  3-6   Post-Incident Investigation . . . . . . . **1033–** 8
  3-7   Presentations . . . . . . . . . . . . . . . **1033–** 9

**Chapter 4  Referenced Publications** . . . . . . **1033–** 9

**Appendix A** . . . . . . . . . . . . . . . . . . . . . **1033–**10

**Appendix B  Referenced Publications** . . . . . . **1033–**10

**Appendix C** . . . . . . . . . . . . . . . . . . . . . **1033–**10

**Index** . . . . . . . . . . . . . . . . . . . . . . . . **1033–**14

ICOVE 89

**NFPA 1033**

**Standard for**

**Professional Qualifications for**

**Fire Investigator**

**1993 Edition**

NOTICE: An asterisk (*) following the number or letter designating a paragraph indicates explanatory material on that paragraph in Appendix A.

Information on referenced publications can be found in Chapter 4 and Appendix B.

## Chapter 1   Administration

**1-1 Scope.** This standard identifies the professional level of performance required for fire investigators. It specifically identifies the job performance requirements necessary to perform as a fire investigator.

**1-2* Purpose.** The purpose of this standard is to specify in terms of minimum job performance requirements the minimum standards required for service as a fire investigator in both the private and public sectors. It is not the intent of this standard to restrict any jurisdiction from exceeding these minimum requirements. Job performance requirements describe the performance required for a specific job. The complete list of requirements for each duty describes the tasks an individual must be able to perform in order to successfully carry out that duty; however, they are not intended to measure a level of knowledge. Together, the duties and job performance requirements define the parameters of the job of fire investigator.

**1-3 General.**

**1-3.1** The fire investigator shall be at least age 18.

**1-3.2** The fire investigator shall have a high school diploma or a state recognized equivalent.

**1-3.3** The authority having jurisdiction shall conduct a thorough background and character investigation prior to accepting an individual as a candidate for certification as a fire investigator.

**1-3.4** The job performance requirements for fire investigator shall be completed in accordance with recognized practices and procedures or as they are defined by law or by the authority having jurisdiction.

**1-3.5*** The job performance requirements defined in this standard need not be mastered in the order in which they appear. Training agencies or authorities shall establish programs that prepare individuals to meet the requirements defined in this standard.

**1-3.6** Evaluation of job performance requirements shall be by individuals approved by the authority having jurisdiction. The evaluator shall be qualified to conduct the evaluation of an investigator.

**1-3.7*** The fire investigator shall remain current with investigation methodology, fire protection technology, and current code requirements by attending workshops/seminars, and/or through professional publications and journals.

## Chapter 2   Definitions

**Approved.** Acceptable to the "authority having jurisdiction."

NOTE: The National Fire Protection Association does not approve, inspect or certify any installations, procedures, equipment, or materials nor does it approve or evaluate testing laboratories. In determining the acceptability of installations or procedures, equipment or materials, the authority having jurisdiction may base acceptance on compliance with NFPA or other appropriate standards. In the absence of such standards, said authority may require evidence of proper installation, procedure or use. The authority having jurisdiction may also refer to the listings or labeling practices of an organization concerned with product evaluations which is in a position to determine compliance with appropriate standards for the current production of listed items.

**Authority Having Jurisdiction.** The "authority having jurisdiction" is the organization, office or individual responsible for "approving" equipment, an installation or a procedure.

NOTE: The phrase "authority having jurisdiction" is used in NFPA documents in a broad manner since jurisdictions and "approval" agencies vary as do their responsibilities. Where public safety is primary, the "authority having jurisdiction" may be a federal, state, local or other regional department or individual such as a fire chief, fire marshal, chief of a fire prevention bureau, labor department, health department, building official, electrical inspector, or others having statutory authority. For insurance purposes, an insurance inspection department, rating bureau, or other insurance company representative may be the "authority having jurisdiction." In many circumstances the property owner or his designated agent assumes the role of the "authority having jurisdiction"; at government installations, the commanding officer or departmental official may be the "authority having jurisdiction."

**Due Process.** The compliance with the criminal and civil laws/procedures within the jurisdiction where the incident occurred.

**Fire Department.** An organization providing rescue, fire suppression, and other related activities. For the purposes of this standard, the term "fire department" shall include any public, private, or military organization engaging in this type of activity.

**Fire Investigator.** An individual who has demonstrated the skills and knowledge necessary to conduct, coordinate, and complete an investigation.

**Investigation.** A systematic inquiry or examination.

**Job Performance Requirement.** A statement that describes a specific job task, lists the items necessary to complete the task, and defines measurable or observable outcomes and evaluation areas for the specific task.

ICOVE 90

**Labeled.** Equipment or materials to which has been attached a label, symbol or other identifying mark of an organization acceptable to the "authority having jurisdiction" and concerned with product evaluation, that maintains periodic inspection of production of labeled equipment or materials and by whose labeling the manufacturer indicates compliance with appropriate standards or performance in a specified manner.

**Listed.** Equipment or materials included in a list published by an organization acceptable to the "authority having jurisdiction" and concerned with product evaluation, that maintains periodic inspection of production of listed equipment or materials and whose listing states either that the equipment or material meets appropriate standards or has been tested and found suitable for use in a specified manner.

NOTE: The means for identifying listed equipment may vary for each organization concerned with product evaluation, some of which do not recognize equipment as listed unless it is also labeled. The "authority having jurisdiction" should utilize the system employed by the listing organization to identify a listed product.

**Prerequisite Knowledge.** Fundamental knowledge required in order to perform a specific task.

**Prerequisite Skills.** The essential skills required in order to perform a specific task.

**Shall.** Indicates a mandatory requirement.

**Should.** Indicates a recommendation or that which is advised but not required.

**Special Tools.** Tools of a specialized or unique nature that may not be required for every fire investigation as are the standard equipment and tools. Examples include heavy equipment, hydrocarbon detectors, microscopes, flash point testers, etc.

**Standard Equipment and Tools.** Standard equipment and tools are: a 35-mm camera, flash, and film; flashlight; shovel; broom; hand tools; tape measure; and evidence collection containers.

**Task.** A specific job behavior or activity.

## Chapter 3  Fire Investigator

### 3-1 General.

**3-1.1\*** The fire investigator shall meet the job performance requirements defined in Sections 3-2 through 3-7. In addition, the fire investigator shall meet the requirements of 2-2.1 through 2-2.3 of NFPA 472, *Standard for Professional Competence of Responders to Hazardous Materials Incidents.*

**3-1.2** The fire investigator shall maintain appropriate liaison with other interested professionals during an investigation.

**3-1.3\*** The fire investigator shall ensure that due process of law is served.

### 3-2 Scene Examination.

**3-2.1 Description of Duty.** To inspect/evaluate the scene so as to determine the area/point of origin, source of ignition, material(s) ignited, act or activity that brought ignition source and materials together, and assess the subsequent progression, extinguishment, and containment of the fire.

**3-2.2** Secure the fire ground, given marking devices, sufficient personnel and special tools and equipment, so that unauthorized persons can recognize the perimeters of the investigative scene, are kept from restricted areas, and all evidence or potential evidence is protected from damage or destruction.

**3-2.2.1** *Prerequisite Knowledge:* Knowledge of fire ground hazards, types of evidence, and the importance of fire scene security and evidence preservation.

**3-2.2.2** *Prerequisite Skill:* Use of marking devices.

**3-2.3** Conduct an exterior survey, given standard equipment and tools, so that evidence is preserved, fire damage is interpreted, hazards are identified to avoid injuries, accessibility to the property is determined, and all potential means of ingress/egress are discovered.

**3-2.3.1** *Prerequisite Knowledge:* Knowledge of the types of building construction and the effects of fire upon construction materials, types of evidence commonly found in the perimeter, evidence preservation methods, the effects of fire suppression, fire behavior/spread, and burn patterns.

**3-2.3.2** *Prerequisite Skill:* Assess fire ground and structural condition, observe the damage and effects of the fire, and interpret burn patterns.

**3-2.4** Conduct an interior survey, given standard equipment and tools, so that areas of potential evidentiary value requiring further examination are identified and preserved, the evidentiary value of contents is determined, and hazards are identified to avoid injuries.

**3-2.4.1** *Prerequisite Knowledge:* Knowledge of the types of building construction and interior finish and the effects of fire upon those materials, the effects of fire suppression, fire behavior/spread, evidence preservation methods, burn patterns, effects of building contents on fire growth, and the relationship of contents to the overall investigation.

**3-2.4.2** *Prerequisite Skill:* Assess structural conditions, observe the damage and effects of the fire, discover the impact of fire suppression efforts on fire flow and heat propagation, and evaluate protected areas to determine the presence and/or absence of contents.

**3-2.5** Interpret burn patterns, given standard equipment and tools and some structural/content remains, so that each individual pattern is evaluated with respect to the burning characteristics of the material involved.

**3-2.5.1** *Prerequisite Knowledge:* Knowledge of fire development and the interrelationship of heat release rate, form, and ignitability of materials.

**3-2.5.2** *Prerequisite Skill:* Interpret the effects of burning characteristics on different types of materials.

ICOVE 91

**3-2.6** Correlate burn patterns, given standard equipment and tools and some structural/content remains, so that fire development is determined, methods and effects of suppression are evaluated, false origin area patterns are recognized, and all areas of origin are correctly identified.

**3-2.6.1** *Prerequisite Knowledge:* Knowledge of fire behavior/spread based on fire chemistry and physics, fire suppression effects, and building construction.

**3-2.6.2** *Prerequisite Skill:* Interpret variations of burn patterns on different materials with consideration given to heat release rate, form, and ignitability; distinguish impact of different types of fuel loads; evaluate fuel trails; and analyze and synthesize information.

**3-2.7** Examine and remove fire debris, given standard equipment and tools, so that all debris is checked for fire cause evidence, the ignition source(s) is identified, the fire cause is determined, and evidence is preserved without investigator-inflicted damage or contamination.

**3-2.7.1** *Prerequisite Knowledge:* Basic understanding of ignition processes, characteristics of ignition sources, and ease of ignition of fuels, debris-layering techniques, use of tools and equipment during the debris search, types of fire cause evidence commonly found in various degrees of damage, and evidence-gathering methods and documentation.

**3-2.7.2** *Prerequisite Skill:* Employ search techniques that further the discovery of fire cause evidence and ignition sources, use search techniques that incorporate documentation, and collect and preserve evidence.

**3-2.8** Reconstruct the area of origin, given standard and, if needed, special equipment and tools as well as sufficient personnel, so that all protected areas and burn patterns are identified and correlated to contents/structural remains, items potentially critical to cause determination and photo documentation are returned to their pre-fire location, and the point(s) of origin is discovered.

**3-2.8.1** *Prerequisite Knowledge:* Knowledge of the effects of fire on different types of material and the importance and uses of reconstruction.

**3-2.8.2** *Prerequisite Skill:* Examine all materials to determine the effects of fire, identify and distinguish among different types of fire-damaged contents, and return materials to their original position using protected areas and burn patterns.

**3-2.9\*** Inspect the performance of building systems, including detection, suppression, HVAC, utilities, and building compartmentation, given standard and special equipment and tools, so that a determination can be made as to the need for expert resources, an operating systems impact on fire growth and spread is considered in identifying origin areas, and defeated systems are identified.

**3-2.9.1** *Prerequisite Knowledge:* Different types of detection, suppression, HVAC, utility, and building compartmentation such as fire walls and fire doors; types of expert resources for building systems; the impact of fire on various systems; and common methods used to defeat a system's functional capability.

**3-2.9.2** *Prerequisite Skill:* Determine the systems operation and its effect on the fire, identify alterations to building

systems, and evaluate the impact of suppression efforts on building systems.

**3-2.10** Discriminate the effects of explosions from other types of damage, given standard equipment and tools, so that an explosion is identified and its evidence is preserved.

**3-2.10.1** *Prerequisite Knowledge:* Different types of explosions and their causes, characteristics of an explosion, and the difference between low- and high-order explosions.

**3-2.10.2** *Prerequisite Skill:* Identify explosive effects on glass, walls, foundations, and other building materials; distinguish between low- and high-order explosion effects; and analyze damage to document the blast zone and origin.

### 3-3 Documenting the Scene.

**3-3.1** Duties shall include diagramming the scene, photographing, and taking field notes to be used to compile a final report.

**3-3.2** Diagram the scene, given standard tools and equipment, so that the scene is accurately represented and evidence, pertinent contents, significant patterns, and origin areas/points are identified.

**3-3.2.1** *Prerequisite Knowledge:* Commonly used symbols and legends that clarify the diagram, types of evidence and patterns that need to be documented, and formats for diagramming the scene.

**3-3.2.2** *Prerequisite Skills:* Ability to sketch the scene, basic drafting skills, and evidence recognition and observational skills.

**3-3.3\*** Photographically document the scene, given standard tools and equipment, so that the scene is accurately depicted and the photographs appropriately support scene findings.

**3-3.3.1** *Prerequisite Knowledge:* Working knowledge of a 35-mm camera and flash, types of 35-mm cameras, and types of film and flash available, as well as the strengths and limitations of each.

**3-3.3.2** *Prerequisite Skills:* Ability to use a 35-mm camera and flash.

**3-3.4** Construct investigative notes, given a fire scene, available documents (e.g., pre-fire plans, inspection reports, etc.), and interview information, so that the notes are accurate, provide further documentation of the scene, and represent complete documentation of the scene findings.

