LOUISVILLE LEXINGTON LONDON FLORENCE CINCINNATI INDIANAPOLIS ORLANDO JACKSONVILLE TAMPA



**KENTUCKIANA**

**— COURT REPORTERS —**

**CASE NO. 18 CV 2523**

**WILLIAM E. AMOR**

V.

**OFFICER MICHAEL CROSS, ET AL.**

**DEPONENT:**

**DAVID ICOVE**

**DATE:**

**August 17, 2021**



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1          IN THE UNITED STATES DISTRICT COURT FOR THE

2                NORTHERN DISTRICT OF ILLINOIS

3                     EASTERN DIVISION

4                  CASE NO. 18 CV 2523

5

6                  WILLIAM E. AMOR,

7                       Plaintiff

8

9                         V.

10

11     OFFICER MICHAEL CROSS, ROBERT GUERRERI, BRIAN

12   CUNNINGHAM, JOHN RIPSKY, AND THE CITY OF NAPERVILLE,

13                     Defendants

14

15

16

17

18

19

20

21

22

23   DEPONENT:  DAVID ICOVE

24   DATE:      AUGUST 17, 2021

25   REPORTER:  LEAH SHARP

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

EXHIBIT 10

```
 1                         APPEARANCES

 2

 3   ON BEHALF OF THE PLAINTIFF, WILLIAM E. AMOR:

 4   Mariah Garcia

 5   Loevy & Loevy

 6   311 North Aberdeen Street

 7   Third Floor

 8   Chicago, Illinois 60607

 9   Telephone No.: (312) 243-5900

10   Facsimile No.: (312) 243-5902

11   E-mail: mariah@loevy.com

12   (Appeared via videoconference)

13

14   ON BEHALF OF THE DEFENDANTS, OFFICER MICHAEL CROSS,

15   ROBERT GUERRERI, BRIAN CUNNINGHAM, JOHN RIPSKY, AND THE

16   CITY OF NAPERVILLE:

17   Joseph Polick

18   The Sotos Law Firm, P.C.

19   141 West Jackson Boulevard

20   Suite 1240A

21   Chicago, Illinois 60604

22   Telephone No.: (630) 735-3300

23   Facsimile No.: (630) 773-0980

24   E-mail: jpolick@jsotoslaw.com

25   (Appeared via videoconference)
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1                          INDEX

 2                                             Page

 3   PROCEEDINGS                                 5

 4   DIRECT EXAMINATION BY MS. GARCIA            6

 5   CROSS EXAMINATION BY MR. POLICK            130

 6

 7

 8                        EXHIBITS

 9   Exhibit                                    Page

10   1 - Disclosure of the Expert Opinion of    11

11         Dr. Icove - ICOVE 01-116

12   2 - Icove & Associates Contract -          12

13         ICOVE 119-122

14   3 - Icove & Associates Invoice 5-7-2020 -  13

15         ICOVE 117

16   4 - Icove & Associates Invoice 7-12-2021 - 13

17         ICOVE 118

18

19    (All exhibits will be forwarded upon receipt.)
```

20

21

22

23

24

25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

```
 1                        STIPULATION

 2

 3   The deposition of DAVID ICOVE was taken at KENTUCKIANA

 4   COURT REPORTERS, 30 SOUTH WACKER DRIVE, 22ND FLOOR,

 5   CHICAGO, ILLINOIS 60606 via videoconference in which all

 6   participants attended remotely on TUESDAY, the 17TH day

 7   of AUGUST 2021 at 9:33 a.m.; said deposition was taken

 8   pursuant to the FEDERAL Rules of Civil Procedure The

 9   oath in this matter was sworn remotely pursuant to

10   FRCP 30.

11

12   It is agreed that LEAH SHARP, being a Notary Public and

13   Court Reporter, may swear the witness and that the

14   reading and signing of the completed transcript by the

15   witness is not waived.

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1               PROCEEDINGS

2

3       COURT REPORTER:  We are now on the record.  My

4  name is Leah Sharp.  I'm the video technician and

5  court reporter today.  Today is the 17th day of

6  August 2021. The time is 9:33 a.m.  We are convened

7  by videoconference to take the deposition of David

8  Icove in the matter of William E. Amor versus

9  Officer Michael Cross et al., pending in the United

10 States District Court for the Northern District of

11 Illinois, Eastern Division, case number 18 CV 2523.

12 Will counsel please state your appearance, how you

13 are attending, and the location you are attending

14 from, starting with the plaintiff's counsel?

15      MS. GARCIA:  This is Mariah Garcia for the

16 plaintiff.  I am attending over Zoom, and I am

17 currently located in a suburb of Chicago.

18      MR. POLICK:  Good morning.  Joseph Polick,

19 P-O-L-I-C-K, on behalf of the defendants, and I am

20 appearing remotely from my office in Chicago.

21      COURT REPORTER:  All right.  And, Mr. Icove,

22 will you please state your full name for the record?

23      THE WITNESS:  David, middle name Jay, J-A-Y,

24 last name Icove, I-C-O-V-E.

25      COURT REPORTER:  All right.  And we did see
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        your ID off the record.  Will all parties present
 2        please agree that the witness is, in fact,
 3        Mr. Icove?
 4             MS. GARCIA:  Plaintiff stipulates.
 5             MR. POLICK:  Same with defendants.
 6             COURT REPORTER:  All right.  And then,
 7        Mr. Icove, whenever you're ready will you please
 8        raise your right hand for me?  Do you solemnly swear
 9        or affirm that the testimony you are about to give
10        will be the truth, the whole truth, and nothing but
11        the truth?
12             THE WITNESS:  I do.
13             COURT REPORTER:  All right.  Thank you.
14                  DIRECT EXAMINATION
15   BY MS. GARCIA:
16        Q    All right.  Mr. Icove, my name is Mariah
17   Garcia, and I am appearing on behalf of the plaintiff,
18   Bill Amor.  And now I know that, as expert, you've been
19   deposed a number of times and you're familiar with the
20   process.  But since we're doing this remotely, and
21   remotely is still relatively new within the litigation
22   sphere, I just have a couple of guidelines for you
23   before we get started, okay?
24        A    Yes.
25        Q    Okay.  So as with other Zoom depositions I've
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    been on, there may be a time when the Internet cuts off

 2    or one of us freezes.  And if that happens and you don't

 3    hear one of my questions fully, please let me know, and

 4    I'll make sure to restate it, okay?

 5         A    Yes, ma'am.

 6         Q    And similarly, if you cut off in the middle of

 7    an answer, I'll let you know, put it on the record, so

 8    that there's no confusion over what was said and what

 9    was testified to, okay?

10         A    Yes.

11         Q    And I'm sure you also know this, but because

12    this is a remote deposition, we have to be even more

13    careful not to speak over each other.  So I'll try my

14    best not to interrupt you when you're answering a

15    question so long as you try your best not to interrupt

16    me when I'm asking one, okay?

17         A    Yes.  Thank you.

18         Q    Okay.  And, Mr. Icove, where are you currently

19    located?

20         A    In Knoxville, Tennessee.

21         Q    Is that where your office is located?

22         A    Yes.

23         Q    Okay.  Do you have any papers in front of you?

24         A    Yes.  I have my --

25         Q    And you presumed my next question.  What
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of DAVID ICOVE, taken on August 9, 2023

1  papers do you have in front of you?

2      A    All of my notebooks.  Notebooks -- where are

3  the other ones?  Oh, here they are.  Here's more

4  notebooks, and they're arranged by volume and

5  individuals.  Notebooks, notebooks, and notebooks.

6      Q    And what are in those notebooks?

7      A    They consist of -- let me start from the

8  beginning.  The first notebook is the disclosure for my

9  expert report as well as some references from

10  Mr. Carpenter.  And then I ran out of room, so I have a

11  second notebook that is -- starts with the depositions.

12  There are seven depo -- depositions in here.  The third

13  notebook are three more depositions.  The fourth is

14  another deposition.  The fifth is a -- some exhibits

15  that were used -- the autopsy reports and diagrams, some

16  work that Peter Vabrauskas did.  But I have the textbook

17  -- is what I'm referring to because that's his textbook,

18  Smoldering Fires.  I have some references to the ASTM

19  and SFPE guidelines, and -- and that is -- is it at this

20  point.  I'll also show you what else I have before me.

21      Q    Okay.

22      A    The -- the NFPA 921 guide.  I have the NFPA

23  1033.  I have the 1995 edition of NFPA 921.  And I have

24  the latest 2021 Annual Book of ASTM Standards.  And then

25  behind me is my library of -- of -- of additional

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  references should you need to ask.

2       Q     That's great.  Thank you so much.

3       A     Thank you.

4       Q     It'll be easier if you have a copy of your

5  report in front of you since we're going to go through

6  it during this deposition.  So if you want to locate

7  that and make sure it's within reaching distance, that

8  might be helpful.

9       A     Okay.

10           MR. POLICK:  While the witness is looking for

11      his report, I just want to make a statement on the

12      record that the defendants had requested from

13      plaintiff's counsel the identification of certain

14      items in plaintiff's expert Douglas Carpenter's

15      post- conviction file.  Defendants were provided

16      with a list of items in that file from

17      Mr. Carpenter's office through plaintiff's counsel.

18      However, not all the items on that list were readily

19      identifiable.  We asked plaintiff's counsel to

20      provide us with identification of a list of items

21      that we were not able to identify ourselves by

22      looking through the list.  We requested that in

23      advance of Mr. Icove's deposition today.  We have

24      not received the identification of those items, so

25      given that we have not received the identification

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  of those items, we're going to make a reservation on
2  the record that Mr. Icove may have additional
3  opinions regarding those items if and when they are
4  identified.
5      MS. GARCIA:  That's totally fair.  And I would
6  assume that, as with most experts, if Mr. Icove is
7  provided with new material that may alter his
8  conclusions, that he would -- he is free to testify
9  or supplement that information.  As to the remaining
10 list of items that defense counsel is not able to
11 identify, plaintiff's counsel has reached out to
12 Mr. Carpenter's office to get a list further
13 identified of the items specifically from the
14 post-conviction proceedings, not from the civil
15 proceedings, and has yet to receive that.
16 Plaintiff's counsel has been in contact with
17 Mr. Carpenter's office and has been told that it
18 will be forthcoming soon, but because plaintiff's
19 counsel's not in charge of how Mr. Carpenter's
20 office is run, cannot give a firm date as to when
21 that will be.  However, the reservation is
22 understood, and if there's something within the
23 post-conviction file that was not provided to
24 defense or to Mr. Icove from defense, he is free to
25 supplement his opinions.  Okay.  Unless you have any

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 12 of 159 PageID #:14110
The Deposition of DAVID ICOVE, taken on August 3, 2021

11

```
 1        other statements you want to make on the record,
 2        Joe?
 3   BY MS. GARCIA:
 4        Q    Mr. Icove, did you locate your report in
 5   disclosure?
 6        A    I did.  It's right here.
 7             MS. GARCIA:  Okay.  So I'm going to mark as
 8        Exhibit 1 what is titled -- and I'll put this on the
 9        Zoom screen, the "Disclosure of the Expert Opinion
10        of David J. Icove," submitted on behalf of the
11        defendants from -- dated June 17, 2021, which is
12        Bates number ICOVE 1 to 116.  Give me a second to
13        share the screen.  My apologies.  It's taking a
14        moment.  My apologies.  My Zoom is not letting me do
15        that, but I should be able -- I'm going to see if I
16        can fix that.  Let's go off the record really
17        quickly just because I need to relaunch my Zoom in
18        order to share the screen.  I apologize.
19             (EXHIBIT 1 MARKED FOR IDENTIFICATION)
20        COURT REPORTER:  All right.  We are off the
21        record at 9:43.
22             (OFF THE RECORD)
23        COURT REPORTER:  We are back on the record at
24        9:45.
25   BY MS. GARCIA:
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  I'm going to share what is being marked
2    as Exhibit 1.  Which again, is Icove 1 to 116.  And,
3    Mr. Icove, this is 116 pages, so I will scroll through
4    it rather quickly.  If you want me to stop at any point,
5    please let me know.  But I'm primarily scrolling to ask
6    if this is the report that you disclosed in this case,
7    Amor v. Cross.  And for the record, I'm continuing to
8    scroll.
9    A    Thank you for your patience.
10    Q    Okay.  So, Mr. Icove, this is the end of the
11    exhibit.  Based on a admittedly quick review of this
12    document, is this the disclosure report that you
13    submitted on behalf of the defendants in Amor versus
14    Cross?
15    A    Yes.  Can you just scroll to page 71 just to
16    make sure that that CV is there?  Yes.  Thank you very
17    much.  I appreciate it.
18    Q    Of course.  And on page 65, is this your seal
19    and signature?
20    A    Yes, ma'am.  It is.
21    Q    Okay.  I'm going to pull up what we have
22    marked as Exhibit 2, which is Bates numbered ICOVE
23    119 to 122, and which is entitled, "Icove & Associates
24    Contract."  And, Mr. Icove, as you did with the first
25    exhibit, will you please review as I scroll the contract

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  that I have pulled up on the screen.  Mr. Icove, on the

2  bottom of page 4, which is Bates numbered 122, there is

3  a signature on the bottom which is demarcated as Joseph

4  M. Polick dated July 27, 2018.  To the best of your

5  recollection, is this the retainer agreement that you

6  completed with defense counsel prior to being retained

7  in this matter?

8              (EXHIBIT 2 MARKED FOR IDENTIFICATION)

9      A    Yes, ma'am.  It is.

10     Q    Okay.  And on the first page, Bates Icove 119,

11 it says that the non-testimonial services for -- within

12 this retainer agreement are $400 per hour, $300 per hour

13 for travel, and $2,000 flat fee for testimony up to four

14 hours, and $450 an hour for testimony after four hours.

15 Is this billing rate still the billing rate that you are

16 using in this case?

17     A    Yes, ma'am.  It is.

18     Q    Okay.  And was this the billing rate that you

19 charged the defense while you were doing work on this

20 case?

21     A    Yes.

22     Q    Okay.  I'm next going to pull up what we'll

23 mark as Exhibit 3 and 4, with Exhibit 3 being ICOVE 117

24 and Exhibit 4 being ICOVE 118.  And Exhibit 3, at the

25 top, it's only one page, says invoice is dated 5-7-2020,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 15 of 159 PageID #:14113
The Deposition of DAVID ICOVE, Taken on August 17, 2021

14

1    and towards the bottom of the description, it says,

2    "case Amor versus Cross et al.," with a total of $5,400

3    at the bottom here.  Mr. Icove, is this a accurate

4    representation of the invoice that you submitted to

5    defendants for your work on the case in Amor versus

6    Cross on May 7, 2020?

7             (EXHIBIT 3 MARKED FOR IDENTIFICATION)

8             (EXHIBIT 4 MARKED FOR IDENTIFICATION)

9    A    Yes.  It {inaudible}.

10    Q    Okay.  And moving on to Exhibit 4, which is

11    another invoice which is dated the -- July 12, 2021,

12    with a total of $12,000.  Is this a accurate

13    representation of the invoice that you submitted to

14    defense for payment on May 20 -- 12, 2021, for payment

15    on your work on this case?

16    A    Yes.  It is.

17    Q    Okay.  And other than the two invoices that

18    were disclosed to plaintiff, are there any additional

19    invoices that you've issued since the one you issued on

20    July 7, 2021?

21    A    No, ma'am.

22    Q    Okay.  And is there any additional work that

23    you've done for defendants that you have yet to bill

24    for?

25    A    Preparation for this deposition.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Okay.  And moving into preparation for this
 2   deposition, without -- strike that.  How many hours did
 3   you prepare with counsel for this deposition?
 4        A     Approximately ten hours.
 5        Q     Ten hours.  And how many hours did you prepare
 6   by yourself, which would include, you know, reviewing
 7   the documents in your disclosures in preparation for
 8   this deposition?
 9        A     Besides the ten hours?
10        Q     Yes.  Besides the ten hours you spent with
11   prepared with counsel?
12        A     Maybe an additional three hours.
13        Q     And generally, how did you prepare for this
14   deposition?  What steps did you take?
15        A     I have typically boxed all my records, and a
16   majority of the time we spent punching holes and
17   assembling these notebooks so that I would have them in
18   order.  So that was probably half of that time, almost
19   three hours.  And then -- and then reviewing to make
20   sure that the -- that the report was clear and accurate.
21   And I want to make sure that I had color copies of the
22   -- of some of the exhibits ready for me.
23        Q     Okay.  And other than your -- strike that.
24   What documents did you review in preparation
25   specifically for this deposition?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Basically, all of the documents that I've
 2   identified today.  This morning when you first asked of
 3   what -- what notebooks do I have in front of me, and
 4   what documents.
 5        Q    And you said you have six notebooks in front
 6   of you or was it seven?  My apologies.
 7        A    I've lost track.  I -- one, two, three, four,
 8   five -- let me get back in order here.  Six notebooks.
 9        Q    Six notebooks.  Okay.  So you spent at least
10   on your own, about an hour-and-a-half reviewing the
11   documents in those six notebooks, would that be fair to
12   say?
13        A    Yes, ma'am.
14        Q    In preparation for this deposition of course,
15   not overall.  I know that you're billed for more time
16   than that.  Okay.  I'm going to go back to Exhibit 1,
17   and specifically to the appendixes to your -- the two
18   appendixes to your report.  Just let me pull that up.  I
19   know you have it in front of you, but I'm also going to
20   sorry, because you have -- do you have this -- the
21   appendix in front of you within the report?
22        A    Appendix A or Appendix B?
23        Q    Appendix A, which I believe is on page --
24   extends from page 66 to 70.
25        A    Yes.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 18 of 159 PageID #:14116
The Deposition of DAVID BROWE, taken on August 1, 2021

17

1    Q    Okay.  So we take a moment, please, to review

2    appendix A, and let me know when you're done.

3         A    Okay.  I'd like to update my references that I

4    -- that I have as appointed behind me.  There were some

5    additional references.

6         Q    Okay.

7         A    The California District Attorneys Association

8    investigation and prosecution of RC -- that is one of

9    the documents that I reviewed.  So like I said, I

10   referred as we originally talked behind me for

11   additional references.  And I apologize for not having

12   that ready for you.

13        Q    That's all right.  Again, you kind of -- I

14   think presumed my question which is, other than the

15   references, documents, and material that are listed in

16   Appendix A, is there any other material besides the

17   California District Attorneys' investigation and

18   prosecution reference that you just listed, that is not

19   included within the appendix itself?  And I'll give you

20   a moment to look over it just so you can be sure.

21        A    Uh-huh.  Thank you.

22        Q    But I want us to be on the same page as to

23   where you're pulling your information from.

24        A    Right.  Also identified in the textbooks and

25   the -- on page 70, there are four textbooks.  I think it

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  was too small to identify.  It was on my desk here.  The

2  Ryan et al. 2007 -- the Dalmarnock fire test experiments

3  and modeling.  That's a copy here that I have.

4       Q    Okay.

5       A    And that's in front of me here.  And the

6  reference to Peacock et al. 2017 -- the CFAST user's

7  guide version 7.  There's a copy of this.  I had it

8  behind me on the floor.  So that's additional material.

9  And --

10      **Q    Sorry, just to clarify, you said that's a --**

11  **that's different from the Peacock that's listed in the**

12  **Appendix A or is it supplemental?**

13      A    This is the most recent --

14      **Q    Okay.**

15      A    -- that I have.  Here as -- this is version 7;

16  they periodically update it.  So this is the June 2021

17  edition.

18      **Q    Okay.**

19      A    Sure.  I had the most -- also the forensic --

20  let me -- the forensic fire scene reconstruction.  I

21  just pulled it off my -- off my shelf.  That's

22  identified along with Kirk's Fire Investigation.  I

23  don't have a co -- I have an electronic copy of the

24  Kirk's Fire Investigation, and that should summarize the

25  textbooks that I have.  So I apologize for not pulling

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1    that off the shelf for you.
 2         Q    So it was Kirk's Fire Investigation was one of
 3    the textbooks, was there another that you didn't
 4    include?  I just want to keep it straight for my own
 5    record.
 6         A    It's -- it's included, it's under the
 7    textbooks on page 70.
 8         Q    Okay.
 9         A    You asked to -- what was going to be in front
10    of me during the deposition.
11         Q    I appreciate you updating that.
12         A    Yeah.  Thanks.
13         Q    Yeah and so -- yes.  My question then is:
14    Other than the material that you've listed, the
15    documents, information, and data you've listed within
16    Appendix A, and the additional references and textbooks
17    that you have referenced, which I believe includes
18    California District Attorneys' reference, a Ryan et al.
19         experimental and modeling reference, and an
20    updated edition of the Peacock version 7 reference, is
21    there any other material or data you relied upon that's
22    not listed within appendix A?
23         A    Not at this time, with the exception of
24    Mr. Carpenter's additional data --
25         Q    Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A      -- that's forthcoming.

 2        Q      I will -- such data exists.  I did --

 3        A      Hopefully it was coming.

 4        Q      As -- I think the crux of the issue -- I don't

 5   even think it's a disagreement is that plaintiff doesn't

 6   believe that any of the post-conviction -- I thought it

 7   -- in terms of rebuttal potentially, sorry.  We can --

 8   strike that.  Okay.  Outside of all of that, there is

 9   nothing else though.

10        A      There is nothing else at this time that I've

11   relied upon that's not listed or in front of me right

12   now.

13        Q      Okay.  And I want to turn to appendix B, which

14   outlines your experience, publications, and testimony,

15   and that is from Bates ICOVE 71 to ICOVE 84.  And so I

16   want to first turn to your professional experience,

17   which is on page 71 and 72.  Once you have a chance to

18   review that, please let me know.

19        A      Okay.  Thank you.

20        Q      Is there any -- oh strike that.  Is this an

21   accurate and up-to-date list of your professional

22   experience?

23        A      It is.

24        Q      Is there anything that is not listed within

25   this subcategory that should be listed?
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    Not at this time.

 2        Q    Okay.  I want to turn next to your education

 3   which is listed on ICOVE 72.  Is this an accurate and

 4   up-to-date list of your education at any secondary or

 5   post-secondary institutions that you have enrolled in

 6   and graduated from?

 7        A    This is correct.  This -- this list of

 8   education regarding formal degrees.

 9        Q    Okay.  And you have a number of professional

10   certifications, professional registrations, and

11   professional association memberships.  So I'll give you

12   a second to review those on page 72 and 73.

13        A    Yes.  Thank you.

14        Q    Okay.  Are there any professional

15   certifications, professional registrations, or

16   professional association memberships that you hold which

17   are not a part of this list?

18        A    Yes.

19        Q    Okay.  What are those?

20        A    The Fraternal Order of Police Volunteer Lodge

21   number 2 in Knoxville, Tennessee.

22        Q    And what does being a member of the Fraternal

23   Order of Police in the Volunteer Lodge, composed of or

24   consist of, rather?

25        A    It consists of a membership representing both
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  active, and retired police officers, and law enforcement

2  officers in Knoxville, Tennessee.

3       Q     And as a -- it's a union, correct?

4       A     No, ma'am.  It's not.  It's just a

5  professional organization.  And let me -- let me

6  refresh.  One of the benefits of being a member is the

7  group life insurance program.  So --

8       Q     Understandable.

9       A     And that's -- it's not a lot of money, but

10 it's something that will be in my estate when I decease.

11 And also, it's a way of seeing and meeting with friends

12 that I worked with, or I retired with in the area.

13      Q     And forgive my candor, Mr. Icove, but have you

14 ever worked as a police officer?

15      A     Yes.

16      Q     Okay.  And when were you a police officer?

17      A     From October 1979 to December 1983.

18      Q     And where -- in December 1979, what was your

19 role, and what department did you work for as a law

20 enforcement officer?

21      A     I worked for the City of Knoxville Department

22 of Public Safety.  I was an arson investigator, and

23 eventually became the supervisor of the arson task

24 force, which represented a combined unit of both police

25 detectives and city fire department investigators.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 24 of 159 PageID #:14122
The Deposition of DAVID ICOVE, taken on August 2, 2019

23

 1      Q    Okay.  And as a arson investigator, what law
 2  enforcement training did you receive when you first
 3  started out with the Knoxville Police Department?
 4      A    Even though I had prior training in law
 5  enforcement, as in other organizations, I was required
 6  to go back through the Knoxville Police Academy, which I
 7  believe was -- I'd have to look at the certificate, but
 8  I believe it was over 400 hours of law enforcement
 9  training.  And that allowed me to be certified by the
10  State of Tennessee, the POST Commission, which is a
11  Police Officer Standards & Training Commission.
12      Q    And you mentioned that by -- my apologies, I
13  didn't mean to cut you off.
14      A    I was a fully sworn officer as well as an
15  assistant to the director of public safety.
16      Q    And you mentioned that you had law enforcement
17  training prior to the Knoxville Academy.  What law
18  enforcement training was that?
19      A    I had basically in-service training in fro --
20  in the state of Tennessee for the Tennessee State Fire
21  Marshal's Office.  Also in-service training for the Ohio
22  State Fire Marshal's Office.  And this -- the Tennessee
23  State Fire Marshal's Office -- I worked from August 1976
24  through March 1978.  And then the Ohio State Fire
25  Marshal's Office -- March 1978 to September 1979.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          Q    Okay.

2          A    And through that, they would have normal

3    training.  And in fact, now I did -- I participate but I

4    also provided training in those schools.

5          Q    Okay.  And for the training as Tennessee and

6    **Ohio Fire Marshal's -- for the Tennessee and Ohio Fire**

7    **Marshal's Office, what would be considered normal**

8    **training as you testified?**

9          A    Normal training would be -- it consist of the

10   standards of care in conducting fire and arson

11   investigations.  And that training predated the

12   establishment of NFPA 921.

13         **Q    When was NFPA 921 created?**

14         A    Its first publication of the standard of care

15   was in 1992.

16         **Q    So was there any sort of standard or guideline**

17   **that you would have been trained on as a fire**

18   **investigator prior to 1992?**

19         A    Yes.

20         **Q    And what would be that standard, or standards**

21   **that you were trained on?**

22         A    Well, part of the standards the -- this is the

23   second edition of the California District Attorneys'

24   Association manual, and I'm a co-author of that training

25   program.  I believe there was a previous edition that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    was before 1995.  There was also -- I participated in

2    providing training to other state and local law

3    enforcement agencies.  This is the state of New Jersey

4    investigation and prosecution manual.  And it is -- was

5    funded by the Law Enforcement Assistance Administration.

6    And unfortunately, there is not a specific date on this

7    manual.  But it was in the time period of in the -- it

8    predated possibly 1975.  I also provided training to the

9    New Jersey State Police in the analysis and -- of arson

10    investigations, as well as standards of care in

11    intelligence gathering.

12    **Q    Okay.  Going back to your role as investigator**

13    **with the Tennessee and Ohio State Fire Marshal's Office,**

14    **what were your duties and responsibilities as**

15    **investigator?**

16    A    Can I amend one more thing?

17    **Q    Yes, of course.**

18    A    The National Bureau of Standards, which is now

19    NIST, published a guide for fire investigations.  And

20    your questions prompt a historical background.

21    **Q    Well I appreciate you taking a dive back into**

22    **what you had trained on many decades ago.  I understand**

23    **that you do -- cannot remember everything that would**

24    **have been a standard or guideline, but I appreciate you**

25    **trying to source that, nonetheless.**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1       A     It's on page 77 of my -- in appendix --

 2       Q     E?

 3       A     -- E.  It's 1979.  Myself and the chief of the

 4  forensic laboratory at the Ohio State Fire Marshal's

 5  Office -- we wrote a chapter in Fire Investigation

 6  Photography in the fire investigation handbook that was

 7  published by The National Bureau of Standards at that

 8  time.  That was most likely one of the first handbooks

 9  for conducting fire investigations.  So -- so thank you.

10  I apologize for the interruption.

11       Q     Oh, no -- no issue at all.  I appreciate the

12  clarification.  So now that we've covered some of the

13  standards and guidelines that you can recall about fire

14  investigation prior to the NFPA being published in 1992,

15  I wanted to shift back to asking you about the duties or

16  responsibilities that you would have had as an

17  investigator within the Tennessee and Ohio State Fire

18  Marshal's Office.

19       A     Thank you for answering that question.  The

20  role of the fire investigators -- we were called arson

21  investigators -- were to conduct large case

22  investigations that some of the local departments could

23  not handle.  We also were responsible for, upon request

24  from a fire department or police department, conducting

25  investigations where they did not have the expertise.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   And the third area which I was formerly received was we
 2   were asked to come in and do peer reviews of
 3   investigations where a department had conducted one and
 4   they wanted an ex -- an outside independent review,
 5   especially regarding the origin and cause of the fire,
 6   as well as the fact that we also had what was called the
 7   vest pocket subpoena powers -- that we could obtain
 8   documents that the local investigators could not obtain.
 9   We also had the authority to conduct what was called a
10   fire marshal's inquest.  It's very similar to a grand
11   jury investigation where we could summon and swear
12   witnesses and in cases like that, especially in -- in
13   the loss of life, those types of powers rendered by the
14   state fire marshal's office were beneficial to the local
15   investigators.  So in most states, it would be
16   considered a felony to falsely swear in front of a state
17   official especially one in which a bona fide subpoena
18   has been issued.
19        Q    Okay.  And when you said that you would
20   provide peer review of investigation or help out
21   departments or counties or cities that didn't have the
22   ability to conduct a thorough investigation, you're
23   referring to specifically fire investigation, correct?
24        A    Well, fire and explosion investigations --
25        Q    Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    -- so by federal and most state laws say it's
 2   causing damage by fire or explosions.  And so the
 3   explosions are just basically a fast-moving fire that
 4   breaks the sound barrier.
 5        Q    Okay.  That --
 6        A    And so -- and -- and so for example, a Molotov
 7   cocktail is considered an explosive device.  So we would
 8   be brought in to do those.  I was also in Ohio --
 9   requested a -- I had a investigation we did with the
10   Federal Bureau of Investigation, which is a RICO case, a
11   Racketeer Influenced Corrupt Organization.  And they
12   needed somebody to testify as to explosibility of an
13   explosion during a fire, and they could not find a
14   federal law enforcement officer or a laboratory to offer
15   that.  So I was able to offer that in lieu as a state
16   officer in lieu of a federal officer, so I can provide
17   testimony such as that.
18        Q    Okay.  And other than providing testimony and
19   expertise on fire and explosions, did you engage in any
20   of the, for lack of better term, activities that a
21   non-arson or non-fire investigator would in conducting
22   criminal or police investigations?
23        A    Yes.
24        Q    Okay.  And what investigations or activities
25   that you undertake that would be outside the office of
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  fire and explosion investigator as an investigator
 2  within the state fire marshal's office?
 3         A      Thank you for asking that question.  I
 4  participated with the chief, especially in Ohio, Chief
 5  Mohammad Gohar, in testing, field testing,
 6  instrumentation such as what we call sniffers.  They had
 7  portable gas chromatographs that were issued to
 8  investigators.  So we would -- we would analyze or
 9  verify and validate that that was a potential tool for
10  the field.  We would also look at situations where new
11  technologies might be advanced.  And Ohio had at that
12  time the best forensics laboratory dedicated just to
13  fire and explosions.  So I worked with Mohammad Gohar
14  and that's how, for example, that photography chapter
15  got written in the NBS handbook.  And we defined now
16  what the standard of carriers for processing fire
17  scenes.  We do an external, internal panoramic views.  We
18  were some of the first to do panoramics using standard
19  cameras.  The other thing I was doing was I was in
20  graduate school, and I was writing a thesis on applying
21  pattern recognition to predicting the behavior of serial
22  arsonists and bombers.  And they -- and so we had
23  problems as other jurisdictions with individuals who
24  were compulsive fire setters.  And based on my
25  background, I developed algorithms that predict where

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    the offender may live or work.  And so that was an

2    additional area that I provided.  Also at the time the

3    law enforcement LEAA, Law Enforcement Assistance

4    Administration, they put out different schools to teach

5    us how to do things like net worth calculations for --

6    for looking at arson for profit cases.  We also looked

7    at intelligence analysis and -- and collection.  We

8    looked at the social networks of organized crime.  And

9    so during that time period, myself and the agent from

10   the Federal Bureau of Investigation -- we published a

11   textbook based on the case we were working on, the RICO

12   case, on how prosecutors and federal agents should

13   investigate RICO arson cases.  And let me see.  This was

14   the -- the second edition of combating arson for profit.

