```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3   WILLIAM E. AMOR,               )
                                    )
 4              Plaintiff,          )
                                    )
 5          vs.                     )   No. 18 CV 2523
                                    )
 6   NAPERVILLE POLICE OFFICERS     )
     MICHAEL CROSS; ROBERT          )
 7   GUERRERI; THE ESTATE OF        )
     MARK CARLSON; BRIAN            )
 8   CUNNINGHAM; JON LIPSKY;        )
     OTHER UNIDENTIFIED             )
 9   NAPERVILLE POLICE OFFICERS     )
     AND THE CITY OF NAPERVILLE,    )
10                                  )
                Defendants.         )
11

12           The video-recorded deposition of

13   WILLIAM E. AMOR, taken pursuant to the Federal

14   Rules of Civil Procedure, before Nicole M. Cheney,

15   Certified Shorthand Reporter No. 084-004744, at

16   141 West Jackson Boulevard, Suite 1240A, Chicago,

17   Illinois, on Thursday, March 5, 2020, commencing at

18   10:40 a.m., pursuant to notice.

19         APPEARANCES:

20             LOEVY & LOEVY, by
               MS. TARA THOMPSON
21             MS. MARIAH E. GARCIA
                (311 North Aberdeen Street, 3rd Floor
22              Chicago, Illinois  60607
                312.243.5900
23              tara@loevy.com
                mariah@loevy.com)
24                appeared on behalf of the plaintiff;
```

EXHIBIT 11

WILLIAM E. AMOR, 03/05/2020                                    Page 2 ..5

---

Page 2

```
 1   APPEARANCES:  (Cont'd)
 2         THE SOTOS LAW FIRM, PC, by
           MR. JOSEPH M. POLICK
 3         MS. LAURA M. RANUM
           MS. CARSON W. CANONIE
 4         (141 West Jackson Boulevard, Suite 1240A
           Chicago, Illinois  60604
 5         630.735.3300
           jpolick@jsotoslaw.com
 6         lranum@jsotoslaw.com
           ccanonie@jsotoslaw.com)
 7           appeared on behalf of the defendants.
 8
     ALSO PRESENT:
 9
           Ms. Brett Schatzle, Video Technician
10         Ms. Rachel Szymanski, Video Intern
11
                 * * * * * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
```

---

Page 4

```
 1       E X H I B I T S (Cont'd)
 2   No.   Description            Marked/Referenced
 3
     11  DuPage County Sheriff Booking Photo
 4       dated 10/4/95......................... 333
 5   12  Naperville Booking Photograph dated
         9/15/95............................... 334
 6
     13  DeKalb County Sheriff Booking Photo
 7       dated 9/15/95......................... 334
 8   14  Naperville Booking Photo
         dated 4/20/95......................... 335
 9
     15  Handwritten Letters................... 357
10
     16  Appointment Card, DuPage County,
11       10/6/95 at 4:00 p.m................... 389
12         (Exhibits attached/scanned.)
13             - - -
14
15
16
17
18
19
20
21
22
23
24
```

---

Page 3

```
 1              I N D E X
 2
 3   Witness:                          Page
 4     WILLIAM E. AMOR
 5       Examination by:
 6       Mr. Polick.....................   6
 7       Ms. Thompson................... 395
 8       Mr. Polick..................... 396
 9
10           E X H I B I T S
11   No.   Description         Marked/Referenced
12    1  218 East Bailey dimension picture...... 123
13    2  218 East Bailey layout picture......... 123
14    3  Statement of Miranda Rights dated
         9/15/95............................... 214
15
16    4  Statement Dated 9/15/95............... 220
17    5  Consent for Polygraph Exam dated
         10/3/95.............................. 263
18    6  Statement of Miranda Rights dated
         10/3/95.............................. 306
19
20    7  Statement dated 10/4/95, 1:14 a.m...... 309
21    8  Transcription of taped interview,
         10/4/95, 2:11 a.m..................... 315
22    9  Transcription of taped interview,
         10/4/95, 5:10 a.m..................... 328
23
24   10  Naperville Booking Photo dated
         10/4/95.............................. 333
```

---

Page 5

```
 1      THE VIDEO TECHNICIAN:  This is the beginning
 2   of media unit one, and we are now on the video
 3   record at 10:41.
 4           This is the videotaped deposition of
 5   William Amor, being taken on March 5th, 2020.
 6           We are located at 141 West Jackson
 7   Boulevard, Suite 1240A, Chicago, Illinois.
 8           This deposition is being taken on
 9   behalf of the defendant in the matter of William E.
10   Amor versus Michael Cross, et al.  The case number
11   is 18 CV 02523, filed in the United States District
12   Court, Northern District of Illinois, Eastern
13   Division.
14           My name is Brett Schatzle, legal
15   videographer, representing Urlaub Bowen &
16   Associates, with offices at 20 North Clark Street,
17   Suite 1260, Chicago, Illinois.
18           The court reporter today is Nikki
19   Cheney, also of Urlaub Bowen & Associates.
20           Counsel, please identify yourselves
21   for the video record and the parties which you
22   represent.
23      MS. GARCIA:  This is Mariah Garcia for the
24   plaintiff.  Tara Thompson will be joining soon.
```

---

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 6

1      MR. POLICK:  Joseph Polick, P-o-l-i-c-k, on
2  behalf of the defendants.
3      MS. RANUM:  Laura Ranum, also on behalf of
4  the defendants.
5      MS. CANONIE:  Carson Canonie, also on behalf
6  of the defendants.
7      THE VIDEO TECHNICIAN:  Will the court
8  reporter please swear in the witness.
9          (Witness sworn.)
10          WILLIAM E. AMOR
11  called as a witness herein, having been first duly
12  sworn, was examined and testified as follows:
13          EXAMINATION
14  BY MR. POLICK:
15      **Q.   Sir, could you state your name and**
16  **spell it for the court reporter, please.**
17      A.   William E. Amor, A-m-o-r.
18      MR. POLICK:  Okay.  Let the record reflect
19  that this is the deposition of William E. Amor.
20          It's being taken pursuant to notice
21  and pursuant to the Federal Rules of Civil
22  Procedure.
23  BY MR. POLICK:
24      **Q.   What does the E stand for, Mr. Amor?**

Page 7

1      A.   Ernest.
2      **Q.   Have you ever given a deposition**
3  **before, what we're doing today?**
4      A.   I have not.
5      **Q.   All right.  Let me just take a few**
6  **moments and explain what's going to happen here**
7  **today.**
8          **We are going to be asking you a**
9  **series of questions today regarding a lawsuit you**
10  **have filed against the City of Naperville and some**
11  **of its police officers.**
12          **Do you understand that you're under**
13  **oath to tell the truth?**
14      A.   I do.
15      **Q.   Okay.  If at any time that I ask you a**
16  **question and you don't understand it, please let me**
17  **know, and I'll try to rephrase it or explain it to**
18  **you so that you do understand it.**
19          **If you don't tell me anything, I'm**
20  **going to assume that you understand my question.**
21          **Fair enough?**
22      A.   I agree.
23      **Q.   Okay.  One of the important things here**
24  **is to keep your voice up.  As you can see, we have**

Page 8

1  a court reporter here --
2      A.   Yes.
3      **Q.   -- and, even though the deposition is**
4  **being video-recorded, your voice has to be loud**
5  **enough to --**
6      A.   Okay.
7      **Q.   -- so it can be recorded and the court**
8  **reporter can hear you and take you down.**
9      A.   I understand.
10      **Q.   Okay.  In normal conversation, we tend**
11  **to sometimes talk over each other.**
12          **Here the rules are a little bit**
13  **different.  The court reporter is very good, but**
14  **she can only take down one person at a time.**
15          **So what I'm going to ask you is that**
16  **you please let me finish my question, and then I'll**
17  **give you as much time as you need to give me an**
18  **answer to that question.  And that way we're not**
19  **talking over each other.**
20          **There may be times where you**
21  **anticipate what I'm going to ask you.  But if you**
22  **can just wait and let me finish, and then I'll let**
23  **you speak, and then it makes it much easier on the**
24  **court reporter and things will go a little bit more**

Page 9

1  smoother here.  Understood?
2      A.   I understand.
3      **Q.   Okay.  If at any time you need to take**
4  **break to use the restroom, make a phone call, let**
5  **us know.**
6          **The only caveat to that is that if**
7  **a question is pending, you need to answer the**
8  **question, and then we can take the break.**
9          **Understood?**
10      A.   I understand.
11      **Q.   Okay.  Any questions that you have**
12  **before we start here?**
13      A.   No, sir.
14      **Q.   Okay.**
15      MS. GARCIA:  Before we get started -- it's
16  not an objection -- can we just wait for five
17  minutes?
18          Tara's almost here.  I don't want to
19  interrupt as we're in the flow of things.
20      MR. POLICK:  Well, we're -- that -- we are in
21  the flow of things here.
22          And I'll note for the record that
23  this deposition was scheduled for 10:00 o'clock
24  this morning.  We started at about 10:40.

WILLIAM E. AMOR, 03/05/2020                           Page 10..13

Page 10

1          We were told that Ms. Thompson was
2 going to be here shortly because of a court
3 appearance.  And, you know, we've waited 40 minutes,
4 and it's not fair to anybody here not to start.
5          This has been noticed for several
6 weeks now.  So we're going to move ahead.
7     MS. GARCIA:  And for the record,
8 Ms. Thompson --
9     MR. POLICK:  You're --
10    MS. GARCIA:  -- is one of the main attorneys.
11 She's almost here.  I don't want to stop and start
12 in the middle of substantive questioning.
13         So I think it's fair, because she is
14 a couple minutes away, to stop and wait a few
15 minutes until she gets here.
16    MR. POLICK:  Okay.  We're going to move ahead.
17         Okay.
18    MS. GARCIA:  Can we go off the record, please?
19    MR. POLICK:  No.
20 BY MR. POLICK:
21    **Q.   Mr. Amor --**
22    MS. GARCIA:  Bill --
23 BY MR. POLICK:
24    **Q.   -- have you used any names --**

Page 11

1     MS. GARCIA:  -- could we take -- can we take
2 a quick break?
3          Tara's almost here, and I know she
4 doesn't want --
5     MR. POLICK:  I'm going to object.  We've
6 already started the deposition.  We've waited 40
7 minutes.
8          And, you know, we've -- we've --
9 everybody's --
10    MS. GARCIA:  Let's take a quick break.
11    MR. POLICK:  -- had a 40-minute break.
12         We've immediately started.  Highly
13 improper to stop this in the middle of my
14 questioning.
15    MS. GARCIA:  It's not --
16    MR. POLICK:  We've literally --
17    MS. GARCIA:  -- in the middle of your
18 questioning.
19    MR. POLICK:  -- just started.  We're still
20 going through the preliminaries here.
21         I'm sure Ms. Thompson is on her way.
22 But she knew this was scheduled, and we're not
23 going to go.
24         So if you're going to play this --

Page 12

1     MS. GARCIA:  We've all -- I'm not playing any
2 game.
3     MR. POLICK:  -- this game -- then let's go
4 ahead --
5     MS. GARCIA:  I'm not playing any game.
6     MR. POLICK:  -- and ask the questions and
7 move on with the deposition.
8     MS. GARCIA:  I am waiting for one of the main
9 attorneys to be here.  She is literally --
10    MR. POLICK:  You've made us wait --
11    MS. GARCIA:  -- five minutes away.
12    MR. POLICK:  -- 40 minutes this morning,
13 Counsel.  We were --
14    MS. GARCIA:  Counsel --
15    MR. POLICK:  We were very patient, and
16 waiting --
17    MS. GARCIA:  And we appreciate --
18    MR. POLICK:  -- and now we can't wait any
19 more.
20    MS. GARCIA:  -- that.
21         But I don't -- and what we're doing
22 now, we are interrupting the flow of questions.
23 BY MR. POLICK:
24    **Q.   All right.**

Page 13

1          **Mr. Amor, I'm going to ask you a**
2 **question.  Okay?  Have you gone by any names --**
3     MS. GARCIA:  Bill, let's go --
4 BY MR. POLICK:
5     **Q.   -- other than William Amor?**
6     MS. GARCIA:  No.  Let's take a quick break.
7     THE WITNESS:  I -- we need to take a break.
8     MS. GARCIA:  Yes.  Thank you.
9 BY MR. POLICK:
10    **Q.   Why do we need to take a break, sir?**
11    A.   Tara is my main attorney.
12         I just met Mariah a couple weeks
13 ago, few weeks ago.  I would prefer -- I'm not -- I
14 apologize for this, but this --
15    **Q.   This isn't your fault.**
16         **I'm not finding any fault with you.**
17    A.   No, it's -- it's not --
18    MS. GARCIA:  Are we on the record still?
19         Could we go off --
20    THE WITNESS:  Yeah, that's fine.
21 BY MR. POLICK:
22    **Q.   It's not any fault of yours.**
23         **Why do you feel you need to have**
24 **Ms. Thompson here?**

WILLIAM E. AMOR, 03/05/2020                                    Page 14..17

Page 14

1    MS. GARCIA:  Going off the record now.
2    MR. POLICK:  No.
3    THE REPORTER:  I need both attorneys --
4    MR. POLICK:  No, we're not.
5    THE REPORTER:  -- to agree.
6    THE VIDEO TECHNICIAN:  Yes, you'll have to
7  agree.
8    THE WITNESS:  I've just -- I've known her for
9  years.  Mariah is new to me, to the case, and I
10 would feel more comfortable, to keep it in simple
11 terms.
12 BY MR. POLICK:
13    **Q.   How long have you known Ms. Thompson?**
14    A.   Four years now.
15    **Q.   Okay.  When did you first meet her?**
16    A.   When my conviction was vacated.
17    MS. GARCIA:  Objection.  Form.
18    THE WITNESS:  Yeah.  Yeah, that's all I'm
19 willing to say right now until she gets here.
20 BY MR. POLICK:
21    **Q.   You're going to refuse to answer my**
22 **questions --**
23    A.   No, no.  I said --
24    **Q.   -- until she's here?**

Page 15

1    MS. GARCIA:  Objection.
2    THE WITNESS:  No.
3    MS. GARCIA:  Harassing the witness.  He's
4  not -- he's not refusing to answer the questions.
5    THE WITNESS:  No.
6    MS. GARCIA:  We asked you to take a break.
7        You said if he wants to take a
8  break -- whenever he wants to feel comfortable --
9    THE WITNESS:  When my -- when my conviction
10 was vacated, that's how I met her.
11 BY MR. POLICK:
12    **Q.   All right.  And that was back in 20- --**
13    A.   '15?
14    **Q.   -- '16?**
15    A.   Well, actually -- actually, the
16 evidentiary hearing was -- I'll answer this; it's
17 fine -- December of 2015.
18        But it was vacated in January of
19 2016 - --
20    **Q.   All right.**
21    A.   -- as the record states.
22    **Q.   All right.  And she was -- she was**
23 **working with you --**
24    A.   Correct.

Page 16

1    **Q.   -- prior to your conviction?**
2    A.   And also -- if we're -- we're on the
3  record, right?  Also --
4    **Q.   Hang on.  Hang on.**
5        **You're going to have to let ask my**
6  **question.**
7    A.   Okay.
8    **Q.   Otherwise we're talking over each other.**
9        **So Ms. Thompson was working as your**
10 **attorney with you prior to your conviction being**
11 **vacated?**
12    MS. GARCIA:  Objection.  Relevance.
13        Bill, do you want to take a break?
14    THE WITNESS:  Yes.
15    MS. GARCIA:  Are you going to refuse a break
16 from a client?
17    THE WITNESS:  I asked and answered the
18 question.
19 BY MR. POLICK:
20    **Q.   You need to answer my question.**
21    MS. GARCIA:  Are you going to refuse to let --
22    MR. POLICK:  There's a question pending,
23 Counsel.
24

Page 17

1 BY MR. POLICK:
2    **Q.   Was Ms. Thompson working as your**
3  **attorney before your conviction was vacated?**
4    MS. GARCIA:  Objection.  Relevance.
5    THE WITNESS:  No.
6 BY MR. POLICK:
7    **Q.   Okay.  So sometime after --**
8    MS. GARCIA:  Could we take a break?
9 BY MR. POLICK:
10    **Q.   -- after the conviction was vacated?**
11    A.   Yes.
12    MR. POLICK:  Okay.
13    MS. GARCIA:  Bill, do you want a quick --
14    MR. POLICK:  Now we can take a break.
15    MS. GARCIA:  -- break?
16    THE WITNESS:  Yes.
17    MS. GARCIA:  Thank you.
18    THE COURT:  We're off the record at 10:49.
19        (Recess taken.)
20    THE VIDEO TECHNICIAN:  We're back on the
21 record at 11:03.
22 BY MR. POLICK:
23    **Q.   Mr. Amor, do you understand that you're**
24 **still under oath to tell the truth?**

WILLIAM E. AMOR, 03/05/2020                          Page 18..21

Page 18

1    A.   I do.
2    Q.   Okay.  Are you taking any medication
3 today?
4    A.   Prilosec and a medication for IBS.
5    Q.   And IBS is irritable bowel syndrome?
6    A.   That's correct.
7    Q.   Okay.  Do any of the medications that
8 you're taking today affect your ability to
9 understand my questions or give answers to them?
10   A.   They do not.
11   Q.   All right.  Have you had anything of an
12 alcoholic nature to drink within the last 24 hours?
13   A.   I have not.
14   Q.   Is there any condition you have today
15 that would prevent you from understanding my
16 questions and giving answers to them?
17   A.   There is not.
18   Q.   All right.  And how old are you, sir?
19   A.   63.
20   Q.   And what town were you born in?
21   A.   South Bend, Indiana.
22   Q.   And did you grow up in the South Bend,
23 Indiana, area?
24   A.   I did.

Page 19

1    Q.   Okay.  And what is your highest level
2 of education?
3    A.   High school.
4    Q.   Okay.  Where did you attend high school?
5    A.   Clay High School, South Bend, Indiana.
6    Q.   And did you receive a diploma?
7    A.   I did.
8    Q.   Any education after high school?
9    A.   No, sir.
10   Q.   Okay.  Ever attend any college courses?
11   A.   Only while incarcerated.
12   Q.   Okay.  Was that through the Illinois
13 Department of Corrections?
14   A.   Yes, sir.
15   Q.   Have you taken any specialized
16 training, either through a job or somewhere else,
17 like auto repair or anything like that?
18   A.   I haven't been to school for auto
19 repair, but I do auto repair.
20   Q.   Okay.  But not specialized training in
21 it?
22   A.   That's correct.
23   Q.   All right.  When you were in high
24 school, did you attend any special education

Page 20

1 courses?
2    A.   Automotive, body shop.
3    Q.   Okay.  What I mean by "special
4 education," were you ever in any classes because
5 you were told that you had some type of learning or
6 developmental disability?
7    A.   No.
8    Q.   In your entire life has anyone ever
9 told you that you have a learning disability?
10   A.   No, sir.
11   Q.   Has anyone ever told you or diagnosed
12 you with a developmental disability?
13   A.   No, sir.
14   Q.   Have you ever been told that you're
15 slow?
16   A.   No, sir.
17   Q.   All right.  What did you do to prepare
18 for this deposition today?
19   A.   Study the facts.
20   Q.   Okay.
21   A.   You know, go back through what has
22 happened and -- but in totality, that's it.
23   Q.   Did you look at any documents to
24 prepare for the deposition?

Page 21

1    A.   Just what -- what did Tara give me?
2         Just things about interrogation, you
3 know, confessions.  Just stuff that, you know, I
4 should be prepared for.
5    Q.   All right.  When you say documents
6 about interrogation and confession, can you be more
7 specific than that?  Were these articles?  Were
8 they testimony?
9         What types of documents were they?
10   A.   They -- at the time they were my
11 testimony.
12   Q.   All right.  Have you reviewed your
13 testimony from both the -- from the motion to
14 suppress hearing in the first trial?
15   A.   I have.
16   Q.   Okay.  What other testimony of yours
17 have you reviewed?
18   A.   Actually, what I've reviewed a lot is
19 Judge Brennan, you know.  I've probably read that
20 more than anything, my exoneration.
21   Q.   All right.  When you say "Judge
22 Brennan," are you referring to Judge Brennan's
23 order?
24   A.   Judge Brennan not only, you know,

WILLIAM E. AMOR, 03/05/2020                                    Page 22..25

Page 22

1 vacated my sentence, but he also acquitted me.

2        So I read that over and over, plus

3 what Ms. Thompson gave me, and -- you know, I mean,

4 just -- just so we're clear on the facts.

5    **Q.   Okay.  Did you review anyone else's**

6 **sworn testimony from either your first trial or**

7 **second trial?**

8    A.   My previous counsel, Public Defender

9 William Padish, which would have been 1995.

10   **Q.   But he didn't testify at the -- at**

11 **either of your trials.  He represented you --**

12   A.   He did.

13   **Q.   -- at the first trial.**

14   A.   But as far as testimony from there, I

15 have not.

16   **Q.   Okay.  So other than your testimony**

17 **from the suppression hearing, you did not review**

18 **anyone else's testimony from your first trial?**

19   A.   I have not.

20   **Q.   Okay.  Did you review anyone else's**

21 **testimony from your second trial?**

22   A.   No, I don't think so.

23        Do you know of anything?

24   **Q.   She can't answer for you.**

Page 23

1    A.   Oh, okay.

2        Not that I can recall.  I'll leave

3 it at that.

4    **Q.   All right.  Did you look at any**

5 **photographs?**

6    A.   I have not.

7    **Q.   Any other documents that you reviewed**

8 **to prepare for the deposition other than what**

9 **you've already told me?**

10   A.   Only -- no.

11   **Q.   All right.  You have a current Illinois**

12 **driver's license?**

13   A.   I do.

14   **Q.   And when did you obtain that license?**

15   A.   Upon my release.

16   **Q.   And since you have obtained that driver's**

17 **license upon your release from incarceration, has**

18 **your license ever been suspended or revoked?**

19   A.   It has not.

20   **Q.   Okay.  Prior to being incarcerated, had**

21 **your Illinois driver's license ever been suspended**

22 **or revoked?**

23   A.   It was.

24   **Q.   How many times?**

Page 24

1    A.   Twice.

2    **Q.   And when you say two times, was that**

3 **suspended or revoked, both?**

4    A.   Yes.

5    MS. GARCIA:  Objection.  Form.

6 BY MR. POLICK:

7    **Q.   And on the first occasion, what was**

8 **your license suspended for?**

9    A.   A DUI.

10   **Q.   And do you recall what year that was?**

11   A.   1986.

12   **Q.   And the second time it was --**

13   A.   Driving on --

14   **Q.   You have to let me finish my question,**

15 **sir.**

16   A.   I apologize.

17   **Q.   If you cut me off, the court reporter**

18 **will never be able to take it down clearly.**

19   A.   Okay.

20   **Q.   So please let me finish.  Again, I'll**

21 **give you the same opportunity, but it's going to be**

22 **extremely difficult on this court reporter if we're**

23 **talking --**

24   A.   I understand.

Page 25

1    **Q.   -- over each other.  Okay?  All right.**

2 **Let me try that question again.**

3        **When was the second time that your**

4 **license was suspended or revoked?**

5    A.   Driving on suspended.

6    **Q.   Okay.  So you were driving on a**

7 **suspended or revoked license?**

8    A.   That's correct.

9    **Q.   And what year was that?**

10   A.   1989.

11   **Q.   From 1989 to 1995, did you ever have a**

12 **valid Illinois driver's license?**

13   A.   I did.

14   **Q.   How -- at what point between 1989 and**

15 **1995 did you get a valid license or get the**

16 **suspension or revocation removed?**

17   MS. GARCIA:  Objection.  Form.

18   THE WITNESS:  A work permit, to and from work.

19 BY MR. POLICK:

20   **Q.   What year was that?**

21   A.   Would have been 1991, I think.  I don't

22 know.  I don't recall the exact date.  It's a long

23 time ago.

24   **Q.   Did you have a valid Illinois driver's**

WILLIAM E. AMOR, 03/05/2020                                    Page 26..29

Page 26

1 license in the year 1995?

2    A.   I did.

3    Q.   And your license was valid from January

4 of 1995 until your arrest in October of that year?

5    MS. GARCIA:  Objection.  Foundation.

6    THE WITNESS:  Yeah.  Yes, sir.

7 BY MR. POLICK:

8    Q.   So during those ten -- first ten months

9 of 1995, you had a valid Illinois driver's license?

10   A.   Actually, what I was -- as I stated

11 previously, to and from work permit.

12   Q.   Okay.  Well, that's a little bit

13 different.

14        So are you telling me that between

15 January of 1995 and October of 1995, your license

16 was suspended or revoked, but you had a permit

17 which allowed you to --

18   A.   To --

19   Q.   -- use the car for work purposes?

20   A.   That's correct.

21   Q.   What limitations were on the permit

22 that allowed you to go to and from work?

23   MS. GARCIA:  Objection.  Foundation.

24   THE WITNESS:  I'll answer.

Page 27

1        You have to map out a route to and

2 from work from where you live.  And if -- you're

3 allowed to stop at the store and get what you need

4 and then go home.

5 BY MR. POLICK:

6    Q.   Were there any time limitations on it?

7    A.   No.  Just directional.

8    Q.   Meaning the route that you were going

9 to take?

10   A.   That's correct.

11   Q.   So were you -- the permit gave you the

12 ability to drive a certain route to work and then a

13 certain route from work back home, correct?

14   A.   That's correct.

15   Q.   All right.  Other than going to and

16 from work between January 1995 and October 1995,

17 was your license valid?

18   MS. GARCIA:  Objection.  Form.

19        You can answer.

20   THE WITNESS:  As far as I know.  I mean,

21 I was -- I was not stated otherwise.

22 BY MR. POLICK:

23   Q.   When you mean it was not stated

24 otherwise, what does that mean?

Page 28

1    A.   I was -- I was not informed it was

2 something other than that.

3        (Enter Ms. Thompson.)

4 BY MR. POLICK:

5    Q.   Okay.  What is your current address?

6    A.   Okay.  3405 Burris, B-u-r-r-i-s,

7 Street, Waukegan, 60087.

8    Q.   And how long have you lived there?

9    A.   One year.

10   Q.   Is that a house or an apartment?

11   A.   It's a house.

12   Q.   And do you rent or do you own that

13 house?

14   A.   I do rent.

15   Q.   And who do you live there with?

16   A.   Angel Gonzalez.

17   Q.   And what is Mr. Gonzalez's relationship

18 to you?

19   A.   Angel Gonzalez took me in.

20        He's an exoneree.

21   Q.   When you say he's an exoneree, do you

22 know what county or part of the state he was --

23   A.   Lake County.

24   Q.   -- exonerated -- sir, you have to let

Page 29

1 me finish my question.

2    A.   Sorry.

3    Q.   Please.

4        Do you know what part of the state

5 or county Mr. Gonzalez is an exoneree of?

6    A.   Lake County.

7    Q.   Do you know when Mr. Gonzalez was

8 exonerated?

9    A.   2005.

10   Q.   When did you first meet Mr. Gonzalez?

11   A.   When he took me in.

12   Q.   What year was that?

13   A.   That would be three years ago,

14 I believe.

15   Q.   2017?

16   A.   Yes.

17   Q.   And when you say he took you in, what --

18 what do you mean by that?

19   A.   He recognized the need for another

20 exoneree that needed help.

21   Q.   Did someone put you in touch with

22 Mr. Gonzalez?

23   A.   They did.

24   Q.   Who was that?

Page 30

1    A.   Illinois -- Southern Illinois Innocence
2 Project.
3    Q.   When Mr. Gonzalez took you in
4 originally in 2017, was it at the Burris address or
5 somewhere else?
6    A.   Previous address is 927 Butrick,
7 B-u-t-r-i-c-k.  Also in Waukegan.
8    Q.   And for how long did you live at
9 927 Butrick in Waukegan?
10   A.   Approximately a year.
11   Q.   And Mr. Gonzalez lived with you at that
12 address?
13   A.   Yes, sir.
14   Q.   And was it a home or an apartment?
15   A.   It was a home.
16   Q.   And did you rent or own the home?
17   A.   I rented.
18   Q.   And other than Mr. Gonzalez and
19 yourself, did anyone else live at the Butrick
20 address?
21   A.   His parents.
22   Q.   Anyone else?
23   A.   No, sir.
24   Q.   And at the 3405 Burris address in

Page 31

1 Waukegan, other than you and Mr. Gonzalez, does
2 anyone else live there?
3    A.   His girlfriend.
4    Q.   And what is his girlfriend's name?
5    A.   Leticia.
6    Q.   What's Leticia's last name?
7    A.   Gonzalez.
8    Q.   Are either of your parents still alive?
9    A.   They are not.
10   Q.   When did your father pass away?
11   A.   I was already incarcerated, so it would
12 have been 1997.
13   Q.   Do you know when in 1997?
14   A.   Would have been November.
15   Q.   And your mother, when did she pass?
16   A.   March of 1989.
17   Q.   And do you have any brothers or sisters?
18   A.   One sister's still alive.
19   Q.   Okay.  And the sister that's still
20 alive, her name?
21   A.   Shelley.
22   Q.   Last name?
23   A.   Williams.
24   Q.   And where does Shelley Williams reside?

Page 32

1    A.   South Bend, Indiana.
2    Q.   And your siblings that have passed?
3    A.   Steven Amor, Sherry Amor.
4    Q.   And your brother, Steven, when did he
5 pass?
6    A.   1994.
7    Q.   And your sister Sherry, when did she
8 pass?
9    A.   1985.
10   Q.   Any other brothers and sisters or
11 stepbrothers, stepsisters?
12   A.   I have a stepbrother that passed, but I
13 was incarcerated -- somewhere in Michigan.
14        I don't know all the details.
15   Q.   Okay.  What was your stepbrother's
16 name?
17   A.   Bobby.  I'm not sure if it's Robert or
18 Bobby.  That's all I know.
19   Q.   Okay.  Last name?
20   A.   Would have been Johnston.  With a T.
21   Q.   You're not sure the year when he
22 passed?
23   A.   I do not.
24   Q.   Okay.  But it was somewhere in

Page 33

1 Michigan?
2    A.   Yes.
3    Q.   Have you ever lived in the state of
4 Michigan?
5    A.   I have not.
6    Q.   Okay.  Other than Illinois and Indiana,
7 have you ever lived in any other states?
8    A.   Arizona.
9    Q.   When did you live in Arizona?
10   A.   1974 to 1976.
11   Q.   And who were you living with in
12 Arizona?
13   A.   Just by myself.
14   Q.   Any other states that you've resided in
15 other than Illinois --
16   A.   No, sir.
17   Q.   -- Indiana, and Arizona?
18   A.   No, sir.
19   Q.   Okay.  Where were you living on
20 September 10th of 1995, the day of the fire?
21   A.   210 East Bailey in Naperville.
22   Q.   You sure it wasn't 218 East Bailey?
23   A.   218.  Forgive me.  Yeah.  Apartment M.
24   Q.   And was that a house or an apartment?

WILLIAM E. AMOR, 03/05/2020                                    Page 34..37

Page 34

1    A.   It was a condominium.

2    Q.   Okay.  And other than apartment M at
3  218 East Bailey, has there ever been a fire in any
4  of the -- of the other places that you have lived
5  during your life?

6    A.   There has not.

7    Q.   Have you yourself ever been caught in a
8  fire?

9        MS. THOMPSON:  Object to form.

10        You can answer.

11        THE WITNESS:  No.  No, sir.

12  BY MR. POLICK:

13    Q.   Has there ever been a fire near any of
14  your residences during your life?

15    A.   Not to my knowledge.

16    Q.   Do you recall the day of the fire?

17    A.   Yes, sir.

18    Q.   Do you recall what day of the week it
19  was?

20    A.   Sunday.

21    Q.   Can you tell me what time you got up
22  that day?

23    A.   I don't recall exactly.  Somewhere
24  around 7:00.

Page 35

1    Q.   Were you an early riser routinely?

2    A.   Yes.

3    Q.   All right.  What did you do when you
4  got up that day?

5    A.   Routinely, shower, make coffee.

6    Q.   Anything other than your routine that
7  day that you recall?

8        MS. THOMPSON:  Object to form.

9        You can answer.

10  BY MR. POLICK:

11    Q.   When you got up in the morning I mean.

12    A.   Yeah, okay.  First -- no.  I would say
13  it's a normal day.

14    Q.   Who were you living there with?

15    A.   Marianne Miceli and her daughter, Tina
16  Miceli.

17    Q.   You were married to Tina at the time?

18    A.   I was.

19    Q.   How long had you and Tina been married?

20    A.   Three months, give or take.  Yeah, it's
21  approximately three months.

22        I don't -- I can't recall exact

23  dates.

24    Q.   Do you recall the date of your wedding?

Page 36

1    A.   I do not.

2    Q.   When you awoke that day, was Tina up?

3    A.   She was not.

4    Q.   Was Marianne up yet?

5    A.   I don't believe so.

6    Q.   After waking up, showering, and making
7  some coffee, what's the next thing you remember
8  doing that day?

9    A.   Turning on the TV, watching the news.

10  I walked down to 7-Eleven to get the Sunday paper.

11    Q.   How far was the 7-Eleven from your
12  condo?

13    A.   Next block.

14    Q.   Okay.  What paper did you get?

15    A.   Chicago Tribune.

16    Q.   Is that the Sunday edition?

17    A.   It was.

18    Q.   Okay.  After getting the paper at the
19  7-Eleven, did you return to the condo?

20    A.   I did.

21    Q.   Prior to leaving for the 7-Eleven, were
22  either Marianne or Tina up and out of bed yet?

23    A.   I think Marianne was up when I got back.

24        Tina slept a little bit later.

Page 37

1    Q.   Okay.  How about before you left?

2    A.   No one was up.

3    Q.   All right.  But when you returned,
4  Marianne you think was up?

5    A.   Marianne was not a real big early
6  riser, but shortly after me.

7    Q.   And what did you do after returning
8  with the paper?

9    A.   Shared coffee with Marianne, watched
10  the news.  To be fair, it was our -- kind of a
11  quiet time in the house.

12    Q.   What do you mean by "quiet time"?
13        Explain it to me.

14    A.   Can I expound on this a little bit?

15    Q.   She can't answer for you.

16    A.   Okay.

17    Q.   You have to answer the question.  If
18  you're -- I didn't explain this in the beginning.

19        But during the course of this
20  deposition, Mr. Amor, your attorneys may raise
21  objections.

22    A.   Okay.

23    Q.   And -- and there's nothing wrong with
24  that.  It doesn't mean you're doing anything wrong.

WILLIAM E. AMOR, 03/05/2020                                    Page 38..41

Page 38

1 They're allowed to do that.
2         But they cannot answer for you?
3   A.  Okay.
4   Q.  Okay?
5   A.  Marianne was bipolar.  She wasn't
6 allowed to drive.  And so it was just a time for us
7 just to talk.  I don't know how else to put it.
8   Q.  Okay.  Did she have any physical
9 disabilities?
10  A.  Yes.  She limped.  She was hit by a car
11 as a child.
12  Q.  You say she limped.
13        Can you describe that to me?
14  A.  I don't know if it was -- remember if
15 it was her right or left leg, but she wasn't
16 allowed to -- wasn't allowed to drive.
17  Q.  Did she use a cane or a walker to
18 assist herself in walking?
19  A.  No.  But she was somewhat overweight,
20 and she had a limp.
21  Q.  Okay.  And I know there's a lot of
22 women in this room, but I'm going to ask you:  When
23 you say "overweight," what do you mean by she was
24 overweight?

Page 39

1   A.  She wasn't allowed to exercise.  I
2 don't -- I don't know exact -- you know.  And I
3 understand.
4   Q.  Okay.  She didn't exercise because of
5 her physical --
6   A.  That's correct.
7   Q.  -- disability?
8         All right.  Can you estimate for me
9 how much Marianne weighed?
10  A.  Two --
11  MS. THOMPSON:  What time are you asking
12 about?
13 BY MR. POLICK:
14  Q.  We're talking about Sunday,
15 September 10th, of 1995.
16  A.  Her weight should be on record, but
17 I'm -- I'm going to guesstimate.  240.
18  Q.  And when she did walk, at what pace did
19 she walk?
20  A.  Slowly.
21  Q.  Okay.  When you say "slowly," can you
22 describe that to me?
23  A.  We lived on the third floor.  So it
24 took her a while to get down the stairs.

Page 40

1   Q.  Okay.  When she would have to go
2 down the stairs, would she have to hold on to the
3 railing?
4   A.  Yes.
5   Q.  Okay.  And when she went down the
6 stairs, would she take it a step at a time, or
7 would she go right down the stairs?
8   A.  No.  Step at a time.
9   Q.  Okay.  How about in the condo itself,
10 moving from room to room?
11        What was her pace in moving from
12 room to room?
13  A.  A little better, because it was a level
14 floor.
15  Q.  Okay.  When she was moving from room to
16 room within the condo, would she have to hold on to
17 the wall or furniture --
18  A.  She did not.
19  Q.  -- for her balance?
20  A.  She did not.
21  MS. THOMPSON:  Bill, you need to wait until
22 he's finished asking the question --
23  THE WITNESS:  Okay.
24  MS. THOMPSON:  -- before you answer --

Page 41

1   THE WITNESS:  I'm sorry.
2   MS. THOMPSON:  -- so you're not talking over
3 each other.
4 BY MR. POLICK:
5   Q.  So what time do you think it was when
6 you got back to the condo after picking up the
7 paper?
8   A.  After 8:00 o'clock.
9         I can't -- some things I just don't
10 remember.  It's been a lot of years.
11  Q.  All right.  And how long do you think
12 you and Marianne had this quiet time?
13  A.  Approximately an hour to an hour and a
14 half.
15  Q.  Okay.  So now we're about 9:30 in the
16 morning?
17  A.  I can't recall.
18  Q.  Okay.  In what room were you and
19 Marianne having quiet time?
20  A.  Living room.
21  Q.  Okay.  Was Tina still sleeping?
22  A.  Yes.
23  Q.  Okay.  What's the next thing you
24 remember happening that day?

Page 42

1    A.    Marianne cooked something to eat, but I
2 couldn't recall what it is.  We chatted.  And she
3 liked to watch news channels.
4          But I don't recall what time Tina
5 got up.  It's been too many years.
6    Q.    All right.  Were you watching TV along
7 with Marianne?
8    A.    I was.
9    Q.    Okay.  How long did you do that for?
10   A.    I said up until about noon.
11   Q.    Okay.  And around noon what do you
12 recall happening?
13   A.    It was in the fall, so NFL.
14        Football was on.
15   Q.    Okay.  Are you a football fan?
16   A.    I am.
17   Q.    Okay.  Were you a football fan back
18 then?
19   A.    I was.
20   Q.    And did you have a particular team that
21 you rooted for?
22   A.    I'm from Indiana, so it would have been
23 the Colts.
24   Q.    Okay.  Were you a Colts fan when they

Page 43

1 were in Baltimore, or only since they've been in
2 Indiana?
3    A.    Yeah -- well, they left Baltimore in
4 '84.  So ... I've -- I've always been a Colts fan.
5    Q.    Okay.  Back in '95, did you have a
6 favorite player on the team?
7    A.    For a while it was Jim Harbaugh, but
8 only for a year.  So ...
9    Q.    Did you ever bet on any of the games?
10   A.    I did not.
11   Q.    Okay.  But you enjoyed watching the
12 Colts?
13   A.    Yes, sir.
14   Q.    Okay.  That particular day, was the
15 Colts game the early game or the later game?
16   A.    It was a late game.
17   Q.    Okay.  So that game started about
18 3:00 o'clock?
19   A.    Approximately 3:00, that's correct.
20   Q.    All right.  So about noontime.
21        Did you watch the earlier game?
22   A.    I did, but I don't recall the teams.
23   Q.    Okay.  Did you have any breakfast that
24 morning when Marianne made food to eat?

Page 44

1    A.    I'm sure I did, but I didn't recall.
2    Q.    Okay.  And about noontime, had Tina
3 gotten out of bed yet?
4    A.    I don't recall.  I can estimate she
5 probably had, but I don't recall.
6    Q.    Okay.  And when you began watching the
7 football games around noon, where were you watching
8 that?  In the living room?
9    A.    In the living room.
10   Q.    Okay.  Were you seated any particular
11 place in that living room?
12   A.    Actually, I had the Chicago Tribune, so
13 I had it spread out on the floor.
14        So I was reading the paper, watching
15 football.
16   Q.    Okay.  And that's the Sunday edition
17 with several --
18   A.    Correct.
19   Q.    -- sections?
20   A.    That's correct.
21   Q.    Okay.  How far in front of the TV were
22 you?
23   A.    Five, six feet.
24   Q.    Okay.  And anything between you and the

Page 45

1 TV?
2    A.    No, sir.
3    Q.    Okay.  How about behind you?
4        What would be behind you
5 furniture-wise?
6    A.    Would be the dining room table.
7    Q.    Were you in the dining room or the
8 living room?
9    A.    No.  Living room.
10   Q.    Okay.  So the way you were seated, the
11 dining room would have been to your back?
12   A.    That's correct.
13   Q.    Okay.  And Marianne, did she watch
14 football?
15   A.    She did.
16   Q.    Okay.  And was she watching along with
17 you?
18   A.    She was.
19   Q.    Okay.  Where was Marianne located in
20 the living room when you started watching football
21 around noon?
22   A.    Sitting in the recliner.
23   Q.    Okay.  Where was the recliner located?
24   A.    Would have been to my left, which would

Page 46

1 be the south side of the living room.

2    Q.  Okay. And can you describe that

3 recliner to me?

4    A.  Cloth, fabric. I don't know. You'd

5 have to refer to -- you know.

6       I'm not a scientist. I don't -- I

7 don't recall.

8    Q.  Okay.

9    A.  It was a fabric. That's all I know.

10    Q.  All right. Well, let me ask some

11 questions, and maybe we could ... was the chair new?

12    A.  It was not.

13    Q.  Okay. And when you say a recliner, was

14 it a rocking recliner?

15    A.  No. Just a recliner.

16    Q.  All right. So if you leaned back, it

17 would stretch out?

18    A.  That's correct.

19    Q.  And the material itself on the outside,

20 you're describing it as a fabric type?

21    A.  That's correct.

22    Q.  Okay. It wasn't a leather or a false

23 leather?

24    A.  It was not.

Page 47

1    Q.  All right. Was it new or used?

2    A.  It was used.

3    Q.  Okay. Do you know how old it was?

4    A.  I don't know.

5    Q.  And the floor you were sitting on, was

6 that carpeted?

7    A.  It was.

8    Q.  Okay. Do you recall what type of

9 carpet it was?

10    A.  Older, beige, shag.

11    Q.  Okay. And what do you mean by "shag"?

12    A.  Well, just older beige carpet.

13       Back in my day, we'd call it shag

14 because -- I'm not sure what they'd call it

15 nowadays. So ...

16    Q.  Okay. Was it short and tight, or did

17 it have long strands of fabric?

18    A.  I don't know. (Indicating.)

19       I didn't look at -- you know, it

20 wasn't -- wasn't to the -- to the floor. It was

21 longer.

22    Q.  And at some point did Tina get up?

23    A.  Yes, but I don't recall the time.

24    Q.  All right. Was it during -- sometime

Page 48

1 during the first game that Sunday, the first

2 football game?

3    A.  I don't recall.

4    Q.  Did you watch the first game from noon

5 till about 3:00?

6    A.  I did.

7    Q.  Do you recall which game that was?

8    A.  No. As I stated earlier, I don't

9 recall the teams.

10    Q.  Okay. And Marianne, did she watch the

11 entire time you were there watching football?

12    A.  She did.

13    Q.  Okay. You were a smoker?

14    A.  I was.

15    Q.  Okay. Are you a smoker today?

16    A.  I am not.

17    Q.  All right. But back then you smoked?

18    A.  I did.

19    Q.  How much did you smoke a day?

20    A.  A pack.

21    Q.  Okay. What brand did you smoke?

22    A.  Marlboro Lights.

23    Q.  Okay. That would be a filtered

24 cigarette?

Page 49

1    A.  That's correct.

2    Q.  And Marianne, was she a smoker?

3    A.  Yes.

4    Q.  And what brand did Marianne smoke?

5    A.  I don't recall.

6    Q.  During the first football game, did she

7 have any cigarettes?

8    A.  Marianne? Yes, sir.

9    Q.  No, I'm asking you. You first.

10       Did you have any cigarettes -- did

11 you smoke any cigarettes during the first football

12 game?

13    A.  I did.

14    Q.  Okay. And that was while you were on

15 the floor?

16    A.  That's correct.

17    Q.  All right. And were there ashtrays in

18 the living room?

19    A.  Yes.

20    Q.  Where were the ashtrays?

21    A.  Marianne had one next to her chair, a

22 table with a lamp, and there was one on the coffee

23 table where I was sitting.

24    Q.  Okay. So the coffee table is different

Page 50

1 than the dining room table you described earlier?

2    A.   That's correct.

3    Q.   Okay.  The ashtray, what type were they?

4    A.   Old school square.

5    Q.   Do you know what material they were

6 made out of?

7    A.   I believe glass.

8    Q.   And when you say Marianne had one near

9 her, was it -- did she rest it on the recliner?

10        Was there a table near the recliner?

11   A.   It was on the table.

12   Q.   The coffee table?

13   A.   Yes -- no.  The table next to her chair

14 with the lamp on it.

15   Q.   Oh.  Okay.  So that's --

16   A.   Two different areas.  That's correct.

17   Q.   All right.  Was Marianne left-handed or

18 right-handed?

19   A.   I believe she was right-handed.

20   Q.   Okay.  How about you?

21   A.   I'm right-handed.

22   Q.   Tina?

23   A.   Right-handed.

24   Q.   Do you recall how many cigarettes you

Page 51

1 smoked during the first game?

2    A.   I do not.

3    Q.   Okay.  More than one?

4    A.   Yes.

5    Q.   Okay.  More than ten?

6    A.   No.

7    Q.   What's your best guesstimate of how

8 many you would have smoked in that period of time?

9    A.   For them --

10   MS. THOMPSON:  Object to form.

11        You can answer.

12   THE WITNESS:  For them few hours, I don't

13 know.  Four, maybe five.

14 BY MR. POLICK:

15   Q.   Okay.  How about Marianne?  Did she

16 smoke during that first game?

17   A.   I did, but I don't recall how many.

18   Q.   When you say "I did," I was asking

19 about Marianne.  She was smoking?

20   A.   Yes.

21   Q.   Okay.  Do you recall how many

22 cigarettes she had during the first game?

23   A.   I do not.

24   Q.   Okay.  So after the first game was

Page 52

1 over, what's the next thing you remember?

2    A.   The best of my recollection is that

3 Tina and Marianne went to -- to the store, to

4 Jewel.  But I don't recall for what purpose or what

5 they bought.

6    Q.   All right.  So to the best of your

7 recollection, Tina woke up sometime after the first

8 game?

9    A.   That's correct.

10   Q.   And sometime following the first

11 football game that day, Tina and Marianne went to

12 Jewel.

13   A.   That's correct.

14   Q.   Do you know which Jewel they went to in

15 Naperville?

16   A.   Would have been 75th and Naper

17 Boulevard.

18   Q.   Was that the Jewel they routinely went

19 to?

20   A.   Yes.

21   Q.   Okay.  How long of a period of time

22 were they gone?

23   A.   I don't recall.

24   Q.   Okay.  What did you do while they were

Page 53

1 gone?

2    A.   Continued to watch football.

3    Q.   So now the second game has started?

4    A.   I don't recall exactly what time -- the

5 gap.  I just -- I don't recall.

6    Q.   Okay.  But the second game would have

7 been the Colts game?

8    A.   Yes.  And I'm -- forget who they played.

9        But it was a late game.

10   Q.   Say that again?  I'm sorry.  I didn't

11 understand.

12   A.   I -- it was a late game.  I don't

13 recall who they played.

14   Q.   You -- it was the second game --

15   A.   It was.

16   Q.   -- of the day.  Okay.

17        Do you recall if it was a home game

18 or an away game for Indiana?

19   A.   I do not.

20   Q.   All right.  At some point in time did

21 Tina and Marianne return from the store?

22   A.   They did.

23   Q.   Okay.  Do you have any memory of when

24 that was?

WILLIAM E. AMOR, 03/05/2020                                    Page 54..57

Page 54

1    A.   It would have been midafternoon.
2    Q.   And when you say "midafternoon," what
3 do you --
4    A.   I don't recall the time.
5    Q.   Anytime before Tina and Marianne left
6 for Jewel that day, had you had anything of an
7 alcoholic nature to drink?
8    A.   I had not.
9    Q.   Okay.  And then after Tina and Marianne
10 returned, what -- what did you do?
11   A.   Sat on the floor looking at the
12 newspaper, watching football.
13   Q.   Okay.  Did they bring groceries back
14 from Jewel?
15   A.   I don't recall.
16   Q.   Okay.  Did you help them at all with
17 the groceries when they brought them back to the
18 apartment?
19   A.   Marianne couldn't carry groceries.
20        So Tina would -- whoever took
21 Marianne to the store, we'd pull up to the front
22 door, carry the groceries up for Marianne.
23   Q.   Okay.  With regard to Marianne, was
24 that true of most things, that she could not carry

Page 55

1 something that was over a certain weight?
2    A.   Yeah.  She could carry her purse, and
3 that was about it.
4    Q.   Okay.  Could she pick up a newspaper?
5    A.   Probably.
6    Q.   Okay.  How many purses did she carry
7 with her?
8    A.   I don't know.  I'm assuming one.
9        But she never carried a big handbag,
10 if that's what you're asking.
11   Q.   Okay.  Was it more of a clutch purse,
12 or the type that a woman wears over the shoulder?
13   A.   Just over the shoulder.
14   Q.   Okay.  So that she was fine with?
15   A.   Yes.
16   Q.   Okay.  Anything heavier than that, she
17 would need help?
18   A.   Yes.
19   Q.   Okay.  Do you recall anything happening
20 during the period of time that you were watching
21 the second game, the Colts game, that Sunday
22 afternoon?
23        MS. THOMPSON:  Object to form.
24        You can answer.

Page 56

1        THE WITNESS:  Nothing out of the ordinary.
2 BY MR. POLICK:
3    Q.   Okay.  Did you change your position at
4 all from being on the floor in front of the TV?
5    A.   Except to use the restroom --
6    Q.   Okay.
7    A.   -- no.
8    Q.   Where was the restroom located?
9    A.   It would have been down the hall, which
10 would be north.
11   Q.   Okay.  Was it just one restroom?
12   A.   No.  There was a full bath, and a half
13 bath.
14   Q.   Other than using the washroom, did you
15 sit on any of the other furniture in the -- in the
16 living room --
17   A.   I did not.
18   Q.   -- when you were watching the football
19 game?
20   A.   I did not.
21   Q.   Okay.  Was there another chair in the
22 living room to sit in, besides Marianne's recliner?
23   A.   A sofa.
24   Q.   Okay.  And where was the sofa in

Page 57

1 relation to Marianne's recliner?
2    A.   Also on the south side.
3    Q.   Okay.  Any other chairs to sit in in
4 the living room?
5    A.   Other than the dining room table and
6 chairs, but that's it.
7    Q.   Okay.  But in the living room itself,
8 were there any other chairs that you could sit in?
9    A.   There was not.
10   Q.   Did you continue to smoke during the
11 second game that Sunday afternoon?
12   A.   I can only assume that I did.
13   Q.   Okay.  Did Marianne resume watching TV
14 with you after she returned to the store --
15   A.   She --
16   Q.   -- with Tina?
17   A.   She did.
18   Q.   Okay.  And before Tina left with her
19 mother to go to Jewel, do you recall any
20 conversation with her or anything that she did
21 before leaving for the store?
22   A.   No.  Routinely Tina got up, showered,
23 and then went on about whatever she had to do.
24   Q.   Tina was a smoker, too?

Page 58

1    A.   She was.

2    Q.   And what was her cigarette habit back
3 in September of '95?

4    A.   A pack-plus.  That's -- I can only
5 estimate.

6    Q.   And did I ask you about Marianne's
7 cigarette use, how much she smoked a day?

8    A.   I believe you did.

9         But she was -- what I remember is
10 that she was on medication for things, and she was
11 a heavy smoker.

12   Q.   When you say "heavy," what do you mean?

13   A.   Pack and a half to two packs.

14   Q.   And when you say she was on medication,
15 what medication do you recall?

16   A.   I don't recall.

17   Q.   Was it for her bipolar condition?

18   A.   Yes.

19   Q.   Okay.  Did she also take medication for
20 her physical disability?

21   A.   Pain medication I'm unclear of.

22        I have -- yeah, I don't recall.

23   Q.   Okay.  When she would move through the
24 house or walk, would she complain about being in

Page 59

1 pain?

2    A.   No.

3    Q.   Okay.

4    A.   She was very stoic.

5    Q.   After Tina returned from the store,
6 what do you recall her doing?

7    A.   I don't.  I don't.  It's just -- too
8 many years have passed.

9    Q.   During the second football game that
10 afternoon, did you have anything of an alcoholic
11 nature to drink?

12   A.   I did.

13   Q.   Okay.  What did you have to drink?

14   A.   A vodka and soda, but I couldn't tell
15 you the name of the soda.

16   Q.   When you say "soda," you're meaning
17 like a -- what's commonly referred to as pop, as
18 opposed to --

19   A.   Correct.

20   Q.   -- regular club soda?

21   A.   Correct.

22   Q.   Okay.  So something like a 7 Up or a
23 Sprite?

24   A.   Sprite.  That's correct.

Page 60

1    Q.   Did you have a particular brand of
2 vodka that you drank?

3    A.   I did not.

4    Q.   Do you know what brand you were
5 drinking at that time?

6    A.   I do not recall.

7    Q.   And the vodka you were drinking, from a
8 bottle?

9    A.   Yes.

10   Q.   What size bottle?

11   A.   Pint?

12   Q.   And where was the vodka bottle that you
13 were mixing with the soda located in the room you
14 were at?

15   A.   It would have been in the kitchen, but
16 I couldn't tell you exactly where in the kitchen.

17   Q.   So you would get up from the floor, go
18 over to the kitchen, mix yourself a drink, and then
19 return --

20   A.   I did that.

21   Q.   -- to watching the TV?

22   A.   Absolutely.

23   Q.   Did Marianne watch the second game?

24   A.   Part of the second game.

Page 61

1    Q.   Okay.  Was she seated in her recliner?

2    A.   She was.

3    Q.   Was that like her chair?

4    A.   It was.

5    Q.   Okay.  Were there rules about who could
6 sit there and who couldn't?

7    A.   Her and Tina.  That was pretty much
8 their thing.

9    Q.   Okay.  When you say "her and Tina,"
10 what do you -- what was the arrangement?

11   A.   There wasn't an arrangement.  It was --
12 it just was kind of their thing in the house.

13   Q.   Okay.  Did you ever sit in that chair?

14   A.   I have not.

15   Q.   And did Tina sometimes sit in the chair?

16   A.   She did.

17   Q.   How did Marianne feel about that?

18   A.   Well, she did it when Marianne was
19 either in bed or taking a nap or -- you know.

20   Q.   Did Marianne watch the entire second
21 game?

22   A.   No.  She went to take a nap.

23   Q.   Okay.

24   A.   But I don't recall the timeline.

Page 62

1    Q.    And that would have been in her bedroom?
2    A.    Yes.
3    Q.    And where was her bedroom located in
4  relation to the living room?
5    A.    There were two bedrooms that were on
6  the north side, and hers was the second. It was at
7  the end of the hallway.
8    Q.    When you said you were drinking vodka
9  and soda, did you do that during the second game
10 that afternoon?
11   A.    I did.
12   Q.    And do you recall how many drinks you
13 had?
14   A.    Two.
15   Q.    Did you finish off the pint of vodka
16 that day?
17   A.    I did not.
18   Q.    And before Marianne went to take a nap,
19 sometime during the second game that Sunday
20 afternoon, had anyone come over to the apartment
21 that day?
22   A.    No, sir.
23   Q.    No visitors?
24   A.    No.

Page 63

1    Q.    Were you on the phone at all that day
2  with anybody?
3    A.    I was not.
4    Q.    Did Tina watch the second game with you
5  at all that day?
6    A.    Briefly.
7    Q.    When you say "briefly," can you explain
8  that to me?
9    A.    I think she went to put on makeup and,
10 you know, just get cleaned up, by what I remember.
11   Q.    All right. And was there some reason
12 she was putting on makeup?
13   A.    We had decided to go -- well, actually
14 she decided we were going to go to the drive-in.
15   Q.    And what drive-in was that?
16   A.    I don't even recall the name of it.
17         It's no longer there. They lost
18 their lease.
19   Q.    Was it in Naperville?
20   A.    No. North Avenue and Route 59.
21         So it would have been -- I'm not
22 sure of the suburb.
23   Q.    You said Route 59 and North Avenue?
24   A.    Yes.

Page 64

1    Q.    And when did Tina decide that she
2  wanted to go to the drive-in?
3    A.    I think earlier that day.
4    Q.    Is that a drive-in you and Tina had
5  been to before that day?
6    A.    I have not.
7    Q.    Did you go to the movies together before
8  that day?
9    A.    We did not.
10   Q.    When Tina went to get ready and put her
11 makeup on, was Marianne already taking her nap?
12   A.    It's a timeline I don't recall after 25
13 years.
14   Q.    Prior to Tina going to put her makeup
15 on, was she watching the football game with you?
16   A.    As I stated, briefly. Then she went to
17 get cleaned up, and ...
18   Q.    When she was briefly watching the
19 football game, where was she seated in the living
20 room?
21   A.    Probably on the couch.
22         That's my best recollection.
23   Q.    Were you ever seating -- seated at --
24 on the couch watching the football game that day?

Page 65

1    A.    I was not.
2    Q.    Okay. And you never sat in Marianne's
3  chair?
4    A.    Not that I recall.
5    Q.    Okay. Fair to say you were on the
6  floor the entire day watching the --
7    A.    That's correct.
8    Q.    Unless you went to the -- unless you
9  went to the washroom?
10   A.    That's correct.
11   Q.    Okay. When you were sitting on the
12 floor watching the football game, did you ever move
13 your position from near the coffee table, as you
14 previously testified?
15   A.    No. I -- as I stated earlier, I was
16 reading the newspaper, watching football. I was --
17 except to use the washroom, I was stationary.
18   Q.    Did you have anything other -- to --
19 other -- strike that.
20         Did you have anything else to drink
21 besides the vodka and soda that you described?
22   A.    I did not.
23   Q.    How often were you drinking back in
24 1995?

WILLIAM E. AMOR, 03/05/2020                                    Page 66..69

Page 66

1    A.   Sporadically.  Not every day, just --
2 some days worse than others.
3    **Q.   Okay.  How many days a week?**
4    A.   Three to four.
5    **Q.   And when you would drink, would you go**
6 **out to drink, or would you drink at home, or both?**
7    A.   No, I wouldn't go out.  I would be at
8 home.
9    **Q.   Okay.  So you didn't have a particular**
10 **bar that you would go to?**
11   A.   I did not.
12   **Q.   And when you would drink at home three**
13 **to four days a week, what would you drink?**
14   A.   Sometimes beer, sometimes something
15 else.  But I don't -- I don't recall what the
16 something else is.
17   **Q.   Okay.  Did you have a favorite beer**
18 **that you would drink back then?**
19   A.   Miller Lite.
20   **Q.   And this particular Sunday, you were**
21 **drinking vodka.**
22       **Did you drink any other types of**
23 **liquor?**
24   A.   I did not.

Page 67

1    **Q.   Do you drink wine at all?**
2    A.   I do not.
3    **Q.   When you were drinking three to four**
4 **times a week back in 1995, were there things you**
5 **felt you could not do while you were drinking?**
6    MS. THOMPSON:  Object to form.
7        You can answer.
8    THE WITNESS:  No.
9 BY MR. POLICK:
10   **Q.   Okay.  Were there things that you felt**
11 **you could only do when you were drinking?**
12   A.   No.
13   MS. THOMPSON:  Object to form.
14       You can answer.
15 BY MR. POLICK:
16   **Q.   When you were drinking three to four**
17 **days a week in 1995, did you ever experience a**
18 **blackout?**
19   A.   No, sir.
20   **Q.   Do you know what a blackout is?**
21   A.   Only from the studies --
22   **Q.   Okay.**
23   A.   -- I read.
24   **Q.   What studies are you referring to?**

Page 68

1    A.   I grew up with alcoholic parents.
2    **Q.   I see.  And was that both parents?**
3    A.   Yes.
4    **Q.   Okay.  And what does blackout mean to**
5 **you?**
6    A.   You don't recall where you were, how
7 you got home and where your car and your wallet is,
8 and these kinds of things.
9        That's the education I know about.
10   **Q.   And you did not experience a blackout**
11 **at any time during 1995?**
12   A.   I did not.
13   **Q.   How about a brownout?**
14       **Do you know what that is?**
15   A.   I do not.
16   **Q.   Okay.  When Tina went to put her makeup**
17 **on, did she have a particular place in the house**
18 **where she would do that?**
19   A.   The full bath.
20   **Q.   And would that bath be directly across**
21 **from Marianne's bedroom?**
22   A.   Yes.
23   **Q.   And did you continue to watch the game**
24 **while she put on her makeup?**

Page 69

1    A.   I did.
2    **Q.   Did the game end in regulation, or did**
3 **it go --**
4    A.   Actually, it went to overtime.
5    **Q.   Okay.  Did the Colts ultimately win?**
6    A.   No.  They lost.
7    **Q.   Did you stay until the Colts lost?**
8    A.   It was in overtime when we left to go
9 to the movies, which was approximately 6:20.
10       I'd have to refer to counsel for the
11 exact time that's on record.
12   **Q.   Do you not remember the exact time that**
13 **you left that day?**
14   A.   Not 25 years ago I don't.
15   **Q.   Okay.  Do you remember what time the**
16 **movie was going to start, approximately?**
17   A.   There were two movies.
18   **Q.   All right.  When was the first one**
19 **going to start?**
20   A.   So the one -- it would have taken us
21 probably 45 minutes to get there, approximately.
22 So I'm -- drive-ins during the summer start after
23 7:00 o'clock.  So ... this one did, but I couldn't
24 tell you exactly what time.

Page 70

1    Q.   Okay.  And you said there were two
2  movies?
3    A.   There was.
4    Q.   Okay.  Double feature?
5    A.   That's correct.
6    Q.   Okay.  Do you remember the movies that
7  you saw that day?
8    A.   Yeah.  Tina wanted to go see that
9  movie, Babe, the pig, was the first one.  And the
10  second one was some movie with Julia Roberts.
11    Q.   So you left the apartment sometime
12  during the overtime of the game?
13    A.   That's correct.
14    Q.   Okay.  Mari- -- strike that.
15        Tina was getting her makeup on to go
16  to the movies.  Is there anything that you did to
17  get ready for the movies?
18    A.   No.  I had already shaved, showered,
19  and ... just watching football.
20    Q.   Okay.  Did you need to pack anything to
21  go to the drive-in?
22    A.   Tina packed a cooler with some soda.
23        And I know she liked wine coolers,
24  but I'm not -- I can't say for certain if she

Page 71

1  packed any or not.
2    Q.   Did you pack any food in the cooler?
3    A.   We did not, because we figured we'd buy
4  munchies at the concession stand at the drive-in.
5    Q.   Did you put anything to drink for
6  yourself in the cooler?
7    A.   As I recall, some beer, but I
8  couldn't -- I don't recall how many.
9    Q.   Okay.  Miller Lite?
10    A.   Would be my guess.
11    Q.   Okay.  Bottle or can?
12    A.   Would be can.
13    Q.   Did you bring any vodka with you in the
14  cooler?
15    A.   I did not.
16    Q.   And was it you or Tina who packed the
17  cooler?
18    A.   Tina.
19    Q.   Okay.  And do you know when she packed
20  that in relation to going to put her makeup on?
21    A.   Would have been after she put her
22  makeup on.
23    Q.   And when she was packing the cooler,
24  what room was she doing that in?

Page 72

1    A.   Would have been in the dining room.
2    Q.   Okay.  And the dining room is adjacent
3  to the living room?
4    A.   That's correct.
5    Q.   And is that the room that would be
6  closest to the entry and exit door?
7    A.   That's correct.
8    Q.   All right.  Was there only one entry
9  and exit door of that apartment?
10    A.   Other than the patio doors.
11    Q.   And you indicated that you were on the
12  third floor?
13    A.   We were.
14    Q.   Okay.  So if you went out that entry/
15  exit door, was there a hallway?
16    A.   There was.
17    Q.   And then how many flights of stairs
18  would you have to go down?
19    A.   We were on the third floor.
20        So one, two, three down to the
21  bottom floor.
22    Q.   Okay.
23    A.   Down to the landing where the mailbox
24  is ...

Page 73

1    Q.   Okay.  Any landings between the landing
2  where the mailbox -- mailboxes were and where your
3  apartment was?
4    A.   I think all apartments and condos have
5  a brief landing.  But they're just -- you know,
6  they're small landings.  I don't know how to
7  describe it.  Yeah, but there was small landings.
8    Q.   Okay.  And the -- you called it a
9  patio.  It's actually a balcony?
10    A.   Yes.
11    Q.   Would that be more -- do you remember
12  what the weather was like day?
13    A.   We were going to the outdoor theater,
14  so it was somewhere in the 70s.
15    Q.   Did you have -- were there sliding
16  glass doors on the -- on the balcony.
17    A.   Yes, there were.
18    Q.   And do you recall how they open, from
19  what end or what side to what side?
20    A.   From north to south.
21    Q.   And were you out on that balcony at all
22  that day?
23    A.   We were not.
24    Q.   What was out on the balcony?

WILLIAM E. AMOR, 03/05/2020                           Page 74..77

Page 74

1        What did you keep out there?
2     A.   I think Tina might have had a small
3 grill out there.
4     Q.   When you say "a small grill," like what
5 type?
6     A.   You know, the little hibachi, or -- I
7 don't -- I don't know what else to call it.
8     Q.   Okay.  Was it like a portable grill,
9 something you could carry?
10    A.   Yes.
11    Q.   Anything else out on the balcony
12 besides the small grill?
13    A.   Not to my knowledge.
14    Q.   Okay.  Did anybody grill anything out
15 there that day?
16    A.   We did not.
17    Q.   Did Tina have the cooler on the dining
18 room table when she was getting it ready?
19    A.   Best of my recollection.
20    Q.   Okay.  Did you help her at all to pack?
21    A.   No.  Tina packed.
22        I -- I carried it downstairs.
23    Q.   Okay.  But during the time that she was
24 packing up, were you still in the apartment?

Page 75

1     A.   When she was packing and the game went
2 into overtime, I went and -- we did not have
3 assigned parking, so the car was parked down the way.
4        So I went and retrieved the car and
5 cleaned the windows so we could see the movie.
6        At the time Tina I believe worked at
7 McDonald's.  So there were some food bags in there
8 I cleaned out, and I retrieved the cooler, and put
9 it in the car.
10    Q.   Did Tina work that day at all?
11    A.   She did not.
12    Q.   Okay.  Were you working at the time?
13    A.   I did -- well, I was a handyman.
14    Q.   What does that mean?
15    A.   Automotive, home restoration, just --
16 you know.
17    Q.   Odd jobs?
18    A.   Yes.
19    Q.   Were you employed by any business by
20 that --
21    A.   At that time I was not.
22    Q.   All right.  So when you say odd jobs,
23 these were things you were doing on your own --
24    A.   That's correct.

Page 76

1     Q.   -- for other people.
2     A.   That's correct.
3     Q.   Do you recall anybody calling you that
4 day and asking you to do any work for them?
5     A.   No.  It was Sunday.
6     Q.   Okay.  Did you have a job for Monday?
7     A.   I don't recall.
8     Q.   Did you know that you had to be back
9 from the movies at a certain time because you had a
10 job to do the following Monday, or the next day?
11    A.   Not that I recall.
12    Q.   Before you went down to the car as you
13 described, were you still sitting there on the
14 carpet watching TV?
15    A.   I was.
16    Q.   Did you go directly from sitting on the
17 floor to --
18    A.   Downstairs.
19    Q.   Downstairs to the car?
20    A.   I did.
21    Q.   Okay.  Did you put a coat on?
22    A.   No, sir.
23    Q.   Did you pack up anything before you
24 went to -- down to the car?

Page 77

1     A.   No, not that I recall.
2     Q.   Did you grab your wallet?
3     A.   I did.
4     Q.   Okay.  Where was your wallet?
5     A.   In my back pocket.
6     Q.   Okay.  Did you have keys for the
7 apartment?
8     A.   I did.
9     Q.   And where were your keys?
10    A.   My right front pocket.
11    Q.   Did you have any interaction with
12 Marianne before you went downstairs to the car?
13    A.   No.  Since I left the apartment first,
14 and Marianne had went to a nap -- I think Marianne
15 was on the phone.  That's -- that's of record.
16    Q.   Okay.  Well, I'm not --
17    A.   But --
18    Q.   I'm not asking you what's of record.
19        I'm asking you what you recall that
20 particular day.
21    A.   No.  I left before Tina.  And I took
22 the cooler down, put it in the car --
23    Q.   Okay.
24    A.   -- because --

WILLIAM E. AMOR, 03/05/2020                        Page 78..81

Page 78

1     Q.   And I'm talking about that period of
2 time before you took the cooler down to the car.
3           Do you understand the period of time
4 we're talking about?
5     A.   Still watching the first part of
6 overtime football.
7     Q.   Okay.  And you stayed in front of the
8 TV.
9     A.   Correct.
10     Q.   Did you ever get up from watching the
11 TV and use the restroom before you picked up the
12 cooler to take it downstairs?
13     A.   Not to my recall.
14     Q.   Before you took the cooler downstairs,
15 did you have any interaction or communication with
16 Marianne?
17     A.   I did not.
18     Q.   You indicated that you believe Marianne
19 was on the phone?
20     A.   As I recall.
21     Q.   Okay.  And why -- why does that stand
22 out in your mind?
23     A.   Obviously because of the trial.
24     Q.   Okay.  But do you have an independent

Page 79

1 recollection other than the trial of Marianne being
2 on the phone with somebody before you picked up the
3 cooler --
4     A.   Her bedroom was -- excuse me.
5     Q.   That's all right.
6     A.   Her bedroom was at the back of the
7 hallway, so she was taking a nap and I think she
8 was talking to her friend.
9     Q.   Okay.  Could you overhear the
10 conversation from where you were?
11     A.   I could not.
12     Q.   Okay.  Did you know who she was talking
13 to before you left?
14     A.   She had a couple of friends back then,
15 but I don't recall their names.
16     Q.   Okay.  Do you recall who her closest
17 friends were back then?
18     A.   She had one or two that used to come
19 pick her up and take her to Bakers Square.
20     Q.   On Route 59?
21     A.   I don't know which location.
22     Q.   Okay.  Did you have any close friends
23 at the time?
24     A.   No, not really.

Page 80

1     Q.   Were there any people that you knew
2 that would come over and visit at the apartment on
3 Bailey?
4     A.   Except for her family, not really.
5     Q.   When you say "her family," whose family
6 are you referring to?
7     A.   Her sister and brother-in-law.
8     Q.   Marianne?
9     A.   Yes.
10     Q.   Did Tina have any friends?
11     A.   She did, but I don't recall who they
12 were.
13     Q.   Before you went to grab the cooler, did
14 you speak to Marianne at all?
15     A.   As I stated before, she went into the
16 room to take a nap or get on the phone, whatever
17 she was doing.
18     Q.   Right.  My question is before you
19 picked up the cooler, did you go back and speak to
20 Marianne at all?
21     A.   I did not.
22     Q.   Before you picked up the cooler to take
23 it downstairs, did you yell out to Marianne, hey,
24 we're leaving, or anything like that?

Page 81

1     A.   Tina was in the bathroom at the time as
2 I recall, which was right next to Marianne's room.
3     Q.   Okay.  Why was Tina in the bathroom at
4 that time?
5     A.   I don't know.  Using the bathroom,
6 finish her makeup.  I don't know.
7     Q.   Okay.  So at some point you were left
8 alone in the living room on the carpet before you
9 picked up the cooler?
10     A.   I'm not sure at which point Tina came
11 out of the bathroom.  I don't recall the timeline.
12     Q.   Okay.  But what you do recall is at
13 some point she packed the cooler, correct?
14     A.   Yes.
15     Q.   She was doing that in the dining room,
16 right?
17     A.   (Nodding.)
18     Q.   Yes?  You have to answer out loud.
19     A.   Yes.
20     Q.   Okay.  And you were watching the Colts
21 game --
22     A.   That's correct.
23     Q.   -- during that time?
24        Correct?

WILLIAM E. AMOR, 03/05/2020                          Page 82..85

Page 82

1    A.   Yes.
2    Q.   Seated on the floor of the living room,
3 right?
4    A.   Yes.
5    Q.   Marianne was back in her bedroom,
6 correct?
7    A.   That's correct.
8    Q.   You indicated that you left sometime
9 during the overtime of the game, correct?
10   A.   That's correct.
11   Q.   Okay.  You knew Marianne was on the
12 phone.  You could hear that, right?
13   A.   As I recall.
14   Q.   Okay.  Cooler was on the dining room
15 table, or somewhere in the dining room?
16   A.   As I recall.
17   Q.   Okay.  And at some point it sounds like
18 Tina had packed the cooler and went back to the
19 restroom.
20   A.   I think probably to talk to Marianne
21 and say we're leaving.  I don't know if she was in
22 the bathroom.
23        But she -- you know, that was her
24 thing.

Page 83

1    Q.   But in any event, Tina was back in that
2 area of the house.
3    A.   As I recall.
4    Q.   All right.  And you were still watching
5 the overtime?
6    A.   When Tina went back, I had already -- I
7 got up, turned off the TV, grabbed the cooler, and
8 went downstairs.
9    Q.   Okay.
10   A.   There was nobody in the living room.
11   Q.   Except you.
12   A.   Well, when Tina went back, as I recall,
13 I grabbed the cooler.  As I stated, I brought the
14 car up front and cleaned it out.
15   Q.   Right.  But we're still -- we're not
16 downstairs yet.  We're still -- we're still in the
17 apartment.
18        So at some point you said you're
19 watching the overtime game, and you turned off the
20 TV.
21   A.   That's correct.
22   Q.   Okay.  And then you went to grab the
23 cooler and take it down?
24   A.   That's correct.

Page 84

1    Q.   Okay.  And when you went to take down
2 the cooler, where was Marianne?
3    A.   In her bedroom.
4    Q.   Okay.  And where was Tina?
5    A.   With Marianne or in the bathroom.
6         I don't recall.
7    Q.   Okay.  Tina was not there in the dining
8 room with you.
9    A.   I don't -- I don't recall.
10   Q.   So you said the parking was not assigned
11 parking.
12   A.   That's correct.
13   Q.   All right.  Were there a number of
14 buildings in -- in this apartment complex?
15   A.   It was a condominium complex.
16   Q.   Okay.
17   A.   There were multiple buildings, but I
18 couldn't tell you how many.
19   Q.   All right.  And the parking, was it by
20 building?  Or if you lived in the complex, you
21 could park --
22   A.   It's where you could find a space.
23   Q.   All right.  You need to let me finish
24 my --

Page 85

1    A.   I'm sorry.
2    Q.   -- my question.
3         Could you park anywhere in the lot
4 as long as you lived in one of the buildings?
5    A.   That's correct.
6    Q.   All right.  What type of car were you
7 using at that time?
8    A.   Some kind of Ford compact.
9    Q.   Okay.  Who owned the car?
10   A.   Tina did.
11   Q.   Okay.  Was the car ever in your name?
12   A.   It was not.
13   Q.   Okay.  Was the car insured?
14   A.   Yes.
15   Q.   Okay.  Who would pay the auto insurance
16 on the car?
17   A.   Tina and myself.
18   Q.   And you said no assigned parking?
19   A.   That's correct.
20   Q.   Okay.  So when you left the apartment,
21 you got to go down to the main floor, correct?
22   A.   That's correct.
23   Q.   Did you leave out the rear of the
24 building or the front of the building?

Page 86

1     A.    The front.
2     Q.    Okay.  And would the front face the
3  parking lot?
4     A.    Yes.
5     Q.    And how far did you have to go to get
6  the car?
7     A.    As I recall, probably 12 to 15 parking
8  spaces.
9     Q.    Okay.  And you carried the cooler down
10  with you?
11     A.    I did, and put it on the first floor
12  landing.
13     Q.    Okay.  How big of a cooler are we
14  talking about?
15     A.    Just (indicating).
16           You know, standard like camping
17  cooler, like a Coleman-type camping cooler.
18     Q.    Did it have a handle that you could
19  carry it, or did you have to hold it with both
20  hands?
21     A.    No.  It just had two handles, and that
22  was it.  It wasn't on wheels or anything.
23     Q.    All right.  And you brought that all
24  the way down to the main landing, where the --

Page 87

1     A.    I did.
2     Q.    -- where the mailboxes were?
3     A.    Yes, sir.
4     Q.    Did you leave it there to go get the
5  car or did --
6     A.    I did.
7     Q.    All right.  Why did you leave it in the
8  landing?
9     A.    So I wouldn't have to carry it all the
10  way to the car.
11     Q.    So you got the car.
12           What did you do then?
13     A.    As I stated, I pulled it up to the
14  Dumpster, cleaned it out, cleaned the windows,
15  and ...
16     Q.    How long did that take you?
17     A.    Approximately ten minutes.
18     Q.    Okay.  Did you clean all the windows,
19  or just the windshield?
20     A.    I don't recall.
21           But I'm sure I cleaned the windshield
22  because everyone was a smoker.  So obviously.
23     Q.    And you did that near a Dumpster, are
24  you saying?

Page 88

1     A.    Yeah.  The Dumpster was out in front of
2  the building.
3     Q.    And then after cleaning the windows,
4  did you do anything else with the car?
5     A.    I did not.  Waited for Tina.
6     Q.    Okay.  By the Dumpster?
7           Or did you move the car?
8     A.    No.  Right in front of the building.
9     Q.    Okay.  So if I'm understanding you, you
10  went over to where the car was parked -- correct?
11     A.    Yes.
12     Q.    And you cleaned out the windows?
13     A.    I pulled the car in front of the
14  building.  Then I cleaned the windows.
15     Q.    Oh, I see.  You brought it over in
16  front of the building.
17     A.    Yeah.  Because the Dumpster's right
18  there, so I could throw the paper towels away.
19     Q.    And the cooler was still inside the
20  building?
21     A.    Well, only briefly.
22           Because once I pulled the car up and
23  cleaned it, I put the cooler in the backseat.
24     Q.    Why'd you put the cooler in the backseat?

Page 89

1     A.    Because we needed the front seat to sit.
2     Q.    Why didn't you put it in the trunk?
3     A.    Small car.
4     Q.    The cooler wouldn't fit in the trunk?
5     A.    Probably would have, but it was easier
6  in the backseat.
7     Q.    And after you put the cooler in the
8  backseat, what did you do next?
9     A.    Waited for Tina.
10     Q.    Did you wait inside the car or outside
11  the car?
12     A.    Inside the car.
13     Q.    Were you in the passenger seat or the
14  driver's seat?
15     A.    I was in the passenger seat.
16     Q.    And how long were you sitting in the
17  passenger seat before you saw Tina?
18     A.    There are two different times I saw
19  Tina --
20     Q.    Okay.
21     A.    -- but I couldn't tell you the time.
22     Q.    All right.  Well, you told me it was
23  about ten minutes to clean the windows of the car
24  and get the cooler loaded, correct?

WILLIAM E. AMOR, 03/05/2020                                        Page 90..93

Page 90

1   A.   That's correct.
2      Q.   All right.  And then you're now sitting
3   in the passenger seat -- front passenger seat of
4   the car, correct?
5      A.   That's correct.
6      Q.   And Tina at some point appears?
7      A.   That's correct.
8      Q.   Okay.  When she -- when you first saw
9   her, what -- did she come out the front entrance?
10     A.   She did.
11     Q.   Okay.  Did she have anything with her?
12     A.   No.  That's the reason for her trip
13  back up -- I don't remember what she said she
14  forgot; purse, cigarettes, whatever.
15     Q.   Okay.  Well, when she first came out
16  the door, did you notice anything unusual about
17  her?
18     A.   No, not, just -- it's just that she
19  stated I had forgotten.
20         But I don't know what she forgot.
21     Q.   When she came out the front door, was
22  she carrying anything?
23     A.   She was not.
24     Q.   Did she carry a purse?

Page 91

1   A.   I'm assuming that's one of the things
2   she forgot, but I don't recall.
3      Q.   Okay.  So when she came out the door,
4   did she walk over to the car?
5      A.   Yes.  Both times.
6      Q.   I'm just talking about the first time
7   now.
8      A.   Yes.
9      Q.   When she first came out the door, did
10  she walk over to the car where you were seated?
11     A.   She did.
12     Q.   Okay.  And what did she say to you and
13  what did you say to her?
14     MS. THOMPSON:  Object to form.
15         You can answer.
16     THE WITNESS:  She stated she forgot something.
17         But I don't recall what she forgot;
18  purse, cigarettes, whatever.
19  BY MR. POLICK:
20     Q.   Did she say that immediately to you
21  when she -- when she walked up to where you were in
22  the car?
23     A.   All I remember is her opening the door.
24         She said, I have to run upstairs,

Page 92

1   and -- but I don't recall what she forgot.
2      Q.   Okay.  When you say she opened the
3   door, which door of the car did she open?
4      A.   Driver's side.
5      Q.   And it's after she opened that door that
6   she told you she had forgotten something?
7      A.   That's correct.
8      Q.   Okay.  And what did Tina do next?
9      A.   Went back upstairs.
10     Q.   Okay.  And what did you do while Tina
11  went back upstairs?
12     A.   Just sat there and waited.
13     Q.   In the front passenger seat of the car.
14     A.   That's correct.
15     Q.   And how long was Tina gone before she
16  returned to the car?
17     A.   Four to five minutes.
18     Q.   And when Tina returned, did she came
19  out the same front door?
20     A.   Yes.
21     Q.   Okay.  Did she come over to the
22  driver's side of the car?
23     A.   She did.
24     Q.   Okay.  Other than sitting there, did

Page 93

1   you do anything else?
2      A.   I did not.
3      Q.   Okay.
4      A.   I stayed in the car.
5      Q.   Did anybody come by and talk to you,
6   any of your neighbors or anything?
7      A.   They did not.
8      Q.   Okay.  Did you ever leave the car
9   during -- when Tina went up to get whatever she
10  forgot?
11     A.   I did not.
12     Q.   Okay.  Was the car running while Tina
13  went back up to get whatever she forgot?
14     A.   I'm assuming no.  It was September and
15  it was warm.  So ... windows were down, I'm
16  assuming.  But, like I said, I don't ...
17     Q.   Do you remember if the car was running
18  or not?
19     A.   I do not recall.
20     Q.   When Tina came back down after being
21  upstairs four or five minutes, did she have
22  anything with her?
23     A.   I don't recall what she went back up
24  the second time to retrieve.  I don't recall.

WILLIAM E. AMOR, 03/05/2020                                    Page 94..97

Page 94

1    Q.   Okay.  When she came back down to the
2 car -- well, strike that.
3         When she went back up to get
4 whatever it was that she forgot, did she do that at
5 a regular pace?  Did she run upstairs?
6         How did she do that?
7    A.   No, Tina just -- regular pace.
8    Q.   Okay.  Did Tina, to your knowledge, have
9 any physical disabilities?
10   A.   She did not.
11   Q.   Okay.  Did she have any trouble going
12 up and down the stairs to the third floor apartment?
13   A.   She did not.
14   Q.   Okay.  We've been told that Tina has
15 some type of learning disability.
16   A.   (Nodding.)
17   Q.   Are you aware of that?
18   MS. THOMPSON:  Object to form.
19        You can answer.
20   THE WITNESS:  As I'm aware of.
21 BY MR. POLICK:
22   Q.   Okay.  What is your understanding of
23 Tina's learning disability as it existed in
24 September of 1995?

Page 95

1    A.   Her learning, she -- her apprehension
2 was not real good.
3    Q.   So it was -- to your understanding,
4 more a learning disability?
5    A.   To be fair, I -- I don't think it was a
6 disability.  Tina was -- had a tendency to not study,
7 do her homework.  And so that's what I recall.
8    Q.   Okay.  Did you find her to be a
9 forgetful person?
10   A.   I did.
11   Q.   Okay.  Did you find her to be someone
12 you could easily convince if you told her something?
13   A.   No.  Tina was stubborn.
14   Q.   When you say "stubborn," explain that
15 to me.
16   A.   Well, she had kind of one way of
17 thinking.  Let's put it that way.
18   Q.   And what was her one way of thinking?
19   A.   Well, it's my way or the highway.
20   Q.   Okay.  Did she have problems
21 concentrating?
22   A.   Not that I recall.
23   Q.   Did she have problems sitting still in
24 one place at a given time?

Page 96

1    A.   No, she did not.
2    Q.   Did you find Tina back then to be a
3 person who would be easily distracted?
4    A.   I guess that would depend on the
5 situation.  But on a general basis, not to my
6 knowledge.
7    Q.   Okay.  So when Tina went back upstairs
8 to get whatever it was that she forgot and was now
9 coming back out the front door, anything unusual
10 about the way she came out the front door?
11   A.   No, except I don't recall what she went
12 up to get.  As I stated, I don't recall.
13   Q.   Okay.  She walked up to the car?
14   A.   She did.
15   Q.   Okay.  Got in the driver's seat?
16   A.   She did.
17   Q.   Okay.  And what was the next thing that
18 happened?
19   A.   We drove to the movies.
20   MR. POLICK:  Okay.
21        Why don't we take a quick break.
22   THE WITNESS:  All right.
23   THE VIDEO TECHNICIAN:  We're off the record
24 at 12:23 at the end of media unit one.

Page 97

1        (Recess taken.)
2    THE VIDEO TECHNICIAN:  We're back on the
3 record at 12:50 at the beginning of media unit two.
4 BY MR. POLICK:
5    Q.   Mr. Amor, do you understand you're
6 still under oath?
7    A.   I do.
8    Q.   You told us earlier that you were
9 drinking three to four days a week back in 1995.
10        How much would -- alcohol would you
11 consume in one of those days?
12   A.   Two to three beers.
13   Q.   And if you were drinking vodka instead
14 of beers, how much would you consume?
15   A.   I only drank liquor on the weekend.
16   Q.   Why would you save the liquor for the
17 weekends?
18   A.   A better time to relax.
19   Q.   Any other reason?
20   A.   No, sir.
21   Q.   Before you and Tina left the apartment
22 on September 10th of 1995 to go to the movies, was
23 Tina smoking?
24   A.   Yes.

Page 98

1    Q.   Okay.  Do you know how many cigarettes
2 she had that day?
3    A.   I do not.  As I stated, she got up
4 after me.  But she did sit in Marianne's chair.
5    Q.   That you recall?
6    A.   That I do recall.
7    Q.   Okay.  How long was she sitting in
8 Marianne's chair?
9    A.   Long enough to do her nails, whatever
10 time element that ...
11    Q.   And was she smoking while she was doing
12 her nails?
13    A.   I can only assume so, but ...
14    Q.   When you say she was doing her nails,
15 was she removing the polish from her nails and
16 repolishing them?
17    A.   Again, I don't -- I was watching
18 football.  So I don't really ...
19    Q.   Okay.  Do you recall her having any
20 polish remover?
21    A.   Well, Tina -- they had -- they both did
22 their nails, so I'm assuming there was -- but I
23 couldn't tell you exactly what table it was on, or
24 bathroom.  So ...

Page 99

1    Q.   So you were familiar with that product,
2 polish remover?
3    A.   That's correct.
4    Q.   Do you know where that was kept in the
5 house?
6    A.   One of the bathrooms, but I couldn't
7 tell you which bathroom.
8    Q.   Okay.  Do you know how long she was
9 sitting in the chair doing her nails?
10    A.   I'm guessing 30 minutes.
11    Q.   Okay.  And was that during the second
12 game of the afternoon?
13    A.   It was.
14    Q.   Okay.  And after doing her nails in
15 that chair for about 30 minutes, did she go
16 somewhere else?
17    A.   We're at that point now where I didn't
18 know if she was talking to Marianne or if she was
19 in the bathroom.
20    Q.   Okay.  When Tina was sitting in the
21 chair, she was smoking as she was doing her nails?
22    A.   She was.
23    Q.   All right.  And was she using an ashtray?
24    A.   Yes.  As I stated earlier, there's an

Page 100

1 ashtray on the end table right there by Mar- -- you
2 know, the chair.
3        We call Marianne's chair Marianne's
4 chair because ...
5    Q.   Okay.  And as you described for me
6 earlier, there was an ashtray closer to that --
7 Marianne's chair --
8    A.   Yes.
9    Q.   -- on a lamp table --
10    A.   Yes.
11    Q.   -- or an end table.
12    A.   Yes.
13    Q.   And then there was another ashtray
14 closer to you.
15    A.   Yes, what we would know as a coffee
16 table.
17    Q.   Okay.  And the ashtray you were using,
18 was that on the coffee table or on the floor?
19    A.   Coffee table.
20    Q.   Okay.  Was it ever on the floor that
21 day?
22    A.   No.
23    Q.   Okay.  Did any of your cigarettes you
24 were smoking that day fall out of the ashtray?

Page 101

1    A.   They did not.
2    Q.   Are you aware of any of Marianne's
3 cigarettes that she was smoking that day falling
4 out of an ashtray?
5    A.   I can only state that I'm unaware.
6    Q.   Okay.  Are you aware of any of the
7 cigarettes Tina was smoking that day falling out of
8 an ashtray?
9    A.   Again, unaware.
10    Q.   Okay.  Did you drop any cigarettes on
11 the carpet that day?
12    A.   I did not.
13    Q.   Do you know if Marianne dropped any
14 cigarettes on the carpet that day?
15    A.   I do not.
16    Q.   Do you know if Tina dropped any
17 cigarettes on the carpet that day?
18    A.   I do not.
19    Q.   Did you eat at all that day before you
20 left for the movies with Tina?
21    A.   Yes, but I don't recall what -- what --
22 Marianne, with her medication, had to eat.
23        But I don't -- I do not recall what
24 we ate.

WILLIAM E. AMOR, 03/05/2020                                    Page 102..105

Page 102

1    Q.   All right.  You --
2    A.   Would have been -- would have been
3  breakfast items of some sort.
4    Q.   Yeah, you indicated earlier that
5  Marianne made some type of breakfast that morning.
6    A.   Yeah, but I don't recall.
7         It's too many years.
8    Q.   And after they returned to the store,
9  was there another meal made that day?
10   A.   Not that Tina and I saw.
11   Q.   Okay.  Do you have a memory of having a
12  meal at all that day?
13   A.   No.  We opted to find something at the
14  drive-in.
15   Q.   Okay.  How was your health that day?
16   A.   Good.
17   Q.   Okay.  Were you feeling okay?  Under
18  the weather?
19        What was -- what was your overall
20  health that day?
21   A.   No.  We were fine.
22   Q.   Okay.  After Tina returned to the car
23  in the parking lot, as you're ready to go to the
24  show, did you remain in the parking lot for any

Page 103

1  period of time before going to the theater?
2    A.   Before leaving.
3         As I stated earlier, I stayed in the
4  car.
5    Q.   Okay.  And after Tina came back
6  downstairs and got in the car, did you stay in the
7  parking lot for any period of time?
8    A.   When she came back down for the second
9  time, we left for the movie.
10   Q.   Okay.  So she got in the car and drove
11  out of the lot?
12   A.   That's correct.
13   Q.   All right.  The lot itself, is there --
14  was there one driveway in and out of it, or multiple?
15   A.   No, two or three --
16   Q.   Okay.
17   A.   -- exits in and out.
18   Q.   Okay.  At any time before you left for
19  the movies with Tina that day, had you spilled
20  anything in the apartment?
21   A.   I did not.
22   Q.   Okay.  Are you aware of Marianne
23  spilling anything in the apartment that day?
24   A.   I do not.

Page 104

1    Q.   Are you aware of Tina spilling anything
2  in the apartment that day?  Before you left.
3    A.   I do not.
4    Q.   Okay.  When you exited the parking lot,
5  what street did you exit onto?
6    A.   We would have went off of Bailey onto
7  75th, and went up to 59 to go north.
8    Q.   So you took Bailey to what, to get to
9  75th?
10   A.   The street in front of the apartment I
11  don't recall.
12        But you go down to Naper Boulevard.
13  Then you go to 75th, go west, and then go to 59 and
14  go north.
15   Q.   Okay.  And did you stop anywhere along
16  the way?
17   A.   We did.
18   Q.   Okay.  And where did you stop?
19   A.   We got gas at -- I believe was a Mobil
20  station.
21   Q.   And where was the Mobil station located?
22   A.   On Route 59.
23   Q.   59 and what?
24   A.   I don't recall.

Page 105

1    Q.   Okay.  Was it 59 and 75th Street?
2    A.   No.  It was farther north.
3    Q.   Ogden?
4    A.   I don't recall.
5    Q.   North of Ogden?
6    A.   It might have been.  I don't recall.
7    Q.   Okay.  Did you have a particular gas
8  station you would gas the car up at?
9    A.   It was low on gas, so we just stopped
10  and got gas.
11   Q.   Okay.  But would you -- did you have a
12  particular gas station that you would go to?
13   A.   We did not.
14   Q.   All right.  Would you go to the gas
15  station that had the lowest price?
16   A.   We were just going to the movies.
17        The car needed gas, so we just
18  stopped and got gas because it was on the way.
19   Q.   Okay.  Who pumped the gas?
20   A.   I did.
21   Q.   Okay.  And what did Tina do while you
22  were pumping the gas?
23   A.   I don't recall if she was in the car,
24  went in to use the restroom.  I don't recall.

WILLIAM E. AMOR, 03/05/2020                    Page 106..109

Page 106

1    Q.   After you finished pumping the gas, did
2  you go in and pay, or did you pay before you pumped?
3    A.   I do believe I prepaid.
4    Q.   Okay.  Did you get a receipt?
5    A.   I did, which was in the hands of
6  Naperville police.
7    Q.   Okay.  But my question is did you get a
8  receipt at the gas station?
9    A.   I did.
10   Q.   All right.  And why did you get a
11 receipt at the gas station?
12   A.   Tina was bad at managing money.
13       So I was trying to, you know, teach
14 her to keep track of, you know, where her money
15 goes.
16   Q.   And did you pay cash or with a credit
17 card?
18   A.   I believe I paid cash.
19   Q.   While you were at the gas station, did
20 you purchase anything other than gas?
21   A.   We did not.
22       Our next stop before the movie was a
23 White Hen to get ice for the cooler, which is also
24 just north on Route 59.

Page 107

1    Q.   So somewhere north on 59 --
2    A.   That's correct.
3    Q.   -- of the gas station?
4    A.   That's correct.
5    Q.   How long were you at the gas station?
6    A.   Whatever it takes to put in 15, 20
7  dollars of gas.
8    Q.   Okay.  And then you drove a certain
9  distance further north to this White Hen?
10   A.   Correct.
11   Q.   Do you know what town the White Hen was
12 in?
13   A.   I couldn't tell you, but there was --
14 both the gas station and the White Hen are on the
15 east side of Route 59.
16   Q.   All right.  Do you know the cross
17 street on 59 the White Hen was located?
18   A.   Too long ago.  I ...
19   Q.   Yeah, those don't even still exist,
20 White Hens.
21   A.   I have -- I don't think so.
22   Q.   I don't think so either.
23       Did you buy anything besides ice at
24 the White Hen?

Page 108

1    A.   We did not.
2    Q.   Okay.  Did you go in the store together?
3    A.   I don't recall if both of us went in.
4        Probably I -- I probably just went
5  in to get a bag of ice, because it was ...
6    Q.   Why do you say you probably just went in?
7    A.   Because you don't need two people to
8  buy a bag of ice.
9    Q.   Did you buy anything other than ice?
10   A.   We did not -- or I did not.
11   Q.   Okay.  Did you pay cash?
12   A.   I did.
13   Q.   And did you get a receipt for the ice?
14   A.   I don't believe so.
15   Q.   And then from the White Hen, you went
16 directly to the drive-in?
17   A.   We did.
18   Q.   Okay.  Any stops in between?
19   A.   We did not.
20   Q.   Okay.  Do you recall what time you got
21 to the drive-in that day?
22   A.   I do not.
23   Q.   Okay.  And you told me earlier you
24 thought the movie started somewhere around --

Page 109

1    A.   Sometime --
2    Q.   -- around 7:00?
3    A.   -- after 7:00, but -- right.  Correct.
4    Q.   Sometime after 7:00.
5    A.   Yeah.
6    Q.   Did you stay for the entirety of both
7  features?
8    A.   We did.
9    Q.   And when would that have ended, then?
10   A.   To my best recollection, would have
11 been sometime between 11:00 and 11:30.
12       I think the records show we got back
13 to the complex at somewhere around midnight.
14   Q.   Okay.  But your recollection is the
15 movie itself at the drive-in ended sometime around
16 11:00, 11:30?
17   A.   Between -- correct.  The second
18 feature, correct.  We stayed for both features.
19   Q.   Was there an intermission between the
20 two?
21   A.   It's a drive-in.  Yes, always.
22   Q.   Okay.  Did you get anything to eat from
23 the concession stand there?
24   A.   We did, but I don't recall what.

WILLIAM E. AMOR, 03/05/2020                    Page 110..113

Page 110

1    Q.    Did you have to purchase a ticket at
2  the drive-in to enter, or get admitted?
3    A.    We did.
4    Q.    Did you get any receipts for that?
5    A.    Also in the hands of the police.
6    Q.    Okay.  My question is did you get any
7  receipts for your tickets at the drive-in?
8    A.    Yes.
9    Q.    Did you have anything of an alcoholic
10 nature to drink while you were at the drive-in?
11   A.    As I recall, I had a beer, because I
12 was not driving.  Tina was driving.
13   Q.    Just one beer?
14   A.    As I recall.
15   Q.    And did Tina have anything to drink
16 while you were at the drive-in?
17   A.    If she did, I'm unaware.
18   Q.    Why would you be unaware?
19   A.    I -- I trust her judgment.  That's
20 why -- you know, I had had -- as I stated, I had
21 already had a drink or two.
22         That's why she was driving.
23   Q.    Okay.  So you had a drink or two at the
24 movies, correct?

Page 111

1    A.    I had a beer, maybe two.
2          I don't recall.
3    Q.    All right.  And was there a period of
4  time Tina was not with you while you were at the
5  movies?
6    A.    Snack bar and restroom.
7    Q.    Okay.  And do you have any memory of
8  her drinking at all, anything of an alcoholic nature,
9  while you were at the movies?
10   A.    I don't recall.
11   Q.    When you left the movies about 11:00,
12 11:30, what route did you take back?
13   A.    59 south to 75th Street, to Naper
14 Boulevard, and we just -- we just backtracked the
15 same route we took to go in -- to the movies.
16   Q.    And during the trip to the movies, was
17 Tina always driving?
18   A.    She was.
19   Q.    Okay.  And on the way back, who drove?
20   A.    Tina.
21   Q.    Did you stop anywhere on the way back?
22   A.    We did not.
23   Q.    At some point you got back to the
24 complex?

Page 112

1    A.    Yes.
2    Q.    And what do you recall when you got
3  back to the complex?
4    A.    Police, fire department.
5          And at that point we didn't know
6  what had happened.
7    Q.    It was dark out at that time?
8    A.    Yes.  It was approaching midnight.
9    Q.    Okay.  Do you recall how many police
10 vehicles are in the parking lot of the complex?
11   A.    I know there was a fire truck, but I
12 couldn't tell you how many police cars there were.
13   Q.    Okay.  More than one fire truck, or
14 just the one?
15   A.    I think the ambulance had already left,
16 as I recall.
17   Q.    All right.  Do you recall what entrance
18 you used to get back into the parking lot?
19   A.    It would have been -- it would have
20 been the north entrance, the same one we always use.
21   Q.    Okay.  Was the entrance blocked off at
22 all because of the fire equipment that was there?
23   A.    The entrance itself was not.
24         But to the north side of the parking

Page 113

1  lot, it was blocked off.
2    Q.    And did you have to park somewhere away
3  from the building because of the fire equipment --
4    A.    We did.
5    Q.    -- that was there?
6          Okay.  And where did you park in the
7  lot?
8    A.    Actually just a little bit south a few
9  spaces.
10   Q.    South of what?
11   A.    South of the entrance.
12   Q.    The entrance to your building?
13   A.    Yes.
14   Q.    And what's the next thing you remember
15 after arriving and parking south of your building?
16   A.    We were approached by Naperville police.
17   Q.    When you say you were approached, is it
18 one person, more than one person?
19   A.    I -- there was a sergeant, and there
20 were, you know, other police.
21         They -- because Tina Miceli is from
22 a police family, I think they knew the car and
23 everything.
24         Back then there weren't cell phones,

WILLIAM E. AMOR, 03/05/2020                                    Page 114..117

Page 114

1 so we had no idea.
2    Q.   You bring up a good point about not
3 having a cell phone --
4    A.   That's correct.
5    Q.   -- back then.
6         Okay.  Obviously Tina didn't have
7 one either, correct?
8    A.   That's correct.
9    Q.   Did you have a pager?
10   A.   No.
11   Q.   How about -- how about Tina?
12        Did she use a pager back then?
13   A.   Unaware.  Not to my knowledge.
14   Q.   Okay.  If you had to get in touch with
15 each other sometime during the day, how would
16 you -- how would you communicate?
17   A.   One of us was always in and out doing
18 something, working or looking for Marianne, or -- I
19 mean, there was somebody usually around.
20   Q.   Okay.  When you said Tina was from a
21 police family, explain that to me.
22   A.   Her uncle was Jon Ripsky, police captain.
23   Q.   When did you become aware that Tina's
24 uncle was a police captain?

Page 115

1    A.   I knew that from the onset.
2    Q.   When you say "from the onset," meaning?
3    A.   Of knowing the family in general.
4    Q.   You attended Mr. Ripsky's deposition in
5 this case, did you not?
6    A.   I did.
7    Q.   Okay.  When was the last time you had
8 seen Jon Ripsky before that deposition?
9    A.   I had never met him.
10   Q.   Did you ever see him at any family
11 function?
12   A.   No.
13   Q.   So you mentioned that the police
14 personnel that approached your car when you
15 returned to the complex lot, one of them appeared
16 to you to be a sergeant?
17   A.   Yes.
18   Q.   Do you recall his name at all?
19   A.   I can't refer to counsel, but I'm
20 guessing it was Carlson.  That would be my guess.
21   Q.   Okay.  And was the sergeant alone or
22 with others?
23   A.   No.  There were multiple police there.
24   Q.   Okay.  Was any of the police personnel

Page 116

1 that were there introduced to you as Jon Ripsky?
2    A.   No.
3    Q.   Okay.  Did it appear that any of these
4 police that were approaching you were in charge or
5 outranked the others that were there?
6    A.   I can only assume the sergeant's in
7 charge.
8    Q.   Okay.  What was that assumption based
9 on?
10   A.   Rank.
11   Q.   Okay.  And did you say anything to
12 them, or did they initiate the conversation?
13        What happened when the police
14 approached?
15   A.   They informed us what had happened.
16   Q.   Okay.  And what did they inform you of?
17   A.   That there had been a fire and that
18 Marianne was at the hospital.
19        At that point in time we were not
20 informed that she had lost her life.
21   Q.   All right.  Was anyone from Tina's
22 family there in addition to the police that
23 approached the car?
24   A.   Her Aunt Pam and uncle live right in

Page 117

1 Naperville.  So I'm assuming they were somewhere,
2 but we weren't really in touch with them right
3 then.  So ...
4    Q.   Do you recall her husband's name being
5 Gary?
6    A.   Yep.  Yes, sir.
7    Q.   Okay.  But you didn't see them
8 immediately upon arriving?
9    A.   If they were there, I don't recall.
10   Q.   Okay.  And other than the police telling
11 you that there had been a fire and Marianne had
12 been taken to the hospital, was there anything else
13 that was communicated to you at that time?
14   A.   No.  They just simply questioned where
15 we had been, and I provided them with all the
16 receipts.  So ...
17   Q.   Who was communicating with the police,
18 you or Tina?
19   A.   Actually, me, because Tina was obviously
20 falling apart.  So ... very upset.
21   Q.   Okay.  What's the next thing you
22 remember happening on the -- on the scene?
23        MS. THOMPSON:  Object to form.
24        You can answer.

WILLIAM E. AMOR, 03/05/2020                    Page 118..121

Page 118

1    THE WITNESS: We didn't -- see, my best
2 recollection, I don't recall that we found out
3 Marianne was deceased until we went to Pam and Gary
4 Leavenworth to stay for the night.
5 BY MR. POLICK:
6      Q.   How long were you at the complex scene
7 before you went to the Leavenworths'?
8      A.   Less than an hour.
9      Q.   And other than speaking to the police,
10 as you've testified to, what else occurred during
11 that period of time while you were still on the
12 complex grounds?
13     A.   Comforting Tina.
14          And that's -- and, you know,
15 answering any questions they asked us.
16     Q.   Were you allowed to go back to the
17 apartment at all?
18     A.   No. No one's allowed in the apartment.
19     Q.   Okay. Were you allowed to go in the
20 building at all?
21     A.   We were not.
22     Q.   Okay. Did you -- you obviously had
23 belongings in the apartment.
24     A.   We did.

Page 119

1      Q.   Okay. And there was a storage area in
2 the building where you kept stuff?
3      A.   In the basement.
4      Q.   Okay. Were you allowed to go there at
5 all and retrieve --
6      A.   We were not.
7      Q.   -- any of your items?
8      A.   We were not.
9      Q.   All right. You mentioned Sergeant
10 Carlson.
11          Was there anyone else from the
12 Naperville Police Department --
13     A.   Not that I can recall.
14     Q.   -- that you recall?
15          You need to let me finish my question,
16 please.
17     A.   I'm sorry.
18     Q.   Other than Sergeant Carlson, is there
19 anyone else that you recall speaking to while you
20 were on the scene of the complex when you returned?
21     A.   I do not.
22     Q.   How did you get over to the
23 Leavenworths'?
24     A.   We drove.

Page 120

1      Q.   In the same car that you had arrived
2 from the movies?
3      A.   Yes.
4      Q.   Where was the cooler when you returned
5 from the movies?
6          Where in the car?
7      A.   Backseat.
8      Q.   Had you spoken to either Pam or Gary
9 Leavenworth before going over to their home?
10     A.   I personally did not.
11     Q.   Okay. Did Tina?
12     A.   I'm unaware.
13     Q.   Okay. Is there some reason you did not
14 speak to the Leavenworths on the scene?
15     A.   I'm assuming Tina did, and I'm assuming
16 that, since she was a family from the police, that
17 somebody had notified them of what had happened.
18 So ...
19     Q.   Okay.
20     A.   We're trying to limit the damage to all
21 of this.
22     Q.   Is there some reason you did not speak
23 to Pam and Gary Leavenworth at the scene?
24     A.   As I stated earlier, I'm not sure they

Page 121

1 were actually at the scene.
2      Q.   Do you have a memory of them being
3 there?
4      A.   I do not.
5      Q.   Do you have a memory of any other
6 members of Tina's or Marianne's family being there?
7      A.   I do not.
8      Q.   Okay. Were any of your neighbors out
9 there when you returned?
10     A.   There were, but I'm not sure what condo
11 they're from and what their names are.
12     Q.   Okay. Do you recall any of your
13 neighbors in that complex while you lived there?
14     A.   I do not.
15     Q.   When you went over to the
16 Leavenworths' -- you indicated they lived in
17 Naperville.
18     A.   They did.
19     Q.   How far away were they from the
20 apartment complex?
21     A.   A mile, mile and a half.
22     Q.   Did you stop anywhere between the
23 apartment complex and the Leavenworths' home --
24     A.   We did not.

WILLIAM E. AMOR, 03/05/2020                    Page 122..125

Page 122

1    Q.   -- when you went over there?
2         Who drove from the apartment complex
3 to the Leavenworths'?
4    A.   I don't recall.
5         She was upset, so maybe me.  I don't
6 recall.
7    Q.   When you say Tina was upset, can you
8 describe her level of being upset?
9    A.   Crying.
10   Q.   When was it that you found out that
11 Marianne had passed?
12   A.   When we got to the Leavenworths'?
13   Q.   Who told you that Marianne had passed?
14   A.   I don't recall.
15   Q.   How long had you been at the
16 Leavenworths' before you found out Marianne had
17 passed?
18   A.   Briefly.
19   Q.   Do you recall what time it was when you
20 got to the Leavenworths'?
21   A.   Had to be between 12:30 and 1:00.
22        That's a guess.
23   Q.   Had you ever been to their home before?
24   A.   I have not.

Page 123

1    Q.   When you got to the Leavenworths' home,
2 what's the next thing that happened?
3    A.   We talked to Pam and Gary briefly, and
4 then Detectives Cross and Guerreri came.
5    Q.   What did you talk about with Pam and
6 Gary Leavenworth?
7    A.   Just -- they were family, you know, so
8 they were just comforting each other.  So ...
9         We were sitting at the kitchen table.
10 That I do recall.
11   Q.   Did any other family members come over
12 to the Leavenworths' home other than Tina and
13 yourself?
14   A.   They did not.
15   Q.   And do you recall how long you had been
16 there at the Leavenworths' home when Detectives
17 Cross and Guerreri arrived?
18   A.   Within the hour, the best I can recall.
19   MR. POLICK:  Can we mark this as Exhibit 1?
20        Can I mark this as Exhibit 2?
21        (Deposition Exhibit Numbers 1
22         and 2, Witness Amor, were
23         marked for identification
24         03/05/2020.)

Page 124

1 BY MR. POLICK:
2    Q.   So, Mr. Amor, I'm showing you what
3 we've marked as Exhibits 1 and 2 of your deposition.
4         Exhibit 1 is a layout of the
5 Apartment M there at 218 East Bailey.
6         And Exhibit 2 is a layout showing
7 the size of the rooms of that particular unit there
8 in the -- in Apartment M of 218 East Bailey.
9         Exhibit 1, looking at it, does that
10 look accurate to you in terms of where furniture
11 and walls were in the apartment?
12   MS. THOMPSON:  Object to form.
13        You can answer.
14   THE WITNESS:  It seems a little -- the dining
15 room table seems a little askew, but that's fine.
16 BY MR. POLICK:
17   Q.   Okay.  And looking at Exhibit 2,
18 that -- does that appear to you to be an accurate
19 layout of the dimensions of the unit there at
20 218 East Bailey?
21   MS. THOMPSON:  Object to form.
22        You can answer.
23   THE WITNESS:  That's correct.
24        Is this supposed to be showing the

Page 125

1 patio doors, or not?
2 BY MR. POLICK:
3    Q.   I'm not exactly sure.  I see --
4    A.   Okay.
5    Q.   -- it's labeled "balcony" there.  You --
6    A.   Yeah.
7    Q.   -- refer to it as the patio?
8    A.   Okay.
9    Q.   And either/or --
10   A.   Okay.
11   Q.   -- is fine with me, whatever you want
12 to refer to it.  But --
13   A.   Okay.  That's fine.
14   Q.   -- you indicated earlier that there
15 were sliding glass doors --
16   A.   There were, from --
17   Q.   -- that led to the --
18   A.   Sliding from north to south.
19   Q.   All right.  So looking at these
20 documents, is it easier for you to use 1 or
21 Exhibit 2?
22        I'd like to ask you where certain
23 things were located in the -- in the apartment.
24   A.   Well, Exhibit 1 shows the dining room

WILLIAM E. AMOR, 03/05/2020                    Page 126..129

Page 126

1 table, although it's -- you know, it's only off a
2 little bit.
3      Q.   Right.
4      A.   And this doesn't show the dining room
5 table.
6      Q.   Right.  And what I'd like to know, what
7 are you more comfortable working off of?
8           Are you okay using Exhibit 1, and I
9 can question you about that?  Or would you like to
10 use Exhibit 2, and you can draw where certain
11 furniture was?  I'll leave it up to you.
12     A.   Well, the other one shows the patio
13 doors.  Let me think here.
14          I'm going to go with Exhibit 2.  I'm
15 more comfortable with this.
16     Q.   All right.  So looking at Exhibit 2, at
17 the bottom left, there's a label that says "Entry,"
18 correct?
19     A.   That's correct.
20     Q.   Okay.  And was that where the main
21 entry door was located?
22     A.   It is.
23     Q.   Okay.  And that was the only entry and
24 exit door out of the unit?

Page 127

1      A.   That's correct.
2      Q.   Okay.  And then as you -- if you were
3 standing at the entry door looking toward the
4 balcony -- or the patio, as you refer to it -- what
5 direction would you be facing?
6      A.   West.
7      Q.   And then the master bedroom and -- at
8 the right end of the diagram would be the north
9 side?
10     A.   Yes.
11     Q.   And then the wall to the left of the
12 living room area would be the south.
13     A.   That's correct.
14     Q.   Okay.  And Marianne's room was the
15 master bedroom?
16     A.   That's correct.
17     Q.   And you and Tina shared what was
18 labeled as Bedroom 2; is that correct?
19     A.   That's correct.
20     Q.   Okay.  And was there one or two beds in
21 that bedroom?
22     A.   There were two.
23     Q.   And then earlier you told me there was
24 a larger bath at the end of the -- north end of the

Page 128

1 hall?
2      A.   Yes, adjacent to the master bedroom,
3 Marianne's bedroom.
4      Q.   Right.  And then there's a smaller
5 powder room next to that?
6      A.   That's correct.
7      Q.   Okay.  And that's accurate as well?
8           Yes?
9      A.   Yes.
10     Q.   Okay.  The kitchen, did you have a gas
11 stove or electric stove?
12     A.   It was a gas stove.
13     Q.   Do you have a pen with you there, or --
14 I can get you one.
15     A.   I don't.  Thank you.
16     Q.   Okay.  So we're going to give you a
17 pen.  And just -- as you walk in the entry door
18 there, immediately to your left, was that some type
19 of closet there, left of the entry door?
20     A.   Actually, this here is a bookshelf.
21     Q.   Yeah.  I'm talking about a little lower.
22          It's kind of darkened.  Do you see
23 where it says Entry?
24     A.   Oh, yeah.  There was a closet.

Page 129

1      Q.   Okay.  Was that a coat closet?
2      A.   Yes.
3      Q.   All right.  And then as you move west
4 into the entry -- from the entry into the first
5 room there, was that the dining area?
6      A.   Yes.  Actually, the -- actually the
7 dining area would be here (indicating).
8      Q.   All right.  Why don't you draw a circle
9 where the dining room table was?
10     A.   Okay.
11     Q.   Okay.  And can you write "dining table"?
12     A.   (Complying.)
13     Q.   And you had chairs associated with that
14 particular table?
15     A.   That's correct.
16     Q.   Do you know how many there were?
17     A.   To my recollection, there were four.
18     Q.   All right.  And then moving into the
19 living room -- why don't we start with the couch,
20 and if you can draw where -- where that was.
21     A.   Let me think.
22          So you walk in, pass the bookshelf.
23 This would have been the chair, Marianne's chair.
24 This would have been the couch.

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 130

1          All against -- all against the south
2  wall, all of this.
3      Q.   All right.
4      A.   This would have been the patio doors.
5      Q.   All right.  And you're indicating, for
6  the record, "patio doors."
7      A.   Yes.  Correct.  And I'm going to mark
8  on here north to south.
9      Q.   And can you draw on there where the TV
10  was located?
11     A.   TV.
12     Q.   And --
13     A.   Would have been the northwest corner,
14  along with TV and VCR.
15     Q.   All right.  And the coffee table you
16  referred to, where would that be?
17     A.   Would have been -- the couch, chair --
18  would have been right in the center of the room.
19     Q.   And then where you've indicated
20  Marianne's chair --
21     A.   Yes.
22     Q.   -- was that like a bookshelf?  Is that
23  what you called that space there?
24     A.   This was the bookshelf (indicating).

Page 131

1          This -- this is -- here.  I'll just
2  mark it, bookshelf.  It was on -- it was previous
3  to Marianne's chair.
4      Q.   And do you recall any other furniture
5  being in the living room other than what you've
6  indicated?
7      A.   A very small desk.
8      Q.   Where was that?
9      A.   Oh, here.  Kind of like a student desk.
10     Q.   Okay.  You're indicating along the
11  north wall --
12     A.   Yes.
13     Q.   -- of the living room?
14     A.   I am.
15     Q.   And earlier you mentioned that there
16  was a lamp table, or end table, near --
17     A.   Yeah.
18     Q.   -- Marianne's chair --
19     A.   Chair --
20     Q.   -- where the ashtray was on?
21     A.   -- would have been to the west side.
22          Lamp and table.
23          Old school, kind of like round, this
24  kind of stuff.

Page 132

1      Q.   If you look back at Exhibit 1 to your
2  deposition --
3      A.   Yes.
4      Q.   -- you'll see in the living room, next
5  to what you're calling Marianne's chair, there's a
6  small table there.
7          Is that what you're kind of
8  referring to when you say an old school kind of --
9      A.   Yeah, it was next to her chair.
10     Q.   All right.  Is that accurately depicted
11  in Exhibit 1 where it was --
12     A.   Yes.
13     Q.   -- in relation to her chair?
14     A.   Yes.
15     Q.   Okay.  And if you look all the way to
16  the west end of the living room in front of the
17  sliding patio doors, do you see another chair there?
18     A.   Yes.
19     Q.   Okay.  Do you have any recollection of
20  another chair being in the living room?
21     A.   We called it the blue chair, because it
22  didn't match anything else.
23     Q.   Okay.  Why don't you mark on the
24  Exhibit 2 where the --

Page 133

1      A.   Couch.
2      Q.   -- where the blue chair was located.
3          And you can write "blue chair."
4      A.   The couch, it was -- it was on the west
5  wall, but it was pulled out a little bit.  So I'm
6  just going to mark "blue chair" here.
7      Q.   So pulled out a little bit so you could
8  get to the sliding patio doors?
9      A.   Absolutely.  Yeah.
10     Q.   All right.  And the blue chair, did it
11  rock?
12     A.   No.  I believe it was stationary.
13     Q.   Okay.  Did it swivel at all?
14     A.   But I -- I mean, I -- I don't recall.
15     Q.   Okay.  Do you recall what it was made
16  out of, what type of material?
17     A.   It was some type of blue cloth.
18          Tina's father donated it.
19     Q.   Okay.  So that piece of furniture was
20  used as well?
21     A.   It was.
22     Q.   And the couch itself, was it -- what
23  type of material was it made out of?
24     A.   Fabric, just like the chair.

WILLIAM E. AMOR, 03/05/2020                    Page 134..137

Page 134

1    Q.   Okay.  So not a leather type, or a
2 false leather?
3    A.   It was not.
4    Q.   Okay.  The couch itself, did it have a
5 pullout bed in it, or was it just --
6    A.   It did not.
7    Q.   -- a couch?
8         Just a couch.
9    A.   Just a couch.
10   Q.   Okay.  Now, neither Exhibit 1 nor
11 Exhibit 2 show any lamps in the living room.
12        Do you recall lamps being in the
13 living room?
14   A.   Except for the one on Marianne's table
15 next to the chair, I do not.
16   Q.   Okay.  Was there an overhead light?
17   A.   There was not.
18   Q.   Okay.  Ceiling fan?
19   A.   The ceiling fan was over the dining
20 room table.
21   Q.   But not the living room.
22   A.   No.
23   Q.   Okay.  All right.  The furniture itself
24 in the living room, do you recall there being any

Page 135

1 burn holes in any of the furniture from cigarettes?
2    A.   Not to my recollection.
3    Q.   Do you recall any burn holes being in
4 the carpeting of the living room?
5    A.   Again, not to my recollection.
6    Q.   Okay.
7    A.   But I would like to -- this was an
8 aging condominium.  And the carpet was old,
9 furniture was old, just -- so if I -- if there's
10 something I don't -- you know.
11   Q.   Okay.  The carpeting, was it just in
12 the living room/dining room area, or did it run
13 down that hallway going to the north end of the --
14   A.   It ran all the way through the
15 condominium.
16   Q.   Okay.  Were the bedrooms carpeted as
17 well --
18   A.   They were.
19   Q.   -- with the same carpeting?
20   A.   Correct.
21   Q.   Okay.  And what was the flooring like
22 in the kitchen?
23   A.   Tile.
24   Q.   And the bathrooms?

Page 136

1    A.   Tile.
2    Q.   Okay.  Do you remember what kind of
3 tile it was?
4    A.   I don't recall.
5    Q.   Okay.  Do you recall any burn holes
6 being in any of the appliances of the kitchen that
7 were caused by cigarettes?
8    A.   Not that I recall.
9    Q.   Okay.  Do you recall any burn marks or
10 burn holes in any of the tile or fixtures in either
11 of the bathrooms?
12   A.   Not that I recall.
13   Q.   Any burn marks or holes in the bedroom
14 that you and Tina shared?
15   A.   Not that I recall.
16   Q.   And the master bedroom, Marianne's
17 bedroom, were you aware of any burn holes or burn
18 marks from cigarettes in that room?
19   A.   If there were, I don't recall.
20   Q.   Okay.  What did you use to light your
21 cigarettes?
22   A.   Disposable lighters.
23   Q.   Like a BIC?
24   A.   Yes.

Page 137

1    Q.   Did you have any type of lighter that
2 was not disposable, that you would have to refill?
3    A.   Not to my knowledge.
4    Q.   Okay.  What type of lighter did
5 Marianne use?
6    A.   I don't recall.  I'm assuming the same.
7    Q.   Okay.  How about Tina?
8         What did she use to light her
9 cigarettes?
10   A.   Disposable.
11   Q.   The TV and VCR, big box TV?
12   A.   Yes.  Old school TV.
13   Q.   Okay.  Did you have table -- cable, or
14 was there an antenna?
15   A.   I believe we had basic cable.
16   Q.   Any problems, while you were living
17 there, with the TV?
18   MS. THOMPSON:  Object to form.
19        You can answer.
20   THE WITNESS:  Not to my knowledge.
21 BY MR. POLICK:
22   Q.   Okay.  Any trouble with the TV
23 operating?
24   A.   Again, it was an old TV.

WILLIAM E. AMOR, 03/05/2020                    Page 138..141

Page 138
1        But not to my knowledge.
2    Q.   Okay.
3    A.   It was a donated TV.
4    Q.   All right.  And you told us earlier
5  that you kind of did odd jobs?
6    A.   Yes.
7    Q.   Handyman work?
8    A.   Correct.
9    Q.   Would that be another way to describe
10 it?
11   A.   (Nodding.)
12   Q.   Did you do that within the apartment
13 itself if things needed repair?
14   A.   No.  Everything was pretty much
15 up-to-date.
16   Q.   Okay.
17   A.   It was a condominium, so there's an
18 association that ...
19   Q.   So if something needed to be repaired,
20 would you take care of it, or -- because you were
21 handy?  Or would you call for some -- the
22 association --
23   A.   No.  Marianne was always good about
24 calling the association because she paid for that.

Page 139
1    Q.   Were you aware of any electric problems
2  within the apartment while you were there?
3    A.   I was not.
4    Q.   No problems with any of the switches?
5    A.   Not to my knowledge.
6    Q.   No problems with any of the outlets?
7    A.   Not to my knowledge.
8    Q.   Did the apartment have a fuse box, or
9  was it circuit breakers?
10   A.   They were circuit breakers.
11   Q.   During the time you resided there, any
12 problems with the circuit breakers?
13   A.   I never had to reset a circuit breaker.
14   Q.   Any problems in the apartment with the
15 appliances in the kitchen?
16        Let's start with the -- you said it
17 was a gas stove, correct?
18   A.   That's correct.
19   Q.   Prior to September 10th of 1995, were
20 you aware of any problems with the stove?
21   A.   If there was, it was previous to my
22 living at the residence.
23        But not to my knowledge.
24   Q.   Okay.  And any electrical problems with

Page 140
1  the refrigerator?
2    A.   Not to my knowledge.
3    Q.   Okay.  Did you guys have a microwave in
4  the kitchen?
5    A.   We did.
6    Q.   Okay.  Any problems with the microwave?
7    A.   Not while I was living there.
8    Q.   Okay.  And you said you had no problem
9  with any of these appliances tripping the switches
10 of the circuit breaker?
11   A.   No, sir.
12   Q.   The grill that you had out on the
13 balcony, a gas grill or charcoal?
14   A.   As I said earlier, I think -- as I
15 recall, it's a little hibachi-type thing --
16   Q.   Okay.
17   A.   -- which would be charcoal.
18   Q.   Okay.  And where did you keep the
19 charcoal?
20   A.   I believe the charcoal was down in the
21 storage unit in the basement.
22   Q.   And if you were going to cook out,
23 would you always go down in the basement and get
24 the charcoal and bring it up?

Page 141
1    A.   Actually, Tina would go down and get
2  the charcoal, and I would cook.
3    Q.   Okay.  Was that a locked storage locker
4  you had down in --
5    A.   It was.
6    Q.   Each unit had one?
7    A.   They did.
8    Q.   How big were those, do you recall?
9    A.   I don't know.  Maybe double closet size.
10        They weren't very big.
11   Q.   Okay.  And how did you light the
12 charcoal when you would grill?
13   A.   Lighter fluid.  Regular charcoal lighter
14 fluid.
15   Q.   And where was the lighter fluid kept?
16   A.   As I recall, they were put together in
17 the storage room.
18   Q.   Were you the griller or the cook when
19 you barbecued?
20   A.   It depends.
21        Usually I prepared the meat, and
22 Tina, you know, got the grill going, and then, you
23 know, I cut up the meat and that kind of stuff.
24        Kind of a collective effort.

Page 142

1    Q.    But she would be the one to use the
2 lighter fluid --
3    A.   Oh, always.
4    Q.   -- to start the grill?
5    A.   That's correct.
6    Q.   Okay.  What would you do with the
7 embers, or the charcoal that you used, after you
8 were done cooking?
9    A.   Well, let them cool down, and then put
10 water on them and, you know, put out the grill.
11    Q.   Okay.  Would you dump those out
12 periodically?
13    A.   Yes.
14    Q.   Okay.  Was there a place on the complex
15 to specifically do that?
16    A.   No.  Once you -- once you -- they cool
17 down, you can just put them in the trash.
18         But you have to wait for them to
19 cool down overnight.
20    Q.   Okay.  And whose job was it to clean
21 that up?
22    A.   Either of ours.  As I stated,
23 collective effort in that household, because
24 Marianne was limited.

Page 143

1    Q.   Right.  Did Marianne do any of the
2 household chores?
3    I mean, I know she cooked; you said
4 she cooked earlier.  But --
5    A.   Yeah, and dishes.  And -- but Tina
6 and I did everything else.  We -- you know, the
7 laundry room was downstairs, so we all -- you
8 know, we did --
9    Q.   Right.
10    A.   -- vacuuming and, you know, basic
11 stuff, stuff that --
12    Q.   So no watcher and dryer in the unit?
13    A.   No.
14    Q.   You had to go downstairs to the laundry
15 room?
16    A.   We did.
17    Q.   All right.  And air conditioning?
18         Did you have that?
19    A.   A wall unit.
20    Q.   And can you show us on Exhibit 2 where
21 the wall unit was?
22    A.   Do-do-do, balcony --
23    Q.   Just write "air conditioner."
24    A.   Yeah.

Page 144

1    Q.   And if you have to write off to the
2 side --
3    A.   Okay.
4    Q.   -- you can do that as well.
5    A.   It was right on -- between the west,
6 and right on the wall there.
7    Q.   All right.  Why don't you mark an X,
8 and then you can draw a line to --
9    A.   Okay.  That's where it was, and --
10 that's exactly where it was, in this corner here
11 (indicating).
12    Q.   Out on the balcony?  Or ...
13    A.   Oh, wait a minute.  My fault.
14         Right here (indicating).
15    Q.   And during the period of time that you
16 resided at Apartment M, were there any problems
17 with that air conditioner?
18    MS. THOMPSON:  Object to form.
19         You can answer.
20    THE WITNESS:  Not to my knowledge.
21 BY MR. POLICK:
22    Q.   Was the air conditioner running that
23 day, the day of the fire?
24    A.   I don't believe so, because we had --

Page 145

1 wouldn't have had the patio doors cracked a little
2 bit.  It was September.
3    Q.   And you said the weather was fairly
4 nice?  70s that day?
5    A.   It was.
6    Q.   Was it routine to keep the patio door
7 open?
8    A.   When you don't have to do the air
9 conditioner, you open the door.
10    Q.   Yeah.  But my question, though, was
11 routinely, would you keep the patio door open?
12    A.   That depended on Marianne.
13    Q.   What do you mean by that?
14    A.   If she wanted it open, you know, we
15 opened it.  If she didn't, you know, we closed it.
16    Q.   I mean, all three of you were smokers,
17 correct?
18    A.   That's correct.
19    Q.   What was the level of smoke like inside
20 the apartment?
21    MS. THOMPSON:  Object to form.
22         You can answer.
23    THE WITNESS:  I don't recall if it was -- I
24 mean, that's probably why the patio door was open,

WILLIAM E. AMOR, 03/05/2020                          Page 146..149

Page 146

1 or cracked.
2 BY MR. POLICK:
3     Q.    Did you use anything else to keep the
4 smoke down?
5            Did you use sprays or candles or
6 incense or anything like that?
7     A.    Either Marianne or Tina had a candle on
8 the table in the center of the room.
9     Q.    The coffee table?
10    A.    Yes.
11    Q.    Was the candle big, a small candle?
12    A.    It wasn't huge.
13    Q.    All right.  Was it in a stand, or some
14 type of base?
15    A.    No.  Just a basic candle.
16    Q.    Okay.  Single wick, multiple wicks?
17    A.    Single wick.
18    Q.    Was it a scented candle?
19    A.    I don't recall.
20    Q.    Okay.  Do you recall the patio doors
21 being opened the day of the fire, if even a crack?
22    A.    I don't recall exactly.
23    Q.    Okay.  Did you shut the patio door
24 before you took the cooler down --

Page 147

1     A.    I did not.
2     Q.    -- to the car?
3            Do you know if Tina shut the patio
4 door before she left?
5     A.    No, I don't know.
6     Q.    Exhibit 2 shows a window -- a single
7 window for each bedroom?
8     A.    That's correct.
9     Q.    Did you keep the window open in your
10 bedroom that you shared with Tina?
11    A.    Depending on the weather, I would
12 assume so.
13    Q.    Do you have any memory of that window
14 being opened the day of the fire?
15    A.    I do not.
16    Q.    Okay.  And was it Marianne's habit to
17 keep her window open or closed in the bedroom?
18    A.    I do not recall her window ever being
19 open.
20    Q.    Okay.
21    A.    But again, I had no reason to be in her
22 room except to bring up laundry to her.
23    Q.    Okay.  So going back to the
24 Leavenworths' home, you said that Detectives Cross

Page 148

1 and Guerreri came to the Leavenworth home sometime
2 within the first hour that you and Tina arrived
3 there.
4     A.    Approximately.
5     Q.    Okay.  Had you ever met Detective Cross
6 before that day?
7     A.    I had not.
8     Q.    And had you ever met Detective Guerreri
9 before that day?
10    A.    I had not.
11    Q.    Can you describe Detective Cross to me?
12    A.    Forty-ish.  Stocky.  Sure of himself.
13           Been a detective for a while.
14    Q.    How did you know that?
15    A.    Some things you just -- my assumption.
16           And I'm not -- to me, he was a
17 bully.  But I'm just saying that's just what I
18 assumed.  So ...
19    Q.    That was your impression?
20    A.    It was.
21    Q.    Okay.  What gave you that impression?
22    A.    Because he took all my clothes and my
23 shoes to check for accelerants, which there were
24 none.

Page 149

1     Q.    What type of shoes were you wearing?
2     A.    I think they were Nikes.
3     Q.    Gym shoes?
4     A.    Um-hmm.
5     Q.    Is that a yes?
6     A.    I apologize.  Yes.
7     Q.    That's all right.  She just has to be
8 able to take it down.
9     A.    Yes.  My apologies.
10    Q.    No.  That's okay.
11           And what other clothes did Detective
12 Cross take from you that morning?
13    A.    That's all I was wearing that night.
14           Everything had perished in the fire.
15    Q.    Right.  But you said Detective Cross
16 took your shoes and your clothes.  So we've covered
17 the shoes.
18           What articles --
19    A.    All right.
20    Q.    -- of your clothing did he take?
21    A.    I think he took my shirt and
22 undershirt.
23           I think I had my shorts and
24 underwear.

WILLIAM E. AMOR, 03/05/2020                                    Page 150..153

Page 150

1    Q.   And did he explain to you that he
2 wanted to take those items to check for accelerants?
3    A.   He did.
4    Q.   Okay.  Did you give your consent for
5 him to do that?
6    A.   I did.
7    Q.   All right.  And certainly there were
8 accelerants in the apartment, correct?
9         You had mentioned earlier there was
10 nail polish remover, correct?
11    A.   That's correct.
12    Q.   Okay.  And from time to time, the
13 lighter fluid would be brought up to use the grill?
14    A.   That's correct.
15    Q.   Okay.  Any other accelerants that you
16 were aware of within the apartment itself?
17    A.   To my knowledge --
18 MS. THOMPSON:  Objection to form.
19         You can answer.
20 THE WITNESS:  Yeah.  To my knowledge, no.
21 BY MR. POLICK:
22    Q.   Did you have like a laundry closet or a
23 cabinet where you kept cleaning supplies or things
24 of that nature?

Page 151

1    A.   Well, our storage room was in the -- in
2 the laundry room downstairs.
3    Q.   Right.  I'm talking about up in the
4 apartment.
5    A.   No, we did not.
6    Q.   Okay.  You didn't keep any cleaning
7 supplies in the kitchen?
8    A.   Unless Marianne had something under the
9 cabinet; you know, have Lysol, or something to that
10 effect.
11    Q.   When did Detective Cross take your
12 clothes and gym shoes?
13    A.   Within the hour.
14    Q.   Okay.  It wasn't immediately upon his
15 arrival there.
16    A.   No.  We -- both detectives and Tina and
17 I sat down and talked.
18    Q.   How was Detective Cross dressed?
19    A.   I don't recall.
20    Q.   Okay.  And can you describe Detective
21 Guerreri to me?
22    A.   This was after 1:00 o'clock in the
23 morning, you know.  Detective -- he was -- he was
24 kind of second in command, if you wanted to put it

Page 152

1 in laymen's term.
2    Q.   Okay.  When Detectives Cross and
3 Guerreri came to the Leavenworths' home, did the
4 Leavenworths allow them in?
5         Did they answer --
6    A.   They did.
7    Q.   All right.  And where did you meet with
8 the detectives?
9    A.   This would have been the dining room
10 table, I believe, if I recall right.
11    Q.   Did you all meet together there?
12    A.   We did.
13    Q.   Okay.  So it would be the two
14 detectives, you and Tina, and the Leavenworths?
15    A.   Yes.  I don't believe the Leavenworths
16 were sitting at the table, but I believe they were
17 in the room, by what I recall.
18    Q.   All right.  And they have a
19 conversation with you?
20    A.   Leavenworths?  They did not.
21    Q.   All right.  The detectives, did they
22 have a conversation with you?
23    A.   They did.
24    Q.   All right.  And what was discussed

Page 153

1 during this conversation?
2    A.   Just reaffirm where we had been, you
3 know, what time we had left and when we returned.
4    Q.   Did they interview you and Tina
5 together or separately?
6    A.   In the beginning together, then
7 separate.
8    Q.   Okay.  How long did the interview
9 together last?
10    A.   Not long.
11    Q.   When you say "not long," how long was
12 not long?
13    A.   I -- I don't know.
14         25 years ago.  I don't recall.
15    Q.   All right.  But a shorter period of
16 time than the separate interviews?
17    A.   That's correct.
18    Q.   Where were you interviewed separately?
19    A.   In the basement.
20    Q.   Okay.  The Leavenworths' basement at
21 the time, was it finished, or partially finished?
22    A.   It was finished.
23    Q.   Okay.  And who interviewed you?
24    A.   Cross.  Detective Cross.

Page 154

1    Q.   Okay.  And where was Tina separately
2  interviewed?
3    A.   Upstairs.
4    Q.   And who interviewed her?
5    A.   Well, there was only two of them, so it
6  had to be Detective Guerreri.
7    Q.   And what did you and Detective Cross
8  discuss while you were in the Leavenworths'
9  basement?
10    A.   I just reaffirmed that, you know, where
11  we were, what time we got home.
12         And I reminded them that I had -- we
13  had turned over receipts for where we were at and
14  at what time and everything.  So ...
15    Q.   Okay.  Is that where the subject of
16  collecting your clothing came up?
17    A.   It was.
18    Q.   Okay.
19    A.   He took my clothes when I was in the
20  basement.
21    Q.   Okay.  But that was somewhere later on
22  in the conversation?
23    A.   It was.  This had to be -- I don't
24  know -- 1:30, 2:00 o'clock.

Page 155

1    Q.   Okay.  Did the subject of insurance
2  come up at all during your conversation with --
3    A.   Previous.
4    Q.   -- Detective Cross?
5         Previous.  When you say "previous" --
6    A.   When all of us were upstairs.
7    Q.   Okay.  In the -- at the dining room
8  table.
9    A.   That's correct.
10    Q.   All right.  And who brought up the
11  subject of insurance?
12    A.   I don't -- I don't know which detective.
13         I don't remember.
14    Q.   What was brought up on the subject of
15  insurance?
16    A.   Well, actually they asked Tina about
17  insurance.
18    Q.   Okay.  What was asked?
19    A.   Do you know anything about insurance,
20  or was there insurance, or did your mom have
21  insurance.
22         I don't recall the exact question.
23    Q.   Okay.  Were you asked about insurance
24  while you were upstairs together?

Page 156

1    A.   No.  Because I was new into the family,
2  so obviously I wasn't part of any insurance.
3    Q.   Did you have any knowledge of -- well,
4  let's start with life insurance on either Tina or
5  Marianne.
6    MS. THOMPSON:  Object to form.
7         You can answer.
8    THE WITNESS:  Yeah.  Neither Tina or I did.
9  BY MR. POLICK:
10    Q.   Neither you or Tina had any life
11  insurance.
12    A.   No, sir.
13    Q.   Okay.  No policy where, if one of you
14  passed, it would go to the other?
15    A.   No, sir.  We were newly married.
16    Q.   All right.  And how about Marianne?
17         Were you aware if she had any life
18  insurance?
19    A.   We did not.
20    Q.   When you say "we," what do you mean,
21  "we"?
22    A.   Tina and I.
23    Q.   How do you know Tina was not aware?
24    A.   She was my wife.  She would have said

Page 157

1  something.
2    Q.   Okay.  But you said you were newly
3  to -- new to the family.
4    A.   Right.
5    Q.   How do you know if Tina didn't know
6  anything about life insurance on her mother?
7    A.   Tina wasn't really good with money, as
8  I stated earlier.  So I doubt that she would have
9  ever known.
10    Q.   Okay.  What do you mean by that, that
11  Tina wasn't really good with money?
12    A.   She wasn't good about saving receipts
13  and -- you know what I mean? -- spending money.
14         She wasn't -- you know people that
15  save money, and she was just not a saver.
16    Q.   Okay.
17    A.   She was a spender.
18    Q.   She was a spender.
19    A.   Yeah.
20    Q.   Okay.  And it sounds like, from what
21  you're saying, when she spent, she didn't get
22  receipts?
23    A.   She did not.
24    Q.   All right.  Was that something you as

WILLIAM E. AMOR, 03/05/2020                    Page 158..161

Page 158

1 her husband asked her to do, so she could see where
2 her money was going?
3   A.  That's correct.
4   Q.  Okay.  But prior to you getting
5 married, did she save her receipts at all?
6   A.  Not to my knowledge.
7   Q.  Okay.  She was working at the time,
8 Tina?
9   A.  At McDonald's.
10   Q.  All right.  How many days a week did
11 she work at McDonald's?
12   A.  Four to five.
13   Q.  And was she getting a paycheck from
14 McDonald's?
15   A.  She was.
16   Q.  Okay.  Did she have a bank account?
17   A.  To my knowledge, she did.
18   Q.  You didn't know if your wife had a bank
19 account or not?
20   A.  I wasn't privy to it.
21   Q.  What do you mean by that?
22   A.  It just -- I didn't ask about it, you
23 know.  She worked for her money.  So ...
24   Q.  Did you have a joint account?

Page 159

1   A.  We did not.
2   Q.  Neither a checking nor savings?
3   A.  We did not.
4   Q.  So when Tina got paid -- do you recall
5 how often she would get paid?
6   A.  I don't know.  I don't recall.
7   Q.  All right.  When she got her paycheck,
8 what would she do with her paycheck?
9       Would she deposit it?  How would she
10 cash her paycheck?
11   A.  I think she would cash it and take some
12 out for gas and cigarettes and, you know, personal
13 needs.
14   Q.  Okay.  And after taking out money for
15 her personal needs, what would she do with the rest
16 of it?
17   A.  I couldn't -- I don't recall.
18   Q.  Okay.  Did she ever give money to you
19 for whatever personal needs that you --
20   A.  She did not.
21   Q.  She did not give you money.
22   A.  No.
23   Q.  Where were you getting your money from?
24   A.  Odd jobs, as I've stated earlier.

Page 160

1   Q.  Okay.  Well, how many odd jobs did you
2 have the week before the fire?
3   A.  I don't recall.  I put in a ceiling fan
4 for someone, and an air conditioner.  So ... I
5 don't recall what else.
6   Q.  When you say you put in an air
7 conditioner, where --
8   A.  Automotive air conditioner.
9   Q.  Oh, like an AC pump in a car?
10   A.  AC compressor.
11   Q.  A compressor.  Okay.
12       What would you charge for your
13 services?
14   A.  Put in a compressor?  250, 300 dollars.
15   Q.  Did you keep receipts for your money
16 and things that you spent?
17   A.  Always, because there were parts
18 involved, because parts have warranties.
19   Q.  But what about things that you just
20 purchased for everyday living, whether it be
21 groceries, beer, vodka, other -- cigarettes?
22       Would you keep receipts for those
23 items?
24   A.  Always, and I would -- I always put

Page 161

1 them in the console of the car.
2   Q.  Okay.  Did you have a savings account
3 of your own?
4   A.  Not at the time.
5   Q.  Okay.  Did you have a checking account
6 of your own?
7   A.  Not at the time.
8   Q.  Did you own any property at the time?
9   A.  I did not.
10   Q.  Did you have any income property at the
11 time?
12   A.  I did not.
13   Q.  Did you ever own a home or any property
14 in the state of Iowa?
15   A.  No, I did not.
16   Q.  Were you aware of any renters insurance
17 for the contents of the condo on Bailey?
18   A.  I was not.
19   Q.  Okay.  Do you know if Tina was aware of
20 any renter's insurance for the condo?
21   A.  I'm unaware of what she did or did not
22 know.
23   Q.  Okay.  Who was asking the questions
24 about insurance?

WILLIAM E. AMOR, 03/05/2020                    Page 162..165

Page 162

1              Was it Cross, Guerreri, or both?
2      A.   As I stated earlier, I don't remember
3 which one.
4      Q.   Okay.  But you do recall a discussion
5 about insurance.
6      A.   That's correct.
7      Q.   At any time during that discussion
8 about insurance, did you ever interrupt the
9 officers and tell Tina not to speak about
10 insurance?
11     A.   I never told Tina not to speak.
12     Q.   If you told her not to speak, do you
13 think she would have listened to you?
14     MS. THOMPSON:  Object to form.
15          You can answer.
16     THE WITNESS:  Yeah.  I -- the only suggestion
17 I made is leave her alone; she just lost her
18 mother.
19 BY MR. POLICK:
20     Q.   Okay.  And by that time you had known
21 that -- that Marianne had passed?
22     A.   We had.
23     Q.   Okay.
24     A.   But it was within a few minutes after

Page 163

1 that that we were informed that she was at the
2 hospital and did not survive.
3      Q.   Right.  So if I'm not mistaken, you
4 said you found out that Marianne had passed when
5 you got to the Leavenworths' home?
6      A.   Shortly after.
7      Q.   Yeah, shortly after.
8           But before the police had arrived?
9      A.   I'm unclear.  I don't remember.
10     Q.   Okay.
11     A.   But it's all -- this is all close in --
12 in time, in proximity.
13     Q.   Okay.  Do you recall, while you were at
14 the Leavenworths' home that evening and you were
15 speaking to the Detectives Cross and Guerreri, that
16 you and Tina went out to have a smoke?
17     A.   Yes.
18     Q.   Okay.  Do you recall going to the --
19 Tina's car --
20     A.   I do.
21     Q.   -- while you had the smoke?
22          And do you recall going in the trunk
23 of the car?
24     A.   I do.

Page 164

1      Q.   Why did you go to the trunk of the car?
2      A.   Tina was looking for something.
3      Q.   What was Tina looking for?
4      A.   I don't know.
5      Q.   And at some point did either of the
6 detectives ask if they could look in the trunk of
7 the car when you and Tina came back into the house?
8      A.   I'm assuming they did, because Tina
9 would have said okay, and I believe we did.
10     Q.   Okay.  It's your belief that Tina gave
11 consent for the officers to search the trunk --
12     A.   It is.
13     Q.   -- of the car?
14          All right.  Do you know what was in
15 the trunk of the car?
16     A.   I do not.
17     Q.   Okay.  Did you know that there was a
18 cooler in the trunk of the car?
19     A.   I did not.  When we left there -- well,
20 I can't carve this in stone.
21          But I'm sure it was still in the
22 backseat when we left there.  So ... when we left
23 the movie.
24     Q.   Okay.  Well, how did the cooler get

Page 165

1 from the backseat to the trunk?
2      A.   Again, 25 years ago, I don't recall.
3      Q.   Okay.  And there was some fruit punch
4 in the -- in the trunk.  Do you recall whose that
5 was?
6      A.   That would have been Tina's.
7      Q.   Okay.  Several receipts.  Do you know
8 what those were, in the trunk?
9      A.   I do not.
10     Q.   Okay.  Did you store your receipts in
11 the trunk of the car?
12     A.   No.  The receipts for that night were
13 in the glove compartment, the ones I turned over to
14 the sergeant.
15     Q.   Okay.  There were some empty ring
16 boxes, like you might get from a jeweler, in the
17 trunk.
18          Do you know where those came from?
19     A.   That was Tina's everyday car.
20          I have no clue.
21     Q.   Do you have any idea where the ring
22 boxes came from, or what they were for?
23     A.   No.  I didn't even know there were ring
24 boxes.

WILLIAM E. AMOR, 03/05/2020                    Page 166..169

Page 166

1    Q.   Okay.  Had you been to a jeweler or a
2 mall, and shopping at a jeweler recently?
3    A.   I have not.
4    Q.   Okay.  And I'm talking now prior to the
5 fire of September 10th of 1995.
6    A.   I personally have not.
7    Q.   Okay.  When you and Tina got married,
8 did you purchase wedding bands?
9    A.   I did not.
10       They -- they came from her family.
11   Q.   Okay.  So it was like a family
12 heirloom --
13   A.   Heirloom setting, correct.
14   Q.   -- or something that they passed along
15 to her?
16   A.   That's correct.
17   Q.   All right.  You didn't go out and buy
18 wedding rings?
19   A.   We did not.
20   Q.   All right.  Did you go anywhere for
21 your honeymoon?  Or did you --
22   A.   We did not.
23   Q.   Okay.  Do you remember where you spent
24 your wedding night?

Page 167

1    A.   At home with Marianne.
2    Q.   Okay.  There was also a vodka bottle
3 found in the trunk of the car.
4        Do you know where that came from?
5    MS. THOMPSON:  Object to form.
6        You can answer.
7    THE WITNESS:  Yeah, I -- again, I'm not sure
8 that -- where that came from.  I would never leave
9 anything in someone else's car, let alone my own
10 car.
11 BY MR. POLICK:
12   Q.   Why wouldn't you leave something else
13 in the car?
14   A.   Well, because we didn't take any
15 alcohol like that to the movie.  So ...
16       I understand the question.  I just
17 don't have a clear answer for you.
18   Q.   All right.  There was also some
19 charcoal briquettes in the trunk of the car.
20   A.   That's possible, too.
21   Q.   Do you know why that was in the trunk?
22   A.   Again, Tina's everyday car.
23       But there was also charcoal
24 briquettes in the storage room.

Page 168

1    Q.   So did you have more than one bag of
2 charcoal briquettes?
3    A.   Well, I'm guessing that -- we obviously
4 did, but I was unaware there was anything in the
5 trunk of the car.
6    Q.   Well, you went out from the
7 Leavenworths' home with Tina to have a smoke,
8 correct?
9    A.   Right.
10   Q.   And while you were out there having
11 your cigarettes, you opened the trunk of the car,
12 didn't you?
13   A.   Tina did.
14   Q.   All right.  And did you look and see
15 what was in the trunk when she opened it?
16   A.   I had no reason to believe that there
17 was something amiss.
18   Q.   Well, I'm not asking you whether
19 anything was amiss.
20       When Tina opened the trunk of the
21 car, did you look into it?
22   A.   No.
23   Q.   Did you ask Tina, Why are you going in
24 the trunk of the car?

Page 169

1    A.   The detectives wanted to look.  So ...
2    Q.   No.  This is before the detectives are
3 looking.  I'm talking about --
4    MS. THOMPSON:  He was giving an answer, Joe,
5 to your question.  I mean --
6    MR. POLICK:  Okay.
7    MS. THOMPSON:  -- you are interrupting his
8 answer.
9 BY MR. POLICK:
10   Q.   Go ahead.
11   A.   I'm just -- I'm not sure why she went
12 in the trunk of the car.  I have no idea.
13   Q.   All right.  But you don't deny that she
14 went into the trunk of the car --
15   A.   I do not.
16   Q.   -- while you were out there --
17   A.   I do not.
18   Q.   Let me finish my question, sir; and I
19 apologize for interrupting you before.
20       But you're not denying the fact that
21 while you and Tina were out having a cigarette
22 outside the Leavenworths' home, that she went into
23 the trunk of the car?
24   A.   I do not.

Page 170

1    Q.   Okay.  And you can't explain to me why
2 you didn't look into the trunk of the car when she
3 opened it.
4    MS. THOMPSON:  Object to form.
5         You can answer.
6    THE WITNESS:  I wasn't suspicious.
7 BY MR. POLICK:
8    Q.   Did you ask her, Why are you going into
9 the trunk of the car?
10   A.   At that point I was -- assumed that the
11 detectives asked her to look in the car.
12        That was my assumption --
13   Q.   All right.
14   A.   -- at that time.
15   Q.   This is before the detectives even
16 asked to look in the trunk of the car.  This is
17 just you and Tina out there having a smoke.
18        And she opens the trunk of the car,
19 correct?
20   A.   That's correct.
21   MS. THOMPSON:  Object to form.
22        You can answer.
23 BY MR. POLICK:
24   Q.   Okay.  When Tina opened the trunk of

Page 171

1 the car, did you ask her, Why are you going in the
2 trunk?
3    A.   I did not.
4    Q.   Okay.  Why not?
5    A.   You know, I can only assume that she
6 needed something out of the trunk, maybe clothes or
7 something.
8         I want to go on the record saying we
9 had nothing.  We had lost everything.  We didn't
10 even have clothes.  No place to live.  I just --
11 she was my wife; I trusted her.
12   Q.   All right.  There was also lighter
13 fluid found in the trunk of the car.
14        Do you know why that was in the
15 trunk of the car?
16   A.   I do not.
17   Q.   Did you have more than one bottle of
18 lighter fluid that you kept at the apartment?
19   A.   Again, the same with the charcoal.
20        If there were two -- I know there
21 were a bag and everything found in the storage room
22 downstairs.  If there were two, I had no knowledge.
23   Q.   While you were smoking with Tina
24 outside the Leavenworths' home and she opened the

Page 172

1 trunk, how long was the trunk open?
2    A.   Briefly.
3    Q.   And when you returned inside the
4 Leavenworths' home, it was then that the detectives
5 asked if they could look in the trunk, correct?
6    A.   That's correct.
7    Q.   Okay.  When the detectives went to look
8 in the trunk of the car, did you go back outside
9 with them?
10   A.   I don't recall.  I ...
11   Q.   Do you know if Tina went back outside
12 with them?
13   A.   I believe Tina did.
14   Q.   Do you know if either of the
15 Leavenworths went out, either Pam or Gary?
16   A.   I do not.
17   Q.   All right.  Where do you believe you
18 were when the detectives were looking in the trunk
19 of the car?
20   A.   Well, I had no shirt or shoes, so I was
21 probably in the basement.
22   Q.   Did you have a shirt and shoes on when
23 you went out to have the cigarette?
24   A.   I did.

Page 173

1    Q.   Okay.  So that was collected sometime
2 after the detectives --
3    A.   In the interim.
4    Q.   -- were searching the trunk?
5    A.   That's correct.
6    MS. THOMPSON:  Let's -- let's take a break.
7    MR. POLICK:  Okay.
8    THE VIDEO TECHNICIAN:  We're off the record
9 at 2:08 at the end of media unit two.
10        (Recess taken.)
11   THE VIDEO TECHNICIAN:  We're back on the
12 record at 2:18 at the beginning of media unit three.
13 BY MR. POLICK:
14   Q.   Mr. Amor, you understand you're still
15 under oath?
16   A.   I do.
17   Q.   The money you were earning from odd
18 jobs, where did you keep that money?
19   A.   Actually, at home.
20   Q.   And I take it you were paid in cash?
21   A.   That's correct.
22   Q.   And where at home did you keep the
23 money?
24   A.   Probably in the bedroom.

WILLIAM E. AMOR, 03/05/2020                                    Page 174..177

Page 174

1    Q.    When you say "probably in the
2  bedroom," which bedroom?
3    A.    Hang on a minute.  I lost my clip.
4          Unless Marianne needed something.
5    Q.    Where in the bedroom would you keep
6  your money?
7    A.    Dresser.
8    Q.    And --
9    A.    Where I put my wallet.
10   Q.    And that would be the bedroom that you
11 and Tina shared?
12   A.    Yeah.  That would be bedroom two.
13   Q.    Would you provide any money to Tina?
14 MS. THOMPSON:  Object to form.
15          You can answer.
16 THE WITNESS:  Yeah.  As needed.
17 BY MR. POLICK:
18   Q.    Okay.  And would she ever give you any
19 money?
20   A.    No, sir.
21   Q.    You indicated earlier that Tina was not
22 a saver.  Were you a saver?
23   A.    Yes, sir.
24   Q.    Where were you saving your money?

Page 175

1    A.    Just wherever.
2          I mean, I would keep it in the house.
3    Q.    What were you saving your money for?
4    A.    For the needs of Tina, Marianne, and I,
5  you know.  I mean ...
6    Q.    Did you provide money to Marianne at
7  all?
8    A.    When I used to take her to the doctors'
9  appointments, we'd go to Bakers Square.  I mean --
10 but if she needed cash, yeah.
11         She was on a fixed income.
12   Q.    When you say Marianne was on a fixed
13 income, was she -- she was not working, correct?
14   A.    Marianne could -- could not work.
15   Q.    Okay.  So she was on some type of
16 disability?
17   A.    That's correct.
18   Q.    Was she getting some type of government
19 check for that disability?
20   A.    Her payee was Pam Leavenworth.
21   Q.    So the government checks that she was
22 receiving, would they come to the apartment there
23 on Bailey, or would they go to Pam Leavenworth?
24   A.    Pam Leavenworth.

Page 176

1    Q.    And how do you know that they would go
2  to Pam Leavenworth?
3    A.    Marianne informed me of that.
4    Q.    Did you ever cash any of Marianne's
5  disability checks?
6    A.    I did not.  They never came to the
7  residence.
8    Q.    Do you know what type of disability she
9  was receiving?
10   A.    The particulars I do not know.
11   Q.    Do you know how much she was receiving?
12   A.    I do not.
13   Q.    So when you talked about finances and
14 Tina really didn't manage her finances in the
15 manner that you would like, are you just talking
16 about your and Tina's finances, or are you
17 including Marianne in that as well?
18 MS. THOMPSON:  Object to form.
19          You can answer.
20 THE WITNESS:  Tina was not privy to
21 Marianne's finances.  When Marianne needed money,
22 she had to ask Pam.
23 BY MR. POLICK:
24   Q.    Okay.  Did Tina ever give Marianne

Page 177

1  money?
2    A.    Probably, but I couldn't tell you when
3  and for what.
4    Q.    Do you recall any arguments between
5  Marianne and Tina over money or finances?
6    A.    If there was, you know, mother-and-
7  daughter things, I don't recall.
8    Q.    All right.  Any arguments between you
9  and Tina over money or finances?
10   A.    Absolutely not.
11   Q.    None whatsoever?
12   A.    No, sir.
13   Q.    After Detective Cross collected your
14 shoes and clothing, with your consent, at the
15 Leavenworth home, did he then -- Detective Guerreri
16 then leave?
17   A.    At some point.
18   Q.    Okay.
19   A.    But this had to be -- excuse me -- wee
20 hours of the morning.
21   Q.    At some point they did leave, though?
22   A.    They did.
23   Q.    Okay.  You just don't have a
24 recollection of when it was?

WILLIAM E. AMOR, 03/05/2020                               Page 178..181

Page 178

1    A.   No, because by the time they took my
2 clothes, it was 1:30, 2:00 o'clock, and so ...
3       Q.   Do you recall any other conversation
4 with Detective Cross at the -- at the Leavenworth
5 home?
6    A.   I do not.
7       Q.   Do you recall any further conversation
8 with Detective Guerreri --
9    A.   I do not.
10       Q.   -- at the Leavenworth home?
11          At any time when Detective Cross was
12 present at the Leavenworth home, did he threaten
13 you in any way?
14    A.   He did not.
15       Q.   At any time at -- while at the
16 Leavenworth home, did Detective Guerreri threaten
17 you in any way?
18    A.   He did not.
19       Q.   Okay.  Did either Detective Cross or
20 Detective Guerreri threaten Tina while they were --
21 while you were at the Leavenworths' home?
22    A.   Since we were separated, I'm unaware.
23       Q.   Okay.  But during those times that you
24 were together, did you see either Detective Cross

Page 179

1 or Detective Guerreri threaten Tina?
2    A.   I did not.
3       Q.   So this is now the morning of
4 September 11th, correct?
5    A.   Yes.
6       Q.   Okay.  Was there a wake for Marianne?
7    A.   There was.
8       Q.   Do you recall when that was, or how
9 many days after the fire?
10    A.   I don't recall the date when her wake
11 was.
12       Q.   Okay.  Did you attend the wake?
13    A.   We did.
14       Q.   Was it somewhere in Naperville?
15    A.   It was.
16       Q.   Do you recall where it was?
17    A.   I don't remember the name of the
18 funeral home.
19       Q.   Okay.  And I take it Marianne's family
20 attended the wake?
21    A.   Yes.
22       Q.   Do you remember any of the family
23 members that were there?
24    A.   Most of her family.  At the time her

Page 180

1 mom was alive.  We attended it.
2          You know, it was an open casket
3 funeral.  Everybody donated.
4       Q.   And when you say her mom was alive,
5 that would be Tina's grandmother?
6    A.   Grandma, yeah.
7       Q.   All right.  Do you remember her name?
8    A.   No.  But she's buried right next to
9 Marianne.
10       Q.   All right.  And was the funeral the
11 same day or the following day?
12    A.   No.  It was a couple days later.
13       Q.   All right.  Do you know what church it
14 was at?
15    A.   Somewhere in Naperville.
16          I don't recall the church.
17       Q.   Okay.  Did you attend church in
18 Naperville?
19    A.   I did.
20       Q.   That Sunday, the day of the fire, did
21 you attend church?
22    A.   In the morning.
23       Q.   What time in the morning?  What Mass
24 did you go to?

Page 181

1    A.   I think Mass was 9:00 or 9:30.
2       Q.   Okay.  And were you a parishioner at
3 any particular church?
4    A.   No.  Just a guy that believes in God.
5       Q.   Okay.  When you would go to church,
6 would you go by yourself, or would you go with
7 Marianne and Tina?
8       MS. THOMPSON:  Object to form.
9          You can answer.
10       THE WITNESS:  Sometimes Tina wouldn't get out
11 of bed, so I took Marianne.
12 BY MR. POLICK:
13       Q.   Okay.  That morning, the day of the
14 fire, September 10th, what church did you attend
15 Mass at?
16    A.   It's in Naperville.
17          I cannot recall the name of the
18 church, but it was -- it was Marianne's favorite.
19       Q.   Okay.  Does the name St. Elizabeth
20 Seton --
21    A.   That's it.  Yep.
22       Q.   Does that refresh your recollection?
23    A.   It does.
24       Q.   Okay.  Where was that in relation to

WILLIAM E. AMOR, 03/05/2020                           Page 182..185

Page 182

1 the condo unit on Bailey?

2    A.   Just south and a little bit east; mile,

3 mile and a half.

4    Q.   And on Sunday, September 10th, the day

5 of the fire, did all three of you go to 9:30 Mass?

6    A.   I do not recall if Tina went or not.

7         But I -- Marianne and I did.

8    Q.   Okay.  And did you regularly attend

9 Sunday Mass?

10   A.   I did.

11   Q.   Were you employed at all by the church,

12 St. Elizabeth Seton?

13   A.   They used to ask me to do odd jobs.

14   Q.   When they say -- when you -- strike

15 that.

16        When you say that they would ask you

17 to do odd jobs, would they -- would those be for

18 their parishioners?

19        Or are you meaning odd jobs there at

20 the church or the rectory or other --

21   A.   Yeah, absolutely.  Just overall in

22 totality work around the church and this kind of

23 stuff.

24   Q.   Okay.  And would the church pay you for

Page 183

1 that?  Or ...

2    A.   Oh, whatever they could afford.

3    Q.   Okay.  Would they pay you in cash, or

4 was there some voucher system they would use?

5    A.   No.  They paid in cash.

6    Q.   Do you remember anyone else that was a

7 parishioner at St. Elizabeth Seton --

8    A.   I do not.

9    Q.   No one you regularly saw at Sunday Mass

10 that you recall?

11   A.   I don't recall the priest or

12 parishioners.

13   Q.   Okay.  Is that where the funeral mass

14 was held?

15   A.   I don't recall.

16        I don't believe so, but I don't

17 recall.

18   Q.   Do you know why it wasn't held there?

19   A.   I do not.  This was in the hands of the

20 family.

21   Q.   I see.

22        Did you serve as a pallbearer for

23 the funeral?

24   A.   I did not.

Page 184

1         That fell in to the family members.

2    Q.   Were you asked?

3    A.   I was not.

4    Q.   And you indicated that Marianne is

5 buried in a cemetery in Naperville?

6    A.   Actually, I believe it's -- it's on

7 Warrenville Road.  I don't know.

8         Actually I was there a couple weeks

9 ago.

10   Q.   Do you remember the name of the

11 cemetery?

12   A.   Can you look that up?

13        Oh, yeah.  I can't ask her that.

14 Sorry.

15   Q.   Yeah.

16        If you don't remember, that's fine.

17   A.   Yeah.  It's on Warrenville Road.  It's

18 on the west side of the street.

19   Q.   All right.  And you said you were there

20 recently?

21   A.   I was.

22   Q.   Why were you there recently?

23   A.   Marianne was my friend.

24        And her mom, Grandma, is buried

Page 185

1 right next to her.

2    Q.   And how long ago was it that you were

3 at the cemetery?

4    MS. THOMPSON:  Object to form.

5         You can answer.

6    THE WITNESS:  I was down in Downers Grove a

7 few weeks ago, so it had to have been three or four

8 weeks ago.

9 BY MR. POLICK:

10   Q.   Okay.  And prior to that, when was the

11 last time you had been to Marianne's gravesite at

12 the cemetery?

13   A.   A few weeks before that.

14   Q.   Is that something you regularly do?

15   A.   Actually, when I was going through --

16 I'm going to answer this.

17        During my second trial, my original

18 trial attorney came from Iowa to help me.  And I

19 said -- you know.

20        And I wanted to go pay my respects

21 for a great woman that lost her life.  So ...

22        And when I -- this was in the middle

23 of winter, and nobody had been there.  We had to

24 shovel the snow off to put flowers on her grave.

WILLIAM E. AMOR, 03/05/2020                    Page 186..189

Page 186
1          So ...
2    Q.    Do you buy flowers for her grave?
3    A.    I do.
4    Q.    Is that something you regularly do?
5    A.    When I buy them for her, I buy them for
6 my sister, my brother, my dad.
7          It's kind of a Sunday thing.
8    Q.    So in the past year, how many times
9 have you been out to the cemetery to Marianne's
10 gravesite?
11   A.    I know of three.
12   Q.    Okay.  When you go there, do you go
13 alone or with somebody?
14   A.    I go alone.
15   Q.    You said that during your second trial,
16 which was in January of 2018 --
17   A.    That's correct.
18   Q.    -- you went there with your trial
19 attorney from Iowa?
20   A.    I'll refer to counsel to give you the
21 name.  So ...
22   Q.    Well, they can't answer these
23 questions.
24         So if there's something you just --

Page 187
1    A.    Erica Nichols Cook.
2    Q.    Okay.  When you say your original trial
3 attorney, what do you mean by that?
4    A.    At the time the original -- Southern
5 Illinois Innocence Project took this case.  And at
6 the time she was appointed.
7          And now she lives in Des Moines, and
8 she has her own innocence project.
9          And I was just there this last
10 weekend, talking to her class.
11   Q.    In Des Moines?
12   A.    Yes.
13   Q.    So when was Erica Nichols Cook
14 appointed to be your attorney?
15   A.    I don't know if it was -- it was at the
16 end of either 2013 or the beginning of '14,
17 somewhere -- give it -- I was still obviously
18 incarcerated.
19   Q.    Okay.  She was also one of your
20 attorneys during your retrial.
21   A.    She was.
22   Q.    Okay.  And since your retrial, have you
23 remained friends with her?
24   A.    Again, I just seen her this last

Page 188
1 weekend.
2    Q.    I understand that.
3          But have you remained friends with
4 her?
5    A.    Of course.
6    Q.    Okay.  Do you see her socially outside
7 of talking to her class, or legal matters?
8    A.    We -- we text and we Facebook.  But
9 Des Moines's a long -- long drive.
10   Q.    Other than going out to Des Moines to
11 talk to her class, have you made other trips to
12 Des Moines to visit her?
13   A.    Yes.
14   Q.    How many times have you visited
15 Erica --
16   A.    Well, in the last year --
17   Q.    -- Nichols Cook --
18   A.    -- probably once.
19   Q.    Let me finish my question.
20   A.    I'm sorry.
21   Q.    In the last year, how many times have
22 you traveled out to Des Moines to visit Erica
23 Nichols Cook?
24   A.    Outside of law -- law stuff?  Probably

Page 189
1 once.
2    Q.    Okay.  And does she travel here to
3 Illinois from Des Moines to visit you at all?
4    A.    She has her own practice, she has a
5 daughter, a husband, and a home.
6    Q.    Okay.  My question was in the last year
7 has Erica Cook --
8    A.    She has not.
9    Q.    -- traveled --
10   A.    She has not.
11   Q.    Let me finish my question, sir.
12         In the last year, has Erica Cook
13 traveled from Des Moines, Iowa, to Illinois to
14 visit you at all?
15   A.    She has not.
16   Q.    Okay.  And how many times have you --
17 or strike that.
18         Have you and Erica Cook ever gone to
19 Marianne's gravesite together?
20   A.    Once.
21   Q.    All right.  And that was during your
22 retrial?
23   A.    It was.
24   Q.    Okay.  And have the two of you been

WILLIAM E. AMOR, 03/05/2020                    Page 190..193

Page 190

1 together there since?
2    A.   We have not.
3    Q.   Do you recall being interviewed by the
4 Naperville Police Department on September 12th of
5 1995?
6    A.   I do not.
7    Q.   All right.  Do you recall taking a
8 polygraph examination that day?
9    A.   I do.
10    Q.   Okay.  Do you recall where the
11 polygraph was taken at?
12    A.   In the basement of the Naperville
13 Police Department.
14    Q.   When you say "the basement," what are
15 you referring to?
16    A.   When you walk in, you have to go down
17 to the lower level.
18    Q.   Okay.
19    A.   And you have to use a card to get down
20 there.
21    Q.   All right.  So not a basement in the
22 traditional sense.
23    A.   Well ...
24    Q.   It's the lower level --

Page 191

1    A.   Lower level, okay.
2    Q.   -- of the building.
3         It is furnished down there, correct?
4    A.   Yeah, it is.
5    Q.   All right.  So do you recall how long
6 the examination lasted?
7    A.   I do not.
8    Q.   Do you remember what the results were?
9    A.   Inconclusive.
10    Q.   Okay.  And do you know why they were
11 inconclusive?
12    A.   Because --
13    MS. THOMPSON:  Object to form.
14         You can answer.
15    THE WITNESS:  Yeah, because Tina and I were
16 up the night before, and everybody had been
17 drinking.  So ...
18 BY MR. POLICK:
19    Q.   How much did you have to drink?
20    A.   Apparently enough.
21         But I don't -- I couldn't tell you.
22 It was too long ago.
23    Q.   Do you recall what you were drinking?
24    A.   We were in a hotel room at that point,

Page 192

1 so it would have been beer.
2    Q.   They didn't allow vodka at the hotel?
3    A.   No.  It's just not something that --
4 you know, just ...  Tina liked wine coolers, and I
5 liked beer.  So ...
6    Q.   At what point did you relocate to the
7 hotel?
8    A.   After -- I think one night at the
9 Leavenworths'.
10    Q.   Do you recall spending only one night
11 at the Leavenworths'?
12    A.   I do.
13    Q.   Okay.  So Detectives Cross and Guerreri
14 there -- were there at the Leavenworths' the
15 morning of the 11th.
16         After the detectives left, did you
17 and Tina go to sleep?  Or -- at the Leavenworths'
18 home?
19    A.   Yeah, we went to sleep for a little bit
20 because it was -- I don't know -- between 2:00 and
21 3:00 o'clock in the morning.
22    Q.   Okay.  And was that the only night you
23 slept there, or did you spend another night at the
24 Leavenworths'?

Page 193

1    A.   I don't recall spending a second night.
2    Q.   Okay.  Why did you leave the
3 Leavenworths'?
4    A.   We went and got a hotel room.
5    Q.   Yeah.  Why?
6    A.   It was just easier.
7         And I think the family wanted to
8 heal.  So ...
9    Q.   Did the Leavenworths ask you to leave?
10    A.   No, they didn't ask us.
11         But, I mean, it was just kind of
12 worked out that we needed our own space, I guess.
13    Q.   After one night?
14    A.   You know what?  You're asking me
15 questions I don't remember, you know.  I mean ...
16    Q.   If you don't remember, sir, just tell
17 me you don't remember.
18    A.   I don't remember.
19    Q.   Okay.  Was there any discussion between
20 you and Tina about leaving the Leavenworths' home
21 and going to a hotel?
22    A.   There was not, except to the point
23 where Tina felt uncomfortable, and she needed some
24 peace.

WILLIAM E. AMOR, 03/05/2020                    Page 194..197

Page 194

1    Q.   When you slept that one night at the
2 Leavenworths' home, where did you sleep?
3         Did you have your own room?
4    A.   In the basement on an air mattress.
5    Q.   All right.  And when you went to the
6 hotel, where -- what hotel was it?
7    A.   I think it was a Motel 6.  I think.
8    Q.   And where -- where was that located?
9    A.   Naperville.
10   Q.   Do you know where in Naperville?
11   A.   Again, 25 years ago.
12   Q.   Sure.
13        How did you pay for the hotel?
14   A.   I don't recall.  I don't remember if it
15 was cash, credit card.  I couldn't tell you.
16   Q.   Do you remember how long you stayed at
17 the hotel?
18   A.   Only two or three nights.
19   Q.   And after two or three nights, where
20 did you go to next?
21   A.   Well, I was picked up on a traffic
22 warrant from DeKalb County.
23   Q.   Okay.  Prior to being picked up on the
24 traffic warrant, were you still residing at the

Page 195

1 hotel --
2    A.   We were.
3    Q.   -- or did you go somewhere else?
4    A.   I don't know where Tina went after that.
5    Q.   Okay.  But up until the point of your
6 arrest on the traffic warrant, you were -- and Tina
7 were living at the hotel.
8    A.   That's correct.
9    Q.   Anyone come to visit you while you were
10 at the hotel?
11   A.   Just the detectives.
12   Q.   Okay.  Any family come there?
13   A.   No.
14   Q.   Any of Tina's friends or your friends
15 come over to the motel?
16   A.   No.
17   Q.   Okay.  Which detectives do you recall
18 coming over to the motel or hotel to talk to you?
19   A.   Cross and Guerreri.
20   Q.   When is the first time -- or strike
21 that.  It's a bad question.
22        How long had you been at the
23 hotel --
24   A.   I think --

Page 196

1    Q.   -- when you --
2    A.   -- a day, maybe two days.
3    Q.   Let me finish my question, sir.
4        How long had you been at the hotel
5 when either Detective Cross or Detective Guerreri
6 first came to talk to you there?
7    A.   One to two days.  I don't recall.
8    Q.   Did Cross and Guerreri come together?
9    A.   They did.
10   Q.   Okay.  Was Tina there?
11   A.   She was.
12   Q.   Was Tina still working her job at
13 McDonald's while --
14   A.   She was not.
15   Q.   Did she leave the McDonald's job?
16   A.   I do not know if she quit or just took
17 a leave because of what happened to her mom.
18   Q.   Were you working any jobs while you
19 were staying at the motel?
20   A.   No.  I didn't go to work because my job
21 was to take care of Tina.
22   Q.   What if anything did you do to help
23 with the funeral?
24   MS. THOMPSON:  Object to form.

Page 197

1        You can answer.
2    THE WITNESS:  We weren't -- Tina and I,
3 neither, were asked to really do much besides
4 flowers and -- and stuff.
5        Pam and Gary and -- as I stated
6 earlier, Jon Ripsky was a police captain, so
7 everybody just kind of collectively made funeral
8 arrangements.
9        And we brought flowers and ...
10 BY MR. POLICK:
11   Q.   What did you do to take care of Tina
12 during that period of time around the funeral?
13   A.   Anything and everything I could.
14   Q.   Okay.  What do you mean by that?
15   A.   Hug her, love her, buy her dinner.
16        Everything that -- it don't have to
17 be a husband.  Just has to be someone who loves
18 someone.
19   Q.   So when Detective Cross or Guerreri
20 came to first speak with you at the motel, were
21 they together?
22   A.   They were.
23   Q.   And was Tina there as well?
24   A.   Yes.

WILLIAM E. AMOR, 03/05/2020                    Page 198..201

Page 198

1    Q.   Okay.  And do you recall what time of
2  day it was that they came?
3    A.   Sometime in the morning.
4    Q.   Okay.  And what do you recall about
5  that contact with the police?
6    A.   Nothing.  As I stated, you know, we --
7  we went out to eat dinner last -- I couldn't tell
8  you where we went to dinner.  But ...
9          Everybody was upset.  Everybody had
10  had a little bit to drink.  And so we just said,
11  We'll call you later.
12          They really didn't give us a lot
13  peace.  So ...
14    Q.   What do you mean by that, they didn't
15  give you a lot of peace?
16    A.   Well, this was less than two days after
17  she lost her mom.  So ...
18    Q.   Okay.
19    A.   Even Tina said, I love my uncle, I love
20  all these detectives.  But they need to leave us
21  alone for a while.
22    Q.   Okay.  Did you feel the fire at the
23  condo was suspicious in nature?
24    MS. THOMPSON:  Object to form.

Page 199

1          You can answer.
2    THE WITNESS:  I did not.
3  BY MR. POLICK:
4    Q.   Why not?
5    MS. THOMPSON:  Same objection.
6          You can answer.
7    THE WITNESS:  I don't know how far to go with
8  this.
9          But Marianne smoked a lot.  And in
10  prep for my second trial, in Tina's testimony, she
11  lost a cigarette in Marianne's chair, but she
12  disputed it later.  So ...
13  BY MR. POLICK:
14    Q.   Did you find that suspicious?
15    MS. THOMPSON:  Object to form.
16          You can answer.
17    THE WITNESS:  I found it accidental.
18  BY MR. POLICK:
19    Q.   Okay.  Can you see how law enforcement
20  might find the fire suspicious --
21    A.   I do --
22    Q.   -- under the circumstances?
23          Could you see that?
24    MS. THOMPSON:  Object to form.

Page 200

1          You can answer.
2    THE WITNESS:  I do.  It's their job to
3  find -- to get to the bottom of it.
4  BY MR. POLICK:
5    Q.   Okay.  So when Cross and Guerreri first
6  came to the hotel, it sounds like you did not talk
7  to them, you asked them to leave?
8          Is that your recollection of it?
9    A.   I didn't ask them to leave.  It was
10  more like Tina said, Look, I'm not up to this; I
11  just lost my mom.
12    Q.   All right.  Did they interview either
13  you or Tina at that time?
14    A.   No.  They more or less made their
15  presence; said, We'd like to talk to you.
16          And we told them -- said, Look, you
17  know, we went and got something to eat in the last
18  night, and we got home kind of late.  So ...
19    Q.   Did they talk to you and Tina together
20  or separately?
21    A.   They did.  It was together.
22    Q.   All right.  Inside the --
23    A.   We were in the hotel room, yeah.
24    Q.   Okay.  And then at any time was it

Page 201

1  discussed with either Detective Cross or Detective
2  Guerreri that you would redo the polygraph because
3  the first time had turned out inconclusive?
4    A.   Only until I was picked up on the
5  traffic warrant.
6          They picked me up in DeKalb.
7    Q.   Right.  I'm talking about in
8  Naperville.
9    A.   No.  They did not ask me to do it there.
10    Q.   At the hotel they never asked you to --
11    A.   They did not.
12    Q.   They never explained to you that the
13  results were inconclusive?
14    A.   That I knew, but they didn't ask me to
15  take a retest.
16    Q.   Okay.  How -- how did you know that the
17  results were inconclusive?
18    A.   They told me.
19    Q.   Okay.  And when they told you your --
20  by "they," you mean Detective Cross and Guerreri?
21    A.   Yeah.
22    Q.   Okay.
23    A.   One of them.
24    Q.   And when they told you the tests were

WILLIAM E. AMOR, 03/05/2020                    Page 202..205

Page 202

1 inconclusive, did they ask you at that time, would
2 you be willing to take the test again?
3     A.    They did not.
4     Q.    Okay.  Did you want to take the test
5 again?
6     A.    I did.
7     Q.    Okay.  Did you offer to take the test
8 again?
9     A.    I did.
10    Q.    Okay.  Did you give them a time or a
11 date when you would be ready to take it again?
12    A.    I did not.  We -- I did not get a
13 chance because we were driving along and I got
14 picked up on the traffic warrant, got held at
15 Naperville Police Department, then transported to
16 DeKalb County.
17    Q.    Okay.  How many times do you recall the
18 police coming to speak to you while you and Tina
19 were staying at the hotel?
20    A.    That would be once.
21    Q.    Okay.  Any more times than that?
22    A.    Not to my knowledge.
23    Q.    Okay.  So it seems like the next event
24 you recall is that you were picked up on an

Page 203

1 outstanding warrant.
2     A.    That's correct.
3     Q.    All right.  Do you know which day that
4 was?
5     A.    (Shaking head.)
6     Q.    If I tell you the 15th of September of
7 1995, does that refresh your memory at all?
8     A.    That would.
9     Q.    Okay.  Do you recall if you were still
10 at -- staying at the hotel at that time?
11    A.    Tina probably was, but I was not.
12    Q.    Where were you?
13    A.    Well, on that date, I was at the police
14 station.
15    Q.    Yeah.  I'm talking about before the
16 police station.
17    A.    We were.
18    Q.    Okay.  And where were you when the
19 warrant was executed?
20    A.    Driving down Naper Boulevard.
21    Q.    Okay.  And whose car were you in?
22    A.    Tina's.
23    Q.    And who was driving?
24    A.    I think Tina was.

Page 204

1     Q.    Do you recall where you were going to?
2     A.    Actually, to be -- I think we were
3 going to the cemetery.
4     Q.    And did you have anything of an
5 alcoholic nature to drink that day --
6     A.    I did not.
7     Q.    -- before you were arrested?
8     A.    (Shaking head.)
9     Q.    None at all?
10    A.    No.  This was in the morning.
11    Q.    Okay.  About what time in the morning
12 was it that you got picked up?
13    A.    Again, 25 years ago.
14    Q.    Okay.  Do you remember -- well, strike
15 that.
16          Was the car pulled over?
17    A.    Yes.
18    Q.    Okay.  Was it a blue and white, or --
19    A.    Unmarked.
20    Q.    Unmarked car.
21          And do you remember who it was that
22 arrested you on the warrant?
23    A.    I do not.
24    Q.    Okay.  And what do you recall about

Page 205

1 being arrested on that -- on that warrant?
2     MS. THOMPSON:  Object to form.
3          You can answer.
4     THE WITNESS:  You have an outstanding traffic
5 warrant.
6 BY MR. POLICK:
7     Q.    Okay.  From DeKalb County?
8     A.    That's correct.
9     Q.    Okay.  When you were told that by the
10 officer, did you understand or know what that was
11 about?
12    MS. THOMPSON:  Object to form.
13          You can answer.
14    THE WITNESS:  I didn't know about the warrant.
15 BY MR. POLICK:
16    Q.    Okay.  Were you surprised?
17    A.    Yeah.  Because I knew that I had a
18 ticket, but I thought I had paid the ticket.  But,
19 again --
20    Q.    Well, was there a period of time that
21 you lived in DeKalb County?
22    A.    Briefly.
23    Q.    Where in DeKalb County did you live?
24    A.    Sandwich.

WILLIAM E. AMOR, 03/05/2020                                    Page 206..209

Page 206

1    Q.    Sandwich, Illinois?
2    A.    Yeah.
3    Q.    Did you live there alone or with
4  somebody?
5    A.    With a person.
6    Q.    Who did you live there with?
7    A.    A friend.
8    Q.    Who was the friend?
9    A.    A female friend.
10        That's all I'm prepared to say.
11   Q.    Okay.  You're-- well, what's the name
12 of the female friend?
13   A.    Again ...
14   Q.    Are you refusing to answer my question?
15   A.    She was just a friend.
16   Q.    I understand that she was a friend.  Do
17 you remember your friend -- your female --
18   A.    I do not.
19   Q.    -- friend's name?
20   A.    I do not.  It was a brief tryst.
21   Q.    Were you seeing Tina at the time, or
22 dating Tina at the time?
23   A.    I was not.
24   Q.    Okay.  What year did you live in

Page 207

1  Sandwich, Illinois?
2    A.    Early '90s.
3    Q.    After you were picked up on the
4  warrant, were you taken to the DeKalb -- I'm
5  sorry -- the Naperville Police Department?
6    A.    I was.
7    Q.    Okay.  Were you handcuffed?
8    A.    I was not.
9    Q.    Was Tina allowed to remain in the car?
10   A.    She was.
11   Q.    Okay.  Did she drive to the Naperville
12 Police Department?
13   A.    She did not.
14   Q.    Do you know where she went?
15   A.    I do not.
16   Q.    Okay.  Are you aware that a vodka
17 bottle was found in the car --
18   A.    I am not.
19   Q.    -- at the time the warrant -- you were
20 arrested on the warrant?
21   A.    I am not.  It was just in the morning.
22 So I'm not ...
23   Q.    Do you know where that vodka bottle
24 came from?

Page 208

1    A.    It might be the same one that was in
2  the trunk.
3    Q.    All right.  Was Tina a vodka drinker?
4    A.    I'm not sure.
5    Q.    Well, during the period of time that
6  you knew her, did you ever know her to drink vodka?
7    A.    Again, I trusted her.  She was my wife.
8  I trusted her.  But I -- again ...
9    Q.    No.  I understand you trusted her.
10        But did you ever see her drink vodka?
11   A.    No.  Just wine coolers.
12   Q.    That was her drink, wine coolers?
13   A.    (Gesturing.)
14   Q.    Okay.  So you're taking her over to the
15 Naperville Police Department?
16   A.    That's correct.
17   Q.    Do you recall where in the police
18 department you were when you were taken there?
19   A.    Upper level until DeKalb come and
20 picked me up.
21   Q.    And when you were brought into the
22 Naperville Police Department, did you go through
23 some type of booking process?
24   A.    No.  I was just in holding.

Page 209

1    Q.    You were in some type of holding area?
2    A.    Yes.
3    Q.    Was it a cell with bars, or was it a
4  room?
5    A.    It was just a room.
6    Q.    Okay.  Any furniture in the room?
7    A.    Yeah.  There was a chair --
8    Q.    Okay.
9    A.    -- I think.  But, again, long time ago.
10   Q.    Were you shown the warrant?
11   A.    I was not.
12   Q.    Okay.  Did you dispute the warrant at
13 all?
14   A.    I did, but I was never provided a copy
15 of it.
16   Q.    Okay.  When you say you disputed it,
17 what -- how did you dispute it?
18   A.    Well, it was a ticket that I -- I'm
19 sure I had paid, but -- apparently, you know ...
20   Q.    Okay.
21   A.    I take responsibility for it.  No
22 problem.
23   Q.    Were you interviewed at all at the
24 Naperville Police Department before you were then

WILLIAM E. AMOR, 03/05/2020                    Page 210..213

Page 210

1 taken to DeKalb?

2    A.  I was not.

3        Q.  Okay.  How long were you at the

4 Naperville Police Department before you were taken

5 to DeKalb?

6    A.  It took two or three hours for them to

7 come pick me up.

8        Q.  Okay.  During that two to three hours,

9 where were you at in the police department?

10   A.  Same holding room.

11       Q.  Okay.  Was anyone else in there with

12 you?

13   A.  People coming and going.

14       Q.  Did any detectives come and interview

15 you during that two to three hours that you were

16 there?

17   A.  They did not.

18       Q.  Okay.  Do you remember seeing Detective

19 Cross that day?

20   A.  No.

21       Q.  Do you remember seeing Detective

22 Guerreri that day at all?

23   A.  No.

24       Q.  Do you have any recollection of

Page 211

1 Detective Cross being at the hotel to see you and

2 Tina before you were picked up on the warrant?

3    A.  Yes.

4    MS. THOMPSON:  Object to form.

5        You can answer.

6    THE WITNESS:  I already stated --

7 BY MR. POLICK:

8        Q.  I mean --

9    A.  -- that they --

10       Q.  You're right.  Let me rephrase my

11 question.  You had indicated that he had come with

12 Guerreri on one occasion --

13   A.  That's correct.

14       Q.  -- while you were there.

15       The day that you were arrested on

16 the warrant, do you have any memory of Detective

17 Cross or Guerreri or any other detective coming out

18 to the hotel to interview you and Tina before you

19 were picked up on the warrant?

20   A.  No.

21       Q.  Okay.  When you were taken to the

22 DeKalb County jail -- that's in Sycamore, Illinois,

23 correct?

24   A.  Yes.

Page 212

1        Q.  Were you taken by Naperville officers?

2        Or did somebody from DeKalb --

3    A.  DeKalb came out.

4        Q.  DeKalb came out.

5    A.  They did.

6    MR. POLICK:  Why don't we go off the record

7 for a second.

8    THE VIDEO TECHNICIAN:  We're off the record

9 at 2:57.

10           (Recess taken.)

11           (Deposition Exhibit Numbers 3

12            and 4, Witness Amor, were

13            marked for identification

14            03/05/2020.)

15   THE VIDEO TECHNICIAN:  We're back on the

16 record at 3:05.

17 BY MR. POLICK:

18       Q.  Mr. Amor, you understand you're still

19 under oath?

20   A.  I do.

21       Q.  I just wanted to return briefly to the

22 Leavenworth residence.

23       After Detectives Cross and Guerreri

24 left the morning of September 11th of '95, did you

Page 213

1 and Tina have any discussion between yourselves

2 about the events of the day of the fire?

3    A.  Only to comfort each other.

4        Q.  Okay.

5    A.  As far as the actual -- what happened?

6        No, sir.

7        Q.  Okay.  And did you indicate that you

8 had been to the cemetery with Tina sometime

9 following the funeral?

10   A.  We did.

11       Q.  Okay.  And that would have been before

12 you were picked up on the warrant?

13   A.  That's correct.

14       Q.  When you visited the cemetery with Tina

15 before being picked up on the warrant, did you and

16 Tina have any discussion about the events of the

17 day of the fire?

18   A.  Not to my knowledge.

19       Q.  Did you discuss with Tina at all,

20 either at the Leavenworths' home or at the

21 cemetery, what could have caused the fire, how the

22 fire could have happened?

23   A.  Not that I recall.

24       Q.  I'm going to show you what's marked as

WILLIAM E. AMOR, 03/05/2020                    Page 214..217

Page 214

1 Exhibit 3 to your deposition.
2        Let me know when you've had an
3 opportunity to look at that, sir.
4    A.  I'm familiar with this.
5    Q.  Okay.  Looking at that document that's
6 entitled Statement of Miranda Rights and Waiver of
7 Rights, do you see your signature on that document?
8    A.  I do.
9    Q.  Okay.  And do you see that it's dated
10 September 15th of 1995 --
11   A.  Yes.
12   Q.  -- at 4:50 p.m.?
13   A.  Yes.
14   Q.  Okay.  Looking at Exhibit 3, does that
15 refresh your recollection in any way of having any
16 conversation with any Naperville police officers on
17 September 15th, 1995, before you were taken to the
18 DeKalb County jail in Sycamore?
19   A.  Obviously I did.
20       But do I recall this?  I do not.
21   Q.  Okay.  Do you have any memory of being
22 shown this form on September 15th of 1995?
23   A.  I do not.
24   Q.  Okay.  Do you have any memory of any

Page 215

1 officer from the Naperville Police Department going
2 over your Miranda rights with you on September 15th
3 of 1995?
4    A.  I do not.
5    Q.  Do you recall signing this form?
6    A.  I do not.
7    Q.  Okay.  Do you have any reason to
8 believe you did not sign this form on September 15th
9 of 1995?
10   A.  I do not.
11   Q.  Would it be fair to say that before
12 September 15th, 1995, you were familiar with what
13 your Miranda rights were?
14      MS. THOMPSON:  Object to form.
15          You can answer.
16      THE WITNESS:  Up until this happened, I
17 didn't know nothing about Miranda rights.
18 BY MR. POLICK:
19   Q.  Not at all?
20   A.  (Gesturing.)
21   Q.  In 1993 did you plead guilty to a fraud
22 charge for unlawful use of an electronic
23 transmission?
24   A.  I did.

Page 216

1    Q.  Okay.  You were arrested by the
2 Naperville Police Department in October of 1993 for
3 that charge?
4    A.  That's correct.
5    Q.  Do you recall that?
6        Do you recall getting your Miranda
7 rights at the time of that arrest for the fraud
8 charge?
9    A.  I do not.
10   Q.  Did you ultimately plead guilty to that
11 charge in December of 1993 --
12   A.  I did.
13   Q.  -- in the Circuit Court of DuPage
14 County?
15   A.  I did.
16   Q.  And were you sentenced to a period of
17 incarceration as a result of that guilty plea?
18   A.  I was.
19   Q.  Okay.  And where were you -- strike
20 that.
21       As a result of that guilty plea, did
22 you also have to pay restitution?
23   A.  I did.
24   Q.  Okay.  And the restitution payments,

Page 217

1 did you have to make those to the Circuit Court
2 of --
3    A.  I did.
4    Q.  -- of DuPage County?
5    A.  I did.
6    Q.  Okay.  And when you were sentenced, did
7 you spend any time in the DuPage County jail?
8    A.  I did.
9    Q.  Okay.  For how long of a period of time
10 were you in the DuPage County jail?
11   A.  180 days, which is 90 days.
12   Q.  Given day-to-day good time?
13   A.  Um-hmm.  Yes, sir.
14   Q.  Is that a yes?
15   A.  Yes.
16   Q.  Okay.  And sometime shortly after you
17 were married to Tina, you violated your probation
18 on that charge and returned to the DuPage County
19 jail; is that correct?
20      MS. THOMPSON:  Object to form.
21          You can answer.
22      THE WITNESS:  No.  Actually Tina picked me up
23 after my 90 days.
24

Urlaub Bowen & Associates, Inc.    312-781-9586

WILLIAM E. AMOR, 03/05/2020                    Page 218..221

Page 218

1 BY MR. POLICK:
2     Q.   Okay.  And you don't recall being in
3 the DuPage County jail serving time for a violation
4 of probation on this fraud charge?
5     A.   I do not.
6     Q.   You don't recall that happening shortly
7 after you were married to Tina?
8     A.   My marriage to Tina included the
9 90 days for this charge.  I do not recall anything
10 after that.
11     Q.   Do you know what month you were married
12 to Tina in 1995?
13     A.   Would have been summertime sometime.
14     Q.   You don't recall being in the DuPage
15 County jail from May 1995 to approximately July
16 1995?
17     A.   I do not.
18     Q.   Do you recall writing any letters to
19 Tina while you were in the DuPage County jail that
20 summer of 1995?
21     A.   The letters would have been the 90 days
22 for the fraudulent check.
23     Q.   Was it a fraudulent check, or some
24 other type of fraudulent transmission that you pled

Page 219

1 guilty to?
2     MS. THOMPSON:  Object to form.
3         You can answer.
4     THE WITNESS:  I helped someone, but I'm
5 ultimately responsible.  That's all I'm going to
6 say.
7         I took -- I took -- I took the heat
8 for something that I'm responsible for.
9 BY MR. POLICK:
10     Q.   Do you recall being arrested for
11 criminal trespass to state-supported land and
12 driving with a revoked license --
13     A.   I do.
14     Q.   -- in September of 1994, by the
15 Naperville police?
16     A.   I do.
17     Q.   Okay.  Do you recall pleading guilty to
18 those charges in May of 1995?
19     A.   I do.
20     Q.   And did you serve time in the DuPage
21 County jail for that --
22     A.   I did.
23     Q.   -- offense?
24         When you were arrested and charged

Page 220

1 with those offenses, were you read your Miranda
2 rights?
3     A.   I can only speculate I was.
4         Do I recall?  I do not.
5     Q.   So looking again at Exhibit 3 in its
6 entirety, does that do anything to refresh your
7 recollection of any conversation you may have had
8 with a Naperville Police Department officer or
9 detective on September 15th, 1995, before -- after
10 being picked up on the traffic warrant, but before
11 being sent to the DeKalb County jail?
12     A.   I do not recall.
13     Q.   All right.  Let me show you what's been
14 marked as Exhibit 4.
15     A.   Okay.
16     Q.   Take a look at that document.
17         Have you had an opportunity to look
18 at that document?
19     A.   Yeah.  I understand it, and I've read
20 it before.
21     Q.   Okay.
22     A.   What's missing here is a timestamp.
23         This was the middle of the night.
24     Q.   I thought you told me that you were

Page 221

1 arrested on the warrant sometime in the morning
2 hours of September 14th.
3     A.   No.  This is -- this is from the
4 Naperville police station.
5     Q.   Yes.  Do you see the date at the bottom
6 of the first page there, 9/15/95?
7     A.   Yes.  But this was in the middle of the
8 night.
9     Q.   Sir, I'm not asking you anything about
10 the time right now.
11         Do you see the date, 9- --
12     A.   I do.
13     Q.   -- -15/95 at the bottom of the first
14 page of this?
15         Is that your handwriting on the
16 first page?
17     A.   It is.
18     Q.   Okay.  Is that your handwritten name at
19 the top of the page?
20     A.   It is.
21     Q.   And at the bottom of the page, is that
22 your signature?
23     A.   It is.
24     Q.   Okay.  Looking at page 1 of this

WILLIAM E. AMOR, 03/05/2020                    Page 222..225

Page 222

1 Exhibit 4, does that in any way refresh your
2 recollection of having any conversation with any
3 Naperville police officer on September 15th, 1995,
4 after you were arrested on the DeKalb warrant, but
5 before you were transferred to the DeKalb County
6 jail?
7     A.    No.
8     Q.    And looking at page 2 of Exhibit 4, do
9 you see the diagram?
10    A.    I do.
11    Q.    Okay.  Do you see that there's certain
12 markings on the diagram?
13    A.    I do.
14    Q.    Are those your initials next to those --
15    A.    They are.
16    Q.    -- items on the -- that are drawn on
17 the diagram?
18    A.    They are.
19    Q.    Okay.  And do you see that right
20 underneath the diagram, it's dated September 15th,
21 1995?
22    A.    Yes, sir.
23    Q.    Okay.  And do you see -- is that your
24 signature at the bottom right-hand corner of that?

Page 223

1     A.    Yes, sir.
2     Q.    Okay.  And you see that it was signed
3 by officers of the Naperville Police Department?
4     A.    Yes, sir.
5     Q.    Okay.  Looking at page 3 of Exhibit 4,
6 does your handwriting appear anywhere on that page?
7     A.    I got three pages.
8     MS. THOMPSON:  Can you just clarify where
9 you're talking about, Joe?  I'm sorry.  I think ...
10    MR. POLICK:  Yeah, pages --
11    THE WITNESS:  I don't have a page 4.
12 BY MR. POLICK:
13    Q.    Pages 2 and 3 -- or page 3 of Exhibit 4.
14          Maybe I was unclear.  It's the last
15 page, if that makes it any clearer.
16    A.    Yeah.
17    Q.    Does your handwriting appear anywhere
18 on the last page of Exhibit --
19    A.    It does not.
20    Q.    Okay.  Does looking at the second and
21 third pages of Exhibit 4 refresh your recollection
22 in any way of having any conversation with any
23 Naperville police officer or detective on
24 September 15th, 1995, after you were arrested on

Page 224

1 the warrant, but before you were transferred to the
2 DeKalb County jail?
3     A.    I do not recall.
4     Q.    Okay.  Looking at Exhibit 4 in its
5 entirety, do you have any reason to believe that
6 you did not have a conversation with someone from
7 the Naperville Police Department on September 15th,
8 1995, after you were picked up on the warrant, but
9 before being transferred to the DeKalb County jail?
10    A.    When I was being held at Naperville
11 Police Department till DeKalb come, I turned over
12 my keys, my wallet.  I had on a pair of shorts and
13 a T-shirt.
14          So I'm not really clear exactly what
15 I said or did not say.
16    Q.    Okay.  And you told me earlier you
17 weren't drinking that day, correct?
18    A.    No, I wasn't.  I was just -- this was
19 in the evening, and I was arrested on a traffic
20 warrant.  I couldn't figure out why I was being
21 held for a traffic warrant.
22    Q.    On that day that you were picked up on
23 the traffic warrant, were you under the influence
24 of any other substance?

Page 225

1     A.    Of course not.
2     Q.    Okay.  On September 15th of 1995,
3 were you taking any prescription medication that
4 affected your memory?
5     A.    I was not.
6     Q.    Okay.
7     A.    To be fair, I was a little outside
8 myself.  I was scared.  I had no money, no keys, no
9 place to live.
10    Q.    Do you have any recollection of Tina
11 being at the Naperville Police Department on
12 September 15th of --
13    A.    She was not.
14    Q.    Let me finish my question, sir.
15    A.    I'm sorry.
16    Q.    Do you have any recollection of Tina
17 being present at the Naperville Police Department
18 on September 15th of 1995?
19    A.    At some point she must have, because
20 she had my wallet and keys.
21    Q.    The officers did not take that personal
22 property with you when they arrested you on the
23 warrant?
24    A.    They did not.  They gave it to Tina.

Page 226

1    Q.   Okay.  Looking at Exhibit 4, the first
2 page, that is your handwriting, correct?
3    A.   That's correct.
4    Q.   Can you read for us what you have
5 written there?
6    A.   On Sunday, September 10th, watch
7 football from 12:00 to approximately 6:20.
8 Marianne Miceli and Tina Amor were watching on and
9 off with me at least.
10        At about 1:15 p.m. they both left to
11 go pick up a pizza at Edwardo's and came back about
12 2:15.  Had a bottle of vodka on the coffee table
13 and a glass and an ashtray on the floor in front of
14 the TV.
15        There was a Chicago Tribune on the
16 floor between the couch and coffee table.  There
17 was a scented candle on the coffee table.  Went to
18 refill my drink, had an accident, knocked over the
19 vodka bottle, spilling it on the newspapers.  I
20 felt it would cause harm, so I didn't wipe off the
21 paper.
22        Upon leaving at 6:20 p.m., I don't
23 recall blowing out the candle, cannot remember when
24 or where I put out my last cigarette.

Page 227

1    Q.   All right.  And that's all in your
2 handwriting.
3    A.   That's correct.
4    Q.   And do you see on the second-to-last
5 line, there appears to be a mark, maybe a
6 correction?
7        Do you see that there, after the
8 word "remember"?
9    A.   I do.
10    Q.   Is that your initials next to it --
11    A.   It is.
12    Q.   -- to the correction?
13        Do you know what was there that you
14 corrected?
15    A.   I do not.
16    Q.   Okay.  Does reading over this refresh
17 your memory in any way about having a conversation
18 with anybody from the Naperville Police Department
19 about the events of the September 10th fire when
20 you were there at -- on September 15th of 1995
21 after being arrested on the warrant?
22    A.   No.  I just -- my assumption is this
23 from the Naperville Police Department after we got
24 back from Chicago.

Page 228

1    Q.   No, sir.  This is --
2    A.   Okay.
3    Q.   This is September 15th of 1995.
4        You indicated that you did see that
5 date there at the bottom of the first page.
6    A.   I did.
7    Q.   Okay.
8    A.   But I'm trying to explain that -- the
9 fact that I didn't -- I don't remember writing
10 this.  I remember writing what I did after actually
11 being arrested --
12    Q.   Okay.  Is there --
13    A.   -- but not on the traffic warrant.
14    Q.   Is there anything inaccurate about what
15 you just read to us from Exhibit 4, the first page?
16    A.   No.  I'm not disputing I wrote it.
17        But I don't recall it.
18    Q.   No, I understand that you're not
19 disputing that you wrote it, and I understand that
20 you -- you don't recall it.
21        My question is, is there anything
22 inaccurate in your handwriting here that you just
23 read to us on the record?
24        MS. THOMPSON:  Object to form.

Page 229

1        You can answer.
2        THE WITNESS:  It's my writing.
3        That's all I'll admit to.
4 BY MR. POLICK:
5    Q.   Well, is there anything inaccurate
6 about what you wrote down here?
7        MS. THOMPSON:  Object to form.
8        You can answer.
9        THE WITNESS:  It's inaccurate.  I made
10 statements that are inaccurate.
11 BY MR. POLICK:
12    Q.   In the entirety of this?
13    A.   No.  The football and everything else
14 was fine.  But ...
15    Q.   Why don't you do this.
16        Why don't you take this highlighter
17 and go through that first page and just highlight
18 with that yellow highlighter the parts of your
19 handwriting here that are inaccurate.
20        MS. THOMPSON:  Object to form.
21        You can answer.
22        THE WITNESS:  (Complying.)
23        MR. POLICK:  Thank you.
24        THE WITNESS:  Thank you.

WILLIAM E. AMOR, 03/05/2020                                    Page 230..233

Page 230

1    MS. THOMPSON:  Joe, can I see that, please?
2    MR. POLICK:  Yeah, sure.
3    THE WITNESS:  Do you want a copy of that?
4    MR. POLICK:  No.
5    THE WITNESS:  Okay.
6    MR. POLICK:  You can keep that for now.
7  BY MR. POLICK:
8    Q.   Okay.  Directing your attention back to
9  Exhibit 4, specifically the areas of that -- of
10 your handwriting that you just highlighted, your
11 first highlight -- it starts about eight lines up.
12        It's the part that says -- and
13 correct me if I'm wrong -- I went to refill my
14 drink and by accident knocked over the vodka
15 bottle, spilling it on the newspapers.  I felt it
16 would cause no harm, so I didn't wipe off the paper.
17        Did I read your that -- handwriting
18 correctly?
19   A.   Yes, that's it.
20   Q.   Okay.
21   A.   But those statements are incorrect.
22   Q.   Okay.  And then the next part of this
23 statement that you indicated was inaccurate is your
24 handwriting three lines from the bottom, starting

Page 231

1 about midline.  It says:  And cannot remember when
2 and where I put out my last cigarette.
3   A.   That's --
4   Q.   Is that correct?
5        I mean, is that what you
6 highlighted?
7   A.   Yeah, that -- that's incorrect.
8   Q.   All right.
9   A.   It's not something I would ever do.
10   Q.   What do you mean, that's not something
11 you would ever do?
12   A.   Leave a cigarette burning?
13        Of course, no.
14   Q.   You did tell us there was a candle on
15 the coffee table that day.
16   A.   That's correct.
17   Q.   Okay.  And --
18   A.   Marianne loves scented candles.
19   Q.   All right.
20   A.   I think it was scented.
21   Q.   And was that candle lit the day of the
22 fire?
23   A.   I believe it was, and it was on the
24 coffee table I was sitting next to.

Page 232

1        What I do not know for a fact is
2 that if one of -- if Tina blew it out before she
3 left, since I was not the last one to leave.
4   Q.   All right.  When you left the living
5 room to get the cooler to take it downstairs, did
6 you blow out the candle?
7   A.   I did not.
8   Q.   And if we could go back to -- I think
9 it's exhibit -- I want to say 2, where you made the
10 drawings, which would be under that exhibit.
11        It's the diagram?
12   A.   Yeah, right.  Okay.
13   Q.   Did you indicate for us that -- the
14 candle on the coffee table?
15   A.   No.  I can, though.
16   Q.   Yeah, please do that.  You can put
17 "candle" or wherever you want to put it there.
18        And while you're doing that, can you
19 indicate -- you told us that you had the sections
20 of the Tribune kind of spread out on the carpet.
21        Can you draw on there where the
22 newspapers were --
23   A.   Well, it would have been --
24   Q.   -- or make it up?

Page 233

1   A.   -- right around the table area, which
2 is in the center of the room.  So ...
3   Q.   Okay.  Can you kind of draw a circle --
4   A.   Just write "Tribune" on there?
5   Q.   Or draw a circle, or whatever you want
6 to mark -- to do there.
7   A.   Okay.  I'm just going to write
8 "Tribune" in.
9        It's a small living room.  It's kind
10 of -- everything's kind of bunched up.  So ...
11   Q.   And I think you told us the ashtray
12 was -- as you recall it, was on the coffee table as
13 well, the one you were using?
14   A.   Candle -- yes, all at the same point.
15   Q.   All right.  And did we indicate on
16 there the ashtray on Marianne's little table next
17 to her chair?
18   A.   Lamp, table, chair, ashtray.
19   Q.   Do you remember what time of day it was
20 when you were transported from the Naperville
21 Police Department to the DeKalb County jail in
22 Sycamore on September 15th of 1995?
23   A.   Early evening.
24   Q.   And before you left Naperville that

Page 234

1 day, did you go through any booking process? Were
2 you photographed? Fingerprinted?
3          Do you recall that happening
4 anywhere?
5     A.  I do not.
6     Q.  All right.  When you got to the DeKalb
7 County jail in Sycamore, did you go through some
8 booking process there upon entry or intake of the
9 jail?
10    A.  I did.
11    Q.  Okay.  Were you photographed?
12    A.  I don't remember -- I'm assuming I was.
13    Q.  Okay.  Does anything stand out in your
14 mind about interacting with the people at the
15 DeKalb County jail who were part of the intake
16 process?
17    A.  No.  I was --
18    MS. THOMPSON:  Object to form.
19          But you can answer.
20    THE WITNESS:  I was thrown in a -- in a cell
21 for two weeks.
22 BY MR. POLICK:
23    Q.  Okay.  When you were put in the cell at
24 the DeKalb County jail, were you in a cell alone,

Page 235

1 or did you have a cellmate?
2     A.  I was in a cell alone.
3     Q.  And was that for the entirety of the
4 time that you were there?
5     A.  That's correct.
6     Q.  Okay.  And is it your memory that the
7 next time you had -- well, strike that.
8          Is it your memory that you were
9 released from the DeKalb County jail on October 3rd
10 of 1995?
11    A.  I'm unclear of the date.  That would
12 be -- that would be accurate.
13    Q.  During that period of time from -- that
14 you were at the DeKalb County jail, from
15 September 15th to October 3rd of 1995, did you have
16 any visitors at the DeKalb County jail?
17    A.  I did not.
18    Q.  Did Tina come to visit you at all while
19 you were at the DeKalb County jail between the 15th
20 of September and the 3rd of October?
21    A.  She did not.
22    Q.  Do you know why she didn't come to
23 visit you?
24    A.  I do not.

Page 236

1     Q.  Did you have any phone contact or phone
2 conversations with Tina during that period of time
3 you were at the DeKalb County jail?
4     A.  I did not.
5     Q.  Did you attempt to contact her while
6 you were at the DeKalb County jail?
7     A.  I did, but it's only collect calls.
8     Q.  Okay.  How many times did you attempt
9 to contact Tina?
10    A.  I can only guess.  I was there for over
11 two weeks, so I'm guessing a few.
12          Again, a long time ago.
13    Q.  You said earlier that back then nobody
14 had cellphones.
15          Where were you calling collect to
16 reach Tina?
17    A.  Probably at Pam and Gary's.  That would
18 be my guess.
19    Q.  Do you know where Tina went to reside,
20 or who she was living with, after your arrest on
21 the DeKalb warrant?
22    A.  I do not.
23    Q.  Do you know if she ever returned to the
24 motel?

Page 237

1     A.  I do not.
2     Q.  Okay.  Do you know for a fact that she
3 went to live with the Leavenworths, or is that just
4 an assumption on --
5     A.  It's --
6     Q.  -- on your part?
7     A.  It's an assumption, and -- but it was
8 also hopeful that she had a place to go.
9     Q.  So when you were released from the
10 DeKalb County jail on October 3rd of '95, do you
11 recall what time of day it was that you were
12 released?
13    MS. THOMPSON:  Object to form.
14          You can answer.
15    THE WITNESS:  Right around 10:00, 10:30.
16 BY MR. POLICK:
17    Q.  Did you attend court that morning prior
18 to your release?
19    A.  I don't think it was that day.
20          I think it was maybe -- I don't
21 recall going to court that early.
22          It may have been.  I'm unclear.
23    Q.  While you were at the DeKalb County
24 jail from September 15th to October 3rd of 1995,

WILLIAM E. AMOR, 03/05/2020                          Page 238..241

Page 238

1  did you sustain any injury at all while you were in
2  the jail?
3      A.   I did not.
4      Q.   Did you suffer from any illnesses while
5  you were in the DeKalb County jail?
6      A.   I did not.
7      Q.   When you were released, about 10:00 or
8  10:30 on October 3rd at the DeKalb County jail, was
9  there anyone there to meet you?
10     A.   Detective Cross and Detective Guerreri.
11     Q.   Was Tina there --
12     A.   She --
13     Q.   -- at the -- at the DeKalb County jail
14  when you were released?
15     A.   She was not.
16     Q.   Did you know why Tina was not there?
17     A.   I did not.
18     Q.   Did you have any understanding of why
19  she did not come to visit you while you were at the
20  DeKalb County jail?
21     A.   I did not.
22     MS. GARCIA:  Object to form.
23         You can answer.
24

Page 239

1  BY MR. POLICK:
2      Q.   Did you have any knowledge of why she
3  did not attempt to reach you by phone at the -- at
4  the jail?
5      A.   I did not.
6      Q.   All right.  Which detectives were at
7  the jail there to meet you, in DeKalb?
8      A.   I just stated both of them.
9      Q.   Cross and Guerreri?
10     A.   That's correct.
11     Q.   Okay.  And were you still inside the
12  building when you saw them, or did you see them as
13  you left the building?
14     MS. THOMPSON:  Object to form.
15         You can answer.
16     THE WITNESS:  They were in the building.
17  BY MR. POLICK:
18     Q.   And what did they say to you and what
19  did you say to them?
20     A.   Again, 25 years ago.
21         We'd like to talk to you.  So I said
22  okay.
23     Q.   And what happened next?
24     A.   We got in the car, and I assumed they

Page 240

1  were going to just take me somewhere to find
2  housing.
3      Q.   Why did you assume that Detective Cross
4  or Detective Guerreri were going to find you some
5  type of housing?
6      A.   I didn't expect them to pay for it.
7  I expected them to be human beings.
8          I had lost everything.
9      Q.   I understand that.  But what -- what
10  formed your belief or understanding that they were
11  going to find you housing when they met you at the
12  DeKalb County jail?
13     A.   I'd been through a lot.  I just thought
14  maybe there was something more to this.
15         I didn't know we were going to
16  Reid & Associates at that point.
17     Q.   They didn't discuss that with you
18  beforehand?
19     A.   Not till we were on the road.
20     Q.   All right.  They didn't mention to you
21  this was an opportunity to retake the polygraph
22  exam that --
23     A.   Not until we were in the car.
24     Q.   How long were you in the car before

Page 241

1  that was discussed?
2      A.   I don't recall.
3          It was a short period of time where
4  I realized the doors were locked.
5      Q.   Was it a police car you were in?
6      A.   A detective car.
7      Q.   Unmarked car?
8      A.   That's correct.
9      Q.   Okay.  Were you handcuffed?
10     A.   I was not.
11     Q.   And did you go directly from the DeKalb
12  County jail in Sycamore to Chicago?
13     A.   We did.
14     Q.   Stop anywhere along the way?
15     A.   We did not.
16     Q.   When the discussion came up about going
17  to Reid & Associates, who brought that subject up?
18     A.   One of the two detectives.
19         I mean, obviously it wasn't me.  I'd
20  never even heard of Reid & Associates.
21     Q.   That had no meaning to you at the time?
22     A.   It did not.
23     Q.   Okay.  Did either of the detectives
24  explain to you that they were a polygraph business

WILLIAM E. AMOR, 03/05/2020                    Page 242..245

Page 242

1 or firm?
2    A.   Yes.
3    Q.   Okay.  And did they tell you that they
4 were probably the best in that business at the time?
5    A.   No.
6    MS. THOMPSON:  Object to form.
7        You can answer.
8 BY MR. POLICK:
9    Q.   How long did it take you to go from
10 Sycamore to Chicago?
11   A.   Hour and a half, two hours.
12   Q.   Okay.  Stop anywhere along the way?
13   A.   We did not.
14   Q.   Okay.  Had you had anything to eat
15 before you were released from the DeKalb jail?
16   A.   I had not.
17   Q.   Did you ask the officers to stop to get
18 you anything to eat during the trip to Chicago?
19   A.   I did not.
20   Q.   Did you ask for anything to drink?
21   A.   I did not.
22   Q.   You were still a smoker back then?
23   A.   I was.
24   Q.   Okay.  Were you allowed to smoke in the

Page 243

1 car on the way?
2    A.   I was not.
3    Q.   Did you ask to have a cigarette?
4    A.   I did not.
5    Q.   When you got to downtown Chicago, do
6 you know where you were taken, where Reid's
7 building was?
8        Do you have any memory of that?
9    A.   Not until I got there.
10   Q.   Okay.
11   A.   To this day I couldn't tell you what
12 the address is.
13   Q.   And was it an office building like
14 you're in today, where you got to go up an
15 elevator?
16   A.   Yes.
17   Q.   Okay.  What happened when you got to
18 Reid & Associates?
19   A.   I don't remember what floor it was.
20   Q.   From the car that you were in, and
21 then --
22   A.   Well, they have a parking garage, I
23 believe.
24   Q.   Okay.  So you parked in some parking

Page 244

1 garage down here?
2    A.   To my recollection.
3    Q.   Okay.  When you were taken out of the
4 car that you were in and you walked to Reid &
5 Associates, were you handcuffed then?
6    A.   I was not.
7    Q.   All right.  Did you have to take an
8 elevator in the building to get to Reid's offices?
9    A.   I believe we did.
10   Q.   All right.  And what happened when you
11 got to Reid's offices?
12   A.   At the time they were still open for
13 business.  We checked in, and we waited for -- I
14 don't know -- someone to come out.  I don't know
15 who it was.
16   Q.   Okay.  When you walked through the main
17 entrance, was it a glass door like you kind of
18 walked in through today?
19   A.   That's correct.  And a lobby.
20   Q.   Okay.  And then a small lobby inside
21 the glass doors?
22   A.   Again, yeah.  Few chairs.
23   Q.   All right.  Was there a reception desk,
24 for lack of a better word?

Page 245

1    A.   I believe so.
2    Q.   Okay.  Anyone else there besides you
3 and Detective Cross and Detective Guerreri in terms
4 of people waiting to be -- for business at Reid?
5    A.   A guy named Masokas, and I don't
6 remember the other guy's name.
7    Q.   Can you describe Masokas to me?
8    A.   25 years ago.  No.
9    Q.   How about the other guy whose name you
10 don't remember?
11   A.   I do not.
12   Q.   Okay.  And was it your understanding
13 that Masokas and the other guy were both employees
14 of Reid?
15   A.   That's correct.
16   Q.   What happened next?
17   A.   We waited for a while, and I was moved
18 around to a couple different rooms.
19       I went to go to the bathroom, which
20 was down the hall.  At the time I thought I was
21 free to leave.
22       But when I came out of the bathroom,
23 they were standing in the hallway.
24   Q.   Let me ask you a few questions about

Page 246

1 that.

2      Q.    At any time while you were at Reid &

3 Associates, were you handcuffed?

4      A.    I was not.

5      Q.    Okay.  And you said at some point you

6 were moved to a different room?

7      A.    Yeah.  One had a window in it, and the

8 other one was just a small room.

9      Q.    Okay.  When you were taken to that --

10 that room, or those rooms, did you have to go past

11 some secure area to get to them?

12     A.    No.  I was escorted.

13     Q.    Who escorted you to those rooms?

14     A.    Detectives.

15     Q.    And when they escorted you to those

16 rooms, were they with Masokas and the other

17 employee?

18     A.    I don't remember.  Too long ago.

19     Q.    Did the detectives remain in those

20 rooms with you, or go somewhere else when you --

21     A.    When I took the polygraph, they were on

22 the other side of the window.

23     Q.    Okay.  What window are you talking

24 about?

Page 247

1      A.    Well, there's a window in the

2 interrogation room.  It's on the other side.

3      Q.    Okay.  Could you see them?

4      A.    No.

5      Q.    Do you know if they could see you?

6      A.    I'm fairly certain they could see me.

7          That's my guess.

8      Q.    All right.  But you don't know for

9 certain?

10     A.    I do not.

11     Q.    And it sounds like sometime while you

12 were at Reid, you did ask to use the restroom, and

13 you were allowed to do that?

14     A.    I did.

15     Q.    Okay.  When you went to use the

16 restroom, did you have to go outside their office

17 doors, like you're doing today here at my office,

18 and use the bathroom out in the hall?

19     A.    I did.

20     Q.    Okay.  Were you handcuffed at that time?

21     A.    I was not.

22     Q.    Okay.  When you went to the bathroom,

23 did you have to pass the elevators to get there?

24     A.    I'm not sure if the elevators were in

Page 248

1 and around the restrooms or not.  I don't remember.

2      Q.    And when you returned from the restroom,

3 you said there were people in the hall?

4      A.    One of the detectives.

5          I couldn't tell you which one.

6      Q.    And then when you went back in to

7 Reid's offices, did you go back to the room that

8 you were in?

9      A.    Yes.  I sat in the lobby.

10     Q.    You sat in the lobby?

11     A.    I did.

12     Q.    Okay.  Were you sitting in the lobby

13 with anyone else?

14     A.    I don't recall.

15     Q.    Okay.  Were either of the detectives

16 with you in the lobby?

17     A.    I don't recall.

18     Q.    Was there a period of time you were in

19 the lobby, and then you were taken back in to one

20 of these smaller rooms where the test is conducted?

21     A.    Yes.

22     Q.    Okay.  At any time that you were at

23 Reid, did you ask for anything to eat?

24     A.    I did not.

Page 249

1      Q.    At any time where you were at Reid, did

2 you ask for anything to drink?

3      A.    I did not.

4      Q.    At any time while you were at Reid &

5 Associates, did you ask to smoke a cigarette?

6      A.    I did not.

7      Q.    Okay.  Did you have cigarettes on you?

8      A.    I did not.

9      Q.    Did you get any cigarettes from anybody

10 while you were there?

11     A.    I did not.

12     Q.    How long do you think you were in the

13 lobby area before you were taken for the exam?

14     A.    We got there sometime afternoon.  I

15 don't know.  Probably an hour, between an hour and

16 two.

17     Q.    And is the test something that you

18 wanted to take?

19     MS. THOMPSON:  Object to form.

20          You can answer.

21     THE WITNESS:  Yeah, I did.

22 BY MR. POLICK:

23     Q.    Did anyone threaten you to take the

24 test?

Page 250

1    A.   No.
2    Q.   When -- before the test was taken, did
3 you have any discussion with any of the employees
4 from Reid?
5    A.   I did not.
6    Q.   Okay.  Before the test, did they -- the
7 Reid employees explain to you what was going to
8 happen and how this would take place?
9    A.   Briefly.  A polygraph, it was pretty
10 simple.  You know what I mean?
11        They explain to you when they're
12 hooking up what -- and they do a test question.
13 So ...
14    Q.   Okay.  Did any of the employees from
15 Reid discuss with you any of the questions that
16 were going to be asked?
17    A.   Just the test question.
18    Q.   What do you mean by "just the test
19 question"?
20    A.   Well, they always test -- yeah, they
21 test you to make sure everything's accurate.
22    Q.   Okay.
23    A.   They say, is your name John Smith, you
24 know?  So this kind of stuff.

Page 251

1    Q.   Okay.  Other than the polygraph on the
2 3rd of October and that one you took back on the
3 12th of September that came back inconclusive, had
4 you been polygraphed before that?
5    A.   I have not.
6    MS. THOMPSON:  Object to -- object to form.
7        You can answer.
8    THE WITNESS:  I have not.
9 BY MR. POLICK:
10    Q.   Okay.  So when you're at Reid now on
11 October 3rd, did any of the employees from Reid ask
12 you about your overall condition before the exam
13 started?
14    A.   They did not.
15    Q.   Did they ask you if you had eaten
16 anything?
17    A.   They did not.
18    Q.   Did they ask you if you were feeling
19 okay?
20    A.   They did not.
21    Q.   Did they ask you if you were suffering
22 from any illness?
23    A.   They did not.
24    Q.   Did they ask you if you had slept?

Page 252

1    A.   They did not.
2    Q.   Did they explain to you that you were
3 free to leave and stop the test at any time?
4    A.   They did not.
5    Q.   Okay.  Did anybody, while you were
6 there, explain to you that you were free to leave?
7    A.   They did not.
8    Q.   You said it was a brief period of time
9 before the test that you were talking to the Reid
10 employees.
11    A.   Yes.
12    Q.   Okay.  Were Detectives Cross and
13 Guerreri in the room while the Reid employees were
14 explaining what was going to go on?
15    A.   I don't recall.
16    Q.   And when you actually gave the test,
17 about how long did that take, to do the polygraph
18 exam?
19    A.   Half an hour, give or take a little
20 bit.
21    Q.   Okay.  Who was in the room with you
22 when you took the test?
23    A.   I don't -- there were two of them.
24        I know Masokas was one, but I don't

Page 253

1 remember the other gentleman's name.
2    Q.   But the other gentleman was a Reid
3 employee?
4    A.   He -- that's correct.
5    Q.   Neither Detective Cross nor Detective
6 Guerreri was in the room while you were given the
7 polygraph.
8    A.   No.  I can only assume they were on the
9 other side of the window.
10    Q.   Okay.  But that's an assumption; you
11 don't know that for a fact.
12    A.   Fair enough.
13    Q.   After you completed the test, was there
14 any discussion with the Reid employees?
15    A.   No.
16    Q.   Did they remain in the room with you?
17    A.   They did.
18    Q.   Okay.  Did they go to look over the
19 results of the -- the test?
20    A.   I'm not --
21    MS. THOMPSON:  Object to form.
22        You can answer.
23    THE WITNESS:  I'm not sure which employee did.
24

WILLIAM E. AMOR, 03/05/2020                    Page 254..257

Page 254

1 BY MR. POLICK:

2    Q.   Okay.  Did either of them leave the
3 room after the test was completed?

4    A.   No.  I was not left alone in the room.

5    Q.   Okay.  Who was in the room with you?

6    A.   As I stated, I don't remember which
7 Masok- -- or, I mean, which employee it was.

8    Q.   All right.  But it was one of the Reid
9 employees --

10   A.   It was.

11   Q.   -- that remained in the room with you?

12        At some point were you told the
13 results of the test?

14   A.   I was.

15   Q.   And what were you told?

16   A.   Told that -- well, two different things.

17        One employee said, you didn't do it,
18 but you know who did.  And then I was told I failed
19 the polygraph.

20   Q.   How did you feel when you were told you
21 failed the polygraph?

22   A.   Like crap.

23   Q.   Do you know which of the Reid employees
24 told you you failed the polygraph?

Page 255

1    A.   I do not.

2        By that time I'd been up since 4:00
3 o'clock in the morning.  And we're approaching -- I
4 was there from like 12:30 or 1:00 till 10:00
5 o'clock at night.

6    Q.   Did you -- strike that.

7        Do you recall which of the Reid
8 employees told you you didn't do it, but you know
9 who did?

10   A.   I don't.  There was only two of them on
11 duty that night.

12   Q.   Okay.

13   A.   Masokas and I don't know the other one.

14        You'd have to refer to counsel.

15   Q.   After you were told that you failed the
16 polygraph test, was there any further conversation
17 with the Reid employees?

18   A.   This was later on in the evening.

19        I don't think so.  If there was, I
20 don't recall.

21   Q.   At any time were -- strike that.

22        At any time that you were with the
23 Reid employees, did you tell them that you needed
24 to rest?

Page 256

1    A.   No.  My main goal was to get through
2 this.

3    Q.   At any time that you were with the Reid
4 employees, did you tell them that you needed to
5 sleep?

6    A.   I did not.

7    Q.   Ever tell them you needed to take a
8 break for a smoke, or to use the washroom?

9    A.   No -- I did, and I did use the washroom.

10   Q.   Okay.  How many times did you use the
11 washroom while you were there?

12   A.   Just once.

13   Q.   Okay.  Did you have anything to eat or
14 drink while you were there?

15   A.   I did not.

16   Q.   Okay.  And you didn't ask for any.

17   A.   I did not.

18   Q.   What's the next thing you remember
19 happening after you were told you failed the
20 polygraph?

21   A.   There was a gap in time, but I couldn't
22 tell you how long.

23   Q.   Did you remain in that room where you
24 took the test, or were you --

Page 257

1    A.   For a little while.  Then out to the
2 lobby.

3    Q.   Okay.  And when you were brought out to
4 the lobby, who was in the lobby?

5    A.   I don't recall.

6        I think all the employees had went
7 home, because this was late at night.

8    Q.   Where were Detective Cross and
9 Detective Guerreri?

10   A.   Somewhere ...

11   Q.   Somewhere in the firm itself?

12   A.   Yeah, somewhere in the building, but I
13 could -- I could not tell you where.

14   Q.   All right.  They weren't in the lobby
15 where you --

16   A.   They were not.

17   Q.   Were there periods of time while you
18 were at Reid where you just didn't know where Cross
19 and Guerreri were?

20   A.   I often didn't know where they were at.

21   Q.   How long did you remain out in the
22 lobby area before having contact with somebody else
23 again?

24   A.   After the polygraph, I don't know.

WILLIAM E. AMOR, 03/05/2020                              Page 258..261

Page 258

1 Probably an hour, two hours. I don't know.
2    Q.   All right. Who was the next person you
3 had contact with after that?
4    A.   Probably both of them.
5    Q.   Meaning?
6    A.   Cross and Guerreri.
7    Q.   Okay. And --
8    A.   But we're -- but we're now approaching
9 10:00 o'clock.
10   Q.   Okay. So when you had contact now with
11 Cross and Guerreri, had the Reid employees left, or
12 were they still there?
13   A.   Somebody was there, because the front
14 doors was locked.
15   Q.   Okay.
16   A.   So they had to -- somebody had to walk
17 downstairs and let us out.
18   Q.   And what was your conversation with
19 Cross and Guerreri?
20   A.   Nothing. I was in shock, I was tired,
21 I was hungry.
22   Q.   Okay.
23   A.   I was mad and -- you know, I was
24 everything that's bad.

Page 259

1    Q.   Did Cross and Guerreri discuss the
2 results of the polygraph with you while you were at
3 Reid?
4    A.   If they did, it had to be in the car.
5         But I don't recall.
6    Q.   Were you under the impression that
7 Cross and Guerreri knew what the results of the
8 test were?
9    A.   Oh, of course.
10   Q.   Okay. And you would agree that you
11 could see how that would make them suspicious of
12 you?
13   A.   Yes.
14   MS. THOMPSON: Object to form.
15        You can answer.
16 BY MR. POLICK:
17   Q.   How long did you remain at Reid after
18 you saw Detective Cross and Guerreri again in the
19 lobby?
20        You said it was around 10:00?
21   A.   Yeah. We were approaching 10:00 o'clock,
22 but I couldn't give you an exact time.
23   Q.   Okay. Do you know how much longer you
24 stayed there before you left?

Page 260

1    A.   I -- as I've said, we -- we left right
2 around 10:00.
3    Q.   Okay. Did you just meet with Cross and
4 Guerreri in the lobby, or did you go somewhere else
5 within the office?
6    A.   No. They came out from wherever they
7 were.
8    Q.   And do you have any recollection of
9 what was discussed between you three at that point?
10   A.   I do not.
11   Q.   What's the next thing that you remember
12 happening?
13   A.   Somebody from Reid & Associates having
14 to walk downstairs, unlock the door, and get back
15 in the car, and said, No, we're going to go back to
16 Naperville and finish discussing this, or something
17 to ... so ...
18   Q.   On the way from Reid's office back to
19 the car in the parking garage, were you handcuffed?
20   A.   I was not.
21   Q.   On the way to the car from Reid's
22 office, did you ask to have a smoke?
23   A.   I did not.
24   Q.   Did you ask to get something to eat?

Page 261

1    A.   I did not.
2    Q.   Did you ask to get something to drink?
3    A.   I did not.
4    Q.   Did you ask if you could rest or sleep?
5    A.   I did not.
6    Q.   Did you have any means by which to get
7 back to the Naperville area?
8    A.   I did not.
9    Q.   Did you have any money on you?
10   A.   I did not.
11   Q.   Any credit card on you?
12   A.   I did not.
13   Q.   When you were released from the DeKalb
14 County jail, did you have any plan as to where you
15 were going to go if Detectives Cross and Guerreri
16 had not met you there?
17   A.   I did not.
18        As I stated earlier, Tina had my
19 wallet, so I had no means to.
20   Q.   So was your plan to get your wallet, or
21 at least find Tina to find out where your --
22   A.   Correct.
23   Q.   -- wallet was?
24   A.   Find out what -- you know, who's living

WILLIAM E. AMOR, 03/05/2020                              Page 262..265

Page 262

1  where, find a place to go.
2      MR. POLICK:  Okay.  Why don't we take a break.
3      THE VIDEO TECHNICIAN:  We're off the record
4  at 3:59 at the end of media unit three.
5          (Recess taken.)
6      THE VIDEO TECHNICIAN:  We're back on the
7  record at 4:17 at the beginning of media unit four.
8  BY MR. POLICK:
9      Q.   Mr. Amor, I just want to go back
10 briefly to September 15th.
11         You do understand you're still under
12 oath, correct?
13     A.  I do.
14     Q.   All right.  While you were at the
15 Naperville police station on September 15th of 1995,
16 before you were transferred to the DeKalb County
17 jail, were you threatened at all by anybody from
18 the Naperville Police Department?
19     A.  I was not.
20     Q.   Okay.  And during that period of time
21 you were at Reid & Associates in Chicago on
22 October 3rd of 1995, did anybody threaten you in
23 the offices of Reid & Associates?
24     A.   They did not.

Page 263

1      Q.   Okay.  So now you're leaving Reid, and
2  you're heading back to Naperville.
3      A.   Correct.
4      Q.   All right.  So you, Cross, and Guerreri
5  walked over to the car, correct?
6      A.   That's correct.
7      Q.   Okay.  And at any time did you tell
8  Cross or Guerreri that you didn't want to go back
9  to Naperville?
10     A.   I did not.
11     MR. POLICK:  Okay.  What are we up to?  5?
12         (Deposition Exhibit Number 5,
13          Witness Amor, was marked for
14          identification 03/05/2020.)
15 BY MR. POLICK:
16     Q.   So, Mr. Amor, we're showing you what's
17 been marked as Exhibit 5 to your deposition.  Take
18 a moment, please, sir, to look over that.
19         Did you have an opportunity to look
20 over Exhibit 5, sir?
21     A.   I did.
22     Q.   Okay.  Do you recognize that to be your
23 voluntary consent to the taking of the polygraph
24 exam at --

Page 264

1      A.   I do.
2      Q.   -- Reid & Associates?
3      MS. THOMPSON:  Object to form.
4          You can answer.
5  BY MR. POLICK:
6      Q.   On page 1 there, is that your signature?
7      A.   It is.
8      Q.   Okay.  And do you see just slightly
9  above that, there's a line that says:  Furthermore,
10 I understand that I am free to leave this office at
11 any time?
12         Do you see that, sir?
13     A.   I do.
14     Q.   And are those your initials there?
15     A.   They are.
16     Q.   Okay.  And then underneath the -- your
17 signature, there is handwritten:  I understand that
18 I am not in custody.
19         Do you see that?
20     A.   I do.
21     Q.   Is that your handwriting?
22     A.   It is.
23     Q.   And are those your initials after that?
24     A.   They are.

Page 265

1      Q.   Okay.  And then looking at the medical
2  data sheet, which is the second page, at the bottom
3  that's dated October 3rd of 1995.
4          Do you see that?
5      A.   Yes.
6      Q.   And is that your printed name at the
7  bottom as well?
8      A.   It is.
9      Q.   Did you write that?
10     A.   I did.
11     Q.   Okay.  And then just looking at the
12 questions, starting 1 there, it says:  In the last
13 24 hours have you taken any medication, drugs
14 (including marijuana) or alcohol?
15         And you indicated there yes.
16         Do you see that?
17     A.   I do.
18     Q.   Okay.  And then it says:  Name of drug
19 or medication.  And you put Actifed.
20         Correct?
21     A.   That's correct.
22     Q.   And, How much consumed?
23         It says:  One tablet.
24     A.   That's correct.

WILLIAM E. AMOR, 03/05/2020                    Page 266..269

Page 266

1    Q.   And the reason for taking the drug or
2 medication, you indicate there:  Cold/sinus
3 problems.
4         Do you see that?
5    A.   I do.
6    Q.   Is that all in your handwriting?
7    A.   Yes.
8    Q.   Okay.  Does that refresh your
9 recollection at all about the Reid employees asking
10 you about your condition and whether you were
11 taking any medication?
12    MS. THOMPSON:  Object to form.
13        You can answer.
14    THE WITNESS:  Do I recollect?  No.
15        Is this my handwriting?  I agree.
16 BY MR. POLICK:
17    Q.   Okay.  Other than the Actifed tablet
18 for cold and sinus problems, had you taken anything
19 else that day, meaning medication, drugs, or
20 alcohol?
21    A.   I have not.
22    Q.   Okay.  And you indicated in response to
23 question number 2 there:  In the last 24 hours, how
24 many hours of sleep have you had?

Page 267

1         You indicated four.  Correct?
2    A.   I agree.
3    Q.   Okay.  Number 3 wanted to know if you
4 are presently under a physician's care, and you
5 indicated no.
6    A.   That's correct.
7    Q.   4 states:  Have you been prescribed to
8 take any medication by a doctor within the last 12
9 months?  And if so, the name of the medication.
10        And you indicated no.
11        Correct?
12    A.   That's correct.
13    Q.   And then question 5 asks about some
14 specific health problems.  The first one, 5(a) is
15 heart problems.
16        And you indicated no, correct?
17    A.   Correct.
18    Q.   5(b) says high blood pressure.
19        And again you indicated no, correct?
20    A.   Correct.
21    Q.   (C) says respiratory or lung problems.
22        And you indicate yes, and then
23 indicate some type of surgery there; is that
24 correct?

Page 268

1    A.   That's correct.
2    Q.   Okay.  Can you explain what the surgery
3 was, or what the issue was with your lungs?
4    A.   They're called congenital blebs.
5         I only have half of each lung.
6    Q.   Did they -- well, let me think about
7 that.  Strike that question.  Just think about that
8 for a moment.
9         Have certain lobes of your lung --
10    A.   Yes.
11    Q.   -- been removed?
12    A.   Yes.
13    Q.   On both sides?
14    A.   Yes.
15    Q.   Okay.  And when did that take place?
16    A.   1980, 1981.  I couldn't give you the
17 exact date.
18        But the surgeries were back to back.
19 My lungs kept collapsing.
20    Q.   And since that time -- what did you
21 say, 1980, '81?
22    A.   Yeah.
23    Q.   -- have you had any issues with your
24 lungs as a result of that?

Page 269

1    A.   I still use an inhaler.
2    Q.   Okay.  Are you someone who suffers from
3 asthma?
4    A.   It's more like COPD than asthma.
5    Q.   All right.  Have you ever been diagnosed
6 with COPD?
7    A.   My doctor says yes.
8    Q.   Okay.  Your current doctor?
9    A.   Correct.
10    Q.   Okay.  But prior to October 3rd of 1995,
11 had you been diagnosed with COPD?
12    A.   No.  Back then, it wasn't really a
13 thing.  But ...
14    Q.   All right.  Any other surgeries that
15 you had had before this date, other than those for
16 your lungs?
17    A.   No.
18    Q.   (D) wants to know about any recent arm
19 injury.  You indicated no, correct?
20    A.   That's correct.
21    Q.   And (e) also asked about recent surgery.
22        And there you said no; is that
23 correct?
24    A.   That's correct.

WILLIAM E. AMOR, 03/05/2020                                    Page 270..273

Page 270

1    Q.   Okay.  And (f) says "Other," and you
2  write:  Sores removed from upper parts of lungs.
3           Is that your explanation for the
4  answer to --
5    A.   Yes.
6    Q.   -- 5(c)?
7    A.   Yes, that's tied together.
8    Q.   I see.
9           Where did you have that surgery
10  done?
11    A.   Methodist Hospital, Indianapolis.
12    Q.   6 asks:  Are you experiencing any
13  physical discomfort at the present time?
14           And you indicated yes.
15           And:  If yes, please explain.
16           And you said:  Headache and cold
17  symptoms.
18           Is that correct?
19    A.   It is.
20    Q.   Okay.  For how long had you been
21  experiencing the cold symptoms before this polygraph
22  exam?
23    A.   Probably a year.
24    Q.   Okay.  Is that basically common cold

Page 271

1  symptoms?
2    A.   After the lung surgery, it's inheritent
3  that you possibly get sinuses and -- so I don't
4  know how to explain that away.
5    Q.   Okay.  Do you suffer from sinus
6  problems as well?
7    A.   I do.
8    Q.   Okay.  Is that all upper respiratory?
9  Or is it --
10    A.   It's all related to the lungs --
11    Q.   Okay.
12    A.   -- and upper respiratory.
13    Q.   And how about the headaches?
14           How long had you been experiencing
15  those before October 3rd of 1995?
16    A.   Again, this is all related.  But I'm
17  not of the medical mind.  So ...
18    Q.   Yeah, just from your own -- you know,
19  I'm not asking you for a medical opinion by any
20  stretch.
21    A.   Yeah.  Sinuses give you headaches, and
22  that's all.
23    Q.   I see.  Ever been diagnosed with
24  migraine headaches?

Page 272

1    A.   No, sir.
2    Q.   7 asks:  Have you ever consulted a
3  doctor about a nervous, psychological, or emotional
4  problem?
5           And you indicated:  No.
6    A.   No.
7    Q.   Is that correct?
8    A.   That's correct.
9    Q.   Okay.  So on the drive back from
10  Chicago to Naperville, do you recall who drove the
11  car?
12    A.   Detective Guerreri.
13    Q.   And where was the Detective Cross?
14           Was he in the front passenger?
15    A.   Yes, he was.
16    Q.   During the return to Naperville, did
17  you ask to stop anywhere?
18    A.   I did not.
19    Q.   Okay.  Did the officers stop anywhere
20  along the road?
21    A.   Actually, they did.
22    Q.   Okay.  Do you know where that happened?
23    A.   I couldn't tell you where.
24    Q.   Okay.

Page 273

1    A.   Detective Cross received a phone call.
2    Q.   When you say he received a phone call,
3  obviously he did not have a cellphone either; is
4  that correct?
5    A.   Actually, he did.
6    Q.   Oh, he did have a cellphone?
7    A.   (Nodding.)
8    Q.   Do you know what type of cellphone he
9  had?
10    A.   I have no idea.
11    Q.   Okay.  And did you hear the phone ring
12  in the --
13    A.   I did not.
14    Q.   -- in the car?
15           Okay.  But your understanding was
16  that he had received some phone call, and they
17  stopped somewhere along the way.
18    A.   Yes, sir.
19    Q.   Do you know how far into the ride back
20  to Naperville you were?
21    A.   Between a third and a half.
22    Q.   Okay.
23    A.   So ...
24    Q.   Do you know how long it took you to get

WILLIAM E. AMOR, 03/05/2020                    Page 274..277

Page 274

1  back to Naperville?
2     A.   We were approaching midnight.
3     Q.   Did Detective Cross step out of the car
4  to take the call?
5     A.   He did.
6     Q.   Okay.  Do you know how long he was
7  outside the car?
8     A.   Five to ten minutes.
9     Q.   Okay.  Did you have any conversation
10  with Detective Guerreri while Detective Cross was
11  out of the car?
12     A.   I did not.
13     Q.   During the trip from trip from Chicago
14  to Naperville, did you discuss anything with Cross
15  and Guerreri?
16     A.   I did not.
17     Q.   Okay.  Were any threats made to you
18  during the ride back from Chicago to Naperville?
19     A.   There were none.
20     Q.   All right.  Any other stops, other than
21  for Detective Cross to make a phone call, on the
22  way back?
23     A.   Not that I'm aware of.
24     Q.   Okay.  During the ride back, did you

Page 275

1  rest at all in the backseat of the car?
2     A.   I did not.
3     Q.   Did you get any sleep?
4     A.   I did not.
5     Q.   Did you ask to sleep?
6     A.   I did not.
7     Q.   Did you ask to have anything to eat?
8     A.   I did not.
9     Q.   Did you ask for anything to drink?
10     A.   I did not.
11     Q.   Did you ask for a cigarette?
12     A.   I did not.
13     Q.   When you got back to Naperville Police
14  Department, do you know approximately what time it
15  was?
16     A.   My estimate is approaching midnight.
17     Q.   And what do you remember when you got
18  back to Naperville?
19     A.   When you go into Naperville Police
20  Department, everything -- you go downstairs.  You
21  need a card.  They swipe their card to go
22  downstairs, and the same to go up.  So ...
23     Q.   So you entered at the main entrance?
24     A.   We did.

Page 276

1     Q.   And when you say "we," was it both
2  Guerreri and Cross?
3     A.   That's correct.
4     Q.   Okay.  Did Detective Guerreri park the
5  car in the lot somewhere?
6     A.   He did.
7     Q.   Okay.  And then you all got out and
8  walked to the front entrance?
9     A.   We did.
10     Q.   Were you handcuffed at that time?
11     A.   I was not.
12     Q.   When you entered the lobby area after
13  going through the front entrance, where did you go
14  next?
15     A.   Downstairs.
16     Q.   Okay.  Were they stairs or an elevator?
17     A.   No.  There were stairs.
18     Q.   Okay.  And both Detective Guerreri and
19  Cross were with you?
20     A.   I know Cross was.  I could not remember
21  if Guerreri was there or not.
22     Q.   All right.
23     A.   But I know they had to swipe a card to
24  be able to get downstairs.  The doors were locked.

Page 277

1     Q.   Like a key card or something --
2     A.   Yes.
3     Q.   -- along those lines?
4     A.   Absolutely.  Yes.
5     Q.   And do you recall how many flights of
6  stairs you had to go down to the next level?
7     A.   I think it was like a flight and a
8  half.  I think it kind of wrapped around, and go
9  downstairs.
10     Q.   Do you remember the area -- can you
11  describe the area you went in when you got to the
12  lower level?
13     A.   Three or four interrogation rooms, and
14  that's about it.  That's all I remember.
15     Q.   Okay.  Where were you taken?
16     A.   To an interrogation room.
17     Q.   Okay.  Was anyone else downstairs when
18  you got to the lower level?
19     A.   Other employees, but I couldn't tell
20  you who they are.  No one I would recognize, or
21  would have, back then.
22     Q.   Okay.  Can you describe the room you
23  were taken to?
24     A.   Small interrogation, slash, meeting

WILLIAM E. AMOR, 03/05/2020                    Page 278..281

Page 278

1  room, you know.
2     Q.   When you say "small," can you give me
3  an approximate size?
4     A.   About half the size of this.
5     Q.   Okay.  It's a pretty big room.  So --
6     A.   Yeah.
7     Q.   -- can you give me a dimension?
8     A.   I cannot.
9     Q.   Okay.  Was there any furniture in the
10  room?
11    A.   A table, and a few chairs.
12    Q.   Do you recall being served with the
13  divorce papers at the police department?
14    A.   Come on, man.  Really?
15         Of course.
16    Q.   And when do you recall being served
17  with the divorce papers at the police department?
18    A.   A little bit after midnight.
19    Q.   Was that before you entered this room
20  that you just described to me?
21    A.   No.  We were already there.
22    Q.   Okay.  And when you were in the room,
23  had anyone else entered the room besides you and
24  Detective Cross and Guerreri?

Page 279

1     A.   I know Cross was right -- I don't know
2  about Guerreri; I don't remember.
3     Q.   Okay.  That was a little unclear.
4          Do you need to take a moment?
5     A.   No.  I'm good.
6     Q.   If you need to, let me know.  Do you
7  want a Kleenex?
8     A.   No.  I'm good.  I'm fine.
9     Q.   All right.  So Cross was in the room
10  with you, correct?
11    A.   Yes.
12    Q.   Guerreri, you're not exactly sure?
13    A.   Again, I'm trying to be helpful.
14         But 25 years ago.
15    Q.   I understand.
16         Was there one door or two doors to
17  the room?
18    A.   One door.
19    Q.   Okay.  Was the door open?
20    A.   I'm unclear.
21    MS. THOMPSON:  Object to form.
22         You can answer.
23    THE WITNESS:  I'm unclear.
24

Page 280

1  BY MR. POLICK:
2     Q.   And by "open," I mean where you could
3  see out to the other area --
4     A.   Well --
5     Q.   -- of the police station?
6    MS. THOMPSON:  Same objection.
7         You can answer.
8    THE WITNESS:  Yeah.  To be clear, the door
9  was unlocked, but the upstairs was not.
10  BY MR. POLICK:
11    Q.   Sure.  I get what you're saying, that
12  you had to key in or whatever.  Now we're in the
13  lower level.
14         But I'm talking specifically about
15  this room you were in.
16    A.   Yeah, it's just a -- the lower level
17  has a number of rooms.
18    Q.   Okay.  And you were in one of these
19  rooms.
20    A.   I was.
21    Q.   Okay.  And when I'm talking about the
22  door, I'm talking about the door to that room.
23         Do you understand what I'm talking
24  about now?

Page 281

1     A.   The door was closed.
2     Q.   Okay.
3     A.   I'm not sure if it was locked or not.
4     Q.   Okay.  Did the door have a window in it?
5     A.   Yeah.  They were glass doors.
6     Q.   Meaning like a full glass door, like we
7  have here?
8     A.   Yes -- well, I'm not sure it was that
9  big, but ...
10    Q.   Okay.  Glass, as opposed to a wooden
11  door with a glass window in it?
12    A.   Right.  Correct.
13    Q.   So when the process server came, was
14  the door open for him?
15         How did that occur?
16    MS. THOMPSON:  Object to form.
17         You can answer.
18    THE WITNESS:  They -- they had to let -- they
19  had to key Russell in to serve me the papers.
20  BY MR. POLICK:
21    Q.   Okay.  Russell is who?
22    A.   The process server.
23    Q.   Okay.  Did you know --
24    A.   I didn't know him.

WILLIAM E. AMOR, 03/05/2020                    Page 282..285

Page 282

1        I mean, I forget his last name.
2    Q.   Okay.
3    A.   And he's since deceased.
4        But I -- if I -- given the
5  circumstances, if I seen him, I'd know him.
6    Q.   How soon after you arrived at Naperville
7  Police Department were you served with the papers?
8    A.   I think the process server says
9  12:00-something, but I don't have that --
10   Q.   All right.  I'm not --
11   A.   I'll direct that to counsel.
12   Q.   -- asking you what somebody else says.
13        I want to know what your memory of
14 it is.
15   A.   I remember it was well after midnight
16 because we couldn't have -- we couldn't have gotten
17 from Reid & Associates downtown to Naperville
18 before close to midnight.  It's a drive.
19   Q.   Okay.  Had either Detective Cross or
20 Detective --
21   A.   Guerreri.
22   Q.   -- Guerreri given you a Miranda waiver
23 form before the process server arrived?
24   A.   I don't recall.

Page 283

1    Q.   Had either Detective Cross or Detective
2  Guerreri began to question you before the process
3  server arrived?
4    A.   Yes.
5    Q.   And what were they -- what were they
6  questioning you about?
7    A.   About everything.  We want the truth,
8  and -- you know, how all this happened, and what
9  happened, and ... you know.
10   Q.   And how long were they questioning you
11 before the process server arrived?
12   A.   Well, the process server is at 12:00-
13 something -- 12:00-something.
14        So it couldn't have been too long.
15   Q.   If you had to put an estimate on it,
16 could you tell me?
17   A.   Less than an hour.
18   Q.   Okay.
19   A.   That's all I can tell you.
20   Q.   And during that period of time, were
21 you in this room that you've described?
22   A.   I was.
23   Q.   Okay.  And where were you seated in the
24 room?

Page 284

1    A.   Well, the door's there.  So they sat
2  there, and I sat on that side.
3    Q.   Okay.  So there was a table?
4    A.   Yes.
5    Q.   And give me an idea the size of the
6  table.
7    A.   Like I said, half the size of the room,
8  half the size of the table.
9    Q.   Okay.  And you were in a chair on one
10 side of the table?
11   A.   That's correct.
12   Q.   Was anybody sitting on your side of the
13 table?
14   A.   They were not.
15   Q.   Okay.  So both Detective Cross and
16 Guerreri were seated at the other side of the table?
17   A.   I remember Cross.
18        I can't carve in stone Guerreri was
19 there.
20   Q.   Okay.  So how did the process server
21 get into the room?
22   A.   Well, he had --
23   MS. THOMPSON:  Object to form.
24        You can answer.

Page 285

1  THE WITNESS:  -- to check in at the front.
2        They had to check him in at the
3  front desk, and then get keyed in to come down to
4  serve me.
5  BY MR. POLICK:
6    Q.   Okay.  Were you taken out of the room
7  so he could --
8    A.   No.
9    Q.   -- serve you?
10   A.   No.
11   Q.   He came into the room?
12   A.   He did.
13   Q.   Okay.  And who was in the room when he
14 served you?
15   A.   I know Cross -- if there's -- I don't
16 recall.
17   Q.   All right.  How long did it take him to
18 serve you?
19   A.   Not long.
20   Q.   Okay.  Did he explain what he was doing?
21   A.   No.  He just -- their only job is to
22 say, here, you've been served.
23   Q.   And is that what he did?
24   A.   That's exactly what he did.

WILLIAM E. AMOR, 03/05/2020                    Page 286..289

Page 286

1    Q.  Okay.  When he served you, did you look
2  at what the documents were?
3    A.  Absolutely.
4    Q.  Okay.  And what were they?
5    A.  My divorce papers.
6    Q.  Okay.  Had you ever been served with a
7  summons to appear in court before?
8    A.  I have not.
9    Q.  Not on any of your criminal court cases?
10   A.  No.  I always showed up for court, you
11 know.  I've never had a summons delivered to any of
12 my doors.
13   Q.  Well, you had a warrant that was
14 outstanding.
15   MS. THOMPSON:  Object to form.
16      You can answer.
17   THE WITNESS:  Yeah.  Okay, I agree.  I had a
18 warrant.
19 BY MR. POLICK:
20   Q.  Any other times you failed to appear in
21 court and had to receive a summons so that you --
22 you had to come back to court on your case?
23   A.  No.  Traffic is one thing; divorce is
24 another.  So I'm going to answer no.

Page 287

1    Q.  Had you ever been married prior to Tina?
2    A.  I have not.
3    Q.  Okay.  How long was the process server
4  in the room?
5    A.  Couple of minutes.
6    Q.  Okay.  Gave you the papers, and then he
7  left?
8    A.  Yep.
9    Q.  What happened next?
10   A.  I looked at him and I'm like -- I can't
11 use the language; there's women in the room.
12      But it was a what the ...  So ...
13   Q.  What was your emotional reaction to it?
14   A.  I was a wreck.
15   Q.  What happened next?
16   A.  I was left alone for a few minutes.
17      And then detectives came in and
18 continued to question me.  So now we're
19 approaching -- I don't know -- 1:00, 1:30.
20   Q.  And it was both Detective Cross and
21 Guerreri in the room at this time?
22   A.  That's correct.
23   Q.  What did they continue to question you
24 about?

Page 288

1    A.  Again, the fire, the motive, and -- you
2  know, a continuation of the whole day prior, and
3  continuing on to this day.
4    Q.  Prior to them questioning you on that
5  day, had you and Tina ever discussed at all the
6  circumstances of the fire?
7    A.  We did not.
8    Q.  You ever talk about how it could have
9  happened?
10   A.  No, we did not.
11      We -- Marianne was a smoker.  And we
12 just -- and let's be clear on the record.
13      Tina was the last one out of the
14 house, and she admitted to losing a cigarette.
15      That's on record.
16   Q.  Okay.  Well, I'm not asking you about
17 what's on a record or what's off a record --
18   A.  Okay.
19   Q.  -- right now.  I'm just --
20   A.  But, no, we had not discussed what
21 actually happened.
22      She lost her mom.  I lost a good
23 friend.  We both lost a place to live.
24      And, you know, there's an abundance

Page 289

1  of bad things.
2    Q.  Right.  But my question is did you ever
3  talk about the fire itself or how it could have
4  happened?
5    A.  We did not.
6    Q.  All right.  So as the detectives are
7  questioning you, was there one officer doing most
8  of the -- the talking, or were they both questioning?
9    A.  Cross.  Guerreri was doing something
10 else, and I don't -- I don't remember at what point
11 Detective Cunningham came into it.
12      I don't recall the time.
13   Q.  Okay.  So there was a third officer --
14   A.  There was.
15   Q.  -- that came in?
16      Can you describe Detective
17 Cunningham to me?
18   A.  Again, 25 years ago; I don't know.
19      I'm sure he don't even look the same
20 anymore.
21   Q.  Okay.  And how long had you been in the
22 interrogation room with Cross and Guerreri before
23 Cunningham entered?
24   A.  I don't know.

WILLIAM E. AMOR, 03/05/2020                                    Page 290..293

Page 290

1          Between half hour and hour, probably.
2     Q.   Okay.  And did all three detectives
3 remain in the room at that time and question you?
4     A.   No.  They rotated around.
5          And I was taken into a separate room
6 for a short brief period of time.
7     Q.   Okay.  Well, before you were moved to
8 that room, was there ever a point in time where
9 Cross, Guerreri, and Cunningham were in the room
10 together with you?
11    A.   I don't believe so.
12    Q.   Okay.  So one would leave, and then the
13 other would come in?
14    A.   That's correct.
15    Q.   Okay.  And before you were moved to the
16 other room, did anybody threaten you in any way?
17    A.   Not until I was moved to a separate
18 room.
19    Q.   Okay.  And while you were in the first
20 room, did anybody touch you or physically abuse you?
21    A.   Not in the first room.
22    Q.   Okay.  And how long do you think you
23 were in that first room?
24    A.   As I've stated, between half hour and

Page 291

1 hour -- I don't know.  I just -- I didn't have a
2 watch or a -- they don't -- there's no clocks in
3 them rooms.  So ...
4     Q.   Okay.  While you were in the first
5 room, did you sign any documents or forms?
6     A.   I don't believe I did.
7          I think that came later.
8     Q.   All right.  And then after that period
9 of time, you said you were moved to another room.
10    A.   I was.
11    Q.   Where was that room in relation to the
12 first room you were in?
13    A.   Across the hall.
14    Q.   Okay.  And was it the same type of room?
15    A.   Yeah.  Small room.
16    Q.   Same setup, with a table and chairs?
17    A.   Correct.
18    Q.   And were you seated at one side of the
19 table?
20    A.   Yeah.  That side of the room.
21    Q.   Okay.  And how many chairs were on the
22 other side?
23    A.   I don't recall.  But I was only one in
24 the room until Detective Cross came in.

Page 292

1     Q.   All right.  How many chairs were on the
2 other side of the table?
3     A.   I don't recall.
4     Q.   Okay.  And it was only Cross that came
5 in?
6     A.   That's correct.
7     Q.   Okay.  Who brought you from the first
8 room to the second room?
9     A.   I don't recall which detective did.
10    Q.   Any time while you were in the first
11 room, were you handcuffed?
12    A.   No.
13    Q.   And when you were moved to the second
14 room, were you handcuffed?
15    A.   No.
16         (Telephone interruption.)
17 BY MR. POLICK:
18    Q.   Okay.  Do you need to take that or ...
19    A.   No, no, no.  I turned it off, and I
20 just ...
21    Q.   Okay.  So you're in the second room now
22 with the -- and Detective Cross comes in.
23    A.   That's correct.
24    Q.   And it's just he and you in the room;

Page 293

1 is that correct?
2     A.   That's correct.
3     Q.   And is the door to this room open or
4 closed?
5     A.   I don't recall.
6     Q.   All right.  Do you recall, was it the
7 same type of door, a glass door, or a wooden door?
8     A.   It wasn't a wooden door.
9     Q.   Okay.
10    A.   It was a glass door.
11    Q.   Glass door.
12         Did it have any barrier, like we
13 have here?  Or could you see right through it?
14    A.   Again, 25 years ago, and I hadn't slept
15 in how many hours, or eaten or anything, done
16 anything.  So ...
17    Q.   Could you see outside through the door?
18    A.   I think maybe I could see a little bit
19 of the lobby, but ...
20    Q.   Same was true of the first room you
21 were in?
22    A.   Correct.
23    Q.   Okay.  So now it's you and Cross in the
24 room --

WILLIAM E. AMOR, 03/05/2020                          Page 294..297

Page 294

1    A.   That's correct.

2    Q.   -- and no one else; is that correct?

3    A.   That's correct.

4    Q.   And what happened next?

5    A.   He said, I want you to come clean.

6         And I just -- to this point, I kept

7 denying everything as I always knew I was innocent.

8         But there was a point in time where

9 it was in the middle of the night, he was angry,

10 and -- although he may deny this, he put his hands

11 around my throat, pushed me against the wall.

12        And then I was left alone for a

13 while.

14        Then I was moved back to the original

15 room.  And by that time, I was just tired.

16        And then, you know, they tell me

17 stuff, like if you just sign this, you can go home.

18 And I hadn't slept in a day.

19        You know what?  I was just -- I was

20 a mess.

21    Q.   All right.  The second room you were

22 in, did anyone other than Detective Cross ever

23 enter that room with you?

24    A.   No.  That was -- obviously nobody wants

Page 295

1 to see that.

2    Q.   So my answer -- your answer -- the

3 answer to my question --

4    A.   Is no.

5    Q.   -- is no one entered that room except

6 Cross?

7    A.   That's correct.

8    Q.   And how long were you in the second room?

9    A.   Half hour, 45 minutes.

10   Q.   Okay.  And when Cross made physical

11 contact with you in the manner that you described,

12 how did he do that?

13        Did he stand up?

14   A.   Yes.

15   MS. THOMPSON:  Object to form.

16        You can answer.

17 BY MR. POLICK:

18   Q.   And was he originally seated, and then

19 stood up?

20   A.   I'm not sure if he was ever seated or

21 not.  Detective Cross back in -- I'll be brief with

22 this.

23        But in my second trial, he had a

24 stroke, and he was a smaller guy.  Back then he was

Page 296

1 huge.

2    Q.   When you --

3    A.   Very intimidating.

4    Q.   When you say he was huge back then, can

5 you tell me how tall he was?

6    A.   I don't know.  Five-eleven, five- --

7 maybe six foot.

8    Q.   Okay.  And can you approximate for me

9 how much he weighed?

10   A.   I was 140.  So he probably had between

11 80 and a hundred pounds on me.

12   Q.   Okay.  What was his build like?

13   A.   Bulky.

14   Q.   Okay.  Fat?

15   A.   Little bit --

16   Q.   Okay.

17   A.   -- to be fair.

18   Q.   And you don't recall if he was ever

19 seated?

20   A.   I don't -- I don't know if he sat down

21 or not.

22   Q.   Okay.  When he grabbed you in the

23 manner that you described, was he on one side of

24 the table and you were on the other?

Page 297

1    A.   No.

2    Q.   He came up to you?

3    A.   Yeah, he did.

4    Q.   Tell me how he did that.

5    A.   He come in, say, them doors.  I was on

6 that side of the table.

7    Q.   You were seated at the time?

8    A.   I was.

9    Q.   Okay.  When he came towards you --

10   A.   Yes.

11   Q.   -- did you stand up at all, or did you

12 remain seated?

13   A.   I'd been -- it took me by surprise, you

14 know.

15        Here's a guy, 80, a hundred pounds

16 bigger than me, you know.  I just ...

17   Q.   So you were seated or did you stand up?

18   A.   I was seated.

19   Q.   Okay.  And what -- what did he do?

20   A.   Like -- I don't know.

21        This (indicating).

22   Q.   Okay.

23   A.   Pushed me against the wall.

24   Q.   Okay.  So I'm just trying to get --

Page 298

1 understand what you're describing to me.
2        He was in front of you?
3    A.   Yes.
4    Q.   Okay.  And he used both hands --
5    A.   He did.
6    Q.   -- around your neck?
7    A.   Upper shoulders, neck, you know.
8    Q.   Okay.  Sort of where --
9    A.   And pushed me against the wall.
10   Q.   -- where your collar bone is?
11   A.   That's correct.
12   Q.   Okay.  And when you say he pushed you,
13 were you still in the chair at the time?
14   A.   That's correct.
15   Q.   Okay.  He didn't pick you up and throw
16 you?
17   A.   No.
18   Q.   Okay.  So kind of pushed you back in
19 the chair.
20   A.   But against the wall.
21   Q.   And when you went against the wall, did
22 any part of your body strike the wall?
23   A.   My head.
24   Q.   Back of your head?

Page 299

1    A.   Correct.
2    Q.   All right.  And the -- when he grabbed
3 you around your neck, or shoulder area as you
4 describe, did he put any pressure on your throat at
5 all?
6    A.   I don't remember.
7        You know, I was shocked.  I was in a
8 stun.  I mean, I was always raised to believe that
9 that's not how we behave, but -- so there's some
10 things that ...
11   Q.   So do you remember pressure being on
12 your throat?
13   A.   I do not.
14   Q.   Okay.  Did you lose the ability to
15 breathe when he did that?
16   A.   No.
17   Q.   How long did he have his hands on your
18 neck area?
19   A.   A minute.
20   Q.   Okay.  Did he release his hands after
21 he had pushed you up against the wall in the chair?
22   A.   Again, within a minute.
23   Q.   Okay.  After your head hit the back of
24 the wall, was he still holding onto your neck in

Page 300

1 the fashion you described?
2    A.   Once I was against the wall, within a
3 few seconds, he -- and then he walked out of the
4 room.
5    Q.   Okay.  Did he say anything to you when
6 he did that?
7    A.   Yeah.  I'm going to kick your fucking
8 ass if you don't confess.
9    Q.   Okay.
10   A.   Excuse my language.  Forgive me.
11   Q.   No.  We need to know exactly he said.
12   A.   Yeah.
13   Q.   So if that's his exact words, then we
14 want to know what he said.  We're all adults here.
15       Did Cross then immediately leave the
16 room?
17   A.   He did.
18   Q.   Okay.  Did he say anything further to
19 you before he left the room?
20   A.   He did not.
21   Q.   Okay.  Did he close the door behind him?
22   A.   He did.
23   Q.   What is the next thing you remember
24 after that?

Page 301

1    A.   I went back to the original room, but I
2 couldn't tell you what the -- the gap in time is.
3    Q.   Okay.
4    A.   I'm asking to remember -- this is --
5 we've been up for 24 hours.  So ...
6    Q.   But do you have a recollection of being
7 in the second room for some period of time before
8 going back to the original room?
9    A.   I do.
10   Q.   Did anyone else ever enter that second
11 room other than to move you back to the original
12 room?
13   A.   No, they did not.
14   Q.   All right.  Who moved you back to the
15 original room?
16   A.   Was not Detective Cross, but I couldn't
17 tell you who it was.
18       I don't remember.  I don't recall.
19   Q.   Okay.  So when you went back to the
20 original room, you're now seated in the chair at
21 the table?
22   A.   That's correct.
23   Q.   And you don't recall who brought you
24 there.  It wasn't Cross?

WILLIAM E. AMOR, 03/05/2020                    Page 302..305

Page 302

1        Or you just don't remember?
2    A.   I don't remember.  I don't recall.
3    Q.   All right.  Were you in that room, the
4 original room now, a period of time before somebody
5 entered again?
6    A.   That's correct.
7    Q.   And who entered?
8    A.   I don't recall which detective.
9    Q.   Okay.  What's the next thing that
10 happened?
11   A.   Write down what actually happened.
12        So ...
13   Q.   Meaning?  I'm not understanding what
14 you're saying.
15   A.   Well, actually write down what actually
16 happened on the night of September 10th.
17   Q.   Oh, you remember writing out a
18 statement.
19   A.   I do.
20   Q.   Okay.  How did that come about?
21        Who asked you to write a statement?
22   A.   I'm not sure which detective.
23   Q.   Okay.  And what did you do?
24   A.   I wrote down a lot of things that

Page 303

1 weren't true, you know.  But I was overwhelmed, I
2 was tired, I was hungry.  I mean, it just --
3 there's a number of things.
4    Q.   Before you wrote anything down on
5 paper, did you say to any of the detectives that
6 you had did it, like Cross had asked you to?
7    A.   I think my statements were all written.
8        I don't believe I -- I don't believe
9 I verbally spoke anything.
10   Q.   Okay.  Did you ever tell any of the
11 detectives that you had set the fire, or did it,
12 before writing out the statement?
13   A.   If I did, I don't recall.
14   Q.   Okay.  How long --
15   A.   The only thing I remember is that, you
16 know, you let us know what actually happened, you
17 can go home.
18   Q.   Who told you that?
19   A.   I don't remember if it was Cross,
20 Cunningham -- you know, I mean, I don't -- I don't
21 recall.
22   Q.   Did you really think that you were
23 going to be allowed to go home if you said what
24 really happened?

Page 304

1    A.   I did.
2    Q.   And when -- by saying what really
3 happened, what did you take that to mean?
4    A.   That the truth is the truth, and -- you
5 know?  You fight to live another day, you know?
6        Or you live to fight another day.
7    Q.   So it was your belief that if you just
8 wrote it out, you would be let free to go home?
9    A.   That's correct.
10   Q.   And you would have left the police
11 station?
12   A.   That's correct.
13   Q.   Did -- did you have -- do you know who
14 told you that?
15   A.   I don't remember which detective.
16   Q.   How long did it take you to write out
17 your statement?
18   A.   Not long.
19        Then they called -- at the time, I
20 think ADA Nigohosian, I think, came.
21        This had to be going on 3:00 o'clock,
22 I think.  So ...
23   Q.   Okay.  At any time before you wrote out
24 your statement, had you asked to use the washroom?

Page 305

1    A.   I did.  I got to use the washroom.
2    Q.   You did get to use the washroom.
3    A.   Correct.
4    Q.   Do you recall who took you to the
5 washroom?
6    A.   I do not.
7    Q.   At any time before you wrote out your
8 statement, did you ask to have a cigarette?
9    A.   I did not.
10   Q.   Okay.  Did you ask to get something to
11 eat?
12   A.   All they had was vending machines, so I
13 did not.
14   Q.   Okay.  Did you ask to get something to
15 drink?
16   A.   I had some coffee.
17   Q.   Okay.  You were asked, and you were
18 given some coffee?
19   A.   I was.
20   Q.   Okay.  Do you know how many cups of
21 coffee you had?
22   A.   One.
23   Q.   Okay.  Did you ask to sleep or rest at
24 all?

WILLIAM E. AMOR, 03/05/2020                                    Page 306..309

Page 306

1    A.   Consistently.
2    Q.   Who did you make those requests to?
3    A.   Whichever -- between three detectives --
4  you know, there's things I just don't remember
5  after 25 years.
6    MR. POLICK:  Okay.  Let's just take a quick
7  moment and let the court reporter ...
8    THE VIDEO TECHNICIAN:  We're off the record
9  at 4:57.
10        (Recess taken.)
11    THE VIDEO TECHNICIAN:  We're back on the
12  record at 4:58.
13        (Deposition Exhibits Numbers 6
14         and 7, Witness Amor, were marked
15         for identification 03/05/2020.)
16  BY MR. POLICK:
17    Q.   You understand you're still under oath,
18  Mr. Amor?
19    A.   I do.
20    Q.   Okay.  We're going to show you what's
21  been marked as Exhibit 6 to your deposition.
22        Did you have an opportunity to look
23  at that, sir?
24    A.   I did.

Page 307

1    Q.   Okay.  You see that document is a
2  Statement of Miranda Rights?
3    A.   I do.
4    Q.   And then there is a Waiver of Rights
5  below that?
6    A.   I see.
7    Q.   And is that your signature there?
8    A.   It is.
9    Q.   Okay.  And did you sign this?
10    A.   I did.
11    Q.   Okay.  Were your rights under Miranda
12  explained to you?
13    A.   I can only assume they were.
14    Q.   Okay.  And why do you assume that they
15  were?
16    A.   That's their job.
17    Q.   Okay.  Do you recall the -- any of the
18  detectives reading these Miranda rights to you?
19    A.   I do not.
20    Q.   Okay.  Do you recall any of the
21  detectives asking you, understanding those rights
22  and having them in mind, you are willing to waive
23  them and make a statement?
24    A.   I do not.

Page 308

1    Q.   Okay.  Do you recall which room you
2  were in when you signed this Miranda waiver?
3    A.   There are multiple rooms in Naperville
4  police downstairs.
5    Q.   Yes.  But you told me you were in --
6    A.   There was one on the right --
7    Q.   -- the original room?
8    A.   -- some on the left.
9    Q.   Yeah.
10    A.   But there's multiple rooms downstairs.
11    Q.   Yes.  But you told me you were in a
12  room originally when you got there, correct?
13    A.   Right.
14    Q.   You were moved to a second room, correct?
15    A.   Correct.
16    Q.   And then you went back to the original
17  room.
18    A.   That's correct.
19    Q.   Okay.  Did you sign those in either --
20  sign this form that we've marked as Exhibit 6 in
21  the original room, or the second room?
22    A.   This had to be the original room
23  because of the timestamp.
24    Q.   Okay.  When you say "the original

Page 309

1  room," was it the first time you were in the
2  original room, or the second time?
3    A.   Judging by the time, it had to be the
4  first -- judging by the timestamp -- or 11:37, had
5  to be the first time.
6    Q.   Okay.  Let's look at Exhibit 7.
7        Did you have an opportunity to look
8  at that document, sir?
9    A.   I've seen it before.
10    Q.   Okay.  Is that the statement that you
11  testified that you wrote out when you were in the
12  original room for the second time?
13    A.   That's correct.
14    Q.   Is that your signature on this document?
15    A.   It is.
16    Q.   Okay.  And it's dated October 4th of
17  1995 at 1:14 --
18    A.   1:14 --
19    Q.   -- a.m. correct?
20    A.   Yes, sir.
21    Q.   Okay.  Was anybody in the room with you
22  when you wrote this out?
23    A.   Yes, but I do not recall which
24  detective.

WILLIAM E. AMOR, 03/05/2020                          Page 310..313

Page 310

1    Q.   Okay.  Was it one detective or more
2  than one detective?
3    A.   At least one.
4         But I couldn't tell you which one,
5  and ...
6    Q.   Okay.  You've had an opportunity to
7  read this statement?
8    A.   I have.
9    Q.   Okay.  Is there anything inaccurate
10 about it?
11   A.   There is not.
12   Q.   Is there anything untruthful in here?
13   A.   Well, yes.
14   Q.   Okay.  Well, if you can do like you did
15 before, take the marker and just go through it and
16 highlight for me the things that are untruthful.
17   A.   (Complying.)
18   Q.   Did you have an opportunity to do that,
19 sir?
20   A.   I did.
21   Q.   Okay.  May I take a look at that for a
22 second?
23   A.   Yes, sir.
24   MS. THOMPSON:  Thanks.

Page 311

1    MR. POLICK:  Thank you.
2  BY MR. POLICK:
3    Q.   All right.  I'm going to give this back
4  to you, Mr. Amor --
5    A.   Thank you.
6    Q.   -- and just get a few questions about
7  that.
8    A.   Okay.
9    Q.   You highlighted a section about in the
10 middle of the page, correct --
11   A.   That's correct.
12   Q.   -- starting with "when I got"?
13        Am I starting that correctly?  I'm
14 going to read it out:
15        When I got up, I bumped the ashtray,
16 knocking the cigarette onto the newspaper with the
17 vodka spilled on it.  I did not pick up the
18 cigarette, but instead continued to go use the
19 restroom, knowing a fire would probably result.
20        Is that the part you highlighted?
21   A.   I did.
22   Q.   Okay.  So that part is untrue.
23   A.   That's correct.
24   Q.   And then you also highlighted at the

Page 312

1  bottom of the page the last couple lines that start
2  with:  The loss was meant to be minimal for
3  personal gain.  No harm was ever supposed to come
4  to any person or persons.
5         Is that correct?
6    A.   That's correct.
7    Q.   And that part was untruthful?
8    A.   That's correct.
9    Q.   Okay.  With respect to the first section
10 that you indicated was untruthful, why did you
11 write that in there?
12   MS. THOMPSON:  Object to form.
13        You can answer.
14   THE WITNESS:  Again, it was 1:14 a.m.
15        I'd been up for 24 hours.
16 BY MR. POLICK:
17   Q.   Any other reason why you wrote that
18 in --
19   A.   I went through a polygraph.  I'd had no
20 sleep, nothing to eat.  I mean ...
21   Q.   And the section at the bottom there
22 that you said was untrue, why did you write that
23 untruthful statement in this?
24   A.   Well, it's -- the untruthfulness of all

Page 313

1  of this is kind of tied together.
2         I mean, Marianne was my friend.
3    Q.   Any other reason why you wrote that
4  untruthful part at the end of this statement as
5  you've highlighted?
6    A.   I was intimidated, I was frightened, I
7  was homeless, I was broke.
8         I don't know what else to tell you.
9    Q.   After you completed the statement that
10 we've marked as Exhibit 7 --
11   A.   Yes.
12   Q.   -- were you in the original room for a
13 period of time before Assistant State's Attorney
14 Nigohosian arrived?
15   A.   I think if there's -- it should be --
16 if you have a statement from it, somewhere around
17 3:00 o'clock.
18   Q.   Okay.  My question was did you remain
19 in that room --
20   A.   I did.
21   Q.   -- until Nigohosian arrived?
22   A.   I did.
23   Q.   Okay.  Do you recall, before Nigohosian
24 arrived, doing an audio recording of your statement?

WILLIAM E. AMOR, 03/05/2020                          Page 314..317

Page 314

1    A.   I do.
2    Q.   Okay.  Did that occur in that original
3 room?
4    A.   It did.
5    Q.   Okay.  And who was present for the tape
6 recording?
7    A.   I don't recall.
8    Q.   Okay.  At least one of the detectives?
9    A.   That would be my guess.
10    Q.   Okay.  Do you have a recollection of
11 what you said on the audiotape?
12    A.   I don't.
13    Q.   Okay.  When is the last time you heard
14 that tape?
15    A.   In my second trial.
16    MR. POLICK:  Okay.  We'd like to play that on
17 the record.
18         (Audio played.)
19 BY MR. POLICK:
20    Q.   Mr. Amor, did you recognize your voice
21 on that tape?
22    A.   I did.
23    MR. POLICK:  Can you mark this as 8.
24

Page 315

1         (Deposition Exhibit Number 8,
2          Witness Amor, was marked for
3          identification 03/05/2020.)
4 BY MR. POLICK:
5    Q.   Mr. Amor, I'm showing you what's been
6 marked as Exhibit 8 to your deposition, previously
7 marked as People's Exhibit 22B, which is a
8 transcription of the tape recording that we just
9 heard.
10         Why don't you take a moment and take
11 a look at that, and I'll have a few questions about
12 that.
13    A.   Well, it matches the original.
14         But since I'm not allowed to confer
15 with counsel, I will dispute the smoke, because I
16 was not the last one out of the apartment.
17    MS. THOMPSON:  Can you read back counsel's
18 last question?
19         (Record read as follows:
20         "Q.  Mr. Amor, I'm showing you
21          what's been marked as Exhibit 8
22          to your deposition previously
23          marked as People's Exhibit 22B
24          which is a transcription of the

Page 316

1          tape recording that we just
2          heard.
3          "Why don't you take a moment
4          and take a look at that, and
5          I'll have a few questions about
6          that.")
7    MS. THOMPSON:  Thank you.
8    THE WITNESS:  Okay.
9 BY MR. POLICK:
10    Q.   Have you had an opportunity to look at
11 it --
12    A.   I have.
13    Q.   -- Mr. Amor?
14         Okay.  And you were making some
15 remarks as you were reading it.
16         We've already gone over the statement
17 that was marked as Exhibit 7, which you basically --
18    A.   That's correct.
19    Q.   -- read into the tape, correct?
20    A.   That's correct.
21    Q.   Okay.  And then following that, you
22 were asked some follow-up questions.
23         You see on page 2 there, Cross asks
24 you:  Now, Bill, didn't you during your interview,

Page 317

1 okay, say that you accidentally spilled vodka?
2         And you answer:  Yes.
3         Were you asked that question and did
4 you give that answer?
5    A.   Yes.
6    Q.   Okay.  And was that the truth?
7    A.   It was not.
8    Q.   And then Cross asks:  Okay, but didn't
9 you also say that you knocked the cigarette onto
10 the paper on purpose?
11         And you answered:  Yes, both
12 would ...
13         Were you asked that question, and
14 did you give that answer?
15    A.   I did.
16    Q.   Okay.  And was that the truth?
17    A.   It was not.
18    Q.   Okay.  And then Cross goes on to ask
19 you:  And did you -- did you also say that you saw
20 smoke coming from the paper?
21         And you say:  I saw a little bit of
22 smoke, yes.
23         Were you asked that question, and
24 did you give that answer?

WILLIAM E. AMOR, 03/05/2020                                    Page 318..321

Page 318

1   A.   That's untrue.
2   Q.   Okay.  But were you asked that
3 question, and did you give that answer?
4   A.   I was.
5   Q.   Okay.  But you're indicating that was
6 untrue?
7   A.   That was untrue.
8   Q.   Okay.  And then Cross asks:  Okay.  And
9 you knew a fire was going to start?
10        And you say:  I anticipated that it
11 would.
12        Were you asked that question and did
13 you --
14  A.   That's untrue.
15  Q.   -- give that answer?
16  A.   Forgive me for interrupting.
17  Q.   That's okay.
18        Were you asked that question, and
19 did you give that answer?
20  A.   I was.
21  Q.   Okay.  Was that true?
22  A.   That's untrue.
23  Q.   Okay.  And then Cross says:  Okay.  And
24 you said at that point you just didn't give a shit?

Page 319

1        And you answered:  That is correct.
2        Were you asked that question, and
3 did you give that answer?
4   A.   I was.
5        Untrue.
6   Q.   So you did give that answer.
7        But that, too, was untrue?
8   A.   I did.
9   Q.   Okay.  And then you say -- Cross asks:
10 Bill, once again, no threats or promises have been
11 made to you, by us or anybody else?
12        And you answer:  That's right.
13        Were you asked that question, and
14 did you give that answer?
15  A.   I did.
16  Q.   And was that true?
17  A.   It was not.
18  Q.   And then you were asked by Cross:  This
19 is freely and voluntarily of your own free will?
20        And you respond:  Yes.
21        Were you asked that question, and
22 did you give that answer?
23  A.   I was.
24  Q.   Okay.  And was that true?

Page 320

1   A.   That's untrue.
2   Q.   So you said it was a while before
3 Assistant State's Attorney Nigohosian arrived.
4   A.   Correct.
5   Q.   Do you have any idea how long you
6 waited before he arrived?
7   A.   I'm not sure what the timestamp is, but
8 it was somewhere around 3:00, 3:00-something.
9   Q.   What were you doing in that period of
10 time before Nigohosian arrived?
11  A.   Just sitting there.
12  MS. THOMPSON:  Hold on.
13        Object to form.
14        You can answer.
15  THE WITNESS:  Just sitting in the first white
16 room.
17 BY MR. POLICK:
18  Q.   The original room?
19  A.   Correct.
20  Q.   Okay.  Were you allowed to use the
21 washroom during that period of time?
22  A.   I had used it once.
23        So I was just kind of hanging tough.
24  Q.   Okay.  Did you ask for anything to eat

Page 321

1 while you were waiting for Nigohosian?
2   A.   As I stated earlier, nothing but
3 vending machine food.  So I just opted out.
4   Q.   Okay.  Did you ask for anything to
5 drink while you were waiting for Nigohosian?
6   A.   Again, I had coffee.
7   Q.   All right.  You got more coffee?
8   A.   I only had one cup the whole time I was
9 there.
10  Q.   All right.  Did you sleep at all while
11 you were waiting for Nigohosian?
12  A.   I did not.
13  Q.   Okay.  Did you ask if you could rest or
14 sleep?
15  A.   I did not.
16  Q.   Did you have any cigarettes to smoke --
17  A.   I did not.
18  Q.   -- while you were waiting for
19 Nigohosian?
20  A.   I did not.
21  Q.   Okay.  Were you ever taken outside by
22 any of the detectives to have a cigarette?
23  A.   Not that I recall.
24  Q.   When Nigohosian arrives, where do you

WILLIAM E. AMOR, 03/05/2020                          Page 322..325

Page 322

1 first meet him?

2   A.   The original room.

3   Q.   The original room.  All right.

4        Was anyone else in there when

5 Nigohosian came in?

6   A.   In and out, but I couldn't tell you

7 which detectives.

8   Q.   Okay.  Can you describe Nigohosian to

9 me?

10  A.   I barely recognize him anymore.

11       So no, I couldn't.

12  Q.   Okay.  And which detectives were in the

13 room with you when Nigohosian got there?

14  A.   As I stated, I don't recall which one.

15  Q.   Okay.  Was it more than one, or just

16 one?

17  A.   There was at least one, but I couldn't

18 tell you whom and how many.

19  Q.   Okay.  And was there ever a period of

20 time where you spoke to Nigohosian alone without a

21 detective present?

22  A.   No.

23  Q.   And did Nigohosian interview you?

24  A.   He did.

Page 323

1   Q.   And was it in that -- what we've been

2 calling the original room?

3   A.   Yes.

4   Q.   Did you ever go to another room with

5 Nigohosian?

6   A.   No.

7   Q.   Okay.  How long were you in the room

8 with Nigohosian?

9   MS. THOMPSON:  Object to form.

10       You can answer.

11  THE WITNESS:  It was after 3:00 o'clock, so I

12 couldn't tell you.

13 BY MR. POLICK:

14  Q.   Okay.  What do you remember about your

15 interaction with Detective Nigohosian?

16  A.   He just confirmed --

17  Q.   I'm sorry.  With State's Attorney

18 Nigohosian?

19  A.   Okay.

20  MS. THOMPSON:  Object to form.

21       You can answer.

22  THE WITNESS:  He just confirmed all of this,

23 so -- he wasn't there very long.

24

Page 324

1 BY MR. POLICK:

2   Q.   How long is not very long?

3   A.   Less than an hour.

4   Q.   Okay.  Did he ask you some questions?

5   A.   Only to confirm what I had written.

6   Q.   Did he ask you how you'd been treated

7 while you were there?

8   A.   He did not.

9   Q.   Did you ever volunteer to him or just

10 outright tell him that you had been physically

11 abused by Detective Cross?

12  A.   The only thing he said to me was "I'm

13 not here to represent you."

14  Q.   All right.  So when he said that, I

15 take it he introduced himself to you?

16  A.   He did.

17  Q.   Okay.  You didn't know him, who he was?

18  A.   No.  I wouldn't have known him from

19 God.  But -- you know.

20  Q.   Okay.  And you understood that he was a

21 state or district attorney?

22  A.   That's correct.

23  Q.   You knew he was not your lawyer?

24  A.   That's correct.

Page 325

1   Q.   Okay.  And did he give you Miranda

2 warnings?

3   A.   I don't recall.

4   Q.   Okay.  Did you agree to speak with ASA

5 Nigohosian?

6   A.   Again, he only reaffirmed what I had

7 already written and taped.

8   Q.   Did you go over the tape with him?

9   A.   He did not.

10  Q.   Okay.  So it was just question and

11 answer?

12  A.   Correct.

13  Q.   Okay.  And you think at least one of

14 the detectives was in the room at the time?

15  A.   Yes.

16  Q.   Okay.  Do you recall any of the

17 questions that ASA Nigohosian asked of you?

18  A.   Other than is this the truth, and --

19 because I'm assuming ASAs have to sign off on this.

20  Q.   Why do you assume that?

21  A.   Well, they come in the middle of the

22 night.  I mean, it's kind of -- isn't it their job,

23 or whatever?

24  Q.   I'm just asking your understanding.

Page 326

1    A.   Yeah, that's my understanding.

2    Q.   Okay.  So was it your understanding
3 that he had to approve what had happened here --

4    A.   That's correct.

5    Q.   -- and the charges against you?

6    A.   That's correct.

7    Q.   Did you ask him at all about that
8 process, or why he was there?

9    A.   I didn't.  I'd been up for 24 hours.

10   Q.   Did you take any bathroom breaks while
11 Nigohosian was there?

12   A.   I did not.

13   Q.   Did you ever ask Nigohosian to get --
14 that you needed something to eat?

15   A.   No.  As I said, he was only there
16 briefly.

17   Q.   Okay.  And I take it you didn't ask him
18 for anything to drink?

19   A.   No.  As I said, it was after 3:00
20 o'clock, and he was only there briefly.

21   Q.   Okay.  Did you ever tell ASA Nigohosian
22 that you needed to take a break, that you needed to
23 get some rest?

24   A.   As I stated, he was only there briefly.

Page 327

1            I did not.

2    Q.   Did you ask ASA Nigohosian if you could
3 have any cigarettes while he was there?

4    A.   I did not.

5    Q.   Okay.  Do you recall, after speaking to
6 Nigohosian, that another tape recording was made?

7    A.   I do not.

8    Q.   Okay.  You don't recall that from any
9 of your trials?

10   A.   I only recall the one recording.

11   Q.   Okay.  You recall the one we played a
12 few minutes ago?

13   A.   That's correct.

14   Q.   Okay.  We're going to play the
15 recording with Nigohosian into the record and let
16 you listen to that.  Okay?

17            (Audio played.)

18 BY MR. POLICK:

19   Q.   Mr. Amor, did you recognize your
20 voice --

21   A.   I did.

22   Q.   -- on that tape?

23        Mark this as 9.

24

Page 328

1            (Deposition Exhibit Number 9,

2            Witness Amor, was marked for

3            identification 03/05/2020.)

4 BY MR. POLICK:

5    Q.   Mr. Amor, I'm showing you what's been
6 marked as Exhibit 9 to your deposition, which is a
7 transcription of the audiotape that we just heard
8 with Assistant State's Attorney Brian Nigohosian,
9 previously marked as People's Exhibit 26B.

10           If you could just take a moment to
11 look that over.

12           Did you have an opportunity to look
13 that over, sir?

14   A.   I did.

15   Q.   Okay.  At the last page there, you say
16 to ASA Nigohosian:  "Everything I have said I said
17 at least once and the truth and from my heart."

18           Do you see that?

19   A.   I do.

20   Q.   Okay.  What does that mean when you say
21 and "from my heart"?

22   A.   All I can tell you at this point is if
23 you look at the end of this, it's 5:20 a.m.

24           I've been up for like 26, 27 hours,

Page 329

1 and I was fed a lot of this information.

2    Q.   All right.  Well, if you want, why
3 don't you take the marker and highlight all the
4 information you claim you were fed.

5    MS. THOMPSON:  You're asking in the entire
6 exhibit, just to be clear?

7    MR. POLICK:  Well, he said he was fed
8 everything.  I'm -- yeah, he can go through the
9 entire exhibit.

10           We can go off the record and --

11   MS. THOMPSON:  No.

12   MR. POLICK:  -- give him a moment to do that.

13   MS. THOMPSON:  No, we're not going to do that.

14   MR. POLICK:  Unless you want to stay on?

15   MS. THOMPSON:  Yeah, we'll stay on the record.

16   MR. POLICK:  Oh, okay.  That's fine.

17   THE WITNESS:  (Complying.)

18   MR. POLICK:  Thank you, sir.

19   THE WITNESS:  Yes, sir.  Thank you.

20   MR. POLICK:  Counsel, do you need to take a
21 look at that?

22   MS. THOMPSON:  Yes.

23   MR. POLICK:  Sure.

24   MS. THOMPSON:  Okay.

WILLIAM E. AMOR, 03/05/2020 Page 330..333

Page 330

1 BY MR. POLICK:
2    Q.   So, Mr. Amor, you've had the
3 opportunity to highlight what you allege was fed
4 to you with respect to the statement that you
5 gave to Assistant State's Attorney Brian
6 Nigohosian, correct?
7    A.   Correct.
8    Q.   Okay.  Who fed you the facts that you
9 highlighted here?
10    MS. THOMPSON:  Object to form.
11       You can answer.
12    THE WITNESS:  Remember, we're talking about
13 three detectives.  So, you know, 25 years ago, I
14 don't recall which one.
15 BY MR. POLICK:
16    Q.   Did Assistant State's Attorney
17 Nigohosian feed you any of the facts?
18    A.   Again, 25 years ago, I don't recall.
19    Q.   And I noticed that you did not
20 highlight the answer on the last page, that,
21 "Everything I have said I said at least once and
22 the truth and from my heart."
23    A.   That's why I highlighted the things
24 that are not truthful.

Page 331

1    Q.   Okay.  Have you ever lied to protect
2 somebody else?
3    MS. THOMPSON:  Object to form.
4       You can answer.
5    THE WITNESS:  Not to my knowledge.
6       I hope not.
7 BY MR. POLICK:
8    Q.   What do you recall happening after the
9 statement with ASA Nigohosian was audiotaped?
10    A.   I'm not sure what time I was put in a
11 cell, but it had to be 5:00 or 6:00 in the morning.
12    Q.   Did you go through the booking process
13 at Naperville?
14    A.   No.  I was put in the cell.
15    Q.   Okay.  At some point were you
16 photographed and fingerprinted?
17    A.   I was, but it was early in the morning
18 before I was transported to DuPage County.
19    Q.   And the transport to DuPage
20 County, did somebody from Naperville take you to
21 DuPage County?
22    A.   They did.
23    Q.   Okay.  And then when you got to DuPage
24 County, did you go through an intake process there?

Page 332

1    A.   I did.
2    Q.   Okay.  Were you photographed and
3 fingerprinted?
4    A.   I was.
5    Q.   When you spoke to the intake personnel
6 at DuPage County jail, did you tell them that you
7 had been physically abused at the Naperville Police
8 Department?
9    A.   I do not recall.
10       It was early in the morning, and
11 they really don't have counselors there at that
12 hour in the morning.
13    Q.   Do you recall speaking to a counselor
14 at some point during your stay at the --
15    A.   I do, but --
16    Q.   Let me finish my question.
17       (Continuing) -- during your stay at
18 the DuPage County jail?
19    A.   I do, but I couldn't tell you at what
20 hour of the day.
21    Q.   Okay.  What do you remember telling the
22 counselor at the DuPage County jail?
23    A.   That I was innocent and I continue to
24 fight.

Page 333

1    Q.   Okay.  Did you mention anything to the
2 counselor about any abuse that occurred at the
3 Naperville Police Department?
4    A.   No.
5    Q.   Did you mention anything to the
6 counselor at the DuPage County jail that you had
7 recently been served with divorce papers?
8    A.   Not until I was assigned an attorney.
9    MR. POLICK:  Why don't we mark this as 10.
10       This is 11.
11       (Deposition Exhibits Numbers 10
12        and 11, Witness Amor, were
13        marked for identification
14        03/05/2020.)
15    THE WITNESS:  Here you go.  You can keep that.
16 BY MR. POLICK:
17    Q.   Can you take a look at Exhibit 10,
18 please, sir.
19       Do you recognize the person in that
20 photograph?
21    A.   Obviously I do.
22    Q.   Okay.  Who is that?
23    A.   Myself.
24    Q.   Okay.  And that's a booking photo from

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 334

1 the Naperville Police Department dated October 4th,
2 1995.
3        And if you could look at Exhibit 11
4 and tell me who the person is in that photograph.
5    A.   William Amor.
6    Q.   Okay.  And Exhibit 11 is a booking
7 photo from the DuPage County Sheriff in Wheaton,
8 Illinois, dated October 4th of 1995.
9    A.   That's correct.
10    MR. POLICK:  Mark this as 12.
11        (Deposition Exhibit Number 12,
12         Witness Amor, was marked for
13         identification 03/05/2020.)
14 BY MR. POLICK:
15    Q.   Looking at Exhibit 12, Mr. Amor, do you
16 recognize the person in that photograph?
17    A.   That is definitely me.
18    Q.   Okay.  And that's a Naperville booking
19 photograph dated September 15th of 1995?
20    A.   That's correct.
21    MR. POLICK:  Let's mark this as 13.
22        (Deposition Exhibit Number 13,
23         Witness Amor, was marked for
24         identification 03/05/2020.)

Page 335

1 BY MR. POLICK:
2    Q.   Looking at Exhibit 13, Mr. Amor, do you
3 recognize the person in that photograph?
4    A.   That is myself.
5    Q.   Okay.  And I'll represent to you that
6 that is a booking photo from the DeKalb County
7 Sheriff taken on September 15th of 1995.
8        Let's mark this as 14.
9        (Deposition Exhibit Number 14,
10         Witness Amor, was marked for
11         identification 03/05/2020.)
12 BY MR. POLICK:
13    Q.   Looking at what we've marked as
14 Exhibit 14 to your deposition, Mr. Amor, do you
15 recognize the person in that photograph?
16    A.   I do.  That's myself.
17    Q.   Okay.  And that is a Naperville Police
18 Department booking photo for April 20th of 1995.
19    MS. THOMPSON:  Is that a question?
20 BY MR. POLICK:
21    Q.   Do you agree with that?
22    A.   I do.
23    MR. POLICK:  Okay.  Thank you.
24        Let's take a break.

Page 336

1    THE VIDEO TECHNICIAN:  We're off the record
2 at 5:57 at end of media unit four.
3        (Recess taken.)
4    THE VIDEO TECHNICIAN:  We're back on the
5 record at 6:13 at the beginning of media unit five.
6 BY MR. POLICK:
7    Q.   Okay.  Mr. Amor, do you understand that
8 you are still under oath?
9    A.   I do.
10    Q.   Okay.  Before the fire of September 10th
11 at 218 East Bailey, was there a smoke alarm or
12 detector within the unit?
13    A.   There was.
14    Q.   Okay.  And was that smoke alarm
15 operable on the day of the fire?
16    A.   It was not.
17    Q.   Okay.  Had you disarmed that smoke
18 alarm before the date of the fire?
19    A.   It needed a battery.  And by the
20 request of Marianne, replace the battery so it
21 would stop beeping.
22    Q.   And did you remove the unit from the
23 wall to replace the battery?
24    A.   I did.

Page 337

1    Q.   Okay.  Did you ever replace the
2 batteries prior to the fire?
3    A.   The day that -- as I stated earlier,
4 they went to the store earlier that day, but they
5 did not buy the battery.
6    Q.   Okay.  Did you remove the smoke alarm
7 from -- well, let me ask you this.
8        Where was the smoke alarm located in
9 the unit?
10    A.   On the ceiling.
11    Q.   Okay.  In the ceiling of what room?
12    A.   Would have been the hallway.
13    Q.   Okay.  And was it only one -- one smoke
14 detector for the unit?  Or was it --
15    A.   That's correct.
16    Q.   All right.  And when you removed the
17 batteries, did you remove the whole unit from the
18 ceiling?
19    A.   In order to replace the battery, you
20 have to take the unit off.
21    Q.   Okay.  After you removed the unit from
22 the ceiling, where did you put it?
23    A.   On the dining room table.
24    Q.   And do you know where the smoke alarm

WILLIAM E. AMOR, 03/05/2020                          Page 338..341

Page 338

1  unit was on the day of the fire?
2     A.   I do not.
3     Q.   You had some pet mice before the fire?
4     A.   We did.
5     Q.   Okay.  How long did you have the mice
6  before the fire?
7     A.   They were Tina's pet mice.
8          I have no idea.  I didn't maintain
9  them, I didn't buy them, I didn't take care of them.
10    Q.   Okay.  Let me ask you this.
11         When did you move into that unit?
12    A.   Only a few months before that.
13    Q.   A few months before the fire?
14    A.   Um-hmm.
15    Q.   Is that a yes?
16    A.   Yeah, that's a yes.
17    Q.   Okay.  And they were Tina's mice?
18    A.   Yes.
19    Q.   Okay.  Did you help care for the mice?
20    A.   That would be a yes.
21    Q.   Were the mice let go, or released,
22  before the fire?
23    A.   Yes.
24    Q.   Do you know when the mice were released

Page 339

1  before the fire?
2     A.   I do not.
3     Q.   Do you know who released the mice
4  before the fire?
5     A.   I do not.
6     Q.   Did you have anything to do that that?
7     A.   I did not.
8     Q.   Okay.  Did you tell Tina to get rid of
9  the mice before the fire?
10    A.   I do believe Marianne.
11    Q.   And why do you believe Marianne told
12  her to get rid of them?
13    A.   Because they reproduce so rapidly.
14    Q.   After the fire, the door to your and
15  Tina's bedroom was found to be closed and locked.
16         Did you and Tina keep that door
17  locked?
18    A.   There was no --
19    MS. THOMPSON:  Object to form.
20         You can answer.
21    THE WITNESS:  There was no lock on the door.
22         It might have been closed, but it
23  was not locked.
24

Page 340

1  BY MR. POLICK:
2     Q.   You didn't keep any type of lock or
3  keylock to get into the room?
4     A.   No.  They were -- we were family, and
5  everybody came and went as they pleased.
6     Q.   Okay.  Did you have any issues where
7  the door had to be locked within the home?
8     A.   We did not.
9     Q.   Okay.  And before you picked up the
10  cooler to leave that day, do you recall whether
11  that bedroom door was open or closed?
12    A.   I do not.
13         Again, as I stated previously, Tina
14  was the last one out of the house.
15    Q.   Do you know a woman by the name of
16  Marilyn Glisson?
17    A.   I did.
18    Q.   And how did you know Marilyn Glisson?
19    A.   She used to be a neighbor.
20    Q.   All right.  When you say she was a
21  neighbor, there in the complex on Bailey, or some
22  other place?
23    A.   It was in Lisle, an apartment I used to
24  live in.

Page 341

1     Q.   Okay.  Did you live with Marilyn?
2     A.   I did not.
3     Q.   Okay.  Did she manage the apartment that
4  you lived in?
5     A.   She kind of helped with maintenance.
6     Q.   What was your relationship with Marilyn?
7     A.   Just a friend.
8     Q.   Okay.  Did you ever have a romantic or
9  intimate relationship --
10    A.   I did not.
11    Q.   -- with her?
12    A.   I did not.
13         And I understand she's deceased.
14    Q.   She is deceased.  That's correct.
15         Was Marilyn a friend of Marianne's?
16    A.   Not to my knowledge.
17    Q.   Do you ever recall Marilyn coming over
18  to the apartment on Bailey and spending time there
19  visiting?
20    A.   No, I do not.
21    Q.   Do you know who Rosemary Hallauer is?
22         That's H-a-l-l-a-u-e-r.
23    A.   She was another neighbor in the
24  apartment building that Marilyn Glisson lived in.

WILLIAM E. AMOR, 03/05/2020

Page 342..345

Page 342

1    Q.   Okay.  In Lisle?

2    A.   Yes.

3    Q.   Did you meet Marilyn through living at

4 that building in Lisle?

5    A.   I did.

6    Q.   Okay.  And Rosemary, did you meet her

7 the same way?

8    A.   Yeah.

9    Q.   Did you meet either one of them through

10 St. Elizabeth Seton Church?

11   A.   I did not.

12   Q.   And what was Rosemary's relationship to

13 you?

14   A.   A friend.  Same as Marilyn Glisson.

15   Q.   Did you ever have a romantic

16 relationship with Rosemary?

17   A.   I did not.

18   Q.   Did Rosemary have any physical

19 disabilities?

20   A.   I think she was mentally slow at times.

21        She was elderly.  So ...

22   Q.   When you say "elderly," what do you mean?

23   A.   I don't know -- at the time, this had

24 to be the early '90s.  So ... and she was already I

Page 343

1 think well into her 70s, I think, at that time.

2    Q.   Okay.

3    A.   Yeah.

4    Q.   And --

5    A.   She was just a friendly neighbor.

6    Q.   Okay.

7    A.   I'll leave it at that.

8    Q.   Do you know if she was receiving any

9 type of disability, or disability income?

10   A.   I would have no -- I do not.

11   Q.   Okay.  Do you know who Steven Ludson

12 is?

13   A.   That's her son-in-law.

14   Q.   Okay.  Did he live with Rosemary?

15   A.   He did.

16   Q.   Okay.  And how about -- is it his wife,

17 Catherine?

18   A.   Then, I couldn't tell you.

19        But that was like, again, 25 years

20 ago.  I couldn't tell you currently.

21   Q.   Did you know Steven well?

22   A.   Only as a friend, but not as a roommate

23 or anything.

24   Q.   You never lived with Rosemary?

Page 344

1    A.   I did -- I did not.

2    Q.   Did you ever live with Steven?

3    A.   No.  Well, actually, I did, briefly.

4        And then I moved into a different

5 apartment --

6    Q.   Okay.  What --

7    A.   -- in the same building.

8    Q.   How long did you live with Steven?

9    A.   I don't know.  Maybe a month.

10   Q.   Did you ever take any money from

11 Rosemary?

12   A.   I did not.

13   Q.   Did you ever take any money from Steven?

14   A.   I did not.  They were -- but if I'm

15 remembering correctly, they were on disability.

16   Q.   And were they receiving some type of

17 disability checks?

18   A.   That was my guess.

19   Q.   Did you ever handle family finances for

20 Rosemary?

21   A.   I did not.

22   Q.   Did you ever handle family finances for

23 Steven Ludson?

24   A.   I did not.

Page 345

1        What I will tell you is they had

2 their electricity turned off.  And I went -- got an

3 extension cord and plugged it into the apartment I

4 lived in so they'd have electricity.

5    Q.   Did Marilyn Glisson have any type of

6 disability?

7    A.   No.  She was a stay-at-home woman who --

8 her boyfriend lived with her, and he was a truck

9 driver.

10   Q.   Do you know if Marilyn was receiving

11 any type of disability income?

12   A.   I do not know.

13   Q.   Did you ever tell anybody that you were

14 managing the finances for Marianne and Tina Miceli?

15   A.   No.  Absolutely not.

16   Q.   Do you remember a neighbor in the complex

17 there by the name of Ronald Heslop, H-e-s-l-o-p?

18   A.   I do not.

19   Q.   And his wife Jean?

20   A.   I do not.

21        These may have been people that came

22 forward after the fire.  That would be my guess.

23   Q.   Okay.  Do you know who Jeannie Ripsky is?

24   A.   That's Marianne's sister.

Urlaub Bowen & Associates, Inc.   312-781-9586

WILLIAM E. AMOR, 03/05/2020                    Page 346..349

Page 346

1    Q.   Okay.  Had you ever met Jeannie Ripsky
2 before the fire of September 10th of '95?
3    A.   I have not.
4    Q.   And have you met her since that time?
5    A.   I have not.
6    Q.   Do you know who Jason Dietrich is?
7    A.   I do not.
8    Q.   Ed Sipolt, S-i-p-o-l-t?
9    A.   I have no idea.
10   Q.   How about John Kuruda, K-u-r-u-d-a?
11   A.   Old guy that I used to hang out with;
12 turned out to be such a good friend --
13   Q.   Okay.
14   A.   -- who now lives in Missouri.
15   Q.   Did you ever live with John?
16   A.   Briefly he stayed with me.
17   Q.   Okay.  Did John ever come over to the
18 apartment on Bailey?
19   A.   Actually he used to date Tina Miceli.
20   Q.   Before you?
21   A.   Before my presence, that's correct.
22   Q.   Okay.  How long were you dating Tina
23 before you and her got married?
24   A.   Not very long.  I couldn't tell you

Page 347

1 exact date, to be honest with you.
2    Q.   Do you know how old she was when you
3 first started dating her?
4    A.   18, almost 19.
5    Q.   Do you know a Norma Jean Kiper,
6 K-i-p-e-r, in Petersburg, Illinois?
7    A.   I do not.
8    Q.   Were you represented at some point by
9 an attorney by the name of John Moroni, M-o-r-o-n-i?
10   A.   That would have been through one of my
11 appeals.
12   Q.   All right.
13   A.   My criminal appeal.
14   Q.   But the name Norma Jean Kiper doesn't
15 mean anything to you?
16   A.   Doesn't ring any bells.  It does not.
17   Q.   Okay.  Did you ever have a girlfriend
18 that lived in Paducah, Kentucky, in 1995?
19   A.   I've been to Paducah.  But I don't --
20 but only briefly.  I don't ...
21   Q.   When were you briefly in Paducah,
22 Kentucky?
23   A.   Would have had to be the early '90s,
24 obviously.  I mean ...

Page 348

1    Q.   Did you have any relationship with a
2 woman while you were in Paducah?
3    A.   I did not.
4    Q.   Do you have any family in Paducah,
5 Kentucky?
6    A.   I do not.
7         Marilyn Glisson's family is from
8 Paducah.
9    Q.   Oh.  Okay.
10   A.   They are actually -- they were from
11 Lisle.  When they retired, they moved to Paducah.
12   Q.   All right.
13   A.   And I used to take Marilyn down there.
14   Q.   When you say you would take Marilyn
15 down there, how many times had you gone down there?
16   A.   I don't know.  Two or three.
17        You know, on the weekends.  It's a
18 long drive.
19   Q.   Yes.
20        Who is Brittany Williams?
21   A.   That's my niece.
22   Q.   Okay.  And do the names Richard and
23 Gayle Gibson mean anything to you?
24   A.   They do not.

Page 349

1    Q.   Do you have any relatives or godparents
2 or friends that live in Lombard, Illinois?
3    A.   I do not.
4         The only Gibsons I -- well, I'm
5 trying to think.  I think I might have had a
6 cellmate named Jeff Gibson.
7         Wonderful guy; wonderful family.
8    Q.   Do you recall a cellmate or person you
9 were in the DuPage County jail with in 1995 by the
10 name of Michael Manion?
11   A.   I do.
12   Q.   What do you remember about Mr. Manion?
13   MS. THOMPSON:  Object to form.
14        You can answer.
15   THE WITNESS:  That he's been interrogated a
16 whole lot of times for things he knows nothing about.
17        I -- I -- and I never said anything
18 to him on or off the record.
19 BY MR. POLICK:
20   Q.   Did you have conversations with Michael
21 Manion when you were both in the DuPage County jail
22 in 1995?
23   A.   Just cellhouse junk.
24   Q.   Did you ever talk to him about Marianne

WILLIAM E. AMOR, 03/05/2020                           Page 350..353

Page 350
1 or Tina?
2    A.   I did not.
3    Q.   Do you know a person by the name of Jay
4 Ciegiala, C-i-e-g-i-a-l-a?
5    A.   I do not.
6    Q.   How about Akela, A-k-e-l-a, and Amika,
7 A-m-i-k-a, Makerchin, M-a-k-e-r-c-h-i-n?
8    A.   These names are completely unfamiliar
9 to me.
10   Q.   All right.  Were you in the DuPage
11 County jail at -- during a period of time in 2017,
12 before your retrial?
13   A.   Yes.
14   Q.   Okay.  Do you recall making a phone
15 call to a woman by the name of Jennifer?
16   A.   Yes.
17   Q.   And who is Jennifer?
18   A.   She's a girlfriend of a gentleman I was
19 locked up with.
20   Q.   And who was the gentleman you were
21 locked up with?
22   A.   Michael -- I can't think of his last
23 name.  Helms, H-e-l-m-s.
24   Q.   And where were you housed with

Page 351
1 Mr. Helms, to your --
2    A.   Taylorville.
3    Q.   Do you remember any of your other
4 cellmates during the period of time you were in the
5 Illinois Department of Corrections?
6    A.   Nobody I was close to.
7    Q.   Other than Mr. Helms?
8    A.   That's correct.
9    Q.   Any other cellmates that you recall or
10 remember?
11   A.   No one I keep in touch with.
12   Q.   Okay.  Whether you keep in touch with
13 them or not, do you recall any of them?
14   A.   Not by name.  Just ...
15   Q.   How about in the DuPage County jail?
16        Anybody you remember from DuPage
17 County jail?
18   A.   I do not.
19   Q.   Okay.  During the period of time you
20 were in the DuPage County jail after your arrest
21 for the murder and arson related to Marianne Miceli,
22 were you injured at all at DuPage County jail?
23   A.   I was not.
24   Q.   Any illnesses while you were in the

Page 352
1 DuPage County jail?
2    A.   I was not.
3    Q.   Okay.  Were you ever assaulted,
4 sexually or otherwise, in the DuPage County jail?
5    A.   I was not.
6    Q.   Were you ever in any type of solitary
7 confinement while you were in the DuPage County
8 jail?
9    A.   I was not.
10   Q.   Any threats to your life while you were
11 in the DuPage County jail?
12   A.   No, sir.
13   Q.   Did you have what's commonly known as
14 trustee status when you were at the DuPage County
15 jail?
16   A.   I did.
17   Q.   And for how long of a period of time
18 did you have that?
19   A.   I was there for two years, so probably
20 the last six, seven months.
21        That's an estimate, of course.
22   Q.   Okay.  And this is before you were
23 transferred for -- to the Illinois Department of
24 Corrections?

Page 353
1    A.   This was before I was -- right.  That's
2 correct.
3    Q.   Okay.  And you were in several
4 institutions while incarcerated in the Illinois
5 Department of Corrections, correct?
6    A.   That's correct.
7    Q.   Okay.  At any of those institutions --
8 and I think the last one you were at was
9 Taylorville?
10   A.   That's correct.
11   Q.   Is that where you were ultimately
12 released from?
13   A.   That's correct.
14   Q.   Okay.  Were you ever a trustee at any
15 of those institutions?
16   A.   Actually, Logan and Taylorville.
17   Q.   Any injuries that you suffered at any
18 time while you were in the Illinois Department of
19 Corrections?
20   A.   Taylorville.  I tore an ACL.
21   Q.   How did that happen?
22   A.   In the gym.
23   Q.   And what happened in the gym that you
24 tore your ACL?

WILLIAM E. AMOR, 03/05/2020                          Page 354..357

Page 354

1    A.   Just weights, and just, you know,
2  trying to stay healthy.
3    Q.   Any other injuries during your time in
4  the Illinois Department of Corrections?
5    A.   Other than the usual flu, bronchitis,
6  and ...
7    Q.   Nothing other than that?
8    A.   No.
9    Q.   Any major illnesses while you were in
10 the Illinois Department of Corrections?
11   A.   No, sir.
12   Q.   Any threats to your life while you were
13 in the Illinois Department of Corrections?
14   A.   No, sir.
15   Q.   Any assaults, sexual or otherwise,
16 while you were in the Illinois Department of
17 Corrections?
18   A.   No.
19   Q.   Were you ever in solitary confinement
20 while you were in the Illinois Department of
21 Corrections?
22   A.   I was not.
23   Q.   Earlier you told me that as a result of
24 that fraud conviction, you had to pay restitution

Page 355

1  to the Circuit Court of DuPage County, correct?
2    A.   I did.
3    Q.   Okay.  Did you have a payment coming
4  due before the fire?
5    MS. THOMPSON:  Object to form.
6        You can answer.
7    THE WITNESS:  I'm not sure how much I owed or
8  what I owed, to be honest with you.
9  BY MR. POLICK:
10   Q.   Were you making periodic payments?
11   A.   I was.
12   Q.   Were you up to date in those payments
13 before the fire, or were you in arrears?
14   A.   If I was behind, it couldn't have been
15 by much.
16       But I didn't get a chance to pay it
17 off because I went to prison.
18   Q.   Well, I'm talking before you were
19 actually arrested --
20   A.   No.
21   Q.   -- for the murder of Marianne.
22   A.   No.  I just -- I'm fairly certain I
23 didn't owe anything.
24   Q.   Before the fire?

Page 356

1    A.   That's correct.
2    Q.   Do you have any reason to believe you
3  were not in the DuPage County jail from April 21st,
4  1995, to July 17th of 1995?
5    A.   I do not.
6    Q.   Okay.  Are you -- do you have a
7  recollection of being there?
8    A.   In DuPage County jail?
9    Q.   Yeah.
10   A.   I do.
11   Q.   Is that where you met Mr. Manion?
12   A.   I didn't meet Mr. Manion in 1995.
13   Q.   When did you meet Mr. Manion?
14   A.   1991 or something.
15   Q.   Okay.  Did you have any contact with
16 Mr. Manion in 1995?
17   A.   I did not.
18   Q.   Did you write Tina any letters from the
19 DuPage County jail while you were there between
20 April and July of 1995?
21   A.   I did.
22   MR. POLICK:  Okay.  I'm going to show you
23 what we're going to mark as -- what are we up to?
24 15.

Page 357

1        (Deposition Exhibit Number 15,
2         Witness Amor, was marked for
3         identification 03/05/2020.)
4    THE WITNESS:  Thank you.
5  BY MR. POLICK:
6    Q.   Take a moment to -- not going to look
7  at all of them.
8        Are these letters in your
9  handwriting, sir?
10   A.   They are.
11   Q.   Okay.  And if I could direct your
12 attention, if you see at the bottom, there is a --
13 what we call a Bates number.
14       The first one says DEFS 491.
15   A.   That's correct.
16   Q.   Okay.  If you go through this to
17 DEFS 548, and tell me when you're there.  It's near
18 the back.
19   A.   Okay.
20   Q.   Are you at 548, sir?
21   A.   I am.
22   Q.   Okay.  If you look at the right-hand
23 margin --
24   A.   Yep.

WILLIAM E. AMOR, 03/05/2020                          Page 358..361

Page 358

1    Q.   -- is that your handwriting there?
2    A.   It is.
3    Q.   It says there:  "I have a plan or two
4 of attack for some capital gain for late summer so
5 we can move"?
6    A.   That's correct.
7    Q.   Okay.  Can you tell us what you meant
8 by that?
9    MS. THOMPSON:  Object to form.
10       You can answer.
11   THE WITNESS:  We went through that.
12       Get my life together, get out of
13 jail, get a better job.
14 BY MR. POLICK:
15   Q.   Did you and Tina have plans to move out
16 of the apartment there on Bailey?
17   A.   She was working on that.
18   Q.   And how was she working on that?
19   A.   Well, she was -- when I was in County,
20 she was doing some homework for other apartments
21 and stuff that she wanted to go.
22   Q.   Is that something you and her agreed
23 on, that you would -- you would eventually leave
24 the apartment there on Bailey --

Page 359

1    A.   Eventually.
2    Q.   -- and get your own place?
3    A.   Eventually, yes.  We were married,
4 newly married.
5    Q.   Yes.
6        Was Tina buying items that you could
7 use in your new apartment, or home?
8    A.   Yeah.  There were some things.
9        But I forget the name of the
10 company.
11   Q.   Does the company Fingerhut --
12   A.   That's correct.
13   Q.   -- refresh your recollection?
14   A.   Yes, it does.
15   Q.   Do you know how much was owed to
16 Fingerhut in --
17   A.   I do not.
18   Q.   -- September of 1995?
19       And the items that Tina was buying
20 from Fingerhut, where was she keeping them in the
21 home there on Bailey?
22   A.   I think they were in the living room.
23   Q.   Okay.  Do you know where in the living
24 room?

Page 360

1    A.   I do not.
2    Q.   Did you buy any items from Fingerhut to
3 use in your new home?
4    A.   Well, she started buying these things
5 when I was still in County, so it was a -- kind of
6 a collective effort.
7    Q.   Okay.  Do you know how much Tina owed
8 to Fingerhut at that point?
9    A.   I do not.  I've never seen the bill.
10   Q.   Do you know what date is Tina's
11 birthday?
12   A.   February 14th.
13   Q.   Okay.  When's the last time you have
14 seen Tina?
15   A.   My second trial, which would have been
16 February --
17   Q.   January of 2018?
18   A.   -- of '18, yeah.
19   Q.   Have you seen her since your second
20 trial?
21   A.   I have not.
22   Q.   Who did you meet first, Marianne or
23 Tina?
24   A.   Marianne.  I -- Marianne.

Page 361

1        I met Marianne through church.
2    Q.   Through St. Elizabeth Seton?
3    A.   That's correct.
4    Q.   And do you recall what year it was that
5 you met Marianne?
6    A.   '90, '91.  I don't know.
7        I don't -- I don't recall.
8    Q.   Okay.  And was that all through the
9 church?
10   A.   It was.
11   Q.   How long after you met Marianne did you
12 meet Tina?
13   A.   It was a period of time.
14   Q.   When you say "a period of time," can
15 you give me something --
16   A.   I couldn't tell you how long.  I
17 couldn't expound on the time.
18       Tina wouldn't always take her mom to
19 church or pick her up --
20   Q.   Okay.
21   A.   -- so it became something that Marianne
22 and I did.
23   Q.   Did you ever have a romantic relationship
24 with Marianne?

WILLIAM E. AMOR, 03/05/2020                              Page 362..365

Page 362

1    A.   I did not.

2    Q.   Had you ever been intimate with
3 Marianne?

4    A.   I have not.

5    Q.   When you and Tina were planning on
6 leaving the apartment there on Bailey, how did
7 Marianne feel about that?

8    MS. THOMPSON:  Object to form.

9        You can answer.

10       THE WITNESS:  Unhappy at first, but not --
11 you know, she wasn't going to miss the traffic.

12 BY MR. POLICK:

13   Q.   Meaning -- what do you --

14   A.   In and out, in and out, in and out.

15   Q.   Oh, not the traffic outside.  The --

16   A.   Oh, no, no, no, no.

17        Just us in and out, in and out.

18 So ...

19   Q.   I see.  So it was your understanding
20 that Marianne was going to remain there on Bailey?

21   A.   No.  That's correct.

22   Q.   Did you and Tina ever go and actually
23 look for a new place to live?

24   A.   I do believe Tina did, but I could not

Page 363

1 tell you what the address is.

2        As I stated, I haven't talked to her
3 in 25 years.  So ...

4    Q.   While you and Tina were living there in
5 the Bailey apartment, did you ever go out on dates?

6    A.   We mostly took care of the house
7 because of Marianne, as I told you, was bipolar.

8        Actually, the night we went to the
9 movies was the first time we were actually out
10 together as a couple, other than going to the store
11 or -- you know what I mean?

12   Q.   Yes.  And you've mentioned Marianne
13 took medication.

14        Do you know how that medication was
15 paid for?

16   A.   I think Medicare would be ...

17   Q.   Okay.  Did you --

18   A.   Or Medicaid.  I'm not sure of the two.

19   Q.   All right.  Did you ever go to the
20 drugstore and pick up her medication for her?

21   A.   I used to take her to pick it up.

22   Q.   I see.

23   A.   And doctors' appointments.

24   Q.   During that period of time, 1995 -- I

Page 364

1 know you told me very early on in this deposition
2 that your father passed I believe in 1997.

3    A.   That's correct.

4    Q.   (Continuing) -- were you in any way
5 taking care of your father, or supporting his care
6 at that period of time in 1995?

7    A.   My father retired in Immokalee,
8 Florida.

9    Q.   Where is Immokalee?

10   A.   Right outside of Fort Myers.

11   Q.   All right.

12   A.   He was a farmer.  So ... and had a -- I
13 went down to see him.  And he just liked the warm
14 weather, so he stayed down there.

15   Q.   All right.  Were you supporting him at
16 all, or taking care of him financially?

17   A.   No.  He was a war veteran.

18   Q.   Okay.  So he had some kind of veterans
19 benefits?

20   A.   Oh, yes.  Plus, he -- when he -- when
21 he left South Bend, he sold the home that we all
22 grew up in.

23   Q.   Did you ever tell anybody you owned a
24 home or property in Iowa?

Page 365

1    A.   I did not.  I'm not sure where this
2 comes from, to be honest with you.  But ...

3    Q.   While you lived with Tina in -- and
4 Marianne at the Bailey apartment, did you ever give
5 Marianne massages?

6    A.   I did.

7    Q.   And why did you give her the massages?

8    A.   Because she was disabled, and she asked
9 for them.  And I loved her.

10   Q.   Okay.  And what was Tina's reaction to
11 you giving Marianne massages?

12   A.   Eh.  Sometimes good, sometimes not so
13 much.

14   Q.   What do you mean by that?

15   A.   Well, she would say, Mom, don't ask
16 Bill to give you a massage, so -- things like that.

17   Q.   Did she ever argue with her mother over
18 the fact that you were giving her mother massages?

19   A.   She did not.

20        What they argued about was something
21 other than that.

22   Q.   What was the something other than that they
23 argued about?

24   A.   Just mother and daughter stuff.

WILLIAM E. AMOR, 03/05/2020                    Page 366..369

Page 366

1      Money, food.
2    Q.   What would they argue about in terms of
3  food?
4    A.   Neither one of them had really good
5  diets.  So ...
6    Q.   So --
7    A.   And I refused to go buy fattening
8  stuff.  Marianne was a little bit overweight.  Tina
9  was a little bit overweight.  So ...
10   Q.   And when you say they argued about
11  that, in what way?
12   A.   Oh, just in a minor way.
13        Just a -- yeah.  It wasn't ...
14   Q.   And what about finances?
15        What did they argue about money?
16   A.   I don't recall either of them.
17        Again, Marianne had -- payee was Pam
18  Leavenworth.  So ...  Marianne did not worry about
19  finances.
20   Q.   And --
21   A.   If she needed some extra money, she
22  would have asked Tina or myself.
23   Q.   And how did Tina react to that?
24        Did she like giving her money to

Page 367

1  Marianne?
2    A.   She barked a little bit from time to
3  time, but nothing horrible.
4    Q.   You told us earlier that you were
5  trying to help Tina with her finances.
6    A.   Yes.
7    Q.   Did she ever hold that against you?
8    A.   She did not.
9    Q.   Did you and Tina ever have arguments
10  about what she was doing with her money?
11   A.   Never an argument.
12   Q.   Would it be heated discussion?
13   A.   I wouldn't call it any of that.
14        Just a reminder to keep track of what
15  you earn.
16   Q.   Did she ever -- strike that.
17        Did you feel she held it against you
18  that she was out working a job, and you were not
19  bringing home a paycheck, or at least a steady
20  paycheck?
21   A.   I'm going to say no because I could do
22  odd jobs, still make money, and take care of
23  Marianne.  So that's a no.
24   Q.   How many odd jobs were you getting a

Page 368

1  week?
2    A.   Two or three.
3        MS. THOMPSON:  Object to form.
4        You can answer.
5        THE WITNESS:  Yeah, two or three, depending
6  on what it was.
7  BY MR. POLICK:
8    Q.   Okay.  And did you charge by the job or
9  by the hour or --
10   A.   By the job.
11   Q.   And back then, in 1995, what were you
12  charging for a job?
13   A.   If you were going to hang a ceiling
14  fan, they'd buy the parts, 200 bucks to install it.
15        Put an AC compressor in the car,
16  2- to 300 bucks, plus the parts.
17        All things I'm well trained on.
18   Q.   Do you know who Dorothy Atten is?
19        A-t-t-e-n.
20   A.   Yes.
21   Q.   Who is she?
22   A.   She's a friend of Marianne's, or was.
23        She is deceased also.
24   Q.   And did Dorothy ever come over to the

Page 369

1  apartment there?
2    A.   Her and Marianne used to go to Bakers
3  Square together.  That was their thing.
4    Q.   Okay.  Did Dorothy ever come over and
5  visit Marianne at the apartment?
6    A.   I'm not sure if I ever seen her in the
7  apartment or not.
8    Q.   Okay.
9    A.   She lived in Carol Stream.
10        I used to drop Marianne over there,
11  and Dorothy would bring her home.
12   Q.   Do you remember Marianne getting any
13  visitors at the apartment?
14   A.   Other than -- I don't think they ever
15  came up.  Dorothy used to stay out in the parking
16  lot, and Marianne would go down.
17        And other than her family, no.
18   Q.   When you say "her family," who from her
19  family would come over?
20   A.   Well, Pam.
21   Q.   Okay.  How often would Pam come over?
22   A.   On an as-needed basis.
23   Q.   What does that mean?
24   A.   To check on Marianne, and ...

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 370

1    Q.   Okay.  Would Marianne be upset about
2  Pam coming over?
3    A.   No, because usually Marianne wanted --
4  since Pam was payee, Marianne wanted money.  So Pam
5  would come over and say, you know, I'm not giving
6  you 50; I'll give you 20.
7         You know, little things like that.
8    Q.   How did you feel about Pam coming over
9  to the apartment?
10   A.   I got along with Pam fine.
11   Q.   Okay.  How about her husband, Gary?
12   A.   We didn't know each other very well.
13        At the time Gary was in real estate,
14  so he was busy.
15   Q.   Prior to your first trial, did the state
16  offer you a plea deal?
17   A.   They did.
18   Q.   And do you recall what it was?
19   A.   20 years to plead guilty.
20   Q.   Okay.  Did you consider taking it?
21   A.   I did not.  Not for a moment.
22   Q.   Okay.  You mentioned earlier that both
23  your parents were alcoholics.
24   A.   They were.

Page 371

1    Q.   Okay.  Have you had any problems with
2  alcohol?
3    A.   Early on I did.
4    Q.   When you say "early on" --
5    A.   Way before prison.
6    Q.   Okay.  So if you had to put a year,
7  from one year to another --
8    A.   As I stated earlier, DUI in '86, and
9  so -- you know, I needed to mend my ways.
10   Q.   In 1995, did you have an alcohol
11  problem?
12   A.   I did not.
13   Q.   Okay.  Have you ever been in Alcoholics
14  Anonymous or some other recovery or 12-step program?
15   A.   Only in prison.
16   Q.   Okay.  In the IDOC?
17   A.   Yes.
18   Q.   Okay.  What type of program were you in
19  in IDOC?
20   A.   We do these programs to remind ourselves
21  that we're in prison and not to make the same
22  mistakes we made on the street.  And it also -- to
23  be fair, it gets you out of the cellhouse, so
24  you -- you meet volunteers.

Page 372

1         These are not IDOC employees.
2  They're volunteers that come in, and they're nice
3  enough to do that, to remind you that -- don't do
4  it again.
5    Q.   Okay.  And earlier you told me you got
6  some of your education continued while you were in
7  the IDOC?
8    A.   Yeah.  I took a business class.  And --
9  but -- you have two ways to go.
10        You don't get paid for going to
11  school.  So if you don't have a job, you don't have
12  any money for soap, toothpaste -- you know,
13  anything.  So ...
14   Q.   Was anybody putting money into your
15  commissary fund?
16   A.   Occasionally.
17   Q.   And who would do that?
18   A.   My sister, when she had it.
19   Q.   Okay.  Who visited you while you were
20  in IDOC?
21   MS. THOMPSON:  Object to form.
22        You can answer.
23   THE WITNESS:  Yeah, my sister, when she
24  could.  But that was only once or twice.

Page 373

1  BY MR. POLICK:
2    Q.   Okay.
3    A.   Mostly it was legal counsel.
4    Q.   All right.  Anyone other than your
5  sister who would come to visit you while you were
6  in any of the facilities of the Illinois Department
7  of Corrections?
8    A.   No.
9    Q.   Randy Anderson.  Who is he?
10   A.   He's an old school friend.
11   Q.   From?
12   A.   South Bend.
13   Q.   South Bend?
14   A.   Yeah.  We went to school together.
15   Q.   How about Mayor Pete?
16        Is he a friend too?
17   A.   Well, he dropped out.  So ...
18   Q.   Yeah.  I mean, do you -- have you been
19  following that?
20   A.   Oh, I have.
21   Q.   Yeah?  Was he the mayor at any time
22  where you -- when you lived there?
23   A.   He was not.
24   Q.   All right.

Page 374

1    A.   He's much younger than me.

2    Q.   So when you say Randy is an old school

3 friend, what -- how far back?  High school?

4    A.   Yes.

5    Q.   And Randy, did he visit you at all

6 while you were in the Illinois Department of

7 Corrections?

8    A.   Randy's health hasn't been good for a

9 while.  His wife's on her third bout of cancer.

10   Q.   I see.

11   A.   I just found out.

12   Q.   And at any period of your life did you

13 live with Randy?

14   A.   His parents', when I left home at 16,

15 1972.  And his parents have been deceased for quite

16 some time now.

17   Q.   When is the last time you spoke with

18 Randy?

19   A.   Two or three weeks ago.

20   Q.   How do you keep in touch with him?

21   A.   Text or phone.

22        It wasn't till recently I found out

23 his wife is on her third bout of cancer, so I send

24 him texts and tell him hope Deb's okay, we love

Page 375

1 you.  So ...

2    Q.   While you were in the Illinois

3 Department of Corrections, did you have any

4 employment?

5    A.   Janitors.

6        Taylorville was clothing room.

7    Q.   What did you do in the clothing room?

8    A.   Issued clothing to inmates coming in,

9 pack up their bags, you know, for people getting

10 off the bus, coming in.  You know, pack up, you

11 know, T-shirts, socks, underwear, soap, and this

12 kind of thing.

13        And before that, I worked in the

14 cafeteria, which was not such a great job.

15        So when I got a chance to go to the

16 clothing room, I did just that.

17   Q.   Any other jobs you had while in the

18 Illinois Department of Corrections?

19   A.   Everybody has a porter job.

20        You're assigned a porter job.

21   Q.   What --

22   A.   Take out the trash.

23        I mean, it's automatic.

24   Q.   Were you ever in any type of protective

Page 376

1 custody while you were in Illinois Department of

2 Corrections?

3    A.   I was never in PC.

4    Q.   Did you have library privileges while

5 you were in the Department of Corrections?

6    A.   I did.

7    Q.   Did you make use of those?

8    A.   I did.

9    Q.   Did you live for a period of time in

10 Silver Lake, Wisconsin?

11   A.   No.  I have a friend that lives there.

12   Q.   Who's your friend that lives there?

13   A.   Her name's Casey.

14   Q.   What's Casey's last name?

15   A.   I don't recall.

16        I just seen her yesterday.  So ...

17   Q.   I'm sorry.  You just saw ...

18   A.   I just saw her yesterday.

19   Q.   Okay.

20   A.   Yeah.

21   Q.   Did she come to visit you here?

22        Or did you go there?

23   A.   No.  She helped me clean out my storage

24 room.

Page 377

1        She's kind of an old friend that

2 Angel Gonzalez -- she does advertising; coffee

3 cups, T-shirts.

4    Q.   Did you meet her through Mr. Gonzalez?

5    A.   I did.

6    Q.   Upon your release when your conviction

7 was vacated, were you on any type of electronic

8 monitoring?

9    A.   When I was in the halfway house.

10   Q.   And where were you in the halfway house

11 at?

12   A.   I forget which suburb it was.

13        Down south.

14   Q.   Calumet City?

15   A.   Yeah, that would be right.

16   Q.   How long were you in the halfway house

17 there?

18   A.   A month.

19   Q.   Was it your understanding that you were

20 on electronic monitoring or supervised release for

21 the fraud conviction that you --

22   A.   That's correct.

23   Q.   -- had?

24   A.   Which was vacated.

WILLIAM E. AMOR, 03/05/2020                                    Page 378..381

Page 378

1          And by -- at the time I had a parole
2   officer. And he came to see me; goes, Look, take
3   that bracelet off. So ...
4      Q.   Where did you go to live after you left
5   the halfway house?
6      A.   Angel Gonzalez.
7      Q.   In Waukegan?
8      A.   Yes.
9      Q.   And right now are you doing any type of
10  work, or employment?
11     A.   We do a lot of automative work.
12     Q.   And when you say "we," who is "we"?
13     A.   Angel and I.
14          Angel owns a trucking company. But
15  he also owns five garages, and we love doing
16  automotive stuff.
17     Q.   Okay.
18     A.   It's kind of on-the-side job.
19     Q.   Okay. How has your adjustment been
20  since you have been back into society?
21     MS. THOMPSON: Object to form.
22          You can answer.
23     THE WITNESS: Any exoneree, or -- will tell
24  you you have good days and bad days.

Page 379

1          You know, some days you -- you get
2   up like a normal person. And some days, you
3   know -- some nights you don't sleep, you know.
4          It's not unusual -- it's not unusual
5   for us to have nightmares.
6          My first month out, I used to wake
7   up and go (descriptive sound). But that's --
8   that's a common response.
9   BY MR. POLICK:
10     Q.   Do you have a relationship with
11  anybody, a girlfriend, at this point?
12     A.   I do not.
13     Q.   Okay.
14     A.   That's a -- that's another common
15  response, that we're afraid to get involved.
16     Q.   Do you have anybody that you're close
17  with, but not in a romantic kind of relationship?
18     A.   Oh, you mentioned Casey. She lives in
19  Silver Lake. She comes down, and we just hang out
20  together.
21          She has an ex-husband and a
22  boyfriend and stuff, and she's just a good friend
23  to Angel and I.
24     Q.   How about your sister Shelley?

Page 380

1      A.   Yes.
2      Q.   Does she have any children?
3      A.   Brittany Williams.
4      Q.   Okay. And that's your --
5      A.   That's my niece.
6      Q.   -- niece.
7          How old is Brittany?
8      A.   35.
9      Q.   Does she have any children?
10     A.   She does.
11     Q.   Okay. Do you have a relationship at
12  all with any of Brittany's children?
13     A.   I do.
14          Kendall will be -- matter of fact,
15  I'm going up in a couple weeks for her fifth
16  birthday.
17     Q.   Any other family members that you
18  maintain a relationship with them?
19     A.   There's nobody else living.
20     Q.   And how often do you see Shelley?
21     A.   Anytime I get to South Bend.
22          Usually once a month or so, give or
23  take, when I go to see Randy. They're only like a
24  mile apart.

Page 381

1      Q.   And the automotive work you're doing
2   with Mr. Gonzalez.
3      A.   Yes.
4      Q.   Do you work for him?
5      A.   It's kind of a team effort.
6      Q.   Okay.
7      A.   You know, we're not -- to be fair,
8   we're not really 9:00-to-5:00 guys, you know.
9          We take on this work, you know. We
10  bid the job, and, you know, we just do it.
11     Q.   Okay.
12     A.   That way, if we want to stay up till
13  3:00 o'clock in the morning working on a car we
14  love, this is what we do.
15     Q.   You mentioned that Mr. Gonzalez owns
16  the business; is that correct?
17     A.   He owns a trucking company.
18     Q.   A trucking company.
19     A.   Yes.
20     Q.   And do you get paid through the
21  trucking company for your work?
22     A.   I mostly do the automotive thing.
23          Angel asks me to take on the
24  paperwork and computer stuff. But, you know, I

Page 382

1 live in his home, so I don't really ask for
2 anything.
3      Q.   And in terms of the paperwork, what do
4 you mean by that?
5      A.   Just billing and if -- when you run a
6 trucking company, you got to keep track of gas
7 receipts, you know; freight, you know.  I mean,
8 this kind -- all this kind of stuff.
9      Q.   Is that something you have experience
10 in?
11     A.   I do now.
12          Did I before?  I did not.  I do now.
13     Q.   Okay.  How about computers?
14     A.   A lot of things I'm still learning.
15          I was gone for so long, it's still a
16 learning curve.
17     Q.   Did you have access to computers while
18 you were in the Illinois Department of Corrections?
19     A.   I did not.
20     Q.   Okay.  What are you earning right now
21 on a -- on a weekly basis?
22     A.   Well, depends on the job.
23          I'd say -- I don't know.  It's hard
24 to keep track because whatever the expenses are at

Page 383

1 the house, there's a bill, I just pay it.
2          So walk-away money?  I don't know,
3 probably 400.  Not a lot.
4          But my car's paid for, my insurance
5 is paid for, all my bills are paid for.
6      Q.   Okay.  And do you pay those yourself?
7      A.   I do.
8      Q.   Okay.  And when you're paid, are you
9 paid in cash, or do you get a check?
10     A.   I usually just pay it by debit or
11 credit card.  That way I have a receipt.
12     Q.   Okay.  And the payment you get, is that
13 through the trucking company?
14          How do you get paid?
15     A.   Actually, it's just -- usually it's
16 just cash.
17     Q.   Okay.
18     A.   Yeah.  Angel has to be responsible for
19 what he pays me by a check.  I mean, it's
20 like -- you know, he says, take care of the house
21 and the dogs and -- you know.
22          And his parents -- aging parents
23 also live in his old house in Waukegan, so I go
24 over there almost every day.  They're in their

Page 384

1 mid-70s.
2          So I take mom flowers and his dad
3 scratch-off tickets because he's had a stroke.
4      Q.   Do you drink socially now?
5      A.   I can't say as I do.
6      Q.   Okay.  When is the last time you had a
7 drink?
8      A.   I don't remember.
9      Q.   Since you've been released from custody,
10 have you been arrested?
11     A.   I have not.
12     Q.   Okay.  Any traffic accidents you've
13 been in?
14     A.   I have not.
15     Q.   Do you keep in touch or contact with
16 anyone that you have been incarcerated or
17 previously incarcerated with?
18     A.   I've had some phone calls from some
19 people that I thought I might know, but I don't
20 call them back.
21     Q.   Is there a reason why you don't call
22 them back?
23     A.   I'm just trying to move along.
24     Q.   Is church a part of your life now?

Page 385

1      A.   I'm looking for a church in Waukegan.
2          I'm a Christian.  But the Christian
3 churches there, they don't -- I know like 30 words
4 of English -- you know, of Spanish.
5          So I'm still searching.
6      Q.   Okay.  Do you go out and exercise at
7 all?
8      A.   I belong to Lifetime Gym.
9      Q.   How often do you go and exercise?
10     A.   At least once a week.
11     Q.   Okay.  Do you have any medical problems
12 that prohibit you from exercising?
13     A.   No, other than what I've -- I've stated.
14     Q.   Okay.  Do you have any medical problems
15 you're currently being treated for or have come up
16 since your release from prison?
17     A.   No, other than what I've previously
18 stated.
19     Q.   When you sleep now, is your sleep
20 restful?
21     A.   Most of the time, but not always.
22     Q.   Okay.  Would you say you have more good
23 days than bad days?
24     A.   It depends on what you -- you know,

Page 386

1 what your day is like, you know.

2      I fall asleep fine, but I don't

3 always stay asleep.

4      Q.   Okay.  On those occasions when you

5 don't always stay asleep, how many times a night do

6 you get up?

7      A.   If I don't stay asleep, I just turn on

8 the TV and turn on the coffee pot.

9      Q.   What do you find wakes you up?

10     A.   Usually something that -- probably a

11 nightmare or a panic attack, but you don't always

12 remember what it is.

13     Q.   Your nightmares or panic attacks, what

14 are they about?

15     A.   Sometimes you don't know where you're

16 at.  You wake up and ask where you're at, you know.

17          After all the years in prison,

18 you're just -- it's hard to settle down.

19     Q.   Are you having any issues with any type

20 of physical pain?

21     A.   No.  Going through all the civil thing

22 as we are doing now, I've lost like ten pounds.

23          So I'm muscling through that.

24     Q.   Are you seeing any counselor or

Page 387

1 psychologist or psychiatrist to deal with any of

2 the emotional things?

3      A.   I'm getting ready to make an

4 appointment with Angel's psychologist.

5          He still sees one.

6      Q.   All right.  And I don't want to get

7 into Mr. Gonzalez's --

8      A.   No.  But I'm just saying, I'm -- it's

9 on the calendar.

10     Q.   All right.  It's something that you're

11 looking to do?

12     A.   Oh, absolutely.

13     Q.   Okay.  But you haven't done it to this

14 point?

15     A.   No.  I wanted -- I wanted to be able to

16 muscle through this, and ... and if it becomes

17 something, then ...

18     Q.   Do you still follow the Colts?

19     A.   I do.

20     Q.   Still watch football on Sunday?

21     A.   I do.

22     Q.   Any other sports you like to watch?

23     A.   I'm not a big NBA guy.

24          The Pacers -- I mean, how can you

Page 388

1 have Larry Bird and not win a championship?  It's

2 just a terrible mess.

3      Q.   You follow college basketball?

4      A.   Indiana, Purdue, you know.

5          I mean, everything.  Of course.

6      Q.   Okay.  Any other sports that you watch

7 or take part in?

8      A.   No.  I'm more of a obviously Notre Dame

9 fan, since I grew up a mile from there.

10     Q.   How about IU?

11     A.   Big IU fan.

12          My now-ex-brother-in-law was

13 assistant couch at Purdue and NIU, and the Golden

14 Gophers in Minnesota.

15     Q.   Are you able to go outside socially?

16     A.   I go out to the store and everything.

17          I don't go out to bars or any of

18 that kind of stuff.

19     Q.   You go to the health club, right?

20     A.   Yes.

21     Q.   Okay.  You go for groceries.

22          Any other --

23     A.   Yeah.

24     Q.   Any other places you go to?

Page 389

1      A.   I'm uncomfortable in crowds.

2      Q.   All right.  When you say you're

3 uncomfortable, like what comes over you?

4      A.   Crowded elevators.  Airplane, you have

5 to -- I have to sit on the aisle seat.

6      Q.   Okay.

7      A.   Those kind of things.

8      MR. POLICK:  All right.  Why don't we take a

9 quick break, and I just want to go through my notes

10 and see where we're at here.

11     THE VIDEO TECHNICIAN:  We're off the record

12 at 7:09 the the -- we're off the record at 7:09.

13          (Recess taken.)

14          (Deposition Exhibit Number 16,

15           Witness Amor, was marked for

16           identification 03/05/2020.)

17     THE VIDEO TECHNICIAN:  We're back on the

18 record at 7:21.

19 BY MR. POLICK:

20     Q.   Mr. Amor, you understand that you're

21 still under oath?

22     A.   I do.

23     Q.   Okay.  I'm showing you what we've

24 marked I believe as Exhibit Number 16 to your

WILLIAM E. AMOR, 03/05/2020                    Page 390..393

Page 390

1 deposition.
2        Is that what it shows on that
3 exhibit sticker?
4    A.   It does.
5    Q.   Okay.  Take a look at that document,
6 please.
7        Did you have an opportunity to look
8 at that, sir?
9    A.   I did.
10   Q.   Do you see the appointment card from
11 the probation department of DuPage County on page 1
12 of that exhibit?
13   A.   I do.
14   Q.   Okay.  And it shows that you have an
15 appointment on Wednesday, September 6th, of 1995?
16   A.   I do.
17   Q.   Do you have any recollection of that --
18 or having that appointment?
19   A.   I do not.
20   Q.   Does your handwriting appear anywhere
21 on that appointment card?
22   A.   Maybe this phone number down here on
23 the right -- lower right.  That might be my
24 writing, but ...

Page 391

1    Q.   Yeah, I'm looking at the card itself
2 for the DuPage County probation department card.
3    A.   Probation department?
4    Q.   Yes.
5    A.   That's not my writing.
6    Q.   Okay.  If you look at page 2 on the top
7 there, it appears to be the back of the card that
8 shows an amount of restitution of $2,156.56.
9        Do you see that?
10   A.   I do.
11   Q.   And is any of this your handwriting?
12   A.   That is not.
13   Q.   Okay.  Did you have to present some
14 type of budget or evidence of income to the
15 probation department as part of the restitution?
16   MS. THOMPSON:  Object to form.
17        But you can answer.
18   THE WITNESS:  My best recollection, it was on
19 a payment plan.
20 BY MR. POLICK:
21   Q.   Okay.
22   A.   But I couldn't tell you what -- if
23 there was a balance, I couldn't tell you what or
24 when it was because this was early '90s.

Page 392

1        And obviously '95 I went to prison.
2 So ...
3    Q.   All right.  But when you met with the
4 probation department regarding that restitution,
5 did you have to show that you were actively
6 employed?
7    A.   I did.
8    Q.   Okay.  And the payment plan, was that
9 something did you by cash or a money order?
10       How did you make the payments?
11   A.   I think I just took either money order
12 or -- the County Clerk, money order, or -- I'm sure
13 I wouldn't have paid cash.  But ...
14   Q.   All right.  Did you get a receipt for
15 that?
16   A.   If I did -- I'm sure I did.
17   Q.   Okay.
18   A.   But again, every -- all my receipts
19 were in the condominium in the fire.
20   Q.   And would you go personally to the
21 court facility in Wheaton there to pay it?
22       Or would you make --
23   A.   Absolutely.  County Clerk.
24   Q.   Okay.  You'd go there in person?

Page 393

1    A.   That's correct.
2    Q.   Get a receipt?
3    A.   That's correct.
4    Q.   All right.  You told me that the
5 wedding ring that Tina had came from her father's
6 side of the family?
7    A.   I believe so.
8    Q.   And was it just Tina that got a wedding
9 ring, or did you get a wedding band as well?
10   A.   Her father gave me an old wedding band.
11   Q.   Okay.  And just fire -- prior to the
12 fire, a few days before the fire on September 10th
13 of 1995, did you and Tina get into some argument
14 where you told her that you'd threw your ring away?
15   A.   I don't recall that.
16   Q.   Were you wearing your wedding band when
17 you were arrested on the warrant --
18   A.   I was.
19   Q.   -- on September 15th --
20   A.   I was.
21   Q.   -- of 1995?
22   A.   Actually, it was probably part of what
23 I gave at the -- my wallet, my keys, and probably
24 the wedding band, by what I recall.

WILLIAM E. AMOR, 03/05/2020                    Page 394..397

Page 394

1    Q.   You have a memory of giving Tina your
2 wedding band?
3    A.   I do.
4    Q.   So it was the wallet, the wedding
5 band --
6    A.   Keys, right.
7    Q.   -- and the keys.
8    A.   That's correct.
9    Q.   What were the keys for?
10    A.   House, cars. You know, everyday keys.
11    Q.   Did Marianne have her own set of keys
12 to the apartment?
13    A.   She did.
14    Q.   Okay. And who else had access to the
15 apartment other than you, Marianne, and Tina?
16    A.   Pam Leavenworth.
17        Anything outside of that, I have no
18 knowledge of.
19    Q.   All right. Did Pam ever come over
20 uninvited?
21    A.   Pam would stop by.
22        But that was her sister, so you
23 don't really need an invitation for your sister.
24    Q.   Were her and Marianne close?

Page 395

1    A.   I wouldn't call it -- they were sisters.
2        Let's put it that way.
3    Q.   Okay.
4    A.   They didn't -- they didn't -- they
5 didn't share holidays together.
6    Q.   But they visited?
7    A.   They -- correct. Yeah, that's correct.
8    Q.   All right. And at the beginning of the
9 deposition, you told me that you reviewed your
10 testimony from the suppression hearing at the first
11 trial?
12    A.   I did.
13    Q.   Okay. And when you reviewed that, did
14 you find that testimony to be accurate and truthful?
15    A.   I do.
16    MR. POLICK:  Okay. I don't have any further
17 questions.
18    THE WITNESS:  Thank you.
19        EXAMINATION
20 BY MS. THOMPSON:
21    Q.   I've got one -- I've got just a couple
22 of questions.
23        You were asked some questions
24 earlier, Bill, about what facts in your statements

Page 396

1 were fed to you. And I want to go back to that
2 topic.
3        Did the facts that were fed to you
4 in your statement include the idea that on the day
5 of this fire, you had spilled vodka on newspapers?
6    A.   That's correct.
7    Q.   Do you know who it was that introduced
8 that idea to you?
9    A.   That would have been Michael Cross.
10    Q.   Did you spill any vodka on newspapers
11 in the living room the day of this fire?
12    A.   I did not.
13    MS. THOMPSON:  Okay. I don't have any other
14 questions.
15    THE WITNESS:  I also want to go on record
16 that they never found a vodka bottle in the fire.
17        FURTHER EXAMINATION
18 BY MR. POLICK:
19    Q.   Just getting back to the ring --
20    A.   I can't carve that into stone.
21        But I will go on the record as
22 saying I'm fairly certain that's where it would
23 have went, because they were taking me to DeKalb
24 County, and I was stripped of everything -- money,

Page 397

1 wallet, keys. So I -- that's my best guess.
2    Q.   Okay. Did you have an understanding
3 back at that time of the concept that one spouse
4 could not testify against another spouse in a court
5 proceeding?
6    A.   Actually, I don't know anything about
7 that. I mean, if I knew anything about that, it's
8 something you watch on TV.
9        But I -- legal knowledge of that, I
10 do not.
11    MR. POLICK:  All right. Thank you, sir. I
12 don't have anything further.
13    THE WITNESS:  All right. Thank you.
14    MS. THOMPSON:  We'll reserve signature.
15    MR. POLICK:  All right.
16    THE VIDEO TECHNICIAN:  This concludes today's
17 deposition.
18        We are going off the record at 7:28
19 at the end of media unit five.
20        (The proceedings adjourned at
21        7:28 p.m.)
22
23
24

WILLIAM E. AMOR, 03/05/2020                                    Page 398..400

Page 398

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION
 3   WILLIAM E. AMOR,              )
                                   )
 4              Plaintiff,         )
                                   )
 5       vs.                       )   No. 18 CV 2523
                                   )
 6   NAPERVILLE POLICE OFFICERS    )
     MICHAEL CROSS, et al.,        )
 7                                 )
                Defendants.        )
 8
 9          This is to certify that I have read my
10   deposition taken on Thursday, March 5, 2020, in the
11   foregoing cause and that the foregoing transcript
12   accurately states the questions asked and the
13   answers given by me, with the changes or
14   corrections, if any, made on the Errata Sheet
15   attached hereto.
16
                    _____
17                        WILLIAM E. AMOR
18
     No errata sheets submitted (Please initial)
19   Number of errata sheets submitted _____ pages
20   Subscribed and sworn to
     before me this _____ day
21   of _____ 2020.
22
     _____
23       Notary Public
24
```

Page 399

```
 1          REPORTER'S CERTIFICATE
 2       I, Nicole M. Cheney, do hereby certify that
     WILLIAM E. AMOR was duly sworn by me to testify the
 3   whole truth, that the foregoing deposition was
     recorded stenographically by me and was reduced to
 4   computerized transcript under my direction, and
     that said deposition constitutes a true record of
 5   the testimony given by said witness.
 6       I further certify that the reading and
     signing of the deposition was not waived, and the
 7   deposition was submitted to Ms. Tara Thompson,
     plaintiff's counsel, for signature.  Pursuant to
 8   Rule 30(e) of the Federal Rules of Civil Procedure,
     if deponent does not appear or read and sign the
 9   deposition within 30 days, the deposition may be
     used as fully as though signed, and this
10   certificate will then evidence such failure to
     appear as the reason for signature not being
11   obtained.
12       I further certify that I am not a relative
     or employee or attorney or counsel of any of the
13   parties, or a relative or employee of such attorney
     or counsel, or financially interested directly or
14   indirectly in this action.
15       IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office at Chicago,
16   Illinois, this 11th day of March 2019.
17
18
     _____
19   Illinois CSR No. 084-004744
20
21
22
23
24
```

Page 400

```
 1   Errata Sheet
 2
 3   NAME OF CASE: WILLIAM E. AMOR vs MICHAEL CROSS
 4   DATE OF DEPOSITION: 03/05/2020
 5   NAME OF WITNESS: William E. Amor
 6   Reason Codes:
 7       1. To clarify the record.
 8       2. To conform to the facts.
 9       3. To correct transcription errors.
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24
25                    _____
```