1        IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF ILLINOIS
2             EASTERN DIVISION

3  WILLIAM E. AMOR,                )
                                  )
4            Plaintiff,           )
                                  )
5         vs.                     )   No. 18 CV 2523
                                  )
6  MICHAEL CROSS, et al.,         )
                                  )
7            Defendants.          )

8

9        The deposition of BRIAN NIGOHOSIAN,

10  taken pursuant to the Federal Rules of Civil

11  Procedure, before Maribeth Reilly, Certified

12  Shorthand Reporter No. 084-002306, at 503

13  North County Farm Road, Wheaton, Illinois,

14  on Wednesday, August 7, 2019, commencing at

15  1:10 p.m. pursuant to subpoena.

16

17  APPEARANCES:

18          KATHLEEN T. ZELLNER & ASSOCIATES, by
            MR. DOUGLAS H. JOHNSON
19          (1901 Butterfield Road, Suite 650
             Downers Grove, Illinois  60515
20           630.955.1212
             dhjohnson43@aol.com;
21           attorneys@zellnerlawoffices.com)

22                  appeared on behalf of the
                    plaintiff;

23

24
                                        EXHIBIT 2

Page 2

```
 1   APPEARANCES:  (Cont'd)
 2          THE SOTOS LAW FIRM, P.C., by
            MS. LISA M. MEADOR
 3          (141 West Jackson Boulevard
            Suite 1240A
 4          Chicago, Illinois  60604
            630.735.3313
 5          lmeador@jsotoslaw.com)
 6                 appeared on behalf of the
                   defendants;
 7
 8          HONORABLE ROBERT BERLIN
            DUPAGE COUNTY STATE'S ATTORNEY'S
 9          OFFICE, by
            MR. GREGORY VACI, Assistant State's
10          Attorney
            (503 North County Farm Road,
11          Wheaton, Illinois  60187
            Gregory.Vaci@dupageco.org)
12
                   appeared on behalf of the
13                 deponent.
14
15
               * * * * * * *
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1              I N D E X
 2   WITNESS                    EXAMINATION
 3   BRIAN NIGOHOSIAN
 4   Examination by Ms. Meador         4
 5   Examination by Mr. Johnson        51
 6   Further examination by
     Ms. Meador                        122
 7
     Further Examination by
 8   Mr. Johnson                       125
 9
10          E X H I B I T S
     NUMBER                   MARKED FOR ID
11
     NIGOHOSIAN DEPOSITION EXHIBIT
12
     1   Report of Proceedings, dated
13       2/27/1996, People v. Amor     12
14   2   Report of Proceedings, dated
         9/11/97, People v. Amor       14
15
     3   Report of Proceedings, dated
16       1/26/18, People v. Amor       16
17   4   Audio recording of statement
         of Mr. Amor, Bates-stamped
18       SDT-SAO 22962
19   5   Memo dated 11/1/95 from
         Mr. Nigohosian to Assigned    20
20       State's Attorney
21   6   Handwritten notes, Bates-stamped
         SDT-SAO 3411 & 3412           30
22
     7   Voluntary Statement of William
23       Amor, dated 10/4/95, DEFS 818  39
24          (EXHIBITS SCANNED/ATTACHED.)
```

Page 4

```
 1            (Witness sworn.)
 2            BRIAN NIGOHOSIAN
 3   called as a witness herein, having been
 4   first duly sworn, was examined and testified
 5   as follows:
 6            EXAMINATION
 7   BY MS. MEADOR:
 8      Q.  Good afternoon, Mr. Nigohosian.
 9   My name is Lisa Meador, and I am an attorney
10   representing the defendants in the case Amor
11   versus Naperville and several police
12   officers.  So we are going to take your
13   deposition here today.
14            If you can state your name and
15   spell it for the record for me?
16      A.  Sure.  Brian Nigohosian,
17   N-i-g-o-h-o-s-i-a-n.
18      Q.  Mr. Nigohosian, I know that you
19   are a practicing attorney.  Have you sat for
20   a deposition before?
21      A.  I don't recall.  I don't think so.
22      Q.  You have taken depositions,
23   however, right?
24      A.  Yes, yes.
```

Page 5

```
 1      Q.  So we can go ahead and forego
 2   discussing the rules.  I will just assume
 3   you are familiar.  And if you need anything,
 4   you will just let me know.  Is that okay?
 5      A.  Sure.
 6      Q.  Can you tell me what you currently
 7   do for employment?
 8      A.  I am an attorney.  I have a
 9   practice that's here in Wheaton.
10      Q.  What kind of law do you practice?
11      A.  Family law.
12      Q.  How long have you been doing that?
13      A.  Since September of 2001.
14      Q.  What did you do prior to the
15   family practice?
16      A.  For four years I worked for a
17   municipal firm in Rosemont; Storino, Romello
18   & Durkin.  And then before that, I was an
19   Assistant State's Attorney in DuPage County.
20      Q.  When did you leave the DuPage
21   County State's Attorney Office?
22      A.  September '97.
23      Q.  When did you start there?
24      A.  April of '89.
```

1     Q.  So can you just give me a little
2  resume snapshot of the different positions
3  that you held at the DuPage County State's
4  Attorney's Office?
5     A.  Sure.  When I started, I was
6  assigned, like most young assistants, to the
7  traffic division.  I prosecuted traffic
8  cases for a number of months.  Shortly after
9  that, I was brought into what we call house
10  court, and I prosecuted misdemeanor cases,
11  anything from DUIs to Class A misdemeanors,
12  a range of cases.
13         For a while, I was assigned to
14  the juvenile division.  I couldn't tell you
15  how many -- if I was there a year or so.
16  For a while, I was also assigned to a felony
17  review.  And for at least three to
18  four years, I was assigned to the felony
19  division.  I worked in the narcotics
20  division of the State's Attorney Office, and
21  then I was an assistant in a felony
22  courtroom, various felony courtrooms.
23     Q.  While you were in -- do you recall
24  when you were assigned to the felony

1  division?
2     A.  A year?
3     Q.  Yes.
4     A.  I couldn't tell you offhand.
5     Q.  Do you know when you were in
6  felony review?
7     A.  Felony review was -- there was one
8  assignment I had where I worked in felony
9  review for maybe six months where I did
10  that -- that was my sole responsibility.
11  And then while you're in -- at that time,
12  while assistants were assigned to the felony
13  division, they also had to serve a duty,
14  felony review duty in the evening hours.  So
15  I did felony review in the evenings.  It
16  rotated.  I would have that assignment maybe
17  once a month, maybe once or twice a month.
18     Q.  When you were -- do you recall the
19  years you were assigned to felony review for
20  those six months?
21     A.  I can't recall.
22     Q.  Do you recall if it was prior to
23  1995?
24     A.  Yes.  The six-month stint was

1  before '95.
2     Q.  When you were in the felony
3  division, explain to me the rotation on
4  assignment or a little stint for felony
5  review?  How did that work?
6     A.  So -- and I am just guessing at
7  the number of attorneys at that time, but it
8  was approximately 30 felony assistants,
9  ranging from third chairs to first chairs.
10  And like I said, it was about once a month
11  somebody would have to do the overnight
12  felony review.  And like any other assistant
13  here in that division at the time, I had to
14  serve an overnight period.  It started at
15  around 5:00 p.m. and ended around 8:00 a.m.
16     Q.  Do you recall handling the felony
17  review related to William Amor?
18     A.  Yes.
19     Q.  Was that review done while you
20  were assigned to the felony division but
21  doing your monthly rotation for felony
22  review?
23     A.  That's my recollection.  I believe
24  it was.

1     Q.  So this would have been after your
2  original stint for your six months in felony
3  review, correct?
4     A.  Yes.
5     Q.  Do you recall what position you
6  held in the felony division, if you were
7  first chair, second chair, third chair at
8  the time of this felony review for William
9  Amor?
10     A.  I was either second or a first
11  chair.
12     Q.  What kind of cases were you
13  handling?
14     A.  Anything from a Class 4 felony to
15  some Class X felonies, and everything in
16  between.
17     Q.  So do you recall independently the
18  date of when you went to handle this felony
19  review related to William Amor?
20     A.  Yes.
21     Q.  What was the date?
22     A.  October 4, 1995.
23     Q.  As of October 4, 1995, did you
24  know -- did you have previous interaction

1 with the Naperville Police Department as
2 part of your duties with the State's
3 Attorney's Office?
4     A. Yes.
5     Q. Did you prior to going to the
6 police department for this review, did you
7 know Michael Cross?
8     A. Yes, I believe I did know him from
9 past cases.
10    Q. Did you have any social
11 friendship --
12    A. No.
13    Q. -- with him?
14    A. No.
15    Q. And what about Robert Guerreri,
16 did you work with him previously?  Let me be
17 clear, prior to your going there for your
18 felony review?
19    A. Prior to October 4th?
20    Q. Yes.
21    A. I believe he also worked with
22 DUMEG during the period of time that I might
23 have been assigned to DUMEG, but I don't
24 recall ever socializing with him.

1     Q. And what about Brian Cunningham,
2 had you worked with Brian Cunningham prior
3 to October 4th of 1995?
4     A. I'm sure we worked on something.
5 I knew him.  But again, I don't recall any
6 socializing with him outside of work.
7     Q. And what about John Ripsky, did
8 you know John Ripsky prior to October 4th of
9 1995?
10    A. I have no recollection of him.
11    Q. And Mark Carlson, did you know
12 Mark Carlson prior to October 4th of 1995?
13    A. Probably knew the name.  I don't
14 think I had much, if any, interaction with
15 him.
16    Q. So it's fair to say no
17 socialization then?
18    A. Correct.
19    Q. You have testified a few times
20 related to your review of this case.  Let me
21 ask you this:  Did you know William Amor
22 prior to going to the police station for the
23 felony review on October 4th of 1995?
24    A. No.

1     Q. What I am going to do is I am just
2 going to mark some transcripts here for you.
3 I figured since you have testified so much,
4 we might try and make this a little bit
5 easier for you.
6         (Whereupon, Nigohosian
7          Deposition Exhibit No. 1 was
8          marked for identification.)
9 BY MS. MEADOR:
10    Q. Mr. Nigohosian, I am showing you
11 what has been marked as Exhibit 1, which is
12 the partial transcript from the criminal
13 case, the People versus William Amor, Court
14 Number 95 CF 2075, which is Bates numbered
15 DEFS 2948-2978, which includes your
16 testimony during those proceedings on
17 February 27th of 1996.
18        Have you seen this transcript
19 before?
20    A. I have.
21    Q. If you can do me a favor and just
22 take a look through it and make sure that
23 it's complete for me.
24    A. Without counting the pages, it

1 appears to be.  It looks like it was the
2 testimony from a motion to suppress
3 statements related to the pretrial motions
4 in this case.  It appears that I was sworn.
5 I gave testimony on direct and
6 cross-examination.
7     Q. You said you have seen this
8 transcript previously?
9     A. I have.
10    Q. Have you looked at it recently?
11    A. I refreshed my memory of the
12 events with this, yes, within the last week.
13    Q. Let me ask you:  Do you have an
14 independent recollection of the events that
15 occurred when you handled the felony review
16 of this case?
17    A. I do.
18    Q. So in this transcript that I have
19 marked as Exhibit 1, does it accurately
20 reflect the testimony that you gave?
21    A. Again, without reading the
22 entirety of it, it appears to be complete,
23 and I have no reason to doubt that it's not
24 a complete transcript from that hearing.

Page 14

1    Q. Do you recall testifying in that
2  hearing?
3    A. Briefly.
4    Q. When you testified, did you
5  accurately recount your -- -- strike that.
6        In your testimony, did you
7  accurately convey the facts and events
8  related to your review of the case?
9    A. Yes.
10   Q. And you were being truthful at
11 that time?
12   A. Yes.
13   Q. Thank you.
14       (Whereupon, Nigohosian
15        Deposition Exhibit No. 2 was
16        marked for identification.)
17 BY MS. MEADOR:
18   Q. Mr. Nigohosian, I am showing you
19 what has been marked as Exhibit 2, which is
20 a partial transcript from the trial in the
21 same criminal case. This is from
22 September 11th of 1997, Bates numbered DEFS
23 1587 to 1588, 1698 to 1715 and 1405 to 1422.
24 And I will -- if you wouldn't mind taking a

Page 15

1  look through this as well, I will point out
2  that beginning on Bates number DEFS 1405, it
3  appears to be a new cover page --
4    A. Right.
5    Q. -- but it's the same date of
6  testimony. It's a continuation of your
7  testimony from the morning. Is that right?
8    A. It appears that way. I didn't
9  recall that the testimony went over a
10 morning and afternoon, but it appears that
11 it's a continuation from that same day.
12   Q. And have you had an opportunity --
13 go ahead and finish.
14   A. No, that's fine. I can listen.
15   Q. Have you had an opportunity to
16 review your testimony from the trial in this
17 case recently?
18   A. I did.
19   Q. And did it accurately reflect the
20 testimony that you gave?
21   A. Yes.
22   Q. And did your testimony accurately
23 reflect the events and facts that surrounded
24 your review of the case?

