## WILLIAM E. AMOR v. MICHAEL CROSS

## NAPERVILLE (IL) POLICE DEPARTMENT

## Case No.1:18-cv-02523

Date of Report: June 17, 2021          Report Number:  TMLLC 2021-2

Assessor:      Lieutenant Colonel (Retired) John R. "Rick" Brown
               Transparency Matters, LLC
               P.O. Box 6598
               Harrisburg, PA 17112
               Telephone: (717) 712-2066
               Email:  rbrown@transparencymattersllc.com
               www.transparencymattersllc.com

### I.      Background and Experience

I am a former Lieutenant Colonel for the Pennsylvania State Police ("PSP"), a full-service police agency, and completed over 29 years of active law enforcement experience within a department that has over 4,200 sworn and 1,900 civilian personnel, an annual budget of more than $840 million, and serves a community with over 12.7 million residents. I served in several key positions, including Deputy Commissioner of Administration and Professional Responsibility.

I served as a criminal investigator (1984 – 1994) and internal affairs investigator (1997 – 2004) and subsequently held supervisory and command positions within these specialized areas.  I have been involved in and supervised/reviewed thousands of criminal investigations during my PSP career.  I have experience preparing and testifying as the investigator in criminal trails, including suppression hearings, in the Pennsylvania State Courts of Common Pleas.  I was responsible for investigations into all facets of crime, including but not limited to suspicious death/homicide, robbery, rape, burglary, theft, motor vehicle theft, organized crime, etc.

After retiring from the PSP in 2010, I created Transparency Matters, LLC, a consulting business that focuses on assisting large and small police departments around the country. I have served on independent monitoring teams involving federal consent decrees of police departments in Oakland, California, and Detroit, Michigan, assessing the use of force in officer-involved shootings (homicide investigations) and their supervisory/command reviews. I also served on the independent monitoring team for the Maricopa County (Arizona) Sheriff's Office as an expert on internal investigations (criminal and administrative) and related training, and I served on an independent audit team pursuant to a state consent decree in

BROWN 01

Niagara Falls, New York on accountability, use of force, and community engagement processes.

I also served as a subject matter expert in use of force investigations for the U.S. Department of Justice in a pattern-and-practice investigation of the Baltimore Police Department involving use of force and their supervisory/command reviews, and for the U.S. Office of Justice Programs concerning recruitment, diversity, and retention issues within the Hartford (Connecticut) Police Department. I have conducted internal misconduct investigations for police departments when requested. Additionally, I have assessed and provided technical assistance on accountability measures for police departments in Anchorage, Alaska; East St. Louis, Illinois; Puerto Rico Police Department, San Juan, Puerto Rico; Springettsbury Township (York County) and Middletown (Dauphin County), Pennsylvania.

My background and experience are further detailed in my curriculum vitae which is appended to this report.

## II.   **Assignment:**

On March 29, 2021, The Sotos Law Firm, P.C., 141 W. Jackson, Suite 1240A, Chicago, IL 60604 retained Transparency Matters, LLC ("Transparency Matters, LLC" or "TMLLC"), P.O. Box 6598, Harrisburg, PA 17112 to provide an expert opinion on the police practices employed by the Naperville Police Department, Illinois ("NPD" or "Department") regarding interviews William E. Amor had with NPD officers in 1995.[1]

TMLLC was requested to review the opinions of Dr. Richard Leo and provide an assessment of the NPD's investigative actions related to generally accepted police practices at the time the time of the investigation in 1995. TMLLC's assessment is based on the facts relevant to this scope of review. I have responded to the opinions of Dr. Leo which relate to police practices as I understand them based on my review and analysis of his report, as well as my assessment of the evidentiary record. Although I may not have responded to every assertion or conclusion in Dr. Leo's report, that should not be construed to indicate my agreement with those assertions or conclusions. My work is continuing, and I may modify this report before my testimony.

## III.   **Opinions**

Based upon my extensive police training, investigative and supervisory experience my opinions are based on the totality of the circumstances surrounding this incident that began on September 10, 1995, involving Marianne Miceli (deceased and hereafter referred to as Miceli), Tina M. Miceli-Amor (Miceli's daughter hereafter referred to as Tina) and her

---

[1] TMLLC reserves the right to amend or supplement this report as deemed appropriate.

BROWN 02

husband William "Bill" E. Amor (hereafter referred to as Amor). The following are my opinions in this case based on my knowledge, experience, and awareness of generally accepted police practices at the time:

1. The use of the polygraph examination process in this case was not a ruse or a trick used by NPD investigators; but rather a tool to assist in the investigation. The polygraph examiners in this case were civilians and not sworn law enforcement officers with police powers. Both Tina and Amor voluntarily submitted to polygraph examinations. No deception was detected on Tina's polygraph examination. However, in the case of Amor, deception was detected on the October 3, 1995, polygraph examination. This test result caused further suspicion that Amor was not telling the truth about his involvement in and knowledge of the circumstances surrounding the death of Miceli. The polygraph examination was an appropriate and useful test at the time of the incident and is still an appropriate tool used today by law enforcement. Polygraph examinations are also used for sensitive pre-employment backgrounds (e.g., Federal, State, and local law enforcement and Intelligence Community screening.) and national security purposes. The use of the polygraph examination as an investigative tool in this case was appropriate.

2. I disagree with Dr. Leo's misleading opinions that the October 3 and 4, 1995 interviews with Amor were lengthy multiple interrogation sessions. During the transport to Reid and Associates no interviewing of Amor occurred. During the polygraph examination the detectives did not interview Amor. Civilian polygraph examiners administered the testing. During the ride back to NPD no interviewing occurred with Amor. Approximately twenty minutes after being Mirandized Amor confessed to intentionally starting the fire. After providing further details Amor provided a handwritten statement that was completed approximately an hour after the initial confession. Amor reading his statement into a tape-recorder on two occasions and submitting to an interview that lasted approximately one hour with the Assistant State Attorney was a regurgitation of the facts already previously provided by Amor. The length of interviews with Amor by investigators in this criminal investigation was appropriate.

3. Minimization is an issue that arises commonly in interviews and interrogations. Police can use minimization as a technique by offering a suspect an explanation for the crime that diminishes the suspect's potential accountability. Likewise, police know that suspects routinely offer half-truths about their involvement in a crime to avoid and/or mitigate the consequences and explain away their role in a particular incident. Dr. Leo's report is noticeably silent on minimization tactics used by criminal suspects to mitigate accountability for their behavior. In this case, Amor introduced statements to minimize his behavior, not the investigators, and it was reasonable for investigators to perceive Amor as minimizing by providing admissions that he started the fire without providing all truthful details regarding the events of September 10, 1995. In his report, Dr. Leo

BROWN 03

discusses the use of minimization as an interview technique by police when interrogating Amor. However, as a police practitioner, I respectfully disagree with Dr. Leo's report that the detectives here did so, to the extent he is still making this claim. The detectives in this case did not use a minimization technique to secure a confession from Amor. Rather, the detectives told Amor of Tina's allegations and confronted him with the results of his failed polygraph examination.

