

# Transcript of David Ferreri

**Date:** September 11, 2020
**Case:** Amor -v- Officer Cross, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

EXHIBIT 1

Transcript of David Ferreri

1 (1 to 4)

Conducted on September 11, 2020

**Page 1**

```
1          UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF ILLINOIS
3               EASTERN DIVISION
4    ----------------------------x
5    WILLIAM AMOR,           :
6              Plaintiff,    :
7       v.        :  Case No. 18-cv-2523
8    OFFICER MICHAEL CROSS,   :
9    et al.,                  :
10             Defendants.   :
11   ----------------------------x
12
13      Videotaped Deposition of DAVID FERRERI
14              Naperville, Illinois
15           Friday, September 11, 2020
16                 10:08 a.m.
17
18
19
20
21
22   Job No.:  319306
23   Pages:  1 - 210
24   Reported by:  Paula M. Quetsch, CSR, RPR
```

**Page 2**

```
1      Videotaped deposition of DAVID FERRERI, held at
2    the location of:
3
4          NAPERVILLE MUNICIPAL CENTER
5          400 South Eagle Street
6          Naperville, Illinois 60540
7          (630) 420-6111
8
9
10
11     Pursuant to notice before Paula M. Quetsch, a
12   Certified Shorthand Reporter, Registered
13   Professional Reporter, and a Notary Public in and
14   for the State of Illinois.
```

**Page 3**

```
1              A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFF:
3        TARA THOMPSON, ESQUIRE
4        MARIAH GARCIA, ESQUIRE
5        LOEVY & LOEVY
6        311 North Aberdeen Street
7        Third Floor
8        Chicago, Illinois 60607
9        (312) 243-5900
10
11   ON BEHALF OF THE DEFENDANTS:
12       JOSEPH POLICK, ESQUIRE
13       THE SOTOS LAW FIRM
14       550 East Devon Avenue
15       Suite 150
16       Itasca, Illinois 60143
17       (630) 735-3300
18
19   ALSO PRESENT:
20       WILLIAM AMOR
21       MARVIN OLTMAN, Videographer
22
23
24
```

**Page 4**

```
1              C O N T E N T S
2    EXAMINATION OF DAVID FERRERI          PAGE
3        By Ms. Thompson                     6
4        By Mr. Polick                      191
5        By Ms. Thompson                    201
6
7              E X H I B I T S
8          (Attached to transcript.)
9
10   FERRERI DEPOSITION EXHIBITS           PAGE
11
12   Exhibit 1  Curriculum Vitae            13
13   Exhibit 2  DEFS 10912                  55
14   Exhibit 3  DEFS 5332 through 5334      97
15   Exhibit 4  PL. AMOR 1876, 1877 and 1878  105
16   Exhibit 5  KC 4 through KC 13         121
17   Exhibit 6  PL. AMOR 17386 and 17387   128
18   Exhibit 7  PL. AMOR 9401              150
19   Exhibit 8  Fire Investigation Closure  153
20            Report
21   Exhibit 9  PL. AMOR 17378 through 17384  162
22   Exhibit 10 Coroner's Inquest          186
23   Exhibit 11 DEFS 5403 through 5408     184
24
```

Transcript of David Ferreri
Conducted on September 11, 2020

**Page 5**

1      P R O C E E D I N G S
2      THE VIDEOGRAPHER: Here begins Tape No. 1 in
3 the videotaped deposition of David Ferreri in the
4 matter of William Amor v. Officer Michael Cross,
5 et al., in the United States District Court for
6 the Northern District of Illinois. The case
7 number is 18-CV-2523.
8      Today's date is September 11th, 2020. The
9 time is now 10:08 a.m. My name is Marvin Oltman,
10 the legal videographer representing Planet Depos.
11 This video deposition is being taken at 400 South
12 Eagle Street, Naperville, Illinois 60540.
13      Will counsel please identify themselves
14 and state who they represent starting with the
15 noticing party.
16      MS. THOMPSON: Good morning. My name is
17 Tara Thompson and I represent the plaintiff,
18 William Amor, and Mr. Amor is also present.
19      MR. POLICK: Good morning. My name is
20 Joseph Polick, P-o-l-i-c-k. I represent the
21 defendants and also the witness, David Ferreri.
22      THE WITNESS: Good morning. My name is
23 David Ferreri. I'm the witness that's been
24 called here.

**Page 6**

1      THE VIDEOGRAPHER: May I get the people on
2 the phone?
3      MS. THOMPSON: Mariah Garcia, who is also
4 representing plaintiff is observing over Zoom.
5      THE VIDEOGRAPHER: Thank you.
6      The court reporter is Pam Quetsch, who is
7 also representing Planet Depos. Will the court
8 reporter please swear in the witness.
9      (Witness sworn.)
10      DAVID FERRERI,
11 having been duly sworn, testified as follows:
12      EXAMINATION BY COUNSEL FOR THE PLAINTIFF
13 BY MS. THOMPSON:
14      Q For starters, good morning, Mr. Ferreri.
**15**      **A Can I make a request about the mask?**
16      MS. THOMPSON: Yeah, we're going to start
17 there. The witness has asked me to examine him
18 without my mask, so I'm going to remove that, and
19 I appreciate you making that request because we
20 want to make sure that you can hear everybody
21 here, so I'll take that off.
22      THE WITNESS: Okay. Would you like me to
23 do the same?
24      MS. THOMPSON: I want to do what you feel

**Page 7**

1 comfortable with so, that's your decision.
2      THE WITNESS: I would prefer not to wear it.
3      Q All right. The second matter, am I saying
4 your name correctly, sir?
**5**      **A Ferreri.**
6      Q Ferreri. Thank you. And how would you
7 prefer that I refer to you as Mr. Ferreri,
8 Lieutenant Ferreri, what is the --
**9**      **A Mr. Ferreri is fine.**
10      Q Mr. Ferreri, have you given a deposition
11 before?
**12**      **A I have.**
13      Q All right. Just a couple of ground rules
14 which you probably already know then. The first
15 is, we're obviously here taking this deposition in
16 circumstances that might be different than how
17 depositions have been done in the past because
18 we're distancing in this room because we're living
19 with COVID currently. So if at any time there's
20 anything I ask you that you can't hear or that you
21 don't understand, please let me know. Otherwise,
22 I'm going to assume that you understood the
23 question. Okay?
**24**      **A Okay.**

**Page 8**

1      Q There is a court reporter here that's
2 writing down everything you say, and we do have a
3 videographer, but because the court reporter's
4 record is important and we want to get it right,
5 it's important for you to give verbal answers. If
6 your answer to something is to shrug your shoulders,
7 or shake your head, or say uh-huh or huh-uh, she
8 may not be able to accurately type that down. So
9 I'd ask you to give responses that the court
10 reporter will be able to put into her transcript.
11 Okay?
**12**      **A Okay.**
13      Q If at any time you need to take a break,
14 obviously, that's fine. I would just ask that if
15 there's any questions pending that you answer that
16 question before you take a break. Okay?
**17**      **A Okay.**
18      Q Is there any reason that you would be
19 unable to give true and accurate testimony here
20 this morning?
**21**      **A No.**
22      Q And I'm asking this in general because, you
23 know, we're here in a time where there are many
24 people in the United States that are not feeling

Transcript of David Ferreri

3 (9 to 12)

Conducted on September 11, 2020

9

1  well.  Are you feeling well this morning, sir?
2     A  I am.
3        MR. POLICK:  Tara, if I could just inject
4  for the record, and I don't mean to interrupt, but
5  I just want to put on the record that the parties
6  did discuss the protocol for this deposition in
7  advance of the deposition to make sure that we
8  were complying with as many safety protocols as we
9  could given the COVID situation.  I don't expect
10 that there's going to be any issues that arise
11 here today.  We are using masks for those people
12 that feel comfortable with them.  My client has
13 indicated he has some trouble hearing; he's asked
14 you to remove your mask so that he can hear you
15 clearly and see the questions that are being asked
16 of him.  He has done the same.
17       I don't think there's going to be any
18 further issues here today as far as COVID safety,
19 but if they do arise, we have no objection to
20 addressing those if they do arise during the
21 course of the deposition.
22       Sorry about that; I didn't mean to
23 interrupt you.
24       MS. THOMPSON:  No, thank you for adding

10

1  that.  And I would just add, as well, that if at
2  any time, sir, there's anything that occurs here
3  that makes you feel uncomfortable or concerned for
4  your health or your safety, please speak up so
5  that we can address it.
6        THE WITNESS:  Okay.
7        THE VIDEOGRAPHER:  Tara, can we go off the
8  record just for a quick second?
9        MS. THOMPSON:  Sure.
10       THE VIDEOGRAPHER:  We're going off the
11 record at 10:13 a.m.
12       (Recess taken, 10:13 a.m. to 10:14 a.m.)
13       THE VIDEOGRAPHER:  We are now going back
14 on the record at 10:14 a.m.
15 BY MS. THOMPSON:
16    Q  Mr. Ferreri, did you review any documents
17 in preparation for your deposition?
18    A  I did.
19    Q  What did you review?
20    A  I reviewed my reports, my notes, the
21 transcript of my testimony, the transcript of my
22 testimony at the coroner's inquest.
23    Q  Did you review any reports or notes for
24 this deposition that were not authored by you?

11

1     A  Yes, I did.
2     Q  Do you remember what in terms of reports or
3  notes you reviewed that were not authored by you?
4     A  I reviewed some documents from my attorney.
5     Q  Am I right that part of the reports or
6  notes that you reviewed for this deposition were
7  police reports that were authored by someone else
8  besides you?
9     A  That is correct.
10    Q  Who were the authors or author of any
11 reports you reviewed for this deposition other
12 than yourself?
13    A  The only thing I reviewed was -- was not
14 authored.  It was a transcript.
15    Q  And what was that?
16    A  I saw the transcript of Mr. Amor's
17 confession and a transcript of the 911 call made
18 by the victim.
19    Q  Any other transcripts that you reviewed
20 other than those you've already told me about?
21    A  No.
22    Q  I don't want to have you discuss any of
23 the content of any conversations you had with
24 counsel potentially in preparing for this

12

1  deposition, but did you meet with your attorney to
2  prepare for this deposition?
3     A  I did.
4     Q  How many times?
5     A  Two times.
6     Q  When was the first time?
7     A  Wednesday.
8     Q  How long did you meet for?
9     A  Five hours.
10    Q  And who was present besides yourself?
11    A  Just he and I.
12    Q  That's the gentleman that's here with you
13 today?
14    A  Yes, Mr. Polick.
15    Q  And when was the first time that you met?
16    A  That was the first time.
17    Q  I'm sorry; when is the second time that
18 you met?
19    A  Yesterday.
20    Q  And how long did you meet for?
21    A  Six hours.
22    Q  And who was present?
23    A  Just Mr. Polick and myself.
24    Q  Have you had any other conversations with

Transcript of David Ferreri
Conducted on September 11, 2020

4 (13 to 16)

13

1  counsel that weren't in person to prepare for this
2  deposition?
3      **A  We spoke on the phone a couple of times**
4  **trying to determine when we would get together and**
5  **the date of this deposition.**
6      Q  Mr. Ferreri, are you currently employed?
7      **A  I am not.**
8      Q  Are you retired from the Naperville Fire
9  Department?
10     **A  Yes, I am.**
11     Q  When did you retire from the Naperville
12  Fire Department?
13     **A  October 2013.**
14     Q  Have you had any employment since that
15  retirement?
16     **A  No, I have not.**
17        MS. THOMPSON:  Can you mark this?
18        (Ferreri Deposition Exhibit 1 marked for
19  identification and attached to the transcript.)
20        MS. THOMPSON:  The witness has been shown
21  what's been marked as Ferreri 1.  That is a two-page
22  document which has a Bates stamp of DEFS5323 and
23  DEFS5324.
24     Q  I'm just going to ask you for starters,

14

1  sir, if you recognize this document.
2      **A  Yes, I do.**
3      Q  Is this a copy of your CV, sir?
4      **A  Yes.**
5      Q  Did you prepare this CV?
6      **A  I did.**
7      Q  And I will -- I will represent to you that
8  there was a copy of a substantially similar CV as
9  Ferreri Exhibit 1 that was produced in discovery
10  in Mr. Amor's criminal case.  So based on that
11  fact, it's my assumption that this is a CV that
12  you prepared sometime back in the mid-'90s.  Is
13  that correct?
14     **A  That would be correct.**
15     Q  All right.  Is there anything on this CV that
16  is incorrect?
17     **A  No.**
18     Q  I see some handwritten numbers on the
19  left-hand side of the first page of Ferreri 1,
20  DEFS5323.  Are those numbers in your handwriting?
21     **A  They are.**
22     Q  Do those numbers reflect the number of hours
23  of various training courses or training seminars
24  that you took over the course of your career?

15

1      **A  I believe they do.**
2      Q  Do those numbers look right to you in terms
3  of the number of hours of those various trainings
4  that are indicated on your -- on your CV?
5      **A  Yes.**
6      Q  If you look at the back page of this CV,
7  sir, this indicates that you became a paid-on-call
8  firefighter for the Naperville Fire Department in
9  1976.  Is that correct?
10     **A  Yes, it is.**
11     Q  Did you have any firefighting experience
12  before you joined the Naperville Fire Department?
13     **A  No, I did not.**
14     Q  Did you become a paramedic in addition to
15  a firefighter in the Naperville -- in the city of
16  Naperville in 1978?
17     **A  Yes, I did.**
18     Q  And did you serve in that capacity
19  until 1990?
20     **A  I believe my paramedic certification**
21  **lapsed about that time, yes.**
22     Q  So for that time period between 1978 and
23  1990, were there certain shifts where you were
24  working as a paramedic as opposed to a firefighter,

16

1  or is -- do those years reflect time that you had
2  this paramedic certification that you just described?
3      **A  In 1978 I became a full-time employee of**
4  **the fire department and began working a fire**
5  **department shift, which is 24 hours on duty and**
6  **48 hours off duty.  During the shift I would work**
7  **as a paramedic or a firefighter depending on the**
8  **officer of the day and what vehicle I was**
9  **assigned to.**
10     Q  In 1990 did you become a lieutenant?
11     **A  Yes, I did.**
12     Q  All right.  And this indicates that --
13  your résumé indicates that you were an officer of
14  Fire/Rescue Company, and I think that says 3 but I
15  can't read it.  Am I right?
16     **A  Correct.**
17     Q  Okay.  Did you work consistently with
18  Rescue Company 3 between 1990 and whatever date on
19  which you completed this CV?
20     **A  Not necessarily.  The Company 3 refers to**
21  **the station I was working at at the time, but I**
22  **did change stations over the years.  I would be**
23  **reassigned to another station in town.**
24     Q  This CV, Exhibit 1, also indicates that in

Transcript of David Ferreri

5 (17 to 20)

Conducted on September 11, 2020

17

1  1990 you became the Naperville fire investigation
2  team coordinator.  Is that correct?
3      A  That is correct.
4      Q  And you became a member of the fire
5  investigation team in 1986?
6      A  That is correct.
7      Q  Did your job duties with the fire department
8  change then in 1986 when you became a fire
9  investigation team member?
10     A  No.  Fire investigation team work was
11 adjunct to my normal shift work.
12     Q  Can you explain what you mean by it being --
13     A  I would work --
14     Q  -- adjunct?
15     A  I would work my normal shift and my off-duty
16 hours would be doing our investigative team work.
17        MR. POLICK:  Dave, just so we're clear
18 here.  The court reporter can only take down one
19 person at a time, and you may anticipate
20 Ms. Thompson's questions, but please let her
21 finish and go ahead and speak.  It will make it
22 easier on the court reporter.  Okay?
23        THE WITNESS:  Okay.  Thank you.
24     Q  When you started with the Naperville fire

18

1  investigation team in 1986, what -- what did that
2  team do?
3      A  The team -- the fire department team then
4  was utilized to determine the origin and cause of
5  fires that occurred in town.
6      Q  And am I right that prior becoming the
7  team coordinator that that's something you did,
8  you said in your off-duty hours?
9      A  That is correct.
10     Q  Were you paid for the time you spent with
11 the team before you became the coordinator?
12     A  Yes.  If it was off-duty work, we were
13 paid overtime.
14     Q  Okay.  How much professional time did you
15 spend with the fire investigation team prior to
16 becoming the coordinator?  And maybe let me ask you
17 that in terms of how much time per week you spent on
18 fire investigation team matters as a team member.
19     A  There was really no set time per week.  I
20 attended training and seminars to learn how to do
21 it, and then the actual work was determined by
22 when fires occurred.
23     Q  So as a team member, what were your job
24 responsibilities in terms of investigating fires?

19

1      A  There were several members on the team,
2  and we were given a schedule of when we would be
3  available for callout during our off-duty hours.
4  So if I was on call, as we called it, for a
5  weekend, I made sure I would be available all
6  weekend if I was needed.  I might have been
7  needed; I might not have been.  It depends when
8  the fires occurred.
9      Q  So as a team member, talking about your
10 responsibilities as a team member before you
11 became the team coordinator, if there was a fire
12 and you were on call, would you then be
13 essentially paged to come to the scene?
14     A  Yes.
15     Q  And what would your job responsibilities
16 be once you got to the scene?
17     A  To determine the origin and cause of
18 the fire.
19     Q  Who was the coordinator of the fire
20 investigation team before you took that
21 responsibility on in 1990?  And I'm asking for the
22 time period you worked as a team member.
23     A  I believe it was Lieutenant William Kurt.
24     Q  As a team member, what kinds of tasks did

20

1  you perform in order to determine the cause and
2  origin of the fires to which you were assigned?
3        MR. POLICK:  Objection to the form.
4        You can answer.
5      A  It was a physical examination of the fire
6  scene after the fire was extinguished.
7      Q  And as a team member, when you were paged
8  to go to the scene of a fire, would you be the
9  only fire investigation team member assigned, or
10 would multiple people from the team be assigned to
11 investigate a particular fire?
12     A  That would have been determined by the
13 size of the fire.  A very small, minor fire may
14 have required just one team member.  A larger fire
15 may have required two or three.
16     Q  Can you give me an example of the kind of
17 fire that would require the assignment of more
18 than one person?
19     A  A fire that was beyond one object
20 potentially.  Circumstances dictated it.  And by
21 that I mean, what was the structure?  Was it
22 residential?  Was it an office building?  Was it a
23 business?  And the physical size of the fire scene
24 also determined how many people we would need.

Transcript of David Ferreri
Conducted on September 11, 2020

6 (21 to 24)

---

**21**

1    Q So if someone has a cooking accident and
2 scorches their kitchen wall, that's a one-person
3 job?
4    **A Potentially, yes.**
5    Q What about a fire with serious injuries or
6 fatalities?
7    **A That most likely would require several**
8 **members of the team.**
9    Q Did you choose to become a member of the
10 fire investigation team?
11    **A Yes.**
12    Q Was that something you had to apply for?
13    **A No. You needed to express interest, and**
14 **when a position became available, the team member --**
15 **the team leader at the time would make a choice on**
16 **who would fill that spot.**
17    Q Was the fire investigation team during the
18 time that you worked on it composed entirely of
19 members of the fire department?
20    **A No.**
21    Q Were -- who else -- or from what other
22 agencies or departments did people -- did people
23 work at that composed parts of that team besides
24 the fire department?

**22**

1    **A The Naperville Police Department.**
2    Q As a team member, what members of the --
3 let me start that question again.
4      When you were just a member of the fire
5 investigation team, what members of the police
6 department worked on the team with you?
7    **A Are you referring to individual names?**
8    Q Yes.
9    **A I'm not sure I remember.**
10    Q What about when you became team coordinator?
11    **A I remember some. But those -- those people**
12 **changed.**
13    Q And your CV here, going back to Exhibit 1,
14 you have in parentheses below the team coordinator
15 line "(Over 70 fire investigations conducted, most
16 as lead investigator.)" Does that refer to 70 fire
17 investigations as both a team member and a team
18 coordinator up to whatever point this CV was
19 authored?
20    **A Yes, it does.**
21    Q Do you know how many -- well, let me ask
22 you this. You understand that you're here for
23 your deposition today relating to a fire that
24 occurred in September of 1995; is that right?

---

**23**

1    **A Yes.**
2    Q How many fire investigations had you
3 conducted as team coordinator from 1990 up through
4 September of 1995?
5    **A I don't recall exactly.**
6    Q How many fire investigations did you conduct
7 as a -- well, let me ask you this. So for that
8 70 number on your CV, do you know roughly how many
9 of those would have been as a team member versus
10 as a team coordinator? I know you say most here
11 but --
12    **A I do not remember.**
13    Q The fire that is at issue in this case
14 concerns a fire in which a woman named Marianne
15 Miceli died. Is that your understanding?
16    **A Yes.**
17    Q Do you have an independent memory of your
18 work on that particular fire?
19    **A Some, yes.**
20    Q Was your memory refreshed by the documents
21 and the testimony that you read in preparation for
22 this deposition?
23    **A Yes, it was.**
24    Q Are -- is your testimony today relying at

**24**

1 least in part on the information that you reviewed
2 and the records that you looked at for this
3 deposition?
4    **A Yes.**
5    Q What were your -- well, let me ask you
6 this. What were the job responsibilities of the
7 team coordinator during the time that you had that
8 position that differed from the responsibilities
9 of just team members?
10    **A I was responsible of maintaining a proper**
11 **number of members on the team. I was responsible**
12 **for training for the team members, and I was the**
13 **liaison with the police department portion of the**
14 **team.**
15    Q And what were your responsibilities
16 specifically as the liaison?
17    **A Communication.**
18    Q As the team coordinator, did you go to the
19 scene of more complex or more serious fires that
20 the team was investigating?
21    **A I was a team member, as well, so I was**
22 **also on the on core call schedule. So I had**
23 **certain days assigned that I was available or that**
24 **I was responsible to respond to if needed.**

---

Transcript of David Ferreri
Conducted on September 11, 2020

25

1    Q  We talked about one person from the team
2  responding as opposed to multiple people
3  responding depending on the circumstances of the
4  fire.  Who made the decision how many team members
5  needed to respond to the scene of a particular
6  fire during the time that you were coordinator?
7    **A  The first member that arrived at the scene.**
8    Q  Who made the decision of, you know, who to
9  contact first in terms of the team to go to the
10  scene?  Was that something that was scheduled?
11    **A  I don't understand the question.**
12    Q  Sure.  Well, am I right that for particular
13  shifts for the investigation team that there could
14  be more than one person on call?
15    **A  Correct.**
16    Q  So if there was a particular fire, how was
17  it determined who of those people that were on
18  call would be the first person to be contacted to
19  go to the scene?
20    **A  It would be -- there were typically**
21  **two people on call for each day, and it was**
22  **between them to make sure at least one of them was**
23  **available.**
24    Q  Whose responsibility was it to actually

26

1  page the fire investigation team person to come to
2  the scene of a fire?
3    **A  A request from the on-duty officer for a**
4  **fire investigator would be made to the 911 dispatch**
5  **office, and they would page out the on-call**
6  **investigators.**
7    Q  After -- as we just talked about, this
8  résumé is only current up to whatever time it was
9  authored, which I think we agree looks like the
10  mid-'90s.  Correct?
11    **A  Correct.**
12    Q  Did you have additional positions or
13  things that you would put in this experience
14  section of your CV for your career with the fire
15  department after this CV was authored?
16    **A  Yes.**
17    Q  What -- can you tell me what else you
18  would put in the experience category?
19    **A  I became a team member of the DuPage**
20  **County Fire Investigation Task Force.**
21    Q  When did you join that task force?
22    **A  On its inception, but I don't remember the**
23  **year.**
24    Q  Can you give me any rough estimate?

