97-0189

FILED
'98 JAN 27 PM 3: 23

*Nel Kagan*

1 STATE OF ILLINOIS )
                    ) SS:
2 COUNTY OF DU PAGE )

3
          IN THE CIRCUIT COURT OF DU PAGE COUNTY
4   FOR THE EIGHTEENTH JUDICIAL CIRCUIT OF ILLINOIS

5                                          FILED

6 THE PEOPLE OF THE STATE    )
  OF ILLINOIS,               )             OCT 08 1998
7           Plaintiff,       )
                             )             LOREN J. STROTZ, CLERK
8        -vs-                ) No. 95 CF   APPELLATE COURT 2nd DISTRICT
                             )
9 WILLIAM AMOR,              )
            Defendant.       )

10         REPORT OF PROCEEDINGS taken at the hearing

11 of the above-entitled cause, before the Honorable

12 RONALD MEHLING, Judge of said Court, on Thursday,

13 the 11th day of September, A.D., 1997, 1:30 p.m.

                                    ORIGINAL
14

15    PRESENT:

16
        MR. JOSEPH BIRKETT, State's Attorney
17      of DuPage County, by
        MS. ROBERTA O'LEARY and
18      MR. DAVID BAYER, Assistant
        State's Attorneys,
19
            appeared on behalf of the People of
20          the State of Illinois.

21      MR. WILLIAM PADISH,
        MS. JOAN PANTSIOS, and
22      MS. GLORIA NAJERA

23          appeared on behalf of the defendant.

   BARBARA JOHNSTON
24 OFFICIAL COURT REPORTER              Lic. No. 84-2903
505 N. COUNTY FARM RD. 3rd FLOOR
   WHEATON, IL 60187        DUPAGE COUNTY

                    C-001330

                              EXHIBIT 2

28

1    Q    And what electrical equipment did you

2    recover?

3    A    I collected -- I didn't actually collect

4    it, but I was with Officer Goergen when he did.

5    There was a fan, a lamp, and a TV and a V.C.R.

6    MS. PANTSIOS:  Thank you.  I have nothing

7    further.

8    THE COURT:  All right.

9    MS. O'LEARY:  Nothing further, Judge.  All

10   right.

11   THE COURT:  Thank you, ma'am.  You may step

12   down.  Watch your step.

13                        (The oath was thereupon duly

14                         administered to the

15                         witness by the Clerk.)

16   MS. O'LEARY:  May I proceed?

17   THE COURT:  You may.

18                    DAVID FERRERI,

19   called as a witness herein, having been first duly

20   sworn, was examined and testified as follows:

21                 DIRECT EXAMINATION

22                 By:  Ms. O'Leary

23   Q    Sir, could you in a nice loud voice state

24   your first and last name -- and spell your last

DUPAGE COUNTY

C-001357

1    name?

2         A    David Ferreri, F E R R E R I.

3         Q    Are you employed?

4         A    Yes, I am.

5         Q    By whom are you employed?

6         A    The City of Naperville.

7         Q    What is your occupation with the City of

8    Naperville?

9         A    I am a fire lieutenant.

10        Q    Presently, what is your position within

11   the fire department?

12        A    I am a company officer.

13        Q    And how long have you been a firefighter

14   in total?

15        A    21 years.

16        Q    How long have you been a lieutenant?

17        A    7 years.

18        Q    Do you have any special duties with the

19   Naperville fire department?

20        A    I am a fire investigator.  And I

21   coordinate the fire investigation team and I also

22   coordinate a program called the Juvenile Fire

23   Setters Program.

24        Q    Let me ask you first concerning your

DUPAGE COUNTY

C-001358

Pl. Amor 037249

30

1    duties as the coordinator of the fire

2    investigative team, how many individuals do you

3    supervise?

4        A    8.

5        Q    And what are your responsibilities as the

6    coordinator of this investigative team for the

7    City of Naperville fire department?

8        A    I review all of the records and reports

9    generated at fire investigations while they are

10   being processed and after they are completed, and

11   I funnel them on for filing.  I also coordinate

12   our trainings and our quarterly meetings.

13       Q    As the coordinator for the Juvenile Fire

14   Starter Program, can you briefly describe what

15   responsibilities you have in that position?

16       A    I conduct the program on an individual

17   basis of juveniles that have had a part in fire

18   play.  We make an evaluation to what their

19   motivation is and put emphasis on fire education

20   and then sometimes refer them out to further

21   counseling.

22       Q    Can you tell us and describe for us what

23   training you have had as a firefighter?

24       A    I have had thousands of hours in training.

DUPAGE COUNTY

C-001359

R 1350

Pl. Amor 037250

31

1    Q    Did some of that training cover the area

2    of fire origin and cause?

3    A    Yes, it has.

4    Q    What level are you presently certified at

5    as a firefighter with the State of Illinois?

6    A    I am a certified firefighter 3 with the

7    Illinois Fire Institute.

8    Q    And can you explain for the ladies and

9    gentlemen of the jury what it means to be

10   certified as a level 3 firefighter?  Is there any

11   higher level firefighter status within the State

12   of Illinois?

13   A    No, there is not.

14   Q    Approximately how many fires have you

15   personally been involved over your 21 years in

16   fighting?

17   A    Hundreds of fires.

18   Q    Can you describe for us now what fire

19   investigator training you personally have received

20   over the years?

21   A    I started with 120 hours of education

22   which resulted in my being certified by the State

23   of Illinois as a fire investigator and then I also

24   attend annual Continuing Education education,

C-001360

Pl. Amor 037251

32

1    also, just seminars. I have attended over 200

2    hours at those seminars.

3        Q    First referring to the 120 hour training

4    session, did that include information as to cause

5    and origin of a fire?

6        A    Yes, it did.

7        Q    Did it include information how to

8    determine cause and origin of a fire?

9        A    Yes, it did.

10       Q    Did this aspect of the 120 hours include a

11   portion that was both book study, educational

12   classroom information as well as practical

13   information where you would make certain

14   observations of actual fires and conduct your own

15   investigations?

16       A    Yes, it did. It was both conducted in the

17   classroom and in the field.

18       Q    And as a result of that 120 hour class,

19   did you take an examination?

20       A    Yes, I did.

21       Q    As a result of taking that examination,

22   can you tell us what you received and whether or

23   not you passed that examination?

24       A    Yes, I took the written examination and

DUPAGE COUNTY

C-001361

R 1352

Pl. Amor 037252

33

1    passed it, applied to the State for certification

2    and was awarded certification as a fire

3    investigator.

4        Q   I believe you have also indicated that you

5    attended a number of seminars in the area of fire

6    investigation, is that correct?

7        A   Yes, I have.  And as continuing education

8    the seminars were put on by Chicago's 3rd District

9    Division 10 Illinois Committee on Arson

10   Prevention, Travelers Insurance, Bureau of

11   Alcohol, Tobacco, and Firearms, and Chicago City

12   College.

13       Q   Have you also attended seminars concerning

14   advanced origin and cause over the years?

15       A   Yes, I have.  The Illinois Committee on

16   Arson Prevention and NEVIS have all conducted

17   seminars in advanced cause and origin

18   determination.

19       Q   When did you first obtain your

20   certification from the State of Illinois as a fire

21   investigator?

22       A   1986.

23       Q   Have you ever since that time lost your

24   certification?

DUPAGE COUNTY

C-001362

R 1353

Pl. Amor 037253

34

1      A    No, I have not.

2      Q    Have you personally, Lieutenant, had an

3  opportunity to teach classes to others in the area

4  of cause and origin of a fire?

5      A    Yes.  I teach our recruit firefighters

6  with Naperville along with certified firefighters

7  in their role in assisting with fire

8  investigations and I also presented a program to

9  the Illinois Committee on Arson Prevention in the

10  Fire Investigation Task Force concepts in which

11  the fire and police department work hand in hand.

12      Q    Have you had an opportunity when you

13  taught that class to teach others outside of the

14  Naperville fire department as well?

15      A    Yes.  There are fire investigators from

16  all agencies across northern Illinois.

17      Q    Can you explain for the ladies and

18  gentlemen what it means to be a certified fire

19  investigator?

20      A    I take on the responsibility to determine

21  cause and origin of a fire when I am requested to

22  a fire scene.

23      Q    And based upon your training, is it

24  possible in fact to determine the cause and origin

CITY OF COUNTY

C-001363

Pl. Amor 037254

35

1    of a fire?

2        A   Yes, it is.

3        Q   Did your training that you have received

4    in cause and origin of a fire and becoming a fire

5    investigator also include the study of fire and

6    the behavior of a fire?

7        A   Yes, it has.

8        Q   Approximately how many fires have you

9    personally investigated?

10       A   I have been involved in about 70 fire

11   investigations.

12      Q   And out of these 70 investigations, have

13   some of the fires that you have investigated been

14   determined to be accidental in nature while others

15   have been determined to be incendiary in nature?

16      A   Yes.

17      Q   Have you testified before as an expert as

18   to cause and origin of a fire?

19      A   Yes, I have.

20      Q   How many times?

21      A   Three times.

22      Q   What counties have you been qualified as

23   an expert before and have you testified before?

24      A   DuPage County and Cook County.

CURACI COUNTY

C-001364

36

1       Q   Do you belong to any professional

2   associations or organizations with regard to fire

3   investigation cause and origin determination?

4       A   Yes, I belong to the International

5   Association of Arson Investigators; I belong to

6   the Illinois Committee on Arson Prevention; I

7   belong to the Illinois Professional Firefighters

8   Association; and I belong to the Northern Illinois

9   Fire Investigation Strike Force.

10      MS. O'LEARY:  Your Honor, at this time I would

11   tender Lieutenant Ferrari as an expert in fire

12   investigation as to cause and origin.

13      THE COURT:  Very well.  Defense?

14      MS. PANTSIOS:  Your Honor, we have no

15   questions.

16      THE COURT:  You may proceed with further

17   questioning.

18   BY MS. O'LEARY:

19       Q   Sir, I would like to draw your attention

20   to the date of Sunday, September 10th, 1995 at

21   approximately 7:45 P. M.

22       Were you called to 218 East Bailey in

23   Naperville, unit M., to investigate a fire?

24       A   Yes, I was.

DUPAGE COUNTY
C-001365

37

1      Q   And did you, in fact, respond to that

2  location?

3      A   Yes, I did.

4      Q   Could you please describe for the ladies

5  and gentlemen of the jury the building that's

6  located at that address?

7      A   It's a brick 3 story building with

8  multiple occupants in the apartment building.

9      Q   What did you do once you first arrived

10  there?

11      A   I met with the fire officer in charge who

12  gave me a briefing as to what had occurred.  He

13  told me that there had been a fire on the 3rd

14  floor and one victim had been removed to the

15  hospital.

16      Q   What did you do after you spoke with this

17  individual?

18      A   I went up to the unit that he had

19  described that suffered fire.

20      Q   Could you please describe for the ladies

21  and gentlemen of the jury what you observed once

22  you reached the 3rd floor level?

23      A   The 3rd floor level was very dark.  The

24  electricity was off in the building.  The brick

DUPAGE COUNTY

C-001366

Pl. Amor 037257

38

1   walls in the hallway were covered with black soot.

2   There were 4 doors off the foyer, all were open,

3   one door obviously was dark and blackened making

4   it obvious which was unit M. that had the fire in

5   it.

6       Q    What did you do after you made these

7   observations?

8       A    I entered unit M.

9       Q    Would you please describe what you

10  observed once you entered unit M.?

11      A    There was still smoke and mist in the air.

12  It was very warm.  The power was off.  There were

13  several firefighters engaged in overhaul

14  operations which is when they are extinguishing

15  small hidden areas of fire.

16      Q    At this time, I believe you indicated it's

17  approximately 8:00 o'clock P. M. you are walking

18  into unit M. for the first time.

19          At that time, you indicated the

20  temperature was still very warm?

21      A    Yes.

22      Q    What did this indicate to you?

23      A    That a significant fire had occurred in

24  that unit.

COUNTY
C-001367

Pl. Amor 037258

39

1     Q   What did you do with respect to the

2   firefighters once you initially walked into that

3   area?

4     A   I identified the officer in charge inside

5   and asked him that if all immediate activities

6   were taken care of in terms of extinguishing the

7   fire, if they could cease all activity and leave

8   the unit.

9     Q   What did they then do that you observed?

10     A   He cooperated and they all left at that

11   time.

12     Q   What did you then do?

13     A   I then made a brief walk-through of the

14   unit to get an idea of the floor plan and

15   preliminary ideas on the damage involved.  I left

16   the unit and placed a firefighter at the door to

17   keep anybody else from entering.

18     Q   After your initial walk-through of the

19   unit, unit M. at 218, were you able to determine

20   an area that had appeared to have sustained the

21   majority of the fire damage?

22     A   Yes, the living room area on initial

23   observation suffered the most severe damage.

