**In the Matter Of:**

WILLIAM E. AMOR vs MICHAEL CROSS, et al.

---

# MITCHELL KUSHNER

*September 28, 2020*

---



3C Litigation Support, Inc.

*Courtesy, Commitment, Consistency*

lit3c.com

773·979·2415
info@lit3c.com

EXHIBIT 3

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF ILLINOIS

 3                     EASTERN DIVISION

 4   WILLIAM E. AMOR,            )
                                 )
 5              Plaintiff,       )
                                 )
 6    v.                         ) No. 18-CV-02523
                                 ) Hon. John Z. Lee
 7   MICHAEL CROSS, et al.,      )
                                 )
 8              Defendants.      )

 9

10         The video discovery deposition of MITCHELL

11   KUSHNER, taken in the above-entitled cause via

12   Zoom videoconference before TRACY JONES, a

13   Certified Shorthand Reporter in Cook County,

14   Illinois, at 1:17 p.m. Central Standard Time on

15   September 28, 2020, pursuant to notice.

16

17

18

19

20

21

22

23   Reported by:     Tracy Jones, CSR, RPR, CLR

24   License No.:     084-004553
```

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 2..5

Page 2

```
1    APPEARANCES:
2         LOEVY & LOEVY, by
          TARA THOMPSON, ESQUIRE
3         MARIAH GARCIA, ESQUIRE
          312 North May Street
4         Suite 100
          Chicago, Illinois  60607
5         312.243.5900
          tara@loevy.com
6
              On behalf of the Plaintiff;
7
          THE SOTOS LAW FIRM, P.C., by
8         LISA MEADOR, ESQUIRE
          141 West Jackson Boulevard
9         Suite 1240A
          Chicago, Illinois  60604
10        630.735.3300
          lmeador@jsotoslaw.com
11
              On behalf of the Defendants;
12
          OFFICE OF THE ILLINOIS ATTORNEY GENERAL, by
13        CHRISTOPHER FLETCHER, ESQUIRE
          100 West Randolph Street
14        12th Floor
          Chicago, Illinois  60601
15        312.814.3000
          cfletcher@atg.state.il.us
16
              On behalf of the Deponent.
17
18
19
20
21
22
23
24
```

Page 3

```
1              I N D E X
2    WITNESS                        EXAMINATION
3    MITCHELL KUSHNER
4      Examination By Attorney Meador          6
5      Examination By Attorney Thompson      187
6      Further Examination By Attorney Meador  253
7
8
9
10             E X H I B I T S
11   NUMBER                      IDENTIFICATION
12   Exhibit No. 1                          50
13   Group Exhibit No. 2                    79
14   Group Exhibit No. 3                   103
15   Group Exhibit No. 4                   121
16   Group Exhibit No. 5                   130
17   Exhibit No. 6                         183
18
19
20
21
22
23
24
          McCORKLE LITIGATION SERVICES, INC.
          CHICAGO, ILLINOIS - (312) 263-0052
```

Page 4

```
1         THE VIDEOGRAPHER:  This is the remote Zoom
2    video deposition of Mitchell Kushner taken by
3    Loevy & Loevy in the matter of William E. Amor v.
4    Michael Cross, et al., Case 18 CV 02523.
5         Today is September 28th, 2020.  The time
6    is 1:17.  The court reporter is Tracy Jones of
7    3C Litigation Support.  I'm the Zoom host,
8    videographer, Rick Kosberg.
9         Counsel can now introduce themselves and
10   agree to the witness being sworn remotely, then
11   the court reporter can administer the oath.
12        ATTORNEY MEADOR:  Lisa Meador on behalf of the
13   defendants.  And to correct the introduction, the
14   deposition is being taken by Sotos Law Firm.
15        THE VIDEOGRAPHER:  Apologies.
16        ATTORNEY THOMPSON:  Tara Thompson on behalf of
17   plaintiff, William Amor.
18        ATTORNEY GARCIA:  Mariah Garcia, also counsel
19   for William Amor.
20        ATTORNEY MEADOR:  Mr. Fletcher, do you want to
21   introduce yourself?
22        ATTORNEY FLETCHER:  My name is Christopher
23   Fletcher.  I represent Mitch Kushner from the
24   Illinois Attorney General's office.
```

Page 5

