EXHIBIT # 9
WIT: Amor
DATE: 3/5/20
Nicole M. Cheney, CSR

Tape interview on October 4, 1995, at 5:10 a.m.

Present at time of taping:   Investigator Robert Guerrieri
Investigator Mike Cross
State's Attorney Brian Nigohosian
William E. Amor

| | |
|---|---|
| R. Guerrieri: | This is Robert...Detective Robert Guerrieri Naperville Police Department. The date is still ahh October 4th, 1995. The time is approximately 5:10 a.m. Also with me ahh consenting to this tape recording is Detective Mike Cross, State's Attorney Brian Nigohosian and William E. Amor. For voice identification purposes Detective Cross will you identify yourself. |
| M. Cross: | Detective Mike Cross of the Naperville Police Department. |
| R. Guerrieri: | States Attorney Nigohosian will you identify yourself. |
| B. Nigohosian: | My name is Brian Nigohosian. |
| R. Guerrieri: | And William Amor will you identify yourself. |
| W. Amor: | My name is William Amor. |
| R. Guerrieri: | This is a continuation of the previous tape h...William Amor do you understand you still...your Miranda Warnings still apply at this point? |
| W. Amor: | Yes. |
| R. Guerrieri: | Okay. You consent to this tape recording? |
| W. Amor: | Yes. |
| R. Guerrieri: | Okay. We have a few more questions for you at this time. |
| B. Nigohosian: | Mister Amor, Uh...we've spoken earlier this evening correct? |
| W. Amor: | Yes. |
| B. Nigohosian: | And at that time I informed you that you understand that my role here is one, as an Assistant State's Attorney, that I don't represent you. Is that correct? |
| W. Amor: | Yes. |

People's Exhibit
26B
SDT-SAO-10517

EXHIBIT 5

| | | |
|---|---|---|
| B. Nigohosian: | Okay. Knowing that, and knowing the rights that the Detectives have informed you about, you agreed to speak to me about the events... | |
| W. Amor: | Yes. | |
| B. Nigohosian: | ...that occurred in this case? Ahh, with reference to the... | |
| B. Nigohosian: | With reference to the fire that began in an apartment building with Marianne Miceli uhh you indicated that...that fire was started as a result of a cigarette that was knocked on to a...Uh...intentionally knocked on to a pile of newspapers that were doused with Vodka. Is that correct? | |
| W. Amor: | Yes. | |
| B. Nigohosian: | You had also indicated that you had formed that idea to do that previously to that night. Correct? | |
| W. Amor: | Yes. | |
| B. Nigohosian: | And the night that I'm referring to is ahh the tenth, Aug...September 10th and you indicated earlier that you were in the DuPage County Jail sometime in Uh...April and May and June of 1995. Correct? | |
| W. Amor: | Yes. Correct. | |
| B. Nigohosian: | At some point while you were in the DuPage County Jail did you ahh form that idea in your head? | |
| W. Amor: | Yes. | |
| B. Nigohosian: | Okay. And, after that period did you write out...or write a letter to your wife Tina explaining to her what you were thinking about? | |
| W. Amor: | Yes. | |
| B. Nigohosian: | Did you go into detail in that letter about what it would involve? | |
| W. Amor: | No. | |
| B. Nigohosian: | You. What was the nature of that...the letter that you wrote? | |
| W. Amor: | That I had some way come up with the money that would help us get out of the house. | |
SDT-SAO 10518

