**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JEANNE OLSON, not individually,<br>But as Trustee of the William Amor Trust | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18-cv-02523 |
| | ) | |
| REBECCA GOMEZ, as Special | ) | |
| Representative for Michael Cross, | ) | The Hon. John J. Tharp, Jr. |
| Deceased, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MOTION TO BAR OPINION**
**TESTIMONY OF DR. MICHAEL WELNER**

Jon Loevy
Gayle Horn
Locke E. Bowman
LOEVY + LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
312 243 5900

**TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

PLAINTIFF'S MOTION TO BAR OPINION TESTIMONY OF DR. MICHAEL WELNER .... 1

LEGAL STANDARD ........................................................................................................ 1

INTRODUCTION ............................................................................................................. 2

I.     DR. WELNER IS NOT QUALIFIED TO OFFER GENERAL OPINIONS ON THE STUDY OF FALSE CONFESSIONS OR ON HOW THAT STUDY BEARS UPON PLAINTIFF'S INTERROGATION. ................................................................. 6

II.    THE VALIDITY OF THE RESEARCH CONDUCTEDDUCTED AND RELIED UPON BY DR. LEO IS FOR THE COURT TO RESOLVE UNDER *DAUBERT* AND RULE 702 ................................................................................................................. 12

III.   DR. WELNER SHOULD BE BARRED FROM OFFERING HIS UNSUPPORTED ASSESSMENTS OF PLAINTIFF'S MENTAL STATE DURING THE INTERROGATION. ................................................................................................. 14

IV.   DR. WELNER MUST BE BARRED FROM TESTIFYING AS TO PLAINTIFF'S CREDIBILITY ........................................................................................................ 19

V.    DR. WELNER'S GRATUITOUS OPINIONS REGARDING OTHER MATTERS FOR WHICH HE LACKS KNOWLEDGE, TRAINING OR EXPERTISE MUST BE EXCLUDED. ........................................................................................................... 19

CONCLUSION ................................................................................................................ 21

# TABLE OF AUTHORITIES

**Cases**                                                                                                   **Page(s)**

*Andersen v. City of Chicago,* No. 16 C 1963, 2020 WL 1848081,(N.D. Ill. Apr. 13, 2020) ..........7

*Brown v. Burlington N. Santa Fe Ry. Co.,* 765 F.3d 765 (7th Cir. 2014).......................................2

*Brown v. City of Chicago,* 633 F. Supp. 3d 1122 (N.D. Ill. 2022) .........................*3, 10, 11,* 15, 18

*Caine v. Burge, 2013 WL 1966381,* at *3 (N. D. Ill. May 10, 2013)...........................................8

*Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990) ...............................................12

*Chatman v. City of Chicago,* No. 14 C 02945, ECF No. 719 (N.D. Ill. Oct. 30, 2018*)* ...............14

*Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, (1993*)*..........................................1, 2, 12, 14,

*Edmonds v. State,* 955 So.2d 787, 801 (Miss. 2007) ....................................................................11

*Edmunds v. State,* No. 2004-CT-02081-SCT (Cir. Ct. Oktibbeha Cty., Miss.)...........................15

*Gayton v. McCoy,* 593 F.3d 610, (7th Cir. 2010) ........................................................................12

*Gen. Elec. Co. v. Joiner,* 522 U.S. 136, (1997*)* ......................................................................2, 11

*Goodwin v. MTD Prods.,* 232 F.3d 600, (7th Cir. 2000)...............................................................19

*Harris v. City of Chicago*, 2017 WL 2436316, (N.D. Ill. June 5, 2017)...................................7, 14

*Higgins v. Koh Dev. Corp.,* 794 F.3d 697, (7th Cir. 2015)...................................................2, 12, 18

*Taylor v. City of Chicago, et al.,* No. 14-cv-00737 (N.D. Ill.) ................................................9, 17

*Jakes v. Boudreau, et al.,* No. 19-cv-02204 (N.D. Ill.)................................................................17

*Jones v. Markham,* No. 00 L 5608 (Cir. Ct. Ck. Cty)..............................................................15, 16

*Kluppelberg v. Burge,* 2016 WL 6821138 (N.D. Ill. Sept. 16, 2016).........................................8

*Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, (1999)* ....................................................1, 14

*Lewis v. CITGO Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009) ...................................2, 18

*Livers v. Schenck,* 2013 WL 5676881, (D. Neb. Oct. 18, 2013) ...................................................8

*Patrick v. City of Chicago*, et al., No. 14-cv-03658 (N.D. Ill.)......................................................17

*People v. Oliver* .....................................................................................................................15

*Scott v. City of Chicago,* 2010 WL 3034254 (N.D. Ill. Aug. 3, 2010) ...........................................8

*Smith v. Ford Motor Co.,* 215 F.3d 713, (7th Cir. 2000)..............................................................14

*Swift v. City of Chicago,* No. 12 L 12995 (Ill. Cir. Ct. Nov. 4, 2016)....................................10, 18

*Taylor v. City of Chicago, et al.,* No. 14-cv-00737 (N.D. Ill.) ................................................9, 17

*The People of the State of New York, v. Kysheen OLIVER,* 991 N.Y.S.2d 260, 269 (Sup. Ct.
2014) ......................................................................................................................................15

*United States v. Hall, 974 F. Supp. 1198, 1205 (C.D. Ill. 1997), aff'd, 165 F.3d 1095 (7th Cir.
1999)* .......................................................................................................................................7

