IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JEANNE OLSON, Trustee of the WILLIAM AMOR Trust, as successor plaintiff, Plaintiff, | ) ) ) ) | Case No. 18 CV 2523 |
| v. | ) ) ) | Judge John J. Tharp, Jr. |
| REBECCA GOMEZ, as Special Representative for Michael Cross, deceased, et al., Defendants. | ) ) ) ) | |

**DEFENDANTS' MOTION TO BAR THE TESTIMONY OF
PLAINTIFF'S EXPERT DOUGLAS J. CARPENTER**

Defendants Rebecca Gomez, as Special Representative of Michael Cross, deceased, Robert Guerrieri, Brian Cunningham, and the City of Naperville, by and through their attorneys, The Sotos Law Firm, P.C., move to bar the testimony of Plaintiff's fire science expert Douglas J. Carpenter, and state:

**FACTUAL BACKGROUND**

Around 6:25 p.m. on September 10, 1995, William and Tina Amor left their Naperville apartment to go a drive-in movie, while Tina's mother, Marianne Miceli remained at home. At 6:40 p.m., a 911 dispatcher received a call from Miceli who stated there was smoke coming through her bedroom. She gave her address and apartment number, but said she was not able to get out of the apartment because the fire was in the way. The dispatcher told Miceli to get low to the ground and asked if she knew what started the fire. Miceli said "Ah, no I don't; I just came out and the chair was on fire." The dispatcher asked Miceli if she could get past the chair, and when she said no, the dispatcher asked if she had a balcony. Miceli replied that she did but "[t]his chair is right by the balcony, and it's also by the main entrance." When Miceli told the dispatcher she was overcome with smoke, the dispatcher asked if she could open a window. Miceli responded that she could, but

then made no further communication. (Ex. A, 911 call based on running time and transcript).

Among the living room furniture in the apartment were two chairs with a sofa between them: a reclining chair to the east of the sofa, and a swivel chair to its west and closer to the balcony's sliding glass doors. Miceli's bedroom was on the north side of the apartment opposite the living room at the end of a connecting hallway. A layout of the apartment and furnishings is depicted at Ex. B.

Miceli was found lying on her bedroom floor at the foot of her bed by responding firefighters. She was unresponsive and pronounced dead at the hospital. Her autopsy determined her cause of death was carbon monoxide intoxication due to the inhalation of smoke and soot during a house fire. (Ex. C, Autopsy and Toxicology reports). Following Naperville's investigation, William Amor confessed to causing the fire by flicking a lit cigarette into newspaper that he had spilt vodka on, knowing that a fire would likely result. He was charged, tried, and convicted of aggravated arson and first-degree murder. His conviction was later vacated and he was acquitted in a retrial in 2018. This lawsuit followed.

## LEGAL STANDARD

The admission of expert testimony is governed by Federal Rule of Evidence 702 and the principles outlined in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). Fed.R.Evid. 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods;

2

and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed.R.Evid. ("Rule") 702.[1]

The trial judge plays a "gatekeeping role" to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert,* 509 U.S. at 589. In considering the admissibility of expert testimony the court must determine whether the expert is qualified, whether his methodology is scientifically reliable, and whether the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue. *Bielskis*, 663 F.3d at 893. This analysis is also subject to Rule 403 which overlays all other evidentiary rules. *Krik v. Exxon Mobil Corp.,* 870 F.3d 669, 674 (7th Cir. 2017). Plaintiff bears the burden of demonstrating by a preponderance of the evidence that the expert's testimony satisfies the *Daubert* standard and the Federal Rules of Evidence. *Id.* at 673.

