*Amor v. Cross, et al.*
Case No. 18-CV-2523
Our File No. 18-4078

# EXHIBIT D

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
2            EASTERN DIVISION

3  WILLIAM E. AMOR,       )
                  )
4        Plaintiff,   )
                  )
5     vs.         )   No. 18 CV 2523
                  )
6  MICHAEL CROSS, et al.,   )
                  )
7        Defendants.   )

8      The videotaped deposition of

9  DOUGLAS J. CARPENTER, taken pursuant to the Federal

10  Rules of Civil Procedure, before Katie K. Elliott,

11  Certified Shorthand Reporter No. 084-004537, via

12  Zoom Video Teleconference, on Wednesday,

13  March 31, 2021, commencing at 9:41 a.m. pursuant to

14  notice.

15     APPEARANCES:

16      LOEVY & LOEVY, by
       MS. MARIAH E. GARCIA
17      (311 North Aberdeen Street, Third Floor
       Chicago, Illinois 60607
18      312.243.5900
       mariah@loevy.com)
19       appeared on behalf of the plaintiff;

20

21

22

23

24

DOUGLAS J. CARPENTER, 03/31/2021      Page 2..5

Page 2

```
 1   APPEARANCES:  (Cont'd)
 2     THE SOTOS LAW FIRM, PC, by
         MR. JOSEPH M. POLICK and
 3     MS. CARSON CANONIE
         (141 West Jackson Boulevard, Suite 1240A
 4       Chicago, Illinois  60604
         630.735.3300
 5       jpolick@jsotoslaw.com)
         appeared on behalf of the defendants.
 6
     ALSO PRESENT:
 7
       Ms. Brett Schatzle, Video Technician.
 8
               * * * * * * *
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1              I N D E X
 2
   Witness:                    Page
 3
     DOUGLAS J. CARPENTER
 4
       Examination by:
 5
         Mr. Polick.................   5
 6
 7          E X H I B I T S
 8 No.  Description        Marked/Referenced
 9   1 Carpenter Report - 1/22/2021...........  20
     2 Affidavit of Douglas J. Carpenter -
10      12/24/2014............................ 100
     3 Rebuttal Opinions - Douglas Carpenter
11      - 9/9/2016........................... 101
     4 Analysis by Douglas Carpenter - State
12      of Oklahoma v. Posy - 11/14/2018....... 115
     5 Carpenter PowerPoint.................. 202
13
14       (Exhibits attached/scanned.)
15
               - - -
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1       THE VIDEO TECHNICIAN:  This is the beginning
 2  of media unit 1, and we are now on the video record
 3  at 9:41 a.m.
 4              This is the videotaped video
 5  conference deposition of Douglas J. Carpenter being
 6  taken on March 31, 2021.  This deposition is being
 7  taken on behalf of the defendant in the matter of
 8  William E. Amor versus Michael Cross, et al.  The
 9  case number is 18 C 02523 filed in the United
10  States District Court, Northern District of
11  Illinois, Eastern Division.
12              My name is Brett Schatzle, legal
13  videographer, representing Urlaub Bowen &
14  Associates with offices at 20 North Clark Street,
15  Suite 600, Chicago, Illinois.  The court reporter
16  today is Katie Elliott of -- also of Urlaub Bowen &
17  Associates.
18              Counsel, please identify yourselves
19  for the video record and the parties which you
20  represent.
21      MS. GARCIA:  Mariah Garcia for the plaintiff.
22      MR. POLICK:  Joseph Polick, P-o-l-i-c-k, on
23  behalf of the defendants.
24      MS. CANONIE:  Carson Canonie, C-a-n-o-n-i-e,
```

Page 5

```
 1  on behalf of the defendants.
 2      THE VIDEO TECHNICIAN:  Will the court
 3  reporter please swear in the witness.
 4              (Witness sworn.)
 5          DOUGLAS J. CARPENTER
 6  called as a witness herein, having been first duly
 7  sworn, was examined and testified as follows:
 8              EXAMINATION
 9  BY MR. POLICK:
10      Q.    All right, sir.  Can you state your
11  name and spell it for the court reporter, please?
12      A.    Sure.  Douglas James Carpenter,
13  C-a-r-p-e-n-t-e-r.
14      MR. POLICK:  All right.  Let the record
15  reflect this is the deposition of Douglas James
16  Carpenter.  It's being taken pursuant to notice and
17  pursuant to the Federal Rules of Civil Procedure.
18  BY MR. POLICK:
19      Q.    Mr. Carpenter, can you hear us okay at
20  your end?
21      A.    Yeah.  I seem to be -- I mean, the --
22  seems like the connection is a little jittery, so
23  we'll just have to keep going.  I think I can -- if
24  I don't understand, I'll have you repeat it.
```

Page 6

1    Q.    Okay.  I just wanted to make sure
2 because I know you had some difficulties before we
3 went on the record here.  So if that does become an
4 issue where you don't hear my question, please let
5 us know and we'll try to remedy that.  All right?
6    A.    Sounds good.
7    Q.    All right.  When's the last time you've
8 given a deposition?
9    A.    I think I have a list of depositions in
10 my report, so that would have been in October 8,
11 2020.
12    Q.    All right.  And you're familiar with
13 the rules of depositions?
14    A.    I am.
15    Q.    Okay.  Rather than going through the
16 ground rules, since you are familiar with them, I
17 would just ask that you allow me to complete my
18 question before you give your answer, especially
19 with the somewhat of a difficulty we're having with
20 the audio.  And I'll give you as much time as you
21 need to give your answer to my question.
22        Fair enough?
23    A.    Fair enough.
24    Q.    All right.  Have you used any names

Page 7

1 other than Douglas James Carpenter?
2    A.    In what setting?  I'm not sure I
3 understand the question.
4    Q.    In any setting?
5    A.    No.  I use my -- that's my legal name.
6    Q.    Anything preventing you today from
7 understanding questions or giving answers to them?
8    A.    No.
9    Q.    Are you taking any medication that
10 might affect your ability to understand questions
11 or give answers to them?
12    A.    No.
13    Q.    What did you do to prepare for your
14 deposition today?
15    A.    I went over materials to make sure I
16 was familiar with my report and the -- basic
17 file.
18    Q.    And when you say your report, are you
19 referring to all the reports that you've authored
20 in this particular matter?
21    A.    Which matter?  The current one or -- or
22 previous?
23    Q.    Both?
24    A.    Yes.  I did -- I did go through those,

Page 8

1 yes.
2    Q.    And when you say you reviewed the basic
3 file, what do you mean by "the basic file"?
4    A.    I have a hard copy file of a number of
5 boxes that I went through, and I reviewed documents.
6    Q.    And when you say you reviewed
7 documents, what documents did you review?
8    THE VIDEO TECHNICIAN:  Did we lose him?  He
9 was frozen on my screen for just a second.
10    Mr. Carpenter, can you hear us?
11    THE WITNESS:  I can barely hear you.
12 Somebody's screen went stagnant, so I don't know.
13 Something's going on.
14 BY MR. POLICK:
15    Q.    Should we try that last question again?
16    A.    We can, yeah.  I didn't -- I don't
17 know.  You went dead for a little while, so I
18 don't --
19    Q.    Okay.  All right.  Please let us know
20 when that happens.  Otherwise, we're going to have
21 no clue that you cannot hear the question or give
22 an answer to that.
23        My question was:  When you looked at
24 documents from the hard copy of your file, what

Page 9

1 documents did you review?
2    A.    Everything that's in my file.
3    Q.    Okay.  And can you identify -- when you
4 say everything that's in your file, can you
5 identify what it is that you're looking at
6 specifically in your file?
7    A.    Well, it would be included in the list
8 of publications.  And both reports have an
9 appendices A that lists all the materials reviewed.
10        So I mean, I skimmed them.  I didn't
11 obviously go through and review all of them.  But I
12 went through and familiarized myself with
13 what's in my file.
14    Q.    All right.  And when you're referring
15 to materials reviewed, you're referring to
16 appendix A of your current report dated
17 January 22nd of 2021?
18    A.    That's -- yes.
19    Q.    So when I ask you what materials you
20 reviewed, these are materials that are included in
21 appendix A of that January 2021 report.
22    A.    Yes.  I also reviewed previous material
23 from the other case.
24    Q.    When you say "the other case," what

DOUGLAS J. CARPENTER, 03/31/2021                    Page 10..13

Page 10

1 other case are you referring to?
2     A.    So that was the post-conviction case
3 that I was involved in and testified at trial.
4     Q.    Do you maintain a different file for
5 the post-conviction case?
6     A.    Yes, I did.
7     Q.    And what materials are contained in
8 that particular file?
9     A.    The most recent case is again what's in
10 the -- what's listed as -- as documents reviewed.
11    Q.    All right.  So even though you maintain
12 a separate file for the post-conviction case, the
13 materials would be the same that are included in
14 exhibit -- excuse me -- appendix A of your
15 January 2021 report?
16    A.    Yeah.  You're breaking up like crazy.
17 Your -- your video seems to be stopping, and I
18 can't -- your video -- or your audio seems to be
19 breaking up.
20          There, now you're back.
21    Q.    Okay.  I'm going to repeat that
22 question.
23          So when you identify that you have a
24 separate file concerning the post-conviction

Page 11

1 proceeding that you testified in in this case, the
2 materials contained in that file would be the same
3 as are listed in appendix A of your January 2021
4 report?
5     A.    No, that's not true.
6     Q.    All right.  So please tell us what is
7 in the post-conviction file as you have labeled it.
8     A.    I could -- it's -- I'd have to go back
9 and see where I -- if I listed all those documents.
10 That would take me a little while to find, but I
11 have a list.  I can give a list of that.
12    Q.    We would ask that that be provided.
13          Do you have separate file for your
14 testimony at the second trial in this case?
15    A.    No.  That was all -- there was a
16 hearing, and then there was a trial, so that's all
17 part of the first post-conviction case.
18    Q.    All right.  So in your organizational
19 scheme, the post-conviction proceeding and the
20 second trial at which you testified comprise one
21 file, correct?
22    A.    That's correct, yes.
23    Q.    And as you sit here today, you cannot
24 tell us what materials are in that file from the

Page 12

1 post-conviction and second trial?
2     A.    Well, I'd have to go through --
3     MS. GARCIA:  Objection, form.
4          You can answer.
5     THE WITNESS:  If I went through and if I know
6 that one of my documents lists everything that was
7 reviewed, I could -- I could give you that.  But
8 other than that, I'd have to -- I'd have to compile
9 a list.
10    MR. POLICK:  Counsel, is there anything in
11 that file that hasn't been produced yet in this
12 particular civil matter?
13    MS. GARCIA:  Well, I'm not sure what his hard
14 copies are, but I would assume that the list would
15 be comparable to what we provided in his -- what's
16 provided in his affidavit and his supplemental
17 report in the post-conviction context.
18          We've produced everything that has
19 been produced to us, so I think this may just be an
20 issue of Mr. Carpenter not recalling all the things
21 that he listed in his affidavit.
22    MR. POLICK:  So you're representing that
23 whatever is in Mr. Carpenter's post-conviction and
24 second trial file has been produced to us in this

Page 13

1 particular case.
2     MS. GARCIA:  Yes.
3 BY MR. POLICK:
4     Q.    Mr. Carpenter, other than reviewing
5 documents in preparation for your deposition today,
6 did you meet at all with any attorneys?
7     A.    Yes.
8     Q.    And when did that meeting occur?
9     A.    Yesterday.
10    Q.    And who was the meeting with?
11    A.    Maria.
12    MS. GARCIA:  For the record, that's Mariah,
13 that's me.
14    THE WITNESS:  I'm sorry.
15    MS. GARCIA:  It's all right.
16 BY MR. POLICK:
17    Q.    Anyone else in the meeting besides you
18 and Ms. Garcia?
19    A.    No.
20    Q.    And for how long was the meeting?
21    A.    Nominally an hour.
22    Q.    And other than meeting with Ms. Garcia,
23 did you meet with any non-attorneys in preparation
24 for your deposition?

DOUGLAS J. CARPENTER, 03/31/2021                    Page 14..17

Page 14

1    A.    No.
2    Q.    What is your occupation, sir?
3    A.    I'm a fire protection engineer.
4    Q.    And what is a fire protection engineer?
5    A.    It's a specific discipline of
6  engineering.  It's built on mechanical engineering
7  and combustion sciences.  It's -- can have -- fire
8  protection engineers can be involved in a number of
9  different endeavors.  But the bottom line is
10 they're applying the principles of chemistry and
11 physics of fire.
12   Q.    All right.  So your degree is in
13 mechanical engineering?
14   A.    I have three degrees.  My under --
15 associate degree, as it's listed in my rÈsumÈ, is
16 in mechanical engineering.  My bachelor's of
17 science is in mechanical engineering.  But my
18 master's of science degree is in fire protection
19 engineering.
20   Q.    And you described that fire protection
21 engineering is a discipline of mechanical
22 engineering; is that correct?
23   A.    Not specifically.  I mean, it -- it
24 builds on those things.  And the master's -- I got

Page 15

1  a master's degree in it, so I had to build on
2  different fundamentals which came from mechanical
3  engineering and from the combustion science.
4    Q.    And your fire protection degree in
5  engineering, is that a two-year or a four-year
6  program?
7    A.    The master's level?
8    Q.    Yes.
9    A.    Not -- it's -- nominally, it's a
10 two-year program.
11   Q.    And I see in your rÈsumÈ that you did a
12 thesis for that particular course of study?
13   A.    I did, yes.
14   Q.    Is that thesis published?
15   A.    All theses are basically published.
16 Yes, it's -- it's publicly available.
17   Q.    What is your current employment?
18   A.    I'm employed -- by a company or what --
19 my employment is I'm pres -- vice president and
20 principal engineer at Combustion Science &
21 Engineering, Incorporated.
22   Q.    And Combustion Science & Engineering,
23 Incorporated, that is a corporation?
24   A.    Yes, it is.

Page 16

1    Q.    And where is that incorporated?
2    A.    We reside in Maryland.  I assume that
3  we're also incorporated -- it's been a long time.
4  We've been in business for 20 years.  I'm pretty
5  sure we're incorporated in Maryland.
6    Q.    And you said you've been in business
7  for 20 years now?
8    A.    More than 20 years, yes.
9    Q.    Okay.  When was the corporation created?
10   A.    In January of 1998.
11   Q.    And has it always gone by the name
12 Combustion Science & Engineering?
13   A.    Yes.
14   Q.    And are there any shareholders to the
15 corporation?
16   A.    We have -- we have unit -- unit
17 holders, yes.  We each -- I have a number of
18 partners that have shares in the company, yes.
19   Q.    And who are the officers or directors
20 of the corporation?
21   A.    So it's Dr. Richard Roby is
22 president/CEO of the company; myself as vice
23 president; Dr. Michael Klassen is vice president;
24 and I think I'm also treasurer currently.

Page 17

1         But those basically are the officers
2  of the corporation.
3    Q.    And how many employees does Combustion
4  Science & Engineering have?
5    A.    It changes, but on the order of -- I'd
6  say 20 is a good representation currently.
7    Q.    And what services does the corporation
8  provide?
9         Did you lose me there?
10   MR. POLICK:  Are we frozen out here or --
11   MS. GARCIA:  You're not frozen on my end, so
12 I assume there may be an issue with -- oh,
13 Mr. Carpenter is --
14   THE VIDEO TECHNICIAN:  Yeah.  Do you want to
15 go off the record for a second?
16   MS. GARCIA:  Yeah.  Let's go off the record.
17   THE VIDEO TECHNICIAN:  Okay.  We're off the
18 record at 9:58.
19        (Discussion off the record.)
20   THE VIDEO TECHNICIAN:  We are back on the
21 record at 10:03.
22 BY MR. POLICK:
23   Q.    All right.  Mr. Carpenter, are you able
24 to hear me now?

DOUGLAS J. CARPENTER, 03/31/2021                                    Page 18..21

Page 18

1          Are you able to hear me,
2 Mr. Carpenter?
3     A.   Yeah, I'm here now.  It just -- I just
4 lost --
5     THE VIDEO TECHNICIAN:  Oh, I'm losing him.
6          (Audio interruption.)
7     MR. POLICK:  You are breaking up on our end.
8     THE VIDEO TECHNICIAN:  We can stop because
9 I've lost him on my end.
10          (Discussion off the record.)
11     THE VIDEO TECHNICIAN:  We are off at 10:03.
12          (Discussion off the record.)
13     THE VIDEO TECHNICIAN:  We are back on the
14 video record at 10:05.
15 BY MR. POLICK:
16     Q.   All right.  Mr. Carpenter, are you able
17 to hear us?
18     A.   I am now, yep.
19     Q.   Okay.  So I think when we lost
20 connection, my question was:  What services does
21 your corporation, Combustion Science & Engineering,
22 provide?
23     A.   So we are a consulting firm that's made
24 up of PhDs, master's level engineers.  We have

Page 19

1 two -- what we refer to as two sides of the
2 business.  That is that we -- we are operating
3 within the combustion and fire sciences.
4          So on one side of the business, we
5 have engineers who are dealing with combustion
6 systems.  It's the fire you want as opposed to the
7 fire you don't want.  We design aircraft engines.
8 We design boilers to help -- help with those
9 processes in terms of the combustion sciences.
10          On the other side, we have the fire
11 sciences.
12          And in each of those sides, we do
13 research, we do design, and we also do forensic
14 work.
15     Q.   And when you say you do forensic work,
16 what type of forensic work do you do?
17     A.   Oh, anything that has to do with
18 investigations of -- related to combustion of fire
19 sciences.
20     Q.   All right.  I'd like to mark as an
21 exhibit your report that's dated January 22nd of
22 2021.
23          Do you have that report available to
24 you to look at, Mr. Carpenter?

Page 20

1     A.   I do.
2     Q.   Okay.  And did you prepare this report
3 that we've marked as Exhibit 1 to your deposition?
4     A.   Yes.
5     Q.   And this consists of 42 pages, correct?
6     A.   Yes.
7     Q.   And is that your signature on the first
8 page?
9     A.   Yes.
10     Q.   Okay.  And then the report itself is
11 comprised of 13 pages, and then there's three
12 appendices, correct?
13     A.   Appendix A, appendix B, and appendix C.
14 That's correct.
15     Q.   All right.  If I could direct your
16 attention to appendix B, which is your CV, your
17 rÈsumÈ, which starts at page 17?
18     A.   Okay.
19     Q.   So you've told us a little bit about
20 your employment.
21          You also have some teaching
22 positions listed?
23     A.   Yes.
24     Q.   Are those still current?

Page 21

1     A.   No, they are not.
2          If you look on there, it says -- one
3 is 2009 to 2016, and the second one is 2004 to 2016.
4     Q.   Okay.  Do you have any current teaching
5 positions?
6     A.   Not formally, no.
7     Q.   When you say "not formally," what do
8 you mean by that?
9     A.   Well, I get asked to teach classes and
10 prepare seminars so -- but not on a -- on a formal
11 level that it's continuing.  I get asked ad hoc, if
12 you will.
13     Q.   When you did have your teaching
14 positions up to the year 2016, were those full-time
15 positions?
16     A.   No.
17     Q.   How often would you teach at Worcester
18 Polytechnic Institute?
19     A.   Worcester Polytechnic Institute, that
20 was more of a research position.  So I had -- was
21 working with professors there on research grants,
22 so as long as those research grants were going.  I
23 believe there was two there, so when they ended, my
24 teaching research assistant.

DOUGLAS J. CARPENTER, 03/31/2021                                    Page 22..25

Page 22

1    Q.    So your position at Worcester
2  Polytechnic Institute was more research related
3  than teaching?
4    A.    Yeah.  If you look on my CV, it says
5  research assistant professor.
6    Q.    I see.
7         And then you were an adjunct leg --
8  lecturer at the University of Mary -- Maryland --
9    A.    That is --
10   Q.    -- College Park?
11   A.    That is correct.
12   Q.    And what type of classes were you
13 teaching at that institution?
14   A.    It says right here we developed a
15 course in advanced fire dynamics.
16   Q.    And as an adjunct lecturer, was that
17 full-time or part-time teaching?
18   A.    No, that was online teaching, so we
19 were responsible for conducting a class.  We
20 usually taught the class at least once a year,
21 sometimes two.  And it depends on whether it be
22 fall, summer, or spring.
23        But it would be meeting, having
24 assignments up for students online, and then also

Page 23

1  having a -- lecture, if you will, or actually a
2  recitation period where people could come online
3  and talk about different things about the class.
4    Q.    Did your program that you taught at the
5  University of Maryland College Park in advanced
6  fire dynamics include material on computer fire
7  modeling?
8    A.    Yep.
9    Q.    And how much of the program was
10 dedicated to that subject --
11   A.    I believe we had --
12   Q.    -- fire modeling?
13   A.    I believe we had a module on that.  But
14 everything that we taught in that class were all --
15 is all pre-required principles, if you will, and
16 fundamental science required to understand computer
17 fire modeling.
18   Q.    So was it a computer fire modeling
19 course, or something different?
20   A.    No.  Computer fire modeling was a part
21 of the course.  But I mean, all -- all application
22 of fundamentals in the fire sciences is -- is
23 considered modeling, so ...
24   Q.    Do you hold any teaching positions or

Page 24

1  have you held any teaching positions where you're
2  exclusively teaching courses in computer fire
3  modeling?
4    A.    Yeah.  I've developed courses for
5  professional societies that teach three- and
6  four-day courses in computer fire modeling, yes.
7    Q.    So these would be for professional
8  organ -- organizations?
9    A.    Yes.  More specifically for the Society
10 of Fire Protection Engineers.  We developed at
11 least three courses over different types of
12 modeling, and we taught -- taught those over a
13 number of days.
14   Q.    When you say "different types of
15 modeling," what -- what modeling or fire modeling
16 are you referring to?
17   A.    So when you look at computer fire
18 modeling, they could be implemented as basic, just
19 a straight closed-form equations that can be solved
20 and they're implemented into a computer, but you
21 can solve them by hand, if you will, with a
22 calculator.
23        Then the next step is to go into
24 what's called zone models.  And we taught courses

Page 25

1  in -- specifically in zone models.
2         And then the next course would have
3  been in what's called computational fluid dynamics,
4  CFD, which is a much more complicated type of -- of
5  modeling.
6    Q.    What was the name of it again?
7    A.    Computational fluid dynamics, CFD.
8    Q.    Thank you.
9         In either of the teaching positions
10 that you previously held, were you a chair of any
11 department at either of the institutions?
12   A.    No.  It says I was a research assistant
13 professor and an adjunct professor.  Or adjunct
14 lecturer, sorry.
15   Q.    And the modeling fire -- strike that.
16        The computer fire modeling courses
17 that you are teaching, are you doing that currently?
18   A.    I've had -- not -- I am not, no.
19   Q.    When was the last time you conducted
20 such a course?
21   A.    Well, it's listed in my CV.  I'll have
22 to go back and look for it.
23        For the Society of Fire Protection
24 Engineers, it looks like it was October of 2011.

DOUGLAS J. CARPENTER, 03/31/2021                    Page 26..29

Page 26

1    Q.    Any courses in computer fire modeling
2  that you've taught since October 2011?
3    A.    As part of the next listing on page 21
4  of my CV, it goes -- did help design and teach a
5  class in Copenhagen, Denmark, on fire patterns and
6  investigation.  And that did include not only
7  examples and case studies with computer fire
8  modeling, but it taught the general basics enough
9  to be able to understand how computer fire modeling
10  might be used in fire investigation.
11    Q.    When did you start teaching computer
12  fire modeling?
13    A.    Probably in about 2000.  I was asked to
14  help develop courses for the Society of Fire
15  Protection Engineers.
16          Looks like I did one introduction to
17  fire modeling in November of 1998 just after we
18  started this -- this company, and then I taught in
19  Baltimore in '99, and then Idaho Falls in 2002.
20    Q.    Have you, yourself, created any
21  programs for computer fire modeling?
22    A.    Not -- not outside of just putting
23  general equations into spreadsheets.
24    Q.    So nothing you have a patent on or a

Page 27

1  trademark on?
2    A.    No.
3          I did develop a model for -- a zone
4  model for a course that we were developing while I
5  was working at WPI trying to construct a curriculum
6  for engin -- an online curriculum for engineers.
7  And as part of some of the exercises, one of the
8  exercises was actually build a zone model.  So I
9  had to obviously build the zone model before that,
10  so -- but that's not patentable.
11    Q.    You were using other programs or
12  software that was available to you to build that
13  zone model?
14    A.    Well, you have all the -- you have the
15  fundamental mathematical elements, and then you
16  have solvers.  So you construct the model, put it
17  together with the equations, and then you have to
18  solve that set of equations based on the inputs.
19  And so I used a prepackaged solver to do that.
20  It's just a mathematical suite of solvers.
21          And so I integrated that and made --
22  made a model out of it, yes.
23    Q.    With regard to your professional
24  licensure, I see you are licensed as a professional

Page 28

1  engineer in the State of Maryland and the State of
2  Virginia, correct?
3    A.    Correct.
4    Q.    And are both those licenses in Maryland
5  and Virginia current?
6    A.    Yes.
7    Q.    Are you a -- strike that.
8          Are you licensed as a professional
9  engineer in any other states besides Maryland and
10  Virginia?
11    A.    No.
12    Q.    Have you ever been licensed in any
13  other states as a professional engineer?
14    A.    No.
15    Q.    Do you have any current applications to
16  any states for licensure as a professional engineer?
17    A.    No.
18    Q.    In order to obtain the licensure for
19  professional engineer, is there some type of state
20  testing?
21    A.    Well, yes.  It's -- it's actually
22  national.  It's national testing.
23    Q.    So the testing for both the State of
24  Maryland and the State of Virginia would be based

Page 29

1  on the nationalized test?
2    A.    That is correct, yep.
3    Q.    And is there a periodic renewal of your
4  licenses for professional engineering?
5    A.    There is.
6    Q.    And is that the same for both Maryland
7  and Virginia?
8    A.    I can't tell you that.  I know it's
9  nominally on a three-year cycle.
10    Q.    And nominally every three years, do you
11  need to retest or just reapply?
12    A.    You have to show that you've done
13  continuing education at -- at the required level.
14    Q.    And how much continuing education do
15  you need to do at the required level for every
16  three-year cycle?
17    A.    There's a number of continuing
18  education credits that you need.  Off the top of my
19  head, it's like 40.
20    Q.    Per three-year cycle?
21    A.    I believe so.
22    Q.    Then I see you're certified as a fire
23  and explosion investigator?
24    A.    That is correct.

DOUGLAS J. CARPENTER, 03/31/2021                           Page 30..33

Page 30

1    Q.    And you obtained that certification in
2  2005?
3    A.    2005, that's correct.
4    Q.    And then that's through the National
5  Association of Fire Investigators?
6    A.    Correct.
7    Q.    And was there any type of testing for
8  that certification?
9    A.    Yes.
10    Q.    And what type of testing was it?
11    A.    It was an exam that was provided that I
12  took.
13    Q.    And is there periodic renewal for that
14  certification?
15    A.    Yes.
16    Q.    And how often is the renewal period?
17    A.    I want to say it's more than three
18  years, so it's probably on the order of five years.
19    Q.    And is there also a continuing
20  education requirement for that certification?
21    A.    Yes.
22    Q.    And do you know what the requirement is
23  for every renewal period?
24    A.    There is again a level of C -- CEUs

Page 31

1  that need to be taken, or you can get equivalent
2  credit.  Sometimes I've -- by teaching the course
3  in Denmark, I got credit for developing a course
4  and teaching it.  But in general, you -- you can
5  take -- take classes and get -- get credits for
6  that, as long as they're tested.
7    Q.    So your certification as a fire and
8  explosion investigator, does that include forensic
9  study?
10    A.    I'm not sure if -- I mean, the answer
11  is yes.  I mean, that's what we're -- forensic fire
12  investigation is what this certification is
13  associated with.
14    Q.    And can you explain to me what forensic
15  fire investigation is.
16    A.    Forensic by definition is basically the
17  practice of engineering in a legal setting, so
18  it's -- it's -- forensic fire investigation is
19  trying to -- depending on what the issue is, you're
20  applying analysis in reaching reliable
21  determinations of what happened, if you will, in
22  the broadest sense.
23    Q.    You also list the certification in fire
24  investigation for fire officers that you obtained

Page 32

1  in 2020?
2    A.    Yes.
3    Q.    And that's through the International
4  Association of Arson Investigators?
5    A.    That is correct.
6    Q.    And can you explain that certification
7  for me, what that entails?
8    A.    Sure.  It's a subset.  So the IAAI has
9  continuing education online.  It's called the CFI
10  trainer.  They have developed over many years
11  individual subject matter videos or material
12  content, if you will, that's presented.  You can
13  access it through -- through the internet, and then
14  it's tested.
15          And what they've done is let's just
16  say there's 50 to 100 subjects.  What they've gone
17  through and said, If you -- if you're able to test
18  and pass each of these modules, we will give you an
19  associated accreditation.
20          So just by going through and taking
21  those and passing those individual units, I was
22  able to gain these -- these certifications provided
23  by IAAI.
24    Q.    And is this also forensic in nature?

Page 33

1  This certification?
2    A.    Which -- specifically which one?
3    Q.    The one we're talking about.  The fire
4  investigation for fire officers.
5    A.    Yeah.  It's a way to educate fire
6  officers who may not have a full breadth and depth
7  of what it takes to be a fire investigator and how
8  it's conducted.  So it's not teaching you exactly
9  how to investigate fires; it gives you an idea
10  of -- an overall view of the subject matter.
11    Q.    So when you say CFI trainer, is that
12  the program, or are you now certified to train
13  others in fire investigation?
14    A.    I don't believe that's what this
15  certification is -- is associated with.
16    Q.    So this certification does not certify
17  you to train others in fire investigation, correct?
18    A.    That is correct.
19    Q.    Do you train others in fire
20  investigation?
21    A.    I have, yes.
22    Q.    When's the last time you've done that?
23    A.    I did it in -- I'd have to go back and
24  look exactly when it was, but we taught -- we

DOUGLAS J. CARPENTER, 03/31/2021                    Page 34..37

Page 34

1 developed and taught a course for the Maryland --
2 the State of Maryland for their fire marshals.  Let
3 me see if I can find it.
4        Yeah, I don't know if I have it
5 specifically listed here.  That was probably ten
6 years ago.
7     Q.    So your company developed a course and
8 then taught it to the state fire marshal's office
9 for State of Maryland?
10     A.    Yeah.  We -- basically a number of us
11 got together, did different modules that were
12 presented over the day, and we had material that we
13 had either had before or created new content and --
14 and taught it over at least -- I think it was a
15 two-day course.
16     Q.    The certification and fire
17 investigation for fire officers, is it just a
18 matter of going through the modules and passing
19 them, or is there some sort of testing involved?
20     A.    Well, passing a course requires testing.
21     Q.    I see.
22        And does each module have its own
23 test, or is it just one test after going through
24 the modules?

Page 35

1     A.    No.  It actually is a little bit more
2 rigorous than that.  It -- it presents a number of
3 different sub modules, and then you'll have a --
4 sort of a knowledge -- knowledge test, as they like
5 to call it, to see if you're -- you're
6 understanding the concept.
7        So you'll take these quizzes, you
8 know, after like three or four and not allowed to
9 continue until you've, you know, passed those
10 quizzes.  And then ultimately, you get tested.
11 There's a final test at the end of the module once
12 you've completed everything.
13     Q.    And do you need to periodically renew
14 that certification?
15     A.    I don't think so.  No.  It's -- they
16 basically provide you with -- it's basically a
17 certificate.  So you're provided a certificate
18 saying you completed these courses.
19     Q.    All right.  How about the certification
20 in principles of fire investigation multiprogram
21 that you have listed that you obtained in 2020?
22     A.    Say that --
23     Q.    Is that a similar type -- is that a
24 similar type module and testing certification?

Page 36

1     A.    Yes.
2     Q.    And that's also through the
3 International Association of Arson Investigators?
4     A.    That is correct.
5     Q.    And can you describe that certification
6 for me?
7     A.    Again, it's the same that I just
8 described before.
9     Q.    How is it different than the
10 certification for fire investigation for fire
11 officers?
12     A.    Well, if you read here, it says for
13 fire investigation for fire officers requires
14 25 hours of credits, whereas the principles of fire
15 investigation multiprogram requires 67 hours of
16 credits.
17     Q.    Yeah, I see there's a time -- a
18 difference in the hours required, but in terms of
19 the subject matter, is there any difference between
20 those two certifications?
21     A.    They may have some similar courses that
22 overlap.  In other words, they select the courses
23 that you will take, and once you pass those, you
24 will -- you are, you know, provided a certificate.

Page 37

1 They may have some crossover in terms of the
2 classes, but they -- they're selected based on a
3 committee to say, under this heading or under this
4 certificate program, we require these courses.
5     Q.    And is there any periodic renewal
6 required of this particular certification in
7 principles of fire investigation?
8     A.    No.  Similar, it's a certificate that
9 says that you have passed those courses.
10     Q.    Are you certified as an arson
11 investigator?
12     A.    I'm not sure what -- if there's a
13 specific arson investigator certification.  There
14 is the IAAI certification.  And with, you know,
15 IAAI obviously has the term arson in it, but
16 that -- it's for fire investigators.  It's a bit of
17 a misnomer.
18        So I would -- I would say the answer
19 is there isn't.  There's a certification for fire
20 investigation.  There is one offered by IAAI.
21     Q.    So the answer to my question is you are
22 not certified as an arson investigator?
23     A.    That's not what --
24     MS. GARCIA:  Object --

DOUGLAS J. CARPENTER, 03/31/2021                    Page 38..41

Page 38

1    THE WITNESS: -- I said.
2    MS. GARCIA: -- to form. You can answer.
3    THE WITNESS: That's not what I said.
4         There is no specific certification
5    that would -- that specifically targets arson.
6    It's -- it's fire investigation that you're
7    certified in, which can include elements of arson
8    investigation.
9    BY MR. POLICK:
10   Q.   Have you ever done an arson
11   investigation?
12   A.   Yes.
13   Q.   And how many have you done over the
14   course of your career?
15   A.   Well, let's -- let's make sure we're
16   very clear about this. The -- when I say I've
17   investigated, I've investigated fires there that
18   are incendiary, that have been determined to be
19   incendiary, which leads on to -- can lead on to an
20   arson fire. And arson is the legal definition
21   of -- of it. But it's -- it's built on the premise
22   that the fire was an incendiary fire.
23        Yes, I have investigated fires that
24   have been involved -- that were determined to be

Page 39

1    incendiary fires.
2    Q.   How many times have you done that?
3    A.   It's a handful.
4         The problem is that if you do find
5    evidence of an arson or incendiary fire, then
6    you're required to turn that -- that knowledge over
7    to the public sector, which I did in one case, but
8    they chose not to -- chose not to follow up, or
9    they chose to do their -- their investigation in
10   parallel with my investigation.
11        But more times, it's usually it's
12   like, Well, yeah, I've found evidence of an
13   incendiary fire and then that gets taken over by
14   the State Fire Marshal's Office, because it can be
15   a criminal matter.
16   Q.   So when you've done arson
17   investigations, this has been in conjunction with
18   state agencies?
19   A.   Yes. Loosely in the sense of a lot of
20   times what the state fire marshals will do is
21   they'll say, Well, we investigated this. We didn't
22   really find anything. But you're continuing your
23   investigation, so we're going to keep this file
24   open. And from time to time, they may check in to

Page 40

1    see how we're doing on our investigation or how I'm
2    doing on my investigation, which happened in this
3    case in Virginia.
4         And then they can choose to do --
5    but they never came back and said, This is -- we're
6    going to investigate this. You have to stop your
7    investigation. I was working for the --
8    Q.   So it wasn't -- I'm sorry?
9    A.   I was working for the --
10   Q.   I didn't --
11   A.   -- insurance -- I was working for the
12   insurance company, and the insurance company was
13   looking at it from the potential of being an arson,
14   an incendiary fire.
15   Q.   And the State of Virginia Fire Marshal
16   was looking at it from the point of view of a
17   potential criminal investigation?
18   A.   Potentially. They wanted to see what
19   we found basically. They weren't going to
20   investigate it -- physically investigate the scene
21   anymore. They had turned it over to the insurance
22   company, and we were allowed to go in and start our
23   investigation.
24   Q.   Other than Virginia, have you worked

Page 41

1    alongside any other state agencies in doing arson
2    investigations?
3    A.   No.
4    Q.   Was it only the one time you were
5    involved in the arson investigation with the State
6    of Virginia?
7    A.   Like I said, I was in contact and --
8    with the fire marshals, kept in contact with them.
9    But that -- that can happen in -- in any case. I
10   mean, there's always this back and forth of -- of,
11   you know, exchanging information, especially when
12   only one party is doing -- you're not going to
13   have -- you're not going to have us and the state
14   fire marshals on the same scene, unless they've --
15   they've acknowledged that their -- they haven't
16   found any evidence, but they'd still like to come
17   in and work side by side.
18        That happens. I mean, it happens at
19   a lot of fire investigations. But, you know, so
20   outside of that context, I can't really -- you
21   know, it's a fairly informal process.
22   Q.   All right. So my question was other
23   than this case you investigated alongside the State
24   of Virginia Fire Marshal, have you worked with any

DOUGLAS J. CARPENTER, 03/31/2021                              Page 42..45

Page 42

1  other state fire marshal offices in a similar
2  capacity?
3       A.   I mean, in a similar capacity that they
4  were present on fire scenes that I was present at,
5  and there were interactions from time to time,
6  which is -- happens quite frequently, so yeah.  I
7  would say in -- in a number of cases.  I mean, I
8  can't say that -- that it's frequent, but it just
9  depends on the circumstances.
10      Q.   Okay.  Can you tell me any other state
11 fire marshal's offices that you've worked alongside
12 of in a similar capacity other than the State of
13 Virginia?
14      A.   I can say that the state fire marshal I
15 believe was on scene when I did a fire scene
16 investigation in Cleveland more recently.  And but
17 again, it's -- you know, their presence -- you
18 know, when there was an inspection scheduled, they
19 were asked if they wanted to attend.  They did
20 attend.  We -- you know, I did my investigation.
21 There was some back and forth with -- with
22 information.
23           So I mean, that's -- again, that's
24 fairly -- that can be typical.

Page 43

1       Q.   Have you ever been trained or certified
2  as a firefighter?
3       A.   No.
4       Q.   Have you ever been trained or certified
5  as a law enforcement officer?
6       A.   No.
7       Q.   Have you ever done any law enforcement
8  work?
9       A.   No.
10           Outside of -- I mean, if you
11 consider forensic fire investigation a precursor to
12 that.
13      Q.   But your forensic fire investigation
14 duties do not give you the authority to arrest,
15 correct?
16      A.   That's correct.
17      Q.   And you've never had that or worked in
18 that capacity, correct?
19      A.   Correct.
20      Q.   Have you ever served in the military?
21      A.   No.
22      Q.   Do you have any legal training?
23      A.   I mean, outside of legal issues that we
24 learn about in fire investigation, no, no formal

Page 44

1  training.
2       Q.   So you're not an attorney or a
3  paralegal?
4       A.   That's correct.
5       Q.   Do you have any medical training beyond
6  maybe basic first aid?
7       A.   I have some related to toxicology and
8  how you can apply that to fire investigation, but
9  outside of that, no.  There's basic --
10      Q.   And when you --
11      A.   -- toxicology as part of our
12 fundamental education in fire investigation -- or
13 in fire protection engineering, so you have to
14 understand chemistry.  You have to understand
15 products of combustion.  You have to understand
16 uptake of those products of combustion and how they
17 can have an effect on -- on the body.
18           So I do have some basic, but I don't
19 hold myself out as a toxicologist, per se; as a
20 degreed toxicologist.
21      Q.   Okay.  You anticipated my -- my next
22 question.
23           So you do not hold yourself out as
24 an expert in toxicology.

Page 45

1       A.   No.  I said I don't have a degree in
2  it.  As it relates to the application of
3  fundamental principles of chemistry to, you know,
4  fatal fires, yes, I do hold myself as -- very
5  narrowly in that -- in that area.
6       Q.   But I thought you just said you don't
7  hold yourself out as a -- as a toxicologist; is
8  that correct?
9       A.   I said I don't have a degree in it, but
10 I don't -- that's not how I market myself, but that
11 is an element of what we do.
12           And same with -- with other
13 chemistry and physics.  You know, those are all
14 things that as engineers we -- we learn and
15 fundamentally apply.
16      Q.   You're not a medical doctor, correct?
17      A.   That is correct.
18      Q.   Any training in forensic pathology?
19      A.   Outside of, you know, the stuff that
20 you -- you learn in the fire investigation
21 community about certain aspects of that, yeah, I --
22 I don't have any, you know, formal degrees in that.
23      Q.   Do you hold yourself out as a forensic
24 pathologist?

DOUGLAS J. CARPENTER, 03/31/2021             Page 46..49

Page 46

1     A.    Well, I am knowledgeable about certain
2 issues that can be used to test hypotheses looking
3 at fire investigation or forensic fire
4 investigation. They're fundamentals that you
5 apply. Every fire investigator who's qualified
6 would know about those issues.
7     Q.    And when you say "those issues," what
8 issues are you referring to?
9     A.    Basically the body -- the response of
10 the body to the environment of fire.
11     Q.    Are you trained in the evaluation of
12 burns to the human body?
13     A.    I have fundamental knowledge in that
14 and -- and have applied that to cases, yes. That
15 is an area of expertise that's provided, and we
16 have engineering guidelines put out by the Society
17 of Fire Protection Engineers on the conditions
18 required to have onset of first and second-degree
19 burns in fires.
20     Q.    So when you say you have fundamental
21 knowledge of that, what -- what is that fundamental
22 knowledge?
23     A.    You're familiar with the basic concepts
24 of heat transfer and knowledge of the layers of the

Page 47

1 skin and their response to temperatures and the
2 temperature gradient. You're familiar with the
3 fire test data as to the onset of heat fluxes that
4 would be required to cause pain, for instance, or
5 cause first -- the onset of first-degree burns or
6 the onset of second-degree burns.
7     Q.    Do you hold yourself out as an expert
8 in the treatment and diagnosis of burns to the
9 human body?
10     A.    No.
11     Q.    Do you have any training as a crime
12 scene investigator?
13     A.    Yes. All fire -- all qualified fire
14 protection engineers have training in that.
15     Q.    And is that training that you received
16 as part of your engineering degree or in some other
17 capacity?
18     A.    It would have been probably more from
19 the professional society, the certifications
20 through the professional societies.
21     Q.    Any professional organizations or
22 societies in particular?
23     A.    Sure. The IAAI and -- and NAFI.
24     Q.    Do you have any training in

Page 48

1 pharmacology?
2     A.    No.
3     Q.    And I believe earlier you told me you
4 do hold yourself out as an expert in forensic
5 engineering; is that correct?
6     A.    I don't know if I said that.
7       Forensic engineering?
8     Q.    Yes.
9       Do -- do you hold yourself out as a
10 forensic engineer?
11     A.    I hold myself out as a forensic fire
12 "investigature" -- investigator or forensic fire
13 protection engineer.
14     Q.    And in your field of expertise, is
15 there a board certification for a forensic fire
16 investigator?
17     A.    I don't believe there's any board
18 certification. There's a national certification
19 for professional engineering that has a subset of
20 fire protection engineering.
21     Q.    Are you board certified by any
22 professional organization or entity?
23     A.    I'm not sure what -- in the context of
24 when you say "board certified." How is that

Page 49

1 different than getting a national certification
2 from a fire investigation society?
3     Q.    Are you familiar with board
4 certification through the National Academy of
5 Forensic Engineers?
6     A.    Not -- not in detail, no.
7     Q.    Have you ever been board certified by
8 the National Academy of Forensic Engineers?
9     A.    No.
10     Q.    Do you have any board certifications by
11 any professional organization or entity?
12     A.    Not under that title "board
13 certification."
14     Q.    Turning to your professional
15 memberships, you have several listed at page 20 of
16 your CV.
17       Are you an officer in any of these
18 professional organizations?
19     A.    Not an officer, no.
20     Q.    Have you ever chaired any committees
21 for any of these organizations?
22     A.    I've chaired subcommittees for -- let
23 me see if it's listed here.
24       Yes, I've chaired task groups and

DOUGLAS J. CARPENTER, 03/31/2021                    Page 50..53

Page 50

1 subcommittees for NFPA 921.

2    Q.   And you're listed there as an alternate
3 member for NFPA 921, the Guide for Fire and
4 Explosion Investigations?

5    A.   Yes.  Let me look and make sure that
6 that's current.

7         Yeah.  So it says at the end 2000 to
8 2018.  So yes, I was.

9    Q.   All right.  And what did that work
10 entail as an alternate member for NFPA 921 during
11 the 2000 to 2018 time frame that you have listed
12 there in your CV?

13    A.   So NFPA maintains a committee called
14 the task group on -- or the committee on fire
15 investigations.  And their primary responsibility
16 is to -- for the revision of the document that's
17 the standard of care, NFPA 921, Guide for Fire and
18 Explosion Investigations.

19         And so as a member of that, I would
20 be -- could be responsible for developing new
21 content as part of subgroup work, which I was
22 actively involved in, and then could write
23 proposals and the proposal process under the
24 guidelines of NFPA -- of the NFPA standards

Page 51

1 development process.

2         And then we were required to go and
3 be in meetings to address issues but also to
4 evaluate proposals and comments and make additions,
5 subtractions, and alterations to the content of
6 NFPA 921.

7    Q.   And when you indicate you were an
8 alternate member, what does that mean?

9    A.   So there's a -- there's a committee
10 member and then an alternate member.  Obviously
11 with volunteer committees, not everybody can be
12 there, but -- but it's a voting body.  So you can
13 have -- you usually will designate -- most
14 committee members will designate an alternate in
15 case there's some conflict.  You know, you have a
16 trial in the middle of when the meeting was
17 scheduled, and you obviously can't go.  So you have
18 a -- you will have a voting member there.

19         So I was an alternate to my partner
20 Dr. Richard Roby.

21    Q.   And then you have listed there a member
22 of the Arson Review Committee, parenthetically ARC,
23 of The Innocence Project, New York City, 2005 to
24 the present.

Page 52

1         What is that membership?

2    A.   Okay.  So I was asked to a committee.
3 In 2005 it was developed.  And we were to review --
4 we were -- it would be a committee that gets asked
5 to review different cases.

6         And in this particular case, it was
7 initiated by what they call the Willingham/Willis
8 cases.  They're two cases in Texas that have an
9 incredible amount of similarities but different
10 outcomes.  And we were asked to go through and
11 identify or do an analysis of both those
12 investigations, and -- and we did that.

13         I don't believe there was any other
14 work.  Although I don't think the committee was
15 ever disbanded, I don't think they were ever asked
16 to do -- to review any more of these types of cases.

17    Q.   Have you done any other work for The
18 Innocence Project either in New York or elsewhere?

19    A.   I have done work for -- so this is the
20 New York City -- sort of what you would consider to
21 be The National Innocence Project.  And then of
22 course each state can have their own innocence
23 project.

24         So yes, I've been asked to do

Page 53

1 analyses by other innocence projects.

2    Q.   What other innocence projects have you
3 been asked to do work for?

4    A.   I -- more specifically, Pennsylvania.
5 That's the one that comes to mind.  I don't --
6 can't think of others at this point, but I've done
7 at least -- at least one in Pennsylvania.

8    Q.   Any other state innocence projects you
9 can recall doing work for other than Pennsylvania?

10    A.   Yeah.  The problem is, I mean, the
11 innocence -- I may have not been -- The Innocence
12 Project may have been involved, but I was basically
13 brought in to work for a specific set of lawyers at
14 the -- at the case level.

15         So I would say that it's possible
16 there are other states.  There was -- hold on just
17 a minute.  Posey was in Oklahoma, so I've done
18 stuff in Oklahoma.

19    Q.   Any other states that you recall doing
20 work for The Innocence Project?

21    A.   Not specifically without going through
22 and fully reviewing cases.

23    Q.   All right.  Mr. Carpenter, the next
24 series of questions I'm going to ask you I'm not

DOUGLAS J. CARPENTER, 03/31/2021                    Page 54..57

Page 54

1  suggesting anything about your character.  They're
2  just questions I need to ask.
3          Have you ever been disciplined by
4  any federal, state, or local agency regarding your
5  professional licensure or certifications?
6      A.   No.
7      Q.   Have you ever been disciplined by or
8  asked to leave any professional organization?
9      A.   No.
10     Q.   Have you ever been disciplined by or
11 asked to leave any educational institution or
12 institution of higher learning?
13     A.   No.
14     Q.   Have you ever been convicted of a
15 felony?
16     A.   No.
17     Q.   Have you ever been convicted of a crime
18 of dishonesty?
19     A.   No.
20     Q.   Have you ever been a defendant in a
21 civil lawsuit arising from your occupation as a
22 professional engineer?
23     A.   No.
24     Q.   So still referring to Exhibit 1, your

Page 55

1  report, I'd like to direct your attention now to
2  what you've labeled as appendix C, which is your
3  list of testimony, and this comprises pages 32
4  through 42 of your report?
5      A.   That is correct.
6      Q.   And the list you provided here of your
7  court testimony and deposition testimony in
8  appendix C, is that current?
9      A.   I believe it is, yes.
10     Q.   And as part of your professional work
11 with Combustion Science & Engineering, do you
12 consult with attorneys who are engaged in
13 litigation?
14     A.   Yes.
15     Q.   And your list of testimony shows that
16 you have been retained in both criminal and civil
17 matters, correct?
18     A.   Correct.
19     Q.   And how much do you charge for your
20 services when you consult in litigation, whether it
21 be criminal or civil litigation?
22     A.   My current rate is $350 an hour.
23     Q.   And is that a flat rate, or do you
24 charge different rates for different type of work?

Page 56

1  For example, record review versus deposition or
2  in-court testimony?
3      A.   No.  Flat fee across the board.
4      Q.   And in this particular matter, the
5  William Amor matter, how much have you billed to
6  date in this case, not counting today's deposition?
7      A.   I don't really know.  I haven't
8  reviewed those records.
9      Q.   Do you have an approximate?
10     A.   Yeah, tens of thousands of dollars.
11     Q.   And what percentage of your income is
12 derived from consultation and litigation?
13     A.   Depends.  When you say "income," so
14 that would be the company income, not my income.
15 So that would be -- nominally it's about -- last
16 time that that analysis was done, about 50/50.
17     Q.   Are you paid a salary through the --
18 through the corporation?
19     A.   Yes.
20     Q.   And when you say about 50/50, what --
21 what is the breakdown?  Is that what you told me
22 before in terms of the way the company is set up
23 with the two sides?
24     A.   Well, I would -- no.  The 50/50 would

Page 57

1  be, you know, forensic type activities or
2  investigation type activities versus, yeah,
3  research, design, yeah, those.  And commercial --
4  commercial analysis if you will.  A client comes in
5  and asks us to do work, so that's obviously
6  outside -- some of that can be forensic, but more
7  times than not, it's just commercial -- we call
8  them commercial clients.
9      Q.   And what percentage of the company
10 business would be related to matters that are in
11 litigation, whether they be criminal or civil?
12     A.   Well, that would come out of the
13 50 percent -- 50 percent of income that would be
14 forensic analysis.
15     Q.   Can you give me an estimate of that
16 50 percent of forensic analysis that is dedicated
17 to consultation and litigation?
18     A.   Well, they all potentially can go that
19 way, so it's just a matter -- for us, it depends on
20 when we get engaged.  There's times when we get --
21 you know, an incident occurs, and the insurance
22 company calls and says, We need you to come out and
23 investigate it, that -- we don't know if it's going
24 to go to litigation.  It might not.  We may tell

DOUGLAS J. CARPENTER, 03/31/2021                                    Page 58..61

Page 58

1  them they don't have an issue here, or -- or we
2  tell them something that doesn't allow them to move
3  forward with subrogation.
4          Or we can get involved in litigation
5  later on, you know, when we've gone through
6  discovery and -- and now -- now they're looking at
7  experts.  So it just depends.
8          But they all have the potential to
9  go -- so forensic, every case has the potential to
10  go to litigation.
11      Q.  It's noted in one of your reports that
12  during the proceedings involving Mr. Amor in DuPage
13  County, Illinois, you were not charging any
14  compensation; is that correct?
15      A.  That is correct.  The -- during the --
16  except for reimbursement for travel expenses.
17      Q.  So other than your travel expenses, you
18  were not charging your flat rate for your services?
19      A.  That's correct.
20      Q.  And why were you not charging any
21  compensation for the Amor proceedings that were
22  going on in DuPage County, Illinois?
23      A.  Well, I got involved in the case, and
24  there was no money at that time to really -- to pay

Page 59

1  for it, but I said I would review the project.
2          We do take cases on a pro bono
3  basis.  We have taken a lot over the years, and
4  this one just happened to fall into that category.
5      Q.  So there are other clients or entities
6  that you've done work for that you do not charge
7  any compensation?
8      A.  Yes.
9      Q.  And how often do you do that?
10      A.  It used to be quite -- quite frequently
11  when we were first starting out in business because
12  there wasn't a lot of money.  And then with the --
13  sort of the exposure of some of the innocence
14  projects, money became a little bit more allocated.
15          And so when -- when the client would
16  come to us and say, We would like you to do on
17  this.  We can pay.  What do you think it's going to
18  cost, we'll get -- we'll get authorization from the
19  court to spend, you know, up to X amount of
20  dollars.  Sometimes we'll get reimbursed for all
21  our hours; sometimes we will not.
22          But more lately, there's been more
23  available funds, so -- but they are -- they tend to
24  be capped, so I can say that we lose a lot of money

Page 60

1  on these cases, but we feel strongly about -- about
2  participating in it.  And if we have cases that
3  need, you know, more work, we're willing to put it
4  in even when we're not going to get paid for it.
5          And that's what happened in the
6  previous Amor case.  That -- that case expanded
7  substantially from what, you know, we were
8  originally working -- working with because of the
9  fact that that -- you know, they granted a hearing
10  and then they also granted a new trial.
11          We weren't going to stop in the
12  middle of it because there was no money.
13      Q.  So how do you decide as a corporation
14  whether you're going to charge for your services in
15  a particular case?
16      A.  Well, if there's money available, we
17  will charge for our time, but it all depends.
18  Sometimes people will come and not have the funds
19  available to do what we need to go, and we'll --
20  it's -- it's a process that I will sit down and
21  talk to my partner and say, This sounds like an
22  interesting case.  I think we can help, or you
23  know, We really can't.  You're -- you know, you
24  need to look -- either look for somebody else, or

Page 61

1  that isn't the issue that -- that you really need
2  to be focused on.
3          So it just depends.  It's on -- we
4  sit and come to a consensus about it.
5      Q.  When did you start being compensated
6  for your services in the Willa -- William Amor case?
7      A.  During this new case.
8      Q.  During the civil proceedings?
9      A.  Well, this -- the one we're talking
10  about today.
11      Q.  So the current case.
12      A.  Yes, that's what I said.
13      Q.  Was there a particular date on which
14  you started being compensated for your time in the
15  William Amor matter?
16      A.  I'm sure there is.  I don't have it off
17  the top of my head right now, but yes, that would
18  have been, you know, the day we set up the project.
19      Q.  When you say the day you set up the
20  project, what do -- what do you mean by that?
21      A.  Well, when we say we're willing to --
22  you know, we have a conversation, somebody
23  approaches and says, We'd like you to work on this
24  case.  Then if that moves forward, then we -- then

Page 62

1  we would set up a billing number, if you will, and
2  the details with our front office.  And so that's
3  the -- the initiation and the start of the project.
4      Q.   I see.
5           So at the time you were retained in
6  this matter is when you became -- when you started
7  being compensated.
8      A.   Yeah.  Sometimes those do -- retainers
9  and retainer agreements always don't show up on the
10 day we set up the project.  Sometimes we wait for
11 them; sometimes we don't.  It all depends on, you
12 know, how fast the case is moving.
13          There are some times where we need
14 to be doing work.  We can't wait for, you know,
15 that -- both the retainer, signed retainer
16 agreement and the -- and the check, so we agree to
17 move forward.
18          So I can't say that those two
19 coincide.
20     Q.   Going back to your case list that's set
21 forth in appendix C, what percentage of your work
22 is in criminal matters versus civil matters?
23     A.   I haven't done that one.  But I
24 could -- if you give me some time, I can go and do

Page 63

1  that?
2      Q.   Sure.
3      A.   So I went -- under court testimony, I
4  listed 15 cases.  I'd have to go back and cross
5  reference.  Because you're going to see -- you
6  know, obviously I had depositions and trial
7  testimony in the same case, so this is --
8      Q.   Yes.
9      A.   -- a rough estimate.
10          So that was -- I counted nominally
11 15 in the first section.
12          Deposition testimony I'll do right
13 now.
14          So just roughly, I would say out of
15 the cases, total number of cases listed here in
16 terms of deposition and the court testimony, I did
17 about 16 cases that would be associated with
18 criminal, that were criminal cases.
19     Q.   And what was the total number of cases --
20     A.   I didn't count --
21     Q.   -- both civil --
22     A.   -- that.
23          You want me to go through and take
24 the time to count all of them?

Page 64

1      Q.   Well, I'm just trying to get an idea of
2  what percentage of cases you're involved in
3  criminal matters versus civil matters.
4           Do you know off the top of your head
5  whether you testify more in criminal cases than
6  civil cases?
7      A.   I probably have testified in deposition
8  more.  So I could say I testified more in
9  deposition in civil cases and more criminal in
10 court testimony.
11     Q.   Sure, because there really is no
12 deposition in the criminal cases, except under
13 certain circumstances, so that -- that would make
14 sense to me.
15          But I mean, off the top of your
16 head, do you know how many -- what your percentage
17 of criminal matters that you're involved in versus
18 civil matters?
19     A.   I just said that it was on the order of
20 15 for the court cases.
21          No, I'd have to go through and do a
22 detailed accounting of that, which I'm willing to
23 do but it's going to take some time.
24     Q.   Okay.  Well, let me ask you this:  In

Page 65

1  the criminal cases that you've testified in as set
2  forth in your case list, in those cases, are you
3  being retained both by the state and the defense?
4      A.   I would say that I have not been
5  retained by the state.
6      Q.   Have you ever testified on behalf of
7  the state in any of the criminal cases listed in
8  your case list?
9      A.   No.
10     Q.   They've all been for the defense.
11     A.   Yes.
12     Q.   And then in the civil cases, have you
13 been retained both by plaintiffs and defendants in
14 civil cases?
15     A.   Yes.
16     Q.   And what is the percentage of
17 plaintiffs versus defendants in civil cases?
18     A.   So I've been asked to do that a number
19 of times over the last let's just say five years
20 I've asked -- been asked to do probably that
21 exercise three times, and each of the time it comes
22 out just about the same.  It's a 50/50.
23          We don't take cases -- we take cases
24 on their merits and decide whether we want to take

DOUGLAS J. CARPENTER, 03/31/2021                    Page 66..69

Page 66

1 the case or not based on -- on what, you know, we
2 initially hear in the case. And sometimes we turn
3 cases down, and sometimes we -- more times than
4 not, we'll -- we'll take them. But we screen them
5 pretty heavily. So it's -- it makes sense that
6 it's about 50/50.
7     Q.   And then in any of the cases that you
8 have listed here in your testimony, are -- any
9 of them Innocence Project cases?
10    A.   Yes.
11    Q.   Can you identify for us by page number
12 and case which are The Innocence Project cases?
13    A.   Not from the -- not from the details
14 provided here.
15         Yeah, I'd have to go back and dig in
16 order to -- unless it was intuitively obvious or it
17 was obvious to me.
18         So I'll look through the list real
19 quick and see if I can see some that are -- that
20 would be innocent projects.
21    Q.   Okay. I take it that would be more
22 criminal cases? Would that be correct?
23    A.   Well, The Innocence Project doesn't
24 deal in noncriminal cases.

Page 67

1     Q.   I don't know if that's true, but if you
2 could look at your list and let us know if just by
3 looking at any of these cases you can tell us
4 whether they are innocent -- Innocence Project
5 cases.
6     A.   I would say I don't -- I have not
7 identified any based on -- on court and deposition
8 testimony.
9     Q.   In the work that you do in innocent --
10 Innocence Project cases, are you charging
11 compensation in those cases?
12    A.   Again, it can -- I know in the one I
13 did in Pennsylvania, I'd have to remember if I did
14 or not. It's not -- it's -- I'm trying to
15 remember. I don't think I did in that -- that
16 case, so ... but obviously we've talked about the
17 current case, so ...
18         But yeah, no, it's not -- it's not a
19 given, but so I have -- I have charged and I have
20 not charged. It depends on the availability of --
21 of funds.
22    Q.   In the cases in which you've been
23 retained and disclosed as an expert, have you ever
24 been barred from testifying by any court?

Page 68

1     A.   Never been barred. I've been limited.
2     Q.   And when you say your testimony has
3 been limited, to what extent has it been limited?
4     A.   In one case, it was limited because of
5 a late disclosure of expert opinions. And the
6 second one was limited because I was rebutting
7 another expert who got limited, so I -- I got
8 limited to the same things basically that he did.
9     Q.   Would it be fair to say that the
10 criminal cases that you have listed here in your
11 case list are arson cases?
12    A.   Yes.
13    Q.   And are any of the civil cases that you
14 have listed the result of an arson?
15    A.   Yes.
16    Q.   Can you tell us which of the civil
17 cases are arson cases?
18    A.   Yep. I'll have to go through the list.
19         I'll go through the deposition list
20 and then figure that out.
21    Q.   Okay.
22    A.   You need to know specifically, or just
23 want to know numbers?
24    Q.   Yeah, no. If you can identify the case

Page 69

1 off your list. I think you indicated you're
2 looking at your deposition testimony, which starts
3 at page 37 of the exhibit?
4     A.   Yep. So I -- we can walk through this
5 together.
6         So State of Vermont v. Dale Spooner
7 was an arson case.
8     Q.   Right. That's a criminal matter, but
9 it appears you gave a deposition in that particular
10 case?
11    A.   I did, yes.
12         Well, let's see, Dale -- yeah, yeah
13 but they -- they allowed depositions in -- in
14 Vermont.
15    Q.   Okay. I guess it would depend on the
16 rules of the particular state. Sometimes there's
17 special circumstances when that occurs, but I think
18 it's safe to say that the -- and correct me if I'm
19 wrong, that the criminal cases are -- are arson
20 cases, correct?
21    A.   Yes, I think that's a fair --
22    Q.   Okay.
23    A.   -- statement.
24    Q.   So then if we turn to the civil cases,

DOUGLAS J. CARPENTER, 03/31/2021                    Page 70..73

Page 70

1  which -- which of the civil cases are arson cases?
2      A.   Well, I don't -- I didn't break them
3  down into -- I haven't break them down into -- I
4  just said I would go through the deposition
5  testimony, because that would -- you're looking for
6  noncriminal cases that involved arson.  I'm sorry.
7  I will go through that.
8      Q.   Yes.
9      A.   I'm sorry.
10     Q.   That's all right.
11     A.   Okay.  So they -- I'm going to say that
12  they involved arson, but the person may -- may not
13  necessarily have been charged with that.  That it
14  was a result of some other litigation issue.
15          But Natural Lifestyles v. Vermont
16  Trading Company -- or Vermont Trading Company v.
17  Kelly was a fire that was started inside an
18  apartment building.  That was an issue of fire
19  spread, but it was arson.
20          Bobbi-Jo Perreault, that was a
21  supposed arson, but this was a -- but this was a
22  civil case.
23          Vestry of St. -- no.  Hardel, no.
24          State of Florida v. Kazem was an

Page 71

1  arson case, so that wasn't --
2      Q.   Yes, that --
3      A.   Uh-hmm.
4      Q.   Criminal matter.
5          How about the Hartford Mutual
6  Insurance?
7      A.   No.
8      Q.   Going back to the Bobbi-Jo Perreault
9  case, what type of fire was that?  What was the
10  structure or type of fire involved there?
11     A.   So that was an old hotel that was
12  renovated into a -- into an apartment, an apartment
13  downstairs and upstairs, and the fire started
14  downstairs and killed two grandkids and a
15  grandmother upstairs.  There was a fire spread
16  issue.
17          The Travelers Indemnity, I don't
18  even remember what that case was involved in, but
19  I'm pretty sure it was not -- not an arson case.
20  Reuter --
21     Q.   Okay.
22     A.   Reuter was not.  Kitchen was not.
23  Knise was not.  Mayor and City Council of
24  Baltimore, not.  Camp Tak -- Takajo, no.  Bobby Jo,

Page 72

1  no, we already talked about that.  That was a no.
2          Smith, actually Smith -- yeah,
3  Smith was a -- was an arson case, but it was a
4  civil case.
5      Q.   Okay.  That's Smith v. Nelson, doing
6  business as Simply Sofas?
7      A.   Yep.
8          Well, I mean, I don't remember
9  what -- the initial determination was that somebody
10  set this fire, so then it became an issue of
11  whether Mr. Smith did that or not.  But it was in a
12  civil environment.
13     Q.   Okay.  And what was the nature of that
14  fire?
15     A.   Yeah.  I'm not -- can you be more
16  specific?
17     Q.   Yeah.  You described the others as, you
18  know, apartment or a hotel.
19          What was the nature of the --
20     A.   Oh.
21     Q.   -- fire in the Smith case?
22     A.   I believe that that was a -- that was a
23  furniture store where Mr. Anthony had purchased
24  some furniture, and they had a subsequent fire, and

Page 73

1  he was blamed for that, but yeah.
2          Potomac Electric, no.
3          Federal Insurance, that was
4  Pensacola, Florida, yeah.  That was insulation;
5  that was not arson.
6          Arch Chemicals was not arson.
7  Virginia Miller v. Invacare was not arson.  Hippert
8  v. Trane was not --
9          (Reporter clarification.)
10  THE WITNESS:  Arch Chemicals was not arson.
11  The next case was Virginia C. Miller, that was not
12  an arson case.  Hippert was not.  Puckett was not.
13  Linger Longer was not.
14          Charleston Apartments, that was in
15  Texas.  That was -- huh -- that was -- that was not.
16          Traci Evans, that was not.  National
17  insurance company, that was Florida, no.
18          Teel, no; Winding River, no.
19          Mark Leonard was an arson case.
20  BY MR. POLICK:
21     Q.   A criminal matter?
22     A.   Yes, it was.  I was trying to remember
23  if it was criminal or civil, yes.
24          Davis, no; Flaminia, no; Sutton, no;

DOUGLAS J. CARPENTER, 03/31/2021                    Page 74..77

Page 74

1 Turcotte, no; Brent, no; and Touse, no.

2    Q.    Does that complete the list?

3    A.    Yes.

4    Q.    Okay.  In the cases that you have

5 listed there, do any of them involve the use of

6 computer fire modeling?

7    A.    Yes.

8    Q.    How many of the cases?  Some?  All?

9 Only specific ones?

10   A.    It would be only specific ones.

11   Q.    Do you know by looking at your list

12 which of the cases involve computer fire modeling?

13   A.    I can go through the list.

14   Q.    When you say you're going through the

15 list, would you have to look at both the test --

16 court testimony and the deposition testimony, or is

17 it just one list that you would need to look

18 through?

19   A.    I'd go look through -- are you asking

20 for both court and deposition testimony?

21   Q.    No.  What I'm looking for is you have

22 several cases listed here.  I know you've got it

23 broken down into court testimony and deposition

24 testimony.

Page 75

1            But what I'm asking is:  Which of

2 these cases involved the use of or presentation of

3 computer fire modeling?

4    A.    Okay.  I can go through.  We'll go

5 through the list, and I will identify the ones that

6 included computer fire modeling.

7    Q.    Okay.

8    A.    State of Ohio v. Angela Garcia, I

9 believe we used computer fire modeling in.

10           State of Florida v. Kazem, we used

11 computer fire modeling.

12           The Carriage Hill Apartments, we did

13 not.

14           Amanda Gutweiler, yes, that involved

15 computer fire modeling on both sides of that case.

16 Like both was generating computer fire modeling but

17 also looking at the other side's computer fire

18 modeling.

19           Camp Takajo, no.  Anthony Smith, I

20 don't believe.

21           State of North Carolina, Greene, I

22 think I did do computer modeling in that case.

23           State of Alabama v. Christi Scott, I

24 used it.

Page 76

1            Eric Williams.  Not sure I used it

2 in the Eric Williams case.

3            Ronald C. Davis, I used aspects of

4 computer fire modeling.

5            Sharon Watkins, not sure, but it's

6 quite possible I did modeling in that case.

7            Bradford definitely used modeling.

8            Sheree Dionne Murphy, State of

9 Georgia, I don't think so.

10           Edward Graf, I believe I used some

11 computer fire modeling in that case.

12           Teel, I don't believe I did.

13           Graf, I did.  Graf, I did.  Amor, I

14 did.

15           Flaminia, we did some -- some fire

16 modeling in the form of heat transfer.

17           Susan Rattner, did not do fire

18 modeling in that case.

19           Amor.

20           Derek Don Posey, I believe I did

21 some fire modeling for that case.

22           Turcotte, I don't believe I did fire

23 modeling in that case.

24           Ketchem, did not do fire modeling in

Page 77

1 that case; Spooner, no.

2            Natural Lifestyles, I've already

3 said yes.

4            Bobbi-Jo Perreault, might have done

5 some in that case.  Not absolutely certain.

6            St. Andrews Church, did modeling but

7 not -- not specific fire modeling.

8            "Hardwood" plywood company, we

9 didn't do specific fire modeling in that case.

10           Hartford, no; Traveler's Indemnity,

11 no; Washington Hospital, no.

12           Kitchen, we did some fire modeling

13 associated with a fire exposure and heat transfer,

14 so we did do it in that case.

15           Knise, we didn't do specific

16 computer fire modeling.  We did modeling of

17 self-heating in that case.

18           City of Baltimore, we did do

19 modeling in that case.  We modeled the tunnel fire.

20           Camp Takajo, we did not model.

21           Bobby Jo Knepp, yeah, I did model

22 that.  I'm uncertain about that, whether I did

23 modeling in that case.

24           Camp Takajo, no.

Urlaub Bowen & Associates, Inc.   312-781-9586

DOUGLAS J. CARPENTER, 03/31/2021                    Page 78..81

Page 78

1        "Annette" Howard, I think we did do
2  some modeling in that case.
3        Q.   Howard?
4        A.   Yes.
5             Narragansett, yes, we did -- there
6  was fire modeling done in that case, and we were --
7  we did an analysis of that.
8             Smith, possible.  I can't -- no, I
9  don't think we did modeling in that case.
10             Automobile versus Potomac, no, we
11  didn't do -- that was outdoors.  We didn't really
12  do computer fire modeling.
13             This was Coastal Insulation, no.
14             Arch Chemicals, we did not do
15  modeling.
16             Hippert, I did modeling.
17             Puckett, I didn't do computer fire
18  modeling.
19             Linger Longer, don't believe we did
20  modeling in that case.
21             Charleston Apartments, that was --
22  there was modeling done in that case.
23             Traci Evans, Albany Electric
24  Company -- oh, yeah, no modeling.

Page 79

1             Pridgen Homes, no modeling; Teel, no
2  modeling; Winding River, no modeling.
3             State of Indiana v. Mark Leonard
4  involved computer fire modeling.
5             Edward J. Davis & Sons, that was,
6  yes, in Vermont.  Can't remember.  It's possible,
7  but I don't think -- I don't think we did modeling
8  in that case.
9             Flaminia involved modeling.
10             Heather Sutton, no modeling;
11  Turcotte, no modeling; Brent, no modeling; and
12  Touse, no modeling.
13             That's the end of the list.
14        Q.   Okay.  Have you ever been barred by any
15  court from presenting computer fire modeling?
16        A.   Not that I remember, no.
17        MR. POLICK:  Why don't we take a short break.
18  I'm going to move to another area.  Maybe a
19  5-minute, 10-minute break.  Is that all right?
20        THE WITNESS:  10 minutes sounds good.
21        MS. GARCIA:  Good on my end.
22        MR. POLICK:  Okay.
23        THE VIDEO TECHNICIAN:  We're off the video
24  record at 11:37 at the end of media unit 1.

Page 80

1             (Recess taken.)
2        THE VIDEO TECHNICIAN:  We're back on the
3  video record at 11:50 at the beginning of media
4  unit 2.
5  BY MR. POLICK:
6        Q.   All right.  Mr. Carpenter, do you
7  understand you're still under oath?
8        A.   I do.
9        Q.   All right.  Before the break, you were
10  identifying cases that you have testified in in
11  which you have used computer fire modeling.
12             Do any of those cases involve a fire
13  in a single unit of a multiunit building similar to
14  the fire we have in the William Amor case?
15        A.   I would say yes.
16        Q.   Okay.  I know you identified the
17  Natural Lifestyles case as an apartment building
18  fire.  I'm not sure if that's a single unit or a
19  whole apartment building that's on fire.
20             But do you understand the
21  distinction or -- of what I'm asking about a single
22  unit within a multiunit building?
23        A.   Yes, I understand that distinction.
24        Q.   Okay.  Which of the cases in which

Page 81

1  you've identified the use of computer fire modeling
2  involved a single unit within a multiunit building?
3        A.   I'd have to go through the list and
4  identify those.
5        Q.   Okay.
6        A.   Are you asking me to do that, or --
7        Q.   Yes.  Go ahead, please.
8        A.   Okay.  You're only asking about civil
9  cases, or you're -- it doesn't matter?
10        Q.   It doesn't matter.  I'm using your
11  response to my question about computer fire
12  modeling.  So with that as the subset of cases in
13  which computer fire modeling was used, I'd like to
14  know which of those cases involved a fire in a
15  single unit of a multiunit building.
16        A.   Okay.  I believe State of Ohio was an
17  apartment in a building.  State of Florida versus
18  Kazem was.  Amanda Gutweiler was a -- was a
19  residential house.
20        Q.   Okay.
21        A.   Smith, Lisa Greene.
22        Q.   I mean, if it's easier -- if it's
23  easier for me to go through the ones you've
24  identified as computer fire modeling, and if that's

DOUGLAS J. CARPENTER, 03/31/2021                    Page 82..85

Page 82

1 an easier way to do it, I can -- we can proceed in
2 that fashion.
3      A.   It'd probably be easier. I didn't
4 mark -- I didn't mark them on here, so I'll just
5 have to go through the whole list.
6      Q.   Okay. Let me -- let me do it that way,
7 and I'll go through the ones you've identified as
8 involving computer fire modeling, and you can tell
9 me which of these involved a fire in a single unit
10 of a multiunit building.
11            Understood?
12     A.   Understood.
13     Q.   Okay. Next one I have is North
14 Carolina v. Greene?
15     A.   That was in residential setting, so no.
16     Q.   Okay. Alabama versus Scott?
17     A.   That was again a house.
18     Q.   Okay. West Virginia versus Davis?
19     A.   That was in a trailer.
20     Q.   Texas versus Watkins?
21     A.   I believe that was an apartment
22 building.
23     Q.   Indiana versus Bradford?
24     A.   Single family home.

Page 83

1      Q.   Texas versus Graf?
2      A.   That was actually a woodshed.
3      Q.   Flaminia?
4      A.   That was a cargo container ship, so no.
5      Q.   Oklahoma versus Posey?
6      A.   That was a single family home.
7      Q.   I think you told me Natural Lifestyles
8 was an apartment building.
9            Was that a single unit, or was it
10 more than one unit in a multiunit building?
11     A.   It was in a multiunit building;
12 multiple levels, multiple units.
13     Q.   Okay. So different than the situation
14 we have in the Amor case, correct?
15     A.   No, it's multiple levels --
16     MS. GARCIA: Object to form --
17     THE WITNESS: -- in the Amor case.
18     MS. GARCIA: Sorry, I didn't mean to
19 interrupt. Object to form.
20 BY MR. POLICK:
21     Q.   So the Natural Lifestyles apartment
22 building fire, was that a fire in a single unit, or
23 did it -- did it involve multiple units within a
24 multiunit building?

Page 84

1      A.   No, single unit.
2      Q.   Okay. How about Perreault?
3      A.   That was an apartment build -- a single
4 unit in an apartment building.
5      Q.   Kitchen?
6      A.   That was in a residential house.
7      Q.   City Council of Baltimore?
8      A.   That was a train tunnel.
9      Q.   Knepp?
10     A.   Knepp. Knepp was -- yeah, that was --
11 I believe that was in an apartment building.
12     Q.   Howard?
13     A.   Apartment building.
14     Q.   Do you recall who you testified on
15 behalf of in that civil case?
16     A.   I want to -- you said --
17     Q.   Was it the plaintiff or the defendant?
18     A.   No, it was defendant. So it was East
19 Lake Management.
20     Q.   Okay. How about Kane? Is that an
21 apartment fire?
22     A.   I believe it was.
23     Q.   Single unit within a multiunit building?
24     A.   Yeah, yep.

Page 85

1      Q.   Hippert?
2      A.   Nope.
3      Q.   Philadelphia Insurance Company?
4      A.   Yes, that was a single unit in a
5 multiple -- multi-apartment building.
6      Q.   Indiana versus Leonard?
7      A.   No. That was in a residential house.
8      Q.   Okay. I think you told me Flaminia was
9 not, correct?
10     A.   No, it says MV, so it's marine vessel.
11     Q.   Okay. All right. I think that covers
12 them all.
13            Can you tell me when you were first
14 retained in the Amor matter?
15     A.   You're talking about originally? Like --
16     Q.   Yes. Originally when --
17     A.   I --
18     Q.   -- you started your work.
19     A.   I'd have to look that date up. I don't
20 have that committed to memory.
21     Q.   I believe your affidavit from December
22 of 2014 indicates September of 2012.
23            Would that be correct?
24     A.   It's possible.

DOUGLAS J. CARPENTER, 03/31/2021                    Page 86..89

Page 86

1    Q.    Do you recall how you were retained in
2 the matter?
3    A.    I assume I would have gotten a phone
4 call from an attorney explaining their -- their
5 case.
6    Q.    Do you recall who that attorney was?
7    A.    Not specifically.
8    Q.    Was it someone -- strike that.
9          Was it an attorney that was involved
10 with the Illinois Innocence Project?
11   A.    I don't remember, because they're
12 not -- not all the attorneys were involved with The
13 Innocence Project so -- or had --
14   Q.    Do you --
15   A.    There's -- yeah, I don't know the
16 answer to that.  I'd have to go back and find out
17 who that was, and then I could tell you at that
18 time who they were affiliated with.
19         There was one lawyer I believe that
20 was transitioning out of that case to a new -- a
21 new position, so ...
22   Q.    Do you have any recollection of the
23 attorney that contacted you -- you initially about
24 or originally about this particular matter?

Page 87

1    A.    Not in this case, no.  That was, you
2 know, prior to 2012.  I mean, that was a long time
3 ago.
4    Q.    And then in the current civil case that
5 we're here on today, when were you retained in
6 that -- in this particular case?
7    A.    I think you asked me that before, and I
8 don't know the answer to that without going and
9 looking it up.
10   Q.    Was -- were you retained in the civil
11 case prior to Mr. Amor's second trial in which you
12 testified?
13   A.    When you say retained, formally
14 retained?  I mean, I was --
15   Q.    Yes, and --
16   A.    Yes?
17   Q.    What I'm asking is when you were
18 retained in the case that we are here on today,
19 you've made a distinction about that earlier.  So
20 I'm trying to find out when it was that you were
21 first retained on the case that we are here on
22 today.
23   A.    And I said I don't off -- did not
24 commit that to memory, so I don't know.  I'd have

Page 88

1 to go get -- dig that detail up.
2    Q.    Right.  So trying to put a time line on
3 it, was it before or after Mr. Amor's second trial
4 at which you testified?
5    A.    It was after.
6    Q.    And do you recall who retained you?
7    A.    The lawyers at Loevy & Loevy.
8    Q.    Was it a particular lawyer there at
9 that law firm?
10   A.    I'd have to go back and look at the
11 retainer agreement.
12   Q.    And was it Ms. Garcia that's with us
13 here today that contacted you?
14   A.    Contacted me, yes.  But that's
15 different than being retained, right?
16   Q.    Well, at some point you were retained
17 in this particular case, so I'm trying to determine
18 which attorney it was that set up the retention for
19 this case.
20   A.    Whoever made the initial call, we would
21 have executed a retainer agreement and then waited
22 for it to get back.  I'd have to go back and look
23 at those records.  I -- I don't know whose name --
24 who signed it, and so without going back and

Page 89

1 looking at that -- that agreement.
2    Q.    Okay.  Does the name of attorney Tara
3 Thompson refresh your recollection at all?
4    A.    I'd have to look at the document.  I
5 certainly know Tara, yes.
6    Q.    Do you have any recollection if it was
7 Tara that retained you in this particular case?
8    A.    No.  I don't -- again, I'd have to go
9 back and look at it.  I can't -- from memory, I --
10 I don't know.  I'd have to confirm by looking at
11 the documentation.
12   Q.    Before this case, had you done any work
13 for the law firm of Loevy & Loevy?
14   A.    Not that I remember.
15   Q.    Are you currently working on any other
16 cases for Loevy & Loevy where you have been
17 disclosed as an expert?
18   A.    No.
19   Q.    Are you working on any cases currently
20 for attorney Mariah Garcia where you have been
21 disclosed as an expert other than this case?
22   A.    No.
23   Q.    Are you currently working on any cases
24 for attorney Tara Thompson where you have been

DOUGLAS J. CARPENTER, 03/31/2021                      Page 90..93

Page 90

1  disclosed as an expert?

2      A.    I don't -- I don't know in that case if

3  I -- if I've been disclosed, so I can't answer

4  that.  I don't believe so.

5      Q.    So there may be another case you're

6  involved in, but you just don't know if you've been

7  disclosed or not.

8      A.    Correct.

9      Q.    How were you initially provided with

10  the materials that you reviewed in this case?

11      A.    I imagine that they were either -- I

12  usually request thumb drives or CDs.  But sometimes

13  I get Dropboxes.  I don't know.  I'd have to go

14  back.  But it was in some electronic format.

15      Q.    And after you received the materials,

16  did you make requests for additional materials to

17  be sent to you?

18      A.    If there was -- if I needed to make a

19  request, I would have, but I don't -- I don't

20  remember as I sit here today making that request.

21  It's possible that I could have.

22      Q.    Were there any materials you asked for

23  that you were not provided with?

24      A.    No.

Page 91

1      Q.    And earlier, you told us that you have

2  billed tens of thousands of dollars to date on this

3  case, so that would be starting at the point you

4  were retained in this matter?

5      A.    Yes.

6      Q.    Other than Mr. Amor's attorneys, did

7  you consult with anyone else in forming your

8  opinions in this case?

9      A.    Attorneys or anybody?

10      Q.    No.  I said other than Mr. Amor's

11  attorneys, did you consult with anyone else in

12  forming your opinions in this case?

13      A.    Well, I certainly -- yes, I -- I

14  worked -- we use a team approach here, so I would

15  have talked about the case with our technical

16  director.  And as an offshoot of this case, we are

17  actually working on another project doing some

18  research.  So I've talked to people about that.

19      Q.    What's the research you're doing as an

20  offshoot of this case?

21      A.    We're actually doing a research paper

22  associated with testing of different types of

23  alcohol in the flashpoint.  We hope to publish it.

24      Q.    So you referred to your technical

Page 92

1  director.

2      Q.    Is that Mr. -- or I'm sorry --

3  Dr. Richard Roby?

4      A.    That is correct.

5      Q.    And what was Dr. Roby's role in your

6  opinions and conclusions in this case?

7      A.    Well, we have a check on everything

8  that goes out the door.  So he would have -- you

9  know, we may have had discussions about the

10  available literature, the -- and some of the

11  testing that -- that we did.  But we always have a,

12  like I said, a team approach where we look, and the

13  technical director is responsible for what goes out

14  the -- out the door ultimately.  So we have a

15  procedure, if you will, of -- of him being involved

16  and knowing -- knowing what's going on and checking

17  the reliability.

18      Q.    So he would be part of, for lack of a

19  better word, your internal quality control on this

20  project?

21      A.    Yep.

22      Q.    Did he have any other roles in this

23  particular case?

24      A.    We always talk about it.  I mean, all

Page 93

1  of our cases are usually interesting, and -- and we

2  always feel that having open discussions about

3  cases, maybe even with engineers that are involved

4  and may be able to bring a different perspective.

5  Maybe, you know, Hey, you might want to think about

6  this, or you -- have you thought about doing this,

7  or, There's another way you can test the

8  hypothesis.  Did you know about this partic --

9  particular piece of information, or I had a case

10  that, you know, involved these -- these issues.

11      We do that on an informal basis and

12  we do it on a more formal basis once a month.  So

13  you know, that -- that's always occurring.

14      Q.    In the invoices that you produced to

15  us, I also saw the name of Mr. Nasir Hussain as a

16  project engineer?

17      A.    Yes.

18      Q.    What was his role in -- in this

19  particular project?

20      A.    So he was the one I asked to do some

21  flashpoint testing associated with vodka.

22      Q.    Did you have any role in that

23  flashpoint testing of the vodka?

24      A.    Yeah.  I charged him with doing that,

DOUGLAS J. CARPENTER, 03/31/2021                    Page 94..97

Page 94

1 and he would keep me up to date on what was going
2 on. And we were making sure that our apparatus was
3 well calibrated. So yes, I was actively involved
4 in overseeing the project. He conducted the
5 experiments.
6     Q.   Anyone else that played a role in this
7 particular project or in forming your opinions and
8 conclusions in this matter, other than Dr. Roby and
9 is it Mr. Hussain or Dr. Hussain?
10    A.   Mister.
11    Q.   Okay.
12    A.   Not that I can think of. I mean, those
13 are -- those are the major players.
14    Q.   All right. And have you consulted with
15 any other experts in your field about this case?
16    A.   No.
17    Q.   Are you aware that other experts in
18 your field have testified about this case?
19    A.   Yes.
20    Q.   Are you aware that they have reached
21 opinions different than yours?
22    MS. GARCIA:  Object to form.
23         You may answer.
24    THE WITNESS:  Yes.

Page 95

1 BY MR. POLICK:
2     Q.   Do you know John DeHaan?
3     A.   Yes.
4     Q.   And who is he?
5     A.   John DeHaan is a well-known expert in
6 our -- in the field of forensic fire investigation.
7     Q.   And is it your understanding that in
8 this particular matter he found the origin and
9 cause of the fire to be undetermined?
10    A.   Yes.
11    Q.   Did his opinions and conclusions on
12 this case cause you to reconsider your opinions and
13 conclusions?
14    A.   No. I did further analysis, went
15 beyond what he did, and I believe I can reliably
16 reach the determinations that I did based on what
17 he did. He relied on what he considered to be the
18 most reliable conclusion he could draw.
19    Q.   Who is David Mitchell Smith?
20    A.   I believe that's Dave Smith from
21 Arizona? Is that correct?
22    Q.   And who is he?
23    A.   And so he's a fire investigator from
24 Arizona that I believe was asked to become involved

Page 96

1 in this case and provide opinions.
2     Q.   And are you aware that his opinion on
3 origin and cause was undetermined?
4     A.   I -- I believe I remember that, yes.
5     Q.   And did Mr. Smith's opinions and
6 conclusions in this case cause you to reconsider
7 your opinions and conclusions?
8     A.   No. I certainly evaluated them and
9 looked at them.
10    Q.   How about John Golder? Do you know who
11 he is?
12    A.   I do based on this case.
13    Q.   And who is Mr. Golder?
14    A.   I believe at the time he testified
15 he was a retired ATF agent, if memory serves me
16 correctly. But he is obviously an expert on the
17 other side.
18    Q.   All right. And is it your
19 understanding that Mr. Golder concluded that the
20 cause of the fire was incendiary?
21    A.   I do remember that. The specific issue
22 that comes to mind for me was, you know, whether --
23 whether the scientific method was followed. But
24 yes, I believe he probably did come to those

Page 97

1 conclusions.
2     Q.   Okay. And did Mr. Golder's opinion and
3 conclusions cause you to reconsider your opinions
4 and conclusions in this case on origin and cause?
5     A.   Again, I looked at his analysis and the
6 basis for his analysis, and he came to the
7 conclusions he did. I do not agree with them, and
8 I did further analysis to support my -- my
9 conclusions.
10    Q.   Do you know who John Lentini is?
11    A.   Yes.
12    Q.   Who is John Lentini?
13    A.   John Lentini is a well-known expert in
14 the fire and -- forensic fire investigation
15 community, and he -- with a very strong background
16 in chemistry and -- and looking at fire debris
17 analysis.
18    Q.   Do you know if Mr. Lentini has made any
19 opinions about origin and cause of the fire in this
20 particular case?
21    A.   Don't remember that he did, but I also
22 don't remember exactly what his role, if any, in
23 this case was.
24    Q.   Were you aware that he believed that

DOUGLAS J. CARPENTER, 03/31/2021                    Page 98..101

Page 98

1 the fire was incendiary as to cause?

2    A.    I don't know that as I sit here today.

3    Q.    Can you briefly explain your opinion in

4 this matter as to the origin and cause of the fire?

5    A.    Briefly, no.  But I can explain some

6 elements of it.

7    Q.    Well, let's start with the origin, and

8 tell us what your opinion is on that.

9    A.    My opinion is the fire started in the

10 reclining chair that was more in line -- located in

11 the living room but closer to the dining room in

12 line with a hallway to the -- to the other

13 bedrooms.

14        I have a whole PowerPoint

15 presentation that goes through my exact analysis of

16 both -- of the origin of this particular fire.  So

17 if you want to go through that, we can.

18    Q.    Yeah, I believe we will at some point

19 during the deposition.

20        And with the origin being the what

21 you call the reclining chair, what is the ignition

22 source of the -- the fire?

23    A.    It would have been a -- a cigarette

24 that had caused a smoldering ignition of the chair.

Page 99

1    Q.    So the reclining chair would be the

2 first fuel to be consumed during the course of this

3 fire?

4    MS. GARCIA:  Object to form.

5        You may answer.

6    THE WITNESS:  It would have been -- yeah,

7 it's the smo -- the first material that would be

8 involved in combustion that is smoldering

9 cigarette -- well, I mean, you could say the --

10 treat the cigarette as the ignition source, so the

11 first fuel ignited is polyurethane, you know,

12 flexible polyurethane foam in upholstered furniture.

13 BY MR. POLICK:

14    Q.    And then am I correct that you believe

15 the cause of this fire to be accidental?

16    A.    Based on that determination, yes.

17    Q.    Are you aware of any other expert in

18 your field who has found this fire to be accidental

19 as cause?

20    A.    Not that I'm aware of.

21    Q.    The report that you prepared in January

22 of 2021 that we've marked as Exhibit 1 is your most

23 recent report in this matter, correct?

24    A.    Correct.

Page 100

1    Q.    And is that intended to be a supplement

2 of the affidavit and report that you previously did

3 in this particular matter?

4    A.    No.

5    Q.    What is it intended to be?

6    A.    Both -- when we write reports, we try

7 to define the -- the analysis in terms of what is

8 at issue.  So in this particular issue, we're

9 looking specifically at the reliability of the fire

10 cause as opposed to origin of the fire, fire spread

11 issues, those type of things.

12        So this is a very -- a bit narrower,

13 so I would consider this not to be a supplement to

14 the other reports.  They certainly --

15    Q.    Okay.  Can we mark --

16    A.    They certainly include analysis from --

17 from the other -- from the other case, but this is

18 a standalone, you know, related to the issues in

19 this particular case.

20    MR. POLICK:  Can we mark as Exhibit 2 the

21 affidavit dated December 24th of 2014.

22 BY MR. POLICK:

23    Q.    Mr. Carpenter, we are marking as

24 Exhibit 2 to your deposition your affidavit that

Page 101

1 was presented in Mr. Amor's proceedings in DuPage

2 County, Illinois, that's dated December 24th of

3 2014.

4        Do you have that document available?

5    A.    I don't know if I have that specific

6 one readily available.

7    Q.    All right.  Just if you are you able to

8 view it on the screen if you don't have it

9 available, I just have a few questions about it at

10 this point.

11    A.    Yes.

12    Q.    Is that in fact your affidavit that

13 we've marked as Exhibit 2?

14    A.    That appears that way, yes.

15    Q.    And is this an affidavit that you

16 prepared?

17    A.    Yes.

18    Q.    And would that be your signature on

19 page 67 of the affidavit?

20    A.    Yes.

21    Q.    All right.  And then if we can mark as

22 Exhibit 3 your report dated September 9th of 2016.

23        Are you able to see that document,

24 Mr. Carpenter?

DOUGLAS J. CARPENTER, 03/31/2021                    Page 102..105

Page 102

1    A.    Yes.  And I have a copy of it here in
2  front of me.
3    Q.    Okay.  And is this a report that you
4  prepared?
5    A.    Yes.
6    Q.    And correct me if I'm wrong, but this
7  report was prepared as a rebuttal to the opinions
8  of Mr. John Golder?
9    A.    That is correct.
10   Q.    And is that your signature at page 9 of
11 the exhibit?
12   A.    Yes.
13   Q.    So other than your current report dated
14 January 22nd of 2021, your report of September 9th
15 of 2016, and your affidavit of December 24th of
16 2014, are there any other reports or affidavits you
17 have authored in this matter?
18   A.    I don't believe so.
19   Q.    All right.  I want to go back to
20 Exhibit 1, and in particular appendix A of that
21 document, which is your list of materials reviewed,
22 and that comprises pages 14 through 16 of the
23 report.
24        Do you have that available --

Page 103

1    A.    I do.
2    Q.    -- Mr. Carpenter?
3    A.    I do.
4    Q.    Okay.  All right.  And is that a
5  complete list of all the materials you reviewed in
6  this case?
7    A.    I believe it's an accurate represen --
8  at the time -- no, these will be lists that are
9  supplemented, so I will not re -- usually will not
10 repeat all of the previous -- you know, if I do a
11 supplemental report, I will do whatever's been
12 reviewed as -- after the first report.  So but this
13 was probably the first report that I did where I
14 listed out materials reviewed.  I don't believe I
15 did that in the affidavit, so I would say that yes,
16 it is.
17   Q.    So it is a complete list of all the
18 materials you reviewed.
19   A.    Should be, yes.
20   Q.    In your field, are there any
21 authoritative texts or treatises that you rely
22 upon?  I know that you have referenced NFPA 921
23 quite a bit, but are there any others that you rely
24 upon in your field other than NFPA 921?

Page 104

1    A.    I rely on the available scientific
2  literature.  There are other books that I might
3  use, or textbooks if you will, reference books that
4  may provide a little bit easier method of looking
5  for -- using that as gateways to the scientific
6  literature.  Obviously there's a lot of literature.
7        But I don't consider anything to be
8  authoritative, because authoritative to me, by
9  definition, means that everything is absolutely
10 correct and reliable.  And I can't think of a
11 document that exists that meets to that -- to that
12 standard.
13        But there are -- there are standards
14 of care documents that represent the standard of
15 care 921, and there's other documents, books on
16 fire investigation that relate people's knowledge
17 and experience that I use, yes.
18   Q.    I think in your PowerPoint one of the
19 texts that you cited was Forensic Fire Scene
20 Reconstruction by Icove and DeHaan?
21   A.    That --
22   Q.    Do you --
23   A.    -- is correct.
24   Q.    -- know that -- that text?

Page 105

1    A.    Yes.
2    Q.    Do you consider that to be an
3  authoritative text or treatise within your field?
4    A.    No.
5    Q.    How about Kirk's Fire Investigation?
6  Do you consider that an authoritative text or
7  treatise within your field?
8    A.    Not authoritative.  I mean, it has good
9  stuff in it, but it's not all exactly the most
10 accurate information.
11   Q.    Going back to your affidavit that we've
12 marked as Exhibit 2, particularly at page 35,
13 paragraph 73, you indicate there -- are you able to
14 see that, Mr. Carpenter, where we're speaking of
15 here?
16   A.    Yes.
17   Q.    Okay.  You indicated there that you
18 were provided with transcripts of the testimony of
19 various persons who had testified on origin and
20 cause of the Amor fire.  And you note Lieutenant
21 David Ferreri, Agent Mitchell Kushner, Detective
22 Sherwin, and John Gust.
23        Do you see that?
24   A.    I do.

Urlaub Bowen & Associates, Inc.    312-781-9586

DOUGLAS J. CARPENTER, 03/31/2021                    Page 106..109

Page 106

1    Q.   And then you go on to say:  In addition
2 to these witnesses, I've also reviewed summaries of
3 nontechnical witnesses who testified at trial.
4         Do you see that?
5    A.   I do.
6    Q.   Who provided you with the summaries of
7 the nontechnical witnesses?
8    A.   The legal team.
9    Q.   And this would have been at the time of
10 Mr. Amor's post-conviction proceedings?
11   A.   Post-conviction case, yes.
12   Q.   And then when you say nontechnical
13 witnesses, which witnesses are you referring to?
14   A.   I don't -- don't have a list.
15   Q.   As you sit here today, do you know who
16 these witnesses are?  Can you name any of them?
17   A.   Not -- I can't name them at the top of
18 my head, no, not as I sit here today.
19   Q.   Where are the summaries of nontechnical
20 witnesses noted in your materials reviewed in your
21 current report?
22   A.   In my current report as of January --
23   Q.   Yes.
24   A.   -- 22nd?  They're not.

Page 107

1    Q.   Why are they not listed as part of the
2 materials reviewed?
3    A.   That's what I explained before.  When I
4 do a new -- new report, then I don't -- then I
5 don't do -- I don't -- I don't cover the tranche of
6 other documents listing it.  It just gets
7 repetitive.
8    Q.   Then going back to your report of
9 September 9th of 2016, you have an appendix
10 attached to that report, appendix A at page 10 of
11 31 and page 11.
12        Do you see that Mr. Carpenter?
13   A.   I do.
14   Q.   And there you have the list of
15 materials reviewed for that particular report,
16 correct?
17   A.   That is correct.
18   Q.   And the only material you have listed
19 there in Exhibit 3, your report of September 9th of
20 2016, is Mr. Golder's expert report dated
21 January 8th of 2016, correct?
22   A.   Correct.
23   Q.   Is Mr. Golder's report included among
24 the materials you reviewed in your current report

Page 108

1 of January 22nd of 2021?
2    A.   No.
3    Q.   As part of the materials you reviewed,
4 did you look at or review any of the expert reports
5 done by John DeHaan or David Smith?
6    A.   When you say "reviewed," what -- what
7 time frame?
8    Q.   Any time frame.
9    A.   I think I testified before that I --
10 that I was aware of their -- their opinions, so I
11 read their reports, yes, and their analysis.
12   Q.   Okay.  And where are their -- where is
13 Mr. DeHaan and Mr. Smith's reports noted in the
14 materials reviewed in your current report dated
15 January 22nd of 2021?
16   A.   They're not.  They would have been
17 included in the list of materials that I would have
18 generated for prior to this.  And I did an
19 affidavit, and that format didn't require a list of
20 materials reviewed, so I never generated it.
21        That's why I say it's hard to come
22 up with a list.  I could generate one, but my
23 report format didn't require it.
24   Q.   Earlier, you told me that there was

Page 109

1 some vodka flashpoint testing that was done by you
2 and Mr. Hussain, correct?
3    A.   Correct.
4    Q.   Are there notes or worksheets or any
5 sort of documentation about that vodka flashpoint
6 testing?
7    A.   It would have been -- we have
8 documentation of the tests, yes.
9    Q.   In fact, you told me you're thinking
10 about publishing that testing as a research
11 article, correct?
12   A.   Well, not -- as a result of doing the
13 testing in this case and looking at the available
14 literature, we found that there were a dearth of
15 experimentations or experimental data, and we
16 wanted to see if we could fill in that gap.  So we
17 did a full on project, in-house, paid for it
18 ourselves, and that is ongoing.
19   Q.   And where is the documentation for that
20 vodka flashpoint testing by you and Mr. Hussain
21 noted in the Materials Reviewed section of your
22 report?
23   A.   It wouldn't fall under that category.
24 It would be -- I listed it in the main body of

DOUGLAS J. CARPENTER, 03/31/2021                    Page 110..113

Page 110

1 the -- of the report. We have documentation. It's
2 just basically a ten -- temperature measurement.
3 And so we have that data, but I reported those --
4 that data in the re -- in the body of the report.
5 So it wouldn't necessarily have to be in here.
6        Anything that I did as part of my
7 analysis or other reports wouldn't be considered
8 materials that I reviewed, per se, in this context.
9    Q.   How much documentation was generated as
10 a result of the flashpoint testing on the vodka?
11    A.   It's probably videotaped. It'd be very
12 short sections of videotape or pictures of the --
13 the scanner for the temperature measurement as the
14 test was being done. And it was -- it would have
15 been written down in a -- in a document too.
16    Q.   So in addition to documentary evidence,
17 there's also videotaped evidence of this vodka
18 flashpoint testing?
19    A.   I'd have to go back and look and
20 confirm that. There might be, or there might be
21 pictures of that too to document the -- what the --
22 the measurement meter was, the temperature meter
23 was recording.
24    Q.   So in addition to documentary evidence,

Page 111

1 videotaped -- and videotaped evidence, there may
2 also be photographic evidence of the vodka
3 flashpoint testing?
4    A.   There might be. I'd have to go back
5 and talk to Nasir.
6    Q.   Have you turned those materials over to
7 Ms. Garcia or Ms. Thompson in this case?
8    A.   No. I used them as part of my analysis
9 in my report. They're reported in the -- in the
10 body of my expert report.
11    Q.   My question though is: Did you turn
12 over the documentary evidence, including the
13 videotape and photos that may exist of that vodka
14 flashpoint testing, to Ms. Garcia or Ms. Thompson?
15    A.   No, I did not.
16    Q.   Are you aware that we issued a subpoena
17 to you for all the materials that you used arriving
18 at your opinions in this case?
19    A.   I understand one was -- there was a
20 subpoena, yes.
21    Q.   And why weren't these materials
22 regarding the vodka flashpoint testing turned over
23 in response to that subpoena?
24    A.   I don't know.

Page 112

1    Q.   Why weren't those materials relating to
2 the vodka flashpoint testing turned over prior to
3 this deposition today?
4    A.   I don't know.
5    Q.   And why are those materials not listed
6 amongst the materials you reviewed and considered
7 in forming your opinions in this case?
8    A.   I already answered that.
9    MS. GARCIA: -- and answered.
10        (Reporter clarification.)
11    MS. GARCIA: I said object to form and also
12 in terms of asked and answered.
13        Did you hear me that time?
14    THE REPORTER: Yeah, you're a little low.
15 You were fine before.
16    MS. GARCIA: I'll speak louder.
17    THE REPORTER: That's okay. Thank you.
18    MR. POLICK: Are we still on the record?
19    THE VIDEO TECHNICIAN: Yes.
20    MS. GARCIA: I don't think we ever went off
21 the record.
22    MR. POLICK: Okay. Everybody can still hear
23 us?
24    THE VIDEO TECHNICIAN: Yes.

Page 113

1 BY MR. POLICK:
2    Q.   Okay. Mr. Carpenter, were you aware
3 that there was a court order that all materials
4 that you relied upon in arriving at your opinions
5 and conclusions in this case were to be turned over
6 by March 22nd of this year?
7    MS. GARCIA: Object to form and foundation.
8    THE WITNESS: The information and the results
9 of my analysis were turned over in my report dated
10 January 22, 2021.
11 BY MR. POLICK:
12    Q.   But the documentation, videotape, and
13 photographs relating to that vodka flashpoint
14 testing were not turned over, were they?
15    MS. GARCIA: Object to form. And I believe
16 Mr. Carpenter testified he's not sure whether those
17 exist, in what form.
18    MR. POLICK: Regardless of whether he's sure
19 or not sure, for the record, we have not received
20 any of those materials, despite the requirements of
21 Rule 26(a), despite a subpoena for those materials,
22 and despite a court order for those materials.
23        So I'd like to know why those
24 materials, Ms. Garcia, have not been turned over

DOUGLAS J. CARPENTER, 03/31/2021                    Page 114..117

Page 114

1 prior to this deposition.

2        MS. GARCIA:  I don't believe it's an

3 appropriate objection you're making on the record,

4 but I'm willing to talk about it off the record.

5        MR. POLICK:  Do you have those records in

6 your possession, Ms. Garcia?

7        MS. GARCIA:  Again, I do not believe that I'm

8 being deposed in this moment, but no, I do not have

9 those in my possession.

10        Any materials I received from any of

11 the experts, I have turned over to Sotos as I have

12 received them.

13        And also for the record, there has

14 been a fair amount of communication back and forth

15 in attempting to respond to the subpoena and the

16 court order.  So there hasn't been any hesitation

17 on the part of the plaintiff's attorney to turn

18 over what we have.

19 BY MR. POLICK:

20     Q.    You also, Mr. Carpenter, did some

21 computer fire modeling in this particular case,

22 correct?

23     A.    Not in this particular case, but a

24 previous case.  I was using analysis that I relied

Page 115

1 upon in the first Amor case.

2     Q.    Well, isn't that part of this

3 particular case?

4     A.    It's part of the -- going through

5 the -- a previous analysis.  It's just a recounting

6 of the previous analysis and using it to test the

7 hypothesis.

8     Q.    Let me ask it this way:  Did you use

9 computer fire modeling in reaching your opinions

10 and conclusions in this case?

11     A.    Yes.

12     Q.    Where is that computer fire modeling

13 listed in your list of materials reviewed in your

14 January 22, 2021, report?

15     A.    It is not.  It's from a previous

16 analysis.

17        I don't list things that are

18 reviewed -- I don't know.  I wouldn't put computer

19 fire modeling in there.  If I had it, I would have

20 put it into the body of the report.

21     MR. POLICK:  Can we mark as Exhibit 4

22 Mr. Carpenter's report in Oklahoma versus Posey.

23 BY MR. POLICK:

24     Q.    Mr. Carpenter, I'm showing you what's

Page 116

1 been marked as Exhibit 4 to your deposition, which

2 is a report in the matter of State of Oklahoma v.

3 Derek Don Posey.

4        Are you able to see that?

5     A.    I am, and I have a copy in front of me.

6     Q.    Okay.  And is that a report that you

7 prepared in that matter?

8     A.    Yes.

9     Q.    And is that your signature on the first

10 page of the report?

11     A.    Yes.

12     Q.    And that report was prepared

13 November 14th of 2018?

14     A.    That is correct.

15     Q.    And in this particular report, you have

16 a whole appendix, that being appendix E at page 97,

17 relating to computer fire modeling, correct?

18     A.    Yes.  Well, it's -- yeah, it's a

19 documentation of the computer fire modeling and the

20 results that was done by Haavard Boehmer at CSE.

21     Q.    And why didn't you include an appendix

22 on computer fire modeling in the report you did in

23 this case involving William Amor dated January 22,

24 2021?

Page 117

1     A.    First of all, the analysis was much

2 simpler, and it was actually -- the results were

3 put into the time line that you see in the report.

4 But again, that modeling was done -- this is a

5 specific modeling that I had Haavard do and indeed

6 required an extensive write-up to be able to

7 understand exactly what the analysis was for and --

8 and what the results said.  Much more complicated

9 than what we did in this particular case.

10     Q.    Did you say that somebody did the

11 modeling -- fire modeling in this case, the Amor

12 case?

13     A.    I had -- I had Haavard do the same

14 modeling, yes, but that was --

15     Q.    What is the name that you're --

16     A.    His name is at the top of the paper.

17     Q.    The top of what paper?

18     A.    The one we are looking at right now.

19 It says CS -- CFAST Model Evaluation of Oklahoma

20 Versus Posey Fire Tests.

21     Q.    Yes.

22     A.    And it says Haavard Boehmer.

23     Q.    And Mr. Boehmer, is he also a officer

24 of your company?

DOUGLAS J. CARPENTER, 03/31/2021                    Page 118..121

Page 118

1    A.    He's not.  He's an employee of our
2  company.
3    Q.    Is he also a professional engineer?
4    A.    If you look at the top of this page, it
5  says Haavard Boehmer, MSc.FPE, so master's of
6  science and fire protection engineering, and then
7  he has a PE after it, so yes.
8    Q.    And he is also the person that did the
9  computer fire modeling in the William Amor case?
10    A.    Yes.
11    Q.    And where is Mr. Haavard Boehmer
12  identified in your report of January 22nd of 2021?
13    A.    He is not identified there.
14    Q.    Are there any other materials that you
15  are aware of, Mr. Carpenter, that have not been
16  identified in your list of materials reviewed set
17  forth in appendix A of your report of January 22,
18  2021?
19    A.    Not that I'm aware of.
20    Q.    Have you, yourself, ever been to the
21  scene of the Miceli fire at 2018 East Bailey,
22  Apartment M, Naperville, Illinois?
23    A.    No, I have not.
24    Q.    Have you ever inspected the apartment

Page 119

1  where the fire occurred in this matter?
2    A.    Not in person.  I certainly inspected
3  all the -- reviewed all the photographs.
4    Q.    To your knowledge, has Mr. Haavard
5  Boehmer ever been to the apartment at 2018 East
6  Bailey in Naperville, Illinois, where the fire in
7  this matter occurred?
8    A.    He has not.
9    Q.    To your knowledge, has Mr. Haavard
10  Boehmer ever inspected the apartment where the fire
11  occurred in this case?
12    A.    He has not.
13    Q.    Have you ever met Mr. William Amor?
14    A.    Yes.
15    Q.    Have you ever interviewed him about the
16  fire that occurred at 218 East Bailey on
17  September 10, 1995?
18    A.    Not directly, no.
19    Q.    What do you mean by "not directly"?
20    A.    I may have asked questions, and the --
21  and the source of the information or the answer may
22  have come from him, but I did not do that directly.
23    Q.    So you did not do a one-on-one
24  interview with Mr. Amor about the circumstances of

Page 120

1  the fire at 2018 East Bailey in Naperville,
2  Illinois?
3    A.    That is correct.
4    Q.    To your knowledge, did Mr. Haavard
5  Boehmer ever do an interview of Mr. William Amor
6  about the circumstances of the fire at 218 East
7  Bailey in Naperville, Illinois?
8    A.    No.
9    Q.    Have you ever met Tina Miceli?
10    A.    No, I have not.
11    Q.    Have you ever done any one-on-one
12  interview of Ms. Tina Miceli about the
13  circumstances of the fire at 218 East Bailey in
14  Naperville, Illinois?
15    A.    No.
16    Q.    To your knowledge, has Mr. Haavard
17  Boehmer ever done an interview of Ms. Tina Miceli
18  about the circumstances of the fire at
19  2018 East Bailey in Naperville, Illinois?
20    A.    No.
21    Q.    Have you, yourself, done any interviews
22  of any of the witnesses to the fire at 218 East
23  Bailey in Naperville, Illinois?
24    A.    No, I have not.

Page 121

1    Q.    To your knowledge, has Mr. Haavard
2  Boehmer done any interviews of the witnesses to the
3  fire at 218 East Bailey in Naperville, Illinois?
4    A.    No.
5    Q.    Have you, yourself, done any interviews
6  of the firefighters who suppressed the fire at
7  218 East Bailey in Naperville, Illinois?
8    A.    No.
9    Q.    To your knowledge, has Mr. Haavard
10  Boehmer done any interviews of the firefighters who
11  suppressed the fire at 218 East Bailey in
12  Naperville, Illinois?
13    A.    No.
14    Q.    Going back to the Posey report that
15  we've marked as Exhibit 4 to your deposition, and
16  you have an appendix D in that document that starts
17  at page 63, and then there's a series of
18  photographs spanning pages 63 through 96.
19    A.    Yes, I'm here.
20    Q.    Okay.  It appears to me, and correct me
21  if I'm wrong, that there was some type of full
22  scale or life-size model done of the structure that
23  was on fire?  Is that -- is that what we're seeing
24  in these photographs?

DOUGLAS J. CARPENTER, 03/31/2021                    Page 122..125

Page 122

1    A.    You're seeing the comparison of the
2  damage that the actual fire scene, and you're
3  seeing the damage in fire tests that were conducted
4  by the ATF in their laboratory.
5    Q.    I see.
6          So was it the ATF that constructed
7  this full scale model of the structure?
8    A.    It's physical testing, not -- not a
9  model.  But full-scale testing, yes.  They did a
10 number of different tests where they recreated this
11 building three times.
12   Q.    Did you do any type of full-scale
13 testing in the William Amor case?
14   A.    I did not.
15   Q.    Do you know if anyone else did?
16   A.    There was some fire testing done, but
17 I -- so yes, I'm aware of some -- of the fire
18 testing that was done in that case.
19   Q.    When you say "the fire testing that was
20 done," do you know by whom it was done?
21   A.    By the investigators or the fire
22 department that was -- I don't know specifically,
23 but those who were investigating the fire were
24 testing hypotheses by running some fire tests.

Page 123

1    Q.    All right.  But to your knowledge,
2  there is -- you did not employ or use any
3  full-scale testing of the type we're seeing in this
4  Posey case in -- in the William Amor case, correct?
5    A.    That's correct.  The resources are
6  limited compared to what the ATF can do.  When the
7  ATF becomes involved, they can spend a substantial
8  amount of money and recreate things that most
9  invest -- fire investigators can't.
10   Q.    Earlier, you mentioned the PowerPoint
11 that you created?
12   A.    Yes.
13   Q.    For this case.
14         Is that something you intend to use
15 as an exhibit to summarize or support your opinions
16 in -- in this particular case that we're here on
17 today?
18   A.    Up to today, I've not planned on that
19 in the sense that it's -- the issues are very
20 narrow.  We've gone past -- you know, that analysis
21 had to do with origin; for the most part, testing
22 of different origin hypotheses.  And we're talking
23 about reliability of fire cause in this particular
24 case.

Page 124

1    Q.    When you say you've not planned on it,
2  does that mean you're not going to use it as an
3  exhibit to summarize or support your opinions in
4  this case?
5    A.    It depends on what questions I get
6  asked or -- or what -- if somebody brings up an
7  issue, I might -- might use it.  I've obviously
8  used the time line that I was using -- the graphics
9  from the time line that I used in the PowerPoint as
10 a figure in my -- in my current report.
11   Q.    Do you intend to use the computerized
12 fire modeling that you used in this case as an
13 exhibit to summarize or support your opinions?
14   A.    Well, yeah, that is the one -- the time
15 for the smoke to travel to fill different spaces
16 and travel to the bedroom door is an issue in this
17 case.  So that modeling was done just to -- to
18 bracket that -- that time.
19   Q.    So the answer to my question is yes,
20 you intend to use it as an exhibit in this case?
21   A.    Yeah.
22   Q.    Do you intend to use any of the
23 documentation or video or photographs of the vodka
24 flashpoint testing as an exhibit to support or

Page 125

1  summarize your opinions in this case?
2    A.    No.  I'm just going to use the results,
3  unless an issue comes up and there's a need to
4  understand how the test was performed and what the
5  test is actually testing.  But the results are just
6  a temperature, which have already been reported.
7    Q.    Are there any other materials that you
8  intend to use to summarize or support your opinions
9  in this case?
10   A.    I don't know.  I mean, we're -- as I
11 sit here today, I think I have what -- what I need,
12 but that -- you know, as this case moves forward,
13 you know, that could change.  So I don't know.
14         But as I sit here today, I think I
15 have everything I need.
16   Q.    If you plan or intend on using the
17 PowerPoint and the computer fire modeling as
18 exhibits to summarize or support your opinions in
19 this case, how come they are not identified in your
20 report dated January 22nd of 2021 that we have
21 marked as Exhibit 1 to this deposition?
22   A.    I think I've answered that.  That --
23 that analysis is -- has to do with the origin of
24 the fire and my analysis and the technical basis

DOUGLAS J. CARPENTER, 03/31/2021                    Page 126..129

Page 126

1 for reaching that -- that conclusion.

2          In this particular case, it's very

3 narrow.  I borrowed the transport time for smoke to

4 the bedroom door from that.  So, and again that is

5 a piece of analysis and documentation of that

6 analysis that doesn't really fit under the heading

7 of materials reviewed.  They -- they certainly are

8 discussed in the body of the report.

9     Q.    Does the flash drive that you produced

10 to us pursuant to the subpoena contain all the

11 documentation regarding the computer fire modeling

12 that you used in this particular case?

13    A.    My understanding it is.  It should

14 have -- it should have the data input files, and it

15 should have the output files, which is what's

16 required.  The software is publicly available.

17    Q.    And earlier you spoke of mathematical

18 equations that you would do prior to modeling; is

19 that correct?

20    A.    No.

21    Q.    Did you do any mathematical

22 calculations or -- well, strike that.

23          Did you do any medical -- strike

24 that.

Page 127

1          Did you do any mathematical

2 calculations prior to doing the computerized fire

3 modeling in this case?

4     A.    If it was, it would be mostly looking

5 at developing inputs.  That the information that

6 was provided may not be the exact way it needs to

7 be inputted into the model, so you may have to do

8 some mathematical computation on that.

9          But you know, as I sit here today, I

10 don't really -- I can't think of anything that was

11 there.  It would have to do with inputs.

12          And what I was talking about in

13 terms of mathematical were closed and predictive

14 formulas for a different phenomena and not -- and

15 by the way, all computer fire models are

16 mathematical models.

17    Q.    So when you're doing the computer fire

18 modeling, do you use the mathematical

19 considerations first before going to the actual

20 modeling?  How does it work?

21    A.    So let's just say you -- one of the

22 things that you need to do with the models is put

23 in geometry of the building.  So the way that

24 it's -- the input is -- in CFAST is that you

Page 128

1 would -- if you had a door opening, what they would

2 ask for is what the -- what the soffit height, what

3 the -- and what the sill height is of the opening.

4 And then what's the heighth and width.

5          So in that particular case, you

6 know, obviously there's the height of the room,

7 there's the height of the soffit, there's the

8 height of the doorway.  Those all would require

9 some mathematical manipulation, even -- you know,

10 nothing more than a simple subtraction or addition

11 to be able to formulate that.

12          So in that case, there -- there are

13 mathematical models, but they're very simplistic

14 and just used as data input.

15    Q.    So it would be part of the data input

16 files?

17    A.    It would be part of the -- right.  It

18 would -- those files would show what the result of

19 that was.  I mean, you know, if you know that the

20 height of the door is 7 feet, you know, and you can

21 figure out what the height of the building is, you

22 subtract those two -- or the height of the ceiling,

23 subtract those two, and you'll get a sill height.

24 Or a soffit height, not a sill height.  Sill

Page 129

1 heighth would be zero in case of a door.  But with

2 a window --

3     Q.    And what particular --

4     A.    -- you have to put in -- you have to

5 put in what the -- you put the height of the room

6 in, you put the location of the -- or the depth of

7 the sill, you'll put in the height of the door, and

8 then you also put it in for the soffit.  So it's

9 not just a -- there's a number of variables --

10 input variables you need to adequately describe an

11 opening such as a door or window.

12    Q.    So what was the specific computer fire

13 modeling that you used in the Amor case?

14    A.    Well, we -- it said right up at the

15 top.  It's a CFAST model.  It's developed by the

16 National Institute of Standards and Technology.

17    Q.    And can you explain what type of model

18 CFAST is.

19    A.    Sure.  It's called a -- it's

20 characterized as a zone model.

21    Q.    And what do you mean by a "zone model"?

22    A.    Zone model makes an approximation of --

23 on the development of the upper layer and -- and

24 the transport of the smoke filling in that

DOUGLAS J. CARPENTER, 03/31/2021                              Page 130..133

Page 130

1  particular space.  They -- all -- all these models
2  break the domain, the computational domain and the
3  modeling domain into a small cubes, if you will, if
4  not rectangular structures where you can -- where
5  you can apply the conservation of mass, momentum,
6  and energy.  In this particular case, we don't do
7  momentum.  And you use a mathematical solver to
8  then solve the conditions in those spaces.
9            And from that, you can model the
10 transport of smoke through a plume, through a
11 ceiling jet, through development of over layers and
12 then spilling over and filling into other -- other
13 spaces.
14           So it's just -- it's no different
15 than the other types of models.  It is a little bit
16 different in the number of zones that are -- that
17 are specified.
18      Q.   So did you task Mr. Haavard Boehmer
19 with doing the modeling in this case?
20      A.   In the Amor case, yes.
21      Q.   And was it his decision or your
22 decision as to what computerized modeling would be
23 used?
24      A.   It was my decision.

Page 131

1      Q.   And then what was Mr. Boehmer's duties
2  or responsibilities with regard to the CFAST
3  modeling?
4      A.   Mr. Boehmer would have set up the model
5  and then run a number of bounding situations that
6  we discussed and then produced the output.
7      Q.   Who did the input?
8      A.   He would have input the modeling
9  specifics.
10     Q.   Did you use any other modeling --
11 strike that.
12           Did you use any other computerized
13 modeling in this case?
14     A.   No.
15     Q.   Did you consider using any other
16 computerized fire modeling in this case?
17     A.   I don't know formally if I considered
18 it, but yeah, sure, we always consider, you know,
19 what's the -- you know, what model -- would we use
20 a zone model, or would we use another type of
21 model, or would we use the models to assess a
22 different variable or -- or condition to test the
23 hypothesis.  But we -- we this was the only
24 hypothesis -- or this model was used to -- to come

Page 132

1  up with a time frame, a bounding analysis of the
2  time for the smoke to be transported from the area
3  of origin to -- to actually fill down and start to
4  flow into the bedroom.
5      Q.   What other computerized fire modeling
6  programs were available to you based on the
7  circumstances of this case?
8      A.   We -- I've authored a paper on all the
9  different types of models.  There's -- it's an
10 extensive, so but it depends on what the issues
11 are.  You know, what -- what is it that you're
12 trying to test.
13     Q.   And what were you trying to test in
14 this particular case?
15     A.   I think I just answered that.
16     Q.   That would be the time frame for the
17 smoke to be transported?
18     A.   To the bedroom as observed.
19     Q.   As observed by the victim, Ms. Miceli?
20     A.   Correct.
21     Q.   Is there some particular reason you
22 decided to choose CFAST as opposed to other models
23 to test that hypothesis?
24     A.   Yeah.  It's a -- it's a very efficient

Page 133

1  model that does -- that can do basic smoke
2  transport with the accuracy that we would need in
3  this particular case without having to run model --
4  more sophisticated models that are very expensive
5  and very time consuming to run.
6            I actually probably could have done
7  some hand calculations and get the same answer, but
8  it's -- it's set up to, you know, be reasonably
9  efficient to get up -- up and running and get a
10 reasonable answer, or a reasonably bounding answer
11 to what we needed, so and that's what we did.
12     Q.   So did you not use more sophisticated
13 modeling based on cost considerations?
14     A.   Yes, we did -- we didn't feel that the
15 level of accuracy would warrant -- that we would
16 achieve from those would warrant anything different
17 than running CFAST.  Zone models are really good
18 for -- they run faster, they take less resources.
19 They have some limitations, but the same is true of
20 more complex models.
21           And so you -- you know, as an
22 engineer, you're taught -- as a fire protection
23 engineer who's doing computer fire modeling, you're
24 taught about the selection of models.  And

DOUGLAS J. CARPENTER, 03/31/2021                          Page 134..137

Page 134

1  sometimes there are models that are -- that are
2  good enough.  And in this particular case, this
3  was -- this was good enough.  I could have done
4  hand calculations.  It was just as easy to do them
5  with the computer that will actually do the smoke
6  transport and filling and gave me -- and I used the
7  bounding analysis to deal with the uncertainty.
8          And yeah, it -- it's a very
9  reasonable choice.  Always more complex is not
10 always better, especially as an engineer.
11     Q.    When we attempted to run what was
12 provided in the flash drive for the CFAST modeling,
13 I saw some reference to something called Smokeview.
14          Is that part of the CFAST program,
15 or is that a separate program?
16     A.    Well, we'll have to go over some real
17 basics, but there -- the CFD model that's put
18 out -- so there's a number of models put out by the
19 National Institute of Standards and Technology.
20 CFAST is one and -- but it has very limited ability
21 to graphically see -- see the results.
22          And subsequent to the development of
23 CFAST, many years, there is another model called
24 fire dynamic simulator.  That's a computational

Page 135

1  fluid dynamics model put out by the National
2  Institute of Standards and Technology.  When you do
3  CFD, you get copious amounts of data that's really
4  hard to -- you can't just look up in the file and
5  say, This is the -- this is the answer or this is
6  the result.  It has to be done graphically, and so
7  you need -- so what they NIST did was develop this
8  thing called Smokeview, which allows you to take
9  the results of the fire dynamic simulator and
10 visualize it.
11          And then subsequent to that, they
12 turned around and said, Hey, maybe we can do this
13 for CFAST.
14          So Smokeview is a standalone program
15 developed by NIST, and it can be incorporated into,
16 was written to be able to handle input from CFAST.
17     Q.    And did you use the Smokeview program
18 in the William Amor case?
19     A.    I believe that it automatically
20 generates it.  But you can look at it, but it's
21 always generated as a result of -- you probably can
22 turn it off, but the data is generated -- (audio
23 interruption) you can absorb it into Smokeview.
24     THE REPORTER:  I apologize, so sorry.  This

Page 136

1  is the court reporter.  There was some background
2  shuffling going on.
3          Sorry, sir.  You said, I believe
4  that it automatically generates.  You can look at
5  it, but it's always generated as a result ...
6      THE WITNESS:  Okay.  As a result of doing
7  the -- doing the run.  It's -- the data is written
8  in CFAST to be able to be presented so that it can
9  be used as input to the graphical software
10 Smokeview.
11 BY MR. POLICK:
12     Q.    So if I'm understanding you correctly,
13 when you run the CFAST model, Smokeview will
14 automatically be part of that program unless it's
15 turned off?
16     A.    Well, no.  You have to -- you can -- I
17 mean, it's got a user interface, so you run -- with
18 all these models, you input the data and then you
19 take that input file and you run it through the
20 solver, all right, whether that's CFAST or fire
21 dynamic simulator.
22          And then when that -- when that has
23 completed its computations and the run is --
24 simulation is complete, then you can take that data

Page 137

1  and put it into Smokeview.  And there's a button in
2  the graphical user interface for CFAST that allows
3  you to look at the data.  You can push it or not
4  push it, but it is generated.
5      Q.    And do you consider the fire dynamics
6  simulator program to be superior to that of CFAST?
7      A.    Not generally, no.  They have
8  different -- like I said, they have different
9  limitations and advantages.  You don't always start
10 out with the most complex.  I mean, we're
11 engineers.  We try to do things in an efficient
12 manner that produces reliable results.  We don't
13 want to -- we don't want to do things, use
14 resources that won't get us any -- any incremental
15 increase in -- in the accuracy.
16          The zone models didn't get pushed
17 aside just because fire dynamic simulator came
18 along.  CFAST is still a viable computer program
19 that -- that is used in fire protection engineering
20 and forensic analysis.
21     Q.    So when the CFAST was run, did you do
22 that, or did Mr. Boehmer do that?
23     A.    I've already answered that question.
24     Q.    Well, I'm asking you it again because

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 138

1 I'm going into another area, so if you can let me
2 know who ran it?
3      A.   He ran it.  I mean, he put it in the
4 input files and then basically pushed solve, if you
5 will.
6      Q.   All right.  And when Mr. Boehmer ran
7 the CFAST initially, what version did he use?
8      A.   There's many different versions.  He
9 would uses the latest version, and that would have
10 been recorded in the data files.
11     Q.   All right.  So the flash drive material
12 that we -- we received in response to our subpoena
13 to you indicated that the version run was 7.1.1.
14          Is that the current version or
15 latest version of that?
16     A.   I don't know that.  I'd have to go back
17 and look at the website.
18          So what happens is the -- there's
19 major revisions, and you get a revision number like
20 7.  But then what happens is you get -- you get --
21 there's a whole series of debugging that can go on.
22 People use the program.  They may find a particular
23 bug when they try to do something and they report
24 those, and then they'll be fixes to it, just like

Page 139

1 any software.
2          It's -- NIST actually maintains the
3 program, and so the versions go -- so 7.1 is
4 probably a, you know, a small incremental change in
5 the model to fix.  You know, maybe there's a
6 problem with Smokeview looking at the -- Smokeview,
7 you can look at the relationship of the
8 compartments, and that's different than the way the
9 model actually treats it.  And you have to set up
10 some additional mathematical inputs to make sure
11 that the position of the compartments has no effect
12 on the model.  It just is an effect on your
13 visualization.  You know, if there's a bedroom
14 that's on this side versus one side of the hallway,
15 you need to make sure that visually when you're
16 looking at it, that you and anybody else looking at
17 it understands where they are in the building and
18 what's being modeled.
19          It doesn't have an effect on the
20 mathematics, but it has an effect on the
21 visualization.  And from time to time, there can be
22 bugs.  They make some changes to the programs, and
23 inadvertently something else, you know --
24     Q.   All right.

Page 140

1      A.   -- changes, so --
2      Q.   So --
3      A.   -- there are minor revisions that
4 are -- that can go on.  So I don't know what -- how
5 many minor revisions has been done since then.
6      Q.   So it would be comparable to an app on
7 your phone that is periodically updated?  Is that
8 what you're describing?
9      A.   Yeah.  If there's a whole -- they
10 maintain the software.  They're not -- they don't
11 just put the software out, but they actually are --
12 they produce and maintain software.
13          It's highly unusual for a government
14 entity to do that, but it's -- they do a good job.
15     Q.   When they -- when the government
16 updates these CFAST versions, is there a rate of
17 error with the prior version?
18     A.   Well, what they do is they do every --
19 every prior version, they have a suite of what's
20 called V&V studies, so it's verification and
21 validation.
22          Verification is making sure that the
23 mathematics are inputted the way you want them; in
24 other words, one plus one equals two.  And then

Page 141

1 there's -- so that's the first -- first line of V&V.
2          The second is validation, and that
3 is how well does the -- if it's operating
4 correctly, how well does that model compare against
5 other fire tests.
6          So NIST has spent a great deal of
7 energy on V&V studies for these models, and
8 actually they run a suite of models every time with
9 a new version to make sure that the current -- the
10 previous accuracy is maintained.  And they can also
11 show changes in the accuracy, you know, better
12 comparisons with better models.
13     Q.   So when you say the validation includes
14 comparison to fire tests, are you speaking of real
15 world historical fire tests?  Is that what they're
16 using in the validation process?
17     A.   Well, I don't know what you mean by
18 "real world historical."
19          What they're saying is we conduct
20 fire -- well-instrumented fire tests to use -- to
21 be used for validation, and that's been being done
22 over the last couple decades.  And again, they have
23 a suite of those.  There's -- there's a lot of
24 tests they run through.  So they automate it and

DOUGLAS J. CARPENTER, 03/31/2021                    Page 142..145

Page 142

1  they run the CFAST program and the FDS program
2  through all those and recreate a whole new document
3  with a new version.
4          So if version 7 comes out, there's
5  going to be a technical manual, there's going to be
6  a user's manual, and there's also going to be a V&V
7  study manual that goes through and says, Look,
8  we've done all these studies, and this is -- we've
9  shown that this model can re -- recreate or is
10 accurate to, you know, some level of -- of
11 certainty and making sure that you don't degrade
12 that uncertainty.
13     Q.   So that's what I'm referring to.
14          When you're -- when you say the
15 studies that they're using to test the modeling,
16 are these studies that have been done in the real
17 world of actual fires?
18     A.   Yeah.  They're full-scale tests, yes.
19     Q.   Okay.  Thank you for clarifying that.
20     A.   Yep.
21     Q.   So --
22     A.   That's all included --
23     Q.   -- if I'm under --
24     A.   All that -- all that documentation for

Page 143

1  CFAST is up on the website.  There's copious
2  amounts of -- that will explain all of that stuff.
3      Q.   All right.  And if I'm understanding
4  you correctly, this verification and validation
5  process is done by NIST?
6      A.   Yeah.  By building and fire research.
7  And what they do, again, their -- they don't just
8  create these models.  They used to do that, and now
9  they've actually -- they actually are maintaining
10 it.  So that's part of their maintaining of
11 these -- of the software.
12     Q.   So when you use the fire modeling
13 program as a user off this, you know, website that
14 you can access, do you have to do any calibration
15 at your end to make sure that the model is running
16 correctly for the purpose you intend to use it for?
17     A.   Well, we -- we do that in a sense.
18 Well, first of all, you don't run it on the
19 internet.  You -- you just download the software.
20 It runs on a PC.
21          So we -- we have those programs
22 resonant on our -- on our computers.  So outside of
23 looking at the model, I mean, one of the things
24 you -- you do as good standard practice is, you

Page 144

1  know, you'll run the model, and then you'll go back
2  and look at it and go, Does this make sense?
3          So in this -- in one of the cases
4  that I've listed there was computer fire modeling,
5  I actually went through and found out that the
6  other person doing the modeling created a condition
7  that's physically impossible.  And there was a bug
8  in the program, and we were able to go back and
9  show it.
10          So you can't just run a model and
11 act as -- that it's a black box.  You have to look
12 at the results and go, Does this make sense?
13          And sometimes, you know, in rare
14 cases, and that's where people find bugs, they'll
15 be like, Well, either that doesn't work as an
16 input, or -- or something's not right here, or I
17 didn't implement the algorithm that I thought was
18 going to be implemented.  And -- and that's when
19 you report those things.
20          But yes, it's a responsibility of
21 the user to -- to understand that the model is
22 working the way -- way it's intended.  So
23 validation -- verification and validation are
24 things that are important, and you want to know

Page 145

1  what -- what has happened with those particular
2  versions.
3          But you also run the model and look
4  at it and go, Does this make sense, you know.  Is
5  this room filling up before this room?  Just --
6  just certain things that you know have to behave
7  that way, and the model needs to behave in that
8  same manner.
9      Q.   So in the Amor case, how many times did
10 you run the CFAST model, or more specifically how
11 many times did Mr. Boehmer run the CFAST model to
12 do what you're saying here; to determine it was
13 working correctly?
14     A.   Well, he didn't -- he would do that on
15 his first run.  I mean, he would do it on all his
16 runs.  There was actually six runs that were done.
17 You do a bounding analysis.  And so he would look
18 at -- you know, obviously look at the output, and
19 say, Does this make sense, so in all those cases.
20     Q.   And was there a rate of error between
21 the six runs that were done?
22     A.   No.  There's -- it's not a rate of
23 error.  It's a -- it's a bounding analysis.  It
24 says, If I change these variables -- you know, if

Page 146

1  there's uncertainty in certain variables that we
2  think might play a role here, then we're going
3  to -- we're going to exercise those variables and
4  then look at the -- look at the change in the
5  result, and that's what we did.
6          So when we bound our analysis on our
7  time line, it's not one specific time that the --
8  that the smoke could have gotten to the bedroom
9  door.  It's actually a range.  And it's -- you
10 know, it's within about a minute.  You know, it
11 could have been 30 seconds.  It could have been 45.
12 Could have been a minute and 15.
13         But bottom line is it didn't
14 change -- these changed the -- you know, the
15 computations and the -- and the result in the
16 model, but it didn't change how it affected the
17 time line and what we used the time line for.
18 It's --
19    Q.   And what was the range of the smoke?
20 I'm sorry.  What was the range of the smoke
21 transport that you --
22    A.   Well, I have to go --
23    Q.   -- you said again?
24    A.   Yeah.  It's on the order of about a

Page 147

1  minute.
2     Q.   All right.  So based on the six runs
3  that you did, what was the range of the smoke
4  transport?
5     A.   Yeah, I don't have that recorded.  I
6  recorded it in -- in gross, if you will, in the --
7  in the time line, but I don't know specifically.  I
8  mean, that's all in the input files, so ...
9     Q.   So did you pick --
10    A.   I could go back --
11    Q.   Did you pick one of the runs of the six
12 runs over another in reaching your opinions and
13 conclusions in this --
14    A.   No, I --
15    Q.   -- case?
16    A.   I just explained that.  I did what's
17 called a bounding analysis, so I took was the
18 minimum and the maximum time.
19    Q.   And can you tell me what the minimum
20 and the maximum was based on the six runs that were
21 done to test the range of the smoke transport?
22    A.   I could go in and get those exact
23 results.  But I basically just couched it as, you
24 know, it's 30 seconds to -- could have been

Page 148

1  30 seconds to a minute, somewhere in that -- in
2  that range.  And so I just used a minute in my time
3  line.
4     MR. POLICK:  We're at a point here.  I just
5  want to know if -- we've been going here for a
6  while if -- what the consensus is on breaking for
7  lunch?  I know we took a break earlier.  I'm not
8  sure what everybody wants to do, but I'm open to
9  suggestions here, because we do have quite a ways
10 to go here.
11    MS. GARCIA:  I know you're an hour ahead of
12 us, so if you want to break for lunch, we should
13 take it.  It's a little bit later for you (audio
14 interruption.)
15    THE VIDEO TECHNICIAN:  You're really low,
16 Counsel.  It's hard to hear you.
17    MS. GARCIA:  Sorry.  I'm not sure why that
18 is.  Can you hear me now?
19    THE VIDEO TECHNICIAN:  Yeah.
20    MS. GARCIA:  I was just saying I know
21 Mr. Carpenter is an hour ahead of us.  He's on
22 Eastern Standard time.  So you definitely should
23 take a lunch break if you need to, Doug.
24         And I'm okay whatever the group

Page 149

1  decides collectively.  I also don't want the court
2  reporter or the videographer to not have a chance
3  to eat lunch, so I'm fine taking a break now.
4     MR. POLICK:  All right.  Do you want to take
5  a longer -- a little longer break at this point,
6  and let everybody just kind of get some nourishment
7  or do whatever they need to do and then return?
8     MS. GARCIA:  That works for me.
9         Doug, how does that work on your end?
10    THE WITNESS:  It's fine.  I can go.  I can
11 keep going.  I'm good.  I'd rather not be here at
12 7:00 o'clock tonight, but if it's -- so if that's
13 going to be the case, then I would rather take a
14 very short break.  But if, you know, we're getting
15 out of here at close of business, then that's fine.
16 I'm good.
17    MR. POLICK:  So how long of a break would you
18 like to take at this point?
19    THE WITNESS:  Well, are you going to go into
20 7:00 or 8:00 o'clock, or are you going to -- I
21 don't want to spend extra time if it means I'm
22 going to spend extra time at the other end of the
23 day, so...
24    MR. POLICK:  Right, I understand.

DOUGLAS J. CARPENTER, 03/31/2021                    Page 150..153

Page 150

1          Can the videographer tell us what
2  the elapsed time is into the dep at this point?
3      THE VIDEO TECHNICIAN:  Sure, can we go off
4  the record first?  Are you okay with that?
5      MR. POLICK:  Yeah, sure.
6      THE VIDEO TECHNICIAN:  Okay.  We're off the
7  video record at 1:30 at the end of media unit 2.
8          (Recess taken.)
9      THE VIDEO TECHNICIAN:  We're back on the
10 video record at 2:00 o'clock at the beginning of
11 media unit 3.
12 BY MR. POLICK:
13     Q.   Mr. Carpenter, you understand you're
14 still under oath?
15     A.   Yes.
16     Q.   Do you know if Mr. Boehmer ran any
17 earlier versions of CFAST in this particular case?
18     A.   Not that I'm aware of.
19     Q.   And the flash drive that we received
20 says the model runs were done on April 21st of
21 2016; is that accurate?
22     A.   I have no reason to question that.
23     Q.   Are you aware of any CFAST model runs
24 that were done prior to April 21st of 2016?

Page 151

1      A.   Not that I'm aware of.
2      Q.   And have you or Mr. Boehmer done any
3  more CFAST modeling runs since April 21st of 2016?
4      A.   No.
5      Q.   Have there been any CFAST model runs
6  done in this case with the latest version of CFAST?
7      A.   No.
8      Q.   So earlier, you were explaining how the
9  CFAST modeling works, and you were talking about
10 room dimensions.  And it appears that the model
11 generates a -- a 3D view of the apartment in
12 question; is that -- is that correct?
13     A.   It can, yes.
14     Q.   And when the data was inputted, is that
15 part of the data, the measurements you were
16 speaking of of the apartment that generate that 3D
17 model?
18     A.   Yes.
19     Q.   And where did those measurements come
20 from?  How did you obtain the measurements to input
21 or more appropriately for Mr. Boehmer to input into
22 the CFAST model?
23     A.   It was with -- could have come from
24 other prior investigations where they made

Page 152

1  measurements, as well as knowing some standard
2  measurements, such as sliding glass doors, width --
3  hallway widths, and then also using pictures for
4  anything that we needed to estimate, or we could --
5  you can use the photographs and you can use scaling
6  to come up with values for that.  So all -- all
7  three of those sources.
8      Q.   So when you're speaking to other
9  investigators, do you mean like the diagrams and
10 the measurements that were taken by the original
11 investigators of the -- of the case, the fire
12 department investigators?
13     A.   Well, anybody that investigated and
14 took measurements and produced those measurements
15 in this case, yes.
16     Q.   Are there any particular documents that
17 you referenced to get those measurements for the
18 apartment to input into the modeling system?
19     A.   Yes.  But as I sit here today, I'd have
20 to do a full review of the box to find those, find
21 those exact documents.
22     Q.   When you're doing the modeling, are you
23 able to input any load bearing beams that may
24 extend down from the ceiling within the apartment

Page 153

1  into the model?
2      A.   Yes.  That would constitute a soffit of
3  an opening.  So you -- you put in the rooms and
4  then you put in vents, and part of that vent can be
5  a window, a door, or other types of openings.  So
6  there was a soffit that went across two different
7  places in -- that separated, made the dining room
8  be considered a separate room from the living room.
9      Q.   And was that inputted into the model?
10     A.   Yes.
11     Q.   That soffit?
12     A.   Yes.
13     Q.   And you said there was another soffit
14 somewhere else in the apartment?
15     A.   Between the -- the living room and the
16 hallway.
17     Q.   And that also was inputted?
18     A.   It was.
19     Q.   And was that based on some
20 documentation or a photograph or an estimate?  Do
21 you -- do you know?
22     A.   Yes.  It was based on a scaling from a
23 photograph.  Actually, we took still photographs
24 from a video because nobody -- the fire

DOUGLAS J. CARPENTER, 03/31/2021                    Page 154..157

Page 154

1 investigators didn't -- didn't take pictures of
2 absolutely everything. But we were able to find
3 the video that showed that, and we were able to
4 take stills and then scale from that.
5      Q.   All right. So you're talking about the
6 video that was done by the evidence technician at
7 the time of the fire?
8      A.   I presume that's who did it. There was
9 a video that was provided.
10     Q.   All right. And you took stills from
11 that.
12     A.   We did that. And then we could -- from
13 there, we could scale -- off known dimensions, we
14 could scale what the -- create a scale and then
15 measure the depth of that soffit, yes.
16     Q.   When you use the CFAST model, are you
17 able to input the material that the -- that the
18 walls of the apartment are made of?
19     A.   Yes.
20     Q.   And --
21     A.   From -- from --
22     Q.   -- what were --
23     A.   Well, from a heat transfer standpoint,
24 yes, you can do that.

Page 155

1      Q.   So what -- what were the walls of the
2 apartment made of in this particular case?
3      A.   I believe that they were of a gypsum --
4 the interior surface, which is the most important.
5 It was made of a gypsum type material, either
6 wallboard or plaster on lath.
7      Q.   What about the material that lies
8 underneath the gystum -- gypsum wall board or
9 plasterboard?
10     A.   Doesn't matter in this time frame
11 because the characteristic time for thermal
12 penetration of the walls is so much longer than the
13 actual run time of our model that -- that it -- the
14 model doesn't even know it's there.
15     Q.   And when you are inputting the windows,
16 does it -- does the model -- or are you able to
17 input the -- I guess the energy efficiency of the
18 window or how -- how -- maybe there's a a -- let me
19 strike that. Let me ask it a different way.
20          If there are leaks within windows
21 because they're older type windows, is that
22 something you're able to input into the CFAST model?
23     A.   If you can both input it, but it's
24 also -- leakage areas are built into the model

Page 156

1 because the model does not run very well if the
2 rooms are all hermetically sealed. So leakage
3 areas are put in -- prescribed as a default, but
4 you can -- you can modify those.
5          So yes, there is. But again, those
6 leakage areas wouldn't -- wouldn't matter in the
7 simulation until much later in the -- until the
8 fire became significantly underventilated. In our
9 simulation time, it never went underventilated
10 because it was so early in the fire. Just talking
11 about the transport of smoke early in the growth
12 rate of the fire.
13     Q.   All right. So when you say the early
14 part of the fire, can you give me an approximate
15 time frame that the CFAST test is calculating in
16 terms of the early part of the fire?
17     A.   Well, it's doing it at that time zero,
18 right? You're saying the fire's starting now, and
19 now you model it, and we're looking at the transit
20 time. So that -- that is just a time period. And
21 then we anchored -- anchored that time period in
22 the time line.
23          But the model doesn't do that. The
24 model just says, all right, you've initiated this

Page 157

1 fire growth, and this is when the smoke would have
2 banked down to the point where it would start to
3 flow into the bedroom.
4      Q.   Would the modeling take into account
5 the breakage of the glass sliding doors that led to
6 the balcony, or is that something that occurred
7 later on in the fire?
8      A.   It -- A, it can do that. You can
9 specify glass breakage and removal of that obstacle
10 so you can have a closed -- closed vent, if you
11 will, be opened.
12          But the other side of it too is
13 you're exactly right. This was -- occurred much
14 later. You're talking about glass breakage that
15 occurs as a result of flashover, and we weren't
16 even close to modeling. That wasn't what we
17 intended to do.
18     Q.   So the modeling that you're doing for
19 the smoke transport, you're looking at the
20 transport of smoke from the living room to the
21 master bedroom that was occupied by the victim,
22 correct?
23     A.   Correct.
24     Q.   And you say that -- were you able

DOUGLAS J. CARPENTER, 03/31/2021                    Page 158..161

Page 158

1  during the break to determine what the minimum and
2  maximum amount of time was for that transport of
3  smoke?
4      A.   I did not do that, no.
5      Q.   But you're saying it's approximately a
6  minute?
7      A.   The range of it is, yes.  If you look
8  at the -- at what I put into the time line, yes.
9      Q.   And when you say you put it into the
10  time line, is there a specific clock time that you
11  are starting from for the ignition of the fire into
12  flame?
13     A.   Yes.  So time zero in the model is
14  anchored to 6:38.  It was actually backed out, so
15  we know when that -- if you look at the time line,
16  so I'm looking at figure 1 on page 9, and it says
17  smoke through bedroom door.  And then that is at
18  6:39.
19          And then you back that out to the
20  start of the fire, based on the modeling, and you
21  get 6:38, so it's on that order.  So that -- that
22  would bound the results of the model.
23     Q.   As far as the inputs go on the model,
24  are you able to input the -- all the furniture that

Page 159

1  existed in the apartment?
2      A.   I didn't do that, because the -- in the
3  early stage of the fire in this particular case, it
4  was either -- it was one piece of upholstered fire.
5  Within the first minute, that's the only thing
6  that's going to be burning.  It doesn't get to a
7  point of spreading the fire to other adjacent
8  materials.
9      Q.   Is it your opinion that the fire did
10  spread to other furniture in the living room from
11  the upholstered reclining chair?
12     A.   That's what the evidence suggests, but
13  that -- the question is at what point under what
14  time.  That's going to occur -- you know, flashover
15  is generally going to be somewhere around, you
16  know, 5 minutes for a well-ventilated fire.
17          In this particular case, you
18  probably had to wait for the sliding glass door to
19  break and that takes time too.  So you're talking
20  about order of 5 to 10 minutes for flashover to
21  occur where it would spread the fire from the first
22  item ignited to -- to other fuel packages.
23          And we're talking about the smoke
24  transport, which happens very early in this fire,

Page 160

1  well before flashover.
2      Q.   So in terms of the inputs to the model,
3  is it -- am I correct that you inputted the
4  upholstered reclining chair but no other furniture?
5      A.   In terms of the specific fire modeling,
6  yes.  I can't remember if -- yeah, that is true,
7  yes.
8      Q.   How about the carpet?  Are you able to
9  input that into the model?
10     A.   Floor coverings can be in there.  The
11  thing about carpet is that it's highly regulated in
12  the United States, and that usually does not become
13  a fuel until about flashover or soon after post
14  flashover burning where you get enough heat flux to
15  actually ignite it.
16          So carpet isn't a good initial fuel.
17  It's a much better fuel later, much later in the
18  compartment fire growth.
19     Q.   How about loose materials within the
20  apartment, whether they be, you know, boxes,
21  clothing, things of that nature?  Are those able to
22  be inputted?
23     A.   You can put those in as -- as specified
24  fires, but not -- not just having them exist in the

Page 161

1  room sort of acting as an inert fuel.
2      Q.   So was the only fuel source that you
3  inputted into the model the upholstered reclining
4  chair?
5      A.   Well, let's go back.
6          This is a fire model where the user
7  puts in the fire -- specification for the fire
8  growth rate, and that's based on the type of
9  furniture.  So if you have upholstered furniture,
10  your growth rate is going -- could be characterized
11  differently than if you had some other -- you know,
12  a box sitting in a corner or something like that.
13          So you have to be -- if you know
14  that those were fuels that got involved, then you
15  can do calculations to figure that out.  At a
16  certain time, you can specify that in the model,
17  absolutely.
18          But in this case, the transport time
19  was so small that there was not going to be any
20  other fuel that was going to be ignited as a result
21  of the fire in the chair.
22     Q.   So when you're trying to calculate this
23  transport time, do you pinpoint the location of
24  where you believe the reclining upholstered chair

DOUGLAS J. CARPENTER, 03/31/2021                          Page 162..165

Page 162

1  was in the apartment?
2      A.    You put it in the -- in the living
3  room, which is -- I don't know if we
4  specifically -- you can -- you can put it in a
5  certain area, but the model won't -- doesn't really
6  handle that.  It handles vertical differences in
7  the fuel, and we did do that.
8              In other words, if fuel is starting
9  in the seat of the chair, then it's not on the
10 floor, so you would -- you would elevate the
11 heighth of the -- of the specified fire.
12     Q.    Do you know if that was done as part of
13 the input information in this case?
14     A.    I'd have to go back and verify, but I'm
15 pretty sure it was.
16     Q.    So if I'm understanding correctly, you
17 can place the upholstered chairs in the living
18 room, but anything more specific, the model doesn't
19 recognize that as an input factor?
20     A.    Well, in terms of the transport, what's
21 most important is the transport time from -- from
22 the fuel to where it can transition and
23 become a ceiling jet and move and, you know, the
24 direction is altered.

Page 163

1              In this particular case, even if --
2  you know, I know from experience that -- that, you
3  know, whether I put a fire a foot off the floor or
4  not in this particular context and this early isn't
5  going to change the outcome.
6              But yes, I believe we did -- we did
7  do that.  So we did change the vertical heighth.
8  And if we didn't, we're just -- it would have been
9  more conservative, because it was just -- it would
10 be a longer transport time.  But it's on the order
11 of seconds.
12             I mean, you're talking about buoyant
13 flows here of 2 meters per second.  That's why I
14 say I didn't have to do a model for this.  I could
15 have done a direct line calculation from the
16 furthest point in the living room to -- to the
17 bedroom door and do some basic filling.
18             But one of the things, as you
19 pointed out, that works very well for this model is
20 I can do Smokeview.  So I can actually show that to
21 a layperson, and they can at least understand what
22 I'm talking about as opposed to just, you know,
23 making up something in their mind based on what I'm
24 telling them.

Page 164

1      Q.    Right.  And we -- we know that the
2  bedroom where the victim was at, I mean, that's a
3  fixed spot.  So I'm trying to figure out where
4  you're starting from in the -- in the transport of
5  the smoke.
6              So other than doing the -- or
7  adjusting for the height, were you able to pinpoint
8  at all where that chair was in the living room, or
9  is it just the living room in general with the
10 height inputted in?
11     A.    It was pinpointed.  We could have -- we
12 could have done that.  You can put in an X/Y
13 coordinate system.  That will then be used only by
14 Smokeview, not by the model.  So there's no real
15 way of doing it that -- you can put a fire closer
16 to -- to a wall or in the middle.  It really
17 doesn't matter.  The smoke filling algorithm that's
18 in this particular model, it's not -- not sensitive
19 to that.
20     Q.    Am I correct that the CFAST model will
21 not determine origin and cause of a fire?
22     A.    Not -- not explicitly, no.  It's used
23 as a tool to test hypotheses for origin.
24     Q.    All right.  And the hypothesis you were

Page 165

1  testing here was the smoke transport from a point
2  in the living room to the master bedroom where the
3  victim was at, correct?
4      A.    No.  I was doing -- using it as an
5  analysis tool to determine that time, and then I
6  was using it as part of information to be put into
7  a time line analysis.  And that time line analysis
8  was used to test the hypothesis.
9      Q.    And what was the hypothesis that you
10 were trying to test then?
11     A.    Well, I developed a hypothesis that the
12 fire -- the origin of the fire was in the reclining
13 chair.
14     Q.    And because the reclining chair was in
15 the living room, that's why you set up the inputs
16 in the model to test the transport of the smoke
17 from the living room to the master bedroom?
18     A.    Correct.
19     Q.    Was there anything else that you used
20 the model for other than to test for the time it
21 took for the smoke to transport from the living
22 room to the master bedroom?
23     A.    No.
24     Q.    And when you're doing the CFAST

DOUGLAS J. CARPENTER, 03/31/2021                    Page 166..169

Page 166

1  modeling, are you inputting a specific ignition
2  source at all?
3      A.   Doesn't -- it assumes ignition.  The
4  model does not -- the model -- the ignition
5  process, so you assume a growth rate starting at
6  T -- time equals zero, and it goes along a
7  prescribed growth rate.
8      Q.   Okay.  So it assumes the ignition but
9  doesn't -- it doesn't differentiate between certain
10 competent sources of ignition, whether it be a lit
11 cigarette, a match, an open flame; is that correct?
12     A.   Correct.
13     Q.   And then you mentioned the model
14 generates an output, correct?
15     A.   Correct.
16     Q.   And what is the output information that
17 it's -- it's generating?
18     A.   Oh, it's -- there's a number of
19 variables that get input out in every -- in every
20 simulation, and that --
21     Q.   Can you give me some examples of the
22 output information?
23     A.   Sure.  Temperature of the hot upper
24 layer with time, the depth of the -- of hot upper

Page 167

1  layer with time, where smoke is transported into
2  what rooms, when does it start filling, what is the
3  flow rate of smoke going through a vent in either
4  direction.
5          Those are just some of the -- so air
6  flow is very -- or the flow of smoke, the transport
7  of that, are all things that you can query or are
8  provided to you in the output file.  And those are
9  all histories, so they're all with time.
10     Q.   And then just going back to the inputs,
11 you mentioned air flow.
12          Is that something that the input --
13 strike that.
14          Is air flow or circulation within
15 the apartment something that can be inputted into
16 the model?
17     A.   You can do forced ventilation in a
18 model.  It's very rudimentary.  So you can look at
19 air -- air going into a compartment, which has an
20 effect on how much -- when you go under ventilated
21 and how much air is available to support a
22 combustion.  But you can also look at removal of
23 smoke if you're talking about an air intake or a
24 return air.  So those are things you can do.

Page 168

1          But there's also the model just
2  naturally due to buoyancy creates -- creates flows,
3  and those flows are tracked based on the
4  mathematics of the model.
5      Q.   And when you were speaking about the
6  leakage earlier, does that mean the model is taking
7  into account whatever ventilation exists into -- in
8  the apartment itself?
9      A.   Well, not specifically --
10     Q.   Or is that something --
11     A.   It's basically saying there are
12 paths -- avenues where under the right conditions,
13 depending on the resistance, you can flow smoke
14 across those openings.  So they -- they're
15 essentially vents.
16          So if I pressurize a room and I have
17 a door with cracks around it, depending on the
18 heighth of the layer and the pressure in the room
19 and the size of the leaks, it will do a calculation
20 of what the rate of smoke flow across there based
21 on the velocity.  But then you can also look at how
22 much mass is going across that -- that door too.
23          So those are all things that are
24 part of the fire dynamics of the model.

Page 169

1      Q.   So does the model assume that, or do
2  you have to input the -- the ventilation sources?
3          For example, we know that there was
4  a room air conditioner on the west wall of the
5  apartment.
6          Is that something you input into the
7  model as a point of leakage or ventilation within
8  the apartment?
9      A.   No, because that's a -- that's a closed
10 system, so it -- if it is intaking air, it's
11 pushing it back out in the same room.  I mean, it's
12 the same as a refrigerator, right.  You can open up
13 a refrigerator; it doesn't mean that you're
14 going -- you're going to cool off the entire room.
15 You need to have separation between two areas.
16          So you could do that, but that's not
17 representative of an air-conditioning system.  If
18 you had a system where you actually had a fan in a
19 wall, yes, you can put that in, yep.  Because that
20 will remove smoke, and it will also allow -- could
21 allow air to come back into the building through
22 other openings, depending on the pressure.
23     Q.   And what is your understanding of the
24 heating system that was in the apartment?

DOUGLAS J. CARPENTER, 03/31/2021                    Page 170..173

Page 170

1    A.    If I remember correctly, it was -- it
2  was not a forced ventilation system, but I'd have
3  to go back and look at that.  But that would be --
4    Q.    All right, so --
5    A.    Yeah.  That would be -- you know, I did
6  it based, you know, assuming that -- not assuming
7  there was.  And I didn't -- I didn't take that into
8  account because that can actually remove or push
9  smoke into the areas faster.  So it was -- it would
10  be conservative in that -- in that particular case.
11    Q.    So when you were speaking of vents
12  earlier, what -- what specifically were your -- you
13  referring to when you say that there's traveling of
14  the smoke through the -- through the vents?
15    A.    So in the model, you put in rooms, but
16  the smoke will -- the model will assume -- if you
17  put no leakage, it assumes it's hermetically
18  sealed.  So you can put in -- there needs to be
19  pathways to transport smoke to the other
20  interconnected rooms, so you have to specify what
21  that interconnection is.
22          So one of the things you can do is
23  put a doorway there.  One of the things you can do
24  is put a window or some type of similar opening.

Page 171

1  So that's -- those are the larger more significant
2  areas.
3          But you can also have leakage.  If
4  you have a closed door, you have leakage around the
5  three sides of the door, plus the bottom, and you
6  can -- we put those in as -- as four vents.  Three
7  vents, right.  We got two vertical vents and then
8  two horizontal but they're at different elevations,
9  so we specify them as different vents.
10          So a closed door is a vent, but we
11  have to -- we have to specify it by using three
12  vents, not just one.
13    Q.    Okay.  And for the model inputs, was
14  the door to the victim's bedroom open or closed?
15    A.    It was partially open as the -- the
16  victim described smoke coming through the bedroom
17  door.  I don't even -- I don't remember if it was
18  exactly open or closed.
19          What was important about that is
20  whenever the layer heighth in the hallway got down
21  to the level of the soffits and we started to see
22  flow into the room, it could have been -- I don't
23  remember, per se, if it was open or closed.
24  Doesn't really matter.  As soon as we got smoke

Page 172

1  flow across there, there's a pressure differential
2  and there's an opening, so you're going to get
3  smoke flow.
4          So that's -- that's what we used as
5  the criteria.
6    Q.    Partially open --
7    A.    Well --
8    Q.    -- is that correct?
9    A.    -- partially open either because it
10  wasn't latched or because there -- it's always
11  partially open, because a closed door is not fully
12  closed.  So as long as there's -- if there's smoke
13  there and there's a pressure difference, you will
14  get across that door, which there is because it's
15  hotter on the outside of the door than it is on the
16  inside, it's going to drive flow through pressure
17  differences, and you're going to get smoke flow
18  through that.
19          So that's the -- at the point where
20  we said smoke had reached and met the observations
21  of the victim.
22    Q.    And then going back to the output
23  information, you were giving us a list of all the
24  information that can be outputted through the use

Page 173

1  of this model.
2          Is there any data in particular that
3  you were looking at or seeking to analyze in terms
4  of that output information?
5    A.    Yes.  The first point that you saw
6  inflow from the hallway to the bedroom through the
7  door.  So you're looking for -- so up until a
8  certain point until the layer gets down below
9  that -- that soffit level, there's going to be no
10  flow into that -- into the bedroom because of --
11  through the bedroom door because of buoyancy,
12  right.  It's going to stay up high.
13          Now, when -- when the layer starts
14  to come down because you're adding more mass to the
15  hallway, that's the point.  So you're looking for
16  the flow, the direction.  There's going to be a
17  plus and minus mass flow that you're going to see
18  that the model will put out.  And so you're looking
19  for -- depending on what -- what negative
20  represents, you're looking for that flow at the
21  time it starts to flow into -- mass starts to go
22  from the hallway into the bedroom.
23    Q.    Will the model also show how the smoke
24  is descending from the ceiling to a lower level?

DOUGLAS J. CARPENTER, 03/31/2021                                  Page 174..177

Page 174

1    A.    It will in the hallway at that point,
2 yes.
3    Q.    And is that part of the Smokeview
4 program that's built into it?  Is that what that
5 visualizes for you?
6    A.    Yep.  So what it will do is it
7 visualized through two means.  One is the size of
8 the upper layer, so it'll just show it descending
9 as the fire's growing and as there more mass goes
10 into the hallway.  And then it will be color-coded.
11 That -- that volume will be color-coded based on a
12 temperature or whatever your -- whatever gradient
13 you're looking at.
14    Q.    How did you verify the output results
15 of the CFAST model?
16    A.    Well, as I said before, you look at --
17 you can look at Smokeview and say, Is everything
18 making sense?  Is the -- is the flows based on the
19 knowledge of the geometry and the -- and the fire,
20 the physics, if you will, is it doing what I would
21 expect to do in terms of fire dynamics.
22          You know, if -- if I have a soffit
23 between the dining room and the living room and I
24 just see smoke going right across that without any

Page 175

1 buildup of a layer before -- in the living room
2 before it goes underneath the soffit, then that
3 probably tells me that my model doesn't
4 recognize -- however I put it in or if there's a
5 bug, that's not doing it the way that I thought I
6 specified in the model.  So we do those types of
7 checks.
8          You look at temperatures.  You'll
9 look at is the temperature in the living room
10 higher than the temperature generally in the
11 hallway.  If the opposite is true, there's
12 something most likely wrong based on the physics
13 and fire dynamics that suggests that either the
14 model is not doing something right or you didn't
15 put it in.
16          So you check for consist -- internal
17 consistency.  We teach that in all commuter --
18 computer fire modeling classes.
19          It was a -- one of my -- my midterm
20 exam in one of my first classes in graduate school
21 was -- had to do with modeling.  And we all did
22 something with the model and didn't look at the
23 results, and when we turned it in and the professor
24 came back and said, you know, does anybody realize

Page 176

1 that you've got -- your model produced, you know,
2 un -- non -- or things that weren't physically
3 possible.  And we ended up identifying a bug in
4 that particular version of the program many, many
5 years ago.  And but I also got a grade commensurate
6 with that.
7          So the lesson to learn was you need
8 to make sure your models are internally consistent.
9 You look at the output and say, Does that make
10 sense, does that make sense.
11          But yes, we did do that.
12    Q.    Okay.  And when you did do that, did
13 you notice any inconsistencies with the output data?
14    A.    No.
15    Q.    And then was the output data -- well,
16 let me strike that.  Let me ask it this way.
17          Was the modeling reviewed by
18 Mr. Roby as you described earlier as part of your
19 internal quality control process?
20    A.    Yeah.  He was interested in the
21 results, so I remember talking to him about that.
22 And I said -- you know, we were just talking about
23 the rationale for using CFAST versus just doing
24 some simple hand calculations based on velocity and

Page 177

1 distance.  And you know, they were -- they were
2 internally consistent.
3          But the value of using the model, as
4 I said before, was show it to lay people.  He
5 understands it, but to be able to explain it to
6 somebody, then you say, okay, I see -- now I see
7 where the smoke's going, and I can see that it
8 doesn't go into the next compartment until it comes
9 underneath the soffit.  And then I can see that I
10 don't get flow into the bedroom until -- until it
11 gets down to the open vent.  Those type of things.
12          So -- so yes, he did review it in
13 that -- in that context, but you know, he's --
14 we're all very good as engineers to sort of know
15 what the right order of magnitude is.
16          Like I said before, smoke transports
17 down hallways about 2 meters per second, 1 to
18 2 meters.  If I know the distance, you know, I can
19 do a simple calculation and tell you what the time
20 is.  I didn't need to do CFAST to do that, but
21 there are other benefits to doing it in CFAST.
22    Q.    So based on your experience in the
23 field, I mean, in terms of smoke transport, is
24 smoke by its nature going to transport to rooms and

Page 178

1  areas that are closer to the source of the fire
2  first as opposed to rooms that are farther away?
3      A.   As a general rule, yes.  But that's why
4  soffits matter.  It depends on the construction.
5  Is there something that will change that.
6          So in other words, when a smoke
7  flume hits the ceiling, it basically goes out
8  radial in all directions until it hits some type of
9  instruction -- obstruction to flow.  And then it
10  behaves depending on what the momentum is and the
11  geometry is.
12          So you -- I could create situations
13  where, yeah, the smoke would go right into the
14  dining room, but if I put a soffit there, that's
15  not going to happen.  So it -- the answer is it
16  depends.  Geometry matters.
17      Q.   So in your modeling, is the smoke at
18  the time it's transporting from the living room to
19  the master bedroom at the far end of the -- of the
20  hallway, is it also transporting into other rooms
21  or areas of the apartment?
22      A.   Yeah, depending on the smoke layer
23  depth and the depth of the soffits.  The model
24  predicts that timing based on the geometry.

Page 179

1      Q.   So just given the general nature of
2  smoke, the -- wouldn't the first room that's going
3  to be filled be the living room or dining room area?
4      A.   Not necessarily.  You may -- at that
5  point you've got a soffit on both -- between the
6  living room and the hallway and the living room and
7  the dining room.  That will impede smoke.  Once it
8  gets down below there, it will flow in there.
9          But now you have to look -- once it
10  starts flowing in, you have to look at the flow
11  rate that's going in there, and then you also have
12  to look at the size of the compartment, the size of
13  the hallway.
14          So it -- let's just say that the
15  smoke is able to go down the hallway and go into
16  the dining room at the same time.  And based on the
17  soffit levels and smoke filling, what's going to
18  fill up faster?  The hallway, right?  Because it's
19  just a smaller -- it's a much smaller volume.  So
20  for the same -- and relative to the width of the
21  hallway, which controls how much flow is going in
22  there.
23          So the model takes all that into
24  account.

Page 180

1      Q.   Yeah, but why is it going to transport
2  into the hallway?  Doesn't -- wouldn't the living
3  room or dining room area have to fill up first with
4  smoke before it starts transporting down the
5  hallway going -- going north into the apartment?
6      A.   No, because the -- the soffit for the
7  hallway is closer to the dining room.  So the
8  hallway actually is interconnected to the -- to the
9  living room, not the dining room.
10      Q.   So how do you calculate that the smoke
11  is not filling up the living room and dining room
12  as opposed to a direct path of travel down the
13  hallway?  Is there some way that you're calculating
14  air flow or circulation in the -- in the apartment
15  that allows you to come to that conclusion?
16      A.   No.  It's straight smoke filling,
17  right?  With the presence of the soffits, the smoke
18  just doesn't go to the ceiling and then suddenly
19  show up at the bedroom door.  What has to happen is
20  initially the smoke is going to be confined by the
21  barriers of the living room.
22          So you're going to actually develop
23  a layer in the living room first.  It's not going
24  to be deep.  It's going to be on the order of the

Page 181

1  depth of the soffit, and then it's going to spill
2  over.
3          And so that will spill over into the
4  dining room, and then -- but at the same time or
5  depending on, you know, the relative depths, you
6  will also get flow going into the hallway.
7      Q.   Okay.  And as the smoke flows into the
8  hallway, by its nature as it's transporting, isn't
9  it going to go into the first rooms in the hallway
10  as opposed to the last room in the hallway --
11      A.   No.
12      Q.   -- or at the end of the hallway?
13      A.   No.  That's also going to fill up --
14  you need to have -- until it can go -- the depth
15  can get down to the type -- the top of the
16  doorways, you will not -- you will not get smoke
17  into those rooms.
18          So in that particular case, you need
19  to fill -- you need to fill the hallway because
20  there's a soffit there and there's bounding walls
21  and the doorways don't go all the way up to the
22  ceiling.  So you develop a layer, again through the
23  depth commensurate with the soffit, and then it
24  will start to go in.

DOUGLAS J. CARPENTER, 03/31/2021                    Page 182..185

Page 182

1    Now, in the model, it would show it
2 going into all those rooms at the -- at the same
3 time once the layer gets down.  But no, it has no
4 place to go.  It can't -- it can't go into that
5 first bedroom first based on the buoyancy of the
6 smoke and the development of a hot upper layer.  I
7 mean, that's basic compartment fire dynamics.
8    Q.    So it's going to transport closer to
9 the ceiling and travel along that path before it
10 starts descending?  Is that what you're -- you're
11 describing?
12    A.    That's correct.  Yep, yep.
13         It's the ceiling jet and the
14 transport across the ceiling is a very small
15 percentage of the depth of the room.  And it's not
16 on the -- usually not on the order of the
17 ceiling -- you're talking about soffit depths of
18 about a foot.  You don't immediately get a depth of
19 a foot in the hallway just because the smoke's
20 going in there.  You have to fill that with a
21 certain amount of mass to get the layer to come
22 down to that -- to that one-foot deep level.
23    Q.    So when the victim observes the smoke,
24 in your opinion, is it still clinging to the

Page 183

1 ceiling in that upper layer, or has it descended at
2 some point?  At that --
3    A.    I think --
4    Q.    -- point rather.
5    A.    I think I just explained that.
6         It has -- there has to be a depth
7 commensurate with the -- with the soffit height.
8 So yes, there would be a layer in the hallway at
9 that point to be able to allow the smoke to go into
10 the -- into the bedroom.
11    Q.    How far down from the ceiling would the
12 smoke be at the point that the victim would have
13 observed it?
14    A.    I think I just answered that.  It's one
15 foot nominally.
16    Q.    Do you know exactly as opposed to
17 nominally at the point in time the victim would
18 have observed it, at the point where it would have
19 come to her attention?
20    A.    Well, the -- the fire dynamics suggest
21 that it's on that order, yes.  A foot.
22         You want to go and look at the model
23 and look at what the -- the layer height is at
24 that -- at that particular time, because it's

Page 184

1 growing.  It's getting deeper with time.  So as the
2 smoke's falling into -- into the room, it could
3 still be descending.  But yeah, it's on that order.
4    Q.    Is it possible the victim did not
5 notice the smoke until it had descended more than a
6 foot off the ceiling?
7    A.    Yes.  There could have been some --
8 some time that didn't exactly, you know, seeing
9 smoke come through the doorway.  You know, she
10 doesn't quantify exactly how much smoke, but I
11 mean, how are you going to do that.
12         What we're doing is basically
13 saying, This is when we would start to see smoke
14 being transported between the -- the two volumes,
15 if you will.
16    Q.    So you brought up the fact that the
17 victim doesn't quantify the smoke for us in the 911
18 call, correct?
19    A.    Well, no.  I said she didn't quantify a
20 flow rate of that.  That's correct.  She did not
21 give the -- precise any numbers or that would --
22 that would be able to be matched to a model.  I
23 mean, I think that's fairly obvious.
24    Q.    All right.  But she doesn't -- she

Page 185

1 doesn't also say how thick the smoke is at that
2 point either, does she?
3    A.    She does not.  She says, I see smoke
4 coming through the bedroom.  I have smoke coming
5 through the bedroom door.
6    Q.    She doesn't say how far off the ceiling
7 the smoke has descended, does she?
8    A.    She does not say that in the phone
9 call, no.
10    Q.    Is it your opinion that the victim was
11 laying in her bed when she observed the smoke
12 coming into her bedroom doorway?
13    A.    I made no assumption about that.  I
14 know she was in the bedroom.
15    Q.    Going back to page 9 of your report
16 that we've marked as Exhibit 1 to your deposition,
17 you were talking earlier about the time line that's
18 presented here in the diagram.
19         Am I understanding this correctly
20 that what you are illustrating here is that if the
21 fire was incendiary in nature rather than a
22 smoldering type fire, the victim would have noticed
23 the smoke earlier and therefore made the call to
24 911 earlier?  Is that what you're -- you're

Page 186

1 illustrating here?

2    A.   Well, that -- what I'm illustrating is
3 that she makes those observations of smoke through
4 the door at the 911 call, so we're using the 911
5 call as an anchoring point.

6    Q.   And you have all these, you know, boxes
7 indicating an incendiary hypothesis.  So are you
8 trying to illustrate there that if the fire was
9 incendiary in nature, she would have noticed the
10 smoke at an earlier point?  Is that the point of
11 the time line?

12    A.   Yeah.  Those are labels for -- so
13 they're basically competing hypotheses.  This is
14 the hypothesis that the fire was started the way
15 the investigators ultimately determined based on
16 their investigation.  And I labeled that as the
17 incendiary hypothesis.

18          And I am labeling my competing
19 hypothesis as being accidental, although this
20 particular case, I don't believe that I used that
21 term exactly on here.  But yeah, basically showing,
22 testing the hypoth -- their hypothesis against the
23 time line.

24    Q.   And when you test the incendiary

Page 187

1 hypothesis against the time line, what is it
2 showing in your opinion?

3    A.   Just what I said in my report.  If
4 that -- if all those things were to have happened,
5 then I can tell you when the 911 call needed to be
6 made.  And we weren't even close to -- you know, we
7 were 12 to 17 minutes difference in the -- in when
8 the 911 call would have been made depending on
9 whether it was an accidental or incendiary fire.

10          So it's a test of the competing
11 hypotheses.

12    Q.   So am I correct that when you're
13 looking at these competing hypotheses, as you have
14 illustrated them in this diagram, that what you're
15 showing is that if the fire was incendiary in
16 nature, the 911 call would have come earlier than
17 it actually did?

18    A.   Well, it's -- the incendiary is just a
19 label.  It's the ignition of vodka on newspaper
20 scenario.  And yes, if that were true, we would not
21 have had the 911 call be when it was actually
22 documented to be made.  It would be off by 12 to
23 17 minutes.

24    Q.   So you're saying under an incendiary

Page 188

1 hypothesis, the victim would have called 911 much
2 earlier than the actual time of 6:40 p.m.

3    A.   No, I'm not saying that.

4    Q.   What are you saying then?

5    A.   I'm saying if you use all those -- the
6 transport time and the fire started at the time or
7 right around the time when the Amors left the
8 apartment, and you anchor all those times, yeah,
9 you will not -- it does not reproduce the time even
10 close to when the actual documented 911 call was
11 made.

12    Q.   And is that because under an incendiary
13 hypothesis, the smoke transport would have -- to
14 the -- from the living room to the master bedroom
15 would have occurred earlier?

16    A.   Yes.

17    Q.   And why did you use time zero as 6:38?

18    A.   I backed it out of the modeling.  So I
19 basically said, This is the time of transport.  So
20 if I know when it reached the bedroom and then I
21 know how long that it nominally took, I just
22 subtract those times, and I can anchor that point
23 at 6:38.

24    Q.   So on your diagram here, you have noted

Page 189

1 at 6:39 p.m., smoke through bedroom door.  And when
2 you say you're backing it off from there, is that
3 what you're talking about?  From that time post?

4    A.   No.  Now you're talking about something
5 different.  I said I'm backing it out.  If I know
6 that the total transport time or the range of
7 transport time and I know when the smoke was -- or
8 based on the 911 call when -- or based on the
9 modeling I would know it's 6:39.  That's when the
10 smoke was through the bedroom.  So I guess, yeah,
11 that's from the 911 call.

12          And then -- and then I would back
13 that out, right?  And then to transition to flaming
14 is T equals zero, time equals zero in the CFAST
15 model.

16    Q.   Because CFAST is assuming that the
17 ignition occurs, correct?

18    A.   Yes.  That's -- it's basically modeling
19 the fire, yes.  It's not modeling the ignition.

20    Q.   All right.  And it's modeling that
21 there is a flame produced from the ignition,
22 correct?

23    A.   Yes.  Or -- either initially or if it
24 was a smoldering fire, it's transitioning to a --

DOUGLAS J. CARPENTER, 03/31/2021                    Page 190..193

Page 190

1  from a smoldering to a flaming fire.
2      Q.    But there would also be a time factor
3  from the time it's transitioning to a flaming fire
4  to the point the fire got to the intensity of what
5  the victim describes in the 911 call, correct?
6      MS. GARCIA:  Object to form.
7      THE WITNESS:  Well, yeah.  There's a growth
8  rate associated with this.  That's correct, yep.
9  BY MR. POLICK:
10     Q.    And where is that growth rate depicted
11 in this diagram?
12     A.    It's not.  It's -- the growth rate is a
13 required element of the analysis of the transport
14 time, so it's -- it's included in the model, which
15 then produces the transport time that's now on this
16 time line.
17     Q.    So the growth rate where the fire grows
18 from the transition to flaming to the intensity
19 that the victim described in the 911 call is
20 something that is part of the output of the CFAST
21 model?
22     MS. GARCIA:  Object to form.
23     THE WITNESS:  Yeah.  It's going to give a
24 history of time of not only the variables or the

Page 191

1  effects of the fire but also how the fire's
2  behaving on that growth rate.
3  BY MR. POLICK:
4      Q.    Other than the CFAST model, are you
5  able to tell how long it took for the fire to go
6  from transition to flaming to the intensity the
7  victim described in the 911 call?
8      A.    Well, you'll have to be very specific
9  about what you mean in terms of her observations.
10 She gave a location of the fire.  I don't think
11 that she quantified -- she certainly didn't
12 quantify the size of the fire.  I don't know how
13 she could do that.  But she saw a visible fire.
14         And again my PowerPoint discuss her
15 field of view and testing the hypothesis through
16 that observation.  But the model will tell you how
17 big the fire was at that point.
18     Q.    Well, she describes the fire big enough
19 that she is not able to leave the apartment,
20 correct?
21     A.    Says she can't -- yes, she can't --
22 there's a blockage in her pathway, so that is
23 correct.  And that doesn't -- I mean, fires grow
24 relatively speaking fairly quickly and the radiant

Page 192

1  energy that allows you to or may not allow you to
2  pass by a burning object, the whole apartment
3  doesn't have to be on fire.  You can not pass a
4  particular object that may be -- may be not
5  necessarily blocking but thermally blocking your
6  exit path.
7      Q.    What do you mean by thermally blocking
8  your -- your exit?
9      A.    Well, one of the things that fires --
10 and people have experience with this, and let's
11 just talk about campfires.
12         One of the modes of heat transfer is
13 called -- it's basically thermal radiation, right?
14 You stick your hand out at a -- at a campfire and
15 you can feel the heat, if you will, or the radiant
16 flux that's coming off that fire.  That's -- it's a
17 phenomena known as -- that goes with the fourth
18 power of temperature.  And then there's also the
19 amount of flux is based on the distance away from
20 that source.  And that goes as 1 over R squared.
21         So there's those two things
22 combined, meaning you have a high heat flux.  But
23 if you step back, you know, half the distance that
24 you are to the fire, you'll get a quarter of the --

Page 193

1  of the radiant energy.
2          And I think most people have that
3  experience.  You're at a campfire.  It starts
4  getting hot.  What do you do?  You take a step
5  back, and for the moment, you're -- you're good.
6  But those distances are fairly short.
7          And if you have this chair that's
8  over -- you know, in line with the hallway in the
9  living room, there may be a pretty good chance
10 based on the growth rate of the fire that you will
11 get a radiant flux that won't allow you to pass by
12 that.
13         So there doesn't have to fire across
14 the entire exit path.  There just has to be a lack
15 of ability to even approach that particular fire at
16 the end of the hallway.  And you can feel that, and
17 there's a pain threshold associated with it.  Your
18 body will not let you go past those.
19         And again, those are things from my
20 PowerPoint presentation.  That was an element of my
21 testing of hypotheses of, you know, the -- the two
22 hypotheses associated with the two chairs.  You
23 know, one chair was much further away and actually
24 was blocked by wall.  So thermal radiant energy is

DOUGLAS J. CARPENTER, 03/31/2021                    Page 194..197

Page 194

1 like light. It doesn't bend around corners. And
2 the same with thermal radiant energy, it's a line
3 of sight.
4           So if it's blocked -- if you're
5 blocked by something, you're not going to feel that
6 radiant energy. But if it's in line with your
7 path, you're going to have a hard time, if not
8 impossibility, your body's going to let you get
9 even close to that fire. Because as the
10 temperature's changing and the size of the fire is
11 getting bigger, it's T to the fourth. So any
12 increase in temperature is a substantial increase
13 in the thermal radiant flux.
14      Q.    So the fire is -- the growth rate of
15 the fire, it's growing exponentially at that point.
16      A.    Yes. It's on a growth rate. That's
17 absolutely correct. From a transition to flaming,
18 yes. You are -- you'll start on that growth rate
19 path.
20      Q.    And in the 911 call, the victim is not
21 specific about what chair she observes on fire,
22 correct?
23      A.    No, not specific. But she says that
24 it's -- you know, she gives details that allows the

Page 195

1 ability to test that particular hypothesis. Like I
2 said, I tested that in my -- as explained in my
3 PowerPoint presentation.
4      Q.    She says that her path of exit is
5 blocked both to the main entry door and the balcony
6 itself, correct?
7      A.    I believe that's correct, yes.
8      Q.    And does that suggest to you that more
9 than one item or piece of furniture was on fire at
10 that point in time?
11      A.    That's a hypothesis you could
12 potentially formulate. But you can also formulate
13 the alternative hypothesis, which is one chair
14 blocking. Because you have to go out the hallway,
15 and at the end of the hallway, you decide whether
16 you're going to the front door or the back door.
17 And if the chair is in that proximity giving off
18 enough thermal flux that you're reaching a pain
19 threshold or you make a decision that, I don't
20 think I can get by that because I'm feeling too
21 much heat, then yes, that -- that is consistent. A
22 single point that blocks both exits.
23           Again, I talk about that in my
24 PowerPoint presentation.

Page 196

1      Q.    So when you're saying the path that's
2 being blocked is from the thermal heat being given
3 off by the fire, not necessarily the flames
4 themselves.
5      A.    Well, it is the flames. It's just
6 you're not -- you don't need to be in direct
7 contact to feel the effects and get burns from -- a
8 lot of burns are caused by radiant -- radiant
9 burns, and in short order when you have fires of
10 this size and you get close enough to them.
11           So you don't have to be walking
12 through flames to be blocked. You can have enough
13 radiant energy that will not allow you or at least
14 give you the impression that you couldn't --
15 couldn't pass that. It doesn't have to be that you
16 reached the pain threshold. But the pain threshold
17 will stop you from going too close to that and
18 could potentially block the ability to get out
19 either exit.
20      Q.    Did you test the hypothesis of whether
21 more than one piece of furniture was on fire?
22      A.    Yes.
23      Q.    And how did you do that?
24      A.    Well, you wouldn't test both of them,

Page 197

1 because if that were the case, then -- I did test,
2 yes. Let me go back.
3           If you had both chairs burning, that
4 means that the first chair if -- and you're
5 assuming that the first chair ignited was closer to
6 the sliding glass door, that means that that chair
7 would have to be able to preferentially ignite the
8 other upholstered chair that was there blocking it.
9           That does not happen given those
10 distances until you get flashover, and we know
11 flashover didn't occur because she wouldn't have
12 been able to even get in the hallway with
13 flashover. And we know that occurred later in
14 the -- in the progression of the fire.
15           So yes, I did test those -- those
16 hypotheses. So in the end, it was really one chair
17 or the other. And I did test those, and it showed
18 that it was inconsistent, you know, with the obs --
19 or her observations. In fact, she may not even
20 been able to see the chair on fire that was over by
21 the -- over by the sliding glass door.
22      Q.    Before forming your opinions in this
23 case, what did you know about the victim, Marianne
24 Miceli?

Urlaub Bowen & Associates, Inc.   312-781-9586

DOUGLAS J. CARPENTER, 03/31/2021                Page 198..201

Page 198

1    A.   In what context?

2    Q.   An overall context.  Her physical

3  condition, her mental condition.

4          Did you know anything about her?

5    A.   I knew what was in the documents that I

6  reviewed.

7    Q.   Before forming your opinions, did you

8  know whether her physical disabilities limited her

9  movement?

10   A.   I think there was some suggestion to

11  that, yes.

12   Q.   Before forming your opinions, do you

13  know if she was taking any medication that evening

14  that made her drowsy or affected her sense of smell?

15   A.   I don't know about sense of smell.  But

16  there were obviously discussions of -- or questions

17  being asked about what other people knew about

18  that, so that was included in the -- included in

19  the documents that I reviewed.

20   Q.   Based on your opinion, was the victim

21  awake or was she napping when she first noticed the

22  smoke?

23   A.   I don't know.  I know when she had

24  smoke coming through her door, at what point, and

Page 199

1  that's what I used to anchor my time line.

2    Q.   When the victim first noticed the

3  smoke, did she see it or smell it?

4    A.   My -- I'd have to go back and look

5  specifically, but my -- it was an -- it was

6  suggested it was an observation of smoke.  Smoke

7  coming through the door.

8    Q.   Are you able to say whether the victim

9  smelled the smoke before she saw it?

10   A.   No.  But I can say from the modeling

11  and fire dynamics that it's likely that in that

12  short period of time that that would be the first

13  visual observation.

14          If you remember, at, you know,

15  1 to 2 meters per second, the momentum transport of

16  the smoke is going to be much faster than

17  diffusion.  Diffusion would be the way that you

18  could get smoke to come well past or transfer for

19  long periods of time without a -- without a visual

20  representation of that.  But that's not in a

21  flaming fire.  That's most likely could be in a

22  smoldering -- a long smoldering fire.

23   Q.   And based on your opinion, once the

24  victim did notice the smoke, how long did it take

Page 200

1  her to react to it?

2    A.   I have a minute basically.  She was --

3  made the observation, and then her next plan was

4  to -- call 911.

5    Q.   Based on your opinion, how long did it

6  take her to get out of her bedroom to the point in

7  the hallway where she was able to make the

8  observations of the fire that she did?

9    A.   All on the order of about a minute.

10   Q.   And in your opinion, what position was

11  the victim in when she observed the fire from the

12  hallway?

13   A.   I don't have any evidence that would

14  allow a reliable determination.

15   Q.   Can you say whether she was standing or

16  whether she was crawling on the ground?

17   A.   I don't specifically know.  I know she

18  was on the phone, but that doesn't suggest that --

19  but I believe that her observations were made in

20  the hallway.

21   Q.   If she was on the phone, does that

22  suggest to you that she only went as far as the

23  phone cord would allow her to go into the hallway?

24   A.   Well, based on a bounding analysis,

Page 201

1  assuming that she's still holding onto the phone,

2  that would be the one end of the bound.

3          But what if she didn't go all the

4  way to the end of the cord?  I don't -- nobody

5  measured the length of the cord.  She could have

6  stuck her head out into the hallway and made those

7  observations.

8          She would need to have made those

9  observations in the hallway.  Whether or not her

10  entire body was in the hallway, I don't have any

11  evidence for or against.

12   Q.   So how is it in your PowerPoint

13  presentation that you say that she had to get to a

14  certain part of the hallway in order to make the

15  observations that she reported to the 911

16  dispatcher?

17   A.   I didn't make any declarations or

18  opinions about that.  I said that she made the

19  observations from the hallway.

20   Q.   But in your PowerPoint presentation,

21  don't you have diagrams that show her line of sight --

22   A.   Yes.

23   Q.   -- from the hallway to the point where

24  the fire she's describing is at?

DOUGLAS J. CARPENTER, 03/31/2021                    Page 202..205

Page 202

1    A.   I can't answer that question.  You're
2  making a supposition that she was observing the
3  fire from the chair by the sliding glass door, and
4  I don't -- don't believe that's true.
5        MR. POLICK:  I think we're up to Exhibit 5.
6  Can we mark the PowerPoint presentation as 5?
7            Do you have the PowerPoint
8  presentation?  Okay.
9  BY MR. POLICK:
10   Q.   So if we look at the page that is
11  marked Bates stamped 38304 -- or let's go back to
12  38293.  I'm sorry.
13           Are you able to see that,
14  Mr. Carpenter, and what we've marked as Exhibit 5
15  to your deposition?
16   A.   I do.
17   Q.   All right.  This part of the PowerPoint
18  presentation is entitled, Victim Sees Recliner on
19  Fire, correct?
20   A.   Correct.
21   Q.   All right.  So what are -- what are you
22  illustrating here in this particular diagram?
23   A.   Where a person would be located and
24  what they could see based on just simple line of

Page 203

1  sight.
2    Q.   And at this point when she is making
3  the 911 call, how much smoke is in that hallway?
4    A.   So at that particular point, it's -- as
5  we talked about before, it's nominally a foot deep,
6  on that order.  It could be a little bit more.
7    Q.   So at least a foot, maybe a little bit
8  more down from the ceiling itself.
9    A.   That is correct, yep.
10   Q.   So is it your opinion that she did not
11  see the chair that was closer to the balcony door
12  or sliding glass doors at all?
13   A.   If she was in the -- closer to the
14  bedroom door, she would not see that.  You can see
15  the point where you need to be, based on the -- on
16  basic geometry of where she'd need to be to be able
17  to see that other chair, or to see actually both at
18  the same time.
19   Q.   If she was at the point where the sight
20  lines in your diagram indicate that she could see
21  both chairs, including the chair that was closer to
22  the balcony door, would that suggest to you that
23  the smoke was not as thick or had not descended as
24  far into the hallway at that point?

Page 204

1    A.   No.  She could -- we could look at the
2  temperature conditions at that point and make some
3  estimate of what she would be experiencing at that
4  point.  But it's still early on in the fire.  A
5  depth layer would allow her to -- probably had --
6  with a commensurate temperature that would allow
7  her to at least stand in the hallway or to peer
8  out, if you will.
9        We -- again, we don't know if she
10  was in the -- in the hallway completely standing
11  there, or if she stuck her head out and made the
12  observation and then -- then made the 911 call.  We
13  have no evidence for or against.
14           But she would have to be -- the
15  conditions would be such that she could tolerate
16  the tenability of the -- the thermal tenability of
17  the hallway for, you know, at least a couple
18  seconds, which is enough time to make that
19  observation.
20   Q.   Do you know if she was using anything
21  to assist her in moving down the hallway, like a
22  cane or a walker?
23   A.   I have no evidence for that.  I don't
24  even know if she -- how far she got down the

Page 205

1  hallway.  So that's an inference I have no evidence
2  for.
3    Q.   Did you know anything specific about
4  her mobility in light of her disabilities before
5  making your opinions in this case?
6    A.   There was some discussion of --
7        MS. GARCIA:  Objection, asked and answered.
8  You can -- you can answer though.
9        THE WITNESS:  I mean, again reviewing the
10  documents, you've got the impression that she had
11  some -- some limited mobility.
12  BY MR. POLICK:
13   Q.   But you can't be more specific than
14  that based on your opinions.
15   A.   Based on the available evidence.
16   Q.   You can't be more specific than that
17  based on the available evidence, correct?
18   A.   Correct.
19   Q.   So if we move now to a page that's
20  Bates stamped 38304 of this exhibit, this diagram
21  is entitled, Both Exits Blocked.
22           What are you illustrating there?
23   A.   I'm basically showing a diagram of a
24  situation you would have if both -- both exits were

DOUGLAS J. CARPENTER, 03/31/2021                    Page 206..209

Page 206

1  blocked and what would be required at -- that the
2  impingement point for blockage is consistent with
3  the end of the hallway.
4       Q.    Meaning that the victim would have had
5  to have been at the south end of the hallway in
6  order to determine that both exits were blocked?
7       A.    Nope.
8       Q.    So what is the point of this particular
9  diagram then?
10      A.    It's showing the exit path that -- so
11 this was an analysis looking at what does it mean
12 when somebody says that both exits are blocked.
13           Well, what are the exits?  So these
14 are exit paths.  It's something we deal with all
15 the time.  Egress paths, exit paths in fire
16 protection engineering.
17           So in order for her to go from the
18 bedroom out one of the traditional exits, she would
19 need to go down the hallway, and then she could
20 take a path either to the front door or take a path
21 to the sliding glass door.
22      Q.    And that's what she describes in the
23 911 call.  That -- that both exits are blocked,
24 correct?

Page 207

1       A.    I'm trying to remember if it's exactly
2  said that or she said, I can't get out.  Yeah, both
3  exits are -- basically implying both exit paths
4  are -- are blocked.
5       Q.    And that's part of the evidence in the
6  case, correct?  The 911 call?
7       A.    That is correct, yes.  And it's part of
8  what I used in my analysis.
9       Q.    So are you saying that she did see both
10 exits were blocked, or are you unable to make that
11 determination at all?
12      A.    That wasn't what the analysis was
13 trying to do.  It was showing that the difference
14 between one -- one chair burning versus the other
15 and, you know, could one block both exits, or -- or
16 what was -- what was consistent here with the
17 available evidence.
18           And that was consistent with the
19 recliner being located where you could get enough
20 thermal flux that wouldn't allow a person to leave
21 or at least make a visual assessment of whether
22 they could leave either going to the front or back
23 of the -- of the dining room or the main entrance
24 in the back door, if you will.

Page 208

1       Q.    In your opinion, does the chair closer
2  to the sliding glass doors leading to the balcony
3  not ignite until flashover occurs?
4       A.    Yes.  I think that that's consistent
5  with -- with ventilation burning, which -- which
6  would not occur, or unventilated burning, that
7  wouldn't occur until the sliding glass door was
8  compromised or the glass broke out of it.  And then
9  it allowed that chair to burn, and then it started
10 to burn back into the coffee table, which is
11 consistent with the physical evidence.
12           So usually what happens in these
13 cases, if you look at, you know, videotapes of
14 compartment fire dynamics, you will see that --
15 usually an upholstered furniture, single piece of
16 upholstered furniture that we have in this
17 particular case, whether it be a sofa or chairs,
18 can bring a room to flashover.
19           In this particular case, we don't
20 have enough available oxygen to sustain flashover.
21 We can reach the threshold for that, but it won't
22 actually occur until those windows go out in the
23 back of the -- back of the apartment.
24           So yes, I think it's a reasonable

Page 209

1  inference that, you know, as long as -- until
2  that -- those doors in the back, the glass breaks
3  out, that you have a single -- single item ignited.
4  And upholstered furniture can put out a very high
5  heat release rate.
6       Q.    So are you saying at the time the
7  victim reported her description of the fire to the
8  911 dispatcher, the only item of furniture on fire
9  is the upholstered reclining chair closer to the
10 dining room?
11      MS. GARCIA:  Objection --
12      THE WITNESS:  Yes, based on fire --
13      MS. GARCIA:  -- misstates the witness'
14 testimony, but you can answer.
15      THE WITNESS:  Yeah.  Based on fire dynamics,
16 I would say that that's a reliable determination.
17 BY MR. POLICK:
18      Q.    And is it also your opinion that the
19 fire generated from that single upholstered chair
20 is generating enough thermal heat or flux to block
21 both exits?
22      A.    Yes.
23           Well, it depends on where you're
24 standing.  It -- what it needs to do is block the

DOUGLAS J. CARPENTER, 03/31/2021                    Page 210..213

Page 210

1  ability to leave the hallway.
2        So in that particular case, yes.
3  The growth rate and the size of the fire can be
4  sufficient to give either a physical threshold that
5  a person can't pass, as I said before, the pain
6  threshold, or their perception of it that they
7  can't pass that.  That that's there -- they do not
8  believe that they would survive or be able to get
9  past.
10        So they take -- take a different
11  action, which in this particular case I believe was
12  retreating to the bedroom and -- and perhaps even
13  trying to locate another exit.
14        So she -- her perception was that
15  her egress path was blocked.
16      Q.    So does the modeling show what the heat
17  temperature would be at that southernmost point of
18  the hallway --
19      A.    You have to remind --
20      Q.    -- at the point in time where the
21  victim is making her 911 call?
22      A.    We can pull the model and find that,
23  yes.  We can know what the temperature of the hot
24  upper layer is.  We can know what the heat flux

Page 211

1  coming down that hallway is.  And we can -- we
2  can't get a visual observation of the size of the
3  fire, but we can have a quantitative observation of
4  the size of the fire.
5      Q.    Yeah, I'm not talking about the heat in
6  the upper layer of the hallway.  I'm talking about
7  the heat being generated off the burning
8  upholstered chair closest to the dining room.  The
9  thermal heat, will it measure that?
10      A.    Well, it predicts that, right.  That's
11  the heat release rate.  So at any point in time,
12  you can pull the model and get the heat release
13  rate.
14      Q.    And at what point in the heat release
15  rate would the temperature have to be before it
16  would cause pain to the human body?
17      A.    Well, that's if you're -- you're mixing
18  phenomena here.  You're talking about thermal
19  radiant flux.  I'd have to do a calculation.  I
20  want to say that I -- that I did just a spot check
21  of that.
22        But the model will look at -- can
23  look at different targets in terms of the thermal
24  radiation heat flux that would be incident at a

Page 212

1  person at different distances from there.  But the
2  temperature is only -- the temperature of the hot
3  gases is only relevant if you're immersed in it.
4  So this is thermal radiant flux.
5      Q.    In your opinion, would the thermal heat
6  being generated off that upholstered reclining
7  chair extend all the way to the southernmost
8  portion of the hallway?
9      A.    I'd have to do a calculation to look at
10  that.  But again, we don't know what -- what
11  stopped her from or assessing that her exit was
12  block.  What we do know is that it's consistent
13  with her looking down the hallway, she would see
14  that chair on fire, but -- and but I -- we don't
15  know -- we don't have evidence to know what she
16  used to assess whether she believed she could
17  traverse those exit paths.
18      Q.    Right.  She doesn't say anything about
19  feeling the heat of the fire, does she?
20      A.    She certainly doesn't quantify it.  So
21  I mean, we could do that, but that doesn't mean
22  that that's what stopped her from doing it.  She
23  could have had the perception that -- that she was
24  not going to be able to pass that.

Page 213

1      Q.    But she doesn't say anything about
2  feeling the heat of the fire, correct?
3      A.    Just -- I answered that.
4      Q.    Where in the 911 call does she say that
5  she feels the heat of the fire?
6      A.    I have no evidence for that.  I don't
7  think there's any evidence in this case of that, so
8  I can't say for or against.
9        Again, it's not what's needed.  It's
10  only her -- it's her perception that matters.
11      Q.    And her perception based on the 911
12  call was that both chairs were on fire, correct?
13  She's not specific as to which one.
14      MS. GARCIA:  Objection, argumentative; also
15  form.
16      THE WITNESS:  I would not agree with that.
17  She says she can't get out, that both her exits are
18  blocked.  So she didn't say anything about one or
19  two chairs on fire.
20  BY MR. POLICK:
21      Q.    Does the model tell us how much smoke
22  was in the master bedroom after the victim
23  retreated into it?
24      A.    It would give a history of that.  I

DOUGLAS J. CARPENTER, 03/31/2021                    Page 214..217

Page 214

1  don't know if we ran it long enough to make
2  those -- to continue that simulation because we
3  were only looking at that -- that one singular
4  observation.
5       Q.    Meaning when the smoke reached the
6  bedroom door from the living room.
7       A.    Correct.
8       Q.    I want to go back to your opinion on
9  the origin of the fire.
10           You indicated that you -- in your
11  opinion, a smoldering cigarette was left in this
12  reclining chair, and eventually it ignited and
13  burst into flame, correct?
14      A.    Correct.
15      Q.    So based on your opinion, at what clock
16  time during the day was the cigarette left in the
17  upholstered reclining chair?
18      A.    I don't have any evidence of the exact
19  time.  It's pretty difficult to predict.
20           What I can say is that the general
21  times for smoldering cigarette ignition of
22  upholstered furniture is -- in the available
23  scientific literature is -- ranges from, you know,
24  on the order of tens of minutes to, you know,

Page 215

1  single hours, five hours, six hours.
2            Those cases have been -- have been
3  documented.  And we know that people were sitting
4  in that chair hours before and smoking hours
5  before, so -- and that is consistent.  I can't tell
6  you I can give you a broad range of times.  Most
7  likely within on the order of five hours, in that
8  window, but I can't tell you what time during that
9  that smoldering ignition was started.
10      Q.    Do you know what type or brand of
11  cigarette it was?
12      A.    If I do, I don't remember.  I don't
13  know if that was something that was documented in
14  the documents that I reviewed.
15      Q.    In your profession as a forensic fire
16  investigator, do cigarettes contain chemicals that
17  will inhibit or allow a cigarette to burn?
18      A.    Well, there's -- they have tried many
19  different ways to try to reduce the pro --
20  propensity of smoldering ignition of polyurethane
21  foam, but some of those are not just chemicals,
22  some of those are barriers.
23      Q.    And are those like barriers that are
24  built into the lining of the cigarette itself?

Page 216

1       A.    They're built into the cigarette.
2  Those are mostly what's considered to be fire safe
3  cigarettes.  So it does reduce the burn time and
4  with the hope that the propensity for ignition
5  would be reduced.  It's not eliminated; it's
6  reduced.
7       Q.    And that would be -- is that something
8  that's woven into the wrapper of the outer layer of
9  the cigarette, or is that a chemical that's put
10  into the cigarette?
11      A.    It can be both.  But the barrier has to
12  be to the -- to the actual smoldering material,
13  which is the tobacco inside.  So I mean, those are
14  things that have been -- that have been tried in
15  the fire safe cigarette.  You know, the research
16  has been done for that.  But that's a fairly --
17  relatively speaking, a fairly new -- new concept.
18      Q.    Do you know when those fire safe
19  cigarettes began to be marketed by the industry?
20      A.    I know that there's substantial amount
21  of the research -- I mean, there's always been
22  research of smoldering ignition associated with
23  cigarettes.  But the research that was used to try
24  to reduce the propensity of that has been around,

Page 217

1  you know, nominally since year 2000 I think is
2  somewhere on that order.
3            But that was the research.  That
4  doesn't necessarily mean that that, you know,
5  propagated into an actual product.  So I don't know
6  exactly when safe -- safe cigarettes came onto the
7  market.
8       Q.    Do you know if the cigarette that was
9  left in the upholstered chair in your opinion in
10  this case was a fire safe cigarette?
11      A.    I don't know if it was or not.  But
12  fire safe cigarettes are still able to cause
13  smoldering combustion because they are being tested
14  in a way that isn't necessarily representative of
15  how cigarettes can actually be exposed to the -- to
16  the upholstered furniture.
17           Again, it reduces the propensity; it
18  doesn't eliminate it.
19      Q.    Was the upholstered chair in the Miceli
20  living room, the upholstered reclining chair new or
21  used furniture?
22      A.    I don't have any evidence for or
23  against.
24      Q.    You have referred to polyurethane foam

DOUGLAS J. CARPENTER, 03/31/2021                    Page 218..221

Page 218

1  a few times during the deposition today.
2          Where are you getting that
3  information from?
4      A.    Polyurethane foam is the product of
5  most upholstered furnitures, especially that kind.
6  And I believe that there was some evidence that --
7  that there were remains of it, but I'd have to --
8  I'd have to go back and look at the pictures.
9          But I don't think anybody disagreed
10  that that -- upholstered furniture is made from
11  flexible polyurethane foam.
12      Q.    Before you formed your opinions in this
13  case, did you know the exact material that the
14  upholstered reclining chair was made of?
15      A.    Generally, I knew that it was -- had a
16  fabric covering, and -- and that it was
17  polyurethane foam, yes.  I think I inquired about
18  that, and I actually, yeah, confirmed that.  So
19  yes, absolutely.
20      Q.    What was the exact material that the
21  fabric cover or surface material was made of?
22      A.    I don't know exactly.  I mean, it was a
23  cloth type material.  It wasn't a vinyl or a fake
24  leather or -- it was some type of cloth

Page 219

1  upholstering.
2      Q.    And I'm not asking in general.  I'm
3  asking:  Do you specifically know what the material
4  of the cover fabric or surface material was of the
5  upholstered chair before you formed your opinions
6  in this case?
7      A.    No, I don't know specifically.
8      Q.    And same question with regard to the
9  filler material:  Do you know what the exact
10  material was that comprised the filler material of
11  the upholstered reclining chair before you formed
12  your opinions in this case?
13      A.    No, I don't know exactly.
14      Q.    Would the nature or composition of
15  either the surface material or the filler material
16  affect the rate of a smoldering cigarette igniting
17  or transitioning into flame?
18      A.    I don't know if anybody's really
19  studied that, but it can have -- it might have
20  some.  Obviously if a cigarette is up in contact
21  with the filler material, it can have -- it has to
22  actually compromise those materials before it can
23  get to the foam.
24          The foam is what is the biggest

Page 220

1  problem.  It's the one that smolders, and it also
2  is the one that produces the HCN that's consistent
3  with the evidence in this particular case.
4          So it can have an affect on it, and
5  that -- but it's -- the broad range is, you know,
6  as I said, tens of minutes to hours for a
7  transition to -- once smoldering ignition occurs in
8  the polyurethane foam.
9      Q.    Before forming your opinions in this
10  case, did you do any tests or experiments with
11  different materials and fabrics to determine if a
12  smoldering cigarette could ignite to flame?
13      A.    I did not.  I relied on the -- the
14  available scientific literature.
15      Q.    Specifically what scientific literature
16  did you rely upon?
17      A.    There's a whole host of publications
18  over the last 10 or 20 years from the National
19  Institute of Standards and Technology and the --
20  previously it was the National Bureau of Standards,
21  so I'm well -- well aware of that literature.
22      Q.    Before forming your opinions in this
23  case, did you know the exact material composition
24  of the other furniture in the living room,

Page 221

1  specifically the sofa and the swivel chair?
2      A.    Not specifically.
3      Q.    And in your opinion, how do you know
4  that the upholstered reclining chair was the first
5  fuel source as opposed to the sofa or the swivel
6  chair?
7      A.    Because I used the application of
8  scientific method to test both hypotheses, as I
9  showed in my full analysis of the -- in my
10  PowerPoint presentation.  So that's the basis of my
11  determination.
12      Q.    Where specifically in your PowerPoint
13  presentation do you illustrate that?
14      A.    Well, it's not just one piece.  It's
15  testing the hypotheses using a number of different
16  means, and that's -- those are all within that
17  PowerPoint presentation.
18      Q.    In your opinion, does the placement of
19  the cigarette in the upholstered chair make a
20  difference or important to whether or not it will
21  ignite into flame?
22      A.    Yes.
23      Q.    How would the cigarette have to be
24  placed in or on the upholstered chair in order for

DOUGLAS J. CARPENTER, 03/31/2021                    Page 222..225

Page 222

1  it to ignite into flame in your opinion?
2      A.   Well, it's not a -- it's not an
3  absolute.  It's more of a propensity.
4          But we know that cigarettes laying
5  on top of upholstered furniture has a less
6  propensity for -- for allowing smoldering ignition
7  to occur on the polyurethane foam.  We can also
8  look at it in a -- when I say crevice, I mean a
9  90-degree angle.  But you're losing a lot of energy
10  from the cigarette that's not being transferred to
11  the foam.
12         So what they found, but they
13  unfortunately don't test for it, is a lot of times
14  cigarettes are dropped, lost, and they get into
15  crevices.  So somebody sits on a three-cushion
16  couch, when you sit on one of the cushions, you'll
17  actually open up a crevice.  If a cigarette goes in
18  there and somebody gets up, that will actually push
19  the cigarette between two -- two pieces of the
20  polyurethane foam and actually compress it and
21  highly insulate it.  And that's where the
22  propensity for smoldering ignition greatly
23  increases.  And it also hides the cigarette.
24  Somebody doesn't see it.

Page 223

1          It also is commensurate with it --
2  the foam being a filter for smoke, so you don't see
3  the smoldering wave propagating, and you're not
4  seeing smoke being displaced from the smoldering.
5  Just like a -- in a cigarette, you have a foam --
6  foam filter on the end to remove the -- the smoke
7  particles that can be visualized.
8          So all of this is consistent with
9  that.  So it's more likely that because nobody
10  found the cigarette and that the -- you know, that
11  the propensity is greater that it probably got into
12  a crevice.
13      Q.   Before forming your opinions in this
14  case, did you do any testing or experiments with
15  different placement of cigarettes to determine if a
16  smoldering cigarette could ignite into flame?
17      A.   I didn't do testing.  I used the
18  testing that's in the available scientific
19  literature.  There's a wealth of tests and -- that
20  are described and analyses that are described in
21  the available scientific literature.
22      Q.   In your affidavit that we previously
23  marked as an exhibit, you say that a smoldering
24  cigarette can ignite and erupt into flame in as

Page 224

1  little as 20 minutes.
2          Is that your opinion in this case?
3  That the smoldering cigarette erupted into flame in
4  as little as 20 minutes?
5      A.   No, that is not my opinion.  I said
6  that's the broad range of times that have been
7  recorded in actual fire testing.
8      Q.   And whether it erupts into flame or how
9  long it takes to erupt into flame is going to be
10  highly dependent on the nature of the material that
11  comprises that upholstered chair, correct?
12      MS. GARCIA:  Objection to form.
13          You may answer.
14      THE WITNESS:  It has something to do with the
15  different types of polyurethane foam, but it has
16  more to do with the actual transport and the
17  smoldering wave.  In order -- if you get deep
18  in-depth smoldering, in order for it to transition,
19  you need to get that smoldering wave to get to the
20  outside surface of the polyurethane foam.
21          So if it's deep in the middle and
22  the smoldering wave is going up or -- due to
23  buoyancy, or if it's down at the bottom of the
24  cushion, it will take -- take more time.  So

Page 225

1  it's -- it also can be geometry.  It doesn't have
2  to be solely material dependent.  It certainly has
3  to be polyurethane foam.
4  BY MR. POLICK:
5      Q.   What if it's not polyurethane foam or
6  some -- and it's a different material?
7      A.   Well, if they can still smolder in
8  cotton, that's actually a high propensity for
9  smoldering.  So those are generally the two types
10  of cushion materials that are -- that are used in
11  upholstered furniture.
12      Q.   But before you formed your opinions in
13  this case, you didn't do any testing of smoldering
14  cigarettes on polyurethane foam or cotton, did you?
15      A.   I already answered that.  I said I used
16  the available scientific literature.
17      Q.   So the answer to my question is no, you
18  did not do that type of testing, correct?
19      A.   Correct.  I did not do test -- specific
20  testing.
21      Q.   And the research you're referring to
22  shows that a smoldering cigarette could transition
23  to an open flame in a range of 22 to 306 minutes,
24  with the average time to flaming being 88 minutes;

DOUGLAS J. CARPENTER, 03/31/2021                    Page 226..229

Page 226

1  is that correct?
2      A.    That's what the literature describes,
3  yes.
4      Q.    So in your opinion, how long did it
5  take the cigarette that was left in the upholstered
6  reclining chair to transition into a flame?
7      A.    I've already answered that question.
8      Q.    Well, you're going to have to answer it
9  again, sir.
10     A.    Somewhere in the time frame of
11 20 minutes to -- to 5 hours.
12     Q.    You cannot be any more specific than
13 that, correct?
14     A.    Correct.
15     THE WITNESS:  How about if we take a little
16 bit of a break?
17     MR. POLICK:  Sure.
18     THE VIDEO TECHNICIAN:  We're off the video
19 record at 3:48 at the end of media unit 3.
20         (Recess taken.)
21     THE VIDEO TECHNICIAN:  We are back on the
22 video record at 4:01 at the beginning of media
23 unit 4.
24

Page 227

1  BY MR. POLICK:
2      Q.    All right.  Mr. Carpenter, do you
3  understand you're still under oath?
4      A.    Yes.
5      Q.    Going back to the modeling for a
6  moment, did you yourself do any of the six runs of
7  the CFAST, or was that all done by Mr. Boehmer?
8      A.    That was done by Mr. Boehmer.
9      Q.    And as part of the input information,
10 was the mass of the upholstered reclining chair
11 inputted into the CFAST model?
12     A.    No, that's not how the model's designed.
13     Q.    And the smoke transition from the
14 living room to the master bedroom that you
15 determined based on the model, is that consistent
16 with both chairs or only one chair in the living
17 room being on fire?
18     A.    What is consistent with that?
19     Q.    I'm sorry?
20     A.    What is consistent?
21     Q.    The findings of the amount of smoke and
22 its transition from the living room to the master
23 bedroom, is that consistent with one chair or both
24 chairs in the living room being on fire, or is that

Page 228

1  something the model is not designed to do?
2      A.    No, we could have input both fires.  We
3  only did one.  So if he had two fires going, then
4  you would have a smoke transfer time even less than
5  what we had.  So it was -- if you want to look at
6  it as being conservative is the longest time that
7  you would have.
8      Q.    Does your opinion on the origin of the
9  fire change if the cigarette was intentionally
10 placed in the upholstered reclining chair rather
11 than carelessly left there or lost in the chair?
12     A.    Would my opinions or my modeling?
13     Q.    Your opinion.
14     A.    If there was evidence of intent,
15 following NFPA 921, then that would disprove the
16 hypothesis of the accidental fire cause and would
17 allow the formulation of an incendiary fire cause.
18         But I have no evidence of that, of
19 intent.
20     Q.    Can you rule out that the cigarette was
21 intentionally placed in the upholstered reclining
22 chair based on your scenario?
23     A.    Well, you don't rule things out until
24 you rule them in.  So you need evidence to

Page 229

1  formulate the hypothesis, and then you have to try
2  to disprove that hypothesis using the scientific
3  method.
4          So you can't just rule things out
5  without evidence.  So you would need evidence of
6  intent, and then you would try to find other
7  evidence that might disprove that.
8          So your application or your question
9  violates the scientific method.
10     Q.    So if you did have evidence of intent,
11 that is something you could use in the scientific
12 method?
13     A.    In the context of incendiary
14 hypotheses, yes.  You need an incendiary fire cause
15 as the element of -- well, ultimately, you have to
16 find evidence of intent to start a fire where one
17 would not have otherwise occurred.
18     Q.    And did you say as part of the modeling
19 you -- you did test from the farthest point in the
20 living room as measured to the master bedroom door?
21     A.    I don't believe I said --
22     Q.    Is that part of the -- I'm sorry.  I
23 didn't mean to interrupt.  Go ahead.
24     A.    I did answer that question.  That fire

DOUGLAS J. CARPENTER, 03/31/2021                    Page 230..233

Page 230

1  was put into the -- to the living room, and what
2  happens is the flume will develop and it will
3  impinge with the ceiling, and then it will go out
4  radially.  And then it will be -- you know, flow in
5  all directions until you hit a barrier, which are
6  the walls and the soffit to the hallway and the
7  soffit to the dining room.  And then the layer will
8  build, and it will move on from there.
9         So the model isn't really -- the
10 phenomena isn't really sensitive to the actual
11 placement of the fuel in the living room in this
12 particular context.  And if it was, it wouldn't
13 change the outcome much.
14     Q.   In arriving at your opinions and
15 conclusions in this case, did you consider ignition
16 sources other than a smoldering cigarette?
17     A.   I certainly considered those as part of
18 the scientific method, yep.  But what was
19 consistent was the toxicology specific to a
20 smoldering cigarette with a polyurethane foam and
21 the 911 call with the victim.
22     Q.   Did you consider a flame from a candle
23 that was noted by Mr. Amor to have been in the
24 living room as a competent ignition source?

Page 231

1      A.   Certainly as a com -- as a competent
2  ignition source, but that's not what's required in
3  this particular case.  You -- your ignition source
4  needs to be in your area of origin.
5         So if your chair's the area of
6  origin, the candle needs to be -- there needs to be
7  evidence of a candle having been there.
8         But again, the toxicology doesn't
9  work for that.  There's the very specific scenario
10 that causes the most residential deaths, and that
11 is cigarette ignition of upholstering, and there's
12 a -- the development of hydrogen cyanide as a
13 result of that transitioning from smoldering to
14 flaming that creates a very toxic environment that
15 can knock people down almost instantaneously.  And
16 that's what we experienced in this particular case.
17     Q.   Are you basing that on the toxicology
18 that was part of the autopsy findings?
19     A.   No.  I'm basing it on the available
20 scientific literature and the paper --
21 peer-reviewed paper that we wrote on the use of
22 toxicological data in fire investigation.
23     Q.   And the toxicology that was part of the
24 autopsy in this particular case, was there any

Page 232

1  information about the toxins that you are speaking
2  about being found in Ms. Miceli's body postmortem?
3      A.   No, we didn't find those.  What I said
4  was that the situation will create a -- you know, a
5  well-defined scenario where you will produce HCN,
6  and HCN will provide rapid knock -- knockdown, and
7  that is what is consistent with the evidence in
8  this particular case.
9         Though again, it's the -- it is that
10 particular hypothesis consistent with what happened
11 in this particular case.
12     Q.   But that would assume that the material
13 of the upholstered reclining chair was this
14 polyurethane foam that you're -- you're referring
15 to, correct?
16     A.   Correct.
17     Q.   Did you consider a disposable cigarette
18 lighter as a competent ignition source?
19     A.   For what?
20     Q.   For the upholstered chair.
21     A.   Yes, but it's no different than the
22 candle.  There's -- I would need evidence of that.
23         But also, a flaming fire starting --
24 initiating in the polyurethane foam doesn't require

Page 233

1  the -- or it doesn't meet with the production of --
2  it wouldn't have a smoldering fire, and that
3  smoldering fire would then cause to transition --
4  at transition the development of HCN, which again
5  is consistent with the observations in this case.
6  So a flaming ignition of polyurethane foam does not
7  make -- is inconsistent with what happened in this
8  case.
9      Q.   In forming your opinions and
10 conclusions, were you able to rule out the use of
11 accelerants in this fire?
12     A.   Again, you're turning the scientific
13 method on its head.
14         You have to find evidence of that
15 first and then be able to find evidence to try to
16 rule it out as part of the application of the
17 scientific method.  So you don't just rule
18 something out.  That implies that everything --
19 every possible scenario that anybody could ever
20 come up with would be in play, and that's just --
21 that's a highly unreliable methodology.
22         So the question is do -- did I find
23 any evidence of flammable liquids in this case?  No.
24     Q.   Is it true that most flammable liquids

DOUGLAS J. CARPENTER, 03/31/2021                    Page 234..237

Page 234

1 or accelerants are consumed during a fire,
2 especially one where you have flashover occurring?
3       MS. GARCIA:  Objection --
4       THE WITNESS:  It can.
5       MS. GARCIA:  -- to form.
6       THE WITNESS:  It can be consumed.
7 Sometimes -- most of the time, you can find some
8 residuals that might suggest.  But as you -- as you
9 lose more and more of the components, it's harder
10 and harder to identify.
11        But you know, therein lies again an
12 application of the scientific method.  You're
13 supposed to consider alternative hypotheses.  So if
14 you don't find flammable liquids or ignite -- we
15 should be calling them ignitable liquids in this
16 particular case, yes, they can be destroyed.
17 That's one hypothesis.
18        The other hypothesis is they never
19 existed.
20        So you have no evidence for either
21 of them.  So it becomes -- there is no evidence of
22 the presence of ignitable liquids.
23 BY MR. POLICK:
24    Q.    So the fact that no remnant of

Page 235

1 ignitable liquid was found doesn't mean that it was
2 not used to ignite this particular fire, correct?
3       MS. GARCIA:  Objection to form; also
4 incomplete hypothetical.
5       THE WITNESS:  Well, again, I just -- I think
6 I just explained that.  That it -- that same piece
7 of data can be used to formulate different
8 hypotheses.
9        And those two hypotheses are yes, it
10 was there, and it was consumed as part of the fire.
11 And we didn't find it either because it was
12 destroyed, or there wasn't enough residual
13 components to be able to make a reliable
14 determination, or we didn't take a sample in the
15 right place.
16        The other alternative hypothesis, it
17 never was there.
18 BY MR. POLICK:
19    Q.    So basically you cannot draw any
20 conclusions one way or the other whether it was
21 present or not present.
22    A.    Not without evidence.
23    Q.    Based on the evidence in the case, do
24 you know what accelerants were available in the

Page 236

1 apartment?
2    A.    Well, there would be ignitable liquids.
3 Nothing -- nothing stood out to me that was -- that
4 would be considered an ignitable liquid and an
5 accelerant.
6        But again, those are just
7 possibilities.  I mean, that's -- and that would
8 be -- arriving at any determination based on
9 possibilities is subjective.  It's an unreliable
10 methodology.  You need evidence.
11    Q.    Well, if there's an ignitable liquid,
12 like for example charcoal lighter within the
13 apartment, isn't that something that should be
14 considered?
15    A.    Considering is different than
16 formulating a hypothesis.  So yes, you can consider
17 that, but without evidence, you can't formulate it.
18 That's how -- that's the difference between using
19 the scientific method in a reliable manner or an
20 unreliable manner.
21    Q.    Is butane cigarette lighter an
22 ignitable liquid?
23    A.    That's not an easy question to answer,
24 because butane is -- well, it's the liquid -- it's

Page 237

1 not the liquid that burns.  It's the vapors that
2 come off of it.  So and butane in lighters are in a
3 pressurized cell to keep them at liquid.  But once
4 you release it into the air at normal atmospheric
5 pressure, they become a gas.
6        So they wouldn't really be
7 considered an ignitable liquid because they have to
8 be in a container under pressure.
9    Q.    How about nail polish remover?  Is that
10 an ignitable liquid?
11    A.    I'd have to go back and look at the
12 flashpoint of it.  I don't know off the top of my
13 head, to be honest with you.
14    Q.    So are you saying based on the
15 scientific method that if remnants or indications
16 of these ignitable liquids are not found you cannot
17 begin to formulate any hypothesis based on them?
18    A.    Yes.  The scientific method allows you
19 to consider hypotheses based on your knowledge,
20 experience, but you need -- in order to take it to
21 the next step, which is actually formulating a
22 hypothesis, you need evidence.
23        So in other words, when you consider
24 it, you say, this is possibly what could have

DOUGLAS J. CARPENTER, 03/31/2021                    Page 238..241

Page 238

1 happened.  But the reality is we don't really care
2 what could have happened, we want to know
3 ultimately what did happen.  And the only way to
4 reliably do that is to have evidence in this
5 particular case.
6        So if I go into a building and it
7 has a fire and somebody said, Oh, yeah, there was a
8 bunch of people here who were working.  They were
9 putting linseed oil onto -- onto walls, and they
10 were using rags.
11           Okay.  I want to consider that, so
12 I'm going to start looking for evidence that that
13 occurred in this particular case.  I'm going to
14 want to find or have some evidence that -- that
15 there were actually rags with linseed oil left.
16 You know, how many rags, those type of things.
17           But if I don't have that, then --
18 then I can't formulate that hypothesis.  It may
19 have been present, but there's no evidence that
20 that's what occurred in this particular case.
21    Q.    In arriving at your opinions and
22 conclusions in this case, did you do any testing of
23 lit cigarettes smoldering in newspaper?
24    A.    No.

Page 239

1    Q.    What does the research show about the
2 viability of a smoldering cigarette to ignite into
3 flame when placed on newspaper?
4    A.    I don't know if that was -- I'd have to
5 go back and look specifically.  I know there was a
6 number of tests done by the ATF looking at
7 cigarettes being disposed of in trash baskets and
8 different barrels, and the propensity tends to be
9 fairly low.
10           But I don't know if anybody's
11 done -- I know that we've done stuff with pieces of
12 paper.  And what ends up happening is you get a
13 glowing smolder of the paper, and it just burns
14 away from the cigarette, and then as it gets
15 further away, there's less and less heat flux and
16 it really doesn't ever ignite.
17           It's pretty -- can be pretty
18 difficult for a cigarette to ignite something, then
19 smoldering, and then -- and transition to flaming.
20    Q.    Does the way the newspaper is placed
21 affect the ability of a smoldering cigarette to
22 ignite it?
23    A.    It can change the propensity for it,
24 yes.

Page 240

1    Q.    How so?
2    A.    Well, it depends.  In certain cases,
3 you need to have a certain heat flux that's being
4 transferred to the material, and so that becomes --
5 can become a heat transfer issue.
6        So if I have a cigarette out in the
7 open versus a cigarette buried in material, the
8 density of that material can matter, the shape, the
9 configuration, the depth.  Those type of things can
10 play a role in whether smoldering can -- can occur
11 or not.
12    Q.    Has there been any research or studies
13 done to show how long it would take a smoldering
14 cigarette to ignite newspaper?
15    A.    I'm sure there is.  It depends on -- if
16 you're just talking about newspaper.  If you're
17 talking about crumpled paper, I know that there is
18 research or testing that's been done related to
19 that.
20           I don't know if anybody's done
21 specifically, or doesn't come to mind, just taking
22 a cigarette and placing it on newspaper without any
23 other characterization of the newspaper.
24    Q.    Right.  And I'm not referring to like

Page 241

1 newspaper being stacked, but what does the research
2 show about crumpled paper that you were referring
3 to?
4    A.    Well, it's crumpled paper.  I believe
5 that it was representative of materials that you
6 might find in waste paper baskets, and so it wasn't
7 just -- it wasn't just newspaper or wasn't just
8 paper towels or just wasn't plain sheets of paper
9 crumpled, uncrumpled, shredded.
10           But those things together, I know
11 that there is some testing of it.  It's been a
12 while since I've reviewed that.
13    Q.    You indicated in your affidavit I
14 believe that the burn patterns that were noted in
15 the carpeting were not inconsistent with an
16 accidental cause of the fire; is that correct?
17    A.    Where was that?
18    Q.    In your affidavit.
19    A.    Can you point me to it?  Can you put it
20 up on the screen?
21    Q.    I can try.
22        So this is Exhibit 2.  We're at
23 page 40, paragraph 84.
24           And you state there:  My

Urlaub Bowen & Associates, Inc.    312-781-9586

Page 242

1  professional opinion about the meaning of the
2  fire -- I'm sorry.  Let me start again.
3          My professional opinion about the
4  meaning of the fire patterns in the Amor/Miceli
5  residence is that these patterns show nothing that
6  would be inconsistent with an accidental fire cause
7  that produced post flashover conditions within the
8  living room.
9      A.  Right.  And then it continues and says:
10 The determination that the fire patterns on the
11 floor were a result of an incendiary fire involving
12 ignitable liquids is the product of a
13 scientifically unreliable methodology, and any
14 opinions resulting from this would be deemed
15 scientifically unreliable.
16         So yes, there's nothing here that
17 says that those patterns would be developed
18 uniquely consistent with the use of an ignitable
19 liquid versus other modes of heat transfer, you
20 know, inherent in any fire, regardless of the
21 presence of ignitable liquid.
22     Q.  So are you saying that the burn
23 patterns in the carpeting are inconsistent with the
24 involvement of an ignitable liquid?

Page 243

1      A.  They don't -- I'm saying they don't
2  have to be.  They're not uniquely consistent with
3  that.
4      Q.  But you can't rule it out.
5      A.  I can't rule it in.  I can't say that
6  that -- there's no evidence that they existed.
7  That can happen without the presence of ignitable
8  liquid, so that's not evidence that that -- that
9  that happened in this case.
10     Q.  I want to return to your report that we
11 marked as Exhibit 1 at page 9 of the report.
12         So in this section of your report,
13 Mr. Carpenter, you're discussing the flashpoint
14 testing of the vodka that was done by your
15 corporation?  You see that?
16     A.  Yes.
17     Q.  Okay.  Can you describe for me or
18 explain what the testing was that was done here.
19     A.  Sure.  This is -- the testing for
20 flashpoint and firepoint, I used a subscribed
21 apparatus and a subscribed methodology according to
22 the AT -- ASTM standards, and we happen to have
23 those -- that test.  This was done in what's called
24 an open-cup flashpoint, which is relevant to the

Page 244

1  situation that you would supposedly have here in
2  terms of the hypothesis being tested.
3          So what happens is you fill a
4  crucible, if you will, with the liquid, and you
5  measure the temperature of the liquid over time as
6  you're heating it.  So you start at room
7  temperature or you start at some temperature below
8  room temperature, and then you use a heater to
9  slowly heat up the liquid over time.  And as the
10 temperature of the liquid is rising, you pass over
11 the vapor space, if you will, with a -- with a
12 piloted ignition source; a small flame, well
13 prescribed.
14         You cast that across.  And if you
15 get a flash of combustion, a nonsustained
16 combustion, then that's what you record as the
17 temperature for the flashpoint.
18         The firepoint takes it one step
19 further and says, All right, we're going to
20 continue to increase the temperature, pass the
21 flame over it, and if we get sustained flaming,
22 then that's called what's referred to as a
23 firepoint temperature.
24         So this is a well-established

Page 245

1  apparatus and methodology that we actually have
2  here.  We calibrated it.  We used a calibrated
3  liquid that's in the standard to make sure that our
4  apparatus and our methodology produced the same
5  results before we actually did the 80-proof vodka
6  testing.
7          And yeah, we did three tests, and we
8  looked at flashpoint and flame point and then got
9  the average of those that are reported here in
10 the -- in the report.
11     Q.  So you did three tests and then took
12 the average of the three tests?
13     A.  Yep, yep.  You need -- you need three
14 data points to be able to do any type of
15 statistical analysis.  I mean, they were so close
16 that it -- there was no reason to do any type of
17 statistical analysis for error rate.  But yeah,
18 they're -- they're fairly repeatable.
19     Q.  Okay.  So you anticipated my next
20 question, which was:  Was there any error rate
21 between the three tests, and it appears that they
22 were fairly consistent, correct?
23     A.  They're not only consistent, but they
24 were -- as part of the ASTM standard, they do round

DOUGLAS J. CARPENTER, 03/31/2021                    Page 246..249

Page 246

1  robin tests of many different laboratories with
2  similar test apparatus, and they go through and
3  they can determine over a large number of -- or as
4  part of the round robin, they can estimate the
5  temperature or the uncertainty.
6         What we did was we went back and
7  said, Okay, if this is what the test and the
8  uncertainty of this measurement is, we fell within
9  that, so -- with our -- with our calibrated liquid.
10 So our -- we're doing exactly what the -- how the
11 test was intended to be implemented.
12     Q.   And when you say there's a small flame
13 used to determine the flash and then the sustained
14 flaming, is that an open flame in the apparatus?
15     A.   Yes.  It's a piloted ignition source
16 with an open flame.  That is correct.
17     Q.   And then when you say there was no
18 ignition at nominal room temperature of 70 degrees,
19 are you saying that you heated the cup of 80-proof
20 vodka to 70 degrees and -- and didn't get it to
21 ignite?
22     A.   Well, every test would be -- we would
23 start just slightly below on the temperature of the
24 laboratory, which is maintained at about

Page 247

1  70 degrees F.  So you start a little bit lower and
2  you go up, and obviously we passed through that
3  temperature range.
4         So yes, we can say that that -- that
5  did not ignite at 70, and it only did when we got
6  up, you know, into the higher 80s and 90s.  So yes,
7  I mean, it's inherent in the test, but we didn't
8  test specifically for 70 degrees.  We passed
9  through that and didn't get ignition.
10     Q.   All right.  So it's the temperature of
11 the liquid itself, not -- not the room temperature
12 that you're rising or lowering here, correct?
13     A.   Well, that's what the flashpoint is.
14 It represents -- yeah, you got to heat the liquid
15 to a point where you're getting sufficient
16 volatiles that actually form a flammable vapor.
17         So that's what you're really testing
18 for is at what temperature liquid do you get a
19 flammable vapor that occurs over the top of the
20 liquid and burns.  Remember, it's not liquid that
21 burns; it's the vapors.  And the vapors have to mix
22 with air in certain proportions to be flammable.
23     Q.   So is that why -- just to use an
24 example of using liquor in cooking where the vapors

Page 248

1  will ignite, is that because they've been heated to
2  a certain point that allows the ignition to occur?
3     A.   Yes.  Usually that's done in a very hot
4  frying pan.  So you've actually can -- it gets so
5  hot that you can actually reach a certain -- it's a
6  phenomena that I'm not going to go into, but you
7  know, the liquid goes in and basically flash
8  vaporizes.  There's -- it doesn't boil.  It just
9  goes right from -- from liquid to vapors.  And that
10 when you get the pan hot enough and you put in a,
11 you know, liquid, that can -- can immediately flash
12 to a vapor, and that's when you get the large --
13 the large fire.
14     Q.   All right.  And then after determining
15 the flashpoint and the firepoint of 80-proof vodka,
16 you go on to talk about competent ignition sources,
17 correct?
18     A.   That is correct.
19     Q.   So in your experiment, did you actually
20 try to ignite the vodka even at higher temperatures
21 with a lit cigarette?
22     A.   No.
23     Q.   So you're relying on other research
24 literature about whether a lighted cigarette is a

Page 249

1  competent ignition sources?
2     A.   Competent ignition source for what?
3     Q.   For 80-proof vodka.
4     A.   I'm relying on this testing, but I'm
5  also relying on the literature that is presented by
6  Hollyhead and Babrauskas.
7     Q.   And according to that research, it
8  doesn't include studies on cigarette ignition on
9  vodka vapors, correct?
10     A.   Well, that's -- it's -- as I talk about
11 in the report, it does actually have a mixture of
12 ethanol, which is part of 80-proof vodka.  And I go
13 on and explain why this can be used as a surrogate
14 for determining whether it's a competent ignition
15 source or not, so ...
16     Q.   Right.  Can you explain that?  I guess
17 that's the part I'm not understanding.  Why -- how
18 the ethanol is a surrogate for the -- for the
19 80-proof vodka.
20     A.   Well, it is in the sense of -- so vodka
21 is made of ethanol and water, okay.  So pure
22 ethanol is going to have the lowest flashpoint, and
23 as you add water, the flashpoint is going to go up
24 because water can absorb a lot of energy before it

Page 250

1  transitions in phase.  That's why it's a good fire
2  suppression agent.
3          And so it basically absorbs the
4  energy that's being put in.  So you would expect to
5  have a much higher flashpoint as a result of that.
6  And it's a 40/60 general mixture.
7          So what we do is we go back and we
8  say, Well, ethanol is ignited, can be ignited, has
9  a flashpoint of 55.  So we know that at the
10  temperatures in this apartment that it would
11  have -- that it would have ignited if the
12  cigarette -- if the flashpoint -- or I should say
13  the ethanol was ignitable, okay.
14          So now what we can do is say, if I
15  can introduce a competent -- or an ignition
16  source -- we don't know if it's competent at this
17  point -- then we can test that.  And we know at
18  that point that the -- we are testing -- we're
19  isolating the cigarette as the competent ignition
20  source as opposed to looking at both whether the
21  cigarette is competent and whether the liquid can
22  be ignited.
23          So we know in this case that it can
24  be ignited, and we have -- you know, based on the

Page 251

1  the flashpoint, and we also know based on the
2  testing that was observed.
3          So now if we introduce a cigarette
4  to this ethanol, which was done in these tests,
5  then we can say that the cigarette is not capable
6  of igniting ethanol that can be ignited with
7  other -- you know, with a piloted flame.
8          So in this particular case, while
9  it's ignitable with a piloted flame, it's not
10  ignitable with a non-piloted flame, which is really
11  a glowing surface of the cigarette.
12     Q.    So if the vodka was 100-percent
13  ethanol, it is ignitable at room temperature,
14  depending on whether you have a competent ignition
15  source?
16     A.    That's correct based on the flashpoint,
17  but that would require a flaming ignition source, a
18  piloted ignition source, which is an easier
19  ignition or more competent ignition source than a
20  smoldering -- smoldering material.  And there's
21  chemical reasons for that.
22     Q.    So you would need an open flame to
23  ignite the 100 percent by volume ethanol at room
24  temperature?

Page 252

1     A.    Yeah.  According to the -- to the
2  flashpoint, yeah.  The piloted flame has -- because
3  it is already ignited and involved in combustion,
4  has the required chemical radicals that are needed
5  to initiate ignition of the vapors.  They're
6  already present.
7          They're not present in the
8  cigarette, so it takes a lot more heat to do that.
9  And there's also other issues with the cigarette
10  that Hollyhead goes into of why it's very difficult
11  for cigarettes to ignite most vapors coming from
12  ignitable liquids.
13          We have quite a bit of research on
14  ignition of gasoline, which has always been sort of
15  an issue in the fire investigation community, and
16  also Coleman fuel.  Tests done by the ATF show that
17  cigarettes cannot ignite gasoline and cannot ignite
18  Coleman camping fuel.
19     Q.    And again, we're talking about the
20  vapors of those ignitable liquids, not the liquid
21  itself, correct?
22     A.    Well, yeah, that's -- as I've talked
23  about a number of times, it's not the liquid that
24  burns; it's the vapors.  And the amount of --

Page 253

1     Q.    So here --
2     A.    -- vapors produced are contingent on
3  the temperature of the liquid.
4     Q.    So here what you're saying is that at
5  room temperature, 100 percent by volume ethanol is
6  not going to ignite using a lighted cigarette,
7  correct?
8     A.    Correct.  That's what the research
9  here -- they did testing.  If you look at the
10  papers and that's what they showed, yes, so --
11     Q.    And -- and therefore based on that
12  research, it's not going to be -- a lighted
13  cigarette is not going to light 80-proof vodka
14  because that would have a higher flashpoint,
15  correct?
16     A.    Than ethanol, yes.
17     Q.    Did you actually run any tests to -- or
18  experiments to verify that yourself, other than the
19  heating of the -- and lighting it
20  with the piloted open flame?
21     A.    I went -- just as talking about this
22  case with my children, and they said, Well, let's
23  see if we can ignite vodka with a lighter.  So we
24  took a Scripto lighter and poured some vodka into a

DOUGLAS J. CARPENTER, 03/31/2021                    Page 254..257

Page 254

1  cup and tried to ignite it, and it obviously didn't
2  happen, and I know from that.  I did not introduce
3  a cigarette.  We don't smoke.  We don't have
4  cigarettes at our house.
5           But knowing about the chemistry and
6  the physics of those competent ignition sources or
7  ignition sources, I know that if it won't ignite
8  with a piloted flame, it's not going to ignite with
9  a lit, smoldering source or a heat -- or a hot
10 surface ignition.
11     Q.    If it were 100 percent by volume vodka,
12 would that ignite with an open flame at room
13 temperature?
14     A.    Yes, because that's what the flashpoint
15 shows, right?  It shows a pure 100 percent by
16 volume ethanol has a flashpoint of 55 degrees F.
17     Q.    Is there any other testing that you've
18 done in this matter to arrive at your opinions and
19 conclusions that we have not discussed at this
20 deposition?
21     A.    No.
22     Q.    Do you have any plans to do any further
23 testing with regard to this particular matter?
24     A.    Not as I sit here today.

Page 255

1      Q.    Do you have any plans to do any other
2  computer fire modeling as it relates to this
3  particular matter?
4      A.    Not as I sit here today.
5      MR. POLICK:  All right.  Why don't we take a
6  quick break and I'll just look over my notes here
7  and see if we can wrap this up.
8      THE VIDEO TECHNICIAN:  We're off the video
9  record at 4:44.
10         (Recess taken.)
11     THE VIDEO TECHNICIAN:  We're back on the
12 video record at 4:49.
13     MR. POLICK:  All right.  At this time,
14 Mr. Carpenter, we're going to suspend the
15 deposition.  We believe that the failure to provide
16 the materials, the documentation, the videotape and
17 photographs, and whatever else exists with regard
18 to the flashpoint testing that was done on the
19 vodka is a discovery violation here.  And we
20 certainly were not provided with those materials
21 and --
22     THE WITNESS:  Those materials don't exist, so
23 what was -- what was recorded were the
24 temperatures.  There's no videotape, there's no

Page 256

1  pictures, and those -- that data has been
2  transferred into my report, so ...
3      MR. POLICK:  All right.  But we don't have
4  any of the underlying data, and I think that's kind
5  of contrary to the testimony you gave earlier in
6  this dep.
7           But I'm not going to beleaguer it
8  with you at this point.  I will take that up with
9  Counsel.  And we are going to suspend the
10 deposition at this time rather than conclude it and
11 reserve our right to seek further questioning once
12 this matter is resolved.
13     MS. GARCIA:  And plaintiff objects to the
14 suspension of the litigation, especially
15 considering the fact that Mr. Carpenter just said
16 that there is no underlying material in terms of
17 video or photo -- photographic evidence that has
18 been withheld in this case.
19         So Counsel may claim to suspend the
20 deposition, but plaintiff believes that they are
21 going to need to petition the Court if they wish to
22 suspend it and reopen it.
23     MR. POLICK:  Yeah.  We intend to seek
24 whatever court intervention we have to if we are

Page 257

1  not able to work it out in conference.  But I am
2  not going to take up time in the dep doing that at
3  this point.
4           So we will have our Rule 37
5  conference and try to resolve this issue and go
6  from there.
7      MS. GARCIA:  And again, plaintiff strenuously
8  objects to ending the deposition in this manner,
9  especially since Mr. Carpenter hasn't, I believe,
10 been understood in this matter.  He just testified
11 to the fact that he doesn't have photographic or
12 videog -- video evidence that you're seeking.  So
13 any purported discovery violation you are seeking
14 or claiming is purely speculative at this moment.
15     MR. POLICK:  Well, let's --
16     MS. GARCIA:  And as --
17     MR. POLICK:  -- let me ask the witness.
18     MS. GARCIA:  And as plaintiff's counsel have
19 said, we have turned over all the underlying
20 documentation that was provided to us.  We went
21 over the subpoena with Mr. Carpenter.  And in doing
22 so, he identified the CFAST data as the material
23 that he relied upon in forming this report.
24         Defense has received all that

DOUGLAS J. CARPENTER, 03/31/2021                    Page 258..261

Page 258

1  information.  Defense has also received an
2  unbelievable amount of production in which I believe some
3  underlying criminal case, in which I believe some
4  of this material may have been referenced in terms
5  of any sort of scientific modeling or testing.
6          So again, I do not believe there's a
7  discovery violation here.  You're well within your
8  right to preserve whatever time you have left in
9  the deposition.  But for the record, plaintiff does
10 not believe there's a discovery violation here and
11 objects to the suspension of this deposition.
12     MR. POLICK:  Well, let me follow up with a
13 few questions for the witness on that -- that point.
14 BY MR. POLICK:
15     Q.   You understand you're still under oath,
16 Mr. Carpenter?
17     A.   Yes.
18     Q.   When you were doing the flashpoint
19 testing of the vodka, I believe it was with
20 Mr. Hussain; is that correct?
21     A.   Correct.
22     Q.   Was there at one point while the
23 testing was being done videotape of the testing?
24     A.   No.  I checked with Nasir at one of the

Page 259

1  breaks, and no, there's no photographs or video.
2     Q.   And that's coming from Mr. Nasir
3  himself?
4     A.   Correct, yes.
5     Q.   And what about the underlying
6  documentation that was done of the flashpoint
7  testing of the vodka that you testified to earlier?
8  Where are those materials at?
9     A.   There is no materials.  It was done
10 on a -- I mean, it's based on an ASTM standard
11 that's publicly available.
12     Q.   But you told us today in your testimony
13 that you conducted three of these tests, and you
14 noted the output or results of each of those tests.
15 And earlier in this deposition, you testified that
16 there was documentation.
17          So please clarify for us whether
18 there was any documentation that was done during
19 this flashpoint testing of the vodka.
20     MS. GARCIA:  I'm just going to interrupt to
21 say I believe that misstates Mr. Carpenter's
22 testimony.  I think he said there may be
23 documentation, couching it in a conditional.  And
24 as he said -- and I'll let him answer your

Page 260

1  question, I'm not trying to impede on that.  But as
2  he said, he checked with Mr. Nasir to see if that
3  was the case, and it indeed is not the case.
4          But go ahead, Mr. Carpenter, you can
5  answer.
6     THE WITNESS:  Well, I think you covered it.
7          Yes, I went and talked to Nasir
8  during a break, and that's the information that I
9  have.
10 BY MR. POLICK:
11     Q.   So was it you or Mr. Hussain that did
12 the testing?
13     A.   I have answered that question before.
14 It was Mr. Hussain that did the testing.
15     Q.   Did Mr. Hussain take any notes while he
16 was doing the testing?
17     A.   No.  It's a total visual type of test,
18 and then he reported the temperatures.
19     Q.   When he reported the temperatures, did
20 he write down the flashpoint and the firepoint of
21 each test that was being done?
22     A.   Yes.  He provided that to me, yes.  And
23 I incorporated that into the -- into my report.
24     Q.   I'm not asking you what he provided to

Page 261

1  you.
2          My question is:  Did he write down
3  the results of each of the three tests to document
4  the flashpoint and the firepoint of the vodka as
5  each test was being done?
6     A.   Yes.
7     Q.   Where are those materials?  Where are
8  those documents?
9     A.   So he's provided me -- it's a single
10 page.  It's nothing more than flash and firepoint
11 for each of the tests.
12     Q.   And to my knowledge, that has not been
13 provided in this case.
14     A.   Outside of what's in my report.
15     Q.   Your report doesn't refer to three
16 tests being done, nor does it refer to any
17 documentation about the three tests.  So that's
18 what we're asking for here.
19     MR. POLICK:  And, Counsel, we'd ask that that
20 information be provided.
21     MS. GARCIA:  I mean, I don't believe that's
22 a, you know, discovery violation of the magnitude
23 you were indicating earlier.  And I do believe that
24 he has testified to the fact that it is in his

DOUGLAS J. CARPENTER, 03/31/2021                    Page 262..265

Page 262

1 report. But if he still has the piece -- single
2 piece of paper where Mr. Hussain wrote down those
3 numbers, we will produce it.
4        MR. POLICK: Thank you.
5             And we'll suspend the deposition
6 until we get that documentation. Thank you.
7        MS. GARCIA: Again, I strenuously -- as
8 plaintiff's counsel, strenuously object to the
9 suspension based on a single piece of paper with
10 the information that is included in Mr. Carpenter's
11 report.
12       MR. POLICK: We don't note whether it's a
13 single piece of paper or more than that.
14       MS. GARCIA: Mr. Carpenter
15       MR. POLICK: What we do know --
16       MS. GARCIA: -- just testified --
17       MR. POLICK: -- is that Mr. Nasir --
18       MS. GARCIA: -- that it's a single piece --
19       MR. POLICK: -- that Mr. Hussain --
20       MS. GARCIA: -- of paper.
21       MR. POLICK: Please -- please don't interrupt
22 me.
23             At the beginning of this deposition
24 or earlier in this deposition, we were told that

Page 263

1 there was a possible videotape, that there were
2 possible photographs. What we do know is three
3 tests were run and that certain documentation was
4 done of that -- those three tests. We don't have
5 the documentation of those three tests. So that is
6 what we were asking for here.
7             So your objection is noted for the
8 record. We're making a demand for the
9 documentation relating to those three tests on the
10 vodka flashpoint and firepoint that was testified
11 here to today.
12       MS. GARCIA: And plaintiff's counsel will
13 provide that with you. Mr. Carpenter however --
14       MR. POLICK: Thank you.
15       MS. GARCIA: -- to clarify, has testified
16 that there are no photographs or videos that
17 captured or documented the testing. And he has
18 also testified that the documentation amounts to a
19 single page upon which someone wrote down numbers.
20             So yes, we will produce that to you,
21 but basing that -- using that as a basis to suspend
22 a deposition as it's ongoing is -- I feel like is
23 not within the bounds of the federal rules, and I
24 also think is actively doubting Mr. Carpenter by

Page 264

1 your counsel's -- on your counsel's part because he
2 has testified here today that there is no more
3 documentation.
4             So we can suspend this deposition.
5 I can't force you to ask any more questions, but we
6 strenuously object to any further questioning here,
7 so ...
8        MR. POLICK: We won't know that until we get
9 the documentation that wasn't provided.
10            So your objection's noted, but we're
11 not concluding the deposition until we've been
12 provided with that documentation. Once we see it,
13 we can make another evaluation of it, but that's
14 where we stand.
15       MS. GARCIA: So we stand that if it's a
16 single piece of paper that plaintiff's counsel was
17 not aware existed and was not within --
18       MR. POLICK: Yes, we -- you've made your
19 point.
20       MS. GARCIA: -- if it was a single piece of
21 paper, we will --
22       MR. POLICK: Your objection --
23       MS. GARCIA: We will --
24       MR. POLICK: Your objection is noted for the

Page 265

1 record.
2        MS. GARCIA: -- file a motion for protective
3 order against any sort of --
4        MR. POLICK: Please --
5        MS. GARCIA: -- attempt to redepose --
6        MR. POLICK: Please produce the --
7        MS. GARCIA: Mr. Carpenter.
8        MR. POLICK: -- document and we can go from
9 there. Your objection has been noted for the
10 record. Please produce the document, and we can
11 continue this discussion from there. But we're not
12 going to continue on in the deposition until we
13 have that documentation. That's our position, and
14 we're done here with the questioning today.
15       THE VIDEO TECHNICIAN: Are we ready to go off
16 the record?
17       MS. GARCIA: Yes.
18       MR. POLICK: Yes, we're ready to go off the
19 record at our end. Thank you.
20       THE VIDEO TECHNICIAN: Okay. This concludes
21 today's deposition. We're going off the video
22 record at 5:00 o'clock at the end of media unit 4.
23            (The proceedings adjourned at
24             5:00 p.m.)

DOUGLAS J. CARPENTER, 03/31/2021                                    Page 266..268

Page 266

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION
3    WILLIAM E. AMOR,          )
                               )
4              Plaintiff,  )
                               )
5         vs.              )  No. 18 CV 2523
                               )
6    MICHAEL CROSS, et al.,    )
                               )
7              Defendants.  )
8
9          This is to certify that I have read my
10   deposition taken on Wednesday, March 31, 2021,
11   in the foregoing cause and that the foregoing
12   transcript accurately states the questions asked
13   and the answers given by me, with the changes or
14   corrections, if any, made on the Errata Sheet
15   attached hereto.
16
            _____
17             DOUGLAS J. CARPENTER
18
     No errata sheets submitted (Please initial)
19   Number of errata sheets submitted _____ pages
20   Subscribed and sworn to
     before me this _____ day
21   of _____ 2021.
22
     _____
23      Notary Public
24

Page 267

1          REPORTER'S CERTIFICATE
2     I, Katie K. Elliott, do hereby certify that
     DOUGLAS J. CARPENTER was duly sworn by me to
3    testify the whole truth, that the foregoing
     deposition was recorded stenographically by me and
4    was reduced to computerized transcript under my
     direction, and that said deposition constitutes a
5    true record of the testimony given by said witness.
6          I further certify that the reading and
     signing of the deposition was not waived, and the
7    deposition was submitted to Ms. Mariah Garcia,
     plaintiff's counsel, for signature.  Pursuant to
8    Rule 30(e) of the Federal Rules of Civil Procedure,
     if deponent does not appear or read and sign the
9    deposition within 30 days, the deposition may be
     used as fully as though signed, and this
10   certificate will then evidence such failure to
     appear as the reason for signature not being
11   obtained.
12         I further certify that I am not a relative
     or employee or attorney or counsel of any of the
13   parties, or a relative or employee of such attorney
     or counsel, or financially interested directly or
14   indirectly in this action.
15         IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office at Chicago,
16   Illinois, this 20th day of April 2021.
17
18         _____
           Illinois CSR No. 084-004537
19
20
21
22
23
24

Page 268

1    Errata Sheet
2
3    NAME OF CASE: WILLIAM E. AMOR vs MICHAEL CROSS
4    DATE OF DEPOSITION: 03/31/2021
5    NAME OF WITNESS: Douglas J. Carpenter
6    Reason Codes:
7       1. To clarify the record.
8       2. To conform to the facts.
9       3. To correct transcription errors.
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24
25         _____

Urlaub Bowen & Associates, Inc.   312-781-9586

**Exhibits**

**1 Carpenter 033121-1** 20:3
54:24 99:22 102:20 125:21 185:16
243:11

**2 Carpenter 033121-2** 100:20,24
101:13 105:12 241:22

**3 Carpenter 033121-3** 101:22
107:19

**4 Carpenter 033121-4** 115:21
116:1 121:15

**5 Carpenter 033121-5** 202:5,14

**$**

**$350** 55:22

**0**

**02523** 4:9

**1**

**1** 4:2 20:3 54:24 79:24 99:22
102:20 125:21 158:16 177:17
185:16 192:20 199:15 243:11

**10** 79:20 107:10 119:17 159:20
220:18

**10-minute** 79:19

**100** 32:16 251:23 253:5 254:11,15

**100-percent** 251:12

**10:03** 17:21 18:11

**10:05** 18:14

**11** 107:11

**11:37** 79:24

**11:50** 80:3

**12** 187:7,22

**13** 20:11

**14** 102:22

**14th** 116:13

**15** 63:4,11 64:20 146:12

**16** 63:17 102:22

**17** 20:17 187:7,23

**18** 4:9

**1995** 119:17

**1998** 16:10 26:17

**1:30** 150:7

**2**

**2** 80:4 100:20,24 101:13 105:12
150:7 163:13 177:17,18 199:15
241:22

**20** 4:14 16:4,7,8 17:6 49:15 220:18
224:1,4 226:11

**2000** 26:13 50:7,11 217:1

**2002** 26:19

**2004** 21:3

**2005** 30:2,3 51:23 52:3

**2009** 21:3

**2011** 25:24 26:2

**2012** 85:22 87:2

**2014** 85:22 100:21 101:3 102:16

**2016** 21:3,14 101:22 102:15 107:9,
20,21 150:21,24 151:3

**2018** 50:8,11 116:13 118:21 119:5
120:1,19

**2020** 6:11 32:1 35:21

**2021** 4:6 9:17,21 10:15 11:3 19:22
99:22 102:14 108:1,15 113:10
115:14 116:24 118:12,18 125:20

**21** 26:3

**218** 119:16 120:6,13,22 121:3,7,11

**21st** 150:20,24 151:3

**22** 113:10 115:14 116:23 118:17
225:23

**22nd** 9:17 19:21 102:14 106:24
108:1,15 113:6 118:12 125:20

**24th** 100:21 101:2 102:15

**25** 36:14

**26(a)** 113:21

**2:00** 150:10

**3**

**3** 101:22 107:19 150:11 226:19

**30** 146:11 147:24 148:1

**306** 225:23

**31** 4:6 107:11

**32** 55:3

**35** 105:12

**37** 69:3 257:4

**38293** 202:12

**38304** 202:11 205:20

**3:48** 226:19

**3D** 151:11,16

**4**

**4** 115:21 116:1 121:15 226:23
265:22

**40** 29:19 241:23

**40/60** 250:6

**42** 20:5 55:4

**45** 146:11

**4:01** 226:22

**4:44** 255:9

**4:49** 255:12

**5**

**5** 159:16,20 202:5,6,14 226:11

**5-minute** 79:19

**50** 32:16 57:13,16

**50/50** 56:16,20,24 65:22 66:6

**55** 250:9 254:16

**5:00** 265:22,24

**6**

**600** 4:15

**63** 121:17,18

**67** 36:15 101:19

**6:38** 158:14,21 188:17,23

**6:39** 158:18 189:1,9

**6:40** 188:2

DOUGLAS J. CARPENTER, 03/31/2021

**7**

**7**  128:20 138:20 142:4

**7.1**  139:3

**7.1.1**  138:13

**70**  246:18,20 247:1,5,8

**73**  105:13

**7:00**  149:12,20

**8**

**8**  6:10

**80-proof**  245:5 246:19 248:15 249:3,12,19 253:13

**80s**  247:6

**84**  241:23

**88**  225:24

**8:00**  149:20

**8th**  107:21

**9**

**9**  102:10 158:16 185:15 243:11

**90-degree**  222:9

**90s**  247:6

**911**  184:17 185:24 186:4 187:5,8, 16,21 188:1,10 189:8,11 190:5,19 191:7 194:20 200:4 201:15 203:3 204:12 206:23 207:6 209:8 210:21 213:4,11 230:21

**921**  50:1,3,10,17 51:6 103:22,24 104:15 228:15

**96**  121:18

**97**  116:16

**99**  26:19

**9:41**  4:3

**9:58**  17:18

**9th**  101:22 102:14 107:9,19

**A**

**a.m.**  4:3

**ability**  7:10 134:20 193:15 195:1 196:18 210:1 239:21

**absolute**  222:3

**absolutely**  77:5 104:9 154:2 161:17 194:17 218:19

**absorb**  135:23 249:24

**absorbs**  250:3

**Academy**  49:4,8

**accelerant**  236:5

**accelerants**  233:11 234:1 235:24

**access**  32:13 143:14

**accidental**  99:15,18 186:19 187:9 228:16 241:16 242:6

**account**  157:4 168:7 170:8 179:24

**accounting**  64:22

**accreditation**  32:19

**accuracy**  133:2,15 137:15 141:10, 11

**accurate**  103:7 105:10 142:10 150:21

**achieve**  133:16

**acknowledged**  41:15

**act**  144:11

**acting**  161:1

**action**  210:11

**actively**  50:22 94:3 263:24

**activities**  57:1,2

**actual**  122:2 127:19 142:17 155:13 188:2,10 216:12 217:5 224:7,16 230:10

**ad**  21:11

**add**  249:23

**adding**  173:14

**addition**  106:1 110:16,24 128:10

**additional**  90:16 139:10

**additions**  51:4

**address**  51:3

**adequately**  129:10

**adjacent**  159:7

**adjourned**  265:23

**adjunct**  22:7,16 25:13

**adjusting**  164:7

**advanced**  22:15 23:5

**advantages**  137:9

**affect**  7:10 219:16 220:4 239:21

**affected**  146:16 198:14

**affidavit**  12:16,21 85:21 100:2,21, 24 101:12,15,19 102:15 103:15 105:11 108:19 223:22 241:13,18

**affidavits**  102:16

**affiliated**  86:18

**agencies**  39:18 41:1

**agency**  54:4

**agent**  96:15 105:21 250:2

**agree**  62:16 97:7 213:16

**agreement**  62:16 88:11,21 89:1

**agreements**  62:9

**ahead**  81:7 148:11,21 229:23 260:4

**aid**  44:6

**air**  167:5,11,14,19,21,23,24 169:4, 10,21 180:14 237:4 247:22

**air-conditioning**  169:17

**aircraft**  19:7

**Alabama**  75:23 82:16

**Albany**  78:23

**alcohol**  91:23

**algorithm**  144:17 164:17

**allocated**  59:14

**allowed**  35:8 40:22 69:13 208:9

**allowing**  222:6

**alongside**  41:1,23 42:11

**alterations**  51:5

**altered**  162:24

**alternate**  50:2,10 51:8,10,14,19

**alternative**  195:13 234:13 235:16

**Amanda**  75:14 81:18

**Amor**  4:8 56:5 58:12,21 60:6 61:6, 15 76:13,19 80:14 83:14,17 85:14 105:20 115:1 116:23 117:11 118:9 119:13,24 120:5 122:13 123:4

129:13 130:20 135:18 145:9 230:23

**Amor's** 87:11 88:3 91:6,10 101:1 106:10

**Amor/miceli** 242:4

**Amors** 188:7

**amount** 52:9 59:19 114:14 123:8 158:2 182:21 192:19 216:20 227:21 252:24 258:2

**amounts** 135:3 143:2 263:18

**analyses** 53:1 223:20

**analysis** 31:20 52:11 56:16 57:4, 14,16 78:7 95:14 97:5,6,8,17 98:15 100:7,16 108:11 110:7 111:8 113:9 114:24 115:5,6,16 117:1,7 123:20 125:23,24 126:5,6 132:1 134:7 137:20 145:17,23 146:6 147:17 165:5,7 190:13 200:24 206:11 207:8,12 221:9 245:15,17

**analyze** 173:3

**anchor** 188:8,22 199:1

**anchored** 156:21 158:14

**anchoring** 186:5

**Andrews** 77:6

**Angela** 75:8

**angle** 222:9

**Annette** 78:1

**answers** 7:7,11

**Anthony** 72:23 75:19

**anticipated** 44:21 245:19

**anybody's** 219:18 239:10 240:20

**anymore** 40:21

**apartment** 70:18 71:12 72:18 80:17,19 81:17 82:21 83:8,21 84:3, 4,11,13,21 118:22,24 119:5,10 151:11,16 152:18,24 153:14 154:18 155:2 159:1 160:20 162:1 167:15 168:8 169:5,8,24 178:21 180:5,14 188:8 191:19 192:2 208:23 236:1,13 250:10

**Apartments** 73:14 75:12 78:21

**apologize** 135:24

**app** 140:6

**apparatus** 94:2 243:21 245:1,4 246:2,14

**appears** 69:9 101:14 121:20 151:10 245:21

**appendices** 9:9 20:12

**appendix** 9:16,21 10:14 11:3 20:13,16 55:2,8 62:21 102:20 107:9,10 116:16,21 118:17 121:16

**application** 23:21 45:2 221:7 229:8 233:16 234:12

**applications** 28:15

**applied** 46:14

**apply** 44:8 45:15 46:5 130:5

**applying** 14:10 31:20

**approach** 91:14 92:12 193:15

**approaches** 61:23

**appropriately** 151:21

**approximate** 56:9 156:14

**approximately** 158:5

**approximation** 129:22

**April** 150:20,24 151:3

**ARC** 51:22

**Arch** 73:6,10 78:14

**area** 45:5 46:15 79:18 132:2 138:1 162:5 179:3 180:3 231:4,5

**areas** 155:24 156:3,6 169:15 170:9 171:2 178:1,21

**argumentative** 213:14

**arising** 54:21

**Arizona** 95:21,24

**arrest** 43:14

**arrive** 254:18

**arriving** 111:17 113:4 230:14 236:8 238:21

**arson** 32:4 36:3 37:10,13,15,22 38:5,7,10,20 39:5,16 40:13 41:1,5 51:22 68:11,14,17 69:7,19 70:1,6, 12,19,21 71:1,19 72:3 73:5,6,7,10, 12,19

**article** 109:11

**asks** 57:5

**aspects** 45:21 76:3

**assess** 131:21 212:16

**assessing** 212:11

**assessment** 207:21

**assignments** 22:24

**assist** 204:21

**assistant** 21:24 22:5 25:12

**associate** 14:15

**Associates** 4:14,17

**Association** 30:5 32:4 36:3

**assume** 12:14 16:2 17:12 86:3 166:5 169:1 170:16 232:12

**assumes** 166:3,8 170:17

**assuming** 170:6 189:16 197:5 201:1

**assumption** 185:13

**ASTM** 243:22 245:24 259:10

**ATF** 96:15 122:4,6 123:6,7 239:6 252:16

**atmospheric** 237:4

**attached** 107:10

**attempt** 265:5

**attempted** 134:11

**attempting** 114:15

**attend** 42:19,20

**attention** 20:16 55:1 183:19

**attorney** 44:2 86:4,6,9,23 88:18 89:2,20,24 114:17

**attorneys** 13:6 55:12 86:12 91:6, 9,11

**audio** 6:20 10:18 18:6 135:22 148:13

**authored** 7:19 102:17 132:8

**authoritative** 103:21 104:8 105:3, 6,8

**authority** 43:14

**authorization** 59:18

**automate** 141:24

**automatically** 135:19 136:4,14

**Automobile** 78:10

**autopsy** 231:18,24

**availability** 67:20

**avenues** 168:12

**average** 225:24 245:9,12

**awake** 198:21

**aware** 94:17,20 96:2 97:24 99:17, 20 108:10 111:16 113:2 118:15,19 122:17 150:18,23 151:1 220:21 264:17

**B**

**Babrauskas** 249:6

**bachelor's** 14:16

**back** 10:20 11:8 17:20 18:13 25:22 33:23 40:5 41:10 42:21 62:20 63:4 66:15 71:8 80:2 86:16 88:10,22,24 89:9 90:14 102:19 105:11 107:8 110:19 111:4 114:14 121:14 138:16 144:1,8 147:10 150:9 158:19 161:5 162:14 167:10 169:11,21 170:3 172:22 175:24 185:15 189:12 192:23 193:5 195:16 197:2 199:4 202:11 207:22, 24 208:10,23 209:2 214:8 218:8 226:21 227:5 237:11 239:5 246:6 250:7 255:11

**backed** 158:14 188:18

**background** 97:15 136:1

**backing** 189:2,5

**Bailey** 118:21 119:6,16 120:1,7,13, 19,23 121:3,7,11

**balcony** 157:6 195:5 203:11,22 208:2

**Baltimore** 26:19 71:24 77:18 84:7

**banked** 157:2

**barely** 8:11

**barred** 67:24 68:1 79:14

**barrels** 239:8

**barrier** 216:11 230:5

**barriers** 180:21 215:22,23

**based** 27:18 28:24 37:2 66:1 67:7 95:16 96:12 99:16 132:6 133:13 147:2,20 153:19,22 158:20 161:8 163:23 168:3,20 170:6 174:11,18 175:12 176:24 177:22 178:24 179:16 182:5 186:15 189:8 192:19 193:10 198:20 199:23 200:5,24 202:24 203:15 205:14,15,17 209:12,15 213:11 214:15 227:15 228:22 235:23 236:8 237:14,17,19 250:24 251:1,16 253:11 259:10 262:9

**basic** 7:16 8:2,3 24:18 44:6,9,18 46:23 133:1 163:17 182:7 203:16

**basically** 15:15 17:1 31:16 34:10 35:16 40:19 46:9 53:12 68:8 110:2 138:4 147:23 168:11 178:7 184:12 186:13,21 188:19 189:18 192:13 200:2 205:23 207:3 235:19 248:7 250:3

**basics** 26:8 134:17

**basing** 231:17,19 263:21

**basis** 59:3 93:11,12 97:6 125:24 221:10 263:21

**baskets** 239:7 241:6

**Bates** 202:11 205:20

**beams** 152:23

**bearing** 152:23

**bed** 185:11

**bedroom** 124:16 126:4 132:4,18 139:13 146:8 157:3,21 158:17 163:17 164:2 165:2,17,22 171:14, 16 173:6,10,11,22 177:10 178:19 180:19 182:5 183:10 185:4,5,12,14 188:14,20 189:1,10 200:6 203:14 206:18 210:12 213:22 214:6 227:14,23 229:20

**bedrooms** 98:13

**began** 216:19

**begin** 237:17

**beginning** 4:1 80:3 150:10 226:22 262:23

**behalf** 4:7,23 5:1 65:6 84:15

**behave** 145:6,7

**behaves** 178:10

**behaving** 191:2

**beleaguer** 256:7

**believed** 97:24 212:16

**believes** 256:20

**bend** 194:1

**benefits** 177:21

**big** 191:17,18

**bigger** 194:11

**biggest** 219:24

**billed** 56:5 91:2

**billing** 62:1

**bit** 20:19 35:1 37:16 59:14 100:12 103:23 104:4 130:15 148:13 203:6, 7 226:16 247:1 252:13

**black** 144:11

**blamed** 73:1

**block** 196:18 207:15 209:20,24 212:12

**blockage** 191:22 206:2

**blocked** 193:24 194:4,5 195:5 196:2,12 205:21 206:1,6,12,23 207:4,10 210:15 213:18

**blocking** 192:5,7 195:14 197:8

**blocks** 195:22

**board** 48:15,17,21,24 49:3,7,10,12 56:3 155:8

**Bobbi-jo** 70:20 71:8 77:4

**Bobby** 71:24 77:21

**body** 44:17 46:9,10,12 47:9 51:12 109:24 110:4 111:10 115:20 126:8 193:18 201:10 211:16 232:2

**body's** 194:8

**Boehmer** 116:20 117:22,23 118:5, 11 119:5,10 120:5,17 121:2,10 130:18 131:4 137:22 138:6 145:11 150:16 151:2,21 227:7,8

**Boehmer's** 131:1

**boil** 248:8

**boilers** 19:8

**bono** 59:2

**books** 104:2,3,15

**borrowed** 126:3

**bottom** 14:9 146:13 171:5 224:23

**bound** 146:6 158:22 201:2

**bounding** 131:5 132:1 133:10 134:7 145:17,23 147:17 181:20 200:24

**bounds** 263:23

**Bowen** 4:13,16

**box** 144:11 152:20 161:12

DOUGLAS J. CARPENTER, 03/31/2021

**boxes** 8:5 160:20 186:6

**bracket** 124:18

**Bradford** 76:7 82:23

**brand** 215:10

**breadth** 33:6

**break** 70:2,3 79:17,19 80:9 130:2 148:7,12,23 149:3,5,14,17 158:1 159:19 226:16 255:6 260:8

**breakage** 157:5,9,14

**breakdown** 56:21

**breaking** 10:16,19 18:7 148:6

**breaks** 209:2 259:1

**Brent** 74:1 79:11

**Brett** 4:12

**briefly** 98:3,5

**bring** 93:4 208:18

**brings** 124:6

**broad** 215:6 220:5 224:6

**broadest** 31:22

**broke** 208:8

**broken** 74:23

**brought** 53:13 184:16

**bug** 138:23 144:7 175:5 176:3

**bugs** 139:22 144:14

**build** 15:1 27:8,9,12 84:3 230:8

**building** 70:18 80:13,17,19,22 81:2,15,17 82:10,22 83:8,10,11,22, 24 84:4,11,13,23 85:5 122:11 127:23 128:21 139:17 143:6 169:21 238:6

**builds** 14:24

**buildup** 175:1

**built** 14:6 38:21 155:24 174:4 215:24 216:1

**bunch** 238:8

**buoyancy** 168:2 173:11 182:5 224:23

**buoyant** 163:12

**Bureau** 220:20

**buried** 240:7

**burn** 208:9,10 215:17 216:3 241:14

242:22

**burning** 159:6 160:14 192:2 197:3 207:14 208:5,6 211:7

**burns** 46:12,19 47:5,6,8 196:7,8,9 237:1 239:13 247:20,21 252:24

**burst** 214:13

**business** 16:4,6 19:2,4 57:10 59:11 72:6 149:15

**butane** 236:21,24 237:2

**button** 137:1

C

**C-A-N-O-N-I-E** 4:24

**C-A-R-P-E-N-T-E-R** 5:13

**calculate** 161:22 180:10

**calculating** 156:15 180:13

**calculation** 163:15 168:19 177:19 211:19 212:9

**calculations** 126:22 127:2 133:7 134:4 161:15 176:24

**calculator** 24:22

**calibrated** 94:3 245:2 246:9

**calibration** 143:14

**call** 35:5 52:7 57:7 86:4 88:20 98:21 184:18 185:9,23 186:4,5 187:5,8,16,21 188:10 189:8,11 190:5,19 191:7 194:20 200:4 203:3 204:12 206:23 207:6 210:21 213:4, 12 230:21

**called** 5:6 24:24 25:3 32:9 50:13 129:19 134:13,23 135:8 140:20 147:17 188:1 192:13 243:23 244:22

**calling** 234:15

**calls** 57:22

**Camp** 71:24 75:19 77:20,24

**campfire** 192:14 193:3

**campfires** 192:11

**camping** 252:18

**candle** 230:22 231:6,7 232:22

**cane** 204:22

**Canonie** 4:24

**capable** 251:5

**capacity** 42:2,3,12 43:18 47:17

**capped** 59:24

**captured** 263:17

**care** 50:17 104:14,15 238:1

**career** 38:14

**carelessly** 228:11

**cargo** 83:4

**Carolina** 75:21 82:14

**Carpenter** 4:5 5:5,12,16,19 7:1 8:10 12:20 13:4 17:13,23 18:2,16 19:24 53:23 80:6 100:23 101:24 103:2 105:14 107:12 113:2,16 114:20 115:24 118:15 148:21 150:13 202:14 227:2 243:13 255:14 256:15 257:9,21 258:16 260:4 262:14 263:13,24 265:7

**Carpenter's** 12:23 115:22 259:21 262:10

**carpet** 160:8,11,16

**carpeting** 241:15 242:23

**Carriage** 75:12

**Carson** 4:24

**case** 4:9 9:23,24 10:1,2,5,9,12 11:1,14,17 13:1 26:7 39:7 40:3 41:9,23 51:15 52:6 53:14 56:6 58:9,23 60:6,15,22 61:6,7,11,24 62:12,20 63:7 65:2,8 66:1,2,12 67:16,17 68:4,11,24 69:7,10 70:22 71:1,9,18,19 72:3,4,21 73:11,12,19 75:15,22 76:2,6,11,18,21,23 77:1, 5,9,14,17,19,23 78:2,6,9,20,22 79:8 80:14,17 83:14,17 84:15 86:5, 20 87:1,4,6,11,18,21 88:17,19 89:7,12,21 90:2,5,10 91:3,8,12,15, 16,20 92:6,23 93:9 94:15,18 95:12 96:1,6,12 97:4,20,23 100:17,19 103:6 106:11 109:13 111:7,18 112:7 113:5 114:21,23,24 115:1,3, 10 116:23 117:9,11,12 118:9 119:11 122:13,18 123:4,13,16,24 124:4,12,17,20 125:1,9,12,19 126:2,12 127:3 128:5,12 129:1,13 130:6,19,20 131:13,16 132:7,14 133:3 134:2 135:18 145:9 147:15 149:13 150:17 151:6 152:11,15 155:2 159:3,17 161:18 162:13 163:1 170:10 181:18 186:20 197:1, 23 205:5 207:6 208:17,19 210:2,11 213:7 217:10 218:13 219:6,12

220:3,10,23 223:14 224:2 225:13 230:15 231:3,16,24 232:8,11 233:5,8,23 234:16 235:23 238:5, 13,20,22 243:9 250:23 251:8 253:22 256:18 258:3 260:3 261:13

cases 42:7 46:14 52:5,8,16 53:22 59:2 60:1,2 63:4,15,17,18,19 64:2, 5,6,9,12,20 65:1,2,7,12,14,17,23 66:3,7,9,12,22,24 67:3,5,10,11,22 68:10,11,13,17 69:19,20,24 70:1,6 74:4,8,12,22 75:2 80:10,12,24 81:9,12,14 89:16,19,23 93:1,3 144:3,14 145:19 208:13 215:2 240:2

cast 244:14

category 59:4 109:23

caused 98:24 196:8

CDS 90:12

ceiling 128:22 130:11 152:24 162:22,23 173:24 178:7 180:18 181:22 182:9,13,14,17 183:1,11 184:6 185:6 203:8 230:3

cell 237:3

certainty 142:11

certificate 35:17 36:24 37:4,8

certification 30:1,8,14,20 31:7,12, 23 32:6 33:1,15,16 34:16 35:14,19, 24 36:5,10 37:6,13,14,19 38:4 48:15,18 49:1,4,13

certifications 32:22 36:20 47:19 49:10 54:5

certified 29:22 33:12 37:10,22 38:7 43:1,4 48:21,24 49:7

certify 33:16

CEUS 30:24

CFAST 117:19 127:24 129:15,18 131:2 132:22 133:17 134:12,14,20, 23 135:13,16 136:8,13,20 137:2,6, 18,21 138:7 140:16 142:1 143:1 145:10,11 150:17,23 151:3,5,6,9, 22 154:16 155:22 156:15 164:20 165:24 174:15 176:23 177:20,21 189:14,16 190:20 191:4 227:7,11 257:22

CFD 25:4,7 134:17 135:3

CFI 32:9 33:11

chair 25:10 98:10,21,24 99:1 159:11 160:4 161:4,21,24 162:9

164:8 165:13,14 193:7,23 194:21 195:13,17 197:4,5,6,8,16,20 202:3 203:11,17,21 207:14 208:1,9 209:9,19 211:8 212:7,14 214:12,17 215:4 217:9,19,20 218:14 219:5,11 221:1,4,6,19,24 224:11 226:6 227:10,16,23 228:10,11,22 232:13, 20

chair's 231:5

chaired 49:20,22,24

chairs 162:17 193:22 197:3 203:21 208:17 213:12,19 227:16,24

chance 149:2 193:9

change 125:13 139:4 145:24 146:4,14,16 163:5,7 178:5 228:9 230:13 239:23

changed 146:14

changing 194:10

character 54:1

characteristic 155:11

characterization 240:23

characterized 129:20 161:10

charcoal 236:12

charge 55:19,24 59:6 60:14,17

charged 67:19,20 70:13 93:24

charging 58:13,18,20 67:10

Charleston 73:14 78:21

check 39:24 62:16 92:7 175:16 211:20

checked 258:24 260:2

checking 92:16

checks 175:7

chemical 216:9 251:21 252:4

chemicals 73:6,10 78:14 215:16, 21

chemistry 14:10 44:14 45:3,13 97:16 254:5

Chicago 4:15

children 253:22

choice 134:9

choose 40:4 132:22

chose 39:8,9

Christi 75:23

Church 77:6

cigarette 98:23 99:9,10 166:11 214:11,16,21 215:11,17,24 216:1, 9,10,15 217:8,10 219:16,20 220:12 221:19,23 222:10,17,19,23 223:5, 10,16,24 224:3 225:22 226:5 228:9,20 230:16,20 231:11 232:17 236:21 239:2,14,18,21 240:6,7,14, 22 248:21,24 249:8 250:12,19,21 251:3,5,11 252:8,9 253:6,13 254:3

cigarettes 215:16 216:3,19,23 217:6,12,15 222:4,14 223:15 225:14 238:23 239:7 252:11,17 254:4

circulation 167:14 180:14

circumstances 42:9 64:13 69:17 119:24 120:6,13,18 132:7

cited 104:19

City 51:23 52:20 71:23 77:18 84:7

civil 5:17 12:12 54:21 55:16,21 57:11 61:8 62:22 63:21 64:3,6,9,18 65:12,14,17 68:13,16 69:24 70:1, 22 72:4,12 73:23 81:8 84:15 87:4, 10

claim 256:19

claiming 257:14

clarification 73:9 112:10

clarify 259:17 263:15

clarifying 142:19

Clark 4:14

class 22:19,20 23:3,14 26:5

classes 21:9 22:12 31:5 37:2 175:18,20

clear 38:16

Cleveland 42:16

client 57:4 59:15

clients 57:8 59:5

clinging 182:24

clock 158:10 214:15

close 149:15 157:16 187:6 188:10 194:9 196:10,17 245:15

closed 127:13 157:10 169:9 171:4, 10,14,18,23 172:11,12

DOUGLAS J. CARPENTER, 03/31/2021

**closed-form** 24:19

**closer** 98:11 164:15 178:1 180:7 182:8 197:5 203:11,13,21 208:1 209:9

**closest** 211:8

**cloth** 218:23,24

**clothing** 160:21

**clue** 8:21

**Coastal** 78:13

**coffee** 208:10

**coincide** 62:19

**Coleman** 252:16,18

**collectively** 149:1

**College** 22:10 23:5

**color-coded** 174:10,11

**combined** 192:22

**combustion** 14:7 15:3,20,22 16:12 17:3 18:21 19:3,5,9,18 44:15,16 55:11 99:8 167:22 217:13 244:15,16 252:3

**commensurate** 176:5 181:23 183:7 204:6 223:1

**comments** 51:4

**commercial** 57:3,4,7,8

**commit** 87:24

**committed** 85:20

**committee** 37:3 50:13,14 51:9,14, 22 52:2,4,14

**committees** 49:20 51:11

**communication** 114:14

**community** 45:21 97:15 252:15

**commuter** 175:17

**company** 15:18 16:18,22 26:18 34:7 40:12,22 56:14,22 57:9,22 70:16 73:17 77:8 78:24 85:3 117:24 118:2

**comparable** 12:15 140:6

**compare** 141:4

**compared** 123:6

**comparison** 122:1 141:14

**comparisons** 141:12

**compartment** 160:18 167:19 177:8 179:12 182:7 208:14

**compartments** 139:8,11

**compensated** 61:5,14 62:7

**compensation** 58:14,21 59:7 67:11

**competent** 166:10 230:24 231:1 232:18 248:16 249:1,2,14 250:15, 16,19,21 251:14,19 254:6

**competing** 186:13,18 187:10,13

**compile** 12:8

**complete** 6:17 74:2 103:5,17 136:24

**completed** 35:12,18 136:23

**completely** 204:10

**complex** 133:20 134:9 137:10

**complicated** 25:4 117:8

**components** 234:9 235:13

**composition** 219:14 220:23

**compress** 222:20

**comprise** 11:20

**comprised** 20:11 219:10

**comprises** 55:3 102:22 224:11

**compromise** 219:22

**compromised** 208:8

**computation** 127:8

**computational** 25:3,7 130:2 134:24

**computations** 136:23 146:15

**computer** 23:6,16,18,20 24:2,6, 17,20 25:16 26:1,7,9,11,21 74:6,12 75:3,6,9,11,15,16,17,22 76:4,11 77:16 78:12,17 79:4,15 80:11 81:1, 11,13,24 82:8 114:21 115:9,12,18 116:17,19,22 118:9 125:17 126:11 127:15,17 129:12 133:23 134:5 137:18 144:4 175:18 255:2

**computerized** 124:11 127:2 130:22 131:12,16 132:5

**computers** 143:22

**concept** 35:6 216:17

**concepts** 46:23

**conclude** 256:10

**concluded** 96:19

**concludes** 265:20

**concluding** 264:11

**conclusion** 95:18 126:1 180:15

**conclusions** 92:6 94:8 95:11,13 96:6,7 97:1,3,4,7,9 113:5 115:10 147:13 230:15 233:10 235:20 238:22 254:19

**condition** 131:22 144:6 198:3

**conditional** 259:23

**conditioner** 169:4

**conditions** 46:17 130:8 168:12 204:2,15 242:7

**conduct** 141:19

**conducted** 25:19 33:8 94:4 122:3 259:13

**conducting** 22:19

**conference** 4:5 257:1,5

**configuration** 240:9

**confined** 180:20

**confirm** 89:10 110:20

**confirmed** 218:18

**conflict** 51:15

**conjunction** 39:17

**connection** 5:22 18:20

**consensus** 61:4 148:6

**conservation** 130:5

**conservative** 163:9 170:10 228:6

**considerations** 127:19 133:13

**considered** 23:23 95:17 110:7 112:6 131:17 153:8 216:2 230:17 236:4,14 237:7

**consist** 175:16

**consistency** 175:17

**consistent** 176:8 177:2 195:21 206:2 207:16,18 208:4,11 212:12 215:5 220:2 223:8 227:15,18,20,23 230:19 232:7,10 233:5 242:18 243:2 245:22,23

**consists** 20:5

**constitute** 153:2

**construct** 27:5,16

constructed 122:6

construction 178:4

consult 55:12,20 91:7,11

consultation 56:12 57:17

consulted 94:14

consulting 18:23

consumed 99:2 234:1,6 235:10

consuming 133:5

contact 41:7,8 196:7 219:20

contacted 86:23 88:13,14

contained 10:7 11:2

container 83:4 237:8

content 32:12 34:13 50:21 51:5

context 12:17 41:20 48:23 110:8
163:4 177:13 198:1,2 229:13
230:12

contingent 253:2

continue 35:9 214:2 244:20
265:11,12

continues 242:9

continuing 21:11 29:13,14,17
30:19 32:9 39:22

contrary 256:5

control 92:19 176:19

controls 179:21

conversation 61:22

convicted 54:14,17

cooking 247:24

cool 169:14

coordinate 164:13

Copenhagen 26:5

copies 12:14

copious 135:3 143:1

copy 8:4,24 102:1 116:5

cord 200:23 201:4,5

corner 161:12

corners 194:1

corporation 15:23 16:9,15,20
17:2,7 18:21 56:18 60:13 243:15

correct 11:21,22 14:22 20:5,12,14

22:11 28:2,3 29:2,24 30:3,6 32:5
33:17,18 36:4 43:15,16,18,19 44:4
45:8,16,17 48:5 55:5,17,18 58:14,
15,19 66:22 69:18,20 83:14 85:9,
23 90:8 92:4 95:21 99:14,23,24
102:6,9 104:10,23 107:16,17,21,22
109:2,3,11 114:22 116:14,17 120:3
121:20 123:4,5 126:19 132:20
151:12 157:22,23 160:3 164:20
165:3,18 166:11,12,14,15 172:8
182:12 184:18,20 187:12 189:17,
22 190:5,8 191:20,23 194:17,22
195:6,7 202:19,20 203:9 205:17,18
206:24 207:6,7 213:2,12 214:7,13,
14 224:11 225:18,19 226:1,13,14
232:15,16 235:2 241:16 245:22
246:16 247:12 248:17,18 249:9
251:16 252:21 253:7,8,15 258:20,
21 259:4

correctly 96:16 136:12 141:4
143:4,16 145:13 162:16 170:1
185:19

cost 59:18 133:13

cotton 225:8,14

couch 222:16

couched 147:23

couching 259:23

Council 71:23 84:7

counsel 4:18 12:10 148:16 256:9,
19 257:18 261:19 262:8 263:12
264:16

counsel's 264:1

count 63:20,24

counted 63:10

counting 56:6

County 58:13,22 101:2

couple 141:22 204:17

courses 24:2,4,6,11,24 25:16
26:1,14 35:18 36:21,22 37:4,9

court 4:10,15 5:2,11 55:7 59:19
63:3,16 64:10,20 67:7,24 74:16,20,
23 79:15 113:3,22 114:16 136:1
149:1 256:21,24

cover 107:5 218:21 219:4

covered 260:6

covering 218:16

coverings 160:10

covers 85:11

cracks 168:17

crawling 200:16

crazy 10:16

create 143:8 154:14 178:12 232:4

created 16:9 26:20 34:13 123:11
144:6

creates 168:2 231:14

credit 31:2,3

credits 29:18 31:5 36:14,16

crevice 222:8,17 223:12

crevices 222:15

crime 47:11 54:17

criminal 39:15 40:17 55:16,21
57:11 62:22 63:18 64:3,5,9,12,17
65:1,7 66:22 68:10 69:8,19 71:4
73:21,23 258:3

criteria 172:5

cross 4:8 63:4

crossover 37:1

crucible 244:4

crumpled 240:17 241:2,4,9

CS 117:19

CSE 116:20

cubes 130:3

cup 246:19 254:1

current 7:21 9:16 15:17 20:24 21:4
28:5,15 50:6 55:8,22 61:11 67:17
87:4 102:13 106:21,22 107:24
108:14 124:10 138:14 141:9

curriculum 27:5,6

cushion 224:24 225:10

cushions 222:16

CV 20:16 22:4 25:21 26:4 49:16
50:12

cyanide 231:12

cycle 29:9,16,20

D

Dale 69:6,12

DOUGLAS J. CARPENTER, 03/31/2021

**damage** 122:2,3

**data** 47:3 109:15 110:3,4 126:14 128:14,15 135:3,22 136:7,18,24 137:3 138:10 151:14,15 173:2 176:13,15 231:22 235:7 245:14 256:1,4 257:22

**date** 56:6 61:13 85:19 91:2 94:1

**dated** 9:16 19:21 100:21 101:2,22 102:13 107:20 108:14 113:9 116:23 125:20

**Dave** 95:20

**David** 95:19 105:21 108:5

**Davis** 73:24 76:3 79:5 82:18

**day** 34:12 61:18,19 62:10 149:23 214:16

**days** 24:13

**dead** 8:17

**deal** 66:24 134:7 141:6 206:14

**dealing** 19:5

**dearth** 109:14

**deaths** 231:10

**debris** 97:16

**debugging** 138:21

**decades** 141:22

**December** 85:21 100:21 101:2 102:15

**decide** 60:13 65:24 195:15

**decided** 132:22

**decides** 149:1

**decision** 130:21,22,24 195:19

**declarations** 201:17

**dedicated** 23:10 57:16

**deemed** 242:14

**deep** 180:24 182:22 203:5 224:17, 21

**deeper** 184:1

**default** 156:3

**defendant** 4:7 54:20 84:17,18

**defendants** 4:23 5:1 65:13,17

**defense** 65:3,10 257:24 258:1

**define** 100:7

**definition** 31:16 38:20 104:9

**degrade** 142:11

**degree** 14:12,15,18 15:1,4 45:1,9 47:16

**degreed** 44:20

**degrees** 14:14 45:22 246:18,20 247:1,8 254:16

**Dehaan** 95:2,5 104:20 108:5,13

**demand** 263:8

**Denmark** 26:5 31:3

**density** 240:8

**dep** 150:2 256:6 257:2

**department** 25:11 122:22 152:12

**depend** 69:15

**dependent** 224:10 225:2

**depending** 31:19 168:13,17 169:22 173:19 178:10,22 181:5 187:8 251:14

**depends** 22:21 42:9 56:13 57:19 58:7 60:17 61:3 62:11 67:20 124:5 132:10 178:4,16 209:23 240:2,15

**depicted** 190:10

**deposed** 114:8

**deposition** 4:5,6 5:15 6:8 7:14 13:5,24 20:3 55:7 56:1,6 63:12,16 64:7,9,12 67:7 68:19 69:2,9 70:4 74:16,20,23 98:19 100:24 112:3 114:1 116:1 121:15 125:21 185:16 202:15 218:1 254:20 255:15 256:10,20 257:8 258:9,11 259:15 262:5,23,24 263:22 264:4,11 265:12,21

**depositions** 6:9,13 63:6 69:13

**depth** 33:6 129:6 154:15 166:24 178:23 181:1,14,23 182:15,18 183:6 204:5 240:9

**depths** 181:5 182:17

**Derek** 76:20 116:3

**derived** 56:12

**descended** 183:1 184:5 185:7 203:23

**descending** 173:24 174:8 182:10 184:3

**describe** 36:5 129:10 243:17

**describes** 190:5 191:18 206:22 226:2

**describing** 140:8 182:11 201:24

**description** 209:7

**design** 19:7,8,13 26:4 57:3

**designate** 51:13,14

**designed** 227:12 228:1

**destroyed** 234:16 235:12

**detail** 49:6 88:1

**detailed** 64:22

**details** 62:2 66:13 194:24

**Detective** 105:21

**determination** 72:9 99:16 200:14 207:11 209:16 221:11 235:14 236:8 242:10

**determinations** 31:21 95:16

**determine** 88:17 145:12 158:1 164:21 165:5 206:6 220:11 223:15 246:3,13

**determined** 38:18,24 186:15 227:15

**determining** 248:14 249:14

**develop** 26:14 27:3 135:7 180:22 181:22 230:2

**developed** 22:14 24:4,10 32:10 34:1,7 52:3 129:15 135:15 165:11 242:17

**developing** 27:4 31:3 50:20 127:5

**development** 51:1 129:23 130:11 134:22 182:6 231:12 233:4

**diagnosis** 47:8

**diagram** 185:18 187:14 188:24 190:11 202:22 203:20 205:20,23 206:9

**diagrams** 152:9 201:21

**difference** 36:18,19 172:13 187:7 207:13 221:20 236:18

**differences** 162:6 172:17

**differential** 172:1

**differentiate** 166:9

**differently** 161:11

**difficult** 214:19 239:18 252:10

**difficulties** 6:2

**difficulty** 6:19

**diffusion** 199:17

**dig** 66:15 88:1

**dimensions** 151:10 154:13

**dining** 98:11 153:7 174:23 178:14 179:3,7,16 180:3,7,9,11 181:4 207:23 209:10 211:8 230:7

**Dionne** 76:8

**direct** 20:15 55:1 163:15 180:12 196:6

**direction** 162:24 167:4 173:16

**directions** 178:8 230:5

**directly** 119:18,19,22

**director** 91:16 92:1,13

**directors** 16:19

**disabilities** 198:8 205:4

**disagreed** 218:9

**disbanded** 52:15

**discipline** 14:5,21

**disciplined** 54:3,7,10

**disclosed** 67:23 89:17,21 90:1,3,7

**disclosure** 68:5

**discovery** 58:6 255:19 257:13 258:7,10 261:22

**discuss** 191:14

**discussed** 126:8 131:6 254:19

**discussing** 243:13

**discussion** 17:19 18:10,12 205:6 265:11

**discussions** 92:9 93:2 198:16

**dishonesty** 54:18

**dispatcher** 201:16 209:8

**displaced** 223:4

**disposable** 232:17

**disposed** 239:7

**disprove** 228:15 229:2,7

**distance** 177:1,18 192:19,23

**distances** 193:6 197:10 212:1

**distinction** 80:21,23 87:19

**District** 4:10

**Division** 4:11

**doctor** 45:16

**document** 50:16 89:4 101:4,23 102:21 104:11 110:15,21 121:16 142:2 261:3 265:8,10

**documentary** 110:16,24 111:12

**documentation** 89:11 109:5,8,19 110:1,9 113:12 116:19 124:23 126:5,11 142:24 153:20 255:16 257:20 259:6,16,18,23 261:17 262:6 263:3,5,9,18 264:3,9,12 265:13

**documented** 187:22 188:10 215:3,13 263:17

**documents** 8:5,7,24 9:1 10:10 11:9 12:6 13:5 104:14,15 107:6 152:16,21 198:5,19 205:10 215:14 261:8

**dollars** 56:10 59:20 91:2

**domain** 130:2,3

**Don** 76:20 116:3

**door** 92:8,14 124:16 126:4 128:1, 20 129:1,7,11 146:9 153:5 158:17 159:18 163:17 168:17,22 171:4,5, 10,14,17 172:11,14,15 173:7,11 180:19 185:5 186:4 189:1 195:5,16 197:6,21 198:24 199:7 202:3 203:11,14,22 206:20,21 207:24 208:7 214:6 229:20

**doors** 152:2 157:5 203:12 208:2 209:2

**doorway** 128:8 170:23 184:9 185:12

**doorways** 181:16,21

**doubting** 263:24

**Doug** 148:23 149:9

**Douglas** 4:5 5:5,12,15 7:1

**download** 143:19

**downstairs** 71:13,14

**draw** 95:18 235:19

**drive** 126:9 134:12 138:11 150:19 172:16

**drives** 90:12

**Dropboxes** 90:13

**dropped** 222:14

**drowsy** 198:14

**due** 168:2 224:22

**duly** 5:6

**Dupage** 58:12,22 101:1

**duties** 43:14 131:1

**dynamic** 134:24 135:9 136:21 137:17

**dynamics** 22:15 23:6 25:3,7 135:1 137:5 168:24 174:21 175:13 182:7 183:20 199:11 208:14 209:15

---

**E**

**earlier** 48:3 87:19 91:1 108:24 123:10 126:17 148:7 150:17 151:8 166:8 170:12 176:18 185:17,23,24 186:10 187:16 188:2,15 256:5 259:7,15 261:23 262:24

**early** 156:10,11,13,16 159:3,24 163:4 204:4

**easier** 81:22,23 82:1,3 104:4 251:18

**East** 84:18 118:21 119:5,16 120:1, 6,13,19,22 121:3,7,11

**Eastern** 4:11 148:22

**easy** 134:4 236:23

**eat** 149:3

**educate** 33:5

**education** 29:13,14,18 30:20 32:9 44:12

**educational** 54:11

**Edward** 76:10 79:5

**effect** 44:17 139:11,12,19,20 167:20

**effects** 191:1 196:7

**efficiency** 155:17

**efficient** 132:14 133:9 137:11

**egress** 206:15 210:15

**elapsed** 150:2

**Electric** 73:2 78:23

**electronic** 90:14

**element** 45:11 190:13 193:20

DOUGLAS J. CARPENTER, 03/31/2021

229:15

**elements** 27:15 38:7 98:6

**elevate** 162:10

**elevations** 171:8

**eliminate** 217:18

**eliminated** 216:5

**Elliott** 4:16

**employ** 123:2

**employed** 15:18

**employee** 118:1

**employees** 17:3

**employment** 15:17,19 20:20

**end** 5:20 17:11 18:7,9 35:11 50:7 79:13,21,24 143:15 149:9,22 150:7 178:19 181:12 193:16 195:15 197:16 201:2,4 206:3,5 223:6 226:19 265:19,22

**endeavors** 14:9

**ended** 21:23 176:3

**ending** 257:8

**ends** 239:12

**energy** 130:6 141:7 155:17 192:1 193:1,24 194:2,6 196:13 222:9 249:24 250:4

**enforcement** 43:5,7

**engaged** 55:12 57:20

**engin** 27:6

**engineer** 14:3,4 15:20 28:1,9,13, 16,19 48:1,10,13 54:22 93:16 118:3 133:22,23 134:10

**engineering** 14:6,13,16,17,19,21, 22 15:3,5,21,22 16:12 17:4 18:21 29:4 31:17 44:13 46:16 47:16 48:5, 7,19,20 55:11 118:6 137:19 206:16

**engineers** 14:8 18:24 19:5 24:10 25:24 26:15 27:6 45:14 46:17 47:14 49:5,8 93:3 137:11 177:14

**engines** 19:7

**entail** 50:10

**entails** 32:7

**entire** 169:14 193:14 201:10

**entities** 59:5

**entitled** 202:18 205:21

**entity** 48:22 49:11 140:14

**entrance** 207:23

**entry** 195:5

**environment** 46:10 72:12 231:14

**equals** 140:24 166:6 189:14

**equations** 24:19 26:23 27:17,18 126:18

**equivalent** 31:1

**Eric** 76:1,2

**error** 140:17 145:20,23 245:17,20

**erupt** 223:24 224:9

**erupted** 224:3

**erupts** 224:8

**essentially** 168:15

**estimate** 57:15 63:9 152:4 153:20 204:3 246:4

**et al** 4:8

**ethanol** 249:12,18,21,22 250:8,13 251:4,6,13,23 253:5,16 254:16

**evaluate** 51:4

**evaluated** 96:8

**evaluation** 46:11 117:19 264:13

**Evans** 73:16 78:23

**evening** 198:13

**eventually** 214:12

**evidence** 39:5,12 41:16 110:16, 17,24 111:1,2,12 154:6 159:12 200:13 201:11 204:13,23 205:1,15, 17 207:5,17 208:11 212:15 213:6,7 214:18 217:22 218:6 220:3 228:14, 18,24 229:5,7,10,16 231:7 232:7, 22 233:14,15,23 234:20,21 235:22, 23 236:10,17 237:22 238:4,12,14, 19 243:6,8 256:17 257:12

**exact** 98:15 127:6 147:22 152:21 214:18 218:13,20 219:9 220:23

**exam** 30:11 175:20

**EXAMINATION** 5:8

**examined** 5:7

**examples** 26:7 166:21

**exchanging** 41:11

**exclusively** 24:2

**excuse** 10:14

**executed** 88:21

**exercise** 65:21 146:3

**exercises** 27:7,8

**exhibit** 10:14 19:21 20:3 54:24 69:3 99:22 100:20,24 101:13,22 102:11,20 105:12 107:19 115:21 116:1 121:15 123:15 124:3,13,20, 24 125:21 185:16 202:5,14 205:20 223:23 241:22 243:11

**exhibits** 125:18

**exist** 111:13 113:17 160:24 255:22

**existed** 159:1 234:19 243:6 264:17

**exists** 104:11 168:7 255:17

**exit** 192:6,8 193:14 195:4 196:19 206:10,14,15 207:3 210:13 212:11, 17

**exits** 195:22 205:21,24 206:6,12, 13,18,23 207:3,10,15 209:21 213:17

**expanded** 60:6

**expect** 174:21 250:4

**expenses** 58:16,17

**expensive** 133:4

**experience** 104:17 163:2 177:22 192:10 193:3 237:20

**experienced** 231:16

**experiencing** 204:3

**experiment** 248:19

**experimental** 109:15

**experimentations** 109:15

**experiments** 94:5 220:10 223:14 253:18

**expert** 44:24 47:7 48:4 67:23 68:5, 7 89:17,21 90:1 95:5 96:16 97:13 99:17 107:20 108:4 111:10

**expertise** 46:15 48:14

**experts** 58:7 94:15,17 114:11

**explain** 31:14 32:6 98:3,5 129:17 143:2 177:5 243:18 249:13,16

**explained** 107:3 147:16 183:5 195:2 235:6

DOUGLAS J. CARPENTER, 03/31/2021

**explaining** 86:4 151:8

**explicitly** 164:22

**explosion** 29:23 31:8 50:4,18

**exponentially** 194:15

**exposed** 217:15

**exposure** 59:13 77:13

**extend** 152:24 212:7

**extensive** 117:6 132:10

**extent** 68:3

**extra** 149:21,22

**F**

**fabric** 218:16,21 219:4

**fabrics** 220:11

**fact** 60:9 101:12 109:9 184:16 197:19 234:24 256:15 257:11 261:24

**factor** 162:19 190:2

**failure** 255:15

**fair** 6:22,23 68:9 69:21 114:14

**fairly** 41:21 42:24 184:23 191:24 193:6 216:16,17 239:9 245:18,22

**fake** 218:23

**fall** 22:22 59:4 109:23

**falling** 184:2

**Falls** 26:19

**familiar** 6:12,16 7:16 46:23 47:2 49:3

**familiarized** 9:12

**family** 82:24 83:6

**fan** 169:18

**farther** 178:2

**farthest** 229:19

**fashion** 82:2

**fast** 62:12

**faster** 133:18 170:9 179:18 199:16

**fatal** 45:4

**FDS** 142:1

**federal** 5:17 54:4 73:3 263:23

**fee** 56:3

**feel** 60:1 93:2 133:14 192:15 193:16 194:5 196:7 263:22

**feeling** 195:20 212:19 213:2

**feels** 213:5

**feet** 128:20

**fell** 246:8

**felony** 54:15

**Ferreri** 105:21

**field** 48:14 94:15,18 95:6 99:18 103:20,24 105:3,7 177:23 191:15

**figure** 68:20 124:10 128:21 158:16 161:15 164:3

**file** 7:17 8:3,4,24 9:2,4,6,13 10:4,8, 12,24 11:2,7,13,21,24 12:11,24 39:23 135:4 136:19 167:8 265:2

**filed** 4:9

**files** 126:14,15 128:16,18 138:4,10 147:8

**fill** 109:16 124:15 132:3 179:18 180:3 181:13,19 182:20 244:3

**filled** 179:3

**filler** 219:9,10,15,21

**filling** 129:24 130:12 134:6 145:5 163:17 164:17 167:2 179:17 180:11,16

**filter** 223:2,6

**final** 35:11

**find** 11:10 34:3 39:4,22 86:16 87:20 138:22 144:14 152:20 154:2 210:22 229:6,16 232:3 233:14,15, 22 234:7,14 235:11 238:14 241:6

**findings** 227:21 231:18

**fine** 112:15 149:3,10,15

**fire** 14:3,4,7,11,18,20 15:4 19:3,6, 7,10,18 22:15 23:6,12,17,18,20,22 24:2,6,10,15,17 25:15,16,23 26:1, 5,7,9,10,12,14,17,21 29:22 30:5 31:7,11,15,18,23,24 33:3,4,5,7,13, 17,19 34:2,8,16,17 35:20 36:10,13, 14 37:7,16,19 38:6,20,22 39:5,13, 14,20 40:14,15 41:8,14,19,24 42:1, 4,11,14,15 43:11,13,24 44:8,12,13 45:20 46:3,5,10,17 47:3,13 48:11, 12,15,20 49:2 50:3,14,17 70:17,18 71:9,10,13,15 72:10,14,21,24 74:6,

12 75:3,6,9,11,15,16,17 76:4,11, 15,17,21,22,24 77:7,9,12,13,16,19 78:6,12,17 79:4,15 80:11,12,14,18, 19 81:1,11,13,14,24 82:8,9 83:22 84:21 95:6,9,23 96:20 97:14,16,19 98:1,4,9,16,22 99:3,15,18 100:9,10 104:16,19 105:5,20 114:21 115:9, 12,19 116:17,19,22 117:11,20 118:6,9,21 119:1,6,10,16 120:1,6, 13,18,22 121:3,6,11,23 122:2,3,16, 17,19,21,23,24 123:9,23 124:12 125:17,24 126:11 127:2,15,17 129:12 131:16 132:5 133:22,23 134:24 135:9 136:20 137:5,17,19 141:5,14,15,20 143:6,12 144:4 152:11 153:24 154:7 156:8,10,12, 14,16 157:1,7 158:11,20 159:3,4,7, 9,16,21,24 160:5,18 161:6,7,21 162:11 163:3 164:15,21 165:12 168:24 174:19,21 175:13,18 178:1 182:7 183:20 185:21,22 186:8,14 187:9,15 188:6 189:19,24 190:1,3, 4,17 191:1,5,10,12,13,17,18 192:3, 16,24 193:10,13,15 194:9,10,14, 15,21 195:9 196:3,21 197:14,20 199:11,21,22 200:8,11 201:24 202:3,19 204:4 206:15 208:14 209:7,8,12,15,19 210:3 211:3,4 212:14,19 213:2,5,12,19 214:9 215:15 216:2,15,18 217:10,12 224:7 227:17,24 228:9,16,17 229:14,16,24 231:22 232:23 233:2, 3,11 234:1 235:2,10 238:7 241:16 242:2,4,6,10,11,20 248:13 250:1 252:15 255:2

**fire's** 156:18 174:9 191:1

**firefighter** 43:2

**firefighters** 121:6,10

**firepoint** 243:20 244:18,23 248:15 260:20 261:4,10 263:10

**fires** 33:9 38:17,23 39:1 45:4 46:19 142:17 160:24 191:23 192:9 196:9 228:2,3

**firm** 18:23 88:9 89:13

**first-degree** 47:5

**fit** 126:6

**fix** 139:5

**fixed** 164:3

**fixes** 138:24

**flame** 158:12 166:11 189:21 214:13 219:17 220:12 221:21 222:1 223:16,24 224:3,8,9 225:23

226:6 230:22 239:3 244:12,21 245:8 246:12,14,16 251:7,9,10,22 252:2 253:20 254:8,12

**flames** 196:3,5,12

**flaming** 189:13 190:1,3,18 191:6 194:17 199:21 225:24 231:14 232:23 233:6 239:19 244:21 246:14 251:17

**Flaminia** 73:24 76:15 79:9 83:3 85:8

**flammable** 233:23,24 234:14 247:16,19,22

**flash** 126:9 134:12 138:11 150:19 244:15 246:13 248:7,11 261:10

**flashover** 157:15 159:14,20 160:1, 13,14 197:10,11,13 208:3,18,20 234:2 242:7

**flashpoint** 91:23 93:21,23 109:1, 5,20 110:10,18 111:3,14,22 112:2 113:13 124:24 237:12 243:13,20, 24 244:17 245:8 247:13 248:15 249:22,23 250:5,9,12 251:1,16 252:2 253:14 254:14,16 255:18 258:18 259:6,19 260:20 261:4 263:10

**flat** 55:23 56:3 58:18

**flexible** 99:12 218:11

**floor** 160:10 162:10 163:3 242:11

**Florida** 70:24 73:4,17 75:10 81:17

**flow** 132:4 157:3 167:3,6,11,14 168:13,20 171:22 172:1,3,16,17 173:10,16,17,20,21 177:10 178:9 179:8,10,21 180:14 181:6 184:20 230:4

**flowing** 179:10

**flows** 163:13 168:2,3 174:18 181:7

**fluid** 25:3,7 135:1

**flume** 178:7 230:2

**flux** 160:14 192:16,19,22 193:11 194:13 195:18 207:20 209:20 210:24 211:19,24 212:4 239:15 240:3

**fluxes** 47:3

**foam** 99:12 215:21 217:24 218:4, 11,17 219:23,24 220:8 222:7,11,20 223:2,5,6 224:15,20 225:3,5,14 230:20 232:14,24 233:6

**focused** 61:2

**follow** 39:8 258:12

**foot** 163:3 182:18,19 183:15,21 184:6 203:5,7

**force** 264:5

**forced** 167:17 170:2

**forensic** 19:13,15,16 31:8,11,14, 16,18 32:24 43:11,13 45:18,23 46:3 48:4,7,10,11,12,15 49:5,8 57:1,6,14,16 58:9 95:6 97:14 104:19 137:20 215:15

**form** 12:3 38:2 76:16 83:16,19 94:22 99:4 112:11 113:7,15,17 190:6,22 213:15 224:12 234:5 235:3 247:16

**formal** 21:10 43:24 45:22 93:12

**formally** 21:6,7 87:13 131:17

**format** 90:14 108:19,23

**formed** 218:12 219:5,11 225:12

**forming** 91:7,12 94:7 112:7 197:22 198:7,12 220:9,22 223:13 233:9 257:23

**formulas** 127:14

**formulate** 128:11 195:12 229:1 235:7 236:17 237:17 238:18

**formulating** 236:16 237:21

**formulation** 228:17

**forward** 58:3 61:24 62:17 125:12

**found** 39:12 40:19 41:16 95:8 99:18 109:14 144:5 222:12 223:10 232:2 235:1 237:16

**foundation** 113:7

**four-day** 24:6

**four-year** 15:5

**fourth** 192:17 194:11

**frame** 50:11 108:7,8 132:1,16 155:10 156:15 226:10

**frequent** 42:8

**frequently** 42:6 59:10

**front** 62:2 102:2 116:5 195:16 206:20 207:22

**frozen** 8:9 17:10,11

**frying** 248:4

**fuel** 99:2,11 159:22 160:13,16,17 161:1,2,20 162:7,8,22 221:5 230:11 252:16,18

**fuels** 161:14

**full** 33:6 109:17 121:21 122:7 152:20 221:9

**full-scale** 122:9,12 123:3 142:18

**full-time** 21:14 22:17

**fully** 53:22 172:11

**fundamental** 23:16 27:15 44:12 45:3 46:13,20,21

**fundamentally** 45:15

**fundamentals** 15:2 23:22 46:4

**funds** 59:23 60:18 67:21

**furniture** 72:23,24 99:12 158:24 159:10 160:4 161:9 195:9 196:21 208:15,16 209:4,8 214:22 217:16, 21 218:10 220:24 222:5 225:11

**furnitures** 218:5

**furthest** 163:16

___

**G**

**gain** 32:22

**gap** 109:16

**Garcia** 4:21 12:3,13 13:2,12,15,18, 22 17:11,16 37:24 38:2 75:8 79:21 83:16,18 88:12 89:20 94:22 99:4 111:7,14 112:9,11,16,20 113:7,15, 24 114:2,6,7 148:11,17,20 149:8 190:6,22 205:7 209:11,13 213:14 224:12 234:3,5 235:3 256:13 257:7,16,18 259:20 261:21 262:7, 14,16,18,20 263:12,15 264:15,20, 23 265:2,5,7,17

**gas** 237:5

**gases** 212:3

**gasoline** 252:14,17

**gateways** 104:5

**gave** 69:9 134:6 191:10 256:5

**general** 26:8,23 31:4 164:9 178:3 179:1 214:20 219:2 250:6

**generally** 137:7 159:15 175:10 218:15 225:9

**generate** 108:22 151:16

**generated** 108:18,20 110:9 135:21,22 136:5 137:4 209:19 211:7 212:6

**generates** 135:20 136:4 151:11 166:14

**generating** 75:16 166:17 209:20

**geometry** 127:23 174:19 178:11, 16,24 203:16 225:1

**Georgia** 76:9

**give** 6:18,20,21 7:11 8:21 11:11 12:7 32:18 43:14 57:15 62:24 156:14 166:21 184:21 190:23 196:14 210:4 213:24 215:6

**giving** 7:7 172:23 195:17

**glass** 152:2 157:5,9,14 159:18 197:6,21 202:3 203:12 206:21 208:2,7,8 209:2

**glowing** 239:13 251:11

**Golder** 96:10,13,19 102:8

**Golder's** 97:2 107:20,23

**good** 6:6 17:6 79:20,21 105:8 133:17 134:2,3 140:14 143:24 149:11,16 160:16 177:14 193:5,9 250:1

**government** 140:13,15

**grade** 176:5

**gradient** 47:2 174:12

**graduate** 175:20

**Graf** 76:10,13 83:1

**grandkids** 71:14

**grandmother** 71:15

**granted** 60:9,10

**grants** 21:21,22

**graphical** 136:9 137:2

**graphically** 134:21 135:6

**graphics** 124:8

**great** 141:6

**greater** 223:11

**greatly** 222:22

**Greene** 75:21 81:21 82:14

**gross** 147:6

**ground** 6:16 200:16

**group** 50:14 148:24

**groups** 49:24

**grow** 191:23

**growing** 174:9 184:1 194:15

**grows** 190:17

**growth** 156:11 157:1 160:18 161:8,10 166:5,7 190:7,10,12,17 191:2 193:10 194:14,16,18 210:3

**guess** 69:15 155:17 189:10 249:16

**Guide** 50:3,17

**guidelines** 46:16 50:24

**Gust** 105:22

**Gutweiler** 75:14 81:18

**gypsum** 155:3,5,8

**gystum** 155:8

---

**H**

**Haavard** 116:20 117:5,13,22 118:5,11 119:4,9 120:4,16 121:1,9 130:18

**half** 192:23

**hallway** 98:12 139:14 152:3 153:16 171:20 173:6,15,22 174:1, 10 175:11 178:20 179:6,13,15,18, 21 180:2,5,7,8,13 181:6,8,9,10,12, 19 182:19 183:8 193:8,16 195:14, 15 197:12 200:7,12,20,23 201:6,9, 10,14,19,23 203:3,24 204:7,10,17, 21 205:1 206:3,5,19 210:1,18 211:1,6 212:8,13 230:6

**hallways** 177:17

**hand** 24:21 133:7 134:4 176:24 192:14

**handful** 39:3

**handle** 135:16 162:6

**handles** 162:6

**happen** 41:9 178:15 180:19 197:9 238:3 243:7,22 254:2

**happened** 31:21 40:2 59:4 60:5 145:1 187:4 232:10 233:7 238:1,2 243:9

**happening** 239:12

**hard** 8:4,24 12:13 108:21 135:4 148:16 194:7

**Hardel** 70:23

**harder** 234:9,10

**Hardwood** 77:8

**Hartford** 71:5 77:10

**HCN** 220:2 232:5,6 233:4

**head** 29:19 61:17 64:4,16 106:18 201:6 204:11 233:13 237:13

**heading** 37:3 126:6

**hear** 5:19 6:4 8:10,11,21 17:24 18:1,17 66:2 112:13,22 148:16,18

**hearing** 11:16 60:9

**heat** 46:24 47:3 76:16 77:13 154:23 160:14 192:12,15,22 195:21 196:2 209:5,20 210:16,24 211:5,7,9,11,12,14,24 212:5,19 213:2,5 239:15 240:3,5 242:19 244:9 247:14 252:8 254:9

**heated** 246:19 248:1

**heater** 244:8

**Heather** 79:10

**heating** 169:24 244:6 253:19

**heavily** 66:5

**height** 128:2,3,6,7,8,20,21,22,23, 24 129:5,7 164:7,10 183:7

**heighth** 128:4 129:1 162:11 163:7 168:18 171:20 183:23

**held** 24:1 25:10

**hermetically** 156:2 170:17

**hesitation** 114:16

**Hey** 93:5 135:12

**hides** 222:23

**high** 173:12 192:22 209:4 225:8

**higher** 54:12 175:10 247:6 248:20 250:5 253:14

**highly** 140:13 160:11 222:21 224:10 233:21

**Hill** 75:12

**Hippert** 73:7,12 78:16 85:1

**historical** 141:15,18

**histories** 167:9

**history** 190:24 213:24

**hit** 230:5

DOUGLAS J. CARPENTER, 03/31/2021

**hits** 178:7,8

**hoc** 21:11

**hold** 23:24 44:19,23 45:4,7,23 47:7 48:4,9,11 53:16

**holders** 16:17

**holding** 201:1

**Hollyhead** 249:6 252:10

**home** 82:24 83:6

**Homes** 79:1

**honest** 237:13

**hope** 91:23 216:4

**horizontal** 171:8

**Hospital** 77:11

**host** 220:17

**hot** 166:23,24 182:6 193:4 210:23 212:2 248:3,5,10 254:9

**hotel** 71:11 72:18

**hotter** 172:15

**hour** 13:21 55:22 148:11,21

**hours** 36:14,15,18 59:21 215:1,4,7 220:6 226:11

**house** 81:19 82:17 84:6 85:7 254:4

**Howard** 78:1,3 84:12

**human** 46:12 47:9 211:16

**Hussain** 93:15 94:9 109:2,20 258:20 260:11,14,15 262:2,19

**hydrogen** 231:12

**hypoth** 186:22

**hypotheses** 46:2 122:24 123:22 164:23 186:13 187:11,13 193:21, 22 197:16 221:8,15 229:14 234:13 235:8,9 237:19

**hypothesis** 93:8 115:7 131:23,24 132:23 164:24 165:8,9,11 186:7, 14,17,19,22 187:1 188:1,13 191:15 195:1,11,13 196:20 228:16 229:1,2 232:10 234:17,18 235:16 236:16 237:17,22 238:18 244:2

**hypothetical** 235:4

———————————

**I**

———————————

**IAAI** 32:8,23 37:14,15,20 47:23

**Icove** 104:20

**Idaho** 26:19

**idea** 33:9 64:1

**identified** 67:7 80:16 81:1,24 82:7 118:12,13,16 125:19 257:22

**identify** 4:18 9:3,5 10:23 52:11 66:11 68:24 75:5 81:4 234:10

**identifying** 80:10 176:3

**ignitable** 234:15,22 235:1 236:2,4, 11,22 237:7,10,16 242:12,18,21,24 243:7 250:13 251:9,10,13 252:12, 20

**ignite** 160:15 197:7 208:3 220:12 221:21 222:1 223:16,24 234:14 235:2 239:2,16,18,22 240:14 246:21 247:5 248:1,20 251:23 252:11,17 253:6,23 254:1,7,8,12

**ignited** 99:11 159:22 161:20 197:5 209:3 214:12 250:8,11,22,24 251:6 252:3

**igniting** 219:16 251:6

**ignition** 98:21,24 99:10 158:11 166:1,3,4,8,10 187:19 189:17,19, 21 214:21 215:9,20 216:4,22 220:7 222:6,22 230:15,24 231:2,3,11 232:18 233:6 244:12 246:15,18 247:9 248:2,16 249:1,2,8,14 250:15,19 251:14,17,18,19 252:5, 14 254:6,7,10

**Illinois** 4:11,15 58:13,22 86:10 101:2 118:22 119:6 120:2,7,14,19, 23 121:3,7,12

**illustrate** 186:8 221:13

**illustrated** 187:14

**illustrating** 185:20 186:1,2 202:22 205:22

**imagine** 90:11

**immediately** 182:18 248:11

**immersed** 212:3

**impede** 179:7 260:1

**impinge** 230:3

**impingement** 206:2

**implement** 144:17

**implemented** 24:18,20 144:18 246:11

**implies** 233:18

**implying** 207:3

**important** 144:24 155:4 162:21 171:19 221:20

**impossibility** 194:8

**impossible** 144:7

**impression** 196:14 205:10

**in-court** 56:2

**in-depth** 224:18

**in-house** 109:17

**inadvertently** 139:23

**incendiary** 38:18,19,22 39:1,5,13 40:14 96:20 98:1 185:21 186:7,9, 17,24 187:9,15,18,24 188:12 228:17 229:13,14 242:11

**incident** 57:21 211:24

**include** 23:6 26:6 31:8 38:7 100:16 116:21 249:8

**included** 9:7,20 10:13 75:6 107:23 108:17 142:22 190:14 198:18 262:10

**includes** 141:13

**including** 111:12 203:21

**income** 56:11,13,14 57:13

**incomplete** 235:4

**inconsistencies** 176:13

**inconsistent** 197:18 233:7 241:15 242:6,23

**incorporated** 15:21,23 16:1,3,5 135:15 260:23

**increase** 137:15 194:12 244:20

**increases** 222:23

**incredible** 52:9

**incremental** 137:14 139:4

**Indemnity** 71:17 77:10

**Indiana** 79:3 82:23 85:6

**indicating** 186:7 261:23

**indications** 237:15

**individual** 32:11,21

**industry** 216:19

**inert** 161:1

**inference** 205:1 209:1

**inflow** 173:6

**informal** 41:21 93:11

**information** 41:11 42:22 93:9 105:10 113:8 119:21 127:5 162:13 165:6 166:16,22 172:23,24 173:4 218:3 227:9 232:1 258:1 260:8 261:20 262:10

**inherent** 242:20 247:7

**inhibit** 215:17

**initial** 72:9 88:20 160:16

**initially** 66:2 86:23 90:9 138:7 180:20 189:23

**initiate** 252:5

**initiated** 52:7 156:24

**initiating** 232:24

**initiation** 62:3

**innocence** 51:23 52:18,21,22 53:1,2,8,11,20 59:13 66:9,12,23 67:4,10 86:10,13

**innocent** 66:20 67:4,9

**input** 126:14 127:24 128:14,15 129:10 131:7,8 135:16 136:9,18,19 138:4 144:16 147:8 151:20,21 152:18,23 154:17 155:17,22,23 158:24 160:9 162:13,19 166:19 167:12 169:2,6 227:9 228:2

**inputs** 27:18 127:5,11 139:10 158:23 160:2 165:15 167:10 171:13

**inputted** 127:7 140:23 151:14 153:9,17 160:3,22 161:3 164:10 167:15 227:11

**inputting** 155:15 166:1

**inquired** 218:17

**inside** 70:17 172:16 216:13

**inspected** 118:24 119:2,10

**inspection** 42:18

**instance** 47:4

**instantaneously** 231:15

**Institute** 21:18,19 22:2 129:16 134:19 135:2 220:19

**institution** 22:13 54:11,12

**institutions** 25:11

**instruction** 178:9

**insulate** 222:21

**insulation** 73:4 78:13

**insurance** 40:11,12,21 57:21 71:6 73:3,17 85:3

**intake** 167:23

**intaking** 169:10

**integrated** 27:21

**intend** 123:14 124:11,20,22 125:8, 16 143:16 256:23

**intended** 100:1,5 144:22 157:17 246:11

**intensity** 190:4,18 191:6

**intent** 228:14,19 229:6,10,16

**intentionally** 228:9,21

**interactions** 42:5

**interconnected** 170:20 180:8

**interconnection** 170:21

**interested** 176:20

**interesting** 60:22 93:1

**interface** 136:17 137:2

**interior** 155:4

**internal** 92:19 175:16 176:19

**internally** 176:8 177:2

**International** 32:3 36:3

**internet** 32:13 143:19

**interrupt** 83:19 229:23 259:20 262:21

**interruption** 18:6 135:23 148:14

**intervention** 256:24

**interview** 119:24 120:5,12,17

**interviewed** 119:15

**interviews** 120:21 121:2,5,10

**introduce** 250:15 251:3 254:2

**introduction** 26:16

**intuitively** 66:16

**Invacare** 73:7

**invest** 123:9

**investigate** 33:9 40:6,20 57:23

**investigated** 38:17,23 39:21 41:23 152:13

**investigating** 122:23

**investigation** 26:6,10 31:12,15, 18,24 33:4,13,17,20 34:17 35:20 36:10,13,15 37:7,20 38:6,8,11 39:9,10,23 40:1,2,7,17,23 41:5 42:16,20 43:11,13,24 44:8,12 45:20 46:3,4 49:2 57:2 95:6 97:14 104:16 105:5 186:16 231:22 252:15

**investigations** 19:18 39:17 41:2, 19 50:4,15,18 52:12 151:24

**investigator** 29:23 31:8 33:7 37:11,13,22 46:5 47:12 48:12,16 95:23 215:16

**investigators** 30:5 32:4 36:3 37:16 122:21 123:9 152:9,11,12 154:1 186:15

**investigature** 48:12

**invoices** 93:14

**involve** 74:5,12 80:12 83:23

**involved** 10:3 14:8 34:19 38:24 41:5 50:22 53:12 58:4,23 64:2,17 70:6,12 71:10,18 75:2,14 79:4,9 81:2,14 82:9 86:9,12 90:6 92:15 93:3,10 94:3 95:24 99:8 123:7 161:14 252:3

**involvement** 242:24

**involving** 58:12 82:8 116:23 242:11

**isolating** 250:19

**issue** 6:4 12:20 17:12 31:19 58:1 61:1 70:14,18 71:16 72:10 96:21 100:8 124:7,16 125:3 240:5 252:15 257:5

**issued** 111:16

**issues** 43:23 46:2,6,7,8 51:3 93:10 100:11,18 123:19 132:10 252:9

**item** 159:22 195:9 209:3,8

**J**

**James** 5:12,15 7:1

**January** 9:17,21 10:15 11:3 16:10 19:21 99:21 102:14 106:22 107:21 108:1,15 113:10 115:14 116:23 118:12,17 125:20

**jet** 130:11 162:23 182:13

**jittery** 5:22

**Jo** 71:24 77:21

**job** 140:14

**John** 95:2,5 96:10 97:10,12,13 102:8 105:22 108:5

**Joseph** 4:22

---

**K**

**Kane** 84:20

**Katie** 4:16

**Kazem** 70:24 75:10 81:18

**Kelly** 70:17

**Ketchem** 76:24

**killed** 71:14

**kind** 149:6 218:5 256:4

**Kirk's** 105:5

**Kitchen** 71:22 77:12 84:5

**Klassen** 16:23

**Knepp** 77:21 84:9,10

**knew** 198:5,17 218:15

**Knise** 71:23 77:15

**knock** 231:15 232:6

**knockdown** 232:6

**knowing** 92:16 152:1 254:5

**knowledge** 35:4 39:6 46:13,21,22, 24 104:16 119:4,9 120:4,16 121:1, 9 123:1 174:19 237:19 261:12

**knowledgeable** 46:1

**Kushner** 105:21

---

**L**

**label** 187:19

**labeled** 11:7 55:2 186:16

**labeling** 186:18

**labels** 186:12

**laboratories** 246:1

**laboratory** 122:4 246:24

**lack** 92:18 193:14

**Lake** 84:19

**large** 246:3 248:12,13

**larger** 171:1

**latched** 172:10

**late** 68:5

**latest** 138:9,15 151:6

**lath** 155:6

**law** 43:5,7 88:9 89:13

**lawsuit** 54:21

**lawyer** 86:19 88:8

**lawyers** 53:13 88:7

**lay** 177:4

**layer** 129:23 166:24 167:1 168:18 171:20 173:8,13 174:8 175:1 178:22 180:23 181:22 182:3,6,21 183:1,8,23 204:5 210:24 211:6 216:8 230:7

**layers** 46:24 130:11

**laying** 185:11 222:4

**layperson** 163:21

**lead** 38:19

**leading** 208:2

**leads** 38:19

**leakage** 155:24 156:2,6 168:6 169:7 170:17 171:3,4

**leaks** 155:20 168:19

**learn** 43:24 45:14,20 176:7

**learning** 54:12

**leather** 218:24

**leave** 54:8,11 191:19 207:20,22 210:1

**lecture** 23:1

**lecturer** 22:8,16 25:14

**led** 157:5

**left** 188:7 214:11,16 217:9 226:5 228:11 238:15 258:8

**leg** 22:7

**legal** 4:12 7:5 31:17 38:20 43:22, 23 106:8

**length** 201:5

**Lentini** 97:10,12,13,18

**Leonard** 73:19 79:3 85:6

**lesson** 176:7

**level** 15:7 18:24 21:11 29:13,15 30:24 53:14 133:15 142:10 171:21 173:9,24 182:22

**levels** 83:12,15 179:17

**licensed** 27:24 28:8,12

**licenses** 28:4 29:4

**licensure** 27:24 28:16,18 54:5

**lies** 155:7 234:11

**Lieutenant** 105:20

**life-size** 121:22

**Lifestyles** 70:15 77:2 80:17 83:7, 21

**light** 194:1 205:4 253:13

**lighted** 248:24 253:6,12

**lighter** 232:18 236:12,21 253:23, 24

**lighters** 237:2

**lighting** 253:19

**limitations** 133:19 137:9

**limited** 68:1,3,4,6,7,8 123:6 134:20 198:8 205:11

**lines** 203:20

**Linger** 73:13 78:19

**lining** 215:24

**linseed** 238:9,15

**liquid** 235:1 236:4,11,22,24 237:1, 3,7,10 242:19,21,24 243:8 244:4,5, 9,10 245:3 246:9 247:11,14,18,20 248:7,9,11 250:21 252:20,23 253:3

**liquids** 233:23,24 234:14,15,22 236:2 237:16 242:12 252:12,20

**liquor** 247:24

**Lisa** 81:21

**list** 6:9 9:7 11:11 12:9,14 31:23 55:3,6,15 62:20 65:2,8 66:18 67:2 68:11,18,19 69:1 74:2,11,13,15,17 75:5 79:13 81:3 82:5 102:21 103:5, 17 106:14 107:14 108:17,19,22 115:13,17 118:16 172:23

**listed** 10:10 11:3,9 12:21 14:15 20:22 25:21 34:5 35:21 49:15,23 50:2,11 51:21 63:4,15 65:7 66:8

DOUGLAS J. CARPENTER, 03/31/2021

68:10,14 74:5,22 103:14 107:1,18
109:24 112:5 115:13 144:4

**listing** 26:3 107:6

**lists** 9:9 12:6 103:8

**lit** 166:10 238:23 248:21 254:9

**literature** 92:10 104:2,6 109:14
214:23 220:14,15,21 223:19,21
225:16 226:2 231:20 248:24 249:5

**litigation** 55:13,20,21 56:12 57:11,
17,24 58:4,10 70:14 256:14

**living** 98:11 153:8,15 157:20
159:10 162:2,17 163:16 164:8,9
165:2,15,17,21 174:23 175:1,9
178:18 179:3,6 180:2,9,11,21,23
188:14 193:9 214:6 217:20 220:24
227:14,16,22,24 229:20 230:1,11,
24 242:8

**load** 152:23

**local** 54:4

**locate** 210:13

**located** 98:10 202:23 207:19

**location** 129:6 161:23 191:10

**Loevy** 88:7 89:13,16

**long** 13:20 16:3 21:22 31:6 87:2
149:17 172:12 188:21 191:5
199:19,22,24 200:5 209:1 214:1
224:9 226:4 240:13

**longer** 73:13 78:19 149:5 155:12
163:10

**longest** 228:6

**looked** 8:23 96:9 97:5 245:8

**loose** 160:19

**Loosely** 39:19

**lose** 8:8 17:9 59:24 234:9

**losing** 18:5 222:9

**lost** 18:4,9,19 222:14 228:11

**lot** 39:19 41:19 59:3,12,24 104:6
141:23 196:8 222:9,13 249:24
252:8

**louder** 112:16

**low** 112:14 148:15 239:9

**lower** 173:24 247:1

**lowering** 247:12

**lowest** 249:22

**lunch** 148:7,12,23 149:3

M

**made** 18:23 27:21,22 87:19 88:20
97:18 151:24 153:7 154:18 155:2,5
185:13,23 187:6,8,22 188:11
198:14 200:3,19 201:6,8,18
204:11,12 218:10,14,21 249:21
264:18

**magnitude** 177:15 261:22

**main** 109:24 195:5 207:23

**maintain** 10:4,11 140:10,12

**maintained** 141:10 246:24

**maintaining** 143:9,10

**maintains** 50:13 139:2

**major** 94:13 138:19

**make** 6:1 7:15 38:15 50:5 51:4
64:13 90:16,18 139:10,15,22 141:9
143:15 144:2,12 145:4,19 176:8,9,
10 195:19 200:7 201:14,17 204:2,
18 207:10,21 214:1 221:19 233:7
235:13 245:3 264:13

**makes** 66:5 129:22 186:3

**making** 90:20 94:2 114:3 140:22
142:11 163:23 174:18 202:2 203:2
205:5 210:21 263:8

**Management** 84:19

**manipulation** 128:9

**manner** 137:12 145:8 236:19,20
257:8

**manual** 142:5,6,7

**March** 4:6 113:6

**Maria** 13:11

**Mariah** 4:21 13:12 89:20

**Marianne** 197:23

**marine** 85:10

**mark** 19:20 73:19 79:3 82:4
100:15,20 101:21 115:21 202:6

**marked** 20:3 99:22 101:13 105:12
116:1 121:15 125:21 185:16
202:11,14 223:23 243:11

**market** 45:10 217:7

**marketed** 216:19

**marking** 100:23

**marshal** 40:15 41:24 42:1,14

**marshal's** 34:8 39:14 42:11

**marshals** 34:2 39:20 41:8,14

**Mary** 22:8

**Maryland** 16:2,5 22:8 23:5 28:1,4,
9,24 29:6 34:1,2,9

**mass** 130:5 168:22 173:14,17,21
174:9 182:21 227:10

**master** 157:21 165:2,17,22 178:19
188:14 213:22 227:14,22 229:20

**master's** 14:18,24 15:1,7 18:24
118:5

**match** 166:11

**matched** 184:22

**material** 9:22 23:6 32:11 34:12
99:7 107:18 138:11 154:17 155:5,7
216:12 218:13,20,21,23 219:3,4,9,
10,15,21 220:23 224:10 225:2,6
232:12 240:4,7,8 251:20 256:16
257:22 258:4

**materials** 7:15 9:9,15,19,20 10:7,
13 11:2,24 90:10,15,16,22 102:21
103:5,14,18 106:20 107:2,15,24
108:3,14,17,20 109:21 110:8
111:6,17,21 112:1,5,6 113:3,20,21,
22,24 114:10 115:13 118:14,16
125:7 126:7 159:8 160:19 219:22
220:11 225:10 241:5 255:16,20,22
259:8,9 261:7

**mathematical** 27:15,20 126:17,21
127:1,8,13,16,18 128:9,13 130:7
139:10

**mathematics** 139:20 140:23
168:4

**matter** 4:7 7:20,21 12:12 32:11
33:10 34:18 36:19 39:15 56:4,5
57:19 61:15 62:6 69:8 71:4 73:21
81:9,10 85:14 86:2,24 91:4 94:8
95:8 98:4 99:23 100:3 102:17
116:2,7 119:1,7 155:10 156:6
164:17 171:24 178:4 240:8 254:18,
23 255:3 256:12 257:10

**matters** 55:17 57:10 62:22 64:3,
17,18 178:16 213:10

**maximum** 147:18,20 158:2

Index: Mayor-nail

DOUGLAS J. CARPENTER, 03/31/2021

**Mayor** 71:23

**meaning** 192:22 206:4 214:5 242:1,4

**means** 104:9 149:21 174:7 197:4,6 221:16

**measure** 154:15 211:9 244:5

**measured** 201:5 229:20

**measurement** 110:2,13,22 246:8

**measurements** 151:15,19,20 152:1,2,10,14,17

**mechanical** 14:6,13,16,17,21 15:2

**media** 4:2 79:24 80:3 150:7,11 226:19,22 265:22

**medical** 44:5 45:16 126:23

**medication** 7:9 198:13

**meet** 13:6,23 233:1

**meeting** 13:8,10,17,20,22 22:23 51:16

**meetings** 51:3

**meets** 104:11

**member** 50:3,10,19 51:8,10,18,21

**members** 51:14

**membership** 52:1

**memberships** 49:15

**memory** 85:20 87:24 89:9 96:15

**mental** 198:3

**mentioned** 123:10 166:13 167:11

**merits** 65:24

**met** 119:13 120:9 172:20

**meter** 110:22

**meters** 163:13 177:17,18 199:15

**method** 96:23 104:4 221:8 229:3, 9,12 230:18 233:13,17 234:12 236:19 237:15,18

**methodology** 233:21 236:10 242:13 243:21 245:1,4

**Miceli** 118:21 120:9,12,17 132:19 197:24 217:19

**Miceli's** 232:2

**Michael** 4:8 16:23

**middle** 51:16 60:12 164:16 224:21

**midterm** 175:19

**military** 43:20

**Miller** 73:7,11

**mind** 53:5 96:22 163:23 240:21

**minimum** 147:18,19 158:1

**minor** 140:3,5

**minus** 173:17

**minute** 53:17 146:10,12 147:1 148:1,2 158:6 159:5 200:2,9

**minutes** 79:20 159:16,20 187:7,23 214:24 220:6 224:1,4 225:23,24 226:11

**misnomer** 37:17

**misstates** 209:13 259:21

**Mister** 94:10

**Mitchell** 95:19 105:21

**mix** 247:21

**mixing** 211:17

**mixture** 249:11 250:6

**mobility** 205:4,11

**model** 27:3,4,8,9,13,16,22 77:20, 21 117:19 121:22 122:7,9 127:7 129:15,17,20,21,22 130:9 131:4, 19,20,21,24 133:1,3 134:17,23 135:1 136:13 139:5,9,12 141:4 142:9 143:15,23 144:1,10,21 145:3,7,10,11 146:16 150:20,23 151:5,10,17,22 153:1,9 154:16 155:13,14,16,22,24 156:1,19,23,24 158:13,22,23 160:2,9 161:3,6,16 162:5,18 163:14,19 164:14,18,20 165:16,20 166:4,13 167:16,18 168:1,4,6,24 169:1,7 170:15,16 171:13 173:1,18,23 174:15 175:3, 6,14,22 176:1 177:3 178:23 179:23 182:1 183:22 184:22 189:15 190:14,21 191:4,16 210:22 211:12, 22 213:21 227:11,15 228:1 230:9

**model's** 227:12

**modeled** 77:19 139:18

**modeling** 23:7,12,17,18,20,23 24:3,6,12,15,18 25:5,15,16 26:1,8, 9,12,17,21 74:6,12 75:3,6,9,11,15, 16,18,22 76:4,6,7,11,16,18,21,23, 24 77:6,7,9,12,16,19,23 78:2,6,9, 12,15,16,18,20,22,24 79:1,2,4,7,9, 10,11,12,15 80:11 81:1,12,13,24

82:8 114:21 115:9,12,19 116:17, 19,22 117:4,5,11,14 118:9 124:12, 17 125:17 126:11,18 127:3,18,20 129:13 130:3,19,22 131:3,8,10,13, 16 132:5 133:13,23 134:12 142:15 143:12 144:4,6 151:3,9 152:18,22 157:4,16,18 158:20 160:5 166:1 175:18,21 176:17 178:17 188:18 189:9,18,19,20 199:10 210:16 227:5 228:12 229:18 255:2 258:5

**models** 24:24 25:1 127:15,16,22 128:13 130:1,15 131:21 132:9,22 133:4,17,20,24 134:1,18 136:18 137:16 141:7,8,12 143:8 176:8

**modes** 192:12 242:19

**modify** 156:4

**module** 23:13 34:22 35:11,24

**modules** 32:18 34:11,18,24 35:3

**moment** 114:8 193:5 227:6 257:14

**momentum** 130:5,7 178:10 199:15

**money** 58:24 59:12,14,24 60:12,16 123:8

**month** 93:12

**motion** 265:2

**move** 58:2 62:17 79:18 162:23 205:19 230:8

**movement** 198:9

**moves** 61:24 125:12

**moving** 62:12 204:21

**MSC.FPE** 118:5

**multi-apartment** 85:5

**multiple** 83:12,15,23 85:5

**multiprogram** 35:20 36:15

**multiunit** 80:13,22 81:2,15 82:10 83:10,11,24 84:23

**Murphy** 76:8

**Mutual** 71:5

**MV** 85:10

---

**N**

**NAFI** 47:23

**nail** 237:9

**names** 6:24

**Naperville** 118:22 119:6 120:1,7, 14,19,23 121:3,7,12

**napping** 198:21

**Narragansett** 78:5

**narrow** 123:20 126:3

**narrower** 100:12

**narrowly** 45:5

**Nasir** 93:15 111:5 258:24 259:2 260:2,7 262:17

**national** 28:22 30:4 48:18 49:1,4,8 52:21 73:16 129:16 134:19 135:1 220:18,20

**nationalized** 29:1

**Natural** 70:15 77:2 80:17 83:7,21

**naturally** 168:2

**nature** 32:24 72:13,19 160:21 177:24 179:1 181:8 185:21 186:9 187:16 219:14 224:10

**necessarily** 70:13 110:5 179:4 192:5 196:3 217:4,14

**needed** 90:18 133:11 152:4 187:5 213:9 252:4

**negative** 173:19

**Nelson** 72:5

**newspaper** 187:19 238:23 239:3, 20 240:14,16,22,23 241:1,7

**NFPA** 50:1,3,10,13,17,24 51:6 103:22,24 228:15

**NIST** 135:7,15 139:2 141:6 143:5

**nominal** 246:18

**nominally** 13:21 15:9 29:9,10 56:15 63:10 183:15,17 188:21 203:5 217:1

**non-attorneys** 13:23

**non-piloted** 251:10

**noncriminal** 66:24 70:6

**nonsustained** 244:15

**nontechnical** 106:3,7,12,19

**normal** 237:4

**north** 4:14 75:21 82:13 180:5

**Northern** 4:10

**note** 105:20 262:12

**noted** 58:11 106:20 108:13 109:21 188:24 230:23 241:14 259:14 263:7 264:10,24 265:9

**notes** 109:4 255:6 260:15

**notice** 5:16 176:13 184:5 199:24

**noticed** 185:22 186:9 198:21 199:2

**nourishment** 149:6

**November** 26:17 116:13

**number** 4:9 8:4 14:8 16:17 24:13 29:17 34:10 35:2 42:7 62:1 63:15, 19 65:18 66:11 122:10 129:9 130:16 131:5 134:18 138:19 166:18 221:15 239:6 246:3 252:23

**numbers** 68:23 184:21 262:3 263:19

## O

**oath** 80:7 150:14 227:3 258:15

**object** 37:24 83:16,19 94:22 99:4 112:11 113:7,15 190:6,22 192:2,4 262:8 264:6

**objection** 12:3 114:3 205:7 209:11 213:14 224:12 234:3 235:3 263:7 264:22,24 265:9

**objection's** 264:10

**objects** 256:13 257:8 258:11

**obs** 197:18

**observation** 191:16 199:6,13 200:3 204:12,19 211:2,3 214:4

**observations** 172:20 186:3 191:9 197:19 200:8,19 201:7,9,15,19 233:5

**observed** 132:18,19 183:13,18 185:11 200:11 251:2

**observes** 182:23 194:21

**observing** 202:2

**obstacle** 157:9

**obstruction** 178:9

**obtain** 28:18 151:20

**obtained** 30:1 31:24 35:21

**obvious** 66:16,17 184:23

**occupation** 14:2 54:21

**occupied** 157:21

**occur** 13:8 159:14,21 197:11 208:6,7,22 222:7 240:10 248:2

**occurred** 119:1,7,11,16 157:6,13 188:15 197:13 229:17 238:13,20

**occurring** 93:13 234:2

**occurs** 57:21 69:17 157:15 189:17 208:3 220:7 247:19

**October** 6:10 25:24 26:2

**offered** 37:20

**office** 34:8 39:14 62:2

**officer** 43:5 49:17,19 117:23

**officers** 16:19 17:1 31:24 33:4,6 34:17 36:11,13

**offices** 4:14 42:1,11

**offshoot** 91:16,20

**Ohio** 75:8 81:16

**oil** 238:9,15

**Oklahoma** 53:17,18 83:5 115:22 116:2 117:19

**older** 155:21

**one-foot** 182:22

**one-on-one** 119:23 120:11

**ongoing** 109:18 263:22

**online** 22:18,24 23:2 27:6 32:9

**onset** 46:18 47:3,5,6

**open** 39:24 93:2 148:8 166:11 169:12 171:14,15,18,23 172:6,9,11 177:11 222:17 225:23 240:7 246:14,16 251:22 253:20 254:12

**open-cup** 243:24

**opened** 157:11

**opening** 128:1,3 129:11 153:3 170:24 172:2

**openings** 153:5 168:14 169:22

**operating** 19:2 141:3

**opinion** 96:2 97:2 98:3,8,9 159:9 182:24 185:10 187:2 198:20 199:23 200:5,10 203:10 208:1 209:18 212:5 214:8,11,15 217:9 221:3,18 222:1 224:2,5 226:4 228:8,13 242:1,3

DOUGLAS J. CARPENTER, 03/31/2021

**opinions** 68:5 91:8,12 92:6 94:7, 21 95:11,12 96:1,5,7 97:3,19 102:7 108:10 111:18 112:7 113:4 115:9 123:15 124:3,13 125:1,8,18 147:12 197:22 198:7,12 201:18 205:5,14 218:12 219:5,12 220:9,22 223:13 225:12 228:12 230:14 233:9 238:21 242:14 254:18

**opposed** 19:6 100:10 132:22 163:22 178:2 180:12 181:10 183:16 221:5 250:20

**opposite** 175:11

**order** 17:5 28:18 30:18 64:19 66:16 113:3,22 114:16 146:24 158:21 159:20 163:10 177:15 180:24 182:16 183:21 184:3 196:9 200:9 201:14 203:6 206:6,17 214:24 215:7 217:2 221:24 224:17, 18 237:20 265:3

**organ** 24:8

**organization** 48:22 49:11 54:8

**organizational** 11:18

**organizations** 24:8 47:21 49:18, 21

**origin** 95:8 96:3 97:4,19 98:4,7,16, 20 100:10 105:19 123:21,22 125:23 132:3 164:21,23 165:12 214:9 228:8 231:4,6

**original** 152:10

**originally** 60:8 85:15,16 86:24

**outcome** 163:5 230:13

**outcomes** 52:10

**outdoors** 78:11

**outer** 216:8

**output** 126:15 131:6 145:18 166:14,16,22 167:8 172:22 173:4 174:14 176:9,13,15 190:20 259:14

**outputted** 172:24

**overlap** 36:22

**overseeing** 94:4

**oxygen** 208:20

_____

**P**

**P-O-L-I-C-K** 4:22

**p.m.** 188:2 189:1 265:24

**packages** 159:22

**pages** 20:5,11 55:3 102:22 121:18

**paid** 56:17 60:4 109:17

**pain** 47:4 193:17 195:18 196:16 210:5 211:16

**pan** 248:4,10

**paper** 91:21 117:16,17 132:8 231:20,21 239:12,13 240:17 241:2, 4,6,8 262:2,9,13,20 264:16,21

**papers** 253:10

**paragraph** 105:13 241:23

**paralegal** 44:3

**parallel** 39:10

**parenthetically** 51:22

**Park** 22:10 23:5

**part** 11:17 23:20 26:3 27:7 44:11 47:16 50:21 55:10 92:18 107:1 108:3 110:6 111:8 114:17 115:2,4 123:21 128:15,17 134:14 136:14 143:10 151:15 153:4 156:14,16 162:12 165:6 168:24 174:3 176:18 190:20 201:14 202:17 207:5,7 227:9 229:18,22 230:17 231:18,23 233:16 235:10 245:24 246:4 249:12,17 264:1

**part-time** 22:17

**partially** 171:15 172:6,9,11

**partic** 93:8

**participating** 60:2

**particles** 223:7

**parties** 4:19

**partner** 51:19 60:21

**partners** 16:18

**party** 41:12

**pass** 32:18 36:23 192:2,3 193:11 196:15 210:5,7 212:24 244:10,20

**passed** 35:9 37:9 247:2,8

**passing** 32:21 34:18,20

**past** 123:20 193:18 199:18 210:9

**patent** 26:24

**patentable** 27:10

**path** 180:12 182:9 192:6 193:14 194:7,19 195:4 196:1 206:10,20

210:15

**pathologist** 45:24

**pathology** 45:18

**paths** 168:12 206:14,15 207:3 212:17

**pathway** 191:22

**pathways** 170:19

**patterns** 26:5 241:14 242:4,5,10, 17,23

**pay** 58:24 59:17

**PC** 143:20

**PE** 118:7

**peer** 204:7

**peer-reviewed** 231:21

**penetration** 155:12

**Pennsylvania** 53:4,7,9 67:13

**Pensacola** 73:4

**people** 23:2 60:18 91:18 138:22 144:14 177:4 192:10 193:2 198:17 215:3 231:15 238:8

**people's** 104:16

**percent** 57:13,16 251:23 253:5 254:11,15

**percentage** 56:11 57:9 62:21 64:2,16 65:16 182:15

**perception** 210:6,14 212:23 213:10,11

**performed** 125:4

**period** 23:2 30:16,23 156:20,21 199:12

**periodic** 29:3 30:13 37:5

**periodically** 35:13 140:7

**periods** 199:19

**Perreault** 70:20 71:8 77:4 84:2

**person** 70:12 118:8 119:2 144:6 202:23 207:20 210:5 212:1

**persons** 105:19

**perspective** 93:4

**petition** 256:21

**pharmacology** 48:1

**phase** 250:1

**Phds** 18:24

**phenomena** 127:14 192:17 211:18 230:10 248:6

**Philadelphia** 85:3

**phone** 86:3 140:7 185:8 200:18, 21,23 201:1

**photo** 256:17

**photograph** 153:20,23

**photographic** 111:2 256:17 257:11

**photographs** 113:13 119:3 121:18,24 124:23 152:5 153:23 255:17 259:1 263:2,16

**photos** 111:13

**physical** 122:8 198:2,8 208:11 210:4

**physically** 40:20 144:7 176:2

**physics** 14:11 45:13 174:20 175:12 254:6

**pick** 147:9,11

**pictures** 110:12,21 152:3 154:1 218:8 256:1

**piece** 93:9 126:5 159:4 195:9 196:21 208:15 221:14 235:6 262:1, 2,9,13,18 264:16,20

**pieces** 222:19 239:11

**piloted** 244:12 246:15 251:7,9,18 252:2 253:20 254:8

**pinpoint** 161:23 164:7

**pinpointed** 164:11

**place** 162:17 182:4 235:15

**placement** 221:18 223:15 230:11

**places** 153:7

**placing** 240:22

**plain** 241:8

**plaintiff** 4:21 84:17 256:13,20 257:7 258:9

**plaintiff's** 114:17 257:18 262:8 263:12 264:16

**plaintiffs** 65:13,17

**plan** 125:16 200:3

**planned** 123:18 124:1

**plans** 254:22 255:1

**plaster** 155:6

**plasterboard** 155:9

**play** 146:2 233:20 240:10

**played** 94:6

**players** 94:13

**plume** 130:10

**plywood** 77:8

**point** 40:16 53:6 88:16 91:3 98:18 101:10 148:4 149:5,18 150:2 157:2 159:7,13 163:16 165:1 169:7 172:19 173:5,8,15 174:1 179:5 183:2,4,9,12,17,18 185:2 186:5,10 188:22 190:4 191:17 194:15 195:10,22 198:24 200:6 201:23 203:2,4,15,19,24 204:2,4 206:2,8 210:17,20 211:11,14 229:19 241:19 245:8 247:15 248:2 250:17, 18 256:8 257:3 258:13,22 264:19

**pointed** 163:19

**points** 245:14

**Polick** 4:22 5:9,14,18 8:14 12:10, 22 13:3,16 17:10,22 18:7,15 38:9 73:20 79:17,22 80:5 83:20 95:1 99:13 100:20,22 112:18,22 113:1, 11,18 114:5,19 115:21,23 136:11 148:4 149:4,17,24 150:5,12 190:9 191:3 202:5,9 205:12 209:17 213:20 225:4 226:17 227:1 234:23 235:18 255:5,13 256:3,23 257:15, 17 258:12,14 260:10 261:19 262:4, 12,15,17,19,21 263:14 264:8,18, 22,24 265:4,6,8,18

**polish** 237:9

**Polytechnic** 21:18,19 22:2

**polyurethane** 99:11,12 215:20 217:24 218:4,11,17 220:8 222:7,20 224:15,20 225:3,5,14 230:20 232:14,24 233:6

**portion** 212:8

**Posey** 53:17 76:20 83:5 115:22 116:3 117:20 121:14 123:4

**position** 21:20 22:1 86:21 139:11 200:10 265:13

**positions** 20:22 21:5,14,15 23:24 24:1 25:9

**possession** 114:6,9

**possibilities** 236:7,9

**possibly** 237:24

**post** 160:13 189:3 242:7

**post-conviction** 10:2,5,12,24 11:7,17,19 12:1,17,23 106:10,11

**postmortem** 232:2

**potential** 40:13,17 58:8,9

**potentially** 40:18 57:18 195:12 196:18

**Potomac** 73:2 78:10

**poured** 253:24

**power** 192:18

**Powerpoint** 98:14 104:18 123:10 124:9 125:17 191:14 193:20 195:3, 24 201:12,20 202:6,7,17 221:10, 12,17

**practice** 31:17 143:24

**pre-required** 23:15

**precise** 184:21

**precursor** 43:11

**predict** 214:19

**predictive** 127:13

**predicts** 178:24 211:10

**preferentially** 197:7

**premise** 38:21

**prepackaged** 27:19

**preparation** 13:5,23

**prepare** 7:13 20:2 21:10

**prepared** 99:21 101:16 102:4,7 116:7,12

**pres** 15:19

**prescribed** 156:3 166:7 244:13

**presence** 42:17 180:17 234:22 242:21 243:7

**present** 42:4 51:24 235:21 238:19 252:6,7

**presentation** 75:2 98:15 193:20 195:3,24 201:13,20 202:6,8,18 221:10,13,17

**presented** 32:12 34:12 101:1 136:8 185:18 249:5

**presenting** 79:15

**presents** 35:2

**preserve** 258:8

**president** 15:19 16:23

**president/ceo** 16:22

**pressure** 168:18 169:22 172:1,13, 16 237:5,8

**pressurize** 168:16

**pressurized** 237:3

**presume** 154:8

**pretty** 16:4 66:5 71:19 162:15 193:9 214:19 239:17

**preventing** 7:6

**previous** 7:22 9:22 60:6 103:10 114:24 115:5,6,15 141:10

**previously** 25:10 100:2 220:20 223:22

**Pridgen** 79:1

**primary** 50:15

**principal** 15:20

**principles** 14:10 23:15 35:20 36:14 37:7 45:3

**prior** 87:2,11 108:18 112:2 114:1 126:18 127:2 140:17,19 150:24 151:24

**pro** 59:2 215:19

**problem** 39:4 53:10 139:6 220:1

**procedure** 5:17 92:15

**proceed** 82:1

**proceeding** 11:1,19

**proceedings** 58:12,21 61:8 101:1 106:10 265:23

**process** 41:21 50:23 51:1 60:2 141:16 143:5 166:5 176:19

**processes** 19:9

**produce** 140:12 232:5 262:3 263:20 265:6,10

**produced** 12:11,18,19,24 93:14 126:9 131:6 152:14 176:1 189:21 242:7 245:4 253:2

**produces** 137:12 190:15 220:2

**product** 217:5 218:4 242:12

**production** 233:1 258:2

**products** 44:15,16

**profession** 215:15

**professional** 24:5,7 27:23,24 28:8,13,16,19 29:4 47:19,20,21 48:19,22 49:11,14,18 54:5,8,22 55:10 118:3 242:1,3

**professor** 22:5 25:13 175:23

**professors** 21:21

**program** 15:6,10 23:4,9 33:12 37:4 134:14,15 135:14,17 136:14 137:6,18 138:22 139:3 142:1 143:13 144:8 174:4 176:4

**programs** 26:21 27:11 132:6 139:22 143:21

**progression** 197:14

**project** 51:23 52:18,21,23 53:12, 20 59:1 61:18,20 62:3,10 66:9,12, 23 67:4,10 86:10,13 91:17 92:20 93:16,19 94:4,7 109:17

**projects** 53:1,2,8 59:14 66:20

**propagated** 217:5

**propagating** 223:3

**propensity** 215:20 216:4,24 217:17 222:3,6,22 223:11 225:8 239:8,23

**proportions** 247:22

**proposal** 50:23

**proposals** 50:23 51:4

**protection** 14:3,4,8,18,20 15:4 24:10 25:23 26:15 44:13 46:17 47:14 48:13,20 118:6 133:22 137:19 206:16

**protective** 265:2

**provide** 17:8 18:22 35:16 96:1 104:4 232:6 255:15 263:13

**provided** 11:12 12:15,16 30:11 32:22 35:17 36:24 46:15 55:6 66:14 90:9,23 105:18 106:6 127:6 134:12 154:9 167:8 255:20 257:20 260:22,24 261:9,13,20 264:9,12

**proximity** 195:17

**public** 39:7

**publications** 9:8 220:17

**publicly** 15:16 126:16 259:11

**publish** 91:23

**published** 15:14,15

**publishing** 109:10

**Puckett** 73:12 78:17

**pull** 210:22 211:12

**purchased** 72:23

**pure** 249:21 254:15

**purely** 257:14

**purported** 257:13

**purpose** 143:16

**pursuant** 5:16,17 126:10

**push** 137:3,4 170:8 222:18

**pushed** 137:16 138:4

**pushing** 169:11

**put** 27:16 46:16 60:3 88:2 115:18, 20 117:3 127:22 129:4,5,6,7,8 134:17,18 135:1 137:1 138:3 140:11 153:3,4 156:3 158:8,9 160:23 162:2,4 163:3 164:12,15 165:6 169:19 170:15,17,18,23,24 171:6 173:18 175:4,15 178:14 209:4 216:9 230:1 241:19 248:10 250:4

**puts** 161:7

**putting** 26:22 238:9

---

**Q**

**qualified** 46:5 47:13

**quality** 92:19 176:19

**quantified** 191:11

**quantify** 184:10,17,19 191:12 212:20

**quantitative** 211:3

**quarter** 192:24

**query** 167:7

**question** 6:4,18,21 7:3 8:15,21,23 10:22 18:20 37:21 41:22 44:22 81:11 111:11 124:19 137:23 150:22 151:12 159:13 202:1 219:8 225:17 226:7 229:8,24 233:22 236:23 245:20 260:1,13 261:2

**questioning** 256:11 264:6 265:14

**questions** 7:7,10 53:24 54:2 101:9 119:20 124:5 198:16 258:13 264:5

DOUGLAS J. CARPENTER, 03/31/2021

**quick** 66:19 255:6

**quickly** 191:24

**quizzes** 35:7,10

---

### R

**radial** 178:8

**radially** 230:4

**radiant** 191:24 192:15 193:1,11,24 194:2,6,13 196:8,13 211:19 212:4

**radiation** 192:13 211:24

**radicals** 252:4

**rags** 238:10,15,16

**ran** 138:2,3,6 150:16 214:1

**range** 146:9,19,20 147:3,21 148:2 158:7 189:6 215:6 220:5 224:6 225:23 247:3

**ranges** 214:23

**rapid** 232:6

**rare** 144:13

**rate** 55:22,23 58:18 140:16 145:20, 22 156:12 161:8,10 166:5,7 167:3 168:20 179:11 184:20 190:8,10,12, 17 191:2 193:10 194:14,16,18 209:5 210:3 211:11,13,15 219:16 245:17,20

**rates** 55:24

**rationale** 176:23

**Rattner** 76:17

**reach** 95:16 208:21 248:5

**reached** 94:20 172:20 188:20 196:16 214:5

**reaching** 31:20 115:9 126:1 147:12 195:18

**react** 200:1

**read** 36:12 108:11

**readily** 101:6

**ready** 265:15,18

**real** 66:18 134:16 141:14,18 142:16 164:14

**reality** 238:1

**realize** 175:24

**reapply** 29:11

**reason** 132:21 150:22 245:16

**reasonable** 133:10 134:9 208:24

**reasons** 251:21

**rebuttal** 102:7

**rebutting** 68:6

**recall** 53:9,19 84:14 86:1,6 88:6

**recalling** 12:20

**received** 47:15 90:15 113:19 114:10,12 138:12 150:19 257:24 258:1

**recent** 10:9 99:23

**recently** 42:16

**recess** 80:1 150:8 226:20 255:10

**recitation** 23:2

**recliner** 202:18 207:19

**reclining** 98:10,21 99:1 159:11 160:4 161:3,24 165:12,14 209:9 212:6 214:12,17 217:20 218:14 219:11 221:4 226:6 227:10 228:10, 21 232:13

**recognize** 162:19 175:4

**recollection** 86:22 89:3,6

**reconsider** 95:12 96:6 97:3

**Reconstruction** 104:20

**record** 4:2,19 5:14 6:3 13:12 17:15,16,18,19,21 18:10,12,14 56:1 79:24 80:3 112:18,21 113:19 114:3,4,13 150:4,7,10 226:19,22 244:16 255:9,12 258:9 263:8 265:1,10,16,19,22

**recorded** 138:10 147:5,6 224:7 255:23

**recording** 110:23

**records** 56:8 88:23 114:5

**recounting** 115:5

**recreate** 123:8 142:2,9

**recreated** 122:10

**rectangular** 130:4

**redepose** 265:5

**reduce** 215:19 216:3,24

**reduced** 216:5,6

**reduces** 217:17

**refer** 19:1 261:15,16

**reference** 63:5 104:3 134:13

**referenced** 103:22 152:17 258:4

**referred** 91:24 217:24 244:22

**referring** 7:19 9:14,15 10:1 24:16 46:8 54:24 106:13 142:13 170:13 225:21 232:14 240:24 241:2

**reflect** 5:15

**refresh** 89:3

**refrigerator** 169:12,13

**regard** 27:23 131:2 219:8 254:23 255:17

**regulated** 160:11

**reimbursed** 59:20

**reimbursement** 58:16

**relate** 104:16

**related** 19:18 22:2 44:7 57:10 100:18 240:18

**relates** 45:2 255:2

**relating** 112:1 113:13 116:17 263:9

**relationship** 139:7

**relative** 179:20 181:5

**release** 209:5 211:11,12,14 237:4

**relevant** 212:3 243:24

**reliability** 92:17 100:9 123:23

**reliable** 31:20 95:18 104:10 137:12 200:14 209:16 235:13 236:19

**reliably** 95:15 238:4

**relied** 95:17 113:4 114:24 220:13 257:23

**rely** 103:21,23 104:1 220:16

**relying** 248:23 249:4,5

**remains** 218:7

**remedy** 6:5

**remember** 67:13,15 71:18 72:8 73:22 79:6,16 86:11 89:14 90:20 96:4,21 97:21,22 160:6 170:1 171:17,23 176:21 199:14 207:1 215:12 247:20

DOUGLAS J. CARPENTER, 03/31/2021

**remind** 210:19

**remnant** 234:24

**remnants** 237:15

**removal** 157:9 167:22

**remove** 169:20 170:8 223:6

**remover** 237:9

**renew** 35:13

**renewal** 29:3 30:13,16,23 37:5

**renovated** 71:12

**reopen** 256:22

**repeat** 5:24 10:21 103:10

**repeatable** 245:18

**repetitive** 107:7

**report** 6:10 7:16,18 9:16,21 10:15
11:4 12:17 19:21,23 20:2,10 55:1,4
99:21,23 100:2 101:22 102:3,7,13,
14,23 103:11,12,13 106:21,22
107:4,8,10,15,19,20,23,24 108:14,
23 109:22 110:1,4 111:9,10 113:9
115:14,20,22 116:2,6,10,12,15,22
117:3 118:12,17 121:14 124:10
125:20 126:8 138:23 144:19
185:15 187:3 243:10,11,12 245:10
249:11 256:2 257:23 260:23
261:14,15 262:1,11

**reported** 110:3 111:9 125:6
201:15 209:7 245:9 260:18,19

**reporter** 4:15 5:3,11 73:9 112:10,
14,17 135:24 136:1 149:2

**reports** 7:19 9:8 58:11 100:6,14
102:16 108:4,11,13 110:7

**represen** 103:7

**represent** 4:20 104:14

**representation** 17:6 199:20

**representative** 169:17 217:14
241:5

**representing** 4:13 12:22

**represents** 173:20 247:14

**reproduce** 188:9

**request** 90:12,19,20

**requests** 90:16

**require** 37:4 108:19,23 128:8
232:24 251:17

**required** 23:16 29:13,15 36:18
37:6 39:6 46:18 47:4 51:2 117:6
126:16 190:13 206:1 231:2 252:4

**requirement** 30:20,22

**requirements** 113:20

**requires** 34:20 36:13,15

**research** 19:13 21:20,21,22,24
22:2,5 25:12 57:3 91:18,19,21
109:10 143:6 216:15,21,22,23
217:3 225:21 239:1 240:12,18
241:1 248:23 249:7 252:13 253:8,
12

**reserve** 256:11

**reside** 16:2

**residence** 242:5

**residential** 81:19 82:15 84:6 85:7
231:10

**residual** 235:12

**residuals** 234:8

**resistance** 168:13

**resolve** 257:5

**resolved** 256:12

**resonant** 143:22

**resources** 123:5 133:18 137:14

**respond** 114:15

**response** 46:9 47:1 81:11 111:23
138:12

**responsibilities** 131:2

**responsibility** 50:15 144:20

**responsible** 22:19 50:20 92:13

**result** 68:14 70:14 109:12 110:10
128:18 135:6,21 136:5,6 146:5,15
157:15 161:20 231:13 242:11
250:5

**resulting** 242:14

**results** 113:8 116:20 117:2,8
125:2,5 134:21 135:9 137:12
144:12 147:23 158:22 174:14
175:23 176:21 245:5 259:14 261:3

**retained** 55:16 62:5 65:3,5,13
67:23 85:14 86:1 87:5,10,13,14,18,
21 88:6,15,16 89:7 91:4

**retainer** 62:9,15 88:11,21

**retainers** 62:8

**retention** 88:18

**retest** 29:11

**retired** 96:15

**retreated** 213:23

**retreating** 210:12

**return** 149:7 167:24 243:10

**Reuter** 71:20,22

**review** 8:7 9:1,11 51:22 52:3,5,16
56:1 59:1 108:4 152:20 177:12

**reviewed** 8:2,5,6 9:9,15,20,22
10:10 12:7 56:8 90:10 102:21
103:5,12,14,18 106:2,20 107:2,15,
24 108:3,6,14,20 109:21 110:8
112:6 115:13,18 118:16 119:3
126:7 176:17 198:6,19 215:14
241:12

**reviewing** 13:4 53:22 205:9

**revision** 50:16 138:19

**revisions** 138:19 140:3,5

**Richard** 16:21 51:20 92:3

**rigorous** 35:2

**rising** 244:10 247:12

**River** 73:18 79:2

**robin** 246:1,4

**Roby** 16:21 51:20 92:3 94:8
176:18

**Roby's** 92:5

**role** 92:5 93:18,22 94:6 97:22
146:2 240:10

**roles** 92:22

**Ronald** 76:3

**room** 98:11 128:6 129:5 145:5
151:10 153:7,8,15 157:20 159:10
161:1 162:3,18 163:16 164:8,9
165:2,15,17,22 168:16,18 169:4,
11,14 171:22 174:23 175:1,9
178:14,18 179:2,3,6,7,16 180:3,7,
9,11,21,23 181:4,10 182:15 184:2
188:14 193:9 207:23 208:18
209:10 211:8 214:6 217:20 220:24
227:14,17,22,24 229:20 230:1,7,
11,24 242:8 244:6,8 246:18 247:11
251:13,23 253:5 254:12

**rooms** 153:3 156:2 167:2 170:15,
20 177:24 178:2,20 181:9,17 182:2

Urlaub Bowen & Associates, Inc.   312-781-9586

**rough** 63:9

**roughly** 63:14

**round** 245:24 246:4

**rudimentary** 167:18

**rule** 113:21 178:3 228:20,23,24 229:4 233:10,16,17 243:4,5 257:4

**rules** 5:17 6:13,16 69:16 263:23

**run** 131:5 133:3,5,18 134:11 136:7, 13,17,19,23 137:21 138:13 141:8, 24 142:1 143:18 144:1,10 145:3, 10,11,15 155:13 156:1 253:17 263:3

**running** 122:24 133:9,17 143:15

**runs** 143:20 145:16,21 147:2,11, 12,20 150:20,23 151:3,5 227:6

**résumé** 14:15 15:11 20:17

———————————

**S**

**safe** 69:18 216:2,15,18 217:6,10, 12

**salary** 56:17

**sample** 235:14

**scale** 121:22 122:7 154:4,13,14

**scaling** 152:5 153:22

**scanner** 110:13

**scenario** 187:20 228:22 231:9 232:5 233:19

**scene** 40:20 41:14 42:15 47:12 104:19 118:21 122:2

**scenes** 42:4

**Schatzle** 4:12

**scheduled** 42:18 51:17

**scheme** 11:19

**school** 175:20

**science** 14:17,18 15:3,20,22 16:12 17:4 18:21 23:16 55:11 118:6

**sciences** 14:7 19:3,9,11,19 23:22

**scientific** 96:23 104:1,5 214:23 220:14,15 221:8 223:18,21 225:16 229:2,9,11 230:18 231:20 233:12, 17 234:12 236:19 237:15,18 258:5

**scientifically** 242:13,15

**Scott** 75:23 82:16

**screen** 8:9,12 66:4 101:8 241:20

**Scripto** 253:24

**sealed** 156:2 170:18

**seat** 162:9

**second-degree** 46:18 47:6

**seconds** 146:11 147:24 148:1 163:11 204:18

**section** 63:11 109:21 243:12

**sections** 110:12

**sector** 39:7

**seek** 256:11,23

**seeking** 173:3 257:12,13

**Sees** 202:18

**select** 36:22

**selected** 37:2

**selection** 133:24

**self-heating** 77:17

**seminars** 21:10

**sense** 31:22 39:19 64:14 66:5 123:19 143:17 144:2,12 145:4,19 174:18 176:10 198:14,15 249:20

**sensitive** 164:18 230:10

**separate** 10:12,24 11:13 134:15 153:8

**separated** 153:7

**separation** 169:15

**September** 85:22 101:22 102:14 107:9,19 119:17

**series** 53:24 121:17 138:21

**served** 43:20

**serves** 96:15

**services** 17:7 18:20 55:20 58:18 60:14 61:6

**set** 27:18 53:13 56:22 61:18,19 62:1,10,20 65:1 72:10 88:18 118:16 131:4 133:8 139:9 165:15

**setting** 7:2,4 31:17 82:15

**shape** 240:8

**shareholders** 16:14

**shares** 16:18

**Sharon** 76:5

**she'd** 203:16

**sheets** 241:8

**Sheree** 76:8

**Sherwin** 105:22

**ship** 83:4

**short** 79:17 110:12 149:14 193:6 196:9 199:12

**show** 29:12 62:9 128:18 141:11 144:9 163:20 173:23 174:8 177:4 180:19 182:1 201:21 210:16 239:1 240:13 241:2 242:5 252:16

**showed** 154:3 197:17 221:9 253:10

**showing** 115:24 186:21 187:2,15 205:23 206:10 207:13

**shown** 142:9

**shows** 55:15 225:22 254:15

**shredded** 241:9

**shuffling** 136:2

**side** 19:4,10 41:17 96:17 139:14 157:12

**side's** 75:17

**sides** 19:1,12 56:23 75:15 171:5

**sight** 194:3 201:21 203:1,19

**signature** 20:7 101:18 102:10 116:9

**signed** 62:15 88:24

**significant** 171:1

**significantly** 156:8

**sill** 128:3,23,24 129:7

**similar** 35:23,24 36:21 37:8 42:1, 3,12 80:13 170:24 246:2

**similarities** 52:9

**simple** 128:10 176:24 177:19 202:24

**simpler** 117:2

**simplistic** 128:13

**Simply** 72:6

**simulation** 136:24 156:7,9 166:20 214:2

**simulator** 134:24 135:9 136:21

137:6,17

**single** 80:13,18,21 81:2,15 82:9,24 83:6,9,22 84:1,3,23 85:4 195:22 208:15 209:3,19 215:1 261:9 262:1,9,13,18 263:19 264:16,20

**singular** 214:3

**sir** 5:10 14:2 136:3 226:9

**sit** 11:23 60:20 61:4 90:20 98:2 106:15,18 125:11,14 127:9 152:19 222:16 254:24 255:4

**sits** 222:15

**sitting** 161:12 215:3

**situation** 83:13 205:24 232:4 244:1

**situations** 131:5 178:12

**size** 168:19 174:7 179:12 191:12 194:10 196:10 210:3 211:2,4

**skimmed** 9:10

**skin** 47:1

**sliding** 152:2 157:5 159:18 197:6, 21 202:3 203:12 206:21 208:2,7

**slightly** 246:23

**slowly** 244:9

**small** 130:3 139:4 161:19 182:14 244:12 246:12

**smaller** 179:19

**smell** 198:14,15 199:3

**smelled** 199:9

**Smith** 72:2,3,5,11,21 75:19 78:8 81:21 95:19,20 108:5

**Smith's** 96:5 108:13

**smo** 99:7

**smoke** 124:15 126:3 129:24 130:10 132:2,17 133:1 134:5 146:8,19,20 147:3,21 156:11 157:1,19,20 158:3,17 159:23 164:5,17 165:1,16,21 167:1,3,6,23 168:13,20 169:20 170:9,14,16,19 171:16,24 172:3,12,17,20 173:23 174:24 177:16,23,24 178:6,13,17, 22 179:2,7,15,17 180:4,10,16,17, 20 181:7,16 182:6,23 183:9,12 184:5,9,10,13,17 185:1,3,4,7,11,23 186:3,10 188:13 189:1,7,10 198:22,24 199:3,6,9,16,18,24 203:3,23 213:21 214:5 223:2,4,6

227:13,21 228:4 254:3

**smoke's** 177:7 182:19 184:2

**Smokeview** 134:13 135:8,14,17, 23 136:10,13 137:1 139:6 163:20 164:14 174:3,17

**smoking** 215:4

**smolder** 225:7 239:13

**smoldering** 98:24 99:8 185:22 189:24 190:1 199:22 214:11,21 215:9,20 216:12,22 217:13 219:16 220:7,12 222:6,22 223:3,4,16,23 224:3,17,18,19,22 225:9,13,22 230:16,20 231:13 233:2,3 238:23 239:2,19,21 240:10,13 251:20 254:9

**smolders** 220:1

**societies** 24:5 47:20,22

**society** 24:9 25:23 26:14 46:16 47:19 49:2

**sofa** 208:17 221:1,5

**Sofas** 72:6

**soffit** 128:2,7,24 129:8 153:2,6,11, 13 154:15 173:9 174:22 175:2 177:9 178:14 179:5,17 180:6 181:1,20,23 182:17 183:7 230:6,7

**soffits** 171:21 178:4,23 180:17

**software** 27:12 126:16 136:9 139:1 140:10,11,12 143:11,19

**solely** 225:2

**solve** 24:21 27:18 130:8 138:4

**solved** 24:19

**solver** 27:19 130:7 136:20

**solvers** 27:16,20

**Somebody's** 8:12

**something's** 8:13 144:16

**Sons** 79:5

**sophisticated** 133:4,12

**sort** 34:19 35:4 52:20 59:13 109:5 161:1 177:14 252:14 258:5 265:3

**Sotos** 114:11

**sounds** 6:6 60:21 79:20

**source** 98:22 99:10 119:21 161:2 166:2 178:1 192:20 221:5 230:24 231:2,3 232:18 244:12 246:15

249:2,15 250:16,20 251:15,17,18, 19 254:9

**sources** 152:7 166:10 169:2 230:16 248:16 249:1 254:6,7

**south** 206:5

**southernmost** 210:17 212:7

**space** 130:1 244:11

**spaces** 124:15 130:8,13

**spanning** 121:18

**speak** 112:16

**speaking** 105:14 141:14 151:16 152:8 168:5 170:11 191:24 216:17 232:1

**special** 69:17

**specific** 14:5 37:13 38:4 53:13 72:16 74:9,10 77:7,9,15 96:21 101:5 117:5 129:12 146:7 158:10 160:5 162:18 166:1 191:8 194:21, 23 205:3,13,16 213:13 225:19 226:12 230:19 231:9

**specifically** 9:6 14:23 24:9 25:1 33:2 34:5 38:5 53:4,21 68:22 86:7 100:9 122:22 145:10 147:7 162:4 168:9 170:12 199:5 200:17 219:3,7 220:15 221:1,2,12 239:5 240:21 247:8

**specification** 161:7

**specifics** 131:9

**speculative** 257:14

**spell** 5:11

**spend** 59:19 123:7 149:21,22

**spent** 141:6

**spill** 181:1,3

**spilling** 130:12

**spoke** 126:17

**Spooner** 69:6 77:1

**spot** 164:3 211:20

**spread** 70:19 71:15 100:10 159:10,21

**spreading** 159:7

**spreadsheets** 26:23

**spring** 22:22

**squared** 192:20

DOUGLAS J. CARPENTER, 03/31/2021

**St** 70:23 77:6

**stacked** 241:1

**stage** 159:3

**stagnant** 8:12

**stamped** 202:11 205:20

**stand** 204:7 264:14,15

**standalone** 100:18 135:14

**standard** 50:17 104:12,14 143:24
148:22 152:1 245:3,24 259:10

**standards** 50:24 104:13 129:16
134:19 135:2 220:19,20 243:22

**standing** 200:15 204:10 209:24

**standpoint** 154:23

**start** 26:11 40:22 61:5 62:3 98:7
132:3 137:9 157:2 158:20 167:2
181:24 184:13 194:18 229:16
238:12 242:2 244:6,7 246:23 247:1

**started** 26:18 61:14 62:6 70:17
71:13 85:18 98:9 171:21 186:14
188:6 208:9 215:9

**starting** 59:11 91:3 156:18 158:11
162:8 164:4 166:5 232:23

**starts** 20:17 69:2 121:16 173:13,
21 179:10 180:4 182:10 193:3

**state** 5:10 28:1,19,23,24 34:2,8,9
39:14,18,20 40:15 41:1,5,13,23
42:1,10,12,14 52:22 53:8 54:4
65:3,5,7 69:6,16 70:24 75:8,10,21,
23 76:8 79:3 81:16,17 116:2
241:24

**statement** 69:23

**states** 4:10 28:9,13,16 53:16,19
160:12

**statistical** 245:15,17

**stay** 173:12

**step** 24:23 192:23 193:4 237:21
244:18

**stick** 192:14

**stills** 154:4,10

**stood** 236:3

**stop** 18:8 40:6 60:11 196:17

**stopped** 212:11,22

**stopping** 10:17

**store** 72:23

**straight** 24:19 180:16

**Street** 4:14

**strenuously** 257:7 262:7,8 264:6

**strike** 25:15 28:7 86:8 126:22,23
131:11 155:19 167:13 176:16

**strong** 97:15

**strongly** 60:1

**structure** 71:10 121:22 122:7

**structures** 130:4

**stuck** 201:6 204:11

**students** 22:24

**studied** 219:19

**studies** 26:7 140:20 141:7 142:8,
15,16 240:12 249:8

**study** 15:12 31:9 142:7

**stuff** 45:19 53:18 105:9 143:2
239:11

**subcommittees** 49:22 50:1

**subgroup** 50:21

**subject** 23:10 32:11 33:10 36:19

**subjective** 236:9

**subjects** 32:16

**subpoena** 111:16,20,23 113:21
114:15 126:10 138:12 257:21

**subrogation** 58:3

**subscribed** 243:20,21

**subsequent** 72:24 134:22 135:11

**subset** 32:8 48:19 81:12

**substantial** 123:7 194:12 216:20

**substantially** 60:7

**subtract** 128:22,23 188:22

**subtraction** 128:10

**subtractions** 51:5

**suddenly** 180:18

**sufficient** 210:4 247:15

**suggest** 183:20 195:8 200:18,22
203:22 234:8

**suggested** 199:6

**suggesting** 54:1

**suggestion** 198:10

**suggestions** 148:9

**suggests** 159:12 175:13

**suite** 4:15 27:20 140:19 141:8,23

**summaries** 106:2,6,19

**summarize** 123:15 124:3,13
125:1,8,18

**summer** 22:22

**superior** 137:6

**supplement** 100:1,13

**supplemental** 12:16 103:11

**supplemented** 103:9

**support** 97:8 123:15 124:3,13,24
125:8,18 167:21

**supposed** 70:21 234:13

**supposedly** 244:1

**supposition** 202:2

**suppressed** 121:6,11

**suppression** 250:2

**surface** 155:4 218:21 219:4,15
224:20 251:11 254:10

**surrogate** 249:13,18

**survive** 210:8

**Susan** 76:17

**suspend** 255:14 256:9,19,22
262:5 263:21 264:4

**suspension** 256:14 258:11 262:9

**sustain** 208:20

**sustained** 244:21 246:13

**Sutton** 73:24 79:10

**swear** 5:3

**swivel** 221:1,5

**sworn** 5:4,7

**system** 152:18 164:13 169:10,17,
18,24 170:2

**systems** 19:6

---

**T**

---

**table** 208:10

**Tak** 71:24

**Takajo** 71:24 75:19 77:20,24

**takes** 33:7 159:19 179:23 224:9 244:18 252:8

**taking** 7:9 32:20 149:3 168:6 198:13 240:21

**talk** 23:3 60:21 92:24 111:5 114:4 192:11 195:23 248:16 249:10

**talked** 67:16 72:1 91:15,18 203:5 252:22 260:7

**talking** 33:3 61:9 85:15 123:22 127:12 151:9 154:5 156:10 157:14 159:19,23 163:12,22 167:23 176:21,22 182:17 185:17 189:3,4 211:5,6,18 240:16,17 252:19 253:21

**Tara** 89:2,5,7,24

**targets** 38:5 211:23

**task** 49:24 50:14 130:18

**taught** 22:20 23:4,14 24:12,24 26:2,8,18 33:24 34:1,8,14 133:22,24

**teach** 21:9,17 24:5 26:4 175:17

**teaching** 20:21 21:4,13,24 22:3, 13,17,18 23:24 24:1,2 25:9,17 26:11 31:2,4 33:8

**team** 91:14 92:12 106:8

**technical** 91:15,24 92:13 125:24 142:5

**technician** 4:1 5:2 8:8 17:14,17,20 18:5,8,11,13 79:23 80:2 112:19,24 148:15,19 150:3,6,9 154:6 226:18, 21 255:8,11 265:15,20

**Technology** 129:16 134:19 135:2 220:19

**Teel** 73:18 76:12 79:1

**telling** 163:24

**tells** 175:3

**temperature** 47:2 110:2,13,22 125:6 166:23 174:12 175:9,10 192:18 194:12 204:2,6 210:17,23 211:15 212:2 244:5,7,8,10,17,20, 23 246:5,18,23 247:3,10,11,18 251:13,24 253:3,5 254:13

**temperature's** 194:10

**temperatures** 47:1 175:8 248:20

250:10 255:24 260:18,19

**ten** 34:5 110:2

**tenability** 204:16

**tend** 59:23

**tens** 56:10 91:2 214:24 220:6

**term** 37:15 186:21

**terms** 19:9 36:18 37:1 56:22 63:16 100:7 112:12 127:13 156:16 160:2, 5 162:20 173:3 174:21 177:23 191:9 211:23 244:2 256:16 258:4

**test** 29:1 32:17 34:23 35:4,11 46:2 47:3 74:15 93:7 110:14 115:6 125:4,5 131:22 132:12,13,23 142:15 147:21 156:15 164:23 165:8,10,16,20 186:24 187:10 195:1 196:20,24 197:1,15,17 221:8 222:13 225:19 229:19 243:23 246:2,7,11,22 247:7,8 250:17 260:17,21 261:5

**tested** 31:6 32:14 35:10 195:2 217:13 244:2

**testified** 5:7 10:3 11:1,20 64:7,8 65:1,6 80:10 84:14 87:12 88:4 94:18 96:14 105:19 106:3 108:9 113:16 257:10 259:7,15 261:24 262:16 263:10,15,18 264:2

**testify** 64:5

**testifying** 67:24

**testimony** 11:14 55:3,7,15 56:2 63:3,7,12,16 64:10 66:8 67:8 68:2 69:2 70:5 74:16,20,23,24 105:18 209:14 256:5 259:12,22

**testing** 28:20,22,23 30:7,10 34:19, 20 35:24 91:22 92:11 93:21,23 109:1,6,10,13,20 110:10,18 111:3, 14,22 112:2 113:14 122:8,9,13,16, 18,19,24 123:3,21 124:24 125:5 165:1 186:22 191:15 193:21 221:15 223:14,17,18 224:7 225:13, 18,20 238:22 240:18 241:11 243:14,18,19 245:6 247:17 249:4 250:18 251:2 253:9 254:17,23 255:18 258:5,19,23 259:7,19 260:12,14,16 263:17

**tests** 109:8 117:20 122:3,10,24 141:5,14,15,20,24 142:18 220:10 223:19 239:6 245:7,11,12,21 246:1 251:4 252:16 253:17 259:13,14 261:3,11,16,17 263:3,4,5,9

**Texas** 52:8 73:15 82:20 83:1

**text** 104:24 105:3,6

**textbooks** 104:3

**texts** 103:21 104:19

**thermal** 155:11 192:13 193:24 194:2,13 195:18 196:2 204:16 207:20 209:20 211:9,18,23 212:4,5

**thermally** 192:5,7

**theses** 15:15

**thesis** 15:12,14

**thick** 185:1 203:23

**thing** 135:8 159:5 160:11

**things** 12:20 14:24 23:3 45:14 68:8 100:11 115:17 123:8 127:22 137:11,13 143:23 144:19,24 145:6 160:21 163:18 167:7,24 168:23 170:22,23 176:2 177:11 187:4 192:9,21 193:19 216:14 228:23 229:4 238:16 240:9 241:10

**thinking** 109:9

**Thompson** 89:3,24 111:7,14

**thought** 45:6 93:6 144:17 175:5

**thousands** 56:10 91:2

**three-** 24:5

**three-cushion** 222:15

**three-year** 29:9,16,20

**threshold** 193:17 195:19 196:16 208:21 210:4,6

**thumb** 90:12

**time** 6:7,20 16:3 25:19 33:22 36:17 39:24 41:4 42:5 50:11 56:16 58:24 60:17 61:14 62:5,24 63:24 64:23 65:21 86:18 87:2 88:2 96:14 103:8 106:9 108:7,8 112:13 117:3 124:8, 9,14,18 126:3 132:1,2,16 133:5 139:21 141:8 146:7,17 147:7,18 148:2,22 149:21,22 150:2 154:7 155:10,11,13 156:9,15,17,20,21,22 158:2,8,10,13,15 159:14,19 161:16,18,23 162:21 163:10 165:5, 7,20 166:6,24 167:1,9 173:21 177:19 178:18 179:16 181:4 182:3 183:17,24 184:1,8 185:17 186:11, 23 187:1 188:2,6,7,9,17,19 189:3, 6,7,14 190:2,3,14,15,16,24 194:7 195:10 199:1,12,19 203:18 204:18 206:15 209:6 210:20 211:11

DOUGLAS J. CARPENTER, 03/31/2021

214:16,19 215:8 216:3 224:24
225:24 226:10 228:4,6 234:7
244:5,9 255:13 256:10 257:2 258:8

**times** 39:2,11,20 57:7,20 62:13
65:19,21 66:3 122:11 145:9,11
188:8,22 214:21 215:6 218:1
222:13 224:6 252:23

**timing** 178:24

**Tina** 120:9,12,17

**title** 49:12

**tobacco** 216:13

**today** 4:16 7:6,14 11:23 13:5 61:10
87:5,18,22 88:13 90:20 98:2
106:15,18 112:3 123:17,18 125:11,
14 127:9 152:19 218:1 254:24
255:4 259:12 263:11 264:2 265:14

**today's** 56:6 265:21

**told** 20:19 48:3 56:21 83:7 85:8
91:1 108:24 109:9 259:12 262:24

**tolerate** 204:15

**tonight** 149:12

**tool** 164:23 165:5

**top** 29:18 61:17 64:4,15 106:17
117:16,17 118:4 129:15 181:15
222:5 237:12 247:19

**total** 63:15,19 189:6 260:17

**Touse** 74:1 79:12

**towels** 241:8

**toxic** 231:14

**toxicological** 231:22

**toxicologist** 44:19,20 45:7

**toxicology** 44:7,11,24 230:19
231:8,17,23

**toxins** 232:1

**Traci** 73:16 78:23

**tracked** 168:3

**trademark** 27:1

**Trading** 70:16

**traditional** 206:18

**trailer** 82:19

**train** 33:12,17,19 84:8

**trained** 43:1,4 46:11

**trainer** 32:10 33:11

**training** 43:22 44:1,5 45:18 47:11,
14,15,24

**tranche** 107:5

**Trane** 73:8

**transcripts** 105:18

**transfer** 46:24 76:16 77:13 154:23
192:12 199:18 228:4 240:5 242:19

**transferred** 222:10 240:4 256:2

**transit** 156:19

**transition** 162:22 189:13 190:18
191:6 194:17 220:7 224:18 225:22
226:6 227:13,22 233:3,4 239:19

**transitioning** 86:20 189:24 190:3
219:17 231:13

**transitions** 250:1

**transport** 126:3 129:24 130:10
133:2 134:6 146:21 147:4,21
156:11 157:19,20 158:2 159:24
161:18,23 162:20,21 163:10 164:4
165:1,16,21 167:6 170:19 177:23,
24 180:1 182:8,14 188:6,13,19
189:6,7 190:13,15 199:15 224:16

**transported** 132:2,17 167:1
184:14

**transporting** 178:18,20 180:4
181:8

**transports** 177:16

**trash** 239:7

**travel** 58:16,17 124:15,16 180:12
182:9

**Traveler's** 77:10

**Travelers** 71:17

**traveling** 170:13

**traverse** 212:17

**treasurer** 16:24

**treat** 99:10

**treatise** 105:3,7

**treatises** 103:21

**treatment** 47:8

**treats** 139:9

**trial** 10:3 11:14,16,20 12:1,24
51:16 60:10 63:6 87:11 88:3 106:3

**true** 11:5 67:1 133:19 160:6 175:11
187:20 202:4 233:24

**tunnel** 77:19 84:8

**Turcotte** 74:1 76:22 79:11

**turn** 39:6 66:2 69:24 111:11 114:17
135:22

**turned** 40:21 111:6,22 112:2
113:5,9,14,24 114:11 135:12
136:15 175:23 257:19

**turning** 49:14 233:12

**two-day** 34:15

**two-year** 15:5,10

**type** 19:16 22:12 25:4 28:19 30:7,
10 35:23,24 55:24 57:1,2 71:9,10
100:11 121:21 122:12 123:3
129:17 131:20 155:5,21 161:8
170:24 177:11 178:8 181:15
185:22 215:10 218:23,24 225:18
238:16 240:9 245:14,16 260:17

**types** 24:11,14 52:16 91:22 130:15
132:9 153:5 175:6 224:15 225:9

**typical** 42:24

---

## U

**Uh-hmm** 71:3

**ultimately** 35:10 92:14 186:15
229:15 238:3

**un** 176:2

**unable** 207:10

**unbelievable** 258:2

**uncertain** 77:22

**uncertainty** 134:7 142:12 146:1
246:5,8

**uncrumpled** 241:9

**underlying** 256:4,16 257:19 258:3
259:5

**underneath** 155:8 175:2 177:9

**understand** 5:24 7:3,10 23:16
26:9 44:14,15 80:7,20,23 111:19
117:7 125:4 144:21 149:24 150:13
163:21 227:3 258:15

**understanding** 7:7 35:6 95:7
96:19 126:13 136:12 143:3 162:16
169:23 185:19 249:17

DOUGLAS J. CARPENTER, 03/31/2021

**understands** 139:17 177:5

**understood** 82:11,12 257:10

**underventilated** 156:8,9

**undetermined** 95:9 96:3

**uniquely** 242:18 243:2

**unit** 4:2 16:16 79:24 80:4,13,18,22 81:2,15 82:9 83:9,10,22 84:1,4,23 85:4 150:7,11 226:19,23 265:22

**United** 4:9 160:12

**units** 32:21 83:12,23

**University** 22:8 23:5

**unreliable** 233:21 236:9,20 242:13,15

**unusual** 140:13

**unventilated** 208:6

**updated** 140:7

**updates** 140:16

**upholstered** 99:12 159:4,11 160:4 161:3,9,24 162:17 197:8 208:15,16 209:4,9,19 211:8 212:6 214:17,22 217:9,16,19,20 218:5,10,14 219:5,11 221:4,19,24 222:5 224:11 225:11 226:5 227:10 228:10,21 232:13,20

**upholstering** 219:1 231:11

**upper** 129:23 166:23,24 174:8 182:6 183:1 210:24 211:6

**upstairs** 71:13,15

**uptake** 44:16

**Urlaub** 4:13,16

**user** 136:17 137:2 143:13 144:21 161:6

**user's** 142:6

---

### V

**V&v** 140:20 141:1,7 142:6

**validation** 140:21 141:2,13,16,21 143:4 144:23

**values** 152:6

**vapor** 244:11 247:16,19 248:12

**vaporizes** 248:8

**vapors** 237:1 247:21,24 248:9

249:9 252:5,11,20,24 253:2

**variable** 131:22

**variables** 129:9,10 145:24 146:1,3 166:19 190:24

**velocity** 168:21 176:24

**vent** 153:4 157:10 167:3 171:10 177:11

**ventilated** 167:20

**ventilation** 167:17 168:7 169:2,7 170:2 208:5

**vents** 153:4 168:15 170:11,14 171:6,7,9,12

**verification** 140:20,22 143:4 144:23

**verify** 162:14 174:14 253:18

**Vermont** 69:6,14 70:15,16 79:6

**version** 138:7,9,13,14,15 140:17, 19 141:9 142:3,4 151:6 176:4

**versions** 138:8 139:3 140:16 145:2 150:17

**versus** 4:8 56:1 57:2 62:22 64:3, 17 65:17 78:10 81:17 82:16,18,20, 23 83:1,5 85:6 115:22 117:20 139:14 176:23 207:14 240:7 242:19

**vertical** 162:6 163:7 171:7

**vessel** 85:10

**Vestry** 70:23

**viability** 239:2

**viable** 137:18

**vice** 15:19 16:22,23

**victim** 132:19 157:21 164:2 165:3 171:16 172:21 182:23 183:12,17 184:4,17 185:10,22 188:1 190:5,19 191:7 194:20 197:23 198:20 199:2, 8,24 200:11 202:18 206:4 209:7 210:21 213:22 230:21

**victim's** 171:14

**video** 4:1,2,4,19 5:2 8:8 10:17,18 17:14,17,20 18:5,8,11,13,14 79:23 80:2,3 112:19,24 124:23 148:15,19 150:3,6,7,9,10 153:24 154:3,6,9 226:18,21,22 255:8,11,12 256:17 257:12 259:1 265:15,20,21

**videog** 257:12

**videos** 32:11 263:16

**videotape** 110:12 111:13 113:12 255:16,24 258:23 263:1

**videotapes** 208:13

**view** 33:10 40:16 101:8 151:11 191:15

**vinyl** 218:23

**violates** 229:9

**violation** 255:19 257:13 258:7,10 261:22

**Virginia** 28:2,5,10,24 29:7 40:3,15, 24 41:6,24 42:13 73:7,11 82:18

**visible** 191:13

**visual** 199:13,19 207:21 211:2 260:17

**visualization** 139:13,21

**visualize** 135:10

**visualized** 174:7 223:7

**visualizes** 174:5

**visually** 139:15

**vodka** 93:21,23 109:1,5,20 110:10, 17 111:2,13,22 112:2 113:13 124:23 187:19 243:14 245:5 246:20 248:15,20 249:3,9,12,19,20 251:12 253:13,19,23,24 254:11 255:19 258:19 259:7,19 261:4 263:10

**volatiles** 247:16

**volume** 174:11 179:19 251:23 253:5 254:11,16

**volumes** 184:14

**volunteer** 51:11

**voting** 51:12,18

---

### W

**wait** 62:10,14 159:18

**waited** 88:21

**walk** 69:4

**walker** 204:22

**walking** 196:11

**wall** 155:8 164:16 169:4,19 193:24

**wallboard** 155:6

DOUGLAS J. CARPENTER, 03/31/2021

**walls**  154:18 155:1,12 181:20 230:6 238:9

**wanted**  6:1 40:18 42:19 109:16

**warrant**  133:15,16

**Washington**  77:11

**waste**  241:6

**water**  249:21,23,24

**Watkins**  76:5 82:20

**wave**  223:3 224:17,19,22

**ways**  148:9 215:19

**wealth**  223:19

**website**  138:17 143:1,13

**well-defined**  232:5

**well-established**  244:24

**well-instrumented**  141:20

**well-known**  95:5 97:13

**well-ventilated**  159:16

**west**  82:18 169:4

**whatever's**  103:11

**When's**  6:7 33:22

**width**  128:4 152:2 179:20

**widths**  152:3

**Willa**  61:6

**William**  4:8 56:5 61:6,15 80:14 116:23 118:9 119:13 120:5 122:13 123:4 135:18

**Williams**  76:1,2

**Willingham/willis**  52:7

**Winding**  73:18 79:2

**window**  129:2,11 153:5 155:18 170:24 215:8

**windows**  155:15,20,21 208:22

**withheld**  256:18

**witness'**  209:13

**witnesses**  106:2,3,7,13,16,20 120:22 121:2

**woodshed**  83:2

**Worcester**  21:17,19 22:1

**word**  92:19

**words**  36:22 140:24 162:8 178:6

237:23

**work**  19:14,15,16 41:17 43:8 50:9, 21 52:14,17,19 53:3,9,13,20 55:10, 24 57:5 59:6 60:3 61:23 62:14,21 67:9 85:18 89:12 127:20 144:15 149:9 231:9 257:1

**worked**  40:24 41:24 42:11 43:17 91:14

**working**  21:21 27:5 40:7,9,11 60:8 89:15,19,23 91:17 144:22 145:13 238:8

**works**  149:8 151:9 163:19

**worksheets**  109:4

**world**  141:15,18 142:17

**woven**  216:8

**WPI**  27:5

**wrap**  255:7

**wrapper**  216:8

**write**  50:22 100:6 260:20 261:2

**write-up**  117:6

**written**  110:15 135:16 136:7

**wrong**  69:19 102:6 121:21 175:12

**wrote**  231:21 262:2 263:19

---

**X**

**X/y**  164:12

---

**Y**

**year**  21:14 22:20 113:6 217:1

**years**  16:4,7,8 29:10 30:18 32:10 34:6 59:3 65:19 134:23 176:5 220:18

**Yesterday**  13:9

**York**  51:23 52:18,20

---

**Z**

**zone**  24:24 25:1 27:3,8,9,13 129:20,21,22 131:20 133:17 137:16

**zones**  130:16