*Amor v. Cross, et al.*
Case No. 18-CV-2523
Our File No. 18-4078

# EXHIBIT F

# NFPA®
# 921

## Guide for Fire and Explosion Investigations

2021





NFPA®

**3.3.167 Scientific Method.** The systematic pursuit of knowledge involving the recognition and definition of a problem; the collection of data through observation and experimentation; analysis of the data; the formulation, evaluation and testing of hypotheses; and, where possible, the selection of a final hypothesis.

**3.3.168 Seat of Explosion.** A craterlike indentation created at the point of origin of some explosions.

**3.3.169 Seated Explosion.** An explosion with a highly localized point of origin, such as a crater.

**3.3.170 Secondary Explosion.** Any subsequent explosion resulting from an initial explosion.

**3.3.171 Self-Heating.** The result of exothermic reactions, occurring spontaneously in some materials under certain conditions, whereby heat is generated at a rate sufficient to raise the temperature of the material.

**3.3.172 Self-Ignition.** Ignition resulting from self-heating, synonymous with *spontaneous ignition.*

**3.3.173 Self-Ignition Temperature.** The minimum temperature at which the self-heating properties of a material lead to ignition.

*N* **3.3.174 Sever Arc.** An arc site where one or more of the circuit conductors were physically severed by the arcing event at that location.

**3.3.175 Short Circuit.** An abnormal connection of low resistance between normal circuit conductors where the resistance is normally much greater; this is an overcurrent situation but it is not an overload.

**3.3.176 Site.** The general physical location of the incident, including the scene and the surrounding area deemed significant to the process of the investigation and support areas.

**3.3.177 Smoke.** The airborne solid and liquid particulates and gases evolved when a material undergoes pyrolysis or combustion, together with the quantity of air that is entrained or otherwise mixed into the mass. [318, 2018]

**3.3.178 Smoke Condensate.** The condensed residue of suspended vapors and liquid products of incomplete combustion.

**3.3.179 Smoke Explosion.** See 3.3.18, Backdraft.

**3.3.180 Smoldering.** Combustion without flame, usually with incandescence and smoke.

**3.3.181 Soot.** Black particles of carbon produced in a flame.

**3.3.182 Spalling.** Chipping or pitting of concrete or masonry surfaces.

**3.3.183 Spark.** A moving particle of solid material that emits radiant energy due either to its temperature or the process of combustion on its surface. [654, 2017]

**3.3.184 Specific Gravity (of a gas or vapor).** The ratio of the average molecular weight of a gas or vapor to the average molecular weight of air, or the ratio of the density of a gas to the density of dry air at standard temperature and pressure.

**3.3.185 Specific Gravity (of a liquid or solid).** The ratio of the mass of a given volume of a substance to the mass of an equal volume of water at a temperature of 4°C.

**3.3.186 Spoliation.** Loss, destruction, or material alteration of an object or document that is evidence or potential evidence in a legal proceeding by one who has the responsibility for its preservation.

**3.3.187\* Spontaneous Heating.** Process whereby a material increases in temperature without drawing heat from its surroundings.

**3.3.188 Spontaneous Ignition.** Initiation of combustion of a material by an internal chemical or biological reaction that has produced sufficient heat to ignite the material.

**3.3.189 Suppression.** The sum of all the work done to extinguish a fire, beginning at the time of its discovery.

**3.3.190 Target Fuel.** A fuel that is subject to ignition by thermal radiation such as from a flame or a hot gas layer.

**3.3.191\* Temperature.** The degree of sensible heat of a body as measured by a thermometer or similar instrument.

**3.3.192 Thermal Column.** See 3.3.148, Plume.

**3.3.193\* Thermal Expansion.** The increase in length, volume, or surface area of a body with rise in temperature.

**3.3.194 Thermal Inertia.** The properties of a material that characterize its rate of surface temperature rise when exposed to heat; related to the product of the material's thermal conductivity $(k)$, its density $(\rho)$, and its heat capacity $(c)$.

**3.3.195 Thermodynamics.** The branch of physics that deals with the relationship between heat and other forms of energy.

**3.3.196 Thermometry.** The study of the science, methodology, and practice of temperature measurement.

**3.3.197 Thermoplastic.** Plastic materials that soften and melt under exposure to heat and can reach a flowable state.

**3.3.198 Thermoset Plastics.** Plastic materials that are hardened into a permanent shape in the manufacturing process and are not commonly subject to softening when heated; typically form char in a fire.

**3.3.199 Time Line.** Graphic representation of the events in a fire incident displayed in chronological order.

**3.3.200 Total Burn.** A fire scene where a fire continued to burn until most combustibles were consumed and the fire self-extinguished due to a lack of fuel or was extinguished when the fuel load was reduced by burning and there was sufficient suppression agent application to extinguish the fire.

**3.3.201 Trailer.** Solid or liquid fuel used to intentionally spread or accelerate the spread of a fire from one area to another.

**3.3.202 Understanding or Agreement.** A written or oral consensus between the interested parties concerning the management of the investigations.

**3.3.203 Upper Layer.** A buoyant layer of hot gases and smoke produced by a fire in a compartment.

**3.3.204 Vapor.** The gas phase of a substance, particularly of those that are normally liquids or solids at ordinary temperatures. (*See also 3.3.100, Gas.*)

**3.3.205 Vent.** An opening for the passage of, or dissipation of, fluids, such as gases, fumes, smoke, and the like.

**3.3.206 Ventilation.** The movement of gases within, into, or from any compartment or space or the firefighting operation of removing smoke and heat from the structure by opening windows and doors or making holes in the roof.

**3.3.207 Ventilation-Controlled Fire.** A fire in which the heat release rate or growth is controlled by the amount of air available to the fire.

**3.3.208 Venting.** The escape of smoke and heat through openings in a building.

**3.3.209 Volt (V).** The unit of electrical pressure (electromotive force) represented by the symbol "E"; the difference in potential required to make a current of one ampere flow through a resistance of one ohm.

**3.3.210 Watt (W).** Unit of power, or rate of work, equal to one joule per second, or the rate of work represented by a current of one ampere under the potential of one volt.

**3.3.211 Work Plans.** An outline of the tasks to be completed as part of the investigation including the order or timeline for completion. See Chapter 15, Planning the Investigation.

*N* **3.4\* Canine Definitions.** Deploying canine-handler teams in fire investigations requires the investigator to understand certain concepts that are described by specialized terminology. This section provides definitions of terms used in relation to the canine section *(see Section 17.7).*

*N* **3.4.1 Canine-Handler Team.** A canine-handler team is a human and working dog who train and work together as an operational unit. [SCI, 2011]

*N* **3.4.2\* Certification.** Certification is the recognition that a canine-handler team has acquired and demonstrated specialized knowledge, skills, and abilities in the standard practices necessary to execute the duties of a canine team. Certification also provides the fire investigator a means of identifying those canine-handler teams that have successfully demonstrated compliance with established requirements. In addition, certification establishes that a canine-handler team achieves and maintains proficiency.

