**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JEANNE OLSON, Trustee of the | ) | |
| WILLIAM AMOR Trust, | ) | Case No. 18 CV 2523 |
| as successor plaintiff, | ) | |
| | ) | Honorable John J. Tharp, Jr. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| REBECCA GOMEZ, as Special Representative | ) | |
| for Michael Cross, deceased, et al., | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**DEFENDANTS' MOTION *IN LIMINE* TO BAR**
**EXPERT OPINIONS AND TESTIMONY OF RICHARD LEO**

Date: May 17, 2024

Respectfully submitted,

/s/ Laura M. Ranum
Laura M. Ranum, Attorney No. 6300636
*One of the Attorneys for Defendants*

James G. Sotos
Laura Ranum
Joseph Polick
Lisa M. Meador
THE SOTOS LAW FIRM, P.C.
141 W. Jackson Blvd., #1240A
Chicago, IL 60604
(630) 735-3300
lranum@jsotoslaw.com

# TABLE OF CONTENTS

**PAGE**

RELEVANT BACKGROUND ..................................................................................................1

The September 10, 1995 Fire and Amor's Statements to the Naperville Police
Department ...........................................................................................................................1

Disclosure of Leo's Opinions Regarding the October 1995 Statements ............................2

LEGAL STANDARD.......................................................................................................................4

ARGUMENT ..................................................................................................................................5

I.    Leo's "False Confessions" Testimony Should Be Barred as The Product of an
Unreliable Methodology Based on Insufficient Data (Opinion Nos. 1-8)....................5

    A.  The Seventh Circuit has never endorsed the reliability of
false-confession theory .......................................................................................5

    B.  "False confession theory" generally and Leo specifically have been barred as
unreliable by courts across the country................................................................6

    C.  Rule 702's recent amendment clarifies that the glaring deficiencies in Leo's data
and methodology is an issue of admissibility, not merely weight ..........................9

    D.  Additionally, Leo's false confession opinions here do not reflect a reliable
application of his "methodology" under Fed. R. Evid. 702(d) ..............................10

II.    Several of Leo's Opinions Invade the Province of the Jury and Must Be Barred .......13

    A.  Leo's opinion that Amor's confession is a "proven false confession"
is unreliable and invades the province of the jury (Opinion 2)..............................13

    B.  Leo may not render opinions on credibility, intent, and ultimate issues ...............16

III.    Leo is Not Qualified to Opine as a Police Practices, Polygrapher, or Clinical
Psychologist Expert ...................................................................................................17

    A.  Leo is not qualified as a police practices expert and has no supporting data ........18

    B.  Leo is not a polygrapher and has no basis for his opinion that they are a "false
evidence ploy" ..................................................................................................19

**TABLE OF CONTENTS**
**-Continued-**

C.  Leo is not a clinical psychologist and cannot opine on Amor's alleged suggestibility, anxiety, and depression ...................................................19

IV.  Leo's Proffered Opinions Are Also Barred by Fed. R. Evid. 403 ..............................20

CONCLUSION .................................................................................................................21

# TABLE OF AUTHORITIES

**CASE**                                                                                              **PAGE**

*Andersen v. Chicago,* No. 16 C 1963, 2020 WL 1848081 (N.D. Ill. April 13, 2020)...............6, 14

*Austin v. Brown*, 2024 WL 1602968 (D.Colo. Feb. 22, 2024) ................................................6, 8, 9

*Brown v. Chicago,* No.18 C 7064, 2023 WL 2561728 (N.D. Ill. March 17, 2023) ............. *passim*

*Cates v. Whirlpool Corp*., 2017 WL 1862640 (N.D. Ill. May 9, 2017)..................................13, 15

*Caine v. Burge,* No. 11 C 8996, 2013 WL 1966381 (N.D. Ill. May 10, 2013) ..................6, 14, 17

*Carroll v. Otis Elevator Co.*, 896 F.2d 210 (7th Cir. 1990)...........................................................17

*C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827 (7th Cir. 2015)...................................................4

*Davis v. Duran*, 277 F.R.D. 362 (N.D. Ill. 2011) ..........................................................................16

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) .............................................. *passim*

*Dhillon v. Crown Controls Corp.*, 269 F.3d 865 (7th Cir. 2001) ...................................................13

*Gayton v. McCoy*, 593 F.3d 610 (7th Cir. 2010) ...................................................................17, 19

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ...............................................................................4

*Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557 (7th Cir. 2003)..............17

*Green v. City of Wenatchee,* 2003 WL 26089744 (E.D. Wash. March 14, 2003).........................7

*Hall v. Flannery*, 840 F.3d 922 (7th Cir. 2016)............................................................................18

*Harris v. Chicago*, No. 14 C 4391, 2017 WL 2436316 (N.D. Ill. June 5, 2017) ..........6, 14, 15, 18

*Harris v. Wexford Health Sources, Inc.*, 2021 WL 1192437 (N.D. Ill. March 30, 2021) ..............4

*Hill v. Chicago*, 2011 WL 2633823 (N.D. Ill. 2011)....................................................................20

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)...............................................5, 11, 15

*People v. Kowalski,* 821 N.W. 2d 14 (Mich. 2012) .......................................................................7

*Taylor v. Chicago,* No. 14 C 737, 2021 WL 12242781 (N.D. Ill. Dec. 1, 2021) ...............6, 17, 18

# TABLE OF AUTHORITIES
## -Continued-

**CASE**                                                                 **PAGE**

*United States v. Hall,* 93 F.3d 1337 (7th Cir. 1996) ......................................................5

*U.S. v. Begay,* 310 F.Supp.3d 1318 (D.N.M. 2018) ......................................................7

