*Amor v. Cross, et al.*
Case No. 18-CV-2523
Our File No. 18-4078

# EXHIBIT D

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3   WILLIAM E. AMOR,              )
                                  )
4            Plaintiff,      )
                                  )
5        vs.              )   No. 18 CV 2523
                                  )
6   NAPERVILLE POLICE OFFICERS )
    MICHAEL CROSS; ROBERT        )
7   GUERRERI; THE ESTATE OF      )
    MARK CARLSON; BRIAN          )
8   CUNNINGHAM; JON LIPSKY;    )
    OTHER UNIDENTIFIED          )
9   NAPERVILLE POLICE OFFICERS )
    AND THE CITY OF NAPERVILLE, )
10                               )
             Defendants.     )
11

12          The video-recorded videoconference

13   deposition of RICHARD A. LEO, Ph.D., J.D., taken

14   pursuant to the Federal Rules of Civil Procedure,

15   before Donna M. Urlaub, Certified Shorthand

16   Reporter No. 084-000993, via Zoom, on Monday,

17   April 12, 2021, commencing at 11:01 a.m., pursuant

18   to notice.

19
        APPEARANCES:
20
          LOEVY & LOEVY, by
21           MS. MARIAH E. GARCIA
          (311 North Aberdeen Street, Third Floor
22           Chicago, Illinois  60607
          312.243.5900
23           mariah@loevy.com)
             appeared on behalf of the plaintiff;
24

## Page 2

```
1    APPEARANCES:  (Cont'd)
2        THE SOTOS LAW FIRM, PC, by
         MS. LAURA M. RANUM
3        MR. JOSEPH M. POLICK
         MS. CARSON W. CANONIE
4        (141 West Jackson Boulevard, Suite 1240A
         Chicago, Illinois  60604
5        630.735.3300
         lranum@jsotoslaw.com)
6        jpolick@jsotoslaw.com
         ccanonie@jsotoslaw.com
7        appeared on behalf of the defendants.
8
9    ALSO PRESENT:
10       MS. BRETT SCHATZLE
         Certified Legal Video Specialist
11       Urlaub Bowen & Associates;
12       MR. EZEKIEL ALICEA
         Court Reporting Intern
13       Urlaub Bowen & Associates.
14                  * * * * * * *
15
16
17
18
19
20
21
22
23
24
```

## Page 3

```
1                I N D E X
2
  Witness:                        Page
3
     RICHARD A. LEO, Ph.D. J.D.
4
       Examination by:
5
       Ms. Ranum.....................   6
6
       Ms. Garcia....................  270
7
       Ms. Ranum.....................  278
8
9
10
            E X H I B I T S
11
12  No.  Description          Marked/Referenced
13
     Invoice from Dr. Leo Re: Amor v
14    Naperville Police Officers - Leo
  1  Subpoena Response 000016 - 000019......  10
15
  2  Dr. Richard A. Leo c.v.................  11
16
  3  Dr. Leo's Report, Amor v Cross.........  21
17
  4  Inside the Interrogation Room..........  30
18
  5  SDT-DCPDO 3562 - 3566..................  91
19
     Report on Interview of William Amor
20    5393-5394; Naperville Police
      Department Supp Reports 12754-12761,
21    12779-12788, 11273-11279, Amor
  6  019108-019116, DEFS 11935, DEFS 12839..  54
22
23
24
```

## Page 4

```
1             I N D E X  (Cont'd)
2
  Number   Description          Referenced
3
  7  The Consequences of False Confessions..  39
4
     Instances Where Dr. Leo Has Been
5     Excluded - Leo Subpoena Response
  8  13 - 15...............................   51
6
  9  SDT-DCPDO 2685 -  2687................ 182
7
10  DEFS 818.............................. 202
8
     "The Social Psychology of Police
9  11  Interrogation.".......................  224
10     The Problem of False Confessions in
12  the Post DNA World....................  39
11
13  SDT-DCJ 85............................ 235
12
     Transcript of deposition of William
14  Amor.................................. 240
15  False Confessions in the 21st Century..  262
16  DEFS 13804 - audio recording........... 218
       (Exhibits 1 - 15 attached/scanned.)
         (Exhibit 16 not attached.)
18
19
20
21
22
23
24
```

## Page 5

```
1        VIDEO TECHNICIAN:  This is the beginning of
2   media unit one, and we are now on the record at
3   11:01 a.m.
4              This is the videotaped video-
5   conference deposition of Dr. Richard Leo being
6   taken on April 12, 2021.  This deposition is being
7   taken on behalf of the defendant in the matter of
8   William E. Amor versus Michael Cross, et al.  The
9   case number is 18 CV 02523, filed in the United
10  States District Court, Northern District of
11  Illinois, Eastern Division.
12            My name is Brett Schatzle, legal
13  videographer, representing Urlaub Bowen &
14  Associates, with offices at 20 North Clark Street,
15  Suite 600, Chicago, Illinois.
16            The court reporter today is Donna
17  Urlaub also of Urlaub Bowen & Associates.
18            Counsel please identify yourselves
19  for the video record and the parties which you
20  represent.
21    MS. GARCIA:  Mariah Garcia for the plaintiff.
22    MS. RANUM:  Laura Ranum on behalf of the
23  defendants.
24    MR. POLICK:  Joseph Polick, P-o-l-i-c-k, on
```

Page 6

1  behalf of the defendants.
2      MS. CANONIE:  Carson Canonie, C-a-n-o-n-i-e,
3  on behalf of defendants.
4      COURT REPORTER:  Pursuant to -- let's see, I
5  have to read it here -- Federal Rule of Civil
6  Procedure 30(b)(4), I will swear the witness
7  remotely, provided all counsel stipulate.
8      MS. GARCIA:  Plaintiff stipulates.
9      MS. RANUM:  Defendants stipulate.
10         (Witness sworn.)
11      RICHARD ANGELO LEO, Ph.D., J.D.
12  called as a witness herein, having been first duly
13  sworn, was examined and testified as follows:
14         EXAMINATION
15  BY MS. RANUM:
16      Q.   Good morning, Dr. Leo.  Can you please
17  state and spell your name for the record.
18      A.   Sure.  Richard Angelo Leo.  My first
19  name is spelled R-i-c-h-a-r-d, my middle name is
20  spelled A-n-g-e-l-o, and my last name is spelled
21  L-e-o.
22      Q.   Thank you.
23         And I know you've been through this
24  process a few times, so I won't spend too much time

Page 7

1  on the rules other than to let you know that we
2  have agreed to take this deposition over Zoom due
3  to the COVID-19 pandemic.
4         You have been sworn in remotely, but
5  obviously your obligations as being sworn in under
6  oath are the same as if you had been sworn in in
7  person.  And you understand that; correct?
8      A.   Yes.
9      Q.   And if you need to take a break, just
10  let me know.  My only request is that we clear up
11  any questions, and not have a question pending when
12  we take a break.  Okay?
13      A.   Yes.
14      Q.   Dr. Leo, did you do anything to prepare
15  for your deposition today?
16      A.   Yes.
17      Q.   What did you do to prepare for your
18  deposition?
19      A.   I reviewed my report in this case.
20      Q.   Okay.  Did you meet with anyone in
21  preparation of your deposition?
22      A.   Yeah.  I consulted with Mariah
23  yesterday.
24      Q.   Okay.  And without disclosing the

Page 8

1  contents of that conversation, for approximately
2  how long did you meet with Ms. Garcia with regard
3  to the deposition?
4      A.   Between an hour and an hour and a half.
5      Q.   Did you meet with anyone else in
6  preparation of your deposition?
7      A.   No.
8      Q.   Did you review any documents other than
9  your report as disclosed in this case?
10      A.   No.
11      Q.   Did you review any articles or
12  publications in preparation of this deposition?
13      A.   No.
14      Q.   You were first contacted regarding this
15  case in October of 2020; correct?
16      A.   I believe so.  I'd have to look at my
17  billing records.  I know that was one of the
18  exhibits.  But if that's what they indicate, then
19  correct.
20      Q.   Okay.  And were you first contacted by
21  Steven Drizin?
22      A.   I don't believe so, no.  I think I was
23  first contacted by Mariah Garcia.
24      Q.   You are being compensated for your work

Page 9

1  on this case; correct?
2      A.   Yes.
3      Q.   At a rate of $450 per hour?
4      A.   Correct.
5      Q.   Is that your standard fee?
6      A.   Yes.  In civil cases, yes.
7      Q.   Is it a different fee in your criminal
8  cases?
9      A.   For public defenders and appointed
10  counsel, yes, I charge a reduced rate of 375 an
11  hour.
12      Q.   And what about the prosecution, are you
13  ever retained by the prosecution?
14      A.   I am, yes.  And since they're a public
15  agency, I would charge the same rate as the public
16  defenders and bar-appointed counsel.
17      Q.   Is the $450-per-hour-rate the same rate
18  that you're charging to sit for this deposition
19  today?
20      A.   Yes.
21      Q.   Is your compensation tied to any
22  conclusion you have reached in this case?
23      A.   No.
24      Q.   Is your compensation tied to the

Page 10

1 outcome in this case?
2    A.   No.
3    Q.   Dr. Leo, you were -- did you receive
4 the pdf exhibits that we sent over this morning?
5    A.   Yes.  I didn't -- yes, I did.  I
6 received a forward of the email that contained a
7 list of the exhibits, yes.
8    Q.   Okay.
9    A.   And attachments as well.
10   Q.   Okay.  Are you able to open up the pdf
11 that's marked Exhibit 1?
12   A.   Yeah.  I printed these out --
13   Q.   Oh, you printed them.  Okay.
14   A.   Yeah.  So I'm looking at Exhibit 1 as a
15 printout.
16   Q.   Okay.
17   A.   I can open it as well, if necessary.
18   Q.   No, no, no, no worries at all.  I
19 wasn't sure if you'd be able to print them.
20        So, for the record, Exhibit 1 is a
21 three-page document Bates stamped Leo Subpoena
22 Response 16, consecutively, through Leo Subpoena
23 Response 18.
24        Dr. Leo, can you take a moment to

Page 11

1 review this document and let me know if you
2 recognize it?
3    A.   I do recognize this document, yes.
4    Q.   Is this the invoice that you sent in
5 the Amor v Naperville case?
6    A.   Correct, yes.
7    Q.   Now, according to this invoice, you
8 have billed plaintiff $36,855?
9    A.   Correct.
10   Q.   Are there any other invoices that
11 you've issued to plaintiff with regard to your work
12 on the Bill Amor case?
13   A.   Not for plaintiff, no.
14   Q.   And is there any outstanding hours that
15 you intend to bill to plaintiff that you have not
16 yet invoiced?
17   A.   Yes.
18   Q.   And approximately how many hours is
19 that?
20   A.   I don't know.  I would estimate around
21 five hours at this point.  It could be a little bit
22 less, it could be a little bit more.
23   Q.   Okay.  Dr. Leo, if you could flip to
24 Deposition Exhibit Number 2, please.  Let me know

Page 12

1 when you have in front of you.
2    A.   Oh, I'm sorry.  I do have it in front
3 of me, yes, thank you.
4    Q.   Okay.  Dr. Leo, I'm showing you what's
5 been marked as Exhibit Number 2 to your deposition.
6 Is this your complete and accurate c.v.?
7    A.   Correct.  Through January 2021.
8    Q.   Okay.  Any updates in terms of
9 publications since January 2021?
10   A.   I don't think so.  It's possible.
11        If so, it would just be an article
12 or two, but I think this is current.
13        Yeah, it's current.
14   Q.   Anything else in here that needs to be
15 updated since January of 2021?
16   A.   There are some entries for talks I've
17 given and talks I plan to give, just a few, but
18 that's it.
19   Q.   Okay.  Now, according to your c.v., you
20 have an undergraduate degree in sociology; correct?
21   A.   Yes.
22   Q.   You have a master's in sociology?
23   A.   Correct.
24   Q.   And then you also have your juris

Page 13

1 doctor?
2    A.   Correct.
3    Q.   You have a Ph.D. in jurisprudence and
4 social policy?
5    A.   Correct.
6    Q.   So is that from the sociology
7 department?
8    A.   No, it's not from the sociology
9 department.
10   Q.   Which department conferred that degree?
11   A.   The program is actually in the law
12 school at UC Berkeley.
13   Q.   You have not attended medical school;
14 correct?
15   A.   Correct.
16   Q.   You are not a psychiatrist?
17   A.   Correct.
18   Q.   You are not a licensed psychologist?
19   A.   Correct.
20   Q.   And you do not have a degree in
21 clinical psychology; correct?
22   A.   Correct.
23   Q.   And you do not have any clinical
24 experience; correct?

Page 14

1    A.   As a clinical psychologist, no.
2    Q.   You are not a police practices expert;
3 correct?
4    A.   I'm not really sure what you mean by
5 that question.
6         I don't think of myself as a police
7 practices expert outside of the context of police
8 interrogation.
9    Q.   And within the context of police
10 interrogation, do you consider yourself a police
11 practices expert?
12    A.   It depends on what you mean by police
13 practices, but yes.
14    Q.   And what's your basis -- what -- how
15 would you define your expertise?
16    A.   Well, somebody who has specialized
17 knowledge about how police are trained to practice
18 interrogation, interviewing and interrogation.
19 That's how I would define a police practices expert.
20         And so, yes, on that definition, I
21 would consider myself a police practices expert
22 with respect to police interviewing and police
23 interrogation and the elicitation of confession
24 evidence.

Page 15

1    Q.   And is there a specific time frame for
2 which you believe you have that specialized
3 knowledge?
4    A.   Yeah.  I would say from 1990 or 1991 to
5 the present.
6    Q.   Okay.  We'll come back to that.
7         You have never served as a police
8 officer; correct?
9    A.   Correct.
10    Q.   You have never served as an investigator
11 or a detective?
12    A.   Correct.
13    Q.   You have never served as a police
14 administrator.
15    A.   Correct.
16    Q.   You are not a fire science expert?
17    A.   Correct.
18    Q.   You have never served as a fire
19 investigator; correct?
20    A.   Correct.
21    Q.   You have never been a certified
22 polygraph examiner; correct?
23    A.   Correct.
24    Q.   Never been trained as a polygraph

Page 16

1 examiner?
2    A.   Correct.
3    Q.   You currently teach at the University
4 of San Francisco?
5    A.   Correct.
6    Q.   What are your duties with regard to
7 your position at the University of San Francisco?
8    A.   Well, I teach courses and I do research
9 and publication, and I do service for the
10 university and beyond the university.  So teaching,
11 research/publication, and service.
12    Q.   What courses do you teach?
13    A.   I teach criminal law, constitutional
14 criminal procedure, and I teach seminars on the
15 wrongful conviction of the innocent, and on police
16 interrogation and confessions.
17    Q.   And is that at the law school?
18    A.   Yes.
19    Q.   Is the research that you conduct also
20 at the law school?
21    A.   No.  I -- I don't really understand the
22 question, the basis for the question.
23         So I am a professor of law, but the
24 research that I conduct is not literally at the law

Page 17

1 school, no.
2    Q.   Do you work with any departments at the
3 University of San Francisco outside of the law
4 school?
5    A.   No.
6    Q.   You also have a position with
7 UC Berkeley School of Law?
8    A.   Yeah.  I'm a fellow in an institute.
9 It's not a formal position.
10    Q.   Okay.  What are your duties as a fellow?
11    A.   There are no formal duties.  Sometimes
12 reading papers or attending conferences, but there
13 are no formal duties.
14    Q.   Do you teach any classes?
15    A.   Not at UC Berkeley, no.
16    Q.   You note in your c.v. that you were
17 previously tenured as a professor at UC Irvine?
18    A.   Correct.
19    Q.   Which department was that in?
20    A.   Two departments.  The Department of
21 Criminology, Law and Society, and the Department of
22 Psychology and Social Behavior.
23    Q.   With regard to your current schedule,
24 how much of your time on a weekly basis is spent

Page 18

1 teaching your courses?
2      A.    So the actual in-class time would be
3 six hours a week, if that's what you mean.
4      Q.    How about if it's in-class time and
5 then also any preparation that you do for your
6 in-person lectures?
7      A.    I would estimate 15 to 25 hours a week,
8 something like that.
9      Q.    How much time on a weekly basis do you
10 spend on your research?
11      A.    I don't have records, so, again, I
12 would -- I would just be able to estimate.  I don't
13 know, 5 or 10 hours a week; maybe more, maybe less.
14      Q.    You indicated that at the University of
15 San Francisco you have a seminar that you teach on
16 wrongful convictions?
17      A.    Correct.
18      Q.    How long have you been teaching that
19 seminar?
20      A.    At the University of San Francisco,
21 since 2006.
22            I taught at -- I taught a version of
23 that class previously at UC Irvine.
24      Q.    With regard to the version that

Page 19

1 you've -- that you're currently teaching, what is
2 the format for that class?
3      A.    So it's a seminar.  So it's a smaller
4 class, and it's a seminar, not a lecture format.
5      Q.    Do you -- in terms of topics, does your
6 class -- do you present specific case studies to
7 your class?
8      A.    Sometimes.
9      Q.    Have you presented Mr. Amor's case to
10 your class?
11      A.    No.
12      Q.    In addition to your time spent teaching
13 and researching, you also serve as an expert
14 witness from time to time; correct?
15      A.    Correct.
16      Q.    When did you first start providing
17 services as an expert witness?
18      A.    So first I consult, and then I may be
19 declared as an expert witness, as you know.
20            I first started consulting in 1996,
21 and the first time I testified as an expert witness
22 was in 1997.
23      Q.    Okay.  Have you been retained to
24 consult or disclose opinions as an expert witness

Page 20

1 on any topic other than confessions and police
2 interrogations?
3      A.    Many years ago, yes, in one case.  It
4 was a police -- private police use of force case.
5 That's the only case.
6            Other than that, all of the cases
7 that I've consulted on and testified in have
8 involved some aspect of interviewing, interrogation,
9 persuasion, deception, manipulation, statements,
10 admissions, and confessions.
11      Q.    Okay.  If you had to estimate, what
12 percentage of your time do you think you spend
13 serving as an expert witness?
14      A.    As an expert witness, I would say very
15 little because that's typically time in court.
16            As a consultant and expert witness,
17 I would estimate 20 percent of my time.
18      Q.    What percentage of your income derives
19 from your expert witness or consulting services?
20      A.    So it varies and has varied.
21            And I assume you mean salary income.
22            I think it's been as low as
23 15 percent, and I think it's been as high as
24 60 percent.  So within that range would be my

Page 21

1 estimate.
2      Q.    Okay.  I know you have your juris --
3 your JD.  Are you a licensed attorney?
4      A.    No.
5      Q.    Have you ever been licensed to practice?
6      A.    No.  I never took the bar examination.
7      Q.    Got it.
8            All right.  Dr. Leo, if you could
9 please flip to Deposition Exhibit Number 3.
10      A.    Okay.
11      Q.    I'm showing you what's been marked as
12 Exhibit Number 3 to your deposition.
13            The case that we will be discussing
14 today arises out of a fire that occurred on
15 September 10, 1995, which resulted in the death of
16 Marianne Miceli; correct?
17      A.    Yes.
18      Q.    And the plaintiff in that case,
19 Bill Amor, was prosecuted and convicted for the
20 September 10th fire; correct?
21      A.    In his first trial, yes.
22      Q.    And did you draft the report that we're
23 looking at in Exhibit Number 3?
24      A.    Yes.

Page 22

1    Q.    That's your signature that appears on
2  page 51 of the report?
3    A.    Yes.
4    Q.    Did anyone else assist in drafting this
5  report?
6    A.    No.
7    Q.    Did you consult anyone in drafting this
8  report?
9    A.    No.
10    Q.    Did you consult Steve Drizin at all?
11    A.    No.
12    Q.    Have you and Steve Drizin ever
13  discussed the case?
14    A.    I think we have discussed the case, but
15  I don't recall the content of our discussion.
16          The -- he and I are working on an
17  article of 250 proven false confessions, and it's
18  possible -- we've been working on this article
19  for years.  It's possible that at some point we
20  discussed this case.  I just don't recall
21  specifically.
22    Q.    But in terms of having a conversation
23  with Steven Drizin, you know, to specifically
24  discuss any of the content of your report, that's

Page 23

1  never occurred?
2    A.    Correct.
3    Q.    And you've never had any conversations
4  with Steven Drizin where he's provided you factual
5  information with regard to Bill Amor's case in the
6  course of your drafting this report?
7    A.    Correct, yes.
8    Q.    Are there any facts or data from
9  plaintiff's counsel that you relied on in forming
10  the opinions in this report -- or that you --
11  strike that.
12          Are there any facts or data from
13  plaintiff's counsel that you relied on in forming
14  your opinions that you did not disclose in this
15  report?
16    A.    I do not believe so.
17    Q.    Are there any assumptions that were
18  provided by plaintiff's counsel to you in the
19  course of you forming the opinions contained in
20  this report?
21    A.    No.
22    Q.    Are there any studies or other
23  publications that you relied upon in reaching these
24  opinions that you did not cite in your report?

Page 24

1    A.    Not to my knowledge.
2    Q.    Now, you know from your review of the
3  materials that Mr. Amor confessed to starting the
4  September 10th fire in the early morning hours of
5  October 4, 1995; correct?
6    A.    Yes.
7    Q.    And your report renders several
8  opinions regarding the questioning and subsequent
9  incriminating statements that were made over the
10  course of October 3rd and 4th, 1995; correct?
11    A.    Yes.
12    Q.    Attached to your report in Exhibit 3
13  there is an Exhibit A which is a 2017 affidavit
14  from Steven Drizin; correct?
15    A.    I didn't print out that report because
16  I already had a copy of it.  And so I'm not looking
17  at the Drizin affidavit, but I will pull it up.
18    Q.    Okay.  And I'm not -- I don't know that
19  I need to ask you anything specific at the moment.
20    A.    Okay.
21    Q.    Well, I guess, just to begin, why did
22  you -- why did you attach this affidavit to your
23  report?
24    A.    I didn't attach the affidavit to the

Page 25

1  report.
2    Q.    Do you know who did?
3    A.    I assume counsel did.  Unless I'm
4  misremembering.  But I don't remember attaching
5  this affidavit to my report.
6    Q.    So do you consider Steve Drizin's
7  affidavit to be a part of your report?
8    A.    I do not.
9    Q.    In 2017, when Mr. Drizin would have
10  been working on this affidavit, do you recall him
11  ever consulting you in the course of the work that
12  he did on Bill Amor's case?
13    A.    No.
14    Q.    To what degree do you rely on
15  Mr. Drizin's affidavit in forming the -- your
16  opinions in Exhibit 3?
17    A.    I did not rely on Professor Drizin's
18  affidavit in forming my opinions.
19    Q.    So in reviewing Professor Drizin's
20  affidavit, it appears that portions of your report
21  are verbatim from Professor Drizin's affidavit.  Is
22  that true?
23    A.    I don't know.  You'd have to show me.
24    Q.    Okay.  So maybe you should pull up his

Page 26

1  affidavit, and I'll just -- I'll give you an
2  example.
3      A.    Okay.
4      Q.    Just to give you an example, if you go
5  to page 13 of your report --
6      A.    Okay.
7      Q.    -- where you discuss inducements, if
8  you were to compare that to Professor Drizin's
9  discussion of inducements on pages 11 and 12 of his
10  affidavit, it appears that portions of this were
11  specifically lifted from Professor Drizin's
12  affidavit.
13          And my question to you is just which
14  portions of your report did you write and which
15  portions of your report did you extract from
16  Professor Drizin's affidavit?
17      MS. GARCIA:  Form, foundation, argumentative.
18      You can answer.
19      THE WITNESS:  Yeah; so just to be really
20  clear, nothing in my report was lifted from
21  Professor Drizin's report.  Everything in my report
22  I wrote.  It's all my words.
23          If there is identical language,
24  you've got the order of extraction in the wrong

Page 27

1  direction.
2  BY MS. RANUM:
3      Q.    Okay.  In the Qualifications section of
4  your report, you discuss that in 1992 and 1993 you
5  observed 122 felony interrogations at the Oakland
6  PD?
7      A.    Correct.
8      Q.    And did you -- you observed those in
9  person?
10      A.    Correct.
11      Q.    And how did it come about that you
12  were -- you had the opportunity to observe those
13  interrogations?
14      A.    My doctoral dissertation advisor,
15  Professor Jerome Skolnick, spelled S-k-o-l-n-i-c-k,
16  had arranged it with the police chief at the time
17  of the Oakland Police Department, whose name I
18  think is George Hart, and so that's how I got
19  entree into the interrogations.
20      Q.    How were the cases chosen that you were
21  able to observe?
22      A.    Well, I showed up when I could.  So I
23  was a student taking courses; I couldn't just show
24  up, you know, Monday through Friday 9:00 to 5:00.

Page 28

1          And there were five felony
2  divisions.  And so I just started in one of the
3  divisions.  I was introduced by the lieutenant of
4  the division, or the captain of the -- I think the
5  lieutenant.  And so I would just show up, and the
6  sergeants, they're called -- they were called
7  sergeants -- maybe they still are -- who were
8  really detectives, in those divisions, would tell
9  me when they had an interrogation, and then I would
10  go sit in and watch the interrogation live.
11      Q.    Okay.  And was it from this experience
12  that you ultimately published your 1996 article
13  Inside the Interrogation Room?
14      A.    Yes.
15      Q.    Were there other observations of any
16  other police departments that were factored into
17  your Inside the Interrogation Room publication?
18      A.    Yes.  So I mentioned it in the report
19  that there were also 60 videotaped interrogations
20  from two other Bay Area police departments; the
21  Vallejo Police Department and the Hayward Police
22  Department.
23          And it wasn't just observing
24  interrogations, it was also reading the case files,

Page 29

1  interviewing the detectives and interviewing other
2  people in the criminal justice system as well.
3      Q.    Okay.  So total there were
4  approximately 182 interrogations that you observed
5  in the course of the work that resulted in your
6  article Inside the Interrogation Room; correct?
7      A.    Correct.
8      Q.    And for each of those interrogations,
9  you indicated that you conducted some additional
10  research.  So can you walk through, for each of
11  those interrogations, what steps you took to
12  further analyze that case?
13      A.    So I got the case file -- so I read
14  police reports.  I spoke to the detectives or
15  interrogators.
16          That would be it on those cases in
17  terms of the information that I acquired, that I
18  recall.
19      Q.    Did you request the entire case file?
20      A.    No.  So I was interested in the police
21  reports.
22          Now, this is, obviously, 30 years
23  ago.  I don't recall requesting the entire case
24  file.

Page 30

1    Q.   Okay.  Did you request all of the
2  police reports?
3    A.   My recollection is that I asked the
4  detectives to provide me the police reports.  And
5  so whatever they provided me, I read.
6    Q.   Okay.  Was it your understanding that
7  you were receiving a complete set of the police
8  reports for the interrogations that you observed?
9    A.   No.
10   Q.   Why do you say that?
11   A.   I'm sorry.  Whatever they provided me
12 is my understanding of what I received.  I don't
13 recall, again, 30 years later, asking for a
14 complete case file.
15   Q.   Okay.  If you could please turn to
16 Exhibit Number 4 to your deposition?
17   A.   Okay.  So I think this is Inside the
18 Interrogation Room.  I didn't print that out.  I
19 just pulled a reprint.
20   Q.   Got it.  So, yes, just so we have a
21 clean record, Exhibit 4 to the deposition is an
22 article titled Inside the Interrogation Room.
23        And this is an article that you
24 published, correct, Dr. Leo?

Page 31

1    A.   Yes.
2    Q.   You published this article in 1996?
3    A.   Correct.
4    Q.   And at the time that you published this
5  article, you note in the introduction that, quote,
6  "American scholars have almost altogether ignored
7  or avoided the empirical study of police
8  interrogation practices and confessions."
9        Correct?
10   A.   Yes.
11   Q.   That's why you decided to conduct the
12 study; correct?
13   A.   Yes.
14   Q.   You had not -- well, strike that.
15        You did not publish anything on your
16 study prior to 1996; correct?
17   A.   Well, my doctoral dissertation in '94 I
18 think technically is a publication.  But other than
19 that, yes.
20   Q.   Okay.  Now, in your -- in your article
21 Inside the Interrogation Room, you indicated that
22 you determined that 2 percent of the confessions
23 that you observed in the course of the
24 interrogations were the result of coercion?

Page 32

1    A.   Correct.
2    Q.   And in the course of the study that you
3  did that's summarized in this article, you did not
4  examine the question of the truth or falsity of any
5  of those confessions; correct?
6    A.   Correct.
7    MS. GARCIA:  Form.
8  BY MS. RANUM:
9    Q.   You also concluded in your study that
10 the only variable significantly related to a
11 successful interrogation was the number of tactics
12 employed by the detective?
13   A.   I don't recall if that was the only
14 variable.  I'd have to -- I'd have to review the
15 article to confirm that.
16   Q.   It's -- if you could -- hopefully it's
17 the same page on your version.  It's page 292 on my
18 version.
19   A.   Okay.
20   Q.   And it's in the paragraph just above
21 section C which is titled The Effective
22 Interrogation Tactics.
23   A.   Okay.  So it looks like statistically
24 significantly related was the number of tactics

Page 33

1  employed by the detective, and the length of
2  interrogation.
3    Q.   Okay.  And, again, though, you found
4  that the overwhelming majority of confessions that
5  you observed in the course of this study were not
6  obtained by coercion; correct?
7    A.   Correct.
8    Q.   But you also concluded that the more
9  tactics that were employed, the more likely an
10 incriminating statement would be made; correct?
11   A.   Yes.
12   Q.   Are you aware of any empirical
13 studies of police interrogations whose publication
14 pre-dates October 1995?
15   A.   Yes.
16   Q.   What studies?
17   A.   There was a number of studies in the
18 1960s and the 1970s about the impact of Miranda
19 warnings.  There was a book written in 1908 about
20 interrogation and confessions.
21        There are articles from 1908 to 1995
22 including a series of experimental studies in the
23 1980s and early 1990s.
24        There's articles in Britain in the

Page 34

1  1980s and 1990s as well.
2          There's other articles in the United
3  States in the 1990s.
4          So there were other publications on
5  interrogations and confessions that pre-dated the
6  199- -- you said 1995, but the publication of this
7  article in 1996.
8      Q.   But in terms of empirical studies with
9  regards to police interrogation in the United
10 States, you specifically set out to close what you
11 identified as a gap in empirical studies because
12 you found that there hadn't been any done since
13 those 1960, 1970s Miranda warning studies that you
14 referenced; correct?
15 MS. GARCIA: Object to --
16 THE WITNESS: Correct -- sorry.
17 MS. GARCIA: Go ahead, Dr. Leo.
18 THE WITNESS: Correct, insofar as I was
19 talking about observational studies, in-person
20 studies, primarily.
21 BY MS. RANUM:
22     Q.   Okay.  Have you conducted any
23 observational studies of police interrogation
24 since your 1992 and 1993 observations?

Page 35

1      A.   Not any in-person studies, no.
2      Q.   Okay.  Any observational studies based
3  on recorded interrogations?
4      A.   In part on recorded interrogations, yes.
5      Q.   Which studies are those?
6      A.   Well, all the articles that I have
7  written on false confessions, some of them contain
8  recordings of interrogations, sometimes partial,
9  sometimes complete.
10         But the only way to really fully
11 answer your question would be to go through all the
12 publications in my c.v. one by one because I
13 published so many articles and book chapters in
14 books that I would just -- that -- I would have to
15 refresh my memory and say this one included some
16 partially or wholly recorded interrogations, this
17 one didn't, this one did.
18     Q.   Well, my question is a little
19 different, though.  So I understand, and we'll talk
20 a little bit about some of the other studies that
21 you've done.
22         Like in 1998 you did a study with
23 Richard Ofshe correct, where you later published an
24 article called The Consequences of False

Page 36

1  Confessions.
2      A.   Correct.
3      Q.   And that was a result of a study of
4  60 cases; correct?
5      A.   Correct.
6      Q.   And those were cases that you and
7  Professor Ofshe had identified as being either
8  highly probable or a probable false confession?
9      A.   Correct.
10     Q.   Okay.
11     A.   Or a proven false confession.
12     Q.   Or a proven false confession.  Okay.
13         So my question is, when you compare
14 that methodology with what you did in 1992 where
15 you just took a look at 180 interrogations without
16 any preconception of whether the result was true,
17 false, coerced, voluntary, but rather just observed
18 a pool of interrogations from which you analyzed
19 them, have you done that since 1992 -- the 1992-
20 1993 time period?
21     A.   If I understand your question correctly,
22 no.  Just a pool of felony interrogations --
23     Q.   Okay.
24     A.   -- with no -- with no pre-knowledge of

Page 37

1  the facts of the case.
2          I may be misremembering.  Again, I
3  have to look through my publications, but I haven't
4  done that kind of -- the same study that I did for
5  my dissertation I have not done since.
6      Q.   So everything since has been about
7  collecting cases that met a certain criteria that
8  you were looking for going into the study; correct?
9  MS. GARCIA: Object to the form.
10 THE WITNESS: I don't think that's accurate
11 as stated.
12         On the false confession studies --
13 maybe that's what you're thinking of, I don't
14 know -- on those studies, yes, we have to
15 identify -- if we're going to go out into the real
16 world, if we're going to analyze real world as
17 opposed to induced false confessions, we have to
18 identify false confession cases and vet them to
19 make sure they meet our criteria before we can
20 study them or analyze them, because there is no
21 known database of false confession cases.
22     Q.   In the study that you conducted with
23 Richard Ofshe in 1998, how did you define a
24 probable false confession?

Page 38

1    A.    A probable false confession, I just
2 have to review the article.  Give me a second.
3    Q.    Well, has your definition of a probable
4 false confession changed at all in the time that
5 you've been doing this research?
6    A.    I don't think I've focused on probable
7 false confessions, so, no, this was the only
8 article in which I used that definition.
9    Q.    It's Exhibit 7 to your deposition, if
10 that assists you.
11    A.    So I do have it in front of me.  I'm
12 just looking through it just to find where that
13 term is defined.
14          So it looks like -- it looks like
15 the term is defined on page 437, if -- in -- if the
16 preponderance of evidence indicated that the person
17 who confessed was innocent, that's what it looks
18 like the definition of that term was at that time.
19    Q.    And this is the only study where you
20 utilized the classification of a probable false
21 confession?
22    A.    To my knowledge, yes.
23    Q.    What about a highly probable false
24 confession?

Page 39

1    A.    So, to your last question, the -- yes.
2 And then, as you probably know, it looks like the
3 definition is included on the same page.
4    Q.    And have you used the classification of
5 a highly probable false confession since your 1998
6 publication with Richard Ofshe?
7    A.    Not that I recall, no.  We focused on
8 proven false confessions since then.
9    Q.    And the article in Exhibit 7 tit- --
10 this is titled, The Consequences of False
11 Confessions, this is an article that you and
12 Richard Ofshe co-authored together; correct?
13    A.    Correct.
14    Q.    In 2004, you co-authored an article
15 with Steven Drizin called The Problem of False
16 Confessions in the Post DNA World; correct?
17    A.    Yes.
18          And I don't think that's an exhibit.
19    Q.    It is.  It's Exhibit 12 to your
20 deposition.
21    A.    Okay.  I apologize.  I missed it.
22          So I don't have it in front of me,
23 but I can get it very quickly.
24    Q.    Now, the 2004 study that you conducted

Page 40

1 with Steven Drizin, this was intended to solely
2 look at proven false confessions; correct?
3    A.    Correct.
4    Q.    How did you gather your sample of what
5 you classified as proven false confessions?
6    A.    So I wouldn't call it a sample.  I call
7 it more a collection or cohort of cases.  And my
8 recollection is that we did extensive Lexis and
9 Westlaw and other media database searches to
10 identify possible cases.  And that cases, potential
11 cases for inclusion, would have been brought to our
12 attention in our own work by journalists, sometimes
13 by lawyers, or by private citizens, or by other
14 scholars who contacted us and said you might want
15 to look at this case.
16    Q.    Once you received an indication that a
17 case might fit the criteria of what you were
18 looking to study, what methodology did you employ
19 to determine whether the case did in fact meet your
20 criteria for a proven false confession?
21    A.    Well, we tried to get all the materials
22 we could on the case.  Some cases were more
23 extensive than other cases.  And then we applied
24 the -- our analysis and understanding of the case

Page 41

1 facts to the criteria.
2          The criteria for what is a proven
3 false confession is pretty straightforward, it's
4 four possibilities.  And so that was the method of
5 analysis or application once we had all the
6 information we could gather on the case.
7    Q.    Did the study include cases that
8 involved a false guilty plea as compared with a
9 false confession?
10    A.    Some of the false confessions did
11 involve false guilty pleas, yes.  So a subset of
12 the cases involved both false confessions and false
13 guilty pleas.
14    Q.    Were there any that only involved a
15 guilty plea, and not a confession?
16    A.    It's possible, but not to my knowledge.
17 If that was the case, it would have been an
18 oversight because the -- all of those cases should
19 have involved at least a police-induced false
20 confession, not merely a false guilty plea.
21    Q.    And once you gathered the cases that
22 you believed met your criteria for a proven false
23 confession, what conclusions did you reach in your
24 study?

Page 42

1    A.    Well, it's a long article, and so there
2  are a lot of conclusions, and I don't have it in
3  front of me.
4          There -- I think there are
5  17 tables.  The point of the article was to analyze
6  the consequences of these false confession cases as
7  people, the 125 suspects, some defendants, traveled
8  through the criminal justice system.
9    Q.    Did the study look at specific
10  interrogation tactics that were employed in those
11  cases?
12    A.    Yes.
13    Q.    Which specific interrogation tactics
14  did it analyze?
15    A.    Again, I don't have it in front of me.
16  I believe we analyzed -- well, I guess -- I think
17  we wrote about interrogation techniques, but I
18  don't know that we coded for specific interrogation
19  techniques.
20    Q.    And if you look at page 947 of your
21  article --
22    A.    Okay.  So I'm just going to get it,
23  okay?  So give me just a second, and I'll be right
24  back.

Page 43

1          All right.  I'm back.  I've got it.
2  947?
3    Q.    Yes.
4    A.    Okay.
5    Q.    So of the 125 proven false confession
6  cases that you looked at in your 2004 study,
7  6 percent of those cases involved the crime of
8  arson; correct?
9    A.    It looks like, unless I'm misreading
10  this, it looked like 2 percent involved the crime
11  of arson.
12    Q.    So correct me if I'm wrong; I read
13  Table 5 to be that 2 percent of them, the most
14  serious reported crime was arson?
15    A.    Correct.
16    Q.    But then in Table 6 it said all
17  reported crimes to which the individual falsely
18  confessed?
19    A.    Oh, I'm sorry.  Okay.  I was looking at
20  Table 5.
21          You're correct, 6 percent involved
22  arson, according to Table 6.  Sorry.  Thanks.
23    Q.    Was this 2004 article subject to peer
24  review?

Page 44

1    A.    It was subject to the Law Review's form
2  of peer review, but not to social science peer
3  review.
4    Q.    Have other studies validated your
5  conclusions since you published the article that
6  we're looking at in Exhibit 12 in 2004?
7    A.    I don't think any study has sought to
8  validate it.  I don't know exactly what you mean by
9  "validate."  You know, if somebody went through all
10  of the cases or ... so I'm not aware of anybody
11  who's analyzed these 125 cases other than myself
12  and Professor Drizin.
13          There is a table in the article that
14  names all the cases and provides citations for all
15  the cases.  So if somebody wanted to do that, they
16  could do that.
17    Q.    Fair to say that none of your studies
18  examining the potential for false confessions
19  derive from a random sampling?
20    A.    Correct.  I don't know how one could do
21  a random sample because there's no database, so
22  it's not possible to do a random sample of proven
23  false confession cases.
24    Q.    Outside of the studies that you

Page 45

1  yourself have done, are you aware of anyone
2  conducting empirical studies of police interrogation
3  and confession since 1996 where they observed a set
4  of interrogations regardless of the outcome of the
5  interrogation?
6    A.    Yes.
7    Q.    What studies are you aware of?
8    A.    Professor Barry Feld, who is now a
9  retired professor at the University of Minnesota,
10  he did a number of studies in the last decade on
11  juvenile interrogations, and he had access to the
12  Minnesota Police Department.
13          I don't know if he observed those in
14  person.  He may have -- he may -- more likely
15  observed recordings.
16          Professor Chris Kelly has observed
17  interrogations at the Los Angeles Police Department.
18          There's a professor in Canada, Brent
19  Snook, who has observed, either by videotape or in
20  person, live interrogations as well.
21          Those come to mind.  There might be
22  others I'm not thinking of.
23    Q.    When Chris Kelly observed the LAPD
24  interrogations, was there a publication that

Page 46

1  followed those observations?
2      A.    I believe so.  And I believe in the
3  last decade he's published several articles based
4  on that data set.
5      Q.    Okay.  And was the second name Snook?
6      A.    Snook is the Canadian professor,
7  correct.
8      Q.    And Professor Snook, were those
9  observations of interrogations in the United States
10 or in Canada?
11     A.    I believe they were in Canada.
12     Q.    Okay.  Are there any quantitative
13 studies on the frequency of false confessions in
14 the United States?
15     A.    No.
16     Q.    You wrote a book in 2008 called Police
17 Interrogation and American Justice; correct?
18     A.    Correct.
19     Q.    And you state in your book that there
20 is no reliable estimate of the incidence of false
21 confessions?
22     A.    Correct.
23     Q.    And you still believe that to be the
24 case today; correct?

Page 47

1      A.    Correct.
2      Q.    Can you point to any meaningful
3  research or data that would contradict the
4  statement that false confessions occur in less than
5  one percent of all confessions?
6      MS. GARCIA:  Objection to form and foundation.
7      THE WITNESS:  There's -- no.  As I have said,
8  there -- we don't know how frequently they occur,
9  so we couldn't contradict that.  Nobody could
10 contradict that.  We simply don't know.
11 BY MS. RANUM:
12     Q.    Have you participated in any laboratory
13 studies regarding police interrogation and
14 confession?
15     A.    I haven't been a primary author on any
16 studies, so I haven't designed any laboratory
17 studies.
18           I've been a secondary or tertiary
19 author on research projects that have involved
20 experimental studies.
21     Q.    And what articles reflect those
22 experimental studies?
23     A.    I'm going to just have to look at my --
24     Q.    Refer to your c.v.?

Page 48

1      A.    -- curriculum vitae.  Yeah, I guess
2  it's Exhibit 2.  So just give me a moment.
3           So on page 12, there's a 2011
4  article called -- it's the second one with 2011
5  listed -- Jurors Believe Interrogation Tactics Are
6  Not Likely to Elicit False Confessions:  Will
7  Expert Witness Testimony Inform Them Otherwise?
8      Q.    Um-hmm.
9      A.    That involved, in part, experimental
10 studies -- excuse me -- an experimental study.
11          On page 13, there is -- the third
12 one on the left that's listed, 2010, going down
13 from the top, Selling Confession:  Setting the
14 Stage with the Sympathetic Detective with a Time-
15 Limited Offer.
16          I'd have to review that.  That may
17 have involved an experimental study as well.
18     Q.    Okay.
19     A.    So there are other articles that have
20 reviewed published experimental studies, but I
21 think those are the only two, as I look at this,
22 that I was involved in as a secondary or tertiary
23 author where there was new experimental data
24 published as part of the study.

Page 49

1      Q.    Okay.  Thank you.
2           You indicate in your report on
3  page 2 that you have testified as an expert witness
4  375 times?
5      A.    As of January 22nd, correct.
6      Q.    And you testified earlier today that
7  you are sometimes retained by the prosecution as
8  well?
9      A.    Correct.  Not commonly, but yes.
10     Q.    Okay.  In your current -- well, strike
11 that.
12          What percentage of the cases that
13 you -- the 375 cases that you testified in would
14 you estimate were for the prosecution in a criminal
15 case?
16     A.    I would estimate one percent.
17     Q.    Have you ever been retained by police
18 officer defendants in a civil case accused of
19 coercing a confession?
20     A.    No.
21     Q.    Have you ever been barred as an expert
22 witness by the court?
23     A.    Yeah, I think one of the exhibits that
24 was provided is a list of exclusions.

Page 50

1        I don't recognize one of the cases
2  on this list, so -- and I don't remember a couple
3  others.  But I think this list is mostly accurate.
4  For --
5        Q.   Sure.  And just so we have a clear
6  record, I assume you're looking at the document
7  that was marked Exhibit 8 to your deposition?
8        A.   Correct.
9        Q.   And, for the record, it is a three-page
10 document Bates stamped Leo Subpoena Response 13
11 consecutively through 15.
12        Dr. Leo, did you prepare this
13 document?
14        A.   Yes.
15        Q.   You said -- which case was it that you
16 don't recognize?
17        A.   I don't recognize the Bresnahan case.
18 I think there was a Bresnahan case -- yeah.  So on
19 page 2, I don't know where that case came from.
20        I looked in my records this morning,
21 and I have no record that I was even retained in
22 that case.
23        So I don't -- this document was
24 actually prepared by Loevy with input from me.  So,

Page 51

1  I don't know, it's possible that that case came
2  from me many years ago, but I don't recall it.  I
3  don't -- I don't know why that case is on the list.
4        And then there's a couple other
5  cases that I don't -- don't -- that I think are
6  accurate, but I just don't recall anything specific
7  about.
8        Q.   Okay.  And, to your knowledge, was
9  Exhibit 8 prepared in or around January of 2021?
10        A.   No.  I think that the initial document
11 was prepared in the 2013 case that I worked for
12 Loevy on, Eric Kane, and I think it was just
13 updated in 2021 with a couple more cases that
14 are -- were after 2013.
15        Q.   Okay.  And in terms of since this
16 document was prepared over the last few months,
17 have there been any court rulings excluding your
18 testimony?
19        A.   Not to my knowledge, no.
20        Q.   In terms of the consulting and expert
21 services that you provide, what percentage of your
22 time -- or strike that.
23        What percentage of the cases that
24 you work on are criminal versus civil?

Page 52

1        A.   I would estimate 95 percent or more
2  are criminal, that the civil cases are a small
3  percentage.
4        Q.   Now, if you turn to page 2 of your
5  report, Section 2 indicates Materials Reviewed.
6  And you say:  "In conjunction with my preparation
7  of this report, I have reviewed the following
8  materials."  And then you -- you have a list of
9  materials that runs through to page 6 of your
10 report.
11        A.   Correct.
12        Q.   Have you reviewed anything related to
13 Bill Amor's case that isn't contained in the list
14 within your report?
15        A.   I don't remember reviewing anything
16 since then, no.  So not to my recollection.
17        Q.   Okay.  So that was actually my next
18 question.
19        So at least in terms of when you
20 signed this report in January 22nd, was this list
21 of the materials you reviewed complete?
22        A.   Yes.
23        Q.   And I think you just answered my second
24 question, which was, since signing this report on

Page 53

1  January 22nd, you have not received any additional
2  materials related to Bill Amor's case.  Correct?
3        A.   Not to my recollection, correct.
4        Q.   Have you been provided any information
5  regarding the deposition of Douglas Carpenter?
6        A.   I don't believe so.
7        Q.   Have you reviewed a transcript of that
8  deposition?
9        A.   I have not.
10        Q.   Was there anything you requested that
11 you were not given access to?
12        A.   No.
13        Q.   Did you conduct any interviews in the
14 course of your drafting of the report that we see
15 in Exhibit 3?
16        A.   No.
17        Q.   Now, on the list of Materials Reviewed,
18 you note several deposition transcripts that were
19 reviewed.
20        To the extent that you reviewed
21 deposition testimony in this case, did those
22 transcripts -- were those with or without the
23 deposition exhibits?
24        A.   I don't recall.  I'd have to -- I'd

Page 54

1  have to look at the materials that were sent to me.
2      Q.   Okay.  And what about more specifically
3  with regard to Bill Amor's deposition, do you
4  recall whether you received the deposition exhibits
5  to his deposition?
6      A.   I do not.
7      Q.   Some of the materials that you reviewed
8  in the course of forming your opinion were police
9  reports and other investigator reports regarding
10  the investigation into the September 10, 1995 fire;
11  correct?
12      A.   Yes.
13      Q.   And in your report you sometimes
14  provide the date, but not the Bates range, for the
15  police reports that you were provided.  And so I'd
16  like you to take a look at Exhibit Number 6 to your
17  deposition.
18      A.   Okay.
19      Q.   And I just want to confirm, is this a
20  complete compilation of the investigator reports
21  that you received regarding this case?
22      MS. GARCIA:  Are you going to give him a
23  moment to look over the exhibits?  It's quite a few
24  pages.

Page 55

1      THE WITNESS:  It looks to me like there are
2  40 pages here, 20, 30, 40 pages.  I would have to
3  locate the materials that I was provided and
4  compare them page by page to answer that question.
5      So I don't know the answer.
6  BY MS. RANUM:
7      Q.   Okay.  Well, in your Materials Reviewed
8  list, you didn't provide the Bates ranges, so then
9  I guess that I would ask that after your
10  deposition, you just supplement that portion of
11  your report to let us know the Bates ranges of what
12  you received, so that we have a clear record of
13  what you reviewed.
14      A.   Can you just tell me what page you're
15  referring to in terms of the police reports that
16  are among the many documents that I list as having
17  reviewed on page 2 to 6?
18      Q.   Sure.  So on page 3, if you go to about
19  the bottom third of the page, you list a Naperville
20  Police Department report dated October 16th, and
21  then a Naperville Police Department Supp. report
22  dated October 20th.
23      Then if you go a little further
24  down, there's a Naperville Police Department report

Page 56

1  dated October 16th again, though I will represent
2  to you that that Bates range is not actually a
3  police report.
4      So we're just trying to understand
5  which police reports in fact you did receive and
6  review.
7      A.   Okay.  So -- I understand.  So it looks
8  like to me I provided Bates stamps whenever the
9  documents that I reviewed contained the Bates
10  stamps.  So the documents that I list as having
11  reviewed that don't list Bates stamps, I suspect
12  it's because the documents I reviewed didn't have
13  Bates stamps.
14      But I understand what you're saying.
15  What you're saying is look at the documents that I
16  reviewed for the report and let you know whether
17  any of these documents on Document 6 were not among
18  those documents.  Is that correct?
19      Q.   Yeah, I mean --
20      MS. GARCIA:  For the record -- just for the
21  record, plaintiff's counsel provided defendants'
22  counsel with an exact -- the exact files that she
23  turned over to Dr. Leo -- or we turned over to
24  Dr. Leo.

Page 57

1      I understand you want to get a clean
2  record.  I'm not sure why they're not Bates ranged,
3  but at least I can represent that anything I turned
4  over in terms of the reports to Dr. Leo have also
5  been turned over to the defense.
6      If we want to talk more about
7  logistics off the record, that's fine, but --
8      MS. RANUM:  That's fine.  We can talk about
9  it off the record.
10  BY MS. RANUM:
11      Q.   All right.  Dr. Leo, your report
12  addresses several opinions that you've rendered in
13  this case, which we're obviously going to spend
14  some time going through today, but first I'd like
15  to understand what your methodology was in
16  Mr. Amor's case.
17      Can you please walk me through the
18  methodology that you employed from the time that
19  you began working on this case to the time that you
20  rendered your opinions.
21      A.   So I reviewed and analyzed all the
22  documents that were provided, and I applied my
23  expertise in reaching the conclusions that I did.
24  So through review and analysis of the materials,

Page 58

1  based on my substantive expertise, I arrived at
2  these conclusions.
3          When you say methodology, I'm not
4  exactly sure what you're referring to, but that's
5  essentially the process.
6      Q.   So what was the first question that you
7  set out to answer as you reviewed the materials?
8  What was the first step in your analysis?
9      A.   Well, the first step would be what
10 happened.  You know, what is this case about?  What
11 was the crime?  What happened in the investigation?
12         Why did they focus on Mr. Amor?
13 What happened in the investigation and
14 interrogation of Mr. Amor?
15         What does the research literature
16 say about the interrogation process and the
17 evidence that was elicited, the testimonial
18 evidence that was elicited through the
19 interrogations of Mr. Amor?
20         What problems does that raise?  What
21 issues does that raise?  What evidence is there of
22 those problems in the materials I reviewed?
23     Q.   Does the type of crime at issue impact
24 your analysis at all?

Page 59

1      A.   The analysis would be the same for any
2  type of crime.  There's no different analysis for a
3  particular type of crime.
4      Q.   Now, obviously when you're dealing with
5  criminal investigations, there are times when you
6  have an unlimited suspect pool.  So I guess a good
7  example would be if someone's assaulted in a public
8  park, it could be just about anybody; correct?
9      A.   Well, anybody present in the park, yeah.
10     Q.   Right.  But first investigators have to
11 determine who was even present in the park; correct?
12     A.   Yes.
13     Q.   Okay.  And then obviously there are
14 times when there -- the suspect pool is a more
15 known quantity; would you agree with that?
16     A.   When you say "known quantity," you mean
17 that only certain numbers of people could have been
18 present at the park.  For example, if there was
19 video surveillance of everybody present at the park
20 in your example, then it would be a known quantity
21 because it would show 10, 20, however many people,
22 and no one who was not present at that park could
23 have been in the suspect pool where the assault
24 occurred.

Page 60

1      Q.   Correct.
2      A.   Yes.
3      Q.   And an example of that would be if you
4  have an arson where there were three people in the
5  home before the fire was set, absent some sort of
6  evidence of an intruder, if it was an arson, one of
7  those three people started the fire; correct?
8      A.   If it was an arson.
9      MS. GARCIA:  Object to form, foundation,
10 calls for speculation, argumentative.
11 BY MS. RANUM:
12     Q.   Does the nature of the potential
13 suspect pool, whether it is a limited or unlimited
14 suspect pool, impact your analysis at all?
15     MS. GARCIA:  Object to form.
16         You can answer, Dr. Leo.
17     THE WITNESS:  So you're -- you're asking this
18 in general, right?
19 BY MS. RANUM:
20     Q.   Yes.
21     A.   With respect to any specific case.
22     Q.   Correct.
23     A.   I guess it depends on the -- what's
24 unstated in your question.  Analysis of what?  So I

Page 61

1  think I would need to know a little bit more about
2  what you're asking before I give a definitive
3  answer.
4      Q.   Okay.  Is it part of your methodology
5  to become as familiar as possible with the
6  individual whose confession is at issue in the case?
7      MS. GARCIA:  Objection to form.
8      THE WITNESS:  Okay.  So you're talking about
9  in my scholarship?
10 BY MS. RANUM:
11     Q.   I'm talking about your -- okay, let's
12 go back.  We're on the methodology you employed in
13 Bill Amor's case.  Is it part of your methodology
14 to become as familiar as possible with the
15 individual whose confession was at issue?
16     MS. GARCIA:  Object to form.
17     THE WITNESS:  As reasonably possible with
18 anything that is relevant about his personality
19 traits to my analysis.
20 BY MS. RANUM:
21     Q.   Okay.  And why is that important?
22     A.   Well, in terms of analyzing risk
23 factors for false confession, there's a body of
24 research that identifies clinical traits of

Page 62

1 individuals that puts them at greater risk for
2 false confession and thus helps explain why he
3 would have made a false confession.
4      Q.    What steps did you take to become
5 familiar with Bill Amor as a person?
6      A.    Well, I was provided reports and
7 testimony by clinical psychologists who had
8 evaluated him or had evaluated records or reports
9 on him, and that was the extent of my analysis of
10 his personality, relying on those reports.
11      Q.    You did not interview him?
12      A.    Correct.
13      Q.    Why not?
14      A.    That's not something that an expert
15 like me would do.  There's no reason for me to
16 interview him.
17      Q.    Did you endeavor to read everything
18 related to the interrogation of Bill Amor in the
19 process of formulating your opinions?
20      A.    Well, everything that I was provided,
21 yes.
22      Q.    Did you request all documents related
23 to Bill Amor's interrogation?
24      A.    I believe so.

Page 63

1      Q.    Is it your understanding that you
2 received them all?
3      A.    Yes.
4      Q.    Did you endeavor to read all statements
5 made by Bill Amor himself in the course of the 1995
6 investigation to formulate your opinion?
7      A.    Yes.  You've seen everything that I --
8 that I reviewed for this report.
9      Q.    Did you request all statements that
10 Bill Amor made during the course of the 1995
11 investigation?
12      A.    I don't know if I used that specific
13 language, but I would have requested all relevant
14 case information related to his interrogation and
15 confession statements.
16      Q.    Is it your understanding that you
17 received all statements made by Bill Amor during
18 the course of the 1995 investigation?
19      A.    It's my understanding that I received
20 all relevant statements, yes.
21      Q.    Does your analysis look into when an
22 individual first started asserting that their
23 confession was coerced?
24      A.    If it's in the record, that's certainly

Page 64

1 a potentially relevant fact, yes.
2      Q.    Is that a data point that's relevant to
3 your analysis?
4      A.    It might be relevant.
5      Q.    How could it be relevant?
6      A.    It could be relevant if somebody gives
7 what's called a persuaded false confession where
8 they come to believe they committed the crime
9 before they realize that they did not.
10           It could be relevant because there
11 might be a contemp- -- there might be a record of a
12 contemporaneous expression that the person is being
13 coerced.
14           Sometimes in interrogations that
15 are recorded, the suspect, when the police walk
16 out, might say things about the interrogation, or
17 the suspect might be allowed to speak to a family
18 member or a friend, and that is being
19 surreptitiously recorded, and they might express
20 that they were coerced into falsely confessing.
21      Q.    So what I'm gathering from you is that
22 if there's some sort of corroboration close in
23 time to when the confession occurred where the
24 individual started saying they were coerced, then

Page 65

1 that would be something you would want to know
2 about; correct?
3      A.    What I'm saying is yes, that could be
4 relevant, yes.
5      Q.    And based on your review of the record,
6 were you able to delineate when it -- when the
7 first time was that Bill Amor claimed that his
8 confession was coerced?
9      A.    I don't recall.
10      Q.    Was that a question that you wanted to
11 answer in the course of rendering your opinions in
12 this case?
13      A.    I don't think that's at all relevant to
14 my opinions in this case.
15      Q.    Why is that?
16      A.    Because I think, as I describe in the
17 report, that this was a provably false confession,
18 so it doesn't really matter when he's saying he was
19 coerced.
20           And I think that there are numerous
21 risk factors in the record for this being a coerced
22 and false confession.
23           So I just don't see the relevance
24 if he said it five minutes after he was

Page 66

1  interrogation -- interrogated, five hours, five
2  days, it doesn't change the underlying facts.
3      Q.    Okay.  And what about the data point of
4  when an individual first started asserting that
5  their confession was false, is that a relevant data
6  point?
7      A.    It's a potentially relevant data point,
8  but I don't think it's a relevant data point here
9  because, again, I think this is a provably false
10  confession.
11      Q.    In the course of your review of Bill
12  Amor's case, am I correct in my understanding that
13  you did not review any recorded phone calls that
14  Bill Amor made from the Illinois Department of
15  Corrections?
16      A.    I don't recall.  If I did, they would
17  be in the list of documents, but I don't recall
18  listening to any recorded phone calls.
19      Q.    Okay.  And if it's not listed in the
20  materials that you reviewed in Section 2 of your
21  report, then you did not review it; correct?
22      A.    Correct.
23      MS. RANUM:  Let's take a five-minute break.
24      VIDEO TECHNICIAN:  We're off the video record

Page 67

1  at 12:25 at the end of media unit one.
2          (Recess taken.)
3      VIDEO TECHNICIAN:  Okay.  We are back on the
4  video record at 12:33 at the beginning of media
5  unit two.
6  BY MS. RANUM:
7      Q.    All right, Doctor.  So as a part of
8  your methodology, did you endeavor to read any and
9  all psychological or psychiatric evaluations
10  conducted of Mr. Amor?
11      A.    That I was provided with, yes.
12      Q.    Was it your expectation that you were
13  provided a complete set of any such evaluations?
14      A.    If they were relevant, yes.
15      Q.    Who determines if they're relevant?
16      A.    Ultimately the attorney retaining me.
17      Q.    You did not review any letters that
18  Bill Amor wrote his sister Shelley shortly after
19  his arrest; correct?
20      A.    Not to my recollection.
21      Q.    You did not review the letters that
22  Bill Amor wrote Tina Miceli shortly before the fire
23  was started which were collected by the police
24  during their investigation; correct?

Page 68

1      A.    Not to my recollection.
2      Q.    Are you able to apply an error rate to
3  the analysis that we see in Exhibit 3?
4      A.    No, there's -- there's no error rate.
5  I don't know how one would apply an error rate to a
6  report.
7      Q.    Your report addresses -- you've
8  mentioned it in your testimony thus far today --
9  the term "proven false confession."
10      A.    Correct.
11      Q.    How are you defining a proven false
12  confession?
13      A.    So the definition would be on page 9 of
14  the report, at the top.
15          So there are four criteria.  And
16  those criteria are laid out on page 9.
17          If you could show that the crime did
18  not occur or that it was physically impossible for
19  the confessor to have committed the crime, or if
20  the true perpetrator was identified, or if there
21  is scientific evidence that establishes the
22  confessor's innocence.
23      Q.    So we are going to walk through those
24  criteria.  And I understand that you analyzed that

Page 69

1  criteria in this case.
2          However, once you reach the
3  conclusion that something is a proven false
4  confession, are you equating that with factual
5  innocence?
6      A.    Well, it would depend on the
7  circumstances of the case.  Usually the answer is
8  yes, but I'm sure we could imagine the situation
9  where somebody gave a factually false confession,
10  but they might have had -- they might have been
11  guilty of a crime.
12          I can't think of one off the top of
13  my head, but usually when somebody is -- provides a
14  provably false confession, that means they're
15  factually innocent of the crime 100 percent,
16  assuming a crime even occurred, because one of the
17  categories is that the crime didn't happen.
18      Q.    Are you opining that Bill Amor is
19  factually innocent of starting the September 10,
20  1995, fire?
21      A.    I think that goes beyond the scope of
22  my opinion.
23          My opinion is that this is a proven
24  false confession.  It's for a jury to decide

Page 70

1  whether or not Mr. Amor is factually innocent, not
2  for me.
3      Q.    Okay.
4      A.    Assuming a crime even occurred.
5      Q.    Now, Mr. Amor gave more than one
6  statement on October 4, 1995; correct?
7      A.    Yes.
8      Q.    He gave a handwritten statement;
9  correct?
10     A.    Yes.
11     Q.    And then there's two audio recorded
12  statements from -- from later that same morning;
13  correct?
14     A.    Correct.
15     Q.    And so when you were saying throughout
16  your report, you refer to it as a proven false
17  confession, are you referring to all of the
18  October 4, 1995, statements as one confession?
19     A.    Yes.
20     Q.    Now, on page 9, as you mentioned, you
21  list four criteria for a proven false confession.
22           And my understanding is, under your
23  methodology, only one of these criteria has to be
24  met for a confession to be classified as a proven

Page 71

1  false confession; is that correct?
2      A.    Yes.
3      Q.    And the first criteria is that the
4  crime did not happen; correct?
5      A.    Correct.
6      Q.    I think in some of your articles, you
7  refer to an example of a person being charged with
8  the murder of a missing person who later shows up
9  alive.
10     A.    Correct.
11     Q.    Have you ever applied this factor to an
12  arson case before?
13     A.    I'm sure I have.  I can't think of one
14  off the top of my head, but the article that you
15  referred to before, the 2004 article with Professor
16  Drizin, had six arsons, I think, and two of those
17  were the most serious crime.  So I'm sure I've seen
18  this before in arson cases.
19           As you may know, there's been
20  developments in fire science in the last two to
21  three decades, and so there are a number of cases
22  where innocence projects have gotten people out of
23  prison who have been exonerated for convictions
24  that were of arson that were subsequently

Page 72

1  determined were actually not arsons, but were just
2  bad investigative police work.
3      Q.    But my question is just, can you think
4  of the name of any other cases where you have said
5  it was a proven false confession -- that an arson
6  was a proven false confession based off of this
7  first criteria that the crime did not happen?
8      A.    Off the top of my head, no.
9      Q.    The second criteria is that it is
10  physically impossible for the confessor to have
11  committed the crime; correct?
12     A.    Yes.
13     Q.    And I think one of the examples you
14  give in your articles is if somebody has a time
15  stamped videotaped alibi of them in a store or a
16  bank at the time -- at the exact time that you know
17  the crime was committed, that that would be an
18  example of a physical impossibility; correct?
19     A.    Correct.
20     Q.    The third -- third criteria is when the
21  true perpetrator is identified and his guilt is
22  objectively established; correct?
23     A.    Yes.
24     Q.    And the fourth is when scientific

Page 73

1  evidence dispositively establishes the confessor's
2  innocence; correct?
3      A.    Correct.
4      Q.    Okay.  Fair to say that to be
5  classified as a proven false confession under your
6  analysis is a high threshold?
7      A.    Yes.
8      Q.    One that you have referred to in some
9  of your publications as being rare?
10     A.    If I have referred to it as being rare,
11  sure.
12           The reason it's a high threshold is
13  that it's difficult to prove the negative.  And so
14  these are the only circumstances that we believe
15  where you can prove the negative in a false
16  confession case, but the -- the ability of a false
17  confessor to prove the negative is extrinsic to the
18  confession in the sense that there has to be the
19  circumstances available that allow him or her to
20  prove their innocence.  And in many cases, there's
21  simply not the evidence even though the person may
22  be innocent.
23     Q.    What -- strike that.
24           When you are working on your inquiry

Page 74

1  of whether a case meets the criteria of a proven
2  false confession, what data do you collect and
3  review to do that?
4      A.   So in my research, I try to collect any
5  and all relevant case materials.  And so we search
6  through legal databases, some of which contain
7  discovery from the case.  Or cases.  Sometimes
8  there's a trial and a post conviction or retrial.
9           So we try to obtain anything that we
10  can that's in the court file electronically.
11          If we know people involved in the
12  cases, which could be journalists or lawyers or
13  others, we try to obtain materials from them.  We
14  try to obtain any writings that people have done
15  about the cases.
16          So any materials that we could
17  obtain that are relevant we would try to obtain.
18      Q.   So in the course of your research, do
19  you consider that process to be an exhaustive
20  process?
21      A.   Well, it depends on what you mean by
22  "exhaustive."  Yes, we want to do as much as we
23  can, but, you know, if we -- if we had millions of
24  dollars, we could have research assistants fly all

Page 75

1  over the country and go to courthouses to see if
2  there were materials available that are not
3  available in databases, but of course we don't have
4  millions of dollars.  So the issue really would be
5  a reasonably exhaustive search of materials based
6  on, you know, what is accessible.
7      Q.   And how, if at all, did that process
8  defer in terms of your inquiry in this case of
9  whether Bill Amor's confession is a proven false
10  confession?
11      A.   So there's a verb in your question that
12  I don't think I understood.  Did you say defer or
13  refer?  How does -- I just didn't get the question.
14      Q.   So you made a comment, I asked you what
15  your process is for determining a false confession.
16  You qualified your answer as saying "in my
17  research."
18          So is there a difference between
19  your process in your research as compared with the
20  process that you used in determining whether Bill
21  Amor's confession in your opinion was a proven
22  false confession?
23      A.   Okay.  Thank you for the clarification.
24          Yeah, I think the difference is that

Page 76

1  if I -- if I had just identified Mr. Amor's case as
2  a case to investigate, somebody wrote to me and
3  said, you might want to look at this case for your
4  next article, I don't think all the materials that
5  I have been provided are publicly available, and so
6  my assumption is that I have had access to far more
7  materials to base my conclusion that this is a
8  provably false confession as a result of being
9  involved in the litigation than I otherwise would
10  have.
11      Q.   Can a proven false confession still
12  contain partial truths?
13      A.   Well, that's a very vague question.
14          It depends on -- on what you're
15  referring to.  The proven false confessions often
16  contain a lot of truth in the sense that the person
17  either guesses correct facts or knows correct facts
18  or is fed and educated correct facts.
19          So, yes, you can have a confession
20  that is false, is provably false, but contains
21  accurate facts.
22      Q.   Would you agree with me that some
23  confessions -- and I'm not talking about proven
24  false confessions right now, I'm just generally --

Page 77

1  would you agree with me that some confessions
2  contain both true and false details?
3      A.   Yes.
4      Q.   Would you agree that you can have a
5  proven true confession?
6      A.   Yes.
7      Q.   Are there any studies that compare the
8  circumstances of an interrogation that resulted in
9  a proven true confession as compared with a proven
10  false confession?
11      A.   If there are, I can't recall as I sit
12  here today any such studies.
13      Q.   Wouldn't that data be necessary to
14  begin to delineate what conditions within an
15  interrogation can actually be the tipping point for
16  someone to falsely confess?
17      MS. GARCIA:  Object to form, foundation,
18  argumentative.
19      Go ahead, Dr. Leo.
20      THE WITNESS:  No.  The answer to your
21  question is no.
22  BY MS. RANUM:
23      Q.   And why is that?
24      A.   Because you said "necessary."

Page 78

1            We have a variety of methodologies
2  where we've analyzed true and false confessions,
3  and I don't think that what you're asking is
4  necessary.  I think it might be helpful, but it's
5  not necessary.
6        Q.   So in your various studies -- and we
7  have looked at some of them together -- how do you
8  account for a control group if you are only looking
9  at confessions that meet a criteria as being proven
10  false or probable -- a probably false confession?
11       A.   So in experimental research, we have
12  control groups.  But the methodology for the study
13  of proven false confessions does not involve
14  experimentation.  These are confessions that are
15  proven false in the real world.  So there is no
16  control group, there's no relevance in the control
17  group in the confessions.
18       Q.   And are you opining in this case that
19  Mr. Amor's confession is a proven false confession?
20       A.   Yes, I opine that in the report very
21  clearly.
22       Q.   And that is based off of which of the
23  four prongs that we have looked at?
24       A.   I don't believe that a crime occurred.

Page 79

1  I don't believe, based on the materials I reviewed,
2  that there was an arson.
3            There was a fire, in my opinion, but
4  not an arson.
5            And I also believe -- that's number
6  one.
7            Number two, that the scientific
8  evidence also objectively establishes that Mr. Amor
9  had left the house when the fire began.  So even if
10  there had been, in my opinion, evidence of an
11  arson, it would have been physically impossible for
12  him to have committed it.
13           So at least one and two of those
14  four criteria, in my opinion, are met.
15       Q.   Okay.  Now, looking at the first prong,
16  your first basis for classifying this as a proven
17  false confession, you said that you don't believe
18  that a crime committed -- strike that -- you said
19  that you don't believe that a crime was committed;
20  correct?
21       A.   Correct.
22       Q.   Isn't the criteria that it must be
23  objectively established that a crime was not
24  committed?

Page 80

1        A.   That's what it says, yes.
2        Q.   But you said the basis of your
3  opinion is your own belief that a crime didn't
4  commit -- wasn't committed.
5        A.   Right, right.  But my belief is based
6  on the materials that I reviewed, and in particular
7  the affidavit of -- I'm going to blank on his
8  name -- Douglas Carpenter, and my understanding
9  that his scientific testimony was credited at the
10  second trial, but it wasn't disputed by any other
11  of the experts.
12       Q.   That's your understanding.
13       A.   Correct.
14       Q.   Okay.  And what about his opinions
15  led you to believe that it's been objectively
16  established that a crime was not committed?
17       A.   Well, I haven't reviewed his opinion in
18  at least three months, but it's the fact that he's
19  a fire scientist and that police investigators are
20  not, and that, as I mentioned earlier, there has
21  been this development of fire science by real
22  scientists, not cops and cop folklore about causes
23  of crime, and there have been a whole litany of
24  cases documented by innocence projects and other

Page 81

1  organizations where, as I mentioned earlier, there
2  have been reverses.  So I am relying on his opinion
3  as a scientist in forming that conclusion.
4        Q.   You're specifically relying on his
5  conclusion that the fire, the September 10th fire,
6  was accidental; correct?
7        A.   Correct.
8        Q.   Okay.  Are you aware -- are you aware
9  of John DeHaan's opinion about the cause and origin
10  of the fire in the case?
11       A.   I don't recall it as I sit here, no.
12       Q.   Have you reviewed his report?
13       A.   I don't recall reviewing his report.
14       Q.   And are you aware of David Smith's
15  opinion on the cause and origin of the fire?
16       A.   As I sit here today, no.
17       Q.   Have you reviewed his report?
18       A.   No, not to my recollection.
19       Q.   Are you aware of Paul Bieber's opinion
20  about the cause and origin of the fire?
21       A.   I don't think so.
22       Q.   Have you reviewed his report?
23       A.   If it's not listed on here, I did not
24  review it.

Page 82

1    Q.   Are you aware of any consulting
2  opinions provided by John Lentini regarding the
3  cause and origin of the fire?
4    A.   I am not aware of any opinions by John
5  Lentini, to my recollection.
6    Q.   Now, you did review the testimony of
7  John Golder in the course of rendering your
8  opinions; correct?
9    A.   Correct.
10   Q.   And you know that Investigator Golder
11 opined that the fire was incendiary; correct?
12   A.   That's my recollection.
13   Q.   Would you agree that something cannot
14 be scientifically dispositive if the relevant
15 experts in the field don't agree?
16   MS. GARCIA:  Object to form.
17   THE WITNESS:  The question is stated at such
18 a level of abstraction and vagueness that, no, I
19 can't agree with them.
20 BY MS. RANUM:
21   Q.   Okay.  Well, you've already testified
22 you're not a fire science expert; correct?
23   A.   Correct.
24   Q.   So your opinion that a crime did not

Page 83

1  occur here is solely based on your reliance on fire
2  science experts; correct?
3    A.   And their analysis, correct.
4    Q.   Okay.  You have only reviewed Doug
5  Carpenter's report and John Golder's testimony;
6  correct?
7    A.   Right.
8    Q.   Can you stand by your opinion that this
9  is a proven false confession without knowing what
10 all the other fire science experts who have weighed
11 in on cause and origin of this fire have had to say?
12   A.   Well, I think I can stand by it, yes,
13 because I also think that number two is met in the
14 criterion that it would have been physically
15 impossible for him to have committed the fire in
16 the manner that he stated.
17        But I -- I don't know what effect,
18 if any, reviewing any other opinions by fire
19 science experts would have on my opinion on number
20 one because I haven't reviewed them.
21   Q.   Okay.  Well, I want to stick to
22 number one.  We'll get to number two in a minute.
23        But with regard to number one, if
24 the fire science experts do not all agree that the

Page 84

1  fire -- the cause of the fire was accidental, would
2  that change your opinion as to whether the criteria
3  for number one, your first prong of your analysis,
4  can be met in this case?
5    MS. GARCIA:  Objection to form and foundation.
6    THE WITNESS:  It depends.  I would have to
7  know what those fire science experts said, and I
8  would have to know what their qualifications were
9  as fire science experts.
10 BY MS. RANUM:
11   Q.   In your 2004 paper with Steve Drizin,
12 you said, quote, "It is rare to find scientific
13 evidence that proves the confessor's factual
14 innocence absolutely even if there is considerable
15 scientific evidence tending to show that the
16 suspect did not commit the crime."  Correct?
17   A.   I'm sorry, I had to turn my ringer down
18 on my land line.
19        Can you tell me where you're
20 referring to before I agree to something that's in
21 a document?
22   Q.   That's fine.  We can come back to it.
23        If I were to represent to you that
24 all of those expert opinions that I referred to,

Page 85

1  that you did not review, that of all of those
2  opinions, Doug Carpenter is the only one who opined
3  that the fire was accidental, would that change
4  your opinion as to whether this confession fits the
5  criteria for a proven false confession based on the
6  fact that a crime was not committed?
7    MS. GARCIA:  Objection to form, foundation,
8  incomplete hypothetical.
9        You can answer, Dr. Leo.
10   THE WITNESS:  Again, I would have to know
11 more information.  I would have to see those
12 reports, and I would have to know the credentials
13 of the experts who were making those opinions.
14        I have seen situations where people
15 are referred to as fire science experts were really
16 just cops or ex-cops.
17        So, you know, you're asking me
18 whether I would change my opinion based on
19 documents that I haven't reviewed or studied.  How
20 would I know?
21 BY MS. RANUM:
22   Q.   Well, wouldn't you have wanted to
23 review all of those opinions prior to deciding that
24 this is a proven false confession because a crime

Page 86

1 was not committed?
2     A.   If they are relevant to the analysis,
3 yes.  But without reviewing the opinions, I can't
4 know if they're relevant to the analysis.
5     Q.   And as someone who has no personal
6 background in fire science, you certainly wouldn't
7 be in a position to credit one scientific expert's
8 opinion over another scientific expert; correct?
9     A.   Not based on the fire science analysis.
10 But if it was an expert who has a reputation as a
11 leading expert versus somebody who has a reputation
12 as a quack, then, yes, of course I would make a
13 distinction between the experts.
14     Q.   Okay.  Moving to the second basis upon
15 which you have opined that this is a proven false
16 confession, and that's that the second prong of
17 your criteria can be met, which, again, is when it
18 can be objectively established that it would have
19 been physically impossible for the confessor to
20 have committed the crime, in what way are you
21 opining that Bill Amor's case fits that criteria?
22 Can you explain that?
23     A.   Yes.  So the spilling of the vodka
24 onto a newspaper and that starting a fire, my

Page 87

1 understanding is that that was scientifically
2 impossible.
3          And also that when we take the 911
4 report from the victim of when she reported the
5 fire, and the autopsy report of -- of her body,
6 that that establishes scientifically that Mr. Amor
7 had left the apartment before the fire -- I'm
8 sorry -- after the fire had begun.
9          And so both of those, as I believe
10 are written about in the report, are the basis for
11 my opinion that it was scientifically impossible
12 for Mr. Amor to have started the fire.
13     Q.   So starting with your first point, your
14 first point is that the fire didn't start the way
15 that he confessed to it.  Correct?
16     A.   Correct.
17     Q.   And your second point with regard to
18 the timeline, can you elaborate on what it is about
19 the timeline that you believe makes it physically
20 impossible for Bill Amor to have started the fire?
21     A.   That he was out of the apartment when
22 the fire had started.
23     Q.   And what part of your review of the
24 record are you basing that on?

Page 88

1     A.   I don't recall specifically, since I
2 read this report over three months ago,
3 approximately three months ago.
4     Q.   You would agree that the fact that
5 Bill Amor -- if Bill Amor provided a confession
6 that included false details about how he started
7 the fire, that alone would not mean that he is
8 innocent; correct?
9     A.   Correct.  But, again, that's not for me
10 to judge.
11     Q.   In your experience, can a person
12 truthfully state that they committed a crime but
13 provide an untruthful set of details about how they
14 committed the crime?
15     A.   That's certainly possible, yes.
16     Q.   Now, again, you have not reviewed all
17 of the fire science experts' opinions in this case;
18 correct?
19     A.   As you've represented them, correct.
20     Q.   And in looking at your materials
21 reviewed, you didn't review any of Tina Miceli's
22 testimony in the criminal case or in the civil
23 case; correct?
24     A.   If it's not listed, I didn't review it.

Page 89

1 I don't recall reviewing it.
2     Q.   Are you familiar with the process to
3 petition for a Certificate of Innocence under
4 Illinois law?
5     A.   I'm familiar that there is a process,
6 but I -- I don't know the details of the process.
7     Q.   Okay.  Were you aware that Bill Amor
8 petitioned for and was subsequently denied his
9 Certificate of Innocence with regard to the
10 September 10, 1995, fire?
11     A.   I don't recall if I was aware of that
12 fact when I wrote the report.
13     Q.   Does that fact change your opinion at
14 all as to whether the -- this is a proven false
15 confession?
16     A.   No.
17     Q.   Why not?
18     A.   I assume that whether or not somebody
19 is granted a Certificate of Innocence is ultimately
20 a decision made by a judge, and so that is an
21 opinion by someone, and that is not the criteria
22 for inclusion in our database or inclusion for a
23 proven false confession.  So it doesn't say
24 opinions by third parties.

Page 90

1      So that's why it wouldn't change my
2 professional opinion about whether a confession was
3 a proven false confession or not.
4      Q.   Now, I think you've already testified
5 to this, but it's not relevant to your analysis in
6 this case when Bill Amor first claimed that his
7 confession was false; is that -- is my
8 understanding correct?
9      A.   It doesn't change my analysis, the
10 conclusions.
11     Q.   Would it be a significant data point if
12 Mr. Amor communicated with family shortly after his
13 arrest and did not make reference to a false
14 confession?
15     A.   No, because that happens in proven
16 false confession cases, and that's independent of
17 the criteria that we look for, the evidence to
18 establish whether a confession is provably false or
19 not.
20     Q.   What about in coerced compliant false
21 confessions?  Haven't you said in your book that
22 those are typically recanted shortly after the
23 interrogation is over?
24     A.   They are often recanted after the

Page 91

1 interrogation is over.
2           Oftentimes there's not a complete
3 record, so we don't know.  But, yes, it does happen
4 that sometimes confessions are recanted and
5 sometimes immediately after, and sometimes we have
6 no record of whether they're recanted immediately
7 after.
8      Q.   One of the documents that you reviewed
9 in the course of rendering your opinions in this
10 case was a November 19, 1996, report from a
11 Dr. Michael Chiappetta?
12     A.   Correct.  I think that's one of the
13 exhibits.  Is it -- you're referring to Exhibit
14 Number 5?
15     Q.   Yes, Exhibit Number 5.
16           So just so we have a clear record,
17 since we're doing everything remotely, for the
18 court reporter, this is a document Bates stamped
19 SDT-DCPDO 3562 consecutively through 3566.
20           Dr. Leo, can you take a moment to
21 review Exhibit 5.
22           Exhibit 5 is one of the documents
23 that you reviewed in rendering your opinions in
24 this case; correct?

Page 92

1      A.   Yes.
2           Did you want me to reread it?
3      Q.   Well, here's my question for you:  This
4 report is regarding a psychological examination
5 that was conducted on Bill Amor in 1996 while his
6 criminal case was pending; correct?
7      A.   I believe so.
8      Q.   And if you need to take a moment to
9 read it, you can.
10           Dr. Chiappetta documented that
11 Mr. Amor told him that he did not lie to
12 investigators when he confessed; correct?
13     A.   I'm going to have to review this.
14     Q.   Sure.  And the relevant portion is on
15 page 5.
16     A.   Do you want to point me to the specific
17 relevant passage that you're referring to?
18     Q.   Sure.  It's actually in the second full
19 paragraph on the page, towards the bottom.  It
20 says, "He also stated that during the interrogation
21 procedure he was served with divorce papers.  He
22 stated, however, that he had told them no lies."
23           Do you see that?
24     A.   Yes.

Page 93

1      Q.   And this assessment was more than a
2 year after his October 4th confession; correct?
3      A.   Correct.
4      Q.   Does that change your opinion at all as
5 to whether this is a proven false confession?
6      A.   No, this doesn't change the opinion.
7 And I think -- I think it's a little ambiguous
8 here, actually.
9           Obviously we have the psychologist's
10 report of what he was told, but he also says that
11 Mr. Amor may have made inaccurate statements during
12 the 20-hour interrogation.
13           So -- so we don't know if what he
14 told the psychologist is being accurately reported
15 by the psychologist, number one.
16           And, number two, we don't know
17 specifically what he had told them no lies is
18 referring to.  It could have been that it was
19 referring to his description of the facts that
20 don't bear on whether he started the fire or not.
21           But regardless, even if this report
22 said Mr. Amor truthfully confessed to this crime,
23 it wouldn't change my opinion because the criteria
24 for the opinion are independent of what a

Page 94

1 psychologist reported somebody said.
2     Q.    Over the course of your career as a
3 consultant and an expert witness, how many cases
4 have you reviewed on behalf of civil attorneys
5 claiming that their client's confession was false?
6     A.    I haven't tallied the number of cases.
7 I don't know; I would guess 15 or 20.  Maybe it's
8 more, maybe it's less.  I just don't know the
9 number of cases.
10         And it's not always that they're
11 claiming their client's confession is false.  There
12 may be other issues involved other than whether or
13 not the confession itself is false.
14     Q.    How many -- in how many of those cases
15 did you opine, subsequently opine that the disputed
16 confession was actually a proven false confession?
17     A.    I don't recall.
18     Q.    In a little bit we're going to be
19 discussing the portion of your report that
20 discusses several, what you've identified and
21 characterized as risk factors for false confessions.
22         And before we get into that, I just
23 want to know, is there a difference in your
24 methodology in applying those risk factors based

Page 95

1 on, you know, the fact that you're characterizing
2 this confession as a proven false confession, as
3 compared with if you had characterized it as a
4 highly probable false confession.
5         Is there any difference in your
6 methodology?
7     A.    No.
8         So, just to be clear, the risk
9 factors for false confession, if they are present,
10 create a risk that somebody will make a false
11 confession; and if that person did make a false
12 confession, they provide an explanation for why
13 that person would have falsely confessed.
14         But I am not concluding, based on
15 the presence of risk factors, that the confession
16 is false.
17         So if -- if -- whether or not I
18 concluded that a confession was a false confession,
19 a proven false confession, or I said hypothetically
20 I don't know whether this is a false confession,
21 my opinion is inconclusive, I don't have enough
22 information from the case facts to provide an
23 opinion about whether or not it was a true
24 confession, a false confession.  It wouldn't matter

Page 96

1 at all to the analysis of risk factors.
2         The analysis of risk factors is,
3 were they present?  And if they were, they create a
4 probabilistic risk or a greater likelihood of a
5 false confession.
6         They don't determine whether it's a
7 false confession, and therefore one can't look to
8 the risk factors to say this is or is not a false
9 confession.
10     Q.    Okay.  So your opinion that this is a
11 proven false confession is independent from your
12 opinions about the risk factors that were present
13 in this case.
14     A.    Correct.  And that's why -- that's why
15 the criteria for proven false confession are listed
16 early in the report and then applied later in the
17 report with respect to that conclusion.
18     Q.    Okay.  On page 18 of your report, in
19 the first full paragraph on the page, you say,
20 "Well trained police detectives realize that an
21 'I did it' statement is not necessarily evidence of
22 guilt, and may instead turn out to be evidence of
23 innocence."
24         Did I read that correctly?

Page 97

1     A.    Yes.
2     Q.    How might the words "I did it" be
3 evidence of innocence?
4     A.    If you -- if you can show that that's
5 false, if that factually didn't occur, then it
6 would be evidence of innocence, if there's other
7 case facts that contradict that.
8     Q.    On page 15 of your report you talk
9 about a classification called a coerced compliant
10 false confession.
11         And my understanding is that you are
12 defining a coerced compliant false confession as,
13 quote, "a false confession knowingly given to put
14 an end to the interrogation or to receive an
15 anticipated benefit or reward in exchange for the
16 confession."
17         Is that correct?
18     A.    Yes.
19     Q.    What methodology do you employ to
20 determine whether a confession is a coerced
21 compliant confession?
22     A.    Well, if the -- if I have concluded
23 that the confession is false and there's evidence
24 in the record that the person knowingly falsely

Page 98

1 confessed, as opposed to the persuaded or
2 internalized false confession where they came to
3 believe they committed the crime despite having no
4 memory, then I would classify it as a coerced
5 compliant false confession.
6        And in this case, my analysis is
7 that if it is a false confession, that's the type
8 of false confession it is.
9    Q.   Okay.  Are you opining that the
10 interrogation atmosphere in this case was
11 intolerable?
12    A.   So there are two accounts, as you know.
13 And if Mr. Amor's account is accurate, then I would
14 say that it was a psychologically coercive and
15 physically coercive environment that Mr. Amor came
16 to perceive as intolerable, as he describes, and
17 that explains why he would have made a coerced
18 compliant false confession.
19    Q.   Did you determine that Mr. Amor was
20 stress intolerant?
21    A.   I don't know what you mean by stress
22 intolerant.
23        Tolerance for stress, like anything
24 else, would be -- would vary by person.

Page 99

1        If there is a measure for stress
2 tolerance, I would rely on a clinical psychologist's
3 measure of that, if it can be objectively measured.
4        I did think that, based on
5 Dr. Chiappetta -- I want to make sure I'm
6 pronouncing his name correctly -- yeah, Chiappetta.
7 His report that Mr. -- and then Dr. DeClue's
8 subsequent report, that he was highly suggestible.
9        Mr. Amor describes the process of
10 somebody who's broken down and coerced.  And at
11 some point everyone has a breaking point.  If
12 that's what you mean by stress intolerant.
13 Although, again, like anything, one's tolerance for
14 stress would vary.
15    Q.   And we will talk a little bit about
16 the -- I know you reference his suggestibility in
17 one of the risk factors, so we will be talking
18 about that.
19        But I guess separate from that, did
20 you do anything to try to objectively determine
21 what Mr. Amor's stress tolerance was in 1995?
22    MS. GARCIA:  Object to form.
23    THE WITNESS:  So, as you pointed out, I am
24 not a clinical psychologist.  And so that is not

Page 100

1 something that would have been within the scope of
2 my expertise.
3        But, again, that is not something,
4 even if that were within the scope of my expertise,
5 and even if it were possible in 2021 to determine
6 that in 1995, it's not at all relevant to any of my
7 opinions.
8        Not only that, there are no false
9 confession experts.  There's nobody in the field,
10 that I'm aware of, that talks about a stress
11 tolerance test as something that is relevant to the
12 analysis of whether or not a confession is provably
13 false or whether there are risk factors for false
14 confession.
15 BY MS. RANUM:
16    Q.   Do you know what percentage of criminal
17 defendants give inculpatory statements to the
18 police and later seek to suppress those statements
19 in advance of their trial?
20    A.   No, I don't believe there's any
21 reported statistic on that.
22    Q.   Based on your experience as someone
23 who's retained, and 95 percent of your cases are
24 criminal cases, would you estimate that that's a

Page 101

1 common occurrence?
2    MS. GARCIA:  Object to form.
3    THE WITNESS:  Well, it depends on what we
4 mean by "common."
5        But I don't think it's uncommon.
6 But, of course, the cases that come to me through
7 my -- through consultation are not likely fully
8 representative of motions to suppress.
9        So I don't think it's very common,
10 but I don't know how common it is.  I don't think
11 it's uncommon.
12 BY MS. RANUM:
13    Q.   So in the course of your research on
14 this subject, you're not aware of how often in the
15 United States criminal defendants who have given an
16 inculpatory statement later seek to suppress that
17 statement before trial.
18    A.   Correct.  I am not aware of what
19 percentage of cases criminal defense attorneys with
20 clients who have made incriminating statements
21 file motions to suppress seeking to suppress those
22 statements, out of all of the cases in which their
23 clients have made incriminating statements.  I
24 don't know what that percentage is, and, to my

1 knowledge, there's no study of that percentage.
2     Q.    Would you agree with me that there are
3 incentives for a criminal defendant to lie about
4 the voluntariness or truthfulness of their
5 confession when they are facing trial?
6     MS. GARCIA:  Objection; form, foundation,
7 calls for speculation.
8     THE WITNESS:  There may be incentives to lie,
9 there may be incentives to tell the truth.
10         Your question is posed at such a
11 level of generality that I don't know how to answer
12 it other than that.
13 BY MS. RANUM:
14    Q.    So when you're retained in criminal
15 cases, is there anything that you do in the course
16 of your methodology on those cases to control for
17 the fact that some individuals may make self-
18 serving but untrue statements about the
19 voluntariness of their statements?
20    A.    It wouldn't be possible to control for
21 that, and it's not relevant to the analysis.  I
22 guess it depends why -- why the attorney -- for
23 what purpose the attorney is retaining me.
24         But, again, I would look at the

1 objective evidence, the interrogation, the evidence
2 of what occurred during the interrogation, and
3 apply the research and findings from the field.
4         There is no psychiatry of false
5 confessions, there's no field of false confessions
6 in psychiatry.  Your question is sort of asking
7 psychiatric questions that are completely
8 irrelevant and not factually or scientifically
9 established in this social science field.
10        So I think that would be completely
11 irrelevant to any situation I could imagine
12 evaluating where an attorney came to me because
13 it's irrelevant to the objective evidence in the
14 case, and that's what I would be evaluating and
15 applying the objective science, and there's no
16 science behind that kind of issue that your
17 question is asking about.
18    Q.    Okay.  Can we agree that a person being
19 questioned for murder inherently faces pressures
20 not to confess because of the seriousness of the
21 crime?
22    MS. GARCIA:  Object to form.
23    THE WITNESS:  Again, that person may face
24 pressures to confess as well as pressures not to

1 confess.  It's such an incomplete and vague and
2 open-ended hypothetical that it can't be answered
3 with a yes or no question.  It's more of a -- a
4 vacuous question at that level of generality.
5 BY MS. RANUM:
6     Q.    Now, based on your review of some of
7 the materials related to the investigation into
8 this fire, did police have a basis to suspect
9 Mr. Amor as having started the fire?
10    A.    As I discuss in the article, I don't
11 think they had a reasonable basis to suspect it --
12 him starting the fire, based on my analysis of
13 these materials.
14    Q.    So do you disagree with Mr. Amor's
15 testimony in his deposition that he believed the
16 police did have a basis to believe that the fire
17 was suspicious under the circumstances?
18    A.    I'm not going to change my answer in
19 response to that -- in response to what he has said
20 or not.  That's his opinion.  It doesn't change my
21 opinion.
22    Q.    And, again, you did not review all of
23 the evidence that was gathered by the police in
24 the course of their investigation into the

1 September 10th fire; correct?
2     A.    I assume that the materials I was
3 provided, which are extensive, are not the
4 entire -- all the available materials in this case.
5 So that's correct that I haven't reviewed all of
6 the materials in this case.
7     Q.    You haven't even reviewed all the
8 police reports, have you?
9     MS. GARCIA:  Object to form, foundation.
10    THE WITNESS:  I don't know if I have reviewed
11 all the police reports.  I've reviewed what was
12 provided to me, but I don't know if they were all
13 of the police reports.
14 BY MS. RANUM:
15    Q.    I mean, as a part of your methodology,
16 do you request that you get -- receive all the
17 police reports of an investigation?
18    A.    Again, all the relevant police reports
19 or relevant information.
20        Oftentimes police reports are
21 repetitive, redundant, irrelevant.  Obviously I'm
22 relying on the judgment, in the cases where I'm
23 retained, of the people who retained me to provide
24 the relevant information.

Page 106

1   Q.   Okay.  On page 22 of your report -- and
2   I think you've testified to it here today -- you
3   acknowledge that the factual record in this case
4   presents more than one account of what occurred
5   during Mr. Amor's interrogation; correct?
6       A.   Yes.
7       Q.   And you are not opining that any one
8   person's account of what occurred during the
9   interrogation is true or false; correct?
10      A.   Correct.
11      Q.   And fair to say you were not in the
12  room on October 3rd and 4th, 1995; correct?
13      A.   Correct.
14      Q.   You don't know -- you have no personal
15  knowledge of what occurred that day; correct?
16      A.   Correct.
17      Q.   But the focus of your report, at least
18  until you get to about page 46, focuses on Bill's
19  account of the interrogation; is that fair to say?
20      A.   Correct.
21      Q.   In the course of reviewing Bill Amor's
22  account of what occurred, did you notice any
23  instances where his account of what occurred was
24  inconsistent with previous statements that he had

Page 107

1   made?
2       A.   I don't recall.  But it's not
3   uncommon for there to be minor inconsistencies or
4   recollections that change over the course of, you
5   know, testimony at a motion to suppress and then
6   testimony years later at a second trial.
7           But I don't recall any significant
8   inconsistencies in what I reviewed his account of
9   what occurred during the interrogation.
10      Q.   If you had, in the course of your
11  review, identified a contradiction, let's say,
12  for instance, that Mr. Amor, in his deposition,
13  contradicted his testimony from the motion to
14  suppress about what occurred during the
15  interrogation, what would your steps be to address
16  that discrepancy in the course of your analysis?
17      A.   Well, first of all, it would depend on
18  how significant that discrepancy is.
19          As a general matter, we know that
20  memory does not improve over time, so the closer in
21  time to the event that someone remembers something,
22  the more likely it is to be accurate.
23          It's also the case in many of these
24  cases that the testimony developed at motions to

Page 108

1   suppress is not very well developed; the questions
2   aren't as good or as thorough as they would be at a
3   deposition, though the deposition is many years
4   later.
5           So it would depend on what the
6   contradiction is and how significant it is and what
7   other evidence there is in the case file bearing on
8   any inconsistency.
9       Q.   As you sit here today, you do not
10  recall any -- noticing any discrepancies in Bill's
11  account as you've reviewed his testimony.
12      A.   As I sit here today, correct.  There
13  may be discrepancies.  If you want to point them
14  out, we can talk about them.
15          There often are minor discrepancies
16  when you -- or inconsistencies when you -- when you
17  have a case that has spanned two or three decades,
18  and somebody is being deposed at great length two
19  or three decades after brief or partial motion to
20  suppress question testimony.
21      Q.   Okay.  So once you get to page 24 of
22  your report, you start to look into -- you've
23  alluded to it today -- the risk factors that you
24  believed were present in this interrogation to

Page 109

1   cause a false confession.  Is that fair to say?
2       A.   Correct.  In Mr. Amor's account.
3       Q.   Now, in your report you will often
4   say -- you will say that these tactics -- and we're
5   going to go through each one -- but you'll say that
6   they were a risk factor for a coerced, unreliable
7   and/or false confession.
8           How are you defining an unreliable
9   confession?
10      A.   Well, an unreliable confession would be
11  one that is either partially or fully false.  It's
12  one that contains false information.
13      Q.   So, I mean, there are a lot of places
14  in your report where you use both terms; you'll say
15  an unreliable and/or false confession.
16          What's the distinction that you're
17  making in making that statement?
18      A.   Reliability is just a broader concept
19  than false.
20          So false would be that it is a
21  hundred percent false, and unreliable would be that
22  it's either partially or entirely false.  So it's
23  just a broader designation of the truth value or
24  falsity of the statement.

Page 110

1      Q.   The studies that you rely upon
2  regarding the risk factors that we're going to look
3  at, do they delineate between the impact of these
4  risk factors on a coerced confession as compared
5  with an unreliable confession?
6      A.   No.  Their focus is just on unreliable
7  confessions, on false confessions, whether or not
8  the -- the techniques or the personality traits,
9  the personal or situational risk factors increase
10 the risk of getting an unreliable or false
11 confession.
12          Oftentimes in the descriptions of
13 why people give those, they say they were coerced,
14 that they came to perceive that they had no
15 meaningful choice but to confess.
16     Q.   So that was actually my second
17 question.  So then do the studies delineate at
18 all between the impact of these risk factors in
19 producing an unreliable confession as compared with
20 a false confession?
21     A.   Well, all false confessions are
22 unreliable confessions.
23          But, no, so I'm using the term --
24 the terms together, but the focus is on false

Page 111

1  confessions in the experimental studies and in the
2  real world studies.
3      Q.   All right.  The first risk factor that
4  you address on page 24 is physical abuse and
5  coercion.
6          For purposes of your opinion, how
7  are you defining physical abuse and coercion?
8      A.   Any unwanted and/or abusive or
9  aggressive physical touching.
10     Q.   Would you agree that the severity of
11 the physical coercion employed would impact the
12 likely that it would have -- the likelihood it
13 would have in resulting in a coerced or false
14 confession?
15     A.   Well, I think that, yes, that the more
16 severe the physical abuse, the more coerced and the
17 more likely false the confession, sure.
18     Q.   So in the course of reviewing the data
19 in a case, do you in any way try to quantify the
20 severity of the physical abuse alleged?
21     A.   There's no quantifi- -- quantitative
22 measure that I'm aware of.  Nobody could do that.
23     Q.   So how would you characterize the level
24 of severity of the physical coercion that you

Page 112

1  believe exists in Bill Amor's account of the case?
2      A.   Well, even mild physical coercion is
3  pretty awful, right?
4          So he describes being grabbed by the
5  shoulders, lifted out of the chairs, violently
6  shaken, and causing his head to be hit against the
7  wall, making him dizzy.
8          You know, a description like that is
9  criminal, right?  If somebody does that to you or
10 me against our will, if a parent does that to a
11 child, it's criminal.  I mean, this meets the
12 elements of assault.
13          So as physical coercion goes in the
14 state of Illinois, I've worked on and studied and
15 written about many cases where the lawlessness and
16 violence of the police is much worse.
17          But I think it trivializes the fact
18 that this is pretty bad if the implication of the
19 question is that, you know, this is kind of mild
20 physical coercion.  I think this is still physical
21 coercion, and all physical coercion is highly
22 problematic.  And this is, if true, criminal.
23     Q.   There's no implication to my question.
24 I'm simply trying to understand what your analysis

Page 113

1  was, understanding that you likely see a range of
2  risk factors in each case that you review; correct?
3      A.   Correct.
4      Q.   So applying the risk factor of physical
5  coercion to this case, did you compare the
6  allegations of physical abuse that were made by
7  Mr. Amor in his motion to suppress testimony with
8  those allegations that were made in his deposition
9  last year?
10     A.   No.  If my recollection is correct,
11 he was instructed by his attorney not to mention
12 allegations of physical coercion that he had made
13 to his attorney because the attorney said the judge
14 wouldn't believe it.
15          And so, if my recollection is
16 correct, he didn't make any allegations of physical
17 coercion in his motion to suppress testimony.
18     Q.   And did you factor that -- well, strike
19 that.
20          If Bill had ever said elsewhere that
21 he was psychologically but not physically coerced
22 into confessing, would that impact your analysis?
23     A.   Not if he was physically coerced,
24 because it's still present as a risk factor.

Page 114

1    Q.   So what would you -- I guess I don't
2 understand your answer.
3         So if he described his own account
4 of the interrogation somewhere as psychologically
5 but not physically coercive, how would that impact
6 your analysis?
7    A.   If you are saying that he's denying any
8 physical coercion occurred, then I would want to
9 know more about what account is accurate if there
10 is an inconsistency in the accounts.
11        If you are saying that he said in
12 another setting it was the psychological coercion,
13 not the physical coercion, that caused him to
14 confess, then, as I previously answered, I'd say
15 physical coercion is still a risk factor for false
16 confession.  It was present, even if in one sitting
17 he described that psychological coercion, not
18 physical coercion, was the motivating cause.
19        And I would also want to know to
20 what extent did the physical coercion contribute to
21 the psychological coercion.
22    Q.   But either way, you would need to see
23 the statement to be able to make that determination;
24 correct?

Page 115

1    A.   It depends on what's in the statement.
2    Q.   Well, don't you want to know about any
3 statement that Mr. Amor is making where he's
4 characterizing what happened to him during his
5 interrogation?
6    A.   Yes, I would.  But that doesn't change
7 the answer in my prior question.
8    Q.   Understood.
9         You mentioned food deprivation
10 several times in your report.
11        How are you defining food
12 deprivation for purposes of your opinions in this
13 case?
14    A.   Well, most people eat three meals a
15 day, so it would be a disruption of a normal eating
16 pattern.  You know, usually the meals are, what,
17 five, six, eight hours apart.
18        So my recollection is that he said
19 he hadn't had anything to eat for the entire day,
20 that he had gone 24 hours or longer without eating.
21        And under any definition of a
22 disruption of one's regular and normal food intake
23 patterns, that would be food deprivation.
24    Q.   To what degree does food deprivation

Page 116

1 increase the likelihood of a false confession?
2    A.   I can't quantify that.
3    Q.   Applying this factor to Mr. Amor's
4 case, is it your understanding that he requested
5 and was denied food on October 3rd, 1995?
6    A.   I believe that's what he says.
7    Q.   And is that significant for you?
8    A.   Well, it's significant both with
9 respect to food deprivation, if he didn't eat any
10 food, but it's also significant to the idea of
11 psychological coercion, which, as you know from the
12 report, is this idea where the suspect comes to
13 perceive they have no meaningful choice.
14        Being denied food, if you request
15 it, from the police, suggests that you're not going
16 to get it, that you don't have control over
17 something as basic -- a need as basic as that.
18        And so it would contribute to the
19 psychological coercion in addition to the issue of
20 food deprivation.
21    Q.   If Mr. Amor -- if the record shows that
22 Mr. Amor was offered and denied offers of food,
23 would that change your analysis?
24    A.   It wouldn't be relevant to the

Page 117

1 psychological coercion point, but it wouldn't
2 change the analysis of the food deprivation point.
3        And -- and, of course, the record
4 might be disputed.
5    Q.   So did you see anything in the record
6 to indicate that it is disputed on whether he was
7 offered food and denied it?
8    A.   That's my recollection.  My
9 recollection is that one or more of the officers
10 testified "we offered him food and he denied it."
11    Q.   What about Mr. Amor?  Did he say he was
12 offered food?
13    A.   I don't recall if at any point in the
14 record he said that.
15    Q.   So if you can't quantify generally how
16 food deprivation increases the likelihood of a
17 false confession, then I assume you can't quantify
18 what the difference would be between a food
19 deprivation that is essentially orchestrated by the
20 interrogators to remove control, as compared with a
21 situation where a person just simply goes without
22 food by their own choice.
23        You can't distinguish what the
24 likelihood would be in either of those scenarios

Page 118

1  for a false confession; is that fair to say?
2      A.   Again, we can't quantify it.
3           If somebody has not eaten for
4  24 hours, it would -- the physical manifestations
5  of that deprivation would be the same whether they
6  requested or they didn't request food.
7           What you're asking would just go to
8  how it does or does not contribute to psychological
9  coercion.
10     Q.   What studies explore how food
11 deprivation impacts the likelihood of a false
12 confession?
13     A.   I don't know of any specific study that
14 explores that relationship directly.
15          Most false confessions do not have
16 food deprivation in them.
17          There is -- there's physiological
18 research on food deprivation, and the more common
19 deprivation, which is also present in Mr. Amor's
20 account, is, of course, sleep deprivation.
21          But there's no -- I can't quantify
22 it, and I can't point you to a study that I can
23 think of off the top of my head of just food
24 deprivation.

Page 119

1           There is a recognition in the
2  literature, as well as in law, that, based on what
3  we know physiologically that goes on in one's body
4  and one's mind when somebody is deprived of food
5  for significant periods of time, that that weakens
6  somebody to the point where they are at greater
7  risk for falsely complying with other people's,
8  particularly authority figures, requests.
9      Q.   And what is -- what are your sources
10 for that?
11     A.   The sources would be literature reviews
12 in the field.
13          The point is so generally accepted
14 that it doesn't -- there's no specific source
15 because, again, there's no -- there's no -- there's
16 no study that I can think of that's just on the
17 relationship between food deprivation and false
18 confession.
19     Q.   Okay.  So you consider it to be common
20 sense?
21     A.   I consider it to be so basic that it's
22 generally accepted in the scientific community.
23          I don't know whether it's common
24 sense.

Page 120

1           I would think that it's probably
2  not common sense because everything about false
3  confession seems to be beyond common sense.
4           Most people believe that false
5  confessions don't occur, and so I would not think
6  that it's common sense among a lay population.
7      Q.   All right.  In Section 2, you discuss
8  the Reid method of interrogation.
9      A.   Correct.
10     Q.   And one of the things that you discuss
11 in this section is that, as a basic premise, you
12 assert that officers should investigate before they
13 interrogate; correct?
14     A.   Correct.
15     Q.   And here you state that Bill Amor was
16 interrogated on October 3rd and 4th, 1995?
17     A.   Correct.
18     Q.   The fire occurred on September 10,
19 1995, right?
20     A.   Yes.
21     Q.   You'd agree with me that in that almost
22 one-month period from the time of the fire to the
23 time of Mr. Amor's -- strike that.
24          You would agree with me that there

Page 121

1  was almost one month from the time of the fire to
2  the time of Mr. Amor's interrogation?
3      A.   Correct.
4      Q.   Understanding that you did not review
5  the entire investigation file, you would agree with
6  me that the investigation -- that the investigation
7  did transpire over that one-month period.
8      A.   I would agree that there was some
9  investigation into this, yes.
10     Q.   You state that there's a consensus in
11 the scientific community about the Reid method.
12     A.   Correct.
13     Q.   What is that consensus?
14     A.   That the techniques taught by the Reid
15 method sometimes lead to or are involved in false
16 confession cases; that some of those techniques are
17 risk factors for false confession.
18     Q.   And what are the specific sources from
19 the scientific community that you're referring to
20 that draw this consensus?
21     A.   There are a number of articles.  The
22 2010 White Paper is an article that would review
23 the literature.
24          But there are other articles as well.

Page 122

1           There's a recent one by somebody
2   named Wyatt Kozinski.  K-o-z-i-n-s-k-i, I think is
3   how you spell his name.
4           But there have been freestanding
5   articles, there have been literature reviews, it's
6   been written about in books.
7           So it's part of the generally
8   accepted knowledge that the Reid method trains
9   police in techniques that are associated with and
10  believed to sometimes cause false confessions.
11      Q.   So you say in your report that, quote,
12  "substantial empirical research" end quote,
13  documents that the method can become -- can easily
14  become psychologically coercive.
15          And then you drop a footnote on
16  page 46 of your report that the Reid interview
17  method has been discredited?
18      A.   You say footnote 46?
19      Q.   Page 46, footnote 85.
20      A.   Okay.
21          Well, the Reid method -- the Reid
22  Behavior Analysis Interview method, yes.
23      Q.   Okay.  And so what -- what piece
24  specifically are you saying has been discredited?

Page 123

1       A.   So you -- I was previously describing
2   the Reid method of interrogation.
3           And this is a pre-interrogation
4   investigative method that Reid & Associates calls
5   behavior analysis, where you, if you follow the
6   Reid method, you ask somebody fifteen to twenty
7   hypothetical questions; and in the Reid training
8   you're supposed to look at the person's body
9   language and make a decision about whether or not,
10  based on their body language in response to the
11  questions, as well as the content of their answers,
12  whether they're telling the truth or lying.  And
13  that can become the basis for interrogating
14  somebody.
15          Essentially it is training the
16  person to be a human lie detector.  And that has
17  been discredited, the behavior analysis interview
18  method, pre-interrogation.
19      Q.   Got it.  So you're not asserting in
20  this report that the actual Reid methods of
21  interrogation have been discredited.
22      A.   No.  It's a different claim because the
23  Behavioral Analysis Interview method is teaching
24  investigators that, to a high level of accuracy,

Page 124

1   you can tell whether they're innocent or guilty
2   based on their body language and their response to
3   these hypothetical questions.
4           The Reid method of interrogation is
5   not about figuring out whether somebody is telling
6   the truth or lying; it's not about human lie
7   detection; it's about breaking down somebody's
8   denials and getting them to make a confession.
9           So it's been criticized as causing
10  and contributing to and sometimes leading to false
11  confessions, but it hasn't been discredited as
12  false because its goal is not to determine whether
13  somebody is lying or telling the truth, its goal is
14  to get a confession.
15          So it's a different -- it's a
16  different method, and therefore susceptible to a
17  different kind of critique.  It doesn't try to do
18  the same thing.
19      Q.   Okay.  You don't actually analyze in
20  your report to what degree the officers adopted the
21  Reid method, do you?
22      A.   No.  I don't think one could quantify
23  that.
24          And, again, we don't have a record.

Page 125

1           But, no, what I do is I say his
2   account describes these techniques, and these are
3   techniques -- these are the techniques that are
4   present in the Reid method.
5           It wouldn't really be possible to do
6   an analysis of degree without a -- without a
7   complete recording of what occurred.
8       Q.   I guess I'm trying to understand how
9   the Reid method specifically is a risk factor for a
10  false confession if you have separately parsed out
11  in the other portions of your opinion the specific
12  tactics, whether Reid or not, which you believe
13  were present in this case and created a risk for a
14  false confession.  That's what I'm trying to
15  understand.
16      A.   It would be more cumulative.  So it
17  would be a cumulative point.
18          But you're right, if -- if there
19  are five hypothetical Reid techniques that are
20  described in an analysis, and they are based on
21  the literature risk factors, that saying the Reid
22  method was used is -- could only be cumulative if
23  all of the separate elements of the Reid method
24  that increase the risk of a false confession were

Page 126

1  also analyzed.
2      Q.    Okay.  And in your report in this case,
3  as we're reviewing today, outside of your, you
4  know, number two, the Reid method of interrogation,
5  elsewhere in your opinion you identify each
6  specific tactic that you believe was a risk factor
7  increasing the likelihood of a false confession in
8  this case; correct?
9      A.    Yeah, correct.  Although, you know, in
10  the general aspect of the report -- in the general
11  description of the report, there's a place where I
12  talk about three errors.  The error of mis-
13  classification, the error of coercion, the error of
14  contamination.
15          And the analysis interview goes to
16  the error of misclassification.
17          The discussion of risk factors is --
18  goes to whether the confession's reliable.
19      Q.    I'm sorry, can you say that last part
20  one last time?
21      A.    Okay.  So the -- there is an analysis
22  of the Reid method of behavior analysis that's
23  separate from the Reid -- the analysis of specific
24  techniques that increase the risk of eliciting a

Page 127

1  false confession.  That was the only point I was
2  trying to make.
3      Q.    Got it.  Okay.
4          Okay.  Number three, which is on
5  page 27 of your report.  And this section
6  discusses lengthy interrogation, sleep deprivation,
7  exhaustion, and fatigue as a risk factor; correct?
8      A.    Yes.
9      Q.    You state that lengthy interrogations
10  can increase the risk of a false or unreliable
11  confession?
12      A.    Correct.
13      Q.    How are you defining a lengthy
14  interrogation?
15      A.    Well, I think I describe in here that
16  the -- the -- 95 percent of interrogations last
17  less than two hours.
18          So as a statistical matter, I would
19  say anything in the range of two hours or longer is
20  a long interrogation.
21          And what we see in the studies of
22  proven false confessions is that I think more than
23  50 percent of them last longer than six hours.
24          So -- so that's how I would define a

Page 128

1  long interrogation.
2          And, by any measure, 15 hours
3  is a very long interrogation, or period of
4  interrogation, detention, and custody.
5      Q.    Has your definition of a lengthy
6  interrogation changed at all when dealing in the
7  present as compared with an interrogation that
8  occurred in 1995?
9      A.    No.  It's just based on the research.
10          So, no, I don't -- I wouldn't change
11  the definition.
12          If there subsequently comes to be
13  new studies in the literature that have different
14  findings, then, yeah, I might adjust.
15          If 95 percent is an hour or longer,
16  or if it's four hours or longer, sure.  But that's
17  not the state of the literature now.
18      Q.    Did you ever define in any of your
19  publications a lengthy interrogation as one that
20  lasted as least a duration of six hours?
21      A.    I don't recall if I have defined that
22  as a lengthy interrogation in one of my
23  publications.  It's certainly possible.
24      Q.    Would you agree with me that a lengthy

Page 129

1  interrogation alone cannot cause a false or
2  unreliable confession?
3      A.    Yeah, I don't think it can cause a
4  false confession or would likely cause a false
5  confession, but it certainly would contribute to a
6  false confession.
7      Q.    You claim in your report that even time
8  that is not spent being interrogated, it's still
9  important because the suspects are, I think you
10  used the phrase "stewing"; is that correct?
11      A.    Yeah, it contributes to the fatigue,
12  just like the breaks in this deposition contribute
13  to fatigue, or in a seminar, right?  It's not the
14  actual time of questioning that is affecting, by
15  itself, the physiological effects of the duration
16  of the event.
17      Q.    And what studies support the idea that
18  stewing can cause false confessions?
19      A.    Well, I never said stewing can cause
20  false confessions.
21          And your last question about length
22  of interrogation not causing false confessions of
23  course recognizes that.
24          The -- the classification of the

Page 130

1 entire time is the way in which researchers count
2 length of interrogation. And that's based on an
3 analysis of the effect of time on somebody's
4 ability to resist.
5        And that's discussed in a number of
6 studies. There are some that are specifically
7 about sleep deprivation, but there are others that
8 are just about physiological mental regulation, so
9 to speak, during an interrogation, and how a
10 greater length of time in custody affects one's
11 ability to comprehend and resist what's going on.
12    Q.   What studies specifically address the
13 idea that the length of interrogation should be
14 defined as the total amount of time, regardless of
15 the amount of breaks, that the individual is given,
16 when determining whether it's a risk factor for a
17 false confession?
18    A.   It's discussed in a number of studies.
19 I know it's discussed in my studies on proven false
20 confessions. I think it's discussed in literature
21 reviews, in books. But I can't point to you one
22 study that is just about that. It's an accepted
23 way of classifying one variable.
24    Q.   You reference it in your report, and I

Page 131

1 think you referenced it in your testimony, that,
2 according to you, the overwhelming majority of
3 routine custodial interrogations last less than one
4 hour? Is that correct?
5    A.   Correct, yeah.
6    Q.   What percentage do you consider to be
7 the overwhelming majority?
8    A.   I would have to -- I would have to look
9 at the studies. It may be that one of the studies
10 I was referring to was Inside the Interrogation
11 Room.
12        So, you know, the overwhelming
13 majority I would think would be 50 or 60 percent or
14 more, you know? Something that's not barely over
15 50 percent, but that's more, well over 50 percent.
16    Q.   Does it vary by the type of crime?
17    A.   I'm sure it does vary by the type of
18 crime.
19        I don't have those statistics at my
20 fingertip.
21    Q.   Are there any studies that specifically
22 examine the average length of a homicide
23 interrogation?
24    A.   Not to my knowledge.

Page 132

1    Q.   Are there any studies that
2 specifically examine the average length of an arson
3 interrogation?
4    A.   Not to my knowledge.
5    Q.   You indicate on page 28 of your report
6 that, quote, "The combined time period of custody
7 and interrogation in most interrogations leading to
8 a false confession is more than six hours."
9        Is that correct?
10    A.   I believe so.
11    Q.   What percentage do you consider to be
12 most interrogations?
13    A.   More than 50 percent.
14    Q.   Are there any studies that look into
15 interrogations of the same length that did not
16 result in an unreliable or a false confession?
17    A.   Not to my knowledge.
18    Q.   Applying this risk factor to this case,
19 you understand that Bill Amor was not in custody on
20 October 3rd, 1995?
21    MS. GARCIA:  Objection to form. Calls for a
22 legal conclusion.
23    THE WITNESS:  I assume what you're asking
24 me -- correct me if I'm wrong -- is that a judge

Page 133

1 said he wasn't in legal custody.
2 BY MS. RANUM:
3    Q.   So are you characterizing his
4 interrogation as a custodial interrogation?
5    A.   Yes.
6    Q.   And what is your basis for doing so?
7    A.   That in his description of what
8 occurred, he did not perceive himself free to leave.
9    Q.   Is your analysis of the various risk
10 factors that we're walking through now dependent on
11 your assumption that Bill Amor's interrogation was
12 a custodial interrogation?
13    A.   No. It depends on what you mean by
14 "custodial," but it -- obviously that is a legal
15 category, right?
16        Based on his description, my opinion
17 is that it was custodial in that it occurred in
18 custody, and he didn't perceive he was free to go.
19        But if there is a judge or judges
20 who say, as a legal matter, it was not custodial,
21 that doesn't change any of my analysis or
22 conclusions.
23    Q.   Mr. Amor's interrogation at the
24 Naperville Police Department on October 3rd started

Page 134

1 around 11:37 p.m.; correct?
2      MS. GARCIA: Object to form. Foundation.
3 Also calls for a legal conclusion.
4      THE WITNESS: My recollection is that there
5 was a Miranda form that is dated around 11:37, and
6 that Mr. Amor states that his recollection was that
7 it started 15 to 20 minutes earlier.
8           Without a recording, I don't know
9 exactly when it started, but I think that's the
10 representation of the police.
11 BY MS. RANUM:
12      Q.   And Mr. Amor confessed sometime shortly
13 after midnight?
14      A.   I believe that's right.
15      Q.   So at least in terms of the
16 interrogation that occurred at Naperville Police
17 Department, it wasn't very long at all; correct?
18      MS. GARCIA: Object to form.
19      THE WITNESS: Yes. But that's so misleading
20 because there were many hours of custody,
21 interviewing, and interrogation that preceded it.
22 BY MS. RANUM:
23      Q.   To what degree did the length of this
24 interrogation increase the risk that Mr. Amor would

Page 135

1 falsely confess?
2      A.   Again, I can't quantify that. I can
3 just say that it is a well known risk factor, and
4 that this was a very long interrogation. But I
5 can't -- I can't give you a statistic, a meaningful
6 statistic.
7      Q.   You talk about sleep deprivation, and
8 you state that substantial research shows that
9 sleep deprivation would increase the likelihood
10 that Mr. Amor would agree to a false or unreliable
11 statement; correct?
12      A.   Yes.
13      Q.   How are you defining sleep deprivation?
14      A.   As a disruption of one's normal
15 expected sleep and sleep routines.
16           Most people sleep 7 to 9 hours a
17 night on 24-hour cycles. As documented in the
18 report, Mr. Amor said he hadn't -- he had gotten
19 two and a half to three hours of sleep the night
20 before. If I'm remembering correctly, I think he
21 said 4 on the Reid & Associates intake form.
22           And then, of course, he didn't get
23 any sleep that night prior to the interrogation and
24 final confession taken very early in the morning.

Page 136

1      Q.   So part of the relevant inquiry is
2 whether the lack of sleep involved in a case is a
3 deviation from the suspect's typical sleep pattern;
4 correct?
5      A.   Right.
6      Q.   Because some people just go on less
7 sleep than others; fair to say?
8      A.   Yes. Although my understanding is that
9 most people sleep within a range or need, in order
10 not to be objectively sleep deprived, a range of
11 7 to 9 hours, most adults.
12      Q.   Did you take any steps to explore what
13 Mr. Amor's normal sleeping pattern was in or around
14 1995?
15      A.   No.
16      Q.   Did you take any steps to explore how
17 sleep -- the sleep dep- -- effects of sleep
18 deprivation impact Mr. Amor personally?
19      A.   I don't think that's possible. So, no.
20           I'm applying a general body of
21 research that's very well documented on the effects
22 of sleep deprivation, which is believed to apply,
23 you know, to humans universally.
24           And recognizing the obvious fact

Page 137

1 that, by his description, he was incredibly sleep
2 deprived, and connecting it to the literature on
3 sleep deprivation and false confessions and
4 pointing out that it is a recognized risk factor.
5      Q.   So you keep referencing that there's --
6 that this all through the literature, and you
7 actually say in your report "substantial
8 research supports sleep deprivation and lengthy
9 interrogation, as well as fatigue, exhaustion, and
10 depletion of psychological resources contribute to
11 and produce -- contribute to and produce,
12 substantially increase the likelihood that Mr. Amor
13 would agree to make a false and unreliable
14 statement."
15           Where is the cite to that
16 substantial research in your report?
17      A.   Can you tell me what page you're
18 referring to?
19      Q.   On page 29. It's the last paragraph of
20 your Section 3. It's actually the last sentence.
21      A.   So it looks like footnote 47 refers to
22 some of that research, as does footnote 45 and
23 footnote 46. So those are the three footnotes
24 that, in this report, refer to that research.

Page 138

1    Q.   So you mentioned that studies show that
2  most adults need 7 to 9 hours of sleep per night?
3    A.   That's my recollection, yes.
4    Q.   So then is your understanding of the
5  studies that if someone has received less than
6  7 hours of sleep on average, they are at an
7  increased vulnerability to falsely confess to a
8  crime?
9    A.   That would be my understanding of the
10 general literature on sleep deprivation, yes.
11   Q.   And, again, you can't quantify what
12 that increased risk would be; correct?
13   A.   I don't think anybody could quantify
14 that, correct.  It's not possible.
15   Q.   Are there studies that look at sleep
16 deprivation alone as a risk factor for a false
17 confession?
18   A.   Yes.
19   Q.   And is that the study in footnote 47
20 that you refer to by Mark Blagrove?
21   A.   Yes.  And then, more recently, the
22 Frenda, et al. study that is also referred to in
23 the footnote.  And I think there are a couple
24 others.

Page 139

1    Q.   Did you see anything in the record to
2  indicate -- well, strike that.
3         You don't live in the Chicagoland
4  area; correct?
5    A.   Correct.  Yeah, I did many years ago,
6  but I don't -- I haven't for 30 years.
7    Q.   Oh, you did many years ago.  So I
8  don't -- do you know approximately how long of a
9  drive it is from downtown Chicago to Naperville?
10   A.   Well, I'm sure it would have changed.
11 I lived there in the late '80s, and I suspect
12 traffic was not as bad as it is now.  But my
13 recollection is that it's anywhere from 45 minutes
14 to an hour and a half.
15   Q.   Did you see anything in the record to
16 indicate that Mr. Amor could not have slept in the
17 car on their drive back to the Naperville Police
18 Department on October 3rd?
19   A.   If your question is that it was not
20 physically possible, no.  I think he reported that
21 he did not physically -- he did not sleep.
22        But if your question is, was it
23 possible that a human in that car could have slept,
24 that they weren't being prevented, through active

Page 140

1  conversation or distraction from sleeping, I don't
2  think so.
3         We don't have a record.  It wasn't
4  recorded, so all we're going on is what the various
5  participants would have said.
6    Q.   And Mr. Amor has testified about how
7  once he was at the Naperville Police Department, he
8  was served with divorce papers; correct?
9    A.   Correct.
10   Q.   And you talk a little bit in your
11 report about the impact that that had on him, and
12 we'll talk about that.
13        But would you agree that receiving
14 the divorce papers would have likely made him less
15 sleep -- sleepy and more aroused?
16   MS. GARCIA:  Objection to form, foundation,
17 calls for speculation.
18   THE WITNESS:  I would have agreed that that
19 would have been a substantial shock to the system
20 regardless of how sleep deprived he was.
21 BY MS. RANUM:
22   Q.   Do the studies about sleep deprivation
23 and interrogation, do they address the notion of
24 adrenaline at all and how adrenaline can impact a

Page 141

1  sleep-deprived individual?
2    A.   Not the specific ones on false
3  confession.  The general literature I suspect does.
4  But I don't know.
5    MS. RANUM:  So I would actually suggest we're
6  like 3 hours and 15 minutes in, and I'm going to
7  need a bathroom break.  So does it make sense to
8  maybe take a short break so that everyone can -- I
9  feel like we're kind of at a good lunch break point
10 in terms of it's about 12:15 by you and it's about
11 2:00 in the afternoon by us.  So does it make sense
12 to take a lunch break for everybody right now?
13   THE WITNESS:  I think so.  I need to walk my
14 dog, which is about 15 or 20 minutes.  I think I
15 can do that and eat in a half hour.  If we want to
16 take a half hour lunch break, I can do my best to
17 be back in a half hour.
18   MS. RANUM:  Okay.  Why don't we plan on
19 reconvening at 2:45 Central Time.
20   THE WITNESS:  Okay, great.  Thank you so much.
21   VIDEO TECHNICIAN:  We're off the video record
22 at 2:14 at the end of media unit two.
23        (Recess taken.)
24   VIDEO TECHNICIAN:  We're going back on the

Page 142

1 video record at 2:49 at the beginning of media unit
2 three.
3 BY MS. RANUM:
4      Q.    Okay.  Dr. Leo, we left off before the
5 break, we were talking about the different risk
6 factors that you have identified in your report
7 which you find to be present in Mr. Amor's
8 October 1995 interrogation.
9            I'd like to move on to what you
10 identify as number four on page 29 of your report,
11 which is rush to judgment based on a premature
12 presumption of guilt, presumption of guilty
13 knowledge, and investigative bias.
14            How are you defining the presumption
15 of guilt that you find to be present here?
16      A.    From Mr. Amor's description of what
17 occurred during his interrogation, it is my opinion
18 that the whole thing was a setup to get him to
19 confess from start to finish, and so they had
20 determined that it was an arson, and that he
21 committed the arson intentionally.
22            And that presumption of guilt is
23 consistent with research on interrogation and on
24 Reid-based interrogation.

Page 143

1      Q.    So you're basing your opinion on what
2 Bill Amor describes as the investigator's tactics
3 with him?
4      A.    Correct.  And approach.
5      Q.    And what about the approach does he
6 describe that leads you to state that there is a
7 presumption of guilt in this case?
8      A.    Well, once he starts getting
9 interrogated, he's describing a guilt-presumptive
10 interrogation.
11            The -- we don't have a record of the
12 polygraph.  Polygraphs are often used as an adjunct
13 to interrogation, and they're often used to get an
14 admission the suspect has not already confessed.
15      Q.    So you said it was a guilt-presumptive
16 interrogation.  And you're referring to once they
17 were back at the Naperville Police Department?
18      A.    Yes.  But I would have to review my
19 notes here just to -- it might have occurred
20 earlier.
21            I would say at least -- sorry, I'm
22 on the wrong page.  Hold on a second.
23      Q.    Just so I know, are you reviewing your
24 report right now, or are you reviewing something

Page 144

1 else?
2      A.    No, no, I'm just reviewing my report.
3            Yeah, what I'm saying in my report
4 is that his description of what occurred at Reid &
5 Associates, is that it appears to me that it was
6 the guilt-presumptive interrogation from the start.
7            But we don't have a record of that,
8 as you know, and so I don't know if it began at
9 Reid & Associates as a guilt-presumptive
10 interrogation, or whether it became one, based
11 on -- based on his account.
12      Q.    Okay.  And you indicate, at the end of
13 this section, "These type of biases have been
14 documented in many psychological studies, and in
15 cases of police-induced false confession and
16 erroneous conviction of the innocent.  The
17 investigators' rush to judgment, and premature
18 presumption of Mr. Amor's guilt substantially
19 increased the risk that they would elicit false
20 and unreliable incriminating statements,
21 admissions, and/or confessions."
22            Did I read that correctly?
23      A.    Yes.
24      Q.    Is this a risk factor that is analyzed

Page 145

1 in any of the studies that you cite to?
2      A.    I believe so.  Let me see the studies
3 that I cite to.
4            Yes, in footnote 48 there's a 2003
5 study.
6            I believe in the 2011 study as well,
7 it's cited in footnote 48.
8            The same study -- one of the same
9 studies is cited in footnote 50 as well.
10      Q.    So in one of your previous opinions we
11 discussed as a risk factor, you criticized the
12 officers for what you believed was an interrogation
13 before there had been enough of an investigation.
14 Do you remember testifying about that?
15      A.    Yes.
16      Q.    So is that the same rush to judgment
17 that you're referring to in paragraph -- in the
18 numbered paragraph 4 on page 29 of your report?
19      A.    Yes.
20      Q.    In cases where there's a premature
21 presumption of guilt that have been studied in the
22 literature, what's the average passage of time from
23 the time of the crime to the time of the allegedly
24 unreliable confession?

Page 146

1    A.    Some of the studies would be
2 experimental, so it would be experimentally-induced
3 confessions.
4         I don't recall what the passage of
5 time is.
6         And in the real world cases, I don't
7 know if that's ever been quantified either.
8    Q.    Is this something that, in your
9 experience, you tend to see as an issue when the
10 investigation unfolds very quickly?
11    A.    This being a premature rush to judgment
12 of a presumption of guilt, yes, it does tend to
13 happen when the investigation unfolds quickly.
14         Obviously he was in jail for three
15 weeks.  But, yeah, in many cases it happens in a
16 short period of time.
17    Q.    And the officers continued to
18 investigate the case while Mr. Amor was at the
19 DeKalb County Jail; correct?
20    A.    Yes.
21    Q.    Page 30.  On page 30, towards the
22 bottom, maybe about eight lines up from the bottom,
23 you say, "There was no evidence that Mr. Amor had
24 set the fire, and in my view, no probable cause to

Page 147

1 arrest Mr. Amor."
2         The statement that there was no
3 evidence that Mr. Amor had set the fire, what are
4 you basing that statement on?
5    A.    Well, I'm basing it on my analysis of
6 the totality of the case file prior to his
7 interrogation-induced incriminating statements.
8    Q.    Based on the documents that you
9 received; correct?
10    A.    Correct.
11    Q.    But, again, you did not review all of
12 the investigation file from the Naperville Police
13 Department; correct?
14    A.    That -- that appears to be the case.
15 That's what you're saying, yeah, that I didn't
16 review every single document.
17    Q.    So without having reviewed the entire
18 investigation file, you can't really make a
19 statement about whether there was any evidence that
20 Mr. Amor had started the fire or not, can you?
21    MS. GARCIA:  Object to form.  Also asked and
22 answered.
23    THE WITNESS:  Of all the materials, the
24 thousands of pages of materials I reviewed, I did

Page 148

1 not see any evidence.
2         My opinion is based on the materials
3 I reviewed, of course.
4 BY MS. RANUM:
5    Q.    Now, on page 30, you also state there
6 is no -- in that same sentence you made a reference
7 that you did not believe there was probable cause
8 for his arrest, you are not rendering an opinion in
9 this case on whether there was probable cause for
10 arrest, are you?
11    A.    Not as a legal matter, no.
12    Q.    You state in that same sentence, you
13 say, "In my -- there was no evidence that Mr. Amor
14 had set the fire, and, in my view, no probable
15 cause to arrest Mr. Amor as they did later in the
16 evening prior to the interrogation sessions that
17 would lead to confession statements from Mr. Amor."
18         So I can't tell from that statement,
19 are you -- is it your understanding that Mr. Amor
20 was arrested prior to his October 3rd interrogation?
21    A.    No.  That -- it's my recollection that
22 when they came to get him out of the jail, they had
23 not arrested him.
24    Q.    You indicate at the top of page 31 that

Page 149

1 no evidence exists that it was an arson.  Do you
2 see that?
3    A.    Correct.
4    Q.    And I know we talked about this a
5 little bit when we spoke about your opinion
6 regarding the proven false confession, but in your
7 past testimony, have we exhausted your basis for
8 why you believe there was no evidence that an arson
9 was committed here?
10    A.    No, I think I stated the basis for that
11 both on the prior testimony and in the report.
12    Q.    Okay.  To what degree did this
13 investigator bias that you identify as a risk
14 factor increase the likelihood that Bill Amor would
15 provide a false or unreliable confession?
16    A.    So, again, I'm interpreting your
17 question as looking for a number between zero and a
18 hundred, and it's not possible for anyone, me or
19 anyone else, to quantify statistically that number
20 that you're looking for.
21    Q.    Would you agree that investigator bias
22 on its own would not cause a person to falsely
23 confess to a crime?
24    MS. GARCIA:  Object to form.

Page 150

1      THE WITNESS:  It's hard to answer that
2  question because it -- my first thought is, if I
3  try to imagine investigative bias disaggregated
4  from the context of this interrogation, there's no
5  interrogation, there's just bias.  And so if there
6  is bias without interrogation, then, of course, by
7  itself, it would not lead to a false confession.
8  BY MS. RANUM:
9      Q.    Page 32, number five, the next risk
10  factor that you identify is what you call false
11  evidence ploys.
12      A.    Correct.
13      Q.    How are you defining a false evidence
14  play?
15      A.    Any representation that there is
16  evidence linking a suspect to the crime which is,
17  in part or in whole, false.  Representation by the
18  interrogator.
19      Q.    So a false evidence ploy occurs when
20  the investigator essentially makes some sort of
21  fabricated representation to the suspect?
22      A.    Typically, yes.  But as I describe in
23  the report, telling somebody that they failed a
24  polygraph, in my view, is an inherently false

Page 151

1  accusation because the polygraph cannot determine
2  whether somebody's lying or telling the truth, and
3  so it's merely an opinion that is represented as
4  fact.
5          And so it's a little bit more
6  complicated because it could be that somebody
7  actually did fail the polygraph, and they are being
8  told this is evidence -- you failed it, this is
9  evidence of your guilt.
10          But because it's bogus evidence,
11  it's a false evidence ploy, even though it may be
12  an accurate representation of what is called the
13  polygraph result.
14      Q.    So let's start with that.  So you
15  identify two false evidence ploys in your report.
16  The first one is the polygraph result, which you
17  just testified a little bit about.
18      A.    Correct.
19      Q.    You indicate in your report that you
20  haven't seen any evidence that the results were
21  accurately relayed to Mr. Amor, but have you seen
22  any evidence in this case that Bill Amor did not
23  fail the polygraph and then was falsely told that
24  he did?

Page 152

1      A.    I have not -- I do not recall seeing
2  any evidence one way or the other whether the
3  polygraph was accurately scored, if that's the
4  question.
5      Q.    Okay.  So do you have -- you wrote a
6  book in 2008 called Police Interrogation and
7  American Justice.  Correct?
8      A.    Yeah.  Give me just a second.  Sorry.
9  It's on my bookshelf.  I forgot to pull it down.
10      Q.    Okay.
11      A.    Okay, I'm back.
12      Q.    So I'm going to ask you about it in a
13  minute, but I guess -- so I'm trying to understand,
14  so in your report you talk a little bit about how
15  the polygraph is a false evidence ploy.
16          Even if it was scored and the
17  results were communicated accurately, you still
18  believe the polygraph to be a false evidence ploy?
19  Am I understanding your report correctly?
20      A.    That is correct, yes.
21      Q.    And why is that?
22      A.    Essentially because the polygraph is
23  junk science.
24          So the theory of the polygraph is

Page 153

1  that when people are lying, they experience
2  differential emotions -- emotional arousal that are
3  graphically registered -- there's four different,
4  heartbeat, perspiration, et cetera -- that's
5  graphically registered on the polygraph exam.
6          And the reason why that's a
7  theoretically -- theoretically flawed is because
8  there's no unique physiological reaction in human
9  behavior to lying.  So it's not like Pinocchio,
10  where every time we lie we -- our nose grows.
11          Any behavior that -- any response,
12  behavioral response that demonstrates greater
13  emotional arousal could be explained by a number
14  of possibilities.
15          And so theoretically the lie
16  detector does not make any sense because there's no
17  unique behaviors associated with deception and
18  lying.
19          And then empirically, there are a
20  number of studies that show high error rates.  And
21  essentially when somebody is told they failed the
22  polygraph, it's just the opinion of the polygrapher.
23          So because it's junk science, like
24  other junk science, there's no reason to put any

Page 154

1 confidence in its results.  But police do.  Some
2 police actually believe that these are accurate and
3 truthful lie verification machines, and others know
4 that it -- don't believe that, and know that it's
5 really just an interrogation strategy.
6         So that's the reason why I don't put
7 any credence in any polygraph result regardless
8 whether somebody is told they passed or told they
9 failed, and why I regard it as an inherent false
10 evidence ploy.
11         It would be like having a Ouija
12 board and saying, well, the Ouija board shows that
13 you're guilty, you lied.
14         Well, maybe in the -- maybe if
15 there was a Ouija board society, that would be an
16 accurate interpretation of the Ouija board,
17 according to the Ouija board society.
18         But anybody who knows the science
19 and the studies, the empirical studies, should know
20 that it's just as reliable as a Ouija board, and
21 that regardless of what the Ouija board operator or
22 the polygrapher says, there's no reason to trust
23 that as a factually accurate representation of any
24 evidence.

Page 155

1     Q.    When did you first start considering a
2 polygraph to inherently be a false evidence ploy
3 regardless of the circumstances of the specific
4 case?
5     A.    I do not recall.
6     Q.    Did you ever -- well, strike that.
7         Has that always been your opinion?
8     A.    I don't know.
9         It's -- it's possible that in my
10 early years I didn't -- I didn't think of it as an
11 inherent false evidence ploy.
12         I just don't recall when I came to
13 that conclusion.
14     Q.    Do you know what caused you to come to
15 the -- to reach the new conclusion?
16     A.    No.  I mean, if you just think about
17 it, sometimes when you think about some -- first of
18 all, I may have had this conclusion all along.  I
19 just don't know.
20     Q.    Well, if you look at page 192 of your
21 2008 book, on the chapter about constructing
22 culpability.
23     A.    Yes.
24     Q.    In the first full paragraph on the

Page 156

1 page, you make a reference to a false failed
2 polygraph as a form of a false evidence ploy.  But
3 I'm not seeing anything that indicates at that time
4 that your methodology included encompassing all
5 polygraphs into your definition of a false evidence
6 ploy.
7     A.    Right.  This chapter is not about false
8 evidence ploys, but -- so it just mentions, as an
9 example of the point that it's trying to make, a
10 false failed polygraph result.
11     Q.    Okay.
12     A.    I don't see anything inconsistent here
13 with my view that polygraphs are inherently false.
14         The representation that a polygraph
15 shows you're lying and therefore guilty is
16 inherently a false evidence ploy.
17     Q.    But you don't know whether you always
18 defined a false evidence ploy to include any
19 polygraph examination or not.
20     MS. GARCIA:  Object to form.
21     THE WITNESS:  I don't recall if there was a
22 time when I would have not referred to a polygraph
23 as an inherent false evidence ploy.  I just don't
24 recall.

Page 157

1 BY MS. RANUM:
2     Q.    If Bill Amor did lie during the
3 polygraph, a communication of a finding of
4 deception would likely have had very little impact
5 on him since he already knew that he lied.  Would
6 you agree with that statement?
7     MS. GARCIA:  Object to form.
8     THE WITNESS:  No.
9 BY MS. RANUM:
10     Q.    Mr. Amor took a polygraph in September
11 of 1995, and then the one on October 3rd of 1995;
12 is that correct?
13     A.    Okay.  Yes.
14     Q.    How does the fact that Mr. Amor did not
15 confess after the first polygraph impact your
16 analysis of the October 3rd polygraph examination
17 as a false evidence ploy that created a risk for a
18 false confession?
19     A.    I just don't remember the specifics of
20 the first polygraph.  I'd have to review that.
21         But it doesn't impact my analysis.
22         I think that the polygraph here
23 occurred in a context, a very psychologically
24 coercive context.  So I think it's a little

Page 158

1 artificial to strip it from context.

2      But I don't recall thinking that
3 there was any relation between the first or the
4 second polygraph in terms of the second polygraph's
5 contribution to the psychological coercion for his
6 false confession.

7      Q.   Are there studies that examine the
8 impact of a communication of a failed polygraph on
9 a suspect as a correlator to a false or unreliable
10 confession?

11      A.   There are studies about false evidence.
12 I don't know that there are studies just about
13 polygraphs as a false evidence ploy.

14      Q.   Okay.  To what degree do you believe
15 this increased the likelihood of Mr. Amor providing
16 a false or unreliable confession?

17      A.   So again I would give the same answer I
18 had given before, that I can't quantify, nobody in
19 the world could quantify the number between zero
20 and a hundred that I interpret your question to
21 be asking for.  It's simply not possible
22 scientifically.

23      Q.   You are not saying that it's
24 inappropriate for an officer to confront a lying

Page 159

1 suspect; correct?

2      A.   Of course not.

3      Q.   Your research that led to your
4 publication in 1996 of Inside the Interrogation
5 Room suggests that false evidence ploys are fairly
6 common.  Would you agree with that?

7      A.   Yes.

8      Q.   And in your -- we can refer back to it,
9 if you'd like to, but in your article, you reported
10 that, of the interrogations that you observed, the
11 suspect was confronted with false evidence of guilt
12 in 30 -- 30 percent of the time; is that correct?

13      A.   Correct.

14      Q.   And again in that same study, with that
15 same set of interrogations, you only found that
16 2 percent of the interrogations were coerced;
17 correct?

18      A.   Correct.

19      Q.   The second false evidence ploy that you
20 state occurred here was when Mike Cross told Bill
21 Amor that Tina Miceli said she now believed that
22 Bill had intentionally started the fire; is that
23 correct?

24      A.   Yes.

Page 160

1      Q.   According to your report, Detective
2 Cross lied about what Tina said, telling Bill that
3 she believed he set the fire intentionally, when in
4 fact she had said that she believed he set the fire
5 accidentally?

6      A.   Correct.

7      Q.   Why was that significant?

8      A.   Well, the reason anything would be
9 significant, the difference between intentional and
10 accidental, that he's imputing intent to Mr. Amor
11 through Tina's accusation.

12      I haven't looked at the elements of
13 arson, but I assume that the difference between
14 intentionally and accidentally starting a fire goes
15 to the elements of whether something is an arson.
16 And it certainly goes to whether somebody is more
17 or less culpable for that act.

18      Q.   So your opinion that this was a false
19 evidence ploy depends on the fact that Detective
20 Cross was told by Tina that she only believed he
21 started the fire accidentally; correct?

22      MS. GARCIA:  Object to form.

23      THE WITNESS:  Yeah -- yes.  Also that it's
24 just her opinion.  And my interpretation of

Page 161

1 Mr. Amor's description is that he interpreted it as
2 evidence.

3 BY MS. RANUM:

4      Q.   How is that a false evidence ploy?

5      A.   Well, she -- her opinion has nothing to
6 do with actual evidence of starting or not starting
7 the fire.  And if her opinion is that it was -- he
8 started it accidentally, that's different than if
9 her opinion is he started it intentionally.

10      So it's a false representation of
11 her opinion, number one; and, number two, her
12 opinion is a false representation of actual
13 evidence.

14      Q.   Did you see anywhere on the record that
15 any investigator ever told Bill Amor that Tina was
16 willing to testify against him?

17      A.   I don't recall.

18      Q.   You would agree with me that Mr. Amor
19 confessed shortly after being confronted with the
20 divorce papers from Tina; is that fair to say?

21      A.   Yes.

22      Q.   And of the cases you reviewed in your
23 studies, how many false confessions have happened
24 after a person was informed that their spouse was

Page 162

1  divorcing them?
2      A.    I can't think of a single case.  And
3  it's certainly possible there are one or two where
4  the issue of divorce has come up, but I would be
5  surprised, and I cannot recall ever seeing somebody
6  served with divorce papers during an interrogation.
7            I think this is unique in the
8  history of American interrogation, as best I can
9  tell.
10     Q.    Do you have any evidence to suggest
11 whether someone would be more likely to confess
12 truthfully after a spouse says that they want a
13 divorce, or whether they would be more likely to
14 confess falsely?
15     A.    Because it's such a unique event, there
16 is no study on that.  But I think it stands to
17 reason, as a hypothesis, based on the existing
18 literature, that anything that traumatic,
19 especially not just being told, but being served
20 with divorce papers, would have a profound effect
21 on someone.
22     Q.    What do you mean by a profound effect?
23     A.    That it would cause them likely to
24 experience psychological destabilization.  If any

Page 163

1  of us learned that our spouses were going to
2  divorce us, in the middle of a very long
3  interrogation, and we had no idea that our spouses
4  were going to divorce us, I think it would, as I
5  said earlier in the deposition, I think it would
6  just be a profound or stunning shock to the system
7  if one actually believed that.
8            And, of course, presenting somebody
9  with divorce papers is different than just telling
10 them, your spouse told us she's going to divorce
11 you or he's going to divorce you.
12           So it's hard for me to imagine,
13 short of being told about the death of a child, or
14 maybe even the death of a parent, an event that is
15 more traumatic than being blindsided by divorce
16 papers in any context.
17           So that's what I mean by it.
18     Q.    And your understanding, from your
19 review of the record, was that up to that point
20 Mr. Amor was not aware that Tina had any intention
21 of divorcing him?
22     A.    That is my understanding, yes.
23     Q.    All right.  Page 34, number six, you
24 identify minimization as a risk factor in this case.

Page 164

1  Correct?
2      A.    Yes.
3      Q.    And you only provide one instance of
4  minimization, and that was minimization that you
5  state was done by polygraph examiner Mike Masokas?
6      A.    I believe so, yes.  Well, he suggested
7  reasons why Mr. Amor would have set the fire, and
8  so I think I give more than one reason; that he had
9  acted out of character, or he had been drinking the
10 night of the fire, or something just came over him.
11           So, yes, one -- one of the
12 interrogations, only the one by the -- Mr. --
13 Mr. Masokas, but three different examples.
14     Q.    Okay.  Mr. Amor did not confess to
15 Mr. Masokas; correct?
16     A.    Correct.
17     Q.    And you indicate that Mr. Masokas
18 suggested that perhaps Mr. Amor, quote, "was talked
19 into it, or acted out of character, or had been
20 drinking the night of the fire and something just
21 came over him."  End quote.  Correct?
22     A.    Yes.
23     Q.    Mr. Amor's confession later that
24 evening did not include any statement that he was

Page 165

1  talked into setting the fire; correct?
2      A.    Correct.
3      Q.    Mr. Amor's confession later that
4  evening did not include a statement that he acted
5  out of character; is that correct?
6      A.    Correct.
7      Q.    Mr. Amor's confession did not include a
8  statement that he had been drinking and something
9  just came over him; correct?
10     A.    To my knowledge, yes.
11     Q.    You've reviewed his confessions;
12 correct?
13     A.    Yes.
14     Q.    If Mr. Amor did not adopt any of the
15 suggestions that Mr. Masokas offered him at Reid,
16 how are -- how is that example of minimization
17 relevant to your opinion?
18     MS. GARCIA:  Object to form.
19     THE WITNESS:  So the opinion is that this was
20 a risk factor that was present in the interrogation.
21           We don't have a record, as you know.
22           Minimization can influence people's
23 reactions even if they don't adopt the minimized
24 account because oftentimes the minimized account is

Page 166

1 like a foot-in-the-door technique.
2        So if a suspect admits to a
3 minimized account, that is then leveraged to get
4 the suspect to admit to the more intentional
5 account that the interrogator is driving for.
6        If there had been a recording of
7 this interrogation, then we could parse that out
8 whether or not that occurred.
9        Of course, we don't.
10       So it could be relevant, we just
11 don't know; but regardless of whether it's
12 relevant, it was a risk factor present in the --
13 in one of the interrogations over the course of the
14 lengthy time that ultimately led to his statement.
15   Q.   And it's not illegal or
16 unconstitutional for an interrogator to minimize
17 while interviewing a suspect; correct?
18   MS. GARCIA:  Calls for a legal conclusion.
19   THE WITNESS:  Most minimization techniques,
20 in my view, are not -- do not violate any
21 constitutional stricture regulating interrogation.
22 BY MS. RANUM:
23   Q.   To what degree did Mr. Masokas'
24 minimization tactics increase the likelihood that

Page 167

1 Bill Amor would falsely confess?
2    A.   Again you're asking for a statistical
3 number.
4        And I just want to make a comment
5 here.  The same thing that I'm saying is true here
6 I believe is true in other areas of risk factors.
7        So we know that obesity and smoking
8 and genetics and family history and diet are all
9 risk factors for heart disease, and there are
10 studies that have statistics.  But you can't even
11 infer from those studies what the exact degree of
12 risk is if somebody has one of those.
13       You know, if somebody's obese, you
14 can't say that they're 20 percent more likely to
15 get a heart attack, even though there might be
16 studies of obesity and the relationship between
17 obesity and heart attack.
18       So it's simply not possible.
19       You've asked this question about
20 every risk factor so far, and I assume you're going
21 to continue asking it about the remaining risk
22 factors.  It's not possible as a scientific or
23 statistical matter to assign a number between zero
24 and 100 and say, if there's a false evidence ploy,

Page 168

1 he would have been 57 percent more likely, or 69,
2 or 2, or 88.  That's simply not possible as a
3 scientific matter.
4    Q.   But none of the studies -- so the
5 studies that you've done have all looked at --
6 started with confessions that you believed to be
7 false, and then worked backwards to identify the
8 risk factors that were present; correct?
9    A.   The -- you're talking about the proven
10 false confession studies.  And they start with
11 confessions that have been proven to be false, of
12 course, after a process of vetting and studying
13 cases and filtering out the nonconfession case --
14 the nonfalse confession cases or the ones that
15 don't meet the classification.
16       But the -- the experimental studies
17 which I'm relying on do have statistics where they,
18 in controlled settings, can say what percentage of
19 people who -- on whom the minimized techniques are
20 used confess falsely.
21       And what I'm telling you is that
22 from those studies, those experimental studies,
23 where there are numbers and percentages, I do not
24 believe we can extrapolate to this situation.

Page 169

1        If 20 percent of the people who
2 confessed falsely, in the experimental studies, for
3 example, were interrogated with minimization
4 techniques, that does not mean that Mr. Amor had a
5 20 percent risk of falsely confessing if there
6 were minimization techniques present in his
7 interrogation.
8    Q.   So what -- what is the percentage of
9 risk that has been found in those experimental
10 studies?
11   A.   I would have to review the studies.  I
12 don't know what the percentages are off the top of
13 my head.
14   Q.   Okay.  Number seven on page 35 is about
15 threats and promises.
16       This is another -- you identify
17 threats and promises as a risk factor that you
18 believed to be present for an involuntary and/or a
19 false confession in this case; correct?
20   A.   Yes.
21   Q.   You opine that Mr. Amor's description
22 of promises and threats made by the officers,
23 quote, "significantly increased the likelihood of
24 eliciting an involuntary or false statement."

Page 170

1 Correct?

2    A.    Correct.

3    Q.    And is your analysis the same for both,
4 eliciting an involuntary or false statement?

5    A.    Yes.

6    Q.    And what do you mean by "significantly
7 increased"?

8    A.    That there's a greater likelihood that
9 the confession is false and that the confession
10 would not be found to be voluntary.

11    Q.    Can you quantify that at all, what a
12 greater likelihood is?

13    A.    No.  I would give the same answer I
14 just gave with regard to risk factors and
15 statistics and studies and extrapolation.  We
16 cannot put a number on it.

17    Q.    You state in this same section that
18 promises of leniency and threats of harm are widely
19 associated with police-induced false confessions,
20 and believed to be one of the leading causes.

21          What do you mean by "widely
22 associated"?

23    A.    That in the real world studies
24 they're -- they're at a very high percentage of

Page 171

1 those studies.  That when innocent people falsely
2 confess, there's almost always some threat and/or
3 some promise.

4          And threats and promises imply one
5 another.  So, for example, here, according to
6 Mr. Amor, Detective Cross said he was going to kick
7 his fucking ass, and that he would be charged with
8 first degree murder if he did not confess.

9          That implies the promise that if he
10 did confess, he would not get his ass kicked and he
11 would not be charged with first degree murder.

12          So threats and promises typically go
13 together, and in the proven false confession cases,
14 they are in a very high percentage of those cases.
15 And that's what I mean by "widely associated."

16          And off the top of my head, I don't
17 know what percentage they're in, in the studies.

18    Q.    What studies reflect those percentages?

19    A.    There's -- I don't recall if my 1998
20 study did.  That is one of the exhibits, The
21 Consequences of False Confessions, or if my 2004
22 study with Steve Drizin did.  It may be that that
23 was reported qualitatively.

24          Those are two studies that come to

Page 172

1 mind.

2          It may also be reviewed in the
3 review essay that I've called the White Paper, the
4 2010 Law and Human Behavior article.  I just have
5 review that.

6          I don't know that percentages
7 have been reported as opposed to qualitative
8 observations.  But it is -- it is a generally
9 accepted view in the field.

10    Q.    You note that Mr. Amor was given a
11 false promise that he would be able to go home if
12 he confessed.

13    A.    Correct, that's what he asserts.

14    Q.    Where in your review of the record --
15 excuse me.  Where in your review of the record did
16 you see some -- did you see Mr. Amor state that he
17 was told that if he confessed, he could go home?

18    A.    I don't recall specifically.  I'm
19 assuming that it would have been in my review of
20 his deposition, or in his pretrial testimony or
21 trial testimony, or in something he said to someone
22 in the case that's reflected in a different
23 document; but I can't tell you where.

24    Q.    So you don't recall, as you sit here

Page 173

1 today, whether Bill Amor ever stated elsewhere that
2 no promises were made to him.

3    A.    Correct.

4    Q.    And if there is a place in the record
5 where he contradicted his deposition testimony, is
6 that a discrepancy that you would want to address
7 in your report?

8    A.    Well, it depends, because oftentimes
9 what happens is at the end of coercive
10 interrogations, interrogators will sanitize the
11 interrogation and get the suspect to admit that
12 there were no promises or threats even if that's
13 false.

14          And so if, for example, he says this
15 in the 11 minutes of tape-recorded, or however long
16 tape-recorded recap questioning there was by the
17 ASA Nigohosian, then, no, I wouldn't -- I would
18 treat that very differently than what he says in
19 this deposition.

20    Q.    What about his motion to suppress
21 testimony?

22    A.    I -- yeah, I mean, I think that's
23 relevant if he says that.  But he -- if my
24 recollection is correct, he also described being

1  told by his lawyer not to mention coercive things.
2          And so it may be -- I don't know,
3  but it may be that he was instructed by his lawyer
4  not to talk about that.
5      Q.   When did he describe his lawyer as
6  telling him not to talk about coercive things?
7      A.   I don't recall where.  It may be in his
8  deposition testimony.
9          My recollection -- and, again, this
10 is in the record, or not in the record, and so, you
11 know, if my recollection is inaccurate, then what
12 I'm about to say would be mistaken and I would need
13 to correct it -- but my recollection is that he,
14 somewhere in the records I reviewed, said that he
15 was told not to testify about physical coercion at
16 his pretrial hearing -- I think it was the pretrial
17 hearing -- because the judge wouldn't put any
18 weight on it, and that could discredit the other
19 things that he -- that he testified to.
20         It's also possible that he testified
21 at the suppression hearing, if he testified that he
22 was not made any promises, he simply wasn't
23 thinking about being told that he'd be able to go
24 home.

1          But, again, because we don't have a
2  record of the interrogation, we don't know.
3      Q.   What other -- other than the promises
4  and threats that we've already talked about, are
5  there any other promises or threats that you're
6  identifying as a part of this opinion that this
7  risk factor was present?
8      A.   No, these are the ones.  They're
9  mentioned on 35 into 36.  So, no, there's none that
10 I didn't mention in my report that I'm aware of.
11     Q.   Okay.  You do state in this section
12 that Mr. Amor was denied a bathroom break at some
13 point?
14     A.   I think that's what he asserted, yes.
15     Q.   Where in the record are you relying on
16 for that assertion?
17     A.   So I don't remember because I haven't
18 looked at this in three months.  So I don't -- I
19 just don't recall where -- where -- what document
20 I reviewed where I believe he asserted that.
21     Q.   Okay.  All right.  Page 36, number
22 eight is a section called Psychological Coercion.
23         Now, in your opinion, the cumulative
24 effect of the tactics that you've described was, in

1  your opinion, psychologically coercive; is that
2  correct.
3      A.   Correct, yes.
4      Q.   And is that the point of this section,
5  to essentially summarize why the tactics that we've
6  just gone over had a cumulative effect of being
7  psychologically coercive?
8      A.   Correct.
9      Q.   Any tactics that we have not
10 discussed that factor into your opinion that the
11 interrogation was psychologically coercive?
12     A.   No.
13     Q.   How are you defining psychological
14 coercion?
15     A.   As either involving techniques that are
16 presumed to be inherently psychologically coercive,
17 like threats and promises, or cumulatively the
18 effect of the interrogation techniques causing
19 somebody to perceive they have no meaningful choice
20 but to comply and confess.
21     Q.   So is psychological coercion, in your
22 methodology, treated as an independent risk factor
23 for a false confession?
24     A.   It would stand to reason that, yes,

1  that if interrogations are psychologically coerced
2  when people perceive they have no meaningful
3  choice, that, yes, they are at greater risk for
4  making a false or unreliable confession.
5      Q.   My question's a little different.  So
6  we've -- you've identified, we've walked through
7  several risk factors that you've indicated are risk
8  factors present in this case that increase the
9  likelihood of a false confession; correct?
10     A.   Correct.
11     Q.   And now we're talking about
12 psychological coercion, which you're also saying
13 was present here, and increased the likelihood of a
14 false confession; correct?
15     A.   Correct.
16     Q.   Do the other risk factors that we have
17 discussed have to work together to reach the level
18 of psychological coercion for you to believe that
19 the risk of a false confession is present?
20     A.   No.  No.  If I understand your question
21 correctly.
22     Q.   Okay.  So you do consider this to be a
23 separate risk factor that happens to combine
24 several other risk factors that we've discussed?

Page 178

1    A.    Correct.

2    Q.    Number nine gets into specific
3  personality traits that you attribute to Mr. Amor
4  that you believe created a risk factor for a false
5  or unreliable confession; correct?

6    A.    Correct.

7    Q.    And as far as I can tell, you identify
8  three traits with Mr. Amor that you believe put him
9  at a heightened risk.  And that's suggestibility,
10  anxiety, and depression; is that correct?

11    A.    Correct.

12    Q.    These are the three factors of his
13  personality that you believe put him at a greater
14  risk for a false or unreliable confession?

15    A.    Correct.

16    Q.    And this is based on your review of the
17  record; correct?

18    A.    Correct, yes.

19    Q.    You cannot diagnose Mr. Amor with
20  depression or anxiety; correct?

21    A.    Correct.

22    Q.    Where has it been established in the
23  studies of the literature that depression is a risk
24  factor for false confessions?

Page 179

1    A.    So I cite on, I think footnote 70, the
2  studies I was relying on for those rates.

3    Q.    Do those studies also address anxiety
4  as a risk factor for false confessions?

5    A.    That's my recollection.

6    Q.    And what do the studies say?  I mean,
7  what is it about a person's depression or anxiety
8  that puts them at a heightened risk for providing a
9  false confession to a crime?

10    A.    I don't recall what the studies say
11  specifically about that, but somebody who's
12  depressed would have a harder time asserting their
13  will, and somebody who's anxious would cave for
14  quickly in the face of pressure.

15    Q.    And that's based on the studies that
16  you cite in footnote 70?

17    A.    Correct.

18    Q.    And you also note that Mr. Amor's
19  suggestibility was a risk factor for a false
20  confession; correct?

21    A.    Yes.

22    Q.    And how are you defining suggestibility
23  in your report?

24    A.    Well, the way the Gudjonsson

Page 180

1  Suggestibility Scales would have defined it, that
2  somebody will shift their response into -- by -- as
3  a result of pressure from an authority figure in
4  response to misleading information.

5          So it's -- it's yielding and
6  shifting to the pressures of an authority figure,
7  and changing your answer.

8          And that can be tested and compared
9  to the population according to the testing manual.
10  And, as you know, I'm describing here a test by
11  Dr. Chiappetta where he said that Mr. Amor was more
12  suggestible than 98 percent of the population.

13          This -- I might actually be quoting
14  Dr. DeClue's reinterpretation of Dr. Chiappetta's
15  results.

16    Q.    Let's start with -- so your opinion
17  that Mr. Amor was suggestible is based off of
18  Dr. Chiappetta's administration of the Gudjonsson
19  Suggestibility Scales; correct?

20    A.    Correct.

21    Q.    Okay.  Have you ever administered the
22  Gudjonsson Suggestibility Scales?

23    A.    No, I have not.  So I'm -- as you asked
24  earlier, I'm not a clinical psychologist, and so I

Page 181

1  do not administer that test.

2    Q.    Have you had other cases where you've
3  had to interpret the Gudjonsson Suggestibility
4  Scales?

5    A.    Yes.

6    Q.    When was Mr. Amor's -- strike that.

7          When was the Gudjonsson
8  Suggestibility Scales administered by
9  Dr. Chiappetta to Mr. Amor?

10    A.    I'm going to have to look at his
11  report.  I'm thinking it's in Exhibit 5, but he
12  might have done more than one report --

13    Q.    You know what?  It's -- we can look at
14  it together.  So I'll show you what's been marked
15  as Exhibit 9 to your deposition.

16    A.    Okay.

17    Q.    And so that we have a clear record,
18  while Dr. Leo looks at that, we're looking at a
19  Bates stamped documents SDT-DCPDO 2685 consecutive
20  through 2687.  It's Exhibit 9 to Dr. Leo's
21  deposition.

22    A.    So -- so I think I see what you're
23  asking.

24          So the -- this is a supplementary

Page 182

1  report from his earlier report.  And the -- he
2  describes in this report that he administered the
3  suggestibility scales on 4/14/97, if I'm reading
4  this correctly.
5      Q.   Is that -- that's my understanding.  Is
6  that your understanding, based on your review of
7  the record as well?
8      A.   Yes.
9      Q.   Okay.  So how did that impact your
10 analysis if there was no suggestibility testing
11 done close in time to October of 1995, when the
12 confession took place?
13     MS. GARCIA:  Object to form.
14     THE WITNESS:  Well, the -- the testing is
15 always done after the interrogation.  Sometimes
16 it's done closer in time, and sometimes it's not.
17          This does not seem like that long of
18 a period of time to me.  But, you know, it's --
19 it's a test, like I said, that's done not during
20 the interrogation, but after the interrogation.
21          I guess ultimately the answer to
22 your question, it doesn't affect my opinion.
23 BY MS. RANUM:
24     Q.   Okay.  Did you review Dr. Chiappetta's

Page 183

1  notes from when he administered the Gudjonsson
2  Suggestibility Scales on Mr. Amor?
3      A.   I do not believe that I did.
4      Q.   Did you do anything to verify the
5  scoring reflected in his report in Exhibit 9?
6      A.   No.  I think that Dr. DeClue did that,
7  but I did not, nor would I ever do that.
8      Q.   Now, you find in your report that
9  Mr. Amor was found to be exceptionally suggestible;
10 correct?
11     A.   Correct, yes.
12     Q.   So I want to walk through with you your
13 understanding of how the Gudjonsson Suggestibility
14 Scales are administered.
15          So can you -- are you familiar
16 with -- I know you said you haven't administered
17 the test, but in the course of -- you said you have
18 interpreted it before.  So are you generally
19 familiar with how the test is administered?
20     A.   Yes.  But I just want to be really
21 clear.  When I say I've interpreted, I don't mean
22 I've actually interpreted the test results.  I mean
23 that I'm familiar with the literature on the test,
24 and have incorporated that into my analyses in

Page 184

1  other cases.
2          So the proper person to interpret
3  the results would be a clinician who administers
4  the test.
5          The test, my understanding, is
6  really a memory test.  So you read a fact pattern,
7  and then you -- you're asked factual questions and
8  you say -- you give the answers, and then the
9  administrator will tell the person that they got
10 some wrong answers, and try to get them to shift
11 their answers to, even though the correct answers,
12 to incorrect answers, and from that process there
13 are different scores.  I think there's a yield
14 score and a shift score.
15          And those are computed, and then
16 they are normed so that the scores, or the combined
17 scores, will tell you how suggestible the person is
18 in the definition that we just discussed relative
19 to different populations.  A normal population, a
20 population of false confessors.  And that's where
21 those percentages come from.
22     Q.   So what is the significance of the
23 yield score as compared to the shift score?
24     A.   I don't -- I don't recall as I sit here

Page 185

1  today.  Usually I go on the interpretation that
2  the -- the clinician makes.  I would have to review
3  the test to give you a definition of the -- of
4  yield and shift scores, what their difference is.
5      Q.   So as you sit here, do you have any
6  understanding of what specifically about an
7  individual's suggestibility the shift score would
8  tell us?
9      A.   Just a general understanding, that
10 shift -- shift combines with yield to tell you how
11 suggestible somebody is; that shift would be the
12 shift in their answers; yield would be about
13 yielding to the pressure of the interrogator.
14     Q.   So Mr. Amor had, fair to say,
15 dramatically different scores on yield and shift;
16 correct?
17     MS. GARCIA:  Object to form.
18     THE WITNESS:  Okay.  So you're referring to
19 the last page on Exhibit 9, or you're referring
20 to --
21 BY MS. RANUM:
22     Q.   I am.  Yeah, I am.
23     A.   Okay.  So it's not clear to me.  It
24 looks like -- it says his response due to

Page 186

1 interpersonal pressure -- his response shift due to
2 interpersonal pressure yielded a scale of 3 of a
3 possible 15.
4         And then before that, his results
5 indicate he -- he was responsive to suggestibility
6 in 14 of the 15 possible answers.
7         I don't know if that first sentence
8 is referring to a yield score.  It seems like -- of
9 the paragraph.  It seems like the other one is
10 referring to a shift score.
11        So I -- I don't -- what you're
12 saying may be accurate; I just don't know.
13 BY MS. RANUM:
14    Q.   If he did in fact receive a 3 out of 15
15 on the shift score, that actually would have made
16 him below the accepted mean of 4 for shift; correct?
17    A.   If this report is accurate -- but,
18 again, my understanding is that they are
19 combined -- and he had a very high combined score.
20    Q.   So is it your understanding that the
21 shift and the yield score have no independent
22 significance prior to being averaged together?
23    A.   No, I'm not saying that.  They might
24 have independent significance.

Page 187

1    Q.   And if they do, you're not aware of
2 what the significance is.
3    A.   Not as I sit here today, no.  But,
4 again, I'm relying on the cumulative opinions of
5 the experts on the suggestibility scales tests, and
6 it seemed to me that Dr. DeClue's opinion mirrored
7 Dr. Chiappetta's opinion on the extraordinarily
8 high suggestibility score, whatever the individual
9 components added up to.
10    Q.   You talk in your report about these
11 three personality traits specific to Mr. Amor that
12 you considered to be risk factors for false
13 confessions.
14         Did you also consider, in the
15 course of your analysis, how any of Bill Amor's
16 personality traits may have made him less
17 susceptible to providing a false or unreliable
18 confession?
19    A.   No.
20    Q.   Why not?
21    A.   There wasn't any evidence in the
22 record, that I was aware of, that suggested he
23 possessed traits that would make him less
24 susceptible to making or agreeing to a false

Page 188

1 confession.
2    Q.   What are traits that, in the course of
3 your research, you have found make an individual
4 less likely to falsely confess?
5    MS. GARCIA:  Object to form.
6    THE WITNESS:  Yeah, I -- I would have to
7 review the clinical literature to see if those
8 traits -- there's even a discussion of those
9 traits.  But off the top of my head, I don't -- I
10 can't think of any that are based in the research.
11 BY MS. RANUM:
12    Q.   So that's not something that you are
13 analyzing as you're looking at the personality
14 traits of Mr. Amor.  You're not looking for things
15 that would make him both more or less likely to
16 falsely confess; correct?
17    A.   Correct.  I'm not aware of a research
18 literature that discusses personality traits based
19 on empirical studies that are associated with a
20 lower risk of false confessions.  I'm just not
21 aware of such a literature, if it exists.
22         And since all of my opinions
23 would be based on my knowledge of the research
24 literature, there would be nothing there for me to

Page 189

1 apply even if it were in the record.
2         The research is focused on which
3 personality traits increase the risk of false
4 confessions, not which personality traits decrease
5 the risk of false confession.
6         To my knowledge, there's no
7 empirical research on that question.
8    Q.   So I guess, going along that point,
9 would an individual's prior interactions or
10 familiarity with the criminal justice system
11 potentially have an impact on their -- on their --
12 strike that.
13         Is there any research to say that
14 someone who's more familiar with the criminal
15 justice system may be less likely to falsely
16 confess?
17    A.   I'm not aware of any empirically based
18 research that says that.  It's possible there's a
19 study out there that mentions it that I'm not
20 remembering.  To my knowledge, no.
21    Q.   In the course of your work on this
22 case, did you review Bill Amor's full criminal
23 history?
24    A.   I don't recall if I was provided with a

1  record of his -- of his criminal history, but I do
2  recall there was some discussion of that in his
3  testimony.
4      Q.    Is it relevant to your inquiry how much
5  prior interaction Bill had with the police?
6      A.    I don't see it as especially relevant.
7           There are plenty of proven false
8  confession cases where people have had prior
9  experience in the criminal justice system, and some
10  where they have not.
11          We could theorize about reasons why
12  it could possibly be relevant, but I don't see that
13  it's relevant.
14      Q.    Well, what if he had been interrogated
15  before by the police, would those interrogations
16  and the way that he interacted with the police
17  during those interrogations be relevant to your
18  analysis?
19      A.    Well, it could be relevant, but it
20  could be relevant in both directions.
21          I've seen cases where somebody will
22  say, you know, I -- I wanted to talk to them and
23  tell them what they wanted to hear even, though it
24  meant incriminating myself, because in my prior

1  experience, that's how I got out of something, or,
2  you know, was let go.  And then, on the other side,
3  it's theoretically possible that somebody who has
4  more experience would be more knowledgeable about
5  the sorts of techniques police use, and it would
6  take more pressure to get them to falsely confess.
7           So it's not clear to me, if it's
8  relevant, how it would be relevant.
9           But what I'm telling you is that I
10  can't think of any studies that show a relationship
11  between the two.  I'm not talking about, you know,
12  somebody's opinion, but actual empirical studies
13  that show if you have more experience in the
14  criminal justice system, you're less likely to
15  falsely confess.
16      Q.    There are studies on why people do not
17  confess; correct?
18      A.    I don't -- I'm -- you'd have to be more
19  specific.
20          I can't think, as I sit here today,
21  of a study on why people don't confess.  Like a
22  study where people who didn't confess, their cases
23  were given -- were collected, and then it was
24  studied why they did not confess.

1      Q.    Okay.  Have you ever conducted any --
2  strike that.
3           Are you aware of any laboratory
4  studies where both true and false confessions have
5  been induced to compare the conditions that led to
6  each?
7      A.    Yes.
8      Q.    What studies have done that?
9      A.    There's a number of studies that have
10  done that.  And many of them are cited in the
11  report.
12          I guess what I would tell you is
13  that up to 2010, the -- if you look at footnote 3 --
14  I'm sorry, 4 on page 8 -- see the Saul Kassin,
15  et al. review article that I've referred to as the
16  White Paper, that would describe all such studies
17  up to 2010.
18          And then there's a few others after
19  2010.  I'm just looking through the footnotes to
20  see if some of them were cited.
21      Q.    Are you still looking or --
22      A.    I'm sorry, I'm still looking.  I'm
23  almost through the report.
24          I thought that some of these studies

1  were cited, and I don't see that they are.
2           There are three studies I can think
3  of in particular.
4           Sorry, I think I'm almost through
5  the end of the report.
6           One of the studies was by someone
7  named Narchet, et al.  If you want, I can look on
8  my computer real quick, and I can tell you the
9  names of the studies specifically.  So give me just
10  a second and I'll do that.
11          All right.  So one of the studies is
12  called Minimization and Maximization Techniques;
13  Assessing the Perceived Consequences of Confessing
14  and Confession Diagnosticity.
15          The first author is Horgan,
16  H-o-r-g-a-n, her first name is Alyson, spelled with
17  a Y, and this is published in Psychology, Crime,
18  and Law, January 2012, pages 65 to 68.
19          And then there's another one --
20  hold on just a second, I have to make it a little
21  larger -- called Modeling the Influence of
22  Investigator Bias on the Elicitation of True and
23  False Confessions.  And the first author is
24  Narchet -- that's the last name -- N-a-r-c-h-e-t.

Page 194

1 Her first name is Fadia, F-a-d-i-a. And it's
2 published in the Journal of Law and Human Behavior,
3 2011, pages 452 to 465.
4          And the third one I was thinking
5 of -- hold on just a second -- is called Inside the
6 Interrogation: The Lie, the Bluff, and False
7 Confessions. And the first author is Perillo.
8 Her last name is P-e-r-i-l-l-o; her first name is
9 Jennifer. It's published in the Journal of Law and
10 Human Behavior, but I don't have a quick page
11 citation to it.
12     Q.    That's fine. Okay.
13          All right. Thank you for finding
14 those.
15          Okay. So we have discussed several
16 risk factors that you've identified in this case.
17          Have we discussed all of the risk
18 factors that you believe to have been present
19 during Mr. Amor's interrogation?
20     A.    Yes. Risk factors for false
21 confession, yes.
22     Q.    Yes.
23          And what is the risk of a false
24 confession if none of the tactics that we've

Page 195

1 discussed are present?
2     A.    So, again, I -- I can't put a number on
3 that. It's not scientifically possible for anyone
4 to put a number on that.
5     Q.    Page 39 of your report, paragraph
6 number 10, Indicia of Unreliability.
7     A.    Correct.
8     Q.    Now, can you explain to me what exactly
9 the purpose of this portion of your report is.
10     A.    The purpose, I believe, was to describe
11 why I classified it as a proven false confession;
12 and, secondly, to discuss evidence consistent
13 with that conclusion that is not part of the
14 definitional criteria of false -- of proven false
15 confession. What I call Indicia of Unreliability,
16 which is described on page 40 of the report.
17     Q.    Okay. And as far as your basis for
18 believing it's a false confession, we already
19 exhausted the basis for that opinion earlier in the
20 deposition; correct?
21     A.    Correct. Why it meets the criteria of
22 a proven false confession.
23     Q.    So then, in addition to that, you say:
24 The numerous indicia of unreliability in Mr. Amor's

Page 196

1 confession statements include, and there's a bullet
2 point list there.
3     A.    Correct.
4     Q.    And from where did you derive this
5 information that you include on this list?
6     A.    From the materials that I reviewed.
7 But specifically I didn't cite to the materials, so
8 I don't recall off the top of my head where any one
9 of these would have come from the materials that I
10 reviewed.
11     Q.    Okay. You do state on page 41 that the
12 confession should never have been the basis for
13 determining the origin and cause of the fire?
14     A.    Correct.
15     Q.    But, again, you are not a fire science
16 expert; correct?
17     A.    Correct.
18     Q.    And you are not an arson investigator?
19     A.    Correct.
20     Q.    And you do not have any experience with
21 determining the cause and origin of a fire?
22     A.    Correct, I do not.
23     Q.    And you do not have any training on
24 that subject; correct?

Page 197

1     A.    Correct.
2     Q.    All right. Let's talk a little bit
3 about paragraph 11, which talks about contamination.
4          And my understanding of your opinion
5 is that contamination is not a risk factor for a
6 false confession; correct?
7     A.    Correct. It's a risk factor that a
8 confession that is false will be perceived to be
9 true and accurate, and thus it's really a risk
10 factor that the false confession will lead to a
11 wrongful conviction.
12     Q.    Okay. What role are you opining
13 contamination played with regard to Mr. Amor's
14 case?
15     A.    So I describe that, I believe on
16 page 43, that -- and I think Professor Drizin's
17 report describes it perhaps in more depth --
18 but that many of these facts that ended up in
19 Mr. Amor's police-written confession statement
20 appeared to have been first conveyed to him by the
21 police.
22          And then I -- I list some of these
23 facts, such as, looking at the beginning of the
24 first full paragraph near the top of page 43, that

Page 198

1  a lit cigarette had been left in the living room
2  before Bill and Tina left; that a flammable
3  substance was spilled in the living room; that the
4  flammable liquid had been spilled near a swivel
5  chair.  And it goes on.
6          So it's both some facts, as well as
7  some of their theories of why -- why the fire
8  occurred.
9      Q.   Did you review Bill Amor's handwritten
10  statement from September 15, 1995?
11     A.   I believe I did.  I'd have to double
12  check in the materials that are listed on pages 2
13  to 6, but I believe I did.
14     Q.   Can you please double check and let me
15  know if that's a document that you reviewed?
16     A.   Yeah, I -- so my quick review is it
17  doesn't appear to be listed, and so I may not have
18  reviewed it.  Or I may have reviewed it and just
19  not listed it.
20     Q.   Well, I thought we went over that.  I
21  mean, are there materials that you reviewed that
22  you didn't list in Section 2 of your report?
23     A.   I don't think there are.  And the only
24  reason I said that is because the depositions

Page 199

1  sometimes in cases come with exhibits.  But I
2  don't -- so I don't believe that I reviewed
3  anything not listed already.
4      Q.   Do you have any recollection of
5  reviewing more than one handwritten statement from
6  Mr. Amor?
7      A.   I do not.
8      Q.   And, again, you're not rendering any
9  opinions with regard to Mr. Amor's September 15,
10  1995, statement; correct?
11     A.   I don't believe I have in the report,
12  correct.
13     Q.   I don't -- is there a reason why you
14  qualified that answer?
15     A.   Because I thought you asked me earlier
16  if my opinions covered both of his confessions, and
17  I thought I said yes.
18     Q.   What I asked you earlier was whether,
19  when you were referring to a false confession, you
20  were referring to the statements that -- all of the
21  statements that were made on October 4th, 1995.
22     A.   Okay.  All right.  Thank you for that
23  clarification.
24     Q.   Well, I want to make sure we're clear

Page 200

1  though, because so your opinions that this is a
2  false confession, when you're referring to the
3  confession, are you referring to anything other
4  than the October 4th, 1995, statements made by
5  Mr. Amor?
6      A.   No, no.
7      Q.   Okay.
8      A.   That's correct; my opinion as described
9  in the report are with respect to those.
10     Q.   Okay.  And you -- again -- I just want
11  to make sure we're clear.  So you're not rendering
12  any opinions with regard to the handwritten
13  statement that Mr. Amor gave on September 15, 1995;
14  correct?
15     A.   I haven't, correct.  If asked -- if
16  presented and asked, then I would render an
17  opinion.
18          But to date, I have not rendered any
19  opinions about this statement that you're referring
20  to on September 15th.
21     Q.   Wouldn't you want to know if Mr. Amor
22  had given another handwritten statement in the
23  course of the investigation prior to the confession
24  that you have rendered your opinions on?

Page 201

1      A.   Yeah, I would want to know that.  But I
2  think it was described in the police report, so I
3  think I was aware of it at the time that I wrote
4  the report.
5      Q.   Mr. Amor -- well, strike that.
6          How can you opine on contamination
7  if you haven't reviewed all of the police reports
8  and all of the handwritten statements that were
9  made during the course of the 1995 investigation?
10     MS. GARCIA:  Objection to form, foundation.
11     THE WITNESS:  Based on what was described in
12  the police reports, and based on what was described
13  in the depositions, and based on the other materials
14  I reviewed.
15  BY MS. RANUM:
16     Q.   Okay.  You indicated on page 43 that
17  you list out some specific pieces of information
18  that you believe were details that were products of
19  contamination; correct?
20     A.   Yes.
21     Q.   I want to turn to what we've marked
22  as Exhibit 10 to your deposition.  And for the
23  record, this is a one-page document Bates stamped
24  Defendants' 818.

Page 202

1        Now, Dr. Leo, take a minute to
2  review this document, and let me know if you
3  recognize it.
4       A.    Yes.  This is one of his October 4th
5  confession statements, police-written statements,
6  dated at 1:14 a.m.
7       Q.    Okay.  Now, did you see anything in the
8  record to indicate that Mr. Amor did not write out
9  the statement that you're viewing in Exhibit 10?
10      A.    Not that I recall, yeah.  So I -- I
11 don't recall whether this particular statement was
12 written by Mr. Amor or by the police.
13           I believe at least one of his
14 statements was written out by the police, but I
15 don't recall specifically whether this one was or
16 was not.
17      Q.    Well, that would be an important piece
18 of data to your analysis, wouldn't it be, whether
19 he wrote out his own confession or not?
20      A.    Well, it depends on what the analysis
21 is, what question in the analysis.
22           I've seen many false confessions
23 that were written by the suspect, and many false
24 confessions that were written by the police.

Page 203

1           So it could be important, but it
2  depends on for what reason.  Or it could not be
3  important at all.
4       Q.    Well, you've opined that this was a
5  coerced compliant confession?
6       A.    Correct.
7       Q.    So wouldn't the details of who wrote
8  out the statement and how that transpired be
9  relevant to your inquiry of whether it was a
10 coerced compliant confession?
11      A.    I think it might be relevant to other
12 inquiries, but it's not really relevant to that
13 inquiry because, again, I've seen plenty of
14 statements that are false coerced compliant --
15 almost all false confessions are coerced compliant,
16 as opposed to coerced persuaded/internalized --
17 that have been written by police, and plenty that
18 have been written by the suspect.
19           So it's not determinative in the way
20 your question implies.
21      Q.    So as you sit here today, you don't
22 know whether or not this statement was written out
23 by Bill Amor.
24      A.    Correct.  As I sit here today, I don't

Page 204

1  know whether this statement was written -- I don't
2  remember whether it was written by Bill Amor or by
3  the police.  And, furthermore, it doesn't change
4  any of my conclusions.  If you told me, and
5  everyone agreed, it was written by Amor versus the
6  police, it doesn't affect any of the conclusions
7  that I've rendered in this case.
8       Q.    What details in Exhibit 10 are you
9  saying were the product of police contamination?
10      A.    I would have to cross reference it with
11 what I mentioned in the report on paragraph 43 --
12 I'm sorry -- the first full paragraph on page 43.
13           The cigarette -- it looks like ...
14           The cigarette in the ashtray before
15 they left the condominium.
16           The vodka on the table.
17           The knocking over of the cigarette.
18           Knowing that a fire would result.
19           So just quickly looking over the
20 report, what I describe in the report and what I am
21 seeing on this exhibit, those would be the ones.
22 It's possible I missed one.
23      MS. RANUM:  Would anyone mind if we took a
24 quick five-minute break?  I just really need to

Page 205

1  grab some water.  Is that okay with everybody?
2      THE WITNESS:  Good with me.  What time should
3  we come back?
4      MS. RANUM:  It's 4:22.  Should we just make
5  it 8 minutes and say -- sorry, it's 6:22 your time.
6  You want to come back at 6:30?
7      THE WITNESS:  Yeah -- no, it's 2:22, sorry.
8  2:30 our time, 4:30 your time sounds good.
9      VIDEO TECHNICIAN:  We're off the video record
10 at 4:23 at the end of media unit 3.
11          (Recess taken.)
12      VIDEO TECHNICIAN:  We are back on the video
13 record at 4:36 at the beginning of media unit 4.
14 BY MS. RANUM:
15      Q.    Dr. Leo, before the break we were
16 reviewing Mr. Amor's October 4th, 1995, handwritten
17 statement which is in Exhibit -- Exhibit 10.
18           During the course of your review of
19 the factual record that you did to draft your
20 report, how much time did you spend analyzing the
21 handwritten statement that we see in Exhibit 10?
22      A.    I don't recall.  It's only one page
23 long, so it wouldn't have been a lot of time.
24      Q.    And what analysis did you conduct on

Page 206

1 this handwritten statement?

2      A.    I think I just looked it over and, like

3 I've said in the prior answer, there are some facts

4 in here that appear to have been suggested to him

5 from my analysis of the police reports.

6            But I did not do a detailed analysis

7 of this particular statement.

8      Q.    And you do not find it to be relevant

9 to your inquiry whether Mr. Amor wrote this

10 statement out or whether this statement was written

11 out for him?

12      A.    It doesn't change any of my conclusions,

13 no.

14      Q.    Is your opinion that this is a coerced

15 compliant confession reliant on your opinion that

16 it's a false confession?

17      A.    Yes.  If I didn't conclude that it

18 was likely a false confession or a proven false

19 confession, then it wouldn't make sense to say that

20 it was a compliant false confession.

21            So I think in the beginning of the

22 report, where I do the overview opinions, I believe

23 I say, if I'm remembering correctly, that -- yeah,

24 so this would be on page 6 under Opinion Number 2,

Page 207

1 the last sentence:  "If false --" and I've just

2 said that it meets the criteria -- sorry.  Okay.

3 So I see now that you're there.  So I'm sorry.

4      Q.    No worries.

5      A.    So in Number 2, I say that it meets the

6 criteria for a proven false confession, which we've

7 gone through; but the very last sentence of that

8 overview opinion is, "If false, Mr. Amor's

9 confession statements are properly classified as

10 coerced compliant false confessions."

11            So -- so it only makes sense to call

12 it a coerced compliant false confession if it has

13 been proven to be a false confession.

14            And what I'm saying here is it meets

15 the criteria for a proven false confession.

16            I'll just stop there.

17      Q.    Okay.  We talked a little bit about

18 it before, but subsequent to this handwritten

19 statement that is timed -- the time written on it

20 is 1:14 a.m., there are two audio recordings with

21 Mr. Amor; correct?

22      A.    Yes.

23      Q.    And he makes additional inculpatory

24 statements in those audio recordings on October 4,

Page 208

1 1995; correct?

2      A.    Correct.

3      Q.    And you also reviewed those audio

4 recordings in the course of your work on this case;

5 correct?

6      A.    Correct.

7      Q.    And so same question as I asked you

8 about Exhibit 10, how much time did you spend

9 analyzing the audio recordings of Bill Amor that

10 were made on October 4th, 1995?

11      A.    I don't know the exact amount of time.

12 I listened to those audios, and then I separately

13 read while I was listening and after.

14            But, you know, when you're writing a

15 report and you're condensing your knowledge from

16 multiple sources, I don't know if I spent a half

17 hour on them cumulatively, 10 minutes on one, 40 on

18 the other, less.

19            So I couldn't give you a time.  But

20 I did consider all three, and I did listen to and

21 read through, together and separately, the 2:11 to

22 2:14 a.m., and then the final one with the ASA.

23      Q.    So you are not -- you have not rendered

24 an opinion in your report that Mr. Amor's

Page 209

1 October 4th, 1995, statements were involuntary,

2 that is, divorced from your opinion that his

3 statements were false; correct?

4      MS. GARCIA:  Object to form.

5      THE WITNESS:  So involuntary is often a legal

6 conclusion by a judge whether a statement is

7 involuntary as a matter of law.

8            And, just to be clear, I'm not

9 saying -- I'm not making a legal conclusion.

10            I do believe that, based on his

11 description, if his description is accurate, that

12 as a psychological matter, the statements were

13 involuntarily given.

14            And I do believe that's a separate

15 analysis because it's the flip side of coercion

16 right?  If somebody comes to perceive that they

17 have no meaningful choice but to comply, then they

18 give an involuntary statement.

19            I do believe that's separate from

20 being false.  You could have an involuntary

21 statement that is not false.  You could have a

22 psychologically or legally voluntary statement that

23 is false.  So I think of them separately, though

24 they are related.

Page 210

1 BY MS. RANUM:
2      Q.   But where in your report do you opine
3 on coercion separate and apart from the truth or
4 falsity of the confession?
5      A.   Well, I thought I did on page 36 and 37
6 under Number 8, psychological coercion.  I know
7 we've been through that.  And I'm saying that this
8 increases the risk of false confession, but it's a
9 separate opinion as well.
10     Q.   So you're offering an opinion that the
11 tactics that were used were psychologically
12 coercive; correct?
13     A.   Under Mr. Amor's description, yes.
14     Q.   Okay.  So that opinion is based off of
15 the tactics that we've discussed today; correct?
16     A.   Correct.  And Mr. Amor's description
17 of those -- the effect of those tactics on his
18 perceptions and reasoning and decision-making when
19 he broke and made the -- made the -- started making
20 the incriminating statements.
21     Q.   But you have not undertaken an analysis
22 of what occurred in detail with regard to the
23 handwritten statement that he provided on
24 October 4th, 1995; correct?

Page 211

1      MS. GARCIA:  Object.  Asked and answered.
2      THE WITNESS:  I mean, it's a brief statement,
3 and I believe that my analysis in the report
4 encompasses what is relevant in it.
5           But, no, a freestanding detailed
6 analysis of the first of three of his statements,
7 no.
8 BY MS. RANUM:
9      Q.   Okay.  And are you aware of Mr. Amor
10 giving any confessions in the case prior to
11 October 4th, 1995?
12     A.   I am not, as I sit here today.
13     Q.   On page 43 of your report, in talking
14 about contamination, you state that investigators
15 scripted Mr. Amor's confession; correct?
16     A.   Yes.
17     Q.   And so where are you -- which part of
18 his confession are you saying was scripted?
19     A.   Sorry, I was on the wrong page of my
20 report.
21           The -- page 43, the second full
22 paragraph in the middle of the page that begins,
23 "In addition to contaminating," the parts that I'm
24 referring to as being in his description of what

Page 212

1 occurred the product of scripting, would be the
2 sentence that reads "the idea that Mr. Amor set
3 the fire intentionally, as well as the motive for
4 setting the fire, that it was to collect on
5 Marianne Miceli's life insurance policy to get
6 furnishings for their condominium, both came from
7 investigators, not Mr. Amor."
8           So this goes to their theory or
9 narrative of why he committed the crime, as opposed
10 to leaking details that would be more like
11 contamination, which I described earlier.
12           The two are related, but
13 contamination is usually feeding details.
14 Scripting is usually pressuring the suspect to
15 adopt the narrative, and tends to go to intent, to
16 motive, and to creating a plausible story for why
17 the person did the underlying act.
18     Q.   So in the handwritten statement in
19 Exhibit 10, Mr. Amor never confesses to setting the
20 fire in order to collect on Marianne Miceli's life
21 insurance policy; correct?
22     A.   Correct.
23     Q.   Now, you say that the scripting is most
24 clearly illustrated through the leading, directive

Page 213

1 and corrective questioning of ASA Nigoshian in the
2 audio recording?
3      A.   Correct.  And I thought there was a
4 transcript of that as well that I reviewed.
5      Q.   Now, at the point of audio recording,
6 Mr. Amor had already provided his handwritten
7 confession to the police; correct?
8      A.   Correct.  You're referring to
9 Exhibit 10, or you're referring to -- yeah, I think
10 that's what you're referring to.
11     Q.   I am referring to Exhibit 10.
12     A.   Okay.
13     Q.   So if Mr. Nigohosian erroneously
14 believed that Mr. Amor's confession contained an
15 indicia of reliability based on his own questioning
16 of Amor, how is that contamination on the part of
17 the police?
18     A.   If I understand your question
19 correctly -- and correct me if I'm wrong -- it
20 would be contamination on the part of
21 Mr. Nigohosian, not on the police.
22           The contamination from the police
23 would have preceded his questioning coming from him.
24     Q.   Okay.  And you have listened to the

Page 214

1 portion of the audio that captures the exchange
2 between Mr. Nigohosian and Mr. Amor; correct?
3      A.    In preparation for the report.  Not in
4 preparation for today, yes.
5      Q.    Mr. Amor was an active participant in
6 that interview; correct?
7      A.    Yeah.  If you define active participant
8 as responding to questions, yes.
9      Q.    He didn't just agree to everything that
10 was posed to him, did he?
11      A.    I don't recall specifically.
12      Q.    Do you recall that Mr. Amor never
13 admitted to starting the fire for the life
14 insurance specifically?
15      A.    I'd have to review the document or the
16 audio.
17      Q.    If Mr. Amor was asked and actually
18 denied starting the fire specifically to collect on
19 the life insurance, that would be an example of how
20 he was not subject to contamination or scripting
21 from Mr. Nigohosian; correct?
22      A.    How he didn't adopt it, correct.
23      Q.    Do you also recall that he was asked,
24 Mr. Amor was asked a leading question about whether

Page 215

1 he knew that Marianne would be staying in the
2 apartment, and that he said he was not sure?
3      A.    Again, I'd have to review the document.
4      Q.    And if in fact he did say that, that
5 would be yet another example of him not adopting
6 the scripted or contaminated version that was being
7 posed to him, in your words.
8      A.    In that session, if that's the only
9 reference, yes.
10      Q.    Do you recall that Mr. Nigohosian asked
11 him about a smoke detector being removed from the
12 condo?
13      A.    Again, I'd have to review it.  I know
14 that -- I believe that came up at some point, but
15 I'd have to review the ten-minute document to
16 recall that it came up there.
17      Q.    Okay.  And if in fact he was asked
18 about the smoke detector being removed and
19 responded that he had taken it down and, quote,
20 "had not gotten around to putting it back up," that
21 would again be an example of him not adopting a
22 scripted or contaminated version of the story;
23 correct?
24      A.    I think I would need to review more to

Page 216

1 conclude on that.
2      Q.    Okay.  Well, I guess -- I mean, you
3 know, this is your report, and you indicate that
4 when you reviewed this audio, it's your opinion
5 that it was the product of contamination and
6 scripting.
7           And so I'm just trying to understand
8 your basis for saying so when there are examples of
9 Mr. Amor clearly defying or failing to adopt the
10 alleged scripted version.
11      A.    Correct.  I don't have a photographic
12 memory, so if you want me to review that particular
13 action, I'm happy to do it and comment on it.  I
14 just don't recall specifically what was said
15 without reviewing it, and that's why I can't answer
16 the questions more affirmatively.
17      Q.    You're really testing my technical
18 skills here.  Let me see if I can find a way to
19 play this over Zoom.
20           So I'm going to try playing this
21 just from my computer, and see if you can hear it.
22 And then if that doesn't work, I'll attempt to
23 share it over Zoom.
24           So I'm going to start with just a

Page 217

1 test, and then if it works, I'll raise the volume.
2           Can you hear that?
3      A.    No.
4      Q.    Okay.  Then let me attempt to share
5 this.
6           Okay.  And so that we have a clear
7 record, I'm going to play Defendants' 13804 for
8 Dr. Leo.  And we can go ahead and make this
9 Exhibit 16 to his deposition.
10           And I'll send it to you afterwards,
11 Donna.
12           So, Dr. Leo, I'm going to play this
13 for you, and then I'm going to ask you some
14 questions about it, okay?
15                (Deposition Exhibit
16                No. 16, audio recording,
17                played.)
18 BY MS. RANUM:
19      Q.    Dr. Leo, could you hear it?
20      A.    I could hear it.  There's also a
21 transcript of it which I printed out.
22      MS. RANUM:  And I apologize, I should have
23 been clearer to you.  And I don't know if you guys
24 could hear me.  Once I clicked share computer

Page 218

1 sound, it occurred to me that you guys might not
2 hear me talking.  But I was identifying the audio
3 as Exhibit 16 to the deposition.  So don't feel
4 like you have to try to transcribe all that, Donna,
5 because we can just attach it, if that works for
6 you.
7     COURT REPORTER:  Yes, thank you.
8 BY MS. RANUM:
9     Q.    Okay.  Dr. Leo, so either -- so you --
10 you also have the transcript with you, it sounds
11 like?
12     A.    I do, yes.
13     Q.    Okay.  And that's the one that you were
14 provided that you identified in Section 2 of your
15 report; correct?
16     A.    I believe so, yes.
17     Q.    Okay.  And so in reviewing the audio
18 and the transcript, did that refresh your memory
19 regarding the October 4th, 1995, recorded statement
20 that Bill Amor gave?
21     A.    Yes.
22     Q.    And so now that you've had an
23 opportunity to listen to that, would you agree with
24 me that Mr. Amor did not just simply accept

Page 219

1 everything that was presented to him in a leading
2 question?
3     A.    Yeah, not everything, but most things.
4     Q.    He did not admit to starting the fire
5 for life insurance proceeds; correct?
6     A.    There was a discussion of that, but --
7 you don't have a transcript, so you can't refer
8 specifically to what you're referring to.
9           So the transcript that I have has,
10 at the bottom, People's Exhibit, Defendants' --
11 it's Bates stamped DEFS5886.
12           And on DEFS5889, toward the bottom,
13 it says, "Did you know that -- that by way of fire,
14 you might be able to collect that money?
15 "Correct."
16           Now, maybe you're referring to
17 something else.  I mean, they ask him above that,
18 on the same page, "Had the idea of collecting
19 insurance money gone through your head on various
20 occasions?"  He says "yes."
21     Q.    My question is a little different.
22 My question is specific -- and, thank you, I have
23 the same transcript up as you now.
24           So my question is more specific.  He

Page 220

1 was asked specifically about life insurance, and
2 did not state anywhere that he started the fire
3 specifically to collect Marianne Miceli's life
4 insurance; correct?
5     MS. GARCIA:  Object to form.  Also
6 foundation.  Kind of taking one specific phrase out
7 of context.
8           But you may answer, Dr. Leo.
9     MS. RANUM:  Okay, this is a really
10 inappropriate speaking objection.  If you have an
11 objection to form, you can put that on the record.
12     MS. GARCIA:  I'm making my objections based
13 on the Federal Rules of Civil Procedure.
14     THE WITNESS:  My interpretation is that it's
15 implied that it's life insurance.  And he says,
16 prior to the words "life insurance" coming up,
17 "through insurance" on DEFS 5888.
18           And then later he says, on the same
19 page, "I wasn't directed right at life insurance,
20 but some insurance money, that's correct."
21 BY MS. RANUM:
22     Q.    Which Bates range was the second part
23 of that at?
24     A.    It was also on 5888.

Page 221

1           So two thirds of the way down, when
2 they ask him, "Did you --" when Nigohosian asked
3 him, "Did you anticipate using that insurance money
4 to help you get out of the apartment?"  And then
5 he says, "One of the insurance moneys.  I wasn't
6 directed right at life insurance, but some
7 insurance money, that's correct."
8     Q.    Would you agree with me that, based on
9 your review of parts of the investigative file,
10 that the -- well, strike that.
11           Would you agree with me that the
12 prosecution's theory was that it would -- his
13 motive was the life insurance policy?
14     MS. GARCIA:  Objection.
15     THE WITNESS:  Yes, that's my recollection.
16 BY MS. RANUM:
17     Q.    And Mr. Amor denies that in his
18 statement to Mr. Nigohosian; correct?
19     MS. GARCIA:  Object to form, foundation, and
20 I believe it misstates the record.  But you can
21 answer.
22     THE WITNESS:  I think if you read this thing
23 contextually, they're trying to get him to admit to
24 life insurance, and he's saying insurance more

Page 222

1  generally.  And so he's going along with their
2  theory, though he's not endorsing life insurance
3  specifically as opposed to just insurance generally
4  at that point in the questioning.
5  BY MS. RANUM:
6      Q.   Did you hear at the end, towards the
7  end of the statement, when Mr. Amor said that his
8  statements were the truth and from his heart?
9      A.   Yes.
10     Q.   Do you believe that that was scripted?
11     A.   I believe that was coerced because I've
12  seen that in so many proven false confessions.
13          This is at the end of 15 hours, and
14  this is what I was referring to earlier when I said
15  sometimes these confession statements are sanitized
16  where the police are -- ask somebody at the end of
17  a process, this was by your own voluntary free
18  will; we didn't say anything that coerced you; this
19  is all true.  And even in cases where it's a
20  hundred percent provably false, you know, there's
21  DNA, the DNA leads to the perpetrator, the people
22  are saying this, false confessors are saying this.
23          So, yes, he says that, but I believe
24  it's the product of a psychologically coercive

Page 223

1  interrogation, and, as you know, I believe his
2  incriminating statements are both provably false
3  and inconsistent with all the meaningful physical
4  evidence in the case.
5      Q.   To the extent that you have reviewed
6  the evidence in the case.
7      A.   Correct.  Based on the materials that I
8  have reviewed which are outlined in the report.
9      Q.   All right.  If you could please pull
10  out Exhibit 11 to your deposition.
11     A.   Can you remind me which one it is?  Is
12  it my article --
13     Q.   It is.  It's the Social Psychology,
14  yes.
15     A.   Okay, great.  Oh, I do have it.
16     Q.   Okay.  Dr. Leo, Exhibit 11 is an
17  article titled "The Social Psychology of Police
18  Interrogation."  This is an article that was
19  authored by you and Richard Ofshe in 1997; correct?
20     A.   Correct.
21     Q.   And on page 194 of this article,
22  you talk about how, on a superficial level, a
23  confession even of a crime that one has committed
24  is a, quote, "irrational act."  Correct?

Page 224

1      A.   I believe so.  But I don't know where
2  specifically on 194 you're referring to.
3      Q.   I believe it's in the middle --
4      A.   Oh, I see.  The first sentence where it
5  says, "Guilty or Innocent, Why Shift From Denial to
6  Admission."
7          And we're saying that existing
8  theories of human behavior would presume that
9  confessing is an irrational act.
10     Q.   Yes.  And then a little further down
11  you say, in the second -- end of the second
12  paragraph, you say, "For both innocent and guilty
13  suspects, confessing is something neither would
14  have chosen to do prior to the start of the
15  interrogation and something each would have
16  predicted he would have resisted to his last
17  breath."
18          Correct?
19     A.   Yes.
20     Q.   And do you still believe that today?
21     A.   I might write the sentence differently
22  today.  You know, some people would, I think, say,
23  as I would, that we all have breaking points.  And
24  so, no, not everybody would have resisted the idea

Page 225

1  that they could be made to falsely confess to their
2  last breath.
3      Q.   Now, you have referred several times
4  today, and you do in your report as well, to the
5  fact that the interrogation is not -- the entire
6  interrogation is not recorded.
7          But you would agree that it's
8  not reasonable to infer that just because an
9  interrogation in 1995 was not recorded, that
10  something illegal or coercive occurred; correct?
11     MS. GARCIA:  Object to form.
12     THE WITNESS:  If all you knew, correct, was
13  that it wasn't recorded, then I would not conclude
14  that it was or was not coerced.  You would have to
15  know more.
16  BY MS. RANUM:
17     Q.   And in 1997, in your article in
18  Exhibit 11 that we're looking at, you actually
19  were advocating for mandatory recording of
20  interrogations; correct?
21     A.   Correct.
22     Q.   Nowadays, far more departments are
23  videotaping their interrogations than in 1995;
24  correct?

Page 226

1   A.   Correct.
2   Q.   On page 199 of your article, you talk a
3 little bit about what might motivate a guilty
4 person to allow themselves to be questioned to
5 begin with.
6   A.   Okay.
7   Q.   And you acknowledge in your article
8 that a guilty person may be motivated to submit to
9 questioning in order to mislead the interrogator
10 and convince him of his innocence; correct?
11   A.   Correct, yes.
12   Q.   Is that still your opinion today?
13   A.   Yes, that's certainly -- yeah, that
14 sometimes that happens, yes.
15   Q.   Would you agree that if someone
16 committed an arson for profit, they would be
17 motivated to get the officers to believe they were
18 innocent in order to escape suspicion and receive
19 the intended insurance proceeds?
20   A.   It -- sorry.  At least initially, yes.
21 If that's all we knew.
22   Q.   You talked a little bit earlier in your
23 report where you talk about minimization as a
24 tactic that was used by Mike Masokas in his time

Page 227

1 with Mr. Amor; correct?
2   A.   Yes.
3   Q.   And you state on page 16 of your
4 report, in the second full paragraph, you say,
5 "Properly trained interrogators also know that
6 guilty suspects sometimes implicate others for
7 crimes they themselves committed in order to
8 diminish their role in the crime."
9        Correct?
10   A.   Yes.
11   Q.   And that would be a form of
12 minimization on the part of the suspect as compared
13 with the interrogator; correct?
14   A.   It depends, because sometimes the
15 suspect may be responding to minimization themes
16 and adopting them, or sometimes the suspect might
17 come up with them on their own.  So it would just
18 depend on whatever interrogation we're talking
19 about, who the idea of blaming a third party came
20 up with -- came up with that first.
21   Q.   And in the interrogations and
22 confessions that you've reviewed in the course of
23 your studies, have you observed situations where
24 suspects minimize -- confess, but attempt to

Page 228

1 minimize their culpability in doing so?
2   A.   Yes.
3   Q.   Have you ever observed a suspect
4 provide what you considered to be a reliable
5 confession to a crime, but provide details that you
6 suspected were inaccurate?
7   A.   Yes.
8   Q.   In the interrogations and confessions
9 that you have observed, have you observed a suspect
10 provide what you considered to be a reliable
11 confession, but then state that it was done in
12 self-defense?
13   A.   I can't think of a case off the top of
14 my head, but it wouldn't surprise me if in some
15 reliable confession cases, the person did act in
16 self-defense.
17   Q.   Well, would you agree that just because
18 someone provides a confession that includes an
19 assertion of self-defense, it does not mean that
20 they actually acted in self-defense?
21   A.   Correct.  You'd have to analyze the
22 circumstances of the case and the evidence that's
23 consistent or inconsistent with that scenario.
24   Q.   Sure.  And would you also agree with me

Page 229

1 that if the suspect falsely stated that they acted
2 in self-defense, that that wouldn't necessarily
3 render the rest of the confession to be false?
4   A.   Yes.  Not necessarily.  Again, we'd
5 have to know more.
6   Q.   In the course of the many
7 interrogations and confessions that you have
8 observed, have you observed instances where a
9 suspect confessed to an act, but stated that it
10 was an accident, in an attempt to minimize their
11 culpability?
12   A.   Yes, I've seen suspects confess to the
13 accident version of committing a crime.
14        Again, oftentimes that comes
15 straight from the interrogator and then is repeated
16 back.
17   Q.   And again you would agree with me that
18 just because someone provides a confession that
19 includes an assertion that their acts were
20 accidental, it doesn't necessarily mean that their
21 actions were actually accidental; correct?
22   A.   Correct.  If that's all you know,
23 again, you have to review the relevant case facts
24 and evidence.

1      Q.   And if the suspect falsely stated that
2  what occurred was an accident, that doesn't mean
3  that the portion of their confession regarding the
4  actions that they took is also false; correct?
5      A.   If that's all you know, of course.
6           Once again, you have to review the
7  relevant case facts and evidence to analyze the
8  question that you're asking.
9      Q.   In the course of the interrogations and
10  confessions that you've observed, have you observed
11  interrogations of sexual assault cases where a
12  suspect admitted to a sexual encounter with the
13  victim, but claimed that it was consensual?
14      A.   Yes.
15      Q.   And would you agree that consent in a
16  sexual assault case is an example of how a suspect
17  may admit to certain actions, but then attempt to
18  minimize their culpability?
19      A.   It depends on the circumstance, but,
20  yes, it's certainly possible that that's coming
21  from the suspect.  It's also possible it's coming
22  from the interrogator.
23      Q.   So what did you do in your analysis of
24  Bill Amor's case to eliminate the possibility that

1  Bill Amor is guilty, and that the false details in
2  his confession were a result of minimization?
3      A.   I don't know that they're a result of
4  minimization.
5           When we talked earlier, I had
6  made reference to if there was a record of the
7  interrogation, we could see how much minimization
8  and what effect it apparently had or didn't have on
9  him, but that it was a risk factor.
10           The issue of reliability just goes
11  back to my analysis that it's a proven false
12  confession or meets the criteria of a proven false
13  confession, and that there are other indicia of
14  unreliability, as we've discussed.
15           So my analysis of the materials that
16  I reviewed lead me to the conclusion that this is a
17  provably false confession, and that eliminates any
18  concern I have that it's reliable.
19      Q.   But it is possible that Bill Amor
20  started the fire in a different way than the
21  manner in which he described it in his confession,
22  correct?
23      MS. GARCIA:  Object to form.
24      THE WITNESS:  I don't think it's

1  scientifically possible if we accept the autopsy
2  and the 911 call.
3           I think he was out of the apartment
4  after the fire had been started, or the fire was
5  started after he was out of the apartment, put
6  differently.
7           So if I'm right about those facts,
8  then it is impossible for him to have started the
9  fire.
10  BY MS. RANUM:
11      Q.   But you have already testified that you
12  are not offering an opinion as to Bill Amor's guilt
13  or innocence in this case; correct?
14      A.   Correct.
15      Q.   And without having reviewed all of the
16  fire science experts's opinions on the fire, you're
17  not really in a position to exclude the possibility
18  that Bill Amor started this fire in a different
19  manner than how he confessed to it; correct?
20      MS. GARCIA:  Object to form, foundation.
21      THE WITNESS:  Well, if the -- the autopsy
22  report -- the inferences drawn from the autopsy
23  report and the 911 call, if they could be -- if
24  those inferences do not rely on the opinions of the

1  fire science, then, no, I would say the conclusion
2  stands regardless of the fire science experts's
3  opinions.
4           The fire science experts's opinions
5  go to cause and origin, they don't go to, to my
6  knowledge, whether or not it can be inferred that
7  he was out of the apartment before the fire was
8  started, right?  Because the two pieces of
9  evidence, the 911 call and the -- the autopsy are
10  not unique to the fire science experts.
11  BY MS. RANUM:
12      Q.   And what is it about the autopsy report
13  that you're relying on?
14      A.   I thought there was an inference about
15  when she died based on the contents of her lungs.
16      Q.   And how is that relevant to your -- your
17  testimony that you're providing right now?
18      A.   I guess -- you know, it's late in the
19  day.  I guess that it would be relevant insofar as
20  the timing of the death.
21           But I guess, more to the point of
22  your question, the -- the 911 call I believe puts
23  him outside of the apartment at the time of the
24  fire -- at the time that she reported the fire,

Page 234

1  right?

2           Anyway, so I don't know if that

3  answers the question.  If it doesn't, can you reask

4  the question?

5      Q.   I'm just trying to understand, I'm not

6  hearing anything from you, how does the fact that

7  he wasn't home when the 911 call was made mean that

8  it was physically impossible that he started the

9  fire?  I'm not following that reasoning.

10     A.   My recollection is that that is reliant

11  on the fire science experts's report or affidavit

12  that I read, to go back to your prior question.

13     Q.   Okay.  And so, again, without having

14  reviewed all of the fire science experts's opinions

15  regarding cause, origin, and timing of the fire,

16  you can't exclude the possibility that Mr. Amor

17  could have started this fire and lied to

18  investigators about how he started it; correct?

19     MS. GARCIA:  Objection; form, foundation,

20  argumentative, and asked and answered like three

21  times.

22           Go ahead.

23     THE WITNESS:  Only based on the materials

24  that I've reviewed can I make that conclusion.  So

Page 235

1  I do believe in that conclusion.

2           I would have to review other

3  materials to see whether it changed my opinion.

4  Without reviewing other materials, I can't really

5  answer your question.

6  BY MS. RANUM:

7      Q.   Okay.  Did you review Mr. Amor's

8  counseling records from his time at the DuPage

9  County Jail following his October 4th arrest?

10     A.   I do not believe that I did.

11     Q.   Okay.  I'd like to show you a document

12  which is marked as Exhibit 13 to your deposition.

13           And so that we have a clear record,

14  this document is a one-page document Bates stamped

15  SDT-DCJ 85.  Doctor --

16     A.   And was --

17     Q.   I'm sorry?

18     A.   I apologize.  Was that document emailed

19  to -- oh, it wasn't.  Okay.  You sent 1 through 12,

20  so I don't have that.  Okay.  Sorry.

21     Q.   You don't have it?

22     A.   No, the -- the emails that -- from you

23  to Mariah that were forwarded to me end with

24  Exhibit -- oh, no, you know what?  You're right.

Page 236

1  I'm wrong.  Sorry.  I do have it.  I'm sorry.  I

2  just -- I must not have printed it out.  I didn't

3  see it.

4      Q.   It's only one page, so hopefully it

5  won't be too --

6      A.   Okay.  I'm sorry.  My mistake.

7      Q.   That's okay.

8           So just so we have a clean record,

9  so, Dr. Leo, I'm now showing you what's been marked

10  as Exhibit 13 to your deposition.  Please take a

11  moment to review this document.

12     A.   Okay.

13           Okay.  I have reviewed this document.

14     Q.   And this is the first time that you're

15  seeing this document; correct?

16     A.   Yes.  Unless I'm mistaken, I don't

17  recall previously seeing this document.

18     Q.   This is a report from a psychological

19  interview of Mr. Amor that was conducted on

20  October 4th, 1995?

21     A.   It looks that way, yes.  I don't

22  recognize the signature, but it looks like it's

23  somebody with a Ph.D., and it's dated 10/4/95.

24     Q.   And it looks like it was, at least

Page 237

1  according to the document, it was done at

2  10:10 a.m.; correct?

3      A.   I see 9:45 a.m. right next to date of

4  incident.

5           Oh, I see 10:10 a.m. as well.  Okay.

6  Date of report.  That looks like that's when the

7  report was done, yeah.

8           And I also see now the reporting

9  officer is -- his name is typed out, Nicholas

10  O'Riordan, O apostrophe R-i-o-r-d-a-n, Ph.D.

11  And -- even if it's described as a psychological

12  interview, yes.

13     Q.   And do you see in the report where it

14  says "Mr. Amor is aware that his charges are

15  serious, but he is absolutely confident his

16  attorney will get his charges reduced"?

17     A.   Yes.

18     Q.   Doesn't this statement suggest that

19  Mr. Amor attempted to minimize by giving false

20  details in his confession which he thought would

21  lead to a reduction in his charges?

22     MS. GARCIA:  Object to form; foundation,

23  argumentative.

24     THE WITNESS:  I don't interpret it that way,

Page 238

1  no.
2          So I -- I don't understand why
3  anybody would think that.
4  BY MS. RANUM:
5      Q.   In the confession cases that you have
6  reviewed, have you encountered any case where an
7  individual provided what you determined to be a
8  proven false confession, and then went and made a
9  statement to someone that they were sure their
10 attorney was going to be able to get them off?
11     A.   This is a common phenomena described in
12 the research literature that people who are
13 innocent of a crime have what is called a sort of
14 just world thinking bias, that they assume,
15 naively, because they are innocent, they won't be
16 wrongly convicted.  And so it is common that people
17 who falsely confess think that they will be
18 exculpated and that they will not be convicted
19 because they are innocent and the truth will come
20 out.
21     Q.   Well, but he doesn't say that he
22 doesn't think he'll be convicted.  He says that his
23 attorney will -- he's confident his attorney will
24 get the charges reduced.

Page 239

1      A.   That's correct.  But we don't really
2  know what he says because it's being reported by
3  Dr. O'Riordan.  That's Dr. O'Riordan's description
4  of what he said.  And we have -- I'm texting, the
5  send to.
6      Q.   Are you aware of any literature or
7  studies that support the idea that someone who
8  provides a proven false confession would
9  subsequently believe that their charges would get
10 reduced, but not that they would be exonerated?
11     A.   No.  But I would need to know more
12 about the context of what was said here because it
13 might be an incomplete description, and likely is,
14 of the conversation.
15     Q.   But if in fact the statement from
16 Mr. Amor was accurately reported by Dr. O'Riordan,
17 that statement would be inconsistent with the
18 behavior you've observed of individuals who have
19 provided proven false confessions; correct?
20     MS. GARCIA:  Objection to form.
21     THE WITNESS:  Not necessarily.  We need to
22 know more about -- about what else was said and the
23 context of what was said.
24

Page 240

1  BY MS. RANUM:
2      Q.   Okay.  Mr. Amor attempted to minimize
3  his fraud conviction in his deposition in this
4  case; correct?
5      MS. GARCIA:  Objection to form; foundation,
6  argumentative.
7      THE WITNESS:  I know now that you attached
8  his deposition as one of the exhibits, but, again,
9  I didn't review it, so you'd have to point me to
10 it, and then we can discuss it.
11 BY MS. RANUM:
12     Q.   Sure.
13     A.   And I also don't recall the specifics
14 of his fraud conviction.
15     Q.   If you can please turn, it's -- and,
16 Donna, for your purposes, we will introduce
17 Mr. Amor's transcript of his deposition as
18 Exhibit 14 to this deposition.
19          And then, Dr. Leo, if you could
20 please turn to page 218.
21     A.   Okay.  So I'm pulling it up on the
22 computer.
23          Okay.  It looks like I'm very close.
24          All right.  I'm on page 218.

Page 241

1      Q.   Okay.  And on page 218, if you go down
2  to line 23:
3          "Question:  Was it a fraudulent
4      check or some other type of fraudulent
5      transmission that you pled guilty to?"
6          And there was an objection, and then
7      answer from Mr. Amor:
8          "I helped someone, but I'm
9      ultimately responsible.  That's all I'm
10     going to say.  I took the heat for something
11     that I'm responsible for."
12          Did I read that correctly?
13     A.   Yes.
14     Q.   Would you agree with me that Mr. Amor
15 is minimizing his fraud conviction with this
16 testimony?
17     A.   I don't know enough about his fraud
18 conviction to make that conclusion.
19     Q.   People don't -- don't think helping
20 someone is an element of crime of fraud in the
21 state of Illinois, do you?
22     A.   Well, I don't know the statute in
23 the -- in Illinois; but, yes, aiding and abetting
24 could always be involved in any crime that somebody

Page 242

1 pleads guilty to.

2        So helping somebody fraudulently

3 transmit a check could get you convicted under

4 the principles of criminal law, at least, of the

5 underlying act. So this could be an accurate

6 description at a level of generality.

7    Q.   Okay. Was this something that you'd

8 want to ask Mr. Amor about to understand if he did

9 in fact attempt to diminish his culpability for his

10 fraud conviction in his deposition?

11    A.   No. I don't think it's relevant to any

12 of the issues that I opined about in the report.

13    Q.   Did your review of the record note that

14 Mr. Amor had a history as a scam artist or a con man?

15    MS. GARCIA: Object to form.

16    THE WITNESS: I'm not sure what the proper

17 characterization would be, but I do recall some

18 discussion of that in the materials that I

19 reviewed, that he had some convictions and some

20 history of -- of that. I just don't recall the

21 proper characterization, if he was involved in low

22 level fraud. I'd just have to -- you'd have to

23 point me to specific documents that were in the

24 record if you want me to comment on them.

Page 243

1 BY MS. RANUM:

2    Q.   Well, I want to know more what

3 relevance it has to your inquiry. I mean, don't

4 you want to know? You're looking into whether

5 someone may have provided a false confession. If

6 they have a history as a deceptive person, isn't

7 that something that should be factored into your

8 analysis?

9    MS. GARCIA: Object to form.

10    THE WITNESS: I don't think -- I'm sorry.

11    MS. GARCIA: Go ahead.

12    THE WITNESS: I'm sorry. I don't think it's

13 relevant because this confession, as I've said,

14 meets the criteria of a proven false confession.

15 And so the explanation then is what occurred that

16 would explain that. And that's what the report

17 goes through and describes and analyzes.

18        I just don't think that is relevant

19 to this situation.

20 BY MS. RANUM:

21    Q.   So if someone is a proven liar, that

22 has no impact on your inquiry into whether they may

23 intentionally provide a false confession to a crime

24 they actually committed.

Page 244

1    MS. GARCIA: Object to form.

2    THE WITNESS: There's a lot in that question.

3        Can you repeat that question?

4    MS. RANUM: Sure. Donna, do you want to read

5 it back, please?

6        (Record read as follows:)

7            So if someone is a proven

8            liar, that has no impact on

8             your inquiry into whether they

            may intentionally provide a

9            false confession to a crime

            they actually committed

10

11    THE WITNESS: Yeah, I need some

12 clarification. Intentionally provided a false

13 confession to a crime they committed? Can you --

14 can you describe to me what you mean by that?

15 BY MS. RANUM:

16    Q.   Well, we've talked a little bit about

17 how your report and your publications discuss the

18 idea that sometimes guilty suspects make the

19 decision to submit to questioning; correct?

20    A.   Yes.

21    Q.   And we've also discussed that in those

22 same publications, you've indicated that sometimes

23 guilty suspects make a decision to make false

24 statements to the police regarding their

Page 245

1 culpability; correct?

2    A.   Yes. But we didn't talk anything about

3 intentional false confessions. So a guilty suspect

4 might minimize their culpability, like you said,

5 which is maybe in response to the interrogation

6 techniques.

7        But a guilty suspect falsely

8 confessing, that's what confused me. Guilty

9 suspects don't falsely confess. They may make

10 false statements, but they are in fact guilty,

11 and so maybe they -- they are giving a minimized

12 account. But that's not a false confession. That

13 would be most accurately characterized as maybe an

14 inaccurate or a partially inaccurate confession.

15    Q.   Okay. So I can reask -- I understand

16 your concern with the question. So then I guess

17 I'll rephrase it.

18        If someone is a proven liar, does

19 that have any impact on your inquiry into whether

20 they may intentionally provide false details in a

21 confession of a crime that they did commit?

22    MS. GARCIA: Object to form.

23    THE WITNESS: I think hypothetically that

24 could be relevant. I don't think it's relevant to

Page 246

1  any of my analysis or conclusions here.
2        We might be able to come up with a
3  counterfactual in which it could be relevant.
4  BY MS. RANUM:
5     Q.   Okay.  Do you agree that naivete can be
6  a risk factor for a false confession?
7     A.   Yes.  It's sometimes described as
8  related to existing risk factors.  It can play a
9  role, yes.
10    Q.   And how is naivete defined in the
11  literature in the context of being a risk factor
12  for a false confession?
13    A.   It's usually part of an explanation of
14  why juveniles are at a higher risk for false
15  confession; that they are more trusting of
16  authority figures because they are naive about how
17  the world works.
18        I haven't -- I don't recall seeing
19  any articles that are just about naivete, it's
20  usually part of a constellation of factors that
21  explains what is often described as the psycho-
22  social immaturity of juveniles and, again, why they
23  are at greater risk for making or agreeing to false
24  confessions.

Page 247

1     Q.   Your report -- well, strike that.
2        Did you analyze, in the course of
3  the work you did on this case, whether the risk
4  factor of Bill Amor being naive was -- was relevant
5  or a risk factor present in this case?
6     A.   I don't recall doing that, no.
7     Q.   Okay.  So when you're going through,
8  do you have a list of risk factors that you're
9  analyzing to determine which of them and how many
10  of them may apply?
11    A.   I don't have a list of risk factors,
12  no.  Based on my knowledge of the research, I know
13  what risk factors exist, and if I see them present,
14  then I would describe them, as I did in this
15  report.
16    Q.   And to the extent that you don't see a
17  known risk factor as being present in this case,
18  you have not noted that anywhere in your report;
19  correct?
20    A.   Correct.  The focus was on what risk
21  factors were present and what I believe explained
22  how and why he was made to make that statement
23  based on his account, and then later based on their
24  account.

Page 248

1     Q.   Given -- and you've been very clear
2  today that none of these risk factors can be
3  quantified for how they would have impacted the
4  likelihood of a false confession; correct?
5     A.   Correct.  There are some studies
6  that have quantitative information, but we can't
7  extrapolate from that a quantity -- a quantitative
8  risk; if one risk factor were present, what the
9  likelihood would be in his case that that would
10  lead to a false confession.
11    Q.   So --
12    A.   And I said earlier that wasn't even
13  possible scientifically.  Life is too complicated,
14  people are too complicated; there's too much going
15  on.
16    Q.   So in light of that, wouldn't it be
17  appropriate for you to note what factors you found
18  to be applicable and what factors you found to be
19  inapplicable to provide a complete opinion of the
20  likelihood that the specific conditions of this
21  interrogation result could have created a risk of a
22  false confession?
23        MS. GARCIA:  Object to form.
24        THE WITNESS:  So if I understand your

Page 249

1  question correctly -- and you correct me if I'm
2  wrong, okay?
3  BY MS. RANUM:
4     Q.   Yeah.
5     A.   You're asking if there are known risk
6  factors in the literature, in order to write a more
7  complete report, shouldn't I have said, in addition
8  to these, let's say, eight risk factors that I
9  identified, there are twelve other known risk
10  factors, and those risk factors were not present.
11    Q.   Yes.
12    A.   I just don't see the relevance of those
13  to understanding why there was a proven false
14  confession, so I do not think that that was
15  necessary for a report or analysis like this.
16    Q.   Have you reviewed any -- strike that.
17        You've already noted that you're not
18  aware of Bill Amor confessing prior to the October
19  1995 interrogation; correct?
20    A.   Yes.
21    Q.   But you do know that he was questioned
22  with regard to the September 10, 1995, fire prior
23  to his October confession; correct?
24    A.   Correct.

Page 250

1    Q.    And he didn't confess on those
2  occasions; correct?
3    A.    Correct.
4    Q.    Doesn't that reflect him as not notably
5  compliant?
6         MS. GARCIA:  Object to form.
7         THE WITNESS:  I don't think the same level
8  of pressure was brought to bear on him.  He doesn't
9  describe that -- and those are my recollections --
10 that he was interviewed more than interrogated.
11 So I think those questioning sessions are not
12 comparable to the 15-plus hours of custody and
13 interrogation on the 3rd and the 4th of October
14 1995.
15 BY MS. RANUM:
16    Q.    Wouldn't an interview of Bill Amor have
17 been helpful to determine his compliance level?
18        MS. GARCIA:  Object to form.
19        THE WITNESS:  Again, I don't think that's
20 relevant.  The -- there is a clinical test in
21 psychology where you can determine somebody's
22 compliance to -- as a personality trait.  A
23 clinical psychologist could have administered that.
24        If a clinical psychologist

Page 251

1  administered that and found that he was hyper-
2  compliant, on the one hand, or the exact opposite,
3  it wouldn't affect or change any of my conclusions.
4  BY MS. RANUM:
5    Q.    On page 44 of your report, Number 12,
6  you state that the officers in this case violated
7  national police interrogation standards, protocols,
8  and best practices as they existed in 1995; correct?
9    A.    I'm sorry.  So did you say page 34 of
10 my report?  Because --
11    Q.    44.
12    A.    Oh, I must have misheard you.  Okay.
13 Yes, correct.  So I do say that they violated
14 national training standards as they existed in 1995.
15    Q.    You've already testified that you have
16 never been a police officer or an investigator;
17 correct?
18    A.    Correct.
19    Q.    And the only cite that you source for
20 what police standards existed in 1995 is an article
21 written by you and a manual from Reid & Associates?
22    A.    Correct.  So the Reid & Associates
23 manual is sort of the bible of interrogation in
24 America.  It was then, and it's now.  And so they

Page 252

1  pretty much set the standards.  And that's why I
2  mentioned the Reid manual.
3         And I've been through the Reid
4  training.  I've read all of their manuals going
5  back to 1942.  I've read every published manual
6  I could get my hands on, including a lot of
7  unpublished manuals.
8         So I'm using that manual as an
9  exemplar of the standards that they violated.  And
10 when you asked, earlier in the deposition, you said
11 we'd get back to it, why do I consider myself a
12 police practices expert, this is the reason why.
13 Because I have read and analyzed all of their
14 training manuals; I've gone to their training; I've
15 gone to other training; I've read all the published
16 materials; many unpublished materials; interviewed
17 dozens of interrogators.
18        I know this field backwards and
19 forwards, including their best practices standards.
20 And so that's why -- those are the two citations,
21 but that's also the background for my knowledge of
22 police interrogation practices and the do's and
23 don'ts.
24    Q.    Putting aside the alleged physical

Page 253

1  assault which I -- you've already noted in your
2  report is disputed -- what actions did the officers
3  in this case take that you are opining violated
4  national police interrogation standards in 1995?
5    A.    Right.  So one would be the use of
6  promises or threats, which is also disputed,
7  according to my understanding or recollection.
8         Another would be the deprivation of
9  essential necessities; food, drink, sleep, rest.
10 And you might characterize that as disputed too
11 because everybody, that I recall, that's deposed
12 said, you know, he always looked fine, he never
13 looked tired, we offered him food.
14        The four hours of interrogation that
15 Reid & Associates says don't go beyond four hours,
16 and this clearly went beyond four hours.
17        And the contamination, we don't have
18 a record of it, but, like I said -- because we
19 don't have a record of, you know, 99 percent of the
20 questioning -- but, like I said, my analysis of the
21 contamination is based, as is Professor Drizin's,
22 on analysis of the police reports.
23        So those would be the issues.  I
24 outline them, of course, on pages 44 to 46 of the

Page 254

1  report, and the basis for those opinions that it
2  was a violation -- there were violations of the
3  best practices, national training standards, as
4  they existed in 1995.
5      Q.    Has any court found you to be qualified
6  as a police practices expert?
7      A.    I don't know -- or I should say I
8  don't recall if I've ever been offered as a police
9  practices expert.  So I -- you know, every time I
10  testify -- and now it's been, you know, almost
11  400 times -- there is the point in the -- after the
12  voir dire where I'm qualified.  And, you know, it's
13  characterized differently by different attorneys in
14  different courts, so -- so I just don't know if
15  that's one of the ways in which a court has
16  qualified me before.
17      Q.    Well, have you stood up in court and
18  testified that any police department violated
19  policing stand- --- the applicable policing
20  standards at that period in time?
21      A.    I suspect I have, yes, that that has
22  come up in testimony and I've testified to it.
23  There is no reason why I wouldn't have testified to
24  that if it were present in a case and I was asked

Page 255

1  to it -- asked to testify to it.
2      Q.    But you can't tell me a specific case
3  where you were allowed to testify in court on that
4  subject.
5      A.    Off the top of my head, no, I can't
6  tell you it was in this case or that case.
7      Q.    Okay.  You said that you attended
8  Reid's trainings.  When did you start attending
9  Reid -- trainings at John Reid & Associates?
10      A.    So it was in 1991.  And it wasn't at
11  John Reid -- Reid & Associates.  They -- you know,
12  they're a traveling show.  So one of them was in
13  Los Angeles, and one of them was in San Francisco.
14      Q.    So you've attended two Reid trainings?
15      A.    Correct.
16      Q.    When was the one in Los Angeles?
17      A.    It's listed on the c.v.  I think it was
18  like in March of 1991.  I think the other one was
19  in November.  But, you know, it's buried deep in
20  the c.v., and I can tell you specifically.
21           But they were both -- my
22  recollection is they were both in 1991.
23           So it's on page 57 and 58.  And
24  that's exactly right.  The introductory on 58 was

Page 256

1  in March of '91, and the advanced was in November
2  of '91.
3           I have not attended any retraining
4  since, but I've read their published materials
5  since.  So I'd be surprised if there was anything
6  that is different.
7      Q.    And you did not review any of the --
8  you did not review any training materials of --
9  related to the investigators in this case; correct?
10      A.    Correct.
11      Q.    You did not review Mike Cross's
12  training file?
13      A.    Correct.
14      Q.    You did not review Robert Guerreri's
15  training file?
16      A.    Correct.  I don't recall reviewing
17  training files.
18      Q.    So, as you have acknowledged throughout
19  your deposition, the majority of your report fronts
20  the fact that it is accepting Bill Amor's account
21  of what occurred and then you render your opinions
22  from there; correct?
23      A.    Well, the majority of the report
24  analyzes his opinion -- his description.

Page 257

1      Q.    Right.
2      A.    And I also make clear in the report, as
3  I have here, that I am not a fact witness, I don't
4  have personal knowledge of what occurred.  But his
5  account is so much more robust than the officers's
6  account that there's a lot more to analyze there.
7           And, as I mentioned in the report,
8  his account fits with the literature on -- both on
9  how interrogations occur, namely, what techniques
10  are used, and also with the literature on risk
11  factors for false confession.
12      Q.    Why do you say that his account is more
13  robust than the officers'?
14      A.    Because he describes more of what was
15  going on in the interrogation.
16           Apart from whether his description
17  is accurate, you know, he has more to say about
18  what he recalls occurring than what they have to
19  say about what they recall occurring.
20      Q.    But you're not making a credibility
21  determination about whose story is more accurate;
22  correct?
23      A.    Correct.  And when you get to page 48 of

Page 258

1  your report, you address the interrogators's
2  accounts; correct?
3      A.  I think it starts earlier than 48.  I
4  think it starts, at least on my --
5      Q.  Oh, on 46.  I'm sorry.
6      A.  46, yeah.
7      Q.  And 48 would be where you address -- so
8  I apologize.  So on page 46, you address what
9  you -- what your review of the record indicates is
10 the investigators's account --
11     A.  Correct.
12     Q.  -- of the interrogation; correct?
13     A.  Yes.
14     Q.  And then on page 48, you analyze the
15 risk factors for a false confession that were
16 present in the interrogator account of the
17 interrogation; correct?
18     A.  Yeah.  Or even if the interrogator
19 accounts were true, correct.
20     Q.  So what do you mean when you say, on
21 page 49, "In my professional opinion, Mr. Amor's
22 robust and detailed account of the multiple,
23 lengthy, and almost entirely unrecorded
24 interrogation sessions on October 3rd and 4th,

Page 259

1  1995, fits better with the findings of the
2  empirical and scientific research literature on
3  how and why individuals can be moved to make or
4  agree to proven false confessions than the
5  investigators's accounts"?
6      A.  Ah.  That if we look to the scientific
7  research literature for the explanations of why
8  people give proven false confessions, his account
9  is more consistent with those factors and
10 explanations than their account.
11     Q.  And if you assume that the officers'
12 account is accurate, and you discount Mr. Amor's
13 account, do you still reach the conclusion that
14 this is a proven false confession?
15     A.  I mean, I reached that conclusion
16 independent of anybody's account, right?  Because
17 the criteria for that don't have to do with what
18 occurred in the interrogation.
19          And so, having reached that
20 conclusion, I think if you took the officers's
21 account, then, yes, you could say what they are
22 describing, or at least what they're not
23 disagreeing with, could have explained it.  But it
24 makes a lot more sense from Mr. Amor's account.

Page 260

1          Now, you know, some of the things I
2  mention in here, like that he was extraordinarily
3  suggestible, of course that -- you would never know
4  that from anything the officers said because they
5  all describe him as, you know, as alert, and he
6  didn't -- you know, they're -- they don't say
7  anything that suggests he was vulnerable to their
8  techniques.
9          That is based on Dr. Chiappetta, not
10 on their description.  But it's not contradicted by
11 their description.
12     Q.  Well, there's nothing in the record to
13 indicate that the officers had any sort of testing
14 done on Mr. Amor; correct?
15     A.  Correct, correct.  They're just --
16 they're just describing their observations of his
17 demeanor and -- and, to some extent, mental state.
18 But yes.
19     Q.  So, I mean, Dr. Chiappetta's clinical
20 testing postdates their interrogation completely.
21     A.  Correct.  I'm just saying that even if
22 we took their -- their account and assumed
23 hypothetically it was accurate, we still have
24 Dr. Chiappetta's finding, which would provide a

Page 261

1  partial explanation for why -- you know, a risk
2  factor, an explanation for why he would have been
3  more vulnerable to making or agreeing to a false
4  confession.
5          Their account does not rule that out.
6      Q.  Do you believe that false confessions
7  only occur as a result of police misconduct?
8      A.  Not only as a result of police
9  misconduct, no.  And it depends on what we mean by
10 police misconduct.
11         I believe that the vast majority
12 of false confessions occur as a result of
13 psychologically coercive interrogation techniques
14 that usually involve legally prohibited threats and
15 promises, as well as legally permitted lies or
16 false evidence ploys.
17         But it's not the case, in my
18 opinion, that every false confession is necessarily
19 a product of police misconduct, a product of
20 psychological coercion, though it is most of the
21 time.
22     Q.  Do you agree that Bill Amor now has a
23 financial motive to blame his confession on the
24 police even if something else was at play at the

Page 262

1 time of the confession?

2     MS. GARCIA:  Objection; form, foundation,
3 argumentative.

4     THE WITNESS:  I guess if you believe that
5 anybody who brings a lawsuit is motivated by that,
6 then -- then yes.

7          But I think that oversimplifies, as
8 a general matter, why people bring lawsuits like
9 this.

10 BY MS. RANUM:

11     Q.    If you can turn to Exhibit 15 to your
12 deposition, please.

13     A.    Okay.  So is that -- I didn't print
14 that out.  I think it's his deposition, right?

15     Q.    No, no, no.  This one is your article
16 with Brian Cutler --

17     A.    Okay.  Okay.  Great.  I'm going to
18 print it out then.

19          So I think it's a preprint of my
20 article, but I may be wrong.  Let's see.

21          Yeah, so it doesn't look like it's
22 the final ... shoot.  All right, give me just a
23 second.

24          All right.  I'm going to print it

Page 263

1 out, and I'm just going to -- it's not going to
2 take very long.  I'm just going to mute my voice
3 here for a second so you don't hear the printing.

4          Okay.  I'm back.

5     Q.    Okay.  So I'm showing you what's been
6 marked as Exhibit 15 to your deposition.  It's an
7 article titled False Conviction -- sorry, it's late
8 in the day -- False Confessions in the 21st Century.

9          This is an article that you
10 co-authored with Brian Cutler?

11     A.    Correct.  Like I said, I think it's a
12 pre-published version, yes.

13     Q.    Okay.  And has it been published?

14     A.    Yeah, it was published in the -- The
15 Champion.

16          So it looks like you downloaded it
17 from my SSRN website?

18     Q.    I did, yes.

19     A.    And sometimes the publication doesn't
20 give me the copyright, and therefore I'm only
21 permitted to have the research librarians post the
22 most recent pre-published copy, and other times
23 when I get the copyright, I can post the actual
24 one, and sometimes I just forget, so I post it

Page 264

1 before it's published and I forget to update it
2 when it's published even if I have the copyright.

3     Q.    Okay.  Are you aware of it changing in
4 any significant ways from the copy that you're
5 looking at in Exhibit 15 to the copy that was
6 published?

7     A.    I am not.  But obviously I'd have to
8 compare it.  But my guess is that it's 95 to
9 99 percent similar.

10     Q.    Okay.  Mr. Cutler, until recently,
11 primarily focused his work on eyewitness
12 identification --

13     A.    Correct.

14     Q.    -- issues; correct?

15     A.    I don't know how recently, I don't
16 recall how recently he developed an expertise in
17 interrogations and confessions.  I would guess
18 around 2010 or '11.

19     Q.    Okay.  Time is moving quickly, I guess?

20     A.    Yeah.  It goes by faster,
21 unfortunately, as we get older.

22     Q.    What was the point of this paper in
23 Exhibit 15?

24     A.    So I think that this magazine was doing

Page 265

1 a special issue on false confessions.  And, if I
2 recall correctly, the point of this was to just
3 give an overview of the context of the phenomena,
4 and then other people wrote articles that might
5 have been more specifically focused on a particular
6 aspect of false confessions.  So I think it was
7 just a general overview of the field article
8 written for an audience of lawyers.

9     Q.    It does appear to lay out strategy that
10 a criminal defense attorney should pursue in the
11 event that they want to dispute a confession; is
12 that fair to say?

13     A.    Correct.  If they're -- if they are --
14 if they believe their client is innocent, and
15 they're making a false confession defense, it does
16 describe what is relevant, or at least some
17 relevant ideas and information that would be
18 relevant to their strategy for successfully
19 litigating a false confession case as a criminal
20 defense attorney.

21     Q.    And the strategy that you lay out
22 does not include working with a false confessions
23 expert; correct?

24     A.    Well, that's good.  Yeah, I didn't

Page 266

1  remember that.  But that's good, yeah.  I'm glad
2  you point that out.  Thank you.
3      Q.    And you state in your conclusion that
4  false confession defenses have never been more
5  winnable.
6            Do you believe that to be the case
7  today?
8      A.    Well, to the extent the defense bar
9  is educated about the science, yes.
10           And when I started in the 1990s,
11 most defense lawyers did not really know about the
12 social science, and, of course, that's evolved
13 tremendously.
14           So, yeah, to the -- and also they're
15 better trained.  So to the extent they're better
16 trained, particularly public defenders, and to the
17 extent that they are more knowledgeable about the
18 relevant social science, then I would say yes.
19     MS. RANUM:  I think I am pretty close to
20 being done.  It would help me a lot if I could just
21 have about five or ten minutes to review my out
22 line, gather my thoughts.  But I know you have a
23 hard stop.  It's 4:12 there, and you have a hard
24 stop at 6:00, right?

Page 267

1      THE WITNESS:  Well, that's 6:00 my time,
2  that's not 6:00 your time.  So --
3      MS. RANUM:  Right.  That's what I meant.
4      THE WITNESS:  Yeah, we've got plenty of time.
5  And I would like a five-minute break too.  So do
6  you want to say five or do you want to say ten?
7  What would you like?
8      MS. RANUM:  Why don't we say --
9      MS. GARCIA:  So that I can also look at my
10 notes, and if you're done after your -- you know,
11 asking more questions, and I could potentially just
12 go straight into my questioning without having to
13 then review?
14     MS. RANUM:  Okay.  So how long would you like
15 to take, Mariah?
16     MS. GARCIA:  Let's say -- let's just round up
17 to 6:30 our time, 4:30 your time, Dr. Leo, if that
18 works for everyone?
19     THE WITNESS:  That sounds good.
20     MS. RANUM:  All right.
21     MS. GARCIA:  It will give me a chance again
22 to review my notes too.
23     MS. RANUM:  All right.  Sounds good.  We'll
24 go off the record and we'll see everyone at 6:30.

Page 268

1      VIDEO TECHNICIAN:  We're off the record at
2  6:13 at the end of media unit four.
3            (Recess taken.)
4      VIDEO TECHNICIAN:  We are back on the video
5  record at 6:33 at the beginning of media unit five.
6  BY MS. RANUM:
7      Q.    All right.  Dr. Leo, I just have a
8  couple follow-up questions for you.  I think we're
9  just about wrapped up.
10           Were you able to establish
11 objectively that Bill Amor had no choice but to
12 confess?
13     A.    I don't know what you mean by
14 "objectively," but I am going on his description of
15 how the interrogation techniques affected him.
16           So because we don't have a recording
17 of the interrogation and his verbalizations at that
18 time, that was the basis for my opinion when
19 reviewing his account.
20     Q.    Now, you would agree with me -- or
21 would you agree with me that Bill Amor did not
22 trust the police in 1995?
23     MS. GARCIA:  Object to form, foundation.
24     THE WITNESS:  Yeah, I would need to know what

Page 269

1  the basis for your belief is.  If you want to point
2  me to something in the record, I'm happy to review
3  it.
4  BY MS. RANUM:
5      Q.    Well, you've said that you did not find
6  naivete to be a risk factor that applied in this
7  case; correct?
8      A.    I didn't see any evidence of naivete,
9  that I recall.
10     Q.    And did you see any evidence that Bill
11 Amor had any sort of unconditional trust in the
12 police in this case?
13     MS. GARCIA:  Object to form.
14     THE WITNESS:  No, but I wasn't inferring from
15 the absence of that --
16     COURT REPORTER:  Excuse me, but did you just
17 object?  Because it's really hard to hear you
18 sometimes, and I'm afraid I'm missing your
19 objections.
20     MS. GARCIA:  Object to form, yes.
21     COURT REPORTER:  The question was:  Did you
22 see any evidence that Bill Amor had any sort of
23 unconditional trust in the police in this case?
24     THE WITNESS:  I do not recall seeing that

Page 270

1  evidence.
2      MS. RANUM:  Okay.  At this time, I don't
3  believe I have any other questions for you.
4  Thank you for your time today.
5      THE WITNESS:  All right.  Thank you.
6          EXAMINATION
7  BY MS. GARCIA:
8      Q.   Okay.  I only have a bit of follow-up.
9  I'll try to make it quick for you so we can all get
10  out of here.
11          Okay.  You testified a lot that you
12  did not receive the entire investigative file in
13  this matter; correct?
14     A.   I think that counsel referred to
15  documents that I have not received, and so I
16  assumed I had not received every single paper in
17  the file.
18     Q.   Okay.  And understanding that
19  investigative file is kind of a loose terminology,
20  have you ever requested an entire investigative
21  file of a proceeding that you've been an expert on
22  in the past?
23     A.   No, I've never requested that, and I've
24  always thought it would be irresponsible to do that

Page 271

1  when there is such a large file, because obviously
2  experts are expensive, and experts only need to
3  review the relevant information, which typically is
4  not the entire information.
5      Q.   Okay.  And during the course of this
6  particular process of writing your expert report,
7  did I, as counsel, or any other counselor,
8  represent to you you were receiving the entire
9  investigative file?
10     A.   No.
11     Q.   Regardless of not receiving the entire
12  investigative file, can you estimate how many pages
13  you reviewed in coming to your conclusions in this
14  report?
15     A.   I would estimate 5,000 pages?  Between
16  5 and 10,000 pages?  Obviously all the documents
17  are listed on pages 4 to 6, but from my
18  perspective, it's a substantial amount of material
19  for an expert like me to have reviewed.
20     Q.   Okay.  And you kind of guessed at my
21  next question, which was, did you feel like the
22  amount of documents and the documents you received
23  were sufficient to allow you to produce a reliable
24  report in this matter?

Page 272

1      A.   Yes.
2      MS. RANUM:  Objection to form, foundation,
3  calls for speculation.
4  BY MS. GARCIA:
5      Q.   You can answer, Dr. Leo.
6      A.   Yes.
7      Q.   And why do you feel that is the case?
8      A.   Well, it struck me as pretty
9  comprehensive as -- as the case went.  There's a
10  lot of material, and it -- I do not recall at any
11  point thinking there were more materials that I
12  needed to review.
13     Q.   Okay.  And if you had felt that you
14  needed to review more materials, would you have
15  asked for those materials?
16     A.   I would have, yes.
17     Q.   Okay.  You testified that you are not a
18  clinical psychologist; correct?
19     A.   Correct.
20     Q.   You also testified to the effect that
21  you relied on the analysis of two clinical
22  psychologists to come to certain conclusions about
23  Mr. Amor's risk of making false or unreliable
24  confession statements; correct?

Page 273

1      A.   Based on his personality, yes.
2      Q.   Based on his personality.  Okay.
3          Within your field of social
4  science and investigating the likelihood of false
5  confessions, is relying on the analysis of clinical
6  psychologists generally accepted, or is that
7  something that you wouldn't be doing as an expert
8  in your field?
9      MS. RANUM:  Objection to form.
10     THE WITNESS:  Yes; my understanding is it
11  generally accepted.
12  BY MS. GARCIA:
13     Q.   And have you relied on analysis of
14  clinical psychologists or other people who are
15  trained to make determinations about the
16  personality of witnesses or suspects in criminal
17  cases to make determinations about the likelihood
18  of false confessions in the past?
19     A.   Yes.
20     Q.   Similarly, you testified you are not a
21  fire expert; correct?
22     A.   Yes.
23     Q.   And you testified that, based on a
24  review of some of the reports of the fire

Page 274

1  scientists, you came to the conclusion that
2  Mr. Amor's confession was a proven false confession;
3  correct?
4      A.   Correct.
5          MS. RANUM:  Objection to form.  Misstates
6  prior testimony.
7  BY MS. GARCIA:
8      Q.   Okay.  Along those lines, when you're
9  coming to the criteria of whether or not something
10 is a proven false confession, is it generally
11 accepted within the field of social science to rely
12 on the analysis of the subject matter expert in
13 that specific field, in this case being fire
14 science?
15     A.   Yes.
16     Q.   We also talked a little bit about
17 contamination and scripting within the deposition;
18 correct?
19     A.   Yes.
20     Q.   Would you say that it was hard to get a
21 full extent of the contamination and scripting in
22 this matter given the lack of contemporaneous
23 recording during Mr. Amor's polygraph testing at
24 Reid & Associates, and then his interrogation on

Page 275

1  October 3rd and 4th prior to ASA Nigohosian's
2  recorded statement?
3          MS. RANUM:  Objection to form.
4          THE WITNESS:  Yes.
5  BY MS. GARCIA:
6      Q.   Okay.  And Mr. Nigohosian's questioning
7  of Mr. Amor was recorded; correct?
8      A.   Yes.
9      Q.   And I know you're not an evidence
10 technician or something comparable, but is there a
11 reason you can think of that the detectives in
12 this case could not have also recorded his prior
13 interrogation, at least the interrogation that
14 occurred at Naperville Police Department?
15         MS. RANUM:  Objection to form, foundation,
16 calls for speculation.
17         THE WITNESS:  If they had the same tape-
18 recorder or access to the same tape-recorder that
19 ASA -- that was used in ASA Nigohosian's question
20 and answer at which both Detectives Guerreri and
21 Cross I believe were present, then, no, they would
22 have had the same capacity to record, at least
23 audio record.
24

Page 276

1  BY MS. GARCIA:
2      Q.   And I believe that counsel asked you
3  whether or not you were making a credibility
4  determination in your report; correct?
5      A.   Correct.
6      Q.   And you are not making a credibility
7  determination; correct?
8      A.   Correct.
9      Q.   And you reviewed Judge Brennan's orders
10 in this case both in 2017 and 2018; correct?
11     A.   I believe so.
12         But as I sit here, I'm not recalling
13 specifically what they said.
14     Q.   I don't think we need to pull it up.
15     A.   Okay.
16     Q.   But based on your review of the 5,000
17 pages that you represented you went over for the
18 report, did you see any evidence in the record
19 that this fire on September 10, 1995, was set by
20 Mr. Amor?
21         MS. RANUM:  Objection to form.
22         THE WITNESS:  My recollection is that the
23 judge at the second trial -- well, my recollection
24 is no, in the second trial there was -- there

Page 277

1  was -- I forgot how you phrased the question, so I
2  don't want to misstate my answer in response to
3  your question.
4  BY MS. GARCIA:
5      Q.   I can rephrase it.
6      A.   Okay.
7      Q.   You testified earlier that you
8  approximate you read through around 5,000 pages of
9  documents; correct?
10     A.   Right.  Correct.
11     Q.   And that included police reports;
12 correct?
13     A.   Yes.
14     Q.   And that included, though you can't
15 remember specifically what was said, that included
16 Judge Brennan's determination in Mr. Amor's post-
17 conviction proceedings and retrial; correct?
18     A.   Yes.
19     Q.   And in those documents, in the police
20 reports, in the opinions that were rendered by
21 Judge Brennan, did you see any evidence within that
22 record that Mr. Amor set the fire on September 10,
23 1995, in the Miceli condo?
24     A.   My best recollection is no, with

Page 278

1  respect to the second trial.

2      MS. GARCIA:  No further questions.

3      MS. RANUM:  I do have one quick follow-up on

4  that, Dr. Leo.

5          FURTHER EXAMINATION

6  BY MS. RANUM:

7      Q.   Counsel asked you about proven false

8  confessions.

9          Who derived the term "proven false

10 confession"?

11     A.   So I coined it with Professor Richard

12 Ofshe in the 1998 article that was one of the early

13 exhibits in the case, The Consequences of False

14 Confessions.  So that's where we coined that term.

15     Q.   And has that term been adopted by your

16 colleagues in your field?

17     A.   It has, yes.

18     Q.   And can you name any studies that

19 weren't conducted by you where your colleagues have

20 utilized the framework that you established with

21 the term "proven false confession"?

22     A.   The 2010 review article that was

23 footnote 3, I believe, I think that they

24 describe -- discuss proven false confessions.

Page 279

1          I know it's been discussed in other

2  articles.  I don't know if anybody has done a study

3  that I haven't been on that aggregates proven false

4  confession cases, but it's been widely used in

5  articles and chapters.  No one has disputed, to my

6  knowledge, that framework.

7      MS. RANUM:  Okay.  Thank you for your time

8  today.

9          I have nothing further.

10     MS. GARCIA:  Nothing further from me.

11     THE WITNESS:  When we're off the record, I

12 just need to ask a couple questions.

13     MS. GARCIA:  Yeah; well, before we go off,

14 I know you're familiar with this, but would you --

15 would you like to waive signature, or do you want

16 to review the transcript?

17     THE WITNESS:  No, I would like to review the

18 transcript.

19     MS. GARCIA:  Okay.

20     VIDEO TECHNICIAN:  This concludes today's

21 deposition.  We are going off the video record at

22 6:48 at the end of media unit five.

23          (The proceedings adjourned at

24               6:48 p.m.)

Page 280

1      IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2            EASTERN DIVISION
3  WILLIAM E. AMOR,         )
                            )
4        Plaintiff,    )
                            )  No. 18 CV 2523
5        vs.               )
                            )
6  NAPERVILLE POLICE OFFICERS )
   MICHAEL CROSS; et al.,    )
7                           )
         Defendants.    )
8
9      This is to certify that I have read my
10 deposition taken on Monday, April 12, 2021, in the
11 foregoing cause and that the foregoing transcript
12 accurately states the questions asked and the
13 answers given by me, with the changes or
14 corrections, if any, made on the Errata Sheet
15 attached hereto.
16
       _____
17        RICHARD A. LEO, Ph.D., J.D.
18
   No errata sheets submitted (Please initial)
19 Number of errata sheets submitted_____pages
20
   Subscribed and sworn to
21 before me this_____day
   of_____2021.
22
23 _____
     Notary Public
24

Page 281

1      REPORTER'S CERTIFICATE
2      I, Donna M. Urlaub, do hereby certify that
   RICHARD A. LEO, Ph.D., J.D., was duly sworn by me
3  to testify the whole truth, that the foregoing
   deposition was recorded stenographically by me and
4  was reduced to computerized transcript under my
   direction, and that said deposition constitutes a
5  true record of the testimony given by said witness.
6      I further certify that the reading and
   signing of the deposition was not waived, and the
7  deposition was submitted to Ms. Mariah E. Garcia,
   plaintiff's counsel, for signature.  Pursuant to
8  Rule 30(e) of the Federal Rules of Civil Procedure,
   if deponent does not appear or read and sign the
9  deposition within 30 days, the deposition may be
   used as fully as though signed, and this
10 certificate will then evidence such failure to
   appear as the reason for signature not being
11 obtained.
12     I further certify that I am not a relative
   or employee or attorney or counsel of any of the
13 parties, or a relative or employee of such attorney
   or counsel, or financially interested directly or
14 indirectly in this action.
15     IN WITNESS WHEREOF, I have hereunto set my
   hand and affixed my seal of office at Chicago,
16 Illinois, this 18th day of April 2021.
17
18
       _____
19        Illinois CSR No. 084-000993
20
21
22
23
24

Page 282

1  Errata Sheet

2

3  NAME OF CASE: WILLIAM E. AMOR vs MICHAEL CROSS

4  DATE OF DEPOSITION: 04/12/2021

5  NAME OF WITNESS: Richard A. Leo, PhD, JD

6  Reason Codes:

7      1. To clarify the record.

8      2. To conform to the facts.

9      3. To correct transcription errors.

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  Page _____ Line _____ Reason _____

23  From _____ to _____

24

25              _____

**Exhibits**

**1 Leo 041221-1** 10:11,14,20

**2 Leo 041221-2** 11:24 12:5 48:2

**3 Leo 041221-3** 21:9,12,23 24:12 25:16 53:15 68:3

**4 Leo 041221-4** 30:16,21

**5 Leo 041221-5** 91:13,14,15,21, 22 181:11

**6 Leo 041221-6** 54:16

**7 Leo 041221-7** 38:9 39:9

**8 Leo 041221-8** 50:7 51:9

**9 Leo 041221-9** 181:15,20 183:5 185:19

**10 Leo 041221-10** 201:22 202:9 204:8 205:17,21 208:8 212:19 213:9,11

**11 Leo 041221-11** 223:10,16 225:18

**12 Leo 041221-12** 39:19 44:6

**13 Leo 041221-13** 235:12 236:10

**14 Leo 041221-14** 240:18

**15 Leo 041221-15** 262:11 263:6 264:5,23

**$**

**$36,855** 11:8

**$450** 9:3

**$450-per-hour-rate** 9:17

**0**

**02523** 5:9

**1**

**1** 10:11,14,20 235:19

**10** 18:13 21:15 54:10 59:21 69:19 89:10 120:18 195:6 201:22 202:9 204:8 205:17,21 208:8,17 212:19 213:9,11 249:22 276:19 277:22

**10,000** 271:16

**10/4/95** 236:23

**100** 69:15 167:24

**10:10** 237:2,5

**10th** 21:20 24:4 81:5 105:1

**11** 26:9 173:15 197:3 223:10,16 225:18 264:18

**11:01** 5:3

**11:37** 134:1,5

**12** 5:6 26:9 39:19 44:6 48:3 235:19 251:5

**122** 27:5

**125** 42:7 43:5 44:11

**12:15** 141:10

**12:25** 67:1

**12:33** 67:4

**13** 26:5 48:11 50:10 235:12 236:10

**13804** 217:7

**14** 186:6 240:18

**15** 18:7 20:23 50:11 94:7 97:8 128:2 134:7 141:6,14 186:3,6,14 198:10 199:9 200:13 222:13 262:11 263:6 264:5,23

**15-plus** 250:12

**15th** 200:20

**16** 10:22 217:9,16 218:3 227:3

**16th** 55:20 56:1

**17** 42:5

**18** 5:9 10:23 96:18

**180** 36:15

**182** 29:4

**19** 91:10

**1908** 33:19,21

**192** 155:20

**194** 223:21 224:2

**1942** 252:5

**1960** 34:13

**1960s** 33:18

**1970s** 33:18 34:13

**1980s** 33:23 34:1

**199** 226:2

**199-** 34:6

**1990** 15:4

**1990s** 33:23 34:1,3 266:10

**1991** 15:4 255:10,18,22

**1992** 27:4 34:24 36:14,19

**1992-** 36:19

**1993** 27:4 34:24 36:20

**1995** 21:15 24:5,10 33:14,21 34:6 54:10 63:5,10,18 69:20 70:6,18 89:10 99:21 100:6 106:12 116:5 120:16,19 128:8 132:20 136:14 142:8 157:11 182:11 198:10 199:10,21 200:4,13 201:9 205:16 208:1,10 209:1 210:24 211:11 218:19 225:9,23 236:20 249:19,22 250:14 251:8,14,20 253:4 254:4 259:1 268:22 276:19 277:23

**1996** 19:20 28:12 31:2,16 34:7 45:3 91:10 92:5 159:4

**1997** 19:22 223:19 225:17

**1998** 35:22 37:23 39:5 171:19 278:12

**1:14** 202:6 207:20

**2**

**2** 11:24 12:5 31:22 43:10,13 48:2 49:3 50:19 52:4,5 55:17 66:20 120:7 159:16 168:2 198:12,22 206:24 207:5 218:14

**20** 5:14 20:17 55:2 59:21 94:7 134:7 141:14 167:14 169:1,5

**20-hour** 93:12

**2003** 145:4

**2004** 39:14,24 43:6,23 44:6 71:15 84:11 171:21

**2006** 18:21

**2008** 46:16 152:6 155:21

**2010** 48:12 121:22 172:4 192:13, 17,19 264:18 278:22

**2011** 48:3,4 145:6 194:3

**2012** 193:18

**2013** 51:11,14

**2017** 24:13 25:9 276:10

**2018** 276:10

**2020** 8:15

**2021** 5:6 12:7,9,15 51:9,13 100:5

**20th** 55:22

**218** 240:20,24 241:1

**21st** 263:8

**22** 106:1

**22nd** 49:5 52:20 53:1

**23** 241:2

**24** 108:21 111:4 115:20 118:4

**24-hour** 135:17

**25** 18:7

**250** 22:17

**2685** 181:19

**2687** 181:20

**27** 127:5

**28** 132:5

**29** 137:19 142:10 145:18

**292** 32:17

**2:00** 141:11

**2:11** 208:21

**2:14** 141:22 208:22

**2:22** 205:7

**2:30** 205:8

**2:45** 141:19

**2:49** 142:1

**3**

**3** 21:9,12,23 24:12 25:16 53:15
55:18 68:3 137:20 141:6 186:2,14
192:13 205:10 278:23

**30** 29:22 30:13 55:2 139:6 146:21
148:5 159:12

**30(b)(4)** 6:6

**31** 148:24

**32** 150:9

**34** 163:23 251:9

**35** 169:14 175:9

**3562** 91:19

**3566** 91:19

**36** 175:9,21 210:5

**37** 210:5

**375** 9:10 49:4,13

**39** 195:5

**3rd** 24:10 106:12 116:5 120:16
132:20 133:24 139:18 148:20
157:11,16 250:13 258:24 275:1

**4**

**4** 24:5 30:16,21 70:6,18 135:21
145:18 186:16 192:14 205:13
207:24 271:17

**4/14/97** 182:3

**40** 55:2 195:16 208:17

**400** 254:11

**41** 196:11

**43** 197:16,24 201:16 204:11,12
211:13,21

**437** 38:15

**44** 251:5,11 253:24

**45** 137:22 139:13

**452** 194:3

**46** 106:18 122:16,18,19 137:23
253:24 258:5,6,8

**465** 194:3

**47** 137:21 138:19

**48** 145:4,7 257:24 258:3,7,14

**49** 258:21

**4:12** 266:23

**4:22** 205:4

**4:23** 205:10

**4:30** 205:8 267:17

**4:36** 205:13

**4th** 24:10 93:2 106:12 120:16
199:21 200:4 202:4 205:16 208:10
209:1 210:24 211:11 218:19 235:9
236:20 250:13 258:24 275:1

**5**

**5** 18:13 43:13,20 91:14,15,21,22
92:15 181:11 271:16

**5,000** 271:15 276:16 277:8

**50** 127:23 131:13,15 132:13 145:9

**51** 22:2

**57** 168:1 255:23

**58** 255:23,24

**5888** 220:17,24

**5:00** 27:24

**6**

**6** 43:7,16,21,22 52:9 54:16 55:17
56:17 198:13 206:24 271:17

**60** 20:24 28:19 36:4 131:13

**600** 5:15

**65** 193:18

**68** 193:18

**69** 168:1

**6:00** 266:24 267:1,2

**6:13** 268:2

**6:22** 205:5

**6:30** 205:6 267:17,24

**6:33** 268:5

**6:48** 279:22,24

**7**

**7** 38:9 39:9 135:16 136:11 138:2,6

**70** 179:1,16

**8**

**8** 50:7 51:9 192:14 205:5 210:6

**80s** 139:11

**818** 201:24

**85** 122:19 235:15

**88** 168:2

**9**

**9** 68:13,16 70:20 135:16 136:11
138:2 181:15,20 183:5 185:19

**91** 256:1,2

**911** 87:3 232:2,23 233:9,22 234:7

**94** 31:17

**947** 42:20 43:2

**95** 52:1 100:23 127:16 128:15 264:8

**98** 180:12

**99** 253:19 264:9

**9:00** 27:24

**9:45** 237:3

---

**A**

**A-N-G-E-L-O** 6:20

**a.m.** 5:3 202:6 207:20 208:22 237:2,3,5

**abetting** 241:23

**ability** 73:16 130:4,11

**absence** 269:15

**absent** 60:5

**absolutely** 84:14 237:15

**abstraction** 82:18

**abuse** 111:4,7,16,20 113:6

**abusive** 111:8

**accept** 218:24 232:1

**accepted** 119:13,22 122:8 130:22 172:9 186:16 273:6,11 274:11

**accepting** 256:20

**access** 45:11 53:11 76:6 275:18

**accessible** 75:6

**accident** 229:10,13 230:2

**accidental** 81:6 84:1 85:3 160:10 229:20,21

**accidentally** 160:5,14,21 161:8

**account** 78:8 98:13 106:4,8,19,22, 23 107:8 108:11 109:2 112:1 114:3,9 118:20 125:2 144:11 165:24 166:3,5 245:12 247:23,24 256:20 257:5,6,8,12 258:10,16,22 259:8,10,12,13,16,21,24 260:22 261:5 268:19

**accounts** 98:12 114:10 258:2,19 259:5

**accuracy** 123:24

**accurate** 12:6 37:10 50:3 51:6 76:21 98:13 107:22 114:9 151:12 154:2,16,23 186:12,17 197:9 209:11 242:5 257:17,21 259:12 260:23

**accurately** 93:14 151:21 152:3,17 239:16 245:13

**accusation** 151:1 160:11

**accused** 49:18

**acknowledge** 106:3 226:7

**acknowledged** 256:18

**acquired** 29:17

**act** 160:17 212:17 223:24 224:9 228:15 229:9 242:5

**acted** 164:9,19 165:4 228:20 229:1

**action** 216:13

**actions** 229:21 230:4,17 253:2

**active** 139:24 214:5,7

**acts** 229:19

**actual** 18:2 123:20 129:14 161:6, 12 191:12 263:23

**added** 187:9

**addition** 19:12 116:19 195:23 211:23 249:7

**additional** 29:9 53:1 207:23

**address** 107:15 111:4 130:12 140:23 173:6 179:3 258:1,7,8

**addresses** 57:12 68:7

**adjourned** 279:23

**adjunct** 143:12

**adjust** 128:14

**administer** 181:1

**administered** 180:21 181:8 182:2 183:1,14,16,19 250:23 251:1

**administers** 184:3

**administration** 180:18

**administrator** 15:14 184:9

**admission** 143:14 224:6

**admissions** 20:10 144:21

**admit** 166:4 173:11 219:4 221:23 230:17

**admits** 166:2

**admitted** 214:13 230:12

**adopt** 165:14,23 212:15 214:22 216:9

**adopted** 124:20 278:15

**adopting** 215:5,21 227:16

**adrenaline** 140:24

**adults** 136:11 138:2

**advance** 100:19

**advanced** 256:1

**advisor** 27:14

**advocating** 225:19

**affect** 182:22 204:6 251:3

**affected** 268:15

**affecting** 129:14

**affects** 130:10

**affidavit** 24:13,17,22,24 25:5,7,10, 15,18,20,21 26:1,10,12,16 80:7 234:11

**affirmatively** 216:16

**afraid** 269:18

**afternoon** 141:11

**agency** 9:15

**aggregates** 279:3

**aggressive** 111:9

**agree** 59:15 76:22 77:1,4 82:13,15, 19 83:24 84:20 88:4 102:2 103:18 111:10 120:21,24 121:5,8 128:24 135:10 137:13 140:13 149:21 157:6 159:6 161:18 214:9 218:23 221:8,11 225:7 226:15 228:17,24 229:17 230:15 241:14 246:5 259:4 261:22 268:20,21

**agreed** 7:2 140:18 204:5

**agreeing** 187:24 246:23 261:3

**ahead** 34:17 77:19 217:8 234:22 243:11

**aiding** 241:23

**alert** 260:5

**alibi** 72:15

**alive** 71:9

**allegations** 113:6,8,12,16

**alleged** 111:20 216:10 252:24

**allegedly** 145:23

**allowed** 64:17 255:3

**alluded** 108:23

**altogether** 31:6

**Alyson** 193:16

**ambiguous** 93:7

**America** 251:24

**American** 31:6 46:17 152:7 162:8

**Amor** 5:8 11:5,12 21:19 24:3
58:12,14,19 62:5,18 63:5,10,17
65:7 66:14 67:10,18,22 69:18 70:1,
5 79:8 87:6,12,20 88:5 89:7 90:6,
12 92:5,11 93:11,22 98:15,19 99:9
104:9 107:12 113:7 115:3 116:21,
22 117:11 120:15 132:19 134:6,12,
24 135:10,18 136:18 137:12
139:16 140:6 143:2 146:18,23
147:1,3,20 148:13,15,17,19 149:14
151:21,22 157:2,10,14 158:15
159:21 160:10 161:15,18 163:20
164:7,14,18 165:14 167:1 169:4
171:6 172:10,16 173:1 175:12
178:3,8,19 180:11,17 181:9 183:2,
9 185:14 187:11 188:14 199:6
200:5,13,21 201:5 202:8,12 203:23
204:2,5 206:9 207:21 208:9 211:9
212:2,7,19 213:6,16 214:2,5,12,17,
24 216:9 218:20,24 221:17 222:7
227:1 231:1,19 232:18 234:16
236:19 237:14,19 239:16 240:2
241:7,14 242:8,14 247:4 249:18
250:16 260:14 261:22 268:11,21
269:11,22 275:7 276:20 277:22

**Amor's** 19:9 23:5 25:12 52:13 53:2
54:3 57:16 61:13 62:23 66:12 75:9,
21 76:1 78:19 86:21 98:13 99:21
104:14 106:5,21 109:2 112:1 116:3
118:19 120:23 121:2 133:11,23
136:13 142:7,16 144:18 161:1
164:23 165:3,7 169:21 179:18
181:6 187:15 189:22 194:19
195:24 197:13,19 198:9 199:9
205:16 207:8 208:24 210:13,16
211:15 213:14 230:24 232:12
235:7 240:17 256:20 258:21
259:12,24 272:23 274:2,23 277:16

**amount** 130:14,15 208:11 271:18,
22

**analyses** 183:24

**analysis** 40:24 41:5 57:24 58:8,24
59:1,2 60:14,24 61:19 62:9 63:21
64:3 68:3 73:6 83:3 84:3 86:2,4,9
90:5,9 96:1,2 98:6 100:12 102:21
104:12 107:16 112:24 113:22
114:6 116:23 117:2 122:22 123:5,
17,23 125:6,20 126:15,21,22,23
130:3 133:9,21 147:5 157:16,21
170:3 182:10 187:15 190:18
202:18,20,21 205:24 206:5,6
209:15 210:21 211:3,6 230:23
231:11,15 243:8 246:1 249:15
253:20,22 272:21 273:5,13 274:12

**analyze** 29:12 37:16,20 42:5,14
124:19 228:21 230:7 247:2 257:6
258:14

**analyzed** 36:18 42:16 44:11 57:21
68:24 78:2 126:1 144:24 252:13

**analyzes** 243:17 256:24

**analyzing** 61:22 188:13 205:20
208:9 247:9

**and/or** 109:7,15 111:8 144:21
169:18 171:2

**Angeles** 45:17 255:13,16

**Angelo** 6:11,18

**answers** 123:11 184:8,10,11,12
185:12 186:6 234:3

**anticipate** 221:3

**anticipated** 97:15

**anxiety** 178:10,20 179:3,7

**anxious** 179:13

**anybody's** 259:16

**apartment** 87:7,21 215:2 221:4
232:3,5 233:7,23

**apologize** 39:21 217:22 235:18
258:8

**apostrophe** 237:10

**apparently** 231:8

**appeared** 197:20

**appears** 22:1 25:20 26:10 144:5
147:14

**applicable** 248:18 254:19

**application** 41:5

**applied** 40:23 57:22 71:11 96:16
269:6

**apply** 68:2,5 103:3 136:22 189:1
247:10

**applying** 94:24 103:15 113:4

116:3 132:18 136:20

**appointed** 9:9

**approach** 143:4,5

**approximate** 277:8

**approximately** 8:1 11:18 29:4
88:3 139:8

**April** 5:6

**area** 28:20 139:4

**areas** 167:6

**argumentative** 26:17 60:10 77:18
234:20 237:23 240:6 262:3

**arises** 21:14

**arousal** 153:2,13

**aroused** 140:15

**arranged** 27:16

**arrest** 67:19 90:13 147:1 148:8,10,
15 235:9

**arrested** 148:20,23

**arrived** 58:1

**arson** 43:8,11,14,22 60:4,6,8
71:12,18,24 72:5 79:2,4,11 132:2
142:20,21 149:1,8 160:13,15
196:18 226:16

**arsons** 71:16 72:1

**article** 12:11 22:17,18 28:12 29:6
30:22,23 31:2,5,20 32:3,15 34:7
35:24 38:2,8 39:9,11,14 42:1,5,21
43:23 44:5,13 48:4 71:14,15 76:4
104:10 121:22 159:9 172:4 192:15
223:12,17,18,21 225:17 226:2,7
251:20 262:15,20 263:7,9 265:7
278:12,22

**articles** 8:11 33:21,24 34:2 35:6,
13 46:3 47:21 48:19 71:6 72:14
121:21,24 122:5 246:19 265:4
279:2,5

**artificial** 158:1

**artist** 242:14

**ASA** 173:17 208:22 213:1 275:1,19

**ashtray** 204:14

**aspect** 20:8 126:10 265:6

**ass** 171:7,10

**assault** 59:23 112:12 230:11,16
253:1

**assaulted** 59:7

**assert** 120:12

**asserted** 175:14,20

**asserting** 63:22 66:4 123:19 179:12

**assertion** 175:16 228:19 229:19

**asserts** 172:13

**Assessing** 193:13

**assessment** 93:1

**assign** 167:23

**assist** 22:4

**assistants** 74:24

**assists** 38:10

**Associates** 5:14,17 123:4 135:21 144:5,9 251:21,22 253:15 255:9,11 274:24

**assume** 20:21 25:3 50:6 89:18 105:2 117:17 132:23 160:13 167:20 238:14 259:11

**assumed** 260:22 270:16

**assuming** 69:16 70:4 172:19

**assumption** 76:6 133:11

**assumptions** 23:17

**atmosphere** 98:10

**attach** 24:22,24 218:5

**attached** 24:12 240:7

**attaching** 25:4

**attachments** 10:9

**attack** 167:15,17

**attempt** 216:22 217:4 227:24 229:10 230:17 242:9

**attempted** 237:19 240:2

**attended** 13:13 255:7,14 256:3

**attending** 17:12 255:8

**attention** 40:12

**attorney** 21:3 67:16 102:22,23 103:12 113:11,13 237:16 238:10, 23 265:10,20

**attorneys** 94:4 101:19 254:13

**attribute** 178:3

**audience** 265:8

**audio** 70:11 207:20,24 208:3,9 213:2,5 214:1,16 216:4 217:16 218:2,17 275:23

**audios** 208:12

**author** 47:15,19 48:23 193:15,23 194:7

**authored** 223:19

**authority** 119:8 180:3,6 246:16

**autopsy** 87:5 232:1,21,22 233:9, 12

**average** 131:22 132:2 138:6 145:22

**averaged** 186:22

**avoided** 31:7

**aware** 33:12 44:10 45:1,7 81:8,14, 19 82:1,4 89:7,11 100:10 101:14, 18 111:22 163:20 175:10 187:1,22 188:17,21 189:17 192:3 201:3 211:9 237:14 239:6 249:18 264:3

**awful** 112:3

**B**

**back** 15:6 42:24 43:1 61:12 67:3 84:22 139:17 141:17,24 143:17 152:11 159:8 205:3,6,12 215:20 229:16 231:11 234:12 244:5 252:5, 11 263:4 268:4

**background** 86:6 252:21

**backwards** 168:7 252:18

**bad** 72:2 112:18 139:12

**bank** 72:16

**bar** 21:6 266:8

**bar-appointed** 9:16

**barely** 131:14

**barred** 49:21

**Barry** 45:8

**base** 76:7

**based** 35:2 46:3 58:1 65:5 72:6 75:5 78:22 79:1 80:5 83:1 85:5,18 86:9 94:24 95:14 99:4 100:22 104:6,12 119:2 123:10 124:2 125:20 128:9 130:2 133:16 142:11 144:10,11 147:8 148:2 162:17 178:16 179:15 180:17 182:6 188:10,18,23 189:17 201:11,12,13

209:10 210:14 213:15 220:12 221:8 223:7 233:15 234:23 247:12, 23 253:21 260:9 273:1,2,23 276:16

**basic** 116:17 119:21 120:11

**basing** 87:24 143:1 147:4,5

**basis** 14:14 16:22 17:24 18:9 79:16 80:2 86:14 87:10 104:8,11, 16 123:13 133:6 149:7,10 195:17, 19 196:12 216:8 254:1 268:18 269:1

**Bates** 10:21 50:10 54:14 55:8,11 56:2,8,9,11,13 57:2 91:18 181:19 201:23 219:11 220:22 235:14

**bathroom** 141:7 175:12

**Bay** 28:20

**bear** 93:20 250:8

**bearing** 108:7

**began** 57:19 79:9 144:8

**begin** 24:21 77:14 226:5

**beginning** 5:1 67:4 142:1 197:23 205:13 206:21 268:5

**begins** 211:22

**begun** 87:8

**behalf** 5:7,22 6:1,3 94:4

**behavior** 17:22 122:22 123:5,17 126:22 153:9,11 172:4 194:2,10 224:8 239:18

**behavioral** 123:23 153:12

**behaviors** 153:17

**belief** 80:3,5 269:1

**believed** 41:22 104:15 108:24 122:10 136:22 145:12 159:21 160:3,4,20 163:7 168:6 169:18 170:20 213:14

**believing** 195:18

**benefit** 97:15

**Berkeley** 13:12 17:7,15

**bias** 142:13 149:13,21 150:3,5,6 193:22 238:14

**biases** 144:13

**bible** 251:23

**Bieber's** 81:19

**bill** 11:12,15 21:19 23:5 25:12 52:13 53:2 54:3 61:13 62:5,18,23

63:5,10,17 65:7 66:11,14 67:18,22
69:18 75:9,20 86:21 87:20 88:5
89:7 90:6 92:5 106:21 112:1
113:20 120:15 132:19 133:11
143:2 149:14 151:22 157:2 159:20,
22 160:2 161:15 167:1 173:1
187:15 189:22 190:5 198:2,9
203:23 204:2 208:9 218:20 230:24
231:1,19 232:12,18 247:4 249:18
250:16 256:20 261:22 268:11,21
269:10,22

**Bill's** 106:18 108:10

**billed** 11:8

**billing** 8:17

**bit** 11:21,22 35:20 61:1 94:18
99:15 140:10 149:5 151:5,17
152:14 197:2 207:17 226:3,22
244:16 270:8 274:16

**Blagrove** 138:20

**blame** 261:23

**blaming** 227:19

**blank** 80:7

**blindsided** 163:15

**Bluff** 194:6

**board** 154:12,15,16,17,20,21

**body** 61:23 87:5 119:3 123:8,10
124:2 136:20

**bogus** 151:10

**book** 33:19 35:13 46:16,19 90:21
152:6 155:21

**books** 35:14 122:6 130:21

**bookshelf** 152:9

**bottom** 55:19 92:19 146:22
219:10,12

**Bowen** 5:13,17

**break** 7:9,12 66:23 141:7,8,9,12,16
142:5 175:12 204:24 205:15 267:5

**breaking** 99:11 124:7 224:23

**breaks** 129:12 130:15

**breath** 224:17 225:2

**Brennan** 277:21

**Brennan's** 276:9 277:16

**Brent** 45:18

**Bresnahan** 50:17,18

**Brett** 5:12

**Brian** 262:16 263:10

**bring** 262:8

**brings** 262:5

**Britain** 33:24

**broader** 109:18,23

**broke** 210:19

**broken** 99:10

**brought** 40:11 250:8

**bullet** 196:1

**buried** 255:19

---

**C**

**C-A-N-O-N-I-E** 6:2

**c.v.** 12:6,19 17:16 35:12 47:24
255:17,20

**call** 40:6 150:10 195:15 207:11
232:2,23 233:9,22 234:7

**called** 6:12 28:6 35:24 39:15 46:16
48:4 64:7 97:9 151:12 152:6 172:3
175:22 193:12,21 194:5 238:13

**calls** 60:10 66:13,18 102:7 123:4
132:21 134:3 140:17 166:18 272:3
275:16

**Canada** 45:18 46:10,11

**Canadian** 46:6

**Canonie** 6:2

**capacity** 275:22

**captain** 28:4

**captures** 214:1

**car** 139:17,23

**career** 94:2

**Carpenter** 53:5 80:8 85:2

**Carpenter's** 83:5

**Carson** 6:2

**case** 5:9 7:19 8:9,15 9:1,22 10:1
11:5,12 19:6,9 20:3,4,5 21:13,18
22:13,14,20 23:5 25:12 28:24
29:12,13,19,23 30:14 37:1 40:15,
17,19,22,24 41:6,17 46:24 49:15,
18 50:15,17,18,19,22 51:1,3,11
52:13 53:2,21 54:21 57:13,16,19

58:10 60:21 61:6,13 63:14 65:12,
14 66:12 69:1,7 71:12 73:16 74:1,
5,7 75:8 76:1,2,3 78:18 81:10 84:4
86:21 88:17,22,23 90:6 91:10,24
92:6 95:22 96:13 97:7 98:6,10
103:14 105:4,6 106:3 107:23
108:7,17 111:19 112:1 112:1 113:2,5
115:13 116:4 125:13 126:2,8
132:18 136:2 143:7 146:18 147:6,
14 148:9 151:22 155:4 162:2
163:24 168:13 169:19 172:22
177:8 189:22 194:16 197:14 204:7
208:4 211:10 223:4,6 228:13,22
229:23 230:7,16,24 232:13 238:6
240:4 247:3,5,17 248:9 251:6
253:3 254:24 255:2,6 256:9 261:17
265:19 266:6 269:7,12,23 272:7,9
274:13 275:12 276:10 278:13

**cases** 9:6,8 20:6 27:20 29:16 36:4,
6 37:7,18,21 40:7,10,11,22,23
41:7,12,18,21 42:6,11 43:6,7
44:10,11,14,15,23 49:12,13 50:1
51:5,13,23 52:2 71:18,21 72:4
73:20 74:7,12,15 80:24 90:16 94:3,
6,9,14 100:23,24 101:6,19,22
102:15,16 105:22 107:24 112:15
121:16 144:15 145:20 146:6,15
161:22 168:13,14 171:13,14 181:2
184:1 190:8,21 191:22 199:1
222:19 228:15 230:11 238:5
273:17 279:4

**categories** 69:17

**category** 133:15

**caused** 114:13 155:14

**causing** 112:6 124:9 129:22
176:18

**cave** 179:13

**Central** 141:19

**Century** 263:8

**Certificate** 89:3,9,19

**certified** 15:21

**cetera** 153:4

**chair** 198:5

**chairs** 112:5

**Champion** 263:15

**chance** 267:21

**change** 66:2 84:2 85:3,18 89:13
90:1,9 93:4,6,23 104:18,20 107:4
115:6 116:23 117:2 128:10 133:21

204:3 206:12 251:3

**changed** 38:4 128:6 139:10 235:3

**changing** 180:7 264:3

**chapter** 155:21 156:7

**chapters** 35:13 279:5

**character** 164:9,19 165:5

**characterization** 242:17,21

**characterize** 111:23 253:10

**characterized** 94:21 95:3 245:13 254:13

**characterizing** 95:1 115:4 133:3

**charge** 9:10,15

**charged** 71:7 171:7,11

**charges** 237:14,16,21 238:24 239:9

**charging** 9:18

**check** 198:12,14 241:4 242:3

**Chiappetta** 91:11 92:10 99:5,6 180:11 181:9 260:9

**Chiappetta's** 180:14,18 182:24 187:7 260:19,24

**Chicago** 5:15 139:9

**Chicagoland** 139:3

**chief** 27:16

**child** 112:11 163:13

**choice** 110:15 116:13 117:22 176:19 177:3 209:17 268:11

**chosen** 27:20 224:14

**Chris** 45:16,23

**cigarette** 198:1 204:13,14,17

**circumstance** 230:19

**circumstances** 69:7 73:14,19 77:8 104:17 155:3 228:22

**citation** 194:11

**citations** 44:14 252:20

**cite** 23:24 137:15 145:1,3 179:1,16 196:7 251:19

**cited** 145:7,9 192:10,20 193:1

**citizens** 40:13

**civil** 6:5 9:6 49:18 51:24 52:2 88:22 94:4 220:13

**claim** 123:22 129:7

**claimed** 65:7 90:6 230:13

**claiming** 94:5,11

**clarification** 75:23 199:23 244:12

**Clark** 5:14

**class** 18:23 19:2,4,6,7,10

**classes** 17:14

**classification** 38:20 39:4 97:9 126:13 129:24 168:15

**classified** 40:5 70:24 73:5 195:11 207:9

**classify** 98:4

**classifying** 79:16 130:23

**clean** 30:21 57:1 236:8

**clear** 7:10 26:20 50:5 55:12 91:16 95:8 181:17 183:21 185:23 191:7 199:24 200:11 209:8 217:6 235:13 248:1 257:2

**clearer** 217:23

**clicked** 217:24

**client** 265:14

**client's** 94:5,11

**clients** 101:20,23

**clinical** 13:21,23 14:1 61:24 62:7 99:2,24 180:24 188:7 250:20,23,24 260:19 272:18,21 273:5,14

**clinician** 184:3 185:2

**close** 34:10 64:22 182:11 240:23 266:19

**closer** 107:20 182:16

**co-authored** 39:12,14 263:10

**coded** 42:18

**coerced** 36:17 63:23 64:13,20,24 65:8,19,21 90:20 97:9,12,20 98:4, 17 99:10 109:6 110:4,13 111:13,16 113:21,23 159:16 177:1 203:5,10, 14,15,16 206:14 207:10,12 222:11, 18 225:14

**coercing** 49:19

**coercion** 31:24 33:6 111:5,7,11,24 112:2,13,20,21 113:5,12,17 114:8, 12,13,15,17,18,20,21 116:11,19 117:1 118:9 126:13 158:5 174:15 175:22 176:14,21 177:12,18

209:15 210:3,6 261:20

**coercive** 98:14,15 114:5 122:14 157:24 173:9 174:1,6 176:1,7,11, 16 210:12 222:24 225:10 261:13

**cohort** 40:7

**coined** 278:11,14

**colleagues** 278:16,19

**collect** 74:2,4 212:4,20 214:18 219:14 220:3

**collected** 67:23 191:23

**collecting** 37:7 219:18

**collection** 40:7

**combine** 177:23

**combined** 132:6 184:16 186:19

**combines** 185:10

**comment** 75:14 167:4 216:13 242:24

**commit** 80:4 84:16 245:21

**committed** 64:8 68:19 72:11,17 79:12,18,19,24 80:4,16 83:15 85:6 86:1,20 88:12,14 98:3 142:21 149:9 212:9 223:23 226:16 227:7 243:24 244:9,13

**committing** 229:13

**common** 101:1,4,9,10 118:18 119:19,23 120:2,3,6 159:6 238:11, 16

**commonly** 49:9

**communicated** 90:12 152:17

**communication** 157:3 158:8

**community** 119:22 121:11,19

**comparable** 250:12 275:10

**compare** 26:8 36:13 55:4 77:7 113:5 192:5 264:8

**compared** 41:8 75:19 77:9 95:3 110:4,19 117:20 128:7 180:8 184:23 227:12

**compensated** 8:24

**compensation** 9:21,24

**compilation** 54:20

**complete** 12:6 30:7,14 35:9 52:21 54:20 67:13 91:2 125:7 248:19 249:7

**completely** 103:7,10 260:20

**compliance** 250:17,22

**compliant** 90:20 97:9,12,21 98:5, 18 203:5,10,14,15 206:15,20 207:10,12 250:5 251:2

**complicated** 151:6 248:13,14

**comply** 176:20 209:17

**complying** 119:7

**components** 187:9

**comprehend** 130:11

**comprehensive** 272:9

**computed** 184:15

**computer** 193:8 216:21 217:24 240:22

**con** 242:14

**concept** 109:18

**concern** 231:18 245:16

**conclude** 206:17 216:1 225:13

**concluded** 32:9 33:8 95:18 97:22

**concludes** 279:20

**concluding** 95:14

**conclusion** 9:22 69:3 76:7 81:3,5 96:17 132:22 134:3 155:13,15,18 166:18 195:13 209:6,9 231:16 233:1 234:24 235:1 241:18 259:13, 15,20 266:3 274:1

**conclusions** 41:23 42:2 44:5 57:23 58:2 90:10 133:22 204:4,6 206:12 246:1 251:3 271:13 272:22

**condensing** 208:15

**conditions** 77:14 192:5 248:20

**condo** 215:12 277:23

**condominium** 204:15 212:6

**conduct** 16:19,24 31:11 53:13 205:24

**conducted** 29:9 34:22 37:22 39:24 67:10 92:5 192:1 236:19 278:19

**conducting** 45:2

**conference** 5:5

**conferences** 17:12

**conferred** 13:10

**confess** 77:16 103:20,24 104:1 110:15 114:14 135:1 138:7 142:19 149:23 157:15 162:11,14 164:14 167:1 168:20 171:2,8,10 176:20 188:4,16 189:16 191:6,15,17,21, 22,24 225:1 227:24 229:12 238:17 245:9 250:1 268:12

**confessed** 24:3 38:17 43:18 87:15 92:12 93:22 95:13 98:1 134:12 143:14 161:19 169:2 172:12,17 229:9 232:19

**confesses** 212:19

**confessing** 64:20 113:22 169:5 193:13 224:9,13 245:8 249:18

**confession** 14:23 36:8,11,12 37:12,18,21,24 38:1,4,21,24 39:5 40:20 41:3,9,15,20,23 42:6 43:5 44:23 45:3 47:14 48:13 49:19 61:6, 15,23 62:2,3 63:15,23 64:7,23 65:8,17,22 66:5,10 68:9,12 69:4,9, 14,24 70:17,18,21,24 71:1 72:5,6 73:5,16,18 74:2 75:9,10,15,21,22 76:8,11,19 77:5,9,10 78:10,19 79:17 83:9 85:4,5,24 86:16 88:5 89:15,23 90:2,3,7,14,16,18 93:2,5 94:5,11,13,16 95:2,4,9,11,12,15, 18,19,20,24 96:5,7,9,11,15 97:10, 12,13,16,20,21,23 98:2,5,7,8,18 100:9,12,14 102:5 109:1,7,9,10,15 110:4,5,11,19,20 111:14,17 114:16 116:1 117:17 118:1,12 119:18 120:3 121:16,17 124:8,14 125:10, 14,24 126:7 127:1,11 129:2,4,5,6 130:17 132:8,16 135:24 138:17 141:3 144:15 145:24 148:17 149:6, 15 150:7 157:18 158:6,10,16 164:23 165:3,7 168:10,14 169:19 170:9 171:13 176:23 177:4,9,14,19 178:5,14 179:9,20 182:12 187:18 188:1 189:5 190:8 193:14 194:21, 24 195:11,15,18,22 196:1,12 197:6,8,10,19 199:19 200:2,3,23 202:5,19 203:5,10 206:15,16,18, 19,20 207:6,9,12,13,15 210:4,8 211:15,18 213:7,14 222:15 223:23 228:5,11,15,18 229:3,18 230:3 231:2,12,13,17,21 237:20 238:5,8 239:8 243:5,13,14,23 244:9,13 245:12,14,21 246:6,12,15 248:4, 10,22 249:14,23 257:11 258:15 259:14 261:4,18,23 262:1 265:11, 15,19 266:4 272:24 274:2,10 278:10,21 279:4

**confession's** 126:18

**confessions** 16:16 20:1,10 22:17 31:8,22 32:5 33:4,20 34:5 35:7 36:1 37:17 38:7 39:8,11,16 40:2,5 41:10,12 44:18 46:13,21 47:4,5 48:6 76:15,23,24 77:1 78:2,9,13, 14,17 90:21 91:4 94:21 103:5 110:7,21,22 111:1 118:15 120:5 122:10 124:11 127:22 129:18,20, 22 130:20 137:3 144:21 146:3 161:23 165:11 168:6,11 170:19 171:21 178:24 179:4 187:13 188:20 189:4 192:4 193:23 194:7 199:16 202:22,24 203:15 207:10 211:10 222:12 227:22 228:8 229:7 230:10 239:19 245:3 246:24 259:4, 8 261:6,12 263:8 264:17 265:1,6, 22 273:5,18 278:8,14,24

**confessor** 68:19 72:10 73:17 86:19

**confessor's** 68:22 73:1 84:13

**confessors** 184:20 222:22

**confidence** 154:1

**confident** 237:15 238:23

**confirm** 32:15 54:19

**confront** 158:24

**confronted** 159:11 161:19

**confused** 245:8

**conjunction** 52:6

**connecting** 137:2

**consecutive** 181:19

**consecutively** 10:22 50:11 91:19

**consensual** 230:13

**consensus** 121:10,13,20

**consent** 230:15

**consequences** 35:24 39:10 42:6 171:21 193:13 278:13

**considerable** 84:14

**considered** 187:12 228:4,10

**consistent** 142:23 195:12 228:23 259:9

**constellation** 246:20

**constitutional** 16:13 166:21

**constructing** 155:21

**consult** 19:18,24 22:7,10

**consultant** 20:16 94:3

**consultation** 101:7

**consulted** 7:22 20:7

**consulting** 19:20 20:19 25:11 51:20 82:1

**contacted** 8:14,20,23 40:14

**contained** 10:6 23:19 52:13 56:9 213:14

**contaminated** 215:6,22

**contaminating** 211:23

**contamination** 126:14 197:3,5,13 201:6,19 204:9 211:14 212:11,13 213:16,20,22 214:20 216:5 253:17, 21 274:17,21

**contemp-** 64:11

**contemporaneous** 64:12 274:22

**content** 22:15,24 123:11

**contents** 8:1 233:15

**context** 14:7,9 150:4 157:23,24 158:1 163:16 220:7 239:12,23 246:11 265:3

**contextually** 221:23

**continue** 167:21

**continued** 146:17

**contradict** 47:3,9,10 97:7

**contradicted** 107:13 173:5 260:10

**contradiction** 107:11 108:6

**contribute** 114:20 116:18 118:8 129:5,12 137:10,11

**contributes** 129:11

**contributing** 124:10

**contribution** 158:5

**control** 78:8,12,16 102:16,20 116:16 117:20

**controlled** 168:18

**conversation** 8:1 22:22 140:1 239:14

**conversations** 23:3

**conveyed** 197:20

**convicted** 21:19 238:16,18,22 242:3

**conviction** 16:15 74:8 144:16 197:11 240:3,14 241:15,18 242:10 263:7 277:17

**convictions** 18:16 71:23 242:19

**convince** 226:10

**cop** 80:22

**cops** 80:22 85:16

**copy** 24:16 263:22 264:4,5

**copyright** 263:20,23 264:2

**correct** 7:7 8:15,19 9:1,4 11:6,9 12:7,20,23 13:2,5,14,15,17,19,21, 22,24 14:3 15:8,9,12,15,17,19,20, 22,23 16:2,5 17:18 18:17 19:14,15 21:16,20 23:2,7 24:5,10,14 27:7,10 29:6,7 30:24 31:3,9,12,16 32:1,5,6 33:6,7,10 34:14,16,18 35:23 36:2, 4,5,9 37:8 39:12,13,16 40:2,3 43:8, 12,15,21 44:20 46:7,17,18,22,24 47:1 49:5,9 50:8 52:11 53:2,3 54:11 56:18 59:8,11 60:1,7,22 62:12 65:2 66:12,21,22 67:19,24 68:10 70:6,9,13,14 71:1,4,5,10 72:11,18,19,22 73:2,3 76:17,18 79:20,21 80:13 81:6,7 82:8,9,11, 22,23 83:2,3,6 84:16 86:8 87:15,16 88:8,9,18,19,23 90:8 91:12,24 92:6,12 93:2,3 96:14 97:17 101:18 105:1,5 106:5,9,10,12,13,15,16,20 108:12 109:2 113:2,3,10,16 114:24 120:9,13,14,17 121:3,12 126:8,9 127:7,12 129:10 131:4,5 132:9,24 134:1,17 135:11 136:4 138:12,14 139:4,5 140:8,9 143:4 146:19 147:9,10,13 149:3 150:12 151:18 152:7,20 157:12 159:1,12,13,17, 18,23 160:6,21 164:1,15,16,21 165:1,2,5,6,9,12 166:17 168:8 169:19 170:1,2 172:13 173:3,24 174:13 176:2,3,8 177:9,10,14,15 178:1,5,6,10,11,15,17,18,20,21 179:17,20 180:19,20 183:10,11 184:11 185:16 186:16 188:16,17 191:17 195:7,20,21 196:3,14,16, 17,19,22,24 197:1,6,7 199:10,12 200:8,14,15 201:19 203:6,24 207:21 208:1,2,5,6 209:3 210:12, 15,16,24 211:15 212:21,22 213:3, 7,8,19 214:2,6,21,22 215:23 216:11 218:15 219:5,15 220:4,20 221:7,18 223:7,19,20,24 224:18 225:10,12,20,21,24 226:1,10,11 227:1,9,13 228:21 229:21,22 230:4 231:22 232:13,14,19 234:18 236:15 237:2 239:1,19 240:4

244:19 245:1 247:19,20 248:4,5 249:1,19,23,24 250:2,3 251:8,13, 17,18,22 255:15 256:9,10,13,16,22 257:22,23 258:2,11,12,17,19 260:14,15,21 263:11 264:13,14 265:13,23 269:7 270:13 272:18,19, 24 273:21 274:3,4,18 275:7 276:4, 5,7,8,10 277:9,10,12,17

**Corrections** 66:15

**corrective** 213:1

**correctly** 36:21 96:24 99:6 135:20 144:22 152:19 177:21 182:4 206:23 213:19 241:12 249:1 265:2

**correlator** 158:9

**corroboration** 64:22

**counsel** 5:18 6:7 9:10,16 23:9,13, 18 25:3 56:21,22 270:14 271:7 276:2 278:7

**counseling** 235:8

**counselor** 271:7

**count** 130:1

**counterfactual** 246:3

**country** 75:1

**County** 146:19 235:9

**couple** 50:2 51:4,13 138:23 268:8 279:12

**courses** 16:8,12 18:1 27:23

**court** 5:10,16 6:4 20:15 49:22 51:17 74:10 91:18 218:7 254:5,15, 17 255:3 269:16,21

**courthouses** 75:1

**courts** 254:14

**covered** 199:16

**COVID-19** 7:3

**create** 95:10 96:3

**created** 125:13 157:17 178:4 248:21

**creating** 212:16

**credence** 154:7

**credentials** 85:12

**credibility** 257:20 276:3,6

**credit** 86:7

**credited** 80:9

**crime** 43:7,10,14 58:11,23 59:2,3
64:8 68:17,19 69:11,15,16,17 70:4
71:4,17 72:7,11,17 78:24 79:18,19,
23 80:3,16,23 82:24 84:16 85:6,24
86:20 88:12,14 93:22 98:3 103:21
131:16,18 138:8 145:23 149:23
150:16 179:9 193:17 212:9 223:23
227:8 228:5 229:13 238:13 241:20,
24 243:23 244:9,13 245:21

**crimes** 43:17 227:7

**criminal** 9:7 16:13,14 29:2 42:8
49:14 51:24 52:2 59:5 88:22 92:6
100:16,24 101:15,19 102:3,14
112:9,11,22 189:10,14,22 190:1,9
191:14 242:4 265:10,19 273:16

**Criminology** 17:21

**criteria** 37:7,19 40:17,20 41:1,2,22
68:15,16,24 69:1 70:21,23 71:3
72:7,9,20 74:1 78:9 79:14,22 84:2
85:5 86:17,21 89:21 90:17 93:23
96:15 195:14,21 207:2,6,15 231:12
243:14 259:17 274:9

**criterion** 83:14

**criticized** 124:9 145:11

**critique** 124:17

**cross** 5:8 159:20 160:2,20 171:6
204:10 275:21

**Cross's** 256:11

**culpability** 155:22 228:1 229:11
230:18 242:9 245:1,4

**culpable** 160:17

**cumulative** 125:16,17,22 175:23
176:6 187:4

**cumulatively** 176:17 208:17

**current** 12:12,13 17:23 49:10

**curriculum** 48:1

**custodial** 131:3 133:4,12,14,17,20

**custody** 128:4 130:10 132:6,19
133:1,18 134:20 250:12

**Cutler** 262:16 263:10 264:10

**CV** 5:9

**cycles** 135:17

---

**D**

**data** 23:8,12 46:4 47:3 48:23 64:2
66:3,5,7,8 74:2 77:13 90:11 111:18
202:18

**database** 37:21 40:9 44:21 89:22

**databases** 74:6 75:3

**date** 54:14 200:18 237:3,6

**dated** 55:20,22 56:1 134:5 202:6
236:23

**David** 81:14

**day** 106:15 115:15,19 233:19
263:8

**days** 66:2

**dealing** 59:4 128:6

**death** 21:15 163:13,14 233:20

**decade** 45:10 46:3

**decades** 71:21 108:17,19

**deception** 20:9 153:17 157:4

**deceptive** 243:6

**decide** 69:24

**decided** 31:11

**deciding** 85:23

**decision** 89:20 123:9 244:19,23

**decision-making** 210:18

**declared** 19:19

**Declue** 183:6

**Declue's** 99:7 180:14 187:6

**decrease** 189:4

**deep** 255:19

**defendant** 5:7 102:3

**defendants** 5:23 6:1,3,9 42:7
49:18 100:17 101:15

**defendants'** 56:21 201:24 217:7
219:10

**defenders** 9:9,16 266:16

**defense** 57:5 101:19 265:10,15,20
266:8,11

**defenses** 266:4

**defer** 75:8,12

**define** 14:15,19 37:23 127:24
128:18 214:7

**defined** 38:13,15 128:21 130:14
156:18 180:1 246:10

**defining** 68:11 97:12 109:8 111:7
115:11 127:13 135:13 142:14
150:13 176:13 179:22

**definition** 14:20 38:3,8,18 39:3
68:13 115:21 128:5,11 156:5
184:18 185:3

**definitional** 195:14

**definitive** 61:2

**DEFS** 220:17

**DEFS5886** 219:11

**DEFS5889** 219:12

**defying** 216:9

**degree** 12:20 13:10,20 25:14
115:24 124:20 125:6 134:23
149:12 158:14 166:23 167:11
171:8,11

**Dehaan's** 81:9

**Dekalb** 146:19

**delineate** 65:6 77:14 110:3,17

**demeanor** 260:17

**demonstrates** 153:12

**Denial** 224:5

**denials** 124:8

**denied** 89:8 116:5,14,22 117:7,10
175:12 214:18

**denies** 221:17

**denying** 114:7

**dep-** 136:17

**department** 13:7,9,10 17:19,20,21
27:17 28:21,22 45:12,17 55:20,21,
24 66:14 133:24 134:17 139:18
140:7 143:17 147:13 254:18
275:14

**departments** 17:2,20 28:16,20
225:22

**depend** 69:6 107:17 108:5 227:18

**dependent** 133:10

**depends** 14:12 60:23 74:21 76:14
84:6 101:3 102:22 115:1 133:13
160:19 173:8 202:20 203:2 227:14
230:19 261:9

**depletion** 137:10

**deposed** 108:18 253:11

**deposition** 5:5,6 7:2,15,18,21 8:3, 6,12 9:18 11:24 12:5 21:9,12 30:16,21 38:9 39:20 50:7 53:5,8, 18,21,23 54:3,4,5,17 55:10 104:15 107:12 108:3 113:8 129:12 163:5 172:20 173:5,19 174:8 181:15,21 195:20 201:22 217:9,15 218:3 223:10 235:12 236:10 240:3,8,17, 18 242:10 252:10 256:19 262:12, 14 263:6 274:17 279:21

**depositions** 198:24 201:13

**depressed** 179:12

**depression** 178:10,20,23 179:7

**deprivation** 115:9,12,23,24 116:9, 20 117:2,16,19 118:5,11,16,18,19, 20,24 119:17 127:6 130:7 135:7,9, 13 136:18,22 137:3,8 138:10,16 140:22 253:8

**deprived** 119:4 136:10 137:2 140:20

**depth** 197:17

**derive** 44:19 196:4

**derived** 278:9

**derives** 20:18

**describe** 65:16 127:15 143:6 150:22 174:5 192:16 195:10 197:15 204:20 244:14 247:14 250:9 260:5 265:16 278:24

**describes** 98:16 99:9 112:4 125:2 143:2 182:2 197:17 243:17 257:14

**describing** 123:1 143:9 180:10 259:22 260:16

**description** 93:19 112:8 126:11 133:7,16 137:1 142:16 144:4 161:1 169:21 209:11 210:13,16 211:24 239:3,13 242:6 256:24 257:16 260:10,11 268:14

**descriptions** 110:12

**designation** 109:23

**designed** 47:16

**destabilization** 162:24

**detail** 210:22

**detailed** 206:6 211:5 258:22

**details** 77:2 88:6,13 89:6 201:18 203:7 204:8 212:10,13 228:5 231:1 237:20 245:20

**detection** 124:7

**detective** 15:11 32:12 33:1 48:14 160:1,19 171:6

**detectives** 28:8 29:1,14 30:4 96:20 275:11,20

**detector** 123:16 153:16 215:11,18

**detention** 128:4

**determination** 114:23 257:21 276:4,7 277:16

**determinations** 273:15,17

**determinative** 203:19

**determine** 40:19 59:11 96:6 97:20 98:19 99:20 100:5 124:12 151:1 247:9 250:17,21

**determined** 31:22 72:1 142:20 238:7

**determines** 67:15

**determining** 75:15,20 130:16 196:13,21

**developed** 107:24 108:1 264:16

**development** 80:21

**developments** 71:20

**deviation** 136:3

**diagnose** 178:19

**Diagnosticity** 193:14

**died** 233:15

**diet** 167:8

**difference** 75:18,24 94:23 95:5 117:18 160:9,13 185:4

**differential** 153:2

**differently** 173:18 224:21 232:6 254:13

**difficult** 73:13

**diminish** 227:8 242:9

**dire** 254:12

**directed** 220:19 221:6

**direction** 27:1

**directions** 190:20

**directive** 212:24

**directly** 118:14

**disaggregated** 150:3

**disagree** 104:14

**disagreeing** 259:23

**disclose** 19:24 23:14

**disclosed** 8:9

**disclosing** 7:24

**discount** 259:12

**discovery** 74:7

**discredit** 174:18

**discredited** 122:17,24 123:17,21 124:11

**discrepancies** 108:10,13,15

**discrepancy** 107:16,18 173:6

**discuss** 22:24 26:7 27:4 104:10 120:7,10 195:12 240:10 244:17 278:24

**discussed** 22:13,14,20 130:5,18, 19,20 145:11 176:10 177:17,24 184:18 194:15,17 195:1 210:15 231:14 244:21 279:1

**discusses** 94:20 127:6 188:18

**discussing** 21:13 94:19

**discussion** 22:15 26:9 126:17 188:8 190:2 219:6 242:18

**disease** 167:9

**dispositive** 82:14

**dispositively** 73:1

**dispute** 265:11

**disputed** 80:10 94:15 117:4,6 253:2,6,10 279:5

**disruption** 115:15,22 135:14

**dissertation** 27:14 31:17 37:5

**distinction** 86:13 109:16

**distinguish** 117:23

**distraction** 140:1

**District** 5:10

**division** 5:11 28:4

**divisions** 28:2,3,8

**divorce** 92:21 140:8,14 161:20 162:4,6,13,20 163:2,4,9,10,11,15

**divorced** 209:2

**divorcing** 162:1 163:21

**dizzy** 112:7

**DNA** 39:16 222:21

**do's** 252:22

**doctor** 13:1 67:7 235:15

**doctoral** 27:14 31:17

**document** 10:21 11:1,3 50:6,10, 13,23 51:10,16 56:17 84:21 91:18 147:16 172:23 175:19 198:15 201:23 202:2 214:15 215:3,15 235:11,14,18 236:11,13,15,17 237:1

**documented** 80:24 92:10 135:17 136:21 144:14

**documents** 8:8 55:16 56:9,10,12, 15,17,18 57:22 62:22 66:17 85:19 91:8,22 122:13 147:8 181:19 242:23 270:15 271:16,22 277:9,19

**dog** 141:14

**dollars** 74:24 75:4

**don'ts** 252:23

**Donna** 5:16 217:11 218:4 240:16 244:4

**double** 198:11,14

**Doug** 83:4 85:2

**Douglas** 53:5 80:8

**downloaded** 263:16

**downtown** 139:9

**dozens** 252:17

**draft** 21:22 205:19

**drafting** 22:4,7 23:6 53:14

**dramatically** 185:15

**draw** 121:20

**drawn** 232:22

**drink** 253:9

**drinking** 164:9,20 165:8

**drive** 139:9,17

**driving** 166:5

**Drizin** 8:21 22:10,12,23 23:4 24:14,17 25:9 39:15 40:1 44:12 71:16 84:11 171:22

**Drizin's** 25:6,15,17,19,21 26:8,11, 16,21 197:16 253:21

**drop** 122:15

**due** 7:2 185:24 186:1

**duly** 6:12

**Dupage** 235:8

**duration** 128:20 129:15

**duties** 16:6 17:10,11,13

---

**E**

**earlier** 49:6 80:20 81:1 134:7 143:20 163:5 180:24 182:1 195:19 199:15,18 212:11 222:14 226:22 231:5 248:12 252:10 258:3 277:7

**early** 24:4 33:23 96:16 135:24 155:10 278:12

**easily** 122:13

**Eastern** 5:11

**eat** 115:14,19 116:9 141:15

**eaten** 118:3

**eating** 115:15,20

**educated** 76:18 266:9

**effect** 83:17 130:3 162:20,22 175:24 176:6,18 210:17 231:8 272:20

**Effective** 32:21

**effects** 129:15 136:17,21

**elaborate** 87:18

**electronically** 74:10

**element** 241:20

**elements** 112:12 125:23 160:12, 15

**elicit** 48:6 144:19

**elicitation** 14:23 193:22

**elicited** 58:17,18

**eliciting** 126:24 169:24 170:4

**eliminate** 230:24

**eliminates** 231:17

**email** 10:6

**emailed** 235:18

**emails** 235:22

**emotional** 153:2,13

**emotions** 153:2

**empirical** 31:7 33:12 34:8,11 45:2 122:12 154:19 188:19 189:7 191:12 259:2

**empirically** 153:19 189:17

**employ** 40:18 97:19

**employed** 32:12 33:1,9 42:10 57:18 61:12 111:11

**encompasses** 211:4

**encompassing** 156:4

**encounter** 230:12

**encountered** 238:6

**end** 67:1 97:14 122:12 141:22 144:12 164:21 173:9 193:5 205:10 222:6,7,13,16 224:11 235:23 268:2 279:22

**endeavor** 62:17 63:4 67:8

**ended** 197:18

**endorsing** 222:2

**entire** 29:19,23 105:4 115:19 121:5 130:1 147:17 225:5 270:12, 20 271:4,8,11

**entree** 27:19

**entries** 12:16

**environment** 98:15

**equating** 69:4

**Eric** 51:12

**erroneous** 144:16

**erroneously** 213:13

**error** 68:2,4,5 126:12,13,16 153:20

**errors** 126:12

**escape** 226:18

**essay** 172:3

**essential** 253:9

**essentially** 58:5 117:19 123:15 150:20 152:22 153:21 176:5

**establish** 90:18 268:10

**established** 72:22 79:23 80:16 86:18 103:9 178:22 278:20

**establishes** 68:21 73:1 79:8 87:6

**estimate** 11:20 18:7,12 20:11,17 21:1 46:20 49:14,16 52:1 100:24

271:12,15

**et al** 5:8 138:22 192:15 193:7

**evaluated** 62:8

**evaluating** 103:12,14

**evaluations** 67:9,13

**evening** 148:16 164:24 165:4

**event** 107:21 129:16 162:15
163:14 265:11

**evidence** 14:24 38:16 58:17,18,21
60:6 68:21 73:1,21 79:8,10 84:13,
15 90:17 96:21,22 97:3,6,23 103:1,
13 104:23 108:7 146:23 147:3,19
148:1,13 149:1,8 150:11,13,16,19
151:8,9,10,11,15,20,22 152:2,15,
18 154:10,24 155:2,11 156:2,5,8,
16,18,23 157:17 158:11,13 159:5,
11,19 160:19 161:2,4,6,13 162:10
167:24 187:21 195:12 223:4,6
228:22 229:24 230:7 233:9 261:16
269:8,10,22 270:1 275:9 276:18
277:21

**evolved** 266:12

**ex-cops** 85:16

**exact** 56:22 72:16 167:11 208:11
251:2

**exam** 153:5

**examination** 6:14 21:6 92:4
156:19 157:16 270:6 278:5

**examine** 32:4 131:22 132:2 158:7

**examined** 6:13

**examiner** 15:22 16:1 164:5

**examining** 44:18

**examples** 72:13 164:13 216:8

**exceptionally** 183:9

**exchange** 97:15 214:1

**exclude** 232:17 234:16

**excluding** 51:17

**exclusions** 49:24

**exculpated** 238:18

**excuse** 48:10 172:15 269:16

**exemplar** 252:9

**exhausted** 149:7 195:19

**exhaustion** 127:7 137:9

**exhaustive** 74:19,22 75:5

**exhibit** 10:11,14,20 11:24 12:5
21:9,12,23 24:12,13 25:16 30:16,
21 38:9 39:9,18,19 44:6 48:2 50:7
51:9 53:15 54:16 68:3 91:13,15,21,
22 181:11,15,20 183:5 185:19
201:22 202:9 204:8,21 205:17,21
208:8 212:19 213:9,11 217:9,15
218:3 219:10 223:10,16 225:18
235:12,24 236:10 240:18 262:11
263:6 264:5,23

**exhibits** 8:18 10:4,7 49:23 53:23
54:4,23 91:13 171:20 199:1 240:8
278:13

**exist** 247:13

**existed** 251:8,14,20 254:4

**existing** 162:17 224:7 246:8

**exists** 112:1 149:1 188:21

**exonerated** 71:23 239:10

**expectation** 67:12

**expected** 135:15

**expensive** 271:2

**experience** 13:24 28:11 88:11
100:22 146:9 153:1 162:24 190:9
191:1,4,13 196:20

**experimental** 33:22 47:20,22
48:9,10,17,20,23 78:11 111:1
146:2 168:16,22 169:2,9

**experimentally-induced** 146:2

**experimentation** 78:14

**expert** 14:2,7,11,19,21 15:16
19:13,17,19,21,24 20:13,14,16,19
48:7 49:3,21 51:20 62:14 82:22
84:24 86:8,10,11 94:3 196:16
252:12 254:6,9 265:23 270:21
271:6,19 273:7,21 274:12

**expert's** 86:7

**expertise** 14:15 57:23 58:1 100:2,
4 264:16

**experts** 80:11 82:15 83:2,10,19,24
84:7,9 85:13,15 86:13 100:9 187:5
233:10 271:2

**experts'** 88:17

**experts's** 232:16 233:2,4 234:11,
14

**explain** 62:2 86:22 195:8 243:16

**explained** 153:13 247:21 259:23

**explains** 98:17 246:21

**explanation** 95:12 243:15 246:13
261:1,2

**explanations** 259:7,10

**explore** 118:10 136:12,16

**explores** 118:14

**express** 64:19

**expression** 64:12

**extensive** 40:8,23 105:3

**extent** 53:20 62:9 114:20 223:5
247:16 260:17 266:8,15,17 274:21

**extract** 26:15

**extraction** 26:24

**extraordinarily** 187:7 260:2

**extrapolate** 168:24 248:7

**extrapolation** 170:15

**extrinsic** 73:17

**eyewitness** 264:11

**F**

**F-A-D-I-A** 194:1

**fabricated** 150:21

**face** 103:23 179:14

**faces** 103:19

**facing** 102:5

**fact** 40:19 56:5 64:1 80:18 85:6
88:4 89:12,13 95:1 102:17 112:17
136:24 151:4 157:14 160:4,19
184:6 186:14 215:4,17 225:5 234:6
239:15 242:9 245:10 256:20 257:3

**factor** 71:11 109:6 111:3 113:4,18,
24 114:15 116:3 125:9 126:6 127:7
130:16 132:18 135:3 137:4 138:16
144:24 145:11 149:14 150:10
163:24 165:20 166:12 167:20
169:17 175:7 176:10,22 177:23
178:4,24 179:4,19 197:5,7,10
231:9 246:6,11 247:4,5,17 248:8
261:2 269:6

**factored** 28:16 243:7

**factors** 61:23 65:21 94:21,24 95:9,
15 96:1,2,8,12 99:17 100:13
108:23 110:2,4,9,18 113:2 121:17

125:21 126:17 133:10 142:6 167:6, 9,22 168:8 170:14 177:7,8,16,24 178:12 187:12 194:16,18,20 246:8, 20 247:8,11,13,21 248:2,17,18 249:6,8,10 257:11 258:15 259:9

**facts** 23:8,12 37:1 41:1 66:2 76:17, 18,21 93:19 95:22 97:7 197:18,23 198:6 206:3 229:23 230:7 232:7

**factual** 23:4 69:4 84:13 106:3 184:7 205:19

**factually** 69:9,15,19 70:1 97:5 103:8 154:23

**Fadia** 194:1

**fail** 151:7,23

**failed** 150:23 151:8 153:21 154:9 156:1,10 158:8

**failing** 216:9

**fair** 44:17 73:4 106:11,19 109:1 118:1 136:7 161:20 185:14 265:12

**fairly** 159:5

**false** 22:17 35:7,24 36:8,11,12,17 37:12,17,18,21,24 38:1,4,7,20,23 39:5,8,10,15 40:2,5,20 41:3,8,9,10, 11,12,19,20,22 42:6 43:5 44:18,23 46:13,20 47:4 48:6 61:23 62:2,3 64:7 65:17,22 66:5,9 68:9,11 69:3, 9,14,24 70:16,21 71:1 72:5,6 73:5, 15,16 74:2 75:9,15,22 76:8,11,15, 20,24 77:2,10 78:2,10,13,15,19 79:17 83:9 85:5,24 86:15 88:6 89:14,23 90:3,7,13,16,18,20 93:5 94:5,11,13,16,21 95:2,4,9,10,11, 16,18,19,20,24 96:5,7,8,11,15 97:5,10,12,13,23 98:2,5,7,8,18 100:8,13 103:4,5 106:9 109:1,7,11, 12,15,19,20,21,22 110:7,10,20,21, 24 111:13,17 114:15 116:1 117:17 118:1,11,15 119:17 120:2,4 121:15,17 122:10 124:10,12 125:10,14,24 126:7 127:1,10,22 129:1,4,6,18,20,22 130:17,19 132:8,16 135:10 137:3,13 138:16 141:2 144:15,19 149:6,15 150:7, 10,13,17,19,24 151:11,15 152:15, 18 154:9 155:2,11 156:1,2,5,7,10, 13,16,18,23 157:17,18 158:6,9,11, 13,16 159:5,11,19 160:18 161:4, 10,12,23 167:24 168:7,10,11 169:19,24 170:4,9,19 171:13,21 172:11 173:13 176:23 177:4,9,14, 19 178:4,14,24 179:4,9,19 184:20 187:12,17,24 188:20 189:3,5 190:7 192:4 193:23 194:6,20,23 195:11, 14,18,22 197:6,8,10 199:19 200:2 202:22,23 203:14,15 206:16,18,20 207:1,6,8,10,12,13,15 209:3,20,21, 23 210:8 222:12,20,22 223:2 229:3 230:4 231:1,11,12,17 237:19 238:8 239:8,19 243:5,14,23 244:9,12,23 245:3,10,12,20 246:6,12,14,23 248:4,10,22 249:13 257:11 258:15 259:4,8,14 261:3,6,12,16,18 263:7, 8 265:1,6,15,19,22 266:4 272:23 273:4,18 274:2,10 278:7,9,13,21, 24 279:3

**falsely** 43:17 64:20 77:16 95:13 97:24 119:7 135:1 138:7 149:22 151:23 162:14 167:1 168:20 169:2, 5 171:1 188:4,16 189:15 191:6,15 225:1 229:1 230:1 238:17 245:7,9

**falsity** 32:4 109:24 210:4

**familiar** 61:5,14 62:5 89:2,5 183:15,19,23 189:14 279:14

**familiarity** 189:10

**family** 64:17 90:12 167:8

**faster** 264:20

**fatigue** 127:7 129:11,13 137:9

**fed** 76:18

**Federal** 6:5 220:13

**fee** 9:5,7

**feeding** 212:13

**feel** 141:9 218:3 271:21 272:7

**Feld** 45:8

**fellow** 17:8,10

**felony** 27:5 28:1 36:22

**felt** 272:13

**field** 82:15 100:9 103:3,5,9 119:12 172:9 252:18 265:7 273:3,8 274:11,13 278:16

**fifteen** 123:6

**figure** 180:3,6

**figures** 119:8 246:16

**figuring** 124:5

**file** 29:13,19,24 30:14 74:10 101:21 108:7 121:5 147:6,12,18 221:9 256:12,15 270:12,17,19,21 271:1, 9,12

**filed** 5:9

**files** 28:24 56:22 256:17

**filtering** 168:13

**final** 135:24 208:22 262:22

**financial** 261:23

**find** 38:12 84:12 142:7,15 183:8 206:8 216:18 269:5

**finding** 157:3 194:13 260:24

**findings** 103:3 128:14 259:1

**fine** 57:7,8 84:22 194:12 253:12

**fingertip** 131:20

**finish** 142:19

**fire** 15:16,18 21:14,20 24:4 54:10 60:5,7 67:22 69:20 71:20 79:3,9 80:19,21 81:5,10,15,20 82:3,11,22 83:1,10,11,15,18,24 84:1,7,9 85:3, 15 86:6,9,24 87:5,7,8,12,14,20,22 88:7,17 89:10 93:20 104:8,9,12,16 105:1 120:18,22 121:1 146:24 147:3,20 148:14 159:22 160:3,4, 14,21 161:7 164:7,10,20 165:1 196:13,15,21 198:7 204:18 212:3, 4,20 214:13,18 219:4,13 220:2 231:20 232:4,9,16,18 233:1,2,4,7, 10,24 234:9,11,14,15,17 249:22 273:21,24 274:13 276:19 277:22

**fit** 40:17

**fits** 85:4 86:21 257:8 259:1

**five-minute** 66:23 204:24 267:5

**flammable** 198:2,4

**flawed** 153:7

**flip** 11:23 21:9 209:15

**fly** 74:24

**focus** 58:12 106:17 110:6,24 247:20

**focused** 38:6 39:7 189:2 264:11 265:5

**focuses** 106:18

**folklore** 80:22

**follow** 123:5

**follow-up** 268:8 270:8 278:3

**food** 115:9,11,22,23,24 116:5,9,10, 14,20,22 117:2,7,10,12,16,18,22 118:6,10,16,18,23 119:4,17 253:9, 13

**foot-in-the-door** 166:1

**footnote** 122:15,18,19 137:21,22, 23 138:19,23 145:4,7,9 179:1,16 192:13 278:23

**footnotes** 137:23 192:19

**force** 20:4

**forget** 263:24 264:1

**forgot** 152:9 277:1

**form** 26:17 32:7 37:9 44:1 47:6 60:9,15 61:7,16 77:17 82:16 84:5 85:7 99:22 101:2 102:6 103:22 105:9 132:21 134:2,5,18 135:21 140:16 147:21 149:24 156:2,20 157:7 160:22 165:18 182:13 185:17 188:5 201:10 209:4 220:5, 11 221:19 225:11 227:11 231:23 232:20 234:19 237:22 239:20 240:5 242:15 243:9 244:1 245:22 248:23 250:6,18 262:2 268:23 269:13,20 272:2 273:9 274:5 275:3,15 276:21

**formal** 17:9,11,13

**format** 19:2,4

**forming** 23:9,13,19 25:15,18 54:8 81:3

**formulate** 63:6

**formulating** 62:19

**forward** 10:6

**forwarded** 235:23

**forwards** 252:19

**found** 33:3 34:12 159:15 169:9 170:10 183:9 188:3 248:17,18 251:1 254:5

**foundation** 26:17 47:6 60:9 77:17 84:5 85:7 102:6 105:9 134:2 140:16 201:10 220:6 221:19 232:20 234:19 237:22 240:5 262:2 268:23 272:2 275:15

**fourth** 72:24

**frame** 15:1

**framework** 278:20 279:6

**Francisco** 16:4,7 17:3 18:15,20 255:13

**fraud** 240:3,14 241:15,17,20 242:10,22

**fraudulent** 241:3,4

**fraudulently** 242:2

**free** 133:8,18 222:17

**freestanding** 122:4 211:5

**Frenda** 138:22

**frequency** 46:13

**frequently** 47:8

**Friday** 27:24

**friend** 64:18

**front** 12:1,2 38:11 39:22 42:3,15

**fronts** 256:19

**fucking** 171:7

**full** 92:18 96:19 155:24 189:22 197:24 204:12 211:21 227:4 274:21

**fully** 35:10 101:7 109:11

**furnishings** 212:6

---

## G

**gap** 34:11

**Garcia** 5:21 6:8 8:2,23 26:17 32:7 34:15,17 37:9 47:6 54:22 56:20 60:9,15 61:7,16 77:17 82:16 84:5 85:7 99:22 101:2 102:6 103:22 105:9 132:21 134:2,18 140:16 147:21 149:24 156:20 157:7 160:22 165:18 166:18 182:13 185:17 188:5 201:10 209:4 211:1 220:5,12 221:14,19 225:11 231:23 232:20 234:19 237:22 239:20 240:5 242:15 243:9,11 244:1 245:22 248:23 250:6,18 262:2 267:9,16,21 268:23 269:13,20 270:7 272:4 273:12 274:7 275:5 276:1 277:4 278:2 279:10,13,19

**gather** 40:4 41:6 266:22

**gathered** 41:21 104:23

**gathering** 64:21

**gave** 69:9 70:5,8 170:14 200:13 218:20

**general** 60:18 107:19 126:10 136:20 138:10 141:3 185:9 262:8 265:7

**generality** 102:11 104:4 242:6

**generally** 76:24 117:15 119:13,22 122:7 172:8 183:18 222:1,3 273:6, 11 274:10

**genetics** 167:8

**George** 27:18

**get all** 40:21

**give** 12:17 26:1,4 38:2 42:23 48:2 54:22 61:2 72:14 100:17 110:13 135:5 152:8 158:17 164:8 170:13 184:8 185:3 193:9 208:19 209:18 259:8 262:22 263:20 265:3 267:21

**giving** 211:10 237:19 245:11

**glad** 266:1

**goal** 124:12,13

**Golder** 82:7,10

**Golder's** 83:5

**good** 6:16 59:6 108:2 141:9 205:2, 8 265:24 266:1 267:19,23

**grab** 205:1

**grabbed** 112:4

**granted** 89:19

**graphically** 153:3,5

**great** 108:18 141:20 223:15 262:17

**greater** 62:1 96:4 119:6 130:10 153:12 170:8,12 177:3 178:13 246:23

**group** 78:8,16,17

**groups** 78:12

**grows** 153:10

**Gudjonsson** 179:24 180:18,22 181:3,7 183:1,13

**Guerreri** 275:20

**Guerreri's** 256:14

**guess** 24:21 42:16 48:1 55:9 59:6 60:23 94:7 99:19 102:22 114:1 125:8 152:13 182:21 189:8 192:12 216:2 233:18,19,21 245:16 262:4 264:8,17,19

**guessed** 271:20

**guesses** 76:17

**guilt** 72:21 96:22 142:12,15,22 143:7 144:18 145:21 146:12 151:9 159:11 232:12

**guilt-presumptive** 143:9,15 144:6,9

**guilty** 41:8,11,13,15,20 69:11 124:1 142:12 154:13 156:15 224:5, 12 226:3,8 227:6 231:1 241:5 242:1 244:18,23 245:3,7,8,10

**guys** 217:23 218:1

## H

**H-O-R-G-A-N** 193:16

**half** 8:4 135:19 139:14 141:15,16, 17 208:16

**hand** 251:2

**hands** 252:6

**handwritten** 70:8 198:9 199:5 200:12,22 201:8 205:16,21 206:1 207:18 210:23 212:18 213:6

**happen** 69:17 71:4 72:7 91:3 146:13

**happened** 58:10,11,13 115:4 161:23

**happy** 216:13 269:2

**hard** 150:1 163:12 266:23 269:17 274:20

**harder** 179:12

**harm** 170:18

**Hart** 27:18

**Hayward** 28:21

**he'll** 238:22

**head** 69:13 71:14 72:8 112:6 118:23 169:13 171:16 188:9 196:8 219:19 228:14 255:5

**hear** 190:23 216:21 217:2,19,20,24 218:2 222:6 263:3 269:17

**hearing** 174:16,17,21 234:6

**heart** 167:9,15,17 222:8

**heartbeat** 153:4

**heat** 241:10

**heightened** 178:9 179:8

**helped** 241:8

**helpful** 78:4 250:17

**helping** 241:19 242:2

**helps** 62:2

**high** 20:23 73:6,12 123:24 153:20

170:24 171:14 186:19 187:8

**higher** 246:14

**highly** 36:8 38:23 39:5 95:4 99:8 112:21

**history** 162:8 167:8 189:23 190:1 242:14,20 243:6

**hit** 112:6

**hold** 143:22 193:20 194:5

**home** 60:5 172:11,17 174:24 234:7

**homicide** 131:22

**Horgan** 193:15

**hour** 8:4 9:3,11 128:15 131:4 139:14 141:15,16,17 208:17

**hours** 11:14,18,21 18:3,7,13 24:4 66:1 115:17,20 118:4 127:17,19,23 128:2,16,20 132:8 134:20 135:16, 19 136:11 138:2,6 141:6 222:13 250:12 253:14,15,16

**house** 79:9

**human** 123:16 124:6 139:23 153:8 172:4 194:2,10 224:8

**humans** 136:23

**hundred** 109:21 149:18 158:20 222:20

**hyper-** 251:1

**hypothesis** 162:17

**hypothetical** 85:8 104:2 123:7 124:3 125:19

**hypothetically** 95:19 245:23 260:23

## I

**idea** 116:10,12 129:17 130:13 163:3 212:2 219:18 224:24 227:19 239:7 244:18

**ideas** 265:17

**identical** 26:23

**identification** 264:12

**identified** 34:11 36:7 68:20 72:21 76:1 94:20 107:11 142:6 177:6 194:16 218:14 249:9

**identifies** 61:24

**identify** 5:18 37:15,18 40:10 126:5 142:10 149:13 150:10 151:15

163:24 168:7 169:16 178:7

**identifying** 175:6 218:2

**illegal** 166:15 225:10

**Illinois** 5:11,15 66:14 89:4 112:14 241:21,23

**illustrated** 212:24

**imagine** 69:8 103:11 150:3 163:12

**immaturity** 246:22

**immediately** 91:5,6

**impact** 33:18 58:23 60:14 110:3,18 111:11 113:22 114:5 136:18 140:11,24 157:4,15,21 158:8 182:9 189:11 243:22 244:7 245:19

**impacted** 248:3

**impacts** 118:11

**implicate** 227:6

**implication** 112:18,23

**implied** 220:15

**implies** 171:9 203:20

**imply** 171:4

**important** 61:21 129:9 202:17 203:1,3

**impossibility** 72:18

**impossible** 68:18 72:10 79:11 83:15 86:19 87:2,11,20 232:8 234:8

**improve** 107:20

**imputing** 160:10

**in-class** 18:2,4

**in-person** 18:6 34:19 35:1

**inaccurate** 93:11 174:11 228:6 245:14

**inapplicable** 248:19

**inappropriate** 158:24 220:10

**incendiary** 82:11

**incentives** 102:3,8,9

**incidence** 46:20

**incident** 237:4

**include** 41:7 156:18 164:24 165:4, 7 196:1,5 265:22

**included** 35:15 39:3 88:6 156:4 277:11,14,15

**includes** 228:18 229:19

**including** 33:22 252:6,19

**inclusion** 40:11 89:22

**income** 20:18,21

**incomplete** 85:8 104:1 239:13

**inconclusive** 95:21

**inconsistencies** 107:3,8 108:16

**inconsistency** 108:8 114:10

**inconsistent** 106:24 156:12 223:3 228:23 239:17

**incorporated** 183:24

**incorrect** 184:12

**increase** 110:9 116:1 125:24 126:24 127:10 134:24 135:9 137:12 149:14 166:24 177:8 189:3

**increased** 138:7,12 144:19 158:15 169:23 170:7 177:13

**increases** 117:16 210:8

**increasing** 126:7

**incredibly** 137:1

**incriminating** 24:9 33:10 101:20, 23 144:20 147:7 190:24 210:20 223:2

**inculpatory** 100:17 101:16 207:23

**independent** 90:16 93:24 96:11 176:22 186:21,24 259:16

**indication** 40:16

**indicia** 195:6,15,24 213:15 231:13

**individual** 43:17 61:6,15 63:22 64:24 66:4 130:15 141:1 187:8 188:3 238:7

**individual's** 185:7 189:9

**individuals** 62:1 102:17 239:18 259:3

**induced** 37:17 192:5

**inducements** 26:7,9

**infer** 167:11 225:8

**inference** 233:14

**inferences** 232:22,24

**inferred** 233:6

**inferring** 269:14

**influence** 165:22 193:21

**Inform** 48:7

**information** 23:5 29:17 41:6 53:4 63:14 85:11 95:22 105:19,24 109:12 180:4 196:5 201:17 248:6 265:17 271:3,4

**informed** 161:24

**inherent** 154:9 155:11 156:23

**inherently** 103:19 150:24 155:2 156:13,16 176:16

**initial** 51:10

**initially** 226:20

**innocence** 68:22 69:5 71:22 73:2, 20 80:24 84:14 89:3,9,19 96:23 97:3,6 226:10 232:13

**innocent** 16:15 38:17 69:15,19 70:1 73:22 88:8 124:1 144:16 171:1 224:5,12 226:18 238:13,15, 19 265:14

**input** 50:24

**inquiries** 203:12

**inquiry** 73:24 75:8 136:1 190:4 203:9,13 206:9 243:3,22 244:8 245:19

**Inside** 28:13,17 29:6 30:17,22 31:21 131:10 159:4 194:5

**instance** 107:12 164:3

**instances** 106:23 229:8

**institute** 17:8

**instructed** 113:11 174:3

**insurance** 212:5,21 214:14,19 219:5,19 220:1,4,15,16,17,19,20 221:3,5,6,7,13,24 222:2,3 226:19

**intake** 115:22 135:21

**intend** 11:15

**intended** 40:1 226:19

**intent** 160:10 212:15

**intention** 163:20

**intentional** 160:9 166:4 245:3

**intentionally** 142:21 159:22 160:3,14 161:9 212:3 243:23 244:8,12 245:20

**interacted** 190:16

**interaction** 190:5

**interactions** 189:9

**interested** 29:20

**internalized** 98:2

**interpersonal** 186:1,2

**interpret** 158:20 181:3 184:2 237:24

**interpretation** 154:16 160:24 185:1 220:14

**interpreted** 161:1 183:18,21,22

**interpreting** 149:16

**interrogate** 120:13

**interrogated** 66:1 120:16 129:8 143:9 169:3 190:14 250:10

**interrogating** 123:13

**interrogation** 14:8,10,18,23 16:16 20:8 28:9,10,13,17 29:6 30:18,22 31:8,21 32:11,22 33:2,20 34:9,23 42:10,13,17,18 45:2,5 46:17 47:13 48:5 58:14,16 62:18,23 63:14 64:16 66:1 77:8,15 90:23 91:1 92:20 93:12 97:14 98:10 103:1,2 106:5,9,19 107:9,15 108:24 114:4 115:5 120:8 121:2 123:2,21 124:4 126:4 127:6,14,20 128:1,3,4,6,7, 19,22 129:1,22 130:2,9,13 131:10, 23 132:3,7 133:4,11,12,23 134:16, 21,24 135:4,23 137:9 140:23 142:8,17,23,24 143:10,13,16 144:6,10 145:12 148:16,20 150:4, 5,6 152:6 154:5 159:4 162:6,8 163:3 165:20 166:7,21 169:7 173:11 175:2 176:11,18 182:15,20 194:6,19 223:1,18 224:15 225:5,6, 9 227:18 231:7 245:5 248:21 249:19 250:13 251:7,23 252:22 253:4,14 257:15 258:12,17,24 259:18 260:20 261:13 268:15,17 274:24 275:13

**interrogation-induced** 147:7

**interrogations** 20:2 27:5,13,19 28:19,24 29:4,8,11 30:8 31:24 33:13 34:5 35:3,4,8,16 36:15,18,22 45:4,11,17,20,24 46:9 58:19 64:14 127:9,16 131:3 132:7,12,15 159:10,15,16 164:12 166:13 173:10 177:1 190:15,17 225:20,23 227:21 228:8 229:7 230:9,11 257:9 264:17

**interrogator** 150:18 166:5,16 185:13 226:9 227:13 229:15 230:22 258:16,18

**interrogators** 29:15 117:20 173:10 227:5 252:17

**interrogators's** 258:1

**interview** 62:11,16 122:16,22 123:17,23 126:15 214:6 236:19 237:12 250:16

**interviewed** 250:10 252:16

**interviewing** 14:18,22 20:8 29:1 134:21 166:17

**interviews** 53:13

**intolerable** 98:11,16

**intolerant** 98:20,22 99:12

**introduce** 240:16

**introduced** 28:3

**introduction** 31:5

**introductory** 255:24

**intruder** 60:6

**investigate** 76:2 120:12 146:18

**investigating** 273:4

**investigation** 54:10 58:11,13 63:6,11,18 67:24 104:7,24 105:17 121:5,6,9 145:13 146:10,13 147:12,18 200:23 201:9

**investigations** 59:5

**investigative** 72:2 123:4 142:13 150:3 221:9 270:12,19,20 271:9,12

**investigator** 15:10,19 54:9,20 82:10 149:13,21 150:20 161:15 193:22 196:18 251:16

**investigator's** 143:2

**investigators** 59:10 80:19 92:12 123:24 211:14 212:7 234:18 256:9

**investigators'** 144:17

**investigators's** 258:10 259:5

**invoice** 11:4,7

**invoiced** 11:16

**invoices** 11:10

**involuntarily** 209:13

**involuntary** 169:18,24 170:4 209:1,5,7,18,20

**involve** 41:11 78:13 261:14

**involved** 20:8 41:8,12,14,19 43:7, 10,21 47:19 48:9,17,22 74:11 76:9 94:12 121:15 136:2 241:24 242:21

**involving** 176:15

**irrational** 223:24 224:9

**irrelevant** 103:8,11,13 105:21

**irresponsible** 270:24

**Irvine** 17:17 18:23

**issue** 58:23 61:6,15 75:4 103:16 116:19 146:9 162:4 231:10 265:1

**issued** 11:11

**issues** 58:21 94:12 242:12 253:23 264:14

## J

**J.D.** 6:11

**jail** 146:14,19 148:22 235:9

**January** 12:7,9,15 49:5 51:9 52:20 53:1 193:18

**JD** 21:3

**Jennifer** 194:9

**Jerome** 27:15

**John** 81:9 82:2,4,7 83:5 255:9,11

**Joseph** 5:24

**Journal** 194:2,9

**journalists** 40:12 74:12

**judge** 88:10 89:20 113:13 132:24 133:19 174:17 209:6 276:9,23 277:16,21

**judges** 133:19

**judgment** 105:22 142:11 144:17 145:16 146:11

**junk** 152:23 153:23,24

**juris** 12:24 21:2

**jurisprudence** 13:3

**Jurors** 48:5

**jury** 69:24

**justice** 29:2 42:8 46:17 152:7 189:10,15 190:9 191:14

**juvenile** 45:11

**juveniles** 246:14,22

## K

**K-O-Z-I-N-S-K-I** 122:2

**Kane** 51:12

**Kassin** 192:14

**Kelly** 45:16,23

**kick** 171:6

**kicked** 171:10

**kind** 37:4 103:16 112:19 124:17 141:9 220:6 270:19 271:20

**knew** 157:5 215:1 225:12 226:21

**knocking** 204:17

**knowing** 83:9 204:18

**knowingly** 97:13,24

**knowledge** 14:17 15:3 24:1 38:22 41:16 51:8,19 102:1 106:15 122:8 131:24 132:4,17 142:13 165:10 188:23 189:6,20 208:15 233:6 247:12 252:21 257:4 279:6

**knowledgeable** 191:4 266:17

**Kozinski** 122:2

## L

**L-E-O** 6:21

**laboratory** 47:12,16 192:3

**lack** 136:2 274:22

**laid** 68:16

**land** 84:18

**language** 26:23 63:13 123:9,10 124:2

**LAPD** 45:23

**large** 271:1

**larger** 193:21

**lasted** 128:20

**late** 139:11 233:18 263:7

**Laura** 5:22

**law** 13:11 16:13,17,20,23,24 17:3, 7,21 44:1 89:4 119:2 172:4 193:18 194:2,9 209:7 242:4

lawlessness 112:15

lawsuit 262:5

lawsuits 262:8

lawyer 174:1,3,5

lawyers 40:13 74:12 265:8 266:11

lay 120:6 265:9,21

lead 121:15 148:17 150:7 197:10 231:16 237:21 248:10

leading 86:11 124:10 132:7 170:20 212:24 214:24 219:1

leads 143:6 222:21

leaking 212:10

learned 163:1

leave 133:8

lecture 19:4

lectures 18:6

led 80:15 159:3 166:14 192:5

left 48:12 79:9 87:7 142:4 198:1,2 204:15

legal 5:12 74:6 132:22 133:1,14,20 134:3 148:11 166:18 209:5,9

legally 209:22 261:14,15

length 33:1 108:18 129:21 130:2, 10,13 131:22 132:2,15 134:23

lengthy 127:6,9,13 128:5,19,22,24 137:8 166:14 258:23

leniency 170:18

Lentini 82:2,5

Leo 5:5 6:11,16,18 7:14 10:3,21, 22,24 11:23 12:4 21:8 30:24 34:17 50:10,12 56:23,24 57:4,11 60:16 77:19 85:9 91:20 142:4 181:18 202:1 205:15 217:8,12,19 218:9 220:8 223:16 236:9 240:19 267:17 268:7 272:5 278:4

Leo's 181:20

letters 67:17,21

level 82:18 102:11 104:4 111:23 123:24 177:17 223:22 242:6,22 250:7,17

leveraged 166:3

Lexis 40:8

liar 243:21 244:7 245:18

librarians 263:21

licensed 13:18 21:3,5

lie 92:11 102:3,8 123:16 124:6 153:10,15 154:3 157:2 194:6

lied 154:13 157:5 160:2 234:17

lies 92:22 93:17 261:15

lieutenant 28:3,5

life 212:5,20 214:13,19 219:5 220:1,3,15,16,19 221:6,13,24 222:2 248:13

lifted 26:11,20 112:5

light 248:16

likelihood 96:4 111:12 116:1 117:16,24 118:11 126:7 135:9 137:12 149:14 158:15 166:24 169:23 170:8,12 177:9,13 248:4,9, 20 273:4,17

limited 48:15 60:13

lines 146:22 274:8

linking 150:16

liquid 198:4

list 10:7 49:24 50:2,3 51:3 52:8,13, 20 53:17 55:8,16,19 56:10,11 66:17 70:21 196:2,5 197:22 198:22 201:17 247:8,11

listed 48:5,12 66:19 81:23 88:24 96:15 198:12,17,19 199:3 255:17 271:17

listen 208:20 218:23

listened 208:12 213:24

listening 66:18 208:13

lit 198:1

litany 80:23

literally 16:24

literature 58:15 119:2,11 121:23 122:5 125:21 128:13,17 130:20 137:2,6 138:10 141:3 145:22 162:18 178:23 183:23 188:7,18,21, 24 238:12 239:6 246:11 249:6 257:8,10 259:2,7

litigating 265:19

litigation 76:9

live 28:10 45:20 139:3

lived 139:11

living 198:1,3

locate 55:3

Loevy 50:24 51:12

logistics 57:7

long 8:2 18:18 42:1 127:20 128:1,3 134:17 135:4 139:8 163:2 173:15 182:17 205:23 263:2 267:14

longer 115:20 127:19,23 128:15, 16

looked 43:6,10 50:20 78:7,23 160:12 168:5 175:18 206:2 253:12, 13

loose 270:19

Los 45:17 255:13,16

lot 42:2 76:16 109:13 205:23 244:2 252:6 257:6 259:24 266:20 270:11 272:10

low 20:22 242:21

lower 188:20

lunch 141:9,12,16

lungs 233:15

lying 123:12 124:6,13 151:2 153:1, 9,18 156:15 158:24

M

machines 154:3

made 24:9 33:10 62:3 63:5,10,17 66:14 75:14 89:20 93:11 98:17 101:20,23 107:1 113:6,8,12 140:14 148:6 169:22 173:2 174:22 186:15 187:16 199:21 200:4 201:9 208:10 210:19 225:1 231:6 234:7 238:8 247:22

magazine 264:24

majority 33:4 131:2,7,13 256:19, 23 261:11

make 37:19 86:12 90:13 95:10,11 99:5 102:17 113:16 114:23 123:9 124:8 127:2 137:13 141:7,11 147:18 153:16 156:1,9 167:4 187:23 188:3,15 193:20 199:24 200:11 205:4 206:19 217:8 234:24 241:18 244:18,23 245:9 247:22 257:2 259:3 270:9 273:15,17

makes 87:19 150:20 185:2 207:11, 23 259:24

**making** 85:13 109:17 112:7 115:3 177:4 187:24 209:9 210:19 220:12 246:23 257:20 261:3 265:15 272:23 276:3,6

**man** 242:14

**mandatory** 225:19

**manifestations** 118:4

**manipulation** 20:9

**manner** 83:16 231:21 232:19

**manual** 180:9 251:21,23 252:2,5,8

**manuals** 252:4,7,14

**March** 255:18 256:1

**Mariah** 5:21 7:22 8:23 235:23 267:15

**Marianne** 21:16 212:5,20 215:1 220:3

**Mark** 138:20

**marked** 10:11 12:5 21:11 50:7 181:14 201:21 235:12 236:9 263:6

**Masokas** 164:5,13,15,17 165:15 226:24

**Masokas'** 166:23

**master's** 12:22

**material** 271:18 272:10

**materials** 24:3 40:21 52:5,8,9,21 53:2,17 54:1,7 55:3,7 57:24 58:7, 22 66:20 74:5,13,16 75:2,5 76:4,7 79:1 80:6 88:20 104:7,13 105:2,4,6 147:23,24 148:2 196:6,7,9 198:12, 21 201:13 223:7 231:15 234:23 235:3,4 242:18 252:16 256:4,8 272:11,14,15

**matter** 5:7 65:18 95:24 107:19 127:18 133:20 148:11 167:23 168:3 209:7,12 262:8 270:13 271:24 274:12,22

**Maximization** 193:12

**meals** 115:14,16

**meaningful** 47:2 110:15 116:13 135:5 176:19 177:2 209:17 223:3

**means** 69:14

**meant** 190:24 267:3

**measure** 99:1,3 111:22 128:2

**measured** 99:3

**media** 5:2 40:9 67:1,4 141:22 142:1 205:10,13 268:2,5 279:22

**medical** 13:13

**meet** 7:20 8:2,5 37:19 40:19 78:9 168:15

**meets** 74:1 112:11 195:21 207:2,5, 14 231:12 243:14

**member** 64:18

**memory** 35:15 98:4 107:20 184:6 216:12 218:18

**mental** 130:8 260:17

**mention** 113:11 174:1 175:10 260:2

**mentioned** 28:18 68:8 70:20 80:20 81:1 115:9 138:1 175:9 204:11 252:2 257:7

**mentions** 156:8 189:19

**met** 37:7 41:22 70:24 79:14 83:13 84:4 86:17

**method** 41:4 120:8 121:11,15 122:8,13,17,21,22 123:2,4,6,18,23 124:4,16,21 125:4,9,22,23 126:4, 22

**methodologies** 78:1

**methodology** 36:14 40:18 57:15, 18 58:3 61:4,12,13 67:8 70:23 78:12 94:24 95:6 97:19 102:16 105:15 156:4 176:22

**methods** 123:20

**Miceli** 21:16 67:22 159:21 277:23

**Miceli's** 88:21 212:5,20 220:3

**Michael** 5:8 91:11

**middle** 6:19 163:2 211:22 224:3

**midnight** 134:13

**Mike** 159:20 164:5 226:24 256:11

**mild** 112:2,19

**millions** 74:23 75:4

**mind** 45:21 119:4 172:1 204:23

**minimization** 163:24 164:4 165:16,22 166:19,24 169:3,6 193:12 226:23 227:12,15 231:2,4,7

**minimize** 166:16 227:24 228:1 229:10 230:18 237:19 240:2 245:4

**minimized** 165:23,24 166:3

168:19 245:11

**minimizing** 241:15

**Minnesota** 45:9,12

**minor** 107:3 108:15

**minute** 83:22 152:13 202:1

**minutes** 65:24 134:7 139:13 141:6,14 173:15 205:5 208:17 266:21

**Miranda** 33:18 34:13 134:5

**mirrored** 187:6

**mis-** 126:12

**misclassification** 126:16

**misconduct** 261:7,9,10,19

**misheard** 251:12

**mislead** 226:9

**misleading** 134:19 180:4

**misreading** 43:9

**misremembering** 25:4 37:2

**missed** 39:21 204:22

**missing** 71:8 269:18

**misstate** 277:2

**misstates** 221:20 274:5

**mistake** 236:6

**mistaken** 174:12 236:16

**Modeling** 193:21

**moment** 10:24 24:19 48:2 54:23 91:20 92:8 236:11

**Monday** 27:24

**money** 219:14,19 220:20 221:3,7

**moneys** 221:5

**month** 121:1

**months** 51:16 80:18 88:2,3 175:18

**morning** 6:16 10:4 24:4 50:20 70:12 135:24

**motion** 107:5,13 108:19 113:7,17 173:20

**motions** 101:8,21 107:24

**motivate** 226:3

**motivated** 226:8,17 262:5

**motivating** 114:18

**motive** 212:3,16 221:13 261:23

**move** 142:9

**moved** 259:3

**moving** 86:14 264:19

**multiple** 208:16 258:22

**murder** 71:8 103:19 171:8,11

**mute** 263:2

**N**

**N-A-R-C-H-E-T** 193:24

**naive** 246:16 247:4

**naively** 238:15

**naivete** 246:5,10,19 269:6,8

**named** 122:2 193:7

**names** 44:14 193:9

**Naperville** 11:5 55:19,21,24 133:24 134:16 139:9,17 140:7 143:17 147:12 275:14

**Narchet** 193:7,24

**narrative** 212:9,15

**national** 251:7,14 253:4 254:3

**nature** 60:12

**necessarily** 96:21 229:2,4,20 239:21 261:18

**necessities** 253:9

**needed** 272:12,14

**negative** 73:13,15,17

**newspaper** 86:24

**Nicholas** 237:9

**night** 135:17,19,23 138:2 164:10, 20

**Nigohosian** 173:17 213:1,13,21 214:2,21 215:10 221:2,18

**Nigohosian's** 275:1,6,19

**nonconfession** 168:13

**nonfalse** 168:14

**normal** 115:15,22 135:14 136:13 184:19

**normed** 184:16

**North** 5:14

**Northern** 5:10

**nose** 153:10

**notably** 250:4

**note** 17:16 31:5 53:18 172:10 179:18 242:13 248:17

**noted** 247:18 249:17 253:1

**notes** 143:19 183:1 267:10,22

**notice** 106:22

**noticing** 108:10

**notion** 140:23

**November** 91:10 255:19 256:1

**Nowadays** 225:22

**number** 5:9 11:24 12:5 21:9,12,23 30:16 32:11,24 33:17 45:10 54:16 71:21 79:5,7 83:13,19,22,23 84:3 91:14,15 93:15,16 94:6,9 121:21 126:4 127:4 130:5,18 142:10 149:17,19 150:9 153:13,20 158:19 161:11 163:23 167:3,23 169:14 170:16 175:21 178:2 192:9 195:2, 4,6 206:24 207:5 210:6 251:5

**numbered** 145:18

**numbers** 59:17 168:23

**numerous** 65:20 195:24

**O**

**O'RIORDAN** 237:10 239:3,16

**O'Riordan's** 239:3

**Oakland** 27:5,17

**oath** 7:6

**obese** 167:13

**obesity** 167:7,16,17

**object** 34:15 37:9 60:9,15 61:16 77:17 82:16 99:22 101:2 103:22 105:9 134:2,18 147:21 149:24 156:20 157:7 160:22 165:18 182:13 185:17 188:5 209:4 211:1 220:5 221:19 225:11 231:23 232:20 237:22 242:15 243:9 244:1 245:22 248:23 250:6,18 268:23 269:13,17,20

**objection** 47:6 61:7 84:5 85:7 102:6 132:21 140:16 201:10 220:10,11 221:14 234:19 239:20 240:5 241:6 262:2 272:2 273:9

274:5 275:3,15 276:21

**objections** 220:12 269:19

**objective** 103:1,13,15

**objectively** 72:22 79:8,23 80:15 86:18 99:3,20 136:10 268:11,14

**obligations** 7:5

**observational** 34:19,23 35:2

**observations** 28:15 34:24 46:1,9 172:8 260:16

**observe** 27:12,21

**observed** 27:5,8 29:4 30:8 31:23 33:5 36:17 45:3,13,15,16,19,23 159:10 227:23 228:3,9 229:8 230:10 239:18

**observing** 28:23

**obtain** 74:9,13,14,17

**obtained** 33:6

**obvious** 136:24

**occasions** 219:20 250:2

**occur** 47:4,8 68:18 83:1 97:5 120:5 257:9 261:7,12

**occurred** 21:14 23:1 59:24 64:23 69:16 70:4 78:24 103:2 106:4,8,15, 22,23 107:9,14 114:8 120:18 125:7 128:8 133:8,17 134:16 142:17 143:19 144:4 157:23 159:20 166:8 198:8 210:22 212:1 218:1 225:10 230:2 243:15 256:21 257:4 259:18 275:14

**occurrence** 101:1

**occurring** 257:18,19

**occurs** 150:19

**October** 8:15 24:5,10 33:14 55:20, 22 56:1 70:6,18 93:2 106:12 116:5 120:16 132:20 133:24 139:18 142:8 148:20 157:11,16 182:11 199:21 200:4 202:4 205:16 207:24 208:10 209:1 210:24 211:11 218:19 235:9 236:20 249:18,23 250:13 258:24 275:1

**Offer** 48:15

**offered** 116:22 117:7,10,12 165:15 253:13 254:8

**offering** 210:10 232:12

**offers** 116:22

**officer** 15:8 49:18 158:24 237:9 251:16

**officers** 117:9 120:12 124:20 145:12 146:17 169:22 226:17 251:6 253:2 260:4,13

**officers'** 257:13 259:11

**officers's** 257:5 259:20

**offices** 5:14

**Ofshe** 35:23 36:7 37:23 39:6,12 223:19 278:12

**oftentimes** 91:2 105:20 110:12 165:24 173:8 229:14

**older** 264:21

**one's** 99:13 115:22 119:3,4 130:10 135:14

**one-month** 120:22 121:7

**one-page** 201:23 235:14

**open** 10:10,17

**open-ended** 104:2

**operator** 154:21

**opine** 78:20 94:15 169:21 201:6 210:2

**opined** 82:11 85:2 86:15 203:4 242:12

**opining** 69:18 78:18 86:21 98:9 106:7 197:12 253:3

**opinion** 54:8 63:6 69:22,23 75:21 79:3,10,14 80:3,17 81:2,9,15,19 82:24 83:8,19 84:2 85:4,18 86:8 87:11 89:13,21 90:2 93:4,6,23,24 95:21,23 96:10 104:20,21 111:6 125:11 126:5 133:16 142:17 143:1 148:2,8 149:5 151:3 153:22 155:7 160:18,24 161:5,7,9,11,12 165:17, 19 175:6,23 176:1,10 180:16 182:22 187:6,7 191:12 195:19 197:4 200:8,17 206:14,15,24 207:8 208:24 209:2 210:9,10,14 216:4 226:12 232:12 235:3 248:19 256:24 258:21 261:18 268:18

**opinions** 19:24 23:10,14,19,24 24:8 25:16,18 57:12,20 62:19 65:11,14 80:14 82:2,4,8 83:18 84:24 85:2,13,23 86:3 88:17 89:24 91:9,23 96:12 100:7 115:12 145:10 187:4 188:22 199:9,16 200:1,12, 19,24 206:22 232:16,24 233:3,4 234:14 254:1 256:21 277:20

**opportunity** 27:12 218:23

**opposed** 37:17 98:1 172:7 203:16 212:9 222:3

**opposite** 251:2

**orchestrated** 117:19

**order** 26:24 136:9 212:20 226:9,18 227:7 249:6

**orders** 276:9

**organizations** 81:1

**origin** 81:9,15,20 82:3 83:11 196:13,21 233:5 234:15

**Ouija** 154:11,12,15,16,17,20,21

**outcome** 10:1 45:4

**outline** 253:24

**outlined** 223:8

**outstanding** 11:14

**oversight** 41:18

**oversimplifies** 262:7

**overview** 206:22 207:8 265:3,7

**overwhelming** 33:4 131:2,7,12

P

**P-E-R-I-L-L-O** 194:8

**P-O-L-I-C-K** 5:24

**p.m.** 134:1 279:24

**pages** 26:9 54:24 55:2 147:24 193:18 194:3 198:12 253:24 271:12,15,16,17 276:17 277:8

**pandemic** 7:3

**paper** 84:11 121:22 172:3 192:16 264:22 270:16

**papers** 17:12 92:21 140:8,14 161:20 162:6,20 163:9,16

**paragraph** 32:20 92:19 96:19 137:19 145:17,18 155:24 186:9 195:5 197:3,24 204:11,12 211:22 224:12 227:4

**parent** 112:10 163:14

**park** 59:8,9,11,18,19,22

**parse** 166:7

**parsed** 125:10

**part** 25:7 35:4 48:9,24 61:4,13 67:7 87:23 105:15 122:7 126:19 136:1 150:17 175:6 195:13 211:17 213:16,20 220:22 227:12 246:13, 20

**partial** 35:8 76:12 108:19 261:1

**partially** 35:16 109:11,22 245:14

**participant** 214:5,7

**participants** 140:5

**participated** 47:12

**parties** 5:19 89:24

**parts** 211:23 221:9

**party** 227:19

**passage** 92:17 145:22 146:4

**passed** 154:8

**past** 149:7 270:22 273:18

**pattern** 115:16 136:3,13 184:6

**patterns** 115:23

**Paul** 81:19

**PD** 27:6

**pdf** 10:4,10

**peer** 43:23 44:2

**pending** 7:11 92:6

**people** 29:2 42:7 59:17,21 60:4,7 71:22 74:11,14 85:14 105:23 110:13 115:14 120:4 135:16 136:6, 9 153:1 168:19 169:1 171:1 177:2 190:8 191:16,21,22 222:21 224:22 238:12,16 241:19 248:14 259:8 262:8 265:4 273:14

**people's** 119:7 165:22 219:10

**perceive** 98:16 110:14 116:13 133:8,18 176:19 177:2 209:16

**perceived** 193:13 197:8

**percent** 20:17,23,24 31:22 43:7, 10,13,21 47:5 49:16 52:1 69:15 100:23 109:21 127:16,23 128:15 131:13,15 132:13 159:12,16 167:14 168:1 169:1,5 180:12 222:20 253:19 264:9

**percentage** 20:12,18 49:12 51:21, 23 52:3 100:16 101:19,24 102:1 131:6 132:11 168:18 169:8 170:24 171:14,17

**percentages** 168:23 169:12 171:18 172:6 184:21

**perceptions** 210:18

**Perillo** 194:7

**period** 36:20 120:22 121:7 128:3 132:6 146:16 182:18 254:20

**periods** 119:5

**permitted** 261:15 263:21

**perpetrator** 68:20 72:21 222:21

**person** 7:7 27:9 38:16 45:14,20 62:5 64:12 71:7,8 73:21 76:16 88:11 95:11,13 97:24 98:24 103:18,23 117:21 123:16 149:22 161:24 184:2,9,17 212:17 226:4,8 228:15 243:6

**person's** 106:8 123:8 179:7

**personal** 86:5 106:14 110:9 257:4

**personality** 61:18 62:10 110:8 178:3,13 187:11,16 188:13,18 189:3,4 250:22 273:1,2,16

**personally** 136:18

**perspective** 271:18

**perspiration** 153:4

**persuaded** 64:7 98:1

**persuaded/internalized** 203:16

**persuasion** 20:9

**petition** 89:3

**petitioned** 89:8

**Ph.d.** 6:11 13:3 236:23 237:10

**phenomena** 238:11 265:3

**phone** 66:13,18

**photographic** 216:11

**phrase** 129:10 220:6

**phrased** 277:1

**physical** 72:18 111:4,7,9,11,16, 20,24 112:2,13,20,21 113:4,6,12, 16 114:8,13,15,18,20 118:4 174:15 223:3 252:24

**physically** 68:18 72:10 79:11 83:14 86:19 87:19 98:15 113:21,23 114:5 139:20,21 234:8

**physiological** 118:17 129:15 130:8 153:8

**physiologically** 119:3

**piece** 122:23 202:17

**pieces** 201:17 233:8

**Pinocchio** 153:9

**place** 126:11 173:4 182:12

**places** 109:13

**plaintiff** 5:21 6:8 11:8,11,13,15 21:18

**plaintiff's** 23:9,13,18 56:21

**plan** 12:17 141:18

**plausible** 212:16

**play** 150:14 216:19 217:7,12 246:8 261:24

**played** 197:13 217:17

**playing** 216:20

**plea** 41:8,15,20

**pleads** 242:1

**pleas** 41:11,13

**pled** 241:5

**plenty** 190:7 203:13,17 267:4

**ploy** 150:19 151:11 152:15,18 154:10 155:2,11 156:2,6,16,18,23 157:17 158:13 159:19 160:19 161:4 167:24

**ploys** 150:11 151:15 156:8 159:5 261:16

**point** 11:21 22:19 42:5 47:2 64:2 66:3,6,7,8 77:15 87:13,14,17 90:11 92:16 99:11 108:13 117:1,2,13 118:22 119:6,13 125:17 127:1 130:21 141:9 156:9 163:19 175:13 176:4 189:8 196:2 213:5 215:14 222:4 233:21 240:9 242:23 254:11 264:22 265:2 266:2 269:1 272:11

**pointed** 99:23

**pointing** 137:4

**points** 224:23

**police** 14:2,6,7,9,10,12,17,19,21, 22 15:7,13 16:15 20:1,4 27:16,17 28:16,20,21 29:14,20 30:2,4,7 31:7 33:13 34:9,23 45:2,12,17 46:16 47:13 49:17 54:8,15 55:15,20,21, 24 56:3,5 64:15 67:23 72:2 80:19 96:20 100:18 104:8,16,23 105:8, 11,13,17,18,20 112:16 116:15

122:9 133:24 134:10,16 139:17 140:7 143:17 147:12 152:6 154:1,2 190:5,15,16 191:5 197:21 201:2,7, 12 202:12,14,24 203:17 204:3,6,9 206:5 213:7,17,21,22 222:16 223:17 244:24 251:7,16,20 252:12, 22 253:4,22 254:6,8,18 261:7,8,10, 19,24 268:22 269:12,23 275:14 277:11,19

**police-induced** 41:19 144:15 170:19

**police-written** 197:19 202:5

**policing** 254:19

**Polick** 5:24

**policy** 13:4 212:5,21 221:13

**polygraph** 15:22,24 143:12 150:24 151:1,7,13,16,23 152:3,15, 18,22,24 153:5,22 154:7 155:2 156:2,10,14,19,22 157:3,10,15,16, 20,22 158:4,8 164:5 274:23

**polygraph's** 158:4

**polygrapher** 153:22 154:22

**polygraphs** 143:12 156:5,13 158:13

**pool** 36:18,22 59:6,14,23 60:13,14

**population** 120:6 180:9,12 184:19,20

**populations** 184:19

**portion** 55:10 92:14 94:19 195:9 214:1 230:3

**portions** 25:20 26:10,14,15 125:11

**posed** 102:10 214:10 215:7

**position** 16:7 17:6,9 86:7 232:17

**possessed** 187:23

**possibilities** 41:4 153:14

**possibility** 230:24 232:17 234:16

**possibly** 190:12

**post** 39:16 74:8 263:21,23,24

**post-** 277:16

**postdates** 260:20

**potential** 40:10 44:18 60:12

**potentially** 64:1 66:7 189:11 267:11

**practice** 14:17 21:5

**practices** 14:2,7,11,13,19,21 31:8 251:8 252:12,19,22 254:3,6,9

**pre-dated** 34:5

**pre-dates** 33:14

**pre-interrogation** 123:3,18

**pre-knowledge** 36:24

**pre-published** 263:12,22

**preceded** 134:21 213:23

**preconception** 36:16

**predicted** 224:16

**premature** 142:11 144:17 145:20 146:11

**premise** 120:11

**preparation** 7:21 8:6,12 18:5 52:6 214:3,4

**prepare** 7:14,17 50:12

**prepared** 50:24 51:9,11,16

**preponderance** 38:16

**preprint** 262:19

**presence** 95:15

**present** 15:5 19:6 59:9,11,18,19, 22 95:9 96:3,12 108:24 113:24 114:16 118:19 125:4,13 128:7 142:7,15 165:20 166:12 168:8 169:6,18 175:7 177:8,13,19 194:18 195:1 247:5,13,17,21 248:8 249:10 254:24 258:16 275:21

**presented** 19:9 200:16 219:1

**presenting** 163:8

**presents** 106:4

**pressure** 179:14 180:3 185:13 186:1,2 191:6 250:8

**pressures** 103:19,24 180:6

**pressuring** 212:14

**presume** 224:8

**presumed** 176:16

**presumption** 142:12,14,22 143:7 144:18 145:21 146:12

**pretrial** 172:20 174:16

**pretty** 41:3 112:3,18 252:1 266:19 272:8

**prevented** 139:24

**previous** 106:24 145:10

**previously** 17:17 18:23 114:14 123:1 236:17

**primarily** 34:20 264:11

**primary** 47:15

**principles** 242:4

**print** 10:19 24:15 30:18 262:13,18, 24

**printed** 10:12,13 217:21 236:2

**printing** 263:3

**printout** 10:15

**prior** 31:16 85:23 115:7 135:23 147:6 148:16,20 149:11 186:22 189:9 190:5,8,24 200:23 206:3 211:10 220:16 224:14 234:12 249:18,22 274:6 275:1,12

**prison** 71:23

**private** 20:4 40:13

**probabilistic** 96:4

**probable** 36:8 37:24 38:1,3,6,20, 23 39:5 78:10 95:4 146:24 148:7,9, 14

**Problem** 39:15

**problematic** 112:22

**problems** 58:20,22

**procedure** 6:6 16:14 92:21 220:13

**proceeding** 270:21

**proceedings** 277:17 279:23

**proceeds** 219:5 226:19

**process** 6:24 58:5,16 62:19 74:19, 20 75:7,15,19,20 89:2,5,6 99:9 168:12 184:12 222:17 271:6

**produce** 137:11 271:23

**producing** 110:19

**product** 204:9 212:1 216:5 222:24 261:19

**products** 201:18

**professional** 90:2 258:21

**professor** 16:23 17:17 25:17,19, 21 26:8,11,16,21 27:15 36:7 44:12 45:8,9,16,18 46:6,8 71:15 197:16 253:21 278:11

**profit** 226:16

**profound** 162:20,22 163:6

**program** 13:11

**prohibited** 261:14

**projects** 47:19 71:22 80:24

**promise** 171:3,9 172:11

**promises** 169:15,17,22 170:18 171:4,12 173:2,12 174:22 175:3,5 176:17 253:6 261:15

**prong** 79:15 84:3 86:16

**prongs** 78:23

**pronouncing** 99:6

**proper** 184:2 242:16,21

**properly** 207:9 227:5

**prosecuted** 21:19

**prosecution** 9:12,13 49:7,14

**prosecution's** 221:12

**protocols** 251:7

**provably** 65:17 66:9 69:14 76:8,20 90:18 100:12 222:20 223:2 231:17

**prove** 73:13,15,17,20

**proven** 22:17 36:11,12 39:8 40:2, 5,20 41:2,22 43:5 44:22 68:9,11 69:3,23 70:16,21,24 72:5,6 73:5 74:1 75:9,21 76:11,15,23 77:5,9 78:9,13,15,19 79:16 83:9 85:5,24 86:15 89:14,23 90:3,15 93:5 94:16 95:2,19 96:11,15 127:22 130:19 149:6 168:9,11 171:13 190:7 195:11,14,22 206:18 207:6,13,15 222:12 231:11,12 238:8 239:8,19 243:14,21 244:7 245:18 249:13 259:4,8,14 274:2,10 278:7,9,21,24 279:3

**proves** 84:13

**provide** 30:4 51:21 54:14 55:8 88:13 95:12,22 105:23 149:15 164:3 228:4,5,10 243:23 244:8 245:20 248:19 260:24

**provided** 6:7 23:4,18 30:5,11 49:24 53:4 54:15 55:3 56:8,21 57:22 62:6,20 67:11,13 76:5 82:2 88:5 105:3,12 189:24 210:23 213:6 218:14 238:7 239:19 243:5 244:12

**providing** 19:16 158:15 179:8 187:17 233:17

**psychiatric** 67:9 103:7

**psychiatrist** 13:16

**psychiatry** 103:4,6

**psycho-** 246:21

**psychological** 67:9 92:4 114:12, 17,21 116:11,19 117:1 118:8 137:10 144:14 158:5 162:24 175:22 176:13,21 177:12,18 209:12 210:6 236:18 237:11 261:20

**psychologically** 98:14 113:21 114:4 122:14 157:23 176:1,7,11,16 177:1 209:22 210:11 222:24 261:13

**psychologist** 13:18 14:1 93:14,15 94:1 99:24 180:24 250:23,24 272:18

**psychologist's** 93:9 99:2

**psychologists** 62:7 272:22 273:6, 14

**psychology** 13:21 17:22 193:17 223:13,17 250:21

**public** 9:9,14,15 59:7 266:16

**publication** 16:9 28:17 31:18 33:13 34:6 39:6 45:24 159:4 263:19

**publications** 8:12 12:9 23:23 34:4 35:12 37:3 73:9 128:19,23 244:17, 22

**publicly** 76:5

**publish** 31:15

**published** 28:12 30:24 31:2,4 35:13,23 44:5 46:3 48:20,24 193:17 194:2,9 252:5,15 256:4 263:13,14 264:1,2,6

**pull** 24:17 25:24 152:9 223:9 276:14

**pulled** 30:19

**pulling** 240:21

**purpose** 102:23 195:9,10

**purposes** 111:6 115:12 240:16

**Pursuant** 6:4

**pursue** 265:10

**put** 97:13 153:24 154:6 170:16 174:17 178:8,13 195:2,4 220:11 232:5

**puts** 62:1 179:8 233:22

**putting** 215:20 252:24

---

## Q

**quack** 86:12

**qualifications** 27:3 84:8

**qualified** 75:16 199:14 254:5,12, 16

**qualitative** 172:7

**qualitatively** 171:23

**quantifi-** 111:21

**quantified** 146:7 248:3

**quantify** 111:19 116:2 117:15,17 118:2,21 124:22 135:2 138:11,13 149:19 158:18,19 170:11

**quantitative** 46:12 111:21 248:6,7

**quantity** 59:15,16,20 248:7

**question** 7:11 14:5 16:22 26:13 32:4 35:11,18 36:13,21 39:1 52:18, 24 55:4 58:6 60:24 65:10 72:3 75:11,13 76:13 77:21 82:17 92:3 102:10 103:6,17 104:3,4 108:20 110:17 112:19,23 115:7 129:21 139:19,22 149:17 150:2 152:4 158:20 167:19 177:20 182:22 189:7 202:21 203:20 208:7 213:18 214:24 219:2,21,22,24 230:8 233:22 234:3,4,12 235:5 241:3 244:2,3 245:16 249:1 269:21 271:21 275:19 277:1,3

**question's** 177:5

**questioned** 103:19 226:4 249:21

**questioning** 24:8 129:14 173:16 213:1,15,23 222:4 226:9 244:19 250:11 253:20 267:12 275:6

**questions** 7:11 103:7 108:1 123:7, 11 124:3 184:7 214:8 216:16 217:14 267:11 268:8 270:3 278:2 279:12

**quick** 193:8 194:10 198:16 204:24 270:9 278:3

**quickly** 39:23 146:10,13 179:14 204:19 264:19

**quote** 31:5 84:12 97:13 122:11,12 132:6 164:18,21 169:23 215:19 223:24

**quoting** 180:13

---

## R

**R-I-C-H-A-R-D** 6:19

**R-I-O-R-D-A-N** 237:10

**raise** 58:20,21 217:1

**random** 44:19,21,22

**range** 20:24 54:14 56:2 113:1 127:19 136:9,10 220:22

**ranged** 57:2

**ranges** 55:8,11

**Ranum** 5:22 6:9,15 27:2 32:8 34:21 47:11 55:6 57:8,10 60:11,19 61:10,20 66:23 67:6 77:22 82:20 84:10 85:21 100:15 101:12 102:13 104:5 105:14 133:2 134:11,22 140:21 141:5,18 142:3 148:4 150:8 157:1,9 161:3 166:22 182:23 185:21 186:13 188:11 201:15 204:23 205:4,14 210:1 211:8 217:18,22 218:8 220:9,21 221:16 222:5 225:16 232:10 233:11 235:6 238:4 240:1,11 243:1,20 244:4,15 246:4 249:3 250:15 251:4 262:10 266:19 267:3,8,14,20,23 268:6 269:4 270:2 272:2 273:9 274:5 275:3,15 276:21 278:3,6 279:7

**rare** 73:9,10 84:12

**rate** 9:3,10,15,17 68:2,4,5

**rates** 153:20 179:2

**reach** 41:23 69:2 155:15 177:17 259:13

**reached** 9:22 259:15,19

**reaching** 23:23 57:23

**reaction** 153:8

**reactions** 165:23

**read** 6:5 29:13 30:5 43:12 62:17 63:4 67:8 88:2 92:9 96:24 144:22 184:6 208:13,21 221:22 234:12 241:12 244:4,6 252:4,5,13,15 256:4 277:8

**reading** 17:12 28:24 182:3

**reads** 212:2

**real** 37:15,16 78:15 80:21 111:2 146:6 170:23 193:8

**realize** 64:9 96:20

**reask** 234:3 245:15

**reason** 62:15 73:12 153:6,24 154:6,22 160:8 162:17 164:8 176:24 198:24 199:13 203:2 252:12 254:23 275:11

**reasonable** 104:11 225:8

**reasoning** 210:18 234:9

**reasons** 164:7 190:11

**recall** 22:15,20 25:10 29:18,23 30:13 32:13 39:7 51:2,6 53:24 54:4 65:9 66:16,17 77:11 81:11,13 88:1 89:1,11 94:17 107:2,7 108:10 117:13 128:21 146:4 152:1 155:5, 12 156:21,24 158:2 161:17 162:5 171:19 172:18,24 174:7 175:19 179:10 184:24 189:24 190:2 196:8 202:10,11,15 205:22 214:11,12,23 215:10,16 216:14 236:17 240:13 242:17,20 246:18 247:6 253:11 254:8 256:16 257:19 264:16 265:2 269:9,24 272:10

**recalling** 276:12

**recalls** 257:18

**recanted** 90:22,24 91:4,6

**recap** 173:16

**receive** 10:3 56:5 97:14 105:16 186:14 226:18 270:12

**received** 10:6 30:12 40:16 53:1 54:4,21 55:12 63:2,17,19 138:5 147:9 270:15,16 271:22

**receiving** 30:7 140:13 271:8,11

**recent** 122:1 263:22

**recently** 138:21 264:10,15,16

**recess** 67:2 141:23 205:11 268:3

**recognition** 119:1

**recognize** 11:2,3 50:1,16,17 202:3 236:22

**recognized** 137:4

**recognizes** 129:23

**recognizing** 136:24

**recollection** 30:3 40:8 52:16 53:3 67:20 68:1 81:18 82:5,12 113:10, 15 115:18 117:8,9 134:4,6 138:3 139:13 148:21 173:24 174:9,11,13 179:5 199:4 221:15 234:10 253:7

255:22 276:22,23 277:24

**recollections** 107:4 250:9

**reconvening** 141:19

**record** 5:2,19 6:17 10:20 30:21 50:6,9,21 55:12 56:20,21 57:2,7,9 63:24 64:11 65:5,21 66:24 67:4 87:24 91:3,6,16 97:24 106:3 116:21 117:3,5,14 124:24 139:1,15 140:3 141:21 142:1 143:11 144:7 161:14 163:19 165:21 172:14,15 173:4 174:10 175:2,15 178:17 181:17 182:7 187:22 189:1 190:1 201:23 202:8 205:9,13,19 217:7 220:11 221:20 231:6 235:13 236:8 242:13,24 244:6 253:18,19 258:9 260:12 267:24 268:1,5 269:2 275:22,23 276:18 277:22 279:11, 21

**recorded** 35:3,4,16 64:15,19 66:13,18 70:11 140:4 218:19 225:6,9,13 275:2,7,12

**recorder** 275:18

**recording** 125:7 134:8 166:6 213:2,5 217:16 225:19 268:16 274:23

**recordings** 35:8 45:15 207:20,24 208:4,9

**records** 8:17 18:11 50:20 62:8 174:14 235:8

**reduced** 9:10 237:16 238:24 239:10

**reduction** 237:21

**redundant** 105:21

**refer** 47:24 70:16 71:7 75:13 137:24 138:20 159:8 219:7

**reference** 90:13 99:16 130:24 148:6 156:1 204:10 215:9 231:6

**referenced** 34:14 131:1

**referencing** 137:5

**referred** 71:15 73:8,10 84:24 85:15 138:22 156:22 192:15 225:3 270:14

**referring** 55:15 58:4 70:17 76:15 84:20 91:13 92:17 93:18,19 121:19 131:10 137:18 143:16 145:17 185:18,19 186:8,10 199:19,20 200:2,3,19 211:24 213:8,9,10,11 219:8,16 222:14 224:2

**refers** 137:21

**reflect** 47:21 171:18 250:4

**reflected** 172:22 183:5

**refresh** 35:15 218:18

**regard** 8:2 11:11 16:6 17:23 18:24 23:5 54:3 83:23 87:17 89:9 154:9 170:14 197:13 199:9 200:12 210:22 249:22

**registered** 153:3,5

**regular** 115:22

**regulating** 166:21

**regulation** 130:8

**Reid** 120:8 121:11,14 122:8,16,21 123:2,4,6,7,20 124:4,21 125:4,9, 12,19,21,23 126:4,22,23 135:21 144:4,9 165:15 251:21,22 252:2,3 253:15 255:9,11,14 274:24

**Reid's** 255:8

**Reid-based** 142:24

**reinterpretation** 180:14

**related** 32:10,24 52:12 53:2 62:18, 22 63:14 104:7 209:24 212:12 246:8 256:9

**relation** 158:3

**relationship** 118:14 119:17 167:16 191:10

**relative** 184:18

**relayed** 151:21

**relevance** 65:23 78:16 243:3 249:12

**relevant** 61:18 63:13,20 64:1,2,4, 5,6,10 65:4,13 66:5,7,8 67:14,15 74:5,17 82:14 86:2,4 90:5 92:14,17 100:6,11 102:21 105:18,19,24 116:24 136:1 165:17 166:10,12 173:23 190:4,6,12,13,17,19,20 191:8 203:9,11,12 206:8 211:4 229:23 230:7 233:16,19 242:11 243:13,18 245:24 246:3 247:4 250:20 265:16,17,18 266:18 271:3

**reliability** 109:18 213:15 231:10

**reliable** 46:20 126:18 154:20 228:4,10,15 231:18 271:23

**reliance** 83:1

**reliant** 206:15 234:10

**relied** 23:9,13,23 272:21 273:13

**rely** 25:14,17 99:2 110:1 232:24 274:11

**relying** 62:10 81:2,4 105:22 168:17 175:15 179:2 187:4 233:13 273:5

**remaining** 167:21

**remember** 25:4 50:2 52:15 145:14 157:19 175:17 204:2 266:1 277:15

**remembering** 135:20 189:20 206:23

**remembers** 107:21

**remind** 223:11

**remotely** 6:7 7:4 91:17

**remove** 117:20

**removed** 215:11,18

**render** 200:16 229:3 256:21

**rendered** 57:12,20 200:18,24 204:7 208:23 277:20

**rendering** 65:11 82:7 91:9,23 148:8 199:8 200:11

**renders** 24:7

**repeat** 244:3

**repeated** 229:15

**repetitive** 105:21

**rephrase** 245:17 277:5

**report** 7:19 8:9 21:22 22:2,5,8,24 23:6,10,15,20,24 24:7,12,15,23 25:1,5,7,20 26:5,14,15,20,21 27:4 28:18 49:2 52:5,7,10,14,20,24 53:14 54:13 55:11,20,21,24 56:3, 16 57:11 63:8 65:17 66:21 68:6,7, 14 70:16 78:20 81:12,13,17,22 83:5 87:4,5,10 88:2 89:12 91:10 92:4 93:10,21 94:19 96:16,17,18 97:8 99:7,8 106:1,17 108:22 109:3, 14 115:10 116:12 122:11,16 123:20 124:20 126:2,10,11 127:5 129:7 130:24 132:5 135:18 137:7, 16,24 140:11 142:6,10 143:24 144:2,3 145:18 149:11 150:23 151:15,19 152:14,19 160:1 173:7 175:10 179:23 181:11,12 182:1,2 183:5,8 186:17 187:10 192:11,23 193:5 195:5,9,16 197:17 198:22 199:11 200:9 201:2,4 204:11,20 205:20 206:22 208:15,24 210:2 211:3,13,20 214:3 216:3 218:15

223:8 225:4 226:23 227:4 232:22, 23 233:12 234:11 236:18 237:6,7, 13 242:12 243:16 244:17 247:1,15, 18 249:7,15 251:5,10 253:2 254:1 256:19,23 257:2,7 258:1 271:6,14, 24 276:4,18

**reported** 43:14,17 87:4 93:14 94:1 100:21 139:20 159:9 171:23 172:7 233:24 239:2,16

**reporter** 5:16 6:4 91:18 218:7 269:16,21

**reporting** 237:8

**reports** 29:14,21 30:2,4,8 54:9,15, 20 55:15 56:5 57:4 62:6,8,10 85:12 105:8,11,13,17,18,20 201:7,12 206:5 253:22 273:24 277:11,20

**represent** 5:20 56:1 57:3 84:23 271:8

**representation** 134:10 150:15,17, 21 151:12 154:23 156:14 161:10, 12

**representative** 101:8

**represented** 88:19 151:3 276:17

**representing** 5:13

**reprint** 30:19

**reputation** 86:10,11

**request** 7:10 29:19 30:1 62:22 63:9 105:16 116:14 118:6

**requested** 53:10 63:13 116:4 118:6 270:20,23

**requesting** 29:23

**requests** 119:8

**reread** 92:2

**research** 16:8,19,24 18:10 29:10 38:5 47:3,19 58:15 61:24 74:4,18, 24 75:17,19 78:11 101:13 103:3 118:18 122:12 128:9 135:8 136:21 137:8,16,22,24 142:23 159:3 188:3,10,17,23 189:2,7,13,18 238:12 247:12 259:2,7 263:21

**research/publication** 16:11

**researchers** 130:1

**researching** 19:13

**resist** 130:4,11

**resisted** 224:16,24

**resources** 137:10

**respect** 14:22 60:21 96:17 116:9 200:9 278:1

**responded** 215:19

**responding** 214:8 227:15

**response** 10:22,23 50:10 104:19 123:10 124:2 153:11,12 180:2,4 185:24 186:1 245:5 277:2

**responsible** 241:9,11

**responsive** 186:5

**rest** 229:3 253:9

**result** 31:24 36:3,16 76:8 132:16 151:13,16 154:7 156:10 180:3 204:18 231:2,3 248:21 261:7,8,12

**resulted** 21:15 29:5 77:8

**resulting** 111:13

**results** 151:20 152:17 154:1 180:15 183:22 184:3 186:4

**retained** 9:13 19:23 49:7,17 50:21 100:23 102:14 105:23

**retaining** 67:16 102:23

**retired** 45:9

**retraining** 256:3

**retrial** 74:8 277:17

**reverses** 81:2

**review** 8:8,11 11:1 24:2 32:14 38:2 43:24 44:2,3 48:16 56:6 57:24 65:5 66:11,13,21 67:17,21 74:3 81:24 82:6 85:1,23 87:23 88:21,24 91:21 92:13 104:6,22 107:11 113:2 121:4,22 143:18 147:11,16 157:20 163:19 169:11 172:3,5,14,15,19 178:16 182:6,24 185:2 188:7 189:22 192:15 198:9,16 202:2 205:18 214:15 215:3,13,15,24 216:12 221:9 229:23 230:6 235:2,7 236:11 240:9 242:13 256:7,8,11,14 258:9 266:21 267:13,22 269:2 271:3 272:12,14 273:24 276:16 278:22 279:16,17

**Review's** 44:1

**reviewed** 7:19 48:20 52:5,7,12,21 53:7,17,19,20 54:7 55:7,13,17 56:9,11,12,16 57:21 58:7,22 63:8 66:20 79:1 80:6,17 81:12,17,22 83:4,20 85:19 88:16,21 91:8,23 94:4 105:5,7,10,11 107:8 108:11

147:17,24 148:3 161:22 165:11
172:2 174:14 175:20 196:6,10
198:15,18,21 199:2 201:7,14 208:3
213:4 216:4 223:5,8 227:22 231:16
232:15 234:14,24 236:13 238:6
242:19 249:16 271:13,19 276:9

**reviewing** 25:19 52:15 81:13
83:18 86:3 89:1 106:21 111:18
126:3 143:23,24 144:2 199:5
205:16 216:15 218:17 235:4
256:16 268:19

**reviews** 119:11 122:5 130:21

**reward** 97:15

**Richard** 5:5 6:11,18 35:23 37:23
39:6,12 223:19 278:11

**ringer** 84:17

**risk** 61:22 62:1 65:21 94:21,24
95:8,10,15 96:1,2,4,8,12 99:17
100:13 108:23 109:6 110:2,4,9,10,
18 111:3 113:2,4,24 114:15 119:7
121:17 125:9,13,21,24 126:6,17,24
127:7,10 130:16 132:18 133:9
134:24 135:3 137:4 138:12,16
142:5 144:19,24 145:11 149:13
150:9 157:17 163:24 165:20
166:12 167:6,9,12,20,21 168:8
169:5,9,17 170:14 175:7 176:22
177:3,7,16,19,23,24 178:4,9,14,23
179:4,8,19 187:12 188:20 189:3,5
194:16,17,20,23 197:5,7,9 210:8
231:9 246:6,8,11,14,23 247:3,5,8,
11,13,17,20 248:2,8,21 249:5,8,9,
10 257:10 258:15 261:1 269:6
272:23

**Robert** 256:14

**robust** 257:5,13 258:22

**role** 197:12 227:8 246:9

**room** 28:13,17 29:6 30:18,22
31:21 106:12 131:11 159:5 198:1,3

**round** 267:16

**routine** 131:3

**routines** 135:15

**rule** 6:5 261:5

**rules** 7:1 220:13

**rulings** 51:17

**runs** 52:9

**rush** 142:11 144:17 145:16 146:11

**S**

**S-K-O-L-N-I-C-K** 27:15

**salary** 20:21

**sample** 40:4,6 44:21,22

**sampling** 44:19

**San** 16:4,7 17:3 18:15,20 255:13

**sanitize** 173:10

**sanitized** 222:15

**Saul** 192:14

**scale** 186:2

**scales** 180:1,19,22 181:4,8 182:3
183:2,14 187:5

**scam** 242:14

**scenario** 228:23

**scenarios** 117:24

**Schatzle** 5:12

**schedule** 17:23

**scholars** 31:6 40:14

**scholarship** 61:9

**school** 13:12,13 16:17,20 17:1,4,7

**science** 15:16 44:2 71:20 80:21
82:22 83:2,10,19,24 84:7,9 85:15
86:6,9 88:17 103:9,15,16 152:23
153:23,24 154:18 196:15 232:16
233:1,2,4,10 234:11,14 266:9,12,
18 273:4 274:11,14

**scientific** 68:21 72:24 79:7 80:9
84:12,15 86:7,8 119:22 121:11,19
167:22 168:3 259:2,6

**scientifically** 82:14 87:1,6,11
103:8 158:22 195:3 232:1 248:13

**scientist** 80:19 81:3

**scientists** 80:22 274:1

**scope** 69:21 100:1,4

**score** 184:14,23 185:7 186:8,10,
15,19,21 187:8

**scored** 152:3,16

**scores** 184:13,16,17 185:4,15

**scoring** 183:5

**scripted** 211:15,18 215:6,22
216:10 222:10

**scripting** 212:1,14,23 214:20
216:6 274:17,21

**SDT-DCJ** 235:15

**SDT-DCPDO** 91:19 181:19

**search** 74:5 75:5

**searches** 40:9

**secondary** 47:18 48:22

**section** 27:3 32:21 52:5 66:20
120:7,11 127:5 137:20 144:13
170:17 175:11,22 176:4 198:22
218:14

**seek** 100:18 101:16

**seeking** 101:21

**self-** 102:17

**self-defense** 228:12,16,19,20
229:2

**Selling** 48:13

**seminar** 18:15,19 19:3,4 129:13

**seminars** 16:14

**send** 217:10 239:5

**sense** 73:18 76:16 119:20,24
120:2,3,6 141:7,11 153:16 206:19
207:11 259:24

**sentence** 137:20 148:6,12 186:7
207:1,7 212:2 224:4,21

**separate** 99:19 125:23 126:23
177:23 209:14,19 210:3,9

**separately** 125:10 208:12,21
209:23

**September** 21:15,20 24:4 54:10
69:19 81:5 89:10 105:1 120:18
157:10 198:10 199:9 200:13,20
249:22 276:19 277:22

**sergeants** 28:6,7

**series** 33:22

**seriousness** 103:20

**serve** 19:13

**served** 15:7,10,13,18 92:21 140:8
162:6,19

**service** 16:9,11

**services** 19:17 20:19 51:21

**serving** 20:13 102:18

**session** 215:8

**sessions** 148:16 250:11 258:24

**set** 30:7 34:10 45:3 46:4 58:7 60:5 67:13 88:13 146:24 147:3 148:14 159:15 160:3,4 164:7 212:2 252:1 276:19 277:22

**setting** 48:13 114:12 165:1 212:4, 19

**settings** 168:18

**setup** 142:18

**severe** 111:16

**severity** 111:10,20,24

**sexual** 230:11,12,16

**shaken** 112:6

**share** 216:23 217:4,24

**Shelley** 67:18

**shift** 180:2 184:10,14,23 185:4,7, 10,11,12,15 186:1,10,15,16,21 224:5

**shifting** 180:6

**shock** 140:19 163:6

**shoot** 262:22

**short** 141:8 146:16 163:13

**shortly** 67:18,22 90:12,22 134:12 161:19

**shoulders** 112:5

**show** 25:23 27:23 28:5 59:21 68:17 84:15 97:4 138:1 153:20 181:14 191:10,13 235:11 255:12

**showed** 27:22

**showing** 12:4 21:11 236:9 263:5

**shows** 71:8 116:21 135:8 154:12 156:15

**side** 191:2 209:15

**signature** 22:1 236:22 279:15

**signed** 52:20

**significance** 184:22 186:22,24 187:2

**significant** 90:11 107:7,18 108:6 116:7,8,10 119:5 160:7,9 264:4

**significantly** 32:10,24 169:23 170:6

**signing** 52:24

**similar** 264:9

**Similarly** 273:20

**simply** 47:10 73:21 112:24 117:21 158:21 167:18 168:2 174:22 218:24

**single** 147:16 162:2 270:16

**sister** 67:18

**sit** 9:18 28:10 77:11 81:11,16 108:9,12 172:24 184:24 185:5 187:3 191:20 203:21,24 211:12 276:12

**sitting** 114:16

**situation** 69:8 103:11 117:21 168:24 243:19

**situational** 110:9

**situations** 85:14 227:23

**skills** 216:18

**Skolnick** 27:15

**sleep** 118:20 127:6 130:7 135:7,9, 13,15,16,19,23 136:2,3,7,9,10,17, 22 137:1,3,8 138:2,6,10,15 139:21 140:15,20,22 253:9

**sleep-deprived** 141:1

**sleeping** 136:13 140:1

**sleepy** 140:15

**slept** 139:16,23

**small** 52:2

**smaller** 19:3

**Smith's** 81:14

**smoke** 215:11,18

**smoking** 167:7

**Snook** 45:19 46:5,6,8

**social** 13:4 17:22 44:2 103:9 223:13,17 246:22 266:12,18 273:3 274:11

**society** 17:21 154:15,17

**sociology** 12:20,22 13:6,8

**solely** 40:1 83:1

**somebody's** 124:7 130:3 151:2 167:13 191:12 250:21

**someone's** 59:7

**sort** 60:5 64:22 103:6 150:20 238:13 251:23 260:13 269:11,22

**sorts** 191:5

**sought** 44:7

**sound** 218:1

**sounds** 205:8 218:10 267:19,23

**source** 119:14 251:19

**sources** 119:9,11 121:18 208:16

**spanned** 108:17

**speak** 64:17 130:9

**speaking** 220:10

**special** 265:1

**specialized** 14:16 15:2

**specific** 15:1 19:6 24:19 42:9,13, 18 51:6 60:21 63:12 92:16 118:13 119:14 121:18 125:11 126:6,23 141:2 155:3 178:2 187:11 191:19 201:17 219:22,24 220:6 242:23 248:20 255:2 274:13

**specifically** 22:21,23 26:11 34:10 54:2 81:4 88:1 93:17 122:24 125:9 130:6,12 131:21 132:2 172:18 179:11 185:6 193:9 196:7 202:15 214:11,14,18 216:14 219:8 220:1,3 222:3 224:2 255:20 265:5 276:13 277:15

**specifics** 157:19 240:13

**speculation** 60:10 102:7 140:17 272:3 275:16

**spell** 6:17 122:3

**spelled** 6:19,20 27:15 193:16

**spend** 6:24 18:10 20:12 57:13 205:20 208:8

**spent** 17:24 19:12 129:8 208:16

**spilled** 198:3,4

**spilling** 86:23

**spoke** 29:14 149:5

**spouse** 161:24 162:12 163:10

**spouses** 163:1,3

**SSRN** 263:17

**Stage** 48:14

**stamped** 10:21 50:10 72:15 91:18 181:19 201:23 219:11 235:14

**stamps** 56:8,10,11,13

**stand** 83:8,12 176:24

**stand-** 254:19

**standard** 9:5

**standards** 251:7,14,20 252:1,9,19 253:4 254:3,20

**stands** 162:16 233:2

**start** 19:16 87:14 108:22 142:19 144:6 151:14 155:1 168:10 180:16 216:24 224:14 255:8

**started** 19:20 28:2 60:7 63:22 64:24 66:4 67:23 87:12,20,22 88:6 93:20 104:9 133:24 134:7,9 147:20 159:22 160:21 161:8,9 168:6 210:19 220:2 231:20 232:4,5,8,18 233:8 234:8,17,18 266:10

**starting** 24:3 69:19 86:24 87:13 104:12 160:14 161:6 214:13,18 219:4

**starts** 143:8 258:3,4

**state** 6:17 46:19 88:12 112:14 120:15 121:10 127:9 128:17 135:8 143:6 148:5,12 159:20 164:5 170:17 172:16 175:11 196:11 211:14 220:2 227:3 228:11 241:21 251:6 260:17 266:3

**stated** 37:11 82:17 83:16 92:20,22 149:10 173:1 229:1,9 230:1

**statement** 33:10 47:4 70:6,8 96:21 101:16,17 109:17,24 114:23 115:1, 3 135:11 137:14 147:2,4,19 148:18 157:6 164:24 165:4,8 166:14 169:24 170:4 197:19 198:10 199:5, 10 200:13,19,22 202:9,11 203:8,22 204:1 205:17,21 206:1,7,10 207:19 209:6,18,21,22 210:23 211:2 212:18 218:19 221:18 222:7 237:18 238:9 239:15,17 247:22 275:2

**statements** 20:9 24:9 63:4,9,15, 17,20 70:12,18 93:11 100:17,18 101:20,22,23 102:18,19 106:24 144:20 147:7 148:17 196:1 199:20, 21 200:4 201:8 202:5,14 203:14 207:9,24 209:1,3,12 210:20 211:6 222:8,15 223:2 244:24 245:10 272:24

**states** 5:10 34:3,10 46:9,14 101:15 134:6

**statistic** 100:21 135:5,6

**statistical** 127:18 167:2,23

**statistically** 32:23 149:19

**statistics** 131:19 167:10 168:17 170:15

**statute** 241:22

**staying** 215:1

**step** 58:8,9

**steps** 29:11 62:4 107:15 136:12,16

**Steve** 22:10,12 25:6 84:11 171:22

**Steven** 8:21 22:23 23:4 24:14 39:15 40:1

**stewing** 129:10,18,19

**stick** 83:21

**stipulate** 6:7,9

**stipulates** 6:8

**stood** 254:17

**stop** 207:16 266:23,24

**store** 72:15

**story** 212:16 215:22 257:21

**straight** 229:15 267:12

**straightforward** 41:3

**strategy** 154:5 265:9,18,21

**Street** 5:14

**stress** 98:20,21,23 99:1,12,14,21 100:10

**stricture** 166:21

**strike** 23:11 31:14 49:10 51:22 73:23 79:18 113:18 120:23 139:2 155:6 181:6 189:12 192:2 201:5 221:10 247:1 249:16

**strip** 158:1

**struck** 272:8

**student** 27:23

**studied** 85:19 112:14 145:21 191:24

**studies** 19:6 23:22 33:13,16,17,22 34:8,11,13,19,20,23 35:1,2,5,20 37:12,14 44:4,17,24 45:2,7,10 46:13 47:13,16,17,20,22 48:10,20 77:7,12 78:6 110:1,17 111:1,2 118:10 127:21 128:13 129:17 130:6,12,18,19 131:9,21 132:1,14 138:1,5,15 140:22 144:14 145:1,2, 9 146:1 153:20 154:19 158:7,11,12 161:23 167:10,11,16 168:4,5,10,

16,22 169:2,10,11 170:15,23 171:1,17,18,24 178:23 179:2,3,6, 10,15 188:19 191:10,12,16 192:4, 8,9,16,24 193:2,6,9,11 227:23 239:7 248:5 278:18

**study** 31:7,12,16 32:2,9 33:5 35:22 36:3 37:4,8,20,22 38:19 39:24 40:18 41:7,24 42:9 43:6 44:7 48:10,17,24 78:12 102:1 118:13,22 119:16 130:22 138:19,22 145:5,6,8 159:14 162:16 171:20,22 189:19 191:21,22 279:2

**studying** 168:12

**stunning** 163:6

**subject** 43:23 44:1 101:14 196:24 214:20 255:4 274:12

**submit** 226:8 244:19

**Subpoena** 10:21,22 50:10

**subsequent** 24:8 99:8 207:18

**subsequently** 71:24 89:8 94:15 128:12 239:9

**subset** 41:11

**substance** 198:3

**substantial** 122:12 135:8 137:7, 16 140:19 271:18

**substantially** 137:12 144:18

**substantive** 58:1

**successful** 32:11

**successfully** 265:18

**sufficient** 271:23

**suggest** 141:5 162:10 237:18

**suggested** 164:6,18 187:22 206:4

**suggestibility** 99:16 178:9 179:19,22 180:1,19,22 181:3,8 182:3,10 183:2,13 185:7 186:5 187:5,8

**suggestible** 99:8 180:12,17 183:9 184:17 185:11 260:3

**suggestions** 165:15

**suggests** 116:15 159:5 260:7

**Suite** 5:15

**summarize** 176:5

**summarized** 32:3

**superficial** 223:22

**Supp** 55:21

**supplement** 55:10

**supplementary** 181:24

**support** 129:17 239:7

**supports** 137:8

**supposed** 123:8

**suppress** 100:18 101:8,16,21
107:5,14 108:1,20 113:7,17 173:20

**suppression** 174:21

**surprise** 228:14

**surprised** 162:5 256:5

**surreptitiously** 64:19

**surveillance** 59:19

**susceptible** 124:16 187:17,24

**suspect** 56:11 59:6,14,23 60:13,
14 64:15,17 84:16 104:8,11 116:12
139:11 141:3 143:14 150:16,21
158:9 159:1,11 166:2,4,17 173:11
202:23 203:18 212:14 227:12,15,
16 228:3,9 229:1,9 230:1,12,16,21
245:3,7 254:21

**suspect's** 136:3

**suspected** 228:6

**suspects** 42:7 129:9 224:13
227:6,24 229:12 244:18,23 245:9
273:16

**suspicion** 226:18

**suspicious** 104:17

**swear** 6:6

**swivel** 198:4

**sworn** 6:10,13 7:4,5,6

**Sympathetic** 48:14

**system** 29:2 42:8 140:19 163:6
189:10,15 190:9 191:14

---

**T**

---

**table** 43:13,16,20,22 44:13 204:16

**tables** 42:5

**tactic** 126:6 226:24

**tactics** 32:11,22,24 33:9 42:10,13
48:5 109:4 125:12 143:2 166:24
175:24 176:5,9 194:24 210:11,15,
17

**taking** 27:23 220:6

**talk** 35:19 57:6,8 97:8 99:15
108:14 126:12 135:7 140:10,12
152:14 174:4,6 187:10 190:22
197:2 223:22 226:2,23 245:2

**talked** 149:4 164:18 165:1 175:4
207:17 226:22 231:5 244:16
274:16

**talking** 34:19 61:8,11 76:23 99:17
142:5 168:9 177:11 191:11 211:13
218:2 227:18

**talks** 12:16,17 100:10 197:3

**tallied** 94:6

**tape-** 275:17

**tape-recorded** 173:15,16

**tape-recorder** 275:18

**taught** 18:22 121:14

**teach** 16:3,8,12,13,14 17:14 18:15

**teaching** 16:10 18:1,18 19:1,12
123:23

**technical** 216:17

**technically** 31:18

**technician** 5:1 66:24 67:3 141:21,
24 205:9,12 268:1,4 275:10 279:20

**technique** 166:1

**techniques** 42:17,19 110:8
121:14,16 122:9 125:2,3,19 126:24
166:19 168:19 169:4,6 176:15,18
191:5 193:12 245:6 257:9 260:8
261:13 268:15

**telling** 123:12 124:5,13 150:23
151:2 160:2 163:9 168:21 174:6
191:9

**ten** 266:21 267:6

**ten-minute** 215:15

**tend** 146:9,12

**tending** 84:15

**tenured** 17:17

**term** 38:13,15,18 68:9 110:23
278:9,14,15,21

**terminology** 270:19

**terms** 12:8 19:5 22:22 29:17 34:8
51:15,20 52:19 55:15 57:4 61:22

75:8 109:14 110:24 134:15 141:10
158:4

**tertiary** 47:18 48:22

**test** 100:11 180:10 181:1 182:19
183:17,19,22,23 184:4,5,6 185:3
217:1 250:20

**tested** 180:8

**testified** 6:13 19:21 20:7 49:3,6,13
82:21 90:4 106:2 117:10 140:6
151:17 174:19,20,21 232:11
251:15 254:18,22,23 270:11
272:17,20 273:20,23 277:7

**testify** 161:16 174:15 254:10
255:1,3

**testifying** 145:14

**testimonial** 58:17

**testimony** 48:7 51:18 53:21 62:7
68:8 80:9 82:6 83:5 88:22 104:15
107:5,6,13,24 108:11,20 113:7,17
131:1 149:7,11 172:20,21 173:5,21
174:8 190:3 233:17 241:16 254:22
274:6

**testing** 180:9 182:10,14 216:17
260:13,20 274:23

**tests** 187:5

**texting** 239:4

**themes** 227:15

**theoretically** 153:7,15 191:3

**theories** 198:7 224:8

**theorize** 190:11

**theory** 152:24 212:8 221:12 222:2

**thing** 124:18 142:18 167:5 221:22

**things** 64:16 120:10 174:1,6,19
188:14 219:3 260:1

**thinking** 37:13 45:22 158:2 174:23
181:11 194:4 238:14 272:11

**thirds** 221:1

**thought** 150:2 192:24 198:20
199:15,17 210:5 213:3 233:14
237:20 270:24

**thoughts** 266:22

**thousands** 147:24

**threat** 171:2

**threats** 169:15,17,22 170:18
171:4,12 173:12 175:4,5 176:17

253:6 261:14

**three-page** 10:21 50:9

**threshold** 73:6,12

**tied** 9:21,24

**time** 6:24 15:1 17:24 18:2,4,9 19:12,14,21 20:12,15,17 27:16 31:4 36:20 38:4,18 51:22 57:14,18, 19 64:23 65:7 72:14,16 107:20,21 119:5 120:22,23 121:1,2 126:20 129:7,14 130:1,3,10,14 132:6 141:19 145:22,23 146:5,16 153:10 156:3,22 159:12 166:14 179:12 182:11,16,18 201:3 205:2,5,8,20, 23 207:19 208:8,11,19 226:24 233:23,24 235:8 236:14 254:9,20 261:21 262:1 264:19 267:1,2,4,17 268:18 270:2,4 279:7

**Time-** 48:14

**timed** 207:19

**timeline** 87:18,19

**times** 6:24 49:4 59:5,14 115:10 225:3 234:21 254:11 263:22

**timing** 233:20 234:15

**Tina** 67:22 88:21 159:21 160:2,20 161:15,20 163:20 198:2

**Tina's** 160:11

**tipping** 77:15

**tired** 253:13

**tit-** 39:9

**titled** 30:22 32:21 39:10 223:17 263:7

**today** 5:16 7:15 9:19 21:14 46:24 49:6 57:14 68:8 77:12 81:16 106:2 108:9,12,23 126:3 173:1 185:1 187:3 191:20 203:21,24 210:15 211:12 214:4 224:20,22 225:4 226:12 248:2 266:7 270:4 279:8

**today's** 279:20

**told** 92:11,22 93:10,14,17 151:8,23 153:21 154:8 159:20 160:20 161:15 162:19 163:10,13 172:17 174:1,15,23 204:4

**tolerance** 98:23 99:2,13,21 100:11

**top** 48:13 68:14 69:12 71:14 72:8 118:23 148:24 169:12 171:16 188:9 196:8 197:24 228:13 255:5

**topic** 20:1

**topics** 19:5

**total** 29:3 130:14

**totality** 147:6

**touching** 111:9

**traffic** 139:12

**trained** 14:17 15:24 96:20 227:5 266:15,16 273:15

**training** 123:7,15 196:23 251:14 252:4,14,15 254:3 256:8,12,15,17

**trainings** 255:8,9,14

**trains** 122:8

**trait** 250:22

**traits** 61:19,24 110:8 178:3,8 187:11,16,23 188:2,8,9,14,18 189:3,4

**transcribe** 218:4

**transcript** 53:7 213:4 217:21 218:10,18 219:7,9,23 240:17 279:16,18

**transcripts** 53:18,22

**transmission** 241:5

**transmit** 242:3

**transpire** 121:7

**transpired** 203:8

**traumatic** 162:18 163:15

**traveled** 42:7

**traveling** 255:12

**treat** 173:18

**treated** 176:22

**tremendously** 266:13

**trial** 21:21 74:8 80:10 100:19 101:17 102:5 107:6 172:21 276:23, 24 278:1

**trivializes** 112:17

**true** 25:22 36:16 68:20 72:21 77:2, 5,9 78:2 95:23 106:9 112:22 167:5, 6 192:4 193:22 197:9 222:19 258:19

**trust** 154:22 268:22 269:11,23

**trusting** 246:15

**truth** 32:4 76:16 102:9 109:23

123:12 124:6,13 151:2 210:3 222:8 238:19

**truthful** 154:3

**truthfully** 88:12 93:22 162:12

**truthfulness** 102:4

**truths** 76:12

**turn** 30:15 52:4 84:17 96:22 201:21 240:15,20 262:11

**turned** 56:23 57:3,5

**twelve** 249:9

**twenty** 123:6

**type** 58:23 59:2,3 98:7 131:16,17 144:13 241:4

**typed** 237:9

**typical** 136:3

**typically** 20:15 90:22 150:22 171:12 271:3

## U

**UC** 13:12 17:7,15,17 18:23

**ultimately** 28:12 67:16 89:19 166:14 182:21 241:9

**Um-hmm** 48:8

**uncommon** 101:5,11 107:3

**unconditional** 269:11,23

**unconstitutional** 166:16

**undergraduate** 12:20

**underlying** 66:2 212:17 242:5

**understand** 7:7 16:21 35:19 36:21 56:4,7,14 57:1,15 68:24 112:24 114:2 125:8,15 132:19 152:13 177:20 213:18 216:7 234:5 238:2 242:8 245:15 248:24

**understanding** 30:6,12 40:24 63:1,16,19 66:12 70:22 80:8,12 87:1 90:8 97:11 113:1 116:4 121:4 136:8 138:4,9 148:19 152:19 163:18,22 182:5,6 183:13 184:5 185:6,9 186:18,20 197:4 249:13 253:7 270:18 273:10

**understood** 75:12 115:8

**undertaken** 210:21

**unfolds** 146:10,13

unique 153:8,17 162:7,15 233:10

unit 5:2 67:1,5 141:22 142:1 205:10,13 268:2,5 279:22

United 5:9 34:2,9 46:9,14 101:15

universally 136:23

university 16:3,7,10 17:3 18:14,20 45:9

unlimited 59:6 60:13

unpublished 252:7,16

unrecorded 258:23

unreliability 195:6,15,24 231:14

unreliable 109:6,8,10,15,21 110:5, 6,10,19,22 127:10 129:2 132:16 135:10 137:13 144:20 145:24 149:15 158:9,16 177:4 178:5,14 187:17 272:23

unstated 60:24

untrue 102:18

untruthful 88:13

unwanted 111:8

update 264:1

updated 12:15 51:13

updates 12:8

Urlaub 5:13,17

utilized 38:20 278:20

V

vacuous 104:4

vague 76:13 104:1

vagueness 82:18

validate 44:8,9

validated 44:4

Vallejo 28:21

variable 32:10,14 130:23

varied 20:20

varies 20:20

variety 78:1

vary 98:24 99:14 131:16,17

vast 261:11

verb 75:11

verbalizations 268:17

verbatim 25:21

verification 154:3

verify 183:4

version 18:22,24 32:17,18 215:6, 22 216:10 229:13 263:12

versus 5:8 51:24 86:11 204:5

vet 37:18

vetting 168:12

victim 87:4 230:13

video 5:1,19 59:19 66:24 67:3,4 141:21,24 142:1 205:9,12 268:1,4 279:20,21

video- 5:4

videotape 45:19

view 146:24 148:14 150:24 156:13 166:20 172:9

viewing 202:9

violate 166:20

violated 251:6,13 252:9 253:3 254:18

violation 254:2

violations 254:2

violence 112:16

violently 112:5

vitae 48:1

vodka 86:23 204:16

voice 263:2

voir 254:12

volume 217:1

voluntariness 102:4,19

voluntary 36:17 170:10 209:22 222:17

vulnerability 138:7

vulnerable 260:7 261:3

W

waive 279:15

walk 29:10 57:17 64:15 68:23 141:13 183:12

walked 177:6

walking 133:10

wall 112:7

wanted 44:15 65:10 85:22 190:22, 23

warning 34:13

warnings 33:19

watch 28:10

water 205:1

ways 254:15 264:4

weakens 119:5

website 263:17

week 18:3,7,13

weekly 17:24 18:9

weeks 146:15

weighed 83:10

weight 174:18

Westlaw 40:9

White 121:22 172:3 192:16

wholly 35:16

widely 170:18,21 171:15 279:4

William 5:8

winnable 266:5

witnesses 273:16

words 26:22 97:2 215:7 220:16

work 8:24 11:11 17:2 25:11 29:5 40:12 51:24 72:2 177:17 189:21 208:4 216:22 247:3 264:11

worked 51:11 112:14 168:7

working 22:16,18 25:10 57:19 73:24 265:22

works 217:1 218:5 246:17 267:18

world 37:16 39:16 78:15 111:2 146:6 158:19 170:23 238:14 246:17

worries 10:18 207:4

worse 112:16

wrapped 268:9

write 26:14 202:8 224:21 249:6

writing 208:14 271:6

**writings** 74:14

**written** 33:19 35:7 87:10 112:15
122:6 202:12,14,23,24 203:17,18,
22 204:1,2,5 206:10 207:19 251:21
265:8

**wrong** 26:24 43:12 132:24 143:22
184:10 211:19 213:19 236:1 249:2
262:20

**wrongful** 16:15 18:16 197:11

**wrongly** 238:16

**wrote** 26:22 42:17 46:16 67:18,22
76:2 89:12 152:5 201:3 202:19
203:7 206:9 265:4

**Wyatt** 122:2

---

## Y

---

**year** 93:2 113:9

**years** 20:3 22:19 29:22 30:13 51:2
107:6 108:3 139:5,6,7 155:10

**yesterday** 7:23

**yield** 184:13,23 185:4,10,12,15
186:8,21

**yielded** 186:2

**yielding** 180:5 185:13

---

## Z

---

**Zoom** 7:2 216:19,23