*Amor v. Cross, et al.*
Case No. 18-CV-2523
Our File No. 18-4078

# EXHIBIT E

**STATE OF ILLINOIS**  
**UNITED STATES OF AMERICA**  
**COUNTY OF DU PAGE**  
IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT

1995CF002075

VS

CASE NUMBER

WILLIAM E AMOR

**FILED**

18 Feb 21   AM 10: 43

*Chris Kachiroubas*

**CLERK OF THE**
**18TH JUDICIAL CIRCUIT**
**DUPAGE COUNTY, ILLINOIS**

File Stamp Here

**ORDER**

This cause coming before the Court; the Court being fully advised in the premises, and having jurisdiction of the subject matter:

**IT IS ORDERED,** based on the     COURT'S     motion:

AFTER A BENCH TRIAL, THE COURT FINDS DEFENDANT NOT GUILTY ON ALL CHARGES FOR THE REASONS STATED ON THE RECORD AND IN ITS WRITTEN ORDER.

Submitted by: THOMAS MINSER

DuPage Attorney Number 50130

Attorney for

503 N COUNTY FARM RD

WHEATON, IL, 60187

(630) 407-8000

_____
JUDGE LIAM BRENNAN
Validation ID : DP-02212018-1043-2698

Date : _____02/21/2018_____

e-FILED
FEB 21, 2018 11:31 AM
*Chris Kachiroubas*
CLERK OF THE
18TH JUDICIAL CIRCUIT
DUPAGE COUNTY, ILLINOIS

STATE OF ILLINOIS COUNTY OF DU PAGE

IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS ) | |
| Plaintiff-Respondent ) | |
| ) | |
| VS. ) | Case No. 95 CF 2075 |
| ) | |
| WILLIAM E. AMOR ) | |
| Defendant/Petitioner ) | |

## ORDER

This cause having come on Defendant's Bench trial on all counts, and the Court having heard the testimony, reviewed the exhibits, and considered the arguments regarding the same, THE COURT FINDS:

Neither party disputes that on September 10, 1995 there was a fire at the Miceli home and that Marianne Miceli died from smoke inhalation during the fire. The question this court must answer is whether the evidence proves beyond a reasonable doubt that the defendant deliberately set the fire.

In support, the state offers the various statements of the defendant. The first statement is contained in a letter sent by defendant to Tina Miceli from jail the summer before the fire. Therein the state points to defendant's words, "I have a plan or two of attack for some capital gain for late summer so we can move!" These words, according to the state, foreshadow the defendant's intention to kill Marianne Miceli for insurance proceeds, which he needed to move out of Marianne's apartment. While it is possible to place a nefarious gloss on this language in isolation, it seems less so in the context of the entire letter. Immediately after the quoted language the defendant says, "Will explain in person!" Tina testified he never explained anything to her, and she did not know what defendant meant by that. It defies credulity to suggest that the defendant planned to kill Tina's mother, and intended to explain this to her in person later. Moreover, later in the letter, defendant indicates, "As long as we are on the subject, we better start and maintain a

1

AMOR 2899

real sound foundation because we may never know when we might have to take care of any members of our families; your mom, who knows about my family and their history, so this next few years... time." Again, the state's nefarious interpretation of the capital gain language makes little sense given that the defendant subsequently raises the possibility of taking care of Marianne later in life.

But there are also the defendant's statements over time to Officers Cross, Gurrerri, Carlson, Cunningham and ASA Nigohosian. The defendant's version of events evolved over time: starting with outright denials; moving to suggestions of accident; and ultimately ending with an admission to setting the fire for insurance proceeds. The problem with the defendant's ultimate admission, of course, is that he confesses to a scenario that both defense and state experts agree is scientifically impossible. Clearly the defendant's vodka soaked newspaper/cigarette story, believed by the investigating officers and fire experts who testified in 1997, cannot serve as a basis for a finding of guilt with the advances in modern fire science knowledge. That having been said, it must nevertheless be determined the import of defendant's confession that he started the fire, notwithstanding that he admitted doing so in an impossible manner.

