## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JEANNE OLSON, Trustee of the WILLIAM AMOR Trust, as successor plaintiff, | ) ) ) | Case No. 18 CV 2523 |
| | ) | Honorable John J. Tharp, Jr. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| REBECCA GOMEZ, as Special Representative for Michael Cross, deceased, et al., | ) ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S
## MOTION TO BAR OPINION TESTIMONY OF DR. MICHAEL WELNER

Date: June 7, 2024

Respectfully submitted,

/s/ Laura M. Ranum
Laura M. Ranum, Attorney No. 6300636
*One of the Attorneys for Defendants*

James G. Sotos
Laura Ranum
Joseph Polick
Lisa M. Meador
Jeffrey C. Grossich
THE SOTOS LAW FIRM, P.C.
141 W. Jackson Blvd., #1240A
Chicago, IL 60604
(630) 735-3300
lranum@jsotoslaw.com

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ..........................................................................................................1

RELEVANT BACKGROUND ......................................................................................2

LEGAL STANDARD....................................................................................................5

ARGUMENT .................................................................................................................6

I.      Dr. Welner Is Qualified to Opine on the Study of False Confessions
and How They Bear Upon Plaintiff's Interrogation .......................................6

II.     Dr. Welner's Sound Methodology Easily Satisfies the
Requirements of Fed.R.Evid. 702................................................................12

III.   It is Well-Established that Dr. Welner is Permitted
to Criticize Leo's Methodology ...................................................................13

IV.   Dr. Welner Does Not Opine on Amor's State of Mind ...............................15

V.    Dr. Welner Does Not Opine on Amor's Credibility ....................................18

VI.  Dr. Welner's Opinions Do Not Exceed His Expertise.................................20

CONCLUSION............................................................................................................21

**TABLE OF AUTHORITIES**

**CASE**                                                                                       **PAGE**

*Angelopoulos v. Keystone Orthopedic Specialists,*
*S.C.*, 2017 WL 2178504 (N.D. Ill. May 16, 2017) ......................................................................15

*Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838 (7th Cir. 2017).....................................................13

*Brown v. City of Chicago*, Case No. 19-CV-4082 (N.D. Ill.)......................................................10

*Chatman v. City of Chicago*, 2018 WL 11426158 (N.D. Ill. Oct. 30, 2018).......................*passim*

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S 579 (1993)..................................6, 10, 12, 13

*Edmonds v. State*, 955 So. 2d 787 (Miss. 2007) ..........................................................................11

*Harris v. City of Chicago,* 2017 WL 3142755 (N.D. Ill. July 25, 2017).....................................13

*Hasan v. Cottrell, Inc.,* 2014 WL 4124254 (N.D. Ill. Aug. 21, 2014).........................................10

*In re Cessna 208 Series Aircraft Prod. Liability Litigation*,
2009 WL 1649773 (D. Kan. 2009) ...............................................................................................15

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ...........................................................10, 12

*Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748 (7th Cir. 2010) .....................................13

*M.G. Skinner and Assoc. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*,
845 F.3d 313 (7th Cir. 2017) ........................................................................................................12

*Niam v. Ashcroft*, 354 F.3d 652 (7th Cir. 2004) .........................................................................11

*Taylor v. City of Chicago*, 2021 WL 12242781 (N.D. Ill. Dec. 1, 2021) ......................................9

*United States v. Gmoser*, 30 F.4th 646 (7th Cir. 2022) ...............................................................17

*United States v. Mamah*, 332 F.3d 475 (7th Cir. 2003) ...............................................................18

*United States v. Sampson*, No. 1:01-10384-LTS (D. Mass. Sept. 2, 2016)..................................12

**STATUTES**                                                                               **PAGE**

Federal Rule of Evidence 702...............................................................................................*passim*

Federal Rule of Evidence 703.......................................................................................................17

Defendants, by their undersigned counsel, and in response to Plaintiff's Motion to Bar Opinion Testimony of Dr. Michael Welner, state:

## INTRODUCTION

Plaintiff has disclosed Richard Leo as a "false confession" expert, to opine concerning William Amor's interviews at the Naperville Police Department (NPD) on October 3–4, 1995. Leo's opinions strike at the heart of this Fifth Amendment case, asserting that Amor's confession is proven false, coerced, and the product of an interrogation that contained several risk factors for producing a false confession. To rebut these opinions, Defendants have disclosed forensic psychiatrist Dr. Michael Welner to testify as to the psychology of interrogation and confessions.

Plaintiff does not challenge Dr. Welner's opinion concerning Amor's suggestibility as previously tested by Dr. Chiapetta while he was awaiting his murder trial or any other opinions based on Welner's review of Amor's psychiatric, psychological, and medical records. (Dkt. 245 at 16, 21.) Regarding Dr. Welner's remaining nine opinions, Plaintiff argues his testimony should be barred because he is not qualified to opine on the study of false confessions or its application to Amor's confession. Beyond her challenge to Dr. Welner's qualifications, Plaintiff does not seek to bar any of the opinions in their entirety. Instead, Plaintiff seeks to bar specific portions of Dr. Welner's opinions which she contends (1) amount to legal conclusions regarding the validity of Leo's research and methodology; (2) are unsupported opinions on Amor's state of mind because Dr. Welner did not interview Amor; (3) are inadmissible credibility determinations; and (4) exceed his expertise.[1] As detailed below, each of these arguments should

---

[1] Plaintiff's motion mischaracterizes opinions and public statements Dr. Welner has made unrelated to this case and to this Court's inquiry. Ironically, these assertions come just before Plaintiff declares Dr. Welner's opinions regarding Dr. Leo's methodology as "uncivil" and "intemperate." (Dkt. 245 at 13) Defendants do not grapple with them in this motion because they are irrelevant to this Court's inquiry.

be rejected because Defendants have more than met their burden that Dr. Welner's testimony is admissible.

