*Amor v. Cross, et al.*
Case No. 18-CV-2523
Our File No. 18-4078

# EXHIBIT C

Dr. Richard A. Leo, Ph.D., J.D.
**JUSTICE RESEARCH & CONSULTING, INC.**
15 Ashbury Terrace
San Francisco, CA 94117

_____

(415) 661-0162 (Phone)
(415) 422-6433 (FAX)
Email: rleo@usfca.edu

January 22, 2021

Mariah Garcia,
Attorney at Law
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607

Re:  **William Amor v. Michael Cross et. al.**
       **Case No. 1:18-cv-02523**

Dear Ms. Garcia,

This report is per your request in the above-referenced case of *William Amor v. Michael Cross et al.*

## I. Qualifications

I am the Hamill Family Professor of Law and Psychology at the University of San Francisco, and formerly an Associate Professor of Psychology and an Associate Professor of Criminology at the University of California, Irvine. My areas of research, training, and specialization include social psychology, criminology, sociology, and law. For more than two decades, I have conducted extensive empirical research on police interrogation practices, the psychology of interrogation and confessions, psychological coercion, police-induced false confessions, and erroneous convictions. In 1992 and 1993, I spent nine months doing field research inside the Oakland Police Department, which included sitting in on and contemporaneously observing one-hundred twenty-two (122) felony interrogations; in 1993, I also observed sixty (60) fully videotaped interrogations in the Vallejo and Hayward Police Departments in northern California. Since then, I have analyzed thousands of cases involving interrogations and confessions; I have researched, written, and published numerous peer-reviewed articles on these subjects in scientific and legal journals; and I have written several books on these subjects, including *Police Interrogation and American Justice* (Harvard University Press, 2008) and *Confessions of Guilt: From Torture to Miranda and Beyond* (Oxford University Press, 2012).

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 2

I am regarded as a national and leading expert on these topics, and I have won numerous individual and career achievement awards for my scholarship and publications. My scholarship has often been featured in the news media and cited by appellate courts, including the United States Supreme Court, on multiple occasions. To date, I have consulted with criminal and civil attorneys on more than two-thousand and one-hundred (2,100) cases involving disputed interrogations and/or confessions, and I have been qualified and testified as an expert witness three-hundred and seventy-five (375) times in state, federal, and military courts in thirty-seven (37) states and the District of Columbia, including thirty-two (32) times in federal and military courts (which includes the 7th circuit). I have given many lectures to judges, defense attorneys, prosecutors, and other criminal justice professionals, and I have taught interrogation training courses and/or given lectures to police departments in the United States, China, and the Republic of Cyprus.

My qualifications are summarized in greater detail in my curriculum vitae, which is attached to this report. A list of my court and deposition testimony in the last four years is attached to this report. I am being compensated for my time at the rate of $450 per hour. My compensation is not contingent on the outcome of this litigation nor on the opinions I express in this report or in subsequent court testimony.

## II. Materials Reviewed

In conjunction with my preparation of this report, I have reviewed the following materials:

- Statement of Miranda Rights (Dated October 3, 1995). Bates Stamped: 019002

- Written Statement of William Amor (Dated October 4, 1995). Bates Stamped: 019003.

- Transcript of Interview of William Amor by Mike Paul, Lauren Kaeseberg, Erica Nichols Cook, John Gant and John Golder (Dated October 30, 2015). Bates Stamped: 024680-024757

- Report of Dr. Michael Chiappetta (Dated November 19, 1996)

- Audio Recording of Confession Statement on October 4, 1995 at 2:11 a.m.

- Audio Recording of Confession Statement on October 4, 1995 at 5:10 a.m.

- Transcript of Confession Statement on October 4, 1995 at 5:10 a.m.

- Transcript of Deposition Testimony of William Amor (March 5, 2020)

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 3

- Transcript of Deposition Testimony of Michael Cross (October 16, 2020)

- Transcript of Deposition Testimony of Brian Cunningham (February 28, 2020)

- Transcript of Deposition Testimony of Robert Guerrieri (February 7, 2020)

- Transcript of Deposition Testimony of Michael Masokas (November 5, 2019)

- Transcript of Deposition Testimony of Shelley Williams (August 6, 2020)

- Transcript of Michael Cross Testimony at Grand Jury Hearing (1995). Bates Stamped: 021293-021313

- Letter from Michael Masokas to Michael Cross (Dated October 20, 1995). Bates Stamped: 023150-023151

- Naperville Police Department Interrogation Room Pictures

- Letter from Richard O'Brien to Michael Cross (Dated September 14, 1995)

- Polygraph Examination Forms (Reid & Associates)

- Transcript of 911 Call from Marianne Miceli

- Naperville Police Department Report (Dated October 16, 1995)

- Naperville Police Department Supplementary Police Report (Dated October 20, 1995)

- Report on Interview of William Amor (Dated September 14, 1995) by David Ferreri. Stamped: 95-42030.

- Naperville Police Department Report (Dated October 16, 1995). Stamped: 11273-11279

- Naperville Police Department Police Report (Dated October 16, 1995)

- Naperville Police Department Supplementary Police Reports (Dated October 20, 1995). Bates Stamped: 019108-019116

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 4

- Naperville Police Department Investigative Supplementary Report (Dated October 16, 1995)

- Pre-Plea Report (September 23, 1996)

- Pre-Sentence Report (October 22, 1997)

- Transcript of Trial Testimony of Dr. Gregory DeClue (2018). Bates Stamped: 029515-09558

- Transcript of Suppression Hearing Testimony of Michael Masokas (1996). Bates Stamped: 023104-023141

- Transcript of Suppression Hearing Testimony of William Amor (1996). Bates Stamped: 021674-021782

- Transcript of Suppression Hearing Testimony of Robert Guerrieri, Parts 1 and 2 (1996). Bates Stamped: 021871-021914

- Transcript of Suppression Hearing Testimony of Brian Nigohosian (1996). Bates Stamped: 023046-023072

- Transcript of Suppression Hearing Testimony of Michael Cross (1996). Bates Stamped: 021783-021870

- Transcript of Trial Testimony of Brian Nigohosian (1997). Bates Stamped: 023477-023510

- Transcript of Trial Testimony of Michael Cross (1997). Bates Stamped: 02352-023377

- Transcript of Trial Testimony of Brian Cunningham (1997). Bates Stamped: 023378-023409

- Transcript of Trial Testimony of Robert Guerrieri (1997). Bates Stamped: 023410-023476

- Transcript of Trial Testimony Russell Wiedemann (1997). Bates Stamped: 023511-023527

- Report of Brian Nigohosian re Statement of William Amor (Dated November 1, 1995).

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 5

- Complaint (Filed 04/09/18)

- Motion for Leave to File First Successive Petition for Post-Conviction Relief (Dated January 28, 2015). Bates Stamped: 016771-016777

- Verified Successive Petition for Post-Conviction Relief (Dated January 28, 2015). Bates Stamped: 016779-016813

- Amended Petition for Post-Conviction Relief. Bates Stamped: 016165-01620

- Affidavit of Douglas Carpenter (Dated December 24, 2014). Bates Stamped: 008367-008444

- Dr. Michael Chiappetta, Addendum Report (Dated April 16, 1997). Bates Stamped: 021557-021559

- Transcript of testimony of Dr. Michael Chiappetta. Bates Stamped: 021559-021648

- Report of Dr. Gregory Declue (Dated December 6, 2017). Bates Stamped: 016673-016683

- Transcript of Not Guilty Ruling (Dated February 21, 2018). Bates Stamped: 028420-028441

- Order Vacating Conviction (Dated April 6, 2017). Bates Stamped: 009131-009142

- William Amor, Pro Se Petition (Dated April 27, 1999). Bates Stamped: 020431-020488

- Rule 23 Order (Dated June 10, 2002). Bates Stamped: 020428-020430

- Transcript of testimony of Michael Cross (Dated January 26, 2018). Bates Stamped: 028905-029107

- Transcript of testimony of Robert Guerrieri (2018). Bates Stamped: 028689-028808

- Transcript of testimony of Douglas Carpenter (2018). Bates Stamped: 029151-029350

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 6

- Transcript of testimony of John Golder (2018). Bates Stamped: 028189-028289

- Expert Affidavit of Steve Drizin (2017). Bates Stamped: Pl. Amor. 032343-32388.

### III. Overview

In this report, I will first provide an overview of the relevant social science research on the psychology of police interrogation practices and techniques, police-induced false confessions, risk factors for false confession, psychological coercion, police interrogation contamination, and indicia of unreliability. I will then discuss these issues as they relate to the investigation, interrogations and alleged confession statement of William Amor.[1]

1) The lengthy and almost entirely unrecorded multiple interrogation sessions of William Amor on October 3-4, 1995 incorporated and used techniques from the Reid method of interrogation. In the scientific research community and published research literature, the Reid method of interrogation is universally believed to lead to coerced and/or false confessions and wrongful convictions in a significant number of criminal cases.

2) William Amor's interrogation-induced confession statements on October 4, 1995 bears the hallmarks, characteristics, and indicia of a false and unreliable confession. The confession statements meet the criteria for what is known as a *proven* false confession in the social science research literature. If false, Mr. Amor's confessions statements are properly classified as *coerced-compliant* false confessions.

3) William Amor's description of what occurred during his lengthy and almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 that led to his confession statements fits with the empirical social science research on the types of interrogation techniques, methods, practices and effects that are associated with, increase the risk of, and are known to cause false confessions, and that explain how and why innocent individuals are often moved to make and/or agree to false and unreliable confessions.

4) William Amor's description of his lengthy, almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 contains examples of physically and psychologically coercive interrogation techniques, methods, strategies and effects that have been demonstrated to cause involuntary confessions as well as false and unreliable ones. These interrogation

---

[1]    Because the multiple police investigators in this case failed to electronically record virtually all of the multiple interrogations of William Amor – despite having the capacity to do so and selectively recorded only 13 minutes of one of his two confession statements over a 15-hour period of detention/custody on October 3-4, 1995 – we are forever deprived of an objective record of what occurred during these multiple interrogations (as well as earlier interviews/interrogations of Mr. Amor on September 11, 12, 14 and 15, all of which were not recorded).

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 7

techniques, methods, strategies and effects cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators.

5) William Amor's description of what occurred during his lengthy, almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 indicates the use of interrogation techniques and practices that were guilt-presumptive, truth-presumptive, confirmatory and theory-driven. Mr. Amor describes investigative and interrogation procedures whose goal was not to find the truth but solely to break down his denials of guilt and elicit from him a confession to starting the fire that resulted in the death of Marianne Miceli that was consistent with the detectives' pre-existing assumptions, speculations, and beliefs about the cause and origin of that fire.

6) William Amor's account of what occurred during his lengthy, almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 contains a description of interrogation techniques, methods, strategies and effects that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions (*i.e.*, *situational* risk factors) when misapplied to the innocent. These included: lengthy interrogation, sleep deprivation, false evidence ploys, minimization, threats, promises, and physical and psychological coercion.

7) William Amor was at a heightened risk for making and/or agreeing to false and unreliable statements, admissions and/or confessions during his lengthy, almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 because of his personality traits at the time (*i.e.*, *personal* risk factors), especially his suggestibility, but also his anxiety and depression.

8) The investigators' accounts of what occurred during Mr. Amor's lengthy, almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 also contain a description of interrogation techniques, methods, strategies and effects that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions when misapplied to the innocent. These include: lengthy interrogation, sleep deprivation (objectively defined), false evidence ploys and minimization, as well as Mr. Amor's *personal* risk factors such as his extremely high interrogative suggestibility.

9) The lengthy and almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 described both by William Amor as well as by the investigators involved multiple documented instances of police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and scripting (pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Mr. Amor's confession statements would, misleadingly, appear to be detailed, accurate and self-corroborating.

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 8

10) The lengthy and almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 described by William Amor violated universally accepted police investigative and interrogation national training standards and best practices that existed in 1995.

## IV. The Scientific Study of Police Interrogation and False Confessions

There is a well-established empirical field of research in the academic disciplines of psychology, criminology, and sociology on the subjects of police interrogation practices, psychological coercion, and false confessions. This research dates back to 1908; has been the subject of extensive publication (hundreds of academic journal articles, stand-alone books, and book chapters in edited volumes); has been subjected to peer review and testing; is based on recognized scientific principles, methods, and findings; and is generally accepted in the social scientific community. Significantly, numerous courts have held repeatedly that these principles, methods, and findings are generally accepted in the social science community[2] and therefore accepted expert testimony in criminal and civil rights litigation.[3]

This research has analyzed numerous police-induced false confessions and identified the personal and situational factors associated with, and believed to cause, false confessions.[4] The fact that police-induced false confessions can and do occur has been well-documented and is not reasonably disputed by anyone in the law enforcement or academic community. Social scientists have documented hundreds of false confessions in America since the early 1970s,[5] but this is surely an underestimate and thus the tip of a much larger iceberg for multiple reasons. First, false confessions are difficult for researchers to discover because neither the state nor any

---

[2] See Saul Kassin, Allison Redlich, Fabiana Alceste and Timothy Luke (2018). "On the General Acceptance of Confessions Research: Opinions of the Scientific Community" *American Psychologist*, 73, 63-80.

[3] See Harris v. City of Chicago, 14 C 4391, 2017 WL 2436316, at *9 (N.D. Ill. June 5, 2017) (finding false confession expert Richard Leo's methodology to be "sound, accepted and reliable" and that he could testify as to the reliability of the plaintiff's confession); *Kluppelberg v. Burge*, 13 C 3963, 2016 WL 6821138, at *4-*5 (N.D. Ill. Sept. 16, 2016) (denying defendants' motion to bar the testimony of plaintiff's false confession expert Richard Ofshe as his methodology is "sound" and could be applied to the facts of the case); *Caine v. Burge*, 11 C 8996, 2013 WL 1966381, at *3 (N.D. Ill. May 10, 2013) (denying defendants' motion to bar the testimony of Richard Leo); *Scott v. City of Chicago*, 07 C 3684, 2010 WL 3034254, at *5 (N.D. Ill. Aug. 3, 2010) (denying defendants' motion to bar the testimony of Richard Ofshe); *United States v. Hall*, 974 F. Supp. 1198, 1206 (C.D. Ill. 1997) , *aff'd,* 165 F.3d 1095 (7th Cir. 1999) (denying the Government's motion to bar the testimony of a criminal defendant's expert, Dr. Richard Ofshe).

[4] See Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); and Gisli Gudjonsson (2003). THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc.).

[5] The largest published study of false confessions to date is Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA World" *North Carolina Law Review*, 82, 891-1007. For a review of the literature documenting proven false confessions, *see* Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press). Since 2004, Steve Drizin, Gillian Emmerich, Amy Shlosberg and I have collected an additional two-hundred and fifty false confessions that are the subject of an academic article we are currently drafting but have not yet submitted for publication.

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 9

organization keeps records of the interrogations producing them. Second, even when they are discovered, false confessions are notoriously hard to establish because of the factual and logical difficulties of establishing the confessor's factual innocence to an absolute certainty. As a result, Richard Ofshe and I coined the term "*proven* false confession" in 1998,[6] showing that there are four ways in which a disputed confession can be classified as proven beyond any doubt to be false:

1)  When it can be objectively established that the suspect confessed to a crime that did not happen;

2)  When it can be objectively established that it would have been physically impossible for the confessor to have committed the crime;

3)  When the true perpetrator is identified and his guilt is objectively established; and/or

4)  When scientific evidence dispositively establishes the confessor's innocence.

However, only a small number of cases involving a disputed confession will ever come with independent case evidence that allows the suspect to prove his innocence beyond dispute because doing so is akin to proving the negative. The documented number of false confessions in the scientific research literature is, therefore, a dramatic undercount of the actual false confessions that police have elicited in the United States in recent decades. There have almost certainly been far more police-induced false confessions than researchers have been able to discover and classify as false. Indeed, in a survey of police that my colleagues and I published in 2007, police investigators themselves estimated that they elicited false confessions in 4.78% of their interrogations.[7] If this estimate is accurate, American police elicit tens, if not hundreds, of thousands of false confessions every year.

The subject of police interrogation and false confessions is beyond common knowledge and highly counter-intuitive.[8] Police detectives receive specialized training in psychological

---

[6]   Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation." *The Journal of Criminal Law and Criminology*. Vol. 88, No. 2. Pp. 429-496.

[7]   Saul Kassin, Richard Leo, Christian Meissner, Kimberly Richman, Lori Colwell, Amy-May Leach, and Dana La Fon (2007). "Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs" *Law and Human Behavior*, 31, 381-400.

[8]   *See* Danielle Chojnacki, Michael Cicchini and Lawrence White (2008). "An Empirical Basis for the Admission of Expert Testimony on False Confessions" *Arizona State Law Journal*, 40, 1-45; Richard A. Leo and Brittany Liu (2009). "What Do Potential Jurors Know About Police Interrogation and False Confessions?" *Behavioral Sciences and the Law*, 27, 381-399; Linda Henkel, Kimberly Coffman, and Elizabeth Dailey (2008). "A Survey of People's Attitudes and Beliefs About False Confessions," *Behavioral Sciences and the Law*, 26, 555-584; Iris Blandon-Gitlin, Kathryn Sperry, and Richard A. Leo (2011). "Jurors Believe Interrogation Tactics Are Not Likely to Elicit False Confessions: Will Expert Witness Testimony Inform Them Otherwise?" *Psychology,*

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 10

interrogation techniques; most people, including most jurors, do not know what these techniques are or how the techniques are designed to work (*i.e.*, move a suspect from denial to admission). In addition, most people also do not know what psychological coercion is, why some techniques are regarded as psychologically coercive, and what their likely effects are. Moreover, most people do not know which interrogation techniques create a risk of eliciting false confessions or how and why the psychological process of police interrogation can, and sometimes does, lead suspects to falsely confess. This unfamiliarity causes most people to assume that virtually all confessions are true.

### V. The Social Psychology of Police Interrogation[9]

Police interrogation is a cumulative, structured, and time-sequenced process in which detectives draw on an arsenal of psychological techniques in order to overcome a suspect's denials and elicit incriminating statements, admissions, and/or confessions. This is the sole purpose of custodial interrogation (as opposed to interviews). To achieve this purpose, interrogators use techniques that seek to influence, persuade, manipulate, and deceive suspects into believing that their situation is hopeless and that their best interest lies in confessing.[10] Sometimes, however, interrogators cross the line and employ techniques and methods of interrogation that are coercive and increase the likelihood of eliciting false confessions or statements.

Dating back to the early 1940s, psychological interrogation methods in the United States have been structured to persuade a rational guilty person who knows he is guilty to rethink his initial decision to deny culpability and choose instead to confess.[11] Police interrogators know that it is not in any suspect's rational self-interest to confess. They expect to encounter resistance and denials to their allegations, and they know that they must apply a certain amount of interpersonal pressure and persuasion to convince a reluctant suspect to confess. As a result, interrogators have, over the years, developed a set of subtle and sophisticated interrogation techniques whose purpose is to alter a guilty suspect's perceptions so that he will see the act of confessing as being in his self-interest.

These interrogation techniques were developed for the purpose of inducing guilty individuals to confess to their crimes, and police are admonished in their training to use them

---

*Crime and Law*, 17, 239-260; and Mark Costanzo, Netta Shaked-Schroer and Katherine Vinson (2010). "Juror Beliefs About Police Interrogation, False Confession and Expert Testimony" *The Journal of Legal Empirical Studies,* 7, 231-247.

[9]  *See* Richard A. Leo (2009). "False Confessions: Causes, Consequences and Implications" *Journal of the American Academy of Psychiatry and Law*, 37, 332-343.

[10]  Deborah Davis and William O'Donohue (2004). "The road to perdition: Extreme influence tactics in the interrogation room" in William O'Donohue, ED. (2004). *Handbook of Forensic Psychology* (San Diego: Academic Press) at 897-996.

[11]  Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATON AND CONFESSIONS, 3rd Edition (The Williams and Wilkins Company).

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 11

only on suspects believed to be guilty.[12]  When these same techniques are used on innocent suspects, they carry the risk that they will elicit false statements, admissions and/or confessions.

The goal of an interrogator is to persuade a suspect to view his immediate situation differently by focusing the suspect's attention on a limited set of choices and alternatives, and by convincing him of the likely consequences that attach to each of these choices.  The process often unfolds in two steps: first, the interrogator causes the suspect to view his situation as hopeless; and, second, the interrogator persuades the suspect that only by confessing will the suspect be able to improve his otherwise hopeless situation.  The interrogator makes it clear what information he is seeking and attempts to convince the suspect that his only rational option is to confirm the information the interrogator purports to already know.

The first step or stage of an interrogation consists of causing a suspect to view his situation as hopeless.  If the interrogator is successful at this stage, he will undermine the suspect's self-confidence and cause the suspect to reason that there is no way to escape the interrogation without incriminating himself.  To accomplish this, interrogators accuse the suspect of having committed the crime; they attack and try to undermine a suspect's assertion of an alibi, alternate sequence of events, or verbalization of innocence (pointing out or inventing logical and factual inconsistencies, implausibilities, and/or impossibilities); they exude unwavering confidence in their assertions of the suspect's and his accomplices' guilt; they refuse to accept the possibility of the suspect's denials; and, most importantly, they confront the suspect with incontrovertible evidence of his guilt, whether real or non-existent.  Because interrogation is a cumulative and time-sequenced process, interrogators often draw on these techniques repeatedly and/or in succession, building on their earlier accusations, challenges and representations at each step in the interrogation process.

Through the use of these techniques, the interrogator communicates to the suspect that he has been caught, that there is no way he will escape the interrogation without incriminating himself and other suspects, and that his future is determined—that regardless of the suspect's denials or protestations of innocence, he is going to be arrested, prosecuted, convicted, and punished.  The interrogator seeks to convince the suspect that this is a fact that has been established beyond any doubt, and thus that any objective person must necessarily reason to this conclusion.  By persuading the suspect that he has been caught, that the existing evidence or case facts objectively prove his guilt, and that it is only a matter of time before he will be prosecuted and convicted, the interrogator seeks to alter the suspect's perceptions, such that he comes to view his situation as hopeless and to perceive that resisting the interrogator's demands is futile.

---

[12]  *See* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013).  CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition ( Jones & Bartlett Learning) at 187 ("These nine steps are presented in the context of the interrogation of suspects whose guilt seems definite or reasonably certain").  For empirical support for this observation, *see* Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 12

Once the interrogator has caused the suspect to understand that he has been caught and that there is no way out of this predicament, the interrogator seeks to convince the suspect that the only way to improve his otherwise hopeless situation is by confessing to the offense(s) of which he is accused and confirming the information the interrogator is seeking to extract from the suspect. The second step of the interrogation thus consists of offering the suspect inducements to confess—reasons or scenarios that suggest the suspect will receive some personal, moral, communal, procedural, material, legal or other benefit if he confesses to the interrogator's version of the offense. One goal of these scenarios or inducements is to downplay both the seriousness of the alleged crime and the suspect's role in the alleged crime as well as the consequences of confessing, leading the suspect to perceive that the consequences of continuing to deny the accusations will be worse than the consequences of admitting to participation in the crime. The interrogator's attempt to diminish the suspect's perception of the consequences of confessing is combined with techniques that are designed to increase the suspect's anxiety in order to create the perceived need for release from the stress of prolonged interrogation. [13] Investigators also use scenarios to plant ideas or suggestions about how or why the suspect may have committed the crime which they may later pressure the suspect to accept and repeat.

Researchers have classified the types of inducements investigators use during the second step of interrogation into three categories: *low-end* inducements, *systemic* inducements, and *high-end* inducements.

*Low-end* inducements refer to interpersonal or moral appeals the interrogator uses to convince a suspect that he will feel better if he confesses. For example, an interrogator may tell a suspect that the truth will set him free if he confesses, that confessing will relieve his anxiety or guilt, that confessing is the moral or Christian thing to do, or that confessing will improve his standing in the eyes of the victim or the eyes of the community.

*Systemic* inducements refer to appeals that the interrogator uses to focus the suspect's attention on the processes and outcomes of the criminal justice system in order to get the suspect to come to the conclusion that his case is likely to be processed more favorably by all actors in the criminal justice system if he confesses. For example, an interrogator may tell a suspect that he is the suspect's ally and will try to help him out—both in his discussions with the prosecutor as well as in his role as a professional witness at trial—but can only do so if the suspect first admits his guilt. Or the interrogator may ask the suspect how he expects the prosecutor to look favorably on the suspect's case if the suspect does not cooperate with authorities. Or the interrogator may ask the suspect what a judge and jury are really going to think, and how they are likely to react, if he does not demonstrate remorse and admit his guilt to authorities.

---

[13]   See Brian Jayne (1986). "The Psychological Principles of Criminal Interrogation," in Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Baltimore, MD: Williams & Wilkins) at 332. ("The goal of interrogation is therefore to decrease the suspect's perception of the consequences of confessing, while at the same time increasing the suspect's internal anxiety associated with his deception.").

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 13

Interrogators often couple the use of *systemic* incentives with the assertion that this is the suspect's one and only chance—now or never—to tell his side of the story; if he passes up this opportunity, all the relevant actors in the system (police, prosecutor, judge and jury) will no longer be open to the possibility of viewing his actions in the most favorable light. This tactic may incentivize a suspect to either falsely confess or confirm an incorrect story for the interrogator based on the belief that the suspect will not have the same opportunity to help himself again in the future. Interrogators rely on *systemic* inducements to persuade the suspect to reason to the conclusion that the justice system naturally confers rewards for those who admit guilt, demonstrate remorse, and cooperate with authorities, whereas it inevitably metes out punishment for those who do not.

Finally, *high-end* inducements refer to appeals that directly communicate the message that the suspect will receive less punishment, a lower prison sentence and/or some form of police, prosecutorial, judicial or juror leniency if he complies with the interrogator's demand that he confess, but that the suspect will receive a higher sentence or greater punishment if he does not comply with the interrogator's demand that he confess. High-end inducements may either be implicit or explicit: the important question is whether the interrogation technique communicates the message, or is understood to communicate the message, that the suspect will receive a lower criminal charge and/or lesser punishment if he confesses as opposed to a higher criminal charge and/or greater amount of punishment if he does not.

