*Amor v. Cross, et al.*
Case No. 18-CV-2523
Our File No. 18-4078

# EXHIBIT D



# THE FORENSIC PANEL

TEL: 212.535.9286   FAX: 212.535.3259   MICHAEL WELNER, M.D., CHAIRMAN

Laura M. Ranum
Joseph M. Polick
The Sotos Law Firm, P.C.
141 W. Jackson Blvd. #1240A
Chicago, IL 60604

Re: **William Amor**

June 18, 2021

Ms. Ranum and Mr. Polick,

Pursuant to your request, I have conducted a forensic assessment of specific claims raised in proposed expert testimony on behalf of the above litigant. Mr. Amor was 39 years old when charged with the September 10, 1995, arson and death of Marianne Miceli, after providing a statement to police and to an Assistant State's Attorney. Subsequently, Mr. Amor unsuccessfully challenged the statements' admissibility in pre-trial proceedings. He was tried in September 1997 and convicted of first-degree murder and aggravated arson.

Testimony at Mr. Amor's 1997 trial included arson investigators. In later years, this testimony drew reconsideration because of evolving understandings in fire science. Fire professionals also considered the merit of Mr. Amor's statements to police on the night of his arrest, and concluded that the ignition scenario could not have transpired as he explained. A court order on April 6, 2017 vacated Mr. Amor's conviction. At an early 2018 bench retrial, Mr. Amor was acquitted.

On April 9, 2018, Mr. Amor filed suit against the Naperville Police Department, officers involved in the original murder investigation and their supervisors. The civil complaint asserts that the defendant officers conspired and "coerced a confession from Mr. Amor through physical force, mental coercion, lies, and improperly suggestive interrogation techniques."

Specifically, the claim states that Detective Brian Cunningham slammed Mr. Amor against a wall and officers verbally intimidated him. This treatment, along with "prolonged deprivation of food and sleep by Defendants as well as emotional impairment from the manner in which Defendants caused plaintiff to be served with the divorce papers."

Plaintiff's attorneys retained Richard Leo, Ph.D. Dr. Leo provided a report on January 22, 2021, in which he opines that Mr. Amor's October 4, 1995 statements bear "the hallmarks,

WELNER 01

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **2** of **48**

characteristics, and indicia" of an unreliable confession; that the social science literature would deem this to have been a "proven" false confession; and that if false, the statements, were indicative of a coerced-compliant confession.

Dr. Leo raises the Reid training method of interrogation, asserting that the Reid techniques are "universally believed to lead to coerced and or false confessions and wrongful convictions in a significant number of criminal cases." He offers that Mr. Amor's "description of what occurred in his interrogation" "contains examples of physically and psychologically coercive interrogation techniques" and "fits with the empirical social science research on the types of interrogation techniques, methods, practices and effects" that are "known to cause false confessions," and explain "how innocent individuals are often moved to make and/or agree to false and unreliable confessions."

Dr. Leo also invokes the importance in this case of, "lengthy interrogation, sleep deprivation, false evidence ploys, minimization, threats and promises." Moreover, according to Dr. Leo, police "leaked non-public case facts and pressured and persuaded the suspect to accept the police narrative." He adds that Mr. Amor was further at risk for a false confession because of his suggestibility, anxiety, and depression.

The case is referred for my consideration to address the following questions:

1) *How are proven false confessions of the innocent identified? What is the distinction between false and unreliable confession, from a standpoint of scientific terminology? Are false confessions identified through psychological techniques, indicia, hallmarks, or through any social science measures or procedures that have been empirically researched?*

2) *Do references of proven false confessions exist? What impacts the reliability of such designation? How are these references informative to the broader scientific and justice community?*

3) *What are the key psychological and personal antecedents to Mr. Amor's self-incriminating statements of October 4, 1995?*

4) *What techniques of Mr. Amor's police questioning on October 3-4, 1995 increase the risk of or are known to cause false confession to murder in the interrogation setting? What is known of the significance of minimization as a technique? False evidence ploys? What study, research, or reliable methodology has demonstrated that the interrogation techniques of this case move an innocent person to make a false confession?*

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **3** of **48**

5) *What is the evidence that Mr. Amor demonstrated a coerced-compliant confession, a scripted confession, or both? Does evidence demonstrate that Mr. Amor had no meaningful choice but to comply with the demands and requests of their interrogators?*

6) *Is the Reid method of interrogation, based on data available from cases of proven false confessions, universally believed to lead to coerced and/or false confessions in a significant number of criminal cases?*

7) *What is the evidence that lengthy interrogation causes false confessions? Did a lengthy interrogation cause Mr. Amor to offer a false self-incriminating statement?*

8) *What is sleep deprivation? Has social science research demonstrated that sleep deprivation causes false confessions to murder? Did sleep deprivation cause Mr. Amor to offer a false self-incriminating statement?*

9) *Has social science research demonstrated that anxiety and depression cause false confessions to murder?*

10) *What is the significance of Mr. Amor's suggestibility, as tested and reported by Dr. Chiapetta?*

## SOURCES OF INFORMATION

1) Naperville Fire Department Investigation File
2) Autopsy of Maryanne Miceli, by Shaku Teas, M.D., September 11, 1995
3) Report on Bill Amor by Michael Masokas, John Reid and Associates, October 20, 1995
4) Report of forensic chemist, Alfred P. Luckas, September 19, 1995
5) Report on William Amor by Richard O'Brien and Associates, September 14, 1995
6) Report on Tina Miceli by Richard O'Brien and Associates, September 19, 1995
7) Letters from William Amor to Tina Miceli, during incarceration
8) Interview of Tina Miceli by Inv. Mike Cross, September 10, 1995, 1159 PM
9) Handwritten statement by Tina Miceli, September 10-11, 1995
10) Interview of Marilyn Glisson, by Dets. Cunningham & Griffith, September 11, 2015, 630 PM
11) Interview of William Amor, by Det. Michael Cross, September 12, 1995 1120 AM
12) Interview of William Amor, by Det. Ferreri & Inv. Cross, September 14, 1995 240 PM
13) Interview of William Amor, by Det. Cross, September 15, 1995 9 AM
14) Interview of William Amor, by Det. Cunningham, September 15, 1995 450 PM
15) Origin and Cause Report, Lt. D. Ferreri, September 10, 1995

WELNER 03

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **4** of **48**

16) Phone records from Miceli apartment, September 10, 1995
17) Notes of Michael Masokas, John Reid and Associates
18) Diagrams of scene
19) Video of Crime Scene
20) Evidence Receipt, September 29, 1995
21) Transcript of 911 call by Marianne Miceli, September 10, 1995
22) Audio recording of M. Miceli 911 call
23) Statement of Bill Amor and Miranda Waiver, September 15, 1995
24) Interview of Tina Miceli, by State Farm Insurance, September 25, 1995
25) Interview of Tina Amor, by Det Sullivan, October 3, 1995 905 PM
26) Statement of William Amor, October 4, 1995 114 AM
27) Statement of William Amor, October 4, 1995 211 AM
28) Statement of William Amor, October 4, 1995 510 AM
29) Statement of Marilyn Glisson, October 9, 1995
30) Grand Jury proceedings, October 25, 1995
31) Memo from ASA Brian Nighosian, re Amor statement, November 1, 1995
32) Coroner's inquest, November 9, 1995
33) Motion to suppress statements, filed January 8, 1996
34) Motion to suppress hearings, February 26 – March 25, 1996
35) Motion to Quash Arrest, March 25, 1996
36) Plea article, May 15, 1996
37) Pre-plea report, September 9, 1996
38) Report of Michael Chiapetta, Psy.D., November 19, 1996
39) Dr. Chiapetta Notes, Tests, and Addendum
40) Notes of Brian Nigohosian from interview of Mr. Amor
41) Photos from fire scene
42) ROP Motion to Suppress and Quash Arrest, February, 11, 1997
43) Trial proceedings, September 10 - 17, 1997
44) Pre-sentencing report, October 24, 1997
45) Sentencing Transcript, October 28, 1997
46) Rule 23 order, April 5, 1999
47) Report of Steven Andrew Drizin, September 12, 2013
48) Petition for Post-Conviction Relief, January 28, 2015
49) Interview of William Amor, by ASA Michael Pawl, Inv. Robert Guerrieri, and John Golder, ATF, October 30, 2015
50) Post-Conviction Hearing Transcripts, December 12-16, 2016
51) Interview of Tina Micelli, by Det. Michael Pauland Det. Guerrieri, May 23, 2017
52) Order re Post-conviction relief, April 6, 2017
53) Amor Motion to Suppress Statement and Suppress Evidence, July 27, 2017
54) People's Motion to Deny Amor's Motion to Suppress and Quash Arrest, September 1, 2017
55) Report of Gregory DeClue, Ph.D., December 6, 2017
56) Acquittal Order, February 21, 2018

WELNER 04

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

57) People v. Amor, May 6, 2019 Transcript
58) Deposition of William Amor, March 5, 2020
59) Deposition of Tina Miceli, March 13 & 14, 2020
60) Divorce petition, Miceli vs. Amor
61) Statement of Russell Weidemann
62) Report of Richard Leo, Ph.D., January 22, 2021
63) Transcript of Retrial, January 24, 2018
64) Transcript of Court Decision, February 21, 2018
65) Criminal record of William Amor
66) Employment records of William Amor
67) Records from DuPage County jail, 1993, 1995
68) Medical records from Taylorville Correctional Center
69) Civil complaint, filed April 9, 2018
70) Deposition of Brian Nigohosian, August 7, 2019 (with Exhibits)
71) Deposition of Robert Guerreri, February 7, 2020 (with Exhibits)
72) Deposition of Brian Cunningham, February 28, 2020 (with Exhibits)
73) Deposition of Michael Cross, October 16, 2020 (with Exhibits)
74) Deposition of David Ferreri, September 11, 2020 (with Exhibits)
75) Deposition of Shelly Williams, August 6, 2020 (with Exhibits)
76) Deposition of Richard Leo, Ph.D., April 12, 2021 (with Exhibits)
77) Deposition of Erica Nichols Cook, March 25, 2020 (with Exhibits)
78) Deposition of Nicholas O' Riordan, Ph.D., March 13, 2020 (with Exhibits)
79) Ill Appellate Court Opinion, November 30, 2020
80) Phone call with Bill Amor and Erica Nichols Cook

**FORENSIC ASSESSMENT**

1) *How are proven false confessions of the innocent identified? What is the distinction between false and unreliable confession, from a standpoint of scientific terminology? Are false confessions identified through psychological techniques, indicia, hallmarks, or through any social science measures or procedures that have been empirically researched?*

Wrongful convictions of the innocent facilitated by self-incriminating statements such as false confessions are proven through three principal methods:

a) Definitive proof that establishes another perpetrator, unrelated to the person who provides a self-incriminating statement, was responsible for the crime
b) Irrefutable scientific evidence, such as DNA, digital evidence or other definitive physical evidence demonstrates another unknown person's involvement in the crime; or

WELNER 05

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

    c) Physical evidence that demonstrates that there is no explanation by which a person who made a self-incriminating statement could have been responsible.

Dr. Leo, in his report, notes that in 1998, he and a colleague coined four prongs of what would make a proven false confession. His characterizations are close to the above, but emphasize whether science "objectively establishes" whether someone could not have committed the crime, or "objectively establishes" another perpetrator, or science "dispositively establishes." All of these are helpful contributions to a case. However, there may be objective evidence exculpating someone, or objective evidence pointing to another perpetrator, yet the individual may still be guilty. A criteria based on disposition relates more to the outcome of the matter rather than the merit of the evidence supporting guilt. The three criteria above are meant to be definitive, because they create scenarios that are inarguable.

In Mr. Amor's case, the false idea that Mr. Amor's spilled vodka could have ignited a fast-moving fire provides objective evidence that he provided a false statement, and was innocent. But that is not the only evidence that can inform his guilt or innocence. Mr. Amor may be innocent or may yet be guilty.

