# EXHIBIT H

```
 1        IN THE CIRCUIT COURT OF THE 18TH JUDICIAL CIRCUIT
                     DU PAGE COUNTY, ILLINOIS
 2

 3
        THE PEOPLE OF THE STATE OF   )
 4      ILLINOIS,                    )
                                     )
 5               Plaintiff,          )
                                     )
 6         -vs-                      ) No. 95 CF 2075
                                     )
 7      WILLIAM AMOR,                )
                                     )
 8               Defendant.          )

 9

10                  REPORT OF PROCEEDINGS had at the trial

11      of the above-entitled cause, before the HONORABLE LIAM

12      C. BRENNAN, Judge of said court, on the 25th day of

13      January, 2018.

14

15      PRESENT:

16          MR. ROBERT B. BERLIN,
            State's Attorney of DuPage County, by
17
                MR. JAMES SCALIATINE,
18              MR. THOMAS MINSER,
                Assistant State's Attorneys,
19
                appeared on behalf of The People of the
20              State of Illinois;

21

22

23      Peggy Cuda, CSR, RDR, CRR
        Official Court Reporter
24      CSR 084-002-818
```

1          MS. THOMPSON:  He is released, Your Honor.

2          MR. MINSER:  Thank you, Your Honor.

3          THE COURT:  The witness is discharged. **MR.

4     SCALIATINE:  The People would call Robert Guerrieri to

5     the stand.

6                    (The oath was thereupon administered to

7                    the witness by the Clerk.)

8          THE COURT:  You may proceed.

9                    ROBERT GUERRIERI,

10    called as a witness on behalf of the People of the

11    State of Illinois, having been first duly sworn, was

12    examined and testified as follows:

13                    DIRECT EXAMINATION

14                    BY MR. SCALIATINE:

15         Q.    Sir, once you get yourself situated there,

16    could you please state your name and spell your last

17    name for the court reporter?

18         A.    Robert Guerrieri, G U E R R I E R I.

19         Q.    And, sir, what is your occupation?

20         A.    Deputy chief of investigations for the DuPage

21    County State's Attorney's Office.

22         Q.    And how long have you been employed at the

23    DuPage County State's Attorney's Office in the

24    investigations unit?

1     A.    For eight years.

2     Q.    What are your duties for the State's

3  Attorney's Office as an investigator?

4     A.    We investigate crimes that are referred to

5  our office.  In addition, we support criminal

6  prosecutions that are on going and we also serve

7  subpoenaes and summonses.

8     Q.    And does part of your unit also transport

9  witnesses to and from courts or pick them up if needed?

10    A.    Yes, we do.

11    Q.    And before you worked for the DuPage County

12  State's Attorney's Office in the investigations unit,

13  where were you employed?

14    A.    The Naperville Police Department.

15    Q.    And when did you start at the Naperville

16  Police Department?

17    A.    1985.

18    Q.    And could you please describe for the Court

19  your career path at the Naperville Police Department?

20    A.    I started as a patrol officer in 1985, and

21  three years later I was transferred to the special

22  enforcement unit, which was a plain clothes street

23  crimes unit that focussed on drug and gang crimes.

24          In 1989 and 1990, I was assigned to DUMEG,

 1    the DuPage County Metropolitan Enforcement Group, where

 2    I worked undercover narcotics investigations for two

 3    years.

 4             After that assignment, I went back to

 5    Naperville and continued on as a special enforcement

 6    investigator until 1996 when I was promoted to

 7    sergeant.  And I was sergeant for ten years, primarily

 8    in the investigations divisions, and then promoted to

 9    commander of the special operations group and I retired

10    from there in 2009.

11        Q.    All right.  Directing your attention then to

12    September of 1995, your assignment and rank then was a

13    sergeant?

14        A.    No.  I was still a special enforcement unit

15    investigator.

16        Q.    All right.  And directing your attention

17    specifically to September the 10th, 1995, that was a

18    weekend.  That was a Sunday, correct?

19        A.    It was.

20        Q.    And what were your duties that weekend?

21        A.    I was the on-call detective.  Detectives do

22    not work the weekends.  So a detective -- sergeant and

23    detective were assigned as the on call detectives from

24    Friday evening till Monday morning to handle any

1    serious crimes or matters that arose on the weekend.

2         Q.    At about 7:30 p.m. on September the 10th,

3    1995, did you receive a page?

4         A.    I did.

5         Q.    And when you called back the police

6    department, what information did you receive about the

7    page?

8         A.    I talked to Com Op Andrea Haidu, and she told

9    me that there was a serious fire at 218 East Bailey;

10   that the resident had been seriously injured and

11   transported to Edward Hospital and they needed the

12   on-call detective to respond to the scene.

13        Q.    And then did you respond to the scene?

14        A.    I did.

15        Q.    And when you responded to the scene at 218

16   East Bailey, could you please describe that for the

17   Court, what you saw?

18        A.    The apartment complex is a large apartment

19   complex with a series of three-story-tall buildings

20   arrayed around a common courtyard.  There was a large

21   number of police and fire vehicles on the scene.  And

22   when I arrived, I talked with Sergeant Jim Bedell, who

23   was the patrol sergeant in charge of the scene, and

24   Dave Ferrari and Dan Boylan from the fire department.

1       Q.    What happened after you spoke to those

2  individuals?

3       A.    Shortly thereafter I arrived, Detective Cross

4  arrived.  And about a half an hour later, the fire

5  department cleared us to go into the apartment,

6  Apartment M, where the fire had happened.  So we went

7  up into the apartment.

8       Q.    And when you went up into the apartment, what

9  did you see?

10      A.    It's on the top floor and the patio faces the

11  courtyard.  It was extremely hot and smoky still inside

12  the apartment.  The living room and dining area were

13  badly damaged from the fire.  And soot and smoke damage

14  traveled down the kitchen all the way down the hall to

15  the end of the hall where there's two bedrooms in the

16  apartment.  The hall was covered in soot.  The two

17  bathrooms at the end of the hall were heavily covered

18  in soot, as was the last bedroom on the left, which

19  would be the master bedroom.

20      Q.    And did you learn that that was where the

21  victim was when she was rescued by paramedics?

22      A.    I did.

23      Q.    And do you recall the damage to the other

24  bedroom?

1        A.   Yeah.  The middle -- The first bedroom, which

2  would be the one closest to where the fire occurred and

3  would have a common wall with the living room, had very

4  little damage.  And I learned later on that that door

5  had been shut and locked when the fire broke out.

6        Q.   After you made these initial observations,

7  what happened?

8        A.   Then I tried to talk with the neighbors who

9  were milling around to get some information about who

10  lived there, and we learned also then that the

11  resident, Marianne Miceli, had died at Edward Hospital.

12  We also learned that she lived in that condo with her

13  daughter, Tina, and her daughter's husband, Bill Amor.

14        Q.   And what happened at that point in time?

15        A.   I went back to the police station to start to

16  check our databases to locate Bill and Tina Amor

17  because they were not on scene and we didn't know where

18  they were at.  We were unsuccessful in locating them,

19  and then we -- me and Mike Cross went back from the

20  police station.  We were headed back to 218 East

21  Bailey, and then we were advised to go -- that Bill and

22  Tina had come home and that they had gone to Pam and

23  Gary Leavenworth's house at 1008 Muirhead, which is not

24  too far away.  So myself and Detective Cross went to

1   the Muirhead address.

2       Q.   And approximately what time did you get to

3   that address?

4       A.   That would have been right about midnight.

5       Q.   And who did you meet when you got there?

6       A.   Pam and Gary Leavenworth.  It was their

7   house.  And then we met with Bill and Tina Amor for the

8   first time.

9       Q.   And you said Bill Amor.  Do you see Bill Amor

10   in court today?

11       A.   I do.  He's the gentleman seated at the table

12   on the far left wearing the blue suit with the glasses.

13      THE COURT:  In-court identification noted for the

14   record.

15      MR. SCALIATINE:  Thank you, Your Honor.

16   BY MR. SCALIATINE:

17       Q.   At that point in time, did you ask to speak

18   to the defendant?

19       A.   I did.

20       Q.   And did he agree to talk to you?

21       A.   He did.

22       Q.   And what happened at that point in time?

23       A.   We went downstairs into the family room.  It

24   was on the lower level of the Leavenworth house.  And I

1     asked him if he would talk to me.  I wanted to ask him

2     questions about what happened tonight.

3          Q.    And can you describe that area that you went

4     down to?

5          A.    It was a furnished family room-type

6     arrangement with couches and chairs.

7          Q.    And who was present when you were speaking to

8     him?

9          A.    Just me and Bill.

10         Q.    What happened at that time?

11         A.    I asked Bill if he could tell me how he came

12     to know the Miceli family.

13         Q.    What did he tell you?

14         A.    He told me that he knew them from mutual

15     friends from Elizabeth Seton Catholic Church in

16     Naperville that he developed.  About four years prior

17     he had met them.  In July of '94, he moved into that

18     apartment; and then in April of '95, he married Tina,

19     Marianne's daughter.

20         Q.    And did you ask him questions about his --

21     Miss Miceli who had perished?

22         A.    I did.  I asked him if -- Our investigation

23     revealed that Miss Miceli had an injury or kind of a

24     disability, and I asked him if he could explain what

1    that disability was.  And he said that Marianne had

2    been hit by a car when she was 3 years old and she had

3    injuries to her left side.  She walked with a

4    pronounced limp, although she didn't need a walker or a

5    cane to get around with.

6         Q.    Did you have a conversation with him about

7    whether or not he had a job?

8         A.    I did.  I asked Bill if he worked full-time.

9    He said he did and that he did side jobs for Elizabeth

10   Seton Church and he worked on cars.

11        Q.    So after this introductory discussion of the

12   family dynamic, did you ask him to relay the events of

13   that day of the fire with you?

14        A.    I did.

15        Q.    And what did he say?

16        A.    He said that that morning, that Marianne got

17   up early to make a pot of coffee, and then he and Tina

18   got up later in the morning.  They picked up around the

19   house and then essentially watched football for the

20   whole day.  They first watched the Denver football

21   game.  When that was over, they watched the Colts

22   football game, the very end of the Colts football game.

23   And then after that, they went to a double feature at

24   the West Chicago drive-in.

1          Q.    And the West Chicago drive-in, did you know
2     it to be an indoor theater or outdoor theater?
3          A.    It was an outdoor -- a drive-in outdoor
4     theater.
5          Q.    Did you ask when they left to go to that
6     drive-in?
7          A.    I did.  I asked Bill what time he thought
8     they left, and he thought that they had left around
9     6:15 to 6:20 that evening.  I asked him when they left
10    what Marianne was doing; and he had said that towards
11    the end of the afternoon when the Colts were playing,
12    Marianne got up and told him that she was going to go
13    take a nap till 7:00 o'clock.  She wanted to watch the
14    Emmy's that night.  And I said, Well, how do you know
15    she was going to sleep till 7:00 o'clock?  And he said,
16    She told me she set her alarm for 7:00 o'clock.  So --
17         Q.    All right.  I apologize.
18         A.    That's all right.
19         Q.    Did he relay anything else to you at that
20    point in time?
21         A.    I asked -- Well, I asked Bill if they were
22    smoking in the apartment.  He said that they were
23    smoking in the apartment.  And I asked Bill what
24    Marianne was doing when they left the apartment around

1   6:20 and he said that he went down the hall.  They said

2   good-bye, see you later.  And I asked if Marianne was

3   smoking in her bed, and he said that she was not.

4       Q.    Did you discuss with him the layout of the

5   apartment in the living room?

6       A.    I did.

7       Q.    And what did he tell you?

8       A.    He said the living room as you're facing it,

9   to the right, it would -- we'll call it the north wall

10  is where the TV and VCR were and some small desks.

11  Next to that on, we'll call it, the west wall was the

12  sliding glass doors that led to the patio.  And then

13  there's a small swivel rocker alongside those doors.

14  Next to the swivel rocker along what we will call the

15  south wall was a couch.  In front of the couch was a

16  coffee table, and further east of the couch was

17  Marianne's chair.

18      Q.    And so he described that whole layout for

19  you?

20      A.    He did.

21      Q.    Did you have a -- Did you ask him whether or

22  not he had been drinking that day?

23      A.    I did.  I asked if anybody in the apartment

24  had been drinking that night, and he said that none of

1  them had been drinking.  And I skid Bill specifically
2  if he had any alcohol to drink, and he said that he had
3  not.
4      Q.  Did you ask him questions about insurance
5  policies?
6      A.  I did.  I asked Bill if he was aware if
7  Marianne had a life insurance policy, and he said he
8  didn't know if she had one and it would surprise him if
9  she had one because he didn't think they had enough
10  money to pay for an insurance policy.
11      Q.  What happened at that point in time?
12      A.  I went back upstairs, talked to Detective
13  Cross who was upstairs in the kitchen talking with
14  Tina.  And then I went back downstairs, and I asked
15  Bill for a friend's phone number.  During my
16  conversation, Bill had said that he got -- a woman
17  named Dorothy Atton (phonetic) had called for him.  He
18  didn't want to talk to her that day on Sunday because
19  he felt she wanted him to work on her car and he didn't
20  feel good.  So he didn't talk with her.
21          So I went back downstairs, asked Bill for
22  Dorothy's phone number, which he gave me.  And I asked
23  him if he recalled when him and Tina were leaving the
24  apartment if Tina had told him that she had lit a

1    cigarette and wasn't sure what she did with the

2    cigarette as they walked out the door.

3         Q.    What did he tell you about that?

4         A.    He told me that Tina told him that she lit a

5    cigarette and she wasn't sure what she did with it, and

6    he looked for the cigarette, didn't find it and then

7    they left.

8         Q.    Could you describe his demeanor when you were

9    having this conversation with him in the basement of

10   the house?

11        A.    Very normal.  Normal conversational tones.

12   His demeanor was normal and relaxed.  He did not appear

13   upset at all on the loss of their apartment and the

14   loss of his mother-in-law.

15        Q.    And what, if anything, did you notice about

16   Tina when you had an opportunity to talk to her that

17   night?

18        A.    She was more upset.  Well, I didn't talk to

19   Tina at any length that night.

20        Q.    Okay.  After you had this conversation about

21   Miss Atton, did you have a further discussion with him

22   about the possible reasons for this house fire?

