# EXHIBIT I

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


WILLIAM E. AMOR                    )
                                   )
          Plaintiff,               )
                                   )
   vs.                             )   No.18 CV 02523
                                   )
NAPERVILLE POLICE OFFICERS         )
MICHAEL CROSS; ROBERT              )
GUERRERI; THE ESTATE OF MARK       )
CARLSON; BRIAN CUNNINGHAM;
JON RIPSKY; OTHER
UNIDENTIFIED NAPERVILLE
POLICE OFFICERS; AND THE CITY
OF NAPERVILLE,

          Defendants.



          The VIDEOTAPED deposition of

INVESTIGATOR ROBERT GUERRERI, taken under oath

at 311 North Aberdeen Street, 3rd Floor,

Chicago, Illinois, at 10:13 A.M. on Friday,

February 7, 2020 pursuant to the Rules of the

United States District Court, Northern District

of Illinois, before Carol M. Siebert-LaMonica,

C.S.R. No. 084.001355 in and for the County of

Cook and State of Illinois, pursuant to notice.

Page 2

 1   APPEARANCES:

 2

 3        LOEVY & LOEVY, by

 4        MS. TARA THOMPSON

 5        MS. MARIAH GARCIA

 6        311 North Aberdeen Street, 4th Floor

 7        Chicago, Illinois  60607

 8         (Tara@loevy.com)

 9         (Mariah@loevy.com)

10             Appeared on behalf of the plaintiff;

11

12        THE SOTOS LAW FIRM, P.C., by

13        MR. JOSPEH M. POLICK

14        141 West Jackson Blvd.

15        Suite 1240A

16        Chicago, IL  60604

17        (Jpolick@jsotoslaw.com)

18             Appeared on behalf of the defendants;

19

20

21

22

23

24

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 3

1    ALSO PRESENT:

2              MR. KEVIN OFFETT, VIDEOGRAPHER

3              (Www.planetdepos.com)

4              MR. WILLIAM AMOR, plaintiff.

5                   - - - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Siebert & Assocs. Court Reporters, Inc.                cmsreporters@comcast.net

Page 4

 1              THE VIDEOGRAPHER:  Here begins disc

 2    number 1 of the videotaped deposition of Robert

 3    Guerrieri in the matter of William Amor v.

 4    Officer Michael Cross, et al., in the United

 5    States District Court for the Northern District

 6    of Illinois, Eastern Division, Case No.

 7    18 CV 2523.

 8              Today's date is Friday, February 7,

 9    2020. The time on the video monitor is 10:15

10    A.M.

11              The videographer is Kevin Offett

12    representing Planet Depos.

13              This video deposition if taking pace

14    at 311 North Aberdeen Street, Chicago,

15    Illinois, 60607.

16              Will counsel please voice identify

17    themselves and state who they represent.

18              MS. THOMPSON:  My name is Tara

19    Thompson and I represent the plaintiff, William

20    Amor.  And I would also note that the

21    plaintiff, William Amor, is also present this

22    morning.

23              MS. GARCIA:  My name is Mariah Garcia,

24    I also represent the plaintiff.

Page 5

1              MR. POLICK:   Joseph Polick,

2    P O L I C K, on behalf of the defendants and

3    the deponent Robert Guerrieri.

4              THE VIDEOGRAPHER:  The court reporter

5    today is Carol Siebert-LaMonica representing

6    Siebert & Associates Court Reporters, Inc.

7                   Will the court reporter please

8    swear in the witness.

9

10             INVESTIGATOR ROBERT GUERRIERI,

11   called as a witness herein, having been first

12   duly sworn, was examined upon oral

13   interrogatories and testified as follows:

14                   (Witness sworn.)

15                 DIRECT EXAMINATION

16   BY MS. THOMPSON:

17             Good morning, Investigator

18   Guerrieri.

19        A.   Good morning.

20        Q.   My name is Tara Thompson, and I

21   represent the plaintiff in this case.

22                 Investigator, have you ever given

23   a deposition before?

24        A.   I have.

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 6

1        Q.   I want to give you just a couple of

2    ground rules, which I will do my best to follow

3    as well, and they may be things you know from

4    prior experience.

5                 I will do my very best not to

6    interrupt you when you are giving an answer and

7    if I make a mistake about that I will apologize

8    to you, but I will do my best not to interrupt

9    you.

10                I would just ask that if I am

11   asking a question you wait until the question

12   is finished before you answer so that we are

13   not talking over each other for the court

14   reporter, okay?

15       A.   Okay.

16       Q.   Similarly, although this is being

17   videotaped this morning, the court reporter has

18   to type down what we both say, so if you say

19   ugh-ugh or uh-uh or shrug, she is not going to

20   be able to record that, so please give verbal

21   answers in answering these questions, all

22   right?

23       A.   All right.

24       Q.   If you need to take a break at any

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 7

1    time, obviously you can do that whenever, I

2    would just ask if there is a question pending

3    that you answer it before breaking, okay?

4         A.   Okay.

5         Q.   Is there any reason that you would be

6    unable to give true and accurate testimony

7    today?

8         A.   No.

9         Q.   Did you review any records in

10   preparing for this deposition?

11        A.   I did.

12        Q.   What did you review?

13        A.   My police reports and my previous

14   testimony.

15        Q.   You have previously testified twice in

16   this case, is that correct?

17             MR. POLICK:   Objection to the form of

18   the question.  You can go ahead and answer.

19             THE WITNESS:  Three times.

20   BY MS. THOMPSON:

21        Q.   Okay.  Did you review all three pieces

22   of testimony?

23        A.   I did.

24        Q.   And when you say that you reviewed

Page 8

1    police reports, did you review police reports

2    that you personally prepared related to Mr.

3    Amor's case?

4        A.    That's correct.

5        Q.    Did you review any police reports that

6    you did not personally prepare?

7        A.    I did.

8        Q.    What police reports did you review

9    that you did not personally prepare?

10       A.    The police reports generated by

11   Naperville police relative to this

12   investigation.

13       Q.    Did you review what you believed to be

14   all of the police reports that Naperville

15   generated relative to this investigation?

16            MS. POLICK:  Objection to the form.

17   Go ahead and answer.

18            THE WITNESS:  I don't believe I

19   reviewed every report.

20   BY MS. THOMPSON:

21       Q.    Do you know how many reports you

22   reviewed that were created by the Naperville

23   Police Department related to this investigation

24   as part of your preparation for this

Page 9

1    deposition?

2         A.   Just other investigative reports,

3    narrative-type reports.

4         Q.   Did you review your interrogatory

5    responses in preparation for this deposition?

6         A.   I -- not extensively, no.

7         Q.   Did you review anyone else's testimony

8    besides your own in preparation for this

9    deposition?

10        A.   No.

11        Q.   Had you ever read transcripts of any

12   testimony, any sworn testimony related to

13   Mr. Amor's case other than testimony you

14   yourself have given?

15        A.   I don't believe so.

16        Q.   I'm not asking you about the content

17   of any communications that you had with your

18   counsel but did you meet with your counsel to

19   prepare for this deposition?

20        A.   Yes, I did.

21        Q.   How many times?

22        A.   Twice.

23        Q.   When was the first of those meetings?

24        A.   We met on Wednesday and then we met

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 10

1    yesterday.

2         Q.    How long was your meeting on

3    Wednesday?

4         A.    It was about five hours.

5         Q.    And how long was your meeting

6    yesterday?

7         A.    About the same.

8         Q.    Was anyone present for that meeting --

9    let me restart that question.

10                   Was anyone present for either of

11   those meetings besides you and your counsel?

12        A.    No.

13        Q.    Other than communications with counsel

14   have you talked with anyone about your

15   deposition today?

16        A.    No.

17        Q.    Now, my understanding, Investigator,

18   is that the parties, and this would have been

19   an agreement was made by prior counsel to --

20   for Mr. Amor, although as his current counsel

21   we intend to honor it, but there was a prior

22   agreement between the parties relating to the

23   providing of information that relates to

24   punitive damages in this case.

Page 11

1               And my question for you is

2      whether -- well, let me ask you this.

3               My understanding of that

4      agreement in general terms is that there is an

5      agreement to hold off on answering -- on asking

6      questions that might relate to punitive

7      damages, questions that the plaintiff believes

8      they have a right to ask, if and until there

9      has been a decision in this case related to

10     summary judgment or this matter is proceeding

11     to trial.

12              And I don't intend that summary

13     to reflect the entirety of the agreement, just

14     that there is an agreement to wait until a

15     future time to provide that information.

16              And my question to you is whether

17     you intend to abide by the terms of that

18     agreement in providing punitive damages

19     information later pursuant to the term of that

20     agreement?

21          MR. POLICK:   I'm going to pose an

22     objection, because I think your question

23     impacts attorney/client privilege.  And I'm

24     going to instruct my client not to answer that

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

```
                                                    Page 12
 1    question because it would impact communications

 2    that we have had about this case and about that

 3    subject.

 4                 So if you have any questions

 5    about that, counsel, I know you raised that

 6    before we started the deposition this morning,

 7    and you can certainly direct those to me

 8    without directing them to my client.

 9    BY MS. THOMPSON:

10         Q.   Are you intending to refuse to answer

11    the question of whether you would abide by the

12    terms of a prior agreement with respect to the

13    providing of information related to punitive

14    damages based on the advice of your attorney?

15                 MR. POLICK:   You can go ahead and

16    answer that.

17                 THE WITNESS:   What was the question?

18    BY MR. THOMPSON:

19         Q.   Sure.  Your counsel has just

20    instructed you, I think, not to answer the

21    question I just posed.

22                 My question for you is whether

23    you are going to on the advice of your counsel

24    not answer the question that I just asked you
```

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

                                                                    Page 13

1      about whether you will abide by the terms of

2      the parties' agreement with respect to punitive

3      damages.

4                     So the question is, are you

5      taking the advice of your counsel in refusing

6      to answer that question?

7           A.   Yes, I am.

8                MR. POLICK:   On behalf of my client

9      we intend to abide by whatever agreement was

10     reached between the parties on that subject.

11     BY MS. GARCIA:

12          Q.   Investigator Guerrieri, obviously by

13     being here this morning you are aware that

14     there is a lawsuit that's been filed by

15     Mr. Amor that includes the naming of you as a

16     defendant related to his prior conviction in

17     DuPage County with respect to the death of

18     Marianne Miceli, is that correct?

19          A.   That's correct.

20          Q.   And other than conversations you had

21     with your counsel, because I don't want you to

22     reveal any information that relates to those

23     communications, have you had conversations with

24     anyone about anything having to do with this

Page 14

1    lawsuit?

2         A.    That the --

3              MR. POLICK:    Outside of the presence

4    of his counsel, is that the extent of your

5    question, because it seems a little broad.   If

6    you are limiting the question to communications

7    he has had outside the presence of his counsel,

8    then fine, I will let him answer that.

9    BY MS. THOMPSON:

10        Q.    Let me pose a different question.

11              Have you had conversations with

12   people who were not your attorney in the

13   presence of your attorney about this lawsuit?

14        A.    No. In the presence of my attorney?

15        Q.    Yes.

16        A.    No.

17        Q.    And setting aside any communications

18   with your counsel, because again I'm not asking

19   you to talk about those, have you had any

20   conversations with anyone who is not your

21   attorney about this lawsuit?

22        A.    My Deputy Chief is aware that I am not

23   at work today, because I had to come downtown

24   for this, but not anything related to the

Page 15

1    substance, just I should be at work today, so

2    obviously I had to tell them.

3         Q.    Other than scheduling conversations

4    with your Deputy Chief, have you ever had a

5    conversation with anyone else about anything

6    having to do with this lawsuit other than your

7    attorneys?

8         A.    Scheduling, no.

9         Q.    Who is your Deputy Chief?

10        A.    Dave Zdan, Z D A N.

11        Q.    Investigator, you started off by

12   telling us that you have been deposed before,

13   how many times have you been deposed?

14        A.    One time.

15        Q.    And were you being deposed in

16   connection with a civil lawsuit?

17        A.    Yes.

18        Q.    Do you remember the names of any of

19   the parties to that lawsuit?

20        A.    I was a witness, I investigated a case

21   for the Sheriff's Office, so the plaintiff in

22   that case is David Hakim, H A K I M.  He is a

23   sheriff's deputy. And I believe the defendant

24   is Safariland, a firearm ammunition

Page 16

1    manufacturer.

2                    (Recess.)

3                        (Question and answer read.)

4    BY MS. THOMPSON:

5         Q.   We had a brief break for the court

6    reporter to fix something.

7                        Was there more information you

8    wanted to give in response to that answer or

9    was that your complete response?

10        A.   That's all.

11        Q.   Okay.  When was that deposition?

12        A.   Oh, two years ago.

13        Q.   Did you know Mr. Hakim other than in

14   the context of your investigation of that case?

15        A.   I did.

16        Q.   Is he someone that you consider to be

17   a friend?

18             MS. POLICK:  Objection to the

19   relevance, but you can go ahead and answer.

20             THE WITNESS:  Yes.

21   BY MS. THOMPSON:

22        Q.   You've indicated in your interrogatory

23   responses that you have been named as a

24   defendant in a lawsuit, Pletzke, P L E T Z K E,

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 17

1    versus Guerrieri, which is 13 CV 2398.

2              Have you not yet been -- well,

3    let me start that question again.

4              As to that case that you

5    identified, Pletzke, have you been deposed in

6    that case?

7         A.   No.

8         Q.   Is that matter still pending?

9         A.   No.

10        Q.   Have you had any communications with

11   anyone other than lawyers that represent you

12   about the Pletzke matter?

13        A.   No.

14        Q.   I want to go briefly through some

15   professional and educational background with

16   you, Investigator.

17              Where did you graduate from high

18   school?

19        A.   Lyons Township High School in

20   LaGrange.

21        Q.   What year?

22        A.   1977.

23        Q.   Have you attended college?

24        A.   I have.

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 18

1      Q.   Did you graduate?

2      A.   I did.

3      Q.   What college degree do you have or

4   degrees do you have?

5      A.   I have an Associate's from College of

6   DuPage and a Bachelor of Science from Southern

7   Illinois University at Carbondale.

8      Q.   What was your major at SIU?

9      A.   Administration of Justice.

10     Q.   When did you get that degree?

11     A.   1981.

12     Q.   When did you get your Associate's

13   Degree?

14     A.   1979.

15     Q.   Have you attended college in the

16   pursuit of any degrees other than the two that

17   you received?

18     A.   No.

19     Q.   Have you attended any graduate level

20   courses?

21     A.   I attended the Northwestern Command

22   Staff, staff and command school, it was ten

23   weeks.

24     Q.   When did you do that?

Page 19

1        A.    That was in 2009.

2        Q.    Have you ever served in the military?

3        A.    I have not.

4        Q.    Do you have any technical or

5    vocational skills training?

6        A.    No.

7        Q.    Prior to joining the Naperville Police

8    Department did you work at the Riverside Police

9    Department?

10       A.    I did.

11       Q.    And am I correct that you were a

12   patrol officer there for about three years?

13       A.    Correct.

14       Q.    And did you hold any other ranks in

15   the Riverside PD other than patrol officer

16   while you worked there?

17       A.    No.

18       Q.    Have you had any other law enforcement

19   positions other than with the Riverside Police

20   Department, the Naperville Police Department,

21   and to the extent to which you consider your

22   employment with the DuPage County State's

23   Attorney's Office to be a law enforcement

24   position?

Page 20

1        A.    Beyond those?

2        Q.    Yes.

3        A.    I was a Brookfield Zoo Police Officer

4   for a few months prior to starting at

5   Riverside.

6        Q.    Were you a sworn officer with the Zoo?

7        A.    Correct.

8        Q.    Any other law enforcement positions

9   besides those you have identified?

10       A.    No.

11       Q.    Did you attend the academy before your

12  position with the Brookfield Zoo?

13       A.    No, I attended the academy before the

14  Riverside position.

15       Q.    When did you attend the academy, what

16  year?

17       A.    Would have been 1982.

18       Q.    Is there a reason that you left the

19  Riverside Police Department?

20       A.    Yes.

21       Q.    What was the reason?

22       A.    I wanted to go to an agency that was

23  growing, had more opportunities.  The Village

24  of Riverside was a small town, was not growing,

Page 21

1    and Naperville was growing at that time.

2         Q.   Is there a reason you left the

3    Brookfield Zoo Police Department?

4         A.   Yes.

5         Q.   What was that?

6         A.   The same reasons, more opportunity at

7    a police department.

8         Q.   And is there a reason you left the

9    Naperville Police Department to go to the

10   State's Attorney's Office?

11        A.   Yes.

12        Q.   What is that reason?

13        A.   I retired from the Naperville Police

14   Department, and I wanted to continue my career

15   in law enforcement.

16        Q.   Have you ever applied for a law

17   enforcement position for which you were not

18   selected?

19        A.   Well, when I was testing back in the

20   '80's certainly there was agencies I tested

21   with that I was never hired for or I was on a

22   list to be hired and then I was hired by

23   another agency first.

24        Q.   Other than in the '80's, when you were

Page 22

1    going through that process, have you ever

2    applied for a law enforcement position that you

3    did not receive?

4        A.    No.

5        Q.    Did you test for the Naperville Police

6    Department when you were hired there or was

7    that an application process outside of the

8    test?

9        A.    No, it was a standard kind of testing

10   for Naperville.

11       Q.    Did you apply for the Naperville

12   Police Department more than one time?

13       A.    No.

14       Q.    Am I correct that your career at the

15   Naperville Police Department was from roughly

16   1985 to 2009?

17       A.    Correct.

18       Q.    I want to go through your assignments

19   while you were at the Naperville Police

20   Department, did you start as a patrol officer?

21       A.    I did.

22       Q.    And was there a particular unit to

23   which you were assigned during the time that

24   you were a patrol officer with Naperville?

Page 23

1       A.   No.

2       Q.   At some point did you start working

3   with the special enforcement unit?

4       A.   I did.

5       Q.   When did you start there?

6       A.   Approximately 1988.

7       Q.   Am I correct that that unit was a

8   plain clothes unit where you focused on gang

9   and gang crimes?

10      A.   Right.

11      Q.   Did you have to testify in Court

12  during the time you were a patrol officer with

13  the Naperville Police Department?

14      A.   I believe I did.

15      Q.   How many times did you testify in

16  Court during the years that you were a patrol

17  officer?

18           MR. POLICK:   Object to the relevance.

19  You can go ahead and answer.

20           THE WITNESS:  I don't know.

21  BY MS. THOMPSON:

22      Q.   Was it more than 10?

23           MR. POLICK:   Same objection.  Lodge a

24  continuing objection on the grounds of

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 24

1    relevance to this line of questioning.

2              MS. THOMPSON:  Let's go off the

3    record.

4                   (Discussion had off the record.)

5    BY MS. THOMPSON:

6         Q.   Did you testify in Court more than 10

7    times as a patrol officer?

8         A.   Yes.

9         Q.   More than 50 times?

10        A.   I don't know.

11        Q.   Did you testify -- well, let me ask

12   you this.

13                   At some point did you become part

14   of the DuPage County Metropolitan Enforcement

15   Group while you were with the Naperville Police

16   Department?

17        A.   I did.

18        Q.   And was that a special assignment from

19   Naperville?

20        A.   It was.

21        Q.   What were your responsibilities as

22   part of the DuPage County Metropolitan

23   Enforcement Group?

24        A.   It was drug enforcement, essentially

Siebert & Assocs. Court Reporters, Inc.              cmsreporters@comcast.net

Page 25

1    undercover drug enforcement.

2         Q.   And did you have that assignment with

3    the DuPage County Metropolitan Enforcement

4    Group until approximately 1996?

5         A.   No.

6         Q.   When did you leave the DuPage County

7    Metropolitan Enforcement Group as part of your

8    responsibilities with the Naperville Police

9    Department?

10        A.   About 1991.

11        Q.   And what was your assignment when you

12   left in '91?

13        A.   Went back to the special enforcement

14   unit.

15        Q.   Were you in that unit when you made

16   sergeant?

17        A.   I was.

18        Q.   And that was in '96?

19        A.   Correct.

20        Q.   You were later promoted to the

21   commander of the Special Operations Group,

22   correct?

23        A.   Correct.

24        Q.   When was that?

Siebert & Assocs. Court Reporters, Inc.                cmsreporters@comcast.net

Page 26

1          A.    2006.

2          Q.    Between the time that you went back to

3     the special enforcement group in 1991 and when

4     you become the commander of the Special

5     Operations group in 2006 did you have any

6     assignments within the Naperville Police

7     Department other than working with the special

8     enforcement group?

9          A.    I did.

10         Q.    And can you tell us what those other

11    assignments were during that time period?

12         A.    I made sergeant in 1996. I was

13    transferred to patrol division for a period of

14    time.

15               And then I was transferred to the

16    crime scene unit and was the sergeant of the

17    crime scene unit for about two years.

18               And then I was transferred to the

19    sergeant of the special enforcement unit.

20               And then sergeant of the major

21    crimes unit.

22               And then I was promoted to the

23    commander in 2006.

24         Q.    When were you transferred to the crime

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 27

1    scene unit?

2          A.    That would have been approximately

3    1998.

4          Q.    So you went -- you were transferred to

5    the sergeant of special enforcement in

6    approximately 2000?

7          A.    Approximately I would have to see my

8    CV.

9          Q.    And then when did you become the

10   sergeant of major crimes?

11         A.    Within a short period of time after

12   being the special enforcement unit sergeant.

13         Q.    Was there a particular time in the

14   Naperville Police Department when you were made

15   a detective?

16         A.    No.

17         Q.    Does the Naperville Police Department

18   recognize the specific designation of detective

19   or investigator?

20         A.    I don't understand how you mean --

21         Q.    Sure. I think you told me when you

22   started this deposition that --

23               Well, let me say this, when we

24   started this deposition you indicated I should

Siebert & Assocs. Court Reporters, Inc.                 cmsreporters@comcast.net

                                                        Page 28

1    refer to you as investigator, correct?

2          A.    Essentially my current position.

3          Q.    That's your current position with the

4    State's Attorney's Office?

5          A.    Correct.

6          Q.    Did you have the title of investigator

7    when you were with the Naperville Police

8    Department?

9          A.    Yes.

10         Q.    When did you achieve that title or

11   start having that title?

12         A.    When I was transferred to the special

13   enforcement unit the first time.

14         Q.    Is that title of investigator in terms

15   of the Naperville Police Department considered

16   to be a rank?

17         A.    No.

18         Q.    Is that just considered to be an

19   assignment title essentially?

20         A.    Correct.

21         Q.    In 1991 when you went back to the

22   special enforcement unit, were your

23   responsibilities in that unit still focusing on

24   drug and gang crimes in a plain clothes

Page 29

1    capacity?

2          A.    It did.

3          Q.    As part of your work on drug and gang

4    crimes in the special enforcement unit during

5    any of the times in your career where you have

6    been assigned there, did part of your

7    responsibilities include interrogating suspects

8    or arrestees related to cases that you were

9    investigating?

10         A.    Yes.

11         Q.    You did attend the Reid & Associates

12   School related to questioning techniques, is

13   that correct?

14         A.    That's correct.

15         Q.    When did you do that?

16         A.    I don't recall.

17         Q.    Do you recall what your assignment was

18   in the Naperville Police Department when you

19   attended that school?

20         A.    I do not.

21         Q.    Were you a sergeant at the time you

22   took that training?

23         A.    I don't believe so.

24         Q.    Did you attend that training before

Page 30

1    1995?

2         A.    Yes.

3         Q.    You had that training at the time of

4    your work on Mr. Amor's case, is that correct?

5         A.    Correct.

6         Q.    Was that training provided through

7    your employment with the Naperville Police

8    Department?

9         A.    It was.

10        Q.    Were there other officers from the

11   Naperville Police Department that attended that

12   training with you?

13        A.    I don't believe so.

14        Q.    Do you remember who from Reid &

15   Associates conducted your training?

16        A.    I don't.

17        Q.    Did someone named Michael Masokas

18   train you as part of your -- the training

19   course that you attended at Reid & Associates?

20        A.    I don't recall.

21        Q.    Prior to your work on William Amor's

22   case had you investigated a homicide?

23        A.    Only in a very peripheral manner.

24        Q.    Can you explain to me what you mean in

Page 31

1    a peripheral manner?

2         A.   I assisted with a search warrant in a

3    downtown office for records related to a

4    homicide investigation.

5         Q.   Is that search warrant work the only

6    time prior to William Amor's case that you had

7    assisted in a homicide investigation?

8         A.   I believe so.

9         Q.   Had you ever been to the scene of a

10   suspected homicide prior to your work on

11   William Amor's case?

12        A.   I don't recall.

13        Q.   Prior to your work on Mr. Amor's case

14   had you ever been at the scene of a fire

15   investigation?

16        A.   I don't recall.

17        Q.   Have you been to the scene of a fire

18   investigation in your career other than in

19   William Amor's case?

20        A.   I responded to house fires, but I

21   didn't conduct any investigation related to

22   that or car fires. There was a car fire, but I

23   think that was after Mr. Amor's case.

24        Q.   How many fires of structures had you

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 32

1    responded to prior to your work on William

2    Amor's case?

3          A.    I don't recall.

4          Q.    How many in your career have you

5    responded to after your work on William Amor's

6    case?

7          A.    I don't recall.

8          Q.    Have there been any to your memory

9    after your work in William Amor's case?

10         A.    I don't recall.

11         Q.    You mentioned responding to house

12   fires, in your career have you ever responded

13   to the scene of a structure bigger than a house

14   other than in this case?

15         A.    I don't believe so.

16         Q.    Have you reviewed your personnel file

17   from the Naperville Police Department at any

18   point in your life?

19         A.    No.

20         Q.    Do you recall one of your work-related

21   goals with the Naperville Police Department at

22   some point being to obtain training in working

23   on arson cases?

24         A.    I don't recall that.

Page 33

1        Q.   Do you believe, as you sit here today,

2    that it was ever your professional goal to

3    learn more about arson investigations?

4        A.   What was the question?

5        Q.   Sure.  As you sit here today, do you

6    remember it ever being a professional goal that

7    you had to learn more about arson

8    investigations?

9        A.   No.

10       Q.   Is there a reason that's never been

11   your professional goal?

12            MR. POLICK:   Objection to the form of

13   the question.  You can answer.

14            THE WITNESS:  No.

15   BY MS. THOMPSON

16       Q.   When you became an investigator with

17   the Naperville Police Department did you

18   receive any training related to that assignment

19   other than on-the-job training?

20       A.   Right.  I don't recall specifically a

21   special enforcement unit training.  I did

22   receive some training in DUMEG, DuPage

23   Metropolitan Enforcement Group.

24       Q.   That's D U M E G, correct?

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 34

1       A.    Correct.

2             MR. POLICK:    Could I have the

3   question and answer read back, please?

4                 (Question and answer read.)

5   BY MS. THOMPSON

6       Q.    What did your DUMEG training consist

7   of?

8       A.    There was a class in Springfield on

9   how to operate in an undercover capacity.

10      Q.    Other than your attending the police

11  academy, and other than courses that you took

12  related to your Bachelor's Degree at SIU, have

13  you received any training with any of the law

14  enforcement agencies that you worked for on the

15  investigation of homicides?

16      A.    I have.

17      Q.    Can you describe that training for me

18  separate and apart from the academy and your

19  course work for the Bachelor's Degree?

20      A.    I did two courses at St. Louis

21  University Medical/Legal Death Investigation in

22  St. Louis.  They were each about four days

23  long.

24      Q.    When did you attend those courses?

Siebert & Assocs. Court Reporters, Inc.                cmsreporters@comcast.net

Page 35

1        A.    I'm not sure.  Probably -- again I'm

2   not sure, before I was sergeant.

3        Q.    Were either of them before your work

4   in this case?

5        A.    I believe so, yes.

6        Q.    Were both of them before?

7        A.    I think so, yes.

8        Q.    Were those two courses something you

9   took close in time to one another?

10       A.    I think about a year apart.

11       Q.    Did they -- I mean you said there were

12  two of them did they cover different topics?

13       A.    Some of it was review of the first

14  course and some partially part of it was

15  updated information.

16       Q.    Do you still have in your possession

17  any of your course materials from those two

18  classes?

19       A.    I don't know.

20       Q.    Did any of your course work for your

21  Bachelor's Degree involve the investigation of

22  homicides?

23       A.    Not that I remember.

24       Q.    Did any of your course work at the

Page 36

1    police academy involve the investigation of

2    homicides?

3         A.   I suspect it did.

4         Q.   Do you still have any of your written

5    materials related to your attending of the

6    police academy?

7         A.   I don't believe so.

8         Q.   After your work on William Amor's case

9    have you participated in any homicide

10   investigations, and let me start by limiting

11   that question just to your time with the

12   Naperville Police Department?

13        A.   I did.

14        Q.   How many other homicides did you

15   investigate after your work on William Amor's

16   case, again just when you were with the

17   Naperville Police Department?

18        A.   Five or six.

19        Q.   Do you remember the names of any of

20   the decedents in those cases?

21        A.   One I remember vividly is Marilyn

22   Lemak and her three children.  And I don't

23   remember the name of the kids.  Lemak.  Emily

24   was the daughter, if I recall, and there was

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

1    two young boys, Joe and Russell.

2        Q.    The last name was M A C K?

3        A.    No, L E M A K, Marilyn was the

4    defendant.

5        Q.    Do you remember, for any of the other

6    five or six cases, do you remember the names of

7    either the decedents or a person that you, I

8    think, just identified as a defendant in those

9    cases?

10       A.    I don't.

11       Q.    Did any of those five to six cases

12   involve a suspected arson?

13       A.    I don't believe so.

14       Q.    Did you interrogate any suspects in

15   any of those five or six other cases?

16       A.    I don't believe so.

17       Q.    Did you testify in Court proceedings

18   related to those other five or six cases?

19       A.    Most likely.

20       Q.    Did you testify in the Lemak -- in a

21   proceeding related to the Lemak case?

22       A.    I don't believe I did.

23       Q.    How many times total in your career

24   with the Naperville Police Department did you

Page 38

 1    testify in Court?

 2         A.    I don't know.

 3         Q.    In total just related to your work

 4    with the Naperville Police Department have you

 5    testified in Court more than 100 times?

 6         A.    I don't know.

 7         Q.    Have you ever received any training in

 8    your career at any point related to how to

 9    testify in Court or at a deposition?

10         A.    I don't believe so.

11         Q.    You mentioned at one point that you

12    were the sergeant of the crime scene unit with

13    the Naperville Police Department, is that

14    correct?

15         A.    Correct.

16         Q.    Did you receive any particular

17    training related to crime scene analysis prior

18    to taking that position?

19         A.    I went to the 40-hour class on

20    becoming an evidence technician.

21         Q.    Where did you attend that class?

22         A.    DuPage County Sheriff's Department.

23         Q.    Do you remember when you attended

24    that?

Page 39

```
 1        A.    Approximately 1998.

 2        Q.    So are you -- as a result of taking

 3   that class are you a certified evidence

 4   technician?

 5        A.    I was.

 6        Q.    Is that a certification you have to

 7   maintain?

 8        A.    Correct.

 9        Q.    Did you let it lapse at some point?

10        A.    Well, before I left Naperville.

11        Q.    I want to go back to your Naperville

12   Police Department career in a minute.

13              I want to talk about your current

14   position first.

15              You are currently, I think you

16   said, the Chief of Investigations for the

17   State's Attorney's Office, have I misstated

18   that title?

19        A.    No, that's correct.

20        Q.    Okay.  When did you obtain that

21   particular title with the State's Attorney's

22   Office?

23        A.    Last year.

24        Q.    And prior to that what was your title
```

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 40

1    with the SAO?

2         A.   Deputy Chief.

3         Q.   Who was the Chief at the time that you

4    were the Deputy Chief?

5         A.   Norm Hall.

6         Q.   Was Chief Hall with another law

7    enforcement agency before working for the SAO?

8         A.   He was.

9         Q.   What agency was he with?

10        A.   He was with Villa Park.

11        Q.   Do you supervise other investigators

12   in your current role as chief?

13        A.   I do.

14        Q.   Are any of those investigators formal

15   Naperville Police Officers?

16        A.   Yes.

17        Q.   Who do you currently supervisor as a

18   former Naperville Officer?

19        A.   Nick Liberio and John Mancinelli.

20        Q.   Other than those two investigators are

21   there any other investigators that you've ever

22   supervised with the SAO either as Chief or

23   Deputy Chief who were former Naperville Police

24   Department Officers?

Page 41

1       A.   No.

2       Q.   What are your current responsibilities

3   as Chief of Investigations?

4       A.   Generally we are investigators.  We

5   investigate criminal matters brought to the

6   attention of the State's Attorney's Office.

7            Other agencies will call us and

8   ask us to investigate or people will appear in

9   our lobby and ask us for assistance on an

10  investigation.

11           We also support current

12  prosecutions in the sense that we serve

13  subpoenas or summons for witnesses, we

14  interview witnesses as they are developed for

15  current prosecutions.

16      Q.   Are you currently involved directly in

17  any State's Attorneys Office investigations or

18  is your role as Chief more in a supervisory

19  capacity?

20      A.   I'm involved in investigations.

21      Q.   When did you become Deputy Chief with

22  the State's Attorney's Office?

23      A.   I believe that was 2015.

24      Q.   How many investigators does the

Page 42

1    State's Attorneys currently have?

2         A.    Including me?

3         Q.    Yes.

4         A.    Six.

5         Q.    You were involved in your capacity as

6    an investigator with the State's Attorney's

7    Office in re-investigating the death of

8    Marianne Miceli at some point, is that correct?

9              MS. POLICK:  Objection to the form.

10   You may answer.

11             THE WITNESS:  I was.

12   BY MS. THOMPSON:

13        Q.    When did you start your work on

14   re-investigating this case in your capacity

15   with the State's Attorney's Office?

16        A.    My work consisted of interviewing

17   Tina Miceli, that was the only work I did on

18   that.

19        Q.    As you sit here today do you remember

20   when you interviewed Ms. Miceli?

21        A.    I believe it was sometime in 2018.

22        Q.    At the time that you re-interviewed

23   Tina Miceli there were other investigators

24   working for the State's Attorney's Office,

Siebert & Assocs. Court Reporters, Inc.          cmsreporters@comcast.net

Page 43

1    correct?

2        A.    Correct.

3        Q.    Did you ask to be involved in

4    interviewing Tina Miceli during that

5    re-investigation in 2018?

6        A.    I did not.

7        Q.    Was that something you were assigned

8    to do?

9        A.    Correct.

10       Q.    Who assigned you to do that?

11       A.    Well, it would have been Mike Pawl who

12   is Chief, Deputy Chief of Criminal

13   Prosecutions, I believe at the time

14       Q.    Pawl, P A W L, correct?

15       A.    Correct.

16       Q.    Did you have any other involvement in

17   any re-investigation of this case with the

18   State's Attorney's Office other than talking

19   with Tina Miceli?

20            MR. POLICK:   Objection to form.   Go

21   ahead and answer.

22            THE WITNESS:  I did not.

23   BY MS. THOMPSON:

24       Q.    Did you make any recommendations to

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 44

1    anyone within the State's Attorney's Office

2    after your interview of Tina Miceli about the

3    prosecution of William Amor for the death of

4    Marianne Miceli?

5         A.   I did not.

6         Q.   Did anyone ever ask you for your

7    opinion about the prosecution of Mr. Amor after

8    your interview of Tina Miceli in 2018?

9         A.   They did not.

10        Q.   As part of your work with the State's

11   Attorney's Office in connection with the death

12   of Marianne Miceli, did you speak with anyone

13   in the Naperville Police Department about the

14   case?

15        A.   I don't believe I did.

16        Q.   Now, there was a point, we will talk

17   about this more, there was a point in your

18   investigation of the death of Marianne Miceli

19   back in 1995 where you talked to somebody named

20   Gary Leavenworth, correct?

21        A.   Correct.

22        Q.   Have you talked to Gary Leavenworth

23   since the time that William Amor was convicted

24   in connection with the death of Marianne

Page 45

1    Miceli?

2         A.   I don't believe so.

3         Q.   Did you ever talk with Gary

4    Leavenworth in connection with a FOIA request

5    that Mr. Leavenworth made of the Naperville

6    Police Department for records related to death

7    of Marianne Miceli?

8         A.   I don't recall that.

9         Q.   Do you recall talking with anyone in

10   connection with a request for records that Gary

11   Leavenworth made to the Naperville Police

12   Department about Ms. Miceli's death?

13        A.   No, I don't.

14        Q.   Let's mark this as one.

15                    (Deposition Exhibit No. 1 was

16                     marked for identification.)

17   BY MS. THOMPSON:

18        Q.   I've shown the witness what's been

19   marked as Exhibit 1. This is a one-page

20   document which is Bates stamped DEFS 9470.

21                    And, Mr. Guerrieri, excuse me,

22   Investigator Guerrieri, I understand from

23   looking at this document that this is likely

24   not something you authored.

Page 46

1              I ask you to review it and let me

2     know when you are done doing that.

3         A.    Okay.

4         Q.    Does looking at Exhibit 1 refresh your

5     memory at all about whether you spoke with Gary

6     Leavenworth at all related to some records

7     request that he had of the Naperville Police

8     Department in 2016?

9         A.    It does not.

10        Q.    You agree with me that the first --

11    the top half of this document appears to be an

12    e-mail from Brian Cunningham to Robert

13    Marshall, did you see that?

14        A.    I do.

15        Q.    There is some text in Exhibit 1, and

16    I'm not reading all of it.  There is some text

17    in Exhibit 1 that says I think Bob Guerreri was

18    able to respond to some of his questions, do

19    you see that?

20        A.    I do.

21        Q.    Do you have any idea, as you look at

22    Exhibit 1, what that sentence refers to?

23              MR. POLICK:   Object to the foundation

24    but can go ahead and answer.

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

```
                                                    Page 47
 1              THE WITNESS:  I do not.
 2    BY MS. THOMPSON:
 3         Q.   Have you ever talked -- let me start
 4    that question again.
 5                   In 2016 did you have any
 6    conversations with either Brian Cunningham or
 7    Robert Marshall about anything having to do
 8    with Marianne Miceli's death?
 9         A.   I do not.
10         Q.   I want to make sure that question was
11    clear.
12                   My question was, in 2016 did you
13    have conversations with Brian Cunningham or
14    Robert Marshall about that topic?
15         A.   I do not.
16         Q.   When you say "you do not"?
17         A.   I do not recall.
18         Q.   Okay.  Have you ever talked with
19    Robert Marshall about anything having to do
20    either with William Amor or with Marianne
21    Miceli?
22         A.   I don't believe so.
23         Q.   Let's mark this as 2.
24                   (Deposition Exhibit No. 2 was
```

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 48

1                    marked for identification.)

2         Q.    Investigator, I'm not asking you to

3    reveal any attorney/client communications in

4    responding to this question.

5              But as part of your -- as part of

6    your involvement in responding to discovery

7    requests in this case, did you collect

8    documents that you had in your personal

9    possession that might be responsive to

10   discovery requests that were made by the

11   plaintiff?

12        A.    I don't believe so.

13        Q.    Have you ever, since this lawsuit was

14   filed, looked for documents in your possession

15   that relate to the William Amor case?

16        A.    I don't believe so.

17        Q.    I'm going to show you what's been

18   marked as Exhibit 2.

19              Exhibit 2 is a number of

20   documents, and they are Bates stamped DEFS 6636

21   through DEFS 6863.

22              And you may need to look through

23   these documents to answer this question.

24              But what I am going to ask you is

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 49

1    if you recognize any of the documents contained

2    in DEFS 6636 through 6863 as being documents

3    that were in your possession after the filing

4    of this lawsuit?

5          A.    I recognize the documents.

6          Q.    Let me ask you this question.

7                Did you ever conduct a search of

8    your e-mail to look for e-mails that might be

9    related to this lawsuit at any point after the

10   lawsuit was filed?

11         A.    I believe I was asked to do that.

12         Q.    Do you know when you did that search,

13   and again I'm not asking you to reveal any

14   attorney/client communications, just when you

15   did the search?

16         A.    Whenever it was requested of me.

17         Q.    Do you know when that was requested of

18   you?

19         A.    No.

20         Q.    Did you ever do a search of your own

21   office at the State's Attorney's Office or your

22   home or any other location to look for records

23   that you might have related to this case?

24         A.    I didn't have any.

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 50

1          Q.   When you say that you didn't have any,

2    did you do a search to determine whether you

3    had any or not?

4          A.   I did not.

5          Q.   So looking, for instance, if you look

6    at Exhibit 2, the first page which is DEFS

7    6636, do you see that?

8          A.   I do.

9          Q.   Just this first page, 6636, is that an

10   e-mail that you located as part your search of

11   your e-mails to find e-mails that might be

12   related to this case?

13         A.   Yes.

14         Q.   How did you pull this e-mail -- let me

15   ask that question in a different way.

16              Did you conduct a specific search

17   of your e-mail looking for e-mails that might

18   be related to this litigation?

19         A.   I did.

20         Q.   What search terms did you use to check

21   through your e-mail?

22         A.   Amor, Amor trial, I believe that was

23   it.

24         Q.   Would you agree with me that

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

                                                                    Page 51

1    Exhibit 2, that first page we were just looking

2    at, DEFS 6636, that does not contain the word

3    "Amor" on it anywhere?

4         A.   Correct.

5         Q.   So do you know how this particular

6    e-mail came up in your search for records

7    related to this case?

8         A.   I don't.

9         Q.   Is it your memory though that -- well,

10   let me ask you this.

11              This first page DEFS 6636, this

12   includes an e-mail that you authored on

13   December 27th of 2017 at 12:31 P.M. to Mike

14   Cross asking him if he was available next

15   Tuesday January 2nd at 1:00 P.M. to meet, is

16   that correct?

17        A.   Correct.

18        Q.   And was your request to meet with Mike

19   Cross as sent on that date a request to meet

20   related to William Amor's case?

21        A.   It was a request for Mike Cross to

22   meet with the attorneys not to meet with me.

23        Q.   Was that for him to meet with the

24   State's Attorney working on the case?

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 52

1       A.    Correct.

2       Q.    Why did you make that request on

3   behalf of the attorneys?

4       A.    They asked me to make the request

5   because I don't believe they had Mike Cross'

6   e-mail, they just asked me to make the request

7   for them.

8       Q.    Did Mike Cross actually meet with the

9   members of the State's Attorney's Office in

10  response to this request that you sent him?

11      A.    I don't know.

12      Q.    Did you meet with Mike Cross at the

13  State's Attorney's Office related to this case

14  at any point in 2016 or 2017 or 2018?

15      A.    I saw him there in a conference room,

16  but I don't recall talking with him.

17      Q.    Did you speak with Mike Cross about

18  the Amor case at any point in 2016 or 2017 or

19  2018 other than just essentially arranging

20  meetings with him with attorneys working on the

21  case?

22      A.    If I saw him I would have said hello.

23  Anything specific to the case, no.

24      Q.    I want to have you turn to page 2 of

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

                                                                  Page 53

1    this exhibit which is DEFS 6637.

2         A.   Yes.

3         Q.   If you want to look at that I have

4    some questions for you just specifically about

5    that page.

6         A.   Okay.

7         Q.   So there is two e-mails on this page

8    DEFS 6637, do you agree?

9         A.   Correct.

10        Q.   And do you agree with me that the

11   bottom of these e-mails is an e-mail sent from

12   you to James Scaliatine and Thomas Minser on

13   December 19th of 2017 at 1:56 P.M.?

14        A.   Correct.

15        Q.   And there is a portion of this e-mail

16   that's been redacted, but do you agree that

17   this lower e-mail, the one from 1:56 P.M.

18   appears to be you providing Mike Cross' e-mail

19   to James Scaliatine and Thomas Minser?

20        A.   Correct.

21        Q.   And the above e-mail is an e-mail

22   from -- let me ask you this, do you know James

23   Scaliatine by Jim?

24        A.   I do.

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 54

1        Q.    Okay.   Does the above e-mail look like

2    an e-mail from Jim to you and Tom from

3    December 19th actually addressed to Mike?

4        A.    Yes.

5        Q.    Do you know why Jim sent that e-mail

6    at 3:27 P.M. to you and Tom apparently

7    containing information that's for Mike Cross?

8            MS. POLICK:   Objection to foundation

9    but go ahead and answer.

10            THE WITNESS:   I don't know.

11   BY MS. THOMPSON:

12       Q.    Looking back at page 1, DEFS 6636, did

13   you respond to Mike Cross' e-mail asking you if

14   the meeting was going to be at the SA office?

15       A.    I don't recall.

16       Q.    Did you call him in response to this

17   e-mail?

18       A.    I don't recall.

19       Q.    Let me have you look at DEFS 6638,

20   which is page 3 of that exhibit.

21            This e-mail 6638 is an e-mail

22   from someone named Jim who's e-mail has been

23   redacted to Thomas Minser, is that correct?

24       A.    Yes.

Page 55

1      Q.   And that e-mail reflects that this

2  person named Jim is retired as a police

3  sergeant and currently works at Home Depot, is

4  that right?

5      A.   That's correct.

6      Q.   Based on that information, do you know

7  who this Jim that e-mail this is?

8      A.   I do.

9      Q.   What's that person's last name?

10      A.   Ensworth.

11      Q.   Okay. And this -- it is

12  E N S W O R T H?

13      A.   Correct.

14      Q.   And Mr. Ensworth indicates in this

15  e-mail that he has spoken with someone named

16  Bob Guerrieri about this matter, is that you?

17      A.   Yes.

18      Q.   What conversation did you have with

19  Jim Ensworth about this matter in December --

20  well, let me ask this question.

21           What conversation did you have

22  with Jim Ensworth about this case in 2017?

23      A.   I called him to make sure we had a

24  correct address for him.  When he said he

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 56

1   retired as a sergeant, he was with Joliet

2   Police Department along with the Naperville

3   Police Department, and I told him I believe at

4   that time it was going to be re-tried, that's

5   why he was asking for a subpoena.

6          Q.   Did you give him notice of the trial

7   in the case?

8          A.   No, but I believe I gave him the

9   subpoena.

10         Q.   Did you or him have any other

11  conversations about the case at that time other

12  than sort of basic scheduling or just

13  notification that the trial was going to occur?

14         A.   No, I did not.

15         Q.   I want to have you now turn to DEFS

16  6639.

17         Q.   Would you agree with me there appears

18  to be a timeline on that page that goes to DEFS

19  6641?

20         A.   Yes.

21         Q.   Have you ever seen this timeline

22  before?

23         A.   I have.

24         Q.   Who prepared this timeline?

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

                                                        Page 57

 1        A.   I don't know if it was Mr. Minser or

 2   Scaliatine.

 3        Q.   Did they ever give -- did one of them

 4   give you this timeline?

 5        A.   They did.

 6        Q.   When did they give it to you?

 7        A.   I don't recall.

 8        Q.   Was it before your testimony in this

 9   case in 2018?

10        A.   I believe so.

11        Q.   Is this a document that you used to

12   prepare for your testimony in 2018?

13        A.   It is.

14        Q.   Is this something that they provided

15   to you in hard copy form?

16        A.   I believe so.

17        Q.   Did you review -- well, let me ask you

18   this.  The question I have for you is whether

19   in reviewing this timeline now you believe

20   there is anything in this timeline that's

21   incorrect.

22             If you need to minute to review

23   it to answer that question, take whatever time

24   you need.

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 58

1                    And when I say "this timeline",

2    I'm referring specifically to what appears on

3    DEFS 6639 through 6641.

4            MR. POLICK:    I'm going to interpose

5    an objection to foundation and speculation

6    since he isn't the author of this timeline.

7            THE WITNESS:    It is just a summary.

8    And the portions listed under September 15th up

9    until October 3rd I can't speak to, because I

10   wasn't part of the investigation.

11                   But again it is a summary but it

12   looks -- from what I know, the parts that I was

13   involved with look substantially correct.

14       Q.    Well, you used this document to

15   prepare for your testimony in 2018, correct?

16       A.    I looked at it.

17       Q.    Well, why did you look at it?

18       A.    Because it was given to me to look at.

19       Q.    Did you have any understanding of why

20   you were being given it to look at?

21       A.    Just my understanding it was a

22   timeline one of the attorneys came up with.

23       Q.    Isn't it true you were being given

24   this document to use to help refresh your

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 59

1    memory about what your testimony was going to

2    be in 2018?

3         A.   I suspect it was.

4         Q.   I have a couple questions about this

5    timeline specifically.

6                    Looking at DEFS 6639, that is the

7    first page of this timeline, and I'm looking at

8    the section that's under 9/10/95, do you see

9    where I am looking?

10        A.   I am.

11        Q.   There is an entry that's under

12   6:15/20p, do you see that?

13        A.   I do.

14        Q.   If you look at sort of the second

15   paragraph or the second entry under that time

16   there is something that says, I'm quoting,

17   "doesn't give a shit; semicolon, goes piss;

18   gives MM a back rub", do you see that?

19        A.   I do.

20        Q.   The specific phrasing here "doesn't

21   give a shit" and "goes piss", those are words

22   are those words that William Amor ever used in

23   talking with you about his actions on

24   September 10th of 1995?

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 60

1        A.    I believe so.

2        Q.    And when you say you believe so, why

3    do you believe that to be true?

4        A.    Because Bill said when he knocked the

5    cigarette onto the papers, that he didn't give

6    a shit anymore.

7        Q.    Did he ever use the words with you,

8    that he, you know, I'm sorry for the crude

9    language but I'm talking about what is in the

10   document, that he ever went piss or that he

11   goes piss?

12       A.    I don't recall.

13       Q.    Do you know how that phrase in

14   particular ended up in this timeline of events

15   in this case?

16            MR. POLICK:    Objection, no

17   foundation, calls for speculation, but you can

18   answer.

19            THE WITNESS:    I don't.

20   BY MS. THOMPSON:

21       Q.    Did you ever tell anyone that

22   specifically that William Amor used the words,

23   you know, goes piss or went piss or the word

24   piss during any of his interviews with you

Page 61

1    about any of his actions in this case?

2         A.   I don't recall.

3         Q.   Have you ever seen any documents that

4    you authored that use that phrase in talking

5    about what William Amor said to you?

6              MR. POLICK:   You are referring to

7    goes piss, that phrase, is that your question?

8    BY MS. THOMPSON:

9         Q.   Specifically, yes.

10             MR. POLICK:   Okay.  Thank you.

11             THE WITNESS:  No, I don't recall that.

12   BY MS. THOMPSON:

13        Q.   Going down to the next entry where it

14   says 6:20 slash, and you see there is a 30p,

15   and the 30 is bold and underlined?

16        A.   Yes.

17        Q.   Do you know why that 30 is bold and

18   underlined there?

19             MR. POLICK:   Same objection to

20   foundation, calls for speculation.  You can go

21   ahead and answer.

22             THE WITNESS:  I do not.

23   BY MS. THOMPSON:

24        Q.   Let me ask you this, did you talk

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 62

1    about this timeline we are looking at 6639

2    through 6641, with anyone after you received

3    it?

4         A.    No.

5         Q.    What did you do with this document

6    after you got it besides looking at it?

7         A.    It sat on my desk.

8         Q.    Did you ever throw it away?

9         A.    I don't recall what I did with it.

10        Q.    Is it possible you saved it?

11        A.    It is possible, but I don't recall

12   what I did with it.

13        Q.    I'm going to have you turn to the last

14   page which is 6641, and looking at the entry

15   that says "AT NAPD", do you see that?

16        A.    I do.

17        Q.    It says there just in reference to

18   that entry, "Det. MC confronts D with TM

19   statement (thinks Bill did it)", that's not the

20   whole entry, but I'm going to start there.

21              Is it your understanding that

22   that's in reference to a time in your and Mike

23   Cross' interrogation of William Amor where

24   Michael Cross confronted William Amor with an

Siebert & Assocs. Court Reporters, Inc.          cmsreporters@comcast.net

                                                        Page 63

1    assertion that Tina Miceli thought that Bill

2    had started the fire that killed Marianne

3    Miceli?

4         A.   Yes, that's my understanding.

5         Q.   Okay.  And you agree that there was a

6    time in your interrogation of William Amor

7    where, in fact, Detective Cross did that, that

8    he told Bill Amor that Tina Miceli thought he

9    did it, correct?

10        A.   Correct.

11        Q.   After that entry, this timeline says

12   quote, "gets all Sipowicz, S I P O W I C Z, and

13   storms out"?

14        A.   Correct.

15        Q.   Do you agree that when Mike Cross

16   confronted William Amor he got all Sipowicz and

17   stormed out?

18             MR. POLICK:   I'll object to the

19   foundation or lack thereof, calling for

20   speculation.  You may answer the question.

21             THE WITNESS:  I don't believe so.

22   BY MS. THOMPSON:

23        Q.   Do you understand this phrase "gets

24   all Sipowicz" to refer to the character Andy

Page 64

1    Sipowicz from the television show NYPD Blue?

2         A.   I do not.

3         Q.   Have you ever seen NYPD Blue?

4         A.   Probably.

5         Q.   Do you have any idea -- well, let me

6    ask you this, have you ever discussed that

7    particular characterization of Mike Cross'

8    behavior with anyone, and when I say that I'm

9    specifically referring to how it is referenced

10   in defendant 6641?

11        A.   No.

12        Q.   When you reviewed this timeline, did

13   you ever tell either Mr. Minser or

14   Mr. Scaliatine that you did not agree with the

15   characterization of Mike Cross as "getting all

16   Sipowicz" at this point?

17        A.   I did not.

18        Q.   Is there a reason you didn't discuss

19   that with them?

20        A.   Not that I'm aware of.

21        Q.   Have you ever in your life had a

22   conversation with anyone that referenced that

23   person's conduct being like the character

24   Sipowicz from NYPD Blue?

Page 65

1      A.   No, not that I recall.

2      Q.   Looking down at the next entry

3   11:45 P.M., and I'm looking at sort of the

4   second paragraph in that entry, the third

5   line -- I'm not reading this entry in total but

6   in the third line there are the words:

7   "Doesn't bite on removal of smoke detector", do

8   you see that?

9      A.   I do.

10     Q.   Do you know what that phrase "doesn't

11   bite on removal of smoke detector" refers to?

12          MR. POLICK:   Objection, lack of

13   foundation, calls for speculation.  You can go

14   ahead and answer.

15          THE WITNESS:  I didn't write that.

16   I will speculate and say when we talked about

17   removing the smoke detector from the -- that

18   had been removed prior to the fire, Bill didn't

19   associate that with the subsequent death two

20   days later.

21   BY MS. THOMPSON:

22     Q.   Have you ever used the phrase in

23   discussing your interrogations of William Amor

24   that there was something related to that

Page 66

1    interview on which Mr. Amor didn't bite?

2          A.   No.

3          Q.   In general, prior to being provided

4    with this timeline, had you talked at all about

5    the Amor case with either -- well, let me ask

6    this question a better way.

7                    Prior to receiving this timeline,

8    had you had any conversations with either Mike

9    Pawl or Thomas Minser or James Scaliatine about

10   your interrogations of William Amor?

11         A.   I don't believe so.

12         Q.   Had you talked with any of them prior

13   to receiving this timeline about your work on

14   the case more generally?

15         A.   I'm sure I did.

16         Q.   I want to refer you now to defendants

17   6642, that's the 4th page of this exhibit, but

18   since they are front and back it is like

19   page 7.

20         A.   Sure.

21         Q.   Do you see where we are?

22         A.   Yes.

23         Q.   Did you prepare -- I guess I should

24   just say it appears that there is a document in

Page 67

1    these pages that goes 6642 through 6644, so let

2    me have you look at those pages.

3         A.   Okay.

4         Q.   Does this appear to be another

5    timeline related to events in William Amor's

6    case?

7         A.   It does.

8         Q.   Did you ever have this timeline, these

9    three pages, 6642 to 6644, in your possession?

10        A.   Yes.

11        Q.   When were you -- did you prepare these

12   three pages?

13        A.   I did not.

14        Q.   Do you know how these pages came to be

15   in your possession?

16        A.   I don't recall.

17        Q.   Who prepared these pages?

18        A.   I don't recall.

19        Q.   Were these pages prepared by an

20   attorney in the State's Attorney's Office?

21        A.   Most likely.

22        Q.   Why do you say that?

23        A.   Because I didn't prepare them.

24        Q.   Is it possible they were prepared by,

Page 68

1    you know, someone in the Naperville Police

2    Department or somebody else with knowledge of

3    this investigation other than someone in the

4    State's Attorney's Office?

5              MR. POLICK:   Objection, calls for

6    speculation.  You can answer.

7              THE WITNESS:  I don't know.

8    BY MS. THOMPSON:

9        Q.   Were you given this timeline, 6642 to

10   6644, before your 2018 testimony in Mr. Amor's

11   case?

12       A.   Yes.

13       Q.   And did you review these pages when

14   you received them?

15       A.   I looked at them.  That's all.

16       Q.   What did you do with these pages since

17   you looked at them?

18       A.   Sat on my desk.

19       Q.   Why did you look at these pages?

20       A.   Because they were given to me to read.

21       Q.   When you got them were you given any

22   direction why you were asked to read them?

23       A.   Yes.

24       Q.   Do you recognize the handwriting?

Page 69

1          A.    I do.

2          Q.    Who's handwriting is that?

3          A.    That's mine.

4          Q.    What does the handwriting on 6642 say?

5          A.    "Need report on finding letter".

6          Q.    Is this a note that you made

7    contemporaneously with your reading of this

8    timeline?

9          A.    Correct.

10         Q.    And at that time did you determine

11   that you needed the report on finding the

12   letter?

13         A.    Correct.

14         Q.    Why did you need the report on finding

15   the letter at that time?

16         A.    I wanted to locate it in the mass of

17   reports about where the letters were found.

18         Q.    I'm going to ask you again, as with

19   the first timeline that we looked at, to review

20   this timeline, so 6642 to 6644, and tell me if

21   there is anything in this timeline that you

22   believe is inaccurate?

23              MR. POLICK:   Again I will object to

24   the foundation, calling for speculation.

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 70

1              THE WITNESS:  Well, the only part can

2    I speak for is 9/10 and 9/11.

3                   After that I wasn't involved in

4    any aspect that's really listed other than 9/10

5    and 9/11.

6                   And the 9/10 and 9/11 entries are

7    substantially correct.

8    BY MS. THOMPSON:

9         Q.   What about -- and I understand that

10   given what you just testified to, that you are

11   saying that the dates that are reflected on

12   6643 are things that you weren't involved in,

13   is that your testimony?

14        A.   Correct.

15        Q.   Looking at 6644, you agree that that

16   page does reference things that you were

17   involved in, correct?

18        A.   Let me look at it.  Yes.

19        Q.   And is there anything in the summary

20   of events from that page 6644 that you think is

21   incorrect?

22              MR. POLICK:  Again object to the

23   foundation, lack thereof, and calls for

24   speculation, but you may answer.

Siebert & Assocs. Court Reporters, Inc.    (773)851-7779  cmsreporters@comcast.net

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 71

1                THE WITNESS:  It looks substantially

2    correct.

3                MS. THOMPSON:   I think this is good

4    time for a brief break, like 10 minutes.

5                MR. VIDEOGRAPHER:  The time is

6    11:35 A.M. and we are going off the record.

7                (Recess.)

8

9                MR. VIDEOGRAPHER:  We are back on the

10   record the time is 11:46 A.M.

11   BY MS. THOMPSON:

12       Q.   And I just want the record to reflect

13   we just took a break and during that break the

14   plaintiff, Mr. Amor, left the deposition.  So I

15   just want the record to reflect he is not

16   present any further.

17                A couple of questions about some

18   things we were just talking about,

19   Investigator, and then I want to go on to some

20   other things.

21                While you with the Naperville

22   Police Department did you have an e-mail

23   address?

24       A.   Yes.

Page 72

1        Q.   And do you know when you started using

2    that official Naperville Police Department

3    e-mail address?

4        A.   I don't recall when that was issued to

5    us.

6        Q.   Was it after Mr. Amor's first trial?

7        A.   I can't say.

8        Q.   Do you recall if someone named Arthur

9    Newee was involved in your Reid & Associates

10   training?

11       A.   I cannot recall that.

12       Q.   I'm going to go back to Exhibit 2 we

13   were looking at before the break, and I have a

14   couple of additional questions for you about

15   that document.

16            Let me have you turn to page DEFS

17   6645.

18       A.   Okay.

19       Q.   And there is a number of pages that go

20   after that page in Exhibit 2 that appear to be

21   police reports related to this case, is that

22   right?

23       A.   Correct.

24       Q.   These are black and white photocopies,

Siebert & Assocs. Court Reporters, Inc.                cmsreporters@comcast.net

Page 73

1    but do you agree with me that it appears to be

2    that portions of these documents are

3    highlighted and underlined not on this copy but

4    probably in the original?

5         A.   Yes.

6         Q.   Did you ever review copies of these

7    police reports as reflected in Exhibit 2 that

8    were highlighted and underlined like these

9    copies are?

10             MR. POLICK:   Object to the form, but

11   you can go ahead and answer.

12             THE WITNESS:  Yes.

13   BY MS. THOMPSON:

14        Q.   Put it another way, just looking, for

15   instance, at the report -- the portion of the

16   report that appears on DEFS 6645 and DEFS 6646,

17   is this a copy of a police report that was in

18   your possession around the time that you

19   received the two timelines from the State's

20   Attorneys Office that we were just talking

21   about?

22        A.   I believe so, yes.

23        Q.   Did you highlight or underline the

24   notations that are on the copies of these

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 74

1    records in Exhibit 2?

2          A.    I did not.

3          Q.    Did they come to you highlighted and

4    underlined that way?

5          A.    They did.

6          Q.    Do you know who did that highlighting

7    or underlining?

8          A.    I do not.

9          Q.    Do you know why you were given

10   highlighted or underlined copies of these

11   police reports?

12              MR. POLICK:    Objection, calls for

13   speculation.

14              THE WITNESS:  I do not.

15   BY MS. THOMPSON:

16         Q.    Looking at 6645, for instance, do you

17   see handwriting on that page that says -- that

18   has a notation -- well, let me ask you this.

19                You see the first symbol in that

20   handwriting is a triangle symbol, do you see

21   that?

22         A.    I do.

23         Q.    Do you understand that triangle symbol

24   to refer to the defendant?

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

                                                                Page 75

    1         A.    I do.

    2         Q.    So do you see the handwriting on 6645

    3    that says "defendant's statements" and then a

    4    star "very important"?

    5         A.    I do.

    6         Q.    Is that your handwriting?

    7         A.    No.

    8         Q.    And do you know why there was a copy

    9    of this report in your possession with somebody

   10    else's handwriting saying "defendant's

   11    statement" star "very important"?

   12         A.    No.

   13         Q.    If you go then to DEFS 6649?

   14         A.    Okay.

   15         Q.    Do you see some handwriting on that

   16    page?

   17              MR. POLICK:    49.

   18    BY MS. THOMPSON:

   19         Q.    6649.  Yes.

   20         A.    I do.

   21         Q.    Is any of that handwriting yours?

   22         A.    No.

   23         Q.    Was that handwriting on this page when

   24    you received this document?

Page 76

1        A.    Yes.

2        Q.    And do you know who's handwriting it

3    is?

4        A.    I do not.

5        Q.    I'm just going to have you look

6    through the next couple pages up to --

7        A.    Can I stop you for a minute?

8        Q.    Sure.

9        A.    We were talking about these other two

10   timelines, and I said after the 10th and the

11   11th, I couldn't really speak to, because I

12   wasn't involved, but specifically on the 15th,

13   because there is a bunch of entries, I'm not

14   named there but it did say that the defendant

15   was arrested for a warrant, and I was the one

16   who arrested him on that timeline.

17       Q.    Right.  So I understand you are sort

18   of clarifying a prior answer, is that correct?

19       A.    Correct.

20       Q.    Other -- and we will talk about this

21   more.

22              I take it then you are not taking

23   issue with the fact that those timelines

24   reference an arrest because it is something you

Page 77

1    participated in, correct?

2         A.    Correct.

3         Q.    I appreciate that clarification.

4               What I'm going to have you do is

5    look from 6649 to 6657 of Exhibit 2.

6               And what I am specifically

7    asking, because there is various handwriting

8    that appear on those pages, if you could look

9    at just those pages, so from 49 to 61, and tell

10   me if any of the handwriting that appears on

11   those pages is yours?

12        A.    49 to 61.

13        Q.    Yes.

14        A.    On -- there is no stamp on this page

15   but it is in the stack.  I don't know how you

16   want -- if it got cut-off.  It is the back of

17   6654, there is a Miscellaneous Incident Report,

18   but there is no number on it.

19        Q.    Can I -- just, for the record, this is

20   a document that does have what looks like an

21   old Bates stamp number on that says "KC 1",  is

22   that correct?

23        A.    Correct.

24        Q.    Sorry I interrupted your answer.  You

Page 78

1    were referencing us to this page why?

2         A.   Because that's my signature on the

3    bottom of it.

4         Q.   Okay.

5         A.    It is not -- it was part of the

6    original document, it wasn't overlaid later on,

7    just so you know.

8         Q.   Okay.  Any other pages that have your

9    handwriting on them?

10        A.   I'm getting to that.  This would be

11   DEFS 6656.  That's my signature at the bottom

12   of it.

13              6658 that's my signature at the

14   bottom when I write Mr. Amor's Miranda

15   warnings.

16              6659, that's my signature at the

17   bottom of the written statement.

18              Up to 62 did you say?

19        Q.   62, yes.

20        A.   So 60 has any signature on it, it is

21   my report.

22              61, that's my signature on it.

23               And, 62, that's my signature on

24   it.

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 79

1          Q.   So looking at 61 and 62, the last two

2     we were just talking about, do you see some

3     words on those pages that say "drinking",

4     "insurance", "background work" and "that day"?

5          A.   I do.

6          Q.   Is any of that handwriting yours?

7          A.   No.

8          Q.   And just in looking, for instance, at

9     6665 and 6666.

10         A.   65 and 66?

11         Q.   Yes.

12         A.   Okay.  65 is a police report that you

13    prepared, correct?

14         A.   Correct.

15         Q.   And that relates to actions that you

16    took as part of the investigation into the fire

17    in this case, right?

18         A.   Correct.

19         Q.   6666 is a police report that you did

20    not prepare, right?

21         A.   That's correct.

22         Q.   And that references an interview that

23    was conducted with Tina Amor that you were not

24    present for or involved in, correct?

Page 80

1          A.    That's correct.

2          Q.    Do you know why this police report was

3     in your possession with these other documents

4     given that it relates to something that

5     happened in the case that didn't involve you?

6          A.    I do not.

7          Q.    Those are all of the questions I have

8     for Exhibit 2 right now.  You can set that

9     aside.

10                    As you sit here today do you have

11    any memory of the content of the training that

12    you received at Reid & Associates?

13         A.    Very basic.

14         Q.    What is your memory of that training

15    in terms of the content?

16         A.    Sure. The first part I recall is just

17    generally questions to ask witnesses or

18    possible suspects to elicit their response, to

19    help determine perhaps if they are a suspect

20    and not just a witness.

21         Q.    Is that the only thing that you recall

22    in terms of content?

23         A.    And then to -- if someone is thought

24    that they are a suspect to try and figure out

Page 81

1   motivation for the crime that they committed,

2   or a theme that might be part of what the

3   suspect was doing at the time they committed

4   the crime.

5       Q.   Anything else in terms of content you

6   recall?

7       A.   That's all I recall.

8       Q.   Am I right then that part of the

9   training that you received was about questions

10  that you could ask to separate out somebody who

11  was a suspect from somebody who was a witness?

12      A.   That's correct.

13      Q.   And what did you -- what training did

14  you receive about questions you could ask to

15  help make that determination?

16      A.   The only ones I recall are ask the

17  witness, potential suspect, what do you think

18  should happen to the person that did X Y Z,

19  committed a robbery or a sex assault.

20           And then based on their answer,

21  you know, that might help guide you as an

22  investigator as to whether this person is just

23  strictly a witness or more involved.

24      Q.   Was it your training with Reid &

Page 82

1    Associates in general terms that if a person

2    expresses like an understanding or a desire for

3    leniency for the person who is involved in a

4    dream that that could reflect they were a

5    suspect and not a witness?

6         A.    It is possible.

7         Q.    I take it that you agree that your

8    training with Reid & Associates encompassed a

9    lot of other topics, but that's specifically

10   what you recall as you sit here today, correct?

11        A.    Right.

12        Q.    Prior to your interrogation of William

13   Amor, have you ever conducted an interrogation

14   in your career of a person that was a suspect

15   in a violent felony?

16        A.    I don't recall.

17        Q.    Have you ever at any point received

18   any training on whether corroborating a

19   confession is something that should be done as

20   part of a criminal investigation?

21        A.    I don't recall any specific training

22   to that.

23        Q.    Do you believe that it is important to

24   corroborate information provided in a

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 83

1    confession?

2        A.    I do.

3        Q.    And why is that important?

4        A.    To determine if the person you are

5    talking with is being truthful about the events

6    that occurred.

7        Q.    Did you have that same belief about

8    the importance of corroboration back in 1995?

9        A.    I did.

10       Q.    And do you believe that part of

11   evaluating the truthfulness of a confession as

12   a police investigator is evaluating whether the

13   information that is received in a confession is

14   coming from a person that is in distress?

15           MR. POLICK:   Objection to the form of

16   the question. You may answer.

17           THE WITNESS:  I'm sorry.  So could you

18   repeat the question?

19

20   BY MS. THOMPSON:

21       Q.    Let me ask that question in a better

22   way.

23           Do you believe it is important in

24   evaluating whether or not a confession is

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 84

1    truthful to evaluate whether or not the person

2    giving the confession is in distress at the

3    time they are making the confession?

4         A.    I think it is important to understand

5    what their general emotional condition is at

6    the time.

7         Q.    Why is that important?

8         A.    Well, only to the degree that, A, you

9    want to make sure they are sober, not under the

10   influence of drugs or alcohol when you are

11   talking to them.

12              And I think just their emotional

13   state, if a person is hysterical, fine, it is

14   going to be hard to get a logical statement

15   from them because of the emotions.

16        Q.    Part of your training from Reid &

17   Associates included training on how to keep a

18   suspect that was being interrogated from

19   persisting in a denial of involvement in a

20   crime, is that correct?

21        A.    It may have been.

22        Q.    Have you ever received training in

23   your career about part of interrogation

24   technique being to prevents a person from

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 85

1    persisting in denial of involvement?

2         A.    I don't know I ever received training

3    in it.

4         Q.    Well, is it your belief in -- is it

5    your belief that an important part of a

6    successful interrogation is to prevent a person

7    from persisting in denial of involvement in a

8    crime?

9              MR. POLICK:    Objection to form.    You

10   may answer.

11             THE WITNESS:    Only if I believe they

12   committed the crime.

13   BY MS. THOMPSON:

14        Q.    So in a situation in which you as a

15   law enforcement officer are interrogating

16   someone and you believe they were involved in

17   the crime, part of the technique you employ as

18   an interrogator is to prevent them from just

19   continuing to deny that involvement, correct?

20             MR. POLICK:    Objection to form.    You

21   may answer.

22             THE WITNESS:    That's fair to say.

23   BY MS. THOMPSON:

24        Q.    And why is that part of the technique

Page 86

1    that you employ in that specific situation?

2         A.   Well, my goal is always to get the

3    truth and if I believe I'm being lied to by the

4    suspect, then I want the suspects to understand

5    that I don't believe their story.

6         Q.   Do you agree that over the course of

7    your career with the Naperville Police

8    Department that you conducted many

9    interrogations of suspects?

10        A.   I do.

11        Q.   As you sit here today, do you believe

12   that you took any confessions from any suspect

13   during the course of your career with the

14   Naperville Police Department where that person

15   falsely implicated themselves a crime?

16        A.   No.

17        Q.   Do you believe it is possible when

18   someone gives a confession for someone to

19   falsely implicate themselves in a crime?

20        A.    I think it is possible.

21        Q.   And I think we would agree that

22   certainly in a situation, for instance, an

23   extreme situation where someone is being, you

24   know, beaten or tortured in that situation

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 87

1    obviously it is very possible for someone to

2    falsely confess in that situation, right?

3         A.    That's correct.

4         Q.    Setting aside that extreme situation,

5    in a situation where a person is not being

6    physically abused, do you believe it is

7    possible for someone to make a confession that

8    falsely implicates themselves in a crime?

9         A.    I would need more facts.  What other

10   factors besides obviously physical violence,

11   what other factors are you referencing?

12        Q.    Well, do you believe that there are

13   factors that exist that would make it possible

14   for someone to make a false confession to a

15   crime other than in a situation where they are

16   being, you know, beaten?

17        A.    Give me a hypothetical.  What fact

18   would you consider or want me to consider?

19        Q.    That's fair.  I mean do you believe it

20   is possible in a situation where a person has

21   been interrogated for hours and is simply tired

22   of being questioned for that person to make a

23   false statement in order to seek an end to an

24   interrogation?

Page 88

1        A.    I guess it is possible.

2        Q.    Do you believe that has ever occurred

3    in your career?

4        A.    That I am aware of personally?  Or

5    that I read about in the newspaper?

6        Q.    That's a fair point.  And I'm asking

7    do you believe that that is possible that that

8    ever occurred in your career in connection with

9    an interrogation that you were involved in?

10       A.    No.

11       Q.    Do you believe it is possible for a

12   person who is predisposed to wanting to please

13   authority figures to make a false statement

14   implicating themselves in a crime because they

15   want to ingratiate themselves with the

16   authorities?

17            MS. POLICK:  I'm going to object to

18   the extent it calls for a medical or an expert

19   opinion or psychological opinion that would

20   be -- would be beyond his competence as a

21   witness.  But other than that you can go ahead

22   and answer.

23            THE WITNESS:  I can't speak to that.

24   BY MS. THOMPSON:

Page 89

1      Q.   Have you ever interrogated anyone in

2  your career that you believed seemed eager to

3  ingratiate themselves to you during an

4  interrogation?

5      A.   Some of the people I've interviewed

6  have been very pleasant and talkative, which I

7  think is just their nature, some people are

8  very iradisent (sp) and condescending or

9  violent.

10            So I don't know what you would

11  classify as someone I'm interviewing as

12  pleasant, talkative, I don't know if that means

13  they are ingratiating, but they just might be

14  pleasant people or polite.

15      Q.   Do you believe that it is possible in

16  the context of an interrogation for someone to

17  give a false confession that is based on them

18  repeating details about a crime that were

19  provided to them by the police in the course of

20  an interrogation?

21            MR. POLICK:   Object to the form of

22  the question. Sounds like an incomplete

23  hypothetical and to the extent it calls for

24  some type of specialized or expert testimony

Page 90

1  that this witness may not be competent to

2  provide.  But other than that you may go ahead

3  and answer.

4          THE WITNESS:  Can you repeat the

5  question?

6  BY MS. THOMPSON:

7      Q.  Can you repeat that question?  Madam

8  Court Reporter, can you repeat that question?

9          (Question read.)

10         MS. POLICK:  Same objection.  You can

11  answer.

12         THE WITNESS:  I believe it is

13  possible.

14  BY MS. THOMPSON:

15     Q.  Have you ever received any training or

16  direction from supervisors about methods to

17  avoid unwittingly feeding details to a suspect

18  that they would then repeat back to you in a

19  confession?

20     A.  I don't recall specific training, but

21  it is a widely held belief in our community of

22  investigators to not provide information about

23  the crime that -- or the incident that the

24  person you are interviewing doesn't already

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 91

1    know.

2         Q.    And do you agree the reason why is

3    because you want to avoid contaminating the

4    information that person has so you can evaluate

5    the credibility of the statements they are

6    making?

7         A.    It is part of the reason.  The other

8    part is, if you were to do that you might be

9    providing a criminal suspect or witness with

10   key information that they can pass along to

11   other co-conspirators at a later time.

12        Q.    Are there any other reasons you would

13   want to avoid doing that besides the one I

14   mentioned and the one you mentioned?

15        A.    Not that I could think of right now.

16        Q.    In the course of your career with the

17   Naperville Police Department, were you ever

18   told by any of your supervisors that your

19   interrogation skills were one of your strongest

20   assets?

21        A.    It is possible.

22        Q.    Do you believe that in the course of

23   your career as an investigator with the

24   Naperville Police Department that your

Page 92

1    interrogation skills were one of your strongest

2    assets?

3        A.   I believe they are.

4        Q.   Do you agree that you obtained a high

5    rate of confessions in your career with

6    Naperville Police Department?

7            MR. POLICK:   Objection to the form.

8    You go ahead and answer.

9            THE WITNESS:   I can't speak to the

10   clearance rate, I don't know what it is.

11   BY MS. THOMPSON:

12       Q.   Did you ever receive a performance

13   review in the course of your career with the

14   Naperville Police Department that reflected

15   that you obtained a high rate of confessions

16   during post-arrest interviews?

17       A.   I may have.

18       Q.   Do you believe that's true?

19            What I say, do you believe it is

20   true that you obtained a high rate of

21   confessions during your post-arrest interviews

22   in the course of your career?

23            MS. POLICK:  Objection to form.  You

24   may answer.

Page 93

1              THE WITNESS:  I believe so.

2    BY MS. THOMPSON:

3         Q.   Do you agree -- well, I actually want

4    to ask you about something else. I will come

5    back to that.

6                   In your time in the Naperville

7    Police Department were there any written

8    policies or procedures that you were aware of

9    that governed the police department's policy,

10   procedures about interviewing suspects of

11   crimes?

12        A.   I believe there were.

13        Q.   And when you were with the Naperville

14   Police Department did you have access to those

15   written policies and procedures?

16        A.   I did.

17        Q.   How did you access them?

18        A.   We were given a binder, three-ring

19   binder with the general orders.

20        Q.   Were those policies and procedures

21   anywhere else other than in the Naperville

22   Police Department general orders, and I'm

23   talking specifically with respect to

24   interrogation?

Page 94

1          A.    Back in 1995?

2          Q.    Yes.

3          A.    I don't believe -- they could have

4    been on a computer server somewhere, but my

5    belief is that they were in a binder.

6          Q.    I want to ask you about some names of

7    other people that may or may not have some

8    connection with this case.

9                Are you familiar with someone

10   named Brian Nigohosian?

11         A.    I am.

12         Q.    Brian Nigohosian was a DuPage State's

13   Attorney at the time of Mr. Amor's arrest in

14   this case, do you agree?

15         A.    He was.

16         Q.    Is he someone you have ever been

17   friendly with outside of professional

18   interactions with him?

19         A.    I may have bumped into him at a

20   retirement party, but that is the extent of it.

21         Q.    Had you ever worked on other cases

22   with Mr. Nogohosian other than Mr. Amor's?

23         A.    I probably did, but I can't be

24   specific beyond that.

Siebert & Assocs. Court Reporters, Inc.                cmsreporters@comcast.net

Page 95

1       Q.   Do you know someone named Jon Ripsky?

2       A.   I do.

3       Q.   What was John Ripsky's role in the

4   Naperville Police Department in 1995?

5       A.   He was the captain in charge of

6   administration.

7       Q.   Was he a person who had supervisory

8   authority over you in 1995?

9       A.   He was not my supervisor, but he was a

10  captain.

11      Q.   Higher rank than you?

12      A.   Correct.

13      Q.   When you said he was over

14  administration, how did that -- how did his

15  assignment relate to what you were doing in the

16  1995?

17      A.   His primary roles were to supervise

18  the dispatch center and records and animal

19  control, and I believe that was his primary.

20  There were three captains, administration,

21  patrol and investigations.

22      Q.   Prior to Marianne Miceli's death had

23  you ever worked in a unit with Jon Ripsky?

24      A.   I did not.

Page 96

1        Q.   Did you know him outside of work?

2        A.   I did not.

3        Q.   Prior to today, when is the last time

4   that you talked with Jon Ripsky?

5        A.   Possibly a retirement party or

6   retirement get together at the police station.

7        Q.   Have you ever talked with Jon Ripsky

8   about anything having to do with William Amor

9   or the Miceli family?

10            MR. POLICK:   Limit that to outside of

11  the presence of his attorneys, your question is

12  broad enough to implicate attorney/client

13  privilege, that's what I am objecting to.  If

14  you want to rephrase it, I will let him go

15  ahead and answer.

16  BY MS. THOMPSON:

17       Q.   Let me ask you this.

18            Have you ever met with your

19  attorneys about this case where anyone was

20  present besides you and your lawyers?

21       A.   About this case?

22       Q.   That's a fair point. Yes, I'm asking

23  about this case.

24       A.   I believe so.

Page 97

1      Q.   So have you ever had any conversations

2   with Jon Ripsky about anything having to do

3   with William Amor or the Miceli family?

4      A.   I may have served Jon Ripsky with a

5   subpoena, but that would be the extent of it.

6      Q.   Did you serve him in person?

7      A.   I did.  R I P S K Y.

8      Q.   Did you serve him with a subpoena for

9   a subpoena for the retrial?

10      A.   I believe so.

11      Q.   Do you talk about anything having to

12   do with the case other than the mechanics of

13   subpoena service at the time you did that?

14      A.   No.

15      Q.   Going back to Brian Nigohosian, have

16   you ever talked with Brian Nigohosian about

17   this case after the conclusion of the

18   statements that were taken from Mr. Amor in

19   this case?

20      A.   After the conclusion of that night, I

21   don't believe so.

22      Q.   It is my understanding that one of the

23   people that had some involvement in this case

24   named Mark Carlson is now deceased, is that

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 98

1    your understanding?

2         A.    That's correct.

3         Q.    Prior to Mark Carlson's passing, did

4    you know him?

5         A.    I did.

6         Q.    Did you work with him at all at the

7    Naperville Police Department?

8         A.    I did.  Mark was the major crimes

9    sergeant for this -- during the time of this

10   investigation.

11              So he was not my direct

12   supervisor, because I was in the special

13   enforcement unit, had a different sergeant, but

14   he was the overall sergeant for this

15   investigation.

16        Q.    At the time of -- and you have used

17   the words "this investigation" a couple of

18   times.  We can agree that refers to the

19   Marianne Miceli death investigation, correct?

20        A.    Right.

21        Q.    At the time of this investigation,

22   what were the responsibilities of the major

23   crimes sergeant with respect to homicide

24   investigations in Naperville?

Page 99

1              MS. POLICK:   In 1995?

2    BY MS. THOMPSON:

3         Q.   At the time of this investigation?

4              MR. POLICK:    I'm sorry.

5              THE WITNESS:   Generally a sergeant

6    would be in charge of the investigation and

7    insure that the case is being followed up in a

8    professional and thorough manner, talk to the

9    detectives assigned to the case and the patrol

10   officers that may have some involvement to make

11   sure all of the proper leads are being followed

12   up with.

13   BY MS. THOMPSON:

14        Q.   So was there a major crimes unit at

15   that time?

16        A.   There was.

17        Q.   And who else was assigned to the major

18   crimes unit at the time of this investigation

19   other than Sergeant Carlson?

20        A.   Mike Cross, Mike Sullivan, Brian

21   Cunningham, Jamie Griffith, might have been

22   Mike Anders, but I'm not 100% sure on that.

23   A N D E R S.

24        Q.   Was Jamie Griffith a man or a woman?

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 100

1          A.    A man.

2          Q.    Anyone else you can recall that was in

3     major crimes at the time of this case?

4          A.    I can't recall anybody else.

5          Q.    And so the officers that you just

6     identified, those people would have been

7     supervised by Mark Carlson?

8          A.    Correct.

9          Q.    Who was Mark Carlson's supervisor at

10    the time of this investigation?

11         A.    That would be the lieutenant in charge

12    of investigations, most likely -- again I don't

13    recall clearly, possibly Lieutenant Hildebrand

14    or Lieutenant Kirk.

15         Q.    Prior to Mark Carlson's passing was

16    that someone who you considered to be a friend

17    outside of work?

18         A.    He was a friend but Mark Carlson was

19    very private, so there was virtually no

20    association out of work.

21         Q.    But you agree he was someone you were

22    on friendly terms with?

23         A.    Correct.

24         Q.    This is -- I don't mean any disrespect

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 101

1   by this question.  I feel it is just something

2   I need to establish on the record.

3                    His passing had nothing to do

4   with the events of this case?

5        A.   That's correct.

6        Q.   When was the last time you spoke to

7   him before his passing?

8        A.   I spoke to him the day before.

9        Q.   Prior -- or let me ask this question.

10                   After the conclusion of the

11  events -- let me start that question again.

12                   After you finished taking the

13  statements that were taken from Mr. Amor in

14  this case, did you ever talk at any point after

15  of that with Mark Carlson about anything having

16  to do with this investigation?

17       A.   I may have.

18       Q.   Did you talk with him at either of

19  Mr. -- well, at Mr. Amor's first trial?

20       A.    It is possible, but I don't recall it.

21       Q.   You mentioned Mike Cross, did you work

22  with Mike Cross on any other Naperville Police

23  Department investigations other than this one?

24       A.    Well, I may have, but all of the time

Page 102

1    he was in major crimes, I was in special

2    enforcement.

3              But a period of time I was a

4    sergeant in charge of major crimes, so I would

5    have been Mike Cross' supervisor.

6         Q.   Did you ever supervise Mike Cross on

7    any other violent felony investigations?

8         A.   I did.

9         Q.   How many?

10        A.   Well, his primary assignment in major

11   crimes would have been crimes against person,

12   so the majority, and how many I can't speak to.

13        Q.   Like --

14        A.   A couple of years I was a supervisor,

15   so during that period of time.

16        Q.   Okay.  Is Mike Cross someone who you

17   consider to be a friend outside of work?

18        A.   He is.

19        Q.   Have you spoken with him -- he is

20   retired now from the police department,

21   correct?

22        A.   He is.

23        Q.   Have you spoken to him since his

24   retirement?

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 103

1        A.    Yes.

2        Q.    When is the last time prior to today

3   that you talked to him?

4        A.    I don't recall if I had seen him this

5   year.  I really can't say.

6        Q.    In 1995 was Mike Cross someone who you

7   considered to be a friend?

8        A.    I was friendly with him, but I didn't

9   associate with him really outside of the

10  office.  He was in a different division

11  component than I was.  He was older than I was.

12  And, you know, my circle of friends was not

13  necessarily the same as his.

14       Q.    We went through earlier an e-mail

15  related to you reaching out to Mike Cross to

16  setup a meeting with the State's Attorney.

17                 Other than those communications

18  that I think we already covered, have you

19  talked with Mike Cross at all about anything

20  having to do with this case since you finished

21  taking the statements from William Amor?

22                 MS. POLICK:  Outside of the presence

23  of his attorneys, because your question is

24  broad enough to impact attorney/client.

Page 104

1          MS. THOMPSON:  Well, I think we

2    already covered that.

3          Q.   Have you ever met with your lawyers

4    with anyone else present?

5          A.   No.

6          Q.   Have you ever had conversations with

7    Mike Cross about anything having to do with

8    this case since you took the statements from

9    William Amor other than the communications we

10   already talked about in terms of setting up his

11   meeting with the state?

12         A.   Since 1995?

13         Q.   Yes.

14         A.   Yes, I'm sure I have.

15         Q.   Why do you say that you are sure you

16   have?

17         A.   Well, a confession didn't stop the

18   investigation in 1995, we were still working on

19   the case together.

20         Q.   Why didn't the confession stop the

21   investigation?

22         A.   Well, the reports had to be written,

23   reviewed and any additional witnesses,

24   additional witnesses were identified to be

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 105

1    interviewed, so that sort of thing.

2         Q.   Since Mr Amor's first trial in this

3    case have you talked with Mike Cross about

4    anything having to do with this case, again

5    other than the stuff we already talked about?

6         A.   I may have.

7         Q.   Do you have a memory as you sit here

8    today about the content of any of those

9    conversations?

10        A.   I do not.

11        Q.   Okay.  You mentioned Brian Cunningham,

12   is Brian Cunningham someone in 1995 you

13   considered to be a friend?

14        A.   He is.

15        Q.   Is he a friend today?

16        A.   He is.

17        Q.   And had you ever worked in the same

18   unit as Brian Cunningham during any point in

19   your Naperville Police Department career?

20        A.   I did.

21        Q.   And were you his supervisor in major

22   crimes, also?

23        A.   I was.

24        Q.   Did you work with him at any other

Page 106

1    times?

2         A.   Well, he was in the special

3    enforcement unit with me for a period of time

4    before he transferred to major crimes.

5         Q.   When was he in special enforcement

6    with you?

7         A.   2001, '02, '03, somewhere in that

8    range.

9         Q.   At that point in time when you and

10   Brian Cunningham were both in special

11   enforcement, how many people were assigned to

12   special enforcement?

13        A.   There was about six including the

14   sergeant.

15        Q.   And did you all work the same shift?

16        A.   No.

17        Q.   Were people different shifts?

18        A.   No, we worked different shifts.

19        Q.   Was it three shifts?

20        A.   No, generally afternoons, but we were

21   flexible, so one team might work days, one team

22   afternoons.  Midnight shift only on for special

23   details.

24        Q.   How many teams were there in special

Page 107

1    enforcement?

2          A.    Essentially two teams but it was

3    flexible.

4          Q.    Two teams of three, essentially?

5          A.    Two or three.

6          Q.    Who was your supervisor in special

7    enforcement at that time?

8          A.    Sergeant Ray McGury, M C G U R Y.

9          Q.    After William Amor's first trial, have

10   you had any conversations with Brian Cunningham

11   about this case?

12         A.    I may have.

13         Q.    Do you remember the contents of any of

14   those conversations?

15         A.    I do not.

16         Q.    Do you know someone named Dave

17   Ferreri?

18         A.    F E R R E R I.

19         Q.    How do you know Dave Ferreri?

20         A.    He works for the Fire Department.

21   He is retired now, too, I believe.

22         Q.    When was the last time you talked to

23   Dave Ferreri prior to today?

24         A.    I gave him a subpoena for this case or

Page 108

1    for the second trial.

2         Q.    When was the last time you talked to

3    him prior to that?

4         A.    It probably would have been years

5    before that.

6         Q.    Did you work on any other cases during

7    your time with the Naperville Police Department

8    with Dave Ferreri other than this one?

9         A.    I don't believe so.

10        Q.    Do you know someone named Donald Bish,

11   B I S H?

12        A.    I do.

13        Q.    Did you ever work with Donald Bish at

14   the Naperville Police Department?

15        A.    I did.

16        Q.    When did you work with him?

17        A.    Me and Donald Bish were hired on the

18   same day in 1985 I was hired higher on the list

19   than he was, so I had more seniority.

20              And I worked with him basically

21   since then, we were different divisions, his

22   specialty was general assignment and financial

23   crimes, but we worked on many cases together.

24        Q.    Have you ever had any conversation or

Page 109

1    communication with Donald Bish about anything

2    having to do with William Amor?

3         A.   I don't recall if I did.

4         Q.   Have you ever seen any records

5    reflecting that you and Donald Bish have ever

6    had any communications relating to William

7    Amor?

8         A.   I don't recall seeing any records.

9         Q.   I don't have this person's first name,

10   do you know an Investigator Hochstetler,

11   H O C H S T E T L E R?

12        A.   Yes.

13        Q.   Am I saying it right?

14        A.   Hochstetler, Steven is his first name.

15        Q.   Okay.  Did you ever work with

16   Investigator Hochstetler at the Naperville

17   Police Department?

18        A.   I did.

19        Q.   When did you work with him?   Or to be

20   clear, what assignments did you work with him?

21        A.   I remember some burglary

22   surveillances, he was part of major crimes,

23   also.  Now that you bring his name up, he was

24   crimes against property.

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 110

1              So I believe I worked with Steve

2      on some -- helping out with surveillance, which

3      is part of what special enforcement did.

4          Q.   Did you ever have any communications

5      with Steven Hochstetler about William Amor?

6          A.   Not that I'm aware.

7          Q.   Do you know someone with the

8      Naperville Police Department who was with the

9      Naperville Police Department by the last name

10     B A R K E R who had the first initial "J"?

11         A.   That would be Jerry Barker.

12         Q.   Did you ever work with Jerry Barker?

13         A.   Very briefly, he transferred to the

14     Los Angeles Police Department many years ago.

15         Q.   Have you ever spoken with him about

16     William Amor?

17         A.   No.

18         Q.   You mentioned Jamie Griffith being

19     assigned to major crimes, to your knowledge did

20     Jamie Griffith have any involvement in the

21     investigation of the death of Marianne Miceli?

22         A.   I think he conducted some interviews.

23         Q.   Do you know which interviews he

24     conducted?

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 111

1        A.    I believe so.  He interviewed Marilyn

2    Glisson, G L I S S O N.

3        Q.    Have you ever had any conversations or

4    communications with Jamie Griffith about

5    anything having to do with William Amor or with

6    this investigation?

7        A.    I don't recall any specific

8    conversations with him about it.

9             MS. THOMPSON:  I want to go into more

10   specifically then some of your work on this

11   investigation, this might be a good time for a

12   break, if people are ready to take it.  But I'm

13   also happy to start, and we can break later,

14   whatever you guys want to do.

15            MR. VIDEOGRAPHER:  Standby.

16              The time is 12:36 P.M. we are

17   going off the record.

18              (Recess.)

19

20            MR. VIDEOGRAPHER:  Standby, please.

21   The time is 1:11 P.M. and we are back on the

22   record.

23   BY MS. THOMPSON:

24       Q.    At the time of the investigation into

Page 112

1    Marianne Miceli's death was David Dial the

2    Chief of Police of the Naperville Police

3    Department?

4          A.    He was.

5          Q.    Have you ever discussed any aspect of

6    the investigation of this case or William Amor

7    with Chief Dial?

8          A.    I don't believe so.

9          Q.    Have you seen a letter of

10   accommodation or a memo of accommodation from

11   Chief Dial that ended up in your personnel

12   file?

13         A.    Yes, I think I did see that.

14         Q.    Do you agree with the content of that

15   letter of accommodation from Chief Dial?

16         A.    What did it say?

17         Q.    I'm not trying to play games about

18   that.  Let me show it to you.  Are we on 3?

19

20                   (Deposition Exhibit No. 3 was

21                    marked for identification.)

22         MS. THOMPSON:  Let's go off the record

23   for one second.

24                   (Discussion had off the record.)

Page 113

1  BY MS. THOMPSON:

2      Q.   I'm showing the witness has been

3  marked as Exhibit 3, which is a one-page

4  document which is Bates stamped DEFS 9033.

5           Do you recognize this,

6  Investigator Guerrieri, to be the memo that we

7  were just discussing?

8      A.   I do.

9      Q.   I'm going to ask you to review it, and

10 I think the question I posed to you a minute

11 ago was whether you agreed with the content of

12 this memo?

13     A.   I don't necessarily agree with the

14 wording of it, I don't know who wrote it, but

15 it came from the Chief's office.

16     Q.   What wording do you disagree with?

17     A.   Well, part of it is that, you know, if

18 "It became apparent that a confession by the

19 perpetrator would be the necessary element to

20 prove the case.", I wouldn't necessarily have

21 worded it that way.

22     Q.   Why not?

23     A.   Well, there was a lot of other factors

24 that led to the State's Attorney approving

Page 114

1    charges, you know, besides the confession.

2        Q.    Anything else in this memo that you

3    disagree with other than that sentence that we

4    just looked at?

5        A.    Well, this Paragraph 2, the second

6    line, we "were able to clear Tina Miceli of any

7    involvement".

8              I mean when this letter was

9    written, it is dated November 9th, so it would

10   have been the next month, the investigation,

11   some aspects were still ongoing.

12             So it is not a wording I would

13   have -- had I been writing it, I would not have

14   used that wording.

15       Q.    Do you know how -- well, let me ask

16   you this.

17             Have you ever heard any member of

18   the Naperville Police Department express the

19   opinion that William Amor's confession, you

20   know, was a necessary element to proving the

21   case or, you know, words to that effect?

22       A.    Well, this says, "the necessary

23   element", so it is like the way I read it, it

24   is the one element, but there is many other

Page 115

1    elements involved in that.

2              So did I hear someone else say

3    that, not that I recall someone using that

4    verbiage.

5        Q.   Do you recall William Amor's

6    confession was a necessary element to prove the

7    case against him?

8        A.   It was an important element,

9    certainly.

10       Q.   Do you agree it was necessary?

11       A.   There is a lot of other evidence in

12   addition, so I can't based on what I know, to

13   say that, you know, what would have happened

14   without it.

15             I'm just going based on what we

16   have and what we did and all of the different

17   elements that lined up that night.

18             And the confession certainly was

19   an important element so --

20       Q.   The issue that you just discussed with

21   respect to clearing Tina Miceli, at what point,

22   if ever, did you clear Tina Miceli of any

23   involvement in this fire?

24       A.   I don't know that it was up to me to

Page 116

1   clear her. Just that in general the evidence

2   didn't point to her substantial involvement, so

3   it is really not up to me to say she was

4   cleared or not cleared.

5          Q.   Did you or Mike Cross ever -- and this

6   obviously is based on your personal knowledge,

7   so -- let me start that question again.

8               To your knowledge did you or Mike

9   Cross ever convey an opinion to anyone that,

10  you know, Tina Miceli was cleared of any

11  involvement in this fire?

12         A.   I don't recall transmitting that

13  information or that idea just by its absence

14  she was not charged with a crime, so I guess

15  that's one way to look at it.

16         Q.   Did you review this memorandum near

17  the time that it was issued?

18         A.   I'm sure I looked at it, but I didn't

19  study it.

20         Q.   Did you ever tell anyone prior to

21  today, and I'm excluding any conversation with

22  counsel potentially, but prior to counsel, did

23  you ever tell anyone prior to today that there

24  were aspects of this memorandum that you

Page 117

1    disagreed with?

2         A.    No.

3         Q.    Anything else in this memorandum that

4    you think is incorrect other than what we just

5    discussed?

6         A.    Well, the last sentence of the first

7    paragraph where Tina and her husband, Bill,

8    become the focus of the investigation due to

9    both subjects having left the apartment just

10   ten minutes prior to the fire starting.

11                    Over time during the

12   investigation it became clear, you know, the

13   timing of what happened.

14                    So at some point I suppose it is

15   fair to say they become the focus but, you

16   know, when that occurred, I don't know.

17        Q.    Any other elements of this memorandum

18   that you believe are incorrect?

19        A.    Extensive heat and fire damage at the

20   fire scene tended to discount the possibility

21   of an accidental fire.  It may have and may not

22   have.  I don't really have any arson or fire

23   training.  I can't say it is incorrect, I'm

24   just saying I don't really know -- I can't

Page 118

1    really speak to whether that's -- whether that

2    conclusion is correct or not.

3         Q.   During your involvement in this

4    investigation, did you ever reach a personal

5    belief that extensive heat or fire damage at

6    the fire scene tended to discount the

7    possibility of an accidental fire?

8         A.   I really don't know.  I never formed

9    an opinion on the fire side of it.  I don't

10   have any training in it.

11        Q.   Anything else that you think is

12   incorrect in this memo?

13        A.   Well, I would kind of object to the

14   word incorrect, because I'm not saying that

15   these things are necessarily incorrect, it is

16   just a matter of how they are worded.  I might

17   have worded them, you know, differently.

18        Q.   Anything else in this memorandum that,

19   you know, based on your understanding of this

20   case you would have worded differently?

21        A.   I think it is summarizes essentially

22   certain aspects of our case, investigation.

23        Q.   While we are on your file.  Mark this.

24                       (Deposition Exhibit No. 4 was

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 119

1                              marked for identification.)

2          Q.   I've shown you what's been marked as

3    Exhibit 4, which is a one-page document that is

4    Bates stamped DEFS 8906.

5                     If you need to take a minute to

6    review it before answering his question, that's

7    fine, but my first question for you is just if

8    you recognize Exhibit 4.

9          A.   I don't, but it looks, you know, like

10   it was from my sergeant at the time,

11   Sergeant Paul Shafer, about the -- this would

12   have been part of the evaluation process.

13         Q.   Did you ever discuss with

14   Sergeant Shafer you seeking more knowledge in

15   arson investigations to expand your expertise

16   and confidence?

17         A.   I don't recall telling the sergeant

18   that I wanted that training, so I don't know

19   that I asked for arson training.

20                     Certainly if I would have asked

21   for it, been persistent, I would have got it at

22   some point.

23         Q.   Did you ever talk with any of your

24   supervisors in the Naperville Police Department

Siebert & Assocs. Court Reporters, Inc.      (773)851-7779   cmsreporters@comcast.net

Page 120

1    at any point about the possibility of you

2    receiving additional arson investigation

3    training?

4         A.   I don't recall.

5         Q.   Was -- in your time in the Naperville

6    Police Department, was arson investigation

7    training something that was a routine part of

8    training for any investigators?

9              MS. POLICK:  Objection to the form,

10   but go ahead and answer.

11             THE WITNESS:  I don't believe so.  It

12   wasn't part of the standard, you know, training

13   that we went through.

14   BY MS. THOMPSON:

15        Q.   In your time in the Naperville Police

16   Department, was major crimes responsible for

17   arson investigations, and let me clarify, I'm

18   talking about arson investigations with respect

19   to structures?

20        A.   Sure.  Yes, I think they were, yes.

21        Q.   Was there any particular training that

22   investigators in major crimes received about

23   arson as part of their training or, you know,

24   in-service training, continuing training for

Page 121

1    major crimes?

2          A.    I don't know.

3          Q.    Are you aware of any specific policies

4    and procedures that the Naperville Police

5    Department had during your time with the police

6    department for arson investigations?

7          A.    I am not.

8          Q.    Do you recall, as you sit here today,

9    any specific general orders that dealt

10   specifically with the question of arson

11   investigations?

12         A.    I do not.

13         Q.    I want to talk to you about your

14   involvement in the investigation into Marianne

15   Miceli's death and when I use the term

16   "investigation" you understand I am talking

17   about the investigation into this case.

18         A.    Yes.

19         Q.    So I don't have to keep repeating a

20   longer phrase.

21               Who assigned you to work on the

22   investigation in this case?

23         A.    I was the on-call detective for that

24   weekend, because it was a Sunday night.  So

Page 122

1    typically detectives work two shifts, days and

2    afternoons, Monday through Friday.

3              So after that point a detective

4    was assigned to be on call, if something urgent

5    would arise Saturday or Sunday, and I was just

6    in that rotation.

7    Q.   All right.  You use the word

8    detective, so I want to make sure I understand

9    something.  Are you using that phrase

10   interchangeably with investigator or does that

11   have a different meaning in the department at

12   that time?

13   A.   No, it is the same.

14             MR. POLICK:   Just wait for her to

15   finish her question before you answer.  You may

16   anticipate it, but let her finish it, it will

17   go a little bit smoother, okay.

18             THE WITNESS:  Okay.

19

20   BY MS. THOMPSON:

21   Q.   Was everybody that was assigned to the

22   special investigations unit that you worked

23   with an investigator other than supervisors

24   potentially?

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 123

1          A.   Yes, they were all investigator

2    detective rank in the special enforcement unit.

3          Q.   Was that the same for major crimes?

4          A.   Correct.

5          Q.   Was everybody in major crimes and

6    special investigations in that pool that would

7    be on call on the weekends?

8          A.   No.

9          Q.   Who was in that pool?

10         A.   All of the major crimes detectives,

11   the general -- some of the general assignment

12   detectives and some of special enforcement unit

13   detectives.

14         Q.   Was there a particular way that people

15   in special investigations were differentiated

16   between being in that group versus not being in

17   that group?

18         A.   There was no criteria, it was just the

19   more experienced special enforcement unit

20   detectives would be put into that rotation.

21         Q.   Could people choose whether or not to

22   be in that rotation?

23         A.   Well, I mean it was the supervisor's

24   decision who would be in that rotation.  If it

Page 124

1    didn't meet with their approval, you would not

2    be in that rotation.

3         Q.   Could the individual investigators

4    either try to opt in or opt out?

5         A.   I don't recall that.  I'm not sure if

6    anybody ever opted out once they were in it.

7              I think an investigator could ask

8    a sergeant, you know, would you consider me for

9    the rotation but there was no process for that.

10        Q.   Did you ever try to get into that

11   rotation specifically or get out of it?

12        A.   No.

13        Q.   So am I correct that you became

14   involved initially in this investigation

15   essentially because you were on call at the

16   time that this fire happened at a time when

17   investigators otherwise weren't working, is

18   that correct?

19        A.   That's correct.

20        Q.   Is there a reason after initially

21   being assigned because of being on call that

22   you remained involved in the investigation?

23        A.   Well, my understanding is just because

24   I started with the case that once you start it

Page 125

1    you kind of stick with it for a substantial

2    part.

3         Q.   Did you ever have any conversation

4    during the course of the investigation about

5    whether or not you would remain involved with

6    anybody?

7         A.   Sure.  I don't recall having a

8    conversation about that.

9         Q.   Am I correct that there was an

10   assumption then that because you started you

11   just were going to keep going as opposed to

12   that being a conscious decision that was made

13   at some point by anybody?

14        A.   Yeah, I think that's fair.

15        Q.   If you had been busy with other work

16   or simply didn't want to remain involved in

17   this investigation for some reason after your

18   initial involvement the night of this fire, do

19   you believe that's something you could have

20   opted out of?

21             MR. POLICK:   Objection to the form.

22   Just point of clarification, are you saying

23   opt out of the investigation or the on-call

24   rotation?

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 126

1    BY MS. THOMPSON:

2        Q.   Let me rephrase my question.

3             We were talking about why you

4    continued being involved in this investigation

5    after your initial assignment.

6             And my question is, if after the

7    initial portion of this assignment ended, you

8    had been busy with other work or just didn't

9    want to remain involved, do you believe that

10   you could have opted out of continuing to be

11   involved in the investigation?

12       A.   I could certainly have asked the

13   sergeant -- to tell the sergeant I didn't want

14   to be involved anymore.  I don't know what

15   would have happened.

16       Q.   That's not a conversation you had

17   here, correct?

18       A.   Correct.

19       Q.   Is there a reason why?

20       A.   Well, I started the investigation, so

21   if they needed my assistance then I would give

22   them the assistance in the major crimes unit.

23       Q.   Was it your goal during the time you

24   were in the special investigations unit to

Page 127

1    advance your career with the Naperville Police

2    Department?

3          A.   Well, I believe at that time I was

4    taking the sergeant's test, so that would be

5    considered an advancement.

6          Q.   It was your goal at that time to

7    advance your career with the Naperville Police

8    Department?

9          A.   My goal was to make sergeant.

10         Q.   One of the things that you were

11   evaluated on in your career with the Naperville

12   Police Department was whether you willingly

13   accepted assignments, correct?

14         A.   I believe it was.

15         Q.   And is it fair to say that your goal

16   in the department was to willingly accept

17   assignments to which you were assigned and

18   participate in work that needed to be done?

19         A.   Yes.

20         Q.   At any point in your involvement in

21   this investigation, did you become aware that

22   William Amor had a prior arrest history in

23   Illinois?

24         A.   Yes.

Page 128

1        Q.   When did you first become aware that

2   William Amor had a prior arrest history in

3   Illinois?

4        A.   Fairly early on in the investigation.

5        Q.   How did you become aware of that?

6        A.   I believe we ran his criminal history

7   in the computer.

8        Q.   Am I right that there was a point when

9   you had originally gone to the scene of this

10  fire where you learned that William Amor lived

11  at this apartment where you left the scene and

12  went back to the police station to run a search

13  on William Amor to find out where he might be?

14            MR. POLICK:   Objection to the form

15  but go ahead and answer.

16            THE WITNESS:  Yes.

17  BY MS. THOMPSON:

18       Q.   Is that the point in which you learned

19  that he had a prior arrest history in Illinois?

20       A.   I don't know that, looking back if

21  that was the time, but the initial it could

22  have been.

23            But we had something called PIMs,

24  P I M S, Police Information Management System,

Page 129

1    so that would have been to check that system to

2    find out possibly where Bill and Tina Amor

3    worked or maybe some of their associates,

4    because they were not on the scene.

5         Q.   Was that a computer interface with

6    that system at the time, meaning that you had a

7    computer terminal at the police department that

8    you checked?

9         A.   Yes.

10        Q.   Okay.  Did the PIMS System include

11   prior arrest history for people if it was

12   available?

13        A.   If they had been arrested in

14   Naperville it would have, but it was specific

15   to the City of Naperville.

16        Q.   Does that PIMS System still exist?

17        A.   No, it is probably two or three

18   generations gone by now.

19        Q.   Has that data been, to your knowledge,

20   like --

21        A.   Carried over.

22        Q.   -- integrated into other systems?

23        A.   I don't know.

24        Q.   So if I understand your testimony, you

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 130

1    are saying it is possible when you ran this

2    PIMS check, that's not when you first learned

3    that Bill Amor had a prior arrest history?

4        A.   It is possible.

5        Q.   If it wasn't when you did that PIMS

6    search, when do you believe you learned that?

7        A.   It would have been done within a day

8    or so of our initial involvement.  I'm just

9    speculating on that.

10       Q.   There was a time after this fire where

11   you spoke to William Amor at the Leavenworth

12   home, correct?

13       A.   Correct.

14       Q.   When you talked to William Amor at the

15   Levinworth home, did you know at that point

16   that he had a prior arrest history in Illinois?

17       A.   I'm not sure at that initial interview

18   that I knew that.

19       Q.   Did you ever learn that William Amor

20   had, in fact, been arrested in the Naperville

21   Police Department parking lot for trespassing?

22       A.   No.

23       Q.   Is the first time that you have ever

24   learned that literally when I'm representing

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 131

1    that to you now?

2        A.    That's correct.  There was before

3    PIMs, the record management system is basically

4    three by five cards, index cards.

5              So I don't know how far back, you

6    know, those records go, if that's what is on

7    those cards, because nobody ever looks at them,

8    but that's how it was done before PIMs came

9    online.

10       Q.    Do you know when PIMS came online?

11       A.    I don't.

12       Q.    Let me just say generally as well, you

13   testified that you reviewed your prior

14   testimony in this case before giving your

15   deposition here today, is that correct?

16       A.    That's correct.

17       Q.    Is that testimony fresh in your mind

18   as you sit here today?

19       A.    No, not especially.

20       Q.    At the time that you reviewed your

21   testimony, any of those three pieces of

22   testimony, did your identify any testimony that

23   you gave that now you believe be to incorrect?

24       A.    I don't believe so.

Page 132

1          Q.   Is your testimony from 2018 in William

2     Amor's case fresh in your mind as you sit here

3     today?

4          A.   Relatively speaking compared to the

5     testimony from 1996 and '97, that's the

6     freshest, but even that's not super fresh.

7          Q.   Well, specifically as to your 2018

8     testimony, in reviewing that testimony, is

9     there any aspect of that testimony that you

10    believe was incorrect?

11         A.   I don't know.

12         Q.   Do you have any memory as you sit here

13    today about what you were doing prior to

14    getting a page about this case on

15    September 10th of 1995?

16         A.   Other than being at home, that's all I

17    really remember.

18         Q.   Do you recall that being a Sunday?

19         A.   Yes.

20         Q.   Were you a person who watched the NFL

21    at that point in your life?

22         A.   Yes, and I still do.

23         Q.   Do you believe you watched any NFL

24    games that day?

Page 133

1        A.    If the Bears were playing, I would

2   have, but I don't know if they were playing,

3   and I don't recall if they were playing when I

4   got the page.

5        Q.    Were you a person at that point in

6   your life that specifically tried to watch

7   Colts games, for instance?

8        A.    No.

9        Q.    The Bears are your team?

10       A.    Yes, that's my team.

11       Q.    Okay.  When you were paged you spoke

12  to Andrea Haidu, H A I D U, about this

13  assignment, correct?

14       A.    I did.

15       Q.    She worked in dispatch?

16       A.    She did.

17       Q.    What did she tell you about this

18  assignment when you spoke to her that night in

19  this initial dispatch conversation?

20       A.    She said they needed the on-call

21  detective, that there was a fire at

22  218 East Bailey, and that somebody had been

23  seriously injured and transported to Edward

24  Hospital.

Page 134

1          Q.   Did she give you any information other

2     than what you just relayed?

3          A.   I believe that was about it.

4          Q.   At that point did you recognize that

5     218 East Bailey address at all?

6          A.   I knew where the complex was, but

7     specific to that, no.

8          Q.   Had you been to that complex before

9     going there that night?

10         A.   Yes.

11         Q.   Had you responded to police calls

12    there?

13         A.   In that complex, yes.

14         Q.   Had you been there for any reason

15    other than professional duties?

16         A.   No.

17         Q.   At the time that you got this

18    information from Andrea Haidu, I take it that

19    you had no understanding at this time as to

20    whether this was a felony investigation, is

21    that correct?

22         A.   Correct.  I knew that there had been a

23    serious fire and someone had been seriously

24    injured, and that's really all I knew.

Page 135

1       Q.   Was there a policy at that time with

2  the Naperville Police Department to have

3  detectives respond to all structure fires?

4       A.   I don't think there was a policy.

5            I think it would be the sergeant

6  or lieutenant on scene that would make the

7  determination.

8            But a serious structure fire, I

9  believe, even absent any injuries, that

10 detectives would have been called out.

11      Q.   So do you believe that it is -- let me

12 ask the question again.

13           Is it your understanding that you

14 were assigned as a normal course of assigning a

15 detective to respond to a serious structure

16 fire as opposed to a specific belief that there

17 might be a felony investigation about this

18 particular fire?

19      A.   Yes.

20      Q.   Okay.  Do you know someone named Jim

21 Bedell, B E D E L L?

22      A.   Yes.

23      Q.   Am I saying his name correctly?

24      A.   Bedell.

Page 136

1          Q.    Sergeant Bedell was the patrol

2     sergeant at the time?

3          A.    He was.

4          Q.    Is it your testimony that he was in

5     charge of the scene of this fire?

6          A.    He was.

7          Q.    What does it mean?

8          A.    He was the ranking police officer on

9     the scene.  So he was directing officers,

10    positioning them to insure safety of

11    pedestrians, other tenants, to make sure they

12    are safe, other apartment dwellers, et cetera,

13    to protect the fire equipment and other duties

14    that might arise in that kind of a scene.

15         Q.    Did he have investigative

16    responsibilities at the scene?

17         A.    No.  He was the patrol sergeant, but

18    certainly the first person on the scene whether

19    they are investigator or patrol officer should

20    have some -- might be very important what --

21    their initial observations and interviews on

22    scene.

23                So he was not assigned any

24    investigative duties but, you know --

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 137

1        Q.   When you got to the scene of this

2   fire, who was the ranking investigative officer

3   at the scene?

4        A.   Would have been me.

5        Q.   You got there before Investigator

6   Cross, correct?

7        A.   Correct.

8        Q.   Were you still the ranking person

9   after Investigator Cross arrived?

10       A.   No.

11       Q.   Was he?

12       A.   Yes.  And I might add we are just

13   talking about the police side as being in

14   charge of that scene, the Fire Department is

15   obviously being rolled out at that point.

16       Q.   And I appreciate that point and I have

17   some questions for you about that.

18            Was there a point in your time at

19   the fire scene where you made a decision to

20   begin investigating some aspect of this fire or

21   was it your understanding even when you were

22   going to the scene that when you got there you

23   were going to do some investigation?

24            MS. POLICK:  Objection to the form,

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 138

1    calls for speculation, but go ahead.

2            THE WITNESS:  My understanding about

3    getting called out was that we were going to

4    investigate what had occurred that led to this

5    woman being hospitalized.

6                 We investigate not just criminal

7    matters, but certainly accidents or what have

8    you.

9                 So when someone is seriously

10   injured, we have a duty to try to find out what

11   happened.

12       Q.   You could get there and learn the

13   building was struck by lightening and this was

14   all just a natural occurrence, for instance?

15       A.   Correct.

16       Q.   I'm sorry.  Go ahead.

17                 So in a fire investigation like

18   this one, the Fire Department also has some

19   work that they are doing at the scene with

20   respect to investigation, is that right?

21       A.   Correct.

22       Q.   At the time of this fire, what was

23   your understanding about how, if at all, your

24   investigation of this fire would relate to the

Page 139

1   investigation that the Fire Department was

2   doing?

3        A.   You mean myself or with Mike Cross or

4   just Bob Guerrieri?

5        Q.   You personally?

6        A.   Well, Mike Cross was on the fire

7   investigation team, so knowing that he was on

8   the scene, he understood the fire science, and

9   I did not.

10            So the best way I could be of

11  service would be to help to take direction from

12  him and to interview people, witnesses, what

13  have you, but not for me to involve myself in

14  determining the cause and origin of the fire,

15  that's above my -- that was not part of my

16  skill set.

17       Q.   When you were at the fire scene on

18  September 10th of '95, was it your

19  understanding that Mike Cross had investigative

20  responsibilities for the fire that were

21  different than yours?

22       A.   I just knew that he brought different

23  skills to the scene that I didn't possess.  So

24  if there was a question, Mike would be giving

Page 140

1    me direction on what steps relative to the

2    investigation.

3         Q.   What was your understanding of what it

4    meant that he wasn't part of the fire

5    investigation team?

6         A.   My understanding was that he was

7    trained, had more training on the fire science

8    side and investigated more of the fires that we

9    encountered.

10        Q.   Was the fire investigation team a team

11   of the police department at this time?

12        A.   Police and Fire.

13        Q.   Who else was on that fire

14   investigation team other than Investigator

15   Cross at the time of this fire?

16        A.   From the police department?

17        Q.   Let's start there.

18        A.   Maybe Jamie Griffith, possibly at some

19   point Don Bish, that's my understanding, but

20   I'm not positive on that.

21        Q.   On the Fire Department side, was Dave

22   Ferreri part of that team?

23        A.   He was.

24        Q.   Anybody else you recall from the fire

Siebert & Assocs. Court Reporters, Inc.                cmsreporters@comcast.net

Page 141

1    side?

2         A.    Not that I'm aware of, but I wouldn't

3    be surprised if there were more.

4         Q.    Given that were you at the scene of

5    this fire deferring to Mike Cross on decisions

6    about how to investigate at the scene?

7         A.    We worked side-by-side, and I'm not

8    sure there was ever a time when we -- I had to

9    defer to his decision making, but certainly he

10   was a senior detective and it become his case,

11   so he has that authority.

12        Q.    When you say it became his case, what

13   do you mean?

14        A.    I mean I was the first detective on

15   scene, but he arrived, you know, ten minutes

16   later, so it was pretty contemporaneous.

17                   And arsons were -- obviously

18   arsons and crime scene person were investigated

19   on the major crime side, not on the special

20   enforcement unit side, so it became their case.

21        Q.    Is it your belief in terms of

22   investigator assignments that the Marianne

23   Miceli death investigation was ultimately Mike

24   Cross' responsibility?

Page 142

1      A.    I believe it was all of our

2  responsibility to do the best job that we

3  could.

4      Q.    Was there someone who was in charge of

5  this investigation at the investigator level?

6      A.    Sure.

7      Q.    Who?

8      A.    Mark Carlson's sergeant was also an

9  investigator, I mean he was involved, too, so

10  he ultimately had the ultimate authority over

11  that case because he was the sergeant.

12      Q.    In -- well, let's me ask you this, you

13  got to the scene of this fire and I think you

14  have given prior testimony, but correct me if

15  I've got this wrong, that you were cleared to

16  go into the apartment about 30 minutes after

17  you got to the scene, is that correct?

18      A.    That sounds correct, yes.

19      Q.    What did you do for those 30 minutes?

20      A.    Talked to some of the people milling

21  about, talked to some of the police officers to

22  try to find out who lived there, and just talk

23  to the sergeant, Bedell, about what his

24  observations were.

Page 143

1        Q.   Do you remember any of the information
2   you received during that 30 minutes?
3        A.   I don't.
4        Q.   Do you remember at any point at the
5   scene any observations that Sergeant Bedell
6   relayed to you?
7        A.   He gave me a gas receipt later on, not
8   right away though, that was later in the
9   evening.
10       Q.   When did he give it to you?
11       A.   That would have been before we went to
12   talk to Tina and Bill Miurhead,
13   M I U R H E A D.
14       Q.   That was at the Leavenworth home?
15       A.   Yes.
16       Q.   And when Sergeant Bedell gave that you
17   gas receipt did he explain to you it came from
18   William Amor?
19       A.   He did.
20       Q.   Did he ever express to you about the
21   authenticity of that receipt?
22       A.   I don't believe he did.
23       Q.   I mean, well, at the time you got the
24   receipt were you accepting as true that it was

Page 144

1    a receipt for gas as it was being represented

2    to you?

3         A.   Yes, I did.

4         Q.   Did you ever obtain any information

5    that suggested to you that that gas receipt did

6    not reflect that William Amor bought gas at the

7    time and location reflected on the receipt?

8         A.   No.

9         Q.   When you first got to the scene, so

10   this is upon arriving at this complex, could

11   you observe anything about the state of the

12   fire at that point?

13        A.   Well, the fire was out before I got

14   there.  And it was towards -- I couldn't see

15   the unit, it was towards the back.

16              So from the parking lot you

17   really couldn't see any aspect of the damaged

18   apartment from outside, but there was fire

19   trucks and hoses and water and that sort of

20   thing all over the parking lot.

21        Q.   Was there smoke still coming out of

22   the unit at that point?

23        A.   Well, when I went into the unit, yes,

24   it was still smoky.

Page 145

1        Q.   Did you ever see any open flames or

2   even, you know, lit ash or debris at the scene?

3   And by lit ash or debris I mean even if it

4   wasn't an open flame, something that looked to

5   you to be stilling burning in some way?

6        A.   No.

7        Q.   Do you remember specifically anyone

8   that you talked to for that 30 minutes before

9   you went inside other than Sergeant Bedell?

10       A.   At some point before I went in to look

11  at the fire or any time at the scene?

12       Q.   I'm talking about that first

13  30 minutes before you went inside.

14       A.   I don't recall anybody else

15  specifically.

16       Q.   Okay.  Detective Cross came sometime

17  in that half an hour, correct?

18       A.   Correct.

19       Q.   Did you talk to him at all?

20       A.   I did.

21       Q.   Do you remember anything you discussed

22  for that first 30 minutes?

23       A.   I don't remember anything specific

24  that we discussed.

Page 146

1        Q.   What was he doing during that first

2   30 minutes?

3        A.   He was talking to Sergeant Bedell,

4   same as I did, and trying to get -- that's all

5   I recall.

6        Q.   Were you talking with Investigator

7   Cross together with anybody at the scene for

8   those first 30 minutes?

9        A.   At some point we talked to Dave

10  Ferreri and Dan Boylan.  Dan Boylan is the

11  Deputy Chief of the Fire Department, but I'm

12  not sure he was on the investigation team, but

13  Lieutenant Ferrari was, so at some point we did

14  talk to those.

15       Q.   Boylan is B O I L A N D?

16       A.   Correct.

17       Q.   When you went into the unit did

18  Investigator Cross go with you?

19       A.   He -- yes, he went in first, and I

20  went in shortly after.

21       Q.   Did you have to put in any special

22  gear to go into the unit at that time?

23       A.   No.

24       Q.   Were you wearing a mask, for instance?

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 147

1        A.    No.

2        Q.    No fire protection gear?

3        A.    No.

4        Q.    When you went into the unit then do

5    you know what time it was roughly when you went

6    into the unit for the first time?

7        A.    It was about 8:30.

8        Q.    Okay.  And at that point when you went

9    into the unit initially had there already been

10   an effort in the unit to poke holes in the wall

11   and ceiling as part of the fire suppression

12   efforts?

13            MR. POLICK:   Objection to the form,

14   calls for speculation, but you may answer.

15            THE WITNESS:  I believe there were

16   holes in a wall.

17   BY MS. THOMPSON:

18       Q.    When you went into the unit, do you

19   recall that there were at least originally

20   there were balcony doors in this unit to go out

21   to a small balcony outside?

22       A.    Sliding glass-type, yes.

23       Q.    Yeah, that's what I am talking about.

24            Did you see any debris on the

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 148

1    balcony area when you first went into the unit?

2         A.   I did.

3         Q.   Did you see -- did you go out onto the

4    balcony at all?

5         A.   I did.

6         Q.   Did you see a pile of debris below the

7    balcony on the ground?

8         A.   I believe there was.

9         Q.   Could you make out what any of the

10   objects on that pile were?

11        A.   I did not.

12        Q.   How big was that pile at that point?

13        A.   Hard for me to characterize it,

14   4 feet by 4 feet.

15        Q.   Were -- when you went into the unit,

16   when you were cleared to go in?  Were there

17   people actively either dropping or shoveling or

18   moving objects or debris from inside of the

19   unit into, you know, out the balcony onto that

20   pile?

21        A.   I don't believe so.

22        Q.   At some point well, let me ask you

23   this, did you have any difficulty when you were

24   in the unit this first time at making out sort

Page 149

1    of what various objects were in the apartment

2    given the fire damage as it existed at that

3    time?

4              MR. POLICK:   Objection, form.  You

5    may answer.

6              THE WITNESS:  There was some objects

7    on the floor that I couldn't quite tell what

8    they were, metal, remnants of, something had

9    metal.

10   BY MS. THOMPSON:

11        Q.   I mean the -- was there a significant

12   amount of soot damage in the apartment that

13   covered a lot of objects?

14        A.   Yes.

15        Q.   And were there objects in the

16   apartment that had been significantly burned?

17        A.   Yes.

18        Q.   And were there objects in the

19   apartment that had -- it appeared to you had

20   melted essentially from the heat?

21        A.   Yes.

22        Q.   At some point did you -- was it your

23   belief that one of the bedroom's doors in the

24   unit was locked at the time of the fire?

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 150

1       A.   Yes.

2       Q.   And how did you learn or how did you

3   obtain an understanding that one of those doors

4   had been locked?

5       A.   I believe it came from the

6   firefighters.

7       Q.   Do you know specifically who told you

8   that?

9       A.   I don't.

10      Q.   And the bedroom that you learned had

11  been locked, that was the second bedroom in the

12  unit that had -- that was occupied by William

13  Amor and Tina?

14      A.   That was -- yes, they occupied that

15  room.  And it was actually would be the first

16  bedroom you would come to when you walked in

17  the front door.

18      Q.   Was the door to that unit on the left

19  if you are walking down the hall?

20      A.   Yes.

21      Q.   Did you try that door yourself when

22  you were in the unit?

23      A.   It was already opened.

24      Q.   Was the door like broken down or

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 151

1    appeared to have been broken down when you saw

2    it in the unit?

3         A.    I don't believe it was broken down,

4    but it looked like it was forced open.

5         Q.    Was the jam damaged in some way?

6         A.    I believe it was.

7         Q.    Did you have a specific purpose in

8    going into the unit after you were cleared to

9    go inside going in?

10        A.    Generally to get -- see what the unit

11   looked like, see the layout of the unit, see

12   where Marianne's body was found so I could

13   orient myself to who stayed in what room, where

14   the kitchen was.

15              I had no previous experience in

16   that apartment, so certainly it was to eyeball

17   the apartment, orient yourself as to where the

18   doors are, windows are, where the kitchen is,

19   all those kinds of things.

20        Q.    Were you able to do that?

21        A.    Yes.  I was only in there very briefly

22   though.

23        Q.    How long?

24        A.    10 minutes.

Page 152

1          Q.   Were there other people in the unit at

2     the time you were in there that had other --

3     that were doing other tasks in there other than

4     fire suppression or fire clean up?

5          A.   No, it was just me, Mike Cross,

6     Lieutenant Ferrari and that was about it.

7          Q.   Did you walk through the unit more or

8     less with Mike and Ferrari?

9          A.   I did.

10          Q.   Did you touch anything while you were

11     in the unit?

12          A.   No.

13          Q.   Other than obviously having to

14     walk-thru, is your answer still no?

15          A.   Yes.

16          Q.   Did you see Cross or Ferrari touch

17     anything?

18          A.   I did not.

19          Q.   For instance, did you see them picking

20     up things or looking underneath objects or

21     something like that during that walk-thru?

22          A.   No, I did not.

23          Q.   Okay.  Why did you leave the unit, I

24     forgot, walk-thru?

Page 153

1       A.    Sure.  I left, and then began

2   interviewing the neighbors who we could

3   assemble who had lived in Unit 218.

4                    I believe there is at least six

5   apartment units in 218.

6                    So I began interviewing those

7   neighbors, either above, below -- not above but

8   alongside that I could find.

9                    And then I went to the office,

10  apartment office and looked through their

11  records as to who rented and owned Unit M,

12  which is the Miceli residence, the Miceli

13  apartment.

14      Q.   Did you -- before you went back to the

15  department to look through those records, did

16  you know that Marianne Miceli was the person

17  who was hurt in this fire?

18      A.    I think I did.  By the time I got back

19  to the police station I was already aware

20  whether Marianne was the one who had been

21  injured and missing was her daughter and

22  son-in-law, Bill Amor.

23      Q.   Did you -- prior to going back to the

24  station, did you learn at all that Marianne

Page 154

1    Miceli had some connection or relationship with

2    Jon Ripsky?

3         A.   I did not.

4         Q.   Did you ever learn that?

5         A.   I did.

6         Q.   When did you learn that?

7         A.   I'm not sure, but it was either that

8    night or, you know, the next day on the 11th

9    most likely I learned that.

10        Q.   Did you learn that from somebody who

11   had been at the hospital with the family?

12        A.   I could have.

13        Q.   Do you know who told you that?

14        A.   I don't.

15        Q.   What did -- when you learned that

16   information what specifically was conveyed to

17   you about that?

18        A.   I don't remember other than Marianne

19   Miceli was the sister of Captain Ripsky's wife.

20        Q.   Did anybody talk to the neighbors with

21   you when you did that after leaving the unit?

22        A.   No, I was by myself.

23        Q.   What did Mike Cross do when you left

24   the unit?

Page 155

1        A.    He went to the hospital where Marianne

2    Miceli was at to check on her condition.

3        Q.    Is there reason you didn't go with

4    him?

5        A.    I had to interview the neighbors.

6        Q.    At the time of this investigation did

7    you have a department issued cell phone?

8        A.    No.

9        Q.    Were you using radios for

10   communicating at that point for police

11   business?

12       A.    Or a land line, there was, I believe,

13   a bag phone, but I was not issued one.

14       Q.    Did Mike Cross have a bag phone?

15       A.    Nobody had one issued to them.  We

16   had, I believe, a few available to take on an

17   assignment, but primarily we worked off pagers.

18       Q.    You had a pager at that time?

19       A.    Yes.

20       Q.    Did you learn anything from your

21   canvass of the neighbors that you did after you

22   left the unit?

23       A.    I basically -- the people I spoke with

24   were essentially had no significant information

Siebert & Assocs. Court Reporters, Inc.                cmsreporters@comcast.net

Page 156

1    until they were aware that a fire had broken

2    out, and so they were screaming, trying to

3    alert all of the neighbors that there was a

4    fire.

5              And they provided information

6    about who lived there, because they at least

7    knew their names, so that helped me identify

8    Marianne and Tina and Bill.

9        Q.   At the time you were talking to those

10   neighbors, did you have any concern that

11   anybody else had been hurt in this fire other

12   than Ms. Miceli?

13       A.   Well, it was unknown, but we had been

14   through the apartment, the Fire Department had

15   been through the apartment and searched all of

16   the rooms, which is why they break open a door

17   that's closed for any other victims, and there

18   were none.

19             And Mike was going to the

20   hospital.  So if someone else had been injured,

21   they should have been there.

22             Also the Fire Department had no

23   record of anybody else being transported.

24       Q.   Was it your understanding at the scene

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 157

1    that although there was other damage to the

2    building that the major damage was more or less

3    confined to Ms. Miceli's unit?

4         A.    That's my understanding.

5         Q.    Had you ever met or talked to Marianne

6    Miceli before this investigation?

7         A.    I had not.

8         Q.    Had you ever met or talked to her

9    daughter Tina?

10        A.    No.

11        Q.    Had you ever met or talked to William

12   Amor before this case?

13        A.    No.

14        Q.    Did you ever learn anything about what

15   had happened when Mike Cross went to the

16   hospital?

17        A.    No.  I mean I'm aware he met with the

18   family, but that is about it.

19        Q.    Okay.  At some point you learned that

20   Ms. Miceli had passed?

21        A.    Correct.

22        Q.    When did you learn that?

23        A.    I was still on scene.  So within the

24   first two hours maybe I learned that.  It was

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 158

1    still while we were on the scene we learned

2    that she passed away.

3         Q.   Is there a reason that you went to the

4    station to check PIMs as opposed to having, you

5    know, somebody already there do a search for

6    you?

7         A.   Well, being it was Sunday night there

8    really wouldn't have been anybody else there.

9    A significant portion of the Patrol Division

10   was tied up at the scene of the fire.  And

11   there was no other detectives working who could

12   have checked, so that's why I went back.

13        Q.   We talked about this a little bit, but

14   do you have any memories of the day of specific

15   information you learned at the station relative

16   to this investigation?

17        A.   No.  My goal was to identify Bill and

18   Tina and see if we could find out where they

19   might be at at that time.

20        Q.   Did you learn any information about

21   Bill or Tina at the station that contributed at

22   all to this investigation?

23        A.   To where they were at at the time, no.

24        Q.   Well, did you learn any background

Page 159

1    information about them at the station?

2         A.   I don't recall anything significant.

3         Q.   Did you do anything at the station

4    other than essentially run that database

5    search?

6         A.   I don't believe so.

7         Q.   At some point you found out that Bill

8    and Tina had been located, correct?

9         A.   Correct.

10        Q.   How did you find that out?

11        A.   We were advised by radio that Bill and

12   Tina had come back to the scene.

13        Q.   Do you know where you were when you

14   got that radio message?

15        A.   I believe I was at the police station.

16        Q.   Do you know who made that announcement

17   on the radio?

18        A.   I believe Sergeant Bedell.

19        Q.   Did he give any other information over

20   the radio other than they had just come to the

21   scene?

22        A.   Not that I'm aware.

23        Q.   All right.  When you got that

24   information, did you have any conversation with

Page 160

1    anybody about this investigation other than

2    just getting the message over the radio that

3    they had been found?

4          A.    No, I don't recall any other

5    conversations about it.

6          Q.    The next thing you did was go to the

7    Leavenworth home to talk to them, is that

8    correct?

9          A.    We wound up there.  We went first to

10   the scene, because we thought they were there,

11   but by the time we got there, they had already

12   left to the Leavenworth home, which isn't that

13   far away.

14         Q.    When you say "we" went, who is "we"?

15         A.    Me and Mike.

16         Q.    Did you guys meet back up at some

17   point?

18         A.    Yes.

19         Q.    Where did you meet back up?

20         A.    At the police station.

21         Q.    He came there from the hospital?

22         A.    Correct.

23         Q.    Okay.  Were you going to scene for the

24   purpose of talking to Bill and Tina?

Page 161

1          A.    Yes.

2          Q.    And who decided you would do that?

3          A.    Well, me and Mike were the detectives

4    assigned to the case, so we wanted to talk to

5    them.

6          Q.    Did you do anything at the scene other

7    than just identify that Bill and Tina weren't

8    there?

9                 And to be clear timingwise, I'm

10   being talking about when you left the station

11   and went to the scene and then left for the

12   Leavenworths?

13         A.    No, spoke briefly with Sergeant Bedell

14   and then we went to the Leavenworths' house.

15         Q.    At that point in that conversation did

16   Sergeant Bedell give you the receipt?

17         A.    I believe that's when he gave it to

18   me.

19         Q.    And other than what you have already

20   testified to with respect to the receipt, do

21   you recall anything Sergeant Bedell told you

22   during that conversation?

23         A.    I think he told me -- I think he

24   talked about that he had talked to Bill because

Page 162

1   he got the receipt from him.  Just that they

2   had come back, they had stopped for gas.

3             And then I think Jim Bedell

4   thought he had been drinking, Bill, but at that

5   point they were already gone.

6        Q.   Did he tell you why it was that he

7   thought he had been drinking or what he

8   observed that led to that?

9        A.   I thought he said he could smell

10  alcohol on his breath.

11       Q.   Did he tell you what specifically he

12  smelled on his breath?

13       A.   I don't recall.

14       Q.   Do you remember anything else that

15  either you said or Sergeant Bedell said or Mike

16  Cross said at the scene when you went there

17  between the police station and the

18  Leavenworths?

19       A.   If I recall, I think Sergeant Bedell

20  thought that Tina had been drinking, too.

21       Q.   Did Sergeant Bedell give you any

22  information about the initial reactions of

23  either Tina or Bill upon coming back to the

24  scene?

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 163

1        A.    I don't recall.

2        Q.    I mean did he tell you whether or not

3    anybody had told Tina or Bill at the scene

4    that, you know, Marianne -- that there had been

5    this fire and that Marianne had been hurt or

6    had died?

7        A.    I don't know.  I don't recall.

8        Q.    Is there anything else you remember

9    anybody saying at the scene other than what you

10   testified to at this particular time period?

11       A.    That's what I recall.

12       Q.    Did you do anything or talk to anyone

13   at the scene other than this conversation with

14   Sergeant Bedell?

15       A.    No, I don't believe so.

16       Q.    Were you inside the building at all

17   during this visit or is this a conversation you

18   had somewhere on the complex grounds?

19       A.    With Sergeant Bedell?

20       Q.    Yes.

21       A.    That would have been outside.

22       Q.    So did you and Investigator Cross then

23   go together to the Leavenworths?

24       A.    We did.

Page 164

```
 1        Q.   Had you ever met the Leavenworths

 2   before that night?

 3        A.   I did not.

 4        Q.   What happened when you got to the

 5   Leavenworth house?

 6        A.   We walked up to the house, knocked on

 7   the door, I think Gary Leavenworth met us at

 8   the door, and let us in, we identified

 9   ourselves and went into the kitchen.

10        Q.   Were people in the kitchen when you

11   got in there?

12        A.   They were.

13        Q.   Who was in there?

14        A.   Pam who was Gary's wife, Pam

15   Leavenworth and Bill and Tina.

16        Q.   Did you at some point learn that

17   Pamela Leavenworth was also Marianne Miceli's

18   sister?

19        A.   I did.

20        Q.   Okay.  When you went into the kitchen,

21   did you have any initial observations of either

22   Bill or Tina?

23        A.   The observation of Tina was that she

24   had been crying, was upset.  That's what is --
```

Page 165

1    I recall.

2         Q.   Did you have any initial observation

3    of Bill in the kitchen?

4         A.   No, he was very calm.  He was not

5    crying, did not appear upset.

6         Q.   Did he appear -- well, let me say

7    this, do you have any memory of any other

8    observations you made about how long he

9    appeared other than that he was not crying, was

10   not upset and seemed calm?

11        A.   No.

12        Q.   Were you trying to evaluate at that

13   point what Sergeant Bedell told you about

14   people potentially having been drinking?

15        A.   Yes.

16        Q.   Did you try to evaluate that for

17   yourself in the kitchen about whether or not

18   you thought anybody had been drinking?

19        A.   No, it wasn't until me and Bill went

20   downstairs, and we could talk one-on-one.

21        Q.   Well, let me ask you this, at the

22   Leavenworth home, did it seem to you at any

23   point that Bill Amor had, you know, trouble

24   walking or with any motor functions in a way

Page 166

1   that you thought was related to maybe being

2   drunk?

3          A.   No.

4          Q.   What about Tina?

5          A.   No.

6          Q.   Did you have any observations when you

7   were at the Levinworth home at this point, one

8   way or another, as to whether you thought Tina

9   had been drinking or was under the influence of

10  alcohol?

11         A.   I did not, but my exposure to Tina was

12  very brief, very brief.  I talked to Bill.  I

13  didn't talk to Tina.

14         Q.   So at the Leavenworth home did you

15  reach any conclusions about whether you thought

16  William Amor had been drinking or was under,

17  you know, was under the influence of alcohol at

18  that point?

19         A.   I asked him if he had been drinking,

20  and he denied it, but his appearance did not

21  appear to me that he was under the influence of

22  alcohol.

23         Q.   Did you smell any alcohol on his

24  breath at all at the Leavenworth home?

Page 167

1          A.    I did not.

2          Q.    Did you smell anything on him like

3    mouthwash or gum or something else that might

4    mask the smell of alcohol?

5          A.    No, I did not.

6          Q.    Did your observations at the

7    Leavenworth home lead to you believe that

8    Sergeant Bedell's observations about drinking

9    were wrong?

10         A.    No, just that I didn't see any

11   behavior or smell alcohol on him that would

12   indicate that to me.

13         Q.    So did you have any conversation with

14   either Tina or Bill in the kitchen when you

15   first went into the kitchen?

16         A.    Other than introducing ourselves, no.

17         Q.    How did you introduce yourselves?

18         A.    I said:  Investigator Bob Guerrieri,

19   Naperville Police, sorry for your loss, because

20   by that time we knew that Marianne had died,

21   that was it.

22         Q.    Did it seem to you when you said that

23   that the people in the house already knew that

24   Marianne Miceli had passed?

Page 168

1        A.    Yes.

2        Q.    I want to be clear, that when I'm

3   asking and I'm saying not only that she has

4   been hurt or something but, in fact, she was

5   not alive anymore?

6        A.    Correct.

7        Q.    Did Mike Cross say anything in the

8   kitchen when you initially came in?

9        A.    Essentially the same, he introduced

10  himself to all of the parties there, and that

11  it was it.

12       Q.    Did one of you then ask Tina or Bill

13  if they would talk to you?

14       A.    Yes.  I asked Bill if he would talk to

15  me, and he said he would.  Because there was a

16  large gathering in the kitchen, we went

17  downstairs where there was some privacy so we

18  could talk.

19       Q.    Is there a reason that -- let me ask

20  you this.  While you were talking to Bill, Mike

21  was talking to Tina, is that right?

22       A.    Correct.

23       Q.    And is there a reason that the sort of

24  division of talking to them was divided up that

Page 169

1    way?

2         A.   I don't know there was a reason, just

3    how it worked out.

4         Q.   Did you and Mike talk in advance at

5    all about who was going to talk to who?

6         A.   I don't recall that we split up that

7    assignment ahead of time.

8         Q.   Was your goal in talking to them

9    separately to do that specifically as part of

10   the investigation to make sure you could get an

11   independent account from each of them?

12        A.   Correct.

13        Q.   While Mike was talking to Tina, where

14   did the Leavenworths go?

15        A.   They were still in the upstairs.  I

16   don't know where they went, but they did not

17   come down in the basement.

18        Q.   Did you ever see the Leavenworths with

19   Tina in the kitchen while Mike was talking with

20   her?

21        A.   They could have been, but when I came

22   back upstairs they were there, but I can't

23   speak to the intervening time if they were

24   there or not.

Page 170

1        Q.   Was there a time -- while you were

2   downstairs talking to Bill, was there a time

3   when you came upstairs like briefly to talk to

4   Mike or Tina like during the middle of your

5   conversation with Bill?

6        A.   Yes.

7        Q.   When you went upstairs for the brief

8   time, were Gary and Pam in the kitchen?

9        A.   I don't recall.

10       Q.   To your knowledge it is possible they

11  were in the kitchen when you went up?

12       A.   They could have been.

13       Q.   At the time that you were -- that you

14  went into the kitchen initially at the

15  Leavenworths like right when you got there, did

16  you have any information one way or another at

17  that time about whether either Tina or Bill was

18  a person with some kind of intellectual

19  deficit?

20       A.   I was not aware of that ahead of time,

21  but through the course of the investigation I

22  learned that Tina had a developmental

23  disability of some sort, cognitive disability.

24       Q.   How did you come to learn that?

Page 171

1        A.    I think through just talking with

2    people involved with the family, that it was

3    understood that Marianne was disabled to a

4    degree and that Tina was, also.

5                    Marianne had been struck by a car

6    and had a really pronounced limp from a young

7    age, I think she was only three years old when

8    she was hit.

9                    And Tina had some developmental

10   disabilities.

11       Q.    Do you specifically when you heard

12   anything about that with respect to Tina?

13       A.    I don't remember.

14       Q.    Did you ever talk about that issue

15   with any source other than Tina's family during

16   the course of the investigation?

17       A.    I don't believe so.

18       Q.    Did you ever talk about that with Bill

19   or with your ever present for a conversation

20   where anybody was talking about that with Bill?

21       A.    I don't recall that.

22       Q.    Did you ever in the course of this

23   investigation talk at all with any member of

24   William Amor's family, other than obviously at

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 172

1    some point in-laws on the Miceli side?

2        A.   Bill's direct family, no, I don't

3    recall talking to anybody directly related to

4    Bill.

5        Q.   Okay.  Prior to learning about some

6    potential -- let me say this, I'm going to use

7    the term "intellectual deficits", because I

8    think that's what I feel comfortable -- it is a

9    term that I feel comfort using.

10            Do you understand that to mean

11   what you refer to as developmental disabilities

12   or developmental delay?

13       A.   I don't really feel qualified to

14   really make any kind of diagnosis, if you want

15   to use it interchangeable, that's fine.

16       Q.   Well, actually let's use your term.

17            I mean, and let me ask you this,

18   when you were talking about this with Tina's

19   family, do you remember the term that they were

20   using or how they were describing a potential

21   issue of some kind of developmental delay with

22   respect to her?

23       A.   I don't remember what term they used.

24       Q.   Okay.  Did they use a term to describe

Page 173

1    their view of Tina in that respect or were they

2    describing behavior that led you to make a

3    conclusion about that?

4         A.    I thought at some point we learned

5    that she was collecting Social Security

6    Disability or something along those lines, but

7    as far as a diagnosis or any official

8    nomenclature, I don't know when or where that

9    would have come from.

10        Q.    Do you believe that the first mention

11   you heard of something about that related to

12   Tina, did that come before or after Bill was

13   arrested on the warrant issue on the -- was

14   that on the 15th?

15        A.    It was.

16        Q.    So do you know when your first

17   knowledge of anything having to do about those

18   issues was before or after the 15th?

19        A.    I don't remember if it was before or

20   after that.

21        Q.    Did you know about those issues at the

22   time that you took Bill to Reid & Associates?

23        A.    I don't know if I knew it then.  Those

24   interviews that were done on the 15th with

Page 174

1    Tina, I wasn't a part of any of those, so I

2    never really had much of a chance to talk to

3    Tina.

4         Q.   To go back then to being at the

5    Leavenworths, did you have any plan in advance

6    of talking to Bill about what you were going to

7    cover with him in that conversation?

8         A.   No.  My thought process was do a

9    wide-ranging interview to try to determine what

10   could have started the fire.

11        Q.   Did you have any information or

12   understanding prior to talking to Bill about

13   what possible causes of this fire there were?

14        A.   Well, essentially there is accidental,

15   my understanding, candle gets knocked over,

16   there is a mechanical or an electrical issue

17   with an outlet or a furnace, some issue with a

18   gas line.

19                   There is arson where someone

20   deliberately sets a fire.

21                   You brought up the act of God

22   with lightening strikes, there is not much

23   outside of that realm that could have started

24   the fire.

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

1        Q.   Prior to talking to Bill at the

2    Leavenworths, had anyone given you any

3    indication that anyone was leaning in any

4    particular direction about what the cause of

5    this fire was?

6        A.   No.

7        Q.   Had any investigator from the fire or

8    police department said to you at that point

9    anything to the effect that something about the

10   way this fire had behaved was an indication

11   that it was arson?

12       A.   The only thing I knew was that it

13   moved very fast based on the timeline from when

14   Tina and Bill -- until Marianne called for

15   help, and from working backwards when we

16   thought Tina and Bill would have left the

17   apartment, based on when we got the receipt,

18   when he got the gasoline, the time that showed.

19            So we knew that it happened

20   pretty fast.

21            I also knew that I had never been

22   to a fire at that large apartment complex in my

23   ten years at the Naperville Police Department.

24       Q.   What you just described about it

Page 176

1   moving very fast, when did you work through the

2   timeline to reach that understanding?

3        A.   I knew the phone call to dispatch was

4   made at 6:40 that Sunday evening, and the

5   receipt that Sergeant Bedell collected showed a

6   time of 6:43 at the Mobile at Ogden and

7   Route 59.  So that's the time, that's a pretty

8   short timeframe.

9        Q.   And so even what you just did, sort of

10  the act of going through those times and kind

11  of making an assessment of the times, when did

12  you first do that?

13       A.   When we realized -- we knew what time

14  the call was made, and then Sergeant Bedell

15  turned over the receipt for the gasoline, so

16  that was probably I think the beginning of

17  that.

18       Q.   Is that --

19       A.   We talked to the neighbors, who were

20  surprised at flames coming out of the window of

21  the apartment, I mean it was a pretty dramatic

22  scene initially to all of the neighbors who on

23  a Sunday afternoon were on a nice day looked

24  out the window and see flames coming out of the

Page 177

1    window.

2         Q.    At the time you talked to Bill in the

3    basement of the Leavenworth did you already

4    believe this was a pretty fast fire?

5         A.    Yes.

6         Q.    How was the time on the gas receipt

7    relevant to your assessment of whether or not

8    this was a fast fire?

9         A.    Marianne called for help at 6:40 and

10   they got gas at 6:43, which is three minutes

11   later, and it is about a 10-minute drive from

12   their apartment to the gas station on Route 59.

13              So if they are pumping gas at

14   6:43, and my understanding is that they left

15   the residence, you know, after talking to them

16   and realized they had left the residence to go

17   to the movies, and they went directly from the

18   apartment, stopped at the gas station, so

19   10 minutes.

20        Q.    Well, in doing the analysis that you

21   just did, I mean were you working from an

22   assumption that this fire had not started at

23   all at the time that Tina and Bill left the

24   apartment?

Siebert & Assocs. Court Reporters, Inc.                cmsreporters@comcast.net

Page 178

1          A.    I had no assumption to that.

2          Q.    I guess that's my question about why

3     you determined that it was a fast fire based at

4     all on the timing of the gas receipt, what were

5     you -- when you were saying it was fast, how

6     were you characterizing the start and stop

7     times of the fire that would make it fast?

8          A.    Just from my belief when they probably

9     left the apartment to go to the movies, and by

10    6:40 Marianne was calling for help.

11         Q.    Were you in assessing it as fast

12    making an assumption the fire started around

13    the time that Bill and Tina left for the

14    movies?

15         A.    At that point, early stage, I don't

16    know if it was before or after they left the

17    apartment, I just knew it was close to the

18    same -- had to be around the same time they

19    left the apartment.

20         Q.    Why?

21         A.    Because if they left directly from the

22    apartment to get gas, and the call was at 6:40,

23    and they were pumping gas at 6:43, and the gas

24    station was fairly close, it seems to me that's

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 179

1    a pretty tight window.

2         Q.    Were you making an assumption in this

3    case from the beginning that the start of this

4    fire coincided in some way with Tina and Bill

5    leaving the apartment?

6         A.    No.

7         Q.    Well, when you talked to Bill in the

8    basement at the Leavenworths, did you say

9    anything to him about your belief that this

10   fire was fast?

11        A.    I don't believe I did.

12        Q.    I mean was your goal in that

13   interview, I think you said a few minutes ago,

14   to get a -- to get as much information as you

15   could about what Bill had been doing that day

16   and what his account was of sort of his

17   movements and conduct that day?

18        A.    Yes.

19        Q.    Was your goal to try to get him to

20   talk as opposed to you doing the talking?

21        A.    Correct.

22        Q.    Was Bill cooperative with you in the

23   basement?

24        A.    He was.

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 180

1        Q.   Was he responsive to all of your
2    questions?
3        A.   He was.
4        Q.   You had never talked to Bill before,
5    that's correct, right?
6        A.   That's correct.
7        Q.   Did the fact that this was your only
8    time ever talking to Bill make it more
9    difficult for you to evaluate whether how he
10   was talking to you was out of the ordinary for
11   him?
12            MR. POLICK:   Objection to the form,
13   calls for speculation and lacks foundation.
14   Go ahead.
15            THE WITNESS:  Yes, that was the first
16   time I ever talked to him, I had nothing to
17   compare it to.
18   BY MS. THOMPSON:
19       Q.   Okay.  Was there anything about Bill's
20   behavior in the basement or anything that he
21   said in the basement that you found suspicious?
22       A.   He gave me a straightforward
23   accounting of what they were doing that day,
24   and I asked him where they met, how he met the

Page 181

1    Miceli family, if he had a job, the layout of

2    the apartment, you know, the rooms and what

3    have you, had he been drinking or anybody been

4    drinking, was anybody smoking.

5                    I asked him what Marianne Miceli

6    specifically was doing when they left.

7                    I asked him about what time they

8    left, asked him if they had any -- was aware of

9    any life insurance she might have had, and

10   asked them is there anything that Bill could

11   tell us that would help us understand how the

12   fire started.

13        Q.   Was there anything about your

14   conversation with Bill in the basement of the

15   Leavenworth home that you found suspicious?

16        A.   At that point he seemed like he gave

17   me a straightforward answer to what -- to my

18   questions without having any other information

19   to compare it to.

20        Q.   When you went upstairs briefly to talk

21   to Investigator Cross why did you do that?

22        A.   I just wanted to find out what was

23   going on with Tina and to relate the initial

24   accounting, talk to Bill what he had told me,

Page 182

1    and see what, you know, Tina had told Mike and

2    was there any new developments I needed to be

3    aware of since I was in the basement and kind

4    of out of the mix of things.

5         Q.   And did you and Mike Cross talk

6    upstairs in front of Tina?

7         A.   Yes.

8         Q.   And what did you say in front of her?

9         A.   I didn't say much about what Bill had

10   told me but Mike asked me to ask Bill for a

11   phone number for a woman named Dorothy Athens

12   that was a friend of Marianne's and to ask if

13   Bill recalled anything about a cigarette being

14   lost or a cigarette that Tina couldn't account

15   for.

16              So I went back downstairs --

17        Q.   Was there anything else -- any other

18   information that was exchanged between you and

19   Mike when you went up there?

20        A.   No, nothing substantive.

21        Q.   Did Tina talk at all during that

22   exchange?

23        A.   No, it was just me and Mike talking.

24        Q.   When you went back downstairs, did you

Page 183

1    then inquire about those issues with Bill about

2    Ms. Athens and about a cigarette?

3         A.   I did.

4         Q.   At any point in your conversation with

5    Bill in the basement did you ask him a more

6    direct question with words to the effect if he

7    had any idea what caused this fire?

8         A.   I asked him if he could help us if

9    there was anything you could think of that

10   might help explain the fire.

11             And he said that they had

12   replaced the refrigerator a relatively short

13   period of time before.

14             And there had been an issue with

15   the pilot light on their stove, and on windy

16   days sometimes the pilot would blow out.  And

17   the gas company came and checked the stove and

18   found no leaks.  And he didn't smell anything

19   leaking.

20             And that's what he offered up

21   when I asked him if there was anything he could

22   help -- help us with to understand what had

23   caused the fire.

24        Q.   Was there any other explanations he

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 184

1    offered?

2         A.    No.

3         Q.    Do you agree then that in that

4    interview he didn't try to somehow deflect

5    responsibility for this fire onto some other

6    person?

7         A.    No, he did not.

8         Q.    Or cause really, because he told you

9    that he didn't think that the utilities thing

10   had anything to do with this?

11        A.    Correct.

12        Q.    You told us earlier that when you

13   talked to Bill in the basement that he denied

14   drinking that day, is that right?

15        A.    That's correct.

16        Q.    Have you had  -- had you had

17   experience in your career in law enforcement

18   with people who have a problem with alcohol

19   having difficulty acknowledging they have a

20   problem?

21             MR. POLICK:   Objection to the form,

22   but go ahead and answer it.

23             THE WITNESS:  I may have.

24

Page 185

1    BY MS. THOMPSON:

2        Q.   Well, as you sit here, can you recall

3    any investigations in your career in law

4    enforcement at any point that had involved

5    people who have alcohol problems other than

6    this one?

7        A.   Sure, many DUI arrests.

8        Q.   Any other cases besides DUI arrests?

9        A.   Possibly.

10       Q.   In your experience in total in your

11   life, do you have an opinion one way or another

12   whether people who have a problem with alcohol

13   sometimes have a difficulty acknowledging that

14   that's an issue they face?

15       A.   Could be, certainly.

16       Q.   You have previously given some

17   testimony that when you were downstairs talking

18   to Bill that to you he did not seem upset about

19   Marianne Miceli's death, is that right?

20       A.   Correct.

21       Q.   And what information from that

22   interview led you to believe that he was not

23   upset?

24       A.   He wasn't crying.  He didn't appear he

Page 186

1    had been crying, his hands weren't trembling,

2    his voice wasn't quacking or wavering, I think

3    his tone was very conversational and matter of

4    fact.

5         Q.   Did you find that suspicious any of

6    the things you just described?

7         A.   No, but this is the first time I ever

8    talked to Bill Amor, so I had nothing to

9    compare it to, and I had no way of knowing

10   what -- how he would react to the stress and

11   tragedy like that.

12        Q.   After you went back down and talked to

13   Bill further in the basement, what did you do?

14        A.   We talked -- I talked to Bill briefly

15   and went back upstairs.

16             And then at some point Tina and

17   Bill -- Bill had come back up the stairs.  Tina

18   went downstairs briefly, I believe.

19             And then her and Bill had come

20   back upstairs while we were still standing

21   around the kitchen.

22        Q.   So when Tina went downstairs was Bill

23   still in the basement?

24        A.   Correct.

Page 187

1       Q.   Was anybody else down there with him?

2       A.   No.

3       Q.   How long was she down there with Bill?

4       A.   I don't recall, brief period.

5       Q.   Like what --

6       A.   Minutes.

7       Q.   Okay.  What were you doing while they

8   were down there?

9       A.   Talking to Cross and Bill Leavenworth

10   trying as to get some background on the family.

11      Q.   Did you get any background?

12      A.   Not that -- anything specific that I

13   recall.  I did write a report, I think Mike

14   did, about his conversations with them.

15      Q.   Did Tina and Bill at some point come

16   back upstairs?

17      A.   They did.

18      Q.   What happened when they got back

19   upstairs?

20      A.   I think they announced that they were

21   going to go outside for a smoke, and so they

22   walked out the front door of the house, I

23   presume to go have a cigarette.

24      Q.   Is it fair to say when they went

Page 188

1    outside to have a cigarette that you went

2    outside to try to observe what they were doing

3    at that point?

4         A.   It was.

5         Q.   Why did you do that?

6         A.   Because I didn't have a base feel for

7    who they were essentially, how the fire

8    started.  At that point we had no idea what

9    started the fire, what didn't start the fire.

10        Q.   Were you trying to observe them

11   outside without them knowing that you were

12   watching them?

13        A.   Correct.

14        Q.   I mean you were -- and I don't mean

15   this in a derogatory way, but you were trying

16   to spy on them essentially, correct?

17        A.   Correct.

18        Q.   Do you believe that when you went out

19   there that they saw you watching them?

20             MR. POLICK:   Objection to what

21   someone else saw, not competent, but go ahead

22   and answer.

23             THE WITNESS:  I don't think they did.

24

Siebert & Assocs. Court Reporters, Inc.          cmsreporters@comcast.net

Page 189

1   BY MS. THOMPSON:

2        Q.   Why do you say that?

3        A.   They never looked in my direction.

4        Q.   Okay.  Did you see them actually

5   smoking out there?

6        A.   I believe they were smoking.

7        Q.   Did you hear them talking to each

8   other?

9        A.   No, I couldn't hear what they were

10  saying.

11       Q.   Did it seem that they were talking,

12  you just couldn't hear?

13       A.   They were standing at the back of

14  their car, and I -- were they talking, I don't

15  recall if they were talking.

16            I just know Bill opened the trunk

17  of the car and was fishing around inside of the

18  trunk.

19       Q.   You were sort around the side of the

20  house at that point, is that correct?

21       A.   I was, correct.

22       Q.   What was your distance from them?

23       A.   100 feet.

24       Q.   Was Tina fishing around in the back of

Siebert & Assocs. Court Reporters, Inc.                cmsreporters@comcast.net

Page 190

1    the car while they were out there smoking?

2         A.   No.

3         Q.   When you say that Bill was fishing

4    around in the car, did you see him take

5    anything out of the car?

6         A.   No, I saw his arms -- him leaning over

7    in the trunk once it was opened, and I saw his

8    arms go into the trunk and his arms moving

9    about, but I never saw him take anything out of

10   the trunk.

11        Q.   Did you see him put anything into the

12   trunk?

13        A.   I did not.

14        Q.   Okay.  At some point they went back

15   into the house, right?

16        A.   They did.

17        Q.   And at that point did you or Cross ask

18   for permission to search the car?

19        A.   We did.

20        Q.   Why did you do that?

21        A.   I asked Tina for permission to search

22   her car, and I just wanted to see what was in

23   the car as part of the normal course of the

24   investigation.

Page 191

1      Q.   And she immediately gave you

2  permission, is that right?

3      A.   She did.  The car belonged to her

4  mother Marianne actually, but she gave me

5  permission.

6      Q.   She expressed no concern about you

7  wanting to look in the car?

8      A.   Correct.

9      Q.   Was Bill there when you asked her for

10  permission?

11      A.   I don't believe he was.  He may have

12  been, but I don't believe at that time he was.

13      Q.   Where was he?

14      A.   I believe he was talking to Mike Cross

15  at that time.

16      Q.   Were you in the same room?

17      A.   When I asked Tina for -- Bill was not

18  in the room.

19      Q.   Okay.

20      A.   I don't believe.

21      Q.   After you got permission from Tina you

22  then did go look in the car, correct?

23      A.   I did.

24      Q.   And you found some empty ring boxes in

Page 192

1    there, is that right?

2         A.    Correct.

3         Q.    Did you think those empty boxes were

4    at all relevant to your investigation?

5         A.    I didn't know.

6         Q.    Have you ever concluded that those

7    empty ring boxes had some relevance to your

8    investigation?

9         A.    I believe today that they had no

10   relevance to the investigation.

11        Q.    Was there ever a point where you

12   thought somehow they they were related?

13        A.    I didn't know.

14        Q.    Were these ring boxes from a

15   particular store?

16        A.    Yes.

17        Q.    What store?

18        A.    I don't know.

19        Q.    When Bill and Tina went outside to

20   smoke, did you follow them outside essentially

21   right after they left?

22        A.    I did.

23        Q.    When you searched the car you also

24   found a cooler in the car, is that correct?

Page 193

```
 1        A.    Correct.
 2        Q.    And then you found some kind of
 3   container of what looked like a fruit punch?
 4        A.    Correct.
 5        Q.    Did you look at that punch to figure
 6   out if it was an alcoholic beverage?
 7        A.    I didn't.
 8        Q.    Did you try to smell it or anything
 9   like that?
10        A.    I did not.
11        Q.    You found some receipts in the car?
12        A.    Correct.
13        Q.    Is that something you collected as
14   evidence?
15        A.    I believe we did.
16        Q.    Did you determine any of those
17   receipts had any relevance to this
18   investigation?
19        A.    They did not.
20        Q.    You also found some lighter fluid and
21   charcoal briquets?
22        A.    Correct.
23        Q.    Did you figure out whether that
24   lighter fluid was an open container of lighter
```

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 194

1    fluid?

2          A.    Well, it was a squeeze bottle, but it

3    was not full, if that's what your question is.

4          Q.    Was it empty?

5          A.    No, it had lighter fluid in it.

6          Q.    Okay.  And the briquets that were in

7    the car, was that an unopened bag of briquets?

8          A.    I don't recall.

9          Q.    You also found some -- a vodka bottle

10   that was concealed in the trunk, is that

11   correct?

12         A.    Correct.

13         Q.    Was that bottle unopened?

14         A.    I don't recall.

15         Q.    Do you know if it was full or not?

16         A.    I don't.

17         Q.    Where specifically in the trunk was

18   the lighter fluid and the briquets?

19         A.    I believe there was a box in the

20   trunk, a cardboard box.

21         Q.    Was that a sealed box?

22         A.    No.

23         Q.    Is there anything else that you recall

24   finding in the car when you looked for it or I

Page 195

1    mean when you looked through it?

2         A.    I don't believe so.

3         Q.    Who was outside while you were looking

4    through the car?

5         A.    Tina and Gary Leavenworth.

6         Q.    After you finished looking through the

7    car, what did you do?

8         A.    Went back in the house.

9         Q.    Did you do anything when you got back

10   in the house?

11        A.    Talked to Mike Cross.

12        Q.    What did you talk about?

13        A.    Just what I found.

14        Q.    Did he have any reaction to what you

15   described finding?

16        A.    I don't recall his reaction.

17        Q.    And what, if anything, did you do

18   after that?

19        A.    At some point we went back to 218 East

20   Bailey.

21        Q.    Before -- at some point while you were

22   at the Leavenworth home during this time period

23   that you just described -- well, let me ask you

24   this.

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 196

1              Did you go back to

2    218 East Bailey to continue investigating the

3    case?

4         A.   I did.

5         Q.   Why were you going back to the scene?

6         A.   We -- I had gotten consent to search

7    the apartment from the family at that point.

8         Q.   Who specifically had given that

9    permission?

10        A.   I believe Sergeant Carlson had

11   been -- it wasn't given to me, but that

12   information was relayed from Sergeant Carlson.

13        Q.   Okay.  Did he give you have that

14   information on the radio?

15        A.   I think it was on the phone.

16        Q.   Did you get that information while you

17   were at the Leavenworths?

18        A.   Possibly.

19        Q.   I mean is it your memory it came from

20   a landline somewhere?

21        A.   It didn't come from a cell phone.  So

22   it could have come from a landline.

23        Q.   Did you have a phone in the car?

24        A.   No.

Page 197

1        Q.   At the point that you went back to the

2   house to search it, did you have any suspicion

3   that either Tina Miceli or William Amor had

4   been involved in setting this fire?

5        A.   I didn't know.

6        Q.   Did you have concerns that potentially

7   they were involved?

8        A.   At that point, we didn't know what

9   started the fire, we don't know why it started.

10  So at that point anybody could have

11  been -- anybody in the apartment or so we could

12  rule out other causes, we had to just talk to

13  the people who lived there and only two of the

14  three are left alive that had been in the

15  apartment just prior to the fire.

16              And then we searched the

17  apartment in a diligent fashion to find

18  whatever evidence we could find.

19       Q.   Was there anything you saw or observed

20  from William Amor at the Leavenworth home that

21  gave you suspicion that he was involved in the

22  fire?

23       A.   Not especially.

24       Q.   I want to skip ahead and we will come

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 198

1    back.  You mentioned that you were involved in

2    an arrest of Bill on September 15th, correct?

3         A.   Correct.

4         Q.   That was an arrest on some outstanding

5    warrants, is that right?

6         A.   That's correct.

7         Q.   Did someone make a decision

8    specifically to arrest William Amor on those

9    outstanding warrants on the 15th?

10        A.   Yes.

11        Q.   Who made that decision?

12        A.   Either Sergeant Carlson or Mike Cross.

13        Q.   Were you directed by one of them to

14   participate in the arrest?

15        A.   I was.

16        Q.   Who told you to be involved?

17        A.   I don't recall.

18        Q.   You think one of those two?

19        A.   Yes.

20        Q.   Between the fire and the time that

21   Bill was arrested on the 15th, were you

22   involved in any other police investigative

23   matters other than work on this case?

24        A.   No, I believe my involvement was the

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 199

1    10th and the 11th.  And then to the 15th, I

2    really didn't get involved in any substantive

3    aspect of any of the investigation.

4         Q.   I want to be clear about that

5    question.  Between the time that you were

6    directed to respond to this fire and the time

7    that you participated in William Amor's arrest

8    on the 15th, during that timeframe were you

9    working on other cases or other investigative

10   work with the police department?

11        A.   I was.

12        Q.   Do you have any documents that reflect

13   what specific other work you were involved in

14   during that time period?

15        A.   Sure.  I don't.  There could be

16   reports that exist, but I don't have any copies

17   of them.

18        Q.   Did you attend any meetings between

19   the time that you left the Miceli apartment on

20   the 6th -- on the 11th, excuse me, and the time

21   that Bill was arrested on the 15th, that

22   related to this case?

23        A.   I don't recall.

24        Q.   When you were directed to participate

Page 200

1    in this arrest, did you have an understanding

2    of why Bill was getting arrested at that time?

3         A.   I was told he had a warrant from

4    DeKalb County and that to take him back to the

5    police station is routine for booking and then

6    I believe they were going to talk to him then

7    at the police station.

8         Q.   Was it the goal of the people involved

9    in William Amor's arrest on that warrant to

10   arrest him and to take the opportunity of him

11   being in custody to ask him more questions

12   about this case?

13             MS. POLICK:  Objection to the form,

14   but you may answer.

15             THE WITNESS:  I don't know if that was

16   the goal, but I believe that was part of it.

17   BY MS. THOMPSON:

18        Q.   Am I right that Bill was arrested in a

19   car that Tina Miceli was driving?

20        A.   Correct.

21        Q.   And how did that car get located by

22   the police to make that arrest?

23        A.   They were staying at the Excel Inn,

24   Bill and Tina, since the fire, and they were --

Page 201

1    my understanding is that they were going to

2    drive south back to the Leavenworth house,

3    which would have taken them down Naperville

4    Boulevard to get to the Leavenworth house.

5         Q.   How did you have that understanding?

6         A.   Came from either Mike or Sergeant

7    Carlson, they were aware of that, because they

8    had talked to them that morning at the hotel.

9              So I think that's where that

10   information probably was developed.

11        Q.   I mean did -- was be somebody

12   surveilling Tina and Bill to know when they

13   were in the car to make the arrest?

14        A.   I don't recall specifically if

15   somebody was watching the parking lot for them,

16   I don't recall that.

17        Q.   Was somebody somewhere on that road

18   waiting for them to drive by to catch them?

19        A.   I was.

20        Q.   Is that what you were assigned to do?

21        A.   Yes.

22        Q.   I mean you were essentially told they

23   will be on this route so wait for them to come?

24        A.   Yes.

Page 202

1        Q.   Was anybody with you when you made

2    that arrest?

3        A.   No, but Officer Kappelman was in a

4    marked car.  I was in an unmarked car.  He

5    affected the traffic stop and transported Bill

6    in the marked car, not in my detective car.

7        Q.   So you were in a separate car

8    observing?

9        A.   Correct.

10       Q.   Is there a reason why you were

11   involved in that arrest as opposed to the --

12   just the person who made the actual traffic

13   stop?

14       A.   Well, only that I had been working on

15   the case.  I would recognize the car and the

16   person.  You know, I knew what Tina and Bill

17   looked like.

18       Q.   What was Mike Cross doing during the

19   time that you were participating in making that

20   arrest?

21       A.   I believe he was back at the police

22   station.

23       Q.   Did you know what, if anything, he was

24   working on at that time?

Page 203

1      A.    I do not.

2      Q.    Did Bill cooperate in the arrest on

3    the 15th?

4      A.    He did.

5      Q.    Did he resist in any way?

6      A.    He did not.

7      Q.    Are you the person that actually

8    cuffed him in making that arrest?

9      A.    Yes.

10      Q.    Did you tell him why he was being

11   arrested?

12      A.    Yes.

13      Q.    What did you say?

14      A.    He had an arrest warrant out of

15   DeKalb County for a traffic ticket.

16      Q.    Do you remember specifically what you

17   said to Bill between the time that you got to

18   wherever the car had been stopped and when Bill

19   was put into the patrol car to go to the

20   station?

21      A.    Other than tell him he had a warrant,

22   I don't recall any other conversation.

23      Q.    Did you say anything to Tina at the

24   scene there of the arrest?

Page 204

1          A.    I don't recall speaking to her, but I

2     have to assume I did, to tell her what was

3     going on.

4          Q.    Do you remember anything she said at

5     the scene?

6          A.    No.

7          Q.    Do you remember anything Bill said at

8     the scene?

9          A.    No.

10         Q.    Do you remember anything that the

11    patrol officer said at the scene?

12         A.    No.

13         Q.    Is there a reason the patrol officer

14    took Bill to the station as opposed to you

15    doing it?

16         A.    Well, he had a cage car, that was to

17    transport a prisoner, a much safer alternative

18    than a detective car that doesn't have any cage

19    or any security in it.

20         Q.    Did you go to the station with the

21    patrol officer when he arrested Bill?

22         A.    I may have gone, followed him in, but

23    I never -- I didn't have any further contact

24    with Bill.

Page 205

1          Q.    And I think the way I phrased that

2     question was, did you go to the station with

3     the patrol officer when he arrested Bill, I

4     think what I meant to say was, you know, did

5     you go to the station with the patrol officer

6     when he took Bill to the station?

7                    You agree that you are the person

8     that arrested Bill, is that right?

9          A.    Correct.  Yes.

10         Q.    Did you see Bill in the police station

11    on the 15th after that arrest?

12         A.    I don't believe I did.

13         Q.    Was it your understanding at the time

14    you were assigned to make this arrest on these

15    outstanding warrants that those -- that arrest

16    would result in Bill going to the DeKalb County

17    Jail?

18         A.    Yes.

19         Q.    You knew that by arresting him he was

20    going to get booked on those warrants?

21         A.    Correct.

22         Q.    Was the -- was a partial goal of his

23    arrest to get him into custody so that he would

24    be somewhere specific for some period of time

Page 206

1    following that arrest while the investigation

2    continued?

3         A.   My belief was that he would be sober

4    after his stay, when he got out of DeKalb

5    County Jail.

6         Q.   I mean was part of the purpose of

7    arresting him because he was too impaired to

8    participate in this investigation?

9         A.   When it came time for the polygraph

10   test, yes.

11        Q.   Had you been involved at all in the

12   actual attempt to polygraph him at

13   O'Brien & Associates?

14        A.   No, I had not.

15        Q.   How did you know that he was too

16   impaired to participate in that polygraph?

17        A.   Just verbally with the other

18   detectives, Mike had said about their inability

19   to get a polygraph test done with Bill because

20   he was impaired.

21        Q.   Did Mike express any, you know,

22   frustration or concern or feelings one way or

23   another about not being able to get that

24   polygraph test done?

Page 207

1              MR. POLICK:   Objection, form.  You

2      may answer.

3              THE WITNESS:  He did not.

4      BY MS. THOMPSON:

5          Q.   When you arrested Bill on the 15th,

6      did he seem impaired to you?

7          A.   He did not.

8          Q.   Did you smell any alcohol on his

9      breath?

10          A.   I did not.

11          Q.   Was he calm during that arrest?

12          A.   He was.

13          Q.   Was he crying or shaking or seem

14      otherwise upset?

15          A.   He did not.

16          Q.   Was it your belief that he didn't care

17      one way or another whether he was getting

18      arrested?

19              MS. POLICK:  Objection to what someone

20      else believed.  You may answer over the

21      objection.

22              THE WITNESS:  I don't know what he

23      believed.  We didn't talk about it.

24

Page 208

1    BY MS. THOMPSON:

2         Q.   Were there any differences in his

3    behavior or demeanor during the arrest on the

4    15th from his behavior or demeanor when you

5    talked to him at the Leavenworths?

6         A.   No, my recollection is that it was

7    pretty consistent.

8         Q.   Between the 15th and the time that you

9    met Bill at the DeKalb Jail on the 3rd, did you

10   do any work connected with this investigation

11   at all?

12        A.   I did.  I called Steve and Katherine

13   Lutzen, L U T Z E N.

14        Q.   Why did you call them?

15        A.   Their name had been referred to one of

16   the other investigators as somebody who knew

17   Bill and who had experienced Bill and -- being

18   taken by Bill for money.

19        Q.   Did you end up talking with them?

20        A.   I did.

21        Q.   Did you talk to them on the phone or

22   in person?

23        A.   On the phone.

24        Q.   Were they both on the phone or were

Page 209

1    you talking to one of them?

2         A.    Talking to Steve primarily and

3    Katherine his wife a little bit.  They moved to

4    South Dakota.

5         Q.    Where specifically did you get their

6    name?

7         A.    I believe that came from Marianne

8    Glisson who was a friend of Bill and Tina and

9    who knew the Lutzens.  And I believe Marilyn

10   may have been their landlord at some property

11   or knew them at their property in Lisle.

12        Q.    What did Steve and Katherine tell you

13   on the phone?

14        A.    They knew Bill.  Bill had moved in

15   with them at their Lisle location.  Also in the

16   house was a woman named Rosemary Halleur,

17   H A L L E U R, but that was Katherine's mom.

18               And the three, Steve, Katherine

19   and Rosemary collected Social Security

20   Disability Insurance.

21               And what they said was that Bill

22   had offered to collect all three of their

23   checks, and he would manage their finances and

24   pay their bills, and then they agreed to that.

Page 210

1                    And shortly thereafter they got

2     evicted from their house, because they were not

3     paying their bills.

4                    And I asked Steve what happened

5     to the money, and he said, well, we were able

6     to pay our bills before Bill took over our

7     finances.

8                    And Bill was walking around with

9     nice clothes, and we got evicted after we

10    trusted Bill to manage our finances.

11         Q.   And was it your understanding that

12    they had been evicted from a property that

13    Marilyn Glisson was renting to them?

14         A.   She may have.  I never talked to

15    Marilyn Glisson.

16         Q.   You said they were referencing a

17    rental property they were at?

18         A.   Correct.

19         Q.   Did you take any notes during your

20    conversation with them?

21         A.   I did.

22         Q.   And you memorialized this in a report?

23         A.   I did.

24         Q.   And did you ever talk yourself to

Page 211

1    Rosemary Halleur?

2         A.   I did.

3         Q.   When did you talk to her?

4         A.   Shortly -- the same timeframe, same

5    day.

6         Q.   Did she tell you anything additional

7    or different than what Bill Lutzen told you?

8         A.   She didn't.

9         Q.   Was she in South Dakota at the time

10   you talked to her?

11        A.   I believe she was.

12        Q.   And did you take any steps to

13   investigate anything that Ms. Halleur or the

14   Lutzens had told you about this issue

15   potentially with Bill?

16        A.   No, I did not.

17        Q.   Did you ask for any financial records

18   related to their lives?

19        A.   I did not.

20        Q.   Are you aware of any investigative

21   steps to follow-up on what the Lutzens or

22   Ms. Halleur told the police after your

23   conversations with them on the phone?

24        A.   I'm not.

Page 212

```
 1        Q.   Did you ask the Lutzens or Ms. Halleur

 2   if they were aware of any other people that

 3   they believed Bill had taken money from?

 4        A.   I don't recall if I asked that

 5   question.

 6        Q.   Did you ever develop any information

 7   about any other people that the Lutzens or

 8   Ms. Halleur thought Bill had taken advantage

 9   of?

10        A.   I don't believe I did.

11        Q.   Did you ever ask William Amor about

12   these allegations from the Lutzens or

13   Ms. Halleur?

14        A.   I don't believe I did.

15        Q.   And is there a specific reason you

16   didn't do that?

17        A.   No.

18        Q.   Is there anything else you did on this

19   case between Bill's arrest and the 3rd?

20        A.   I don't believe so.

21        Q.   Did you talk with anyone else in the

22   police department about this case during that

23   time period other than conversations

24   specifically related to the Lutzens and
```

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 213

1   Halleurs?

2        A.   I'm sure that I did, but I don't have

3   any specific recollection.

4        Q.   Did you talk with anyone from the Fire

5   Department during that time period about this

6   investigation?

7        A.   I don't believe I did.

8        Q.   Did you -- let me ask you this.

9             At any point during this

10  investigation were there any regular -- let me

11  ask this question a better way.

12            At any point during this

13  investigation was there any investigative

14  meetings that were held where people involved

15  in the investigation got together to sort of

16  touch base about what was going on in the

17  investigation?

18       A.   There may have been.

19       Q.   Do you have any specific memory of

20  attending any of those kinds of meetings?

21       A.   I do not.

22       Q.   And when you say there may have been,

23  why do you believe there may have been?

24       A.   Well, typically for a major case those

Siebert & Assocs. Court Reporters, Inc.    (773)851-7779  cmsreporters@comcast.net

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 214

1    were not uncommon.  A meeting might be three

2    detectives, could be 20 people, so there could

3    have been, but I don't recall any specifically.

4        Q.   Do you believe there could have been

5    those kinds of meetings because it is important

6    in a major investigation like this one for

7    people involved in the investigation to be

8    caught up on what is go on?

9        A.   Yes.

10       Q.   And during this investigation did you

11   take steps to make sure that you knew what

12   other people were doing in the investigation to

13   advance it, separate and apart from what you

14   were doing?

15       A.   I don't recall any specific meetings.

16   So other than talking informally to the

17   detectives, I don't recall any other steps I

18   took to stay abreast on what was going on.

19       Q.   But did you have informal

20   conversations with other detectives for the

21   purpose of staying up on what was going on?

22       A.   Yes.

23       Q.   Did you review any police reports

24   during the investigation to catch up on what

Siebert & Assocs. Court Reporters, Inc.          cmsreporters@comcast.net

Page 215

1    other people were doing in the case?

2        A.   I don't recall reading any other

3    reports.

4             MS. THOMPSON:  Okay.  I know that the

5    videographer needs to change the tape here, so

6    this might be a good time to just take a break

7    so he can do that.

8             MR. VIDEOGRAPHER:  The time is 3:03

9    P.M. and we are going off the record.

10            (Recess.)

11

12            MR. VIDEOGRAPHER:  The time is 3:14

13   P.M., and we are back on the record.

14   BY MS. THOMPSON:

15       Q.   Let's mark that.

16            (Deposition Exhibit No. 5 was

17              marked for identification.)

18       Q.   I'm ready to proceed when you are.

19       A.   Okay.

20       Q.   Have you ever had any text messages

21   with either Mike Cross or Brian Nigohosian

22   related to this case?

23       A.   I don't believe so, but I don't recall

24   specifically.

Page 216

1        Q.   I'm going to show you what's been

2    marked as Exhibit 5.

3                   Just for the record, these are

4    text messages that are Bates stamped DEFS 11588

5    through 11590.

6                   Do you recognize any of the text

7    chains that are contained on these three pages?

8        A.   Are you asking me about Brian

9    Nigohosian, but BC probably is referring to

10   Brian Cunningham, right.

11       Q.   So you are looking at page 3, 11590,

12   right?

13       A.   Yeah, yeah.  That's right.

14       Q.   I mean are 11588 through 11590

15   screenshots of text messages from your phone?

16       A.   From my phone?

17       Q.   Yes.

18       A.   Could be.

19       Q.   Well, looking at Defendant's 11588,

20   did Mike Cross text you on February 20th of

21   2018 asking if there was a verdict in the Bill

22   Amor case?

23       A.   If this is a screenshot of my phone,

24   then it appears that he did.

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 217

1        Q.   Did you respond to him should be

2   announced tomorrow, I'm not hopeful?

3        A.   I believe I did.

4        Q.   Do you know why on February 20th you

5   were not hopeful about the verdict?

6        A.   I didn't believe that getting a trial

7   in front of Judge Brennan was going to give us

8   a fair verdict.

9        Q.   Were you hopeful that the outcome of

10  that trial was going to be that William Amor

11  was going to be convicted?

12       A.   Yes.

13       Q.   And why was that your hope?

14       A.   Because I believe he committed the

15  crime.

16       Q.   Is that what you believe as you sit

17  here today?

18       A.   Yes.

19       Q.   Have you ever reviewed any of the

20  arson evidence that was presented by either the

21  state or lawyers representing Mr. Amor during

22  Mr. Amor's post-conviction proceedings or the

23  retrial?

24       A.   No.

Page 218

1      Q.   Has anyone ever given you any

2  explanation or description of the arson

3  evidence that was developed?

4           MR. POLICK:   Other than his attorney.

5           MS. THOMPSON:  And that's a fair

6  point.  I'm not asking about communications

7  with your lawyer.

8      Q.   But other than your counsel, has

9  anyone ever explained any of that evidence to

10 you?

11     A.   No.

12     Q.   Do you believe, as you sit here today,

13 you could give any description of any of the

14 scientific testimony that was presented at

15 William Amor's retrial?

16     A.   That I could describe it?

17     Q.   Yes.

18     A.   I don't believe I could.

19     Q.   Do you believe it is relevant at all

20 to your personal beliefs about whether William

21 Amor is guilty what the arson scientists

22 looking at this fire had to say about its cause

23 and origin?

24     A.   Could be.

Page 219

1        Q.   Could it be relevant to your beliefs

2   as to whether he is guilty or not what ATF

3   agents had to say about the timing of this

4   fire?

5        A.   It could be.

6        Q.   And are you willing to sit here and

7   say that you believe he is guilty without

8   knowing any of that scientific evidence that

9   was presented at the trial?

10       A.   I am.

11       Q.   Does it matter to you one way or

12  another what scientists have said about this

13  case?

14            MR. POLICK:   Objection, misstates his

15  testimony.  Go ahead and answer.

16            THE WITNESS:  Could you ask the

17  question again?

18  BY MS. THOMPSON:

19       Q.   Sure.  I mean are you willing to state

20  a belief about whether William Amor is guilty

21  or not without nothing what scientific evidence

22  was presented to Judge Brennan at this retrial?

23       A.   It is my belief that we did a thorough

24  professional investigation in 1995.

Page 220

1             And based on all of the evidence

2    and all of the factors we considered, and the

3    State's Attorney's Office considered when we

4    presented the case to them, yes, I believe he

5    did it.

6         Q.   Have you ever asked the State's

7    Attorney's Office to give you any, you know,

8    rundown of what the scientific evidence showed

9    in this case as of the retrial in 2018?

10        A.   No.

11        Q.   I mean are you interested at all in

12   learning about that as part of your personal

13   evaluation of whether or not William Amor is

14   guilty?

15        A.   At this point, no.

16        Q.   I mean do you believe that any of that

17   science would even change your mind?

18             MR. POLICK:   Objection, calls for

19   speculation.  Go ahead and answer.

20             THE WITNESS:  Based on all of the

21   factors in the investigation that we

22   discovered, I still maintain my position that

23   Bill started the fire.

24   BY MS. THOMPSON:

Page 221

1        Q.    If there was testimony from an ATF

2   agent that the fire in this case could not have

3   been started while William Amor was in the

4   apartment, would that change your beliefs about

5   whether or not William Amor is guilty?

6              MR. POLICK:    Again, let me just

7   interpose an objection because it is an

8   incomplete hypothetical and calls for

9   speculation, but you may go ahead and answer.

10             THE WITNESS:  Well, is that what you

11  are saying?

12  BY MS. THOMPSON:

13       Q.    I'm asking if there was such

14  testimony --

15       A.    I'm asking you, is that what you are

16  saying?

17       Q.    And I'm not trying to not respond to

18  your question, I don't think it is appropriate

19  for me to give you --

20             MR. POLICK:    She can't answer your

21  questions unless you have -- unless you don't

22  understand her question, so you should just try

23  to answer her question without questioning her

24  about it.

Page 222

1              Unless, of course, you don't

2    understand her question, then you are entitled

3    to ask her a question you do understand.

4              THE WITNESS:  Okay.  Well, without

5    knowing when you say that the fire didn't start

6    until after Bill left, correct?

7    BY MS. THOMPSON:

8         Q.   As a hypothetical I'm representing

9    that to you.

10        A.   The question -- or one factor I would

11   consider, well, how much longer -- what was the

12   timeframe from when Bill left to when the fire

13   broke out, was it three hours or was it five

14   minutes?

15              Who is to know when the fire

16   broke out since the only person who was there,

17   you know, that reported the fire is dead.

18        Q.   Do you believe, as you sit here today,

19   that William Amor started the fire at the

20   Miceli unit by putting a cigarette into contact

21   with vodka soaked newspapers?

22        A.   I wasn't there when the fire started.

23   And at the time, with all of the factors that

24   we considered and learned then plus his

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 223

1    admission, it is my belief that it was

2    plausible that it could have started in that

3    manner, that was just what he told me, and I

4    thought it was plausible.

5          Q.   And I understand what you are telling

6    me about what you thought.

7                    I'm asking to be clear, as you

8    sit here today whether it is your belief that

9    that is how this fire began?

10              MR. POLICK:   Again I'm going to

11   object to the incomplete hypothetical.  It

12   calls for speculation, but go ahead and answer.

13              THE WITNESS:  I'm not sure that that's

14   the exact sequence of events that started the

15   fire.  So I can't say that I know that that's

16   the exact route that caused the fire to start.

17   BY MS. THOMPSON:

18         Q.   Well, as you sit here today do you

19   have a belief as to the sequence of events that

20   led to this fire starting?

21         A.   Other than what Bill told me and the

22   evidence pointing to, I do not.

23         Q.   Do you believe that the account of

24   this fire that is contained in William Amor's

Siebert & Assocs. Court Reporters, Inc.    (773)851-7779  cmsreporters@comcast.net

Page 224

1    handwritten statement and later conversation

2    with Brian Nigohosian is an accurate account of

3    how this fire started?

4            MS. POLICK:  I'm going to object to

5    the kind of compound nature of that question

6    but you can go ahead and answer that.

7            THE WITNESS:  With respect to the

8    written statement you are talking about or

9    statements that Bill told us.

10        Q.   Well, let's start with the written

11    statement.

12            Do you believe that the written

13    statement is an accurate account of how this

14    fire started?

15        A.   It is an accurate account of what Bill

16    told us.

17        Q.   I'm asking if it is an accurate

18    account of what happened?

19            MS. POLICK:  Objection, again calls

20    for speculation, but go ahead and answer.

21            THE WITNESS:  Without being there when

22    the fire started, I can't say if it is or

23    isn't.

24    BY MS. THOMPSON:

Page 225

1       Q.   Is it relevant to you in evaluating

2   what in your account William Amor told you in

3   your interrogation of him whether or not his

4   version of how this fire started is true or

5   not?

6       A.   What was the question?

7       Q.   Sure.  Let me ask you that question in

8   a better way.

9            As part of your duties as a law

10  enforcement officer during the time that you

11  were in the Naperville Police Department, was

12  it important to you in assessing confessions

13  whether or not the information that was being

14  given in the confession was plausible?

15      A.   Yes.

16      Q.   I mean if, for instance, and this is a

17  hypothetical, if someone tells you, you know, I

18  shot the President of the United States on a

19  certain date, and you know with absolute

20  certainty that that person was in prison at the

21  time they claimed they shot the President, is

22  that a confession that you are going to give

23  credence to?

24            MS. POLICK:  I'm going to object to

Page 226

1    the incomplete hypothetical.  The answer can

2    stand.

3    BY MS. THOMPSON:

4         Q.   And is it important to you in

5    evaluating the credibility of a statement that

6    you take during an interrogation to evaluate

7    whether the statement that you have taken

8    contains facts that are false?

9         A.   So your question is, is it important

10   for me to know what I am being told is a lie or

11   the truth or some portion of that?

12        Q.   Well, let me ask you that.

13             I mean when you are taking a

14   confession from someone, is it relevant to you

15   whether the confession is true or not?

16        A.   Yes.

17        Q.   Why?

18        A.   Because my goal is to get to the

19   truth.

20        Q.   And if the statement that is being

21   given to you contains facts that are false,

22   would that matter to you?

23             MR. POLICK:   Objection to the form of

24   the question.  It is an incomplete hypothetical

Page 227

1    which calls for speculation, but go ahead and

2    answer.

3              THE WITNESS:  It is important to me

4    that being told to me to the best of my ability

5    is the truth, yes.

6    BY MS. THOMPSON:

7        Q.   After you took the statement from

8    William Amor in this case, did you take any

9    steps to check whether the facts in that

10   statement were true?

11             MR. POLICK:  Just for point of

12   clarification, counsel, when you say the

13   statement from Mr. Amor, are you referring to

14   the October 4th statement?

15             MS. THOMPSON:  That's a fair point.

16   So let me say this.

17       Q.   There were various statements that

18   William Amor gave between the 3rd --

19   October 3rd and October 4th, correct?

20       A.   Correct.

21       Q.   And ultimately he gave a statement to

22   you that was memorialized in a handwritten

23   statement?

24       A.   Correct.

Page 228

1      Q.   And then there was -- do you agree

2  that there was sort of what I would call an

3  addendum to that statement later when he talked

4  to Brian Nigohosian?

5           MR. POLICK:   Objection to the form,

6  but go ahead and answer.

7           THE WITNESS:  He gave an additional

8  statement to Brian Nigohosian.

9  BY MS. THOMPSON:

10     Q.   An additional statement, let's call it

11  that.

12     A.   Correct.

13     Q.   In your evaluation of -- well, let me

14  just ask you this, after William Amor gave that

15  additional statement to Brian Nigohosian, did

16  you take any steps to assess whether the

17  information that William Amor gave in that

18  written statement or in that statement to Brian

19  Nigohosian were true?

20     A.   I did talk to Mike Manion who was a

21  cellmate of Mr. Amor's over the summer about

22  his conversations with Bill and Bill's

23  relationship with Marianne about what they

24  talked about.

Page 229

1        Q.   Did you take any other steps besides

2   talking to Mike Mannion?

3        A.   I did not.

4        Q.   Are you aware of any steps that anyone

5   in the Naperville Police Department or the

6   Naperville Fire Department took after the

7   Nigohosian statement to check whether the

8   content of William Amor's handwritten statement

9   and statement to Brian Nigohosian were true?

10       A.   I'm not aware of that.

11       Q.   Have you and Mike Cross ever talked

12  about whether Mike Cross has any belief one way

13  or the other about how specifically William

14  Amor started this fire?

15       A.   Other than that night, during the

16  taking of the statement, no, I don't believe he

17  did.

18       Q.   So that night during the taking of the

19  statement did you talk about that?

20       A.   We took the statement, and we talked

21  about it, you know, while Brian Nigohosian

22  arrived, but I don't recall any specific

23  details from the conversations.

24       Q.   Did you talk about it with Mike Cross

Page 230

1    out of William Amor's hearing like while you

2    were waiting for Nigohosian to get there?

3         A.    Probably.

4         Q.    And did that conversation go at all

5    into whether Mike Cross thought that this

6    version of events that this fire was started

7    with a cigarette and vodka soaked newspapers

8    was true?

9         A.    I don't recall.

10        Q.    After you got this account from

11   William Amor about starting this fire with

12   vodka soaked newspapers, did you ever take any

13   steps to talk to somebody who had any knowledge

14   about arson to find out if this was a possible

15   way this fire could have began?

16        A.    I did not.

17        Q.    Did you take any steps before you took

18   this statement to talk with anybody who had

19   knowledge about arson to find out if a fire

20   could be started using vodka as an accelerant

21   at all?

22        A.    I did not.

23        Q.    Have you ever read or heard anywhere,

24   other than communications with your counsel,

Page 231

1   that a cigarette cannot ignite vodka soaked

2   newspapers?

3        A.   I have not.

4        Q.   Have you ever heard that it can?

5        A.   I have not.

6        Q.   I mean when you took the handwritten

7   statement from William Amor, were you at all

8   concerned at that time about verifying whether

9   the method that he was giving to you for this

10  fire being started was scientifically possible?

11       A.   I believe at the time it was

12  plausible.

13       Q.   Why did you believe that?

14       A.   Well, knowing that a cigarette burns

15  and generates enough heat to start a fire, it

16  was not beyond the realm of possibilities that

17  it could you start newspapers on fire, whether

18  they were soaked in vodka or not.

19            There is many ignition sources,

20  whether there is vodka on the papers or not

21  vodka on the papers, certainly a cigarette

22  burns hot enough to burn.  It certainly was

23  plausible.

24       Q.   I mean at the time that you took

Page 232

1    William Amor's statement, is it true that you

2    had zero training in arson investigation?

3         A.    That's correct.

4         Q.    And is it true that Mike Cross never

5    told you one way or another whether he had a

6    view as to whether this fire could have begun

7    using a cigarette and vodka soaked newspapers?

8         A.    He never expressed to me that it

9    couldn't start a fire with cigarette and the

10   newspapers.

11        Q.    Is it true he also never expressed to

12   you that it could?

13        A.    At no point did he express that he

14   didn't think that that was possible.

15        Q.    I understand.  But at no point did he

16   express to you that -- well, let's me ask you

17   this.

18              Is it true then that you in your

19   own mind reached a conclusion that what the

20   handwritten statement from William Amor

21   contained about this fire was plausible despite

22   having no arson training whatsoever?

23        A.    There were a number of other factors

24   that played into the decision to move forward

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 233

1    with the case.

2                    And it wasn't just the

3    confession, it was Bill's behavior, his -- we

4    knew he had a motive to get out of the Bailey

5    Road apartment, he was trying to find money to

6    pay for a substantial fine for a Court fine.

7                    We knew that he had taken the

8    smoke alarm down off the house out of the

9    hallway two days before the fire, which we

10   never recovered.

11                   We knew that he had sent letters

12   from the jail to Tina, one of which -- we got a

13   couple-line statement about he had a plan to

14   get some capital gain at the end of the summer.

15                   I know that he -- when he was

16   aware of the life insurance policy, that

17   Marianne Miceli had taken out against her life,

18   I know that when we asked him about insurance,

19   when I asked him in the basement he said he was

20   not aware of any life insurance.

21                   And I know that when Mike asked

22   Tina upstairs that day about, did your mom have

23   insurance, she said yes, condo insurance, car

24   insurance.

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 234

1              And specifically when asked about

2    life insurance Bill cut Tina off and yelled,

3    that we didn't know anything about that, which

4    was a suspicious statement and cut Tina off

5    from answering us.

6                   There is many other factors and

7    including the fact that he had released his --

8    the mice that he cared about the week before

9    the fire.

10                  And there was other factors

11   besides this statement that he gave to us.

12        Q.   It is your testimony as you sit here

13   today that it was relevant to your decision to

14   proceed with charges against William Amor that

15   he released his pet mice prior to the fire?

16        A.   I was a piece of the puzzle at the

17   time, yes.

18        Q.   How big of a piece of the puzzle was

19   the mice?

20        A.   Not a big piece.  And I didn't charge

21   him, we presented the facts to the State's

22   Attorney's Office.

23        Q.   You are talking about presenting those

24   facts to Brian Nigohosian?

Siebert & Assocs. Court Reporters, Inc.      (773)851-7779  cmsreporters@comcast.net

Page 235

1          A.    Yes, and I assume he talked to his

2     bosses.

3          Q.    I want to go back to my original

4     question.  All right.

5                Is it your testimony as you sit

6     here today that you could have proceeded with

7     presenting this case to the State's Attorney's

8     Office for possible charges even if William

9     Amor had never made his handwritten statement

10    or his statement to Brian Nigohosian on the 3rd

11    and the 4th?

12         A.    We had many factors, some of which I

13    just described, and if he had not given us that

14    statement that night, we would have continued

15    the investigation.

16         Q.    Isn't it true if he had not given that

17    statement that night that he would not have

18    been arrested on the 4th?

19         A.    Most likely not.

20         Q.    Are you saying -- well, let me ask you

21    this.

22                In your mind, did you have

23    probable cause to arrest William Amor on the

24    4th without the handwritten statement and the

Siebert & Assocs. Court Reporters, Inc.          cmsreporters@comcast.net

Page 236

1    statement to Brian Nigohosian?

2         A.    Well, I didn't explain all of the

3    other factors.  So at this point I can't

4    speculate on what we would have done or not

5    done with or without the statement, that was

6    certainly a piece of the puzzle.  There were

7    many pieces that we developed and the

8    investigation would have continued.

9         Q.    So are you saying as of today you

10   don't have any opinion one way or the other on

11   whether you had probable cause to arrest

12   William Amor but for the handwritten statement

13   and the statement to Brian Nigohosian?

14        A.    I'm not going to speculate on that.

15        Q.    I'm not asking you to speculate.  I'm

16   asking you given the sum total of everything

17   you knew, did you have probable cause without

18   the statement?

19        A.    I'm not going to speculate on that.

20        Q.    I want to go back to Exhibit 5 and

21   let's go to DEFS 11589.

22        A.    Okay.

23        Q.    If you want to read this for a second,

24   I have some questions about the contents so you

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 237

1   can look at that.

2          MS. POLICK:  What is the page?

3          MS. THOMPSON:  It is page 2 of that

4   exhibit, so it is DEFS 11589.

5          MR. POLICK:   Okay.

6   BY MS. THOMPSON:

7      Q.   Have you had a chance to review that

8   page?

9      A.   Yes.

10     Q.   Did -- on the 21st of February did

11  Mike Cross send you a text asking you when

12  William Amor was going to sue everyone?

13     A.   He did.

14     Q.   And did you express the opinion in

15  response that William Amor was going to sue

16  everyone soon?

17     A.   I did.

18     Q.   Why was it your belief at that point

19  that William Amor was going to sue everyone?

20     A.   Just an understanding that once the

21  Judge ruled the way he did, and knowing that

22  Bill Amor doesn't have any means of income, it

23  would not surprise me that we would be sued.

24     Q.   Did you hear any of the trial

Page 238

1   testimony from the retrial other than obviously

2   your own testimony on the stand?

3        A.   No.

4        Q.   Did you talk with anyone about any of

5   the trial testimony or what took place in Court

6   other than obviously again experiencing your

7   own testimony?

8        A.   I don't recall talking about it.

9   I didn't sit in on any of it after I testified.

10        Q.   Did you look at any newspaper articles

11   summarizing any of the --

12        A.   I probably did read some newspaper

13   articles.

14        Q.   Is it your memory you read those

15   articles like during the trial?

16        A.   I don't recall.

17        Q.   Did you read any accounts of the trial

18   before you testified in the second trial?

19        A.   I don't believe there were any.

20        Q.   I want to just have you go to the

21   third page of this exhibit which is 11590.

22             We have talked a little bit about

23   those first two pages that have "MC" at the top

24   and this page obviously has "BC" at the top,

Page 239

1    which I think you said references -- you think

2    might reference Brian Cunningham?

3         A.    Yes.

4         Q.    Did you text with Brian Cunningham on

5    or around January 25th of 2018 about this case?

6         A.    It appears so.

7         Q.    And on January 25th did Brian text

8    you, looks like Mike and I will be here all

9    day, let me know if you are free for a cup?

10        A.    It appears, yes.

11        Q.    Did you -- as you sit here today do

12   you interpret that to mean that Brian was

13   asking if you wanted to grab a cup of coffee?

14        A.    Yes.

15        Q.    Did you have a cup of coffee with

16   Brian during the trial?

17        A.    No.

18        Q.    There is a response to the text I just

19   read, I'm not trying to disparage anyone's

20   grammar, but it seems like it is not

21   grammatically correct, would you agree?

22        A.    Which one?

23        Q.    The one below that looks like Mike, I

24   think it says:  "All S stop up for the there",

Page 240

1    do you see that?

2          A.    Yes.

3          Q.    Do you know if you had an intention to

4    say something else that just didn't get typed

5    correctly?

6          A.    I believe it was I will stop up there,

7    something along those lines.

8          Q.    It is your memory you didn't actually

9    stop to talk to them?

10         A.    No, I think I said, I will stop up

11   there.

12         Q.    Meaning stop up where they were

13   waiting basically?

14         A.    Yes.

15         Q.    Did you do that?

16         A.    I did stop up briefly.

17         Q.    Did you chat with Brian and Mike,

18   wherever they were waiting?

19         A.    Said "Hi" to them, said how are you

20   doing, and that was it.

21         Q.    During the trial were you working in

22   your office area of the Court's building there

23   in DuPage?

24         A.    I was.

Page 241

1      Q.    Okay.  There is a text below that I
2  will stop up there, let me know when Tina goes
3  in, do you see that?
4      A.    I do.
5      Q.    Were you asking Brian to let you know
6  when Tina testified?
7      A.    No, my intent was I didn't want to be
8  there when Tina was waiting outside or
9  whatever.
10     Q.    Why was that?
11     A.    Well, I didn't want, you know, to
12  mix -- talk to her, have her see me, whatever,
13  I just thought it would be better, just let her
14  go in and testify.  I didn't want to be in the
15  waiting area or in the hallway when she was
16  around.
17     Q.    Was that because obviously you had had
18  some more recent interviews with her?
19     A.    Correct.
20     Q.    Were you trying to make sure you
21  didn't somehow taint this process by having a
22  conversation with her?
23     A.    Yeah, I didn't want to talk to her.
24     Q.    Are you aware as you sit here today of

Page 242

1    any specific efforts that anyone took to search

2    Ms. Miceli's unit for a smoke detector?

3         A.   We all looked for it, the firefighters

4    looked for it.  We were never able to find

5    where the smoke detector was.

6         Q.   What is your understanding of when

7    firefighters searched for the smoke detector?

8         A.   Well, it was either that day or the

9    next day we went back when we learned there

10   should have been a smoke detector and saw where

11   the holes in the wall were at where the smoke

12   detector had been installed.

13              It was near the bathrooms by the

14   electrical panel.  And the screw holes were

15   there, and the wall was heavily soot covered

16   from the fire.

17              But clearly there was no smoke

18   detector not in place when the fire broke out

19   because there was no pattern against the wall

20   where the smoke detector should have been

21   snugged up against the wall.

22        Q.   Other than looking at that area you

23   just described, did you personally take any

24   steps to look for a smoke detector in the unit

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 243

1    ever?

2          A.   Yes.  We looked through the whole

3    unit.

4          Q.   Who is we?

5          A.   Me and Jamie Griffith and Mike Cross,

6    Jamie took pictures of the area we are

7    describing where the smoke detector was.

8          Q.   And is it your belief that

9    firefighters did something to look through the

10   scene for a smoke detector?

11         A.   I don't -- unless -- and I don't know

12   that the typical firefighter would bother to

13   look for it.  Lieutenant Ferrari on the fire

14   team may have.

15         Q.   Did you ever look through any debris

16   or stuff that was taken out of the unit that

17   was dropped downstairs or somewhere else for a

18   smoke detector?

19         A.   I did not.

20         Q.   And are you testifying with confidence

21   today that you have a memory of you personally

22   doing something to search for the smoke

23   detector in the unit?

24         A.   Yes.

Page 244

```
 1       Q.   If you testified differently

 2  previously, are you saying that you believe

 3  that prior testimony was incorrect?

 4            MR. POLICK:   Are you impeaching him

 5  with something?

 6            MS. THOMPSON:  No, I'm asking the

 7  question.

 8            THE WITNESS:  I do recall when I was

 9  looking -- I believe we were looking for the

10  letters, and I walked down the halls and looked

11  to see what I could see.

12                With regards to the debris that

13  you described, the alarm, the smoke alarm was

14  on the far end of the apartment not near where

15  the fire actually was.  It was just the soot

16  covered area at that point.

17                So it is my understanding that

18  anything that was removed or thrown out to the

19  ground below was from the living room area not

20  the area where the alarm was at.

21       Q.   Did William Amor tell you at some

22  point he may have left the smoke detector on a

23  book shelf somewhere?

24       A.   Yes, he did.
```

Page 245

```
1        Q.   Where was that book shelf?

2        A.   At the end of the hall.

3        Q.   Did you -- other than what you now

4   testified to today, are you now saying that

5   there was anything else you did to look for the

6   smoke detector other than what you just

7   testified about?

8        A.   No, I don't believe so.

9        Q.   I want to go back to William Amor's

10  arrest.

11            Did you -- when did you discuss

12  with other members of the Naperville Police

13  Department bringing William Amor into custody

14  on those outstanding warrants as a method for

15  helping him be sober enough to take a polygraph

16  exam?

17            MR. POLICK:   We are going back to the

18  15th of September.

19            MS. THOMPSON:   We are talking about

20  the 15th.

21       Q.   My question is when you had those

22  conversations?

23       A.   It could have been the 15th, because I

24  wasn't part of the team that interviewed Bill
```

Page 246

1    and Tina that morning at the hotel.

2              So at some point subsequent to

3    their interviews or the attempt to do the

4    polygraph test, they had I believe, attempted

5    to do another test on the 15th.  That's when

6    the discussion would have happened.

7         Q.   Did anyone to your knowledge discuss

8    either amongst officers or with William Amor

9    asking William Amor if he wanted to go to

10   alcohol abuse treatment as a method for, you

11   know, sobering up to be able to participate

12   further in this investigation?

13        A.   I'm not aware of that.

14        Q.   Did you personally ever consider that

15   as a possibility here?

16        A.   No.

17        Q.   Is there a reason why not?

18        A.   No.

19        Q.   Do you believe as you sit here today

20   that Tina Miceli had -- has any knowledge of

21   how the fire in her mother's apartment began?

22        A.   My best belief at this point, with

23   everything I know and learned, is that she does

24   not or did not.

Page 247

1      Q.   Have you received any training on the

2   use of polygraphs as a tool in an

3   investigation?

4      A.   No, I haven't received trained on the

5   use of a polygraph.

6      Q.   Have you taken someone to be

7   polygraphed in any other cases that you worked

8   on in your career other than this one?

9      A.   Probably, but I can't recall when it

10  might have been.

11     Q.   Prior to going to John Reid &

12  Associates in this case, other than any

13  training you had at Reid & Associates, had you

14  ever taken somebody there for the purpose of a

15  polygraph?

16     A.   No.  I've been polygraphed, but I'm

17  familiar with that aspect of it.  I've not

18  taken anybody other than Bill to Reid.

19     Q.   Prior to this case had you ever taken

20  someone to O'Brien & Associates?

21     A.   I don't believe so.  We have had

22  polygraphists come to the police station and do

23  exams, too.

24     Q.   Have you personally had a polygrapher

Page 248

1    come to the station to take a polygraph in any

2    cases you were involved in before William

3    Amor's?

4         A.    I remember, not my cases, but I do

5    remember polygraphs being given in our

6    investigations to different people.

7         Q.    Did you talk with anybody at Reid &

8    Associates in advance of taking William Amor

9    there about any aspect of this investigation?

10        A.    I did not.

11        Q.    Is it your understanding that somebody

12   else did at least some scheduling with Reid &

13   Associates to make sure that they were

14   available to participate in this case on the

15   3rd of October?

16        A.    Yes.

17        Q.    Who had that conversation?

18        A.    I believe it was Mike Cross.

19        Q.    Did he tell you anything about that

20   conversation?

21        A.    No.

22        Q.    Why do you believe he is the person

23   who did that?

24        A.    Well, it was his case at that point.

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 249

1    And I could see from the reports I had a pretty

2    minimal involvement during this investigation

3    at that point.  So it would have been him and

4    possibly Sergeant Carlson.

5         Q.   When you got to Reid & Associates on

6    the 3rd, did you talk there with somebody named

7    Mike Masokas?

8         A.   Yes.

9         Q.   Did you talk with Mr. Masokas before

10   any polygraph exam of William Amor started?

11        A.   We did.

12        Q.   What did you talk about at that point?

13        A.   Just generally we had arrived and Bill

14   was willing to take the polygraph and Mike was

15   aware of the facts of the case up to that

16   point, we discussed that briefly, and that's

17   all I recall from that talk when we first got

18   there.

19        Q.   Did you tell Mike, you know, something

20   to the effect that William Amor had been in

21   jail for awhile in an effort for him to be

22   sober for this exam?

23        A.   We could have.

24        Q.   Do you believe that you did tell him

Page 250

1    that?

2         A.    I don't recall.

3         Q.    Did you tell Mike Masokas anything

4    about Bill having a prior alcohol problem that

5    it impacted the investigation?

6              MR. POLICK:    Objection to the form.

7    Go ahead.

8              THE WITNESS:   I don't recall whether

9    we did or not.

10   BY MS. THOMPSON:

11        Q.    Did you believe that was a relevant

12   fact to tell the polygrapher?

13        A.    I don't know if it is relevant or not

14   relevant, I'm not a polygrapher.

15        Q.    Well, was it your understanding that

16   alcohol use by Mr. Amor had had an impact on

17   the ability to do a polygraph exam before?

18        A.    Yes.

19        Q.    So was it your understanding that

20   that -- that alcohol did have some impact on

21   this process?

22        A.    It did prior, but that evening it

23   didn't, because he hadn't been drinking.

24        Q.    How do you know that Mr. Amor wasn't

Siebert & Assocs. Court Reporters, Inc.                cmsreporters@comcast.net

1     drinking while he was in the jail?

2          A.   It is not allowed.

3          Q.   I mean in your experience do people

4     sometimes get alcohol into the jail, even if it

5     is a contraband substance?

6          A.   I'm not aware of it.

7          Q.   Are you aware of people making home

8     made alcohol in jail?

9          A.   I read stories about it.

10         Q.   Do you believe that doesn't occur?

11         A.   I read stories about it.

12         Q.   Did you ask William Amor at any point

13    between when you saw him, you know, in the jail

14    lobby on the 3rd and when you got to Reid &

15    Associates whether or not he had anything to

16    drink at all while he was in the jail?

17         A.   No.

18         Q.   Did you talk with Mike Masokas before

19    he started the the polygraph exam with William

20    Amor about any questioning that Mike Masokas

21    might do of William Amor after he was done

22    administering the polygraph?

23         A.   I don't recall that.

24         Q.   Well, was it your understanding and

Siebert & Assocs. Court Reporters, Inc.    (773)851-7779  cmsreporters@comcast.net

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 252

1    expectation that after he did the polygraph

2    exam he was going to question William Amor?

3         A.   Yes, that was my understanding.

4         Q.   And was that something that you wanted

5    him to do?

6         A.   Well, you know, we are not present

7    during the polygraph exam, and I can't

8    interpret the results.  So they do --

9    polygraphists do what they do, and I was kind

10   of hands off.

11              Generally they do pre-interview,

12   they do the polygraph and then post-interview

13   if it is necessary.

14              So I just assume that's what they

15   were going to do.

16        Q.   Have you ever been told by anyone

17   other than your lawyer that, you know, that one

18   way that a polygraph exam could be used is to

19   confront someone with the results that they

20   failed as a technique for encouraging that

21   person to talk?

22        A.   Been told that?

23        Q.   Yes.

24        A.   I'm not sure anyone told me that, but

Page 253

1    I was aware that if somebody failed it,

2    certainly could use that information to

3    pre-interview them.

4         Q.   And was your belief on October 3rd

5    that that's something that would happen at

6    Reid & Associates with respect to Mr. Amor,

7    that Mr. Masokas would question Mr. Amor after

8    the polygraph exam, if William Amor failed, and

9    talked to him about the failure as a way of

10   seeing if he would talk?

11        A.   I suspect that's what happened.

12        Q.   Well, was it your understanding going

13   into the polygraph that that's what would

14   happen if Masokas thought William Amor failed?

15        A.   I don't know what my understanding at

16   that was, I don't recall.

17        Q.   What did you believe as you went into

18   Reid & Associates that Mike Masokas was going

19   to talk to William Amor about after the exam?

20             MR. POLICK:   Objection, calls for

21   speculation.  You can go ahead and answer.

22             THE WITNESS:  He would talk about the

23   results of the polygraph exam.

24

Page 254

1    BY MS. THOMPSON:

2        Q.    Including talking to him about the

3    results if he failed?

4        A.    Correct.

5        Q.    Did at some point somebody from Reid &

6    Associates tell you whether or not William Amor

7    had passed or failed the polygraph?

8        A.    He did.

9        Q.    When did someone give you those

10   results first?

11       A.    After the polygraph test was over and

12   we were told that he failed.

13       Q.    And do you know relative to when you

14   got to Reid & Associates how long it was before

15   somebody told you that Bill failed?

16       A.    I don't recall the time.  I just

17   remember we got there about 4:00, but I don't

18   recall the time they came out.

19       Q.    Did you observe any part of the

20   polygraph exam?

21       A.    No.

22       Q.    Were you waiting in the lobby?

23       A.    Yes.

24       Q.    What were you doing while you were

Page 255

1    waiting in the lobby?

2         A.    I don't recall.

3         Q.    Did you bring a book or a newspaper to

4    read or something?

5         A.    I didn't bring a book.  I might have

6    been reading a newspaper.

7         Q.    Do you have any memory one way or

8    another?

9         A.    I do not.  Just sitting in the lobby.

10        Q.    Was Mike Cross with you?

11        A.    He was.

12        Q.    When someone came out to tell you that

13   Bill Amor failed, did they give you any other

14   information at that point?

15        A.    Well, I believe he said he failed

16   badly and that they were going to -- him and

17   his partner were going to talk to Bill Amor.

18        Q.    Did you have an understanding at that

19   point of what they were going to talk to him

20   about?

21        A.    About the results and about our

22   investigation.

23        Q.    Did you give -- did you or Mike Cross

24   give the Reid & Associates people any

Page 256

1    information about your investigation to assist

2    in that questioning process?

3         A.   I don't recall that I gave anything to

4    them, any paperwork or any summarization or

5    anything like that, I didn't.

6              If Mike did, you know, I'm not

7    aware of him giving him any piece of paper.

8              So I don't know what Mike had

9    given to them prior.

10        Q.   When you met with them before the

11   exam, did either you or Mike even give them an

12   oral summary of what the case was about?

13        A.   Yes.  Sure.

14        Q.   In terms of there being a fire and

15   somebody dying?

16        A.   Yes.

17        Q.   Did you give them any information

18   about reasons that you felt gave you suspicion

19   about Bill Amor being involved?

20        A.   I don't recall specifically what we

21   told them.  That's all we talked about the case

22   in general.

23        Q.   Well, did it include you giving them

24   any information about reasons that you

Page 257

1    thought -- let me ask you this.

2              Did you give them any information

3    about how you thought this fire might have

4    started?

5        A.   I don't recall.

6        Q.   Is it your understanding that after

7    somebody came out and told you that Bill failed

8    and that they were going to question him, that

9    in fact that happened?

10       A.   Yes.

11       Q.   Did someone give you like summary of

12   what happened during that questioning?

13       A.   I do recall that we were told he --

14   following that subsequent interview that he did

15   not -- he did not confess to starting the fire

16   to the people from Reid.

17       Q.   Did the people from Reid tell you

18   that?

19       A.   Yes.

20       Q.   How long did their questioning of Bill

21   take after they came out to tell you he failed

22   and when they finished?

23       A.   I don't recall that.

24       Q.   Did the interview that Reid have to

Page 258

1    end that night because their office closed?

2          A.    Correct.

3          Q.    So is it fair to say that process was

4    sort of cut-off at Reid because you ran out of

5    time?

6          A.    Correct.

7          Q.    Did you talk with Mike Cross in

8    advance about what was going to happen after

9    you were done with the Reid & Associates

10   process?

11         A.    No.  I really didn't discuss what we

12   were going to do following that process, that I

13   recall.  I think it depended on what happened

14   at Reid.

15         Q.    Well, when the Reid & Associates

16   people were done with their questioning of

17   Bill, did you have a conversation at that point

18   about what to do next?

19         A.    Yes.  We, you know, we tried to talk

20   to Bill, but they were closing.  So we asked

21   Bill if he would come back to Naperville and

22   continue talking to him there, because we had

23   to leave.

24         Q.    And he agreed to do that?

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 259

1          A.    He did.

2          Q.    And was any of his demeanor with you

3     that you observed at Reid & Associates any

4     different than his demeanor the first night

5     that you talked to him at the Leavenworths?

6          A.    No, it seemed consistent.

7          Q.    During the entirety of the time you

8     were with Bill on the 3rd and the 4th, did you

9     ever see him eating anything?

10         A.    I did not.

11         Q.    Did you have any food during that time

12    period?

13         A.    I don't recall.

14         Q.    Did Mike Cross?

15         A.    I don't remember him eating anything

16    either.  Bill had some sodas and smoked a

17    number of cigarettes.  And we asked him a

18    number of times if he wanted to eat, and he

19    told us that he just had lunch in DeKalb when

20    we picked him up.

21         Q.    Do you have any memory one way or

22    another if you had any food between when you

23    picked Bill up in DeKalb and when you finished

24    with Brian Nigohosian?

Page 260

1        A.   I don't believe I did, but I don't

2    have a strong recollection.

3        Q.   Were you tired at the end of that

4    process?

5             MR. POLICK:   Objection to the form

6    but go ahead.

7             THE WITNESS:  By the next morning I

8    was starting to get tired, yes.

9    BY MS. THOMPSON:

10       Q.   Were you -- let me ask you this.

11                By the time that Brian Nigohosian

12   left the police station the next morning, were

13   you hungry?

14       A.   I do not remember being hungry.

15       Q.   But do you remember being tired?

16       A.   I was getting tired.

17       Q.   Have you ever seen any origin and

18   cause report that are was prepared by Dave

19   Ferreri related to this case?

20       A.   No, I don't believe I have.

21       Q.   Has Dave Ferreri ever given you any

22   analysis of -- let me start that again.

23                Has Dave Ferreri ever given you

24   any summary of his beliefs about the fire?

Siebert & Assocs. Court Reporters, Inc.                cmsreporters@comcast.net

Page 261

1        A.   Verbally or in writing or --

2        Q.   Either way.

3        A.   I don't believe so.

4        Q.   Mark this.

5                        (Deposition Exhibit No. 6 was

6                         marked for identification.)

7        Q.   I'm showing the witness what has been

8    marked as Exhibit 6.

9                   This is a three-page document

10   that is Bates stamped Amor 19002 through

11   Amor 19004.

12                   Do you recognize Exhibit 6?

13       A.   Exhibit 6, I do.

14       Q.   Is the first page of Exhibit 6 Amor

15   19002, a copy of a waiver of rights form that

16   William Amor signed in your presence on

17   February 3rd of '95?

18       A.   You mean October 3rd?

19       Q.   I'm sorry.  October 3rd of '95?

20       A.   Yes, it is.

21       Q.   And do you see in the form that there

22   is an "X" and there is a signature next to it?

23       A.   Yes.

24       Q.   Just below the waiver of rights, like

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 262

1    preprinted information?

2         A.    I do.

3         Q.    Did William Amor make that signature?

4         A.    He did.

5         Q.    And then below that there is a

6    signature of an "R" and then I think some other

7    letters, is that your signature?

8         A.    That is.

9         Q.    And then is the signature next to that

10   Mike Cross'?

11        A.    It is.

12        Q.    Down where it says date and time there

13   are some -- there is a date and time that are

14   written in there, is that correct?

15        A.    Correct.

16        Q.    Who wrote in that date and time?

17        A.    I did.

18        Q.    Did you at the time you were writing

19   in the 11:37 P.M. take a note of the time?

20        A.    Well, I wrote down the time after

21   Bill -- I read the rights to Bill, and then he

22   looked over the document and then he signed it,

23   me and Mike signed it, and I signed the time,

24   that was the time that he read through it.

Page 263

1       Q.    Okay.  And is that a -- like you

2    looked at a clock or a watch and wrote the time

3    down?

4       A.    Yes.

5       Q.    You were not estimating?

6       A.    No.

7       Q.    Okay.  The next two pages --

8       A.    Just to stop you.

9       Q.    Sure.

10      A.    They are duplicates, the next two

11   pages.

12      Q.    Right.  Let me just say this -- these

13   documents sort of came and the way they came in

14   the case were sort of collected, I don't mean

15   to suggest they have some connection with each

16   other, but you are right those two pages are

17   duplicates.

18             So let me just have you look at

19   Amor 19003 for starters.

20             Do you see there is a date and a

21   time written on this document, 19003?

22      A.    I do.

23      Q.    Who wrote in that date and time?

24      A.    I did.

Page 264

1     Q.   And that says 1:14 A.M., is that
2  right?
3     A.   Correct.
4     Q.   At what point did you note the time?
5     A.   At that time I affixed it after Bill
6  had finished writing the statement and then he
7  signed it.  And then Mike Cross and I signed
8  our names to it which are to the right, and
9  then I affixed the date and time, because it
10 was essentially finished.
11    Q.   Prior to your trial testimony in 2018,
12 did you review any documents or prior testimony
13 related to this case?
14    A.   I did.
15    Q.   Did you review those documents to
16 refresh your own memory to be prepared to
17 testify?
18    A.   I did.
19    Q.   Was there anything that you wanted to
20 review to refresh your memory to prepare to
21 testify in 2018 that for some reason was not
22 available to you?
23    A.   I don't recall that.
24    Q.   Did you recall asking anybody, could I

Page 265

1    see "X" and they weren't able to give you "X"

2    to look at?

3         A.   I don't recall that.

4         Q.   Did you have access to what you

5    understood to be the entire investigative file

6    if you wanted to or needed to prior to your

7    testimony in 2018?

8         A.   Well, I think the most complete file

9    should have been in Naperville Police

10   Department, but I'm only assuming that that

11   file was in its entirety transmitted to the

12   State's Attorney's Office.

13        Q.   Did you ever review the State's

14   Attorney's file related to this case leading up

15   to the 2018 trial?

16        A.   From the previous trial in 1995 or --

17        Q.   Let me ask that question in a better

18   way.

19             You were obviously working at the

20   State's Attorney's Office at the time of the

21   second trial, correct?

22        A.   Correct.

23        Q.   And you had some involvement in the

24   State's Attorney's investigation in this case,

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 266

1    correct?

2         A.    Correct.

3         Q.    As part of any of that process, either

4    your employment with the State's Attorney or

5    specifically your work on the investigation

6    with them, did you review the State's Attorneys

7    file related to this case?

8         A.    No, I did not.

9         Q.    Okay.  When you were preparing to go

10   talk to Tina Miceli as part of the State's

11   Attorney's Office, did you review any documents

12   in preparation for that conversation?

13        A.    Just the reports that I had written or

14   that Mike had written when he talked to Tina

15   on, you know, that evening in the Leavenworth

16   house.

17             Just the reports that we already

18   had.  There was nothing new that I would have

19   reviewed prior to talking to Tina.

20        Q.    In looking at this statement, 19003,

21   it is your testimony that William Amor wrote

22   out this statement, is that correct?

23        A.    Correct.

24        Q.    Did you give him any instructions or

Page 267

1    statements about how to fill out this form?

2         A.   I just -- we just told him write out

3    what you told us in your own handwriting and

4    gave him a piece of paper and said this is the

5    paper, if you need more let me know, and that's

6    what he did.

7         Q.   He then wrote this out in your

8    presence?

9         A.   He did.  On and off.  We would leave

10   the room and come back and to check on his

11   status.  We didn't sit in the room with him

12   while he was writing it out in its entirety.

13        Q.   When you say "we" who is "we"?

14        A.   Me or Mike.

15        Q.   Did you leave and come back in at

16   different times than Mike?

17        A.   Yes.

18        Q.   And by that I mean, were there times

19   when he was writing this out that just Mike was

20   there or you were there?

21        A.   Correct.  And there was times that

22   nobody was there.

23        Q.   While he was writing this out when

24   you weren't in the room, what were you doing?

Siebert & Assocs. Court Reporters, Inc.                cmsreporters@comcast.net

Page 268

1        A.   Getting coffee or talking to Mike.

2   Mike at some point was calling felony

3   screening, also, taking direction from Brian

4   Nigohosian about what steps we should be

5   taking.

6        Q.   What is your understanding of what, if

7   any, direction Brian Nigohosian gave to Mike

8   prior to Brian getting to the station?

9        A.   Brian told Mike that he wanted a taped

10  statement, a tape recorder.

11       Q.   Anything else?

12       A.   As far as I know that's all I'm aware

13  of.  I didn't talk to Brian.

14       Q.   During the time that William Amor was

15  writing the statement, did he ask you or Mike

16  any questions about like what should be in here

17  as he was writing it out?

18       A.   Sure.  I don't believe.  We had talked

19  to him for some time after he gave me this

20  statement, the initial confession.

21             And so once we said, here, we

22  would like a handwritten statement in your own

23  words.  Here is a paper and pen.  Start

24  writing.  If you need more paper, let us know.

Siebert & Assocs. Court Reporters, Inc.                cmsreporters@comcast.net

Page 269

1       Q.   After you gave those directions is it
2   your testimony that without conferring with you
3   again at all about the content here, that he
4   wrote every single word that's on this page,
5   beginning with on September 10th, 1995 leading
6   up to person or persons?
7       A.   Yes.
8       Q.   So without any -- is it your testimony
9   without any additional instruction or
10  conversation with you or Mike Cross that he
11  just wrote in at the end, the loss was meant to
12  be minimal for personal gain, no harm was ever
13  supposed to come to any person or persons?
14      A.   Yes.
15      Q.   Did William Amor talk to any other
16  people at all, other than you and Mike, during
17  the time that he was filing out this statement?
18      A.   Sure.  Well, no, once he finished it
19  and looked at it, and he did not -- he had told
20  us that he had spilled the vodka up onto the
21  chair.
22           And in reviewing it he said,
23  about the top third, that he spilled the vodka
24  on the Chicago Tribune.

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 270

1            I said:  Well, you said you

2    spilled it up on the chair when I asked you.

3    So that's when he added "and chair".

4        Q.   Other than "and chair", is there

5    anything else in here that he added after you

6    started reviewing and discussing with him?

7        A.   No, I don't believe so.

8        Q.   And I think my other question, I just

9    want to make sure it got answered.

10            Was there anybody else that he

11   had the opportunity to talk to other than you

12   and Mike Cross from when he started writing to

13   when it was done?

14       A.   No, I don't believe so.

15       Q.   Was there anybody else that was coming

16   in and out of the room at that time?

17       A.   No.

18       Q.   Were there any other police officers

19   other than you and Mike Cross in the area of

20   the station where this conversation with

21   William Amor was going on during this time?

22       A.   When he wrote this out, no.

23       Q.   Do you have any understanding of how

24   Russell Wiedmann, W I E D M A N N, came to

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 271

1    the -- came to be at the Naperville Police

2    Station that night to serve William Amor with

3    divorce papers?

4         A.    I do not.

5         Q.    Did you know in advance of Russell

6    Wiedmann coming that a person was coming to the

7    station in order to give William Amor divorce

8    papers?

9         A.    I don't believe I knew that.

10        Q.    When -- were you present for when

11   Mr. Amor actually got served?

12        A.    I was.

13        Q.    And were you surprised to have a

14   process server there to serve him with

15   something?

16        A.    Somewhat.

17        Q.    Did you talk with Mike Cross at all

18   about anything having to do with a process

19   server being there?

20        A.    I don't recall that I did.

21        Q.    Was Mike Cross surprised that Russell

22   Wiedmann was there?

23             MR. POLICK:   Objection to what Cross

24   knew, but go ahead and answer.

Siebert & Assocs. Court Reporters, Inc.    (773)851-7779  cmsreporters@comcast.net

Page 272

1           THE WITNESS:  I don't know if he was

2    surprised.

3    BY MS. THOMPSON:

4         Q.   Did Mike Cross express to you any

5    surprise or question about how Russell Wiedmann

6    got there?

7         A.   He did not.

8         Q.   Did you guys discuss at all anything

9    about it being surprising that someone knew to

10   find William Amor at the police station that

11   night?

12        A.   I don't recall discussing that aspect.

13        Q.   Have you ever discussed that with

14   anyone other than your counsel as to how

15   Russell Wiedmann ended up coming to the station

16   to find William Amor there and serve him?

17        A.   I did not.

18        Q.   As you sit here now what is your

19   understanding of when, what time specifically

20   Russell Wiedmann served William Amor with those

21   papers?

22        A.   It was just prior to us -- to me

23   reading the Miranda warnings to Bill.  So

24   11:30ish that night.

Page 273

1          Q.   Was Mike Cross ever on the phone

2     during the time that you guys were at Reid &

3     Associates?

4          A.   I don't recall if we even had a phone

5     in the car.

6          Q.   What about at Reid & Associates

7     itself, the office?

8          A.   Right.  I don't know if he was.

9          Q.   Were you ever -- did you make any

10    calls specifically when you were at the

11    Reid & Associates office?

12         A.   No, I did not.

13         Q.   Did you guys have to stop anywhere at

14    any point between leaving the DeKalb Jail and

15    getting back to Naperville Police Department

16    later other than Reid & Associates?

17         A.   I don't think so.

18         Q.   Did you have to stop for gas or any

19    pit stops or anything like that?

20         A.   No.

21         Q.   Did you talk to Brian Cunningham or

22    Mark Carlson at all on October 3rd or

23    October 4th of 1995?

24         A.   October 3rd or October 4th. I don't

Page 274

1    recall speaking to either one of them.

2        Q.   Did you see either one of them at the

3    police station?

4        A.   No.

5        Q.   Do you know why you participated in

6    this questioning of William Amor on the 3rd and

7    the 4th as opposed to say Brian Cunningham?

8        A.   I don't know why.

9        Q.   Do you believe that has anything to do

10   with the fact that you have a higher rate of

11   successful interrogations?

12       A.   I could tell you Brian Cunningham has

13   a very high rate of successful confessions.

14       Q.   Do you have any idea why it was you

15   and not him?

16       A.   I don't know.

17       Q.   As a sergeant did Mark Carlson

18   participate in any interrogations of suspects?

19       A.   He did.

20       Q.   Do you have any idea why he didn't

21   participate in this interrogation?

22       A.   I do not.

23       Q.   Has anyone ever told you that Brian

24   Cunningham was unavailable to participate in

Page 275

1    this work those nights?

2         A.    Not that I'm aware.

3         Q.    What about Mark Carlson?

4         A.    No, I'm not aware of what his

5    availability was either.

6         Q.    Prior -- well, let me ask you this.

7               In prior testimony you've

8    testified about a moment in Bill's

9    interrogation where he finally said words to

10   the effect, he is responsible for this fire,

11   correct?

12        A.    Correct.

13        Q.    Do you know what time it was that he

14   very first made those statements?

15        A.    I believe it was around midnight.

16        Q.    Between when you arrived at the

17   Naperville Police Department -- well, let me

18   ask you this.

19              When you got to the Naperville

20   Police Department is it true that you

21   essentially dropped Bill and Mike Cross off at

22   the station and then sort of went to deal with

23   the car, do I have that correct?

24        A.    Correct.

Page 276

1        Q.    Okay.  And did you sort of come and

2    join them in the station?

3        A.    I did.

4        Q.    Okay.  So between the time when you

5    joined them in the station, when you got there,

6    and when William Amor finally said that he

7    started this fire, were there times that you

8    were alone with Bill without anybody else

9    present in the room where you were?

10        A.    Just prior to him giving the first

11    statement, yes.  But other than that, me and

12    Bill alone, I don't believe so.

13        Q.    And when you said just prior to him

14    giving that statement, are you referring to the

15    time when he first orally said something to the

16    effect of I did it?

17        A.    Correct.

18        Q.    Just prior to that statement, is it

19    your testimony that there was a moment when

20    Mike Cross confronted Bill essentially about

21    believing he was involved?

22        A.    Yes.

23        Q.    And then he left?

24        A.    He did.

Page 277

1        Q.   Did you know in advance that was

2   something that Mike Cross was going to do?

3        A.   I did not.

4        Q.   Had you worked out with Mike at all in

5   advance sort of how you were going to conduct

6   this interrogation?

7        A.   Did not.

8        Q.   Had you ever interrogated a suspect

9   with Mike Cross before with this conversation

10  with Bill?

11       A.   I don't know if I did or not.

12       Q.   Is it possible you had prior to this

13  one?

14       A.   It is possible.

15       Q.   Had you ever observed an interrogation

16  that Mike Cross had conducted before this one?

17       A.   No.

18       Q.   Had you ever talked with Mike Cross

19  about his, you know, method or ways that he --

20  strategies he used to conduct interrogations

21  prior to this interrogation with Bill Amor?

22       A.   No.

23       Q.   Do you know where Mike Cross went when

24  he, you know, got up and left the room at that

Page 278

1    point?

2         A.   He went through the door into the what

3    would be the work room, which is right behind

4    the office, the interview room.  And where he

5    went after that, I don't know.

6         Q.   How long was he gone for?

7         A.   Just a few minutes, five minutes,

8    maybe a little longer.

9         Q.   Was it your belief that the way that

10   Mike Cross was acting in getting up and

11   challenging Bill and then leaving was something

12   he did strategically as part of an effort in

13   the interrogation to get Bill to confess?

14        A.    I don't know that was his plan or if

15   it just -- he thought of it at that moment.

16   What he knew, too, that he had just learned

17   that Tina told Detective Sullivan prior to our

18   arrival that she felt that Bill had started the

19   fire, he didn't like her mother.

20              So that was another new factor in

21   addition to failing the polygraph.  But Mike

22   Sullivan told that to Mike Cross, and so he

23   took that information and did what he did with

24   it.

Page 279

1      Q.    When did Sullivan tell Cross that?

2      A.    When we got back to the Naperville

3   Police Department.

4      Q.    Were you there for that?

5      A.    Well, no, I don't recall that

6   conversation, but there is a period of time

7   when I dropped them off at the front and drive

8   all the way around to the back of the building

9   and walked in the opposite side, there was a

10  period of time when I wasn't with them.

11     Q.    So did Mike Cross later tell you that

12  Sullivan had told him that essentially?

13     A.    Yes.

14     Q.    Okay.  Do you know if he told him that

15  in Bill's presence or not?

16     A.    Told --

17     Q.    Told --

18     A.    Did Sullivan tell that to Cross?

19     Q.    Yes.

20     A.    I don't know.  I don't know how

21  that -- I doubt Mike Sullivan would have told

22  that to Mike Cross with Bill standing there.

23     Q.    And it is your understanding that he

24  wouldn't have done that because he wouldn't

Page 280

1    have wanted to give Bill information about the

2    investigation prior to him being interrogated

3    like that?

4         A.   Right.  Correct.

5         Q.   Okay.  So is it your testimony that

6    you are not sure whether Mike Cross did that as

7    sort of a strategy or whether it is possible

8    that he said those things acting on his sort of

9    true emotion at that moment of how he was

10   reacting emotionally?

11            MR. POLICK:   Objection to the form of

12   the question.

13            THE WITNESS:  I don't know.

14   BY MS. THOMPSON:

15        Q.   Have you ever talked with Mike Cross

16   about that point of the interrogation?

17        A.   No.

18        Q.   Between the time then that you joined

19   Mike Cross and Bill in the police station after

20   coming back from Reid & Associates and the time

21   that Bill first said orally that he did it,

22   were there times that Mike Cross and Bill Amor

23   were alone in the room in the station?

24        A.   No, when we sat down in the interview

Page 281

1   room, my understanding that was the first time

2   we sat in that interview room, Mike and Bill.

3                   And Mike and Bill had come

4   through the front of the police station through

5   the lobby downstairs to the lobby downstairs.

6   That's where I encountered them.

7                   So after that point, you know,

8   prior to his initial statement, there was no

9   other time that Mike would have been alone with

10  Bill.

11       Q.   Did Bill smoke at all while you were

12  at Reid & Associates?

13       A.   He smoked in the car on the way there,

14  and he smoked in the car on the way back.  He

15  smoked at the police station, but I'm not sure

16  if he smoked inside of the John Reid &

17  Associates building on Wacker.

18       Q.   All of the cigarettes that he smoked

19  on the 3rd and the 4th, were those cigarettes

20  you or another police officer gave him?

21       A.   I don't know.  I don't know if that

22  was in his property when he left DeKalb, I

23  couldn't tell you.

24       Q.   How many cigarettes did he smoke in

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 282

1    the car on the way from DeKalb to Reid &

2    Associates?

3         A.    More than one, but I don't know how

4    many.

5         Q.    Was he chain smoking in the car?

6         A.    I don't believe he was chain smoking.

7         Q.    What about from Reid & Associates to

8    Naperville, was he chain smoking then?

9         A.    No, but I do recall he was smoking.

10        Q.    And at the Naperville Police

11   Department -- where in the police department

12   did he smoke?

13        A.    I let him out -- Well, we were sitting

14   in Sergeant McGury's office preparing the taped

15   statement, we had to go in that office, that's

16   where the tape recorder was at, still in the

17   same area, but we had left the interview room.

18             So when he asked me to smoke, I

19   said sure, so we went outside through the

20   cafeteria.  There is a patio outside of the

21   cafeteria.  It overlooks the retention pond.

22   That's where we smoked.

23        Q.    Were you standing with him when he

24   smoked a cigarette?

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 283

1        A.    I was.

2        Q.    Did you talk with him about anything

3    at that time?

4        A.    I don't remember any conversations,

5    no.  I think Bill was just relaxing having a

6    smoke.

7        Q.    Is that the first cigarette that he

8    had had since you got back from -- since you

9    got out of the car when you got back from Reid

10   & Associates?

11       A.    I believe it was.

12       Q.    At any point between when you picked

13   Bill up at the DeKalb Jail and when he told

14   you, you know, gave you this oral statement

15   that he did it, was there ever a point where

16   his demeanor changed at all?

17       A.    Well, he laid his head on the table

18   and was quiet.  Bill is very talkative about

19   anything.  So he laid his head down on the

20   table.  Got quiet. And that's -- sat back up

21   and said:  "I did it.  I started the fire."

22       Q.    Other than putting his head on the

23   table, is there any way in which his demeanor

24   and him being quiet, is there any way in which

Page 284

1   his demeanor changed at all at any point really

2   between when you picked him up at the jail and

3   when he made that statement?

4        A.   No.

5        Q.   Now, you said Bill is talkative, isn't

6   it true that you -- that Bill Amor really

7   didn't talk in the car from either from DeKalb

8   to Reid or from Reid back to Naperville?

9        A.   He talked, we talked, but it is hard

10  to talk, he had the window open sometimes when

11  you are smoking, he was in the back seat.

12            So he didn't really have anybody

13  to talk to.  We didn't want to talk about the

14  case or anything driving down the highway.

15       Q.   So is it your testimony now he did

16  talk in the car?

17       A.   He did talk, but I mean he didn't say

18  much, because me and Mike were in the front and

19  he was in the back.  We didn't really want to

20  talk to him.

21       Q.   I mean is it your testimony that he

22  was trying to talk about the case in the car?

23       A.   No, not at all.

24       Q.   What was he talking about?

Page 285

1      A.   I don't recall, it was just small

2   talk.

3      Q.   Like about -- do you have any memory

4   specifically of what it was?

5      A.   I do not.

6      Q.   Was it about his personal life?

7      A.   I don't remember what he talked about.

8      Q.   Did you talk with him while he was

9   smoking?

10     A.   In the car?

11     Q.   That's a good question.  So let me

12   restate that.

13          While he was smoking on the patio

14   at the police department did you guys talk?

15     A.   I don't remember if we did.

16     Q.   Was he talkative then?

17     A.   I don't remember.

18     Q.   I want to talk to you about your

19   interview with Michael Mannion.

20          Do you recall talking with him on

21   October 9th of 1995?

22     A.   Yes, me and Mike went to the DuPage

23   County Jail to talk to him.

24     Q.   Mike Cross?

Siebert & Assocs. Court Reporters, Inc.          cmsreporters@comcast.net

Page 286

1        A.    Correct.

2        Q.    To your knowledge did Michael Mannion

3    know that someone from law enforcement was

4    going to be talking to him that day?

5        A.    I know Don Knoll arranged us to talk

6    to him, and I don't know what Don Knoll,

7    K N O L L, told him prior.

8        Q.    Is Don Knoll somebody with the jail?

9        A.    He is.  And for an interview you have

10   to get ahold of them, get their permission and

11   the inmate can say no.

12       Q.    So it is your understanding that

13   Mannion had agreed in advance to talk to law

14   enforcement?

15       A.    I don't know if he agreed in advance,

16   or if we called up Don Knoll and said, hey, two

17   detectives want to talk to you, I don't know.

18       Q.    But is it your understanding that

19   Don Knoll would first get somebody's agreement

20   that they were willing to talk to you before

21   having law enforcement coming to talk to

22   somebody at the jail?

23       A.    Correct.

24       Q.    Did you have any information about

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 287

1    what Michael Mannion might have to say relative

2    to William Amor before you talked to him on

3    October 4, 1995 other than whatever mention of

4    Michael Mannion there was in Bill's interview

5    with you on the 3rd or the 4th?

6         A.    No, I believe he was a cell mate, and

7    I did not have any information as to what Mike

8    Mannion might say, but it was felt accordingly

9    that we should go to talk to him.

10        Q.    To your knowledge has Michael Mannion

11   ever been an informant for any law enforcement

12   agency?

13        A.    I do not know.

14        Q.    During your conversation with Michael

15   Mannion on October 9th of 1995, did you or Mike

16   Cross discuss with him at all any assistance

17   that Mike Mannion could receive in his own case

18   as part of agreeing to talk with you?

19        A.    I don't believe so.

20        Q.    Did you talk at all with Mike Mannion

21   about any benefit that he might receive in

22   exchange for talking with you including, you

23   know, some accommodations at the jail or

24   financial assistance or any kind of benefit?

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 288

1          A.    Not that I recall.

2          Q.    Did you know anything when you went to

3    talk to Mike Mannion about why he was in the

4    jail?

5          A.    I don't recall why he was in DuPage

6    County Jail.

7          Q.    But you  -- the time period that you

8    were talking with him about was him being in

9    the jail with Bill Amor in June of '95,

10   correct?

11         A.    Correct.

12         Q.    Have you recently reviewed your report

13   of your interview of Mike Mannion?

14         A.    I read it over, yes.

15         Q.    Is there anything in that report that

16   you believe is inaccurate in summarizing your

17   interview with Mr. Mannion?

18         A.    I would have to look at it again.

19         Q.    We are going to come back to that

20   topic.

21               Do you recall Mike Mannion

22   telling you something during the interview to

23   the effect that he saw Bill reading a letter

24   from a girlfriend in Paducah, Kentucky.

Siebert & Assocs. Court Reporters, Inc.     (773)851-7779  cmsreporters@comcast.net

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 289

1              Let me show you the report, I'm

2    getting a copy of the report, and we will talk

3    about that more.

4              MS. POLICK:  Do you want to take a

5    break?

6              MS. THOMPSON:  Okay.  Thanks.

7              MR. VIDEOGRAPHER:  Standby one second.

8    The time is 4:38 P.M., we are going off the

9    record.

10              (Recess.)

11

12              (Deposition Exhibit No. 7 was

13                 marked for identification.)

14              MR. VIDEOGRAPHER:  The time is 4:48

15    P.M., and we are back on the record.

16    BY MS. THOMPSON:

17     Q.   I'm showing the witness what has been

18    marked with Exhibit 7 which is a two-page

19    document which is Bates stamped Amor 19105 and

20    Amor 19106.

21              If you want to review this and

22    when you are done I have some questions about

23    it.

24     A.   Okay.  I've read it.

Page 290

1          Q.   Okay.   A couple of questions about

2    Exhibit 7.

3                    First of all, is there anything

4    that's documented as being something that

5    Michael Mannion told you in this interview on

6    October 9th of '95 that you believe is

7    inaccurate?

8                    By that I mean is there anything

9    that is documented as something he told you

10   that upon reviewing this report you don't think

11   is something he related to you?

12         A.   No, I don't believe so.

13         Q.   Do you remember anything that he told

14   you that you believe is significant that is not

15   documented in this report?

16         A.   No.

17         Q.   This report references Mannion saying

18   that he was a trustee with Bill Amor in June of

19   '95 at the jail?

20         A.   Correct.

21         Q.   What does it mean to be a trustee in

22   that context?

23         A.   My understanding that you are given

24   some freedom in return for responsibilities

Page 291

1    within the facility, specific jobs, whether it

2    was working the kitchen or cleaning the floors

3    or what have you, some responsibility in return

4    you get some -- a little more freedom,

5    privileges within the jail.

6         Q.   I asked you a minute ago if you

7    remembered anything that Mannion told you about

8    a girlfriend in Paducah, and you now had a

9    chance to review the report, did any of that

10   refresh your memory about what he said about

11   Paducah?

12        A.   It did, yes.

13        Q.   Did you or any law enforcement officer

14   take any steps after this interview to try to

15   figure out whether or not Bill Amor had ever

16   got a letter from a girl friend while he was in

17   the jail in December of '95?

18        A.   I did not.

19        Q.   Did the jail at that time have any

20   system for tracking inmate mail?

21        A.   I don't know.

22        Q.   I mean some institutions log mail or

23   will even photocopy inmate mail, do you know

24   whether the DuPage Jail did any of those things

Page 292

1    in December of '95?

2         A.    I don't know.

3         Q.    Did you ever ask the jail to track

4    William Amor's mail while he was in custody

5    after his arrest in this case?

6         A.    After his arrest in the 1995 case?

7         Q.    Yes.

8         A.    I did not, and I don't know if Mike

9    did, Mike Cross.

10        Q.    Do you know -- well, let me ask you

11   this.

12              This report also references the

13   talking with someone named Michael Funches,

14   F U N C H E S?

15        A.    Correct.

16        Q.    Why did you speak with Michael

17   Funches?

18        A.    I don't recall talking to him.  I'm

19   only -- it might have been a cell mate, also.

20        Q.    Similar, I mean along the same lines

21   of what I asked you about Michael Mannion, do

22   you know if Michael Funches has ever been an

23   informant for law enforcement?

24        A.    I'm not aware of that.

Page 293

1      Q.   Did Michael Funches ask you at all

2  during the interview about whether there was

3  any benefit that he could receive from talking

4  with you about this case?

5      A.   I don't recall him saying that.

6      Q.   Did you discuss with him at all any

7  benefit that might be available to him in

8  exchange for talking with you about the case?

9      A.   I don't recall that.

10     Q.   Did Michael Funches tell you anything

11 more specific about Amor fighting with his wife

12 other than just saying in effect that sometimes

13 Bill would fight with his wife?

14     A.   No.

15     Q.   Other than Michael Mannion, did any --

16 are you aware of any other person in the course

17 of this investigation relating that William

18 Amor had used the word "bitch" in describing

19 Marianne Miceli?

20     A.   I'm not aware.

21     Q.   This second part of the interview sort

22 of describes Michael Mannion telling you words

23 to the effect that he had told Bill Amor in a

24 conversation that he could kill his

Page 294

1    mother-in-law by getting drunk and running her

2    over with his car, do you remember that part of

3    the interview?

4         A.    I do.

5         Q.    Was Michael Mannion telling you that

6    in the context of Michael Mannion sort of

7    unsolicited offering that suggestion to William

8    Amor?

9         A.    Well, it follows him talking about how

10   Bill said he hated his mother-in-law, and he

11   could live without her.

12              And we asked him if he talked at

13   all about killing his mother-in-law, and that's

14   what Mike Mannion essentially came up with.

15        Q.    Mike Mannion said in response to that

16   question by you that he had told Bill you could

17   kill her by running her over with your car?

18        A.    Correct.

19        Q.    Did Michael Mannion ever tell you

20   anything that lead you to believe that William

21   Amor had solicited Michael Mannion to murder

22   his mother-in-law or had specifically asked

23   Michael Mannion if he had ideas about how

24   William Amor could get rid of his

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 295

1    mother-in-law?

2        A.   Other than to state about what Michael

3    said about running her over, I don't have any

4    further information than that.

5        Q.   Do you have any information that that

6    was something that William Amor solicited in

7    terms of an idea or suggestion from Michael

8    Mannion other than what your report reflects

9    about Bill telling Michael Mannion that he

10   could live without his mother-in-law?

11            MR. POLICK:   Objection to the form.

12   You can answer.

13            THE WITNESS:   Correct.

14   BY MS. THOMPSON:

15       Q.   Is there --

16       A.   There is no further --

17       Q.   Okay.  Are you aware of any other

18   person in the course of this investigation

19   telling law enforcement that Michael -- that

20   William Amor had discussed killing his

21   mother-in-law with any other person?

22       A.   I do not recall that.

23       Q.   Are you aware of any people that the

24   Naperville Police Department wanted to

Page 296

1    interview in connection with this investigation

2    that either law enforcement could not locate or

3    that were unwilling to be interviewed for some

4    reason as part of this investigation?

5         A.   I am not.

6         Q.   Is there -- let me ask you this, on

7    the morning of September 15th of 1995, were you

8    unavailable to go participate in any interview

9    of William Amor?

10        A.   I don't believe I was available.

11        Q.   Okay.  Were you unavailable to go to

12   O'Brien & Associates that morning?

13        A.   I don't believe I was unavailable.

14        Q.   Do you have any understanding as you

15   sit here today, other than anything that may

16   have come from your attorney, why you didn't

17   participate in that polygraph attempt or that

18   interview with Bill and Tina that day?

19        A.   I do not.

20                  (Deposition Exhibit No. 8 was

21                   marked for identification.)

22        Q.   I'm showing the witness what has been

23   marked as Exhibit 8.

24                  This is a document which is Bates

Page 297

1    stamped Amor 19108 through 19116.  Do you

2    recognize Exhibit 8?

3         A.   I do.

4         Q.   Is Exhibit 8 a report that you

5    prepared related to your work in the Marianne

6    Miceli investigation?

7         A.   It is.

8         Q.   And this report, would you agree, it

9    reflects various interviews and investigative

10   steps that you conducted over the course of the

11   10th and the 11th and then the 17th of -- the

12   15th and the 17th of September of '95?

13        A.   Correct.

14        Q.   Did you complete this report

15   reflecting these various dates on which you did

16   investigative tasks in this case at the same

17   time?

18        A.   Did I complete the report all these

19   pages?

20        Q.   Yes.

21        A.   No.

22        Q.   Is there a reason that this is sort of

23   one supplementary report as opposed to

24   different reports reflecting these activities?

Page 298

1        A.    The way I did it, I started the

2   initial report, it was done on the computer,

3   saved it, and then let it sit until I did

4   another review into some other aspect of the

5   investigation.

6               So then I would add that to the

7   original document and continue to add as I went

8   along.

9        Q.    Did you prepare the various aspects of

10  this report, Exhibit 8, from notes that you

11  took contemporaneous with these various events?

12       A.    I did.

13       Q.    What did you do with your notes when

14  you were done preparing Exhibit 8?

15       A.    I threw them out.

16       Q.    Is there something on this report that

17  reflects when it was started or when it was

18  completed?

19       A.    No.  There really isn't.  The first

20  page shows the date and time, the beginning of

21  this investigation, and it references dates and

22  times of various points.

23               But as to when I opened that

24  document for the first time and began typing

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 299

1    it, it doesn't show that.

2         Q.   Do you see where it says on the bottom

3    left-hand corner "WC" approval?

4         A.   Yes.

5         Q.   And is that box for?

6         A.   That's the watch commander's approval

7    of the report.

8              And in this case the watch

9    commander would have been, that's Mark

10   Carlson's signature on it.

11        Q.   And does this reflect he approved it

12   on 10/20 of '95?

13        A.   That's what it appears.

14        Q.   Was there a policy or practice from

15   the Naperville Police Department at this time

16   as to when relative to a report being submitted

17   it got approved by the watch commander?

18        A.   No, not that I'm aware that there was

19   a policy.

20        Q.   Do you have any knowledge in this case

21   as to when you turned this report in?

22        A.   I do not.

23        Q.   Do you believe that you turned it in

24   close in time to when you finished it?

Page 300

1          A.    Yes.

2          Q.    I mean is there any reason after you

3     finished writing this out and reviewing it and

4     signing it you would have held onto it for some

5     period of time?

6          A.    No, it would have went to Sergeant

7     Carlson for his approval.

8          Q.    Do you believe that you turned this

9     report in close in time to October 20th of

10    1995?

11         A.    I don't know.  I can't speak to that,

12    because I don't recall.  But I will say that

13    Sergeant Carlson was notorious for leaving

14    reports sitting on his desk before he approved

15    them or read through them.

16         Q.    Is there a reason that -- well, let me

17    ask you this.

18               Do you see where it says final

19    closure, that box on this report?

20         A.    Yes.

21         Q.    What does that box reference?

22         A.    A "3" is a closure of an arrest, adult

23    arrest.

24         Q.    And is that your handwriting on the

Page 301

1    "3" box on there?

2         A.   No, that was Mark Carlson, the

3    supervisor, would be responsible for what

4    closure code, there are IUCR closure codes, and

5    the supervisor would be responsible for

6    affixing the closure code to it.

7         Q.   After completing this report and then

8    discarding any notes that you had used to

9    create this report, is it true that this report

10   at that point would reflect your only

11   memorialization of the events that are

12   reflected in this report?

13        A.   Yes, but I believe there was -- you

14   gave me the manual report, I believe there was

15   a report I did with the neighborhood canvass.

16   I don't see it in here.

17        Q.   Right.  And I don't mean to suggest

18   that this is like your only -- the only reports

19   you have seen.

20             My point is just for the events

21   that are documented in Exhibit 8, once you

22   completed this and discarded your notes this

23   report, Exhibit 8, is your only documentation

24   of the events that are reflected in this

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 302

1    report, correct?

2         A.    Correct.

3         Q.    And so for that reason, was it

4    important to you that this report be accurate?

5         A.    Yes.

6         Q.    And was it important to you that this

7    report contain the important details related to

8    the events that are described in this report?

9         A.    Yes.

10        Q.    Did you anticipate when you were

11   completing this report that you might use this

12   report to refresh your memory in the event that

13   you had to testify in this case potentially

14   that even years later?

15        A.    Yes.

16        Q.    Did you complete any reports

17   reflecting your interrogation of William Amor

18   other than your participation in the

19   handwritten statement and the waiver of rights

20   forms that we looked at earlier?

21        A.    I did not.

22        Q.    Is there a reason that you didn't do a

23   supplementary report related to that

24   examination?

Page 303

1        A.    Mike Cross was going to do that

2   report.

3        Q.    Did you review Mike Cross' report of

4   that interrogation before you -- before he

5   submitted it?

6        A.    I don't believe I did.

7        Q.    Have you ever reviewed that report?

8        A.    I've seen it subsequent.

9        Q.    Have you ever reviewed that report for

10   the purpose of refreshing your memory about the

11   interrogation?

12        A.    I may have, but I don't recall

13   specifically for that reason.

14        Q.    Did you review that report as part of

15   your preparation for this deposition today?

16        A.    I've read it, you know, I did read it

17   prior to today, yes.

18                         (Deposition Exhibit No. 9 was

19                          marked for identification.)

20        Q.    Showing the witness what's been marked

21   as Exhibit 9, did you prepare Exhibit 9?

22        A.    I did not.

23        Q.    Have you ever seen Exhibit 9 before?

24        A.    I may have, but I didn't prepare it.

Page 304

1      Q.    Mark this.

2                       (Deposition Exhibit No. 10 was

3                        marked for identification.)

4      Q.    Showing the witness what's been marked

5   as Exhibit 10. I may not have put what

6   Exhibit 9 was.

7                  I showed the witness what was

8   marked Exhibit 9, which was a document Bates

9   stamped 19179 to 19180.

10                 I've now shown the witness what's

11  been marked as Exhibit 10, that is document

12  that is Bates stamped Amor 8692 through

13  Amor 8697.

14                 The last two pages of this

15  document, is that something that actually

16  comprises a part of the arrest report for

17  Mr. Amor, as you understand that report,

18  Investigator?

19     A.    The last two.  One is just -- yes,

20  when they are brought in initially to the

21  detention area and the other one is a

22  fingerprint -- kind of a compilation, looks

23  like a fingerprint card and palm print card, a

24  photocopy was made.

Siebert & Assocs. Court Reporters, Inc.                cmsreporters@comcast.net

Page 305

1          Q.   Let me have you look at just the

2     first -- start by looking at the first three

3     pages of this document.

4                    Well, actually the first four

5     pages of this document.

6                    So from Amor 8692 to 8965, do you

7     see those four pages?

8          A.   I do.

9          Q.   Those four pages, does that comprise

10    an arrest report relative to Mr. Amor's arrest

11    in this case?

12         A.   The first two pages would be the

13    actual arrest report.

14         Q.   Let's start with the first two pages,

15    did you complete those pages?

16         A.   Looking at the handwriting, some of it

17    is mine, and it looks like some of it is Mike

18    Cross'.

19         Q.   Do you know why you signed this as the

20    arresting officer?

21         A.   Probably because I walked Bill

22    upstairs to the detention area.

23         Q.   Okay.  Did you complete this form

24    upstairs, to the extent that it is your

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 306

1   writing?

2        A.    Yes.  It could have been completed --

3   yes, because you have to account for the

4   property and stuff like that, so for the

5   mostpart handwritten and not typed, as you

6   could see, this could have been upstairs.

7        Q.    The line on the front that has sex and

8   race and then height and weight, you know,

9   eyes, hair, skin, did you complete that

10  information?

11       A.    Yes.

12       Q.    How did you establish his height and

13  weight?

14       A.    I don't recall.

15       Q.    Did you ask him those numbers?

16       A.    Possibly.

17       Q.    What about below that where it

18  identifies that he has a scar under, I can't

19  actually read that, but reflects that he had a

20  scar, right?

21       A.    Yes, scar underneath each armpit.

22       Q.    Did you ask him about that?

23       A.    Yes.

24       Q.    And I take it you didn't like look at

Siebert & Assocs. Court Reporters, Inc.          cmsreporters@comcast.net

Page 307

1    his armpits?

2          A.    No, I didn't look at his armpits.

3          Q.    The boxes where -- the box that says

4    appearance, how did you select casual?  Well,

5    let me ask you first, did you mark that as

6    casual?

7          A.    I did it.

8          Q.    How did you select that?

9          A.    I believe he was wearing a T-shirt and

10   shorts.

11         Q.    So based on a visual look at him you

12   decided that was casual?

13         A.    Yes.

14         Q.    The next box that says cautions, what

15   is that box for?

16         A.    Well, if the person being booked is

17   violent or has expressed suicidal ideations, or

18   is intoxicated, whether on drugs or alcohol, so

19   has previous attempts to escape, fights with

20   the police, so we check that box so if someone

21   else comes in to deal with the prisoner after I

22   leave they could see there is cautions on

23   there.

24         Q.    Why did you not mark the alcohol use

Page 308

1   box?

2        A.   Because at that time he wasn't

3   drinking.  That's more if they are intoxicated,

4   not has he ever used alcohol in his life.

5        Q.   What is the speech pattern box for?

6        A.   I just marked as not apply.

7        Q.   It is true that you did not mark in

8   that box that he was rapid or talkative,

9   correct?

10       A.   Correct.

11       Q.   And then the criminal history checks,

12  are you marking that to reflect that you did do

13  a check of those various places?

14       A.   Correct.

15       Q.   And when did you perform the checks

16  that are noted in that box?

17       A.   That day or during the course of the

18  investigation when we ran Bill through the

19  local SOS, Secretary of State, his driver's

20  license status.

21            You know, the other one is -- I

22  think it says PIMs, which is the one we talked

23  about, so that's kind of standard, LEADS and

24  NCI, see if he is wanted on any warrants, which

Page 309

1    he definitely was not.

2         Q.    Did you write in the arrest date and

3    time on this reports?

4         A.    I did.

5         Q.    And you wrote in that the arrest time

6    was 11:37 P.M., correct?

7         A.    Yes, it looks like I did.

8         Q.    I mean was it your belief that William

9    Amor was under arrest at 11:37 P.M. when he

10   signed the waiver of rights form?

11        A.    I wrote that down there, but I'm not

12   sure that that's -- I might have just been

13   referencing the one time I recall, which was on

14   the Miranda waiver form.

15        Q.    The prisoner searched by box also has

16   your signature?

17        A.    Correct.

18        Q.    Did you pat William Amor down?

19        A.    I did.

20        Q.    Did you do a search beyond a sort of a

21   patdown?

22        A.    No, I did not.

23        Q.    Did you ever have any concern at the

24   station that William Amor had a weapon on him?

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 310

1       A.    No.

2       Q.    I mean he just come out of jail I take

3   it you weren't too worried?

4       A.    Right, but you still had to be careful

5   because he was in our care and custody and

6   never handcuffed at any point and sitting alone

7   at some point in Sergeant McGury's office, so

8   we had to do our due diligence.

9       Q.    Let me have you look at the next page,

10  this is 8693, you are listed as the

11  inventorying officer?

12      A.    Correct.

13      Q.    Does that mean you went through what

14  property that he had on him at that point?

15      A.    Correct.

16      Q.    Was there any property that he had on

17  him at the station that you did not inventory?

18      A.    I don't believe so.

19      Q.    So this doesn't reflect that he had a

20  wallet on him at the station, correct?

21      A.    Correct.

22      Q.    It shows he, in fact, had $0.60?

23      A.    Correct.

24      Q.    And is that, below that does that say

Page 311

1    pager?

2         A.    I think it does, yes.

3         Q.    He had a hotel key?

4         A.    Yes.

5         Q.    And then here it indicates he had a

6    pack of Marlboro cigarettes, do you know

7    whether those were his cigarettes or cigarettes

8    somebody from law enforcement gave him?

9         A.    I do not.

10        Q.    And, number 1, paperwork does that

11   reflect the divorce paperwork that he was

12   served with during the interrogation?

13        A.    Most likely, and possibly also the

14   bond slip from DeKalb County.

15        Q.    Okay.  Is there anything else that

16   paperwork could reflect as far as you recall?

17        A.    Not that I could recall.

18        Q.    Let me have you turn to page 3, 3 is

19   8694.

20              Is this a separate supplementary

21   report, just this page?

22        A.    Yes.

23        Q.    What is the purpose of this report?

24        A.    Just to give a brief summary as to

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 312

1   what occurred the first night.  This is really

2   on the investigation dates 9/10 of '95.

3                  And you will see at the top

4   classification, 7632, suspicious death -- or

5   sudden death, I'm sorry, suspicious

6   circumstances.

7                  And the case report number, and

8   who initially from the police department was on

9   scene.

10                  It is very preliminary, just kind

11  of a nutshell sheet, it was later changed.

12     Q.   Was this submitted like with the

13  arrest report or is it -- the fact that it is

14  in this exhibit is just sort of a random thing?

15     A.   I'm not sure why it is with the arrest

16  report.  It doesn't make a lot of sense to me.

17     Q.   I don't know either, which is why I'm

18  asking, I'm not certain.

19     A.   This is just the opening report.  And

20  I can't read the bottom of the one that was

21  approved.  It is too hard for me to read that.

22  WC, that box, so I don't know.

23     Q.   You agree you signed this as the

24  reporting officer?

Siebert & Assocs. Court Reporters, Inc.                cmsreporters@comcast.net

Page 313

1       A.   I did.

2       Q.   And then what is the assignments box

3   next to that, what is that box meant to

4   capture?

5       A.   It is assigned to Investigator Cross,

6   handwriting above that Sergeant Carlson's

7   handwriting, so he would have received this

8   cover sheet, basic information, and then by him

9   assigning that status code of "2", that meant

10   that it was open investigation and he was

11   assigning it to Mike Cross.

12               So this would have been

13   transmitted probably to records fairly soon so

14   everybody, especially the Chief and Deputy

15   Chiefs had some inkling of what, who was there,

16   there is always a lot of questions upstairs.

17       Q.   Have you ever had any conversations

18   with about this case, either in person or on

19   the phone or in writing with Elizabeth

20   Guerrero?

21       A.   Probably, she was an evidence

22   technician.

23       Q.   Do you remember seeing her at the

24   scene?

Page 314

1        A.   Yes, she was at the scene.  She was

2   one of quite a few evidence technicians.

3        Q.   The next page Amor 8695, what is the

4   purpose of this report?

5        A.   8695.  What you are looking at is the

6   fingerprint card.

7        Q.   I want to just be clear, I want to

8   make sure we are on the same page, I'm looking

9   at 8695?

10       A.   8695.  Okay. That's just the first

11  page of what we were just talking about.

12       Q.   It is part of the same report?

13       A.   That's one, and we went backwards.

14  You hit 2 first and then the opening.

15       Q.   Okay.

16       A.   That is the case opening.

17       Q.   Okay.

18       A.   That is the case opening.

19       Q.   There is a stamp on this one that's

20  more readable that appears to me to say

21  September 27th of '95, do you agree?

22       A.   Yes.

23       Q.   What does that stamp reflect?

24       A.   I don't know.  I don't know, it is not

Page 315

1    something that we typically affix.  So is that

2    something the records department affixed to it

3    once it went upstairs, I don't know.  But I

4    don't see, you know, I don't see it on a lot of

5    other documents.  So I'm not sure what that's

6    all about.

7         Q.    The names that are listed on here that

8    have the O's by them, what are those names

9    meant to reference?

10        A.    O's just refers to "other" versus

11   witness or suspect or "V" for victim, these are

12   just some of the initial responding officers.

13        Q.    People that were at the scene?

14        A.    Correct.

15        Q.    You started to tell us about the

16   fingerprint card which is 8696, correct?

17        A.    Yes.

18        Q.    Did you complete any portion of this

19   page?

20        A.    I did, and looking at the handwriting

21   at the top, the name William Amor is my

22   handwriting and then down to description, and I

23   signed it and Bill signed it, but the actual

24   chargings, 1 and 2, that looks like Mike Cross'

Page 316

1    handwriting to me.

2         Q.    This is the lines that have

3    first-degree murder and arson on them?

4         A.    Correct.

5         Q.    Is there any other handwriting here

6    you recognize as Mick Cross', just on this page

7    8696?

8         A.    I'm not sure if what is below that he

9    filled out.  I'm not sure why it took two of us

10   to fill it out, because normally it doesn't,

11   but for whatever reason.

12        Q.    Is there a particular point in the

13   booking or the arrest process where in

14   Naperville procedures at this time this form

15   got completed, just talking about 8696?

16        A.    Sure.  It should have been been

17   completed pretty fast.

18                I think we used a life scan

19   fingerprint machine back then, but this needed

20   to be, you know, completed on scene up in the

21   booking room.

22        Q.    Like contemporaneous with the booking

23   process?

24        A.    Yes, sometime that night it should be

Page 317

1    done.

2         Q.   Okay.  Let me have you turn to the

3    last page, 8697.  Did you complete 8697?

4         A.   I did.

5         Q.   What is the purpose of this page, just

6    8697?

7         A.   Sure.  When a new prisoner is brought

8    into the detention center, if I am working, if

9    I am the officer, if I am the detention officer

10   this has to be filled out with the information

11   that he could see about the condition

12   essentially of the person coming in.

13        Q.   Do you fill this out by conferring

14   with the person about the answers to some of

15   these questions?

16        A.   Yes.

17        Q.   Are any of the information that you

18   completed in here based solely or even

19   partially on your own assessment of what you

20   are observing of the person or what you know of

21   the person?

22        A.   Well, the name and address, that sort

23   of thing.  And on the left side, I would based

24   on my observation in this case alerts or

Page 318

1    whatever, that's -- you would observe that and

2    write that.

3              But the parts on the right

4    typically you would ask the detainee those

5    questions.

6         Q.   Did you ask Mr. Amor during booking

7    whether he had any emergency notification

8    person?

9         A.   I'm assuming I did.  It is on the

10   list, if it is on the list I should have asked

11   him.

12        Q.   And from this report does it reflect

13   that he had nobody should be notified in the

14   event of an emergency?

15        A.   I'm not sure what line?

16        Q.   I'm just looking below where it says,

17   Amor William, there is a box below that that

18   says emergency notification?

19        A.   Oh, I see, yes.  I don't know how to

20   take that.  He didn't fill it in or I didn't

21   ask him or he didn't answer.

22             MS. THOMPSON:  I'm sorry to stop, but

23   we've got to switch the tape real quick, so

24   let's do that.

Page 319

```
1              MR. VIDEOGRAPHER:  The time is 5:23
2    P.M., we are going off the record.
3              (Recess.)
4
5
6              MR. VIDEOGRAPHER:  The time is 5:26
7    and we are back on the record.
8    BY MS. THOMPSON:
9       Q.   We were looking at Amor 8697 before we
10   had to break to deal with the video.
11             In the behavior conduct area of
12   this report, you circled alert and cooperative
13   and quiet, is that correct?
14      A.   Correct.
15      Q.   Let me have you look to -- at the
16   other side of this for medical history, is that
17   based on information that Mr. Amor provided to
18   you during the intake process?
19      A.   Yes.
20      Q.   Do you see the allergy one, number 5,
21   can you read your handwriting about what that
22   says?
23      A.   Not without my glasses.  That's a
24   funny looking word there.  I don't know what it
```

Page 320

1    says.  I don't know.

2         Q.   Did Bill tell you during the intake

3    process that he previously had a surgery

4    related to some medical problems?

5         A.   I don't recall that.

6         Q.   Do you recall asking him what the

7    scars on his armpits were related to?

8         A.   No, I don't think I did.

9         Q.   Have you ever read a transcript of

10   Judge Brennan's ruling from the retrial?

11        A.   No.

12        Q.   Has anyone ever told you anything

13   about what Judge Brennan said in the ruling?

14             MR. POLICK:   Again other than

15   conversations with his attorneys?

16             MS. THOMPSON:  Fair point.

17        Q.   Other than in conversation with your

18   attorneys?

19        A.   No.

20        Q.   We talked some about -- we talked some

21   about this concept of being careful as an

22   investigator to make sure that somebody in

23   interrogation is not learning details about the

24   investigation or what occurred in the potential

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 321

1  crime from the officers providing that

2  information, do you recall the questions

3  earlier about that?

4        A.   I do.

5        Q.   As part of your questioning of

6  Mr. Amor, did you take any steps to learn what

7  he had said during any interviews that you were

8  not present for in this case, and I'm talking

9  about interviews prior to your questioning of

10 him on the 3rd and 4th?

11       A.   Sure. The only thing I recall is that

12 he had told, I believe Detective Cunningham,

13 that he spilled some vodka in the apartment.

14 But I hadn't read the reports of those

15 interviews, and I'm not sure they would have

16 been done by October 3rd.

17       Q.   Did you talk with Cunningham at all

18 about the interview he had with Bill that you

19 weren't present for where that topic came up?

20       A.   I was just aware that -- about the

21 spilling of the vodka, I don't recall the

22 discussion with Brian Cunningham about the sum

23 and substance of the whole interview.

24       Q.   Did you become aware about the

Page 322

1    spilling of the vodka?

2          A.   I think we were just talking about the

3    case and what happened after I dropped Bill

4    off.

5          Q.   You and --

6          A.   Me and Brian Kappelman, and after we

7    arrested him on the DeKalb County warrant.

8          Q.   Essentially -- on the 15th?

9          A.   Or within the days after, after Bill

10   was dropped off at the jail on the 15th, I was

11   essentially done.

12         Q.   Did you ever talk with Dave Ferreri

13   about any of his conversations with Bill Amor?

14         A.   I don't believe I did.  I don't recall

15   that.

16         Q.   Are you aware that there was an

17   interview that William Amor did in this case

18   with Mike Pawl during a later investigation

19   into the case?

20         A.   I -- outside of meeting with my

21   attorney --

22         Q.   You know that's fair, and I do not

23   want to go into attorney --

24         A.   Right.

Page 323

1        Q.    -- attorney conversations.

2              So let me say that clearly.

3              Other than -- prior to your --

4    prior to Mr. Amor's -- the verdict in

5    Mr. Amor's second trial, were you aware at all

6    about an interview that Mr. Amor had done with

7    Mike Pawl during the re-investigation?

8        A.    I was not.

9        Q.    Did you ever talk with Mike Pawl about

10   any investigative steps that the State's

11   Attorney's Office was taking with respect to

12   this case other than your involvement in the

13   Tina re-interview?

14       A.    No.

15       Q.    Have you ever had any conversations

16   with Tina Miceli, other than those you talked

17   about during your deposition today, or ones

18   that you previously testified about?

19       A.    No, I don't believe so.

20       Q.    Have you ever talked with her on the

21   telephone?

22       A.    No, I don't believe I did.

23       A.    I talked with her here with Mike Pawl,

24   if you are aware of that obviously.

Page 324

```
 1        Q.   Right.

 2        A.   But beyond that, not much of a

 3   discussion with her about anything.

 4        Q.   Have you ever talked with -- well, let

 5   me ask you this.

 6             Did you yourself talk with any

 7   members of the extended

 8   Miceli-Leavenworth-Ripsky family about this

 9   case after William Amor was granted a new trial

10   in the post-conviction proceedings?

11             MR. POLICK:   Object to the form, but

12   go ahead and answer.

13             THE WITNESS:  After he was granted a

14   new trial, I don't recall talking with them.

15             I don't see them socially or Jon

16   Ripsky has been retired for many years, and I

17   don't work in Naperville anymore.

18   BY MS. THOMPSON:

19        Q.   Do you believe that any of your

20   actions in the course of the investigation into

21   Marianne Miceli's death violated any policy or

22   procedure of the Naperville Police Department

23   as you understand those polices and procedures?

24        A.   No, I don't believe so.
```

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 325

1          Q.   Other than -- well, let me ask you

2     this.

3               At any point during your

4     questioning of William Amor did you ever ask

5     him what he thought should happen to a person

6     who was responsible for starting the fire that

7     killed Marianne Miceli in this case?

8          A.   I don't believe I did.

9          Q.   And is there a reason you didn't ask

10    him that question?

11         A.   It was not appropriate at that time.

12         Q.   Did anybody in your presence ever ask

13    him a question to that effect about what he

14    thought should happen to a perpetrator in this

15    case?

16         A.   No.

17         Q.   And when you said that it wasn't

18    appropriate in the times that you were talking

19    to him, why is that?

20         A.   Because that's the initial interview

21    phase when you are trying to determine whether

22    somebody might be a suspect versus strictly a

23    witness in a case.

24         Q.   Okay.  At any of the times that you

Page 326

1    talked to William Amor, was he ever somebody

2    that you were still trying to ascertain whether

3    he was a suspect or a witness?

4         A.   The first night we talked to him,

5    which would have been the 10th, he was at that

6    point strictly a witness, and I was not sure

7    that there was even a crime at that point.

8                   And the next time I talked to him

9    was on the 3rd.

10        Q.   When you talked to him on the 3rd were

11   you sure that there had been a crime?

12        A.   Yes.

13        Q.   Why?

14        A.   All of the factors that we had already

15   determined that I had discussed already.

16        Q.   Are you aware of any other interviews

17   that were conducted of William Amor at a time

18   when it was still trying to be determined

19   whether or not he was a witness or a suspect?

20        A.   I'm just aware that September -- after

21   September 11th and through the 15th, they tried

22   to do polygraph exams with Bill through those

23   dates, but I wasn't there.

24        Q.   Do you know based on any conversations

Page 327

1    you had with any of the police personnel

2    involved in this case, not communications with

3    counsel but communications with other law

4    enforcement officers, as to whether during any

5    of those interviews William Amor was considered

6    to be a suspect or a person that was still

7    unclear whether he was a suspect or a witness?

8          A.    I don't recall having those

9    conversations.

10         Q.    Have you ever talked to any member of

11   the Naperville Police Department that has

12   expressed to you any doubt in whether or not

13   William Amor is guilty of starting a fire that

14   killed Marianne Miceli?

15         A.    I have not.

16         Q.    Have you ever talked to anyone at the

17   Naperville Fire Department who has doubt

18   whether or not William Amor is responsible for

19   starting that fire?

20         A.    I have not.

21         Q.    Have you ever talked to any member of

22   law enforcement who has any doubt as to whether

23   Tina Miceli was not involved in starting that

24   fire?

Page 328

1            MR. POLICK:   Objection to the form

2    but go ahead and answer.

3            THE WITNESS:  So you are asking if I

4    talked to anybody in law enforcement that did

5    not think that Tina was involved or --

6    BY MS. THOMPSON:

7        Q.   Let me ask that question better.   I

8    had kind of a double -- a negative in there

9    that was confusing.

10               Have you ever talked to any

11   member of law enforcement who expressed some

12   belief or possible belief that Tina Miceli had

13   any role in the fire that killed her mother?

14       A.   Mike Pawl, would he be considered law

15   enforcement?

16       Q.   Let's get to Mike Pawl in one minute.

17   Other than Mike Pawl anyone else?

18       A.   My initial questioning was to Bill was

19   about, how did Tina know, did she not know, how

20   could she not see.

21               Certainly at that point we were

22   still trying to figure out was Tina involved or

23   not.

24               But subsequent to that, I didn't

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 329

1    talk to anybody that I can recall who expressed

2    a strong belief that she was involved in it.

3         Q.   Has Mike Pawl ever expressed to you

4    any doubt about Tina's role?

5         A.   He asked me, did we question her, did

6    we think she might be involved, after he read

7    the reports that we had produced, so that was

8    his question and that led to re-interviewing

9    her.

10        Q.   Other than that exchange, any other --

11   is there any other doubt that anyone has ever

12   expressed to you in law enforcement about Tina

13   Miceli's involvement?

14        A.   No, I don't believe so.  P A W L.

15        Q.   In all of the conversations that you

16   had with William Amor, and in all of the

17   conversations that were related to you about

18   other people in law enforcement having

19   conversations with William Amor, did Bill or

20   anyone telling you what Bill told them ever

21   relate that Bill ever attempted to blame this

22   fire on any other person?

23             MR. POLICK:   Objection to the form.

24   You can answer.

Siebert & Assocs. Court Reporters, Inc.                cmsreporters@comcast.net

Page 330

1            THE WITNESS:  No, I don't recall that

2    he tried to blame anybody else for the fire or

3    anybody else telling me that.

4            MS. THOMPSON:  Give me one minute, I

5    think I'm done here, but I just want to check

6    through my notes real quick.

7                  I do have one other question.

8                  Have you ever been involved in an

9    investigation of William Amor for any other

10   crimes other than the crimes -- the potential

11   crimes at issue in this case, and recognizing

12   your testimony that you were involved in

13   arresting him for this other warrant?

14       A.   Sure.

15       Q.   So apart from that, have you been

16   involved in investigating any other cases in

17   which it was being investigated whether or not

18   William Amor committed a crime?

19       A.   No.

20            MS. THOMPSON:   I don't have any other

21   questions.

22            MR. POLICK:   Okay.  I have a few

23   follow-ups.

24

Page 331

1                    CROSS EXAMINATION

2    BY MR. POLICK:

3         Q.    Investigator Guerrieri, you testified

4    that sometime between September 15th of 1995

5    and your interview of Bill Amor on October 3rd

6    going into October 4th of 1995, you became

7    aware of the 9/15 interview of Bill by Brian

8    Cunningham, Detective Brian Cunningham,

9    correct?

10        A.    Correct.

11        Q.    And you indicated that what you

12   learned from that, about that interview by

13   Detective Cunningham was that Bill had told

14   Detective Cunningham that he had spilled vodka,

15   correct?

16        A.    Correct.

17        Q.    So you also had learned through that

18   process that Bill had been drinking the day of

19   the fire before he and Tina left for the

20   movies, correct?

21        A.    Correct.

22        Q.    You mentioned earlier as well, that

23   while you were at the Leavenworths' home on

24   September 11th in the early morning hours, when

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

                                                              Page 332

1     you interviewed Bill in the basement and

2     Detective Cross was interviewing Tina upstairs,

3     that at some point Bill and Tina went out to

4     have a cigarette and then came back into the

5     house, do you recall the timeframe I'm talking

6     about?

7          A.   I do.

8          Q.   Okay.  And you had testified that at

9     some point after they returned to the inside of

10    Leavenworths' home there was some further

11    discussion with both Bill and Tina about

12    insurance by Detective Cross, is that correct?

13         A.   Correct.

14         Q.   And you indicated that at some point

15    when Tina was asked about life insurance that

16    Bill had either uninterrupted and/or talked

17    over her, do you recall that?

18         A.   I do.

19         Q.   Okay.  Can you elaborate on that, what

20    happened there, what the questioning of Tina

21    was that Bill interrupted?

22         A.   Mike Cross asked Bill -- asked Tina in

23    Bill's presence, did Marianne have insurance?

24    And Tina said that she had car insurance, she

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 333

1    had insurance on the apartment.

2              And then Mike asked well -- were

3    you aware if she had a life insurance policy.

4    She started answering, yes, and then Bill

5    snapped.  We don't know anything about that and

6    dramatically changed the demeanor in his tone

7    when he said that brief statement.

8        Q.   When you say snapped, can you describe

9    that as anything more than changing his tone of

10   voice or was there something more to it?

11       A.   He interrupted Tina.  The question

12   wasn't directed at Tina, it was directed at

13   Bill.  He was within earshot, and that's when

14   he said that, and it took all of us by surprise

15   his response.

16       Q.   Other than being surprised, did you --

17   did that have any other effect on you?

18       A.   Well, that was I thought a suspicious

19   answer to something he wasn't even being asked

20   about.

21       Q.   You mentioned that during your

22   interview of Bill Amor on October 3rd and going

23   into October 4th of 1995, that there was only

24   one change in Bill's demeanor where he laid his

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 334

1    head on the table and become quiet and then

2    admitted that he started the fire, correct?

3         A.   Correct.

4         Q.   Okay.  During that whole process

5    between October 3rd and October 4th of 1995,

6    when you were speaking to Bill, did his

7    demeanor change at any other time during that

8    interview?

9         A.   No.

10        Q.   You talked about Bill being served

11   with divorce papers by the process server?

12        A.   I did.

13        Q.   Okay.  And you -- where did you first

14   see the process server when you came into the

15   police station after dropping off Bill and

16   Detective Cross at the front entrance of the

17   building?

18        A.   He was downstairs in the

19   investigations lobby, our waiting room I will

20   call it, right outside of the door to the

21   interview room.

22        Q.   And the lobby there, is there a

23   receptionist there, can you describe that area

24   you are talking about?

Page 335

1          A.    There is a desk, there is -- during

2     the day shift there is a receptionist there.

3     There is bathrooms and couches, and kind of an

4     open area and chairs for people to sit and wait

5     for appointments.

6          Q.    Okay.  Was there anyone there at the

7     time that you, Detective Cross and Mr. Amor

8     were there and Bill was being served with the

9     papers?

10         A.    No.

11         Q.    Okay.  Anyone else present at that

12    time?

13         A.    In that lobby?

14         Q.    In that lobby or waiting area?

15         A.    No.

16         Q.    Where is that waiting area in relation

17    to the interview room that you and Detective

18    Cross interviewed Bill Amor in subsequent to

19    that?

20         A.    Right next to the area you step from

21    the interview room directly to the lobby and

22    vice versa.

23         Q.    Is there any wall hiding the interview

24    room door from that waiting room or lobby area?

Page 336

1        A.    No.

2        Q.    Was -- Strike that.

3              Did you notice any change in

4   Bill's demeanor after he had been served with

5   the papers?

6        A.    I did not.

7        Q.    During your interview of him on

8   October 3rd and October 4th of 1995, did you

9   ever or did it ever appear to you that Bill was

10  under the influence of alcohol?

11       A.    It did not.

12       Q.    Did it appear to you that Bill was

13  under the influence of any drugs?

14       A.    Did not.

15       Q.    Did it appear to you in any way that

16  during that interview that Bill was under some

17  kind of physical distress?

18       A.    No, it did not.

19       Q.    Did it appear to you in any way that

20  Bill was under any type of emotional distress?

21       A.    No, it did not.

22       Q.    Your practice of discarding your notes

23  after completing a report, was that a routine

24  practice of yours back in 1995?

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 337

1      A.    It was.

2      Q.    And at certain points during your

3  deposition today, you described Mr. Amor, Bill

4  Amor being talkative.

5            Does that -- are you describing a

6  person who is continually talking, what is your

7  definition of talkative?

8            MS. THOMPSON:  Object to form.  You

9  can answer.

10            THE WITNESS:  When I asked Bill a

11  question he would readily answer it.  He would

12  expand on it.  He would talk at length about

13  his answers.  So he was very talkative in that

14  respect.

15            You know, he typically would talk

16  to you.  I didn't -- he didn't ask me about my

17  family or did I watch the ball game last night,

18  but if I asked him a question he talked, he was

19  very talkative.

20      Q.    Okay.  Was he talkative in the sense

21  that he would continue talking almost

22  inappropriately so that neither you nor

23  Detective Cross could get a word in edgewise or

24  ask him the questions?

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 338

1       A.    No, it was responsive to the question.

2             MR. POLICK:    Thank you.  I don't have

3    anything further.

4

5             DIRECT EXAMINATION (CONT'D)

6    BY MS. THOMPSON:

7       Q.    I just have a couple of questions

8    based on that very briefly.

9                You were asked some questions

10   about the life insurance exchange --

11      A.    Yes.

12      Q.    -- with Tina and Bill during the

13   Leavenworth interviews.

14                You said that Tina started to say

15   yes before he interrupted her?

16      A.    Correct.

17      Q.    How much of yes or starting to say yes

18   did she get out before she got --

19      A.    From what I saw her answer was yes,

20   she did, and then that was -- my interpretation

21   was she had said shortly thereafter it was

22   stopped.  She just trailed off from what I

23   heard, she started to say yes, I could tell it

24   was in the affirmative and then it trailed off.

Page 339

1        Q.    Did she get the, you know, "Y" sound

2    out?  Did she get to the "S"?

3        A.    Yes.

4        Q.    Did she say the word "yes"?

5        A.    Yes, she did.

6        Q.    And so how much time past between when

7    she finished yes and Bill said, we don't know

8    anything about that?

9        A.    Almost immediately.  My feeling is as

10   soon as he realized what the question was and

11   her response, he started talking.

12       Q.    Okay.  Did he say anything other than

13   we don't know anything about that?

14       A.    No.

15       Q.    Now, you said that he said that

16   loudly?

17       A.    He did.

18       Q.    Could you use the tone of voice and

19   volume that he used in saying that for us now?

20            MR. POLICK:   Objection to the

21   re-creation, but go ahead if it is easy for you

22   to describe it, describe it as well.

23            THE WITNESS:  So you want me to do it?

24   BY MS. THOMPSON:

Page 340

1          Q.   I want you to do it, and if you do it

2     and you feel what you just wasn't -- didn't

3     capture it, then just tell us that, but I would

4     like you to do it.

5          A.   We don't know anything about that.

6          Q.   Are you satisfied with how you --

7          A.   I'm pretty satisfied with that.

8          Q.   Okay.  How -- did he go over to Tina

9     when she said this?

10         A.   He was standing right next to her.

11         Q.   Did he touch her when he said it?

12         A.   They were side-by-side, so I didn't

13    see him squeeze her arm or anything like that.

14              MS. THOMPSON:  I don't have any other

15    questions.

16              MR. POLICK:  Okay.  Signature is

17    reserved.

18                   The only question I have, Tara,

19    is I think a couple of these exhibits were,

20    that were marked by you today were stamped

21    confidential.

22                   How do you want to deal with

23    that?  We don't have to do that on the record

24    but --

```
                                                       Page 341

  1             MS. THOMPSON:   Let's go off the

  2   record.

  3             MS. POLICK:  We will sort it out.

  4

  5             MR. VIDEOGRAPHER:   The time is

  6   5:56 P.M. and we are off the record.

  7                  (WHEREUPON, the deposition was

  8                   concluded at 5:56 P.M.)

  9

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24
```

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 342

1    STATE OF ILLINOIS  )

2                       )  SS:

3      COUNTY OF COOK  )

4              The within and foregoing deposition

5    of the aforementioned witness was taken before

6    Carol M. Siebert-LaMonica, C.S.R, at the place,

7    date and time aforementioned.

8              There were present during the taking

9    of the deposition the previously named counsel.

10             The said witness was first duly sworn

11   and was then examined upon oral interrogatories;

12   the questions and answers were reported in

13   shorthand by the undersigned and transcribed

14   via computer-aided transcription.

15             The within and foregoing is a true,

16   accurate and complete record of all of the

17   questions asked of and answers made by the

18   forementioned witness at the time and place

19   hereinabove referred to.

20                The signature of the witness was

21   not waived and the deposition was submitted

22   pursuant to Rules 207 and 211 (d) of the Rules

23   of the Supreme Court of Illinois to the

24   deponent per copy of the attached letter.

Siebert & Assocs. Court Reporters, Inc.          cmsreporters@comcast.net

Page 343

1          The undersigned is not interested in

2     the within case, nor of kin or counsel to any

3     of the parties.

4          Witness my official signature in and

5     for Cook County Illinois on November 2, 2020.

6

7

8               Carol M. Siebert-LaMonica

9               C.S.R. No. 084.001355

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 344

C O R R E C T I O N   P A G E

I made the following changes for the following reasons:

PAGE LINE  CHANGE:

_____ _____  _____

            REASON: _____

_____ _____  _____

            REASON: _____

_____ _____  _____

            REASON: _____

_____ _____  _____

            REASON: _____

_____ _____  _____

            REASON: _____

_____ _____  _____

            REASON: _____

_____ _____  _____

            REASON: _____

_____ _____  _____

            REASON: _____

_____ _____  _____

            REASON: _____

_____ _____  _____

            REASON:

(Signed)_____

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 345

WITNESS CERTIFICATION


            I hereby certify that I

have read the foregoing transcript of my

deposition consisting of Pages 1 through 348,

inclusive.  Subject to the changes set forth on

the preceding pages, the foregoing is a true

and correct transcript of my deposition taken

on February 7, 2020.



                    (Signed) _____




SUBSCRIBED AND SWORN TO

Before me this ___ day of

_____,2020.




_____


Notary Public

Page 346

         SIEBERT & ASSOCIATES COURT REPORTERS, INC.

                  3768 North Oleander Avenue

                     Chicago, IL  60634


    November 2, 2020

    THE SOTOS LAW FIRM, P.C., by

          MR. JOSPEH M. POLICK

          141 West Jackson Blvd.

          Suite 1240A

          Chicago, IL  60604

          (Jpolick@jsotoslaw.com)

    Re:  Amor v Officer Michael Cross

         Dep:  INVESTIGATOR ROBERT GUERRIERI


    Dear MR. POLICK:

         The deposition testimony given on

    February 7, 2020 in the above captioned case

    has been transcribed, and inasmuch as signature

    was not waived, this is to advise that the

    deposition will be available in our office for

    30 days for reading and signing.

         If you choose to read and sign the

    deposition at our offices, please call the

    undersigned for an appointment.  Our office

Page 347

hours are from 9:00 a.m. to 4:00 p.m., Monday

thru Friday.

        If you choose to make other

arrangements for the reading and signing of the

deposition, please advise us of the

arrangements you have made in writing with 30

days from the date of this letter.




            Sincerely yours,




            Carol M. Siebert-LaMonica

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 331

I N D E X

Witness:                                    Examination

INVESTIGATOR ROBERT GUERRIERI


Ms. Thompson                                    5
Mr. Polick

Ms. Thompson
                                                338


E X H I B I T S

Number                                         Page


No. 1                                           45
No. 2                                           47
No. 3
                                                112
No. 4
                                                118
No. 5
                                                215
No. 6
                                                261
No. 7
                                                289
No. 8
                                                296
No. 9
                                                303
No. 10
                                                304

348

Siebert & Assocs. Court Reporters, Inc.          cmsreporters@comcast.net

**A**

**aberdeen** 1:17
  2:6 4:14
**abide** 11:17
  12:11 13:1,9
**ability** 227:4
  250:17
**able** 6:20 46:18
  114:6 151:20
  206:23 210:5
  242:4 246:11
  265:1
**abreast** 214:18
**absence** 116:13
**absent** 135:9
**absolute** 225:19
**abuse** 246:10
**abused** 87:6
**academy** 20:11
  20:13,15 34:11
  34:18 36:1,6
**accelerant**
  230:20
**accept** 127:16
**accepted** 127:13
**accepting**
  143:24
**access** 93:14,17
  265:4
**accidental**
  117:21 118:7
  174:14
**accidents** 138:7
**accommodation**
  112:10,10,15
**accommodati...**
  287:23
**account** 169:11
  179:16 182:14
  223:23 224:2
  224:13,15,18
  225:2 230:10
  306:3
**accounting**
  180:23 181:24
**accounts** 238:17

**accurate** 7:6
  224:2,13,15,17
  302:4 342:16
**achieve** 28:10
**acknowledging**
  184:19 185:13
**act** 174:21
  176:10
**acting** 278:10
  280:8
**actions** 59:23
  61:1 79:15
  324:20
**actively** 148:17
**activities** 297:24
**actual** 202:12
  206:12 305:13
  315:23
**add** 137:12
  298:6,7
**added** 270:3,5
**addendum**
  228:3
**addition** 115:12
  278:21
**additional** 72:14
  104:23,24
  120:2 211:6
  228:7,10,15
  269:9
**address** 55:24
  71:23 72:3
  134:5 317:22
**addressed** 54:3
**administering**
  251:22
**administration**
  18:9 95:6,14
  95:20
**admission** 223:1
**admitted** 334:2
**adult** 300:22
**advance** 127:1,7
  169:4 174:5
  214:13 248:8
  258:8 271:5
  277:1,5 286:13

  286:15
**advancement**
  127:5
**advantage** 212:8
**advice** 12:14,23
  13:5
**advise** 346:19
  347:11
**advised** 159:11
**affirmative**
  338:24
**affix** 315:1
**affixed** 264:5,9
  315:2
**affixing** 301:6
**aforementioned**
  342:5,7
**afternoon**
  176:23
**afternoons**
  106:20,22
  122:2
**age** 171:7
**agencies** 21:20
  34:14 41:7
**agency** 20:22
  21:23 40:7,9
  287:12
**agent** 221:2
**agents** 219:3
**ago** 16:12
  110:14 113:11
  179:13 291:6
**agree** 46:10
  50:24 53:8,10
  53:16 56:17
  63:5,15 64:14
  70:15 73:1
  82:7 86:6,21
  91:2 92:4 93:3
  94:14 98:18
  100:21 112:14
  113:13 115:10
  184:3 205:7
  228:1 239:21
  297:8 312:23
  314:21

**agreed** 113:11
  209:24 258:24
  286:13,15
**agreeing** 287:18
**agreement**
  10:19,22 11:4
  11:5,13,14,18
  11:20 12:12
  13:2,9 286:19
**ahead** 7:18 8:17
  12:15 16:19
  23:19 43:21
  46:24 54:9
  61:21 65:14
  73:11 88:21
  90:2 92:8
  96:15 120:10
  128:15 138:1
  138:16 169:7
  170:20 180:14
  184:22 188:21
  197:24 219:15
  220:19 221:9
  223:12 224:6
  224:20 227:1
  228:6 250:7
  253:21 260:6
  271:24 324:12
  328:2 339:21
**ahold** 286:10
**al** 4:4
**alarm** 233:8
  244:13,13,20
**alcohol** 84:10
  162:10 166:10
  166:17,22,23
  167:4,11
  184:18 185:5
  185:12 207:8
  246:10 250:4
  250:16,20
  251:4,8 307:18
  307:24 308:4
  336:10
**alcoholic** 193:6
**alert** 156:3
  319:12

**alerts** 317:24
**alive** 168:5
  197:14
**allegations**
  212:12
**allergy** 319:20
**allowed** 251:2
**alongside** 153:8
**alternative**
  204:17
**ammunition**
  15:24
**amongst** 246:8
**amor** 1:4 3:4 4:3
  4:20,21 10:20
  13:15 44:3,7
  44:23 47:20
  48:15 50:22,22
  51:3 52:18
  59:22 60:22
  61:5 62:23,24
  63:6,8,16
  65:23 66:1,5
  66:10 71:14
  79:23 82:13
  96:8 97:3,18
  101:13 103:21
  104:9 109:2,7
  110:5,16 111:5
  112:6 127:22
  128:2,10,13
  129:2 130:3,11
  130:14,19
  143:18 144:6
  150:13 153:22
  157:12 165:23
  166:16 186:8
  197:3,20 198:8
  212:11 216:22
  217:10,21
  218:21 219:20
  220:13 221:3,5
  222:19 225:2
  227:8,13,18
  228:14,17
  229:14 230:11
  231:7 232:20

Siebert & Assocs. Court Reporters, Inc.    (773)851-7779   cmsreporters@comcast.net

Case: 1:18-cv-02523 Document #: 355-9 Filed: 07/15/24 Page 351 of 393 PageID #:35043

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 333

| | | | | |
|---|---|---|---|---|
| 234:14 235:9 | 31:11,13,19,23 | 90:3,11 92:8 | 324:17 | 22:2 |
| 235:23 236:12 | 32:2,5,9 36:8 | 92:24 96:15 | **anyones** 239:19 | **apply** 22:11 |
| 237:12,15,19 | 36:15 51:20 | 120:10 122:15 | **apart** 34:18 | 308:6 |
| 237:22 244:21 | 67:5 68:10 | 128:15 147:14 | 35:10 214:13 | **appointment** |
| 245:13 246:8,9 | 72:6 78:14 | 149:5 152:14 | 330:15 | 346:24 |
| 248:8 249:10 | 94:13,22 | 181:17 184:22 | **apartment** | **appointments** |
| 249:20 250:16 | 101:19 105:2 | 188:22 200:14 | 117:9 128:11 | 335:5 |
| 250:24 251:12 | 107:9 114:19 | 207:2,20 | 136:12 142:16 | **appreciate** 77:3 |
| 251:20,21 | 115:5 132:2 | 219:15 220:19 | 144:18 149:1 | 137:16 |
| 252:2 253:6,7 | 171:24 199:7 | 221:9,20,23 | 149:12,16,19 | **appropriate** |
| 253:8,14,19 | 200:9 217:22 | 223:12 224:6 | 151:16,17 | 221:18 325:11 |
| 254:6 255:13 | 218:15 223:24 | 224:20 226:1 | 153:5,10,13 | 325:18 |
| 255:17 256:19 | 228:21 229:8 | 227:2 228:6 | 156:14,15 | **approval** 124:1 |
| 261:10,11,14 | 230:1 232:1 | 253:21 271:24 | 175:17,22 | 299:3,6 300:7 |
| 261:16 262:3 | 245:9 248:3 | 295:12 318:21 | 176:21 177:12 | **approved** |
| 263:19 266:21 | 292:4 305:10 | 324:12 328:2 | 177:18,24 | 299:11,17 |
| 268:14 269:15 | 323:4,5 | 329:24 333:19 | 178:9,17,19,22 | 300:14 312:21 |
| 270:21 271:2,7 | **amount** 149:12 | 337:9,11 | 179:5 181:2 | **approving** |
| 271:11 272:10 | **analysis** 38:17 | 338:19 | 196:7 197:11 | 113:24 |
| 272:16,20 | 177:20 260:22 | **answered** 270:9 | 197:15,17 | **approximately** |
| 274:6 276:6 | **anders** 99:22 | **answering** 6:21 | 199:19 221:4 | 23:6 25:4 27:2 |
| 277:21 280:22 | **andor** 332:16 | 11:5 119:6 | 233:5 244:14 | 27:6,7 39:1 |
| 284:6 287:2 | **andrea** 133:12 | 234:5 333:4 | 246:21 321:13 | **area** 148:1 |
| 288:9 289:19 | 134:18 | **answers** 6:21 | 333:1 | 240:22 241:15 |
| 289:20 290:18 | **andy** 63:24 | 317:14 337:13 | **apologize** 6:7 | 242:22 243:6 |
| 291:15 293:11 | **angeles** 110:14 | 342:12,17 | **apparent** 113:18 | 244:16,19,20 |
| 293:18,23 | **animal** 95:18 | **anticipate** | **apparently** 54:6 | 270:19 282:17 |
| 294:8,21,24 | **announced** | 122:16 302:10 | **appear** 41:8 | 304:21 305:22 |
| 295:6,20 296:9 | 187:20 217:2 | **anybody** 100:4 | 67:4 72:20 | 319:11 334:23 |
| 297:1 302:17 | **announcement** | 124:6 125:6,13 | 77:8 165:5,6 | 335:4,14,16,20 |
| 304:12,13,17 | 159:16 | 140:24 145:14 | 166:21 185:24 | 335:24 |
| 305:6 309:9,18 | **answer** 6:6,12 | 146:7 154:20 | 336:9,12,15,19 | **arm** 340:13 |
| 309:24 314:3 | 7:3,18 8:17 | 156:11,23 | **appearance** | **armpit** 306:21 |
| 315:21 318:6 | 11:24 12:10,16 | 158:8 160:1 | 166:20 307:4 | **armpits** 307:1,2 |
| 318:17 319:9 | 12:20,24 13:6 | 163:3,9 165:18 | **appearances** 2:1 | 320:7 |
| 319:17 321:6 | 14:8 16:3,8,19 | 171:20 172:3 | **appeared** 2:10 | **arms** 190:6,8,8 |
| 322:13,17 | 23:19 33:13 | 181:3,4 187:1 | 2:18 149:19 | **arranged** 286:5 |
| 323:6 324:9 | 34:3,4 42:10 | 197:10,11 | 151:1 165:9 | **arrangements** |
| 325:4 326:1,17 | 43:21 46:24 | 202:1 230:18 | **appears** 46:11 | 347:9,13 |
| 327:5,13,18 | 48:23 54:9 | 247:18 248:7 | 53:18 56:17 | **arranging** 52:19 |
| 329:16,19 | 57:23 60:18 | 264:24 270:10 | 58:2 66:24 | **arrest** 76:24 |
| 330:9,18 331:5 | 61:21 63:20 | 270:15 276:8 | 73:1,16 77:10 | 94:13 127:22 |
| 333:22 335:7 | 65:14 68:6 | 284:12 325:12 | 216:24 239:6 | 128:2,19 |
| 335:18 337:3,4 | 70:24 73:11 | 328:4 329:1 | 239:10 299:13 | 129:11 130:3 |
| 346:12 | 76:18 77:24 | 330:2,3 | 314:20 | 130:16 198:2,4 |
| **amors** 8:3 9:13 | 81:20 83:16 | **anymore** 60:6 | **application** 22:7 | 198:8,14 199:7 |
| 30:4,21 31:6 | 85:10,21 88:22 | 126:14 168:5 | **applied** 21:16 | 200:1,9,10,22 |

Siebert & Assocs. Court Reporters, Inc.          cmsreporters@comcast.net

Page 334

201:13 202:2
202:11,20
203:2,8,14,24
205:11,14,15
205:23 206:1
207:11 208:3
212:19 235:23
236:11 245:10
292:5,6 300:22
300:23 304:16
305:10,10,13
309:2,5,9
312:13,15
316:13
**arrested** 76:15
76:16 129:13
130:20 173:13
198:21 199:21
200:2,18
203:11 204:21
205:3,8 207:5
207:18 235:18
322:7
**arrestees** 29:8
**arresting** 205:19
206:7 305:20
330:13
**arrests** 185:7,8
**arrival** 278:18
**arrived** 137:9
141:15 229:22
249:13 275:16
**arriving** 144:10
**arson** 32:23 33:3
33:7 37:12
117:22 119:15
119:19 120:2,6
120:17,18,23
121:6,10
174:19 175:11
217:20 218:2
218:21 230:14
230:19 232:2
232:22 316:3
**arsons** 141:17
141:18
**arthur** 72:8

**articles** 238:10
238:13,15
**ascertain** 326:2
**ash** 145:2,3
**aside** 14:17 80:9
87:4
**asked** 12:24
49:11 52:4,6
68:22 119:19
119:20 126:12
166:19 168:14
180:24 181:5,7
181:8,10
182:10 183:8
183:21 190:21
191:9,17 210:4
212:4 220:6
233:18,19,21
234:1 258:20
259:17 270:2
282:18 291:6
292:21 294:12
294:22 318:10
329:5 332:15
332:22,22
333:2,19
337:10,18
338:9 342:17
**asking** 6:11 9:16
11:5 14:18
48:2 49:13
51:14 54:13
56:5 77:7 88:6
96:22 168:3
216:8,21 218:6
221:13,15
223:7 224:17
236:15,16
237:11 239:13
241:5 244:6
246:9 264:24
312:18 320:6
328:3
**aspect** 70:4
112:5 132:9
137:20 144:17
199:3 247:17

248:9 272:12
298:4
**aspects** 114:11
116:24 118:22
298:9
**assault** 81:19
**assemble** 153:3
**assertion** 63:1
**assess** 228:16
**assessing** 178:11
225:12
**assessment**
176:11 177:7
317:19
**assets** 91:20
92:2
**assigned** 22:23
29:6 43:7,10
99:9,17 106:11
110:19 121:21
122:4,21
124:21 127:17
135:14 136:23
161:4 201:20
205:14 313:5
**assigning**
135:14 313:9
313:11
**assignment**
24:18 25:2,11
28:19 29:17
33:18 95:15
102:10 108:22
123:11 126:5,7
133:13,18
155:17 169:7
**assignments**
22:18 26:6,11
109:20 127:13
127:17 141:22
313:2
**assist** 256:1
**assistance** 41:9
126:21,22
287:16,24
**assisted** 31:2,7
**associate** 65:19

103:9
**associates** 5:6
18:5,12 29:11
30:15,19 72:9
80:12 82:1,8
84:17 129:3
173:22 206:13
247:12,13,20
248:8,13 249:5
251:15 253:6
253:18 254:6
254:14 255:24
258:9,15 259:3
273:3,6,11,16
280:20 281:12
281:17 282:2,7
283:10 296:12
346:1
**association**
100:20
**assume** 204:2
235:1 252:14
**assuming**
265:10 318:9
**assumption**
125:10 177:22
178:1,12 179:2
**atf** 219:2 221:1
**athens** 182:11
183:2
**attached** 342:24
**attempt** 206:12
246:3 296:17
**attempted** 246:4
329:21
**attempts** 307:19
**attend** 20:11,15
29:11,24 34:24
38:21 199:18
**attended** 17:23
18:15,19,21
20:13 29:19
30:11,19 38:23
**attending** 34:10
36:5 213:20
**attention** 41:6
**attorney** 12:14

14:12,13,14,21
51:24 67:20
94:13 103:16
113:24 218:4
266:4 296:16
322:21,23
323:1
**attorneyclient**
11:23 48:3
49:14 96:12
103:24
**attorneys** 15:7
19:23 21:10
28:4 39:17,21
41:6,17,22
42:1,6,15,24
43:18 44:1,11
49:21 51:22
52:3,9,13,20
58:22 67:20
68:4 73:20
96:11,19
103:23 220:3,7
234:22 235:7
265:12,14,20
265:24 266:6
266:11 320:15
320:18 323:11
**authenticity**
143:21
**author** 58:6
**authored** 45:24
51:12 61:4
**authorities**
88:16
**authority** 88:13
95:8 141:11
142:10
**availability**
275:5
**available** 51:14
129:12 155:16
248:14 264:22
293:7 296:10
346:20
**avenue** 346:2
**avoid** 90:17 91:3

91:13
**aware** 13:13
  14:22 64:20
  88:4 93:8
  110:6 121:3
  127:21 128:1,5
  141:2 153:19
  156:1 157:17
  159:22 170:20
  181:8 182:3
  201:7 211:20
  212:2 229:4,10
  233:16,20
  241:24 246:13
  249:15 251:6,7
  253:1 256:7
  268:12 275:2,4
  292:24 293:16
  293:20 295:17
  295:23 299:18
  321:20,24
  322:16 323:5
  323:24 326:16
  326:20 331:7
  333:3
**awhile** 249:21

_____
        **B**
**b** 108:11 110:10
  135:21 146:15
  331:9
**bachelor** 18:6
**bachelors** 34:12
  34:19 35:21
**back** 21:19
  25:13 26:2
  28:21 34:3
  39:11 44:19
  54:12 59:18
  66:18 71:9
  72:12 77:16
  83:8 90:18
  93:5 94:1
  97:15 111:21
  128:12,20
  131:5 144:15
  153:14,18,23

158:12 159:12
160:16,19
162:2,23
169:22 174:4
182:16,24
186:12,15,17
186:20 187:16
187:18 189:13
189:24 190:14
195:8,9,19
196:1,5 197:1
198:1 200:4
201:2 202:21
215:13 235:3
236:20 242:9
245:9,17
258:21 267:10
267:15 273:15
279:2,8 280:20
281:14 283:8,9
283:20 284:8
284:11,19
288:19 289:15
316:19 319:7
332:4 336:24
**background**
  17:15 79:4
  158:24 187:10
  187:11
**backwards**
  175:15 314:13
**badly** 255:16
**bag** 155:13,14
  194:7
**bailey** 133:22
  134:5 195:20
  196:2 233:4
**balcony** 147:20
  147:21 148:1,4
  148:7,19
**ball** 337:17
**barker** 110:11
  110:12
**base** 188:6
  213:16
**based** 12:14
  55:6 81:20

89:17 115:12
115:15 116:6
118:19 175:13
175:17 178:3
220:1,20
307:11 317:18
317:23 319:17
326:24 338:8
**basement**
  169:17 177:3
  179:8,23
  180:20,21
  181:14 182:3
  183:5 184:13
  186:13,23
  233:19 332:1
**basic** 56:12
  80:13 313:8
**basically** 108:20
  131:3 155:23
  240:13
**bates** 45:20
  48:20 77:21
  113:4 119:4
  216:4 261:10
  289:19 296:24
  304:8,12
**bathrooms**
  242:13 335:3
**bc** 216:9 238:24
**bears** 133:1,9
**beaten** 86:24
  87:16
**becoming** 38:20
**bedell** 135:21,24
  136:1 142:23
  143:5,16 145:9
  146:3 159:18
  161:13,16,21
  162:3,15,19,21
  163:14,19
  165:13 176:5
  176:14
**bedells** 167:8
**bedroom** 150:10
  150:11,16
**bedrooms**

149:23
**began** 153:1,6
  223:9 230:15
  246:21 298:24
**beginning**
  176:16 179:3
  269:5 298:20
**begins** 4:1
**begun** 232:6
**behalf** 2:10,18
  5:2 13:8 52:3
**behaved** 175:10
**behavior** 64:8
  167:11 173:2
  180:20 208:3,4
  233:3 319:11
**belief** 83:7 85:4
  85:5 90:21
  94:5 118:5
  135:16 141:21
  149:23 178:8
  179:9 206:3
  207:16 219:20
  219:23 223:1,8
  223:19 229:12
  237:18 243:8
  246:22 253:4
  278:9 309:8
  328:12,12
  329:2
**beliefs** 218:20
  219:1 221:4
  260:24
**believe** 8:18
  9:15 15:23
  23:14 29:23
  30:13 31:8
  32:15 33:1
  35:5 36:7
  37:13,16,22
  38:10 41:23
  42:21 43:13
  44:15 45:2
  47:22 48:12,16
  49:11 50:22
  52:5 56:3,8
  57:10,16,19

60:1,2,3 63:21
66:11 69:22
73:22 82:23
83:10,23 85:11
85:16 86:3,5
86:11,17 87:6
87:12,19 88:2
88:7,11 89:15
90:12 91:22
92:3,18,19
93:1,12 94:3
95:19 96:24
97:10,21
107:21 108:9
110:1 111:1
112:8 117:18
120:11 125:19
126:9 127:3,14
128:6 130:6
131:23,24
132:10,23
134:3 135:9,11
142:1 143:22
147:15 148:8
148:21 150:5
151:3,6 153:4
155:12,16
159:6,15,18
161:17 163:15
167:7 171:17
173:10 177:4
179:11 185:22
186:18 188:18
189:6 191:11
191:12,14,20
192:9 193:15
194:19 195:2
196:10 198:24
200:6,16
202:21 205:12
209:7,9 211:11
212:10,14,20
213:7,23 214:4
215:23 217:3,6
217:14,16
218:12,18,19
219:7 220:4,16

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 336

222:18 223:23
224:12 229:16
231:11,13
238:19 240:6
244:2,9 245:8
246:4,19
247:21 248:18
248:22 249:24
250:11 251:10
253:17 255:15
260:1,20 261:3
268:18 270:7
270:14 271:9
274:9 275:15
276:12 282:6
283:11 287:6
287:19 288:16
290:6,12,14
294:20 296:10
296:13 299:23
300:8 301:13
301:14 303:6
307:9 310:18
321:12 322:14
323:19,22
324:19,24
325:8 329:14
**believed** 8:13
  89:2 207:20,23
  212:3
**believes** 11:7
**believing** 276:21
**belonged** 191:3
**benefit** 287:21
  287:24 293:3,7
**best** 6:2,5,8
  139:10 142:2
  227:4 246:22
**better** 66:6
  83:21 213:11
  225:8 241:13
  265:17 328:7
**beverage** 193:6
**beyond** 20:1
  88:20 94:24
  231:16 309:20
  324:2

**big** 148:12
  234:18,20
**bigger** 32:13
**bill** 60:4 62:19
  63:1,8 65:18
  117:7 129:2
  130:3 143:12
  153:22 156:8
  158:17,21
  159:7,11
  160:24 161:7
  161:24 162:4
  162:23 163:3
  164:15,22
  165:3,19,23
  166:12 167:14
  168:12,14,20
  170:2,5,17
  171:18,20
  172:4 173:12
  173:22 174:6
  174:12 175:1
  175:14,16
  177:2,23
  178:13 179:4,7
  179:15,22
  180:4,8 181:10
  181:14,24
  182:9,10,13
  183:1,5 184:13
  185:18 186:8
  186:13,14,17
  186:17,19,22
  187:3,9,15
  189:16 190:3
  191:9,17
  192:19 198:2
  198:21 199:21
  200:2,18,24
  201:12 202:5
  202:16 203:2
  203:17,18
  204:7,14,21,24
  205:3,6,8,10
  205:16 206:19
  207:5 208:9,17
  208:17,18

209:8,14,14,21
210:6,8,10
211:7,15 212:3
212:8 216:21
220:23 222:6
222:12 223:21
224:9,15
228:22 234:2
237:22 245:24
247:18 249:13
250:4 254:15
255:13,17
256:19 257:7
257:20 258:17
258:20,21
259:8,16,23
262:21,21
264:5 272:23
275:21 276:8
276:12,20
277:10,21
278:11,13,18
279:22 280:1
280:19,21,22
281:2,3,10,11
283:5,13,18
284:5,6 288:9
288:23 290:18
291:15 293:13
293:23 294:10
294:16 295:9
296:18 305:21
308:18 315:23
320:2 321:18
322:3,9,13
326:22 328:18
329:19,20,21
331:5,7,13,18
332:1,3,11,16
332:21,22
333:4,13,22
334:6,10,15
335:8,18 336:9
336:12,16,20
337:3,10
338:12 339:7
**bills** 172:2

180:19 209:24
210:3,6 212:19
228:22 233:3
275:8 279:15
287:4 332:23
333:24 336:4
**binder** 93:18,19
  94:5
**bish** 108:10,13
  108:17 109:1,5
  140:19
**bit** 122:17
  158:13 209:3
  238:22
**bitch** 293:18
**bite** 65:7,11 66:1
**black** 72:24
**blame** 329:21
  330:2
**blow** 183:16
**blue** 64:1,3,24
**blvd** 2:14 346:8
**bob** 46:17 55:16
  139:4 167:18
**body** 151:12
**bold** 61:15,17
**bond** 311:14
**book** 244:23
  245:1 255:3,5
**booked** 205:20
  307:16
**booking** 200:5
  316:13,21,22
  318:6
**bosses** 235:2
**bother** 243:12
**bottle** 194:2,9,13
**bottom** 53:11
  78:3,11,14,17
  299:2 312:20
**bought** 144:6
**boulevard** 201:4
**box** 194:19,20
  194:21 299:5
  300:19,21
  301:1 307:3,14
  307:15,20

308:1,5,8,16
309:15 312:22
313:2,3 318:17
**boxes** 191:24
  192:3,7,14
  307:3
**boylan** 146:10
  146:10,15
**boys** 37:1
**break** 6:24 16:5
  71:4,13,13
  72:13 111:12
  111:13 156:16
  215:6 289:5
  319:10
**breaking** 7:3
**breath** 162:10
  162:12 166:24
  207:9
**brennan** 217:7
  219:22 320:13
**brennans**
  320:10
**brian** 1:9 46:12
  47:6,13 94:10
  94:12 97:15,16
  99:20 105:11
  105:12,18
  106:10 107:10
  215:21 216:8
  216:10 224:2
  228:4,8,15,18
  229:9,21
  234:24 235:10
  236:1,13 239:2
  239:4,7,12,16
  240:17 241:5
  259:24 260:11
  268:3,7,8,9,13
  273:21 274:7
  274:12,23
  321:22 322:6
  331:7,8
**brief** 16:5 71:4
  166:12,12
  170:7 187:4
  311:24 333:7

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 337

**briefly** 17:14
  110:13 151:21
  161:13 170:3
  181:20 186:14
  186:18 240:16
  249:16 338:8
**bring** 109:23
  255:3,5
**bringing** 245:13
**briquets** 193:21
  194:6,7,18
**broad** 14:5
  96:12 103:24
**broke** 222:13,16
  242:18
**broken** 150:24
  151:1,3 156:1
**brookfield** 20:3
  20:12 21:3
**brought** 41:5
  139:22 174:21
  304:20 317:7
**building** 138:13
  157:2 163:16
  240:22 279:8
  281:17 334:17
**bumped** 94:19
**bunch** 76:13
**burglary** 109:21
**burn** 231:22
**burned** 149:16
**burning** 145:5
**burns** 231:14,22
**business** 155:11
**busy** 125:15
  126:8

**C**
**c** 1:22 2:12 5:2
  37:2 63:12
  107:8 109:11
  292:14 342:6
  343:9 344:1,1
  346:6
**cafeteria** 282:20
  282:21
**cage** 204:16,18

**call** 41:7 54:16
  122:4 123:7
  124:15,21
  176:3,14
  178:22 208:14
  228:2,10
  334:20 346:23
**called** 5:11
  55:23 128:23
  135:10 138:3
  175:14 177:9
  208:12 286:16
**calling** 63:19
  69:24 178:10
  268:2
**calls** 60:17 61:20
  65:13 68:5
  70:23 74:12
  88:18 89:23
  134:11 138:1
  147:14 180:13
  220:18 221:8
  223:12 224:19
  227:1 253:20
  273:10
**calm** 165:4,10
  207:11
**candle** 174:15
**cant** 58:9 72:7
  88:23 92:9
  94:23 100:4
  102:12 103:5
  115:12 117:23
  117:24 169:22
  221:20 223:15
  224:22 236:3
  247:9 252:7
  300:11 306:18
  312:20
**canvass** 155:21
  301:15
**capacity** 29:1
  34:9 41:19
  42:5,14
**capital** 233:14
**captain** 95:5,10
  154:19

**captains** 95:20
**captioned**
  346:17
**capture** 313:4
  340:3
**car** 31:22,22
  171:5 189:14
  189:17 190:1,4
  190:5,18,22,23
  191:3,7,22
  192:23,24
  193:11 194:7
  194:24 195:4,7
  196:23 200:19
  200:21 201:13
  202:4,4,6,6,7
  202:15 203:18
  203:19 204:16
  204:18 233:23
  273:5 275:23
  281:13,14
  282:1,5 283:9
  284:7,16,22
  285:10 294:2
  294:17 332:24
**carbondale** 18:7
**card** 304:23,23
  314:6 315:16
**cardboard**
  194:20
**cards** 131:4,4,7
**care** 207:16
  310:5
**cared** 234:8
**career** 21:14
  22:14 29:5
  31:18 32:4,12
  37:23 38:8
  39:12 82:14
  84:23 86:7,13
  88:3,8 89:2
  91:16,23 92:5
  92:13,22
  105:19 127:1,7
  127:11 184:17
  185:3 247:8
**careful** 310:4

  320:21
**carlson** 1:9
  97:24 99:19
  100:7,18
  101:15 196:10
  196:12 198:12
  201:7 249:4
  273:22 274:17
  275:3 300:7,13
  301:2
**carlsons** 98:3
  100:9,15 142:8
  299:10 313:6
**carol** 1:21 5:5
  342:6 343:8
  347:24
**carried** 129:21
**case** 4:6 5:21
  7:16 8:3 9:13
  10:24 11:9
  12:2 15:20,22
  16:14 17:4,6
  30:4,22 31:6
  31:11,13,19,23
  32:2,6,9,14
  35:4 36:8,16
  37:21 42:14
  43:17 44:14
  48:7,15 49:23
  50:12 51:7,20
  51:24 52:13,18
  52:21,23 55:22
  56:7,11 57:9
  60:15 61:1
  66:5,14 67:6
  68:11 72:21
  79:17 80:5
  94:8,14 96:19
  96:21,23 97:12
  97:17,19,23
  99:7,9 100:3
  101:4,14
  103:20 104:8
  104:19 105:3,4
  107:11,24
  112:6 113:20
  114:21 115:7

  118:20,22
  121:17,22
  124:24 131:14
  132:2,14
  141:10,12,20
  142:11 157:12
  161:4 179:3
  196:3 198:23
  199:22 200:12
  202:15 212:19
  212:22 213:24
  215:1,22
  216:22 219:13
  220:4,9 221:2
  227:8 233:1
  235:7 239:5
  247:12,19
  248:14,24
  249:15 256:12
  256:21 260:19
  263:14 264:13
  265:14,24
  266:7 284:14
  284:22 287:17
  292:5,6 293:4
  293:8 297:16
  299:8,20
  302:13 305:11
  312:7 313:18
  314:16,18
  317:24 321:8
  322:3,17,19
  323:12 324:9
  325:7,15,23
  327:2 330:11
  343:2 346:17
**cases** 29:8 32:23
  36:20 37:6,9
  37:11,15,18
  94:21 108:6,23
  185:8 199:9
  247:7 248:2,4
  330:16
**casual** 307:4,6
  307:12
**catch** 201:18
  214:24

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

caught 214:8
cause 139:14
    175:4 184:8
    218:22 235:23
    236:11,17
    260:18
caused 183:7,23
    223:16
causes 174:13
    197:12
cautions 307:14
    307:22
ceiling 147:11
cell 155:7
    196:21 287:6
    292:19
cellmate 228:21
center 95:18
    317:8
certain 118:22
    225:19 312:18
    337:2
certainly 12:7
    21:20 86:22
    115:9,18
    119:20 126:12
    136:18 138:7
    141:9 151:16
    185:15 231:21
    231:22 236:6
    253:2 328:21
certainty 225:20
certification
    39:6 345:1
certified 39:3
certify 345:4
cetera 136:12
chain 282:5,6,8
chains 216:7
chair 269:21
    270:2,3,4
chairs 335:4
challenging
    278:11
chance 174:2
    237:7 291:9
change 215:5

220:17 221:4
    333:24 334:7
    336:3 344:4
changed 283:16
    284:1 312:11
    333:6
changes 344:2
    345:7
changing 333:9
character 63:24
    64:23
characterizati...
    64:7,15
characterize
    148:13
characterizing
    178:6
charcoal 193:21
charge 95:5 99:6
    100:11 102:4
    136:5 137:14
    142:4 234:20
charged 116:14
charges 114:1
    234:14 235:8
chargings
    315:24
chat 240:17
check 50:20
    129:1 130:2
    155:2 158:4
    227:9 229:7
    267:10 307:20
    308:13 330:5
checked 129:8
    158:12 183:17
checks 209:23
    308:11,15
chicago 1:18 2:7
    2:16 4:14
    269:24 346:3
    346:10
chief 14:22 15:4
    15:9 39:16
    40:2,3,4,6,12
    40:22,23 41:3
    41:18,21 43:12

43:12 112:2,7
    112:11,15
    146:11 313:14
chiefs 113:15
    313:15
children 36:22
choose 123:21
    346:22 347:7
cigarette 60:5
    182:13,14
    183:2 187:23
    188:1 222:20
    230:7 231:1,14
    231:21 232:7,9
    282:24 283:7
    332:4
cigarettes
    259:17 281:18
    281:19,24
    311:6,7,7
circle 103:12
circled 319:12
circumstances
    312:6
city 1:10 129:15
civil 15:16
claimed 225:21
clarification
    77:3 125:22
    227:12
clarify 120:17
clarifying 76:18
class 34:8 38:19
    38:21 39:3
classes 35:18
classification
    312:4
classify 89:11
clean 152:4
cleaning 291:2
clear 47:11
    109:20 114:6
    115:22 116:1
    117:12 161:9
    168:2 199:4
    223:7 314:7
clearance 92:10

cleared 116:4,4
    116:10 142:15
    148:16 151:8
clearing 115:21
clearly 100:13
    242:17 323:2
client 11:24 12:8
    13:8
clock 263:2
close 35:9
    178:17,24
    299:24 300:9
closed 156:17
    258:1
closing 258:20
closure 300:19
    300:22 301:4,4
    301:6
clothes 23:8
    28:24 210:9
coconspirators
    91:11
code 301:4,6
    313:9
codes 301:4
coffee 239:13,15
    268:1
cognitive 170:23
coincided 179:4
collect 48:7
    209:22
collected 176:5
    193:13 209:19
    263:14
collecting 173:5
college 17:23
    18:3,5,15
colts 133:7
com 2:8,9,17 3:3
    346:11
come 14:23 74:3
    93:4 150:16
    159:12,20
    162:2 169:17
    170:24 173:9
    173:12 186:17
    186:19 187:15

196:21,22
    197:24 201:23
    247:22 248:1
    258:21 267:10
    267:15 269:13
    276:1 281:3
    288:19 296:16
    310:2
comes 307:21
comfort 172:9
comfortable
    172:8
coming 83:14
    144:21 162:23
    176:20,24
    270:15 271:6,6
    272:15 280:20
    286:21 317:12
command 18:21
    18:22
commander
    25:21 26:4,23
    299:9,17
commanders
    299:6
committed 81:1
    81:3,19 85:12
    217:14 330:18
communicating
    155:10
communication
    109:1
communicatio...
    9:17 10:13
    12:1 13:23
    14:6,17 17:10
    48:3 49:14
    103:17 104:9
    109:6 110:4
    111:4 218:6
    230:24 327:2,3
community
    90:21
company 183:17
compare 180:17
    181:19 186:9
compared 132:4

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

competence
  88:20
competent 90:1
  188:21
compilation
  304:22
complete 16:9
  265:8 297:14
  297:18 302:16
  305:15,23
  306:9 315:18
  317:3 342:16
completed
  298:18 301:22
  306:2 316:15
  316:17,20
  317:18
completing
  301:7 302:11
  336:23
complex 134:6,8
  134:13 144:10
  163:18 175:22
component
  103:11
compound
  224:5
comprise 305:9
comprises
  304:16
computer 94:4
  128:7 129:5,7
  298:2
computeraided
  342:14
concealed
  194:10
concept 320:21
concern 156:10
  191:6 206:22
  309:23
concerned 231:8
concerns 197:6
concluded 192:6
  341:8
conclusion
  97:17,20

101:10 118:2
  173:3 232:19
conclusions
  166:15
condescending
  89:8
condition 84:5
  155:2 317:11
condo 233:23
conduct 31:21
  49:7 50:16
  64:23 179:17
  277:5,20
  319:11
conducted 30:15
  79:23 82:13
  86:8 110:22,24
  277:16 297:10
  326:17
conference
  52:15
conferring
  269:2 317:13
confess 87:2
  257:15 278:13
confession 82:19
  83:1,11,13,24
  84:2,3 86:18
  87:7,14 89:17
  90:19 104:17
  104:20 113:18
  114:1,19 115:6
  115:18 225:14
  225:22 226:14
  226:15 233:3
  268:20
confessions
  86:12 92:5,15
  92:21 225:12
  274:13
confidence
  119:16 243:20
confidential
  340:21
confined 157:3
confront 252:19
confronted

62:24 63:16
  276:20
confronts 62:18
confusing 328:9
connected
  208:10
connection
  15:16 44:11,24
  45:4,10 88:8
  94:8 154:1
  263:15 296:1
conscious
  125:12
consent 196:6
consider 16:16
  19:21 87:18,18
  102:17 124:8
  222:11 246:14
considered
  28:15,18
  100:16 103:7
  105:13 127:5
  220:2,3 222:24
  327:5 328:14
consist 34:6
consisted 42:16
consistent 208:7
  259:6
consisting 345:6
contact 204:23
  222:20
contain 51:2
  302:7
contained 49:1
  216:7 223:24
  232:21
container 193:3
  193:24
containing 54:7
contains 226:8
  226:21
contaminating
  91:3
contd 338:5
contemporane...
  141:16 298:11
  316:22

contemporane...
  69:7
content 9:16
  80:11,15,22
  81:5 105:8
  112:14 113:11
  229:8 269:3
contents 107:13
  236:24
context 16:14
  89:16 290:22
  294:6
continually
  337:6
continue 21:14
  196:2 258:22
  298:7 337:21
continued 126:4
  206:2 235:14
  236:8
continuing
  23:24 85:19
  120:24 126:10
contraband
  251:5
contributed
  158:21
control 95:19
conversation
  15:5 55:18,21
  64:22 108:24
  116:21 125:3,8
  126:16 133:19
  159:24 161:15
  161:22 163:13
  163:17 167:13
  170:5 171:19
  174:7 181:14
  183:4 203:22
  210:20 224:1
  230:4 241:22
  248:17,20
  258:17 266:12
  269:10 270:20
  277:9 279:6
  287:14 293:24
  320:17

conversational
  186:3
conversations
  13:20,23 14:11
  14:20 15:3
  47:6,13 56:11
  66:8 97:1
  104:6 105:9
  107:10,14
  111:3,8 160:5
  187:14 211:23
  212:23 214:20
  228:22 229:23
  245:22 283:4
  313:17 320:15
  322:13 323:1
  323:15 326:24
  327:9 329:15
  329:17,19
convey 116:9
conveyed 154:16
convicted 44:23
  217:11
conviction 13:16
cook 1:23 342:3
  343:5
cooler 192:24
cooperate 203:2
cooperative
  179:22 319:12
copies 73:6,9,24
  74:10 199:16
copy 57:15 73:3
  73:17 75:8
  261:15 289:2
  342:24
corner 299:3
correct 7:16 8:4
  13:18,19 19:11
  19:13 20:7
  22:14,17 23:7
  25:19,22,23
  28:1,5,20
  29:13,14 30:4
  30:5 33:24
  34:1 38:14,15
  39:8,19 42:8

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 340

43:1,2,9,14,15
44:20,21 51:4
51:16,17 52:1
53:9,14,20
54:23 55:5,13
55:24 58:13,15
63:9,10,14
69:9,13 70:7
70:14,17 71:2
72:23 76:18,19
77:1,2,22,23
79:13,14,18,21
79:24 80:1
81:12 82:10
84:20 85:19
87:3 95:12
98:2,19 100:8
100:23 101:5
102:21 118:2
123:4 124:13
124:18,19
125:9 126:17
126:18 127:13
130:12,13
131:2,15,16
133:13 134:21
134:22 137:6,7
138:15,21
142:14,17,18
145:17,18
146:16 157:21
159:8,9 160:8
160:22 168:6
168:22 169:12
179:21 180:5,6
184:11,15
185:20 186:24
188:13,16,17
189:20,21
191:8,22 192:2
192:24 193:1,4
193:12,22
194:11,12
198:2,3,6
200:20 202:9
205:9,21
210:18 222:6

227:19,20,24
228:12 232:3
239:21 241:19
254:4 258:2,6
262:14,15
264:3 265:21
265:22 266:1,2
266:22,23
267:21 275:11
275:12,23,24
276:17 280:4
286:1,23
288:10,11
290:20 292:15
294:18 295:13
297:13 302:1,2
308:9,10,14
309:6,17
310:12,15,20
310:21,23
315:14,16
316:4 319:13
319:14 331:9
331:10,15,16
331:20,21
332:12,13
334:2,3 338:16
345:9
**correctly** 135:23
240:5
**corroborate**
82:24
**corroborating**
82:18
**corroboration**
83:8
**couches** 335:3
**couldnt** 76:11
144:14,17
149:7 182:14
189:9,12 232:9
281:23
**counsel** 4:16
9:18,18 10:11
10:13,19,20
12:5,19,23
13:5,21 14:4,7

14:18 116:22
116:22 218:8
227:12 230:24
272:14 327:3
342:9 343:2
**county** 1:22
13:17 19:22
24:14,22 25:3
25:6 38:22
200:4 203:15
205:16 206:5
285:23 288:6
311:14 322:7
342:3 343:5
**couple** 6:1 59:4
71:17 72:14
76:6 98:17
102:14 290:1
338:7 340:19
**coupleline**
233:13
**course** 30:19
34:19 35:14,17
35:20,24 86:6
86:13 89:19
91:16,22 92:13
92:22 125:4
135:14 170:21
171:16,22
190:23 222:1
293:16 295:18
297:10 308:17
324:20
**courses** 18:20
34:11,20,24
35:8
**court** 1:1,20 4:5
5:4,6,7 6:13,17
16:5 23:11,16
24:6 37:17
38:1,5,9 90:8
233:6 238:5
342:23 346:1
**courts** 240:22
**cover** 35:12
174:7 313:8
**covered** 103:18

104:2 149:13
242:15 244:16
**create** 301:9
**created** 8:22
**credence** 225:23
**credibility** 91:5
226:5
**crime** 26:16,17
26:24 38:12,17
81:1,4 84:20
85:8,12,17
86:15,19 87:8
87:15 88:14
89:18 90:23
116:14 141:18
141:19 217:15
321:1 326:7,11
330:18
**crimes** 23:9
26:21 27:10
28:24 29:4
93:11 98:8,23
99:14,18 100:3
102:1,4,11,11
105:22 106:4
108:23 109:22
109:24 110:19
120:16,22
121:1 123:3,5
123:10 126:22
330:10,10,11
**criminal** 41:5
43:12 82:20
91:9 128:6
138:6 308:11
**criteria** 123:18
**cross** 1:8 4:4
51:14,19,21
52:5,8,12,17
53:18 54:7,13
62:23,24 63:7
63:15 64:7,15
99:20 101:21
101:22 102:5,6
102:16 103:6
103:15,19
104:7 105:3

116:5,9 137:6
137:9 139:3,6
139:19 140:15
141:5,24
145:16 146:7
146:18 152:5
152:16 154:23
155:14 157:15
162:16 163:22
168:7 181:21
182:5 187:9
190:17 191:14
195:11 198:12
202:18 215:21
216:20 229:11
229:12,24
230:5 232:4
237:11 243:5
248:18 255:10
255:23 258:7
259:14 262:10
264:7 269:10
270:12,19
271:17,21,23
272:4 273:1
275:21 276:20
277:2,9,16,18
277:23 278:10
278:22 279:1
279:11,18,22
280:6,15,19,22
285:24 287:16
292:9 303:1,3
305:18 313:5
313:11 315:24
316:6 331:1
332:2,12,22
334:16 335:7
335:18 337:23
346:12
**crude** 60:8
**crying** 164:24
165:5,9 185:24
186:1 207:13
**cuffed** 203:8
**cunningham** 1:9
46:12 47:6,13

Siebert & Assocs. Court Reporters, Inc.    (773)851-7779   cmsreporters@comcast.net

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 341

99:21 105:11
105:12,18
106:10 107:10
216:10 239:2,4
273:21 274:7
274:12,24
321:12,17,22
331:8,8,13,14
**cup** 239:9,13,15
**current** 10:20
28:2,3 39:13
40:12 41:2,11
41:15
**currently** 39:15
40:17 41:16
42:1 55:3
**custody** 200:11
205:23 245:13
292:4 310:5
**cut** 234:2,4
**cutoff** 77:16
258:4
**cv** 1:6 4:7 17:1
27:8

       **D**
**d** 15:10 33:24
62:18 99:23
133:12 135:21
143:13 146:15
270:24 342:22
331:1
**dakota** 209:4
211:9
**damage** 117:19
118:5 149:2,12
157:1,2
**damaged** 144:17
151:5
**damages** 10:24
11:7,18 12:14
13:3
**dan** 146:10,10
**data** 129:19
**database** 159:4
**date** 4:8 51:19
225:19 262:12

262:13,16
263:20,23
264:9 298:20
309:2 342:7
347:15
**dated** 114:9
**dates** 70:11
297:15 298:21
312:2 326:23
**daughter** 36:24
153:21 157:9
**dave** 15:10
107:16,19,23
108:8 140:21
146:9 260:18
260:21,23
322:12
**david** 15:22
112:1
**day** 79:4 101:8
108:18 130:7
132:24 154:8
158:14 176:23
179:15,17
180:23 184:14
211:5 233:22
239:9 242:8,9
286:4 296:18
308:17 331:18
335:2 345:18
**days** 34:22
65:20 106:21
122:1 183:16
233:9 322:9
346:21 347:15
**dead** 222:17
**deal** 275:22
307:21 319:10
340:22
**dealt** 121:9
**dear** 346:15
**death** 13:17
34:21 42:7
44:3,11,18,24
45:6,12 47:8
65:19 95:22
98:19 110:21

112:1 121:15
141:23 185:19
312:4,5 324:21
**debris** 145:2,3
147:24 148:6
148:18 243:15
244:12
**deceased** 97:24
**decedents** 36:20
37:7
**december** 51:13
53:13 54:3
55:19 291:17
292:1
**decided** 161:2
307:12
**decision** 11:9
123:24 125:12
137:19 141:9
198:7,11
232:24 234:13
**decisions** 141:5
**defendant** 13:16
15:23 16:24
37:4,8 64:10
74:24 76:14
**defendants** 1:12
2:18 5:2 66:16
75:3,10 216:19
**defer** 141:9
**deferring** 141:5
**deficit** 170:19
**deficits** 172:7
**definitely** 309:1
**definition** 337:7
**deflect** 184:4
**defs** 45:20 48:20
48:21 49:2
50:6 51:2,11
53:1,8 54:12
54:19 56:15,18
58:3 59:6
72:16 73:16,16
75:13 78:11
113:4 119:4
216:4 236:21
237:4

**degree** 18:3,10
18:13 34:12,19
35:21 84:8
171:4
**degrees** 18:4,16
**dekalb** 200:4
203:15 205:16
206:4 208:9
259:19,23
273:14 281:22
282:1 283:13
284:7 311:14
322:7
**delay** 172:12,21
**deliberately**
174:20
**demeanor** 208:3
208:4 259:2,4
283:16,23
284:1 333:6,24
334:7 336:4
**denial** 84:19
85:1,7
**denied** 166:20
184:13
**deny** 85:19
**dep** 346:13
**department**
8:23 19:8,9,20
19:20 20:19
21:3,7,9,14
22:6,12,15,20
23:13 24:16
25:9 26:7
27:14,17 28:8
28:15 29:18
30:8,11 32:17
32:21 33:17
36:12,17 37:24
38:4,13,22
39:12 40:24
44:13 45:6,12
46:8 56:2,3
68:2 71:22
72:2 86:8,14
91:17,24 92:6
92:14 93:7,14

93:22 95:4
98:7 101:23
102:20 105:19
107:20 108:7
108:14 109:17
110:8,9,14
112:3 114:18
119:24 120:6
120:16 121:5,6
122:11 127:2,8
127:12,16
129:7 130:21
135:2 137:14
138:18 139:1
140:11,16,21
146:11 153:15
155:7 156:14
156:22 175:8
175:23 199:10
212:22 213:5
225:11 229:5,6
245:13 265:10
273:15 275:17
275:20 279:3
282:11,11
285:14 295:24
299:15 312:8
315:2 324:22
327:11,17
**departments**
93:9
**depended**
258:13
**deponent** 5:3
342:24
**depos** 4:12
**deposed** 15:12
15:13,15 17:5
**deposition** 1:15
4:2,13 5:23
7:10 9:1,5,9,19
10:15 12:6
16:11 27:22,24
38:9 45:15
47:24 71:14
112:20 118:24
131:15 215:16

261:5 289:12
296:20 303:15
303:18 304:2
323:17 337:3
341:7 342:4,9
342:21 345:6,9
346:16,20,23
347:11
**depot** 55:3
**deputy** 14:22
    15:4,9,23 40:2
    40:4,23 41:21
    43:12 146:11
    313:14
**derogatory**
    188:15
**describe** 34:17
    172:24 218:16
    333:8 334:23
    339:22,22
**described**
    175:24 186:6
    195:15,23
    235:13 242:23
    244:13 302:8
    337:3
**describes** 293:22
**describing**
    172:20 173:2
    243:7 293:18
    337:5
**description**
    218:2,13
    315:22
**designation**
    27:18
**desire** 82:2
**desk** 62:7 68:18
    300:14 335:1
**despite** 232:21
**det** 62:18
**details** 89:18
    90:17 106:23
    229:23 302:7
    320:23
**detainee** 318:4
**detective** 27:15

27:18 63:7
121:23 122:3,8
123:2 133:21
135:15 141:10
141:14 145:16
202:6 204:18
278:17 321:12
331:8,13,14
332:2,12
334:16 335:7
335:17 337:23
**detectives** 99:9
122:1 123:10
123:12,13,20
135:3,10
158:11 161:3
206:18 214:2
214:17,20
286:17
**detector** 65:7,11
65:17 242:2,5
242:7,10,12,18
242:20,24
243:7,10,18,23
244:22 245:6
**detention**
304:21 305:22
317:8,9
**determination**
81:15 135:7
**determine** 50:2
69:10 80:19
83:4 174:9
193:16 325:21
**determined**
178:3 326:15
326:18
**determining**
139:14
**develop** 212:6
**developed** 41:14
201:10 218:3
236:7
**developmental**
170:22 171:9
172:11,12,21
**developments**

182:2
**diagnosis**
172:14 173:7
**dial** 112:1,7,11
112:15
**didnt** 31:21
49:24 50:1
60:5 64:18
65:15,18 66:1
67:23 80:5
103:8 104:17
104:20 116:2
116:18 124:1
125:16 126:8
126:13 139:23
155:3 166:13
167:10 182:9
183:18 184:4,9
185:24 188:6,9
192:5,13 193:7
196:21 197:5,8
199:2 204:23
207:16,23
211:8 212:16
217:6 222:5
232:14 234:3
234:20 236:2
238:9 240:4,8
241:7,11,14,21
241:23 250:23
255:5 256:5
258:11 267:11
268:13 274:20
278:19 284:7
284:12,13,17
284:19 296:16
302:22 303:24
306:24 307:2
318:20,20,21
325:9 328:24
337:16,16
340:2,12
**died** 163:6
167:20
**differences**
208:2
**different** 14:10

35:12 50:15
98:13 103:10
106:17,18
108:21 115:16
122:11 139:21
139:22 211:7
248:6 259:4
267:16 297:24
**differentiated**
123:15
**differently**
118:17,20
244:1
**difficult** 180:9
**difficulty** 148:23
184:19 185:13
**diligence** 310:8
**diligent** 197:17
**direct** 5:15 12:7
98:11 172:2
183:6 338:5
**directed** 198:13
199:6,24
333:12,12
**directing** 12:8
136:9
**direction** 68:22
90:16 139:11
140:1 175:4
189:3 268:3,7
**directions** 269:1
**directly** 41:16
172:3 177:17
178:21 335:21
**disabilities**
171:10 172:11
**disability**
170:23,23
173:6 209:20
**disabled** 171:3
**disagree** 113:16
114:3
**disagreed** 117:1
**disc** 4:1
**discarded**
301:22
**discarding**

301:8 336:22
**discount** 117:20
118:6
**discovered**
220:22
**discovery** 48:6
48:10
**discuss** 64:18
119:13 245:11
246:7 258:11
272:8 287:16
293:6
**discussed** 64:6
112:5 115:20
117:5 145:21
145:24 249:16
272:13 295:20
326:15
**discussing** 65:23
113:7 270:6
272:12
**discussion** 24:4
112:24 246:6
321:22 324:3
332:11
**disparage**
239:19
**dispatch** 95:18
133:15,19
176:3
**disrespect**
100:24
**distance** 189:22
**distress** 83:14
84:2 336:17,20
**district** 1:1,2,20
1:20 4:5,5
**divided** 168:24
**division** 1:3 4:6
26:13 103:10
158:9 168:24
**divisions** 108:21
**divorce** 271:3,7
311:11 334:11
**document** 45:20
45:23 46:11
57:11 58:14,24

Siebert & Assocs. Court Reporters, Inc.          cmsreporters@comcast.net

Page 343

60:10 62:5
66:24 72:15
75:24 77:20
78:6 113:4
119:3 261:9
262:22 263:21
289:19 296:24
298:7,24 304:8
304:11,15
305:3,5
**documentation**
301:23
**documented**
290:4,9,15
301:21
**documents** 48:8
48:14,20,23
49:1,2,5 61:3
73:2 80:3
199:12 263:13
264:12,15
266:11 315:5
**doesnt** 59:17,20
65:7,10 90:24
204:18 237:22
251:10 299:1
310:19 312:16
316:10
**doing** 46:2 81:3
91:13 95:15
132:13 138:19
139:2 146:1
152:3 177:20
179:15,20
180:23 181:6
187:7 188:2
202:18 204:15
214:12,14
215:1 240:20
243:22 254:24
267:24
**don** 140:19
286:5,6,8,16
286:19
**donald** 108:10
108:13,17
109:1,5

**dont** 8:18 9:15
11:12 13:21
23:20 24:10
27:20 29:16,23
30:13,16,20
31:12,16 32:3
32:7,10,15,24
33:20 35:19
36:7,22 37:10
37:13,16,22
38:2,6,10
44:15 45:2,8
45:13 47:22
48:12,16 51:8
52:5,11,16
54:10,15,18
57:1,7 60:12
60:19 61:2,11
62:9,11 63:21
66:11 67:16,18
68:7 72:4
77:15 82:16,21
85:2 86:5
89:10,12 90:20
92:10 94:3
97:21 100:12
100:24 101:20
103:4 108:9
109:3,8,9
111:7 112:8
113:13,14
115:24 116:12
117:16,22,24
118:8,9 119:9
119:17,18
120:4,11 121:2
121:19 124:5
125:7 126:14
128:20 129:23
131:5,11,24
132:11 133:2,3
135:4 143:3,22
145:14,23
148:21 150:9
151:3 154:14
154:18 159:2,6
160:4 162:13

163:1,7,7,15
169:2,6,16
170:9 171:13
171:17,21
172:2,13,23
173:8,19,23
178:15 179:11
187:4 188:14
188:23 189:14
191:11,12,20
192:18 194:8
194:14,16
195:2,16 197:9
198:17 199:15
199:16,23
200:15 201:14
201:16 203:22
204:1 205:12
207:22 212:4
212:10,14,20
213:2,7 214:3
214:15,17
215:2,23,23
218:18 221:18
221:21 222:1
229:16,22
230:9 236:10
238:8,16,19
243:11,11
245:8 247:21
250:2,8,13
251:23 253:15
253:16 254:16
254:17 255:2
256:3,8,20
257:5,23
259:13,15
260:1,1,20
261:3 263:14
264:23 265:3
268:18 270:7
270:14 271:9
271:20 272:1
272:12 273:4,8
273:17,24
274:8,16
276:12 277:11

278:5,14 279:5
279:20,20
280:13 281:21
281:21 282:3,6
283:4 285:1,7
285:15,17
286:6,15,17
287:19 288:5
290:10,12
291:21 292:2,8
292:18 293:5,9
295:3 296:10
296:13 300:11
300:12 301:16
301:17 303:6
303:12 306:14
310:18 312:17
312:22 314:24
314:24 315:3,4
315:4 318:19
319:24 320:1,5
320:8 321:21
322:14,14
323:19,22
324:14,15,17
324:24 325:8
327:8 329:14
330:1,20 333:5
338:2 339:7,13
340:5,14,23
**door** 150:17,18
150:21,24
156:16 164:7,8
187:22 278:2
334:20 335:24
**doors** 147:20
149:23 150:3
151:18
**dorothy** 182:11
**double** 328:8
**doubt** 279:21
327:12,17,22
329:4,11
**downstairs**
165:20 168:17
170:2 182:16
182:24 185:17

186:18,22
243:17 281:5,5
334:18
**downtown**
14:23 31:3
**dramatic** 176:21
**dramatically**
333:6
**dream** 82:4
**drink** 251:16
**drinking** 79:3
162:4,7,20
165:14,18
166:9,16,19
167:8 181:3,4
184:14 250:23
251:1 308:3
331:18
**drive** 177:11
201:2,18 279:7
**drivers** 308:19
**driving** 200:19
284:14
**dropped** 243:17
275:21 279:7
322:3,10
**dropping**
148:17 334:15
**drug** 24:24 25:1
28:24 29:3
**drugs** 84:10
307:18 336:13
**drunk** 166:2
294:1
**due** 117:8 310:8
**dui** 185:7,8
**duly** 5:12 342:10
**dumeg** 33:22
34:6
**dupage** 13:17
18:6 19:22
24:14,22 25:3
25:6 33:22
38:22 94:12
240:23 285:22
288:5 291:24
**duplicates**

Siebert & Assocs. Court Reporters, Inc.     cmsreporters@comcast.net

Page 344

263:10,17
**duties** 134:15
 136:13,24
 225:9
**duty** 138:10
**dwellers** 136:12
**dying** 256:15

**E**

**e** 1:4 16:24,24
 33:24 37:3
 55:12 99:23
 107:18,18
 109:11,11
 110:10 135:21
 135:21 143:13
 208:13 209:17
 270:24 292:14
 344:1,1 331:1
 331:9
**eager** 89:2
**earlier** 103:14
 184:12 302:20
 321:3 331:22
**early** 128:4
 178:15 331:24
**earshot** 333:13
**east** 133:22
 134:5 195:19
 196:2
**eastern** 1:3 4:6
**easy** 339:21
**eat** 259:18
**eating** 259:9,15
**edgewise** 337:23
**educational**
 17:15
**edward** 133:23
**effect** 114:21
 175:9 183:6
 249:20 275:10
 276:16 288:23
 293:12,23
 325:13 333:17
**effort** 147:10
 249:21 278:12
**efforts** 147:12

242:1
**either** 10:10
 35:3 37:7
 40:22 47:6,20
 64:13 66:5,8
 101:18 124:4
 148:17 153:7
 154:7 162:15
 162:23 164:21
 167:14 170:17
 197:3 198:12
 201:6 215:21
 217:20 242:8
 246:8 256:11
 259:16 261:2
 266:3 274:1,2
 275:5 284:7
 296:2 312:17
 313:18 332:16
**elaborate**
 332:19
**electrical** 174:16
 242:14
**element** 113:19
 114:20,23,24
 115:6,8,19
**elements** 115:1
 115:17 117:17
**elicit** 80:18
**elizabeth** 313:19
**elses** 9:7 75:10
**email** 46:12 49:8
 50:10,14,17,21
 51:6,12 52:6
 53:11,15,17,18
 53:21,21 54:1
 54:2,5,13,17
 54:21,21,22
 55:1,7,15
 71:22 72:3
 103:14
**emails** 49:8
 50:11,11,17
 53:7,11
**emergency**
 318:7,14,18
**emily** 36:23

**emotion** 280:9
**emotional** 84:5
 84:12 336:20
**emotionally**
 280:10
**emotions** 84:15
**employ** 85:17
 86:1
**employment**
 19:22 30:7
 266:4
**empty** 191:24
 192:3,7 194:4
**encompassed**
 82:8
**encountered**
 140:9 281:6
**encouraging**
 252:20
**ended** 60:14
 112:11 126:7
 272:15
**enforcement**
 19:18,23 20:8
 21:15,17 22:2
 23:3 24:14,23
 24:24 25:1,3,7
 25:13 26:3,8
 26:19 27:5,12
 28:13,22 29:4
 33:21,23 34:14
 40:7 85:15
 98:13 102:2
 106:3,5,11,12
 107:1,7 110:3
 123:2,12,19
 141:20 184:17
 185:4 225:10
 286:3,14,21
 287:11 291:13
 292:23 295:19
 296:2 311:8
 327:4,22 328:4
 328:11,15
 329:12,18
**ensworth** 55:10
 55:14,19,22

**entire** 265:5
**entirety** 11:13
 259:7 265:11
 267:12
**entitled** 222:2
**entrance** 334:16
**entries** 70:6
 76:13
**entry** 59:11,15
 61:13 62:14,18
 62:20 63:11
 65:2,4,5
**equipment**
 136:13
**escape** 307:19
**especially**
 131:19 197:23
 313:14
**essentially** 24:24
 28:2,19 52:19
 107:2,4 118:21
 124:15 149:20
 155:24 159:4
 168:9 174:14
 188:7,16
 192:20 201:22
 264:10 275:21
 276:20 279:12
 294:14 317:12
 322:8,11
**establish** 101:2
 306:12
**estate** 1:8
**estimating** 263:5
**et** 4:4 136:12
**evaluate** 84:1
 91:4 165:12,16
 180:9 226:6
**evaluated**
 127:11
**evaluating** 83:11
 83:12,24 225:1
 226:5
**evaluation**
 119:12 220:13
 228:13
**evening** 143:9

176:4 250:22
 266:15
**event** 302:12
 318:14
**events** 60:14
 67:5 70:20
 83:5 101:4,11
 223:14,19
 230:6 298:11
 301:11,20,24
 302:8
**everybody**
 122:21 123:5
 313:14
**evicted** 210:2,9
 210:12
**evidence** 38:20
 39:3 115:11
 116:1 193:14
 197:18 217:20
 218:3,9 219:8
 219:21 220:1,8
 223:22 313:21
 314:2
**exact** 223:14,16
**exam** 245:16
 249:10,22
 250:17 251:19
 252:2,7,18
 253:8,19,23
 254:20 256:11
**examination**
 5:15 302:24
 331:1 338:5
 331:2
**examined** 5:12
 342:11
**exams** 247:23
 326:22
**excel** 200:23
**exchange** 182:22
 287:22 293:8
 329:10 338:10
**exchanged**
 182:18
**excluding**
 116:21

Siebert & Assocs. Court Reporters, Inc.          cmsreporters@comcast.net

Page 345

199:20
**exhibit** 45:15,19
46:4,15,17,22
47:24 48:18,19
50:6 51:1 53:1
54:20 66:17
72:12,20 73:7
74:1 77:5 80:8
112:20 113:3
118:24 119:3,8
215:16 216:2
236:20 237:4
238:21 261:5,8
261:12,13,14
289:12,18
290:2 296:20
296:23 297:2,4
298:10,14
301:21,23
303:18,21,21
303:23 304:2,5
304:6,8,11
312:14
**exhibits** 340:19
**exist** 87:13
129:16 199:16
**existed** 149:2
**expand** 119:15
337:12
**expectation**
252:1
**experience** 6:4
151:15 184:17
185:10 251:3
**experienced**
123:19 208:17
**experiencing**
238:6
**expert** 88:18
89:24
**expertise** 119:15
**explain** 30:24
143:17 183:10
236:2
**explained** 218:9
**explanation**
218:2

**explanations**
183:24
**exposure** 166:11
**express** 114:18
143:20 206:21
232:13,16
237:14 272:4
**expressed** 191:6
232:8,11
307:17 327:12
328:11 329:1,3
329:12
**expresses** 82:2
**extended** 324:7
**extensive** 117:19
118:5
**extensively** 9:6
**extent** 14:4
19:21 88:18
89:23 94:20
97:5 305:24
**extreme** 86:23
87:4
**eyeball** 151:16
**eyes** 306:9

---
**F**

**f** 107:18 292:14
**face** 185:14
**facility** 291:1
**fact** 63:7 76:23
87:17 130:20
168:4 180:7
186:4 234:7
250:12 257:9
274:10 310:22
312:13
**factor** 222:10
278:20
**factors** 87:10,11
87:13 113:23
220:2,21
222:23 232:23
234:6,10
235:12 236:3
326:14
**facts** 87:9 226:8

226:21 227:9
234:21,24
249:15
**failed** 252:20
253:1,8,14
254:3,7,12,15
255:13,15
257:7,21
**failing** 278:21
**failure** 253:9
**fair** 85:22 87:19
88:6 96:22
117:15 125:14
127:15 187:24
217:8 218:5
227:15 258:3
320:16 322:22
**fairly** 128:4
178:24 313:13
**false** 87:14,23
88:13 89:17
226:8,21
**falsely** 86:15,19
87:2,8
**familiar** 94:9
247:17
**family** 96:9 97:3
154:11 157:18
171:2,15,24
172:2,19 181:1
187:10 196:7
324:8 337:17
**far** 131:5 160:13
173:7 244:14
268:12 311:16
**fashion** 197:17
**fast** 175:13,20
176:1 177:4,8
178:3,5,7,11
179:10 316:17
**february** 1:19
4:8 216:20
217:4 237:10
261:17 345:10
346:17
**feeding** 90:17
**feel** 101:1 172:8

172:9,13 188:6
340:2
**feeling** 339:9
**feelings** 206:22
**feet** 148:14,14
189:23
**felony** 82:15
102:7 134:20
135:17 268:2
**felt** 256:18
278:18 287:8
**ferrari** 146:13
152:6,8,16
243:13
**ferreri** 107:17
107:19,23
108:8 140:22
146:10 260:19
260:21,23
322:12
**fight** 293:13
**fighting** 293:11
**fights** 307:19
**figure** 80:24
193:5,23
291:15 328:22
**figures** 88:13
**file** 32:16 112:12
118:23 265:5,8
265:11,14
266:7
**filed** 13:14 48:14
49:10
**filing** 49:3
269:17
**fill** 267:1 316:10
317:13 318:20
**filled** 316:9
317:10
**final** 300:18
**finally** 275:9
276:6
**finances** 209:23
210:7,10
**financial** 108:22
211:17 287:24
**find** 50:11

128:13 129:2
138:10 142:22
153:8 158:18
159:10 181:22
186:5 197:17
197:18 230:14
230:19 233:5
242:4 272:10
272:16
**finding** 69:5,11
69:14 194:24
195:15
**fine** 14:8 84:13
119:7 172:15
233:6,6
**fingerprint**
304:22,23
314:6 315:16
316:19
**finish** 122:15,16
**finished** 6:12
101:12 103:20
195:6 257:22
259:23 264:6
264:10 269:18
299:24 300:3
339:7
**fire** 31:14,17,22
63:2 65:18
79:16 107:20
115:23 116:11
117:10,19,20
117:21,22
118:5,6,7,9
124:16 125:18
128:10 130:10
133:21 134:23
135:8,16,18
136:5,13 137:2
137:14,19,20
138:17,18,22
138:24 139:1,6
139:8,14,17,20
140:4,7,10,12
140:13,15,21
140:24 141:5
142:13 144:12

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 346

| | | | | |
|---|---|---|---|---|
| 144:13,18 | 150:6 242:3,7 | 278:7 | 260:5 261:15 | 187:22 217:7 |
| 145:11 146:11 | 243:9 | **fix** 16:6 | 261:21 267:1 | 279:7 281:4 |
| 147:2,11 149:2 | **fires** 31:20,22,24 | **flame** 145:4 | 280:11 295:11 | 284:18 306:7 |
| 149:24 152:4,4 | 32:12 135:3 | **flames** 145:1 | 305:23 309:10 | 334:16 |
| 153:17 156:1,4 | 140:8 | 176:20,24 | 309:14 316:14 | **fruit** 193:3 |
| 156:11,14,22 | **firm** 2:12 346:6 | **flexible** 106:21 | 324:11 328:1 | **frustration** |
| 158:10 163:5 | **first** 5:11 9:23 | 107:3 | 329:23 337:8 | 206:22 |
| 174:10,13,20 | 21:23 28:13 | **floor** 1:17 2:6 | **formal** 40:14 | **full** 194:3,15 |
| 174:24 175:5,7 | 35:13 39:14 | 149:7 | **formed** 118:8 | **funches** 292:13 |
| 175:10,22 | 46:10 50:6,9 | **floors** 291:2 | **former** 40:18,23 | 292:17,22 |
| 177:4,8,22 | 51:1,11 59:7 | **fluid** 193:20,24 | **forms** 302:20 | 293:1,10 |
| 178:3,7,12 | 69:19 72:6 | 194:1,5,18 | **forth** 345:7 | **functions** |
| 179:4,10 | 74:19 80:16 | **focus** 117:8,15 | **forward** 232:24 | 165:24 |
| 181:12 183:7 | 101:19 105:2 | **focused** 23:8 | **found** 69:17 | **funny** 319:24 |
| 183:10,23 | 107:9 109:9,14 | **focusing** 28:23 | 151:12 159:7 | **furnace** 174:17 |
| 184:5 188:7,9 | 110:10 117:6 | **foia** 45:4 | 160:3 180:21 | **further** 71:16 |
| 188:9 197:4,9 | 119:7 128:1 | **follow** 6:2 | 181:15 183:18 | 186:13 204:23 |
| 197:15,22 | 130:2,23 | 192:20 | 191:24 192:24 | 246:12 295:4 |
| 198:20 199:6 | 136:18 141:14 | **followed** 99:7,11 | 193:2,11,20 | 295:16 332:10 |
| 200:24 213:4 | 144:9 145:12 | 204:22 | 194:9 195:13 | 338:3 |
| 218:22 219:4 | 145:22 146:1,8 | **following** 206:1 | **foundation** | **future** 11:15 |
| 220:23 221:2 | 146:19 147:6 | 257:14 258:12 | 46:23 54:8 | |
| 222:5,12,15,17 | 148:1,24 | 344:2,3 | 58:5 60:17 | **G** |
| 222:19,22 | 150:15 157:24 | **follows** 5:13 | 61:20 63:19 | **g** 33:24 107:8 |
| 223:9,15,16,20 | 160:9 167:15 | 294:9 | 65:13 69:24 | 111:2 344:1 |
| 223:24 224:3 | 173:10,16 | **followup** 211:21 | 70:23 180:13 | **gain** 233:14 |
| 224:14,22 | 176:12 180:15 | **followups** | **four** 34:22 305:4 | 269:12 |
| 225:4 229:6,14 | 186:7 238:23 | 330:23 | 305:7,9 | **game** 337:17 |
| 230:6,11,15,19 | 249:17 254:10 | **food** 259:11,22 | **free** 239:9 | **games** 112:17 |
| 231:10,15,17 | 259:4 261:14 | **forced** 151:4 | **freedom** 290:24 | 132:24 133:7 |
| 232:6,9,21 | 275:14 276:10 | **foregoing** 342:4 | 291:4 | **gang** 23:8,9 |
| 233:9 234:9,15 | 276:15 280:21 | 342:15 345:5,8 | **fresh** 131:17 | 28:24 29:3 |
| 242:16,18 | 281:1 283:7 | **forementioned** | 132:2,6 | **garcia** 2:5 4:23 |
| 243:13 244:15 | 286:19 290:3 | 342:18 | **freshest** 132:6 | 4:23 13:11 |
| 246:21 256:14 | 298:19,24 | **forgot** 152:24 | **friday** 1:18 4:8 | **gary** 44:20,22 |
| 257:3,15 | 305:2,2,4,12 | **form** 7:17 8:16 | 122:2 347:5 | 45:3,10 46:5 |
| 260:24 275:10 | 305:14 307:5 | 33:12 42:9 | **friend** 16:17 | 164:7 170:8 |
| 276:7 278:19 | 312:1 314:10 | 43:20 57:15 | 100:16,18 | 195:5 |
| 283:21 325:6 | 314:14 326:4 | 73:10 83:15 | 102:17 103:7 | **garys** 164:14 |
| 327:13,17,19 | 334:13 342:10 | 85:9,20 89:21 | 105:13,15 | **gas** 143:7,17 |
| 327:24 328:13 | **firstdegree** | 92:7,23 120:9 | 182:12 209:8 | 144:1,5,6 |
| 329:22 330:2 | 316:3 | 125:21 128:14 | 291:16 | 162:2 174:18 |
| 331:19 334:2 | **fishing** 189:17 | 137:24 147:13 | **friendly** 94:17 | 177:6,10,12,13 |
| **firearm** 15:24 | 189:24 190:3 | 149:4 180:12 | 100:22 103:8 | 177:18 178:4 |
| **firefighter** | **five** 10:4 36:18 | 184:21 200:13 | **friends** 103:12 | 178:22,23,23 |
| 243:12 | 37:6,11,15,18 | 207:1 226:23 | **front** 66:18 | 183:17 273:18 |
| **firefighters** | 131:4 222:13 | 228:5 250:6 | 150:17 182:6,8 | **gasoline** 175:18 |

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

176:15
**gathering**
168:16
**gear** 146:22
147:2
**general** 11:4
66:3 82:1 84:5
93:19,22
108:22 116:1
121:9 123:11
123:11 256:22
**generally** 41:4
66:14 80:17
99:5 106:20
131:12 151:10
249:13 252:11
**generated** 8:10
8:15
**generates**
231:15
**generations**
129:18
**getting** 64:15
78:10 132:14
138:3 160:2
200:2 207:17
217:6 260:16
268:1,8 273:15
278:10 289:2
294:1
**girl** 291:16
**girlfriend**
288:24 291:8
**give** 6:1,20 7:6
16:8 56:6 57:3
57:4,6 59:17
59:21 60:5
87:17 89:17
126:21 134:1
143:10 159:19
161:16 162:21
196:13 217:7
218:13 220:7
221:19 225:22
254:9 255:13
255:23,24
256:11,17

257:2,11 265:1
266:24 271:7
280:1 311:24
330:4
**given** 5:22 9:14
58:18,20,23
68:9,20,21
70:10 74:9
80:4 93:18
141:4 142:14
149:2 175:2
185:16 196:8
196:11 218:1
225:14 226:21
235:13,16
236:16 248:5
256:9 260:21
260:23 290:23
346:16
**gives** 59:18
86:18
**giving** 6:6 84:2
131:14 139:24
231:9 256:7,23
276:10,14
**glasses** 319:23
**glasstype** 147:22
**glisson** 111:2
209:8 210:13
210:15
**go** 7:18 8:17
12:15 16:19
17:14 20:22
21:9 22:18
23:19 24:2
39:11 43:20
46:24 54:9
61:20 65:13
71:19 72:12,19
73:11 75:13
88:21 90:2
92:8 96:14
111:9 112:22
120:10 122:17
128:15 131:6
138:1,16
142:16 146:18

146:22 147:20
148:3,16 151:9
155:3 160:6
163:23 169:14
174:4 177:16
178:9 180:14
184:22 187:21
187:23 188:21
190:8 191:22
196:1 203:19
204:20 205:2,5
214:8 219:15
220:19 221:9
223:12 224:6
224:20 227:1
228:6 230:4
235:3 236:20
236:21 238:20
241:14 245:9
246:9 250:7
253:21 260:6
266:9 271:24
282:15 287:9
296:8,11
322:23 324:12
328:2 339:21
340:8 341:1
**goal** 33:2,6,11
86:2 126:23
127:6,9,15
158:17 169:8
179:12,19
200:8,16
205:22 226:18
**goals** 32:21
**god** 174:21
**goes** 56:18 59:17
59:21 60:11,23
61:7 67:1
**going** 6:19 11:21
11:24 12:23
22:1 48:17,24
54:14 56:4,13
58:4 59:1
61:13 62:13,20
69:18 71:6

72:12 76:5
77:4 84:14
88:17 97:15
111:17 113:9
115:15 125:11
125:11 134:9
137:22,23
138:3 151:8,9
153:23 156:19
160:23 169:5
172:6 174:6
176:10 181:23
187:21 196:5
200:6 201:1
204:3 205:16
205:20 213:16
214:18,21
215:9 216:1
217:7,10,11
223:10 224:4
225:22,24
236:14,19
237:12,15,19
245:17 247:11
252:2,15
253:12,18
255:16,17,19
257:8 258:8,12
270:21 277:2,5
286:4 288:19
289:8 303:1
319:2 331:6
333:22
**good** 5:17,19
71:3 111:11
215:6 285:11
**gotten** 196:6
**governed** 93:9
**grab** 239:13
**graduate** 17:17
18:1,19
**grammar**
239:20
**grammatically**
239:21
**granted** 324:9
324:13

**griffith** 99:21,24
110:18,20
111:4 140:18
243:5
**ground** 6:2
148:7 244:19
**grounds** 23:24
163:18
**group** 24:15,23
25:4,7,21 26:3
26:5,8 33:23
123:16,17
**growing** 20:23
20:24 21:1
**guerreri** 1:8,16
46:17
**guerrero** 313:20
**guerrieri** 4:3 5:3
5:10,18 13:12
17:1 45:21,22
55:16 113:6
139:4 167:18
331:3 346:13
331:3
**guess** 66:23 88:1
116:14 178:2
**guide** 81:21
**guilty** 218:21
219:2,7,20
220:14 221:5
327:13
**gum** 167:3
**guys** 111:14
160:16 272:8
273:2,13
285:14

---
## H

**h** 15:22 55:12
108:11 109:11
109:11 133:12
143:13 209:17
292:14 331:9
**hadnt** 250:23
321:14
**haidu** 133:12
134:18

Siebert & Assocs. Court Reporters, Inc.          cmsreporters@comcast.net

Page 348

**hair** 306:9
**hakim** 15:22
   16:13
**half** 46:11
   145:17
**hall** 40:5,6
   150:19 245:2
**halleur** 209:16
   211:1,13,22
   212:1,8,13
**halleurs** 213:1
**halls** 244:10
**hallway** 233:9
   241:15
**handcuffed**
   310:6
**hands** 186:1
   252:10
**handwriting**
   68:24 69:2,4
   74:17,20 75:2
   75:6,10,15,21
   75:23 76:2
   77:7,10 78:9
   79:6 267:3
   300:24 305:16
   313:6,7 315:20
   315:22 316:1,5
   319:21
**handwritten**
   224:1 227:22
   229:8 231:6
   232:20 235:9
   235:24 236:12
   268:22 302:19
   306:5
**happen** 81:18
   253:5,14 258:8
   325:5,14
**happened** 80:5
   115:13 117:13
   124:16 126:15
   138:11 157:15
   164:4 175:19
   187:18 210:4
   224:18 246:6
   253:11 257:9

257:12 258:13
   322:3 332:20
**happy** 111:13
**hard** 57:15
   84:14 148:13
   284:9 312:21
**harm** 269:12
**hated** 294:10
**havent** 247:4
**head** 283:17,19
   283:22 334:1
**hear** 115:2
   189:7,9,12
   237:24
**heard** 114:17
   171:11 173:11
   230:23 231:4
   338:23
**hearing** 230:1
**heat** 117:19
   118:5 149:20
   231:15
**heavily** 242:15
**height** 306:8,12
**held** 90:21
   213:14 300:4
**hello** 52:22
**help** 58:24 80:19
   81:15,21
   139:11 175:15
   177:9 178:10
   181:11 183:8
   183:10,22,22
**helped** 156:7
**helping** 110:2
   245:15
**hereinabove**
   342:19
**hey** 286:16
**hi** 240:19
**hiding** 335:23
**high** 17:17,19
   92:4,15,20
   274:13
**higher** 95:11
   108:18 274:10
**highlight** 73:23

**highlighted** 73:3
   73:8 74:3,10
**highlighting**
   74:6
**highway** 284:14
**hildebrand**
   100:13
**hired** 21:21,22
   21:22 22:6
   108:17,18
**history** 127:22
   128:2,6,19
   129:11 130:3
   130:16 308:11
   319:16
**hit** 171:8 314:14
**hochstetler**
   109:10,14,16
   110:5
**hold** 11:5 19:14
**holes** 147:10,16
   242:11,14
**home** 49:22 55:3
   130:12,15
   132:16 143:14
   160:7,12
   165:22 166:7
   166:14,24
   167:7 181:15
   195:22 197:20
   251:7 331:23
   332:10
**homicide** 30:22
   31:4,7,10 36:9
   98:23
**homicides** 34:15
   35:22 36:2,14
**honor** 10:21
**hope** 217:13
**hopeful** 217:2,5
   217:9
**hoses** 144:19
**hospital** 133:24
   154:11 155:1
   156:20 157:16
   160:21
**hospitalized**

138:5
**hot** 231:22
**hotel** 201:8
   246:1 311:3
**hour** 145:17
**hours** 10:4
   87:21 157:24
   222:13 331:24
   347:3
**house** 31:20
   32:11,13
   161:14 164:5,6
   167:23 187:22
   189:20 190:15
   195:8,10 197:2
   201:2,4 209:16
   210:2 233:8
   266:16 332:5
**hungry** 260:13
   260:14
**hurt** 153:17
   156:11 163:5
   168:4
**husband** 117:7
**hypothetical**
   87:17 89:23
   221:8 222:8
   223:11 225:17
   226:1,24
**hysterical** 84:13

——————
**I**
**idea** 46:21 64:5
   116:13 183:7
   188:8 274:14
   274:20 295:7
**ideas** 294:23
**ideations** 307:17
**identification**
   45:16 48:1
   112:21 119:1
   215:17 261:6
   289:13 296:21
   303:19 304:3
**identified** 17:5
   20:9 37:8
   100:6 104:24

164:8
**identifies** 306:18
**identify** 4:16
   131:22 156:7
   158:17 161:7
**ignite** 231:1
**ignition** 231:19
**il** 2:16 346:3,10
**ill** 63:18
**illinois** 1:2,18,21
   1:23 2:7 4:6,15
   18:7 127:23
   128:3,19
   130:16 342:1
   342:23 343:5
**im** 9:16 11:21,23
   14:18 35:1,1
   41:20 46:16
   48:2,17 49:13
   58:2,4 59:7,16
   60:8,9 62:13
   62:20 64:8,20
   65:3,5 66:15
   69:18 72:12
   76:5,13 77:4
   78:10 83:17
   86:3 88:6,17
   89:11 93:22
   96:22 99:4,22
   104:14 110:6
   111:12 112:17
   113:2,9 115:15
   116:18,21
   117:23 118:14
   120:17 124:5
   130:8,17,24
   138:16 140:20
   141:2,7 145:12
   146:11 154:7
   157:17 159:22
   161:9 168:2,3
   172:6 211:24
   213:2 215:18
   216:1 217:2
   218:6 221:13
   221:15,17
   222:8 223:7,10

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

223:13 224:4
224:17 225:24
229:10 236:14
236:15,15,19
239:19 244:6
246:13 247:16
250:14 251:6
252:24 256:6
261:7,19
265:10 268:12
275:2,4 281:15
289:1,17
292:18,24
293:20 296:22
299:18 309:11
312:5,15,17,18
314:8 315:5
316:8,9 318:9
318:15,16,22
321:8,15
326:20 330:5
332:5 340:7
**immediately**
191:1 339:9
**impact** 12:1
103:24 250:16
250:20
**impacted** 250:5
**impacts** 11:23
**impaired** 206:7
206:16,20
207:6
**impeaching**
244:4
**implicate** 86:19
96:12
**implicated**
86:15
**implicates** 87:8
**implicating**
88:14
**importance** 83:8
**important** 75:4
75:11 82:23
83:3,23 84:4,7
85:5 115:8,19
136:20 214:5

225:12 226:4,9
227:3 302:4,6
302:7
**inability** 206:18
**inaccurate**
69:22 288:16
290:7
**inappropriately**
337:22
**inasmuch**
346:18
**incident** 77:17
90:23
**include** 29:7
129:10 256:23
**included** 84:17
**includes** 13:15
51:12
**including** 42:2
106:13 234:7
254:2 287:22
**inclusive** 345:7
**income** 237:22
**incomplete**
89:22 221:8
223:11 226:1
226:24
**incorrect** 57:21
70:21 117:4,18
117:23 118:12
118:14,15
131:23 132:10
244:3
**independent**
169:11
**index** 131:4
**indicate** 167:12
**indicated** 16:22
27:24 331:11
332:14
**indicates** 55:14
311:5
**indication** 175:3
175:10
**individual** 124:3
**influence** 84:10
166:9,17,21

336:10,13
**informal** 214:19
**informally**
214:16
**informant**
287:11 292:23
**information**
10:23 11:15,19
12:13 13:22
16:7 35:15
54:7 55:6
82:24 83:13
90:22 91:4,10
116:13 128:24
134:1,18 143:1
144:4 154:16
155:24 156:5
158:15,20
159:1,19,24
162:22 170:16
174:11 179:14
181:18 182:18
185:21 196:12
196:14,16
201:10 212:6
225:13 228:17
253:2 255:14
256:1,17,24
257:2 262:1
278:23 280:1
286:24 287:7
295:4,5 306:10
313:8 317:10
317:17 319:17
321:2
**ingratiate** 88:15
89:3
**ingratiating**
89:13
**initial** 110:10
125:18 126:5,7
128:21 130:8
130:17 133:19
136:21 162:22
164:21 165:2
181:23 268:20
281:8 298:2

315:12 325:20
328:18
**initially** 124:14
124:20 147:9
168:8 170:14
176:22 304:20
312:8
**injured** 133:23
134:24 138:10
153:21 156:20
**injuries** 135:9
**injury** 131:23
**inkling** 313:15
**inlaws** 172:1
**inmate** 286:11
291:20,23
**inn** 200:23
**inquire** 183:1
**inservice** 120:24
**inside** 145:9,13
148:18 151:9
163:16 189:17
281:16 332:9
**installed** 242:12
**instance** 50:5
73:15 74:16
79:8 86:22
133:7 138:14
146:24 152:19
225:16
**institutions**
291:22
**instruct** 11:24
**instructed** 12:20
**instruction**
269:9
**instructions**
266:24
**insurance** 79:4
181:9 209:20
233:16,18,20
233:23,23,24
234:2 332:12
332:15,23,24
333:1,3 338:10
**insure** 99:7
136:10
**intake** 319:18

320:2
**integrated**
129:22
**intellectual**
170:18 172:7
**intend** 10:21
11:12,17 13:9
**intending** 12:10
**intent** 241:7
**intention** 240:3
**interactions**
94:18
**interchangeable**
172:15
**interchangeably**
122:10
**interested**
220:11 343:1
**interface** 129:5
**interpose** 58:4
221:7
**interpret** 239:12
252:8
**interpretation**
338:20
**interrogate**
37:14
**interrogated**
84:18 87:21
89:1 277:8
280:2
**interrogating**
29:7 85:15
**interrogation**
62:23 63:6
82:12,13 84:23
85:6 87:24
88:9 89:4,16
89:20 91:19
92:1 93:24
225:3 226:6
274:21 275:9
277:6,15,21
278:13 280:16
302:17 303:4
303:11 311:12
320:23

Siebert & Assocs. Court Reporters, Inc.    (773)851-7779   cmsreporters@comcast.net

Siebert & Assocs. Court Reporters, Inc.        cmsreporters@comcast.net

Page 350

interrogations
  65:23 66:10
  86:9 274:11,18
  277:20
interrogator
  85:18
interrogatories
  5:13 342:11
interrogatory
  9:4 16:22
interrupt 6:6,8
interrupted
  77:24 332:21
  333:11 338:15
intervening
  169:23
interview 41:14
  44:2,8 66:1
  79:22 130:17
  139:12 155:5
  174:9 179:13
  184:4 185:22
  257:14,24
  278:4 280:24
  281:2 282:17
  285:19 286:9
  287:4 288:13
  288:17,22
  290:5 291:14
  293:2,21 294:3
  296:1,8,18
  321:18,23
  322:17 323:6
  325:20 331:5,7
  331:12 333:22
  334:8,21
  335:17,21,23
  336:7,16
interviewed
  42:20 89:5
  105:1 111:1
  245:24 296:3
  332:1 335:18
interviewing
  42:16 43:4
  89:11 90:24
  93:10 153:2,6

332:2
interviews 60:24
  92:16,21
  110:22,23
  136:21 173:24
  241:18 246:3
  297:9 321:7,9
  321:15 326:16
  327:5 338:13
intoxicated
  307:18 308:3
introduce
  167:17
introduced
  168:9
introducing
  167:16
inventory
  310:17
inventorying
  310:11
investigate
  36:15 41:5,8
  138:4,6 141:6
  211:13
investigated
  15:20 30:22
  140:8 141:18
  330:17
investigating
  29:9 137:20
  196:2 330:16
investigation
  8:12,15,23
  16:14 31:4,7
  31:15,18,21
  34:15,21 35:21
  36:1 41:10
  44:18 58:10
  68:3 79:16
  82:20 98:10,15
  98:17,19,21
  99:3,6,18
  100:10 101:16
  104:18,21
  110:21 111:6
  111:11,24

112:6 114:10
  117:8,12 118:4
  118:22 120:2,6
  121:14,16,17
  121:22 124:14
  124:22 125:4
  125:17,23
  126:4,11,20
  127:21 128:4
  134:20 135:17
  137:23 138:17
  138:20,24
  139:1,7 140:2
  140:5,10,14
  141:23 142:5
  146:12 155:6
  157:6 158:16
  158:22 160:1
  169:10 170:21
  171:16,23
  190:24 192:4,8
  192:10 193:18
  199:3 206:1,8
  208:10 213:6
  213:10,13,15
  213:17 214:6,7
  214:10,12,24
  219:24 220:21
  232:2 235:15
  236:8 246:12
  247:3 248:9
  249:2 250:5
  255:22 256:1
  265:24 266:5
  280:2 293:17
  295:18 296:1,4
  297:6 298:5,21
  308:18 312:2
  313:10 320:24
  322:18 324:20
  330:9
investigations
  33:3,8 36:10
  39:16 41:3,17
  41:20 95:21
  98:24 100:12
  101:23 102:7

119:15 120:17
  120:18 121:6
  121:11 122:22
  123:6,15
  126:24 185:3
  248:6 334:19
investigative 9:2
  136:15,24
  137:2 139:19
  198:22 199:9
  211:20 213:13
  265:5 297:9,16
  323:10
investigator
  1:16 5:10,17
  5:22 10:17
  13:12 15:11
  17:16 27:19
  28:1,6,14
  33:16 42:6
  45:22 48:2
  71:19 81:22
  83:12 91:23
  109:10,16
  113:6 122:10
  122:23 123:1
  124:7 136:19
  137:5,9 140:14
  141:22 142:5,9
  146:6,18
  163:22 167:18
  175:7 181:21
  304:18 313:5
  320:22 331:3
  346:13 331:3
investigators
  40:11,14,20,21
  41:4,24 42:23
  90:22 120:8,22
  124:3,17
  208:16
involve 35:21
  36:1 37:12
  80:5 139:13
involved 41:16
  41:20 42:5
  43:3 58:13

70:3,12,17
  72:9 76:12
  79:24 81:23
  82:3 85:16
  88:9 115:1
  124:14,22
  125:5,16 126:4
  126:9,11,14
  142:9 171:2
  185:4 197:4,7
  197:21 198:1
  198:16,22
  199:2,13 200:8
  202:11 206:11
  213:14 214:7
  248:2 256:19
  276:21 327:2
  327:23 328:5
  328:22 329:2,6
  330:8,12,16
involvement
  43:16 48:6
  84:19 85:1,7
  85:19 97:23
  99:10 110:20
  114:7 115:23
  116:2,11 118:3
  121:14 125:18
  127:20 130:8
  198:24 249:2
  265:23 323:12
  329:13
iradisent 89:8
isnt 58:6,23
  160:12 224:23
  235:16 284:5
  298:19
issue 76:23
  115:20 171:14
  172:21 173:13
  174:16,17
  183:14 185:14
  211:14 330:11
issued 72:4
  116:17 155:7
  155:13,15
issues 173:18,21

Siebert & Assocs. Court Reporters, Inc.          cmsreporters@comcast.net

Page 351

| | | | | |
|---|---|---|---|---|
| 183:1 | **joliet** 56:1 | 136:14 170:18 | 60:23 61:17 | 207:22 215:4 |
| **iucr** 301:4 | **jon** 1:9 95:1,23 | 172:14,21 | 65:10 67:14 | 217:4 220:7 |
| **ive** 45:18 89:5 | 96:4,7 97:2,4 | 176:10 182:3 | 68:1,7 72:1 | 222:15,17 |
| 119:2 142:15 | 154:2 324:15 | 193:2 224:5 | 74:6,9 75:8 | 223:15 225:17 |
| 247:16,17 | **joseph** 5:1 | 252:9 287:24 | 76:2 77:15 | 225:19 226:10 |
| 289:24 303:8 | **jospeh** 2:13 | 304:22 308:23 | 78:7 80:2 | 229:21 233:15 |
| 303:16 304:10 | 346:7 | 312:10 328:8 | 81:21 85:2 | 233:18,21 |
| | **jpolick** 2:17 | 335:3 336:17 | 86:24 87:16 | 234:3 239:9 |
| **———— J ————** | 346:11 | **kinds** 151:19 | 89:10,12 91:1 | 240:3 241:2,5 |
| **j** 110:10 | **jsotoslaw** 2:17 | 213:20 214:5 | 92:10 95:1 | 241:11 243:11 |
| **jackson** 2:14 | 346:11 | **kirk** 100:14 | 96:1 98:4 | 246:11,23 |
| 346:8 | **judge** 217:7 | **kitchen** 151:14 | 103:12 107:16 | 249:19 250:13 |
| **jail** 205:17 206:5 | 219:22 237:21 | 151:18 164:9 | 107:19 108:10 | 250:24 251:13 |
| 208:9 233:12 | 320:10,13 | 164:10,20 | 109:10 110:7 | 252:6,17 |
| 249:21 251:1,4 | **judgment** 11:10 | 165:3,17 | 110:23 113:14 | 253:15 254:13 |
| 251:8,13,16 | **june** 288:9 | 167:14,15 | 113:17 114:1 | 256:6,8 258:19 |
| 273:14 283:13 | 290:18 | 168:8,16 | 114:15,20,21 | 266:15 267:5 |
| 284:2 285:23 | **justice** 18:9 | 169:19 170:8 | 115:12,13,24 | 268:12,24 |
| 286:8,22 | | 170:11,14 | 116:10 117:12 | 271:5 272:1 |
| 287:23 288:4,6 | **———— K ————** | 186:21 291:2 | 117:16,16,24 | 273:8 274:5,8 |
| 288:9 290:19 | **k** 5:2 15:22 | **knew** 130:18 | 118:8,17,19 | 274:16 275:13 |
| 291:5,17,19,24 | 16:24 37:2,3 | 134:6,22,24 | 119:9,18 | 277:1,11,19,23 |
| 292:3 310:2 | 97:7 110:10 | 139:22 156:7 | 120:12,23 | 277:24 278:5 |
| 322:10 | 286:7 | 167:20,23 | 121:2 124:8 | 278:14 279:14 |
| **jam** 151:5 | **kappelman** | 173:23 175:12 | 126:14 128:20 | 279:20,20 |
| **james** 53:12,19 | 202:3 322:6 | 175:19,21 | 129:23 130:15 | 280:13 281:7 |
| 53:22 66:9 | **katherine** | 176:3,13 | 131:5,6,10 | 281:21,21 |
| **jamie** 99:21,24 | 208:12 209:3 | 178:17 202:16 | 132:11 133:2 | 282:3 283:14 |
| 110:18,20 | 209:12,18 | 205:19 208:16 | 135:20 136:24 | 286:3,5,6,15 |
| 111:4 140:18 | **katherines** | 209:9,11,14 | 141:15 145:2 | 286:17 287:13 |
| 243:5,6 | 209:17 | 214:11 233:4,7 | 147:5 148:19 | 287:23 288:2 |
| **january** 51:15 | **kc** 77:21 | 233:11 236:17 | 150:7 153:16 | 291:21,23 |
| 239:5,7 | **keep** 84:17 | 271:9,24 272:9 | 154:8,13 158:5 | 292:2,8,10,22 |
| **jerry** 110:11,12 | 121:19 125:11 | 278:16 | 159:13,16 | 300:11 303:16 |
| **jim** 53:23 54:2,5 | **kentucky** 288:24 | **knocked** 60:4 | 163:4,7 165:23 | 305:19 306:8 |
| 54:22 55:2,7 | **kevin** 3:2 4:11 | 164:6 174:15 | 166:17 169:2 | 308:21 311:6 |
| 55:19,22 | **key** 91:10 311:3 | **knoll** 286:5,6,8 | 169:16 173:8 | 312:17,22 |
| 135:20 162:3 | **kids** 36:23 | 286:16,19 | 173:16,21,23 | 314:24,24 |
| **job** 142:2 181:1 | **kill** 293:24 | **know** 6:3 8:21 | 177:15 178:16 | 315:3,4 316:20 |
| **jobs** 291:1 | 294:17 | 12:5 16:13 | 181:2 182:1 | 317:20 318:19 |
| **joe** 37:1 | **killed** 63:2 325:7 | 23:20 24:10 | 189:16 192:5 | 319:24 320:1 |
| **john** 40:19 95:3 | 327:14 328:13 | 35:19 38:2,6 | 192:13,18 | 322:12 326:24 |
| 247:11 281:16 | **killing** 294:13 | 46:2 49:12,17 | 194:15 197:5,8 | 328:19,19 |
| **join** 276:2 | 295:20 | 51:5 52:11 | 197:9 200:15 | 333:5 337:15 |
| **joined** 276:5 | **kin** 343:2 | 53:22 54:5,10 | 201:12 202:16 | 339:1,7,13 |
| 280:18 | **kind** 22:9 | 55:6 57:1 | 202:23 205:4 | 340:5 |
| **joining** 19:7 | 118:13 125:1 | 58:12 60:8,13 | 206:15,21 | **knowing** 139:7 |

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

186:9 188:11
219:8 222:5
231:14 237:21
**knowledge** 68:2
110:19 116:6,8
119:14 129:19
170:10 173:17
230:13,19
246:7,20 286:2
287:10 299:20

---

**L**

**l** 5:2 16:24 37:3
43:14 109:11
111:2 135:21
135:21 146:15
208:13 209:17
209:17 286:7,7
329:14
**lack** 63:19 65:12
70:23
**lacks** 180:13
**lagrange** 17:20
**laid** 283:17,19
333:24
**land** 155:12
**landline** 196:20
196:22
**landlord** 209:10
**language** 60:9
**lapse** 39:9
**large** 168:16
175:22
**law** 2:12 19:18
19:23 20:8
21:15,16 22:2
34:13 40:6
85:15 184:17
185:3 225:9
286:3,13,21
287:11 291:13
292:23 295:19
296:2 311:8
327:3,22 328:4
328:11,14
329:12,18
346:6

**lawsuit** 13:14
14:1,13,21
15:6,16,19
16:24 48:13
49:4,9,10
**lawyer** 218:7
252:17
**lawyers** 17:11
96:20 104:3
217:21
**layout** 151:11
181:1
**lead** 167:7
294:20
**leading** 265:14
269:5
**leads** 99:11
308:23
**leaking** 183:19
**leaks** 183:18
**leaning** 175:3
190:6
**learn** 33:3,7
130:19 138:12
150:2 153:24
154:4,6,10
155:20 157:14
157:22 158:20
158:24 164:16
170:24 321:6
**learned** 128:10
128:18 130:2,6
130:24 150:10
154:9,15
157:19,24
158:1,15
170:22 173:4
222:24 242:9
246:23 278:16
331:12,17
**learning** 172:5
220:12 320:23
**leave** 25:6
152:23 258:23
267:9,15
307:22
**leavenworth**

44:20,22 45:4
45:5,11 46:6
130:11 143:14
160:7,12 164:5
164:7,15,17
165:22 166:14
166:24 167:7
177:3 181:15
187:9 195:5,22
197:20 201:2,4
266:15 338:13
**leavenworths**
161:12,14
162:18 163:23
164:1 169:14
169:18 170:15
174:5 175:2
179:8 196:17
208:5 259:5
331:23 332:10
**leaving** 154:21
179:5 273:14
278:11 300:13
**led** 113:24 138:4
162:8 173:2
185:22 223:20
329:8
**left** 20:18 21:2,8
25:12 39:10
71:14 117:9
128:11 150:18
153:1 154:23
155:22 160:12
161:10,11
175:16 177:14
177:16,23
178:9,13,16,19
178:21 181:6,8
192:21 197:14
199:19 222:6
222:12 244:22
260:12 276:23
277:24 281:22
282:17 317:23
331:19
**lefthand** 299:3
**lemak** 36:22,23

37:20,21
**length** 337:12
**leniency** 82:3
**letter** 69:5,12,15
112:9,15 114:8
288:23 291:16
342:24 347:15
**letters** 69:17
233:11 244:10
262:7
**level** 18:19
142:5
**levinworth**
130:15 166:7
**liberio** 40:19
**license** 308:20
**lie** 226:10
**lied** 86:3
**lieutenant**
100:11,13,14
135:6 146:13
152:6 243:13
**life** 32:18 64:21
132:21 133:6
181:9 185:11
233:16,17,20
234:2 285:6
308:4 316:18
332:15 333:3
338:10
**light** 183:15
**lightening**
138:13 174:22
**lighter** 193:20
193:24,24
194:5,18
**limit** 96:10
**limiting** 14:6
36:10
**limp** 171:6
**line** 24:1 65:5,6
114:6 155:12
174:18 306:7
318:15 344:4
**lined** 115:17
**lines** 173:6
240:7 292:20

316:2
**lisle** 209:11,15
**list** 21:22 108:18
318:10,10
**listed** 58:8 70:4
310:10 315:7
**lit** 145:2,3
**literally** 130:24
**litigation** 50:18
**little** 14:5
122:17 158:13
209:3 238:22
278:8 291:4
**live** 294:11
295:10
**lived** 128:10
142:22 153:3
156:6 197:13
**lives** 211:18
**living** 244:19
**lobby** 41:9
251:14 254:22
255:1,9 281:5
281:5 334:19
334:22 335:13
335:14,21,24
**local** 308:19
**locate** 69:16
296:2
**located** 50:10
159:8 200:21
**location** 49:22
144:7 209:15
**locked** 149:24
150:4,11
**lodge** 23:23
**loevy** 2:3,3,8,9
**log** 291:22
**logical** 84:14
**long** 10:2,5
34:23 151:23
165:8 187:3
254:14 257:20
278:6
**longer** 121:20
222:11 278:8
**look** 46:21 48:22

Siebert & Assocs. Court Reporters, Inc.     (773)851-7779   cmsreporters@comcast.net

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

49:8,22 50:5
53:3 54:1,19
58:13,17,18,20
59:14 67:2
68:19 70:18
76:5 77:5,8
116:15 145:10
153:15 191:7
191:22 193:5
237:1 238:10
242:24 243:9
243:13,15
245:5 263:18
265:2 288:18
305:1 306:24
307:2,11 310:9
319:15
**looked** 48:14
58:16 68:15,17
69:19 114:4
116:18 145:4
151:4,11
153:10 176:23
189:3 193:3
194:24 195:1
202:17 242:3,4
243:2 244:10
262:22 263:2
269:19 302:20
**looking** 45:23
46:4 50:5,17
51:1 54:12
59:6,7,9 62:1,6
62:14 65:2,3
70:15 72:13
73:14 74:16
79:1,8 128:20
152:20 195:3,6
216:11,19
218:22 242:22
244:9,9 266:20
305:2,16 314:5
314:8 315:20
318:16 319:9
319:24
**looks** 58:12 71:1
77:20 119:9

131:7 239:8,23
304:22 305:17
309:7 315:24
**los** 110:14
**loss** 167:19
269:11
**lost** 182:14
**lot** 82:9 113:23
115:11 130:21
144:16,20
149:13 201:15
312:16 313:16
315:4
**loudly** 339:16
**louis** 34:20,22
**lower** 53:17
**lunch** 259:19
**lutzen** 208:13
211:7
**lutzens** 209:9
211:14,21
212:1,7,12,24
**lyons** 17:19

---

### M

**m** 1:18,21 2:13
4:10 15:22
33:24 37:2,3
51:13,15 53:13
53:17 54:6
65:3 71:6,10
107:8 111:16
111:21 128:24
143:13 153:11
215:9,13
262:19 264:1
270:24 289:8
289:15 309:6,9
319:2 341:6,8
342:6 343:8
346:7 347:3,3
347:24
**machine** 316:19
**madam** 90:7
**mail** 291:20,22
291:23 292:4
**maintain** 39:7

220:22
**major** 18:8
26:20 27:10
98:8,22 99:14
99:17 100:3
102:1,4,10
105:21 106:4
109:22 110:19
120:16,22
121:1 123:3,5
123:10 126:22
141:19 157:2
213:24 214:6
**majority** 102:12
**making** 84:3
91:6 141:9
148:24 176:11
178:12 179:2
202:19 203:8
251:7
**man** 99:24 100:1
**manage** 209:23
210:10
**management**
128:24 131:3
**mancinelli** 40:19
**manion** 228:20
**manner** 30:23
31:1 99:8
223:3
**mannion** 229:2
285:19 286:2
286:13 287:1,4
287:8,10,15,17
287:20 288:3
288:13,17,21
290:5,17 291:7
292:21 293:15
293:22 294:5,6
294:14,15,19
294:21,23
295:8,9
**manual** 301:14
**manufacturer**
16:1
**mariah** 2:5,9
4:23

**marianne** 13:18
42:8 44:4,12
44:18,24 45:7
47:8,20 63:2
95:22 98:19
110:21 112:1
121:14 141:22
153:16,20,24
154:18 155:1
156:8 157:5
163:4,5 164:17
167:20,24
171:3,5 175:14
177:9 178:10
181:5 185:19
191:4 209:7
228:23 233:17
293:19 297:5
324:21 325:7
327:14 332:23
**mariannes**
151:12 182:12
**marilyn** 36:21
37:3 111:1
209:9 210:13
210:15
**mark** 1:8 45:14
47:23 97:24
98:3,8 100:7,9
100:15,18
101:15 118:23
142:8 215:15
261:4 273:22
274:17 275:3
299:9 301:2
304:1 307:5,24
308:7
**marked** 45:16
45:19 48:1,18
112:21 113:3
119:1,2 202:4
202:6 215:17
216:2 261:6,8
289:13,18
296:21,23
303:19,20
304:3,4,8,11

308:6 340:20
**marking** 308:12
**marlboro** 311:6
**marshall** 46:13
47:7,14,19
**mask** 146:24
167:4
**masokas** 30:17
249:7,9 250:3
251:18,20
253:7,14,18
**mass** 69:16
**mate** 287:6
292:19
**materials** 35:17
36:5
**matter** 4:3 11:10
17:8,12 55:16
55:19 118:16
186:3 219:11
226:22
**matters** 41:5
138:7 198:23
**mc** 62:18 238:23
**mcgury** 107:8
**mcgurys** 282:14
310:7
**mean** 27:20
30:24 35:11
87:19 100:24
114:8 123:23
136:7 139:3
141:13,14
142:9 143:23
145:3 149:11
157:17 163:2
172:10,17
176:21 177:21
179:12 188:14
188:14 195:1
196:19 201:11
201:22 206:6
216:14 219:19
220:11,16
225:16 226:13
231:6,24
239:12 251:3

Siebert & Assocs. Court Reporters, Inc.   (773)851-7779   cmsreporters@comcast.net

261:18 263:14
267:18 284:17
284:21 290:8
290:21 291:22
292:20 300:2
301:17 309:8
310:2,13
**meaning** 122:11
129:6 240:12
**means** 89:12
237:22
**meant** 140:4
205:4 269:11
313:3,9 315:9
**mechanical**
174:16
**mechanics** 97:12
**medical** 88:18
319:16 320:4
**medicallegal**
34:21
**meet** 9:18 51:15
51:18,19,22,22
51:23 52:8,12
124:1 160:16
160:19
**meeting** 10:2,5,8
54:14 103:16
104:11 214:1
322:20
**meetings** 9:23
10:11 52:20
199:18 213:14
213:20 214:5
214:15
**melted** 149:20
**member** 114:17
171:23 327:10
327:21 328:11
**members** 52:9
245:12 324:7
**memo** 112:10
113:6,12 114:2
118:12
**memorandum**
116:16,24
117:3,17

118:18
**memorializati...**
301:11
**memorialized**
210:22 227:22
**memories**
158:14
**memory** 32:8
46:5 51:9 59:1
80:11,14 105:7
132:12 165:7
196:19 213:19
238:14 240:8
243:21 255:7
259:21 264:16
264:20 285:3
291:10 302:12
303:10
**mention** 173:10
287:3
**mentioned**
32:11 38:11
91:14,14
101:21 105:11
110:18 198:1
331:22 333:21
**message** 159:14
160:2
**messages** 215:20
216:4,15
**met** 9:24,24
96:18 104:3
157:5,8,11,17
164:1,7 180:24
180:24 208:9
256:10
**metal** 149:8,9
**method** 231:9
245:14 246:10
277:19
**methods** 90:16
**metropolitan**
24:14,22 25:3
25:7 33:23
**mice** 234:8,15
234:19
**miceli** 13:18

42:8,17,20,23
43:4,19 44:2,4
44:8,12,18
45:1,7 47:21
63:1,3,8 96:9
97:3 98:19
110:21 114:6
115:21,22
116:10 141:23
153:12,12,16
154:1,19 155:2
156:12 157:6
157:20 167:24
172:1 181:1,5
197:3 199:19
200:19 222:20
233:17 246:20
266:10 293:19
297:6 323:16
325:7 327:14
327:23 328:12
**micelileavenw...**
324:8
**micelis** 45:12
47:8 95:22
112:1 121:15
157:3 164:17
185:19 242:2
324:21 329:13
**michael** 1:8 4:4
30:17 62:24
285:19 286:2
287:1,4,10,14
290:5 292:13
292:16,21,22
293:1,10,15,22
294:5,6,19,21
294:23 295:2,7
295:9,19
346:12
**mick** 316:6
**middle** 170:4
**midnight** 106:22
275:15
**mike** 43:11
51:13,18,21
52:5,8,12,17

53:18 54:3,7
54:13 62:22
63:15 64:7,15
66:8 99:20,20
99:22 101:21
101:22 102:5,6
102:16 103:6
103:15,19
104:7 105:3
116:5,8 139:3
139:6,19,24
141:5,23 152:5
152:8 154:23
155:14 156:19
157:15 160:15
161:3 162:15
168:7,20 169:4
169:13,19
170:4 182:1,5
182:10,19,23
187:13 191:14
195:11 198:12
201:6 202:18
206:18,21
215:21 216:20
228:20 229:2
229:11,12,24
230:5 232:4
233:21 237:11
239:8,23
240:17 243:5
248:18 249:7
249:14,19
250:3 251:18
251:20 253:18
255:10,23
256:6,8,11
258:7 259:14
262:10,23
264:7 266:14
267:14,16,19
268:1,2,7,9,15
269:10,16
270:12,19
271:17,21
272:4 273:1
275:21 276:20

277:2,4,9,16
277:18,23
278:10,21,22
279:11,21,22
280:6,15,19,22
281:2,3,9
284:18 285:22
285:24 287:7
287:15,17,20
288:3,13,21
292:8,9 294:14
294:15 303:1,3
305:17 313:11
315:24 322:18
323:7,9,23
328:14,16,17
329:3 332:22
333:2
**military** 19:2
**milling** 142:20
**mind** 131:17
132:2 220:17
232:19 235:22
**mine** 69:3
305:17
**minimal** 249:2
269:12
**minser** 53:12,19
54:23 57:1
64:13 66:9
**minute** 39:12
57:22 76:7
113:10 119:5
291:6 328:16
330:4
**minutes** 71:4
117:10 141:15
142:16,19
143:2 145:8,13
145:22 146:2,8
151:24 177:10
177:19 179:13
187:6 222:14
278:7,7
**miranda** 78:14
272:23 309:14
**miscellaneous**

Siebert & Assocs. Court Reporters, Inc.　　　cmsreporters@comcast.net

Page 355

77:17
**missing** 153:21
**misstated** 39:17
**misstates** 219:14
**mistake** 6:7
**miurhead**
　143:12
**mix** 182:4
　241:12
**mm** 59:18
**mobile** 176:6
**mom** 209:17
　233:22
**moment** 275:8
　276:19 278:15
　280:9
**monday** 122:2
　347:3
**money** 208:18
　210:5 212:3
　233:5
**monitor** 4:9
**month** 114:10
**months** 20:4
**morning** 4:22
　5:17,19 6:17
　12:6 13:13
　201:8 246:1
　260:7,12 296:7
　296:12 331:24
**mostpart** 306:5
**mother** 191:4
　278:19 328:13
**motherinlaw**
　294:1,10,13,22
　295:1,10,21
**mothers** 246:21
**motivation** 81:1
**motive** 233:4
**motor** 165:24
**mouthwash**
　167:3
**move** 232:24
**moved** 175:13
　209:3,14
**movements**
　179:17

**movies** 177:17
　178:9,14
　331:20
**moving** 148:18
　176:1 190:8
**murder** 294:21
　316:3

_____
**N**
**n** 15:10 55:12
　99:23 111:2
　146:15 208:13
　270:24,24
　286:7 292:14
　344:1 331:1
**name** 4:18,23
　5:20 36:23
　37:2 55:9
　109:9,14,23
　110:9 135:23
　208:15 209:6
　315:21 317:22
**named** 16:23
　30:17 44:19
　54:22 55:2,15
　72:8 76:18
　94:10 95:1
　97:24 107:16
　108:10 135:20
　182:11 209:16
　249:6 292:13
　342:9
**names** 15:18
　36:19 37:6
　94:6 156:7
　264:8 315:7,8
**naming** 13:15
**napd** 62:15
**naperville** 1:7
　1:10,11 8:11
　8:14,22 19:7
　19:20 21:1,9
　21:13 22:5,10
　22:11,15,19,24
　23:13 24:15,19
　25:8 26:6
　27:14,17 28:7

28:15 29:18
30:7,11 32:17
32:21 33:17
36:12,17 37:24
38:4,13 39:10
39:11 40:15,18
40:23 44:13
45:5,11 46:7
56:2 68:1
71:21 72:2
86:7,14 91:17
91:24 92:6,14
93:6,13,21
95:4 98:7,24
101:22 105:19
108:7,14
109:16 110:8,9
112:2 114:18
119:24 120:5
120:15 121:4
127:1,7,11
129:14,15
130:20 135:2
167:19 175:23
201:3 225:11
229:5,6 245:12
258:21 265:9
271:1 273:15
275:17,19
279:2 282:8,10
284:8 295:24
299:15 316:14
324:17,22
327:11,17
**narrativetype**
　9:3
**natural** 138:14
**nature** 89:7
　224:5
**nci** 308:24
**near** 116:16
　242:13 244:14
**necessarily**
　103:13 113:13
　113:20 118:15
**necessary**
　113:19 114:20

114:22 115:6
115:10 252:13
**need** 6:24 48:22
　57:22,24 69:5
　69:14 87:9
　101:2 119:5
　267:5 268:24
**needed** 69:11
　126:21 127:18
　133:20 182:2
　265:6 316:19
**needs** 215:5
**negative** 328:8
**neighborhood**
　301:15
**neighbors** 153:2
　153:7 154:20
　155:5,21 156:3
　156:10 176:19
　176:22
**neither** 337:22
**never** 21:21
　33:10 118:8
　174:2 175:21
　180:4 189:3
　190:9 204:23
　210:14 232:4,8
　232:11 233:10
　235:9 242:4
　310:6
**new** 182:2
　266:18 278:20
　317:7 324:9,14
**newee** 72:9
**newspaper** 88:5
　238:10,12
　255:3,6
**newspapers**
　222:21 230:7
　230:12 231:2
　231:17 232:7
　232:10
**nfl** 132:20,23
**nice** 176:23
　210:9
**nick** 40:19
**night** 97:20

115:17 121:24
125:18 133:18
134:9 154:8
158:7 164:2
229:15,18
235:14,17
258:1 259:4
271:2 272:11
272:24 312:1
316:24 326:4
337:17
**nights** 275:1
**nigohosian**
　94:10,12 97:15
　97:16 215:21
　216:9 224:2
　228:4,8,15,19
　229:7,9,21
　230:2 234:24
　235:10 236:1
　236:13 259:24
　260:11 268:4,7
**nogohosian**
　94:22
**nomenclature**
　173:8
**norm** 40:5
**normal** 135:14
　190:23
**normally** 316:10
**north** 1:17 2:6
　4:14 346:2
**northern** 1:2,20
　4:5
**northwestern**
　18:21
**notary** 345:24
**notation** 74:18
**notations** 73:24
**note** 4:20 69:6
　262:19 264:4
**noted** 308:16
**notes** 210:19
　298:10,13
　301:8,22 330:6
　336:22
**notice** 1:23 56:6

Siebert & Assocs. Court Reporters, Inc.          cmsreporters@comcast.net

336:3
**notification**
56:13 318:7,18
**notified** 318:13
**notorious**
300:13
**november** 114:9
343:5 346:5
**number** 4:2
48:19 72:19
77:18,21
182:11 232:23
259:17,18
311:10 312:7
319:20 331:10
**numbers** 306:15
**nutshell** 312:11
**nypd** 64:1,3,24

───────
**O**
───────
**o** 5:2 55:12
63:12 109:11
111:2 146:15
286:7 344:1,1
**oath** 1:16
**object** 23:18
46:23 63:18
69:23 70:22
73:10 88:17
89:21 118:13
223:11 224:4
225:24 324:11
337:8
**objecting** 96:13
**objection** 7:17
8:16 11:22
16:18 23:23,24
33:12 42:9
43:20 54:8
58:5 60:16
61:19 65:12
68:5 74:12
83:15 85:9,20
90:10 92:7,23
120:9 125:21
128:14 137:24
147:13 149:4

180:12 184:21
188:20 200:13
207:1,19,21
219:14 220:18
221:7 224:19
226:23 228:5
250:6 253:20
260:5 271:23
280:11 295:11
328:1 329:23
339:20
**objects** 148:10
148:18 149:1,6
149:13,15,18
152:20
**obrien** 206:13
247:20 296:12
**observation**
164:23 165:2
317:24
**observations**
136:21 142:24
143:5 164:21
165:8 166:6
167:6,8
**observe** 144:11
188:2,10
254:19 318:1
**observed** 162:8
197:19 259:3
277:15
**observing** 202:8
317:20
**obtain** 32:22
39:20 144:4
150:3
**obtained** 92:4
92:15,20
**obviously** 7:1
13:12 15:2
87:1,10 116:6
137:15 141:17
152:13 171:24
238:1,6,24
241:17 265:19
323:24
**occupied** 150:12

150:14
**occur** 56:13
251:10
**occurred** 83:6
88:2,8 117:16
138:4 312:1
320:24
**occurrence**
138:14
**october** 58:9
227:14,19,19
248:15 253:4
261:18,19
273:22,23,24
273:24 285:21
287:3,15 290:6
300:9 321:16
331:5,6 333:22
333:23 334:5,5
336:8,8
**offered** 183:20
184:1 209:22
**offering** 294:7
**offett** 3:2 4:11
**office** 15:21
19:23 21:10
28:4 31:3
39:17,22 41:6
41:17,22 42:7
42:15,24 43:18
44:1,11 49:21
49:21 52:9,13
54:14 67:20
68:4 73:20
103:10 113:15
153:9,10 220:3
220:7 234:22
235:8 240:22
258:1 265:12
265:20 266:11
273:7,11 278:4
282:14,15
310:7 323:11
346:20,24
**officer** 4:4 19:12
19:15 20:3,6
22:20,24 23:12

23:17 24:7
40:18 85:15
136:8,19 137:2
202:3 204:11
204:13,21
205:3,5 225:10
281:20 291:13
305:20 310:11
312:24 317:9,9
346:12
**officers** 1:7,10
30:10 40:15,24
99:10 100:5
136:9 142:21
246:8 270:18
315:12 321:1
327:4
**offices** 346:23
**official** 72:2
173:7 343:4
**ogden** 176:6
**oh** 16:12 318:19
**okay** 6:14,15 7:3
7:4,21 16:11
39:20 46:3
47:18 53:6
54:1 55:11
61:10 63:5
67:3 72:18
75:14 78:4,8
79:12 102:16
105:11 109:15
122:17,18
129:10 133:11
135:20 145:16
147:8 152:23
157:19 160:23
164:20 172:5
172:24 180:19
187:7 189:4
190:14 191:19
194:6 196:13
215:4,19 222:4
236:22 237:5
241:1 263:1,7
266:9 276:1,4
279:14 280:5

289:6,24 290:1
295:17 296:11
305:23 311:15
314:10,15,17
317:2 325:24
330:22 332:8
332:19 334:4
334:13 335:6
335:11 337:20
339:12 340:8
340:16
**old** 77:21 171:7
**older** 103:11
**oleander** 346:2
**oncall** 121:23
125:23 133:20
**once** 124:6,24
190:7 237:20
268:21 269:18
301:21 315:3
**oneonone**
165:20
**onepage** 45:19
113:3 119:3
**ones** 81:16
323:17
**ongoing** 114:11
**online** 131:9,10
**onthejob** 33:19
**open** 145:1,4
151:4 156:16
193:24 284:10
313:10 335:4
**opened** 150:23
189:16 190:7
298:23
**opening** 312:19
314:14,16,18
**operate** 34:9
**operations**
25:21 26:5
**opinion** 44:7
88:19,19
114:19 116:9
118:9 185:11
236:10 237:14
**opportunities**

Siebert & Assocs. Court Reporters, Inc.          cmsreporters@comcast.net

Page  357

20:23
**opportunity**
21:6 200:10
270:11
**opposed** 125:11
135:16 158:4
179:20 202:11
204:14 274:7
297:23
**opposite** 279:9
**opt** 124:4,4
125:23
**opted** 124:6
125:20 126:10
**oral** 5:12 256:12
283:14 342:11
**orally** 276:15
280:21
**order** 87:23
271:7
**orders** 93:19,22
121:9
**ordinary** 180:10
**orient** 151:13,17
**origin** 139:14
218:23 260:17
**original** 73:4
78:6 235:3
298:7
**originally** 128:9
147:19
**os** 315:8,10
**outcome** 217:9
**outlet** 174:17
**outside** 14:3,7
22:7 94:17
96:1,10 100:17
102:17 103:9
103:22 144:18
147:21 163:21
174:23 187:21
188:1,2,11
192:19,20
195:3 241:8
282:19,20
322:20 334:20
**outstanding**

198:4,9 205:15
245:14
**overall** 98:14
**overlaid** 78:6
**overlooks**
282:21
**owned** 153:11

_____
**P**
**p** 2:12 5:2 16:24
43:14 51:13,15
53:13,17 54:6
63:12 65:3
97:7 111:16,21
128:24 215:9
215:13 262:19
289:8,15 309:6
309:9 319:2
329:14 341:6,8
344:1 346:6
347:3
**pace** 4:13
**pack** 311:6
**paducah** 288:24
291:8,11
**page** 50:6,9 51:1
51:11 52:24
53:5,7 54:12
54:20 56:18
59:7 62:14
66:17,19 70:16
70:20 72:16,20
74:17 75:16,23
77:14 78:1
132:14 133:4
216:11 237:2,3
237:8 238:21
238:24 261:14
269:4 298:20
310:9 311:18
311:21 314:3,8
314:11 315:19
316:6 317:3,5
344:4 331:10
**paged** 133:11
**pager** 155:18
311:1

**pagers** 155:17
**pages** 67:1,2,9
67:12,14,17,19
68:13,16,19
72:19 76:6
77:8,9,11 78:8
79:3 216:7
238:23 263:7
263:11,16
297:19 304:14
305:3,5,7,9,12
305:14,15
345:6,8
**palm** 304:23
**pam** 164:14,14
170:8
**pamela** 164:17
**panel** 242:14
**paper** 256:7
267:4,5 268:23
268:24
**papers** 60:5
231:20,21
271:3,8 272:21
334:11 335:9
336:5
**paperwork**
256:4 311:10
311:11,16
**paragraph**
59:15 65:4
114:5 117:7
**park** 40:10
**parking** 130:21
144:16,20
201:15
**part** 8:24 24:13
24:22 25:7
29:3,6 30:18
35:14 44:10
48:5,5 50:10
58:10 70:1
78:5 79:16
80:16 81:2,8
82:20 83:10
84:16,23 85:5
85:17,24 91:7

91:8 109:22
110:3 113:17
119:12 120:7
120:12,23
125:2 139:15
140:4,22
147:11 169:9
174:1 190:23
200:16 206:6
220:12 225:9
245:24 254:19
266:3,10
278:12 287:18
293:21 294:2
296:4 303:14
304:16 314:12
321:5
**partial** 205:22
**partially** 35:14
317:19
**participate**
127:18 198:14
199:24 206:8
206:16 246:11
248:14 274:18
274:21,24
296:8,17
**participated**
36:9 77:1
199:7 274:5
**participating**
202:19
**participation**
302:18
**particular** 22:22
27:13 38:16
39:21 51:5
60:14 64:7
120:21 123:14
135:18 163:10
175:4 192:15
316:12
**parties** 10:18,22
13:2,10 15:19
168:10 343:3
**partner** 255:17
**parts** 58:12

318:3
**party** 94:20 96:5
**pass** 91:10
**passed** 157:20
158:2 167:24
254:7
**passing** 98:3
100:15 101:3,7
**pat** 309:18
**patdown** 309:21
**patio** 282:20
285:13
**patrol** 19:12,15
22:20,24 23:12
23:16 24:7
26:13 95:21
99:9 136:1,17
136:19 158:9
203:19 204:11
204:13,21
205:3,5
**pattern** 242:19
308:5
**paul** 119:11
**pawl** 43:11,14
66:9 322:18
323:7,9,23
328:14,16,17
329:3
**pay** 209:24
210:6 233:6
**paying** 210:3
**pd** 19:15
**pedestrians**
136:11
**pen** 268:23
**pending** 7:2
17:8
**people** 14:12
41:8 89:5,7,14
94:7 97:23
100:6 106:11
106:17 111:12
123:14,21
129:11 139:12
142:20 148:17
152:1 155:23

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

167:23 171:2
184:18 185:5
185:12 197:13
200:8 212:2,7
213:14 214:2,7
214:12 215:1
248:6 251:3,7
255:24 257:16
257:17 258:16
269:16 295:23
315:13 329:18
335:4
**perform** 308:15
**performance**
92:12
**period** 26:11,13
27:11 102:3,15
106:3 163:10
183:13 187:4
195:22 199:14
205:24 212:23
213:5 259:12
279:6,10 288:7
300:5
**peripheral**
30:23 31:1
**permission**
190:18,21
191:2,5,10,21
196:9 286:10
**perpetrator**
113:19 325:14
**persistent**
119:21
**persisting** 84:19
85:1,7
**person** 37:7 55:2
81:18,22 82:1
82:3,14 83:4
83:14 84:1,13
84:24 85:6
86:14 87:5,20
87:22 88:12
90:24 91:4
95:7 97:6
102:11 132:20
133:5 136:18

137:8 141:18
153:16 170:18
184:6 202:12
202:16 203:7
205:7 208:22
222:16 225:20
248:22 252:21
269:6,13 271:6
293:16 295:18
295:21 307:16
313:18 317:12
317:14,20,21
318:8 325:5
327:6 329:22
337:6
**personal** 48:8
116:6 118:4
218:20 220:12
269:12 285:6
**personally** 8:2,6
8:9 88:4 139:5
242:23 243:21
246:14 247:24
**personnel** 32:16
112:11 327:1
**persons** 55:9
64:23 109:9
269:6,13
**pet** 234:15
**phase** 325:21
**phone** 155:7,13
155:14 176:3
182:11 196:15
196:21,23
208:21,23,24
209:13 211:23
216:15,16,23
273:1,4 319:19
**photocopies**
72:24
**photocopy**
291:23 304:24
**phrase** 60:13
61:4,7 63:23
65:10,22
121:20 122:9
**phrased** 205:1

**phrasing** 59:20
**physical** 87:10
336:17
**physically** 87:6
**picked** 259:20
259:23 283:12
284:2
**picking** 152:19
**pictures** 243:6
**piece** 234:16,18
234:20 236:6
256:7 267:4
**pieces** 7:21
131:21 236:7
**pile** 148:6,10,12
148:20
**pilot** 183:15,16
**pims** 128:23
129:10,16
130:2,5 131:3
131:8,10 158:4
308:22
**piss** 59:17,21
60:10,11,23,23
60:24 61:7
**pit** 273:19
**place** 238:5
242:18 342:6
342:18
**places** 308:13
**plain** 23:8 28:24
**plaintiff** 1:5
2:10 3:4 4:19
4:21,24 5:21
11:7 15:21
48:11 71:14
**plan** 174:5
233:13 278:14
**planet** 4:12
**planetdepos** 3:3
**plausible** 223:2
223:4 225:14
231:12,23
232:21
**play** 112:17
**played** 232:24
**playing** 133:1,2

133:3
**pleasant** 89:6,12
89:14
**please** 4:16 5:7
6:20 34:3
88:12 111:20
346:23 347:11
**pletzke** 16:24
17:5,12
**plus** 222:24
**point** 23:2 24:13
32:18,22 38:8
38:11 39:9
42:8 44:16,17
49:9 52:14,18
64:16 82:17
88:6 96:22
101:14 105:18
106:9 115:21
116:2 117:14
119:22 120:1
122:3 125:13
125:22 127:20
128:8,18
130:15 132:21
133:5 134:4
137:15,16,18
140:19 143:4
144:12,22
145:10 146:9
146:13 147:8
148:12,22
149:22 155:10
157:19 159:7
160:17 161:15
162:5 164:16
165:13,23
166:7,18 172:1
173:4 175:8
178:15 181:16
183:4 185:4
186:16 187:15
188:3,8 189:20
190:14,17
192:11 195:19
195:21 196:7
197:1,8,10

213:9,12 218:6
220:15 227:11
227:15 232:13
232:15 236:3
237:18 244:16
244:22 246:2
246:22 248:24
249:3,12,16
251:12 254:5
255:14,19
258:17 264:4
268:2 273:14
278:1 280:16
281:7 283:12
283:15 284:1
301:10,20
310:6,7,14
316:12 320:16
325:3 326:6,7
328:21 332:3,9
332:14
**pointing** 223:22
**points** 298:22
337:2
**poke** 147:10
**police** 1:7,10
7:13 8:1,1,5,8
8:10,11,14,23
19:7,8,19,20
20:3,19 21:3,7
21:9,13 22:5
22:12,15,19
23:13 24:15
25:8 26:6
27:14,17 28:7
28:15 29:18
30:7,11 32:17
32:21 33:17
34:10 36:1,6
36:12,17 37:24
38:4,13 39:12
40:15,23 44:13
45:6,11 46:7
55:2 56:2,3
68:1 71:22
72:2,21 73:7
73:17 74:11

Siebert & Assocs. Court Reporters, Inc.          cmsreporters@comcast.net

Page 359

79:12,19 80:2
83:12 86:7,14
89:19 91:17,24
92:6,14 93:7,9
93:14,22 95:4
96:6 98:7
101:22 102:20
105:19 108:7
108:14 109:17
110:8,9,14
112:2,2 114:18
119:24 120:6
120:15 121:4,5
127:1,7,12
128:12,24
129:7 130:21
134:11 135:2
136:8 137:13
140:11,12,16
142:21 153:19
155:10 159:15
160:20 162:17
167:19 175:8
175:23 198:22
199:10 200:5,7
200:22 202:21
205:10 211:22
212:22 214:23
225:11 229:5
245:12 247:22
260:12 265:9
270:18 271:1
272:10 273:15
274:3 275:17
275:20 279:3
280:19 281:4
281:15,20
282:10,11
285:14 295:24
299:15 307:20
312:8 324:22
327:1,11
334:15
**polices** 324:23
**policies** 93:8,15
93:20 121:3
**polick** 2:13 5:1,1

7:17 8:16
11:21 12:15
13:8 14:3
16:18 23:18,23
33:12 34:2
42:9 43:20
46:23 54:8
58:4 60:16
61:6,10,19
63:18 65:12
68:5 69:23
70:22 73:10
74:12 75:17
83:15 85:9,20
88:17 89:21
90:10 92:7,23
96:10 99:1,4
103:22 120:9
122:14 125:21
128:14 137:24
147:13 149:4
180:12 184:21
188:20 200:13
207:1,19 218:4
219:14 220:18
221:6,20
223:10 224:4
224:19 225:24
226:23 227:11
228:5 237:2,5
244:4 245:17
250:6 253:20
260:5 271:23
280:11 289:4
295:11 320:14
324:11 328:1
329:23 330:22
331:2 338:2
339:20 340:16
341:3 346:7,15
331:5
**policy** 93:9
135:1,4 233:16
299:14,19
324:21 333:3
**polite** 89:14
**polygraph** 206:9

206:12,16,19
206:24 245:15
246:4 247:5,15
248:1 249:10
249:14 250:17
251:19,22
252:1,7,12,18
253:8,13,23
254:7,11,20
278:21 296:17
326:22
**polygraphed**
247:7,16
**polygrapher**
247:24 250:12
250:14
**polygraphists**
247:22 252:9
**polygraphs**
247:2 248:5
**pond** 282:21
**pool** 123:6,9
**portion** 53:15
73:15 126:7
158:9 226:11
315:18
**portions** 58:8
73:2
**pose** 11:21 14:10
**posed** 12:21
113:10
**position** 19:24
20:12,14 21:17
22:2 28:2,3
38:18 39:14
220:22
**positioning**
136:10
**positions** 19:19
20:8
**positive** 140:20
**possess** 139:23
**possession** 35:16
48:9,14 49:3
67:9,15 73:18
75:9 80:3
**possibilities**

231:16
**possibility**
117:20 118:7
120:1 246:15
**possible** 62:10
62:11 67:24
80:18 82:6
86:17,20 87:1
87:7,13,20
88:1,7,11
89:15 90:13
91:21 101:20
130:1,4 170:10
174:13 230:14
231:10 232:14
235:8 277:12
277:14 280:7
328:12
**possibly** 96:5
100:13 129:2
140:18 185:9
196:18 249:4
306:16 311:13
**postarrest** 92:16
92:21
**postconviction**
217:22 324:10
**postinterview**
252:12
**potential** 81:17
172:6,20
320:24 330:10
**potentially**
116:22 122:24
165:14 197:6
211:15 302:13
**practice** 299:14
336:22,24
**preceding** 345:8
**predisposed**
88:12
**preinterview**
252:11 253:3
**preliminary**
312:10
**preparation**
8:24 9:5,8

266:12 303:15
**prepare** 8:6,9
9:19 57:12
58:15 66:23
67:11,23 79:20
264:20 298:9
303:21,24
**prepared** 8:2
56:24 67:17,19
67:24 79:13
260:18 264:16
297:5
**preparing** 7:10
266:9 282:14
298:14
**preprinted**
262:1
**presence** 14:3,7
14:13,14 96:11
103:22 261:16
267:8 279:15
325:12 332:23
**present** 3:1 4:21
10:8,10 71:16
79:24 96:20
104:4 171:19
252:6 271:10
276:9 321:8,19
335:11 342:8
**presented**
217:20 218:14
219:9,22 220:4
234:21
**presenting**
234:23 235:7
**president**
225:18,21
**presume** 187:23
**pretty** 141:16
175:20 176:7
176:21 177:4
179:1 208:7
249:1 316:17
340:7
**prevent** 85:6,18
**prevents** 84:24
**previous** 7:13

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 360

151:15 265:16
307:19
**previously** 7:15
185:16 244:2
320:3 323:18
342:9
**primarily**
155:17 209:2
**primary** 95:17
95:19 102:10
**print** 304:23
**prior** 6:4 10:19
10:21 12:12
13:16 19:7
20:4 30:21
31:6,10,13
32:1 38:17
39:24 65:18
66:3,7,12
76:18 82:12
95:22 96:3
98:3 100:15
101:9 103:2
107:23 108:3
116:20,22,23
117:10 127:22
128:2,19
129:11 130:3
130:16 131:13
132:13 142:14
153:23 172:5
174:12 175:1
197:15 234:15
244:3 247:11
247:19 250:4
250:22 256:9
264:11,12
265:6 266:19
268:8 272:22
275:6,7 276:10
276:13,18
277:12,21
278:17 280:2
281:8 286:7
303:17 321:9
323:3,4
**prison** 225:20

**prisoner** 204:17
307:21 309:15
317:7
**privacy** 168:17
**private** 100:19
**privilege** 11:23
96:13
**privileges** 291:5
**probable** 235:23
236:11,17
**probably** 35:1
64:4 73:4
94:23 108:4
129:17 176:16
178:8 201:10
216:9 230:3
238:12 247:9
305:21 313:13
313:21
**problem** 184:18
184:20 185:12
250:4
**problems** 185:5
320:4
**procedure**
324:22
**procedures** 93:8
93:10,15,20
121:4 316:14
324:23
**proceed** 215:18
234:14
**proceeded** 235:6
**proceeding**
11:10 37:21
**proceedings**
37:17 217:22
324:10
**process** 22:1,7
119:12 124:9
174:8 241:21
250:21 256:2
258:3,10,12
260:4 266:3
271:14,18
316:13,23
319:18 320:3

331:18 334:4
334:11,14
**produced** 329:7
**professional**
17:15 33:2,6
33:11 94:17
99:8 134:15
219:24
**promoted** 25:20
26:22
**pronounced**
171:6
**proper** 99:11
**property** 109:24
209:10,11
210:12,17
281:22 306:4
310:14,16
**prosecution**
44:3,7
**prosecutions**
41:12,15 43:13
**protect** 136:13
**protection** 147:2
**prove** 113:20
115:6
**provide** 11:15
90:2,22
**provided** 30:6
57:14 66:3
82:24 89:19
156:5 319:17
**providing** 10:23
11:18 12:13
53:18 91:9
321:1
**proving** 114:20
**psychological**
88:19
**public** 345:24
**pull** 50:14
**pumping** 177:13
178:23
**punch** 193:3,5
**punitive** 10:24
11:6,18 12:13
13:2

**purpose** 151:7
160:24 206:6
214:21 247:14
303:10 311:23
314:4 317:5
**pursuant** 1:19
1:23 11:19
342:22
**pursuit** 18:16
**put** 73:14
123:20 146:21
190:11 203:19
304:5
**putting** 222:20
283:22
**puzzle** 234:16
234:18 236:6

───────────
**Q**
───────────
**quacking** 186:2
**qualified** 172:13
**question** 6:11,11
7:2,18 10:9
11:1,16,22
12:1,11,17,21
12:22,24 13:4
13:6 14:5,6,10
16:3 17:3 33:4
33:13 34:3,4
36:11 47:4,10
47:12 48:4,23
49:6 50:15
55:20 57:18,23
61:7 63:20
66:6 83:16,18
83:21 89:22
90:5,7,8,9
96:11 101:1,9
101:11 103:23
113:10 116:7
119:6,7 121:10
122:15 126:2,6
135:12 139:24
178:2 183:6
194:3 199:5
205:2 212:5
213:11 219:17

221:18,22,23
222:2,3,10
224:5 225:6,7
226:9,24 235:4
244:7 245:21
252:2 253:7
257:8 265:17
270:8 272:5
280:12 285:11
294:16 325:10
325:13 328:7
329:5,8 330:7
333:11 337:11
337:18 338:1
339:10 340:18
**questioned**
87:22
**questioning**
24:1 29:12
221:23 251:20
256:2 257:12
257:20 258:16
274:6 321:5,9
325:4 328:18
332:20
**questions** 6:21
11:6,7 12:4
46:18 53:4
59:4 71:17
72:14 80:7,17
81:9,14 137:17
180:2 181:18
200:11 221:21
236:24 268:16
289:22 290:1
313:16 317:15
318:5 321:2
330:21 337:24
338:7,9 340:15
342:12,17
**quick** 318:23
330:6
**quiet** 283:18,20
283:24 319:13
334:1
**quite** 149:7
314:2

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 361

| | | | | |
|---|---|---|---|---|
| quote 63:12 | 238:12,14,17 | 204:13 212:15 | 201:16 203:22 | 80:12 81:9 |
| quoting 59:16 | 239:19 251:9 | 246:17 264:21 | 204:1 212:4 | 82:17 83:13 |
| | 251:11 255:4 | 296:4 297:22 | 214:3,15,17 | 84:22 85:2 |
| **R** | 262:21,24 | 300:2,16 302:3 | 215:2,23 | 90:15 120:22 |
| r 1:22 55:12 | 288:14 289:24 | 302:22 303:13 | 229:22 230:9 | 143:2 247:1,4 |
| 97:7 99:23 | 300:15 303:16 | 316:11 325:9 | 238:8,16 244:8 | 313:7 |
| 107:8,18,18,18 | 303:16 306:19 | 344:6,8,10,12 | 247:9 249:17 | receiving 66:7 |
| 109:11 110:10 | 312:20,21 | 344:14,16,18 | 250:2,8 251:23 | 66:13 120:2 |
| 110:10 143:13 | 319:21 320:9 | 344:20,22 | 253:16 254:16 | receptionist |
| 209:17 262:6 | 321:14 329:6 | reasons 21:6 | 254:18 255:2 | 334:23 335:2 |
| 342:6 343:9 | 345:5 346:22 | 91:12 256:18 | 256:3,20 257:5 | recess 16:2 71:7 |
| 344:1,1 | readable 314:20 | 256:24 344:3 | 257:13,23 | 111:18 215:10 |
| race 306:8 | readily 337:11 | recall 29:16,17 | 258:13 259:13 | 289:10 319:3 |
| radio 159:11,14 | reading 46:16 | 30:20 31:12,16 | 264:23,24 | recognize 27:18 |
| 159:17,20 | 65:5 69:7 | 32:3,7,10,20 | 265:3 271:20 | 49:1,5 68:24 |
| 160:2 196:14 | 215:2 255:6 | 32:24 33:20 | 272:12 273:4 | 113:5 119:8 |
| radios 155:9 | 272:23 288:23 | 36:24 45:8,9 | 274:1 279:5 | 134:4 202:15 |
| raised 12:5 | 346:21 347:9 | 47:17 52:16 | 282:9 285:1,20 | 216:6 261:12 |
| ran 128:6 130:1 | ready 111:12 | 54:15,18 57:7 | 288:1,5,21 | 297:2 316:6 |
| 258:4 308:18 | 215:18 | 60:12 61:2,11 | 292:18 293:5,9 | recognizing |
| random 312:14 | real 318:23 | 62:9,11 65:1 | 295:22 300:12 | 330:11 |
| range 106:8 | 330:6 | 67:16,18 72:4 | 303:12 306:14 | recollection |
| rank 28:16 | realized 176:13 | 72:8,11 80:16 | 309:13 311:16 | 208:6 213:3 |
| 95:11 123:2 | 177:16 339:10 | 80:21 81:6,7 | 311:17 320:5,6 | 260:2 |
| ranking 136:8 | really 70:4 | 81:16 82:10,16 | 321:2,11,21 | recommendati... |
| 137:2,8 | 76:11 103:5,9 | 82:21 90:20 | 322:14 324:14 | 43:24 |
| ranks 19:14 | 116:3 117:22 | 100:2,4,13 | 327:8 329:1 | record 6:20 24:3 |
| rapid 308:8 | 117:24 118:1,8 | 101:20 103:4 | 330:1 332:5,17 | 24:4 71:6,10 |
| rate 92:5,10,15 | 132:17 134:24 | 109:3,8 111:7 | recalled 182:13 | 71:12,15 77:19 |
| 92:20 274:10 | 144:17 158:8 | 115:3,5 116:12 | receipt 143:7,17 | 101:2 111:17 |
| 274:13 | 171:6 172:13 | 119:17 120:4 | 143:21,24 | 111:22 112:22 |
| ray 107:8 | 172:14 174:2 | 121:8 124:5 | 144:1,5,7 | 112:24 131:3 |
| reach 118:4 | 184:8 199:2 | 125:7 132:18 | 161:16,20 | 156:23 215:9 |
| 166:15 176:2 | 258:11 284:1,6 | 133:3 140:24 | 162:1 175:17 | 215:13 216:3 |
| reached 13:10 | 284:12,19 | 145:14 146:5 | 176:5,15 177:6 | 289:9,15 319:2 |
| 232:19 | 298:19 312:1 | 147:19 159:2 | 178:4 | 319:7 340:23 |
| reaching 103:15 | realm 174:23 | 160:4 161:21 | receipts 193:11 | 341:2,6 342:16 |
| react 186:10 | 231:16 | 162:13,19 | 193:17 | recorder 268:10 |
| reacting 280:10 | reason 7:5 20:18 | 163:1,7,11 | receive 22:3 | 282:16 |
| reaction 195:14 | 20:21 21:2,8 | 165:1 169:6 | 33:18,22 38:16 | records 7:9 31:3 |
| 195:16 | 21:12 33:10 | 170:9 171:21 | 81:14 92:12 | 45:6,10 46:6 |
| reactions 162:22 | 64:18 91:2,7 | 172:3 185:2 | 287:17,21 | 49:22 51:6 |
| read 9:11 16:3 | 124:20 125:17 | 187:4,13 | 293:3 | 74:1 95:18 |
| 34:3,4 68:20 | 126:19 134:14 | 189:15 194:8 | received 18:17 | 109:4,8 131:6 |
| 68:22 88:5 | 155:3 158:3 | 194:14,23 | 34:13 38:7 | 153:11,15 |
| 90:9 114:23 | 168:19,23 | 195:16 198:17 | 62:2 68:14 | 211:17 313:13 |
| 230:23 236:23 | 169:2 202:10 | 199:23 201:14 | 73:19 75:24 | 315:2 |

Siebert & Assocs. Court Reporters, Inc.    (773)851-7779   cmsreporters@comcast.net

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

recovered
  233:10
recreation
  339:21
redacted 53:16
  54:23
refer 28:1 63:24
  66:16 74:24
  172:11
reference 62:17
  62:22 70:16
  76:24 239:2
  300:21 315:9
referenced 64:9
  64:22
references 79:22
  239:1 290:17
  292:12 298:21
referencing 78:1
  87:11 210:16
  309:13
referred 208:15
  342:19
referring 58:2
  61:6 64:9
  216:9 227:13
  276:14
refers 46:22
  65:11 98:18
  315:10
reflect 11:13
  71:12,15 82:4
  144:6 199:12
  299:11 301:10
  308:12 310:19
  311:11,16
  314:23 318:12
reflected 70:11
  73:7 92:14
  144:7 301:12
  301:24
reflecting 109:5
  297:15,24
  302:17
reflects 55:1
  295:8 297:9
  298:17 306:19

refresh 46:4
  58:24 264:16
  264:20 291:10
  302:12
refreshing
  303:10
refrigerator
  183:12
refuse 12:10
refusing 13:5
regards 244:12
regular 213:10
reid 29:11 30:14
  30:19 72:9
  80:12 81:24
  82:8 84:16
  173:22 247:11
  247:13,18
  248:7,12 249:5
  251:14 253:6
  253:18 254:5
  254:14 255:24
  257:16,17,24
  258:4,9,14,15
  259:3 273:2,6
  273:11,16
  280:20 281:12
  281:16 282:1,7
  283:9 284:8,8
reinterview
  323:13
reinterviewed
  42:22
reinterviewing
  329:8
reinvestigating
  42:7,14
reinvestigation
  43:5,17 323:7
relate 11:6
  48:15 95:15
  138:24 181:23
  329:21
related 8:2,23
  9:12 11:9
  12:13 13:16
  14:24 29:8,12

31:3,21 33:18
  34:12 36:5
  37:18,21 38:3
  38:8,17 45:6
  46:6 49:9,23
  50:12,18 51:7
  51:20 52:13
  65:24 67:5
  72:21 103:15
  166:1 172:3
  173:11 192:12
  199:22 211:18
  212:24 215:22
  260:19 264:13
  265:14 266:7
  290:11 297:5
  302:7,23 320:4
  320:7 329:17
relates 10:23
  13:22 79:15
  80:4
relating 10:22
  109:6 293:17
relation 335:16
relationship
  154:1 228:23
relative 8:11,15
  140:1 158:15
  254:13 287:1
  299:16 305:10
relatively 132:4
  183:12
relaxing 283:5
relayed 134:2
  143:6 196:12
released 234:7
  234:15
relevance 16:19
  23:18 24:1
  192:7,10
  193:17
relevant 177:7
  192:4 218:19
  219:1 225:1
  226:14 234:13
  250:11,13,14
remain 125:5,16

126:9
remained
  124:22
remember 15:18
  30:14 33:6
  35:23 36:19,21
  36:23 37:5,6
  38:23 42:19
  107:13 109:21
  132:17 143:1,4
  145:7,21,23
  154:18 162:14
  163:8 171:13
  172:19,23
  173:19 203:16
  204:4,7,10
  248:4,5 254:17
  259:15 260:14
  260:15 283:4
  285:7,15,17
  290:13 294:2
  313:23
remembered
  291:7
remnants 149:8
removal 65:7,11
removed 65:18
  244:18
removing 65:17
rental 210:17
rented 153:11
renting 210:13
repeat 83:18
  90:4,7,8,18
repeating 89:18
  121:19
rephrase 96:14
  126:2
replaced 183:12
report 8:19 69:5
  69:11,14 73:15
  73:16,17 75:9
  77:17 78:21
  79:12,19 80:2
  187:13 210:22
  260:18 288:12
  288:15 289:1,2

290:10,15,17
  291:9 292:12
  295:8 297:4,8
  297:14,18,23
  298:2,10,16
  299:7,16,21
  300:9,19 301:7
  301:9,9,12,14
  301:15,23
  302:1,4,7,8,11
  302:12,23
  303:2,3,7,9,14
  304:16,17
  305:10,13
  311:21,23
  312:7,13,16,19
  314:4,12
  318:12 319:12
  336:23
reported 222:17
  342:12
reporter 5:4,7
  6:14,17 16:6
  90:8
reporters 5:6
  346:1
reporting
  312:24
reports 7:13 8:1
  8:1,5,8,10,14
  8:21 9:2,3
  69:17 72:21
  73:7 74:11
  104:22 199:16
  214:23 215:3
  249:1 266:13
  266:17 297:24
  300:14 301:18
  302:16 309:3
  321:14 329:7
represent 4:17
  4:19,24 5:21
  17:11
represented
  144:1
representing
  4:12 5:5

Siebert & Assocs. Court Reporters, Inc.     (773)851-7779   cmsreporters@comcast.net

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 363

130:24 217:21
222:8
**request** 45:4,10
46:7 51:18,19
51:21 52:2,4,6
52:10
**requested** 49:16
49:17
**requests** 48:7,10
**reserved** 340:17
**residence**
153:12 177:15
177:16
**resist** 203:5
**respect** 12:12
13:2,17 93:23
98:23 115:21
120:18 138:20
161:20 171:12
172:22 173:1
224:7 253:6
323:11 337:14
**respond** 46:18
54:13 135:3,15
199:6 217:1
221:17
**responded** 31:20
32:1,5,12
134:11
**responding**
32:11 48:4,6
315:12
**response** 16:8,9
52:10 54:16
80:18 237:15
239:18 294:15
333:15 339:11
**responses** 9:5
16:23
**responsibilities**
24:21 25:8
28:23 29:7
41:2 98:22
136:16 139:20
290:24
**responsibility**
141:24 142:2

184:5 291:3
**responsible**
120:16 275:10
301:3,5 325:6
327:18
**responsive** 48:9
180:1 338:1
**restart** 10:9
**restate** 285:12
**result** 39:2
205:16
**results** 252:8,19
253:23 254:3
254:10 255:21
**retention** 282:21
**retired** 21:13
55:2 56:1
102:20 107:21
324:16
**retirement**
94:20 96:5,6
102:24
**retrial** 97:9
217:23 218:15
219:22 220:9
238:1 320:10
**retried** 56:4
**return** 290:24
291:3
**returned** 332:9
**reveal** 13:22
48:3 49:13
**review** 7:9,12,21
8:1,5,8,13 9:4
9:7 35:13 46:1
57:17,22 68:13
69:19 73:6
92:13 113:9
116:16 119:6
214:23 237:7
264:12,15,20
265:13 266:6
266:11 289:21
291:9 298:4
303:3,14
**reviewed** 7:24
8:19,22 32:16

64:12 104:23
131:13,20
217:19 266:19
288:12 303:7,9
**reviewing** 57:19
132:8 269:22
270:6 290:10
300:3
**rid** 294:24
**right** 6:22,23
11:8 23:10
33:20 55:4
72:22 76:17
79:17,20 80:8
81:8 82:11
87:2 91:15
98:20 109:13
122:7 128:8
138:20 143:8
159:23 168:21
170:15 180:5
184:14 185:19
190:15 191:2
192:1,21 198:5
200:18 205:8
216:10,12,13
235:4 263:12
263:16 264:2,8
273:8 278:3
280:4 301:17
306:20 310:4
318:3 322:24
324:1 334:20
335:20 340:10
**rights** 261:15,24
262:21 302:19
309:10
**ring** 191:24
192:7,14
**ripsky** 1:9 95:1
95:23 96:4,7
97:2,4 154:2
324:16
**ripskys** 95:3
154:19
**riverside** 19:8
19:15,19 20:5

20:14,19,24
**road** 201:17
233:5
**robbery** 81:19
**robert** 1:8,16
4:2 5:3,10
46:12 47:7,14
47:19 346:13
331:3
**role** 40:12 41:18
95:3 328:13
329:4
**roles** 95:17
**rolled** 137:15
**room** 52:15
150:15 151:13
191:16,18
244:19 267:10
267:11,24
270:16 276:9
277:24 278:3,4
280:23 281:1,2
282:17 316:21
334:19,21
335:17,21,24
335:24
**rooms** 156:16
181:2
**rosemary**
209:16,19
211:1
**rotation** 122:6
123:20,22,24
124:2,9,11
125:24
**roughly** 22:15
147:5
**route** 176:7
177:12 201:23
223:16
**routine** 120:7
200:5 336:23
**rub** 59:18
**rule** 197:12
**ruled** 237:21
**rules** 1:19 6:2
342:22,22

**ruling** 320:10,13
**run** 128:12
159:4
**rundown** 220:8
**running** 294:1
294:17 295:3
**russell** 37:1
270:24 271:5
271:21 272:5
272:15,20

─────────
**S**

**s** 1:22 55:12
63:12 97:7
99:23 108:11
109:11 111:2,2
128:24 239:24
292:14 339:2
342:6 343:9
331:9
**sa** 54:14
**safariland** 15:24
**safe** 136:12
**safer** 204:17
**safety** 136:10
**sao** 40:1,7,22
**sat** 62:7 68:18
280:24 281:2
283:20
**satisfied** 340:6,7
**saturday** 122:5
**saved** 62:10
298:3
**saw** 52:15,22
151:1 188:19
188:21 190:6,7
190:9 197:19
242:10 251:13
288:23 338:19
**saying** 70:11
75:10 109:13
117:24 118:14
125:22 130:1
135:23 163:9
168:3 178:5
189:10 221:11
221:16 235:20

Siebert & Assocs. Court Reporters, Inc.    (773)851-7779    cmsreporters@comcast.net

Case: 1:18-cv-02523 Document #: 355-9 Filed: 07/15/24 Page 382 of 393 PageID #:35074

Siebert & Assocs. Court Reporters, Inc.          cmsreporters@comcast.net

Page 364

236:9 244:2
245:4 290:17
293:5,12
339:19
says 46:17 59:16
61:14 62:15,17
63:11 74:17
75:3 77:21
114:22 239:24
262:12 264:1
299:2 300:18
307:3,14
308:22 318:16
318:18 319:22
320:1
scaliatine 53:12
53:19,23 57:2
64:14 66:9
scan 316:18
scar 306:18,20
306:21
scars 320:7
scene 26:16,17
27:1 31:9,14
31:17 32:13
38:12,17
117:20 118:6
128:9,11 129:4
135:6 136:5,9
136:14,16,18
136:22 137:1,3
137:14,19,22
138:19 139:8
139:17,23
141:4,6,15,18
142:13,17
143:5 144:9
145:2,11 146:7
156:24 157:23
158:1,10
159:12,21
160:10,23
161:6,11
162:16,24
163:3,9,13
176:22 196:5
203:24 204:5,8

204:11 243:10
312:9 313:24
314:1 315:13
316:20
scheduling 15:3
15:8 56:12
248:12
school 17:18,19
18:22 29:12,19
science 18:6
139:8 140:7
220:17
scientific 218:14
219:8,21 220:8
scientifically
231:10
scientists 218:21
219:12
screaming 156:2
screening 268:3
screenshot
216:23
screenshots
216:15
screw 242:14
sealed 194:21
search 31:2,5
49:7,12,15,20
50:2,10,16,20
51:6 128:12
130:6 158:5
159:5 190:18
190:21 196:6
197:2 242:1
243:22 309:20
searched 156:15
192:23 197:16
242:7 309:15
seat 284:11
second 59:14,15
65:4 108:1
112:23 114:5
150:11 236:23
238:18 265:21
289:7 293:21
323:5
secretary 308:19

section 59:8
security 173:5
204:19 209:19
see 27:7 46:13
46:19 50:7
59:8,12,18
61:14 62:15
65:8 66:21
74:17,19,20
75:2,15 79:2
112:13 144:14
144:17 145:1
147:24 148:3,6
151:10,11,11
152:16,19
158:18 167:10
169:18 176:24
182:1 189:4
190:4,11,22
205:10 240:1
241:3,12
244:11,11
249:1 259:9
261:21 263:20
265:1 274:2
299:2 300:18
301:16 305:7
306:6 307:22
308:24 312:3
315:4,4 317:11
318:19 319:20
324:15 328:20
334:14 340:13
seeing 109:8
253:10 313:23
seek 87:23
seeking 119:14
seen 56:21 61:3
64:3 103:4
109:4 112:9
260:17 301:19
303:8,23
select 307:4,8
selected 21:18
semicolon 59:17
send 237:11
senior 141:10

seniority 108:19
sense 41:12
312:16 337:20
sent 51:19 52:10
53:11 54:5
233:11
sentence 46:22
114:3 117:6
separate 34:18
81:10 202:7
214:13 311:20
separately 169:9
september 58:8
59:24 132:15
139:18 198:2
245:18 269:5
296:7 297:12
314:21 326:20
326:21 331:4
331:24
sequence 223:14
223:19
sergeant 25:16
26:12,16,19,20
27:5,10,12
29:21 35:2
38:12 55:3
56:1 98:9,13
98:14,23 99:5
99:19 102:4
106:14 107:8
119:10,11,14
119:17 124:8
126:13,13
127:9 135:5
136:1,2,11
142:8,11,23
143:5,16 145:9
146:3 159:18
161:13,16,21
162:15,19,21
163:14,19
165:13 167:8
176:5,14
196:10,12
198:12 201:6
249:4 274:17

282:14 300:6
300:13 310:7
313:6
sergeants 127:4
serious 134:23
135:8,15
seriously 133:23
134:23 138:9
serve 41:12 97:6
97:8 271:2,14
272:16
served 19:2 97:4
271:11 272:20
311:12 334:10
335:8 336:4
server 94:4
271:14,19
334:11,14
service 97:13
139:11
set 80:8 139:16
345:7
sets 174:20
setting 14:17
87:4 104:10
197:4
setup 103:16
sex 81:19 306:7
shafer 119:11,14
shaking 207:13
sheet 312:11
313:8
shelf 244:23
245:1
sheriffs 15:21,23
38:22
shift 106:15,22
335:2
shifts 106:17,18
106:19 122:1
shit 59:17,21
60:6
short 27:11
176:8 183:12
shorthand
342:13
shortly 146:20

210:1 211:4
338:21
**shorts** 307:10
**shot** 225:18,21
**shoveling**
148:17
**show** 48:17 64:1
112:18 216:1
289:1 299:1
**showed** 175:18
176:5 220:8
304:7
**showing** 113:2
261:7 289:17
296:22 303:20
304:4
**shown** 45:18
119:2 304:10
**shows** 298:20
310:22
**shrug** 6:19
**side** 118:9
137:13 140:8
140:21 141:1
141:19,20
172:1 189:19
279:9 317:23
319:16
**sidebyside** 141:7
340:12
**siebert** 5:6 346:1
**siebertlamonica**
1:21 5:5 342:6
343:8 347:24
**sign** 346:22
**signature** 78:2
78:11,13,16,20
78:22,23
261:22 262:3,6
262:7,9 299:10
309:16 340:16
342:20 343:4
346:18
**signed** 261:16
262:22,23,23
264:7,7 305:19
309:10 312:23

315:23,23
344:24 345:13
**significant**
149:11 155:24
158:9 159:2
290:14
**significantly**
149:16
**signing** 300:4
346:21 347:9
**similar** 292:20
**similarly** 6:16
**simply** 87:21
125:16
**sincerely** 347:19
**single** 269:4
**sipowicz** 63:12
63:16,24 64:1
64:16,24
**sister** 154:19
164:18
**sit** 33:1,5 42:19
80:10 82:10
86:11 105:7
121:8 131:18
132:2,12 185:2
217:16 218:12
219:6 222:18
223:8,18
234:12 235:5
238:9 239:11
241:24 246:19
267:11 272:18
296:15 298:3
335:4
**sitting** 255:9
282:13 300:14
310:6
**situation** 85:14
86:1,22,23,24
87:2,4,5,15,20
**siu** 18:8 34:12
**six** 36:18 37:6,11
37:15,18 42:4
106:13 153:4
**skill** 139:16
**skills** 19:5 91:19

92:1 139:23
**skin** 306:9
**skip** 197:24
**slash** 61:14
**sliding** 147:22
**slip** 311:14
**small** 20:24
147:21 285:1
**smell** 162:9
166:23 167:2,4
167:11 183:18
193:8 207:8
**smelled** 162:12
**smoke** 65:7,11
65:17 144:21
187:21 192:20
233:8 242:2,5
242:7,10,11,17
242:20,24
243:7,10,18,22
244:13,22
245:6 281:11
281:24 282:12
282:18 283:6
**smoked** 259:16
281:13,14,15
281:16,18
282:22,24
**smoking** 181:4
189:5,6 190:1
282:5,6,8,9
284:11 285:9
285:13
**smoky** 144:24
**smoother**
122:17
**snapped** 333:5,8
**snugged** 242:21
**soaked** 222:21
230:7,12 231:1
231:18 232:7
**sober** 84:9 206:3
245:15 249:22
**sobering** 246:11
**social** 173:5
209:19
**socially** 324:15

**sodas** 259:16
**solely** 317:18
**solicited** 294:21
295:6
**somebody** 44:19
68:2 75:9
81:10,11
133:22 154:10
158:5 201:11
201:15,17
208:16 230:13
247:14 248:11
249:6 253:1
254:5,15
256:15 257:7
286:8,22 311:8
320:22 325:22
326:1
**somebodys**
286:19
**somewhat**
271:16
**soninlaw** 153:22
**soon** 237:16
313:13 339:10
**soot** 149:12
242:15 244:15
**sorry** 60:8 77:24
83:17 99:4
138:16 167:19
261:19 312:5
318:22
**sort** 56:12 59:14
65:3 76:17
105:1 144:19
148:24 168:23
170:23 176:9
179:16 189:19
213:15 228:2
258:4 263:13
263:14 275:22
276:1 277:5
280:7,8 293:21
294:6 297:22
309:20 312:14
317:22 341:3
**sos** 308:19

**sotos** 2:12 346:6
**sound** 339:1
**sounds** 89:22
142:18
**source** 171:15
**sources** 231:19
**south** 201:2
209:4 211:9
**southern** 18:6
**sp** 89:8
**speak** 44:12
52:17 58:9
70:2 76:11
88:23 92:9
102:12 118:1
169:23 292:16
300:11
**speaking** 132:4
204:1 274:1
334:6
**special** 23:3
24:18 25:13,21
26:3,4,7,19
27:5,12 28:12
28:22 29:4
33:21 98:12
102:1 106:2,5
106:10,12,22
106:24 107:6
110:3 122:22
123:2,6,12,15
123:19 126:24
141:19 146:21
**specialized**
89:24
**specialty** 108:22
**specific** 27:18
50:16 52:23
59:20 82:21
86:1 90:20
94:24 111:7
121:3,9 129:14
134:7 135:16
145:23 151:7
158:14 187:12
199:13 205:24
212:15 213:3

Siebert & Assocs. Court Reporters, Inc.        cmsreporters@comcast.net

Page 366

213:19 214:15
229:22 242:1
291:1 293:11
**specifically**
33:20 53:4
58:2 59:5
60:22 61:9
64:9 76:12
77:6 82:9
93:23 111:10
121:10 124:11
132:7 133:6
145:7,15 150:7
154:16 162:11
169:9 171:11
181:6 194:17
196:8 198:8
201:14 203:16
209:5 212:24
214:3 215:24
229:13 234:1
256:20 266:5
272:19 273:10
285:4 294:22
303:13
**speculate** 65:16
236:4,14,15,19
**speculating**
130:9
**speculation** 58:5
60:17 61:20
63:20 65:13
68:6 69:24
70:24 74:13
138:1 147:14
180:13 220:19
221:9 223:12
224:20 227:1
253:21
**speech** 308:5
**spilled** 269:20
269:23 270:2
321:13 331:14
**spilling** 321:21
322:1
**split** 169:6
**spoke** 46:5

101:6,8 130:11
133:11,18
155:23 161:13
**spoken** 55:15
102:19,23
110:15
**springfield** 34:8
**spy** 188:16
**squeeze** 194:2
340:13
**ss** 342:2
**st** 34:20,22
**stack** 77:15
**staff** 18:22,22
**stage** 178:15
**stairs** 186:17
**stamp** 77:14,21
314:19,23
**stamped** 45:20
48:20 113:4
119:4 216:4
261:10 289:19
297:1 304:9,12
340:20
**stand** 226:2
238:2
**standard** 22:9
120:12 308:23
**standby** 111:15
111:20 289:7
**standing** 186:20
189:13 279:22
282:23 340:10
**star** 75:4,11
**start** 17:3 22:20
23:2,5 28:11
36:10 42:13
47:3 62:20
101:11 111:13
116:7 124:24
140:17 178:6
179:3 188:9
222:5 223:16
224:10 231:15
231:17 232:9
260:22 268:23
305:2,14

**started** 12:6
15:11 27:22,24
63:2 72:1
124:24 125:10
126:20 174:10
174:23 177:22
178:12 181:12
188:8,9 197:9
197:9 220:23
221:3 222:19
222:22 223:2
223:14 224:3
224:14,22
225:4 229:14
230:6,20
231:10 249:10
251:19 257:4
270:6,12 276:7
278:18 283:21
298:1,17
315:15 333:4
334:2 338:14
338:23 339:11
**starters** 263:19
**starting** 20:4
117:10 223:20
230:11 257:15
260:8 325:6
327:13,19,23
338:17
**state** 1:23 4:17
84:13 104:11
144:11 217:21
219:19 295:2
308:19 342:1
**statement** 62:19
75:11 78:17
84:14 87:23
88:13 224:1,8
224:11,13
226:5,7,20
227:7,10,13,14
227:21,23
228:3,8,10,15
228:18,18
229:7,8,9,16
229:19,20

230:18 231:7
232:1,20
233:13 234:4
234:11 235:9
235:10,14,17
235:24 236:1,5
236:12,13,18
264:6 266:20
266:22 268:10
268:15,20,22
269:17 276:11
276:14,18
281:8 282:15
283:14 284:3
302:19 333:7
**statements** 75:3
91:5 97:18
101:13 103:21
104:8 224:9
227:17 267:1
275:14
**states** 1:1,20 4:5
19:22 21:10
28:4 39:17,21
41:6,17,22
42:1,6,15,24
43:18 44:1,10
49:21 51:24
52:9,13 67:20
68:4 73:19
94:12 103:16
113:24 220:3,6
225:18 234:21
235:7 265:12
265:13,20,24
266:4,6,10
323:10
**station** 96:6
128:12 153:19
153:24 158:4
158:15,21
159:1,3,15
160:20 161:10
162:17 177:12
177:18 178:24
200:5,7 202:22
203:20 204:14

204:20 205:2,5
205:6,10
247:22 248:1
260:12 268:8
270:20 271:2,7
272:10,15
274:3 275:22
276:2,5 280:19
280:23 281:4
281:15 309:24
310:17,20
334:15
**status** 267:11
308:20 313:9
**stay** 206:4
214:18
**stayed** 151:13
**staying** 200:23
214:21
**step** 335:20
**steps** 140:1
211:12,21
214:11,17
227:9 228:16
229:1,4 230:13
230:17 242:24
268:4 291:14
297:10 321:6
323:10
**steve** 110:1
208:12 209:2
209:12,18
210:4
**steven** 109:14
110:5
**stick** 125:1
**stilling** 145:5
**stop** 76:7 104:17
104:20 178:6
202:5,13
239:24 240:6,9
240:10,12,16
241:2 263:8
273:13,18
318:22
**stopped** 162:2
177:18 203:18

Siebert & Assocs. Court Reporters, Inc.          cmsreporters@comcast.net

Page 367

338:22
**stops** 273:19
**store** 192:15,17
**stories** 251:9,11
**stormed** 63:17
**storms** 63:13
**story** 86:5
**stove** 183:15,17
**straightforward**
    180:22 181:17
**strategically**
    278:12
**strategies**
    277:20
**strategy** 280:7
**street** 1:17 2:6
    4:14
**stress** 186:10
**strictly** 81:23
    325:22 326:6
**strike** 336:2
**strikes** 174:22
**strong** 260:2
    329:2
**strongest** 91:19
    92:1
**struck** 138:13
    171:5
**structure** 32:13
    135:3,8,15
**structures** 31:24
    120:19
**study** 116:19
**stuff** 105:5
    243:16 306:4
**subject** 12:3
    13:10 345:7
**subjects** 117:9
**submitted**
    299:16 303:5
    312:12 342:21
**subpoena** 56:5,9
    97:5,8,9,13
    107:24
**subpoenas**
    41:13
**subscribed**

345:17
**subsequent**
    65:19 246:2
    257:14 303:8
    328:24 335:18
**substance** 15:1
    251:5 321:23
**substantial**
    116:2 125:1
    233:6
**substantially**
    58:13 70:7
    71:1
**substantive**
    182:20 199:2
**successful** 85:6
    274:11,13
**sudden** 312:5
**sue** 237:12,15,19
**sued** 237:23
**suggest** 263:15
    301:17
**suggested** 144:5
**suggestion** 294:7
    295:7
**suicidal** 307:17
**suite** 2:15 346:9
**sullivan** 99:20
    278:17,22
    279:1,12,18,21
**sum** 236:16
    321:22
**summarization**
    256:4
**summarizes**
    118:21
**summarizing**
    238:11 288:16
**summary** 11:10
    11:12 58:7,11
    70:19 256:12
    257:11 260:24
    311:24
**summer** 228:21
    233:14
**summons** 41:13
**sunday** 121:24

122:5 132:18
    158:7 176:4,23
**super** 132:6
**supervise** 40:11
    95:17 102:6
**supervised**
    40:22 100:7
**supervisor**
    40:17 95:9
    98:12 100:9
    102:5,14
    105:21 107:6
    301:3,5
**supervisors**
    90:16 91:18
    119:24 122:23
    123:23
**supervisory**
    41:18 95:7
**supplementary**
    297:23 302:23
    311:20
**support** 41:11
**suppose** 117:14
**supposed**
    269:13
**suppression**
    147:11 152:4
**supreme** 342:23
**sure** 12:19 27:21
    33:5 35:1,2
    47:10 55:23
    66:15,20 76:8
    80:16 84:9
    99:11,22
    104:14,15
    116:18 120:20
    122:8 124:5
    125:7 130:17
    136:11 141:8
    142:6 146:12
    153:1 154:7
    169:10 185:7
    199:15 213:2
    214:11 219:19
    223:13 225:7
    241:20 248:13

252:24 256:13
    263:9 268:18
    269:18 270:9
    280:6 281:15
    282:19 309:12
    312:15 314:8
    315:5 316:8,9
    316:16 317:7
    318:15 320:22
    321:11,15
    326:6,11
    330:14
**surgery** 320:3
**surprise** 237:23
    272:5 333:14
**surprised** 141:3
    176:20 271:13
    271:21 272:2
    333:16
**surprising** 272:9
**surveillance**
    110:2
**surveillances**
    109:22
**surveilling**
    201:12
**suspect** 36:3
    59:3 80:19,24
    81:3,11,17
    82:5,14 84:18
    86:4,12 90:17
    91:9 253:11
    277:8 315:11
    325:22 326:3
    326:19 327:6,7
**suspected** 31:10
    37:12
**suspects** 29:7
    37:14 80:18
    86:4,9 93:10
    274:18
**suspicion** 197:2
    197:21 256:18
**suspicious**
    180:21 181:15
    186:5 234:4
    312:4,5 333:18

**swear** 5:8
**switch** 318:23
**sworn** 5:12,14
    9:12 20:6
    342:10 345:17
**symbol** 74:19,20
    74:23
**system** 128:24
    129:1,6,10,16
    131:3 291:20
**systems** 129:22

|  |
| --- |
| **T** |

**t** 16:24 55:12
    109:11,11
    208:13 344:11
    331:9
**table** 283:17,20
    283:23 334:1
**taint** 241:21
**take** 6:24 57:23
    76:22 82:7
    111:12 119:5
    134:18 139:11
    155:16 190:4,9
    200:4,10
    210:19 211:12
    214:11 215:6
    226:6 227:8
    228:16 229:1
    230:12,17
    242:23 245:15
    248:1 249:14
    257:21 262:19
    289:4 291:14
    306:24 310:2
    318:20 321:6
**taken** 1:16 97:18
    101:13 201:3
    208:18 212:3,8
    226:7 233:7,17
    243:16 247:6
    247:14,18,19
    342:5 345:9
**talk** 14:19 39:13
    44:16 45:3
    61:24 76:20

97:11 99:8
101:14,18
119:23 121:13
142:22 143:12
145:19 146:14
154:20 160:7
161:4 163:12
165:20 166:13
168:13,14,18
169:4,5 170:3
171:14,18,23
174:2 179:20
181:20,24
182:5,21
195:12 197:12
200:6 207:23
208:21 210:24
211:3 212:21
213:4 228:20
229:19,24
230:13,18
238:4 240:9
241:12,23
248:7 249:6,9
249:12,17
251:18 252:21
253:10,19,22
255:17,19
258:7,19
266:10 268:13
269:15 270:11
271:17 273:21
283:2 284:7,10
284:13,13,16
284:17,20,22
285:2,8,14,18
285:23 286:5
286:13,17,20
286:21 287:9
287:18,20
288:3 289:2
321:17 322:12
323:9 324:6
329:1 337:12
337:15
**talkative** 89:6
89:12 283:18

284:5 285:16
308:8 337:4,7
337:13,19,20
**talked** 10:14
44:19,22 47:3
47:18 65:16
66:4,12 96:4,7
97:16 103:3,19
104:10 105:3,5
107:22 108:2
130:14 142:20
142:21 145:8
146:9 157:5,8
157:11 158:13
161:24,24
166:12 176:19
177:2 179:7
180:4,16
184:13 186:8
186:12,14,14
195:11 201:8
208:5 210:14
211:10 228:3
228:24 229:11
229:20 235:1
238:22 253:9
256:21 259:5
266:14 268:18
277:18 280:15
284:9,9 285:7
287:2 294:12
308:22 320:20
320:20 323:16
323:20,23
324:4 326:1,4
326:8,10
327:10,16,21
328:4,10
332:16 334:10
337:18
**talking** 6:13
43:18 45:9
52:16 59:23
60:9 61:4
71:18 73:20
76:9 79:2 83:5
84:11 93:23

120:18 121:16
126:3 137:13
145:12 146:3,6
147:23 156:9
160:24 161:10
168:20,21,24
169:8,13,19
170:2 171:1,20
172:3,18 174:6
174:12 175:1
177:15 179:20
180:8,10
182:23 185:17
187:9 189:7,11
189:14,15
191:14 208:19
209:1,2 214:16
224:8 229:2
234:23 238:8
245:19 254:2
258:22 266:19
268:1 284:24
285:20 286:4
287:22 288:8
292:13,18
293:3,8 294:9
314:11 316:15
321:8 322:2
324:14 325:18
332:5 334:24
337:6,21
339:11
**tape** 215:5
268:10 282:16
318:23
**taped** 268:9
282:14
**tara** 2:4,8 4:18
5:20 340:18
**tasks** 152:3
297:16
**team** 106:21,21
133:9,10 139:7
140:5,10,10,14
140:22 146:12
243:14 245:24
**teams** 106:24

107:2,4
**technical** 19:4
**technician** 38:20
39:4 313:22
**technicians**
314:2
**technique** 84:24
85:17,24
252:20
**techniques**
29:12
**telephone**
323:21
**television** 64:1
**tell** 15:2 26:10
60:21 64:13
69:20 77:9
116:20,23
126:13 133:17
149:7 162:6,11
163:2 181:11
203:10,21
204:2 209:12
211:6 244:21
248:19 249:19
249:24 250:3
250:12 254:6
255:12 257:17
257:21 274:12
279:1,11,18
281:23 293:10
294:19 315:15
320:2 338:23
340:3
**telling** 15:12
119:17 223:5
288:22 293:22
294:5 295:9,19
329:20 330:3
**tells** 225:17
**ten** 18:22 117:10
141:15 175:23
**tenants** 136:11
**tended** 117:20
118:6
**term** 11:19
121:15 172:7,9

172:16,19,23
172:24
**terminal** 129:7
**terms** 11:4,17
12:12 13:1
28:14 50:20
80:15,22 81:5
82:1 100:22
104:10 141:21
256:14 295:7
**test** 22:5,8 127:4
206:10,19,24
246:4,5 254:11
**tested** 21:20
**testified** 5:13
7:15 38:5
70:10 131:13
161:20 163:10
238:9,18 241:6
244:1 245:4,7
275:8 323:18
331:3 332:8
**testify** 23:11,15
24:6,11 37:17
37:20 38:1,9
241:14 264:17
264:21 302:13
**testifying** 243:20
**testimony** 7:6,14
7:22 9:7,12,12
9:13 57:8,12
58:15 59:1
68:10 70:13
89:24 129:24
131:14,17,21
131:22,22
132:1,5,8,8,9
136:4 142:14
185:17 218:14
219:15 221:1
221:14 234:12
235:5 238:1,2
238:5,7 244:3
264:11,12
265:7 266:21
269:2,8 275:7
276:19 280:5

Siebert & Assocs. Court Reporters, Inc.      cmsreporters@comcast.net

284:15,21
330:12 346:16
**testing** 21:19
22:9
**text** 46:15,16
215:20 216:4,6
216:15,20
237:11 239:4,7
239:18 241:1
**thank** 61:10
338:2
**thanks** 289:6
**thats** 8:4 13:14
13:19 16:10
28:3 29:14
33:10,24 39:19
53:16 54:7
55:5 56:4
57:20 59:8,11
62:19,22 63:4
66:17 68:15
69:3 70:4 78:2
78:11,13,16,22
78:23 79:21
80:1 81:7,12
82:9 85:22
87:3,19 88:6
92:18 96:13,22
98:2 101:5
116:15 118:1
119:6 124:19
125:14,19
126:16 130:2
131:2,6,8,16
132:5,6,16
133:10 134:24
139:15 140:19
146:4 147:23
156:17 157:4
158:12 161:17
163:11 164:24
172:8,15 176:7
176:7 178:2,24
180:5,6 183:20
184:15 185:14
194:3 198:6
201:9 216:13

218:5 223:13
223:15 227:15
232:3 246:5
249:16 252:14
253:5,11,13
256:21 267:5
268:12 269:4
270:3 281:6
282:15,22
283:20 285:11
290:4 294:13
299:6,9,13
308:3,23
309:12 314:10
314:13,19
315:5 318:1
319:23 322:22
325:20 333:13
**theme** 81:2
**thereof** 63:19
70:23
**thing** 80:21
105:1 144:20
160:6 175:12
184:9 312:14
317:23 321:11
**things** 6:3 70:12
70:16 71:18,20
118:15 127:10
151:19 152:20
182:4 186:6
280:8 291:24
**think** 11:22
12:20 27:21
31:23 35:7,10
37:8 39:15
46:17 70:20
71:3 81:17
84:4,12 86:20
86:21 89:7
91:15 103:18
104:1 110:22
112:13 113:10
117:4 118:11
118:21 120:20
124:7 125:14
135:4,5 142:13

153:18 161:23
161:23 162:3
162:19 164:7
171:1,7 172:8
176:16 179:13
183:9 184:9
186:2 187:13
187:20 188:23
192:3 196:15
198:18 201:9
205:1,4 221:18
232:14 239:1,1
239:24 240:10
258:13 262:6
265:8 270:8
273:17 283:5
290:10 308:22
311:2 316:18
320:8 322:2
328:5 329:6
330:5 340:19
**thinks** 62:19
**third** 65:4,6
238:21 269:23
**thomas** 53:12,19
54:23 66:9
**thompson** 2:4
4:18,19 5:16
5:20 7:20 8:20
12:9,18 14:9
16:4,21 23:21
24:2,5 33:15
34:5 42:12
43:23 45:17
47:2 54:11
60:20 61:8,12
61:23 63:22
65:21 68:8
70:8 71:3,11
73:13 74:15
75:18 83:20
85:13,23 88:24
90:6,14 92:11
93:2 96:16
99:2,13 104:1
111:9,23
112:22 113:1

120:14 122:20
126:1 128:17
147:17 149:10
180:18 185:1
189:1 200:17
207:4 208:1
215:4,14 218:5
219:18 220:24
221:12 222:7
223:17 224:24
226:3 227:6,15
228:9 237:3,6
244:6 245:19
250:10 254:1
260:9 272:3
280:14 289:6
289:16 295:14
318:22 319:8
320:16 324:18
328:6 330:4,20
337:8 338:6
339:24 340:14
341:1 331:5,6
**thorough** 99:8
219:23
**thought** 63:1,8
80:23 160:10
162:4,7,9,20
165:18 166:1,8
166:15 173:4
174:8 175:16
192:12 212:8
223:4,6 230:5
241:13 253:14
257:1,3 278:15
325:5,14
333:18
**three** 7:19,21
19:12 36:22
67:9,12 95:20
106:19 107:4,5
129:17 131:4
131:21 171:7
177:10 197:14
209:18,22
214:1 216:7
222:13 305:2

**threepage** 261:9
**threering** 93:18
**threw** 298:15
**throw** 62:8
**thrown** 244:18
**ticket** 203:15
**tied** 158:10
**tight** 179:1
**time** 4:9 7:1
11:15 15:14
21:1 22:12,23
23:12 26:2,11
26:14 27:11,13
28:13 29:21
30:3 31:6 35:9
36:11 40:3
42:22 43:13
44:23 56:4,11
57:23 59:15
62:22 63:6
69:10,15 71:4
71:5,10 73:18
81:3 84:3,6
91:11 93:6
94:13 96:3
97:13 98:9,16
98:21 99:3,15
99:18 100:3,10
101:6,24 102:3
102:15 103:2
106:3,9 107:7
107:22 108:2,7
111:11,16,21
111:24 116:17
117:11 119:10
120:5,15 121:5
122:12 124:16
124:16 126:23
127:3,6 128:21
129:6 130:10
130:23 131:20
134:17,19
135:1 136:2
137:18 138:22
140:11,15
141:8 143:23
144:7 145:11

Siebert & Assocs. Court Reporters, Inc.          cmsreporters@comcast.net

Page 370

146:22 147:5,6
148:24 149:3
149:24 152:2
153:18 155:6
155:18 156:9
158:19,23
160:11 163:10
167:20 169:7
169:23 170:1,2
170:8,13,17,20
173:22 175:18
176:6,7,13
177:2,6,23
178:13,18
180:8,16 181:7
183:13 186:7
191:12,15
195:22 198:20
199:5,6,14,19
199:20 200:2
202:19,24
203:17 205:13
205:24 206:9
208:8 211:9
212:23 213:5
215:6,8,12
222:23 225:10
225:21 231:8
231:11,24
234:17 254:16
254:18 258:5
259:7,11
260:11 262:12
262:13,16,18
262:19,20,23
262:24 263:2
263:21,23
264:4,5,9
265:20 268:14
268:19 269:17
270:16,21
272:19 273:2
275:13 276:4
276:15 279:6
279:10 280:18
280:20 281:1,9
283:3 288:7

289:8,14
291:19 297:17
298:20,24
299:15,24
300:5,9 308:2
309:3,5,13
316:14 319:1,6
325:11 326:8
326:17 334:7
335:7,12 339:6
341:5 342:7,18
**timeframe** 176:8
199:8 211:4
222:12 332:5
**timeline** 56:18
56:21,24 57:4
57:19,20 58:1
58:6,22 59:5,7
60:14 62:1
63:11 64:12
66:4,7,13 67:5
67:8 68:9 69:8
69:19,20,21
76:16 175:13
176:2
**timelines** 73:19
76:10,23
**times** 7:19 9:21
15:13 23:15
24:7,9 29:5
37:23 38:5
98:18 106:1
176:10,11
178:7 259:18
267:16,18,21
276:7 280:22
298:22 325:18
325:24
**timing** 117:13
178:4 219:3
**timingwise**
161:9
**tina** 42:17,23
43:4,19 44:2,8
63:1,8 79:23
114:6 115:21
115:22 116:10

117:7 129:2
143:12 150:13
156:8 157:9
158:18,21
159:8,12
160:24 161:7
162:20,23
163:3 164:15
164:22,23
166:4,8,11,13
167:14 168:12
168:21 169:13
169:19 170:4
170:17,22
171:4,9,12
173:1,12 174:1
174:3 175:14
175:16 177:23
178:13 179:4
181:23 182:1,6
182:14,21
186:16,17,22
187:15 189:24
190:21 191:17
191:21 192:19
195:5 197:3
200:19,24
201:12 202:16
203:23 209:8
233:12,22
234:2,4 241:2
241:6,8 246:1
246:20 266:10
266:14,19
278:17 296:18
323:13,16
327:23 328:5
328:12,19,22
329:12 331:19
332:2,3,11,15
332:20,22,24
333:11,12
338:12,14
340:8
**tinas** 171:15
172:18 329:4
**tired** 87:21

260:3,8,15,16
**title** 28:6,10,11
28:14,19 39:18
39:21,24
**tm** 62:18
**today** 5:5 7:7
10:15 14:23
15:1 33:1,5
42:19 80:10
82:10 86:11
96:3 103:2
105:8,15
107:23 116:21
116:23 121:8
131:15,18
132:3,13 192:9
217:17 218:12
222:18 223:8
223:18 234:13
235:6 236:9
239:11 241:24
243:21 245:4
246:19 296:15
303:15,17
323:17 337:3
340:20
**todays** 4:8
**told** 27:21 56:3
63:8 91:18
150:7 154:13
161:21,23
163:3 165:13
181:24 182:1
182:10 184:8
184:12 198:16
200:3 201:22
211:7,14,22
223:3,21 224:9
224:16 225:2
226:10 227:4
232:5 252:16
252:22,24
254:12,15
256:21 257:7
257:13 259:19
267:2,3 268:9
269:19 274:23

278:17,22
279:12,14,16
279:17,21
283:13 286:7
290:5,9,13
291:7 293:23
294:16 320:12
321:12 329:20
331:13
**tom** 54:2,6
**tomorrow** 217:2
**tone** 186:3 333:6
333:9 339:18
**tool** 247:2
**top** 46:11 238:23
238:24 269:23
312:3 315:21
**topic** 47:14
288:20 321:19
**topics** 35:12
82:9
**tortured** 86:24
**total** 37:23 38:3
65:5 185:10
236:16
**touch** 152:10,16
213:16 340:11
**town** 20:24
**township** 17:19
**track** 292:3
**tracking** 291:20
**traffic** 202:5,12
203:15
**tragedy** 186:11
**trailed** 338:22
338:24
**train** 30:18
**trained** 140:7
247:4
**training** 19:5
29:22,24 30:3
30:6,12,15,18
32:22 33:18,19
33:21,22 34:6
34:13,17 38:7
38:17 72:10
80:11,14 81:9

Siebert & Assocs. Court Reporters, Inc.                    cmsreporters@comcast.net

Page 371

81:13,24 82:8
82:18,21 84:16
84:17,22 85:2
90:15,20
117:23 118:10
119:18,19
120:3,7,8,12
120:21,23,24
120:24 140:7
232:2,22 247:1
247:13
transcribed
342:13 346:18
transcript 320:9
345:5,9
transcription
342:14
transcripts 9:11
transferred
26:13,15,18,24
27:4 28:12
106:4 110:13
transmitted
265:11 313:13
transmitting
116:12
transport
204:17
transported
133:23 156:23
202:5
treatment
246:10
trembling 186:1
trespassing
130:21
trial 11:11 50:22
56:6,13 72:6
101:19 105:2
107:9 108:1
217:6,10 219:9
237:24 238:5
238:15,17,18
239:16 240:21
264:11 265:15
265:16,21
323:5 324:9,14

triangle 74:20
74:23
tribune 269:24
tried 133:6
258:19 326:21
330:2
trouble 165:23
trucks 144:19
true 7:6 58:23
60:3 92:18,20
143:24 225:4
226:15 227:10
228:19 229:9
230:8 232:1,4
232:11,18
235:16 275:20
280:9 284:6
301:9 308:7
342:15 345:8
trunk 189:16,18
190:7,8,10,12
194:10,17,20
trusted 210:10
trustee 290:18
290:21
truth 86:3
226:11,19
227:5
truthful 83:5
84:1
truthfulness
83:11
try 80:24 124:4
124:10 138:10
142:22 150:21
165:16 174:9
179:19 184:4
188:2 193:8
221:22 291:14
trying 112:17
146:4 156:2
165:12 187:10
188:10,15
221:17 233:5
239:19 241:20
284:22 325:21
326:2,18

328:22
tshirt 307:9
tuesday 51:15
turn 52:24 56:15
62:13 72:16
311:18 317:2
turned 176:15
299:21,23
300:8
twice 7:15 9:22
two 16:12 18:16
26:17 34:20
35:8,12,17
37:1 40:20
53:7 65:19
73:19 76:9
79:1 107:2,4,5
122:1 129:17
157:24 197:13
198:18 233:9
238:23 263:7
263:10,16
286:16 304:14
304:19 305:12
305:14 316:9
twopage 289:18
type 6:18 89:24
336:20
typed 240:4
306:5
typical 243:12
typically 122:1
213:24 315:1
318:4 337:15
typing 298:24

————————
      U
————————
u 33:24 107:8
133:12 143:13
208:13 209:17
292:14
ughugh 6:19
uhuh 6:19
ultimate 142:10
ultimately
141:23 142:10
227:21

unable 7:6
unavailable
274:24 296:8
296:11,13
unclear 327:7
uncommon
214:1
undercover 25:1
34:9
underline 73:23
underlined
61:15,18 73:3
73:8 74:4,10
underlining
74:7
underneath
152:20 306:21
undersigned
342:13 343:1
346:24
understand
27:20 45:22
63:23 70:9
74:23 76:17
84:4 86:4
121:16 122:8
129:24 172:10
181:11 183:22
221:22 222:2,3
223:5 232:15
304:17 324:23
understanding
10:17 11:3
58:19,21 62:21
63:4 82:2
97:22 98:1
118:19 124:23
134:19 135:13
137:21 138:2
138:23 139:19
140:3,6,19
150:3 156:24
157:4 174:12
174:15 176:2
177:14 200:1
201:1,5 205:13
210:11 237:20

242:6 244:17
248:11 250:15
250:19 251:24
252:3 253:12
253:15 255:18
257:6 268:6
270:23 272:19
279:23 281:1
286:12,18
290:23 296:14
understood
139:8 171:3
265:5
unidentified
1:10
uninterrupted
332:16
unit 22:22 23:3
23:7,8 25:14
25:15 26:16,17
26:19,21 27:1
27:12 28:13,22
28:23 29:4
33:21 38:12
95:23 98:13
99:14,18
105:18 106:3
122:22 123:2
123:12,19
126:22,24
141:20 144:15
144:22,23
146:17,22
147:4,6,9,10
147:18,20
148:1,15,19,24
149:24 150:12
150:18,22
151:2,8,10,11
152:1,7,11,23
153:3,11
154:21,24
155:22 157:3
222:20 242:2
242:24 243:3
243:16,23
united 1:1,20

Siebert & Assocs. Court Reporters, Inc.    (773)851-7779    cmsreporters@comcast.net

Siebert & Assocs. Court Reporters, Inc.      cmsreporters@comcast.net

Page 372

4:4 225:18
**units** 153:5
**university** 18:7
34:21
**unknown**
156:13
**unmarked** 202:4
**unopened** 194:7
194:13
**unsolicited**
294:7
**unwilling** 296:3
**unwittingly**
90:17
**updated** 35:15
**upset** 164:24
165:5,10
185:18,23
207:14
**upstairs** 169:15
169:22 170:3,7
181:20 182:6
186:15,20
187:16,19
233:22 305:22
305:24 306:6
313:16 315:3
332:2
**urgent** 122:4
**use** 50:20 58:24
60:7 61:4
121:15 122:7
172:6,15,16,24
247:2,5 250:16
253:2 302:11
307:24 339:18
**utilities** 184:9

     **V**

**v** 4:3 315:11
346:12
**various** 77:7
149:1 227:17
297:9,15 298:9
298:11,22
308:13
**verbal** 6:20

**verbally** 206:17
261:1
**verbiage** 115:4
**verdict** 216:21
217:5,8 323:4
**verifying** 231:8
**versa** 335:22
**version** 225:4
230:6
**versus** 17:1
123:16 315:10
325:22
**vice** 335:22
**victim** 315:11
**victims** 156:17
**video** 4:9,13
319:10
**videographer**
3:2 4:1,11 5:4
71:5,9 111:15
111:20 215:5,8
215:12 289:7
289:14 319:1,6
341:5
**videotaped** 1:15
4:2 6:17
**view** 173:1
232:6
**villa** 40:10
**village** 20:23
**violated** 324:21
**violence** 87:10
**violent** 82:15
89:9 102:7
307:17
**virtually** 100:19
**visit** 163:17
**visual** 307:11
**vividly** 36:21
**vocational** 19:5
**vodka** 74:9
222:21 230:7
230:12,20
231:1,18,20,21
232:7 269:20
269:23 321:13
321:21 322:1

331:14
**voice** 4:16 186:2
333:10 339:18
**volume** 339:19
**vs** 1:6

     **W**

**w** 43:14 55:12
63:12 270:24
329:14
**wacker** 281:17
**wait** 6:11 11:14
122:14 201:23
335:4
**waiting** 201:18
230:2 240:13
240:18 241:8
241:15 254:22
255:1 334:19
335:14,16,24
**waived** 342:21
346:19
**waiver** 261:15
261:24 302:19
309:10,14
**walk** 152:7
**walked** 150:16
164:6 187:22
244:10 279:9
305:21
**walking** 150:19
165:24 210:8
**walkthru**
152:14,21,24
**wall** 147:10,16
242:11,15,19
242:21 335:23
**wallet** 310:20
**want** 6:1 13:21
17:14 22:18
39:11,13 47:10
52:24 53:3
56:15 66:16
71:12,15,19
77:16 84:9
86:4 87:18
88:15 91:3,13

93:3 94:6
96:14 111:9,14
121:13 122:8
125:16 126:9
126:13 168:2
172:14 197:24
199:4 235:3
236:20,23
238:20 241:7
241:11,14,23
245:9 270:9
284:13,19
285:18 286:17
289:4,21 314:7
314:7 322:23
330:5 339:23
340:1,22
**wanted** 16:8
20:22 21:14
69:16 119:18
161:4 181:22
190:22 239:13
246:9 252:4
259:18 264:19
265:6 268:9
280:1 295:24
308:24
**wanting** 88:12
191:7
**warnings** 78:15
272:23
**warrant** 31:2,5
76:15 173:13
200:3,9 203:14
203:21 322:7
330:13
**warrants** 198:5
198:9 205:15
205:20 245:14
308:24
**wasnt** 58:10
70:3 76:12
78:6 120:12
130:5 140:4
145:4 165:19
174:1 185:24
186:2 196:11

222:22 233:2
245:24 250:24
279:10 308:2
325:17 326:23
333:12,19
340:2
**watch** 133:6
263:2 299:6,8
299:17 337:17
**watched** 132:20
132:23
**watching** 188:12
188:19 201:15
**water** 144:19
**wavering** 186:2
**way** 50:15 66:6
73:14 74:4
83:22 113:21
114:23 116:15
123:14 139:10
145:5 151:5
165:24 166:8
169:1 170:16
175:10 179:4
185:11 186:9
188:15 203:5
205:1 206:22
207:17 213:11
219:11 225:8
229:12 230:15
232:5 236:10
237:21 252:18
253:9 255:7
259:21 261:2
263:13 265:18
278:9 279:8
281:13,14
282:1 283:23
283:24 298:1
336:15,19
**ways** 277:19
**wc** 299:3 312:22
**weapon** 309:24
**wearing** 146:24
307:9
**wednesday** 9:24
10:3

Siebert & Assocs. Court Reporters, Inc.          cmsreporters@comcast.net

Page 373

| | | | | |
|---|---|---|---|---|
| **week** 234:8 | **white** 72:24 | 230:11 231:7 | 61:11,22 63:21 | **worded** 113:21 |
| **weekend** 121:24 | **whos** 54:22 69:2 | 232:1,20 | 65:15 68:7 | 118:16,17,20 |
| **weekends** 123:7 | 76:2 | 234:14 235:8 | 70:1 71:1 | **wording** 113:14 |
| **weeks** 18:23 | **widely** 90:21 | 235:23 236:12 | 73:12 74:14 | 113:16 114:12 |
| **weight** 306:8,13 | **wideranging** | 237:12,15,19 | 80:20 81:11,17 | 114:14 |
| **went** 25:13 26:2 | 174:9 | 244:21 245:9 | 81:23 82:5 | **words** 59:21,22 |
| 27:4 28:21 | **wiedmann** | 245:13 246:8,9 | 83:17 85:11,22 | 60:7,22 65:6 |
| 38:19 60:10,23 | 270:24 271:6 | 248:2,8 249:10 | 88:21,23 90:1 | 79:3 98:17 |
| 103:14 120:13 | 271:22 272:5 | 249:20 251:12 | 90:4,12 91:9 | 114:21 183:6 |
| 128:12 143:11 | 272:15,20 | 251:19,21 | 92:9 93:1 99:5 | 268:23 275:9 |
| 144:23 145:9 | **wife** 154:19 | 252:2 253:8,14 | 113:2 120:11 | 293:22 |
| 145:10,13 | 164:14 209:3 | 253:19 254:6 | 122:18 128:16 | **work** 14:23 15:1 |
| 146:17,19,20 | 293:11,13 | 261:16 262:3 | 138:2 147:15 | 19:8 29:3 30:4 |
| 147:4,5,8,18 | **william** 1:4 3:4 | 266:21 268:14 | 149:6 180:15 | 30:21 31:5,10 |
| 148:1,15 153:9 | 4:3,19,21 | 269:15 270:21 | 184:23 188:23 | 31:13 32:1,5,9 |
| 153:14 155:1 | 30:21 31:6,11 | 271:2,7 272:10 | 200:15 207:3 | 34:19 35:3,20 |
| 157:15 158:3 | 31:19 32:1,5,9 | 272:16,20 | 207:22 219:16 | 35:24 36:8,15 |
| 158:12 160:9 | 36:8,15 44:3 | 274:6 276:6 | 220:20 221:10 | 38:3 42:13,16 |
| 160:14 161:11 | 44:23 47:20 | 287:2 292:4 | 222:4 223:13 | 42:17 44:10 |
| 161:14 162:16 | 48:15 51:20 | 293:17 294:7 | 224:7,21 227:3 | 66:13 79:4 |
| 164:9,20 | 59:22 60:22 | 294:20,24 | 228:7 244:8 | 96:1 98:6 |
| 165:19 167:15 | 61:5 62:23,24 | 295:6,20 296:9 | 250:8 253:22 | 100:17,20 |
| 168:16 169:16 | 63:6,16 65:23 | 302:17 309:8 | 260:7 261:7 | 101:21 102:17 |
| 170:7,11,14 | 66:10 67:5 | 309:18,24 | 272:1 280:13 | 105:24 106:15 |
| 177:17 181:20 | 82:12 96:8 | 315:21 318:17 | 289:17 295:13 | 106:21 108:6 |
| 182:16,19,24 | 97:3 103:21 | 322:17 324:9 | 296:22 303:20 | 108:13,16 |
| 186:12,15,18 | 104:9 107:9 | 325:4 326:1,17 | 304:4,7,10 | 109:15,19,20 |
| 186:22 187:24 | 109:2,6 110:5 | 327:5,13,18 | 315:11 324:13 | 110:12 111:10 |
| 188:1,18 | 110:16 111:5 | 329:16,19 | 325:23 326:3,6 | 121:21 122:1 |
| 190:14 192:19 | 112:6 114:19 | 330:9,18 | 326:19 327:7 | 125:15 126:8 |
| 195:8,19 197:1 | 115:5 127:22 | **willing** 219:6,19 | 328:3 330:1 | 127:18 138:19 |
| 242:9 253:17 | 128:2,10,13 | 249:14 286:20 | 337:10 339:23 | 176:1 198:23 |
| 275:22 277:23 | 130:11,14,19 | **willingly** 127:12 | 342:5,10,18,20 | 199:10,13 |
| 278:2,5 282:19 | 132:1 143:18 | 127:16 | 343:4 345:1 | 208:10 266:5 |
| 285:22 288:2 | 144:6 150:12 | **window** 176:20 | 331:2 | 275:1 278:3 |
| 298:7 300:6 | 157:11 166:16 | 176:24 177:1 | **witnesses** 41:13 | 297:5 324:17 |
| 310:13 314:13 | 171:24 197:3 | 179:1 284:10 | 41:14 80:17 | **worked** 19:16 |
| 315:3 332:3 | 197:20 198:8 | **windows** 151:18 | 104:23,24 | 34:14 94:21 |
| **west** 2:14 346:8 | 199:7 200:9 | **windy** 183:15 | 139:12 | 95:23 105:17 |
| **weve** 318:23 | 212:11 217:10 | **witness** 5:8,11 | **woman** 99:24 | 106:18 108:20 |
| **whats** 45:18 | 218:15,20 | 5:14 7:19 8:18 | 138:5 182:11 | 108:23 110:1 |
| 48:17 55:9 | 219:20 220:13 | 12:17 15:20 | 209:16 | 122:22 129:3 |
| 119:2 216:1 | 221:3,5 222:19 | 16:20 23:20 | **word** 51:2 60:23 | 133:15 141:7 |
| 303:20 304:4 | 223:24 225:2 | 33:14 42:11 | 118:14 122:7 | 155:17 169:3 |
| 304:10 | 227:8,18 | 43:22 45:18 | 269:4 293:18 | 247:7 277:4 |
| **whatsoever** | 228:14,17 | 47:1 54:10 | 319:24 337:23 | **working** 23:2 |
| 232:22 | 229:8,13 230:1 | 58:7 60:19 | 339:4 | 26:7 32:22 |

Siebert & Assocs. Court Reporters, Inc.          cmsreporters@comcast.net

Page 374

40:7 42:24
51:24 52:20
104:18 124:17
158:11 175:15
177:21 199:9
202:14,24
240:21 265:19
291:2 317:8
**workrelated**
32:20
**works** 55:3
107:20
**worried** 310:3
**wouldnt** 113:20
141:2 158:8
279:24,24
**wound** 160:9
**write** 65:15
78:14 187:13
267:2 309:2
318:2
**writing** 114:13
261:1 262:18
264:6 267:12
267:19,23
268:15,17,24
270:12 300:3
306:1 313:19
347:13
**written** 36:4
78:17 93:7,15
104:22 114:9
224:8,10,12
228:18 262:14
263:21 266:13
266:14
**wrong** 142:15
167:9
**wrote** 113:14
262:16,20
263:2,23
266:21 267:7
269:4,11
270:22 309:5
309:11
**www** 3:3

**X**

**x** 81:18 261:22
265:1,1 331:1
331:9

**Y**

**y** 81:18 97:7
107:8 339:1
**yeah** 125:14
147:23 216:13
216:13 241:23
**year** 17:21 20:16
35:10 39:23
103:5
**years** 16:12
19:12 23:16
26:17 102:14
108:4 110:14
171:7 175:23
302:14 324:16
**yelled** 234:2
**yesterday** 10:1,6
**young** 37:1
171:6
**youve** 16:22
40:21 275:7

**Z**

**z** 15:10 16:24
63:12 81:18
208:13
**zdan** 15:10
**zero** 232:2
**zoo** 20:3,6,12
21:3

**0**

**0** 310:22
**00** 51:15 254:17
347:3,3
**001355** 1:22
343:9
**02** 106:7
**02523** 1:6
**03** 106:7 215:8
**084** 1:22 343:9

**1**

**1** 4:2 45:15,19
46:4,15,17,22
51:15 53:13,17
54:12 77:21
111:21 264:1
311:10 315:24
345:6 331:11
**10** 1:18 4:9
23:22 24:6
71:4 151:24
177:19 304:2,5
304:11 331:19
**100** 38:5 99:22
189:23
**1020** 299:12
**10minute**
177:11
**10th** 59:24 76:10
132:15 139:18
199:1 269:5
297:11 326:5
**11** 65:3 71:6,10
111:21 262:19
272:24 309:6,9
**112** 331:13
**11588** 216:4,14
216:19
**11589** 236:21
237:4
**11590** 216:5,11
216:14 238:21
**118** 331:14
**11th** 76:11 154:8
199:1,20
297:11 326:21
331:24
**12** 51:13 111:16
**1240a** 2:15
346:9
**13** 1:18 17:1
**14** 215:12 264:1
**141** 2:14 346:8
**15** 4:9
**1520p** 59:12
**15th** 58:8 76:12

173:14,18,24
198:2,9,21
199:1,8,21
203:3 205:11
207:5 208:4,8
245:18,20,23
246:5 296:7
297:12 322:8
322:10 326:21
331:4
**17th** 297:11,12
**18** 1:6 4:7
**19002** 261:10,15
**19003** 263:19,21
266:20
**19004** 261:11
**19105** 289:19
**19106** 289:20
**19108** 297:1
**19116** 297:1
**19179** 304:9
**19180** 304:9
**1977** 17:22
**1979** 18:14
**1981** 18:11
**1982** 20:17
**1985** 22:16
108:18
**1988** 23:6
**1991** 25:10 26:3
28:21
**1995** 30:1 44:19
59:24 83:8
94:1 95:4,8,16
99:1 103:6
104:12,18
105:12 132:15
219:24 265:16
269:5 273:23
285:21 287:3
287:15 292:6
296:7 300:10
331:4,6 333:23
334:5 336:8,24
**1996** 25:4 26:12
132:5
**1998** 27:3 39:1

**19th** 53:13 54:3

**2**

**2** 47:23,24 48:18
48:19 50:6
51:1 52:24
72:12,20 73:7
74:1 77:5 80:8
114:5 237:3
313:9 314:14
315:24 343:5
346:5 331:12
**20** 61:14 214:2
**2000** 27:6
**2001** 106:7
**2006** 26:1,5,23
**2009** 19:1 22:16
**2015** 41:23
**2016** 46:8 47:5
47:12 52:14,18
**2017** 51:13
52:14,18 53:13
55:22
**2018** 42:21 43:5
44:8 52:14,19
57:9,12 58:15
59:2 68:10
132:1,7 216:21
220:9 239:5
264:11,21
265:7,15
**2020** 1:19 4:9
343:5 345:10
345:19 346:5
346:17
**207** 342:22
**20th** 216:20
217:4 300:9
**211** 342:22
**215** 331:15
**218** 133:22
134:5 153:3,5
195:19 196:2
**21st** 237:10
**23** 319:1
**2398** 17:1
**2523** 4:7

Siebert & Assocs. Court Reporters, Inc.     (773)851-7779   cmsreporters@comcast.net

Siebert & Assocs. Court Reporters, Inc.              cmsreporters@comcast.net

Page 375

**25th** 239:5,7
**26** 319:6
**261** 331:16
**27** 54:6
**27th** 51:13
  314:21
**289** 331:17
**296** 331:18
**2nd** 51:15

_____

**3**

**3** 54:6,20 112:18
  112:20 113:3
  215:8,12
  216:11 300:22
  301:1 311:18
  311:18 331:12
**30** 61:15,17
  142:16,19
  143:2 145:8,13
  145:22 146:2,8
  147:7 346:21
  347:13
**303** 331:19
**304** 331:20
**30ish** 272:24
**30p** 61:14
**31** 51:13
**311** 1:17 2:6
  4:14
**338** 331:7
**348** 345:6
  331:24
**35** 71:6
**36** 111:16
**37** 262:19 309:6
  309:9
**3768** 346:2
**38** 289:8
**3rd** 1:17 58:9
  208:9 212:19
  227:18,19
  235:10 248:15
  249:6 251:14
  253:4 259:8
  261:17,18,19
  273:22,24

274:6 281:19
287:5 321:10
321:16 326:9
326:10 331:5
333:22 334:5
336:8

_____

**4**

**4** 118:24 119:3,8
  148:14,14
  254:17 287:3
  289:8,14 347:3
  331:13
**40** 176:4 177:9
  178:10,22
**40hour** 38:19
**43** 176:6 177:10
  177:14 178:23
**45** 65:3 331:11
**46** 71:10
**47** 331:12
**48** 289:14
**49** 75:17 77:9,12
**4th** 2:6 66:17
  227:14,19
  235:11,18,24
  259:8 273:23
  273:24 274:7
  281:19 287:5
  321:10 331:6
  333:23 334:5
  336:8

_____

**5**

**5** 215:16 216:2
  236:20 319:1,6
  319:20 341:6,8
  331:5,14
**50** 24:9
**56** 53:13,17
  341:6,8
**59** 176:7 177:12

_____

**6**

**6** 59:12 61:14
  176:4,6 177:9
  177:10,14

178:10,22,23
261:5,8,12,13
261:14 331:15
**60** 78:20 310:22
**60604** 2:16
  346:10
**60607** 2:7 4:15
**60634** 346:3
**61** 77:9,12 78:22
  79:1
**62** 78:18,19,23
  79:1
**65** 79:10,12
**66** 79:10
**6636** 48:20 49:2
  50:7,9 51:2,11
  54:12
**6637** 53:1,8
**6638** 54:19,21
**6639** 56:16 58:3
  59:6 62:1
**6641** 56:19 58:3
  62:2,14 64:10
**6642** 66:17 67:1
  67:9 68:9 69:4
  69:20
**6643** 70:12
**6644** 67:1,9
  68:10 69:20
  70:15,20
**6645** 72:17
  73:16 74:16
  75:2
**6646** 73:16
**6649** 75:13,19
  77:5
**6654** 77:17
**6656** 78:11
**6657** 77:5
**6658** 78:13
**6659** 78:16
**6665** 79:9
**6666** 79:9,19
**6863** 48:21 49:2
**6th** 199:20

_____

**7**

**7** 1:19 4:8 66:19
  289:12,18
  290:2 345:10
  346:17 331:16
**7632** 312:4

_____

**8**

**8** 147:7 296:20
  296:23 297:2,4
  298:10,14
  301:21,23
  331:17
**80s** 21:20,24
**8692** 304:12
  305:6
**8693** 310:10
**8694** 311:19
**8695** 314:3,5,9
  314:10
**8696** 315:16
  316:7,15
**8697** 304:13
  317:3,3,6
  319:9
**8906** 119:4
**8965** 305:6

_____

**9**

**9** 303:18,21,21
  303:23 304:6,8
  347:3 331:18
**9033** 113:4
**91** 25:12
**910** 70:2,4,6
  312:2
**91095** 59:8
**911** 70:2,5,6
**915** 331:7
**9470** 45:20
**95** 139:18
  261:17,19
  288:9 290:6,19
  291:17 292:1
  297:12 299:12
  312:2 314:21
**96** 25:18
**97** 132:5

**9th** 114:9 285:21
  287:15 290:6