**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| JEANNE OLSON as successor plaintiff for WILLIAM E. AMOR, | ) ) ) | |
| Plaintiff, | ) ) | No. 18 CV 2523 |
| v. | ) ) | Judge John J. Tharp, Jr. |
| REBECCA GOMEZ as Special Representative for the Estate of MICHAEL CROSS; ROBERT GUERRIERI; and the CITY OF NAPERVILLE, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

The parties' *Daubert* motions are before the Court. For the reasons explained below, the defendants' motion to bar the testimony of Douglas Carpenter and Dr. Richard Leo [244] [239] are granted in part and denied in part; the plaintiff's motions to bar the testimony of Dr. David Icove and Dr. Michael Welner [229] [245] are granted in part and denied in part; and the plaintiff's motions to bar the testimony of David Ferreri and Mitchell Kushner, and Brian Nigohosian [233] [231] are granted with respect to their capacity to testify as expert witnesses in this case.

## BACKGROUND

William Amor spent over twenty years in prison for an arson-homicide that he insisted he did not commit, despite confessing to doing so during the original investigation. After the state court vacated his conviction on the basis that his confession was scientifically impossible, the court found Mr. Amor not guilty on a bench retrial. Mr. Amor then filed this lawsuit against the City of Naperville and several police officers in the Naperville Police Department who

conducted the original investigation. At this point, the only remaining individual defendants are Detectives Michael Cross, who is deceased, and Robert Guerrieri.[1] This case is scheduled to go to trial on the plaintiff's claims for coercing an involuntary confession, conspiracy to violate his constitutional rights, failure to intervene, intentional infliction of emotional distress, and state civil conspiracy. Both sides have disclosed several expert witnesses who will address the central issues of how the fire may have started and the science supporting or discrediting Mr. Amor's confession (the fire science experts), as well as the circumstances of Mr. Amor's interrogation and whether the tactics the defendants employed may have been coercive (the false confession experts). Both sides have moved to exclude the other side's experts from testifying.

## *DAUBERT* MOTIONS

The admission of expert testimony is governed by the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Fed. R. Evid. 702, which provides that to admit a "witness who is qualified as an expert by knowledge, skill, experience, training, or education," the proponent must demonstrate, by a preponderance of the evidence, that,

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. In *Daubert*, the Court interpreted Rule 702 as appointing courts the gatekeeper to ensure "that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." 509 U.S. at 592. The Court's role as gatekeeper, however, is cabined to its review of the expert's methodology and analysis—*Daubert* does not invite the

---

[1] The City of Naperville, Illinois, remains a defendant as to the plaintiff's indemnification and respondeat superior claims, but will not be identified as a defendant at trial.

Court to critique the expert's ultimate conclusion or undertake its own efforts to debunk the underlying theory, so long as the opinion is based on "reliable principles and methods." *Eagle v. Vee Pak, Inc.*, 343 F.R.D. 552, 565 (N.D. Ill. 2023) ("Rather than scrutinizing the accuracy of the expert's conclusions, the Court evaluates 'the soundness and care' of the expert's analysis.") (quoting *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015)). "The district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013).

## I. The Fire Science Experts

### A. *Plaintiff's Expert Douglas Carpenter*

The plaintiff disclosed Douglas J. Carpenter, a certified fire and explosion investigator, as an expert witness in this case. Mr. Carpenter served as a witness for Mr. Amor in his post-conviction proceedings and authored two expert reports on his behalf. Pl. Resp. 2, ECF No. 259. The plaintiff disclosed those two reports and an additional supplemental report in this case. *Id.*; Suppl. Report Ex. 3, ECF No. 259. The defendants identify four of Mr. Carpenter's opinions as pertinent to their motion, specifically "(1) the origin of the fire was the reclining chair in the living room; (2) the ignition source was a lit cigarette; (3) the first fuel ignited was polyurethane foam in the reclining chair; and (4) the cause of the fire was accidental." *Daubert* Mot. 3, ECF No. 244.

The defendants do not challenge Mr. Carpenter's qualifications to offer an expert opinion on this topic, so the Court notes only that Mr. Carpenter has a master's degree in fire protection engineering and has "personally investigated hundreds of fires" since 1996. *Daubert* Mot. 4, ECF No. 244; Carpenter Aff. Ex. 5, at ¶ 2, ECF No. 259. Rather than contest his qualifications,

the defendants lodge several objections to the admissibility of Mr. Carpenter's opinions, including that (1) he fails to utilize "undetermined" as a cause classification of the fire, instead referring to it as accidental without basis, *id.* at 4-5; (2) his hypothesis that the fire's origin/cause was a lit cigarette left in the recliner lacks concrete evidence, *id.* at 5; (3) he did not reliably apply his methodology in creating a Consolidated Fire and Smoke Transport ("CFAST")[2] model to predict the travel smoke in the apartment, *id.* at 9; (4) his CFAST model and associated timeline of events should be barred under Fed. R. Evid. 403, *id.* at 12; and (5) his opinions regarding thermal heat and Ms. Miceli's incapacitation are based on sufficient facts and unreliable methodology, *id.* at 13. For the reasons described below, all challenges are denied, except the challenge to Mr. Carpenter's classification of the fire as "accidental," rather than "undetermined."

Addressing the successful challenge first, the defendants argue that Mr. Carpenter improperly termed the fire as "accidental," rather than "undetermined," based on his belief that all fires should be considered accidental unless there is evidence to prove otherwise—an approach which is contrary to the guidance of the National Fire Protection Association in the NFPA 921.[3] *Id.* at 5. The plaintiff disputes this characterization, arguing that Mr. Carpenter describes the fire as "accidental" because he identified one hypothesis which uniquely accounted

---

[2] A CFAST model is a "computer fire simulation zone model that predicts the path and time of movement of smoke from one area to another." *Daubert* Mot. 9, ECF No. 244. According to Mr. Carpenter, the CFAST model was developed by the National Institute of Standards and Technology and can approximate the development of the smoke filling an upper layer of space. Carpenter Dep. Ex. 10, at 129:14-24, ECF No. 259.

[3] The NFPA 921 refers to the National Fire Protection Association's Guide for Fire and Explosion Investigations, which Mr. Carpenter describes as "the recognized guide, and the de facto standard of care for assessing the scientific reliability of expert testimony in fire investigations." Carpenter Aff. Ex. 5, at ¶ 23, ECF No. 259. Courts in this district have similarly recognized the NFPA 921 as "a recognized guide for use by fire investigators in the fire investigation process." *Abu-Hashish v. Scottsdale Ins. Co.*, 88 F. Supp. 2d 906, 908 (N.D. Ill. 2000).

for all available evidence and data: that the origin of the fire was a lit cigarette left smoldering in the recliner chair. Pl. Resp. 8, ECF No. 259. Even if the Court accepts this characterization of Mr. Carpenter's scientific process, however, it still runs into one fundamental flaw: he provides no basis for why the validity of his hypothesis supports his resulting conclusion that the fire was accidentally set. He fails to account for the seemingly equally likely possibility that an individual could intentionally leave a smoldering cigarette on the recliner chair, with the intent of causing a fire. With no basis upon which the Court can conclude that Mr. Carpenter reliably applied his methodology in concluding that his hypothesis supports an "accidental" cause characterization, this opinion is inadmissible.

The defendants next challenge Mr. Carpenter's cause opinion as unreliable and not based in fact because there is no hard evidence to support his hypothesis that a lit cigarette was left on the recliner on the day of the fire. *Daubert* Mot. 5, ECF No. 244. Further, the defendants argue that Mr. Carpenter's hypothesis fails to account for several facts, such as the "brand of the cigarette," "whether the reclining chair was new or used furniture," "the specific cover fabric material," "the exact filler material of the reclining chair," and "the specific material composition of the other furniture in the living room." *Id.* at 6. They also point to the fact that Mr. Carpenter did not interview Mr. Amor or Tina Miceli[4] about the fire as the NFPA 921 directs fire investigators to do. *Id.* Finally, Mr. Carpenter's opinion is based on a "largely random" timeline (as described by the NFPA) for when a cigarette may transition from smoldering to an open flame. *Id.* at 7-8.

