IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JEANNE OLSON, as Trustee of the William Amor Trust for WILLIAM E. AMOR, deceased, <br>        Plaintiff, <br><br>v. <br><br>REBECCA GOMEZ, as Special Representative for MICHAEL CROSS, deceased; ROBERT GUERRERI; and THE CITY OF NAPERVILLE, <br>        Defendants. | 18-CV-02523 <br><br>Judge John J. Tharp, Jr. |

**DEFENDANTS' PARTIAL RULE 50(a) MOTION
FOR JUDGMENT AS A MATTER OF LAW**

Pursuant to Federal Rule of Civil Procedure 50(a), Defendants move this Court for judgment as a matter of law ("JMOL") on all remaining counts against Defendant Robert Guerrieri and on the failure to intervene count and both conspiracy counts against the Defendant Estate of Michael Cross. In support, Defendants state:

**GERMANE FACTS ADDUCED AT TRIAL[1]**

On September 10, 1995, thirty-nine-year-old William Amor was living with Tina Miceli—an eighteen-year-old woman with learning disabilities—and Tina's mother, Marianne Miceli, in a third-story condominium in Naperville, Illinois. That evening, minutes after Amor and Tina left for the movies, the condo unit went up in flames. Marianne, who was left home alone, died in the fire.

---

[1] Defendants have confined this factual recitation to only those facts that bear on the specific arguments raised in this motion. In addition, Defendants note that the daily transcript readouts do not yet include substantial testimony from William Amor that was entered into the record by video deposition early on in trial. As a result, Defendants have declined to included citations to the transcripts, as those citations may well be inaccurate to the eventual final transcript, since Amor's video deposition testimony will likely add a few hundred pages to the beginning of the transcript. Counsel for Defendants represents, however, that every fact contained herein is supported by record evidence.

A suite of information learned between September 10 and October 3, 1995, led Defendants Cross and Guerrieri to suspect that Amor had purposefully set fire to the condominium in the hopes of reaping financial gain:

- Amor was two decades older than Tina, he moved into the condo just the previous year, and he married Tina—when she was eighteen years old—that same year.

- Immediately after the fire, Defendant Cross, in Defendant Guerrieri's presence, asked Tina if she knew anything about a life insurance policy, to which Cross had been alerted by Tina's aunt. Amor acknowledged interceding, though he contends he did so to protect his wife from intrusive and questions.

- Marilyn Glisson—a friend of Marianne—told officers that, prior to the fire, she had overheard Bill and Tina discussing insurance in hushed tones and that Bill had talked about owning a house in Iowa. Defendants had information that Amor lied to Glisson about owning the house in Iowa.

- Amor admitted to officers that, shortly before the fire, he had removed the smoke detector from Marianne's condo.

- The door to Amor and Tina's room in the condo was closed and locked during the fire, largely preserving the contents of the room. The remainder of the condo and the contents therein were heavily damaged.

- Officers knew that while in prison on a fraud conviction in the summer of 1995, Amor had written letters to Tina indicating that he had a plan of attack for capital gain in the fall.

- Defendants learned that the week before the fire, Bill and Tina's pet mice were released, sparing them from the fire.

- Amor failed a polygraph at Reid & Associates on October 3, 1995.

On September 15, 1995, Guerrieri arrested Amor on a failure-to-appear warrant out of DeKalb County. Amor proceeded to spend two weeks in the DeKalb County Jail and was released on October 3, 1995. According to Amor, he went to sleep that morning in prison at 2:00 or 3:00 AM, and he slept for about three hours before waking up. Amor had some coffee that morning, but he declined to eat any breakfast, as he was feeling nauseous. Nor did Amor eat lunch.

Upon his release at around 2:15 PM, Amor was met outside the jail by Cross and Guerrieri. Amor agreed to travel with Defendants to John Reid & Associates in Chicago for a polygraph, as he had previously told Defendants that he "would like to clear this up." Per Amor, on the ride downtown, Defendants asked him if he wanted some food; Amor declined, saying he was not hungry. Amor testified that he and Defendants had very limited conversation on the drive to Chicago from DeKalb, mostly comprised of Amor's asking the detectives questions about the polygraph process, along with a query from the detectives as to whether Amor had spoken with Tina.

