IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JEANNE OLSON, not individually, But as Trustee of the William Amor Trust, <br><br> Plaintiff, <br><br> v. <br><br> REBECCA GOMEZ, as Special Representative for Michael Cross, Deceased, *et al.*, <br><br> Defendants. | Case No. 18-cv-02523 <br><br> The Hon. John J. Tharp, Jr. |

**PLAINTIFF'S MOTION TO LIMIT MS. LEAVENWORTH'S TESTIMONY
OR PERMIT PLAINTIFF TO ELICIT HER RELATIONSHIP TO THE CASE**

Now comes Plaintiff, by counsel, Loevy & Loevy, and hereby moves to limit Ms. Leavensworth's testimony or permit Plaintiff to elicit her relationship to the case. In support, Plaintiff states as follows:

**BACKGROUND**

Pam Leavenworth is the sister of Marianne Miceli, the woman who perished in the fire at 218 E. Bailey Street. Ms. Leavenworth is also the sister of Jeanne Ripsky, the wife of Naperville Police Captain Jon Ripsky, a former Defendant in this lawsuit. Mr. Ripsky had a substantial connection to, and influence over, the investigation into the fire—a fact which was cause for great concern during Mr. Amor's criminal trials and his eventual acquittal.

First, at Mr. Amor's criminal trial in 1997, Defendant Cross testified that Captain Ripsky was Naperville's Chief of Investigations. Exhibit A (DX176, Testimony of M. Cross) at 38:8-16; Exhibit B (2/21/18 Acquittal Order) at 2 ("It is noted that the Miceli family, which included the Naperville Police Department's Chief of Investigations, who was Marianne's brother-in-law, greatly disliked the Defendant . . ."); *id.* at 5 (observing that the fact that "their boss was the brother-in-law

of the victim" was relevant to the investigators' actions).

At the pretrial conference, the Court accepted Defendants' representation that Mr. Ripsky was not actually the Chief of Investigations, and ruled that there had been no evidence that the divisions had been breached. Plaintiff objected, arguing that Naperville is a fairly small Department, with only three captains, and that Defendants had proffered no evidence that Ripsky had been affirmatively walled off from the investigation. This Court made its ruling over Plaintiff's objection.

Second, Mr. Ripsky testified in his deposition for this matter that because of the fire, he directed his subordinate, Naperville police officer Bob Mayer, to drive his mother-in-law from East Dubuque to Naperville (179-mile trip). Exhibit C (PX133, Ripsky Deposition) at 40:19-41:17, 42:18-43:3.

Third, many Naperville police officers were aware of Mr. Ripsky's connection to the victim, Marianne, and offered him condolences very shortly after the fire, reflecting that his relationship with Marianne had quickly become common knowledge among Naperville officers. Exhibit C (PX133) at 46:15 23, 47:6 8. Officer Ferreri testified that he learned of Mr. Ripsky's relationship to the victim shortly after the fire, and Defendants met with Mr. Ripsky's wife Jeanne at the hospital the night of the fire. Exhibit D (DX216, Deposition of David Ferreri) at 73:3-11; Exhibit F (DX25J) at 584. Importantly, Defendant Cross himself testified that learning about the relationship between Ripsky and Marianne on the night of the fire motivated him to investigate this case more "thoroughly." Exhibit A (DX176) at 38-39.

Fourth, prior to the fire, Mr. Ripsky had been Defendant Cross's direct supervisor. Exhibit C (PX133) at 18:23-19:9, 21:4-10; Exhibit A (DX176) at 38:8-16. Not only that, but Defendant Cross and Mr. Ripsky were friends. Exhibit C (PX133) at 18:8 16. Mr. Ripsky was also friends with

2

Defendant Guerrieri and Officer Ferreri—the latter of whom was friends with both Jon and Jeanne Ripsky and talked with Jeanne about this case at a wedding. *Id.* at 21:18-22:1; Exhibit H (PX146, Ferreri Deposition) at 53:11-18; 53:20-54:19; 57:21-58:22.

Fifth, Mr. Ripsky was kept apprised of the investigation and the actions of the detectives because he was part of the command staff, and it was the policy of the Naperville Police Department to keep the captains up to date on what investigations were occurring. Exhibit C (PX133) at 54:15-56:3.

Lastly, Mr. Ripsky's wife Jeanne, along with Pam Leavenworth and the rest of Marianne's family, strongly disliked Mr. Amor, believed him to be guilty, and was extremely invested in his prosecution. According to Tina, Jeanne Ripsky sat with Tina in the gallery at Mr. Amor's trial, and she testified during the sentencing phase—comparing Mr. Amor to a venomous snake. Exhibit E (PX120, Transcript of Proceedings 10/28/1997) at 9-18. During her sentencing testimony, Mrs. Ripsky stated that her husband was an NPD captain, and that Bill was uncomfortable around him. *Id.* at 14:1-5.

*Motion in limine* rulings are provisional, pending how things develop at trial. Now that the Court has a better vantage point to assess the relevance, Plaintiff seeks leave to elicit the relationship between the Defendants who investigated the case and the Naperville police captain whose family hated Mr. Amor. That connection is especially relevant to establish the family-related bias of Pam Leavenworth—a witness the Defendants intend to present at trial as part of their case in chief.