**3-3.4.1** *Prerequisite Knowledge:* Relationship between notes, diagrams, and photos; how to reduce scene information into concise notes; and the use of notes during report writing and legal proceedings.

**3-3.4.2** *Prerequisite Skills:* Data reduction skills, note taking skills, observational and correlating skills.

### 3-4 Evidence Collection/Preservation.

**3-4.1** Duties shall include using proper physical and legal procedures to retain evidence required within the investigation.

ICOVE 92

**3-4.2** Utilize proper procedures for managing victims and fatalities, given a protocol and appropriate personnel, so that all evidence is discovered and preserved and the protocol procedures are followed.

**3-4.2.1** *Prerequisite Knowledge:* Types of evidence associated with fire victims and fatalities and evidence preservation methods.

**3-4.2.2** *Prerequisite Skills:* Observational skills and the ability to apply protocols to given situations.

**3-4.3** Select appropriate evidence for analysis, given information from the investigative file, so that samples forwarded for analysis support specific investigative needs.

**3-4.3.1** *Prerequisite Knowledge:* Knowledge of the capabilities of the services performing the analysis, purposes for submitting samples, and types of analytical services available.

**3-4.3.2** *Prerequisite Skills:* Evaluate the fire incident to determine forensic, engineering, or laboratory needs.

**3-4.4** Collect and package evidence, given standard tools and equipment and evidence collection materials, so that evidence is identified, preserved, collected, and packaged to avoid contamination and investigator-inflicted damage and the chain of custody is established.

**3-4.4.1** *Prerequisite Knowledge:* Types of evidence (exclusionary or fire-cause supportive evidence), types of laboratory tests available, packaging techniques and materials, and impact of evidence collection on the investigation.

**3-4.4.2** *Prerequisite Skills:* Ability to recognize different types of evidence and determine evidence critical to the investigation.

**3-4.5** Maintain a chain of custody, given standard investigative tools, marking tools, and evidence tags/logs, so that written documentation exists for each piece of evidence and evidence is secured.

**3-4.5.1** *Prerequisite Knowledge:* Rules of custody and transfer procedures, types of evidence (e.g., physical evidence obtained at the scene, photos, documents, etc.), and methods of recording the chain of custody.

**3-4.5.2** *Prerequisite Skills:* Ability to execute the chain of custody procedures and accurately complete necessary documents.

**3-4.6** Dispose of evidence, given jurisdictional/agency regulations and file information, so that the disposal is timely, safely conducted, and in compliance with jurisdictional/agency requirements.

**3-4.6.1** *Prerequisite Knowledge:* Disposal services available and common disposal procedures and problems.

**3-4.6.2** *Prerequisite Skill:* Documentation skills.

**3-5 Interview/Interrogation.**

**3-5.1** Duties shall include obtaining information regarding the overall fire investigation from others through verbal communication.

**3-5.2** Develop an interview plan, given no special tools or equipment, so that the plan reflects a strategy to further determine the fire cause and affix responsibility and includes a relevant questioning strategy for each individual to be interviewed that promotes the efficient use of the investigator's time.

**3-5.2.1** *Prerequisite Knowledge:* Persons who may provide information that furthers the fire cause determination or the affixing of responsibility, types of questions that are pertinent and efficient to ask of different information sources (fire department, neighbors, witnesses, suspects, etc.), and pros and cons of interviews versus document gathering.

**3-5.2.2** *Prerequisite Skill:* Planning skills, development of focused questions for specific individuals, and evaluation of existing file data to help develop questions and fill investigative gaps.

**3-5.3** Conduct interviews or interrogations, given incident information, so that pertinent information is obtained, follow-up questions are asked, responses to all questions are elicited, and the response to each question is documented accurately.

**3-5.3.1** *Prerequisite Knowledge:* Knowledge of types of interviews, personal information needed for proper documentation or follow-up, documenting methods and tools, and types of nonverbal communications and their meaning.

**3-5.3.2** *Prerequisite Skill:* Adjust interviewing strategies based on deductive reasoning, interpret verbal and nonverbal communications, apply applicable legal requirements, and exhibit strong listening skills.

**3-5.4** Evaluate interview information, given interview transcripts or notes and incident data, so that all interview data is individually analyzed and correlated with all other interviews, corroborative and conflictive information is documented, and new leads are discovered.

**3-5.4.1** *Prerequisite Knowledge:* Types of interviews, report evaluation methods, and data correlating methods.

**3-5.4.2** *Prerequisite Skill:* Data correlating skills and the ability to evaluate source information (e.g., fire department, witness, etc.).

**3-6 Post-Incident Investigation.**

**3-6.1** Duties shall include the investigation of all factors beyond the fire scene at the time of the origin and cause determination.

**3-6.2** Gather reports and records, given no special tools, equipment, or materials, so that all gathered documents are appropriate to the investigation, complete, and authentic, the chain of custody is maintained, and the material is acceptable to the courts.

**3-6.2.1** *Prerequisite Knowledge:* Types of reports needed that facilitate determining responsibility for the fire (e.g., police reports, fire reports, insurance policies, financial records, deeds, private investigator reports, outside photos, and videos, etc.) and location of these reports.

**3-6.2.2** *Prerequisite Skills:* Identify the proper reports and documents necessary for the investigation, implementing the chain of custody, and organizational skills.

**3-6.3** Evaluate the investigative file, given all available file information, so that areas for further investigation are

ICOVE 93

identified, the relationship between gathered documents and information is interpreted, and corroborative evidence and information discrepancies are discovered.

**3-6.3.1** *Prerequisite Knowledge:* File assessment and/or evaluation methods, proper and acceptable documentation, and proper contents of investigative findings and gathered documentation.

**3-6.3.2** *Prerequisite Skills:* Information assessment and correlation skills and organizational skills.

**3-6.4** Coordinate expert resources, given the investigative file, reports, and documents, so that the expert's competencies are matched to the specific investigation needs, financial expenditures are justified, and utilization clearly furthers the investigation toward the goals of causation determination or affixing responsibility.

**3-6.4.1** *Prerequisite Knowledge:* Knowledge of the investigator's own expertise, qualifications needed for expert testimony, types of expert resources (e.g., forensic, CPA, polygraph, financial, human behavioral disorders, engineering, etc.), and methods to identify expert resources.

**3-6.4.2** *Prerequisite Skills:* Recognize the value of expert resources to further the investigation, network with other investigators to identify experts, question experts relative to their qualifications, and plan utilization of expert resources.

**3-6.5** Establish evidence as to motive and/or opportunity, given an incendiary fire, so that the evidence is the result of a prudent and complete investigation, is supported by documentation, and the evidence meets the evidentiary requirements of the jurisdiction.

**3-6.5.1** *Prerequisite Knowledge:* Types of motives common to incendiary fire investigation, methods used to discover opportunity, and understanding human behavioral patterns relative to fire setting.

**3-6.5.2** *Prerequisite Skills:* Financial analysis, records gathering and analysis, interviewing, and interpreting fire scene information and evidence for relationship to motive and/or opportunity.

**3-6.6** Formulate an opinion of the person(s) and/or product(s) responsible for the fire, given all investigative findings, so that the opinion regarding responsibility for a fire is supported by all records, reports, documents, and evidence.

**3-6.6.1** *Prerequisite Knowledge:* Analytical methods and procedures such as data reduction matrixing, hypothesis testing, and systems analysis, etc.

**3-6.6.2** *Prerequisite Skills:* Analytical and assimilation skills.

### 3-7 Presentations.

**3-7.1** Duties shall include the ability to present findings to those individuals not involved in the actual investigation.

**3-7.2** Prepare a written investigation report, given investigative findings, documentation, and a specific audience, so that the report accurately reflects the investigative findings, is concise, expresses the investigator's opinion, and is appropriate for the intended audience(s).

**3-7.2.1** *Prerequisite Knowledge:* Elements of writing, typical components of a written report, and types of audiences and their respective needs.

**3-7.2.2** *Prerequisite Skills:* Writing skills, ability to analyze information and apply deductive reasoning, and ability to determine the reader's needs.

**3-7.3** Express investigative findings verbally, given investigative findings, notes, a time allotment, and a specific audience, so that the information is accurate, the presentation is completed within the allotted time, and the presentation includes only need-to-know information for the intended audience.

**3-7.3.1** *Prerequisite Knowledge:* Types of investigative findings, the informational needs of various types of audiences, and the impact of releasing information.

**3-7.3.2** *Prerequisite Skills:* Communication skills, ability to determine audience needs, and ability to correlate findings.

**3-7.4** Testify during legal proceedings, given investigative findings, contents of reports, and consultation with legal counsel, so that all pertinent investigative information is presented clearly and accurately and the investigator's demeanor is appropriate to the proceedings.

**3-7.4.1** *Prerequisite Knowledge:* Types of investigative findings, understanding of the types of legal proceedings, appropriate demeanor for each, and an understanding of legal proceedings.

**3-7.4.2** *Prerequisite Skills:* Communication and listening skills; ability to differentiate facts from opinions; and ability to determine appropriate procedures, practices, and etiquette during legal proceedings.

**3-7.5** Conduct public informational presentations, given relative data, so that information is accurate, appropriate to the audience, and clearly supports the information needs of the audience.

**3-7.5.1** *Prerequisite Knowledge:* Types of data available regarding the fire loss problem and the issues about which the community must know.

**3-7.5.2** *Prerequisite Skills:* Ability to assemble, organize, and present information.

### Chapter 4 Referenced Publications

**4-1** The following document or portions thereof are referenced within this standard and shall be considered part of the requirements of this document. The edition indicated for each reference is the current edition as of the date of the NFPA issuance of this document.

**4-1.1 NFPA Publication.** National Fire Protection Association, 1 Batterymarch Park, P.O. Box 9101, Quincy, MA 02269-9101.

NFPA 472, *Standard for Professional Competence of Responders to Hazardous Materials Incidents*, 1992 edition.

ICOVE 94

## Appendix A

*This Appendix is not a part of the requirements of this NFPA document, but is included for information purposes only.*

**A-1-2**  See Appendix C.

**A-1-3.5**  See Appendix C.

**A-1-3.7**  Fire investigation technology and practices are changing rapidly. It is essential for an investigator's performance and knowledge to remain current. It is recommended that investigators be familiar with the technical information and procedural guidance presented in materials such as NFPA 921, *Guide for Fire and Explosion Investigations*, and NFPA 907M, *Manual for the Determination of Electrical Fire Causes*.

**A-3-1.1**  Chapter 10 of NFPA 921, *Guide for Fire and Explosion Investigations*, also provides the investigator with guidance.

**A-3-1.3**  It is understood that fire investigators with arrest powers, fire investigators without arrest powers, and private sector fire investigators may utilize this standard. The following is a list of those due process issues that are critical to the fire investigation field. It is the responsibility of the authority having jurisdiction to select those issues that are pertinent to its respective agency or organization. Those selected issues should then serve as the measurement criteria or training guideline for the authority having jurisdiction.

Due process issues (stated in task terms): Conduct search and seizure, conduct arrests, conduct interviews and interrogations, maintain chain of custody, utilize criminal and civil statutes applicable to the situation, and interpret and utilize contract law and insurance law. Show due process of civil rights laws, privacy laws, the fair credit reporting act, laws of trespass and invasion of privacy, laws of libel and slander, laws of punitive damages and attorney-client privilege, and other rules of evidence and law applicable to the authority having jurisdiction.

**A-3-2.9**  Examples of tampered systems:  Fire doors propped open, sprinkler systems shut down, detection systems disabled. Examples of proper operating systems: Fire doors, sprinkler activation systems, shutdown of HVAC systems, automatic utility shutoff.

**A-3-3.3**  The use of a 35-mm camera or other similar high quality format is highly recommended. The use of various video camera systems to supplement visual documentation may be utilized and is encouraged.

## Appendix B    Referenced Publications

**B-1**  The following documents or portions thereof are referenced within this standard for informational purposes only and thus are not considered part of the requirements of this document. The edition indicated for each reference is the current edition as of the date of the NFPA issuance of this document.

**B-1.1 NFPA Publication.**  National Fire Protection Association, 1 Batterymarch Park, P.O. Box 9101, Quincy, MA 02269-9101.

NFPA 907M, *Manual for the Determination of Electrical Fire Causes*, 1988 edition

NFPA 921, *Guide for Fire and Explosion Investigations*, 1992 edition.

## Appendix C

*This Appendix is not a part of the requirements of this NFPA document, but is included for information purposes only.*

### Explanation of the Standards and Concepts of JPRs

The primary benefit of establishing national professional qualification standards is to provide both public and private sectors with a framework of the job requirements for the fire service. Other benefits include enhancement of the profession, individual as well as organizational growth and development, and standardization of practices.

NFPA professional qualification standards identify the minimum job performance requirements for specific fire service positions. The standards may be used for training design and evaluation, certification, measuring and critiquing on-the-job performance, defining hiring practices, and setting organizational policies, procedures, and goals (other applications are encouraged).

Professional qualification standards for a specific job are organized by major areas of responsibility defined as duties. For example, the fire fighter's duties may include fire suppression, rescue, and water supply; and the Public Fire Educator's duties may include education, planning and development, and administration. Duties are major functional areas of responsibility within a job.