15   And so we learned a lot about how to analyze and predict

16   what was happening, as well as the proper application of

17   the federal and state statutes and -- and arson for

18   profit.  So that was something we were proud of and that

19   occurred during the time period that I worked for the

20   Ohio State Fire Marshal's Office.

21        Q    Okay.  And as an investigator within either

22   the Ohio State Fire Marshal's Office or the Tennessee

23   State Fire Marshal's Office, did you have the power to

24   arrest or detain suspects of crimes?

25        A    Not only that -- it included that, but also



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  the -- the authority to obtain search warrants.  And

2  also to as I indicated before, we had vest pocket

3  subpoena powers to summon and swear witnesses or obtain

4  documents.  So both of those fire marshal's offices had

5  those powers.

6      Q    And how often as a investigator did you arrest

7  or detain a suspect personally?

8      A    Physically arrest -- most of my -- it was

9  funny the -- when you get your law enforcement

10  certification, they bring you before a psychologist. And

11  so the last -- the last review, they said, "Describe to

12  me how you made your last arrest."  And I said, "It's

13  typical that how I make my arrest are by appointment."

14  So in majority of the cases, we followed the federal

15  standard, and we presented our cases to the grand jury

16  rather than getting arrest warrants.  And that was part

17  of the peer review process to make sure that the

18  District Attorney's Office, where the United States

19  Attorney's Office was, had conducted their own peer

20  review and were satisfied with the completeness of the

21  investigation.

22      Q    Okay.  And as a fire investigator with the

23  state fire marshal's offices, was it within your

24  responsibility or duties to identify suspects of crimes

25  outside of -- of scenes, explosions, and bombings?  Or

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  was that something that other persons within the law

2  enforcement bodies of Tennessee and Ohio dealt with?

3        A     Arson cuts across the strata of most every

4  other crime.  For example, the racketeering case that I

5  worked on, we looked at not only the predicate offenses

6  required by RICO of -- of arson, but we also looked at

7  other crimes such as bank fraud, wire fraud, also

8  obstruction of justice, and any other related crimes

9  that might come about from that.  So arson may have been

10 one of the crimes.  And in fact, in some cases, it was

11 probably the lower crime.  For example, it was not

12 unreasonable or uncalled on that we would have deaths --

13 fire deaths, and it was up to us to make a determination

14 with the -- with the guidance of the medical examiner's

15 offices whether it was a accidental or -- manner of

16 death is -- is -- they would look at it -- what the

17 manner of death was and the cause of death.  So we would

18 work with them.  So to be a arson investigator, you have

19 to basically know every other field within -- within

20 criminal investigation.  And that's why the -- typically

21 the investigators are put through a full police academy

22 if they come from the fire department.  So they are

23 exposed to that.  For example, in -- in Virginia, there

24 was one town that approximately a third of the fires

25 were drug-related.  So it was not uncommon for us to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    come across drugs if it's not uncommon to come across an
2    accidental fire or an intentional fire involving a
3    indoor grow operation for marijuana.  So when you
4    arrived at the scene, you'd realize that there were
5    other collateral crimes that were involved in that.  We
6    also looked at hate crimes before they really came
7    about, especially involving radical organizations.

8         **Q    Okay.  Outside of what you referred to as**
9    **collateral crimes that you would come across as a fire**
10   **investigator, were there other aspects of the criminal**
11   **investigation that a police officer would do that you**
12   **undertook as an investigator within the fire marshal's**
13   **office?**

14        A    Yes.  We were responsible, especially for the
15   cases in which we made direct presentments to the grand
16   jury.  We were responsible for coming up with trial
17   notebooks.  Basically, the training was as to have a
18   complete investigative file with expected testimonies,
19   sworn statements, and -- and results of all of the
20   forensic laboratory exams for the prosecutor where the
21   Assistant US Attorney to be able to use.  And in some
22   cases, they were complete enough that we would be just
23   walked down the hall to the grand jury and present the
24   case.

25        Q    But those --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        A    So trial note -- trial notebooks are an

 2   important factor and I -- and we teach -- I have taught

 3   that in the past.  In fact, my partner from the FBI --

 4   when I was at the Ohio State Fire Marshal's Office,

 5   trained me on how the federal trial notebooks are done.

 6   And they're very comprehensive in their approach.  And

 7   so that was a skill set that I acquired and continued on

 8   in my career.

 9        Q    Okay.  I guess another que -- way to ask this

10   would be the trial notebooks that you were tasked with

11   putting together or -- or helping to promulgate for

12   prosecution, did those have to do with any crimes that

13   did not involve arson, explosions, or bombing or other

14   as you said, collateral crimes that would go along with

15   those?

16        A    Yes.

17        Q    Okay.  And what would those be other than what

18   I've listed and the RICO investigation that you

19   commented on?

20        A    For example, if you're an arsonist, and you

21   break into a occupied or an unoccupied dwelling, you

22   have also committed the crime of burglary because you've

23   entered with an intent to commit a felony.

24        Q    Wouldn't that be a collateral crime to arson

25   in this instance?
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 36 of 159 PageID #:14134
The Deposition of DAVID ICOVE, taken on August 8, 2021

35

1          A     I -- it is -- I -- I typically would charge

2   both.  I would ask for indictments of both burglary and

3   arson.

4          Q     **Okay.**

5          A     Especially if they were items removed prior to

6   the fire.

7          **Q     And as a fire investigator, was it your stated**

8   **responsibility to investigate crimes that were not**

9   **collaterally related to arson, explosions, and bombings?**

10          A     It was.

11          **Q     Okay.  And what were those responsibilities**

12   **outside of investigating?**

13          A     The reason -- and like I indicated, when I

14   left the Ohio State Fire Marshal's Office, I went to the

15   Knoxville Police Department.  Early on, this is the --

16   another project that I was involved in, the Anti-Arson

17   Resource and Action Guide.  This grant came about when I

18   came to the Knoxville Police Department where we would

19   describe how to put together arson task forces.  And the

20   relationship on the task force is the combined -- the

21   combined union of both police and fire investigators.

22   Police detectives and -- and fire investigators, were

23   that we could have basically look at all of the

24   collateral crimes that are involved.  So it was

25   responsibility of the unit, my unit to -- to look at the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   entire spectrum of what was happening.  And with -- with
 2   experienced police detectives, that was part and parcel.
 3   For example, if we had a collateral drug relate --
 4   drug-related investigation, there is a homicide.  There
 5   is a -- a whole series of things where we ended up with
 6   sexual-related homicides.  All of those areas were
 7   covered.  Also with the responsibility of victims'
 8   rights, we would coordinate with the victim witness
 9   coordinators that were responsible.  So the formula for
10   conducting a thorough and comprehensive investigation is
11   to cover the entire strata of all the crimes that we may
12   have come across.  So we were a self-standing unit
13   basically.  For example, auto theft, it was not uncommon
14   to -- for us to get a call that a car has been found
15   burning.  And two things would typically come into my
16   mind, and I would ask when we got these calls is, "Have
17   you looked in the trunk?"  And there are several times
18   in my career when -- when they've called back, and I'm
19   on the way to a scene by saying, "You know, we're glad
20   we looked in the trunk.  There is a body in the trunk."
21   And things like that occurred.  So we were a self-
22   standing unit, having both police and fire cooperating
23   together under one unit.
24        Q    And this was within the Ohio State Fire
25   Marshal's Office and the Tennessee State Fire Marshal's
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    **Office?**

2         A     No.  This was in the Knoxville Police

3    Department.

4         **Q     Okay.**

5         A     Public safety.

6         **Q     Okay.**

7         A     And that was a -- that was an innovative. That

8    was advanced by the National League of Cities.  It

9    turned out that the mayor was a former police detective,

10   who became an attorney, then he became safety director.

11   And he realized that the combined resources of both the

12   police and the fire department working together was --

13   was the way to go.  And we were part of the development

14   of this guidebook for local government officials and --

15   and -- and provided some impact, and uploading policy

16   guidelines, standards of care.  Even down to writing

17   civil services examinations.  So it was quite a eye

18   opener, and it was on the cusp of what was going on. And

19   that model now is being used throughout the country as

20   well as worldwide.

21        **Q     So I understand that you're a combined unit.**

22   **But individually the -- the work that you did in helping**

23   **with this unit was related to fire investigation,**

24   **correct?  If that was your re -- re -- responsibility in**

25   **being a part of this unit?**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1       A    It was called the arson task force, but there

2    is a situation in which you may not know immediately

3    that an arson has been committed.  So that's why the

4    thoroughness of the investigations have to be approached

5    as if -- and the documentation and the interviews as if

6    this is a criminal case or not a criminal case.  So the

7    -- the standard of care is -- is to treat all fires with

8    the same level of effort.  So down the road something

9    happens -- there's also the other reason is, is that if

10   it becomes a product's liability problem.  If it's a

11   faulty product or it's a faulty process that the fire

12   codes need to be changed, that -- that thoroughness of

13   the investigation helps justify making the changes.  For

14   example, in Ohio there was a Cambridge, Ohio fire.  An

15   arson case in a motel by -- owned by a national firm

16   that had an open stairwell.  And the people who died

17   were on the second floor.  It's because the smoke

18   entrained -- went down the hallway, up the staircase,

19   and we found the victims at the top of the staircase

20   trying to get down.  So the problem was a codes issue

21   and that's why they now enclose the stair -- the

22   staircases to the -- to those areas.  The other thing

23   that I had in my tool kit was having been prior to

24   working for the state fire marshal's offices is having a

25   degree in fire protection engineering.  So I understood

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    the codes and standards that applied.  And -- and in

2    that fire in Cambridge, Ohio, I recognize pretty quickly

3    that the defect and the design was the open stairwell.

4    And I got with the -- with the organization, the firm

5    that owns the -- own those hotels and said, I think you

6    should look at retrofitting all of your hotels' joint

7    closed stairwells, and that's exactly what they did. But

8    also that was a -- a criminal case.  And so there are

9    other spinoffs that come from this.  So doing a thorough

10   investigation, it also helped explain how the fire

11   developed and -- and propagated and it -- it helped

12   justify that organization as well as other ones to -- to

13   do that to make that change.

14        Q    Mr. Icove, I'm not really asking about the

15   thoroughness of the investigation, I'm asking when you

16   were a fire investigator within the state fire marshal's

17   office or when you were a part of the Knoxville Police

18   Department, whether or not your responsibility was to

19   provide your opinion and expertise on fire arson and

20   explosion-related instances, which I guess would include

21   also some of the training and testing that you mentioned

22   earlier as a part of your time at the fire marshal's

23   office.  Were there --

24        A    Yes.

25        Q    -- responsibilities -- yeah.  Would it be fair

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  to say that that was your primary responsibility in it

2  being a part of these units and investigative task

3  forces?

4  MR. POLICK:  Objection to the form.  But you go

5  ahead and answer.

6  A    I wish right here still had a copy of my job

7  description.  But if you look at -- on page 26.  Page 26

8  basically is the NFPA 1033, which basically is the job

9  description for a fire investigator.  And these are

10  their roles and responsibilities.  And I don't think I

11  have -- oh, yes, I have right here.  I -- in

12  anticipation of your question, ma'am, NFPA 1033 first

13  came into existence in 1987, followed by 1993, 1998,

14  2003, 2009, 2014, and there will be a 2022 edition. That

15  standard -- which your job performance requirements are

16  exactly what fire investigators are expected to do. So

17  an answer to your question, they're responsible for

18  beating the general requirements.  They're responsible

19  for conducting scene examinations.  They're responsible

20  for documenting the scene.  They're responsible for

21  evidence collection and preservation, conducting

22  interviews, doing post-incident investigations, and

23  making presentations.  Each one of those -- and I

24  compared those in 1993 for this case to the present

25  2014.  And the only difference between this is the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  mention of employing the elements of the scientific

2  method.  So these basically -- and I would have to pull

3  the '87 to basically tell you what was in -- in -- in

4  the -- in play then.  But these are the general roles

5  and responsibilities and job performance requirements.

6  So these are not -- a fire investigator will examine the

7  scene, they shall examine the scene.  And so this

8  probably answer -- may answer your question that of what

9  the roles and responsibilities were.  And I had these

10 backs then in this -- 1970s and I still have these now.

11 These also -- job performance work responsibilities

12 apply to both individuals in the public and private

13 sectors.  So it's a -- it's a unique thing.  So that's

14 why I decided to document that.  If necessary, we could

15 do a literature review to come up with all of these, but

16 these are the -- the dates of the 1033 standard and it's

17 consistent.

18      Q    And that --

19      A    So this is --

20      Q    That is -- sorry, go ahead.

21      A    No.

22      Q    So that is very helpful.  And I think maybe a

23 way of summarizing this entire line of questioning is

24 that: Would it be fair to say that the table 2 on

25 page 76 of your report generally outlines the



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1    responsibilities that you would have had as a fire
2    investigator or someone working on a fire investigation
3    task force back in the '70s up until present times?
4         A    Yes, ma'am.  That would be fair --
5         Q    Okay.
6         A    -- to say.  Thank you.
7         Q    And going back quickly to your law enforcement
8    background, other than the academy that -- the police
9    academy that you were trained in, did you have any
10   continuing training on police investigations
11   specifically after completing the Knoxville Police
12   Academy?
13        A    Yes.  I did.
14        Q    And when were those trainings?
15        A    I would have to pull them.  But they're
16   in-service trainings.  They're annual certification
17   classes.  Especially the -- for fire investigators,
18   there would be an annual training seminar.  With the
19   police departments and law enforcement agencies, they're
20   a lot more stringent and they also give you greater
21   opportunity to take the courses.  For example, in Ohio,
22   we took the two-week criminal intelligence school, which
23   allowed us, like I said, to do -- learn how to do
24   techniques, like, social network analysis, net worth
25   calculations, things like that -- that were advanced
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  schools.  So we were -- had the opportunity for those.

2  Also, now I did -- I take the training but also

3  participated and -- and in training for that.  So

4  progressively in each agency that I've worked for, I

5  have received ample training.

6       **Q**  **And would that training be on -- strike that.**

7  **What would that training be on for, actually -- strike**

8  **that as well.  I'm so -- I apologize.  I'm trying to**

9  **come up with a question that gets to what I wanted to**

10 **actually ask you.  Since you've left the Knoxville,**

11 **Tennessee Criminal Investigations Division in 2005, have**

12 **you taken any further trainings similar to what you**

13 **described as an in-service training on specifically**

14 **police investigations?**

15      A  Yes.

16      **Q**  **Okay.  And when was the last time you took a**

17 **training on police practices or police investigations?**

18      A  Probably two months ago.  I was -- I may -- I

19 spend several days a month conducting peer reviews

20 training and testimony for the Knox County Sheriff's

21 Office for their Fire and Explosives Investigations

22 Unit.  And part of that is that we are required to go to

23 certain in-service training.  The last one I went to

24 dealt with domestic violence.  The previous one I went

25 to involved organization in preparation for riots.  I've

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  also have been enrolled in taking online classes --

2  formal classes that are police standards.  And then I'm

3  involved taking one-hour lengthy course on emergency

4  pursuit.  Also, I'm a board-certified forensic engineer,

5  and the -- with the National Academy of Forensic

6  Engineers.  I'm the co-chair of their fire investigation

7  committee, which looks at the broad range of -- of fires

8  in the United States.  And two years ago, we put on an

9  extensive workshop for forensic engineers as well as

10  investigators in that area.  So to answer your question

11  shortly, I meet or exceed the requirements for the post

12  -- for the police officers standards and training for

13  the State of Tennessee at this point.  But in the

14  previous jobs that I've had, we've always maintained our

15  -- our training and met or exceed -- exceeded the

16  requirements.

17  **Q    And Mr. Icove, other than your time within the**

18  **Knoxville Police Department -- sorry, strike that.  Was**

19  **there ever a time during your tenure with any of the law**

20  **enforcement agencies you worked with, that you would**

21  **have held the role of police officer?**

22  A    Yes.

23  **Q    And when was that?**

24  A    Before I retired, I was the assistant chief

25  for the Criminal Investigations Division for the United

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   States -- Tennessee Valley Authority.  And I worked for

 2   them from December 1993 -- December 1993 to December

 3   2005.  So we held the roles of both a state-certified

 4   police officer or public safety officer.  We were also

 5   federal law enforcement agents.

 6        Q     Okay.

 7        A     So we had -- go ahead.

 8        Q     Now, as assistant chief, how many non-arson or

 9   non-fire related investigations were you a part of?

10        A     They were less.

11        Q     Okay.  Can you approximate what percentile?

12        A     As part of the organization, we also provided

13   assistance to other agencies in fire-related matters,

14   fire and explosions.  So I'd say that with the

15   assistance as well as the participation, I'd say that

16   20 percent or 30 percent of my work involved fire and

17   explosions investigations as part of my duties.  The

18   rest of my duties, I -- I oversaw major investigations

19   involving everything from enforcement of ARPA, which is

20   the Archaeological Resources Protection Act.  Archeolo

21   -- archaeological sites, if somebody was to disinter a -

22   - a indigenous Indian grave site, that was a federal

23   violation, and we investigated that all the way to

24   computer intrusions.  So one day I could -- could range

25   between the areas.  At one time during my -- prior to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  becoming the assistant chief, I was -- I oversaw the

2  training that the US TVA Police conducted.  So we sent

3  all of our officers to the Federal Law Enforcement

4  Training Academy in Glynco.  And they received full

5  training, then they came back, and we -- and we carried

6  on that -- that training for them to make sure that they

7  met those things.  A lot of the training I'm imagining

8  you're probably going to ask the question of how much

9  legal training do we have?  An extensive amount of legal

10  training.

11     Q    I was going to actually ask if you had any

12  training to become or along the lines of what a police

13  detective or law enforcement detective would have

14  received?

15     A    Yes.  In fact, in the Knoxville Police

16  Department, our training was divided into police

17  officers and police detectives.  So detectives had their

18  own formal training that they went through.  And that's

19  -- that was not only the training that I received but

20  also participated in providing.

21     Q    And at any time during your tenure in the

22  various law enforcement agencies you were a part of, did

23  you have the rank or role of being a police detective?

24     A    No.

25     Q    Okay.  I'm going to move off of your appendix

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   B and just ask you a couple of questions about the body
 2   of the report now.  The first one was --
 3            MR. POLICK:  You want -- do you want to take a
 4       break, or are you comfortable?
 5            MS. GARCIA:  I could take a short break to go
 6       to the bathroom if you would like, but I also can
 7       keep on going.
 8            MR. POLICK:  Why don't we just take a short
 9       break, maybe five minutes; is that okay?
10            MS. GARCIA:  Perfect.
11            MR. POLICK:  Thank you.
12            THE WITNESS:  Okay.
13            COURT REPORTER:  We're off the record at 10:54.
14              (OFF THE RECORD)
15            COURT REPORTER:  We're back on the record at
16       11:00.
17   BY MS. GARCIA:
18       Q    Mr. Icove, I didn't ask at the beginning, but
19   do you prefer to be referred to as Mr. or Dr. Icove?
20       A    My students call me Dr. Dave if that's what
21   you like.
22       Q    How about I call you Dr. Icove?  It will be a
23   compromise between the two.
24       A    You can just call me Dave if that's okay.
25       Q    Okay.  Dave, when were you first contacted by
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  defense counsel about providing expert services for this

2  case?  And just to -- for the record, defense counsel

3  equals Sotos Law Firm.

4      A    Just prior to them signing that contract.

5      Q    That would that have been in -- I don't have

6  it pulled up in front of me, but I believe that --

7      A    It was --

8      Q    -- was 2018?

9      A    It was July 27, 2018.

10     Q    Okay.  And had you worked with Sotos before

11  you were contacted for work on this case or is this the

12  first time you've been retained as an expert for them?

13     A    This is the first time.

14     Q    Okay.  And on average, how many expert reports

15  do you provide per year?

16          MR. POLICK:  Just a small objection -- on that

17     question.  By provide, do you mean disclose?

18          MS. GARCIA:  Yeah.  That's a good

19     clarification.

20     Q    On ex -- average, how many expert reports do

21  you disclose per year?

22     A    That -- can I ask for a clarification there,

23  meaning the ones that are published --

24     Q    Yeah.  The ones --

25     A    -- in reports in -- in -- in the court system

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   such as PACER?

2       Q    I would say ones that are published in a court

3   system such as PACER or that are disclosed from one

4   attorney's side to another attorney's side.  So for an

5   example, your report was disclosed to plaintiffs.  As of

6   now, it's not within PACER because we haven't filed any

7   documents that include your report.  But what I'm asking

8   about is both documents that would be filed in PACER for

9   whatever reason, potentially a Daubert Hearing or

10  documents in reports that would be disclosed to the

11  other side but not necessarily in PACER.

12      A    I would have to look back, but it's probably

13  on an average year five or less.

14      Q    And what percentage of your income, if you had

15  to guess or hypothesize, comes from the expert work --

16  and so this is not just reports but expert consultation

17  testimony and writing reports per year?

18      A    Gross or net?

19      Q    I would say gross.

20      A    Okay.  I would have to look at my income tax

21  returns to -- to get, but I can tell you in net.  As

22  with anybody in our professions, COVID had a significant

23  impact.  So I had a net loss for the last at least two

24  years.

25      Q    Okay.  I guess prior to COVID, what percentage



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1   net wise of your income would have come from your expert

2   services per year?

3        A    Net for my total personal income?

4        Q    Yes.

5        A    I would have to look at it.  I -- I -- I also

6   have a academic appointment at the university.

7        Q    Yes.

8        A    And I would have to review my income tax

9   returns to give you that information.

10        Q    And outside of the -- your income, how -- what

11   would be the balance, again, percentagewise or however

12   makes sense to you of expert work you do within a

13   litigation context versus your appointment within the

14   university?

15        A    I do approximately one day per week on expert

16   work, which also includes training, development, writing

17   articles and textbooks, and conducting peer reviews of

18   cases that are submitted.  So I would say realistically

19   eight hours per week.

20        Q    And is there any aspect of your academic

21   appointment that other than obviously your credentials

22   and the academic work you do that directly pairs on to

23   the expert work that you're providing in a litigation

24   context?

25        A    Yes.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  Can you describe what those would be?

2    A    I teach several courses in fire protection

3    engineering and related areas.  One specific course is

4    on forensic engineering.

5    Q    Okay.

6    A    I also teach for the University of Maryland, a

7    course -- a graduate course entitled, "forensic fire

8    analysis," which is basically a -- a complete review for

9    engineers at the graduate level -- fire protection

10   engineers of the Kirk's Fire Investigation textbook.

11   It's totally based upon that on that treatise.

12   Q    And when you are providing expert reports

13   specifically, do you typically write reports for civil

14   litigants or criminal litigants?

15   A    A majority are for civil, but in criminal

16   litigates, as I mentioned, I do work as of -- on a

17   nonpaid basis as a reserve deputy officer for the Knox

18   County Sheriff's Office.  So I'll write reports.  In

19   cases, I've provided testimony.  I help in preparing

20   trial notebooks, as well as -- are called out on death

21   investigations, as well as scenes in which the -- it's

22   not obvious the origin and cause of the fire.

23   Q    Okay.  Of the work that the expert reports

24   that you provide to litigants, how much would you --

25   what percentile, rather, would you say are provided to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    your civil litigants versus criminal litigants?

2        A    I'd have to take a look.  If you included the

3    work with the Knox County Sheriff's Office, as well as

4    contract work that I've done, for example, with the

5    Texas State Fire Marshal's Office for their Innocence

6    Project, I would say it's either a -- a 80/20 split.

7    80 percent civil, 20 percent criminal.

8        Q    Okay.  And of this civil litigants that you

9    write reports for, are they typically for plaintiffs or

10   defendants?

11       A    It is split equally.

12       Q    And when you provide expert reports for

13   plaintiff's side, what are you typically asked to expand

14   upon or analyze?  And I understand that it might be a

15   broad question, so if you give broad answers, that's

16   fine.  And I'll ask any specifics past that.

17           MR. POLICK:  I just wanted to interpose an

18       objection there, David, that you should not get into

19       any cases where you are consulting at the moment or

20       -- whether it'd be a plaintiff in civil litigation

21       or a defendant in civil litigation.  The question

22       should be limited to those cases where you have

23       actually been disclosed.

24       A    An answer to your question, whether it'd be a

25   plaintiff or a defendant, I approach all cases with the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    same rigor as any other case.  For example, the first

2    thing that I do before even discussing or accepting a

3    case is -- is to do a conflict of -- a conflicts

4    analysis to determine if I have any conflicts of

5    interest regarding those types of cases, whether they be

6    present or previous litigants.  The second thing I do is

7    -- and I ignore -- and the first thing I do is tell

8    potential clients, "Do not tell me your theory about

9    what happens."  I take the approach of saying, "Provide

10   me with the information you can if you're going to

11   retain me, and I will make a determination as to --

12   through peer review of what areas I consider significant

13   in a case."  And that's basically a -- a verbal

14   approach.  And that is only after I've been retained

15   because of the issues of privacy.  I have been retained,

16   I believe, by clients that want to make sure that the

17   other side doesn't retain me.  And that's a unique

18   approach.  But I take all cases and ask for as much data

19   as possible to do the review.

20        Q    Have you ever been retained on a case and

21   found that you did not believe -- strike that.  Have you

22   ever been retained on a case and had to tell the counsel

23   in that case that you could not write a report for them

24   that would support their client?

25             MR. POLICK:  Objection to the form of the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1         question.
2         Q    This would be based on after you've collected
3    the data.  Has there ever been a time when you've seen
4    the data and said, "Oh, the data doesn't support your
5    client and -- so I cannot provide expert consultation or
6    provide an expert report for you"?
7              MR. POLICK:  Same objection as the form, but
8         you can go ahead and answer.
9         A    Yes.
10        Q    And approximately how many times would you say
11   that's occurred?
12        A    I don't recall, but it's not frequent.
13        Q    Okay.  And so along those lines, prior to
14   writing the report that was disclosed in this case, did
15   the defense counsel ever provide you with a written
16   summary that summarized or was a synopsis of the events
17   in the case?
18        A    Yes.
19        Q    Okay.
20        A    And can I qualify that?
21        Q    Sure.
22        A    The only synopsis I have, basically, are from
23   the court filings.  So I actively monitor PACER on any
24   federal case that I take, and I read as much of the
25   filings as possible.  And that's where I get from
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    counsel the facts that are ongoing in the case.  And I
2    guess --
3         Q    I guess my question is -- sorry, continue.
4         A    And I asked for -- before they realized that I
5    have PACER account, I asked for all filings to date, so
6    I don't have to pay for them.
7         Q    That's understandable.  I guess my question is
8    a little bit different, which is, did the defense
9    counsel ever provide you with a written summary or
10   synopsis of the case that wouldn't have been within one
11   of the court filings on PACER?
12        A    Not in this case.
13        Q    Okay.  And you mentioned that it's important
14   to you to review all the relevant documents in a case
15   because it is important to have all the data before you
16   make a peer review analysis, correct?
17        A    To make their final conclusion regarding a
18   peer review?
19        Q    Yes.
20        A    I'm constantly asking for additional
21   information.  For example, I was insistent on getting
22   the additional information that Mr. Carpenter had that
23   he relied upon in making his conclusions.  And so I'm a
24   -- a data-rich person.  I want to get as much
25   information as possible from -- from a case.  For

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    example, I asked for every deposition given.  Every

2    disclosure.  I ask for everything.  And so I can

3    independently review and assess the information that's

4    contained in those documents.

5         Q    **Were there any documents that you requested**

6    **from defense that you would have -- for your analysis**

7    **that you were not able to review or were not given?**

8         A    From the defense or plaintiff?

9         Q    **From the defense.**

10        A    I expressed a -- a wish that -- that whether

11   or not that the plaintiffs would agree to -- that was

12   only really one.  Besides the documents that

13   Mr. Carpenter had, the latest -- an inventory.  The

14   materials reviewed was that I was missing the fire scene

15   videos of the investigators, and just received those and

16   found them to be -- didn't -- they did not change my

17   opinion, but I found them to be very informative.

18        Q    **And you received those from the defense**

19   **counsel?**

20        A    Yes.

21        Q    **Okay.**

22        A    And I believe that the defense counsel has

23   updated my disclosure to reflect that.

24        Q    **And how long did it take you to review all the**

25   **documents and material that was referenced in appendix A**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  prior to and during, I suppose, the writing of your

2  report?

3      A    I believe the best estimate of the number of

4  hours would be the two invoices that I provided.  The

5  number of hours.

6      Q    And then I'm going to pull up the invoices and

7  share them on the screen.  And exhibit -- I'll share

8  Exhibit 3, which is the May 2020 invoice, and with the

9  understanding that these are redacted for work product

10  privilege reasons.  Does this refresh your recollection

11  at all as to the amount of time you spent reviewing the

12  documents in this case?

13      A    That was for the first invoice.

14      Q    Yes.

15      A    There's a second invoice.

16      Q    Okay.  And I can pull that one up as well.  It

17  says Exhibit 4, which is the second invoice that was

18  dated July of 2021.

19      A    Yes.

20      Q    Okay.  So based on your review of those two

21  invoices, what would be your best estimate for the

22  amount of time you spent reviewing the documents in this

23  case?

24      A    I'm a master of the 80/20 rule, and I would

25  estimate that 80 percent of those hours were reviewing

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 59 of 159 PageID #:14157
The Deposition of DAVID Icove, Taken on August 5, 2021

58

1    documents.

2         Q    And so I guess I'll pull this up again on the

3    screen just for your purposes and for the record.  It

4    appears that the -- and I apologize, I didn't go into a

5    mathematics field because I am not great at math, but it

6    appears the number of hours is -- let's see.  Ten.  20 -

7    - 26 hours for the first invoice and 30 hours for the

8    second invoice, which would be approximately 56 hours in

9    total that you billed for both the review and the

10   writing of the case.  Is 56 hours, give or take, an

11   accurate reflection of the amount of time you spent both

12   reviewing and writing the report that you disclosed in

13   this case?