Page 16

1    A. Yes.
2    Q. And you were truthful at that
3  time?
4    A. Yes.
5        (Whereupon, Nigohosian
6         Deposition Exhibit No. 3 was
7         marked for identification.)
8  BY MS. MEADOR:
9    Q. Mr. Nigohosian, I am showing you
10 what has been marked as Exhibit 3, which is
11 testimony in the case People, State of
12 Illinois versus William Amor, 95 CF 2075 on
13 January 26th of 2018, which was the retrial
14 in this case, Bates numbered Amor 1823 to
15 1825 and 1945 to 1984. This portion of the
16 transcript reflects your testimony, if you
17 wouldn't mind taking a look at that.
18   A. Okay.
19   Q. And do you recall testifying at
20 the retrial in this case?
21   A. I do.
22   Q. And have you recently reviewed
23 your testimony from that --
24   A. Briefly.

Page 17

1    Q. -- retrial?
2    A. Yes.
3    Q. And does it accurately reflect the
4  testimony that you gave?
5    A. It appeared to have, yes.
6    Q. And did your testimony accurately
7  reflect the facts and events surrounding
8  your review of the William Amor case?
9    A. Yes.
10   Q. Were you truthful when giving that
11 testimony?
12   A. Yes.
13       MS. MEADOR: The next exhibit will
14 be Exhibit 4, and it's going to be an audio
15 recording that we are going to play. The
16 parties have agreed the court reporter
17 doesn't need to transcribe the audio
18 recording as it's playing, and I will
19 provide a copy of the recording to be
20 attached as an exhibit to the transcript.
21       MR. JOHNSON: Agreed.
22       MS. MEADOR: Great. And for the
23 record, it is Bates Numbered SDT-SAO 22962,
24 which is part of the subpoena response from

Page 18

1  the State's Attorney's Office.
2      (Audio recording played.)
3      Thank you for indulging me.
4  We just listened to the recording.  And as
5  pointed out, it's a compilation of two
6  recordings of William Amor; correct?
7      A.  Yes.
8      Q.  And for the record, the first
9  recording was taken at the police station by
10  detectives, but you were not present for
11  that recording; correct?
12      A.  Correct.
13      Q.  You were present -- there's been a
14  second part of the recording that is called
15  a continuation of the tape, and you were
16  present for that portion; correct?
17      A.  Yes.
18      Q.  When was the last time you
19  listened to that audio recording?
20      A.  Last January.
21      Q.  At the retrial?
22      A.  Yes.
23      Q.  And does the transcript accurately
24  reflect the discussion -- strike that.

Page 19

1          Does the audio recording of
2  the portion you participated in accurately
3  reflect those discussions at that time?
4      A.  Yes, it accurately reflects what I
5  said, what the people in the room said.  It
6  doesn't appear to have been altered in any
7  way other than -- it's as it was in October
8  of 1995.
9      Q.  As you sit here today, do you have
10  an independent recollection of that
11  conversation that you had?
12      A.  Yes.
13      Q.  Just as a note, in the recording
14  where you were present, Detective Guerreri
15  began the discussion on the recording, and
16  then you took over for your conversation
17  with Mr. Amor; correct?
18      A.  Yes.  I recognize Guerreri's
19  voice, Cross's voice, and my own voice.
20      Q.  Fair enough.
21          (Whereupon, Nigohosian
22          Deposition Exhibit No. 5 was
23          marked for identification.)
24

Page 20

1  BY MS. MEADOR:
2      Q.  Mr. Nigohosian, I am showing you
3  what is being marked as Exhibit 5, if you
4  can take a minute and look at that for me,
5  please.
6      A.  I am familiar with it.
7      Q.  You recognize that document?
8      A.  I do.
9      Q.  What is it?
10      A.  It's a memo statement that I
11  prepared, and it's November -- or actually
12  prepared at the end of October.  This typed
13  version was November 1, 1995, of my
14  interview with Mr. Amor at the Naperville
15  Police Department on October 4, 1995.
16      Q.  Did anyone else assist in
17  preparation of this memorandum?
18      A.  No.  I am not sure if I actually
19  typed it or a secretary typed it, but she
20  didn't make any -- if the secretary typed
21  it, she didn't make any changes to it.  It's
22  my own words.
23      Q.  So this isn't a compilation of
24  your writing and someone else's?

Page 21

1      A.  No.
2      Q.  This is all you?
3      A.  Yes.
4      Q.  Have you reviewed this memo
5  recently?
6      A.  Yes.
7      Q.  Does the memo accurately reflect
8  your interactions with William Amor on
9  October 4th of 1995?
10      A.  Yes.
11      Q.  So like I said, you have given a
12  lot of testimony.  There's been a lot of
13  documents reflecting what took place in your
14  review.  I just want to focus on a few
15  topics if we could.
16      A.  Sure.
17      Q.  So can you describe for me your
18  observations of Mr. Amor on October 4th of
19  1995?
20      A.  Yes, I -- you want me to expound
21  on that?
22      Q.  Yes, please.
23      A.  So first time I saw him was in an
24  office at the Naperville Police Department.

Page 22

1  So it was some time after 3:00 a.m. I want
2  to say a sergeant's office of some kind.
3  There was a desk, chair, couple of chairs,
4  file cabinet. Mr. Amor was seated at a
5  chair in the office, was unrestrained. He
6  appeared relaxed. I don't think he ever
7  stood up out of the chair.
8          I could also recall that he
9  was wearing a short-sleeved shirt and
10 shorts.
11     Q. When you say he was unrestrained,
12 you mean he had no -- he was not wearing
13 handcuffs?
14     A. Correct.
15     Q. At any time while you were at the
16 Naperville Police Department, did you see
17 Mr. Amor handcuffed?
18     A. No, I never saw him handcuffed.
19     Q. You arrived at the police station,
20 you said, about 3:00 a.m.?
21     A. Yes.
22     Q. What time do you think you left?
23     A. Left the police department?
24     Q. Yes.

Page 23

1      A. I would imagine it was around
2  6:00 a.m.
3      Q. You were there for a few hours,
4  right?
5      A. Yes.
6      Q. When you interacted with Mr. Amor,
7  can you describe those interactions for me?
8      A. Yes, they were -- they were
9  relaxed, conversational. He appeared to be
10 relaxed the entire time I was with him. He
11 appeared to be under -- I didn't appear him
12 to be anything other than relaxed the entire
13 time. He was responsive to questions.
14         He was -- at one point I think
15 he had a drink of some kind, maybe a
16 beverage, soda, something like that. He was
17 polite, never raised his voice, nor did I,
18 nor did anyone else in the room.
19     Q. Would it be fair to say that he
20 engaged you in your discussions with him?
21         MR. JOHNSON: Objection to the
22 form of the question.
23         THE WITNESS: Yes.
24

Page 24

1  BY MS. MEADOR:
2      Q. So you didn't feel that you had to
3  press him for answers to your questions; is
4  that right?
5      A. That's correct. I might have
6  questioned him about answers that he had
7  given, but I did not have to -- I didn't act
8  in any way that might be considered
9  argumentative from the standpoint of how an
10 attorney might ask a question. There was
11 nothing argumentative about the question and
12 answering. I spoke to him like I am
13 speaking to you now.
14     Q. Very conversational?
15     A. As I heard myself on the tape,
16 I -- it was the same way that I spoke then,
17 might have been a little formal at the time,
18 but it was nothing more than conversational.
19     Q. And he was responsive to your
20 questions? You didn't have to then -- he
21 wouldn't stay silent, and you'd have to
22 repeat your questions to him in order to
23 obtain an answer?
24     A. No, I didn't have to. Like I

Page 25

1  said, there were very few times where any --
2  either one of us stepped on the other
3  person's question or answer. He was allowed
4  to finish. He'd let me finish.
5      Q. Did he appear scared to you?
6      A. No.
7      Q. Did you see any signs of physical
8  abuse?
9      A. I did not see any signs of
10 physical abuse.
11     Q. Are you aware of whether or not he
12 -- strike that.
13         Did he ever tell you that he
14 was hit or struck in any manner?
15     A. No, he never said anything to that
16 effect. In fact, his statements that he
17 made in my presence indicated that he was
18 not.
19     Q. Did he appear fatigued to you?
20     A. He did not appear fatigued.
21     Q. Did he ever tell you that he was
22 fatigued?
23     A. He did not.
24     Q. Did he ever tell you that he had

Page 26

1  been deprived of sleep?
2      A.  He did not ever say anything like
3  that.
4      Q.  Did he ever tell you that he had
5  been deprived of food?
6      A.  No.
7      Q.  Or water?
8      A.  No.
9      Q.  In the time that you were with
10  him, did he ever ask to speak with an
11  attorney?
12     A.  He did not.
13     Q.  At the time you were with him, did
14  he ever ask you to stop speaking with him,
15  that he no longer wished to speak with you?
16     A.  He did not.
17     Q.  Did he ever tell you that he was
18  intimidated by any of the detectives?
19     A.  No.
20     Q.  Did he appear intimidated or
21  scared to you?
22     A.  No.
23     Q.  If I recall correctly, you had
24  testified in the criminal case that at one

Page 27

1  point while you were with the detectives and
2  Mr. Amor, you all left the office, but
3  Mr. Amor stayed in the office; is that
4  right?
5      A.  Yes.  If I recall the chronology
6  of events, when I got to the police
7  department, we had a conversation, then left
8  the room.  I left the room, and I think all
9  the other detectives left, too.
10     Q.  And that was for 20 or 25 minutes
11  or so; is that right?
12     A.  Leaving the room?
13     Q.  Yes.  It was -- yes, it was around
14  20 minutes.
15     A.  Okay.
16     Q.  And Mr. Amor was left in the
17  office alone during all that time period,
18  right?
19     A.  Yes.
20     Q.  Did you have any concerns
21  returning into the room after Mr. Amor had
22  been alone for that time period
23  unhandcuffed?
24     A.  No.

Page 28

1      Q.  Did the detectives convey any
2  concerns they had about returning into the
3  office while after Mr. Amor had been left
4  all that time unhandcuffed?
5      A.  No.
6      Q.  When you were there on October 4th
7  of 1995, were you ever made aware that
8  Mr. Amor had been served with divorce papers
9  by his wife while at the police station?
10     A.  I don't recall whether I was aware
11  of that.  I know that happened.  I don't
12  know if I learned it afterwards or before.
13     Q.  Do you recall when you were there
14  anyone telling you that he had been served
15  with divorce papers?
16     A.  I don't recall that.
17     Q.  Do you recall Mr. Amor telling you
18  that he had been served with divorce papers?
19     A.  No, I have no recollection of him
20  ever raising that.
21     Q.  Did he ever raise any indications
22  that he was upset because he thought his
23  marriage was over?
24     A.  No.

Page 29

1      Q.  Did he ever tell you that he was
2  distraught because his wife was divorcing
3  him?
4      A.  No.
5      Q.  Anything along those lines?
6      A.  No.  The only thing he said on
7  tape was that they had some financial
8  difficulties, but that was only related to
9  the time period before the fire.  Never said
10  anything about anything that happened --
11  that may have happened at the police
12  department on October 3rd or 4th.
13     Q.  And he gave you no indication that
14  he was affected in some way by this serving
15  of divorce papers?
16     A.  No.
17     Q.  If you didn't know that he had
18  been served with divorce papers but you now
19  know in reflecting back, would that have
20  affected your review of the case at all?
21     A.  No.  I would have looked to see
22  whether he was able to answer questions, was
23  willing to answer questions.  The service of
24  papers is not, in my mind, anything that's

Page 30

1 that traumatic.
2     (Whereupon, Nigohosian
3        Deposition Exhibit No. 6 was
4        marked for identification.)
5 BY MS. MEADOR:
6     Q.  Mr. Nigohosian, I am showing you
7 what's been marked as Exhibit 6.  For the
8 record, Bates-stamped SDT-SAO 3411 to 3412.
9 If you can take a look at that document and
10 tell me if you recognize it?
11     A.  Yes.  This contains my handwriting
12 with the exception of one line at the very
13 top of the page.
14     Q.  And when you say, the one line at
15 the top of the page, that's where it says,
16 "Brian's notes from interview on 10/4/95
17 approx 3:00 a.m."?
18     A.  Right.  I don't refer to myself in
19 the third person.
20     Q.  And it's recognizably different
21 handwriting than yours on the rest of the
22 page?
23     A.  Yes.
24     Q.  So then looking at the remainder

Page 31

1 of the document, which goes on to two pages,
2 did anyone else take any other notes on this
3 document?
4     A.  No.  Everything that's on there
5 except for what's at the top is my
6 handwriting.
7     Q.  And these are the notes that you
8 took on October 4th of 1995?
9     A.  Yes.
10     Q.  Did you take some of these notes
11 prior to going to the police station that
12 night?
13     A.  There may have been, like, a name,
14 something at the top that I got from my
15 phone call.  It wasn't a phone call.  We
16 were paged.  And so when I returned the
17 page, it might have been the name of the
18 victim, but the majority was, I think -- I
19 think this was after our conversation.
20     Q.  When you say, "after our
21 conversation," whose conversation are you
22 referring to?
23     A.  My conversation with -- it's kind
24 of a compilation.  It's a conversation with

Page 32

1 the police officer before I went in the room
2 and with Mr. Amor.
3     Q.  Is there any way for us to
4 identify at which point it refers to
5 conversations with Mr. Amor?
6     A.  No.  I can't tell you where --
7 where one begins and where one ends.
8     Q.  Was it your standard practice when
9 conducting a felony review to take notes
10 while you were at the police station?
11     A.  I may have started these notes at
12 my home, carried the note pad with me, and
13 then continued it there.
14     Q.  Was that your standard practice?
15     A.  Yes.
16     Q.  Did you then use these notes to
17 prepare your memorandum that we have marked
18 as Exhibit 5?
19     A.  Yes.
20     Q.  Was that your standard practice as
21 well?
22     A.  Yes.  There weren't memos prepared
23 on every case.  You understand that the
24 Exhibit 5 -- that a memo wasn't prepared

Page 33

1 every time I was contacted on a screen.
2     Q.  Right.  So why did you prepare it
3 in this case?
4     A.  Seriousness of the charge and the
5 fact that I was more involved than standard
6 felony review call, and the amount of
7 evidence that I actually witnessed.
8     Q.  So if it's okay, I just would like
9 to go through your notes a little bit.
10     A.  Sure.
11     Q.  So at the top where it says.
12 "custody since 4:00 p.m.," you testified
13 quite a bit about this issue, but just to
14 clarify here, can you explain what that
15 means?
16     A.  Yeah.  That was my -- it was my
17 interpretation of the fact that he was with
18 the police officers since the prior
19 afternoon but had not been placed under
20 arrest.
21        So I don't -- that he wasn't
22 physically -- he wasn't under arrest since
23 4:00 p.m. the day before, but he was with
24 the police officers, answering questions,

Page 34

1  going through a polygraph exam, and other
2  things.
3      Q. And then, it says, "Armacelli,
4  Marianne," which is probably how you heard
5  it on the telephone; is that right?
6      A. That's my understanding.
7  Although, I heard myself again say that name
8  on the tape. I guess I didn't have a really
9  clear spelling or understanding of her last
10  name. I never heard of this case before
11  that night.
12      Q. Then it says, "physically and
13  mentally handicapped"?
14      A. That's her. Ms. Miceli.
15      Q. That means Ms. Miceli?
16      A. Yes.
17      Q. Do you know who provided you with
18  this information?
19      A. Cross or Guerreri.
20      Q. And then this information, "Tina
21  and Bill, April '95 married Tina"?
22      A. "18 years of age."
23      Q. "18 years of age and Bill 40 years
24  of age"?