4. I disagree with Dr. Leo's criticisms of investigators for not videotaping the entirety of their interviews with Amor. In my opinion, the documentation and recordings associated with the October 3 and 4 interviews of Amor were consistent with best practices in 1995. Amor agreed to complete an NPD Voluntary Statement form in his own handwriting after initially confessing to starting the fire on October 3, 1995. After completing the signed one-page written statement, he agreed to read his statement into an audio-cassette recorder at the request of the investigators. Later that morning he agreed to be audio-recorded by the Assistant State Attorney for DuPage County for a portion of his interview. The audio recording of Amor was an extra step taken by investigators after securing the handwritten confession that was beyond what was routinely required. Investigators obtaining a handwritten statement followed-up by an audio-recorded statement to document Amor's confession during the criminal investigation was appropriate.

## IV.  Synopsis of Investigation

### A.  Relevant Facts

**On September 10, 1995,** Miceli called 911 and reported there was a fire in her apartment, and she was overcome with smoke and could not get out. The dispatcher received the call from Miceli at 6:41 p.m. and the NFD arrived at the incident at approximately 6:49 p.m.[2] The fire was under control in approximately thirty (30) minutes according to the NFD. Miceli was found unconscious, removed, and treated for burns and other related fire injuries by EMS personnel. Miceli was transported to Edward Hospital and was later pronounced deceased.

Among those who respond to the scene are Detectives Michael Cross and Robert Guerrieri. The joint investigative team of the Naperville Fire Department (NFD) and NPD learned that night that both Tina and her husband Amor were in the apartment until approximately 6:30 p.m.

**September 12, 1995, 10:00 am,** Tina and Amor both submitted themselves for a polygraph examination to investigate whether or not either one of them was involved in or had

---

[2] Naperville Public Safety Incident Dispatch Detail Report, RD#: NV 95-42030, dated September 10, 1995, (Defendant's 574)

BROWN 04

knowledge of who set a fire that caused the death of the victim, Miceli on September 10, 1995.

> Both Tina and Amor signed forms releasing the NPD of any liability which may result from the polygraph examination. During the pre-test interview Tina requested her polygraph examination be rescheduled due to her mother's funeral/burial services that same afternoon and she was emotionally upset. Amor did not request a postponement and submitted to the polygraph examination this date.

> The Polygraph Examiner, Richard T. O'Brien documented he could not render an opinion as to Amor's status in the case at that time. O'Brien further noted that Amor consumed a quantity of alcohol just prior to the polygraph examination which may have contributed to the unemotional nature of his polygraph records. O'Brien recommended that Amor submit to a re-examination later to further clarify the results of his examination.[3]

It is noted the recommendation for re-examination was made by O'Brien and not the NPD or NFD investigators.

Amor agreed to be re-tested at a time when he had not been drinking.

**On September 15, 1995, at 8:00 am,** Detective Cross apparently (mentions Amor called in report) spoke to Amor by telephone. Detective Cross reported:

> Amor advised Tina woke up at 4:00 am having nightmares about her mother's death. Amor said they have been up since then and he had been drinking. He advised they would not be coming in for the polygraph tests.[4]

**On September 15, 1995, at 5:45 pm,** Tina submitted herself for the rescheduled polygraph examination. Tina signed a new form releasing the Naperville Police Department of any liability which might result from the polygraph examination. O'Brien conducted the polygraph examination and opined that Tina was substantially telling the truth on the questions asked during the testing. O'Brien noted that Tina had a learning dysfunction limited comprehension of the polygraph technique.[5]

---

[3] Letter from Richard T. Obrien, Polygraph Examiner, Richard T. O'Brien Associates, Inc., 15 Spinning Wheel Road, Suite 14-B, Hinsdale, Illinois 6052, dated September 14, 1995. (Masokas Court Exhibit #10)
[4] Naperville Police Department Incident Report #95-42030 Original Report, Page 2 of 7. (Defendant's 717)
[5] Letter from Richard T. O' Brien, Polygraph Examiner, Richard T. O'Brien Associates, Inc., 15 Spinning Wheel Road, Suite 14-B, Hinsdale, Illinois 60521, to Det. Michael J. Cross dated September 18, 1995. (Masokas Court Exhibit #10)

BROWN 05

**On October 3, 1995, at 2:15 pm,** Detectives Cross and Guerrieri went to the DeKalb County Jail and met Amor when he was released. Detective Cross reported:

> Amor was asked if he was still willing to take the polygraph test as he previously indicated he would take. Amor said he was willing to do so and said he wanted to get it over with. Amor was advised that an appointment was set up for the polygraph test today. Amor agreed to voluntarily accompany us to John E. Reid and Associates in Chicago where the (polygraph) test would be conducted. We asked him if he had eaten lunch and he said he had. We asked if he wanted anything else. Amor asked if he could smoke, and we said he could. Amor smoked several cigarettes while on the way to Chicago. We arrived at 3:55 pm at 250 S. Whacker Drive and met with the polygraph examiners Arthur Newey and Mike Masokas.

**On October 3, 1995, at 4:20 pm,** Amor submitted himself for a second polygraph at John E. Reid and Associates, Inc. to investigate whether he was involved or had knowledge of who set a fire that caused the death of the victim, Miceli on September 10, 1995. Reid's offices are a professional civilian entity, and their employees are not sworn law enforcement officers with police powers.

Polygraph Examiner Michael Masokas documented:

> Masokas covered the consent form with Amor. Amor completed the John E. Reid and Associates, Inc., consent to taking the polygraph examination and disclosure of the results to the Naperville Police Department. Amor also acknowledged he was free to leave the polygraph office and that he was not in custody by placing his initials next to these annotations that Polygraph Examiner Masokas indicated he printed and initialed. At 4:20 p.m. in Chicago at the Reid Offices, Amor signed the form acknowledging he was provided and understood these circumstances.[6]

> Masokas determined Amor was not telling the truth about his involvement in and knowledge of the circumstances surrounding the death of Miceli.