27

1    **A  The late '90s.**
2    Q  How long did you serve on that task force?
3    **A  I believe six years.**
4    Q  Is there a reason you left the task force?
5    **A  Personal reasons.**
6    Q  Were those reasons unrelated to the
7  performance of your job?
8    **A  They were.**
9    Q  Anything else you'd put in the experience
10  section of your CV for your time with the
11  Naperville Fire Department?
12    **A  No.**
13    Q  Did you continue to serve as part of the
14  Naperville investigations team during the time you
15  were on the task force?
16    **A  I did.**
17    Q  And when you left the task force, did you
18  go back to working on the fire investigations team?
19    **A  I was part of -- I was the coordinator for**
20  **the Naperville fire investigation team continually**
21  **until 2010.**
22    Q  Okay.  And as the -- as a team member and
23  team coordinator for the fire investigation team,
24  did you continue during that time to also work

28

1  other shifts just as a lieutenant responding to
2  fire calls not in an investigative capacity?
3    **A  Could you repeat that, please?**
4    Q  Sure.  I think you were telling me earlier
5  that some of the fire investigations work that you
6  did was off-duty from your other fire department
7  responsibilities.  Correct?
8    **A  Correct.**
9    Q  Was it true the entire time you were with
10  the fire investigations team even as team
11  coordinator that you also continued to work as a
12  fire lieutenant responding to fire calls not in an
13  investigative capacity?
14    **A  Yes.**
15    Q  There's some handwriting on the top of the
16  second page of Ferreri 1 that says "Have witnessed
17  hundreds of fire scenes."  Do you see that?
18    **A  Yes.**
19    Q  Is that your handwriting?
20    **A  It is.**
21    Q  And do you know, first of all, why you
22  wrote that on this copy your CV?
23    **A  I do not.**
24    Q  I take it was true at the time you

Transcript of David Ferreri
Conducted on September 11, 2020

8 (29 to 32)

---

29

1  wrote it.
2  **A  I -- I would believe it was.**
3  Q  And when you were giving that number
4  "hundreds of fire scenes," were you referencing
5  both fire scenes as an investigator and fire
6  scenes as a responding firefighter?
7  **A  Yes.**
8  Q  As the team coordinator for the fire
9  investigations team, were you the one coordinator,
10  or was that a position that other people held at
11  the same time as you?
12  **A  It was just me.**
13  Q  And how many members of the fire
14  investigation team were there in September of 1995?
15  **A  I don't recall exactly.**
16  Q  In general, during your time as team
17  coordinator in the mid-'90s, how many members were
18  there?
19  **A  Eight.  That's an estimate.**
20  Q  I want to ask you a little bit about your
21  training, as well, so maybe have you turn to the
22  first page of Ferreri Exhibit 1.
23  As of -- as of the end of the calendar
24  year 1995, is there any training you had related

---

30

1  to fire investigation that is not listed in this
2  training section of your CV here in Exhibit 1?
3  **A  Yes.**
4  Q  Can you tell me what's not in here?
5  **A  Fire investigation training in my career**
6  **was ongoing.  I went to seminars constantly**
7  **whenever they were available, and I also attained**
8  **my International Association of Fire Investigation**
9  **certification, which is based on experience and**
10  **years of knowledge.**
11  Q  When did you get that -- the International
12  Association certification?
13  **A  I don't recall exactly.  The late '90s**
14  **would be my estimate.**
15  Q  Was it after December of 1995?
16  **A  Yes, it was.**
17  Q  Okay.  This CV then looks like it's got
18  training on it up to at least some point in 1996.
19  Do you agree?  The first thing on here is a
20  conference from '96?
21  **A  Yes.**
22  Q  Is there any training that you had before
23  that Midwest Fire and Rescue conference with
24  respect to fire investigation that is not included

---

31

1  on Exhibit 1?
2  **A  On this résumé the most current is at the**
3  **top, and the oldest is at the bottom of that list.**
4  Q  So my question is, is anything missing from
5  before '96 that's not on this CV but that you did?
6  **A  I couldn't be sure but I don't believe so.**
7  Q  In your training on fire investigation,
8  did you ever receive any training on something
9  called NFPA 921?
10  **A  Yes.**
11  Q  Are you familiar with what I mean by that?
12  **A  Yes.**
13  Q  Can you tell me your understanding of what
14  NFPA 921 is.
15  **A  It's a document that was produced by the**
16  **National Fire Protection Agency, and it -- first**
17  **published in the early '90s, and it became kind of**
18  **a standard and a guideline for fire investigation.**
19  Q  What is your understanding of when it
20  became a guideline for fire investigations?
21  **A  The first edition was in 1992.**
22  Q  Did any of the training that you have
23  that's reflected on Ferreri Exhibit 1 cover the
24  guidelines in NFPA 921?

---

32

1  **A  That document or that text was utilized in**
2  **various training sessions.**
3  Q  And when you say that, do you mean training
4  that you attended?
5  **A  That I attended.**
6  Q  Can you tell me just looking at this list
7  of training in Ferreri Exhibit 1 which, if any of
8  these trainings covered NFPA 921?
9  **A  No, I could not.**
10  Q  What is MABAS here on your training?  It's
11  about midway through the list.
12  **A  It's an acronym for Mutual Aid Box Alarm**
13  **System.**
14  Q  And do you remember in general terms what
15  you covered in that MABAS advanced origin and
16  cause seminar from 1982?
17  **A  That would be various topics.**
18  Q  Did you -- was there any discussion or
19  training on NFPA 921 seminar?
20  **A  It may have been utilized by the**
21  **instructor, yes.**
22  Q  What about at the Northern Illinois Arson
23  seminar from '92?
24  **A  I don't remember specifically.**

---

**33**

1    Q  What about the Kinesic Interview and
2  Interrogation seminar from '93?
3    **A  I don't remember.**
4    Q  Did you cover interviewing and
5  interrogation techniques at that seminar?
6    **A  Yes.**
7    Q  Was interviewing and interrogation part of
8  your job responsibilities with the fire
9  investigation team?
10   **A  It would be, yes.**
11   Q  Prior to September of 1995, as a member of
12  the fire investigation team had you ever
13  interviewed someone that you considered to be a
14  suspect in the setting of a fire that you were
15  investigating?
16   **A  Yes.**
17   Q  How many of those kinds of interviews had
18  you conducted before September of 1995?
19   **A  I don't recall exactly.**
20   Q  In -- well, let me ask you this.  As you
21  sit here today, do you consider NFPA 921 to be an
22  authoritative source on methodology for
23  investigating fires?
24   **A  Yes.**

**34**

1    Q  Has there been any point in your career
2  since 921 was published that you did not consider
3  it to be an authoritative source for fire
4  investigation?
5    **A  I don't believe so.**
6    Q  As a fire investigator, did you use
7  NFPA 921 to guide your investigation of fires?
8    **A  As a guideline, yes.**
9    Q  And can you tell me what you mean by that?
10   **A  As it states in its name, it's a**
11  **guideline.  It was meant to standardize the method**
12  **of investigating a fire, but they weren't --**
13  **things in that document were not mandated; they**
14  **were guidelines.**
15   Q  And I just want to understand based on
16  what you just told us what for you is the
17  difference between a guideline and a mandate as
18  you've just differentiated the two.
19   **A  I think a mandate is "thou shall," and a**
20  **guideline is "this is what you might want to think**
21  **about" in so many words.**
22   Q  As part of your preparation for this
23  deposition, did you review a report by someone
24  from the ATF named John Golder?

**35**

1    **A  I did not.**
2    Q  Have you ever seen a report by the ATF about
3  the fire that killed Marianne Miceli?
4    **A  I have not.**
5    Q  Has anyone ever -- and I'm not including
6  any conversations with counsel for this question.
7  So has anyone other than your attorney ever
8  discussed with you the opinions of the ATF with
9  respect to the fire that killed Marianne Miceli?
10   **A  No.**
11   Q  Have you ever been told -- and, again, I'm
12  excluding any communications with your attorney
13  from this question.  Has anyone ever told you,
14  other than your lawyer, that someone from the ATF
15  disagreed with your assessment of the location of
16  origin of the fire that killed Marianne Miceli?
17      MR. POLICK:  Object to the form.
18      You can answer.
19   **A  No.**
20   Q  Would that surprise you to learn?
21   **A  No.**
22   Q  Why not?
23   **A  People have opinions.**
24   Q  I mean, I take it from what you're saying

**36**

1  that learning that would not change your personal
2  opinion about the conclusions you reached in
3  this case.
4    **A  No.**
5    Q  Do you consider the ATF to be a -- an
6  investigating agency whose opinions as to the
7  cause and origin of fires you respect?
8    **A  Yes.**
9    Q  Have you had any training in your career
10  about how ventilation and ventilation effects
11  could impact the way that a fire behaves?
12   **A  Yes.**
13   Q  Had you had training about ventilation and
14  ventilation effects prior to September of 1995?
15   **A  Yes.**
16   Q  I have a number of questions for you about
17  the fire at issue in this case, and I don't want
18  to keep using all these words to describe that
19  fire.  So can we agree that when I'm asking you
20  questions about the fire that we're talking about
21  the fire that killed Marianne Miceli?
22   **A  Agreed.**
23   Q  Okay.  Thank you.
24      That is a fire to which you were assigned;

Transcript of David Ferreri
Conducted on September 11, 2020

---

37

1  correct?

2  **A  Correct.**

3  Q  Were you in charge of the fire

4  investigation team's investigation of that fire?

5  **A  I was in charge of the fire department**

6  **members' portion of that, yes.**

7  Q  And can you tell me what you mean by the

8  fire investigation -- excuse me -- "the fire

9  department members' portion of that investigation"?

10  **A  The Naperville fire investigation team was**

11  **comprised of firefighters and police officers or**

12  **detectives.  We each had our role.  It is one team**

13  **but the fire department was responsible for the**

14  **origin and cause and the physical scene**

15  **examination, and if required, the police**

16  **department members were in charge of any follow-up**

17  **of a criminal nature or -- and any other**

18  **information that needed follow-up on.**

19  Q  Am I right that with respect to the fire

20  in this case, you worked together with members of

21  the police department in conducting an

22  investigation of this fire even though you had

23  different purposes as you just --

24  **A  Yes.**

---

38

1  Q  -- described?  Okay.

2       Who from the Naperville Police Department

3  were the police members of the fire investigation

4  team that worked on the investigation?

5  **A  Detective Mike Cross was a team member.**

6  **There were other team members that assisted, but I**

7  **don't recall specifically who they were.**

8  Q  What about Robert Guerrieri?  Was he a

9  member of the fire investigation team at this time?

10  **A  No, he was not.**

11  Q  Did you have an understanding of who on

12  the police department side was leading the police

13  investigation of this fire?

14  **A  It would have been Detective Mike Cross.**

15  Q  Do you know when he became a member of the

16  fire investigation team?

17  **A  I do not.**

18  Q  Had you worked on any fire investigations

19  with Mike Cross before the investigation of this

20  fire?

21  **A  Yes.**

22  Q  How many?

23  **A  I don't remember.**

24  Q  More than five?

---

39

1  **A  Yes.**

2  Q  More than 20?

3  **A  Don't know that I remember that.**

4  Q  In general, over the course of your career

5  with the Naperville Fire Department, how common

6  was it in Naperville to have a fire that resulted

7  in a fatality?

8  **A  It was not common.**

9  Q  Is this something that happened less than

10  once a month?

11  **A  It happened less than once a year.**

12  Q  And that was true for 1995?

13  **A  Correct.**

14  Q  Is it fair to say that fire investigations

15  where there was a fatality would be of extreme

16  importance to the fire department during the time

17  you were on the fire investigation team?

18  **A  Yes.**

19  Q  And was that true from your experience for

20  police members of the fire investigation team, as

21  well, that these fires with fatalities would be of

22  extreme importance?

23  **A  Yes.**

24  Q  Did you know Marianne Miceli before she

---

40

1  passed?

2  **A  I didn't know her.  I knew of her.**

3  Q  How did you know of her?

4  **A  I grew up in Naperville and so did she.**

5  **And I knew of her.**

6  Q  Did you have -- well, how did you know of

7  her?  Did you have mutual friends or some

8  connections?

9  **A  I would see her in town.  She had a**

10  **significant limp from a previous injury, I**

11  **believe, and I just noticed.  And Naperville**

12  **wasn't that big when we grew up.**

13  Q  When you say that you would see her in

14  town, before you became involved in this fire

15  investigation, would you be able to see her and

16  say, "That's Marianne Miceli" or see her and say,

17  "That's a lady I recognize whose name I don't know"?

18  **A  That's a lady I recognize whose name I**

19  **don't know.**

20  Q  Just as an aside to -- while we're talking

21  about this, have you ever been associated with

22  St. Elizabeth rectory?

23  **A  St. Elizabeth Seton Church?**

24  Q  Sure.  Let me ask you about that.  Have

---

Transcript of David Ferreri

11 (41 to 44)

Conducted on September 11, 2020

41

1 you been associated with that church?
2    **A Yes.**
3    Q Were you a lay staff member there?
4    **A I worked there part time as an assistant --**
5 **that was my parish. I went to church there. My**
6 **mother-in-law at the time was a business manager,**
7 **and they needed somebody to coordinate maintenance**
8 **work and other -- other things with the church.**
9    Q Were you essentially volunteering there to
10 help the church?
11    **A No, I was paid.**
12    Q Okay. How many hours a week did you work
13 there let's say in '97?
14    **A 10.**
15    Q Do you recall being contacted by someone
16 in connection with a presentence investigation for
17 Mr. Amor with respect to -- I'm not going to get
18 the name right -- but St. Elizabeth Church?
19    **A Can you repeat that?**
20    Q Sure. Do you recall being contacted by
21 someone in connection with a presentence
22 investigation for Mr. Amor relating to the church
23 we've been discussing?
24    **A No.**

42

1    Q So we've been talking about this -- about
2 the fire investigation team and the different
3 responsibilities of the police department versus
4 the fire department with respect to the
5 investigation team, and I want to ask you some
6 additional questions about that topic.
7      You said that the fire department's
8 responsibility was to determine origin and cause
9 and to investigate the physical scene; is that
10 correct?
11    **A That is correct.**
12    Q All right. Did the police members of the
13 team participate in any of those aspects of the
14 investigation team's work?
15    **A They would assist from time to time.**
16    Q And how would it be determined for a
17 particular fire whether they would assist during
18 the time that you were team coordinator?
19    **A It had likelihood to do with whether they**
20 **were available and whether they wanted to come**
21 **out. And by that -- by -- come to the scene.**
22    Q You talked then about the police
23 department's role being -- and I think the term
24 that you used was follow-up a criminal nature. Is

43

1 that right?
2    **A Correct.**
3    Q When you use the word "follow-up," can you
4 tell me what you mean by that word specifically?
5    **A Any further investigation work that wasn't**
6 **physical scene investigation. If it had to do**
7 **with criminal activity, if it had to do with**
8 **financial records, telephone records, things of**
9 **that sort, that was their responsibility.**
10    Q Am I right that for -- for fires where
11 there was some immediate question as to whether a
12 fire was intentional or not that there might be
13 investigation going on simultaneously where people
14 are doing some things in an investigation and fire
15 are doing other things related to origin and cause
16 and the scene potentially?
17    **A Yes.**
18    Q And so for periods of time where there's
19 simultaneous investigation going on, within the
20 fire investigation team would fire department
21 members share with police department members what
22 was going on in the fire department side of the
23 investigation?
24    **A Yes.**

44

1    Q And would police share with fire what was
2 going on with their investigation?
3    **A Yes.**
4    Q Can you think of any situation where fire
5 department investigators would deliberately hold
6 back something from the police department
7 investigators that they had learned in their part
8 of the investigation?
9    **A No.**
10    Q I mean, for every -- am I right that for
11 every single fire investigation you were involved
12 in there would be an effort to share all
13 information with everybody working on whatever
14 part of the investigation they were working on
15 within the fire investigation team?
16    **A Yes.**
17    Q Did members on the fire investigation side
18 of the fire investigation team rely on information
19 that the police members of the team gave them to
20 aid in their portion of the investigation?
21    **A Yes.**
22    Q I mean, did you personally do that in your
23 time --
24    **A Yes.**

Transcript of David Ferreri

12 (45 to 48)

Conducted on September 11, 2020

---

Page 45

1    Q  -- on the team?
2        Prior to the fire in this case, do you
3  know how many multiunit residential fires you had
4  investigated?
5        MR. POLICK:  Object to the form.
6        You can answer.
7    A  I don't remember.
8    Q  I mean, we agree that this fire took place
9  in a condo complex; correct?
10   A  Correct.
11   Q  Am I right that this is not the first time
12 you had investigated that kind of residential fire?
13   A  You would be correct.
14   Q  I wanted to go back to just one other thing
15 on Exhibit 1, if you have that in front of you.
16   A  I do.
17   Q  I'm looking at DEFS 5324.
18   A  Yes.
19   Q  Is there any other prior times that you
20 had testified either at a trial, or before a grand
21 jury, or in a deposition, or at an inquest prior
22 to your testimony at William Amor's criminal trial
23 other than what's listed here on your CV?
24   A  No.

---

Page 46

1    Q  Do you see the second one down is a
2  criminal grand jury for arson from 1989?
3    A  Yes.
4    Q  Was that a case in which there were no
5  fatalities?
6    A  That is correct.
7    Q  Do you remember what kind of fire that was?
8    A  Yes.
9    Q  Can you tell me?
10   A  It was a restaurant fire.
11   Q  And then going down to -- well, let me ask
12 you this.  The one below that, the civil trial
13 deposition that's an arson, was there no fatality
14 in that case?
15   A  Correct.
16   Q  And it looks like this top one on your CV,
17 the civil trial with a fire death, you said you
18 were testifying as a paramedic?
19   A  That is correct.
20   Q  Did you offer any testimony analyzing the
21 cause and origin or behavior of a fire in that case?
22   A  No.
23   Q  Do you remember what case this deposition
24 was from 1995?

---

Page 47

1    A  I don't recall.  No, I don't recall.
2    Q  Did you end up testifying at the trial on
3  that case?
4    A  Yes.  I'm going to qualify that as I'm --
5  that's why I listed it but I don't recall it.
6    Q  Okay.  The coroner's inquest for arson
7  murder from 1996, do you remember the name of the
8  victim in that case?
9    A  No.
10   Q  Do you remember anything about the
11 circumstances of that fire?
12   A  That was -- actually, that -- I believe
13 that this was the Marianne Miceli case.
14   Q  Okay.  Other than what's listed here, over
15 the course of your entire career -- so I'm talking
16 about the Marianne Miceli case, too -- did you
17 ever testify at a criminal trial about the cause
18 or origin of a fire?
19   A  No.
20   Q  Is William Amor's criminal case the one time
21 you've done that in criminal court?
22   A  Yes.
23   Q  Have you testified at other civil trials
24 about the cause or origin of a fire other than

---

Page 48

1  what's identified here on your CV?
2    A  No.
3    Q  We talked just a second ago about the
4  police side of the investigation team and the fire
5  side of the investigation team communicating.  In
6  your time as the team leader, how would members of
7  the fire investigation team that were working on
8  the same fire update each other about what they
9  had learned during various portions of their
10 investigation?
11   A  I'm not sure I understand the question.
12   Q  Sure.  Well, I think you agreed with me
13 that there was information sharing that went on
14 when multiple members of the fire investigation
15 team were working on an investigation.  Correct?
16   A  Correct.
17   Q  And how would that information be shared?
18   A  Phone calls, face-to-face meetings.
19   Q  Did the members of the fire investigation
20 team have particular office space that they shared
21 or meeting space that they shared?
22   A  No.
23   Q  Would the fire investigation team do --
24 well, let me ask you this.  Did members of the

---

Transcript of David Ferreri

13 (49 to 52)

Conducted on September 11, 2020

49

1 fire investigation team that were working on the
2 same investigation share copies of their reports
3 with each other?
4    A  Yes.
5    Q  And how would the reports be shared?
6    A  Physically.
7    Q  Would you hand the reports to each other
8 on occasion?
9    A  Yes.
10    Q  Would -- was there a place where you could
11 leave reports for somebody like in their box or
12 something like that?
13    A  There was a mail system, yes, for both the
14 fire and police department.
15    Q  So if you and the fire department wanted
16 to share a report with somebody in the police
17 department, could do you that through interoffice
18 mail basically?
19    A  Interoffice mail is exactly what it was, yes.
20    Q  Okay.  I take it then that you know
21 Mike Cross from working professionally with him.
22 Correct?
23    A  That's correct.
24    Q  Is he someone that you consider to be a

50

1 friend outside of your personal relationship?
2    A  Could you repeat that?
3    Q  Sure.  Is Mike Cross someone you consider
4 to be a friend outside of your professional
5 relationship?
6    A  Yes.
7    Q  Were you friends with him in December
8 of 1995?
9    A  Yes.
10    Q  What about Robert Guerrieri?  Is he
11 someone you considered to be a friend?
12    A  Yes.
13    Q  I understand that Mark Carlson has passed
14 away.  Is he someone that you considered to be a
15 friend before his passing?
16    A  Excuse me; I'm tangled up.
17       I knew Mark but not as well as I know Mike
18 and Bob.  I knew him just from being a police
19 officer.
20    Q  What about Brian Cunningham?
21    A  The same.  I got to know Brian just
22 professionally.
23    Q  When is the last time prior to today that
24 you talked to Mike Cross?

51

1    A  I don't recall.
2    Q  Have you talked to him this year?
3    A  No.
4    Q  Do you -- is he someone that you text or
5 email with?
6    A  No.  The last time I saw him was at a
7 mutual friend's father's funeral.
8    Q  When was that?
9    A  Two or three years ago.  Maybe --
10    Q  Since -- I'm sorry; go ahead.
11    A  Maybe longer; I'm sorry.  Maybe longer.
12    Q  Since the time that William Amor was
13 convicted in connection with the fire in this case,
14 have you talked with Mike Cross about anything
15 having to do with William Amor, or the Miceli
16 family, or anything having to do with this fire?
17    A  No.
18    Q  I take it that in connection with your
19 testimony at William Amor's trial that you met
20 with someone from the State's Attorney's Office to
21 help prepare your testimony.  Is that correct?
22    A  That's correct.
23    Q  When you -- well, let me ask you this.
24 How many times did you meet with someone from the

52

1 State's Attorney's Office to prepare your testimony?
2    A  I don't recall.
3    Q  Do you know who you met with?
4    A  I don't recall that, either.
5    Q  Was Mike Cross present when you met to
6 prepare your testimony?
7    A  No.
8    Q  Did you talk -- well, let me ask you this.
9 Are you aware that there was a postconviction
10 process for Mr. Amor where there were some
11 postconviction proceedings and then he was
12 ultimately granted a new trial?
13    A  I became aware of that, yes.
14    Q  All right.  Did you become aware of that
15 through any source other than your own counsel?
16 I'm not asking you to disclose any communications
17 with counsel; I'm asking if you learned about that
18 from some other source.
19    A  Yes.
20    Q  Who did you learn that from?
21    A  Ironically, Bob Guerrieri.
22    Q  How did Mr. Guerrieri tell you about that?
23    A  He served me with a subpoena.
24    Q  Was this a subpoena for a retrial for

Transcript of David Ferreri
Conducted on September 11, 2020

53

1 Mr. Amor?
2    A  Yes.
3    Q  When he served you with the subpoena,
4 what, if anything, did he tell you?
5    A  Pretty much that, that there was going to
6 be a new trial.
7    Q  Did you say anything to him?
8    A  Not too much that I recall, no.
9    Q  Do you know someone named John Ripsky?
10   A  I do.
11   Q  Is John Ripsky someone that you consider
12 to be a friend?
13   A  Yes.
14   Q  Do you know someone named Jeanne Ripsky?
15   A  I do.
16   Q  And are you friends with her through
17 John --
18   A  Yes.
19   Q  -- or know her through John?
20      Have you ever talked with John Ripsky
21 about anything having to do with William Amor or
22 this fire since Mr. Amor's conviction?
23   A  No.
24   Q  Have you talked with Jeanne Ripsky about

54

1 anything having to do with this fire or Mr. Amor
2 since Mr. Amor's conviction?
3    A  Yes.
4    Q  How many times have you talked to her?
5    A  Once.
6    Q  And when was that?
7    A  It was at a wedding we both happened to
8 be at.
9    Q  When was that wedding?
10   A  Two or three years ago.
11   Q  And what do you recall about your
12 conversation?
13   A  Just that there was going to be this trial.
14   Q  So that was before the retrial?
15   A  Yes.
16   Q  So was that after you were served but
17 before you testified?
18   A  I don't recall for sure.  I'm guessing it
19 was because I knew about it.
20   Q  Have you talked with her about anything
21 having to do -- well, let me start that question
22 again.
23      Have you talked with Jeanne Ripsky about
24 anything having to do with this fire or Mr. Amor

55

1 since you saw her at the wedding?
2    A  No.
3       (Ferreri Deposition Exhibit 2 marked for
4    identification and attached to the transcript.)
5       MS. THOMPSON:  I've shown the witness what's
6 been marked as Ferreri Exhibit 2.  This is a
7 one-page document that's Bates-stamped DEFS 10912.
8 I have a couple questions about that, but if you
9 want to just review it, sir, and let me know when
10 you've had a chance to read it.
11      THE WITNESS:  Okay.
12   Q  Did you review a copy of Exhibit 2 in
13 preparation for this deposition?
14   A  I did not.
15   Q  Okay.  So you agree with me that Exhibit 2 is
16 an email chain; is that right?
17   A  Yes.
18   Q  Okay.  So the bottom -- the bottom email
19 is from someone named Ruthi Sommers an email
20 address that's a Comcast.net email as well as some
21 others?
22   A  Yes.
23   Q  Is that your email address, the Comcast.net
24 email?