24     Q   I believe you then indicated you then left

UKRAGE COUNTY

C-001368

40

1    the unit, unit M.

2         Where did you go when you left?

3    A    I went back down to the parking lot area

4    and met with the assistant chief in charge and

5    told him I was going to summon additional help to

6    help process the scene.

7    Q    A short time later did you have an

8    opportunity to once again be back on that landing

9    outside of unit M.?

10   A    Yes.  When the people requested were

11   assembled, we met on the 3rd floor in the foyer.

12   Q    Who was it that you met at that location?

13   A    Detective Cross and Detective Guerrieri

14   from the police department and fire lieutenant's

15   Steve Hinz and firefighter Barry Quan from the

16   fire department.

17   Q    What did you do at that time?

18   A    We made a real quick walk-through of the

19   unit, again, to give everybody an idea on what had

20   occurred and then we formulated a game plan as to

21   who was going to do what.

22   Q    What was the assignment that you gave

23   Detective Cross and Detective Guerrieri at that

24   time.

COUNTY
C 001369

41

1      A    They were going to start assembling as

2 much information as they could in terms of the

3 occupants and start taking statements from

4 neighbors and witnesses.

5      Q    And what did you then do with the other 2

6 firefighters that were there?

7      A    We decided that we would start the

8 physical scene, processing.

9      Q    When you physically processed the scene,

10 did you then have an occasion to go back inside of

11 unit M.?

12      A    Yes, we entered the unit.

13      Q    Was there a particular order in which you

14 examined the rooms within unit M.?

15      A    We entered and moved to our right. That

16 way we would have a formulated, organized travel

17 through the unit taking each of them room by room.

18      Q    And what was the first room that you came

19 to and you examined upon entering in to the

20 apartment?

21      A    Just inside the front door, we were in the

22 dining area. And that area had sustained quite

23 significant damage. I wanted to further examine

24 it but not at that time. So we proceeded into the

KANE COUNTY

C-001370

Pl. Amor 037261

42

1       kitchen.

2           Q    When you proceeded in to the kitchen,

3       could you please describe for us what you observed

4       in the kitchen?

5           A    It was a typical kitchen in an apartment,

6       all surfaces had a heavy accumulation of soot.

7       There was evidence of high heat, the seal in the

8       refrigerator door had melted away.  All appliances

9       had soot on them.

10              I looked at the stove, all of the switches

11      on the stove were in the off position.  The stove

12      was covered with soot, but there was no evidence

13      of any direct flame contact on or around the

14      stove.

15              I moved the stove away from the wall; the

16      gas supply line was still hooked to it.  The gas

17      valve was open.  No evidence, though, that it was

18      damaged, and it was my opinion that there was no

19      direct fire damage to anything in the kitchen

20      which told me that the origin of the fire was not

21      in the kitchen.

22          Q    I believe you indicated that you did, in

23      fact, observe the gas hookup to the stove that was

24      in the kitchen, is that correct?

DUPAGE COUNTY
C - 001371

R 1362

Pl. Amor 037262

43

1    A   Yes.

2    Q   Did you note anything of significance that

3    would have indicated to you that the fire,

4    somehow, started with regard to the stove?

5    A   There would have been significant damage

6    to the appliance if the fire had started there.

7    And there was none.

8    Q   I believe you indicated that there was

9    some heavy soot damage in the kitchen area.

10   A   Yes, all surfaces, walls, ceiling, and the

11   appliances and contents of the kitchen had a heavy

12   black coating.

13   Q   What did this indicate to you?

14   A   That heavy smoke and heat had entered the

15   kitchen from another room.

16   Q   After you had ruled out the kitchen as

17   being the source of origin, did you then travel to

18   another location?

19   A   Yes.  Moving to our right, we entered the

20   hallway and observed that on the south end of the

21   hallway, there was quite severe damage.  The

22   carpet had been burned away at the floor.  The

23   walls sustained flame contact damage which is

24   evident by the paint being burned off, the walls

MONROE COUNTY

C-001372

R 1363

Pl. Amor 037263

44

1   being very light.

2          There was damage to the base board at

3   floor level.  As we moved north down the hall, the

4   line of damage became higher and higher and at the

5   north end it was -- it consisted only of soot

6   accumulation on all surfaces.  The carpet at the

7   north end of the hallway was intact but soot

8   covered.

9      Q   Lieutenant, I see you are referring to the

10  diagram here we have marked as People's Exhibit

11  No. 4.

12         Would that diagram assist you in

13  explaining to the ladies and gentlemen of the jury

14  where you noted the more significant fire damage

15  in the hallway?

16     A   Yes, it would.

17     Q   Your Honor, at this time I ask that the --

18  Strike that.

19         Lieutenant, again, looking at People's

20  Exhibit No. 4, do you recognize that to be a true

21  and accurate diagram or depiction of the layout of

22  unit M. at 218 East Bailey?

23     A   Yes, it is.

24         MS. O'LEARY:  At this time, your Honor, I ask

DUPAGE COUNTY

C-001373

45

1    that the lieutenant be allowed to step down and

2    use the diagram to explain the damage he observed

3    in the hallway.

4        THE COURT:  Certainly.

5    BY MS. O'LEARY:

6        A    As I stated, most severe damage was pretty

7    much in this area where the hallway is.  On behalf

8    living room/dining room area, as we proceeded

9    north, the damage -- we call it line of

10   demarcation -- separates flame contacts and on

11   drywall flame contact is left white looking.  The

12   paint is either burned or missing completely.

13       As we move north, that line of demarcation

14   went up to a point when we got to this end of the

15   wall from ceiling to floor was covered with soot.

16   The carpet was intact but covered with soot.

17       Q    Thank you.  If you could again go back to

18   the witness stand.

19       I believe you used the term line of

20   demarcation, is that correct?

21       A    Yes.

22       Q    What is the -- what does it mean, a line

23   of demarcation?

24       A    It's a form of physical evidence that we

C-001374

R 1365

Pl. Amor 037265

46

1    use to determine heat levels in certain rooms. As

2    a fire progresses, high heat moves from one room

3    to the next, it effects physical contents. And as

4    I stated, it's most obvious on a wall in terms of

5    the damage done to the wall.

6        Q   What did you note about the line of

7    demarcation at the south end of the hall, which

8    would be closer to the living room/dining room

9    area as opposed to the north end of the hall which

10    would be down by the linen closet?

11        A   The line was much lower, indicating that

12    to me that the fire had entered the hallway from

13    the south end.

14        Q   And what did you observe about the floor

15    in the area of the south end?

16        A   The floor to the building is concrete. It

17    was covered -- the whole unit was covered with

18    wall-to-wall carpeting. The carpet and pad was

19    burned away at the south entrance.

20        Q   What did you notice about the floor

21    further down the wall by the north end -- Strike

22    that, by the linen closet?

23        A   The carpeting was intact.

24        Q   What did this indicate to you?

_____ COUNTY

C-UU1375

47

1    A   Again, that fire, the most intense heat

2  had entered the hallway from the south end.

3    Q  And when you are referring to fire, what

4  are you talking about?  Are you talking about the

5  actual flames that you would observe in a fire?

6    A   Yes.  In a fire, damage is done by two

7  methods, one by direct flame contact, which causes

8  usually the most severe damage.  The actual

9  destruction of a content.  And damage is also

10  caused by smoke or heated gas.  The object will be

11  identifiable, it will be darkened and it may be

12  melted depending on what material it is made out

13  of.

14    Q  Do you have an opinion based upon the

15  observations you made in the hallway as to where

16  the fire had originated, what area it would have

17  been closer to, the south area or the north end of

18  the hallway?

19    A   The fire originated more towards the south

20  end of the hallway.

21    Q  Did you have an opportunity to inspect

22  that same hallway in the area then also -- the

23  hallway I believe you have indicated it goes

24  primarily north/south.  Is there another section

DUPAGE COUNTY

C-001376

R 1367

Pl. Amor 037267

48

1    of the hallway, however, that jogs a little bit?

2        A    Yes, at the north end it turns south --

3    turns east which goes in to 2 bathrooms there.

4        Q    Did you have an opportunity to inspect the

5    entire hallway for the presence of a smoke

6    detector?

7        A    Yes, I did.  I was looking for evidence of

8    a smoke detector in every room.

9        Q    What, if any, smoke detectors did you

10   locate in any condition in that hallway?

11       A    There was no evidence that a smoke

12   detector was present.

13       Q    Can you explain for the ladies and

14   gentlemen of the jury -- Strike that.

15            As a matter of fact, going ahead for just

16   a moment to September 19th, 1995, did you have an

17   opportunity on that date to go back to unit M. at

18   218 East Bailey?

19       A    Yes, I did.

20       Q    What was the reason you went back to that

21   unit at that time?

22       A    We had received information from the

23   DuPage Housing Authority that a smoke detector was

24   present in that unit upon their last examination.

DUPAGE COUNTY

C-001377

R 1368

Pl. Amor 037268

49

1     Q   And did you have a specific area that the

2   smoke detector was present?

3     A   Yes.  We were told it was in the hallway

4   toward the north end of the hallway where it turns

5   east to go to the smaller bathroom.  If you are

6   entering the bathroom, to your immediate right

7   there was a circuit breaker panel.  And we were

8   told that the smoke detector was attached to the

9   wall above the circuit breaker panel.

10     Q   Did you specifically on September 19th,

11   1995 look for any evidence that the smoke detector

12   during the fire had been present, mounted on the

13   wall in that area?

14     A   Yes, I did.

15     Q   What did you observe?

16     A   The wall above the circuit breaker panel

17   was very consistently covered with soot.  There

18   were 2 little plastic anchors noted that had -- at

19   one time, apparently, held a smoke detector.  They

20   were the right distance apart, but there was no

21   evidence that a detector was there.

22     Q   How is it that you are able to say there

23   was no evidence?  What would you expect to observe

24   if a smoke detector had been mounted to that wall

DUPAGE COUNTY

C-001378

50

1   at the time of the fire back on September 10th, of

2   1995?

3      A   The wall behind the smoke detector would

4   have been protected from the fire, originally.  It

5   wouldn't have suffered the same damage as the

6   unprotected wall.  There also would have been

7   remains of melted plastic in the internal

8   components of the smoke detector.  We found none

9   of that.

10      Q   As a matter of fact, Lieutenant, what

11   would you expect to observe if the smoke detector

12   at one point on September 10th, 1995 when the fire

13   was occurring had been mounted to the wall, but

14   then melted off during the course of the fire?

15      A   There would have been an outline to the

16   shape of the detector, whether it was square or

17   round, we would have seen it on the drywall.

18      Q   Somehow there would have been a line,

19   again?

20      A   Yes.

21      Q   Physical evidence that would have shown

22   the outline of the smoke detector?

23      A   Yes.

24      Q   Did you observe any indication whatsoever

DUPAGE COUNTY

C-001379

51

1　that a smoke detector had been mounted to that

2　wall during the fire?

3　　　A　None whatsoever.

4　　　Q　Again, I would like to go right back to

5　September 10th.  When you are going through your

6　walk-through at this time, after searching the

7　hallway, did you have an opportunity to search

8　another area?

9　　　A　Yes, the next room we moved into was the

10　smaller bathroom, the half bathroom.  We observed

11　heavy sooting on all surfaces, walls, mirror,

12　contents, some melting of plastic materials; no

13　evidence of any direct flame contact.

14　　　Q　What did this information indicate to you

15　including the fact that there was no evidence of

16　direct flame contact?

17　　　A　That smoke had filled that room, also,

18　from another portion of the unit, and that the

19　origin of that fire was not in the bathroom.

20　　　Q　What did you then do?

21　　　A　Moved to the next room which was the

22　larger bathroom; observed the same things, heavy

23　sooting, some melting of plastics, no evidence of

24　any direct flame contact.  And again, my feeling

DUPAGE COUNTY

C-001380

R 1371

Pl. Amor 037271

52

1    was the origin of the fire was not in that

2    bathroom.

3        Q   After examining the full bathroom at this

4    point, did you then have an opportunity to examine

5    the linen closet?

6        A   Yes, as we continued to our right.  There

7    was a linen closet, the doors had been open at the

8    time of the fire.  That was determined because the

9    contents of the linen closet were covered with

10    soot and did show some damage due to heat.

11        Q   What did you observe about the condition

12    the linen closet and the contents of the linen

13    closet specifically referring to direct fire

14    contact damage?

15        A   No evidence of any flame contact.  All

16    damage was due to exposure to high heat and smoke

17    which again told me that the origin of the fire

18    was not in the linen closet.

19        Q   After you examined this area, did you then

20    examine a further area of unit M.?

21        A   We moved in to the master bedroom,

22    observed again heavy sooting to surfaces, walls,

23    contents, carpet.  No evidence of any direct flame

24    contact.

ORANGE COUNTY

C-001381      R 1372

Pl. Amor 037272

53

1            I did examine the door to try to determine

2    if it was open or closed at the time of the fire.