```
1         ATTORNEY MEADOR:  And I think we want to state
2    for the record that the parties have agreed that
3    the video recording of this deposition will be
4    maintained only for the purpose of use at trial
5    and will not be -- I'm sorry?
6         ATTORNEY FLETCHER:  I have something to add to
7    that.
8         ATTORNEY MEADOR:  Okay.  Is that not -- Is
9    that not our agreement?
10        ATTORNEY FLETCHER:  That's true that it can
11   only be used for the purpose at trial.  And I want
12   to be make sure that it's not published,
13   transmitted to third parties, nor posted to any
14   YouTube, social media, or otherwise.
15        ATTORNEY MEADOR:  Okay I think that's our
16   agreement, that it would be utilized only for
17   purposes of trial in this matter.
18        ATTORNEY THOMPSON:  Just the video that's
19   produced.
20        ATTORNEY MEADOR:  That's correct.
21        Okay.  I think we can swear in the
22   witness.
23        THE COURT REPORTER:  Wonderful.  And before I
24   swear the witness, if I might just have a chorus
```

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020                                                Pages 6..9

Page 6

1   of ascension from all counsel present that they
2   agree to the witness being sworn remotely, please.
3       ATTORNEY MEADOR:  Agree.
4       ATTORNEY THOMPSON:  Plaintiff's agree.
5       ATTORNEY FLETCHER:  Agreed.
6               (Witness sworn.)
7   WHEREUPON:
8                   MITCHELL KUSHNER,
9   called as a witness herein, having been first duly
10  sworn, was examined and testified as follows:
11              EXAMINATION
12  BY ATTORNEY MEADOR:
13      Q.   Okay.  Mr. Kushner, thank you for being
14  here today.  We appreciate it.
15           Can you state and spell your name for the
16  record?
17      A.   My first name is Mitch -- Mitchell,
18  spelled M-I-T-C-H-E-L-L.  Last name Kushner,
19  K-U-S-H-N-E-R.
20      Q.   Okay.  Mr. Kushner, have you given a
21  deposition before?
22      A.   Yes.
23      Q.   Okay.  When was the last time that you
24  gave a dep?

Page 7

1       A.   I have a lot -- I don't know.  I can't
2   remember.
3       Q.   Okay.  Just wanted to go over a few
4   things.  I'm sure you're well versed in, you know,
5   providing testimony, but just to say a couple of
6   the ground rules, this is being transcribed by a
7   court reporter.  So to make it easy on her, I
8   promise to wait until you finish your answer
9   before I ask my next question, try not to
10  interrupt you.  And then I ask that you do the
11  same, wait for me to finish my question until you
12  answer.
13           Does that sound fair?
14      A.   Yes.
15      Q.   Okay.  And if you don't understand any of
16  my questions, feel free, let me know.  I'll
17  clarify it for you to the best way I can.  And
18  make sure that you understand my questions.
19           Does that sound fair as well?
20      A.   Yes.
21      Q.   Okay.  And if at any time you want to
22  take a break, let me know, we can do that.  I
23  would just ask that you not do so while a question
24  is pending.  Just answer the question, then we can

Page 8

1   take a break.
2           Does that sound fair as well?
3       A.   Yes.
4       Q.   Okay.  Thank you.
5           Mr. Kushner, what is your current
6   employment?
7       A.   I'm employed by the Office of the
8   Illinois State Fire Marshal's Office.
9       Q.   And what is your position there?
10      A.   I'm a special agent canine handler.
11      Q.   How long have you held that position?
12      A.   As a canine handler?
13      Q.   Yes, sir.
14      A.   Since April of 1992.
15      Q.   And what are your duties as a special
16  agent canine handler?
17      A.   We assist the fire departments, police
18  departments, and sheriff's departments in the
19  origin and causes of fires and explosions and the
20  use of -- utilization of an accelerant sniffing
21  canine if needed.
22      Q.   I apologize.  Did you say if needed?
23      A.   If needed.
24      Q.   Okay.  Thank you.

Page 9

1           I know that you've received a lot of
2   training for your position.  If you wouldn't mind
3   indulging me and just kind of running through from
4   the beginning of your training for your position
5   that you currently hold.
6           I understand you were a firefighter with
7   the United States Air Force; is that correct?
8       A.   Air Force Reserves; yes, ma'am.
9       Q.   Okay.  And can you tell me what your
10  training was with the Air Force reserves?
11      A.   It's a six-week and one day firefighting
12  school that was held at Chanute Air Force Base in
13  Rantoul, Illinois.
14      Q.   And after you finished that training,
15  were you then certified as a firefighter?
16      A.   In the United States Air Force, yes.  But
17  I had -- Yes.  In the United States Air Force, I
18  was, yes.
19      Q.   Okay.  And then did you obtain
20  certification -- Strike that.
21           Let me clarify.  Were you certified as a
22  Firefighter 1?
23      A.   No.
24      Q.   Okay.  It was -- Can you explain to me

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 10..13

Page 10

1  what the certification was?
2    A.  The Air Force has its own certifications
3  as far as it was -- I was considered a 571XO,
4  which is the firefighter classification.  When you
5  graduate your school, you have to do tech books,
6  you know, technical books on CDC courses.  So I
7  became a 3 level.  The military is separate from
8  the civilians.  I can explain the civilian part
9  that would be equivalent to it.
10   Q.  Sure.  That would be great.  Please.
11   A.  When I completed my firefighting school
12  at Chanute Air Force Base and I came back to the
13  real world after December when I was off the
14  reserve time, I challenged the Firefighter 2 test
15  for the State of Illinois certification and became
16  a certified Firefighter 2.
17   Q.  Okay.  And was that in 1980 or 1981?
18   A.  I think I challenged the test in '80 --
19  late '80s into '81.  I think I became certified in
20  '81.
21   Q.  So that was as a Firefighter 2?
22   A.  Yes, ma'am.
23   Q.  In a civilian certification level,
24  correct?

Page 11

1    A.  Yes, ma'am.
2    Q.  Okay.  And then did you then work for NAS
3  Glenview?
4    A.  Yes, ma'am.
5    Q.  And what did you do there?
6    A.  I was a firefighter for Naval Air Station
7  Glenview.
8    Q.  Did you receive, then, additional fire
9  investigation training?
10   A.  I wouldn't consider it additional, I
11  think -- additional, I think, if I had my initial
12  training in 1985.
13   Q.  Okay.  So then prior to 1985, you had
14  training as a firefighter but not in fire
15  investigation; do I have -- is that correct?  Do I
16  have that correct?
17   A.  Yes, ma'am.
18   Q.  Okay.  Thank you for clarifying for me.
19  Okay.  Then in 1985 when you attended --
20  obtained training in fire investigation, can you
21  explain to me what that was?
22   A.  Yes, ma'am.  It's a -- It's three weeks
23  offered by University of Illinois Fire Service
24  Institute.  At that time, you had to be a

Page 12

1  Firefighter 2 to apply for the fire investigation
2  field.  So what had happened was I took my
3  firefighting modules in Flossmoor, Illinois, and
4  that was in 1985 into early 1986.  It's two weeks
5  back to back, and then it's a break, and then
6  there's another week, a third week about a couple
7  of weeks after that.
8    Q.  Okay.  And you successfully completed
9  that training?
10   A.  Yes, ma'am.
11   Q.  Okay.  And did you then obtain your
12  certified fire investigator's certificate?
13   A.  Yes, ma'am.
14   Q.  Did I describe that correctly?
15   A.  Yes, ma'am.
16   Q.  Okay.  And is that through the State Fire
17  Marshal?
18   A.  Yes, ma'am.
19   Q.  Okay.  And then what did you do with your
20  career?
21   A.  I worked in Naval Air Station Glenview
22  from 1983 to 1987.  I tested for a position with
23  the Fire Marshal's Office as a Clerk 4.  I
24  received that position in June or July of '87.  I

Page 13

1  worked in the office of the Division of Arson
2  Investigation at the Thompson Center from '87
3  until March 3rd of '89.
4    Q.  And then what did you do in 1989?
5    A.  March 3rd of '89, I came out in the field
6  as a fire investigator trainee.
7    Q.  Did you attend any training as a fire
8  investigator trainee?
9    A.  Yes.  There was conferences held down in
10  Champaign offered by the Illinois Association of
11  Arson Investigators, which is also known as IAAI.
12  Fire investigation is different training held in
13  the northern part of Illinois.  I would go to
14  conferences.  Also I was a member of the Fire
15  Investigators Strike Force, which is a monthly
16  training -- training group, I guess.
17   Q.  Okay.  Did you also attend the Illinois
18  State Police Academy?
19   A.  Oh, yeah.  I forgot about that.  That was
20  in -- That was in '89.  That was September --
21  September of '89, I believe.
22   Q.  Okay.  And can you explain to me what the
23  training was that you received there?
24   A.  That was the law enforcement training.

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 14..17

Page 14

1  That was -- In order to be an arson investigator
2  in the state of Illinois, you had to be a
3  Firefighter 2, which made you Investigator 1
4  qualified when you took the module.  With the
5  firefighter -- With the Investigator 1
6  certificate, you could apply for arson
7  investigator, which is a peace officer status.  So
8  they taught us about Chapter 38, weapons
9  qualifications, report writing, a lot of defensive
10  tactics, physical fitness.  It's almost like --
11  It's a very, very scaled down version of the State
12  Police Academy.  We didn't have to do the chasing
13  cars and -- you know what I mean, the drive fast
14  stuff.  We didn't do that.
15      Q.   You do that separately on your own?
16      A.   54 miles an hour.
17      Q.   And then did you receive your arson
18  investigator certificate in 1989 as a result of
19  that training?
20      A.   Yes, ma'am.
21      Q.   Okay.  Did you also -- Strike that.
22          Do you also attend continuing learning
23  education seminars and training throughout your
24  career?

Page 15

1      A.   Absolutely.
2      Q.   Okay.  How often do you do that?
3      A.   Up until March of this year, we used to
4  have monthly meetings with the Strike Force, which
5  was January through July and August were breaking
6  months.  So it was -- Let's see.  So there's
7  twelve months in a year, ten months a year we
8  would try to have training.  I tried to make every
9  one since 1985.
10      Q.   What kind of training would there be?
11      A.   There would be different topics such as
12  fire patterns, report writing, photography.  What
13  they do is they take different aspects of the
14  field investigations and they bring it in, and
15  they teach younger investigators.  And we also
16  have seasoned fire investigators that also do a
17  lot of teaching, and we pass on new techniques and
18  things like that.
19      Q.   Okay.  And then can you explain to me,
20  you mentioned the Strike Force.  What is that?
21      A.   The Fire Investigator Strike Force is an
22  organization that I've been president of since
23  20 something years now.  What we do, again, is we
24  train and bring in speakers to talk about current

Page 16

1  topics of fire investigations.  It's usually
2  held -- It was held on the second Wednesday of
3  each month except for July and August.  And we
4  have two seminars a year, two six-hour seminars
5  which are held at the Northern Illinois University
6  in Hoffman Estates.  And we bring in -- Sometimes
7  we bring in federal people; we bring in State; we
8  bring in County, different groups that have --
9  depends on what topics they want to come in and
10  talk about.
11      Q.   And do you -- As part of your role as
12  president of that organization, do you set up
13  these different speakers who come in?
14      A.   I have a training committee.  But what
15  happens is that because I have a lot of contacts
16  out there, I kind of say, Hey, call so and so, and
17  they'll talk about whatever.  If we're looking for
18  somebody to talk about depositions, so of course I
19  do depositions, so therefore I say, Contact so and
20  so who I just had a deposition with and see if
21  they're willing to come in for two hours and talk
22  about deposition prep.  You know what I mean?
23      Q.   Sure.
24      A.   So various topics.  I mean, you name it,

Page 17

1  we try to cover it.
2      Q.   Okay.  And there is -- You've described a
3  very large number of continuing education that you
4  engage in throughout the year.  Is it fair to say
5  that it's important to stay current and
6  knowledgeable about different issues and tactics
7  and techniques that are available as a fire
8  investigator and, specifically, an arson
9  investigator?
10      A.   Yes.
11      Q.   Okay.
12      A.   There's a lot more training.  I just
13  testified about what you asked me about.
14      Q.   Sure.  Go ahead and fill me in, your
15  additional training.
16      A.   In 1993, I attended the Federal Law
17  Enforcement training facility in Glynco, Georgia.
18  That was a two-week class on advanced origin and
19  cause that was conducted by the Bureau of Alcohol,
20  Tobacco and Firearms.  And they had a courtroom --
21  courtroom prep course or whatever, you had to take
22  that part too for a few days, and they had a trial
23  where they voir dire you or whatever they do to
24  you.

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 18..21

Page 18

1    And then we also have online training.
2  There's a thing called the -- it's free online
3  training offered by -- who does it?  I forgot who
4  does it.  It's been a while.  I've done them all.
5  But it's online training that you get college
6  credit hours for.  It's a test that each one is
7  tested.  It's -- I forgot the name of it.
8      Q.    Is it through the State?
9      A.    No, no, no.  It's -- It's through the
10  IAAI, International Association.  It's the
11  continuing ed program they have.
12      Q.    Okay.
13      A.    And then you take a test, at the end
14  there's a certificate, you can print the
15  certificate.
16    Also too I attend, like I said,
17  conferences once in a while down in Champaign, the
18  Illinois chapter.  I also taught there a couple of
19  times, you know, at least one time last year.  I
20  taught in September of last year.  I don't know.
21  There's training all over the place.
22    And then there's the online police
23  training that we have to keep current on the
24  police stuff.  So we have online police training

Page 19

1  too.
2      Q.    Okay.
3      A.    It's all done on the computer.
4      Q.    You mentioned that you attended in 1993
5  an ATF course on advanced origin and cause.  Did I
6  describe that correctly?
7      A.    And courtroom techniques, yeah.
8      Q.    Okay.  And what kind of information
9  besides the courtroom techniques, what kind of
10  information was covered when you call it advanced
11  cause and origin?
12      A.    Okay.  They had Dr. Glen Cherry
13  (phonetic), and they had this thing called QDoc.
14  And he was talking about things giving off heat
15  and release rate.  That was an eight-hour -- that
16  was a whole day on that.  And then they had John
17  Dehan, Dr. Dehan, he came in, and he talked about,
18  what do you call it, fire -- it wasn't really fire
19  modeling.  It was a use of thermal couples in room
20  urns and stuff like that.  And then they had --
21  Let's see.  It was two weeks long too.  It was,
22  like -- there was a lot of stuff that they were
23  starting to put out in the field.  Like they did
24  this computer modeling thing where they talked

Page 20

1  about fire spread and travel based on fire
2  modeling, like if the windows were open, if the
3  windows were closed, if the doors were open, if
4  the doors were closed.  So it was a lot of the
5  technical stuff being thrown at us for those two
6  weeks.  It was all taught by either the doctors
7  that came in or ATF agents.
8      Q.    Okay.  And attending all of this
9  additional training was important to maintain your
10  ability to be current with techniques and
11  technology in your investigations, correct?
12      A.    Well, back then, it was done because you
13  wanted to advance yourself and learn more.  But
14  now you have a mandate in Illinois that you have
15  to have recertification every four years.
16      Q.    Okay.  And when you say
17  "recertification," is that for your arson
18  investigator's certificate or for your fire
19  investigator's certificate?
20      A.    Both.
21      Q.    Understood.  Okay.
22    And I believe my understanding is you
23  also attended, back in 1991, an advanced cause and
24  origin training with the ATF; is that correct?

Page 21

1      A.    No.  That was '93.
2      Q.    '93?  You didn't attend one a couple of
3  years before that as well?
4      A.    I don't know.  I may have gone to one of
5  their classes.  I don't know.  It's been a long --
6  It's been 31 years.
7      Q.    Understood.
8    And in 1992, you became a certified
9  accelerant detection canine handler, correct?
10      A.    Yes, ma'am.
11      Q.    Okay.  Can you explain to me what kind of
12  training that involves?
13      A.    It's a 200-hour course that was at the
14  time offered at the --  they moved -- just
15  recently moved to New Hampshire, but it was in
16  Maine, the state of Maine.  And what happens is
17  that we were trained by Trooper Paul Gallagher,
18  who was our trainer.  And at that time in '92, he
19  was still a trooper.  And then we were certified
20  by the Maine State Police Justice Academy or
21  Justice System, whatever they call it.
22      Q.    And what kind of training did you receive
23  there?
24      A.    Well, I was issued -- Well, actually, the

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 22..25

Page 22

1  first time, I brought my own dog with me because
2  we had the dog from Island Lake.  Her name was
3  Nikki, N-I-K-K-I.  That was my first canine.  So
4  Nikki and I drove out to Maine in March of --
5  March of '92.  And then we both learned -- she
6  learned how to sniff stuff for accelerants, and I
7  learned how to handle her.
8      Q.   And you said she was from Island Lake.
9  Is that from a fire department there?
10     A.   No.  It was from -- She was originally
11  supposed to be a show dog, but she had a partial
12  cataract in her eye.  So she's actually -- her
13  name was Ms. Nikki, Ms. Nikki of Gypsy Glen
14  Kennels.  She was a show dog.  Her brother,
15  Watson, Mr. Watson, was one of our -- was one of
16  our first two accelerant detecting canines in
17  Illinois, and that was in '91, '90.  So this was
18  Watson's twin sister, Nikki.  So Kathy Ryland from
19  Ryland Kennels donated Nikki to the program and
20  Watson.
21     Q.   Okay.  So then did you use Nikki moving
22  forward from 1992 as your canine accelerant
23  detection?
24     A.   Yeah.  Nikki worked from 1992 until 2003.

Page 23

1      Q.   And then did you train with a new canine
2  after that?
3      A.   Yes.
4           I'm sorry.  I didn't wait for you to
5  finish.
6      Q.   No, that's okay.  I paused.
7      A.   Your pause, my answer.
8      Q.   That's right.  And it's easy to know
9  where I'm going with these questions.
10          ATTORNEY FLETCHER:  Mitch, do you want a can
11  of water?
12          THE WITNESS:  A can of water?  I'm all right.
13  Thanks.
14          ATTORNEY MEADOR:  I can get you some water in
15  a cup.  I'm happy to.
16          THE WITNESS:  No, we're good.  No, I'll go get
17  it.
18  BY ATTORNEY MEADOR:
19     Q.   Okay.  So then who then was your new
20  canine?
21     A.   My new canine was Canine Raider,
22  R-A-I-D-E-R.  And he was from Clearwater, Florida.
23  Somebody donated him from Paws for Cause in
24  Clearwater, Florida.  And then he worked from 2003

Page 24

1  until 2013.
2      Q.   And then did you work with another canine
3  since 2013?
4      A.   Yes, ma'am.
5      Q.   Who's that?
6      A.   Zoe, Z-O-E.
7      Q.   And do you still work with Zoe?
8      A.   She's home on the couch right now, yes.
9  She had a fire last night.
10     Q.   Okay.  She's resting?
11     A.   Probably.
12     Q.   So when you did this training with Nikki,
13  I understand -- I'm understanding from what you're
14  explaining is that she had not been trained as an
15  accelerant detecting canine before you both went
16  to Maine in 1992; is that correct?
17     A.   She might have been imprinted.
18     Q.   What does that mean?
19     A.   That means that she was already
20  acknowledging the scent of gasoline in order to --
21  She's on food reward.  They're all on food
22  reward --
23     Q.   Okay.
24     A.   -- like the Pavlovian food reward thing.

Page 25

1      Q.   Sure.
2      A.   Where the -- you know, the chicken rings
3  the bell and they eat.  Well, they're hand fed.
4  They don't eat out of the bowl.  The dogs are on
5  food reward.  So she was on food reward when I got
6  her, but she was already pre -- what they call
7  imprinted by Bill Glover.  That was Watson's
8  handler.
9      Q.   And then how -- how does that work with
10  the canine and the training?  Do you two then work
11  together as a pair when you're going through this
12  training?
13     A.   She didn't leave my side.  We were
14  together all the time.
15     Q.   Okay.  And were you being trained at the
16  same time she was?  Is that how it was set up?
17     A.   Yes.
18     Q.   Okay.  Describe for me, you know, what
19  that kind of looked like.
20     A.   Well, you got up in the morning, and then
21  they had a thing called a hot can.  And on the hot
22  can, meaning a metal container, you know, like, a
23  can.  They put a cotton ball in the can, and that
24  cotton ball had 50 -- one microliter or less of

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020                                                    Pages 26..29

Page 26

1  50 percent air evaporated gasoline on the high
2  side.  And what the dog would do, a dog or this
3  dog, Nikki, would do is that the trainer or
4  somebody would be sitting down, you would have the
5  dog on a leash with your food pouch on because
6  they're food reward.  The dog comes up to the can,
7  you know, sniffs the can, sits down.  You feed the
8  dog, then you move on.  And you do that maybe six,
9  seven times, eight times in the morning to get
10 them going in for the rest of the day.  And then
11 there's other things you do with them over a
12 period of time to get them to sniff rooms and all
13 that kind of stuff.  And then you actually start
14 working fire scenes down the line.  Then you have
15 to take, there's a written test.  There's a test
16 with the Maine State Police people, you know, to
17 show you know what you're doing.  And then there's
18 a trial, like a field trial.  You have to show
19 them all the aspects of what you do, and they have
20 to sign off on it.  Some of the Maine State Police
21 guys have to sign off on it.
22      Q.   What's the certification that you
23 received at the end?
24      A.   I became a Certified Accelerant Detection

Page 27

1  Canine Handler.
2       Q.   And then did Nikki receive a certificate
3  or certification?
4       A.   It was -- Go ahead.
5       Q.   No, that's okay.
6            I'm sorry.  Was it not Nikki?
7       A.   No.  We did it as a team, so both of our
8  names were on the certificate.
9       Q.   Gotcha.
10      A.   She did the sniffing, and I did the
11 feeding.
12      Q.   Gotcha.
13           Could she go with a different handler if
14 needed?
15      A.   They got a thing -- Yes and no.  They
16 wanted the handlers to be only one-dog handlers.
17 But what happened was is that I was in the
18 Reserves.  So sometimes I had to go away for two
19 weeks, and then I had to go to my weekends.  So my
20 wife at the time was a certified home handler.
21 She just, you know, fed the dog at home, didn't
22 take the dog out of the house, but just had to
23 feed the dog because you can't not feed the dog
24 for 15 days, you know.  So she was a home handler,

Page 28

1  they called it.
2       Q.   Okay.
3       A.   We don't live so close to everybody for
4  us to give the dog to another handler and work --
5  you know, feed the dog, because they're not
6  certified with that dog.  So you're -- the person
7  and the dog are certified as a team.
8       Q.   Yes.
9       A.   So you could feed the dog, but you can't
10 work the dog in fire school.
11      Q.   Okay.  And then once you are certified,
12 then how do you determine whether or not you use
13 your canine at a fire scene?
14      A.   Okay.  Good question.  I guess it's up to
15 me.  I don't know.  If I go there and I think
16 there's accelerant used, I would run the dog.  If
17 I was there, if it was an accident, you know, if
18 it was something like a stove fire or that,
19 something that was a cooking fire or something
20 like that, I wouldn't bring her.  But sometimes I
21 would just to keep her in stuff like that.
22      Q.   So give me some examples of occasions
23 where you would use your canine when you're
24 investigating a fire scene.

Page 29

1       ATTORNEY THOMPSON:  Object to form.
2            You can answer.
3       THE WITNESS:  I didn't hear that.
4       ATTORNEY MEADOR:  She just said -- She just
5  made an objection to my question.
6       THE WITNESS:  I don't know if I've got to wait
7  until someone says I can answer.  So I can go
8  ahead and answer?
9  BY ATTORNEY MEADOR:
10      Q.   Yeah.  You can go ahead and answer.
11 Because we don't have a judge here --
12      A.   No, no.  I just didn't hear her.  I'm
13 sorry.
14      Q.   No.  That's okay.  She just objected.  We
15 can -- Did you understand my question?
16      A.   No.  I just -- I didn't -- When someone
17 objects to something, I'm supposed to wait.
18      Q.   You're well trained.
19      A.   But it's supposed to be objection, you've
20 got to answer the question anyway.  Someone says
21 I'll make a note that you objected.  I didn't hear
22 what you said.  That was the problem.
23      ATTORNEY THOMPSON:  I understand.
24      THE WITNESS:  So the question was that give

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 30..33

Page 30

1   you an idea the fire I would work her in?
2   BY ATTORNEY MEADOR:
3      Q.   Yeah.
4      A.   Yesterday, last night.
5      Q.   Okay.
6      A.   It was in Chicago.  It was in a high
7   rise -- not a high rise, a four-story building in
8   Chicago.  And the interior staircase was burnt.
9      Q.   Okay.  And what is it when you came to
10  the scene that caused you to think that you might
11  be able to utilize your canine?
12     A.   Well, usually, hallways, stairways don't
13  burst into flames on their own.  So something had
14  to help it along.  And it was still there.  So
15  she's trained either to sniff the staircase, let's
16  say, in this case.  And if there's any accelerant
17  left on any of the stairs, she would stop, put her
18  nose down within that area.  Then she'll sit down.
19  Then I'll feed her.  Then I take a golf tee and
20  mark the area with a golf tee showing that's where
21  she indicated.  I finish the staircase, and then
22  when I go back, I tell the Bomb and Arson
23  detective in the Office of Fire Investigation Fire
24  Marshal this is where Zoe indicated.  And she

Page 31

1   didn't indicate this, I'm just telling you if
2   that's the case.
3      Q.   Sure.
4      A.   I don't know.  I guess it's up to me.
5      Q.   What is considered an accelerant that
6   your canine would track?  Is that the right
7   terminology?
8      A.   Find.
9      Q.   Find.  What kind of accelerant could
10  there be that your canine would find?
11     ATTORNEY THOMPSON:  Object to form.
12     I'm sorry to interrupt.  Just so it's
13  clear, I can't advise you whether or not to
14  answer, because I'm not your counsel.  But I'll
15  make objections and --
16     THE WITNESS:  No, no.  Sometimes when you say
17  something, when I hear your -- when I hear your --
18  it comes out as (vocally demonstrating).  It comes
19  out as a noise.  I don't hear a --
20     ATTORNEY MEADOR:  Word.
21     THE WITNESS:  I don't know if you're turning
22  around.  I don't know.
23     ATTORNEY MEADOR:  She's not.
24     THE WITNESS:  That's later.  No, I just didn't

Page 32

1   hear -- I just didn't hear you.  That's the
2   problem.
3      ATTORNEY THOMPSON:  I'll try to speak more
4   clearly --
5      THE WITNESS:  Well, when you're upset with
6   something, then I'll know what happened.
7      All right.  So you objected.  I'm going
8   to go ahead and answer the question.  And the
9   question in my mind was what type of accelerants
10  does she indicate on?
11  BY ATTORNEY MEADOR:
12     Q.   Yeah.
13     A.   Everything pretty much from, what's that
14  stuff, acetone, the nail polish remover.  Acetone
15  has the -- Acetone has only one hydrocarbon
16  molecule -- or carbon molecule, I'm sorry, carbon
17  molecule.  It's the lowest in the chain of
18  hydrocarbons is nail polish remover, or acetone.
19  And then it goes all the way up to home fuel oil.
20  But I don't think you'll start your house with
21  home fuel oil.  That's going to take a long time
22  to get going.  Good luck on that.
23     So if it's a hydrocarbon, then she should
24  be able to indicate on it if it's still there.

Page 33

1      Q.   Okay.  I think that you also became a
2   certified evidence technician within your career;
3   is that correct?
4      A.   Yes, ma'am.
5      Q.   Okay.  When was that?
6      A.   Probably in '95, sounds like.
7      Q.   And was that through NEMRT?
8      A.   Okay.  Yes, ma'am.
9      Q.   Okay.
10     A.   It was in DuPage County.  They held the
11  class in DuPage County at the Sheriff's Office.
12  That's where we were at.
13     Q.   Have you retained that certification to
14  the present?
15     A.   I don't -- I didn't hear of anybody to
16  recertify.  You know, that's --
17     Q.   Okay.  So it's not --
18     A.   It's part of being an arson -- fire and
19  arson investigator, it's part of that.  But I do
20  have updated classes on it.  I teach evidence.
21     Q.   Okay.  So it's not something that you
22  then have to recertify like the other
23  certifications we talked about?
24     A.   Not that I heard of.  If you find out,

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 34..37

Page 34

1  let me know.
2       Q.   And you mentioned you were the president
3  of the Fire Investigations Strike Force, correct?
4       A.   Yes, ma'am.
5       Q.   Are you also a member of the
6  International Association of Fire Investigators?
7       A.   No, ma'am.
8       Q.   Not anymore?
9       A.   International Association of Arson
10 Investigators.
11      Q.   Understood.  Okay.
12           How long have you had that membership?
13      A.   Let's see.  I want to say, '89.
14      Q.   Any other professional organization
15 memberships that we haven't talked about?
16      A.   FOP, Fraternal Order of Police,
17 Lodge 120.
18      Q.   When did you become a member of the FOP?
19      A.   Probably right after I got sworn in in
20 '89.
21      Q.   And you mentioned that you've done quite
22 a bit of teaching.  Any other teaching that we
23 haven't talked about already?
24      A.   No.  I did in 20- -- what was it?  I

Page 35

1  became a fire inspector a couple of years ago.
2  2016, I became a fire inspector in Illinois.
3       Q.   And what was the certification to become
4  a fire inspector?
5       A.   I had to go to a lot of classes for that.
6  It was -- I don't know if it was two weeks.  I
7  don't remember.  It was either a week or two weeks
8  long, eight-hour day.  You had to do the -- I
9  think it was two weeks.  I don't know.  But just
10 not -- I mean, that was the basic fire inspector.
11 I mean, there's, like, different classifications
12 of those guys.  I was just doing it for the basic
13 one.
14      Q.   What's the difference between being a
15 fire investigator and a fire inspector?
16      A.   The fire investigator determines origin
17 and cause of fires and explosions and tries to
18 prevent them.  And a fire prevention person
19 prevents them and does a lot of public education
20 to keep people from getting hurt, kind of works
21 hand in hand.  I mean, I'm also a juvenile fire --
22 I just became a juvenile -- juvenile whatever you
23 want to the call it, fire setter person.  I don't
24 set fires, but I'm the one to talk to juvenile

Page 36

1  people, you know.  That was a year ago.
2       Q.   Okay.  And was that through the State as
3  well?
4       A.   Yes, ma'am.
5           See, a lot of times, if I go to a fire
6  where a juvie is involved, I have to report with
7  somebody else.  But now I can at least have an
8  idea because I'm not -- I haven't done any yet
9  because, thank God, didn't have any, you know, in
10 a year so far.  So, I mean, if I got one, I'd have
11 to work with somebody who was seasoned doing it
12 because I haven't done it yet.  You know what I
13 mean?  But at least I have an idea of what to look
14 for and say, Uh-oh, this kid needs help.  You
15 know.  So that's why fire prevention and
16 investigation, most of your fire investigators out
17 on the street in the fire departments are also
18 fire inspectors.  Very knowledgeable, very well
19 knowledged, well-rounded people.
20      Q.   When you have -- Strike that.
21           The specialized juvenile training that
22 you received, how long was that training?
23      A.   A week.  It was either a week or four
24 days, eight-hour days.  I would have to look it up

Page 37

1  somewhere.  I don't know.  It was at the Northlake
2  Fire Department.
3       Q.   Anything else?
4       A.   Yes.  Then I took the week class of, it's
5  called a public life safety educator.
6       Q.   What does that mean?
7       A.   Well, see, I figured since I could go out
8  and tell people -- I do a talk to -- I give a talk
9  to the PTA groups and all these other groups and
10 schools about home safety.  The problem is I was
11 just doing it as an arson investigator.  So I
12 thought to myself, I said, Self, I think I better
13 go to that public law -- public speaker, you know,
14 the thing, public educator class, just to get an
15 idea at least some paper under me to say, Look,
16 this is a certification now rather than just doing
17 it for my job.
18      Q.   And you say you recently received that
19 certification?
20      A.   I did right after -- I'm sorry.  You
21 weren't finished.
22      Q.   That's okay.  I'm done.  Go right ahead.
23      A.   I did it right about the same time or
24 right after I got the fire inspector one.  I kind

Page 38

1 of -- It was in 2016. I kind of grouped in that
2 all together.
3     Q.   Understood.
4     A.   You know. I was looking at a career
5 change, and I decided to stick around a little
6 longer. So that's why I was trying -- I was
7 deciding if I was going to go into the fire
8 prevention to, you know, teach people around the
9 country how to stay safe in their homes, you know?
10 And then I thought, nah, I'll stick around here
11 for a long time so ...
12     Q.   Okay. Over the course --
13     A.   I forget these people were there.
14     Q.   It's easy to forget.
15     A.   This guy's sleeping right there.
16     Q.   He's just running the videotape.
17     A.   I just see letters. I don't even see
18 people.
19     Q.   So over the course of your very long
20 career, how many fires would you estimate that you
21 have investigated?
22     A.   I have right now, I'm at 90. So I would
23 say on average, I'm at approximately a hundred
24 fires a year.

Page 39

1     Q.   Okay. And explain to me how it is that
2 you come to investigate a fire. How is it that
3 you're --
4     A.   Requested? I don't want to put words in
5 your mouth.
6     Q.   No, that's okay. Through whatever means.
7 How is it that you go to a fire scene to conduct
8 an investigation?
9     A.   Okay. My office, we have an 800 number.
10 It's called the Arson Hotline, which is
11 1 (800) 252-2947. And a long time ago, before --
12 I'm talking about when I first started, the 800
13 number was answered by the State Police in
14 Springfield. You know, what had happened was is
15 that they have a sheet of questions to ask,
16 because we're spread out all over Illinois.
17 There's only 17 of us. So, I mean, we cover the
18 areas. So there's not -- there's not a lot of us
19 out there. So they have a map. And what happens
20 is is that -- Okay. So the 800 number is called,
21 "Hey, this is Fire Chief So and So from ABC Fire
22 Department Illinois. I'm looking for an
23 investigator."
24          So that 800 number answered at that time

Page 40

1 a long time ago by the State Police, now it's
2 answered by IEMA, Illinois Emergency Management
3 Association. That's in Springfield also. So
4 that's who's answering it now. They have a list
5 of questions that they're going to ask whoever
6 calls for an investigator, the -- you know, the
7 address of the fire, what type of the fire, any
8 injuries, any fatalities, why do you need an
9 investigator, you know, roughly; is it suspicious
10 in nature, stuff like that. Is there -- If you
11 need a canine, do you need an investigator, or do
12 you need a canine and investigator. Because all
13 of our investigators are not canines, you know
14 what I mean?
15          So what will happen is is that every --
16 from Friday at 4:30 until Friday at 4:30, one of
17 us is what they call the duty agent. And so what
18 happens is that the State Police, or at this time
19 it would be IEMA, so IEMA will look on that list