| | |
|---|---|
| B. Nigohosian: | Okay. At that time you were living with Marianne and her in a in a condo that was owned by another person, correct? |
| W. Amor: | That's correct. |
| B. Nigohosian: | And you needed, you indicated that you wanted to get out of that condo? |
| W. Amor: | That's correct. |
| B. Nigohosian: | Did you...and was one of the ways that you intended on getting out of that condo by getting some money for yourself? |
| W. Amor: | Yes. |
| B. Nigohosian: | How were you going to get the money? |
| W. Amor: | Through insurance. |
| B. Nigohosian: | And you knew that...that there were various forms of insurance available right? |
| W. Amor: | Yes. |
| B. Nigohosian: | You knew that there was a Life Insurance policy on Marianne R. Miceli correct? |
| W. Amor: | Yes. |
| B. Nigohosian: | Did you know the amount of that insurance? |
| W. Amor: | No. |
| B. Nigohosian: | Did you ahh anticipate using that insurance money to help you get out of that apartment? |
| W. Amor: | One of the insurance monies, I wasn't directed right at life insurance but some insurance money that's correct. |
| B. Nigohosian: | After you wrote that let...Did you write that, a letter explaining your thoughts about getting money to Tina in June of 1995? |
| W. Amor: | I expressed an idea to get money but not in detail about how to go about it. |
| B. Nigohosian: | After you wrote that letter did you think about that plan from time to time in your head? |
| W. Amor: | Yes I did. |

| | | |
|---|---|---|
| B. Nigohosian: | You indicated that there was a...that the situation that you were living in was to ahh put it in your own words "unbearable" is that correct? |
| W. Amor: | That is correct? |
| B. Nigohosian: | You needed to do whatever you could to get out of that situation. Is that correct? |
| W. Amor: | Yes. |
| B. Nigohosian: | Now, on ahh September 10th there was a smoke detector in that third floor condominium correct? |
| W. Amor: | Yes. |
| B. Nigohosian: | Was that smoke detector hooked up? |
| W. Amor: | No, it was not. |
| B. Nigohosian: | Why was it not hooked up? |
| W. Amor: | I had taken it down previously a couple days earlier to replace the battery and I had not gotten around to putting it back up. |
| B. Nigohosian: | Okay. In the time period when you left the DuPage County Jail to the day of September 10th, 1995, had the idea of collecting insurance money gone through you head on various occasions? |
| W. Amor: | Yes. |
| B. Nigohosian: | What was the manner in which you were going to collect that money? Or how were you going to obtain that money? |
| W. Amor: | I didn't actually have an executed plan as far as anything written down. Ahh, |
| B. Nigohosian: | Did you know that, that by way of fire you might be able to collect that money? |
| W. Amor: | Correct. |
| B. Nigohosian: | You never acted on that until that day correct? |
| W. Amor: | That is correct. |
| B. Nigohosian: | On that day you indicated that you had been arguing with Marianne and Tina? Or been involved in an... |

| | |
|---|---|
| W. Amor: | In between them two. Yes. |
| B. Nigohosian: | Were you the subject of the argument? |
| W. Amor: | The actions that...surrounding Marianne. Yes. The back rub and and then there was the money issues between them two, between Tina and Marianne. |
| B. Nigohosian: | Okay. What was your financial situation at that time? |
| W. Amor: | Rough. Tina worked part-time I was working you know a few hours every couple of weeks at a church it was rough. Very tough. |
| B. Nigohosian: | Would you say it was a desperate financial situation? |
| W. Amor: | Sure. |
| B. Nigohosian: | You knew that a...previously that ahh Marianne had a substantial Life Insurance policy? |
| W. Amor: | I didn't know the amount of it. No. No idea. |
| B. Nigohosian: | What was (silence) What was your understanding of how much insurance she had? |
| W. Amor: | It was, the dollar amount was never discussed probably because of the finances of the family I was...any numbers that crossed my head were very low ball because of the financial situation in the household itself. |
| B. Nigohosian: | Okay. You had indicated that when we spoke earlier that you had thoughts of anywhere between ten to fifteen thousand dollars. Is that correct? |
| W. Amor: | That's right. |
| B. Nigohosian: | And you knew that on the date of the fire correct? |
| W. Amor: | The amount? |
| B. Nigohosian: | Well you did...Your thoughts about that amount were in that ball park on that day. |
| W. Amor: | The actual amount didn't enter. Just the money. Umm, Friday after getting out I was getting out were very (inaudible) in my head. Yes. |