*United States v. Hayat, 2017 WL 6728639, at \*10–11 (E.D. Cal. Dec. 27, 2017)*.........................8

*United States v. Sampson, No. 1:01-10384-LTS, ECF 2459 (D. Mass. Sept. 2, 2016)* .................8

*United States v. Whittle, 2016 WL 4433685, at \*2 (W.D. Kentucky Aug. 18, 2016)*......................8

**Other Authorities**

CONFESSIONS OF GUILT: FROM TORTURE TO MIRANDA AND BEYOND (Oxford,
2012) .......................................................................................................................................8

M. Guyll, et al., Innocence and Resisting Confession During Interrogation: Effects on
Physiologic Activity, 37 LAW & HUM. BEHAV. 366 (2013)................................................10

Fed. R. Evid. 702 .........................................................................................1, 2, 7, 12, 14, 18, 19

POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard, 2008)...............................8

## PLAINTIFF'S MOTION TO BAR OPINION TESTIMONY OF DR. MICHAEL <u>WELNER</u>

Plaintiff Jeanne Olson ("Plaintiff") moves pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993) to bar the proposed expert testimony of forensic psychiatrist Michael Welner, whom Defendants have retained to offer expert opinions on interrogation and the subject of false confessions. Dr. Welner's proposed expert testimony ranges far beyond his training and expertise. Rather than being helpful to the trier of fact, Dr. Welner's testimony will confuse and mislead the jury. He should be barred from testifying as to virtually all the opinions and ruminations in his 48-page, single-spaced report.

## LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence ("Rule") 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 requires the Court to ensure that expert evidence "is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The reliability requirement serves to distinguish a well-grounded expert opinion, which is admissible, from "subjective belief," which is not. *Id.* at 590. The purpose of this gatekeeping is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137,

152 (1999). "'[N]othing . . . requires a district court to admit opinion evidence'" that rests solely on "'the *ipse dixit* of the expert.'" *Id.* at 157 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

The Court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152. Courts consider the proposed expert's full range of experience and training in the subject area, as well as the methodology used to arrive at a particular conclusion. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). The Federal Rules of Evidence permit expert opinion only if the testimony is "based on sufficient facts or data" *and* "the product of reliable principles and methods," which the expert has "reliably applied." Fed. R. Evid. 702 ("Rule 702"); *Higgins v. Koh Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015). "Rule 703 requires the expert to rely on 'facts or data,' as opposed to subjective impressions." *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014). In addition to being reliable, expert testimony must "assist the trier of fact to understand the evidence or determine a fact at issue." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

The burden of establishing that the requirements of Rule 702 and *Daubert* have been satisfied rests with the proponent of the expert testimony. *Id.*

## INTRODUCTION

Plaintiff claims that Defendants violated the Fifth Amendment rights of William Amor by coercing him to falsely state that on September 10, 1995 he deliberately set a fire that resulted in the death of Marianne Miceli in her Naperville apartment. Mr. Amor's confession came about following a marathon interrogation process that began on October 3, 1995 at 2:00 p.m., when Defendant Detectives Michael Cross and Robert Guerreri met Amor in the lobby of the DeKalb County Jail to transport him to the Chicago offices of Reid and Associates for a pre-scheduled

polygraph examination, and culminated the following morning, October 4 at 5:10 a.m., with a 10-minute, audio-recording in which Amor assented to the leading questions of an assistant state's attorney implicating himself in the crimes of arson and murder.

Plaintiff retained Dr. Richard Leo, a nationally regarded expert in the study of police interrogation and false confession, as an expert witness to acquaint the jury with the phenomenon of false confessions, including by explaining that researchers have identified specific interrogation techniques that are found in cases of proven false confessions and have discovered that specific vulnerabilities of an interrogation subject are also associated with known instances of false confessions. Applying principles that have guided researchers since 1908, Dr. Leo concludes, among other things, that Amor's October 4, 1995 confession statement bears "the hallmarks, characteristics and indicia of a false and unreliable confession" and that Amor's account of the interrogation that led to his statement "fits with the empirical social science research on the types of interrogation techniques, methods, practices and effects that are associated with, increase the risk of, and are known to cause false confessions." Leo 1/22/21 Report (Ex. A hereto) at 6.

Dr. Welner is a purported rebuttal witness. Unlike Dr. Leo, Dr. Welner is not a qualified researcher with training, expertise and a track record of research and peer reviewed publication in the social scientific study of police interrogation and the risk of false confession. He is a forensic psychiatrist with a well-known proclivity for weighing in on multiple topics that stray far beyond the legitimate range of his training and experience. He deems himself to be an expert in identifying "depravity" in human beings. *See* Welner 10/24/23 Dep. in *Brown v. City of Chicago* (excerpts attached as Ex. B hereto) at 64. He claims expertise in defining the likelihood that a convicted person will recidivate. *Id.* at 65. He is an expert on voluntary intoxication. *Id.* He

3

believes himself to have the expertise to distinguish between religious zeal and psychosis. *Id.* at 66. He is expert in his own self-created "Clinical Inventory of the Everyday Extreme and Outrageous." *Id.* On national television, he has opined that Donald J. Trump is a "healthy narcissist,"[1] a viewpoint he apparently felt comfortable expressing even though Mr. Trump is not his patient and not someone he has ever clinically interviewed. *Id.* at 57-61. In a Fox News appearance,[2] Dr. Welner opined, based on zero evidence, that the news network CNN demonizes gun enthusiasts and thereby contributes to mass shootings. *See id.* at 61-63.  All of these views—like the ones on the subject of false confessions that Dr. Welner plans to espouse in this case—are extemporized; they have not been tested and shaped through research, peer review, and publication in respected journals as they must be to warrant admission at trial.