## ARGUMENT

Plaintiff disclosed Douglas J. Carpenter, a fire protection engineer, to provide expert testimony on the origin and cause of the September 10, 1995 fire that resulted in Miceli's death. Pertinent here, Carpenter opines that (1) the origin of the fire was the reclining chair in the living room; (2) the ignition source was a lit cigarette; (3) the first fuel ignited was polyurethane foam in the reclining chair; and (4) the cause of the fire was accidental. (Ex. D, Carpenter Dep. Tr. at 98-99.) Carpenter also opines that the Naperville fire investigation team did not follow the scientific method based on the then available standard of care in the industry, National Fire Protection Association (NFPA) 921, *Guide for Fire and Explosion Investigations* ("NFPA 921"), and that

---

[1] Rule 702 was amended effective 12/1/2023 "to clarify and emphasize that expert testimony may not be admitted unless…it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Rule 702 Advisory Committee Notes to the 2023 amendment, citing Rule 104(a). The Committee Notes caution that "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a)." *Id.*

3

vapor from vodka cannot be ignited by a lighted cigarette at nominal room temperature, but Defendants do not move to exclude those opinions under *Daubert*.

The asserted relevance of Carpenter's testimony is apparently to establish that Amor was not responsible for the fire and thus wrongfully prosecuted and convicted. However, Carpenter acknowledges that other experts in his field have testified about this case and have reached different conclusions. (Ex. D at 94.) He also admits that he is unaware of any other expert in his field who has determined the cause of the fire was accidental. (*Id.*, at 99.) Defendants do not contest Carpenter's qualifications in the field of fire science. Rather, the challenged opinions are inadmissible because they are not based on sufficient facts or data, are the product of an unreliable methodology, his opinions do not reflect a reliable application of his methods to the facts of the case, and his testimony will not assist the trier of fact. Rule 702. Plaintiff, as the proponent of Carpenter's expert testimony, cannot meet her burden to demonstrate these admissibility requirements have been satisfied by a preponderance of the evidence. *Id.*

## I. Carpenter's Origin and Cause Opinions Are Unreliable

Carpenter opines the fire originated in the reclining chair from a lit cigarette dropped into it as the ignition source, and that the cause of the fire was accidental. In support of his opinion, he relies upon (1) a computer-generated model tracking and timing the flow of smoke through the apartment after fire ignition; (2) thermal heat created by the burning chair; and (3) the toxic effect of hydrogen cyanide produced as a result of burning polyurethane foam. Carpenter's origin and cause opinions should be barred because they are based on insufficient facts and data (Fed. R. Evid. 702(b)), they do not reflect a reliable application of his methodology (Fed. R. Evid. 702(d)), and they do not assist the trier of fact as required by Fed. R. Evid. 702(a). *Daubert,* 509 U.S. 579.

### A. Carpenter fails to utilize "undetermined" as a cause classification.

Initially, Carpenter presumes that all fires should be considered accidental unless there is evidence to prove otherwise. He admits this is his own personal opinion and contrary to NFPA 921, the standard of care in the industry. (Ex. E, Carpenter Test., *People v. Amor*, PC hearing, 12/13/2016). NFPA 921 instructs that in all investigations of fire incidents investigators should approach incidents without presumption as to origin, ignition sequence, cause, fire spread, or responsibility for the incident until the use of the scientific method has yielded testable hypotheses which cannot be disproved by vigorous testing. (NFPA 921, 2021 Edition attached as Ex. F, at pt. 4.3.8, Avoid Presumption.) NFPA 921 further directs that in circumstances where all hypotheses have been rejected, or two or more hypotheses cannot be rejected, the only choice for investigators is to conclude that the fire cause was undetermined. (*Id*., at pt. 19.6.5.1, Cause Undetermined.) Thus, at the outset, the reliability of Carpenter's methods are questionable under Rule 702(c) given his deviation from the standard of care.

**B. Carpenter speculates the fire origin is a lit cigarette in the reclining chair.**

Carpenter's theory that the fire's origin was a lit cigarette in the reclining chair is not based on any concrete evidence that someone left a lit cigarette in the apartment during the day of the fire, let alone in the specific location of the reclining chair. No cigarette was found at the scene in the reclining chair – the chair was almost totally consumed during the fire. Carpenter's conclusion that a lit cigarette was "left" *in* the reclining chair is purely speculative. Expert opinion may not be based on speculation. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010).