*N* **3.4.3 Handler.** The handler is a person who has successfully completed a documented training and certification process in canine handling in the specific discipline of ignitible liquid canine detection and maintains those abilities through field application, maintenance training, scheduled recertification, and continuing education. *(See 3.4.2, Certification.)* [SCI, 2011].

*N* **3.4.4\* Ignitible Liquid Detection Canines (IGL Canines).** Ignitible liquid detection canines (IGL canines) are dogs specifically trained to locate and respond to the presence of certain classes of ignitible liquids by associated odor.

*N* **3.4.5\* Scent Discrimination.** Operational usage: A dog's olfactory ability to distinguish between various odors.

### Chapter 4   Basic Methodology

**4.1\* Nature of Fire Investigations.** A fire or explosion investigation is a complex endeavor involving skill, technology, knowledge, and science. The compilation of factual data, as well as an analysis of those facts, should be accomplished objectively, truthfully, and without expectation bias, preconception, or prejudice. The basic methodology of the fire investigation

should rely on the use of a systematic approach and attention to all relevant details. The use of a systematic approach often will uncover new factual data for analysis, which may require previous conclusions to be reevaluated. With few exceptions, the proper methodology for a fire or explosion investigation is to first determine and establish the origin(s), then investigate the cause: circumstances, conditions, or agencies that brought the ignition source, fuel, and oxidant together.

**4.2 Systematic Approach.** The systematic approach recommended is based on the scientific method, which is used in the physical sciences. This method provides an organizational and analytical process that is desirable and necessary in a successful fire investigation.

**4.3 Relating Fire Investigation to the Scientific Method.** The scientific method *(see Figure 4.3)* is a principle of inquiry that forms a basis for legitimate scientific and engineering processes, including fire incident investigation. It is applied using the following steps outlined in 4.3.1 through 4.3.10.

**4.3.1 Recognize the Need.** First, one should determine that a problem exists. In this case, a fire or explosion has occurred and the cause should be determined and listed so that future, similar incidents can be prevented.

**4.3.2 Define the Problem.** Having determined that a problem exists, the investigator or analyst should define the manner in which the problem can be solved. In this case, a proper origin and cause investigation should be conducted. This is done by an examination of the scene and by a combination of other data collection methods, such as the review of previously conducted investigations of the incident, the interviewing of witnesses or other knowledgeable persons, and the results of scientific testing.



**Scientific Method**

Recognize the need
(identify the problem)

↓

Define the problem

↓

→ Collect data

→ Analyze the data

Develop hypotheses
(inductive reasoning)

↓

Test the hypotheses
(deductive reasoning)

Select final hypothesis

△ **FIGURE 4.3**   Use of the Scientific Method.

**4.3.3 Collect Data.** Information about the fire **or explosion incident** is now collected by observation, experiment, or other direct data-gathering means. The data collected is called empirical data because it is based on observation or experience and is capable of being verified or known to be true.

**4.3.4\* Analyze the Data.** The scientific method requires that all data collected be analyzed. This is an essential step that must take place before the formation of the final hypothesis. The identification, gathering, and cataloging of data does not equate to data analysis. Analysis of the data is based on the knowledge, training, experience, and expertise of the individual doing the analysis. If the investigator lacks expertise to properly attribute meaning to a piece of data, then assistance should be sought. Understanding the meaning of the data will enable the investigator to form hypotheses based on the evidence, rather than on speculation.

**4.3.5\* Develop Hypotheses (Inductive Reasoning).** Based on the data analysis, the investigator produces **hypotheses** to explain the phenomena, whether it be the nature of fire patterns, fire spread, identification of the origin, the ignition sequence, the fire cause, or the causes of damage or responsibility for the fire or explosion incident. This process is referred to as inductive reasoning. These hypotheses should be based solely on the empirical data that the **investigator has collected** through observation and then developed into explanations for the event, which are based upon the investigator's knowledge, training, experience, and expertise.

**4.3.6\* Test the Hypotheses (Deductive Reasoning).** The investigator does not have a valid or reliable conclusion unless the hypothesis can stand the test of careful and serious challenge. Testing of the hypothesis is done by the principle of deductive reasoning, in which the investigator compares the hypothesis to all known facts as well as the body of scientific knowledge associated with the phenomena relevant to the specific incident. Testing of a hypothesis should be designed to disprove, or refute, the hypothesis. This may also be referred to as falsification of the hypothesis. Working to disprove a hypothesis is an attempt to find all the data or reasons why the hypothesis is not supported or not true, rather than simply finding and relying on data that support the hypothesis or why the hypothesis is true. This method of testing the hypothesis can prevent "confirmation bias," which can occur when the hypothesis or conclusion relies only on supporting data *(see 4.3.10)*. A hypothesis can be tested physically by conducting experiments, analytically by applying accepted scientific principles, or by referring to scientific research. When relying on the research of others, the investigator or analyst must ensure that the conditions, circumstances, and variables of the research and those of the hypothesis are sufficiently similar. Whenever the investigator relies on research as a means of hypothesis testing, references to the research relied upon should be acknowledged and cited. If the hypothesis is refuted or not supported, it should be discarded and alternate hypotheses should be developed and tested. This may require the collection of new data or the reanalysis of existing data. The testing process needs to be continued until all feasible hypotheses have been tested and one is determined to be uniquely consistent with the facts and with the principles of science. If no hypothesis can withstand an examination by deductive reasoning, the issue should be considered undetermined.

**4.3.6.1\*** Any hypothesis that is incapable of being tested either physically or analytically, is an invalid hypothesis. A hypothesis

developed based on the absence of data is an example of a hypothesis that is incapable of being tested. The inability to refute a hypothesis does not mean that the hypothesis is true.

**4.3.7 Select Final Hypothesis.** The final step in applying the scientific method is to select the final hypothesis. Once the hypothesis has been tested, the investigator should review the entire process to ensure that all credible data are accounted for and all feasible alternate hypotheses have been considered and eliminated. When using the scientific method, the failure to consider alternate hypotheses is a serious error. A critical question to be answered is, "Are there any other hypotheses that are consistent with the data?" The investigator should document the facts that support the final hypothesis to the exclusion of all other reasonable hypotheses.

**4.3.8 Avoid Presumption.** Until data have been collected, no specific hypothesis can be reasonably formed or tested. All investigations of fire and explosion incidents should be approached by the investigator without presumption as to origin, ignition sequence, cause, fire spread, or responsibility for the incident until the use of the scientific method has yielded testable hypotheses, which cannot be disproved by rigorous testing.

**4.3.9 Expectation Bias.** Expectation bias is a well-established phenomenon that occurs in scientific analysis when investigator(s) reach a premature conclusion without having examined or considered all of the relevant data. Instead of collecting and examining all of the data in a logical and unbiased manner to reach a scientifically reliable conclusion, the investigator(s) uses the premature determination to dictate investigative processes, analyses, and, ultimately, conclusions, in a way that is not scientifically valid. The introduction of expectation bias into the investigation results in the use of only that data that supports this previously formed conclusion and often results in the misinterpretation and/or the discarding of data that does not support the original opinion. Investigators are strongly cautioned to avoid expectation bias through proper use of the scientific method.