*U.S. v. Begay*, 497 F.Supp.3d 1025 (D.N.M. 2020) ..........................................6, 7, 8, 13

*U.S. v. Deuman*, 892 F. Supp. 2d 881 (W.D. Mich. 2012) ......................................... 6-7

*U.S. v. Mamah*, 332 F.3d 475 (7th Cir. 2003)..............................................5, 6, 10, 12

*U.S. v. Mamah*. 2002 WL 34358182 (N.D. Ill. Feb. 4, 2002) ....................................12

*U.S. v. Phillipos*, 849 F.3d 464 (1st Cir. 2017)..............................................................6, 7

*U.S. v. Redlightning*, 624 F.3d 1090 (9th Cir. 2010) ...................................................6, 7

*U.S. v. Scheffer*, 523 U.S. 303 (1998) ............................................................................16

*U.S. v. Yazzie,* 2012 WL 13076228 (D.N.M. Sept. 17, 2012) ...................................7, 20


**STATUTUES**                                                           **PAGE**

Fed. R. Civ. P. 26...............................................................................................................2

Fed. R. Evid. 403 .............................................................................................................20

Fed. R. Evid. 702 ....................................................................................................... *passim*

Defendants, by and through their undersigned counsel, move for an order barring expert opinions and testimony from Richard Leo and in support thereof state:

## RELEVANT BACKGROUND

Plaintiff has disclosed Richard Leo as a "false confession" expert, along with his 52-page report containing ten opinions, all which concern Amor's interviews at the Naperville Police Department (NPD) on October 3–4, 1995. The relevant background necessary to an assessment of those opinions under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) follows.

### *The September 10, 1995 Fire and Amor's Statements to the Naperville Police Department*

On September 10, 1995, a fire ripped through a condo unit at 218 E. Bailey in Naperville, killing Mariane Miceli (40). (¶¶ 6-7.)[1] Marianne (40) lived in the condo with her daughter Tina (18) and Tina's new husband, Bill Amor (39), neither of whom were home when Marriane perished. (¶ 13) Naperville's Fire Investigation Team (FIT) and NPD Defendant-Detective Mike Cross commenced an investigation. (¶¶ 7-9, 11.) Cross worked with NPD Defendant-Detectives Guerrieri and Cunningham on the NPD side of the investigation. (¶ 11.)

Amor was interviewed multiple times during the investigation and provided two handwritten statements. On September 15, 1995, Amor was interviewed by Cunningham and Sgt. Mark Carlson and volunteered that on the day of the fire, he spilt vodka between the couch and the coffee table on the Chicago Tribune, and he may have left a cigarette and candle burning when he left. (¶¶ 51-52.) Amor drew a diagram of the location of the spill as well as the candle and wrote a statement in his own words containing this information. (¶¶ 53-56; 9/15 Statement is attached as Ex. A.) Plaintiff has no claim based on the September 15 interview (Dkt. 209, Memorandum Opinion and Order on Summary Judgment, p. 23, n. 12.) and Leo does not analyze

---

[1] The background facts are taken from Defendants' L.R. 56.1 Statement of Facts filed in support of their motion for summary judgment. (Dkt. 137.)

or opine regarding that statement. (Leo's Dep., Ex. D at 198:9–200:20.)

On October 3, Amor was released from jail by DeKalb County on an unrelated matter and met by Cross and Guerrieri. (¶ 68.) Amor agreed to sit for a polygraph examination and went with the detectives to John Reid & Associates in Chicago for the polygraph—the results of which indicated deception—and then headed back to NPD. (¶¶ 68-69, 74.)

While at NPD, Amor told Guerrieri he started the fire. (¶ 75.) Following a discussion between Amor, Guerrieri, and Cross, Amor wrote a statement including, in part that he: (1) spilled vodka on the Chicago Tribune and a chair; (2) lit a cigarette and put it on the ashtray but then bumped the ashtray and knocked the cigarette onto the newspaper with the vodka spill; (3) did not pick up the cigarette and knew a fire would probably result; and (4) intended for the loss to be minimal and no harm was supposed to come to anyone. (¶¶ 75-77; Amor's 10/4/1995 statement attached as Ex. B.) Cross contacted felony review and Assistant State's Attorney (ASA) Brian Nigohosian responded to the NPD. (¶¶ 80-81.) At 2:11 a.m. on October 4, Cross and Guerrieri audio-recorded Amor reading his handwritten statement followed by a short question and answer session. (¶¶ 82-83.) ASA Nighosian then arrived, interviewed Amor, and made a second recording in which Amor said he knew about the life insurance, planned the fire, and anticipated using "one of the insurance monies" to get out of the apartment but "wasn't directed right at life insurance." (¶¶ 84-86.) Nigohosian approved charges and following a trial, Amor was convicted of aggravated arson and first-degree murder. (¶¶ 93-110.) His conviction was later overturned based on evolutions in fire science, and he was acquitted at a 2018 retrial. (¶¶ 117-118.) This lawsuit followed.

### *Disclosure of Leo's Opinions Regarding the October 1995 Statements*

Pursuant to Fed. R. Civ. P. 26(a)(2)(B), Plaintiff disclosed Leo as a "false confession"

expert along with his 52-page report (Ex. C)[2] which offers ten opinions, all concerning Amor's

October 3–4 interviews:

1) The interrogation utilized the "Reid method of interrogation" which Leo opines is "universally believed to lead to coerced and/or false confessions[.]" (*Id*. at 6.)

2) Amor's confession bears the "hallmarks, characteristics and indicia of a false and unreliable confession" which meets the criteria to be classified as both a "proven false confession" and a "coerced-compliant false confession." (*Id*.)

3) Amor's description of his interrogation "fits with the empirical social science research" regarding "interrogation techniques, methods, practices and effects" associated with increased risk of (and known to cause) false confessions and why individuals are moved to make or agree to a false and unreliable confession. (*Id*.)