Though the state acknowledges the scientific impossibility of how the defendant said he started the fire, it nevertheless urges that this court accept that portion of the defendant's confession admitting that he started the fire. The state argues that the defendant was minimizing when he offered up the vodka scenario, that he did not want to look like the monster he really was. Stated otherwise, it was easier for the defendant to say he accidentally spilled vodka on paper and then intentionally dropped his cigarette on the paper and watched its sizzle, than to admit they used an open flame to set the fire. Indeed, the state goes so far as to suggest that the charcoal lighter fluid found in the trunk of the defendant's car (along with coal briquettes) may have used as an accelerant by the defendant even though chemical testing of furniture fabric and carpeting from the scene disclosed no petrochemical-related accelerants. The state focuses further on the defendant's statement to ASA Nigohosian that his life at the apartment was unbearable, that he set the fire for insurance proceeds, that he had earlier contemplated drugging Marianne, and finally, that "[e]verything I said is true from my heart." Taking all of this together, the state concludes that that portion of defendant's confession that he set the fire should be believed.

The defendant counters that the fire and death of Marianne Miceli was a tragedy, and not a crime. It notes the implausibility of arguing that the capital gain language in the letter

2

foreshadows Marianne Miceli's murder given that the same letter subsequently talks about taking care of Marianne Miceli in later life. He also notes Tina Miceli's testimony that the defendant and Marianne got along well, enjoyed each other's company, and was unaware of any antagonism. Tina's testimony certainly did not corroborate the notion that defendant's life was unbearable in the apartment.

But what of the confession? The defendant argues that law enforcement had tunnel vision both as to the fire being arson and the defendant's responsibility. It is noted the Miceli family, which included the Naperville Police Department's Chief of Investigations, who was Marianne's brother-in-law, greatly disliked the defendant-- an unemployed drunk that took advantage of Marianne's kindness by staying at her home for several years and then eloping with her 18 year-old daughter Tina at the age of 40, after which they continued to live with Marianne up until the date of the fire. The defendant suggests that this disdain for him seeped into the investigation and, combined with incorrect fire science beliefs, led them to jump the gun on an arson theory and continue to focus on the defendant.

Specifically, the defendant contends that this tunnel vision as to cause and origin led the officers to focus on the defendant notwithstanding his persistent denials and the absence of physical evidence. The capital gain letter is given a sinister gloss; the disabled smoke detector results not from laziness or inadvertence, but rather as part of an intentional design to facilitate Marianne's murder; the interpretation of the fire as fast and hot leads to the conclusion of arson without reference to the role ventilation and flashover may have played to explain the course of the fire. With this in mind, and notwithstanding the defendants persistent denials, law enforcement suggests to defendant that perhaps something was accidentally spilled that might explain the fast and hot nature of the fire? The defendant acknowledges wait a minute, I did spill vodka earlier in the day, which fell on the newspapers laying on the floor. There were cigarettes around, also a lit candle, maybe one of those fell on the papers, I don't know, it's possible. The defendant's not sure, he was drinking at the time. Indeed, as one considers the evolution of defendant's statements, one must keep in mind that defendant was a bit of a drunkard, with interviews having to be rescheduled at least twice due to his inebriation. But now the mechanism of an accidental fire caused by vodka, then erroneously considered flammable in 1995, has been suggested to the defendant.

After these discussions, the defendant is transported on an unrelated traffic warrant to the Kendall County Jail where he remained for two weeks until October 3, 1995. On that date he was

AMOR 2901

released mid-afternoon, only to find detectives Cross and Gurrerri waiting for him to discuss the Miceli fire. The defendant voluntarily accompanied them to Chicago for further interviews. In Chicago the defendant was interviewed on and off for multiple hours where he persisted in his denials of setting the fire. At approximately 9:30 p.m., the defendant agreed to accompany the officers to the Naperville Police Department to continue discussions regarding the Miceli fire.