## RELEVANT BACKGROUND

On September 10, 1995, a fire ripped through a condo unit in Naperville, Illinois killing Marianne Miceli (40). (¶¶ 6-7.)[2] Marianne (40) lived in the condo with her daughter Tina (18) and Tina's new husband, Bill Amor (39), neither of whom were home when Marianne perished. (¶ 13.) Naperville's Fire Investigation Team (FIT) and NPD Defendant-Detective Mike Cross commenced an investigation. (¶¶ 7-9, 11.) Cross worked with NPD Defendant-Detectives Guerrieri and Cunningham on the NPD side of the investigation. (¶ 11.)

Amor was interviewed multiple times and provided two handwritten statements. On September 15, 1995, Amor was interviewed by Cunningham and Sgt. Mark Carlson and volunteered that on the day of the fire, he spilt vodka between a couch and a coffee table onto the Sunday Chicago Tribune, and he may also have left a cigarette and candle burning when he and Tina left. (¶¶ 51-52.) Amor drew a diagram of the location of the spill as well as the candle and wrote a statement in his own words containing this information. (¶¶ 53-56; 9/15 Statement and diagram are attached as Ex. A.) Plaintiff does not claim that this statement and/or diagram were coerced.

Amor spent the next couple weeks in the DeKalb County jail on an unrelated matter, and on October 3, was met by Cross and Guerrieri when he was released. (¶ 68.) Amor agreed to provide a polygraph and accompanied the detectives to John Reid & Associates in Chicago for the polygraph—the results of which indicated deception—and then headed to NPD with Cross and Guerrieri. (¶¶ 68-69, 74.)

---

[2] The background facts are taken from Defendants' L.R. 56.1 Statement of Facts filed in support of their motion for summary judgment. (Dkt. 137.)

While at NPD, Amor told Guerrieri he started the fire. (¶ 75.) Following a discussion between Amor, Guerrieri, and Cross, Amor wrote a statement including, in part that he: (1) spilled vodka on the Chicago Tribune and a chair; (2) lit a cigarette and put it on the ashtray but then bumped the ashtray and knocked the cigarette onto the newspaper with the vodka spill; (3) did not pick up the cigarette and knew a fire would probably result; and (4) intended for the loss to be minimal and no harm was supposed to come to anyone. (¶¶ 75-77; Amor's 10/4/1995 statement attached as Ex. B.) Cross contacted DuPage County State's Attorney's Office and Assistant State's Attorney (ASA) Brian Nigohosian responded to the NPD. (¶¶ 80-81.) At 2:11 a.m. on October 4, Cross and Guerrieri audio-recorded Amor reading his handwritten statement followed by a short question and answer session. (¶¶ 82-83.) ASA Nighosian then arrived, interviewed Amor, and made a second recording in which Amor said he knew about a life insurance policy, planned the fire, and anticipated using "one of the insurance monies" to get out of the apartment but "wasn't directed right at life insurance." (¶¶ 84-86.) Nigohosian approved charges and Amor was tried and convicted of aggravated arson and first-degree murder. (¶¶ 93-110.) His conviction was later overturned based on evolutions in fire science, and he was acquitted at a 2018 retrial. (¶¶ 117-118.) This lawsuit followed.

Plaintiff has disclosed Dr. Richard Leo as a "false confession" expert, who offers nine opinions concerning Amor's October 3–4 interviews (Leo Report, Ex. C):

1) The interrogation utilized the "Reid method of interrogation" which Leo opines is "universally believed to lead to coerced and/or false confessions[.]" (*Id*. at 6.)

2) Amor's confession bears the "hallmarks, characteristics and indicia of a false and unreliable confession" which meets the criteria to be classified as both a "proven false confession" and a "coerced-compliant false confession." (*Id*.)

3) Amor's description of his interrogation "fits with the empirical social science research" regarding "interrogation techniques, methods, practices and effects" associated with increased risk of (and known to cause) false confessions and why individuals are moved to make or agree to a false and unreliable confession. (*Id*.)

3

4) Amor's description of his interrogation includes examples of "physically and psychologically coercive interrogation techniques, methods, strategies and effects" demonstrated to cause involuntary, unreliable, and false confessions because they "cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators." (*Id*. at 6–7.)

5) Amor's description of his interrogation indicates the use of "guilt-presumptive, truth-presumptive, confirmatory and theory-driven" practices whose goal was to elicit a confession from Amor consistent with the detectives' "pre-existing assumptions, speculations, and beliefs". (*Id*. at 7.)

6) Amor's account of his interrogation describes risk factors for false confessions including lengthy interrogation, sleep deprivation, false evidence ploys, minimization, threats, primes, and physical and psychological coercions, referred to as "situational risk factors". (*Id*.)

7) Amor was at a "heightened risk" for making a false or unreliable admission because of his suggestibility, anxiety, and depression, which are "personal risk factors". (*Id*.)

8) The investigators' accounts of the interrogation contain risk factors for a false confession including lengthy interrogation, sleep deprivation, false evidence ploys, and minimization as well as Amor's suggestibility. (*Id*.)

9) The interrogation involved multiple instances of contamination and scripting, increasing the risk that Amor's confession would misleadingly appear to be "accurate and self-corroborating." (*Id*.)