Explicit *high-end* inducements can include telling a suspect that there are several degrees of the alleged offense, each of which carry different amounts of punishment, and asking the suspect which version he would like to confess to. Or the interrogator may explicitly tell the suspect that he will receive a long prison sentence—or perhaps even the death penalty—if he does not confess to the interrogator's version of events. The interrogator may also point out what happens to men of the suspect's age, or men accused of crime, in prison if the suspect does not confess to the interrogator's minimized account. Sometimes interrogators who rely on *high-end* inducements will present the suspect with a simple two-choice situation (good vs. bad): if the suspect agrees to the good choice (a minimized version of the offense, such as involuntary manslaughter or self-defense, or the implication of another person), he will receive a lower amount of punishment or no punishment at all; but if he does not confess right then, criminal justice officials will impute to him the bad choice (a maximized version of the offense, such as pre-meditated first degree murder, or that the suspect was acting alone), and he will receive a higher level of punishment, or perhaps the harshest possible punishment.[14] The purpose of *high-end* inducements is to communicate to a suspect that it is in his rational self-interest to confess to the minimized or less-incriminating version of events that the interrogator is suggesting because if the suspect does so, he will receive a lower charge, a lesser amount of punishment and/or no

---

[14] This technique is sometimes referred to in the academic literature as the maximization/minimization technique. *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 14

time in prison, but if he fails to do so, he will receive a higher charge, a greater amount of punishment and more time in prison, perhaps even the death penalty.

To evaluate whether a particular interrogation was psychologically coercive, an expert must evaluate the interrogator's techniques, methods, and strategies in the light of the generally accepted findings of the social science research literature on the subjects of interrogation, coercive influence techniques, and confessions.

Social science research has repeatedly demonstrated that some *systemic* inducements (depending on the content of the inducement, how explicitly or vaguely it is stated, and the message that it communicates) and all *high-end* inducements are coercive because they rely on implicit and/or explicit promises of leniency and threats of harm to induce compliance. *Systemic* and *high-end* inducements increase the likelihood of eliciting false confessions and false statements from suspects because of the *quid pro quo* arrangement and the benefit a suspect expects to receive in exchange for the information the interrogator is seeking, regardless of whether the suspect knows that information to be true or not. Such promises of leniency and threats of harm are regarded as coercive in the social science literature because of the messages they convey and their demonstrated impact on the decision-making of individuals. The expert may also evaluate whether the interrogation techniques, either individually or cumulatively, had the effect of causing a suspect to perceive that he had no choice but to comply with the demands of the interrogator, and thus, the interrogation, in effect, overbore the suspect's will.

## VI. The Three Types of False Confessions

False confessions and false statements, of course, will occur in response to traditionally-coercive methods of interrogation such as the use of physical violence, threats of immediate physical harm, excessively long or incommunicado interrogation, or deprivation of essential necessities such as food, water, and/or sleep. However, these types of traditionally coercive techniques no longer appear to be common in the United States. The psychological techniques of interrogation that cross the line and sometimes cause false confessions typically involve one of two patterns: (1) the interrogator communicates to the suspect, implicitly or explicitly, that he will receive a higher charge and harsher sentence or punishment if he does not provide a satisfactory statement, but that he will receive a lesser charge or sentence, or perhaps no punishment at all, if he does; or (2) the interrogator wears down and distresses the suspect to the point that the suspect subjectively feels that he has no choice but to comply with the interrogator's demands if he is to put an end to the intolerable stress of continued interrogation and/or escape the oppressive interrogation environment.

Whether a police-induced false confession or statement is caused primarily by coercive interrogation techniques or by a suspect's pre-existing vulnerabilities to interrogation, or some combination of both, there are three fundamental types of false confessions and statements: a *voluntary* false confession or statement (*i.e.*, a false confession knowingly given in response to little or no police pressure); a *coerced-* or *stress-compliant* false confession or statement (*i.e.*, a

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 15

false confession knowingly given to put an end to the interrogation or to receive an anticipated benefit or reward in exchange for confession); and a *coerced-* or *non-coerced-persuaded* false confession or statement (*i.e.*, a confession given by a suspect who comes to doubt the reliability of his memory and thus comes to believe that he may have committed the crime, despite no actual memory of having done so).[15] These different types of false confession typically involve different levels of police pressure, a different psychology of influence and decision-making, and different beliefs about the likelihood of one's guilt.

### VII. The Three Sequential Police Errors
### That Can Lead to False (But Sometimes Detailed) Confessions

There are three important decision points in the interrogation process that are known to be linked to false confessions or statements. The first decision point is the police decision to classify someone as a suspect. This is important because police only *interrogate* individuals whom they first classify as suspects; police *interview* witnesses and victims. There is a big difference between interrogation and interviewing: unlike interviewing, an interrogation is accusatory, involves the application of specialized psychological interrogation techniques, and the ultimate purpose of an interrogation is to get an incriminating statement from someone whom police believe to be guilty of the crime. False confessions or statements occur when police misclassify an innocent suspect as guilty and then subject him to a custodial interrogation, and are satisfied with elicitation of a version of events that, in fact, is not true. This is called *the misclassification error*. It is one reason why interrogation training manuals implore detectives to investigate their cases before subjecting any potential suspect to an accusatorial interrogation.[16]

The second important decision point in the process occurs when the police interrogate the suspect. Again, the goal of police interrogation is to elicit an incriminating statement from the suspect by moving him from denial to admission. To accomplish this, police use psychologically-persuasive, manipulative, and deceptive interrogation techniques. As described in detail in the previous sections, police interrogators use these techniques to accuse the suspect of committing the crime, to persuade him that he is caught and that the case evidence overwhelmingly establishes his guilt, and then to induce him to confess by suggesting it is the best course of action for him, sometimes resulting in false confessions from innocent suspects.

---

[15]  *See* Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251.

[16]  *See* Fred Inbau and John Reid (1967). CRIMINAL INTERROGATION AND CONFESSIONS, 2nd Edition (Williams & Wilkins) at 13-15 ("Prior to the interrogation, and preferably before any contact with the suspect, become thoroughly familiar with all the known facts and circumstances of the case…. All too often, time and effort are unnecessarily expended in the interrogation of a suspected innocent person when an alibi check could have readily established the fact of his innocence."). *See also* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 18 ("One basic principle to which there must be full adherence is that the interrogation of suspects should follow, and not precede, an investigation conducted to the full extent permissible by the allowable time and circumstances of the particular case. The authors suggest, therefore, that a good guideline to follow is "investigate before you interrogate").

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 16

This is called *the coercion error*. However, properly trained police interrogators do not use physically- or psychologically-coercive techniques because they may result in involuntary and/or unreliable incriminating statements, admissions, and/or confessions.[17]

      The third important decision point in the interrogation process occurs after the police have elicited an admission—an "I did it" statement—from the suspect. This is referred to as the post-admission phase of the interrogation. The post-admission phase of the interrogation is important because it is here that the police can acquire information and evidence that will either support or not support the accuracy of the suspect's admission. Properly-trained police interrogators should know that innocent people sometimes falsely confess to crimes they did not commit. Although the "Reid" Manual[18] did not include a full chapter on false confessions until the Fourth Edition in 2001, the need for police interrogators to be diligent to avoid false confessions has been present for decades. From the very first manual in 1942 and in all subsequent editions (1948, 1953, 1962, 1967, 1986, 2001 and 2013), it has repeatedly implored interrogators not to use any methods that are "apt to make an innocent person confess to a crime he did not commit," such as "the use of force, threats, o promises of leniency," suggesting that interrogators do know that suspects can be made to falsely confess to crimes they did not commit.

      Properly-trained interrogators also know that guilty suspects sometimes implicate others for crimes they themselves committed in order to diminish their role in the crime.[19] Interrogators therefore will seek to elicit information (that is not generally known and cannot likely be guessed by chance) from the suspect that either demonstrates, or fails to demonstrate, independent knowledge of the crime scene details and case facts. Properly-trained interrogators, therefore, will not ask leading or suggestive questions and will not educate the suspect about details of the victim's allegations or of the alleged crime. This is called *the contamination error*. Instead, properly trained interrogators will let the suspect supply the details of the case independently. Properly-trained interrogators will also seek to test the suspect's post-admission account against the physical and other credible evidence. Truthful confessions and statements are typically corroborated by solid physical evidence and independent knowledge of underlying case facts that have not been suggested to the suspect; false confessions and false statements are not.[20]

---

[17]   Fred Inbau and John Reid (1967). CRIMINAL INTERROGATION AND CONFESSIONS, 2nd Edition (Williams & Wilkins), at 114-115, 198-200.

[18]   Fred Inbau and John Reid (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins).

[19]   Fred Inbau and John Reid (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins).

[20]   Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and Criminology*, 88, No. 2 at 429-496. This observation has been made in the police interrogation training literature as well. *See also* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 354-360.

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 17

### VIII. Populations with Particular Vulnerability in the Interrogation Room

While coercive and/or improper interrogation techniques are often the primary cause of false confessions, certain types or groups of individuals are far more vulnerable to the pressures of interrogation, having their will overborne and/or making a false confession, particularly when subjected to the coercive interrogation techniques described above. These include individuals who have intellectual disabilities or disorders or are mentally ill, and therefore may confess falsely because they are easily confused, disoriented, delusional or experiencing a non-rational emotional or mental state. These vulnerable groups also include juveniles (traditionally meaning individuals under age 18; however the adolescent brain continues to develop until the age of 25) and individuals with a low IQ or low-level cognitive functioning, who may be more vulnerable to interrogators because of their inability to understand the nature or gravity of their situation, their inability to foresee the consequences of their actions, their inability to cope with stressful situations and/or their eagerness to please others, especially authority figures. Juveniles and young adults may also be more easily intimidated than older adults and may lack the maturity, knowledge, or sense of authority needed to resist even simple police pressures and manipulations. Finally, these also include individuals who, by their nature and personality, are naive, passive, avoidant, excessively trusting of authority, highly suggestible and/or highly compliant and who are therefore predisposed to believe that they have no choice but to comply with the demands of authorities or who simply lack the psychological resources to resist the escalating pressures of accusatorial interrogation.

### IX. Evaluating the Reliability of Incriminating Statements, Admissions and Confessions

In addition to studying the psychology of police interrogation and the correlates and causes of false confessions from the innocent, scientific researchers have also analyzed the patterns, characteristics and indicia of reliability in true and false confession cases. To evaluate the likely reliability or unreliability of an incriminating statement, admission or full confession from a suspect, scientific researchers analyze the fit between the suspect's post-admission narrative and the crime facts and/or corroborating evidence derived from the confession (*e.g.*, location of the missing murder weapon, loot from a robbery, the victim's missing clothing, etc.).[21]

The purpose of evaluating the fit between a suspect's post-admission narrative and the underlying crime facts and derivative crime evidence is to test the suspect's actual knowledge of the crime. If the suspect's post-admission narrative corroborates details only the police know, leads to new or previously undiscovered evidence of guilt, explains apparent crime fact

---

[21]  *See* Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251; and Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and Criminology*, 88, No. 2. at 429-496.

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 18

anomalies and is corroborated by independent facts and evidence, then the suspect's post-admission narrative objectively demonstrates that he possesses the actual knowledge that would be known only by the true perpetrator and therefore is strong evidence of guilt. If the suspect cannot provide police with the actual details of the crime, fails to accurately describe the crime scene facts, cannot lead the police to new or derivative crime evidence, and/or provides an account that contains factual errors and is disconfirmed by the independent case evidence, then the suspect's post-admission narrative demonstrates that he fails to possess the actual knowledge that would be known only by the true perpetrator and is therefore strongly consistent with innocence. Indeed, absent contamination (*i.e.*, the leaking and disclosing of non-public crime facts that cannot easily be guessed by chance), the fit between the suspect's post-admission narrative and both the crime scene facts and the derivative crime evidence therefore provides an objective basis for evaluating the likely reliability of the suspect's incriminating statements.

The well-established and widely accepted social science research principle of using the fit standard to evaluate the validity of a confession statement is also a bedrock principle of criminal investigation within law enforcement. Well-trained police detectives realize that an "I did it" statement is not necessarily evidence of guilt and may, instead, turn out to be evidence of innocence.[22] For example, in high-profile murder cases, police regularly screen out volunteered confessions by seeing whether or not the person can tell the police details known only to the perpetrator or lead the police to derivative crime evidence that either corroborates, or fails to demonstrate, the person's guilty knowledge.[23] Police often keep particularly heinous or novel aspects of the crime from the press so that they can be used to demonstrate a confessor's guilty knowledge. Police sometimes deliberately include an error in media releases or allow incorrect statements to go uncorrected so that a true perpetrator will be able to demonstrate his personal knowledge of the crime. In other types of cases, police detectives regularly rely upon the fit standard to identify a true admission that might be mixed in with a collection of volunteered statements.

Using the fit standard to evaluate the validity of a suspect's incriminating statements, admissions or confessions is a bedrock principle of law enforcement because police detectives realize that seeking corroboration during the post-admission phase of interrogation is essential to proper investigative work.[24] This is because it is a fundamental principle of police investigation that true explanations can be supported and false explanations cannot be supported (assuming no

---

[22] Fred Inbau and John Reid (1967). CRIMINAL INTERROGATION AND CONFESSIONS, 2nd Edition (Williams & Wilkins).

[23] Fred Inbau, John Reid, and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins) at 173 ("The interrogator should attempt to develop information that can be corroborated by further investigation, and he should seek from the suspect full details of the crime and also about his subsequent activities. What should be sought particularly are facts that would only be known by the guilty person (*e.g.*, information regarding the location of the murder weapon or the stolen goods, the means of entry into the building, the type of accelerant used to start the fire, and the type of clothing on the victim").

[24] Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 354-360.

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 19

contamination has occurred), and because false explanations will not fit the facts of the crime, lead to derivative evidence or be corroborated by independent evidence.

Moreover, post-admission narrative analysis and the fit standard are central to proper criminal investigation because well-trained detectives should realize that the purpose of detective work is not to clear a crime or get a conviction, but to carefully collect evidence in a way that will lead to the arrest, prosecution and conviction of the guilty while at the same time ensuring that no innocent individual is wrongly arrested, prosecuted or convicted.

A suspect's post-admission narrative therefore provides potential evidence to the unbiased, well-trained detective who is seeking to ferret out the truth. If the suspect is guilty, the collection of a detailed post-admission narrative will allow the detective to establish the suspect's guilt beyond question, both by demonstrating the suspect's actual knowledge and by corroborating the suspect's statements with derivative evidence. Properly-trained detectives realize that the strongest form of corroboration comes through the development of new evidence using a suspect's post-admission narrative. While it is not possible to verify every post-admission narrative with the crime facts, a skillful interrogator will seek as much verifiable information about the crime as he can elicit. The more verifiable information elicited from a suspect during the post-admission period, and the better it fits with the crime facts, the more clearly the suspect demonstrates his responsibility for the crime.

If the suspect is innocent, the detective can use the suspect's post-admission narrative to establish his lack of knowledge and thus demonstrate his likely or certain innocence. Whereas a guilty suspect can corroborate his admission because of his actual knowledge of the crime, the innocent suspect cannot. The more information the interrogator seeks, the more frequently and clearly an innocent suspect will demonstrate his ignorance of the crime. His answers will turn out either to be wrong, to defy evaluation, or to be of no value for discriminating between guilt and innocence. Assuming that neither the investigator nor the media have contaminated the suspect by transferring information about the crime facts, or that the extent of contamination is known, the likelihood that his answers will be correct should be no better than chance. Absent contamination, the only time an innocent person will contribute correct information is when he makes an unlucky guess. The likelihood of an unlucky guess diminishes as the number of possible answers to an investigator's questions grows large. If, however, his answers about missing evidence are proven wrong, he cannot supply verifiable information that should be known to the perpetrator, and he inaccurately describes verifiable crime facts, then the post-admission narrative provides evidence of innocence.

This, of course, assumes that the suspect's knowledge of the crime has not been contaminated by the media, community gossip, the police or some other source with inside knowledge about crime details. If a suspect has learned unique or non-public crime facts from one of these sources, then the fact that his confession contains these details is, of course, not indicative of pre-existing knowledge or probative of guilt. This is an important point to emphasize because an innocent suspect's confession, if contaminated, will often contain both

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 20

inaccurate as well as accurate crime facts—inaccurate because the innocent suspect lacks personal knowledge of the crime details, accurate because these crime details have been suggested to him by third parties or the police interrogators, even if inadvertently. This problem is discussed in detail in the following section.

## X. The Problem of Police Interrogation Contamination and Scripting

The post-admission narrative process is about more than merely eliciting information from the suspect. Investigators in practice have been observed to shape the suspect's narrative to make the confession as persuasive as possible and to enhance the chances of conviction.[25] In this way, confessions are scripted or constructed by interrogators. A persuasive crime narrative requires an explanation of why the crime happened—the motives and explanations of the suspect for committing the crime. It also should contain a statement of the suspect's emotions, not only his emotions at the time of committing the crime, but also the shame, regret, or remorse the suspect now feels for having committed the crime. Interrogators are also trained to get the suspect to cleanse the interrogation process, usually by providing statements to the effect that the confession was voluntary. Interrogators will ask the suspect, usually after the suspect's resistance has been broken down and he has been made to believe that it is in his best interests to confess, whether the suspect was treated well, given food and drink, bathroom breaks, and other comforts, and whether any promises or threats were made to the suspect. Finally, and perhaps most importantly, interrogators seek to ensure that the confession contains both general and specific crime knowledge—the details of the crime that only the true perpetrator should know.

The problem of contamination in false confession cases arises when the interrogator pressures a suspect during the post-admission narrative phase to accept a particular account of the crime story—one that usually squares with the interrogator's theory of how the crime occurred—and then suggests crime facts to the suspect, leads or directs the suspect to infer correct answers, and sometimes even suggests plausible motives for committing the crime.[26] Because they are trained to presume the guilt of those whom they interrogate, police assume that they are interrogating suspects who already know the correct crime facts. But this is not true when they are mistakenly interrogating an innocent person.

Instead, the innocent suspect is often pressured to use facts disclosed to him by his interrogators in order to construct a plausible-sounding confession and post-admission narrative. Indeed, the presence of these details in the suspect's confession falsely gives the suspect's narrative credibility and the appearance of corroboration. After police interrogators have contaminated the suspect with non-public crime facts, they often attribute "guilty knowledge" to the suspect when he repeats back and incorporates into his confession the very facts that they first educated him about. One researcher has called these contaminated details "misleading

---

[25]  Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press) at 165-194.

[26]  Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 21

specialized knowledge."[27] In many false confession cases, police and prosecutors argue that the suspect's confession corroborates his guilt because he "knows facts only the true perpetrator would know," even though the suspect first learned these facts from his interrogators.

Researchers have found that contamination by police regularly occurs in interrogation-induced false confession cases. In a study of the first two-hundred and fifty (250) post-conviction DNA exonerations of innocent prisoners in the American criminal justice system, Professor Brandon Garrett of the University of Virginia Law School showed that this pattern was present in 95% of the false confession cases in this data set (38 of 40 cases). In other words, in the overwhelming majority of these proven false confession cases, police interrogators fed the suspect unique non-public facts that "only the true perpetrator would know," but the prosecutor erroneously alleged that the suspect volunteered these facts and that the suspect thereby corroborated the reliability of his confession. But because the jury in each case mistakenly believed the prosecutor rather than the defense, each of the confessors was convicted, and in each of these cases the defendant's innocence (and the falsity of the confession) was only proven many years later by DNA.[28] In a recent follow-up study more recent false confession DNA exonerations, Garrett found that another 21 of 23 (91%) were contaminated.[29]

In sum, the problem of contamination means that when applying the fit test to assess the reliability of the confession, it is essential to separate out the contaminated facts from the facts that unquestionably were provided by the defendant.

## XI. The Multiple Interrogations and Confession Statements of William Amor

### A) Introduction

Because only 23 minutes of William Amor's 15 hours of detention and questioning (from 2:15 pm on October 3, 1995 to 5:20 a.m. on October 4, 1995) were selectively recorded, there is no objective record of virtually all of the multiple interrogation sessions that resulted in Mr. Amor's confession statements to Detectives Guerrieri and Cross, as well as ASA Nigohosian, in the early morning hours of October 4, 1995 (nor were any of the police interviews, polygraph sessions or interrogations of William Amor on September 11, 12, 14 and 15, 1995 recorded by Naperville police and their agents). Prior to Mr. Amor's partially recorded confession statement by ASA Nigohosian on October 4, 1995, the only (highly imperfect) record that exists of Mr. Amor's multiple interrogations is the recollections of the various participants: William Amor and detectives Cross, Guerrieri, Sullivan, Cunningham, Carlson, polygraphers O'Brien and Masokas, and ASA Nigohosian, all of whom testified about their recollections, or absence of recollections, of what occurred during William Amor's interrogation sessions at his pre-trial

---

[27] Gisli Gudjonsson (2003). THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc.).

[28] Brandon Garrett (2011). CONVICTING THE INNOCENT (Harvard University Press).

[29] Brandon Garrett (2015). "Contaminated Confessions Revisited" *University of Virginia Law Review*, 101, 395-454.

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 22

hearings, at trial, and/or subsequently in deposition testimony in this case. Not surprisingly, this case therefore presents a classic swearing contest: the accounts provided by William Amor and the various interrogating detectives, the polygrapher and ASA of what occurred during these multiple interrogation sessions are dramatically different.

I am neither a fact witness nor a finder of fact, and therefore it is not my role in this case to decide whose version of the facts is more accurate. I therefore cannot opine about whose account of what occurred during the multiple off-tape interrogation sessions is more factually accurate. I can only evaluate the accounts provided by the various participants of these off-tape interrogations in light of decades of empirical social science research on the psychology, practice, and effects of American police interrogation and the elicitation of confession evidence. In the remainder of this section of the report, I will apply the findings of this empirical social science literature to each set of accounts of William Amor's interrogation (focusing almost exclusively on his 15 hours of interrogation and detention/custody on October 3-4, 1995), and discuss the implications and concerns that they raise for each set of accounts and offer my professional expert opinions.

### B) William Amor's Description of His Interrogations on October 3-4, 1995

William Amor was questioned on September 11th, 12th, 14th and 15th by Naperville police detectives. On October 3, 1995, when he was released from DeKalb County jail, Mr. Amor was met in the jail lobby by Detectives Cross and Guerrieri at approximately 2:00-2:15 p.m. According to Mr. Amor, he was told by the detectives that they had pre-arranged a polygraph for him at Reid and Associates in Chicago. The detectives told him it was in his best interest to go with them, and Mr. Amor perceived that he had no choice, that he was in custody. The car ride from the DeKalb County jail in Sycamore, Illinois to Chicago was approximately an hour to an hour and a half. Mr. Amor believes that the detectives arrived at Reid and Associates at around 4 p.m., and that he was placed in the foyer for approximately a half hour before the polygraph-interrogation sessions began.

At approximately 4:40, Mr. Amor was greeted by Michael Masokas, a polygrapher-interrogator at Reid and Associates and subjected to a polygraph-interrogation process for approximately the next 6 hours. During this approximate six-hour period, Mr. Amor was questioned and interrogated in what is traditionally described as the three phases of the polygraph process (pre-polygraph interview, administration of polygraph examination, post-polygraph interview/interrogation), then interrogated again by Mr. Masokas and fellow Reid polygrapher-interrogator Arthur Newey, and then interrogated by Detectives Cross and Guerrieri at Reid and Associates until approximately 10:30 when Mr. Newey had to close the office at Reid and Associates. During the more than 8 hours from the time the detectives picked up Mr. Amor to the end of his multiple interrogation sessions at Reid and Associates in Chicago, Mr. Amor states that he repeatedly told detectives and Mr. Masokas that he was hungry and that he was tired, though he was not given food. Mr. Amor also states that at Reid and Associates he

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 23

was repeatedly accused of lying and that the interrogations became "very heated" when denying the accusations that he had set the fire that resulted in the death of Marianne Miceli.

At approximately 10:30, Detectives Cross and Guerrieri drove Mr. Amor back to the Naperville Police Department, arriving at approximately 11:30. During the car ride, again Mr. Amor states that he felt trapped and assumed he was in custody. During the car ride, Detective Cross told Mr. Amor that when they got back to Naperville, he better come clean. According to Mr. Amor, he repeatedly told Detectives Cross and Guerrieri that he was extremely tired. Shortly after they arrived at the Naperville Police Department, Mr. Amor was interrogated again. The Miranda form that Mr. Amor signed indicates a time of 11:37, though Mr. Amor recalls being interrogated approximately 15-20 minutes prior to the Miranda waiver. By then Mr. Amor – who reports that he had only received 2 ½ - 3 ½ hours of sleep the night before and had felt tired and nauseous, developed a bad headache. Sometime after the 11:30-ish interrogation at Naperville Police Department had begun, a process server arrived at the Naperville, Police Department and served Mr. Amor with divorce papers at approximately 11:55 p.m., causing Mr. Amor to cry. Prior to that, Detectives Cross had told Mr. Amor that his wife Tina had told Detective Sullivan that she now believed that Mr. Amor intentionally set the fire that killed her mother (though she had just changed her opinion after speaking to friends of hers who attacked Mr. Amor's personality, Tina Miceli at that time had come to believe that Mr. Amor unintentionally started the fire).

Mr. Amor describes that this interrogation went on for another or so before he completely fell apart, and told the detectives whatever they wanted to hear just to get them away from them. During this time, Mr. Amor reports that Detective Cross had grabbed him by the shoulders, lifting him out of his chair, violently shook him, and caused him to hit his head against the wall, making him dizzy. While Detective Cross was physically assaulting Mr. Amor, Detective Cross was yelling at Mr. Amor that if he did not tell Detective Cross      the truth, he was "going to kick my fuckin' ass" (Deposition of William Amor, P. 14). Mr. Amor describes the shaking as "rather severe," and at that point (approximately 1 p.m. on October 4, 1995) had a terrible headache, which he attributed not only to being detained and/or coercively interrogated by multiple investigators (Cross, Guerrieri and Masokas) for 11 hours, but also not having slept for 20 hours (and after only receiving 2 ½ to 3 and ½ hours of sleep the night before) and not having eaten all day (Mr. Amor testified that he did not eat breakfast on the morning of October 3rd because he was feeling nauseous, that he missed lunch at the jail due to a court appearance, and that he was not provided dinner by the detectives). In addition, Mr. Amor reports that he was not allowed to use the restroom until he confessed, and that he had been repeatedly threatened by Detective Cross that he would be charged with first degree murder if he did not confess. At that point, Mr. Amor reports that he would have said or done anything to get away from the detectives, who had scared him all evening, and that he believed that if he told the detectives what they wanted to hear, he would be able to go home because one of the interrogating detectives had told him so.

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 24

At approximately 1 a.m. on October 4, 1995, the detectives provided Mr. Amor with a pencil and paper and he wrote out a one-page confession statement, which he signed at 1:14 a.m., and they recorded him reading out loud to them from 2:11 a.m. to 2:14 a.m. Mr. Amor thought the confession statement would be the end of his ordeal, but the detectives then told him that he would need to make a statement to Assistant State's Attorney Brian Nigohosian, and that this would only take a short period of time, after which he could rest. ASA Nigohosian arrived at the Naperville Police Department at approximately 3:45 a.m., and, with Detectives Cross and Guerrieri in the room, interrogated Mr. Amor until 5:20 a.m. At 5:10 a.m., ASA Nigohosian turned a tape recorder on that memorialized the last 10 minutes of this final, early morning interrogation session, during which Mr. Amor can be heard to mostly passively agree to Mr. Nigohosian's mostly highly leading and suggestive questioning. Mr. Amor reports that he repeatedly told Mr. Nigohosian that he was extremely tired and wanted to rest, but he was not allowed to.