Moreover, while Dr. Leo interprets that fire science evidence objectively and dispositively establishes that Mr. Amor could not have started the fire, he acknowledged in his deposition that he studied only Dr. Carpenter's report, and not those who disagreed with him. Without having reviewed the disputing expertise, Dr. Leo certainly cannot establish how one opinion eclipses the others, how valuing one opinion and devaluing all others is objective, and how such evidence is "dispositive." Above all, in a case in which the very evolution of fire science is central, fire science itself and the analysis it informs can hardly be equated with the certainty of DNA. The fire science remains objective at its very best but admittedly not definitive. What is not definitive is not proven.

The entire consideration of proven false confessions and false admissions originates only when a wrongful conviction has been identified by courts that reverse a conviction. For those still serving a criminal penalty, a vacated conviction may be followed by retrial. Such a retrial, as in the case of Mr. Amor, does not rely upon some of the evidence used to prosecute the first trial.

In preparation for such retrials, especially those that occur twenty-one years later as did Mr. Amor's, the opportunity to develop evidence has evaporated. No longer able to gather evidence from scenes that have been cleaned, from witnesses that have died or moved

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

away or forgotten, prosecutors must work with the evidence they established twenty-one years ago.

In some instances, prosecutors decide that the evidence remaining is insufficient to establish a person's guilt beyond reasonable doubt, and they elect not to try a case – even if they believe in guilt. In other instances, they may try the case after a conviction has been vacated. At that point, a trier of fact may still determine that the evidence is inadequate to demonstrate guilt beyond a reasonable doubt. In neither of those scenarios is the case a proven false confession of the innocent; what has only been established is that the evidence used to convict the individual was wrong.

Acquittal does not mean innocence. It does mean guilt cannot be demonstrated beyond a reasonable doubt. In some cases, acquittal in a particular case may prove innocence to some, but others may disagree. In other instances, all come to agree in time that an acquittal reflects innocence. This typically happens after other evidence comes to light.

The judge at Mr. Amor's 2018 retrial specifically noted, as he issued findings of "not guilty," that the

> *"Court cannot determine he was criminally responsible for the fire beyond a reasonable doubt."*

The absence of consensus is precisely why a false confession of the innocent is not "proven" unless everyone agrees that the defendant is innocent. Innocence does exist, and can be proven by the above three criteria. The presence of such evidence is persuasive to all, regardless of ideological affiliation or representation.

There is no psychological, sociological, or behavioral science measure or technique that establishes a false confession or false admission. Opinion evidence of 'why a false confession of the innocent happened' only accompanies factual and physical evidence from a), b), and c) presented in parallel that otherwise establishes that a person is innocent. Why is this?

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **8** of **48**

In the course of interrogation, suspects routinely make false statements.[1] Some are to cover guilt.[2] Some are to ensure the perception of innocence.[3] Some are to mitigate culpability. Both guilty and innocent suspects make false statements. A person's inclination to make false statements in interrogation is unique to that person.[4] It is as unique as that person's capacity to lie.

Some individuals lie more readily; those with antisocial personality features lie as a diagnostic quality of their condition.[5] Those with borderline and narcissistic personality features have also been described as having a tendency to lie.[6]

For others, making false statements is more context-specific. That context may be in their communication with spouses,[7] sales clients,[8] investors,[9] politicians,[10] or media pundits.[11] Lying is also mediated by cultural context, in which one's external circumstances are more or less likely to enable lying as ordinary and unimportant,[12] or discourage and punish it as unacceptable.[13]

[1] Birch, G. A. (1990). False Statements to Federal Agents: Induced Lies and the Exculpatory No. *The University of Chicago Law Review, 57*(4), 1273–1296.
[2] Ofshe, R. J., & Leo, R. A. (1997). The social psychology of police interrogation: The theory and classification of true and false confessions. *Studies in Law Politics and Society, 16*, 189-254.
[3]Ibid.
[4] Blair, J. P. (2007). The roles of interrogation, perception, and individual differences in producing compliant false confessions. *Psychology, Crime & Law, 13*(2), 173–186.
[5] American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders: DSM-5.* Washington, D.C.: American Psychiatric Association, pp 659-661.
[6] Ford, C. V., King, B. H., & Hollender, M. H. (1988). Lies and liars: Psychiatric aspects of prevarication. *The American Journal of Psychiatry, 145*(5), 554–562.
[7] Miller, G. R, Mongeau, P. A., & Sleight, C. (1986). Fudging with friends and lying to lovers: Deceptive communication in personal relationships. *Journal of Social and Personal Relationships, 3*, 495-512.
[8] Llewellyn, N., & Whittle, A. (2019). Lies, defeasibility and morality-in-action: The interactional architecture of false claims in sales, telemarketing and debt collection work. *Human Relations (New York), 72*(4), 834–858.
[9] Pollack, J., & Bosse, D. (2014). When do investors forgive entrepreneurs for lying? *Journal of Business Venturing, 29*(6), 741–754.
[10] Celse, J., & Chang, K. (2019). Politicians lie, so do I. *Psychological Research, 83*(6), 1311–1325.
[11] Finneman, T., & Thomas, R. (2018). A family of falsehoods: Deception, media hoaxes and fake news. *Newspaper Research Journal, 39*(3), 350–361.[12] Seiter, J., Bruschke, J., & Bai, C. (2002). The acceptability of deception as a function of perceivers' culture, deceiver's intention, and deceiver-deceived relationship. *Western Journal of Communication, 66*(2), 158–180.
[12] Seiter, J., Bruschke, J., & Bai, C. (2002). The acceptability of deception as a function of perceivers' culture, deceiver's intention, and deceiver-deceived relationship. *Western Journal of Communication, 66*(2), 158–180.
[13] Ibid.

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

False statements by suspects in murder interrogation are common and part of denials and other efforts to prevent being incriminated. There are many reasons why suspects may offer false statements even when incriminating themselves. These include:

1) To redirect investigators to thinking one is not responsible for a criminal act
2) To redirect investigators to think an event was more spontaneous and less of a premeditated killing performed with malice
3) To reflect a more impaired mental state at the time of the event, suggesting an impaired memory for events or the diminished ability to avoid antisocial decision-making
4) To redirect investigators from more longstanding deviance and cunning that accompanied a killing and would have reflected on the actor with more culpability
5) To reflect a more sympathetic posture when a suspect had a callous disregard for the victim
6) To present a scenario that is a more relatable scenario than one of behavior that would have been exceptionally depraved to most people
7) To redirect investigators from other suspects and conspirators
8) To save psychological face with others who would react strongly to the truth
9) To redirect investigators from discussion of other aborted attempted killings

Fire experts involved in the Amor matter now agree that a cigarette dropped onto a newspaper soaked in vodka will not ignite. But there is no consensus as to how the fire started in the Miceli home. There is no current support for an electrical, gas, or spontaneous combustion source. Incendiary or accidental causes, are the remaining considerations.

As fire science evolved once over the course of this case, it can certainly evolve further to provide more definitive answers to the Miceli fire. In the meantime, whatever the September 10 timeline of Mr. Amor -- generally irresponsible, marginally functioning, sick that day and with alcohol in his system, but dutifully securing a gas receipt – there are scenarios by which he could have ignited a fatal fire in a method unrelated to spilled vodka.

Perhaps the fire ignited from a smoldering cigarette left by Marianne Miceli, who was not given to dropping cigarettes. Perhaps Mr. Amor ignited an area that had been doused with lighter fluid or another accelerant. Or, as Lt. Ferreri testified, Mr. Amor could have ignited the fire with a cigarette on dry newspaper as opposed to wet newspaper. Under the latter circumstances, his September 15 and October 4 account to police would not have been admission of what actually caused the fatal inferno. Rather he would have chosen to represent an account whose details best approximated an accident or, at worst, negligence.

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

No approaches from the social and behavioral sciences that could determine a false confession by an innocent suspect have been employed in research designs involving actual suspects in actual crimes. Statements are proven false when they contradict established facts or are otherwise physically impossible. However, the false statement does not equate with innocence because false statements can be made by the innocent and the guilty, inspired by motivations as noted above, for example.

Theories about how to tell a confession is false and a suspect is innocent, independent of the physical and factual evidence as noted above, could be studied under generally accepted and ethically sound research protocols. But they have not been. All that has been done is that proven false confessions have been subject to speculation which starts with the end result and postulates a scenario for how fate arrived there. This is not science when it does not rely upon what has been proven and undisputed. Nor is it objective when it chooses sides.

Thus, any statement that suggests "indicia" and "hallmarks" for determining a false or "unreliable" confession cannot account for its error rate or success rate, and is essentially psychological snake oil adorned with ornamental jargon specifically offered as advocacy. It is the advocacy reserved for an attorney as argument, but breaches the standards of objectivity expected for psychologists and mental health professionals and other professionals testifying in court.[14]

There are no shortcuts to the forensic scientist's diligent search for factual and definitive physical evidence.

In science, the concept of "reliability" refers to whether the evidence presents itself as the same in successive reviews. That means that successive specialists reviewing data will have the same interpretation of that data.

As it relates to a statement, that would be to say that the statement is consistent in successive accounts. A reliable witness, for example, is a person whose account would be expected to reflect what his experience was, and would be consistent in accounts over time.

---

[14] American Psychological Association. (2017). *Ethical principles of psychologists and code of conduct.* Washington, D.C.: American Psychological Association; Specialty guidelines for forensic psychology. (2013). *The American Psychologist, 68*(1), 7–19; Glancy, G. D., Ash, P., Bath, E. P., et al. (2015). AAPL practice guideline for the forensic assessment. *Journal of the American Academy of Psychiatry and Law, 43* (2), S3-S53.

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

An unreliable statement is one that changes in meaningful form and substance from one account to the next and does not echo the person's personal experience.

Dr. Leo, in his Amor report, repeatedly uses the term "unreliable" alongside "false." Moreover, he expresses opinions on the "unreliability" of the Amor statement as if he is speaking of its falseness and Mr. Amor's innocence. This rhetorical device renders the ideas of false and unreliable interchangeable. Dr. Leo uses "unreliable" as a proxy term because it is a well-established understanding that expert witnesses cannot testify that confessions are "false." Therefore, Dr. Leo refers to "unreliable" so as to convey the idea of falsehood without uttering the magic word. Dr. Leo doing this repeatedly serves the purpose of indoctrinating the reader with a particular narrative without full-throatedly pronouncing this a false confession.

Reliable does not equate with true or false. A person's story may change to the end that one does not know if one version is true, multiple versions are largely true, or all are false.

"Unreliable" likewise does not inform the question of innocence. A person may give a statement that is not meant to reflect the available history or facts – for reasons that are entirely self-serving. That does not render a person innocent; rather it supports an impression that one is an unreliable and self-serving historian who may be innocent or guilty. One need not look further for an example than William Amor himself. When he gave a statement on passing an empty envelope and withdrawing cash from an ATM, he gave a false and a changing statement.[15] Yet he was guilty.

The use of "unreliable confession" interchangeably with "false confession" has no scientific foundation. Dr. Leo does it consistently, indeed reliably, demonstrating that it is his intent to do so. Over the course of a number of years, Dr. Leo's testimony has been excluded because his use of the term "unreliable confession" is deemed to be an effort to encroach on the province of the jury to assert that a confession is false.[16] That he continues

---

[15] See, DEFS 21-23; 4835-4977
[16] *Taylor v. City of Chicago*, No. 14 C 737, 2020 U.S. Dist. (N.D. Ill. Sep. 21, 2020)*; United States v. Begay*, 310 F. Supp. 3d 1318, 1353–56 (D.N.M. 2018); *United States v. Phillips*, 849 F.3d 464, 470 (1st Cir. 2017); *Kogut v. Cty. of Nassau*, 2013 WL 3820826 at *7 (E.D.N.Y. 2013); *United States v. Deumann*, 2012 WL 4379777 (W.D. Mich. 2012); *Green v. City of Wenatchee*, 2003 WL 26089744, at *3–4 (E.D.Wash. 2003); *State v. Rafay*, 168 Wash.App. 734, 791 (2012); *People v. Kowalski*, 492 Mich. 106 at 132-133 (2012); *United States v. Yazzie*, 2012 WL 13076228 at *2 (D.N.M. 2012); *United States v. Sequi*, 2007 WL 9757900 at *2 (D. Mont. 2007); *Redlightning*, 2008 WL 11396798 at *3 (W.D. Wash. 2008); *Vent v. State*, 67 P.3d 661, 670 (Alaska Ct. App. 2003); *State v. Wooden*, 2008-Ohio-3629, ¶ 24; *State v. Davis*, 32 S.W.3d 603 (Mo.App.2000); *State v. Cobb*, 30 Kan. App. 2d 544, 567 (2002).