23        A.    I did.  I asked Bill if he could help us

24   understand how this fire might have broke out, and he

1   said that the past Friday a new refrigerator had been

2   installed in the kitchen.  In addition, the gas company

3   had come out to check the stove because on a really

4   windy day the pilot light blows out.  But the gas

5   company checked the stove, and they could find no

6   problem and they didn't smell any natural gas in the

7   house.

8       Q.    So at this point in time in your

9   conversations with him, Detective, is it fair to say

10  you're just trying to figure out what happened?

11      A.    Yes, correct.

12      Q.    And describe the tone of the conversation

13  that you were having with him.

14      A.    I was just asking him open-ended questions to

15  glean information as to what could have caused the

16  fire.

17      Q.    What happened at that point in time?

18      A.    Me and Bill then went back upstairs to the

19  kitchen, and Mike Cross was talking to Tina more up in

20  the kitchen.

21      Q.    And when the Defendant and you were up in the

22  kitchen with -- Who else was in the kitchen at that

23  point in time?

24      A.    Mike Cross and Tina Amor.

1      Q.    What happened at that time?

2      A.    Mike was asking Tina about insurance.  Mike

3 asked Tina if she knew if her mom had any insurance,

4 and Tina said that her mom had insurance for the car.

5      MS. THOMPSON:  Objection, Your Honor.  Objection,

6 hearsay.

7      THE COURT:  Mr. Scaliatine.

8      MR. SCALIATINE:  Judge, I think it's not at this

9 time being offered for the truth of the matter asserted

10 but the effect on the listener and the Defendant.

11      THE COURT:  Overruled.

12 BY THE WITNESS:

13      A.    She asked if -- Tina said that her mom had

14 car insurance, had insurance on the apartment, the

15 contents of the apartment.

16      Q.    What happened at that point in time?

17      A.    Mike Cross asked her, Did your mom have an

18 insurance policy -- life insurance policy?  And when

19 Tina started to answer the question, Bill cut her off

20 and spoke up in a loud and assertive way and said, We

21 don't know anything about that.  And with that, Tina

22 trailed off and stopped talking.

23      Q.    Was the way he said "We don't know anything

24 about that" in the same tone as the way he was talking

1    to you in the basement?

2         A.    No, it was not.

3         Q.    Was the way he said "We don't know anything

4    about that," did he ever have or repeat that tone that

5    whole evening in the rest of your conversations with

6    him?

7         A.    He did not.

8         Q.    It's fair to say that you remained at the

9    house there for a while, correct?

10        A.    Correct.

11        Q.    And I'd like to direct your attention to

12   around 1:00 a.m. then of that same morning, which is

13   technically September the 11th of 1995, because you had

14   gotten there at around midnight, correct?

15        A.    Correct.

16        Q.    So at around 1:00 a.m. when you're still

17   there, what, if anything, occurred?

18        A.    Tina and Bill said they were going to go

19   outside to have cigarette.  So they walked out the

20   front of the house.  And I walked out the back of the

21   house and walked along the back of the house to the

22   west side and watched them in front of the house.  They

23   were at the trunk of Tina's blue mercury Topaz which

24   was parked directly in front of 1008 Muirhead.

1      I watched them.  Bill looked around as he was

2  standing at the trunk with Tina, and he opened the

3  trunk of the car and he bent over into the car into the

4  trunk and it looked like he was moving things around in

5  the trunk.  He looked around again and shut the trunk,

6  and then the two of them came back into the house.

7      So I went back into the house through the

8  back door, and I asked Tina if I could search her car

9  and she said I could.  And I gave her a written consent

10 form, a consent to search, and she looked it over and

11 signed the form.  And she said, I want to come with you

12 when you come outside.  I said, That's fine.  And she

13 came out along with her Uncle Gary Leavenworth, and we

14 went out and I searched her car.

15     Q.   And when you searched the car with her

16 present, where did you look and what did you find?

17     A.   In the passenger compartment in the front, I

18 found two ring boxes that would contain rings and I

19 asked her what that was about.

20     MS. THOMPSON:  Objection, Your Honor.  It's

21 hearsay.

22     THE COURT:  Mr. Scaliatine.

23     MR. SCALIATINE:  What did you -- I would agree,

24 Judge.

1    BY THE WITNESS:

2        A.    I found the ring boxes in the passenger

3    compartment.

4        Q.    And I'm sorry.  Because of that, I was a

5    little -- I wanted to make sure -- Describe what was in

6    the ring boxes.

7        A.    They were empty.

8        Q.    All right.  What else did you find?

9        A.    In the back seat of the car, I found a cooler

10   that contained some pop and ice and it looked like a

11   jug of fruit punch.  There was a baggie with receipts

12   in it, and there was a copy of Bill's resume in the

13   back seat.

14            In the trunk, I found a bag of charcoal

15   briquettes and a plastic squirt bottle of Gulf Lite

16   lighter fluid.  Wrapped up in a blanket in the trunk of

17   the car was a bottle of Barton's vodka.  And I seized

18   those items from the trunk and the resume and the

19   receipts.

20       Q.    At around 4:00 a.m. that same early morning

21   of September the 11th, 1995, did officers receive

22   permission to search the actual bedroom of Tina and the

23   Defendant?

24       A.    We did.

1      Q.    And later on, did you conduct that search

2   with Detective Cross?

3      A.    We did.

4      Q.    And were letters recovered from a dresser

5   drawer in that south bedroom?

6      A.    They were.

7      Q.    And, Officer, were you -- so you were in and

8   out of that apartment that night, correct?

9      A.    Correct.

10     Q.    And were you there the next day?

11     A.    Into the 11th, the next day, yes.

12     Q.    At any time when you were in that apartment,

13  did you see any remnants of a smoke alarm?

14     A.    I did not.

15     Q.    Or an intact smoke alarm?

16     A.    I did not.

17     Q.    I'd like to direct your attention then to

18  October the 3rd of 1995.  Did you have an opportunity

19  to pick up the Defendant in DeKalb, Illinois?

20     A.    I did.

21     Q.    At approximately what time was that?

22     A.    2:00 to 2:30 in the afternoon.

23     Q.    Did you ask him if he would be willing to go

24  with you to Chicago, Illinois for an interview?

1          A.    I did.

2          Q.    And who were you with when you went to

3     Chicago for this interview?

4          A.    Myself and Mike Cross.

5          Q.    And did the Defendant agree to go?

6          A.    He did.

7          Q.    And did you drive him then to that interview

8     in Chicago?

9          A.    I did.

10         Q.    And when he was there, how long did he stay

11    at that interview location in Chicago?

12         A.    Till about 10:30 that evening.

13         Q.    And at 10:30 when that interview was done,

14    did you have an opportunity to ask the Defendant if he

15    was willing to go to the Naperville Police Department?

16         A.    I did.

17         Q.    And did he agree to go?

18         A.    He did.

19         Q.    Did he seem to hesitate at all?

20         A.    No.

21         Q.    Did you drive him then from this Chicago

22    location to the Naperville Police Department?

23         A.    I did.

24         Q.    And who was with you when you went from

1    Chicago to Naperville?

2        A.    Myself and Mike Cross and Bill in the back

3    seat of the car.

4        Q.    And you were the driver of that motor

5    vehicle?

6        A.    I was.

7        Q.    When you had the Defendant in that motor

8    vehicle, was he handcuffed?

9        A.    No, he was not.

10       Q.    Was the Defendant ever handcuffed in your

11   presence on October the 3rd, 1995?

12       A.    No, he was not.

13       Q.    All the way from DeKalb to Chicago did he sit

14   in the back seat?

15       A.    He did.

16       Q.    Did anybody talk to him at that time about

17   this case?

18       A.    While in the car?

19       Q.    Yes.

20       A.    No.

21       Q.    And on the way back from Chicago he was still

22   in the back seat?

23       A.    Correct.

24       Q.    Not handcuffed?

1       A.   Correct.

2       Q.   And did anybody talk to him while in the car

3  about this case?

4       A.   No.

5       Q.   So once you got to -- Approximately what time

6  did you get to the Naperville Police Department?

7       A.   We got back there about 11:30 that night.

8       Q.   And when you arrived at the station, what

9  happened?

10      A.   I dropped Bill and Mike off at the front of

11  the police station, and I went and parked my car.

12      THE COURT:  I apologize.  What was the time you

13  arrived back there?

14      THE WITNESS:  11:30.

15  BY MR. SCALIATINE:

16      Q.   So when you arrived at the Naperville Police

17  Department at 11:30, you dropped him off at the front

18  door?

19      A.   I did.

20      Q.   So the Defendant just walked freely into the

21  front door of the Naperville Police Department?

22      A.   He did.

23      Q.   He wasn't handcuffed?

24      A.   Correct.

1          Q.    What did you do at that point in time?

2          A.    I parked my car and then I went into the

3     downstairs area where the investigation section is.

4     That's where there's a lobby in front of the

5     investigation section.  And I went down there and Bill

6     was down there with Mike Cross.

7          Q.    What happened at -- All right.  Strike that.

8     Excuse me.

9                At some point in time was the Defendant

10    served with divorce papers?

11         A.    He was.

12         Q.    And where did that occur?

13         A.    In that investigations lobby downstairs.

14         Q.    And who was there?

15         A.    Bill, Mike Cross myself and the process

16    server.

17         Q.    And did you arrange for this to happen?

18         A.    No, I did not.

19         Q.    Can you describe the Defendant's demeanor

20    when he was served with these divorce papers?

21         A.    It didn't really change.  It was the same

22    demeanor as it was before.

23         Q.    Can you describe that demeanor?

24         A.    He was very talkative, very open, relaxed,

1    and seemed at ease.

2         Q.    Did he seem upset by receiving these divorce

3    papers?

4         A.    He did not.

5         Q.    What happened next?

6         A.    Me and Bill and Mike went into an interview

7    room, which is just off the lobby.  The room's about 12

8    feet by 12 feet with a table and some chairs arrayed

9    around it and two doors, one in the front and one in

10   the back.

11        Q.    And who was in this interview room?

12        A.    Just Bill, myself and Mike Cross.

13        Q.    And at that point in time, did -- what

14   happened at that time?

15        A.    I read Bill his Miranda warnings from a

16   preprinted form.

17        Q.    Detective -- or, Officer, when you say you

18   read these Miranda warnings to him, what did you tell

19   him?

20        A.    I told him he had a right to remain silent.

21   I told him he had a right to have an attorney present

22   with him before and during questioning.  If he could

23   not afford an attorney, we would appoint one.  And he

24   could stop answering questions at any time.  I was

1    reading directly from a form.

2         Q.    And when you were reading the -- this to him,

3    was he acknowledging those rights?

4         A.    He was.  After each admonishment I asked him

5    if he understood, and he said that he did.

6         Q.    So after each of the separate five

7    admonishments, you asked him if he understood?

8         A.    I did.

9         Q.    And after each and every one of those he said

10   yes --

11        A.    Yes.

12        Q.    -- or I do?

13        A.    He understood.

14        Q.    Did you ask him to sign that Miranda form?

15        A.    I did.  I told Bill if he wanted to talk with

16   us, to look over the form, read it and sign it if he

17   wanted to talk with us; and I handed him the form.

18        Q.    And what happened at that point in time?

19        A.    He looked at it and within a short amount of

20   time he signed it.

21        Q.    At that point in time, did you start with

22   Detective Cross in asking him questions about the

23   events of the day of the fire?

24        A.    I did.  We went over the events that occurred

1    on the -- that evening of the fire with Bill.

2         Q.    And, in general, what was he saying?

3         A.    Essentially the same that he had told us

4    before.  The same series of events that he had told us

5    prior.

6         Q.    And five or ten minutes into this discussion

7    or him relaying these events, what, if anything,

8    happened?

9         A.    Mike Cross looked at Bill and he pointed his

10   finger and said, Bill, even Tina thinks you started the

11   fire potentially but you didn't mean to kill her

12   mother.  You better start telling us the truth.  And he

13   walked out of the room.

14        Q.    And when you say "he," what do you mean?

15        A.    Mike Cross.

16        Q.    And when he was telling the Defendant this

17   sentence, what, if anything, was he doing?

18        A.    He was pointing at Bill and he stood up.

19        Q.    And can you describe his tone at that time?

20        A.    He raised his voice when he made that

21   statement to Bill.

22        Q.    And then he left?

23        A.    Then he left.

24        Q.    Once Detective Cross walks out after making

1    that statement, what happened?

2         A.    I looked at Bill, I said, Bill, we want the

3    truth.  I said, I think I know what happened.  I want

4    to know why it happened.  And when I said that, Bill

5    looked at me.  He laid his head on the table for a

6    short amount of time.

7         Q.    All right.  After he laid his head on the

8    table for a short amount of time, what happened?

9         A.    He said -- He sat back up.  He said, It's my

10   fault.  I did it.  I started the fire.  And I asked him

11   to repeat that statement.  He said, It's my fault.  I

12   did it.  I started the fire.

13        Q.    What happened at that time?

14        A.    I asked Bill what he meant by that.  And he

15   told me that during the football games, that towards

16   the end when the Colts were playing, Marianne had gone

17   off to take her nap and Tina had gone to -- was in the

18   bathroom or bedroom getting ready to go to the movies.

19   He spilled a bottle of vodka that was laying on the

20   cocktail -- or coffee table in the living room.  The

21   vodka spilled onto newspapers that were on the floor

22   between the swivel rocker and the table and the end of

23   the couch.  He was smoking a cigarette.  He stubbed out

24   that cigarette.  He lit another cigarette and he stood

1    up and he bumped -- intentionally bumped the ashtray

2    and knocked the cigarette onto the newspapers that had

3    been -- the vodka had spilled onto.

4         Q.    When he was relaying this information to you,

5    were you asking him questions in between?

6         A.    No.

7         Q.    He was just telling you this is what

8    happened?

9         A.    Correct.

10         Q.    And did he say anything about what he saw the

11    cigarette doing when it was on the wet newspapers?