In response, the plaintiff points to Tina's statements after the fire indicating that her mother had been smoking in the recliner that day and that Tina was not sure whether she put her

---

[4] The Court refers herein to Tina Micelli as "Tina" to distinguish her from Marianne Micelli, her mother.

cigarette out before leaving the apartment and where she might have put it out. Pl. Resp. 3-4, ECF No. 259. The Court agrees that there is sufficient evidence in the record to support Mr. Carpenter's hypothesis. According to Tina, multiple people were smoking in the apartment on the day of the fire, including in or by the recliner chair. Cross Police Report Ex. 6, ECF No. 259 (stating that Tina told Detective Cross that she "was sitting in the living room in her mother's chair smoking a cigarette" just before she and Mr. Amor left for the movies); 01/25/2018 Trial Tr. Ex. 18, at 81:4-11, ECF No. 259 (Tina responding "correct" when asked if her "mom was smoking in that chair that day?"); Amor Dep. Ex. 7, at 97:21-24–98:1-13, ECF No. 259.

As for the "missing data," piece, the plaintiff contends that this is an area properly reserved for cross examination—not a *Daubert* challenge. Pl. Resp. 5, ECF No. 259. The Court agrees. As an initial matter, Mr. Carpenter provided reasonable explanations in his deposition for why the "missing" data points would not impact his analysis. Carpenter Dep. Ex. 10, at 216:20–217:18 (describing fire safe cigarettes as a "new" technology, not available in 1995, and which is still capable of resulting in a fire); *id.* at 218:4-19 (describing his process to confirm that the chair was made of polyurethane foam based on the remains from the fire). Further, in an investigative field where "evidence is often destroyed," the NFPA encourages investigators to generate hypotheses based on the available evidence and then subject them to rigorous testing, which is evidenced in Mr. Carpenter's process in this case. *Ball Corp v. Air Tech of Mich., Inc.*, No. 4:16-CV-42-TLS, 2022 WL 1801120, at *6 (N.D. Ind. June 2, 2022); NFPA 19.6.1 (2021).

As for the contention that Mr. Carpenter's opinion is unreliable because he failed to interview relevant witnesses, the plaintiff notes that both Mr. Amor and Tina have provided extensive testimony about this fire, which Mr. Carpenter can reasonably rely upon in forming his

opinion. Pl. Resp. 6, ECF No. 259. The defendants' expert (David Icove) similarly did not interview Mr. Amor or Tina, so the Court finds this challenge unpersuasive.

Finally, with respect to the broad timeline, Mr. Carpenter opines that the cigarette could have ignited the chair within a range of ten minutes to five or six hours. Carpenter Dep. Ex. 10, at 214:20-24–215:1, ECF No. 259. If the defendants believe this wide range decreases the probative value or strength of Mr. Carpenter's opinion, they are again welcome to raise it on cross examination, but it is not a basis upon which to exclude his opinion. Mr. Carpenter's acknowledgement of the limitation of his ability to predict how long it took for the cigarette to transition from smoldering to ignited is not reason to discredit his opinion; it makes it more reliable, in fact, because Mr. Carpenter accounted for a data point which is "largely random" in conducting his analysis, rather than assigning it a random value. NFPA 5.7.4.1.7.2. (2021) ("The time required from smolder initiation to transition to flaming is not predictable. Transition to flaming in upholstered furniture have been observed in times ranging from 20 minutes to many hours."); *see* Predictive Validity Slide Ex. 13, at 48, ECF No. 259.

Next, the defendants challenge Mr. Carpenter's use of a CFAST computer model, which he utilized to predict how long it took for the smoke to travel from the living to Ms. Miceli's bedroom.[5] By estimating how long it took for the smoke to move from its ignition point in the living room to Ms. Miceli's bedroom, Mr. Carpenter worked backwards to pinpoint the time of ignition based on Ms. Miceli's 911 call at 6:40 p.m. and her incapacitation one minute later at 6:41 p.m. Applying the results of his model, Mr. Carpenter opines that it took approximately one minute for smoke to travel to the bedroom once the fire ignited. Carpenter Timeline Ex. 16, ECF

---

[5] The CFAST modeling system is "widely accepted by fire experts," and is operated and produced by the National Institute of Standards and Technology, an agency within the United States Department of Commerce. *Bradford v. Brown*, 831 F.3d 902, 914 (7th Cir. 2016) (Hamilton, J., dissenting).

No. 259. Assuming it took one minute from the smoke first entering the room to Ms. Miceli noticing and calling 911, Mr. Carpenter estimates that the fire transitioned from a smolder to flame at 6:38 p.m., more than ten to fifteen minutes after Mr. Amor allegedly left the apartment. *Id.*

The defendants point to several alleged deficiencies in the model, namely (1) the failure to account for other sources of ventilation and rooms within the apartment, and (2) the omission of other furniture items or carpet as possible fuel sources. *Daubert* Mot. 9-10, ECF No. 244. As with the defendants' challenge above, Mr. Carpenter explains that these data points did not impact his analysis because (1) the smoke would have entered those omitted spaces and ventilation areas at roughly the same time it entered Ms. Miceli's bedroom, and (2) other furniture items in the living room would not ignite until "flashover occurred," which does not happen within the first minute of a fire. Pl. Resp. 11-12, ECF No. 259; Carpenter Dep. Ex. 10, at 159:9-24–160:1, ECF No. 259 (estimating that it would take "5 to 10 minutes for flashover to occur."). In any event, even if Mr. Carpenter provided debatable explanations for these omissions, the defendants' challenge goes to the data the expert relied upon, not the reliability of his underlying methodology, which is not a basis to exclude an opinion under *Daubert*. *See Manpower*, 732 F.3d at 808.

The defendants also claim that Mr. Carpenter's use of the CFAST model to estimate the time for ignition is based on pure speculation. *Daubert* Mot. 11, ECF No. 244. Specifically, the defendants contest Mr. Carpenter's assumption that it would have taken Ms. Miceli about one minute to notice the smoke and call 911 after it entered her bedroom. *Id.* First, the timeline provides for wiggle room that mitigates this issue. For example, if it took Ms. Miceli, say, five minutes to notice the smoke entering her room, that would place the time of ignition at 6:34

p.m.—still roughly ten minutes after Mr. Amor is alleged to have left the apartment. And second, Mr. Carpenter opined, based on the CFAST model, that it only took the smoke one minute to travel from the living room to Ms. Miceli's bedroom. At that rate of saturation, the smoke would have substantially filled the room within a relatively short period of time. This is further supported by Ms. Miceli's incapacitation at 6:41 p.m., within one minute of placing the 911 call. Regardless, the validity of Carpenter's underlying assumptions is something to be "tested by the adversarial process and determined by the jury," not the Court. *Manpower*, 732 F.3d at 808.

Alternatively, the defendants seek to exclude the CFAST model and timeline under Fed. R. Evid. 403, "because what little probative value they may have is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury." *Daubert* Mot. 12, ECF No. 244. Specifically, the defendants are concerned that it could mislead the jury "to believe the simulation is a recreation of an actual event." *Id.* The Court declines to exclude this evidence pursuant to Rule 403. The defendants' motion parrots many of their preceding arguments. Further, the jury is capable of understanding that a model is just that—a model—not a recreation of events that forecloses any argument contrary to the opinions reached by Mr. Carpenter.