Amor rode in the back seat of the car, and he realized during the drive downtown that the car doors were locked. Amor alerted Defendants to this fact, who agreed to unlock them when they stopped the vehicle. Upon arriving at Reid, Amor spent at least three hours with Reid employees—without Defendants present—answering questions and taking a polygraph. During this questioning, Amor took a bathroom break, as he "was there a couple of hours before [he] needed to go to the restroom." Defendants Cross and Guerrieri were uninvolved and not present for the pre-polygraph and polygraph exams of Amor. After being advised that he had failed the

3

polygraph, Amor was questioned for about two hours by representatives of Reid and denied any knowledge of the fire. Defendants were uninvolved in the questioning.

From 9:30 PM until 10:00 or 10:30 PM, Defendants questioned Amor, told him he had failed the polygraph, asked him "heated" questions, and continually told him that he was lying. Amor and Defendants left Reid between 10:00 and 10:30 PM, as the Reid offices were closing for the night. Cross told Amor that they were going back to Naperville. While Defendant Guerrieri was away retrieving the car, Cross asked Amor if he needed to be handcuffed; Amor responded, "no."

Cross and Guerrieri did not question Amor on the ride to the NPD, where they arrived a little before 11:30 PM. Viewed in the light most favorable to Plaintiff, upon arrival at NPD, Cross and Guerrieri questioned Amor for at least fifteen to twenty minutes before reading him his Miranda rights at 11:37 PM. Guerrieri's arrest report indicates that Amor was "arrested" at 11:37 PM, which is also the time indicated on the Miranda rights/waiver document. Shortly before being read those rights, a private process server served him with divorce papers at the NPD. Before Amor opened the papers, Cross told Amor that they were a summons for his divorce; the process server testified that he arranged to serve the papers through Cross.

Cross and Guerrieri then proceeded with questioning. Per Amor, at one point, he and Cross were alone in an interrogation room, and Cross struck him in some way—Amor has variably described this as a poke with the finger, or a shove, or a grabbing of the shoulders with a shake—causing Amor's head to hit the wall. Per Amor, at this moment, Cross said, "if [Amor] didn't tell the truth [Cross] was going to kick [Amor's] fucking ass." Per Guerrieri, however, Amor was never alone with Cross in an interrogation room at NPD, and Cross never struck Amor. Thus, the facts in the record indicate that either (1) Cross struck Amor without Guerrieri

4

present, or (2) Guerrieri was always present with Cross at the NPD, and Cross never struck Amor. Under either scenario, Guerrieri was never present for an instance when Cross struck Amor.

Amor ultimately confessed "sometime close to midnight." He signed a written statement memorializing that confession at 1:14 AM on October 4, 1995. During the period between leaving DeKalb County Jail and through the moment of this confession, Amor was never placed in handcuffs. At no point did Amor tell Defendants that he did not want to go to any of the places they were taking him, that he wanted them to stop questioning him, or that he wanted a lawyer.

## STANDARD

A court may enter JMOL against a party who "has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). "A legally sufficient amount of evidence need not be overwhelming, but it must be more than a 'mere scintilla.'" *Filipovich v. K & R Express Sys., Inc.*, 391 F.3d 859, 863 (7th Cir. 2004) (quoting *Massey v. Blue Cross-Blue Shield of Ill.*, 226 F.3d 922, 924 (7th Cir. 2000)). A motion for JMOL "may be made at any time before the case is submitted to the jury" and must "specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2).

The reviewing standard "'mirrors'" that for summary judgment, such that "'the inquiry under each is the same.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)). The question is thus "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff," who bears the "*onus* of proof," "is entitled to a verdict." *Anderson*, 477 U.S. at 252 (citation and internal quotation marks omitted).