## ARGUMENT

**I. Plaintiff Should Be Permitted to Establish Ms. Leavenworth's Relationship with the Naperville Police Department**

3

Marianne Miceli's family strongly disliked Mr. Amor, and still very much does to this day. Plaintiffs' counsel have already described for the Court Ms. Leavenworth's efforts to keep Tina from speaking with Plaintiff's counsel, and her efforts to help Tina remember things favorable to the defense.

Ms. Leavenworth's knowledge of anything relevant to this case is very narrow. As was true at the criminal trial, her testimony should be equally narrow. But to the extent she starts saying anything substantively helpful to the defense or outside of those bounds, Plaintiff should be permitted to counter that Ms. Leavenworth is no disinterested witness.

The Court may not be inclined to allow Plaintiff to elicit that her brother-in-law was formerly a Defendant, but Plaintiff should at least be allowed to introduce the fact that she was very connected to the Naperville Police Department in the form of this relationship. Her brother-in-law was friends with the detectives investigating this case who, by self-admission, became more motivated to "solve" the case because it involved Mr. Ripsky.

For example, Ms. Leavenworth's ability to get the divorce papers served on Mr. Amor at midnight *during an interrogation* was undoubtedly related to the fact that her brother-in-law previously supervised Defendant Cross, that Ripsky and Cross were friends, and that Cross was extremely motivated to have someone—Bill Amor—go down for this fire.

As it stands, there is unnecessary confusion around the issue. The jury is undoubtedly wondering how the process server managed to do what he did. To the extent Ms. Leavenworth will testify that the divorce proceedings and service of the divorce papers were her idea, omitting the family relationship to Captain Ripsky would give the jury an unfairly distorted view of the situation.

The only reason the Court originally barred a fact that the criminal court found very relevant

was that the Court could not yet see a reason why the relationship might be probative. If Defendants elicit what Plaintiff expects they will elicit, Plaintiff must be able to fill in the rest of the story. It would be prejudicial to Plaintiff's case for Ms. Leavenworth to testify to the reasons she and her family disliked Mr. Amor and then not be able to elicit how that dislike could, and almost certainly did, affect how this investigation was undertaken—particularly the circumstances that led to Mr. Amor's coerced false confession.

The question becomes what is the danger of unfair prejudice to the Defendants. As Plaintiff understood the initial ruling, there might be prejudice if the jury was left to speculate that perhaps the Ripsky relationship affected the investigation when there was no evidence that it did. While Plaintiff disagrees with that definitive characterization of the evidence, the Defendants are about to put that relationship directly at issue. Under those circumstances, the only danger of unfair prejudice is to Plaintiff if Plaintiff cannot respond to Ms. Leavenworth's accusations and her bias.

The alternative would be to permit Ms. Leavenworth to explain that the divorce was her idea and that she made the service of process happen on her own. That would be misleading. A reasonable jury could very easily infer that she only had the ability to do so because she had direct access to coordinate with her sister's husband's subordinate (and friend) who was conducting the investigation. The Miceli family's bias against Mr. Amor and their relationship to this investigation is a fair part of the story.

## II. Alternatively, Ms. Leavenworth's Testimony Should Be Limited to Her Relevant Knowledge, Which Is Very Little

Ms. Leavenworth testified at the criminal trial. That very limited direct examination testimony (which consumed all of 17 pages) is a very accurate proxy for exactly how much

information Ms. Leavenworth possesses that is truly relevant to this dispute. Exhibit G (PX168). She testified that Marianne had a disability, that she provided Marianne with financial support, and then gave a physical description of the layout of the apartment, including the chairs. Ms. Leavenworth also authenticated Marianne's voice on the 911 tape and identified her photograph.

Most centrally, Ms. Leavenworth described the insurance policy. Plaintiff has no dispute with any of that testimony.

The problem is, Ms. Leavenworth's dislike of the man who she thinks killed her sister is almost impossible to contain. Given any opening, she will offer an opinion that he was a parasite who was taking advantage of her family.

There is no relevance to her extremely prejudicial personal opinions in that regard, much less foundation. Prior to the fire, Ms. Leavenworth had not been present in the apartment since "probably early August" in her estimation. Exhibit G (PX168) at 9:2-6. She had no personal knowledge of anything untoward. Just feelings, resentment, suspicions, and opinions—some of which she let rip at Mr. Amor's sentencing after the trial. Given any chance, she is going to try to prejudice the jury against Mr. Amor every way possible, including her testimony that she thought Tina was too young for him when they got married.

None of that testimony would be relevant. The trial is too far along to risk a mistrial. Ms. Leavenworth has nothing truly relevant to say beyond the insurance policy. Her testimony should be limited accordingly.

                        Respectfully submitted,

                        **JEANNE OLSON, Not Individually But**
                        **As Trustee of the William Amor Trust**

                        By:   /s/    Jon Loevy

                                             Attorney for the Trustee

Jon Loevy
Gayle Horn
Locke E. Bowman
Alyssa Martinez
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
312-243-5900

## CERTIFICATE OF SERVICE

      The undersigned, an attorney, certifies that on August 1, 2024, he caused the foregoing document to be served on all counsel of record by filing the same using the Court's CM/ECF system, which automatically effected service on all counsel of record.

                                                  /s/ Jon Loevy