The professional qualification standards are written as job performance requirements (JPRs). Job performance requirements describe the performance required for a specific job. JPRs are grouped according to the duties of a job. The complete list of JPRs for each duty defines what an individual must be able to do in order to successfully perform that duty. Together, the duties and their JPRs define the job parameters; that is, the professional qualification standard as a whole is a job description.

### Breaking Down the Components of a Job Performance Requirement

The job performance requirement is the assembly of three critical components. These components are as follows:

(1)  Task to be performed.

(2)  Tools, equipment, or materials that must be provided to successfully complete the task.

(3)  Evaluation parameters and/or performance outcomes.

ICOVE 95

## Example

| | |
|---|---|
| (1) Task | (1) Ventilate a pitched roof; |
| (2) Tools, equipment, or materials | (2) Given an ax, a pike pole, an extension ladder, and a roof ladder; |
| (3) Evaluation parameters and performance outcomes | (3) So that a 4-foot × 4-foot hole is created, all ventilation barriers are removed; ladders are properly positioned for ventilation; ventilation holes are correctly placed; and smoke, heat, and combustion by-products are released from the structure. |

The task to be performed: The first component is a concise statement of what the person is supposed to do.

Tools, equipment, or materials that must be provided to successfully complete the task: This component ensures that all individuals completing the task are given the same minimal tools, equipment, or materials when being evaluated. By listing these items, the performer and evaluator know what must be provided in order to complete the task.

Evaluation parameters and/or performance outcomes: This component defines how well one must perform each task—for both the performer and evaluator. The JPR guides performance outcomes. This portion of the JPR promotes consistency in evaluation by reducing the variables used to gauge performance.

In addition to these three components, the JPR contains prerequisite knowledge and skills. Just as the term prerequisite suggests, these are the necessary knowledge and skills one must have prior to being able to perform the task. Prerequisite knowledge and skills are the foundation for task performance.

Once the components and prerequisites are put together, the JPR might read as follows:

**Example 1:**

The Fire Fighter I shall ventilate a pitched roof, given an ax, a pike pole, an extension ladder, and a roof ladder; so that a 4-foot × 4-foot hole is created; all ventilation barriers are removed; ladders are properly positioned for ventilation; and ventilation holes are correctly placed.

*Prerequisite Knowledge:* Pitched roof construction, safety considerations with roof ventilation, the dangers associated with improper ventilation, knowledge of ventilation tools, the effects of ventilation on fire growth, smoke movement in structures, signs of backdraft, and the knowledge of vertical and forced ventilation.

*Prerequisite Skills:* Remove roof covering; properly initiate roof cuts; use the pike pole to clear ventilation barriers; use ax properly for sounding, cutting, and stripping; position ladders; and climb and position self on ladder.

**Example 2:**

The Fire Investigator shall interpret burn patterns, given standard equipment and tools and some structural/content remains, so that each individual pattern is evaluated with respect to the burning characteristics of the material involved.

*Prerequisite Knowledge:* Knowledge of fire development and the interrelationship of heat release rate, form, and ignitability of materials.

*Prerequisite Skill:* Interpret the effects of burning characteristics on different types of materials.

## Examples of Potential Uses

**Certification:**

JPRs can be used to establish the evaluation criteria for certification at a specific job level. When used for certification, evaluation must be based on the successful completion of JPRs.

First, the evaluator verifies the attainment of prerequisite knowledge and skills prior to JPR evaluation. This might be through documentation review or testing.

Next, the candidate is evaluated on completing the JPRs. The candidate performs the task and is *evaluated* based on the evaluation parameters and/or performance outcomes. This performance-based evaluation can be either practical (for psychomotor skills* such as "ventilate a roof") or written (for cognitive skills* such as "interpret burn patterns").

Using Example 1, a practical performance-based evaluation would measure the ability to *"ventilate a pitched roof."* The candidate passes this particular evaluation if the standard was met, i.e., a 4-foot × 4-foot hole was created; all ventilation barriers were removed; ladders were properly positioned for ventilation; ventilation holes were correctly placed; and smoke, heat, and combustion by-products were released from the structure.

For Example 2, when evaluating the task *"interpret burn patterns,"* the candidate could be given a written assessment in the form of a scenario, photographs, and drawings and then be asked to respond to specific written questions related to the JPRs evaluation parameters.

> * NOTE: Psychomotor skills are those physical skills that can be demonstrated or observed. Cognitive skills (or mental skills) cannot be observed, but rather are evaluated on how one completes the task (process oriented) or on the task outcome (product oriented).

Remember, when evaluating performance, candidates must be given the tools, equipment, or materials listed in the JPR before they can be properly evaluated, e.g., an ax, a pike pole, an extension ladder, and a roof ladder.

**Curriculum Development/Training Design and Evaluation:**

The statements contained in this document that refer to job performance were designed and written as job performance requirements. While a resemblance to instructional objectives may be present, these statements should not be used in a teaching situation until after they have been modified for instructional use.

Job performance requirements state the behaviors required to perform specific skill(s) on the job, as opposed to a learning situation. These statements should be converted into instructional objectives with behaviors, conditions, and standards that can be measured within the teaching/learning environment. A job performance requirement that requires a fire fighter to "ventilate a pitched roof" should be converted into a measurable instructional objective for use when teaching the skill. (*See Figure C-1.*)

Using Example 1, a terminal instructional objective might read as follows:

The candidate will ventilate a pitched roof, given a simulated roof, an ax, a pike pole, an extension ladder, and a

ICOVE 96

**Converting JPRs into Instructional Objectives**

**JPR**

The Fire Fighter I shall ventilate a pitched roof given an axe, a pike pole, an extension ladder, and a roof ladder so that a 4 foot x 4-foot hole is created, all ventilation barriers are removed, ladders are properly positioned for ventilations, and ventilation holes are correctly placed.

*Prerequisite Knowledge:*

*Pitched roof construction; safety considerations with roof ventilation; the dangers associated with improper ventilation; knowledge of ventilation tools; the effects of ventilation on fire growth; smoke movement in structures; signs of backdraft; and the knowledge of vertical and forced ventilation.*

*Prerequisite Skills:*

*Remove roof covering; properly initiate roof cuts; use the pike pole to clear ventilation barriers; use axe properly for sounding, cutting, and stripping; position ladders; and climb and position self on ladder.*

The JPR, Prerequisite Knowledge, and Pre-requisite Skills are all used as information from which instructional objectives can be written.

JPRs may be converted into any Instructional Objective format. For demonstration purposes, these examples have been written as Terminal and Example Objectives.

**EXAMPLE TERMINAL OBJECTIVES**

**(Cognitive/Knowledge Domain)**

The Fire Fighter shall describe the methods, processes, and safety precautions to be taken in order to perform ventilation on a pitched roof in a safe manner.

**EXAMPLE: ENABLING OBJECTIVES (Cognitive)**

The Fire Fighter shall list the safety precautions to be taken when performing roof ventilation as stated in the "XYZ" ventilation manual, with "X" percent accuracy on a written evaluation.

The Fire Fighter shall explain the effects of ventilation on fire growth as it relates to fire spread, intensity and movement through structures, with "X" percent acccuracy on a written evaluation.

Given the conditions surrounding an incident, the Fire Fighter will identify backdraft, flashover, and other dangerous conditions created by fire and the effects of ventilation on these conditions with "X" percent accuracy on a written evaluation.

**(Psychomotor/Skills Domain) (see example skills checklist)**

The Fire Fighter shall demonstrate ventilating a pitched roof, given the proper tools, within 5 minutes and with 100 percent accuracy on the skills checklist.

**EXAMPLE: ENABLING OBJECTIVES (Psychomotor)**

The Fire Fighter shall demonstrate removing roof covering in order to prepare a roof for ventilation with 100 percent accuracy on the skills checklist.

The Fire Fighter shall demonstrate the removal of ventilation obstructions (ceiling materials, insulation, etc.) in order to clear the ventilation opening with 100 percent accuracy on the skills checklist.

The Fire Fighter shall demonstrate the proper use of firefighting tools used for ventilation with 100 percent accuracy on the skills checklist.

**Figure C-1  Converting JPRs into Instructional Objectives.**

ICOVE 97

## Skills Checklist
## (Roof Ventilation)

**OBJECTIVE:** The Fire Fighter shall demonstrate ventilating a pitched roof, given the proper tools, within 5 minutes and with 100 percent accuracy on the skills checklist.



YES   NO

1. 4' X 4' hole was created.

2. All ventilation barriers were removed.

3. Ladders were properly positioned.

4. Ventilation holes were correctly placed (directly over fire, highest point, etc.).

5. Task completed within 5 minutes.
(Time to complete task: _____ ).

**Figure C-2  Skills Checklist.**

roof ladder, so that 100 percent accuracy is attained on a skills checklist. (At a minimum, the skills checklist should include each of the measurement criteria from the JPR.)

Figure C-2, is a sample checklist for use in evaluating this objective.

While the differences between job performance requirements and instructional objectives are subtle in appearance, the purpose of each statement differs greatly. JPRs state what is necessary to perform the job in the "real world." Instructional objectives, however, are used to identify what students must do at the end of a training session and are stated in behavioral terms that are measurable in the training environment.

By converting JPRs into instructional objectives, instructors will be able to clarify performance expectations and avoid confusion related to using statements designed for purposes other than teaching. Additionally, instructors will be able to add local/state/regional element of performance into the standards as intended by the developers.

Prerequisite skills and knowledge should be converted into enabling objectives. These help to define the course content. The course content should include each of the prerequisite knowledge and skills. Using Figure C-2, the enabling objectives are pitched roof construction, safety considerations with roof ventilation, remove roof covering, properly initiate roof cuts, etc. These ensure that the course content supports the terminal objective.

NOTE: It is assumed that the reader is familiar with curriculum development or training design and evaluation.

### Other Uses

While the professional qualifications standards are principally used to guide the development of training and certification programs, there are a number of other potential uses for these documents. Because they are written in JPR terms, they lend themselves well to any area of the profession where a level of performance or expertise must be determined. Such areas might include:

**Employee Evaluation/Performance Critiquing.** The JPRs can be used as a guide by both the supervisor and the employee during an evaluation. The JPRs for a specific job define tasks that are essential to perform on the job, as well as the evaluation criteria to measure when those tasks are completed.

**Establishing Hiring Criteria.** Professional qualifications standards may be used in a number of ways to further the establishment of hiring criteria. The Authority Having Jurisdiction might simply require certification at a specific job level, e.g., Fire Fighter 1. The JPRs might also be used as the basis for pre-employment screening by establishing essential minimal tasks and the related evaluation criteria. An added benefit is that individuals interested in employment can work toward the minimal hiring criteria at local colleges.

**Employee Development.** The professional qualifications standards can be useful to both the employee and the employer in developing a plan for the individual's growth within the organization. The JPRs and the associated prerequisite skills and knowledge can be used as a guide to determine additional training and education required for the employee to master the job or profession.

**Succession Planning.** Succession planning or career pathing addresses the efficient placement of people into jobs in response to current needs and anticipated future needs. A career development path can be established for targeted individuals to prepare them for growth within the organization. The JPRs and prerequisite knowledge and skills could then be used to develop an educational path to aid in the individual's advancement within the organization or profession.

**Establishing Organizational Policies, Procedures, and Goals.** The JPRs can be incorporated into organizational policies, procedures, and goals where employee performance is addressed.

### Bibliography

Boyatzis, R. E. (1982). *The Competent Manager: A Model For Effective Performance.* New York: John Wiley & Sons.

Castle, D. K. (1989). Management Design: A Competency Approach to Create Exemplar Performers. *Performance and Instruction, 28,* 42-48.

Cetron, M., & O'Toole, T. (1983). *Encounters with the future: A forecast into the 21st century.* New York: McGraw Hill.

Elkin, G. (1990). Competency-Based Human Resource Development: Making Sense of the Ideas. *Industrial & Commercial Training, 22,* 20-25.

Furnham, A. (1990). The Question of Competency. *Personnel Management, 22,* 37.

ICOVE 98

Gilley, J. W., & Eggland, S. A. (1989). *Principles of Human Resource Development*. Reading: Addison-Wesley.

Hooton, J. (1990), *Job Performance = Tasks + Competency x Future Forces*. Unpublished manuscript, Vanderbilt University, Peabody College, Nashville, TN.

McLagan, P. A. (1989). Models for HRD Practice. *Training & Development Journal*, Reprinted.

McLagan, P. A., & Suhadolnik, D. (1989). *The Research Report*. Alexandria, VA: American Society for Training and Development.

Nadler, L. (1983, October). HRD on the Spaceship Earth. *Training and Development Journal*, pp. 19-22.

Nadler, L. (1984). *The Handbook of Human Resource Development*. New York: Weiley-Interscience.

Naisbitt, J., (Speaker). (1984). *Megatrends* (Cassette Recording No. 210). Chicago: Nightingale-Conant.

Spellman, B. P. (1987). Future Competencies of the Educational Public Relations Specialist (Doctoral dissertation, University of Houston, 1987) *Dissertation Abstracts International*, 49, 02A.

Springer, J. (1980). *Job Performance Standards and Measures*. A Series of Research Presentation and Discussions for the ASTD Second Annual Invitational Research Seminar, Savannah, Georgia (November 5-8, 1979). Madison, Wisconsin: American Society for Training and Development.

Tracey, W. R. (1984). *Designing Training and Development Systems*. New York: AMACOM.

## Index

© 1993 National Fire Protection Association. All Rights Reserved.