14        A    Yes.

15             MR. POLICK:  I object to the form of the

16        question.  I'm not sure if that's an accurate

17        accounting of all the hours and also object to the

18        extent that the question attempts to get into

19        attorney work product or communications with Mr.

20        Icove.

21             MS. GARCIA:  And the objections are noted.  I

22        would say that my math may be off, but I believe

23        based on the math that I did that it was around 56

24        hours or five off a couple hours.  I apologize.  I'm

25        just trying to get an approximate amount of time

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1          that you spent.  I also, per Mr. Icove's request,

 2          pulling up the invoices to help refresh his

 3          recollection as to the work he did. So I don't

 4          believe that there's an issue of work product

 5          privilege here, but your objection obviously stands.

 6          **Q     Okay.  So going off of the assumption that you**

 7     **spent in and around 56 hours reviewing this -- the**

 8     **documents and writing the report --**

 9          A     Let me clarify.

10          **Q     Yes.**

11          A     Those are actual hours -- desk hours, I would

12     say, where I was -- feet were planted, sitting at a desk

13     doing a review.  If you are familiar with experts, there

14     are experts that have what they call, walking around

15     time where they're walking in the park just thinking

16     about a case, and this and that.  Some of them bill for

17     that.  I don't bill for that.  So this is a -- it's like

18     writing music.  You keep it in your head for a while and

19     then you'll sit down and write it.  But it's going to

20     formulate and germinate in your mind.  So I -- I'm a

21     conservative biller, and I only do it for the exact time

22     that I'm actually sitting actually reviewing documents.

23     So like I said, I don't bill for walking around time.

24          **Q     Okay.**

25          A     And -- okay.  Thank you.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q    Of course.  But going off the assumption that
 2   the hours in the invoices are reflective of the sitting
 3   down time, which would be the actual reviewing of the
 4   document, so reading them, going through them and the
 5   writing of the report, then the invoices themselves
 6   would be reflective of both the time that you reviewed
 7   the documents and wrote the report, correct?
 8        A    Okay.  And in fact, you're probably going to
 9   ask the question, is this typical of the work that I do?
10   And it's within the scope of the amount of hours
11   typically that I would use in writing a report.
12        Q    Okay.
13        A    Reviewing documents and writing a report.
14        Q    And again, with the understanding that I'm not
15   a mathematician, if you spent in and around 56 hours
16   reviewing and writing the report, then that would mean
17   that you spent about 44, 45 hours reviewing the
18   documents, correct?
19        A    I'd say so, yes.
20        Q    Okay.  So in those -- does the 45 to -- the 45
21   to 46 hours, pair on to what you recall the time you
22   spent reviewing the documents outside of the invoices
23   themselves as a guidepost?
24             MR. POLICK:  Objection to the form of the
25        question.  You can go ahead and answer it as long as
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1          you're not getting into any of attorney work product

2          or our communications.

3          A    Can you repeat that question, please?

4          Q    Yes.  Of course.  I will rephrase it slightly.

5     Going off of the -- your earlier testimony that the

6     invoices are somewhat reflective or are reflective of

7     the time that you spent at the desk writing or reviewing

8     documents, and also your testimony that approximately 80

9     percent of the time formulating a report would be spent

10    reviewing those documents, they would come to the figure

11    of 45 or 46 hours.  Does -- do 45 or 46 hours, based on

12    your recollection of reviewing the documents, pair on to

13    the amount of time that you, in your own belief, spent

14    reviewing the documents in this case?

15          MR. POLICK:  Same objection as to form.  You

16    may answer.

17    A     I believe that's a rea -- realistic estimate.

18    Q     Okay.  Would it be fair to say going off of

19    that estimate that you were able to review all the

20    material in the six binders that you indicate are in

21    front of you within 45 to 46 hours?

22    A     And additional documents.

23    Q     But would it be fair to say that you were able

24    to review additional documents plus the material that

25    are in your six binders within 45 to 46 hours?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      A    Yes.
 2      Q    Okay.  And did you write the entirety of the
 3 report?
 4           MR. POLICK:  I'm objecting and direct the
 5      witness not to answer that question as it gets into
 6      the drafting process.
 7      Q    What portions of the report did you write
 8 without any -- did you write independently, Mr. Icove?
 9           MR. POLICK:  Same objection to the question as
10      it goes to the drafting process and direct the
11      witness not to answer.
12      Q    Without as -- without going into who drafted
13 what, did you independently draft the report that was
14 disclosed in this matter?
15           MR. POLICK:  Again, I'm going to object on the
16      grounds that this gets into the drafting process and
17      also into communications with the expert as well as
18      to attorney work product and direct the witness not
19      to answer that question.
20 BY MS. GARCIA:
21      Q    Are you going to take your defense counsel's
22 advice and not answer the question as to what parts of
23 the report that you drafted specifically, Mr. Icove?
24      A    Yes.  I am -- I am complying with his
25 objections.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1        Q     Did you write any portion of the report
 2   independently?
 3             MR. POLICK:  Same objection as the question
 4        goes into the drafting process of the report.  Also
 5        implicates attorney work product and communications
 6        with the expert.  So I direct the witness not to
 7        answer that question.
 8        Q     Are you going to take your attorney's advice
 9   and not answer whether or not you drafted any of the
10   report that you disclosed in this matter?
11        A     Yes, ma'am.
12        Q     Okay.  Let me take a second to pull up your
13   report.  And I wanted to first go to page 28.
14        A     And that's regarding opinion number 1; is that
15   correct?
16        Q     Yes.  Regarding opinion number 1, and my first
17   line of questioning will be about opinion number 1.  But
18   actually, prior to getting into the specific details of
19   the report, would it be fair to say that you've been
20   disclosed as the fire and arson expert in this re -- in
21   this matter?
22        A     I believe so.
23        Q     Okay.  And would you also believe yourself to
24   be an expert in police practices?
25        A     With regards to conducting fire
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1    investigations, yes.

 2         Q    Okay.  And would you consider --

 3         A    And my --

 4         Q    I'm sorry, continue.

 5         A    I apologize for interrupting.

 6         Q    No.  No.  Go ahead.

 7         A    My expertise and -- is regarding the standards

 8    of care for conducting fire investigations and I believe

 9    that standards of care cover police practices.

10         Q    Police practices with regards to fire

11    investigations, correct?

12         A    Fire and law enforcement investigations.

13         Q    Have you ever been retained to give an expert

14    opinion or put together an expert report on the

15    standards of care relating to law enforcement

16    investigations that do not have anything to do with fire

17    or arson?

18         A    I do not recall.

19         Q    Okay.  And is that you do not recall, or it

20    hasn't occurred?

21         A    I do not recall having ever been retained.

22         Q    Okay.  And would it be fair to say that you

23    were not a medical expert?

24         A    I am not a medical expert.  However, I've

25    received as well as taught courses in death

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 66 of 159 PageID #:14164
The Deposition of DAVID ICOVE, Taken on August 6, 2021

65

1   investigation for the Federal Bureau of Investigation. I

2   -- I also previously was certified as an emergency

3   medical technician, so I received guidance on that.  And

4   that also, the Society of Fire Protection Engineers have

5   a guidelines for evaluating burn injuries, and that is

6   the forensic engineering aspects of -- of injuries that

7   an individual may sustain for second, third, and fourth

8   degree burn injuries, and what the exposure of the fires

9   -- radiation, or conduction, or convection -- may have

10  produced those injuries.

11      **Q   Okay.  Have you ever worked as a medical**

12  **doctor, Mr. Icove?**

13      A   No, ma'am.

14      **Q   Have you ever, other than receiving emergency**

15  **medical technician training, have you ever worked in the**

16  **field as an emergency medical technician?**

17      A   Only -- I was -- worked for the Hyattsville

18  Fire Department.  It was -- I lived in their station and

19  actively ran calls as an emergency medical technician on

20  the fire department, and I was required to have the

21  state certification for that along with a firefighter

22  certification.

23      **Q   Okay.  Other than working with the**

24  **firefighters' office, and assisting with emergency**

25  **medical technician, and the services they provide, have**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    you worked in the field as an emergency medical

2    technician?

3        A    No.  Besides -- besides that service, no.  I

4    have not.

5        Q    Have you ever conducted an autopsy?

6        A    I have participated in autopsies.

7        Q    Okay.  Have you ever conducted an autopsy?

8        A    Not as the primary pathologist, no.

9        Q    Okay.

10        A    I have assisted in autopsies.

11        Q    And would -- have you received any training or

12    certification in pathology?

13        A    No.

14        Q    Okay.  And have you ever received any training

15    or certification on polygraph?

16        A    No.

17        Q    Okay.

18        A    Let me -- let me rephrase that.  I apologize.

19    While employed at the Federal Bureau of Investigation, I

20    served on the peer review panel for the research into

21    polygraphs.  And that peer review panel was a science

22    based multidisciplinary panel.  And I provided feedback

23    and guidance regarding the -- the testing and evaluation

24    of polygraphs.

25        Q    Have you ever personally conducted a polygraph

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  examination?

2      A    No.

3      Q    Have you ever analyzed a polygraph examination

4  in one of your cases?

5      A    No.  However, I have provided questions that

6  the polygrapher should ask the subject.

7      Q    Okay.  But more specifically, you've never

8  been asked to or given an analysis of whether an

9  examiner under polygraph has been truthful or

10  duplicitous, correct?

11      A    Can you rephrase that, please?

12      Q    Sure.  Have you ever been the person -- the

13  examiner of a suspect and been tasked with concluding

14  whether or not the answers they have given indicate

15  truthfulness or deception?

16      A    So if you asked me, did I look at the tracings

17  in making an interpretation from the behavioral

18  responses from the tracings?

19      Q    Yes.

20      A    No.

21      Q    Okay.  So turning back to the first section of

22  your report, you talk a lot about the scientific method

23  and how it relates to fire investigations.  So could you

24  please briefly list the steps of the scientific method

25  for me?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     A     Well, the best ones are the ones contained in

2     my report.  If -- in the introduction.

3     **Q     Be that page 13?**

4     A     You're right on track, yes.  Page --

5     **Q     Okay.**

6     A     This diagram -- figure 1.  The flow chart of

7     the -- outlining the scientific method integral to NFPA

8     921 as it applies to fire scene investigation and

9     reconstruction.  The partner to that is configured to,

10    which are the sources of evidence information they may

11    contribute to working hypotheses as it applies to fire

12    scene investigation and reconstruction.  So when the

13    flow chart talks about developing and testing

14    hypotheses, these are the hypothesis -- this is the

15    information that the hypothesis -- the information and

16    data that's used to generate hypotheses.  So the answer

17    to your question.  There was basically seven steps.

18    **Q     And those steps would be "recognizing the**

19    **need, defining the problem, collecting data, analyzing**

20    **the data, developing a working hypothesis, testing that**

21    **working hypothesis, and then selecting the final**

22    **hypothesis with the understanding that there may be**

23    **several cycles of testing working hypotheses," correct?**

24    A     Well, when you were reading those off, you may

25    not have seen it.  It says in step 5 -- step 6 are

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  hypotheses.  NFPA 921, for a period of time to solicit a

2  hypothesis, and myself and my co-authors changed that

3  mantra to say that it's correct to say hypotheses, and

4  eventually 921 also changed it.

5      **Q    And why is it important for -- to say,**

6  **hypotheses versus hypothesis?**

7      A    Because, when you're looking at data -- you're

8  collecting data.  One of the things, and it's the last

9  bullet item on there is that -- is assemble historic

10  loss histories of similar incidents.  So for example, if

11  apartment fires or residential fires -- about a third of

12  those fires occur in the kitchen.  But, they may occur

13  somewhere else.  So you need to look at the potential

14  types of incidents that may occur within a residential

15  or a space.  So the loss histories generate hypotheses.

16  For example, you know, and there are plenty of examples

17  in this case, as well as in others.

18      **Q    And why is it important to, specifically the**

19  **scientific method, to allow for there to be multiple**

20  **hypotheses versus only having one hypothesis that you**

21  **test and come to a conclusion on?**

22      A    The scientific method is an internationally

23  accepted standard of care for all sciences, and to

24  deviate from that would be considered to be not correct.

25  And the best example -- the best example is COVID.  Look

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  -- look what's happened with COVID.  I mean, how many

2  working hypotheses do we need?  Masks?  No masks?  Two

3  shots?  One shots?  Booster shots?  These are working

4  hypotheses.  This is what we live with, and -- and it

5  shows you that we need to continue to collect data.

6      Q    And the scientific method specifically, as you

7  said, is an internationally recognized standard for

8  analyzing data.  But my specific question is, how long

9  has a scientific method been understood to be necessary

10  as a methodological tool in analyzing scientific data or

11  medical data?

12      A    I think Sir Francis Bacon started all of this.

13  And however, in the -- in the area of fire

14  investigation, the message was driven home to me.  While

15  I was at the University of Maryland, the first course in

16  fire protection engineering dealt with the scientific

17  method.  That's how codes and standards are developed,

18  and it was our -- as engineers our primary methodology

19  for approaching any problem having to do with fires.

20      Q    And I know on page -- going back on page 28,

21  I'll give you a second to flip to that.  You've said

22  that the scientific method was not cited in the 1993

23  edition of the NFPA 1033.  With that understanding and

24  with what you just testified, would it be fair to say

25  that even though it wasn't as part of the NFPA 1033

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 72 of 159 PageID #:14170
The Deposition of DAVID SMITH, taken on August 7, 2019

71

1  edition in 1993, you -- fire investigators such as

2  yourself still would've been using the scientific method

3  in order to conduct fire investigations?

4      A    Yes.

5      Q    Okay.  And if a fire investigator did not use

6  the scientific method while testing a hypothesis or

7  conducting a fire investigation, would that support a

8  conclusion that they met the minimum standards of care

9  for fire investigations?

10     A    As long as they used a similar methodology.

11  And for example, there are -- have been arguments of

12  whether or not you used NFPA 921 as your guide to

13  conduct any investigation.  And it's been upheld in the

14  profession that as long as you used a systematic

15  technique that embraced the scientific method, that you

16  were in good steads.  So just because nobody called it

17  the scientific method, it still was the methodology of

18  the time period.

19     Q    So would it be fair to say that to meet the

20  minimum standards of care in doing a fire investigation,

21  the methodology used to test the data and hypothesis

22  would either need to be the scientific method as

23  articulated in the report or be of a similar methodology

24  as the scientific method articulated in this report?

25     A    Yes.  As long as it embraced the same -- the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  same iterative process, it would be considered of their
 2  use.
 3       Q    And what does the -- what would you consider
 4  the iterative process to be that would need to be used
 5  for fire investigation?
 6       A    The same one that's reflected in figure 1.
 7       Q    Okay.  So that's broadly, you know, collecting
 8  data, analyzing it, testing, developing, and testing
 9  hypotheses?
10       A    Yes.
11       Q    And when conducting a fire investigation, why
12  is it important to test various hypotheses regarding the
13  cause and origin of the fire?
14       A    Basically, if -- if you look at the
15  methodology, it provides you with evaluations of
16  potentially what could have happened such as loss
17  histories.  For example, did you -- somebody leave the
18  controls on -- on a stove and leave, or did the stove
19  malfunction, or other types of factors, or if somebody
20  accidentally bumped into the control.  So there's a
21  series of things that -- of typical loss histories that
22  you need to explore.  So example, you know, a fire, like
23  I said if about a third of the fires or maybe higher are
24  cooking related.  So it's the loss histories of what was
25  going on.  It come down -- it could come down to as

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    simple as what type of oil were you using to cook French

2    fries, for example.  If they may have different flash

3    points.  They may have different characteristics.  So it

4    comes down to the issue of not only loss histories but

5    also witness recollection.  So if somebody said "I left

6    the stove on," and there was a fire in their apartment

7    and the fire was not in the kitchen, you may be testing

8    the veracity of that witness or their recall.  So the

9    scientific method can be used not only to evaluate

10    hypotheses but also look at the credibility of

11    witnesses.

12    **Q    And can you this -- define what a loss history**

13    **would be in this context?**

14    A    Say, just like we were talking about food on

15    the stove.  Could it be a malfunction of a -- of a knob

16    or let's look at an area -- they had coffee makers at

17    one time.  Had problems with not shutting off properly

18    or not being unplugged.  So some of those were design

19    problems. Some of those were the thermal element -- the

20    thermal protective element in there -- failed to

21    operate.  So just having a fire regarding a -- the

22    device such as that, you'd have to take a look at that.

23    Other places where they find loss histories are their

24    Consumer Product Safety Commission.  So if you have

25    something like that.  If they ran the -- the model and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   brand, they'd be able to see what the complaints were
 2   regarding that coffee maker.  For example, the
 3   complaints may be, "I touched it and I got shocked," or
 4   this happened or that happened.  So those are loss
 5   histories, but the more important thing is if you look
 6   on figure 2 on the working hypothesis, that really tells
 7   you a little bit more about loss histories.  It talks to
 8   you about human behavior, what witnesses are saying,
 9   what's the forensic evidence reveal, if there are any
10   environmental interactions.  For example, we had a power
11   outage yesterday and the dryer stopped working hence and
12   my wife didn't realize that there's a thermal reset
13   relay.  And the -- and the dryer that after a period of
14   time resets itself.  So she was ready to call the
15   maintenance folks to come out and fix it.  So when I got
16   back and I just looked at it, turned it on, and it
17   worked, and I explained to her that that was the -- one
18   of the environmental interactions that we have.  Seeing
19   assessments, fire testing brings a lot of information
20   in.  For example, if you have a device like the coffee
21   maker and you decide you are going to try to fail it --
22   it could fail -- there's different things you can do to
23   it.  And then fire dynamics and modeling come to -- come
24   to -- to that area, as well as the professional
25   standards that we have.  NFBA 921, for example, has a
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   whole section on fire modes and effects analysis where
 2   they -- one of the examples is a coffee maker.  And --
 3   and they come up with the procedures on how to make that
 4   evaluation.  So there's a lot that goes into fire and
 5   explosion loss histories that degenerate hypotheses that
 6   need to be tested.  So I'm always saying I need more
 7   data, more data, and constantly searching the
 8   literature, looking at what's the -- what the other
 9   present expert treatises in the field and take it from
10   there.
11        Q    So would it be important -- sorry, is one of
12   the reasons why it's important to test hypotheses in
13   fire investigation to determine the possibility of a
14   hypothesis that an investigator has come to about the
15   cause and origin of the fire?
16        A    Sometimes it's just plain obvious what
17   happened.
18        Q    And so will hypothesis testing then be
19   important to confirm this -- what happened or
20   potentially deny a hypothesis of what happened?
21        A    The best reference, if you look on page 64 of
22   my report, and this is language from NFPA 921.  It says,
23   "there are times when there's no physical evidence of
24   the ignition source found at the origin, but there is an
25   ignition sequence that can logically be inferred for
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    using other data.  Any determination of fire cause
2    should be based on evidence rather than on absence of
3    evidence.  However, there are limited circumstances when
4    the ignition source cannot be identified, but the
5    ignition sequence can logically be inferred.  This
6    inference may be arrived at through the testing of
7    alternative hypotheses involving potential ignition
8    sequences, provided that the conclusion regarding the
9    remaining ignition sequence is consistent with all known
10   facts."
11        Q    Okay.  My question then is that - all right,
12   strike that.  Could hypothesis testing, which shows that
13   the manner a fire investigator believed caused or
14   originated a particular fire -- if that is found to not
15   be plausible based on the testing of those
16   circumstances, is that evidence that would then be
17   utilized and analyzed in determining the overall cause
18   and origin of the fire?
19            MR. POLICK:  Objection to the form of the
20        question, but you may answer.
21        A    Let me beg the question.  In this case, the
22   defendants used and explored several hypotheses for this
23   fire.  In comparison, your expert honed in on one and
24   didn't consider other potential hypotheses.  So I would
25   consider that the defendants' investigation was superior

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    over the plaintiff's investigation regarding the use of

2    the scientific method.

3        Q    Okay.  And so going to the defendants' or

4    rather the fire investigators on behalf of Naperville's

5    actions in this case, in what ways was the scientific

6    method adequately used by the Naperville Fire Department

7    or fire investigators?

8        A    They did not have a presumption in this case.

9    Your expert had a presumption that all fires are

10   accidental.  They exhaustively looked at alternatives.

11   They looked at the television set.  They called in

12   engineers to assist them.  They also called the state

13   fire marshal's office and -- to do an independent peer

14   review.  And from the record, it indicates that's

15   exactly what he did and that was consistent with what I

16   did as a state fire marshal's investigator.  They -- you

17   can see through the record that they did not jump to

18   conclusions right away, but they looked for other data.

19   For example, they exhaustively interviewed your client

20   in this case, as well as -- they spent a great deal of

21   time doing what we do calling neighborhoods.  Several

22   days of knocking on doors, searching out additional

23   witnesses in this case just to determine what had

24   happened.  Other things that they looked at had to deal

25   with burn patterns.  They went through the formal

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
1   process of conducting an investigation.  They subpoenaed
2   telephone toll records.  They got -- they came back and
3   re-examined the scene, as well as they did some
4   exhaustive reconstruction dimensionally of what the
5   scene looked like.  They also performed eloquently in
6   reconstructing the scene, where they placed the
7   furniture in their pre-fire positions and looked at
8   that, and -- and conducted the analysis.  They also
9   protected the integrity of the investigation by filming
10  with video early on.  And so I got the feeling as if I
11  was there.  So I have a very good assessment of what
12  happened.  Between the interviews, the peer reviews, and
13  -- and the -- and what they had they did not jump to
14  conclusions in this case.  They took it all in, as well
15  as the fact that they sought out the prosecutor to get
16  his important end of this case, and he independently
17  reviewed it.  So as far as the exhaustive work that they
18  did, they concluded and -- and -- and I believe that
19  they uniquely followed the investigation.  And in fact,
20  they met all of the professional levels of performance.
21  They applied the standard of care.  They met the
22  requirements for fire investigations.  They did an
23  exhaustive scene exam.  They did an exhaustive
24  documentation.  They -- their evidence collection and
25  preservation was elegant to the point that they
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   collected, and it was not required at this time, control

2   samples.  So there were actually samples of materials

3   that may -- may be used later.  And during that time

4   period, 1995, we're talking about some significant

5   investigative work.  They conducted numerous interviews.

6   They did post-incident investigations, as well as their

7   presentations were sound.  There's no doubt in my mind

8   that this is -- that was a very, very thorough

9   investigation and they exploited as much as they could

10  -- the scientific method.

11      **Q      Because an investigation is a thorough**

12  **investigation, does that mean it automatically meets**

13  **this minimum standards of care that are required for**

14  **fire investigators?**

15      A     In this case, yes, they met the minimum.

16      **Q      I'm not asking in this case.  I'm asking, does**

17  **a thorough investigation automatically correlate to a**

18  **fire investigator meeting the minimum standards of care**

19  **during their investigation?**

20      A     Yes.

21      **Q      Okay.  And so to -- given a hypothetical that**

22  **a fire investigative team does a thorough investigation**

23  **but fails to adequately test the hypothesis -- the**

24  **hypotheses that are promulgated in their investigation,**

25  **would that still be considered meeting a minimum**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   standard of care for fire investigations?

2        A    Is this a hypothetical question or is this

3   applied to the circumstances in this case?

4        Q    **This is a hypothetical question.**

5             MR. POLICK:  I object to the incomplete

6        hypothetical, but you may go ahead and answer the

7        question.

8        A    I would need more information about the

9   process.  In a hypothetical, I would need a case

10  scenario.  I would need basically more data than to make

11  a general comment regarding that.

12       **Q    Okay.  So in further hypothetical, if a fire**

13  **investigative team was presented with several plausible**

14  **hypotheses for the cause and origin of a fire and did**

15  **not test those hypotheses, and those hypotheses are**

16  **presented to them during the course of the**

17  **investigation, could that investigation itself still**

18  **meet the minimum standards of care for a fire**

19  **investigator?**

20       A    Yes.

21       **Q    And in what circumstances would that happen?**

22       A    In my personal experience, as well as

23  interviewing convicted arsonists in prisons, sometimes,

24  individuals who are involved in setting the fire may not

25  be open and honest about exactly what happened and may

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  play upon the fact that this was a mere accident.  And

2  so I have -- in interviewing convicted arsonists, there

3  was a large FBI study on that in the prison interviews,

4  as well as cases that I have worked on personally and --

5  and followed through prosecutions, and with successful

6  convictions that may occur.  There may be a hypothesis

7  that's presented by the suspect or target at the

8  investigation.  It really wasn't exactly what happened.

9  However, they place themselves at the scene.  The origin

10  is exactly the way that they indicated and there's a

11  plausible explanation for what happened.  So yes, I have

12  experienced that and been presented with hypotheses that

13  -- alternative hypotheses.  If they're very close, I

14  could have explained --

15      **Q    Okay.**

16      A    -- what happened.

17      **Q    And shifting away from a suspect themselves,**

18  **if prior to the end of an investigation, a plausible**

19  **hypothesis about the cause and origin of the fire was**

20  **postulated by someone working on the case, so that would**

21  **be a investigator, should the fire investigators in the**

22  **case per the minimum standards of care articulated by**

23  **the NFPA 921 and 1033, have tested that hypothesis?**

24      A    In presented with cases hypothetically or --

25      **Q    Yes.**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1      A      -- actual cases in the past, where somebody
2  has given me an explanation of what they did, the end
3  result was an arson, was an intentionally set an
4  {inaudible} fire.  They se -- set a fire knowing that it
5  was going to create a developing fire.  And the scena --
6  scenario that was given to me didn't meet the testing.
7  And let me give you an example.  A case I've worked once
8  involved a bee laboratory.  Bumblebees.  And the -- the
9  loss was the loss of a $10,000 notebook of original
10 data.  How the fire occurred was the janitor said that
11 he was smoking some marijuana, and that while he was
12 smoking it the seeds must have got into it and started
13 exploding.  And he ran to the sink to put it out.  To
14 put out his joint.  Along the way he said that flaming
15 pieces of the marijuana cigarette dropped in locations
16 across the room.  So when I investigated it, I saw that
17 the -- that the logbook containing the $10,000 worth of
18 data was burned and scourged, and I found other fires
19 there.  Now, did I go back and ask my boss, "Oh, by the
20 way, I want to go down and buy a nickel bag of marijuana
21 and go test this myself," or do I accept the fact that
22 this was a implausible hypothesis and that the fires
23 were intentionally set by other means?  So that goes
24 back to that -- that conclusion that the 921 says that
25 basically, there are times when this ignition sequence

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   -- it is -- no physical evidence is found but an

2   ignition sequence can be logically inferred.  So what do

3   you think?  What would you do in a position like that?

4   How would you test it?

5        Q    No.  I --

6        A    Would you go and buy some marijuana and then

7   go ahead and say, "Well, if -- if the weeds and seeds

8   went out of there or that they -- if they dropped down,

9   were they a competent ignition source as a ci -- as a

10  cigarette might be to papers on a desk"?  No.  I didn't

11  test that hypothesis, but I knew that that individual

12  had set that fire -- those fires.  I had continuous

13  cases over my career where identically, the same

14  scenarios are being put forth and the offenders are

15  trying to make it look like an accident, when in fact,

16  they knew that they set the fire.  So --

17       Q    But, Dr. Icove, I'm not actually asking --

18  again, I'm not asking if a defendant presented this

19  evidence.  I'm asking -- and I'm not asking if a

20  defendant presented what someone would obviously know

21  was an implausible scenario as you said.  I'm asking if

22  a person on the investigation that isn't the defendant

23  or isn't the suspect rather, gave a plausible hypothesis

24  as to the cause and origin of a fire, could they still

25  meet the minimum standards of fire investigation as

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  you've articulated them if they didn't pass that

2  plausible hypothesis?

3      A    The answer is yes.  And the examples that I

4  just provided solidly backs up that scenario.

5      Q    And would that be a situation in which the

6  outcome of the hypothesis was already known, such as if

7  I lit a candle on fire and then pushed it onto some

8  curtains?

9          MR. POLICK:  I'm going to object to the

10          incomplete hypothetical, but you may go ahead and

11          answer it.

12      A    Like I said, are you talking about a

13  hypothetical question or are you talking about this

14  case?

15      Q    I'm talking hypothetically.

16      A    You would do.  And the standards of care

17  involve what we call the Bilancia Matrix, in which

18  off-fuel sources and potential ignition sources are

19  pairwise compared and eliminated -- exhaustively

20  eliminated or included as a potential hypothesis.  So

21  that's what fire investigators use now, and they have

22  intellectually used in the past.  They've looked at

23  everything in the room. They've looked for potential

24  candles.  They've looked at -- for curtains, they look

25  for this and that.  And then they said, "is it possible

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  that this candle could have ignited that curtain?"  So

2  what intuitively has been done for years since the --

3  the science of fire investigation is to compare fuel

4  packages such as drapes with ignition sources and say,

5  which one is possible, which one is not possible.  And

6  that is part of the scientific method because this is an

7  exhaustive pairwise comparison of potentials and not

8  potentials for this. So like I said, you have to

9  consider the circumstances. You also have to do a

10  thorough fire investigation and look at all the facts

11  and circumstances.  So I don't --

12      Q    So what --

13      A    -- know if that answers your question.

14      Q    That does.  So where in the record did the

15  fire investigators compare the fuel package in this case

16  which would have been a cigarette dropping on a

17  newspaper covered in vodka with the ignition source?

18      A    I believe that when they brought the state

19  fire marshal's investigator in.  Did an independent

20  review -- that was his conclusion.