Page 35

1      A. Yes.
2      Q. Did you obtain that information
3  from the police as well?
4      A. Yes.
5      Q. And then it says, "6:40 phone call
6  from V"?
7      A. The victim.
8      Q. V means victim?
9      A. Ms. Miceli. I believe there was a
10  phone call on September 10th, the day of the
11  fire, that she had called.
12      Q. And then it says, "(911 tape)" in
13  parentheses. Do you see that?
14      A. Yes.
15      Q. Did you listen to the 911 tape
16  when you were at the police station?
17      A. No, not that I recall.
18      Q. And then it talks -- there is some
19  information or notes on there that says,
20  "chair's on fire, I can't get out, chair by
21  door on fire." Did you obtain that
22  information from the police as well?
23      A. Yes.
24      Q. And was this during your meeting

Page 36

1  when you first arrived at the police
2  station, you were obtaining the information
3  from them?
4      A. It was either then or at around
5  1:45 when I returned the page. I was at
6  home, so I was jotting down some notes. I
7  don't know if these notes came from the
8  initial returned call to the police
9  department or when I got there.
10      Q. Got it, okay.
11          And then there is -- it says,
12  "$100,000 insurance policy, beneficiary
13  Tina."
14          Did you ever see any life
15  insurance policy?
16      A. No.
17      Q. And then there is some
18  description, "spilled vodka, half bottle,
19  cigarette, could have fallen out." Do you
20  see that?
21      A. Yes.
22      Q. I just want to make sure that I am
23  accurately reading what you have written
24  since it's not my handwriting.

Page 37

1      A. Sure.
2      Q. And then underneath that, it says,
3  "today take polygraph, failed"?
4      A. Correct.
5      Q. Did you get that information from
6  the police also?
7      A. Yes.
8      Q. Then underneath that it says,
9  "bills $200 Fingerhut" maybe?
10      A. Yes. I can't tell you what that's
11  related to.
12      Q. And then it says, "remote control
13  TV"?
14      A. Yes.
15      Q. Do you have an independent
16  recollection of what that was related to?
17      A. I do not.
18      Q. Then it says, "smoke detector
19  missing," and there is a parentheses. Do
20  you know what that says in the parentheses?
21      A. It says, "gone completely."
22      Q. Gone completely. Then underneath
23  "subconsciously"?
24      A. Yes.

Page 38

1    Q. What does it say underneath that?
2    A. "Got rid of" --
3    Q. Could it be mice?
4    A. It could be. I don't know what
5  role mice would have had in it.
6    Q. Do you have a recollection of
7  being told that --
8    A. Maybe there was an issue with
9  mice, and that's why it was thrown out. I
10  think that was -- I don't -- I don't recall
11  exactly, but I think that might have been
12  part of the explanation as to why the smoke
13  detector was gone a week before. That's my
14  abbreviation.
15    Q. So do you recall being told that
16  Mr. Amor had pet mice that he had gotten rid
17  of the week before?
18    A. I am sorry. I don't recall that.
19    Q. And then it says, "written
20  statement"?
21    A. Right.
22    Q. Did you review Mr. Amor's
23  handwritten statement while you were at the
24  police station?

Page 39

1    A. I may have. I don't recall.
2    MS. MEADOR: Let's mark it.
3       (Whereupon, Nigohosian
4       Deposition Exhibit No. 7 was
5       marked for identification.)
6  BY MS. MEADOR:
7    Q. If you can just take a second and
8  look at that for me.
9    A. Okay.
10    Q. So does that refresh your
11  recollection as to whether or not you read
12  his handwritten statement when you were at
13  the police station?
14    A. I still can't recall if I read it.
15  I am not sure.
16    Q. So then going back to your notes,
17  Exhibit 6, the back page. It says, "Marilyn
18  Glisson knew about policy, wouldn't it be
19  nice if mom was gone." Am I reading that
20  correctly.
21    A. Yes.
22    Q. Do you recall being advised about
23  someone named Marilyn Glisson making this
24  statement?

Page 40

1    A. I don't recall.
2    Q. Do you recall ever seeing a
3  handwritten statement by Marilyn Glisson
4  when you were at the police station?
5    A. I don't recall that.
6    Q. Then underneath that you have in
7  quotes "strong probability"?
8    A. Right.
9    Q. Can you explain to me what that
10  means to you?
11    A. I think it was related to whether
12  or not his actions constituted first degree
13  murder.
14    Q. You have it in quotes?
15    A. Right.
16    Q. So that's what I am kind of
17  wondering. Does that mean someone said
18  those words to you, or are you saying that
19  that's part of your review of the evidence,
20  what it needs to establish?
21    A. The second thing, that what
22  evidence would be needed to establish that.
23    Q. Fair enough. And then underneath
24  that, what does it say?

Page 41

1    A. "Form idea."
2    Q. Form idea. And that's kind of in
3  quotes? It's halfway in quotes?
4    A. Yes.
5    Q. Would that be along the same lines
6  as your explanation of the quotes of strong
7  probability?
8    A. Yes.
9    Q. So that's an element of the crime
10  that your review entails; is that right?
11    A. Yes.
12    Q. And when you are conducting the
13  felony review, what is your burden when you
14  are reviewing the evidence?
15    A. So going -- when I did this -- I
16  haven't reviewed a felony case since 1997.
17  But when I reviewed it, I was looking to see
18  whether or not the evidence met the criteria
19  of the statute, whether there was probable
20  cause to believe that a crime was committed
21  and a charge was appropriate.
22    Q. And were you also in your felony
23  review analyzing the likelihood of success
24  at trial? Is that part of your review?

Page 42

1      A. I don't think that success at
2  trial was a determination. It was more
3  whether or not the evidence met the legal
4  burdens of a statute. Obviously, it
5  depended on if Judge or Jury could determine
6  whether or not that met the criteria. We
7  were interested in whether or not there was
8  probable cause.
9      Q. So let's -- if we could talk about
10  the evidence that you considered because it
11  seems by your own statements that it was a
12  good amount of evidence, particularly
13  evidence that you witnessed?
14      A. Yes.
15      Q. And so you were -- in your review,
16  you considered all of these -- all this
17  information that's contained in your notes;
18  is that right?
19      A. Among other things, yes.
20      Q. Yes. So this is one piece?
21      A. Yes.
22      Q. So but there are numerous
23  components?
24      A. Yes.

Page 43

1      Q. Numerous pieces that are included
2  in your notes, correct?
3      A. They are.
4      Q. And what else did you consider as
5  part of your review?
6      A. The statements that were made to
7  me, statements that were made to the police
8  officers, his statements on the tape, facts
9  and circumstances surrounding the death of
10  Ms. Miceli, you know, the statements of
11  other third parties.
12      Q. When you were at the police
13  station, did you review any police reports
14  that had been prepared related to the
15  underlying occurrence?
16      A. I don't believe so.
17      Q. Did you review any fire department
18  reports related to any of the -- or the
19  underlying occurrence?
20      A. I don't believe so.
21      Q. In your notes, there is reference
22  to a polygraph examination?
23      A. Right.
24      Q. Did you review any questions,

Page 44

1  answers, or results from that polygraph
2  examination?
3      A. No.
4      Q. As part of your -- the statements
5  that you took from him, including the audio,
6  you referenced a letter that he had written
7  to his wife, Tina. Do you recall that?
8      A. I do recall that.
9      Q. Did you ever see any letter or
10  letters that he had written to Tina?
11      A. I don't recall ever seeing a
12  letter.
13      Q. So we have listened to the audio
14  recording. You also had prior to that audio
15  recording of your discussion with him, you
16  had a conversation with him off tape;
17  correct?
18      A. Correct.
19      Q. And I think in your testimony, you
20  described the audio recording as a summary
21  of the things you discussed prior to the
22  recording; is that right?
23      A. Yes.
24      Q. And you have taken a look at his

Page 45

1  handwritten statement that was done prior to
2  you talking with him and then recording his
3  statement; right?
4      A. Yes.
5      Q. Is it fair to say that your
6  discussion with Mr. Amor about the facts and
7  circumstances of this fire and his
8  involvement go beyond what's written in
9  Mr. Amor's handwritten statement?
10      A. Yes.
11      Q. And you had a discussion with him
12  seeking more specificity about certain
13  things; is that fair?
14      A. Correct.
15      Q. Do you recall your discussion with
16  him that you questioned his claim that he
17  spilled the vodka on purpose or
18  intentionally? Do you recall that?
19      A. Yes.
20      Q. And do you recall that Mr. Amor
21  told you that he didn't intentionally spill
22  the vodka but that he intentionally dropped
23  the cigarette and left the cigarette on the
24  newspaper?

Page 46

1      A.  Yes, yes.
2      Q.  So Mr. Amor was correcting you,
3  providing you his version of what took
4  place; is that accurate?
5      A.  Yes.
6          MR. JOHNSON:  Object to the form
7  of the question.
8          THE WITNESS:  Sorry.  Yes.
9  BY MS. MEADOR:
10     Q.  Do you recall -- we listened to
11  the audiotape -- you were asking him about
12  his knowledge of the life insurance policy?
13     A.  Yes.
14     Q.  And the amount, correct?
15     A.  Yes.
16     Q.  And you had questioned him about
17  whether he was seeking to commit this crime
18  in order to obtain life insurance money?
19     A.  Yes.
20     Q.  And did Mr. Amor correct you and
21  say, advise you that it wasn't specifically
22  related to life insurance money but
23  insurance money generally?
24     A.  Yes.

Page 47

1      Q.  Do you recall in your discussion
2  with Mr. Amor that he was asked about his
3  knowledge of whether Ms. Miceli, the victim,
4  was going to be staying in the apartment
5  after the fire was lit?
6      A.  Yes.
7      Q.  And do you recall Mr. Amor telling
8  you that he wasn't aware or thinking about
9  whether she was going to be staying at the
10  apartment?
11     A.  I think he might have said that
12  initially, but as I listened on the tape, he
13  said that she was going to watch some award
14  show between 7:00 and 10:00.
15     Q.  So during your discussion with
16  him, he became more forthcoming about what
17  his knowledge and understanding was at the
18  time; is that right?
19     A.  Yes.
20     Q.  Are you familiar with the idea of
21  minimization or minimizing by a suspect?
22     A.  Sure, I am familiar with the
23  concept, I mean, yeah.
24     Q.  Where a suspect would minimize his

Page 48

1  or her involvement so that they didn't look
2  so bad, would that be accurate?
3      A.  Yes.
4      Q.  Did you get the sense that
5  Mr. Amor was minimizing some of his
6  involvement?
7      A.  Yes.
8      Q.  Did you have the idea that
9  Mr. Amor was minimizing some of his
10  knowledge in order to make himself not look
11  so bad?
12     A.  Yes.
13     Q.  Then also in the recording of your
14  discussion with him, at various times,
15  Mr. Amor interjected additional information
16  to you as well; is that right?
17     A.  Yes.
18     Q.  So at one point, you had asked him
19  about how long after he had dropped the
20  cigarette that he left.  And he said, two to
21  three minutes tops.  I got my jacket and
22  cooler, and I was out of there?
23     A.  Yes, I recall listening to that.
24     Q.  Do you know if that was in his own

Page 49

1  words?
2      A.  It was.  I don't recall that being
3  discussed earlier.
4      Q.  And he did that throughout your
5  discussion with him?
6      A.  Yes.  I think at the beginning, I
7  asked him to put it in his own words.
8      Q.  And he did so?
9      A.  Yes.
10     Q.  Is that right?
11     A.  Yes, that's right.
12     Q.  And at the end, he, in fact, said
13  that what he had told you was the truth and
14  from his heart, right?
15     A.  Yes.
16     Q.  Did you consider all of this as
17  part of your review of the evidence for
18  approving charges?
19     A.  Yes.
20     Q.  So there's been some discussion
21  about the vodka being spilled on the
22  newspaper -- strike that.
23         In October of 1995, did you
24  have any knowledge as to whether vodka was

Page 50

1  an accelerant for a fire?
2      A. No.
3      Q. You didn't have any expertise or
4  knowledge related to fire?
5      A. No, no.
6      Q. Did the vodka spilling on the
7  newspaper have any impact on your review of
8  the evidence?  Maybe that's not a great
9  question.
10     A. It was a minor point in it.  I
11 think the more significant point was the
12 fact that a cigarette was knocked on the
13 papers.
14     Q. Do you recall Mr. Amor telling you
15 how much vodka spilled?
16     A. I seem to recall a point where he
17 said about half a glass.  I don't know -- I
18 don't know where that came in the
19 conversation, if it was something he said on
20 the tape, or something that I recall from
21 our earlier conversation, but it was a half
22 a glass, I believe.
23     Q. Did he tell you he was making
24 himself a drink at the time that it spilled?