Detective Cross further reported:

> Amor was interviewed and given a polygraph test and we were advised that he failed. Masokas and Newey interviewed Amor regarding the test. He did not make any admissions. While at Reid, Amor was allowed to go to the

---

[6] John E. Reid and Associates, Polygraph Case History File dated 10/3/1995. (Masokas Court Exhibit #1)

BROWN 06

Transparency Matters, LLC
Amor v. Cross
June 17, 2021

bathroom when he asked.  He was left alone several times in the lobby and during the interviews.[7]

**On October 3, 1995, at 9:05 pm,** Detectives Mike Sullivan and M. Anders interviewed Tina at the NPD.  Detective Sullivan reported:

> Tina related she was in the process of getting a divorce from Amor.  She had spoken to an attorney and that Amor would be getting served with the divorce papers very soon.  Tina felt Amor had taken advantage of her and her mother and was just living off them.  Tina advised the detectives she now feels that Amor "deliberately" set the fire, but he accidentally killed her mother.

> Tina was asked why she felt Amor was responsible for the fire.  Tina said Amor lies about everything.  He said he owned a house and it turned out it did not.  Amor said he had money from some profit sharing, and he did not.  Amor picked on her appearance always telling her how bad she looked, and this did not seem right if he loved her as much as he said he did.  Amor made inappropriate comments at Miceli's wake.  Amor was due to pay a fine from a prior court case.  The fine was approximately $2000.00, and it was due September 15, 1995.  Amor told Tina that the fine could be put off for six months if something disastrous happened to the family.  She also said Amor had not been treating her and Miceli very well.  He stopped giving them back rubs and was mean to Tina.[8]

**On October 3, 1995, at 10:30 pm,** Detective Cross reported:

> Amor agreed to accompany us back to NPD to continue the interview.  Amor smoked several cigarettes while on the way to Naperville.  Amor was never handcuffed or restrained in any way.  We asked him if he was hungry or wanted anything to drink?  Amor requested and received several cans of pop.  Detective Cross met with Investigator Sullivan who had been talking to Tina and advised that Tina said she knew Amor intentionally started the fire but did not think he meant to kill her mother.[9]

**On October 3, 1995, at 11:37 pm,** Detective Cross reported:

[7] Naperville Police Department Incident Report #95-42030 Original Report dated October 3, 1995. (Defendant's 719)
[8] Naperville Police Department Incident Report #95-42030 Supplementary Report dated October 3, 1995, Page 1 of 3. (Defendant's 724-726)
[9] Naperville Police Department Incident Report #95-42030 Supplementary Report dated October 3, 1995, Page 5 of 7. (Defendant's 720)

BROWN 07

Amor was advised of his Miranda Rights in writing by Detective Guerrieri who also read them to him. (The form used was the pre-printed NPD #50.) The form was witnessed by Detectives Guerrieri and Cross.[10] The Miranda Rights form was provided to Amor to read himself and to sign the waiver if he continued to want to talk to the detectives. Amor read and signed the form.

Detective Cross then advised Amor that Tina told other investigators that he intentionally started the fire, but she did not think he intended to kill Marianne[11]. Amor then said he started the fire.

When asked why he did it he responded, "I just don't give a shit anymore." Amor said he has no job, drinks too much, and didn't like living with Tina and Marianne because they always argued about him. Amor said he did not pour the vodka, that he had accidentally spilled it. When asked how the vodka got onto the chair Amor said it splashed up onto the chair. Amor further stated he then knocked the cigarette off the ash tray knowing it would start a fire. (Amor is not an expert in fire science and at the time he believed the smoldering cigarette would ignite the vodka.) Amor said he did it to collect insurance money for contents of the apartment. He planned to use the insurance money to pay for the 'Fingerhut[12]' products he and Tina owed $200.00 on and get a new television and some new furniture. When asked how much vodka he spilled Amor said about one half (1/2) of a one-liter bottle.[13]

When asked why he did not give a shit anymore? Amor said he got married in April and then got put into jail. When he got out of jail, he did not have a job and was drinking too much. The more he touched the more things went wrong. He wanted to start a small "contained" fire to get some new things. He said Marianne and Tina knew nothing of his plan to start the fire and he did not know why he did not start the fire when she was out of the apartment. Amor once again said he did not spill the vodka on purpose, but he did knock the cigarette onto the newspaper on purpose. Amor voluntarily agreed to make

[10] Naperville Police Department, Statement of Miranda Rights, Form NPD #50, dated October 3, 1995 @ 11:37 pm. (Defendant's 715)
[11] Naperville Police Department Incident Report #95-42030 Supplementary Report dated October 3, 1995, Page 5 of 7. (Defendant's 720)
[12] Fingerhut, 11 McLeland Road, St. Cloud, Minnesota, 56395 dated 6/22/1994 and 7/6/1995. (Defendant's 464, 466, and 480)
[13] Naperville Police Department Incident Report #95-42030 Supplementary Report dated October 3, 1995, Page 6 of 7. (Defendant's 721)

BROWN 08

a written statement and began to write shortly after the oral confession to Detective Cross.[14]

**On October 4, 1995, at 1:14 am,** Amor printed out a Voluntary Statement on NPD #20 (Form) and signed it at 1:14 am on October 4, 1995 (Witnessed by Detectives Guerrieri and Cross).[15] The statement contained significant information on how Amor believed the fire that killed Miceli was ignited. Amor wrote:

> Amor described spilling vodka on a Chicago Tribune (newspaper) and chair laying next to the table the vodka was on. This happened about 6:15 pm. (This was twenty-six minutes before Miceli's call to 911 to report her residence was on fire and the exits were blocked.) Amor said before using the restroom he lit a cigarette and put it in the ashtray. He said when he got up, he bumped the ashtray knocking the cigarette onto the newspaper with the vodka spilled on it. Amor said he did not pick up the cigarette and continued to go use the bathroom knowing a fire would probably result. He then left the apartment to go out. A minute or so later his wife Tina followed. Amor then said "The loss was meant to be minimal for personal gain. No harm was ever supposed to come to any person or persons."

**On October 4, 1995, between 1:30 – 1:45 am,** Assistant State's Attorney (ASA) Brian Nigohosian was contacted by the Naperville Police Department at approximately and spoke with Detective Cross. ASA Nigohosian was on felony review that is the process in this jurisdiction that cases are reviewed by ASA's that are on call twenty-four (24) hours a day. ASA Nigohosian learned the NPD had a subject in custody by the name of William Amor and that he made statement to investigators indicating his involvement in the arson and death of Miceli.

**On October 4, 1995, at 2:11 am,** Amor agreed to read his Voluntary Written Statement into a tape-recorder when requested by Detectives Guerrier and Cross. The audio-recording began at 2:11 am and ended at 2:14 am (Three minutes total).

> Amor stated he understood the Miranda Rights that were read to him again on the audio-recording and that no threats or promises were made to him. Amor acknowledged he was advised of his rights and that he gave this recorded statement voluntarily and of his own free will.[16]

---

[14] Naperville Police Department Incident Report #95-42030 Supplementary Report dated October 3, 1995, Page 7 of 7. (Defendant's 722)

[15] Naperville Police Department Voluntary Statement, Form #NPD #20, dated October 4, 1995, at 1:14 am. (Defendant's 818)

[16] Naperville Police Department Audio-Recording of William Amor dated October 4, 1995, at 2:11 am.