56

1    A  It is.
2    Q  And it looks like this is also to someone
3 named Scott Scheller, S-c-h-e-l-l-e-r, and Steve
4 Hinze, H-i-n-z-e.
5    A  Yes.
6    Q  Are Scott Scheller and Steve Hinze also
7 Naperville employees?
8    A  They are.
9    Q  Do you know what their positions were
10 in 2017?
11   A  Scott Scheller is the fire department fire
12 marshal, and Steve Hinze is a captain with the
13 fire department and currently the fire investigation
14 team coordinator.
15   Q  Okay.  And then Ruthi Sommers -- that's
16 R-u-t-h-i S-o-m-m-e-r-s, was she a Naperville
17 employee on May 11th of 2017?
18   A  Yes.
19   Q  What was her responsibility?
20   A  She does -- she's an administrative aide
21 with the fire department.
22   Q  So it looks like in this bottom email she
23 is sending you and these other people a link to an
24 article about this case; correct?

57

1      MR. POLICK:  Objection to the form.
2      You can answer.
3    **A  That is correct.**
4    Q  Okay.  And do you see in the email that
5  looks like it's in response to that there's an
6  email from you on May 11th of 2017 back to Ruthi
7  and Steve and Scott; correct?
8    **A  Correct.**
9    Q  And in that email you said, "Thanks, I saw
10 that."  In part that's what you responded; correct?
11   **A  Correct.**
12   Q  Did you independently see this article
13 that she sent you in this email, or is that
14 something that you read because she sent it to you?
15   **A  I read that because she sent it to me, I**
16 **believe.**
17   Q  Do you recall reading any other television --
18 any other news coverage about either Mr. Amor's
19 postconviction case or his retrial?
20   **A  No.**
21   Q  And you see in the email that you sent to
22 Scott, and Steve, and Ruthi and you said that you
23 had an interesting conversation with Jeanne Ripsky
24 over the weekend.  Do you see that?

58

1    **A  I do.**
2    Q  Is this a different conversation than the
3  wedding conversation, or is this the wedding
4  conversation?
5    **A  That's the wedding conversation.**
6    Q  What did you talk about with Jeanne that
7  was interesting?
8    **A  About this coming about.  She had more**
9  **information about it than I did.**
10   Q  What did she tell you?
11   **A  It was about the -- and I don't know if I**
12 **still have the name right, the exoneration**
13 **project, the reason this was going to happen.**
14   Q  Did she express any opinion to you about
15 her feelings about there being a retrial?
16   **A  She wasn't happy about it.**
17   Q  Did you express to her any feelings that
18 you had about a retrial?
19   **A  I was a little curious as to what the**
20 **whole process was about.  I was not aware of it.**
21 **I was not aware of the means by which this retrial**
22 **could occur.**
23   Q  Have you ever read any of the pleadings or
24 documents that were filed in connection with

59

1  Mr. Amor's postconviction case?
2    **A  Could you repeat that?**
3    Q  Sure.  Have you ever read any of the
4  pleadings or documents that were filed as part of
5  Mr. Amor's postconviction case?
6    **A  I don't believe so, no.**
7    Q  Are you aware that there were additional
8  arson investigators who gave opinions and
9  testimony as part of the postconviction case?
10     MR. POLICK:  Let me interject there.  You
11 mean other than in conversations with his counsel?
12     MS. THOMPSON:  That's a fair point.
13   Q  Other than conversations with your
14 counsel?
15   **A  No.**
16   Q  Have you ever read any opinions or
17 testimony from any of the arson experts who
18 testified as part of the postconviction case?
19   **A  Nothing other than what I got from my**
20 **counsel.**
21   Q  Okay.  And when I'm saying reading, I'm
22 talking about looking at actual copies of
23 something.  I'm not asking you about conversations
24 with your lawyer, but I'm asking if you've

60

1  actually read, you know, copies of the report --
2    **A  No.**
3    Q  -- or copies of testimony.
4    **A  I did not.**
5    Q  Have you since your retirement from the
6  fire department ever consulted on any fire
7  investigations as a consulting expert or
8  potentially a testifying expert?
9    **A  No.**
10   Q  Did you do that at all while you were with
11 the City of Naperville?
12   **A  No.**
13   Q  Did anyone from the DuPage County State's
14 Attorney's Office speak with you at any point
15 about Mr. Amor's retrial?
16   **A  I had a conversation.  I don't remember**
17 **the gentleman's name, the Assistant State's**
18 **Attorney that was involved about it.  I received a**
19 **message to call him.  I called him, offered my**
20 **assistance, and essentially he said, "I'll let you**
21 **know if we need you," and then he said, "I don't**
22 **think we will need you," and that was the last I**
23 **heard from him.**
24   Q  Was that someone named Jim Scalatini?

Transcript of David Ferreri
Conducted on September 11, 2020

61

1    A No.
2    Q Or Tom Minzer?
3    A Tom Minzer.
4    Q Did you call Tom to offer your assistance
5    before or after you were served with the subpoena
6    by Mr. Guerrieri?
7    A After.
8    Q And when you say you offered your
9    assistance, what to the best of your memory did
10   you say to Mr. Minzer?
11   A I'd be happy to testify.
12   Q Did you ask Mr. Minzer at all about any of
13   the -- any developments in the case since the time
14   you had testified before?
15   A I don't recall but I don't believe so.
16   Q Were you curious at all about anything new
17   that was going on with the case?
18   A More as to -- questions were, "What's this
19   retrial all about? How did this come about?"
20   Q Questions like how was Mr. Amor able to
21   get his conviction vacated?
22   A More of how was he able to get a retrial.
23   Q Was it surprising to you that he was able
24   to get a retrial?

62

1    A Yes. I was unaware of that possibility.
2    Q Are there any other conversations that you
3    have had about this case other than any
4    communications with counsel which I'm not asking
5    you about and other than the conversations you've
6    testified about so far since your original
7    testimony in Mr. Amor's trial?
8       MR. POLICK: Objection to the form.
9       You can answer.
10   A No.
11   Q Do you know either Gary or Pam Leavenworth?
12   A Yes.
13   Q Have you ever talked with either Gary or
14   Pam about anything having to do with this fire or
15   William Amor?
16   A I may have. I don't recall specific
17   conversations, but I did see them on and off after
18   the initial trial.
19      MS. THOMPSON: I think this would be a
20   good time for a short break.
21      THE VIDEOGRAPHER: We are now going off
22   the record at 11:25 a.m.
23      (Recess taken, 11:25 a.m. to 11:40 a.m.)
24      THE VIDEOGRAPHER: We are now going back

63

1    on the record at 11:40 a.m.
2    BY MS. THOMPSON:
3    Q One follow-up question from what we talked
4    about earlier, and then I want to move on to a
5    different topic.
6       Have you done anything since your
7    retirement -- well, let me ask you this question,
8    actually. Have you done anything since you left
9    the fire investigation team with the Naperville
10   Fire Department to keep yourself up to date on the
11   science of arson investigation?
12   A No, I have not.
13   Q And one other question from your résumé,
14   as well. What is your bachelor's degree that you
15   got in 1996 in?
16   A Fire science.
17   Q Have you taken any courses for graduate
18   level credit in fire science since you got your
19   bachelor's degree?
20   A No, I have not.
21   Q I want to ask you some additional questions
22   now about your work on the fire in this case. All
23   right, sir?
24   A Yes.

64

1    Q I want to first just generally understand
2    your -- the steps that you took as part of your
3    investigation of this fire. First, let me ask
4    you, though, were you in charge of the fire
5    investigations team's investigation of this fire?
6    A Yes.
7    Q And you ultimately did reach a conclusion
8    about the cause and origin of this fire; correct?
9    A Correct.
10   Q Were you the person responsible for
11   reaching that cause-and-origin decision?
12   A Yes.
13   Q Did you rely on information that you
14   received from other members of the fire
15   investigation team to reach that cause-and-origin
16   decision?
17   A I did.
18   Q And did that include relying on information
19   you received from Mike Cross in reaching that
20   decision?
21   A Yes.
22   Q Was there anyone else on the fire side of
23   the fire investigation team that participated in
24   this investigation with you?

Transcript of David Ferreri
Conducted on September 11, 2020

65

1    A  Yes.
2    Q  Who was that?
3    A  Steve Hinze.
4    Q  Anyone else?
5    A  Barry Quane, Q-u-a-n-e.  And Hinze was
6  H-i-n-z-e.
7    Q  That's the same person from the email from
8  before; right?
9    A  Yeah.
10    Q  Okay.
11    A  That would be all, just the three of us.
12    Q  You did respond to the scene of the fire
13  in this case?
14    A  I did.
15    Q  Did you have any fire suppression
16  responsibilities at that scene, or were you only
17  there in an investigative capacity?
18    A  I was only there to investigate it.
19    Q  All right.  I have some more questions for
20  you about some of these specifics, but I want to
21  go through the bigger picture first.
22        In addition to being at the fire
23  investigation scene, you also attended the autopsy;
24  correct?

66

1    A  Correct.
2    Q  And you did some additional searches of
3  the -- of Marianne Miceli's condo after the
4  autopsy over those next several days; correct?
5    A  Yes.
6    Q  You also interviewed Bill Amor yourself;
7  correct?
8    A  Correct.
9    Q  And you interviewed someone named Dan
10  Krakora?
11    A  I don't recall that interview, but I saw
12  my report so yes.
13    Q  I take it that even though you don't
14  independently remember this, you have no reason to
15  doubt you interviewed Mr. Krakora.
16    A  I have no reason to doubt that.
17    Q  Are there any other interviews of people
18  that you conducted as part of your investigation
19  other than Mr. Amor and Mr. Krakora?
20    A  No, I don't -- I don't recall any others.
21    Q  All right.  You also communicated with
22  someone from the Illinois State Fire Marshal's
23  office about this fire; correct?
24    A  Correct.

67

1    Q  Do you remember that person's name?
2    A  Mitch Kushner.
3    Q  Did you know Mitch Kushner from before you
4  communicated with him about this fire?
5    A  Yes.
6    Q  Did you know him professionally or in some
7  other capacity?
8    A  Professionally.
9    Q  Had you ever attended any trainings with
10  Mr. Kushner before this fire?
11    A  Yes.
12    Q  What trainings did you attend with him?
13    A  Various trainings that were on fire
14  investigation.
15    Q  Why did the Illinois State Fire Marshal's
16  office become involved in the investigation of
17  this fire?
18    A  They had -- as a resource to us they had
19  an accelerant detecting dog that we could utilize.
20    Q  So was it your decision to call them to
21  ask for --
22    A  Yes.
23    Q  -- the dog?
24        Is that the only reason why you involved

68

1  the State Fire Marshal in this investigation?
2    A  That's correct.
3    Q  At the time of this fire, was it your
4  understanding that the fire marshal had any
5  jurisdiction to investigate this fire other than
6  if they were invited by Naperville to participate?
7    A  They had no other jurisdiction.
8    Q  Did you end up using -- well, let me ask
9  you this.  Did you consult with Mr. Kushner about
10  anything having to do with this fire other than
11  this question about the accelerant detecting dog?
12    A  Could you rephrase that?
13    Q  Sure.  And let me ask you that question in
14  a better way.  I mean, did you talk to Mr. Kushner
15  at all about his opinions with respect to this
16  fire other than in connection with the issue of
17  the dog potentially detecting accelerants?
18    A  I'm relying on memory from my typical
19  conversation with Mitch because we used him
20  multiple times.  He would arrive, we'd meet with
21  him, describe what the scenario was, and he would
22  take his dog in -- he would do an examination on
23  his own and take the dog -- let me back up one step.
24  He would usually visualize the scene first and

Transcript of David Ferreri
Conducted on September 11, 2020

69

1 deem it safe and appropriate to bring his dog in.
2        And in this particular case he walked in
3 independent of us. I believe we actually stepped
4 out, which I never wanted to be around him; I
5 wanted him to do his own independent examination.
6 And then he came back out, and he never did bring
7 the dog in on that scene.
8    Q  After -- and I'll -- we'll get back to
9 that issue or to those events in a moment, but
10 after he came back out without bringing the dog
11 in, did you talk with Mr. Kushner again about this
12 case at all?
13    A  I did.
14    Q  When is the next time you talked with him
15 after him coming with the dog?
16    A  When he exited. I don't exactly remember
17 where I was, but when he exited the -- the unit, I
18 spoke to him.
19    Q  Did you talk with him again after that
20 about this case?
21    A  No, I've not talked to him since he left
22 the scene that day.
23    Q  And I take it that's in person, by phone,
24 nothing related to this case?

70

1    A  Correct.
2    Q  Let's go back then to your initial
3 involvement in this fire scene. Do you know what
4 time you got to the scene of this fire?
5    A  I don't recall but in reading -- reviewing
6 my reports I believe it was 7:00 p.m.
7    Q  Did you have a habit yourself for fire
8 investigation reports of trying to note as
9 accurately as you could your arrival time?
10    A  It would be noted when I would arrive, yes.
11    Q  I mean, is this something like you'd look
12 at your watch when you got there --
13    A  Yes.
14    Q  -- to jot that down?
15    A  Yes.
16    Q  When you got to the scene, was there still
17 a fire going on where there was actual flames
18 burning?
19    A  No.
20    Q  Did you consider at the time that you got
21 there at least that the fire was suppressed?
22    A  Yes. And I guess to explain a little bit
23 better, the fire was well under control, and it
24 was in what is called the overhaul phase of

71

1 suppression, and that is when firefighters go
2 through the scene and just extinguish small
3 smoldering areas that are left to make sure the
4 fire is completely out.
5    Q  So when you got there at 7:00 p.m., it was
6 in overhaul?
7    A  Yes.
8    Q  And were there firefighters in the unit
9 when you got there doing what you just described --
10    A  Yes, there were.
11    Q  -- the overhaul?
12       What did you do when you got to the scene?
13    A  And I'm going off my routine. I don't
14 have direct memory of it, but I report to the
15 incident commander, let them know I'm there, get a
16 description of what's been going on.
17    Q  Do you remember who the incident commander
18 was at this fire, or do you know that from your
19 review of records?
20    A  Rich Polarek.
21    Q  Can you spell that last name?
22    A  P-o-l-a-r-e-k.
23    Q  Do you remember anything that Mr. Polarek
24 told you when you checked in with him about what

72

1 was going on with this fire?
2    A  That they had a severe fire in a condo
3 unit, and there was one victim that had been
4 injured and had been removed to the hospital.
5    Q  At that time did you know that Ms. Miceli
6 had died?
7    A  No. At that time I didn't know it was
8 Ms. Miceli.
9    Q  At that time did you know that the victim
10 was in, you know, extremely -- was at least
11 extremely injured?
12    A  Yeah, I got the impression that the victim
13 was in critical condition.
14    Q  Like sometimes someone's death hasn't been
15 officially called, but it might be clear they're
16 not going to make it. Was that your impression
17 when you got there?
18       MR. POLICK: Objection to the form.
19       Go ahead.
20    A  I don't remember thinking that, no.
21    Q  And when you got there -- I know you just
22 said you -- as to Ms. Miceli's name, that you
23 weren't sure about that. Do you know when you
24 first became aware that the victim in this case

Transcript of David Ferreri
Conducted on September 11, 2020

73

1  was Marianne Miceli?
2  **A I don't remember.**
3      Q  Do you know when you first became aware
4  that the victim was someone who was related to
5  John Ripsky?
6  **A I don't remember.  It was sometime**
7  **after that.**
8      Q  Did you learn that at the scene?
9  **A No.**
10     Q  Did you learn that that evening?
11 **A No.**
12     Q  Is it your memory that you had to wait
13 some period of time before you could actually go
14 in the unit to begin your investigation up in that
15 space?
16 **A I'm not sure what you mean by "wait."**
17     Q  Well, did you immediately go up in the
18 unit after you talked with Mr. Polarek?
19 **A Yes.**
20     Q  Did you --
21 **A Let me qualify that.  No, not immediately.**
22 **I worked my way into the scene.  I walked around**
23 **the building just to get a feel for where that**
24 **building was, what it was, who was around it, and**

74

1  **then eventually I took a -- observed the exterior**
2  **of the building and anything that I saw damaged**
3  **windows removed, doors removed, and then worked my**
4  **way back to the unit.**
5      Q  Were you taking handwritten notes of some
6  kind at the scene as you were doing your work on
7  the investigation?
8  **A Probably.**
9      Q  Did you take those on a form, or were
10 these loose freeform notes?
11 **A Usually just on a freeform.**
12     Q  Have you preserved those notes?
13 **A No.**
14     Q  Did you use those notes to prepare your
15 report?
16 **A Probably.**
17     Q  What did you do with those notes after you
18 finished your report?
19 **A They may have become part of the file.**
20     Q  When is the last time you saw those notes?
21 **A Just recently I saw some notes when I**
22 **reviewed the file.**
23     Q  You're saying you saw your notes?
24 **A Yes.**

75

1      Q  And you say that you walked around the
2  building.  Did you -- was it -- is it your memory
3  that this condo unit had multiple buildings like
4  in the --
5  **A Yes.**
6      Q  -- set of condos?
7  **A Yes.**
8      Q  Did you walk just around the building
9  where Ms. Miceli's unit was?
10 **A Correct.**
11     Q  Okay.  Is there anything that you remember
12 noting that you felt was significant when you did
13 a walk around the building?
14 **A No.**
15     Q  When you walked around the building, did
16 you see firefighters pushing any objects from the
17 condo unit out onto the balcony or the ground
18 below?
19 **A I don't recall that.**
20     Q  At some point did you see that there was a
21 pile of objects from the condo unit that had been
22 taken out through the balcony to the ground below?
23 **A I think I saw that note in my notes but I**
24 **don't recall it.**

76

1      Q  Is that typical in fire scenes in your
2  experience that there's some stuff that's pushed
3  out of the unit during suppression?
4  **A Yes, it is.**
5      Q  Do you remember anything about how big the
6  pile was of stuff that was on the ground that had
7  come out through the balcony?
8  **A I don't remember but I don't believe it**
9  **was very large.**
10     Q  And can you describe that pile to the best
11 of your memory?
12 **A Debris.  It's usually drywall and pieces**
13 **of charred wood.**
14     Q  Was there -- were there objects in that
15 pile that were burned?
16 **A I'm sure there were.**
17     Q  I mean, was this essentially a pile of
18 stuff from the condo?
19 **A Yes.**
20     Q  Were there objects in the pile that you
21 couldn't recognize what they were?
22 **A I'm sure there were.**
23     Q  So after going around the building, you
24 then went into the unit?

Transcript of David Ferreri
Conducted on September 11, 2020

77

1    A  I don't have direct recall of that, but
2  that would have been my routine.
3    Q  Okay.  When you went up into the unit,
4  were there still firefighters in the unit doing
5  overhaul?
6    A  Yes.
7    Q  And were you -- did you go into the unit
8  with any other members of the investigation team?
9    A  I believe I was the only one at that time.
10    Q  Were there any members of the police
11 department in the unit when you went in initially?
12    A  I don't recall but I don't think so.
13    Q  What did you do when you were in the unit
14 at this point?
15    A  I asked the officer inside to have the
16 overhaul work stopped if it didn't need to be done.
17    Q  Why did you do that?
18    A  To preserve any potential evidence.
19    Q  I mean, were you concerned at this point
20 that there were things that the firefighters on
21 the scene had done that had potentially obscured
22 the fire scene?
23    A  Yes.  And I conducted training on the fire
24 department for just that topic is to don't destroy

79

1  studs and if it is to extinguish it.  Drywall and
2  the marks on it from a fire can tell a fire
3  investigator quite a bit about the progress of the
4  fire, so if they remove it all, we don't have that
5  to utilize.  And they had removed quite a bit in
6  this unit.
7    Q  Well, did you infer from how much drywall
8  had come down that -- that there was a significant
9  amount of fire damage to those walls?
10    A  Yes.
11    Q  Did you see when you were in the condo
12 unit that the balcony doors -- what the sliding
13 door to the balcony was destroyed at some point
14 during this fire?
15    A  Yes.
16    MR. POLICK:  Objection to the form.
17    But go ahead.
18    A  (Continuing.)  The glass was broken out
19 and the frame had been removed.
20    Q  Did you see William Amor at all at the
21 scene of this fire during your initial -- during
22 your time at the scene before you went to the
23 autopsy?
24    A  Yes.

78

1  things you don't have to and please don't throw
2  things out in the yard because we have to bring
3  them back in then.
4    Q  So were you concerned here when you got in
5  that there was maybe overzealous overhauling?
6    A  Yes.  And I was a firefighter, also, so I
7  understood the mindset of what they were doing,
8  but it was typical for the fire investigator to
9  ask for all work inside to be stopped if it wasn't
10 really necessary to continue.
11    Q  This is actually also an issue that you
12 raised at the critique after the initial scene
13 investigation was done; correct?
14    A  Yes.
15    Q  Was there anything in particular that you
16 were concerned had been taken out of the condo
17 during the overhaul, or was it just in general you
18 were concerned that there was more overhauling
19 going on than was needed?
20    A  The overhauling may have been necessary
21 but not all of it.  And to my recollection,
22 because it was usually the main topic, is during
23 the overhaul phase drywall is removed, pulled down
24 to see if there's fire behind the wall in the

80

1    Q  Where did you see him?
2    A  In the parking lot.
3    Q  Now, at that point -- well, let me ask you
4  this.  When -- when specifically did you see him
5  in the parking lot?
6    A  When he and Tina returned.
7    Q  Were you outside when they came back?
8    A  No.
9    Q  Did you -- did you see them in the parking
10 lot like from up in the condo, or did you come out
11 at some point and see them?
12    A  I was told -- I was in the unit, and I was
13 told that two of the occupants had just returned.
14    Q  Did you go out because you wanted to talk
15 to them or to hear what they had to say?
16    A  Yes.  I wanted to go out and meet them and
17 talk to them.
18    Q  Do you know who it was that told you they
19 had come back?
20    A  I don't remember.
21    Q  Do you know what time it was that you were
22 told they were outside?
23    A  No, I don't.
24    Q  So did you go down and actually talk to them?