3    The way we do that is by looking at the carpet and

4    if the door was open, the carpet directly under

5    the door would be clean again because it wasn't

6    exposed to the heat.

7            When I moved the door slightly, I saw a

8    clean area of carpet which told me the position of

9    the door when the fire occurred which is the full

10   open position.

11   Q   Lieutenant,  just so I am clear, so the

12   door -- obviously, a door has hinges to it.  Do

13   you remember which side of the doorway --

14   A   As you enter the doorway, the hinges are

15   on the left.

16   Q   You indicated the door was open.  How is

17   it that you were able to determine that at the

18   time of the fire the door was opened?

19   A   Again, the main observation is the carpet.

20   The carpet one-fourth inch or three-eighths,

21   whatever it is, is clear.  If we also look for the

22   doorjamb, the wood frame will sustain even damage

23   all the way across it.  If the door is closed,

24   again, that surface isn't exposed to the heat and

DUPAGE COUNTY

C-001382

Pl. Amor 037273

54

1    smoke, it will suffer less damage.

2       Q   Can you please describe for the ladies and

3    gentlemen of the jury then the furniture and

4    basically how the items were arranged in the

5    master bedroom?

6       A   They were fairly typical.  The bed is

7    pretty much as you see it, standing at the foot of

8    the bed if you are facing the head of the bed,

9    there is a night stand to the left of the bed at

10   the head.  There was a dresser which would be on

11   the north wall, a closet is as you see it, had

12   typical contents.

13      Q   What did you observe about the walls

14   within the master bedroom?

15      A   Heavily soothed down to an area of about a

16   foot off the floor, contents of the room, all

17   surfaces also had a heavy accumulation of soot.

18      Q   What did this indicate to you?

19      A   That that room, also, was filled with gas,

20   fire, gas, and smoke from a fire in another part

21   of the unit because of the absence of any direct

22   flame contact to any object in that room.

23      Q   Can you explain for the ladies and

24   gentlemen of the jury what you mean, what is soot?

DUPAGE COUNTY

C-001383

R 1374

Pl. Amor 037274

55

1    What are you talking about when you are talking

2    about soot?

3         A    When a fire burns, it decomposes objects.

4    Sometimes it burns very efficiently and they are

5    gone completely with very little smoke.  But what

6    smoke is is actually the object being burned.

7    It's not burned completely, a lot of the chemicals

8    coming off that object turn into this thick black

9    smoke and is released into the atmosphere,

10   depending how efficiently the fire is burning

11   depends how much smoke there is.

12        Q    I believe you indicated you observed soot

13   all the way almost about a foot --

14        A    Heavy soot.  There was soot on the carpet

15   but not as heavy from about a foot off the floor

16   up to the ceiling.

17        Q    What did you observe about the plastics

18   within this room?

19        A    They were melted at various stages.

20   Again, due to exposure to heat and smoke, nothing

21   showed evidence of direct flame contact damage.

22        Q    And in addition to the information you

23   observed on the floor of the door, did you make

24   any other observations in the master bedroom

DUPAGE COUNTY

C-001384

R 1375

Pl. Amor 037275

56

1   concerning the floor?

2      A   Towards the foot of the bed there was a

3   clean area of carpet that formed the silhouette of

4   the victim where she was lying when the

5   firefighters found her and removed her.

6      Q   Again, lieutenant, why is this silhouette

7   area left on a carpet surface during a fire?

8      A   Her body protected the carpet as the fire

9   progressed and burned, the area of carpet under

10   her body was protected.  It wasn't exposed to the

11   heat, smoke that the other surfaces in that room

12   were.

13      Q   After making these observations of the

14   bedroom, did you then make observations of the

15   south bedroom?

16      A   Yes, the next bedroom we came across was

17   the smaller bedroom.  The door had been closed at

18   the time.  This I learned from statements from the

19   firefighters that conducted the search and rescue

20   activity in the apartment.  And also, the contents

21   to that room were fairly clean, very little

22   evidence of any soot or smoke damage to the

23   contents.

24      Q   Lieutenant, just going back for one moment

DUPAGE COUNTY

C-001385

Pl. Amor 037276

57

1  to the master bedroom, you indicated this outline

2  on the floor of the victim's body, was there some

3  indication that there was some soot under that

4  outline?

5      A   Yes, there was minimal amounts, but there

6  was a distinction between that amount and the soot

7  on the rest of the carpet.

8      Q   That would indicate to you that the victim

9  went down in that position some time prior to --

10  as the fire was burning and the soot was

11  continuing to come in to the room?

12      A   That told me that some soot had been

13  deposited onto that carpet before she was in that

14  position.

15      Q   Thank you.  Now, what did you note about

16  the bedroom door in the south bedroom?

17      A   It had been closed at the time of the

18  fire.  Again, evident by the real clean walls,

19  clean contents in that bedroom.  The wood panel

20  facing the hallway was almost just about burned

21  away from a distance a couple feet down from the

22  door.  The wood panel facing inside of the bedroom

23  was intact.

24      MS. O'LEARY:  If the record can reflect I am

CUYAGE COUNTY

C-001386

R 1377

Pl. Amor 037277

58

1   showing counsel a series of photographs.  If we

2   can show them all photographs including exhibits

3   1, 16, 17, 7, 8, 9, 27, 10, 5, 28, and 6?

4        THE COURT:  So reflect.

5        MS. O'LEARY:  May I approach the witness?

6        THE COURT:  Yes.

7   BY MS. O'LEARY:

8        Q    Lieutenant, I would first like to show you

9   what we have marked as People's Exhibit No. 1 for

10  identification.

11            Do you recognize what's depicted in this

12  photograph?

13       A    Yes.  This is the entrance door to unit M.

14       Q    And what do you note about the entrance

15  door of significance there?

16       A    It looks as if it did when I entered it.

17  The hallway shows soot on the walls, damage to the

18  contents of the foyer.  The door also shows signs

19  of being forcibly entered, forcibly opened by the

20  fire department.

21       Q    Does that photograph truly and accurately

22  reflect the conditions of the door when you

23  observed it on September 10th 1995?

24       A    Yes.  It does.

DUPAGE COUNTY

C-001387

Pl. Amor 037278

59

1      Q   Referring now to what we have marked as

2  People's Exhibit No. 17 for identification.  Do

3  you recognize what's depicted in that photograph?

4      A   Yes.  This is a hallway.  The photographer

5  was standing on the south end of the hallway

6  facing north.

7      Q   What do you note about the condition of

8  the hallway at that time?

9      A   It's evident the line of demarcation I

10  spoke of is lower at the south end and it raises

11  as you go toward the north end of significant

12  damage to the upper portions of the hallway.  The

13  drywall that is missing was removed by fire

14  fighting activity.

15      Q   Referring now to what we have marked as

16  People's Exhibit No. 16, can you tell us what is

17  depicted in People's Exhibit No. 16?

18      A   This is a photograph.  The photographer

19  was photographing in the master bedroom out

20  through the door toward the hall where the circuit

21  breaker panel is located.  You can also see the

22  level of soot on the door frame as it came down

23  heaviest at the ceiling and levels decreasing as

24  you got towards the floor. DUPAGE COUNTY

C-001388

Pl. Amor 037279

60

1    Q    And Lieutenant, I believe this would --

2    depicted in that photograph would be the door to

3    the master bedroom?

4    A    Yes.  And if you look close towards the

5    bottom you will see the light area next to the

6    door which is that area of carpet that was fairly

7    clean and protected by the door, showing its

8    position at the time of the fire.

9    Q    Does that exhibit also show the area where

10   you observed on the 19th of September the 2 screws

11   that were used to attach the smoke detector to the

12   door?

13   A    Yes, in the area above the circuit breaker

14   panel we found 2 plastic anchors that had held a

15   smoke dector.

16   Q    Thank you.  Showing you now what we have

17   marked as People's Exhibit No. 7, do you recognize

18   what's depicted in People's Exhibit No. 7?

19   A    Yes, this is the head of the bed in the

20   master bedroom.

21   Q    And what, if anything, do you note about

22   the walls and the soot in that room?

23   A    There is soot on the walls, ceiling, and

24   contents of the room.  The night table next to the

DUPAGE COUNTY

C-001389

Pl. Amor 037280

61

1      bed and its contents were all covered with soot.

2          Q    Referring now to People's Exhibit No. 9,

3      do you recognize what's depicted in that

4      photograph?

5          A    Yes.   This is the foot of the bed and the

6      floor area in the master bedroom.

7          Q    Does that particular area depict -- that

8      photograph -- the outline, the silhouette, if you

9      will, of the victim where she had collapsed on the

10     floor?

11         A    Yes, it does.   It is this light area in

12     the carpet right here.   The head and arm being at

13     this end and dorso and legs extended that way.

14         Q    Referring now to People's Exhibit No. 27.

15         A    This is the bedroom in the master bedroom

16     or the closet in the master bedroom showing

17     typical contents.   You can see the degree that the

18     soot covered the contents, again, thicker at the

19     ceiling level and decreasing as you go down

20     towards the floor.   There was soot on the floor.

21         Q    Referring now to People's Exhibit No. 5,

22     do you recognize what's depicted in People's

23     Exhibit No. 5?

24         A    This is the door to the second bedroom.

DUPAGE COUNTY

C-001390

Pl. Amor 037281

62

1    This door had been closed.  There is a boot print

2    in the middle of the door from the firefighter who

3    kicked it open during his search of the unit.

4    Right toward the top you can see where the outside

5    panel of the door is burned away.

6        Q   If you can now refer to People's Exhibit

7    No. 10, do you recognize what that is and where

8    was that item found?  What room in the residence?

9        A   This is the bed in the master bedroom and

10   that is the phone as it was positioned when I

11   first entered the unit.  Statements from

12   firefighters stated that it was the cord going

13   from that handset to the base of the phone was

14   tangled in the victims legs and they remember

15   untangling that while they were removing her and

16   throwing it up on the bed.

17       Q   And again, going back to the south

18   bedroom, showing you what we marked as People's

19   Exhibit No. 28, do you recognize what that is?

20       A   Yes, this is the top of the door frame and

21   the top of the door to the second bedroom.  You

22   can see that outside panel of the door burned

23   away, the side that faced the hallway.

24           The doorjamb had various degrees of damage

C-UO1391

R 1382

Pl. Amor 037282

63

1    where the door contacted it.  There was actually

2    paint left, you can see the color of the paint

3    that was protected, again, because the door was

4    closed and covering that portion of the frame.

5        Q    Now, referring to lastly People's Exhibit

6    No. 6, do you recognize what that is shown in that

7    photograph?

8        A    The contents of the smaller, second

9    bedroom.  As you can see they are clean, very

10   little soot evidence in there.  The closed door

11   kept the fire and smoke out of this room.

12       Q    Are each of those exhibits, the

13   photographs that I have shown you, 1, 16, 17, 7,

14   8, 9, 27, 10, 5, 28, and 6, do they truly and

15   accurately depict the condition of the various

16   items that you have described within unit M. at

17   218 East Bailey on September 10th, 1995?

18       A    Yes, they do.

19       Q    Now, after you went through these rooms,

20   did you have an opportunity to then examine the

21   living room and dining room area?

22       A    Yes, I did.

23       Q    And could you for the ladies and gentlemen

24   of the jury explain initially when you looked at

C-001392

Pl. Amor 037283

64

1    the living room and the dining room, could you

2    sort of determine just by looking, without moving

3    anything, where it appeared that there was most

4    extensive damage?

5        A    Yes.   It was obvious that the most severe

6    damage had occurred at the west end of the living

7    room.

8        Q    What did you do relative to the dining

9    room and the living room area at this time once

10   you made these observations?

11       A    In the progress of examining the physical

12   scene, we always move from the least destruction

13   and move to the area of greatest destruction.  We

14   then examined the dining room because it didn't

15   show the level of damage that the living room did.

16       Q    Can you describe what you found in the

17   dining room?

18       A    A dining room table, 4 upholstered

19   chaired, contents on top of the table, papers,

20   ashtrays, they all showed evidence of damage from

21   being exposed to high heat and smoke, not damage

22   from direct flame contact.

23       Q    What did this indicate to you?

24       A    That the origin of the fire was not in the

COUNTY
C-001393

R 1384

Pl. Amor 037284

65

1    dining room.

2         Q    Did you then make certain observations of

3    the living room area?

4         A    Yes, I did.

5         Q    Can you describe for the ladies and

6    gentlemen the condition of the living room at this

7    time when you were in there?

8         A    It was quite a bit of drywall and

9    insulation down on the contents of the living

10   room.  In the course of the fire fighting

11   activities, drywall had fallen down, had been

12   knocked down.  It was very wet.  The contents of

13   the living room were moved around and that was

14   done by the firefighters during their search of

15   the unit.

16        Q    What did you do at that time in order to

17   further your investigation?