20 to see who's the duty investigator. And let's say
21 it's me. So IEMA will call me up and say, "Hey,
22 Mitch, this is the Arson Hotline. I've got a fire
23 in Carbondale."
24          And I'll say, "Okay." You know, that's

Page 41

1 not my area. I live up north, so Carbondale is
2 down south. So I have a map and all the addresses
3 and phone numbers of our guys who's available for
4 the call, you know, who covers Carbondale. So
5 then I find Johnny Blow-and-So, you know,
6 whatever, he's the investigator who lives in
7 Carbondale. He's the primary. So I look on my
8 sheet and make sure he's working, and I'll say,
9 "Okay. I'll be right with you. I'll call
10 So-and-So, Blow-and-So, and have him call you."
11          So I'll call Johnny Blow-and-So up and
12 say, "Hey, Johnny Blow-and-So" -- which is not one
13 of our guys -- and say, "Hey, I've got a fire for
14 you in Carbondale. No injuries, no fatals. It's
15 residential. They're looking for an
16 investigator."
17          "Cool. What's the address?"
18          Okay. I give him the address and the
19 phone number and name of the person who requested
20 it, then the investigator -- then the investigator
21 will call -- I'll call first to make sure what's
22 going on. And I'll say, Sir, ma'am, Chief,
23 whatever you are, "I'll have a guy call you right
24 back."

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 42..45

Page 42

1        Okay.  "No problem, Mitch."

2        So then I get ahold of Johnny Blow-and-So

3 and chief -- "Call Chief Farouk at ABC Fire

4 Department.  They've got a fire."

5        So Blow-and-So will get ahold of Farouk,

6 they'll make arrangements, and they'll go work the

7 fire.

8    **Q.  When another investigator conducts the**

9 **investigation, are you involved in that**

10 **investigation at any point beyond that initial**

11 **contact?**

12    ATTORNEY THOMPSON:  Object to form.

13    ATTORNEY FLETCHER:  You can answer.

14    THE WITNESS:  Thank you.  I have to.

15        Once I hand it off to whom, what I have

16 to do is we have a form in the computer, it's

17 called IEMA sheets.  You punch in IEMA sheets, you

18 come up, you've got to fill out the blanks, who

19 you gave it to, what time you gave it to them, all

20 that stuff.  And then it goes into the database.

21 And then each one of us as an investigator sees it

22 on our phones.  We have a cell phone.  It will

23 show up on our cell phone that Johnny Blow-and-So

24 is in Carbondale.

Page 43

1 BY ATTORNEY MEADOR:

2    **Q.  At what point -- Strike that.**

3    **What year did IEMA begin taking those**

4 **calls versus the Illinois State Police?**

5    A.  I want to say, I don't know exactly.  It

6 was between around '96, '97, right there, '98, I

7 think.

8    **Q.  So you understand we're here today to**

9 **talk about a fire investigation that you conducted**

10 **in 1995, correct?**

11    A.  Yes, ma'am.

12    **Q.  Okay.  Back then, do you know whether the**

13 **calls were being taken by the State Police or by**

14 **IEMA?**

15    A.  No.  I mean, I could find out, but I

16 don't -- not sitting here.  I don't remember -- I

17 think it was further off in the '90s that they

18 changed over.  I'm not sure.

19    **Q.  Okay.**

20    A.  '95 might have been State Police.  I

21 don't know.  It was right about, I don't know,

22 somewhere in the middle there is when they

23 changed.  I know it was before 2000.  And I know

24 it was after '90.  It might have been after '95.

Page 44

1 It might have been right in that window there

2 somewhere.

3    **Q.  Okay.  So then for -- if you are the duty**

4 **agent and you received a request that was within**

5 **your area, would you then take that investigation?**

6    A.  Sure.

7    **Q.  Okay.  And what -- Currently, what is**

8 **your area?**

9    A.  Well, if you talk to the State of

10 Illinois, it's the state of Illinois.  I normally

11 handle -- Like, right now or then?

12    **Q.  We're talking about right now presently.**

13    A.  Oh, right now, there's three of us that

14 go (inaudible).  I pretty much handle everything

15 from, I don't know, northeast part of Illinois.

16 There's actually one, two, three -- five, six of

17 us up here.

18    **Q.  In the northeast part of Illinois?**

19    A.  Mm-hmm.

20    **Q.  Is that a yes?**

21    A.  Yes.  Can't answer with noises, you have

22 to answer.  And no nods of the head.

23    Yes.

24    **Q.  See, you received that training**

Page 45

1 perfectly.

2    A.  I retained it.  I didn't learn it.

3    **Q.  And then back in 1995, what was your**

4 **area?**

5    A.  Same.

6    **Q.  Same?**

7    **And do you recall being called to testify**

8 **in the criminal case on behalf of the State**

9 **against William Amor in 1997?**

10    A.  Yes.  Yes.  You got a subpoena, you're

11 going.

12    **Q.  And do you recall that you were offered**

13 **as an expert witness in that case?**

14    A.  Yes.  The answer would be yes.  But I

15 would say I was more so, I guess I was qualified,

16 I guess they said instead of offered.  I don't

17 know.  It sounds like a sacrifice.

18    **Q.  Well, that was my next question.  And**

19 **then you were qualified by the Court as an expert**

20 **witness to testify in that case, correct?**

21    A.  Yes, ma'am.

22    **Q.  Okay.  In preparation for your deposition**

23 **today, did you review any documents or records?**

24    A.  I certainly tried.  I did a few, but I

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 46..49

Page 46

1  mean, we had a problem with the photos being sent
2  because I guess it was so many mega gillion,
3  zillion bytes or whatever you call it.  And
4  basically, it didn't transfer over.  So the only
5  thing I got was a copy of the report, transcript
6  thing.
7      Q.  And that was the court transcript for
8  your testimony in the criminal case we were just
9  talking about; is that right?
10     A.  Yes, ma'am.
11     Q.  Okay.  Did you prepare a report related
12  to your investigation of that fire scene?
13     A.  Then, yes.
14     Q.  Yes.  Back then.
15     A.  Yes.
16     Q.  Okay.  Did you review that report in
17  preparation for your deposition?
18     A.  No.  I know it exists.  I did not.  Our
19  systems in our computer goes back to 2011 that I
20  can bring up reports, so I never really asked them
21  to send me that one up.
22     Q.  Do you know when the last time was that
23  you looked at it?
24     A.  Probably sitting in the courtroom

Page 47

1  wondering what I was doing there.
2     Q.  Did you review any diagrams of the fire
3  scene prior to the deposition?
4     A.  Yes.
5     Q.  How many, do you remember?
6     A.  I know it was one that just had words on
7  it, like an outline of the building with words on
8  it.  And there was one that had dimensions or
9  something on it.  And I accidentally deleted that
10  one after seeing it for the first time.  So I saw
11  that once, and I deleted it, because it was on a
12  string of about a hundred things.  So I do
13  remember the one with the dark lines on it with
14  the words in there.  I'm not very much on the
15  computer stuff.  I apologize.
16     Q.  That's okay.
17        Do you need to take a break or anything?
18    ATTORNEY FLETCHER:  Do you want a cup of water
19  or anything?
20    THE WITNESS:  Yeah, let's go for some water.
21  How about that?  I don't want a can of water.
22    ATTORNEY MEADOR:  I'll get you some water.
23  Why don't we take a --
24    THE WITNESS:  I pour that in my car.

Page 48

1    THE VIDEOGRAPHER:  Off the record at 2:04.
2          (Whereupon, a short break was
3          taken.)
4    THE VIDEOGRAPHER:  Back on the record, 2:10.
5  BY ATTORNEY MEADOR:
6     Q.  Okay.  Mr. Kushner, before the break, we
7  were talking about you had testified in the
8  criminal case against Mr. Amor back in 1997.  And
9  you said that you had reviewed the transcript from
10  your testimony; is that correct?
11     A.  Yes, ma'am.
12     Q.  Okay.  When you testified in the case,
13  were you being truthful?
14     A.  Of course.
15     Q.  And when you reviewed your transcript,
16  was it an accurate transcription of your
17  testimony?
18     A.  There was a few misspelled words, but
19  yeah.
20     Q.  Other than the misspelled words, it was
21  accurate?
22     A.  I would say yes.  Yeah.
23     Q.  When you -- Prior to you reviewing the
24  transcript, did you have an independent

Page 49

1  recollection of doing an investigation of this
2  fire?
3     A.  Yes.
4     Q.  Okay.  Did reviewing the transcript help
5  you remember certain details or information that
6  you may not have remembered prior to reviewing the
7  transcript?
8     A.  Yes.
9     Q.  So going back to -- I'm just going to
10  interrupt really quickly.  If you want any more
11  water, just let us know.
12     A.  Okay.
13     Q.  Going back to September 13th of 1995,
14  were you contacted to investigate a fire in
15  Naperville?
16     A.  Yes.
17     Q.  Okay.  And can you tell me how that came
18  about?
19     A.  Yes.
20     Q.  Do you remember how it was that you
21  became assigned to do this investigation?
22     A.  It would help me if I could read the
23  first sentence of my report.  But I remember -- If
24  I remember correctly, I was dispatched by our duty

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 50..53

Page 50

1  agent.
2      Q.   Okay.  So why don't we go ahead and mark
3  your report.
4      ATTORNEY THOMPSON:  I have a copy.
5      ATTORNEY MEADOR:  You do?  Okay.
6          Tracy, Exhibit 1.
7              (Whereupon, Kushner Deposition
8               Exhibit No. 1 was marked for
9               identification.)
10     ATTORNEY MEADOR:  So for the record, it is
11 Bates stamped SDTIFSM05 to 07.
12         That's for you as well.  Here you go, Mr.
13 Kushner.  I'll give you this one, because that
14 one's been marked.
15 BY ATTORNEY MEADOR:
16     Q.   So showing you what's been marked as
17 Exhibit 1, do you recognize that document?
18     A.   Yes, ma'am.
19     Q.   What is it?
20     A.   It's the investigative report for the
21 fire that occurred in Naperville.
22     Q.   Okay.  And is this the report that you
23 were just referencing?
24     A.   Yes, ma'am.

Page 51

1      Q.   And in looking at it, does that refresh
2  your recollection as to how you were first
3  assigned to the case?
4      A.   Yes, ma'am.
5      Q.   And if you want, why don't you take a
6  minute and take a look at the report.
7      A.   No.  I just saw that there.
8      Q.   Okay.
9      ATTORNEY THOMPSON:  Lisa, I'm sorry to
10 interrupt.
11     THE WITNESS:  I didn't hear you.
12             (Whereupon, a discussion was had
13              off the record.)
14     THE WITNESS:  Now it makes more sense how I
15 received this call, yes.  Now I know how it
16 happened.
17 BY ATTORNEY MEADOR:
18     Q.   Okay.  Can you tell me how that happened?
19     A.   Okay.  During the day, Monday through
20 Friday, between 8:30 and 4:30, the 800 number was
21 transferred to either our Chicago office or our
22 Springfield office.  Because there was people that
23 were in the office, meaning secretarial people,
24 you know, like staff.  And because it says that on

Page 52

1  the 13th -- See where it says "Case #" and then
2  "Date & Time" the date and time on the left side?
3      Q.   Yes.  So it says "Case #, Date & Time
4  Incident, Date & Time Requested."  Is that what
5  you're referencing?
6      A.   Right.  I'm going to reference the date
7  and time requested.  Is that all right?  Everybody
8  all right on that?
9      Q.   Sure.
10     A.   All right.  So what happened was is that
11 on 13 September '95 at 1500 hours, which is
12 3:00 o'clock real world time, what happened was is
13 that they called our office, the 800 number, and
14 they got transferred to the Springfield office.
15 That would be on the right side, says "Notified
16 by."
17     Q.   Yes.
18     A.   Okay.  So then the Springfield office
19 personnel more than likely called me and said get
20 ahold of Lieutenant Dave Ferreri, see where it
21 says "Requested by"?
22     Q.   I do.
23     A.   You don't mind if I do this, that's
24 because you asked me to explain how I did this.

Page 53

1      Q.   No.  That's absolutely fine.
2      A.   All right.  So this is how it reads.  So
3  date and time requested was 13 September '95 at
4  3:00 o'clock or 1500 hours, and it was notified by
5  the Springfield office.  So the 800 number
6  answered by either the State Police or IEMA, which
7  is probably State Police, went to the Springfield
8  office.  The Springfield office notified me and
9  said get ahold of Lieutenant Dave Ferreri, they
10 had a fatal fire, and this is the phone number.
11 Okay?
12         So they're asking for an investigator.
13 That's where it says "Canine Agent:  DNA," does
14 not apply underneath where it says "Agency:
15 Naperville Fire Department."  So they didn't ask
16 for a canine, so I wasn't going to work the canine
17 at the time.  That's how it came in as an
18 investigative request, not a canine request.
19         So then I got -- I got it -- I called --
20 Okay.  I'll stop there, because that's how I got
21 the call.  I'll get more questions after that.
22 No, no, no.  I just don't want to keep going
23 because I don't know what else -- That's how I got
24 the call.

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 54..57

Page 54

1   Q.   Okay.  And how do you know when you then
2  were contacted by the Springfield office about
3  this call?
4   A.   They called me as soon as they hung up
5  because it says -- where it says "Details," see,
6  like, the middle section towards the bottom, it
7  says "Details" with two little points, I don't
8  know what you call it, semicolon, colon, whatever
9  it is, "This agent was requested" -- Okay.  And
10  then on 13 September '95, so they must have hung
11  up the phone, turned around, and called me right
12  away and said get ahold of him.
13   Q.   Is this information in the Details
14  section filled in by you or someone in the
15  Springfield office, or a combination of both?
16   A.   This is all filled out by me.
17   Q.   Okay.  When you fill in this information,
18  is it directly into a computer form?
19   A.   Yes.
20   Q.   And when do you fill out this
21  information, at what point?
22   A.   When I got all the information I need to
23  fill it out.
24   Q.   Okay.  Based on the information that is

Page 55

1  in this Details section, is it fair to say that
2  you filled in this section after initiating your
3  investigation of this fire?
4   ATTORNEY THOMPSON:  Object to form.
5   THE WITNESS:  Yes.
6  BY ATTORNEY MEADOR:
7   Q.   Okay.
8   A.   Can I just back up a little bit?
9   Q.   For sure.
10   A.   Okay.  What happens is is this is what's
11  called the informational sheet, the first one.  So
12  for instance, you're -- you're a reporter, or
13  you're a fire department, a police department that
14  wants information, like, right now.  So what they
15  do is they -- the first page gets sent out, or
16  back then, the first page got sent out.  They
17  answer all the general questions anyone would
18  have.  The Origin and Cause section, that's two
19  pages down.  That's on page 3.  So until all this
20  stuff is filled out, the middle part with the
21  weather and all that stuff, when I get all the
22  information and this is filled out completely,
23  then I send it to my lead worker or my supervisor.
24  And that was on 19 September '95.  That's at the

Page 56

1  bottom.  Then he approved it on 9/20.
2   Q.   And you said that the informational sheet
3  is -- Strike that.
4   You said that this top page is called the
5  informational sheet; is that right?
6   A.   Kind of, yeah.  That's what we used to
7  call it just if somebody needed information right
8  away, this is all the general stuff they needed
9  without knowing anything about the investigation.
10   Q.   And is this informational sheet saved in
11  the computer before you submit it later on?
12   A.   No.  Okay.  What happens is is that you
13  fill out all the blanks on the form in the
14  computer, which I did on 19 September '95, and I
15  gave it to my lead worker, which was Mickey Zito,
16  and he signed it on 9/20/95.  So all this was all
17  done at one time.
18   Q.   Understood.
19   A.   But I'm saying this, but if you called
20  the office and said, "Hey, I'm reporter," whatever
21  your name is, from whatever paper, "do you have
22  information on this," they would redact -- do you
23  see the redactions on this with the dates of birth
24  redacted, mine is redacted anyway, what they would

Page 57

1  do is redact the stuff that you're supposed to
2  redact, and then they -- reporters used to, what
3  do they call that, fax it to you.
4   Q.   Okay.
5   A.   But that was the cover sheet.  That's
6  what they sent out.
7   Q.   Okay.  But this sheet couldn't be sent
8  out until after you had inputted the information
9  at whatever point that was in your investigation,
10  correct?
11   A.   Yes, ma'am.
12   Q.   Okay.
13   A.   No, it could not have been sent out.
14   Q.   I think I asked you a double negative.
15   A.   Yeah.  Well, I answered two questions at
16  the same time, right.  They could not send it out
17  until everything was filled up.
18   Q.   Okay.  Thank you.
19   And in this top section again, where it
20  says "Address of Incident, Injury, Fatality,
21  Cause," and "Smoke Detectors," that information,
22  do you fill all of that in as well?
23   A.   Yes, ma'am.
24   Q.   The information about -- in the next

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 58..61

Page 58

1  section about "Occupants and Owner," do you fill
2  that information out?
3      A.   Yes, ma'am.
4      Q.   So I guess just for clarification, on
5  this top section, is any of it filled out by
6  someone else prior to you being assigned?
7      A.   No.
8      Q.   When a request is made for a fire
9  investigator, at what point is it determined
10 whether a canine would be used?
11     A.   That's almost the same question you asked
12 earlier.  But I can give you an example.  Would
13 that help?
14     Q.   Okay.
15     A.   I do not conduct origin and cause
16 investigations in the city of Chicago.  I only run
17 the canine.  I worked the canine in Chicago since
18 1992.  I don't render any opinions on how any of
19 their fires start.  So they -- when the Office of
20 Fire Investigation in Chicago requests a canine,
21 all I'm there to do with the canine is to work the
22 canine through accessible areas at the fire scene
23 and determine whether or not there's accelerant
24 present or the ignitable liquid present.

Page 59

1      Q.   When you investigate a fire scene, since
2  1992, do you always bring your canine with you?
3      A.   Yes, except for one time recently.
4  That's a very interesting question.  But it's only
5  happened one time in all the years.  It only
6  happened one time I didn't have a car -- a dog in
7  the car.
8      Q.   Okay.  And why was that?
9      A.   What happened was is that they were
10 rioting in Chicago, and I had a call to go to a
11 fire in Chicago Heights.  They set fire to the DMV
12 building.  And I thought that I -- I thought
13 because if I was in the building conducting an
14 investigation inside, and my canine was in the
15 vehicle, there's a chance they may have set my
16 vehicle on fire with my canine in it.  So I didn't
17 want to take the chance of getting my canine
18 killed.  I left her home.
19     Q.   You mentioned earlier here in this top
20 section of the investigative report, it says
21 "Canine Agent:  DNA:  That means does not apply;
22 is that right?
23     A.   Yes, ma'am.
24     Q.   Okay.  It is your practice, however, to

Page 60

1  bring your canine with you whenever you
2  investigate a fire scene, regardless of whether
3  someone has requested a canine agent; is that
4  correct?
5      A.   Yes, ma'am.
6      Q.   Okay.  Have you had occasion when a
7  canine investigator has not been requested, but
8  then upon beginning your investigation of the fire
9  scene, you utilize your canine to check for
10 accelerants?
11     A.   The beginning of that question was, was
12 there a time that that happened?  I kind of lost
13 you somewhere.
14     Q.   That's okay.  Then let me clarify.  It's
15 okay.  I don't want to -- I sometimes can be a
16 little convoluted.
17     A.   Yeah.
18     Q.   So have there been occasions where you've
19 been asked to conduct just a fire investigation
20 not utilizing a canine, but once you arrive and
21 begin your investigation, you decide you would
22 like to utilize the canine to check for
23 accelerants?
24     A.   Yes.

Page 61

1      Q.   Okay.  And how many occasions did that
2  happen?
3      A.   Never counted them.
4      Q.   Is the determination -- Strike that.
5           Is it very few times that that has
6  happened, or numerous times?
7      A.   I'm thinking.  I'm not trying to -- I'm
8  just trying to go back in my head to think.  I
9  don't think it happens that often.  I mean, like,
10 for instance, if I'm at a fire scene, and I'm
11 thinking to myself, I think I'd better get out of
12 the car and just run -- run her through the scene
13 and see if anything is there.  And I don't think
14 it happens that often.
15     Q.   How many fire investigations do you
16 utilize your canine?
17     A.   In a year?
18     Q.   Sure.  Yeah.  Let's say in a year.  That
19 would be a good --
20     A.   Probably half.  Maybe a little over half.
21     Q.   And I think we talked about this earlier,
22 and so I apologize if I asked you.  But I
23 understand -- Strike that.
24           Am I correct to understand that utilizing

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 62..65

Page 62

1  your canine is your decision to make?
2      A.   Absolutely.
3      Q.   Okay.  Have you ever had an occasion
4  where a fire department or law enforcement agency
5  has requested use of your canine, and you have
6  declined?
7      A.   Declined being there, or declined using
8  the canine?
9      Q.   Declined using the canine.
10     A.   I can answer that part -- I can answer
11 two parts to that.  Yes, because of unsafe
12 building conditions.  And then came back after it
13 was deemed to be safe and then worked her when it
14 was deemed to be safe.
15     Q.   Okay.
16     A.   So yes, there's a time where sometimes
17 the building is gone.  If I get out there, and I'm
18 like, what do you want me to work her over?  It's
19 a big pile of ashes.  And it was still burning,
20 you know, the coals are still burning.  So no.  I
21 told them I can't work her in the building because
22 you'll barbecue her and me.  So I told them no,
23 that's unsafe.
24     Q.   Any other occasions where you have

Page 63

1  declined to utilize your canine when requested
2  other than in an unsafe condition?
3      A.   I can't see why I wouldn't utilize her.
4  You know what I mean?  She's a tool, you know.
5      Q.   And your understanding when being asked
6  to investigate this fire is that you were being
7  asked to determine the cause and origin of the
8  fire; is that right?
9      A.   No, ma'am.
10     Q.   Okay.  Can you explain to me what your --
11 the understanding of your scope -- the scope of
12 investigation was.
13     A.   It's actually the origin and cause.
14     Q.   Oh.
15     A.   You have to determine where the fire
16 started before how it started.
17     Q.   Okay.  That's a fair distinction.  Can
18 you explain that to me, then?
19     A.   Let's say we're in this room right now,
20 and the garbage can was on fire.  So I can walk in
21 and say -- You first have to determine where -- it
22 depends on the damage of the building also.  But
23 if the fire is contained to the garbage can, let's
24 say, so you know your area of the origin -- the

Page 64

1  origin is your garbage can; your cause is
2  something you have to look into.  You can't walk
3  into a building and come up with a cause without
4  knowing where it started.  Does that make sense?
5      Q.   Are you ever unable to determine the
6  origin of a fire that you have investigated?
7      A.   Absolutely.
8      Q.   Okay.  And have you ever been unable to
9  determine a cause for a fire that you have
10 investigated?
11     A.   Absolutely.
12     Q.   What are the different types of causes of
13 fires?
14     A.   Okay.  You have manmade acts, you know,
15 someone caused the fire to happen, whether it's
16 intentional or not.  You have lightning strike
17 fires.  You have spontaneous combustion fires.
18 You have fires as a result of an accident, like
19 when two cars smash and the fuel tank is ruptured
20 and the fuel is out and it comes in contact with
21 the hot surface of your motor.  A lot of -- I
22 don't know.
23     Q.   Could fires also be caused by electrical
24 issues?

Page 65

1      A.   Oh, sure.
2      Q.   Okay.
3      A.   Okay.  There's smoking.  There's
4  electrical.  Cooking, did I mention that?
5  Cooking.  Unattended -- They call it leaving on
6  the stove unattended cooking.  I don't know.  I
7  mean, those are pretty much the common ones we see
8  all the time.
9      Q.   Those are the most common?
10     A.   I mean, smoking.  And open -- we call
11 open flames to available combustibles.  That can
12 be -- That's a man -- You know, that could be --
13 that's a manmade act.  There's electrical.
14 There's lightning.
15     Q.   What is a combustible?
16     A.   Something that's able to burn or combust.
17     Q.   Do you recall conducting the
18 investigation of this fire in 1995 in Naperville?
19     A.   If there's one word I don't agree with
20 you on that --
21     Q.   Sure.
22     A.   -- I wasn't there to conduct the
23 investigation on, I was there to conduct an
24 investigation.  Because I was not the lead or

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 66..69

Page 66

1  anything. I was there to render an opinion.
2      Q.   And you were there to render an opinion
3  as to origin and cause, correct?
4      A.   To the best of my ability.
5      Q.   Did you know Dave Ferreri prior to going
6  to this fire scene?
7      A.   I may have met him at a conference at
8  something. But, I mean, personally know him, I
9  don't believe I did. I can't -- That was --
10 Again, that was a long time ago.
11          I started getting involved with the
12 Strike Force in '85. I don't know if he was a
13 member then. That would have been ten -- you
14 know, ten years difference. I may have seen him
15 at a conference or a meeting because, you know,
16 there's sometimes the international meeting in
17 Champaign he might have been at. Or maybe -- I
18 can't say I didn't -- I knew of him, but I didn't
19 know him. Does that make sense?
20     Q.   Okay. Did you know detective Mike Cross
21 prior to doing an investigation of this fire?
22     A.   I don't believe I had ever met him.
23     Q.   And what was the first thing that you did
24 when you began your investigation for this fire?

Page 67

1      A.   You're talking about at the fire scene,
2  or you're talking about at the -- I called him,
3  Dave Ferreri.
4      Q.   At any time, yeah. The very first thing.
5      A.   I returned Lieutenant Ferreri's call.
6      Q.   And did you speak with him?
7      A.   Yes.
8      Q.   Was that on September 13th of 1995?
9      A.   Yes.
10     Q.   Do you recall what you discussed?
11     A.   I said, "This is Mitch from the Fire
12 Marshal's Office. What's going on?"
13          He said they had a fire in an apartment
14 condo building and that -- I think he did tell me
15 it resulted in one fatality, one civilian
16 fatality. And he said that, "Would you have a
17 chance to come out and take a look at it?"
18     Q.   Did you agree to do so?
19     A.   Yeah. Boy, that was a great decision. I
20 thought he meant right then and there too. I
21 mean, I was just going to go because nobody could
22 do it -- you know, come out in the morning. So
23 yes. So we made arrangements to come out the next
24 day, at the firehouse the next day.

Page 68

1      Q.   And did you meet with Mr.- -- Strike
2  that.
3          Did you meet with Lieutenant Ferreri at
4  the Naperville Fire Department the next day?
5      A.   Yes, ma'am.
6      Q.   Okay. Was Detective Cross with him also?
7      A.   He was there, yes.
8      Q.   Okay. Did you --
9      A.   Was he -- I don't know. I think he was
10 there.
11     Q.   You don't recall?
12     A.   Yeah. Because I met up at the fire
13 department with him. He was there, yes.
14     Q.   Okay. And you're referencing in your
15 report?
16     A.   The detail section on page 1, yeah. He
17 was there.
18     Q.   Okay.
19     A.   At the firehouse.
20     Q.   Okay. And can you explain to me what you
21 did at the firehouse.
22     A.   What did I do at the firehouse?
23 Introduced myself to the detectives, and they
24 said, We've got a whole bunch of stuff if you want

Page 69

1  to look at it and all that kind of cool, you know,
2  whatever. I said I don't want to look at
3  anything. I said I'm not there to determine it,
4  to give you an opinion, you know. Then I said I
5  have to go out and take a look at the building and
6  do my own independent thing.
7      Q.   Is it fair to say that you wanted to have
8  an open mind when you conducted your investigation
9  of the fire scene?
10     A.   Absolutely.
11     Q.   Did you bring your canine with you on
12 that day?
13     A.   Probably, yeah. She was in the car.
14     Q.   Okay. That would have been Nikki--
15     A.   Mm-hmm. Yes.
16     Q.   -- at the time? Okay.
17          What did you do then after speaking with
18 Lieutenant Ferreri and Detective Cross at the fire
19 department?
20     A.   Since I didn't know where the building
21 was and we didn't have GPS back then, I asked them
22 where the building was, and they said, Follow us
23 over there.
24          So they got in their car and Dave got in

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 70..73

Page 70

1  his fire car, and I followed them over.
2      Q.   When you arrived at the scene of the
3  building, what did you observe?
4      A.   It was a three-story.
5      Mind if I refresh my memory real quick?
6      Q.   Sure.
7      A.   It was either a three- or four-story.  It
8  was a three-story apartment building, kind of like
9  a condo apartment building I guess, multi
10 occupied, multi -- Let's see here.
11     Q.   And for the record, you're referencing
12 your investigative report?
13     A.   Yes, ma'am.
14     Q.   Okay.
15     A.   I'm sorry.  Page 1, "Type of occupancy:
16 3 story wood frame brick veneer."
17     I'm sorry.  It's under "Date & time
18 arrived" on page 1.
19     Q.   Okay.
20     A.   These are old reports.  I haven't seen
21 these in a long time.
22     Q.   Okay.
23     A.   Three-story multifamily dwelling.
24     Q.   When you began -- Strike that.

Page 71

1          When you arrived at the building, did you
2  then observe anything in particular about the
3  building itself related to the fire?
4      A.   Oh, no, no, no.  I'm just trying to
5  think.
6      Q.   No, that's okay.  Just in case I wasn't
7  clear.
8      A.   I mean, from the front of the building, I
9  didn't really see much of anything.  It just
10 looked like a building.
11     Q.   Did you walk around the building?
12     A.   This is one of the things if I said yes,
13 and I was wrong -- I don't remember if I walked
14 around the back and I saw it boarded up on the
15 third floor or if I didn't -- I mean, I might have
16 not walked around the back of the building.
17 Honestly, I don't remember.  I want to say I do.
18 But if I said yes, I'm just trying to think, and I
19 don't want to say something wrong and lie to you.
20 So I don't remember.  Honestly, I don't remember.
21     Q.   I appreciate that you wouldn't lie to me
22 either.
23     A.   So would the judge.
24     Q.   Do you recall there being a uniformed

Page 72

1  officer outside of the building?
2      A.   Yes.
3      Q.   Okay.  And did you then gain access to
4  the building?
5      A.   Yes, after identifying -- everybody
6  identifying everything, yeah, showing IDs and all
7  that stuff.
8      Q.   Okay.  Who all went with you?
9      A.   I can't remember if there were cops that
10 went with me.  I can only account for Mike and
11 Dave.  The other detective may or may not have
12 been with me, I can't remember.  But I know it was
13 Dave Ferreri and the -- Mike Cross, the detective.
14     Q.   Okay.
15     A.   His partner might have come up too, I
16 don't know.
17     Q.   Okay.  You're talking about Mike's
18 partner?
19     A.   Yes.
20     Q.   Okay.  So do you recall another detective
21 present?
22     A.   I met the two guys at the police
23 station -- or out at the firehouse.  So I don't
24 know if the second detective stayed in the car

Page 73

1  when I went up with Dave and Mike, let's say, or
2  he came up too.  I don't know.  I was pretty much
3  focused on the building, so I mean, I wasn't --
4  there was not that much chatter going on.  You
5  know what I mean?  We didn't talk about anything
6  because I wanted -- I didn't want -- I wanted to
7  do my thing.  I wanted to go and investigate what
8  happened or at least see what was going on.  So it
9  wasn't one of those warm and fuzzy things, it was
10 just I was just there to do a job, you know.
11     Q.   Okay.  So can you describe for me what it
12 is that you did then once you gained access into
13 the building?
14     A.   I went up to the third floor.  I believe
15 there was another officer up on the third floor.
16 There was a uniformed officer, I think, on the
17 third floor, if I remember right.  I don't think
18 the guy on the floor could have got up that fast
19 before us, so there might have been another copper
20 up on the third floor, a uniformed cop.
21     Q.   Did you take the stairs or an elevator?
22     A.   I was younger back then.  I probably took
23 the stairs.  I don't remember.  I think I might
24 have taken the stairs.

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 74..77

Page 74

1  Q.  Do you recall making any observations
2  about any fire or smoke damage within the
3  stairwell?
4  A.  I mean, there was -- I mean, there was
5  smoke towards the third floor.  There was smoke on
6  the -- you know, you could smell smoke and stuff
7  on the third floor, and there was some sooting in
8  the -- in the staircase.  When you went into the
9  hallway, then you could see a pattern, a smoke
10  pattern that was on the ceiling that was going
11  towards one of the apartments or condos.  I don't
12  know.
13  Q.  So when you use the word "sooting," can
14  you explain to me what you mean by that?
15  A.  When something burns, let's say you had a
16  birthday cake, I don't know, and you were -- you
17  blow out the candles that was burning, it's giving
18  off black -- you'll see black smoke because it's
19  paraffin or something that's burning, or the
20  hydrocarbon is burning.  And what happens is it's
21  called soot staining.  You know, it stains
22  whatever it comes in contact with.  It also
23  depends on how long that smoke was there for it to
24  stain and also how much heat will cause it to

Page 75

1  permeate, the smoke would impermeate [sic].  It's
2  called smoke sooting or staining.  It's kind of
3  hard to explain.  I could show you a picture if
4  you had one.
5  Q.  Is smoke sooting the same as staining, or
6  are they different?
7  A.  The smoke causes the stain.  I mean, it's
8  the smoke sticking to something.  And then when
9  the smoke is hot and the walls are cold, it'll
10  stick to wherever, you know, ceiling, it'll stick
11  wherever it's going.  But it traveled out of one
12  of the apartments, in this case, I believe it was
13  M, and it came down the hallway.  And then the
14  fire department got there, and they put the fire
15  out.  So that's where the smoke staining in the
16  hallway ended is when the fire department fought
17  the fire in the apartment so it didn't go further,
18  any down further in the hallway.  It stayed right
19  where they stopped it.  It's called a stop.
20  Q.  Where did you see the sooting on the --
21  in the third floor hallway?
22  A.  The ceiling and on the walls.
23  Q.  Was there any pattern that you observed?
24  A.  Yes.  Smoke pattern, yeah.

Page 76

1  Q.  Okay.  And what did that indicate to you,
2  the smoke pattern?
3  A.  I don't remember how many apartments were
4  per floor, but this particular smoke pattern that
5  was the only one present was coming out of only
6  one room, out of one apartment.
7  Q.  And was it the apartment that you were
8  there to investigate?
9  A.  To be quite honest with you, they didn't
10  tell me.  They told me just, Do your thing.  So I
11  read the pattern back of that particular door,
12  which happened to be where the fire was at.
13  Like I said, they were standing behind me
14  and away from me.  I didn't want any -- I didn't
15  want any input from them.  I just wanted to do my
16  thing.  I mean, I wanted to do my investigation.
17  So came up the stairs, third floor, saw the
18  sooting and staining on the walls and the ceiling
19  in the hallway, read the pattern and the sooting
20  back to the room that was later, I guess now
21  identified as M.  And that's where I stood.  I
22  stood at the doorway and proceeded into the
23  apartment or condo, whatever you want to call it.
24  Q.  Okay.

Page 77

1  A.  Sometimes people get upset if I say an
2  apartment because it's a condo, and some people
3  want to say apartment.  It's the lawyers.  So the
4  apartment or condo of origin.  How about that?
5  Q.  Okay.  And you said that there was a
6  uniformed officer outside of the apartment or
7  condo?
8  A.  Yeah.  But he moved when I came up the
9  stairs and got into the hallway.  He already