| | |
|---|---|
| B. Nigohosian: | On the day of the fire you and Tina had agreed to make plans to leave and go to a...Go out. |
| W. Amor: | Yes. |
| B. Nigohosian: | Where were you going? |
| W. Amor: | To the Drive In. |
| B. Nigohosian: | Was Marianne going with you that day? |
| W. Amor: | No. |
| B. Nigohosian: | Then she stayed at home. Correct? |
| W. Amor: | (Inaudible) |
| B. Nigohosian: | At the time that the...She stayed home...You Uh...Immediately before you left was that the time period in which you dropped the cigarette? Or... |
| W. Amor: | Right before I left. Yes. |
| B. Nigohosian: | Or knocked dropped the cigarette onto...and um...Did you leave Uh...leave the condominium? Very shortly or immediately there after? |
| W. Amor: | Two, Two and a half minutes maybe three at the tops. |
| B. Nigohosian: | At the time you left did you see the the smoke coming up from the papers? |
| W. Amor: | I didn't look for it. It was over in the corner where I was previously and I didn't even look at it, I walked over got my jacket grabbed cooler and out I went. I didn't want to look for it. |
| B. Nigohosian: | Did you know at that point?...Did the smoke look... |
| W. Amor: | I...I anticipated... |
| B. Nigohosian: | You anticipated a fire? |
| W. Amor: | But I didn't look. Incorrect. |
| B. Nigohosian: | You didn't want to see the fire? |
| W. Amor: | That's correct. |
| B. Nigohosian: | You had a strong probability that the fire would excel right? |

| | |
|---|---|
| W. Amor: | Yes. |
| B. Nigohosian: | You know there was a strong probability that a fire would result. Right? |
| W. Amor: | Yes. |
| B. Nigohosian: | You also knew that Marianne was going to remain that apartment right? |
| W. Amor: | I was unsure. I wouldn't...I'm not sure about that part...when it came to Marianne because it's just that I hadn't got that far in thinking. |
| B. Nigohosian: | All right. She wasn't going with you though? |
| W. Amor: | No. Correct. |
| B. Nigohosian: | She was staying behind. Right? |
| W. Amor: | Right. |
| R. Guerrieri: | Bill, when we spoke earlier you said when the...when the cigarette landed on the papers you saw some smoke coming up at that time initially. |
| W. Amor: | It was like it was starting to...I didn't actually see a flame. |
| R. Guerrieri: | Right. |
| W. Amor: | I just seen a little bit you know it started to smoke, but I didn't see a flame. |
| R. Guerrieri: | And then after that you got up and gave Marianne the back rub? |
| W. Amor: | Correct. |
| R. Guerrieri: | Okay. |
| M. Cross: | And at that time Marianne was dressed in just a short nightie with no underwear on. |
| W. Amor: | Well I didn't...I didn't see know about the "no underwear" on but that's another story. |
| M. Cross: | |
| W. Amor: | But yes, that was how she was dressed laying on her bed. |
| M. Cross: | Okay so all indication was she was not going anywhere. |

| | |
|---|---|
| W. Amor: | Yes. That's correct she was laying down to take a nap to get up to watch the Emmy's between seven and ten. |
| M. Cross: | Okay. |
| B. Nigohosian: | I don't know that I have any other questions that I wanted to ask. Was there...was there anything that we talked about earlier that you wanted to bring up? |
| W. Amor: | Everything I have said I said at least once and the truth and from my heart. |
| B. Nigohosian: | Alright. You've been treated fairly here. |
| W. Amor: | Yes. |
| B. Nigohosian: | Okay. |
| R. Guerrieri: | Mike can you think of anything else? |
| M. Cross: | No I can't think of anything else. |
| R. Guerrieri: | Okay. Bill you gave this statement of your own fee will then... |
| W. Amor: | Yes, I did. |
| R. Guerrieri: | Okay at this point then we will terminate the tape. It's 5:20 a.m. on October 4th, 1995. |

SDT-SAO 10524