There are several fundamental problems with Dr. Welner's proposed testimony. *First,* Dr. Welner does not have the credentials or the research experience to opine reliably about false confessions, what causes them, and whether Mr. Amor's case presents an example of false confession. Nor does Dr. Welner have a foundation for the full-throated polemic against the social sciences and false confession research that permeates his report. *See, e.g.,* Welner 6/18/ 21 Report, Ex. C, at 10 (Dr. Leo's opinions regarding the hallmarks of false confessions are "psychological snake oil adorned with ornamental jargon specifically offered as advocacy."). All of Welner's opinions on these subjects must be barred, as Plaintiff shows in Sections I and II below.

*Second,* Dr. Welner has only limited data on Mr. Amor upon which to base a psychiatric opinion about Mr. Amor's susceptibility to false confession. Dr. Welner purports to provide a

---

[1] https://www.youtube.com/watch?v=utvHEMxrHG8
[2] https://pjmedia.com/pj-video/2017/10/03/psychiatrist-cnns-going-answer-twisted-priorities-mass-shootings-n89979

"forensic assessment" of Amor's interrogation, but he did not conduct a psychiatric evaluation of Mr. Amor during his lifetime and there are only a handful of available mental health records concerning Mr. Amor. Dr. Welner's field of expertise has correspondingly little to contribute to the analysis of Amor's interrogation. Dr. Welner should be barred from offering the jury his ruminations about Mr. Amor's character and why he confessed. Among other problems, these are just credibility determinations in disguise *See* Section III.

*Third,* Dr. Welner plans to weigh in explicitly on whether Mr. Amor's account of his interrogation should be believed. *See, e.g., id.* at 11 (Amor is "an unreliable and self-serving historian"). He plans to divine for the jury Amor's interior thought process leading to his inculpatory statements. *See, e.g., id.* at 34 (Amor was "inspired" to make a statement because he was served with a divorce petition filed by his wife, Tina Miceli, and informed (falsely) that she believed Amor had set the fire). Dr. Welner intends to give the jury his gratuitous, negative assessments of Amor's character. *See, e.g., id.* at 27 (Amor was "wily" and "brazen"). Opinions of this nature lack foundation, are improper and must be barred. *See* Section IV.

*Finally,* Dr. Welner plainly lacks any training or experience in fire science or police investigation and is utterly unqualified to offer speculations about how the Miceli fire might have started or the reasonableness of the defendant police officers' actions in their investigation. These opinions, for which there is an utter lack of foundation, must likewise be barred. *See* Section V.

In sum, there are only a few limited opinions as to Mr. Amore that are within Dr. Welner's legitimate area of expertise, that are based on "facts or data" of the type considered by forensic psychiatrists, and that Dr. Welner should be allowed to provide to the jury. Dr. Welner should be barred from testifying as to anything beyond that limited range.

I. **DR. WELNER IS NOT QUALIFIED TO OFFER GENERAL OPINIONS ON THE STUDY OF FALSE CONFESSIONS OR ON HOW THAT STUDY BEARS UPON PLAINTIFF'S INTERROGATION.**

Dr. Welner proposes to offer many opinions generalizing about the study of false

confessions. His report identifies the following, among others:

- How are proven false confessions of the innocent identified. Ex. C at 5.

- What are the reasons why suspects make false statements during interrogation. *Id.* at 9.

- Can psychological coercion induce a false confession. *Id.* at 12.

- How is the length of an interrogation to be measured for purposes of comparison and research. *Id.* at 42.

- Do false evidence ploys increase the risk of false confession by those who are innocent of murder. *Id.* at 34.

- Does use of the so-called Reid Method of interrogation increase the risk of false confession. *Id.* at 39-40.
1.

- Does the technique of "minimization" (downplaying the significance of the crime to the suspect) increase the risk of false confession. *Id.* at 32.

- Does an interrogation subject's anxiety and/or depression heighten the risk of a false confession. *Id.* at 44-45.

- Does a subject's tested suggestibility bear on the risk of that person confessing falsely. *Id.* at 45.

Then, Dr. Welner plans to apply the "answers" to all these questions to the interrogation of Mr.

Amor, opining that Amor's confession cannot be classed as "proven false" (*id.* at 6), that Mr.

Amor was not subjected to interrogation techniques that are associated with false confessions (*id.*

at 29-34, 39-44), and that Mr. Amor did not have personal characteristics associated with

confessing falsely (*id.* at 35, 38, 44-47).

All the questions in the prior paragraph are within the domain of social scientists and

social psychologists, unlike Dr. Welner, who have devoted their professional careers to the study of police interrogation and false confession. Dr. Welner is an armchair consumer of the literature on this subject. But, despite the heat of his rhetoric and the tenacity with which he adheres to his opinions, Dr. Welner has never himself collected data on false confessions or analyzed such data with the rigor and discipline required of credentialed scholars in this area. There are no citations in Dr. Welner's report for his many *ipse dixit* assertions about what causes false confession and whether Mr. Amor's interrogation and confession share traits with other such cases.