In addition, Carpenter reached his opinions without considering and collecting significant data points as directed in determining fire origin under NFPA 921. "The fundamental purpose of conducting an examination of any incident scene is to collect all the available data." (Ex. F at pt.

5

4.4.3.1, Conducting the Investigation.) Specifically, Carpenter does not know any of the following facts: the brand of the cigarette and whether it was a "fire safe" cigarette manufactured to reduce its ability to burn (Ex. D at 215-16); whether the reclining chair was new or used furniture (*Id.* at 217); the specific cover fabric material or surface material of the reclining chair (*Id.* at 219); the exact filler material of the reclining chair (*Id.*); and, the specific material composition of the other furniture in the living room, including the sofa and the swivel chair. (*Id.* at 220-21). Without considering all the available data points, Carpenter basically speculates that the first item ignited was the reclining chair and that the ignition source was a lit cigarette. However, "[a] narrow focus only identifying the first item ignited and a competent ignition source fails to take into account important data that can be used to test any origin hypothesis. In such a narrow focus, the growth and spread of the fire and the resulting fire damage are not well considered." (Ex. F at pt. 18.2.1, Overall Methodology for Determining Origin.) And "[g]enerally, if the correct origin is not identified, the subsequent cause determination will also be incorrect. (*Id.* at pt. 18.1, Introduction to Origin Determination.)

Carpenter also did not interview either Amor or Tina about the circumstances of the fire, or to determine any of these facts (Ex. D at 119-20), contrary to the standard of care set forth by NFPA 921 which directs that an "investigator should…interview any witnesses who may have data relevant to the incident, including…individuals familiar with the characteristics of the property or with the activities of individuals prior to, during, and after the incident." (Ex. F at pt. 18.1.2(1), Witness Information for Origin Determination; *Id.* at pt. 14.5.1.1, Witness Data.) Carpenter was involved in Amor's criminal defense since the post-conviction stage and as an expert in this civil proceeding, had access to Amor but never spoke with him to obtain this basic information. Additionally, despite basing his opinion on complete speculation that the fire started

6

in the recliner chair, he also made no efforts to review or analyze the samples of the carpet and chair fabric collected by Naperville investigators, (Ex. G, DuPage County Sheriff Lab Report, 9/15/95), to analyze their composition or to test their potential flammability. (Ex. F at pt 17.2.1 ("Physical evidence at the fire scene may be relevant to the issues of origin, cause, spread, or responsibly for the fire").) These omissions deviate from the standard of care under NFPA 921 and establish Carpenter's opinions are not based on sufficient facts or data in contravention of Rule 702.

Lacking this relevant and required data to make a fire origin determination, Carpenter instead substitutes assumptions. He assumes that a lit cigarette smoldered somewhere within the chair. (Ex. D at 98.) He agrees that the placement of a cigarette in the chair can make a difference whether it will actually ignite into flame (*id.* at 221), but cannot say where on or in the chair the cigarette was placed. He further acknowledges ignition to flame is not an absolute, but more of a propensity – a lit cigarette laying on top of upholstered furniture has less propensity for smoldering ignition to occur on the polyurethane foam than a cigarette dropped within a crevice created by the cushions. (*Id.* at 221-222.) Because he can only offer propensity, Carpenter cannot say to any degree of certainty which of those cigarette placement and ignition scenarios occurred here.