**4.3.10\* Confirmation Bias.** Different hypotheses may be compatible with the same data. When using the scientific method, testing of hypotheses should be designed to disprove a hypothesis (i.e., falsification of the hypothesis), rather than relying only on confirming data that support the hypothesis. Confirmation bias occurs when the investigator relies exclusively on data that supports the hypothesis and fails to look for, ignores, or dismisses contradictory or nonsupporting data. The same data may support alternate and even opposing hypotheses. The failure to consider alternate or opposing hypotheses, or prematurely discounting seemingly contradictory data without appropriate analysis and testing can result in incorrect conclusions. A hypothesis can be said to be valid only when rigorous testing has failed to disprove the hypothesis. Disproving the hypothesis is a process in which all the evidence is compared against the proffered hypothesis in an effort to find why the hypothesis is not true.

**4.4 Basic Method of a Fire Investigation.** Using the scientific method in most fire or explosion incidents should involve the steps shown in 4.4.1 through 4.4.6.

**4.4.1 Receiving the Assignment.** The investigator should be notified of the incident, told what his or her role will be, and told what he or she is to accomplish. For example, the investigator should know if he or she is expected to determine the

**Shaded text** = Revisions.   **Δ** = Text deletions and figure/table revisions.   • = Section deletions.   *N* = New material.

2021 Edition

origin, cause, and responsibility; produce a written or oral report; prepare for criminal or civil litigation; make suggestions for code enforcement, code promulgation, or changes; make suggestions to manufacturers, industry associations, or government agency action; or determine some other results.

**4.4.2 Preparing for the Investigation.** The investigator should marshal his or her forces and resources and plan the conduct of the investigation. Preplanning at this stage can greatly increase the efficiency and therefore the chances for success of the overall investigation. Estimating what tools, equipment, and personnel (both laborers and experts) will be needed can make the initial scene investigation, as well as subsequent investigative examinations and analyses, go more smoothly and be more productive.

**4.4.3 Conducting the Investigation.**

**4.4.3.1** It is during this stage of the investigation that an examination of the incident fire or explosion scene is conducted. The fundamental purpose of conducting an examination of any incident scene is to collect all of the available data and document the incident scene. The investigator should conduct an examination of the scene if it is available and collect data necessary to the analysis.

**4.4.3.2** The actual investigation may include different steps and procedures, which will be determined by the purpose of the assignment. These steps and procedures are described in detail elsewhere in the document. A fire or explosion investigation may include all or some of the following tasks: a scene inspection or review of previous scene documentation done by others; scene documentation through photography and diagramming; evidence recognition, documentation, and preservation; witness interviews; review and analysis of the investigations of others; and identification and collection of data from other appropriate sources.

**4.4.3.3** In any incident scene investigation, it is necessary for at least one individual/organization to conduct an examination of the incident scene for the purpose of data collection and documentation. While it is preferable that all subsequent investigators have the opportunity to conduct an independent examination of the incident scene, in practice, not every scene is available at the time of the assignment. The use of previously collected data from a properly documented scene can be used successfully in an analysis of the incident to reach valid conclusions through the appropriate use of the scientific method. Thus, the reliance on previously collected data and scene documentation should not be inherently considered a limitation in the ability to successfully investigate the incident.

**4.4.3.4** The goal of all investigators is to arrive at accurate determinations related to the origin, cause, fire spread, and responsibility for the incident. Improper scene documentation can impair the opportunity of other interested parties to obtain the same evidentiary value from the data. This potential impairment underscores the importance of performing comprehensive scene documentation and data collection.

**4.4.4 Collecting and Preserving Evidence.** Valuable physical evidence should be recognized, documented, properly collected, and preserved for further testing and evaluation or courtroom presentation.

**4.4.5 Analyzing the Incident.** All collected and available data should be analyzed using the principles of the scientific method. Depending on the nature and scope of one's assignment, hypotheses should be developed and tested explaining the origin, ignition sequence, fire spread, fire cause or causes of damage or casualties, or responsibility for the incident.

**4.4.6 Conclusions.** Conclusions, which are final hypotheses, are drawn as a result of testing the hypotheses. Conclusions should be drawn according to the principles expressed in this guide and reported appropriately.

**4.5 Level of Certainty.** The level of certainty describes how strongly someone holds an opinion (conclusion). Someone may hold any opinion to a higher or lower level of certainty. That level is determined by assessing the investigator's confidence in the data, in the analysis of that data, and testing of hypotheses formed. That level of certainty may determine the practical application of the opinion, especially in legal proceedings.

**4.5.1** The investigator should know the level of certainty that is required for providing expert opinions. Two levels of certainty commonly used are probable and possible:

(1) Probable. This level of certainty corresponds to being more likely true than not. At this level of certainty, the likelihood of the hypothesis being true is greater than 50 percent.

(2) Possible. At this level of certainty, the hypothesis can be demonstrated to be feasible but cannot be declared probable. If two or more hypotheses are equally likely, then the level of certainty must be "possible."

**4.5.2** If the level of certainty of an opinion is merely "suspected," the opinion does not qualify as an expert opinion. If the level of certainty is only "possible," the opinion should be specifically expressed as "possible." Only when the level of certainty is considered "probable" should an opinion be expressed with reasonable certainty.

**4.5.3 Expert Opinions.** Many courts have set a threshold of certainty for the investigator to be able to render opinions in court, such as "proven to an acceptable level of certainty," "a reasonable degree of scientific and engineering certainty," or "reasonable degree of certainty within my profession." While these terms of art may be important for the specific jurisdiction or court in which they apply, defining these terms in those contexts is beyond the scope of this document.

**4.6 Review Procedure.** A review of a fire investigator's work product (e.g., reports, documentation, notes, diagrams, photos, etc.) by other persons may be helpful, but there are certain limitations. This section describes the types of reviews and their appropriate uses and limitations.

**4.6.1 Administrative Review.** An administrative review is one typically carried out within an organization to ensure that the investigator's work product meets the organization's quality assurance requirements. An administrative reviewer will determine whether all of the steps outlined in an organization's procedure manual, or required by agency policy, have been followed and whether all of the appropriate documentation is present in the file, and may check for typographical or grammatical errors.

**4.6.1.1 Limitations of Administrative Reviews.** An administrative reviewer may not necessarily possess all of the knowledge, skills, and abilities of the investigator or of a technical reviewer. As such, the administrative reviewer may not be able to provide a substantive critique of the investigator's work product.

size of the wood specimen, and the geometry of the specimen play a deciding role. The scientific community has not reached consensus concerning the self-heating ignition of wood subjected to long-term heating.

**5.7.4.1.3.10\* Charcoal Briquettes.** Charcoal briquettes have been suspected of self-heating to ignition even when packaged in household-sized bags [<9 kg (<20 lb)] at ordinary ambient temperatures. Of particular suspicion is the effect of wetting briquettes with water followed by evaporation. However, rigorous laboratory testing has shown that common-size bags of briquettes do not even approach self-ignition, even when placed in unusually high ambient temperatures, such as in a closed automobile in the sun. Charcoal briquettes have no greater tendency for self-heating than other common materials such as sawdust or hay, even after wetting. Spontaneous combustion of bagged charcoal briquettes in commercially available sizes is not possible under any normal ambient conditions. The effect of contaminants upon self-heating of charcoal briquettes has not been studied.