4) Amor's description of his interrogation includes examples of "physically and psychologically coercive interrogation techniques, methods, strategies and effects" demonstrated to cause involuntary, unreliable, and false confessions because they "cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators." (*Id*. at 6–7.)

5) Amor's description of his interrogation indicates the use of "guilt-presumptive, truth-presumptive, confirmatory and theory-driven" practices whose goal was to elicit a confession from Amor consistent with the detectives' "pre-existing assumptions, speculations, and beliefs". (*Id*. at 7.)

6) Amor's account of his interrogation describes risk factors for false confessions including lengthy interrogation, sleep deprivation, false evidence ploys, minimization, threats, primes, and physical and psychological coercions, referred to as "situational risk factors". (*Id*.)

7) Amor was at a "heightened risk" for making a false or unreliable admission because of his suggestibility, anxiety, and depression, which are "personal risk factors". (*Id*.)

8) The investigators' accounts of the interrogation contain risk factors for a false confession including lengthy interrogation, sleep deprivation, false evidence ploys, and minimization as well as Amor's suggestibility. (*Id*.)

9) The interrogation involved multiple instances of contamination and scripting,

---

[2] "Exhibit A" to Leo's report is the September 2013 affidavit of another "false confession" expert, Steven Drizin, regarding Amor's case. Footnote 82 of Leo's report indicates the affidavit is referenced because it "provides a thorough review of the details that were leaked to Mr. Amor and Tina…and how they contaminated their interactions with police." (Ex. C at 43.) Nonetheless, Leo testified that he does not consider the affidavit to be a part of his report and did not rely on it in rendering his opinions. (Ex. D at 24:12–25:18.) As such, the opinions set forth in Drizin's affidavit are not addressed in the instant motion.

increasing the risk that Amor's confession would misleadingly appear to be "accurate and self-corroborating." (*Id*.)

10) The interrogation "violated universally accepted police investigative and interrogation national training standards and best practices that existed in 1995." (*Id*. at 8.)

## LEGAL STANDARD

Fed. R. Evid. 702 permits a witness who is qualified as an expert by their "knowledge, skill, experience, training or education" to testify "if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." A proffered expert's opinion must "have a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592. Evidence "that is connected to existing data only by the *ipse dixit* of the expert" should be excluded. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

"The district court is the gatekeeper of expert testimony" and must assess its reliability by examining whether: (1) the theory has or can be tested; (2) the theory has been subjected to peer-review and/or academic publication; (3) there is a known rate of error; and (4) the theory is generally accepted in the relevant scientific community. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015) (citations omitted). Additional factors include whether the expert has unjustifiably extrapolated an unfounded conclusion from an accepted premise and whether the expert has accounted for "obvious alternative explanations". *Harris v. Wexford Health Sources, Inc.*, 2021 WL 1192437, at *3 (N.D. Ill. March 30, 2021) *quoting* Fed. R. Evid. 702 advisory committee's note to 2000 amendment. "Where [an expert's] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question... the trial judge

must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (citation omitted).

**ARGUMENT**

I.      **Leo's "False Confessions" Testimony Should Be Barred as The Product of an Unreliable Methodology Based on Insufficient Data (Opinion Nos. 1-8)**

Eight of Leo's ten opinions address the veracity and voluntariness of Amor's confession and risk factors he claims were present during his interrogation that purportedly increase the risk of a false confession. Initially, these eight opinions are based on fundamentally flawed data and non-existent methodology, rendering them inadmissible under Rule 702(b) and (c). Additionally, Leo's analysis of Amor's confession does not reflect a reliable application of his "methodology", rendering the opinions inadmissible under Rule 702(d).

A.  **The Seventh Circuit has never endorsed the reliability of false-confession theory.**

The Seventh Circuit has never held that any "false confession" expert's methodology passed muster under Fed. R. Evid. 702(b)-(d). In *United States v. Hall*—which predated the 2000 amendments to Rule 702—the Seventh Circuit reviewed the appeal of convicted murderer Larry Hall including a challenge to the exclusion of his false confession expert, Richard Ofshe. 93 F.3d 1337 (7th Cir. 1996). The Seventh Circuit found error in the trial court's failure to conduct "a full *Daubert* inquiry", which "assumed" *arguendo* that the scientific bases for Ofshe's opinions were valid without "prejudging the outcome of that inquiry in any further proceedings[.]" *Id*. at 1344-1345.

Seven years later, the Seventh Circuit affirmed the exclusion of Ofshe's testimony in *U.S. v. Mamah*, 332 F.3d 475 (7th Cir. 2003). The court found an "absence of an empirical link between [the] research and the opinion that Mamah likely gave a false confession[,]" because

5

Ofshe "could not connect his research to the particulars of Mamah's case[,]" which rendered the opinions insufficiently reliable for admission. *Id*. at 478. *Mamah* dictates that, like all experts, false confession experts must sufficiently tether their opinions to empirical data and research in the context of the case at hand to hold water under Fed. R. Evid. 702.