The defense argues that what happens next is important to understanding why the defendant ultimately confesses to a scientifically impossible arson scenario. According to the 1997 trial testimony of process server Russell Wiedemann, admitted pursuant to Illinois Evidence Rule 804(a)(4), he received a rush assignment to serve defendant with divorce papers on October 3, 1995, with instructions to contact Det. Cross to coordinate same. Wiedemann actually spoke with Cross and ultimately went to the Naperville Police Department, at first reporting to the main lobby. Shortly thereafter, Cross came to the lobby and transported Wiedemann downstairs to what he described as a downstairs lobby area, and what Det. Gurrerri described as a secure waiting room in the investigations division not open to the public. Cross explained to Wiedemann that defendant was a suspect in a murder case and that they needed to wait a few minutes before serving him because he didn't want to interrupt the flow of the interrogation. They waited at least 15 minutes and then Cross brought Weidemann into the interview room to serve defendant. He was served notice of Tina's petition for divorce, mid interview at 11:55 p.m. Law enforcement testimony that defendant was served with the divorce papers prior to the commencement of the interview and the reading of Miranda warnings is belied by the time of the Miranda warnings noted on People's Exhibit 43.

The defense suggests that this highly unusual confluence of events was no coincidence, and the Court agrees. Clearly service was orchestrated by law enforcement to break defendant down and get him to confess to what the officers believed to be the truth. And it was successful: shortly after being served notice of Tina's intent to divorce him in the interview room, Det. Cross sternly yells at defendant that even Tina believed he set the fire but did not mean to kill Marianne. Det. Cross walks out in disgust leaving defendant with Gurrerri; defendant put his head down and stated, "It's my fault. I did it. I started the fire." Thereafter he detailed the scientifically impossible arson narrative.

Now there is nothing inherently wrong with attempting to break down a defendant's will over time or attempting to weaken his resolve, for example by arranging for divorce papers to be

4

AMOR 2902

served in the middle of his interview. Armed with a sincere belief in a suspect's guilt, one would not expect law enforcement to simply accept the suspect's initial denials and call it a day. And admittedly, the capital gain letter, the missing smoke detector, their belief that the fast and hot fire indicated the use of an accelerant, and that their boss was the brother-in-law of the victim, all of this explains their focus on defendant and their persistence in attempting to secure a confession.

Considering the evolution of the defendant's statements over time and the context of his final scientifically impossible confession, this court does concludes that it cannot simply extract his bare admission, "It's my fault. I did it. I started the fire," and find him guilty beyond a reasonable doubt. More is needed. Which brings us to the science: that is to say, the similarly credentialed expert testimony of Mr. Carpenter, Dr. DeHaan and Mr. Smith for the defense, and Mr. Golder for the state.

The defendant's first expert, Mr. Carpenter, utilized computer modelling to demonstrate his opinion that the fire originated in the recliner chair commonly used by Marianne Miceli and that its cause was a smoldering cigarette that transitioned to open flame sometime after defendant and Tina left the apartment. In support he explained the fire science underlying smoldering cigarette fires in upholstered furniture and asserted that there was just enough time for a cigarette left in the recliner by Tina to transition to open flame and fit with the timeline of the 911 call. His analysis of the damage to the recliner supported his opinion that the chair was subjected to a smoldering fire that transitioned to open flame from within.

The State crossed Mr. Carpenter and otherwise argued against his opinion noting Tina's trial testimony that she never sat in her mother's recliner and that the cigarette she found the cigarette she misplaced on the kitchen table before her final exit from the apartment. Of course Tina's recollection in this regard was impeached by previous accounts to law enforcement back in 1995 where she indicated she did sit on her mother's recliner and misplaced a cigarette. The state further sought to discount Mr. Carpenter's testimony by noting that his estimates for a cigarette transitioning to open flame on upholstered furniture were a few minutes faster than the scientific literature supported, and way faster than the 60-minute average for polyurethane furniture, which was the believed cushioning for the recliner. Of course what can never be known is whether Marianne, who smoked two packs of cigarettes per day and fell asleep in the recliner earlier that afternoon, misplaced a cigarette there. Likewise, though Tina today disputes ever sitting in the

5

AMOR 2903

recliner or losing a cigarette in the recliner, this is apparently at odds with statements made to law enforcement in 1995, and calls into question the credibility of her memory some 22+ years later.