Defendants have moved to bar Dr. Leo's testimony in its entirety because his opinions are not premised on reliable data and methodology, they invade the province of the jury, and he offers opinions that exceed his alleged area of expertise. (*See generally,* Dkt. 239.)

In case the Court denies Defendants' motion to bar Leo, Defendants also disclosed Dr. Michael Welner, a board-certified forensic psychiatrist, to rebut Leo's proffered opinions. (Dr. Welner's report, Ex. D; Dr. Welner's Decl., Ex. E; Dr. Welner's Current CV, Ex. F.) In response to Leo, Dr. Welner's report sets out ten questions with corresponding opinions:

1) How are proven false confessions of the innocent identified? What is the distinction between false and unreliable confessions from a standpoint of scientific terminology? Are false confessions identified through psychological techniques, indicia, hallmarks, or through any social science measures or procedures that have been empirically researched? (Ex. D at 5-18.)

4

2) Do references of proven false confessions and admissions exist? What impacts the validity of such designation? How are these references informative to the broader scientific and justice community? (*Id*. at 18-22.)

3) What are the key psychological and personal antecedents to Mr. Amor's self-incriminating statements of October 4, 1995? (*Id*. at 22-29.)

4) What techniques of Mr. Amor's police questioning on October 3-4, 1995 increase the risk of or are known to cause false confession to murder in the interrogation setting? What is known of the significance of minimization as a technique? False evidence ploys? What study, research, or reliable methodology has demonstrated that the interrogation techniques of this case move an innocent person to make a false confession? (*Id*. at 29-34.)

5) What is the evidence that Mr. Amor demonstrated a coerced-compliant confession, a scripted confession, or both? Does evidence demonstrate that Mr. Amor had no meaningful choice but to comply with the demands and requests of his interrogators? (*Id*. at 34-38.)

6) Is the Reid method of interrogation, based on data available from cases of proven false confessions, "universally believed to lead to coerced and/or false confessions in a significant number of criminal cases," as Leo asserts? (*Id*. at 39-40.)

7) What is the evidence that lengthy interrogation causes false confessions to murder? Did a lengthy interrogation cause Mr. Amor to offer a false self-incriminating statement? (*Id*. at 40-42.)

8) What is sleep deprivation? Has social science research demonstrated that sleep deprivation causes false confessions to murder? Did sleep deprivation cause Mr. Amor to offer a false self-incriminating statement? (*Id*. at 43-44.)

9) Has social science research demonstrated that anxiety and depression cause false confessions to murder? (*Id*. at 44-45.)

10) What is the significance of Mr. Amor's suggestibility, as tested and reported by Dr. Chiapetta? (*Id*. at 45-48.)

With the exception of Opinion 10, which remains unchallenged, Defendants only offer Dr. Welner's testimony in the event Dr. Leo is permitted to testify.

## LEGAL STANDARD

Fed. R. Evid. 702 permits a witness who is qualified as an expert by their "knowledge, skill, experience, training or education" to testify "if the proponent demonstrates to the court that

it is more likely than not that: (a) the expert's scientific, technical, or other specialized

knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable

principles and methods; and (d) the expert's opinion reflects a reliable application of the

principles and methods to the facts of the case." A proffered expert's opinion must "have a

reliable basis in the knowledge and experience of his discipline." *Daubert v. Merrell Dow*

*Pharm., Inc*, 509 U.S. 579, 592 (1993).

## ARGUMENT

## I.  Dr. Welner Is Qualified to Opine on the Study of False Confessions and How They Bear Upon Plaintiff's Interrogation

Despite having been found by many courts to be qualified to opine on false confessions

since 2001, Plaintiff's primary challenge to Dr. Welner's testimony is that he is not qualified to

testify about the study false confessions or how it bears upon Amor's interrogation. (Dkt. 245 at

6-12; Ex. E at ¶ 60; Ex. F.) This ill-conceived position disregards Dr. Welner's extensive

background and experience in the field of false confessions and incorrectly presumes that only a

background identical to social psychologist Richard Leo can provide the required "scientific,

technical or other specialized knowledge" to qualify as an expert under Fed.R.Evid. 702(a).[3]

More specifically, Plaintiff theorizes that Dr. Welner's opinions, including whether

Amor's confession can be "proven false", why suspects make false statements during

interrogations, and whether Amor was subjected to interrogation tactics and/or had personal

characteristics associated with false confessions, are within the exclusive "domain" of social

---

[3] This position is particularly odd given that, as Defendants point out in their Motion *in Limine* to Bar Expert Opinions and Testimony of Richard Leo, Dr. Leo has been barred from testifying numerous times. (Dkt. 239 at 7.)

scientists and psychologists who "have devoted their professional careers to the study of police interrogation and false confession." (Dkt. 245 at 6-7.) This couldn't be further from the truth.

Dr. Welner, based on his education, qualifications, and wide array of professional experience, is ***exceptionally*** well-qualified to analyze and rebut Dr. Leo's opinions on disputed confessions. He is a board-certified physician in psychiatry and forensic psychiatry. (Ex. E at ¶¶ 1-77; Welner Dep. Tr., Ex. G at 88:11-89:17.) His psychiatric training has included review of research and literature across not only the behavioral and social sciences but also includes medical research, critical assessment of methods and results, and applying the research to his casework. (*Id*. at ¶¶ 21, 35, 40, 42, 48, 59, 61.) But Plaintiff is right about one thing—Dr. Welner has not devoted his entire career to academia. Rather, Dr Welner's clinical experience includes more than 30 years of examining, assessing, and treating hundreds of criminal defendants including evaluating issues related to their experiences with the police, their decisions to confess, and their appraisal of the evidence against them, all with real world application and consequences that do not exist in academia. (*Id*. at ¶¶ 7, 21, 26-34, 44-45, 61.)