Mr. Amor has always maintained that his confessions to Detectives Cross and Guerrieri at 1:14 a.m. and 2:14 a.m., as well as to ASA Nigohosian and both detectives from 5:10-5:20 a.m. on October 4, 1995 were false. He has also maintained that he was fed both the facts as Detectives Cross and Guerrieri, Reid polygrapher-interrogator Masokas and ASA Nigohosian had believed them to be at the time, as well as their theories of the alleged arson-murder, and that he parroted these facts and the alleged motive back to the various interrogators in order to put an end to, and escape from, what had become an unbearably stressful and coercive set of interrogations over the course of the prior 15 hours.

## C) Risk Factors for False Confession in William Amor's Account

William Amor provides a robust account of what he recalls occurring during his lengthy, almost entirely unrecorded interrogations by Detectives Cross and Guerrieri, Reid polygrapher-interrogator Michael Masokas, and ASA Brian Nigohosian. He also describes how and why these interrogators moved him from denial to admission and then to give two confession statements to an arson-murder that he asserts is false. In his account of the multiple interrogation sessions by Reid polygrapher-interrogator Masokas, Naperville detectives Cross and Guerrieri, and ASA Nigohosian, William Amor describes numerous interrogation techniques, methods and strategies, as well as other factors, that empirical social science research has shown significantly increases the risk of eliciting false, unreliable and involuntary confessions when applied to innocent suspects. These include:

1) *Physical Abuse and Coercion*. Once common, the historical use of physical coercion by police detectives in the United States to extract confessions has been well-documented.[30] The fact that physical coercion leads to false and unreliable statements, admissions, and confessions is so well-established that no one – neither police nor social scientists –dispute it, and it has been

---

[30] See Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 25

prohibited by federal constitutional law that has applied to the States for more than eighty (80) years. Police interrogation training manuals emphatically advise police never to use any physical force or intimidation whatsoever during interrogation because it is universally recognized as apt to make an innocent person falsely confess. All police officers and investigators are trained that the use of physical coercion to elicit confessions during interrogation is absolutely unlawful.

As discussed above, Mr. Amor asserts that he was physically assaulted by Detective Cross, that Detective Cross had grabbed him by the shoulders, lifting him out of his chair, violently shook him, and caused him to hit his head against the wall, making him dizzy. While Detective Cross was physically assaulting Mr. Amor, Detective Cross was yelling at Mr. Amor that if he did not tell Detective Cross the truth, he was "going to kick my fuckin' ass" (Deposition of William Amor, P. 14). Mr. Amor describes the shaking as "rather severe," and was made worse by Mr. Amor's terrible headache at that point, his sleep and food deprivation and the length of time he had been detained/in custody (approximately 10-11 hours at that point). There is no dispute that the physical coercion that Mr. Amor describes is regarded as a direct cause of interrogation-induced false confessions from innocent suspects, and that this kind of physical coercion would have significantly increased the risk of eliciting false and unreliable confession statements from Mr. Amor.

2) *The Reid Method of Interrogation*. The investigators' lengthy questioning of William Amor over multiple, almost entirely unrecorded sessions on October 3-4, 1995 were police interrogations, not mere police interviews. Police are trained to "interview" and to "interrogate," which they regard as two very different forms of investigative information-gathering activity, even though police often use the terms interchangeably in public and in court. These two concepts are thus derived from police training and are analytically distinct. A police interview consists of open-ended, non-accusatory, and non-leading questions; police are supposed to let the subject do most of the talking, and the goal is to get the truth to develop a case. Police interviews are not supposed to be suggestive or involve any pressure or persuasion. Police typically interview victims, witnesses, and potential suspects. They can occur at any stage of the investigative process.

A police interrogation is very different from a police interview. Though there may be exceptions, police are trained only to interrogate suspects. A police interrogation is not supposed to occur at the beginning of an investigation. Rather, police are trained to interrogate only after they have done an initial investigation – "investigate before you interrogate" is one of the mantras of the Reid Method -- and have *reasonably* concluded that the suspect has committed the crime under investigation, assuming an actual crime has, in fact, been committed. Police interrogation is therefore guilt-presumptive and accusatory. Police are trained in specialized interrogation techniques that are based on pressure and persuasion. The goal of a police interrogation is to move the suspect from the denials that police anticipate to the admission of guilt that they seek, ideally to a full and verifiable confession narrative. As discussed earlier, police interrogators are trained to use a variety of Reid-based interrogation techniques – such as accusations, challenging denials, confronting with evidence (real or fictitious), monologuing,

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 26

suggesting inducements -- until the suspect breaks and starts making incriminating statements. The goal of an interrogation is not to get the truth per se, but to elicit incriminating statements that allow police to gather evidence and build a case against the presumed guilty suspect and assist the prosecution in eventually successfully convicting him or her.

The investigators' multiple, lengthy and almost entirely unrecorded questioning sessions of William Amor on October 3-4, 1995 are properly characterized as police interrogations, not police interviews. The sessions were interrogations because they were guilt-presumptive, because they were accusatory, because they involved the use of multiple, repetitive and escalating interrogation techniques that rely on pressure and persuasion – including evidence ploys, inducements, minimization, and promises and threats, as discussed in more detail below – and their clear goal was to elicit an admission of guilt from Mr. Amor to intentionally setting the fire that resulted in Marianne Miceli's death (even the polygraph at Reid and Associates was, in my opinion, part of an orchestrated interrogation process for reasons that will be discussed in more detail later in this report). The investigators used numerous Reid-based interrogation techniques, including accusations, attacks on denials, evidence ploys, so-called "themes"[31] (i.e., scenarios that seek to rationalize, excuse or justify the crime, according to the Reid Method), and minimization, as discussed in more detail below. Scholars have suggested that three processes are at work in Reid-based interrogation: isolation/custody, confrontation and minimization.[32] All three were present in in the investigators' multiple and lengthy interrogations of William Amor on October 3-4, 1995. The investigators isolated William Amor multiple times by questioning him alone in different interrogation rooms, each time with the door closed; repeatedly accused him of committing a fire they believed to be an arson; expressed relentless, unwavering confidence in their belief in his guilt; attacked and undermined his denials; relied on false and unreliable evidence that they alleged established his (presumed) guilt; and attempted to minimize his culpability during part of the interrogation process. These Reid-based interrogation techniques are designed so that the suspect perceives cooperation and confession as the only means to putting an end to a stressful interrogation.

There is consensus in the scientific community about the Reid Method of interrogation and its effects.[33] Substantial empirical research has documented that Reid-based methods of interrogation can easily become psychologically coercive,[34] and they increase the risk of eliciting

---

[31]  *See* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 202-255.

[32]  Saul Kassin and Gisli Gudjonsson (2004). "The Psychology of Confessions: A Review of the Literature and Issues." Psychological Science in the Public Interest, Vol. 5, 33-67 (see page 43).

[33]  See Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

[34]  Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251.

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 27

false confessions from the innocent,[35]especially from psychologically vulnerable individuals.[36] Reid-based interrogation techniques run the risk of causing the suspect to feel intimidated, trapped and hopeless, and ultimately to perceive that he or she has no choice but to agree with the interrogator and confess in order to escape the aversive pressures of the guilt-presumptive accusatory interrogation or to minimize his or her blameworthiness and consequences by confessing.[37] As I will discuss in greater detail below, the investigators' use of Reid-based techniques and methods during their interrogations of October 3-4, 1995 increased the risk that William Amor would make and/or agree to involuntary and/or unreliable statements.

3) *Lengthy (Incommunicado) Interrogation, Sleep Deprivation, Exhaustion and Fatigue.* Researchers consider the length of an interrogation to include both the time that a suspect is being questioned and/or accused as well as any breaks between questioning/accusation sessions, because breaks between accusation and questioning add to the stress and fatigue of the interrogation and sometimes are used as an interrogation technique itself. It is the total amount of time in custody during interrogation that matters. Some police use a technique known as "letting the suspect stew" in which they intentionally let the suspect wait in a locked interrogation room, thinking it will raise the suspect's anxiety and contribute to the softening up (what interrogators refer to as rapport-building) process that precedes interrogations.[38] Other times, police will intentionally take breaks during interrogation as part of their strategy to elicit a confession. These breaks contribute to a suspect's fatigue and exhaustion. The amount of time that Mr. Amor was either detained or in custody, and interrogated, on October 3-4, 1995 (more than 15 hours, from at least 2:15 p.m. to 5:20 a.m.) was extraordinarily lengthy per traditional police standards existing both then and now.

Lengthy custodial detention and accusatory interrogation leads to fatigue and exhaustion, conditions that significantly increase the risk of overbearing a suspect's will and eliciting false and unreliable statements, admissions and/or confession. Lengthy interrogation/custody is a *situational* risk factor that could overbear a suspect's will and could cause a suspect to make or agree to a false confession during police interrogation.[39] Empirical studies indicate that the

---

[35]  Wyatt Kozinski (2018). "The Reid Interrogation Technique and False Confessions: A Time for Change." *Seattle Journal for Social Justice*, 16, 301-345; Richard A. Leo (2008) POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[36]  See Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38; and Gisli Gudjonsson (2003). THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc.).

[37]  *See* Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251.

[38]  Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[39]  *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 28

overwhelming majority of routine custodial interrogations last less than one hour,[40] whereas the combined time period of custody and interrogation in most interrogations leading to a false confession is more than six hours.[41]  Once again, researchers count the total amount of time during interrogation when measuring the length of an interrogation and its correlates because even time for custodial breaks or questioning after an initial admission during the interrogation process can contribute to fatigue, exhaustion, depletion of mental or physical energy, learning impairments, loss of accurate memory recall, and a decrease in one's ability to concentrate and resist pressure.  The 1986 Reid and Associates police interrogation training manual (which was the current one in 1986) specifically recommends that police interrogate for no longer than four (4) hours absent "exceptional situations" and that "most cases require considerably fewer than four hours."[42]  Lengthy detention and interrogation is a significant risk factor for false confessions because the longer an interrogation lasts, the more likely the suspect is to become fatigued and depleted of the physical and psychological resources necessary to resist the pressures and stresses of accusatory interrogation,[43] especially where interrogators use psychologically aggressive, manipulative and/or coercive methods.[44]  The longer custody and interrogation last, the more pressure interrogators can bring to bear on the suspect and the more techniques and strategies they may use to move the suspect from denial to admission.  Lengthy interrogation, fatigue and exhaustion increase the risk that a suspect's will could be overborne and that an innocent suspect will make or agree to a false statement, admission and/or confession.

Longstanding social science research has demonstrated that sleep deprivation is another significant risk factor for false confession because the more sleep deprived the suspect is, the more likely he or she is to become fatigued and depleted of the physical and psychological resources necessary to resist the pressures and stresses of accusatory interrogation,[45] especially when investigators use psychologically aggressive, manipulative and/or coercive methods.[46] Sleep deprivation heightens interrogative suggestibility by impairing decision-making abilities, such as the ability to sustain attention and flexibility of thinking as well as the ability anticipate

[40]   Richard A. Leo (1996).  "Inside the Interrogation Room" Journal of Criminal Law and Criminology, 86, 266-303.  *See also* Barry Feld (2013).  *Kids, Cops and Confessions: Inside the Interrogation Room* (New York, NY: New York University Press).

[41]   Steven Drizin and Richard A. Leo (2004).  "The Problem of False Confessions in the Post-DNA World.  *North Carolina Law Review*, 82, 891-1007.

[42]   Fred Inbau, John Reid, and Joseph Buckley (1986).  CRIMINAL INTERROGATION AND CONFESSIONS, 3rd Edition (Williams & Wilkins) at 310.

[43]   Deborah Davis and Richard A. Leo (2012).  "Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess" *Psychology, Public Policy and Law*, 18, 673-704.

[44]   Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010).  "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

[45]   Deborah Davis and Richard A. Leo (2012).  "Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess" *Psychology, Public Policy and Law*, 18, 673-704.

[46]   Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010).  "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 29

risks and consequences, inhibit behavioral impulses and resist suggestive questioning.[47]  Sleep deprivation also impairs the ability to sustain attention and flexibility in thinking and, more generally, it diminishes a suspect's ability to resist suggestive and/or coercive influences, especially the longer an interrogation lasts.  Fatigue and exhaustion increase the risk that a suspect's will could be overborne and that an innocent suspect will make or agree to a false statement, admission and/or confession.

As noted above, a 15-hour period of detention/custody and interrogation is considered extraordinarily lengthy and creates the risk of exhausting, fatiguing and psychologically weakening, if not impairing, a suspect's ability to freely choose to continue participating in the interrogation.  In addition, Mr. Amor reports that he had only slept 2 ½ - 3 ½ hours the previous night, and thus had not slept almost 24 hours by the time he signed he provided his first confession statement at 1:14 a.m., and over 24 hours by the time he provided his second confession statement at 5:20 a.m. on October 4, 1995.  Mr. Amor also reports both that he was hungry (that he had not eaten since the morning of October 3rd and was not offered any food by his various interrogators) and that he was in a heightened state of stress and fear during these marathon series of interrogation sessions, which would have added to his fatigue and exhaustion.  As substantial research supports, sleep deprivation and lengthy interrogation, as well as the fatigue, exhaustion and depletion of psychological resources they contribute to and produce, substantially increased the likelihood that Mr. Amor would make or agree to false and unreliable statements, admissions and/or confessions on October 3-4, 1995.

4) *Rush to Judgment Based on a Premature Presumption of Guilt, Presumption of Guilty Knowledge, and Investigative Bias*.[48]  The *misclassification error*, briefly discussed earlier in this report, is born of an investigative rush to judgment that leads to a premature behavioral presumption of guilt in the interrogation room. Substantial social science research has demonstrated that a behavioral presumption of guilt leads to tunnel vision, confirmation bias, and investigative bias among police investigators, who, as a result, often end up eliciting unreliable case information.[49]  When investigators rush to judgment and begin with or arrive at a premature belief in the suspect guilt, empirical studies show that they seek to build a case against an individual whose guilt they assume *a fortiori*—rather than seeking to even-handedly collect factual information, objectively investigate a case and test their hypotheses against independent

---

[47]  Mark Blagrove (1996).  "Effects of length of sleep deprivation on interrogative suggestibility" *Journal of Experimental Psychology: Applied*, 2, 48-59.  *See also* Stephen Frenda, Shari R. Berkowitz, Elizabeth F. Loftus, and Kimberly M. Fenn (2016).  "Sleep Deprivation and False Confessions" *Proceedings of the National Academy of Sciences*, 113, 2047-2050 (February 23, 2016).

[48]  *See* Saul Kassin, Christine Goldstein, and Kenneth Savitsky (2003).  "Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt" *Law and Human Behavior*, 27, 187-203; C. Hill, A. Memon, and P. McGeorge (2008).  "The Role of Confirmation Bias in Suspect Interviews: A systematic Evaluation" *Legal & Criminological Psychology*, 13, 357-371; and Fadia Narchet, Christian Meissner, and Melissa Russano (2011).  "Modeling the Influence of Investigator Bias on the Elicitation of True and False Confessions" *Law and Human Behavior*, 35, 452-465.

[49]  *See* Carol Tavris and Elliott Aronson (2015*).  MISTAKES WERE MADE (BUT NOT BY ME), (Harcourt Books).

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 30

case evidence. Under these circumstances, investigators act as if they are seeking to prove their pre-existing theories or conclusions rather than investigate a hypothesis. This mental framework causes investigators to disregard contradictory information and evidence, selectively [mis]characterize existing information and evidence, [mis]interpret a suspect's statements and behavior to conform to the investigators' pre-existing assumptions, and to more aggressively interrogate suspects whose guilt they presume.[50] Significantly, social science research has demonstrated that an investigative rush to judgment based on premature and pre-existing presumption of guilt puts innocent suspects at an elevated risk of making or agreeing to a false statement, admission, or confession in order to satisfy overzealous investigators and put an end to the accusatory pressures of sustained police interrogation.[51]

In my professional opinion, the detectives began their investigation into the fire that killed Ms. Miceli with a rush to judgment and, and thereby created a substantial risk of making a *misclassification* error (i.e., subjecting a factually innocent person to a guilt-presumptive and accusatory interrogation designed for a factually guilty suspect). Without meaningful supporting evidence, Detective Cross and Guerrieri immediately and prematurely formed a presumption that (1) the fire that killed Marianne Miceli was an arson; (2) that William Amor started the fire; and (3) that he did so intentionally. The investigators then set out to prove their prematurely formed theories, and essentially began to create a case against Mr. Amor. When Detective Cross interviewed Mr. Amor on the night of the fire, merely an hour or so after Mr. Amor found out about the fire, at midnight on September 12, 1995, Detective Cross immediately smelled Mr. Amor's clothes for accelerants (there were none) and took Mr. Amor's shoes into evidence to test for accelerants (none were found). Tina Miceli, who Detective Cross also interviewed that night, had neither her shoes nor clothes checked for accelerants. This was a give-away to Detective Cross's belief in Mr. Amor's guilt, though again there was no evidence to support that belief. Later that day, the detectives subjected Mr. Amor to a polygraph, in my opinion to confirm his belief in Mr. Amor's guilt, and then to be able to use the polygraph as an orchestrated evidence ploy and interrogation technique to break down Mr. Amor's anticipated denials and elicit a confession of guilt. Detectives Cross and Guerrieri would later deploy this strategy at Reid and Associates on October 3, where Detective Cross told Mr. Masokas, prior to his polygraph examination, that the fire was an arson (that they had ruled out any other explanation), and that Mr. Amor was their suspect. There was no evidence that Mr. Amor had set the fire, and in my view no probable cause to arrest Mr. Amor, as they did later in the evening, prior to the interrogation sessions that would lead to confession statements from Mr. Amor that then served to confirm the investigators' prematurely formed presumption of Mr. Amor's guilt. As their deposition testimony illustrates, not even the undisputed modern fire science evidence from both the state's and the defense's experts, demonstrating that it was scientifically impossible for Mr. Amor to have started the first from a lit cigarette that dropped

---

[50] *See* Saul Kassin, Christine Goldstein, and Kenneth Savitsky (2003). "Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt." *Law and Human Behavior*, 27, 187-203.

[51] Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 31

onto vodka-soaked newspapers could shake the investigators' belief today in Mr. Amor's guilt for a fire that no evidence exists was an arson.

The investigators engaged in a classic rush to judgment. Mr. Amor describes an extraordinarily guilt-presumptive and truth-presumptive interrogation whose goal was to get a confession corroborating the investigators' belief of Mr. Amor's involvement in what they theorized was an intentional crime with a very specific motive (killing a mother-in-law to collect on life insurance). According to Mr. Amor's account of what occurred during the various, almost entirely unrecorded, lengthy interrogation sessions, the investigators had their mind made up from virtually the beginning of the interrogation that he intentionally set the first to kill Marianne Miceli and collect on her insurance policy (even though he was not a beneficiary and Tina Miceli was not a direct beneficiary). Put differently, based on the interrogation techniques Mr. Amor describes, Detectives Cross and Guerrieri, Reid polygrapher-interrogator Masokas and ASA Nigohosian employing, their investigative approach in this case was not to treat Mr. Amor's possible guilt as a hypothesis to be investigated and independently corroborated or falsified depending on where the evidence took them. Rather, on the basis of their gut hunches and misguided belief in their own human lie detection abilities, they conducted an interrogation as if there were already substantial evidence of Mr. Amor's guilt. The investigators refused to accept Mr. Amor's initial statements denying setting the fire or having any interest in killing his mother-in-law. The investigators (especially Reid polygrapher-interrogator Masokas) treated Mr. Amor's body language and demeanor as a sign of his guilt, confirming their pre-existing theory of the case. And the detectives were far more aggressive in interrogating Mr. Amor than an even-handed investigative effort to gather information would have required. The detectives' guilt-presumptive tactics increased the risk that they would overbear his will and elicit an involuntary and/or false confession from him. The investigators' interrogation of Mr. Amor was not only guilt-presumptive it was also truth-presumptive. In pressuring and persuading Mr. Amor to confess to intentionally setting the condominium fire to kill Marianne Miceli and collect on her insurance policy, the detectives sought not to objectively or independently investigate or test the truth, but rather to have Mr. Amor repeat back their preconceived belief about what they thought must have happened. They were creating, not gathering, evidence of his guilt.

As well-established social science research has repeatedly demonstrated, once an investigator rushes to judgment about a suspect's guilt (typically following their gut hunches, speculation or human lie detectors/scientifically discredited judgments about body language or demeanor), an interrogator's guilt-presumptive or truth-presumptive investigative tactics substantially increase the risk of eliciting involuntary, false and unreliable statements, admissions and/or confessions from innocent suspects. The detectives' unwavering presumption of Mr. Amor's guilt and confession-driven interrogation led to investigative bias, behavioral confirmation bias and tunnel vision: They not only refused to accept Mr. Amor's protestations of innocence, but also saw his later interrogation-induced compliance and incriminating statements as corroboration of their belief in his guilt, as opposed to the product of their own guilt-presumptive and psychologically coercive interrogation techniques. These types of biases have been documented in many psychological studies and in cases of police-induced false

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 32

confession and erroneous conviction of the innocent.[52]  The investigators rush to judgment and premature presumption of Mr. Amor's guilt substantially increased the risk that they would elicit false and unreliable incriminating statements, admissions and/or confessions from him.

　　　5) *False evidence ploys*.  Police interrogators routinely tell criminal suspects that the evidence establishes their guilt:  If police possess real evidence, this is called a true evidence ploy.  If police are making up, lying about, or exaggerating non-existent evidence, this is called a false evidence ploy.  The social science research literature has demonstrated that false evidence ploys are potentially psychologically coercive techniques that are virtually always present in, and substantially likely to increase the risk of, eliciting false statements, admissions, and/or confessions.  False evidence ploys are among the most well-documented *situational* risk factors for eliciting false and unreliable statements, admissions, and/or confessions, as described in the social science research literature.[53]  The use of false evidence ploys can create or contribute to the suspect's perception that he is trapped, there is no way out, and/or that his conviction will be inevitable.  False evidence ploys can lead the suspect to perceive that he is in a hopeless situation and thus has little choice but to agree to or negotiate the best available outcome or mitigation of punishment given the perceived, subjective reality of his situation.[54]

　　　There were at least two false evidence ploys in the investigators' multiple, lengthy interrogation sessions of William Amor on October 3-4, 1995.[55]  First, the investigators brought Mr. Amor to Reid and Associates in Chicago to undergo a polygraph examination procedure that was, in effect, designed to be an orchestrated evidence ploy.  When Detectives Cross and Guerrieri met with Reid polygrapher-interrogator Masokas prior to the administration of the polygraph, they informed him that William Amor was their only suspect in a fire death that they credited as an arson, creating the conditions for what researchers have called *forensic confirmation bias* (i.e., creating pre-existing beliefs through the provision of contextual information that biases an evaluator's interpretation of subsequent evidence).[56]  Empirical research has also shown that pre-existing expectations can influence the way polygraph

---

[52]　Keith Findley and Michael Scott (2006).  "The Multiple Dimensions of Tunnel Vision in Criminal Cases" *University of Wisconsin Law Review*, 291-397.

[53]　Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

[54]　*See* Richard Ofshe and Richard A. Leo (1997).  "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions."  *Studies in Law, Politics & Society*, 16, 189-251.

[55]　Arguably the investigators used at least three false evidence ploys.  Reid polygrapher-interrogator Masokas used what Reid and Associates call the "Bait Question," (presenting a suspect with hypothetical false evidence of his guilty), during the pre-polygraph interview, in which he asked Mr. Amor how he would respond if there was fingerprint evidence linking him to the alleged arson-murder.  Researchers have identified this as a variant of the false evidence ploy, and sometimes referred to it as the bluff technique. See Jennifer Perillo and Saul Kassin (2011). "Inside Interrogation: The Lie, The Bluff, and False Confessions," *Law and Human Behavior*, 35, 327-337.

[56]　Saul Kassin, Itiel Dror, and Jeff Kukucka (2013).  "The Forensic Confirmation Bias: Problems, Perspectives, and Proposed Solutions*," Journal of Applied Research in Memory and Cognition*, 2, 42-52

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 33

examiners conduct their interviews and the questions they ask, thus influencing (and biasing) the conditions they draw from the test results,[57]as I believe likely occurred here.

During the polygraph-interrogation of William Amor on October 3rd, Reid polygrapher-interrogator Michael Masokas told Mr. Amor that failed the polygraph exam, presumably to a scientific certainty. This was a false evidence ploy because the polygraph, even if its results were reported accurately (and I have seen no evidence that they were), is a pseudo-scientific police-created instrument that can never tell whether a person is lying or telling the truth (because there is no unique physiological response when one tells the truth or when one lies), and the polygraph is highly prone to error (some estimate a false positive error rate of 50%, no better than the flip of a coin) because there is no underlying science to support the concept, either theoretically or empirically.[58] In other words, the polygraph is an inherent, if psychologically powerful, false evidence ploy because it can never be a valid or reliable instrument of human lie detection or truth verification, but is highly effective at eliciting confessions as an adjunct topsychologically manipulative, if not coercive, interrogation. The polygraph is thus often explicitly used as an interrogation technique, as I believe it was here, not as an attempt at behavioral lie detection, and the polygraph *false evidence ploy* often exerts a profound impact on suspects, inducing feelings of hopelessness and despair and moving them from denial to admission.

The second false evidence ploy occurred after 11:37 p.m. on October 3rd when Detective Cross told Mr. Amor that his wife Tina had told Detective Sullivan that she now believed that Mr. Amor had said the fire intentionally. This was a false evidence ploy because Tina's *opinion* about whether Mr. Amor had set a fire does not constitute actual evidence, even though Detectives Cross represented it as evidence in his effort to break down Mr. Amor's denial and elicit a confession. In addition, Detective Cross lied about what Tina had said, claiming that she believed that he had set the fire intentionally when, instead, her changed opinion at that time was that he had set the fire accidentally. The truly extraordinary fact that the detectives had prearranged to have Mr. Amor served with divorce papers during this interrogation undoubtedly contributed to the potency of this evidence ploy by sending the message that Tina believed so strongly in Mr. Amor's guilt that she was now seeking to legally terminate their marriage. The investigators' false evidence ploys contributed to Mr. Amor's perception of being trapped and feeling hopeless during the marathon interrogation as well as to making two confessions that he insists are false.

As a century of basic psychological research on misinformation effects has shown[59] (as well as decades of applied psychological research on police lying to suspects during

---

[57]   E. Elaad, A. Ginton, and G. Ben-Shakhar (1994). "The Effects of Prior Expectations and Outcome Knowledge on Polygraph Examiners's Decisions." *Journal of Behavioral Decision Making*, 7, 279-292.