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **12** of **48**

to do this, in testimony here and in his publications[17] demonstrates that he willfully ignores these court boundaries.

Such a practice by Dr. Leo also reflects that the professional community that publishes his writings in which he does this is not aware of the boundaries in place. Publications have disclosure rules about potential sources of bias and conflict; there is no record of Dr. Leo publishing such disclosure that he is promoting admissibility of ideas that have already been excluded by courts for not reflecting the product of relevant, reliable, or valid methodology.

This unabashed practice demonstrates how publication within the social and behavioral sciences is disconnected from legal realities and therefore unqualified in the peer review it provides before approving publication.

The fact that professional journals publish relevant, reliable, and valid studies and articles on various topics does not mean that they are universally immune to embarrassing ignorance of legal precedents known to the authors who submit articles that publications approve in good faith. Courts may not be aware of how ignorant these professional journals are, and how therefore deficient their peer review processes are. That is because court rigor is necessarily more scrupulous because of its priorities of upholding justice. The question can be more readily informed by scrutiny of who performed peer review of Dr. Leo's submissions, their ideological biases (and tendency to employ the same misleading rhetoric), or qualification to do so.

Dr. Leo's conjoining of "unreliable" with "false" is one example of phraseology he employs that manipulates the reader and trier of fact. The term "psychological coercion" is another accusation he embeds throughout the report as if it is a well-studied construct when in fact, Dr. Leo's definition of "psychological coercion" has not been studied at all.

The Supreme Court, in the landmark case *Colorado vs. Connelly*, ruled that a murder defendant's confession would not be excluded because it was not elicited by physical coercion. Dr. Leo and his colleague Dr. Richard Ofshe who introduced the term "psychological coercion" over twenty years ago, evoke the familiar "coercion" verbiage to argue for exclusion. "Psychological coercion" as a construct, however, has not been researched among populations of the interrogated, or confessing, by any systematic generally accepted methodology.

---

[17] Kassin, S., Drizin, S., Grisso, T., Gudjonsson, G., Leo, R., & Redlich, A. (2010). Police-Induced Confessions: Risk Factors and Recommendations. *Law and Human Behavior, 34*(1), 3–38.

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **13** of **48**

According to Dr. Leo,

> *"Most people also do not know what psychological coercion is, why some techniques are regarded as psychologically coercive, and what their likely effects are."*

That is true, and it includes the behavioral and social science community, because psychological coercion the way Dr. Leo uses it has never been studied to demonstrate that it is what he says it is.[18] The human trafficking community studied a construct of psychological coercion[19] developed by a researcher of U.S. military returning from captivity in the Korean War.[20]

However, the Biderman data, from fifteen interviewed servicemen, is far more dramatic than Dr. Leo's implication that, in a matter of minutes, Mr. Amor would come to perceive that he had "no meaningful choice." Biderman referenced prisoner treatment by the Korean enemy that aimed to force false confessions by different measures, applied over prolonged periods. Specifically, Biderman noted that compliance to confession was shaped through a "complex teaching procedure." This procedure consisted of eight methods: isolation, monopolization of perception, induced debility or exhaustion, threats, occasional indulgences, demonstration of omnipotence, degradation, and enforcing trivial demands. What Dr. Leo bases his assertion of "psychological coercion" upon is different.

Construct validity is a core scientific principle, and is relied upon in the physical and non-physical sciences in order to ensure that terms are not misleading and reflect their appellation. For example, the diagnoses of DSM, as well as psychopathy, have all been extensively studied for construct validity.

Yet no research has ever been undertaken to establish the validity of the psychological coercion construct as Dr. Leo defines it. Neither, therefore, can Dr. Leo demonstrate any empirically-based study to demonstrate what "techniques are psychologically coercive" beyond his designation that Dr. Leo himself does not approve of their use in police work. Neither he nor colleagues have studied, in any empirical and systematic fashion

---

[18] Baldwin, S., Fehrenbacher, A., & Eisenman, D. (2015). Psychological Coercion in Human Trafficking: An Application of Biderman's Framework. *Qualitative Health Research, 25*(9), 1171–1181.
[19] Ibid.
[20] Biderman, A. D. (1957). Communist attempts to elicit false confessions from Air Force prisoners of war. *Bulletin of the New York Academy of Medicine, 33*(9), 616-625.

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **14** of **48**

approximating his 1992 methodology that he references in his report, any of these techniques to examine what their effects are.

In his report, Dr. Leo also references "high-end" inducements. But even this characterization is made up as a term that presented as if it has been a focus of study among actual suspects and defendants when it has not – at all. What study, for example, demonstrated that there is a reliable and valid way for identifying what is a "high-end" versus a "low-end" inducement? Nothing.

The very same section of Dr. Leo's report intones that a social scientist can review "interrogation techniques, methods, and strategies" through the prism of social science literature. This literature, almost exclusively a blend of college student or community volunteer mock-experiments and police critique, derives from no law enforcement training or experience and by its own concession, does not utilize study from actual suspects and actual cases. In other words, it provides almost no ecological validity[21] for what Dr. Leo is using it for.

Another such gimmick promoted in Dr. Leo's report is his "analysis" of the "post-admission narrative." Once again referencing his own earlier theoretical polemics, Dr. Leo lays out a rationale for disqualifying statements if they do not include certain qualitative information. He adds the disclaimer that even if such information is found in the statements, the interrogations may have been contaminated and therefore still illegitimate. It is a mechanism by which one can always argue that any interrogation is "unreliable," and, in the vocabulary created by Dr. Leo for the rest of us, false.

Dr. Leo grandiosely terms this 'analysis' the "fit standard," but this "standard" has never been studied through statements of the guilty but self-serving versus the innocent in order to ascertain its success and error rate.

It is richly ironic that in the same report in which Dr. Leo proposes to advise the court what is a legitimate confession or not through an untested reliability analysis, he dismisses the polygraph (in which he has no qualification) because one "can never tell whether a person is lying or telling the truth (because there is no unique physiological response when one tells the truth or when one lies)." When it comes to Dr. Leo's completely untested confession analysis machine ("reliability analysis"), that's "science," but when it comes to the polygraph, Dr. Leo adopts the persona of methodological orthodoxy.

---

[21] Schmuckler, M. (2001). What Is Ecological Validity? A Dimensional Analysis. *Infancy, 2*(4), 419–436.

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **15** of **48**

Alongside pompous appellations such as "fit standard," Dr. Leo makes reference to the "scientific community." There is no "scientific community" of the boutique micro-niche of false confessions, but rather a complement of perhaps eight active expert witnesses (and their acolytes) who testify for criminal defendants and civil plaintiffs that their confessions were false, unreliable, and invariably occurred because the experts pronounce police misconduct. These academics, who unctuously refer to each other as "scholars," parrot each other's phraseology verbatim,[22] repeatedly cite to each others' work, generate publications repeating the same theories as accepted "consensus," peer reviewed by each other or by people unfamiliar with the handicaps of said studies, and exploit publication to create the totems of the appearance of study of interrogation methods.

In actuality, there is no empirical research being conducted in actual interrogations of suspects for murder and major crimes. There has been virtually none since the research Dr. Leo conducted in 1992 and 1993. When he published his observational studies of interrogation in 1996, Dr. Leo wrote at that time:

> *American scholars have almost altogether ignored or avoided the empirical study of police interrogation practices and criminal confessions...*

...and then concluded...

> *"I began this Article by pointing to the familiar contrast between how law is written in the books and how it is actually practiced by legal actors in the social world, arguing that the gap in our knowledge between legal ideals and empirical realities remains as wide as ever in the study of American police interrogation. In this Article I have tried to fill in this gap – a gap that has widened considerably in the last two decades due to the complete*

---

[22] Even in the case, such formulaic mimicking is on display. Steven Drizin, plaintiff's attorney and law professor, filed an affidavit in this case in 2013. Dr. Leo's 2021 report, on pages 11 and 12, has portions that appear to be identical to Drizin's affidavit. Dr. Leo, in his deposition, was asked whether he based his analysis on Steven Drizin's affidavit. He replied that he did not. The following exchange then took place:

**Attorney:** Which portions of your report did you write and which portions of your report did you extract from Professor Drizin's report?
**Dr. Leo:** So, just to be really clear, nothing in my report was lifted from Professor Drizin's report. Everything in my report I wrote. It's all my words. If there is identical language, you've got the order of extraction in the wrong direction.

That this small group provides what are better appreciated as homogeneous talking points with empty foundation reflects on their zealotry.

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **16** of **48**

> *absence of any empirical research on police interrogation practices – by providing quantitative data from the almost 200 interrogations I observed in nine months of participant observation fieldwork at three police departments.*
>
> *Although this Article breaks new ground as the first empirical study of its type in more than two decades, our understanding of contemporary American police interrogation practices and outcomes remains highly incomplete. If we are to close the gap in our knowledge between the ideal and reality that the Miranda Court decried, we need more primary data and empirical studies of everyday police investigative practices, especially in other regions of the country."[23]*

Dr. Leo's example of nearly thirty years ago, however, has not been followed up with other empirical research on police interrogation practices. The candid critique he expresses in 1996 on the condition of the scientific body of knowledge remains unremedied, many years later.

In his report as a retained witness, however, Dr. Leo offers hollow pronouncements such as references to "well-established social science research," and "many psychological studies" that reference articles that make reference to "well-established social science research" but never get around to demonstrating what that "research" is at all. Because in reality it does not exist, as the body of empirical study has not changed since Dr. Leo's work thirty years ago.

Instead of conducting empirical research, this coterie of individuals conflate findings from college student mock exercises that they fatuously refer to as "laboratory experiments" to claim that they inform risk factors of false confessions when they do not.

Dr. Richard Ofshe, one of the other originators of this advocacy scholarship and cited sixteen times in Dr. Leo's report, was asked about "laboratory experiments" paradigm touted in the articles that Dr. Leo cites as references:

> *Prosecutor: The computer crash test. You're familiar with that, aren't you?*
>
> *Dr. Ofshe: Oh, I know about that, yes.*
>
> *Prosecutor: Could you explain that to the court, please?*

---

[23] Leo, R. (1996). Inside the Interrogation Room. *The Journal of Criminal Law & Criminology, 86*(2), 266–303.

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

> *Dr. Ofshe: That's a silly piece of research that I think is laughable, incompetent, and the kind of thing that people like you keep bringing up because it is so stupid.*
>
> *Prosecutor: Well, why don't you explain it to the Court?*
>
> *Dr. Ofshe: Oh, I'll be happy to explain it to the Court. Somebody thought he could simulate interrogation by setting up an experiment in which someone crashed a computer and was told they had hit the wrong key on the key board and when that person was gotten to admit to that, somehow this was offered as an example of eliciting a false confession. It is a terribly naïve, incompetent piece of research which I have criticized in courtrooms all over this country and to the author of the work.*
>
> *Prosecutor: This Dr. Redlich apparently cites as part of her testimony.*
>
> *Dr. Ofshe: Then she doesn't know what she's doing.*
>
> *Prosecutor: OK. So you disagree with her on that?*
>
> *Dr. Ofshe: That's a laughable piece of research. If a graduate student gave me that piece of research, I'd give the graduate student a "D" and recommend that they be dropped from graduate school."[24]*

Conflating the exercise of a mock interrogation of college students with the interrogation of a suspect in a murder investigation has no contextual validity.

- A college student adopting a role-play does not face the unconscious pressures coursing through the mind of a suspect being interrogated for murder.
- A student adopting the role play of cheating does not experience the gravity of one confronting the consequences of accountability for murder.
- A person who participates in an experiment for class credit is not the same as a suspect detained and powerless in a situation of gravity for which they have no control.
- A person participating in a mock exercise of cheating or being accused of theft does not experience the same pressure of facing the death penalty for the investigated offense.