12         A.    I told Bill -- I asked Bill, What happened?

13    He said the cigarette -- he looked at the cigarette and

14    it was sizzling and smoldering.  He got up, walked down

15    the hall, used the bathroom, came out of the bathroom,

16    gave Marianne a back rub.  Marianne was still awake and

17    was in her bed in her bedroom.  He gave her a back rub

18    and then he walked quickly down the hall, picked up a

19    blanket and cooler that were in the kitchen, and walked

20    out into the hallway.

21         Q.    During this point in time when the Defendant

22    was relaying this information to you, where was

23    Detective Cross?

24         A.    Well, initially he wasn't in the room; but

1    about the middle of the statement, Mike came back in

2    the room and I told Mike that Bill just told me that he

3    started the fire.  And we went over the statement a

4    number of times.  And when Bill said that he knocked

5    the cigarette onto the newspapers, he knew it was going

6    to cause a fire but he just didn't give a shit anymore

7    were his words.

8         Q.    All right.  During that statement, can you

9    describe the Defendant's demeanor?

10        A.    He was a little more subdued than he had been

11   previously.  But the more he talked, the more relaxed

12   he got and we just continued to talk.

13        Q.    Describe the questioning or the back and

14   forth that was occurring.

15        A.    Well, we went over the statement a number of

16   times.  I said, Bill, you're telling me that you

17   knocked the cigarette off intentionally to start a

18   fire.  He said yes.  I said -- We asked him, Well, did

19   you pour the vodka on the newspapers intentionally?  He

20   said, No, that was an accident.  And I said, Well, if

21   it was an accident, how did it get on the chair -- on

22   the swivel rocker that was next to the table?  And he

23   said, Well, it spilled up onto the table -- I'm sorry,

24   spilled up onto the chair when it fell over.  So we

1  went over that a number of times that he intentionally

2  knocked the cigarette onto it but that he accidentally

3  spilled the vodka.

4      Q.   Did you discuss with him his phrase when he

5  said he, quote, didn't give a shit anymore?

6      A.   We did.  I asked him, I said, Bill, what do

7  you mean you don't give a shit anymore?  Because he

8  said it more than once.  And Bill said, I'm tired of

9  living here.  Tina and Marianne are always fighting

10  over me.  I don't have a job.  I drink too much.  And

11  words to that effect.

12      Q.   Did you have a conversation with him about

13  Tina's involvement?

14      A.   We did.  I said, Bill, how could Tina not see

15  the fire in the corner of the living room by the patio

16  doors when she was walking out?  And he said, I don't

17  know.  We kept asking him, How -- you know, did she

18  know about this ahead of time?  And he said no.  Did

19  she know about it while you were driving to the movies?

20  Did you talk about it?  Bill said no.  He said, Tina

21  had no involvement in it.

22      Q.   Did you ask him about how much vodka he had

23  spilled?

24      A.   We did.  He thought he spilled about half of

1    a liter bottle of vodka.

2           Q.    Did you discuss the issue of life insurance

3    and his knowledge of life insurance?

4           A.    We said, Bill, you know, did you start the

5    fire to collect on the life insurance policy?  He said

6    no, he didn't.  He started the fire to collect the

7    contents insurance.  He called it the content insurance

8    for the contents of the apartment; that he wanted to

9    collect that money to pay off his Fingerhut bill --

10   they had about a $200 bill -- and buy a new television

11   set and some new furniture.  And he did not -- he said

12   he didn't do it for the life insurance.  I said, Well,

13   if you didn't do it for the life insurance, why did you

14   start the fire when Marianne was taking a nap in the

15   bedroom?

16          Q.    What did he reply to that?

17          A.    He said he didn't know.

18          Q.    Did he offer any other explanation?

19          A.    No.  He just described it as a contents fire

20   to get -- you know, a contained fire.  He described a

21   contained fire for the contents and denied that it was

22   for the life insurance policy.

23          Q.    Did you ask him what he was doing when he was

24   leaving the apartment knowing that this fire was about

1    to break out?

2          A.    I said, Bill, when you walked out at the very

3    end while Marianne was in bed, I said, did you look

4    over to where the fire was?  And he said, No, I didn't

5    want to look over there.  I knew a fire was going to

6    start, but I just didn't care anymore.  And he walked

7    out the door.

8          Q.    Did you discuss the issue of a smoke alarm?

9          A.    I did.  I said -- We asked him -- Our

10   investigation revealed that there should have been a

11   smoke alarm in that apartment, and we never found the

12   smoke alarm.  And what Bill said was that on the Friday

13   before the fire, the battery was failing on the smoke

14   alarm and he took the cover off the alarm, pulled the

15   battery out, and him and Tina went and bought a new

16   battery; but he said he never put the battery in the

17   smoke alarm.  I said, Well, the smoke alarm, we never

18   found the smoke alarm.  We knew where it was to be

19   located at on the wall and was covered in soot

20   indicating that the smoke alarm was not in its position

21   during the fire.

22         Q.    When you confronted him with that

23   information, what did he say?

24         A.    He said he might have taken the whole unit

1  down, but it should be on the book shelves.  And,

2  again, we told him we had searched the book shelves and

3  we -- in the apartment.  We didn't find the cover.  We

4  didn't find the battery.  We never found any part of

5  the smoke alarm.

6       Q.    So at first when you were talking to him

7  about the smoke alarm, he admitted -- or stated that he

8  took the cover off.

9       A.    Correct.

10      Q.    And when he was confronted with the fact that

11 there was no smoke alarm on the wall -- it appeared to

12 you that there was no smoke alarm on the wall when the

13 fire broke out, he then changed his story.

14      A.    Correct.

15      Q.    After the conversation about the smoke alarm,

16 did you rediscuss this idea of a contents fire or a

17 contained fire?

18      A.    We just went over the same, you know, issues

19 and points again about why he started the fire.  He

20 maintained it was for the contents.  He had just wanted

21 to make -- start a contained fire only to get the

22 contents insurance on the policy.

23      Q.    Did he reiterate this concept that he

24 accidentally spilled the vodka but intentionally --

1      A.     Yes.

2      Q.     -- put the cigarette on the newspaper?

3      A.     He did.

4      Q.     And did he reiterate that his wife -- his

5 18-year-old wife wasn't involved?

6      A.     He did.

7      Q.     After this conversation that you had with the

8 Defendant, was he asked to prepare a written statement?

9      A.     He was.

10     Q.     When did that happen?

11     A.     That would have been after midnight, 12:45,

12 maybe in the morning, he was asked to write out a

13 statement.

14     Q.     How was that done?

15     A.     We have a preprinted form. We asked Bill if

16 he would give us a written statement. He said that he

17 would. So we handed him a -- the Naperville verbal

18 statement form. At the top of it you just fill in your

19 name, the person authoring the statement. It's just a

20 series of lines, and at the bottom the author writes

21 and prints their name and then witnesses can sign their

22 name, and the date and time is also there.

23     Q.     I'm going to approach you with what's been

24 marked as People's 43 and 44.

1      MS. THOMPSON:  I'm sorry, Mr. Scaliatine.  Can I

2   just look at it briefly?

3      MR. SCALIATINE:  I'm sorry.

4      THE COURT:  Actually, the court reporter has been

5   typing for an hour and a half.  I think what we'll do,

6   because you're not done with --

7      MR. SCALIATINE:  No.  And actually we have to move

8   the TV over, Judge.

9      THE COURT:  All right.  So we're going to take

10   about a ten-minute break and then you can resume your

11   examination of Detective Guerrieri.

12          Detective Guerrieri, you may step down.

13      THE DEPUTY:  The Court stands in recess.

14              (A short recess was had.)

15      THE CLERK:  William Amor.

16      THE COURT:  All the parties are present with their

17   respective counsel.

18          Investigator Guerrieri, you may resume the

19   witness stand.  You remain under oath.

20          Mr. Scaliatine, you can continue.

21      MR. SCALIATINE:  Thank you.

22   BY MR. SCALIATINE:

23      Q.    Investigator Guerrieri, I believe we left off

24   with after your conversations you had asked the

1    Defendant if he would be willing to do a written

2    statement, correct?

3          A.    Correct.

4          Q.    I'm going to show you what's been previously

5    marked as People's Exhibits 43 and 44.

6                As to 43, Investigator, do you recognize that

7    document?

8          A.    I do.

9          Q.    And what is that document?

10         A.    This is the statement of Miranda rights that

11   I read to Bill Amor on October 3rd and -- which he

12   signed.

13         Q.    And also signing is you and Detective Cross?

14         A.    Correct.

15         Q.    And it's dated the 3rd of October 1995 and

16   timed 11:37 p.m., correct?

17         A.    Correct.

18         Q.    And I will show you what's been previously

19   marked as People's 44.

20               Do you recognize that document?

21         A.    I do.  This is the written statement that

22   Bill Amor wrote out at our request early that next

23   morning on October 4, '95 at -- he finished it up at

24   1:14 a.m.

1        Q.    All right.  And that document is signed by

2  the Defendant, yourself and Detective Cross?

3        A.    Correct.

4        Q.    Dated 10-4 of '95 because it's after the

5  midnight hour.

6        A.    Correct.

7        Q.    And it has a handwritten time of 1:14 a.m.?

8        A.    Correct.

9        Q.    And, Detective, after the Defendant finished

10  his written statement, was he asked whether or not he

11  would be willing to complete a recorded statement?

12        A.    He was.

13        Q.    And what happened at that point in time?

14        A.    We moved from the interview room to Sergeant

15  Ray McGury's office where the recorder was at.  We sat

16  in that office and did the recording of the -- of his

17  statement.

18        Q.    All right.  And could you, in general,

19  describe that office?

20        A.    It's a small office about, again, 12 by 12

21  with one desk -- Sergeant McGury's desk and his chair

22  and credenza behind it and a couple of file cabinets

23  and two or three chairs also inside that office.

24        Q.    And when the Defendant went from the

1    investigative room to the Sergeant's personal office,

2    was he handcuffed?

3         A.    No, he was not.

4         Q.    And did he agree to go and make that recorded

5    statement?

6         A.    He did.

7         Q.    And was part of that recorded statement the

8    Defendant reading onto the audiotape that was recording

9    it, just literally reading his statement?

10        A.    It was.

11        Q.    And you had an opportunity to listen to that

12   whole tape that records that -- that recorded that

13   audio statement, correct?

14        A.    I did.

15        Q.    And after you had an opportunity to listen to

16   it, you had an opportunity to initial it, correct?

17        A.    Correct.

18        MR. SCALIATINE:  Judge, at this time if we could

19   publish People's 45.

20        THE COURT:  I think this is the first time you

21   have ever mentioned it other than describing it.  Are

22   you seeking to admit it?

23        MR. SCALIATINE:  I am.

24        THE COURT:  Any objection?

```
 1          MS. THOMPSON:  I'm sorry, Your Honor.  No,
 2     Your Honor.
 3          THE COURT:  All right.  You may publish it.
 4          MR. SCALIATINE:  Okay.
 5          THE COURT:  Obviously there is sound on it.  I
 6     take it neither side wishes the court reporter to take
 7     down the sound?
 8          MR. SCALIATINE:  Not from the People.
 9          MS. THOMPSON:  No, Your Honor.
10               (Whereupon, an audiotape was played.)
11          THE COURT:  Can you stop it?
12               (Whereupon, an audiotape was stopped.)
13          MR. CARAHER:  You talked earlier about moving the
14     screen so that we could --
15          THE COURT:  There is nothing on it.
16          MR. CARAHER:  Oh.  I couldn't tell.
17          THE COURT:  No.  I will make a representation that
18     it's blank.
19          MR. CARAHER:  All right.  Thank you.
20          THE COURT:  Well, there is some --
21          MR. SCALIATINE:  Is it coming out of here or is it
22     coming out of there (indicating)?
23          MR. CARAHER:  Sounds like it's coming out of the
24     laptop.
```

1          THE COURT:  There is -- I don't know.  There is

2     something recognizing the decibel levels.  But other

3     than that, there's no -- no one's visible on it.

4          MR. CARAHER:  I couldn't tell I was missing

5     anything.

6          THE COURT:  Fair enough.

7          MR. CARAHER:  Or I was not missing anything.

8          THE COURT:  All right.  And then if you just want

9     to rewind -- start again from the beginning.

10          MR. SCALIATINE:  It sounds like it's coming out

11     of ...

12               Mr. Minser, could you help?

13                    (Whereupon, an audiotape was played.)

14     BY MR. SCALIATINE:

15          Q.    Investigator Guerrieri, that was People's 45

16     and all your taped conversation that occurred at the

17     station, at the Sergeant's office, correct?

18          A.    Correct.

19          Q.    And on it, it was yourself, Detective Cross

20     and the Defendant, correct?

21          A.    Correct.

22          Q.    And during -- in the beginning of this

23     statement, actually the Defendant was again advised of

24     his Miranda warnings, correct?

1       A.   He was.

2       Q.   After that tape finished recording, what

3 happened?

4       A.   Later that morning, about 3:00 o'clock,

5 Assistant State's Attorney Brian Nigohosian arrived at

6 the police station to continue the investigation.

7       THE COURT:  Can you spell Nigohosian for the

8 record?

9       THE WITNESS:  N I G O H O S I A N.

10      THE COURT:  Thank you.

11      MR. SCALIATINE:  Thank you, Detective.

12 BY MR. SCALIATINE:

13      Q.   In the interim time between 2:15 in the

14 morning when that time had finished recording and

15 3:00 o'clock when Prosecutor Nigohosian comes into the

16 Naperville Police Department, where is the Defendant?

17      A.   He was in the Sergeant's office.

18      Q.   Just sitting there?

19      A.   He was.

20      Q.   He wasn't -- Was he arrested or cuffed?

21      A.   No, he was not.

22      Q.   When Prosecutor Nigohosian came to the

23 Naperville Police Department, what happened?

24      A.   He came into the Sergeant's office.  Before

1    he came in, I briefed him on the status of the

2    investigation and then he went into the Sergeant's

3    office and spoke with Mr. Amor.

4         Q.    And when he spoke with Mr. Amor in that

5    Sergeant's office, were you present for some of that

6    conversation?

7         A.    For parts of it, yes.

8         Q.    Were you in and out of the room during that

9    conversation?