Finally, the defendants challenge Mr. Carpenter's related opinions that "the thermal heat generated by the burning reclining chair alone was sufficient to prevent Miceli from exiting the apartment and that she was incapacitated by toxic hydrogen cyanide (HCN) produced as a result of the burning polyurethane foam from the reclining chair." *Daubert* Mot. 13, ECF No. 244. As to the first issue, the defendants claim that Mr. Carpenter's opinion that the thermal heat from the fire in the reclining chair blocked Ms. Miceli's exit is based on insufficient evidence. *Id.* ("There is no evidence of the heat of the fire in this case."). This seemingly frivolous challenge is denied.

The Court will take judicial notice: Fire is hot—hot enough to deter most people from running through it. The fact that Ms. Miceli did not verbalize the level of heat she felt while observing the chair on the 911 call does not undermine Mr. Carpenter's opinion sufficiently to justify its exclusion. The defendants also argue that the opinion is speculative because Mr. Carpenter cannot estimate Ms. Miceli's exact distance from the chair when she told the 911 operator, "I can't get past the chair No." 911 Call Tr. Ex. A, ECF No. 244; *Daubert* Mot. 14, ECF No. 244. In light of Ms. Miceli's definite statement that she could not get past the chair, it is unnecessary for Mr. Carpenter to pinpoint her exact location to support his opinion that the chair that was ***actively on fire*** was emitting enough heat to prevent her exit.

So too with Mr. Carpenter's opinion that "Marianne's relatively rapid incapacitation . . . was 'consistent' with there being HCN in the environment from the burning of the polyurethane foam in the chair." Pl. Resp. 17, ECF No. 259; Carpenter Dep. Ex. 10, at 232:3-8, ECF No. 259. Mr. Carpenter "confirmed," based on remnants from the fire, that the foam in the chair was polyurethane foam and cites to a study establishing that cigarette ignition of this type of foam produces high concentrations of HCN, a toxic chemical. Carpenter Dep. Ex. 10, at 218:15-19, ECF No. 259; Pl. Resp. 17, ECF No. 259. The fact that officials did not test for HCN at the time of the fire does not foreclose this hypothesis, particularly considering the study cited by Mr. Carpenter that carbon-monoxide poisoning would not result in such a rapid rate of incapacitation. *Daubert* Mot. 14, ECF No. 244; Pl. Resp. 17, ECF No. 259; Carpenter Aff. Ex. 5, at ¶ 114, ECF No. 259. Finally, although Mr. Carpenter is not a toxicologist, he has specialized knowledge on the effects of combustion reactions on the human body and therefore has sufficient expertise to render an opinion "related to toxicology and how you can apply that to fire investigation."

Carpenter Dep. Ex. 10, at 44:7-20, ECF No. 259. For these reasons, the defendants' motion to bar Douglas Carpenter is granted in part and denied in part.

### B. Defendants' Expert David Icove

The defendants disclosed David Icove, a board-certified forensic engineer and certified fire and explosion investigator, as a retained fire expert in this case.[6] The plaintiff does not challenge Dr. Icove's qualifications to offer an opinion as to the cause and origin of the fire, so the Court notes only that Dr. Icove has a Ph.D. in engineering science and mechanics and over forty-five years of experience investigating fires. Icove Report Ex. 9, at 7, ECF No. 229.

Dr. Icove offers several opinions, including that the City of Naperville adhered to professional standards of fire investigation in 1995 and that the plaintiff's expert Douglas Carpenter did not properly apply the scientific method in reaching his opinions, but the plaintiff only seeks to exclude his opinion as to the origin and cause of the fire. Specifically, Dr. Icove opines that the cause of the fire was a lit cigarette landing on and igniting dry newspaper in the southwest corner of the living room. *Id.* at 9. The plaintiff raises two central challenges to Dr. Icove's cause opinion: (1) that the opinion lacks sufficient supporting evidence in the record, and (2) that Dr. Icove cannot rely on minimization in supporting his opinion because he does not have expertise in that area, and it is cumulative of other defense expert testimony. *Daubert* Mot. 3, 5-6, ECF No. 229.

---

[6] Initially, the defendants disclosed two additional expert witnesses, David Ferreri and Mitchell Kushner, who worked as fire investigators in the original 1995 case. To the extent that the defendants intended to offer their opinion testimony as to the cause and origin of the fire, their testimony would be cumulative of Icove's opinions on those same issues. Ferreri and Kushner can, however, testify about historical facts, including their process of investigating the fire and the substance of the information they provided to investigators about the cause and origin of the fire. The plaintiff's motion to bar the expert testimony of Mr. Ferreri and Mr. Kushner is granted. *Daubert* Mot., ECF No. 233.

The plaintiff's first argument mirrors the defendants' previously rejected argument to exclude the plaintiff's own fire expert, Douglas Carpenter, for a lack of concrete evidence to support his hypothesis that the fire started by a lit cigarette smoldering in the recliner chair. Now, with the shoe on the other foot, the plaintiff argues that Dr. Icove's opinion is based on pure speculation because he hypothesizes that the cigarette either lit a portion of dry newspaper, untouched by vodka, or Mr. Amor lied when he told police that he spilled vodka on the newspaper. *Id.* at 4. The Court denies this challenge for the same reasons it denied the challenge as to Mr. Carpenter. As with Mr. Carpenter's opinion, although there is not evidence in the record establishing Dr. Icove's opinion as a matter of fact, it is also not divorced from the factual record, because it is derived from Mr. Amor's confession. As the defendants note, the plaintiff has not established that Mr. Amor's confession, "equates *with the entire newspaper having been doused with vodka.*" Defs. Resp. 3, ECF No. 254. Dr. Icove's opinion is based, in part, on the assumption that some of the newspaper was not exposed to vodka, which is not reason to exclude it as unreliable. *See Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 768 (7th Cir. 2013) ("The fact that an expert's testimony contains some vulnerable assumptions does not make the testimony irrelevant or inadmissible."). Further, Dr. Icove concluded based on research that "cigarettes placed on paper goods (aka, newspapers) had short time periods" for ignition. Icove Report Ex. 9, at 62, ECF No. 229. The plaintiff can inquire on cross examination whether this peer-reviewed evidence is sufficient to support Icove's hypothesis that the cigarette could ignite dry newspaper, but it is sufficient to pass muster under *Daubert*.

The plaintiff also seeks to exclude Dr. Icove's opinion that Mr. Amor minimized his culpability in his confession. *Daubert* Mot. 5, ECF No. 229. During his deposition, in response to a question from plaintiff's counsel, Dr. Icove referenced minimization, which he described as

a situation where an individual "set a fire knowing that it was going to create a developing fire," but the confessed "scenario that was given to me didn't meet the testing." Icove Dep. Ex. 10, at 82:3-6, ECF No. 229. To the extent the defendants seek to offer this testimony as an expert opinion, it is barred because Dr. Icove is not qualified to opine on whether Mr. Amor was telling the truth when he confessed. Dr. Icove's law enforcement experience as a fire investigator is not relevant to this unrelated testimony on minimization, which only arose during his deposition. Minimization was not discussed in his expert report, and the subject matter is not adequately connected to his underlying qualifications to permit him to render an opinion in this case. For these reasons, the plaintiff's motion to bar Dr. Icove's testimony is granted and denied in part.

## II.     The False Confession Experts

Turning to the false confession experts, the Court starts by addressing the conclusion first and setting out the governing principle that should guide the trial testimony of Dr. Richard Leo and Dr. Michael Welner. The fundamental resolution of the parties' disputes about the scope of permissible testimony as to the allegedly coerced statements of Mr. Amor on October 3-4 is that Dr. Leo may testify that certain interrogation practices employed during that interview increase the risk of a coerced confession. Dr. Welner is permitted to rebut those opinions and testify that interrogation practices cited by Dr. Leo do not increase the risk of false or coerced confession. Neither expert may testify as to whether Mr. Amor ultimately gave a coerced confession in this case.