5

**ARGUMENT**

I. **Guerrieri Is Qualifiedly Immune from Liability for the Purported Coercion of Amor's Confession**

Initially, "[i]ndividual liability under § 1983…requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chi.*, 851 F.3d 649, 657 (7th Cir. 2017) (internal citation and quotation marks omitted). As already noted, ***Amor himself concedes that Guerrieri was not present for the only alleged physical altercation between Amor and Cross***. As a result, the theory of coercion against Guerrieri turns exclusively on whether Plaintiff's other allegations of coercive tactics make out a case of clearly established unconstitutional misconduct.[2]

That issue is resolved straightforwardly by qualified immunity.[3] Qualified immunity insulates officers from liability unless they (1) violated a constitutional right and (2) the unlawfulness of their conduct was clearly established at the time. *D.C. v. Wesby*, 583 U.S. 48, 62–63 (2018). "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (internal citation and quotation marks omitted).

In the context of a coerced confession claim, the critical inquiry for qualified immunity is whether Guerrieri's alleged conduct during Savory's questioning, which culminated in his confession, had been clearly condemned by controlling authority. As the Seventh Circuit put it in

---

[2] Whether Guerrieri conspired with Cross to coerce a confession from Amor, which conspiracy included a physical strike, is a separate question. Plaintiff has two conspiracy claims here, and Defendants address those below. As to the direct liability claim of coerced confession, however, that claim specifically asks whether Guerrieri used unconstitutional tactics against Amor—tactics that Amor concedes did not include the deployment of a physical strike by Guerrieri.

[3] Qualified immunity is properly raised—and frequently granted—in Rule 50 motions. *E.g. Dawson v. Dugan*, No. 2:19-cv-002220MG-JPH, 2023 WL 5509255, at *6–10 (S.D. Ind. Aug. 23, 2023) (granting judgment as a matter of law pursuant to Rule 50 in § 1983 case based on qualified immunity).

*Gill v. City of Milwaukee*, "[w]hether interrogation tactics are unconstitutionally coercive is an inquiry that depends on the specific facts and circumstances present in a particular case." 850 F.3d 335, 341 (7th Cir. 2017). This is in line with the Supreme Court's recent reminders on the strictures of qualified immunity, as it has "repeatedly told courts not to define clearly established law at a high level of generality," and instead zero in on "the specific context of the case, not…a broad general proposition." *Mullenix*, 577 U.S. at 12 (citations and internal quotation marks omitted). For coerced confession claims, which "depend upon the coercive nature of the interrogation," "highly generalized" authority "cannot be the basis for defeating a qualified immunity defense, unless there is closely analogous precedent that is 'particularized' to the facts of the instant case." *Gill*, 850 F.3d at 340–41.

Initially, Defendants note that Amor conceded that no food was, in fact, withheld from him. Rather, he "opted out" of consuming any of the available vending machine food or any fast food on the way to Chicago. As a threshold matter, then, there is no evidentiary basis upon which to find that Defendants' interrogation tactics included the withholding of food.

Thus, for Guerrieri, Plaintiff must uncover closely analogous caselaw predating October 3, 1995, that clearly established the following tactics as unconstitutionally coercive: (1) offering a suspect food and drink over the course of the day, but having those overtures declined by the suspect; (2) declining to expressly offer a suspect the opportunity to sleep over the course of eleven hours together;[4] (3) driving the suspect to multiple locations in the back of a locked police

---

[4] Defendants arrive at eleven hours together based on the amount of time passed between when Amor was released from DeKalb County at 2:15 PM and when Amor signed his written confession at 1:14 AM. If the Court is inclined to consider time spent together after Amor confessed—up to the point of the Nigohosian confession after 5:00 AM—then the time would extend to fifteen hours. Even under that framing, all of Guerrieri's qualified immunity arguments apply with equal force, as there is no evidence that, after 1:14 AM, Guerrieri utilized any additional, differentiable tactics beyond those already described in this motion.

vehicle, with no handcuffs on; (4) causing a suspect to be polygraphed and questioned by a polygrapher, without police officers being present for those interactions; and (5) asking questions of a suspect at two different locations for a couple of hours *after* being told that the suspect failed a polygraph, despite the suspect's protestations of being tired and wishing to go home.