The copyright in this index is separate and distinct from the copyright in the document which it indexes. The licensing provisions set forth for the document are not applicable to this index. This index may not be reproduced in whole or in part by any means without the express written permission of the National Fire Protection Association, Inc.

**-A-**

**Arrest powers** ................................................ A-3-1.3

**-B-**

**Building systems**
   Inspecting ............................................ 3-2.9, A-3-2.9
   Tampered ............................................... A-3-2.9
**Burn patterns**
   Correlating ................................................ 3-2.6
   Interpreting ............................................... 3-2.5

**-C-**

**Cause of fire, determining** ................................. 3-6.1
**Court**
   Evidence for .............................................. 3-6.2
   Testifying in .............................................. 3-7.4

**-D-**

**Diagramming the scene** ...................... 3-3.1, 3-3.2
**Due process** ............................ 3-1.3, A-3-1.3
   Definition ................................................ Chap. 2
   Issues ...................................................... A-3-1.3

**-E-**

**Evidence**
   As to motive/opportunity ................................ 3-6.5
   Collecting and packaging ................................ 3-4.4
   Corroborative ............................................. 3-6.3
   Disposal of ................................................ 3-4.6
   Documenting chain of custody ........................... 3-4.5
   Selecting for analysis .................................... 3-4.3
**Experts, competencies of** ................................ 3-6.4
**Explosions, discriminating effects of** ................. 3-2.10

**Exterior survey** ........................................... 3-2.3

**-F-**

**Fire debris, examining and removing** .................. 3-2.7
**Fire department**
   Definition ................................................ Chap. 2
**Fire ground, securing** ..................................... 3-2.2
**Fire investigator** .......................................... Chap. 3
   Definition ................................................ Chap. 2
**Fire origin** ................................. see Origin, area of

**-G-**

**General requirements** ........................ 1-3, A-1-3.5

**-I-**

**Interior survey** ........................................... 3-2.4
**Interrogation** ............................... see Interviews
**Interviews** .................................................. 3-5
   Conducting ................................................ 3-5.3
   Evaluating information .................................... 3-5.4
   Planning for .............................................. 3-5.2
**Investigation**
   Definition ................................................ Chap. 2
   Post-incident .................. see Post-incident investigation

**-J-**

**Job performance requirements (JPRs)** .......... 1-2, 1-3, 3-1.1
                                                A-3-1.1, App. C
   Benefit of establishing ................................... App. C
   Components of ............................................ App. C
   Converting into instructional objectives ............... Fig. C-1
   Definition ................................................ Chap. 2
   Examples of potential uses ................................ App. C

**-N-**

**Notes, investigative** ...................................... 3-3.4

ICOVE 99

**-O-**

**Origin, area of**
  Determining ......................................... 3-6.1
  Reconstructing ..................................... 3-2.8


**-P-**

**Photographs** ............................... 3-3.3, A-3-3.3
**Post-incident investigation** ...................... 3-6
  Coordinating expert resources .................. 3-6.4
  Establishing evidence as to motive/opportunity ......... 3-6.5
  Evaluating information ......................... 3-6.3
  Factors beyond the fire scene .................. 3-6.1
  Formulating opinions ........................... 3-6.6
  Gathering reports and records .................. 3-6.2
**Prerequisite knowledge** ........................ App. C
  Definition ..................................... Chap. 2
**Prerequisite skills** ........................... App. C
  Checklist example .............................. Fig. C-2
  Definition ..................................... Chap. 2
**Presentations** .................................. 3-7
  Court .......................................... 3-7.4
  Public informational ........................... 3-7.5
**Purpose of standard** ...................... 1-2, A-1-2


**-R-**

**Records, for court** ............................. 3-6.2
**Reports**
  For court ...................................... 3-6.2

  Preparing ...................................... 3-7.2


**-S-**

**Scene**
  Diagramming .............................. 3-3.1, 3-3.2
  Documenting .................................... 3-3
  Examination .................................... 3-2
  Photographing ............................ 3-3.3, A-3-3.3
**Scope of standard** ............................. 1-1
**Standard equipment and tools**
  Definition ..................................... Chap. 2


**-T-**

**Task**
  Definition ..................................... Chap. 2
**Testifying** .................................... 3-7.4
**Tools**
  Special
    Definition ................................... Chap. 2
  Standard
    Definition ................................... Chap. 2


**-V-**

**Video cameras** ........................... A-3-3.3

1993 Edition

ICOVE 100

FILED

2014 May-22  AM 10:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

Copyright © 2013 National Fire Protection Association®. All Rights Reserved.

# NFPA® 1033

### Standard for

## Professional Qualifications for Fire Investigator

### 2014 Edition

This edition of NFPA 1033, *Standard for Professional Qualifications for Fire Investigator*, was prepared by the Technical Committee on Fire Investigator Professional Qualifications and released by the Technical Correlating Committee on Professional Qualifications. It was issued by the Standards Council on May 28, 2013, with an effective date of June 17, 2013, and supersedes all previous editions.

This edition of NFPA 1033 was approved as an American National Standard on June 17, 2013.

### Origin and Development of NFPA 1033

In 1972, the Joint Council of National Fire Service Organizations (JCNFSO) created the National Professional Qualifications Board (NPQB) for the fire service to facilitate the development of nationally applicable performance standards for uniformed fire service personnel. On December 14, 1972, the board established four technical committees to develop those standards using the National Fire Protection Association (NFPA) standards-making system. The initial committees addressed the following career areas: fire fighter, fire officer, fire service instructor, and fire inspector and investigator.

The original concept of the professional qualification standards as directed by the JCNFSO and the NPQB was to develop an interrelated set of performance standards specifically for the uniformed fire service. The various levels of achievement in the standards were to build upon each other within a strictly defined career ladder. In the late 1980s, revisions of the standards recognized that the documents should stand on their own merit in terms of job performance requirements for a given field. Accordingly, the strict career ladder concept was revised, except for the progression from fire fighter to fire officer, in order to allow civilian entry into many of the fields. These revisions facilitated the use of the documents by other than the uniformed fire services. The Committee on Fire Inspector and Investigator Professional Qualifications met and produced the first edition of NFPA 1031, *Professional Qualifications for Fire Inspector, Fire Investigator, and Fire Prevention Education Officer*. This document was adopted by the NFPA in May of 1977.

In 1986, the joint council directed the committee to develop separate documents for each of the job functions the original document addressed. This direction was coupled with the decision to remove the job of fire investigator from the strict career path previously followed and allow for civilian entry. The first edition of this new document, NFPA 1033, *Standard for Professional Qualifications for Fire Investigator,* was adopted by the NFPA in June of 1987.

In 1990, responsibility for the appointment of professional qualifications committees and the development of the professional qualifications standards was assumed by the NFPA. The Professional Qualifications Correlating Committee was appointed by the NFPA Standards Council and assumed the responsibility for coordinating the requirements of all of the documents in the professional qualifications system.

The NFPA Standards Council established the Technical Committee on Fire Investigator Professional Qualifications in 1990 to address the need for specific expertise in the area of fire investigation to review and revise the existing document. This committee completed a job task analysis and developed specific job performance requirements for the job of fire investigator.

The intent of the Technical Committee on Fire Investigator Professional Qualifications was to develop clear and concise job performance requirements that can be used to determine that an individual, when measured to the standard, possesses the skills and knowledge to perform as a fire investigator. These job performance requirements are applicable to fire investigators both public and private.

NFPA and National Fire Protection Association are registered trademarks of the National Fire Protection Association, Quincy, Massachusetts 02169.

In the 2003 edition of the document, the Technical Committee made changes to bring it into conformance with the new *Manual of Style for NFPA Technical Committee Documents*.

In the 2009 edition of the document, the Technical Committee added an explanatory annex item to the Scope statement. The committee's intent was to clarify that the standard applies to all fire investigation, including outside, vehicle, and other fires that are not structural. The committee added a skills maintenance requirement to Chapter 1 and included more specific Requisite Knowledge statements to various JPRs.

For the 2014 edition, the fire investigator is expected to remain current on the topics listed in the general requirements section of the document by attending formal education courses, workshops, and seminars, and through professional publications and journals. While the technical committee views a high-school level education as a minimum, the fire investigator is expected to maintain up-to-date basic knowledge of topics already projected in the document, as well as knowledge of fire protection systems; evidence documentation, collection, and preservation; and electricity and electric systems. Definitions for *fire analysis*, *fire dynamics*, *fire investigation technology*, and *fire science* have been added. The technical committee has also made clarifications under the evidence collection and preservation section of the document.

ICOVE 102

## Correlating Committee on Professional Qualifications (PQU-AAC)

**William E. Peterson,** *Chair*
Plano, TX [M]
Rep. International Fire Service Training Association

**Douglas P. Forsman,** Champaign Fire Department, IL [E]
**Richard Galtieri,** Washington State Fire Marshal's Office, WA [E]
**R. Kirk Hankins,** Fire Consulting & Case Review International, Inc., MO [SE]
    Rep. International Association of Arson Investigators, Inc.
**Alan E. Joos,** Louisiana State University, LA [SE]
    Rep. North American Fire Training Directors

**Jerrold Prendergast,** Springfield Fire Department, MA [U]
**Willie G. Shelton,** Virginia Department of Fire Programs, VA [E]
    Rep. National Board on Fire Service Professional Qualifications
**Philip C. Stittleburg,** La Farge Fire Department, WI [L]
    Rep. National Volunteer Fire Council

### Alternates

**Frederick W. Piechota, Jr.,** National Board on Fire Service Professional Qualifications, MA [E]
    (Alt. to W. G. Shelton)

### Nonvoting

**Stephen P. Austin,** Cumberland Valley Volunteer Firemen's Association, DE [L]
    Rep. TC on Traffic Control Incident Management Professional Qualifications
**John Michael Brackin,** Kaplan University, MS [U]
    Rep. TC on Accreditation & Certification Professional Qualifications
**Richard W. Carlson,** Okolona Fire Department, KY [U]
    Rep. TC on Fire Inspector Professional Qualifications
**Ernest J. Grant,** North Carolina Jaycee Burn Center, NC [U]
    Rep. TC on Public Fire Educator Professional Qualifications
**Edward M. Hawthorne,** Shell Oil Company, TX [U]
    Rep. TC on Industrial Fire Brigades Professional Qualifications
**Ronald L. Hopkins,** TRACE Fire Protection & Safety Consultant, Ltd., KY [SE]
**Jacklyn Kilby-Richards,** Town of Groton Emergency Dispatch, CT [U]
    Rep. TC on Public Safety Telecommunicator Professional Qualifications
**Randy J. Krause,** Port of Seattle Fire Department, WA [E]
    Rep. TC on Fire Service Occupational Safety and Health

**F. Patrick Marlatt,** Maryland Fire and Rescue Institute, MD [SE]
    Rep. TC on Fire Fighter Professional Qualifications
**Michael S. Mayers,** Hilton Head Island Fire & Rescue, SC [U]
    Rep. TC on Rescue Technician Professional Qualifications
**Gregory G. Noll,** Hildebrand & Noll Associates Inc., PA [SE]
    Rep. TC on Hazardous Materials Response Personnel
**Lawrence L. Preston,** Maryland Fire and Rescue Institute, MD [E]
    Rep. TC on Fire Officer Professional Qualifications
**Jim Stumpf,** Organizational Quality Associates, ID [SE]
    Rep. TC on Wildfire Suppression Professional Qualifications
**R. Paul Valentine,** Nexus Engineering, IL [M]
    Rep. TC on Fire Marshal Professional Qualifications
**George A. Wendt,** Travelers Insurance Company, NJ [I]
    Rep. TC on Fire Investigator Professional Qualifications
**Michael A. Wieder,** Fire Protection Publications, OK [M]
    Rep. TC on Incident Management Professional Qualifications
**Stephen Wilde,** Certified Fleet Services, Inc., IL [U]
    Rep. TC on Emergency Vehicle Mechanic Technicians Professional Qualifications

**Thomas McGowan,** NFPA Staff Liaison

*This list represents the membership at the time the Committee was balloted on the final text of this edition. Since that time, changes in the membership may have occurred. A key to classifications is found at the back of the document.*

NOTE: Membership on a committee shall not in and of itself constitute an endorsement of the Association or any document developed by the committee on which the member serves.

**Committee Scope:** This Committee shall have primary responsibility for the management of the NFPA Professional Qualifications Project and documents related to professional qualifications for fire service, public safety, and related personnel.

ICOVE 103

## Technical Committee on Fire Investigator Professional Qualifications (PQU-FIV)

**George A. Wendt,** *Chair*
Travelers Insurance Company, NJ [I]

**Adrian J. Cales,**   Public Service Enterprise Group, NJ [U]
**Steve Campolo,**   Leviton Manufacturing Company, Inc., NY [M]
 Rep. National Electrical Manufacturers Association
**Karrie J. Clinkinbeard,**   Armstrong Teasdale LLP, MO [U]
**Ryan M. Cox,**   Kodiak Enterprises, Inc., IN [SE]
**Don J. Hancock,**   Insurance Committee for Arson Control, IL [I]
**Daniel P. Heenan,**   U.S. Bureau of Alcohol, Tobacco, Firearms & Explosives, NV [U]
**Patrick M. Kennedy,**   John A. Kennedy & Associates, FL [U]
 Rep. National Association of Fire Investigators
**Todd Kerkhoff,**   Consolidated Fire District #2, KS [U]
**Roger A. Krupp,**   State Farm Fire & Casualty Company, IL [SE]
 Rep. International Association of Arson Investigators, Inc.