21      Q    Where in the record was that review taken?

22      A    When -- when we take the next break, I'll go

23  ahead and pull it up for you.  Do you want to keep a

24  list of questions and I'll -- and during the breaks,

25  I'll go ahead and answer them?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 87 of 159 PageID #:14185
The Deposition of DAVID SMITH, taken on August 7, 2019

86

```
 1        Q    Well, we could pull up the fire marshal -- we
 2   should be able to pull up the fire marshal report in
 3   just a second.  I have it on my --
 4        A    So the experts in your case have pointed to
 5   that as the potential ignition area.  So there are
 6   numerous experts in this case that have continued to
 7   point to where the area and point of origin is.
 8        Q    And I was specifically referring to the fire
 9   investigators in the initial investigation.  I'm not
10   talking about the experts that were retained during the
11   criminal trial or during the post-conviction
12   proceedings.  I'm talking about the fire investigators
13   who in this case were Lieutenant Guerreri and
14   Mr. Kushner.  Based on your review of their records --
15   and of course we can pull those up, where did they
16   compare the fuel package in this case with the ignition
17   source?
18        A    They were going on the basis that your client
19   was telling the truth, and that the area and point of
20   origin matched exactly to what it was.  That was the
21   hypothesis that they were looking at.  And
22   independently, I've looked at their findings and
23   independently confirm that they were right about the
24   origin -- area of origin and point of origin.
25        Q    Okay.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1      A    So --
 2      Q    And you said the basis was on the fact that
 3   the client was telling the truth, but you yourself has
 4   test -- have testified that suspects in cases will often
 5   lie or obfuscate the truth to make themselves look
 6   better or innocent.  So why and how did -- or rather how
 7   did Mr. Guerreri and Mr. Kushner meet the minimum
 8   standards of care and fire investigation if they simply
 9   took the suspect at his word and didn't do any testing
10   of the hypothesis?
11      A    First off, are you implying that your client
12   is lying?
13      Q    I'm implying that -- I'm doing no such thing.
14   I'm saying --
15      A    That -- I believe that's what you're implying
16   is that your client told complete lies repeatedly and
17   they were consistent with exactly what happened.  It was
18   not a fire in a kitchen.
19      Q    I believe that you're avoiding answering my
20   question.
21      A    I'm --
22      Q    I did not imply that my client was lying.  I
23   said your testimony is that you have dealt with suspects
24   in cases who have not told the truth or obfuscated the
25   truth in some way, which is why it's important to
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    undergo rigorous scientific testing on all the data to

2    be sure that any of the plausible hypotheses are being

3    tested as to the origin and cause of a fire, correct?

4         A    That's correct.

5         Q    And as fire investigators, Mr. Guerreri and

6    Mr. Kushner would have been trained similarly to you,

7    correct?

8         A    Yes.

9         Q    Okay.  So then how can you say -- or can you

10   say that Mr. Guerreri and Mr. Kushner met the minimum

11   standards of care for fire investigation if they did not

12   test the hypothesis that was presented to them both by

13   the plaintiff here and also by several of the detectives

14   in this case without making sure that, as you said, "The

15   fuel package matched the ignition source"?

16        A    Well, in this case, it did.  If I did --

17        Q    And what's the evidence that backs that up?

18        A    We were talking about your client saying that

19   he spilled vodka on the newspapers --

20        Q    Yes.

21        A    -- on the Sunday edition of the Chicago

22   Tribune.  What portion of the papers was it spilled on

23   and when he discarded that cigarette, was it on the wet

24   portion or the dry portion?  And I believe that

25   Detective Guerreri in testimony in court, when posed for

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  that question said, "Yeah, you know, that -- that was a
2  pote -- that could have been a potential ignition
3  scenario."  And it was in this case.
4      **Q    And where did Detective -- Lieutenant Guerreri**
5  **test that?**
6      A    He -- I don't believe that he tested it.  Of
7  course, I didn't go back on that other case involving
8  the bee laboratory and buy up all that marijuana to do
9  the testing myself.  I knew what was considered to be a
10 competent ignition scenario and so did he.
11     **Q    And wha -- how did -- what supports your**
12 **testimony that Mr. Guerreri knew that a lit cigarette on**
13 **vodka-soaked newspaper was a competent ignition source?**
14     A    This is where the data comes in.  This is
15 where -- is the science advances itself, as well as back
16 in the days when I was in liquor establishments where
17 you saw flaming drinks.  You could only imply that
18 somehow the flames got there.  So did they miss that
19 factor?  No.  But here's what's happened.  The science
20 of smoldering fires, which is what this was, has
21 advanced so far, that we now have the answers to the
22 question from Dr. Vyto Vabrauskas, who just wrote the
23 premiere text on smoldering fires and the potential for
24 ignition of exactly the scenario we have here.  Minus
25 the vodka.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    Q    What testing, if any, did Detective Guerreri

2    and Mr. Kushner do to confirm that the hypothesis, which

3    was articulated by Mr. Amor, could have come to pass?

4    A    The test -- the testing.  I don't believe that

5    they did the testing.  However, there was significant

6    motive in this case that was brought up by the

7    prosecutor in the final interviews of your client.  So

8    not only did your client say that he left the cigarette

9    there, he realized it was -- in -- in one of the

10    statements, that it was smoldering, like, Dr. Vabrauskas

11    talks about, but also, he left it unattended and left

12    the apartment knowing that there was going to be a fire.

13    And if you want me to pull from the -- from the district

14    attorney's report, established what the motive was.  He

15    established that he wanted to cause a fire that would

16    destroy enough furniture in the department -- in the

17    apartment to go from there.  So investigations deal with

18    motive, means, and opportunity.  And that's what you

19    have in this case.  All three factors.

20    Q    And that's all well and good, Dr. Icove.  But

21    the fire department and the fire investigators tested --

22    did a test burn of the VCR in this case, correct?

23    A    Uh-huh.

24    Q    They did a test burn of various other ignition

25    sources in this case such as the electrical wiring,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 92 of 159 PageID #:14190
The Deposition of DAVID Amor, taken on August 9, 2023

91

1    correct?

2        A    They looked at -- they examined it, yes.

3        Q    **Yet despite being presented with the**

4    **hypothesis that Mr. Amor dropped a cigarette on**

5    **vodka-soaked newspaper, they did not test on that**

6    **hypothesis as they did with other hypotheses in the**

7    **case?**

8        A    No.  But they exhaustively eliminated all of

9    the potential ignition sources and fuel sources.  It

10   came together.  They --

11       Q    **How can you testify that they exhausted --**

12   **they eliminated the ignition sources and fuel sources if**

13   **they did not test the hypothesis articulated by**

14   **Mr. Amor?**

15       A    I don't know what they were thinking.  I can't

16   testify this -- about what they were thinking regarding

17   this case.  However, let me put it to this way.

18   45 years of law enforcement, as well as ten years at the

19   -- almost ten years at the FBI, reviewing case

20   submittals by local state and international law

21   enforcement agencies, of all the cases, the thousands of

22   cases that I've reviewed, this case is the most thorough

23   investigation that I've ever witnessed in my life. There

24   are things that are extraordinary things that these

25   investigators did.  So if you want to look at

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  comparisons and thoroughness for investigations, I can't

2  find another example worldwide that meets this case.

3  They proceeded in doing exactly what they were -- what

4  they were assigned to do, and they believed what your

5  client had to say and took it for face value as well as

6  the fact that he realized that there was a fire -- if we

7  believe what he said, that he realized that there was

8  going to be an ongoing fire.  He saw the smoke and he

9  left it.  I mean, I don't know how much more that you

10  need from that, especially from the fact just because

11  they didn't realize whether or not at the time, that

12  vodka-soaked paper may be a competent ignition scenario,

13  but a non-soaked area could be.

14       **Q    And, Dr. Icove, you are aware that Mr. Amor**

15  **has been exonerated of this crime, correct?**

16       A    Yes.

17       **Q    And you are aware --**

18            MR. POLICK:  Object to the form of -- objection

19       to the form of that question.  Don't believe that

20       accurately states the record, but you can go ahead

21       and answer that.

22            MS. GARCIA:  To clarify for the record, the

23       conviction in this case has been vacated for

24       Mr. Amor and you are aware --

25            MR. POLICK:  Yes.  The record also indicates

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

 1          that Mr. Amor sought a certificate of innocence
 2          which was denied.  So I think describing that the
 3          record reflects that Mr. Amor was exonerated is
 4          incorrect.
 5               MS. GARCIA:  And I just clarified, Joseph.
 6          Thank you.
 7     BY MS. GARCIA:
 8          Q    And you are also aware after reading -- or do
 9     you recall from reading Mr. Cross' deposition that
10     Mr. Cross did not believe the scenario that Mr. Amor
11     suggested of dropping a cigarette on a vodka-soaked
12     newspaper would have caused the fire to occur, correct?
13          A    Can you point me in his deposition where
14     you're looking at that?
15          Q    Sure.  Or potentially -- how about at the
16     break, I'll pull it up.  But if I represent to -- I'll
17     represent to you that within Mr. Cross' deposition, he
18     said that he did not believe the method in which
19     Mr. Amor confessed to starting the fire would have
20     actually caused the fire at issue.  With all that in
21     mind, can you -- is it your testimony here today that
22     the Naperville Police Department accurately and
23     thoroughly tested all the hypotheses in this fire
24     investigation in this case?
25               MR. POLICK:  Objection to the form.  But you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 95 of 159 PageID #:14193
The Deposition of DAVID Fluker, Taken on August 9, 2021

94

1    can go ahead and answer.

2        A    I'm testifying that based on today's science

3    for what we know, this -- that hypothesis could have

4    been tested.  However, from what we know now is the

5    propensity for cigarettes to ignite newspaper.  And we

6    also know the latest information regarding smoldering

7    fires.  Am I saying at that time in 1995, did the

8    science exist to replicate or demonstrate these ignition

9    scenarios?  I don't know.  However, what I do know is

10   what the science says today and -- and I'm applying that

11   to the facts of this case.

12       Q    And you were a fire investigator in 1995,

13   correct?

14       A    I was employed at that time.  In '95 I was a

15   -- a federal agent.

16       Q    Okay.  But prior to being a federal agent, you

17   had been a fire investigator for several law enforcement

18   agencies, correct?

19       A    Yes.

20       Q    Okay.  And during your tenure as a fire

21   investigator, you would have had to test and investigate

22   fire and ignition sources, correct?

23       A    Yes.

24       Q    So you would have some -- would it be fair to

25   say you would have some understanding of what the fire

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    science would have been in 1995 with regards to

2    competent ignition sources?

3         A    Yes.

4         Q    Okay.  And so I'll ask it in a slightly

5    different way.  Was, in 1995, the hypothesis that

6    Mr. Amor dropped a lit cigarette on a vodka-soaked

7    newspaper which caused it to ignite, a plausible

8    hypothesis?

9         A    Yes.

10        Q    Was it a testable hypothesis?

11        A    Yes.

12        Q    Was it a hypothesis known to investigators

13   both before Mr. Amor confessed and after Mr. Amor

14   confessed?

15        A    I don't know.

16        Q    Okay.  Regardless, was there anything that

17   would have prevented investigators from testing this

18   hypothesis?

19        A    No.

20        Q    Was it -- would it have been in an unduly

21   burdensome hypothesis to test?

22        A    If it was, I was concerned that your expert

23   did not test it and he had plenty of the capabilities.

24   He's got a large engineering firm with all the test

25   equipment.  He didn't even pursue that.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    My question is not about my expert.  My

2    question is about whether or not it would have been duly

3    burdensome for these fire investigators, given the fact

4    that they test -- did other fire hypotheses, to test the

5    one that was presented by Mr. Amor?

6        A    They could have tested it, yes.

7        Q    Okay.  And so given the fact that the -- it

8    was a testable hypothesis, that they tested other

9    hypothesis and it was a hypothesis known to the

10   investigators, can you really say that the minimum

11   standards of care for fire investigations were met even

12   though they failed to test the hypothesis either during

13   the investigation or during the post-investigation

14   proceedings?

15       A    I believe based on the totality of their

16   investigation, that they met or exceeded the standards

17   of care for fire investigation.

18       Q    And you believe that despite the fact that

19   they didn't do this testing?

20       A    The same reason that I didn't buy the

21   marijuana and test the -- test that hypothesis in that

22   bee laboratory.

23       Q    Is that a yes or a no?

24       A    That's a qualified response.

25       Q    Okay.  I wanted to go to the page 32 of your

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1   report.  So that's Exhibit 1 under the prong -- the
2   post-incident investigation where it says, "Evaluation
3   of the investigative file."  And specifically, that
4   paragraph says, "If evidence exists that investigators
5   documented and reviewed their files for potential
6   motives, opinions of witnesses, and responsibility for
7   the fire."  And we understand that you may not recall
8   off the top of your head, what evidence existed that the
9   investigators actually did document and review their
10  files for the motives and opinions of witnesses and
11  responsibility for the fire that you indicated here?
12      A     There are ample.  There are ample areas of
13  documentation that existed and if you look between that
14  one range I gave as an example, of -- of 5141, 5142, but
15  there are numerous examples throughout this
16  investigation where they were testing these hypotheses,
17  including motive.  So also, they had the -- if you want,
18  during the break, I will go ahead and pull the ones
19  where I -- where I said they -- they looked for motives,
20  they looked for the opinions of witnesses and the
21  responsibility, which includes the -- the prosecutor's
22  interview.  The prosecutor's interview pretty much
23  addresses motive and responsibility.  So that alone is
24  one of the best pieces of evidence.  And the
25  investigators were present for that interview.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1        Q      And moving on to -- con -- sorry, continue.

2        A      They did an exhaustive -- I mean, the testing.

3    Guerreri did an excellent comprehensive report and they

4    did not jump to conclusions right off the bat.  This was

5    not a rush to judgment type case.  So for example,

6    motive and opportunity, if you look on page 33, Ms. Amor

7    told investigator Michael Cross that she "felt that Bill

8    was probably responsible for the fire."  I mean, why

9    would she say that?  Also, there were some other things

10   that were going on regarding other financial

11   circumstances in their life.  The -- the fact that he

12   owed restitution.  He was on probation.  And statements

13   are consistent throughout the -- throughout the

14   investigation that he said that he intentionally dropped

15   a lit cigarette onto a newspaper, witnessed the

16   smoldering, and left the apartment knowing that a fire

17   would ensue.  And he admitted that he set the fire to

18   profit by collecting insurance and that he had

19   previously devised his plan while he was incarcerated in

20   the DuPage County Jail.  I don't -- you know, I don't

21   know how much thorough an investigation like this could

22   have been, as well as the fact that in his -- your

23   client's defense, it did an exhaustive -- an exhaustive

24   review of potential witnesses in the area.  So I don't

25   know.  I mean, like I said, the -- they attended the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1   autopsies, they did -- they did as much as possible in
 2   this case.  So I don't know what better areas to can --
 3   that can come about.  And like I said, 921 says,
 4   basically, there are times where there's no physical
 5   evidence, but you can imply an ignition sequence.  And
 6   this is what happened.  And this is what -- this is what
 7   Vyto Vabrauskas is saying.
 8       Q    A -- ex -- stop -- putting aside Vabrauskas'
 9   report, which you've said is -- would not have been
10   available to investigators in 1995 --
11       A    It's available now.
12       Q    I know.  but we're focusing on what the
13   investigators could have done at the time, not on the
14   science as it exists currently.  And would you -- does
15   your statement that this was, you know, a thoroughly
16   exhaustive investigation, logically -- strike that.  You
17   testified that this was a very thorough investigation,
18   yet the fire investigators failed to test a plausible
19   hypothesis that was articulated by Mr. Amor, correct?
20           MR. POLICK:  Objection.  Asked and answered.
21       You can answer again.
22       A    What I thought was unique in this case was the
23   time frame.  And I know that the state looked at the
24   time frame, as well as your expert looked at the time
25   frame from smoldering ignition to the time of the 911

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  call.  And that is information that only recently comes

2  to light based on peer-reviewed studies regarding this

3  time frame.

4  **Q   And wouldn't a test burn, that tested the**

5  **hypothesis that Mr. Amor articulated have also shown**

6  **whether or not the time frame of the fire was -- could**

7  **have been -- could have occurred had the hi -- the**

8  **scenario that Mr. Amor confessed to been carried out?**

9      A   At that time --

10      MR. POLICK:  Let me interpose an objection to

11      the form of that question.  You can go ahead and

12      answer it.

13      A   At that time, there was a lot we were learning

14  regarding cigarette ignitions.  And at that time, there

15  may not have been sufficient peer-reviewed data to put

16  an appropriate timeline.  However, the data exists now.

17  **Q   Wouldn't one way to find that data be testing**

18  **the hypothesis?**

19      A   I've tested it.  So, however, the way --

20  **Q   So that would be yes?  I just want, for the**

21  **record, that would be yes.  That would be a way to test**

22  **the hypothesis.**

23      A   It would be one way, but the question would

24  be, is it -- does it meet the scientific rigor of what

25  was going on?  But we already knew -- everybody knew

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    that if you lift -- let -- left a lit cigarette in a
2    garbage can in contact with paper that you're going to
3    have a fire.
4        Q    Okay.  And where -- what evidence or data or
5    peer-reviewed studies existed in 1995 that would have
6    supported a hypothesis that a lit cigarette could have
7    started a fire if it dropped on a vodka-soaked
8    newspaper?
9        A    I know of no studies.
10       Q    Okay.
11       A    At that time.
12       Q    Okay.  Moving on --
13       A    However -- however the significance of flaming
14   drinks in bars can only imply that somehow those drinks
15   are set on fire and sustain combustion.
16       Q    And how is that significant?  For me, it seems
17   completely irri -- unrelated if a drink at a bar that's
18   set on fire can sustain combustion versus whether a
19   vodka-soaked newspaper can support combustion.  How do
20   those pair on together, in your expert opinion?
21       A    Well, let me pose the question: What if your
22   client did not spill vodka on the newspapers?
23       Q    And where is the evidence for that?
24       A    Well, the only evidence is the eyewitness
25   evidence of your client.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 103 of 159 PageID #:14201
The Deposition of DAVID POWELL, taken on August 19, 2021
102

1     Q     So is there any evidence that exists in the

2     record that my client dropped a lit cigarette on a non-

3     vodka-soaked newspaper?

4          A     Well, I would have to review to see whether or

5     not that evidence was tested for an accelerant.  Vodka

6     would probably not survive if it did based on the amount

7     of water.  But if -- there are two scenarios.  The vodka

8     didn't touch the newspaper and where the cigarette

9     landed, or it wasn't on there to begin with, or it

10    missed it.  All the record shows is that there are two,

11    basically -- there are multiple scenarios in which the

12    same scenario happens.

13         Q     I'm sorry, I'm not sure if I understand what

14    you're saying.  Is there any evidence in the record that

15    shows my client dropped a lit cigarette on a portion of

16    the newspaper that wasn't soaked with vodka?  Yes or no?

17         A     Not at this time.  More data might reveal it

18    though.

19         Q     And what -- how would that data be -- could

20    that data be come upon?

21         A     Well, in this case, I'd like to re-interview

22    all of the experts for the defense -- of the defendants.

23    I'd like to re-interview all of the experts that were

24    used or retained or not retained for the plaintiffs. And

25    then I like about two or three hours with your client,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 104 of 159 PageID #:14202
The Deposition of DAVID ICOVE, taken on August 11, 2021
103

1  and we might be able to get additional data to clarify

2  this.

3       Q    And did you ever seek to re-interview any of

4  the defen -- the experts for the defense?

5       A    No.

6       Q    Did you ever seek to interview any of the

7  experts for the plaintiff either in the post-conviction

8  proceedings or in this civil trial?

9       A    That was outside the scope of how -- why I was

10 retained.  I was retained to do a peer review of the

11 investigation, but we have adequate documentation from

12 the experts that have talked about what they have.

13      Q    Sorry, just to back up.  You said it's outside

14 the scope of you -- what you were retained to do.  You

15 said that the scope of what you were retained to do is

16 conduct a peer review of Mr. Carpenter's report,

17 correct?

18      A    No.  Mine was to do a peer review of the

19 overall investigation.

20      Q    Okay.

21      A    Both plaintiffs and the defendants.

22      Q    And where, within that peer review, would be

23 conducting an investigation into the cause and origin of

24 the fire?

25      A    What I did using the tools and the sufficient

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 329-10 Filed: 05/17/24 Page 105 of 159 PageID #:14203
The Deposition of DAVID ICOVE, taken on August 19, 2021
104

 1    amount of photographs that independently, I can identify
 2    not only the area of origin, but what I believed to be
 3    the point of origin for this fire.  And it's through an
 4    exhaustive re-examination of the photographs, prior
 5    testing that I have done, and documentation at the scene
 6    and observations that validate that this is exactly the
 7    area where the newspapers were that the fire started.
 8         **Q    Okay.  And so you can -- you've investigated**
 9    **and made a postulation based on the origin of the fire,**
10    **but what data or analysis have you done to determine the**
11    **cause of the fire, if any at all?**
12         A    What I've --
13         MR. POLICK:  Objection to the -- hang on a
14         minute.  Objection to the form of that question.
15         Are you asking him outside of his report?  Because
16         that is documented in his report.
17         MS. GARCIA:  No.  I'm asking --
18         MR. POLICK:  It's his third opinion.
19         MS. GARCIA:  -- him in terms of his report.
20              His third opinion, in my view, is that this is
21    where the origin of the fire was and this may have been
22    what the cause of the fire was, namely dropping a
23    cigarette on a newspaper that didn't have vodka on it.
24    My question within that opinion is: What data or
25    evidence supports his hypothesis as to the cause of the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 106 of 159 PageID #:14204
The Deposition of DAVID ICOVE, taken on August 10, 2021
105

1    fire.

2              THE WITNESS:  Okay.

3              MR. POLICK:  Do you understand that question?

4              THE WITNESS:  Oh, I understand it exactly.  That

5         question.

6              MR. POLICK:  All right.  Why don't you go ahead

7         and answer that question then?

8         A    If we look at Dr. Dahan's (phonetic) report

9    from August 31, 2016, the next to last paragraph says,

10   and this is a time issue that we have because of the

11   time that apparently elapsed, and he's got 20 minutes

12   between Tina Amor leaving and Ms. -- Ms. Ellie

13   discovering the fire, the unidentified origin and fuel

14   involved and the human factors involved in the detection

15   of small smoldering fires, the possibility of a ign --

16   cigarette-ignited fire cannot be completely eliminated.

17   What Dr. Dahan didn't have at the time is what we have

18   as new data.

19   BY MS. GARCIA:

20        Q    What is this new data?

21        A    This new data is what's produced by -- and I

22   documented in my report -- it references, basically, Dr.

23   Vabrauskas' new information.  Basically --

24        Q    And what is Dr. Vabrauskas' new information?

25        A    Okay.  What time do you think that the Amors

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 329-10 Filed: 05/17/24 Page 107 of 159 PageID #:14205
The Deposition of DAVID ICOVE, taken on August 17, 2021
106

```
 1   left?  Was it between 6:20 and 6:35 p.m.?  What --
 2   what's your recollection of that?
 3        Q    I mean, we're not here to ask -- to go over my
 4   recollection.
 5             MR. POLICK:  Just answer counsel's question.
 6        Q    It's based on your recollection, Mr. Icove.
 7        A    The research shows that cigarette ignition of
 8   paper normally occurs within a window of -- and Dr.
 9   Vabrauskas says 15 to 20 minutes, based on his overall
10   review of peer-reviewed research from several sources. A
11   guy named Sanderson said it was between 14 and 18
12   minutes.  Lord and Gehman (phonetic) who -- who we're
13   looking at it, looked from 1.1 minutes to 16 minutes and
14   they -- and they basically -- the -- the transition was
15   6.2 minutes.  And -- oh yeah, there was a German study.
16   It's the German study that's, basically, is anywhere
17   from -- and this is cigarette ignition of paper,
18   combustibles and --
19        Q    And what paper combustibles were tested?  Was
20   a newspaper tested?
21        A    That's basically paper.  Paper is paper.
22        Q    I'm not asking if it's basically paper.  Is --
23   are the chemical compositions of newspaper and paper the
24   same?
25        A    Basically, they are.
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 108 of 159 PageID #:14206
The Deposition of DAVID ICOVE, taken on August 19, 2021
107

1    Q    Basically they are or they are?

2    A    They are.  They're -- basically they are.  I

3  mean, waxed paper may have wax.  We're talking about

4  standard paper.

5    Q    So within the Vabrauskas report or other

6  reports that he cites, you can't point to a test

7  scenario that was a dropped cigarette onto newspaper

8  specifically?

9    A    Well, Lord and Gehman studied cigarette --

10  cigarette ignitions of diverse paper goods.

11    Q    And does Lord -- sorry, continue.  I didn't

12  mean to interrupt you.

13    A    Lord and Gehman looked at diverse papers.

14    Q    And do those papers, based on your review of

15  Lord and Gehman studies include newspaper?

16    A    The implication was is that they do.

17    Q    I'm not asking about the implication, I'm

18  asking if the data and the analysis from Lord and Gehman

19  -- I apologize if I'm saying that incorrectly --

20  included the dropping of a cigarette onto newspaper,

21  specifically.

22    A    I would have to go back, pull the study and --

23  and take a look at it.  But they were -- they were

24  looking at it -- a whole series of different papers.

25    Q    Well, and, Mr. Icove, you've testified and

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 109 of 159 PageID #:14207
The Deposition of DAVID SCOTT, taken on August 19, 2021
108

```
 1   written about the importance of having as much data as
 2   possible in testing a hypothesis, correct?
 3        A    Yes.
 4        Q    So couldn't the type of paper and the
 5   variables in how paper burns cause there to be a
 6   different outcome of one paper that was hypothetically
 7   lit by a cigarette versus another type of paper that was
 8   lit by a cigarette?
 9        A    That's a good question.
10        Q    Is it a question, yes or no?  Based on your
11   expertise?
12        A    Well, based on the expertise, a range of paper
13   goods -- what we're talking about, independent studies
14   that are looking at the range of paper are basically
15   placing a scenario within the fact pattern of this case.
16        Q    And I'm not asking -- basically, I'm asking if
17   the -- this fact scenario specifically pairs onto this
18   Vabrauskas and Lord and Gehman and other and you were --
19   analysis that's done on cigarettes lighting newspap --
20   papers on fire, fits specifically with our fact scenario
21   here?
22        A    Well, your fact scenario has to deal with
23   furniture ignition.  Your expert looks at that.  Now I
24   agree with some of the things that he has to say.
25        Q    What do you -- no.  I would prefer to stay on
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 110 of 159 PageID #:14208
The Deposition of DAVID ICOVE, taken on August 11, 2021
109

1  this topic for now.

2      A    Yeah.  I'm just reporting what Vabrauskas has

3  to say.

4      Q    Okay.  So --

5      A    And -- and I can -- and if you want me to, I

6  can pull the studies.  But -- but -- and -- and we're

7  looking at a range of paper goods.  Now, look at the --

8  the Chicago Trib.  It may have sections that are --

9  advertising sections that are different diverse papers.

10  The comics may be different.  The advertisements may be

11  different, but we're talking about a general range of

12  ignition for these tests.

13      Q    But aren't --

14      A    And the point --

15      Q    -- you proving your own point in that there

16  are various scenarios of a cigarette being dropped onto

17  a type of paper that has not specifically been tested by

18  any of the more current literature that you've cited in

19  your report?

20      A    This is the best it gets.  They're -- they're

21  looking at the ranges and this is what -- this is

22  science.  This is like COVID.  The more data we get, the

23  better we're getting at making these assertations.

24  However --

25      Q    And wouldn't more data include actually

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 111 of 159 PageID #:14209
The Deposition of DAVIS ICOVE, taken on August 11, 2021
110

```
 1   testing what the ignition -- what happens if you drop a
 2   cigarette on newspaper specifically?
 3        A    Oh, yeah.
 4        Q    Okay.  And so doesn't that conflict with your
 5   testimony that this is as -- the best it gets in terms
 6   of testing what would occur if a cigarette is dropped on
 7   newspaper?
 8             MR. POLICK:  Objection to the form of the
 9        question.  You can answer over the objection.
10        A    Okay.  I think -- I think we're going astray
11   to what -- my retention in this case, was to conduct a
12   fire engineering analysis peer review of the totality of
13   the investigations done here.  And to -- and I was able
14   to, based on my independent examination using a -- using
15   the accepted principles of fire investigation, to
16   identify what I considered to be the area of origin for
17   the fire.  The area of origin is consistent from where
18   the newspapers were sitting and -- and where Mr. Amor
19   indicated that he dropped a cigarette.  It's consistent
20   also with the timing scenario when you're looking at
21   burning papers.  And it's consistent with the -- the
22   fact that it's a smoldering fire.  I agree with that.  I
23   agree with your expert, Mr. Carpenter, who said that the
24   smoldering fire was caused by a cigarette, and he bases
25   it on his timeline.  I'm looking at the same timeline
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 112 of 159 PageID #:14210
The Deposition of DAVIS SCOTT, taken on August 11, 2021
111

1 and saying Dr. Vabrauskas' research of looking at 15 to

2 20 minutes fits within the scenario here of where -- of

3 when the Amors left the apartment and when the fire is

4 first reported.  And so the timelines are -- are there.

5 I also agree with Mr. Carpenter that the fire was

6 ventilation limited.  It produced sufficient amounts of

7 carbon monoxide and that Marianne basically died from

8 the intake -- intake of that carbon monoxide.  So I'm

9 not here to argue about your expert and what his

10 findings are.  I'm saying that this is consistent with

11 the findings of Dr. Vabrauskas that fits like a glove as

12 far as the determination of what happened here.

13      Q    And how does it fit like a glove if

14 Dr. Vabrauskas did not test scenario that you

15 hypothesized could have happened in your report?

16      A    He is not testing it if he's reporting on the

17 factors regarding cigarette ignition.

18      Q    And those are --

19      A    He --

20      Q    -- based on laboratory studies, correct?

21      A    Based on laboratory peer-reviewed studies.

22      Q    Okay.  So how does Dr. Vabrauskas' report of

23 those studies fit like a glove if the exact back

24 scenario that is being discussed here that you actually

25 hypothesized that it could have been dropped on a non-

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 113 of 159 PageID #:14211
The Deposition of DAVID ICOVE, taken on August 13, 2021
112

1  vodka-soaked part of the newspaper has not specifically
2  been tested?
3       A    I was not retained to do the testing.
4       Q    I am not asking if you were retained.  I'm --
5  you postulated in your report --
6       A    Uh-huh.
7       Q    -- "Mr. Carpenter, for example, does not
8  examine the impact of a cigarette being placed on one of
9  the drier portions of the newspaper.  This is a
10 realistic and competent ignition source, and the
11 resulting scenario could ignite a fire in that exact
12 area of origin."  You would then later say, "In the
13 scenario of a dropped cigarette onto newspaper -- the
14 scenario of a dropped cigarette onto newspaper is a
15 competent ignition source and sequence," and then cite
16 the Dr. Vabrauskas' report about cigarettes being placed
17 on paper goods.  So I -- the reason I'm asking this is
18 not because I'm trying to get you to form an opinion on
19 something that you haven't --
20      A    That's -- that's --
21      Q    -- already hypothesized --
22           MR. POLICK:  Let her finish her question,
23      please.
24      Q    -- or talked about.  I'm asking you this
25 because you, yourself, came up with this hypothesis that

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 329-10 Filed: 05/17/24 Page 114 of 159 PageID #:14212
The Deposition of DAVID ICOVE, taken on August 11, 2021
113

1   wasn't previously in the record.  And I'm trying to

2   understand whether or not there is data and evidence

3   that back up the hypothesis that you articulated.

4           MR. POLICK:  All right.  I'm go --

5       Q    And going off -- sorry.

6           MR. POLICK:  I'm sorry.  Go ahead.

7       Q    And going off of that, other than

8   Dr. Vabrauskas' report, did you -- what is the other

9   evidence that supports the hypothesis of the cause in

10  the record that you reviewed?