Page 51

1  Do you remember that?
2      A. I don't recall that it was in the
3  process of making a drink.
4      Q. At any point in your review of the
5  case, did you become concerned that Mr. Amor
6  was not involved in the crime that
7  charges -- for which charges were being
8  sought?
9      A. No.
10     Q. Did you ever at any point in your
11 review of the case become concerned that
12 Mr. Amor was giving a statement that wasn't
13 his own?
14     A. No.
15         MS. MEADOR:  Give me one second.
16 That's all I have for now.  Thank you.
17         THE WITNESS:  Sure.
18             EXAMINATION
19 BY MR. JOHNSON:
20     Q. Hi.  As I said, my name is Doug
21 Johnson.  I represent Mr. Amor.  Did you
22 want to take a break, or do you want to just
23 plod on through?
24     A. I can keep going if you guys are

Page 52

1  good.
2      Q. I am good.
3          MS. MEADOR:  I'm good.
4  BY MR. JOHNSON:
5      Q. You currently practice family law?
6      A. Yes.
7      Q. Does that get very emotional?
8      A. It can be.
9      Q. I've heard it's the most emotional
10 practice one could be involved in?
11         MS. MEADOR:  Object as to
12 foundation.  Emotional for who?
13 BY MR. JOHNSON:
14     Q. Let me put it this way.  You
15 practiced criminal law here at the DuPage
16 County State's Attorney's Office --
17     A. Right.
18     Q. -- for some time, and now you're
19 practicing family law?
20     A. Right.
21     Q. Can you compare those two
22 disciplines as far as how emotional the
23 proceedings get?
24         MS. MEADOR:  Objection.

Page 53

1  Foundation.
2          THE WITNESS:  Sure.  I think they
3  are both emotional in different ways.
4  BY MR. JOHNSON:
5      Q. Okay.
6      A. Somebody is about to be
7  incarcerated, that could be emotional.  If
8  someone is about to be found guilty, that's
9  emotional.
10         In my business, anything
11 related to children is emotional.
12     Q. You mention that you have taken
13 depositions.  About -- are we talking
14 hundreds?
15     A. I don't know if I have hit a
16 hundred yet, but maybe.  Maybe less than
17 that.
18     Q. Over 50?
19     A. Yes.
20     Q. Have you had the opportunity to
21 meet with Lisa before, counsel before today?
22     A. I don't think we have ever met.
23     Q. How about anyone from Mr. Sotos's
24 firm representing the police officers in

Page 54

1  this case?
2      A. I have met two individuals from
3  that firm a while back, just introduced
4  themselves.
5      Q. Was that in regard to this case?
6      A. In regard to this case.
7      Q. Who were those two individuals?
8      A. I can't tell you their names. I
9  just don't remember.
10     Q. Male or female?
11     A. One of each.
12     Q. Laura Ranum ring a bell?
13     A. The names don't --
14     Q. But you met two attorneys, and was
15  that to prepare for your deposition in this
16  case?
17     A. Just to find out what kinds of
18  things I knew. You know, there wasn't
19  any -- it's what I would do before I was
20  involved in a deposition. I would meet the
21  individual and find out what they know.
22     Q. Did you go to their office, or did
23  they come to yours?
24     A. No. They came to my office.

Page 55

1      Q. How long ago was that?
2      A. Month or two, couple of months
3  ago.
4      Q. And since that time, have you had
5  any --
6      A. Contact.
7      Q. -- contact with the firm?
8      A. No.
9      Q. Do you recall anything else about
10  when you spoke to the people on that
11  occasion?
12     A. No. It was probably 15,
13  20 minutes.
14     Q. Did they update you on what had
15  transpired with Mr. Amor? Had you already
16  known that he had been released from prison
17  early?
18     A. Well, I knew that he was
19  acquitted.
20     Q. As you testified in the trial?
21     A. Yes.
22     Q. How did you feel about that
23  acquittal? Did you have an opinion at all?
24     A. I don't know how I feel about it.

Page 56

1  I guess I am not the trier of fact. The
2  judge was. So I respect the judge's ruling
3  on that. But and I didn't -- I didn't hear
4  the evidence either. I was there -- I
5  wasn't a participant in the trial. I was a
6  witness. I knew what I heard from Mr. Amor,
7  and that's it.
8      Q. Was Justice Birkett -- now Justice
9  Birkett the State's Attorney when you were
10  with the DuPage County State's Attorney's
11  Office?
12     A. For part of the time. There were
13  three State's Attorneys in my term.
14     Q. Ryan, Birkett, and?
15     A. Peccarelli.
16     Q. Are you still friends with some of
17  the prosecutors in the office?
18     MS. MEADOR: Objection. Assumes
19  facts not in evidence.
20     THE WITNESS: Should I go ahead
21  and answer it?
22     MR. VACI: Sure.
23     THE WITNESS: I know fewer and
24  fewer of the prosecutors in the office.

Page 57

1  BY MR. JOHNSON:
2      Q. Do you socialize with any current
3  prosecutors in the office?
4      A. I might see a prosecutor at a bar
5  event. I don't socialize with anybody in
6  the office.
7      Q. Do you socialize with any
8  prosecutors that were involved in the Amor
9  prosecution?
10     A. I would have to say no. I am
11  trying to think because there were -- if you
12  are talking about the initial prosecution?
13     Q. Yes. I think for the initial one
14  David Bare. Did you know him?
15     A. I did know him. I worked with
16  him. We were friendly in the office. After
17  I left, I would have only maybe seen him in
18  passing and said hello, and how are you. I
19  never socialized with him outside of work
20  after I left the office.
21     Q. You respected him as a prosecutor?
22     A. Of course.
23     Q. And then how about Keith Chval?
24     A. Craig Chval?

Page 58

1    Q. This says Keith Chval.
2    A. Is it Keith?
3    Q. That might answer the question.
4    A. I do know Keith Chval.
5    Q. Is he a social friend?
6    A. He is not a social friend.
7    Q. Do you respect him as a
8  prosecutor?
9    A. He is no longer a prosecutor.
10  When he was a prosecutor?
11    Q. Yes.
12    A. Yes.
13    Q. What is he doing now, do you know?
14    A. He's got a business. Keith --
15  yeah, for some reason I didn't know he was
16  involved in the 1996. Because his brother
17  also worked in the office.
18    Q. Okay.
19    A. That's why I am using a different
20  name.
21    Q. When is the last time you saw
22  Keith?
23    A. A year or two ago.
24    Q. What were the circumstances of

Page 59

1  that?
2    A. I represented him.
3    Q. Can you tell me about that?
4    A. Yeah. It was related to his -- he
5  had a post-decree, post-decree issue with
6  his former wife. My representation was
7  about a month. I withdrew at some point.
8    Q. Why did you withdraw?
9    MS. MEADOR: I am going to object
10  to the extent that it calls for an
11  attorney-client privilege communication, I
12  would assume. You could probably make the
13  objection yourself.
14    THE WITNESS: Yes.
15    MR. JOHNSON: I figured you'll
16  know. Okay, we can move on.
17  BY MS. MEADOR:
18    Q. How about Scalatine?
19    A. Scalatine.
20    Q. Scalatine?
21    A. I met him in the course of the
22  second prosecution. I might have known him
23  in passing before that, but we didn't -- I
24  don't think we ever socialized together.

Page 60

1    Q. You respect him as a prosecutor?
2    A. I do.
3    Q. Is there anybody related to the
4  Amor case as prosecutor that you had any
5  issues with?
6    A. No.
7    Q. With regard to felony review, can
8  you tell me why it exists? Why there is a
9  need for felony review, at least as far as
10  with the DuPage State's Attorney's Office?
11    A. It's my understanding that's a
12  concept that's used in many counties,
13  including Cook.
14    Q. Right.
15    A. I don't know exactly what the
16  genesis of that is. I know they want to --
17  wanted somebody with more knowledge of the
18  law to have an input on these charges.
19  That's my understanding of it.
20    Q. Do you believe that felony review
21  acts as sort of a safeguard between police
22  misconduct and suspects of a crime?
23    MS. MEADOR: Objection. Form and
24  foundation.

Page 61

1    THE WITNESS: I can answer it,
2  right, subject to your objection?
3    MS. MEADOR: Yes.
4    THE WITNESS: So I never thought
5  of it as a safeguard. I think it's just
6  another layer of good prosecution.
7  BY MR. JOHNSON:
8    Q. Was one of your duties and
9  responsibilities as prosecutor involved in
10  felony review to ensure that a suspect had
11  been treated properly while in police
12  custody?
13    A. Yes. If I was involved in the
14  questioning, if I was in some way at the
15  police department, that would be an
16  important consideration for me.
17    If I was just answering a
18  question on the phone as to whether or not
19  certain elements were met, I probably didn't
20  get that deep into the rights and things
21  like that. I assume the police officers had
22  done their job already.
23    Q. When you did the felony review in
24  Mr. Amor's case, that was pursuant to your

Page 62

1  assignment, your one-time-a-month
2  assignment?
3      A.  That's my recollection.  At that
4  time, I was on the evening felony review, if
5  you want to call it that.
6      Q.  So I think if I understood you
7  correctly, the way it works was you, just
8  like many other, all other State's Attorneys
9  as you went along and climbed up the ladder,
10  would do a six-month stint of felony review?
11      A.  No.
12      Q.  How did it work?
13      A.  How did what work?
14      Q.  Did you say something about doing
15  a six-month stint in felony review?
16      A.  Yes.  As counsel was asking me
17  what assignments I had.
18      Q.  Yes.
19      A.  I had -- I myself had an
20  assignment of about six months where I did
21  the daytime felony review.  There was a
22  complaints division.  We reviewed cases,
23  things like that issues.  Not everybody had
24  that assignment.  I just had it for six

Page 63

1  months.
2              And then in the case of
3  October 4, 1995, I was one of the 30 or so
4  State's Attorneys who had to serve a stint
5  in the evening felony review, a rotating
6  thing where my rotation came up about once a
7  month.
8      Q.  How often did you get called in --
9  how many times did you have that assignment?
10  Once a month for how long?
11      A.  Probably the entire time I was in
12  the felony division.
13      Q.  So even while you were trying
14  cases and doing things, you still have one
15  on-call night a month?
16      A.  Yes.  If I was on -- if I needed
17  to switch times with somebody, I could do
18  that.  But, yeah, it was about once a month.
19      Q.  Up to October 4, 1995, how many
20  times had you been called pursuant to that
21  specific felony review assignment?
22      A.  How many?
23      Q.  How many times had you had nightly
24  call?

Page 64

1      A.  Oh, I can't recall, but -- I can't
2  recall the exact number.
3      Q.  Would it be less than ten?
4      A.  No.  I think it was more than ten.
5      Q.  More than 25?
6      A.  Don't know.
7      Q.  Is it fair to say sometimes you
8  would go in, and sometimes you would answer
9  questions over the phone?
10      A.  Yes.  More often than not, it was
11  on the phone.
12      Q.  And why might, in general, not
13  necessarily limiting you to the Amor case
14  right now, but why might you go in as
15  opposed to answering questions on the phone?
16      A.  It depended on the seriousness of
17  the charges.
18      Q.  On certain occasions, did the
19  police ask you to come in because they
20  wanted your help?
21      A.  They wouldn't ask me to come in if
22  they wanted my help.  They -- I might have
23  been contacted to assist with the search
24  warrant.  There were other times where I

Page 65

1  went out and took other statements from
2  individuals.
3      Q.  Could those individuals be
4  witnesses, suspects, or both?
5      A.  Suspects.
6      Q.  Up to October 4, 1995, had you
7  taken a confession from any suspect before?
8      A.  I don't recall.  I don't know.  I
9  have done others.  I shouldn't say I have
10  done others.  I have witnessed other
11  confessions.  I don't know if it was before
12  or after Mr. Amor's.
13      Q.  Do you know during your career
14  about how many confessions you personally
15  took?
16      A.  Less than five.
17      Q.  Any other felony confessions?  Can
18  you give me the names of any of those
19  people?
20      A.  I recall People v. Watson,
21  W-a-t-s-o-n, Savonna Watson.  It was a
22  murder case.
23      Q.  Any other ones?
24      A.  Not that I can recall.