BROWN 09

Amor read into the tape-recorder the contents of his written voluntary statement as indicated above paragraph.

**On October 4, 1995, at approximately 3:00 am,** ASA Nigohosian arrived and was informed of the interview with Amor by Detectives Cross and Guerrieri. ASA Nigohosian then met with Amor, introduced himself, and advised Amor that he was an Assistant States Attorney. ASA Nigohosian also advised Amor that he was not his attorney and that he did not represent him. ASA Nigohosian asked Amor if he understood his rights that were previously explained to him and that still applied by the NPD officers, he stated he did understand.

Amor related the following to ASA Nigohosian regarding the fire on September 10, 1995, that is documented in ASA Nigohosian's report/memorandum dated November 1, 1995.[17]

Amor said he spilled the vodka onto the newspaper and then a short time later intentionally knocked a cigarette onto the paper to start a fire. Amor indicated he heard a sizzling sound when he knocked the cigarette onto the paper.

Amor went into the bedroom where Miceli was located. Miceli asked Amor for a back rub. He was giving her a back rub when Tina entered the bedroom coming from the bathroom, Tina became upset, and an argument began between her and Miceli. Amor said there were constant arguments between the three of them and he felt he was unfairly placed in the middle of these arguments.

Amor stated he started the fire to collect money. He had become desperate and wanted to get out of the apartment where the three (Miceli, Tina, and Amor) of them were living. Amor said he first got the idea while in DuPage County Jail. He said he discussed it with another inmate named Mike. Amor and Mike discussed various ways of getting money. One way was to start a fire to collect insurance money or obtaining street drugs to mix with medication that Miceli was taking to cause an overdose.

Amor said he did write down some thoughts in a letter he sent to Tina while he was still incarcerated in the County Jail. Amor said he wrote Tina and told her he had a plan to get money. Amor said he did not think about life insurance on Miceli but did not care what kind of insurance she had because his only concern was getting money. Amor guessed Miceli's insurance would be somewhere around $10,000 to $15,000.

---

[17] Assigned States Attorney, People v. William Amor, from Brian Nigohosian, dated November 1, 1995. (Defendant's #'s 733 -737)

BROWN 10

Amor said he took down the smoke detector in the apartment because the battery had burned out. He said he had a battery for the smoke detector but did not replace the smoke detector at the time he started the fire. He mentioned again he did not care what insurance he collected he just wanted money.

ASA Nigohosian noted in his report that after the interview Amor agreed to a tape-recording of his statement.

**On October 4, 1995, at 5:10 am,** Amor agreed to a second tape-recorded statement when requested by ASA Brian Nigohosian. Detectives Guerrieri and Cross were present for the tape-recording. The tape-recording began at 5:10 am and ended at 5:20 am (Ten minutes total). Amor stated he understood the Miranda Rights that were read to him again on the recording and that no threats or promises were made to him. Amor acknowledged he was advised of his rights and that he gave this recorded statement voluntarily and of his own free will.[18]

Amor stated he understood that Nigohosian's role as an Assistant State's Attorney that he was not there to represent him. Amor responded "yes." Amor also stated he knew his rights as the detectives informed him of and he agreed to speak with him about the events that occurred in the case.

Amor acknowledged that the fire was started because of a cigarette that was knocked onto a pile of newspapers that were doused with vodka.

Amor also acknowledged that he was in DuPage County Jail sometime in April, May, and June of 1995 and that is where he formed the idea in his head. Amor also acknowledged that he wrote a letter to his wife from jail explaining what he was thinking about. Amor said that he had some way to come up with some money that would help us get out of the house through insurance. Amor clarified it was not life insurance money that he was directed right at but some insurance money. He acknowledged he indicated the situation he was living in was unbearable.

Amor said he had taken down the apartment's smoke detector a couple of days before the fire to replace the battery and had not got around to putting it back up. He said the day of the fire he was in an argument between Miceli and Tina that had to do with the back rub and a money incident. Amor said he dropped the cigarette right before he left approximately two and one half to three minutes tops. Amor said he did not look for smoke coming from the

---

[18] Naperville Police Department Audio-Recording of William Amor dated October 4, 1995, at 5:10 am.

BROWN 11

newspapers that he did not look for it and he did not want to look for it. He said he did not look for the smoke but anticipated that it would start a fire.

Amor clarified that he saw some smoke but that he did not actually see a flame. Amor agreed that Miceli was dressed in a nightie laying on her bed and the indication was she was not going anywhere. Amor responded she was laying down to take a nap and then was going to get up to watch the Emmy's between 7:00 pm and 10:00 pm. Amor responded that he said everything at least once was the truth from his heart. This was a response to the comment from ASA Nigohosian if there was anything they had talked about earlier that he wanted to bring up. There were no previous questions specifically regarding everything he said and the truth from his heart.

## B.    Analysis

### 1.  Non-Custodial Interviews

Investigators are trained to take steps such as not restraining subjects with handcuffs or any other restraints, advising them that they are free to leave at any time, offering them amenities such as food or opportunities for food, providing beverages, smoke breaks if appropriate, restroom breaks, and leave unattended at times where a reasonable person would feel they could leave.

The investigators in this case provided Amor these conveniences and opportunities on October 3, 1995. Additionally, the investigators drove an unmarked police car (Dodge Dynasty) and were in plain clothes. Even though they were on-duty and armed their firearms were not visible during their contact with Amor.

Amor was provided with various amenities during interviews with police, he was never physically restrained, and was provided with opportunities to obtain food, provided beverages, use of the restroom, and being able to smoke cigarettes when he wanted, and even being left unattended at times. Amor continually indicated he understood his rights, knew he could talk to an attorney, and was free to leave at any time. Amor has high school diploma, indicated on his resume he has a Bachelor of Arts degree from Indiana University, and has held various responsible jobs. Amor was determined to be fit, competent, no diagnosis of mental illness was noted. The amenities or conveniences offered and provided to Amor by detectives during his interviews were appropriate.

### 2.  Custodial Interviews

BROWN 12

Amor was advised of his Miranda Rights and waived same at 11:37 pm on October 3, 1995. He was being confronted with the results of the polygraph examination and the allegations made by his wife Tina. Amor related that he intentionally started the fire but most of the facts provided by him in **prior** statements remained the same, including that he accidentally spilled vodka on the newspaper that might ignite a fire, a lit candle was left burning on the coffee table that he did not remember blowing out, and he could not remember where and when he put out his last cigarette.

The major change in his statement was that he intentionally knocked the cigarette off the ashtray versus one burning down and falling off the ash tray. The interviews of Amor after being advised of his Miranda Rights were appropriate and is a generally accepted police practice.