Transcript of David Ferreri
Conducted on September 11, 2020

81

1      A  I did.
2      Q  How close were you to them when you were
3   talking to them?
4      A  Directly next to them.
5      Q  They had come back in a car; correct?
6      A  I'm assuming so.
7      Q  Were they out of the car when you were
8   talking to them?
9      A  Yes.
10     Q  Who else was there when you were talking
11  to them?
12     A  I don't recall.
13     Q  Did you know William Amor at all before
14  you talked to him at that point?
15     A  No.
16     Q  We talked a little bit about, you know,
17  Marianne Miceli looking familiar to you.  Did you
18  ever -- when you saw -- so let me start that
19  question again.
20         When you saw William Amor there in the
21  parking lot, was that somebody that you thought,
22  "That guy looks familiar"?
23     A  No.
24     Q  He was also with Tina Amor or Tina Miceli?

82

1      A  Yes.
2      Q  Was Tina someone that you thought, "She
3   looks familiar"?
4      A  No.
5      Q  Did you know either of their names before
6   learning them in connection with this investigation?
7      A  I did not.
8      Q  What do you remember about your conversation
9   with Tina and Bill in the parking lot?
10     A  I remember just getting typical information
11  from them, who lived there, how long you've lived
12  there, what were you doing, what time did you
13  leave, just basic information.  But I also
14  remember -- and this struck me -- that Mr. Amor
15  didn't seem to show much emotion.
16     Q  Can you tell me what you mean by that?
17     A  Well, their -- their condo unit had burned
18  severely; his mother-in-law had been injured, I
19  didn't know to what extent and taken to the
20  hospital.  He didn't seem upset whatsoever, and it
21  struck me right away.
22     Q  I mean, he didn't seem happy about it; right?
23     A  He was talking as if we're talking right now.
24     Q  Well, as you and I are talking right now,

83

1   I mean, do you -- you're comparing it to the
2   conversation you and I are having currently; right?
3      A  Currently, yes.
4      Q  Do I seem happy to you in the way that I'm
5   talking to you now?
6      A  You don't seem upset or unhappy.
7      Q  But I don't seem happy?
8      A  But I would have -- you seem pleasant
9   right now, and he was pleasant when I spoke to
10  him.  That's probably the best word to use.
11     Q  Was he smiling?
12     A  I don't recall.
13     Q  What about Tina in terms of her demeanor?
14     A  I don't remember Tina's demeanor, and I
15  don't remember questioning Tina.
16     Q  You had another interview with Bill a few
17  days later; correct?
18     A  I did.
19     Q  Was his demeanor during that interview
20  different than how he was in the parking lot
21  with you?
22     A  No.  He was very pleasant for most of it.
23     Q  Again, sort of comparing it to the
24  conversation we're having now, the interview you

84

1   had with Bill a couple days later, was the tone
2   similar to you and I talking now?
3      A  Yes.
4      Q  At the time you were talking to Bill in
5   the parking lot at the scene, did you know that
6   Marianne had passed?
7      A  I don't know.
8      Q  Was -- did that come up in your conversation
9   with him?
10     A  I don't recall that.  I don't recall when
11  I found out that the victim was deceased.
12     Q  Is it -- did you consider the possibility
13  in reflecting on Bill's demeanor in the parking
14  lot that the severity of what had happened with
15  this fire just wasn't registering with him for
16  some reason?
17         MR. POLICK:  Objection to the form.
18         You may answer.
19     A  I just noted his response as I've said.  I
20  had been doing this a long time, been to a lot of
21  scenes.  People are generally upset, or excited,
22  or sad because of what just occurred, and Bill
23  didn't show any of those emotions.
24     Q  Did he seem like he could be in shock to you?

Transcript of David Ferreri
Conducted on September 11, 2020

85

1    MR. POLICK: Same objection to form.
2    Go ahead.
3    **A No.**
4    Q And why did you rule out that as being an
5 explanation for the way he was acting?
6    **A Well, in shock in my definition would be**
7 **in a daze, just blank like -- but he wasn't that**
8 **way. He was pleasant as if I was chatting to him**
9 **on a street corner.**
10    Q Did you tell him in that conversation you
11 were a fire investigator?
12    **A I don't have direct recollection, but I**
13 **believe I would have.**
14    Q What were you wearing when you went to the
15 fire scene?
16    A Fire gear.
17    Q Did you look just like any other firefighter
18 at the scene would look?
19    A Yes.
20    Q Could you tell just from your personal
21 observations in the parking lot whether or not
22 Bill had been drinking?
23    **A I didn't notice anything, no.**
24    Q What about Tina?

86

1    **A I didn't notice anything, no.**
2    Q Did you ask either of them whether they
3 had -- whether they were impaired in some way
4 because of drinking, or drugs, or anything like that?
5    A No.
6    Q How long was your conversation with them
7 in the parking lot?
8    **A Not long. I don't recall exactly but as I**
9 **stated previously, it was just to gather initial**
10 **information, how many people lived there, who was**
11 **home, what time did you leave, what were the**
12 **activities going on prior to you leaving.**
13    Q Did you get information from them in terms
14 of them going to the movies and coming back?
15    **A Yes.**
16    Q Did Bill talk with you in that interview
17 about stopping for gas?
18    **A I don't recall.**
19    Q Were you -- at any point when you saw him
20 at the scene when you were there that night did
21 you see him produce a receipt to give to somebody?
22    **A I don't recall.**
23    Q At the time that you were having this
24 conversation with Mr. Amor, the demeanor that

87

1 you're describing, is that something you found
2 suspicious?
3    **A I found it unusual.**
4    Q But you're saying that there was nothing
5 that you found unusual about Tina Miceli's
6 demeanor?
7    **A I don't -- I don't have a lot of**
8 **recollection of Tina. I'm not sure why. I don't**
9 **know that I spoke to her much.**
10    Q Well, if she was also acting the way that
11 you just described in terms of being pleasant or
12 having a normal conversation with you, is that
13 something that you would have noted?
14    **A I would have but I don't remember Tina**
15 **answering the questions. That conversation, that**
16 **meeting I remember speaking to Bill. I don't have**
17 **any recollection of conversation with Tina.**
18    Q Is there anything that you can recall
19 about either Tina or Bill's demeanor at the scene
20 other than what you've already testified to?
21    A No.
22    Q Do you know -- so let me go back a minute.
23 So you went up into the unit after doing your
24 walk-around. You were in the unit for some period

88

1 of time before you learned that Bill and Tina had
2 come back; is that correct?
3    **A Correct.**
4    Q So you went down to talk to them?
5    A Yes.
6    Q And then what did you do next?
7    **A Went back to the unit.**
8    Q And up in the unit, other than telling the
9 overhaul folks to stop, what else were you doing
10 up there?
11    **A Once I told them to stop -- and this is --**
12 **my memory has been refreshed from the report, and**
13 **this was typical, too -- I asked everybody to**
14 **leave the unit, and I left but I put -- assigned a**
15 **firefighter to stay at the door and not let**
16 **anybody enter that unit.**
17    **And then I went down and met with the**
18 **commander and said, "I'm going to need to bring**
19 **some more people in and request through radio" --**
20 **his radio traffic was, I believe put in for more**
21 **fire investigators and police investigators.**
22    Q And was that based on your decision to
23 have more people come?
24    **A Yes.**

Transcript of David Ferreri
Conducted on September 11, 2020

89

1    Q  Why did you make that decision?
2    A  Because it was a severe fire, and there
3  was at least what I knew at the time a critical
4  injury involved in it.
5    Q  Did additional personnel come to participate
6  in the investigation?
7    A  Yes.
8    Q  Who -- who came?
9    A  Firefighter Barry Quane, Lieutenant Steve
10  Hinze, Detective Mike Cross, and Detective Bob
11  Guerrieri.
12    Q  And is it your understanding then that
13  Detectives Cross and Guerrieri came because you'd
14  put out a call for additional personnel?
15    A  I would assume that.  Sometimes they showed
16  up on their own because they were aware of a fire
17  going on, and they would just show up and ask if
18  they were needed.  I don't -- I don't recall if
19  that was the case here or not.
20    Q  Am I right that the reason that you called
21  for these additional people was because there had
22  been a critical injury, as you said, and because
23  this was a large fire?
24    A  Yes.

90

1    Q  And so when you say that those are your
2  reasons, it's because the fire had a significant
3  amount of destruction in terms of how much of the
4  unit was damaged?
5    A  Correct.
6    Q  Is there any other reason that you called
7  for those additional investigators?
8    A  No.
9    Q  So you cleared out the unit and went down
10  to call for more people, and I take it those
11  people came to the scene.  Correct?
12    A  Correct.
13    Q  What did you do while you were waiting for
14  more investigators to arrive?
15    A  I don't recall.  I probably talked to --
16  and this is just based on what I would normally
17  do -- talked to the fire suppression people who
18  first responded, got their statements about what
19  they encountered when they got there, how the fire
20  was, how easy was it to put out, was there
21  anything unusual about it, what their activities
22  were, what they might have -- was the front door
23  locked or did they have to force it open, just
24  things like that.

91

1    Q  Did you also have responding personnel do
2  memos to you related to what they had observed at
3  the scene?
4    A  Along the same lines, yes, I would ask
5  them all to submit a memo to me describing what
6  their activities were.
7    Q  And those memos were for you to use in
8  connection with your investigation?
9    A  Correct.
10    Q  So while you're waiting for more
11  investigators, you're basically in information
12  gathering mode trying to talk to people?
13    A  Correct.
14    Q  Okay.  When the additional investigators
15  got there, what did you do?
16    A  I don't recall exactly but I would have
17  assigned the two fire investigators to work with
18  me in going through the unit.  Police detectives
19  typically would kind of follow us until we
20  gathered more information that would give them a
21  direction to go.
22    Q  Did the police members of the fire
23  investigation team also attend the kinds of arson
24  trainings that you have in your CV that you

92

1  attended?
2       MR. POLICK:  Objection to the form and the
3  foundation.
4       But you may answer.
5    A  They would attend some.  They weren't
6  required to but most of them would attend some, yes.
7    Q  Did you ever attend any arson trainings
8  with Mike Cross?
9    A  I don't recall.
10    Q  Have you ever had any conversations with
11  any of the fire -- about -- let me start that
12  question again.
13       Have you ever had any conversations as to any
14  of the fires in your career that you investigated
15  with Mike Cross where you and Mike Cross talked
16  about cause-and-origin issues of the -- of the
17  fire that you were investigating?
18    A  Yes.
19    Q  And in those conversations did it seem to
20  you that Mike Cross had an understanding of basic
21  arson science?
22       MR. POLICK:  Objection to the form and the
23  foundation.
24       But you may answer.

Transcript of David Ferreri
Conducted on September 11, 2020

93

1    A  Basic fire science and fire behavior, yes,
2  he had basic knowledge of that.
3    Q  Did he have knowledge, in your experience,
4  with fire pattern interpretation?
5      MR. POLICK:  Same objection to form and
6  foundation.
7      You can answer.
8    A  Some, I would say.
9    Q  Is it your opinion that in September of
10 1995 that Mike Cross was an experienced fire
11 investigator?
12   A  Yes.
13   Q  So after you had the other members of the
14 team there, and you went back up to the unit, did
15 you continue investigating the scene up in the
16 unit at that point?
17   A  Yes.
18   Q  And what did you do to investigate the
19 scene at that point?
20   A  I don't have direct recall, but the
21 routine would be remove -- typically in a fire
22 that severe drywall and insulation falls down on
23 everything in the room, and we want to remove that
24 and uncover the contents of the unit, the

94

1  remaining contents of the room that were there
2  prior to the fire.  So it takes hours to remove
3  the drywall and insulation, and through Bill Amor
4  and Tina's description put everything back to
5  where it was prior to the fire, and by that I mean
6  the contents.
7      When the firefighters are putting the fire
8  out, they typically move things.  Couches get
9  moved, tipped over, things get moved around.  We
10 want to put them back to their original position
11 as best we can.
12   Q  Before you kicked out the overhaul team
13 the first time that you went up, when you went up
14 into the unit, were there fire hoses still up in
15 the unit?
16   A  There was one, I believe.
17   Q  And when you kicked them out initially,
18 did the hose get removed?
19   A  When I asked them to leave?
20   Q  I'm not trying to be flip about that,
21 either.  When you asked them to leave --
22   A  Yes.
23   Q  -- to preserve your scene, did they take
24 it out.

95

1    A  Sometimes it was; sometimes it wasn't.  I
2  don't recall.
3    Q  Did you ever have either Bill or Tina come
4  up to the unit with you to point out specifically,
5  you know, this goes there, this goes there?
6    A  No.
7    Q  You were basing your reconstruction on the
8  general layout they'd given you?
9    A  Yeah, and typically -- and I don't know
10 that this was the case, but I would give somebody
11 a blank piece of paper and say, "Draw up what the
12 room was, tell me where the couch was, the chair,
13 tables," and let them do that.  I don't recall if
14 I did that with Mr. Amor or Tina or not.
15   Q  In your review of your notes here, have
16 you seen any diagram that looks to you like
17 something that was done on the scene for you like
18 what you just described?
19   A  I don't recall.
20   Q  In this course of trying to reconstruct
21 the apartment, did you determine that there was
22 some furniture that had been in the living room of
23 the unit that had ended up outside on the ground?
24   A  I don't remember that.

96

1    Q  Well, did you -- what -- do you remember
2  looking for any pieces of furniture to do this
3  reconstruction of the living room?
4    A  I don't remember how -- how much I had to
5  look for things, no.
6    Q  Do you remember one of the issues with
7  this fire investigation being the placement of
8  two easy chairs or upholstered chairs that had
9  been in the living room?
10   A  I remember repositioning them.  I don't
11 remember there being an issue with it.
12   Q  Is it your testimony that you found both
13 those chairs in the condo?
14   A  I believe so.  I don't have -- I'd have to
15 refer to my testimony to see what that said.
16   Q  Would you defer to what your original
17 trial testimony --
18   A  Yes.
19   Q  -- said about that if it was different
20 than what you're saying now?
21   A  Whatever that testimony was would have
22 been accurate.
23   Q  Do you remember one of those chairs being
24 almost wholly consumed in the fire by the time you

Transcript of David Ferreri
Conducted on September 11, 2020

---

97

1  saw it --
2      **A  Yes.**
3      Q  -- at the unit?
4      **A  Yes.**
5      Q  Do you remember specifically where that
6  chair was?
7      **A  It would have been near the southwest**
8  **corner in front of the patio door.**
9      Q  Was there anyone else actually doing this
10  reconstruction process, moving things where they
11  needed to be, getting out drywall or insulation,
12  other than the specific fire investigation team
13  folks?
14     **A  I don't recall anybody else, no.**
15     Q  Were you done with your reconstruction of
16  the scene by the time you left to go to the autopsy?
17     **A  Yes.**
18         (Ferreri Deposition Exhibit 3 marked for
19  identification and attached to the transcript.)
20         MS. THOMPSON:  The witness has been shown
21  what's been marked as Ferreri 3.  This is a
22  multipage document that is Bates-stamped DEFS 5332
23  through 5334.
24     Q  Do you know what Exhibit 3 is, Mr. Ferreri?

---

98

1  And take your time to look at it.
2      **A  I'm familiar with it.**
3      Q  This is something that's called a
4  structure scene checklist; is that right?
5      **A  Yes.**
6      Q  What did the fire investigation team use
7  this form for?
8      **A  To make notes and as a reminder to check**
9  **certain areas and certain things and document them.**
10     Q  Is this your handwriting on this form?
11     **A  Yes, it is.**
12     Q  Is this something that you would have
13  completed as you did your initial reconstruction
14  and investigation of the scene on the night of
15  this fire?
16     **A  It would have been completed either during**
17  **or shortly thereafter my initial examination.**
18     Q  And is some of the information on this
19  form information that you got from the first
20  responders that had gotten there before you?
21     **A  Yes.**
22     Q  I'm going to ask you to turn to the second
23  page -- and I know that this isn't a great copy.
24  I've got some questions for you about some in here

---

99

1  of what is hard to read.
2         If you look at the -- that interior fire
3  smoke/heat damage section --
4      **A  Yes.**
5      Q  -- what is the -- what is supposed to be
6  noted in this section of this checklist!
7      **A  Things that -- noteworthy items of damage**
8  **to contents which had signs of fire damage, which**
9  **had signs of just heat damage or smoke damage,**
10  **what the severity of the damage was.  And that**
11  **helps us determine the flow of the fire.**
12     Q  So it looks like there may be one or
13  two words in -- very first in that narrative
14  section.  I can't read anything that appears
15  before the word "fire" on that first line.
16  Although, it looks like something is there.  Do
17  you have any idea what you originally wrote there?
18     **A  No, I don't.  Fire damage to the contents**
19  **of the something room, and I'm referring to**
20  **contents, furniture, tables, television, VCR.  It**
21  **might be direct fire damage.**
22     Q  On that first line?
23     **A  Yeah.**
24     Q  I know that you're probably -- you're

---

100

1  making your best guess there; correct?
2      **A  Based on how I write, yes.**
3      Q  Okay.  If you look in the middle -- I'm
4  looking four lines down where it starts with "Area."
5  Did you write, "The area of greatest damage
6  was in the NW corner of the living room"?
7      **A  Yes.**
8      Q  And then what appears after "living room"?
9      **A  Some burn was to the floor level in this**
10  **area.**
11     Q  Okay.  Let me have you go down to the
12  "Contributing Factors to Fire Spread" section.
13  What is the purpose of that section of this
14  checklist?
15     **A  It refers to what's in parentheses, the**
16  **types of fuels, meaning physically was it**
17  **furniture, was it tables, was it wood, was it**
18  **upholstered furniture, how it was configured, and**
19  **that ventilation factors means were there windows**
20  **or doors open where more air could have come in to**
21  **continue to feed the fire, ventilate the fire.**
22     Q  Okay.  I'm going to try as best I can to
23  make sure I understand what you wrote in this
24  section.  I think it says "Severity of fire

---

Transcript of David Ferreri
Conducted on September 11, 2020

101

1  damage." Is that correct?
2  **A Yes.**
3  Q And then what follows "damage"?
4  **A I spelled "do" wrong. "Was due to the**
5  **high probability that flashover occurred prior to**
6  **the arrival of the fire department," the FD.**
7  Q Was it your assessment in looking at the
8  scene that there was a high probability that this
9  fire flashed over?
10 **A Yes.**
11 Q And I think you said in this section,
12 "This is supported by evidence of extreme heat at
13 both floor and ceiling level."
14 **A Correct.**
15 Q And then what is the -- what follows
16 "ceiling level"?
17 **A "Low areas of carpet, burn away from" -- I**
18 **think that's "low areas first." I was referring**
19 **to the burn on the carpets.**
20 Q Okay. And then following -- so there's --
21 I think you're saying "low areas, carpet burned."
22 **A "Carpet burned away in the center of the**
23 **room."**
24 Q Okay. And then, "A metal glob of silver

102

1  metal that was approximately 4 to 5 inches in
2  diameter and weighing approximately half a pound";
3  is that correct?
4  **A Yes.**
5  Q Did you ever determine what that metal was?
6  **A I don't recall.**
7  Q Can you tell from how much metal was there
8  how big of an object that had been before it --
9  **A No.**
10 Q -- melted?
11 **A What I would look for there is try to**
12 **determine what kind of metal it was and at what**
13 **temperature that metal melts. It gives you an**
14 **idea of how hot it was at floor level or 3 feet**
15 **off the floor.**
16 Q But were you ever here able to figure
17 anything about that?
18 **A I -- based on this report, no.**
19 Q And then in "Condition of glass" you say,
20 "Patio door broken out at about the time of
21 arrival of the FD most likely due to thermal
22 shock"; is that correct?
23 **A Correct.**
24 Q I mean, was it your conclusion that the

103

1  door essentially failed during the fire?
2  **A Correct.**
3  Q Okay. Then we're -- I'm looking at the
4  next page then, so 5334. You've indicated point
5  of origin here as "along west wall northwest
6  corner of living room"?
7  **A Correct.**
8  Q Was that your conclusion after conducting
9  that initial reconstruction of the unit putting
10 the furniture back in place?
11 **A This was my initial thought.**
12 Q And why was that your initial conclusion?
13 **A That was the -- that was the corner that**
14 **showed the lowest burning all the way to floor**
15 **level, which is often an indication of an area of**
16 **origin, but there's other variables that may have**
17 **affected how low the burn was.**
18 Q All right. You can set that document down.
19 During that initial reconstruction of the
20 fire, was there anything that you observed that
21 made you suspicious that this fire had been
22 intentionally set?
23 **A No.**
24 Q So am I right that after you finished the

104

1  reconstruction you went to the autopsy?
2  **A Shortly thereafter. I -- I don't recall**
3  **exactly where -- how far I had gotten with the**
4  **reconstruction. I was pretty much done with the**
5  **initial exam of the unit.**
6  Q Okay. Did you go straight from the unit
7  to the autopsy?
8  **A That's the part I don't know. I don't know**
9  **if I went straight there or not. I don't recall.**
10 Q You were not the only fire investigation
11 team member at the autopsy; correct?
12 **A Correct.**
13 Q Mike Cross was there?
14 **A And Bob Guerrieri, too, I believe.**
15 Q All right. Did you talk with them at all
16 during the autopsy about your initial impressions
17 of the fire?
18 **A I don't recall the exact conversation, but**
19 **that would have been expected.**
20 Q You believe you would have filled them in
21 essentially about what you knew at that point?
22 **A Yes.**
23 Q Did you tell them during the autopsy that
24 you had suspicions about this fire in any way?

Transcript of David Ferreri
Conducted on September 11, 2020

105

1      A  No, not to that point.
2      Q  Is there anything that you learned at the
3  autopsy that contributed to your evaluation of
4  this fire?
5      A  No.
6      Q  Now, by the time this autopsy was done it
7  was the next day, September 11th; correct?
8      A  Right.
9      Q  At some point later in the day on
10 September 11th, are you aware that Detective Cross
11 submitted a request for the testing of some
12 materials from the fire?
13     A  I don't recall that.
14        (Ferreri Deposition Exhibit 4 marked for
15 identification and attached to the transcript.)
16        MS. THOMPSON:  The witness has been shown
17 what's been marked as Group Exhibit 4.  This is a
18 multipage document that's Bates-stamped
19 PL. AMOR 1876, 1877 and 1878.
20     Q  And I'm just asking you to look at the
21 first page of this document, which is 1876.  Have
22 you seen this laboratory request form before?
23     A  I don't believe so.
24     Q  In -- in your experience in investigating

106

1  fires in Naperville, did you ever submit a
2  laboratory request form for any of the fires you
3  worked on?
4      A  No.
5      Q  Is this something that you believe when it
6  was done in Naperville was done by police members
7  of the investigation team?
8      A  That's correct.
9      Q  Was it relevant to your cause-and-origin
10 analysis if there was or wasn't accelerant noted
11 on debris from the fire scene?
12     A  Well, that would have been significant.
13     Q  So even if you didn't submit this request,
14 do you believe that you would have learned about
15 any results of this testing?
16     A  Sure.  We -- the firefighters would
17 sometimes gather the evidence, put it in cans or
18 bags.  If a police evidence tech was there, maybe
19 they would gather it, or we would direct them
20 where we wanted it gathered.  The cause-and-origin
21 team members would say, "This is where I want it,"
22 and then they would process it for us, and that's
23 what this is.
24     Q  So do you know anything about why these

107

1  specific pieces of evidence were selected for
2  testing?  I mean, let me say it appears that some
3  of these are control pieces.  Correct?
4      A  Yes.
5      Q  So those would be pieces where you have
6  every expectation --
7      A  There's nothing there.
8      Q  -- there's nothing.  Do you know why the
9  ones that are marked "Accelerant Test" on this
10 form were selected?
11     A  It would have been maybe -- and I'm again
12 referring to our routine -- marks on carpets, an
13 area of origin that we thought we were going to
14 test debris that was there.
15     Q  Did you collect debris during your initial
16 reconstruction at the scene?
17     A  I'm sure we did.
18     Q  Okay.  And in your description about this
19 you said that the cause-and-origin members of the
20 team will point out where they want collection made?
21     A  Yes.
22     Q  Do you believe that you participated in
23 doing that in this case?
24     A  I may have.