18        A    What I wanted to do was to remove the

19   drywall and insulation from those contents and

20   then replace the contents to their position at the

21   time of the fire.

22        Q    How was it that you cleaned up or removed

23   the drywall and the insulation?

24        A    The drywall and insulation were removed

DUPAGE COUNTY

C-001394

R 1385

Pl. Amor 037285

66

1   handful by handful.  They were very wet and

2   brittle.  We searched, examined each handful, put

3   it in a bucket and carried it out.

4        Q    About how large of an area are we talking

5   about that you did this in?

6        A    15 feet by 13 feet.

7        Q    And who, if anyone, was assisting you in

8   this process?

9        A    Firefighter Barry Quan and Lieutenant

10  Steve Hinz.

11       Q    Where were they working in relation to

12  you?

13       A    We were pretty much side by side.

14       Q    How long did it take the 3 of you to hand

15  by hand remove all of the drywall and insulation

16  in this area?

17       A    About 4 hours.

18       Q    After you had removed the drywall and

19  insulation, what was the next step you took in

20  furtherance of your investigation?

21       A    To identify and replace the contents to

22  their position at the time of the fire.

23       Q    How did you go about doing that?

24       A    As far as identification, just look at the

C-001395

R 1386

Pl. Amor 037286

67

1    content and you can get an idea to what it was.

2    And as far as positioning, we usually look at the

3    floor.  Again, if an object is covering a surface

4    of the floor at the time of the fire, that area of

5    surface will have a different degree of damage.  A

6    lot of times it will be clean, the carpet will

7    still remain.

8        Q   Were you able to identify the items

9    that -- or the furniture and items, electronic

10   items, present in the living room at the time of

11   the fire?

12       A   Yes, we were.

13       Q   What did you determine were the items that

14   were present in the living room area?

15       A   There was a recliner chair, a sofa, coffee

16   table, this -- the remains of a swivel chair, a

17   television and V.C.R. that was on a small metal

18   stand, and 2 desks, one smaller, one larger.

19   There was a trunk under one of the desks, and

20   there was a suitcase behind the recliner and also

21   a floor lamp and a box fan.

22       Q   Were you able to place these items back

23   into the living room?

24       A   Yes, we were.



... ... CPUNTY
C-001395

Pl. Amor 037287

68

1      Q  And I believe you have indicated for us

2  how you were able to place these items back into

3  the room.  Could you again, using People's Exhibit

4  No. 4, could you explain for us and identify the

5  position of the various items within the room?

6      A  Can I step down?

7  THE COURT:  Yes.

8  THE WITNESS:  Starting at this point by the

9  hallway, this was a larger of the 2 desks

10  contained a trunk underneath it.  This was a

11  smaller desk.  Between that desk and the

12  television, there was a floor lamp and a box fan.

13  This was the television and V.C.R. on a small

14  metal stand.  The remains of a swivel chair were

15  here, sofa, coffee table, and recliner chair.

16  BY MS. O'LEARY:

17      Q  I believe you also indicated there was a

18  suitcase in the room?

19      A  The suitcase was behind the recliner

20  chair.

21  MS. O'LEARY:  Again, if you can have a seat

22  back in the witness box.  If the record can

23  reflect I am showing counsel People's Exhibit No.

24  24.

C..... COUNTY
C-001397

R 1388

Pl. Amor 037288

1       THE COURT:  Sure.

2    BY MS. O'LEARY:

3       Q    Lieutenant, referring you to People's

4    Exhibit No. 24, the diagram that Bill Amor

5    prepared on September 15th, 1995 indicating the

6    position of the items, the furniture and the

7    television and the V.C.R., the fan, the lamp

8    within the room of the living room, those items

9    that he indicated where they were located, how, if

10   at all, did those items differ from where you had

11   positioned the items?

12      A    They did not differ, they were in the same

13   position.

14      Q    So, now you have everything back in the

15   room in its condition that it was in, placement it

16   was before.

17           Did you make certain observations at this

18   time concerning the walls in the room?

19      A    Yes, I did.

20      Q    Can you explain for the ladies and

21   gentlemen of the jury what it is, generally, that

22   a fire investigator does?

23      A    We look for the cause which is how a fire

24   started.  And the origin which is where the fire

C-001393

Pl. Amor 037289

70

1    started.

2        Q    Can you explain what a fire is?

3        A    Simply put, a fire is a chemical reaction

4    that gives off light and heat.  As an object is

5    heated, it decomposes molecularly.  It starts

6    giving off vapors, those vapors mix with oxygen

7    and are exposed to a heat source, open flame

8    develops, the heat rises until it hits a ceiling

9    and then it spreads out laterally until it hits

10   the walls.

11        As long as fire is generated, the layer of

12   heat gets thicker because the walls are holding it

13   in.  It will move down towards the floor radiating

14   heat on to the other contents in the room.

15        If the fire continues to burn and that

16   radiant heat continues to the other contents, they

17   will reach their ignition temperatures and at one

18   point a phenomena that we call flash-over occurs

19   where all of the contents in that particular

20   portion of the unit will ignite simultaneously.

21        Q    Are you familiar with the term V. pattern?

22        A    Yes, I am.

23        Q    What is a V. pattern?

24        A    It's a sign of physical evidence that we

C-001398A

R 1390

Pl. Amor 037290

71

1    look for.  When a fire starts, usually in what we

2    call the incipient phase which is when it is first

3    starting, it will start low, and as I said, it

4    moves up and it will move out.  And it will effect

5    the contents around it in that you will see burn

6    markings in a shape of a V. and it usually

7    indicates an origin of a fire.

8         Q    And did you observe a V. pattern in the

9    living room?

10        A    Yes, I did.

11        Q    Could you describe for the ladies and

12   gentlemen where the apex of the V. pattern was

13   located in the living room?

14        A    The V. pattern was on the wall behind the

15   swivel chair.  The apex was at the floor level.

16        Q    What piece of furniture was in the area of

17   the apex of the V. pattern?

18        A    A swivel chair.

19        Q    What did this indicate to you?

20        A    Initially that the origin of that fire was

21   in that area.

22        Q    Could you describe for the ladies and

23   gentlemen what the term "fire load" means?

24        A    Fire load is what in that unit was

GRANT COUNTY
C-001399

R 1391

Pl. Amor 037291

72

1   combustible, what fuels were present and how much.

2      Q   What was the extent of the fire damage

3   done to the swivel chair?

4      A   Very severe in that the only components

5   left was the swivel base of the chair, some

6   upholstery, and some of the cotton batting,

7   stuffing on the chair.

8      Q   What did this indicate to you?

9      A   This chair had suffered the most severe

10   damage of anything in that area which again is an

11   indication that it was subjected to heat longer

12   than any other object.  And it's evidence of the

13   origin of the fire.

14      Q   Did you subsequently after observing the

15   swivel chair make observations about the condition

16   of the couch?

17      A   Yes, I did.

18      Q   What did you note about the condition of

19   the couch?

20      A   It was severely damaged.  It was a

21   polyurethane foam cushion typical couch.  The west

22   end of the couch closest to where the swivel chair

23   was had sustained the heaviest damage.  There was

24   evidence all across the couch it had sustained

DUPAGE COUNTY

C-001400

R 1392

Pl. Amor 037292

73

1  significant damage.  The cushions were burned away

2  except for the bottom surface.

3    Q   What did you note about the condition of

4  the couch relative to that swivel chair and what

5  did this indicate to you?

6    A   Again, the wooden frame of the couch was

7  intact and all areas except the west end of the

8  sofa which is closest to the swivel chair.  The

9  wooden frame at that end had come apart and was

10 deeply charred indicating to me that it had been

11 subjected to heat of more intensity and for a

12 longer duration than the rest of the couch.

13   Q   Was this again consistent with the fire --

14 the apex of the fire V. pattern being in that

15 swivel chair and the fire communicating, going up

16 and out over to the couch and communicating to the

17 couch?

18   A   The V. pattern indicated to me that the

19 fire started in that area which means that's

20 generating the heat first.  Anything in that area

21 is going to be subjected to the radiant heat

22 longer than anything else.  As the chair burned,

23 the radiant heat ignited the couch and other

24 contents close to it.

DUPAGE COUNTY

C-001401

R 1393

Pl. Amor 037293

74

1     Q  Did you then make observations about the

2    recliner chair that was at the opposite end of the

3    couch -- opposite end of the couch from the swivel

4    chair?

5    A  Yes, I did.  It also sustained heavy

6    damage but the most severe damage was at the top

7    most portion of the chair indicating to me that

8    the heat exposure on that chair was from the

9    ceiling down.

10    Q  What did, in essence, this indicate to

11    you, the fact that the damage was from the higher

12    portion of the chair down to the lower portion?

13    A  As I stated, when the fire is burning and

14    pumping all kinds of heat up to the ceiling level,

15    that layer of hot gas thickens and comes down to

16    the floor.  The first surface of the chair to be

17    exposed to high heat is the top as the gas

18    radiated heat from the ceiling.

19    Q  Did you make observations about the coffee

20    table placed in front of the couch?

21    A  Yes, I did.  It was a wooden coffee table

22    covered with parquet squares.  The west side of

23    the coffee table closest to the swivel chair was

24    missing completely, consumed.  As you moved east

C-001402

R 1394

Pl. Amor 037294

75

1    on the coffee table, it became identifiable and

2    the east end of the coffee table was intact but

3    damaged.

4        Q    What did this damage at the more severe

5    damage at the west end of the coffee table

6    indicate as opposed to the east end of the coffee

7    table?

8        A    As with the couch, it was subjected to

9    high heat longer than the east side facing the

10   chair had suffered the greater damage.

11       Q    I realize you have told us that the floor

12   of the entire apartment was at one point covered

13   with carpet and then there was concrete underneath

14   the carpet.  Did you note anything of significance

15   in the area of the floor by the swivel chair?

16       A    Yes.  A large portion of the center of the

17   living room was void of carpet.  It had been

18   burned away, the carpet and padding.  And where

19   carpet remained there was a very irregular edge to

20   how the melting and burning of that carpet

21   occurred.

22           In the area that the swivel chair was

23   positioned, there was a very clean, for lack of a

24   better term, sharp edge symmetrical arc which told

C-001403

R 1395

Pl. Amor 037295

1    me that it could be due to the radiant heat from

2    the chair burning radiating the heat out in a

3    symmetrical arc burning from that or possibly the

4    presence of something poured on that carpet or put

5    on that carpet that burned in a very symmetrical

6    pattern.

7         Q    Did you make any observations in the area

8    surrounding the patio or balcony door?

9         A    Looking in the patio door and the frame

10   around it, the most severe damage would be to the

11   south side of the frame as you are looking out the

12   door to the left side.

13        Q    What did this indicate to you that the

14   south side, the area of the patio door closest to

15   the swivel chair had more damage, what did that

16   indicate to you as opposed to the fact that there

17   was less damage to the wood around the patio door

18   on the north side of the room?

19        A    That the south edge was more near the

20   origin of the fire, had been exposed to heat

21   longer.

22        Q    Are you familiar with the term flash-over?

23        A    Yes, I am.

24        Q    Can you tell us first of all what did you

DUPAGE COUNTY

C-001404

1    note about the ceiling in the living room/dining

2    room area?

3        A   The ceiling was very severely damaged.

4    The west end, the drywall had come down during the

5    course of the fire.

6        Q   Can you tell us, though, the ceiling

7    itself structurally, how is that ceiling composed

8    at one point before the fire?  Is there any type

9    of a change in the level of the ceiling?

10        A   In the area between the living room and

11    dining room which would be right at the entrance

12    to the hallway and that area right behind the

13    swivel chair, that was a 12 inch partition that

14    came down from the ceiling that more or less gave

15    a division between the dining room and the living

16    room.

17        Q   Just so I am understanding you correctly,

18    you are indicating that at approximately this

19    area, if you could draw a line consistent with the

20    east wall of the hallway to the --

21        A   That was a bookcase.

22        Q   To the bookcase, that there was a drop in

23    the ceiling of approximately 12 inches, the

24    drywall dropped down?

CLARE COUNTY
C-001405

78

1    A    Yes.

2    Q    And then went back up to the ceiling?

3    A    Yes.   That's correct.

4    Q    Did you make observations about the

5    ceiling with regard to the term flash-over?

6    A    Yes, I did.

7    Q    What were those observations?

8    A    The ceiling sustained heavy damage.   The

9    paint was burned away.   Paper was burned away from

10   the drywall.

11   Q    Did you make observations of the northwest

12   corner?

13   A    Yes, I did.

14   Q    Can you tell us what you observed about

15   the northwest corner?

16   A    It was a very low level of damage in the

17   northwest corner which would be behind the

18   television.   A section of the base board was

19   deeply charred.   There was a -- on the west wall

20   just to the right of the patio door was a section

21   of hot water base board heater and that had

22   sustained significant damage, also.