10  moved, so I wasn't exactly sure where he was at.
11  He could have been walking down the hallway.  But
12  he just wanted to get out of my way.  I said hello
13  to him.  I wasn't going to be rude to him.  I said
14  hello to him.  And then he just stood off to the
15  side.  I think, to be honest with you, when I made
16  that door to the apartment or condo M, I don't
17  know how far Lieutenant Ferreri or Mike --
18  Detective Cross was.  They might have been right
19  behind me.  I really didn't pay any attention.
20  Q.  Okay.  Did you go -- Strike that.
21  Did you see -- make any observations
22  about the door of the apartment?
23  I think, let's say for the record, we'll
24  refer to it as an apartment, just to make it

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 78..81

Page 78

1  easier so we don't have to keep using both words.
2  Is that fine with you?
3      A.   Sure.
4      Q.   Okay.  So did you make any observations
5  about the door of the apartment?
6      A.   Yes, I did.
7      Q.   What were those?
8      A.   There was soot staining and heavy
9  staining, partial charring on the
10 inside of the door facing the apartment rather
11 than the hallway side.  So that indicated to me
12 that the fire didn't come from the hallway into
13 the apartment; it originated in the apartment and
14 extended out into the hallway.
15     Q.   When you say "charring," what do you mean
16 by that?
17     A.   It's basically like a decomposition of
18 something such as wood.  Plastic doesn't
19 decompose.  It just melts.  But wood is a fibrous
20 material that gives off vapors that burn.  And
21 what happens when it's heated up, it starts
22 deforming, or actually the fire starts burrowing
23 into the wood, and it gets the vapors going, which
24 gets more vapors going, which gets more vapors

Page 79

1  going, which produces more heat.  And when you put
2  out the fire, that's -- the result is charring.
3           It's like if you ever went to a fireplace
4  and you had a log in the fireplace, you put the
5  logs in there and you burn them, and you put --
6  the fire goes out, the logs burn and they look
7  like alligators, you know, what they call
8  alligating.  But that's charring.
9      Q.   Okay.  Did you then go inside the
10 apartment?
11     A.   Yes.
12     Q.   Okay.  I'm going to --
13     A.   Do you want your Exhibit 1 back?
14     Q.   No.  You can keep that if you need it.
15 You can reference it.
16     A.   I don't want to get water on it.
17     ATTORNEY MEADOR:  I am going to mark as a
18 Group Exhibit 2 -- There you go, Tara.
19          This is -- There you go, Mr. Kushner.
20          For reference, these are three diagrams.
21 The first page is Bates No. Plaintiff Amor 017704;
22 the second is Plaintiff Amor 017600; the third is
23 Plaintiff Amor 017560.
24          Does everybody have the same documents I

Page 80

1  have?  Okay.
2  BY ATTORNEY MEADOR:
3      Q.   So, Mr. Kushner, I have marked these
4  three diagrams as Group Exhibit 2.  Have you seen
5  any of these diagrams before?
6      A.   Yes.
7      Q.   Okay.  Have you seen all of them or just
8  less than all of them?
9      A.   Less than all of them.
10     Q.   Okay.  Which ones have you seen before?
11     A.   For a brief moment, I saw, until I
12 deleted it by accident, it was 017600.
13     Q.   Okay.
14     A.   And I saw Pl. Amor 017560.  That's the
15 one I saw that I mentioned about the heavy dark
16 lines.
17     Q.   Okay.  I am going to represent to you
18 that these are diagrams of the apartment where the
19 fire took place.  Do the diagrams accurately
20 reflect your recollection of the layout of the
21 apartment?
22     ATTORNEY THOMPSON:  Object to form.
23     THE WITNESS:  Well, the only thing I can say
24 is I don't -- this is all pristine.  It's got all

Page 81

1  the furniture in there.  So I don't know -- you
2  know what I'm saying, I don't know -- I would --
3  as far as where all the furniture was and all that
4  kind of stuff, I'm trying to -- I'm trying to
5  bring it back in my mind about the thing here.
6           Pretty much.
7  BY ATTORNEY MEADOR:
8      Q.   Okay.  So why don't we take a look at the
9  document that's Bates No. Plaintiff Amor 017560,
10 which is, I think, the one that you said that you
11 reviewed?
12     A.   Yes, ma'am.
13     Q.   Okay.  So this one does not depict
14 furniture inside of the unit.  Looking at the
15 layout of this in terms of the -- where the rooms
16 are located, it's got --
17     A.   Yes -- Oh.
18     Q.   No, that's okay.
19     A.   Is that a question?  I didn't know.  You
20 just kept going.
21     Q.   Is that your recollection of how the unit
22 was laid out?
23     A.   Yes, ma'am.
24     Q.   Okay.  When you gained entry into the

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 82..85

Page 82

1  apartment, can you tell me what it is that you
2  did?
3      A.   Yes, ma'am.  I'm just going to orientate
4  that in front of me so I have it.  Okay.  What I
5  did was is that I did a right hand systemic
6  examination of the fire scene.
7      Q.   Tell me what you mean by "right hand
8  systemic investigation."
9      A.   I guess for lack of a better term, when
10  firefighters are going into a building to rescue
11  somebody, to look or see -- you know, try to fight
12  fires, what they do is they determine whether
13  they're going to go to the right and follow the
14  wall around to find you or they're going to go to
15  the left and follow the wall around to find you.
16      So what I do is in this particular case,
17  I just said I was going to go to the right and
18  follow it all the way around and take everything.
19  That way, you don't miss anything.  Or you try not
20  to miss anything.
21      So came in the front door, followed the
22  wall to the right.  And at that time, there was,
23  like, I call it an eating area, I guess.  There
24  was a table and chairs.  Because they can't eat in

Page 83

1  the kitchen, the kitchen wasn't that big for a
2  table, so they eat -- First thing I did was I came
3  across tables and chairs.  And there was some
4  papers or something on the top of the table.
5      Q.   And did you walk through a small hallway
6  to get to that dining room area?
7      A.   Well, the entranceway.
8      Q.   Yeah.
9      A.   Yeah.  I walked in.  There was nothing --
10  There was a closet to my left.  But again, I'm
11  doing a right hand, so I didn't even bother
12  looking to the left yet because I'm following the
13  right around.
14      Q.   When you went in, did you turn yourself
15  around and look at the inside of the entry door
16  for the apartment?
17      A.   No.
18      Q.   Okay.
19      A.   I did that on the way out.
20      Q.   Okay.  When you then moved through the
21  hallway, did you make any observations?
22      A.   There was a lot of soot in there.
23      Q.   Anything else?
24      A.   No.  That's how I started.  I mean, I had

Page 84

1  to start my -- you know, I only -- it's only about
2  a 2 or 3 foot hallway or a little entranceway.
3      Q.   Where was the sooting?
4      A.   The whole place was sooted up.  I mean,
5  there was sooting everywhere.  I mean, there was
6  smoke.
7      Q.   I'm sorry.  I just mean right in that
8  hallway, where did you see sooting?
9      A.   Oh, the top.
10      Q.   At the top?
11      A.   Mm-hmm.
12      Q.   Meaning the ceiling?
13      A.   Yes.  I'm sorry, the ceiling and the
14  walls, yeah.
15      Q.   So I understand, are you saying that the
16  sooting was on the ceiling and all of the walls or
17  on the ceiling and at the top of the walls?
18      A.   I would say in the doorway, it was at the
19  top of the wall.
20      Q.   Then what did you observe when you went
21  into the dining room area?
22      A.   There was a table and chairs, I don't
23  know how many chairs.  There was a table there,
24  and that's -- it had some -- it had some heat

Page 85

1  damage to it and some smoke damage, but nothing
2  significant.
3      Q.   How could you tell that there was heat
4  damage?
5      A.   I don't think they bought the furniture
6  like that.  I think -- Unless they bought it with
7  heat damage.  But I imagine when there's heat
8  applied to something, it has a tendency to scorch
9  things and melt them.  I just didn't have a chance
10  to ask the person if they bought it that way.
11      Q.   Well, I mean, my question is, how did it
12  look to you that exhibited heat damage?
13      A.   Sooted, discolored, and minor melting, I
14  think, or minor burning.  A lot of soot.  A lot of
15  heat and a lot of soot.
16      Q.   Was the table still intact?
17      A.   I thought so.
18      Q.   What is radiant heat damage?
19      A.   Sunburn.
20      Q.   What does that mean?
21      A.   Well, if you're standing, and the sun is
22  heating up and burns your skin, that's radiant
23  heat damage.  Heat that's from a fire that's
24  radiant to attack something or starts heating

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020                                      Pages 86..89

Page 86

1  something up, causing it to change its normal --
2  normal whatever it was.
3      Q.    Is that different from heat damage caused
4  by direct fire contact?
5      A.    Yes.  Well, direct flame contact is
6  actual flames impinging on the object or bringing
7  out the vapor from it.  Radiant heat is more of
8  the sun baking it out and actually, like, turning
9  your arm red at first and then brown for sunburn.
10 There's no direct sun -- no direct heat applied to
11 your arm from the sun.  It's radiating.
12     Q.    So when you talk about radiant heat
13 damage within a fire scene, does that mean it's
14 from the heat from the fire but not a direct flame
15 contact?
16     A.    Correct.  It's almost like being at a
17 campfire.  Ever -- If anybody has ever gone
18 camping, they put the logs in the center and
19 everybody sits around the campfire, and you feel
20 the heat from the fire, that's radiant heat
21 fire -- that's radiant heat.  If you stuck your
22 arm in there, that would be direct flame contact.
23     Q.    Got it.
24          Then what did you do once you moved

Page 87

1  through the dining room?
2      A.    Went through the kitchen.
3      Q.    And again, you're utilizing your right
4  side to move along through the unit?
5      A.    Yes, ma'am.
6      Q.    And what did you observe in the kitchen?
7      A.    What I normally do is check the knobs of
8  the stove to see if they're in the on or off
9  position.  I check to see if there's a toaster
10 oven or a toaster or any kind of heat producing
11 appliance such as a coffee maker, and I check to
12 make sure that they were either involved or not
13 involved with the fire.  Because if the appliances
14 are unplugged or turned off, then they usually
15 don't start fires.  And also that they were --
16 they were slightly sooted in the kitchen, and I
17 didn't see any fire patterns coming from any of
18 the appliances that might have been in there.
19     Q.    Did you see if the stove knobs were in
20 the off position?
21     A.    Yes.
22     Q.    And were they?
23     A.    Yes.  Because if they weren't, I would
24 have made a note telling somebody, Make sure you

Page 88

1  get a photograph of that.  I'm just -- I'm sorry
2  to back up a little bit more.  My understanding
3  was it was already photoed before I got there the
4  day of the fire.
5      Q.    And you didn't take any photographs?
6      A.    No, I didn't take any photos, no.
7  Because I -- I just wanted to back up and say that
8  yeah, I didn't take any photos.  And if I would
9  have said, Did you get a picture of this or
10 something or this particular thing, then I would
11 have asked, Was this photographed?  Because I
12 didn't want to move or touch -- you can't move or
13 touch anything because that's spoilization [sic]
14 of evidence.  So I just wanted to make sure
15 everything was photographed.  So I may have gone
16 back to the door, Was all this stuff photographed?
17 You know, Hey, was this all photographed or
18 whatever, the detective.  He listed yes, but he
19 took photos earlier.  I just wanted to see because
20 as I was proceeding through, I had stuff in my
21 mind.  Plus I was probably asking them questions
22 also, you know, Was this photographed?  Was that
23 photographed?  And they more than likely said yes.
24 If it wasn't, then I would have said, Could you

Page 89

1  get somebody in there to photograph it.
2      Q.    Did you as either detective -- Strike
3  that.
4          Did you ask either Lieutenant Ferreri or
5  Detective Cross if the stove had been found with
6  the knobs off?
7      A.    Not just particularly the stove knobs,
8  but the entire building.  They say that's how they
9  left it.  I mean, from after the fire and after
10 they did their thing the day of the fire, they
11 said that's exactly how it was left.
12     Q.    That was one of the things that you
13 specifically discussed with them?
14     A.    Oh, absolutely.  Because if anybody
15 turned or moved anything, that would -- you know,
16 that would -- that would change, you know, how do
17 we make an opinion on something if everything was
18 changed?  But they said everything was just left
19 the same.
20     Q.    And did you see -- Strike that.
21          Did you observe anything in the kitchen
22 area that indicated to you it was an origin of the
23 fire?
24     A.    No.

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 90..93

Page 90

1    Q.   Did you see any direct flame contact in
2    the kitchen?
3    A.   It was a lot of sooting.  I don't -- If
4    there was, it was minimal.  Like I said, it's
5    20 something years ago.  I don't -- I don't
6    remember seeing any in there.  It was mostly smoke
7    and heat, but I don't believe there was any direct
8    flame contact in there.
9    Q.   If I represented to you that when you
10   testified in court, you said there was -- you
11   observed no direct flame contact in the kitchen,
12   would that refresh your recollection?
13   A.   Yeah.  I think that's what I just said.
14   I don't remember seeing any direct flame contact
15   of anything in the kitchen.
16   Q.   And then what did you do next?
17   A.   Well, the next thing is I went back to
18   the hallway, and I don't remember if that's the
19   time -- because usually -- usually, there's a
20   smoke detector in the -- in the hallway, you know,
21   by the bedrooms or in the unit somewhere, and I
22   don't recall seeing any of them -- like, the
23   remains on the floor or anything in the ceiling.
24   Q.   Did you have any discussion with either

Page 91

1    Lieutenant Ferreri or Detective Cross about
2    whether or not a smoke detector was found?
3    A.   I don't know if it happened right then
4    and there or at the end when I stood by the door
5    and recapped what I found.  You know what I mean?
6    So I don't -- I made a mental note of it to find
7    out about the smoke detector because that's
8    important, you know.  And so that I don't remember
9    if I turned to them and said, Hey, Dave or Mike,
10   was there a smoke detector here?  I think I may
11   have made a mental note, you know, to make sure I
12   remembered that and then talked about it when I
13   was at the door when I was leaving the apartment.
14   Q.   And can you explain to me what occurred
15   in that discussion?
16   A.   Well, that's all it would be then.
17   Q.   That's okay.
18   A.   Oh.  Okay.  So what I said to him, I
19   said, "Was there a smoke detector there?"  And I
20   believe Mike or Lieutenant Ferreri who was on the
21   fire department side of it said that the
22   firefighters did not hear anything, you know, no
23   audible fire alarms coming from that apartment.
24   And I said, well, because there was -- I believe

Page 92

1    there was a plug-in.  You know, there was a
2    plug-in battery backup, you know, power with
3    battery backup.  So the wires were still -- I
4    believe the wires were still there, but we were
5    trying to figure out why -- where was the smoke
6    detector.
7    Q.   Okay.  So explain to me what that looks
8    like, the battery backup you're talking about.
9    A.   Well, what happens is -- Somebody said
10   something.
11   Q.   No, I think it was just the sound,
12   somebody kind of moved.
13   A.   In a smoke detector, normally in
14   condominium buildings and apartment buildings
15   they're hard wired they call it.  And they have
16   what they call battery backup.  And so if the
17   power to a building is cut -- well, not cut but
18   lost, the battery will still be there to make sure
19   that the smoke detector would sound if needed.  Do
20   you see what I mean?
21   Q.   Okay.
22   A.   There was nothing in the ceiling.  There
23   was no smoke detector up there.  So first I made a
24   mental note of it saying where's the smoke

Page 93

1    detector.  And then on the way out, since you
2    jumped all the way to the end, I made a comment to
3    them saying, to both -- actually, I was talking to
4    Dave because the cops weren't there.  The fire
5    department was there putting the fire out.  So I
6    said, "Did you hear from any of the firefighters
7    about hearing any smoke detectors in there?"  And
8    he said no.  There was none found.
9    Q.   Did you see a place in the ceiling where
10   the smoke detector would have been?
11   A.   I believe so, yes.
12   Q.   Do you recall where that was in the unit?
13   A.   It was in the hallway.  Not by the
14   kitchen.  It was the hallway would have been --
15   well, to be honest with you, if you look at your
16   diagram with the 017600, do you see where it says
17   5 foot 7?
18   Q.   Yes.
19   A.   Somewhere in there.  Do you see those
20   lines from the left to the right?
21   Q.   Yeah.
22   A.   It would have been right in there
23   somewhere.
24   Q.   Okay.

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 94..97

Page 94

1    A.    Should have been there.
2    Q.    And is it fair to say that that's in the
3  hallway leading from the kitchen towards the
4  bedrooms and bathroom?
5    A.    Yes, ma'am.
6    Q.    Okay.  So as you're proceeding down --
7  Strike that.
8       To clarify, when you said, then, when you
9  left the kitchen, you went into the hallway, is
10 that the same hallway that we were just talking
11 about, the one leading to the bedroom?
12   A.    Yes, ma'am.
13   Q.    Okay.  And what did you observe in the
14 hallway?
15   A.    There was some fire debris on the floor,
16 not much.  I don't know if they pulled some of the
17 ceiling down around things just to check for
18 extension into the -- because fire travels.  So
19 they had probably opened up the ceiling to see if
20 any of the fire traveled down the hallway,
21 interior hallway, not the hallway from the
22 building, but from the Apartment M hallway.  They
23 might have poked a hole or something.  I don't
24 remember.

Page 95

1    Q.    Okay.  Did you observe any sooting or
2  staining in that hallway?
3    A.    Yes, ma'am.
4    Q.    Where at?
5    A.    The ceiling, and then the walls.
6    Q.    Was it on the entirety of the wall or
7  located someplace in particular on the wall?
8    A.    More to the top or near the top.  I'm
9  6 foot tall, so probably maybe 2 feet down from
10 the ceiling.  I don't know.  Approximately that.
11   Q.    Then where did you go?
12   A.    To the bathroom.  Well, I didn't go to
13 the bathroom.  I already went to the bathroom.
14 There was a bathroom just past the kitchen.
15   Q.    Okay.
16   A.    And I made sure that there wasn't any --
17 sometimes you'll find a curling iron.  Sometimes
18 you'll find a straightener I guess you call it.
19 Sometimes people will iron in the bathroom.  So
20 you have to look and see if there's any heat
21 producing appliances in there.  I did not find
22 any.  Plus there was just small sooting in there
23 and no direct flame contact in there.
24   Q.    And did you say there was sooting in that

Page 96

1  bathroom?
2    A.    There was sooting, but it wasn't a lot of
3  sooting.  It was all at the ceiling.
4    Q.    Then where did you go?
5    A.    To the next bathroom.
6    Q.    And what did you do?
7    A.    Same thing.  I looked around.  There was
8  some radiant heat damage.  There was sooting,
9  smoke damage, sooting and smoke damage at the
10 ceiling.  Nothing indicated that the fire
11 originated in either one of the bathrooms.
12   Q.    And then what did you do?
13   A.    Then there was, like, between the
14 bathroom and one of the bedrooms, there was a
15 small closet, like a linen closet or whatever you
16 call it closet, hallway closet, used to call it a
17 linen closet when I was a kid, that was at the end
18 of the hallway.  And I think it had doors on
19 there.  And I think the top of the doors or the
20 door itself was sooted and heated up at the top.
21 It might have been some blistering on there too
22 from radiant heat damage.  I can't recall.  But
23 there might have been blistering, you know, from
24 the bubbles in the paint blistering from the heat.

Page 97

1    Q.    On the ceiling?
2    A.    On the ceiling and on the -- It might
3  have been on the wall above on the doorway to the
4  closet.
5       This is (inaudible).
6    Q.    And then where did you go?
7    A.    Went into the bedroom.  It was -- So
8  again, following it to the right, just keep going
9  right, right, right, right, and then there's a
10 doorway to the bedroom, lead bedroom.
11   Q.    Okay.  Was that the master bedroom, do
12 you know?
13   A.    It was bigger than the other one.
14   Q.    Okay.
15   A.    I grew up in Chicago.  My room wasn't
16 that much bigger.  Mine was like a broom closet,
17 so everything bigger than a broom closet was a
18 master bedroom to me.
19   Q.    Okay.  And what did you observe in that
20 bedroom?
21   A.    Sooting.  There was a lot of sooting
22 down.  There was a bed in there, I don't know what
23 size.  I don't know if it was a queen or king.
24 There was a bed in there.  There was the phone.  I

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 98..101

Page 98

1  don't know if the phone was still on the -- there
2  was a phone and some stuff on an end table.  I
3  almost said a coffee table, but like a bedroom --
4  a nightstand, I guess you call it.  Then there
5  was, like, the clean mark on the carpeting.  Like,
6  we call that a protected area.
7      Q.   Where was that?
8      A.   That was -- I think, if I remember
9  correctly, it was at the -- near the foot of the
10 bed kind of, side or the foot.  Yeah.  Because
11 there was a closet, the bed, nightstand, and then,
12 like, a dresser.  And it was a clean spot in
13 between -- towards the end of the bed.  On the
14 floor, I mean, on the floor in the carpeting.
15     Q.   Okay.  And what did that indicate to you?
16     A.   Well, I said -- I said to Dave Ferreri,
17 Lieutenant Ferreri, I said -- I just called him
18 Dave too.  I guess after -- I said, "Is this -- Is
19 this where the victim was found?"  Because
20 there's, like, an outline.  It was almost like an
21 outline of, you know, a person or something that
22 was there.  And I said, "Is this where the victim
23 was found," and he said, "Yes.  That's where they
24 located the victim."

Page 99

1      Q.   Did you ask them if they had photographed
2  that area?
3      A.   I didn't.  You know, I'm sure they did.
4  But I don't think -- I may have.  I don't know.
5  But I'm sure they did because -- Yeah.  And I may
6  have.  I don't know.  I just -- maybe I just
7  assumed they photoed it, you know what I mean,
8  because they photoed everything else.  But, again,
9  I didn't know those -- the two coppers.  I had
10 never met them.  Dave asked them.  So I was, like,
11 they said they photoed it.
12     Q.   So my question, I guess, is do you recall
13 having a discussion with them periodically as you
14 went along about whether they photographed certain
15 things, or if you had one conversation with them
16 about photographing everything?
17     A.   They told me when I first met them at the
18 firehouse that there was an ET that already
19 photoed, the victim wasn't still there when I got
20 there.  So the scene was processed and
21 photographed the day of the fire.  But there were
22 certain things like the knobs and the stove and
23 certain things that I wanted to make sure in my
24 mind.  I have what's called a checklist.  You

Page 100

1  know, in your head, you have, like, a checklist of
2  things you want to make sure are done.  So I would
3  imagine that they would -- in my mind was that I
4  said I would imagine why they wouldn't photograph
5  the victim or any of that stuff.  I mean, that
6  kind of thing, that's important, you know.  So
7  maybe I don't want to the use the word assume, but
8  they told me they photoed, so ...
9      Q.   Okay.  Was there a window in that bedroom
10 that you observed?
11     A.   It may have been boarded up if there was
12 one, you know what I mean?  So I --
13     Q.   Do you --
14     A.   -- knew there was one there, I just don't
15 remember.  There wasn't any wind blowing around in
16 there, so it had to be secured.
17     Q.   Did you have any conversations with
18 Lieutenant Ferreri or Detective Cross about
19 whether a window in the bedroom had been found
20 open?
21     A.   I honestly don't remember, to be honest
22 with you.
23     Q.   Okay.  So then where did you go?
24     A.   Went back through the hallway, the famous

Page 101

1  hallway, turned to the right, turned another
2  right, and went into another bedroom.  I don't
3  think this bedroom had any soot or smoke in it.  I
4  think the door may have been closed.  I'm not
5  sure.  Because it wasn't as sooted or damaged as
6  the master bedroom.  There really wasn't much in
7  there, I mean, as far as content.  There was two
8  beds, I guess, and an end table, I guess.
9          So went in there, looked around, didn't
10 see anything.  If I remember correctly, there was
11 very little, if any, smoke or soot in there.  And
12 that to me seemed to me like the door was closed
13 at the time of the fire.
14     Q.   That's what that indicates to you?
15     A.   Well, yeah.  The smoke's not going to go
16 through your door.  I mean, it may go through the
17 seeping, through the -- you know, a little bit up
18 under.  But the other rooms had soot and smoke to
19 it.  This one I don't remember if it had a lot or
20 not.
21     Q.   Did you observe any damage to the hallway
22 side of the bedroom door?
23     A.   The fire -- There was heat and smoke at
24 the ceiling, so the top of the door would have

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 102..105

Page 102

1  been damaged on the hallway side. But something,
2  if I remember correctly, that room did not have a
3  lot of smoke or heat to it or sooting in there.
4  And then again, like I said earlier, I didn't want
5  Lieutenant Ferreri telling me what -- you know,
6  all the stuff they did or found. So I didn't want
7  them to, you know, tell me -- You know what I
8  mean? I wanted -- I wanted myself as open-minded
9  an opinion to go in and look around and do
10  something rather than -- you know, we discussed
11  this pretty much towards the end.
12      Q.   Okay. Did you have a conversation
13  with Lieutenant Ferreri about whether that door
14  was closed at the time the fire department gained
15  entry to the unit?
16      A.   Later on.
17      Q.   Later on.
18      A.   Yeah. Because we still have to take the
19  living room. We haven't gone in the living room.
20  I haven't gone in the living room yet.
21      Q.   Okay. So then what did you do next?
22      A.   Turned right, went down the hallway, and
23  now we're standing at the entranceway to the
24  family room or living room, whatever you want to

Page 103

1  call it.
2      Q.   And what did you observe?
3      A.   Let's see. I turned to my right because
4  I followed the wall to the right. And if --
5  Again, this is all from memory. There was a -- I
6  believe there was, like, an entertainment center
7  or something there, like a wooden entertainment
8  center that would have, like, shelves on the top
9  and stereo equipment and stuff at the bottom or
10  towards the middle.
11      Q.   Do you recall encountering a desk in the
12  living room?
13      A.   That might have been -- That might have
14  been the desk. I don't know. I haven't seen a
15  picture of this thing since '95. So if you could
16  show me a picture to refresh my memory.
17      Q.   Sure. Okay. Why don't we do that.
18      Okay. I am going to show you, this is
19  Group Exhibit 3. For the record, it is
20  SDT-SAO22776 through 22793. Okay. I'm going to
21  hand that to you.
22          (Whereupon, Kushner Deposition
23           Exhibit No. 3 was marked for
24           identification.)

Page 104

1  BY ATTORNEY MEADOR:
2      Q.   And these are some photographs, if you
3  want to take a look. The beginning are a few
4  diagrams. If you look behind that, there are
5  photographs. And see -- Take a look at these
6  photographs and see if that helps refresh your
7  recollection.
8      A.   Can I take the paper clip off of this
9  thing?
10      Q.   Sure.
11      A.   I'll do it on camera, look.
12          Maybe I should (inaudible).
13      Q.   That's okay. Those are yours.
14      A.   I see the desk, yes.
15      Q.   Okay. Can you tell me --
16      A.   Which picture?
17      Q.   Yes, which picture you're --
18      A.   It's S, Sam; D, David; T, Tom; S, Sam; A,
19  Adam; zero 22785.
20          I believe it's SAO for state's attorney's
21  office?
22      Q.   Yeah.
23      A.   So it's O, ocean, instead of zero.
24      Q.   Okay. And this picture, what is it

Page 105

1  depicting?
2      A.   This is a view of the family room or
3  living room from the kitchen dining area from the
4  west.
5      Q.   That's just what I was going to ask you.
6  In order to orient us, north is the wall that's
7  depicted on the right-hand side of the photograph;
8  is that correct?
9      A.   The studded wall, yes, on the right.
10      Q.   Okay. And west is the open door area to
11  the patio?
12      A.   That would be the hand -- the rail for
13  the balcony.
14      Q.   Okay. And can you tell me what it is
15  that you observed about the desk?
16      A.   Still intact. The burning is coming from
17  the -- would be coming from the south and from the
18  west. Because the legs -- You see the paper bags?
19  There's two brown paper bags?
20      Q.   Okay.
21      A.   Everybody see them? Okay. So the
22  spindle or the leg to the right of it is charred
23  on the, what do you call it, is charred towards
24  the southwest. Do you see the leg in front here

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 106..109

Page 106

1   on the right where it says William Amor in blue?
2   And it's got a leg that's got -- Do you see the
3   trunk?
4      Q.   Yeah.
5      A.   I don't know.  How do I describe this?
6      Q.   Yeah.
7      A.   Are you good?
8      Q.   Yeah.  Why don't we --
9      A.   I mean, okay, no.  I just want to make
10  sure -- I don't want to do this five times.
11     Q.   I think you're explaining it.  You can
12  keep going.
13     A.   So anyway, in my opinion, the desk is in
14  pretty good shape, and the trunk underneath it is
15  in pretty good shape as far as fire damage.  I
16  mean, it's -- it's not -- looks like it's got some
17  heat and some -- may have had some radiant heat to
18  the leg on that side where those brown paper bags
19  are.  But the desk is pretty -- In my opinion, the
20  desk is pretty much intact.  The brown paper bags
21  didn't burn.
22     Q.   And is it your observation that there was
23  more damage on the west side of that desk than on
24  the east side?

Page 107

1      A.   Yes.
2      Q.   And what did that indicate to you?
3      A.   Well, it indicated to me that the fire
4   did not come from the dinette sitting area.  We'll
5   call that the kitchen sitting area.  It didn't
6   come from the kitchen because all the fire
7   patterns were coming from the southwest to the
8   northeast and to the east and also out the -- what
9   do you call it, out the -- the west door.  So the
10  desk and the cabinet underneath there, in my
11  opinion, there was no fire over there.  I mean,
12  the fire didn't originate in that area.
13     Q.   Did you observe any sooting or heat
14  damage to the ceiling and wall in that area?
15     A.   Yes.
16     Q.   Okay.  Can you explain to me what you
17  observed?
18     A.   Well, what's left.  The -- Behind the
19  desk itself, the wall behind the desk still has
20  the drywall standing, or at least in place, and
21  it's black in color.  And then it also has some
22  white and some black and green, like a turquoise.
23     Q.   And can you explain what that means to
24  you?

Page 108

1      A.   I'm sorry.
2           So what happens is that drywall has
3   various stages of existence, I guess.  I don't
4   know, for lack of a better term.  Black -- When
5   you see the black on there, that means the
6   covering of whatever is on there, whether it's
7   wallpaper or just the paper itself or paint,
8   that's what they call surface, where the surface
9   turns black, that's the first stage of drywall
10  breaking down.  The next stage of drywall would be
11  it starts to turn into a turquoise base.  The
12  turquoise base, if you look at the ceiling and
13  behind -- mostly behind starting about where
14  the -- that's a window air -- it's a wall air
15  conditioner there because there's no window there.
16  Do you see the wall air conditioner that's on the
17  left side on the west wall?
18     Q.   To the left --
19     A.   To the left of the opening for the patio?
20     Q.   Yes.
21     A.   Everybody on that?  Okay.  So you can see
22  the green and stuff, it's a turquoise.  And what
23  happens is that drywall has gypsum in it.  And
24  what happens is, everybody -- you guys all have

Page 109

1   the pictures, right?  They have all the pictures?
2      Q.   Yes.
3      A.   So what happens is is that the first
4   stage is when the covering of your drywall starts
5   to turn black or sooted to where it's starting
6   to -- you know, starting to burn, and it's
7   starting to take the covering off.  The next --
8   The next phase is more heat is continuing to be
9   applied to it.  The heat -- next phase is when it
10  starts turning turquoise is when it's starting to
11  bake -- the heat of the fire is starting to bake
12  the moisture out of the gypsum.  Because you have,
13  it's called gypsum board.  Once it takes the
14  moisture out, it turns into a powder form.  It
15  actually goes back to it's original powder, white
16  powder.  Okay?
17          As you can see that across the ceiling,
18  you have various stages of what I'm talking about.
19  Now, if you see the very remains, if you look
20  directly above the desk, you'll see the black
21  that's right on the edge between the wall and the
22  ceiling.  Is everybody with me?  Right over here
23  (indicating).
24     Q.   Okay.

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 110..113

Page 110

1    A.   Okay.  That's black.  So that means
2  there's not a lot of heat applied to that area.
3  It's coming from another area across the ceiling
4  and banking down and causing the -- Now, the fire
5  department, remember I mentioned earlier about
6  pulling the ceiling down in the hallway looking
7  for extension, looking for fire extension?
8    Q.   Yes.
9    A.   Well, they did the same thing on this
10 wall.  They stripped -- They call it stripping the
11 wall or stripping the ceiling.  They pulled the
12 drywall.  The truck company probably pulled the
13 drywall down or the hose, hit the drywall with the
14 hose, caused the drywall to weaken and fall down.
15 I don't know if they -- To be honest with you, I
16 don't know how much overhaul they did in there.  I
17 don't think they did much, but I think the hose
18 drains caused a lot of that ceiling to come down
19 because it was already powder.
20   Q.   Were you still able to conduct a
21 sufficient investigation?
22   A.   Yes.
23   Q.   Okay.
24   A.   So that explains your desk.

Page 111

1    Q.   And just so I understand, you described
2  the various stages of the drywall effect.  The
3  first stage is black to the surface, the second
4  stage, it turns a turquoise green; do I have that
5  correct?
6    A.   Turquoise green, yes.
7    Q.   And the third stage is the powder?
8    A.   White -- It turns white powder.
9         I didn't mean to not let you finish.  I'm
10 sorry.
11   Q.   No.  That's okay.
12        And is that the drywall disintegrating?
13   A.   It's the moisture baking out.  The heat
14 of the fire is baking the water out of it, and
15 it's turning back into its original gypsum form.
16   Q.   Thank you.
17        Did you notice any indication that the
18 fire was banking down from the ceiling?
19   A.   On that side of the room?
20   Q.   Yes.
21   A.   Yes.  Because across the ceiling, you see
22 the white.  You'll see the green, or the
23 turquoise, and then the black is at the bottom.
24 So it didn't start -- The green and the white, the

Page 112

1  heat was not at the bottom causing it to go the
2  other direction.  The heat was coming across the
3  ceiling and banking down.  So the heat was
4  collecting at the ceiling and then radiating down.
5  Because fire is going to travel the path of least
6  resistance.  So what's going to happen is it's
7  going to collect at the highest level and then
8  starts seeking its path down until it finds an
9  opening such as the front door or a window or
10 anywhere else.  So it's going to actually start
11 banking down from the ceiling causing the heat at
12 the ceiling to be more intense, banking down,
13 banking down until either the fire is extinguished