The study of false confessions has occupied researchers since the beginning of the twentieth century and has become an established sub-field within the social sciences. *See generally* Saul M. Kassin, et al., *On the General Acceptance of Confessions Research: Opinions of the Scientific Community*, 73 AM. PSYCHOLOGIST 63 (2018), Ex. D (the high rate of agreement among 87 surveyed experts on the psychology of false confessions as to 30 propositions, indicates that those propositions "are sufficiently reliable to present in court"). Courts around the country and in this district have repeatedly allowed false confessions experts, including Dr. Leo in particular, to offer opinions on the phenomenon of false confessions, the susceptibility of persons with certain characteristics to confessing falsely, and the types of interrogation conduct that can lead to false confessions. *See, e.g., United States v. Hall*, 974 F. Supp. 1198, 1205 (C.D. Ill. 1997), *aff'd*, 165 F.3d 1095 (7th Cir. 1999) ("[T]he science of social psychology, and specifically the field involving the use of coercion in interrogations, is sufficiently developed in its methods to constitute a reliable body of specialized knowledge under Rule 702."); *Andersen v. City of Chicago*, No. 16 C 1963, 2020 WL 1848081, at *3 (N.D. Ill. Apr. 13, 2020) (admitting testimony of Saul Kassin, a false confession expert like Leo); *Harris v. City of Chicago*, 2017 WL 2436316, at *9 (N.D. Ill. June 5, 2017) (approving Dr Leo's methodology as "sound,

accepted and reliable" and permitting Dr Leo to testify on matters related to the reliability of the plaintiff's confession); *Caine v. Burge*, 2013 WL 1966381, at *3 (N. D. Ill. May 10, 2013) (denying the defense motion to bar Dr Leo); *Kluppelberg v. Burge*, 2016 WL 6821138 (N.D. Ill. Sept. 16, 2016) (denying in substantial part a motion to bar Dr Richard Ofshe, regarded by many as the father of this area of study); *Scott v. City of Chicago*, 2010 WL 3034254 (N.D. Ill. Aug. 3, 2010); *Hurt v. Vantlin*, 2019 WL 8267074, at *5 (S.D. Ind. Sept. 26, 2019) (admitting false confessions expert); *United States v. Hayat*, 2017 WL 6728639, at *10–11 (E.D. Cal. Dec. 27, 2017) (admitting Dr. Leo's testimony); *United States v. Whittle*, 2016 WL 4433685, at *2 (W.D. Kentucky Aug. 18, 2016) (admitting false confessions expert); *Livers v. Schenck*, 2013 WL 5676881, at *5 (D. Neb. Oct. 18, 2013).

Unlike Dr. Welner, Dr. Leo is a leading researcher and scholar in this area. Dr Leo has extensively studied the interrogation process, among other ways, by personally observing over 120 police interrogations. *See* Richard Leo CV, Ex. E. He has analyzed the causes and risk factors for false confessions in numerous peer-reviewed articles in scientific and legal journals. *Id.* Prof. Leo is the author of several books on these subjects, including POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard, 2008) and CONFESSIONS OF GUILT: FROM TORTURE TO MIRANDA AND BEYOND (Oxford, 2012). He is the recipient of a long and impressive list of awards and honors for this research and writing. *See* Leo Report Ex. F, at 1-2. Prof. Leo's work has repeatedly been cited by the United States Supreme Court and other courts. *Id.* at 2. Prof. Leo has qualified as an expert witness in hundreds of cases; the citations in the paragraph above are but a small sample. *See id.*

Dr. Welner, in contrast, though he is a medical doctor and a psychiatrist, does not have the training, the expertise, or the skill set to offer opinions in the area of false confessions

research. Dr. Welner is not a social psychologist; he is not an expert in the area of social psychology. *See* Michael Welner CV, Ex. G ("Welner CV"). His CV reveals that he does not have a doctorate—or, indeed, any academic degree—in the social sciences. He has never published in a peer-reviewed journal in the area of false or disputed confessions.[3] Welner 8/20/21 Dep. Ex. H, at 92.

Dr. Welner's report acknowledges the method that guides archival research into the causes of false confessions, *i.e.,* through the study of past interrogations in which researchers know with reasonable certainty that a suspect confessed falsely, reasonable inferences can be drawn as to the interrogation techniques that are associated with that outcome. *See* Ex. C at 19 (the study of proven false confessions "can inform understandings"). Dr. Welner once attempted unsuccessfully to perform archival research of this nature. His CV lists funded research on false confessions that Dr. Welner claims to have conducted in 2004 and 2005. Ex. G at 2. The study consisted of a partial analysis of the confession cases listed on the website of the Innocence Project to assess which of the listed exonerees was innocent. Ex. I at 26, 29–31. Dr. Welner did not complete the study; he did not publish the results of his study; and he freely acknowledged in his deposition in the *Taylor v. City of Chicago* case that the study was "half baked." *Id.* at 26, 28.