Furthermore, he has no evidence of when during the day the cigarette was left in the reclining chair (*Id.* at 214), nor can he say with any specificity when the smoldering cigarette transitioned into flame (*Id.* at 215). Even the literature he relies on indicates a substantial range of time for a smoldering cigarette on an upholstered chair to transition to flame—anywhere from 20 minutes to five hours. (*Id.* at 226). Indeed, NFPA 921 cautions that:

> "[t]he time required from smolder initiation to transition to flaming is not predictable Transitions to flaming in upholstered furniture have been observed in times ranging from 20 minutes to many hours. . . . Because transition to flaming is governed by changes in airflow and the creation of holes or channels, the time to

7

transition to flaming combustion, if it happens at all, appears to be largely random." (Ex. F at pt. 5.7.4.1.7.2, Transition to Flaming Combustion.) Moreover, even if there was a transition from smoldering cigarette to flame, a certain amount of time would still be necessary for the flame to progress to the fire Miceli described during her 911 call. Carpenter does not account for the progression to fire time contrary to NFPA 921 (*See*, Ex. F at pt. 5.10.1.4, Compartment Fire Development, "The rate of fire growth [in a compartment fire] is dependent on many factors besides fuel load, including fuel configuration, compartment size, compartment properties, ventilation, ignition sources, and first fuel ignited.").

These omissions regarding cigarette placement on or in the reclining chair, time of placement, time of transition from smoldering into flame, and time to progress to the fire witnessed and reported by Miceli establish Carpenter's methods to determine fire origin are lacking in data and unreliable. An expert may not rely on data that has no quantitative or qualitative connection to the methodology employed, and an opinion connected to existing data "only by the *ipse dixit* of the expert" must be excluded. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017) quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Indeed, Carpenter's lack of detail regarding cigarette placement, placement time, transition time from smoldering to flame, and progression time to the fire Miceli observed is strikingly similar to an expert's lack of detail in *Gopalratnam*, whose opinion was excluded because it was too speculative to pass muster under *Daubert* and Rule 702. *Id.* at 787-88. In that fire case, the "battery safety" expert opined that an internal fault in a battery cell was caused by a manufacturing defect, but "could not provide details as to *what* the specific defect was; *why* it transpired; *when* it occurred in the manufacturing process; or even *where* such manufacturing took place." *Id.* at 787 (emphasis in original). As in *Gopalratnam*, Carpenter's testimony is too speculative to be admissible opinion evidence. *Id*.

8

Therefore, his origin and cause opinions should be barred.

### C. The CFAST model and corresponding fire timeline do not reflect a reliable application of Carpenter's methodology.

Carpenter intends to support his opinion with Consolidated Fire and Smoke Transport (CFAST), a computer fire simulation zone model that predicts the path and time of movement of smoke from one area to another. (Ex. D at 129-30). Significantly, and Carpenter agrees, the CFAST model does not determine the origin and cause of a fire (*Id.* at 164). Here, Carpenter used CFAST to specifically test a hypothesis: the transport of smoke from the reclining chair in the living room to the primary (Miceli's) bedroom as observed by Miceli, and the time it took to do so. (*Id.* at 132, 137-38, 146-48, 157, 164-65.) However, the model does not reliably support that hypothesis.

According to Carpenter, the model does not specifically account for whatever ventilation exists in the apartment itself. (Ex. D at 168). NFPA 921 defines ventilation as "[t]he movement of gases within, into, or from any compartment or space . . . ." (Ex. F, at pt. 3.3.206); a "vent" is defined as "[a]n opening for the passage of, or dissipation of, fluids, such as gases, fumes, smoke, and he like; (*Id.* at pt. 3.3.205); "venting" is the "escape of smoke and heat through openings in a building (*Id.* at pt. 3.3.208). Notably, certain rooms in the apartment, the kitchen and two bathrooms, which were located on the east side of the hallway leading to Miceli's bedroom, were not included in the CFAST model. Carpenter's model exclusions (fig. b) as compared with the actual layout with furniture (fig. a) is depicted in Ex. H.

How the absence of these rooms, which typically contain exhaust vents, effected the overall ventilation in the apartment and thus the smoke movement and venting in the model is unknown. NFPA 921 requires an investigator to consider ventilation in determining fire origin:

> "[F]ires can produce unburned hydrocarbons that can be driven outside the compartment through ventilation openings….Thus, knowledge of changes in ventilation (e.g., forced ventilation from building systems, window breakage,

9

> opening or closing of doors, burn-through of compartment boundaries) is important to understand in the context of fire pattern analysis.