**5.7.4.1.3.11\* Contaminants.** Contaminants in wood or other cellulosic materials are known to have an effect on thermal decomposition and oxidation. Contaminants that have been identified include fatty acids, vegetable oils, iron, iron oxide, iron sulphides, cobalt, copper, magnesium, lead carbonate, potassium carbonate, lead acetate, sodium acetate, and vanadium pentoxide. Quantitative work to deduce the effect of such contaminants on ignition behavior remains to be done.

**5.7.4.1.4\* Common Materials Subject to Self-Heating.**

**5.7.4.1.4.1** The most commonly encountered forms of self-heating and self-ignition by fire investigators are the following:

(1) Polymerization of fatty acids (animal fats, cooking oils, and drying oils) in cellulose materials (wood, cloth, and paper)
(2) Oxidation of carbonaceous materials (coal and charcoal)
(3) Biologically induced oxidation (hay bales and compost)
(4) Heat-induced oxidation of lignocellulose materials (usually wood fiber and cloth)
(5) Polymerization reactions (plastics, rubbers, adhesives, and paint overspray particles) *(See NFPA 33.)*

**5.7.4.1.4.2** Because of the many possible combinations of these controlling or influencing factors, it is difficult to predict when the material will self-heat. Annex A of the NFPA *Fire Protection Handbook*, 19th edition, includes a list of materials susceptible to spontaneous ignition. Omission of any material does not necessarily indicate that it is not subject to self-heating.

**5.7.4.1.5 Oxidizer Fires.** An oxidizing agent is a chemical substance that, while not necessarily combustible by itself, can rapidly increase the rate of burning of other substances, or result in spontaneous combustion when combined with other substances. Many of these oxidizers are only found in industrial situations, but swimming pool sanitizers, such as calcium hypochlorite and the salts of dichloroisocyanuric or trichloroisocyanuric acid (stabilized chlorine) will undergo spontaneous heating or spontaneous combustion when contaminated with certain organic materials, particularly hypergolic substances, or with other oxidizers. Once an oxidizer fire starts, a decomposition reaction may take place within the mass of oxidizer, which, while not technically combustion, evolves large quantities of heat and light. These reactions may be quite violent. For a list

of oxidizing substances, and the regulations governing their classification and storage requirements, see NFPA 400.

**5.7.4.1.6 Pyrophoric Materials.** Certain elements, particularly white phosphorus, sodium, potassium, and some finely divided metals, such as zirconium, spontaneously ignite when exposed to air. Materials that undergo spontaneous combustion upon exposure to air are known as *pyrophoric.*

**5.7.4.1.7 Transition to Flaming Combustion.**

**5.7.4.1.7.1** Smoldering can transition to flaming if the smoldering creates sufficient flammable vapors for piloted flaming ignition. This normally occurs when the smoldering becomes vigorous as a result of enhanced airflow to the smolder region. This can occur as a result of the spread of smoldering to generate additional airflows, the creation of a hole or channel by smoldering that then acts as a chimney, or by external imposition of an airflow. When a flammable concentration of vapors is developed, the glowing char can act as the ignition source for ignition of the vapors.

**5.7.4.1.7.2\*** The time required from smolder initiation to transition to flaming is not predictable. Transitions to flaming in upholstered furniture have been observed in times ranging from 20 minutes to many hours. Times for transitions to flaming in large piles can be measured in days or months. Because transition to flaming is governed by changes in airflow and the creation of holes or channels, the time to transition to flaming combustion, if it happens at all, appears to be largely random.

**5.7.4.1.7.3** When flaming combustion is initiated by a smoldering source such as a cigarette, or by self-heating, the process leading up to the appearance of the first flame may be quite slow. Once flaming combustion begins, however, the development of the fire may be faster than if the original ignition source were a flame, due to preheating of the fuel.

**5.7.4.2 Piloted Flaming Ignition of Solid Fuels.** For solid fuels to burn with a flame, the substance must either be melted and vaporized (e.g., thermoplastics) or pyrolyzed into gases or vapors (e.g., wood or thermoset plastics). In both cases, heat must be supplied to the fuel to generate the flammable vapors. In piloted ignition, these flammable vapors are ignited by a pilot source, in the form of a small flame, a spark, an ember, or a hot surface.

△ **5.7.4.2.1\*** While the concept of a piloted ignition temperature for solids is an engineering approximation rather than a reproducibly measurable property, the principle is sufficiently robust to allow general application of experimentally determined ignition temperatures. The range temperatures for solids range from about 250°C to 450°C (480°F to 840°F).The ignition temperature for wood varies with the heating conditions. For wood or wood-based products, the ignition temperature is 250°C (480°F) when heated at the lowest heat flux for which ignition occurs, and this is irrespective of whether piloting is present. Unlike for many other fuels, when wood is exposed to higher heat fluxes, the ignition temperature rises and an effect of piloting begins to be seen. Wood is likely to ignite under piloted conditions at 300°C to 350°C (570°F to 660°F) for higher heat fluxes, and around 400°C (750°F) without a pilot. Ignition temperatures for non-fire-retardant plastics tend to range from 270°C to 360°C (520°F to 680°F), and wood-based products tend to range from 330°C to 375°C (630°F to 710°F). Ignition temperatures above 400°C (750°F) are generally

Shaded text = Revisions.   △ = Text deletions and figure/table revisions.   • = Section deletions.   *N* = New material.

2021 Edition

**921-46**                FIRE AND EXPLOSION INVESTIGATIONS

**5.10.1.2** In a compartment fire, the collection of heat at the top of the room can raise the temperature at the ceiling and produce a large body of high-temperature smoke and hot gases. The radiation from this upper portion of the space can significantly enhance the rate of fire spread and heat release from a burning item. This can result in heat release rates significantly greater than are observed in open burning.

**5.10.1.3** Compartments can also restrict the heat release rate by limiting the inflow of air to support combustion. This section summarizes the development of a fire in a compartment.

**5.10.1.4** The rate of fire growth as determined by witness statements is highly subjective. Many times witnesses are reporting the fire growth from time of discovery, which cannot be directly correlated to ignition time. The rate of fire growth is dependent on many factors besides fuel load, including fuel configuration, compartment size, compartment properties, ventilation, ignition source, and first fuel ignited. Eyewitnesses reporting a rapid rate of fire growth should not be construed as data supporting an incendiary fire cause.

**5.10.2 Compartment Fire Phenomena.**

**5.10.2.1** When a fire plume reaches the ceiling of a compartment, the flow of smoke and hot gases and the growth of the fire will be affected. Figure 5.10.2.1 depicts a room with a door opening. There are multiple fuel items in the room; one is the item first ignited, and the others are "target" fuels. The fire plume strikes the ceiling and the flow is diverted to flow under the ceiling as a ceiling jet. Ceiling jet gases flow in all directions until the gases strike the walls of the compartment. As the ceiling jet flow reaches the walls and can no longer spread horizontally, the gases turn downward and begin the creation of a layer of hot gases below the ceiling.