Despite the Seventh Circuit's clear directives requiring analysis of such "false confession" experts' testimony, courts in this district which have permitted false confession experts to testify have inexplicably done so without analysis of *Mamah*. *See, e.g., Brown v. Chicago,* No.18 C 7064, 2023 WL 2561728, at *10-12 (N.D. Ill. March 17, 2023) (partially admitting Leo's testimony without mention or analysis of *Mamah*); *Taylor v. Chicago,* No. 14 C 737, 2021 WL 12242781, at *2-3 (N.D. Ill. Dec. 1, 2021) (same); *Caine v. Burge,* No. 11 C 8996, 2013 WL 1966381, at *3 (N.D. Ill. May 10, 2013) (same); *Andersen v. Chicago,* No. 16 C 1963, 2020 WL 1848081, at *3 (N.D. Ill. April 13, 2020) (partially admitting false confession testimony without analysis of *Mamah*); *Harris v. Chicago*, No. 14 C 4391, 2017 WL 2436316, n. 2 (N.D. Ill. June 5, 2017) (partially admitting Leo's testimony and relegating *Mamah* to a footnote.) The lack of proper analysis pursuant to appellate directives in *Mamah* is unfortunate. *Mamah* is binding on this Court and should be carefully considered when addressing whether Leo's "false confession" testimony should be admitted.

**B. "False confession theory" generally and Leo specifically have been barred as unreliable by courts across the country.**

*Mamah* was certainly not an outlier—courts around the country have found false confession expert testimony inadmissible based on the lack of reliability. *See e.g., U.S. v. Phillipos*, 849 F.3d 464, 471–472 (1st Cir. 2017); *U.S. v. Redlightning*, 624 F.3d 1090, 1112 (9th Cir. 2010); *U.S. v. Begay*, 497 F.Supp.3d 1025, 1069-1080 (D.N.M. 2020); *Austin v. Brown*, 2024 WL 1602968, at *14 (D.Colo. Feb. 22, 2024); *U.S. v. Deuman*, 892 F. Supp. 2d 881, 888

(W.D. Mich. 2012).

Paramount to this Court's inquiry, Leo also has been barred numerous times because of his unreliable methodology, with one court even referring to his studies as "faux science." *Phillipos*, 849 F.3d at 472. *See also*, *U.S. v. Begay,* 310 F.Supp.3d 1318, 1356 (D.N.M. 2018); *Deuman*, 892 F. Supp. 2d at 886; *U.S. v. Yazzie,* 2012 WL 13076228, at *2 (D.N.M. Sept. 17, 2012); *Redlightning*, 624 F.3d at 1112; *Green v. City of Wenatchee,* 2003 WL 26089744, at *4 (E.D. Wash. March 14, 2003); *People v. Kowalski,* 821 N.W. 2d 14, 36-37 (Mich. 2012). In so ruling, these courts cite Leo's inability to identify any evidence for determining how often false confessions occur, lack of reliable, empirical data on what tactics cause false confessions, and lack of methodology connecting such tactics with false confessions. All of these problems are evident in Leo's opinions in this case.

The extensive and pervasive problems in Leo's field of alleged expertise were recently highlighted in *U.S. v. Begay*, 497 F.Supp.3d 1025 (D.N.M. 2020) which barred a false confession expert who relied largely upon Leo's methodology. *Begay* provided a detailed analysis of this flawed methodology*,* concluding, "scientific testimony must meet some minimum threshold of reliability" and "[f]alse-confession theory -- which posits that there is an understood mechanism by which false confessions are produced and that demonstrates false confessions' prevalence -- does not generally satisfy *Daubert*." (*Id*. at 1073.) *Begay* identified numerous flaws in false confession theory including: (1) the lack of quantification for how many confessions are false regardless of the tactic employed; (2) the inability to ascertain whether the data supporting the purported study of false confessions are actually false confessions; (3) false confession theory cannot be applied to determine whether a given confession is false, which renders it an untested hypothesis; (4) there is a lack of significant data from real world interrogations; and (5) it is

based on primarily anecdotal evidence with statistically insignificant samples, conclusions drawn from unreliable sources, and prone to "an unacceptably high rate of error." *Id*. at 1073-1077.

Stripped of rhetoric, Leo and his fellow "false confession" experts do not employ a methodology at all. Instead, they begin with a subjective conclusion that a particular confession is "false," then review the circumstances of the confession, accept Plaintiff's version as true, and work backwards to identify "risk factors" that were present that "prove" their predetermined conclusion. *See, Austin*, 2024 WL 1602968, at *17-19 (adopting reasoning in *Begay* in barring false confession expert and noting "the dearth of empirical data on the false-confession theory, along with the absence of any established methodology for scientifically assessing that very limited data set").

As *Begay* and *Austin* make clear, false confession theory is also built on insufficient data. Indeed, Leo even acknowledges that no reliable estimates of incidents of false confessions exist. (Ex. D at 46:19-47:1.) As discussed below, he also concedes that the studies he cites do not include a quantitative measure to analyze the impact any of the alleged "risk factors" have on the likelihood of a false confession, only that at most, there is a correlation. Put best in *Austin*, "[c]orrelation, of course, does not equate to causation." *Austin*, 2024 WL 1602968, at *18.

Leo confirmed in his deposition the infeasibility of quantifying the likelihood of a false confession based on the presence of the risk factors discussed in his report including physical abuse (Ex. D at 111:6-22); food deprivation (*Id.* at 115:24-118:24); length of interrogation (*Id.* at 134:23-135:6); less than seven hours of sleep (*Id.* at 138:4-14); investigator bias (*Id.* at 149:12-150:7); communication of a failed polygraph (*Id.* at 158:7-22); minimization tactics (*Id.* at 166:23-168:3); and threats and promises (*Id*. at 169:14-170:16). Not only can Leo not opine as to how much any one risk factor increases the risk of a false confession, but he also "can't put a

number on" the risk of a false confession if ***none*** of the risk factors he analyzes are present because as he admits: "[i]t's not scientifically possible". (*Id.* at 194:15-195:4.) As such, Leo's opinions fall short of the standards set forth in Fed. R. Evid. 702(b) and (c).