While Dr. DeHaan does not discount the possibility of a smoldering cigarette transitioning to open flame on the recliner, he finds it unlikely given the timeframe. He instead opines that there is no way to determine the point of origin of the fire or the ignition source, such that this fire can only properly be characterized as "undetermined." He further testified that the chemical analyses employed by forensic chemist Al Lucas back in 1995, which detected no petrochemical accelerants, were reasonably sophisticated and could have detected accelerants if they had been utilized on the tested upholstery, carpeting and carpet tacks.

Defense expert Smith concurred in Dr. DeHaan's opinion that the fire should have been classified as "undetermined." He also noted that because Marianne was not coughing on the 911 call, she likely made the 911 call after seeing smoke or fire, rather than breathing it in, which would have produced coughing.

Two other observations by the defense experts need also be emphasized. All of course agreed that defendant's confession as to how he started the fire was scientifically impossible. Also, considering their time estimates as a group, once open flaming commenced, it would have taken no more than five minutes at the outside for smoke to reach Marianne's bedroom.

This brings us to the state's lone rebuttal witness, Agent Golder. Golder reviewed all the evidence and was the only expert to interview the defendant. Golder likewise discounted defendant's confession as to how he started the fire, but engaged in a scientific examination of the crime scene in much the same fashion as DeHaan and Smith. Golder excluded the recliner as a possible point of origin because, in his assessment, the damage to the recliner showed it was attacked from above by radiant heat as opposed to from within by a smoldering fire that transitioned to open flame. His opinion was further buttressed by his assessment that the nearby couch and coffee table did not have damage consistent with the point of origin being the recliner. Golder instead concluded that the area of origin was near the swivel chair in the other side of the living room near where defendant said he started the fire. He further opined that the cause of the fire was open flame ignition by human hands. On cross-examination, Golder did not disavow his original opinion that because Tina was the last person to leave the apartment, her involvement must at least be considered. As to this last point, this court, which had the opportunity to listen to Tina Miceli and weigh her credibility, completely discounts the possibility of Tina's involvement.

6

AMOR 2904

The court found all the defense experts to be imminently qualified and sound in their varied opinions. That having been said, it also found Agent Golder's analysis that the recliner was attacked by radiant heat, and not the source of damage to the couch and table, equally compelling in support of his conclusion that the recliner was not the point of origin. Nevertheless, two realities preclude this court from concluding that Agent Golder's opinion should prevail beyond a reasonable doubt. First, if defendant started the fire by open flame before leaving the apartment, as Agent Golder suggests, Tina should have seen the fire when she returned to the apartment after he had left. Secondly, if an open flame fire started contemporaneous with defendant leaving the apartment between 6:15-6:20 p.m., then Marianne would have seen and smelled smoke no later than 6:25 according to the outer limits of the defense experts' calculations—calculations neither disputed nor otherwise addressed by Agent Golder. Because Marianne was not sleeping when Tina and defendant left the apartment and would not have waited 15 minutes to call the police after seeing or smelling smoke, the state's timeline, along with its theory of the case is fatally compromised.

## CONCLUSION

Considering the evidence in its entirety, this court cannot determine that the defendant was criminally responsible for the fire, and thus Marianne Miceli's death, beyond a reasonable doubt. Accordingly, the state has failed to meet its burden and Findings of Not Guilty shall enter on all counts.

Liam C. Brennan  2/26/18
18th Judicial Circuit Court

AMOR 2905