As one component of his work in forensic psychiatry, Dr. Welner has extensively studied the relevant literature from the social sciences on disputed confessions. (Ex. E at ¶¶ 12, 48, 59-61.) However, unlike Leo, Dr. Welner was not restricted to only reading literature about criminal cases; rather he was also living them, and actively providing psychiatric treatment to criminal defendants awaiting trial, including many who had themselves confessed. Any suggestion that Dr. Welner's wealth of clinical experience with the very population that is subject to police interrogations undercuts—rather than bolsters—Dr. Welner's qualifications is patently absurd. *See, e.g.*, *Chatman v. City of Chicago*, 2018 WL 11426158, at *3 (N.D. Ill. Oct. 30, 2018) (finding Dr. Welner qualified because he "has several years of clinical experience evaluating

criminal defendants' confessions through his work in the corrections psychiatry unit at Bellevue Hospital.")

And contrary to Plaintiff's assertions, Dr. Welner **has** conducted research on disputed confessions and other behavioral science issues affecting criminal suspects. (Ex. D at 2; Ex. E at ¶¶ 72-73.) Plaintiff attacks Dr. Welner's 2004-2005 archival research study on disputed confessions as if it is the sole basis for his opinions and expertise—misleadingly stating that it was "not complete" and that Dr. Welner himself described it as "half-baked". (Dkt. 245 at 9.) To the contrary, and as Plaintiff knows, Dr. Welner testified that he did successfully identify which confessions presented in the study were false. (Dkt. 245-9 at 9:19-30:16.)[4] Nonetheless, with regard to his analysis of the cause of false confessions, Dr. Welner's belief was that his overall "conclusions were based on a smaller case sample of the overall universe of false confessions, and because [he] felt that were [he] to examine more confirmed false confessions the prevalence of [his] findings might change," he chose not to submit the research for publication. (Dkt. 245-9 at 30:1-8; Ex. E at ¶¶ 72-73.) For that reason, and appropriately acting as his own gatekeeper, Dr. Welner chose not to publish the study—he certainly could have—because he felt the conclusions were provisional, reflecting an exercise of professional restraint that illustrates the unwavering standards to which Dr. Welner holds himself, rather than any deficiency in his work. (Ex. E at ¶¶ 72-73.)

Indeed, Dr. Welner has been invited to teach on his research and on disputed confessions at forums of multiple disciplines impacted by false confessions including forensic science, law, the judiciary, and law enforcement. (Ex. F at 3, 15, 18, 21; Ex. E at ¶ 71.) The intersection of false confessions across these various disciplines demonstrates that the universe of experts in

---

[4] The page number in this citation refers to the transcript pagination.

false confessions is not and cannot be limited to social science academics. Dr. Welner has also taught and presented on the role of forensic psychiatry and death investigations, *Miranda* and interrogation issues faced by intellectually disabled suspects, and mental health issues faced by criminal defendants. (Ex. F at 3, 15-26; Ex. E at ¶¶ 58, 71.) He has also sat on the editorial board for several publications in these same disciplines including the Journal of Forensic & Legal Medicine, International Journal of Criminal and Community Justice, and the Journal of Practicing Forensic Psychology. (Ex. F at 3.)

Notably, Dr. Welner was invited by the New York State Court of Appeals to present regarding juvenile suspect interrogations and solutions to promote confession integrity. (Ex. E at ¶¶ 74.) In his role as a consulting forensic psychiatrist, Dr. Welner has thoroughly studied and evaluated the research on disputed confessions and assessed the state of the science. (*Id*. at ¶¶ 12-13, 48, 59-61.) Based on this wealth of credentials, Dr. Welner has been frequently retained as an expert in federal and state cases involving disputed confessions for over 20 years. (*Id*. E at ¶ 60.) These credentials undoubtedly qualify him to testify in this matter.

Unsurprisingly, the notion that only someone with Leo's social science academic background can be an expert in false confessions has been rejected multiple times.[5] *See, e.g.*, *Taylor v. City of Chicago*, 2021 WL 12242781, at *8 (N.D. Ill. Dec. 1, 2021) ("…Plaintiff objects to Dr. Welner's qualifications as an expert in false confessions, arguing that Dr. Welner's expertise is in the area of forensic psychiatry rather than false confessions specifically. Plaintiff contrasts Dr. Welner's qualifications with those of his own proposed expert, Dr. Richard Leo. But experts need not have identical resumes to opine on the same subjects."); *Chatman*, 2018

---

[5] As addressed in their Motion *in Limine* to Bar Expert Opinions and Testimony of Richard Leo, Defendants vehemently dispute Plaintiff's assertions that Leo, and others in his social psychology discipline, have developed a reliable set of data and methodology for application to disputed confession cases. (*See*, Dkt. 239 at 5-9.)

WL 11426158, at *3 ("As to Plaintiff's substantive challenges to Dr. Welner's qualifications, many of the objections focus on the fact that Dr. Welner does not have the same credentials as Dr. Russano. This, however, is not dispositive . . . Dr. Welner is qualified through his own professional experience[.]") (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). *See also, Hasan v. Cottrell, Inc.,* 2014 WL 4124254, at *3 (N.D. Ill. Aug. 21, 2014) ("The notion that Daubert requires particular credentials for an expert witness is radically unsound[.]") This Court should also reject Plaintiff's baseless argument, especially when Plaintiff failed to even address Dr. Welner's deposition testimony concerning the cross-disciplinary nature of the study of false confessions and the relevance of his clinical experience to his forensic work with disputed confessions. (Ex. G at 81:8-84:25.)