[58]   David Lykken (1998). *A Tremor in the Blood: Uses and Abuses of the Lie Detector* (Plenum Press).

[59]   Elizabeth Loftus (2005). "Planting Misinformation in the Human Mind: A 30 Year Investigation of the Malleability of Memory" *Learning & Memory*, 12, 361-366.

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 34

interrogation)[60] false evidence ploys are effective at eliciting compliance,[61] confusing some suspects into believing that they have been framed or that such evidence really does exist,[62] causing some suspects to doubt themselves (deferring to interrogators' authoritative assertions of irrefutable evidence despite knowing they did not commit a crime),[63] and even causing some suspects to develop false beliefs and/or memories of committing crimes.[64] Based on well-established basic and applied social scientific research going back decades, the detectives' false evidence ploys during the multiple, lengthy interrogation sessions on October 3-4, 1995 significantly increased the risk of eliciting a false and unreliable statements, admissions and/or confessions from Mr. Amor.

6) *Minimization*. A common interrogation strategy is for investigators to portray the offense in a way that minimizes its moral, psychological and/or legal seriousness, thus lowering the perceived cost of confessing by communicating that the consequences of confessing will not be that serious. Interrogation techniques and strategies that implicitly or explicitly minimize the legal seriousness of the crime, in particular, are associated with and known to increase the risk of eliciting involuntary and/or unreliable statements, admissions and/or confessions. Such *minimization* techniques and strategies can imply leniency, reduced punishment, or even no punishment at all if the suspect perceives that there is no consequence to confessing (*i.e.*, either that the act to which the suspect is confessing is not a crime or that it carries little or no penalty).[65] Conversely, interrogation techniques and strategies that maximize the legal seriousness of the crime – i.e., suggest that the suspect will face a bad or perhaps the worst possible outcome if he or she does not make or agree to an incriminating statement – are also associated with and known to increase the risk of eliciting involuntary and/or unreliable confessions. Such *maximization* strategies can imply harsher treatment, confinement, punishment, sentencing and/or other negative outcomes if the suspect fails to comply and confess. *Minimization* and *maximization* interrogation strategies are, in effect, two sides of the same coin and thus work together: if the suspect confesses to the minimized scenario (implying reduced culpability and/or reduced punishment in exchange for compliance and confession), the suspect avoids the maximized scenario (implying increased culpability and/or punishment in the absence of compliance and confession).

---

[60]   Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38.

[61]   Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press)

[62]   Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251.

[63]   Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, 16, 189-251.

[64]   Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press). *See also* Deborah Wright, Kimberly Wade and Derrick Watson (2013). "Delay and Déjà Vu: Timing and Repetition Increase the Power of False Evidence" *Psychonomic Bulletin Review*, 20, 812-818; Julia Shaw and Don Read (2014). "Constructing Rich False Memories of Committing Crime" *Psychological Science*, 1-11 (published online January 14, 2015); and Julia Shaw (2016). THE MEMORY ILLUSION (Random House).

[65]   Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 35

In his deposition, Reid polygrapher-interrogator Michael Masokas' admits using *minimization* techniques or "themes" (i.e., scenarios) in his unrecorded post-polygraph interrogation of William Amor on October 3, 1995. Mr. Masokas describes suggesting reasons why Mr. Amor would have set the fire, for example that Mr. Amor was talked into it or acted out of character or had been drinking the night of the fire and something just came over him. The purpose of these Reid-based minimizing "themes" is to get the suspect (here Mr. Amor) to admit to a minimized version of the alleged crime (here the fire that Mr. Masokas erroneously believed to be an arson), implying Mr. Amor would be perceived as less culpable if he did, and thus that he would face less adverse consequences.

Social science research has repeatedly demonstrated that m*inimization* techniques sometimes imply that the suspect will receive help, leniency, immunity, freedom and/or a different benefit in exchange for compliance and confession, and, conversely, *maximization* techniques sometimes also imply harsher treatment of punishment in the absence of compliance and confession. Reid polygrapher-interrogator Michael Masokas' use of these *minimization* interrogation techniques during his post-polygraph interrogation of William Amor increased the risk that Mr. Amor's will would be overborne and that he would make or agree to a false and/or unreliable incriminating statements, admissions and/or confessions.

7) *Threats and Promises.* As discussed earlier in this report, the use of implicit and/or explicit promises (for example, of leniency, immunity and/or a tangible benefit) as well as implicit and/or explicit threats (for example, of physical harm, a higher charge, longer sentence or harsher punishment) significantly increases the risk of eliciting a false and/or unreliable statement, admission, and/or confession when applied to the innocent. Indeed, as empirical social science research has repeatedly demonstrated, promises of leniency and threats of harm, whether implicit or explicit, are widely associated with police-induced false confession in the modern era and are believed to be among the leading causes.

Mr. Amor describes an interrogation that contained both threats and promises. As discussed above, when Detective Cross physically assaulted Mr. Amor (grabbing him by the shoulders, lifting him out of his chair, violently and severely shaking him, and causing him to hit his head against the wall), Detective Cross threatened Mr. Amor that if he did not tell Detective Cross what Detective Cross believed to be the truth, he was "going to kick my fuckin' ass" (Deposition of William Amor, P. 14). In addition, Mr. Amor reports that the detectives repeatedly threatened that he would be charged with first degree murder if he did not confess, and that he was not allowed to rest and to use the restroom at one point until he confessed. These explicit threats also function as implicit promises: if he complied and confessed, then Detective Cross would not "kick my fuckin' ass"; that if he complied and confessed, he would not be charged with first degree murder; and that if he complied and confessed, he would be allowed to rest and to use the restroom. According to Mr. Amor, he was also told that if he told the investigators what they wanted to hear, he would be able to go home, a promise of (false)

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 36

confession in exchange for freedom that also functions as an implicit threat (of not being able to leave if he did not tell them what they wanted to hear).

The use of implicit and explicit promises of leniency, immunity and/or a tangible benefit, as well as the use of implicit and explicit threats of harm, significantly increases the risk of overbearing a suspect's will and eliciting an involuntary false statement, admission, and/or confession when applied to the innocent. Indeed, as empirical social science research has repeatedly demonstrated, promises of leniency and threats of harm or harsher punishment are widely associated with police-induced false confession in the modern era and are believed to be among the leading causes. There may be no psychological interrogation technique more potent than the use of threats and promises. Promises and threats (whether implied or express) are inherently coercive because they exert substantial pressure on a suspect to comply and thus can easily overbear the will or ability of a suspect to resist an interrogator's demands or requests. Like other *high-end* inducements, promises and threats contribute to creating a sense of despair and hopelessness about a suspect's perceptions of his available options during interrogation. The extreme threats, and promises, that Mr. Amor describes that the detectives used in his lengthy, almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 terrified Mr. Amor, and significantly increased the likelihood of eliciting an involuntary and false statements, admissions and/or confessions from him.

8) *Psychological Coercion*. As discussed earlier, it is well-established that psychologically coercive interrogation techniques increase the risk of eliciting false and/or involuntary incriminating statements, admissions and/or confessions. [66] In my professional opinion, the lengthy interrogation sessions described by William Amor were extremely psychologically coercive for at least two reasons.

First, as just discussed and illustrated, the lengthy interrogation described by William Amor on October 3-4, 1995 contained explicit and substantial threats of harm (ongoing physical assaults and being charged with first degree murder) in the absence of confession and promises of leniency and freedom in exchange for confession (being able to go home if he falsely confessed that he intentionally started a fire that killed his mother-in-law). These extreme techniques are regarded as inherently psychologically coercive because they are so likely to overbear a suspect's will and lead to involuntary statements. Avoiding the use of threats of harm—especially extreme ones being physically assaulted or charged with first degree murder if the suspect does not confess, as Mr. Amor describes here—and promises of leniency or freedom in exchange for confessing is among the most fundamental prohibitions in American police

---

[66] Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions" *Studies in Law, Politics & Society*, 16, 189-251.

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 37

interrogations,[67] second only to the prohibition against using physical violence on suspects to elicit confessions,[68] which Mr. Amor had also described and which, of course, made the threat of additional physical violence seem all the more real and certain if Mr. Amor did not confess to avoid it. Threats and promises are psychologically coercive and thus taint the rest of an interrogation.[69]

Second, the investigators' interrogation techniques, methods, strategies and pressures, according to Mr. Amor, caused him to perceive that his situation was hopeless and that there was no way out the interrogation room other than to write out a confession statement and subsequently repeat it back to ASA Nigohosian – in other words, the investigators' interrogation techniques (not only the threats and promises, but also the prolonged incommunicado isolation, sleep and food deprivation, length of interrogation, absence of Miranda warnings until almost ten hours into the 15 hour ordeal, as well as many other factors, including truly the extraordinary police tactic of orchestrating the serving of divorce papers during the interrogation) cumulatively caused Mr. Amor to perceive that he had no meaningful choice but to comply with and to submit to their demands to sign the police-written confession statement if he wished to put an end to lengthy, frightening, overwhelming and despairing interrogation sessions. As Mr. Amor describes, he felt scared, trapped and worn down during the multiple interrogation sessions, and ultimately felt forced to make and sign a false confession statement out of fear, exhaustion and a sense of hopelessness. Mr. Amor describes a highly psychologically (and even physically) coercive interrogation that took away his free will and made him comply involuntarily with investigators' demands and requests. As Mr. Amor described in his suppression testimony, the interrogators were so cumulatively psychologically coercive that he would have said anything to get away from them.

Psychologically coercive interrogation pressures and techniques substantially increase the risk that an innocent person will be made to make or agree to false and unreliable statements, admissions and/or confessions, and the psychologically coercive interrogation pressures in the multiple and cumulatively lengthy interrogation sessions that Mr. Amor describes enduring on October 3-4, 1995 substantially increased his risk of falsely confessing.

9) *Personality Traits as Risk Factors for False and/or Involuntary Confessions*. In addition to the *situational* risk factors present here—physical coercion; lengthy, guilt-presumptive interrogation; false evidence ploys; minimization; explicit threats and promises; and psychological coercion—Mr. Amor was at a heightened risk of making and/or agreeing to a false

---

[67]   Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press)
[68]   Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press)
[69]   Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); Richard Ofshe and Richard A. Leo (1997). "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions" *Studies in Law, Politics & Society*, 16, 189-251.

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 38

and/or unreliable confession statement because of his personality traits and characteristics (*i.e.*, *personal* risk factors), specifically his extreme suggestibility, as well as his anxiety and depression. Dr. Chiappetta administered the Gudjonsson Suggestibility Scales and found that Mr. Amor is *exceptionally* suggestible. This means that he easily yields to the suggestions of others, particularly to authority figures, and shifts his answers to conform to their expectations, even when they suggest misleading information to him. He is given to uncritically accept, adopt and parrot back the suggestions of others, even when they are misleading and to his detriment. Mr. Amor is more suggestible than 98% of the population, according to testing by Dr. Chiappetta and more recently interpreted by Dr. DeClue. Compared to others, it takes comparatively little interpersonal pressure from an authority figure to elicit false compliance and/or incriminating statements from Mr. Amor because he is so highly suggestible. Mr. Amor is extraordinarily vulnerable to making and/or agreeing to a false confession in the face of sustained psychological pressure from authority figures. In addition, Dr. Chiappetta described Mr. Amor as depressed and anxious, two additional personality factors that are associated with an increased risk of making and/or agreeing to false and unreliable statements in response to interrogative pressure.[70] Dr. Chiappetta also opined that Mr. Amor had a panic attack at some point during the multiple, marathon interrogation sessions on October 3-4, 1995. In short, Mr. Amor's personality traits make it hard for him to assert himself in the face of sustained accusatory questioning and to resist the pressures of aggressive custodial interrogation, thereby increasing the risk that his will be overborne and that he will make or agree to a false and/or unreliable statement, admission or confession in response to police pressure.

In addition, as discussed above, Mr. Amor reported feeling extremely tired, exhausted and sleep deprived over the course of his more than 15 hours of detention/custody and multiple interrogation sessions on October 3-4, 1995. Longstanding social science research has demonstrated that sleep deprivation is another significant risk factor for false confession because the more sleep deprived the suspect is, the more likely he or she is to become fatigued and depleted of the physical and psychological resources and energy necessary to resist the pressures and stresses of accusatory interrogation,[71] especially when investigators use psychologically manipulative, deceptive and/or coercive methods.[72] Sleep deprivation heightens interrogative suggestibility by impairing comprehension and decision-making abilities, such as the ability to anticipate risks and consequences, inhibit behavioral impulses and resist suggestive

---

[70] Jon Sigurdsson, Gisli Gudjonsson, Emil Einarsson, and Gudmundur Gudjonsson (2006). "Differences in Personality and Mental State Between Suspects and Witnesses Immediately After Being Interviewed by Police," *Psychology, Crime & Law*, 12, 619-628; and Allison Redlich, Alicia Summers and Steven Hoover (2010). "Self-Reported False Confessions and False Guilty Pleas Among Offenders with Mental Illness," *Law and Human Behavior*, 34, 79-90. See also Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

[71] Deborah Davis and Richard A. Leo (2012). "Interrogation Related Regulatory Decline: Ego-Depletion, Failures of Self-Regulation and the Decision to Confess" *Psychology, Public Policy and Law*, Vol 18. Pp. 673-704.

[72] Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 39

questioning.[73] Sleep deprivation also impairs the ability to sustain attention, concentration and flexibility in thinking.[74] Sleep deprivation increases depression and anxiety, which, as just mentioned, are also personal risk factors for false confession.[75] More generally, sleep deprivation diminishes a suspect's ability to resist suggestive and/or coercive influences, especially the longer an interrogation lasts. Fatigue and exhaustion increase the risk that a suspect's will could be overborne and that an innocent suspect will make or agree to a false statement, admission and/or confession. Mr. Amor's extreme sleep deprivation during the marathon interrogation sessions on October 3-4, 1995 created an increased risk that he would make or agree to false and unreliable statements, admissions and/or confessions as a result.

10) *Indicia of Unreliability.* As discussed earlier, in the empirical research literature on the psychology of police interrogation and false confessions, there are four ways a suspect's interrogation-induced statement can be classified as a *proven* false confession: When it can be objectively established that the suspect confessed to a crime that did not happen; when it can be objectively established that it would have been physically impossible for the confessor to have committed the crime; when the true perpetrator is identified and his guilt is objectively established; and/or when scientific evidence dispositively establishes the confessor's innocence.

Relying on the report and testimony of modern fire science expert Douglas Carpenter, it is my professional opinion that Mr. Amor's interrogation-induced incriminating statements on October 3-4, 1995 meet the criteria for a *proven* false confession because there is little evidence that the fire resulting in Marianne Miceli's death was an arson much less a fire that William Amor could have started under any circumstances. The methods used by the initial fire investigators to determine the cause and origin of the fire have been scientifically discredited, and, based on the materials I have reviewed, I understand that both the defense and prosecution experts found, at minimum, that whatever caused this fire could not have happened when William Amor was in the apartment.. A recent study found that nearly one third of all known exonerations since 1989 involve people wrongfully convicted of crimes that never happened.[76] Mr. Amor's interrogation-induced incriminating statements on October 3-4, 1995 meet the criteria for a *proven* false confession for a second reason as well: according to modern fire science experts Carpenter and Golder, it was scientifically (and thus physically) impossible for Mr. Amor's actions, as described in his interrogation-induced incriminating statements, to have set the fire that resulted in Marianne Miceli's death (a lit cigarette cannot ignite vodka soaked newspapers).

---

[73] Mark Blagrove (1996). "Effects of length of sleep deprivation on interrogative suggestibility. *Journal of Experimental Psychology: Applied*, 2, 48-59. See also Stephen Frenda, Shari R. Berkowitz, Elizabeth F. Loftus, and Kimberly M. Fenn (2016). "Sleep Deprivation and False Confessions," *Proceedings of the National Academy of Sciences,* Vol. 113, Pp. 2047-2050 (February 23, 2016).

[74] Matthew Hall (2017). WHY WE SLEEP (Scribner).

[75] Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38

[76] See Jessica Henry (2020). SMOKE BUT NO FIRE: CONVICTING THE INNOCENT OF CRIMES THAT NEVER HAPPENED (University of California Press).

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 40

William Amor's confession statements do not bear any of the traditional indicia of reliability researchers and experts use to assess confession evidence: they are not supported or corroborated by any physical, forensic, medical or other credible independent evidence; they do not lead to new or missing evidence; they do not contain any non-public case facts that only the true perpetrator, but not the police investigators, knew; and they are inconsistent with and contradicted by numerous other case facts, logic and evidence. In fact, there is no reliable evidence linking Mr. Amor to the fire that resulted in the death of Tina Miceli other than his provably false interrogation-induced confession statements.

In addition to (1) the scientific evidence establishing the fire investigators in 1995 used scientifically discredited methods to erroneously determine the cause and origin of the fire (2) that no arson occurred and (3) that, as attested to by both the Defense's and State's experts, it was impossible for Mr. Amor to have set the fire in the way his confession statement describes, there are additional indicia of its unreliability in Mr. Amor's interrogation-induced confession statements. These include:

The numerous indicia of unreliability in Mr. Amor's confession statements include:

- That from a timing perspective, Mr. Amor could not have set the fire, since he left before the fire began;

- That no accelerant was found on Mr. Amor's shoes, clothes or body after the fire;

- That Mr. Amor did not know whether he was a beneficiary of Marianne Miceli's life insurance policy (he was not; Tina was a secondary beneficiary) or the amount of the policy;

- That when questioned on September 14, 1995, Mr. Amor did not know that Tina had spilled any lighter fluid by the swivel chair;

- That Mr. Amor's stated in his oral confession that he did not immediately rush out of the house after the lit cigarette landed on the newspaper, but instead he went to give Marianne Miceli a back rub, a fact that so is nonsensical that it can only be false;

- That upon re-entering the condominium after Mr. Amor left, Tina Miceli did not see the fire, did not see flames, did not smell smoke and did not hear any noise associated with fire;

- The confession statement said that charcoal lighter fluid found in the trunk of Mr. Amor's car, along with coal briquettes, may have been used as an accelerant by Mr. Amor, but chemical testing of the furniture fabric and carpeting from the fire scene revealed no petro-chemical related accelerants

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 41

- That the origin of the fire was at a different location in the condominium than the location indicated in Mr. Amor's statement; and

- That Lt. Ferreri had initially listed the cause of the fire as undetermined in his original report, and only subsequently changed it to "incendiary" based on William Amor's subsequent confession;

A confession – especially one that is the product of so many problematic interrogation techniques and riddle with as many problems as this one – should never be the basis for a determination of the origin and cause of a fire, only undisputed and properly gathered forensic evidence of cause and origin should be. As mentioned earlier, American researchers in recent decades have documented hundreds of proven false confessions, which are believed to be the tip of a much larger problem.

In short, in addition to meeting the criteria for a *proven* false confession in the scientific research literature for multiple reasons (no crime occurred and physical impossibility), William Amor's interrogation-induced confession statements bear numerous indicia and hallmarks of unreliability, and contain no hallmarks or indicia of reliability. As documented above, there is no meaningful evidence corroborating Mr. Amor's interrogation-induced confession statements and substantial, even dispositive, exculpatory evidence contradicting it and making the veracity of his confession statements impossible. In addition, Mr. Amor did not supply non-public facts that only the true perpetrator (and not the police investigators) would know (assuming, contrary to all evidence, that a crime had even occurred) nor did his interrogation-induced incriminating statements lead to any new, missing or derivative case evidence that would have corroborated them. These features indicate that Mr. Amor's incriminating statements were more likely, if not certainly, the involuntary product of coercive and improper police interrogation methods and pressures than they were reliable or trustworthy evidence of criminal guilt.

11) *Police Interrogation Contamination and Scripting.* As mentioned earlier, police interrogators are trained not to contaminate a suspect by leaking or disclosing non-public case facts to him or her but, instead, to hold back unique case information and let the suspect volunteer case details in order to demonstrate inside knowledge of the crime details to corroborate the accuracy of any incriminating statements. The absence of contamination allows police to verify the accuracy of reliable confessions, but the presence of contamination prevents police from corroborating confessions that are true and makes confessions that are false misleadingly appear true (because they contain non-public crime scene details suggested by the interrogators, and repeated by the suspect, but the claim is made that they were volunteered by the suspect). Though police interrogation contamination is believed to often be inadvertent

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 42

rather than intentional, it can make otherwise completely false confessions appear not only to be true but persuasively so.[77]

Related to contamination, police investigators sometimes "script" a suspect's confession by not only providing the suspect with details of the crime, but also by coaching, directing and/or leading the suspect to adopt a specific police-driven narrative of how and why he or she must have committed the crime. This is problematic when police are interrogating a suspect because, after all, the whole point of police interrogation should be to get a truthful account from the person who committed the crime, as opposed to pressuring and persuading the suspect to regurgitate back to the investigators what they want to believe occurred. Like contamination, scripting can make otherwise completely false confessions appear not only to be true but persuasively so.[78] Interrogators sometimes seek to shape and edit the suspect's narrative in order to incriminate the suspect and build a more specific case against him or her that will ensure conviction. To do so, interrogators usually try to elicit an account that is consistent with their theory of the crime. If the suspect's narrative does not fit the interrogators' pre-existing expectations about how and why the suspect must have committed the crime, interrogators continue to interrogate the suspect, often correcting the suspect and pressuring and persuading him or her to adopt the interrogators' scripted version of what they believe must have happened to cause the crime and why.[79] The problem with scripting is that it is truth-presumptive and replaces what should be an investigative function (seeking the truth) with a prosecutorial function (making a case against someone whose guilt they assume). Instead or pursuing truthful information from someone who knows what occurred, by scripting investigators are seeking to create evidence that confirms their pre-existing assumptions, speculations, beliefs and/or theories. Just as police interrogation contamination it can make otherwise completely false confessions appear not only to be true but persuasively so.,[80] the same is true of police interrogation scripting.[81]

Without a recording of the interrogation, it is usually not possible to know with complete certainty whether non-public crime facts in a suspect's confession originated with the suspect or originated with police interrogators who already knew those facts and suggested them to the suspect, who then parroted them back in a confession statement. According to Mr. Amor, the police investigators repeatedly suggested detailed crime scene facts to him that he did not know, repeatedly tried to put words in his mouth, and repeatedly pressured and persuaded him to parrot

[77]   Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[78]   Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[79]   Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE. *Justice* (Harvard University Press).

[80]   Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[81]   Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 43

back to them and which he believed was the only way he would be allowed to leave the police station and go home.

Although it is not possible to know the source of the details in Mr. Amor's police-written confession statement with absolute certainty, it is clear from an analysis of the police reports that some of the details that ultimately became the basis for the final confession statement – such as that a lit cigarette had been left in the living room before Bill and Tina left the condominium; that a flammable substance was spilled in the living room; and that this flammable liquid had been spilled near a swivel chair; that the swivel chair was the location where the police believed the fire had started; that the motive for the fire was just an insurance scheme to collect money to furnish the apartment; and that someone in the condominium lit this flammable substance—were first suggested to Mr. Amor by the investigators through leading and directive questions and later incorporated into his confession statements. Moreover, the content of Mr. Amor's confession statement, the dispositive crime scene evidence and case evidence exculpating him, and the numerous *situational* and *personal* risk factors for false confession present during his interrogation all suggest that the details in his confession statement almost certainly were provided by the police investigators who interrogated him before or as they wrote up his confession statement.[82]

In addition to contaminating Mr. Amor with non-public fire scene details believed by the police, the investigators also scripted Mr. Amor's confession statements, pressuring and persuading him to adopt a narrative that was consistent with not only how the police theorized the alleged arson occurred, but also why. This is most clearly illustrated through the leading, directive and corrective questioning of ASA Nigohosian because the last 10 minutes of the 15+ hour detention/custody and series of interrogation sessions was the only part at that the investigators chose to record (other than the 3 minutes of Mr. Amor re-reading his 1:14 a.m. confession statement at 2:11-2:14 a.m.). The idea that Mr. Amor set the fire intentionally, as well as the idea that the motive for setting the fire was to collect on Marianne Miceli's life insurance policy in order to get new furnishings for their condominium, both came from the investigators, not Mr. Amor. This was classic police interrogation scripting.

Eventually, after many hours of guilt-presumptive accusatory interrogation according to Mr. Amor, he parroted back this theory. Police interrogation contamination and scripting are not so much a risk factor for eliciting a confession as a process that makes an otherwise false confession appear true. As mentioned above, police interrogation contamination is often believed to be inadvertent, not deliberate. Police interrogation contamination and scripting make false confessions appear true, and persuasively true, because the innocent suspect's confession is said to contain "details that only the true perpetrator would know" (erroneously since the details were supplied by the police), and it contains characteristics that most people associate with a true

---

[82]  Steve Drizin's Affidavit provides a thorough review of the details that were leaked to Mr. Amor and Tina Micelli during the course of the investigation, and how they contaminated their interactions with the police. The details *See Drizin Affidavit,* Bates 32366-32375, attached as Ex. A to this report.

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 44

confession (*e.g.*, a story line, motive, explanation, emotions and an attribution of voluntariness), even though it is completely false.[83] Police interrogation contamination and scripting therefore increase the risk that once a suspect has falsely confessed to a crime he or she did not commit, third parties—such as prosecutors, judges, juries, the media and outside observers—will mistakenly believe that the confession is self-corroborating and therefore true. The investigators' contamination and scripting in this case did not increase the risk that Mr. Amor would falsely confess as much it increased the risk that his false confession, once given, would cause third parties to erroneously believe that in contained indicia of reliability, and thus that it was corroborated, and erroneously convict him.

12) *Violation of National Police Interrogation Training Standards*. William Amor's account of his more than 15 hours of detention/custody and multiple interrogation sessions on October 3-4, 1995 repeatedly violated national police interrogation standards, protocols and best practices in general, as well as various precepts of the Reid Method of interrogation in particular, as they existed in 1995.

First, American police investigators are universally trained to absolutely avoid the use of physical force and coercion in the interrogation room, which is unlawful, unconstitutional and correctly believed by law enforcement to lead to both involuntary and false confessions. As discussed above, William Amor describes the repeated use of violent physical assaults by Detective Cross. Mr. Amor testified that at one point during the lengthy sessions of interrogations, Detective Cross had grabbed Mr. Amor by the shoulders, lifted him out of his chair, violently shook him, and caused Mr. Amor bang his head against the wall. Physically coercive interrogation is not only illegal, but also a violation of universal American police interrogation standards since 1936.