---

[24] *State of Louisiana vs. Hayes*, 97-3780, October 13, 2006

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **18** of **48**

- A person participating in a mock project operates with the inherent trust that the role-play is managed by a person with a responsible interest in their experience.
- It is quite obvious in murder interrogations that the police officer is not aligned with the suspect. Whatever the acting skills of the mock interrogator, their bearing does not replicate someone who is genuinely questioning a murder suspect and attempting to do so forcefully.

Another of the terms sprinkled in the Leo report that sound academic but are actually conjured as unvalidated test-marketed catchphrases is "implied leniency." The misuse of this term by Dr. Leo and colleagues stems from a 1996 college student study[25] That research, like other mock protocols, does not simulate the conditions of actual interrogation. But for Dr. Leo and his acolytes, the expression "implied leniency" enables the mushiness to interpret anything they wish as a promise of leniency and therefore an argument for inadmissibility of a confession. The uncertainty of "implied" renders social and behavioral science in the court, already fighting uphill to overcome subjectivity and standardless standards, completely fungible.

"Psychological coercion," "implied leniency," and other verbiage grafting influential legal concepts are not scientific terms, but indicia or hallmarks that when one reads it, Dr. Leo or one of perhaps 8-10 cross-referencing social or behavioral scientist clique is either using it in a report for plaintiffs in post-release civil litigation to spin a narrative, or in a theoretical paper or in mock experiments involving students or volunteers that are later referenced in case consultation as if the protocols are methodologically relevant to the case at hand. These expressions are without foundation or depth, but are catchy, like other attention-getting devices that take the place of actual empirical study of police interrogation and false confessions of the innocent.

## 2) *Do references of proven false confessions and admissions exist? What impacts the validity of such designation? How are these references informative to the broader scientific and justice community?*

There are several databases that reference false confessions. One is maintained by the Innocence Project;[26] another maintained by the Northwestern University School of Law, [27]

---

[25] Kassin, S. M., & McNall, K. (1991). Police interrogations and confessions: Communicating promises and threats by pragmatic implication. *Law and Human Behavior, 15*, 233–251.
[26] https://innocenceproject.org/all-cases/
[27] https://www.law.northwestern.edu/legalclinic/wrongfulconvictions/exonerations/

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **19** of **48**

one a project of the University of Michigan Law School,[28] as well as a database of the Death Penalty Information Center.[29] Some cases do represent proven false confessions of the innocent. Others are instances in which a conviction was vacated and prosecutors did not retry a case, but continued to believe in the guilt of the individual.[30] Others are admissions, not confessions; the suspect gave a statement that he did not believe would result in murder charges, but the statement was ultimately incriminating. Still others are not confessions, but false statements of third-party witnesses.

Leo and Drizin published, in a law review, a sample of what they termed "proven false confessions" of persons they assert are innocent. By the authors' own admission, the cases they have included were sometimes informed only by news accounts or defense attorney or advocacy briefs. With limited access to more objective, more fully informed sources, or neither, such databases carry the potential for erroneous inclusion.

The Drizin and Leo database comingles confessions with admissions. They are not the same, for qualities noted above. There are also cases in the Leo and Drizin sample of individuals who may well have been guilty, based on my familiarity with the entire case files of those cases.[31] Certainly, their innocence is not "proven."

Sometimes information comes to light that, just as it may exonerate, ultimately demonstrates that a person once thought innocent is likely criminally responsible. Indeed, the Innocence Project has removed cases that were originally included as a wrongful conviction when evidence emerges that a defendant may have been guilty.[32] That is easier on a website than a publication in a law review article that is not in a position to retract erroneous information. So the Leo and Drizin article, warts and all, remains a testament to what its exhaustive efforts could achieve, rather than the validity of the content itself.

Proven false confessions for which a full, objective dataset is available can inform understandings about false confessions. The most relevant question to answer is – what was it that moved an innocent person from denying responsibility to acceptance of responsibility for a crime one knows one did not commit? If that information is not

---

[28] https://www.law.umich.edu/special/exoneration/Pages/about.aspx
[29] https://deathpenaltyinfo.org/policy-issues/innocence-database
[30] https://innocenceproject.org/davontae-sanford-officially-exonerated/
[31] Miguel Castillo is one such example from the Leo-Drizin list
[32] https://www.detroitnews.com/story/news/local/detroit-city/2020/01/09/dna-evidence-contested-davontae-sanford-case/4422466002/

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

available in a particular case, even if it is a proven false confession, then there is little to be learned from a case's circumstantial features that may generalize to another case.

One example of this, discussed at length in Section 8 below, is "sleep deprivation." Many interrogations are conducted between midnight and 8 AM. Few if any of those suspects took a nap knowing they would be taken into custody, or necessarily slept long, well, or on a comfortable bed the night before. Given the infinitesimal fraction of false confessions of the innocent emerging from those offering statements during the wee morning hours, how is one to interpret that being questioned well past someone's customary bedtime causes false confession?

This reality, held up against the tenacity of Dr. Leo's arguments of the last time a suspect slept, illustrates that one can identify a given false confession that occurred late at night and declare that there is an association, causation or elevated risk relating to sleep that is altogether meaningless and misleads those who take it seriously because of that witness' degree or number of publications.

Let's consider whether one hypothetically re-examines a list of legitimately confirmed and undisputed false confessions for religious association. The number of Hindus on the list is negligible. Does that mean Hindu affiliation is a protective feature against false confessions? That police are more coercive toward non-Hindus? Suppose someone were to study the same list and find that there are more African Americans on the list. Does that make Mr. Amor necessarily from a low-risk group because he is Caucasian? One can pore up and down for demographics, and then interpret findings any number of ways, but that does not constitute validity, risk, or causation. This is especially true because false confessions of the innocent are truly rare.

In an effort to shock and unsettle the reader about the incidence of false confessions of the innocent, Dr. Leo misrepresents his own study to say that police:

> *"elicited false confessions in 4.78% of their interrogations. If this estimate is accurate, American police elicit tens, if not hundreds of thousands of false confessions every year."*

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **21** of **48**

In actuality, in this survey of police officers, those who responded said that 3.8% of innocent suspects provided a partial admission and .97% a complete false confession.[33]

These are very different distinctions, and Dr. Leo knows this. A partial admission can be provided by a person who does not embrace responsibility for a crime, does not believe one is guilty, but provides information that may be false which nevertheless incriminates because it puts a suspect at a given scene, near a victim or another suspect, in possession of a weapon of interest, entangled in a conflict of note, or any number of pieces of information that may appear to be circumstantially incriminating. A false confession of an innocent person means that a person who did not commit a crime knowingly took ownership for having committed that crime.

Dr. Leo is also aware that the same survey found that police estimate on average that they have less than one false confession (.71, to be exact) in their entire career. That includes, by his own admission, those who voluntarily false confess to police to gain attention or as a result of active psychotic symptoms, both of which happen independent of police interrogation, as well as those who confess to other people (including those who may confess to a crime to protect others).

Despite all efforts of Dr. Leo to identify as many false confessions as possible to promote his "tens to hundreds of thousands of false confessions a year" hyperbole, and to declare that false confessions occur "often," Dr. Leo has only been able to cobble together a small fraction of cases relative to the number of interrogations for which police employ the very interrogation techniques he decries as "adding to the risk" of false confessions.

Dr. Leo indicates that most people "assume that virtually all confessions are true." He proposes that he needs to introduce the court to a term of his invention, "psychological coercion" and what he and a coterie of several academics whose agenda-based talking points deem "psychologically coercive" because otherwise, most people would make assumptions about the rarity of false confessions.

Yet it is 1) the rarity of what Dr. Leo or anyone else has identified 2) the fact that part of the very small number of cases he identified are not even false confessions, and 3) his cynical misrepresentation of his own research to suggest "tens to hundreds of thousands a

---

[33] Kassin, S., Leo, R., Meissner, C., Richman, K., Colwell, L., Leach, A., & La Fon, D. (2007). Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs. *Law and Human Behavior, 31*(4), 381–400.

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **22** of **48**

year" of false confessions that demonstrate that "most people" have a more demonstrably accurate understanding of the rarity of this phenomenon – even in the age of Netflix shows on false confessions, and highly publicized false confessions in Illinois – that Dr. Leo touts.

The consensus of academic understanding of false confessions of the innocent to police is that they arise from a convergence of police approaches to the suspect, suspect vulnerability, and the context in which that questioning occurs. Complex forces converge for each particular suspect to move one from denial to acceptance – both for the guilty and for the innocent.

Gisli Gudjonsson, a forensic psychologist and researcher in this area, distinguished three underlying explanations for why people confess: 1) Perception of proof (belief that police will eventually prove one responsible, that there is no point in denying responsibility); 2) Internal pressures (guilt, shame); and 3) External pressures (police interrogation itself, perceived incentives, fears).[34] These three categories are informed in part by the Gudjonsson Confession Questionnaire (GCQ).[35]

False confessions to murder by the innocent are a conscious decision one has made in spite of being exposed to a heavy potential punishment. For this reason, data that is specific to that case informs how one came to make that decision. In some instances, the qualities in one case may manifest in an earlier documented false confession of the innocent. In other instances, there is no precedent or scientific foundation from which one can say that one's statements bear the hallmarks of false statements of the innocent any more than one can say they bear hallmarks of false statements of the guilty. False statements are made by both the guilty and the innocent.

### 3) *What are the key psychological and personal antecedents to Mr. Amor's self-incriminating statements of October 4, 1995?*

**In my professional opinion, Mr. Amor offered a self-incriminating statement shortly after he was confronted with both Tina's filing for divorce and a report that she believed him to be responsible for the fire.**

---

[34] Gudjonsson, G., & Sigurdsson, J. (1999). The Gudjonsson Confession Questionnaire-Revised (GCQ-R) factor structure and its relationship with personality. *Personality and Individual Differences, 27*(5), 953–968.
[35] Ibid.

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **23** of **48**

On October 3, Detectives Mike Cross and Robert Guerrieri met William Amor as he left jail. He was acquainted with them from their earlier repeated questioning of him in connection with the fatal Miceli house fire. Mr. Amor had taken a polygraph on September 12; he showed no response to any questions, leading the examiner to express concerns that he was affected by alcohol he drank prior to the test. He recommended retesting; Mr. Amor declined at that time, but was agreeable to a retest. Police attempted to reschedule on multiple occasions with him but were not successful.

Now, at just after 2:00 p.m. on October 3, Mr. Amor was being released from jail and therefore sober. Police offered to take him into Chicago to the offices of John Reid and Associates for a polygraph. The detectives told Mr. Amor that Reid polygraphers were exceptionally skilled, and this could be a way to clear his name. He agreed to go with them, and they traveled to Chicago and the Reid offices. Once there, Mr. Amor signed a consent form, voluntarily underwent the polygraphy, and signed an acknowledgment that he understood he was not in custody.

After conducting the test, polygrapher Michael Masokas informed William Amor that he had failed the polygraph administered to him. Following the polygraph, Mr. Masokas continued to speak to Mr. Amor until 9:30 p.m. Mr. Amor did not offer a self-incriminating statement. Then, Detective Guerrieri and Cross interviewed Mr. Amor; he did not offer a self-incriminating statement to them, either. The Reid offices closed at 10:30 p.m.

Detectives Guerrieri and Cross offered to transport him back to Naperville, and he accepted. They drove him back to police headquarters. During the ride they did not communicate, although at one point an officer admonished him that he had "better come clean." On the ride from the Reid headquarters to the Naperville Police Department, Mr. Amor made no self-incriminating statement.

A process server went to the Naperville police station to present Mr. Amor with divorce papers from his wife, Tina. Records show that Russell Weidemann served Mr. Amor at 11:55 p.m., only minutes after he had been read his Miranda rights at 11:37 p.m.

Detective Cross, moreover, told him that Tina told Detective Sullivan that she believed him to have been responsible for intentionally starting the fire that killed her mother.[36] He

---

[36] DEFS 720

reportedly demanded that Mr. Amor "tell the truth," then left the room to get coffee. Detective Guerrieri remained in the room with Mr. Amor, alone.