10        A.    I was.

11        Q.    And ultimately, after the prosecutor had an

12   opportunity to speak to the Defendant, did the

13   Defendant agree to give a second recorded statement?

14        A.    He did.

15        Q.    And what time was that statement given?

16        A.    That was about 5:00 o'clock in the morning on

17   that same day.

18        Q.    I'm going to show you what has been marked

19   previously as People's 46.

20        MS. THOMPSON:   Okay.

21   BY MR. SCALIATINE:

22        Q.    And do you recognize People's 46?

23        A.    I do.

24        Q.    And what is People's 46?

1    A.    It's a CD with the label affixed to it People

2    versus William Amor with the indictment number and my

3    initials on it, and this would be the tape recorded

4    statement conducted by Prosecutor Nigohosian with Bill

5    Amor.

6        Q.    And you were present for that second

7    recording, correct?

8        A.    I was.

9        Q.    And you recognize People's 46 by previously

10   listening to it and putting your initials on it after

11   you had listened to it, correct?

12       A.    I do.

13       Q.    And during the time that you and Detective

14   Cross are talking to Prosecutor Nigohosian and the

15   Defendant is in the Sergeant's office, is anybody there

16   with him?

17       A.    No.

18       Q.    He's sitting there alone?

19       A.    Correct.

20       Q.    At any point in time before making the final

21   recorded statement at 5:10 in the morning, did the

22   Defendant ask for any food?

23       A.    He did not.

24       Q.    Was he provided bathroom drinks -- I'm sorry,

1     bathroom breaks?

2         A.    He was.

3         Q.    Was he provided drinks?

4         A.    He was.

5         Q.    Was he provided drinks that would cause him

6     to go to the bathroom?

7         A.    Yes.  And cigarettes.  He had a cigarette

8     break also.

9         Q.    And so he was allowed to go out and smoke a

10    cigarette?

11         A.    Correct.

12         Q.    At any time in your presence that October

13    the 3rd, 1995 to October the 4th, 1995, in your

14    presence did he ever ask for an attorney?

15         A.    He did not.

16         Q.    Did he ever say to anyone in your presence

17    that he didn't want to talk to anyone?

18         A.    He did not.

19         Q.    Did he ever say that to you?

20         A.    No.

21         Q.    Other than the one time that you've testified

22    to in which Detective Cross raised his voice at him,

23    did anyone ever raise their voices at him --

24         A.    No, they didn't.

```
 1          Q.    -- in your presence?

 2          A.    They did not.

 3          Q.    Was he ever threatened in any way?

 4          A.    He was not.

 5          MR. SCALIATINE:  If I could have a moment.

 6          THE COURT:  Yes.

 7                         (Brief pause.)

 8          MR. SCALIATINE:  Nothing further.

 9          THE COURT:  Cross.

10          MS. THOMPSON:  Thank you, Your Honor.

11                     CROSS-EXAMINATION

12                     BY MS. THOMPSON:

13          Q.   Good afternoon, Investigator.

14          A.   Good afternoon.

15          MS. THOMPSON:  May I proceed, Your Honor?

16          THE COURT:  Yes.

17          MS. THOMPSON:  Thank you, Your Honor.

18   BY MS. THOMPSON:

19          Q.   Investigator, as you previously testified,

20   you currently work for the DuPage County State's

21   Attorney's Office?

22          A.   I do.

23          Q.   And in your prior time at the Naperville

24   Police Department, you did make sergeant after this
```

1    case, correct?

2         A.    I did.

3         Q.    Or after Mr. Amor was arrested in this case,

4    right?

5         A.    In 1996 I was promoted to sergeant.

6         Q.    And as of the time -- at the time that you

7    were investigating this case with your colleagues in

8    Naperville, you had been with the police department for

9    how long?

10        A.    Naperville police for about 10 years.

11        Q.    And had you been a police officer in other

12   agencies before that?

13        A.    I was.  I was a patrol officer in Riverside

14   Police Department for three years.

15        Q.    You had also been a detective in Naperville

16   at the time you were investigating this for eight

17   years; is that right?

18        A.    That's about right.  In various roles,

19   correct.

20        Q.    You were an experienced police officer at the

21   time you were involved in this investigation.

22        A.    I was.

23        Q.    And you were an experienced detective.

24        A.    Correct.

1       Q.    And you were an experienced detective at

2 investigating serious cases, right?

3       A.    Correct.

4       Q.    This was not your first murder investigation.

5       A.    It was not, but I primarily -- up to that

6 point, I was primarily involved with gang drug crimes

7 and street crimes.  I was not on the major crimes unit

8 with the Naperville Police Department.  I was on the

9 special enforcement unit primarily, which was a street

10 level crime unit.

11      Q.    In the street level crimes that you

12 investigated, you undoubtedly interviewed countless

13 people?

14      A.    I did.

15      Q.    And you took statements from numerous people

16 in -- even working in the street crimes -- in

17 investigating street crimes, correct?

18      A.    Correct.

19      Q.    Had you received training in your time as a

20 Naperville detective on how to interview suspects?

21      A.    I did.

22      Q.    And where did you receive that training?

23      A.    At the John Reid School in downtown Chicago.

24      Q.    We'll talk about that more in a minute.

1          Your involvement in Mr. Amor's case did not

2     end at the time that Mr. Amor was arrested; is that

3     correct?

4          A.    Primarily it did after that night.

5          Q.    Well, let me ask you this:  Have you had some

6     involvement in Mr. Amor's case even in your role as an

7     investigator with the DuPage County State's Attorney's

8     Office in continuing to examine the fire in this case?

9          A.    No, I have not.

10         Q.    Well, weren't you involved in interviewing a

11    witness in this case last year?

12         A.    Oh, re-interviewing Tina you mean?

13         Q.    Yes.

14         A.    Yes, I did.

15         Q.    So this is not a matter that went away for

16    you in 1995.

17         A.    Correct.

18         Q.    I want to ask you some questions about your

19    arrival at the scene of this fire.  It was your

20    testimony a minute ago that when you got to the scene,

21    that the apartment was still hot and smoky?

22         A.    Correct.

23         Q.    You got there at about 8:00 o'clock?

24         A.    I did.

1      Q.    And when you got there, there were still

2   fire -- there were fire investigators that were at the

3   scene?

4      A.    Correct.

5      Q.    And there were still firefighters working on

6   a cleanup effort when you were at the scene?

7      A.    That's fair to say.

8      Q.    Was the suppression effort done at that

9   point?

10     A.    It was.

11     Q.    And so people were shoveling out debris?

12     A.    I wasn't allowed up there, so I can't speak

13  to that.

14     Q.    Okay.  So did you ever -- When is the first

15  time that you entered the unit in this case?

16     A.    It was about 8:30 that we were allowed to go

17  up into the unit.

18     Q.    Okay.  And when you went up into the unit at

19  8:30, were there fire personnel inside the apartment?

20     A.    There were.

21     Q.    And were those -- the suppression effort was

22  done at the point you went inside?

23     A.    Correct.

24     Q.    There were people that were cleaning up at

1    that point?

2        A.    Fair to say, yes.

3        Q.    Okay.  And there was items from the apartment

4    that had been shoved out the balcony out into the

5    courtyard below?

6        A.    It appeared so, yes.

7        Q.    And was there furniture down in the courtyard

8    from the apartment at the time you went up there at

9    8:30?

10        A.    I don't recall what was down in that heap.

11        Q.    How big was the heap downstairs, would you

12    estimate?

13        A.    I can't even estimate it.

14        Q.    When you went into the apartment at 8:30,

15    were there remnants of any furniture in the living

16    room?

17        A.    There were.

18        Q.    Did you see a couch in the living room at

19    that time?

20        A.    I did.

21        Q.    Did you see the remnants of a chair in the

22    living room?

23        A.    I did.

24        Q.    Did you see the remnants of more than one

1    chair?

2        A.   In the living room, I primarily remember the

3    one recliner, which I think would have been Marianne's

4    chair, was recognizable, the one on the south wall

5    furthest east.

6        Q.   Okay.  And at the time that you went into the

7    apartment initially at 8:30, you didn't know whose

8    chair that was, correct?

9        A.   Correct.

10       Q.   But that's something you learned later.

11       A.   Correct.

12       Q.   All right.  I'm showing the witness what's

13    been marked as Defendant's Exhibit 53.

14           Investigator, I have shown you a photograph

15    that's marked as Defendant's Exhibit 53.  Does

16    Defendant Exhibit 53 reflect how the unit looked when

17    you got there at 8:30 p.m.?

18        A.   Generally.  But the couch was more in the

19    middle of the room when we first got there.

20       MS. THOMPSON:  And, Your Honor, may I publish

21    Exhibit 53?

22       THE COURT:  Any objection?

23       MR. SCALIATINE:  No objection.

24    BY MS. THOMPSON:

1       Q.    Can you see the --

2       A.    Yes.

3       Q.    Are you able to see the screen?

4       A.    Yes.

5       Q.    So the copy I put on the Elmo is the same as

6 I just showed you.  Actually, I will take the actual

7 exhibit.

8          So the screen -- Can you see the screen that

9 depicts -- that has Exhibit 53?

10      A.    Can you turn it a little bit more towards me?

11         That's good.  Thank you.

12      Q.    Okay.  So when you got there at 8:30, is this

13 the couch right there?

14      A.    Yes.

15      Q.    Where I'm looking on the left side of the

16 photograph against the wall of the living room?

17      A.    Yes.

18      Q.    And when you got there, was it more in this

19 area?

20      A.    Yeah, it was pulled more to the center of the

21 room.

22      Q.    Okay.

23      A.    When was this picture taken?

24      Q.    Well, that's not a question I think I can

```
1    answer.  I'm just asking you how this compares to what

2    you observed.

3             Do you see a portion of a chair where my

4    finger is pointing on the bottom left of this photo?

5         A.   It could be, yes.

6         Q.   And you described a recliner chair earlier?

7         A.   Correct.

8         Q.   Where was the recliner chair when you got

9    there at 8:30?

10        A.   I think it was about in that same position.

11        Q.   And then do you see where I'm pointing here

12   that there is a remnant of something on the floor?

13        A.   Yes.

14        Q.   And was item -- Was that item that I'm

15   pointing at there when you got there at 8:30?

16        A.   I don't recall.

17        Q.   And then do you see where my finger is that

18   there's some just debris up here at the -- on the

19   balance?

20        A.   Yes.

21        Q.   Was that there when you got there at 8:30?

22        A.   Could have been.

23        Q.   And on this photograph, do you see where I'm

24   pointing that you can see the studs of the wall that is
```

1    on the right side of this photograph?

2         A.   I can.

3         MR. SCALIATINE:  Judge, I'd ask that the exhibit

4    be marked so that we have a better understanding of

5    where counsel is just pointing.

6         THE COURT:  I'm not going to direct the witness to

7    mark her exhibit if she doesn't want to.

8    BY MS. THOMPSON:

9         Q.   I would ask --

10        THE COURT:  The exhibit itself is marked.

11   BY MS. THOMPSON:

12        Q.   On the right side of Exhibit 53, do you see

13   some visible studs in the wall on the right side of the

14   photograph?

15        A.   I do.

16        Q.   And is that how the unit appeared when you

17   were there at 8:30?

18        A.   It does.

19        Q.   Now, earlier you testified that you were

20   never able to locate a smoke detector in the unit?

21        A.   Correct.

22        Q.   Did you ever undertake to search for a smoke

23   detector in the unit?

24        A.   I did not.

1        Q.    Did you ever -- Were you ever present in the

2   unit when other people were looking for a smoke

3   detector?

4        A.    I was not.

5        Q.    You also said in your testimony earlier that

6   you came to learn that the second bedroom of the condo,

7   that the door was locked at the time of the fire?

8        A.    That's what I was advised, yes.

9        Q.    Was that something that Bill told you?

10       A.    Bill Amor?

11       Q.    Yes.

12       A.    No, it's not.

13       Q.    Okay.  Did you -- It was your understanding

14   that Bill and Tina were married?

15       A.    Correct.

16       Q.    And they were staying at the condo that

17   belonged to Tina's mother?

18       A.    Correct.

19       Q.    Did you find it or was it relevant to your

20   investigation that that door had been locked at the

21   time of the fire?

22       A.    I thought it unusual that the door was --

23   that I was advised that it was locked.

24       Q.    Have you ever been inside anyone else's home

1     where adult children that share a condo with a parent

2     lock their personal living space?

3          A.    No.

4          MR. SCALIATINE:  Objection, argumentative.

5          THE COURT:  Sustained.

6     BY MS. THOMPSON:

7          Q.    And it was your understanding that that door

8     that was locked was the bedroom that Tina and Bill

9     shared?

10         A.    It is.

11         Q.    At what point in the investigation did you

12    come to understand that that door had been locked?

13         A.    Probably -- I'm trying to recall.  That night

14    or early the next morning.

15         Q.    Now I want to ask you a couple questions

16    about being at the Leavenworth home and interviewing

17    Bill.  You went there with Detective Cross, correct?

18         A.    Correct.

19         Q.    And Detective Cross talked to -- Let me ask

20    you this before I start into these questions.

21              At the time that you spoke -- At the time

22    that you were investigating this case, Tina Miceli was

23    married to Bill Amor, correct?

24         A.    Correct.

1      Q.    And I'm going to refer to her as Tina Miceli,

2  but you understand that we're talking about the person

3  who was Bill's wife at the time.

4      A.    Sure.

5      Q.    All right.  So Detective Cross talked to Tina

6  Miceli upstairs, right?

7      A.    Correct.

8      Q.    And you talked to Bill downstairs?

9      A.    I did.

10     Q.    When you arrived at the home, were Bill and

11 Tina together?

12     A.    They were.

13     Q.    And Bill did not interfere, as far as you

14 saw, with Detective Cross's efforts to talk to Tina

15 when you first got there.

16     A.    Correct.

17     Q.    He didn't say, Don't talk to her.

18     A.    Correct.

19     Q.    He went downstairs and spoke with you and

20 left Tina alone with Detective Cross, right?