### A.     *Plaintiff's Expert Dr. Richard Leo*

The plaintiff seeks to admit the expert testimony of Dr. Richard Leo,[7] an expert in police interrogations and false confessions. Dr. Leo, a professor of law and psychology at the

---

[7] In addition to the false confession experts, the parties each disclosed a police practices expert, John Brown for the defendants and Andrew Scott for the plaintiffs. The Court reserves

University of San Francisco, has conducted empirical research on false confessions, based on his personal observation of numerous felony interrogations, and his research has been cited to by the Supreme Court. Curriculum Vitae Ex. 2, ECF No. 260; *Corley v. United States*, 556 U.S. 303, 320–21 (2009). Dr. Leo seeks to offer the following opinions in this case, based on his evaluation of the competing accounts of the October 3-4, 1995 interview:

> 1) The lengthy and almost entirely unrecorded multiple interrogation sessions of William Amor on October 3-4, 1995 incorporated and used techniques from the Reid method of interrogation. In the scientific research community and published research literature, the Reid method of interrogation is universally believed to lead to coerced and/or false confessions and wrongful convictions in a significant number of criminal cases.

> 2) William Amor's interrogation-induced confession statements on October 4, 1995 bears the hallmarks, characteristics and indicia of a false and unreliable confession. The confession statements meet the criteria for what is known as a proven false confession in the social science research literature. If false, Mr. Amor's confessions statements are properly classified as coerced-compliant false confessions.

> 3) William Amor's description of what occurred during his lengthy and almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 that led to his confession statements fits with the empirical social science research on the types of interrogation techniques, methods, practices and effects that are associated with, increase the risk of, and are known to cause false confessions, and that explain how and why innocent individuals are often moved to make and/or agree to false and unreliable confessions.

> 4) William Amor's description of his lengthy, almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 contains examples of physically and psychologically coercive interrogation techniques, methods, strategies and effects that have been demonstrated to cause involuntary confessions as well as false and unreliable ones. These interrogation techniques, methods, strategies and effects cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators.

> 5) William Amor's description of what occurred during his lengthy, almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 indicates the use of interrogation techniques and practices that were guilt-presumptive,

---

ruling on these experts as the parties attempt to reach an agreement as to their admissibility and/or the need for their testimony.

truth-presumptive, confirmatory and theory-driven. Mr. Amor describes investigative and interrogation procedures whose goal was not to find the truth but solely to break down his denials of guilt and elicit from him a confession to starting the fire that resulted in the death of Marianne Miceli that was consistent with the detectives' pre-existing assumptions, speculations, and beliefs about the cause and origin of that fire.

6) William Amor's account of what occurred during his lengthy, almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 contains a description of interrogation techniques, methods, strategies and effects that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions (i.e., situational risk factors) when misapplied to the innocent. These included: lengthy interrogation, sleep deprivation, false evidence ploys, minimization, threats, promises, and physical and psychological coercion.

7) William Amor was at a heightened risk for making and/or agreeing to false and unreliable statements, admissions and/or confessions during his lengthy, almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 because of his personality traits at the time (i.e., personal risk factors), especially his suggestibility, but also his anxiety and depression.

8) The investigators' accounts of what occurred during Mr. Amor's lengthy, almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 also contain a description of interrogation techniques, methods, strategies and effects that have been shown by social science research to increase the risk of eliciting false and unreliable statements, admissions and/or confessions when misapplied to the innocent. These include: lengthy interrogation, sleep deprivation (objectively defined), false evidence ploys and minimization, as well as Mr. Amor's personal risk factors such as his extremely high interrogative suggestibility.

9) The lengthy and almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 described both by William Amor as well as by the investigators involved multiple documented instances of police interrogation contamination (i.e., leaking and disclosing nonpublic case facts) and scripting (pressuring and persuading the suspect to accept the police narrative of how and why the alleged crime occurred), which increased the risk that Mr. Amor's confession statements would, misleadingly, appear to be detailed, accurate and self-corroborating.

10) The lengthy and almost entirely unrecorded multiple interrogation sessions on October 3-4, 1995 described by William Amor violated universally accepted police investigative and interrogation national training standards and best practices that existed in 1995.

Leo Report Ex. C, at 50-51, ECF No. 239.

The defendants lodge several challenges to the admissibility of Dr. Leo's conclusions: (1) his testimony is based on unreliable methodology and insufficient data, *Daubert* Mot. 5, ECF No. 233; (2) his opinions are not based on a reliable application of his methodology, *id.* at 10; (3) his opinions invade the province of the jury and should be excluded, *id.* at 13; (4) he is not qualified to opine on police practices, polygraphs, or clinical psychiatry, so any testimony on these issues should be barred, *id.* at 18; and (5) his testimony should be excluded pursuant to Rule 403 because his opinions are highly prejudicial, *id.* at 20.

In broad strokes, the Court reaches the following conclusions as to Dr. Leo's opinions. First, Dr. Leo's testimony is generally based on a reliable methodology derived from his extensive experience and study of the phenomenon of false confessions. Second, Dr. Leo may, subject to noted exceptions, testify as to the application of specific risk factors to Mr. Amor's confession and the possibility that those factors increased the likelihood of eliciting a false confession. In assessing identified risk factors, however, Dr. Leo may not opine as to whether Mr. Amor's confession was coerced or attempt to quantify (numerically or by reference to degree) the coercive effect of various interrogation methods. Nor may he testify as to the defendants' motivations or state of mind in conducting the investigation, he may not testify as to the relative reliability of competing factual accounts, and he may not make generalized statements about the scientific accuracy, or inaccuracy, of Mr. Amor's confession. The Court clarifies the boundaries of these rulings in the analysis that follows.

First, with respect to the reliability of Dr. Leo's methodology and the admission of this type of testimony as expert testimony pursuant to Rule 702 and *Daubert*, the defendants' challenge fails. The defendants argue that Dr. Leo's testimony is inadmissible in its entirety because it employs no discernable methodology, but instead adopts the conclusion that the

16

confession is false and works backwards to identify "risk factors" which support that conclusion. *Daubert* Mot. 8, ECF No. 239. The defendants cite to the lack of quantifiable data for how often false confessions occur and Dr. Leo's inability to quantify the likelihood that police may elicit a false confession based on the risk factors he identifies. *Daubert* Mot. 8, ECF No. 239. At bottom, the defendants take issue with "[s]uperimposing a witness/advocate under the guise of so-called 'expert testimony'" because whether an involuntary confession "occurred in a particular case depends on a jury's assessment of all of the factors surrounding testimony concerning an interrogation." *Id.* at 9.

"When determining the reliability of a qualified expert's testimony under *Daubert*, courts are to consider, among other things: (1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 844 (7th Cir. 2017). Though not subject to traditional scientific methods like quantification and generating predictive outcomes, the social science of "false confessions is sufficiently developed in its methods to constitute a reliable body of specialized knowledge under Rule 702." *Caine v. Burge*, No. 11 C 8996, 2013 WL 1966381, at *3 (N.D. Ill. May 10, 2013). Dr. Leo's report includes an extensive overview of the peer-reviewed literature and research supporting his work on false confessions, identifying risk factors associated with specific interrogation practices and the predisposition of certain criminal suspects that have been shown to increase the likelihood of eliciting a false confession. Leo Report Ex. 1, at 8-21, ECF No. 260. As many other courts in this district have found, this is sufficient to pass muster under Rule 702. *Taylor v. City of Chicago*, No. 14 C 737, 2021 WL 12242781, at *2-3 (N.D. Ill. Dec. 21, 2021); *Harris v. City of Chicago*,

No. 14 C 4391, 2017 WL 2436316, at *9 (N.D. Ill. June 5, 2017); *Kluppelberg v. Burge*, No. 13 C 3963, 2016 WL 6821138, at *4 (N.D. Ill. Sept. 16, 2016) (finding Dr. Leo's colleague Richard J. Ofshe's methodology reliable); *Caine*, 2013 WL 1966381 at *3. The defendants are free to cross examine Dr. Leo on the strength of his conclusions based on the alleged deficiencies they identify with his methodology, but the impossibility of quantifying his conclusions is not a sufficient reason to exclude Dr. Leo's testimony when it is part of a well-developed social science discipline. *See Kluppelberg*, 2016 WL 6821138 at *4 ("[D]efendants have not offered a reason why Ofshe's opinion is rendered unreliable by his inability to identify the rate at which coerced confessions occur.").