Because no authority predating October 3, 1995, "demonstrate[s] that [Amor's] right to be free from the interrogation tactics used [by Guerrieri] here [wa]s clearly established," Plaintiff cannot carry this burden. *Gill*, 850 F.3d at 341. To be abundantly clear, **there is *no evidence* in the record of the following**: that Guerrieri deprived Amor of food; that Guerrieri told Amor he could not sleep or ever employed a tactic of depriving Amor of sleep; that Guerierri ever struck Amor, was present for the striking of Amor, or was made aware that Amor was struck; that Amor ever requested for questioning to end or that Guerrieri ever ignored such a request. Any suggestion otherwise is purely argument, a creation of lawyers' conviction. "[A]rgument [is], of course, not evidence." *Denius v. Dunlap*, 330 F.3d 919, 928–29 (7th Cir. 2003). And sending a case to a jury requires evidence—not argument—sufficient to sustain a verdict. Here, the above-listed tactics are the only ones supported by evidence, and considered in their totality, they fall comfortably within the guardrails of qualified immunity.

Qualified immunity having been raised, "[P]laintiff…bears the burden of demonstrating the violation of a clearly established right." *Purtell v. Mason*, 527 F.3d 651, 621 (7th Cir. 2008). Lacking "precedent that places the constitutionality of [Guerrieri's] actions 'beyond debate,'" Defendant Guerrieri is "entitled to qualified immunity" on the coerced confession claim. *Id.* (quoting *Mullenix*, 577 U.S. at 12).

8

II. **Plaintiff Does Not Possess a Viable Claim for Conspiracy Under § 1983 Against Either Defendant**

    a. **Because there are no state actor defendants, § 1983 conspiracy has no role to play.**

"'To establish §1983 liability through a conspiracy, a plaintiff must demonstrate that…a state official *and a private individual(s)* reached an understanding to deprive the plaintiff of his constitutional rights….'" *Cooney v. Casady*, 735 F.3d 514, 518 (7th Cir. 2013) (quoting *Lewis v. Mills*, 677 F.3d 324, 333 (7th Cir. 2012)) (emphasis added). As a result, a federal "conspiracy claim is superfluous" where "all named defendants are state actors." *Turley v. Rednour*, 729 F.3d 645, 649 (7th Cir. 2014). The Seventh Circuit has expressly wed this reasoning to Plaintiff's theory of federal conspiracy liability, noting in a § 1983 conspiracy case that where "[a]ll of the defendants in th[e] suit…are public employees…a conspiracy claim has no role to play." *Scott v. City of Chi.*, 619 Fed. App'x 548, 548 (7th Cir. 2015).

As recently held in *Hernandez v. City of Peoria*, "[u]nder the case law of this circuit, 'to establish § 1983 liability through a conspiracy theory, a plaintiff must demonstrate that…a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights.'" No. 19 CV 01153, 2022 WL 22624877, at *8 (C.D. Ill. Aug. 5, 2022). (quoting *Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019)) (citing *Green v. Howser*, 942 F.3d 772, 779 (7th Cir. 2019) (same)). The court, refusing "to depart from the established and binding precedent of the Seventh Circuit," dropped the § 1983 conspiracy claim from the case, as the "case d[id] not represent an alleged conspiracy between state and private individuals as only state actors are named." *Hernandez*, 2022 WL 22624877, at *8

Here, "all named defendants"—Cross and Guerrieri—"are state actors," such that Plaintiff's § 1983 conspiracy theory cannot proceed as a matter of law. *Turley*, 729 F.3d at 649;

9

*e.g., id.* at 649 n.2 ("the function of a [federal] conspiracy claim…is to 'permit recovery from a private actor who has conspired with state actors,'" such that "[w]hen, as here, the defendants are all state actors, 'a [federal conspiracy] claim does not add anything except needless complexity'") (quoting *Fairley v. Andrews*, 578 F.3d 518, 526 (7th Cir. 2009)).