**George M. Kusterer,**   Valley Consultants/Investigative Services, PA [M]
 Rep. Bock Water Heaters
**Hunter B. Lacy,**   Donan Engineering Company, NC [SE]
**Michael S. Linscott,**   SEA, Limited, OH [SE]
**Hal C. Lyson,**   Fire Cause Analysis, ND [SE]
**Russell K. Mason,**   Central County Fire and Rescue, MO [U]
**David W. Miller,**   Grinnell Mutual Reinsurance Company, IA [I]
**Gerard J. Naylis,**   Penn Well Company, NJ [M]
**Stuart A. Sklar,**   Fabian, Sklar and King, P.C., MI [U]
**Dennis W. Smith,**   Premier Fire Consulting Services, LLC, IN [SE]
**G. Terry Smith,**   EFI Global, IA [SE]
**Howard S. Stein,**   State of Connecticut, CT [C]
**Christopher Williams,**   Office of the Fire Marshal of Ontario, Canada, Canada [E]

### Alternates

**Phillip W. Fouts,**   U.S. Bureau of Alcohol, Tobacco, Firearms & Explosives, CA [U]
 (Alt. to D. P. Heenan)
**Gregory E. Gorbett,**   John A. Kennedy & Associates, FL [U]
 (Alt. to P. M. Kennedy)
**Gerald A. King,**   Armstrong Teasdale LLP, MO [U]
 (Alt. to K. J. Clinkinbeard)

**James H. Shanley, Jr.,**   Travelers Insurance Company, CT [I]
 (Alt. to G. A. Wendt)
**Jack A. Ward,**   Jack Ward Fire Consultants, LLC, FL [SE]
 (Alt. to R. A. Krupp)
**Charles R. Watson,**   SEA, Limited, GA [SE]
 (Alt. to M. S. Linscott)

### Nonvoting

**Michael L. Donahue,**   U.S. Department of Homeland Security, MD [U]
**Woodrow W. Stratton,**   U.S. Department of Homeland Security, MD [U]
 (Alt. to M. L. Donahue)

**Thomas McGowan,** NFPA Staff Liaison

*This list represents the membership at the time the Committee was balloted on the final text of this edition. Since that time, changes in the membership may have occurred. A key to classifications is found at the back of the document.*

NOTE: Membership on a committee shall not in and of itself constitute an endorsement of the Association or any document developed by the committee on which the member serves.

**Committee Scope:** This Committee shall have primary responsibility for documents on professional qualifications required of fire investigators.


**ICOVE 104**

## Contents

**Chapter 1  Administration** ...................................... **1033**– 6

  1.1  Scope............................................. **1033**– 6

  1.2  Purpose .......................................... **1033**– 6

  1.3  General........................................... **1033**– 6

**Chapter 2  Referenced Publications** ..................... **1033**– 6

  2.1  General........................................... **1033**– 6

  2.2  NFPA Publications. (Reserved)..................... **1033**– 6

  2.3  Other Publications ............................... **1033**– 6

  2.4  References for Extracts in Mandatory
       Sections. (Reserved) ........................... **1033**– 6

**Chapter 3  Definitions**............................................ **1033**– 6

  3.1  General........................................... **1033**– 6

  3.2  NFPA Official Definitions ................................. **1033**– 6

  3.3  General Definitions ........................................ **1033**– 7

**Chapter 4  Fire Investigator** ................................... **1033**– 7

  4.1  General.......................................... **1033**– 7

  4.2  Scene Examination .................................... **1033**– 7

  4.3  Documenting the Scene.................................. **1033**– 8

  4.4  Evidence Collection/Preservation ............ **1033**– 9

  4.5  Interview......................................... **1033**– 9

    4.6  Post-Incident Investigation................ **1033**–10

    4.7  Presentations .................................... **1033**–10

**Annex A   Explanatory Material** ............................ **1033**–10

**Annex B   Explanation of the Standard and
           Concepts of JPRs** ................................. **1033**–12

**Annex C   Informational References** ...................... **1033**–15

**Index** .................................................................. **1033**–16

ICOVE 105

**NFPA 1033**

**Standard for**

# Professional Qualifications
# for Fire Investigator

**2014 Edition**

*IMPORTANT NOTE: This NFPA document is made available for use subject to important notices and legal disclaimers. These notices and disclaimers appear in all publications containing this document and may be found under the heading "Important Notices and Disclaimers Concerning NFPA Documents." They can also be obtained on request from NFPA or viewed at www.nfpa.org/disclaimers.*

NOTICE: An asterisk (*) following the number or letter designating a paragraph indicates that explanatory material on the paragraph can be found in Annex A.

Changes other than editorial are indicated by a vertical rule beside the paragraph, table, or figure in which the change occurred. These rules are included as an aid to the user in identifying changes from the previous edition. Where one or more complete paragraphs have been deleted, the deletion is indicated by a bullet (•) between the paragraphs that remain.

Information on referenced publications can be found in Chapter 2 and Annex C.

## Chapter 1  Administration

**1.1\* Scope.** This standard identifies the minimum job performance requirements (JPRs) for fire investigators.

**1.2    \* Purpose.** The purpose of this standard shall be to specify the minimum job performance requirements for serving as a fire investigator in both the private and public sectors.

**1.2.1**  It is not the intent of this standard to restrict any jurisdiction from exceeding the minimum requirements.

**1.2.2**  Job performance requirements for each duty are the tasks an individual must be able to perform in order to successfully carry out that duty; however, they are not intended to measure a level of knowledge. Together, the duties and job performance requirements define the parameters of the job of fire investigator.

**1.3 General.**

**1.3.1**  The fire investigator shall be at least age 18.

**1.3.2**  The fire investigator shall have a high school diploma or equivalent.

**1.3.3**  The authority having jurisdiction shall conduct a thorough background and character investigation prior to accepting an individual as a candidate for certification as a fire investigator.

**1.3.4**  The job performance requirements for fire investigator shall be completed in accordance with established practices and procedures or as they are defined by law or by the authority having jurisdiction.

**1.3.5**  \* The job performance requirements found in this stan- dard are not required to be mastered in the order they appear.  Training agencies or authorities shall establish instructional pri-

ority and the training program content to prepare individuals to meet the job performance requirements of this standard.

**1.3.6**    \* Evaluation of job performance requirements shall be by individuals who are qualified and approved by the authority having jurisdiction.

**1.3.7**    \* The investigator shall have and maintain at a minimum an up-to-date basic knowledge of the following topics beyond the high school level:

(1) Fire science
(2) Fire chemistry
(3) Thermodynamics
(4) Thermometry
(5) Fire dynamics
(6) Explosion dynamics
(7) Computer fire modeling
(8) Fire investigation
(9) Fire analysis
(10) Fire investigation methodology
(11) Fire investigation technology
(12) Hazardous materials
(13) Failure analysis and analytical tools
(14) Fire protection systems
(15) Evidence documentation, collection, and preservation
(16) Electricity and electrical systems

**1.3.8**    \* The fire investigator shall remain current in the topics listed in 1.3.7 by attending formal education courses, workshops, and seminars and/or through professional publications and journals.

## Chapter 2    Referenced Publications

**2.1 General.** The documents or portions thereof listed in this chapter are referenced within this standard and shall be considered part of the requirements of this document.

**2.2 NFPA Publications. (Reserved)**

**2.3 Other Publications.**

*Merriam-Webster's Collegiate Dictionary,* 11th edition, Merriam-Webster, Inc., Springfield, MA, 2003.

**2.4 References for Extracts in Mandatory Sections. (Reserved)**

## Chapter 3    Definitions

**3.1 General.** The definitions contained in this chapter shall apply to the terms used in this standard. Where terms are not defined in this chapter or within another chapter, they shall be defined using their ordinarily accepted meanings within the context in which they are used. *Merriam-Webster's Collegiate Dictionary,* 11th edition, shall be the source for the ordinarily accepted meaning.

**3.2 NFPA Official Definitions.**

**3.2.1\* Approved.**   Acceptable to the authority having jurisdiction.

**3.2.2**     \* **Authority Having Jurisdiction (AHJ).**     An organization, office, or individual responsible for enforcing the requirements of a code or standard, or for approving equipment, materials, an installation, or a procedure.

ICOVE 106

**3.2.3 Labeled.** Equipment or materials to which has been attached a label, symbol, or other identifying mark of an organization that is acceptable to the authority having jurisdiction and concerned with product evaluation, that maintains periodic inspection of production of labeled equipment or materials, and by whose labeling the manufacturer indicates compliance with appropriate standards or performance in a specified manner.

**3.2.4          * Listed.** Equipment, materials, or services included in a  list published by an organization that is acceptable to the author- ity having jurisdiction and concerned with evaluation of products or services, that maintains periodic inspection of production of listed equipment or materials or periodic evaluation of services, and whose listing states that either the equipment, material, or service meets appropriate designated standards or has been tested and found suitable for a specified purpose.

**3.2.5 Shall.** Indicates a mandatory requirement.

**3.2.6 Should.** Indicates a recommendation or that which is advised but not required.

**3.2.7 Standard.** A document, the main text of which contains only mandatory provisions using the word "shall" to indicate requirements and which is in a form generally suitable for mandatory reference by another standard or code or for adoption into law. Nonmandatory provisions are not to be considered a part of the requirements of a standard and shall be located in an appendix, annex, footnote, informational note, or other means as permitted in the *Manual of Style for NFPA Technical Committee Documents*.

**3.3  General Definitions.**

**3.3.1 Due Process.** The compliance with the criminal and civil laws and procedures within the jurisdiction where the incident occurred.

**3.3.2 Fire Analysis.** The process of determining the origin, cause, development, responsibility, and, when required, failure analysis of a fire or explosion.

**3.3.3 Fire Department.** An organization providing rescue, fire suppression, and related activities. For the purposes of this standard, the term "fire department" includes any public, private, or military organization engaging in this type of activity.

**3.3.4 Fire Dynamics.** The detailed study of how chemistry, fire science, and the engineering disciplines of fluid mechanics and heat transfer interact to influence fire behavior.

**3.3.5 Fire Investigation.** The process of determining the origin, cause, and development of a fire or explosion.

**3.3.6 Fire Investigation Technology.** Applied technology subjects related to and used in fire investigation including, but not limited to, specialized knowledge and skills in documentation of the investigation, scene and evidence processing, and failure analysis and analytical tools.

**3.3.7 Fire Investigator.** An individual who has demonstrated the skills and knowledge necessary to conduct, coordinate, and complete a fire investigation.

**3.3.8 Fire Science.** The body of knowledge concerning the study of fire and related subjects (such as combustion, flame, products of combustion, heat release, heat transfer, fire and explosion chemistry, fire and explosion dynamics, thermodynamics, kinetics, fluid mechanics, fire safety) and their interaction with people, structures, and the environment.

**3.3.9 Job Performance Requirement.** A statement that describes a specific job task, lists the items necessary to complete the task, and defines measurable or observable outcomes and evaluation areas for the specific task.

**3.3.10 Requisite Knowledge.** Fundamental knowledge one must have in order to perform a specific task.

**3.3.11 Requisite Skills.** The essential skills one must have in order to perform a specific task.

**3.3.12 Task.** A specific job behavior or activity.

**3.3.13 Tools.**

**3.3.13.1* *Investigator's Special Tools*.** Tools of a specialized or unique nature that might not be required for every fire investigation.

**3.3.13.2 * *Standard Equipment and Tools*.** Investigator's tools and equipment that every investigator must carry.

## Chapter 4   Fire Investigator

**4.1 General.**

**4.1.1*** The fire investigator shall meet the job performance requirements defined in Sections 4.2 through 4.7.

**4.1.2          *** The fire investigator shall employ all elements of the scientific method as the operating analytical process through- out the investigation and for the drawing of conclusions.

**4.1.3          *** Because fire investigators are required to perform ac- tivities in adverse conditions, site safety assessments shall be completed on all scenes and regional and national safety stan- dards shall be followed and included in organizational poli- cies and procedures.

**4.1.4          *** The fire investigator shall maintain necessary liaison with other interested professionals and entities.

**4.1.5          *** The fire investigator shall adhere to all applicable legal and regulatory requirements.

**4.1.6** The fire investigator shall understand the organization and operation of the investigative team within an incident management system.

**4.2* Scene Examination.** Duties shall include inspecting and evaluating the fire scene, or evidence of the scene, and/or conducting a comprehensive review of documentation generated during the examination(s) of the scene if the scene is no longer available, so as to determine the area or point of origin, source of ignition, material(s) ignited, and act or activity that brought the ignition source and materials together and to assess the subsequent progression, extinguishment, and containment of the fire.

**4.2.1** Secure the fire ground, given marking devices, sufficient personnel, and special tools and equipment, so that unauthorized persons can recognize the perimeters of the investigative scene and are kept from restricted areas and all evidence or potential evidence is protected from damage or destruction.

**(A) Requisite Knowledge.** Fire ground hazards, types of evidence, and the importance of fire scene security, evidence preservation, and issues relating to spoliation.

**(B) Requisite Skills.** Use of marking devices.



Case 5:13-cv-00895-CLS Document 29-7 Filed 05/22/14 Page 8 of 16

**4.2.2** * Conduct an exterior survey, given standard equipment and tools, so that evidence is identified and preserved, fire damage is interpreted, hazards are identified to avoid injuries, accessibility to the property is determined, and all potential means of ingress and egress are discovered.