11          MR. POLICK:  All right.  Let me interpose an

12      objection there because that was kind of a long

13      narrative question and there was probably several

14      questions in there which makes it compound.  So I'm

15      objecting to the form.  If you want to break that

16      down and ask him a question, I think that would be a

17      more appropriate form here than the narrative that -

18      -

19          MS. GARCIA:  Sure.

20          MR. POLICK:  -- you just did.

21          MS. GARCIA:  And I wasn't attempting to lead

22      the witness or provide a narrative.  I was trying to

23      kind of provide the context because I felt like

24      Mr. Icove and I were talking past each other.

25          MR. POLICK:  Agreed.  And I understand that. So



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 115 of 159 PageID #:14213
The Deposition of DAVID ICOVE, Taken on August 11, 2021
114

 1          I think the appropriate way to proceed there now is
 2      just to ask your question which kind of narrows --
 3      based on now that you've put it into context to ask
 4      your question.  Do you understand the context that
 5      Ms. Garcia is talking about, Mr. Icove?
 6              THE WITNESS:  Yes.
 7              MR. POLICK:  Okay.
 8              MS. GARCIA:  Okay.
 9              MR. POLICK:  She -- now that he understands the
10      context, please go ahead and ask a question.
11  BY MS. GARCIA:
12      **Q    Yes.  Other than the reports that Dr.**
13  **Vabrauskas put together on the laboratory studies of**
14  **cigarettes being dropped on paper goods, what other**
15  **evidence in the record supports your hypothesis that a**
16  **cigarette being dropped on a non-vodka-soaked newspaper**
17  **could have been the cause of the fire here?**
18      A    Based on fire testing that I've conducted, in
19  my experience, this is consistent with the time frame
20  for ignition from smoldering to flaming ignition. That's
21  based on my testing.  And this was not in laboratory
22  conditions, but they were in demonstrations for fire
23  investigators.  So the answer is no.  In the record, I
24  cannot find any additional information to support that.
25  However, the science is evolving, and it begs the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 116 of 159 PageID #:14214
The Deposition of DAVID ICOVE, taken on August 16, 2021
115

1    question of who else -- whom else has also done these

2    testing?

3         Q    And outside of Dr. Vabrauskas and the other

4    people, I believe Lord and Gehman was one of them that

5    you talked about earlier, do you know of any other

6    investigators or fire experts who have done this -- the

7    testing we're talking about here?

8         A    Not at this time.

9         Q    Okay.  And this is potentially an obvious

10   question, but you did not conduct any modeling of the

11   fire based on the hypothesis that it was -- the source

12   and the cause of the fire was a cigarette being dropped

13   on dry newspaper?

14        A    I did not conduct a fire model.  I did not --

15        Q    Okay.

16        A    -- I did not model this fire.

17        Q    And to the best of your knowledge, has anybody

18   else modeled -- strike that.  That's a bad question.  I

19   wanted to -- and I know we're running out of time, so I

20   -- actually, it might make sense for us to take a quick

21   break so I can kind of go over the notes I have, and we

22   can have a more streamlined conversation before you have

23   to depart, Mr. Icove.

24        A    Thank you.

25             COURT REPORTER:  All right.  We are off the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 117 of 159 PageID #:14215
The Deposition of DAVID ICOVE, taken on August 11, 2021
116

```
 1           record at 1:06.
 2                   (OFF THE RECORD)
 3           COURT REPORTER:  We are back on the record at
 4           1:12.
 5   BY MS. GARCIA:
 6      Q     All right.  Mr. Icove, I wanted to first go
 7   back to something that we discussed earlier.  I'm not
 8   going to ask you again whether or not -- or what
 9   portions of this report that you wrote, but my question
10   is whether or not you typed any portions of this report?
11      A     I typed it all.
12      Q     Okay.  And did you consult on this report with
13   anyone other than defense counsel?
14      A     Yes.
15      Q     And who did you consult with outside of
16   defense counsel?
17      A     My corporate attorney.
18      Q     And I won't ask about -- actually, strike
19   that.  When -- other than your corporate attorney and
20   the defense attorney in this case, was there anyone else
21   you consulted on regarding this case?
22      A     No.
23      Q     Okay.  And did your corporate attorney draft
24   any portions of this report?
25      A     That's --
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 118 of 159 PageID #:14216
The Deposition of DAVID ACTON, Taken on August 11, 2021
117

```
 1            MR. POLICK:  I'm going to object to the extent
 2       that this gets into the drafting process but go
 3       ahead and answer that question.
 4       A    My attorney reviewed it for consistency as to
 5   the facts provided in this case.
 6       Q    Okay.  And what is your corporate attorney's
 7   name?
 8       A    Michael Durr, D-U-R-R.
 9       Q    Okay.  And did you have any -- did you --
10   within the process of writing this report, were there
11   any notes that you kept?
12       A    Some -- the notes that I kept, I -- here's the
13   -- my drafting process.  I take my notes --
14            MR. POLICK:  Wait.  Wait.  Let me stop you
15       there.  I don't want you to get into the drafting
16       process because that's -- the drafting process is
17       protected under Rule 26.  Her question is: Did you
18       take any notes?  Please answer her questions without
19       getting into the drafting process.
20       A    Yes.
21       Q    Okay.  And are those notes still in your
22   possession?
23       A    Yes.
24       Q    Okay.  Moving on to the second topic.  And I
25   understand we'll have to go through this quickly, so
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    I'll tailor my questions about Mr. Carpenter's expert

2    investigation.  I wanted to turn to page -- sorry, let

3    me pull it up.  Sorry.  Just give me one second.  I want

4    to make sure I'm getting you the right page.  Page 49.

5    And that's under the subheading of "Failure to account

6    for error rates in the report."  And in the report, you

7    say that Mr. Carpenter used an earlier version of the

8    computer zone known as CFAST and that there is a more

9    current version that is available to analyze the data.

10   My question is whether or not the modeling that he used

11   or rather the CFAST version that he used had an impact

12   in the model itself and whether or not it -- it could

13   have caused his hypothesis to be incorrect?

14        MR. POLICK:  I'll object to the form.  But you

15     may go ahead and answer.

16   A    Mr. Carpenter, in having this model

17   constructed, had some significant errors in its

18   construction that I estimate without constructing the

19   model, impacted this case and his conclusion.

20   Q    And in what ways do you feel that the modeling

21   he used impacted his case in the conclusions?

22   A    First off, he selected what I believed to be

23   the wrong model for this case.

24   Q    And what model do you feel he -- would've been

25   a better model?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 120 of 159 PageID #:14218
The Deposition of DAVID ICOVE, taken on August 17, 2021
119

```
 1        A     The Fire Dynamics Simulator.
 2        Q     And why would the Fire Dynamics Simulator be a
 3   better model than the CFAST?
 4        A     It is more accurate as to the modeling the
 5   ignition scenarios and it better represents the
 6   apartment that's used.
 7        Q     Okay.  And so do you believe if Mr. Carpenter
 8   had used this Fire Dynamic modeling instead of the CFAST
 9   modeling, he would have come to a different conclusion
10   than he did?
11              MR. POLICK:  Objection.  Calls for speculation,
12        but you may answer over the objection.
13        Q     Based on your experience, of course.
14              MR. POLICK:  Same objection.  That's the
15        speculation.  You may answer over the objection.
16        A     One of the significant errors, and on page 44,
17   in figure 6, is that when they modeled that fire, they
18   left -- left out the kitchen and two bathrooms.
19        Q     Okay.  So let me just parse up a part of your
20   answer for a second.  Is the modeling itself -- is there
21   -- and I apologize if I am not asking this correctly
22   because I'm not an engineer at all.  But is it the
23   modeling itself, CFAST versus this Fire Dynamic model,
24   that you believe impacted Mr. Carpenter's results or is
25   it the fact that his mo -- his type of model didn't take
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 121 of 159 PageID #:14219
The Deposition of DAVIS ICOVE, taken on August 12, 2021
120

1  into account the kitchen and two bathrooms that you

2  believe impacted Mr. Carpenter's results, or is it a

3  combination of the two?

4      A    It's a combination of the two.  One is, if he

5  didn't include the kitchen and two bathrooms in the

6  CFAST model, would he have included them in the Fire

7  Dynamics Simulator model?  And the impact is the fact

8  that when you're looking at -- he was looking at the

9  dispersion of the smoke that contains the carbon

10 monoxide, that bathrooms typically have vents in the

11 ceiling, and so does a kitchen for the hood to the

12 range.  That would have been a logical pathway for smoke

13 to be diverted into those areas.  It would have been --

14 it would have taken them five minutes more, I estimate,

15 to include those rooms. And I don't know if it was an

16 oversight or not, but that's a significant problem with

17 their case with this oversight.  Also, his model assumes

18 that the fire is in the other chair, not the one that's

19 close to the sliding glass door, but that chair.  And

20 that's based on what he thinks to be the victim's point

21 of view.  So he's got the model with the fire starting

22 in a different place in the room.  Placement of fires,

23 especially in corners, can have a significant impact.

24 Now, I have not attempted to fix his errors, but they

25 could be remedy.  The other thing is -- is that he

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1   spends a lot of time looking at the relationship between
 2   the carboxy hemoglobin level of the 42.1 percent that
 3   the victim had and the carbon monoxide.  So he has
 4   cobbled together studies, and some of them are dated,
 5   where he could've taken the carbon monoxide that
 6   degenerated by the CFAST model.  They have an area there
 7   where CFAST, that model as well as FDS, will tell you
 8   the parts per million of the carbon monoxide.  So he
 9   completely left out that impact.  He had that data and
10   he could have used that, according to 921, to determine
11   time to incapacitation, using what's called the Stewart
12   equation and he did not do that.  He also considered the
13   ignition source not to be newspapers, but he assumed
14   that the cigarette was deposited in the chair.  So he
15   went through that scenario, and he used an average of
16   several different types of materials in chairs.  What he
17   failed to realize was -- is that Mr. Amor readily told
18   investigators, as well as put in an affidavit, that the
19   furniture that he had was not modern furniture, it was
20   hand-me-downs or what I referred to as -- people would
21   ask me what style my apartment was decorated in, and
22   they'd say what we're in, you know, early American. Mine
23   was late and fanny (phonetic).  And that was her
24   furniture.  That was the type of -- of -- and those have
25   different consistencies as well as the model.  So he has
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    oversimplified not only the placement of the -- where

2    the fire is, but the materials that it accounted.  So

3    there is a wi -- wide range of different type of data

4    based on the heat release rates of what they had.  Also,

5    if we look at other reports that Mr. Carpenter has done

6    and one that was revealed in this case, he looked at

7    multiple hypotheses in his investigation, an exhaustive

8    number of hypotheses.  In this case, if I were

9    performing an analysis, I would have used at least two

10   scenarios.  One by where the newspapers were, and the

11   other one is to the chair that he selected to do.  So he

12   failed to the -- test the alternative working hypothesis

13   in that area.  And that's -- adds error after error

14   after error.  The other thing is, he didn't use the

15   latest version of CFAST.  I was involved with other fire

16   protection engineers and fire scientists in the approval

17   of the use of CFAST for the US Department of Energy.  In

18   that review, the peer review that I did, I insisted on

19   several items to be included.  One was the smoke alarm

20   issues; the other thing was leakage factors.  The newest

21   version of CFAST has the ability to look at leakage

22   factors between rooms, that is plumbing chases and

23   things like that, which makes the model more

24   authoritative.  And -- and those are some of the -- some

25   of the areas that they have.  But I do agree, you know,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 329-10 Filed: 05/17/24 Page 124 of 159 PageID #:14222
The Deposition of DAVID ICOVE, taken on August 12, 2021
123

```
 1    like I said, that the -- some of the factors that he's
 2    considering did occur in this case.  So the model is
 3    incomplete.  The -- the heat release rates for the --
 4    for the ignition scenario is based on an average of
 5    different types of things.  So you talk about an average
 6    of newspapers, he took an average of different types of
 7    chairs and -- and the histories that they had.  Also, he
 8    failed to update the references that they had and the
 9    failure not to use the latest version of the model is --
10    I would not have done that.  I would have used the most
11    complete version.  And it's about a four, five-year gap
12    between the model that he selected to use and the one
13    that's in existence now.  And the entire accuracy of
14    that model has been increased and enhanced from that. So
15    those are some of the error rates that we have.  The
16    other error rate is the fact that these models, based on
17    the references that I've cited, basically are only good
18    for the first possibly five to ten minutes of the fire.
19    And past that, the error rates go out the window.  And
20    -- and this has been affirmed by studies that I've
21    examined personally as well US government standards and
22    -- and studies where these error rates are just
23    completely off base.  And the reason that -- the -- I
24    had mentioned the Dalmarnock fire tests were that the
25    experiments and modeling -- the world's experts were
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 125 of 159 PageID #:14223
The Deposition of DAVID ICOVE, taken on August 12, 2021
124

1   told that they were going to conduct fire tests.  And in

2   England, regarding that, they were given the different

3   types of models.  They were allowed to pick their own

4   models and they coded these things.  And the bottom line

5   was, basically, that the modeling is still a -- not an

6   exact science.  The final part of it is that Vyto

7   Vabrauskas says in the latest book on page 57,

8   implications for computer room fire modeling.  And he

9   states, "Since adequate experimental data do not exist,"

10  and that's -- they're looking for the heat release rates

11  of smoldering fires, which is what we have in this case,

12  "no valid numerical sub-models," and he looks -- he

13  lists several of them, "can be utilized as part of a

14  computer room fire modeling.  As a result, fire models,

15  whether there based on CFT," which is the computational

16  fluid dynamics model, "or other times cannot properly

17  encompass the smoldering process.  For models to be

18  credible, they must be validated against appropriate

19  experimental data, and this cannot be done in the

20  absence of reliable experimental data, which does not

21  exist."  So even Vyto Vabrauskas is saying that it's

22  inappropriate to use a model such as this for a

23  smoldering fire.  And what that does is it adds a

24  cumulative issue for the error rates again, again, and

25  again.  And so I don't know how much more that you would

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

 1  want to explore with this, but I would have wished that
 2  in his follow-up report that he had rerun this model, as
 3  well as include the impact of the missing rooms that had
 4  ventilation paths to them, as well as included the
 5  carbon monoxide estimates that are generated as a
 6  routine course of this model.  That's what I would've
 7  done, and that's what he has done in the past.  In that
 8  Oklahoma case -- in the ope -- in the Oklahoma case, he
 9  did an extraordinary amount of excellent work.  And I
10  know him personally as well as professionally, he does
11  good work.  And the Oklahoma case, which is Exhibit 4 in
12  his depo, goes to the extent in which he establishes a
13  standard of care of how to use a computer fire model in
14  a significant investigation.  And he goes through origin
15  hypothesis in this case here.  He -- he sets the bar for
16  what is expected in a case.  Origin hypothesis testing,
17  comparison with the physical fire damage -- thermalon
18  injuries he's doing, hypothesis testing is to cover
19  monoxide uptake.  Hypothesis to testing of all -- all
20  alternative hypotheses.  He did not do this in this
21  case.  He did not look at the scenario that your client
22  said.  He also looks at CO levels.  This is the -- the
23  Oklahoma case -- physical fire damage.  He does an
24  extraordinary amount of work in formulating and testing
25  hypotheses.  Multiple hypotheses.  And in the past, he's

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 127 of 159 PageID #:14225
The Deposition of DAVID ICOVE, taken on August 17, 2021
126

1  written articles about comparing and contrasting the

2  two.  NFPA 921 says, "Fire modeling in its own should

3  not be used as the basis for origin determination."  And

4  that's what he's done in this case.  Unfortunately, he

5  didn't -- he didn't follow the same standard of care

6  that he espoused in another similar investigation.  So

7  if that outlines where I think at least what his -- what

8  his performance is on this, I would have expected any

9  expert -- I would have expected would have used the

10  present-day model as well as to take into consideration

11  all of this information.  The Dalmarnock fire test

12  showed varying with the simple model, which was

13  consistent with this case, the layout of the apartment.

14  They said there was diverse discrepancies about what the

15  -- what the experts had to say, and they were shocked.

16  They were actually shocked about where you do -- what

17  they call verification and validation.  Verify that the

18  model works.  The verification in this case should have

19  been -- he should have verified that his model works

20  with the present model.  And he should've validated it

21  based on known data.  So those in a nutshell are the

22  reasons why I believed that there is extraordinary error

23  rate in his -- in his modeling and his approach in this

24  case.

25      Q    Thank you for that extensive answer.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 128 of 159 PageID #:14226
The Deposition of DAVID ICOVE, taken on August 17, 2021
127

1  Dr. Icove, with the mind towards the limited time that

2  you have, I would just like to ask a couple of follow-up

3  questions.  Within your previous answer, you said

4  something to the effect of you did not attempt to fix

5  Mr. Carpenter's -- or at least you did not attempt to

6  fix what you presumed to be Mr. Carpenter's errors in

7  modeling and running a hypothesis of this fire, correct?

8      A    That's correct.

9      Q    You did not create any modeling in this to

10  determine either the cause or origin of his fire,

11  correct?

12          MR. POLICK:  Objection to the form.  But go.

13      Answer can stand.

14      Q    Okay.  And so then you can't say whether

15  remedying the errors that you have articulated would

16  lead Mr. Carpenter to a different conclusion than the

17  one he came to in his report in both the post-conviction

18  proceedings and in the civil case at hand, correct?

19          MR. POLICK:  I'll object to the form of that

20      question.  It's compound.  It calls for speculation

21      and it to some extent is argumentative but go ahead

22      and answer.

23      A    Ms. Garcia, are you asking me why I did not

24  use a computer fire modeling in this case?

25      Q    No.  I said because you haven't used one, you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 129 of 159 PageID #:14227
The Deposition of DAVID SCOTT, taken on August 27, 2021
128

```
 1    can't say whether, providing the remedies that you
 2    articulated very robustly, would lead Mr. Carpenter to a
 3    different conclusion than he reached, correct?
 4              MR. POLICK:  Same objections.  But you can go
 5         ahead and answer.
 6         A    It depends.  This is fire modeling -- computer
 7    fire modeling using this model or others.  At this time,
 8    it is not appropriate use for determining smoldering
 9    fires.  And that's backed up by the authoritative
10    research done by Dr. Vyto Vabrauskas, as well as what
11    he's concluding in this new expert treatise on
12    smoldering fires.  He said, basically, this is an
13    inappropriate model.  So no matter what Mr. Carpenter
14    does, it's still an inappropriate application.
15         Q    I'm not asking if it's an inappropriate
16    application.  I'm asking specifically, can you say
17    whether if, for example, he had used the newer CFAST
18    model or for example -- these are all examples you gave
19    -- added in the kitchen and the two bathrooms, whether
20    or not the conclusion he came to would have been
21    different than the conclusion in his initial report?
22         A    I don't --
23              MR. POLICK:  Objection.  It calls for
24         speculation.  You may go ahead and answer.
25         A    I don't know at this time.
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 130 of 159 PageID #:14228
The Deposition of DAVID ICOVE, taken on August 13, 2021
129

```
 1        Q    Okay.  So you can't say whether it would, or
 2   it wouldn't, correct?
 3             MR. POLICK:  Objection.  Calls for speculation.
 4        Asked and answered.  You may answer again.
 5        A    I don't know at this time.
 6        Q    Okay.  And my last question is about
 7   Dr. Vabrauskas.  You said that he is -- and I apologize
 8   if I'm saying this wrong, but you said something to the
 9   effect of he created a treatise about the CFAST fire
10   modeling itself, and it's whether or not it would be
11   appropriate to be used as a source for modeling fires,
12   correct?
13        A    Correct.
14        Q    Okay.  Is Dr. Vabrauskas, the only fire expert
15   who has given a opinion on whether or not this model is
16   appropriate for modeling fires?
17        A    Let me give you some background.
18   Dr. Vabrauskas is the first PhD in fire protection
19   engineering.  He was developed -- the first model for
20   flash, ever -- computer model.  He's written extensively
21   regarding the proper and improper application of
22   computer fire modeling in this case.  And I'm saying
23   this case, but in -- in -- in this area.  And he's noted
24   for the most cited expert treatise in the field is the
25   Ignition Handbook.  And the follow up has been just his
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 131 of 159 PageID #:14229
The Deposition of DAVID ICOVE, taken on August 31, 2021
130

1  evaluation of smoldering fires.  So that is probably the

2  most up-to-date review regarding the science of

3  smoldering fires.

4      Q    It's the most up-to-date review, but it's not

5  the only review, correct?

6      A    Correct.

7      Q    And there are other experts and other

8  treatises that have and maybe used in order to analyze

9  smoldering fires, correct?

10     A    Correct.

11         MS. GARCIA:  Okay.  No further questions.

12                 CROSS EXAMINATION

13  BY MR. POLICK:

14     Q    I have just a few follow-ups.  Mr. Icove, you

15  were asked about notes.  Can you describe what your

16  notes are?

17     A    My notes consist of a file where I write my

18  report, address the questions that need to be formulated

19  in the report, and it's a ongoing draft.  So for

20  example, in the review of the investigation -- the peer

21  review -- as I was going through materials, I would add

22  the notes that were generated into the report or

23  actually bulletize them into sections.  And then as I

24  completed that, I passed through that.  For example,

25  weather conditions.  I wanted to verify what the weather

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 132 of 159 PageID #:14230
The Deposition of DAVID COWEN, taken on August 13, 2021
131

1  was at the time.  So I had a section where I bulleted

2  weather conditions, and then I went and looked it up and

3  then filled in that data for that information.  And then

4  as I went through this, I put together tables like for

5  example page 22.  Everybody has looked at the narrative

6  of the 911 call at 6:40 p.m. I went back through and

7  said this is unique.  So I listened to the -- to the 911

8  call and put on it the actual number of seconds that

9  that call proceeded through.  So now, not only did I

10  capture information about the case file -- from the case

11  file, but I also added some value to what was happening.

12  And I also would put together a timeline.  So in

13  summary, I put my case notes into a working file, which

14  is my report.  And as new information comes in, I layer

15  it into the report, and that's where those notes go. And

16  those notes are prompts to expand upon different areas.

17      Q    Counsel asked you a question about whether

18  there was evidence that Mr. Amor had dropped a cigarette

19  onto newspaper.  But as part of your materials reviewed

20  in this case, did you review a transcript of the audio

21  recorded interview of Mr. Amor that was taken by state's

22  attorney Brian Nigohosian along with Detectives Guerreri

23  and Cross on October 4, 1995, at 5:10 a.m.?

24      A    Yes.  I did.

25      Q    And as part of that review of that document,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 133 of 159 PageID #:14231
The Deposition of DAVID SCOTT LAKES, on August 13, 2021
132

1  which for the record is SDT-SAO 3413 through 3420, in

2  that particular interview of Mr. Amor, did he not

3  indicate that he dropped the cigarette onto papers and

4  that he saw smoke?

5      A    Yes.

6      Q    You were also asked some questions about

7  hypothesis testing.  Can testing always replicate the

8  conditions that existed at the time of the fire?

9      A    No.

10      Q    And when you are determining whether the

11  standard is -- of care is met in a certain fire

12  investigation, is hypothesis testing the sole aspect of

13  the standard of care or does it also include those

14  factors, which you have outlined in figures 1 and figure

15  2 of your report in this matter?

16      A    Yes.

17      Q    So for clarification, would the standard of

18  care analysis also include looking at witness'

19  statements and human behavior as outlined in figure 2?

20      A    Yes.

21      Q    And would it include the other factors that

22  you have documented in figure 2 of your report?