Page 66

1      Q. Was that after Amor or before?
2      A. I don't recall. It might have
3  been around the same time.
4      Q. In regard to the Amor case
5  specifically, you mentioned you have seen
6  other confessions. We know who was in the
7  room when you were talking to Amor. Was
8  there anybody watching from outside?
9      A. You mean, like in the hallway?
10      Q. Yes. I don't know if you were in
11  a room where there was a one-way mirror or
12  anything like that?
13      A. No. It was an office. I didn't
14  see anybody else, to be honest with you, at
15  the police department that evening that I
16  can recall. Maybe somebody buzzed me in,
17  but I don't know.
18      Q. Would it be a goal in the event
19  your felony review duties led you to be
20  interacting with a suspect, would it be a
21  goal to get a confession from that suspect?
22      A. Well, that implies that it was
23  some kind -- something I was setting out to
24  do.

Page 67

1      Q. Right.
2      A. I was called out to witness a
3  statement from an individual that had
4  already given some statements. I didn't --
5  if an individual is willing to talk to me
6  after being advised as to who I was, and
7  what I did and clearly indicating that I
8  wasn't their attorney, if they wanted to
9  talk to me, I would absolutely talk to them.
10      Q. And I am not -- I was asking
11  whether or not it was a goal. I don't know
12  if it was. But say that, yeah, you are
13  going to talk to a suspect, is one of your
14  goals to get a confession?
15      MS. MEADOR: Objection. Asked and
16  answered.
17      THE WITNESS: Again, I was there
18  to listen to what the individual had to say
19  and if they weren't going to talk to me,
20  then I stopped talking. If they wanted to
21  speak with an attorney, I stopped talking.
22  I was there to witness -- I was there to be
23  a witness.
24

Page 68

1  BY MR. JOHNSON:
2      Q. And maybe you just answered
3  another question I had. You mentioned I was
4  there to witness a statement.
5      You are not saying witness a
6  statement someone else was taking? You are
7  talking about yourself taking the statement?
8      A. Sometimes I would witness another
9  individual asking questions. I don't recall
10  in any of the other circumstances whether I
11  was doing the questioning or I was being a
12  witness.
13      Q. In Amor's case, we will go to
14  that, I understand that, you know, you said,
15  well, if he will talk to me, I will talk to
16  him. But in Amor's case was one of your
17  goals when you were first put into contact
18  with him to get a confession?
19      A. It was to find out whether or not
20  what he had to say met the criteria of the
21  statute.
22      Q. Did you go through training with
23  the DuPage County State's Attorney's Office
24  as to how to conduct a felony review?

Page 69

1      A. There may have been a seminar or
2  -- nothing that I recall specifically
3  related to interrogation or taking
4  statements or anything like that. It might
5  have been part of a seminar I attended. I
6  don't recall.
7      Q. Would you say that you
8  interrogated William Amor?
9      A. No.
10      Q. How would you classify what you
11  did with him?
12      A. I asked him questions. I met him.
13  I introduced myself and talked to him.
14      Q. Was there ever a time that you can
15  recall when you were acting pursuant to your
16  felony review duties with the DuPage County
17  State's Attorney's Office that you declined
18  to approve felony charges when officers
19  requested them?
20      A. Declined felony charges, is that
21  what you are asking me?
22      Q. Yes.
23      A. And reviewed, yes.
24      Q. Where the police officers said we

Page 70

1  would like you to approve charges against
2  this individual, and you went in on your
3  felony review duties and said, no, we are
4  not going to?
5      A.  Yeah, absolutely.  You said, went
6  in.
7      Q.  Okay.
8      A.  I might have declined them on the
9  telephone, never having gone in.  But based
10  on what I heard that the evidence and -- the
11  evidence that was presented to me did not
12  meet the criteria for establishing probable
13  cause on a felony.
14      Q.  Do you recall ever going in on a
15  felony, personally going to -- going in on a
16  call from the police officers where you
17  declined charges when the police were
18  requested?
19      A.  I don't recall.  I think we
20  have -- I know it was a handful of times
21  that I actually went to the police
22  department.  I don't recall if any of those
23  I declined charges.
24      Q.  Is it correct that you were never

Page 71

1  alone with Mr. Amor?
2      A.  Correct.
3      Q.  Is that standard practice?
4      A.  It's not a standard practice.  I
5  had no practice.  I just -- I was at a
6  police department after hours.  I don't -- I
7  don't know that I would have wanted to be
8  alone.  That way it wasn't any -- anybody
9  could say I did anything wrong.
10      Q.  I know in Cook County, often the
11  prosecutors will go to the suspect alone so
12  they can talk so the suspect can kind of say
13  what has happened with the cops without the
14  cops there.  Did you consider doing that
15  with Mr. Amor?
16      A.  No.
17          MS. MEADOR:  Objection.  Form.
18          THE WITNESS:  Sorry.
19          MS. MEADOR:  That's okay.
20  Objection.  Form.  Foundation.  Incomplete
21  hypothetical.
22  BY MR. JOHNSON:
23      Q.  Do you recall what you were
24  wearing --

Page 72

1      A.  Yes.
2      Q.  -- when you went in to see
3  Mr. Amor?
4      A.  Yes.
5      Q.  Can you describe it?
6      A.  It was a suit.
7      Q.  Did you have a suit and tie?
8      A.  I think it was a tie, yeah.  I
9  know I had a suit on.
10      Q.  And did you have a badge?
11      A.  Well --
12      Q.  Did you have anything official,
13  anything?
14      A.  Displayed on me?
15      Q.  Yes.
16      A.  No.
17      Q.  And I don't even know.  Do you
18  have a gun?
19      A.  No.  I -- again, you are talking
20  about 1995.
21      Q.  I am talking about when you went
22  to Amor?
23      A.  No, I did not.
24      Q.  Do you know how big you were,

Page 73

1  about the same size you are now?
2      A.  Probably about five or ten pounds
3  lighter, more hair.
4      Q.  I am terrible with weights and
5  heights.  Can you just tell me your weight
6  and height?
7      A.  188 and I am 5'10".
8      Q.  And Mr. Amor is smaller than that,
9  right?
10      A.  Yes.
11      Q.  Now, how about Guerreri, what was
12  his -- how did he appear at that time, that
13  evening?
14      A.  I would say he might be an inch or
15  two shorter than I am.  Probably ten pounds
16  lighter.
17      Q.  And same questions about Cross?
18      A.  Cross was shorter than both of us.
19  Maybe a little stockier.
20      Q.  And was there anyone -- I think
21  you might have answered this.  Was there
22  anyone else at the police station that
23  evening?
24      A.  Not that I recall.

Page 74

1    Q. You didn't see anyone else?
2    A. Not that I recall.
3    Q. And you didn't see Officer Ripsky?
4    A. No, I don't recall Ripsky.
5    Q. And do you know him even as you
6  sit here today?
7    A. I don't think I would know him if
8  he walked in this room.
9    Q. First you got the phone call and
10  you talked to Cross, or was it Cross?
11   A. A page.
12   Q. A page in those days, yeah.
13   A. Cross. I believe I talked to
14  Cross on the phone.
15   Q. After speaking with him, do you
16  recall how you felt, whether or not you were
17  convinced that Amor was guilty, or what your
18  mind-set was, having been talked to by
19  Cross?
20      MS. MEADOR: Objection. Form.
21      THE WITNESS: No. I formed no
22  opinion as to his guilt.
23  BY MR. JOHNSON:
24   Q. Do you remember how long you

Page 75

1  talked to Cross?
2    A. Initially when he called -- when I
3  was paged?
4    Q. Yes.
5    A. Maybe ten, fifteen minutes at the
6  most.
7    Q. My brother is a doctor, and the
8  one thing he hates about being a doctor is
9  being on call, and he will do anything to
10  try to not have to go in.
11      When you were called in this
12  situation, was there any discussion about
13  whether or not you needed to come in?
14      MS. MEADOR: Objection. Form.
15      THE WITNESS: Discussion about
16  whether I needed to come in?
17  BY MR. JOHNSON:
18   Q. I am just trying to think, like,
19  you're there --
20   A. If you are asking me if I was
21  reluctant to go in or like your brother?
22   Q. No, no, I was just -- I am just
23  saying, maybe I need to come in, maybe I
24  don't need to come in. Any discussion like

Page 76

1  that, or was it, Brian, we need you to come
2  in?
3    A. It wasn't a demand. I get that.
4  In talking to him, I decided it might be a
5  good idea.
6    Q. Was there a discussion about, hey,
7  we want you to talk to him, too?
8    A. I don't recall those words. I
9  think that might have been the thought that
10  I could come in and interview him myself.
11   Q. That was discussed?
12   A. That would have been the purpose
13  of me going.
14   Q. Why would it be one purpose for
15  you to go in and talk to him yourself if he
16  had already talked to the police officers?
17   A. Well, again, I don't -- I don't
18  know the genesis of that, but I think that
19  another individual who is witnessing it that
20  maybe wasn't a police officer might be
21  beneficial and find -- and if Mr. Amor was
22  willing to talk to me, then I would be
23  another individual who witnessed his
24  statement.

Page 77

1    Q. Up to that point, October 4, 1995,
2  had you litigated motions to suppress as a
3  prosecutor?
4    A. I am sure I did.
5    Q. So you were familiar with --
6    A. Voluntariness?
7    Q. And the other types of issues
8  regarding the admission of suspect
9  statements?
10   A. Yes.
11   Q. You arrived at the police station,
12  and you first met with the police officers
13  before you were introduced to Mr. Amor?
14   A. Yes.
15   Q. And you spoke to them for how
16  long?
17   A. Maybe 20 minutes.
18   Q. Can you tell me to the best of
19  your recollection what you talked about?
20   A. Summarized what they had known up
21  until that point. Maybe some of it was a
22  repeat of what we talked about on the phone
23  about what they had talked to him about.
24  Earlier today when I was given Exhibit

Page 78

1  No. 7, I may have seen this.  I don't
2  recall.  That was essentially it.
3      Q.  Do you recall having any concerns
4  about the police officers' interaction with
5  Mr. Amor at that point as they were talking
6  to you when you arrived at the Naperville
7  Police Department?
8      A.  No.
9      Q.  Do you recall anything at all that
10 sticks out in your mind that caused you to
11 be concerned about the conduct of the police
12 officers?
13     A.  No, I did not.
14     Q.  After you concluded that
15 conversation with the police officers, did
16 you then go into Mr. Amor?
17     A.  Yes.
18     Q.  Was there any suggestion by you
19 that you would like to talk to him alone?
20     A.  No.
21     Q.  During that conversation with the
22 police officers, do you recall asking them
23 if they had physically had physical contact
24 with Mr. Amor?

Page 79

1      MS. MEADOR:  Objection.  Form.
2  Vague.
3      THE WITNESS:  I don't think I ever
4  asked them if they had any physical contact
5  with Mr. Amor.
6  BY MR. JOHNSON:
7      Q.  Did you ask them anything such as
8  did either of you hit him?
9      A.  No.
10     Q.  Did the police officers tell you
11 at that time that the victim of the fire was
12 related to a high ranking member of the
13 Naperville Police Department?
14     A.  No.
15     Q.  Are you aware of what I am
16 referring to?
17     A.  No.
18     Q.  Are you aware that Ms. Miceli was
19 the sister-in-law of Mr. Ripsky, Officer
20 Ripsky, of the Naperville Police Department?
21     A.  No, I don't think I ever knew
22 that.
23     Q.  Did you feel that Mr. Guerreri,
24 Officer Guerreri and Officer Cross were

Page 80

1  convinced of Mr. Amor's involvement in
2  starting the fire at the time that you spoke
3  to them that evening?
4      MS. MEADOR:  I'm sorry, could you
5  just read back the question.
6      (Whereupon, the record was
7      read as requested.)
8      MS. MEADOR:  Objection.
9  Foundation.
10     Go ahead.
11     THE WITNESS:  I think he had
12 already told them that the fire was started
13 by something he did.  I think he was
14 indicating that it was an accident, so I
15 don't know that it was necessarily that he
16 wasn't involved in the fire, but that he was
17 alleging that it was accidental.
18 BY MR. JOHNSON:
19     Q.  Right.  And do you believe that
20 Officer Cross and Officer Guerreri were
21 convinced that he was somehow involved?
22     MS. MEADOR:  Objection.  Asked and
23 answered.
24     THE WITNESS:  Yes, I believe that

Page 81

1  they believed that he was involved, yes.
2  BY MR. JOHNSON:
3      Q.  And do you know if they believed
4  that he was involved by accidentally setting
5  the fire or intentionally setting the fire?
6  Did they know, or were they convinced of
7  either of those?
8      MS. MEADOR:  Objection.
9  Foundation.
10     THE WITNESS:  I don't recall what
11 their mind-set was at the time.  But I do
12 recall the things that he had said to him --
13 said to them, indicated that it was not
14 something accidental.
15 BY MR. JOHNSON:
16     Q.  Was one of your goals when you
17 went in to determine whether or not it was
18 accidental or not?
19     A.  It was to expand on that, yes, to
20 find out whether or not he had accidentally
21 spilled vodka, accidentally knocked a
22 cigarette over, had any intentions with
23 regard to the insurance money, the living
24 situation that he was in.  Yes, to expand on

Page 82

1  all of that.
2      Q.  Was there any discussion about
3  possibly as an option you going in, which I
4  know you did it, or them doing the
5  questioning, was that discussed?
6      A.  I believe it was because I took
7  the lead in the taped conversation.  So
8  there was a discussion.  I can only assume.
9  I am not going to guess.
10     Q.  What were the considerations, I
11  guess, is what I am asking is why they
12  wouldn't just go in after speaking to you
13  and talk to him instead of you going in and
14  taking the lead?
15     A.  Maybe they respected me as an
16  Assistant State's Attorney.  I don't know.
17     Q.  That's kind of what I was -- one
18  of the questions I had is when you go in, is
19  it kind of understood I am the Assistant
20  State's Attorney, I have been doing this
21  stuff for several years, I am kind of in
22  charge?
23     A.  That's not my personality.
24     Q.  No, I am saying that's understood

Page 83

1  of how this works, having never done it?
2      MS. MEADOR:  Objection.
3  Foundation.
4      THE WITNESS:  Yeah.  No, I don't
5  think that's an understood by any means.
6  BY MR. JOHNSON:
7      Q.  So it isn't a situation where, in
8  general, it is understood that in felony
9  review when a prosecutor comes in, he is in
10  charge?
11     MS. MEADOR:  Objection.
12  Foundation.
13     THE WITNESS:  No, it's not.
14  BY MR. JOHNSON:
15     Q.  In any event, you go in, and they
16  join you with Mr. Amor; correct?
17     A.  We all went in together.
18     Q.  Do you know why prior to this,
19  they had not only had Mr. Amor do the
20  written statement, I believe it's Exhibit 5,
21  but have him read it so that it was
22  memorialized in audio form?
23     A.  I don't know what their thinking
24  was on that.