After Amor confessed, he intentionally started the fire he wrote his statement down and was tape recorded on two additional occasions to preserve his statement by investigators and the Assistant State's Attorney. These were not lengthy interrogation sessions as suggested by Dr. Leo from the time Amor confessed until the last recording ended. The interrogation after the Miranda Rights was regurgitation of what Amor already confessed to and clarified some of the facts he previously provided. The statement did not change significantly during this time.

### 3. Polygraph Examinations

During my training and experience in criminal investigations, including homicide investigations, investigators were familiarized with the use of the polygraph as an investigative tool. The polygraph records with its instrumentation any changes in the examinees cardiovascular, respiratory, and skin reflex as questions are asked. The polygraph examiner assesses the charts and decides on whether the examinee was truthful, untruthful, or inconclusive. During homicide investigations the polygraph examination can be used to eliminate certain suspects so that investigative efforts and resources can be focused and used more efficiently.

Polygraph examinations are strictly voluntary and consent to submit to the testing must be obtained from the polygraph examiner. The examinee cannot be forced into participating in the examination and the test cannot be expedited or rushed. The polygraph examination process (Pre-test, explaining how the examination work and preparing test questions, performing the polygraph examination, and post-test follow-up) can last several hours. During the ride from DeKalb County Jail to Reid and Associates, Inc. Amor indicated there was limited discussion about where they were going and had he talked to Tina. Investigators are advised not to question a person who is agreeing to submit to a polygraph examination prior to the test. It was appropriate for the investigators not to discuss the case even in casual conversation prior to the polygraph examination being given.

BROWN 13

Additionally, investigators accept the results of the polygraph examination when the results of the subject's examination are found to be truthful. Investigators then focus their resources and efforts in other areas where the evidence and leads take them.

On September 12, 1995, Tina, and Amor both submitted themselves for a polygraph examination to investigate whether either one of them was involved in or had knowledge of who set a fire that caused the death of the victim, Miceli on September10, 1995.

On October 3, 1995, Amor submitted himself for a second polygraph examination to investigate whether either he was involved in or had knowledge of who set the fire that caused the death of the victim, Miceli on September10, 1995.

Amor spent approximately five (5) and a half (1/2) hours at John E. Reid and Associates. Dr. Leo describes in his opinion that this was part of a lengthy interrogation when in fact it was not. The polygraph examiner met with the detectives to get background on the investigation for approximately thirty (30) minutes while Amor was left unattended in the lobby and not physically restrained where he was free to leave at any time. He was interviewed by a civilian examiner with no police powers. The pre-test portion of the examination includes some discussion about the case but also includes completion of a waiver and/or consent form(s), an explanation of how the polygraph works and a test to show it works, development of questions by the polygrapher, etc.

Prior to the examination Amor made denials about his involvement or knowledge of who started the fire. He was there voluntarily, not restrained, not in custody, and free to leave. Amor signed a form acknowledging same. This process was not a lengthy interrogation. After the examination Amor was interviewed post polygraph test for approximately forty-five (45) minutes and then agreed to accompany the detectives back to Naperville.

Polygraphs themselves are voluntary and are not forced as an industry standard. The polygraph examination of Amor occurred at a civilian business by a polygraph examiner with no police powers. The test would not have been given if it were not voluntary. The NPD investigators did not discuss the case on the ride to Reid and Associates from the county jail. After the examination for approximately 45 minutes Detectives Cross and Guerrieri interviewed Amor regarding the results of the polygraph examination. Amor provided no new information and continued to deny he was involved with the fatal fire. The detectives did not discuss the case on the ride back to Naperville arriving at approximately 11:30 pm. The use of the polygraph examination as an investigative tool by detectives in this case was appropriate.

BROWN 14

### 4. Recording/Documenting Statements

There are over 18,000 law enforcement agencies in the United States alone and many are small agencies. During the mid-1990's many investigators obtained written statements from suspects, on occasion audio-recordings by use of cassette recorders were used in the most serious cases, and departments that had the capability available would videotape suspects in accordance with their policy. Police departments have many different options for recording statements and confessions from criminal suspects. Handwritten statements, audio, and audio-video recordings are the means commonly used. Department policies on use of these capabilities vary from agency to agency. Many departments due to budgetary constraints did not have videotaping equipment during this time. Even in large departments purchasing videotaping equipment for example, the Pennsylvania State Police with 15 Troops, 88 stations, covering 67 counties each with criminal investigation units would have accounted for a large budgetary purchase requiring layers of approvals.

In the mid-1990's NPD did not have a policy on recording of statements or confessions. This was commonplace in many police departments. The Internal Association of Chiefs of Police (IACP) Model Policy on Interrogations and Confessions established by the IACP National Law Enforcement Policy Center was not published until January 2004 that provided guidance to member agencies on documenting statements and confessions and encouraging the use of agency video and audio taping capabilities at their disposal. The lead investigative officer may decide in which cases audio or video tape recordings may be appropriate.[19] This is still the most recent IACP Model Policy on this issue to date.

Investigators obtaining a handwritten statement followed-up by an audio-recorded statement to document Amor's confession during the criminal investigation was appropriate. The audio recording of Amor was an extra step taken by investigators after securing the handwritten confession that was beyond the generally accepted police practice used at the time.

### 5. Length of Interviews

Dr. Leo in his expert report continually refers to the interviews that occurred on October 3, 1995, as lengthy unrecorded multiple interrogation sessions. The following analysis is opposite of Dr. Leo's assertions:

**On October 3, 1995, at 2:15 pm,** Detectives Cross and Guerrieri went to the DeKalb County Jail and met Amor when he was released. No discussion or interview about the case occurred while transporting Amor for his polygraph examination.

---

[19] IACP Model Policy, Interrogations and Confessions, Effective Date: January 2004.

BROWN 15

**On October 3, 1995, at 3:55 pm,** the detectives arrived with Amor at Reid and Associates in Chicago.  No interview of Amor was conducted by detectives upon their arrival at Reid and Associates.

**On October 3, 1995, at 4:20 pm,** Amor submitted himself for a second polygraph examination.  Amor spent approximately five (5) and a half (1/2) hours with the polygraph examiners that are civilians and not sworn police officers.  Amor was not interviewed by NPD detectives at this time.  The polygrapher(s) met with the detectives to get background on the investigation for approximately thirty (30) minutes while Amor was left unattended in the lobby and not physically restrained where he was free to leave at any time.  He was interviewed by a civilian examiner and occasionally with another examiner, both with no police powers.  The pre-test portion of the examination includes some discussion about the case but also includes completion of a waiver and/or consent form(s), an explanation of how the polygraph works and a test to show it works, development of questions by the polygrapher, etc.  This process was not a police interrogation.