108

1      Q  Is it possible that you asked Mike Cross
2  to submit this form in this case?
3      A  Well, it's possible I said I wanted these
4  things tested, and then this was his form.  I have
5  no control over this form.  It's part of the
6  process to send it to the lab to be tested.
7      Q  Do you see up on the "Offense" line of
8  this form that it says "suspicious circumstances" --
9      A  Yes.
10     Q  -- in part on that line?
11        Do you know why Mike Cross wrote that here?
12        MR. POLICK:  Objection to the foundation.
13        You may answer.
14     A  I do not.
15     Q  If you can turn ahead, those next two pages,
16 1877 and 1878, do you recognize this to be a
17 report of the results of the testing that Mike Cross
18 submitted on this first page?
19     A  I've not seen this report before, but yes,
20 that's what it is.
21     Q  For the fires that you investigated as a
22 member of the fire investigation team, would you
23 have received a copy of a report -- of a lab
24 report like this giving the -- giving the results

Transcript of David Ferreri
Conducted on September 11, 2020

109

1 of the testing?
2    A No.
3    Q Would police members of the team have
4 orally reported to you what the results were of
5 this kind of testing?
6    A Yes.
7    Q Do you believe that happened in this case?
8    A Most likely.
9    Q After the autopsy was done, did you do any
10 other work on this investigation on the 11th?
11    A I don't recall.
12    Q Do you recall going back to the scene on
13 the 12th to do an additional search of the condo?
14    A And I -- if you're referring to -- I do
15 remember going back in to see if a smoke detector
16 or evidence of a smoke detector was there.
17    Q Do you believe that happened on the 12th?
18    A I don't recall the date.
19    Q Do you know who you went with to look for
20 the smoke detector?
21    A I don't remember that, either.
22    Q We talked a little bit about Kushner's
23 role in this investigation.  Do you know why he
24 was contacted in this case to come participate in

110

1 investigating the scene?
2    A For utilization of his dog.
3    Q Why was there -- was it your decision that
4 a dog was needed in this case?
5    A Yes.
6    Q Why did you make that decision?
7    A It was -- on a severe fire with an injury
8 or death it was routine.
9    Q Do you know when you had initially contacted
10 him to come out?
11    A No, I don't.
12    Q And you said that you talked with him
13 some, and then he went into the unit by himself?
14    A Yes.
15    Q Do you remember what you talked with him
16 about before he went in?
17    A I just gave him a briefing on what had
18 occurred.
19    Q Did you tell him at that point anything in
20 terms of suspicions that you had about the fire or
21 any theories you were working on about what had
22 happened with this fire?
23    A No.  And it's intentional not to do that.
24    Q So you said he then went in and ultimately

111

1 determined not to the bring the dog in?
2    A Correct.
3    Q Why did -- did he tell you why he made
4 that decision?
5    A I don't remember.  I don't remember why.
6    Q From everything that you've reviewed in
7 terms of reports, and testimony, and the sum total
8 of your knowledge about this fire, do you have an
9 understanding of why he would not have wanted to
10 bring the K9 in?
11    MR. POLICK:  Objection to the form and
12 foundation.
13    A I -- I don't.  And he didn't always.  I
14 left the decision up to him whether he wanted to
15 bring the dog through or not.
16    Q I mean, in situations where you had worked
17 with him where he didn't bring the dog in, was
18 that because he determined it wasn't going to
19 result in some additional evidence?
20    A Possibly.  But I don't recall all the
21 circumstances.  Or the scene was unsafe.  You
22 can't always bring a dog in if it's unsafe.
23    Q Well, for this particular scene multiple
24 people had been in and out of there, so it

112

1 probably wasn't a safety issue here?
2    A It was not a safety issue, no.  But I
3 don't recall why he chose not to bring the dog in.
4    Q Do you remember anyone trying to persuade
5 him to bring the dog in?
6    A I don't recall that.
7    MS. THOMPSON:  We talked a little bit
8 about you interviewing Bill Amor.  I have some
9 questions about that.  If we are going to take a
10 longer break, this might be a good time to do it
11 since I'm getting into a topic of more questions.
12    MR. POLICK:  Okay.
13    THE VIDEOGRAPHER:  We are now going off
14 the record at 12:39 p.m.
15    (Recess taken, 12:39 p.m. to 12:58 p.m.)
16    THE VIDEOGRAPHER:  We are now going back
17 on the video record at 12:58 p.m.
18 BY MS. THOMPSON:
19    Q One question from what we were talking
20 about before and then I'll move on to a new topic.
21    Was there -- was there anything you
22 learned from Mr. Kushner on the scene when you
23 were there with him that was relevant to your
24 ultimate determinations about the cause and origin

Transcript of David Ferreri
Conducted on September 11, 2020

113

1  of this fire?
2  **A There was information I got from him, but**
3  **it wasn't relevant in that it didn't change**
4  **anything we did or determinations that we made.**
5    Q  So to make sure I understand you, if I was
6  to ask you, you know, the reasons for your
7  ultimate determination as to the cause and origin
8  of this fire, would you answer that question in
9  part by referencing anything that Mr. Kushner told
10 you as part of his walkthrough at the scene?
11   **A The information I'm referring to is**
12 **Mr. Kushner told me his opinion of the origin --**
13   Q  All right.
14   **A -- place of origin.**
15   Q  Other than that, is there anything he told
16 you that was relevant for your evaluation?
17   **A No.**
18   Q  And I take it that you're saying that you
19 didn't reach your origin conclusion because of
20 what he said --
21   **A Correct.**
22   Q  -- but he agreed with you?
23     MR. POLICK: Objection to the form.
24   **A He didn't agree with us.  He gave me his**

114

1  **opinion.**
2    Q  All right.
3    **A It wasn't a matter of agreeing with us; it**
4  **was just his opinion.**
5    Q  Understood.  Okay.  Going back then, after
6  you looked at the scene with Mr. Kushner, did you
7  and Mr. Cross then make a plan to go interview
8  Bill and Tina?
9    **A The plan was made.  I don't recall when**
10 **it was.**
11   Q  So when did you decide that it was
12 necessary to go interview them again?
13   **A We had additional questions.**
14   Q  When did you --
15   **A I don't remember when that was.**
16   Q  All right.  But you have seen records
17 indicating that basically the afternoon --
18 basically, right before you went to see them you
19 formulated some questions with Mr. Cross;
20 correctly --
21   **A Yes.**
22   Q  -- correct?
23   **A Yes.**
24   Q  But as far as when you specifically

115

1  decided -- when it was specifically decided "We
2  should go back and talk to them again," you don't
3  know when that was?
4    **A Correct.**
5    Q  You were aware at the time you went to
6  talk to them on the 14th that they had been
7  interviewed before; correct?
8    **A I don't remember that.**
9    Q  Did --
10   **A I don't remember if I was aware or not.**
11   Q  Do you believe that Mike Cross would have
12 updated you about the results of those interviews
13 before you guys went back again to talk to them?
14   **A If they had happened, he would have told**
15 **me about it, yes.**
16   Q  Okay.  Did you ever review any reports or
17 summaries that he or anybody else in the police
18 department did about interviews that were done of
19 either Bill or Tina before you talked with Bill on
20 September 14th?
21   **A I did not review any documents.**
22   Q  Okay.  And I know that you said that you
23 had additional questions, which is why you went to
24 talk to them.  Was there at some point where you

116

1  sort of sat down and took stock of what you had
2  learned from your scene investigation, what others
3  had learned from their investigation and sort of
4  decided how you were going to go move the
5  investigation forward?
6    **A Yes.**
7    Q  When -- do you know when you kind of did
8  that taking stock?
9    **A It would have been after the initial scene**
10 **investigation and conferring with everybody that**
11 **was there for that.  At that point we had not**
12 **determined -- we had made a determination on the**
13 **origin, but we did not determine the cause.  We**
14 **had eliminated what we knew wasn't there -- or**
15 **what was there that was not the cause.**
16     **So the investigation continues.  We have**
17 **unanswered questions and it's typical to go back**
18 **and talk to the occupants or the owners, find out**
19 **if what they said initially matches what they --**
20 **we may repeat the same questions and just see if**
21 **their answers have changed.**
22   Q  Was it as part of this taking stock of
23 where you were at that it was decided to have you
24 and Mr. Cross go back to talk to Bill and Tina

Transcript of David Ferreri
Conducted on September 11, 2020

117

1  again?
2      A  Yes.
3      Q  Do you know how it was decided which one of
4  you would talk to which of Bill and Tina?
5      A  I don't recall how that was decided.
6      Q  I take it that as part of your preparation
7  for this deposition that you did rereview your
8  report of your interview with Bill.
9      A  I did, yes.
10     Q  All right.  Separate and apart from your
11 report, do you have any independent memory of
12 talking to Bill in that conversation?
13     A  I do.
14     Q  Are there specific things that you recall
15 about that interview that are not based on your
16 rereview of your report?
17     A  Yes.
18     Q  What things?
19     A  There was a change in his mannerism, his
20 demeanor while I was speaking with him.
21     Q  There was a change over the course of the
22 interview, or it was different from your prior
23 conversations?
24     A  Over the course of that interview.

118

1      Q  Okay.  Can you describe to me how his
2  demeanor changed?
3      A  We were speaking -- I don't remember all
4  the questioning, but, again, it was pleasant
5  conversation.  And when I brought up the lighter
6  fluid, his demeanor changed in that he broke eye
7  contact with me, looked at the floor, and started
8  shuffling around.
9      Q  And when you say "brought up the lighter
10 fluid," are you referencing that you told him that
11 Tina had told police in an earlier interview that
12 she had spilled lighter fluid in that area?
13     A  I don't remember the exact question, other
14 than that that was -- the question was about the
15 lighter fluid, about the charcoal lighter fluid.
16     Q  Do you remember how far into the interview
17 it was that his demeanor changed like you just
18 described?
19     A  Toward the end.
20     Q  All right.  Is there anything else you
21 specifically recall about this interview that's an
22 independent memory from what you -- from how your
23 memory was refreshed by reviewing your report?
24     A  Only that it was in the hallway outside

119

1      their room, and Detective Cross interviewed Tina
2      in the room, and my interview concluded first, and
3      I asked Bill to stay in the hall, and I went into
4      the room where Detective Cross was finishing up
5      with Tina.
6          Q  Did you get a chance to at least hear a
7      little bit of Tina in that interview when you
8      went in?
9          A  I don't recall any of that conversation.
10         Q  Do you remember anything about Tina's
11     demeanor at all during that?
12         A  No, I don't.
13         Q  These interviews were at a motel where
14     they were staying at?
15         A  Yes.
16         Q  The Excel Inn?
17         A  Okay.  I don't remember the name.  There
18     are several of those up on the north side of
19     Naperville.
20         Q  But it was in a motel?
21         A  Yes.
22         Q  Were you taking handwritten notes while
23     you talked to Bill?
24         A  I should have been, yes.  I don't recall

120

1      but I should have been.
2          Q  The report of yours we're talking about
3      which I'll show you in a minute, that was
4      typewritten; correct?
5          A  Correct.
6          Q  So do you believe you prepared that based
7      on looking at notes?
8          A  Yes.
9          Q  And do you know where those notes are today?
10         A  I do not.
11         Q  During your interview with Bill at the
12     motel, did he appear to be under the influence of
13     any substances?
14         A  I don't recall noticing anything, no.
15         Q  Was he cooperative with you?
16         A  Yes.
17         Q  Were there any of your questions that he
18     refused to answer?
19         A  None that I remember, no.
20         Q  And he -- you were the person who made the
21     decision to end the interview; correct?
22         A  Yes.
23         Q  I mean, he never said to you, "I've had
24     enough; I'm done here"?

Transcript of David Ferreri
Conducted on September 11, 2020

---

121

1    A   Correct, he never did that.
2    Q   Did you ask Bill the questions that you
3  and Detective Cross had worked out that you wanted
4  to ask Bill and Tina?
5    A   Could you repeat that, please?
6    Q   Sure.  You said that during -- that before
7  this interview you and Detective Cross sat down
8  and identified the questions that you wanted to
9  ask; correct?
10    A   Correct.
11    Q   And did you actually ask those questions
12  of Bill during the course of your interview?
13    A   I don't recall but I would assume so.
14    Q   Have you seen a report from Detective Cross
15  that lists out nine questions that it indicates in
16  his report you guys discussed asking Bill and Tina?
17    A   I don't remember one, no.
18       MS. THOMPSON:  I'm going to show you this.
19       (Ferreri Deposition Exhibit 5 marked for
20  identification and attached to the transcript.)
21       MS. THOMPSON:  Let's go off the record
22  one second.
23       THE VIDEOGRAPHER:  We are going off the
24  record at 1:09 p.m.

---

122

1       (Recess taken, 1:09 p.m. to 1:10 p.m.)
2       THE VIDEOGRAPHER:  We are now going back
3  on the record at 1:10 p.m.
4       MS. THOMPSON:  I'm showing the witness
5  what's been marked as Ferreri Exhibit 5.
6  BY MS. THOMPSON:
7    Q   I'll represent to you this is a 10-page
8  document which does have numbers on it that are
9  KC with numbers that follow.  Those numbers are
10  KC 4 through KC 13.
11       This report appears to me to be a 10-page
12  report that was signed by -- by M. Cross which has
13  an approval date on it of 9/16/95.  Feel free to
14  look through this document if that's helpful to you,
15  but I want to direct your attention specifically
16  to KC 8, which would be the fifth page of the
17  document which has -- it's Page No. 5 of 10 at the
18  top.  Do you see that?
19    A   Yes.
20    Q   So if you look midway through this page,
21  there's a section that says, "Inv Ferreri and I
22  discussed a list of nine questions we need to ask
23  Bill and Tina Amor."  Do you see that?
24    A   Yes.

---

123

1    Q   And then there's some questions listed?
2    A   Yes.
3    Q   If you need to look at this to answer,
4  please do, but do those nine questions reflect the
5  questions that you and Mike Cross decided to ask
6  Bill and Tina at the motel interview?
7    A   Yes, that would be them.  This would be
8  information we would have wanted to obtain.
9    Q   Those nine questions as reflected on
10  this page?
11    A   Yeah.
12    Q   Okay.
13    A   Yes.
14    Q   I want to ask you about these questions.
15  Why did you want to ask about where everyone was
16  sitting in the living room throughout the day?
17    A   Just to account for who was in that piece
18  of furniture.
19    Q   And why was that relevant to your
20  investigation?
21    A   And what their activities were, if they
22  were smoking, anything they may have done that may
23  have resulted in a fire.
24    Q   I mean, it looks like the second question,

---

124

1  too, is asking about whether anybody was sitting
2  in the swivel rocker while smoking.  Was the
3  purpose of that question the same, you were trying
4  to figure out who was where and --
5    A   Yes.
6    Q   Okay.  Were you also thinking about the
7  possibility that somehow a cigarette had related
8  to the starting of this fire?
9    A   It was something we wanted to rule out.
10    Q   Like whether there -- this fire was
11  accidentally caused by somebody putting a cigarette
12  somewhere it shouldn't have been put and --
13    A   Correct.
14    Q   -- starting a fire?
15    A   Yes.
16    Q   Okay.  The next several questions, 3, 4 and
17  5 have to do with whether various windows or doors
18  were open or closed.  Do you see that?
19    A   Yes.
20    Q   Were you trying to get more information
21  about possible ventilation effects of this fire?
22    A   Correct.
23    Q   I mean, did you understand that ventilation
24  effect could impact the behavior of this fire and --

---

Transcript of David Ferreri
Conducted on September 11, 2020

125

1      A  Yes.
2      Q  -- how it spread?
3      A  Yes.
4      Q  And were -- did you also understand that
5  ventilation effects could impact why the fire
6  scene in the living room looked the way it did?
7      A  Yes.
8      Q  Question 6 says, "If the door was locked,
9  why?"  Do you see that?
10     A  Yes.
11     Q  What was your purpose in wanting to ask
12  about that?
13     A  It just seemed unusual that a bedroom door
14  would be locked.
15     Q  And what about No. 7 about the front door
16  being locked?  Why did you want to ask that?
17     A  That was a routine question.
18     Q  What's the purpose of that question?
19     A  If it was not locked, why?  Did they
20  typically lock it?  Our firefighters found it
21  locked, wanted to see if they were the ones that
22  locked it.
23     Q  No. 8 about the TV/VCR, part of what you
24  were investigating at one time was whether there

126

1  could have been some electrical problem with those
2  devices?
3      A  Correct.
4      Q  And 9 asks about charcoal lighter fluid.
5  Why did you want to ask when charcoal lighter
6  fluid was purchased?
7      A  To get an idea if it was very recently
8  purchased or if they had had it a long time.
9      Q  And why did you want to ask about that?
10     A  I don't recall but if it were me, if this
11  was used in the fire, was it purchased recently
12  strictly for that purpose.
13     Q  At the time that you went to question Bill
14  and Tina with Mike Cross, did you consider either
15  of them to be suspects in the fire?
16     A  No.
17     Q  Had you told Mike Cross up to this point
18  that you thought either Tina or Bill had some role
19  in setting this fire?
20     A  No.
21     Q  That's my only questions about that
22  document.  You can set it aside.  Thank you.
23        After these interviews, did you and
24  Mike Cross talk to share information with each

127

1  other about what Tina and Bill had told each of you?
2      A  Yes, we did.
3      Q  Did Mike Cross tell you that Tina had told
4  him that she was smoking a cigarette in her mom's
5  chair earlier the day of this fire?
6      A  I don't recall that but I will agree that
7  he probably did.
8      Q  Did he tell you that Tina had told him
9  that she had taken two to three drags of a
10  cigarette and then gotten up to pour a drink in a
11  glass?
12     A  I don't recall that.
13     Q  Did he tell you that Tina had told him
14  that she wasn't sure what she'd done with her
15  cigarette or words to that effect?
16     A  I just remember that by -- anything that
17  is in the report that he said he told me I'll say
18  he did.  I just don't remember it.
19     Q  Well, do you -- can you think of any
20  reason why in reporting to each other what was
21  told to you by the witness you had spoken to that
22  either of you would have left out anything --
23     A  No.
24     Q  -- that responded directly to the questions

128

1  you planned to ask?
2      A  No.  And that's what I was going to go
3  qualify.  When information was obtained, we shared
4  it.  Nothing was ever held back.
5      Q  But you believe that you would have shared
6  with each other at least the information that
7  related to the specific questions --
8      A  Yes.
9      Q  -- that you both had?
10     A  Yes.
11     Q  And I don't mean this to be a dumb question,
12  but I take it that you relied on what Mike Cross
13  told you in reaching your conclusions about the
14  fire in this case.  Correct?
15     A  Correct.
16     Q  And you believed that the information that
17  he was conveying to you was accurate?
18     A  Correct.
19        (Ferreri Deposition Exhibit 6 marked for
20  identification and attached to the transcript.)
21        MS. THOMPSON:  I've shown the witness
22  what's been marked as Ferreri 6.
23        Is that correct?
24        THE COURT REPORTER:  Yes.

Transcript of David Ferreri
Conducted on September 11, 2020

33 (129 to 132)

129

1    Q  This is a two-page document which is
2  Bates-stamped PL. Amor 17386 and 17387.
3      Mr. Ferreri, is this the typewritten
4  summary of your interview with William Amor on
5  September 14th of 1995 that you testified about
6  previously?
7    A  Yes, it is.
8    Q  And you said you'd had a chance to review
9  this report before this deposition; correct?
10    A  Yes.
11    Q  I know you told us there were some things
12  about Mr. Amor's demeanor that you recall.  From
13  your review of this report -- and if you need to
14  review it again now, feel free.  Is there anything
15  you remember Bill Amor telling you that is not
16  included in this report?  And I'm talking about
17  things he told you specifically during this
18  September 14th, 1995, interview.
19    A  No, there's nothing.
20    Q  Do you believe that everything in this
21  report is accurate in terms of what he told you
22  and what you asked him during that interview?
23    A  Yes.
24    Q  I want to refer you -- well, let me ask

130

1  you this.  In general, during this interview what
2  was your questioning style with Mr. Amor?  Was
3  this an interview where you asked him specific
4  questions, or was this a "Tell me -- tell me what
5  you know, Bill," and he just talked to you?
6    A  It was I had specific questions.
7    Q  I want to refer you to the second page,
8  the second to last paragraph.  This paragraph
9  talks about the lighter fluid issue, and I think
10  you told me earlier you -- you yourself recall him
11  becoming anxious or changing demeanor when you
12  talked about that with him; right?
13    A  Correct.
14    Q  Do you see -- the second to last sentence
15  in this paragraph says, "Mr. Amor was unaware that
16  Tina had spilled any lighter fluid by the swivel
17  chair."  Do you see that?
18    A  I do.
19    Q  And if you need to read more of this
20  report to answer this question, feel free, but my
21  question for you is, given the notation in this
22  report about that issue, do you believe that you
23  asked Bill during this interview if he was aware
24  or knew that Tina had spilled lighter fluid by the

131

1  swivel chair?
2    A  I would have asked him.
3    Q  I mean, he doesn't spontaneously offer,
4  "Oh, I don't know about lighter fluid"?
5    A  His statements would have been in response
6  to one of my questions.
7    Q  Okay.  So it's your memory that you asked
8  him about Tina spilling lighter fluid, and he
9  became more anxious when that topic came up?
10    A  I don't remember asking him specifically
11  that question, but in looking at my report, I'm
12  sure I did.
13    Q  Okay.  And it was during specifically the
14  conversation about lighter fluid that he became
15  more nervous?
16    A  Yes.
17    Q  Okay.  And, in fact, I said "more
18  nervous," but you said that was really when he
19  became anxious; right?
20    A  Yes.
21    Q  Before that what was his demeanor?
22    A  Pleasant, casual.
23    Q  Have you had other interviews with people
24  about fires where the topic of lighter fluid has

132

1  come up?
2    A  I don't remember lighter fluid specifically,
3  but I had interviews with lots of people.
4    Q  Well, in your experience and training as a
5  fire investigator, do you believe that in -- do
6  you believe that people sometimes associate
7  lighter fluid with being a way that people might
8  deliberately set fires?
9    A  I'm not sure I understand the question.
10    Q  Sure.  Given your training and experience
11  about fire investigation, do you believe that
12  there's a common understanding that one way a
13  person might set a fire is using lighter fluid?
14    A  It's a possibility.
15    Q  I mean, that's literally what lighter
16  fluid is for, right, is to set a fire?
17    A  Well, it's to start barbecue fires generally.
18    Q  Right.  It is commonly understood that
19  lighter fluid is a flammable -- is an accelerant?
20    A  Correct.
21    Q  Do you think it's possible that Mr. Amor
22  became nervous when you were talking about lighter
23  fluid because that suggested to him that you had
24  some suspicions about this fire?