23   Q    Were the occupants of the residence

24   questioned as to what, if anything, had been

I MAGE COUNTY

C-001406

79

1    located at the floor level behind the television

2    or any items that would have fueled the fire

3    behind the television?

4        A    Yes.  I asked exactly what was around the

5    television.

6        MS. PANTSIOS:  Objection, foundation.

7        THE COURT:  Okay.  Foundation.

8        MS. O'LEARY:  Judge, this is an expert.  He

9    can rely on any --

10       THE COURT:  They want to know where he got the

11   information from.

12   BY MS. O'LEARY:

13       Q    Lieutenant, can you please tell us who was

14   the person that gave you this information and

15   whether or not you personally interviewed them or

16   if someone else did.

17       A    It was a conversation I had with Bill and

18   Tina Amor asking them if the contents that we had

19   replaced were the only contents in that area at

20   the time of the fire.  And they said that they

21   were, there was nothing else there.

22       Q    What did your observations about that

23   northwest corner indicate to you with regard to

24   the term flash-over?

DUPAGE COUNTY
C-001407

R 1399

Pl. Amor 037299

80

1    A    Again, flash-over is a phenomena that

2    occurs during the course of a fire.  Normally in a

3    fire, the hottest temperatures are at the ceiling

4    level.  Floor level temperatures will be less.

5    When flash-over occurs, every surface area in that

6    unit is burning temperatures at the ceiling which

7    are between 1200 and 1500 degrees will also be at

8    the floor level, 1200, 1500 degrees.  That is

9    evidence by the carpet being burned away and the

10   low level of burning in other areas of the unit.

11   Q    Do you have an opinion and did you reach

12   any conclusions as to the origin of the fire that

13   occurred on September 10th, 1995 in unit M.?

14   A    My observations from physical evidence of

15   the contents told me that the origin was near the

16   swivel chair on the west wall in unit M.

17   Q    And would that be primarily then in the

18   southwest corner of the living room?

19   A    Yes, southwest corner.  That's correct.

20   Q    Did you, after determining the origin of

21   the fire, then search for a cause of the fire?

22   A    Yes.

23   Q    What is an accidental fire?

24   A    An accidental fire is just as it states,

CIT OE COUNTY

C-001408

Pl. Amor 037300

81

1    it's an accident.  It wasn't intended to be

2    started, sometimes due to mechanical failure,

3    sometimes it's due to human error.

4        Q    Did you observe anything at all present in

5    unit M. that would have indicated to you an

6    accidental cause to that fire?

7        A    No.  The first thing we look for when we

8    determine the origin is what was in the area, what

9    could have accidentally started the fire.  And our

10   observations revealed it was nothing there that

11   could have resulted in an accidental fire.

12       Q    And did you, in fact, perform an

13   elimination study to rule out any type of

14   accidental cause to a fire?

15       A    Yes.  We conducted a test burn of the TV

16   and V.C.R. in the facility and found that fire in

17   those units would not have resulted in the fire

18   that occurred in that unit.

19       Q    Specifically, what did you note about the

20   television and the V.C.R. -- first of all, can you

21   tell us how they were arranged according to the

22   information that you had received from the

23   occupants as to the television and V.C.R. being

24   placed in the room?

DUPAGE COUNTY

C-001409

1     A   It was a small metal cart. It had a shelf

2 underneath, one above, the shelf underneath held

3 the V.C.R.; the top shelf had held I think it was

4 a 19 inch television.

5     Q   What did you observe about the television

6 and the V.C.R.

7     A   The visible damage that I observed told me

8 that again the damage occurred from the top down.

9 Very severe and significant damage, but the

10 melting and the destruction was from the top down,

11 there were piles of some 30 video cassettes in and

12 around the television and they, too, were melted

13 and damaged from the top down.

14     Q   Had the fire originated in the area of the

15 television set and the V.C.R., would you have

16 observed direct fire contact damage and where

17 would that come from? Would it come from the top

18 or would it come from the floor level up?

19     A   If the -- it would have started -- if

20 there was an accidental fire, whatever level it

21 started, that damage would have been from that

22 point working up.

23     Q   But clearly you observed the damage to be

24 in your opinion heat damage going down?

DUPAGE COUNTY

C-00 1410

83

1     A    Yes.

2     Q    Do you have an opinion as to whether or

3   not the TV or V.C.R. played any role in the cause

4   of the fire in that apartment?

5     A    The television and the V.C.R. did not

6   cause this fire.

7     Q    Did you have an opportunity to collect and

8   send to Kragh Engineering and review a report from

9   Kragh Engineering, an electrical engineer company?

10    A    Yes.

11    Q    And did you determine that there was a

12  wall outlet in the northwest corner of the room?

13    A    Yes, there was an outlet on the west wall

14  in the northwest corner and an outlet on the north

15  wall in the northwest corner.

16    Q    Having had the benefit of presently -- of

17  being in the apartment shortly after the fire,

18  within a couple hours of the fire occurring, did

19  you personally look at that wall outlet?

20    A    Yes, I did.

21    Q    Was there anything plugged into that wall

22  outlet?

23    A    The outlet on the west wall had the

24  television and the V.C.R. plugged into them and

COTTAGE COUNTY

C-001411

Pl. Amor 037303

84

1   the outlet on the north wall had the floor lamp

2   and box fan plugged into them.

3       Q   Did you personally observe the plug

4   portion of the television and the V.C.R. that were

5   plugged into that northwest outlet?

6       A   Yes, I did.

7       Q   How many prongs did you note to be present

8   in the plug of the outlet?

9       A   Just 2 prongs on each plug.

10      Q   Was there any type of a ground pin to the

11  outlet that was present?

12      A   No.

13      Q   You know exactly what was plugged into

14  that outlet at the time of the fire, is that

15  correct?

16      A   That's correct.

17      Q   How do you know that?

18      A   There were only 2 plugs on each outlet,

19  total of 4.  And we had 4 objects plugged into

20  them.  There was not another plug available to

21  potentially have anything else plugged into it.

22      Q   Did the television have that 3rd prong

23  into it, the third copper ground pin?

24      A   No.

ORANGE COUNTY
C-001412

Pl. Amor 037304

85

1      Q   Did the V.C.R. have that component to it?

2      A   No, it did not.

3      Q   Had either one of those plugs had at one

4  point the copper ground pin that just melted off

5  from the plug itself?

6      A   No, they were only 2 pronged plug.  They

7  were not intended to have grounding pin on them.

8      Q   Now, I believe you indicated the only

9  other two electrical appliances in that particular

10  area then was along the north wall of the living

11  room, correct?

12     A   Yes.

13     Q   And again, you observed the fan and the

14  box fan to be plugged into that particular outlet?

15     A   Floor lamp and box fan.  Yes.

16     Q   And did you note the plugs -- what were

17  the conditions of the plugs -- Strike that.

18         What was plugged into that north wall

19  outlet?

20     A   On the north wall, the box fan and the

21  floor lamp were plugged into the 2 plugs.

22     Q   What did you note about the number of

23  pins, if you will, or connectors that went into

24  the wall outlet?

DUPAGE COUNTY

C-001413

Pl. Amor 037305

86

1     A    Both of those 2 items had only a 2 prong

2    plug.  They were not the type of plug that had the

3    3rd ground pin attached.

4     Q    Do you have an opinion as to whether or

5    not the ground pin had any role in this fire?

6     A    The ground pin that was determined to be

7    in the outlet in the west wall had no role in this

8    ignition.

9     Q    Did you, in fact, examine the wood furring

10    strips that would have held the metal electric box

11    that was behind the drywall on the west wall that

12    the television and the V.C.R. were plugged into?

13     A    Yes.  On the west wall the outlet that had

14    sustained the greatest damage had wooden furring

15    strips 1 inch by 3 inches on either side of it.

16    It was a moderate degree of charring to the inside

17    edge, the edge that faced the outlet on each piece

18    of wood.

19     Q    And in your opinion, what, if any, role

20    did this electrical outlet have with regard to the

21    fire on September 10th of 1995?

22     A    All damage done to the outlet and its

23    components were a result of being exposed to heat

24    from another fire.  They didn't play a role in the

DUPAGE COUNTY

C-001414

87

1    ignition of this fire.

2        Q   Had there been an electrical fire in that

3    particular electric box in that area, what would

4    you have -- what type of damage would you have

5    expected to see on the wood furring strips?

6        A   In an electrical fire, commonly there is

7    an arc called a ground fault, very high

8    temperature capable of destroying the metal

9    components of the outlet.

10       The outlets metal components were all

11   intact and in place.  Also, the high heat would

12   have resulted in a greater destruction of the

13   furring strips on either side of the outlet box.

14   Because you have to remember at the time of the

15   fire, there was drywall there.  The heat would

16   have been contained behind the drywall inside of

17   the wall, if you will, and the damage would have

18   been much more severe.

19       Q   Now, drawing your attention to September

20   14th, 1995 about 2:40 in the afternoon, did you

21   have an opportunity to meet with anyone to conduct

22   an interview?

23       A   Yes, I did.

24       Q   Who did meet with?

DUPAGE COUNTY

C-001415

R 1407

Pl. Amor 037307

88

1   A    I met with Bill Amor.

2   Q    Do you see the defendant in court today,

3   the person you met with?

4   A    Yes.

5   MS. PANTSIOS:  We'll stipulate to the

6   identification.

7   THE COURT:  Very well.

8   BY MS. O'LEARY:

9   Q    Where did the meeting take place?

10  A    At a local hotel.  The Excel Inn.

11  Q    And other than yourself and the defendant,

12  was anyone present when you spoke with the

13  defendant?

14  A    I went to the hotel with Detective Cross

15  and Bill and Tina Amor were in their room.  And

16  Detective Cross and I had questions to ask them.

17  Detective Cross talked to Tina in the room, and I

18  asked Bill if it was all right if we stepped into

19  the hallway and he agreed.

20  Q    When you spoke to the defendant, was

21  Detective Cross out in the hallway with you?

22  A    No.

23  Q    What did the defendant tell you at that

24  time with regard to the swivel chair?

ORANGE COUNTY

C-001416

Pl. Amor 037308

89

1    A    I wanted to substantiate some information

2    we had regarding the activity prior to the fire.

3    I wanted to find out if anybody had been in this

4    chair and what their activities were.  He told me

5    that the chair was seldom used and that the

6    afternoon previous to the fire, there was nobody

7    sitting in it.

8    Q    What did the defendant indicate to you

9    with regard to the television and the V.C.R.,

10   whether or not they had been on or off at the time

11   of the -- his leaving the apartment?

12   A    He indicated to me that they were both off

13   at the time he left the apartment.

14   Q    And during this time period when you were

15   speaking with Mr. Amor, the defendant, was he

16   pretty much giving you answers, did you make any

17   observations about his demeanor?

18   A    He was very cooperative and at ease.

19   Q    At some point did you ask Mr. Amor if he

20   was aware if Tina spilled any type of lighter fuel

21   in the living room area?

22   A    Yes, we spoke of lighter fluid.

23   Q    What did you notice about Mr. Amor's

24   demeanor that was different from when you had been

DUPAGE COUNTY

C-001417

R 1409

Pl. Amor 037309

90

1    speaking to him previous at this time when you

2    asked that question of him?

3       A   When we brought up the topic of lighter

4    fluid, he seemed to become a little nervous.

5       MS. PANTSIOS:  Objection to the conclusion, he

6    can describe actions.

7       THE WITNESS:  Actions were that his -- he

8    didn't have eye contact with me any longer, he

9    began shuffling his feet.

10   BY MS. O'LEARY:

11      Q   Again, when you say we, it's just you and

12   Bill Amor out there, Detective Cross wasn't out

13   there at this time; is that correct?

14      A   That's correct.

15      Q   Did you subsequent to September 10th,

16   1995, learn anything about who was home at the

17   time of the fire?

18      A   The information I had received told me

19   that Bill and Tina Amor and Marianne Miceli were

20   home at the time of the fire -- let me go back.

21   At the time -- Bill and Tina Amor left the

22   apartment, leaving Marianne Miceli home at the

23   apartment.

24      Q   And did you learn information that the

DUPAGE COUNTY

C-001418

91

1    defendant and Tina Amor had left at approximately

2    somewhere between as early as 6:20 and as late as

3    6:30 in the evening?

4         A    Yes.  By their statements.

5         Q    And did they indicate to you at that time

6    that they did not observe any type of a fire in

7    the unit?  Specifically, did Bill indicate to you

8    that he had not observed any type of a fire at

9    that time?

10        A    That's correct.

11        Q    Did you also learn about the time frame --

12   and what exactly did you learn about the time

13   frame as to how quickly the fire spread?

14        A    By their account, they left the apartment

15   at 6:20, 6:25.  The call to 9-1-1 by the victim

16   was placed at 6:41 which gives us a window of some

17   20 minutes for this fire to have occurred in.

18        Q    What is the significance of that very

19   short time frame relative to the fire?

20        MS. PANTSIOS:  Objection to the phrase very

21   short.