14 or vented out or, like, in the hallway or out the
15 windows or somewhere to get all the heat released
16 from it, and then you'll have -- what remains is
17 what you have is your different forms of where the
18 heat was at.  And I was able to determine that in
19 the area of your desk and your -- you mentioned
20 about the desk in that area, if you looked across
21 at the other side, you could still see black.
22        So looking at -- I've got to do this to
23 help me.  You're still seeing black over here.
24 And what's happening is is that this is all black

Page 113

1  here.  This is black (indicating).  So there was
2  no fire in this area.  It's all coming across the
3  ceiling and banking down.
4    Q.   Okay.  So let me just stop you really
5  quick so I can describe it for the written record
6  for people who aren't going to see the video.
7        When you're talking about the black in
8  the corner, are you talking about the northwest
9  corner?
10   A.   Yes.
11   Q.   Toward the floor?
12   A.   Yes.
13   Q.   Okay.  And then you reference the black,
14 you were pointing to the area around the desk in
15 the northeast corner; is that correct?
16   A.   Yes.
17   Q.   Okay.  And then you pointed towards the
18 ceiling, indicating some of -- some pattern up
19 there, correct?
20   A.   Yes.
21   Q.   Okay.  And can you describe for me what
22 you see as the pattern across the ceiling and from
23 which direction?
24   A.   Okay.  I would have -- So I would have to

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 114..117

Page 114

1  refer as I further moved around the room, because
2  I was looking at here going around the right of
3  the room and looking up at the ceiling, and again,
4  the intensity part was coming from the southwest,
5  so I had to go again look towards the northwest
6  corner.  I had to keep going around the room.  I
7  just didn't turn around and go, Oh, there it is.
8  I still had to continue my way around.  So I would
9  have tried to find another picture to see if that
10  will help me say -- to answer your question about
11  when I turned around.
12      Q.   I'm just referencing what you were just
13  describing.  You were pointing at it for the
14  video.  So I was just trying to explain in, like,
15  the written record what it was that you were
16  referencing.  And is it accurate that you were
17  referencing a -- that there was more damage toward
18  the southwest corner of the ceiling moving
19  outward?
20      A.   Yes, ma'am.
21      Q.   Okay.  All right.  And then did you see a
22  different photograph that you would like to
23  reference?
24      A.   Okay.  Sam, David, Tom, state's

Page 115

1  attorney's office 22786.
2      Q.   Okay.
3      A.   This is actually another, just a slight
4  turn to the left.
5          So you'll see that the -- Let's see.  I
6  lost my train of thought.
7      I apologize.  I lost my train of thought.
8      Q.   That's okay.
9          I think you were explaining to me about
10  the ceiling, what you saw on the ceiling of the
11  room.
12      A.   Yes.  Yes.  Okay.  So if you're looking
13  at 22786, you'll see that the ceiling up in the
14  area and above and around -- the walls and the
15  ceiling in front of -- I'm sorry, above and below
16  the window or the wall air continuing unit -- I
17  wish I could -- Okay.  See my finger (indicating)?
18  There's a pattern coming off of this corner area
19  here apparently upwards and outwards from that
20  area, apparently up to the ceiling and then over,
21  and then also following which would be the south
22  wall toward the front door.
23      Q.   Okay.
24      A.   See what I'm saying?  So it's got to --

Page 116

1  These aren't three-dimensional.  So that's why I'm
2  trying to -- It's easier if you're there.  You
3  know what I'm saying?
4          No, no, no I'm just --
5      Q.   Of course it is.
6          So for reference to the record, you were
7  pointing to a location in the southwest corner of
8  the room towards the floor indicating that black
9  line going diagonally across the wall towards the
10  ceiling; is that accurate?
11      A.   Yes.  I don't want to use the word
12  "corner."  I want to use the word "section."
13  Because corner puts you too much into the corner.
14  We'll call it the area, the southwest area.
15      Q.   Okay.  Fair enough.
16      A.   Because, again, corner to somebody might
17  be corner.  To me, it could be 5 feet out.  You
18  know what I mean?
19      Q.   So let's talk about when you are in your
20  investigation and you have made your observations
21  as to the desk on the north wall on the east side
22  of the living room.
23      A.   Okay.  Yes, ma'am.
24      Q.   What do you do next?

Page 117

1      A.   I rule that out.
2      Q.   Rule what?
3      A.   Fire didn't originate there.  Fire
4  didn't -- Fire attacked that piece of the -- or
5  the heat and the smoke attacked that piece of
6  furniture.  It was not the heat source of the
7  fire.  I said I can eliminate that.  So it's like
8  I did the stove, the same thing with the kitchen
9  dinette, same thing with the beds, same thing with
10  the shower, everything, that's all been
11  eliminated.  So what I'm doing is I'm going
12  through the process of elimination.  I'm doing
13  what they call inductive and deductive reasoning.
14  I said if this happened, why did that happen?  If
15  that happened, what caused that?  So it's a
16  spont- -- it's a never ending -- it's a never
17  ending thing.  Because once you open that door and
18  walk in there, it starts.  It's -- So if this
19  caused that, how come that didn't cause this.
20          So if the fire originated -- If the fire
21  originated in the trunk, we would have had
22  different fire patterns.  So if the fire
23  originated in the desk or on the desk, we would
24  have had a different fire pattern.  In my opinion,

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 118..121

Page 118

1    that had nothing to do with the fire.  That's what
2    we call a victim of the fire.
3        Q.   Okay.
4        A.   So what I do is I go through each and
5    everything around the room, and I determine in
6    my -- I determine in my mind where the fire
7    started and the possibility of how it started.
8        Q.   Okay.  And is it fair to say that you
9    were conducting a systematic analysis to rule out
10   each potential origin as you moved through the
11   fire scene?
12       A.   Absolutely.
13       Q.   Okay.  So then once you moved from the
14   desk, where do you go?
15       A.   Okay.  From the desk, I continued along,
16   that would be the north wall of the living room.
17   And I made it to the corner, not the corner but
18   the area to make the turn to the left.  And I
19   turned to the left again.  So actually -- Okay.
20   So I'm facing the desk.  I turned to the left,
21   which I'm now facing west.  I'm walking towards
22   the -- I never had a, what do you call it?  I
23   forgot what you call it.  Balcony.  I never had a
24   balcony.  So a balcony.  Okay?  So I'm walking

Page 119

1    towards the balcony, and I turn left again
2    following the right wall, which the balcony
3    windows would have been the wall.  And then I'm
4    now facing south.  So I don't know.  Is there a
5    picture facing south?
6        Q.   Did you -- Did you encounter a TV
7    console, entertainment center I think you
8    referenced earlier -- Strike that.
9            On the north wall, did you encounter a TV
10   console or entertainment center?
11       A.   I do remember something like that, yes.
12   I do.  I do remember that.  But I don't remember
13   if it was on the north -- I do remember one being
14   there or something.  There was -- You know, there
15   was something like a VCR, that kind of stuff.
16       Q.   Did you make any observations about any
17   sooting or heat damage to that TV console?
18       A.   I don't recall, to be honest with you.
19   If there's -- I'm trying to find -- I'm trying to
20   find a picture.
21           In the pictures that I'm showing, there's
22   nothing there.  So I'm just trying to figure out
23   if it was there, where did it go.  I don't see it
24   in any of the pictures.  Do you have any other

Page 120

1    pictures that might help me?  Not help me, but
2    refresh my memory.  I'm sorry.
3        ATTORNEY MEADOR:  I will have to --
4        THE WITNESS:  Do you mind if I stand up?  I've
5    been sitting for, holy cow, three and a half
6    hours.  Can I just stand up real quick.
7        ATTORNEY MEADOR:  Yeah.  Why don't we take a
8    quick break.
9        THE WITNESS:  Is that okay?
10       ATTORNEY MEADOR:  Sure.  Absolutely.  I want
11   you to be comfortable.
12       THE WITNESS:  I just want to stand up.
13       THE VIDEOGRAPHER:  Off the record, 3:39.
14           (Whereupon, a short break was
15            taken.)
16       THE VIDEOGRAPHER:  Back on the record, 3:43.
17   BY ATTORNEY MEADOR:
18       Q.   Okay.  Mr. Kushner, we were talking about
19   you in your investigation observing a TV console,
20   and you mentioned something about a VCR.  Did you
21   observe any VCR tapes that were in the console?
22       A.   Boy, I tell you what.  I have to be
23   honest with you, which I am going to be.  I just
24   don't remember honestly.

Page 121

1        Q.   Then let's do this.
2        A.   Do you have a picture of the --
3        Q.   You know what?  I've given -- I think I
4    have given you the pictures that I have.  But --
5        A.   There's a blank between the desk and the
6    wall, so I don't know if that's where it was at.
7    I don't know where it's at.
8        ATTORNEY MEADOR:  Tracy, what are we on?  What
9    exhibit are we on?
10       THE COURT REPORTER:  It's going to be 4.
11   BY ATTORNEY MEADOR:
12       Q.   Okay.  So, Mr. Kushner, I'm going to show
13   you what we're going to be marking as Group
14   Exhibit 4.
15           (Whereupon, Kushner Deposition
16            Exhibit No. 4 was marked for
17            identification.)
18       ATTORNEY MEADOR:  I'm doing both days as one
19   exhibit.  Okay.  Fine.  So for the record,
20   Exhibit 4 is the transcript of Mr. Kushner's
21   testimony in the criminal trial on September 11,
22   1997, Bates stamped Defendants 1405 to 1584 and
23   Defendants 1331 to Defendants 1351, which is his
24   continued testimony on September 12, 1997.

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020                                                    Pages 122..125

Page 122

1  BY ATTORNEY MEADOR:
2      Q.   And, Mr. Kushner, are these the
3  transcripts that you reviewed prior to your
4  deposition?
5      A.   Only up to day one.
6      Q.   Okay.
7      A.   No, no, no.  Because I remember it was
8  getting late, and I took a break and asked if they
9  wanted -- I can come back.  I told them of course
10 I've got to come back.  So I only saw up to that
11 part.  I didn't get the other half.
12     Q.   Okay.  Well, I'm going to refer you to in
13 day one on September 11.
14     A.   Oh, you're right.  Okay.
15     Q.   Give me two seconds.
16     A.   This was interesting because ...
17     Q.   You can look at page Bates marked
18 Defendants 1559.
19     A.   That's where I was at.
20     ATTORNEY THOMPSON:  Can you repeat that
21 number, just the -- our number.
22     ATTORNEY MEADOR:  155.
23         You're welcome.
24

Page 123

1  BY ATTORNEY MEADOR:
2      Q.   If you can take a look at --
3      A.   You said Bates 1 --
4      Q.   Beginning on -- I'm going to start you
5  with the question, Line 9.
6      A.   Okay.
7      Q.   Do you see that?
8      A.   Yes.
9      Q.   The question is:
10         QUESTION:  Continue then and tell where
11     you went and what you saw?
12         Do you see that?
13     A.   Yes, ma'am.
14     Q.   Okay.  So then if you could just read
15 through the next page, Defendants 1560, Line 5 for
16 me.
17     A.   Okay.  Okay.  Can I take the clip off,
18 please?
19     Q.   For sure.  Yes.
20     A.   Okay.  Now I can get to the corner.
21     Q.   It was just holding the two days
22 together.
23     A.   Yeah.  Okay.  (Inaudible).
24         You said up to Line 5.

Page 124

1      Q.   Yes, on the next page.
2      A.   Right.  Okay.  I read the Line 5.
3      Q.   Okay.  Does that refresh your
4  recollection about observing a television console
5  in the living room?
6      A.   So to answer your question, no.
7  But no.  Seriously, I mean, I've read it.  But to
8  go back to the -- to go back to -- Okay.  Sitting
9  here today, I honestly don't.  Is it behind the
10 bags, something hidden?  Like I said, is it
11 something that's back there?  I can't see in the
12 bags.  I don't remember, to be honest with you.
13     Q.   Okay.  So you're not recognizing it in
14 the photographs that you're looking at, correct?
15     A.   I'm trying.
16     Q.   No.  That's okay.  If you're not, that's
17 okay.  I just want you to clarify for the record
18 whether --
19     A.   As I sit here right now, I don't have
20 anything to refresh my memory about that being
21 there.
22     Q.   Okay.
23     A.   Does that make sense?  I'm not going to
24 answer you something that I don't know.

Page 125

1      Q.   Okay.
2      A.   I know what I read, and that was two
3  years after the fire or a year and a half, I don't
4  know, two years, a year and a half after the fire.
5  This was 20 -- 20 years?  No.  15 years?  I don't
6  know.  How long ago was that?  '95?  Yeah.  So I
7  don't remember, to be honest with you.  I wish
8  this picture would have showed it to me.  But if
9  there's something behind those paper bags that are
10 there ...
11     Q.   Okay.  So when you testified at the trial
12 in September of 1997, you provided the court with
13 an accurate delineation of your investigation,
14 correct?
15     A.   To the best of my ability, of course.  I
16 was under oath.
17     Q.   Okay.  So if you testified then that you
18 observed a television console when you were
19 conducting your investigation, would that have
20 been accurate?
21     A.   Absolutely.
22     Q.   Okay.
23     A.   Can I ask a question?
24     Q.   Do you need clarification?

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 126..129

Page 126

1    A.   No, no.  I just need one -- just one very
2  quick -- even Terry can be able to answer this.
3  What day were these pictures taken?
4    Q.   Okay.  So that question I cannot answer
5  for you.
6    A.   Because the victim's not in the pictures,
7  so it had to be after the victim was there.  So
8  I'm trying to figure out if when I -- See, again,
9  the fire was on the -- No.  They contacted me on
10  the 13th.  I went out there the 14th.  The fire
11  was on the 10th.  So my question is is that was
12  something put there after these photos were taken
13  to reenact the -- you know what I mean?  You know
14  what I mean?  I don't know when these pictures
15  were taken.
16    Q.   Okay.
17    A.   So I don't know if this section here
18  somebody put it to replace -- We have to do what
19  they call fire scene reconstruction.
20    Q.   Okay.
21    A.   So I don't know when this picture was
22  taken because if they reconstructed it after the
23  picture was taken, then the remains of that would
24  have been there, you know what I mean?  I don't

Page 127

1  see the picture.  I can't see behind these bags.
2  So I'm not trying to give you a hard time or
3  nothing.  I'm trying to be as -- I'm under oath.
4  I've got to tell you the truth.  You know.  But if
5  I said it in there, that's true.  And if I said I
6  don't remember, that's true I don't remember.
7    Q.   Okay.  Well, when you take a look at your
8  testimony referring to Defendants 1559, Line 21?
9    A.   Okay.
10    Q.   ANSWER:  In that particular area, there
11       was a TV, I believe, a metal TV frame or I
12       am sorry, a TV stand.  And on the bottom of
13       the TV stand, there was a lot of things
14       that were melted there.  And I noted there
15       was a VCR tape, brown VCR tape boxes that
16       weren't damaged.  They were slightly
17       heated, but they weren't damaged.  That
18       indicated to me that the fire wasn't coming
19       from the floor up.  It was coming from the
20       ceiling down.
21       Did I read that correctly?
22    A.   Absolutely.
23    Q.   Okay.  Does that refresh your
24  recollection of your observations of that TV

Page 128

1  console?
2    A.   Yes, ma'am.
3    Q.   Okay.  And do you recall seeing VCR tapes
4  at the bottom portion of that TV console?
5    A.   At the time I testified, I did.
6    Q.   Okay.  Is it something that you do not
7  recall as you sit here today?
8    A.   I know how goofy this sounds, but this is
9  the thing.  I was telling the truth there.  I'm
10  telling the truth now.  I just don't remember if I
11  remember -- I don't -- I -- You know what I mean?
12  They were there, I guess, you know.  But I'm just
13  saying I can't tell you sitting here right now and
14  having a bolt of lightning hit me because I'm
15  lying, I don't remember.
16    Q.   Okay.  That's fair?
17    A.   But I mean --
18    Q.   But you testified accurately at the time?
19    A.   Absolutely.  I mean, I was -- And again,
20  this was '97 testimony.
21    Q.   Yes, sir.
22    A.   And that was from -- how many years has
23  that been, then, 23.  It's 230 fires later.  I
24  mean, not 230, but that was almost 2300 fires ago.

Page 129

1    Q.   Okay.
2    A.   I can't remember every one.
3    Q.   Okay.
4    A.   But I mean, I'm only honest with you.  I
5  can't make it up.
6    Q.   Okay.  That's okay.
7       Then what did you do, moving through your
8  investigation?
9    A.   Okay.  So what I did, I then turned to my
10  left again following the right wall in front of
11  me, and then I looked and I viewed the wall and
12  the contents that was in the southwest section of
13  the living room.  And I noticed it was one
14  particular piece of furniture that was extensively
15  damaged versus anything else in the room.  I
16  hadn't seen anything in the whole building.
17       I'm sorry.  Strike that.  Like that one.
18  In that apartment.  And I noticed that there was a
19  remains of a, for lack of a better term, swivel
20  upholstered chair.  And the fire patterns which I
21  described earlier coming from that area going
22  upward and outward, you know, hitting the ceiling,
23  traveling across the ceiling to the north was
24  coming from the southwest section of that room.

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 130..133

Page 130

1  And so, now, here's the thing. I couldn't touch
2  or move anything because you could spoil the
3  evidence. So I was there as an opinion. So I
4  didn't move anything. I didn't move or touch or
5  do anything. So I'm trying to find the next
6  picture. It would be -- Let's see. That would
7  be -- I wish I had a better picture.
8      Q.   Well, let me -- So I have --
9      A.   I'm assuming either 22785 or 22786. If
10 you've got a 22785.5, that would be all right.
11 There's a picture in the middle there that there's
12 one angle, and then there's another angle, but
13 they don't take one -- or whoever took these, I
14 don't see one that helps me describe it.
15     Q.   Okay. So I am going to mark --
16     A.   Does that make sense?
17     Q.   -- this is Exhibit -- Group Exhibit 5.
18              (Whereupon, Kushner Deposition
19               Exhibit No. 5 was marked for
20               identification.)
21     ATTORNEY MEADOR: That's for you. That's for
22 you, Counsel. Tara.
23          So for the record, these are photographs
24 Bates stamped SDT-SAO 22973. I think there's --

Page 131

1  74, 75, 76, 77, 78, 79, 81, 82, 83, 84, 85, 86,
2  87, 88, 89, 90, 91, 92, 93, and 94 and 95.
3      Sorry. That took me a long time.
4  BY ATTORNEY MEADOR:
5      Q.   Okay. I'll represent to you,
6  Mr. Kushner, these are additional photographs
7  taken related to this fire. Go ahead and take a
8  look at these photographs and tell me if any of
9  these assist you in your testimony about this
10 southwest section of the room.
11     A.   I'm trying to find the closest one. It's
12 kind of hard when it's not the whole pictures.
13 I'm trying to figure out what in the world does
14 22995 represent. There should be a photo log with
15 it. To me, looks like (inaudible). You know,
16 that might be your television right there, 22995.
17 Because the metal flat melted down thing with the
18 VCR thing in it, that's your 22995, I believe.
19     Q.   Okay. If you take a look at 22995, do
20 you see the -- for lack of a better word, the
21 fibering, the fibers coming out from that item?
22     A.   I don't know if those are fibers or
23 wires.
24     Q.   Okay.

Page 132

1      A.   I think, you know what? Oh, I'm sorry.
2  It just drew something to my attention. That's
3  why, can I make an observation?
4      Q.   Sure.
5      A.   If you look at the picture and you look
6  at the metal thing that's on the left -- by the
7  top left corner going toward the semi middle of
8  the top to the -- I'll just point to it, this
9  thing here (indicating), I think that's the bottom
10 sliding glass door. And that's your TV and melted
11 VCR thing.
12     Q.   In the upper left-hand corner of the --
13     A.   That's the top of your door frame.
14 That's the right side of your door frame looking
15 out.
16     Q.   So if we take a look at 22785, the
17 picture we were looking at earlier, do you see the
18 door frame in there?
19     A.   Yes.
20     Q.   Where?
21     A.   That would be the bottom and -- You know
22 what? It's not the door frame. It's the --
23 whatever that metal -- You know what? That is. I
24 think that's your baseboard heater. I think

Page 133

1  that's your baseboard heater. Here, look. Okay,
2  yeah. Look. I think that's it. That's your
3  baseboard heater, I believe. Okay. So if you're
4  looking here, it's right there. It's on the right
5  just where your balcony opening is. Look at the
6  bottom right here. There's a metal bar right
7  there. So that -- that note that a TV thing was
8  originally sitting and it's not in this, that's
9  that big glob right there. It's not here. Do you
10 follow what I'm saying? Are you with me?
11     Q.   Okay.
12     ATTORNEY THOMPSON: I'm not allowed to --
13     THE WITNESS: No, I just want to make sure
14 everybody is -- I just when I'm showing
15 something -- I apologize. But I just didn't want
16 you to miss something, I guess. I don't know.
17 BY ATTORNEY MEADOR:
18     Q.   No. She doesn't want you to think that
19 she's being rude to you.
20     A.   Yeah, I thought she might have an
21 objection or something. I don't know. She could
22 say take a break or have dinner. I don't know.
23          No. So this, this piece right here,
24 okay, which is, okay, you see the two prongs, the

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 134..137

Page 134

1  two outlet box, the electrical box right there?
2     Q.   And you're pointing to the northwest
3  corner?
4     A.   This is the west wall, north side.
5  You've got drywall, two pieces of burning strips
6  in the middle of a cinderblock wall right there.
7  So if you go -- If you go down, and this piece
8  right -- this piece right there, I think that's
9  your baseboard here.  And then if you look at
10  22995, you'll see that picture is blown up in
11  there.  That's why I can't see the television
12  remains on this picture because it's in this
13  picture.  I think it's 22995 is your melted TV
14  remains.
15     Q.   So in referring back to your testimony
16  about your observations about this television
17  console, it was the testimony at the time by you
18  that the -- a bottom of the TV stand was there,
19  and there were a lot of things that were melted,
20  and there were VCR tapes that were not damaged at
21  the bottom of that console?
22     A.   Yes, ma'am.
23     Q.   Okay.
24     A.   And I found evidence of it right here.

Page 135

1     Q.   Okay.  So then --
2     A.   So you provided the evidence of it.
3     Q.   Okay.  So then moving to, I think our
4  quest in reviewing the pictures was to assist you
5  in explaining what you saw in the southwest
6  section of the living room.
7     A.   Right.
8     Q.   Can you tell me what it is that you
9  observed there?
10     A.   Yes, ma'am.
11     Q.   Okay.
12     A.   I stated earlier that there was the
13  remains of an upholstered swivel type chair that
14  was between the outside of the -- it was the
15  furthest piece of furnishings along the south wall
16  to the west, west end of the south wall.  Does
17  that make sense?  So if you're facing the south
18  wall, it's all the way to your far right was the
19  remains of an upholstered chair with -- a swivel
20  upholstered chair.
21     Q.   When you looked at the patio doors, did
22  you make an observation about damage to the patio
23  doors being more extensive on one side versus
24  another?

Page 136

1     A.   That went from the outside.  The patio
2  doors weren't there when I was there.
3     Q.   Okay.  So let me rephrase.  So did you
4  make any observations about the area around where
5  the patio doors were in terms of damage at the
6  time you were inside the unit?
7     A.   Yes.
8     Q.   Okay.  What was that?
9     A.   The far damage was towards the south and
10  west not the north and -- not the northwest but
11  the south.
12     Q.   Okay.  And did that make -- give you any
13  indication as to the origin of the fire?
14     A.   The fire pattern did, yes.
15     Q.   Okay.  What was that?
16     A.   The fire pattern was coming from the
17  remains of the upholstered swivel type chair.
18     Q.   And that is the one that was in the
19  southwest section of the living room?
20     A.   Yes, ma'am.
21     Q.   Did you -- Strike that.
22        How much of the chair in that southwest
23  section of the living room remained when you were
24  there?

Page 137

1     A.   I believe the base, all the metal parts,
2  I believe there was a base, and there might have
3  been a plate that held the chair to the base.
4     Q.   Would you say that it was burned out?
5     A.   No.  I would say it was extensively
6  damaged and no longer present.
7     Q.   Okay.
8     A.   So to answer your question, no.  And I'll
9  give you an answer after that.
10     Q.   That's fine.  Thank you.
11     A.   You're welcome.
12     Q.   Did you observe any papers in that
13  southwest section of the living room?
14     A.   I do remember papers.  I don't remember
15  if they were behind it or next to it.  I don't
16  remember.  I know it was the chair was, like,
17  right near the couch.  I don't know if there was
18  much room between the chair and the couch.  So I
19  do remember papers being there.  I just can't
20  remember exactly where.  It might have been behind
21  it.
22     Q.   Okay.  So I'm going to ask you to take a
23  look at your testimony, which is Exhibit 4.  Yes,
24  that one.  On page 1561 --

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 138..141

Page 138

1   A.   Yes, ma'am.
2   Q.   -- beginning with --
3   A.   Oh, okay.  It's 12.  So that would be
4   like fun.
5   Q.   No.  That's okay.  I'm trying to -- I
6   hate to start, like, in the middle of a statement.
7   So I will unfortunately have to refer you to the
8   prior page.  So --
9       ATTORNEY THOMPSON:  Can you give me the top
10  right number.
11      ATTORNEY MEADOR:  156, Tara.  So I'll have him
12  start at that question which is on Line 6.
13  BY ATTORNEY MEADOR:
14  Q.   And if you could then read through to the
15  next page 1561, Line 10.
16      ATTORNEY MEADOR:  And, Tara, that's 157.
17      THE WITNESS:  Do you want me to read it out
18  loud?
19  BY ATTORNEY MEADOR:
20  Q.   No, just read it to yourself.
21  A.   Oh, I'm sorry.
22  Q.   No.  That's okay.
23  A.   How far did you want me to go?
24  Q.   To Line 20.  I might have said to Line 5

Page 139

1   before.  That was my mistake.
2   A.   That's okay.  I have a short attention
3   span.
4       Okay.
5   Q.   Are you finished reading, Mr. Kushner?
6   A.   Yes, ma'am.
7   Q.   Does this refresh your recollection about
8   where the papers were located in comparison to the
9   chair in the southwest corner -- or strike that,
10  southwest section?
11  A.   Yes, ma'am.
12  Q.   Okay.  And where were they located?
13  A.   They were behind it.
14  Q.   Did you make any observations about those
15  papers behind the chair?
16  A.   Yes, ma'am.
17  Q.   What were they?
18  A.   Well, when you have burned papers or
19  anything stacked, what happens is you have what
20  they call -- I call it the toaster effect.
21  Q.   Okay.  Explain that to me.
22  A.   Well, that's what -- I don't call it, but
23  it's referred to as that.  For instance, if you
24  had a stack of anything like a Chicago phone book

Page 140

1   or a phone book where all the papers are all
2   tightly bunched together or packed onto each
3   other, when you try to burn an object, what
4   happens is is when heat applies to it is that it
5   will only get the edges, and the top -- it depends
6   if the top is exposed.  But it usually gets the
7   edges and anywhere the heat can get to it, and it
8   bakes it.  Do you remember how I was talking about
9   the drywall gets the moisture baked out of it?
10  Well, paper of course has some moisture in it.  So
11  what happens is when heat is applied to the paper,
12  it starts to draw out the moisture, it starts to
13  brown or turn brown.  And in this case, the heat
14  was exterior to the papers rather than interior
15  because if it was interior, you would have the
16  fire traveling from in the bundle of papers to the
17  outside.  This had the fire was to the outside
18  edges and to the top or to the, you know, sides.
19  And it wasn't -- the fire wasn't from the stack of
20  papers, it was an effect from the fire.  The fire
21  attacked the papers.  Similar to that it
22  attacked -- attacked the desk from the heat coming
23  down.
24  Q.   Okay.  And did you see any burn pattern

Page 141

1   in that section of the living room?
2   A.   Yes, ma'am.
3   Q.   What was that?
4   A.   It's called a fire V pattern because fire
5   normally travels upward and outward in its normal
6   path of travel until, again, like I explained
7   earlier, that it hits resistance.  And it follows
8   the path of least resistance.  And what basically
9   happened in this particular case is that I backed
10  up, stood in front of the remains of that object,
11  which was later identified as a swivel chair, that
12  the pattern came upward and outward from the scene
13  of the -- from the area of the swivel chair.
14  Q.   What do you mean when you say that
15  something is burning up and away in its normal
16  path of travel?
17  A.   That heat has the tendency to rise.  And
18  also because it does -- it keeps traveling until
19  it's hit or obstructed by an object that either
20  deflects it or causes it to go somewhere else,
21  like the ceiling.  Remember we talked about the
22  heat backing back down and then coming out of the
23  room because it found the path of least
24  resistance?  So in this particular case, this

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 142..145

Page 142

1  object that was on fire, the fire traveled upward
2  and outward in its normal path of travel.  In this
3  particular case, the left side -- I don't know how
4  far do you want me to go.
5      Q.   That's okay.
6      A.   The left side of the V pattern, actually,
7  if you look at 22786, the pattern of the fire
8  pattern is traveling from, you can see the --
9  well, there's another picture I'll show you in a
10 moment too.  But it's traveling upward and
11 outward.  In this particular case, the
12 right-handed side of the pattern is actually
13 reflecting off the bottom of your window wall air
14 conditioner.  And it's deflecting back down.
15     Do you see the white that's down the wall
16 underneath the window or wall air conditioner,
17 when we talked about the intensity patterns of the
18 white of the drywall being it's the third stage --
19     Q.   Okay.
20     A.   -- the white on there, you see -- you see
21 all -- actually, to the left, you'll see the
22 black, then in the middle, you'll start to see a
23 turquoise, and then right there, you'll see the
24 white.  So actually, you have all three phases

Page 143

1  underneath the air conditioning unit.  The bottom
2  of the air conditioning unit was distorted also.
3  And that means that the heat was coming upward and
4  outward deflecting off the bottom of your air
5  conditioning unit, and then it went towards the
6  right.  And that's where it vented out the corner
7  of your sliding glass doors at the top left of
8  your sliding glass door.
9      The other side of your V pattern traveled
10 upward and outward, as you can see on the page on
11 22786, was coming upward and outward to the side
12 of the couch.  And there's a better one -- Okay,
13 there's a better one of 22788 that's coming up and
14 over the couch arm of the couch to the right side
15 of the couch, left if you're sitting on it, that's
16 going upward and outward that's traveling -- going
17 back to 22786, that's going across the south wall
18 from the west.  You can tell by the -- I mentioned
19 a thing called blistering, when the paint and
20 everything is blistered and, you know, it causes
21 the surface to blister or it starts breaking the
22 wall down into the drywall phase, okay, what
23 happens is that it came upward and outward from
24 the southwest section where the chair was at,

Page 144

1  traveled upward.  Now, it's easy easier if I just
2  showed you.  Okay.  Traveled upward and outward.
3  And this is all -- all of this is the fire travel.
4  And then what it did is when it hit the ceiling,
5  the heat started banking down.  That's the same
6  heat that was collected at the ceiling that
7  affected the desk on the other side when
8  everything started to melt on the other side, like
9  the TV and all -- or not melt but distort, that
10 was the heat coming down from the ceiling level.
11 It went over and then banked down.  Because what
12 it did was it went from the southwest up to the
13 ceiling, it deflected off the window -- the air
14 conditioning unit, went around the air
15 conditioning unit to follow the path of least
16 resistance, vented itself out the sliding glass
17 door corner where it was seeking fresh air, but
18 also went over the ceiling, it traveled upward and
19 outward, started banking down, and when that
20 sliding glass door window was hot enough and
21 cracked, that's when it drew it out the window.
22 Does that make sense?
23     Q.   It does.  Okay.  Then what did you do in
24 your investigation?

Page 145

1      A.   Okay.  The next thing I did was is that I
2  stood in front of the three cushion couch.  So I'm
3  actually now facing south.  And the remains of
4  that item was to my right, which was to the west.
5  And what I did was is that I looked very gingerly,
6  because again, I didn't want to cause any
7  spoliation of evidence.  But I was looking for any
8  kind of cords, you know, like an extension cord
9  running through there or a lamp cord or anything
10 that might have been plugged in there or in that
11 area.  And I noticed that the window air
12 conditioning unit had its own plug, you know,
13 about where the fire was down below.  So it had
14 its own plug.  I'm sorry.  I stand corrected.  It
15 had its own outlet.  Of course it had a plug.  It
16 had its own outlet.  So that got plugged -- If it
17 was plugged in, it was plugged into that
18 particular outlet.  It wasn't plugged in behind
19 the couch or the chair.
20     So by the patterns of the paper being
21 burned from away from the paper, not the paper
22 being on fire, that also told me that the fire was
23 not at the baseboard, because the paper was
24 against the baseboard, and the baseboard is the

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 146..149

Page 146

1  board that is the bottom where your wall meets
2  your floor. And so what I wanted to do was I
3  wanted to look through that area, and I did not
4  find any remains of any extension cords or
5  anything. I also did not find any signs of a
6  heater, you know, like a baseboard heater or any
7  kind of heater, a space heater. I didn't find any
8  remains of any space heaters or anything.
9          Then I noticed at the end of the couch
10  which would be the west end of the couch, three
11  cushion upholstered couch, was extensively damaged
12  or heavily damaged on the side where the fire was
13  coming from, rather than the other side. And as
14  you got further from the fire on the couch when
15  you're sitting on the couch, the couch got better
16  and better and better as far as the wood and the
17  foam and the fabric was getting better and better
18  on the couch saying that the fire did not occur on
19  the left side cushion, middle cushion. It was all
20  from the exterior side of the couch coming from
21  the burned remains.
22      Q.  Okay. So just in terms of maintaining
23  direction, the damage to the couch was more
24  significant on the west side of the couch than on

Page 147

1  the east side?
2      A.  Absolutely.
3      Q.  Okay. And it got better and better in
4  terms of condition moving from west to east in the
5  room?
6      A.  Absolutely.
7          Do you want me to continue?
8      Q.  And then what did you do next?
9      A.  Okay. From there, it was another chair.
10  22788 is a good picture of the couch that I was
11  talking about. It shows the damage to the right
12  side, which would be the west side, versus the
13  left side, which would be the east side.
14          Then there was another chair that was
15  what we call an armchair, okay, because they're
16  not upholstered but just an armchair with a