Dr. Welner does not have the training or the skill set to competently conduct such a study. In a deposition in another case, Dr. Welner demonstrated that he was unable to define basic social psychology terms employed regularly in the false confessions literature, including: "illusion of transparency" and its relevance to suspects in an interrogation, "fundamental

---

[3] Dr. Welner has padded his CV with roughly six pages of "publications" in the "Forensic Echo" or the "Forensic Panel Letter," in-house newsletters of the Forensic Panel, Dr. Welner's consulting firm. *See* Welner CV (Ex. G) at 7-12.

attribution error" and its relevance to the perception of confessions, "social impact theory," "secondary confession" as used in the research literature, "dependent corroboration" in the Reid Method of interrogation, "diagnosticity," and "Othello error" as used in research on deception detection in police interrogations. Dr. Welner was also wholly unfamiliar with the work of prominent social psychologists who conduct social science research related to false confessions and police interrogations, such as Par Granhag (*see, e.g.*, Maria Hartwig et al., *Strategic Use of Evidence During Police Interviews*: *When Training to Detect Deception Works*, 30 LAW & HUM. BEHAV. 603 (2006)) and Kyle Scherr (*see, e.g.*, M. Guyll, et al., *Innocence and Resisting Confession During Interrogation: Effects on Physiologic Activity*, 37 LAW & HUM. BEHAV. 366 (2013)). *See* Welner Dep. *Swift v. City of Chicago*, No. 12 L 12995 (Ill. Cir. Ct. Nov. 4, 2016) 132–134, 141–43, 149–50, excerpt attached as Ex. J.

Dr. Welner does understand that the ability to coherently define a universe of cases in which false confessions did occur is the necessary starting point for informed opinions about the interrogation techniques and suspect vulnerabilities that cause such confessions. In his report in another case, Dr. Welner said, without citation, that the "phenomenon of false confessions in major crimes has been confirmed in 300 to 400 individuals over the past 40 to 50 years." Welner 8/29/23 Report in *Brown v. City of Chicago*, Ex. K at 18. He acknowledged that "[t]he current body of understanding of false confessions derives from identified and thoroughly documented cases in which both prosecution and defense agree that an innocent person falsely confessed to a crime." *Id.*

Dr. Welner's differences with Leo and the false confessions research community center on defining the universe of confirmed false confession cases. Welner claims that his (purportedly more legitimate) claims about the causes of false confessions derive from a narrower universe

10

than the scholarly community has used. *See, e.g.,* Welner Report at 10. But Dr. Welner cannot

define his claimed narrower universe. When pressed in the *Brown* case deposition, Dr. Welner

was incapable of identifying the 300 to 400 false confessions referred to in his report in that case.

*See* Welner Dep. in *Brown,* at 131:2-10 (Ex. B). He claimed to have made notes concerning this

universe of cases but said he could not "immediately access" the notes and might be able to "dig

up some notes over time." *Id.* at 11-20. He was unable to generate a list of the 300 to 400 cases.

*Id.* at 133:4-8. Dr. Welner explained:

> I think if I had some time to put [the list of cases] together, I would do it and I
> would probably write it up. Because if I'm going to put that amount of work
> together on something, then I'll—I'll probably publish it. Because it really
> does require—you know, it—it—it requires—you know, it would require some
> effort on my part to put that together.

*Id.* at 133:8-14.

But, of course, Dr. Welner has not found the time and has not done the work. The

archival study of false confessions is not his area of expertise, and he has other priorities. Dr.

Welner may express himself with bombast and unswerving confidence, but, at bottom, he does

not know and has no business opining as to how people confess falsely under police

interrogation and whether Mr. Amor's interrogation and confession are consistent with the

universe of cases in which people have confessed falsely. For Dr. Welner to declaim in this area

is nothing more than the *ipse dixit* of an expert who has strayed beyond the field in which he is

credentialed and experienced. *Gen. Elec. Co. v. Joiner*, 522 U.S. at 146. Instead of enlightening

the jury, Dr. Welner's uninformed proclamations will confuse and mislead the jury.

Other courts have recognized that Dr. Welner is in no position to opine in that area. *See*

*Edmonds v. State*, 955 So.2d 787, 801 (Miss. 2007) (Diaz, J., concurring) (stating that Dr.

Welner would not qualify as an expert in the field of false confessions and observing, "Dr.

Welner testified at the *Daubert* hearing that he has never published a peer-reviewed article on false confessions."). Dr. Welner has been chastised for offering expert testimony that exceeded the "'boundaries of [his] professional contribution and scientific integrity.'" *See* Sealed Mem. Order Rule 12.2 Motions 32–33, *United States v. Sampson*, No. 1:01-10384-LTS, ECF 2459 (D. Mass. Sept. 2, 2016), Ex. L. *And see generally Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) ("'Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.'") (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)).

All of Dr. Welner's opinions in this case purport to assess Defendants' interrogation of Mr. Amor against what Dr. Welner terms "the empirical evidence" as to what motivates false confessions and what specific interrogation techniques may be deemed "coercive." These opinions are not "reliable" and do not pass muster under *Daubert* because they are not "the product of reliable principles and methods" that Dr. Welner has "reliably applied." Fed. R. Evid. 702 ("Rule 702"); *Higgins v. Koh Dev. Corp.*, 794 F.3d at 704. Dr. Welner should be barred from offering any such opinions.

## II. THE VALIDITY OF THE RESEARCH CONDUCTEDDUCTED AND RELIED UPON BY DR. LEO IS FOR THE COURT TO RESOLVE UNDER *DAUBERT* AND RULE 702

Even though Dr. Welner is not a member of the scholarly community that studies false confessions and lacks expertise in the area, he is quick to deride the opinions of Dr. Leo and others who do this work. By way of example, Dr. Welner offers the following proposed testimony in his report (Ex. C):

- "[A]ny statement that suggests 'indicia' and 'hallmarks' for determining a false or 'unreliable' confession cannot account for its error or success rate, and is

12

essentially psychological snake oil adorned with ornamental jargon specifically offered as advocacy." Welner Report at 10.