(Ex. F at pt. 18.4.1.4, Ventilation.) Hence, ventilation openings in the kitchen and bathrooms (vents, doorways, or other entryways) could divert the path and movement of air, smoke, and contaminants as they proceeded down the hallway towards Miceli's bedroom. (*See id*.) Yet, Carpenter disregards this significant factor. Carpenter also did not input a room air conditioner on the west wall of the apartment, nor did he account for the apartment's heating system which could also affect ventilation and smoke movement (Ex. D at 169-70.)

Further, Carpenter did not input any of the other furniture in the apartment, the carpet, or any inert fuel, such as boxes or clothing, into the model. (*Id.* at 158-161.) He only inputted the reclining chair as a fuel source. (*Id.* at 160-61; 227-228.) Thus, Carpenter did not test any alternate fuel sources as hypotheses; instead, he only tested his own hypothesis with the model. This too is contrary to NFPA 921:

> "When using the schematic method, testing of hypotheses should be designed to disprove a hypothesis…rather than relying only on confirming data that support the hypothesis. Confirmation bias occurs when the investigator relies exclusively on data that supports the hypothesis and fails to look for, ignores, or dismisses contradictory or nonsupporting data…. The failure to consider alternate or opposing hypotheses…can result in incorrect conclusions."

(Ex. F at pt. 4.3.10, Confirmation Bias.) *See also, Gopalratnam*, 877 F.3d at 787, *citing* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("[w]hether the expert has adequately accounted for obvious alternative explanations" relevant "in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact."). Thus, Carpenter did not employ a reliable methodology with regard to his model and associated timeline to test his hypothesis as required under Rule 702(c).

Carpenter uses the CFAST model to determine the time the fire started based on how long

10

it took the smoke to reach Miceli in her bedroom. (Ex. I, Carpenter Rule 26(a)(2) Report, 1/22/2021 at p. 9, fig. 1.) According to Carpenter, Boehmer did six runs of the model, and Carpenter took the minimum and maximum times of the smoke transport to determine that the smoke took about one minute to travel from the reclining chair in the living room to Miceli's bedroom where she observed it. (Ex. D at 146-48.) Apparently using the known time of Miceli's 911 call at 6:40 p.m., Carpenter then "backs out" or counts backwards that one minute from the time of the call to the time Miceli would have seen the smoke was coming through the bedroom door at 6:39 p.m., and counts back another one minute to speculate that the start of the fire was 6:38 p.m. (*Id.* at 158, 188-89; Ex. I at p. 9, fig. 1.) This is also sheer speculation because as noted above Carpenter admits he does not know when the lit cigarette was dropped into the reclining chair during the day, when it transitioned from smoldering to flame igniting the chair given the vast range of transition time (20 minutes to 5 hours) based on the literature he reviewed, or the time it took for the flame to progress to the fire Miceli reported. (*See*, Ex. F at pt. 5.7.4.1.7.2, Time to Flaming Combustion, *supra*.) And it can only be sheer speculation because significantly the model assumes ignition -- it does not differentiate between certain sources of ignition such as a lit cigarette, a match, or an open flame (Ex. D at 166). Thus, there is no rational connection between the data and Carpenter's opinion as to when the fire started, and his flawed methodology must be barred.