**5.10.2.2 Smoke Filling.** The fire acts as a "pump," adding mass (hot gases) and energy to the upper layer. This continued addition of hot gases to the layer causes the upper layer to grow in depth. The depth of the upper layer of hot gases will continue until the hot upper gas layer reaches the base of the fire or until the layer fills down to the top of an opening.

**5.10.2.3** When the hot smoky layer reaches the top of the door opening, as illustrated in Figure 5.10.2.3, it will begin to flow out of the compartment. The descent of the hot gas layer will be stopped when the flow of hot gases out of the opening is equal to the rate of hot gas addition to the layer by the plume.

**5.10.2.4** If the fire grows in size, the bottom of the upper layer, the layer interface, will continue to descend, the temperature of the hot smoke and gases will increase, and radiant heat from the layer will begin to heat the unignited target fuel, as shown in Figure 5.10.2.4. A well-defined flow pattern will be established at the opening, with the hot combustion products flowing out the top and cool air flowing into the compartment under the smoke layer.

**5.10.2.5** In the early stage of burning, there is sufficient air to burn all of the materials being pyrolyzed. This is referred to as *fuel-controlled burning*. As the burning progresses, the availability of air may continue and the fire may have sufficient oxygen even as it grows. Normally, this would be a compartment that had a large door or window opening. In such cases, the gases collected at the upper portion of the room will contain significant oxygen and relatively small amounts of unburned fuel.

**5.10.2.6** As the fire continues to grow, the upper layer gas temperature and the intensity of the radiation on the exposed combustible contents in the room increase. Figure 5.10.2.6 shows the evolution in the relative importance of convection and radiation heat transfer. As the fire develops, both convective and radiative heat fluxes increase, but radiation comes to dominate the overall heat transfer. The surface temperature of these combustible contents rises, and pyrolysis gases are produced. When the upper layer temperature reaches approximately 590°C (1100°F), the combustible contents ignite, involving all of the combustible surfaces exposed to upper layer radiation. This phenomenon, known as flashover, is illustrated in Figure 5.10.2.6. The terms *flameover* and *rollover* are often used to describe the condition where flames propagate through or across the upper layer only and do not involve the surfaces of target fuels. Flameover or rollover generally precede flashover but may not always result in flashover. As the fire develops, the relative significance of radiation heat transfer comes to dominate over convection heat transfer.



Thin ceiling jet

△ FIGURE 5.10.2.1    Early Compartment Fire Development.

unless it is specifically exempted from such disclosure by law. Most agencies of the federal government have implemented procedures designed to comply with the provisions of the act. These procedures inform the public where specific sources of information are available and what appeal rights are available to the public if requested information is not disclosed.

14.2.1.2 Like the federal government, most states have also enacted similar laws that provide the public with the opportunity to access sources of information concerning government operations and their work products. The fire investigator is cautioned, however, that the provisions of such state laws may vary greatly from state to state.

**14.2.2 Privileged Communications.**

14.2.2.1 Privileged communications are those statements made by certain persons within a protected relationship such as husband-wife, attorney-client, priest-penitent, and the like. Such communications are protected by law from forced disclosure on the witness stand at the option of the witness spouse, client, or penitent.

14.2.2.2 Privileged communications are generally defined by state law, although the federal courts also recognize certain forms of privilege such as attorney-client privilege and privilege for spousal communications. As such, the fire investigator is cautioned that the provisions of such laws may vary greatly from state to state.

14.2.3 Confidential Communications. Closely related to privileged communications, confidential communications are those statements made under circumstances showing that the speaker intended the statements only for the ears of the person addressed.

*N* 14.2.4 Privacy Considerations. In a search for relevant nonscene information, an investigator may encounter laws protecting people's rights to privacy. Corporations are considered people under the law and similarly have privacy rights that should be considered by investigators in the collection or dissemination of information acquired during the work. Such laws are wide-ranging, protecting many types of information. In criminal matters, warrants may be necessary to access ESI, such as phone records or GPS recordings. In civil matters, court orders may be required.

*N* 14.2.5 Authorizations for Release of Information. Written releases for personal information can circumvent the need for court-mandated authorization. Consideration should be given to releases for the following types of authorizations necessary to obtain private records relevant to the investigation:

(1) Authorization for release of employment records
(2) Authorization for release of medical records (HIPAA compliant)
(3) Release of income tax records
(4) Authorization for release of police accident/incident report
(5) Authorization for release of insurance documentation

*N* 14.3 ASTM Standards for Collecting, Preserving, and Evaluating Data.

*N* 14.3.1 The investigator is directed to three ASTM standards that are particularly useful in providing directions for collecting, preserving, and analyzing data:

(1) ASTM E678, *Standard Practice for Evaluation of Scientific or Technical Data*
(2) ASTM E860, *Standard Practice for Examining and Preparing Items that Are or May Become Involved in Criminal or Civil Litigation*
(3) ASTM E1188, *Standard Practice for Collection and Preservation of Information and Physical Items by a Technical Investigator*

*N* 14.3.2 The investigator should apply these standard practices and use them in conjunction with the recommendations in this chapter.

14.4 Forms of Information. Sources of information will present themselves in differing forms. Generally, information is available to the fire investigator in four forms: verbal, written, visual, and electronic.

14.4.1 Verbal Information. Verbal sources of information, by definition, are limited to the spoken word. Such sources, which may be encountered by the fire investigator, may include, but are not limited to, verbal statements during interviews, telephone conversations, electronic recordings, radio transmissions, commercial radio broadcasts, and the like.

△ 14.4.2 Written and Printed Information. Written and printed sources of information are likely to be encountered by the fire investigator during all stages of an investigation. Such sources may include, but are not limited to, reports, documents, reference materials, newspapers, and the like.

14.4.3 Visual Information. Visual sources of information, by definition, are limited to those that are gathered utilizing the sense of sight. Sources may include, but are not limited to, photographs, video recordings, motion pictures, and computer-generated animations.

14.4.4 Digital Information. Computers have become an integral part of modern information and data systems. As such, the computer system maintained by any particular source of information may provide a wealth of information relevant to the fire investigation.

14.5 Sources of Non-Scene Data. Numerous government and private organizations exist that may provide information of relevance to assist the investigator. For example, property records, business records, licenses, permits, insurance coverage, property loss claims, product recalls, and the like may be important to a given incident investigation. This chapter begins by categorizing types of non-scene data, including property data, witness data print and electronically stored information (ESI), data from research, and data from experiments or testing. Most of these organizations have websites where the information is available.

*N* 14.5.1 Witness Data.

14.5.1.1 Purpose of Interviews. Witnesses are a primary source of non-scene data in almost every incident. The investigator should identify and interview any witnesses who may have data relevant to the incident, including eyewitnesses who observed the incident and individuals familiar with the characteristics of the property or with the activities of individuals prior to, during, and after the incident. Suspects may provide incriminating statements or clearly false alibis.