Defendants freely acknowledge that as a matter of common sense, and in a particular case, one or more of the factors Leo identifies can lead a person to involuntarily confess to a crime he did not commit. The point is that whether that occurred in a particular case depends on a jury's assessment of all of the factors surrounding and testimony concerning an interrogation. Superimposing a witness/advocate under the guise of so-called "expert" testimony is improper absent evidence that the witness has specific scientific, technical, or other specialized knowledge that qualifies him to reliably interpret and communicate data in a way that will enable the trier of fact to comprehend relevant evidence in a manner it could not adequately do on its own by weighing the testimony of fact witnesses and the arguments of counsel. Here, consideration of Leo's proffered opinions reveals him to be nothing more than an advocate in expert clothing.

### C. Rule 702's recent amendment clarifies that the glaring deficiencies in Leo's data and methodology is an issue of admissibility, not merely weight.

Against this backdrop, this Court should resist the anticipated urging from Plaintiff that these objections merely speak to the weight, not admissibility, of Leo's testimony. Indeed, the recent amendment to Rule 702 was specifically targeted to address the failure of many courts to properly apply Rule 702's reliability requirements, incorrectly declaring it an issue of weight rather than admissibility. *See, e.g., Austin*, 2024 WL 1602968, at *10 (discussing 2023 amendment and the court's role as a gatekeeper). Now expressly requiring that the proponent of the expert testimony demonstrate that it is "more likely than not" that each reliability requirement is met, gone are the days of writing off Leo's gaping holes in reasoning and data as mere fodder for cross-examination.

Defendants acknowledge that several courts in this district have partially permitted Leo's testimony. But all of these non-precedential decisions pre-date the 2023 amendments to Rule 702 and further give short shrift to binding precedent in *Mamah*. Meanwhile, courts across the country that have properly delved into false confession theorist data and methodology have easily concluded that it is much too flawed to be admitted under *Daubert*. As the proponent of this evidence, Plaintiff bears the burden of demonstrating Leo's testimony is based on reliable principles and sufficient data. *See*, Fed. R. Evid. 702. That burden cannot be met here.

### D. Additionally, Leo's false confession opinions here do not reflect a reliable application of his "methodology" under Fed. R. Evid. 702(d).

Beyond the dearth of reliability in Leo's overall data and methodology, his opinions also do not reflect a reliable application of his methodology as required by Rule 702(d) because he (1) blindly relied upon Plaintiff's counsel to determine what was relevant to his inquiry; (2) failed to analyze the impact of the "risk factors" for false confessions on Amor specifically; and (3) failed to analyze Amor's September 15 statement. These deficiencies prevent Plaintiff from meeting her burden that Leo's opinions reflect a reliable application of his methodology.

As a starting point, Rule 702(d) also was amended to "emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." (Fed. R. Evid. 702 advisory committee's note to 2023 amendment). This amendment too aims at refocusing courts on their critical gatekeeping function because jurors do not have the specialized knowledge in the expert's field and therefore have limited ability to meaningfully evaluate the reliability of an expert's data and methods, as well as whether the expert's conclusions go beyond what they can reliably support. (*Id.*)

Initially, according to Leo, his methodology requires analyzing all documents provided to determine "what happened in the investigation[,]" yet he never even took inventory of whether

he had the full investigative file because he "rel[ied] on the judgment…of the people who retained [him] to provide the relevant information." (Ex. D at 40:16-41:6, 57:17-58:22, 67:7-16, 104:22-105:13, 147:11-16.) Leo conceded that he also deferred to Plaintiff's counsel to determine what was relevant to *his expert inquiry* and was unsure whether he even reviewed all of the police reports--a complete deviation from his claimed methodology of gathering as many documents as possible. Leo's willingness to accept the relevancy determinations of Plaintiff's counsel with no questions asked is a far cry from the intellectual rigor required under *Daubert*. *See Kumho*, 526 U.S. at 152 (*Daubert* ensures experts "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.")

Second, Leo claims that part of his methodology is to familiarize himself with "anything that is relevant to [Amor's] personality traits" and "reasonably possible" to access, yet he did no such thing here. (Ex. D at 53:13-16, 61:12-62:16.) Indeed, Leo made no attempt to interview Amor, review the testimony of his ex-wife Tina, or otherwise analyze how the identified risk factors may impact Amor personally. (Ex. C at 2-6; Ex. D at 53:13-16, 62:4-16, 88:20-89:1.) Specifically, Leo admits that he failed to analyze:

(1) The degree of severity of the physical abuse claimed by Amor (Ex. D at 111:4-115:7);

(2) Amor's typical eating patterns and whether he requested or was offered food while identifying "food deprivation" as a risk factor (*Id*. at 115:9-119:8);

(3) Which Reid techniques were employed (*Id*. at 123:19-125:17);

(4) Amor's typical sleep patterns and how they may affect a claim of sleep deprivation (*Id*. at 136:1-137:4);

(5) The impact of the failed polygraph as a risk factor when Amor was previously subjected to a polygraph in September 1995 and did not confess to starting the fire (Ex. D at 157:10-21);

(6) The impact of adrenaline on Amor even if he was experiencing sleep or food deprivation (*Id*. at 140:6-141:4);

11

(7) Whether details from polygrapher Masokas' alleged minimization with Amor ended up in the October 4 confession (*Id*. at 164:3-166:14); and

(8) Amor's prior criminal history and interactions with police despite identifying threats/promises as a risk factor (*Id*. at 189:8-191:15).

Similarly, Leo opines that Amor was at a heightened risk for making a false confession because of his "suggestibility", anxiety, and depression—referred to by Leo as personal risk factors. (Op. 7.) But like the situational risk factors addressed above, Leo fails to quantify the risk presented by any of these factors for causing a false confession.