It is worth noting that Plaintiff burdens this Court with a lengthy attack on Dr. Welner's qualifications that is largely a cut and paste from other cases,[6] having not even taken the time or care to comb through Dr. Welner's deposition in this case to assess the admissibility of his testimony here. Presumably, Plaintiff intends to improperly shift that onerous task to Defense counsel and the Court because she knows her argument is unlikely to gain traction.

In fact, Plaintiff's only citation to Dr. Welner's deposition in this case—offered as illusory support for her contention that he has not published in a peer-reviewed journal in the area of disputed confessions—misleadingly omits his testimony that he ***was subject to peer review*** on this subject for his 2015 publication in the Encyclopedia of Forensic and Legal Medicine. (Ex. G at 91:7-92:5.) Even worse, Plaintiff relies on statements taken out of context in an eight-year-old deposition from an unrelated case to argue that Dr. Welner is "unable to define

---

[6] The motion largely resembles one filed by Plaintiff's Counsel last month in *Brown v. City of Chicago*, Case No. 19-CV-4082, Dkt. 307 (N.D. Ill.), having also placed significance reliance on Dr. Welner's deposition in that case to bar his opinions offered in this case.

basic social psychology terms" and was unfamiliar with the work of two "prominent social psychologists" with relevant research, but she ***never explains*** how these terms or academics are relevant to Amor's confessions or Leo's opinions. (Dkt. 245 at 9-10.) Indeed, of the several terms listed and two social psychologists referenced, Leo does not reference either in the report Dr. Welner was retained to rebut in this case, and Dr. Welner was not asked about any of them in his 2021 deposition in this case. (*See generally*, Ex. C and G.)

If Plaintiff truly believes that a jury will be persuaded that Dr. Welner's opinions should be disregarded because he does not have a doctorate in the social sciences—all other experience, education, and specialized knowledge be damned—then she is free to cross-examine on that basis but it certainly does not render Dr. Welner unqualified under Fed.R.Evid. 702(a) such that the jury should not hear his testimony. *See, Niam v. Ashcroft*, 354 F.3d 652, 660 (7th Cir. 2004) ("There is no ironclad requirement that an academic, to be qualified as an expert witness, must publish academic books or articles on the precise subject matter of her testimony."); *Chatman*, 2018 WL 11426158, at *3 ("To the extent that Plaintiff believes that the jury should afford Dr. Welner's testimony less weight than Dr. Russano's, he can explore that on cross-examination and make that argument to the jury.")

Nor has Plaintiff identified a single case where any court has held that Dr. Welner was not qualified to opine on disputed confessions. Instead, she misapplies two cases where his expertise was at issue. In *Edmonds v. State*, the Mississippi Supreme Court determined whether the trial court erroneously barred the testimony of a *different false confession expert.* 955 So. 2d 787, 791 (Miss. 2007). The concurring justice believed that the trial court improperly relied on Dr. Welner's opinions to bar the expert (*Id.* at 801), whereas the majority made no mention of the trial court's reliance on Dr. Welner's opinions. *Id.* at 791. Plaintiff also cites *United States v.*

11

*Sampson*, No. 1:01-10384-LTS (D. Mass. Sept. 2, 2016), contending that the court chastised Dr. Welner for offering expert testimony that exceeded the "boundaries of [his] professional contribution and scientific integrity" but his opinion in that case did not relate to his qualifications for opining on false confessions, the subject matter of his testimony was not disputed confessions, and his testimony was not barred. These cases are wholly inapposite and do not support Plaintiff's argument that Dr. Welner's testimony should be barred.

## II.  Dr. Welner's Sound Methodology Easily Satisfies the Requirements of Fed.R.Evid. 702

Plaintiff argues in conclusory fashion that "[a]ll of Dr. Welner's opinions in this case purport to assess Defendants' interrogation of Mr. Amor against what Dr. Welner terms 'the empirical evidence' as to what motivates false confessions and what specific interrogation techniques may be deemed 'coercive.' These opinions are not 'reliable' and do not pass muster under Daubert[.]" (Dkt. 245 at 12.) This undeveloped argument—two sentences in length with not a single record citation to Welner's report or deposition—has been waived and Dr. Welner's methodology has not been sufficiently called into question. *See, e.g., M.G. Skinner and Assoc. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc*., 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived"); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) ("Where [an expert's] testimony's factual basis, data, principles, methods, or their application are *called sufficiently into question*... the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'") (emphasis added).

At any rate, Plaintiff has mischaracterized Dr. Welner's methodology. As he laid out, he "(1) reviewed the antecedent history leading to Mr. Amor's confession, (2) reviewed antecedent data on Mr. Amor's vulnerabilities and strengths at the time of his interrogation, (3) studied the context of

how Mr. Amor came to be a focus of investigation and the police investigation, including his confession, (4) reviewed Dr. Leo's report and source materials, and (5) considered the available literature on the areas cited by Dr. Leo to evaluate his opinions in light of the literature relied upon by fellow behavioral scientists (psychologists and psychiatrists)." (Ex. E at ¶ 78, Ex. D.)

Dr. Welner reached various conclusions as set forth in his report with supporting data, analysis, and literature. (Ex. E at ¶¶ 78-85.) His combined application of core scientific principles, experience, knowledge and research surely meet the threshold requirements under *Daubert*. *See Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 845-846 (7th Cir. 2017) (application of well-established principles sufficient for reliable methodology); *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761–62 (7th Cir. 2010) (application of experience sufficient for reliable methodology).