Second, American police investigators are trained generally, and in the Reid Method in particular, to avoid the use of threats of harm (explicit or implicit) and promises of leniency (explicit or implicit) to elicit statements, admissions and/or confessions because they are understood to be psychologically coercive and is understood by law enforcement to lead to involuntary and/or false confessions. As discussed above, Mr. Amor describes interrogation sessions in which the investigators threatened continued physical assault and first degree murder charges if he continued to deny their accusations, and did not confess to the version of events that they were pressuring him to accept and parrot back. These threats are not only illegal and violate universal American police interrogation standards, they also imply promises of leniency (if Mr. Amor stopped denying and started confessing, he would not be physically assaulted and he would not be charged with first degree murder) that also are illegal and violate universal American police interrogation standards as they existed in 1995. As mentioned above, Mr. Amor also reported explicit promises of freedom/leniency in exchange for confessing (i.e., that he would be able to put an end to the interrogation and leave the police station). In addition, Mr.

---

[83] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 45

Amor describes more subtle threats and promises (e.g., that he would not be able to put an end to
the interrogation or use the restroom until he stopped denying and started confessing) that are
also psychologically coercive and violated American police interrogation standards and best
practices as they existed in 1995.

Third, relatedly, American police are trained to never deprive a suspect of essential
necessities (food, drink, sleep, rest) during interrogation because that is also unconstitutional and
is recognized by law enforcement to lead to coerced, involuntary and/or false confessions. Mr.
Amor describes not having eaten all day long. By the time of his confession statements in the
early morning hours of October 4th, Mr. Amor had not eaten for over 24 hours (Mr. Amor
testified that due to feeling nauseous he did not eat breakfast at the jail on the morning of
October 3rd, that he missed lunch at the jail due to his court appearance that morning, and that he
was not provided dinner by the detectives that evening). Mr. Amor also describes having been
sleep deprived, and thus extremely tired and fatigued, because, as he had told the investigators,
he only received 2 ½-3 ½ hours of sleep the night before. The fact that the investigators
continued to interrogate Mr. Amor into the early morning hours of October 4th (taking his first
confession statement at 1:14 a.m., having him repeat into a tape recorder at 2:11-2:14 a.m., and
then having ASA Nigohosian interrogate him again from 3:45 a.m. to 5:20 a.m.) reinforces Mr.
Amor's assertions. Even had Mr. Amor received a full night of sleep on October 2, 1995, he
would have been objectively sleep deprived at these times. The food and sleep deprivation that
Mr. Amor describes violated American police interrogation standards and best practices as they
existed in 1995.

Fourth, and related, the investigators violated best practice standards with respect to
police interrogation. As discussed earlier, The 1986 Reid and Associates police interrogation
training manual specifically recommends that police interrogate for no longer than four (4) hours
absent "exceptional situations" and that "most cases require considerably fewer than four
hours."[84] The multiple interrogations that investigators subjected Mr. Amor to over more than 15
hours of combined detention and custody on October 3-4, 1995 violated American police
interrogation standards and best practices as they existed in 1995.

Fifth, as described above, American police interrogators are trained not to contaminate a
suspect by leaking or disclosing non-public case facts to him or her but, instead, to hold back
unique case information and let the suspect volunteer case details in order to demonstrate inside
knowledge of the crime details to corroborate the accuracy of any incriminating statements.
Reid-polygrapher Masokas trains police interrogators to avoid contamination, and both
Detectives Cross and Guerrieri, who had been trained in interviewing and interrogation by Reid
and Associates, acknowledged the anti-contamination norm during police interrogation in their
testimony. Yet even though the investigators chose not to record virtually all of their extended,
multiple interrogation sessions of Mr. Amor on October 3-4, they leaked numerous non-public

---

[84]   Fred Inbau, John Reid, and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS,
     3rd Edition (Williams & Wilkins) at 310.

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 46

fire scene details, as well as their theory of how and why the fire occurred, to Mr. Amor as previously discussed and illustrated. The investigators' contamination of Mr. Amor during his numerous interrogation sessions on October 3-4, 1995 violated American police interrogation standards and best practices as they existed in 1995.

### (D) Detective Cross's, Detective Guerrieri's, Polygrapher-Interrogator Masokas and Assistant State Attorney Nigohosian's Account of the Multiple, Almost Entirely Unrecorded Custodial Interrogation Sessions of William Amor on October 3-4, 1995

Compared to Mr. Amor's description of what occurred during his more than 15 hours of detention, custody and multiple interrogation sessions from approximately 2:00 or 2:15 p.m. on October 3, 1995 to 5:20 a.m. on October 4, 1995, Detective Cross and Guerrieri's, Reid polygrapher-interrogator Masokas, and ASA Nigohosian's descriptions of what occurred are relatively sparse.

According to Detectives Cross and Guerrieri, they met Mr. Amor at the DeKalb County Jail at 2:15 p.m. on October 3, 1995, and asked him whether he would speak to them and was willing to take a polygraph at Reid and Associates in Chicago. Mr. Amor agreed, and they drove to Reid and Associates in an unmarked vehicle, arriving at approximately 4:00 p.m. During the car ride, the detectives did not speak to Mr. Amor, other than to ask him if he wanted lunch, which he declined. According to the detectives, they did not tell Mr. Amor that he was under arrest or not free to leave. Once at Reid and Associates, Mr. Amor waited in the lobby for approximately a half-hour while Detectives Cross and Guerrieri spoke to Reid polygrapher-interrogator Michael Masokas about the fire and death of Ms. Miceli. They informed Mr. Masokas that an arson had occurred resulting in Ms. Miceli's death, and that they had developed Bill Amor as a suspect.

At approximately 4:40 p.m. Reid polygrapher-interrogator Michael Masokas started what he describes as the pre-test interview. This involved the use of background questions, as well as questions that Reid and Associates describes as Behavior Analysis Interview questions (questioned that Reid and Associates claims triggers verbal and non-verbal behavior, i.e., body language, from which Reid and Associates claims investigators can, like a human lie-detector, allegedly make inferences of likely truth-telling and deception at high rates of accuracy),[85] as well as a discussion of the polygraph examination, and at least one interrogation technique known as the Bait Question (wherein the investigator asks the suspect how he would respond if told there is a specific piece of evidence linking him to the crime). The pre-test interview, according to Mr. Masokas, lasted until approximately 5:20 p.m., after which Mr. Masokas left the room and entered again at 5:40 p.m. From then until 6:15 p.m., according to Mr. Masokas,

---

[85]  Reid's Behavior Analysis Interview method of alleged human lie detection has been discredited by the empirical scientific research literature as inaccurate, unreliable and simple-minded. See Aldert Vrij, Samantha Mann, and Ronald Fisher (2006). "An Empirical Test of the Behaviour Analysis Interview." *Law and Human Behavior*, 30, 329-345; and Jaume Masip, Carmen Herrero, Eugenio Garrido and Alberto Barba, "Is the Behaviour Analysis Interview Just Common Sense?" *Applied Cognitive Psychology*, 25, 593-604.

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 47

he administered the polygraph itself.  At 6:15 p.m., he left the room for approximately 15 minutes, and then at 6:30 p.m., he told Mr. Amor he failed the polygraph exam and interrogated Mr. Amor until 7:30 p.m.  Mr. Masokas describes using Reid based interrogation techniques when questioning Mr. Amor, such as minimizing "themes" (scenarios) to suggest why he would have set the fire (e.g., Mr. Amor was talked into it or acted out of character or had been drinking the night of the fire and something just came over him).  At 7:30 p.m., Mr. Masokas stepped out of the interrogation room, and then re-interrogated Mr. Amor, along with fellow Reid polygrapher-interrogator Arthur Newey, from 7:45-8:30 p.m., after which they took a 15-minute break.

According to Mr. Masokas, Mr. Newey then interrogated Mr. Amor by himself from 8:45-9:30 or 9:45 p.m., after which Detectives Cross and Guerrieri interrogated Mr. Amor at Reid and Associates from 9:30/9:45 p.m. to 10:00/10:30 p.m.  According to Mr. Masokas, he asked Mr. Amor if he was had been placed in custody or was under arrest, and Mr. Amor said no, and Mr. Masokas also told Mr. Amor that he was free to leave at any time.  According to Mr. Masokas, Mr. Amor never complained or lack of sleep appeared tired, never expressed that he was hungry or asked for any food, and was provided with water when he asked for drink and was allowed to use the restroom on 2-3 occasions.  Though Mr. Amor reported getting 4 hours of sleep the night before according to Mr. Masokas, having a headache and some cold symptoms on the Reid intake form, Mr. Masokas said that Mr. Amor appeared very comfortable. According to Mr. Masokas, Mr. Amor wanted to stay at Reid and Associates and answer questions because he wanted to straighten things out.  Mr. Amor continued to deny the accusations that he had set the fire that killed Ms. Miceli through the multiple interrogations at Reid and Associates (first by Masokas, then by Masokas and Newey, then by Newey, then by Cross and Guerrieri).

At 10:30, Detectives Cross and Guerrieri drove Mr. Amor back to the Naperville Police Department, after asking Mr. Amor if he wanted to return to Naperville with them and he agreed. The detectives told Mr. Amor that there were inconsistencies in his story that they wished to talk to him about, and that they wanted to continue to question him at the Naperville Police Department.  They did not tell Mr. Amor that he was required to go with him or that he was under arrest nor did they ask him any questions on the car ride.  They arrived at the Naperville Police Department at approximately 11:30 p.m., and Mr. Amor signed a Miranda waiver at 11:37 p.m.  Detective Cross accused Mr. Amor of not telling the truth when denying the accusations that he intentionally set the fire, and told Mr. Amor that his wife Tina had told Detective Sullivan that she now believed that Mr. Amor had set the fire that resulted in the death of her mother, though not intentionally.  In addition, according to the Detectives, shortly before the Miranda waiver, and without any planning by either Detectives Cross or Guerrieri, a process server came to the Naperville Police Department to serve Mr. Amor with divorce papers. This account was refuted by the testimony of process server Russell Wiedemann at the 1997 trial, and credited as false by the trial judge at Mr. Amor's criminal retrial in 2018.

Regardless, the Detectives claim that Mr. Amor did not react with any emotion to the process server. The then detectives continued to ask Mr. Amor questions, continuing to implore

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 48

him to tell the truth.  They told Mr. Amor they knew what happened, but they wanted to know why it happened. At one point, Detective Cross raised his voice when demanding that Mr. Amor stop denying the accusations and tell the truth.  Around midnight, when Detective Guerrieri was questioning Mr. Amor, and Detective Cross was out of the room, Mr. Amor, according to Detective Guerrieri, laid his head on the table, got quiet and said "I did it. I started the fire" (Guerrieri Deposition, P. 283, Lines 17-21). The detectives provided Mr. Amor with pencil and paper at around 1 a.m., and Mr. Amor wrote up a one-page statement, signing it at 1:14 a.m. According to the detectives, at no time did Mr. Amor say he did not want to speak to them; at no time did Mr. Amor request sleep or say that he was tired; at no time did he request food or say he was hungry, though they offered him food and he declined; and at no time did he complain that he was thirsty, though they provided him with several cans of soda and coffee.  Detectives Cross and Guerrieri denied using physical force or making any threats or promises to Mr. Amor.

After Mr. Amor's one-page written statement, the detectives paged ASA Nigohosian, who arrived at the Naperville Police Department at 3 a.m. to take a recorded statement from 2:11 a.m.-2:14 a.m.).  For approximately 40 minutes, the detectives briefed ASA Nigohosian on what they believed to be the facts of the case. ASA Nigohosian's interrogation of Mr. Amor began at 3:45 a.m., included Detectives Cross and Guerrieri for part of the time, and lasted until 5:20 a.m., culminating in a tape-recorded statement by Mr. Amor from 5:10 a.m. to 5:20 a.m.  According to ASA Nigohosian, he reminded Mr. Amor that his Miranda rights still applied, that he did not represent Mr. Amor's interests, but that he wanted to give Mr. Amor an opportunity to tell him in Mr. Amor's own words what happened.  Mr. Amor indicated that he would still speak to ASA Nigohosian.  Mr. Nigohosian described his interrogation of Mr. Amor as question and answer, though he accused Mr. Amor of not being truthful, told Mr. Amor that he had left some facts out when he was previously interrogated by Detectives Cross and Guerrieri, and told Mr. Amor that he did not believe that Mr. Amor accidentally spilled vodka on the newspaper, but told Mr. Amor that he believed Mr. Amor did intentionally start the fire.  Mr. Nigohosian said that Mr. Amor appeared relaxed, that he never displayed any signs of fatigue and that Mr. Amor consented to a recorded statement after an hour or so of interrogation by Mr. Nigohosian.

### E) Risk Factors for False Confessions Present in the Interrogators' Accounts

The accounts (by William Amor on the one hand, and Detectives Cross and Guerrieri, Reid polygrapher-interrogator Masokas, and ASA Nigohosian on the other) of what occurred during the multiple, lengthy and almost entirely unrecorded interrogations on October 3-4, 1995 are dramatically different and diverge on virtually every key factual detail.  In Mr. Amor's telling, there were numerous interrogation techniques (*e.g.*, accusations, attacks on denials, false evidence ploys, yelling, epithets, escalation of pressure, inducements, explicit promises and threats, physical violence) as well as contamination and scripting.  These interrogation techniques were physically and psychologically coercive and involved several known risk factors for eliciting false confessions according to decades of empirical scientific research on the psychology of police interrogations and suspect confessions.  The interrogation methods,

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 49

strategies and techniques that Mr. Amor describes fit with the empirical research on the kinds of interrogation techniques, methods, practices and effects that lead to *proven* false confessions.

In the law enforcement telling, the almost entirely unrecorded questioning of William Amor -- despite the multiple sessions in multiple locations for many hours and continuing overnight and through the early hours of the next morning – was mostly conversational and more interview than interrogation (*i.e.*, mostly question and answer), and involved only a few interrogation techniques before Mr. Amor, who was never tired, hungry, or unsettled (even when served by divorce paper approximately 10 hours into his detention/custody and questioning) voluntarily confessed to intentionally setting the fire that resulted in the death of Marianne Miceli.

Despite these dramatic differences in recounting the almost entirely unrecorded historical record of the multiple interrogation sessions, even if we accept the investigators' version of what happened, there are still were multiple risk factors for false confession present during the more than 15 hours of Mr. Amor's detention/custody and multiple interrogation sessions on October 3-4, 1995. As discussed and illustrated in great detail above, these include: (1) the presumption of guilt (Cross admits to thinking Mr. Amor was guilty of arson prior to his polygraph at Reid, and none of the investigators dispute that they all believed Mr. Amor to be guilty of arson and first degree murder after he failed the polygraph); (2) false evidence ploys (none of the investigators dispute that they told Mr. Amor of the failed polygraph results or deny that Detective Cross lied to Mr. Amor when he told Mr. Amor that Tina had said he intentionally started the fire or that Mr. Masokas used the Bait Technique in his pre-polygraph interview; (3) Lengthy interrogation (the lengthy interrogation sessions lasted well over 4 hours); (4) Sleep deprivation (Mr. Amor was objectively sleep deprived even if he looked calm, normal, and never tired according to the various investigators); (5) Mr. Amor was extraordinarily suggestible, as established by Dr. Chiappetta's clinical testing; and (6) the investigators, as documented in their reports, leaked non-public fire details, as well as their theories about how and why the fire started, to Mr. Amor during their many interviews and interrogations of him from September 11, 1995 to October 4, 1995.

In my professional opinion, Mr. Amor's robust and detailed account of the multiple, lengthy, and almost entirely unrecorded interrogation sessions on October 3-4, 1995 fits better with the findings of the empirical and scientific research literature on how and why individuals can be moved to make or agree to *proven* false confessions than the investigators' accounts. However, the multiple risk factors present in the investigators' own sparse accounts of what occurred and was present during the interrogation sessions on October 3-4, 1995 also provides an explanation of how and why Mr. Amor was at risk for, and could have been moved, give a *proven* false confession.

### XIV. Conclusion

In conclusion, based on my detailed analysis above, it is my professional opinion that:

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 50

1) The lengthy and almost entirely unrecorded multiple interrogation sessions of William Amor on October 3-4, 1995 incorporated and used techniques from the Reid method of interrogation. In the scientific research community and published research literature, the Reid method of interrogation is universally believed to lead to coerced and/or false confessions and wrongful convictions in a significant number of criminal cases.

2) William Amor's interrogation-induced confession statements on October 4, 1995 bears the hallmarks, characteristics and indicia of a false and unreliable confession. The confession statements meet the criteria for what is known as a *proven* false confession in the social science research literature. If false, Mr. Amor's confessions statements are properly classified as *coerced-compliant* false confessions.

3) William Amor's description of what occurred during his lengthy and almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 that led to his confession statements fits with the empirical social science research on the types of interrogation techniques, methods, practices and effects that are associated with, increase the risk of, and are known to cause false confessions, and that explain how and why innocent individuals are often moved to make and/or agree to false and unreliable confessions.

4) William Amor's description of his lengthy, almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 contains examples of physically and psychologically coercive interrogation techniques, methods, strategies and effects that have been demonstrated to cause involuntary confessions as well as false and unreliable ones. These interrogation techniques, methods, strategies and effects cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators.

5) William Amor's description of what occurred during his lengthy, almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 indicates the use of interrogation techniques and practices that were guilt-presumptive, truth-presumptive, confirmatory and theory-driven. Mr. Amor describes investigative and interrogation procedures whose goal was not to find the truth but solely to break down his denials of guilt and elicit from him a confession to starting the fire that resulted in the death of Marianne Miceli that was consistent with the detectives' pre-existing assumptions, speculations, and beliefs about the cause and origin of that fire.

6) William Amor's account of what occurred during his lengthy, almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 contains a description of interrogation techniques, methods, strategies and effects that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions (*i.e.*, *situational* risk factors) when misapplied to the innocent. These included: lengthy interrogation, sleep deprivation, false evidence ploys, minimization, threats, promises, and physical and psychological coercion.

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 51

7) William Amor was at a heightened risk for making and/or agreeing to false and unreliable statements, admissions and/or confessions during his lengthy, almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 because of his personality traits at the time (*i.e.*, *personal* risk factors), especially his suggestibility, but also his anxiety and depression.

8) The investigators' accounts of what occurred during Mr. Amor's lengthy, almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 also contain a description of interrogation techniques, methods, strategies and effects that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions when misapplied to the innocent. These include: lengthy interrogation, sleep deprivation (objectively defined), false evidence ploys and minimization, as well as Mr. Amor's *personal* risk factors such as Mr. Amor's extremely high interrogative suggestibility.

9) The lengthy and almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 described both by William Amor as well as by the investigators involved multiple documented instances of police interrogation contamination (*i.e.*, leaking and disclosing non-public case facts) and scripting (pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Mr. Amor's confession statements would, misleadingly, appear to be detailed, accurate and self-corroborating.

10) The lengthy and almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 described by William Amor violated universally accepted police investigative and interrogation national training standards and best practices that existed in 1995.

The opinions I express in this report are based on my own knowledge, research, and publications; research and publications in the field; and the case-specific information and evidence that has been provided to me. Should any additional information or testimony come to my attention, I reserve the right to modify any opinions expressed herein accordingly.

If you have any questions, please do not hesitate to contact me.

Sincerely yours,

Richard A. Leo, Ph.D., J.D.
Hamill Family Professor of Law and

Mariah Garcia, Esq.
LOEVY & LOEVY
January 22, 2021
Page 52


Social Psychology
University of San Francisco

# EXHIBIT A

## STEVE DRIZIN AFFIDAVIT
## BATES 32366-32375

*Chris Kachiroubas*
e-filed in the 18th Judicial Circuit Court
********* DuPage County *********
TRANS# : 4085820
1995CF002075
FILEDATE : 07/27/2017
*Date Submitted : 07/27/2017 04:41 PM*
*Date Accepted : 07/28/2017 09:37 AM*
**VANESSA EDGERTON**
........................

## EXPERT AFFIDAVIT OF STEVEN A. DRIZIN

STEVEN A. DRIZIN, being first duly sworn, deposes and says:

## I.  Qualifications

1. I have been retained as a consultant by counsel for the defendant, William Amor.

2. I graduated from Northwestern University School of Law in1986 with a J.D.

3. In 1991, I returned to Northwestern University as a Clinical Fellow supervising law students on juvenile and criminal cases while working at the Law School's Legal Clinic.  Since 1991, I have been promoted several times, rising to the rank of Clinical Law Professor.  In 2005, I was named the Legal Director of the Center on Wrongful Convictions, one of the oldest and most successful innocence organizations in the United States.  Effective September 1, 2013, I will be an Assistant Dean at the Law School.

4. A copy of my Curriculum Vitae is attached to this Affidavit as Exhibit A.

5. Since January 1995, I have conducted extensive research into the subject matter of police interrogations and confessions.  I have collected and analyzed (with Dr. Richard Leo) the largest data set of proven false confessions in the United States.  In 2004, Dr. Leo, a criminologist and law professor at the University of San Francisco Law School, and I published *The Problem of False Confessions in the Post-DNA World*, 82 N.C.L.Rev 897 (March 2004), a qualitative and quantitative analysis of the first 125 proven false confessions in the post-DNA age.  We have amassed an additional 150 or more proven false confessions since 2004 and are currently working on a sequel to our article.

6. I have published numerous other law review articles, book chapters, Op-eds, and peer-reviewed articles for psychological journals such as Law and Human Behavior since 2001.  Law and Human Behavior is one of the most prestigious social science journals in the United States and I

C  1919

Pl. Amor 032343

have been selected to be a peer-reviewer of the work of other social scientists for inclusion in Law and Human Behavior.

7. My work on police interrogations and confessions has been cited widely by state and federal courts and is routinely cited by other scholars in the fields of law, psychology, sociology, criminology, juvenile and criminal justice and other related disciplines.

8. *The Problem of False Confessions in the Post-DNA World* has twice been cited by the United States Supreme Court. First, in *Corley v. U.S.,* 129 S.Ct. 1558, 1570 (2009), it was cited for the proposition that the pressures of a custodial interrogation are so immense that they can "induce a frighteningly high percentage of people to confess to crimes they never committed." More recently, the article was cited in *J.D.B. v. North Carolina*, No. 09-11121 (2011) for the proposition that "the risk of false confessions is all the more troubling – and recent studies suggest, all the more acute – when the subject of the custodial interrogation is a juvenile."

9. I lecture frequently on the subject of police interrogations and confessions to judges, lawyers, law students, undergraduates, psychologists, and to law enforcement groups and have lectured throughout the United States, Canada, and Japan.

10. I have been qualified and have testified on several occasions on matters related to police interrogation and confessions. I have given expert testimony related to the voluntariness of confessions during motions to suppress and the voluntariness and reliability of confession evidence at trial in courts in Washington, D.C., the State of          Washington, and most recently, at a jury trial in Indiana. I have also testified as an expert before clemency boards and the North Carolina Innocence Commission, a state governmental body charged with investigating claims of actual innocence.

11. In the Fall of 2010, I was retained, along with former D.C. Metro Police Homicide Detective James Trainum, as a consultant by the United States Department of Justice, Civil Rights Division, to analyze and to prepare a report documenting the interrogation practices of the New Orleans Police Department ("NOPD") as part of the Justice Department's civil rights lawsuit against the NOPD.

2 of 34

C 1920

Pl. Amor 032344

12. I have also been retained as a consultant by the International Association of Chiefs of Police ("IACP") and the Office of Juvenile Justice and Delinquency Prevention ("OJJDP") to draft a guide for police executives on effective interviewing and interrogation of juvenile suspects and currently serve on the IACP's Advisory Board for Advanced Juvenile Interview and Interrogation Techniques.

13. In the case of William Amor, I have been retained by counsel for William Amor, Erica Anne Nichols, of the Illinois Innocence Project. I am charging $200/hour for my time. (I also attach a list of the testimony I have given in court and/or by deposition testimony in the four year period from February, 2007 to February, 2011).

## II.    Materials Reviewed

14. I have reviewed the following materials in this case:
   - Transcript of Motion to Suppress Hearing, including testimony of William Amor
   - Transcript of Trial testimony of Det. Cross
   - Transcript Trial testimony of Det. Guerreri
   - Transcript Trial testimony of Det. Cunningham
   - Transcript Trial testimony of Sgt. Carlson
   - Transcript Trial testimony of ASA Brian Nigoshian
   - Transcript of Trial testimony of Michael Mannion
   - Transcript of Trial testimony of Dr. Chiapetta
   - Police reports regarding Tina Miceli and William Amor interviews & interrogations dated 9-11-95, 9-12-95, 9-14-95, 9-15-95, 10-3-95 and 10-4-95.
   - Polygraph report by Michael Masokas dated October 20, 1995
   - Transcript Trial testimony of Michael Masokas
   - Transcript of interrogation of William Amor on October 4, 1995 at 5:10 am.
   - Handwritten statement by William Amor dated October 4, 1995 at 1:14 am.
   - Handwritten statement by William Amor dated September 15, 1995

Document received on 2017-07-27-16.41.18.0 Document accepted on 07/28/2017 09:44:13 # 4085820/1704378485

C 1921

Pl. Amor 032345

- Memo from ASA Nigoshian to State's Attorney dated November 1, 1995
- Transcript of 911 call by Marianne Miceli
- Dr. Chiapetta fitness report
- Grand Jury Transcript of testimony of Marilyn Glisson
- Grand Jury Transcript of testimony of Michael Mannion
- Transcript of Inquest proceedings
- Grand Jury Transcript of testimony of Det. Cross
- Police report of interview with Michael Mannion dated 10-9-95
- State v. Amor, 303 Ill. App.3d 1107, 747 N.E.2d 1110 (2d Dist. 1999)(unpublished pursuant to Rule 23).

## III.   The Social Scientific Study of Police Interrogation and False Confessions

15. To many, it is hard to accept that a person would ever confess to a crime – particularly a murder – that he or she did not commit.  Indeed, it was once considered a universal truth that "one who is innocent would not imperil his safety or prejudice his interests by an untrue statement."[1] But today, it is no longer possible to doubt the reality of false confession cases.[2]  To date, 311 individuals have been exonerated by DNA evidence, approximately 25% of whom had falsely confessed.[3] A closer

---

[1] *Hopt v. Utah,* 110 U.S. 574, 585 (1884).

[2] See, e.g. *Corley v. United States,* 129 S.Ct. 1558 (2009)(citing Steven A. Drizin & Richard A. Leo, *The Problem Of False Confessions in the Post-DNA World* (hereinafter "Drizin & Leo"), 82 N.Car.L.Rev. 891, 907(2004) for the proposition that "mounting empirical evidence" shows that a "frighteningly high percentage of people" falsely confess.)

[3] See The Innocence Project, http://www.innocenceproject.org/understand/False-Confessions.php (last checked September 9, 2013).  This statistic does not include false confessors who have been exonerated on the basis of non-DNA evidence or false confessors who have yet to be exonerated.  Nor does it include cases of proven false confessions that lead to wrongful arrests but are discovered before trial before they have a chance to ripen into wrongful convictions.