Detective Guerrieri testified at the 1997 trial that he told Mr. Amor, "I think I know what happened. I want to know why it happened." Only minutes later, at around midnight, Mr. Amor offered an account that he had dropped a lit cigarette from an ashtray and onto a newspaper on which he had spilled vodka, and heard it sizzle. Detective Guerrieri relates that Mr. Amor related his account with neither tears, grief, or anger. He said that he did not pick up the cigarette, knowing a fire would probably result. Mr. Amor then wrote out a statement by 1:14 a.m.

In a recorded statement given at 2:11 a.m, Mr. Amor said that he knocked the cigarette to the floor on purpose, saw smoke on the paper, but "just didn't give a shit," that he had an outstanding bill from the Fingerhut Corporation and wanted to buy some things for the new apartment.

At 5:10 a.m., in a follow up statement, Mr. Amor said that he dropped his cigarette in a corner, 2-3 minutes before he left the apartment, adding, "It was over in the corner where I was previously and I didn't even look at it, I walked by, I got my jacket, grabbed a cooler and out I was." This account parallels what Tina has recounted about his movements when he left the apartment.

The most notable association between events of this case and Mr. Amor's self-incriminating statement is his being served with divorce papers. By Mr. Amor's account, he was very much affected by this. The relationship in time between this event and his statement that he had started the fire was minutes.

As Mr. Amor's criminal defense attorney conveyed in his closing argument of the second trial:

> *"Serving papers had a profound impact on what happened afterward. We know it had a profound impact on what happened after because this is the turning point in this whole thing."*

Mr. Amor was also told that Tina now believed him to be guilty, without additional information about what she had said. At that point, Mr. Amor had no idea how she might have implicated him. Prior to his detention on September 16, Mr. Amor was communicating with Tina Amor about the investigation, silencing her on the night of

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **25** of **48**

September 10 in a discussion about the insurance, and reminding her that she was the last to leave the apartment when she queried him about perceived suspicions of others. Removed from Tina by over two weeks on October 3, and with proof that she wanted to divorce him, Mr. Amor no longer could psychologically dominate or manipulate her approach to police or what she might communicate, and could not ensure her silence.

There is no disagreement that William Amor was told that he failed the polygraph. Polygraph failure is known to prompt confessions even when there is high internal pressure not to confess, such as among suspected sex offenders.[37] This clinical phenomenon accounts for the widespread use of polygraphs in programs by psychologist professionals monitoring higher probability sex offender with a probability of having recidivated.[38]

Success of the polygraph in eliciting confessions is believed to relate to a suspect's perception that evidence for this is proof of guilt. With that noted, William Amor did not offer a self-incriminating statement to Mr. Masokas afterward, or to detectives in the car ride back to Naperville.

*-*

It was on September 15 that Mr. Amor had first told Detective Brian Cunningham he had spilled vodka onto the carpeting and on a newspaper. He also mused that he could not remember whether he had put out his cigarette before he had left the apartment; it was possible, he told investigators then, that the cigarette could have flipped off the ashtray and ignited something. Mr. Amor has not asserted coercion led to his account in that September 15 interview.

In the same September 15 interview, Mr. Amor also indicated that Tina had tripped and spilled lighter fluid on the carpeting about a week before the fire.

---

[37] Ahlmeyer, S., Heil, P., McKee, B., & English, K. (2000). *The Impact of Polygraphy on Admissions of Victims and Offenses in Adult Sexual Offenders. Sexual Abuse, 12*(2), 123–138.
[38] https://innocenceproject.org/polygraph-tests-contribute-to-false-confessions-in-chicago/; Bourke, M., Fragomeli, L., Detar, P., Sullivan, M., Meyle, E., & O'Riordan, M. (2015). The use of tactical polygraph with sex offenders. *The Journal of Sexual Aggression, 21*(3), 354–367; Grubin, D. (2008). The case for polygraph testing of sex offenders. *Legal and Criminological Psychology, 13*(2), 185.

**Re: William Amor**
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **26** of **48**

Suspects do not cease to advocate their best interests, even when they incriminate themselves. Mr. Amor was self-serving even in his self-incriminating statements. For example:

- He attributed the idea of a house fire to former cellmate Michael Mannion. Mannion acknowledged the conversation but gave a different version.
- He said they were not behind on bills, though they were.
- He explained that he had taken the cover of the smoke detector off to replace the battery. Yet the entire smoke detector was removed and never found.
- He noted vodka that he was drinking had spilled, rather than reporting that he had spilled an incendiary chemical like lighter fluid.
- He characterized the spill of the vodka as accidental spill, and an impetuous dropping of the cigarette.
- He stated that he went to the back to massage Marianne after dropping the cigarette on the vodka-soaked newspaper; Tina remembered that Mr. Amor had abruptly rushed out of the apartment while watching his favorite football team play an overtime game.
- He stated that he had never intended to kill Marianne Miceli, but he never alerted her of a fire.

That noted, Mr. Amor's earlier fraud arrest is informative. Police questioned him about depositing an empty envelope. Even as they confronted him about the evidence in their possession, Mr. Amor had the tenacity to refute these allegations and contend that were false.

In actuality, Mr. Amor's statement became factually problematic only because fire expert opinion evolved to emphatic rejection that vodka-soaked newspaper would have been sufficiently flammable to have ignited the fire.

In his report, Dr. Leo states that "whatever caused this fire could not have happened while William Amor was in the apartment." Apart from his not being a fire analysis expert, Mr. Amor's statement at 5:10 a.m. on October 4, which parallels what Tina recalls about his movements, does allow for potential explanations in which Mr. Amor was the perpetrator. That ambiguity is to be resolved by the fire professionals as the science matures.

\*-\*

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **27** of **48**

Early in the morning of October 4, William Amor said in his statement that he had not been threatened by police.

In a motion to suppress filed January 8, 1996, however, he asserted that he was threatened, and police used physical force against him.

In testimony at the subsequent suppression hearing in February 1996, Mr. Amor asserted that Detective Cross grabbed him, shook him, and threatened that "If I don't tell the truth, he'll kick my fuckin' ass." The statement was admitted after the court found that Mr. Amor's account, which included that he was not allowed to use the rest room until he gave the police his statement, to not be credible.

On September 10, 1997, attorney Gloria Najera argued in her opening statement at trial that Mr. Amor had not slept the night before, was tired and homeless, easily led and manipulated. She noted that Mr. Amor had been pushed to a breaking point by police yelling at him for ten hours and not providing him food, drink, and rest. According to Ms. Najera, he confessed just after the timed presentation of the divorce papers. Dr. Michael Chiapetta, a psychologist who examined Mr. Amor for the defense, then testified at trial that he had confessed because he was increasingly depressed, and that Detective Cross had poked a finger in his chest and yelled at him, used loud intimidating language, and slammed him against a wall.

Defense attorney William Padish argued in his closing on September 17, 1997 that Mr. Amor was suggestible and confessed as a result of hours of intimidation. Mr. Padish argued that he was even more suggestible than his baseline because he stopped taking medicine on October 3.

Mr. Padish also argued that police broke Mr. Amor's will when they served him with divorce papers because the one thing remaining in his life, his wife, was now lost. Dr. Chiapetta, who testified for Mr. Amor's defense after interviewing him in November 1996, related that Mr. Amor told him that when he was served the divorce papers, he felt "everything was gone."

With this civil litigation in 2018, Mr. Amor has embellished upon his earlier assertions that prior to giving his statement, he was physically slammed into the wall.

Detective Robert Guerrieri testified at the 1997 trial that when they returned to the Naperville station with Mr. Amor, and after the process server Russell Weidemann gave

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

him the divorce papers, Detective Cross raised his voice and told Mr. Amor he did not think he was telling the truth, but did not touch him and did not push him against a wall. Detective Cross acknowledges that he rose, raised his voice and confronted Mr. Amor before leaving the room to get coffee.

At 5'9 and 140 lbs., he was physically inadequate. Yet Mr. Amor handled himself with verbal agility in an earlier interrogation on simpler charges. And when asked to take an earlier polygraph, he drank alcohol beforehand. This resourcefulness recalls his holding his breath in an earlier arrest when given a breathalyzer, blocking the device with his tongue and claiming he had only one lung.[39]

On another occasion of a motor vehicle accident, after leaving the scene, he persuaded someone else to say he was driving, as Mr. Amor had no insurance. And on May 4, 1995, after being sentenced on other charges, he petitioned for a reduction of his sentence on the grounds that he would lose his maintenance job – except he did not have one.

Mr. Amor is wily and brazen enough to have seduced the underage Tina Miceli by placing itching powder in her boyfriend's bed and, with her vacating the bed to Mr. Amor's nearby, squiring her and making her his own. Mr. Amor was undeterred in consummating the relationship, moving into her home, and eventually marrying her. That, after convincing her mother, the late Marianne Miceli, that it was Marianne he was going to ask to marry. Mr. Amor is resourceful.

However, just because one is willing to be manipulative, or to con others, does not ensure that he will employ especially good judgment. Mr. Amor may have been calculating, but mistaken choices – such as one to offer a watered down self-incriminating statement – did not later prove to be a good decision in the final outcome. That reflects more on the convergence of his demonstrated propensity to give inaccurate information to police with his more simple intellect, rather than aversiveness of surroundings.

The reference point for people offering false statements that expose them to arrest is that jail is a forbidding place that one would normally do anything to avoid. William Amor had just been released from custody, and had been incarcerated, and uneventfully, for much of the previous few years. Only five days after he and Tina were married, he was jailed.

---

[39] SDT-LPD 10-11

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **29** of **48**

When Mr. Amor offered his statement to police, he was not only spurned by the only support he thought he had remaining, but he was now homeless.

An admission to a scenario that would have suggested being primarily negligent, reckless, and removing him from an intent to kill the victim would not be as forbidding a choice as would be for others.

Following his arrest, corrections psychologist Nicholas O'Riordan, Ph.D. noted him to be relaxed and smiling and confident his attorney would get his charges "reduced." Mr. Amor did not tell corrections medical staff that he had been "abused." Dr. O'Riordan, a corrections and clinical psychologist who interviewed Mr. Amor right after his arrest, indicates in his deposition that he would have included any history of abuse in his evaluation. Moreover, Dr. O'Riordan found his relaxed and upbeat manner to be inappropriate; however, it would not necessarily have been inappropriate for him.

Mr. Amor was hardly disengaged from his legal defense; Mr. Amor reportedly had met his attorney 12-15 times before a competency challenge was raised on his behalf. At trial, his defense attorney argued that Mr. Amor's relaxed demeanor reflects that his client had "given up." What this does not account for was the observations of corrections staff that Mr. Amor was not only relaxed, but he was "smiling" and "absolutely confident" – the antithesis of hopeless. And again, a sign of his miscalculation.

> 4) *What techniques of Mr. Amor's police questioning on October 3-4, 1995 increase the risk of or are known to cause false confession to murder in the interrogation setting? What is known of the significance of minimization as a technique? False evidence ploys? What study, research, or reliable methodology has demonstrated that the interrogation techniques of this case move an innocent person to make a false confession?*

**There are no techniques identified from Mr. Amor's October 3-4 interrogation that are established to cause false confessions to murder.**

Other than legal threats of the death penalty, physical threats and actual violence, there are no techniques that have been illustrated to cause an innocent person to confess.

Dr. Leo critiques "guilt-presumptive, truth-presumptive, confirmatory and theory-driven" questioning aimed at eliciting a confession from Mr. Amor, "that was consistent with the

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

detectives' pre-existing assumptions, speculations, and beliefs about the cause and origin of that fire."

Police were hardly impetuous in being guilt presumptive on October 3. In the earlier phases of this investigation, police drew from fire investigators who were suspicious of arson as a cause. No one else entered or had reason to enter the apartment, and only William Amor and Tina Miceli were living there with Marianne.

Police learned that Mr. Amor and Tina Miceli left the apartment around the time the fire would have started. Moreover, the two departed for the evening, although Tina Miceli depicted him as laying on the couch, then laying on the floor, so sick he did not even eat the pizza she had bought earlier.