21     A.    He did.

22     Q.    You indicated that in your conversation with

23 Bill downstairs, that to your mind Bill did not seem

24 upset about what had happened?

```
 1        A.    Correct.

 2        Q.    And was he laughing with you?

 3        A.    No, he was not.

 4        Q.    Was he joking?

 5        A.    No.

 6        Q.    Did he express any happiness that Marianne

 7   had died?

 8        A.    No.

 9        Q.    So what about his tone led you to believe

10   that he was unconcerned?

11        A.    He was very conversational.  He was very

12   talkative.  He was even-toned.  His voice wasn't

13   trembling.  His hands weren't trembling.  He wasn't

14   crying.  His face wasn't flushed.  Did not appear to me

15   to be upset about the loss of his apartment and his

16   mother-in-law.

17        Q.    Did you assess whether you thought he was

18   under the influence of alcohol when you interviewed

19   him?

20        A.    I did not assess it per se.  I did not smell

21   alcohol on his breath at the time.

22        Q.    How close were you in proximity to Bill when

23   you were interviewing him downstairs?

24        A.    Normal conversation length.  Two or three
```

1    feet.

2         Q.    And to you as an experienced investigator,

3    did you find it suspicious that in your view his tone

4    did not reflect concern for Marianne's passing?

5         A.    Not on its own.  It was just something that

6    noted at the time.

7         Q.    Well, didn't -- But, I mean, is it something

8    you thought -- is it evidence to you that there was

9    something suspicious about his involvement in this

10   case?

11        A.    It's difficult to say how people react to

12   stress and tragedy.  So I can't say that that alone

13   would have made me suspicious.  It was just something

14   that I had noted at the time.

15        Q.    You did prepare a report in this case that

16   reflects the activity -- reflects the investigative

17   steps that you took on September 10th and 11th, right?

18        A.    I did.

19        MS. THOMPSON:  And I've marked this as Defendant's

20   Exhibit 51, Your Honor.

21   BY MS. THOMPSON:

22        Q.    Do you know when it is that you prepared your

23   report in this case that documents your interview with

24   Bill on the early morning hours of September 11th?

1          A.     I don't recall the date I wrote the report or

2     the number of days afterwards.

3          Q.     Would it have been after further events in

4     this case had led to Mr. Amor being arrested?

5          A.     In October?

6          Q.     Well, Mr. Amor was arrested on October 4th,

7     correct?

8          A.     Correct.

9          Q.     And the report that you completed that

10    documented what happened on September 11th in the

11    morning, did you complete that after Bill was arrested

12    on October 3rd?

13         A.     I don't believe so.

14         Q.     But it was some number of days after the

15    interview with Bill.

16         A.     Correct.

17         Q.     Okay.  And your reports of interviews are --

18    Well, let me ask you this:  As an investigator, you

19    complete reports?

20         A.     I do.

21         Q.     And those reports are meant to document

22    investigative steps that you take?

23         A.     Correct.

24         Q.     And you know it's important -- you know that

1    you may be using the reports later to refresh your

2    memory about events that occurred?

3         A.   Correct.

4         Q.   And so it's important for those reports to be

5    accurate?

6         A.   Correct.

7         Q.   And what you try to do when you complete

8    those reports is to note important details?

9         A.   Correct.

10        Q.   And in your report of your interview with

11   Bill Amor, you never noted that he had an unconcerned

12   tone when you talked to him on the morning of September

13   11th.

14        A.   I don't know if I wrote that or not.  But if

15   I didn't write it, I didn't write it.

16        Q.   Well, is your memory exhausted as to whether

17   or not that's something you noted?

18        A.   Yes.

19        Q.   Would reviewing that report refresh your

20   recollection?

21        A.   The whole report?

22        Q.   I can direct your attention to the --

23        A.   Sure.  Okay.

24        Q.   -- portion.

```
 1              And for the record, I'm showing the witness
 2    what's --
 3         THE COURT:  How do you direct his attention to the
 4    portion that doesn't have it?
 5         MS. THOMPSON:  Well, what I was going to direct
 6    his attention to is the portion that refers to this
 7    interview.
 8         THE COURT:  Did you want to stipulate it's not in
 9    there?
10         MR. SCALIATINE:  Yes, sir.
11         THE COURT:  All right.
12         MR. SCALIATINE:  Thank you, Your Honor.
13         MS. THOMPSON:  Thank you, Your Honor.
14    BY MS. THOMPSON:
15         Q.   That he was, in your words now, unconcerned
16    is not something that you thought was important enough
17    to note in your report of that interview.
18         A.   But he didn't show that he was un- -- that he
19    was concerned.
20         Q.   And that's not something you noted in your
21    report, that he did not show that he was concerned.
22         A.   Correct.
23         Q.   And, in fact, he was cooperative with you.
24         A.   He was.
```

1       Q.    You were there as an investigator of the

2  police department?

3       A.    I was.

4       Q.    And certainly looking into what had happened

5  with Marianne was important?

6       A.    It was.

7       Q.    Were you dressed in a suit when you went

8  there?

9       A.    No.

10      Q.    What were you wearing?

11      A.    Jeans and a Polo shirt.

12      Q.    You came as a police officer?

13      A.    I did.

14      Q.    And he was willing to speak with you.

15      A.    He was.

16      Q.    And he also told you in that interview that

17  Marianne Miceli had said good-bye to them as they left

18  for the movies on September 10th, right?

19      A.    She did.

20      Q.    So he told you that she was not asleep when

21  they left?

22      A.    Correct.

23      Q.    You mentioned that you talked with him for

24  some time and then you went upstairs, right?

1       A.   Correct.

2       Q.   And then you came back downstairs and you

3  asked him some questions about a lost cigarette?

4       A.   Correct.

5       Q.   And you asked him those questions because of

6  information you learned when you went upstairs,

7  correct?

8       A.   That's correct.

9       Q.   And when you went upstairs, Detective Cross

10  was talking to Tina Miceli, right?

11       A.   He was.

12       Q.   How long did you talk with Bill downstairs

13  before you went back upstairs?

14       A.   I believe it was about a half an hour.

15       Q.   Okay.  And your second interaction where you

16  were asking about the lost cigarette, how long was that

17  interaction?

18       A.   Shorter.  Maybe ten minutes.

19       Q.   Okay.  And at that point you went -- At that

20  point you went back upstairs with Bill, right?

21       A.   Correct.

22       Q.   And that's the point where this exchange with

23  Tina about the life insurance happened?

24       A.   Correct.

```
1         Q.    And you in your description today said that
2    he spoke over Tina when you asked that question?
3         A.    When Mike Cross asked that question.
4         Q.    And I appreciate that clarification.  Thank
5    you.
6               It's your testimony that he spoke over Tina
7    when Mike Cross asked that question.
8         A.    Correct.
9         Q.    And that his tone was different than it had
10   been with you downstairs.
11        A.    Correct.
12        Q.    And again, you completed a report of what
13   happened from an investigator perspective when you
14   spoke with Bill at the Leavenworth home on
15   September 11th of 1995.
16        A.    I did.
17        Q.    And nowhere in your report do you document
18   that there was some exchange with Tina about life
19   insurance where Bill cut her off.
20        A.    Correct.  That's in Mike Cross's report.
21        Q.    Okay.  That's not something you documented.
22        A.    Correct.
23        Q.    And so did you complete your report with Mike
24   Cross?
```

1    A.    I don't know what you mean by "with."

2    Q.    Well, sure.  Was it something you didn't

3    document because you understood somebody else was

4    writing that down?

5    A.    Correct.

6    Q.    So as to your testimony today as to what

7    happened, that's not something you were able to refresh

8    your recollection with from your own report, right?

9    A.    That's correct.

10    Q.    When you talked to Tina upstairs about --

11    after you had been downstairs with Bill and when

12    Detective Cross asked her that question, what was her

13    demeanor?

14    A.    She was subdued once Bill talked over her,

15    and she kind of trailed off in her answer to him.  She

16    had answered just previously that her mom had car

17    insurance and had insurance on the contents, and it was

18    kind a normal tone at that point.

19    Q.    What was her demeanor before that question

20    was asked?

21    A.    Well, I could only speak to that brief

22    exchange about the insurance.  So that's really my only

23    exposure to her was when that exchange was -- Up to

24    that point, that was my exposure with Tina.

1     Q.    Did you see her at all when you came into the

2    house before you went to talk to Bill?

3          A.    Yes, briefly.

4          Q.    And could you assess her demeanor when you

5    first came in?

6          A.    I don't recall what her demeanor was.  I

7    didn't really talk with her other than introduce

8    myself.

9          Q.    Was she crying at that time?

10         A.    I don't recall if she was crying.

11         Q.    Then later you testified about seeing Bill

12   outside the Leavenworth house?

13         A.    I did.

14         Q.    And you said that you saw him doing what you

15   described as moving items in the trunk of the car?

16         A.    Correct.

17         Q.    Where was the -- I want to understand this a

18   little better.  Where were you standing when you saw

19   him around the trunk?

20         A.    I went out the back door of the house and

21   walked along the back of the house to the west side of

22   the house.  Standing along the west side of the house

23   you could see to the front, and her Topaz was parked

24   directly in front of the house where I could see it

1   from my position.

2        Q.    So was the car in front of the house parked

3   on the street?

4        A.    Correct.

5        Q.    So the car was perpendicular to you?

6        A.    Correct.

7        Q.    So you could not -- Could you see inside the

8   trunk?

9        A.    I could not.

10       Q.    But you could see that he had the door open

11  and he was inside?

12       A.    Correct.

13       Q.    And it looked to you like he was moving items

14  around?

15       A.    Correct.

16       Q.    Later when you went to the trunk to look, you

17  found some Vodka in the trunk?

18       A.    I did.

19       Q.    And was what Bill was doing in the trunk

20  consistent with him trying to sneak a drink from the

21  trunk?

22       A.    I never saw him lift the bottle to his lips.

23  I just saw what looked like his arms moving inside the

24  trunk.  So I can't speak to what he was touching or

1    doing at that point.

2         Q.    Did you -- From where you were standing, did

3    you see him take anything out of the trunk?

4         A.    I did not.

5         Q.    When you asked Tina for permission to search

6    the car, was Bill there?

7         A.    No.

8         Q.    Where was Bill when you asked Tina about

9    that?

10        A.    He had gone downstairs with Mike Cross.

11        Q.    And you testified that at some point later

12   you were able to get a consent to search the apartment

13   back at Bailey Road?

14        A.    Correct.

15        Q.    And you were able to get that because Tina

16   and Bill signed a consent to search form?

17        A.    I was not -- It was not in my presence when

18   they signed that form.

19        Q.    But your understanding was that Bill had --

20        A.    Given consent, yes.

21        Q.    So Bill agreed to let you search the house?

22        A.    Correct.

23        Q.    And who was it that got the consent to search

24   signed by Bill?

```
 1        A.    I believe it was Sergeant Carlson.

 2        Q.    And you subsequently were involved in

 3   searching their -- in searching the apartment?

 4        A.    Correct.

 5        Q.    And you testified that you found -- Did you

 6   find some letters when you were searching?

 7        A.    We did.

 8        Q.    All right.  And did you find any other

 9   evidence at the house that you collected in connection

10   with this investigation as a result of that consent to

11   search?

12        A.    That was a very limited search in that room,

13   and my recollection was that those letters were the --

14   from the dresser were of value for us.

15        Q.    Okay.  So what area were you searching?

16        A.    Their bedroom.  And then there was a small

17   dresser between the two beds, and in the dresser drawer

18   is where the letters were at.

19        Q.    Did you search all throughout that room --

20        A.    Yes.

21        Q.    -- when you got the consent to search?

22        A.    Correct.

23        Q.    And you didn't search any other part of the

24   apartment?
```

1       A.   At that point we were limited -- I was

2  limited to just the bedroom at that point.

3       Q.   Because that's the area you were assigned to

4  search or were you limited for some other reason?

5       A.   No.  That was just the area that we wanted to

6  concentrate on.

7       Q.   And you looked all through the bedroom?

8       A.   Correct.

9       Q.   And the only thing that you found at that

10  point that you thought was relevant to the

11  investigation was the letters?

12       A.   Correct.

13       Q.   And then the next contact that you have with

14  Bill in this investigation is actually on September

15  15th of 1995, right?

16       A.   Correct.

17       Q.   And on that day you arrested Bill.

18       A.   I did.

19       Q.   And that was not in connection with this

20  case.

21       A.   Correct.

22       Q.   Was he in his -- Was he in Tina's car when he

23  was arrested?

24       A.   He was.

```
 1        Q.    And was Tina driving?
 2        A.    She was.
 3        Q.    All right.  And so this was not a traffic
 4   stop.
 5        A.    Well, it was a traffic stop.  We pulled the
 6   car over that Bill was riding in.
 7        Q.    Did you pull that car over because the car
 8   had violated a rule of traffic?
 9        A.    No.
10        Q.    All right.  So you were pulling the car over
11   to execute that warrant.
12        A.    Correct.
13        Q.    And how did you come to know that the car was
14   at the location it was at when you curbed it?
15        A.    I don't recall how we knew -- found the car
16   driving on Naperville Boulevard, but we did.  We
17   followed it and pulled it over.
18        Q.    And at that point you arrested Bill.
19        A.    I did.
20        Q.    And Tina was not arrested.
21        A.    Correct.
22        Q.    And so did you inform -- Well, let me ask you
23   a different question.
24              At that point you took him to the Naperville
```

1    Police Department?

2         A.    We did.

3         Q.    And you took him to the detention center?

4         A.    Correct.

5         Q.    And he was in custody at that point?

6         A.    He was.

7         Q.    Did you have any further contact with Bill on

8    the 15th after you took him to the police department?

9         A.    I did not.

10        Q.    And did you have any conversation with him

11   about this case when you arrested him?

12        A.    I did not.

13        Q.    Was Bill cooperative in the process of that

14   arrest?

15        A.    He was.

16        Q.    Did he ask you any questions about this case

17   when he was arrested on the other case?

18        A.    No.

19        Q.    All right.  Let's go now to the events of

20   October 3rd.  You and Detective Cross met Bill in

21   DeKalb?

22        A.    We did.

23        Q.    And he was -- You actually met him in the

24   lobby of the DeKalb County Jail?

1        A.    We did.

2        Q.    And he was getting released from jail when

3    you saw him?

4        A.    He was.

5        Q.    And he had spent, to your understanding, all

6    of the time from September 15th after he left

7    Naperville till when he was being released either in

8    jail or in court on whatever that proceeding was?