In *United States v. Hall*, the Seventh Circuit reversed a criminal conviction because the district court "overlooked the utility of valid social science" offered by an expert on false confessions. 93 F.3d 1337, 1345 (7th Cir. 1996). Though the court did not address the issue of admissibility, the Seventh Circuit held that the false confession testimony would have helped the trier of fact because it "would have let the jury know that a phenomenon known as false confessions exists, how to recognize it, and how to decide whether it fit the facts of the case being tried." *Id.* In the *Mamah* case, relied on heavily by the defendants, the Seventh Circuit excluded false confession expert testimony based on the lack of an "empirical link" between the proposed expert testimony and the case at hand. *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). In that case, the issue was not with the quality of the expert's underlying research in the field of false confessions, but the lack of evidence ***in that case*** to establish that the defendant had been interrogated under circumstances that the expert identified as giving rise to a false confession. *Id.* In this case, however, Dr. Leo's report details the situational and personal risk factors which apply to Amor's account of the interrogation. *Mamah*, therefore, does not bar Dr.

Leo's testimony. The Court finds that the plaintiff has carried its burden of proving, by a preponderance of the evidence, that Dr. Leo's opinion is based on reliable principles and methodology.

Second, the defendants argue that Dr. Leo did not reliably apply his methodology to the facts of this case because he relied on the plaintiff to determine what evidence was relevant, failed to analyze the impact of his "risk factors" on Mr. Amor specifically, and did not analyze the September 15 statement, which contained information that was later included in the October 4 statement. *Daubert* Mot 10, ECF No. 239. Whether Dr. Leo reviewed the entire record of this case or only reviewed those reports and documents that the plaintiff deemed relevant is a data issue and is therefore reserved for cross-examination—it is not an issue of admissibility. *Manpower, Inc.*, 732 F.3d at 902. ("[An expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility."); *see also Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 3142755, at *4 (N.D. Ill. July 25, 2017*)* ("[I]t is well-settled that experts can rely on their client's version of the facts."). The defendants also fault Dr. Leo for not interviewing Mr. Amor to better inform his analysis of how the respective risk factors he identified affected Mr. Amor personally. However, as the plaintiff notes, "Dr. Leo's methodology does not include conducting personal interviews." Pl. Resp. 14, ECF No. 260. Dr. Leo also provided a reasonable explanation for why an interview of Mr. Amor would not alter his analysis with respect to the risk factors he identified. *See id.* at 15 ("[B]y any measure, denying a person the opportunity to sleep for 24 hours or failing to feed a person for a full day would result in the person being sleep- and food-deprived."). Finally, as for the September 15 statement, Dr. Leo stated in his deposition that he was aware of Mr. Amor's prior statement. Leo

Dep. Ex. 3, at 201, ECF No. 260. In any event, the extent to which Dr. Leo considered the September 15 statement is a data issue that can be inquired into on cross examination.

Having found that Dr. Leo employs a reliable methodology to evaluate the potential risk for a false confession based on the circumstances of an interrogation, the Court will permit Dr. Leo to opine on the presence or absence of those risk factors in Mr. Amor's case. There are areas of the expert report, however, where Dr. Leo goes far afield of his own expertise and his role as an expert, invading the province of the jury. As a result, the following testimony will be inadmissible for the reasons described below:

- As a general principle, Dr. Leo's opinion that the defendants' interrogation of Mr. Amor was consistent with empirical social science research on practices "associated with, [that] increase the risk of, and are known to cause false confessions" must be trimmed. Leo Report Ex. C, at 6, ECF No. 239. Dr. Leo may identify these risk factors and acknowledge that they are present in Mr. Amor's account of the interrogation. He cannot go further than that, however. For example, Dr. Leo offers no basis to conclude that the presence of any one or more interrogation practices "causes" false confessions with any measure of consistency and so he cannot opine generally that they "cause" false confessions or that they "caused" a false confession in this case.

- Dr. Leo's may not opine that the investigators in this case "engaged in a classic rush to judgment" as described in the fourth risk factor of his analysis. *Id.* at 31. Based on his review of Mr. Amor's account, Dr. Leo opines that "investigators had their mind made up from virtually the beginning of the interrogation that he intentionally set the first [sic] to kill Marianne Miceli and collect on her insurance policy" *Id.* "[O]n the

basis of their gut hunches and misguided belief in their own human lie detection abilities, they conducted an interrogation as if there were already substantial evidence of Mr. Amor's guilt." *Id.* This opinion extends beyond Dr. Leo's expertise to offer a speculative opinion about a party's mental state and underlying motivations—a subject which Dr. Leo has no basis to testify about. *See Brown v. City of Chicago*, No. 18 C 7064, 2023 WL 2561728 at *11 (N.D. Ill. Mar. 17, 2023) (holding that Dr. Leo's "conclusions about the Defendants' mental states" were inadmissible). The same conclusion warrants excluding other references to the motivations and desires of investigators elsewhere in the report, such as Leo's opinion on minimization that "[t]he purpose of these Reid-based minimizing 'themes' is to get the suspect (here Mr. Amor) to admit to a minimized version of the alleged crime." Leo Report Ex. C, at 35, ECF No. 239.[8]

- Dr. Leo's conclusion that Mr. Amor's statements "meet the criteria for a *proven* false confession because there is little evidence that the fire resulting in Marianne Miceli's death was an arson much less a fire that William Amor could have started under any circumstances" in his analysis of other indica of unreliability is excluded. *Id.* at 39. Dr. Leo may not opine that Mr. Amor's statement is a "proven false confession." Though the Court recognizes that this is purportedly a term of art, developed by Dr. Leo and Richard Ofshe, to describe disputed confessions which "can be classified as proven beyond any doubt to be false," the parties do not agree that Mr. Amor's confession has been "proven beyond any doubt to be false." *Id.* at 9. Instead, the

---

[8] The Court notes as well that the plaintiff risks "opening the door" to unfavorable evidence concerning Mr. Amor known to the defendants before the interview of October 3-4 by presenting evidence and/or argument that the defendants inappropriately focused their investigation on Mr. Amor prior to the interview.

defendants present their own expert testimony, rebutting Mr. Carpenter's conclusions, that the fire may have been set in a manner that is consistent with some elements of Mr. Amor's confession. Therefore, Dr. Leo's application of that term is inconsistent with his own methodology and inappropriately purports to resolve fact disputes in this case. Further, the use of the term "proven false confession" is unduly prejudicial and could confuse the jury, resulting in the unfounded belief that the veracity of Mr. Amor's confession to intentionally starting the fire is not subject of debate between the parties. Fed. R. Evid. 403; *see Brown*, 2023 WL 2561728 at \*12 (excluding Leo's opinion that a plaintiff's confession was false where it was a dispute "at the heart of the case.") (internal citation omitted).