      **b. Defendants are shielded from conspiracy liability under the intracorporate-conspiracy doctrine.**

Alternatively, Defendants cannot be held liable under a § 1983 conspiracy theory by reason of the intracorporate-conspiracy doctrine. "Under this principle…an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Ziglar v. Abbasi*, 582 U.S. 120, 153 (2017). The reasoning is straightforward. "When two agents of the same legal entity make an agreement in the course of their official duties[,] as a practical and legal matter their acts are attributed to their principal. And it then follows that there has not been an agreement between two or more separate people." *Id*.

Although the Seventh Circuit has long held that the intracorporate-conspiracy doctrine applies to § 1985 conspiracy claims, it has not decided whether the doctrine applies to § 1983. *See Wright v. Ill. Dep't of Child. & Fam. Servs.*, 40 F.3d 1492, 1508–09 (7th Cir. 1994) ("except in egregious circumstance, intra-entity discussions…lie outside the scope of § 1985"). However, Defendants urge the Court to consider the body of caselaw that strongly counsels in favor of applying the intracorporate-conspiracy doctrine to § 1983. In particular, a 2019 opinion from the Sixth Circuit makes a convincing argument for why the doctrine should apply to §1983 conspiracy:

> When employees of a corporation act to further the purposes of [a corporation in its legal status as] "person," principles from the law of agency dictate that those employees be treated not as separate "persons" but as part of the same "person."

10

> …[T]he Supreme Court has made clear that municipalities are "persons" for purposes of § 1983.
>
> Because the intracorporate conspiracy doctrine follows from the legal definition of "person," which includes local governments, the doctrine has been developed to deal with the question whether there are two separate persons to form a conspiracy. The doctrine's application to other civil rights statutes has not been premised upon any factor unique to those statutes[, so there is] no reason to decline to apply the doctrine to § 1983.

*Jackson v. City of Cleveland*, 925 F.3d 793, 819 (6th Cir. 2019) (internal citations and quotations omitted).

A variety of courts have held the same as *Jackson*—including the Eleventh Circuit and courts in the Northern District of Illinois, which has suggested that the Seventh Circuit's jurisprudence on the doctrine is in line with extension to § 1983. *See Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1261 (11th Cir. 2010) (intracorporate-conspiracy doctrine bars plaintiffs' § 1983 conspiracy claims); *Strauss v. City of Chi.*, 346 F. Supp. 3d 1193, 1210, 1210 n.6 (N.D. Ill. 2018) (same, noting that "[m]ost courts in this district have held that [the intracorporate-conspiracy doctrine] applies to conspiracy claims under 42 U.S. § 1983" and the court has seen no "reason why the Seventh Circuit's logic [applying the doctrine to § 1985] should not apply with equal force to conspiracy claims under Section 1983"); *Tabor v. City of Chi.*, 10 F. Supp. 2d 988, 994 (N.D. Ill. 1998) (same, noting that "the overwhelming majority of judges in this district…have held" that "the doctrine extends to § 1983 claims").

Boiled to its essence, *Jackson* stands for the cleareyed axiom "that members of the same legal entity cannot conspire *with one another* as long as their alleged acts were within the scope of their employment." 925 F.3d at 819 (internal citation and quotations omitted). Here, the parties have already agreed that, "[a]t all relevant times," each Defendant "act[ed]…in the course and scope of their employment with the City of Naperville." (Dkt. 148, Am. Ans. ¶ 8.) And Plaintiff, of course, has adduced no evidence that Defendants were acting in any sort of private