**(A) Requisite Knowledge.** The types of building construction and the effects of fire on construction materials, types of evidence commonly found in the perimeter, evidence preservation methods, the effects of fire suppression, fire behavior and spread, fire patterns, and a basic awareness of the dangers of hazardous materials.

**(B) Requisite Skills.** Ability to assess fire ground and structural condition, observe the damage from and effects of the fire, and interpret fire patterns.

**4.2.3** Conduct an interior survey, given standard equipment and tools, so that areas of potential evidentiary value requiring further examination are identified and preserved, the evidentiary value of contents is determined, and hazards are identified in order to avoid injuries.

**(A) Requisite Knowledge.** The types of building construction and interior finish and the effects of fire on those materials, the effects of fire suppression, fire behavior and spread, evidence preservation methods, fire patterns, effects of building contents on fire growth, the relationship of building contents to the overall investigation, weather conditions at the time of the fire, and fuel moisture.

**(B) Requisite Skills.** Ability to assess structural conditions, observe the damage and effects of the fire, discover the impact of fire suppression efforts on fire flow and heat propagation, and evaluate protected areas to determine the presence and/or absence of contents.

**4.2.4** Interpret fire patterns, given standard equipment and tools and some structural or content remains, so that each individual pattern is evaluated with respect to the burning characteristics of the material involved and in context and relationship with all patterns observed and the mechanisms of heat transfer that led to the formation of the pattern.

**(A) Requisite Knowledge.** Fire dynamics, fire development, and the interrelationship of heat release rate, form, and ignitibility of materials.

**(B) Requisite Skills.** Ability to interpret the effects of burning characteristics on different types of materials.

**4.2.5** Interpret and analyze fire patterns, given standard equipment and tools and some structural or content remains, so that fire development is determined, methods and effects of suppression are evaluated, false origin area patterns are recognized, and all areas of origin are correctly identified.

**(A) Requisite Knowledge.** Fire behavior and spread based on fire chemistry, fire dynamics, and physics, fire suppression effects, building construction.

**(B) Requisite Skills.** Ability to interpret variations of fire patterns on different materials with consideration given to heat release rate, form, and ignitibility; distinguish impact of different types of fuel loads; evaluate fuel trails; and analyze and synthesize information.

**4.2.6** Examine and remove fire debris, given standard equipment and tools, so that all debris is checked for fire cause evidence, potential ignition source(s) is identified, and evidence is preserved without investigator-inflicted damage or contamination.

**(A) Requisite Knowledge.** Basic understanding of ignition processes, characteristics of ignition sources, and ease of ignition of fuels; debris-layering techniques; use of tools and equipment during the debris search; types of fire cause evidence commonly found in various degrees of damage; and evidence-gathering methods and documentation.

**(B) Requisite Skills.** Ability to employ search techniques that further the discovery of fire cause evidence and ignition sources, use search techniques that incorporate documentation, and collect and preserve evidence.

**4.2.7** Reconstruct the area of origin, given standard and, if needed, special equipment and tools as well as sufficient personnel, so that all protected areas and fire patterns are identified and correlated to contents or structural remains, items potentially critical to cause determination and photo documentation are returned to their prefire location, and the area(s) or point(s) of origin is discovered.

**(A) Requisite Knowledge.** The effects of fire on different types of material and the importance and uses of reconstruction.

**(B) Requisite Skills.** Ability to examine all materials to determine the effects of fire, identify and distinguish among different types of fire-damaged contents, and return materials to their original position using protected areas and fire patterns.

**4.2.8** * Inspect the performance of building systems, including detection, suppression, HVAC, utilities, and building compart- mentation, given standard and special equipment and tools, so that a determination can be made as to the need for expert resources, an operating system's impact on fire growth and spread is considered in identifying origin areas, defeated and/or failed systems are identified, and the system's poten- tial as a fire cause is recognized.

**(A) Requisite Knowledge.** Different types of detection, suppression, HVAC, utility, and building compartmentation such as fire walls and fire doors; types of expert resources for building systems; the impact of fire on various systems; common methods used to defeat a system's functional capability; and types of failures.

**(B) Requisite Skills.** Ability to determine the system's operation and its effect on the fire; identify alterations to, and failure indicators of, building systems; and evaluate the impact of suppression efforts on building systems.

**4.2.9** Discriminate the effects of explosions from other types of damage, given standard equipment and tools, so that an explosion is identified and its evidence is preserved.

**(A) Requisite Knowledge.** Different types of explosions and their causes, characteristics of an explosion, and the difference between low- and high-order explosions.

**(B) Requisite Skills.** Ability to identify explosive effects on glass, walls, foundations, and other building materials; distinguish between low- and high-order explosion effects; and analyze damage to document the blast zone and origin.

**4.3 Documenting the Scene.** Duties shall include diagramming the scene, photographing, and taking field notes to be used to compile a final report.

**4.3.1** Diagram the scene, given standard tools and equipment, so that the scene is accurately represented and evidence, pertinent contents, significant patterns, and area(s) or point(s) of origin are identified.

ICOVE 108

**(A) Requisite Knowledge.** Commonly used symbols and legends that clarify the diagram, types of evidence and patterns that need to be documented, and formats for diagramming the scene.

**(B) Requisite Skills.** Ability to sketch the scene, basic drafting skills, and evidence recognition and observational skills.

**4.3.2** * Photographically document the scene, given standard tools and equipment, so that the scene is accurately depicted and the photographs support scene findings.

**(A) Requisite Knowledge.** Working knowledge of high-resolution camera and flash, the types of film, media, and flash available, and the strengths and limitations of each.

**(B) Requisite Skills.** Ability to use a high-resolution camera, flash, and accessories.

**4.3.3** Construct investigative notes, given a fire scene, available documents (e.g., prefire plans and inspection reports), and interview information, so that the notes are accurate, provide further documentation of the scene, and represent complete documentation of the scene findings.

**(A) Requisite Knowledge.** Relationship between notes, diagrams, and photos, how to reduce scene information into concise notes, and the use of notes during report writing and legal proceedings.

**(B) Requisite Skills.** Data-reduction skills, note-taking skills, and observational and correlating skills.

**4.4 Evidence Collection/Preservation.** Duties shall include using proper physical and legal procedures to identify, document, collect, and preserve evidence required within the investigation.

**4.4.1** Utilize proper procedures for managing victims and fatalities, given a protocol and appropriate personnel, so that all evidence is discovered and preserved and the protocol procedures are followed.

**(A) Requisite Knowledge.** Types of evidence associated with fire victims and fatalities and evidence preservation methods.

**(B) Requisite Skills.** Observational skills and the ability to apply protocols to given situations.

**4.4.2** * Locate, document, collect, label, package, and store evidence, given standard or special tools and equipment and evidence collection materials, so that it is properly identified, preserved, collected, packaged, and stored for use in testing, legal, or other proceedings and examinations, ensuring cross- contamination and investigator-inflicted damage to eviden- tiary items is avoided and the chain of custody is established.

**(A) Requisite Knowledge.** Types of evidence, authority requirements, impact of removing evidentiary items on civil or criminal proceedings (exclusionary or fire-cause supportive evidence), types, capabilities, and limitations of standard and special tools used to locate evidence, types of laboratory tests available, packaging techniques and materials, and impact of evidence collection on the investigation.

**(B) Requisite Skills.** Ability to recognize different types of evidence and determine whether evidence is critical to the investigation.

**4.4.3** Select evidence for analysis, given all information from the investigation, so that items for analysis support specific investigation needs.

**(A) Requisite Knowledge.** Purposes for submitting items for analysis, types of analytical services available, and capabilities and limitations of the services performing the analysis.

**(B) Requisite Skills.** Ability to evaluate the fire incident to determine forensic, engineering, or laboratory needs.

**4.4.4** Maintain a chain of custody, given standard investigative tools, marking tools, and evidence tags or logs, so that written documentation exists for each piece of evidence and evidence is secured.

**(A) Requisite Knowledge.** Rules of custody and transfer procedures, types of evidence (e.g., physical evidence obtained at the scene, photos, and documents), and methods of recording the chain of custody.

**(B) Requisite Skills.** Ability to execute the chain of custody procedures and accurately complete necessary documents.

**4.4.5** Dispose of evidence, given jurisdictional or agency regulations and file information, so that the disposal is timely, safely conducted, and in compliance with jurisdictional or agency requirements.

**(A) Requisite Knowledge.** Disposal services available and common disposal procedures and problems.

**(B) Requisite Skills.** Documentation skills.

**4.5 Interview.** Duties shall include obtaining information regarding the overall fire investigation from others through verbal communication.

**4.5.1** Develop an interview plan, given no special tools or equipment, so that the plan reflects a strategy to further determine the fire cause and affix responsibility and includes a relevant questioning strategy for each individual to be interviewed that promotes the efficient use of the investigator's time.

**(A) Requisite Knowledge.** Persons who can provide information that furthers the fire cause determination or the affixing of responsibility, types of questions that are pertinent and efficient to ask of different information sources (first responders, neighbors, witnesses, suspects, and so forth), and pros and cons of interviews versus document gathering.

**(B) Requisite Skills.** Planning skills, development of focused questions for specific individuals, and evaluation of existing file data to help develop questions and fill investigative gaps.

**4.5.2** Conduct interviews, given incident information, so that pertinent information is obtained, follow-up questions are asked, responses to all questions are elicited, and the response to each question is documented accurately.

**(A) Requisite Knowledge.** Types of interviews, personal information needed for proper documentation or follow-up, documenting methods and tools, and types of nonverbal communications and their meaning.

**(B) Requisite Skills.** Ability to adjust interviewing strategies based on deductive reasoning, interpret verbal and nonverbal communications, apply legal requirements applicable, and exhibit strong listening skills.

**4.5.3** Evaluate interview information, given interview transcripts or notes and incident data, so that all interview data is individually analyzed and correlated with all other interviews, corroborative and conflictive information is documented, and new leads are developed.

**(A) Requisite Knowledge.** Types of interviews, report evaluation methods, and data correlation methods.



**(B) Requisite Skills.** Data correlation skills and the ability to evaluate source information (e.g., first responders and other witnesses).

**4.6 Post-Incident Investigation.** Duties shall include the investigation of all factors beyond the fire scene at the time of the origin and cause determination.

**4.6.1** Gather reports and records, given no special tools, equipment, or materials, so that all gathered documents are applicable to the investigation, complete, and authentic; the chain of custody is maintained; and the material is admissible in a legal proceeding.

**(A) Requisite Knowledge.** Types of reports needed that facilitate determining responsibility for the fire (e.g., police reports, fire reports, insurance policies, financial records, deeds, private investigator reports, outside photos, and videos) and location of these reports.

**(B) Requisite Skills.** Ability to identify the reports and documents necessary for the investigation, implement the chain of custody, and organizational skills.

**4.6.2** Evaluate the investigative file, given all available file information, so that areas for further investigation are identified, the relationship between gathered documents and information is interpreted, and corroborative evidence and information discrepancies are discovered.

**(A) Requisite Knowledge.** File assessment and/or evaluation methods, including accurate documentation practices, and requisite investigative elements.

**(B) Requisite Skills.** Information assessment, correlation, and organizational skills.

**4.6.3** Coordinate expert resources, given the investigative file, reports, and documents, so that the expert's competencies are matched to the specific investigation needs, financial expenditures are justified, and utilization clearly furthers the investigative goals of determining cause or affixing responsibility.

**(A) Requisite Knowledge.** How to assess one's own expertise, qualification to be called for expert testimony, types of expert resources (e.g., forensic, CPA, polygraph, financial, human behavior disorders, and engineering), and methods to identify expert resources.

**(B) Requisite Skills.** Ability to apply expert resources to further the investigation by networking with other investigators to identify experts, questioning experts relative to their qualifications, and developing a utilization plan for use of expert resources.

**4.6.4** Establish evidence as to motive and/or opportunity, given an incendiary fire, so that the evidence is supported by documentation and meets the evidentiary requirements of the jurisdiction.

**(A) Requisite Knowledge.** Types of motives common to incendiary fires, methods used to discover opportunity, and human behavioral patterns relative to fire-setting.

**(B) Requisite Skills.** Financial analysis, records gathering and analysis, interviewing, and interpreting fire scene information and evidence for relationship to motive and/or opportunity.

**4.6.5** * Formulate an opinion concerning origin, cause, or re- sponsibility for the fire, given all investigative findings, so that the opinion regarding origin, cause, or responsibility for a fire is supported by the data, facts, records, reports, documents, and evidence.

**(A) Requisite Knowledge.** Analytical methods and procedures (e.g., hypothesis development and testing, systems analysis, time lines, link analysis, fault tree analysis, and data reduction matrixing).

**(B) Requisite Skills.** Analytical and assimilation skills.

**4.7 Presentations.** Duties shall include the presentation of findings to those individuals not involved in the actual investigations.

**4.7.1\*** Prepare a written report, given investigative findings, documentation, and a specific audience, so that the report accurately reflects the investigative findings, is concise, expresses the investigator's opinion, contains facts and data that the investigator relies on in rendering an opinion, contains the reasoning of the investigator by which each opinion was reached, and meets the needs or requirements of the intended audience(s).

**(A) Requisite Knowledge.** Elements of writing, typical components of a written report, and types of audiences and their respective needs or requirements.