23      A    Yes.

24      Q    And would it include those items that are set

25  forth in figure 1 of your report as well?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 229-10 Filed: 05/17/24 Page 134 of 159 PageID #:14232
The Deposition of DAVID ICOVE, taken on August 13, 2021
133

```
 1    A    Yes.

 2         MR. POLICK:  Okay.  I don't have any further

 3    questions.

 4         MS. GARCIA:  I don't have any follow-up

 5    questions.  Thank you, Mr. Icove.  Joe, do you want

 6    to explain reserving signature, though, I'm sure you

 7    --

 8         MR. POLICK:  No.  We will reserve signature.

 9         COURT REPORTER:  All right.

10         MR. POLICK:  Thank you.

11         COURT REPORTER:  All right.  We're off the

12    record at 1:48 and this concludes today's

13    deposition.

14              (DEPOSITION CONCLUDED AT 1:48 P.M.)

15

16

17

18

19

20

21

22

23

24

25
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1              CERTIFICATE OF REPORTER

 2           COMMONWEALTH OF KENTUCKY AT LARGE

 3

 4   I do hereby certify that the witness in the foregoing

 5   transcript was taken on the date, and at the time and

 6   place set out on the Stipulation page hereof, by me

 7   after first being duly sworn to testify the truth, the

 8   whole truth, and nothing but the truth; and that the

 9   said matter was recorded by me and then reduced to

10   typewritten form under my direction, and constitutes a

11   true record of the transcript as taken, all to the best

12   of my skill and ability. I certify that I am not a

13   relative or employee of either counsel and that I am in

14   no way interested financially, directly or indirectly,

15   in this action.

16

17

18
```



```
22   LEAH SHARP

23   COURT REPORTER/NOTARY

24   MY COMMISSION EXPIRES: 11/01/2023

25   SUBMITTED ON:  08/26/2021
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 329-10 Filed: 05/17/24 Page 136 of 159 PageID #:14234
The Deposition of DAVID POWE, taken on August 13, 2021

135

**$**

**$10,000** 82:9, 17

**$12,000** 14:12

**$2,000** 13:13

**$300** 13:12

**$400** 13:12

**$450** 13:14

**$5,400** 14:2

**1**

**1** 11:8,12,19 12:2 16:16 63:14,16,17 68:6 72:6 97:1 132:14,25

**1.1** 106:13

**1033** 8:23 40:8, 12 41:16 70:23, 25 81:23

**10:54** 47:13

**116** 11:12 12:2, 3

**117** 13:23

**118** 13:24

**119** 12:23 13:10

**11:00** 47:16

**12** 14:11,14

**122** 12:23 13:2

**13** 68:3

**14** 106:11

**15** 106:9 111:1

**16** 106:13

**17** 11:11

**17th** 5:5

**18** 5:11 106:11

**1970s** 41:10

**1975** 25:8

**1976** 23:23

**1978** 23:24,25

**1979** 22:17,18 23:25 26:3

**1983** 22:17

**1987** 40:13

**1992** 24:15,18 26:14

**1993** 40:13,24 45:2 70:22 71:1

**1995** 8:23 25:1 79:4 94:7,12 95:1,5 99:10 101:5 131:23

**1998** 40:13

**1:06** 116:1

**1:12** 116:4

**1:48** 133:12,14

**2**

**2** 12:22 13:8 21:21 41:24 74:6 132:15,19, 22

**20** 14:14 45:16 52:7 58:6 105:11 106:9 111:2

**2003** 40:14

**2005** 43:11 45:3

**2007** 18:2

**2009** 40:14

**2014** 40:14,25

**2016** 105:9

**2017** 18:6

**2018** 13:4 48:8, 9

**2020** 14:6 57:8

**2021** 5:6 8:24 11:11 14:11,14,

**20** 18:16 57:18

**2022** 40:14

**22** 131:5

**2523** 5:11

**26** 40:7 58:7 117:17

**27** 13:4 48:9

**28** 63:13 70:20

**3**

**3** 13:23,24 14:7 57:8

**30** 45:16 58:7

**31** 105:9

**32** 96:25

**33** 98:6

**3413** 132:1

**3420** 132:1

**4**

**4** 13:2,23,24 14:8,10 57:17 125:11 131:23

**400** 23:8

**42.1** 121:2

**44** 60:17 119:16

**45** 60:17,20 61:11,21,25 91:18

**46** 60:21 61:11, 21,25

**49** 118:4

**5**

**5** 68:25

**5-7-2020** 13:25

**5141** 97:14

**5142** 97:14

**56** 58:8,10,23 59:7 60:15

**57** 124:7

**5:10** 131:23

**6**

**6** 68:25 119:17

**6.2** 106:15

**64** 75:21

**65** 12:18

**66** 16:24

**6:20** 106:1

**6:35** 106:1

**6:40** 131:6

**7**

**7** 14:6,20 18:7, 15 19:20

**70** 16:24 17:25 19:7

**70s** 42:3

**71** 12:15 20:15, 17

**72** 20:17 21:3, 12

**73** 21:12

**76** 41:25

**77** 26:1

**8**

**80** 52:7 57:25 61:8

**80/20** 52:6 57:24

**84** 20:15

**87** 41:3

**9**

**911** 99:25

131:6,7

**921** 8:22,23 24:12,13 68:8 69:1,4 71:12 74:25 75:22 81:23 82:24 99:3 121:10 126:2

**95** 94:14

**9:33** 5:6

**9:43** 11:21

**9:45** 11:24

**A**

**a.m.** 5:6 131:23

**ability** 27:22 122:21

**absence** 76:2 124:20

**academic** 50:6,20,22

**academy** 23:6, 17 32:21 42:8, 9,12 44:5 46:4

**accelerant** 102:5

**accept** 82:21

**accepted** 69:23 110:15

**accepting** 53:2

**accident** 81:1 83:15

**accidental** 32:15 33:2 77:10

**accidentally** 72:20

**account** 55:5 118:5 120:1

**accounted** 122:2

**accounting** 58:17

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 329-10 Filed: 05/17/24 Page 137 of 159 PageID #:14235
The Deposition of DAVID COVE, taken on August 13, 2021

136

accuracy 123:13

accurate 14:3, 12 15:20 20:21 21:3 58:11,16 119:4

accurately 92:20 93:22

acquired 34:7

Act 45:20

Action 35:17

actions 77:5

active 22:1

actively 54:23 65:19

activities 28:20,24

actual 59:11 60:3 82:1 131:8

add 130:21

added 128:19 131:11

additional 8:25 10:2 14:18,22 15:12 17:5,11 18:8 19:16,24 30:2 55:20,22 61:22, 24 77:22 103:1 114:24

address 130:18

addresses 97:23

adds 122:13 124:23

adequate 103:11 124:9

adequately 77:6 79:23

Administration 25:5 30:4

admitted 98:17

admittedly 12:11

advance 9:23

advanced 29:11 37:8 42:25 89:21

advances 89:15

advertisements 109:10

advertising 109:9

advice 62:22 63:8

affidavit 121:18

affirm 6:9

affirmed 123:20

agencies 25:3 42:19 44:20 45:13 46:22 91:21 94:18

agency 43:4

agent 30:9 94:15,16

agents 30:12 45:5

agree 6:2 56:11 108:24 110:22,23 111:5 122:25

Agreed 113:25

agreement 13:5,12

ahead 40:5 41:20 45:7 54:8 60:25 64:6 80:6 83:7 84:10 85:23,25 92:20 94:1 97:18 100:11 105:6 113:6 114:10 117:3 118:15 127:21 128:5, 24

alarm 122:19

algorithms

29:25

allowed 23:9 42:23 124:3

alter 10:7

alternative 76:7 81:13 122:12 125:20

alternatives 77:10

amend 25:16

American 121:22

Amor 5:8 6:18 12:7,13 14:2,5 90:3 91:4,14 92:14,24 93:1, 3,10,19 95:6,13 96:5 98:6 99:19 100:5,8 105:12 110:18 121:17 131:18,21 132:2

Amors 105:25 111:3

amount 46:9 57:11,22 58:11, 25 60:10 61:13 102:6 104:1 125:9,24

amounts 111:6

ample 43:5 97:12

analysis 25:9 30:7 42:24 51:8 53:4 55:16 56:6 67:8 75:1 78:8 104:10 107:18 108:19 110:12 122:9 132:18

analyze 29:8 30:15 52:14 118:9 130:8

analyzed 67:3 76:17

analyzing 68:19 70:8,10 72:8

annual 8:24 42:16,18

answering 7:14 26:19 87:19

answers 52:15 67:14 85:13 89:21

Anti-arson 35:16

anticipation 40:12

apartment 69:11 73:6 90:12,17 98:16 111:3 119:6 121:21 126:13

apologies 11:13,14 16:6 23:12

apologize 11:18 17:11 18:25 26:10 43:8 58:4,24 64:5 66:18 107:19 119:21 129:7

apparently 105:11

appearance 5:12

appearing 5:20 6:17

appears 58:4,6

appendix 16:21,22,23 17:2,16,19 18:12 19:16,22 20:13 26:1 46:25 56:25

appendixes 16:17,18

application 30:16 128:14, 16 129:21

applied 39:1 78:21 80:3

applies 68:8, 11

apply 41:12

applying 29:20 94:10

appointed 17:4

appointment 31:13 50:6,13, 21

approach 34:6 52:25 53:9,14, 18 126:23

approached 38:4

approaching 70:19

approval 122:16

approximate 45:11 58:25

approximately 15:4 32:24 50:15 54:10 58:8 61:8

archaeological 45:20,21

Archeolo 45:20

area 22:12 27:1 30:2 44:10 70:13 73:16 74:24 86:5,7, 19,24 92:13 98:24 104:2,7 110:16,17 112:12 121:6 122:13 129:23

areas 36:6 38:22 45:25 51:3 53:12 97:12 99:2 120:13 122:25 131:16

argue 111:9

argumentative 127:21

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**arguments**
71:11

**ARPA** 45:19

**arranged** 8:4

**arrest** 30:24
31:6,8,12,13,16

**arrived** 33:4
76:6

**arson** 22:22,23
23:1 24:10 25:9
26:20 30:6,13,
14,17 32:3,6,9,
18 34:13,24
35:3,9,19 38:1,
3,15 39:19
63:20 64:17
82:3

**arsonist** 34:20

**arsonists**
29:22 80:23
81:2

**articles** 50:17
126:1

**articulated**
71:23,24 81:22
84:1 90:3 91:13
99:19 100:5
113:3 127:15
128:2

**aspect** 50:20
132:12

**aspects** 33:10
65:6

**assemble** 69:9

**assembling**
15:17

**assertations**
109:23

**assess** 56:3

**assessment**
78:11

**assessments**
74:19

**assigned** 92:4

**assist** 77:12

**assistance**
25:5 30:3
45:13,15

**assistant**
23:15 33:21
44:24 45:8 46:1

**assisted** 66:10

**assisting**
65:24

**Associates**
12:23

**association**
17:7 21:11,16
24:24

**assume** 10:6

**assumed**
121:13

**assumes**
120:17

**assumption**
59:6 60:1

**ASTM** 8:18,24

**astray** 110:10

**attempt** 127:4,
5

**attempted**
120:24

**attempting**
113:21

**attempts** 58:18

**attended** 98:25

**attending**
5:13,16

**attorney** 33:21
37:10 58:19
61:1 62:18 63:5
116:17,19,20,
23 117:4
131:22

**attorney's**
31:18,19 49:4
63:8 90:14
117:6

**Attorneys** 17:7

**Attorneys'**
17:17 19:18
24:23

**audio** 131:20

**August** 5:6
23:23 105:9

**authoritative**
122:24 128:9

**authority** 27:9
31:1 45:1

**auto** 36:13

**automatically**
79:12,17

**autopsies**
66:6,10 99:1

**autopsy** 8:15
66:5,7

**average** 48:14,
20 49:13
121:15 123:4,5,
6

**avoiding** 87:19

**aware** 92:14,
17,24 93:8

———

**B**

**back** 11:23
16:8,16 23:6
25:12,21 26:15
36:18 42:3,7
46:5 47:15
49:12 67:21
70:20 74:16
78:2 82:19,24
89:7,15 103:13
107:22 111:23
113:3 116:3,7
131:6

**backed** 128:9

**background**
25:20 29:25
42:8 129:17

**backs** 41:10
84:4 88:17

**Bacon** 70:12

**bad** 115:18

**bag** 82:20

**balance** 50:11

**bank** 32:7

**bar** 101:17
125:15

**barrier** 28:4

**bars** 101:14

**base** 123:23

**based** 12:11
29:24 30:11
51:11 54:2
57:20 58:23
61:11 66:22
76:2,15 86:14
94:2 96:15
100:2 102:6
104:9 106:6,9
107:14 108:10,
12 110:14
111:20,21
114:3,18,21
115:11 119:13
120:20 122:4
123:4,16
124:15 126:21

**bases** 110:24

**basically** 16:1
23:19 28:3
32:19 33:17
35:23 36:13
40:8 41:2,3
51:8 53:13
54:22 68:17
72:14 80:10
82:25 99:4
102:11 105:22,
23 106:14,16,
21,22,25 107:1,
2 108:14,16
111:7 123:17
124:5 128:12

**basis** 51:17
86:18 87:2
126:3

**bat** 98:4

**Bates** 11:12
12:22 13:2,10
20:15

**bathroom** 47:6

**bathrooms**
119:18 120:1,5,
10 128:19

**beating** 40:18

**bee** 82:8 89:8
96:22

**beg** 76:21

**begin** 102:9

**beginning** 8:8
47:18

**begs** 114:25

**behalf** 5:19
6:17 11:10
12:13 77:4

**behavior**
29:21 74:8
132:19

**behavioral**
67:17

**belief** 61:13

**believed** 76:13
92:4 104:2
118:22 126:22

**beneficial**
27:14

**benefits** 22:6

**Bilancia** 84:17

**bill** 6:18 14:23
59:16,17,23
98:7

**billed** 16:15
58:9

**biller** 59:21

**billing** 13:15,
18

**binders** 61:20,
25

**bit** 55:8 74:7

**board-
certified** 44:4

**bodies** 32:2

**body** 36:20

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

47:1

**bombers** 29:22

**bombing** 34:13

**bombings** 31:25 35:9

**bona** 27:17

**book** 8:24 124:7

**Booster** 70:3

**boss** 82:19

**bottom** 13:2,3 14:1,3 124:4

**boxed** 15:15

**brand** 74:1

**break** 34:21 47:4,5,9 85:22 93:16 97:18 113:15 115:21

**breaks** 28:4 85:24

**Brian** 131:22

**briefly** 67:24

**bring** 31:10

**brings** 74:19

**broad** 44:7 52:15

**broadly** 72:7

**brought** 28:8 85:18 90:6

**bullet** 69:9

**bulleted** 131:1

**bulletize** 130:23

**Bumblebees** 82:8

**bumped** 72:20

**burdensome** 95:21 96:3

**Bureau** 25:18 26:7 28:10

---

30:10 65:1 66:19

**burglary** 34:22 35:2

**burn** 65:5,8 77:25 90:22,24 100:4

**burned** 82:18

**burning** 36:15 110:21

**burns** 108:5

**buy** 82:20 83:6 89:8 96:20

---

**C**

**calculations** 30:5 42:25

**California** 17:7,17 19:18 24:23

**call** 29:6 36:14 47:20,22,24 59:14 74:14 84:17 100:1 126:17 131:6,8,9

**called** 26:20 27:6,9 36:18 38:1 51:20 71:16 77:11,12 121:11

**calling** 77:21

**calls** 36:16 65:19 119:11 127:20 128:23 129:3

**Cambridge** 38:14 39:2

**cameras** 29:19

**candle** 84:7 85:1

**candles** 84:24

**candor** 22:13

**capabilities** 95:23

---

**capture** 131:10

**car** 36:14

**carbon** 111:7,8 120:9 121:3,5,8 125:5

**carboxy** 121:2

**care** 24:10,14 25:10 37:16 38:7 64:8,9,15 69:23 71:8,20 78:21 79:13,18 80:1,18 81:22 84:16 87:8 88:11 96:11,17 125:13 126:5 132:11,13,18

**career** 34:8 36:18 83:13

**careful** 7:13

**Carpenter** 8:10 55:22 56:13 110:23 111:5 112:7 118:7,16 119:7 122:5 127:16 128:2,13

**Carpenter's** 9:14,17 10:12, 17,19 19:24 103:16 118:1 119:24 120:2 127:5,6

**carried** 46:5 100:8

**carriers** 29:16

**case** 5:11 12:6 13:16,20 14:2, 5,15 26:21 28:10 30:11,12 32:4 33:24 38:6,15 39:8 40:24 48:2,11 53:1,3,13,20, 22,23 54:14,17, 24 55:1,10,12, 14,25 57:12,23 58:10,13 59:16 61:14 69:17 76:21 77:5,8, 20,23 78:14,16

---

79:15,16 80:3,9 81:20,22 82:7 84:14 85:15 86:4,6,13,16 88:14,16 89:3,7 90:6,19,22,25 91:7,17,19,22 92:2,23 93:24 94:11 98:5 99:2,22 102:21 108:15 110:11 116:20,21 117:5 118:19, 21,23 120:17 122:6,8 123:2 124:11 125:8, 11,15,16,21,23 126:4,13,18,24 127:18,24 129:22,23 131:10,13,20

**cases** 27:12 30:6,13 31:14, 15 32:10 33:15, 22 50:18 51:19 52:19,22,25 53:5,18 67:4 81:4,24 82:1 83:13 87:4,24 91:21,22

**caused** 76:13 93:12,20 95:7 110:24 118:13

**causing** 28:2

**ceiling** 120:11

**certificate** 23:7 93:1

**certification** 31:10 42:16 65:21,22 66:12, 15

**certifications** 21:10,15

**certified** 23:9 65:2

**CFAST** 18:6 118:8,11 119:3, 8,23 120:6 121:6,7 122:15, 17,21 128:17 129:9

---

**CFT** 124:15

**chair** 120:18,19 121:14 122:11

**chairs** 121:16 123:7

**chance** 20:17

**change** 39:13 56:16

**changed** 38:12 69:2,4

**chapter** 26:5 29:14

**characteristics** 73:3

**charge** 10:19 35:1

**charged** 13:19

**chart** 68:6,13

**chases** 122:22

**chemical** 106:23

**Chicago** 5:17, 20 88:21 109:8

**chief** 26:3 29:4 44:24 45:8 46:1

**chromatographs** 29:7

**ci** 83:9

**cigarette** 82:15 83:10 85:16 88:23 89:12 90:8 91:4 93:11 95:6 98:15 100:14 101:1,6 102:2, 8,15 104:23 106:7,17 107:7, 9,10,20 108:7,8 109:16 110:2,6, 19,24 111:17 112:8,13,14 114:16 115:12 121:14 131:18 132:3

**cigarette-ignited** 105:16

---

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

cigarettes 94:5 108:19 112:16 114:14

circumstances 76:3,16 80:3, 21 85:9,11 98:11

cite 112:15

cited 70:22 109:18 123:17 129:24

cites 107:6

cities 27:21 37:8

city 22:21,25

civil 10:14 37:17 51:13,15 52:1,7,8,20,21 103:8 127:18

clarification 26:12 48:19,22 132:17

clarified 93:5

clarify 18:10 59:9 92:22 103:1

classes 42:17 44:1,2

clear 15:20

client 53:24 54:5 77:19 86:18 87:3,11, 16,22 88:18 90:7,8 92:5 101:22,25 102:2,15,25 125:21

client's 98:23

clients 53:8,16

close 81:13 120:19

closed 39:7

co-author 24:24

co-authors 69:2

co-chair 44:6

cobbled 121:4

cocktail 28:7

coded 124:4

codes 38:12,20 39:1 70:17

coffee 73:16 74:2,20 75:2

collateral 33:5, 9 34:14,24 35:24 36:3

collaterally 35:9

collect 70:5

collected 54:2 79:1

collecting 68:19 69:8 72:7 98:18

collection 30:7 40:21 78:24

color 15:21

combating 30:14

combination 120:3,4

combined 22:24 35:20,21 37:11,21

combustibles 106:18,19

combustion 101:15,18,19

comfortable 47:4

comics 109:10

comment 80:11

commented 34:19

Commission 23:10,11 73:24

commit 34:23

committed 34:22 38:3

committee 44:7

communications 58:19 61:2 62:17 63:5

compare 85:3, 15 86:16

compared 40:24 84:19

comparing 126:1

comparison 76:23 85:7 125:17

comparisons 92:1

competent 83:9 89:10,13 92:12 95:2 112:10,15

complaints 74:1,3

complete 33:18,22 51:8 87:16 123:11

completed 13:6 130:24

completely 101:17 105:16 121:9 123:23

completeness 31:20

completing 42:11

complying 62:24

composed 21:23

compositions 106:23

compound 113:14 127:20

comprehensive 34:6 36:10 98:3

compromise 47:23

compulsive 29:24

computational 124:15

computer 45:24 118:8 124:8,14 125:13 127:24 128:6 129:20, 22

con 98:1

concerned 95:22

concluded 78:18 133:14

concludes 133:12

concluding 67:13 128:11

conclusion 55:17 69:21 71:8 76:8 82:24 85:20 118:19 119:9 127:16 128:3,20,21

conclusions 10:8 55:23 77:18 78:14 98:4 118:21

conditions 114:22 130:25 131:2 132:8

conduct 26:21 27:9,22 71:3,13 103:16 110:11 115:10,14 124:1

conducted 27:3 31:19 46:2 66:5,7,25 78:8 79:5 114:18

conducting 24:10 26:9,24

28:21 36:10 40:19,21 43:19 50:17 63:25 64:8 71:7 72:11 78:1 103:23

conduction 65:9

confessed 93:19 95:13,14 100:8

configured 68:9

confirm 75:19 86:23 90:2

conflict 53:3 110:4

conflicts 53:3, 4

confusion 7:8

conservative 59:21

consideration 126:10

considered 24:7 27:16 28:7 69:24 72:1 79:25 89:9 110:16 121:12

consist 8:7 21:24 24:9 130:17

consistencies 121:25

consistency 117:4

consistent 41:17 76:9 77:15 87:17 98:13 110:17, 19,21 111:10 114:19 126:13

consists 21:25

constantly 55:20 75:7

constructed 118:17

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

constructing 118:18

construction 118:18

consult 116:12,15

consultation 49:16 54:5

consulted 116:21

consulting 52:19

Consumer 73:24

contact 10:16 101:2

contacted 47:25 48:11

contained 56:4 68:1

context 50:13, 24 73:13 113:23 114:3,4, 10

continue 55:3 64:4 70:5 98:1 107:11

continued 34:7 86:6

continuing 12:7 42:10

continuous 83:12

contract 12:24,25 48:4 52:4

contrasting 126:1

contribute 68:11

control 72:20 79:1

controls 72:18

convection 65:9

convened 5:6

conversation 115:22

convicted 80:23 81:2

conviction 9:15 92:23

convictions 81:6

cook 73:1

cooking 72:24

cooperating 36:22

coordinate 36:8

coordinators 36:9

copies 15:21

copy 9:4 18:3, 7,23 40:6

corners 120:23

corporate 116:17,19,23 117:6

correct 21:7 22:3 27:23 37:24 55:16 60:7,18 63:15 64:11 67:10 68:23 69:3,24 88:3,4,7 90:22 91:1 92:15 93:12 94:13,18, 22 99:19 103:17 108:2 111:20 127:7,8, 11,18 128:3 129:2,12,13 130:5,6,9,10

correctly 119:21

correlate 79:17

Corrupt 28:11

could've 121:5

counsel 5:12, 14 9:13,17,19 10:10,11,16 13:6 15:3,11 48:1,2 53:22 54:15 55:1,9 56:19,22 116:13,16 131:17

counsel's 10:19 62:21 106:5

counties 27:21

country 37:19

County 43:20 51:18 52:3 98:20

couple 6:22 47:1 58:24 127:2

courses 42:21 51:2 64:25

court 5:3,5,10, 21,25 6:6,13 11:20,23 47:13, 15 48:25 49:2 54:23 55:11 88:25 115:25 116:3 133:9,11

cover 36:11 64:9 125:18

covered 26:12 36:7 85:17

COVID 49:22, 25 69:25 70:1 109:22

create 82:5 127:9

created 24:13 129:9

credentials 50:21

credibility 73:10

credible 124:18

crime 30:8

32:4,11 34:22, 24 92:15

crimes 30:24 31:24 32:7,8,10 33:5,6,9 34:12, 14 35:8,24 36:11

criminal 28:22 32:20 33:10 38:6 39:8 42:22 43:11 44:25 51:14,15 52:1,7 86:11

Cross 5:9 12:7, 14 14:2,6 93:10 98:7 130:12 131:23

Cross' 93:9,17

crux 20:4

cumulative 124:24

current 109:18 118:9

curtain 85:1

curtains 84:8, 24

cusp 37:18

cut 7:6 23:13

cuts 7:1 32:3

CV 5:11 12:16

cycles 68:23

———

D

D-U-R-R 117:8

Dahan 105:17

Dahan's 105:8

Dalmarnock 18:2 123:24 126:11

damage 28:2 125:17,23

data 19:15,21, 24 20:2 53:18 54:3,4 55:15

68:16,19,20 69:7,8 70:5,8, 10,11 71:21 72:8 75:7 76:1 77:18 80:10 82:10,18 88:1 89:14 100:15, 16,17 101:4 102:17,19,20 103:1 104:10, 24 105:18,20, 21 107:18 108:1 109:22, 25 113:2 118:9 121:9 122:3 124:9,19,20 126:21 131:3

data-rich 55:24

date 10:20 25:6 55:5

dated 11:11 13:4,25 14:11 57:18 121:4

dates 41:16

Daubert 49:9

Dave 47:20,24, 25

David 5:7,23 11:10 52:18

day 5:5 45:24 50:15

days 43:19 77:22 89:16

deal 77:20,24 90:17 108:22

dealt 32:2 43:24 70:16 87:23

death 32:16,17 51:20 64:25

deaths 32:12, 13

decades 25:22

decease 22:10

December 22:17,18 45:2

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 329-10 Filed: 05/17/24 Page 142 of 159 PageID #:14240
The Deposition of DAVID SCOVE, taken on August 14, 2021

141

deception 67:15

decide 74:21

decided 41:14

decorated 121:21

dedicated 29:12

defect 39:3

defen 103:4

defendant 52:21,25 83:18, 20,22

defendants 5:19 6:5 9:12, 15 11:11 12:13 14:5,23 52:10 76:22 102:22 103:21

defendants' 76:25 77:3

defense 10:10, 24 13:6,19 14:14 48:1,2 54:15 55:8 56:6,8,9,18,22 62:21 98:23 102:22 103:4 116:13,16,20

define 73:12

defined 29:15

defining 68:19

degenerate 75:5

degenerated 121:6

degree 38:25 65:8

degrees 21:8

demarcated 13:3

demonstrate 94:8

demonstrations 114:22

denied 93:2

deny 75:20

depart 115:23

department 22:19,21,25 23:3 26:24 27:3 32:22 35:15,18 37:3,12 39:18 44:18 46:16 65:18,20 77:6 90:16,21 93:22 122:17

departments 26:22 27:21 42:19

depends 128:6

depo 8:12 125:12

deposed 6:19

deposited 121:14

deposition 5:7 7:12 8:14 9:6, 23 14:25 15:2, 3,8,14,25 16:14 19:10 56:1 93:9,13,17 133:13,14

depositions 6:25 8:11,12,13

deputy 51:17

describe 31:11 35:19 51:1 130:15

describing 93:2

description 14:1 40:7,9

design 39:3 73:18

desk 18:1 59:11,12 61:7 83:10

destroy 90:16

details 63:18

detain 30:24 31:7

detection 105:14

detective 37:9 46:13,23 88:25 89:4 90:1

detectives 22:25 35:22 36:2 46:17 88:13 131:22

determination 32:13 53:11 76:1 111:12 126:3

determine 53:4 75:13 77:23 104:10 121:10 127:10

determining 76:17 128:8 132:10

developed 29:25 39:11 70:17 129:19

developing 68:13,20 72:8 82:5

development 37:13 50:16

deviate 69:24

device 28:7 73:22 74:20

devised 98:19

diagram 68:6

diagrams 8:15

died 38:16 111:7

difference 40:25

dimensionally 78:4

direct 6:14 33:15 62:4,10, 18 63:6

directly 50:22

director 23:15 37:10

disagreement 20:5

discarded 88:23

disclose 48:17,21

disclosed 12:6 14:18 49:3,5,10 52:23 54:14 58:12 62:14 63:10,20

disclosure 8:8 11:5,9 12:12 56:2,23

disclosures 15:7

discovering 105:13

discrepancies 126:14

discussed 111:24 116:7

discussing 53:2

disinter 45:21

dispersion 120:9

distance 9:7

district 5:10 17:7,17 19:18 24:23 31:18 90:13

dive 25:21

diverse 107:10,13 109:9 126:14

diverted 120:13

divided 46:16

Division 5:11 43:11 44:25

doctor 65:12

document 12:12 41:14 60:4 97:9 131:25

documentation 38:5 78:24 97:13 103:11 104:5

documented 97:5 104:16 105:22 132:22

documenting 40:20

documents 15:7,24 16:1,4, 11 17:9,15 19:15 27:8 31:4 49:7,8,10 55:14 56:4,5,12,25 57:12,22 58:1 59:8,22 60:7, 13,18,22 61:8, 10,12,14,22,24

domestic 43:24

door 120:19

doors 77:22

doubt 79:7

Douglas 9:14

draft 62:13 116:23 130:19

drafted 62:12, 23 63:9

drafting 62:6, 10,16 63:4 117:2,13,15,16, 19

drapes 85:4

drier 112:9

drink 101:17

drinks 89:17 101:14

driven 70:14

drop 110:1

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 329-10 Filed: 05/17/24 Page 143 of 159 PageID #:14241
The Deposition of DAVID PLOVER, taken on August 17, 2021
142

dropped 82:15
83:8 91:4 95:6
98:14 101:7
102:2,15 107:7
109:16 110:6,
19 111:25
112:13,14
114:14,16
115:12 131:18
132:3

dropping
85:16 93:11
104:22 107:20

drug 36:3

drug-related
32:25 36:4

drugs 33:1

dry 88:24
115:13

dryer 74:11,13

duly 96:2

Dupage 98:20

duplicitous
67:10

Durr 117:8

duties 25:14
26:15 31:24
45:17,18

dwelling 34:21

Dynamic
119:8,23

dynamics
74:23 119:1,2
120:7 124:16

_____

E

earlier 39:22
61:5 115:5
116:7 118:7

early 35:15
78:10 121:22

easier 9:4

Eastern 5:11

edition 8:23
18:17 19:20

24:23,25 30:14
40:14 70:23
71:1 88:21

education
21:2,4,8

effect 127:4
129:9

effects 75:1

effort 38:8

elapsed
105:11

electrical
90:25

electronic
18:23

elegant 78:25

element 73:19,
20

elements 41:1

eliminated
84:19,20 91:8,
12 105:16

Ellie 105:12

eloquently
78:5

embraced
71:15,25

emergency
44:3 65:2,14,
16,19,24 66:1

employed
66:19 94:14

employing
41:1

enclose 38:21

encompass
124:17

end 12:10
78:16 81:18
82:2

ended 36:5

Energy 122:17

enforcement
22:1,20 23:2,5,

8,16,18 25:3,5
28:14 30:3 31:9
32:2 42:7,19
44:20 45:5,19
46:3,13,22
64:12,15 91:18,
21 94:17

engage 28:19

engineer 44:4
119:22

engineering
38:25 51:3,4
65:6 70:16
95:24 110:12
129:19

engineers
44:6,9 51:9,10
65:4 70:18
77:12 122:16

England 124:2

enhanced
123:14

enrolled 21:5
44:1

ensue 98:17

entered 34:23

entire 36:1,11
41:23 123:13

entirety 62:2

entitled 12:23
51:7

entrained
38:18

environmental
74:10,18

equally 52:11

equals 48:3

equation
121:12

equipment
95:25

error 118:6
122:13,14
123:15,16,19,
22 124:24
126:22

errors 118:17
119:16 120:24
127:6,15

espoused
126:6

established
90:14,15

establishes
125:12

establishment
24:12

establishment
s 89:16

estate 22:10

estimate 57:3,
21,25 61:17,19
118:18 120:14

estimates
125:5

et al 5:9 14:2
18:2,6 19:18

evaluate 73:9

evaluating
65:5

evaluation
66:23 75:4 97:2
130:1

evaluations
72:15

events 54:16

eventually
22:23 69:4

evidence
40:21 68:10
74:9 75:23
76:2,3,16 78:24
83:1,19 88:17
97:4,8,24 99:5
101:4,23,24,25
102:1,5,14
104:25 113:2,9