Page 84

1      Q.  Do you understand that as whether
2  or not that's a standard practice of the
3  Naperville Police Department?
4      A.  No, I don't know what their
5  practice was.
6      Q.  At some point while you were a
7  prosecutor, did the law require videotaping
8  of confessions?
9      A.  I don't think so, not -- I left in
10  '97.  I don't think there was a requirement.
11     Q.  Had you ever been involved in a
12  videotaped confession?
13     A.  No.  We weren't allowed -- I mean,
14  there wasn't a lot available in '97.  I
15  think tape recording was kind of the norm.
16     Q.  Have you ever seen anything like
17  was done in this case with regard to reading
18  by a suspect a statement he had already
19  written out, as opposed to a
20  question-and-answer period on audio?
21     MS. MEADOR:  Objection.  Form.
22     THE WITNESS:  So there were both,
23  though.  There was the reading.
24

Page 85

1  BY MR. JOHNSON:
2      Q.  Yes.
3      A.  And then separate, there was the
4  question-and-answer.
5      Q.  Right.  And I am saying before
6  your involvement, setting aside your
7  questioning and answer, had you ever seen a
8  situation like this where the police
9  officers had had a suspect write out
10  something and then read it in audio form?
11     A.  I don't recall.
12     Q.  In this case, are you aware of any
13  other audiotape of Mr. Amor?
14     A.  No.
15     Q.  Other than what we have listened
16  to today?
17     A.  I am unaware of any.
18     Q.  Have you ever heard that there was
19  another taping of Mr. Amor's statements, be
20  it audio and/or video that has gone missing?
21  Ever heard anything like that?
22     A.  No.
23     Q.  What new did you learn that the
24  police department did not learn through your

Page 86

1  interaction with Mr. Amor?
2        MS. MEADOR: Objection.
3  Foundation. Calls for speculation and the
4  mind-set and knowledge of third party, of
5  other individuals.
6        THE WITNESS: I don't know if
7  everything that he told me had been stated
8  to them in a form. He might have expanded
9  on something to me that he had said to them.
10  I don't know.
11        I think with regard to the
12  cigarette, initially he was kind of alluding
13  to the fact that it was knocked over. I
14  think as we talked further, it wasn't a
15  knock. It wasn't an accident. He
16  intentionally tossed the cigarette on the
17  newspapers.
18        So I don't know where in this
19  spectrum of statements that he made more
20  came out after I talked to him, but I think
21  that was one thing that was expanded upon
22  from the time that we had our first
23  conversation and the taped conversation.
24

Page 87

1  BY MR. JOHNSON:
2     Q. Other than that, is there anything
3  that sticks out in your mind right now?
4  Understanding you haven't been able to
5  compare exactly the documents regarding
6  police conduct, police interaction with
7  Mr. Amor, and your own interaction, is there
8  anything that sticks out in your mind from
9  personal recollection that Mr. Amor told you
10  that he had not told the police?
11     A. Not that I can recall.
12     Q. Would you classify your
13  involvement in the Amor case as that of, at
14  least in part, an investigator?
15     A. No.
16     Q. Would you say that you were not an
17  investigator in this case?
18     A. I would. I would say I am not an
19  investigator.
20     Q. Did you ask the police officers
21  prior to personally speaking with Mr. Amor
22  whether they had promised him any leniency
23  for giving a statement?
24     A. I never asked that question of

Page 88

1  them.
2     Q. Did you ask the police officers
3  prior to your interaction with Mr. Amor
4  whether they had threatened him in any way?
5     A. I think you asked me a similar
6  question before, but the answer is still no.
7  I did not ask them if they threatened him or
8  harmed him or touched him.
9     Q. Yeah. I previously asked if they
10  hit him and now I am just asking about
11  threatening.
12     A. I apologize.
13     Q. At the time you first laid eyes on
14  Mr. Amor, was he in custody?
15     A. I don't believe so.
16     Q. So do you believe he was free to
17  leave?
18     A. That wasn't my call. I don't -- I
19  don't know whether he was free to leave or
20  not. He hadn't been charged with any crime.
21     Q. And I think you testified about
22  this, but you did put on your notes, custody
23  since 4:00 o'clock?
24     A. Correct.

Page 89

1     Q. And you understand as a seasoned
2  prosecutor at that time that those words
3  have meaning under the law, correct?
4     A. Correct.
5     Q. So do you feel it was a mistake to
6  write "custody"?
7     A. I felt that term, as I wrote it,
8  meant that he was with them.
9     Q. Do you believe the story -- I
10  guess Exhibit 5 is in front of you. Do you
11  believe that is a true -- whichever one is
12  Amor's statement?
13     A. 7.
14     Q. 7, I'm sorry. Do you believe his
15  story about what happened that night or that
16  day with regard to the fire?
17     A. No.
18     Q. And do you believe the story told
19  in your interaction with Mr. Amor is true
20  about what happened that night?
21     A. It's partly true.
22     Q. What part is true?
23     A. I think that he threw the
24  cigarette on some newspapers, that he --

Page 90

1  that he was desperate for money, that his
2  living -- his living arrangements were
3  unbearable, that he had formulated a plan to
4  get money of some kind.  He didn't know how
5  before this day.  I think that his taking
6  the smoke detector down is highly curious,
7  that he knew that there was insurance money,
8  but he didn't know the amount, and that he
9  knew that Marianne Miceli was not leaving
10 that apartment.
11     Q.  Do you think it's -- does it mean
12 the same to you if one says their financial
13 situation is rough, is that the same as
14 saying they are desperate for money?
15     MS. MEADOR:  Objection.  Form.
16 Calls for speculation.
17     THE WITNESS:  I think the word
18 "desperate" is a step up from "rough" so to
19 put it on a spectrum --
20 BY MR. JOHNSON:
21     Q.  If one is desperate for money,
22 their situation is much more dire?
23     A.  That's how I would view it.
24     Q.  Did the police officers tell you

Page 91

1  that Tina had dropped a cigarette and
2  couldn't account for where it had gone just
3  prior to the fire starting?
4      A.  I don't recall ever having that
5  discussion or that statement.
6      Q.  Did the police officers tell you
7  that Tina returned to the apartment after
8  Bill had left and did not see any smoke or
9  fire or indication of any smoke or fire?
10     A.  I don't recall.  It might have
11 been made.  I don't recall.
12     Q.  That's a pretty important detail,
13 would you agree with me?
14     MS. MEADOR:  Objection.  Form.
15     THE WITNESS:  I don't know that
16 it's important or not important.
17 BY MR. JOHNSON:
18     Q.  If you were making a decision to
19 approve felony charges against William Amor,
20 would it be a fair statement to say that you
21 would like to know if Tina had returned to
22 the apartment after William Amor was gone
23 for good, and she did not see any smoke,
24 fire or indication of any fire whatsoever?

Page 92

1      A.  Not necessarily.
2      Q.  Why is that?
3      A.  Because I don't think the fire
4  could have -- from what I -- from what I
5  understood from his statement that he didn't
6  look, but he thought he -- I thought he said
7  that he heard some noise, but that Tina also
8  had nothing to do with this.
9      Q.  And you agree that Tina had
10 nothing to do with this, correct?
11     MS. MEADOR:  Objection.  Calls for
12 speculation.
13     THE WITNESS:  I don't believe she
14 had anything to do with it.
15     MR. JOHNSON:  Let me ask it again.
16 BY MR. JOHNSON:
17     Q.  On October 4, 1995, you were there
18 to determine whether felony charges should
19 be approved against William Amor.  Wouldn't
20 you have wanted to know that Tina was the
21 last person in that apartment, and she did
22 not -- other than Ms. Miceli, and she did
23 not see any flame, fire, or indication of
24 any flame or fire?

Page 93

1      MS. MEADOR:  I am going to object
2  to the extent that the question assumes
3  facts not in evidence, and mischaracterizes
4  the evidence.
5      THE WITNESS:  I don't know that
6  that would have been that significant a
7  fact.
8  BY MR. JOHNSON:
9      Q.  And why is that?
10     A.  Because he had just told me that
11 he was the one who was desperate, did not
12 share how he was going to get the
13 information -- how he was going to try to
14 get the money with Tina, told me she had
15 nothing to do with it.  And from what he had
16 said, it sounded as if this was not
17 something that just went up in flames the
18 second he tossed his cigarette.  It could
19 have been a smoldering type thing for a
20 while.
21 BY MR. JOHNSON:
22     Q.  But even if it was smoldering,
23 wouldn't it still show some smoke or
24 something?

Page 94

1        MS. MEADOR:  Objection.  Calls for
2  speculation.  Foundation.  He doesn't have
3  the qualifications to answer that question.
4  He's not been determined to be a fire
5  expert.
6        THE WITNESS:  Should I answer?
7        MR. JOHNSON:  Yes.
8        MS. MEADOR:  To the extent you
9  can.
10       THE WITNESS:  I was asked the
11  question earlier whether or not I had any
12  training in fire, and I had none.  So I
13  don't know that if by dropping a cigarette
14  on a stack of newspapers, whether they were
15  doused or not doused with anything, how long
16  it would take for that to turn into smoke
17  and flame.  I didn't know that.
18  BY MR. JOHNSON:
19     Q.  Let me ask you:  Would you agree
20  that dousing the newspapers with vodka is
21  different than spilling vodka on the
22  newspapers, correct?
23       MS. MEADOR:  Objection.  Form.
24  Foundation.

Page 95

1        THE WITNESS:  I don't know that
2  it's different.
3  BY MR. JOHNSON:
4     Q.  Those aren't equivalent
5  statements?  Aren't they --
6     A.  Dousing sounds like it's
7  more, a greater quantity.
8     Q.  Did the police officers tell you
9  that they had -- that William had been in
10  the DeKalb County jail for a few weeks prior
11  to that night?  And when I mean that night,
12  I mean the night of the interview with
13  Mr. Amor?
14     A.  I don't recall DeKalb.  I recall
15  DuPage.  I think he was in the DuPage jail,
16  maybe a work-release sentence or something.
17     Q.  Did the police officers on that
18  evening just before you came into contact
19  with Mr. Amor, had they told you he had been
20  in jail for a few weeks?
21     A.  I don't recall.
22     Q.  Did the police officers tell you
23  that, in fact, they had picked up Mr. Amor
24  unannounced?  And by that, I mean they went

Page 96

1  to the jail that he was in, and they picked
2  him up as he was leaving the jail?
3     A.  I don't recall.
4        MS. MEADOR:  Objection.
5  Mischaracterizes the evidence and testimony
6  and form as to "picked up."
7        THE WITNESS:  I don't recall that.
8  BY MR. JOHNSON:
9     Q.  You don't recall if they told you
10  that or not?
11     A.  No.
12     Q.  Would that be something you would
13  have wanted to know?
14     A.  I don't think it would have had
15  any impact.
16     Q.  Did you have any understanding of
17  Mr. Amor's drinking habits at that time?
18     A.  Nothing other than what he said.
19  He had a glass of vodka in his statement,
20  but no.
21     Q.  Did the police officers tell you
22  that he was an alcoholic?
23     A.  I don't think so.
24     Q.  Would that have been something you

Page 97

1  would have wanted to know?
2     A.  No.  It wouldn't -- it was not
3  significant if he was.
4        Sorry, I just looked at my
5  notes.  It says, he spilled half a bottle.
6  I think I might have said earlier half a
7  glass.  My notes said half a bottle.
8     Q.  Did the police officers tell you
9  anything about the polygraph other than that
10  he failed it?
11     A.  No.
12     Q.  Did you talk to the polygraph
13  examiner at any time?
14     A.  No.
15     Q.  Did you at that time have an
16  attitude about polygraphs about whether or
17  not they were reliable or not reliable, or
18  do you have any personal beliefs about them?
19     A.  I know they are inadmissible.
20     Q.  We all know they are inadmissible.
21     A.  Other than that, no.  I know they
22  were used in other cases, but no.
23     Q.  We talked about whether you asked
24  the police officers.  Did you ask Mr. Amor

Page 98

1  if he had been hit or threatened?
2      MS. MEADOR: Objection. Asked and
3  answered.
4      THE WITNESS: I thought I asked
5  him if he had been treated fairly. I don't
6  know if I said the word "hit."
7  BY MR. JOHNSON:
8      Q. You mentioned you had probably
9  worked with Cross, Guerreri, and Cunningham
10  before?
11      A. Yes. By '95 I had been in the
12  office over -- about six years, so probably,
13  yeah. I know -- I know I have worked with
14  them on other things. I couldn't tell you
15  what kind of cases, if it was a traffic case
16  or a drug case or a felony case.
17      Q. With regard to those three
18  officers, did you have any opinions as of
19  October 4, 1995, as to whether they were
20  good cops, questionable cops, that type of
21  thing?
22      A. Yes, I had an opinion.
23      Q. What was your opinion about
24  Officer Cross?