After the polygraph examination Amor was interviewed for approximately forty-five (45) minutes by the polygraphers and briefly by the detectives after which Amor agreed to then accompany the detectives back to Naperville.

**On October 3, 1995, at 10:30 pm,** Amor agreed to accompany the detectives back to NPD to continue the interview.  No interviewing occurred during the transport back to NPD.

**On October 3, 1995, at 11:37 pm,** after being Mirandized, and after approximately 20 minutes of questioning by detectives Amor confessed saying he intentionally started the fire.

**On October 4, 1995, at 1:14 am,** Amor printed out a Voluntary Statement on NPD #20 (Form) and signed it at 1:14 am on October 4, 1995.   No interviewing by detectives occurred while Amor wrote out his statement.

**On October 4, 1995, between 1:30 – 1:45 am,** Assistant State's Attorney (ASA) Brian Nigohosian was contacted by the Naperville Police Department at approximately and spoke with Detective Cross.  Amor was not interviewed by detectives during this contact.

**On October 4, 1995, at 2:11 am,** Amor agreed to read his Voluntary Written Statement into a tape recorder when requested by Detectives Guerrier and Cross.  The tape-recording began at 2:11 am and ended at 2:14 am **(Three minutes total).**

**On October 4, 1995, at 3:00 am,** ASA Nigohosian arrived at NPD and was informed of the interview with Amor by Detectives Cross and Guerrieri.  ASA Nigohosian then met with

BROWN 16

Amor, introduced himself, and advised Amor that he was an Assistant States Attorney. Amor was not being interviewed by detectives during this briefing.

**On October 4, 1995, at approximately 3:45 – 4:00 am,** ASA Nigohosian interviewed Amor for approximately an hour and ten minutes before requesting the tape-recording. The interview covered the previous confession to detectives and provided some additional clarification.

**On October 4, 1995, at 5:10 am,** Amor agreed to a second audio-recorded statement when requested by ASA Brian Nigohosian. The audio-recording began at 5:10 am and ended at 5:20 am **(Ten minutes total).**

As delineated here, that the interviews of Amor by detectives in this criminal investigation were not multiple lengthy interrogation sessions as described Dr. Leo and were appropriate in this case.

### 6. Minimization

Investigators can use minimization as a technique by offering a suspect an explanation for the crime that diminishes the suspect's potential accountability. For example, I was the lead investigator in a rape investigation that began on July 26, 1990. The female victim was raped by a male suspect. During the interview, I advised the suspect that I only had one side of the story in this case, and for all I knew the sexual misconduct alleged could have been consensual. The suspect said he did have sex with the victim and that it was consensual and not rape. At this point, by using the minimization technique with the suspect, we obtained an admission by him to having sex with the victim. At the time, the physical evidence was still being analyzed by laboratory personnel. After laboratory analysis, I learned that the suspect provided only a fraction of the truth, and that he was involved in an act of involuntary deviate sexual intercourse with the victim, and the conduct alleged was in fact a forcible rape.

Criminal investigators know that suspects routinely offer half-truths about their involvement in a crime to avoid the consequences and/or try to justify their role in a particular incident. A suspect may offer voluntarily an explanation that reduces or removes criminal intent from their actions, i.e., that the incident was an accident or that a sexual assault did not occur because consent was present. A suspect offers mitigation believing this tactic will reduce their accountability. For example, On June 9, 1991, I was the lead investigator from the Pennsylvania State Police on a joint homicide investigation with the New York State Police into the death of a Harrisburg, PA resident, that occurred in the Town of Romulus, New York. The victim was shot in the head while he slept in his cottage near Lake Seneca, NY. The investigation within hours focused on residents from the Harrisburg, PA area. One of the five involved suspects was interviewed by me and another investigator. The suspect admitted to

BROWN 17

killing the victim within 36 hours of the murder. He told us during the interview that he did it because the victim sexually molested his 16-year-old girlfriend in an attempt to explain his behavior to mitigate his accountability.

In another case, I was the lead investigator in a rape and involuntary deviate sexual intercourse investigation that began on March 15, 1992. An eleven-year-old boy was sexually assaulted by his mother's live-in boyfriend and forcibly raped. The suspect confessed to the rape but blamed the victim's mother for leaving the child with him to baby sit and also that he was using cocaine and not in control of his actions. The suspect besides trying to minimize his accountability by blaming the child's mother and his cocaine use tried to escape punishment by suicide by cop.

**On September 15, 1995, at 7:15 pm,** Amor told investigators he had been smoking and left a cigarette in an ash tray on the coffee table. They also had a candle burning on the coffee table that he did not blow out when he left. Amor suggested the cigarette could have burned down, fell into the papers, and started the fire. This statement was provided by Amor eighteen days before he confessed to intentionally starting the fire.

**On September 15, 1995, at 9:35 pm,** Amor completed a written statement and wrote, "I had a bottle of vodka on the coffee table and a glass and ashtray on the floor in front of the T.V. There was a Chicago tribune on the floor between the coach and the coffee table. There was a scented candle lit also on the coffee table. I went to refill my drink and by accident knocked over the vodka bottle spilling it on the newspapers. I felt it would cause no harm, so I didn't wipe off the paper. Upon leaving at 6:00 pm I don't recall blowing out the candle and cannot remember where and when I put out my last cigarette." This statement was provided by Amor eighteen days before he confessed to intentionally starting the fire.

**On October 4, 1995, at 1:14 am,** Amor provided a handwritten statement and described spilling vodka on a Chicago Tribune (newspaper) and chair laying next to the table the vodka was on. This happened about 6:15 pm. (This was twenty-six minutes before Miceli's call to 911 to report her residence was on fire and the exits were blocked.) Amor said before using the restroom he lit a cigarette and put it in the ashtray. He said when he got up, he bumped the ashtray knocking the cigarette onto the newspaper with the vodka spilled on it. Amor said he did not pick up the cigarette and continued to go use the bathroom knowing a fire would probably result. He then left the apartment to go out. A minute or so later his wife Tina followed. Amor then said "The loss was meant to be minimal for personal gain. No harm was ever supposed to come to any person or persons."

**On October 4, 1995, at 5:10 am,** Amor agreed to a second tape-recorded statement when requested by ASA Brian Nigohosian. Amor also acknowledged that he was in DuPage County Jail sometime in April, May, and June of 1995 and that is where he formed the idea in

BROWN 18

his head. Amor also acknowledged that he wrote a letter to his wife from jail explaining what he was thinking about. Amor said that he had some way to come up with some money that would help us get out of the house through insurance. Amor clarified it was not life insurance money that he was directed right at but some insurance money. He acknowledged the situation he was living in was unbearable.