Transcript of David Ferreri
Conducted on September 11, 2020

34 (133 to 136)

---

133

1        MR. POLICK:  Objection to the foundation
2  but -- and the form.
3        But you may answer.
4        **A  Not specifically.  It was just a topic**
5  **that made him uncomfortable.  Why I don't know.**
6     Q  Is it -- is it possible -- and let me be
7  clear about this question.  In your reflection on
8  this interview as part of your investigation in
9  the case, did you consider the possibility that he
10 became noticeably anxious, in your words, about
11 this topic because it led him to believe that you
12 had some suspicions about this fire having been
13 started with lighter fluid?
14       MR. POLICK:  Same objection to the
15 foundation and the form.
16       But go ahead.
17    **A  I don't know what he was thinking.  I just**
18 **know what I saw, and there was a sign that he was**
19 **uncomfortable.  And I base that on many interviews**
20 **I did with other people, whatever the topic was,**
21 **you know, the quote, "You hit a nerve."  There's**
22 **something about that topic that's making them**
23 **uncomfortable.**
24    Q  And I understand that you're telling me

---

134

1  you don't know what he was thinking.  I'm asking
2  if you considered the possibility in the course of
3  your investigation that the reason he seemed nervous
4  about that was because he thought that you were
5  suggesting that this fire was deliberately set.
6     **A  Again, I don't know what he was thinking.**
7  **It made me suspicious as to why he became**
8  **uncomfortable when we talked about it.  A red**
9  **flag, as you want to call it, went up for me that**
10 **this is maybe something we need to look at more.**
11    Q  I understand what you're telling me.  I
12 guess my very specific question is not whether you
13 knew what he was thinking or not but whether in
14 the course of your investigation, even given what
15 you just said that you found that suspicious, did
16 you in the course of reaching that conclusion
17 consider the possibility that he became nervous
18 because he thought you were suggesting he had set
19 this fire?
20    **A  I considered that he was -- had some feelings**
21 **of guilt about it, about the fire, -- yes.**
22    Q  In addition to considering whether he had
23 feelings of guilt, did you consider whether he was
24 concerned that you were suggesting that he started

---

135

1  this fire, wrongfully perhaps?
2     **A  I don't -- I don't know that I thought he**
3  **was -- he felt -- that he was concerned that I**
4  **felt that way.  I felt more that the talk of the**
5  **lighter fluid made him uncomfortable, and my**
6  **thought was maybe he's feeling -- feeling guilty.**
7  **It struck me at the time and it's just my**
8  **experience.  I had young children at the time, and**
9  **when young children misbehave or do something**
10 **wrong, you start talking to them and they first**
11 **deny it, and then as you bring things up to them,**
12 **you can tell when they're feeling guilty.  They**
13 **break eye contact; they look down; they start**
14 **shuffling around.  I got the same thing -- I got**
15 **the same feeling when I was talking to Mr. Amor.**
16    Q  Have you ever had experience with kids
17 where they think you're mad at them, and that
18 makes them break eye contact, and shuffle, and be
19 nervous?
20    **A  No, not -- if they think they're wrongly**
21 **accused, they usually direct that to me.  They**
22 **don't usually break away eye contact.  It's**
23 **usually more of a -- I won't say defiant but more**
24 **like -- more concentration on me like, "You think**

---

136

1  **what?" -- if you understand.**
2        **I didn't -- to answer your question, I did**
3  **not get that feeling with Bill.  My feeling was**
4  **he's feeling guilty about this.**
5     Q  And I -- I understand you didn't get that
6  feeling.  I'm asking you about your thought
7  process.  My question is, in your thought process,
8  did you -- are you telling me that you considered
9  that possibility and rejected it, or did you not
10 consider that possibility?
11    **A  What possibility?**
12    Q  The possibility that he was nervous because
13 he thought you were wrongly suggesting that this
14 fire had been intentionally set.
15    **A  No, I did not have the thought process**
16 **that he was nervous because he was being wrongly**
17 **accused.**
18    Q  And your report reflects that the question --
19 one of the questions you asked him was specifically
20 about whether Tina had spilled lighter fluid; right?
21    **A  I have his response there, so I'm going to**
22 **assume I asked him the question.**
23    Q  Did you consider the possibility that he
24 became nervous because he was concerned that you

---

Transcript of David Ferreri
Conducted on September 11, 2020

137

1  were suggesting that Tina was somehow involved in
2  the setting of this fire?
3      **A   No.**
4      Q   That is -- and I just want to be -- make
5  sure I understand your answer.  You're saying you
6  did not consider that possibility?
7      **A   That is correct, I did not consider that.**
8      Q   Have you -- in your interrogation training
9  that was indicated on your CV or any other
10 training that you've had in your career on
11 interviewing or on interrogation, have you been
12 trained in something called the Reid technique,
13 R-e-i-d?
14     **A   I attended seminars that were put on by**
15 **employees of Reid, yes.**
16     Q   Is it your belief based on your training
17 in Reid or other training you've had that an
18 innocent person, to go to what you just said, will
19 strongly maintain their innocence in an interview
20 with you as opposed to potentially just becoming
21 nervous?
22     **A   In my experience they would try to maintain**
23 **their innocence.**
24     Q   Are you basing that on your actual experience

138

1  with interviewing folks or on the training that
2  you've received that's told you what to expect in
3  these situations?
4      **A   Both.**
5      Q   As you sit here today, do you believe that
6  William Amor was responsible for setting this fire?
7      **A   Yes, I do.**
8      Q   And do you believe that this fire was
9  intentionally set by Mr. Amor for the purpose of
10 causing harm either to that apartment or to
11 Marianne Miceli?
12     **A   I believe he intentionally set the fire.**
13 **I'm -- I don't know that his motive was to harm**
14 **Ms. Miceli.**
15     Q   Do you have any interest as you sit here
16 today in learning what additional scientists have
17 to say about the cause and origin of this fire?
18     **A   I have received information about their**
19 **opinions through my attorney.**
20     Q   And my -- I understand -- and as we've
21 said, I don't want to get into that, but as you
22 sit here today -- you said you haven't read their
23 actual reports or testimony; correct?
24     **A   Correct.**

139

1      Q   Do you have any interest in doing that?
2      **A   No.**
3      Q   Do you believe that there's any additional
4  information you could learn about this case that
5  would cause you to change your opinions about the
6  cause or origin of this fire?
7      **A   No.**
8      Q   Do you believe there's any information you
9  could learn that would cause you to change your
10 belief that William Amor intentionally set it?
11     **A   To change my belief that he did in that**
12 **now I believe he didn't?**
13     Q   Right.
14     **A   No.**
15     Q   Is there anything more you could learn
16 that you think could possibly change your view
17 about that?
18     **A   No.**
19     Q   Do you believe that there's been any
20 changes in arson science since you last took a
21 training or a course on arson science that could
22 cause you to change your beliefs about the cause
23 or origin of this fire?
24     **A   No.**

140

1      Q   Is there any arson expert in the world who
2  if they told you they disagreed with your
3  assessment and felt differently about the cause or
4  origin of this fire that you would credit their
5  views over your own?
6      **A   No.**
7      Q   Do you believe at the time that you
8  retired from the Naperville fire investigation
9  team that you are the most knowledgeable and
10 experienced arson investigator in the world?
11     **A   No.**
12     Q   Are there any particular arson investigators
13 who you personally believe are people whose
14 opinions you respect?
15     MR. POLICK:  Objection to the form.
16     But you can answer.
17     **A   I've got colleagues that I respect.  I**
18 **respect most people.**
19     Q   And I appreciate that and I believe that
20 about you, sir, so I should -- I should rephrase
21 my question.
22     Are there any particular arson investigators
23 as you sit here today whose professional opinions
24 you respect?

Transcript of David Ferreri
Conducted on September 11, 2020

141

1    A  I respect most of them, yes.  My -- and
2  I'm trying to think of what you're trying to ask.
3  There are experts in the fire investigation field --
4  they're not necessarily investigators but have
5  published information, authors that I respect.  As
6  far as fellow fire investigators, I respect them,
7  also, but it doesn't mean I'm going to respect
8  their opinion over my own.
9    Q  At the time that you finished your interview
10  with Mr. Amor on the 14th, was it still your belief
11  that it was not yet possible to determine the
12  cause of this fire?
13    A  There were still some things to determine.
14    Q  What things did you still have to determine
15  at that point?
16    A  I wanted to test the -- do a test burn on
17  the television and VCR.
18    Q  And that's because you felt like you still
19  needed to rule that out for sure?
20    A  Correct.
21    Q  I take it, though, at that point even
22  after the interview with Bill and Tina you were
23  not seriously considering the possibility this was
24  caused -- this was an electric fire caused by

142

1  those devices malfunctioning.
2    A  We did not --
3    MR. POLICK:  Objection to the form.
4    But go ahead.
5    A  We did not test them on thinking they
6  might have been the cause necessarily.  I wanted
7  to test them to see if a fire load from those
8  objects could have driven that room to the
9  flashover phase.
10    Q  You wanted to rule --
11    A  Could they have produced enough heat --
12  for a flashover to occur there has to be a lot of
13  heat generated in the room, and I didn't feel that
14  that TV -- it wasn't a large TV -- and a VCR, and
15  there weren't many contents around it, in
16  themselves burning if the fire had started there
17  would have resulted in the fire that did occur.
18    Q  Were you trying to evaluate then what role
19  those could have had in the ultimate flashover as
20  opposed to whether they were --
21    A  Were they the cause or were they just part
22  of the fire load.
23    Q  Understood.  So even at the time you
24  tested them, you weren't really considering them

143

1  as a cause?
2    A  Correct.
3    Q  Okay.  What else did you need to -- I
4  think -- and I don't want to misstate your words,
5  so tell me if I've got this wrong, but I think you
6  said there were still some things you needed to
7  figure out after the interview with Bill.  Right?
8    A  The test burn was one, and I don't really
9  recall at what point I felt that we had everything.
10  I don't remember.
11    Q  So are you telling me that after the
12  interview with Bill, even if you couldn't yet
13  definitively say what the cause was, you had a
14  pretty good idea in your mind?
15    A  We had eliminated all the accidental
16  sources that we identified, that they were not the
17  cause.  So officially it was classified as
18  undetermined.  We began to have suspicions, but
19  officially it was classified as undetermined.
20    Q  If your investigation had for some reason
21  had to end after you left the interview with Bill --
22  so, obviously, this is a hypothetical.  But if for
23  some reason it had to conclude at that time, and
24  there was nothing more that you could learn or do

144

1  about this fire, would your official classification
2  have been undetermined?
3    A  Yes.
4    Q  On the 14th -- I think you told me you
5  don't have a memory of this, but do you agree
6  based on your review of this report that on the
7  14th you also talked to Mr. Krakora?
8    A  I'll agree to that.
9    Q  All right.  And I think I asked you about
10  this, but I just want to make sure we've covered
11  this.  I think you've told me you don't know why
12  you specifically went to talk to him.
13    A  I believe he was a witness.  I believe he
14  was one of the first people outside the apartment
15  aware of it.  Correct me if I'm wrong.  I would
16  have to go off my report, but I think that's why I
17  spoke to him.
18    Q  I'll represent to you that that's my
19  understanding, as well.  So with that understanding
20  that he was a firefighter who got to the scene
21  very early --
22    A  Excuse me for interrupting.
23    Q  Sure.  Go ahead.
24    A  He was not a Naperville firefighter.  He

145

1  was a firefighter in another community that --
2      Q  He lived?
3      A  He lived there.
4      Q  Right.  We have the same understanding,
5  Mr. Ferreri.  My question is, do you know why you
6  as opposed to somebody else are the one that went
7  to talk to him?
8      A  I don't -- don't know why.
9      Q  After you spoke with Mr. Krakora, are there
10 any other investigative steps that you took with
11 respect to this fire before you reached the
12 conclusion that you reached as to the cause and
13 origin?
14     MR. POLICK:  Objection to the form.
15     But you can go ahead.
16     A  Could you rephrase that, please?
17     Q  Sure.  After your interview with
18 Mr. Krakora, are there any other steps you took
19 with respect to this investigation before you
20 reached your final cause-and-origin conclusion?
21     A  I don't remember.
22     Q  Based on your review of your testimony and
23 the reports and records in this case, do you
24 believe there are any additional investigative

146

1  steps that you personally took after talking to
2  Mr. Krakora before you reached your cause and
3  origin conclusion?
4      A  I don't know.  I don't remember.
5      Q  Do you know specifically when you reached
6  your conclusion about the cause of this fire?
7      A  Yes.
8      Q  Can you tell me when that was?
9      A  I received a phone call from Detective Cross.
10     Q  When did he call you?
11     A  I don't remember the exact date or time.
12     Q  What did he tell you on that call?
13     A  That he had obtained a confession from
14 Mr. Amor.
15     Q  Did you get the impression from the call
16 that he was calling you close in time to that
17 happening?
18     A  I got the impression it was fairly
19 recently, yes.
20     Q  Do you know where he was calling you from?
21     A  I do not.
22     Q  Do you know what time of day it was?
23     A  It was -- it was -- he didn't get me out
24 of bed.  It was during the day.

147

1      Q  Where were you?
2      A  I was at home.  I was off duty.
3      Q  And at this time were you still doing
4  24 hours on --
5      A  Yes.
6      Q  -- 24 hours off?
7      A  Yes.
8      Q  Do you know if it was a weekend or a weekday?
9      A  I don't remember.
10     Q  That probably didn't mean much to you with
11 your schedule anyway at that time.
12     A  Yes, you're right.
13     Q  Do you believe that you had any phone calls
14 with any member of the fire investigation team
15 between when you finished talking to Mr. Krakora
16 and when you got that call from Mr. Cross where
17 they were updating you about something with respect
18 to the case?
19     A  I don't remember any.
20     Q  Did you review any reports during that
21 time with respect to the investigation?
22     A  I don't remember.
23     Q  And do you remember what it is that
24 Mr. Cross told you on that phone call?

148

1      A  That he had obtained a confession from
2  Mr. Amor that Mr. Amor set the fire.
3      Q  Did he tell you any of the details about
4  that confession?
5      A  He said he did it by pouring vodka on
6  newspaper and igniting it with a cigarette around
7  the swivel chair, which is the origin that we had
8  determined, also.
9      Q  In that northwest corner?
10     A  The area of origin, yes.
11     Q  Now, before -- well, let me ask you this.
12 Had you told Mr. Cross even going back to your
13 initial scene investigation that you believed that
14 the area of origin was the northwest corner?
15     A  Yes.
16     Q  I mean, that conclusion by you didn't
17 change over the course of your investigation --
18     A  No.
19     Q  -- from your very first investigative look
20 at the scene; right?
21     A  Our initial investigation put it along the
22 west wall, and I referred to the corner behind the
23 TV.  But after further examination we all agreed,
24 and that means all the team members involved, that

Transcript of David Ferreri
Conducted on September 11, 2020

149

1 the area of origin was on or around that swivel
2 chair.
3  Q  And when did you -- are you talking about
4 like a conversation you had where everybody agreed?
5  **A  The course of conversations as the**
6 **investigation went on.**
7  Q  Do you know when it was that you first
8 yourself included it was in that corner?
9  **A  I do not remember.**
10  Q  Was it after your initial work at the
11 scene before you went to the autopsy?
12  **A  I don't remember.**
13  Q  Was it before your interview with Bill at
14 the Excel Inn?
15  **A  I don't remember that, either.  I don't**
16 **remember the timing of it.**
17  Q  Did you say anything to Mike Cross during
18 that call where he was telling you about Bill's
19 statement?
20  **A  I don't recall any specific conversation.**
21 **It wasn't a very long conversation, I know that.**
22  Q  And after you had that phone call with
23 Mike Cross, you then reached your cause conclusion
24 about the cause of this fire; correct?

150

1  **A  Yes.**
2  Q  Is it fair to say that the information you
3 received from Mike Cross about the statement was
4 necessary information for you to reach a cause
5 determination in this case?
6  **A  Yes.**
7  Q  You could not have reached a cause
8 determination without learning what Mike Cross
9 told you about the statement?
10  **A  Correct.**
11  Q  Did you read any transcripts or reports
12 about the statement or listen to any audio of the
13 statement before you made your formal cause-and-
14 origin finding?
15  **A  No.**
16  Q  Did you rely solely on the phone conversation
17 you had with Mike Cross to prepare those formal
18 opinions?
19  **A  Yes.**
20    (Ferreri Deposition Exhibit 7 marked for
21 identification and attached to the transcript.)
22    MS. THOMPSON:  The witness has been shown
23 what's been marked as Ferreri Exhibit 7.
24  Q  This is a one-page document that's Bates

151

1 stamped PL. Amor 9401.  Do you have this in front
2 of you, sir?
3  **A  I do.**
4  Q  Now, you drafted a formal origin-and-cause
5 narrative report in this case; correct?
6  **A  Yes.**
7  Q  And I'm going to show that to you in a
8 minute.  The report that you have in front of you,
9 though, that's titled a supplemental report;
10 correct?
11  **A  Correct.**
12  Q  What is the purpose of this report?
13  **A  Supplemental reports were used to add**
14 **information to the original report after the**
15 **original report had been filed.  If more information**
16 **was obtained, it was put on a supplemental report**
17 **and added to the case file.**
18  Q  So was your origin-and-cause narrative
19 report done first and then this came after?
20  **A  Yes.**
21  Q  Was this because there essentially was an
22 amendment to the origin-and-cause narrative report
23 that you had done earlier?
24  **A  This was done based on the information I**

152

1 **received about Mr. Amor's confession.**
2  Q  Do you know -- well, let me ask you this.
3 This report has a handwritten date there of
4 December 14th of 1995.  Do you see that?
5  **A  I do.**
6  Q  Do you know how close to your preparation
7 of this supplemental report that you got the call
8 from Mike Cross?
9  **A  I do not.**
10  Q  Did you have a practice as to when you
11 would prepare this kind of report when you had
12 something to supplement to your origin-and-cause
13 narrative report?
14  **A  It should have been shortly thereafter, a**
15 **day or two or three.  I don't recall but there**
16 **would have been no reason to delay it.**
17  Q  So if this report is dated December 14th,
18 do you believe that he contacted you at least, you
19 know, on or after December 1st?
20  **A  I think it was quite a bit before that.  I**
21 **don't -- I looked at this date, too, and I don't**
22 **know why it has December 14th on it.  I don't recall.**
23  Q  You think he contacted you much earlier?
24  **A  I think so.  I don't remember the date of**

Transcript of David Ferreri
Conducted on September 11, 2020

153

1 **Mr. Amor's confession. You might refresh my memory**
2 **on that.**
3    Q  Well, I mean, that is one of the things I
4 wanted to ask you about.  I mean, if I'm
5 representing to you that the statements at issue
6 here, those events occurred on October 3rd and
7 4th, can you think of a reason why he wouldn't
8 have called you for two months?
9    **A  Oh, no, he called me right away.  My**
10 **thought about this is it was overlooked, and**
11 **somebody realized we never updated the case file,**
12 **and that's when I filled this out.**
13    Q  Okay.  Because there would be no real good
14 reason to wait to get this issue finalized once
15 you were kind of ready to close this issue in the
16 case; correct?
17    **A  No, there was no reason to delay it.**
18    Q  Okay.
19    **A  It also may be the date of my signature.**
20 **I don't know why it has this later date on it.  I**
21 **don't recall when I signed this.**
22    (Ferreri Deposition Exhibit 8 marked for
23    identification and attached to the transcript.)
24    Q  I'm going to come back to that Exhibit 7,

154

1 so you can set it aside, but don't set it too far
2 aside.
3       You've been shown Ferreri Exhibit 8 -- I'm
4 sorry -- can we go off the record again?
5    THE VIDEOGRAPHER:  We are going off the
6 record at 1:49 p.m.
7    (Recess taken, 1:49 p.m. to 1:50 p.m.)
8    THE VIDEOGRAPHER:  We are now going back
9 on the record at 1:50 p.m.
10 BY MS. THOMPSON:
11    Q  You've been shown Ferreri Exhibit 8.  This
12 document doesn't have any Bates stamp numbers on
13 it.  I'll represent to you, though, that this is a
14 four-page document.  There is a date on the last
15 page of October 10th, 1995, and that page has --
16 that page is labeled "Naperville Fire Department
17 Fire Investigation Closure Report."
18    So let me ask you first, this exhibit,
19 Group Exhibit 8 has four pages attached to it.  In
20 the fire -- in the fire department's filing system
21 or how you would normally think of what these
22 documents consist of, do these four documents belong
23 together, or are these sort of four separate
24 documents that form Exhibit 8?

155

1    A  I don't know why the checkoff list is part
2 of this.  It normally wouldn't have been --
3    Q  Okay.
4    **A  -- and the personal log sheet.  I'm not**
5 **sure who put these four together and why.**
6    Q  It has no sort of --
7    **A  No, there's no.**
8    Q  -- connection here for you?
9    **A  There's no reasoning for it, no.**
10    Q  Okay.  So the first page, the general data
11 sheet, is that something that you would have
12 prepared?
13    **A  Yes.**
14    Q  And what's the purpose of that?
15    **A  Just the general information about an**
16 **incident.**
17    Q  Okay.  Do you see on the cause on that
18 first page that it lists cause as incendiary?
19    **A  Yes.**
20    Q  Do you believe this is a document then
21 that you would have completed sometime after Cross
22 called you?
23    **A  I would think so but I have no**
24 **recollection as to when I did this, but it was**

156

1 **obviously after we had made the determination it**
2 **was incendiary.**
3    Q  Okay.  The second document, this checkoff
4 list, I understand what you're saying that this
5 doesn't really belong with these other documents.
6 What is that checkoff list?
7    **A  It's a checkoff list.  It's a reminder of**
8 **certain things to check on the scene.**
9    Q  Okay.  Is this -- is this your handwriting
10 on this document?
11    **A  Yes, it is.**
12    Q  Okay.  Then the third page, the log sheet,
13 what is the purpose of that?
14    **A  That just lists people that have been**
15 **involved in the incident.**
16    Q  Did you create -- did you fill this in?
17    **A  I don't recall making this report, no.**
18    Q  You agree with me that there's obviously
19 numerous other people that were interviewed in
20 connection with this investigation; correct?
21    **A  Yes.**
22    Q  Do you know why only these three are on
23 this sheet?
24    **A  I do not, no.**

157

1    Q  Okay.  Then let's go to the fourth page
2  which is fire investigation closure report.  What
3  is the purpose of that report?
4    A  As it states, it's a closure report, the
5  end result of an investigation.
6    Q  This document is dated October 10th of
7  1995.  Do you see that?
8    A  Yes.
9    Q  And this document has a cause that -- and
10  we'll talk about it in a minute, but it references
11  vodka and newspapers.  Do you see that?
12    A  Yes.
13    Q  Did you fill out this fire investigation
14  closure report after Mike Cross called you?
15    A  Yes, it would have been filled out
16  after that.
17    Q  Okay.  And are you basing the specific
18  information in the cause that vodka was poured on
19  a chair and newspapers then ignited with a
20  cigarette on what Mike Cross told you that
21  Bill Amor had said?
22    A  Yes.
23    Q  Did you have any reason to believe that
24  vodka or newspapers or a cigarette were involved

158

1  in this fire other than what Mike Cross told you?
2    MR. POLICK:  Objection to the form.
3    Go ahead.
4    A  Could you rephrase that question?
5    Q  Sure.  Did anything else in your
6  investigation point to vodka being involved in
7  this fire in some way other than what Mike Cross
8  told you Bill Amor confessed to?
9    A  I knew it was present on the scene, as I
10  knew newspaper was present and lit cigarettes were
11  present.  Just as a matter of fact those were
12  things that were there that could have been
13  involved in starting the fire.
14    Q  And when you say they were there, you're
15  saying they were in the -- in the condo?
16    A  They were just in the condo.  Based on
17  conversations, we knew that people were smoking,
18  we knew the newspaper was there, and we knew there
19  was vodka there.  Bill talked about having drank
20  some during the day.
21    Q  There were other paper objects in the
22  condo, as well; right?
23    A  There were a lot of contents in the condo.
24    Q  Yeah, I mean, the condo was full of

159

1  objects besides vodka, chairs, newspapers, and
2  cigarettes; correct?
3    A  Correct.
4    Q  There were matches in the apartment?
5    A  I don't know for certain.  I don't remember
6  seeing matches.
7    Q  Do you know how the -- well, let me ask
8  you this.  The residents of this condo all had
9  significant smoking habits to your understanding;
10  correct?
11    A  Correct.
12    Q  Do you know how they lit their cigarettes?
13    A  I do not.
14    Q  I mean, did you have a reason to
15  specifically believe that vodka or newspapers were
16  associated with this fire as opposed to the other
17  contents of the condo other than Mike Cross
18  telling you that's what Bill Amor said?
19    A  No.
20    Q  Did -- I may have asked you this, and I
21  apologize if I did; I just want to make sure that
22  we covered this.  Do you remember anything that
23  you said to Mike Cross on that phone call where he
24  was telling you about the statement?