22        THE COURT:  Sustained.

23   BY MS. O'LEARY:

24        Q    What is the significance of the time frame

DUPAGE COUNTY

C-001419

92

1    as short as 10 minutes for the fire to occur as

2    long as 20 minutes?

3       A    It says something about the fire behavior

4    that took place.  The fires start by various

5    means.  Those means, specific means, require

6    certain amount of time to develop.  We have got a

7    window again of some 15 to 20 minutes which tells

8    me that only a certain type of fire was possible.

9       Q    What did you learn about the chair with

10   regard to who was sitting in the chair and whether

11   or not anybody had been smoking in the chair --

12   being the swivel chair that I am referring to.

13      A    By Bill Amor's statement, nobody had been

14   in the swivel chair and nobody had been smoking in

15   or around the swivel chair.

16      Q    What was the importance of this

17   information relative to the cause of the fire?

18      A    It would be a possible accidental cause.

19   Again, we try to eliminate those first, so I

20   wanted to find out if it was possible that a

21   discarded cigarette dropped in the chair started

22   the fire -- though, as we stated previously, the

23   window of time would not support that, would not

24   support a slow, smoldering fire.

DUPAGE COUNTY

C-001420

R 1412

Pl. Amor 037312

93

1     Q   Did you also subsequently learn about the

2   statement the defendant had made that he had

3   spilled vodka on the newspaper and on the chair,

4   that he had dropped a lit cigarette and that this

5   had caused the fire to happen?

6     A   Yes, I became aware of that information.

7     Q   Did you also have an opportunity to review

8   the 9-1-1 call that the victim, Marianne Miceli,

9   made and listen to that statement?

10     A   Yes, I did.

11     Q   What was significant about the call to

12   9-1-1?

13     A   She stated to the dispatcher specifically

14   that the chair was on fire, not referring to the

15   swivel chair, but the chair was on fire.

16     Q   Did you have an opportunity to review some

17   photographs that were taken of the fire by a

18   neighbor shortly after he had heard the fire alarm

19   go off?

20     A   Yes, I did.

21     Q   And what was significant or important in

22   looking at those photographs in determining cause

23   and origin?

24     A   From the photographs, the most intense

.... COUNTY

C-001421

94

1    fire scene from outside at ground level looking up

2    into the apartment, most intense fire was the

3    chair burning.

4        Q    Based upon your observations at the scene,

5    the photographs, the other information that you

6    received, the statements of the defendant, the

7    statement or the 9-1-1 call, the Kragh Engineering

8    report, all of the information that you gathered

9    from being present in that apartment on September

10   10th, 1995 and these other things, do you have an

11   opinion as to the cause and origin of the fire?

12       A    Yes, I do.

13       Q    And what is your opinion as to the origin

14   of the fire that occurred on September 10th, 1995

15   in unit M.?

16       A    The origin of the fire was on or directly

17   around the swivel chair.

18       Q    Do you have an opinion as to the cause of

19   the fire on that date?

20       A    Yes, I do.

21       Q    And what is your opinion?

22       A    My opinion is based on the Bill Amor

23   statement that he started the fire intentionally

24   and on the --

DUPAGE COUNTY

C-001422

95

 1      MS. PANTSIOS:  Objection, your Honor.  I think

 2   he can talk about cause in the sense of accidental

 3   or -- but I don't think he can say --

 4      THE COURT:  Well, I will strike that portion

 5   but he may proceed.

 6      THE WITNESS:  The cause of the fire was

 7   incendiary, meaning it was started by a human

 8   intentionally in an area where fire was not meant

 9   to be started.

10   BY MS. O'LEARY:

11      Q    Would it be started with the use of an

12   ordinary combustible using possibly a flammable

13   liquid and a heat source, being an open flame?

14      A    Yes.

15      Q    And could a lit cigarette cause an open

16   flame?

17      A    Yes.

18      MS. O'LEARY:  May I approach the witness?

19      THE COURT:  Yes.

20   BY MS. O'LEARY:

21      Q    Lieutenant, real quickly, I will show you

22   People's Exhibit 2 and 3.  Do you recognize what

23   those are photographs of?

24      A    Yes.  These are the photographs taken by a

ORANGE COUNTY

C-001423

96

1    witness.

2        Q    And are those the photographs that you

3    indicated you used to help you reach your opinion

4    that the fire started in the swivel chair that was

5    the point of origin, or the area of the swivel

6    chair and that it then was caused by incendiary

7    means?

8        A    Yes.  These are supporting evidence.

9        Q    Thank you.  Now referring to what we have

10   marked as People's Exhibit No. 30, do you

11   recognize what's depicted in People's Exhibit No.

12   30?

13       A    Yes.  This is the contents of the living

14   room after we have cleaned the area and

15   repositioned the contents.

16       Q    And present going to the left hand portion

17   of that photograph, can you explain for us what is

18   indicated on the line -- I am sorry, on the wall?

19       A    On the west wall to the left of the door

20   is a -- the V. pattern I spoke of, the apex being

21   here where my finger is.

22       Q    What was positioned at the bottom of the

23   apex?

24       A    The remains of the swivel chair were right

DUPAGE COUNTY

C-001424

Pl. Amor 037316

97

1    in this area.

2        Q   Sir, now referring to People's Exhibits

3    No. 31, do you recognize what's depicted in that

4    photograph?

5        A   Pretty much the same thing, just a better

6    view of the couch.

7        Q   And what did you note about the couch,

8    what's depicted in this photograph relative to the

9    V. pattern and the swivel chair point of origin?

10       A   The west end of the couch is different

11   from the east end in that as you can see on the

12   east end, the supporting members of the couch are

13   still present.  The west end the damage is more

14   severe, the members are missing or charred.

15       Q   Referring now to People's Exhibit No. 32,

16   do you recognize what's depicted in that

17   photograph?

18       A   Yes, I do.  In the center of the

19   photograph is a bucket that we put the remains of

20   the swivel chair that we found.

21       Q   And that's the only portion of the swivel

22   chair that existed and was left after the fire?

23       A   Yes, it is.

24       Q   Was there any other object in that room

COUNTY
C-091425

R 1417

Pl. Amor 037317

98

1    that had sustained greater fire damage than the

2    swivel chair?

3        A    No, there was not.

4        Q    Generally, what did that indicate to you?

5        A    That generally is a good place to look for

6    the origin of the fire.  The fire occurred hottest

7    and for longest duration in that area.

8        Q    Again, in the wall, what could you observe

9    on the wall behind that swivel chair?

10       A    The burn pattern indicates a V.

11       Q    And referring to that exhibit as well as

12   going back to what we have referred to as People's

13   Exhibit No. 31, the wood strips that were around

14   the patio door, what's depicted in those

15   photographs regarding those wood portions?

16       A    The south side is more severely damaged

17   than the north side.  Again, indicating it's more

18   than likely closer to the origin of the fire.

19       Q    And again, if the fire had originated in

20   the northwest corner, what would you expect to

21   have observed with regard to that wood strip over

22   by the patio door on the north side?

23       A    Greater damage, again, because it was

24   subjected to longer and more intense heat.

WILL KE COUNTY

C-601426

R 1418

Pl. Amor 037318

99

1     Q   Now, showing you what we have marked as

2    People's Exhibit 33, do you recognize what that is

3    a photograph of?

4     A   That's a picture of the sofa.

5     Q   And what do you note about the photograph

6    and what does it depict about the sofa relative to

7    the swivel chair?

8     A   The west end of the sofa, again, the

9    disruption of the supporting members of the sofa

10   are more severe than on the east end indicating

11   that it was closer to the origin of the fire.

12    Q   And showing you now People's Exhibit No.

13   34, can you explain what's depicted in that

14   photograph?

15    A   Just another angle of the same thing, the

16   west end of the sofa.

17    Q   Showing you now People's Exhibit No. 35,

18   can you look at that and let me know what's

19   depicted in that exhibit?

20    A   That's the east end of the sofa, less

21   damage, actually part of the side of the cushion

22   is still evident.

23    Q   Using 34 and 35, there was a coffee table

24   that was in front of the sofa, is that correct?

DUPAGE COUNTY

C-001427

R 1419

Pl. Amor 037319

1     A   Yes.

2     Q   What is depicted with regard to the coffee

3  table in those 2 photographs?

4     A   This is the east end of the coffee table

5  which is kind of angled up because the west end of

6  the coffee table was missing.

7     Q   Showing you now People's Exhibit 36.

8     A   In the center of the picture is the

9  recliner chair again severely damaged, most

10  severely damaged on the back which again would

11  have been subjected to heat longer, a layer of hot

12  gases at the ceiling was radiating the heat down.

13     Q   And finally then showing you People's

14  Exhibit No. 37, what's depicted in that

15  photograph?

16     A   Again, the reclining recliner chair.  The

17  only structural member that was actually missing

18  or had come apart was the top of the back of the

19  chair.

20     Q   And again, that would be -- is that

21  consistent with the fire having originated in the

22  swivel chair, communicated then to the couch,

23  coffee table, and then communicated going further

24  east to the recliner chair?

DUPAGE COUNTY

C-001428

101

1     A   Yes, that's consistent with the fire

2   originating in the swivel chair and building that

3   layer at the ceiling to the point where flash-over

4   occurred.

5     Q   And then the heat starts coming down, the

6   fire starts coming down and that's why the top

7   membrane of the chair is no longer in existence?

8     A   That's true.

9     Q   Do each of these photographs truly and

10   accurately depict the observations you made of

11   unit M. and the contents on September 10, 1995?

12     A   Yes, they do.

13     MS. O'LEARY:  Judge, I have nothing further at

14   this time.

15     THE COURT:  All right.  We'll take a 10 minute

16   recess at this point.  Do not discuss your

17   testimony, sir.  We'll take a short break.

18   Remember those admonitions.

19               (Short recess.)

20     THE COURT:  We'll proceed then with

21   cross-examination.

22     MS. O'LEARY:  Judge, may I show a couple more

23   exhibits?

24     THE COURT:  Sure.  Go ahead.

DUPAGE COUNTY

C-001429

102

BY MS. O'LEARY:

Q    Thank you.

     Lieutenant Ferrari, back on the 19th of September when you went back to look for the smoke detector, did you inspect the book shelf as well that was located in the apartment?

A    Yes, I did.

Q    And did you find any remnants of the smoke detector being present on the bookshelf?

A    No, I did not.

Q    If the record could reflect I am showing counsel 29, 38, and 39.

     First showing you People's Exhibit No. 29, do you recognize what's depicted in that exhibit?

A    Yes, this is the closet in the second bedroom.

Q    That was not the bedroom that the victim was found in, is that correct?

A    That is correct.

Q    And showing you now People's Exhibit No. 38, do you recognize what that is an exhibit of?

A    Yes, this would be that symmetrical arc of destruction to the edge of the carpet. The swivel chair remains were found approximately here. And

CHICAGO COUNTY

C-001430

1    there is the very straight symmetrical line of

2    destruction to the edge of the carpet as opposed

3    to this irregular burning that occurred in all

4    other areas of the living room.

5        Q   And again, that was significant to you

6    indicating that there was a very intense heat and

7    fire from that area where the carpet had the

8    smooth burn away?

9        A   Yes.

10       Q   Can you explain for us just a little bit

11   how the carpet would burn away from that area and

12   cause the smooth line?

13       A   If there was a fire burning here, the

14   radiant heat would be exposed in an even manner to

15   all adjacent contents.  The carpet also would be

16   in exposure to that fire.  So the heat was evenly

17   distributed, here which could account for the nice

18   even burn on the carpet, or it could be evident of

19   something being in that carpet.  Some type of a

20   flammable liquid could also result in a pattern

21   like that.

22       Q   Again, now referring to People's Exhibit

23   No. 39, do you recognize what's depicted in that

24   exhibit?

DUPAGE COUNTY

C-001431

Pl. Amor 037323

104

1    A    This is the remains of the V.C.R. that was

2    under the television.

3    Q    And what does that show you to the damage

4    to the V.C.R. and the television as to I believe

5    you testified heat damage?

6    A    When we lifted the V.C.R. up, the carpet

7    and shelf underneath it were still intact.  The

8    V.C.R. was stuck to both of those from the high

9    heat but all of the damage was from the top down

10   on this unit.

11   Q    And again, you can see in the back area of

12   that picture the base board area and the north --

13   MS. PANTSIOS:  Objection to her testifying.

14   THE COURT:  Well, I think she is laying the

15   foundation for something.  Proceed.

16   BY MS. O'LEARY:

17   Q    You can see the northwest area of the base

18   board, is that correct?

19   A    Yes.

20   Q    All right.  And can you explain the term

21   flash-over with regard to the photograph and what

22   we would be observing in the photograph?

23   A    Normally we -- to determine origin, we

24   look for the lowest level of burning which would

C-001432

R 1424

Pl. Amor 037324

1    be the incipient stage of the fire, burns up.  So

2    the lowest level will be where it first started

3    and we look for areas of greatest destruction that

4    are low.