17  cushion in the back and front, but it wasn't
18  upholstered. It was more like, I don't know what
19  you call it, but it wasn't the same in my -- I
20  don't think it was the same as the one that was in
21  the corner. I think the one in the corner was
22  actually an upholstered chair. You can see some
23  of it in the picture on 22788 in the left bottom
24  corner or section of the picture.

Page 148

1      Q.  If you look at 22791 --
2      A.  I'm sorry.
3          How about 22786.
4      Q.  Or 22791.
5      A.  791.
6          Ready, set, hike. 91. Yes, ma'am. Yes.
7  22791. Yes.
8      Q.  Okay.
9      A.  Okay. So as I described before how the
10  fire was traveling along the -- in 22788, you can
11  see the fire traveling on the wall behind the
12  couch.
13      Q.  Okay.
14      A.  What that did was when you got to the
15  bookcase, it was maybe about a foot -- maybe about
16  a foot wall that -- or that bookcase or whatever
17  that is right there, you can see it. It's in the
18  center of the picture. There's a blue book or
19  something that's in front of it.
20          Let me get it. Right here.
21      Q.  Go ahead.
22      A.  Remember I said that the fire is going to
23  travel until it bounces off of something or it
24  causes -- gets resistance? Okay. So what it did

Page 149

1  is it's traveling across the ceiling from the west
2  to the east. It got to that part to where that
3  bookcase or wherever it was sitting, it deflected
4  off the bookcase. Now it's coming back down. So
5  that whole part of the bookcase, you can see the
6  bottom of it where the blue book or whatever that
7  is, whatever that blue object is, it's like sky
8  blue, from that point forward up is all fire
9  damage. It's all radiant heat damage from the
10  ceiling and everything coming down. And that's
11  another thing of 22788 where the fire is coming
12  across the top of the couch. And when fire is
13  going to travel, it's going to stop, and then it's
14  going to deflect. So now when you pointed out
15  that picture of 91, or what was the -- oh, 91,
16  this is the arm of the same chair that was in
17  22788.
18      Q.  Okay.
19      A.  So it was an upholstered chair, I think.
20  It was an upholstered chair. So this is
21  indicating to me that the fire was coming from the
22  south to the east and from behind the chair and
23  from down. It wasn't coming from the chair; it
24  was actually being attacked from the west and from

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020                                    Pages 150..153

Page 150

1   the north -- I'm sorry, the south, and it was also
2   being attacked from the top.  This chair got beat
3   up three different ways.  Because you not only --
4       Q.   And --
5       A.   I'm sorry.
6       Q.   No.  That's okay.
7       A.   So you not only had radiant heat coming
8   from the ceiling attacking it, you had radiant
9   heat coming from the west, and you had the flame
10  coming across too.  But what happened is is that
11  when this thing started on -- this thing started
12  on top down back down, or the back side.
13           I apologize.
14      Q.   And what -- Strike that.
15           Does this photograph exemplify what
16  you're describing, the way --
17      A.   Part of it, yes.
18      Q.   -- the chair was attacked?
19      A.   Correct.  That and a couple of others;
20  yes, ma'am.
21      Q.   Okay.  And when you are making these
22  observations, how is it that you understood the
23  direction that the chair was being attacked from?
24      A.   Training.

Page 151

1           I'm sorry.
2       Q.   No.  That's okay.  It was probably a
3   poorly worded question.
4           How -- What observations did you make
5   about the chair itself that indicated to you how
6   it was burned?
7       A.   My fire scene examination, training, and
8   experience.  I mean, the pattern to me was very
9   clear.
10          THE WITNESS:  Can I -- My mother -- That's my
11  wife.  I hope my mom's okay.  Could I just take
12  it?
13          ATTORNEY MEADOR:  Sure.  Let's take a break.
14          THE WITNESS:  Because she called me four times
15  already.  I want to make sure my mom's okay.
16          ATTORNEY MEADOR:  That's fine.  Take your
17  time.
18          THE VIDEOGRAPHER:  Off the record, 4:23.
19               (Whereupon, a short break was
20                taken.)
21          THE VIDEOGRAPHER:  Back on the record, 4:25.
22          THE WITNESS:  Okay.  I'm sorry.
23  BY ATTORNEY MEADOR:
24      Q.   That's okay.

Page 152

1       Q.   Did you make any observations about the
2   carpeting in the living room being affected by the
3   fire?
4       A.   Yes, ma'am.
5       Q.   Okay.  What was that that you observed?
6       A.   What happens is is that in this
7   particular fire that I saw, the carpeting was --
8   when an object is on fire and there's carpeting,
9   most -- not every time but most of the time that
10  I've observed, the carpeting will actually peel
11  away from the heat like your skin.  So if you burn
12  your finger or your skin, the skin will start
13  peeling away from it to try to protect whatever is
14  around it, you know what I'm saying, because it's
15  like your defense system.
16          Carpeting, of course is not human or
17  anything.  But what happens is is that when heat
18  is applied to carpeting, it actually pulls away or
19  moves away from the object on fire.  And it
20  actually -- it's almost like skin peeling.  I know
21  that's kind of a sad way to say it, but it pulls
22  away from it.  So -- And you asked me about this
23  particular one?
24      Q.   Yes, sir.

Page 153

1       A.   Okay.  So in front of this particular
2   item that was extensively damaged by fire, there
3   was carpet, the carpet, you could see like a half
4   a moon or whatever it was from the couch to the
5   remains.  The carpeting was burned away from that
6   particular item showing that it was intense heat
7   coming from that piece of furniture.
8       Q.   And are you talking about that same
9   southwest section of the living room?
10      A.   Yes, the upholstered -- Yeah, the
11  upholstered chair or whatever it was.  Yeah.  The
12  upholstered chair.  Yeah.
13      Q.   Okay.
14      A.   I did notice that, yes.
15      Q.   Okay.  What did you do next in your
16  investigation?
17      A.   Okay.  So we were -- So basically, at
18  that time, I went around the chair.  I went
19  towards the door now because again, the bookcase
20  was facing the west, and all the damage was on the
21  west side of the bookcase and the top and the wall
22  side, you know, to the south.  So that was attack
23  scene, you know, coming from the west, southwest.
24  So I went past the bookcase, and I went towards --

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 154..157

Page 154

1  I believe -- I think there was a closet by the
2  front door.  Do you remember you asked earlier
3  about -- you took me all the way from the hallway
4  back?  And so now I'm at the homestretch.  Now I'm
5  standing by the kitchen.  The kitchen area, the
6  sitting area where I first came in, is now on my
7  left side.  I'm following the wall to now it would
8  be the east, and I'm heading towards the door.
9  And so I had them both -- They were standing there
10 so I told them to close the door.  And remember
11 you asked about the back of the door.  So yes.  So
12 they closed the door, and I noticed that the
13 charring and the burning was coming -- matched the
14 same burn patterns was coming across the ceiling
15 and deflecting from that bookcase area and then
16 burning it's way out into the hallway.  You
17 understand?  In other words, it didn't come from
18 the hallway.  This gave me the proof that it was
19 coming from the inside out.  I couldn't say that a
20 hundred percent until I got finished.  Right?
21     Q.   Understood.
22     A.   So, I mean, I had to make sure that I
23 looked at everything before I did that because it
24 could have been a closet fire right on the other

Page 155

1  side of the door.
2     Q.   And did you then at that point make a
3  determination as to the origin of the fire?  Or
4  did you still continue to conduct your
5  investigation?
6     ATTORNEY THOMPSON:  Object to form.
7     THE WITNESS:  I just -- I had -- I had it -- I
8  took it in my mind I had determined that where I
9  believed -- not where I believe, I know where the
10 fire started.
11 BY ATTORNEY MEADOR:
12     Q.   Okay.  Where was that?
13     A.   In my opinion, it was from the southwest
14 section of the room in that piece of furniture,
15 that upholstered chair.
16     Q.   Okay.  Did you have an opinion as to the
17 cause of the fire at that time?
18     A.   No, ma'am.
19     Q.   Did you then have a conversation with
20 Lieutenant Ferreri and Detective Cross about
21 observations that you had made?
22     A.   Yes.
23     Q.   Can you explain to me what that
24 discussion entailed?

Page 156

1     A.   Absolutely.  When I was standing at the
2  doorway, Mike Cross, Detective Cross, and
3  Lieutenant Ferreri were in the hallway.  I walked
4  around the same way I did by myself with them
5  behind me pointing out things that I made
6  observations.  I made sure again, you know, I must
7  have made -- I believe I asked them again make
8  sure it's photographed.  They ensured -- they
9  assured me, I guess is the word I was looking for,
10 that it was.  I went around the whole same thing I
11 described earlier, went through the -- I mean, not
12 in all that detail, but I just went to each room
13 and said, Okay, the kitchen, dinette area, I'm not
14 worried about that.  That's not where the fire
15 started.
16     I went in the first kitchen area, said
17 the same thing.  Looked around there, the fire is
18 not in the kitchen.  Went in the bathroom; I said
19 the fire is not in the bathroom.  Went in the
20 hallway, and I said, "Hey, what about the smoke
21 detector?"  Because there was no smoke detector.
22 And then they said there was none found.  I mean,
23 I put in my report none found.  That's what they
24 told me.  There weren't any there.

Page 157

1     Q.   Okay.
2     A.   I went into the second bathroom, the
3  bigger bathroom, and I said to the -- I said,
4  Okay, there's no fire in here.  Everything was
5  intact and still whatever, but there wasn't
6  nothing much going on.
7     So then I went into the master bedroom,
8  and I asked them about the phone.  And they said
9  that was -- they believed that was the phone that
10 was the 911 caller was -- the victim was in that
11 room.  You know, I told you earlier about that
12 clean spot on the carpeting, that's where they had
13 recovered Mrs. --
14     Q.   Miceli?
15     A.   -- Miceli, right, Ms. Miceli, that's
16 where they recovered the victim.  You know, they
17 found her on the carpeting.  And I said okay, and
18 I said -- went back into the second bedroom.  And
19 that's when I said there wasn't that much smoke or
20 soot in there.  I thought Dave Ferreri or somebody
21 said that door was closed.  Because there was -- I
22 don't think there was any much fire or smoke in
23 that room.  I think that room was -- the door
24 might have been slightly open, but it wasn't open

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 158..161

Page 158

1   to where the fire and smoke traveled in there.
2           I went back into the -- We're big guys,
3   so we had to wait for each other to get out of the
4   way.  So we were coming back down walking the
5   other way now, the kitchen is on my left, the
6   bathroom is on my left.  I'm heading towards the
7   south, right?  So I stopped in the room, and I
8   said -- to the right, I said this desk and the
9   trunk and the chair were all burned from the top
10  down, because the legs of the chair, I believe,
11  were still -- there was the top seat and the back
12  was burned.  Then I moved over to the other side
13  where there was remains of -- the remains of that
14  TV had to be there.  I said the picture without
15  them, I don't know why -- I don't know when that
16  was.  But there is one that would have been there.
17  But I said this was heat coming back down.  You
18  know, even the VCR -- I was concerned about if
19  somebody went in there and may have poured
20  something, you know, like an accelerant.  But
21  every indication was the fire on 90 percent if not
22  95 percent of the room or building was up high.
23  Right?  Because I described the baseboards and all
24  that stuff.  And so all the fire was up high.  So

Page 159

1   then I turned to -- They were on my left side kind
2   of behind me.  They were actually standing in the
3   kitchenette, and I was standing, to my right side
4   was the desk.  Because they were like this
5   (indicating).  And I said to them, I said, This is
6   what you guys have to do, my suggestion.  Take it
7   for what it's worth.  My old boss used to say
8   that.  Your fire started in this upholstered
9   chair, whatever this object is.  I wasn't sure
10  what it was, but I thought it was a chair or
11  something.  And I said, Your fire originated here,
12  it traveled upward and outward, and I remember
13  showing them the pattern which I explained and the
14  deflection off the air conditioning unit, and I
15  showed them the same thing I just described here.
16  And I said this is what I would do.  I said first
17  you've got to find out who was home at the time of
18  the fire.  Right?  Second, you've got to find
19  out -- and in no particular order -- I said find
20  out who was home at the time of the fire.  Does
21  anybody smoke?  What were they doing?  Where
22  was -- Where was everybody at?  Was there two
23  people in the living room, one in the bedroom?  I
24  don't know.  I said find out what everybody was

Page 160

1   doing.  And find out everything -- I said this
2   just like this:  "Find out everything you can
3   about that piece of furniture, and then let me
4   know."  Or, you know, just this is what you have
5   to do is find out everything about that piece of
6   furniture because that's in my opinion where the
7   fire originated.  I told them I did not have a
8   cause because I wasn't there at the time of the
9   fire.  But you need to do a lot of examining and
10  finding out about that piece of furniture.  And
11  that was it.  I left, drove home.  I don't drink,
12  so that didn't help.  And then I probably went to
13  another fire.
14      Q.   When you say the fire started in the
15  chair in that area, are you talking about the
16  southwest section of the living room?
17      A.   Yes, ma'am.
18      Q.   And did you tell Lieutenant Ferreri and
19  Detective Cross to concentrate their attention to
20  that area?
21      A.   What I told them was this.  In my
22  opinion, that's where the fire started.  Find out
23  everything you can about that particular piece of
24  furniture.  That's what I told them.  And I said

Page 161

1   to them, As a matter of fact, I said, If you want
2   me to help you, you know, if you need further --
3   because we are involved where I can help them, I
4   said, If you need further help on that, let me
5   know.  They said they got it.  I mean, they didn't
6   say the words "Got it."  But my assistance was not
7   required, I guess.  I didn't hear from them.
8       Q.   And you did not decide to use your canine
9   when you were investigating this fire, correct?
10      A.   Right.  That's correct.
11      Q.   Okay.  Can you explain why?
12      A.   Because of the, in my opinion, the chair
13  being burned top down and, you know, inside out, I
14  didn't see any -- you know, the base was still
15  pretty much there, and the couch was still there
16  on the bottom.  You know what I was saying about
17  the couch being burned?  If the couch legs were
18  burned, you know, down below along the floor line,
19  I may have considered working her there thinking
20  there might have been an ignitable liquid applied
21  to it.  But then again I said, well, I didn't -- I
22  didn't think it was warranted to be honest with
23  you.
24           ATTORNEY THOMPSON:  I'm sorry.  Could you

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 162..165

Page 162

1  repeat --
2      THE WITNESS:  I didn't think it was warranted.
3      I thought you would be quieter over
4  there.
5      Holy crap, it's 20 to 5:00.  No wonder.
6  Everybody's getting hungry.
7  BY ATTORNEY MEADOR:
8      Q.  Did you obtain any information from
9  either Lieutenant Ferreri or Detective Cross about
10  the use of that chair in the southwest corner?
11      ATTORNEY THOMPSON:  Object to form.
12      THE WITNESS:  Yes.
13  BY ATTORNEY MEADOR:
14      Q.  Okay.  What was that information?
15      A.  I don't know the exact date, but I got
16  paged -- we used to have pagers -- so I got paged.
17  I returned the page, and it was Detective Cross.
18  It was Detective Mike Cross.  Now, this is only
19  the second time I talked -- you know, like, this
20  is the second time I talked to him, I mean,
21  since -- one time since the fire, or since I was
22  there.  And I -- He goes that's -- that's -- So to
23  answer your question, yes.
24      Q.  Okay.  And what information did he

Page 163

1  provide you?
2      A.  Okay.  This is -- This is what I remember
3  him telling me.  I said, Okay.  Who was home at
4  the time of the fire?  He said it was Mrs. Miceli,
5  Mr. Amor -- Amor?  Amor?  I just refer to
6  Mr. Amor.  Is that okay?  Mr. Amor?  Is it Amor or
7  Amor?  Mr. Amor.
8      And I did know he was married at the time
9  to Mrs. Miceli's daughter and that they were home
10  watching a football game.  And after the football
11  game was over, Mrs. Miceli was in her bedroom,
12  went to her bedroom.  And Mr. Amor and Tina I'll
13  call it -- was it Mrs. Amor at the time?  I don't
14  know.  I honestly don't -- maybe I think it was
15  Mrs. Amor.  But I think her name was Tina.  Is
16  that -- Tina is the daughter?  Mrs. Miceli's
17  daughter, was it Tina?  It was a young female
18  there.  How about that?
19      Q.  Fine.
20      A.  There was about an 18-year-old female
21  there.  How does that sound?
22      Q.  Okay.
23      A.  I thought it was her daughter.  It was --
24  I think it was her daughter, Mrs. Miceli's

Page 164

1  daughter.  I do know they had -- It was her
2  daughter.  Anyway.
3      But they left the apartment to go
4  either -- I thought it was probably -- probably to
5  go to a movie.  And that was it.  And I said to
6  Detective Cross, I said, What about the chair?  I
7  thought, you know, that would probably be
8  important.  Right?  I think he -- I know he said
9  what he was told that he's telling me on the
10  phone, nobody was sitting on that chair during the
11  football game.  There was a chair, there was a
12  couch that two people were sitting on, the young
13  girl, the daughter of Ms. Miceli, and Mr. Amor.
14  And Ms. Miceli was sitting in another chair.
15  That's what I remember him telling me.
16      Q.  Did you obtain any information about
17  whether anyone smoked in the house?
18      ATTORNEY THOMPSON:  Object to form.
19      THE WITNESS:  That was my next -- That was my
20  next thing I was going to mention.
21  BY ATTORNEY MEADOR:
22      Q.  Okay.
23      A.  I asked him about the smoking.  And
24  Detective Cross informed me, and I do remember

Page 165

1  this plain as day, he said no one was smoking in
2  the apartment.  And in that chair, no one was
3  smoking in that chair.  He said absolutely.  He
4  said no one was sitting in the chair.
5      And we're talking about the chair in the
6  southwest section next to the couch.
7      Q.  Did you -- In your observation of that
8  southwest section of the living room, did you make
9  any observation about whether the chair had been
10  smoldering?
11      ATTORNEY THOMPSON:  Object to form.
12      THE WITNESS:  I was waiting for you.
13      I had no way of knowing that.  That chair
14  was gone when I got there.
15  BY ATTORNEY MEADOR:
16      Q.  Okay.  Was it important for you to know
17  if anyone had been smoking in that chair to
18  address the question as to whether that had been a
19  factor in the fire?
20      A.  Absolutely.
21      Q.  Okay.  Did you obtain any information at
22  that time from Detective Cross about the time
23  frame from when Tina and Bill Amor left the
24  apartment until the fire was called in to 911?

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020
Pages 166..169

Page 166

1    A.   Yes.
2    Q.   What was that information?
3    A.   He told me it was a few minutes.
4         I'm sorry.  Detective Cross informed me
5    it was approximately a few minutes.
6    Q.   Would that have an impact on your
7    analysis of whether the fire was caused by a piece
8    of furniture smoldering?
9         ATTORNEY THOMPSON:  Object to form.
10        THE WITNESS:  Yes.
11   BY ATTORNEY MEADOR:
12   Q.   Okay.  How so?
13   A.   If a piece of furniture was smoldering,
14   the smoldering phase also gives off smoke.  So
15   they would have noticed an odor of smoke or some
16   kind of sight of smoke or some kind of anything
17   that this was smoldering, like a smolder smell.
18   And I said -- I asked Detective Cross, Did anybody
19   smell or see anything, you know, after the
20   football game or after anything, did anybody see
21   anything on that chair?  He said no.  So I said,
22   Well, how does a chair burst into flames moments
23   after someone -- no one was sitting on it.  How
24   does that chair burst into flames on its own?

Page 167

1    Q.   Did Detective Cross tell you at some
2    point that Mr. Amor had confessed to starting the
3    fire?
4    A.   Yes.
5    Q.   Was it in that same phone call?
6    A.   I think I only talked to Mike Cross once.
7    More than likely, it was that phone call, yes.
8    Q.   And what did he tell you?
9    A.   Detective Cross informed me that Mr. Amor
10   stated to him -- I know that sounds like hearsay
11   or whatever -- but that Mr. Amor might have
12   dropped or started the fire or caused the fire
13   with a cigarette and tried to do something with
14   vodka.  Or I think it was vodka.
15   Q.   Did Detective Cross tell you that
16   Mr. Amor had given a couple of different versions
17   of what happened?
18   A.   He said a few.
19   Q.   Okay.  Did Detective Cross tell you that
20   Mr. Amor told him that he had spilled vodka on the
21   newspaper or the object itself?
22   A.   I don't remember.  We were talking about
23   the chair, no other object.  So I thought we were
24   talking about the chair.

Page 168

1    Q.   Let's take a look at Exhibit 4, please.
2         If you could look at Defendants 1572.
3    A.   Wait, wait.  15 --
4    Q.   72.
5         ATTORNEY MEADOR:  1572.  Tara, that's 168.
6         THE WITNESS:  1572.  Okay.
7    BY ATTORNEY MEADOR:
8    Q.   Yes, sir.
9         Beginning at Line 10.
10   A.   Okay.
11   Q.   If you can read through to the next page,
12   1573, Line 6.
13   A.   Okay.
14   Q.   Okay.  Does that refresh your
15   recollection about the information that Detective
16   Cross provided to you about Mr. Amor recounting
17   how the fire started?
18   A.   Yes.
19   Q.   Okay.  And what was that?
20   A.   That Mr. Amor caused vodka to spill on
21   papers behind the chair and a cigarette was the
22   ignition source.
23   Q.   Okay.  Can a cigarette be an ignition
24   source?

Page 169

1    A.   Of course.
2    Q.   Did you at some point hear the 911 call
3    that was made by Mrs. Miceli from the apartment?
4    A.   Yes, I did.
5         But could we take a break so I could talk
6    to my counsel for just a brief moment?
7         ATTORNEY MEADOR:  Sure.  Yeah.
8         THE WITNESS:  I mean, there's just one thing I
9    answered, you know, truthfully.  But let me run it
10   past him real quick.
11        ATTORNEY MEADOR:  Okay.
12        THE VIDEOGRAPHER:  Off the record, 4:49.
13             (Whereupon, a short break was
14             taken.)
15        THE VIDEOGRAPHER:  Back on the record, 4:57.
16        ATTORNEY MEADOR:  Okay.  So I think there was
17   a question posed.  Tracy, could you read back the
18   question for me.
19             (Whereupon, the record was read as
20             requested.)
21   BY ATTORNEY MEADOR:
22   Q.   Did you at some point listen to the 911
23   call that was made by Mrs. Miceli from the
24   apartment?

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 170..173

Page 170

1      A.   Yes, ma'am.
2      Q.   And you asked for an opportunity to speak
3    with your counsel.  Was there something that you
4    wanted to clarify?
5      A.   I thought he was taking me out to dinner,
6    but that didn't work out.  No, I -- There was a
7    couple of questions ago, you asked me a question.
8    I answered it, and then I -- I had a -- I had a,
9    like, a brain freeze or something.  And I was like
10   okay.  And then I was like, okay.  And then when I
11   read that, and you asked me to read that, and that
12   made sense.  And yeah, he just needed to hit me.
13   That's all.
14     Q.   All right.  Well, if there's anything you
15   want --
16     A.   No, no, no, no.
17     Q.   -- you can let me know.
18     A.   No.  That's okay.  That's what he's there
19   for.  I've got to ask him something or he'll say,
20   I sat here for nothing for the whole day for
21   nothing.  His wife's going to call and yell at me.
22     Q.   And did you, in listening to the 911
23   call, did you obtain additional information about
24   where the victim saw the fire?

Page 171

1      A.   Yes, ma'am.
2      Q.   What was that?
3      A.   It was in the living room.  The chair
4    was -- I think, if I remember correctly, the chair
5    was on fire in the living room by the -- I --
6    there was a chair on fire in the living room.  I
7    can't remember the exact wording.  I heard it
8    once.  And that was during my supposed trial prep.
9      Q.   Okay.
10     A.   I could refresh my memory if you want.
11     Q.   Sure.  That sounds good.  So why don't we
12   refer to Exhibit 4.
13     A.   Thank God for Exhibit 4.
14     Q.   Defendants 1573.
15     ATTORNEY MEADOR:  Tara, that's 169.
16     THE WITNESS:  Oh, yeah.  To 19.
17   BY ATTORNEY MEADOR:
18     Q.   So it looks like the question begins at
19   Line 11.  And if you could read through Line 22.
20     A.   Correct.  Thank you.  I apologize.  I
21   just --
22     Q.   That's okay.
23     A.   That's right about a year after that.
24   Okay.

Page 172

1      A.   Sure.  Okay.  I remember now.
2      Q.   Okay.
3      A.   I wasn't that far off.
4      Q.   Okay.
5      A.   I still remembered the word "balcony."
6      Q.   So does that refresh your recollection as
7    to where you heard the victim indicate the chair
8    was on fire?
9      A.   Yes, ma'am.
10     Q.   Okay.  And where was that?
11     A.   That was the chair in the living room by
12   the balcony.
13     Q.   Okay.  I'm going to ask you to take a
14   look at Exhibit 3, which is the diagram and the
15   photograph together.  Okay?
16     A.   Hang on a minute.  Let me go back that
17   way.  Exhibit 3.  All right.  One moment.
18     Q.   Page SDT-SAO 22782.
19     A.   Yes, ma'am.
20     Q.   Okay.  Are you there?
21          Okay.  And then also 22783.
22     A.   Yes, ma'am.
23     Q.   Okay.  And do you know what those
24   photographs depict?

Page 173

1      A.   It's a picture of a building on fire.
2      Q.   Is it this fire that you investigated?
3      A.   Yes, ma'am.
4      Q.   And is that a view from the outside of
5    the building looking toward that balcony?
6      A.   Yes, ma'am.
7      Q.   And can you tell me what those photos
8    indicate to you about the fire?
9      A.   So, I -- I have to answer it with an
10   answer and a question, if you don't mind.
11     Q.   Okay.
12     A.   So are we going from the perspective of I
13   know it was on the other side, or is this
14   perspective somebody walking up and seeing the
15   fire for the first time on the outside?
16     Q.   I'm asking you as a fire investigator
17   having investigated --
18     A.   I'll --
19     Q.   -- the scene on the interior, correct.
20     A.   Okay.  I just wanted to make sure you're
21   just not asking if somebody just says what you see
22   in the picture.
23     Q.   No.  I'm asking --
24     A.   In my opinion --

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 174..177

Page 174

1    Q.   -- your opinion.
2    A.   -- knowing after conducting an
3    internal -- interior inves- -- interior
4    examination of the structure, it is my opinion
5    that that picture that is shown in 22782 and 3 is
6    the actual chair on fire from the outside looking
7    in towards the east.
8    Q.   And does the coloring of the flame
9    indicate anything to you?
10   A.   Somewhat, yes.  It's a petroleum product.
11   Q.   Is there -- What color would you describe
12   the flame as being?
13   A.   Orange and red.
14   Q.   Okay.  And to a layperson like me, can
15   you explain what that means that you're seeing an
16   orange and red flame?
17   A.   There's a hydrocarbon or petroleum
18   product burning.
19   Q.   Did you, after your scene
20   investigation --
21   A.   Yes, ma'am.
22        Oh, I'm sorry.
23   Q.   At some point after your scene
24   investigation, did you review a report done by

Page 175

1    Craig Engineering?
2    A.   I wouldn't say reviewed it.  I looked at
3    it, yeah.  Yes.
4    Q.   What information did you obtain -- Strike
5    that.
6         Did you obtain any information from the
7    Craig Engineering report related to this fire?
8    A.   Yes, ma'am.
9    Q.   What was that?
10   A.   Whether it be Richard Craig himself or
11   somebody from Craig Engineering who was an
12   electrical engineering firm, he was -- he's
13   deceased now.  But anyway, but somebody from the
14   Rich Craig firm, whether it was him or somebody
15   there, examined the electrical wiring and
16   determined that there was no electrical faults or
17   arcing or anything to cause the fire.
18   Q.   When you testified -- Strike that.
19        Do you have an opinion as an arson
20   investigator as to whether this fire was
21   incendiary in nature?
22        ATTORNEY THOMPSON:  Objection.  And I'll just
23   say for the record that you're asking for his
24   opinion today.  My objection is on the basis that

Page 176

1    he hasn't been disclosed as an expert.  Just so I
2    make a record.
3    BY ATTORNEY MEADOR:
4    Q.   Okay.  Go ahead.  You can answer.
5    A.   This fire is incendiary in nature, yes.
6    Q.   Okay.  And can you explain your opinion
7    to me.
8        ATTORNEY THOMPSON:  Same objection.
9        THE WITNESS:  As far as the origin and cause
10   of the fire, ma'am?
11   BY ATTORNEY MEADOR:
12   Q.   As to it being incendiary in nature; yes,
13   sir.
14   A.   Yes.  This fire is incendiary in nature
15   with the ignition of ordinary combustibles being
16   the chair and the -- you know, the upholstered
17   swivel chair with the heat source being that of an
18   open flame.
19   Q.   Were the -- Strike that.
20        Do you consider the papers and the
21   newspaper to be part of the combustibles?
22        ATTORNEY THOMPSON:  Objection -- I'm sorry.
23        ATTORNEY MEADOR:  No.  That's okay.  No.
24   That's okay.

Page 177

1    BY ATTORNEY MEADOR:
2    Q.   As part of this fire.
3        ATTORNEY THOMPSON:  Object to form and my
4    prior objections as well.
5        THE WITNESS:  I do not believe it was the
6    first material that ignited.
7    BY ATTORNEY MEADOR:
8    Q.   Okay.  Was the -- Strike that.
9        Did you have the opinion that the fire
10   was caused by an open flame and utilized a
11   volatile liquid, being the vodka?
12        ATTORNEY THOMPSON:  Object to form.
13        THE WITNESS:  When I testified, yes.
14   BY ATTORNEY MEADOR:
15   Q.   Did you determine that the fire was not
16   accidental in nature?
17        ATTORNEY THOMPSON:  Object to form.
18        THE WITNESS:  Yes.
19   BY ATTORNEY MEADOR:
20   Q.   Can you explain that?
21   A.   That it was not accidental in nature?
22   Q.   Yes.
23   A.   Yes.  It was not accidental in nature.
24   Q.   Okay.  Can you explain that to me?

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 178..181

Page 178

1    A.   In my opinion, based on what I examined
2  and obtained information from Detective Cross and
3  through the review of Mr. Craig's illumination of
4  electrical in the area of origin, the time
5  frame -- the -- the fact that the chair or the
6  whatever was supposed to have been smoldering in
7  my opinion wasn't, it would have been detected by
8  at least somebody in the house that would have
9  smelled or saw smoke coming from that particular
10 chair.  And I believe that the chair was set on
11 fire by an open flame when the two people that
12 were there that were still alive on the way out,
13 one of them caused it to happen.
14   Q.   Okay.  So if you can turn to Exhibit --
15 your report.  I think that it's Exhibit 1.  I can
16 see if I can find mine.
17   A.   Okay.
18   Q.   You keep ahold of yours.  I'm sure I've
19 got one here.
20   A.   Okay.
21   Q.   Okay.  So I just wanted to ask you a few
22 questions about this report.
23        So as you testified earlier, you prepared
24 this on September 19, 1995, correct?

Page 179

1    A.   Yes, ma'am.
2    Q.   Okay.  And then we had an opportunity to
3  speak about the first page of the exhibit.  I just
4  wanted to walk through the next couple of pages.
5        The information that is in this section
6  at the top of the second page, for the record
7  SDT-ISFM 06, is this information reflective of the
8  time that the fire occurred or the time you
9  conducted your scene investigation?
10   A.   It was at the time of the fire.
11   Q.   And where did you obtain that
12 information?
13   A.   I looked it up on The Weather Channel.
14   Q.   Towards the bottom of the report, do you
15 see the section that says Evidence?
16   A.   Yes, ma'am.
17   Q.   Okay.  And it says "Number of
18 Exhibits: 4."  Do you know what that is
19 referencing?
20   A.   That the officer, Ray Gergen of the
21 Naperville Police Department, obtained four
22 exhibits.
23   Q.   Okay.  So that's what it's talking
24 about --

Page 180

1    A.   Taken by --
2    Q.   -- the police department?
3    A.   "Taken by" was the next line over.
4    Q.   And do you know if that's referring to
5  the photographs that is documented two lines lower
6  or if it's something else?
7    A.   Something else.
8    Q.   Okay.  As you sit here today, do you know
9  what that is referencing?
10   A.   I have no idea.
11   Q.   And you indicate here that the scene was
12 photographed by James Ensworth of the Naperville
13 Police Department and Lieutenant Ferreri of the
14 Naperville Fire Department.  Where did you obtain
15 that information?
16   A.   From Detective Cross and from Lieutenant
17 Ferreri.
18   Q.   Down at the bottom, it says
19 "Notification."  What's that section -- What's the
20 purpose of that section?
21   A.   If I made any notifications.
22   Q.   Notifications for what reason?  Can you
23 explain to me what notifications you would have
24 made?

Page 181

1    A.   If I was at a fire scene and I was with
2  the fire department and we needed law enforcement,
3  I would have notified that particular law
4  enforcement agency.  If there was a bar -- or not
5  a bar, a liquor store or a church or something
6  like that, because I believe that '95 is when they
7  came up with the church fire thing that we had to
8  notify ATF on all church fires.  They had -- I
9  think the President at the time did a thing for
10 church fires, we had to notify them.  So FBI,
11 that's very rare unless we have a bombing.
12 Coroner if there's a fatal.  Other, it could be
13 equipment; it could be another investigator.  Then
14 I have to put the agency who I would have notified
15 and the person I notified.  So I didn't make any
16 notifications, not at this point.
17   Q.   Thank you.
18   A.   No problem.
19   Q.   And if you flip the page to ISFM07.
20   A.   Yes, ma'am.
21   Q.   Is that top section, is that your, for
22 lack of a better word, short version of the
23 results of your scene investigation?
24   A.   Yes, ma'am.

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 182..185

Page 182

1    Q.    Okay.  And this doesn't include all of
2  the details of your scene investigation, correct?
3    A.    Correct.
4    Q.    And then in the second section, there is
5  a section that says "Does this report close this
6  case?"  And it's marked no.  The reason indicated
7  is "Further investigation will be conducted by
8  investigators from Naperville Police Department
9  and Fire Department and this RA."
10        Is that the discussion we talked about
11  that you had with Lieutenant Ferreri and Detective
12  Cross to obtain additional information related to
13  the fire and the occupants of the unit?
14    A.    Yes.
15    Q.    Okay.  And is that your signature at the
16  end of the report?
17    A.    Yes, ma'am.
18    Q.    And it indicates that you submitted the
19  report on September 19, 1995, correct?
20    A.    Yes, ma'am.
21    Q.    Now I'm going to move to -- I've got a
22  new exhibit.
23        ATTORNEY MEADOR:  Are we on 5?
24        ATTORNEY THOMPSON:  6.

Page 183

1        (Whereupon, Kushner Deposition
2              Exhibit No. 6 was marked for
3              identification.)
4  BY ATTORNEY MEADOR:
5    Q.    Mr. Kushner, I'm showing you what has
6  been marked as Exhibit 6.
7    A.    Sorry.  Hang on one second.
8    Q.    That's okay.
9    A.    I'm trying to get my exhibits in order.
10  I kind of like 4 myself.
11    Q.    Okay.  So for purposes of the record,
12  this is SDT-ISFM 08 and 09.  Do you recognize what
13  that document is, Mr. Kushner?