- "There is no 'scientific community' of the boutique micro-niche of false confessions, but rather a complement of perhaps eight active expert witnesses (and their acolytes) who testify for criminal defendants and civil plaintiffs that their confessions were false, unreliable, and invariably occurred because the experts pronounce police misconduct. These academics, who unctuously refer to each other as 'scholars,' parrot each other's phraseology verbatim, [footnote omitted] repeatedly cite to each others' work, generate publications repeating the same theories as accepted 'consensus,' peer-reviewed by each other or by people unfamiliar with the handicaps of said studies, and exploit publication to create the totems of the appearance of study of interrogation methods." *Id.* at 15.

- "[P]ublication within the social and behavioral sciences is disconnected from legal realities and therefore unqualified in the peer review it provides before approving publication." *Id.* at 12.

- Welner implies that Dr. Leo has somehow hoodwinked peer reviewers at the journals where his publications have been accepted: "The fact that professional journals publish relevant, reliable, and valid studies and articles on various topics does not mean that they are universally immune to embarrassing ignorance of legal precedents known to the authors who submit articles that publications approve in good faith." *Id.*

- Welner says that Dr. Leo "promotes gimmicks," he is "grandiose," and "pompous," and "cynically misrepresents his own research." *Id.* at 14, 15, 21.

- Dr. Leo "sprinkles" terms in his report "that sound academic but are actually conjured as unvalidated test-marketed catchphrases." *Id.* at 18.

These attacks on the opposing expert's methodology, motivations and integrity are uncivil, intemperate and inadmissible. They are all the more striking because, as shown in the previous section, Dr. Welner is not qualified by experience and training to offer his assessment as to the quality of the data in social science research or the validity of Dr. Leo's application of that research to Mr. Amor's interrogation.

Dr. Welner's commentary on Dr. Leo is improper for the jury to hear for a third reason as well. These opinions stray into the realm of legal argument. Whether there is sufficient

13

foundation or reliable methodology underlying Dr. Leo's opinions is for the court to decide pursuant to its *Daubert* gate-keeping function. *See Daubert*, 509 U.S. at 595; *Kumho*, 526 U.S. at 147 (1999); *Smith*, 215 F.3d at 718.  Judge St. Eve affirmed this proposition, ruling in a closely analogous situation that an expert's "opinion concerning the science upon which [a false confessions expert] relied is … a legal conclusion for the Court's resolution pursuant to *Daubert* and Rule 702." *Harris v. City of Chicago,* 2017 WL 3142755 at *5 (N.D. Ill. July 25, 2017). In *Chatman v. City of Chicago*, addressing a report of Dr. Welner's offering opinions about the reliability of false confessions research like those Dr. Welner offers here, Judge Lee followed Judge St. Eve's reasoning in *Harris* and barred the opinions, noting that the court had already found the social science research sufficiently reliable to pass muster under *Daubert.* Order 8–9, *Chatman v. City of Chicago*, No. 14 C 02945, ECF No. 719 (N.D. Ill. Oct. 30, 2018), Ex. M.

Dr. Welner should be barred from offering any commentary on the foundation or the scientific legitimacy of Dr. Leo's opinions. These are matters for the court to decide.

## III.    DR. WELNER SHOULD BE BARRED FROM OFFERING HIS UNSUPPORTED ASSESSMENTS OF PLAINTIFF'S MENTAL STATE DURING THE INTERROGATION.

Dr. Welner is undoubtedly a qualified forensic psychiatrist. His CV reflects that he has engaged in the practice of civil and criminal forensic psychiatry since 1992. Welner CV at 1 (Ex. G). Standard practice in forensic psychiatry is to conduct an interview of a particular subject and, based on clinical observations in that interview, to offer an assessment of the subject, applying the clinical observations to the legal question in issue. For example, prior to a suppression hearing, a forensic psychiatrist might conduct a forensic interview of the subject of an interrogation to evaluate that person's competency to waive *Miranda*. Dr. Welner acknowledged

in a recent deposition that he continues to perform such "garden variety" forensic assessments. *See* Welner Dep. in *Brown* at 45:14-46:8 (Ex. B).

For the forensic psychiatrist, a personal interview of the subject is essential to formulating a trustworthy opinion. So much so that the ethical guidelines issued by the American Academy of Psychiatry and Law say this: "Honesty, objectivity and the adequacy of the clinical evaluation may be called into question when an expert opinion is offered without personal examination." *See* American Academy of Psychiatry and the Law (AAPL), *Ethics Guidelines for the Practice of Forensic Psychiatry* (adopted May 2005), Ex. N, at 3.