Carpenter's timeline opinion also depends on Miceli noticing the smoke at a certain time and at a certain level in the apartment, and then reacting to it by calling 911. This too is based on speculation. Carpenter is only speculating on when or how Miceli noticed the smoke. He concludes, based on the smoke descending nominally one foot from the ceiling, that Miceli would have observed it at that point, but acknowledges it is possible she did not notice the smoke until it had descended more than a foot off the ceiling. (Ex. D at 184). Indeed, in her 911 call Miceli does

11

not quantify the smoke, the thickness of the smoke, of how far off the ceiling the smoke has descended. (*Id.* at 184-85.) Carpenter does not know whether Miceli was laying in her bed when she observed smoke coming into her bedroom doorway (*id.* at 185), whether she was awake when she first noticed the smoke (*id.* at 198), whether she smelled the smoke before she saw it (*id.* at 199) or opine whether the medication she took affected her senses (*id.* at 198). Similarly, he speculates that it took Miceli about a minute to react to the smoke and get out of her bedroom and into the hallway to make her observations of the fire communicated during the 911 call (*id.* at 200), despite knowing she had physical disabilities that limited her movement. (*Id.* at 198, 205.) Thus, the method Carpenter employs is unreliable and inadmissible because it is based on speculation. *Metavante Corp.*, 619 F.3d at 761. It also evidences an unreliable application of the method to the facts of the case under Rule 702(d).

In sum, there are way too many analytical gaps in Carpenter's timeline theory to satisfy *Daubert*, and therefore, the model and the associated timeline should be excluded. *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

**D. The CFAST Model and Timeline should also be barred under Fed. R. Evid 403.**

Additionally, Carpenter's CFAST model and corresponding timeline should be excluded under Rule 403 because what little probative value they may have is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. Rule 403. As noted above, the inputs to the model are susceptible to manipulation from insufficient data and flawed methodology which creates the danger of misleading the jury to believe the simulation is a recreation of an actual event. The model will confuse the jury because it does cannot determine the origin and cause of the fire. Here, the model was done to test a specific hypothesis – the

12

movement of smoke from the reclining chair in the living room to Miceli's bedroom at the end of the hallway and the time it took to do so. This also misleads the jury regarding ignition and timing because the model assumes ignition regardless of the ignition source, and Carpenter does not know when the cigarette was left in the chair or when it transitioned from smoldering into flame. Because the model and timeline pose a substantial danger of misleading and confusing the jury they should be barred under Rule 403.

### E. Carpenter's Opinions as to Thermal Heat and Incapacitation Are Also Based on Insufficient Facts and an Unreliable Methodology.

Also in support of his origin opinion, Carpenter opines the thermal heat generated by the burning reclining chair alone was sufficient to prevent Miceli from exiting the apartment and that she was incapacitated by toxic hydrogen cyanide (HCN) produced as a result of the burning polyurethane foam from the reclining chair. These opinions should be excluded because they also are based on insufficient facts and an unreliable methodology under Rule 702.

In Carpenter's opinion, at the time Miceli reported her description of the fire to the 911 dispatcher the only item of furniture on fire was the reclining chair, and that single chair was generating enough thermal heat to block her path from both exits—the main door to the east of the living room and the balcony sliding door on the west side of the living room. (Ex. D at 209.) He illustrates the concept of thermal heat as someone too close to a campfire who does not touch the fire but will feel the heat generated by it and pain if he does not step back from it. (*Id.* at 192-93.) However, Carpenter admits Miceli does not say anything about the heat of the fire during her 911 call, and that there is no evidence of the heat of the fire in this case. (*Id.* at 212-13.) Nor is there any evidence that Miceli said she was in any pain associated with the fire she reported. Carpenter has no basis whatsoever to opine that Miceli perceived thermal heat from the fire or that this was the reason she told dispatch that she could not pass to either the balcony or main exit. (*Id.* at 212.)

13

Thus, whether Miceli was feeling the heat and experiencing enough pain from it so that she perceived she could not pass to either of the exits is inadmissible subjective belief and speculation. *Metavante Corp.*, 619 F.3d at 761.