*N* 14.5.1.2 Identifying Possible Witnesses. Relevant witnesses include eyewitnesses, first responders, victims, property owners and occupants, tenants, business customers and suppliers,

16.5* **Reports.** The final step in the documentation of the investigation may be the preparation and submittal of a report. The format and content of the report will depend on the needs of the organization or client on whose behalf the investigation was performed. Therefore, no report format is prescribed here. However, for guidance on court-mandated reports, see Chapter 12.

△ 16.5.1 **Purpose.** The purpose of a written report is to document an accurate reflection of the investigator's observations, activities, analyses, and conclusions. The report should contain facts and data that the investigator relied upon to reach any opinions or conclusions. The report should also contain the investigator's reasoning of how each opinion was reached. Reports may be used for improvement of public safety, prevention of similar future incidents, the basis for criminal or civil litigation, the basis for insurance claims, or simply documentation of the facts for the record. *(See NFPA 1033.)*

16.5.2 **Report Organization.** The investigator should develop and organize a report to provide the desired information of the party requesting the report. The investigator should know that a cursory report may not meet the requirements or the needs of a jurisdiction and NFPA 1033.

16.5.3 **Descriptive Information.** The following information is usually found in a report:

(1) Date the report was submitted
(2) Date, time, and location of incident
(3) Date and location of examination(s)
(4) Name of the person or entity requesting the report
(5) The scope of the investigation (i.e., tasks assigned and tasks completed)
(6) Nature of the report (e.g., preliminary, interim, final, summary, supplementary)
(7) Name of person(s) preparing the report

16.5.4 **Opinions and Conclusions.** The report should contain the investigator's opinions and conclusions in a clear, delineated section, whether at the beginning or the end of the report. The reader should not have to search the report looking for opinions and conclusions in a narrative or analysis section. The report should also state the basis or bases for each opinion and conclusion. The name, address, and affiliation of each person who has contributed to the work or rendered an opinion contained in the report, other than the report author, should also be provided.

16.5.5 **Pertinent Facts.** A description of the incident scene, dates and times when visited, items examined, and relevant evidence collected should be provided. If subsequent examination and testing of evidence took place, dates and places should be documented. The observations and information contained in the report should be those relevant to the opinions. Supporting material such as photographs, diagrams, evidence lists, and laboratory reports may be included in appendices.

16.5.6 **Reference to Methodology.** When the investigator states that the scientific method was used *(see Section 4.3)* to determine origin and cause, the report should give sufficient detail to show that the methodology was indeed used and not just cited.

## Chapter 17 Physical Evidence

17.1* **General.** During the course of any fire investigation, the fire investigator is likely to be responsible for locating, collecting, identifying, storing, examining, and arranging for testing of physical evidence. The fire investigator should be thoroughly familiar with the recommended and accepted methods of processing such physical evidence.

17.2 **Physical Evidence.**

17.2.1 Physical evidence, defined generally, is any physical or tangible item that tends to prove or disprove a particular fact or issue. Physical evidence at the fire scene may be relevant to the issues of the origin, cause, spread, or the responsibility for the fire.

17.2.2* The decision on what physical evidence to collect at the incident scene for submission to a laboratory or other testing facility for examination and testing, or for support of a fact or opinion, rests with the fire investigator. This decision may be based on a variety of considerations, such as the scope of the investigation, legal requirements, or prohibition. *(See Section 14.2.)* Additional evidence may also be collected by others, including other investigators, insurance company representatives, manufacturer's representatives, owners, and occupants. The investigator should also be aware of standards and procedures relating to evidentiary issues and those issues related to spoliation of evidence.

17.3* **Preservation of the Fire Scene and Physical Evidence.**

△ 17.3.1 **General.** Every attempt should be made to protect and preserve the fire scene, because evidence could be easily be destroyed or lost in an improperly preserved fire scene.

17.3.1.1 Generally, the cause of a fire or explosion is not known until near the end of the investigation. Therefore, the evidentiary or interpretative value of various pieces of physical evidence observed at the scene may not be known until, at, or near the end of the fire scene examination, or until the end of the complete investigation. As a result, the entire fire scene should be considered physical evidence and should be protected and preserved. Consideration should be given to temporarily placing removed ash and debris into bags, tarps, or other suitable containers labeled as to the location from which it was removed. This way, if components from an appliance or an incendiary device are found to be missing they can be more easily found in a labeled container.

17.3.1.2 The responsibility for the preservation of the fire scene and physical evidence does not lie solely with the fire investigator, but should begin with arriving fire-fighting units or police authorities. Lack of preservation may result in the destruction, contamination, loss, or unnecessary movement of physical evidence. Initially, the incident commander and, later, the fire investigator should secure or ensure the security of the fire scene from unnecessary and unauthorized intrusions and should limit fire suppression activities to those that are necessary.

17.3.1.3 Evidence at the fire scene should be considered not only in a criminal context, such as in traditional forensic evidence (e.g., weapons, bodily fluids, footprints), nor should it be limited to arson-related evidence, items, or artifacts, such as incendiary devices or containers. Potential evidence at the fire scene and surrounding areas can include the physical struc-

Shaded text = Revisions. △ = Text deletions and figure/table revisions. • = Section deletions. *N* = New material.

2021 Edition

**17.11.3.1** Certainly, the fire investigator will not always have the opportunity to determine the quantity of physical evidence he or she can collect. Often, the fire investigator can collect only that quantity that is discovered during his or her investigation.

**17.11.3.2** Each laboratory examination or test requires a certain minimum quantity of physical evidence to facilitate proper and accurate results. The fire investigator should be familiar with these minimum requirements. The laboratory that examines or tests the physical evidence should be consulted concerning these minimum quantities.

### 17.11.4 Comparative Examination and Testing.

**17.11.4.1** During the course of certain fire investigations, the fire investigator may wish to have appliances, electrical equipment, or other products examined to determine their compliance with recognized standards. Such standards are published by the American Society for Testing and Materials, Underwriters Laboratories Inc., and other agencies.

**17.11.4.2** Another method of comparative examination and testing involves the use of an exemplar appliance or product. Utilizing an exemplar allows the testing of an undamaged example of a particular appliance or product to determine whether it was capable of causing the fire. The sample should be the same make and model as the product involved in the fire.

### 17.12 Evidence Disposition.

**17.12.1** The fire investigator is often faced with disposing of evidence after an investigation has been completed. The investigator should not destroy or discard evidence unless proper authorization is received. Circumstances may require that evidence be retained for many years and ultimately may be returned to the owner.

**17.12.2** Criminal cases such as arson require that the evidence be kept until the case is adjudicated. During the trial, evidence submitted — such as reports, photographs, diagrams, and items of physical evidence — will become part of the court record and will be kept by the courts. Volatile or large physical items may be returned to the investigator by the court. There may be other evidence still in the investigator's possession that was not used in the trial. Once all appeals have been exhausted, the investigator may petition the court to either destroy or distribute all of the evidence accordingly. A written record of authorization to dispose of the evidence should be kept. The criminal investigator should be mindful of potential civil cases resulting from this incident, which may require retention of the evidence beyond the criminal proceedings.