The absence of consideration of how the identified risk factors might have impacted Amor or to what degree their presence was a deviation from Amor's typical behavior renders Leo's opinions entirely unreliable under *Mamah*. 2002 WL 34358182, at *1 (N.D. Ill. Feb. 4, 2002) *aff'd on appeal U.S. v. Mamah*, 332 F.3d 475 (7th Cir. 2003) ("That false confessions do occur in certain circumstances requires both a detailed description of the interrogation circumstances and, at least, its arguable effect on Mr. Mamah. Dr. Ofshe can apparently supply neither.")

Lastly, the most glaring omission from Leo's report is his failure to analyze Amor's September 15 statement—a fatal blow to his confession opinions because several of the details from the October 4 statement were first introduced by Amor on September 15 including: (1) he spilled vodka on newspaper; (2) he could not recall when and where he put out his last cigarette; (3) the location of the newspaper and vodka spill was in roughly the same location as where the fire was suspected to have begun. (*See generally*, Ex. A.) Leo ignores the fact that these details were provided by Amor weeks before his October 4 confession and provides no opinion about whether any identified "situational risk factors" for false confessions were present on September 15, or how the statement impacts his opinion that the October 4 confession was the result of

scripting and contamination. (*See* Op. 9; Ex. C at 43; Ex. D at 200:10-201:14.) An expert who disregards "highly relevant data in front of him and effectively crossed out a large portion of it without any adequate explanation" should be barred. *Cates v. Whirlpool Corp.*, 2017 WL 1862640, at *15 (N.D. Ill. May 9, 2017).

And, because Leo has failed to analyze his data against Amor specifically, his opinions will not help the trier of fact. *See Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) (expert must testify to something more than what is obvious to a layperson); *Begay*, 497 F.Supp.3d at 1078 (reasoning that most jurors understand generally that false confessions occur).

Leo's failure to review all relevant materials, analyze the potential impact of his identified risk factors on Amor specifically, and his omission of the September 15 statement from his analysis render his opinions far too unreliable for admission under Fed. R. Evid. 702(d).

## II. Several of Leo's Opinions Invade the Province of the Jury and Must Be Barred

Even if Leo's methodology satisfied *Daubert*, his proffered opinions far exceed what is appropriate even under the analysis of courts in this District which have allowed false confession theory testimony. Specifically, courts in this District have barred testimony concerning: (1) whether the confession was false or coerced; (2) whether the interrogation was coercive; (3) weighing the evidence and/or rendering credibility determinations; (4) ultimate issues in the case; (5) issues of state of mind or intent; and (6) the police practices. Leo offers these same opinions here and should be barred from doing so.

### A. Leo cannot opine that Amor's confession is a "proven false confession" because it is unreliable and invades the province of the jury (Opinion 2).

Leo opines that Amor's confession is a "proven false confession" because; (1) no arson occurred and (2) it was physically impossible for Amor to have started the fire. (Ex. D at 78:18-79:21.) Initially, Leo's opinions that the confession is false—or better yet, "proven false"—

should be barred because they usurp the role of the jury. (Op. 2; Ex. C at 39-40.) *See e.g., Brown,* 2023 WL 2561728, at *12 ("Leo's opinion about whether Mr. Brown's confession was, in fact, false and fabricated invades the province of the jury."); *Andersen,* 2020 WL 1848081, at *3 (barring expert testimony that confession was false); *Harris,* 2017 WL 2436316, at *16 ("Plaintiff acknowledges that Dr. Leo cannot testify that her interrogation was coercive or that she gave a false confession because these are questions for the jury."); *Caine,* 2013 WL 1966381, at *3 (barring Leo from testifying to his opinion that the confessions at issue were false).

Even if there were an appropriate construct under which Leo could testify that Amor's confession was provably false, both these pronouncements rest on fire science, an area of expertise which Leo readily concedes he does not possess. (Ex. D at 15:16-20, 82:21-23, 86:5-13.) Specifically, Leo asserts that Amor's confession meets two of his criteria for a proven false confession—a crime did not occur and it was physically impossible for Amor to have started the fire. (Ex. C at 31, 39; Ex. D at 78:22-79:12.)

Leo's conclusion that there was no arson is based solely on the findings of Plaintiff's fire expert, Douglas Carpenter, who Leo believes determined that the fire was accidental and "was credited at the second trial, ***but it wasn't disputed by any other of the experts***." (Ex. D at 80:2-13, 81:4-7.) (emphasis added). This is simply not true. During his second trial, Amor presented two other experts who classified the fire as "undetermined," and the State's expert opined the fire was incendiary. (Ex. D at 81:4-84:9; Acquittal Order, Ex. E at 6-7.)[3] Leo's reliance here is premised on demonstrably false facts, rendering it unreliable.

---

[3] Though not available at the time of Amor's second trial, it is worth noting that Defendants' retained expert in this lawsuit, David Icove, has also opined that the fire was incendiary, making for <u>four</u> fire experts who do not support Leo's opinion that it has been proven that no crime was committed.

Notably, Leo acknowledged that he "d[id] not know what effect, if any, reviewing any other opinions by fire science experts would have on my opinion [that this was a proven false confession] because I haven't reviewed them.". (Ex. D at 83:17-20.) He also admits he is not qualified to analyze and credit one fire science expert opinion over another. (*Id*. at 86:2-13.) At a minimum, Leo was provided the acquittal order from Amor's second trial which discusses the various fire expert opinions, yet he chose to rely solely on Carpenter, the ***only expert*** who opines the fire was accidental. (*See*, Feb. 21, 2018 Order, Ex. E at 15:14-17:17.) Indeed, [t]his selective blindness underscores the unreliability" of Leo's methodology. *Cates*, 2017 WL 1862640, at *15. *See also, Harris*, 2017 WL 2436316 at *15 (barring Leo from testifying the victim's death was accidental as outside of his knowledge, skill, and experience).