## III.  It is Well-Established that Dr. Welner is Permitted to Criticize Leo's Methodology

Plaintiff argues that Dr. Welner should not be permitted to comment on Leo's motivations or criticize his methodology because it is improper and "stray[s] into the realm of legal argument." (Dkt. 245 at 13.) Initially, Defendants do not intend to elicit testimony from Dr. Welner regarding Leo's motivations for his opinions. However, Dr. Welner's criticism of Leo's methodology is fair game and falls well within the bounds of admissible testimony from a rebuttal expert. Plaintiff's cited authority does not suggest otherwise.

Here, Dr. Welner's testimony will be limited to his criticisms of Leo's methodology, not its admissibility. This is in stark contrast to Plaintiff's cited opinion in *Harris v. City of Chicago* in which a false confession expert opined that Leo's opinions were "generally either unreliable or unhelpful to the jury", a pronouncement which the court determined was a legal conclusion that had already been rejected by the Court's analysis under Fed.R.Evid. 702. (*See*, Report of Paul G. Cassel, Ex. H at 1; *Harris*, 2017 WL 3142755, at *5 (N.D. Ill. July 25, 2017)).

Similar opinions offered by Dr. Welner in *Chatman* were deemed inadmissible legal conclusions including: "(1) What is the *basis* of behavioral science opinion on disputed confessions"; (2) "How are false confessions established, *as a foundation* for behavioral science opinion"; and (3) Is there research or other study or *foundation to have established a methodology* for the analysis of a 'post-admission narrative?" *Chatman*, 2018 WL 11426158, at *3 (emphasis added). But Plaintiff disregards the fact that the *Chatman* court further found that it was proper for Dr. Welner to rebut the opposing expert by critiquing the research she relied upon, identifying limitations in the studies she relied upon, and identifying gaps in the existing research. *Id.* at *5.

Defendants agree that similar parameters such as those set forth in *Chatman* are appropriate here, and that as a result, one of the four specific assertions from Dr. Welner that Plaintiff seeks to exclude (*see*, Dk. 245 at 12-13) has merit. Namely, if this court rejects Defendants' contention that the studies offered from Leo lack sufficiently reliable data to support his opinions, then Defendants will not offer testimony from Dr. Welner that there is no such "scientific community".[7]

However, Plaintiff's remaining efforts to limit Dr. Welner's criticism of Leo's opinions, including that (1) they cannot account for an error or success rate; (2) disagreement with his interpretation of certain literature and studies; (3) that there is no empirical research being conducted on actual interrogations of murder suspects; and (4) describing variations in the quality of peer review process for certain publications, all lack merit because these are

---

[7] Notably, in calling out Dr. Welner for accusing Leo and others in his field of "parroting" each other, Plaintiff selectively omits Footnote 22 of Dr. Welner's report in which he describes what he means by parroting. Specifically, that Dr. Leo could not explain in his deposition why portions of his report appeared lifted directly from the previous work of another purported false confession expert, Steven Drizin. Dr. Leo accused Dr. Drizin of being the one to parrot his language, proclaiming, "[i]f there is identical language, you've got the order of extraction in the wrong direction." (Ex. D at 15, n. 22.)

appropriate areas of expert rebuttal testimony which would in no way undermine any ruling that Leo's testimony passes muster under Fed.R.Evid. 702. *See, e.g., Taylor,* 2021 WL 12242781, at *8 (holding Dr. Welner may properly "critique… the data underlying Dr. Leo's opinions"); *Angelopoulos v. Keystone Orthopedic Specialists, S.C.*, 2017 WL 2178504, at *10 (N.D. Ill. May 16, 2017) (noting distinction between impermissible drawing of legal conclusions as contrasted with permissible criticism of an expert's "methodology, factual assumptions, and conclusions."); *In re Cessna 208 Series Aircraft Prod. Liability Litigation*, 2009 WL 1649773, at *1 (D. Kan. 2009) (collecting cases and holding it "proper rebuttal" for an expert to "critique the methodology and scientific principles which plaintiff's experts use to arrive at their conclusions.")

## IV.    Dr. Welner Does Not Opine on Amor's State of Mind

Plaintiff argues that Dr. Welner should be barred from assessing Plaintiff's mental state and thought processes with the exception of Opinion No. 10 regarding the suggestibility scales, which Plaintiff concedes is admissible. As detailed below, Dr. Welner's opinions are history-driven and observational in nature, and do not opine on Amor's state of mind. As such, Plaintiff's argument should be rejected.

First, Plaintiff makes a lengthy objection to Dr. Welner's reference to Amor as "street-wise and anything but naïve to the criminal justice system." (Dkt. 245 at 17.) However, these opinions, as detailed in Dr. Welner's report, concern Plaintiff's prior exposure to the criminal justice system as it relates to his purported naivety to offer a false confession—not Plaintiff's state of mind or thought process. (Ex. D at 45-46.) This analysis is clearly fair game in light of Leo's opinions that Defendants' use of certain interrogation tactics may have increased the risk

of a false confession from Amor: opinions that completely failed to even address the relevance of Amor's prior experience with law enforcement.