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1922

Pl. Amor 032346

look inside the DNA database numbers, however, shows that in murder cases, false confessions play an even more significant role. The DNA database, is composed largely of sex crimes, sex-related murders, and non-sex related murders, crimes where defendants are most likely to leave DNA. According to Peter Neufeld of the Innocence Project: Of the 195 sex crime only cases, 95% involved a misidentification and only 9% involved a false confession. Of the 85 sex crime plus murder cases, only 27% involved a misidentification whereas 66% involved a false confession. Of the 19 murder only cases, 47% involved a misidentification and 42% involved a false confession.[4]

16. Aside from the DNA exoneration cases, there is a well-established empirical field of research in the academic disciplines of psychology, criminology, and sociology on the subject of police interrogation practices, psychological coercion, and false confessions. This research dates back to 1908; has been the subject of extensive publication (hundreds of academic journal articles, stand-alone books, and book chapters in edited volumes); has been subjected to peer review and testing; is based on recognized scientific principles, methods, and findings; and is generally accepted in the social scientific community. This research has analyzed several hundred cases of police-induced false confessions and identified the personal and situational factors associated with, and believed to cause, false confessions.[5]

---

[4] E-mail from Peter Neufeld to Steven A. Drizin dated 9/9/2013 (on file with author). This is consistent with the largest study to date, Drizin and Leo's 2004 study of 125 proven false confessions, which found that over 80% of their database involved false confessions to murders, including sex-related and non sex-related murders.

[5] See Saul Kassin et al., "Police-Induced Confessions: Risk Factors and Recommendations," 34 *Law and Human Behavior*, 3-38 (2010); Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); and Gisli Gudjonsson (2003), THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc).

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1923

Pl. Amor 032347

17. The subject of police interrogation and false confessions is beyond common knowledge and therefore highly counter-intuitive.[6] Most people do not know that police detectives receive highly specialized training in psychological interrogation techniques, what these techniques are, or how the techniques are designed to work (i.e., move a suspect from denial to admission). In addition, most people also do not know what psychological coercion is, why some techniques are regarded as psychologically coercive, and what their likely effects are. Moreover, most people do not know which interrogation techniques create a risk of eliciting false confessions when applied to innocent suspects or how and why the psychological process of police interrogation can, and sometimes does, lead suspects to falsely confess. In fact, most people are skeptical that innocent suspects will give or agree to false confessions to serious crimes in response to purely psychological interrogation techniques in the absence of a physical torture or mental illness. This is because people view confessing falsely to a crime as an irrational and self-destructive act. Most people have no direct knowledge of, or experience with, psychological police interrogation, and do not believe that they themselves could be made to falsely confess unless tortured. This skepticism and relative ignorance causes most people to assume that virtually all confessions are true and to presume that any defendant who has confessed is therefore guilty. Empirical studies have shown that confession evidence (even confession evidence that is later proven false) is highly prejudicial in the sense that once a confession is introduced into evidence against a suspect at trial it almost inevitably leads to a suspect's conviction. In the two leading studies to date on the issue, individuals who have falsely confessed and chosen to

---

[6] See Danielle Cojnacki, Michael Cicchini and Lawrence White, *An Empirical Basis for the Admission of Expert Testimony on False Confessions*, 40 ARIZ. ST. L. J. 40, 1-45 (2008); Richard Leo and Brittany Liu, *What Do Potential Jurors Know About Police Interrogation and False Confessions?*" 27 BEH. SCI. & LAW 381-399 (2008); Linda Henkel, Kimberly Coffman, and Elizabeth Dailey, *A Survey of People's Attitudes and Beliefs About False Confessions*, 26 BEH. SCI. & LAW 555-584 (2008); Iris Blandon-Gitlin, Kathryn Sperry, & Richard Leo, *Jurors Believe Interrogation Tactics Are Not Likely to Elicit False Confessions: Will Expert Witness Testimony Inform Them Otherwise?*; 17 PSYCHOLOGY, CRIME & LAW 239-260 (2011); and Mark Costanzo, Netta Shaked-Schroer and Katherine Vinson *Juror Beliefs About Police Interrogation, False Confession and Expert Testimony*, 7 THE JOURNAL OF LEGAL EMPIRICAL STUDIES, 231-247 (2010).

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1924

Pl. Amor 032348

take their case to trial were convicted by juries between 73-81% of the time.[7]

18. Not only can false confession evidence bias jurors, it also has the potential to bias the work of both lay and expert witnesses. Both controlled experimental studies and case studies from the DNA exoneration dataset have demonstrated the powerful corruptive effect of confession evidence on other witnesses. For example, studies have demonstrated that a confession can bias professional polygraph operators, fingerprint experts, and mock eyewitnesses. Moreover, this same corruptive effect was found in an analysis of the first 240 DNA exonerations. False confession cases were more likely to contain multiple errors than eyewitness cases and, in order of frequency, confessions were accompanied by invalid or improper forensic science, eyewitness misidentifications, and then informant errors.[8]

19. Interrogators must be especially careful to be on the lookout for false confessions in arson cases. There are several reasons for this. First, the science of arson is inexact and until recently, has not been subjected to rigorous scientific scrutiny. Different experts looking at the same evidence often reach differing conclusions (as they did here) and even the same experts can, and often do change their opinions, during the course of an investigation (as Lt. Ferreri did). There is often inexactitude in determining the origin of the fire and the cause of the fire (i.e. whether the fire is accidental or intentional). Second, the "scientific" conclusions of arson investigators can cause tunnelvision among investigators, leading them to push for a confession that comports with one theory of how the fire occurred (arson) as opposed to another (accident). Third, confessions are more critical in arson

---

[7] Richard Leo & Richard Ofshe ,*The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation*, 88 J. CRIM. L. & CRIMIN. 429 (1998); and Drizin and Leo, at 958-959 (2004).

[8] Saul Kassin, et al., *Confessions that Corrupt: Evidence from the DNA Exoneration Cases*, 23 PSYCH. SCI. 41-45 (Jan. 2012), *available at:http://web.williams.edu/Psychology/Faculty/Kassin/files/Kassin,%20Bogart%20&%20Kerner %20(2012)%20-%20Corruptive%20confessions.pdf* . *See also* Lisa E. Hasel & Saul M. Kassin, *On the Presumption of Evidentiary Independence,: Can Confessions Corrupt Eyewitness Identifications*, 20 PSYCH. SCI. 122, 122 (Jan. 2009).

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1925

Pl. Amor 032349

investigations than other investigations because even if arson science suggests that a fire was set intentionally instead of accidentally, investigators still must determine "who set the fire" and "why?" The best and most direct way to answer these questions is often to get a suspect to confess.

## IV.     The Social Psychology of Police Interrogation

20. Once patrol officers promote to the rank of detective, they typically receive intensive training in the practice and law of interrogation and thereafter learn to apply, refine and hone their interrogation skills through extensive case experience, supervision, and/or additional training. Police interrogation is a cumulative, structured, and time-sequenced process in which detectives draw on an arsenal of psychological techniques in order to overcome a suspect's denials and elicit incriminating statements, admissions and/or confessions. This is the sole purpose of custodial interrogation. To achieve this purpose, interrogators use techniques -- all of which are generally legal -- that seek to influence, persuade, manipulate and deceive suspects into believing that their situation is hopeless and that their best interest lies in confessing. Sometimes, however, interrogators cross the line and employ techniques and methods of interrogation that are coercive and thus regarded as legally impermissible.

21. Contemporary American interrogation methods are structured to persuade a rational person who knows he is guilty to rethink his initial decision to deny culpability and choose instead to confess. Police interrogators know that it is not in any suspect's rational self-interest to confess. They expect to encounter resistance and denials to their allegations, and they know that they must apply a certain amount of interpersonal pressure and persuasion to convince a reluctant suspect to confess. As a result, interrogators have, over the years, developed a set of subtle and sophisticated interrogation techniques whose purpose is to alter a suspect's perceptions such that he eventually comes to see the act of confessing as being in his self-interest. Interrogators accomplish this by persuading a suspect to view his immediate situation differently, by focusing his attention on a limited set of choices and alternatives, and by convincing him of the likely consequences that attach to each of these choices. If successful, this process unfolds in two steps: first, the

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1926

Pl. Amor 032350

interrogator causes the suspect to view his situation as hopeless; and, second, the interrogator persuades the suspect that only by confessing will the suspect be able to improve his otherwise hopeless situation.

22. The first step or stage of successful interrogation consists of causing a suspect to view his situation as hopeless. If the interrogator is successful at this stage, he will undermine the suspect's self-confidence and cause the suspect to reason that there is no way for him to escape the interrogation without incriminating himself. To accomplish this, interrogators accuse the suspect of having committed the crime; they attack and try to undermine a suspect's assertion of an alibi or verbalization of innocence (pointing out or inventing logical and factual inconsistencies, implausibilities and/or impossibilities); they exude unwavering confidence in their assertions of the suspect's guilt; they refuse to accept the possibility of the suspect's denials; and, most importantly, they confront the suspect with incontrovertible evidence of his guilt, whether real or non-existent. Because interrogation is a cumulative and time-sequenced process, interrogators often draw on these techniques repeatedly and/or in succession, building on their earlier accusations and representations at each step in the interrogation process.

23. Through the use of these techniques, the interrogator communicates to the suspect that he has been caught, that there is no way he will escape the interrogation without incriminating himself, and that his future is determined -- that regardless of the suspect's denials or protestations of innocence, he is going to be arrested, prosecuted, convicted and eventually incarcerated. The interrogator seeks to convince the suspect that this is a fact that has been established beyond any doubt, and thus that any objective person must necessarily reason to this conclusion. By persuading the suspect that he has been caught, that the existing evidence or case facts objectively prove his guilt, and that it is only a matter of time before he will be prosecuted and convicted, the interrogator seeks to alter the suspect's perceptions such that he comes to view his situation as hopeless and comes to perceive that resisting the interrogator's demands is futile.

24. Once the interrogator has caused the suspect to understand that he has been caught and that there is no way out of this predicament, he seeks to convince the suspect that the only way to improve his otherwise

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1927

Pl. Amor 032351

hopeless situation is by confessing to the offense(s) of which he is accused. The second step of successful interrogation thus consists of offering the suspect inducements to confess -- reasons or scenarios that suggest the suspect will receive some personal, moral, communal, procedural, material or other benefit if he confesses to some version of the offense. Researchers have classified the types of inducements investigators use during the second step of interrogation into three categories: *low-end* inducements, *systemic* inducements, and *high-end* inducements. *Low-end* inducements refer to interpersonal or moral appeals the interrogator uses to convince a suspect that he will feel better if he confesses. For example, an interrogator may tell a suspect that the truth will set him free if he confesses, or that confessing will relieve his anxiety or guilt, or that confessing is the moral or Christian thing to do, or that confessing will improve his standing in the eyes of the victim or the eyes of the community.

25. *Systemic* inducements refer to appeals that the interrogator uses to focus the suspect's attention on the processes and outcomes of the criminal justice system in order to get the suspect to come to the conclusion that his case is likely to be processed more favorably by all actors in the criminal justice system if he confesses. For example, an interrogator may tell a suspect that he is the suspect's ally and will try to help him out -- both in his discussions with the prosecutor as well as in his role as a professional witness at trial -- but can only do so if the suspect first admits guilt. Or the interrogator may ask the suspect how he expects the prosecutor to look favorably on the suspect's case if the suspect does not cooperate with authorities. Or the interrogator may ask the suspect what a judge and jury are really going to think, and how they are likely to react, if he does not demonstrate remorse and admit his guilt to authorities. Interrogators often couple the use of systemic incentives with the assertion that this is the suspect's one and only chance -- now or never -- to tell his side of the story; if he passes up this opportunity, all the relevant actors in the system (police, prosecutor, judge and jury) will no longer be open to the possibility of viewing his actions in their most favorable light. Interrogators rely on *systemic* inducements to persuade the suspect to reason to the conclusion that the justice system naturally confers rewards for those who admit guilt, demonstrate remorse, and cooperate with authorities, whereas it inevitably metes out punishment for those who do not.

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1928

Pl. Amor 032352

26. Finally, *high-end* inducements refer to appeals that directly communicate the message that the suspect will receive less punishment, a lower prison sentence and/or some form of police, prosecutorial, judicial or juror leniency if he complies with the interrogator's demand that he confess, but that the suspect will receive a higher sentence or greater punishment if he does not comply with the interrogator's demand that he confess. *High-end* inducements may either be implicit or explicit: the important question is whether the interrogation technique communicates the message, or is understood to communicate the message, that the suspect will receive a lower criminal charge and/or lesser punishment if he confesses as opposed to a higher criminal charge and/or greater amount of punishment if he does not. For example, interrogators sometimes try to persuade suspects that their behavior was merely an accident, or a reasonable response to the victim's provocation or an act of self-defense. By portraying the suspect's behavior as an accident or reasonable response to provocation, the interrogator communicates the message that the suspect did not intend to harm the victim, that the act was therefore not a crime or a significantly lower lever of crime, and that the suspect will therefore receive little or no punishment if he agrees to this version of what happened. By portraying the suspect's behavior as self-defense, the interrogator communicates that no crime at all even occurred and that the suspect will receive no punishment at all if he agrees to this version of what happened (since self-defense is not a crime, but a legally excused response to physical aggression).

27. Sometimes interrogators use more explicit *high-end* incentives, such as telling a suspect that there are several degrees of the alleged offense, each of which carry different amounts of punishment, and asking the suspect which version he would like to confess to. Or the interrogator may explicitly tell the suspect that he will receive a long prison sentence, or perhaps even the death penalty, if he does not confess, and/or may point out what happens to men of his age, or men accused of crime, in prison if he does not confess to the interrogator's minimized account. Sometimes interrogators who rely on *high-end* inducements will present the suspect with a simple two choice situation (good vs. bad): if the suspect agrees to the good choice (a minimized version of the offense, such as involuntary manslaughter or self-defense), he will receive a lower amount of punishment or no punishment at all; but if does not confess, criminal justice offices will impute to him the bad choice (a

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C  1929

Pl. Amor 032353

maximized version of the offense, such as pre-meditated first degree murder), and he will receive a higher level of punishment or perhaps the harshest possible punishment. (This technique is sometimes referred to in the academic literature as the maximization/minimization technique). The point of *high-end* inducements is to communicate to a suspect that it is in his rational self-interest to confess to the minimized or non-incriminating version of the offense that the interrogator is suggesting because if he does so, he will receive a lower charge, a lesser amount of punishment and/or no time in prison, but if he fails to do so, he will receive a higher charge, a greater amount of punishment and more time in prison, perhaps even the death penalty (although it is rare that interrogators these days ever threaten a suspect with receiving the death penalty if he does not confess).

28. To evaluate whether a particular interrogation is coercive, experts must first determine the facts of the case and then analyze these facts in light of the extensive social science research literature on the social psychology of interrogation and confession. The expert must evaluate whether any of the interrogator's techniques, methods or strategies were coercive by applying the generally accepted findings of the social science research literature on the subject of interrogation, coercive influence techniques and false confessions to the specific facts of the case. In particular, the expert looks to whether the interrogator used any techniques that communicated, either implicitly or explicitly, that the suspect would receive a lower sentence, a lesser amount or type of punishment or perhaps no punishment at all if he complied with the interrogator's demands and/or receive a higher amount or type of punishment or perhaps the harshest punishment possible if he did not comply with the interrogator's demands. Social science research has repeatedly demonstrated that some *systemic* inducements (depending on the content of the inducement, how explicitly or vaguely it is stated, and the message that it communicates) and all *high-end* inducements are coercive because they rely on implicit and/or explicit promises of leniency and threats of harm to induce compliance. Such promises of leniency and threats of harm are not only regarded as coercive in the social science literature because of the messages they convey and their demonstrated impact on the decision-making of individuals, but they are also regarded as legally impermissible by courts. The expert may also evaluate whether the interrogation techniques, either individually or cumulatively, had the effect of causing a suspect to perceive he had no

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1930

Pl. Amor 032354

choice but to comply with the demands of the interrogator and thus, the interrogation, in effect, overbore his will.

### V. The Three Sequential Errors That Lead to
### False (But Detailed and Persuasive) Confessions

29. There are three important decision points in the interrogation process to analyze when trying to understand the causes of a false confession. The first decision point is the police decision to classify someone as a suspect. This is important because police only *interrogate* individuals whom they first classify as suspects; police *interview* witnesses and victims. There is a big difference between interrogation and interviewing: interrogation is based on a presumption of guilt (unlike interviewing); interrogation involves the application of specialized psychological interrogation techniques (unlike interviewing); and the ultimate purpose of an interrogation is to get an incriminating statement from someone whom police believe to be guilty of the crime (unlike interviewing). False confessions only occur when police misclassify an innocent suspect as guilty and then subject him to a custodial interrogation. This is one reason why interrogation training manuals implore detectives to adequately investigate their cases before subjecting any potential suspect to an accusatorial interrogation.

30. The second important decision point in the process occurs when the police interrogate the suspect. As mentioned above, the goal of police interrogation is to elicit an incriminating statement from the suspect by moving him from denial to admission. To accomplish this, police use psychologically persuasive, manipulative and deceptive interrogation techniques. As described in detail in the previous section, police interrogators use these techniques to accuse the suspect of committing a crime, persuade him that he is caught and that the case evidence overwhelmingly establishes his guilt, and then induce him to confess by suggesting it is the best course of action for him. Properly trained police interrogators do not use physically or psychologically coercive techniques because they may result in involuntary and/or unreliable incriminating statements, admissions and/or confessions.

31. To understand how and why police-induced false confessions occur, one must first understand how interrogation is intended to influence and manipulate a suspect's perceptions, reasoning and decision-making.

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/1704378485

C 1931

Pl. Amor 032355

Police interrogation is designed for the guilty, not the innocent. Police therefore only interrogate suspects whom they believe to be guilty, and the purpose of interrogation of suspects unlike the interviewing of witnesses or victims is to elicit an incriminating statement, admission and/or confession that confirms the interrogator's belief in the suspect's guilt and assists the state in prosecuting the suspect. Because police expect the suspect to be guilty and to deny his guilt, interrogation is intended to break down the suspect's resistance and move him to admission. As discussed above, police typically achieve this by accusing a suspect of committing the crime, attacking the suspect's alibi, cutting off a suspect's denials and confronting the suspect with seemingly irrefutable (whether real or non-existent) evidence of his guilt. The point of these techniques is to break down a suspect's confidence in his denials by convincing him that he is caught, that no one will believe his assertions of innocence, and that objective evidence of his guilt is so overwhelming that it will inevitably lead to his arrest and conviction regardless of what he says or does during interrogation.

32. To elicit an admission or confession, however, it is often not sufficient simply to break down a suspect's resistance. Interrogators also try to persuade the suspect that -- given the circumstances in which he now finds himself -- he is caught, all the evidence is against him, and there is no way out of his predicament and that are positive reasons for confessing that will improve his otherwise hopeless situation. In other words, interrogators seek not only to overcome a suspect's denials, but also to convince him of the positive benefits of compliance and confession. Interrogators sometimes do this by using appeals to morality, religion, catharsis or simply doing the right thing. Interrogators sometimes do this by focusing the suspect's attention on the processing of his case in the criminal justice system and implying or stating the benefits of cooperation and confession versus the disadvantages of continued denial and resistance. Interrogators sometimes do this by trying to focus the suspect's attention on how certain actors in the criminal justice system (police, prosecutors, judges, juries) can either help or hurt the suspect depending on what he says in the interrogation room or how they will react to his unsympathetic and implausible denials versus a confession that demonstrates remorse and accepts responsibility for the offense. Sometimes interrogators do this by trying to persuade the suspect that the alleged crime will be framed in a way that minimizes the suspect's culpability if he admits to the

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1932

Pl. Amor 032356

underlying act (e.g., a murder may be portrayed as a complete accident or a willful act of self-defense), but that it will be framed in a way that maximizes his culpability if he does not admit to the underlying act during the interrogation (e.g., a murder may be portrayed as intentional and premeditated). And sometimes interrogators do this by using explicit promises of prosecutorial leniency in exchange for a confession and explicit threats of harsher treatment or punishment in the absence of a confession.

33. False confessions to police typically occur when detectives use inappropriate, improper and/or coercive interrogation techniques that cause a suspect to feel hopeless and perceive that he has no choice but to comply with the detectives' demands if he wishes to put an end to the interrogation. False confessions, of course, will occur in response to traditionally coercive methods of interrogation such as the use of physical violence, threats of physical harm, excessively long or incommunicado interrogation, or deprivation of essential necessities such as food, water and/or sleep. However, these types of traditionally coercive techniques no longer appear to be common in America. The psychological techniques of interrogation that cross the line and sometimes cause false confessions typically involve one of two patterns: (1) either the interrogator communicates to the suspect, implicitly or explicitly, that he will receive a higher charge and harsher sentence or punishment if he does not comply with the detective's request for confession but that he will receive a lesser charge or sentence, or perhaps no punishment at all, if he complies with the detective's request for confession; or (2) the interrogator wears down and distresses the suspect to the point that he subjectively feels that he has no choice but to comply with the interrogator's demand for confession if he is to put an end to the intolerable stress of continued interrogation and/or escape the oppressive interrogation environment.

34. While coercive and/or improper interrogation techniques are often the primary cause of false confessions, certain types or groups of individuals are far more vulnerable to the pressures of interrogation, having their will overborne and/or making a false confession. This includes individuals who are mentally ill, and therefore may confess falsely because they are easily confused, disoriented, delusional or experiencing a non-rational emotional or mental state. This also includes individuals with a low IQ or low-level cognitive functioning, who may be more

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1933

Pl. Amor 032357

vulnerable to interrogators because of their inability to understand the nature or gravity of their situation, their inability to foresee the consequences of their actions, their inability to cope with stressful situations and/or their eagerness to please others, especially authority figures. This also includes juveniles, who may be more easily intimidated than adults and may lack the maturity or knowledge to resist simple police pressures and manipulations. And this also includes individuals who, by their nature and personality, are naive, excessively trusting of authority, highly suggestible and/or highly compliant and who are therefore predisposed to believe that they have no choice but to comply with the demands of authorities or who simply lack the psychological resources to resist the escalating pressures of accusatorial interrogation.

35. Whether a police-induced false confession is caused primarily by coercive interrogation techniques or by a suspect's pre-existing vulnerabilities to interrogation or some combination of both, there are three fundamental types of false confession: a *voluntary* false (i.e., a false confession knowingly given in response to little or no police pressure); a *compliant* false confession (a false confession knowingly given to put an end to the interrogation or to receive an anticipated benefit or reward in exchange for confession); and a *persuaded* false confession (a confession given by a suspect who comes to doubt the reliability of his memory and thus comes to believe that he may have committed the crime despite no actual memory of having done so). These different types of false confession typically involve different levels of police pressure, psychological logics of influence and decision-making, and different beliefs about the likelihood of one's guilt. Regardless, false confessors typically recant their confessions shortly after they are removed from the pressures and reinforcements of the interrogation environment.

36. The third important decision point in the interrogation process occurs after the police have elicited an "I did it" statement or admission from a suspect. This is referred to as the post-admission phase of the interrogation. The post-admission phase of the interrogation is important because it is here that the police can acquire information and evidence that will either support or not support the accuracy of the suspect's admission. Properly trained police interrogators know that innocent people sometimes falsely confess to crimes they did not

Document received on 2017-07-27-16.41.18.0 Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1934

Pl. Amor 032358

commit. Properly trained police will therefore seek to elicit information (that is not generally known and cannot likely be guessed by chance) from the suspect that either demonstrates, or fails to demonstrate, independent knowledge of the crime scene details and case facts. Properly trained police interrogators will therefore not ask leading or suggestive questions and will not educate the suspect about the details of the victim's allegations or alleged crime, but, instead, will let the suspect independently supply the details of the case. Properly trained police interrogators will also seek to test the suspect's post-admission account against the physical and other credible evidence. Truthful confessions are typically corroborated by solid physical evidence and independent knowledge of underlying case facts that have not been suggested to the suspect; false confessions are not.

### VI. Evaluating the Reliability of Incriminating Statements, Admissions and Confessions

37. In addition to studying the psychology of police interrogation and the correlates and causes of false confessions from the innocent, social science researchers have also analyzed the patterns, characteristics and indicia of reliability in true and false confession cases. To evaluate the likely reliability or unreliability of an incriminating statement, admission or full confession from a suspect, social science researchers analyze the fit between the suspect's post-admission narrative and the crime facts and/or corroborating evidence derived from the confession (e.g., location of the missing murder weapon, loot from a robbery, the victim's missing clothing, etc.).

38. The purpose of evaluating the fit between a suspect's post-admission narrative and the underlying crime facts and derivative crime evidence is to test the suspect's actual knowledge of the crime. If the suspect's post-admission narrative corroborates details only the police know, leads to new or previously undiscovered evidence of guilt, explains apparent crime fact anomalies and is corroborated by independent facts and evidence, then the suspect's post-admission narrative objectively demonstrates that he possesses the actual knowledge that would be known only by the true perpetrator and therefore is strong evidence of guilt.

17 of 34

C 1935

Pl. Amor 032359

39. This, of course, assumes that the suspect's knowledge of the crime has not been contaminated by the media, community gossip, the police or some other source with inside knowledge about crime details.  If a suspect has learned unique or non-public crime facts from one of these sources, then the fact that his confession contains these details is, of course, not indicative of pre-existing knowledge or probative of guilt. One problem with contemporary American police interrogation in practice is that police detectives often describe crime facts to suspects, lead or direct them to infer correct answers, and sometimes even suggest plausible motives for committing the crime.[9]  Because they are trained to presume the guilt of those whom they interrogate, American police assume that they are interrogating suspects who already know the correct crime facts.  But this is not true when they are mistakenly interrogating an innocent person.  When the entirety of an interrogation is not electronically recorded, there may be a dispute about whether the interrogator(s) first suggested a non-public fact to the suspect or whether the suspect independently volunteered it.  Without an electronic recording, there is typically no way of objectively resolving this swearing contest.

40. Contamination by police, however, regularly occurs in interrogation-induced false confession cases.  And after police interrogators have contaminated the suspect with non-public crime facts, they often attribute "guilty knowledge" to the suspect when he repeats back and incorporates into his confession the very facts that they first educated him about.  One researcher has called these contaminated details "misleading specialized knowledge."[10]  In many false confessions cases, police and prosecutors argue that the suspect's confession corroborates his guilt because he "knows facts only the true perpetrator would know," even though the suspect first learned these facts from his interrogators. In a recent study of the first two-hundred and thirty two (232) DNA exonerations of innocent prisoners in the American criminal justice system, Brandon Garrett has shown that this pattern was present in more than 90% of the false confession cases in this data set (31 of 34 cases). In other words, in the overwhelming majority of these proven false

[9] Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).
[10] Gisli Gudjonsson (2003), THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc).