Exiting the apartment shortly before flames were reported by Marianne Miceli, Mr. Amor, who also characterized himself as "sick all day," darted out of the apartment in the middle of his football team playing in overtime, behavior that Tina Miceli found out of character. She indicated that he had said he wanted to watch the end of the game to see who would win. The two went to see a double feature movie despite never having gone to the movies before – and Mr. Amor essentially slept through the first film, according to Tina Miceli.

When police interviewed Mr. Amor and Ms. Miceli after the fire, they perceived him to be controlling her answers. The intellectually limited Ms. Miceli recounted how Mr. Amor told her on multiple occasions, when she queried him about whether he was responsible for the fire, that he told her with an aggressive tone to remember that she was the last one to leave the apartment.

Police also were aware of Mr. Amor's history of fraud. The Hallauers, furthermore, reported how they had been parasitically bilked by Mr. Amor despite Ms. Hallauer being disabled, the family poor, and their having opened their doors to Mr. Amor. Ms. Glisson, who had been the Hallauer's landlord, told police that Mr. Amor was similarly redirecting Marianne Miceli's benefits and Tina's modest earnings for his alcohol and other personal needs. Marianne Miceli was complaining to Ms. Glisson that she did not have enough to eat.

Detectives learned that just prior to the fire, Mr. Amor was desperate to move, that he had accumulated boxes of newly purchased belongings in the living room. Two to three days before the fire, Mr. Amor unexpectedly released their pet mice, explaining "we can't take them with us."

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Police also learned that a week and a half before the fire, Mr. Amor had told Marilyn Glisson, a family friend, that he would be coming into money soon and moving to a better living arrangement. According to Tina, he had an expense of two thousand dollars to pay by September 15.

Moreover, Mr. Amor had removed the apartment's smoke detector days before the fire to "change the battery." He neither replaced the smoke detector, which was never found, or referred it to the handyman as otherwise defective.

During the ensuing investigation and interviews, detectives caught Mr. Amor in repeated lies, beginning with his telling them that he had not been drinking that day. Fire Investigator David Ferreri found Mr. Amor vague and visibly anxious when questioned about lighter fluid. According to Investigator Ferreri, when the lighter fluid topic arose, Mr. Amor became very nervous, was shuffling his feet, no longer maintained eye contact and looked down.

Detectives also noticed how Mr. Amor talked over Tina Miceli when a discussion arose about Marianne Miceli's insurance. Ms. Glisson recalled Mr. Amor speaking with Tina Miceli at Ms. Glisson's home on September 12, and in hushed tones, about Marianne Miceli's life insurance. Mr. Amor denied knowledge of the policy to detectives.

At her mother's funeral, according to Ms. Miceli, he did not sit with her, but rather spent most of his time in the back of the room laughing and telling jokes. She reported that he made statements like, "At least she doesn't limp anymore," and "She is out of her misery now." When Tina told him that whomever did this to her mother should get the death, penalty he replied that the death of her mother was "not that bad," she added.

The investigation also yielded a conversation he had had months earlier while recently locked up on fraud charges. In that discussion with Michael Mannion, his cellmate, the two pondered how to kill Marianne Miceli without being detected. On continuing investigation after his arrest, police learned from his former cell mate that he hated Marianne Miceli, characterizing her as "a bitch." In their conversation, according to Mr. Mannion, Mr. Amor mused about "getting drunk and running her over with his car," reasoning that he would be charged with vehicular manslaughter and serve only 2-3 years for killing her. Mr. Amor

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

had a long history of alcohol abuse, a mental health history that is particularly associated with fire-setting.[40]

In addition, investigators found a letter Mr. Amor had written to Tina Miceli earlier in the summer in which he indicated that he had a plan for capital gains that would enable them to move at the end of that summer.

Detectives questioned both Mr. Amor and Tina Miceli, repeatedly, between September 11 and September 15. They administered a polygraph to Tina Miceli, who passed. After an equivocal result, police arranged a subsequent polygraph for Mr. Amor on October 3, and he failed.

Ample evidence, amassed over a few weeks, pointed to Mr. Amor as a presumptive suspect before October 3. He remains a presumptive suspect, despite fire specialists determining that fire would not have ignited the apartment from a cigarette dropped on a newspaper wet with spilled vodka. Just as fire science has demonstrably evolved to refute earlier interpretations of the scene evidence, the science may further evolve to more directly incriminate the plaintiff.

The detectives' questioning did not account for the detectives' earlier suspicions about the cause of the fire. Questioning detectives noted lighter fluid in his trunk, and his caginess about the trunk after the fire. Detectives believed him to have murdered Ms. Miceli for access to her life insurance, though they referred him to ASA Nigohosian after Mr. Amor told them he had clumsily dropped a cigarette onto a newspaper.

Minimization refers to downplaying the significance of the crime to the suspect – legally, or morally. Minimization has not been researched to demonstrate a link to false confessions to murder. In a study that Dr. Leo references, a mock-minimization scenario was set up for college students who role played as jurors to offer input about how severely sentenced suspects in different interrogation scenarios. The results of mock and college student exercises can hardly be applied to how a suspect, with pressures not to confess to murder, would respond to a minimization scenario.

There is no scientific foundation illustrating minimization as adding to the risk of or causing false confessions. Dr. Leo calling minimization a risk to falsely confess to murder

---

[40] Vaughn, M., Fu, Q., DeLisi, M., Wright, J., Beaver, K., Perron, B., & Howard, M. (2010). Prevalence and correlates of fire-setting in the United States: results from the National Epidemiological Survey on Alcohol and Related Conditions. *Comprehensive Psychiatry, 51*(3), 217–223.

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **33** of **48**

and having several others dutifully echo him does not endow minimization with the requisite empirical foundation to assert that it causes false confessions to murder.

As relates to Mr. Amor's interrogation, it was he who minimized his responsibility, not police. He spurned police probing of life insurance money as a motive. It was Mr. Amor who volunteered that he had spilled vodka. It was Mr. Amor who offered only that even as he reportedly heard the newspaper sizzle, he did not care that a fire could start. In minimizing his responsibility, Mr. Amor was making conscious, self-serving choices, and was therefore not helpless and without the ability to assert his will.

Tina was telling others as early as September 16 that she came to think that Mr. Amor started the fire. These goings on were unbeknownst to Mr. Amor, who was in jail on a traffic charge until October 3. There are instances in which investigators pit co-conspirators against each other to elicit self-incriminating statements. False confessions have occurred this way.

At the time of his statements to police, investigators were considering both Mr. Amor and his wife as potentially responsible. For this reason, it is possible that police conveying Tina's belief in his guilt prompted him to make a watered-down admission that contributed to his conviction. It was Tina's family that engineered the divorce, not police, however. The divorce action was not an interrogation tactic – the timing of its news, however, was impactful.

There are identified false confessions that occurred after a suspect was falsely told he had failed a polygraph. Mr. Amor, however, failed the polygraph. Dr. Leo, in his deposition, denigrates the polygraph as inherently bogus, and therefore false evidence. That has never, however, been the premise behind "false evidence." The polygrapher does not believe it to be bogus, and the police administering it did not do so as a fake exercise. The application of "false evidence" as Dr. Leo creates in his testimony for this case is his own creation of his own value judgment.

In this regard, Dr. Leo contradicts his own writing which clearly denoted false evidence ploys – regardless of whether they are truly a "risk factor" for false confessions – to be schemes in which officers reference bogus exercises or false outcomes, not properly applied techniques. His deposition therefore illustrates how Dr. Leo uses his own stated principles as replaceable placeholders which one can move as needed to virtually any confession into arguments that it is "unreliable." That is argument befitting the law professor that he is, but it has nothing to do with the expectations of the rest of us who are

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **34** of **48**

relying on and responsibly applying what is in the scientific literature and the research islands that have been developed in this niche area.

No study has demonstrated how the presentation of false evidence increases false confessions of the innocent to murder, irrespective of other factors in the interrogation that might have more directly contributed to the outcome.

The data point most closely associated with William Amor's October 3-4 questioning was his being served with divorce papers shortly before he offered a self-incriminating statement. The process service along with Tina's reported belief in his guilt, and the timing of that information being delivered to Mr. Amor, inspired his making a statement.

Of this approach, the judge in Mr. Amor's retrial noted, as he acquitted Mr. Amor:

> *"Now, let's be clear – there is nothing inherently wrong with attempting to break down the defendant's will over time of attempting to weaken his resolve; for example, I suppose, by arranging for divorce papers to be served in the middle of his interrogation. Armed with a sincere belief in a suspect's guilt, one doesn't expect law enforcement to simply accept a suspect's initial denials and call it a day."*

Prior to informing Mr. Amor that Tina had a sincere belief in his guilt, detectives did call it a day at Reid. There, he denied responsibility less than two hours before he confessed to Detectives Michael Cross and Robert Guerrieri. No longer being aligned with Tina, and no longer being able to affect how she might communicate to police was an important change in the context of the case that preceded Mr. Amor's self-incriminating statements.

> 5) *What is the evidence that Mr. Amor demonstrated a coerced-compliant confession, a scripted confession, or both? Does evidence demonstrate that Mr. Amor had no meaningful choice but to comply with the demands and requests of their interrogators?*

**The totality of evidence does not reflect on Mr. Amor providing a coerced compliant confession, or that he had no meaningful choice but to comply with demands of interrogators. Nor was his confession scripted.**

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **35** of **48**

A coerced-compliant confession occurs when the interrogation atmosphere is so aversive that a suspect confesses to escape the setting.[41] Coerced-compliant confessions may be offered by guilty suspects or by innocent suspects. The aversive environment does not cause people to necessarily say false things; it causes people to say what they feel they need to in order to escape the situation. Those who are innocent may confess falsely; those who are guilty may confess guilt.

Dr. Leo, in his report, misrepresents that coerced-compliant confessions occur because of "intolerable stress" of the interrogation. This is without foundation. Coerced-compliant confessions of the innocent do not happen because the suspect is stressed; every murder suspect is stressed in interrogation!

It is common sense that if high stress alone caused people to confess falsely to murder, true and false confessions would be ubiquitous. However, even those who use liberal inclusion criteria to count as many numbers as they can to be false confessions, no more than a few hundred have been identified in recorded history of the American justice system spanning the past forty years.

What distinguishes the coerced-compliant confession is that interrogating officers create such an intolerable atmosphere that the suspect – guilty or innocent – offers a confession in order to end the experience. The subtype is about the aversiveness created by the officers and the compliance of the suspect.

Stress intolerance would lower the threshold for the aversiveness of the environment. Notably, in previous encounters with the same detectives and with others such as the polygrapher, Mr. Amor did not confess. He consistently denied allegations in interrogations in earlier cases as well. So historically, William Amor showed no stress intolerance for interrogation.

There were no allegations of their mistreating Mr. Amor when he told them he had spilled vodka in the apartment on September 15.

---

[41] Gudjonsson, G., & MaCkeith, J. (1990). A Proven Case of False Confession: Psychological Aspects of the Coerced-Compliant Type. *Medicine, Science, and the Law*, *30*(4), 329–335.

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **36** of **48**

William Amor had been with police for parts of nine hours, driving to and from Chicago. A visit of several hours to the Reid and Associates offices highlighted another aspect of the day. The atmosphere between him and police was altogether unremarkable.

Mr. Amor does not recount any mistreatment or abuse traveling to or from Chicago, or at the Reid offices. There was no expectation for the detectives to relate to him any differently after 11:30 p.m. on October 3rd than they had prior to that day.

Therefore, one can appreciate the relevance of being served with his divorce papers at the Naperville Police Department, which alone was very stressful for him, by his account and by his incriminating himself. The divorce, and news of Tina's communication to police that he was responsible, was a very new development and an event in an otherwise familiar back and forth with investigating officers.

News that Tina Miceli believed him to be guilty, and was suing to divorce him, dismantled his support system. Moreover, his wife was asserting that she believed him to be responsible for killing her mother. By his account, this powerfully impacted him.

Mr. Amor asserted in his suppression hearing in 1996 that before he gave a statement, Detective Michael Cross grabbed him by the shoulders, shook him, pulled him out of his chair and said, "You'd better start telling the truth or I'm going to kick your fucking ass."