9        A.    He was.

10        MR. SCALIATINE:  Objection, relevance.

11        THE COURT:  Overruled.

12   BY THE WITNESS:

13        A.    He was.

14        Q.    And when you saw him in the lobby, you asked

15   him if he would go to this other interview with you?

16        A.    We did.

17        Q.    And he agreed to do that?

18        A.    He did.

19        Q.    Did he have any property with him when you

20   saw him in the lobby of the jail?

21        A.    I don't believe so.

22        Q.    Was he carrying anything at all that you

23   could see?

24        A.    I don't recall.

1    Q.    Did he have cigarettes with him?

2    A.    I don't recall if he had cigarettes or not.

3    Q.    Well, you said that -- earlier in your

4    testimony you said that he was able to smoke when he

5    was at the police department later?

6    A.    He was.

7    Q.    Was he smoking his cigarettes?

8    A.    We had cigarettes in our cars and there's

9    cigarettes in our office.

10    Q.    You gave him cigarettes to smoke?

11    A.    Correct.

12    Q.    And what was he wearing when you met him at

13    the jail?

14    A.    I believe he had shorts and a T-shirt on.

15    Q.    Were those the same clothes that he was

16    wearing when you arrested him on September 15th?

17    A.    Yes.

18    Q.    So he drives with you to Chicago?

19    A.    He did.

20    Q.    And that's about a two-hour drive?

21    A.    A little less.  Maybe hour and a half.

22    Q.    All right.  And you already testified that

23    you did not discuss the case with him on that drive?

24    A.    Correct.

```
1        Q.    Did you talk with him at all?

2        A.    Not much.

3        Q.    Detective Cross was in the car with you?

4        A.    He was.

5        Q.    Did you and Detective Cross talk about the

6   case?

7        A.    No.

8        Q.    Did you talk about anything?

9        A.    I drove.  I don't remember what the

10  conversation was, but it was not about the case.

11       Q.    And you -- The car that you were driving is a

12  car where once it starts to go into motion, the doors

13  automatically lock.

14       A.    I'm unaware if it was or not.

15       Q.    So you got to Chicago.

16       A.    We did.

17       Q.    And Mr. -- You went with Mr. Amor to where

18  this interview was going to take place?

19       A.    Correct.

20       Q.    And he was interviewed by a third party?

21       A.    He was.

22       Q.    And that was not in your presence?

23       A.    Correct.

24       Q.    And then after he had that interview, you and
```

1    Detective Cross did interview him in Chicago at that

2    office.

3         A.    We did.

4         Q.    And how long did you interview him for?

5         A.    It was for about -- I believe about an hour

6    and a half.

7         Q.    Was he cooperative with you during that

8    hour-and-a-half interview?

9         A.    He was.

10        Q.    And can you describe the space that you

11   interviewed him in in Chicago?

12        A.    It was just an office in that other facility,

13   a normal business office.

14        Q.    And was he answering narrative questions when

15   you were in the business office in Chicago interviewing

16   him?

17        A.    He was.

18        Q.    And was there anything that he said in

19   that --

20        THE COURT:  I beg your pardon.  What's a narrative

21   question?

22        MS. THOMPSON:  Let me ask the witness a better

23   question.

24   BY MS. THOMPSON:

1      Q.    Were you asking him questions during that

2  interview that required him to give longer answers?

3      A.    Yes.

4      Q.    And he was giving you longer answers?

5      A.    He was.

6      Q.    And do you know what time it was that you

7  interviewed him in the offices in Chicago?

8      A.    It was about 9:00 o'clock that night.

9      Q.    So you interviewed him there from 9:00 to

10  10:30?

11      A.    Correct.

12      Q.    And your understanding was before you started

13  talking with him, that he was being interviewed by

14  somebody else?

15      A.    Correct.

16      Q.    And those interviews were by someone who was

17  being paid by Naperville to do those interviews?

18      A.    Correct.

19      Q.    And I think this question I asked you

20  earlier, but I want to make sure I got the answer.

21  Could you describe the space in Chicago where it was

22  that you were interviewing him?

23      A.    It's a suite of offices.  I believe the

24  address is 250 South Wacker.

```
 1        Q.    What kind of office space were you in when
 2   you were talking to him there?
 3        A.    I recall it was just a standard office.  I
 4   don't recall anything outstanding about it.
 5        Q.    Was -- Were you at a table and chairs?
 6        A.    Yes.
 7        Q.    And was it in an office space where the front
 8   door was a buzzer door?
 9        A.    I don't recall.
10        Q.    So at 10:30 your interview with him in
11   Chicago ended?
12        A.    It did.
13        Q.    And at that point you came back to
14   Naperville?
15        A.    We did.
16        Q.    And did you know if when you were with Bill
17   if he -- there in the offices in Chicago, did he have
18   his wallet with him?
19        A.    I don't recall.
20        Q.    When he -- Ultimately he was booked in this
21   case.
22        A.    He was.
23        Q.    Was he booked with a wallet?
24        A.    I don't recall.
```

1     Q.    Do you know if he had any money on him?

2     A.    I don't recall.

3     Q.    Did he have a cell phone on him?

4     A.    Not in 1995.

5     Q.    I had a -- There were bag phones in 1995, but

6 you probably would have seen that, right?

7     A.    He did not have a bag phone.

8     Q.    Okay.  Was anyone -- Did anyone that was --

9 Well, let me ask you a separate question.

10     So he drove back to Naperville with you?

11     A.    He did.

12     Q.    And when you got to Naperville, you went to

13 the Naperville Police Department?

14     A.    We did.

15     Q.    And can you describe how it is specifically

16 that you got from wherever you parked the car into the

17 Naperville Police Department.

18     A.    I pulled the car around to the back of the

19 police station, so -- and then walked into the rear as

20 opposed to the front where I dropped Mike and Bill off

21 and just went downstairs into the investigations

22 division and into the lobby.

23     Q.    And the area of the investigations division

24 where you interviewed Bill, that's not a public area of

1    the police department.

2            A.    Correct.

3            Q.    It is behind a locked door.

4            A.    Correct.

5            Q.    And can a person just walk out of there or do

6    they have to be buzzed out or have a key to get out?

7            A.    No.   They could just walk out.

8            Q.    But to get in you have to get -- you have to

9    have a key or get buzzed in?

10           A.    Well, yes.   An electronic swipe card got you

11   in the door.

12           MS. THOMPSON:   I'm sorry, Your Honor.

13   BY MS. THOMPSON:

14           Q.    I'm showing the witness what was previously

15   marked as Defendant's 15.

16                 Is Defendant's 15 the area of the

17   investigations division where you interviewed Mr. Amor?

18           A.    It is.

19           MS. THOMPSON:   And, Your Honor, may I publish

20   Defendant's Exhibit 15?

21           THE COURT:   Any objection?

22           MR. SCALIATINE:   No objection.

23   BY MS. THOMPSON:

24           Q.    Defendant's Exhibit 15 depicts a table and

```
1   three chairs, is that right, Detective?

2        A.   Correct.

3        Q.   And on the right side of this photo, looks

4   like there's an open door?

5        A.   There is.

6        Q.   Where does that -- On the right side, the

7   door that's depicted, where does that go?

8        A.   That goes to the investigation work room

9   where there's typewriters and computers and a sink and

10  coffee pot.

11       Q.   When you were interviewing Bill in that room,

12  did people go in and out of that doorway?

13       A.   During the interview?

14       Q.   Yes.

15       A.   No.

16       Q.   Okay.  Was this -- Does this door close?

17       A.   It does.

18       Q.   Was it closed during your interview with

19  Bill?

20       A.   It was.

21       Q.   And there's three chairs in this photo.

22  There's a chair on the left side of the photograph

23  that's on that side of the desk just by itself.  Do you

24  see where I'm pointing?
```

1         A.    I do.

2         Q.    During the interview, was anybody sitting in

3    that chair?

4         A.    That's where Bill was sitting.

5         Q.    All right.  And I'm going to put over --

6    Well, let me --

7              Can I have the witness come down to the Elmo,

8    Your Honor, or should I --

9         THE COURT:  You may do, yes, if you wish.

10   BY MS. THOMPSON:

11        Q.    Can I have the witness come down to the Elmo?

12             I have given the witness a pen, and I'd ask

13   you to write the initials WA on the chair that Mr. Amor

14   was sitting in during your interview.

15        A.    (Witness complying.)

16        Q.    And you were with Detective Cross, correct?

17        A.    Correct.

18        Q.    And was there a particular chair that

19   Detective Cross sat in during your interview with Bill?

20        A.    He sat in this chair and I sat on the inside

21   chair (indicating).

22        Q.    Can I have you put a C over the chair where

23   Detective Cross sat?

24        A.    (Witness complying.)

1      Q.    Can I have you put a G over the chair where

2  you sat?

3      A.    (Witness complying.)

4      Q.    Thank you.

5      And let the record reflect that the witness

6  has put a WA over the chair on the left side of this

7  photo and a G on the photo over the photo that's -- or

8  the chair that is in the center of the picture and a C

9  over the chair that is the further right depicted in

10  Defendant's Exhibit 15.

11      THE COURT:  The record will so reflect.

12  BY MS. THOMPSON:

13      Q.    And, by the way, as to Defendant's 15, this

14  doesn't show that entire room, correct?

15      A.    It's pretty close.  It's not much bigger than

16  that.  There's another door from the perspective of the

17  viewer and might be where the picture was taken once

18  from the other door.

19      Q.    In that doorway?

20      A.    Yeah.  And that's all there is in that room.

21      Q.    So what is -- The chair that you've marked as

22  where Bill sat, what's behind that chair?

23      A.    Well, you have to go back a ways.  It would

24  just be wall.  There is no cabinets or countertop

```
1     there.
2           Q.    So the only -- Are the only furniture that
3     was in that room at the time you were interviewing Bill
4     just this table and these three chairs?
5           A.    Correct.
6           Q.    You talked about Bill being served with
7     divorce papers?
8           A.    I did.
9           Q.    And you said that happened in the lobby.
10          A.    Correct.
11          Q.    Had you been -- Had Bill been in that
12    investigation room before the papers were served?
13          A.    No.
14          Q.    When Bill was served those divorce papers,
15    were they in an envelope or some kind of package?
16          A.    I believe they were.
17          Q.    And did he open the papers?
18          A.    Yeah.  He was aware of what it was.
19          Q.    But that wasn't my question.  Did he open the
20    papers?
21          A.    He looked at them.
22          Q.    How long did he look at them for?
23          A.    Brief period of time.
24          Q.    Can you tell us how long brief is?
```

1       A.   I cannot.

2       Q.   Did he -- I mean, it was multiple pieces of

3  paper, right?

4       A.   It was.

5       Q.   He didn't sit there and read through every

6  piece of paper?

7       A.   He did not.

8       Q.   It was too short of an amount of time for him

9  to have done that?

10      A.   Correct.

11      Q.   And then what did -- What happened with the

12  paperwork after it had been opened and briefly looked

13  at?

14      A.   Bill hung on to it.

15      Q.   Where was that paperwork while you were

16  questioning him in the room?

17      A.   It was in the room.

18      Q.   Where in the room was it?

19      A.   I don't recall if he put it on the table or

20  just left it on the floor.

21      Q.   Was it sitting on the floor --

22      A.   I don't recall.

23      Q.   And if he put it on the table, was it on the

24  table just right in front of him?

1    A.    That's the only table in there.

2    Q.    For the entire interview?

3    A.    Correct.

4    THE COURT:  May I ask a question about the -- what

5    you call the lobby where the divorce papers were

6    served.  Can someone enter whatever that location is

7    without being given permission or access by law

8    enforcement?

9    THE WITNESS:  No.

10    THE COURT:  And when you say no, you mean they

11    could not get in without being buzzed in?

12    THE WITNESS:  Swiped in.  Buzzed in.  Yes,

13    correct.

14    THE COURT:  So when you call it a lobby, it's not

15    a lobby open to the public.

16    THE WITNESS:  Correct.  It's the investigations

17    lobby in the basement where people are brought down for

18    interviews or to talk with a detective, but you have to

19    be buzzed in or swiped in or someone open the door to

20    let you in.

21    THE COURT:  All right.  Thank you.

22    BY MS. THOMPSON:

23    Q.    When you came into the investigative division

24    after you had gotten back from Chicago, did you go

1    directly to that lobby area?

2         A.    Yes, we did.

3         Q.    And when you say "we," who is "we"?

4         A.    Well, I dropped Bill and Mike off at the

5    front of the building, like I said, and they walked in

6    the front and I drove around the back.  So we entered

7    from opposite sides of the building.

8         Q.    Obviously you don't know what they did

9    between when you dropped them off and when you next saw

10   them, right?

11        A.    Right.

12        Q.    But when you next saw them, they were in the

13   lobby area you just described?

14        A.    Correct.

15        Q.    And was the process server there when you

16   walked in?

17        A.    He was.

18        Q.    And that process server's name was Robert

19   Wiednann; is that right?  W I E D N A N N.

20        A.    I believe.

21        Q.    Did you know Mr. Wiednann?

22        A.    I did not.

23        Q.    At that time did he work for the Sheriff's

24   Office?

1        A.    I'm not sure who he worked for, ma'am.

2        Q.    And what time was it that he was served with

3    the divorce papers?

4        A.    It would have been shortly before 11:37 when

5    I read him his Miranda warnings from that written form.

6        Q.    Then you go into the investigative -- or then

7    you go into the room that we just have been talking

8    about, right?

9        A.    Correct.

10        Q.    And had you or Detective Cross talked about

11    anything with Bill before Detective Cross stood up and

12    said the words that you described in your testimony

13    earlier?

14        A.    We started to go over, ask Bill again about

15    the details of that night when the fire broke out, and

16    he just starting to relay them briefly; and that's when

17    Mike Cross said that.

18        Q.    So he was starting to relay those details

19    when Mike Cross said what he said?