- Dr. Leo's conclusion that the October 3 polygraph examination and investigators' statements to Mr. Amor that Tina believed he set the fire intentionally constituted "false evidence ploys" in factor five is excluded. Leo Report Ex. C, at 32-33, ECF No. 239. With respect to the polygraph examination, Dr. Leo opines that a polygraph "can never be a valid or reliable instrument of human lie detection or truth verification, but is highly effective at eliciting confessions as an adjunct to psychologically manipulative, if not coercive, interrogation." *Id.* at 33. First, Dr. Leo is not qualified to offer his opinion that polygraphs are "a pseudo-scientific police-created instrument that can never tell whether a person is lying or telling the truth." *Id.* Dr. Leo does not explain the underlying basis for this opinion apart from his citation to a book on the "uses and abuses of the lie detector." *Id.* That polygraphs are used in numerous other contexts than police interrogations further undermines Dr. Leo's unsupported judgment that they lack any permissible use. *United States v. Lea*,

249 F.3d 632, 638 (7th Cir. 2001) ("[T]he admissibility of polygraph evidence is a matter within the discretion of the district court."). Like the term "proven false confession" above, the reference to the polygraph examination as a "false evidence ploy" is unduly prejudicial and might confuse the jury who could conclude, quite reasonably based on the language used by Dr. Leo, that Michael Masokas lied when he told Mr. Amor that he failed the polygraph examination. Dr. Leo is not a polygraph examiner and lacks the relevant expertise such that he could describe the polygraph examination in this case as "false."

- The same is true with respect to the defendants' statement to Mr. Amor on October 3 that Tina believed he was guilty of starting the fire. Dr. Leo describes this incident as another "false evidence ploy" because "Tina's opinion about whether Mr. Amor had set a fire does not constitute actual evidence, even though Detectives [sic] Cross represented it as evidence." Leo Report Ex. C, at 33, ECF No. 239. Dr. Leo lacks any expertise to conclude that this statement was false; indeed, he maintains that it was not even evidence, a stance that omits any explanation for why it should be described as "false evidence." Again, Dr. Leo may not use the term "false evidence" in describing the fact that Tina believed Mr. Amor had intentionally set the fire because it is unduly prejudicial and could serve to confuse the jury. Further, Dr. Leo provides no basis for his underlying assumption that investigators are only permitted to present concrete, hard evidence to suspects during interrogations.

- Dr. Leo's opinion that "the details in [Mr. Amor's] confession almost certainly were provided by the police investigators who interrogated him before or as they wrote up his confession statement" and that "investigators also scripted Mr. Amor's confession

statements, pressuring and persuading him to adopt a narrative that was consistent with" the officers' theory of the case, is not admissible. *Id.* at 43. Dr. Leo makes bare assertions of fact, entirely lacking support, such as "[t]he idea that Mr. Amor set the fire intentionally, as well as the idea that the motive for setting the fire was to collect on Marianne Miceli's life insurance police . . . both came from the investigators, not Mr. Amor." *Id.* These opinions go to the truthfulness of Mr. Amor's confession that he started the fire by concluding that the interrogation methods were coercive and resulted in Mr. Amor providing a false, scripted statement. This opinion goes to an ultimate issue in the case and is therefore unduly prejudicial. Further, Dr. Leo lacks an adequate basis to support this opinion, citing only to the "content of Mr. Amor's confession statement, the dispositive crime scene evidence and case evidence exculpating him, and the numerous *situational* and *personal* risk factors," as well as "the leading, directive and corrective questioning of ASA Nigohosian." *Id.* However, as explained above, Dr. Leo may not characterize Mr. Amor's confession as "proven false" because the crime scene evidence is, in fact, not dispositive and the parties actively dispute the origin and cause of the fire.

- Similarly, Dr. Leo's description of the interrogation as "extremely psychologically coercive" is not permitted. *Id.* at 36. This opinion purports to resolve a key issue in this case, which is hotly contested by the parties and subject to the jury's determination: whether the defendants employed improperly coercive interrogation methods which resulted in Mr. Amor providing an involuntary statement. *Brown*, 2023 WL 2561728 at *11. This opinion does not help or assist the jury in determining whether the defendants employed coercive methods—it reaches that conclusion

24

outright and is therefore inadmissible. *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). Further, Dr. Leo's opinion that the interrogation was "extremely" coercive impermissibly quantifies the effect of the defendants' allegedly coercive tactics, which (as discussed above) is a conclusion that Dr. Leo's methodology cannot support. Dr. Leo, himself, recognizes this fact throughout his deposition when he acknowledges that he cannot quantify the effect of certain risk factors on the likelihood that an individual may give a false confession. Leo Dep. Ex. D, at 118:21-24, 135:2-6, 138:13-14, 158:17-22, ECF No. 239.

- Dr. Leo may not offer his opinion that "Mr. Amor's robust and detailed account of the multiple, lengthy, and almost entirely unrecorded interrogation sessions on October 3-4, 1995 fits better with the findings of the empirical and scientific research literature on how and why individuals can be moved to make or agree to *proven* false confessions than the investigators' accounts." Leo Report Ex. C, at 49, ECF No. 239. First, Dr. Leo's testimony classifying Mr. Amor's statements as a "proven false confession" is excluded and can therefore no longer serve as the basis for this conclusion regarding the relative consistency of competing testimony with the factual record. Further, this type of testimony goes beyond Leo's role as an expert and interferes with the jury's ability to sort out and evaluate conflicting testimony. *See Davis v. Duran*, 277 F.R.D. 362, 370 (N.D. Ill. 2011) ("[E]xpert witnesses are not allowed to sort out possible conflicting testimony or to argue the implications of those inconsistencies. That is the role of the lawyer, and it [is] for the jury to draw its own conclusions from the testimony it hears.").

- Dr. Leo may not testify that "the Reid method of interrogation is universally believed to lead to coerced and/or false confessions and wrongful convictions in a significant number of criminal cases." Leo Report Ex. C, at 6, ECF No. 239. Dr. Leo offers no factual foundation to support this sweeping conclusion, which again seeks to quantify (with adjectives rather than numbers) the coercive effect of various interrogation methods.

In addition to the issues outlined above, the defendants seek to exclude Dr. Leo's opinions on police practices and clinical psychiatry as beyond the scope of his expertise.[9] *Daubert* Mot. 18, ECF No. 239. The defendants are correct that Dr. Leo is not qualified to opine on "national policing standards" and whether the defendants in this case complied with those standards. To start, he provides no basis in the section of his expert report titled "*Violation of National Police Interrogation Training Standards*," to support his assertion that police departments, across the board in 1995, adhered to the standards he describes (*e.g.*, not interrogating an individual for more than four hours, not contaminating suspect responses with non-public information, avoiding promises of leniency). Leo Report Ex. C, at 44-46, ECF No. 239. Dr. Leo's reference to the "Reid and Associates police interrogation training manual" does not change this conclusion. *Id.* at 45. Dr. Leo certainly has experience and specialized knowledge about the Reid method, but that does not warrant the secondary conclusion that the Reid manual represented the national standard in 1995. As the *Brown* court previously found when considering this same issue, Dr. Leo's experience, "could support a finding that Dr. Leo has knowledge and expertise concerning *best* practices for interrogation, but would not necessarily

---

[9] The defendants also sought to exclude Dr. Leo's opinions on polygraphs examinations as outside the realm of his expertise, but that evidence has already been excluded for the reasons set forth above.

establish that he is an expert concerning *actual* national police practices in 1988." 2023 WL 2561728 at *9 (emphasis in original). Dr. Leo may not opine on whether the defendants complied with nationally accepted police practices in conducting the interrogation of Mr. Amor.

The defendants also seek to exclude Dr. Leo's opinion that Mr. Amor's personal characteristics, such as the fact that he was found to be extremely suggestible, increased the risk that he provided a false confession. Leo Report Ex. C, at 38, ECF No. 239. The defendants claim that this opinion falls outside the realm of Dr. Leo's expertise because he is not a clinical psychologist and lacks the expertise to opine on Mr. Amor's mental condition. *Daubert* Mot. 19, ECF No. 239. As another court in this district previously found, however, Dr. Leo is "very familiar" with the Gudjonsson Suggestibility Scales, which is the test that Dr. Chiappetta administered to Mr. Amor in the original criminal trial to evaluate his suggestibility. *Harris*, 2017 WL 2436316 at *13. Dr. Leo is permitted, therefore, to rely upon Dr. Chiappetta's findings in analyzing Mr. Amor's personal characteristics as they relate to the risk of providing a false confession, because they qualify as "sufficient facts or data." *See Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 789 (7th Cir. 2017) ("[A]s a general matter, there is nothing objectionable about an expert relying upon the work a colleague."). He cannot, however, opine—rather than assume—that the results are valid.