11

capacity. The Seventh Circuit has not yet commented, but as *Strauss* indicates, there is nothing from a legal reasoning perspective to suggest that our Court of Appeals would not follow the Sixth and Eleventh Circuit's lead and apply this axiom to § 1983. Therefore, by reason of the intracorporate-conspiracy doctrine, the jury cannot find Defendants liable for § 1983 conspiracy, such that they should be awarded JMOL on the federal conspiracy count.

c. **Defendants are qualifiedly immune from federal conspiracy liability.**

"When the courts are divided on an issue so central to the cause of action alleged, a reasonable official lacks the notice required before imposing liability." *Ziglar*, 582 U.S. at 154. Thus, even if the Court is disinclined to enter judgment based on the no-private-actor or intracorporate-conspiracy defenses in the first instance, qualified immunity should result based on either.

As a threshold matter, each defense is plainly central to the conspiracy cause of action, since a decision in Defendant' favor on either defense would defeat Count III. *Hernandez* makes clear the no-private-actor theory is central, having recognized its role in defeating a § 1983 claim. 2022 WL 22624877, at *8. And *Ziglar* demonstrates the centrality of the intracorporate-conspiracy doctrine, as the Supreme Court held that division amongst the courts on the applicability of said defense in the § 1985(3) conspiracy context is enough for qualified immunity to attach. 582 U.S. at 151–55.

The only question left, then, is whether either issue was so resolved within the law in July 2018 that "reasonable officers in [Defendant'] positions would…have known with any certainty" that their actions subjected them to liability. *Id.* at 155. As detailed above, Defendants contend precisely the opposite, that the law quite clearly signaled to the officers that they were entitled to both defenses. Indeed, the no-private-actor defense is trending fast toward calcification as hard-

and-fast law, as demonstrated by *Turley*, *Scott*, *Cooney*, *Lewis*, *Fairley*, and *Hernandez*. And the intracorporate-conspiracy doctrine is clearly unsettled, as Seventh Circuit courts continue to hold that the doctrine lacks the articulation in the law necessary to deprive officers of qualified immunity from § 1983 conspiracy liability. *See Haliw v. City of S. Elgin*, No. 19 C 01515, 2020 WL 1304697, at *4 (N.D. Ill. Mar. 18, 2020) (defendant officers qualifiedly immune from § 1983 conspiracy claim because judicial "extensions of the intracorporate conspiracy doctrine to § 1983" show that "it cannot be said that the law is clearly established on this point" and "reasonable officers would not necessarily know that a conspiracy amongst employees of a single municipality can violate the Constitution (no matter what the underlying substantive right is at stake)"); *see also Long v. Weeks*, No. 23-55004, 2024 WL 1672258, at *1 (9th Cir. April 18, 2024) (reversing the district court and holding that defendant officers were "entitled to qualified immunity on the conspiracy claim because it is not clearly established that the intracorporate conspiracy doctrine is inapplicable to Section 1983 claims").

Because qualified immunity is appropriate on the no-private-actor defense as well as the intracorporate-conspiracy defense, JMOL should enter for Defendants on the federal conspiracy claim.

### d. Plaintiff has adduced no evidence of a meeting of the minds.

Finally, Plaintiff has not adduced sufficient evidence to send the federal conspiracy issue to the jury. "To establish § 1983 liability through a conspiracy theory, a plaintiff must demonstrate…an understanding to deprive the plaintiff of his constitutional rights." *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003) (citation omitted). While "circumstantial evidence" can establish a conspiracy, the Seventh Circuit "ha[s] stressed that such evidence cannot be speculative." *Id*. To that end, "merely relay[ing] information to…coworkers" "does not indicate

13

the defendants conspired to violate [a] plaintiff's rights." *Levitan v. Morgan*, No. 3:12cv117/MCR/CJK, 2014 WL 6801818, at *4 (N.D. Fla. Dec. 2, 2014). Indeed, "the mere relay of such information is [not] indicative of wrongdoing" at all." *Id*.