**(B) Requisite Skills.** Writing skills, ability to analyze information and determine the reader's needs or requirements.

**4.7.2** Express investigative findings verbally, given investigative findings, notes, a time allotment, and a specific audience, so that the information is accurate, the presentation is completed within the allotted time, and the presentation includes only need-to-know information for the intended audience.

**(A) Requisite Knowledge.** Types of investigative findings, the informational needs of various types of audiences, and the impact of releasing information.

**(B) Requisite Skills.** Communication skills and ability to determine audience needs and correlate findings.

**4.7.3** Testify during legal proceedings, given investigative findings, contents of reports, and consultation with legal counsel, so that all pertinent investigative information and evidence are presented clearly and accurately and the investigator's demeanor and attire are appropriate to the proceedings.

**(A) Requisite Knowledge.** Types of investigative findings, types of legal proceedings, professional demeanor requirements, and an understanding of due process and legal proceedings.

**(B) Requisite Skills.** Communication and listening skills and ability to differentiate facts from opinion and determine accepted procedures, practices, and etiquette during legal proceedings.

•

## Annex A   Explanatory Material

*Annex A is not a part of the requirements of this NFPA document but is included for informational purposes only. This annex contains explanatory material, numbered to correspond with the applicable text paragraphs.*

**A.1.1** The intent of this standard applies to all fire investigation, including outside, wildland, vehicle, and structural fires.

**A.1.2** See Annex B.

**A.1.3.5** See Annex B.

 2014 Edition

**ICOVE 110**

**A.1.3.6** Those responsible for conducting evaluations should have experience levels or qualifications exceeding those being evaluated or be certified as a fire investigator by an accredited agency, and be trained or qualified to conduct performance evaluations. The latter, for authorities having jurisdiction, can be based on instructor certification. Many agencies select specialists to evaluate various sections of Chapter 4, which the committee accepts as best practice.

**A.1.3.7** Basic up-to-date information on these topics can be found in the current edition of NFPA 921. NFPA 921 is written on a basic level for competency in fire and explosion investigation and updated on a three-year cycle "to establish guidelines and recommendations for the safe and systematic investigation or analysis of fire and explosion incidents" and "is designed to produce a systematic, working framework or outline by which effective fire and explosion investigation and origin and cause analysis can be accomplished." As stated in NFPA 921, "[It] is not intended as a comprehensive scientific or engineering text. Although many scientific and engineering concepts are presented within the text, the user is cautioned that these concepts are presented at an elementary level and additional technical sources, training, and education may often need to be utilized in an investigation…. The documents or portions thereof listed in this [document] are referenced within this guide and shall be considered part of the requirements of this document."

**A.1.3.8** Fire investigation technology and practices are changing rapidly. It is essential for an investigator's performance and knowledge to remain current. It is recommended that investigators be familiar with the technical information and procedural guidance presented in materials such as NFPA 921 and *Fire Protection Handbook*.

**A.3.2.1 Approved.** The National Fire Protection Association does not approve, inspect, or certify any installations, procedures, equipment, or materials; nor does it approve or evaluate testing laboratories. In determining the acceptability of installations, procedures, equipment, or materials, the authority having jurisdiction may base acceptance on compliance with NFPA or other appropriate standards. In the absence of such standards, said authority may require evidence of proper installation, procedure, or use. The authority having jurisdiction may also refer to the listings or labeling practices of an organization that is concerned with product evaluations and is thus in a position to determine compliance with appropriate standards for the current production of listed items.

**A.3.2.2 Authority Having Jurisdiction (AHJ).** The phrase "authority having jurisdiction," or its acronym AHJ, is used in NFPA documents in a broad manner, since jurisdictions and approval agencies vary, as do their responsibilities. Where public safety is primary, the authority having jurisdiction may be a federal, state, local, or other regional department or individual such as a fire chief; fire marshal; chief of a fire prevention bureau, labor department, or health department; building official; electrical inspector; or others having statutory authority. For insurance purposes, an insurance inspection department, rating bureau, or other insurance company representative may be the authority having jurisdiction. In many circumstances, the property owner or his or her designated agent assumes the role of the authority having jurisdiction; at government installations, the commanding officer or departmental official may be the authority having jurisdiction.

**A.3.2.4 Listed.** The means for identifying listed equipment may vary for each organization concerned with product evalu-

ation; some organizations do not recognize equipment as listed unless it is also labeled. The authority having jurisdiction should utilize the system employed by the listing organization to identify a listed product.

**A.3.3.13.1 Investigator's Special Tools.** Examples include heavy equipment, hydrocarbon detectors, ignitible liquid detection canine teams, microscopes, flash point testers, and so forth.

**A.3.3.13.2 Standard Equipment and Tools.** An investigator's standard equipment and tools include a high-resolution camera, flash, and film or media; a flashlight; a shovel; a broom; hand tools; a tape measure or other measuring device; safety clothing and equipment; and evidence collection equipment and supplies. Examples of safety clothing and equipment are found in the safety chapter of NFPA 921.

**A.4.1.1** Job Performance Requirements (JPRs) are organized according to duties. Duties describe major job functions and result from a job task analysis. JPRs, in total, define the tasks that investigators must be able to perform to be qualified; however, it is not logical, nor the committee's intent, that each and every JPR be performed during each investigation. Rather, the investigator should correctly apply selected JPRs as related to the investigation demands or the individual responsibilities.

**A.4.1.2** The basic methodology for fire investigation involves collecting data, then developing and testing hypotheses (*see the methodology chapter of NFPA 921*). The methodology recommended is the scientific method. Key steps in the scientific method are as follows:

(1) Recognizing the need
(2) Defining the problem
(3) Collecting data
(4) Analyzing the data
(5) Developing the hypothesis
(6) Testing the hypothesis
(7) Selecting final hypothesis

Developing hypotheses is an ongoing process of data collection and evaluation that happens throughout the investigation. Hypotheses are generally developed and tested for evaluating fire spread and growth, evaluating the nature of fire patterns, and determining origin, cause, and responsibility.

Testing of hypotheses can be either experimental or cognitive. Ultimately, the hypotheses and conclusions reached are only as dependable as the data used or available. Each investigator must apply a level of confidence in that opinion. For additional information regarding evaluation methods see ASTM E 678, *Standard Practice for Evaluation of Scientific or Technical Data*.

**A.4.1.3** For additional information concerning safety requirements or training, see applicable local, state, or federal occupational safety and health regulations and *Safety at Scenes of Fire and Related Incidents*.

**A.4.1.4** Fire investigators are encouraged to interact with other professionals or organizations in their respective communities. The interaction is important for the effective transfer of information, which can be general, such as what is related in training seminars or journals, or specific to one particular incident.

**A.4.1.5** It is understood that fire investigators with arrest powers, fire investigators without arrest powers, and private sector fire investigators can utilize this standard. The following is a

ICOVE 111

list of those legal and regulatory requirements that are critical within the fire investigation field. It is the responsibility of the AHJ to select those issues that are pertinent to its respective agency or organization. Those selected issues should then serve as the measurement criteria or training guideline for the AHJ.

Due process issues (stated in task terms) are as follows: Conduct search and seizure, conduct arrests, conduct interviews, maintain chain of custody, utilize criminal and civil statutes applicable to the situation, and interpret and utilize contract law and insurance law. Show due process of civil rights laws, privacy laws, the fair credit reporting act, laws of trespass and invasion of privacy, laws of libel and slander, laws of punitive damages and attorney-client privilege, rules of evidence including spoliation, and other laws applicable to the AHJ.

**A.4.2** Documents reviewed when a scene is not otherwise available can include but not be limited to incident reports, notes, photographs, diagrams and sketches, evidence, witness statements, test results, laboratory reports, and other information that would assist in the determination of the origin and cause.

**A.4.2.2** For additional information concerning safety requirements or training, see applicable local, state, or federal occupational safety and health regulations; *Safety at Scenes of Fire and Related Incidents*; IAAI *Fire Investigator Safety Checklist*; NFPA 472; *Hazardous Materials for Fire and Explosion Investigators: Guidelines and Procedures*; *Safety and Health Guidelines for Fire and Explosion Investigators*; and the safety chapter of NFPA 921.

**A.4.2.8** Examples of tampered systems are fire doors propped open, sprinkler systems shut down, and detection systems disabled. Examples of system failures include construction features such as compartmentation or fire doors that do not confine a fire, sprinkler systems that do not control a fire, smoke control systems that do not function correctly, HVAC systems that do not perform adequately, and alarm systems that fail to provide prompt notification. It is always important to consider the design and intention of the system. Investigators should keep in mind the possibility that systems might not have failed to function, but rather, might have been overcome by the fire development.

**A.4.3.2** The use of a high-resolution camera is highly recommended. The use of various video camera systems to supplement visual documentation can be utilized and is encouraged.

**A.4.4.2** Fire investigators should determine and identify in advance what authority and specific need each may have to seize and hold item(s) considered to be evidence. Where such authority or need is lacking, items should not be seized.

For additional information regarding evidence collection methods, see ASTM E 860, *Standard Practice for Examining and Preparing Items That Are or May Become Involved in Criminal or Civil Litigation*.

For additional information regarding evidence collection methods, see ASTM E 1188, *Standard Practice for Collection and Preservation of Information and Physical Items by a Technical Investigator*.

**A.4.6.5** For additional information regarding evaluation methods, see ASTM E 678, *Standard Practice for Evaluation of Scientific or Technical Data*.

**A.4.7.1** For additional information regarding the contents of a written report and evaluation methods, see ASTM E 620, *Standard Practice for Reporting Opinions of Scientific or Technical Experts*, and ASTM E 678, *Standard Practice for Evaluation of Scientific or Technical Data*.

 2014 Edition

## Annex B   Explanation of the Standard and Concepts of JPRs

*This annex is not a part of the requirements of this NFPA document but is included for informational purposes only.*

**B.1 Explanation of the Standard and Concepts of Job Performance Requirements (JPRs).** The primary benefit of establishing national professional qualification standards is to provide both public and private sectors with a framework of the job requirements for the fire service. Other benefits include enhancement of the profession, individual as well as organizational growth and development, and standardization of practices.

NFPA professional qualification standards identify the minimum JPRs for specific fire service positions. The standards can be used for training design and evaluation, certification, measuring and critiquing on-the-job performance, defining hiring practices, and setting organizational policies, procedures, and goals. (Other applications are encouraged.)

Professional qualification standards for a specific job are organized by major areas of responsibility defined as duties. For example, the fire fighter's duties might include fire suppression, rescue, and water supply; the public fire educator's duties might include education, planning and development, and administration. Duties are major functional areas of responsibility within a job.

The professional qualifications standards are written as JPRs. JPRs describe the performance required for a specific job. JPRs are grouped according to the duties of a job. The complete list of JPRs for each duty defines what an individual must be able to do in order to successfully perform that duty. Together, the duties and their JPRs define the job parameters; that is, the standard as a whole is a job description.

**B.2 Breaking Down the Components of a JPR.** The JPR is the assembly of three critical components. *(See Table B.2.)* These components are as follows:

(1) Task that is to be performed
(2) Tools, equipment, or materials that must be provided to successfully complete the task
(3) Evaluation parameters and/or performance outcomes

**Table B.2  Example of a JPR**

| (1) Task | (1) Ventilate a pitched roof |
|---|---|
| (2) Tools, equipment, or materials | (2) Given an ax, a pike pole, an extension ladder, and a roof ladder |
| (3) Evaluation parameters and performance outcomes | (3) So that a 4 ft × 4 ft hole is created, all ventilation barriers are removed, ladders are properly positioned for ventilation, ventilation holes are correctly placed, and smoke, heat, and combustion by-products are released from the structure |

ICOVE 112

**B.2.1 The Task to Be Performed.** The first component is a concise, brief statement of what the person is supposed to do.

**B.2.2 Tools, Equipment, or Materials that Must Be Provided to Successfully Complete the Task.** This component ensures that all individuals completing the task are given the same minimal tools, equipment, or materials when being evaluated. By listing these items, the performer and evaluator know what must be provided in order to complete the task.

**B.2.3 Evaluation Parameters and/or Performance Outcomes.** This component defines how well one must perform each task — for both the performer and the evaluator. The JPR guides performance toward successful completion by identifying evaluation parameters and/or performance outcomes. This portion of the JPR promotes consistency in evaluation by reducing the variables used to gauge performance.

In addition to these three components, the JPR contains requisite knowledge and skills. Just as the term *requisite* suggests, these are the necessary knowledge and skills one must have to be able to perform the task. Requisite knowledge and skills are the foundation for task performance.

Once the components and requisites are put together, the JPR might read as follows.

**B.2.3.1 Example 1.** The Fire Fighter I shall ventilate a pitched roof, given an ax, a pike pole, an extension ladder, and a roof ladder, so that a 4 ft × 4 ft hole is created, all ventilation barriers are removed, ladders are properly positioned for ventilation, and ventilation holes are correctly placed.

**(A) Requisite Knowledge.** Pitched roof construction, safety considerations with roof ventilation, the dangers associated with improper ventilation, knowledge of ventilation tools, the effects of ventilation on fire growth, smoke movement in structures, signs of backdraft, and the knowledge of vertical and forced ventilation.

**(B) Requisite Skills.** The ability to remove roof covering; properly initiate roof cuts; use the pike pole to clear ventilation barriers; use an ax properly for sounding, cutting, and stripping; position ladders; and climb and position self on ladder.