114:15 131:18

evolving
114:25

exact 59:21
111:23 112:11

124:6

exam 78:23

examination
6:14 67:1,3
110:14 130:12

examinations
37:17 40:19

examine 41:6,
7 112:8

examined 91:2
123:21

examiner 67:9,
13

examiner's
32:14

examples
69:16 75:2 84:3
97:15 128:18

exams 33:20

exceed 44:11,
15

exceeded
44:15 96:16

excellent 98:3
125:9

exception
19:23

exhausted
91:11

exhaustive
78:4,17,23 85:7
98:2,23 99:16
104:4 122:7

exhaustively
77:10,19 84:19
91:8

exhibit 11:8,19
12:2,11,22,25
13:8,23,24
14:7,8,10 16:16
57:7,8,17 97:1
125:11

exhibits 8:14
15:22

exist 94:8
124:9,21

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**existed** 97:8, 13 101:5 132:8

**existence** 40:13 123:13

**exists** 20:2 97:4 99:14 100:16 102:1

**exonerated** 92:15 93:3

**expand** 52:13 131:16

**expected** 33:18 40:16 125:16 126:8,9

**experience** 20:14,16,22 80:22 114:19 119:13

**experienced** 36:2 81:12

**experimental** 19:19 124:9,19, 20

**experiments** 18:2 123:25

**expert** 6:18 8:9 9:14 11:9 48:1, 12,14,20 49:15, 16 50:1,12,15, 23 51:12,23 52:12 54:5,6 62:17 63:6,20, 24 64:13,14,23, 24 75:9 76:23 77:9 95:22 96:1 99:24 101:20 108:23 110:23 111:9 118:1 126:9 128:11 129:14,24

**expertise** 26:25 28:19 39:19 64:7 108:11,12

**experts** 10:6 59:13,14 86:4, 6,10 102:22,23 103:4,7,12 115:6 123:25

126:15 130:7

**explain** 39:10 133:6

**explained** 74:17 81:14

**explanation** 81:11 82:2

**exploding** 82:13

**exploited** 79:9

**explore** 72:22 125:1

**explored** 76:22

**explosibility** 28:12

**explosion** 27:24 28:13 29:1 75:5

**explosion-related** 39:20

**explosions** 28:2,3,19 29:13 31:25 34:13 35:9 45:14,17

**explosive** 28:7

**Explosives** 43:21

**exposed** 32:23

**exposure** 65:8

**expressed** 56:10

**extends** 16:24

**extensive** 44:9 46:9 126:25

**extensively** 129:20

**extent** 58:18 117:1 125:12 127:21

**external** 29:17

**extraordinary** 91:24 125:9,24 126:22

**eye** 37:17

**eyewitness** 101:24

———————

**F**

———————

**face** 92:5

**fact** 6:2 24:3 27:6 32:10 34:3 46:15 60:8 78:15,19 81:1 82:21 83:15 87:2 92:6,10 96:3,7,18 98:11,22 108:15,17,20, 22 110:22 119:25 120:7 123:16

**factor** 34:2 89:19

**factors** 72:19 90:19 105:14 111:17 122:20, 22 123:1 132:14,21

**facts** 55:1 76:10 85:10 94:11 117:5

**fail** 74:21,22

**failed** 73:20 96:12 99:18 121:17 122:12 123:8

**fails** 79:23

**failure** 118:5 123:9

**fair** 10:5 16:11 39:25 41:24 42:4 61:18,23 63:19 64:22 70:24 71:19 94:24

**falsely** 27:16

**familiar** 6:19 59:13

**fanny** 121:23

**fast-moving** 28:3

**faulty** 38:11

**FBI** 34:3 81:3 91:19

**FDS** 121:7

**federal** 28:1, 10,14,16 30:10, 12,17 31:14 34:5 45:5,22 46:3 54:24 65:1 66:19 94:15,16

**fee** 13:13

**feedback** 66:22

**feel** 118:20,24

**feeling** 78:10

**feet** 59:12

**felony** 27:16 34:23

**felt** 98:7 113:23

**fide** 27:17

**field** 29:5,10 32:19 58:5 65:16 66:1 75:9 129:24

**figure** 61:10 68:6 72:6 74:6 119:17 132:14, 19,22,25

**figures** 132:14

**file** 9:15,16 10:23 33:18 97:3 130:17 131:10,11,13

**filed** 49:6,8

**files** 97:5,10

**filings** 54:23, 25 55:5,11

**filled** 131:3

**filming** 78:9

**final** 55:17 68:21 90:7 124:6

**financial** 98:10

**find** 28:13 73:23 92:2 100:17 114:24

**findings** 86:22 111:10,11

**fine** 52:16

**finish** 112:22

**fire** 18:2,20,22, 24 19:2 22:25 23:20,22,23,24 24:6,10,17 25:13,19 26:4, 5,6,9,13,17,20, 24 27:5,10,14, 23,24 28:2,3, 13,19 29:1,2, 13,16,24 30:20, 22,23 31:4,22, 23 32:13,22 33:2,9,12 34:4 35:6,7,14,21,22 36:22,24,25 37:12,23 38:11, 14,24,25 39:2, 10,16,19,22 40:9,16 41:6 42:1,2,17 43:21 44:6 45:14,16 51:2,7,9,10,22 52:5 56:14 63:20,25 64:8, 10,12,16 65:4, 18,20 67:23 68:8,11 70:13, 16 71:1,3,5,7,9, 20 72:5,11,13, 22 73:6,7,21 74:19,23 75:1, 4,13,15 76:1, 13,14,18,23 77:4,6,7,13,16 78:22 79:14,18, 22 80:1,12,14, 18,24 81:19,21 82:4,5,10 83:12,16,24,25 84:7,21 85:3, 10,15,19 86:1, 2,8,12 87:8,18 88:3,5,11 90:12,15,21 92:6,8 93:12,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 329-10 Filed: 05/17/24 Page 145 of 159 PageID #:14243
The Deposition of DAVID ICOVE, taken on August 14, 2021
144

19,20,23 94:12,
17,20,22,25
96:3,4,11,17
97:7,11 98:8,
16,17 99:18
100:6 101:3,7,
15,18 103:24
104:3,7,9,11,
21,22 105:1,13,
16 108:20
110:12,15,17,
22,24 111:3,5
112:11 114:17,
18,22 115:6,11,
12,14,16 119:1,
2,8,17,23
120:6,18,21
122:2,15,16
123:18,24
124:1,8,14,23
125:13,17,23
126:2,11 127:7,
10,24 128:6,7
129:9,14,18,22
132:8,11

**fire-related**
45:13

**firefighter**
65:21

**firefighters'**
65:24

**fires** 8:18 32:24
38:7 44:7 65:8
69:11,12 70:19
72:23 77:9
82:18,22 83:12
89:20,23 94:7
105:15 120:22
124:11 128:9,
12 129:11,16
130:1,3,9

**firm** 10:20
38:15 39:4 48:3
95:24

**fit** 111:13,23

**fits** 108:20
111:2,11

**five-year**
123:11

**fix** 11:16 74:15
120:24 127:4,6

**flames** 89:18

**flaming** 82:14
89:17 101:13
114:20

**flash** 73:2
129:20

**flat** 13:13

**flip** 70:21

**floor** 18:8
38:17

**flow** 68:6,13

**fluid** 124:16

**focusing** 99:12

**folks** 74:15

**follow** 126:5
129:25

**follow-up**
125:2 127:2
133:4

**follow-ups**
130:14

**food** 73:14

**force** 22:24
35:20 38:1 42:3

**forces** 35:19
40:3

**forensic** 18:19,
20 26:4 33:20
44:4,5,9 51:4,7
65:6 74:9

**forensics**
29:12

**forgive** 22:13

**form** 40:4
53:25 54:7
58:15 60:24
61:15 76:19
92:18,19 93:25
100:11 104:14
110:8 112:18
113:15,17
118:14 127:12,
19

**formal** 21:8
44:2 46:18

77:25

**formula** 36:9

**formulate**
59:20

**formulated**
130:18

**formulating**
61:9 125:24

**forthcoming**
10:18 20:1

**found** 36:14
38:19 53:21
56:16,17 75:24
76:14 82:18
83:1

**fourth** 8:13
65:7

**frame** 99:23,
24,25 100:3,6
114:19

**Francis** 70:12

**Fraternal**
21:20,22

**fraud** 32:7

**free** 10:8,24

**freezes** 7:2

**French** 73:1

**frequent** 54:12

**friends** 22:11

**fries** 73:2

**fro** 23:19

**front** 7:23 8:1
9:5 16:3,5,19,
21 18:5 19:9
20:11 27:16
48:6 61:21

**fuel** 85:3,15
86:16 88:15
91:9,12 105:13

**full** 5:22 32:21
46:4

**fully** 7:3 23:14

**funded** 25:5

**funny** 31:9

**furniture** 78:7
90:16 108:23
121:19,24

**G**

**gap** 123:11

**garbage** 101:2

**Garcia** 5:15
6:4,15,17 10:5
11:3,7,25 47:5,
10,17 48:18
58:21 62:20
92:22 93:5,7
104:17,19
105:19 113:19,
21 114:5,8,11
116:5 127:23
130:11 133:4

**gas** 29:7

**gathering**
25:11

**gave** 83:23
97:14 128:18

**Gehman**
106:12 107:9,
13,15,18
108:18 115:4

**general** 40:18
41:4 80:11
109:11

**generally**
15:13 41:25

**generate**
68:16 69:15

**generated**
125:5 130:22

**German**
106:15,16

**germinate**
59:20

**give** 6:9 10:20
11:12 17:19
21:11 42:20
50:9 52:15
58:10 64:13
70:21 82:7

118:3 129:17

**glad** 36:19

**glass** 120:19

**glove** 111:11,
13,23

**Glynco** 46:4

**Gohar** 29:5,13

**good** 5:18
48:18 71:16
78:11 90:20
108:9 123:17
125:11

**goods** 107:10
108:13 109:7
112:17 114:14

**government**
37:14 123:21

**graduate**
29:20 51:7,9

**graduated**
21:6

**grand** 27:10
31:15 33:15,23

**grant** 35:17

**grave** 45:22

**great** 9:2 58:5
77:20

**greater** 42:20

**gross** 49:18,19

**grounds** 62:16

**group** 22:7

**grow** 33:3

**Guerreri** 86:13
87:7 88:5,10,25
89:4,12 90:1
98:3 131:22

**guess** 34:9
39:20 49:15,25
55:2,3,7 58:2

**guidance**
32:14 65:3
66:23

**guide** 8:22
18:7 25:19



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 329-10 Filed: 05/17/24 Page 146 of 159 PageID #:14244
The Deposition of DAVID ICOVE, taken on August 14, 2021
145

35:17 71:12

**guidebook** 37:14

**guideline** 24:16 25:24

**guidelines** 6:22 8:19 26:13 37:16 65:5

**guidepost** 60:23

**guy** 106:11

---

**H**

**half** 15:18

**hall** 33:23

**hallway** 38:18

**hand** 6:8 127:18

**hand-me-downs** 121:20

**handbook** 26:6 29:15 129:25

**handbooks** 26:8

**handle** 26:23

**hang** 104:13

**happen** 80:21

**happened** 70:1 72:16 74:4 75:17,19,20 77:24 78:12 80:25 81:8,11, 16 87:17 89:19 99:6 111:12,15

**happening** 30:16 36:1 131:11

**hate** 33:6

**head** 59:18 97:8

**hear** 7:3

**Hearing** 49:9

**heat** 122:4 123:3 124:10

**held** 44:21 45:3

**helped** 39:10, 11

**helpful** 9:8 41:22

**helping** 34:11 37:22

**helps** 38:13

**hemoglobin** 121:2

**higher** 72:23

**historic** 69:9

**historical** 25:20

**histories** 69:10,15 72:17, 21,24 73:4,23 74:5,7 75:5 123:7

**history** 73:12

**hold** 21:16

**holes** 15:16

**home** 70:14

**homicide** 36:4

**homicides** 36:6

**honed** 76:23

**honest** 80:25

**hood** 120:11

**hotels** 39:5

**hotels'** 39:6

**hour** 13:12,14

**hour-and-a-half** 16:10

**hours** 13:14 15:2,4,5,9,10, 12,19 23:8 50:19 57:4,5,25 58:6,7,8,10,17, 24 59:7,11 60:2,10,15,17,

21 61:11,21,25 102:25

**human** 74:8 105:14 132:19

**Hyattsville** 65:17

**hypotheses** 68:11,14,16,23 69:1,3,6,15,20 70:2,4 72:9,12 73:10 75:5,12 76:7,22,24 79:24 80:14,15 81:12,13 88:2 91:6 93:23 96:4 97:16 122:7,8 125:20,25

**hypothesis** 68:14,15,20,21, 22 69:2,6,20 71:6,21 74:6 75:14,18,20 76:12 79:23 81:6,19,23 82:22 83:11,23 84:2,6,20 86:21 87:10 88:12 90:2 91:4,6,13 94:3 95:5,8,10, 12,18,21 96:8, 9,12,21 99:19 100:5,18,22 101:6 104:25 108:2 112:25 113:3,9 114:15 115:11 118:13 122:12 125:15, 16,18,19 127:7 132:7,12

**hypothesize** 49:15

**hypothesized** 111:15,25 112:21

**hypothetical** 79:21 80:2,4,6, 9,12 84:10,13

**hypothetically** 81:24 84:15 108:6

---

**I**

**I-C-O-V-E** 5:24

**Icove** 5:8,21,24 6:3,7,16 7:18 10:2,6,24 11:4, 10,12 12:2,3, 10,22,23,24 13:1,10,23,24 14:3 20:15 21:3 22:13 39:14 44:17 47:18,19, 22 58:20 62:8, 23 65:12 83:17 90:20 92:14 106:6 107:25 113:24 114:5 115:23 116:6 127:1 130:14 133:5

**Icove's** 9:23 59:1

**ID** 6:1

**identically** 83:13

**identifiable** 9:19

**identification** 9:13,20,24,25 11:19 13:8 14:7,8

**identified** 10:4,13 16:2 17:24 18:22 76:4

**identify** 9:21 10:11 18:1 31:24 104:1 110:16

**ign** 105:15

**ignite** 94:5 95:7 112:11

**ignited** 85:1

**ignition** 75:24, 25 76:4,5,7,9 82:25 83:2,9 84:18 85:4,17 86:5,16 88:15

89:2,10,13,24 90:24 91:9,12 92:12 94:8,22 95:2 99:5,25 106:7,17 108:23 109:12 110:1 111:17 112:10,15 114:20 119:5 121:13 123:4 129:25

**ignitions** 100:14 107:10

**ignore** 53:7

**Illinois** 5:11

**imagining** 46:7

**immediately** 38:2

**impact** 37:15 49:23 112:8 118:11 120:7, 23 121:9 125:3

**impacted** 118:19,21 119:24 120:2

**implausible** 82:22 83:21

**implicates** 63:5

**implication** 107:16,17

**implications** 124:8

**imply** 87:22 89:17 99:5 101:14

**implying** 87:11,13,15

**importance** 108:1

**important** 34:2 55:13,15 69:5, 18 72:12 74:5 75:11,12,19 78:16 87:25

**improper**



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

129:21

**in-service**
23:19,21 42:16
43:13,23

**inappropriate**
124:22 128:13,
14,15

**inaudible** 14:9
82:4

**incapacitation**
121:11

**incarcerated**
98:19

**incidents**
69:10,14

**include** 15:6
19:4 39:20 49:7
107:15 109:25
120:5,15 125:3
132:13,18,21,
24

**included** 17:19
19:6 30:25 52:2
84:20 107:20
120:6 122:19
125:4

**includes** 19:17
50:16 97:21

**including**
97:17

**income** 49:14,
20 50:1,3,8,10

**incomplete**
80:5 84:10
123:3

**incorrect** 93:4
118:13

**incorrectly**
107:19

**increased**
123:14

**independent**
27:4 77:13
85:19 108:13
110:14

**independently**
56:3 62:8,13

63:2 78:16
86:22,23 104:1

**Indian** 45:22

**indictments**
35:2

**indigenous**
45:22

**individual** 65:7
83:11

**individually**
37:22

**individuals**
8:5 29:23 41:12
80:24

**indoor** 33:3

**inference** 76:6

**inferred** 75:25
76:5 83:2

**Influenced**
28:11

**information**
10:9 17:23
19:15 50:9
53:10 55:21,22,
25 56:3 68:10,
15 74:19 80:8
94:6 100:1
105:23,24
114:24 126:11
131:3,10,14

**informative**
56:17

**initial** 86:9
128:21

**injuries** 65:5,6,
8,10 125:18

**innocence**
52:5 93:1

**innocent** 87:6

**innovative**
37:7

**inquest** 27:10

**insisted**
122:18

**insistent** 55:21

**instance** 34:25

**instances**
39:20

**institutions**
21:5

**instrumentatio
n** 29:6

**insurance**
22:7 98:18

**intake** 111:8

**integral** 68:7

**integrity** 78:9

**intellectually**
84:22

**intelligence**
25:11 30:7
42:22

**intent** 34:23

**intentional**
33:2

**intentionally**
82:3,23 98:14

**interactions**
74:10,18

**interest** 53:5

**internal** 29:17

**international**
91:20

**internationally**
69:22 70:7

**Internet** 7:1

**interpose**
52:17 100:10
113:11

**interpretation**
67:17

**interrupt** 7:14,
15 107:12

**interrupting**
64:5

**interruption**
26:10

**interview**

97:22,25 103:6
131:21 132:2

**interviewed**
77:19

**interviewing**
80:23 81:2

**interviews**
38:5 40:22
78:12 79:5 81:3
90:7

**introduction**
68:2

**intrusions**
45:24

**intuitively** 85:2

**inventory**
56:13

**investigate**
30:13 35:8
94:21

**investigated**
45:23 82:16
104:8

**investigating**
35:12

**investigation**
17:8,17 18:22,
24 19:2 25:4
26:5,6,14
27:11,20,22,23
28:9,10 30:10
31:21 32:20
33:11 34:18
36:4,10 37:23
38:13 39:10,15
42:2 44:6 51:10
65:1 66:19
68:8,12 70:14
71:7,13,20
72:5,11 75:13
76:25 77:1
78:1,9,19 79:9,
11,12,17,19,22,
24 80:17 81:8,
18 83:22,25
85:3,10 86:9
87:8 88:11
91:23 93:24
96:13,16,17
97:2,16 98:14,

21 99:16,17
103:11,19,23
110:15 118:2
122:7 125:14
126:6 130:20
132:12

**investigations**
24:11 25:10,19
26:9,22,25
27:3,24 28:22,
24 38:4 40:22
42:10 43:11,14,
17,21 44:25
45:9,17,18
51:21 64:1,8,
11,12,16 67:23
71:3,9 78:22
79:6 80:1 90:17
92:1 96:11
110:13

**investigative**
33:18 40:2
79:5,22 80:13
97:3

**investigator**
22:22 23:1
24:18 25:12,15
26:17 28:21
29:1 30:21
31:6,22 32:18
33:10,12 35:7
39:16 40:9 41:6
42:2 71:5 75:14
76:13 77:16
79:18 80:19
81:21 85:19
94:12,17,21
98:7

**investigators**
22:25 26:20,21
27:8,15 29:8
32:21 35:21,22
40:16 42:17
44:10 56:15
71:1 77:4,7
79:14 81:21
84:21 85:15
86:9,12 88:5
90:21 91:25
95:12,17 96:3,
10 97:4,9,25
99:10,13,18
114:23 115:6
121:18

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 329-10 Filed: 05/17/24 Page 148 of 159 PageID #:14246
The Deposition of DAVID PCOVE, taken on August 14, 2021
147

**invoice** 13:25
14:4,11,13
57:8,13,15,17
58:7,8

**invoices**
14:17,19 57:4,
6,21 59:2 60:2,
5,22 61:6

**involve** 34:13
84:17

**involved** 33:5
35:16,24 43:25
44:3 45:16
80:24 82:8
105:14 122:15

**involving** 33:2,
7 45:19 76:7
89:7

**irri** 101:17

**issue** 20:4
26:11 38:20
59:4 73:4 93:20
105:10 124:24

**issued** 14:19
27:18 29:7

**issues** 53:15
122:20

**item** 69:9

**items** 9:14,16,
18,20,24 10:1,
3,10,13 35:5
122:19 132:24

**iterative** 72:1,4

___

**J**

___

**J-A-Y** 5:23

**Jail** 98:20

**janitor** 82:10

**Jay** 5:23

**Jersey** 25:3,9

**job** 40:6,8,15
41:5,11

**jobs** 44:14

**Joe** 11:2 133:5

**joint** 39:6 82:14

**Joseph** 5:18
13:3 93:5

**judgment** 98:5

**July** 13:4
14:11,20 48:9
57:18

**jump** 77:17
78:13 98:4

**June** 11:11
18:16

**jurisdictions**
29:23

**jury** 27:11
31:15 33:16,23

**justice** 32:8

**justify** 38:13
39:12

___

**K**

___

**kind** 17:13
113:12,23
114:2 115:21

**Kirk's** 18:22,24
19:2 51:10

**kit** 38:23

**kitchen** 69:12
73:7 87:18
119:18 120:1,5,
11 128:19

**knew** 83:11,16
89:9,12 100:25

**knob** 73:15

**knocking**
77:22

**knowing** 82:4
90:12 98:16

**knowledge**
115:17

**Knox** 43:20
51:17 52:3

**Knoxville** 7:20
21:21 22:2,21
23:3,6,17

35:15,18 37:2
39:17 42:11
43:10 44:18
46:15

**Kushner** 86:14
87:7 88:6,10
90:2

___

**L**

___

**laboratory**
26:4 28:14
29:12 33:20
82:8 89:8 96:22
111:20,21
114:13,21

**lack** 28:20

**landed** 102:9

**language**
75:22

**large** 26:21
81:3 95:24

**late** 121:23

**latest** 8:24
56:13 94:6
122:15 123:9
124:7

**law** 22:1,19
23:1,4,8,16,17
25:2,5 28:14
30:3 31:9 32:1
42:7,19 44:19
45:5 46:3,13,22
48:3 64:12,15
91:18,20 94:17

**laws** 28:1

**layer** 131:14

**layout** 126:13

**LEAA** 30:3

**lead** 113:21
127:16 128:2

**League** 37:8

**Leah** 5:4

**leakage**
122:20,21

**learn** 42:23

**learned** 30:15

**learning**
100:13

**leave** 72:17,18

**leaving** 105:12

**left** 35:14 43:10
73:5 90:8,11
92:9 98:16
101:1 106:1
111:3 119:18
121:9

**legal** 46:9

**lengthy** 44:3

**letting** 11:14

**level** 38:8 51:9
121:2

**levels** 78:20
125:22

**liability** 38:10

**library** 8:25

**lie** 87:5

**lies** 87:16

**lieu** 28:15,16

**Lieutenant**
86:13 89:4

**life** 22:7 27:13
91:23 98:11

**lift** 101:1

**light** 100:2

**lighting** 108:19

**limited** 52:22
76:3 111:6
127:1

**lines** 46:12
54:13

**liquor** 89:16

**list** 9:16,18,20,
22 10:10,12
20:21 21:4,7,17
67:24 85:24

**listed** 17:15,18
18:11 19:14,15,
22 20:11,24,25

21:3 34:18

**listened** 131:7

**lists** 124:13

**lit** 84:7 89:12
95:6 98:15
101:1,6 102:2,
15 108:7,8

**literature**
41:15 75:8
109:18

**litigants** 51:14,
24 52:1,8 53:6

**litigates** 51:16

**litigation** 6:21
50:13,23 52:20,
21

**live** 30:1 70:4

**lived** 65:18

**local** 25:2
26:22 27:8,14
37:14 91:20

**locate** 9:6 11:4

**located** 5:17
7:19,21

**location** 5:13

**locations**
82:15

**Lodge** 21:20,
23

**logbook** 82:17

**logical** 120:12

**logically** 75:25
76:5 83:2 99:16

**long** 7:15 56:24
60:25 70:8
71:10,14,25
113:12

**looked** 30:6,8
32:5,6 33:6
36:17,20 74:16
77:10,11,18,24
78:5,7 84:22,
23,24 86:22
91:2 97:19,20
99:23,24

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 329-10 Filed: 05/17/24 Page 149 of 159 PageID #:14247
The Deposition of DAVID ICOVE, taken on August 19, 2021
148

106:13 107:13 122:6 131:2,5

**Lord** 106:12 107:9,11,13,15,18 108:18 115:4

**loss** 27:13 49:23 69:10,15 72:16,21,24 73:4,12,23 74:4,7 75:5 82:9

**lost** 16:7

**lot** 22:9 30:15 42:20 46:7 67:22 74:19 75:4 100:13 121:1

**lower** 32:11

**lying** 87:12,22

**M**

**made** 31:12 33:15 104:9

**maintained** 44:14

**maintenance** 74:15

**major** 45:18

**majority** 15:16 31:14 51:15

**make** 7:4 9:7, 11 10:1 11:1 12:16 15:19,21 31:13,17 32:13 39:13 46:6 53:11,16 55:16, 17 75:3 80:10 83:15 87:5 115:20 118:4

**maker** 74:2,21 75:2

**makers** 73:16

**makes** 50:12 113:14 122:23

**making** 38:13

40:23 55:23 67:17 88:14 109:23

**malfunction** 72:19 73:15

**manner** 32:15, 17 76:13

**mantra** 69:3

**manual** 24:24 25:4,7

**March** 23:24, 25

**Mariah** 5:15 6:16

**Marianne** 111:7

**marijuana** 33:3 82:11,15, 20 83:6 89:8 96:21

**mark** 11:7 13:23

**marked** 11:19 12:1,22 13:8 14:7,8

**marshal** 86:1,2

**marshal's** 23:21,22,23,25 24:6,7 25:13 26:4,18 27:10, 14 29:2 30:20, 22,23 31:4,23 33:12 34:4 35:14 36:25 38:24 39:16,22 52:5 77:13,16 85:19

**Maryland** 51:6 70:15

**masks** 70:2

**master** 57:24

**matched** 86:20 88:15

**material** 10:7 17:15,16 18:8 19:14,21 56:25 61:20,24

**materials** 56:14 79:2 121:16 122:2 130:21 131:19

**math** 58:5,22, 23

**mathematicia n** 60:15

**mathematics** 58:5

**Matrix** 84:17

**matter** 5:8 13:7 62:14 63:10,21 128:13 132:15

**matters** 45:13

**mayor** 37:9

**meaning** 48:23

**means** 82:23 90:18

**medical** 32:14 64:23,24 65:3, 11,15,16,19,25 66:1 70:11

**meet** 44:11 71:19 80:18 82:6 83:25 87:7 100:24

**meeting** 22:11 79:18,25

**meets** 79:12 92:2

**member** 21:22 22:6

**membership** 21:25

**memberships** 21:11,16

**mention** 41:1

**mentioned** 23:12,16 39:21 51:16 55:13 123:24

**mere** 81:1

**message** 70:14

**met** 44:15 46:7 71:8 78:21 79:15 88:10 96:11,16 132:11

**met all** 78:20

**method** 41:2 67:22,24 68:7 69:19,22 70:6, 9,17,22 71:2,6, 15,17,22,24 73:9 77:2,6 79:10 85:6 93:18

**methodologic al** 70:10

**methodology** 70:18 71:10,17, 21,23 72:15

**Michael** 5:9 98:7 117:8

**middle** 5:23 7:6

**million** 121:8

**mind** 36:16 59:20 79:7 93:21 127:1

**Mine** 103:18 121:22

**minimum** 71:8,20 79:13, 15,18,25 80:18 81:22 83:25 87:7 88:10 96:10

**Minus** 89:24

**minute** 104:14

**minutes** 47:9 105:11 106:9, 12,13,15 111:2 120:14 123:18

**missed** 102:10

**missing** 56:14 125:3

**mo** 119:25

**model** 37:19 73:25 115:14,

16 118:12,16, 19,23,24,25 119:3,23,25 120:6,7,17,21 121:6,7,25 122:23 123:2,9, 12,14 124:16, 22 125:2,6,13 126:10,12,18, 19,20 128:7,13, 18 129:15,19, 20

**modeled** 115:18 119:17

**modeling** 18:3 19:19 74:23 115:10 118:10, 20 119:4,8,9, 20,23 123:25 124:5,8,14 126:2,23 127:7, 9,24 128:6,7 129:10,11,16, 22

**models** 123:16 124:3,4,14,17

**modern** 121:19

**modes** 75:1

**Mohammad** 29:5,13

**Molotov** 28:6

**moment** 11:14 17:1,20 52:19

**money** 22:9

**monitor** 54:23

**monoxide** 111:7,8 120:10 121:3,5,8 125:5,19

**month** 43:19

**months** 43:18

**morning** 5:18 16:2

**motel** 38:15

**motive** 90:6, 14,18 97:17,23 98:6



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

motives 97:6, 10,19

move 46:25

moving 14:10 15:1 98:1 101:12 117:24

multidisciplinary 66:22

multiple 69:19 102:11 122:7 125:25

music 59:18

_____

_____

N

named 106:11

Naperville 77:6 93:22

Naperville's 77:4

narrative 113:13,17,22 131:5

narrows 114:2

national 25:18 26:7 37:8 38:15 44:5

NBS 29:15

necessarily 49:11

needed 28:12

neighborhoods 77:21

net 30:5 42:24 49:18,21,23 50:1,3

network 42:24

networks 30:8

newer 128:17

newest 122:20

newspap 108:19

newspaper 85:17 89:13

91:5 93:12 94:5 95:7 98:15 101:8,19 102:3, 8,16 104:23 106:20,23 107:7,15,20 110:2,7 112:1, 9,13,14 114:16 115:13 131:19

newspapers 88:19 101:22 104:7 110:18 121:13 122:10 123:6

NFBA 74:25

NFPA 8:22,23 24:12,13 26:14 40:8,12 68:7 69:1 70:23,25 71:12 75:22 81:23 126:2

nickel 82:20

Nigohosian 131:22

NIST 25:19

non- 102:2 111:25

non-arson 28:21 45:8

non-fire 28:21 45:9

non-soaked 92:13

non-testimonial 13:11

non-vodka-soaked 114:16

nonetheless 25:25

nonpaid 51:17

normal 24:2,7, 9

Northern 5:10

note 34:1

notebook 8:8,

11,13 82:9

notebooks 8:2,4,5,6 15:17 16:3,5,8,9,11 33:17 34:1,5,10 51:20

noted 58:21 129:23

notes 115:21 117:11,12,13, 18,21 130:15, 16,17,22 131:13,15,16

number 5:11 6:19 11:12 21:9,21 57:3,5 58:6 63:14,16, 17 122:8 131:8

numbered 12:22 13:2

numerical 124:12

numerous 79:5 86:6 97:15

nutshell 126:21

_____

O

obfuscate 87:5

obfuscated 87:24

object 58:15, 17 62:15 80:5 84:9 92:18 117:1 118:14 127:19

objecting 62:4 113:15

objection 40:4 48:16 52:18 53:25 54:7 59:5 60:24 61:15 62:9 63:3 76:19 92:18 93:25 99:20 100:10 104:13,14 110:8,9 113:12

119:11,12,14, 15 127:12 128:23 129:3

objections 58:21 62:25 128:4

observations 104:6

obstruction 32:8

obtain 27:7,8 31:1,3

obvious 51:22 75:16 115:9

occupied 34:21

occur 69:12,14 81:6 93:12 110:6 123:2

occurred 30:19 36:21 54:11 64:20 82:10 100:7

occurs 106:8

October 22:17 131:23

off-fuel 84:18

offender 30:1

offenders 83:14

offenses 32:5

offer 28:14,15

office 5:20 7:21 9:17 10:12,17,20 23:21,22,23,25 24:7 25:13 26:5,18 27:14 28:25 29:2 30:20,22,23 31:18,19 33:13 34:4 35:14 36:25 37:1 39:17,23 43:21 51:18 52:3,5 65:24 77:13

officer 5:9 22:14,16,20 23:11,14 28:14, 16 33:11 44:21 45:4 51:17

officers 22:1,2 44:12 46:3,17

offices 31:4,23 32:15 38:24

official 27:17

officials 37:14

Ohio 23:21,24 24:6 25:13 26:4,17 28:8 29:4,11 30:20, 22 32:2 34:4 35:14 36:24 38:14 39:2 42:21

oil 73:1

Oklahoma 125:8,11,23

one-hour 44:3

ongoing 55:1 92:8 130:19

online 44:1

ope 125:8

open 38:16 39:3 80:25

opener 37:18

operate 73:21

operation 33:3

opinion 11:9 39:19 56:17 63:14,16,17 64:14 101:20 104:18,20,24 112:18 129:15

opinions 10:3, 25 97:6,10,20

opportunity 42:21 43:1 90:18 98:6

order 11:18 15:18 16:8 21:20,23 71:3

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

130:8

**organization** 22:5 28:11 39:4,12 43:25 45:12

**organizations** 23:5 33:7

**organized** 30:8

**origin** 27:5 51:22 72:13 75:15,24 76:18 80:14 81:9,19 83:24 86:7,20, 24 88:3 103:23 104:2,3,9,21 105:13 110:16, 17 112:12 125:14,16 126:3 127:10

**original** 82:9

**originally** 17:10

**originated** 76:14

**outage** 74:11

**outcome** 84:6 108:6

**outlined** 132:14,19

**outlines** 20:14 41:25 126:7

**outlining** 68:7

**oversaw** 45:18 46:1

**oversight** 120:16,17

**oversimplified** 122:1

**owed** 98:12

**owned** 38:15

**owns** 39:5

---

P

---

**P-O-L-I-C-K**

5:19

**p.m.** 106:1 131:6 133:14

**PACER** 49:1,3, 6,8,11 54:23 55:5,11

**package** 85:15 86:16 88:15

**packages** 85:4

**pages** 12:3

**pair** 60:21 61:12 101:20

**pairs** 50:22 108:17

**pairwise** 84:19 85:7

**panel** 66:20,21, 22

**panoramic** 29:17

**panoramics** 29:18

**paper** 92:12 101:2 106:8,17, 19,21,22,23 107:3,4,10 108:4,5,6,7,12, 14 109:7,17 112:17 114:14

**papers** 7:23 8:1 83:10 88:22 107:13,14,24 108:20 109:9 110:21 132:3

**paragraph** 97:4 105:9

**parcel** 36:2

**park** 59:15

**parse** 119:19

**part** 21:17 24:22 31:16 36:2 37:13,25 39:17,22 40:2 43:22 45:9,12, 17 46:22 70:25 85:6 112:1

119:19 124:6, 13 131:19,25