Page 99

1      A. That he was a good police officer.
2      Q. What was your opinion about
3  Officer Guerreri?
4      A. That he was a very good police
5  officer.
6      Q. Same question with Officer
7  Cunningham?
8      A. All very good officers.
9      Q. Any issues with them whatsoever
10  throughout your career?
11      A. No.
12      Q. Did you have any police officers
13  other than them that you believed -- let me
14  put it this way. You are on felony review
15  and you find out a police officer is on a
16  case. Were there any police officers that
17  you, without naming them, that you may have
18  thought hmm, the fact that this guy is
19  involved in this case makes me question what
20  went on?
21      A. No.
22      Q. During your entire time as a
23  prosecutor with the DuPage County State's
24  Attorney's Office, did you have any police

Page 100

1  officers that you questioned their
2  professionalism?
3      A. I might not question their
4  professionalism. I might have suggested
5  that -- I might have pointed out things in
6  the law that they didn't understand, issues
7  with probable cause determinations, why
8  certain cases -- usually after if a case
9  was -- if an arrest was quashed or a
10  statement was suppressed, I might have
11  explained why these things happened and what
12  could be done to avoid that problem, but
13  nothing that I ever questioned their
14  professionalism.
15      Q. There were no police officers that
16  suggested to you because of the specific
17  police officer that misconduct may be
18  involved?
19      A. No.
20      Q. That evening did you ask Cross or
21  Guerreri to do anything additional with
22  regard to the case?
23      A. Not that I recall.
24      Q. Would you agree with me that

Page 101

1  there's been kind of an evolution in
2  confessions and more of a general belief at
3  least that false confessions exist more than
4  it used to be thought back in the mid-'90s?
5      MS. MEADOR: Objection. Form.
6  Foundation. Relevance.
7      THE WITNESS: So my involvement
8  with criminal law tapered off dramatically
9  in 1997. I do next to none now. I might
10  have a domestic battery case related to one
11  of my divorces or an order of protection, so
12  I have very little knowledge of what the
13  current state is of confessions, the manner
14  in which they are memorialized or anything
15  else.
16  BY MR. JOHNSON:
17      Q. Back then, did you have a belief
18  as to whether or not false confessions
19  existed?
20      A. I don't know that a false
21  confession. Maybe a statement that was
22  obtained under duress was a concern. It's
23  always a concern, but I didn't see anything
24  here that indicated that.

Page 102

1      Q.  Well, you would agree with me at
2  the time you interacted with Mr. Amor he had
3  been under a certain amount of duress;
4  correct?
5      A.  No.
6          MS. MEADOR:  Objection.
7          THE WITNESS:  Sorry.
8          MS. MEADOR:  That's okay.
9          THE WITNESS:  No.
10 BY MR. JOHNSON:
11     Q.  You know now that he had been
12 served with divorce papers prior to the time
13 you saw him?
14     A.  I know that today, yes.  I don't
15 know if I knew that before I spoke to him.
16     Q.  And you would agree with me that
17 would be, to some degree, a very emotional
18 situation for him?
19     A.  I am going to disagree with you.
20 I don't agree.  It's a paper.
21     Q.  What?
22     A.  It's a piece of paper.  You're
23 formally served with a petition.
24     Q.  Assuming -- I think I have this

Page 103

1  right, but assuming that when he went into
2  jail a few weeks prior to when he got out
3  and was taken down for his polygraph and
4  then brought to the Naperville Police
5  Department where you saw him, assuming that
6  when he went into the jail, he was on fine
7  terms with his wife, and there had been no
8  talk about a divorce, wouldn't you think
9  that the next contact he has with her -- or
10 has with regard to her, he is served with
11 papers, wouldn't that be a certain amount of
12 duress?
13         MS. MEADOR:  Objection.  Hold on.
14 Objection.  Form.  Foundation.  Assumes
15 facts not in evidence.  Mischaracterizes
16 facts in evidence and calls for speculation.
17         THE WITNESS:  Am I answering it
18 over your objection?
19         MS. MEADOR:  Yes, go ahead.
20         THE WITNESS:  So, no, I disagree
21 with that premise.  I think that he knew --
22 he had said that there were trouble -- there
23 were problems at the household or problems
24 between him, his wife, and his

Page 104

1  mother-in-law.  There were fights.  And my
2  experience and my belief is that the service
3  of papers itself is not that significant.
4  BY MR. JOHNSON:
5      Q.  Are you aware that Tina testified
6  at the trial that there was no discord in
7  the household?
8      A.  I did not review any testimony or
9  watch any of the trial, so I don't know what
10 she said.
11     Q.  If she did say there was no
12 discord in the household before this fire,
13 would that change your mind about the
14 service of the divorce papers?
15     A.  No.
16     Q.  Do you think the fact -- were you
17 aware that William Amor was friends with
18 Marianne Miceli?
19     A.  I assumed.
20     Q.  Do you think that losing your
21 mother-in-law would -- that he having lost
22 his mother-in-law would be a certain amount
23 of duress for him?
24     A.  It didn't seem to be.

Page 105

1      Q.  Had you ever heard of someone
2  being served divorce papers in the middle of
3  a criminal interrogation prior to this case?
4          MS. MEADOR:  Objection.  Form.
5  Mischaracterizes the evidence.
6          THE WITNESS:  I don't recall ever
7  hearing a scenario like that.
8  BY MR. JOHNSON:
9      Q.  We talked about the insurance.  Is
10 it your understanding -- strike that.
11         Did the police officers tell
12 you that Tina was the beneficiary of an
13 insurance policy?
14     A.  I believe so, yes.
15         Excuse me, are we near a
16 breaking point?
17         MR. JOHNSON:  I don't think I have
18 that much more.
19         THE WITNESS:  All right.
20         MS. MEADOR:  We can take a break
21 if you want.
22         MR. JOHNSON:  You have been in our
23 position.
24         THE WITNESS:  I just need to use

Page 106

1  the washroom.  Five minutes.
2        MR. JOHNSON:  Yes.
3        (Whereupon, a break was taken
4        at 3:19 p.m. to 3:22 p.m.)
5  BY MR. JOHNSON:
6     Q.  I think you testified you were
7  likely a first chair felony assistant at the
8  time of the Amor?
9     A.  First or second chair, yes.
10    Q.  Did you alone have the power to
11 approve felony charges?
12    A.  Yes.
13    Q.  You didn't have to call up
14 anybody?
15    A.  No.  It wasn't unusual if I did,
16 though, call.
17    Q.  Do you know if you did on this
18 occasion call Birkett or whoever it was at
19 that point?
20    A.  I think I did speak to either
21 Birkett or Kinsella.  Kinsella was a -- he
22 was the first assistant.
23    Q.  Who was?
24    A.  Kinsella.

Page 107

1     Q.  That's now Judge Kinsella?
2     A.  Yes.
3     Q.  Do you recall was that from the
4  Naperville Police Department that you would
5  have called Kinsella?
6     A.  Yes.
7     Q.  Do you recall what you talked
8  about with him?
9     A.  No.  Probably just recited what I
10 had -- what I had learned, substance of our
11 conversations.  We wanted to make sure I was
12 on the right track with him.
13    Q.  And do you recall what he said to
14 you?
15    A.  I'm sorry, I don't.
16    Q.  Any other prosecutors you would
17 have called?
18    A.  No.  Like I said, it was either
19 Birkett or Kinsella.  I don't know which
20 one.
21    Q.  To give you a hypothetical, I know
22 this didn't happen, but I am just going to
23 ask you to assume that it did.  If Cross
24 told you, oh, yeah, Brian, also I wanted to

Page 108

1  tell you that I did hit him on one occasion,
2  just so prior to when he gave his
3  confession, how would that have -- what
4  would you have done in that situation?
5     A.  I don't know what I would have
6  done.  I know I would have been greatly
7  concerned about the statement that he was
8  giving to us, and his condition and the
9  veracity of the police officer who did that.
10    Q.  You agree now that some portions
11 of the statement you took from Amor are
12 untrue, correct?
13       MS. MEADOR:  Objection.  Misstates
14 the witness' testimony.
15       THE WITNESS:  I think at that time
16 I realized it probably wasn't totally
17 accurate.  I think he was minimizing.
18 BY MR. JOHNSON:
19    Q.  That's kind of what I am getting
20 at.  As we sit here now, I know you were a
21 witness, and you weren't there for the whole
22 trial, as we sit here now, I think it's --
23 we are going to find out in a second if it's
24 undisputed.  I think it's undisputed that

Page 109

1  the fire did not ignite by spilling vodka on
2  newspapers and then a cigarette landing on
3  it?
4     A.  That's what I understand.  Again,
5  I understand that that part of the evidence
6  was refuted and was the basis for a new
7  trial, essentially.
8     Q.  So do you believe right now,
9  that's how it happened?
10    A.  No.
11    Q.  At the time you heard that, did
12 you believe that's how it happened?
13    A.  No.  I mean, I didn't have -- I
14 didn't know whether vodka had served as an
15 accelerant or a cigarette on dry paper would
16 have been enough to start a fire.
17    Q.  So I think you may have answered
18 this.  I apologize.  But so if you knew then
19 that it was impossible for a cigarette to
20 ignite vodka-soaked newspaper, would that
21 have changed in any way your decision to
22 approve charges?
23       MS. MEADOR:  I am going to object
24 to the extent it mischaracterizes the

Page 110

1  evidence.
2       THE WITNESS: I don't think so.
3  BY MR. JOHNSON:
4       Q. Going to your notes, Exhibit 6.
5       A. 6?
6       Q. Yes, just at the top. I want to
7  ask you a couple of things about those.
8       A. Sure.
9       Q. It says under Tina, 18 years old,
10  Bill, 40 years old. Do you see that?
11       A. Yes.
12       Q. Why is that there?
13       A. No reason. I think I was just
14  trying to get information about the parties.
15       Q. Do you recall anything that --
16  assuming this is something the police
17  officers told you; is that correct?
18       A. Yes.
19       Q. Do you recall anything else about
20  why the ages were discussed?
21       MS. MEADOR: Objection. Calls for
22  speculation.
23       THE WITNESS: No, I don't.
24

Page 111

1  BY MR. JOHNSON:
2       Q. Do you recall -- I am trying to
3  ring some bells. Do you recall if the
4  police officers thought it was sort of
5  disgusting that a 40-year-old would marry an
6  18-year-old?
7       A. No.
8       Q. Or it made the situation more --
9  did they feel it was more suspicious that a
10  40-year-old was marrying an 18-year-old?
11       A. I don't know what was in their
12  head. It wasn't related to me, and I didn't
13  view it that way.
14       Q. A little -- about the middle of
15  the page, it says, "cigarette could have
16  fallen out." Do you know what does that
17  mean?
18       A. That was related to his statement
19  that where I think he initially was
20  testifying that he might have knocked the
21  cigarette out. It was like an accident onto
22  the papers, and I believe that's what it's
23  related to.
24       Q. And then under smoke detector, it

Page 112

1  says, "subconsciously." Do you know what
2  that subconsciously is referring to?
3       A. I believe that was related to the
4  statement that he had made to the police
5  officers that removing the smoke detector,
6  maybe he subconsciously he was getting
7  things ready to start a fire. So those are
8  his -- those are his words, not -- not mine.
9       Q. Turning over Exhibit 6, I see it's
10  written, "strong probability." Those are
11  your words, correct?
12       A. Those are my words.
13       Q. Bill never used the term "strong
14  probability," correct?
15       A. He agreed with that term, yes.
16       Q. Would you agree on this statement,
17  there are many things that where he didn't
18  say the words, he agreed with words you
19  used?
20       A. You are asking me if I was asking
21  leading questions at some point?
22       Q. You would agree with me some of
23  the questions were leading?
24       A. Some of them were leading in an

Page 113

1  attempt to just kind of get a conversation
2  going. So preliminary type questions might
3  have been leading.
4       Q. Would you agree with me that the
5  best confession as far as when one speaks in
6  terms of reliability is to get a free
7  narrative, correct?
8       MS. MEADOR: Objection. Form.
9  Foundation.
10       THE WITNESS: Yeah. I don't know
11  there is a best. I think it -- I didn't
12  have any -- I didn't have any issues with
13  the fact that he said those in response to
14  my question. Whether it was a direct
15  question or leading question, he had the
16  right to say yes or no. He had the right to
17  stop it. He never indicated that in some
18  way the way I was asking the question was
19  limiting him in his answers.
20  BY MR. JOHNSON:
21       Q. You have tried cases, correct?
22       A. Yes.
23       Q. Have you ever objected when
24  someone on the basis of the question is