**On October 9, 1995, at 1:45 pm,** Detectives Guerrieri and Cross along with Don Knoll of the DuPage County Sheriff's Office interviewed inmate Michael Mannion at the DuPage County Jail. Mannion said he knew Amor and that Amor was a trustee with him in the DuPage County Jail back in June 1995. Mannion related he did tell Amor that he could kill his mother-in-law by getting drunk and running her over with his car. This way he would only be charged with vehicular manslaughter and serve only two or three years for killing her. This discussion was clearly about Amor escaping full accountability for intentionally killing Miceli by getting drunk and making an intentional act look like an accident.

In summary, Amor acknowledged that he was in DuPage County Jail sometime in April, May, and June of 1995 and that is where he formed the idea in his head and even wrote a letter to his wife about it. (The letter was seized as evidence by investigators.) This is consistent with the time frame provided by inmate Mannion who described a discussion with Amor and how he could make killing Miceli look like and accident. On September 15, 1995, Amor said by accident he knocked over a bottle of vodka onto newspapers and he did not recall blowing out the candle or remember where and when he put out his last cigarette. On October 3 – 4, 1995, Amor confessed to intentionally bumping the ash tray with the lit cigarette knowing a fire would result. However, he also stated "The loss was meant to be minimal for personal gain. No harm was ever supposed to come to any person or persons." In my view, the only person in this investigation that used mitigation as a tactic to escape accountability for their conduct was Amor.

Dr. Leo opines in his report that the police use of minimization as an interview technique was used in interrogating Amor. However, as a police practitioner, I respectfully disagree with Dr. Leo's report, to the extent he is still making this claim. The detectives in this case did not use a minimization technique to secure a confession from Amor. Rather, the detectives told Amor of Tina's allegations and confronted him with the results of his failed polygraph examination.

### 7. Documents and Materials Reviewed

In performing this assessment, I did not interview any witnesses; however, I received the following information from The Sotos Law Firm and may use any of the documents and/or other information (audio-recordings) pertaining to this case which I reviewed and considered in my opinions:

BROWN 19

1. William Amor, Plaintiff v. Naperville Police Officers, et al., Defendants, Case: 1:18-cv-02523 filed April 9, 2018.

2. Naperville Police Department Incident Report #95-42030, Sudden Death – Suspicious Circumstances, Defendant's 66 – 824.

3. Office of the State Fire Marshal, Division of Arson Investigation, Investigative Report, Case No. 95-022-021 dated September 19, 1995.

4. Letter from Richard T. O'Brien, Polygraph Examiner, Richard T. O'Brien Associates, Inc., 15 Spinning Wheel Road, Suite 14-B, Hinsdale, Illinois 60521, to Det. Michael J. Cross dated September 14, 1995 (William Amor polygraph examination results.).

5. Letter from Richard T. O' Brien, Polygraph Examiner, Richard T. O'Brien Associates, Inc., 15 Spinning Wheel Road, Suite 14-B, Hinsdale, Illinois 60521, to Det. Michael J. Cross dated September 18, 1995 (Tina's polygraph examination results).

6. Naperville Police Department Audio-Recorded Interview of William Amor on October 4, 1995, at 2:11 am with Detectives Robert Guerrieri and Mike Cross.

7. Naperville Police Department Audio-Recorded Interview of William Amor on October 4, 1995, at 5:10 am with NPD Detectives Robert Guerrieri and Mike Cross, and Assistant State's Attorney Brian Nigohosian.

8. Audio Transcription of Interviews of William Amor on October 4, 1995, at 2:11 am and on October 4, 1995, at 5:10 am.

9. Complaint, State of Illinois, Circuit Court of the Eighteenth Judicial Circuit, First Degree Murder and Aggravated Arson, William E. Amor dated October 4, 1995.

10. Letter from Michael F. Masokas, Polygraph Examiner, John E. Reid and Associates, Inc., 250 South Whacker Drive, Suite 1100, Chicago, Illinois 60606, to Det. Michael J. Cross dated October 20, 1995. (William Amor polygraph examination results)

11. Six Count Indictment, State of Illinois, Circuit Court of the Eighteenth Judicial Circuit, William E. Amor, filed Clerk of Courts, October 25, 1995.

12. Report of Proceedings, Circuit Court, Grand Jury of DuPage County, State of Illinois, dated October 25, 1995.

BROWN 20

13. Report of Proceedings, Circuit Court, Coroner's Inquest, DuPage County, State of Illinois, dated November 9, 1995.

14. Report of Proceedings, Circuit Court, Motion to Suppress Statements, DuPage County, State of Illinois, dated January 8, 1996.

15. Report of Proceedings, Circuit Court, Motion to Suppress Statements, DuPage County, State of Illinois, dated February 27, 1996, at 10:00 am.

16. Report of Proceedings, Circuit Court, Motion to Suppress Statements, DuPage County, State of Illinois, dated February 27, 1996 (1:30 pm).

17. Report of Proceedings, Circuit Court, Motion to Suppress Statements, DuPage County, State of Illinois, dated March 6, 1996, at 1:30 pm.

18. Motion to Quash Arrest and Suppress Evidence, Circuit Court, DuPage County, State of Illinois, dated March 25, 1996.

19. Report of Proceedings, Circuit Court, Motion to Suppress Statements, DuPage County, State of Illinois, dated March 25, 1996.

20. Report of Proceedings, Circuit Court, Motion to Suppress Evidence, DuPage County, State of Illinois, dated February 11, 1997.

21. Report of Proceedings, Circuit Court, Trial, DuPage County, State of Illinois, dated September 9, 1997, at 1:30 pm.

22. Report of Proceedings, Circuit Court, Trial, DuPage County, State of Illinois, dated September 10, 1997, at 9:30 am.

23. Report of Proceedings, Circuit Court, Trial, DuPage County, State of Illinois, dated September 10, 1997, at 1:30 pm.

24. Report of Proceedings, Circuit Court, Trial, DuPage County, State of Illinois, dated September 11, 1997, at 9:30 am.

25. Report of Proceedings, Circuit Court, Trial, DuPage County, State of Illinois, dated September 11, 1997, at 1:30 pm.

26. Report of Proceedings, Circuit Court, Trial, DuPage County, State of Illinois, dated September 12, 1997, at 9:30 am.

BROWN 21

27. Report of Proceedings, Circuit Court, Trial, DuPage County, State of Illinois, dated September 16, 1997, at 10:15 am.

28. Report of Proceedings, Circuit Court, Trial, DuPage County, State of Illinois, dated September 16, 1997, at 1:30 pm.

29. Report of Proceedings, Circuit Court, Trial, DuPage County, State of Illinois, dated September 16, 1997, at 1:30 pm (2) Trail resumed after recess.