160

1    A  I may have congratulated him.
2    Q  Is there anything else you can think of
3  that you said?
4    A  No.
5    Q  Did you -- well, let me ask you one other
6  question.  This fire investigation closure report
7  that's dated October 10th, would that lead you to
8  believe, as you and I were talking about a minute
9  ago, that Mike Cross called you pretty soon after --
10    A  Yes.
11    Q  -- whatever statements occurred on the
12  3rd or 4th?
13    A  Yes.
14    Q  Okay.  So then to go back to the
15  supplemental report which is Exhibit 7, is it your
16  conclusion based on the sum total of information
17  you have in this case that you may have simply
18  forgotten to do this additional supplement and had
19  to prepare that later?
20    A  I think that's why --
21    MR. POLICK:  Objection to the form.
22    You can answer.
23    A  Yes, I think that's why it's postdated.
24    Q  When you prepared this, were you

Transcript of David Ferreri
Conducted on September 11, 2020

161

1  referencing any notes or documents that you had to
2  put the content in here about Mr. Amor's supposed
3  statements?
4  **A I'm not sure I understand --**
5      MR. POLICK: Objection to the form.
6  **A (Continuing.) I'm not sure I understand**
7  **that question.**
8      Q Sure. Well, this supplemental report
9  updates the cause of this fire to incendiary;
10 correct?
11 **A Yes.**
12     Q And then it gives some information about,
13 in its words, what Mr. Amor admitted to police
14 detectives; right?
15 **A Correct.**
16     Q So my question is, when you sat down to
17 write this, were you basing what you wrote in here
18 from memory, or were you referencing some notes or
19 documents that you had?
20 **A It most likely would have been memory.**
21     Q Okay. And when you're saying it was based
22 on memory, was it based on your memory of what
23 Mike Cross told you on that phone call?
24 **A Yes.**

162

1      MS. THOMPSON: I say -- I asked you --
2  well, let me do this first.
3      (Ferreri Deposition Exhibit 9 marked for
4  identification and attached to the transcript.)
5      Q I've shown you Ferreri Exhibit 9, which is
6  a document that's Bates-stamped PL. Amor 17378
7  through PL. Amor 17384. Do you see that, sir?
8  **A Yes.**
9      Q And this is your origin-and-cause narrative
10 report; correct?
11 **A Yes.**
12     Q And this is the report that was
13 supplemented by the exhibit we just looked at,
14 Ferreri 7?
15 **A Yes.**
16     Q Do you know when you authored this report?
17 And by "this report," I'm referring to Exhibit 9.
18 **A No, I don't.**
19     Q Given your practice at the time, do you
20 know when you would have authored this?
21 **A No.**
22     Q Is this a document that you reviewed prior
23 to your deposition here today?
24 **A Yes.**

163

1      Q Is there anything in this report that you
2  believe is inaccurate as of the time that you
3  wrote it -- understanding, of course, that you
4  supplemented your opinion in this case. But other
5  than that, is there anything in here that you
6  believe was inaccurate?
7  **A I don't believe so, no.**
8      Q Is there anything that -- well, let me ask
9  you this. In general, this report gives a very
10 detailed description of various observations that
11 you made at the fire scene about the state of the
12 unit; correct?
13 **A Correct.**
14     Q And that really is the -- sorry. Let me
15 start that question again.
16     That really is -- the only issue that is
17 addressed in this report is a -- is a summary of
18 what the scene looked like followed by your
19 conclusion in that last paragraph about the area
20 of origin; correct?
21 **A Correct.**
22     Q Given that that's what this covers and
23 that it does not summarize or include the other
24 information you subsequently learned in your

164

1  investigation such as the additional details you
2  learned from Bill Amor about those questions on
3  the 14th, would that suggest to you that this
4  report was authored before the 14th?
5  **A It may, yes. But I'm not certain when it**
6  **was authored.**
7      Q Well, can you think of a reason why you
8  would have waited to write this report but then
9  not include in the report additional information
10 that you learned when you and Detective Cross
11 asked your nine questions on the 14th?
12 **A The only thing I can state, and it's in**
13 **the last paragraph, "See report of TV/VCR test**
14 **burn." So I don't recall what the date of that**
15 **test burn was, but it would have been after that.**
16     Q So you believe that that report had to
17 have been done at the time that you authored this?
18 **A This final report would have been done**
19 **after the test burn.**
20     Q Yeah. Do you believe -- can you think of
21 a reason why you would have authored this report
22 and then not included the information that you and
23 Mike Cross learned from Bill and Tina on the
24 14th if this report was authored after that?

Transcript of David Ferreri
Conducted on September 11, 2020

165

1      A  This -- it would have been authored before
2  I received Detective Cross' information on
3  Mr. Amor's confession.
4      Q  Understood.  My question was, can you
5  think of a reason why you would have authored this
6  report after the 14th when you and Mr. Cross
7  talked to Bill and Tina at the hotel but not
8  include in the report the things that you and
9  Mike Cross learned from Bill and Tina at the
10  hotel?
11      A  I don't think there's think any -- there's
12  no reason I can think of.
13      Q  Did you ever become aware in this case
14  that Mr. Amor had been arrested at some point
15  before he made the statements that Mike Cross told
16  you about on that phone call?
17      A  I became aware of his past.
18      Q  Well, did you learn that at some point
19  during this investigation he was picked up and
20  arrested on a traffic --
21      A  No.
22      Q  -- issue?
23      A  I was not aware of that.
24      Q  Okay.  Did you ever talk with Mike Cross

166

1  or Robert Guerrieri after the 14th about an
2  interest they had in questioning Bill further?
3      A  No.
4      Q  Did you ever express to -- well, let me
5  ask you this.  When you finished this origin-and-
6  cause report, did you -- what did you do with it?
7  And I'm specifically referring to Exhibit 9.
8      A  I may have held it in my file.  I may have
9  turned it over to the administrative secretary who
10  her role was to officially file our investigation
11  reports.  The official files were kept in the
12  administrative offices.
13      Q  Would you have also given copies of this
14  report via interoffice mail or otherwise to the
15  police side of this investigation?
16      A  No.
17      Q  Why not?
18      A  It wasn't their lane.  I mean, they had
19  their roles; we had ours.  If it didn't have
20  anything to do with what they were doing -- I
21  didn't withhold it from them, just they didn't
22  want it, I didn't give it to them.
23      Q  And is that in part because you had
24  already shared orally with Mike Cross your views

167

1  of this fire, about what at least at that point
2  you had concluded about the cause and origin?
3      A  Yeah.  As the -- as the investigation
4  unfolded, information was freely shared.
5      Q  Because that would be relevant to them in
6  their investigation; correct?
7      A  Yes.  Things we knew would help them;
8  things they discovered would help us.
9      Q  I mean, for instance, if they were going
10  to question Bill Amor, they might -- they would
11  probably want to know what you were thinking in
12  terms of origin at that point; correct?
13          MR. POLICK:  Objection to the form.
14          But you can answer.
15      A  I don't know.  I mean, if you're referring
16  to the interview that you mentioned a little bit
17  ago, I don't know -- I don't remember the timing,
18  so I'm not sure what they knew then.
19          If he had information he wanted to know,
20  he would have contacted me and asked me questions.
21      Q  Well, did -- prior to you -- prior to
22  Mike Cross calling you to say that Bill Amor had
23  confessed, had you ever told him that you had
24  reached a conclusion about the cause of this fire?

168

1      A  Yes.  At that point he knew where we all
2  felt the origin was, and he knew that we had
3  discounted all the accidental causes.  So now
4  where are we going to look?  We started looking at
5  who may have set this fire then.
6      Q  Other than what you just told me about
7  your views, is there anything else you told him
8  before he called you to say Bill Amor had
9  confessed about your views about cause and origin?
10      A  No.
11      Q  And did you -- was it -- in the
12  conversations you had with him before he called
13  you to say Bill Amor confessed, had you told him
14  that in terms of cause that that was the issue,
15  that it would be the state of your cause opinions
16  were that you were looking at other potential
17  causes besides accidental?
18      A  It was officially classified as
19  undetermined.  So we didn't know what the cause
20  was.  We had not identified an accidental cause,
21  so then the investigation -- and this is typical,
22  too -- would start to shift to who may have
23  started this and why.
24      Q  And prior to Mike Cross calling you to say

Transcript of David Ferreri
Conducted on September 11, 2020

43 (169 to 172)

169

1 that Bill confessed, you had conveyed to him at
2 that point that the official cause was undetermined?
3   A  Yes.
4   Q  Looking at Exhibit 9 at that last paragraph,
5 and looking at the last sentence of that last
6 paragraph, that sentence reads, "It is the opinion
7 of myself and the rest of the investigation team
8 that this fire's ignition is suspicious in
9 nature."  Have I read that right?
10   A  You have.
11   Q  When you talk about the rest of the
12 investigation team, are you including Mike Cross
13 in that?
14   A  Members from the police and fire side, yes.
15   Q  So that would include Mike Cross?
16   A  Yes.
17   Q  And had he told you as of the writing of
18 this report that it was his belief that the fire's
19 ignition is suspicious in nature?
20   A  I don't recall if he said that or not.
21   Q  Well, had he told you words to the effect
22 that he believed this fire was intentionally set?
23   A  He may have.  I don't recall him telling
24 me that exactly, but at this point in the

170

1 investigation we -- we were looking for other
2 answers.  Something started the fire.
3   Q  Did Mr. Cross or Robert Guerrieri ever
4 give you any other details about the circumstances
5 of their interrogation of William Amor other than
6 the things you've already told us that Mike Cross
7 told you on that telephone call?
8   A  No.
9   Q  Was it your belief at the time that you
10 changed the cause of this fire to incendiary that
11 William Amor had made the statements that Mike Cross
12 said he made voluntarily?
13   A  You're asking me if I thought it was
14 voluntarily?
15   Q  Was that your understanding --
16   A  Yes.
17   Q  -- at the time you determined this was --
18 and I'm sorry -- we're talking over each other; I
19 just want to make sure our record is clear.  So
20 let me just ask the question to make sure it's clear.
21     Was it your belief at the time that you
22 authored this report -- well, let me start that
23 again.
24     Was it your belief at the time you changed

171

1 the cause of this fire to incendiary that any
2 statements that Mr. Amor made to Mike Cross
3 confessing that he said it that he made those
4 statements voluntarily?
5   A  Yes.
6   Q  I mean, if, for instance -- and this is a
7 hypothetical; I'm not representing this occurred.
8 But hypothetically, if Mike Cross had said to you,
9 "Bill Amor told me that he set this fire after I,
10 you know, punched him in the face for an hour,"
11 would that have influenced your decision to change
12 the cause of this fire to incendiary?
13   A  I'm not sure I can answer that.  I know
14 it's hypothetical but that wouldn't have happened.
15   Q  We all agree that that didn't occur in
16 this case.
17   A  I would have asked more questions of Mike --
18   Q  Before you -- I'm sorry.  Go ahead.
19   A  Obviously, that's not how you want to
20 obtain a confession.
21   Q  And if Mike had told you that, as you
22 said, you would have had more questions because
23 that would have raised a lot of issues for you to
24 say the least?

172

1   A  That would have raised a lot of issues for
2 me, yes.
3   Q  Did you ever learn in the course of this
4 investigation before you testified at Mr. Amor's
5 criminal trial that he and Tina had separated over
6 the course of this investigation?
7   A  I had learned that.
8   Q  How did you learn that?
9   A  I don't recall who told me or when but I
10 did -- I do remember that it happened.
11   Q  Do you have any idea as you sit here today
12 who it is that first told you about that?
13   A  No.
14   Q  Did you learn about that before Mike Cross
15 called you to tell you that Bill had confessed?
16   A  I believe I did.
17   Q  Do you believe you learned that from
18 either a law enforcement or a fire source?
19   A  I -- I would assume so.
20   Q  Have you ever talked to Brian Nigohosian
21 about this case at all?
22   A  I'm not familiar with Brian Nigohosian.
23   Q  If I represented to you at one point he was a
24 member of the State's Attorney's Office, would

Transcript of David Ferreri
Conducted on September 11, 2020

44 (173 to 176)

173

1 that refresh your memory at all about who he is?
2 **A Was he involved in the initial trial,**
3 **criminal trial?**
4 Q I'll represent to you that he was a
5 witness, yes?
6 **A Then that does ring a bell, but I don't**
7 **recall specifically who he was.**
8 Q Okay. Did you ever -- I know I asked you
9 about postconviction experts. Did you ever look
10 at any reports of experts who testified at
11 Mr. Amor's first trial?
12 **A I saw a report from an investigator, yes.**
13 Q Did you see a report from a Robert Sherwin?
14 **A Yes.**
15 Q Before I show it to you, in what context
16 did you see that report?
17 **A It may have been through the attorney, the**
18 **State's Attorney prior to the trial. I don't**
19 **remember exactly when I saw it.**
20 Q Do you believe you may have looked at that
21 in the context of the State's Attorney just asking
22 for your take on it or help for a cross-examination,
23 for instance?
24 **A It may have been. I don't recall**

174

1 **specifically.**
2 Q Did you have any impressions of that report
3 when you read it?
4 **A I did.**
5 Q I mean, I take it you disagreed with that
6 person's conclusions.
7 **A Yes, I did.**
8 Q Did you ever talk about this report with
9 anybody else involved in the investigation?
10 **A I --**
11 MR. POLICK: You mean Sherwin's report?
12 MS. THOMPSON: That's a fair point, Joe.
13 Q Did you ever talk about Sherwin's report
14 with anyone else involved in the investigation.
15 **A I don't remember.**
16 Q When Mike Cross told you that Bill Amor
17 had confessed to setting this fire with vodka, did
18 you think to yourself that that was an unlikely
19 mechanism for this fire to have begun?
20 **A I thought to myself that it's plausible,**
21 **could happen, but I had other opinions on how it**
22 **may have happened.**
23 Q Well, at the time that Mike Cross told you
24 that, you knew that vodka, that commercial vodka

175

1 is a substance that's largely water; correct?
2 **A There's water in it, yes.**
3 Q A lot of water; right?
4 **A Right.**
5 Q I mean, the vast majority of vodka is water?
6 **A Correct.**
7 Q It's certainly your understanding that you
8 cannot start a fire by pouring water on newspapers
9 and igniting them; right?
10 **A It had ethyl alcohol in it, so it is a**
11 **possibility.**
12 Q I mean, is it your belief as you sit here
13 today that I could start newspapers on fire by
14 pouring vodka on them and using -- and dropping a
15 cigarette on those newspapers and lighting it
16 on fire?
17 **A It's highly unlikely.**
18 Q I mean, it's impossible; right?
19 **A It's not impossible.**
20 Q Have you ever seen any scientific studies,
21 or training materials, or publications of any kind
22 that report a fire that was begun by pouring vodka
23 on newspapers and lighting them on fire with a
24 cigarette?

176

1 **A I have read texts that refer to that, and**
2 **it is very difficult, highly unlikely, but in that**
3 **same text it says it's not impossible. Theoretically**
4 **it's possible because of the temperature on the**
5 **glowing ember of a cigarette and the ignition**
6 **temperature of ethyl alcohol.**
7 Q What's the name of the text that you've
8 reviewed that talks about this issue?
9 **A Kirk's Fire Investigation written by**
10 **John DeHaan.**
11 Q Other than Kirk's Fire Investigation, have
12 you ever read that anywhere else?
13 **A No.**
14 Q Did you ever discuss the likelihood of
15 this being the way that this fire began with
16 Mike Cross?
17 **A I had reservations about his admission,**
18 **but as I said, what he said he used was a**
19 **plausible ignition source. I don't think the**
20 **vodka helped at all. I think his intent was to**
21 **light the vodka, but as you know and I know, it's**
22 **fairly difficult -- very unlikely that that's**
23 **going to happen, but there was plenty of newspaper**
24 **there, and there was a lit cigarette.**

Transcript of David Ferreri

Conducted on September 11, 2020

---

177

1  Q  What are you basing the "plenty of
2  newspaper there" on?
3  A  He had a Chicago Tribune, a Sunday
4  edition.  In 1995, if you remember, it was about
5  3 inches thick.  There was plenty of newspaper.
6  I have no idea how much was around the
7  chair; I have no idea how much vodka was on it.
8  Q  I mean, you never had an understanding
9  from Mike Cross about how much newspaper or even
10  supposedly talking about here in terms of --
11  A  I don't know that anybody knew the exact
12  amount.  I've read the transcript on Mr. Amor's
13  confession and it doesn't give amounts.  It
14  doesn't give an exact location, doesn't give the
15  exact amount of vodka poured, but all those
16  components are definitely a possible ignition
17  source.
18  Q  I mean, so you're describing those things
19  as reservations; right?
20  MR. POLICK:  Objection to the form;
21  misstates the witness' testimony.
22  Q  Well, you used the word "reservation"; right?
23  A  I did.  And as a -- there's a copy of my --
24  of Mr. Sherwin's report with my notes on it, and I

178

1  put down that the vodka was not vital in the
2  ignition of that fire with those items.  The
3  cigarette on the newspaper was plenty.
4  Q  So it's your belief that somehow the vodka --
5  somehow Mr. Amor bypassed the vodka and got the
6  newspapers going with a cigarette?
7  A  Yes.
8  Q  Have you seen any studies that indicate
9  that it's possible to light newspapers with a
10  cigarette?
11  A  Yes.
12  Q  And what -- what publications or reports
13  have you seen that talk about the possibility of
14  doing that?
15  A  The NFP journals, Mr. DeHaan's texts.
16  Igniting newspaper with a cigarette is quite easy
17  to do.
18  Q  Do you have any understanding of the
19  timing from dropping a cigarette on newspapers to
20  those newspapers igniting based on your review of
21  materials or your experience?
22  A  It would depend on variables about the
23  position of the newspaper, if it was a cigarette
24  recently lit, how long it had burned.  So I mean,

179

1  there's a lot of variables there that we didn't
2  have the answers known to.
3  Q  How long was your call with Mike Cross
4  when he called you to tell you that Bill had
5  confessed?
6  A  I mentioned before not long.
7  Q  Do you have any understanding -- like by
8  "not long," what are we talking about?  A couple --
9  a minute?
10  A  A minute or two.
11  Q  And am I right that on this call you did
12  not tell him that you didn't think the vodka was
13  vital to the way this fire began; correct?
14  A  I don't remember if I told him that or not.
15  Q  Am I right then that for you personally to
16  be able to change the origin -- let me start that
17  again.
18  Am I right then that for you personally,
19  what led you to be able to change your determination
20  of cause was not so much how Bill Amor said he
21  said it but the fact that he said it at all, that
22  he said he said it?
23  MR. POLICK:  Objection to the form.
24  You may answer.

180

1  A  I felt -- he put -- two things.  He put
2  the origin right where we all agreed it was.  He
3  had no way of knowing what our determination of
4  the origin was at that time.  So that matched what
5  we knew, and the things he said he used to set it
6  was a plausible combination of things to ignite
7  a fire.
8  Q  Taking out the vodka, in your view?
9  A  I don't think the vodka was necessary.  It
10  may have inhibited it.
11  Q  Why do you say he had no way of knowing
12  what the origin was?
13  A  We had never told him.  He had never been
14  back in the apartment.
15  Q  Well, if somebody had told him what --
16  where the origin of the fire was, would that
17  change your perspective that that's something he
18  had no way of knowing?
19  A  I'm not sure I understand the question.
20  Q  Sure.  I mean, isn't it possible that over
21  the course of the many times he was questioned
22  that somebody told him what everyone's thinking
23  was about where the origin of this was?
24  A  No, it's not possible.

181

1    Q  Why do you say that?
2    A  Because we intentionally don't give that
3 information out.
4    Q  Because it would be a problem if someone
5 had told him that; right?
6    A  It would be.
7    Q  It would taint the entire investigation
8 and the confession?
9    A  It would be something I wouldn't want to
10 have happened.
11   Q  Right.  And that's because it would make
12 it so that you couldn't trust what he said in the
13 confession about that issue?
14   A  I don't know about that.  It's just
15 something I wouldn't want him to have known.
16   Q  Well, and that's because if he then said
17 it in a confession, you'd have no way of knowing
18 if he was saying that because someone had told him
19 that or because it's what actually happened?
20   A  To my knowledge, nobody told him that.
21   Q  And if someone had told him that, that
22 would be concerning to you?
23   A  It would be.
24   MS. THOMPSON:  I think I'm almost done

182

1 here.  Let me just take a quick break to go over
2 things.
3    THE VIDEOGRAPHER:  We are going off the
4 record at 2:23 p.m.
5    (Recess, 2:23 p.m. to 2:29 p.m.)
6    THE VIDEOGRAPHER:  We are now going back
7 on the record at 2:29 p.m.
8 BY MS. THOMPSON:
9    Q  Just a few additional things and I'm done,
10 Mr. Ferreri.
11   You told me before that you had -- that
12 you recall taking some notes on a copy of
13 Mr. Sherwin's report; correct?
14   A  Yes.
15   Q  And were those notes that you took for
16 yourself to kind of guide your thinking about what
17 you were reading?
18   A  Yes.
19   Q  At the time that you were reading
20 Mr. Sherwin's report, was it relevant to you how
21 much vodka Mr. Amor said in his confession that he
22 had poured on these newspapers?
23   A  Well, the relevancy would have been -- I'm
24 trying to think how to phrase it.  I never thought

183

1 he soaked the entire paper.  There was dry paper
2 left.
3    Q  Because if there wasn't really dry paper
4 left, then it wouldn't be possible to kind of
5 avoid the vodka spots, as you were talking about
6 earlier?
7    A  That's correct.
8    Q  And, again, that issue is not something
9 that you discussed with Mr. Cross on your phone
10 call with him when he called you; correct?
11   A  I don't remember.
12   Q  Did you ever discuss -- did you tell
13 either Detective Cross, or Detective Guerrieri, or
14 any member of the police department that you
15 thought that the way that this fire began was by
16 somehow a cigarette igniting newspapers with the
17 vodka being uninvolved?
18   A  I expressed my opinion that I didn't think
19 the vodka was instrumental in starting this fire.
20   Q  When did you express that opinion?
21   A  I don't remember.  Sometime after the
22 confession.
23   Q  Who did you express that opinion to?
24   A  I don't remember specifically but I'm sure

184

1 I expressed it to Detective Cross and --
2    Q  Did he have -- I'm sorry -- go ahead and
3 finish.
4    A  -- and other members of the investigation
5 team.
6    Q  Did anyone have any response to you saying
7 that?
8    A  Not that I remember.
9    (Ferreri Deposition Exhibit 11 marked for
10 identification and attached to the transcript.)
11   Q  I'm showing you these out of order because
12 we marked them, but this is a multipage document
13 that is DEFS 5403 through 5408.  Exhibit 11 is
14 this copy of Sherwin's report that you took notes
15 on that we've been talking about; right?
16   A  Yes.
17   Q  And there's notes in the margins on various
18 pages; do you agree?
19   A  Yes.
20   Q  Are those notes all in your handwriting?
21   A  Not all of them.  The notes on the very
22 front page are not mine.
23   Q  There's something on the right margin
24 there that's hard to read; correct?