5            This obviously is low, it's floor level,

6    it got my attention because the base board and the

7    hot water heater was severely damaged.  The fact

8    that flash-over occurred, though, meant that 12 to

9    1500 degrees occurred at the ceiling level and

10   also at floor level.  This is unexposed in that

11   there was nothing else in this area to protect

12   those surfaces, nothing resting against them,

13   nothing on top of them.  So they were subjected to

14   12 to 1500 degrees when flash-over occurred which

15   accounts for the severe damage to them.

16       Q    Thank you.  Each of these exhibits, the

17   photographs, do they truly and accurately depict

18   the items in them that were found in the apartment

19   or unit M. on September 10th, 1995?

20       A    Yes, they do.

21       MS. O'LEARY:  Nothing further, Judge.

22       THE COURT:  All right.  Cross-examination,

23   Miss Pantsios.

24       MS. PANTSIOS:  Thank you LAKE COUNTY

C-001433

1                      CROSS-EXAMINATION

2                    By:  Ms. Pantsios

3       Q   Lieutenant Ferrari, when you are assigned

4   to do a fire investigation, there are certain

5   procedures within your department for you to

6   follow, is that right?

7       A   That's correct.

8       Q   One of the things that you do is try to

9   gather as much information as you possibly can

10   regarding the fire?

11       A   That's correct.

12       Q   You, as you described here today, you go

13   to the scene of the fire?

14       A   Yes.

15       Q   You also have the firefighters who

16   responded prepare reports which they forward to

17   you?

18       A   That's correct.

19       Q   And that was done in this case, also?

20       A   Yes, it was.

21       Q   In fact, over the few days following the

22   fire, you received probably a couple dozen reports

23   from the firefighters?

24       A   Yes, I did.

DUPAGE COUNTY

C-001434

107

1      Q   And of course, all those reports what they

2  had to say went into your investigation and help

3  you in forming your opinion?

4      A   Yes.

5      Q   Now, with regard to your presence at the

6  scene, you said you went there first on September

7  10th.

8      A   Yes, I did.

9      Q   And you subsequently after doing a quick

10  walk-through got some assistance in processing the

11  scene?

12      A   That's correct.

13      Q   What, exactly, did you and the other

14  firefighters do to process the scene?

15      A   Myself and Firefighter Quan and Fire

16  Lieutenant Steve Hinz, as I stated, made a

17  walk-through, an orderly walk-through of the unit

18  and examined contents of every room in unit M.

19      Q   Before you did the walk-through of each

20  room, the room-by-room examination, you videotaped

21  the scene, is that right?

22      A   I personally did not videotape, but it was

23  done.  Yes.

24      Q   Was it done in your presence?

DUPAGE COUNTY

C-001435

108

1    A    Yes.

2    Q    And who did the videotaping?

3    A    It was a forensics technician from the

4    Naperville police department.

5    Q    And following that videotaping, you and

6    the other firefighters began to do the

7    room-by-room examination that you were talking

8    about earlier today?

9    A    Yes, we did not examine anything until

10   that was done.

11   Q    And after you obtained the reports from

12   the firefighters, after you did your on-the-scene

13   investigation, after you did further

14   investigation, you prepared what is known as an

15   Origin and Cause Narrative Report?

16   A    Yes.

17   Q    Can you tell us when you completed that

18   report?

19   A    I would have to look at the report.  It

20   was within days.

21   Q    I will show you what I will mark as

22   Defense Exhibit 12 and ask you if this is your

23   Origin and Cause Narrative Report?

24   A    Yes, it is.

DUPAGE COUNTY
C-001436

Pl. Amor 037328

109

1      Q  Can you take a quick look at that and tell

2  me, if you can, when you prepared it?

3      A  It was prepared over a matter of days.  I

4  can't really tell you when the exact date it was

5  submitted.

6      Q  Could you perhaps give me an

7  approximation?  Would it have been completed say

8  within a week?

9      A  Approximately a week, maybe a little bit

10  longer.

11      Q  You at one point during direct examination

12  began to talk about collecting some items for

13  Kragh Engineering.  What items were those?

14      A  The items that we collected were the

15  television and V.C.R., the floor lamp, and the box

16  fan.

17      Q  Kragh Engineering to your knowledge,

18  however, did receive some additional items, did

19  they not?

20      A  Yes, they did.

21      Q  Do you know what they received?

22      A  They received the outlets that were in the

23  living room area.

24      Q  Do you know who recovered those outlets?

DUPAGE COUNTY

C-001437

Pl. Amor 037329

110

1    A    I believe it was an investigator from a
2    private investigation firm.

3    Q    And they also received what is referred to
4    in direct examination a copper grounding pin, is
5    that right?

6    A    Part of one outlet, yes.

7    Q    Do you know which outlet that was part of?

8    A    According to their report, it was the
9    outlet on the west wall behind the television.

10   Q    With regard to the hallway, there is a
11   circuit breaker, circuit box in that hallway,
12   correct?

13   A    Yes.

14   Q    And that circuit box contains circuit
15   breaker panel?

16   A    Yes.

17   Q    At the time that you did your room-by-room
18   examination, the breakers were off?

19   A    Yes.

20   Q    However, you also later learned from one
21   of those firefighters' statements that at the time
22   the Firefighter Haas responded, the breakers were
23   in the on position with one exception?

24   A    When he examined the panel.  That's

DUPAGE COUNTY

C-001438

111

1   correct.

2       Q   And the one that was not in the on

3   position was the breaker that protected the living

4   room circuit?

5       A   That's correct.

6       Q   Lieutenant, what is a Structure Scene

7   Check List?

8       A   It is just a form to jot down notes and

9   observations while making an examination.

10      Q   And was such a check list prepared in this

11  case?

12      A   Yes.

13      Q   Did you prepare that or did someone else?

14      A   I did.

15      Q   I will show you what I will mark as

16  Defendant's No. 13 which is a form Structure Scene

17  Check List and that is filled out.  Is that the

18  report that you prepared?

19      A   Yes.

20      Q   Thank you.  That Structure Scene Check

21  List indicates what I believe you already

22  indicated today, that the lowest burn was in the

23  northwest corner of the living room?

24      A   That was a preliminary observation, yes.

DUPAGE COUNTY
C-001439

Pl. Amor 037331

112

1       Q   And just so we are clear, when you say low

2  burn or lowest burn, you are talking about

3  location as opposed to extent, correct?

4       A   Location as opposed to height in the room.

5  Lowest as opposed to ceiling level.

6       Q   So, we are talking about location where

7  the burn is located as opposed to the severity of

8  the burn?

9       A   Specifically, the lowest burning is pretty

10  much as it states, the lowest level in the area

11  where the burning occurred.

12       Q   I think we are on the same page there.

13  This report also indicates under points of origin,

14  along west wall, northwest corner of living room?

15       A   As an area.  Yes.

16       Q   It states that point of origin along west

17  wall, northwest corner of living room, is that

18  right?

19       A   That's correct.

20       Q   There is also a place on that form to

21  write down appliances and area of origin, is that

22  right?

23       A   Yes.

24       Q   And in that place, you have written

DUPAGE COUNTY
C-001440

Pl. Amor 037332

113

1    television and V.C.R., make unknown.

2         A    That's correct.

3         Q    Are you also familiar with something

4    called a General Data Sheet?

5         A    Yes.

6         Q    And that is also a form that is used by

7    your department in preparing fire investigation

8    reports?

9         A    Right.

10        Q    Does that form include what is called a

11   Check Off List or is that a separate form?

12        A    That's a separate form.

13        Q    And was such a form, a Check Off List,

14   prepared in conjunction with this investigation?

15        A    Yes.

16        Q    Who prepared that form?

17        A    I did.

18        Q    I will show you what I have marked as

19   Defendant's Exhibit 14.  Is that your Check Off

20   List?

21        A    Yes, it is.

22        Q    That Check Off List -- it is kind of

23   basically what the name implies, there are certain

24   spaces there and you have options, choices, and

CUYAH... COUNTY

C-001441

114

1    you check them off, right?

2        A    Yes.

3        Q    And there are also certain places where

4    you can write things in.

5        A    Yes.

6        Q    Now, one of the items on the Check Off

7    List, item number 8, is number of devices at point

8    of origin.  Is that right?

9        A    That's an area.  Yes.

10       Q    And you have indicated there switches

11   zero, ceiling fixtures zero, wall fixtures zero,

12   receptacles one, TV antenna outlet zero, cable TV

13   one, other zero.  Is that right?

14       A    That's right.

15       Q    There is also number 9, type and wattage

16   of connected appliances at point of origin.

17       A    Yes.

18       Q    You have indicated there TV and you

19   indicate U. N. K.  Does that stand for unknown?

20       A    Yes, it does.

21       Q    What do you mean by unknown with regard to

22   the TV?

23       A    The make of the TV is unknown.

24       Q    All right.  You have also indicated lamps

DU?AGE COUNTY
C 001442

115

1    and you have also indicated there unknown?

2         A    Yes.

3         Q    And other, V.C.R., unknown?

4         A    Yes.

5         Q    So, that would indicate that there was the

6    TV, a lamp, and a V.C.R. at point of origin?

7         A    At the time I was taking those notes,

8    that's what I recorded.

9         Q    You have also indicated there is a place

10   here number 11, connected load on the circuit and

11   fire area.

12        A    Yes.

13        Q    And you have several things -- options

14   that you can check, fans, clocks, TV, iron,

15   appliance, and other.

16        A    Correct.

17        Q    On the form you filled out with reference

18   to this case, you have added a TV, V.C.R. and

19   written one.  Is that right?

20        A    Yes.

21        Q    Under other, you have written light, one.

22        A    Yes.

23        Q    You did not indicate on that form anything

24   with regard to a fan?

DUPAGE COUNTY
C-001443

Pl. Amor 037335

116

1    A    Yes.

2    Q    I will go back to the northwest corner of

3  the living room for a minute.  You indicated that

4  there was a -- in fact, lowest level of damage at

5  that point?

6    A    Yes.

7    Q    You have also indicated that the base

8  board was melted?

9    A    Yes.

10   Q    That was an aluminum base board?

11   A    Aluminum components.

12   Q    It was the aluminum components that were

13  melted?

14   A    Yes.

15   Q    That would indicate that the temperature

16  at that area had reached 1200 degrees?

17   A    Yes, at a minimum.

18   Q    That's the melting point of aluminum?

19   A    Right.

20   Q    Those aren't the only base boards in the

21  room?

22   A    That is correct.

23   Q    Other base boards have that severity of

24  damage?

CUYAHOGA COUNTY
C  001444

117

1     A    That one sustained the most damage.

2     Q    The electrical outlet in that corner had

3 the most severe damage of the electrical outlets?

4     A    Yes.

5     Q    It was heat damage inside of the

6 electrical box?

7     A    Yes.

8     Q    I want to ask you a little bit about the

9 way the room was furnished. There was the chair,

10 2 chairs, a swivel chair and a recliner?

11     A    Yes.

12     Q    And a couch. Were all those 3 items

13 upholstered furniture?

14     A    Yes, they were.

15     Q    There is a balcony with sliding glass

16 doors?

17     A    Yes.

18     Q    There were draperies or some sort of

19 window treatment around those sliding glass doors?

20     A    I believe they were vertical blinds.

21     Q    It was made of a woven fabric, however, is

22 that right?

23     A    Yes.

24     Q    Your report indicates that the remains

R 1437

Pl. Amor 037337

118

1    that you found of those woven vertical blinds

2    would suggest that they were closed at the time of

3    the fire?

4        A    I -- that was my opinion along with the

5    statement from Bill Amor that he thought they were

6    closed.

7        Q    With regard to your conversation with Mr.

8    Amor on the 14th, I am going to show you what I

9    have marked as Defendant's 15, being a two-page

10   typed narrative.

11            Is that your report on your interview

12   with Mr. Amor?

13       A    Yes, it is.

14       Q    And that report does not indicate that Mr.

15   Amor, when you talked to him about the lighter

16   fluid, the report does not indicate that he lost

17   eye contact with you?

18       A    No, it does not.

19       Q    Finally, I would like to ask you a few

20   questions about the test burn that you did.  Now

21   that test burn was done with the TV and the V.C.R.

22       A    Yes.

23       Q    Where was that test burn conducted?

24       A    At the Naperville fire department training

DUPAGE COUNTY
C-001446

119

1  facility which contains a burn building in which

2  we can have live fire.

3      Q   Would you describe for us, for the ladies

4  and gentlemen of the jury, what that structure is

5  like?

6      A   It's built of concrete and brick.  We can

7  conduct live fire training there in that we can

8  control the amount of fuel for the fire.  We don't

9  have to worry about the structure itself being

10 part of the fire.

11     Q   The room where you conducted the test

12 burn, can you describe that for us, please?