14    A.    Yes, ma'am.
15    Q.    What is it?
16    A.    It's an adult arrest card.
17    Q.    And what is --
18        THE COURT REPORTER:  I'm sorry.  I'm sorry.  I
19  did not hear that answer.
20        THE WITNESS:  It's an adult arrest card.
21  BY ATTORNEY MEADOR:
22    Q.    And what is an adult arrest card?
23    A.    An adult arrest card has to be filled out
24  any time an arrest has been made on one of our

Page 184

1  cases.
2    Q.    How do you, in a normal course, obtain
3  information that someone is arrested related to
4  one of your investigations?
5    A.    Very rarely.
6    Q.    Okay.  When you do receive notification,
7  how does that notification come to you?
8    A.    Various ways.
9    Q.    Okay.  What are those ways?
10    A.    I can be at another fire somewhere, one
11  of the guys says, By the way, they made an arrest
12  on one of your cases.  And I'm like, Okay.  Thanks
13  for letting me know.  Or I could be in the same
14  town again, and they go, By the way, we made an
15  arrest on this.  Or I could read about it in
16  the -- I don't read the newspaper, but I could
17  hear about it through the grapevine, you know,
18  through the fire department grapevine.  Or I could
19  be at a training place somewhere and say, By the
20  way, you know, just by word of mouth.  Or the
21  police or fire department can call you and say,
22  Hey, we made an arrest on your case.
23        Because I got -- out of a hundred cases,
24  I don't have time to call each one of them and ask

Page 185

1  them if they made an arrest on them.
2    Q.    Okay.
3    A.    I mean, if it's a set fire.
4    Q.    And in this case in particular, where did
5  you obtain this information?
6    A.    This came from Mr.- -- Detective Cross.
7    Q.    Okay.  Do you know when you obtained this
8  information?
9    A.    It was before the trial.  Let's see here.
10  I don't know.  I mean, the day of the arrest was
11  3rd October '95.  So I imagine it would have to be
12  after that.  I think it said in my thing that I
13  talked to him on the 4th, the 4th of October, if I
14  talked to Mr. Cross or Detective Cross.
15    Q.    So this document says "Day and date of
16  arrest:  October 3, 1995."  Do you see that in the
17  upper right-hand corner?
18    A.    Yes, ma'am.
19    Q.    Okay.  So would it be fair to say you
20  obtained the information at some point after the
21  arrest?
22    A.    That would make sense.
23    Q.    Okay.  Did you then fill in this adult
24  arrest card based on the information that

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020
Pages 186..189

Page 186

1   Detective Cross gave you?
2       A.   To be honest with you, I may have been on
3   the phone with him when I was filling it out.
4       Q.   What do you do with this adult arrest
5   card?
6       A.   It gets mailed down to Springfield.
7       Q.   For what purpose?
8       A.   To be put in the file.
9       Q.   And when you say "the file," do you mean
10  your investigative file?
11      A.   Yes, ma'am.
12      Q.   Okay.  And does your -- Strike that.
13           What is contained within an investigative
14  file?
15      A.   I would imagine it would be the report,
16  if there was a canine run done, you know, a canine
17  used on there, or an arrest card, or it could mean
18  a lot of things.
19      Q.   Did you ever read the coroner's report
20  related to this fire?
21      A.   No, ma'am.
22      Q.   And you did not testify at the coroner's
23  inquest for this case, correct?
24      A.   I had no idea they had one.  I guess I

Page 187

1   was not invited.
2       Q.   And on the second page, is that your --
3       A.   Oh, I'm sorry.  We're still on Exhibit 6?
4       Q.   We're still on Exhibit 6, yes.  I'm
5   sorry.  I should say, on both of these pages, is
6   this your handwriting?
7       A.   As neat as it is, I would say yes.
8       Q.   Give me one second.
9       A.   No problem.
10  ATTORNEY MEADOR:  Okay.  Those are all the
11  questions I have for now.
12           I'm going to pass it to Ms. Thompson.
13  ATTORNEY THOMPSON:  Can we go off the record
14  briefly.
15  THE VIDEOGRAPHER:  Off the record, 5:23.
16           (Whereupon, a short break was
17           taken.)
18  THE VIDEOGRAPHER:  Going on the record, 5:24.
19               EXAMINATION
20  BY ATTORNEY THOMPSON:
21      Q.   Mr. Kushner -- Oh, I'm sorry.
22      A.   No.  I can listen and drink at the same
23  time.
24           All right.

Page 188

1       Q.   Thank you for being here.  I have some
2   additional questions.  I know that I'm sitting a
3   little further away from you than Ms. Meador was,
4   so if at any --
5       A.   I can hear you fine.
6       Q.   My point is just if at any point you
7   can't hear me, you're not sure what I said, let me
8   know, because I want to make sure that you're
9   answering the question that was asked, not trying
10  to guess about what I'm -- what I'm saying down
11  here at the other end of the table.
12      A.   Sounds good.
13      Q.   You testified with Ms. Meador that you
14  were there to do an investigation, not the
15  investigation; is that right?
16      A.   Yes, ma'am.
17      Q.   And can you explain to me what you meant
18  by that?
19      A.   The investigation was conducted by the
20  fire and police department prior to my arrival.
21  That would be like if -- I understand my part was
22  an official also part, but it was an investigation
23  to assist them.
24      Q.   And when you talked about your

Page 189

1   conversation with the people from Naperville that
2   were there when you did your walkthrough of the
3   apartment, you said that what you said to them
4   was, "My suggestion.  Take it for what it's
5   worth."
6           Is that right?
7       A.   Yes, ma'am.
8       Q.   And am I right that you ultimately were
9   not the person who made the decision about whether
10  to arrest somebody in connection with this fire,
11  correct?
12      A.   Correct.
13      Q.   And you never represented yourself to
14  anybody investigating it as the person who made
15  that decision, correct?
16      A.   Correct.
17      Q.   And I take it that you never told anyone
18  at any point in the work that you were doing on
19  this fire that you believed Mr. Amor should be
20  arrested?
21      A.   Correct.
22      Q.   And you never told anyone, "I believe
23  Mr. Amor set this fire"?
24      A.   Correct.

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 190..193

Page 190

1    Q.   At the time you submitted your report
2    which we've been looking at, which is Exhibit 1,
3    at that time you were not able to make a
4    determination about the cause of this fire,
5    correct?
6    A.   Yes, ma'am.
7    Q.   And it was not until you were informed by
8    Detective Cross that Mr. Amor had confessed that
9    you were able to reach a conclusion about the
10   cause of this fire, correct?
11   A.   That assisted me in my determination,
12   yes.
13   Q.   You relied on the information that
14   Detective Cross gave you about that statement from
15   Mr. Amor in order to reach your conclusions about
16   the cause of this fire, correct?
17   ATTORNEY MEADOR:  Objection:  Form.
18   THE WITNESS:  Not 100 percent.  That helped
19   make my decision, but I already had an opinion in
20   my mind what occurred.
21   BY ATTORNEY THOMPSON:
22   Q.   Well, your opinion officially prior to
23   hearing that Mr. Amor had confessed was that the
24   cause of this fire was undetermined, correct?

Page 191

1    A.   Correct.  And I can clarify that for you
2    if you want.
3    Q.   Well, we'll come back to that.  But if
4    you had been called to testify under oath at the
5    time that you completed your report on
6    September 19th, you would have testified that the
7    cause of this fire was undetermined, correct?
8    A.   Pending further -- Pending further
9    investigation, yes.
10   Q.   But your official opinion as an official
11   of the Office of the State Fire Marshal, Division
12   of Arson Investigation on September 19th was that
13   the cause of this fire was undetermined?
14   ATTORNEY MEADOR:  Objection:  Form; asked and
15   answered.
16   THE WITNESS:  Yes.
17   BY ATTORNEY THOMPSON:
18   Q.   So and I want to come back to what you
19   said about pending further investigation, but let
20   me ask you this first.  When you were doing your
21   walkthrough of the unit where this fire occurred,
22   were you taking notes?
23   A.   No, ma'am.
24   Q.   And so when you -- you talked about

Page 192

1    preparing Exhibit 1, and I think your testimony
2    was you thought this was something that had to be
3    done with a computer; is that right?
4    A.   Yes.
5    Q.   So did you prepare Exhibit 1 totally from
6    memory?
7    A.   No.  I -- I did have -- I did have notes
8    prior.  I did not take notes during the
9    walkthrough, no.
10   Q.   Okay.  When did you take those notes?
11   A.   When I received the assignment.
12   Q.   Okay.  And that was when you got call
13   saying, "You need to come down here"?
14   A.   Yes, ma'am.
15   Q.   Okay.  So you took some notes then about
16   some of the basics of what you were being told
17   about the fire and the cause?
18   A.   No, ma'am.
19   Q.   Okay.  What did you take -- What did you
20   take notes about when you got the -- when you got
21   the call?
22   A.   The name of the caller, the address of
23   the fire, that there was a fatality, that
24   Lieutenant Ferreri was requesting me to contact

Page 193

1    him in reference to it, gave me the address of the
2    fire, like I said, the alarm time, and it was a
3    multi occupied building.
4    Q.   Have you ever taken any notes related to
5    your work on the investigation into this fire
6    other than the notes you just described?  And
7    maybe just for time frame's sake, let me ask you,
8    as of the time that you got the page from
9    Detective Cross.
10   ATTORNEY MEADOR:  Objection:  Form.
11   THE WITNESS:  That was a long question.  Can
12   you break it up a little bit?
13   BY ATTORNEY THOMPSON:
14   Q.   Sure.
15   A.   I had you up until a certain point, and
16   then I kind of lost you.
17   Q.   So you described some notes that you took
18   when you got the assignment to go assist with this
19   fire investigation, correct?
20   A.   Yes, ma'am.
21   Q.   Okay.  And after you took those notes, up
22   until the time you got that page from Detective
23   Cross, did you take any other notes related to
24   your investigation of this fire?

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 194..197

Page 194

1    A.   No.
2    Q.   Okay.  So, for instance, looking back at
3  Exhibit 1, that's your report.  Do you have that
4  in front of you?
5    A.   Yes, ma'am, right here.
6    Q.   When you -- So on page 3 of that report
7  when you're talking about I think what Counsel
8  described as a summary or the short version of
9  your investigation, at that point, you didn't have
10  any other written summary of what you determined
11  other than the paragraph that you wrote on page 3
12  of Exhibit 1, correct?
13    A.   Correct.
14    Q.   As to your Exhibit 1, while we're here,
15  if you go back to page 1, I think you told us, you
16  know, looking at the incident time and the
17  requested time, that this fire happened the
18  evening of September 10th, and you were called the
19  afternoon of September 13th; is that right?
20    A.   Yes, ma'am.
21    Q.   In your experience working with the state
22  fire marshal's office, is it unusual to have a
23  couple of days pass like in this case before a
24  local agency asks you to get involved?

Page 195

1    ATTORNEY MEADOR:  Objection: Form.
2    THE WITNESS:  It happens, but not -- it
3  doesn't happen a lot.
4  BY ATTORNEY THOMPSON:
5    Q.   Did you have any idea why that happened
6  here?
7    A.   You have to ask them.
8    Q.   But that is unusual in your experience?
9    A.   No, it's --
10    ATTORNEY MEADOR:  Objection: Mischaracterizes
11  the witness' testimony.
12    Go ahead.
13    THE WITNESS:  It's happened before, but I
14  couldn't tell you how many times.  But when people
15  request us, it's up to them to request us.  We
16  don't self respond to anything.
17  BY ATTORNEY THOMPSON:
18    Q.   And they can bring you in at any point of
19  their investigation when they decide that
20  assistance from you might be useful?
21    ATTORNEY MEADOR:  Objection: Calls for
22  speculation.
23    THE WITNESS:  It depends.
24

Page 196

1  BY ATTORNEY THOMPSON:
2    Q.   Well, are there any rules of the State
3  Fire Marshal's Office or professional rules of
4  arson investigation that you're aware of that were
5  in place in 1995 that provided some requirements
6  about how much time needed to pass before somebody
7  could contact you?
8    ATTORNEY MEADOR:  Objection: Form.
9    THE WITNESS:  Are you talking about me as an
10  investigator or me as in my office?
11  BY ATTORNEY THOMPSON:
12    Q.   I'm talking about you as an investigator.
13    A.   They don't have to contact me.  They
14  don't have to have an investigator out at the fire
15  scene, but they do have to make contact to our
16  office by what they call a NIFRS report.  The
17  NIFRS report informs our office that there was a
18  fatality in their jurisdiction.  Whether they call
19  for an investigator or not, that's on them.
20    Q.   They have to tell your office, as you
21  said, there's been a fire and someone died in the
22  fire?
23    A.   Correct.
24    Q.   But they don't have to seek your

Page 197

1  assistance at all?
2    A.   Absolutely not.
3    Q.   And in this case, the Naperville Fire
4  Department had its own fire investigator working
5  on an investigation of this case, correct?
6    A.   Yes.
7    Q.   You described in your time that you went
8  through the apartment, or the unit, I think that
9  you essentially walked it through twice, once by
10  yourself, and then once bringing in the people
11  that were with you to show them what you were
12  looking at; is that right?
13    A.   With less detail, yes.
14    Q.   The first time you went through on your
15  own, how long did that take?
16    A.   I have no idea.  I've never timed myself.
17    Q.   Do you have any idea as you sit here
18  today how long that took?
19    A.   No.
20    Q.   Do you have any idea the second time that
21  you went through in less detail how long that
22  took?
23    A.   No.  From the beginning of my first
24  walkthrough to the end of the second walkthrough

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 198..201

Page 198

1  was -- was the same date.
2      Q.   Right.  And my question is, it sounds
3  like, as you said, that you went through once by
4  yourself, and then a second time where you brought
5  in the people that were with you to show them
6  your -- what you were thinking, correct?
7      A.   Correct.
8      Q.   And so my question is, how long did that
9  second walkthrough take?
10     A.   Shorter than the first one.
11     Q.   Do you have any idea how -- how long?
12     A.   No.  I've never timed myself there.
13     Q.   Okay.  I want to go back too to what you
14 did before going and walking through the unit.
15 You said that you had a meeting at the firehouse;
16 is that correct?  At the fire department?
17     A.   Yeah.  I never met the guy before.  I met
18 him at the firehouse, yeah.
19     Q.   Okay.  And while you were with them at
20 the firehouse, did you look through any
21 photographs of this fire with them at that time?
22     A.   As I stated before, I didn't see
23 anything.
24     Q.   Okay.  So no reports, no photographs,

Page 199

1  nothing?
2      A.   Nothing.
3      Q.   Did you have -- And I don't want to
4  misstate your testimony, so if I'm getting this
5  wrong, I want you to tell me.  Did you have sort
6  of a short conversation with them about what was
7  going on with this fire?
8      A.   Well, to answer your question, like I
9  said before, I didn't want to know anything about
10 it.
11     Q.   So did you talk with them at all about
12 this before meeting with them at the firehouse to
13 go to the unit?
14     A.   They told me there was a fire and a
15 fatal.  That's it.  They didn't say anything about
16 origin and cause or anything else like that, no.
17     Q.   Okay.  So did you literally just kind of
18 meet up there and go to the unit?
19     A.   Yeah.  I mean, normally what I would have
20 done is just go right to the fire scene.  But
21 since I went to the firehouse first, that's where
22 the police department and fire department wanted
23 to meet up with before we went.
24     Q.   Okay.

Page 200

1      A.   I think the fire and police department
2  wanted to show me all the stuff, and I told them
3  I'm not -- I can't -- I don't want to see any of
4  it.
5      Q.   When you walked through the unit, did you
6  have a camera with you?
7      A.   No.
8      Q.   And is that typical for you in your -- in
9  your work when walking through a scene not to
10 bring a camera?
11     A.   Yes.
12     Q.   Did you ever consider bringing your dog
13 into this unit to do some accelerant detection?
14     A.   No.
15     Q.   And why not?
16     A.   I didn't think it was warranted.
17     Q.   Why is that?
18     A.   The fire -- Like I said, the fire was all
19 up high.  It traveled upward and outward, and
20 there was no signs of any type of liquid on
21 anywhere that I thought there would be or should
22 be or could be.
23     Q.   Did you talk with anyone about whether
24 they had done some attempts to collect debris

Page 201

1  prior to you coming with the dog?
2      ATTORNEY MEADOR:  Object to form.
3      THE WITNESS:  I kind of missed part of your --
4  Are you saying when I was at the scene, when I was
5  at the fire scene and somebody mentioned -- yeah,
6  somebody did say -- at the end, remember I said at
7  the end, we had a discussion, and that's when they
8  told me that the evidence technician took samples.
9  BY ATTORNEY THOMPSON:
10     Q.   And that's while you were there, when
11 they told you --
12     A.   That was the day of the fire.  I wasn't
13 there.
14     Q.   Okay.  You understood in giving the
15 opinion that you were giving after you did your
16 walkthrough that the people that were
17 investigating this fire from Naperville were going
18 to use that information to aid in their
19 investigation; is that right?
20     A.   I sure hope so.
21     Q.   I mean, you yourself did not interview
22 any witnesses, correct?
23     A.   Nope.
24     Q.   And you never told anyone that that was a

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 202..205

Page 202

1  step you were going to take?
2      A.   No.
3      Q.   Did you ever talk to any of the
4  firefighters who responded to the scene of this
5  fire?
6      A.   No.
7      Q.   Did you talk with anyone --
8      A.   Wait, wait, wait, wait.  The firefighter
9  part, you're talking about the day of the fire or
10 when I was out there?  Because I could have talked
11 to them after the fire.  You know what I mean, at
12 a meeting or training or something.  Somebody that
13 was there may have said something.  So I have to
14 clarify that.  I did not talk to any firefighter,
15 police officer, anything about the fire or
16 anything like that before I did my walkthrough and
17 my second one.  After that, I may have seen a guy
18 at a conference or something, or even Ferreri
19 somewhere, and he may have mentioned something.
20 But yes, I did talk about it, but it wasn't prior
21 to -- prior to my initial and secondary
22 examination.
23     Q.   And prior to testifying in Mr. Amor's
24 trial, did you ever try to get information about

Page 203

1  what the firefighters that had responded to this
2  fire had said about what they observed there?
3      ATTORNEY MEADOR:  Object to form.
4      THE WITNESS:  I mean, you know, it might have
5  been passing at another fire.  I don't know.  I
6  didn't -- I didn't go out and search -- I did not
7  go out and seek that information.  It might have
8  been relayed or told to me at another fire.
9  BY ATTORNEY THOMPSON:
10     Q.   But was it -- I mean, is it your
11 expectation that other people investigating this
12 fire might seek out that information?
13     A.   What they did is you have to ask them.
14     Q.   Well, as a fire investigator, it can be
15 helpful to know what responding firefighters at
16 the fire's behavior, correct?
17     A.   Oh, absolutely.
18     Q.   There's a lot you can tell from that,
19 correct?
20     A.   Oh, absolutely.
21     Q.   And that's not information that you ever
22 represented to anybody from Naperville that you
23 were taking into account?
24     A.   No.  I never spoke to them.

Page 204

1      Q.   We talked a little bit about the scene as
2  you saw it when you were at the unit.  And then we
3  talked a little bit about the overhaul, or you
4  talked a little bit with Ms. Meador about the
5  overhaul process?
6      A.   Mm-hmm.
7      Q.   So the overhaul process is when
8  firefighters are going through the scene to make
9  sure that there's not fire that's still hidden in
10 the walls or the ceiling or somewhere else,
11 correct?
12     A.   Correct.
13     Q.   And as you talked about, there is some
14 additional destruction of the walls or ceiling
15 that might take place during that overhaul,
16 correct?
17     A.   Yes.  I was talking about the hallway by
18 the bathrooms, yes.
19     Q.   Okay.  In general, when you were looking
20 through the unit, was it your belief in the scene
21 that you were looking at that there was not much
22 overhaul that had been done at this fire?
23     ATTORNEY MEADOR:  Object to form; foundation.
24     Go ahead.

Page 205

1      THE WITNESS:  Thank you.
2      I kind of missed the ending.  The amount
3  of -- amount of overhaul?  I -- I -- I --
4  BY ATTORNEY THOMPSON:
5      Q.   Yeah.  Let me --
6      A.   You kind of -- You kind of phased out
7  towards the end, and then I heard the beginning
8  and all of a sudden you kind of got soft on me.
9  So I didn't hear the whole thing.
10     Q.   I want to -- Let me ask the question
11 again.
12     At the time you were looking through this
13 unit --
14     A.   Correct.
15     Q.   -- what was your understanding about how
16 much overhaul had been done at the scene of this
17 fire?
18     ATTORNEY MEADOR:  Same objection.
19     THE WITNESS:  It was minimal.
20 BY ATTORNEY THOMPSON:
21     Q.   And did someone tell you that there was
22 minimal overhaul?
23     A.   Yes.
24     Q.   Who told you that?

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 206..209

Page 206

1    A.    That would have been Lieutenant Ferreri.
2    Q.    Did Lieutenant Ferreri tell you that he
3  had actually raised at a later meeting at the fire
4  department his concern that the overhaul efforts
5  here had been too extensive?
6    A.    No.
7    Q.    Did he tell you that a number of items
8  from this unit had actually been pushed out
9  that -- those balcony doors during fire
10 suppression and had to be located and brought back
11 up into the unit?
12   ATTORNEY MEADOR:  Objection:  Form and
13 foundation.
14   THE WITNESS:  I don't remember that.
15 BY ATTORNEY THOMPSON:
16   Q.    Did he tell you that those walls and
17 ceilings that you are looking at in these
18 photographs of the living room that we talked
19 about were pulled down by firefighters during
20 overhaul?
21   ATTORNEY MEADOR:  Objection:  Form.
22   THE WITNESS:  I don't remember if I had that
23 conversation with him.  I mean as referenced to
24 the drywall in that room.

Page 207

1  BY ATTORNEY THOMPSON:
2    Q.    Well, would the amount of overhaul and
3  why the living room looked the way it looked
4  potentially have impacted your belief about the
5  behavior of this fire while it was burning?
6    ATTORNEY MEADOR:  Objection:  Form.
7    THE WITNESS:  The patterns and the fire -- The
8  patterns that I saw, even with the ceiling down
9  that was missing from the area, I still
10 determined that -- my fire patterns led me back to
11 that corner, that section of the room.  So I don't
12 think the patterns on the ceiling if they were
13 there or not would have -- it would have helped if
14 they were there, but it didn't hinder it as much.
15 BY ATTORNEY THOMPSON:
16   Q.    Well, what about the condition of the
17 furniture itself, would it have been relevant to
18 your opinion if any of those pieces of furniture
19 had been damaged during overhaul as opposed to
20 during the fire?
21   A.    I did not -- I didn't see that.  That
22 was -- I didn't see any damage from overhaul or
23 the couch or the upholstery chair that was gone.
24 It was extensively damaged.

Page 208

1    Q.    Well, the chair was gone, right?
2    A.    It was burned away, yes.
3    Q.    But that's your assumption is that it
4  burned away as opposed to being broken during
5  overhaul or something like that, right?
6    A.    I saw that pile of ashes, not broken
7  wood.
8    Q.    Well, you couldn't -- Well, let's look at
9  this.  Let's look at it.
10   A.    Let's look at it.
11   Q.    This is Exhibit 5.  I'm going to direct
12 you to, in Group Exhibit 5 SDT-SAO 22988.  That's
13 near the -- you know, five or six from the end, so
14 let me know when you're there.
15   A.    Mm-hmm.
16   ATTORNEY THOMPSON:  Is everybody there?
17   ATTORNEY MEADOR:  Mm-hmm.
18 BY ATTORNEY THOMPSON:
19   Q.    So, Mr. Kushner, when we look at
20 SDT-SAO 22988, the picture we're looking at is
21 actually sitting on top of a bucket, right?
22   A.    There's a base of something on the
23 bucket, yes.
24   Q.    I mean, what -- what you see in this

Page 209

1  picture is a bucket with a red bottom.  And then
2  so what remains of the chair is sitting on top of
3  that bucket, right?
4    ATTORNEY MEADOR:  Objection:  Asked and
5  answered.
6    THE WITNESS:  I'm sorry.  Oh, I'm trying --
7  Yeah.  There is an object that looks like a base
8  of something that is on the bucket; yes, ma'am.
9  BY ATTORNEY THOMPSON:
10   Q.    Okay.  And I'm not asking this question
11 to be funny.  But it's not your understanding that
12 when this chair originally was in this unit before
13 the fire that it was sitting on top of a bucket?
14   A.    I never met them before.
15   Q.    Okay.  Do you -- Did you consider it
16 possible in your analysis of this fire that the
17 bucket was there before the fire?
18   A.    No.
19   Q.    I mean, that's a fire collection --
20 That's a debris bucket of some kind from the fire
21 effort, right?
22   ATTORNEY MEADOR:  Objection:  Foundation.
23   THE WITNESS:  To be honest with you, I never
24 saw that bucket in my life before.

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 210..213

Page 210

1  BY ATTORNEY THOMPSON:
2      Q.   So when you saw the chair, it was not
3  sitting in a bucket?
4      A.   No, ma'am.
5      Q.   And was it your understanding when you
6  looked at the scene that this chair had never --
7  had basically burned where it sat, as you saw it,
8  went you went through the apartment?
9      A.   Yes.  When I looked -- When I went
10 through the apartment, the base of that swivel
11 chair was right where it was on the floor next to
12 the couch.
13     Q.   Okay.  Does this picture raise a question
14 to you as to how the chair was handled before you
15 saw the scene?
16     A.   I don't know when these pictures were
17 taken.
18     Q.   Well, if this picture predates you
19 looking at the unit, does it raise questions for
20 you about how the chair was handled before you got
21 to the scene?
22     A.   If you're saying that's the same chair
23 base.
24     Q.   And that's a good question.  So --

Page 211

1      A.   How do you know that's the -- How do you
2  now that's the chair base of the chair that was in
3  the -- at the southwest area?
4      Q.   And I appreciate that question.  Let
5  me --
6      A.   So do I.
7      Q.   Let me ask you this question:  Does that
8  look to you like the same chair you saw in the
9  corner?
10     A.   I -- I don't know.  All I know is is that
11 when I went through the first time ever and I saw
12 the base of a chair sitting in the area of origin.
13 Where the other -- this piece came from, it could
14 have came from any -- I don't know where it came
15 from.
16     Q.   In this picture we're looking at where
17 the bucket is, is that more or less where you saw
18 the chair when you went through the scene?
19     ATTORNEY MEADOR:  I'm sorry.  Can you read
20 back the question please.
21         (Whereupon, the record was read as
22          requested.)
23     ATTORNEY MEADOR:  Objection:  Form.
24     THE WITNESS:  I'll answer it the same way.

Page 212

1  When I was going through the fire scene, I saw the
2  remains of a swivel chair, upholstered chair
3  bottom base in the area of origin.  I do not know
4  where this particular frame came from.
5  BY ATTORNEY THOMPSON:
6      Q.   I understand.  My question is, is this
7  bucket in this picture, SDT-SAO 22988 more or less
8  in the same location where you saw the remnants of
9  an upholstered chair when you went through the
10 unit?
11     ATTORNEY MEADOR:  Objection:  Form; asked and
12 answered.
13     THE WITNESS:  No.
14 BY ATTORNEY THOMPSON:
15     Q.   Can you tell -- Well, let me ask you
16 this.  Is this -- Does this picture, SDT-SAO 22988,
17 include in it the area where you did see the
18 remnants of an upholstered chair when you went
19 through your walkthrough?
20     A.   Yes.
21     Q.   And where relative to where the bucket is
22 did you see the remnants of the chair?
23     A.   It would be to the southwest.
24     Q.   So is that behind the bucket?

Page 213

1      A.   Southwest is behind it, yes.
2      Q.   Okay.  Do you see a chair behind this
3  bucket?
4      A.   No, not in this photo.
5      Q.   So this photo depicts the same area you
6  looked at, but it's in a different condition than
7  when you saw that area, right?
8      ATTORNEY MEADOR:  Objection:  Form.
9      THE WITNESS:  I don't know.  That sounds like
10 double talk.  Yes.  The bucket wasn't there when I
11 was there.  I don't know when these pictures were
12 taken.
13 BY ATTORNEY THOMPSON:
14     Q.   Well, my question is, we've talked about
15 some of the differences.  And my question is given
16 that there are some differences, if this picture
17 was taken before you saw the scene, does that
18 raise concerns for you about the condition of the
19 scene as you saw it?
20     ATTORNEY MEADOR:  Objection:  Asked and
21 answered.
22     THE WITNESS:  The burn patterns and what I
23 found are my standings as what I found.  I don't
24 know where that base that you're pointing at on

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 214..217

Page 214

1  the bucket came from.  It could have came from
2  anywhere.
3  BY ATTORNEY THOMPSON:
4      Q.   Well, if you don't know where -- if you
5  don't know whether it's possible that that chair
6  was somehow moved before you saw it, then how can
7  you definitively say that those burn patterns are
8  associated with the chair?
9      A.   I'm talking about they're associated
10  with -- the burn patterns are associated with the
11  chair base because I saw it in a pile of ashes.
12  And as far as this piece, can you tell me that
13  that was the same piece?
14      Q.   Well --
15      A.   So I mean, so if you went behind that
16  bucket and found another base of a chair, this
17  base could have come from -- I don't know where
18  this piece came from.  All I'm saying is that when
19  I examined the room, that's what I saw.  You can
20  ask me 20 different ways.  I'm going to give you
21  the same answer.
22      Q.   Well, and my question is this:  If your
23  patterns about those V patterns being associated
24  with that chair based on your assumption that the

Page 215

1  scene that you saw at the time you went through --
2  at the time you went through the unit represents
3  where those items were at the time of the fire.
4      A.   I can only answer half your question
5  because then you say "those items."  You're
6  talking about the one in the bucket?  I don't know
7  what that -- where that's from.
8      Q.   We agreed, I think, and let me ask you
9  this, I mean, we both agree that it does not seem
10  that this bucket was there when you saw the scene,
11  correct?
12      A.   Correct.
13      Q.   So I'm going -- I'm setting aside the
14  bucket and going back to the scene that you saw.
15  And my question is, as to the scene that you saw
16  when you went through the unit, are your opinions
17  about the importance of those V patterns based on
18  your assumption that the furniture that you saw
19  when you went through the unit was in the same
20  place that that furniture had been at the time of
21  the fire?
22      A.   Yes.
23      ATTORNEY MEADOR:  Objection.
24          Hang on.

Page 216

1      Objection:  Form.
2      THE WITNESS:  Yes.
3  BY ATTORNEY THOMPSON:
4      Q.   I don't think we finished with this issue
5  with Ms. Meador, although I know there were a
6  number of questions about it.  But I want to take
7  you back briefly to this issue of the VCR.
8      ATTORNEY MEADOR:  I'm going to object to form.
9          Is that a question.
10  BY ATTORNEY THOMPSON:
11      Q.   I'm trying find the photo that I want to
12  show you.
13          Let's go back to Exhibit 3, and I want to
14  direct you to SDT-SAO 22785.  And maybe you should
15  also --
16      A.   You said 785?  I'm sorry.
17      Q.   22785.
18      A.   Okay.
19      Q.   And let me also suggest from Group
20  Exhibit 5, let's go back up SDT-SAO 22995.
21      A.   22995?
22      Q.   Yes.
23      A.   I got 94.  Where is 95?
24      Q.   I'm happy to just show you my copy.

Page 217

1      A.   Hang on.  Hang on.
2      ATTORNEY MEADOR:  It should be the very last
3  page.
4      THE WITNESS:  I think I got them mixed up.
5          Here it is.  I must have missed that day
6  in school.  Okay.  You've got me at 22785 and
7  22995?
8  BY ATTORNEY THOMPSON:
9      Q.   So 22995 is the object that I think you
10  said you believe was the remnants of the VCR?
11      A.   Yes.
12      Q.   Okay.  So in that other picture, 22785,
13  is -- do you see the remnants of the VCR in this
14  photo?
15      ATTORNEY MEADOR:  Hold on.
16          I'm just going to -- it's a belated
17  objection as to it mischaracterizes the witness'
18  testimony.
19          But go ahead.
20  BY ATTORNEY THOMPSON:
21      Q.   Well, in light of that objection, let me
22  ask you this.  When you --
23      A.   You're asking me?  Or I'm about to ask
24  you.

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 218..221

Page 218

1    Q.   I don't get to ask questions of
2    Ms. Meador.
3    A.   Sounded like you had to ask her a
4    question.
5    Q.   So looking back at SDT-SAO 22985, do you
6    have any idea what this item is?
7    A.   Yes.  It looks to me like the remains of
8    a TV and some components underneath it.
9    Q.   Okay.  And so when you look at the other
10   photo, SDT-SAO 22785, do you see the item as you
11   determined it --
12   A.   You know what's kind of funny?  I think I
13   do.
14   Q.   Okay.
15   A.   Because -- Yeah, I do, actually.  I do.
16   I'm sorry.  I -- I do, yes.  I see it in the
17   picture.
18   Q.   You understand my question --
19   A.   Yes.
20   Q.   I'm asking you where it is in 22785.
21   A.   Right.
22   Q.   If you could maybe hold the photo up like
23   you were before.
24   A.   Yeah.  No.  I just realized where it was

Page 219

1    at.  I just realized it.  It's like Where's Waldo?
2    I just found Waldo.  I can tell you where it was
3    at.
4         This is the one you're telling me about
5    (indicating)?
6    Q.   Yeah.
7    A.   So if you look -- You want me to show
8    you?
9    Q.   Sure.
10   A.   If you look between the garbage, look at
11   the -- look at the, for lack of a better thing,
12   look at the outlet.  Do you see the outlet by the
13   two strips on the wall, the south -- the west
14   wall?
15   Q.   You're talking about to the right of
16   the -- to the right of the door?
17   A.   Yeah.  You've got to follow that outlet
18   down, and then you've got the heater thing, the
19   metal object there, that rectangle thing that's
20   going sideways.  Now look at the -- you can just
21   make out the -- Okay.  So you see the chair is
22   laying down on its back?
23   Q.   I'm going -- I'm going to --
24   A.   It's right there.  The object that we're

Page 220

1    talking about is right there between the brown
2    paper bag and that -- the metal -- horizontal
3    metal object by the outlet down behind right
4    there.
5    Q.   I'm going to suggest this.  And I'm happy
6    to give you a pen for the question if you need to
7    take this -- Oh, Yeah.  I mean, that's fine.
8    A.   Should I point and give it to these guys
9    like this and show them?
10   ATTORNEY MEADOR:  I don't think those --
11        (Multiple voices.)
12   BY ATTORNEY THOMPSON:
13   Q.   I'm just going to ask you to circle where
14   on 22785 --
15   A.   Sure.
16   Q.   -- you see the object we've been talking
17   about.
18   A.   Okay.
19   Q.   Can you hold that up for the ...
20   THE VIDEOGRAPHER:  Good.
21   THE WITNESS:  Thank you.
22   BY ATTORNEY THOMPSON:
23   Q.   While we're looking at 22785 --
24   A.   It doesn't say how much work this is as

Page 221

1    well.
2    Q.   While we're looking at 22785, we've been
3    talking about those bags on the right side.  Do
4    those look to you like they're part of evidence
5    collection efforts, the two paper bags on the
6    right?
7    A.   Yes.
8    Q.   And then in the middle of this picture,
9    do you see what looks like maybe a flood light in
10   the middle, it's on a red base?
11   A.   Yes.
12   Q.   And I take it that's also part of the
13   investigation or cleanup efforts?