Dr. Welner himself has insisted that an in-person psychiatric interview is essential for a psychiatrist to have a legitimate opinion about the susceptibility of an interrogation subject to making a false confession. For example, in *People v. Oliver*, the court excluded testimony from another false confession expert, citing Dr. Welner's own opinion that "it is only through 'rigorous psychological and psychiatric examinations' that a professional can determine whether a person is susceptible to confessing to a crime he did not commit." 991 N.Y.S.2d 260, 269 (Sup. Ct. 2014). In *Edmunds v. State*, testifying as an expert witness, Dr. Welner declared it impossible to ascertain a person's vulnerabilities in the police interrogation context unless you interviewed them: "shallow research and case reports is [sic] so illegitimate because how do you know people don't have vulnerabilities if you don't talk to them? How do you really know what a person's vulnerabilities are as they related to a disputed confession, if they haven't been examined?" Welner Tr. 835, *Edmunds v. State*, No. 2004-CT-02081-SCT (Cir. Ct. Oktibbeha Cty., Miss.), Ex. O. In *Jones v. Markham*, a civil false confession case in the Cook County Circuit Court, Dr. Welner was still more emphatic, stating without qualification that an expert forensic opinion about a confession that considers only the conduct of the police without

examining "the individual for the specific vulnerabilities," does not "rise to the standard of any kind of forensic examination." *See* Welner Dep. 19, *Jones v. Markham*, No. 00 L 5608 (Cir. Ct. Ck. Cty), Ex. P.

Here, Dr. Welner conducted no in-person interview of Mr. Amor prior to his death. There are less than a handful of available psychiatric or other mental health records regarding Mr. Amor. Dr. Welner does have the training and experience to comment on the significance of psychological testing Dr. Michael Chiapetta performed on Mr. Amor prior to his first trial. Thus, Dr. Welner's assessment of the significance of that testing (Welner Report, Ex. C, at 45-47) would be an appropriate subject for Dr. Welner's testimony. But Dr. Welner's report ranges way beyond the confines of his expertise, offering extensive commentary on Mr. Amor's mental state and thought process during the interrogation, opinions for which there is no underlying psychological data. By way of example, Welner asserts (Ex. C):

- "In minimizing his responsibility [by confessing to spilling vodka on a newspaper] Mr. Amor was making conscious, self-serving choices and was therefore not helpless and without the ability to assert his will." (Welner Report at 33)

- "The process service [of the divorce petition] along with Tina [Miceli]'s reported belief in his guilt, and the timing of that information being delivered to Mr. Amor, inspired his making a statement." (*Id*. at 34)

- Bill confessed after learning that Tina wanted to divorce him and that he "could no longer psychologically dominate or manipulate her approach to police or what she might communicate, and could not ensure her silence." (*Id*. at 25)

- "Historically, William Amor showed no stress intolerance for interrogation." (*Id*. at 35)

- Disputing that Mr. Amor showed compliance during the interrogation, Dr. Welner asserts that "his lack of compliance contributed to his dysfunction." (*Id*. at 38)

- Because Amor had spent time in jail, "[a]n admission to a scenario that would have suggested being primarily negligent, reckless, and removing him from an

16

intent to kill the victim would not be as forbidding a choice as would be for others." (*Id*. at 29)

- Mr. Amor was "willing to be manipulative" and to "con others" and, therefore, his choice to confess as he did was "calculating but mistaken." (*Id.* at 27)

- Amor was "wily" and "brazen." (*Id.* at 27)

- Mr. Amor was "street-wise and anything but naïve to the criminal justice system." (*Id.* at 46).

These opinions are not grounded in any psychiatric judgment. They are not a function of Dr. Welner's reliable application of his expertise to psychiatric data. They merely reflect Dr. Welner's negative judgment of Mr. Amor and his assessment of Mr. Amor's credibility. In this respect, Dr. Welner's report mirrors other false confession reports in which Dr. Welner characterizes other interrogation subjects in similar negative terms. They are "street smart" or otherwise impervious to interrogation techniques associated with false confessions. For example, Welner's report in the Anthony Jakes[4] case asserts that Mr. Jakes "was easily street wise enough to make allegations of police abuse in 1991 and especially years later." Welner July 1, 2022 Report in *Jakes v. Boudreau, et al.,* No. 19-cv-02204 (N.D. Ill.) at 29, Ex. Q hereto. His report in the Deon Patrick[5] case says of Mr. Patrick that "shame and guilt had little sway with him." Welner June 15, 2015 Report in *Patrick v. City of Chicago, et al.,* No. 14-cv-03658 (N.D. Ill.) at 8, Ex. R. Dr. Welner's report in the Daniel Taylor[6] case opines that Mr. Taylor was "not compliant," "street smart," and "very experienced in dealing with the police." Welner March 1, 2018 Report in *Taylor v. City of Chicago, et al.,* No. 14-cv-00737 (N.D. Ill.), at 29, Ex. S. Dr. Welner's report in the Terrill Swift[7] case says that Mr. Swift, like Jakes, Taylor, and Mr. Amor,

---

[4] *See* https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=5321.
[5] *See* https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4320.
[6] *See* https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4212.
[7] *See* https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3845.

was "street smart." Welner October 3, 2016 Report in *Swift v. City of Chicago,* at 34, Ex. T. Just as Dr. Welner never met Mr. Amor, he has never met any of these men. Welner Dep. in *Brown* at 93, 95, 97, 101.