Carpenter's thermal heat opinion further speculates on Miceli's distance from the burning reclining chair. He cannot say whether she was standing or crawling on the ground when she made her observations, how far she could go down the hallway or if her entire body was even in the hallway. (Ex. D at 200-201.) Like the lack of evidence from Miceli about the heat of fire and how she perceived she could not pass to the exits, her position in the hallway relative to the burning reclining chair such that she could actually feel the thermal heat generated is without any supporting evidence. Thus, Carpenter cannot render his speculative thermal heat opinion because there are simply insufficient facts or evidence to do so, or to reliably apply his principles and methods to the facts of the case under Rule 702 (b) and (d). In sum, his opinion that there was enough thermal heat from the burning reclining chair to block Miceli from passing to both exits of the apartment is nothing but speculation and should be barred. *Metavante Corp.*, 619 F.3d at 761.

Similarly, Carpenter's opinion about the cause of Miceli's incapacitation is entirely speculative. Carpenter states that HCN produced as a result of a smoldering cigarette in polyurethane foam transitioning to flame produces a very toxic environment that can knock people down almost instantaneously, and this is consistent with Miceli's incapacitation in this case. (*Id.* at 230-232.) As noted above, Miceli's autopsy determined her cause of death was carbon monoxide intoxication due to the inhalation of smoke and soot during a house fire. (Ex. C, at SDT-SAO 3572.) Neither the autopsy report nor toxicology report reference testing for HCN, rendering Carpenter's opinion speculative and impermissibly based on insufficient data under Rule 702(b).

Furthermore, Miceli's 911 call evidences that she was not instantaneously knocked down,

14

and that although she reported being overcome with smoke, she was able to tell the dispatcher she could open a window. (Ex. A.) We also know she was able to retreat to her bedroom because that is where her body was found by the firefighters. Based on these facts, Carpenter's opinion that Miceli was incapacitated by HCN, which by his account would have immediately knocked her down, is not the product of a reliable methodology, or a reliable application of the principles and methods to the facts of the case in violation of Rule 702 (c) and (d). Carpenter's field of expertise may allow him to determine that HCN is produced to certain levels as a result of a smoldering cigarette in polyurethane foam transitioning to flame and burning it, but it does not allow him to opine beyond his field of expertise to conclude that HCN caused Miceli's incapacitation. Carpenter is not a medical doctor, a forensic pathologist, or a toxicologist. (Ex. D at 45-46.) *See*, *Ammons v. Aramark Uniform Serv., Inc.*, 368 F.3d 809, 816 (7th Cir. 2004) (expert must be qualified in the relevant field). Further, simply accounting for HCN levels produced by burning polyurethane does not establish the existence of HCN in Miceli's bedroom where she retreated and was eventually found, and if so, how long they were present or the actual level of HCN toxicity sustained by her, if at all. Thus, his methodology is unreliable. *Id.* at 816 (methodology underlying expert's conclusions must be reliable). And because Carpenter cannot apply the purported HCN toxicity levels to Miceli particularly to determine they caused her incapacitation, he has not reliably applied his methods to the facts of the case under Rule 702 (d). His opinion is nothing more than *ipse dixit*. *Joiner*, 522 U.S. at 146 (court not required to admit opinion evidence connected to existing data only by the *ipse dixit* of the expert). Because Carpenter's HCN incapacitation opinion is unreliable it is unhelpful to the trier of fact and should be barred. Rule 702.

## CONCLUSION

WHERERFORE, Defendants respectfully request that this Honorable Court bar the

testimony of plaintiff's fire science expert Douglas Carpenter and grant such other relief as this Court deems appropriate.

Dated: May 20, 2024                  Respectfully Submitted,

                                              /s/ Joseph M. Polick
                                              JOSEPH M. POLICK, Attorney No. 6203682
                                              *One of the Attorneys for Defendants*

James G. Sotos
Laura M. Ranum
Joseph M. Polick
Lisa M. Meador
**THE SOTOS LAW FIRM, P.C.**
141 W. Jackson Bld., Ste. 1240A
Chicago, IL 60604
(630) 735-3300
jpolick@jsotoslaw.com

16