## Chapter 18   Origin Determination

△ **18.1 Introduction.** This chapter recommends a methodology to follow in determining the origin of a fire. The origin of a fire is one of the most important hypotheses that an investigator develops and tests during the investigation. Generally, if the origin cannot be determined, the cause cannot be determined, and generally, if the correct origin is not identified, the subsequent cause determination will also be incorrect. The purpose of determining the origin of the fire is to identify in three dimensions the locations at which the fire began.

**18.1.1** This chapter deals primarily with the determination of origin involving structures; however, the methodology generally applies to all origin determinations. Separate chapters address the particular requirements for determining origin in non-structure fire incidents (motor vehicles, boats, wildfire, etc.).

△ **18.1.2** Determination of the origin of the fire involves the coordination of information derived from one or more of the following:

(1) *Witness Information and/or Electronic Data.* The analysis of observations reported by persons who witnessed the fire or were aware of conditions present at the time of the fire as well as the analysis of electronic data including but not limited to security camera footage, alarm system activation, or other such data recorded in and around the time of the fire event *(see Chapter 14)*

(2) *Fire Patterns.* The analysis of effects and patterns left by the fire, which may include patterns involving electrical conductors *(see Chapter 6)*

(3) *Fire Dynamics.* The analysis of the fire dynamics [i.e., the physics and chemistry of fire initiation and growth *(see Chapter 5)* and the interaction between the fire and the building's systems *(see Chapter 7)*]

△ **18.2 Overall Methodology.** The overall methodology for determining the origin of the fire is the scientific method as described in Chapter 4. This methodology includes recognizing and defining the problem to be solved, collecting data, analyzing the data, developing hypotheses, and most importantly, testing the hypothesis or hypotheses. In order to use the scientific method, the investigator must develop at least one hypothesis based on the data available at the time. These hypotheses should be considered "working hypotheses," which upon testing may be discarded, revised, or expanded in detail as new data is collected during the investigation and new analyses are applied. This process is repeated as new information becomes available. *(See Figure 18.2.)*

**18.2.1** Testing any origin hypothesis requires an understanding of the associated fire events as well as the growth of the fire and how the fire spread through the structure. A narrow focus on only identifying the first item ignited and a competent ignition source fails to take into account important data that can be used to test any origin hypothesis. In such a narrow focus, the growth and spread of the fire and the resulting fire damage are not well considered.

**18.2.1.1** The purpose of the fire spread analysis is to determine whether the resulting physical damage and available data are consistent with the area of origin hypothesis. For example, a fire starting in a wastebasket is a plausible working hypothesis, but the resulting fire damage would be highly dependent on the position of the first fuel and any subsequently ignited fuels. If the wastebasket had been located in an area with no adjacent fuel, then the results may be significantly different than if the wastebasket had been located next to a polyurethane sofa. Both hypotheses posit the same first item ignited, but the outcome is very different. Thus, if the origin hypothesis is not consistent with the resulting growth and spread of the fire, it is not a valid hypothesis. Fire spread scenarios within a compartment or building should be analyzed using the principles of fire dynamics presented in Chapter 5 and fire pattern development in Chapter 6.

**18.2.1.2** In some instances, a single item, such as an irrefutable article of physical evidence or a credible eyewitness to the

that area. Some systems provide only alarm or water flow data, and do not specify a particular zone. This information can be helpful in comparing the time of system activation to the time and observations of first arriving fire fighters or other witness, in assessment of the growth and spread of the fire.

**18.3.3.12 Security Cameras.** Security cameras that monitor buildings or ATMs may be very useful, particularly for providing "hard" times *(see the discussion of timelines in Chapter 24).* Events before or during the fire including, in some cases, the actual ignition and development of the fire may have been recorded. The video recorder may be found in a secure area or a remote location. It should be recovered and reviewed even if damaged.

**18.3.3.13 Intrusion Alarm Systems.** An intrusion system may activate during a fire due to heat, smoke movement, the destruction of wiring, or loss of power. A monitored intrusion system may send a trouble signal to the monitoring station if a transmission line is compromised or power is lost. As with fire alarm systems, attempts should be made to recover the alarm panel history before the alarm system is reset. This frequently requires special expertise. Some alarm systems may record the identity of persons entering and leaving the building.

**18.3.3.14 Witness Observations.** Observations by witnesses are data that can be used in the context of determining the origin. Such witnesses can provide knowledge of conditions prior to, during, and after the fire event. Witnesses may be able to provide photographs or videotapes of the scene before or during the fire. Observations are not necessarily limited to visual observations. Sounds, smells, and perceptions of heat may shed light on the origin. Witness statements regarding the location of the origin create a need for the fire investigator to conduct as thorough an investigation as possible to collect data that can support or refute the witness statements. When witness statements are not supported by the investigator's interpretation of the physical evidence, the investigator should evaluate each separately.

**18.4 Analyze the Data.** The scientific method requires that all data collected that bears upon the origin be analyzed. This is an essential step that must take place before the formation of any hypotheses. The identification, gathering, and cataloging of data does not equate to data analysis. Analysis of the data is based on the knowledge, training, experience, and expertise of the individual doing the analysis. If the investigator lacks the knowledge to properly attribute meaning to a piece of data, then assistance should be sought from someone with the necessary knowledge. Understanding the meaning of the data will enable the investigator to form hypotheses based on the evidence, rather than on speculation or subjective belief.

**18.4.1 Fire Pattern Analysis.** An investigator should read and understand the concepts of fire effects, fire dynamics, and fire pattern development described in Chapters 5 and 6. This knowledge is essential in the analysis of a scene to determine the origin of the fire.

**18.4.1.1 Consideration of All Patterns.** All observed patterns should be considered in the analysis. Accurate determination of the origin of a fire by a single dominant fire pattern is rare, as in the case of very limited fire damage where there may be only one fire pattern.

**18.4.1.2 Sequence of Patterns.** While fire patterns may be the most readily available data for origin determination, the investi-

gator should keep in mind that the damage and burn patterns observed after a fire represent the total history of the fire. A major challenge in the analysis of fire pattern data is to determine the sequence of pattern formation. Patterns observed in fires that are extinguished early in their development can present different data than those remaining after full room involvement or significant building destruction. Patterns generated as a result of a rekindle may impact the perception of the fire's history or sequence of pattern production.

**18.4.1.3 Pattern Generation.** The investigator should not assume that the fire at the origin burned the longest and therefore fire patterns showing the greatest damage must be at the area of origin. Greater damage in one place than in another may be the result of differences in thermal exposure due to differences in fuel loading, the location of the fuel package in the compartment, increased ventilation, or fire-fighting tactics. For similar reasons, a fire investigator should consider these factors when there is a possibility of multiple origins.

**18.4.1.3.1** The size, location, and heat release rate of a fuel package may have as much effect on the extent of damage as the length of time the fuel package was burning. An area of extensive damage may simply mean that there was a significant fuel package at that location. The investigator should consider whether the fire at such a location might have spread there from another location where the fuel load was smaller.

**18.4.1.3.2** Fuel packages of identical composition and equal size may burn very differently, depending on their location in a compartment. The possible effect of the location of walls relative to the fire should be considered in interpreting the extent of damage as it relates to fire origin. In making the determination, the possibility that the fuel in the suspected area of origin was not the first material ignited and that the great degree of damage was the result of wall or corner effects should be considered.