Leo's opinion that the confession is proven false because it is impossible that Amor started the fire succumbs to the same flaws. Initially, Leo is unqualified to opine on the timeline of the fire's ignition and/or how it spread through the condominium as compared with the timing of Amor's departure. Second, Leo credits Amor's testimony without review of Tina's testimony—who left with him just before the fire broke out—to opine that he left prior to the fire starting. This is a far cry from Leo meeting his own criteria that he can only opine as to a proven false confession based on impossibility if "it can be objectively established that it would have been physically impossible for the confessor to have committed the crime," and, therefore, lacks the intellectual rigor required under *Daubert*. (Ex. C at 9.) *See Kumho*, 526 U.S. at 152 (*Daubert* ensures experts "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.")

Thus, Leo should be barred from offering an unreliable opinion that Amor's confession is "proven false" because it would improperly posture him as both a fire expert and a finder of fact.

**B. Leo may not render opinions on credibility, intent, and ultimate issues.**

Leo's proffered opinions also include improper analysis of the credibility (or incredibility) of contested evidence. "It is a fundamental premise of our trial system that 'determining the weight and credibility of witness testimony ... belongs to the jury who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men.'" *Davis v. Duran*, 277 F.R.D. 362, 370 (N.D. Ill. 2011) *citing U.S. v. Scheffer*, 523 U.S. 303, 313 (1998). "It is well-settled that...experts are not permitted to offer opinions as to the believability or truthfulness of [witness] testimony." Despite this clear line of demarcation, Leo improvidently offers opinions and uses terminology throughout his report that (1) the confession was "coerced-complaint" and "coercive" (Op. 2, 4; Ex. C at 24-26, 36-37, 48); (2) the confession bears the hallmarks of an "unreliable confession" and lack any "indicia of reliability" (Op. 2, 4, 6; Ex. C at 39-41); (3) Amor's account is "more robust"[4] (Ex. C at 24, 49; Ex. D at 257:4-6)); (4) Amor "can be heard to mostly passively agree to" ASA Nigohosian's questioning (Ex. C at 24); (5) Amor's account "fits better with the findings of the empirical and scientific research literature on how and why individuals can be moved to make or agree to proven false confessions than the investigators'…sparse accounts" (Ex. C at 49); (6) there was no probable cause to arrest Amor (Ex. C at 30); (7) Defendants' state of mind (Op. 5, Ex. C at 29-32 (defendants "prematurely formed presumption of Mr. Amor's guilt.")); and (8) to the extent the confession is corroborated, it is due to scripting and contamination. (Op. 9.)

Leo has already been admonished in this district that such opinions are outside the bounds of admissibility. *See Brown,* 2023 WL 2561728, at *10 (barring Leo from opining on

---

[4] To that end, Leo's lip service in his deposition that his describing Amor's account as "more robust" is not a credibility determination is belied by common sense. Leo's attempts to camouflage impermissible credibility determinations does not make them any less impermissible. (Ex. D at 257:20-23.)

reliability of witnesses and state of mind); *Taylor,* 2021 WL 12242781, at *3 (barring Leo from offering credibility opinions of defendants and making "post-hoc comparisons between the facts given to him [by plaintiff] and the substance of the [ ] confessions"); *Caine,* 2013 WL 1966381 at *3 ( "...[Leo] will not be allowed to testify as to his comparison of the witnesses' confessions and the physical evidence[.]") As is commonplace, Leo should be barred from offering testimony which usurps the role of the jury in this case to assess credibility.

Regarding Leo's opinions that the confession was coerced, Defendants' tactics were coercive, and whether there was probable cause to arrest Amor, these opinions should further be barred because they are the ultimate issues in the case. The law is clear that "expert testimony as to legal conclusions that will determine the outcome of the case" are inadmissible. *Good Shepherd Manor Found., Inc. v. City of Momenc*e, 323 F.3d 557, 564 (7th Cir. 2003). Whether the confession was coerced and/or Amor was prosecuted without probable cause are at the heart of this case. These opinions bear on the ultimate issues of the case, would usurp the role of the jury, and must be barred. *See, e.g., Brown*, 2023 WL 2561728, at *11-12 (barring Leo from testifying regarding coercion and fabrication because it would invade the province of the jury).

III.     **Leo is Not Qualified to Opine as a Police Practices, Polygrapher, or Clinical Psychologist Expert**

"[W]hether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990). The focus is not on whether the "expert is qualified in general, but whether his or her 'qualifications provide a foundation for [him or her] to answer a specific question.'" *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010). More specifically, the court first "must look at each of the conclusions he draws individually to see if he has the adequate education, skill, and

17

training to reach them." *Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016) (citations omitted). Even a qualified expert may not cross into areas in which he does not have equivalent expertise. Inadmissible here are Leo's opinions that Defendants violated national police training standards and best practices (Op. 10), polygraphs are a false evidence ploy (Op. 6, 8; Ex. C at 32-34), and Amor's personality risk factors placed him at heightened risk for a false confession. (Op. 7.)

**A. Leo is not qualified as a police practices expert and has no supporting data.**

Leo opines that the October interrogation violated "universally accepted" police training and best practices in 1995. (Op. 10.) He repeatedly addresses police investigatory practices throughout his report, including surmising about knowledge possessed and actions taken by "properly" or "well-trained" police officers. (Ex. C at 15-16, 18-21, 24-26, 41-46.) There can be no question that Leo is not qualified to opine on police practices, training, and standards in 1995. Leo has never been a detective, police officer, or administrator for a police department and has never been trained as such. (Ex. D at 15:7-20; 251:15-18.)