The remaining statements from Dr. Welner's report to which Plaintiff objects are based on identified conduct from the record and/or provide context for the confession rather than Amor's state of mind. Namely, Amor's actions in seducing an underage Tina were "wily" and "brazen"; Amor confessed after learning Tina wanted a divorce and "he could no longer psychologically dominate or manipulate her"; once Amor learned he was homeless by way of Tina divorcing him, an inculpatory statement short of admitting an intent to kill "would not be as forbidding a choice as would be for others"; Amor's lack of compliance in other areas of his life led to the dysfunction and/or problems he experienced; the timing of Amor receiving the divorce papers indicates that it was psychologically impactful; and Amor's consistent denials in prior interviews did not indicate a stress intolerance that would impact Amor's suggestibility. (Dkt. 245 at 16-17.) None of these opinions attempt to opine on Amor's state of mind and all of them rebut Leo's testimony that the confession was false and coerced due to the presence of certain risk factors during the interrogation.

Dr. Welner also opines on the role occupied by various interrogation techniques based on Leo's opinion that the interrogation presented certain risk factors for false confessions. One such factor discussed in Leo's report is the interrogators' use of "minimization". (Ex. C at 34-35.) Dr. Welner counters that it is Amor whose conduct in the interrogation is consistent with a suspect who is minimizing responsibility and provides context for why one might choose to make an incriminating statement containing false details without any coercion. (Ex. D at 26, 28-29, 33.)

Finally, Plaintiff contends that because Dr. Welner did not interview Amor—an undertaking which was also not taken by Dr. Leo—he has no psychological data to render

16

opinions on Amor's state of mind. As addressed above, this criticism is irrelevant because Dr.

Welner is not offering diagnoses or opinions on Amor's state of mind, defeating Plaintiff's claim

that the necessary psychological data is not available.

Notably, despite the lengthy objection, Plaintiff fails to cite a single case setting forth a

rule that psychiatric experts cannot testify about subjects they have not interviewed or examined.

Plaintiff's omission highlights that no such rule exists. *See, e.g.*, *United States v. Gmoser*, 30

F.4th 646 (7th Cir. 2022) ("He asserts that psychiatric experts cannot testify about people they

have not examined. That is not what Fed. R. Evid. 703 says.") Dr. Welner explained in his

deposition—which Plaintiff ignores—that an interview or personal examination can inform a

diagnosis and supplement the available information. (Ex. G at 138:19-139:8, 151:8-153:3, 238:3-

239:20.) He also testified that he "offered opinions where [he] felt it was adequately informed"

without interviewing Amor. (*Id*. at 152:152:21-153:3.) Dr. Welner did not offer a diagnosis of

Amor and worked within the bounds of the information that he had. Rather than address Dr.

Welner's testimony *in this case*, Plaintiff relies upon partial statements taken out of context (Dkt.

245 at 15-16), none of which support Plaintiff's position that Dr. Welner's inability to interview

Amor in this case renders his opinions inadmissible given the materials that he did rely on. (See,

Ex. E at ¶¶ 22-25, 78-85.)

Plaintiff seeks to apply an impermissible double standard in this case that Leo—who had

access to Amor—can testify without having conducted an interview but Defendants' expert

cannot. This is at best a point for cross-examination and certainly does not justify barring Dr.

Welner's opinions regarding his observations of Amor and his conduct leading up to his

confession.

17

**V.      Dr. Welner Does Not Opine on Amor's Credibility**

Plaintiff takes issue with what she deems Dr. Welner's "credibility determinations" of Amor, directing this Court to five excerpts from his report. However, not one of those cited excerpts speaks to "the credibility of Amor's account of the interrogation[.]" (Dkt. 245 at 19.)

To begin, Dr. Welner did not—as Plaintiff asserted in her motion—declare that Amor was an unreliable and self-serving historian. (Dkt. 245 at 19.) Rather, Dr. Welner explains that a person under questioning may give a false statement for self-serving reasons which "support an impression that one is an unreliable and self-serving historian who may be innocent or guilty", but that the false statement does not necessarily indicate innocence. (Ex. D at 11.) Given Leo's insistence that Amor gave a proven false confession, it is important for Dr. Welner to be able to explain to the jury that an inaccurate confession does not always equate to innocence and that guilty suspects sometimes make incriminating statements that contain false details.

To be sure, it is Leo who concludes that Amor's confession was "coerced compliant" and "proven false." (*See generally*, Ex. C.) Coinciding these opinions, Leo identifies risk factors for false confessions which he opines were present during Amor's interrogation. (*Id*.) Leo's assertions are devoid of any analysis of how these risk factors may or may not have personally impacted Amor. As addressed in Defendants' motion, this gaping hole in Leo's opinion is one that renders his methodology deficient under *United States v. Mamah*, 332 F.3d 475 (7th Cir. 2003). (Dkt. 239 at 11-12.)

That said, Defendants must prepare for the possibility that the Court may deny Defendants' motion, or that Plaintiff will otherwise open the door, which is why Dr. Welner has carefully analyzed Amor's personality traits and how they impact Leo's conclusions that the confession was coerced compliant, that Amor was suggestible, and/or how Leo's purported risk

factors impacted Amor's decision to confess, if at all. This includes Dr. Welner's analysis that Amor's confession was "self-serving." (Dkt. 245 at 19; Ex. D at 26.) Against this backdrop, Dr. Welner's description of Amor as "willing to be manipulative, or to con others" is a relevant and well-documented personality trait. Indeed, Dr. Welner relies on several incidents in the record, including other incidents in which Amor attempted to talk his way out of run-ins with the police, Amor's manipulation of Tina and Marianne Miceli, his manipulation of the Hallauer family, and his comment to corrections psychologist Nicholas O'Riordan following his arrest for this incident that he was confident that he would get the charges "reduced." (*See*, Ex. D at 26-30; Ex. G at 235:19-238:2.)