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1936
Pl. Amor 032360

confession cases, police interrogators fed the suspect unique non-public facts that "only the true perpetrator would know," but the prosecutor erroneously alleged that the suspect volunteered these facts and that the suspect thereby corroborated the reliability of his confession. But because the jury in each case mistakenly believed the prosecutor rather than the defense, each of the confessors was convicted, and in each of these cases the defendant's innocence (and the falsity of the confession) was only proven many years later by DNA.[11]

41. Absent contamination, the fit between the suspect's post-admission narrative and both the crime scene facts and the derivative crime evidence therefore provides an objective basis for evaluating the likely reliability of the suspect's incriminating statements. If the suspect cannot provide police with the actual details of the crime, fails to accurately describe the crime scene facts, cannot lead the police to new or derivative crime evidence, and/or provides an account that is full of gross errors and disconfirmed by the independent case evidence, then the suspect's post-admission narrative demonstrates that he fails to possess the actual knowledge that would be known only by the true perpetrator and is therefore strongly consistent with innocence.

42. The well-established and widely accepted social science research principle of using the fit standard to evaluate the validity of a confession statement is also a bedrock principle of criminal investigation within law enforcement. Properly trained police detectives realize that an "I did it" statement is not necessarily evidence of guilt and may, instead, turn out to be evidence of innocence. For example, in high profile murder cases, police regularly screen out volunteered confessions by seeing whether or not the person can tell the police details known only to the perpetrator or lead the police to derivative crime evidence that either corroborates, or fails to demonstrate, the person's guilty knowledge. If an element of a crime is particularly heinous or novel, police often keep this fact from the press so that it can be used to demonstrate a confessor's guilty knowledge. Police sometimes deliberately include an error in media releases or allow incorrect statements to go uncorrected so that a true perpetrator will be able to demonstrate his personal knowledge of the crime. In other types of cases, police detectives regularly rely upon the

---

[11] Brandon Garrett, *The Substance of False Confessions*, 62 STANFORD LAW REVIEW, 1051-1118 (2010).

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1937

Pl. Amor 032361

fit standard to identify a true admission that might be mixed in with a collection of volunteered statements.

43. Using the fit standard to evaluate the validity of a suspect's incriminating statements, admissions or confessions is a bedrock principle of law enforcement because police detectives realize that seeking *corroboration* during the post-admission phase of interrogation is essential to proper investigative work. This is because it is a fundamental principle of police investigation that true explanations can be supported and false explanations cannot be supported (assuming no contamination has occurred), and because false explanations won't fit the facts of the crime, lead to derivative evidence or be corroborated by independent evidence.

44. Moreover, post-admission narrative analysis and the fit standard are central to proper criminal investigation because properly trained detectives realize that the purpose of detective work is not to clear a crime or get a conviction, but to carefully collect evidence in a way that will lead to the arrest, prosecution and conviction of the guilty while at the same time insuring that no innocent individual is wrongfully arrested, prosecuted or convicted.

45. A suspect's post-admission narrative therefore provides a gold mine of potential evidence to the unbiased, properly trained detective who is seeking to ferret out the truth. For if the suspect is guilty, the collection of a detailed post-admission narrative will allow the detective to establish the suspect's guilt beyond question, both by demonstrating the suspect's actual knowledge and by corroborating the suspect's statements with derivative evidence. Properly trained detectives realize that the strongest form of corroboration comes through the development of new evidence using a suspect's post-admission narrative. While it is not possible to verify every post-admission narrative with the crime facts, a skillful interrogator will seek as much verifiable information about the crime as he can elicit. The more verifiable information elicited from a suspect during the post-admission period and the better it fits with the crime facts, the more clearly the suspect demonstrates his responsibility for the crime.

46. If the suspect is innocent, the detective can use the suspect's post-admission narrative to establish his lack of knowledge and thus demonstrate his likely or certain innocence. Whereas a guilty suspect

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/1704378485

C 1938

Pl. Amor 032362

can corroborate his admission because of his actual knowledge of the crime, the innocent suspect cannot. The more information the interrogator seeks, the more frequently and clearly an innocent suspect will demonstrate his ignorance of the crime. His answers will turn out either to be wrong, to defy evaluation, or to be of no value for discriminating between guilt and innocence. Assuming that neither the investigator nor the media have contaminated the suspect by transferring information about the crime facts, or that the extent of contamination is known, the likelihood that his answers will be correct should be no better than chance. Absent contamination, the only time an innocent person will contribute correct information is when he makes an unlucky guess. The likelihood of an unlucky guess diminishes as the number of possible answers to an investigator's questions grows large. If, however, his answers about missing evidence are proven wrong, he cannot supply verifiable information that should be known to the perpetrator, and he inaccurately describes verifiable crime facts, then the post-admission narrative provides evidence of innocence.

## VII. The Problem of Contamination

47. The post-admission narrative process is about more than merely eliciting information from the suspect. Investigators are trained to shape the suspect's narrative to make the confession as persuasive as possible and to enhance the chances of conviction. In this way, confessions are scripted or constructed by interrogators. A persuasive crime narrative requires an explanation of why the crime happened – the motives and explanations of the suspect for committing the crime. It also should contain a statement of the suspect's emotions, not only his or her emotions at the time of committing the crime, but also the shame, regret, or remorse the suspect now feels for having committed the crime. Interrogators are also trained to get the suspect to cleanse the interrogation process, usually by providing statements to the effect that the confession was voluntary. Interrogators will ask the suspect, usually after the suspect's resistance has been broken down and he has been made to believe that it is in his best interests to confess, whether the suspect was treated well, given food and drink, bathroom breaks, and other comforts, and whether any promises or threats were made to the suspect. Finally, and perhaps most importantly, the confession must contain both general and specific crime knowledge – the details of the crime that only the true perpetrator should know.

21 of 34

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1939

Pl. Amor 032363

48. The problem of contamination in false confession cases arises when the interrogator pressures a suspect during the post-admission narrative phase to accept a particular account of the crime story – one that usually squares with the interrogator's theory of how the crime occurred – and then suggests, deliberately or inadvertently, crime facts to the suspect. The presence of these facts in the suspect's confession gives the suspect's narrative credibility and the appearance of corroboration. If the interrogation process is not electronically recorded, the interrogator is free to assert that these crime facts were volunteered by the suspect and the trial devolves into a swearing contest between the suspect and the interrogators over who was the source of the details in the confession. If the entire process is recorded, however, then it may be possible to trace the contamination.

49. Contamination by interrogators is only one of several possible sources of contamination. Suspects can learn crime facts from the media, from conversations with others in the community, from the rumor mill, or may simply possess knowledge of the crime facts because they live at or near the crime scene or were present at the crime scene shortly after the crime occurred.

50. In applying the *fit* test to assess the reliability of the confession, therefore, it is essential to separate out the contaminated facts from the facts that unquestionably were provided by the defendant.

### VIII. Professional Opinions

51. Based on my analysis of the materials provided to me in this case, it is my opinion that there are strong reasons to question the reliability of William Amor's confession.

52. My opinions concerning the reliability of Amor's confession is hampered by the failure of the investigators to electronically record most of their conversations with Amor, especially those which occurred during the lengthy interrogation on the evening of October 3, 1995 and the early morning hours of October 4, the day he was arrested and charged with the murder. Without such a recording, it is impossible to assess the full extent of the coercion, contamination, rehearsing and scripting that led to the final confession.

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1940

Pl. Amor 032364

53. Nevertheless, a review of the police officer's own reports and testimony demonstrate that psychological coercion played a role in Amor's decision to confess. On the very day when Amor was being released from the DeKalb County Jail, his interrogators greeted him at the jail and took him from DeKalb County to Chicago for a lie detector test. This was no accident. The officers had arranged to be there when he was released and had pre-arranged the polygraph examination with Reid and Associates, a Chicago-based interrogation training and polygraphy firm.

54. For the next fifteen hours, from 2:15 p.m. on October 3, 1995 until 5:00 a.m. on October 4, 1995, Amor was in the continuous custody of law enforcement officers or their agents. After the lie detector test, Amor was told he had failed the test and both the polygrapher and the interrogators interrogate Amor. The interrogation stopped – without an admission or confession -- because the polygrapher at Reid and Associates had to close the office. Amor was then driven back to the police station for further interrogation. When Amor arrived at the station, another surprise was waiting for him. The officers arranged, or at the very least permitted, a process server to hand divorce papers to Amor. Again, this was no accident. Someone from the police had to tip off the process server that Bill Amor was returning to the police station late in the evening of October 3rd.

55. Back at the police station, almost immediately after Amor received the divorce papers, Amor's interrogators was accused of committing the crime and told him that his wife (Tina) now believed that he had set the fire on purpose but did not mean to kill her mother. This evidence ploy, especially when combined with the divorce papers, was psychologically coercive in that it was clearly designed to bring Amor to a place of hopelessness where it became easier for the police to persuade him to confess.

56. There were other facts that added to an atmosphere of coercion, including taking Amor into custody immediately upon his release, the examination and interrogations at the polygrapher's office, the lengthy and repeated interrogations back at the station, a lack of food, drink, or sleep, and the fact that many of these interrogations took place in the wee hours of the morning.

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1941

Pl. Amor 032365

57. In addition to this atmosphere of coercion, a clear picture of contamination also emerges from a review of the police reports. During their numerous interviews and interrogations of Amor, through the use of leading questions, Naperville Police and Fire investigators leaked details of the crime from their investigation, and tried to persuade Mr. Amor to adopt their theory of the case. For example the following key details were leaked to Amor during the course of their many interrogations:

    i.  that a lit cigarette had been left in the living room;

    ii.  that a flammable liquid had been spilled in the living room;

    iii.  that the liquid had been spilled on or near the swivel chair and in proximity to the lit cigarette;

    iv.  that the motive for the fire was to just an insurance scheme to collect money to "get new furnishings for the apartment."

58. The police and prosecutors persuaded Amor to accept to most of their narrative. In fact, almost every detail contained in the final confession was either known or suspected by the police before Amor's interrogation. Many of these details came not from Amor in the first instance but from Tina or the police.

59. First, the idea that a **"lit cigarette"** was left in the living room came not from Amor in the first instance, but from Tina. In her very first interview, at 11:59p.m., Tina volunteered to Det. Cross, both that she had been *smoking in the living room* (in her mother's chair) and that she may have left a *lit cigarette* in the apartment because she could not find it before she left and could not remember if she had put it out. Bill Amor did not volunteer this information but only agreed to it after Inv. Guerreri asked him a leading question about whether he recalled **"Tina leaving a cigarette lit in the living room area just before they left."**

60. Second, the idea that a **flammable substance was "spilled" in the living room and that someone within the apartment lit this flammable substance** emerged in the minds of investigators early in the investigation. Again, it was Tina, not Bill, who first disclosed that she

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1942

Pl. Amor 032366

had spilled lighter fluid in the living room in the very area near where the fire was believed to have been started.

61. On September 11, 2001, at around 1:05a.m., upon discovering lighter fluid in the trunk of Amor's car, Investigator Guerreri asked Tina **"if I might find lighter fluid on the carpet of the condo where the fire started."** Investigator Cross recalls the conversation slightly differently, noting that **"Inv. Guerreri asked Tina what she would say if they found traces of *that* lighter fluid in the area where the fire started."**

62. Cross's version is a classic interrogation tactic – a bait question coupled with a false evidence ploy. A "bait question" is a non-accusatory question in which the possible existence of incriminating evidence is implied for the purpose of enticing the subject to change or consider changing his or her answer. The bait question can use real or fictitious evidence. In this case, Investigator Guerreri did not have any evidence, just a suspicion, that lighter fluid was the flammable liquid. If the suspect takes the bait – that is they change their story and come up with an explanation that incorporates the bait – this is a sign, according to the leading interrogation training manual that the suspect is being deceptive.[12]

63. **Tina took the bait.** According to Cross, Tina said, "she spilled lighter fluid from *that* bottle (the suspicious one from the trunk of the car) on the ***carpet and boxes in the corner under the air conditioner*** about two weeks ago….[and that] she tripped over the ***chair*** by the patio door when she was coming in from starting the grill on the patio." According to Guerreri, Tina replied "That's because about two weeks ago, I was barbecuing and I tripped coming back inside from the balcony and ***spilled lighter fluid in the corner by the boxes.***" Tina's statements were highly inculpatory for three reasons: first, she had not yet been told where officers suspected the fire had started; second, she mentioned the **chair** near the patio door (the swivel chair) without any prompting; third, she described in great detail one of the two areas where the investigators believed the fire may have been started (the area of the chair) and the boxes in the corner behind the chair. Tina also told the officers that she did not think that anyone saw her spill the lighter fluid and that she did not tell anyone of the spill. The next mention of the

---

[12] Inbau, Reid, et al., Criminal Interrogations and Confessions (5th ed, 2011).

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1943

Pl. Amor 032367

spilling of flammable liquid came later that evening at 11:00p.m. when Tina, *unsolicited,* came up to Ferreri, Cross, Guerreri and other investigators and pointed to the place on the ground where she had spilled the lighter fluid on the living room floor.

64. Tina made other suspicious statements during this brief conversation, statements relating to a possible motive that later ended up in Bill's confession. After pointing to what appeared to be "a burned comforter", Tina told Inv. Guerreri that these were some of the items that Bill had bought at **Fingerhut** and asked him **"if the insurance company would reimburse her for the loss."** Guerreri then asked her how much she and Bill owed on the items and she told him that they owed about **$200.00.**

65. On September 14, 1995, at approximately 1:00p.m., Naperville Fire Department Investigator Ferreri met with Illinois Fire Marshall Agent Mitchell Kushner at the fire scene. Prior to the meeting, Ferreri had not yet determined the cause or the origin of the fire. He suspected the fire may have started in the Northwest corner of the living room near an outlet into which the TV and VCR had been plugged . This was the area of lowest burn and the only area behind which the drywall had crumbled from excessive heat. Kushner, however, directed investigators to find out more information about the swivel chair located in the southwest corner of the living room and suggested that the chair may have been the origin of the fire. This prompted Ferreri and Detective Cross to re-interview Bill and Tina Amor at the Excel Inn, a motel where they had been staying since the fire. Ferreri spoke to Bill Amor and Cross interviewed Tina. Both of these detectives again brought up the subject of "spilling" during the interview.

66. On September 14, Tina's story changed yet again with regard to the lighter fluid when she spoke with Cross. Cross confronted her with the fact that she could not have tripped over the swivel chair when she came in from the patio because the chair was not in front of the part of the door that opens. This time, Tina said she spilled the lighter fluid when she slipped on a "throw rug" in front of the patio door. (note that this supposed throw rug was nowhere near the "boxes" of clothing where Tina first said she had spilled the lighter fluid; the clothes were in the Southwest corner) behind the swivel chair and near an air conditioner unit.)

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1944

Pl. Amor 032368

67. What is critical here is that when questioned by the police more than three days after Tina first revealed she had spilled lighter fluid, Bill **did not know** about the lighter fluid spill. On the afternoon of the 14th, Lt. Ferreri informed Bill, for the first time, that a flammable liquid had been spilled. Ferreri's report of the incident suggests that he asked Amor about the lighter fluid:

> **I next asked Mr. Amor about the charcoal lighter fluid.** He said he purchased it a couple of weeks ago. He said he brought it to the barbeque because he did not know if his friend had any….***Mr. Amor was unaware that Tina had spilled any lighter fluid by the swivel chair.*** Mr. Amor became noticeably more anxious when we spoke about the lighter fluid (shifting weight and moving feet).

This is significant for two reasons. First, Amor's lack of awareness, if true, is consistent with Tina's earlier statement that she did not tell anyone about the spill. But more importantly, Inv. Ferreri leaked to Bill not only that Tina had said she had spilled the lighter fluid but that she had done so by the ***swivel chair – the exact location where the police believed the fire started.*** These leading questions fed Bill two critical facts of the police theory.

68. For reasons that are unclear to me, the investigation shifted away from Tina and focused almost exclusively on Bill Amor. Although the police had uncovered information that painted Bill in a bad light (scam artist, etc.), none of this information should have led the police to abandon Tina as a suspect. After all, Tina admitted to leaving a lit cigarette in the living room, had accepted the bait and admitted to spilling lighter fluid in the living room, pinpointed the suspected area of the fire without any help, mentioned the swivel chair, appeared to be highly jealous of Bill's relationship with her mother, had a fight with her mother over money and about leaving her alone just before the fire, and was the last person to leave the apartment. She also had been overheard discussing insurance payments with Bill but unlike Bill, she stood to benefit directly from the insurance money.

69. Because the police had no evidence that Bill had ever spilled the lighter fluid, they needed for Bill to admit to spilling something flammable on or near the swivel chair. At 9:00 in the morning on the 15th, Investigator

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1945

Pl. Amor 032369

Cross and Cunningham arrived at the Excel Inn for yet another round or questioning. During this line of questioning, the investigators again revealed information to Amor that contained additional key aspects of the police theory of his guilt. First, Cross told Amor that the **"fire may not be accidental"** and that **"fire spread so fast within 10 to 15 minutes after they left the apartment that Marianne was not able to get out."** He again pressed Amor about his knowledge of a **life insurance policy** for Marianne and accused him of setting the fire.

70. In this interview at 9:00a.m., Det. Cross planted one more idea in Amor's head with regard to motive – the idea that the fire was not set to harm Marianne and to collect on her life insurance but was **"just a scheme to get new furnishings for the apartment that got out of hand."** Amor denied that there was any plan to start the fire.

71. The next interview took place at 4:50p.m. on September 15th at the Naperville Police Department Detention Facility and was conducted by Investigator Cunningham and Sgt. Carlson of the Naperville Police Department at the Naperville Detention Center after Bill had been arrested on an outstanding traffic warrant. Officer Cunningham, this time joined by Sgt. Carlson, picked up where Cunningham and Cross had left off earlier in the day. Early in the interview, Amor told the investigators that he "drank heavily" with vodka, had a "pretty good buzz going" and that he lay on the floor smoking, drinking vodka, and watching football for much of the afternoon.

72. According to Cunningham's report, "we explained various aspects of the fire to Amor and we informed him that shortly after Tina left the apartment, the fire broke out and spread quickly." The next line of questioning concerned Amor's knowledge of any "recent spills" at which time Amor told the police that Tina had spilled some charcoal starter fluid a week earlier coming into the house. Immediately after the "lighter fluid" spill discussion, Cunningham asked Bill if he had spilled anything. Cunningham's report reads as follows:

> We then asked Amor if he spilled anything in that apartment. Amor thought for several minutes and informed us that on the date in question he *may* have spilled some vodka. Amor thought for several more minutes and then advised us that he remembered he was lying on the floor watching television at the time he was drinking from a

28 of 34

C 1946

Pl. Amor 032370

> large tumbler. Amor placed the bottle of vodka onto the coffee
> table and during the course of the day he would refill his tumbler from
> the bottle. Amor advised that at one point he reached up to the coffee
> table to grab the vodka and over onto fell over to the floor. Amor
> advised that a large quantity of vodka spilled out of the bottle onto
> the Sunday Tribune newspaper. Amor advised us that the vodka
> soaked into the newspaper so he didn't bother to wipe it up."

73. Shortly after Mr. Amor disclosed that he may have spilled some vodka,
Sgt. Carlson exited the room at 6:10p.m and contacted Detective Cross
who was interviewing Tina Amor at the time. Cross asked Amor about
the spilling of vodka. Tina claimed she *never saw a vodka bottle* and
that "she said *she never saw Bill spill it* but she had been sleeping off
and on." Tina did not corroborate Bill's account.

74. After speaking to Tina about the vodka, Cross came back to interrogate
Bill Amor about the vodka spilling incident. Up until this point in time,
Bill Amor had claimed the spill took place on papers *between the coffee
table and the couch.* This did not coincide with the police theory which
suggested that the origin of the fire was between the couch and the
swivel chair or on the swivel chair. In perhaps the worst example of
contamination, Det. Cross simply told Bill where the fire started:

> **I advised Mr. Amor that the fire appeared to have started
> in the swivel rocking chair not on the floor in front of the
> chair. I advised that we could tell that from the burn
> patterns....**I told Mr. Amor that I didn't think the fire could
> have started that way and again asked him if he had anything to
> do with starting the fire. He continued to deny having anything
> to do with the fire.

75. Questioning concerning the vodka spilling incident, it location, the
location of the newspaper and other items, including a lit candle and a lit
cigarette in an ashtray, continued on and off from 4:50p.m. until
approximately 9:35p.m. when a "voluntary statement" was taken by the
investigators. Despite this lengthy interrogation and extensive
contamination by police officers, the detectives could not get an
admission from Bill that he had started the fire. The "voluntary
statement" only contained a description of an **"accidental"** spilling of
vodka on newspapers **between the couch and the "coffee table" (the**

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1947

Pl. Amor 032371

**wrong location)** and the possibility that he might have left a lit candle or a lit cigarette burning in his ashtray.

76. Several weeks passed before investigators re-interrogated Bill Amor. At 2:15p.m on October 3, Investigator Guerreri and Det. Cross went to the DeKalb County Jail to greet Amor just as he was being released. Amor did not have any time to savor his freedom. He was driven from DeKalb to downtown Chicago to the offices of Reid & Associates, a polygraphy and interrogation training firm, and given a series of polygraph tests. Amor and the officers arrived at Reid at 3:55p.m. He did not leave until 10:30 p.m. He did not arrive back at Naperville Police Department until 11:37p.m.

77. Just before the final series of interrogations began, two things happened that brought Amor to a place of hopelessness and made it easier for police to get him to confess. He was served with divorce papers and then the police confronted him with the "fact" that Tina believed that he had set the fire intentionally. One need only read Amor's love letters to Tina from jail to understand how important his relationship with Tina was to his self-esteem and his hope for a better future. The letters are filled with statements like "there is no element in my life that is more precious than you are," "you are all I ever wanted," "you are all I need to survive," and "I can't picture my life without you in it."

78. According to police reports, Amor was told "that Tina had told other investigators that he had intentionally started the fire but didn't think he intended to kill her." Immediately after hearing that his wife had implicated him in the crime, Amor supposedly admitted to starting the fire. Amor, at the motion to suppress, described how devastated he was by the news that his wife had not only abandoned him but was telling the police he had set the fire on purpose: "[I] really literally fell apart ... I was just about willing to say anything. I was just physically and emotionally ...what I consider in bad shape.

79. Again, the interrogation which produced Amor's confession was not electronically recorded, making it difficult to assess how much the Investigators shaped the confession with leading or suggestive questions. All of the elements of Bill's confession, however, had been fed to him during earlier rounds of questioning, including the motive, which had first been mentioned not by Bill, but by Tina to Inv. Guerreri: that Bill

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1948

Pl. Amor 032372

"did it to collect money from the insurance money for the contents of the apartment" and that **he planned to use the money to pay for the "Fingerhut" products he and Tina owed $200.00 on**, get a new TV and some new furniture."

80. There are several other things about Bill's oral confession to Investigators Guerreri and Cross that are of interest to me. According to Cross's account of the confession. Bill Amor knocked a cigarette off the ashtray when he got up to give Marianne a back rub, saw it fall onto the newspapers, and saw it sizzling and smoldering but no longer "gave a shit." First, this story is absurd. First, knocking a lit cigarette on to some wet papers is not a sure-fire way to ignite a fire. As the defense expert report notes, efforts to ignite a fire in this way, proved highly unsuccessful. Amor might have thought a fire could start but certainly would not have been certain this would be the case. Second, and perhaps more importantly, Amor did not immediately rush out of the house after the lit cigarette hit the paper. *He went to give Marianne a back rub*. This is the most absurd part of the story. What kind of arsonist takes the time to give his mother-in-law a massage while a fire is starting in the apartment? Moreover, taking the extra time to give Marianne a back rub not only would have given the fire time to grow, it would have enabled. Yet, Tina claimed she did not see the fire when she went back into the apartment after leaving with Bill.

81. After Amor's oral confession, he signed a written "voluntary statement" at 1:14a.m. This confession is unusual because the written confession is far less detailed than the account provided in the police reports. Police officers are trained to make sure that these written confessions are as detailed as possible. Amor, who wrote the confession, provided a sanitized version of that described in Cross' police reports. For example, there is no mention of using the insurance money to pay for the "Fingerhut" furniture. Amor does not say that he purposefully knocked the cigarette on to the papers. (he says that he "bumped" the ashtray knocking the cigarette onto the newspaper). He also does not say that he knew that a fire would result. Instead, when given the pen and asked to write out his statement, Amor wrote only that he knew that "a fire would *probably* result.

82. After the written statement was signed at 1:14a.m., the investigators contacted the DuPage County State's Attorney's Office Felony Review

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1949

Pl. Amor 032373

Unit and Assistant State's Attorney Brian Nigohosian arrived to speak to the detectives and Mr. Amor. His interview with Amor began at 3:45a.m. and was also unrecorded, although the final interrogation/confession which began at 5:10a.m. and concluded at 5:20a.m. was recorded.

83. In this final conversation, ASA Nigohosian, cognizant of the elements of first degree murder, arson, and felony murder, sought to fill in some of the gaps in his case against Amor with his questions. To do this, Nigohosian asked a series of leading questions which established that Amor had hatched a plan to collect insurance money, that the plan may have originated when he was in jail, that he knew that Marianne had life insurance and other insurance, etc. Unfortunately, ASA Nigohosian contaminated the final confession, usually by referencing Amor back to some of his earlier statements and then getting Amor to agree to his characterizations. Because of the leading nature of these questions, it is not clear whether the final "confession" is Amor's confession or whether Amor is simply complying with Nigohosian in an effort to end the interrogation process. None of the fight or "sticking to the guns" attitude is left in Amor in this final exchange. Amor answers virtually every one of the leading questions with one word: "yes."

84. In addition to some evidence of coercion and extensive contamination, there is a lack of corroboration of many of the key aspects of the State's theory, including:

- The origin of the fire (Northwest corner v. Southwest corner);
- Whether a flammable substance was used (pieces of carpet and swivel chair fabric were tested and no flammable substances were found);
- Whether a lit cigarette could ignite vodka-soaked newspapers (the State did not even test this theory and defense experts found that this is an unlikely scenario)
- Whether Bill Amor planned this scheme to collect insurance while in the county jail (cellmate Mike Mannion claims they never discussed setting a fire to collect insurance)
- Whether Bill was drinking vodka and whether he spilled vodka (Tina did not recall ever seeing a bottle of vodka, no vodka bottle was found in the house);

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1950

Pl. Amor 032374

- Whether the vodka spilled between the couch and the coffee table or between the couch and the swivel chair (Bill's story changed over time on this point)
- Whether life insurance was a motive (neither Tina nor Bill were beneficiaries of the insurance.