A threat taken seriously would contribute to an aversive environment. That noted, no one disputes that Detective Cross then left the room to get coffee. Were he to have been that agitated, would he have had the urge to get coffee?

Detective Guerrieri remained, and it was while he was alone with Detective Guerrieri that Mr. Amor provided his statement. Therefore, he began offering a statement after the source of the noxious encounter had already left. There were no urgencies in the atmosphere that were forcing him to make a self-incriminating statement because he had no choice.

At the suppression hearing, Mr. Amor also testified that he was told at one point by Detective Cross that he could not go to the bathroom unless he made a statement; the court found that testimony not credible and admitted his statement, saying he was not intimidated.

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Mr. Amor's own attorney stated in his closing argument of the retrial:

> *"This is not about (the police) being wrong in the sense of them doing something bad. That is not an issue in this case or, frankly, a relevant question. And the State, also, said in opening statements and didn't mention this again in what they said now, but may later, that they will be able to show that the statement was knowing and voluntary, and they played some of the statements, at least one of the statements, that Mr. Amor said about, you know, was it freely given. The question isn't about a legal question of voluntariness."*

In his civil claim, Mr. Amor changed his story to assert that Detective Cross assaulted him and caused him to strike the wall behind him.

In his 2020 deposition, Mr. Amor introduced an account that Detective Cross put his hands around Amor's throat and pushed him against a wall, telling him, "I want you to come clean," and "Sign this and you can go home."

Detective Cross and Detective Guerrieri both deny any physical contact occurred, or anything more than raising his voice and demanding that he "tell the truth," then walking out of the room. What exactly happened between them not cannot be resolved.

Frustration of interrogators as an interrogation drags on may contribute to an increasingly hostile or menacing atmosphere which may eventually lead to a coerced-compliant confession, especially when the suspect feels that there is no other way to escape the very unpleasant setting. At his suppression hearing, Mr. Amor asserted that he was frightened of the detectives and "would have said anything to get away from them." That is the reaction one would experience in a coerced-compliant confession.

Nevertheless, William Amor did not say "anything." His statement was ultimately very close to what he had already told Investigator Cunningham on September 15. On October 4, Mr. Amor did not admit to intending to kill Marianne Miceli, he did not admit to intentionally spilling lighter fluid, having quickly exited the apartment without explanation, or having taken down the smoke detector to eliminate a warning alarm.

Were police to be coercing a scripted statement implicating Mr. Amor in murder, police would not be directing a statement to suggest that the fire arguably started accidently. Scripting would not have yielded the account that, intoxicated, he dropped a cigarette inadvertently on a presumably flammable liquid but did not care. He would not have been

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **38** of **48**

scripted to say that he did not see the newspaper ignite, he would not have been scripted to say that he did not know about the life insurance policy, and did not want anything to happen to Marianne Miceli. Were he to be scripted, he would not have been giving wrong information about the amount of Ms. Miceli's insurance coverage.

Moreover, the statements that ultimately prompted Mr. Amor's arrest did not center around contaminating data. He was at the scene, he was drinking, he was smoking, he was reading the Sunday newspaper and it was spread out on the carpet. There was nothing introduced to him about the scene that contributed to the incriminating nature of his statements.

Contamination may or may not have occurred about the location of the fire's ignition. Investigator David Ferreri was more confident in Mr. Amor's culpability because of where he had noted the fire began. However, this point is incidental to all of the other accumulating qualities noted here that contributed to increasing suspicions that Mr. Amor started the fire.

Coerced-compliant confessions are more likely to be found among compliant personalities. Compliance is not interchangeable with suggestibility; the two are tested differently and have different meanings.[42] Mr. Amor's compliance was not tested. Moreover, his personal history reflects that his lack of compliance contributed to his dysfunction.

Moreover, confirmed cases of coerced compliant confession reflect far more frightening examples of aversiveness. Coerced-compliant confessions of the innocent, as described in confirmed cases, are accompanied by protestations of innocence[43] and indignation about mistreatment after the interrogation ends.[44] In records from the jail after arrest, corrections staff found him to be relaxed, smiling and "absolutely confident his attorney will get charges reduced."[45] Mr. Amor was immediately content with the prospect of a reduced punishment, and visible contentment is inconsistent with what has been described to follow coerced-compliant confessions.

---

[42] Gudjonsson, G. (1989). Compliance in an interrogative situation: A new scale. *Personality and Individual Differences, 10*(5), 535–540.
[43] Gudjonsson, G., & MaCkeith, J. (1990). A Proven Case of False Confession: Psychological Aspects of the Coerced-Compliant Type. *Medicine, Science, and the Law, 30*(4), 329–335.
[44] Ibid.
[45] SDT-DCJ 47

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

6) *Is the Reid method of interrogation, based on data available from cases of proven false confessions, "universally believed to lead to coerced and/or false confessions in a significant number of criminal cases," as Dr. Leo asserts?*

**The techniques of the Reid interrogation training do not cause false confessions. Reid interrogation training is irrelevant to Mr. Amor's self-incriminating statements in this case.**

To begin with, officers who train in the Reid technique are well removed from their training when they question suspects. Homicide investigators are all the more advanced in their careers and further remote in time from the police academy and other in-service training.

Professional practice is influenced by personal experience, mentorship of senior colleagues and partners and observation of them, and continuing education when feasible. The record of the interrogations of this case does not demonstrate interview technique that differentiates itself from the universe of scenarios that arise in questioning deriving from any potential source, including one's own experience. Whatever influence of Reid training in this case, be it rapport building or insistence on telling the truth, these tactics have no demonstrable causation of false confession.

There is nothing in the Reid training, for example, that advocates service of divorce papers as a vehicle to interrogation.

Furthermore, it is the lack of techniques that are implicated in proven false confessions. There is no technique to beating a confession from someone, or threatening a person into a self-incriminating statement. Such approaches occur in the absence of technique. The Reid training does not counsel its students to beat, threaten, or to create the adverse climates that generate coerced-compliant confessions.

Reid approaches specifically build in cautions to their techniques in order to safeguard against false confessions.[46] The Reid training responds to the critics of police interrogation to say that those police whose interrogations contribute to false confessions are specifically

---

[46] Inbau, F. E., Reid, J. E., Buckley, J. P., & Jayne, B. C. (2011). *Criminal interrogation and confessions- 5th ed.* Burlington, MA.: Jones & Bartlett Learning.

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

not following the techniques being taught. There is no research to date to show that, responsibly applied according to training, Reid methods cause false confessions to murder.

That law enforcement officers continue to train in these techniques, and have for twenty-five years since Mr. Amor offered self-incriminating statements, illustrates Dr. Leo's assertion that it is "universally believed" that Reid techniques lead to false confessions to be self-serving. The hubris of such a pronouncement – "I think this way, therefore everyone must think this way" stages a parallel universe in which Reid as a training enterprise can be liable as another target until they are litigated out of existence. For advocates like Dr. Leo, lawfare is another form of effecting interrogation reform.

Moreover, there is no linkage between the police and state's attorneys' defendants' actions and their Reid training. Even as the defendant officers have had Reid training, they have been trained in other investigative methods as well.

Other than attending lectures and seminars, there is no demonstrable history that the defendant officers were relying upon Reid methodology for what they were doing on a regular basis, or in this particular case. The depositions of this case, which probed the influence Reid had on day-to-day practice, showed that the lessons incorporated by the detectives were both reflected in this case and would not contribute to toxic interrogations that reflect in coercion and coerced compliance.

> 7) *What is the evidence that lengthy interrogation causes false confessions to murder? Did a lengthy interrogation cause Mr. Amor to offer a false self-incriminating statement?*

**The length of Mr. Amor's interrogation did not cause him to offer a false self-incriminating statement.**

Over the course of the investigation of Ms. Miceli's September 10, 1995 death, William Amor was questioned on at least eleven occasions, including multiple times on the same day, even in mid-September. October 3rd was no exception. He was questioned by Mr. Masokas before and after receiving the polygraph. He did not then offer any self-incriminating statement, even after being told he had failed the polygraph.

Later that night, after returning to the Naperville Police Department headquarters, Mr. Amor offered a self-incriminating statement less than an hour after being read his Miranda rights at 11:37 p.m. Length of time in interrogation had no bearing on his decision to give

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

the statement he did. Dr. Leo refers to "marathon interrogation sessions." Such an assertion is hyperbole.

Interrogations of several hours have been features of a number of proven false confessions. Whether that is a long period of time for an interrogation in a murder case is not yet established by any particular study. Interrogations do not operate on a cook timer. Interrogations of several hours may be fruitful and demonstrably necessary in eliciting true confessions. That's why they extend as long as they do. The lone instance in which Dr. Leo conducted empirical research, he found that among a group of well over a hundred interrogations he observed, confessions were most closely related to the length of the interrogation and number of techniques used.[47] He did not identify a false confession from that sample.[48] Dr. Leo recognized in his own research that longer interrogations are associated with more techniques used. It follows, then, that any suggested association of length of interrogation with false confessions still relates to the use of a specific technique within that interrogation, in which police are trying different things, rather than the length itself.

No one has researched longer interrogations to offer a percentage of how frequently false confessions occur among longer interrogations, and what factors mediate this – although just as Dr. Leo did, videotaped interrogations can be monitored and followed as well. For example, are longer interrogations more likely associated with a false confession when they occur at 3:00 a.m. as opposed to 8:00 p.m.? Are suspects more likely to confess in a longer interrogation if they have eaten? If they have not eaten? If they have taken prescribed medicine? If they have skipped a dose?

None of this is studied or known. There is no science from which to offer testimony in this area. There is some association of longer interrogations, but it has not been studied to any degree to ascertain under which circumstances, and in what types of cases, and with what type of defendants, is a longer interrogation a risk factor for false confessions.

Fatigue can reflect the effects of a long interrogation, and affect decision-making. Mr. Amor has indicated that he was feeling tired and run down when he provided a statement. Yet he gave the statement shortly after being served with his divorce papers, which he did not expect. Given his description of how powerful it was to have been served, and to learn

---

[47] Leo, R. A. (1996). Inside the Interrogation Room. *The Journal of Criminal Law & Criminology*, *86*(2), 266–303.
[48] It is also notable that Dr. Leo measured length of interrogation in that study and did not use custodial time interchangeably with time in actual questioning.

**Re: William Amor**
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

that Tina now believed he had set the fire, it is my professional opinion that he was quite aroused at the time he was making a decision on how to proceed in the interrogation.

There is, moreover, no academic or scientific basis for comingling time in custody with time in interrogation. Dr. Leo now actually asserts that resting may be more stressful than the interrogation itself. What is more striking about the vacuousness of the idea, for which there is no empirical research to support, is that this unsubstantiated opinion otherwise requires the trier of fact to conclude – and without basis -- that common sense is mistaken.

Were mere time in custody to have relevance to eliciting confessions, police would simply keep suspects in holding cells for long stretches of time. Of course, silence is not so fertile.

Downtime in custody allows for introspection, collecting one's bearings, distancing from the pressures of uncontrollable adversarial interviewing, and planning – including planning how to handle certain aspects of the questioning.

There is no research study or empirical experience to characterize downtime in custody as interchangeable with time in actual interrogation. To use the two concepts of rest and interrogation with comparable degrees of risk to false confession is brazenly specious.

Apart from that, the very issue of custodial time is overstated. Mr. Amor had declined to receive polygraph at earlier times and voluntarily agreed to the polygraph when leaving jail on October 3. At the time of his polygraph at the Reid offices, he was advised and signed an acknowledgment form indicating that he was aware that he was not in custody at that time.

Mr. Amor left the Reid offices at 10:30 p.m. and voluntarily agreed to return to Naperville with officers. This supports a custodial span much closer in time to his signing his Miranda rights form at 11:37 p.m., and just before his self-incriminating statements began.

A longer period of continual interrogation occurred on September 15. Then, according to Detective Brian Cunningham, he and Sergeant Mark Carlson interviewed Mr. Amor spanning 4:45 p.m. to 10:00 or 10:30 p.m., with breaks. During that meeting, Mr. Amor did not provide a self-incriminating statement.