20        A.    Correct.

21        Q.    And Mike Cross stood up when he said that?

22        A.    Correct.

23        Q.    And he spoke loudly.

24        A.    He did.

```
 1        Q.    I mean, he was forceful.

 2        A.    He spoke loudly, yes.

 3        Q.    Well, he was forceful, right?

 4        A.    Well, he spoke loudly.

 5        Q.    And Bill was sitting down at the time that

 6   Mike Cross stood up?

 7        A.    He was.

 8        Q.    Now, we talked earlier about the -- or you

 9   mentioned earlier that the investigative training that

10   you received about questioning suspects was through

11   John Reid & Associates?

12        A.    That was one of the classes I went to, yes.

13        Q.    And the Reid class, the technique that you

14   learned, is to not accept denials from the suspect that

15   they are guilty, right?

16        MR. SCALIATINE:  Objection.

17        THE COURT:  What's the objection?

18        MR. SCALIATINE:  I don't think it's been

19   established when he attended those classes, whether it

20   was before 1995 or after.

21        THE COURT:  Lay a foundation.

22   BY MS. THOMPSON:

23        Q.    When did you receive the -- Where did you

24   attend the class from John Reid about questioning
```

1    suspects?

2          A.    I believe it was at their downtown location.

3          Q.    When was that?

4          A.    I don't remember what year.  I think 1988.

5          Q.    All right.  And in the class that you took at

6    John Reid, did you learn about a technique for

7    interrogating suspects where you do not allow a suspect

8    to deny the assertion by the questioner that the person

9    is guilty?

10         A.    I believe that's part of the training.

11         Q.    I mean, the training is that if someone

12   denies it, you do not let them persist in that denial,

13   right?

14         A.    As I recall.

15         Q.    If they say I didn't do it, you say, I don't

16   believe you.

17         A.    That could have been part of the training.

18         Q.    Or words to that effect, right?

19         A.    I believe.

20         Q.    And the training is that over time someone

21   will come to understand that continuing to deny it is

22   hopeless.

23         A.    I can't say that.

24         Q.    Well, the goal is for the person to stop

```
1   denying they're guilty and to admit to the thing that
2   you're trying to get them to admit to, right?
3        A.   The goal is to get them to admit the truth.
4        Q.   Well, the goal is to get them to admit to
5   something that they are previously denying, right?
6        A.   Again, the goal is to get them to admit the
7   truth.
8        Q.   And so if they say, I didn't do it, your
9   response is, We know that's not what happened, or words
10  to that effect, right?
11       A.   It can be.
12       Q.   And that's the training that you were
13  following when you interrogated William Amor on
14  October 3rd and 4th of 1995.
15       A.   I can't say that's the only training I was
16  following.
17       Q.   Well, what you just described, here Mr. Amor
18  is, once again, going through his account of the events
19  that occurred on September 10th, right?
20       A.   Correct.
21       Q.   And in the account that he's given you up
22  till then, he persisted that he left the apartment
23  without starting a fire, right?
24       A.   Right.
```

1    Q.   And in those accounts when he's told you that

2   he didn't do it, the response when you have been

3   present has been, We know that's not what happened, or

4   to challenge or question his account, right?

5    A.   He never told me that he didn't do it.

6    Q.   But he was giving you an account that didn't

7   include him starting the fire?

8    A.   That evening he was starting the account

9   about the beginning of events on the 10th.

10    Q.   And was this the first time in all of the

11   interviewing and questioning that you had observed of

12   Bill where the response from either you or a detective

13   in the room was, We don't believe you?

14    A.   Well, I talked to Bill on the 10th and it was

15   kind of an informational, fact-gathering, kind of

16   interview.  And that was for that night, the 3rd.  That

17   was really the last time I talked with him.  And so the

18   intervening time between the 10th and 11th and then the

19   3rd, I didn't really talk to Bill at all.

20    THE COURT:  I think the question was:  Was this

21   the first time you ever told Bill you didn't believe

22   him.

23    THE WITNESS:  That I told him that?

24    THE COURT:  That was the question.

BY THE WITNESS:

    A.   It would have been that night.  I mean, I didn't say any words to that effect on the 10th and 11th when I talked to him.  This was the first time that I really had a chance to interview Bill after we had learned what we had learned through the investigation.

    Q.   And when you talked to him earlier at the offices downtown, earlier in the day on October 3rd, in that interview you were also telling him words to the effect that you didn't believe him, right?

    A.   I don't recall.

    Q.   And you did complete a report of -- Well, let me ask you this:  Did you complete a report of your interviews with Bill on October 3rd and October 4th?

    A.   I did not.

    Q.   And so do you have any report -- The report that was done about the interview with Bill back at the Naperville Police Department, those were done by Detective Cross, correct?

    A.   Correct.

    Q.   And even after you -- Even after -- And your testimony is that there was a point after -- Let me start that question again.

138

```
 1              So Mike Cross stands up and he says, you
 2     know, Even Tina thinks that you intentionally set this
 3     fire.  And then Mark Cross leaves, right?
 4          A.   Correct.
 5          Q.   And then you're alone with Bill?
 6          A.   I was.
 7          Q.   And it's your testimony here today that he
 8     put his head on the table and then started -- and then
 9     said, I did it?
10          A.   Correct.
11          Q.   And then he gave you a different account of
12     the fire than he had been giving previously, right?
13          A.   Correct.
14          Q.   And even after he gave you that statement, as
15     you testified earlier, you went over the statement with
16     him a number of times.
17          A.   We did.
18          Q.   You kept going through that account over and
19     over again.
20          A.   Correct.
21          Q.   And at some point, as you said, he did this
22     handwritten statement?
23          A.   He did.
24          Q.   We'll talk about that in a minute.
```

PIPA-Amo-0240391

```
 1                    And then he did this audio statement?

 2        A.    Correct.

 3        Q.    And then ASA Nigohosian came?

 4        A.    He did.

 5        Q.    And then there was more questions, right?

 6        A.    Correct.

 7        Q.    And you were there for part of that?

 8        A.    Part, correct.

 9        Q.    And then there was the audio statement when

10   Detective -- or excuse me, when ASA Nigohosian was

11   there, right?

12        A.    Correct.

13        Q.    You weren't present for that?

14        A.    I was there for parts of the audio recording.

15   But I was not there for the total interview between him

16   and ASA Nigohosian.

17        Q.    But even then there was more questions,

18   right?

19        A.    Correct.

20        Q.    And even after he -- Even on that audio

21   statement, he's continued to be questioned by ASA

22   Nigohosian.

23        A.    He is.

24        Q.    Now, you testified that at some point in your
```

1    interview with Bill, that he told you that vodka

2    spilled on a chair?

3        A.    Yeah.  He said that the vodka spilled off the

4    table onto the newspapers on the floor between the

5    swivel rocker and the couch and the coffee table.  And

6    he also said that it spilled up onto the swivel rocker.

7        Q.    And when is it that he gave you that

8    statement?

9        A.    It was that early morning.

10        Q.    So this is after he said I did it and he's

11    giving you this other account?

12        A.    Correct.

13        Q.    And --

14              If I could have one moment.

15        THE COURT:  Yes.

16    BY MS. THOMPSON:

17        Q.    And again, you don't have a report of the --

18    you don't have a report of the conversation you had

19    with him at that time because that's something

20    Detective Cross was keeping, right?

21        A.    Correct.

22        Q.    Were you taking notes during your interview

23    with Bill?

24        A.    I was not.

1     Q.   So you have a conversation with him and then

2  he completes this handwritten statement, right?

3     A.   He did.

4     Q.   And are you present when he does the

5  handwritten statement?

6     A.   I am.

7     Q.   And why were you present for that?

8     A.   Just to sit with him.

9     Q.   And while he was completing the handwritten

10  statement, you were asking him questions to make sure

11  the details got in there, right?

12     A.   I don't recall.  But I told him just to write

13  down what he had told us.

14     Q.   While he was writing out the handwritten

15  statement, were you asking him questions as he was

16  writing?

17     A.   No.

18     Q.   Were you -- At any point did you say, well,

19  didn't you tell us this and then he wrote that down?

20     A.   I don't recall that.

21     Q.   So did you give him any direction about

22  completing this voluntary statement other than to write

23  down what he -- what had happened?

24     A.   No.

1      MS. THOMPSON:  Permission to publish People's
2  Exhibit 44, Your Honor.
3      THE COURT:  One moment.  I apologize.
4          I take it there's no objection?
5      MR. SCALIATINE:  No objection.
6  BY MS. THOMPSON:
7      Q.   And before I publish People's Exhibit 44, how
8  long did it take Mr. Amor to write this out?
9      A.   I think it was like 20, 25 minutes perhaps.
10     Q.   Was he talking as he was writing?
11     A.   No, not that I recall.
12     Q.   I mean, was there any conversation in the
13  room while he was writing out People's Exhibit 44?
14     A.   I don't recall any substantive conversation.
15     Q.   I'm going to publish People's Exhibit 44.
16          On the monitor in front of you is People's
17  Exhibit 44.  And this, as you testified earlier --
18     THE COURT:  I believe if you bring down -- if I
19  vaguely recall this, if you bring that down, it will
20  expand it; but I could be wrong.
21  BY MS. THOMPSON:
22     Q.   Well, I have a particular question about the
23  document, which I think you can see from here.  And I
24  can show you the document, Investigator, if you need to

143

1    see it.

2             You can see on the monitor the text of the

3    statement, right?

4        A.    I can.

5        Q.    And as you said, it's your testimony Mr. Amor

6    wrote this?

7        A.    He did.

8        Q.    And do you see that on the right side of the

9    statement most of the words end before the end line

10   there of the statement paper?

11       A.    I do.

12       Q.    And there is one line that extends over the

13   margin of where the lines end on the right side of the

14   page, right?

15       A.    I can see that.

16       Q.    And can you see the words that extend over

17   the line?

18       A.    I cannot.

19       Q.    So the line before it is, "When I reached up

20   to mix a drink, comma, I spilled the vodka on the

21   Chicago Tribune."  And then the words that extend over

22   the line there, "and" is inside the line and the word

23   "chair" is outside the line.  Do you see that?

24       A.    I can't read that from here.

```
1          Q.    And let me -- I can approach and show the
2     witness.  On People's Exhibit 44?
3          A.    Yep, I see it.
4          Q.    That's Line 6, correct?
5          A.    Correct.
6          Q.    There's one line -- or one word in this
7     entire document that's over in the right margin.  Do
8     you see that?
9          A.    Correct.
10         Q.    And that word is "chair"?
11         A.    Correct.
12         Q.    So without the word "chair," this reads, I
13    spilled the vodka on the Chicago Tribune and laying
14    next to the table the vodka was on."  If you omit the
15    word "chair," correct?
16         A.    Correct.
17         Q.    And it's your testimony that that's not
18    something you discussed with Mr. Amor while he was
19    writing out the statement.
20         A.    No.  When he finished, I read over it and I
21    told him that "You said you spilled it up on the chair"
22    and then he added that.
23         Q.    Oh, so that was added later?
24         A.    Correct.
```

```
 1          Q.    Okay.  Are there any initials on there to
 2    indicate that that was the change?
 3          A.    No.
 4          Q.    There's also a word that's crossed out here
 5    on Line 15.  Do you see there's a cross-out there?
 6          A.    I do.
 7          Q.    How did that cross-out come to be there?
 8          A.    I don't recall.  I don't know.
 9          Q.    Okay.  Other than adding the word "chair,"
10    are there any other changes that Mr. Amor made to this
11    statement after he was done?
12          A.    Not that I recall.
13          Q.    But that's something he had to be reminded to
14    put in there?
15          A.    Correct.
16          Q.    Had he told you before he wrote out the
17    statement -- Well, let me ask you something different.
18          THE COURT:  Does the sentence make sense unless he
19    also adds the word "and"?
20          MS. THOMPSON:  I mean ...
21          THE COURT:  Can I see the exhibit?
22          MS. THOMPSON:  Yes, Your Honor.
23                      (Document tendered.)
24          THE COURT:  So when you reminded him that he also
```

 1    indicated something about the chair -- it's your

 2    testimony that he added "chair" -- it could have been

 3    "and chair," I presume.  You don't have a specific

 4    recollection.

 5        THE WITNESS:  Correct.

 6    BY MS. THOMPSON:

 7        Q.    So he might have added "and chair"?

 8        A.    Correct.

 9        Q.    And --

10        THE COURT:  Was it his handwriting?

11        THE WITNESS:  Yes.

12    BY MS. THOMPSON:

13        Q.    But your reminder was that he said -- he had

14    said the vodka had spilled on the chair too.

15        A.    Correct.

16        Q.    That's not something that was in the

17    statement until you reminded him.

18        A.    Correct.

19        Q.    And at the time that you were -- Well, let me

20    ask you this too.  You last talked to Mr. Amor on

21    September 15th.

22        A.    Briefly, correct.

23        Q.    Right.  And it's your understanding that

24    nobody from the Naperville Police Department had talked

1    to him from the 16th until you and Detective Cross were

2    there on October 3rd.

3        A.    No, that's not correct.

4        Q.    Had you spoken to him in that intervening

5    time?

6        A.    I had not.

7        Q.    Okay.  Obviously after you arrested Mr. Amor

8    on September 15th, he did have conversations with other

9    members of the Naperville Police Department.

10       A.    He did.

11       Q.    But after that date, no one talked to him

12   from the Naperville Police Department until

13   October 3rd.

14       A.    After what date?

15       Q.    After -- after the end of the day on

16   September 15th.

17       A.    That's my understanding.

18       Q.    Okay.  And in that intervening time, as you

19   said, there were more investigative steps that you did,

20   right?

21       A.    Correct.

22       Q.    And at the time that you talked to him on

23   October 3rd, it was your belief that the origin of this

24   fire was on the chair, right?

 1          MR. SCALIATINE:  Objection.

 2          THE COURT:  Overruled.

 3    BY THE WITNESS:

 4          A.    I don't -- I am not a fire investigator.  So

 5    the origin -- the exact origin of where it started I

 6    can't speak to.

 7          Q.    Well, at the time that you interviewed

 8    Mr. Amor on October 3rd when you asked him about adding

 9    the chair to that statement, did you believe that the

10    chair was the area where this fire began?

11          A.    It was the general area, correct.

12          Q.    When he -- I want to ask you about the

13    specific conversation you had with Bill before he

14    signed that statement.  You said that he told you that

15    when he threw the cigarette on the newspapers, that

16    they were sizzling and smoldering?