Finally, the Court addressed the defendants' challenge to Dr. Leo's testimony under Rule 403 in the bulleted rulings above. In sum, Dr. Leo may testify that, based on the record of the case he reviewed in this case, certain risk factors were present in the interrogation which may have increased the risk that Mr. Amor provided a coerced confession. What he may not do, however, is make final determinations as to the factual record in this case or provide ultimate

judgments on whether, in fact, the confession was coerced. For these reasons, the defendants'

motion to bar Dr. Leo as an expert witness is granted in part and denied in part.

### B.        Defendants' Expert Dr. Michael Welner

The defendants offer Dr. Michael Welner, a forensic psychiatrist, to rebut the opinions of

Dr. Leo. In his report, Dr. Welner offers his opinions addressing the following questions:

1) How are proven false confessions of the innocent identified? What is the distinction between false and unreliable confession, from a standpoint of scientific terminology? Are false confessions identified through psychological techniques, indicia, hallmarks, or through any social science measures or procedures that have been empirically researched?

2) Do references of proven false confessions exist? What impacts the reliability of such designation? How are these references informative to the broader scientific and justice community?

3) What are the key psychological and personal antecedents to Mr. Amor's self-incriminating statements of October 4, 1995?

4) What techniques of Mr. Amor's police questioning on October 3-4, 1995 increase the risk of or are known to cause false confession to murder in the interrogation setting? What is known of the significance of minimization as a technique? False evidence ploys? What study, research, or reliable methodology has demonstrated that the interrogation techniques of this case move an innocent person to make a false confession?

5) What is the evidence that Mr. Amor demonstrated a coerced-compliant confession, a scripted confession, or both? Does evidence demonstrate that Mr. Amor had no meaningful choice but to comply with the demands and requests of their interrogators?

6) Is the Reid method of interrogation, based on data available from cases of proven false confessions, universally believed to lead to coerced and/or false confessions in a significant number of criminal cases?

7) What is the evidence that lengthy interrogation causes false confessions? Did a lengthy interrogation cause Mr. Amor to offer a false self-incriminating statement?

8) What is sleep deprivation? Has social science research demonstrated that sleep deprivation causes false confessions to murder? Did sleep deprivation cause Mr. Amor to offer a false self-incriminating statement?

9) Has social science research demonstrated that anxiety and depression cause false confessions to murder?

10) What is the significance of Mr. Amor's suggestibility, as tested and reported by Dr. Chiapetta?

Welner Report Ex. C, at 2-3, ECF No. 245.

Before turning to the plaintiff's substantive challenges to Dr. Welner's opinions, the Court addresses and rejects the challenge to Dr. Welner's qualifications. The plaintiff seeks to exclude Dr. Welner from testifying in this case because, unlike Dr. Leo, he is not a social scientist who has devoted his professional career to the study of police interrogations and false confessions. *Daubert* Mot. 7, ECF No. 245. According to the plaintiff, Dr. Welner is "an armchair consumer of the literature on this subject," and lacks any specific credentials or reputable research experience, citing to the fact that he does not have a degree in the social sciences and has never been published in a peer-reviewed journal on this subject. *Id.*

As a preliminary matter, the fact that Dr. Leo has different experience or credentials in the field of false confessions is not dispositive as to whether Dr. Welner is qualified to opine on the same subject. *See Chatman v. City of Chicago*, No. 14 C 2945, 2018 WL 11426158, at *3 (N.D. Ill. Oct. 30, 2018). Dr. Welner has not dedicated his career to the academic study of false confessions, as defendants readily acknowledge, but he does have decades of experience assessing and providing treatment to criminal defendants, many of whom have confessed. Defs. Resp. 7, ECF No. 261; *see also Taylor*, 2021 WL 12242781, at *8 (finding Dr. Welner qualified to opine on the indicia of false confessions based on his "substantial field work reviewing the confessions of inmates awaiting trial."). This experience is supported by a review of his curriculum vitae which demonstrates that Dr. Welner has written articles on confessions and the Gudjonsson Suggestibility Scales, offered case commentary on several cases involving false confessions, and presented on the topic on various occasions. Curriculum Vitae Ex. F, ECF No.

261. For these reasons, the Court denies the plaintiff's challenge to Dr. Welner's qualifications. The defendants have demonstrated, by a preponderance of the evidence, that Dr. Welner is qualified to opine on this subject based on his knowledge and experience.

The plaintiff also objects that Dr. Welner's report fails to adequately describe his methodology. *Daubert* Mot. 12, ECF No. 245. In response, the defendants attached an affidavit supplementing the description of the methodology set forth in his initial report. Welner Decl. Ex. E, ECF No. 261. The plaintiff objects to this late disclosure, but that objection is unfounded for two reasons. Mot. to Exclude Decl., ECF No. 266. First, the methodology description in the original disclosure is adequate. As defendants note, Dr. Welner's report indicates that he "conducted a forensic assessment of specific claims raised in proposed expert testimony on behalf of [Amor]", describes an overview of the facts of the case and Dr. Leo's opinions, lists ten questions that he then sets out to answer in his report, and identifies the source materials he viewed in conducting his forensic assessment. Welner Report Ex. A, at 1-3, ECF No. 266. In other words, Dr. Welner examined the factual records in this case, reviewed Mr. Amor's opinions, consulted the relevant literature and his own body of experience, and identified what he believes are flaws and errors in Dr. Leo's opinions. Particularly in light of the non-quantitative nature of research on false statements and coercive interrogation tactics, this methodology (which is consistent with Dr. Leo's methodology) is sufficiently reliable.

Second, Rule 37 provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Here, the affidavit is harmless. The plaintiff fails to identify any material in Dr. Welner's affidavit of which the plaintiff was

previously unaware. Indeed, in *Chatman*, 2018 WL 11426158 at \*2, Judge Lee addressed a substantially similar argument challenging a supplemental affidavit by Dr. Welner and rejected it, observing that the affidavit merely provided greater detail to the disclosures that had already been made.[10] In that regard, the affidavit is, if anything, helpful to the plaintiff's efforts to properly evaluate Dr. Welner's testimony and prepare for cross examination.

Turning to the substantive challenges to Dr. Welner's testimony, the plaintiff seeks to exclude Dr. Welner's: (1) testimony relating to Dr. Leo's scholarship and methodology, *Daubert* Mot. 12, ECF No. 245; (2) evaluation of Mr. Amor's mental state during the interrogation, *id.* at 14; (3) assessment of Mr. Amor's credibility, *id.* at 19; and (4) speculative opinions on the cause of the fire that stray outside his area of expertise, *id.* at 20. Before addressing each of these challenges in turn, the Court notes that Dr. Welner was introduced as a rebuttal witness to Dr. Leo. Therefore, any rulings excluding certain areas of Dr. Leo's testimony similarly apply to Dr. Welner's testimony on the same subject matter. Dr. Welner's testimony is also governed by the same broad stroke limitations the Court imposed on Dr. Leo. Therefore, Dr. Welner may express his contrary opinion that a specific "risk factor" or interrogation method identified by Dr. Leo did not increase the risk of eliciting a false confession. He may not, however, provide an alternative explanation for why Mr. Amor chose to confess or conclude that Mr. Amor's confession was not coerced by the defendants.