Here, there is no evidence that Guerrieri and crossed ever reached an agreement to conspiratorially coerce a confession from Amor. Indeed, Amor offered his confession just after Cross made a firm, pointed accusation at him, and Guerrieri offered unrebutted testimony that he was surprised by Cross' firmness. That, a conspiracy does not make. To that end, Plaintiff has not offered a single piece of testimony in this case so much as *accusing* the officers of a conspiracy. Thus, "[w]e must conclude that [Plaintiff] has not introduced evidence to support h[er] assertions of a conspiracy." *Seniff*, 342 F.3d at 785. JMOL is appropriate as a result.

### III. JMOL Is Warranted On Plaintiff's Failure to Intervene Claim

#### a. Plaintiff has not adduced evidence sufficient to send the failure to intervene claim to the jury for either Defendant.

<u>First</u>, as to Cross, "[a] 'failure to intervene' claim requires that one person fails to intervene while another person is committing a constitutional violation." *Gaines v. Chi. Bd. of Educ.*, __ F. Supp. 3d __, 2024 WL 640802, at *20 (N.D. Ill. 2024) (quoting *Gill*, 850 F.3d at 342). Where one individual did not commit a constitutional violation, "at no point did [the other individual] fail to intervene to prevent the commission of a constitutional violation." *Gaines*, 2024 WL 640802, at *20. Here, because Guerrieri is entitled to JMOL on the underlying coerced confession claim, there was no violation for Cross to intervene in, such that JMOL is necessarily warranted for Cross on failure to intervene. *Id*.

<u>Second</u>, for essentially the same reason as Guerrieri is entitled to qualified immunity on the coerced confession claim, Cross is entitled to qualified immunity for failing to intervene. Necessarily, if there was no caselaw putting Guerrieri on notice that his tactics violated

14

constitutional law, there was no caselaw putting Cross on notice to intervene to stop those tactics. *Purtell*, 527 F.3d at 621.

Third, as to Guerrieri, "[t]o succeed on this claim, [Plaintiff] must demonstrate that [Guerrieri] (1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it." *Gill*, 850 F.3d at 342. Here, the only tactic utilized by Cross that is in any way distinct from those utilized by Guerrieri was a physical strike, and Amor concedes that Guerrieri was not present for that alleged act. Indeed, there is no evidence that Guerrieri was so much as aware of this accusation until Amor lodged it at the motion to suppress stage during the initial criminal prosecution—well after his confessions. Thus, Guererri never had an opportunity to intervene, and JMOL is warranted.

      **b. The failure to intervene tort was improperly created and since abrogated by recent Supreme Court caselaw.**

Recently, Seventh Circuit Judge Frank Easterbrook questioned the viability of the failure to intervene theory of § 1983 liability, explaining in a concurrence that "'[f]ailure to intervene' sounds like vicarious liability," which would of course be untenable, as "[t]he Supreme Court has held many times that § 1983 supports only direct, and not vicarious, liability." *Mwangangi v. Nielsen*, 48 F.4th 816, 834 (7th Cir. 2022) (Easterbrook, J., concurring) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009); *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). Defendants recognize that the Seventh Circuit itself created the failure to intervene claim in *Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972). However, this decision and the jurisprudence flowing therefrom is out of step with *Monell* and was abrogated full-stop by the Supreme Court's more recent decision in *Iqbal*, such that the tort is no longer viable as a federal claim. The Court

15

should thus enter judgment for Defendants.[5] *See Heidelberg v. Manias*, No. 1:18-cv-01161-SLD-JEH, 2024 WL 1316206, at *25 (C.D. Ill. Mar. 27, 2024) (noting the "compelling argument questioning the constitutional basis and legitimacy of the failure to intervene tort," but not deciding the issue because the cause of action was barred by claim preclusion).