**B.2.3.2 Example 2.** The Fire Investigator shall interpret fire patterns, given standard equipment and tools and some structural/content remains, so that each individual pattern is evaluated with respect to the burning characteristics of the material involved.

**(A) Requisite Knowledge.** Knowledge of fire development and the interrelationship of heat release rate, form, and ignitibility of materials.

**(B) Requisite Skills.** The ability to interpret the effects of burning characteristics on different types of materials.

**B.3 Examples of Potential Uses.**

**B.3.1 Certification.** JPRs can be used to establish the evaluation criteria for certification at a specific job level. When used for certification, evaluation must be based on the successful completion of JPRs.

First, the evaluator would verify the attainment of requisite knowledge and skills prior to JPR evaluation. This might be through documentation review or testing.

Next, the candidate would be evaluated on completing the JPRs. The candidate would perform the task and be evaluated based on the evaluation parameters and/or performance outcomes. This performance-based evaluation can be either practical (for psychomotor skills such as "ventilate a roof") or written (for cognitive skills such as "interpret fire patterns").

Note that psychomotor skills are those physical skills that can be demonstrated or observed. Cognitive skills (or mental skills) cannot be observed but are evaluated on how one completes the task (process-oriented) or on the task outcome (product-oriented).

Using Example 1, a practical performance-based evaluation would measure the ability to "ventilate a pitched roof." The candidate passes this particular evaluation if the standard was met — that is, a 4 ft × 4 ft hole was created, all ventilation barriers were removed, ladders were properly positioned for ventilation, ventilation holes were correctly placed, and smoke, heat, and combustion by-products were released from the structure.

For Example 2, to evaluate the task "interpret fire patterns," the candidate could be given a written assessment in the form of a scenario, photographs, and drawings and then be asked to respond to specific written questions related to the JPR's evaluation parameters.

Remember, when evaluating performance, you must give the candidate the tools, equipment, or materials (e.g., an ax, a pike pole, an extension ladder, and a roof ladder) listed in the JPRs before he or she can be properly evaluated.

**B.3.2 Curriculum Development/Training Design and Evaluation.** The statements contained in this document that refer to job performance were designed and written as JPRs. While a resemblance to instructional objectives might be present, these statements should not be used in a teaching situation until after they have been modified for instructional use.

JPRs state the behaviors required to perform specific skill(s) on the job as opposed to a learning situation. These statements should be converted into instructional objectives with behaviors, conditions, and standards that can be measured within the teaching/learning environment. A JPR that requires a fire fighter to "ventilate a pitched roof" should be converted into a measurable instructional objective for use when teaching the skill. *[See Figure B.3.2(a).]*

Using Example 1, a terminal instructional objective might read as follows.

The learner will ventilate a pitched roof, given a simulated roof, an ax, a pike pole, an extension ladder, and a roof ladder, so that 100 percent accuracy is attained on a skills checklist. (At a minimum, the skills checklist should include each of the measurement criteria from the JPR.)

Figure B.3.2(b) is a sample checklist for use in evaluating this objective.

While the differences between job performance requirements and instructional objectives are subtle in appearance, the purpose of each statement differs greatly. JPRs state what is necessary to perform the job in the "real world." Instructional objectives, however, are used to identify what students must do at the end of a training session and are stated in behavioral terms that are measurable in the training environment.

By converting JPRs into instructional objectives, instructors will be able to clarify performance expectations and avoid confusion related to using statements designed for purposes other than teaching. Additionally, instructors will be able to add local/state/regional elements of performance into the standards as intended by the developers.

Requisite skills and knowledge should be converted into enabling objectives. The enabling objectives help to define the course content. The course content should include the

**ICOVE 113**



**FIGURE B.3.2(a)   Converting JPRs into Instructional Objectives.**

requisite knowledge and skills. Using Figure B.3.2(b) as an example, the enabling objectives are pitched roof construction, safety considerations with roof ventilation, removal of roof covering, properly initiated roof cuts, and so forth. These enabling objectives ensure that the course content supports the terminal objective.

Note that it is assumed that the reader is familiar with curriculum development or training design and evaluation.

**B.4 Other Uses.** While the professional qualifications standards are principally used to guide the development of training and certification programs, there are a number of other potential uses for these documents. Because the documents are written in JPR terms, they lend themselves well to any area of the profession where a level of performance or expertise must be determined.

OBJECTIVE: The fire fighter shall demonstrate ventilating a pitched roof, given the proper tools, within 5 minutes and with 100 percent accuracy on the skills checklist.

| YES | NO | |
|-----|-----|---|
| ❏ | ❏ | 1. 4-ft × 4-ft hole was created. |
| ❏ | ❏ | 2. All ventilation barriers were removed. |
| ❏ | ❏ | 3. Ladders were properly positioned. |
| ❏ | ❏ | 4. Ventilation holes were correctly placed (directly over fire, at highest point, and so forth). |
| ❏ | ❏ | 5. The task was completed within 5 minutes. (Time to complete task:_____) |

**FIGURE B.3.2(b)   Skills Checklist.**



ICOVE 114

These areas might include the following:

(1) *Employee Evaluation/Performance Critiquing.* The JPRs can be used as a guide by both the supervisor and the employee during an evaluation. The JPRs for a specific job define tasks that are essential to perform on the job as well as the evaluation criteria to measure when those tasks are completed.

(2) *Establishing Hiring Criteria.* The professional qualifications standards can be used in a number of ways to further the establishment of hiring criteria. The AHJ could simply require certification at a specific job level (e.g., Fire Fighter I). The JPRs could also be used as the basis for pre-employment screening by establishing essential minimal tasks and the related evaluation criteria. An added benefit is that individuals interested in employment can work toward the minimal hiring criteria at local colleges.

(3) *Employee Development.* The professional qualifications standards can be useful to both the employee and the employer in developing a plan for an individual's growth within an organization. The JPRs and the associated requisite knowledge and skills can be used as a guide to determine additional training and education required for the employee to master the job or profession.

(4) *Succession Planning.* Succession planning or career pathing addresses the efficient placement of people into jobs in response to current needs and anticipated future needs. A career development path can be established for targeted individuals to prepare them for growth within an organization. The JPRs and requisite knowledge and skills can then be used to develop an educational path to aid in the individual's advancement within the organization or profession.

(5) *Establishing Organizational Policies, Procedures, and Goals.* The JPRs can be incorporated into organizational policies, procedures, and goals where employee performance is addressed.

## Annex C   Informational References

**C.1 Referenced Publications.** The documents or portions thereof listed in this annex are referenced within the informational sections of this standard and are not part of the requirements of this document unless also listed in Chapter 2 for other reasons.

**C.1.1 NFPA Publications.** National Fire Protection Association, 1 Batterymarch Park, Quincy, MA 02169-7471.

NFPA 472, *Standard for Competence of Responders to Hazardous Materials/Weapons of Mass Destruction Incidents*, 2013 edition.

NFPA 921, *Guide for Fire and Explosion Investigations*, 2011 edition.

*Fire Protection Handbook,* 20th edition.

**C.1.2 Other Publications.**

**C.1.2.1 ASTM Publications.** ASTM International, 100 Barr Harbor Drive, P.O. Box C700, West Conshohocken, PA 19428-2959.

ASTM E 620, *Standard Practice for Reporting Opinions of Scientific or Technical Experts,* 2004.

ASTM E 678, *Standard Practice for Evaluation of Scientific or Technical Data,* 2007.

ASTM E 860, *Standard Practice for Examining and Preparing Items That Are or May Become Involved in Criminal or Civil Litigation,* 2007.

ASTM E 1188, *Standard Practice for Collection and Preservation of Information and Physical Items by a Technical Investigator,* 2011.

**C.1.2.2 IAAI Publications.** International Association of Arson Investigators, 2111 Baldwin Avenue, Suite 203, Crofton, MD 21114.

*Fire Investigator Safety Checklist*, 1997.

**C.1.2.3 IFSTA Publications.** International Fire Service Training Association, 930 North Willis, Stillwater, OK 74078-8045.

*Hazardous Materials for Fire and Explosion Investigators: Guidelines and Procedures,* 1998.

*Safety and Health Guidelines for Fire and Explosion Investigators,* 2002.

**C.1.2.4 Other Publications.**

Munday, J. W., *Safety at Scenes of Fire and Related Incidents*. London: Fire Protection Association, 1994.

**C.2 Informational References.** The following documents or portions thereof are listed here as informational references only. They are not a part of the requirements of this document. These references apply to Annex B material.

Boyatzis, R. E., *The Competent Manager: A Model for Effective Performance*. New York: John Wiley & Sons, 1982.

Castle, D. K., "Management Design: A Competency Approach to Create Exemplar Performers." *Performance and Instruction* 28:1989; 42–48.

Cetron, M., and O'Toole, T., *Encounters with the Future: A Forecast into the 21st Century*. New York: McGraw Hill, 1983.

Elkin, G., "Competency-Based Human Resource Development: Making Sense of the Ideas." *Industrial & Commercial Training* 22:1990; 20–25.

Furnham, A., "The Question of Competency." *Personnel Management* 22:1990; 37.

Gilley, J. W., and Eggland, S. A., *Principles of Human Resource Development*. Reading, MA: Addison-Wesley, 1989.

Hooton, J., *Job Performance = Tasks + Competency × Future Forces.* Unpublished manuscript, Vanderbilt University, Peabody College, Nashville, TN, 1990.

McLagan, P. A., "Models for HRD Practice." *Training & Development Journal.* Reprinted, 1989.

McLagan, P. A., and Suhadolnik, D., *The Research Report.* Alexandria, VA: American Society for Training and Development, 1989.

Nadler, L., "HRD on the Spaceship Earth." *Training and Development Journal,* October 1983; 19–22.

Nadler, L., *The Handbook of Human Resource Development.* New York: Wiley-Interscience, 1984.

Naisbitt, J., *Megatrends,* Chicago: Nightingale-Conant, 1984.

Spellman, B. P., "Future Competencies of the Educational Public Relations Specialist" (Doctoral dissertation, University of Houston, 1987). *Dissertation Abstracts International,* 49:1987; 02A.

Springer, J., *Job Performance Standards and Measures.* A series of research presentations and discussions for the ASTD Second Annual Invitational Research Seminar, Savannah, GA (November 5–8, 1979). Madison, WI: American Society for Training and Development, 1980.

Tracey, W. R., *Designing Training and Development Systems.* New York: AMACOM, 1984.

**C.3 References for Extracts in Informational Sections. (Reserved)**

ICOVE 115

## Index

Copyright © 2013 National Fire Protection Association. All Rights Reserved.

The copyright in this index is separate and distinct from the copyright in the document that it indexes. The licensing provisions set forth for the document are not applicable to this index. This index may not be reproduced in whole or in part by any means without the express written permission of NFPA.

**-A-**

Administration ...................................................... Chap. 1
   General .............................................................. 1.3
   Purpose ....................................................... 1.2, A.1.2
   Scope........................................................... 1.1, A.1.1
Approved
   Definition ............................................. 3.2.1, A.3.2.1
Authority Having Jurisdiction (AHJ)
   Definition ............................................. 3.2.2, A.3.2.2

**-D-**

Definitions ......................................................... Chap. 3
Due Process
   Definition .............................................................. 3.3.1

**-E-**

Explanation of the Standard and Concepts of JPRs .......... Annex B
Explanatory Material.............................................. Annex A

**-F-**

Fire Analysis
   Definition............................................................... 3.3.2
Fire Department
   Definition............................................................... 3.3.3
Fire Dynamics
   Definition............................................................... 3.3.4
Fire Investigation
   Definition............................................................... 3.3.5
Fire Investigation Technology
   Definition............................................................... 3.3.6
Fire Investigator
   Definition............................................................... 3.3.7
Fire Investigator ................................................... Chap. 4
   Documenting the Scene ........................................... 4.3
   Evidence Collection/Preservation ............................. 4.4
   General ................................................................. 4.1
   Interview................................................................ 4.5
   Post-Incident Investigation ....................................... 4.6
   Presentations ......................................................... 4.7
   Scene Examination ......................................... 4.2, A.4.2
Fire Science
   Definition............................................................... 3.3.8

**-I-**

Informational References ........................................ Annex C

**-J-**

Job Performance Requirement
   Definition .............................................................. 3.3.9

**-L-**

Labeled
   Definition .............................................................. 3.2.3
Listed
   Definition ............................................. 3.2.4, A.3.2.4

**-R-**

Referenced Publications........................................... Chap. 2
   General.................................................................. 2.1
   NFPA Publications. (Reserved) ................................. 2.2
   Other Publications .................................................. 2.3
   References for Extracts in Mandatory Sections.
      (Reserved) ......................................................... 2.4
Requisite Knowledge
   Definition .............................................................. 3.3.10
Requisite Skills
   Definition .............................................................. 3.3.11

**-S-**

Shall
   Definition .............................................................. 3.2.5
Should
   Definition .............................................................. 3.2.6
Standard
   Definition .............................................................. 3.2.7

**-T-**

Task
   Definition .............................................................. 3.3.12
Tools
   Definition .............................................................. 3.3.13
   Investigator's Special Tools
      Definition ..................................... 3.3.13.1, A.3.3.13.1
   Standard Equipment and Tools
      Definition ..................................... 3.3.13.2, A.3.3.13.2

ICOVE 116