**participate** 24:3

**participated** 25:1 29:4 43:3 46:20 66:6

**participation** 45:15

**parties** 6:1

**partner** 34:3 68:9

**parts** 62:22 121:8

**pass** 84:1 90:3

**passed** 130:24

**past** 34:3 52:16 82:1 84:22 113:24 123:19 125:7,25

**pathologist** 66:8

**pathology** 66:12

**paths** 125:4

**pathway** 120:12

**patience** 12:9

**pattern** 29:21 108:15

**patterns** 77:25

**pay** 55:6

**payment** 14:14

**Peacock** 18:6, 11 19:20

**peer** 27:2,20 31:17,19 43:19 50:17 53:12 55:16,18 66:20, 21 77:13 78:12 103:10,16,18, 22 110:12 122:18 130:20

**peer-reviewed** 100:2,15 101:5

106:10 111:21

**pending** 5:9

**people** 38:16 115:4 121:20

**percent** 45:16 52:7 57:25 61:9 121:2

**percentage** 49:14,25

**percentagewis e** 50:11

**percentile** 45:11 51:25

**Perfect** 47:10

**performance** 40:15 41:5,11 78:20 126:8

**performed** 78:5

**performing** 122:9

**period** 25:7 30:9,19 69:1 71:18 74:13 79:4

**periodically** 18:16

**person** 55:24 67:12 83:22

**personal** 50:3 80:22

**personally** 31:7 66:25 81:4 123:21 125:10

**persons** 32:1

**Peter** 8:16

**Phd** 129:18

**phonetic** 105:8 106:12 121:23

**photographs** 104:1,4

**photography** 26:6 29:14

**physical** 75:23

83:1 99:4 125:17,23

**Physically** 31:8

**pick** 124:3

**pieces** 82:15 97:24

**place** 81:9 120:22

**placement** 120:22 122:1

**places** 73:23

**placing** 108:15

**plain** 75:16

**plaintiff** 5:16 6:4,17 14:18 20:5 52:20,25 56:8 88:13 103:7

**plaintiff's** 5:14 9:13,14,17,19 10:11,16,18 52:13 77:1

**plaintiffs** 49:5 52:9 56:11 102:24 103:21

**plan** 98:19

**planted** 59:12

**plausible** 76:15 80:13 81:11,18 83:23 84:2 88:2 95:7 99:18

**play** 41:4 81:1

**plenty** 69:16 95:23

**plumbing** 122:22

**pocket** 27:7 31:2

**point** 8:20 12:4 44:13 78:25 86:7,19,24 93:13 104:3 107:6 109:14, 15 120:20



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

pointed 86:4

points 73:3

police 21:20,23
22:1,14,16,24
23:3,6,11 25:9
26:24 28:22
32:21 33:11
35:15,18,21,22
36:2,22 37:2,9,
12 39:17 42:8,
10,11,19 43:14,
17 44:2,12,18,
21 45:4 46:2,
12,15,16,17,23
63:24 64:9,10
93:22

Polick 5:18 6:5
9:10 13:4 40:4
47:3,8,11 48:16
52:17 53:25
54:7 58:15
60:24 61:15
62:4,9,15 63:3
76:19 80:5 84:9
92:18,25 93:25
99:20 100:10
104:13,18
105:3,6 106:5
110:8 112:22
113:4,6,11,20,
25 114:7,9
117:1,14
118:14 119:11,
14 127:12,19
128:4,23 129:3
130:13 133:2,8,
10

policy 37:15

polygraph
66:15,25 67:3,9

polygrapher
67:6

polygraphs
66:21,24

portable 29:7

portion 63:1
88:22,24
102:15

portions 62:7
112:9 116:9,10,

24

pose 101:21

posed 88:25

position 83:3

positions 78:7

possession
117:22

possibility
75:13 105:15

possibly 25:8
123:18

post 23:10
44:11

post- 9:15

post-
conviction
10:14,23 20:6
86:11 103:7
127:17

post-incident
40:22 79:6 97:2

post-
investigation
96:13

post-
secondary
21:5

postulated
81:20 112:5

postulation
104:9

pote 89:2

potential 29:9
53:8 69:13
76:7,24 84:18,
20,23 86:5
89:2,23 91:9
97:5 98:24

potentially
20:7 49:9 72:16
75:20 93:15
115:9

potentials
85:7,8

power 30:23
74:10

powers 27:7,
13 31:3,5

practices
43:17 63:24
64:9,10

pre-fire 78:7

predated
24:11 25:8

predicate 32:5

predict 29:25
30:15

predicting
29:21

prefer 47:19
108:25

premiere
89:23

preparation
14:25 15:1,7,24
16:14 43:25

prepare 15:3,
5,13

prepared
15:11

preparing
51:19

present 6:1
33:23 40:24
42:3 53:6 75:9
97:25 126:20

present-day
126:10

presentations
40:23 79:7

presented
31:15 80:13,16
81:7,12,24
83:18,20 88:12
91:3 96:5

presentments
33:15

preservation
40:21 78:25

presumed
7:25 17:14
127:6

presumption
77:8,9

pretty 39:2
97:22

prevented
95:17

previous
24:25 43:24
44:14 53:6
127:3

previously
65:2 98:19
113:1

primarily 12:5

primary 40:1
66:8 70:18

principles
110:15

prior 13:6 23:4,
17 24:18 26:14
35:5 38:23
45:25 48:4
49:25 54:13
57:1 63:18
81:18 94:16
104:4

prison 81:3

prisons 80:23

privacy 53:15

private 41:12

privilege 57:10
59:5

probation
98:12

problem
38:10,20 68:19
70:19 120:16

problems
29:23 73:17,19

procedures
75:3

proceed 114:1

proceeded
92:3 131:9

proceedings
5:1 10:14,15
86:12 96:14
103:8 127:18

process 6:20
31:17 38:11
62:6,10,16 63:4
72:1,4 78:1
80:9 117:2,10,
13,16,19
124:17

processing
29:16

produced
65:10 105:21
111:6

product 38:11
57:9 58:19 59:4
61:1 62:18 63:5
73:24

product's
38:10

profession
71:14

professional
20:16,21 21:9,
10,11,14,15,16
22:5 74:24
78:20

professionally
125:10

professions
49:22

profit 30:6,14,
18 98:18

program 22:7
24:25

progressively
43:4

project 35:16
52:6

prompt 25:20

prompts
131:16



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

promulgate 34:11

promulgated 79:24

prong 97:1

propagated 39:11

propensity 94:5

proper 30:16 129:21

properly 73:17 124:16

prosecution 17:8,18 25:4 34:12

prosecutions 81:5

prosecutor 33:20 78:15 90:7

prosecutor's 97:21,22

prosecutors 30:12

protected 78:9 117:17

protection 38:25 45:20 51:2,9 65:4 70:16 122:16 129:18

protective 73:20

proud 30:18

provide 9:20 27:20 28:16 39:19 48:15,17 51:24 52:12 53:9 54:5,6,15 55:9 65:25 113:22,23

provided 9:15 10:7,23 24:4 25:8 30:2 37:15 45:12 51:19,25 57:4 66:22 67:5

76:8 84:4 117:5

providing 25:2 28:18 46:20 48:1 50:23 51:12 128:1

proving 109:15

psychologist 31:10

public 22:22 23:15 37:5 41:12 45:4

publication 24:14

publications 20:14

published 25:19 26:7,14 30:10 48:23 49:2

pull 12:21 13:22 16:18 41:2 42:15 57:6,16 58:2 63:12 85:23 86:1,2,15 90:13 93:16 97:18 107:22 109:6 118:3

pulled 13:1 18:21 48:6

pulling 17:23 18:25 59:2

punching 15:16

purposes 58:3

pursue 95:25

pursuit 44:4

pushed 84:7

put 7:7 11:8 30:4 32:21 35:19 44:8 64:14 82:13,14 83:14 91:17 100:15 114:3, 13 121:18 131:4,8,12,13

putting 34:11 99:8

_____

**Q**

qualified 96:24

qualify 54:20

question 7:15, 25 17:14 19:13 26:19 29:3 40:12,17 41:8 43:9 44:10 46:8 48:17 52:15,21, 24 54:1 55:3,7 58:16,18 60:9, 25 61:3 62:5,9, 19,22 63:3,7 68:17 70:8 76:11,20,21 80:2,4,7 84:13 85:13 87:20 89:1,22 92:19 96:1,2 100:11, 23 101:21 104:14,24 105:3,5,7 106:5 108:9,10 110:9 112:22 113:13, 16 114:2,4,10 115:1,10,18 116:9 117:3,17 118:10 127:20 129:6 131:17

questioning 41:23 63:17

questions 7:3 25:20 47:1 67:5 85:24 113:14 117:18 118:1 127:3 130:11, 18 132:6 133:3, 5

quick 12:11 115:20

quickly 11:17 12:4 39:2 42:7 117:25

_____

**R**

Racketeer

28:11

racketeering 32:4

radiation 65:9

radical 33:7

raise 6:8

ran 8:10 65:19 73:25 82:13

range 44:7 45:24 97:14 108:12,14 109:7,11 120:12 122:3

ranges 109:21

rank 46:23

rate 13:15,18 123:16 126:23

rates 118:6 122:4 123:3,15, 19,22 124:10, 24

RC 17:8

re-examination 104:4

re-examined 78:3

re-interview 102:21,23 103:3

rea 61:17

reached 10:11 128:3

reaching 9:7

read 54:24

readily 9:18 121:17

reading 60:4 68:24 93:8,9

ready 6:7 15:22 17:12 74:14

realistic 61:17 112:10

realistically 50:18

realize 33:4 74:12 92:11 121:17

realized 37:11 55:4 90:9 92:6, 7

reason 35:13 38:9 49:9 96:20 112:17 123:23

reasons 57:10 75:12 126:22

rebuttal 20:7

recall 26:13 54:12 60:21 64:18,19,21 73:8 93:9 97:7

receive 10:15 23:2

received 9:24, 25 27:1 43:5 46:4,14,19 56:15,18 64:25 65:3 66:11,14

receiving 65:14

recent 18:13

recently 100:1

recognition 29:21

recognize 39:2

recognized 70:7

recognizing 68:18

recollection 13:5 57:10 59:3 61:12 73:5 106:2,4,6

reconstructing 78:6

reconstruction 18:20 68:9,12 78:4



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 329-10 Filed: 05/17/24 Page 154 of 159 PageID #:14252
The Deposition of DAVID PICOVE, taken on August 17, 2021

153

record 5:3,22
6:1 7:7 9:12
10:2 11:1,16,
21,22,23 12:7
19:5 47:13,14,
15 48:2 58:3
77:14,17 85:14,
21 92:20,22,25
93:3 100:21
102:2,10,14
113:1,10
114:15,23
116:1,2,3 132:1
133:12

recorded
131:21

records 15:15
78:2 86:14

redacted 57:9

reference
17:18 18:6
19:18,19,20
75:21

referenced
19:17 56:25

references
8:9,18 9:1 17:3,
5,11,15 19:16
105:22 123:8,
17

referred 17:10
33:8 47:19
121:20

referring 8:17
27:23 86:8

reflect 56:23

reflected 72:6

reflection
58:11

reflective 60:2,
6 61:6

reflects 93:3

refresh 22:6
57:10 59:2

registrations
21:10,15

relate 36:3

related 32:8
35:9 37:23 45:9
51:3 72:24

relates 67:23

relating 64:15

relationship
35:20 121:1

relaunch
11:17

relay 74:13

release 122:4
123:3 124:10

relevant 55:14

reliable 124:20

relied 19:21
20:11 55:23

remaining
10:9 76:9

remedies
128:1

remedy 120:25

remedying
127:15

remember
25:23

remote 7:12

remotely 5:20
6:20,21

removed 35:5

rendered
27:13

repeat 61:3

repeatedly
87:16

rephrase 61:4
66:18 67:11

replicate 94:8
132:7

report 8:9 9:5,
11 11:4 12:6,12
15:20 16:18,21
41:25 47:2
49:5,7 53:23
54:6,14 57:2

58:12 59:8
60:5,7,11,13,16
61:9 62:3,7,13,
23 63:1,4,10,
13,19 64:14
67:22 68:2
71:23,24 75:22
86:2 90:14 97:1
98:3 99:9
103:16 104:15,
16,19 105:8,22
107:5 109:19
111:15,22
112:5,16 113:8
116:9,10,12,24
117:10 118:6
125:2 127:17
128:21 130:18,
19,22 131:14,
15 132:15,22,
25

reported 111:4

reporter 5:3,5,
21,25 6:6,13
11:20,23 47:13,
15 115:25
116:3 133:9,11

reporting
109:2 111:16

reports 8:15
48:14,20,25
49:10,16,17
51:12,13,18,23
52:9,12 107:6
114:12 122:5

represent
93:16,17

representation
14:4,13

represented
22:24

representing
21:25

represents
119:5

request 26:23
59:1

requested
9:12,22 28:9
56:5

required 23:5
32:6 43:22
65:20 79:1,13

requirements
40:15,18 41:5
44:11,16 78:22

rerun 125:2

research
66:20 106:7,10
111:1 128:10

reservation
10:1,21

reserve 51:17
133:8

reserving
133:6

reset 74:12

resets 74:14

residential
69:11,14

Resource
35:17

resources
37:11 45:20

response
96:24

responses
67:18

responsibilitie
s 25:14 26:16
35:11 39:25
40:10 41:5,9,11
42:1

responsibility
31:24 35:8,25
36:7 37:24
39:18 40:1
97:6,11,21,23

responsible
26:23 33:14,16
36:9 40:17,18,
19,20 98:8

rest 45:18

restate 7:4

restitution
98:12

result 82:3
124:14

resulting
112:11

results 33:19
119:24 120:2

retain 53:11,17

retained 13:6
48:12 53:14,15,
20,22 64:13,21
86:10 102:24
103:10,14,15
112:3,4

retainer 13:5,
12

retention
110:11

retired 22:1,12
44:24

retrofitting
39:6

returns 49:21
50:9

reveal 74:9
102:17

revealed 122:6

review 12:11,
25 15:24 17:1
20:18 21:12
27:4,20 31:11,
17,20 41:15
50:8 51:8
53:12,19 55:14,
16,18 56:3,7,24
57:20 58:9
59:13 61:19,24
66:20,21 77:14
85:20,21 86:14
97:9 98:24
102:4 103:10,
16,18,22
106:10 107:14
110:12 122:18
130:2,4,5,20,21
131:20,25

reviewed 17:9
56:14 60:6
78:17 91:22
97:5 113:10

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 329-10 Filed: 05/17/24 Page 155 of 159 PageID #:14253
The Deposition of DAVID PECOVE, taken on August 15, 2023
154

117:4 131:19

reviewing
15:6,19 16:10
57:11,22,25
58:12 59:7,22
60:3,13,16,17,
22 61:7,10,12,
14 91:19

reviews 27:2
43:19 50:17
78:12

RICO 28:10
30:11,13 32:6
34:18

rights 36:8

rigor 53:1
100:24

rigorous 88:1

riots 43:25

road 38:8

robustly 128:2

role 22:19
25:12 26:20
44:21 46:23

roles 40:10
41:4,9 45:3

room 8:10
82:16 84:23
120:22 124:8,
14

rooms 120:15
122:22 125:3

routine 125:6

rule 57:24
117:17

run 10:20

running
115:19 127:7

rush 98:5

Ryan 18:2
19:18

─────────

S

─────────

safety 22:22

23:15 37:5,10
45:4 73:24

samples 79:2

Sanderson
106:11

satisfied 31:20

scena 82:5

scenario 80:10
82:6 83:21 84:4
89:3,10,24
92:12 93:10
100:8 102:12
107:7 108:15,
17,20,22
110:20 111:2,
14,24 112:11,
13,14 121:15
123:4 125:21

scenarios
83:14 94:9
102:7,11
109:16 119:5
122:10

scene 18:20
33:4 36:19
40:19,20 41:7
56:14 68:8,12
78:3,5,6,23
81:9 104:5

scenes 29:17
31:25 51:21

school 29:20
42:22

schools 24:4
30:4 43:1

science 66:21
85:3 89:15,19
94:2,8,10 95:1
99:14 109:22
114:25 124:6
130:2

sciences
69:23

scientific 41:1
67:22,24 68:7
69:19,22 70:6,
9,10,16,22
71:2,6,15,17,
22,24 73:9

77:2,5 79:10
85:6 88:1
100:24

scientists
122:16

scope 60:10
103:9,14,15

scourged
82:18

screen 11:9,
13,18 13:1 57:7
58:3

scroll 12:3,8,
15,25

scrolling 12:5

SDT-SAO
132:1

seal 12:18

search 31:1

searching
75:7 77:22

secondary
21:4

seconds 131:8

section 67:21
75:1 131:1

sections
109:8,9 130:23

sectors 41:13

seeds 82:12
83:7

seek 103:3,6

selected
118:22 122:11
123:12

selecting
68:21

self- 36:21

self-standing
36:12

seminar 42:18

sense 50:12
115:20

September
23:25

sequence
75:25 76:5,9
82:25 83:2 99:5
112:15

sequences
76:8

serial 29:21

series 36:5
72:21 107:24

served 66:20

service 66:3

services 13:11
37:17 48:1 50:2
65:25

set 34:7 77:11
82:3,4,23
83:12,16 98:17
101:15,18
132:24

sets 125:15

setters 29:24

setting 80:24

sexual-related
36:6

SFPE 8:19

share 11:13,18
12:1 57:7

Sharp 5:4

shelf 18:21
19:1

Sheriff's 43:20
51:18 52:3

shift 26:15

shifting 81:17

shocked 74:3
126:15,16

short 47:5,8

shortly 44:11

shots 70:3

should've
126:20

show 8:20

showed
126:12

shown 100:5

shows 70:5
76:12 102:10,
15 106:7

shutting 73:17

side 49:4,11
52:13 53:17

signature
12:19 13:3
133:6,8

significance
101:13

significant
49:22 53:12
79:4 90:5
101:16 118:17
119:16 120:16,
23 125:14

signing 48:4

similar 27:10
43:12 69:10
71:10,23 126:6

similarly 7:6
88:6

simple 73:1
126:12

simply 87:8

Simulator
119:1,2 120:7

sink 82:13

Sir 70:12

sit 59:19

site 45:22

sites 45:21

sitting 59:12,
22 60:2 110:18

situation 38:2
84:5

situations
29:10

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 329-10 Filed: 05/17/24 Page 156 of 159 PageID #:14254
The Deposition of DAVID ICOVE, taken on August 15, 2021

155

skill 34:7

sliding 120:19

slightly 61:4
95:4

small 18:1
48:16 105:15

smoke 38:17
92:8 120:9,12
122:19 132:4

smoking
82:11,12

smoldering
8:18 89:20,23
90:10 94:6
98:16 99:25
105:15 110:22,
24 114:20
124:11,17,23
128:8,12 130:1,
3,9

sniffers 29:6

soaked 102:16

social 30:8
42:24

Society 65:4

sole 132:12

solemnly 6:8

solicit 69:1

solidly 84:4

sort 24:16

Sotos 48:3,10

sought 78:15
93:1

sound 28:4
79:7

source 25:25
75:24 76:4 83:9
85:17 86:17
88:15 89:13
112:10,15
115:11 121:13
129:11

sources 68:10
84:18 85:4
90:25 91:9,12

94:22 95:2
106:10

space 69:15

speak 7:13

specific 25:6
51:3 63:18 70:8

specifically
10:13 15:25
16:17 27:23
42:11 43:13
51:13 62:23
67:7 69:18 70:6
86:8 97:3
107:8,21
108:17,20
109:17 110:2
112:1 128:16

specifics
52:16

spectrum 36:1

speculation
119:11,15
127:20 128:24
129:3

spend 43:19

spends 121:1

spent 15:10,16
16:9 57:11,22
58:11 59:1,7
60:15,17,22
61:7,9,13 77:20

sphere 6:22

spill 101:22

spilled 88:19,
22

spinoffs 39:9

split 52:6,11

stair 38:21

staircase
38:18,19

staircases
38:22

stairwell 38:16
39:3

stairwells 39:7

stand 127:13

standard
24:14,16,20
25:24 29:16,18
31:15 38:7
40:15 41:16
69:23 70:7
78:21 80:1
107:4 125:13
126:5 132:11,
13,17

standards
8:24 23:11
24:10,20,22
25:10,18 26:7,
13 37:16 39:1
44:2,12 64:7,9,
15 70:17 71:8,
20 74:25 79:13,
18 80:18 81:22
83:25 84:16
87:8 88:11
96:11,16
123:21

standing 36:22

stands 59:5

start 8:7

started 6:23
23:3 70:12
82:12 101:7
104:7

starting 5:14
93:19 120:21

starts 8:11

state 5:12,22
23:10,20,22,23,
24 25:2,3,9,13
26:4,17 27:14,
16 28:1,15 29:2
30:17,20,22,23
31:23 34:4
35:14 36:24,25
38:24 39:16
44:13 52:5
65:21 77:12,16
85:18 91:20
99:23

state's 131:21

state-certified
45:3

stated 35:7

statement
9:11 99:15

statements
11:1 33:19
90:10 98:12
132:19

states 5:10
27:15 31:18
44:8 45:1 92:20
124:9

station 65:18

statutes 30:17

stay 108:25

steads 71:16

step 68:25

steps 15:14
67:24 68:17,18

Stewart 121:11

stipulates 6:4

stop 12:4 99:8
117:14

stopped 74:11

stove 72:18
73:6,15

straight 19:4

strata 32:3
36:11

streamlined
115:22

strike 15:2,23
20:8,20 43:6,7
44:18 53:21
76:12 99:16
115:18 116:18

stringent
42:20

students 47:20

studied 107:9

studies 100:2
101:5,9 107:15
108:13 109:6
111:20,21,23
114:13 121:4

123:20,22

study 81:3
106:15,16
107:22

style 121:21

sub-models
124:12

subcategory
20:25

subheading
118:5

subject 67:6

submittals
91:20

submitted
11:10 12:13
14:4,13 50:18

subpoena
27:7,17 31:3

subpoenaed
78:1

suburb 5:17

successful
81:5

sufficient
100:15 103:25
111:6

suggested
93:11

summarize
18:24

summarized
54:16

summarizing
41:23

summary
54:16 55:9
131:13

summon 27:11
31:3

Sunday 88:21

superior 76:25

supervisor
22:23

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**supplement** 10:9,25

**supplemental** 18:12

**support** 53:24 54:4 71:7 101:19 114:24

**supported** 101:6

**supports** 89:11 104:25 113:9 114:15

**suppose** 57:1

**survive** 102:6

**suspect** 31:7 67:13 81:7,17 83:23 87:9

**suspects** 30:24 31:24 87:4,23

**sustain** 65:7 101:15,18

**swear** 6:8 27:11,16 31:3

**sworn** 23:14 33:19

**synopsis** 54:16,22 55:10

**system** 48:25 49:3

**systematic** 71:14

---

**T**

---

**table** 41:24

**tables** 131:4

**tailor** 118:1

**taking** 11:13 25:21 44:1,3

**talk** 67:22 123:5

**talked** 17:10 103:12 112:24 115:5

**talking** 73:14 79:4 84:12,13, 15 86:10,12 88:18 107:3 108:13 109:11 113:24 114:5 115:7

**talks** 68:13 74:7 90:11

**target** 81:7

**task** 22:23 35:19,20 38:1 40:2 42:3

**tasked** 34:10 67:13

**taught** 34:2 64:25

**tax** 49:20 50:8

**teach** 30:4 34:2 51:2,6

**team** 79:22 80:13

**technician** 5:4 65:3,15,16,19, 25 66:2

**technique** 71:15

**techniques** 42:24

**technologies** 29:11

**telephone** 78:2

**television** 77:11

**telling** 86:19 87:3

**tells** 74:6

**ten** 15:4,5,9,10 58:6 91:18,19 123:18

**Tennessee** 7:20 21:21 22:2 23:10,20,22 24:5,6 25:13 26:17 30:22

32:2 36:25 43:11 44:13 45:1

**tenure** 44:19 46:21 94:20

**term** 28:20

**terms** 20:7 104:19 110:5

**test** 18:2 69:21 71:21 72:12 75:12 79:23 80:15 82:21 83:4,11 87:4 88:12 89:5 90:4,22,24 91:5,13 94:21 95:21,23,24 96:4,12,21 99:18 100:4,21 107:6 111:14 122:12 126:11

**testable** 95:10 96:8

**tested** 75:6 81:23 88:3 89:6 90:21 93:23 94:4 96:6,8 100:4,19 102:5 106:19,20 109:17 112:2

**testified** 7:9 24:8 70:24 87:4 99:17 107:25

**testify** 10:8 28:12 91:11,16

**testifying** 94:2

**testimonies** 33:18

**testimony** 6:9 13:13,14 20:14 28:17,18 43:20 49:17 51:19 61:5,8 87:23 88:25 89:12 93:21 110:5

**testing** 29:5 39:21 66:23 68:13,20,23 71:6 72:8 73:7

74:19 75:18 76:6,12,15 82:6 87:9 88:1 89:9 90:1,4,5 95:17 96:19 97:16 98:2 100:17 104:5 108:2 110:1,6 111:16 112:3 114:18, 21 115:2,7 125:16,18,19, 24 132:7,12

**tests** 109:12 123:24 124:1

**Texas** 52:5

**text** 89:23

**textbook** 8:16, 17 30:11 51:10

**textbooks** 17:24,25 18:25 19:3,7,16 50:17

**theft** 36:13

**theory** 53:8

**thermal** 73:19, 20 74:12

**thermalon** 125:17

**thesis** 29:20

**thing** 25:16 29:19 38:22 41:13 53:2,6,7 74:5 87:13 120:25 122:14, 20

**things** 30:5 36:5,15,21 42:25 46:7 69:8 72:21 74:22 77:24 91:24 98:9 108:24 122:23 123:5 124:4

**thinking** 59:15 91:15,16

**thinks** 120:20

**thoroughness** 38:4,12 39:15 92:1

**thought** 20:6 99:22

**thousands** 91:21

**time** 5:6 7:1 15:16,18 16:15 19:23 20:10 21:1 25:7 26:8 29:12 30:2,9,19 39:22 43:16 44:17,19 45:25 46:21 48:12,13 54:3 57:11,22 58:11,25 59:15, 21,23 60:3,6,21 61:7,9,13 69:1 71:18 73:17 74:14 77:21 79:1,3 92:11 94:7,14 99:13, 23,24,25 100:3, 6,9,13,14 101:11 102:17 105:10,11,17, 25 114:19 115:8,19 121:1, 11 127:1 128:7, 25 129:23 131:1 132:8

**timeline** 100:16 110:25 131:12

**timelines** 111:4

**times** 6:19 36:17 42:3 54:10 75:23 82:25 99:4 124:16

**timing** 110:20

**Tina** 105:12

**titled** 11:8

**today** 5:5 9:23 16:2 93:21 94:10

**today's** 94:2 133:12

**told** 10:17 87:16,24 98:7 121:17 124:1



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 329-10 Filed: 05/17/24 Page 158 of 159 PageID #:14256
The Deposition of DAVID PICOVE, taken on August 15, 2021
157

toll 78:2

tool 29:9 38:23
70:10

tools 103:25

top 13:25 38:19
97:8

topic 109:1
117:24

total 14:2,12
50:3 58:9

totality 96:15
110:12

totally 10:5
51:11

touch 102:8

touched 74:3

town 32:24

tracings 67:16,
18

track 16:7 68:4

trained 24:17,
21 25:22 34:5
42:9 88:6

training 23:2,4,
9,11,17,18,19,
21 24:3,4,5,8,9,
11,24 25:2,8
33:17 39:21
42:10,18 43:2,
3,5,6,7,13,17,
20,23 44:12,15
46:2,4,5,6,7,9,
10,12,16,18,19
50:16 65:15
66:11,14

trainings
42:14,16 43:12

transcript
131:20

transition
106:14

travel 13:13

treat 38:7

treatise 51:11
128:11 129:9,

24

treatises 75:9
130:8

trial 33:16 34:1,
5,10 51:20
86:11 103:8

Trib 109:8

Tribune 88:22

trunk 36:17,20

truth 6:10,11
86:19 87:3,5,
24,25

truthful 67:9

truthfulness
67:15

turn 20:13,16
21:2 118:2

turned 37:9
74:16

turning 67:21

TVA 46:2

two-week
42:22

type 73:1 98:5
108:4,7 109:17
119:25 121:24
122:3

typed 116:10,
11

types 27:13
53:5 69:14
72:19 121:16
123:5,6 124:3

typical 31:13
60:9 72:21

typically 15:15
32:20 35:1
36:15 51:13
52:9,13 60:11
120:10

———————

U

Uh-huh 17:21
90:23 112:6

unattended
90:11

uncalled 32:12

uncommon
32:25 33:1
36:13

undergo 88:1

understand
25:22 37:21
52:14 97:7
102:13 105:3,4
113:2,25 114:4
117:25

understandabl
e 22:8 55:7

understanding
57:9 60:14
68:22 70:23
94:25

understands
114:9

understood
10:22 38:25
70:9

undertake
28:25

undertook
33:12

unduly 95:20

unidentified
105:13

union 22:3
35:21

unique 41:13
53:17 99:22
131:7

uniquely 78:19

unit 22:24
35:25 36:12,22,
23 37:21,23,25
43:22

United 5:9
31:18 44:8,25

units 40:2

university
50:6,14 51:6

70:15

unoccupied
34:21

unplugged
73:18

unreasonable
32:12

unrelated
101:17

up-to-date
20:21 21:4
130:2,4

update 17:3
18:16 123:8

updated 19:20
56:23

updating
19:11

upheld 71:13

uploading
37:15

uptake 125:19

user's 18:6

utilized 76:17
124:13

———————

V

Vabrauskas
8:16 89:22
90:10 99:7
106:9 107:5
108:18 109:2
111:11,14
114:13 115:3
124:7,21
128:10 129:7,
14,18

Vabrauskas'
99:8 105:23,24
111:1,22
112:16 113:8

vacated 92:23

valid 124:12

validate 29:9
104:6

validated
124:18 126:20

validation
126:17

Valley 45:1

variables
108:5

varying 126:12

VCR 90:22

ventilation
111:6 125:4

vents 120:10

veracity 73:8

verbal 53:13

verification
126:17,18

verified 126:19

verify 29:9
126:17 130:25

version 18:7,
15 19:20 118:7,
9,11 122:15,21
123:9,11

versus 5:8
12:13 14:2,5
50:13 52:1
69:6,20 101:18
108:7 119:23

vest 27:7 31:2

victim 36:8
121:3

victim's
120:20

victims 38:19

victims' 36:7

video 5:4 78:10

videoconferen
ce 5:7

videos 56:15

view 104:20
120:21

views 29:17

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:18-cv-02523 Document #: 329-10 Filed: 05/17/24 Page 159 of 159 PageID #:14257
The Deposition of DAVID PICOVE, taken on August 19, 2021

158

**violation** 45:23

**violence** 43:24

**Virginia** 32:23

**vodka** 85:17 88:19 89:25 101:22 102:5,7, 16 104:23

**vodka-soaked** 89:13 91:5 92:12 93:11 95:6 101:7,19 102:3 112:1

**volume** 8:4

**Volunteer** 21:20,23

**Vyto** 89:22 99:7 124:6,21 128:10

———————
**W**
———————

**Wait** 117:14

**walked** 33:23

**walking** 59:14, 15,23

**wanted** 26:15 27:4 43:9 52:17 63:13 90:15 96:25 115:19 116:6 118:2 130:25

**warrants** 31:1, 16

**water** 102:7

**wax** 107:3

**waxed** 107:3

**ways** 77:5 118:20

**weather** 130:25 131:2

**weeds** 83:7

**week** 50:15,19

**wet** 88:23

**wha** 89:11

**wi** 122:3

**wide** 122:3

**wife** 74:12

**William** 5:8

**window** 106:8 123:19

**wire** 32:7

**wiring** 90:25

**wise** 50:1

**wished** 125:1

**witness'** 132:18

**witnessed** 91:23 98:15

**witnesses** 27:12 31:3 73:11 74:8 77:23 97:6,10, 20 98:24

**word** 87:9

**work** 8:16 13:19 14:5,15, 22 22:19 30:1 32:18 37:22 41:11 45:16 48:11 49:15 50:12,16,22,23 51:16,23 52:3,4 57:9 58:19 59:3,4 60:9 61:1 62:18 63:5 78:17 79:5 125:9,11,24

**worked** 22:12, 14,21 23:23 29:13 30:19 32:5 43:4 44:20 45:1 48:10 65:11,15,17 66:1 74:17 81:4 82:7

**working** 30:11 37:12 38:24 42:2 65:23 68:11,20,21,23 70:2,3 74:6,11 81:20 122:12 131:13

**works** 126:18, 19

**workshop** 44:9

**world's** 123:25

**worldwide** 37:20 92:2

**worth** 30:5 42:24 82:17

**would've** 71:2 118:24 125:6

**write** 51:13,18 52:9 53:23 59:19 62:2,7,8 63:1 130:17

**writing** 29:20 37:16 49:17 50:16 54:14 57:1 58:10,12 59:8,18 60:5, 11,13,16 61:7 117:10

**written** 29:15 54:15 55:9 108:1 126:1 129:20

**wrong** 118:23 129:8

**wrote** 26:5 60:7 89:22 116:9

———————
**Y**
———————

**year** 48:15,21 49:13,17 50:2

**years** 44:8 49:24 85:2 91:18,19

**yesterday** 74:11

———————
**Z**
———————

**zone** 118:8

**Zoom** 5:16 6:25 11:9,14,17

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com