Page 114

1  leading?
2      A.  Yes.
3      Q.  Why do you do that?
4      MS. MEADOR:  Objection; relevance.
5      THE WITNESS:  Well, depends if
6  it's on direct exam, it's improper to ask a
7  leading question, but you can ask it if you
8  are dealing with basic, foundational issues.
9  It's how our -- it's how our rules of
10 evidence are.  But in my mind, it doesn't
11 make the question or answer less relevant or
12 less believable.
13 BY MR. JOHNSON:
14     Q.  A leading question suggests the
15 answer, correct?
16     A.  Correct.
17     Q.  Did you have any -- I know you
18 were there during the time.  Did you have
19 any involvement in the James Kelly case?  Do
20 you recall that, Jim Kelly killing his wife,
21 Jayne Kelly?
22     A.  I don't recall that.
23     Q.  The letter you talked about, you
24 didn't see any letter where Amor wrote to

Page 115

1  Tina about a plan for financial gain, did
2  you?
3      A.  I don't recall ever seeing a
4  letter.
5      Q.  But the police officers told you
6  he had written such a letter?
7      A.  I think he told me, too.  I don't
8  know if they told me or he told me.
9      Q.  Did the police officers also tell
10 you that in that very same letter, he told
11 Tina they had to plan for their future, and
12 how they would take care of Marianne
13 health-wise?
14     A.  I don't recall that.  I don't
15 recall that being part of a letter.
16     Q.  If in the very same letter where
17 it was talked about that Amor had a plan for
18 financial gain, wouldn't you have wanted to
19 know in the very same letter that Bill
20 talked about how they had to be sure they
21 could take care of Marianne in the future
22 health-wise?  Would you have wanted to know
23 that?
24     A.  I don't think that would have been

Page 116

1  a concern of mine.
2      Q.  Doesn't that sort of destroy the
3  interpretation that the police officers were
4  telling you, and by that I mean, maybe they
5  were misinterpreting it?  Because one
6  wouldn't talk about how I have a plan for
7  financial gain, which is to kill your mother
8  and get insurance money, it doesn't make
9  sense in the very same letter the writer
10 would talk about taking care of the mother
11 health-wise?
12     MS. MEADOR:  I'm so sorry, I just
13 wanted to make sure you were done.  I didn't
14 want to interrupt.
15     MR. JOHNSON:  Sure.
16     MS. MEADOR:  Objection.  Form.
17 Foundation.  Calls for speculation.
18 Mischaracterizing the evidence and
19 incomplete hypothetical.
20     THE WITNESS:  Based on that --
21 based on everything else I heard that really
22 wouldn't have had much of an impact at all,
23 if any.
24

Page 117

1  BY MR. JOHNSON:
2      Q.  You mentioned that no one
3  raised -- on the tape we listened to of your
4  discussion with Mr. Amor, no one raised
5  their voice.  Do you recall that testimony?
6      A.  Today?
7      Q.  Yes.
8      A.  I believe that we did talk about
9  whether or not anybody yelled at him or
10 raised their voice.
11     Q.  Prior to when you got to the
12 Naperville Police Department, you don't know
13 one way or another whether anyone raised
14 their voice at Mr. Amor; correct?
15     A.  No.
16     Q.  And fair to say you really don't
17 know what happened between the police
18 officers and Mr. Amor?
19     A.  I know some, but I don't know if
20 anybody raised their voice at him.
21     Q.  How do you know some?
22     A.  Because we talked about it when I
23 got there.  I know there was a polygraph.  I
24 knew that he had been there since the

Page 118

1 afternoon before. He hadn't been there yet
2 24 hours.
3        So I guess -- maybe I am not
4 understanding your question. I do know
5 some, but I don't know whether anybody
6 yelled at him before I got there. But I
7 don't believe that -- I didn't see any
8 evidence of anybody yelling at him. He
9 didn't appear to have been yelled at or
10 diminished in any way.
11     **Q. But it's fair to say that what you**
12 **knew about what happened between the police**
13 **officers and Bill Amor is based on what the**
14 **police officers told you?**
15        MS. MEADOR: Objection. Misstates
16 the witness' testimony and mischaracterizes
17 the evidence.
18        THE WITNESS: I know what they
19 told me and I know what he told me when we
20 spoke because we did speak a little bit
21 about before on the tape. There is some
22 talk about talked to him earlier, that kind
23 of stuff.
24

Page 119

1 BY MR. JOHNSON:
2     **Q. Were Guerreri and Cross in**
3 **plainclothes?**
4     A. Yes.
5     **Q. Do you know if they had their guns**
6 **on when they talked to Amor with you?**
7     A. I don't recall seeing either one
8 with a gun.
9     **Q. Let me ask you this: Your memo is**
10 **dated November 1st. This is Exhibit 5. Can**
11 **you tell me why it was produced on**
12 **November 1st if the events happened on**
13 **October 4th? It just seems like a long**
14 **time.**
15     A. I didn't -- I don't know. I don't
16 think it was that long a time period. It
17 was less than a month. No.
18     **Q. Do you know if you typed this or**
19 **your secretary typed it?**
20     A. Strong likelihood that somebody
21 typed it. I am not a very good typist, and
22 I definitely wasn't in 1995.
23     **Q. Is there any kind of form -- would**
24 **this be generated from computer or a**

Page 120

1 **typewriter, do you know?**
2     A. I don't know what we used. I
3 don't think there was like a -- I am pretty
4 sure we didn't have computers in our office.
5     **Q. I think you said you testified due**
6 **to the serious nature of the offense and**
7 **maybe some other things why this was**
8 **produced. Did anyone tell you to write**
9 **this?**
10     A. That was probably something that
11 we were advised to do as assistants. You
12 asked me before if I had any training, that
13 might have been one of the things that
14 was -- that we were trained on was to make
15 sure that we keep notes of what was said and
16 done, what our involvement was. It was
17 meant to memorialize my involvement.
18     **Q. You mentioned that you reviewed**
19 **transcripts about a week ago or so involved**
20 **in the case. Where did you get the**
21 **transcripts?**
22     A. Well, I have had them probably for
23 a long time. Some I had -- I used to keep a
24 file, and this was a case I testified to, so

Page 121

1 I know I had my transcripts of the motion to
2 suppress and the original trial. I just
3 received earlier this week a copy of the
4 trial from January of '18.
5     **Q. Where did you get that?**
6     A. From the State's Attorney's
7 Office.
8     **Q. Had you requested it?**
9     A. I think I did.
10     **Q. All right. Go ahead.**
11     A. And I have had my notes since -- a
12 copy of my notes, Exhibit 6. I have not had
13 Exhibit 7. I have had Exhibit 5, 2, and 1.
14     **Q. You keep a file on the case?**
15     A. I don't intend to. I'd like to
16 dispose of all of this. Can I do that?
17     **Q. In Exhibit 5, the second page, at**
18 **the top, it says, "I did not think that he**
19 **was being totally truthful and that he had**
20 **left out some facts when speaking to the**
21 **Detective Cross and Detective Guerreri."**
22        **Do you recall why you felt**
23 **that way?**
24     A. Yeah, because he was minimizing

Page 122

1 certain things, and he was -- it was
2 inconsistent with the other things that he
3 was saying. So he said that he was
4 desperate. He was hard-up for money, had an
5 unbearable living arrangement, so that just
6 didn't jibe with everything else.
7     Q. And then lastly, have you ever
8 been censured, suspended, disciplined or
9 anything by the ARDC?
10     A. No.
11        MR. JOHNSON: Nothing further.
12 Thank you.
13        THE WITNESS: Thank you.
14        MS. MEADOR: I just have a couple
15 quick follow-ups.
16        THE WITNESS: Sure.
17        FURTHER EXAMINATION
18 BY MS. MEADOR:
19     Q. Going back to counsel's question
20 about your time handling felony review
21 cases, and some you'd handle on the phone,
22 and some you'd handle in person; correct?
23     A. Correct.
24     Q. So how would you distinguish

Page 123

1 between cases you would handle over the
2 phone and cases you would handle in person?
3     A. The only time that I ever handled
4 cases in person or went to the police
5 department were cases of a more serious
6 nature.
7     Q. I mean, this case, it was
8 considered a serious case; correct?
9     A. It was a death. There was a
10 person who was making incriminating
11 statements, and I felt it was important to
12 go out. I don't know that they demanded
13 that I go out. I made a decision to go out.
14     Q. That was my next question I was
15 going to ask you.
16     A. Sorry.
17     Q. You were advised that the suspect
18 had made inculpatory statements, right?
19     A. Yes.
20     Q. And whose decision was it whether
21 you go in-person or handle the case over the
22 phone?
23     A. I said it was mine.
24     Q. Turning a little bit to counsel's

Page 124

1 questions to you about your discussions with
2 Mr. Amor and you on the tape asking some
3 leading questions. Do you recall that line
4 of questioning?
5     A. Yes.
6     Q. And as we discussed earlier, in
7 the discussions that you had with Mr. Amor
8 both off tape and on tape, he interjected
9 information, added information, and
10 corrected statements you had made for
11 clarification and to provide his version of
12 events; correct?
13        MR. JOHNSON: Objection. Object
14 to the form of the question and calls for
15 speculation.
16        THE WITNESS: Yes.
17 BY MS. MEADOR:
18     Q. Did you ever at any time feel that
19 Mr. Amor was -- felt he was not able to
20 interject information or add information or
21 correct you on statements you had made?
22     A. No. In listening to the tape
23 again, I realized it was -- there were --
24 there was dead air at certain points. I was

Page 125

1 either thinking of my next question, or he
2 was finishing an answer, and there was --
3 there was a pause. There was at the end,
4 maybe 15 to 30, 25 seconds, I don't know,
5 where everybody said, is there anything
6 else? And he made that statement about the
7 statements being from his heart.
8     Q. And you, in fact, asked him
9 open-ended questions, as well as some
10 leading questions; right?
11     A. Yes.
12        MS. MEADOR: That's all I have.
13 Thank you.
14        MR. JOHNSON: Just two.
15        FURTHER EXAMINATION
16 BY MR. JOHNSON:
17     Q. When is the last time you talked
18 to Officer Cross?
19     A. I think I saw him at the trial in
20 January of 2018.
21     Q. Have you talked to him since the
22 civil lawsuit was filed?
23     A. No.
24     Q. Have you talked -- when is the

Page 126

1  **last time you talked to Guerreri?**
2      A.  I see him around the courthouse
3  from time to time.  He works for the State's
4  Attorney's Office, so I might see him in the
5  hallway and say, hello, how are you doing.
6      **Q.  What does he do for the State's**
7  **Attorney's Office?**
8      A.  I think he is an investigator.
9      **Q.  Have you talked to him about the**
10 **civil lawsuit?**
11     A.  No, not at all.
12     **Q.  Same questions with regard to**
13 **Cunningham.  Have you seen him lately?**
14     A.  I don't know the last time I saw
15 him.  It was maybe a couple of years ago
16 maybe.  Before the -- I have not talked to
17 him about anything related to this.
18     **Q.  After you took the statement from**
19 **Amor, did you have an understanding of what**
20 **Amor thought was going to happen to him?**
21 **And by that I mean, did he think he was**
22 **going to walk out after you took the**
23 **statement?**
24     A.  I don't know what he thought.  I

Page 127

1  didn't say anything.  I never made some
2  pronouncement.
3      **Q.  So he may have thought he was**
4  **going to walk out?  He may have thought he**
5  **was going to jail?  You don't really know?**
6      A.  I have no idea.
7      **Q.  Did you meet with Guerreri and**
8  **Cross after the statement?  Do you recall**
9  **any discussions about --**
10     A.  I think we left the room together
11 and probably had a brief conversation in
12 the, I believe, the detective division.  I
13 have only been to that police department
14 maybe once or twice.  It wasn't significant.
15 I think we had -- I think a decision was
16 made to go ahead and write up the charge,
17 and that was it.
18     **Q.  You wrote up the charge with their**
19 **assistance?**
20     A.  No.  They type out a complaint.  I
21 have nothing to do with it.  Initially the
22 charges are by complaint in DuPage County,
23 and most often by complaint, and then there
24 is an indictment by a grand jury.  That's

Page 128

1  how it was back then.
2      **Q.  Now you know that Mr. Amor was**
3  **released early.  And have you questioned or**
4  **have you gone back to evaluate your role in**
5  **this case in any way and formed any**
6  **different opinions that I thought I would**
7  **have done anything differently or anything**
8  **like that?**
9      A.  No.
10         MR. JOHNSON:  I have no further
11 questions.  Thanks.
12         MS. MEADOR:  That's it.
13         Do you want to waive or
14 reserve signature?
15         THE WITNESS:  I am going to waive.
16         (Deposition concluded at
17             3:48 p.m.)
18
19             * * * * *
20
21
22
23
24

Page 129

1  STATE OF ILLINOIS  )
2                    )   SS:
3  COUNTY OF DU PAGE  )
4      I, MARIBETH REILLY, a notary public
5  within and for the County of DuPage County
6  and State of Illinois, do hereby certify
7  that heretofore, to-wit, on August 7, 2019,
8  personally appeared before me, at 503 North
9  County Farm Road, Wheaton, Illinois, BRIAN
10 NIGOHOSIAN, in a cause now pending and
11 undetermined in the United States District
12 Court, Northern District of Illinois,
13 Eastern Division, wherein WILLIAM E. AMOR is
14 the Plaintiff, and MICHAEL CROSS, et al.,
15 are the Defendants.
16     I further certify that the said BRIAN
17 NIGOHOSIAN was first duly sworn to testify
18 the truth, the whole truth and nothing but
19 the truth in the cause aforesaid; that the
20 testimony then given by said witness was
21 reported stenographically by me in the
22 presence of the said witness, and afterwards
23 reduced to typewriting by Computer-Aided
24 Transcription, and the foregoing is a true