30. Report of Proceedings, Circuit Court, Trial, DuPage County, State of Illinois, dated September 17, 1997, at 9:30 am.

31. Report of Proceedings, Circuit Court, Trial, DuPage County, State of Illinois, dated September 17, 1997, at 1:30 pm.

32. Report of Proceedings, Circuit Court, Motion to Suppress Purported Statements, DuPage County, State of Illinois, dated July 27, 2017.

33. Report of Proceedings, Circuit Court, The People's Motion to Deny Defendant's Motion to Suppress Statements Pursuant to 725 ILCS 5/114-11, DuPage County, State of Illinois, dated September 1, 2017.

34. Deposition of Michael Masokas, case No. 18 CV 2523, U.S. District Court, Northern District of Illinois, Eastern District, dated November 5, 2019.

35. 218 E. Bailey – Vandes, Outside Video of Fire of Apartment, Defendant's 5612 – 218.

36. Marianne Miceli 911 Call, September 10, 1995, Defendant's 5613 – F95-4922.

37. Report of Proceedings, Circuit Court, People's Motion to Dismiss Petition for Innocence, DuPage County, State of Illinois, dated May 6, 2019.

38. Illinois State Fire Marshall Response to Subpoena Duces tecum dated September 6, 2018.

39. 2018 Trail Transcript Index, Circuit Court, Retrial, DuPage County, State of Illinois.

40. Report of Proceedings, Circuit Court, Retrial, DuPage County, State of Illinois, dated January 24, 2018.

BROWN 22

41. Report of Proceedings, Circuit Court, Retrial, DuPage County, State of Illinois, dated January 25, 2018 – AM Session.

42. Report of Proceedings, Circuit Court, Retrial, DuPage County, State of Illinois, dated January 25, 2018 – PM Session.

43. Report of Proceedings, Circuit Court, Retrial, DuPage County, State of Illinois, dated January 26, 2018.

44. Report of Proceedings, Circuit Court, Retrial, DuPage County, State of Illinois, dated January 29, 2018.

45. Report of Proceedings, Circuit Court, Retrial, DuPage County, State of Illinois, dated January 30, 2018.

46. Report of Proceedings, Circuit Court, Retrial, DuPage County, State of Illinois, dated January 31, 2018.

47. Report of Proceedings, Circuit Court, Retrial, DuPage County, State of Illinois, dated February 1, 2018.

48. Report of Proceedings, Circuit Court, Retrial, DuPage County, State of Illinois, dated February 2, 2018.

49. Report of Proceedings, Circuit Court, Retrial, DuPage County, State of Illinois, dated February 21, 2018.

50. Naperville Fire Department Fire Investigation File, Defendants 5410-5611.

51. Investigator David Ferreri File, Defendants 5299 – 5409.

52. Dr. Richard Leo Expert Report, William Amor v. Michael Cross, et al., case No. 1:18-cv-02523, dated January 22, 2021.

**I. Supplemental Information:**

1. Statement of compensation to be paid for the study and testimony in this case:

   On March 29, 2021, The Sotos Law Firm, P.C., 141 W. Jackson, Suite 1240A, Chicago, IL 60604 retained Transparency Matters, LLC, P.O. Box 6598, Harrisburg, PA 17112 to provide an expert opinion on the police practices employed by the Naperville Police Department, Illinois regarding interviews William Amor had with NPD officers in the mid 1990's in a Sudden Death - Suspicious Circumstances criminal investigation.

BROWN 23

In consideration of rendering these services, hourly time charges will be applied at the rate of $175 per hour of consultant time for all matters. Expenses, if any and when appropriate, for travel, lodging, rental(s), meals (Federal Per Diem Rates Apply), and mileage, as needed, will be billed on monthly invoices. TMLLC respectfully requests that all outstanding invoices be paid thirty days after invoice or expense receipt. No retainer fee is required for this engagement.

My compensation is not contingent upon the substance of my opinions or the outcome of this case.

2. Publications authored in the last 10 years, if any.

None.

Lt. Col. (Ret.) Brown has not authored any publications for circulation to the public in the last ten years. However, Lt. Col. (Ret.) Brown has authored numerous reports regarding police policy development, internal investigations, supervisory/command reviews, evaluations of police use of force (including the use of deadly force), complaint reception and processing, case adjudications/reviews, and reports regarding corrective action through the disciplinary process for the Federal Consent Decrees of the Independent Monitor of the Oakland, CA Police Department, Detroit MI, Police Department, and the Federal Court Orders involving the Maricopa County AZ Sheriff's Office. Lt. Col. (Ret.) Brown also authored reports for the Niagara Falls NY Police Department in their State Consent Decree.

The reports are subsequently approved by the Court Appointed Monitor and provided/reviewed to the Federal or State Judge assigned to the case. The parties review and comment on these reports to include the Department of Justice, Special Litigation Section, and related Plaintiff's Counsel to include the American Civil Liberties Union (ACLU). These are internally generated reports that in some cases are made public (Oakland, Detroit Monitor Reports).

Lt. Col. (Ret.) Brown also authored reports for police department assessments for Department of Justice, Office for Justice Programs, Diagnostic Center, and the Middletown Police Department, Middletown, PA and Springettsbury Township Police Department, York, PA.

3. Cases during the previous 5 years testified as an expert by trial or deposition.

Lt. Col. (Ret.) Brown was the external independent investigator contracted by the Municipality of Anchorage, AK to investigate misconduct alleged by a lieutenant with the

BROWN 24

Transparency Matters, LLC
Amor v. Cross
June 17, 2021

Anchorage Police Department, Lt. Col. (Ret.) Brown was deposed as the Municipality of Anchorage's investigator (does not involve the use of force and was not questioned or requested to give an opinion as an Expert Witness) on November 15 & 16, 2016. Subsequently testified at trial on November 5, 2018, refer to Case No. 3:15-cv-00187-RRB, The United States District Court of Alaska, Anthony Henry, Plaintiff v. Municipality of Anchorage and Mark Mew, Defendants.

Subject Matter Expert, retained by Attorney Charles Bonner of the Law Offices of Bonner & Bonner, 475 Gate Five Road, Suite 212, Sausalito, CA 94965 to provide an expert opinion on the use of force used by the Syracuse Police Department in the case of Alonzo Grant v. City of Syracuse, NY. On Tuesday October 16, 2018, Lt. Col. (Ret.) Brown was certified as an Expert Witness in this case during trial testimony in police use of force by United States District Judge David Hurd, U.S. District Court, Northern District of New York, 10 Broad Street, Utica, NY 13501.

Subject Matter Expert, Use of Force Review and Analysis retained by Attorney Charles Bonner, 475 Gate Five Road, Suite 212, Sausalito, CA in case Maurice Crawley v. Syracuse Police Department, October 2018 – October 2020. Deposed by defendant's counsel on June 21, 2019, and eventually the case was settled out of court.

John R. ("Rick") Brown