Transcript of David Ferreri

Conducted on September 11, 2020

---

185

1    A    Yeah.

2    Q    That's not you?

3    **A    That's not me but I believe everything**

4    **else is.**

5    Q    Will you just look through this briefly,

6    and if there's any other handwriting that aren't

7    your notes tell me.

8    **A    I believe all the rest are mine.**

9    Q    We talked about that note on the end -- or

10   on the last page about the vodka, and you explained

11   what you meant by, "I don't believe the vodka was

12   vital."  Do you see on that note, though, that

13   what you've written is, "I don't believe the vodka

14   was vital.  However, it fit into the picture"; do

15   you see that?

16      MR. POLICK:  I'm sorry; is there another

17   page that maybe I don't --

18      MS. THOMPSON:  Are you missing --

19      MR. POLICK:  My last page is 5408.

20      MS. THOMPSON:  Yeah.

21      MR. POLICK:  Is that where we're at?

22      MS. THOMPSON:  We are.

23   Q    I'm looking at the last note on 5408 in

24   the margin.  Do you see where I'm looking, sir?

---

186

1    A    I do.

2    Q    So what did you mean by, "However, it fit

3    into the picture"?

4    **A    That his description of the materials he**

5    **used and where fit.  I wasn't necessarily**

6    **referring to the vodka.  I know it looks that way,**

7    **but my thought process was his confession of what**

8    **he did fit and was a plausible means of igniting**

9    **that fire.**

10   Q    In the event that somehow there was dry

11   newspaper that could have been ignited by the

12   cigarette.

13   **A    Correct.**

14      (Ferreri Deposition Exhibit 10 marked for

15   identification and attached to the transcript.)

16      MS. THOMPSON:  I'm showing you what's been

17   marked as Exhibit 10.  We can just do this on the

18   record for time.

19      Joe, this also doesn't have a Bates stamp.

20   I take it there's not an issue for you there.  I

21   will obviously identify the pages.

22      MR. POLICK:  Is this the coroner's inquest?

23      MS. THOMPSON:  Yes.  I've shown the

24   witness a copy of what's been marked as Ferreri

---

187

1    Exhibit 10.

2    Q    Do you recognize Exhibit 10 to be a copy

3    of your testimony at the coroner's inquest?

4    **A    I do.**

5    Q    And you said you had a chance to review

6    that before your deposition today; right?

7    **A    Yes.**

8    Q    Do you believe that your testimony in this

9    inquest was accurate?

10   **A    Yes.**

11   Q    And after having reviewed it for this

12   deposition, is there anything in that testimony

13   that you believe needs to be changed to best

14   reflect your opinions in this case?

15   **A    No.**

16   Q    I want to refer you to page 10, and let me

17   just say, too, while we're doing that this is a

18   multipage document that has -- the first page of

19   which is page 4 and the last page of which is

20   page 13.

21      So I'm directing you to page 10, meaning

22   the page that's got the 10 at the top right-hand

23   corner.  Are you there, sir?

24   **A    I am.**

---

188

1    Q    During the inquest you were asked this

2    question, line 19: "Question:  Did you ever learn

3    how it was started?

4      "Answer:  It was starred with vodka being

5    poured on newspapers and then ignited."  Do you

6    see that?

7    **A    I do.**

8    Q    I mean, you -- you are testifying now that

9    you believe that this fire started with vodka

10   being poured on newspapers and newspapers igniting;

11   is that correct?

12   **A    That's correct.**

13   Q    All right.  So do you agree that this

14   statement as worded suggests that it was the vodka

15   that ignited?

16   **A    The way it's worded, that's what it**

17   **suggests.**

18   Q    Right.  And you -- you agree with me that

19   that is unlikely?

20   **A    I do.**

21   Q    I mean, given the circumstances of this fire,

22   do you agree with me that that is implausible?

23   **A    To ignite vodka with a cigarette?**

24   Q    Yes.

---

189

1    A  It's not impossible.
2    Q  I'm saying implausible.
3    A  Implausible?
4    Q  Let me ask it a different way.  Do you
5  agree with me that that is highly unlikely in the
6  circumstances of this fire?
7    A  Of igniting the vodka with a cigarette?
8    Q  Yes.  But you won't go so far to say
9  impossible; is that right?
10   A  I would not, no.
11   Q  And to be clear, I'm not talking about it
12 ever being impossible; I'm talking about the
13 circumstances -- I'm talking about what was
14 described to you by Mike Cross as how Bill Amor in
15 the statement supposedly said he did it.
16      Is it your testimony that given what your
17 understanding is of what Bill Amor told Mike Cross
18 that you think it is possible, although unlikely
19 that Bill Amor was able to ignite the vodka with a
20 cigarette?
21   A  This statement and another statement pretty
22 much are taken -- were made strictly on what I
23 knew of Mr. Amor's confession.  My opinion on how
24 it started was a little different, as I previously

190

1  described.
2    Q  Right.  And when you say it was a little
3  different, you mean that it was a cigarette
4  igniting newspapers?
5    A  I believe Mr. Amor intended the vodka to
6  be part of it.  My opinion was the vodka wasn't
7  needed and the fire started with a cigarette and
8  dry newspaper.
9    Q  And, again, you're basing that on your
10 understanding of what Mike Cross relayed to you
11 about what Bill Amor said?
12   A  Correct.
13   Q  All right.  I want you to turn to page --
14 I'm sorry; give me just one minute.
15      I want you to turn to page 12, please.  On
16 page 12 you were asked a question -- I'm starting
17 at line 7, and I'm paraphrasing the question, but
18 you were asked if there was anything else from a
19 fire standpoint that you could tell the coroner's
20 jury that would help explain how or why this fire
21 took place.  Do you see that question?
22   A  I do.
23   Q  And your answer in part -- and if you need
24 to read your whole answer to answer this question,

191

1  take your time to do that.  But your answer in
2  part was, "After the statements were obtained, we
3  got those pieces put into place.  We feel we have
4  a complete picture of what happened now."  Do you
5  see that?
6    A  I do.
7    Q  Was it your belief after Mike Cross told
8  you what he told you about the statement that you
9  personally had a complete picture of what happened?
10   A  Yes.
11      MS. THOMPSON:  Those are all the questions
12 I have at this time.  Thank you.
13      THE WITNESS:  Thank you.
14      MR. POLICK:  I have a few follow-up.
15      EXAMINATION BY COUNSEL FOR THE DEFENDANTS
16 BY MR. POLICK:
17   Q  With respect to NFPA 921, did you follow the
18 guidelines and standards set forth in that document
19 during your investigation of the Miceli fire?
20   A  Yes.
21   Q  And you were asked some questions by
22 counsel about the fire investigation team and how
23 the fire department portion of that team would
24 communicate with the police department portion of

192

1  that team.  Do you recall that line of questioning?
2    A  Yes.
3    Q  During your communications with the police
4  department portion of the fire investigation team,
5  did you ever have any interaction with John Ripsky?
6    A  No.
7    Q  Did John Ripsky ever instruct you on how
8  to conduct your investigation in this case?
9    A  No.
10   Q  Outside of your involvement in the fire
11 investigation team, did John Ripsky ever instruct
12 or direct you how to conduct your investigation in
13 this case?
14   A  No.
15   Q  And outside of your professional work with
16 the fire department, did John Ripsky ever instruct
17 you or direct you as to how your investigation in
18 this matter should be conducted?
19   A  No.
20   Q  With respect to Bill's confession and the
21 vodka being used, you were asked some questions
22 about how much vodka was on the newspaper, and you
23 testified in response to those questions.  In
24 doing your analysis of that information that you

Transcript of David Ferreri
Conducted on September 11, 2020

193

1 obtained regarding his confession, did you know
2 how long the vodka had been on the newspaper?
3    **A No.**
4    Q  Earlier today you mentioned that at some
5 point you had either listened to the 911 call or
6 read a transcript. Do you recall that?
7    **A Yes.**
8    Q  Was it the actual audio recording or the
9 transcript that you reviewed?
10   **A I have heard the audio recording and read**
11 **the transcript.**
12   Q  And do you know when you listened to that
13 audio and read that transcript in relation to your
14 investigation of this fire?
15   **A No, I don't.**
16   Q  Do you know if it was done before or after
17 you made your cause-and-origin narrative report?
18   **A I don't remember.**
19   Q  And you also indicated today that you had
20 reviewed the transcripts of Mr. Amor's confession.
21 Do you recall that?
22   **A Yes.**
23   Q  Does that have any bearing on your
24 conclusions in this case?

194

1     MS. THOMPSON: Object to form.
2    **A Yes, it does.**
3    Q  And how so?
4    **A It supports what I was thinking.**
5    Q  When you say it supports how you were
6 thinking, what do you mean by that?
7    **A My initial knowledge of his confession was**
8 **only what I heard from Detective Cross, whose**
9 **interpretation was that Mr. Amor poured vodka on a**
10 **newspaper and ignited it, pretty short and sweet.**
11 **When I read the transcript of Mr. Amor's actual**
12 **confession of his activities, he -- in my mind I**
13 **interpreted that that there was plenty of**
14 **newspaper there, and he put the cigarette in the**
15 **newspaper and not on the vodka.**
16   Q  You were asked some questions earlier
17 today about your investigative steps during this
18 fire investigation at the Miceli residence. During
19 your interior survey of the unit, did you interpret
20 the effects of the burning characteristics on the
21 materials inside the apartment?
22   **A We did.**
23   Q  And as part of your interior survey of the
24 unit, did you also interpret and analyze any fire

195

1 patterns that you observed?
2    **A Yes.**
3    Q  You also explained that at some point you
4 went through the debris and contents in an attempt
5 to reconstruct how the contents were placed in the
6 room prior to the fire; correct?
7    **A Correct.**
8    Q  Do you recall how long of a process that
9 was to go through the debris and contents and
10 reconstruct their arrangement inside the unit?
11   **A Hours.**
12   Q  While you were in the apartment, did you
13 check for natural gas or a gas leak as a cause of
14 this particular fire?
15   **A Yes.**
16   Q  When did you do that?
17   **A Well, when I examined the kitchen, that**
18 **was the only area that had natural gas to an**
19 **appliance.**
20   Q  Okay. And what about your inspection of
21 the kitchen -- strike that.
22      What was it about your inspection of the
23 kitchen with regard to the source of natural gas?
24   **A It was to the stove. The stove controls**

196

1 **were all in the off position, the gas line was**
2 **intact, and there was no sign of any leak.**
3    Q  So based on that observation, did you rule
4 out natural gas as a cause of this fire?
5    **A Yes.**
6    Q  Was there any indication of any explosion
7 in the kitchen area?
8    **A No.**
9    Q  Was there any indication of any direct
10 fire damage in the kitchen area?
11   **A No.**
12   Q  At some point did you employ the services
13 of an electrical engineer to review the contents
14 of the apartment unit in order to determine if
15 there was an electrical cause to the fire?
16   **A Yes.**
17   Q  Okay. And who was the electrical engineer
18 that was used?
19   **A It was Craig Engineering.**
20   Q  And did Craig Engineering ultimately come
21 to a conclusion about whether there was an
22 electrical cause to the fire?
23   **A Yes.**
24   Q  And what was Craig Engineering's

197

1 determination?
2   **A  That there was not an electrical component.**
3 **It failed to cause this fire.**
4   Q  When you entered the unit to do your
5 inspection, did you ever locate a smoke detector
6 in the apartment?
7   **A  No.**
8   Q  Was there anything that indicated to you
9 upon inspection that there had been a smoke
10 detector inside the apartment?
11   **A  Yes.**
12   Q  What was that?
13   **A  It had been located in the hallway near**
14 **the circuit breaker panel, and we found the**
15 **position because the two plastic anchors that held**
16 **the screws that held the smoke detector were still**
17 **in the wall.**
18   Q  So the screws that anchored the smoke
19 detector were present?
20   **A  The screws were not.  The plastic**
21 **anchors were.**
22   Q  Did you ever locate the smoke detector
23 itself?
24   **A  No.**

198

1   Q  Was there any indication from what you
2 observed that it had been anchored to the wall at
3 the time of the fire?
4   **A  The burn patterns on the wall showed that**
5 **it was not on the wall at the time of the fire.**
6   Q  And can you explain what that means?
7   **A  It would have protected the paint behind**
8 **it, and that paint would have suffered a different**
9 **degree of damage than the paint around it.**
10   Q  Going back to electrical causes, did you
11 examine the circuit breaker box inside the unit?
12   **A  Yes.**
13   Q  And what were your observations with
14 regard to the circuit breaker?
15   **A  When I saw the panel, they were all in the**
16 **off position.**
17   Q  Did you learn subsequent to your observation
18 any information about that circuit breaker?
19   **A  Yes.  From a statement of a firefighter**
20 **who had been told by his officer to turn all the**
21 **breakers off as a measure of safety for the**
22 **firefighters still involved in suppression in the**
23 **room and overhaul.  And before he did that, he**
24 **looked at the breakers and noticed that one of**

199

1   them had tripped.
2   Q  And the breaker that had tripped, do you
3 know what electrical outlet it controlled in the
4 apartment unit?
5   **A  I believe it controlled the outlets on the**
6 **west wall.**
7   Q  And as part of your investigation into
8 this fire, did you create diagrams of the scene?
9   **A  Yes.**
10   Q  Were those hand-drawn diagrams or models?
11 How did you do that?
12   **A  The diagrams were hand drawn initially,**
13 **and then models utilizing a computer program, that**
14 **was used to create a better diagram.**
15   Q  And those diagrams then became part of
16 your investigative file?
17   **A  Yes.**
18   Q  Were photographs also taken to document
19 the scene?
20   **A  Correct.**
21   Q  Were those done by you, or were the
22 photographs taken by the police department
23 evidence technicians?
24   **A  I took some, also.  I don't know where**

200

1   they went.  They were taken early on when there
2   was still smoke and mist in the room, but the
3   primary responsibility for photographing and
4   videotaping that scene was police forensic people.
5   Q  And was there also some videotape that was
6 taken of the scene before you began your
7 walkthrough --
8   **A  Yes.**
9   Q  -- of the unit?
10   Do you know who that was done by?
11   **A  I believe it was Elizabeth Guerrero,**
12 **one of our evidence technicians.**
13   Q  She's a police department evidence tech?
14   **A  She's a police department employee.**
15   Q  Other than reconstructing the contents of
16 the apartment unit to the arrangement that existed
17 before the fire, did you yourself collect or
18 package any evidence within the unit?
19   **A  I don't recall if I did or not.**
20   Q  Would it have been the practice and
21 procedure at that time to have directed fire
22 department -- I'm sorry -- police department
23 evidence technicians as to what should be
24 collected?

Transcript of David Ferreri
Conducted on September 11, 2020

---

201

1    A  If they were on the scene, yes, they would
2  have done it.
3        MR. POLICK:  I believe that's all I have.
4  Counsel may have some follow-up.
5        MS. THOMPSON:  Just very limited.
6        EXAMINATION BY COUNSEL FOR THE PLAINTIFF
7  BY MS. THOMPSON:
8    Q  You gave some testimony about reading the
9  transcript of the statements and you concluding
10 from that that there was plenty of newspaper; is
11 that right?
12   A  There was an adequate amount to ignite
13 the fire.
14   Q  Okay.  What in the transcript specifically
15 told you that there was an adequate amount of
16 newspaper to start the fire?
17   A  That he put the cigarette on the newspaper
18 or flicked it in the newspaper, I don't remember
19 his exact words, and that he did see smoke.
20   Q  So what did you determine from that told
21 you that there was an adequate amount of newspaper?
22   A  That the cigarette was igniting the
23 newspaper, so there was adequate amount of
24 newspaper.

---

202

1    Q  A possible thing that could occur if a
2  cigarette ignites newspaper, though, is that the
3  newspaper just burns out; right?
4    A  It could.
5    Q  I mean, for this type of fire to occur,
6  even assuming it starts from a cigarette igniting
7  newspaper, the newspaper has got to burn enough
8  that something else catches fire and the room gets
9  going; correct?
10   A  Correct.
11   Q  So it's possible that you could even have
12 some ignition on a newspaper, but it just doesn't
13 go anywhere and goes out; right?
14   A  That's possible.
15   Q  Was there anything in the transcript that
16 told you that that didn't -- that the mechanism
17 that he confessed to didn't lead to that?
18       MR. POLICK:  Objection; form.
19   A  I don't understand the question.
20   Q  Sure.  My question is, there's nothing in
21 the transcript that told you that there was an
22 adequate amount of newspaper involved in this fire
23 according to the confession that would ensure that
24 other objects in the condo would catch fire as a

---

203

1  result of the cigarette igniting the newspaper;
2  correct?
3        MR. POLICK:  Same objection to form.
4        But go ahead.
5    A  I'm not sure I can agree.  There was
6  newspaper that -- that ignited, and by the fire
7  that resulted there was adequate newspaper there
8  to create that fire.  I mean, there's nothing to
9  tell me that there wasn't enough newspaper there.
10   Q  Well, there was nothing to tell you there
11 was enough; right?
12   A  Right.
13   Q  It's silent on that issue?
14   A  Except for the ensuing fire.
15   Q  But I'm saying in the confession itself
16 Bill doesn't say that he observed the fire; right?
17   A  He did not refer to seeing flame.
18   Q  Right.  So you're -- in what you're
19 describing, you're assuming that the confession
20 describes events that actually occurred which led
21 to a fire, which obviously we know did happen, the
22 fire happened?
23   A  Yes.
24   Q  But there's nothing in the confession itself

---

204

1  that confirms for you that there was enough
2  newspaper in the way that Bill confessed to
3  lighting this fire, that that newspaper could have
4  ignited other objects on fire in a way that would
5  lead to the fire that occurred; right?
6    A  In his confession he did not specify as to
7  how much newspaper there was there.  In my
8  experience, newspaper is a great fuel if you want
9  to start a fire.
10   Q  If you have enough of it?
11   A  Doesn't take a lot.  Newspaper gives off a
12 lot of heat in a hurry, so you don't need a lot of
13 newspaper.
14   Q  It gives off a lot of heat in a hurry, but
15 it also burns out quickly?
16   A  It depends how much you have.
17   Q  Right.  You've got -- you've got to have
18 enough for it to be burning long enough for other
19 things to go; right?
20   A  Correct.
21   Q  I mean, all of us have tried to light a
22 fire in a fireplace where you start with newspaper,
23 but the logs don't get going.
24   A  It all depends on how you use it and the

---

Transcript of David Ferreri
Conducted on September 11, 2020

205

1 placement of the fuels.
2    Q  Exactly.  It depends on all those things;
3 right?
4    A  Yes.
5    Q  There's no guarantee if you light
6 newspaper that the room is going to go up?
7    A  No guarantee.
8    Q  I mean, as a bad fire starter, it's --
9 many people have the experience of trying to get a
10 fire going with newspaper and failing; correct?
11    A  I agree.
12    Q  All right.
13    A  But I believe there was adequate newspaper
14 there to start the fire.
15    Q  And I understand that.
16    A  But I don't base that on his confession.
17    Q  And, again, when you're talking about
18 reading the transcript, that's something that you
19 did after your testimony at the first trial;
20 correct?
21    A  Yes.
22    Q  For the first time?
23    A  Correct.
24    Q  You were asked initially about whether you

206

1 believed you followed the NFPA 921 guidelines in
2 your analysis of this fire.  Is it your
3 understanding as you sit here today that other
4 experts disagree with you that you followed those
5 guidelines completely?
6       MR. POLICK:  Objection to the foundation.
7    A  I don't know that they did.  I don't have
8 any knowledge that they disagreed with that.
9    Q  Well, if there are one or more arson
10 experts who disagree with you on that front, is
11 there anything that those experts could say to you
12 or point out to you that would change your mind
13 about whether you followed the 921 guidelines?
14    A  No.
15    Q  How in this case -- well, let me ask you
16 this.  You were asked some additional questions
17 about ruling out various accidental causes.  Isn't
18 it true that one accidental cause that you -- that
19 this investigation never ruled out is the
20 possibility that this fire was accidentally set by
21 a cigarette igniting newspaper or some other
22 object in the living room to start this fire?
23    A  I don't understand your scenario how we
24 would have arrived at that.  I don't understand

207

1 what you're asking.
2    Q  Sure.  I mean, is it -- I think it's been
3 your testimony in this deposition that you believe
4 your investigation exhausted all potential
5 accidental sources of this fire.
6    A  That we -- yes.
7    Q  How did your investigation rule out as an
8 accidental source that a cigarette accidentally
9 came in contact with something that ignited
10 starting this fire?
11    A  The timeline had something to do with that.
12    Q  Well, if Bill Amor's confession is enough
13 for you to say it's incendiary where he says he
14 put a cigarette on newspapers and walked out, how
15 have you ruled out that a cigarette was
16 accidentally put on newspapers and then left?
17    A  If it was accidentally placed there as he
18 was leaving, I wouldn't rule that out, but I
19 didn't have that knowledge.  The only knowledge I
20 had was his confession that he intentionally did it.
21    Q  So isn't it true that the only way that
22 you ruled out an accidental cause of this fire
23 being a cigarette coming in contact with something
24 that it lit accidentally not intentionally was

208

1 because Bill Amor gave his confession saying that
2 he intentionally did that?
3    A  That and none of them said they had a
4 cigarette that they lost track of.
5    Q  Well, is it your testimony as you sit here
6 that no one ever told you that somebody had lost a
7 cigarette in the living room that day?
8    A  I don't recall that.
9    Q  Is that something you would have wanted to
10 have known if a witness had said that?
11    A  We would have investigated that, yes.
12       MS. THOMPSON:  All right.  I don't have
13 any other questions.
14       MR. POLICK:  None for me.  Signature is
15 reserved.
16       THE VIDEOGRAPHER:  This concludes today's
17 deposition.  We are now going off the record at
18 3:04 p.m.
19       (Off the record at 3:04 p.m. CST.)
20
21
22
23
24

Transcript of David Ferreri
Conducted on September 11, 2020

53 (209 to 212)

209

1          ACKNOWLEDGMENT OF DEPONENT

2

3

4      I, #David Ferreri, do hereby

5  acknowledge that I have read and examined the

6  foregoing testimony, and the same is a true, correct

7  and complete transcription of the testimony given by

8  me and any corrections appear on the attached Errata

9  sheet signed by me.

10

11

12

13

14

15

16  _____ _____

17   (DATE)        (SIGNATURE)

18

19

20

21

22

23

24

210

1  CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

2

3     I, Paula M. Quetsch, Certified Shorthand

4  Reporter No. 084-003733, CSR, RPR, and a Notary

5  Public in and for the County of Kane, State of

6  Illinois, the officer before whom the foregoing

7  deposition was taken, do hereby certify that the

8  foregoing transcript is a true and correct record

9  of the testimony given; that said testimony was

10  taken by me stenographically and thereafter reduced

11  to typewriting under my direction; that reading and

12  signing was requested; and that I am neither

13  counsel for, related to, nor employed by any of

14  the parties to this case and have no interest,

15  financial or otherwise, in its outcome.

16     IN WITNESS WHEREOF, I have hereunto set my

17  hand and affixed my notarial seal this 19th day of

18  October, 2020.

19  My commission expires: October 16, 2021

20

21

22  _____

23  Notary Public in and for the

24  State of Illinois