13     A   It's a little bit smaller than the room we

14 are in.  It has an 8 foot ceiling, again the walls

15 are brick, cinder block, ceiling and floors are

16 concrete.

17     Q   Are the walls or the ceiling covered with

18 any kind of drywall?

19     A   No.

20     Q   Is there any carpeting on the floor?

21     A   No.

22     Q   Is there any kind of drywall on the

23 ceiling?

24     A   No.

DUPAGE COUNTY
C 001447

Pl. Amor 037339

120

1    Q    Are there any windows in that room?

2    A    Yes.

3    Q    How many windows are there?

4    A    I believe there are 3.

5    Q    What is their size and location?

6    A    Without a diagram of the building, it

7    would be hard to describe, but they are -- nothing

8    immediately next to the area where the fire was.

9    About the size of a normal window.

10   Q    Are there any window treatments on them?

11   A    No.

12   Q    What color are the walls?

13   A    They are black.

14   Q    Is that because there have been a lot of

15   test fires conducted in that building?

16   A    It's the first test fire we have had

17   there.  There have been training fires.

18   Q    There have been --

19   A    A lot of previous fires, yes.

20   Q    That has caused the walls to darken over

21   time?

22   A    Yes.

23   Q    The same is true of the ceiling, is that

24   right?

DUPAGE COUNTY
C-001449

121

1    A    Yes.

2    Q    That is darkened over time due to the

3    number of fires you have had in that room?

4    A    That is true.

5    Q    Other than the test burn that you

6    conducted with the TV and the V.C.R., did you

7    conduct any other tests in conjunction with this

8    investigation?

9    A    No, I did not.

10    Q    If I can have one moment, your Honor?

11         I would like to clarify one thing,

12    Lieutenant, you stated earlier that when you went

13    into the apartment initially, the furniture had

14    been moved around by the firefighters when they

15    were fighting the fire?

16    A    Yes.

17    Q    Subsequently you were able to determine

18    where the furniture had been originally and

19    replaced it in that position?

20    A    That is correct.

21    Q    You have also talked a little bit about

22    the fact that there was a videotape of the scene.

23    Was that videotape made before or after the

24    furniture was replaced in its original positions?

122

1     A    I believe it was before.

2     Q    The videotape was before?

3     A    Yes.

4     MS. PANTSIOS:  Okay.  I have nothing further.

5     THE COURT:  All right.  Redirect?

6                    REDIRECT EXAMINATION

7                    By:  Ms. O'Leary

8     Q    Lieutenant, you explained to us there was

9     the circuit breaker and there was one circuit

10    breaker that had -- was in a different position or

11    had actually changed during the fire.  It wasn't

12    in a closed position, is that correct?

13    MS. PANTSIOS:  Objection.  He did not testify

14    that it changed during the fire.

15    THE COURT:  All right.  Why don't you rephrase

16    the question.

17    BY MS. O'LEARY:

18    Q    Can you describe to us the circuit breaker

19    when you observed it on the 10th, what did you

20    notice about the circuit breaker?

21    A    When I observed the panel all of the

22    panels were in the off position.

23    Q    Did you come to learn that there was one

24    circuit breaker that originally was not in the off

DUPAGE COUNTY

C-001451

123

1   position or was in a different position than when

2   you were observing it?

3       A   Yes.  From Firefighter Haas.  He was told

4   to turn all the power to the unit off as a matter

5   of safety.  Firefighters before they do that are

6   told to examine the breakers and report any

7   positions that are in the open position where a

8   breaker would trip.

9       Q   And can you explain for the ladies and

10  gentlemen of the jury just basically how a circuit

11  breaker functions?

12      A   It's a protection device that is in place.

13  Energy electricity that goes to different portions

14  of the house goes through a circuit breaker.

15          If there is an electrical surge, a

16  disturbance, any arcing holds a greater amount of

17  electricity through a circuit breaker than it

18  would normally have during normal operation.

19          When the breaker senses that -- and I am

20  not an electrical engineer -- but due to the

21  electrical components, the breaker will pop open,

22  breaking that circuit and preventing any

23  electricity from going to any point beyond that.

24      Q   And in the particular circuit breaker that

DUPAGE COUNTY

C-001452

124

1    had been changed was the circuit breaker that

2    covered what portion of the residence that unit

3    M.?

4         A    The circuit breaker that Firefighter Haas

5    said was in the open position covered the living

6    room.

7         Q    Once that circuit breaker functioned the

8    way it did by turning off, is there electricity

9    then going to the appliances in that room?

10        A    After it opens, there is not.

11        Q    Now, specifically, you don't know which

12   outlet was covered by that circuit breaker, do

13   you?

14        A    Specifically, no.

15        Q    And would it be consistent with the

16   phenomena you have talked about, flash-over, if

17   the outlet in the west wall was one of the outlets

18   that was connected to that circuit breaker, would

19   it be consistent with that outlet being exposed to

20   flash-over, the temperature rising to 1200 degrees

21   or more, popping or effecting that circuit

22   breaker?

23        A    I would expect the circuit breaker to have

24   opened prior to that because the TV and V.C.R.

DUPAGE COUNTY

C-001453

125

1    were plugged in, they would have sustained damage

2    prior to the internal components of the outlet and

3    an arcing within the V.C.R. and television would

4    cause a circuit breaker to open.

5        Q    And particularly, in this case, did you

6    have a report from the defendant from one of the

7    statements as to whether or not the television and

8    the V.C.R. were on at the time he left the

9    residence?

10       A    He said they were off.

11       Q    And what significance was this in

12   relationship to the circuit breaker?

13       A    The fact that they were off pretty much

14   reduced, in my opinion, that ignition occurred

15   there.  In order to have ignition by an electrical

16   means, current has to be flowing.  That's what

17   produces the heat.

18            Once the TV and V.C.R. were subjected to

19   the heat and started to be destroyed, the wires,

20   everything inside, moves as the melting and

21   burning is taking place.  I would expect, and in

22   other fires with electrical appliances, arcing

23   occurs, the breaker senses that and the breaker

24   opens as it is designed to do.  At what point that

DUPAGE COUNTY
C-001454

Pl. Amor 037345

126

1      occurs, we don't know.

2           Q    And again, the wood strips in the area of

3      the west electric box, did they sustain the type

4      of damage that you would expect them to have

5      sustained had there been some type of an

6      electrical malfunction in that electrical box?

7           A    No.   They would have been damaged further.

8           Q    You identified a number of reports you

9      actually prepared in this case.   I believe you

10     indicated you prepared a report referred to as a

11     General Data Sheet.   You prepared a cause and

12     origin report being a Structure Scene Check List

13     and a Check Off List, is that correct?

14          A    That's correct.

15          Q    Those reports are prepared as you are

16     going through the scene prior to gathering all of

17     the information, is that correct?

18          A    The Check Off List and the Structure Scene

19     Check List are just to aid me in recording my

20     initial observations and ideas as I am going

21     through the scene.

22          Q    Do you also prepare a Naperville Fire

23     Department Fire Investigation Closure Report?

24          A    Yes, I do.

DUPAGE COUNTY
C-001455

Pl. Amor 037346

127

1       Q   Did you, in fact, prepare one of those

2   reports concerning this case on October 10th,

3   1995?

4       A   I believe there were 2 of those prepared.

5       Q   Specifically, I would like to show you

6   what we have marked at this time as People's

7   Exhibits 50 and 51 previously marked as R.W.O. 6,

8   and 46.

9            Referring to first People's Exhibit No.

10   50, is that a copy of your Fire Investigation

11   Closure Report?

12       A   Yes, it is.

13       Q   And is that report dated October 10th of

14   1995?

15       A   Yes, it is.

16       Q   And what did you determine the origin of

17   the fire to be?

18       A   On this date the origin was in the

19   immediate vicinity of the swivel chair.

20       Q   And what did you determine the cause of

21   that fire to be?

22       A   Incendiary.

23       Q   Now, referring to your report dated

24   December 14th, 1995, referred to as People's

DUPAGE COUNTY
C 001455

Pl. Amor 037347

128

1    Exhibit No. 51. Is that a report that you

2    prepared?

3        A   Yes. A clarification, the date is the

4    date I received this report back and signed it.

5    It is not the date it was prepared.

6        Q   Okay. And that report indicates again

7    that you determined the origin of the fire to be

8    where?

9        A   At the swivel chair.

10       Q   And have you on today's date, as we

11   indicated on direct examination, had an

12   opportunity to review the Kragh Engineering

13   report?

14       A   Yes.

15       Q   And do you on today's date, we asked you,

16   what is your opinion as to the cause and the

17   origin of the fire that occurred in unit M. on

18   September 10th, 1995?

19       A   The origin of the fire was on or in the

20   immediate area of the swivel chair. The cause of

21   the fire was incendiary.

22       Q   I believe you indicated that the northwest

23   corner, the base board, sustained heavy damage, is

24   that correct?

DU___ COUNTY
C - 001457

Pl. Amor 037348

129

1  A    That's correct.

2  Q    And the base board in this particular

3  area, was that protected or unprotected by items

4  that would have been up against it?

5  A    That was unprotected.

6  Q    Other areas of the base board that you

7  examined, were they protected or unprotected?

8  A    Many areas were protected.

9  Q    And finally, referring to Defense Exhibit

10  15, you indicated in your report that was of the

11  interview of Mr. Amor did not indicate anything

12  about his eyes, is that correct?

13  A    That is correct.

14  MS. PANTSIOS:  Objection, that was not the

15  question asked of of this witness.

16  THE COURT:  Proceed.

17  BY MS. O'LEARY:

18  Q    Referring to the section when you

19  specifically asked Mr. Amor concerning whether or

20  not Tina had spilt any lighter fuel down in the

21  area and you indicated Mr. Amor changed his

22  demeanor, is that correct?

23  A    Yes.

24  Q    And I believe on direct examination you

DUPAGE COUNTY
C-001458

R 1449

Pl. Amor 037349

130

1    indicated that he had changed his demeanor and you

2    noted one of the things among the other things was

3    that his eyes looked down, is that correct?

4       A    Yes.

5       Q    Referring now to Defense Exhibit No. 15,

6    the report of that interview, what did you

7    indicate about the defendant's demeanor in

8    People's Exhibit 15?

9       A    The second to last paragraph in the

10   report, the last sentence back up to the sentence

11   before that speaking of lighter fluid, "Mr. Amor

12   was unaware that Tina had spilled any lighter

13   fluid by the swivel chair.  Mr. Amor became

14   noticeably more anxious when he spoke of the

15   lighter fluid."  In parenthesis, "Shifting weight,

16   moving feet."

17       MS. O'LEARY:  I have nothing further, Judge.

18       THE COURT:  All right.  Anything else then on

19   those issues, Miss Pantsios?

20       MS. PANTSIOS:  Just very briefly.

21                 RECROSS-EXAMINATION

22                 By:  Ms. Pantsios

23       Q    Lieutenant Ferrari, we have talked about

24   the videotape and the timing of that, were there

DUPAGE COUNTY

C-001459

Pl. Amor 037350

131

1   still photographs taken by you before the

2   videotape was made?

3       A   Yes, there were.

4       MS. O'LEARY:  Objection, Judge, beyond the

5   scope.

6       THE COURT:  Well, it is, but I will allow it.

7   BY MS. PANTSIOS:

8       Q   Just one other.  The forms on which you

9   prepared this Check Off List and the closure

10  report that had been referred to, those are blank

11  forms that you have available to you?

12      A   Yes.

13      Q   They are revised from time to time by the

14  Naperville fire department?

15      A   Yes.

16      Q   And when they are revised, a revision date

17  is indicated on the form?

18      A   Usually.

19      Q   All right.  I am going to show you both

20  Defendant's Exhibit No. 14 and a copy of People's

21  I believe it was 50 and ask that you look at the

22  lower left hand corner of those reports, report

23  forms.  What's the revision date on that?

24      A   March of '96.

DUPAGE COUNTY

C-001460

132

1      MS. PANTSIOS:  Thank you.  Nothing further.

2      THE COURT:  All right.  Anything else from the

3  State on those issues?

4      MS. O'LEARY:  No, your Honor.

5      THE COURT:  Thank you, sir.  You may step

6  down.  Watch your step.  State may call their next

7  witness.

8                      (The oath was thereupon duly

9                       administered to the

10                      witness by the Clerk.)

11                  MITCHELL KUSHNER,

12  called as a witness herein, having been first duly

13  sworn, was examined and testified as follows:

14                  DIRECT EXAMINATION

15                  By:  Mr. Bayer

16      Q    Would you state your name spell your last

17  name?

18      A    Mitchell Kushner, K U S H N E R.

19      Q    And what is your profession or occupation?

20      A    I am a special agent assigned to the

21  Illinois State fire marshals office, division of

22  arson investigation.

23      Q    And what are your duties with the Illinois

24  State fire marshals office?

DUPAGE COUNTY

C-001461

Pl. Amor 037352