14   A.   Okay.  I just consider it a scene light.
15   Q.   Okay.  But it's not your understanding
16   that scene light was originally in this apartment?
17   A.   No.
18   Q.   And then if you look to the back of this
19   photo where those balcony doors were that we're --
20   we've been talking about, where the opening for
21   those balcony doors are, you see a number of items
22   that are lined up in that entryway to that door?
23   A.   Yes.
24   Q.   Were those items there when you went

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020                          Pages 222..225

Page 222

1  through the scene?
2      A.   See, that door was boarded up when I got
3  there.  There was nothing in front of it.
4      Q.   Okay.  So all that kind of, for lack of a
5  better word, that debris that's there on the
6  floor, that was not there when you got there?
7      ATTORNEY MEADOR:  Objection:  Form;
8  foundation; calls for speculation.
9      THE WITNESS:  Same answer.
10 BY ATTORNEY THOMPSON:
11     Q.   Okay.  When you -- Let me ask you this.
12 You, it sounds like, took care before you went to
13 the scene, as you said, not to be painted by what
14 other people had done on this investigation so
15 far, correct?
16     A.   Yes, ma'am.
17     Q.   And did you ever learn from Mr. Ferreri,
18 for instance, what his opinions were, to the
19 extent he had any, about this fire?
20     A.   I never asked him.  I could say that was
21 a good question, because I don't think I ever
22 asked him.
23     Q.   Did any of the police personnel who were
24 investigating this fire ever give you any of their

Page 223

1  opinions about this fire?
2      A.   No.
3      Q.   And was it your understanding --
4      A.   Let me back up.  When he called and told
5  me about when Detective Cross mentioned about the
6  confession, all those stories, and all that, then
7  that's -- that's probably when I kind of caught on
8  that Mr. -- Detective Cross -- I never asked him
9  what he thought, to be honest with you.  Because
10 you know what?  I was there for -- to help them --
11 whatever -- that's a funny question.  I don't
12 think I ever asked them what their opinions were.
13 You know what?  That -- I'm going to learn from
14 that, Counselor.  I'm serious.  I don't think I
15 ever asked either one of them what their opinion
16 was.  And I wasn't allowed to sit in their
17 courtroom testimony.  I don't even know if both of
18 them testified.  But that's a great question.  I
19 don't think I ever asked him.
20          Man, oh, man, I should call and ask him.
21 I know he's retired, Ferreri is retired, but I
22 never asked him.
23     Q.   When you finished your work at the scene
24 and you then went and prepared your report that is

Page 224

1  Exhibit 1, had you learned anything else about
2  this fire?
3      A.   Okay.  So let me just back up a little
4  bit about my report.  A lot of times what I do is
5  I start my first two sheets, the pages, and then I
6  do the narrative later on when I have time if I
7  don't do it.  So there was a chance that I did the
8  two front pages right from my field notes when I
9  did it that day of the fire but then waited -- I
10 had to wait because I might have had, like,
11 20 other fires since.  That's probably why I
12 didn't finish my narrative.  So just because it
13 says the 19th of September is when I submitted it
14 for approval, the first two pages might have been
15 finished the day after I was there.  You know what
16 I'm saying?
17          So when you asked me if I did the third
18 sheet by memory, I could have typed it but not
19 submitted it because I might have been waiting for
20 further information.  I don't -- I may have been
21 waiting just to see what happened.
22     Q.   And that is my question.  At the time you
23 completed the entire report --
24     A.   Yes.

Page 225

1      Q.   -- including page 3 and you submitted it
2  to your supervisor for approval, had you learned
3  anything else about this fire other than what you
4  knew at the time you finished the walkthrough?
5      A.   It was still under investigation.
6      Q.   And during that time from when you left
7  the scene of your walkthrough till when you
8  completed this report, you did not talk to anybody
9  from Naperville about this fire?
10     A.   Not until -- I believe not until
11 Detective Cross paged me and said what he told
12 them.
13     Q.   That is the next time anybody from
14 Naperville contacted you about this?
15     A.   Yeah.  I got -- I mean, I don't -- I
16 don't recall ever calling them, but I -- I mean, I
17 had other fires to do.  That wasn't the only one
18 for that year.
19     Q.   You've gone through I think with Ms.
20 Meador what it is that Mr.- -- what it is that
21 Detective Cross told you on the phone when he
22 paged you.  Is there anything else that he told
23 you at the time he talked to you other than what
24 you've testified about so far?

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 226..229

Page 226

1    A.   No, ma'am.

2    Q.   He did not at that time send you copies
3  of any additional reports; is that right?

4    A.   No.

5    Q.   And he did not give you information about
6  any other interviews that Naperville conducted; is
7  that right?

8    ATTORNEY MEADOR:  Wait.  Hold on.

9    THE WITNESS:  Oh, I'm sorry.

10   ATTORNEY MEADOR:  No, that's okay.

11       I'm just going to object to the extent
12  that it includes what the witness has already
13  testified to.  I don't know if you had that same
14  qualification on that question.

15  BY ATTORNEY THOMPSON:

16   Q.   Let me be clear, then.  You've testified
17  that he gave you some information about what he
18  said Bill Amor told him, right?

19   A.   When he paged me, yes.

20   Q.   Right.  Other than that, did he give you
21  any other information about any other
22  investigative steps that Naperville took as part
23  of that investigation?

24   ATTORNEY MEADOR:  Objection:  Form, and it

Page 227

1  mischaracterizes the witness' testimony.

2    THE WITNESS:  The next time I heard from
3  Detective Cross about anything about the fire was
4  the fact there was an arrest made.

5  BY ATTORNEY THOMPSON:

6    Q.   And is that -- When you're saying the
7  next time you had heard from him was when you
8  heard there had been an arrest, was that the same
9  time that we've been talking about where he pages
10  you and then says that statement, or was there
11  another call?

12   A.   No.  He did not tell me anything about an
13  arrest being made when he paged me and told me
14  about the information.  On the 4th of October,
15  it's somewhere in my statement, I talked to him
16  again I think on the 4th of October.  And that's
17  when I heard that there was an arrest made.  So it
18  wasn't one of those things where I kept contact
19  with him because, you know what?  I had other
20  things going.  I mean, this -- Unfortunately, I
21  had more fires to go to.  So, I mean, Naperville's
22  fatal was just one of many that I went to.

23   Q.   Their investigation is not your
24  investigation, right?

Page 228

1    A.   No.  That's what I said earlier.  They
2  were conducting the investigation.  I was there to
3  render an opinion to assist them in the origin and
4  cause of the fire if I could.

5    Q.   So this October 4th call, tell me what
6  you remember about that conversation.

7    A.   That there was an arrest made, and I
8  asked for the information.  And I just --
9  Actually, I think I asked him on the page call
10  when I called him, I said, If there's an arrest
11  made, call me.  And I think he paged me or called
12  me.  I think he paged -- I think we paged all the
13  time back then.  And he called or paged him -- or
14  I paged him, he called me back, he said there was
15  an arrest made.  I said I need the information.  I
16  got the information.  That's basically how it went
17  down.

18   Q.   And you used that to make Exhibit 6 that
19  we --

20   A.   I have to because my office requires me
21  to have one filled out on an arrest.

22   Q.   Did you talk to any investigators from
23  Naperville again after that October 4th call up
24  until the time of -- up until after you testified

Page 229

1  at Mr. Amor's criminal trial?

2    ATTORNEY MEADOR:  Objection:  Form;
3  mischaracterizes the witness' testimony.

4    THE WITNESS:  Talked to them as far as this
5  investigation or talked to them in general?

6  BY ATTORNEY THOMPSON:

7    Q.   Talked to them about this investigation.

8    ATTORNEY MEADOR:  Same objection.

9    THE WITNESS:  I don't know.  I don't know if I
10  did too many -- I didn't do many fires in
11  Naperville.  So if I would have saw him at another
12  fire, he would have mentioned -- somebody would
13  have said they made an arrest on it.  But again,
14  that was just in passing, you know what I mean?  I
15  didn't seek out any information from anybody out
16  there about it.  So if there was, it was all in
17  passing.

18  BY ATTORNEY THOMPSON:

19   Q.   So when you talked about being able to
20  listen to the 911 call, is that something you did
21  with the prosecutor in preparation for your
22  testimony?

23   A.   Yes.

24   Q.   So that's not something that you did with

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 230..233

Page 230

1 Detective Cross or Investigator Ferreri?
2      A.   They may have been there.
3      Q.   Were they there?
4      A.   I think I've only been prepped once.  I
5 don't know who was there because there was two
6 attorneys.  I was talking to a female attorney
7 named Bobbie O'Leary or Myrtle O'Leary (phonetic).
8 There was a male attorney.  And as far as
9 everybody was doing their thing.  So I don't
10 remember if Detective Cross was sitting there when
11 I heard it or Dave Ferreri was.  But I know I
12 heard it.
13     Q.   And was that something that you did close
14 in time to your testimony in -- Mr. Amor's
15 trial?
16     A.   It was before the trial, yes.
17     Q.   How much before the trial?
18     A.   I don't know.  It wasn't that far.  It
19 wasn't that -- I don't know.  It was before the
20 trial, but it wasn't that far back.  It was closer
21 to the trial than not.  Does that make sense?
22     Q.   Yes.
23          Did you at that time after October 4th --
24 Well, let me start the question again.

Page 231

1          After October 4th, did you, other than
2 listening to that 911 call -- Well, let me
3 actually ask you this first.  The other thing you
4 did, you said, was watched some video of the fire
5 from outside?  Or did you --
6      A.   No.  I don't know if I saw a picture of
7 it.  I didn't see a video of it.
8      Q.   Did you look at just one picture of the
9 outside or --
10     A.   There's -- Exhibit 5 has a couple of
11 pictures, but I only -- I saw one or two of them.
12     Q.   And that was also closer in time to the
13 trial that you saw those pictures?
14     A.   Yes.
15     Q.   And was that something that you looked at
16 with the prosecutor?
17     A.   Yes.
18     Q.   Okay.  Other than looking at those photos
19 and listening to the 911 call, is there any other
20 information that you received about this
21 investigation between when you talked with
22 Detective Cross on October 4th and when you
23 testified?
24     ATTORNEY MEADOR:  Objection:  Form;

Page 232

1 mischaracterizes the witness' testimony.
2     THE WITNESS:  Sure was a long question, but
3 I'll have to say no.
4 BY ATTORNEY THOMPSON:
5     Q.   You talked about the smoke detector.  Did
6 you, at the time you were at the unit doing your
7 walkthrough, ever do anything to look for a smoke
8 detector?
9     ATTORNEY MEADOR:  Objection:  Asked and
10 answered.
11    THE WITNESS:  When I went into the bathroom in
12 the hallway, I did not see any remnants of any
13 smoke detector on the floor.  I didn't see it in
14 the hallway.  And I asked if there was one
15 present, and that was Mr. Ferreri stated that
16 they -- that there was no -- there wasn't one
17 present, or at least it wasn't going off, and they
18 could not find it when -- at the time right after
19 the fire.
20 BY ATTORNEY THOMPSON:
21    Q.   You said that when -- Well, we went
22 through some of your testimony where you talked
23 about seeing papers behind the chair.  Do you
24 recall looking at that testimony?

Page 233

1      A.   Yes, ma'am.
2      Q.   Can you describe the papers that you saw
3 behind the chair?
4      A.   Stacked papers with brown toasted edges
5 and dirt on top, fire debris on top.
6      Q.   What kind -- What kind of papers were
7 they, could you tell?
8      A.   A stack -- I didn't go through them.
9 Again, I didn't -- I didn't want to touch anything
10 because I didn't want to spoil any of the
11 evidence.
12     Q.   When you talk about them being papers,
13 were they personal papers?
14     A.   I didn't have an opportunity to --
15     ATTORNEY MEADOR:  Objection:  Form.
16     THE WITNESS:  Oh, sorry.
17     ATTORNEY MEADOR:  That's okay.
18 BY ATTORNEY THOMPSON:
19     Q.   Were they a stack of papers like if I'm
20 holding up to you some of the exhibits from
21 this -- we've been looking at at this hearing, is
22 that the kind of paper we're talking about?
23     ATTORNEY MEADOR:  Objection:  Form;
24 foundation.

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 234..237

Page 234

1    THE WITNESS:  It was paper.  I don't remember
2  how high it was stacked, but it was stacked
3  papers.
4  BY ATTORNEY THOMPSON:
5    Q.   Was it --
6    A.   I don't believe it was newspaper.  I
7  don't know.
8    Q.   Was it cardboard?
9    A.   I don't believe so.  I believe it was
10  just papers.
11    Q.   Let go back briefly to the photographs.
12  And let me refer you to 22988.
13    A.   Is this Exhibit 3?
14    ATTORNEY FLETCHER:  Exhibit 5.
15  BY ATTORNEY THOMPSON:
16    Q.   It is Exhibit 5.
17    A.   Thank you.  And what was the number?
18    Q.   22988.
19    A.   There it is.  Okay.
20    Q.   Can you see in Exhibit -- in this photo,
21  SAO 22988, the photos -- or, excuse me, the papers
22  that you were talking about?
23    A.   No, ma'am.
24    Q.   We talked a little bit about this bucket.

Page 235

1  But as to what's in the corner of this photo
2  between the wall and the remnants of the couch, do
3  you see there are a bunch of items there?
4    A.   Yes, ma'am.
5    Q.   Were those items there when you went
6  through the unit?
7    A.   I don't believe so.
8    Q.   Were the papers that you saw roughly in
9  the area of where that -- those items are in this
10  picture?
11    A.   It was against the wall.  It was against
12  the south wall behind the remnants of the chair
13  frame or the chair base.
14    Q.   Okay.  Was it your belief when you were
15  going through the scene that the papers you were
16  seeing had something to do with the cause of the
17  fire?
18    A.   No, ma'am.
19    Q.   So you never saw any newspaper at the
20  scene that you believed was connected with the
21  fire?
22    A.   I did not see any paper that was
23  connected with the fire as far as the starting of
24  the fire.

Page 236

1    Q.   When you testified at Mr. Amor's trial,
2  was there anything that you were relying on as a
3  basis for your opinions other than your own
4  observations during the walkthrough, any
5  information that Detective Cross gave you about
6  Mr. Amor's statement, the 911 call, and the
7  photographs that you reviewed?
8    ATTORNEY MEADOR:  Objection:  Form.
9    THE WITNESS:  I missed you somewhere.  I got
10  the ending of it with the pictures, the 911, and
11  the statement from Mr.- -- from Detective Cross
12  about what Mr. Amor stated to him.  What was the
13  beginning?  I didn't get it.
14  BY ATTORNEY THOMPSON:
15    Q.   My question is, when you gave the
16  testimony that you gave at trial --
17    A.   Yes.
18    Q.   -- was there any information that you
19  were relying on to reach your opinions about the
20  cause and origin of this fire other than your own
21  observations of walking through the unit, the 911
22  call you listened to, the photos that you looked
23  at, and what Detective Cross told you about
24  Mr. Amor's statement?

Page 237

1    A.   No.  No.
2    ATTORNEY MEADOR:  Objection --
3    THE WITNESS:  No.
4    ATTORNEY MEADOR:  Mischaracterizes the
5  witness' testimony.
6    THE WITNESS:  No.
7  BY ATTORNEY THOMPSON:
8    Q.   Have I mischaracterized your testimony
9  that those are four things that you relied on in
10  giving your testimony in this case?
11    A.   There are things that he did that he --
12  Yes, my testimony is that yes, those are the
13  things that I helped -- that helped rely on my
14  decision.
15    Q.   Did you ever tell anyone from Naperville
16  that you believed that this fire began -- Let me
17  start the question one more time.
18    Prior to being notified by Detective
19  Cross that Mr. Amor had been arrested, had you
20  ever told anyone from Naperville that you believed
21  that this fire was set by means of using vodka as
22  a volatile liquid to ignite the fire?
23    A.   No.
24    Q.   Is that an opinion you ever offered to

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 238..241

Page 238

1   anyone before you testified at Mr. Amor's criminal
2   trial?
3       A.   No.
4       Q.   We talked a little bit about the color of
5   the flames, and you looked at, I think, the photo
6   that shows the flames coming through that door.
7   And I think you said that from looking at the
8   color of those frames, you could tell it's a
9   petroleum product?
10      A.   Yes.
11      Q.   And when you say that, do you mean that
12  the thing that is burning in the unit is a
13  petroleum product?
14      A.   Yes.
15      Q.   Is polyurethane foam a petroleum product?
16      A.   Yes.
17      Q.   I mean, chairs have petroleum -- can be
18  made of petroleum products, correct?
19      A.   Yes.
20      Q.   So your conclusion is -- Well, let me ask
21  you this.  When you say that it's a petroleum
22  product, you don't mean that you can tell that
23  there is some type of alcohol involved in the fire
24  when you look at those flames?

Page 239

1       A.   No.
2       Q.   You're just saying what's burning --
3       A.   I was answering the question that was
4   asked of me, the color of the flame and what
5   causes that color of flame.
6       Q.   You talked about the number of fires you
7   have investigated in your career, and I think you
8   said that there's been at least 2300 fires since
9   this one, correct?
10      A.   Give or take.
11      Q.   Do you have a better or worse memory than
12  average of your involvement in this fire compared
13  to the 2300 that you've investigated?
14      ATTORNEY MEADOR:  Objection:  Form.
15      THE WITNESS:  It's kind of funny because I'm
16  known as a -- I don't know what you call it, a
17  person that can remember things.  I can pretty
18  much -- I remember a lot of my fires.  Some more
19  than others.  But I mean if somebody gives me a
20  date and time and refreshes me a little bit, I can
21  probably tell you about that fire.  But I forget
22  what you call it when you can rec- -- recall
23  certain things.  But this -- I -- this one stands
24  out in my mind.  I mean, I'm not -- I'm not

Page 240

1   heartless, I mean, it is a fatal.  But I mean did
2   I forget some fires?  Sure.  Do I remember this
3   one?  Sure.
4   BY ATTORNEY THOMPSON:
5       Q.   How many fires a year on average have you
6   investigated in your career where somebody passed
7   away?
8       A.   I don't even want to know.  I don't know.
9   A lot.  Usually in the wintertime.
10      Q.   How many fires have you investigated
11  where somebody ultimately ended up being charged
12  with homicide in connection with a fire?
13      ATTORNEY MEADOR:  Objection:  Foundation;
14  calls for speculation.
15      THE WITNESS:  Charged with homicide or murder
16  or homicide?  I don't know.  I used to keep a
17  tally sheet.  I kind of gave up on it.  I don't
18  know.  More than ten.
19  BY ATTORNEY THOMPSON:
20      Q.   Well, and my question is, is one of the
21  reasons this fire has stuck with you is because
22  someone died and someone was charged with murder
23  in this case?
24      A.   Is that a question?

Page 241

1       Q.   Yes.
2       A.   Oh.  I thought you were making a
3   statement.
4           Well, yeah, that -- Yes.  Not just this
5   one, but there's a lot more I could tell you about
6   too.  We don't have the time for that.  We'll be
7   here another seven and a half hours.
8       Q.   You talked about your process of
9   determining the origin of this fire.  And am I
10  right that in your examination of the scene, it
11  was not very complicated to figure out that the
12  fire began in this particular unit, correct?
13      A.   I don't believe I said it wasn't that
14  complicated.
15      Q.   Well, I'm asking if that was complicated.
16      A.   Every fire to me is -- you do the same
17  job with every fire whether it's complicated or
18  not.  It was a fire investigation or a fire death
19  investigation.  So as far as saying it was
20  complicated, all fires are complicated.
21      Q.   Can you give any -- any estimate whether
22  figuring out the origin of this fire took you more
23  or less time than the average fire that you
24  investigate?

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 242..245

Page 242

1    A.   I never timed myself, to be honest with
2 you.  I mean, I go in there, if it takes me a day,
3 a week, a month, an hour, a century, that's what I
4 have to do.  I mean, I don't walk in there and say
5 I have to get out of here; that's where the fire
6 started.  No.  I do -- Every fire I do the same.
7 It's I have -- you do the walk around.  You do
8 your elimination and inclusion.  So, I mean, every
9 fire I do, I have the same routine at every fire.
10 I didn't mean routine, but my -- it's the same
11 procedures at every fire.
12    Q.   So are you able to offer any opinion
13 whether figuring the origin of this fire was more
14 or less complex than the average fire you
15 investigated?
16    A.   Explain to me what you mean by average
17 fire.  I don't know your definition of an average
18 fire.
19    Q.   I'm asking if you would consider the
20 average fire that you've looked at.
21    A.   There's no --
22    ATTORNEY MEADOR:  Objection:  Form.
23    THE WITNESS:  I think it's like badgering.
24 But the thing is in my opinion, there's no such

Page 243

1 thing as an average fire.
2 BY ATTORNEY THOMPSON:
3    Q.   Have you ever reviewed any other expert
4 report related to the fire that we've been talking
5 about today?
6    ATTORNEY MEADOR:  Objection:  Form.
7    THE WITNESS:  No.
8 BY ATTORNEY THOMPSON:
9    Q.   Has anyone, and I guess I'm excepting any
10 communications you've had with your own lawyer; I
11 don't want to know about those.
12    A.   I just met him today.
13    Q.   Well, and I don't --
14    A.   Right, Counselor?
15    Q.   I'm not asking you about your
16 communications with your lawyer.  So let me just
17 say this.  Setting aside any communications you've
18 ever had with your attorney, has anyone ever
19 discussed with you what any other experts had to
20 say about this fire?
21    A.   No.
22    Q.   If you learned that there were experts
23 who disagreed with you, is that information that
24 you would want to be taken into account in

Page 244

1 thinking about or in assessing your own opinions
2 about the fire in this case?
3    ATTORNEY MEADOR:  Objection:  Form;
4 foundation; calls for speculation; incomplete
5 hypothetical.
6    THE WITNESS:  I forgot my answer.  My answer
7 is everyone's entitled to their opinion.
8 BY ATTORNEY THOMPSON:
9    Q.   Well, am I correct that since your
10 testimony in William Amor's case that you have
11 changed your opinion about the cause of the fire
12 in this case?
13    A.   No.
14    Q.   At the time of trial, wasn't your opinion
15 that this fire was started with the use of vodka?
16    A.   No.
17         Wait.  It was -- It was -- It was an open
18 flame to available combustibles with the use of
19 vodka.  It wasn't -- had anything -- the vodka was
20 not the first material ignited.
21    Q.   But you had never told anyone that
22 vodka -- Well, let me ask you this.  Is it your
23 belief that in the course of this fire, that there
24 was vodka that burned?

Page 245

1    A.   I wasn't there.  I don't know.
2    Q.   So have your opinions about the cause of
3 this fire changed at all since the time that you
4 testified at Mr. Amor's trial?
5    ATTORNEY MEADOR:  Objection:  Asked and
6 answered.
7    THE WITNESS:  No.
8 BY ATTORNEY THOMPSON:
9    Q.   Since 1997, have you personally learned
10 about any new methodology for investigating the
11 cause or origin of a fire?
12    A.   Sure.
13    Q.   Have you learned more about ventilation
14 effect since 1997 than you knew back when you
15 testified in this case in 1997?
16    A.   Sure, but not that would change my
17 opinion.
18    Q.   Have you ever considered whether
19 ventilation could have had some impact on the way
20 this fire behaved?
21    A.   No.  I think the fire went up and
22 outward, it's normal path of travel.  The
23 ventilation was what it did, and that's what I
24 agree with.

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 246..249

Page 246

1    Q.   Have you ever considered at any point
2    before or after you testified in the criminal
3    trial whether flashover occurred in this fire?
4    A.   Yes, I did consider it.
5    Q.   Do you believe that flashover occurred in
6    this fire?
7    A.   No, because it was still objects that
8    were not burned.  It's all exposed surfaces.  If a
9    fire burns and is on fire at the same time and the
10   surface of the desk was not burning.  So no, I
11   don't believe flashover occurred.
12   Q.   Have you ever discussed with anyone who
13   was not your own attorney about whether or not
14   flashover occurred in this fire?
15   A.   I don't recall -- remember discussing it
16   with anyone.
17   Q.   You talked about getting some training in
18   your own career from John Dehan?
19   A.   Yes.
20   Q.   If John Dehan had opinions about the
21   cause and origin of this fire, are those opinions
22   that you would give credence to?
23   A.   No.
24   Q.   And why is that?

Page 247

1    A.   It depends on -- I don't know what his
2    opinion is.  I would have to listen to his opinion
3    and see if I agree to it or not.
4    Q.   Well, in general do you believe that John
5    Dehan is a credible person in your -- in the field
6    of arson investigation?
7    ATTORNEY MEADOR:  Objection: Form.
8    THE WITNESS:  I would have to say yes.
9    BY ATTORNEY THOMPSON:
10   Q.   And have you ever worked with someone
11   formerly of the ATF named John Golder (phonetic)?
12   A.   No.
13   Q.   In general, do you believe that the ATF
14   is a fire investigation agency that conducts their
15   investigations using appropriate methods of fire
16   science investigation?
17   ATTORNEY MEADOR:  Objection: Form;
18   foundation.
19   THE WITNESS:  You're saying --
20   ATTORNEY MEADOR:  Hold on one second.
21        Objection: Form; foundation; calls for
22   speculation.
23   THE WITNESS:  Are you saying that I used
24   inappropriate methods of investigation versus ATF?

Page 248

1    BY ATTORNEY THOMPSON:
2    Q.   No, no.  I --
3    A.   You said they use "appropriate," meaning
4    did I say that mine wasn't?
5    Q.   I'm not saying that at all.  I'm --
6    A.   The way you asked the question it sounded
7    like they're the ones that are appropriate, and
8    others aren't.  So I misunderstood the question.
9    Q.   Sure.  I'm just asking you if given your
10   knowledge of arson investigation, do you believe
11   that the ATF is an agency that conducts
12   investigations using appropriate methods of
13   scientific analysis?
14   ATTORNEY MEADOR:  Same objection.
15   THE WITNESS:  They have their opinion.
16   They're entitled to their opinion.
17   BY ATTORNEY THOMPSON:
18   Q.   Well, do you personally -- Well, let me
19   ask you this.  Have you ever been told by anyone
20   that a former ATF agent named John Golder
21   disagreed with some aspect of your analysis?
22   A.   He has every right to.  Everybody is
23   entitled to their opinion.
24   Q.   And do you have any interest as you sit

Page 249

1    here today in understanding why to the extent
2    anybody disagrees with you about the cause and
3    origin of this fire that they came to a different
4    conclusion?
5    ATTORNEY MEADOR:  Objection: Form;
6    foundation.
7    THE WITNESS:  No.
8    BY ATTORNEY THOMPSON:
9    Q.   I just -- I want to make sure that I
10   understand what you reviewed in preparation for
11   this deposition.  You've been shown various
12   exhibits during this deposition.  Is there
13   anything that you looked at to prepare for this
14   deposition that you have not seen during this
15   deposition, understanding that not everything
16   you've seen is something you received before?
17   A.   I've seen quite a bit here.  And like I
18   said, the only thing I got was part 1 of my
19   testimony.  And I looked at my report one time.
20   And then that dark version of the sketch.  That's
21   what I looked at.
22   Q.   And prior to today, when is the last time
23   that you thought about any of your opinions that
24   you reached in connection with this fire

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Pages 250..253

Page 250

1  investigation?

2      ATTORNEY MEADOR: Objection: Form.

3      THE WITNESS: When I was informed by my office

4  that there was going to be a second trial.

5  BY ATTORNEY THOMPSON:

6      Q.  Did you talk at that time with anyone

7  from the DuPage County State's Attorney's Office?

8      A.  I'm thinking.  That's a good question.  I

9  called to see if it was true, and I got the

10  runaround, and nobody ever gave me a direct

11  answer, and they -- apparently they didn't want

12  anything that -- anything I had to offer.  But I

13  think I did, when my office got word that there

14  was a second trial coming, they -- I called the

15  DuPage County -- I wanted to speak to Roberta Byrd

16  (phonetic).  I think she had retired or left.  And

17  I got -- nobody ever -- nobody ever got back to me

18  at all.

19      Q.  Have you ever talked -- and I'm not

20  suggesting there would be anything improper about

21  this -- but have you ever talked with anyone from

22  Ms. Meador's office or somebody who's representing

23  a defendant in this case before your deposition

24  today?

Page 251

1      A.  Yes.

2      Q.  When did you talk with them?

3      A.  Let's see.  We tried something about a

4  week or so ago or two weeks ago that didn't last

5  too long because the connections were all garbage.

6  And I got frustrated and told them, I'll see you

7  in court.

8      Q.  Prior to that, did you talk to anybody

9  that's representing a defendant in this case?

10      ATTORNEY MEADOR: Objection: Foundation.

11      THE WITNESS: No.

12  BY ATTORNEY THOMPSON:

13      Q.  As you sit here today, do you know that

14  there is any information that you could learn from

15  any source that would change any of your opinions

16  about the cause of origin of this fire?

17      ATTORNEY MEADOR: Objection: Form;

18  foundation; incomplete hypothetical.

19      THE WITNESS: Yes.

20  BY ATTORNEY THOMPSON:

21      Q.  And can you give me an example of

22  something that would change your opinions about

23  the cause and origin of this fire?

24      A.  I would like to interview Tina Amor.

Page 252

1      Q.  Why is that?

2      A.  Because she was there at the time of the

3  fire and that she would be a witness.

4      Q.  What is -- Is your understanding that she

5  was there at the time of the fire based on

6  information that you received from the Naperville

7  Police Department?

8      A.  Yes.

9      Q.  Is there anything else that you believe

10  you could learn that might change your opinion

11  about the cause or origin of this fire?

12      A.  I just answered your question.

13      Q.  Is there anything else?

14      ATTORNEY MEADOR: Same objection.

15      THE WITNESS: Oh, anything else?  Yeah.  I

16  would like to speak to Mr. Amor.

17  BY ATTORNEY THOMPSON:

18      Q.  Why is that?

19      A.  I would just like to interview him and

20  find out what happened.

21      Q.  In reaching your opinions that you

22  testified about at Mr. Amor's criminal trial, were

23  you relying on a belief that a -- that what

24  Mr. Cross had told you about what Mr. Amor said

Page 253

1  during his statement to the police was true?

2      ATTORNEY MEADOR: I'm going to ask -- I

3  apologize.  I lost some of that.  Tracy, can you

4  have the question read back, please.

5          (Whereupon, the record was read as

6          requested.)

7      THE COURT REPORTER: Should I do that for you

8  again?  Do you --

9      ATTORNEY MEADOR: No, we're fine.

10      Thank you, Tracy.

11      THE COURT REPORTER: Sure.

12      ATTORNEY MEADOR: Object to form.

13      THE WITNESS: Yes.

14      ATTORNEY THOMPSON: I don't have any other

15  questions.

16      THE WITNESS: I'm sure you'll come up with

17  some more.

18          EXAMINATION

19  BY ATTORNEY MEADOR:

20      Q.  Mr. Kushner, really quickly, I just --

21  there's one thing I wanted to clarify.  You talked

22  about speaking with Detective Cross after you did

23  your scene investigation, correct?

24      A.  Yes.

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020                                      Pages 254..257

Page 254

1    Q.   Okay.  Did you speak with him on two
2  separate occasions, one where he provided you with
3  additional information that you were -- that you
4  had discussed with him, and a second when he
5  advised you that Mr. Amor had confessed and been
6  arrested?
7    A.   There was two.  There was two times, the
8  one he said that what happened -- what he said
9  that had happened and confessed.  The other was
10  just about an arrest card.
11    ATTORNEY MEADOR:  Okay.  All right.  That's
12  all the questions I have.  Thank you.
13    ATTORNEY THOMPSON:  I don't have anything
14  else.
15    ATTORNEY MEADOR:  Okay.  Reserve?  Waive?
16    ATTORNEY FLETCHER:  Let's reserve.
17       What they're talking about --
18    THE WITNESS:  Yeah, I know.  I've got to wait
19  to read it before I sign it.
20    ATTORNEY FLETCHER:  Well, you don't have to,
21  but you may want to.
22    THE WITNESS:  I'll have a reading party.
23       The one that I circled is in one of these
24  files.

Page 255

1    ATTORNEY MEADOR:  That's fine.  I will take
2  all of the exhibits and get them to the court
3  reporter.
4    THE COURT REPORTER:  How about we go off the
5  record?
6    THE WITNESS:  How about if I call home?
7    THE VIDEOGRAPHER:  This concludes the
8  deposition of Mitchell Kushner, time 6:33.
9         (Off the record at 6:33 p.m. CST)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 256

1       IN THE UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF ILLINOIS
3               EASTERN DIVISION
4
5  WILLIAM E. AMOR,          )
                             )
                             )
       Plaintiff,            )
                             )  No. 18-CV-02523
    v.                       )  Hon. John Z. Lee
                             )
  MICHAEL CROSS, et al.,     )
                             )
         Defendants.         )
10
11    I, MITCHELL KUSHNER, being first duly
12  sworn, on oath say that I am the deponent in the
13  aforesaid deposition taken on September 28, 2020;
14  that I have read the foregoing transcript of my
15  deposition, consisting of pages 1 through 256
16  inclusive, and affix my signature to same.
17
18
19       _____
              MITCHELL KUSHNER
20
21  Subscribed and sworn to
   before me this        day
22  of                 , 2020
23
24  Notary Public

Page 257

1  STATE OF ILLINOIS   )
2                      )  SS:
3  COUNTY OF C O O K   )
4    I, TRACY JONES, a Certified Shorthand
5  Reporter within and for the County of Cook and
6  State of Illinois, do hereby certify that on
7  September 28, 2020, there appeared before me via
8  Zoom videoconference MITCHELL KUSHNER in a cause
9  now pending and undetermined in the United States
10  District Court for the Northern District of
11  Illinois, Eastern Division, wherein WILLIAM E.
12  AMOR is the Plaintiff, and MICHAEL CROSS, et al.,
13  are the Defendants.
14       I further certify that the said MITCHELL
15  KUSHNER was first duly sworn to testify the truth,
16  the whole truth and nothing but the truth in the
17  cause aforesaid; that the testimony then given by
18  said witness was reported stenographically by me
19  in the presence of the said witness, and
20  afterwards reduced to typewriting by Computer-
21  Aided Transcription, and the foregoing is a true
22  and correct transcript of the testimony so given
23  by said witness as aforesaid.
24       I further certify that the signature to the

WILLIAM E. AMOR vs MICHAEL CROSS, et al.
KUSHNER, MITCHELL on 09/28/2020

Page 258

Page 258

```
1   foregoing deposition was reserved by counsel for
2   the respective parties.
3        I further certify that the taking of this
4   deposition was pursuant to notice and that there
5   were present at the deposition the attorneys
6   hereinbefore mentioned.
7        I further certify that I am not counsel for
8   nor in any way related to the parties to this
9   suit, nor am I in any way interested in the
10  outcome thereof.
11       IN TESTIMONY WHEREOF:  I have hereunto set
12  my hand and affix my seal this 12th day of October
13  2020.
14
15
16
17       _____  _____
18       TRACY JONES, CSR, RPR, CLR
19       LIC. NO. 084-004553
20
21
22
23
24
```