Dr. Welner's opinions about Mr. Amor (Amor was not naïve, was "street smart," "manipulative," "self-serving," "calculating," etc.) are nothing more than veiled credibility determinations. They must be barred because such determinations are beyond any expert's province. The determination of whether Mr. Amor was a credible person is for the jury to make. *See* Section IV, *infra.*

Dr. Welner's proposed testimony would be deeply and unfairly prejudicial because the jury will likely give his opinions weight; he is a fully credentialed psychiatrist. Dr. Welner's opinions are not "based on sufficient facts or data" of the type forensic psychiatrists typically consider. Nor are they "the product of reliable principles and methods" that Dr. Welner has "reliably applied." Fed. R. Evid. 702 ("Rule 702"); *Higgins v. Koh Dev. Corp.*, 794 F.3d at 704. Dr. Welner does not rely on medical impressions from a clinical interview or the review of medical records for these gratuitous assertions. Dr. Welner's medical training gives him no particular authority or privilege to weigh in on how Amor must have experienced the interrogation. Dr. Welner has done what the jury will do at the trial: he has reviewed the records of Amor's interrogation and the transcripts of testimony and become familiar with Defendants' investigation of the Miceli fire. Dr. Welner's views about Mr. Amor and his character will not "assist the trier of fact to understand the evidence or determine a fact at issue." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d at 705. The jury can consider the evidence and reach its own conclusions. Perhaps they will find that Amor was not coerced. But Dr. Welner's *ipse dixit* pronouncements will not assist them in reaching their determination.

18

## IV.  DR. WELNER MUST BE BARRED FROM TESTIFYING AS TO PLAINTIFF'S CREDIBILITY

Dr. Welner's report contains repeated negative assessments of Mr. Amor's credibility generally and the credibility of Amor's account of the interrogation in particular. Again, by way of example:

- Mr. Amor is an "unreliable and self-serving historian." Welner Report, Ex. C at 11.

- Mr. Amor continued to "advocate for [his] best interests" in his confession statement, which was "self-serving." (*Id.* at 26)

- Mr. Amor was "willing to be manipulative" and to "con others." (*Id.* at 27)

- Amor had a "penchant for chatty dissimulation to law enforcement." (*Id.* at 48)

- Amor's account of Defendant Det. Cross's physical abuse of Amor, followed by Cross leaving the room to get coffee, is not credible according to Welner's proposed testimony because, "Were [Cross] to have been agitated, would he have had the urge to get coffee?" (*Id.* at 36)

All other considerations aside, it is not Dr. Welner's province to offer the jury his assessments of Mr. Amor's credibility, his "reliability" as an "historian," and whether Amor's account of the interrogation should be believed. "[A]n expert cannot testify as to credibility issues." *Goodwin v. MTD Prods.*, 232 F.3d 600, 609 (7th Cir. 2000). The jury will make its own judgment about whether to believe what Mr. Amor has said about his interrogation and on other topics. Dr. Welner's opinions will not assist them in this task, and they must be barred.

## V.  DR. WELNER'S GRATUITOUS OPINIONS REGARDING OTHER MATTERS FOR WHICH HE LACKS KNOWLEDGE, TRAINING OR EXPERTISE MUST BE EXCLUDED.

It is fundamental that expert opinion evidence may only be given by persons who are "qualified as an expert by knowledge, skill, experience, training, or education." Rule 702. Dr. Welner's report is infected with stray assertions that are far beyond his expertise.

Dr. Welner is not an expert in fire science. He has never been a police officer or an arson investigator. *See* Welner Dep. at 153, 96. This does not prevent Dr. Welner from speculating that:

- Developments in fire science may continue so that one day the physical evidence will directly implicate Mr. Amor. *See* Welner Report at 32.

- "Perhaps the fire ignited from a smoldering cigarette left by Marianne Miceli, who was not given to dropping cigarettes." (*Id.* at 9)

- Mr. Amor could have ignited the fire with a cigarette on dry newspaper as opposed to wet newspaper. (*Id.*)

- "Perhaps Mr. Amor ignited an area that had been doused with lighter fluid or another accelerant." (*Id.*)

- "[T]here are scenarios by which [Amor] could have ignited a fatal fire in a method unrelated to spilled vodka." (*Id.*)

Dr. Welner's unfounded speculation in the area of fire science must be barred.

Similarly, Dr. Welner has never investigated a crime. He also has no legal expertise. His CV reflects zero background that would qualify him to opine as to the reasonableness of steps police take in an investigation. Yet his report absolves the Defendant Detectives of premature focus on Mr. Amor ("Police were hardly impetuous in being guilt presumptive on October 3") and includes several pages of one-sided discussion regarding the strength of the circumstantial evidence against Amor prior to the commencement of the October 3-4 interrogation. *See* Welner Report at 29-32. Any testimony along the lines of that portion of Dr. Welner's report is well beyond Dr. Welner's legitimate sphere of expertise and must also be barred.

Finally, Dr. Welner has never conducted or documented an interrogation. Yet he asserts that, if Mr. Amor's confession statement were to have been scripted by police, it would have been more inculpatory than the statement police obtained in the early morning of October 4. *See*

Welner Report at 37 ("Were police to be coercing a scripted statement implicating Mr. Amor in murder, police would not be directing a statement to suggest that the fire arguably started accidently.") This is base speculation. Dr. Welner should not be allowed to offer it to the jury.

## CONCLUSION

9.      For the foregoing reasons, this Court should enter an order barring the opinion testimony of defense expert Michael Welner except to the limited extent that his opinions are the product of his review and analysis of psychiatric, psychological and medical records as to which he is qualified to opine.

Respectfully submitted,

**JEANNE OLSON, Not Individually But
As Trustee of the William Amor Trust**

By:    /s/
           Attorney for the Trustee

Jon Loevy
Gayle Horn
Locke E. Bowman
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
312 243 5900

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on May 17, 2024, he caused the foregoing document to be served on all counsel of record by filing the same using the Court's CM/ECF system, which automatically effected service on all counsel of record.
<sup>i</sup>

                                                              /s/   Locke E. Bowman