**18.4.1.4 Ventilation.** Ventilation, or lack thereof, during a fire has a significant impact on the heat release rate and consequently on the extent of observable burn damage. The analysis of fire pattern data should, therefore, include consideration that ventilation influenced the production of the pattern. Ventilation-controlled fires tend to burn more intensely near open windows or other vents, thereby producing greater damage. Knowledge of the location and type of fuel is important in fire pattern analysis. During full room involvement conditions, the development of fire patterns is significantly influenced by ventilation. Full room involvement conditions can cause fire patterns that developed during the earlier fuel-controlled phase of the fire to evolve and change. In addition, fires can produce unburned hydrocarbons that can be driven outside the compartment through ventilation openings. This unburned fuel can mix with air and burn on the exterior of the compartment, producing additional fire patterns that indicate the fire spread out of the original compartment. Thus, knowledge of changes in ventilation (e.g., forced ventilation from building systems, window breakage, opening or closing of doors, burn-through of compartment boundaries) is important to understand in the context of fire pattern analysis. Determination of what patterns were produced at the point of origin by the first item ignited usually becomes more difficult as the size and duration of the fire increases. This is especially true if the compartment has achieved full room involvement.

**18.4.1.5 Movement and Intensity Patterns.** As discussed in Chapter 6, fire patterns are generated by one of two mecha-

FIRE CAUSE DETERMINATION                                   921-235

tested using the scientific method and is determined to be probable, then the probable fire cause is identified.

△ **19.6.1 Scientific Method.** Use of the scientific method dictates that any hypothesis formed from analysis of the data collected in an investigation must stand the test of careful and serious challenge by the investigator testing the hypothesis or by examination by others. *[See Chapter 4 and Daubert v. Merrell Dow Pharmaceuticals, Inc. 509 U.S. 579, 113 S. Ct. 2786 (1993).]*

**19.6.2 Deductive Reasoning.** Testing of the hypothesis is done by the principle of deductive reasoning, in which the investigator compares the hypothesis to all the known facts as well as the body of scientific knowledge associated with the phenomena relevant to the specific incident. Ultimately, the cause determination is arrived at through the testing of cause hypotheses.

**19.6.3 Hypotheses Testing Questions.** In testing a cause hypothesis, the following questions should be answered:

(1) Is the hypothesized ignition source a competent ignition source for the first fuel ignited?

(2) Is the required time for ignition consistent with the time line associated with the cause hypothesis and facts of the incident?

(3) What were the circumstances that brought the ignition source in contact with the first fuel ignited?

(4) What, if any, were the failure modes required for ignition to occur?

△ **19.6.4 Means of Hypothesis Testing.** When testing a hypothesis, the investigator should attempt to disprove, rather than to confirm, the hypothesis. If the hypothesis cannot be disproved, then it may be accepted as either possible or probable. Hypothesis testing may include any application of fundamental principles of science, physical experiments or testing, cognitive experiments, analytical techniques and tools, and systems analysis.

**19.6.4.1\* Scientific Literature.** The use of the scientific literature is an important means to develop information that can be used in hypothesis testing. A review of the literature may include descriptions of experiments and testing that can also be applied to the investigator's specific case. "Gateways" to the scientific literature can include Internet databases, technical libraries, textbooks, and handbooks. The validity of the information in the literature should be considered by the investigator.

**19.6.4.2 Fundamental Principles of Science.** A cause hypothesis is disproved if it violates the fundamental laws of physics or thermodynamics. Water does not burn — a hypothesis positing the ignition of water would be wrong.

**19.6.4.3 Physical Experiments or Testing.** Experiments can be conducted to test the hypothesized cause. Care must be exercised in developing an experimental protocol that will produce reliable and applicable results for the specific fire or explosion incident. For more information, see Section 21.5.

**19.6.4.4 Cognitive Experiments.** In a cognitive experiment, one sets up a premise and tests it against the data. An example of a cognitive experiment is, "If it were posited that the door was open during the fire and the hinges were found with mirror image patterns, then the hypothesis would be disproved." For more information see Chapter 4.

**19.6.4.5 Time Lines.** In the context of testing a cause hypothesis, the time frame may be a discriminator for determining if

an ignition scenario is consistent with the available data as it related to time frames.

**19.6.4.6 Fault Trees.** Fault trees can be used to test the possibility of a hypothesized fire cause. Fault trees are developed by breaking down an event into causal component parts. These components are then placed in a logical sequence of events or conditions necessary to produce the event. If the conditions or sequence are not present then the hypothesis is disproved.

**19.6.4.7 Additional Techniques.** Additional analytical techniques and tools in Chapter 21 can be helpful in hypothesis testing.

△ **19.6.5 Appropriate Use.** The process of elimination is an integral part of the scientific method. All potential ignition sources present or believed to be present in the area of origin should be identified, and alternative hypotheses should be considered and challenged against the facts. Elimination of a testable hypothesis by disproving the hypothesis with reliable data is a fundamental part of the scientific method. However, the process of elimination can be used inappropriately. Identifying the ignition source for a fire by believing to have eliminated all ignition sources found, known, or suspected to have been present in the area of origin, and for which no supporting evidence exists, is referred to by some investigators as *negative corpus.* Determination of the ignition source must be based on data or logical inferences drawn from that data. Negative corpus has been used in classifying fires as incendiary, although the process has also been used to characterize fires as accidental. The negative corpus process is not consistent with the scientific method, is inappropriate, and should not be used because it generates untestable hypotheses and may result in incorrect determinations of the ignition source and first fuel ignited. Any hypotheses formulated for the causal factors (e.g., first fuel, ignition source, and ignition sequence) must be based on the analysis of facts and logical inferences that flow from those facts. Those facts and logical inferences are derived from data, observations, calculations, experiments, and the laws of science. Speculative information cannot be included in the analysis.

**19.6.5.1 Cause Undetermined.** In circumstances where all hypotheses have been rejected, or if two or more hypotheses cannot be rejected, the only choice for the investigator is to conclude that the fire cause, or specific causal factors, is undetermined. It is improper to base hypotheses on the absence of any supportive evidence. That is, it is improper to opine a specific fire cause, ignition source, or fuel that has no evidence to support it even though all other such hypothesized elements were eliminated.

△ **19.6.5.2 Ignition Source vs Fire Cause.** The investigator should remember that the fire cause is defined as "the circumstances, conditions, or agencies that bring together a fuel, ignition source, and oxidizer (such as air or oxygen) resulting in a fire or a combustion explosion" *(see 3.3.71).* The identification of an ignition source and a first fuel is not sufficient to determine a cause. Determining a fire cause and ignition sequence requires that any proposed hypothesis include consideration of the relationship between the competency of the ignition source and the first fuel ignited. The investigator should determine if the proposed ignition source is a competent ignition source for the proposed first fuel ignited *(see 19.4.2).*

△ **19.7 Selecting the Final Hypothesis.** Once the hypotheses regarding the "cause" of the fire have been tested, the investi-