Leo is routinely barred from rendering expert opinions on police practices, yet he keeps offering them. *See Brown,* 2023 WL 2561728, at *9-10 (barring Leo from testifying regarding police practices and training because "[t]hese sorts of statements exceed Dr. Leo's expertise."); *Taylor,* 2021 WL 12242781, at *3 (finding Leo is not qualified to offer opinions on "whether [the plaintiff's] interrogators violated police policy and best practice"); *Harris*, 2017 WL 2436316 at *15 ("[Leo] does not have sufficient law enforcement or forensic evidence experience or training to connect the dots to his conclusion that [decedent's] death was accidental.") His lack of expertise also requires exclusion here and his continuous offering of opinions that obviously exceed his background raise questions whether they are proffered in the hopes that courts will then look less critically at any of his opinions that are minimally in the

realm of his education and experience.

Putting aside his complete lack of qualification, Leo's opinions are also not sufficiently reliable to be admissible. Leo bases his opinion about police practices on a text written by Reid & Associates and the fact that he attended their training. (Ex. C at n. 84.) But he provides no basis to explain why the materials from Reid constitute best police practices in 1995 or how it can in any way substitute for his complete lack of experience and qualifications. As such, these opinions are also not sufficiently reliable to be admissible under Fed. R. Evid. 702.

**B. Leo is not a polygrapher and has no basis for his opinion that they are a "false evidence ploy".**

Leo opines that a polygraph examination in general is a "false evidence ploy," that the October 3, 1995 polygraph was an "orchestrated evidence ploy" because "there is no underlying science to support the concept", it is "highly prone to error", and "there is no unique physiological response when one tells the truth or one lies." (Ex. C at 32-33; Ex. D at 150:9-151:13.) Leo has never been a certified polygraph examiner or trained as a polygraph examiner. (Ex. D at 15:21-16:2.) His lack of any training, experience, or education in polygraphy renders him unqualified to opine on the reliability of polygraphs, the degree to which the underlying science is sound, and how they are employed by investigators. *See Gayton*, 593 F.3d at 617.

**C. Leo is not a clinical psychologist and cannot opine on Amor's alleged suggestibility, anxiety, and depression.**

In addition to the methodology issues addressed above, Leo is not qualified to opine that Amor's alleged suggestibility, depression, and anxiety placed him at a heightened risk for making a false statement. (*See* Op. 7; Ex. C at 38-39, 49.) Leo is not a clinical psychologist, he never interviewed Amor, and he is not qualified to render a diagnosis on Amor's emotional or mental state. (Ex. D at 13:13-14:1, 53:13-16.) Evidencing his lack of qualifications on this

matter, Leo could only speculate in his deposition about how depression and/or anxiety would impact one's risk to give a false confession. (Ex. D at 178:7-179:17.)

Similarly, with regard to suggestibility, Leo is relying upon hearsay from two witnesses who will be the subject of motions in limine—one (Chiapetta), who is deceased and one (DeClue) who was never disclosed. (*Id*. at 179:22-187:9.) Indeed, Leo had such limited understanding of Amor's score on the Gudjonsson Suggestibility Scales[5] that he conceded he could not interpret the results and "the proper person to [do so] would be a clinician[.]" (*Id*. at 182:9-187:9.) *Yazzie,* 2012 WL 13076228, at *2 (noting Leo testified he is not a psychologist or medical doctor and "not qualified [ ] to evaluate dispositional factors rendering" a person unusually susceptible to coercion); *Hill v. Chicago*, 2011 WL 2633823, *8 (N.D. Ill. 2011) (police policies expert not qualified to opine on mental state because "he is not a mental health expert and he has not met with or observed" plaintiff). Lacking expertise to offer these opinions, Leo's testimony must be barred.

## IV.     Leo's Proffered Opinions Are Also Barred by Fed. R. Evid. 403

For the reasons described above, Leo's opinions should also be barred under Rule 403. They serve only to persuade the jury—through a hired gun with no actual data or methodology— that Amor's confession is false and was coerced by Defendants who violated their professional standards to extract this confession. This, combined with the potential for jury confusion from Leo's testimony that certain techniques that are legally permissible may result in a coerced and/or false confession, renders these opinions highly prejudicial to the defense. Fed. R. Evid. 403. *See also, Brown*, 2023 WL 2561728, at *13 (barring Leo opinion due to risk that testimony would confuse and mislead the jury).

---

[5] According to Chiappetta's report, the Gudjonsson Suggestibility Scales is "an assessment of an individual's response to leading questions." (Ex. F, Chiappetta Report at 2.)

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request this Court bar the testimony of

Plaintiff's false confession and police practices expert, Richard Leo in its entirety.

Date: May 17, 2024                                      Respectfully submitted,

                                                                    /s/ Laura M. Ranum
                                                                    LAURA M. RANUM, Attorney No. 6300636
                                                                    *One of the Attorneys for Defendants*

James G. Sotos
Laura M. Ranum
Joseph M. Polick
Lisa M. Meador
THE SOTOS LAW FIRM, P.C.
141 W. Jackson Blvd., #1240A
Chicago, IL 60604
(630) 735-3300
lranum@jsotoslaw.com

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746 that on May 21, 2024, I electronically filed the foregoing **Defendants' Motion *In Limine* to Bar Expert Opinions and Testimony of Richard Leo** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants listed on the below Service List.

***Attorneys for Plaintiff:***
Jon Loevy
Mariah Garcia
Gayle Horn
Locke Bowman
Loevy & Loevy
311 N. Aberdeen Street, 3rd Floor
Chicago, IL 60607
(312) 243-5900
jon@loevy.com
mariah@loevy.com
gayle@loevy.com
locke@loevy.com

/s/ Laura M. Ranum
LAURA M. RANUM, Attorney No. 6300636
*One of the Attorneys for Defendants*