The same is true for Dr. Welner's reference to Amor as having a "penchant for chatty dissimulation to law enforcement," a history-driven comment based on several of Amor's interactions with the police both prior to this incident and during the investigation into the fire that pre-dated the October 3 interview, all of which demonstrated his "verbal agility" to field an interrogation, and directly refuting Leo's opinions that he was coerced, compliant, and suggestible. (*See*, Dkt. 245 at 19; Ex. D at 26-29.)

Lastly, Plaintiff attacks Dr. Welner's statement that "no one disputes that Detective Cross then left the room to get coffee. Were he to have been agitated, would he have had the urge to get coffee?" (Dkt. 245 at 19; Ex. D at 36.) However, when analyzing this alleged threat as a risk factor for a false confession per Leo, it is relevant that the allegedly threatening force was not present when Amor first admitted culpability for the fire.

Defendants have already argued that Leo's failure to analyze the specifics of Amor's personality traits in reaching his conclusions renders them much too unreliable for admission. (Dkt. 239 at 11-12.) In contrast, Dr. Welner has analyzed Amor's behavioral and emotional

19

history—something he is qualified to do—and provided the depth that Leo did not. Plaintiff's attempts to bar Dr. Welner by mischaracterizing his analysis as forbidden character determinations should not be entertained by this Court.

## VI. Dr. Welner's Opinions Do Not Exceed His Expertise

Plaintiff's last argument—that Dr. Welner should be barred from opining on the topics of fire science and police practices (Dkt. 245 at 19-21)—misconstrues his opinions.

Dr. Welner is not a fire science expert and has never held himself out as one. In fact, he readily acknowledged this point in his deposition. (Ex. G at 133:13-134:19.) Dr. Welner's point is far simpler—that the evolutions in fire science that called into question the specific ignition scenario presented in Amor's confession does not demonstrate that Amor gave a proven false confession, as Leo has opined, because the fire science experts do not agree on the cause of the fire. *See*, Ex. D at 9 ("there is no consensus as to how the fire started in the Miceli home.") Dr. Welner is not endorsing a particular theory or crediting any one expert over another. (Ex. G at 133:13-134:19.) Rather, he is pointing out that the cause of the fire remains disputed by experts and criticizes Leo's methodology in adopting a single expert's opinion to the exclusion of all others in order to opine that it was physically impossible for Amor to have set the fire and that no crime occurred. (*See*, Dkt. 239 at 14-15; Ex. D at 6 ("Without having reviewed the disputing expertise, Dr. Leo certainly cannot establish how one opinion eclipses the others…and how such evidence is 'dispositive.'"))[8]

---

[8] Plaintiff has gone out of her way to misrepresent Dr. Welner's opinions as one-sided. As a prime example, Plaintiff cites in her brief that Dr. Welner should not be permitted to testify that the fire science may develop in a manner that directly implicates Amor. (Dkt. 245 at 20.) The actual statement acknowledged that scientific developments can impact both evidence of guilt and innocence. *See*, Report at 32 ("Just as fire science has demonstrably evolved to refute earlier interpretations of the scene evidence, the science may further evolve to more directly incriminate the plaintiff.") *See also*, Ex. D at 6 ("Mr. Amor may be innocent or may yet be guilty.")

Plaintiff also misses the mark in arguing that Dr. Welner has overstepped his expertise by addressing the police focus on Amor during their investigation. (Dkt. 245 at 20.) Dr. Welner's analysis is in response to Leo's opinion that one of the risk factors for a false confession that was present on October 3, 1995 was that the officers "began their investigation into the fire that killed Ms. Miceli with a rush to judgment" and employed a guilt-presumptive interrogation. (Ex. C at 30-32, 37-38.) The same is true for Dr. Welner's opinion highlighting the evidence that shows Amor's confession was not scripted, an opinion offered only to rebut Leo's opinion that the police in this case did employ scripting when coercing Amor's confession. (Ex. C at 41-44; Ex. D at 36-37.) Though Dr. Welner has never been a police officer, he is not opining on police practices, and he has a vast investigatory background in the context of his forensic work. (Ex. E at ¶¶ 58, 71.) Plaintiff's claims that Dr. Welner's proffered testimony exceeds his expertise is without merit.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request this Court deny Plaintiff's Motion to Bar Opinion Testimony of Dr. Michael Welner.

Date: June 7, 2024

Respectfully submitted,

/s/ Laura M. Ranum
LAURA M. RANUM, Attorney No. 6300636
*One of the Attorneys for Defendants*

James G. Sotos
Laura M. Ranum
Joseph M. Polick
Lisa M. Meador
Jeffrey C. Grossich
THE SOTOS LAW FIRM, P.C.
141 W. Jackson Blvd., #1240A
Chicago, IL 60604
(630) 735-3300
lranum@jsotoslaw.com

21

## **CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746 that on June 11, 2024, I electronically filed the foregoing **Defendants' Response in Opposition to Plaintiff's Motion to Bar Opinion Testimony of Dr. Michael Welner** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants listed on the below Service List.

***Attorneys for Plaintiff:***
Jon Loevy
Gayle Horn
Locke Bowman
Alyssa Martinez
Loevy & Loevy
311 N. Aberdeen Street, 3rd Floor
Chicago, IL 60607
(312) 243-5900
jon@loevy.com
gayle@loevy.com
locke@loevy.com
alyssa@loevy.com

/s/ Laura M. Ranum
LAURA M. RANUM, Attorney No. 6300636
*One of the Attorneys for Defendants*