85. In sum, there are numerous reasons to question the reliability of William Amor's confessions to the police. In particular, there is evidence of two of the three errors associated with false confessions – coercion and contamination.[13] The evidence of psychological coercion can be gleaned from the police officer's own accounts of the interrogations (timing the polygraph to take place upon his release and timing the serving of the divorce papers upon his return, and other objective circumstances (including length of time in custody, lack of food or sleep, the time of the interrogations, etc). The more significant error is that of contamination. Suspects who are guilty should be able to provide police with the details of the crime without so much fact-feeding by the police. The ability of the suspect to provide these details is what Reid and Associates call "dependent corroboration." In fact, police officers are trained withhold this information from the media and to see whether the suspect provides this information on his own without prompting by the police. Time and time again, it was Tina, and not Bill who came up with such details on her own. Not only did Amor's confession lack dependent corroboration, it also lacked independent corroboration;" i.e. information volunteered by the suspect that can be independently verified by the police or which leads the police to information not uncovered by their investigation.

---

[13] The police had reason to classify Amor as a "person of interest" if not a suspect early in the investigation. Although they did not have strong evidence that Amor set the fire, they had strong suspicion that he may have been involved, either alone, or in concert with Tina and had good reason to want to interview, if not, interrogate him. If Amor's confession is false, the more significant error in the case is one of police tunnelvision, fixing on a theory of the case early in the case, sticking with that theory even though other evidence was at odds with it, and then coercing and contaminating Amor's confession to fit with the theory.

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1951

Pl. Amor 032375

I declare under penalty of perjury that the foregoing is true and correct.
Executed on this 12th day of September 2013.

_Steven A. Drizin_

Subscribed and affirmed before me
this 12th day of September, 2013.

Notary Public

```
OFFICIAL SEAL
DOLORES G. ANGELES
NOTARY PUBLIC-STATE OF ILLINOIS
MY COMMISSION EXPIRES 04/26/2015
```

34 of 34

C 1952

Pl. Amor 032376

# EXHIBIT

# A

C 1953

Pl. Amor 032377

# CURRICULUM VITAE

**STEVEN ANDREW DRIZIN**
Northwestern University School of Law
350 E. Superior, Room 370 McCormick
Chicago, IL. 60611
(312) 503-8576 (w)
(312) 503-8977 (FAX)
(847) 446-6778 (h)
s-drizin@law.northwestern.edu

## EDUCATION

**NORTHWESTERN UNIVERSITY SCHOOL OF LAW**
Chicago, Illinois
Juris Doctor, May 1986
**HONORS:**    Dean's List, Semesters 1, 2, 6;
Editor-in-Chief, *Journal of Criminal Law &
Criminology*, 1985-1986.

**HAVERFORD COLLEGE**
Haverford, Pennsylvania
Bachelor of Arts in Political Science, 1983
**HONORS:**    Graduated with Honors in Political Science

## PROFESSIONAL EXPERIENCE

**NORTHWESTERN UNIVERSITY LEGAL CLINIC**
**NORTHWESTERN UNIVERSITY SCHOOL OF LAW**
**Clinical Professor, September 2003**
**Assistant Director, January 2001**
**Legal Director, Center on Wrongful Convictions, February 2005**
**Co-Founder, Center on Wrongful Convictions of Youth 2008**
**Supervising Attorney, Children and Family Justice Center, June 1993 – Feb. 2004**

Responsibilities have included teaching criminal law to first year law students, serving as an attorney and professor in clinical program in which second and third year law students provide legal assistance to indigent clients in criminal, juvenile delinquency, appeals, and post-conviction cases involving wrongful convictions. In juvenile justice, I worked with a team of attorneys, social workers and researchers in a project aimed at reforming Juvenile Court of Cook County and advocating for juvenile justice policy based on sound research and principles of adolescent development. Much of my policy and research-related work has been directed at preventing false and coerced confessions by collecting and analyzing false confession cases in Illinois and throughout the country and promoting solutions such as the videotaping of all custodial interrogations.

1

C 1954

Pl. Amor 032378

**SACHNOFF & WEAVER LTD.**
Chicago, Illinois

> **Litigation Associate, September 1986-October 1988;**
> **September 1989-August 1991.**
> Practice in commercial litigation, including federal and state civil procedure, securities fraud, fraudulent conveyance, bankruptcy, Section 1983, prisoner's rights, and breach of contract actions.

**LAW CLERK TO THE HONORABLE ILANA D. ROVNER, UNITED STATES DISTRICT COURT JUDGE FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION, October 1988-August 1989.**

AWARDS

**American Bar Association's Livingston Hall Award (2005)** recognizes an "unsung hero, an attorney working in the juvenile justice field who embodies both exceptional dedication and advocacy skills."

**National Juvenile Defender Center's 2000 Juvenile Defender Leadership Award** for outstanding dedication and advocacy in the juvenile justice field. October 26, 2000 in Houston, TX.

**PUBLICATIONS IN THE AREA OF FALSE AND COERCED CONFESSIONS**

**BOOKS**

David Strauss, Barbarous Souls (Afterword by Steven A. Drizin)(Northwestern University Press, 2010)

Rob Warden & Steven A. Drizin (eds.), True Stories of False Confessions (Northwestern University Press)(August 2009, Northwestern University Press).

Steven A. Drizin & Richard A. Leo, The Problem of False Confessions in the Post-DNA Age (2008)(translated into Japanese and published as a book along with an amicus brief filed by the Center on Wrongful Convictions before the Supreme Court of Japan)(translated by Kazuko Ito)(Japan UNI Agency, Tokyo, 2008).

**LAW REVIEW ARTICLES**

Steven A. Drizin, *The Lee Arthur Hester Case and the Unfinished Business of the United States Supreme Court to Protect Juveniles During Police Interrogations*, 6 Journal of Law and Social Policy __ (2011).

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1955

Pl. Amor 032379

Drizin, S., *Remarks at the Dinner Celebrating the Centennial of the Journal of Criminal law and Criminology, January 29, 2009,* 100 Journal of Criminal Law & Criminology 101-108 (2010)

Drizin, S. & Luloff, G, *Are Juvenile Courts Wrongful Conviction Factories?,* 34 N.KY. L. REV. 257-322 (2007)

Leo, R., Drizin, S., Neufeld, P., Hall, B., and Shavell, A., *Bringing Reliability Back In: False Confessions and Legal Safeguards in the Twenty-First Century,* 2006 Wis. L. Rev. 479-539 (2006).

Drizin, S. and Reich, M., *Heeding the Lessons of History: The Need for Mandatory Recording of Police Interrogations To Accurately Assess the Reliability and Voluntariness of Confessions,* 52 Drake L. Rev. 619 (Summer 2004).

Drizin, S. and Leo, R. *The Problem of Police-Induced False Confessions in the Post DNA Age,* 82 N.C.L.Rev. 891 (March 2004)(qualitative and quantitative analysis of 125 proven false confessions)

Drizin, S. and Tanenhaus, D. *"Owing to the extreme youth of the accused": The Changing Legal Response to Juvenile Homicide,* 92 Journal of Criminal Law & Criminology 641-705 (Spring/Summer 2002).

Drizin, S. and Colgan, B. *Let the Cameras Roll: Mandatory Videotaping of Interrogations is the Solution to Illinois' Problem of False Confessions,* 32 Loyola University Chicago Law Journal 337 (Winter 2001).

## JOURNAL ARTICLES AND POLICY BRIEFS

Kassin, S., Drizin, S., Grisso, T., Thomas Grisso, Gudjonsson, G., Leo, R.A., Redlich, A., *Police-Induced Confessions: Risk Factors and Recommendations,* 34 Law and Human Behavior 3-38 (2010) (published as a White Paper by the American Psychological Association).

Drizin, S. , *Defending a False or Coerced Confession Case: What You Need to Know To Represent Your Clients Effectively?,* The Wisconsin Defender, Vol. 12, Issue 1 (Winter 2004), available online at **http://www.wisspd.org/html/publications/docs/wdefwinter04.pdf**

Drizin, S.A. *False Confessions: Some Developmental And Forensic Considerations,* available on website of Cornell Institute on Research for Children at http://www.human.cornell.edu/units/circ

## BOOK CHAPTERS

Leo, R.A. and Drizin, S.A., "The Three Errors: Pathways to False Confessions and Wrongful Convictions, in Interrogation and Confessions: Research, Policy and Practice (edited by G.D. Lassiter and Christian A. Meissner)(American Psychological Association, 2010).

3

C 1956

Pl. Amor 032380

Redlich, A. and Drizin, S. *"Police Interrogation of Youth,"* in <u>Mental Health Needs of Young Offenders: Forging Paths Toward Reintegration and Rehabilitation</u> (edited by Carol Kessler and Louis Krause, M.D.)(Cambridge University Press, 2007)

Drizin, S, and Colgan, B. **"Tales From The Juvenile Confession Front: A Guide To How Standard Police Interrogation Tactics Can Produce Coerced and False Confessions From Juvenile Suspects",** a chapter in <u>Interrogations, Confessions, and Entrapment</u> (edited by G. Daniel Lassiter), a volume in the *Perspectives in Law and Psychology Series,* edited by Ron Roesch (Kluwer Academic/Plenum Publishers, 2005)

## OP-ED PIECES

*"Controls vital when cops question kids,"* The Arizona Republic, November 26, 2008.

*"Videotape All Police Interrogations,"* The Providence Journal, March 6, 2003, Commentary, at B4.

*"Good Reason to Tape Suspect's Interrogation,"* Chicago Sun Times, June 30, 2002, at 36A.

*"Taping Confessions Makes Just Sense,"* Milwaukee Journal Sentinel, May 12, 2002, Commentary, at __ .

*"False Confessions: Evidence of Flaws,"* Chicago Sun Times, December 28, 2001, at 41.

*"Juvenile Interrogation Reform Still Lacking,"* Chicago Sun Times, September 4, 2001, at 31.

*"Let's go to the videotape: Why law-enforcement officials should start taping interrogations."* Chicago Tribune, Commentary, June 20, 2001, at 17.

*"Coerced Confessions Shine Light on Taping,",* Chicago Sun Times, Commentary, February 1, 2001, at 29.

"Require Police to Videotape Confessions," The Detroit News, Comment, Sunday April 22, 2001, at 15A.

"It's T.V., Not A True 'Confession'," by Steven A. Drizin and Richard A. Leo, Los Angeles Times, Commentary, September 4, 2000, at B15.

**Reprinted As:**

"It's T.V., Not A True 'Confession', by Steven A. Drizin and Richard A. Leo, Orlando Sentinel, Editorial, September 12, 2000, at A11.

*"Television Doesn't Do Justice to Real-Life 'Confessions'"* by Steven A. Drizin and Richard A. Leo, Opinion, San Francisco Chronicle, September 10, 2000.

*"Quelling an Outcry with Meaningless Reforms,"* Chicago Daily Law Bulletin, Lawyer's

4

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1957

Pl. Amor 032381

Forum, October 8, 1998, at 6.

*"In the Maelstrom: Children as Murder Suspects,"* Chicago Daily Law Bulletin, Lawyers' Forum, August 28, 1998, at 19-20.

*"When Little Tykes Give 'Full Confessions',"* Chicago Tribune, August 26, 1998, Commentary, at 19.

*"Interrogation Law Puts Youths at Risk,"* Chicago Sun Times, May 7, 1998, Commentary/Letters to the Editor, at 34.

## LECTURES AND PRESENTATIONS IN THE AREA OF FALSE CONFESSIONS AND POLICE INTERROGATIONS

National Judicial Institute (Institut National de la Magistrature), *The Problem of False Confessions in the Post-DNA Age* presentation to trial court judges **(St. John, Newfoundland)(October 27, 2010).**

Cook County Public Defender's Training, Nutshell IV, *The Three Errors: Pathways to False Confessions and Wrongful Convictions* **(September 2, 2010, Oakbrook, IL.)**

Roundtable on Police Interrogations of Youth, *Anatomy of a Juvenile False Confession,* Illinois Juvenile Defender Symposium, **(June 4, 2010, Chicago, IL.)**

Innocence Network Conference, Presentation on Pathways to False Confessions, **(Atlanta, Ga. April 18, 2010)**

Rutgers Law Review Symposium, Presentation on Juvenile False Confessions, **(Newark, NJ, April 11, 2010)**

Arkansas Public Defender Commission, Conference on Juvenile Defense, Defending a False Confession Case **(Little Rock, Arkansas, December 11, 2009)**

Ontario Court of Justice, East Regional Seminar, National Judicial Institute (Institut National de la Magistrature), The Problem of False and Coerced Confessions, presentation to trial court judges **(Kingston, Ontario, October 6, 2009).**

Cook County Public Defender's Office, Attacking the Statement Case in the Age of False Confessions **(Oak Brook, IL. September 9, 2009)**

National Judicial Institute (Institut National de la Magistrature), *Frailties in the Criminal Justice Process,* presentation to trial and appellate court judges **(Victoria, British Columbia, Canada, March 3-6, 2009).**

Lectures on False Confessions sponsored by the Japanese Federated Bar Association, Tokyo Bar Association, Osaka Bar Association, and at Ryokuku University **(December 2009, Japan)**

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1958

Pl. Amor 032382

National Juvenile Justice Network, *Juvenile False Confessions, Advocacy Opportunities in an Age of Wrongful Convictions* **(Chicago, IL. June 26, 2008).**

Defending Illinois Death Penalty Cases in 2008, *Presentation on False Confessions* **(Chicago, IL. March 4, 2008).**

National Judicial Institute **(**Institut National de la Magistrature**),** *Frailties in the Criminal Justice Process,* presentation to trial and appellate court justices from all provinces of Canada **(St. John's, Newfoundland, Canada, Nov. 1, 2007).**

National Juvenile Defender Summit, *Paint By Numbers: Colorable Constitutional Claims Under the 4th, 5th, 6th, and 8th Amendments* **(Portland, OR. October 20, 2007)**

Wisconsin State Public Defender's 2007 Annual Criminal Defense Conference, Forty Years After *Gault*: Advocating For Children and Young Adults in Juvenile and Adult Courts, *Why Juveniles Are More Vulnerable to Police Interrogation Tactics* **(Milwauke, WI. October 11, 2007)**

Interrogations and Confessions: A Conference Exploring Current Research, Practice & Policy, *Police Interrogation of Children and Teenagers in the post-DNA and post-Roper v. Simmons ages* **(El Paso, TX. September 26-29, 2007).**

OACDL Juvenile Law Seminar: *Defending Juvenile False and Coerced Confession Cases* **(Columbus, OH. Sept. 20, 2007)**

Presentation of False and Coerced Confessions to New Orleans Parish Public Defenders **New Orleans, LA. May 4, 2007)**

Juvenile Defender Training in Arkansas, *The Problem of Juvenile False Confessions in the Post-DNA Age*, **(Little Rock, AR, April 20, 2007)**

Defending Illinois Death Penalty Cases in 2007, Illinois Institute for Continuing Legal Education (IICLE), *Presentation on False Confessions,* **(Chicago, IL. March 20, 2007).**

Forensic Seminar at DePaul University School of Law, *The Problem of False Confessions in the Post-DNA Age* **(Chicago, IL. February 16, 2007).**

The California Public Defender's Association Presents: 11th Annual Felony Defense Practice Seminar, *Police Interrogations, False Confessions, Coerced Confessions & Wrongful Convictions* **(Yosemite, Ca. November 2006)**

2006 Juvenile & Forensic Science Conference, *The Science of False Confessions*, Emory Univ. School of Law **(Atlanta, Ga. Nov. 8, 2006)**

Symposium of Salmon P. Chase College of Law and Children's Law Center of Northern Kentucky, Re-envisioning the Role of the Juvenile Court in the 21st Century, *Are Juvenile Courts Breeding Grounds for Wrongful Convictions: Using the Lessons of the Innocence Movement to Improve the Juvenile Court* **(Covington, Ky., Sept. 28-29, 2006).**

6

C 1959

Pl. Amor 032383

MacArthur Foundation Research Network on Adolescent Development & Juvenile Justice Network Conference, *Presentation on Juvenile False Confessions* (**Washington, D.C., Sept. 20-22, 2006**)

Montana Public Defender's Orientation Conference, *Presentation of Defending Confession Cases in the Age of False Confessions* (**Bozeman, Mont., July 14, 2006**)

Rhode Island Public Defender's Training, *Presentation on Defending Confession Cases in the Age of False Confessions* (**Providence, R.I., June 28, 2006**)

Kentucky Bar Association, Annual Convention, Presentation of False Confessions in the Post-DNA Age (**Covington, Ky., June 16, 2006**)

Maine Juvenile Defender's Training, *Defending Juvenile Clients in False and Coerced Confession Cases* (**Portland, Me, April 28, 2006**)

Mississippi Public Defenders Association, Spring Conference, *"Why Would My Client Give A False Confession,"* (**Robinsonville, MS, April 20, 2006**)

National Judicial Institute (Institut National de la Magistrature), Appellate Courts Seminar, *Frailties in the Criminal Justice Process,* presentation to appellate court justices from all provinces of Canada (**Montreal, Canada, April 10, 2006**)

Wisconsin Criminal Justice Study Commission, *False Confessions and Police Interviewing* (**Milwaukee, WI, February 23, 2006**)

Wisconsin Law Review Symposium, *"Preventing Wrongful Convictions: Reexamining Fundamental Principles of Criminal Law to Protect the Innocent,"* presentation on legal changes needed to ensure reliability of confessions and safeguard against wrongful convictions (with Richard Leo)(**Madison, WI., November 19, 2005**)

National Judicial Institute (Institut National de la Magistrature), *Frailties in the Criminal Justice System: The Judge's Role,* presentation to Saskatchewan judges on the psychology of police interrogations and confessions (**Regina, Saskatoon, November 9, 2005**)

Montana Statewide Juvenile Justice Conference, *Kids Are Different, Juvenile Justice Issues in Montana,* presentations on juvenile confessions (**Big Sky, Montana, September 27, 2005**)

National Judicial Institute (Institut National de la Magistrature), *Frailties in the Criminal Justice System: The Judge's Role,* presentation to Canadian judges on the psychology of police interrogations and false confessions (**Prince Edward Island, Canada, September 21, 2005**)

ABA Annual Meeting, *The Challenge of False and Coerced Confessions of Juveniles* (**Chicago, IL. August 7, 2005**)

Eyewitness Identification Best Practices, *Effective Law Enforcement Intervention,* sponsored by the Office of the Wisconsin Attorney General (**Appleton, WI, April 28, 2005**)

7

C 1960

Pl. Amor 032384

2005 National Innocence Network Conference, *Practical Tips on Litigating Eyewitness Identification and Confession Cases* (**Washington, D.C., April 2, 2005**)

8th Annual National Alliance Conference, Juvenile Justice: Youth and Disabilities, *What Parents Need to Know When a Child with a Disability Has Been Arrested (***Washington, D.C., February 2, 2005**)

National Juvenile Defender Summit, Plenary Speaker: *Challenging False and Coerced Confessions;* Workshop Speaker: *Using Research and Psychology to Litigate a False Confession Case* (**Nashville, TN, October 22-24, 2004**)

Minnesota Criminal Justice Institute, *The Problem Of False Confessions in the Post-DNA Age* (**Minneapolis, MN, August 24, 2004**)

Wyoming Juvenile Justice Conference, *Police Interrogations and False and Coerced Confessions of Juveniles, (***Sheridan, Wyoming, June 17-18, 2004**)

Office of the Maryland Public Defender, Spring Conference 2004, *Police Interrogations and False and Coerced Confessions* (**Ocean City, Md. May 21, 2004**)

Ohio Juvenile Defender Leadership Summit, *False and Coerced Confessions,* (**Dayton, Ohio, April 30, 2004**)

Los Angeles County Public Defender's Office, 22d Annual Juvenile Delinquency Law Conference, *Defending a False or Coerced Juvenile Confession Case*, (**El Segundo, CA, April 23, 2004**)

Cornell University Department of Human Development, College of Human Ecology, Cornell Law School, American Studies Program, Death Penalty Project, Department of Government, Family Life Development Center and Cornell Institute for Research on Children: "Rethinking the Criminalization of Youth": Presentation on Juvenile Interrogations and Confessions (**November 7, 2003, Ithaca, N.Y.)**

American Bar Association, Juvenile Justice Center, Juvenile Defender Leadership Summit, *Assessing Knowing and Voluntary Waivers of Miranda Rights and Juvenile False Confessions; Strategies to End Life without Parole Sentences for Juveniles; and a United States Supreme Court Wrap-Up.* (**Baltimore, Md. October 25-26, 2003**)

Wisconsin Association of Criminal Defense Attorneys Annual Conference, *"Can't Trust The Message,"* Presentation on False Confessions (**June 19, 2003, Madison, WI**)

Law and Society Association Annual Conference, *Exploding the Myth of False Confessions: Lessons from the Central Park Jogger Case* (**presented with Professor Richard Leo, June 2003, Pittsburgh, Pa.**)

Salmon P. Chase College of Law's Wrongful Convictions Symposium, *The Problem of False Confessions,* (**to be presented in Cincinnati, OH, February 22, 2003**)

8

C 1961

Pl. Amor 032385

American Academy of Forensic Sciences, 55th Annual Meeting, *Police Induced False Confession in the Post-DNA Age* (**Chicago, IL. February 20, 2003**).

Family Resource Center on Disabilities, *What Parents Need to Know About Protecting Children from Police Interrogations* (**Chicago, IL., January 18, 2002**).

The American Society of Criminology Annual Conference, *The Consequences of False Confessions Revisited in the DNA Age,* (**with Professor Richard Leo**) (**Chicago, IL. November 14, 2002**).

Midwest Regional Defender Center's Conference, 2002 Leadership Summit, *Kids Are Different, Individual and Systemic Methods for Attacking Confessions* (**Chicago, IL. July 25-26, 2002**).

Midwest Regional Defender Center's Conference, Juvenile Justice on Appeal, Training of Illinois State Appellate Defenders, *Coerced and False Confessions, What You Need to Know in Order to Protect Your Client* (**Chicago, IL., July 18, 2002**)

Maine Association of Criminal Defense Attorneys Annual Conference, *False Confessions, Adult and Juvenile Defense,* (**Portland, Maine June 7, 2002**)

American Bar Association, Juvenile Justice Center, Juvenile Defender Leadership Summit, *The Chicago Experience: Using the Principles of Adolescent Development and Research to Impact Policies and Practices Regarding Questioning Children.* (**Miami, Fla, October 26, 2001**)

Twelfth Annual Public Defender Seminar, Iowa Public Defender's Association, *Interrogations and Confessions of Juveniles.* (**Sioux City, Iowa, June 20, 2001**)

The Illinois Public Defender Association Spring Seminar, *False Confessions and Problematic Interrogations (Protecting Children and Preserving the Truth).* (**Urbana, IL, May 18-19, 2001**)

American Bar Association, Juvenile Justice Center, Juvenile Defender Leadership Summit, *Child Suggestibility: Implications for Confessions, Interrogations and Interviews.* (**Houston, TX, October 27-29, 2000**)

Indigent Defense 2000, *Redefining Leadership for Equal Justice*, Moderator of Plenary Session: *Fulfilling the Promise of Gault – Better Outcomes for Children* and of Workshop: *Police Interrogations, False Confessions, and the Impact on Children and the Court.* (**Washington, D.C. June 29-30, 2000**)

University of Michigan Law School's Criminal Law Society, Juvenile Justice Symposium, Presenter on Police Interviewing Techniques (**Ann Arbor, MI, January 28, 2000**)

Amnesty International's Hearings on Police Brutality, Presenter on False Confessions and Children (**Chicago, IL, October 21, 1999**)

9

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1962

Pl. Amor 032386

American Academy of Child & Adolescent Psychiatry, AACAP Annual Meeting Symposium, *Juvenile Justice: Who, Where, and What Next?*, Panelist (**Chicago, IL, October 20, 1999**)

American Bar Association, Juvenile Justice Center, Juvenile Defender Leadership Summit, *The Impact of High-Powered Police Interrogations on Children*, Co-Panelist with Richard Ofshe (**Washington, D.C., October 16, 1999**)

1998 Annual Fall Criminal Defense Conference, Wisconsin Public Defender, Presentations on Competencies and Capacities of Children and Prosecuting Childhood—Some Legal Issues (**November 12, 1998**)

## TESTIMONY AS EXPERT WITNESS ON POLICE INTERROGATIONS AND FALSE CONFESSIONS

In the Matter of Marquis G., 10 Del. 522 *(testified as an expert in pre-trial voluntariness hearing on issues relating to juvenile false confessions in September 21, 2010)*

In the Matter of Gregory Taylor *(testified as expert in assessing the reliability of confession evidence in hearing before North Carolina Innocence Inquiry Commission)(September 2009)*

In the Matter of Tyler T., *(testified as expert on juvenile false confessions in juvenile court in Grays Harbor, Washington (September 2008)*

In the Matter of Christine Susan Cummings *(testified as expert on juvenile false and coerced confessions in clemency hearing)( February 2004)*

In the Matter of J.R., No. J-1150-04 *(qualified as an expert in subject of juvenile false and coerced confessions in juvenile court in Washington, D.C.)(Trial: October 2004)(Judge Fern Saddler)*

Best v. Grant County *(gave deposition as expert witness in class action litigation concerning the failure of Grant County public defenders to adequately represent defendants in confession cases)(June 2005)*

In the Matter of Barry Massey *(testified as expert on juvenile false and coerced confessions in clemency hearing)(September 2006 )*

## TELEVISION, RADIO, AND PRINT MEDIA APPEARANCES

Mr. Drizin has frequently appeared on national and local news programs as an expert in the area of juvenile justice and has widely been quoted on the subject of false confessions and police interrogations. He has been a featured guest on ABC's *Nightline* with Ted Koppel, *The News Hour* with Jim Lehrer, CNN's *Burden of Proof*, FOX T.V.'s *In-Depth Program*, CBS's *The Dr. Phil Show*, MSNBC's *The Dan Abrams Show*, National Public Radio's *Weekend All Things Considered* with Jacki Lyden, Pacifica Radio's *Democracy Now* with Amy Goodman, and National Public

10

C 1963

Pl. Amor 032387

Radio's *Tavis Smiley Show*. In addition, portions of his interviews have been broadcast nationally on ABC News, ABC's *Good Morning America*, NBC's *Nightly News*, NBC's *Weekend Today Show*, CNN's *The World Today*, MSNBC's *The Brian Williams Show*, CNBC's *The Rivera Show Live*, CNN's *Headline News*, and The Voice of America's *News Now*, the A & E. Network's *The Point* and *American Justice*, and CBS News' *60 Minutes*. He has been consulted and cited as an expert in false confessions and videotaping police interrogations in numerous newspapers and magazines, including the *New York Times, the New York Times Magazine, Washington Post, Wall Street Journal, Newsday, Chicago Tribune, Chicago Sun Times, Miami Herald, South Florida Sun-Sentinel, Detroit Free Press, Detroit News, San Francisco Chronicle, Chicago Magazine, Columbia Journalism Review,* and *Atlantic Magazine.*

11

Document received on 2017-07-27-16.41.18.0  Document accepted on 07/28/2017 09:44:13 # 4085820/17043785485

C 1964

Pl. Amor 032388