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **43** of **48**

8) *What is sleep deprivation? Has social science research demonstrated that sleep deprivation causes false confessions to murder? Did sleep deprivation cause Mr. Amor to offer a false self-incriminating statement?*

**Mr. Amor did not provide a false statement as a result of sleep deprivation.**

Sleep deprivation involves the active preventing of a person from falling asleep. Sleep deprivation has been extensively studied in the military, for whom sleep deprivation is part of training.[49] Armed forces are expected to operate effectively and make decisions in settings in which their body yearns for sleep, but they are unable to yield to a natural need.

Among the sleep deprived, the effects most relevant to the interrogation would be confusion, or hallucinations.[50] When such symptoms occur, they are manifest to questioners through communications that do not make sense. Or, as perceptual disturbances as a person is falling off to sleep in spite of forced wakefulness.[51]

William Amor was not sleep deprived. At no point was he prevented from falling asleep. He traveled alone in the back seat of a police cruiser for lengthy period prior to his questioning on October 3 at just after 11:30 p.m. Nothing impeded his dozing off prior to that questioning.

Over the course of the next several hours, he met repeatedly with police and then, with ASA Nigohosian. At intervals in which no questioning occurred he was likewise unimpeded. In the questioning that did occur, there is no evidence for his confusion or of perceptual disturbances. Fatigue did not affect his ability to present a consistent and coherent story through the night.

Fatigue is not to be confused with sleep deprivation. Fatigue will occur in sleep deprivation, but fatigue can occur from a long car ride,[52] or from boredom.[53] Fatigue can

---

[49] Tomczak, A., Gajewski, J., & Mazur-Różycka, J. (2014). Changes in physiological tremor resulting from sleep deprivation under conditions of increasing fatigue during prolonged military training. *Biology of Sport, 31*(4), 303–308.
[50] Babkoff, H., Sing, H., Thorne, D., Genser, S., & Hegge, F. (1989). Perceptual Distortions and Hallucinations Reported during the Course of Sleep Deprivation. *Perceptual and Motor Skills, 68*(3), 787–798.
[51] Ibid.
[52] El Falou, W., Duchêne, J., Grabisch, M., Hewson, D., Langeron, Y., & Lino, F. (2003). Evaluation of driver discomfort during long-duration car driving. *Applied Ergonomics, 34*(3), 249–255.
[53] Hinds, P., Hockenberry, M., Tong, X., Rai, S., Gattuso, J., McCarthy, K., Pui, C., & Srivastava, D. (2007). Validity and Reliability of a New Instrument to Measure Cancer-Related Fatigue in Adolescents. *Journal of Pain and Symptom Management, 34*(6), 607–618.

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

occur as a matter of the body being tired, or even as a somatic defense among the anxious.[54]

More significant fatigue can affect split-second decision-making.[55] Whether Mr. Amor was slightly fatigued or more, he was audiotaped nearly two hours after offering his first self-incriminating statement, and did not manifest significant fatigue. Given how impacted he said he was by news of the divorce petition, Mr. Amor likely was much less fatigued after he received this news than before. The factual sequence further renders the role of fatigue, if present, to be irrelevant.

It is possible that Mr. Amor elected to tell officers what he did as a judgment call that he believed would assist his interest. Were Mr. Amor to have known that he presented a story that was less culpable, his judgment would have been understandable.

He subsequently expressed confidence at the jail that his attorney would have his charges reduced. Were fatigue to have affected his decision-making, one would have expected him not to present as smiling, relaxed, and confident but aghast at what transpired when he was compromised.

### 9) Has social science research demonstrated that anxiety and depression cause false confessions to murder?

**No.**

Anxiety and depression are not overrepresented among those who have confessed falsely to murder. Neither is demonstrated by research or available data to cause false confession in interrogation to murder.

When sadness is implicated in false confession, it relates to self-incriminating statements driven by personal guilt. There is no evidence that Mr. Amor experienced guilty emotions in the aftermath of Marianne Miceli's death. Others noted that he was emotionally unaffected at the funeral and even joking with friends. Mr. Amor has not expressed feeling guilt as a prompt to his self-incriminating statement.

---

[54] Roy-Byrne, P., Afari, N., Ashton, S., Fischer, M., Goldberg, J., & Buchwald, D. (2002). Chronic fatigue and anxiety/depression: A twin study. *British Journal of Psychiatry, 180*(1), 29–34.
[55] Royal, K., Farrow, D., Mujika, I., Halson, S., Pyne, D., & Abernethy, B. (2006). The effects of fatigue on decision making and shooting skill performance in water polo players. *Journal of Sports Sciences, 24*(8), 807–815.

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **45** of **48**

Interrogation in a murder investigation is very stressful, and anxiety would be expected of in any suspect. For anxiety to be a personal vulnerability to a false confession to murder, one would expect difficulty handling interrogation in other instances as well.

Records are available of Mr. Amor's interrogation in numerous meetings with police, including the night of Ms. Miceli's death. He did not make any self-incriminating statements and was even seen directing Tina how to answer questions about whether the family had insurance, for example.

Dr. Chiapetta, retained by Mr. Amor, testified at his first trial that Mr. Amor had had depression for a number of years. Mr. Amor's 1996 pre-plea report, as well as jail medical records, however, noted no history of psychiatric counseling or treatment. Mr. Amor had been questioned numerous times by police on this case, and in previous unrelated investigations, and did not provide a false confession.

Research data linking depression with false confession is not developed; the idea that depression in some way increases a risk of false confession or has even caused it does not bear out from confirmed false confession case data. Mr. Amor's statements over the course of numerous interrogations during the period in which he may have been depressed do not show a link of depression to false confessions.

### 10) *What is the significance of Mr. Amor's suggestibility, as tested and reported by Dr. Chiapetta?*

**Suggestibility was not the vehicle through which Mr. Amor moved from denying responsibility to admitting setting the fire.**

Suggestibility does not equate with false confessions. Nor does suggestibility per se increase the risk of false confessions in all.

Suggestibility relates to false confessions in which a suspect naïve to the criminal justice system responds to the suggestions of interrogators to whom he relates as benign, and adopts a false narrative of one's criminal responsibility.[56] Specifically, this is known as a

---

[56] Otgaar, H., Schell-Leugers, J. M., Howe, M. L., Vilar, A. D. L. F., Houben, S. T., & Merckelbach, H. (2021). The link between suggestibility, compliance, and false confessions: A review using experimental and field studies. *Applied Cognitive Psychology, 35*(2), 446.

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

coerced-internalized false confession,[57] and happens in those suspects who, for various reasons, do not recall their movements at the time of the crime.[58]

Suggestibility is tested by the Gudjonsson Suggestibility Scales,[59] which Dr. Chiapetta administered to Mr. Amor in November 1996. Mr. Amor scored high on the administered GSS. However, no study has been done to demonstrate that performance on the GSS applies retrospectively.

Moreover, the yield-shift model of the GSS does not account for pressures on a suspect not to confess, especially when someone has that amount of experience in the criminal justice system.

In addition, the ability to recall the benign GSS story to which one has no connection may differ from the ability to recall an experience to which one has a personal and emotional connection.

More relevant to this case, Mr. Amor was street-wise and anything but naïve to the criminal justice system. Moreover, he did not characterize the interrogating officers as benign, and related to them with an awareness that he was a prime suspect from his first contact with them on September 11. He did not demonstrate memory distrust for the events of the September 10, and of his movements and whereabouts. For this reason, the GSS performance is irrelevant to the facts and circumstances of his interrogation.

Very little of Mr. Amor's core statement was a product of suggestion. Arguably, detectives suggested that he did not intend to kill Marianne. The scenario he volunteered offered a motive to obtain insurance money without aiming to kill her in the process.

Mr. Amor's account of police conduct in his interview has evolved considerably from his earliest depictions of his questioning as devoid of abuse. He has been questioned and interviewed numerous times by defense counsel. If he is as suggestible as Dr. Chiapetta has testified to, that suggestibility would have direct bearing on his amending his story to the cues of someone in whom he trusted. While Mr. Amor did not trust police officers

---

[57] Chapman, F. E. (2013). Coerced internalized false confessions and police interrogations: The power of coercion. *Law & Psychol. Rev., 37*, 159.
[58] Gudjonsson, G. H., Sigurdsson, J. F., Sigurdardottir, A. S., Steinthorsson, H., & Sigurdardottir, V. M. (2014). *The role of memory distrust in cases of internalised false confession. Applied Cognitive Psychology, 28*(3), 338-340.
[59] Gudjonsson Suggestibility Scales - Gudjonsson, G. H. (1997). *The Gudjonsson suggestibility scale*s. Hove: Psychology Press.

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

questioning him on this case, he did trust his defense attorney and does trust his civil attorney.

Since there is no available record of his interviews with his criminal defense attorneys, no notes produced of their interactions with Mr. Amor, no videotape of their interactions, there is no way of knowing whether Mr. Amor's attributions of police misconduct are the product of his responding to the suggestions of others charged with his advocacy.

Suggestibility may be more a salient issue in this case for Tina Miceli. She has described longstanding memory and cognitive problems. She received special education and her extended family had already expressed concerns about her vulnerability to being exploited. And, in the aftermath of Marianne Miceli's death, Mr. Amor was controlling the message, with both investigators and with her.

According to Ms. Miceli, in the aftermath of the fire, Mr. Amor repeatedly told her, "Let me remind you, you were the last person to leave the house." Detective Guerrieri recalled in his testimony that when they were interviewed and Mr. Amor spoke up, she shut down and would not speak.

Dr. Leo relies upon Dr. Chiapetta to inform his conclusions. The psychologist's examination was not videotaped. Videotaping was available to Dr. Chiapetta, and he chose not to videotape at all. Nowhere does Dr. Leo take the examiner to task for how he accounted for his interview.

Audio recording was available to police in their October 3rd and 4th interrogations of Mr. Amor, but they recorded only the interview at 2:11 a.m. A portion of the interview with ASA Nigohosian at 5:10 a.m. was also audio recorded.

Dr. Leo wrote in his report 31 times of the police interrogations being unrecorded. His critique suggests some form of malpractice in police procedure for not having completely recorded an interrogation in 1995. Dr. Leo does not, however, assert any malfeasance by officers in the interviews conducted on September 11, 12, 14 and 15, during which Mr. Amor volunteered to them that he had spilled vodka on newspaper and the carpet, and that Tina had spilled lighter fluid, and that he could not account for whether his cigarette could have fallen out of the ash tray.

It is also notable that, although Dr. Leo would underline the importance of officers not videotaping their interrogation, he does not take issue with no videotaping of a

Re: William Amor
*The Forensic Panel – Michael Welner, M.D.*
June 18, 2021

Page **48** of **48**

psychological interview, for which precise evidence would better inform his analysis of suggestibility, anxiety, or depression – or any other pertinent history that was not recorded or queried. In 1995, many forensic professionals were recording their examinations for exactly the same reasons as recommended for police interrogation.

In 1995, most interrogations and interviews were not recorded. Dr. Leo knows this. He conducted research of 122 interrogations only three years earlier, and did so over nine months and with extensive opportunity to devise a protocol beforehand. None of his interviews were videotaped for another person to re-evaluate his data. Nowhere in his publication of the interrogations – of suspects who could later have challenged their interrogations – did he observe that the lack of videotaping deprived the justice system of understanding what transpired.

Despite repeatedly bemoaning that as a result of a lack of recorded interview "we are forever deprived of an objective record of what occurred," Dr. Leo asserted that the interrogations incorporated techniques that lead to false confessions. A lack of objective record does constitute a basis for presuming malfeasance, a biased interpretation, to fill that void.

Consistent with that bias, Dr. Leo touts Mr. Amor's account as "robust." Again, choosing a term that connotes "credible," without explaining how he is able to ascertain that Mr. Amor giving an elaborate explanation equates with his giving a sincere explanation. Using verbosity to ascertain sincerity would be impossible, given Mr. Amor's penchant for chatty dissimulation to law enforcement in previous statements in this case, questioning in his previous case about his fraud, even questioning when he was stopped for driving under the influence.

Please call me with any questions you may have on this matter.

Very truly yours,

Michael Welner, M.D.
Clinical Professor of Psychiatry, Icahn School of Medicine at Mt. Sinai
Chairman, The Forensic Panel