17          A.    Correct.

18          Q.    Did he tell you that the -- And he told you

19    that those newspapers were on the floor, right?

20          A.    Correct.

21          Q.    And did he use the specific words "sizzling

22    and smoldering"?

23          A.    He did.

24          Q.    He maintained throughout all of your

1    interviews with him that he was not motivated by life

2    insurance, right?

3         A.    Correct.

4         Q.    And he -- Did you ever ask him if he was

5    aware that there was life insurance?

6         A.    I did.

7         Q.    And what did he say about that?

8         A.    He told me that he was unaware if she had an

9    insurance policy -- life insurance policy.

10        Q.    And when it was that Mike Cross stood up and

11   said, you know, Even Tina believes this was

12   intentional, and left, at that point his demeanor

13   changed, right?

14        A.    It did.

15        Q.    He became more subdued?

16        A.    He did.

17        Q.    He became quieter, right?

18        A.    He did.

19        Q.    And we heard some of the statement that he

20   read on the audio.  Before he gave that statement on

21   the audio, you gave him some instructions about how to

22   do that, right?

23        A.    I did.

24        Q.    I mean, you told him you need to be heard on

1    the tape recorder, right?

2         A.   Correct.

3         Q.   So you need to speak up?

4         A.   Correct.

5         Q.   And you need to speak in a normal tone so

6    that you can be heard?

7         A.   Correct.

8         Q.   In your -- All of your conversations with

9    Bill about the smoke detector, he never told you that

10   he took the entire smoke detector down, right?

11        A.   He did.  He said he may have taken it down

12   when we pointed out that it was not on the wall where

13   he said it was when we couldn't find a smoke alarm

14   anywhere in the apartment.

15        Q.   Well, before that did he tell you that he had

16   taken the cover off?

17        A.   He did.

18        Q.   Did he tell you what kind of smoke detector

19   that unit had?

20        A.   He did not.  It was battery operated.

21        Q.   Because he told you he had taken it down to

22   put batteries into it and he never put it back up,

23   right?

24        A.   He said he had taken the cover off, pulled

1    the battery out, went to the store to buy a new battery

2    but never replaced the battery cover.

3         Q.    All right.  And he never --

4         A.    Initially.

5         Q.    I'm sorry.  Please finish your answer.

6         A.    That's what he initially told us.

7         Q.    All right.  And he never told you at any

8    point that he had taken the smoke detector down so that

9    he could start a fire more easily.

10        A.    He did not say that.

11        Q.    When --

12              Well, can I have one moment, Your Honor?

13        THE COURT:  Yes.

14   BY MS. THOMPSON:

15        Q.    Just a couple more questions, Investigator.

16              How tall were you in October of 1995?

17        A.    Back then?

18        Q.    Yes.

19        A.    About five ten.

20        THE COURT:  How tall are you now?

21        THE WITNESS:  About five nine and a half.

22   BY MS. THOMPSON:

23        Q.    And this is not a good question to ask a

24   woman, but how much did you weigh at that time, sir?

```
 1          A.    I weigh about the same.  185 pounds.

 2          Q.    And Bill Amor was shorter than you, right?

 3          A.    Correct.

 4          Q.    And he weighed less than you?

 5          A.    He did.

 6          Q.    And at that time was Mike Cross a bigger guy

 7    than you?

 8          A.    Yes.

 9          Q.    He was taller -- a little taller than you?

10          A.    I don't believe he was taller.

11          Q.    Weighed a little more?

12          A.    Yes.

13          Q.    When ASA Nigohosian came to the police

14    station on October 4th after you had taken the written

15    statement and the audio statement from Mr. Amor, you

16    and Detective Cross talked to him for a little while,

17    right?

18          A.    Correct.

19          Q.    And you were informing him about the -- what

20    the investigation was about?

21          A.    Correct.

22          Q.    And you were giving him some background on

23    the case?

24          A.    Yes.
```

1      Q.    Had you ever communicated with ASA Nigohosian

2  about this case before October 4th?

3      A.    I had not.

4      Q.    And let me ask you this:  Is it your

5  testimony that earlier that day -- Well, let me start

6  that with a different question.

7            At what point on October 3rd or October 4th

8  was Bill arrested?

9      A.    Well, he was never placed in handcuffs at any

10  point in the police station.  I would say formally he

11  was arrested after Mr. Nigohosian interviewed him early

12  that morning.

13     Q.    So that was early in the morning on

14  October 4th?

15     A.    It was.

16     Q.    I mean, isn't it true that at any point after

17  4:00 o'clock p.m. on October 3rd that if Bill Amor had

18  asked to leave, you would have said no?

19     A.    Not correct.

20     MR. SCALIATINE:  Objection, relevance,

21  speculation.

22     THE COURT:  What is the relevance?

23     MS. THOMPSON:  Well, the relevance is the

24  voluntariness of the statement.  And we have

1    impeachment on this point, Your Honor, which I'm laying

2    the foundation for now.

3        THE COURT:  Overruled.  But I don't know that I

4    heard the answer.  Do you want to reask the question?

5        MS. THOMPSON:  Sure.

6    BY MS. THOMPSON:

7        Q.    And let me ask you that question in a

8    different way:  Isn't it true that William Amor was not

9    free to leave the custody of the Naperville Police

10   Department after 4:00 o'clock on October 3rd of 1995?

11       A.    No.

12       Q.    When ASA Nigohosian came to the police

13   department --

14       A.    Let me back up.  It was kind of a negative

15   question.  He was free to go at that time.

16       Q.    That is your testimony today?

17       THE COURT:  At that time, meaning at 4:00 o'clock?

18       THE WITNESS:  4:00 o'clock, yes.

19   BY MS. THOMPSON:

20       Q.    Isn't it true that when ASA Nigohosian came

21   to the Naperville Police Department --

22       THE COURT:  And by the way, 4:00 p.m.?

23       THE WITNESS:  Correct, 4:00 p.m.

24       THE COURT:  Okay.

1    BY MS. THOMPSON:

2         Q.   Isn't it true that when ASA Nigohosian came

3    to the police station on October 4th, that you told him

4    that Bill had been in custody since 4:00 o'clock on

5    October 3rd?

6         A.   I didn't tell him that, but he was with us

7    since that time.  But if he at any point prior to his

8    admission about dropping the cigarette on the papers

9    had told me that he wanted to leave, he would have

10   walked out the door.

11        Q.   Is it your testimony that neither you nor

12   Detective Cross told ASA Nigohosian that Bill was in

13   custody at 4:00 p.m. on October 3rd?

14        A.   I don't know what Detective Cross told him.

15   But my testimony is that if he had said he wanted to

16   leave before he made that statement about dropping the

17   cigarette on the papers, he would have been allowed to

18   leave.

19        MS. THOMPSON:  No further questions, Your Honor.

20        THE COURT:  Redirect?

21                  REDIRECT EXAMINATION

22                  BY MR. SCALIATINE:

23        Q.   Investigator, as to that point, when you

24   picked up the Defendant at the DeKalb County Jail with

1  Detective Cross, you asked him if he would accompany

2  you to Chicago, correct?

3       A.    Correct.

4       Q.    Because -- And you went to Chicago with him

5  so that he could be interviewed.

6       A.    Correct.

7       Q.    Had he previous to going into custody in

8  DeKalb agreed to go to that interview?

9       A.    He did.

10      Q.    And so when you approached him and Detective

11 Cross approached him in DeKalb, did you say, hey, do

12 you want to go to that interview?

13      A.    Yes.

14      Q.    And he agreed to?

15      A.    He did.

16      Q.    If he told you at the DeKalb County Jail to

17 pound sand, what would you have done?

18      A.    We would have got in our car and driven back

19 to Naperville.

20      Q.    All right.  And instead, he agreed to go down

21 to Chicago to do the interview that he had previously

22 promised to do.

23      A.    He did.

24      Q.    And when he was there, were there times when

1   you and Detective Cross were speaking to the person who

2   was performing this interview?

3        A.   Yes.

4        Q.   And where was the Defendant at that time?

5        A.   He was in the lobby of the office.

6        Q.   Could he have walked out the front door?

7        A.   He could have.

8        Q.   Did he?

9        A.   No.

10       Q.   All right.  And after he had conducted this

11  interview, there was more questions, right?

12       A.   Correct.

13       Q.   Did he say at any time from -- at any time

14  that he was in that office in Chicago that he didn't

15  want to talk to you?

16       A.   He did not.

17       Q.   Or anybody else?

18       A.   He did not.

19       Q.   Or that he wanted to leave?

20       A.   He never said that.

21       Q.   If he wanted to leave, would you have given

22  him a ride back to Naperville?

23       A.   We would have.

24       Q.   All right.  And when that was all done at

1    10:30, did you -- was he asked whether or not he wanted

2    to -- whether or not he was willing to go back to the

3    Naperville Police Department?

4         A.    He was.

5         Q.    He wasn't told go back home.  He was

6    specifically asked as to the Naperville Police

7    Department for another interview.

8         A.    He was.

9         Q.    And he agreed to that.

10        A.    He did.

11        Q.    He got in the car, correct?

12        A.    He did.

13        Q.    And you all drove down to the Naperville

14    Police Department, correct?

15        A.    We did.

16        Q.    He walked in on his own?

17        A.    He did.

18        Q.    All right.  And just so we're clear, counsel

19    asked you questions about you are the person who

20    arrested him on the outstanding warrant that put him

21    into the DeKalb County Jail, correct?

22        A.    Correct.

23        Q.    Counsel asked you if Tina Miceli was arrested

24    that day.

1       A.    She did.

2       Q.    And you said she wasn't, correct?

3       A.    Correct.

4       Q.    Did she have an outstanding warrant?

5       A.    She did not.

6       Q.    All right.  So was the Defendant on 9-15 when

7    his motor vehicle that he was in was pulled over, was

8    he taken into custody for an outstanding warrant or for

9    this case?

10       A.    He had the outstanding warrant for DeKalb

11   County.

12       Q.    All right.  And he agreed to talk to other

13   officers that day?

14       A.    He did.

15       Q.    Counsel asked you questions about not

16   preparing a police report of the events of October

17   10th -- October 3rd and October 4th.  You did not,

18   correct?

19       A.    I did not.

20       Q.    As you sit here now, do you recall the

21   Defendant placing his head down and making the

22   statements he did as you earlier testified to?

23       A.    I do.

24       Q.    And you personally recall all the statements,

```
1    all the testimony you have given today?
2         A.    I do.
3         Q.    After he was ultimately arrested, after he
4    was talked to by Investigator Nigohosian, you completed
5    reports, correct?
6         A.    Correct.
7         Q.    You later on testified in the case?
8         A.    I did.
9         Q.    Counsel asked you whether or not -- she said
10   in 1995 the case didn't go away.  Did you do anything
11   on this case from 1995 to a year or two ago?
12        A.    Other than testifying in the trial, no.
13        Q.    All right.
14              If I could have one second.
15        THE COURT:  Yes.
16   BY MR. SCALIATINE:
17        Q.    Counsel asked you if you continued to speak
18   to the Defendant after he had made his admissions to
19   clarify his statements.
20        A.    Correct.
21        Q.    Was that your intent and purpose?  Why did
22   you continue to ask him questions after he made his
23   initial admissions?
24        A.    To clarify what he was telling us.
```

```
 1        Q.    And to make sure you got it right?
 2        A.    Correct.
 3        Q.    Why did you have him do a written statement?
 4        A.    I wanted it to be in his own words; him to
 5   write down what he told us in his own words.
 6        Q.    And why was it recorded?
 7        A.    Pardon me?  Why was it recorded?  Again, for
 8   the same reason that he could relate his story in his
 9   own words.
10        Q.    And there would be documentation of it?
11        A.    Correct.
12        MR. SCALIATINE:  No further questions.
13        THE COURT:  Any recross?
14        MS. THOMPSON:  Very briefly, Your Honor.
15                      RECROSS-EXAMINATION
16                      BY MS. THOMPSON:
17        Q.    You essentially had three days that you
18   interacted with Mr. Amor on this case, right?
19        A.    Essentially, correct.
20        Q.    So on 9-11 the interview at Pam's, right?
21        A.    Correct.
22        Q.    And then on 9-15 you appropriately arrested
23   him for something else, but you interacted with him,
24   right?
```

```
 1          A.    I did.

 2          Q.    And then on October 3rd and October 4th, you

 3    had sort of a third time you were with him, right?

 4          A.    Correct.

 5          Q.    And in all three of those times, Bill Amor

 6    was agreeable as to everything you ever asked him,

 7    right?

 8          A.    Correct.

 9          Q.    I mean, he cooperated with you 100 percent.

10          A.    He did.

11          Q.    If you wanted to meet with him in a certain

12    room, he agreed to that, right?

13          A.    Correct.

14          Q.    If you wanted to drive to Chicago for an

15    interview, he agreed to that.

16          A.    He did.

17          Q.    If you wanted to come back to Naperville, he

18    agreed to that.

19          A.    He did.

20          Q.    When you arrested him on this other matter,

21    he was agreeable to go to the station with you.

22          A.    Correct.

23          Q.    So he -- When there were things that you

24    wanted, he agreed to those things, right?
```

```
1        A.   He did.

2        MS. THOMPSON:  Okay.  No further questions.

3        THE COURT:  Detective Guerrieri, thank you.  You

4   may step down.

5        MS. THOMPSON:  We would release Investigator

6   Guerrieri from our subpoena, Your Honor.

7        THE COURT:  All right.  The subpoena is

8   discharged.

9        THE WITNESS:  Thank you.

10        THE COURT:  This seems like a natural breaking

11   point for the day.

12             All right.  If we could discuss briefly

13   scheduling as it relates to tomorrow.  Is there a full

14   day of witnesses on the part of the State tomorrow?

15        MR. SCALIATINE:  There are two witnesses left,

16   Judge.

17        THE COURT:  I presume one is Cross.

18        MR. SCALIATINE:  And there would be a cross of

19   Cross.

20        THE COURT:  A cross of Cross.

21        MR. SCALIATINE:  And then attorney -- the private

22   attorney, Nigohosian.

23        THE COURT:  All right.  So -- Judge Bakalis -- I

24   ask only because the judge who is taking our call when
```