First, with respect to the plaintiff's objection to Dr. Welner's testimony criticizing Dr. Leo's methodology, the Court will not preclude Dr. Welner from offering his opinion that Dr. Leo's opinions are without merit. *Daubert* Mot. 12, ECF No. 245. This is an ordinary and non-

---

[10] This situation is not remotely similar to that confronted by this Court in regard to the plaintiff's untimely motion to add two previously undisclosed expert witnesses on damages more than a year after the deadline for disclosing experts. Order, ECF No. 228.

controversial purpose of rebuttal expert testimony. *See Onvi, Inc. v. Radius Project Dev., Inc.*, No. 19 C 3201, 2022 WL 22647297 at *2 (N.D. Ill. Sept. 19, 2022) ("[A]n expert witness 'may criticize the methods, calculations, and conclusions offered by the opposing side's expert.'") (internal citation omitted). This objection is overruled, with the reminder that the Court expects professionals (including counsel who are presenting expert professional witnesses, and those witnesses themselves) to conduct themselves civilly during court proceedings. *See Chatman*, 2018 WL 11426158 at *4 ("[I]t is one thing to say that the jury should not give much weight to Dr. Russano's opinions because her research does not adequately simulate actual situations, and quite another to say that it is all hogwash. Dr. Welner can testify as to the former, but not the latter.").

The plaintiff also seeks to bar Dr. Welner's opinions that speculate as to Mr. Amor's mental state during the interrogation. *Daubert* Mot 15, ECF No. 245. The plaintiff references several of Dr. Welner's statements, including, that "Mr. Amor was making conscious, self-serving choices," during the interrogation and ultimately chose to confess after receiving "[t]he process service [of the divorce petition] along with Tina's reported belief in his guilt" because he "could no longer psychologically dominate or manipulate her approach to police or what she might communicate, and could not ensure her silence." Welner Report Ex. C, at 33, 34, 25, ECF No. 245. As with Dr. Leo's speculation to the defendants' motivations in investigating Mr. Amor and conducting the interrogation, testimony of this kind is inadmissible. The plaintiff moves to exclude these opinions as "not grounded in any psychiatric judgment," because Dr. Welner did not interview Mr. Amor, and therefore "not a function of Dr. Welner's reliable application of his expertise to the psychiatric data." *Daubert* Mot. 17, ECF No. 245. There is a larger issue with this testimony, however, because regardless of the purported methodology applied or the steps

taken to adhere to that methodology, Dr. Welner cannot reliably provide a definitive opinion as to why Mr. Amor chose to confess (nor could any proposed expert witness for that matter).

In addition to these statements speculating as to Mr. Amor's internal reasoning and motivation, Dr. Welner offers his assessment of Mr. Amor as "wily," "brazen," and "street-wise" individual, to refute Dr. Leo's characterization of Mr. Amor as suggestible and easily coerced. Welner Report Ex. C, at 46, ECF No. 245. In Dr. Welner's view, Mr. Amor made a "calculating but mistaken" choice to confess, which undermines the plaintiff's central theory that Mr. Amor involuntarily confessed after being subjected to coercive interrogation tactics by the defendants. Again, Dr. Welner's statement that Mr. Amor made a "calculating" judgment to confess is inadmissible. Dr. Welner has no basis to definitively resolve Mr. Amor's personal motivations and the reason he chose to confess.

Dr. Welner's description of Mr. Amor as "wily" and "street-wise" also relates to the plaintiff's third substantive challenge to exclude Dr. Welner's testimony on Mr. Amor's character and credibility. In his report, Dr. Welner takes shots at Mr. Amor's character and questions the credibility of his account, referring to him as a "con" and "manipulative," and attempting to poke holes and note inconsistencies in Mr. Amor's version of events. *Daubert* Mot. 19, ECF No. 245; Welner Report Ex. C., at 28, ECF No. 245 ("[J]ust because one is willing to be manipulative or to con others, does not ensure that he will employ especially good judgment."). As described above, this type of testimony is inadmissible. As with Dr. Leo, Dr. Welner is not permitted to opine on which version of the facts he finds more reliable or believable. Contrary to the defendants' assertions, these statements do more than assess the impact of Mr. Amor's "relevant and well-documented personality trait[s]" on Mr. Amor's reaction to the defendants'

interrogation. Defs. Resp. 19, ECF No. 261. They impugn Mr. Amor's credibility and invade the province of the jury. *See Davis*, 277 F.R.D. at 370.

This testimony does have a limited admissible purpose, however, to the extent that Dr. Welner opines that an individual's prior exposure to police interrogation bears upon the influence of coercive tactics in subsequent interrogations. *Id.* As to that issue, Dr. Welner may testify that, based on his review of the record and the prior incidents to which he cites, Mr. Amor had preexisting experience with the criminal justice system which may have mitigated the coercive effect associated with the defendants' interrogation methods.

Finally, the plaintiff seeks to exclude certain opinions as extending beyond Dr. Welner's area of expertise,[11] such as his statements that the fire could have started from Mr. Amor dropping a cigarette on dry newspaper or igniting an area "doused with lighter fluid or another accelerant." Welner Report Ex. C, at 9, ECF No. 245; *Daubert* Mot. 20, ECF No. 245. These statements clearly fall outside the scope of Dr. Welner's expertise and are not admissible. Dr. Welner has no expertise in fire investigation and no basis to opine on the possible causes of the fire.

The plaintiff also takes issue with Dr. Welner's conclusion that had the police scripted Mr. Amor's confession, they would have directed Mr. Amor to confess to a more inculpatory scenario. Welner Report Ex. C, at 37, ECF No. 245 ("Were police to be coercing a scripted statement implicating Mr. Amor in murder, police would not be directing a statement to suggest that the fire arguably started accidently."). The plaintiff argues that Dr. Welner lacks the

---

[11] The Court notes that some of the testimony which plaintiff alleges goes beyond Dr. Welner's expertise is already excluded based on its prior ruling with respect to Dr. Leo. For example, Dr. Welner's assertion that "[p]olice were hardly impetuous in being guilt presumptive on October 3," cannot come in because it is responsive to Dr. Leo's opinion that the defendants engaged in a rush to judgment, which has been excluded. Welner Report Ex. C, at 30, ECF No. 245.

expertise to offer this opinion because he "has never conducted or documented an interrogation." *Daubert* Mot. 20, ECF No. 245. This opinion is inadmissible because, like some of Dr. Leo's opinions, it opines—speculates, actually—on the subjective state of mind of the investigators. Dr. Welner offers no reason that that the opposite conclusion is not equally likely: that police intentionally scripted a confession with minor inaccuracies and exculpatory elements to avoid detection that the confession was scripted because of its perfect alignment with their evidence. For these reasons, the plaintiff's motion to bar Dr. Welner is granted in part and denied in part.

## III.   Brian Nigohosian

Brian Nigohosian, the assistant state's attorney who originally authorized charges against Mr. Amor, is barred from offering an opinion as an expert witness in this case. The plaintiff dismissed the malicious prosecution claim at the initial pretrial conference. Therefore, Mr. Nigohosian's opinion on the existence of probable cause to prosecute Mr. Amor in 1995 is irrelevant. To the extent what he observed during the October 4 interview is relevant, he may testify as a fact witness to his recollections of historical fact. The plaintiff's motion to bar Mr. Nigohosian as an expert witness is granted.

\*      \*      \*

For the reasons set forth above, the defendants' motion to bar the testimony of Douglas Carpenter and Dr. Richard Leo [244] [239] are granted in part and denied in part; the plaintiff's motions to bar the testimony of David Icove and Dr. Michael Welner [229] [245] are granted in part and denied in part; and the plaintiff's motions to bar the testimony of David Ferreri and Mitchell Kushner, and Brian Nigohosian [233] [231] are granted with respect to their capacity to testify as expert witnesses in this case.

Date: July 18, 2024

John J. Tharp, Jr.
United States District Judge

36