IV. **Guerrieri Is Entitled to JMOL on Plaintiff's IIED Claim Because He Did Not Engage in Extreme or Outrageous Conduct**

As the Court noted at the summary judgment stage, a claim for IIED requires evidence "that the defendant's conduct was extreme and outrageous." *Olson v. Cross*, __ F. Supp. 3d __, 2024 WL 361200, at *19 (N.D. Ill. 2024) (citations and internal quotation marks omitted). As noted above, the evidence against Guerrieri amounts to little more than a few hours of questioning, some additional hours spent driving around, and unsuccessful efforts to get Amor food. While Plaintiff has a decidedly different spin on those facts, Defendants submit that there is simply nothing in that evidence that even approaches the standard of "beyond all possible bounds of decency such that it is intolerable in a civilized community." *Id.* (citation and internal quotation marks omitted). Since no reasonable jury, on this evidence, could find that Guerrieri acted so despicably, he is entitled to JMOL on the IIED claim.

V. **Defendants Are Entitled to JMOL on Plaintiff's State Law Conspiracy Claim Based On a Lack of Clear and Convincing Circumstantial Evidence of an Agreement to Conspire**

In Illinois, "[c]ivil conspiracy is defined as a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means." *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999) (internal citation and quotation marks omitted). To "recover[] under a civil conspiracy claim, the

---

[5] Defendants recognize that this Court is bound by Seventh Circuit precedent recognizing failure to intervene as a legitimate cause of action; they merely raise it here to preserve the issue for appeal.

16

plaintiff must prove an agreement," which "must be knowingly and intentionally made." *Menssen v. Pneumo Abex Corp.*, 2012 IL App (4th) 100904, ¶ 12 (Ill. App. Ct. 2012). Mere knowledge of the fraudulent or illegal actions of others" "does not amount to conspiracy." *McClure*, 720 N.E.2d at 258. In addition, because "[a] conspiracy is almost never susceptible to direct proof," the tort "[u]sually…must be established from circumstantial evidence and inferences drawn from evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances" *Id.* (internal citation and quotation marks omitted). This amounts to a high bar, as "[c]ircumstantial, as opposed to direct, evidence of a conspiracy must be clear and convincing." *Gillenwater v. Honeywell Int'l, Inc.*, 2013 IL App (4th) 120929, ¶ 82 (Ill. App. Ct. 2013).

There is, in the most literal sense, no evidence here of a meeting of the minds. Indeed, Plaintiff has adduced ***no*** evidence that the Defendants ever reached an agreement to conspire against Amor. Any hypothetical circumstantial evidence—i.e., that Cross and Guerrieri were coworkers, or that they suspected that Amor was guilty—simply does not rise to the level of "clear and convincing" evidence of an actual, full-blown agreement to conspire, which is necessary as a matter of law for a juror to find that Defendants knowingly and intentionally agreed to a conspiracy. That alone defeats a state law conspiracy claim, and JMOL must enter for Defendants.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request JMOL for Guerrieri on all counts and for Cross on the failure to intervene count and both conspiracy counts.

Date: July 31, 2024 Respectfully submitted,

/s/ Thomas J. Sotos
THOMAS J. SOTOS, Attorney No. 6327630
*One of the Attorneys for Defendants*

James G. Sotos
Laura M. Ranum
Lisa M. Meador
Jeffrey C. Grossich
Thomas J. Sotos
THE SOTOS LAW FIRM, P.C.
141 W. Jackson Blvd., #1240A
Chicago, IL 60604
(630) 735-3300
tsotos@jsotoslaw.com

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746 that the foregoing is true and correct, that on July 31, 2024, I electronically filed the foregoing **Defendants' Partial Rule 50(A) Motion for Judgment as a Matter of Law** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants listed on the below Service List.

*<u>Attorneys for Plaintiff</u>:*
Jon Loevy
Gayle Horn
Locke Bowman
Alyssa Martinez
Loevy & Loevy
311 N. Aberdeen Street, 3rd Floor
Chicago, IL 60607
(312) 243-5900
jon@loevy.com
gayle@loevy.com
locke@loevy.com
alyssa@loevy.com

/s/ Thomas J. Sotos
THOMAS J. SOTOS, Attorney No. 6327630
*One of the Attorneys for Defendants*